Dale L. Wilcox*
D.C. Bar No. 1029412
Julie B. Axelrod
California Bar No. 250165
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
Telephone:(202) 232-5590

Lesley Blackner*
Florida Bar No. 654043
340 Royal Poinciana Way, Suite 317-377
Palm Beach, Florida 33480
Telephone: (561) 659-5754

*Pro Hac Vice application forthcoming

# THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITEWATER DRAW NATURAL RESOURCE CONSERVATION DISTRICT, HEREFORD NATURAL RESOURCE CONSERVATION, DISTRICT, ARIZONA ASSOCIATION OF CONSERVATION DISTRICTS, CALIFORNIANS FOR POPULATION STABILIZATION, SCIENTISTS AND ENVIRONMENTALISTS FOR POPULATION STABILIZATION, NEW MEXICO CATTLEGROWERS' ASSOCIATION, GLEN COLTON, FLORIDIANS FOR SUSTAINABLE POPULATION, RALPH POPE<br><br>                    Plaintiffs,<br>vs. | Case No.:  **'16CV2583 L    BLM**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

JEH JOHNSON, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF
THE DEPARTMENT OF HOMELAND
SECURITY, and THE DEPARTMENT
OF HOMELAND SECURITY

                    Defendants.

## Preliminary Statement

1.      This case addresses a class of discretionary actions taken by the
Department of Homeland Security ("DHS") and DHS Secretary Jeh Johnson
(together, DHS and DHS Secretary are referred to as "DHS"). These myriad
actions concern the entry and settlement of multitudinous foreign nationals into
the United States. Thirty-three of these actions are itemized and summarized in ¶
53 and attached hereto in Ex. 1. Like its predecessor agency, the Immigration and
Naturalization Service ("INS"), DHS has turned a blind eye regarding the
environmental impacts, including the cumulative impacts, of its actions
concerning foreign nationals who enter and settle into the United States pursuant
to the agency's discretionary actions. The resulting environmental impacts from
these actions are significant and an analysis of these impacts by DHS is required
pursuant to the National Environmental Policy Act ("NEPA"), *see* 42 U.S.C. §
4331 *et seq.* (2016), and its implementing regulations. But DHS, like INS before

it, undertakes no such NEPA review. Accordingly, DHS is acting in contravention of its legal obligations.

2.     The core purpose of NEPA is to ensure that, before a federal agency undertakes a federal action, its decision makers consider the range of potential environmental impacts the action may have on the environment. NEPA embodies the nation's policy of ensuring that decisions affecting the human environment are made with eyes wide open and in full view of the public so that all stakeholders may understand the implications of federal actions on the natural resources that we all depend on, in one way or another. NEPA "help[s] public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1 (2016) (Council on Environmental Quality ("CEQ") regulations). DHS is woefully deficient in carrying forth this mandate.

3.     After DHS was established in 2003, it adopted its own NEPA procedures, which were finalized in 2014. But these new procedures continue to perpetuate its blindspot to the manifold environmental consequences of its actions concerning the entry and settlement of mass numbers of people into the U.S. Moreover, in recent years DHS has, with increasing frequency, undertaken discretionary actions on a greater scale to allow such entry and settlement of a myriad of foreign nationals into the United States. These frequent, large scale,

related actions by DHS result in significant environmental impacts throughout the entire United States. Nonetheless, DHS continues to fail to undertake NEPA review, in direct contravention of its mandate, before commencing such actions.

4.      Given DHS's failure, those members of the public (like the Plaintiffs) particularly affected by or interested in such environmental consequences have no opportunity to voice their views before the agency takes action. Not only does DHS take actions of great environmental significance with increasing frequency, it also often does not explain or present to the public in any formal way what it has actually done. In the worst cases, DHS never even publishes its actions, and the public only realizes what has happened at all because of leaks to the media. Meanwhile, the environmental consequences reverberate around the country, with the public largely in the dark about why and how it is happening. The intention of NEPA is to prevent exactly this scenario.

5.      In order to establish the scope and magnitude of the environmental impacts at issue, Plaintiffs have undertaken extensive research and retained experts[1] to:

---

[1] Plaintiffs retained three experts for this action. Jessica Vaughan, an expert on United States immigration law, policy and practice, produced two reports regarding the discretionary actions of DHS, analyzing them and their specific impacts on the U.S. population and the influx of foreign nationals over the Southwest border. Her reports are attached hereto in Ex. 2. Steven Camarota, Ph.D., an expert on the demographic impacts of immigration, produced an expert

a) identify and delineate those specific, ongoing discretionary actions that DHS has undertaken concerning the entry and settlement into the United States of multitudinous foreign nationals; and

b) identify and delineate environmental impacts to Plaintiffs resulting from these and past actions, including, but not limited to, the impacts from massive population growth directly attributable to DHS actions and environmental damage along the Southwest border of the United States.

6. Plaintiffs seek to compel DHS to properly comply with NEPA in connection with its agency actions that concern the entry and settlement of multitudinous foreign nationals into the United States. Plaintiffs seek both a declaration from this Court that DHS is violating NEPA and an injunction to require DHS to comply with the law. Further, Plaintiffs assert that, in the course of approving its agency actions concerning the entry and settlement of foreign nationals into the United States, DHS violated its fundamental obligation to engage in well-reasoned, non-arbitrary decision-making under the Administrative Procedure Act, ("APA"). *See* 5 U.S.C. § 701 *et seq.* (2016). In Count I, Plaintiffs assert that the NEPA procedures DHS adopted in 2014 are arbitrary and capricious,

report addressing the impact of immigration upon population growth. His report is attached hereto as Ex. 3. Phil Cafaro, Ph.D., a sustainability expert, produced a report on the environmental impacts of population growth. His report is attached hereto as Ex. 4.

in violation of the APA and NEPA. In Count II, Plaintiffs assert that DHS's failure to initiate NEPA compliance for thirty-three actions relating to the entry and settlement of foreign nationals into the United States violates the APA and NEPA. In Count III, Plaintiffs assert that DHS's failure to prepare a Programmatic Environmental Impact Statement for these thirty-three actions violates the APA and NEPA. Count IV addresses one particular action, a recently adopted DHS rule, that DHS deemed categorically excluded from NEPA review. Plaintiffs assert the application of the categorical exclusion was arbitrary and capricious, in violation of the APA and NEPA. Finally, in Count V, Plaintiffs challenge the NEPA review DHS completed for its June 2, 2014 Action "Response to the Influx of Unaccompanied Alien Children," with violating NEPA and the APA.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 5 U.S.C. § 701 *et seq*. (APA), 28 U.S.C. § 1361 (mandamus) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. § 2202 (declaratory and injunctive relief). Plaintiffs claim that DHS has not and is not acting in accordance with federal law. *See* 5 U.S.C. § 706.

8.    Venue in this judicial district is proper under 28 U.S.C. § 1391(e) because this is an action against an agency of the United States and at least one plaintiff resides in this district.

## RELEVANT STATUTES

## A.    THE NATIONAL ENVIRONMENTAL POLICY ACT

9.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. NEPA's essential purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

10.    NEPA expressly recognizes Congressional concern for "the profound influences of population growth" on "the natural environment[.]" 42 U.S.C. § 4331(a). Through NEPA, Congress directs, in relevant part, that the Federal Government shall:

> use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may--
>
>   (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
>   (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
>   (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or

> safety, or other undesirable and unintended consequences;
>
>     (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible an environment which supports diversity and variety of individual choice;
>
>     (5) *achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities . . . .*

42 U.S.C. § 4331(b) (emphasis added).

11.     To accomplish its goals, NEPA requires each federal agency to identify and consider the environmental impacts of its proposed federal actions. *See generally*, 42 U.S.C. § 4331. Each agency must also consider alternatives and mitigating measures which could avoid or reduce such impacts before implementing federal agency actions that may significantly affect the environment. To these ends, NEPA establishes, in relevant part:

> The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--
>
> ...
>
>     (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

(i) the environmental impacts of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action, ...
(v) any irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332.

12.     "The phrase 'to the fullest extent possible' in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operation expressly prohibits or makes compliance impossible." 40 C.F.R. § 1500.6 (2016); *see also* 40 C.F.R. § 1507.2 (2016) (Agency capability to comply).

13.     NEPA is designed to inject environmental considerations early into a federal agency's decision-making process in order that the agency can "take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). NEPA is also intended to engage the public and stakeholders while the agency gathers and solicits relevant, "high quality" information, as well as inform and engage the public in the agency decision-making process. *See* 40 C.F.R. § 1500.1(b); *see also* §§ 1503.1(a)(4) (Inviting comments), 1506.6 (Public involvement) (2016). Because "public involvement" is paramount in the NEPA

process, each agency shall "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(b).

14.    NEPA established the White House Council on Environmental Quality (CEQ), which issues regulations guiding agencies' compliance with NEPA. *See* 42 U.S.C. § 4341 *et seq.* (2016); 40 C.F.R. § 1500. CEQ regulations clearly define what constitutes agency action and set forth the process for determining whether an action or program significantly affects the quality of the human environment. "Major federal actions" are defined to "include new and continuing activities including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures . . . ." 40 C.F.R. § 1508.18(a) (2016).

15.    CEQ regulations provide that each federal agency shall adopt procedures to ensure that its "decisions are made in accordance with [NEPA's] policies and procedures . . . ." 40 C.F.R. § 1505.1 (2016). Further, agency procedures shall comply with CEQ regulations. *See* 40 C.F.R. § 1507.3(b)(1) (2016). An agency must specifically ensure that its NEPA procedures provide for designating the major decision points for the agency's principal programs likely to

have a significant effect on the human environment and assuring that the NEPA process corresponds with them. 40 C.F.R. § 1505.1(b).

16.    Pursuant to NEPA, DHS adopted its "Instruction Manual 023-01-001-01, Implementation of the National Environmental Policy Act (NEPA)" on November 6, 2014 ("Instruction Manual" attached hereto as Ex. 5).[2] The Instruction Manual "serves as the DHS implementing procedures for NEPA (as required by 40 C.F.R. §§ 1505.1 and 1507.3) which supplement the CEQ regulations and therefore must be read in conjunction with them." *Id.* at III-1. The Instruction Manual states that NEPA applies to a wide range of DHS activities:

> Generally, NEPA applies to Federal actions that affect the human environment. Within DHS, NEPA generally applies to actions to be undertaken, funded, permitted or otherwise approved by DHS[,] including activities that may be wholly initiated within DHS, executed by DHS under the direction of Congress, or proposed by persons or organizations outside of DHS that require approval funding, a license, or a permit from DHS.

*Id.*

---

[2] *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)*, Department of Homeland Security (Nov. 6, 2014), https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508compliantversion.pdf.

11

17.     Pursuant to 42 U.S.C. § 4332(C) (2016), each agency is required to prepare an "Environmental Impact Statement" ("EIS") for each "major federal action[] significantly affecting the quality of the human environment . . . ."

18.     CEQ regulations provide for the preparation of a document known as an Environmental Assessment ("EA") to enable an agency to determine whether a particular action may have a significant impact on the quality of the human environment and thus require preparation of an EIS. 40 C.F.R. § 1501.4 (2016).

19.     An EA or EIS must also discuss and analyze alternatives to a proposed program or project--including a "no-action" alternative, which may have less environmental impact than the proposed action, as well as mitigation measures in relation to potential environmental impacts. *See* 40 C.F.R. §§ 1502.14, 1508.9, 1502.16 (2016).

20.     CEQ regulations provide that agency actions that are "related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a) (2016). In such actions an EIS:

> may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

40 C.F.R. § 1502.4(b). Such actions "have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter." 40 C.F.R. § 1502.4(c)(2).

21.     In preparing an EA or EIS, an agency must consider direct, indirect, and cumulative effects. *See* 40 C.F.R. §§ 1502.16, 1508.8, 1508.9, 1508.27 (2016). Under NEPA, "effects" and "impacts" are synonymous and include:

> ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects . . . .

40 C.F.R. § 1508.8(b).

22.     "Cumulative impact" is defined as:

> the impact on the environment which results from the incremental impact of a project when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. "Indirect effects" are defined as those impacts that:

> are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth

13

> inducing effects and other effects related to induced
> changes in the pattern of land use, population density
> or growth rate, and related effects on air and water and
> other natural systems, including ecosystems.

40 C.F.R. § 1508.8(b).

23.     CEQ regulations authorize agencies to exempt agency certain actions from environmental review through the use of "categorical exclusions." 40 C.F.R. § 1508.4 (2016). CEQ defines a categorical exclusion as "a category of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.*

24.     For those federal actions that are not categorically excluded and are, following completion of an EA, determined not to have "a significant impact on the human environment" and thus do not require preparation of an EIS, the agency issues a "finding of no significant impact" ("FONSI"). 40 C.F.R. § 1508.13 (2016).

## B.     THE ADMINISTRATIVE PROCEDURE ACT

25.     The APA provides for judicial review of federal agency actions. *See* 5 U.S.C. § 701 *et seq.* Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A) (2016). Accordingly, a federal agency must take a hard look at the consequences of its actions. It must examine the relevant data and articulate a

14

satisfactory explanation for its action, including "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must explain in an explicit and rational manner how its decision is based upon and complies with the relevant factors specified in the controlling statutory provision(s), together with applicable agency regulations. *See id.* at 42-43. A reviewing court may set aside, as arbitrary and capricious, agency factual findings and conclusions found to be unsupported by substantial record evidence. 5 U.S.C. § 706(2).

## PARTIES

### A. PLAINTIFFS

26.     The Whitewater Draw Natural Resource Conservation District ("WWDNRCD") and the Hereford Natural Resource Conservation District ("HNRCD") are part of the state of Arizona's Natural Resource Conservation District program that was established in response to the 1930's dust bowl. *Natural Resources Conservation Districts,* Ariz. State Land Dep't., https://land.az.gov/natural-resources/natural-resource-conservation-districts (last visited Oct. 13, 2016). The conservation district program promotes restoration and conservation of the state's natural resources. *Id.* As part of the conservation district program, WWDNRCD and HRNCD operate pursuant to Arizona Revised Statutes ("A.R.S.") § 37, Chapter 6 and are governed by locally elected and appointed

officials. *Id*. The districts are charged with evaluating the conservation needs of their respective areas and partnering with local, state, and federal agencies to restore and conserve the landscapes and waters of their respective regions. *Id*. The statutory purpose of the WWDNRCD and HNRCD is defined as follows:

> to provide for the restoration and conservation of lands and soil resources of the state, the preservation of water rights and the control and prevention of soil erosion, and thereby to conserve natural resources, conserve wildlife, protect the tax base, protect public lands and protect and restore this state's rivers and streams and associated riparian habitats, including fish and wildlife resources that are dependent on those habitats, and in such manner to protect and promote the public health, safety and general welfare of the people.

Ariz. Rev. Stat. Ann. § 37-1001 (2016); *see also Natural Resources Conservation Districts,* Ariz. State Land Dep't, https://land.az.gov/natural-resources/natural-resource-conservation-districts (last visited Oct. 13, 2016).

27.     The Arizona Association of Conservation Districts ("AACD") is the state association of the Arizona Conservation Districts. *See Ariz. Ass'n of Conservation Dists.,* https://aznrcd.org/ (last visited Oct. 13, 2016). The mission of the AACD is to support the conservation partnerships between the conservation districts and state and federal agencies, raise awareness of the activities of the conservation districts, and provide them with training and education. *See id*.

16

28.     The members of the WWDNRCD, HNRCD, and AACD have been victimized and damaged by DHS's failure to comply with NEPA because their members live along the Southwest border which has been environmentally degraded as a result of DHS's discretionary actions relating to border enforcement and immigration law. The policies of DHS have resulted in an increase in the numbers of individuals illegally crossing their members' properties. *See* Jessica Vaughan's Report, "Analysis of Discretionary Agency Actions (Past and Ongoing) That Resulted in Cumulatively Significant Environmental Impacts on the Southwest Border," attached hereto in Ex. 2. at 750 as Ex. B.

29.     Fred Davis is the Chairman of WWDNRCD, located in Southeastern Arizona. F. Davis Aff. at ¶ 1. He is also member of AACD. Mr. Davis's affidavit is attached hereto as Ex. 6. He notes that "[t]he WWDNRCD seeks to protect, conserve and sustain natural resources in th[e] region, particularly soil and water." *Id.* at ¶ 2. Most of WWDNRCD's members are, like Mr. Davis, "multi-generation ranchers and farmers who are stewards of their land that plan to pass their traditional way of life on to future generations." *Id.* Mr. Davis lives on a vast ranch 25 miles from the US/Mexico border that has been in his family for generations. *Id.* at ¶ 1. For Mr. Davis, "the ranch was a quiet and peaceful place to live and raise a family" before illegal border-crossings by illegal aliens and smugglers started

becoming rampant across his property. *Id.* at *¶* 5. The unending parade of illegal aliens has "physically degraded" his land. *Id.* at ¶ 11.

> The constant trampling of the land by illegal border crossers has left permanent damage as well. Many illegal aliens crossing over our native grasslands will follow the paths beaten over time by previous crossers, and in those places, the grass will no longer grow. There are now eleven paths near our house where sixty percent of the grass is gone. These grasses are native to the area, and illegal border crossers also have an adverse impact on protected plant life. Native plants that grow on our property, such as the Soaptree Yucca cactus, which can grow to be 12 feet high, Century Plant, barrel cactus, and the Mesquite tree that have been trampled by drug cartels crossing in vehicles. What makes me even angrier is that many of these plants are protected by the state of Arizona—we ourselves would be violating the law if we removed these native plants from our property. Yet these plants that take 6 to 8 years to grow are destroyed without consequence by illegal aliens.

*Id.* at ¶ 13.

Mr. Davis and his family have "picked up literally tons of trash" that illegal border-crossers have dumped on their land. *Id.* at ¶ 11. They have found human feces on their property "in abundance." *Id.* The garbage is a dangerous health hazard. *Id.* It has killed some of their cattle, and it has made ranching "far more difficult, dangerous and expensive." *Id.* at ¶¶ 11, 12. The years of illegal border-crossings have shattered Mr. Davis's peace and tranquility. *Id.* at ¶ 14. Life on the ranch has

become much more stressful; Mr. Davis feels like he is living in a "war zone." *Id.* at ¶ 15.

> We feel that we are in constant reactionary mode, as people keep unlawfully crossing, and we know some of them may be a threat to our personal safety, giving us great anxiety for our children. The dogs bark in the night at the border crossers, making it difficult for us to sleep.

*Id.* at ¶ 14.

The constant stress means that Mr. Davis has "headaches and health problems [] at home, that go away when I travel." *Id.* at ¶ 15. The DHS actions at issue in this case "have real, concrete, harmful ongoing impacts on me, my family, our land, and the general border environment." *Id.* at ¶ 20. Like so many others, Mr. Davis is "angry contemplating all of the damage done to our environment that might never have occurred if DHS had followed its obligations under NEPA." *Id.* at ¶ 20.

30.     Peggy Davis has served as a clerk and as the Education Center Director of the WWDNRCD. P. Davis Aff. at ¶ 2. She is also a member of the AACD. *Id.* Her affidavit is attached hereto as Ex. 7. Mrs. Davis lives with her husband Fred Davis, together with her children and grandchildren on a 10,000-acre ranch 25 miles from the Arizona/Mexico border. *Id.* at ¶ 1. In her role as clerk and Education Director, Mrs. Davis has planned workshops on such topics as water and soil, solar energy, estate planning and ranch tours. *Id.* at ¶ 2. Because of the unending flow of illegal border-crossers over her land, she can no longer take

walks or ride bikes alone. *Id.* at ¶ 4. She is "afraid to go alone without a firearm." *Id.* Mrs. Davis's enjoyment of her ranch has diminished significantly over the years because DHS, and INS before it, adopted policies that have failed to secure the border. *Id.* Accordingly, "it feels like our land has been under siege." *Id.* at ¶ 1. She and her family are constantly picking up trash of all sorts, as well as continuously repairing fences, as documented in the photographs that are included in her affidavit. *Id.* She too has suffered injuries because DHS has failed to conduct any NEPA analysis regarding its myriad immigration-related actions, stating:

> Perhaps, if DHS had done the proper analysis and informed the public when it made discretionary decisions that encouraged illegal aliens to continue crossing the border, as the law requires, it would have decided that it was important to ramp up enforcement instead. Perhaps the public, if it had understood the environmental costs of DHS's actions, would have demanded more effective enforcement. My land and the whole border region in the Southwest might look different today—unspoiled, serene, and undamaged environmentally. Instead, ceaseless flows of people have crossed the border, with no end in sight, . . . because, our government has simply given up.

*Id.* at ¶ 9.

31.    Californians for Population Stabilization ("CAPS") is a 501(c)(3), non-partisan, membership-based, public interest organization organized and existing under the laws of California. *See: About Us*, Californians for Population Stabilization, http://www.capsweb.org/about/about-us (last visited Oct. 12, 2016).

CAPS's mission is to end policies and practices that cause human overpopulation and the resultant decline in Americans' quality of life in California as well as in the United States. *Id.* CAPS believes that unending human population growth causes environmental damage and overuse of nature's bounty, leaving an impoverished Golden State. *See id.* Unending population growth in California also strains local infrastructure. *Id.* Further, it frays community institutions. Environmental impacts resulting from unending population growth include, but are not limited to: damage to air quality, increasing sprawl, increasing demand for water, increasing water pollution, increasing greenhouse gases and accelerating climate change, exacerbated traffic congestion, school overcrowding, loss of green space, farmland, forests and wildlife, and other non-renewable resources. *See generally id.* CAPS has members and supporters in every state of the United States, with a majority residing throughout California. Because essentially all of California's population growth presently stems from immigration and births to immigrants, CAPS's priority goal is to reduce both legal and illegal immigration into California and the United States. *Id.* Indeed, California's population nearly doubled during the period from 1970 to 2015, from approximately 20 million to 39.6 million.[3] Most of that population growth resulted from immigrants and their

---

[3] Steven A. Camarota & Bryan Griffith, *By State: Number Immigrants and Their Minor Children*, Center for Immigration Studies (March 28, 2016),

offspring. *Id.* California has the largest share of foreign born of any state in this nation. *Id.* In 1970, immigrants and their minor children constituted roughly 13% of California's population--2.6 million people. *Id.* By 2015, 37.4% of California's population was comprised of immigrants and their minor children--nearly 15 million people. *Id.* There is no end in sight to the state's immigration-driven population growth. CAPS and its members who live, work and pursue recreational activities in California are adversely affected by the population growth resulting from the DHS actions at issue. CAPS members have a substantial interest in ensuring that DHS complies with federal law, including the requirements of NEPA. CAPS and its members are being, and will continue to be, harmed by the failure of DHS to make any attempt to comply with NEPA. Plaintiff's expert Jessica Vaughan estimates over two million individual beneficiaries of DHS's discretionary actions remain settled in California. *See* Ex. 2 at 763, in Ex. C.

32.     Richard D. Lamm, an attorney and Certified Public Accountant, served as Governor of Colorado from 1975 to 1987, and is a longtime member of CAPS. R. Lamm Aff. at ¶ 2. Governor Lamm, whose affidavit is attached hereto as Ex. 8, has been a resident of Colorado since 1961. *Id.* at ¶ 1. He is presently Co-Director of Public Policy at the University of Denver. *Id.* at ¶ 2. Governor Lamm has "been deeply involved in the environmental movement for decades and ha[s]

---

http://cis.org/Camarota/Map-Number-Immigrants-Minor-Children.

always been concerned about out of control population growth." *Id.* at ¶ 3. While

attending law school at Berkeley during the years 1958-1961, he "was already

appalled at what population growth was doing to California." *Id.* at ¶ 5. He notes

that California's population has continued to swell, now largely because of

immigration. *Id.* That is why he joined CAPS. *Id.* In the more than 50 years since

Governor Lamm moved to Colorado he has "embraced and cherished its

wilderness." *Id.* at ¶ 8. He notes that he has climbed 50 of Colorado's highest

peaks, hiked and skied its mountains, and kayaked its rivers. *Id.* "That unspoiled,

beautiful Colorado that stirred me so deeply has fallen victim to population growth,

which is inseparable from mass foreign immigration." *Id.* Unhappily, he has

"watched Colorado go from a lovely state with a high quality of life to a Colorado

whose front range (from Pueblo to Fort Collins) is rapidly becoming a Los Angeles

of the Rockies." *Id.* Substantial numbers of immigrants have settled in Colorado

and the state's population has more than doubled during the period 1970 to 2015--

from 2.2 million people to about 5.5 million people.[4] Many of the newcomers are

Americans who have been "crowded out of California by endless foreign

immigration." R. Lam. Aff. at ¶ 14. He believes that his lifelong effort "to save

---

[4] *See* Statista, The Statistics Portal, *Resident Population in Colorado from 1960 to 2015, in millions,* https://www.statista.com/statistics/206101/resident-population-in-colorado/ (last accessed on October 15, 2016).

Denver from an environmentally unsustainable, high growth future would not have been in vain" if DHS had complied with NEPA "as it was supposed to." *Id.* at ¶ 17.

> The National Environmental Policy Act (NEPA), which became law in 1970, was supposed to have stopped this kind of ill-considered population growth from happening. In the 1960s and 1970s, the environmental movement understood how important population stabilization was to everything it stood for. This emphasis in NEPA itself of the importance of population growth reflects this priority. NEPA, the bedrock of our environmental law, was designed to ensure for environmentally informed decision making and public participation . .... Federal agencies, like the Department of Homeland Security (DHS), are not supposed to carry out actions that affect the environment without first considering the consequences. What can have a greater environmental impact on our states and the nation than immigration? In the days when NEPA was passed, population growth was not substantially a matter of immigration, but now immigration is our population's primary driver. Moreover, it is certainly the primary driver of population growth that is most within the federal government's control. Our immigration levels are ultimately a policy choice. DHS is the federal agency that actually implements our nation's immigration policies, and so DHS is responsible for carrying out the federal policy that has the greatest impact on the environment of all. And yet, DHS has done zero environmental review of its immigration related actions. Zero!

*Id.* at ¶ 16.

33.    Josephine Foulk Wideman, whose affidavit is attached as Ex. 9, has been the Executive Director of CAPS for the past fifteen years. J. Wideman Aff. at ¶ 2. Ms. Wideman has lived in Santa Barbara, California for nearly 40 years. *Id.* at

¶ 1. Over the decades she has unhappily witnessed the ongoing erosion of Santa Barbara's small town charm due, in large part, to unending, unrelenting population growth, which has doubled the size of her town. *Id.* at ¶ 3. Many special, beautiful places in Santa Barbara that Ms. Wideman has treasured over the years, including local parks, playgrounds, and waters, are now routinely overrun with people. *Id.* at ¶ 7. As an environmentalist, she laments the impacts of this growth not only on her town, but also upon California's famed, unique biodiversity, and its unparalleled landscape. *See id.* at ¶ 13. She further laments the ever-increasing ecological footprint of ever more people upon California's natural systems. *See id.* at ¶¶ 7-8. California's historic drought is exacerbated by population growth, and, due to water restrictions, she no longer cultivates an English garden at her home. *Id.* at ¶ 8. She notes that "[d]espite California's progressive stance on water consumption, energy consumption and protecting the environment, unending population growth erases those conservation efforts because more and more people mean more and more energy consumption, water consumption and land consumption." *Id.* at ¶ 16. Ms. Wideman believes that the Santa Barbara and California she loves has been and are continuing to be sacrificed at the altar of endless population growth. *See id.* at ¶ 19. The reality is that this massive, unending population growth is now resulting almost exclusively from the arrival of foreign nationals in California, together with their subsequent offspring. *See id.* at ¶ 19. Ms. Wideman notes that

out of a population of 39 million, over 10 million Californians are foreign-born, a higher percentage than any other state. *See id.* at ¶¶ 16-17. If current trends continue, California is headed to a population of 50 million in the coming decades, with no end in sight. *Id.* She laments the enormous consequences of DHS's failure to even attempt to comply with NEPA in its immigration-related actions, stating:

> I have been dismayed that for all these years DHS has failed to even attempt to comply with NEPA. The agency has never considered the likely environmental impacts of its agency decisions and actions relating to immigration. DHS[] is the biggest driver of US population growth. And because it is *people* who impact the environment, it is incredible to think how different Santa Barbara, California, and the entire country might be if DHS had complied with NEPA. For example, DHS might not have implemented as many programs granting illegal aliens reprieves from deportation (such as Deferred Action for Childhood Arrivals), if the resultant overpopulation issues and impending overuse of resources had been evaluated and considered and made open to the American public. Going forward, the agency must comply with NEPA and help our nation move toward real environmental sustainability.

*Id.* at ¶ 19.

34.     Don Rosenberg, whose affidavit is attached hereto as Ex. 10, is a 27-year resident of California. D. Rosenberg Aff. at ¶ 1. He is also the father of Drew

26

Rosenberg, a 25-year old law student who was hit and killed in 2010 by Roberto

Gallo, a Honduran national who illegally entered the United States and

subsequently received Temporary Protected Status under federal law, one of the

federal actions at issue in this case. *Id.* at ¶ 8. Mr. Rosenberg joined CAPS after his

son was killed because:

> mass immigration was imposing huge social and
> environmental costs. Mass immigration wasn't adding to
> our quality of life--it was detracting from it in a
> tremendous way. Furthermore, our government is even
> fostering and overlooking illegal activity, because our
> "leaders" were more interested in votes, campaign
> contributions and the cheap labor . . . .

*Id.* at ¶ 13. Mr. Rosenberg dreads the ever-increasing congestion of Los Angeles

County's roads, and resents the ever-increasing air pollution coming from

"millions of cars sitting on the 101 freeway for hours." *Id.* at ¶ 5. Because of the

drought, exacerbated by endless population growth, he and his neighbors no longer

water their yards. *Id.* at ¶ 6. He finds that "[l]iving in a landscape without plants

drastically reduces the natural beauty and enjoyability of the surroundings." *Id.* Mr.

Rosenberg recognizes that Southern California has a limited water supply and

"when more people come in, we have no choice but to use less water personally."

*Id.* He states:

> I fear that in the future, the environment will continue to
> deteriorate in Southern California. Despite the fact that
> we seem to have reached our land's capacity, and we are

> already straining to support the population we have now,
> DHS seems to only want to force ever more population
> growth on the nation. For Southern California's future, I
> see more water shortages, more traffic, and more
> pollution. The state is already in a hole, and it just seems
> like our public officials are looking for a bigger shovel. It
> will probably drive me out of California in the future.

*Id.* at ¶ 14. Finally, Mr. Rosenberg wistfully muses that perhaps, if DHS had complied with NEPA, it might not have created such a huge TPS program that allowed his son's killer to stay in the United States and maybe his son would still be alive. *Id.* at ¶ 16.

35.     Claude Wiley, whose declaration is attached hereto as Ex. 11, joined CAPS because "something needs to be done about the population explosion, the reckless disregard of immigration laws, and the ecological impacts" resulting from both. C. Wiley Decl. at ¶ 2. He lives in Pasadena, California and commutes to work by bicycle (wearing a mask) because he is "dedicated to doing [his] part to reduce pollution and carbon emissions." *Id.* at ¶ 5. But large scale unending population growth in the Los Angeles region, all of which now results from immigration, simply adds ever more pollution and erases air quality gains. *Id.* at ¶ 5. Mr. Wiley is frustrated because "if not for the immigration-driven population growth, the air quality in the Los Angeles region would be getting better." *Id.* at ¶ 10. He takes mass transit to lessen his impact on the environment and observes that, due to strong state and local policies to support mass transit, the buses and the trains are

full and yet the roads are still choked with cars: "we're starting to hit a wall." *Id.* at ¶ 13. The lovely places where Mr. Wiley has enjoyed hiking and nature-watching over the years, including the San Gabriel Mountains and Echo Mountain, grow ever more crowded with people, and "[t]he more crowded the path becomes, the less I want to use it." *Id.* at ¶ 15. Like others, Mr. Wiley fears for California's future if population growth trends continue unabated. *Id.* at ¶ 18. He notes that "DHS continues to drive population growth through its discretionary actions . . ." *Id.* "If DHS had only followed its legal obligations under NEPA, perhaps the public would have realized the impact immigration was having on the environment and made different decisions--Perhaps the Los Angeles area and California would look very different today." *Id.* at ¶ 17.

36.     Ric Oberlink has lived in Berkeley California for nearly 40 years and is a member of CAPS. R. Oberlink Aff. at ¶ 1-2. Mr. Oberlink's affidavit is attached as Ex. 12. As the population of California, and particularly the Bay area, has continued to rise, his enjoyment of local parks has diminished, due to increased crowding. *Id.* at ¶ 4. He notes that "[a]n increased human population has made camping in wilderness areas and national parks much more troublesome and much less convenient than it was in previous years when population levels were lower." *Id.* at ¶ 5. "Camping spots in prime areas at prime times require advance reservations, often far in advance." *Id.* at ¶ 5. Mr. Oberlink's enjoyment of cycling

has also diminished because areas he once cycled through are more heavily trafficked and open space has been developed. *Id.* at ¶ 8. He notes that during the years 1990-2014, the population increase in Alameda County, where Berkeley is located, all resulted from immigration. *Id.* at ¶ 11. By 2014, immigrants comprised 31% of the county population, or 483,750 individuals out of a total population of 1,559,308. *Id.* He states that in Alameda County, "the portion of the population comprised of immigrants soared from 18 percent in 1990 to 31 percent in 2014, to a total of about half a million," not counting offspring. *Id.* Mr. Oberlink asserts that:

> Had DHS considered the environmental implications of its immigration actions, it might have chosen different actions, resulting in a California and an America with lower levels of population, more open space and wildlife habitat, and less environmental damage than that which we have today. Failure to review future actions could condemn this country to never-ending population growth and further diminution of natural resources.

*Id.* at ¶ 19.

37.   Richard Alan Schneider is the Chair of CAPS. R. Schneider Aff. at ¶ 2. His affidavit is attached hereto as Ex. 13. Mr. Schneider has lived for nearly fifty years in California, mostly in Oakland. *Id.* at ¶ 1. Mr. Schneider, a conservationist and scientist, has "spent thousands of hours fighting to protect open space in the Bay Area . . . ." *Id.* at ¶ 13. He states:

> Since 2000, I have orchestrated nine open space initiative campaigns in Alameda and Contra Costa Counties-- formulating policies to protect the land, helping write the text to enact those policies, organizing signature drives to qualify the initiatives for the ballot, raising money for election campaigns, and then walking precincts and distributing literature in favor of those ballot measures. For each initiative I have put in hundreds of hours of volunteer time, and when an initiative passes, as most have, they must be defended in court if the developers sue; and after they are successfully defended, they must be continually monitored to make sure they are implemented and enforced by the local jurisdiction.

> *Id.* at ¶ 12.

Mr. Schneider has spent so much time trying to protect open space because he enjoys observing native California species, such as hawks and eagles, and irreplaceable native habitats. *Id.* at ¶¶ 18-19. The species he treasures and the open space he loves regularly disappear. *Id.* He states that "California leads the nation in the number of species at risk of extinction and the number of endemic species at risk, those species that occur nowhere else in the world." *Id.* at ¶ 18. The disappearance of nature and wildlife is deeply disturbing to Mr. Schneider. *See id.* at ¶¶ 19-20. Land is routinely bulldozed for new construction, all in service of accommodating endless population growth:

> Is it really too many people that are causing this loss of wildlife? In California, the answer is most emphatically yes. The California Department of Fish and Wildlife, in its Atlas of the Biodiversity of California, states unequivocally, "Habitat loss

31

> due to human population growth presents the
> single biggest problem facing native plants and
> animals in California."

*Id.* at ¶ 20.

Mr. Schneider observes that presently, all of California's population growth is

"coming from foreign immigration and births to immigrants." *Id.* at ¶ 25.

California's population continues to climb even though more U.S. citizens leave

California for other states than move to California. *Id.* He views population growth

as "one of the greatest threats to the natural world." *Id.* at ¶ 27. And, like other

affiants, he is "amazed and appalled by DHS's total abdication of its legal

obligations under NEPA." *Id.* at ¶ 26.

38.    Scientists and Environmentalists for Population Stabilization

("SEPS") is a small, informal, non-governmental organization run by scientists, but

open to all. *See generally* Scientists and Environmentalists for Population

Stabilization, http://www.populationstabilization.org/index.html (last visited on

Oct. 13, 2016). It currently has about 50 members throughout the United States. *Id.*

SEPS's mission is to improve understanding within the U.S. scientific, educational

and environmental communities of the fact of overpopulation and its social,

economic and environmental consequences at both the national and global levels.

*See generally id*. SEPS advocates for U.S. population stabilization, followed by its

gradual reduction to a sustainable level through humane, non-coercive means. *Id.*

SEPS also advocates for a gradual transition to ecological economics for our economic system. *See generally id*. It chiefly advocates by operating exhibitor booths addressing population stabilization at the annual meetings of scientific societies; SEPS is usually the only U.S. organization of its kind at these meetings. *See id.*

39.     Dr. Stuart Hurlbert is the president of SEPS and a longtime member of CAPS. S. Hurlbert Aff. at ¶¶ 4, 16. His affidavit is attached hereto as Ex. 14. Dr. Hurlbert is Professor Emeritus of Ecology at San Diego State University and has lived in San Diego and Del Mar, California since 1970. *Id.* The negative impacts of constant population growth have been an ongoing subject of personal and professional concern for Dr. Hurlbert for many years. *Id.* at ¶¶ 1-2. San Diego County's population has more than doubled from 1.36 to 3.30 million people since 1970.[5] A substantial share of the population growth is the result of immigration. As an example, the immigrant share of the population in San Diego County has risen from 17.2% in 1990 to 23.4% in 2014. S. Hurlbert Aff. at ¶ 5. Unending population growth translates into more traffic, despite the addition of new freeways and

---

[5] *See* Population.us, Population of San Diego County, http://population.us/county/ca/san-diego-county/ (last visited on Oct. 15, 2016) and Tatiania Sanchez, The San Diego Union Tribune, *SD County second largest in CA, despite slow growth*, (Jan. 4, 2016), http://www.sandiegouniontribune.com/news/border-baja-california/sdut-san-diego-county-population-2016jan04-story.html.

expansion of existing roads. *Id.* at ¶ 5. Dr. Hurlbert avers that ever more traffic, and the congestion it creates, means "loss of time, restriction of travel schedules, and increased aggravation [which] has had a negative impact" on him. *Id.* A particular source of unhappiness is the increasing degradation of Mission Trails Regional Park, one of the largest urban parks in the United States, which Dr. Hurlbert has enjoyed both personally and professionally over the decades, for hiking, birdwatching and class trips. *Id.* at ¶ 7. The vastly increased use of the park and its concomitant deterioration over the decades has corresponded with the population growth of San Diego County. *See id.* Areas in Del Mar that Dr. Hulbert used to hike with his son are now covered with "new highways, new housing developments and new shopping centers." *Id.* at ¶ 8. For Dr. Hurlbert, "[o]ne of the biggest ongoing, population-driven environmental disasters in Southern California is what is happening at the Salton Sea." *Id.* at ¶ 9. Dr. Hurlbert has studied the Salton Sea for several decades. It is "one of the most important habitats for waterbirds of diverse sorts in the Southwest" and Dr. Hurlbert has enjoyed bird watching there for fifty years. *Id.* at ¶¶ 9, 11. Much to Dr. Hurlbert's dismay, population growth now threatens the Salton Sea because the water that drains into it is now being tapped for diversion to facilitate population growth in coastal California. *See id.* at ¶ 9. "It pains me greatly to be a witness to its population-driven demise." *Id.* at ¶ 11. Dr. Hurlbert is well acquainted with NEPA and

34

distinctly recalls being "greatly pleased at its passage, with its clear references to the 'profound influences of population growth' and 'the critical importance of restoring and maintaining environmental quality' and the need to 'achieve a balance between population and resource use.'" *Id.* at ¶ 16. He notes that population growth in both California and the United States in now driven primarily by immigration, and "[i]f DHS and its predecessor agencies had been doing proper NEPA analyses all along, it might have changed it policies long ago, and I might have seen much less damage occur to the places I love." *Id.* at ¶ 19.

40.    Glen Colton has lived in Fort Collins, Colorado for 37 years. G. Colton Aff. at ¶ 1. Mr. Colton's affidavit is attached as Ex. 15. When he moved to Fort Collins, the town had 65,000 residents and was surrounded by "wide open spaces," and agricultural land. *Id.* at ¶ 3. At that time Fort Collins was "an idyllic place to live, work, and raise a family." *Id.* at ¶ 3. Over the decades, however, the town's population has soared to 160,000 today. *Id.* at ¶ 4. Its population is expected to grow by another 80,000 over the next 10 to 15 years with no end to the growth in sight. *See id.* Many of the agricultural areas and "wide open spaces" that used to surround the city are gone. *See id.* The population of the surrounding region is "projected to nearly double" from 500,000 to one million people within 20 years, with no end in sight. *See id.* Mr. Colton is negatively impacted by the endless surge of population growth which causes sprawl, degradation of the Poudre River, loss of

nature and wildlife, increasing light and air pollution and increasing traffic and congestion. *See id.* at ¶¶ 5-7. Like Mr. Oberlink, Mr. Colton's enjoyment of protected public land in the region has diminished because more and more users are "putting increasing pressure on trails, fragile habitat and wildlife." *Id.* at ¶ 8. He unhappily notes that Estes Park, the gateway to Rocky Mountain National Park, has changed over the years he has visited and now "is a crowded, congested mess . . . ." *Id.* at ¶ 8. The destruction of the natural world from "rampant and destructive effects of population growth" is evident to Mr. Colton as he travels around the western United States. *Id.* at ¶ 10. He states that "[w]ater issues are becoming increasingly dire, infrastructure is overloaded, wildlife habitat is being destroyed, development is rapidly encroaching on fire prone areas, congestion and crowding is widespread, and consumption and resulting energy usage . . . are increasing." *Id.* He does not believe that this endless population growth is ecologically sustainable and indeed, feels "incredibly betrayed and cheated by the United States" because he chose to have only one child to help stabilize the nation's population yet the federal government has embraced a national population policy that imposes unending massive population growth through immigration. *Id.* at ¶ 15. DHS and the State Department are "de facto U.S. growth spigot[s]" that have completely ignored NEPA. *Id.* at ¶ 17. If these agencies had complied with NEPA, "the US landscape . . . would most likely look very different today." *Id.*

41.     Caren Cowan has been the Executive Director of the New Mexico Cattlegrowers' Association ("NMCGA") for nineteen years. C. Cowan Aff. at ¶ 2. Ms. Cowan's affidavit is attached hereto as Ex. 16. The purpose of NMCGA is to promote the interests of the cattle-ranching community in New Mexico and nineteen other states. *Id.* As Ms. Cowan states, "We preserve and protect our land not only because we depend on the land economically, but also because we love our land and way of life. We also seek to protect the land in order to ensure the wellbeing and opportunities of generations to come." *Id.* at ¶ 3. Ms. Cowan's family has been continuously ranching in Cochise County, Arizona since 1884, and she owns part of a ranch near Elfrida, Arizona. *Id.* at ¶ 4. She has always enjoyed being on the borderlands and calls it "a special place." *Id.* at ¶ 6. Ms. Cowan states, "I experience a spiritual renewal when I am out in these vast open spaces with no sounds other than wildlife and livestock, and not a person for miles around." *Id.* Because of the constant fear of illegal border-crossers, Ms. Cowan no longer feels safe out on the range. *Id.* at ¶¶ 5, 7 Her grandmother's homestead was ransacked and despoiled by illegal aliens on multiple occasions. *Id.* at ¶ 9. Many members of NMCGA have also experienced criminal activities on their lands, including stolen vehicles and break-ins. *Id.* at ¶ 7. Ms. Cowan understands DHS has failed to consider any of the environmental impacts resulting from its myriad of agency actions and finds this a "shocking disappointment." *Id.* at ¶ 10.

42.     John W. Ladd is a supervisor for the HNRDC and a member of the AACD. J. Ladd Aff. at ¶ 4. His affidavit is attached as Ex. 17. Mr. Ladd has lived his entire life on a 16,400-acre ranch on the Arizona/Mexico border. *Id.* at ¶ 1. The ranch has been in his family since 1896. *Id.* at ¶ 1. He states that "[r]anching on this land is my heritage--passed from previous generations to me, and it is a way of life I have always hoped to pass on to many generations to come." *Id.* During his youth, illegal border-crossers were not much of a problem, but he states the flow "has become such a problem that it has ruled our lives and dictated the way we ranch. An endless stream of illegal border crossers has trashed my land and destroyed my enjoyment of my property." *Id.* at ¶ 2. The grass has stopped growing in areas used as trails and "[t]he ground where grasses no longer grow is an eyesore that reminds me of how much environmental damage I am constantly suffering." *Id.* at ¶ 9. He estimates that hundreds of thousands of illegal border-crossers have been caught by the border patrol on his property. *Id.* at ¶ 5. This huge flow of people has led to the dumping of approximately 20 tons of trash on his property--too much to control, despite Mr. Ladd and his family's efforts to pick up as much as they can. *See id.* at ¶ 6. Much of this garbage ultimately gets swept into the San Pedro River, which was clean enough to swim in when he was young but is now polluted with trash and human waste. *See id.* at ¶¶ 6-7. Mr. Ladd understands that DHS has never done "any environmental analysis that acknowledges that

arriving aliens have environmental impacts." *Id.* at ¶ 13. This failure affects Mr. Ladd personally, because "[i]f DHS had done the proper NEPA analysis of the environmental impacts of its policies before implementing them, perhaps it would have realized that the environmental costs were too severe. The damages to the environment on my land might never occurred if DHS and the INS had followed NEPA." *Id.* at ¶ 14.

43.     John Charles Oliver is the President of Floridians for a Sustainable Population ("FSP"). J. Oliver Aff. at ¶¶ 4, 17. His affidavit is attached hereto as Ex. 18. FSP was established as a not-for-profit in 1994 in an effort to educate Floridians about the necessity to stabilize Florida's human population in order "to preserve and protect our natural resources and open spaces for future generations to enjoy." *Id.* at ¶ 17. FSP recognizes that immigration is now the engine driving population growth in both Florida and the entire United States. *See id.* FSP operates a website and, among other things, commissioned a sprawl study in 2000 to coincide with Florida Overpopulation Awareness Week. *Id.* In the fifteen years following that 2000 campaign, Florida's population has continued to mushroom, from about 16 million to over 20 million. *Id.* at ¶ 16. Mr. Oliver has lived 28 years in Southeastern Florida--Broward, Palm Beach and Martin Counties. *Id.* at ¶¶ 1, 6. The population of Broward increased from 628,980 to 1,815, 269 from 1970 to 2014. *Id.* at ¶ 16. Palm Beach County tells much the same story; its population

grew from 353,158 in 1970 to 1,359,074 in 2014. *Id.* Martin County's population

has increased from 28,460 in 1970 to 149,658 in 2014. *Id*. During the years he has

lived in Florida, Mr. Oliver has witnessed and experienced the harmful impacts of

intense population growth upon the natural world, especially water habitats. *Id.* at ¶

13. Mr. Oliver is a certified diver and has "done extensive diving and fishing on the

reefs of Broward and Palm Beach Counties, the Florida Keys, the Bahamas, and

Cozumel Mexico." *Id.* at ¶ 2. Coral reefs he enjoyed so much in the 1970's are

largely gone now: "Today, the beautiful coral reefs I dived and fished [on] in

Broward and Palm Beach County are no longer living[;] [93%] of hard corals have

vanished due to six municipal sewage outfalls, port-dredging, and coral bleaching

due to carbon acidification caused by the increase of fossil fuels being burned." *Id.*

at ¶ 9. Formerly an avid fisher, Mr. Oliver no longer fishes as often because boat

launches are backed up and it is hard to find a place to put one's boat in the water.

*Id.* at ¶ 14. Previously-free boat ramps now charge money. *Id.* Moreover, numerous

waterways, especially the St. Lucie River, have become polluted and contaminated

by the septic tanks installed for thousands of new homes built along the river and

fertilizer nitrate runoff:

> The river grasses that covered the bottom of the estuary
> are now dead and the bottom is covered with green slime.
> These grasses were essential to sustaining the entire food
> chain of fish, birds, turtles, and marine mammals. Many
> of the dolphins and manatees have sores on their bodies
> and some have died. Unfortunately, this scenario is being

> repeated at an alarming pace in waters across the state.
> The estuary of the west coast of Florida by Pine Island
> that was one of my favorite places to fish has also seen
> declining water quality.

*Id.* at ¶ 13. Mr. Oliver further notes that "[m]any species of table fare fish are now

heavily regulated due to overharvesting...[n]umerous reefs in the Florida Keys have

become Marine Sanctuaries and are totally off limits to fishing." *Id.* at ¶ 15.

Florida's rapid population growth over the past fifty years has been exacerbated by

large inflows of immigrants--over 25% of Florida's 20-million plus-population of

are immigrants and their children. *Id.* at ¶ 16. Most of Florida's recent population

growth is presently the result of federal immigration policies--67% according to a

recent report, "Vanishing Open Spaces." *Id.* at ¶ 19. Mr. Oliver understands that

DHS has not considered the environmental impacts of its myriad immigration-

related actions, all the while, he says, "it has been established without question that

the doubling and tripling of our population has had a very detrimental effect on our

environment." *Id.* at ¶ 23.

44.     Ralph Pope is a retired Natural Resource Management/Ecologist for

the U.S. Forest Service. R. Pope Aff. at 7. His affidavit is attached hereto as Ex.

19. Mr. Pope has lived in Southeastern Arizona and Southwestern New Mexico

along the U.S/Mexico border for most of his life. *See id. at* ¶¶ 1-2. His affidavit

details his personal and professional pleasure over the decades, experiencing and

enjoying the entire "scope and range of southwest ecosystems, from desert to high elevation mixed conifers." *See id.* at ¶ 10. He notes his particular affection for the region's famed "sky islands"--hot spots of great biodiversity found nowhere else on the globe. *Id.* Mr. Pope devoted his career to monitoring and trying to protect the Piloncillo, Chiricahua and Dragoon Mountains, federal lands which make up the Douglas Ranger District. *Id.* at ¶ 4. His job with the Forest Service entailed monitoring ecosystem health and livestock grazing operations on federal lands. *Id.* Unfortunately, over the decades, Mr. Pope has personally witnessed the ecological degradation of "unique native ecosystems located on hundreds of thousands of acres of once pristine and unspoiled lands . . . ." *Id.* at ¶ 5. This degradation was caused by illegal border-crossings, whose destructive impacts include trampled native vegetation, garbage, polluted water, destroyed wilderness and fires that burn out of control. *Id.* at ¶ 11. Mr. Pope's affidavit describes the destruction of Burro Springs and the Chiricahua Mountain Range that occurred as a result of fires set by illegal border-crossers. *See id.* at ¶¶ 11, 14. One significant negative impact of such fires is that much of the native vegetation gets burned away and is replaced by invasives. *See id.* at ¶ 15. He states that "[a]s an ecologist, this upsets me tremendously." *Id.*

**B.    DEFENDANTS**

45.     Defendant, DHS, is a federal agency which was established in 2003, pursuant to the Homeland Security Act passed on November 25, 2002. *See* Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (2002). Pursuant to this grant of authority, DHS is mandated to administer border security, immigration enforcement and naturalization, and establish and administer rules governing the granting of visas or other forms of permission to enter the country. *See* 116 Stat. at 2178, 2187. By the authority of that Act, DHS took over the functions of government formerly delegated by Congress to an agency known as the U.S. Immigration and Naturalization Service ("INS"), a division since 1940 of the Department of Justice. DHS now carries out the functions of the former INS, that is, the regulation of immigration into the U.S., through three sub-agencies, U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and Immigration and Customs Enforcement ("ICE").[6] As a federal agency, DHS is subject to NEPA and the APA. In accordance with NEPA, DHS has adopted NEPA regulations to guide its discretionary agency action decisionmaking. *See* 42 U.S.C. § 4333; Dep't of Homeland Sec., DHS Directive 023-01, Environmental Planning Program (2006) (attached hereto as Ex. 20); Instruction Manual, *supra* note 2 (*See* Ex. 5); Synopsis of Administrative Record to

---

[6] *Our History*, U.S. Citizenship and Immigration Services (May 25, 2011), https://www.uscis.gov/about-us/our-history (providing a discussion of the history of the organization of immigration regulation within the U.S. government).

43

Support Proposed New Categorical Exclusions Under the National Environmental Policy Act, Department of Homeland Security (Dec. 2014), https://www.dhs.gov/sites/default/files/publications/CATEXs_admin%20record_version_Final_Dec2014_508compliantversion.pdf.

46.     Defendant Jeh Johnson is sued in his official capacity as the Secretary of DHS ("Secretary"). The Secretary is authorized to lead and manage DHS. The Secretary is responsible for ensuring that DHS's actions, such as those actions at issue *sub judice*, comply with the requirements of NEPA.

## **GENERAL ALLEGATIONS**

**Connecting the Dots: People Cause Environmental Impacts. Therefore, DHS Actions that Address the Entry and Settlement of People into the United States are Subject to NEPA.**

47.     The Allegations in this complaint rest on a set of straightforward facts, and one need only connect the dots:

i)      NEPA requires Federal agencies to apply NEPA when undertaking actions and making decisions that could have a significant impact on the human environment.

ii)     One of the biggest environmental impacts results directly, as well as indirectly, from the size of human population, particularly where vital natural resources such as drinking water are over-

subscribed.

iii)     The primary factor driving U.S. population growth is international migration. Immigrants from abroad add directly to the nation's population by their arrival and by the children they have after they come. Because the fertility of American women has been at or below replacement level for many years — 2.1 children per women — absent immigration there would be very little long-term population growth in the United States. Census Bureau projections published in 2014 indicate that because of future immigration the U.S. population will be 95 million larger in 2060 than it otherwise would be absent immigration.

*See* Ex. 3 at 765. The Pew Research center reported in 2015 that the 72 million post-1965 immigrants and their offspring and grandchildren account "for the majority of U.S. population growth in the past five decades." *See* Ex. 3 at 766. Indeed, Dr. Camarota estimates that during the years 2010-2014, immigration and offspring added 8.3 million people to the U.S. population. This increase comprises 87% of U.S. population growth during that brief period. *Id.*

iv)     DHS is the agency charged with the mission of regulating and

controlling the entry (both legal and illegal) and settlement of foreign nationals into the United States.

v)      After connecting these dots, it becomes indisputable that DHS controls one of the most environmentally significant mandates delegated to any federal agency, and yet DHS fails to even consider the direct, much less enormous indirect and cumulative environmental impacts of its actions relating to this mandate.

48.    DHS, like its predecessor agency INS, has continuously failed to make well-informed decisions as mandated by NEPA; has failed to conduct reasoned analyses of those potential impacts; has failed to engage the public on the range of potential environmental impacts or create a public record so that interested or affected members of the public could learn about the environmental implications of the DHS actions, all as required by both NEPA and the APA.

49.    Despite the enormous impacts to the human environment resulting from DHS's actions relating to the entry and settlement of foreign nationals into the United States, DHS has failed to initiate NEPA review for these ongoing actions. Such actions include the regulations, policies, programs and plans promulgated pursuant to the Immigration and Nationality Act ("INA"), the Immigration Control and Reform Act ("IRCA"), the Immigration Act of 1990, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),

and other immigration statutes. *See* Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952); Immigration Control and Reform Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (1986); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996). Such actions also include discretionary decisions that implement and enforce the nation's immigration laws which DHS and its predecessor INS adopted by means other than regulation, such as via policy memoranda. The actions at issue in this complaint have resulted and will continue to result in impacts to the human environment, including, but not limited to significant population growth in the United States and ongoing environmental degradation along the Southwest border.

50.     In the few paltry places where DHS makes reference to NEPA, as will be demonstrated in ¶¶ 54-57 and 90-98, DHS does so in a dismissive manner, and its record of decisions are woefully devoid of even the most basic forms of analytical support.

51.     One can only conclude - as the Plaintiffs in this case have - that DHS, with its outsized influence on our nation's population growth and *ipso facto* on our nation's environmental health, has acted and continues to act in a manner that is arbitrary and capricious with respect to its NEPA obligations.

**DHS Actions Subject to NEPA**

47

52.    The Instruction Manual promulgated by DHS to guide its NEPA compliance is silent with respect to the entry and settlement of foreign nationals in the United States, even though such entry and settlement constitutes one or more of DHS's "principle programs" subject to specific NEPA mandates and EISs are required for "broad actions." *See* 40 C.F.R. §§ 1502.4(b), 1505.1(b).

53.    DHS' ongoing actions, relating to the entry and settlement of foreign nationals into the United States, are set forth as follows, attached in full where publicly available in Ex. 1, and further described and analyzed in Ex. 2, by Jessica Vaughan, a longtime immigration researcher at the Center for Immigration Studies:

● Action 1: Legal Op. No. 98-10, issued August 21, 1998 entitled, "Subject: Authority to parole applicants for admission who are not also arriving aliens." This action created a discretionary authority known as "parole-in-place" whereby DHS and its predecessor INS can grant "parole," generally a process that allows inadmissible aliens outside the country to enter the U.S., to aliens already inside the U.S. as well as those still outside. The memorandum is attached in Ex. 1 at 2, under Action 1.

● Action 2: Directive 11002.1, issued December 8, 2009 entitled, "Parole of arriving aliens found to have a credible fear of persecution or terror." This action allowed for aliens claiming asylum to be released rather than detained if a USCIS officer determines they have made a "credible" claim of fear of return.

The directive is attached in Ex. 1 at 7, under Action 2.

- Action 3: Policy Memorandum 602-0091 issued November 15, 2013 entitled, "Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)." This action creates a parole program for relatives of military members and veterans. The memorandum is attached in Ex. 1 at 18, under Action 3.

- Action 4: Memorandum issued by Secretary Johnson on November 20, 2014 concerning "Families of U.S. Armed Forces Members and Enlistees." This action expands eligibility for the military parole program. The memorandum is attached in Ex. 1 at 28, under Action 4.

- Action 5: Announcement by USCIS officials on October 27, 2011 of creation of "Parole for Caregivers of Critical Medical or Special Needs Individuals" in Northern Mariana Islands. This action creates a parole program for in home caregivers in the Commonwealth of the Northern Mariana Islands. The memorandum is attached in Ex. 1 at 31, under Action 5.

- Action 6: Memorandum issued by Secretary Johnson on November 20, 2014 concerning "Directive to Provide Consistency Regarding Advance

Parole." This action formalizes the discretionary power of "advance parole," which allows aliens in the country to leave and return as parolees. The memorandum is attached in Ex. 1 at 37, under Action 6.

- Action 7: Central American Minors Refugee and Parole Program, initially conceived and established between July 2014 and February 2015, and recently expanded on July 26, 2016 in an announcement by DHS. USCIS sets out the eligibility requirements on its website on a page entitled, "In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM)." *See* Ex. 1 at 40, under Action 7. This action creates a program using parole by which aliens living in the U.S. may bring in relatives and minors with whom they have legal guardianship over by petitioning the U.S. government. The program criteria available on USCIS' website are also attached in Ex. 1 at 40 under Action 7.

- Action 8: Haitian Family Reunification Parole Program established December 18, 2014. This action gives parole to Haitians whose immigration applications have been approved to accelerate their arrival in the country. The program criteria available on USCIS' website are included in Ex. 1 at 44 under Action 8.

- Action 9: Proposed "International Entrepreneur Parole Rule" published in the Federal Register on August 31, 2016. Federal Register, Vol. 81,

No. 169, Wednesday, August 31, 2016. This is a proposed action that would, when finalized, create a program that would give parole to foreign entrepreneurs meeting certain eligibility criteria. The proposed rule is attached in Ex. 1 at 51, under Action 9. Plaintiff CAPS commented during the public comment period that DHS must analyze the environmental impacts of this proposed rule, pursuant to NEPA.

• Action 10: Temporary Protected Status ("TPS"), established in 1990 pursuant to INA Section 244 (8 U.S.C. § 1254a) by which INS and subsequently DHS received discretion to grant foreign nationals the right to remain in the United States and work. Since its inception, 20 countries have been designated. USCIS's list of countries designated and eligibility requirements are included in Ex. 1 at 92, under Action 10.

• Action 11: the President has discretion to authorize Deferred Enforced Departure ("DED") as part of his power to conduct foreign relations. Although DED is not a specific immigration status, individuals covered by DED are not subject to removal from the United States, usually for a designated period of time. USCIS's list of current countries covered and eligibility requirements are included in Ex. 1 at 108, under Action 11.

• Action 12: DHS Policy Memorandum 10072.1 issued March 2, 2011 entitled, "Civil Immigration Enforcement: Priorities for the Apprehension, Detention and Removal of Aliens." This action removes the practical threat of

deportation from illegal aliens who don't meet certain criteria. The memorandum is attached in Ex. 1 at 111, under Action 12.

● Action 13: DHS Policy Memorandum 10075.1, issued June 17, 2011 entitled, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens." This action ordered immigration agents to discontinue enforcement activities against certain categories of illegal aliens. The memorandum is attached in Ex. 1 at 116, under Action 13.

● Action 14: DHS Policy Memorandum 10076.1, issued June 17, 2011 entitled, "Prosecutorial Discretion: Certain Victims, Witnesses and Plaintiffs." This action orders immigration agents to discontinue enforcement activities against illegal aliens who are victims of crimes. The memorandum is attached in Ex. 1 at 123, under Action 14.

● Action 15: DHS Memorandum, issued November 11, 2011 entitled, "Case by Case Review of Incoming and Certain Pending Cases," with two attachments: "Next Steps in the Implementation of the Prosecutorial Discretion Memorandum and the August 18th Announcement on Immigration Enforcement Priorities," and "Guidance to ICE Attorneys Reviewing the CBP, USCIS, and ICE Cases Before the Executive Office of Immigration Review." This action orders immigration attorneys to review pending and incoming deportation cases and to

dismiss all those cases meeting certain criteria and allow the individuals to remain in the country. The memorandum is attached in Ex. 1 at 127, under Action 15.

- Action 16: DHS Policy Memorandum 602-055, issued November 7, 2011 entitled, "Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens." This action established new guidelines preventing USCIS from issuing Notices To Appear without ICE's permission in specified cases. The memorandum is attached in Ex. 1 at 136, under Action 16.

- Action 17: New Detainer form, which ICE announced it had issued in a bulletin on December 29, 2011, and which changed the policy on detainers. This action meant ICE officers could now only issue detainers for aliens that had been convicted, not just booked, for a crime. The new form and the bulletin announcing it are attached in Ex. 1 at 146, under Action 17.

- Action 18: DHS Memorandum issued by John Morton on December 12, 2012 entitled, "Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems." This action limited the circumstances under which ICE can issue detainers. The memorandum is attached in Ex. 1 at 152, under Action 18.

- Action 19: DHS Memorandum issued by Janet Napolitano on June 15, 2012 entitled, "Exercising Prosecutorial Discretion with Respect to Individuals

Who Came to the United States as Children" and DHS Memorandum issued by John Morton on June 15, 2012 entitled, "Secretary Napolitano's Memorandum Concerning the Exercise of Prosecutorial Discretion for Certain Removable Individuals Who Entered the United States as a Child" ("DACA"). The action created by these two memoranda initiated a new program giving a *de facto* lawful status to certain illegal aliens. The memoranda are attached in Ex. 1 at 156, under Action 19.

● Action 20: DHS Policy Memorandum 602-0093 issued November 13, 2013 entitled, "Adjudication of Adjustment of Status Applications for Individuals Admitted to the United States Under the Visa Waiver Program." This action allows visa-overstayers admitted through the Visa Waiver Program to adjust their status to lawful permanent resident. The memorandum is attached in Ex. 1 at 162, under Action 20.

● Action 21 and Action 22: DHS Memorandum issued by Secretary Johnson on November 20, 2014 entitled, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents." This memorandum takes two separate actions. The first action expands the DACA program so that more people are eligible and extends the duration of the status. The second action creates a new and bigger program, Deferred Action for

Parental Accountability (DAPA), which gives a *de facto* lawful status to the parents of U.S. citizens and lawful permanent residents. The memorandum is attached in Ex. 1 at 170, under Action 21 and Action 22, respectively. The two actions ordered by this memorandum have been put on a temporary hold by a district judge's preliminary injunction. DHS still intends to carry them out if they are ultimately allowed to go forward.

- Action 23: DHS Memorandum issued by Secretary Johnson on November 20, 2014 entitled, "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants." This action instructs DHS immigration agents to protect a larger number of aliens from deportation than DHS policies previously had. The memorandum is attached in Ex. 1 at 176, under Action 23.

- Action 24: DHS Memorandum issued by Secretary Johnson on November 20, 2014 entitled, "Secure Communities." This action discontinues the immigration enforcement program Secure Communities and replaces it with a different program. The memorandum is attached in Ex. 1 at 183, under Action 24.

- Action 25: DHS Final Rule entitled, "Provisional Unlawful Presence Waivers of Inadmissibility for Certain Relatives, Final Rule" published in the Federal Register on January 3, 2013. Federal Register, Vol. 78, No. 2, Thursday, January 3, 2013. This action creates a categorical waiver of the three- and ten-year bars on admissibility for which certain relatives of U.S. citizens may apply. The

rule is attached in Ex. 1 at 187, under Action 25.

- Action 26: DHS Final Rule entitled, "Expansion of Provisional Unlawful Presence Waivers of Inadmissibility; Final Rule," published in the Federal Register on July 29, 2016. Federal Register, Vol. 81, No. 146, Friday, July 29, 2016. This action expands the categorical waiver of the three- and ten-year bars on admissibility to cover more classes of relatives of U.S. citizens. The rule is attached in Ex. 1 at 232, under Action 26.

- Action 27: DHS Memorandum issued April 30, 2009 entitled, "Worksite Enforcement Strategy." This action suspended worksite raids, whereby aliens working illegally were apprehended at their place of employment, and directed ICE agents to conduct worksite enforcement largely through paper audits of employment documents. The memorandum is attached in Ex. 1 at 268, under Action 27.

- Action 28: DHS Policy Memorandum 602-0092 issued November 11, 2013 entitled, "Additional Guidance on Determining Periods of Admission for Foreign Nationals Previously Admitted as H-4 Nonimmigrants who are Seeking H-2 or H-3 Status." This action allows the holders of certain dependent-visas, which are derivative of their spouse, to obtain a principal visa in their own right without counting the time spent previously in the country toward the maximum time-limit of the visa. The memorandum is attached in Ex. 1 at 273, under Action 28.

● Action 29: INS Interim Rule proposed July 20, 1992 entitled Pre-Completion Interval Training; F-1 Student Work Authorization, 57 Fed. Reg. 31,954 (proposed July 20, 1992); and Final Rule issued December 11, 2002, entitled, "Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS), 67 Fed. Reg. 76,256 (proposed Dec. 11, 2002) (codified at 8 C.F.R. § 212.1, 212.2, 212.3). These rules created a program, the Optional Practical Training Program (OPT) that, in its revised version in 2002, authorized all aliens in the country on a student visa to remain and work for a year when they should otherwise be required to leave the U.S. The 1992 interim rule and the 2002 final rule are attached in Ex. 1 at 278 and at 286, respectively, under Action 29.

● Action 30: DHS Final Rule issued March 11, 2016 entitled, "Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students," 81 Fed. Reg. 13,040, March 11, 2016 (codified at 8 C.F.R. §§ 214 and 274(a)). This action expanded the Optional Practical Training ("OPT") Program, which allows aliens in the country on student visas to stay and work for a time, for students working after graduation in the science, technology, engineering, and/or math (STEM) fields for a longer period of time. The final rule is attached in Ex. 1 at 333, under Action 30. A member of CAPS, and other interested individuals commented during this rule's

public comment period stating that the rule's environmental impacts should be analyzed by DHS pursuant to NEPA. DHS did not initiate a NEPA analysis. Instead, it stated in its final rule:

> Comment. DHS received several comments regarding potential environmental costs resulting from an increased population, both in the United States generally, and in Silicon Valley, California specifically, where many STEM jobs are located. Some also noted that California has been struggling with an ongoing drought.
> Response. Upon review, DHS remains convinced that our review pursuant to the National Environmental Policy Act is in compliance with the law and with our Directive and Instruction.

Ex. 1 at 587. DHS categorically excluded this rule from NEPA analysis, finding that:

> J. Environment
> The U.S. Department of Homeland Security Management Directive (MD) 023–01 Rev. 01 establishes procedures that DHS and its components use to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321–4375, and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500–1508. CEQ regulations allow federal agencies to establish categories of actions, which do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1508.4. The MD 023–01 Rev. 01 lists the Categorical Exclusions that DHS has found to have no such effect. MD 023–01 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, MD 023–01 Rev. 01 requires the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions.

(2) The action is not a piece of a larger action.

(3) No extraordinary circumstances exist that create the potential for a significant environmental effect. MD 023–01 Rev. 01 section V.B(1)–(3).

Where it may be unclear whether the action meets these conditions, MD 023–01 Rev. 01 requires the administrative record to reflect consideration of these conditions. MD 023–01 Rev. 01 section V.B. DHS has analyzed this rule under MD 023–01 Rev. 01. DHS has determined that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment. This rule clearly fits within the Categorical Exclusion found in MD 023–01 Rev. 01, Appendix A, Table 1, number A3(a): ''Promulgation of rules . . . of a strictly administrative or procedural nature;'' and A3(d): ''Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect.'' This rule is not part of a larger action. This rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

Ex. 1 at 611-613.

● Action 31: DHS Policy Memorandum 602-0111 issued March 24, 2015 entitled, "L-1B Adjudications Policy." This action broadens the definition of the "specialized knowledge" that an applicant must demonstrate to obtain an L-1B visa. This memorandum is attached in Ex. 1 at 634, under Action 31.

● Action 32: T and U Visa Implementation. DHS first adopted an interim rule implementing the visa categories created by the Victims of Trafficking

and Violence Protection Act of 2000 (PL-106-386) with the published rule "New Classification for Victims of Criminal Activity, Eligibility for 'U' Nonimmigrant Status," 72 Federal Register, 53014, September 17, 2007. DHS further updated the regulations on December 12, 2008, "Adjustment of Status to Lawful Permanent Resident for T and U nonimmigrants" (codified at 8 C.F.R. § 245.24). These rules are attached in Ex. 1 at 651 and 701, under Action 32.

● Action 33: Order from U.S. Border Patrol Headquarters in September 2011 to discontinue its practice of routinely searching buses, trains, and airports at transportation hubs along the northern border and in the nation's interior. This action was never made public, so there is no available written record, however, two Border Patrol agents described the order to the Associated Press on condition of anonymity. *See* The Associated Press, *Border Patrol stops searches at Hubs*, Portland Press Herald, October 29, 2011, http://www.pressherald.com/2011/10/29/border-patrol-stops-searches-at-hubs_2011-10-29/.

**Programmatic Environmental Assessment for Actions to Address an Increased Influx of Unaccompanied Alien Children and Family Units Across the Southwest Border of the United States.**

54.    DHS did conduct a NEPA review in one instance related to the entry of foreign nationals into the United States. On June 2, 2014, the President issued a

Presidential Memorandum entitled, "Response to the Influx of Unaccompanied Alien Children across the Southwest Border" directing the Secretary of Homeland Security to establish an interagency working group to address the "humanitarian aspects" of a large influx of foreign nationals. *See* Ex. 21, attached hereto, at 1266. The President's goal was to assure a unified response by federal agency in providing "housing, care, medical treatment, and transportation" to the unaccompanied alien children crossing the Southwest border. *Id*.

55.     DHS determined that the Southwest Border Memorandum and the actions DHS took in response were a federal action subject to NEPA and accordingly prepared a "Programmatic Environmental Assessment for Actions to Address an Increased Influx of Unaccompanied Alien Children and Family Units Across the Southwest Border of the United States" ("PEA") (attached hereto as Ex. 22) together with a FONSI that was issued on August 12, 2014 (attached hereto as Ex. 23).

56.     The PEA provides, in relevant part:

> In addition to the influx of unaccompanied alien children, there is also an increase in the number of family units entering the Unites [*sic*] States. [DHS] is responsible for the apprehension, processing, detention, and removal of such persons crossing the southwest border into the United States without authorization. The unprecedented increase in the number of apprehended persons has the potential to fill or exceed the capacity of the DHS supporting infrastructure (real property for processing and

housing apprehended persons, services including medical care, transportation, utilities, meals, hygiene, recreation, etc.) currently available. Therefore, action is being considered at the DHS level to provide increased and expedited allocation of Departmental resources in the following three areas:

> 1) Provide adequate facilities for Customs and Border Protection (CBP) to safely house unaccompanied alien children (normally for no more than 72 hours) and family units until they can be transferred to the department of Health and Human Services (HHS) and Immigrations [*sic*] and Customs Enforcement (ICE) respectively, and provide adequate facilities for ICE to safely house family units;

> 2) Provide transportation (land, air, water) between intake, processing, and housing facilities, as well as between these facilities and physicians and dentists [*sic*] offices, hospitals, consular offices, and airports or other transportations hubs, and

> 3) Provide medical care, including care to treat, prevent, and minimize the spread of communicable illnesses.

Ex. 22 at 1268.

57. The PEA states that DHS's needs for increased support infrastructure (e.g., housing and associated services, transportation, and medical care), while the foreign nationals are in DHS's custody will result in only "minor" and "temporary" environmental impacts. *See* Ex. 22 at 1283-1292. DHS's NEPA review only addresses the direct physical impacts resulting from DHS's temporary custody of

foreign nationals. The PEA and FONSI fail to recognize that the foreign nationals comprising the "increased influx of unaccompanied alien children and family units" subject to the June 2, 2104 action entered the United States with the intent to settle in this nation. Many have indeed settled in the United States. Like the thirty-three actions set forth *supra*, the PEA and FONSI issued for this action fail to address the environmental impacts on the Southwest border resulting from these foreign nationals or the population growth resulting therefrom. Moreover, DHS performed no NEPA review of indirect or cumulative impacts, or connected and similar actions in the PEA or FONSI.

**Environmental Impacts Resulting from these Actions.**

58.    Upon information and belief, several million foreign nationals have entered the United States and settled and will continue to enter and settle pursuant to these thirty-three DHS actions. Unfortunately, DHS does not routinely publish comprehensive demographic data regarding the numbers of foreign nationals subject to and benefiting from most of these thirty-three actions. DHS's failure to provide public transparency regarding the numbers of foreign nationals subject to and benefiting from these or other such actions has disadvantaged Plaintiffs in their quest to establish the true magnitude of impacts resulting from DHS discretionary actions. DHS's compliance with NEPA would remedy this lack of transparency. Nonetheless, Plaintiffs have obtained data that paints a picture of the multitudes of

foreign nationals who have unlawfully crossed the Southwest border and also

added to the U.S. population. In order to arrive at an estimate of foreign nationals

entering and settling in the United States, Plaintiffs' expert, Jessica Vaughan,

scoured available government and academic data and reports. From available

sources, she was able to estimate, for at least a proportion of past and ongoing

federal actions, numbers of foreign nationals that have settled or will settle, if the

actions remain in operation, in the U.S. as a direct result. A detailed explanation of

how she arrived at her numbers is available in her report "Discretionary Actions,

Past, Ongoing, and Potential that Increased or will Increase the Settled Population

of the United States," *see* Ex. A of Ex. 2 at 714.

59.     Below are two charts compiled by Jessica Vaughan of the population

growth resulting from those past and ongoing agency actions which she found

possible to calculate. The first shows actions whose impacts to the United States

population as a whole are possible to estimate. The second shows actions whose

impacts to the counties in which the plaintiffs live or have lived, and whose

impacts to the state of California, are possible to calculate on publically available

information.

### A) Estimation of Potential Population Growth in the United States of Agency Actions, on an Action by Action Basis

| ACTION | DATE | NUMBER ADDED | CHAIN MIGRATION MULTIPLIER (3.45) | COMMENTS |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Humanitarian Parole (1990s) | 1989-1998 | 176,000 | 607,200 | These are the parolees who adjusted to LPR. |
| Temporary Protected Status | 1990-2014 | 340,000 | | Most recent estimate available. As a result of Arrabally (see below), some will be allowed to adjust to LPR status, bringing chain migration. |
| Parole-in-Place | 1998-Present | No data | | Mixed in with other parolees. |
| I-601A Provisional Waiver to 3/10 year bar | 2012 Effective March 2013 | 189,000-476,000 | 380,000-964,000 | Without the provisional waiver (and relaxation of hardship standard) most affected aliens would not apply for LPR status, preferring to depart or stay in illegal status (and would not be able to sponsor relatives). |
| Expansion of I-601 Waivers | July, 2015 | 100,435 | 280,630 | See above. |
| OPT 24-month extension for STEM graduates | 2016 | 360,000 | 1,240,000 | 700,000 workers + 35,000 family w/50% stay rate = 360,000 |
| U and T Visas | 2007 | 507,000 new residents added (includes kids) | 1.7 million | One-fifth are denied or withdrawn. 99.8% of those approved resulted in permanent residency. |
| Deferred Enforced Departure | 1989 | 322,227 | | 1992 – 190,000 Salvadorans<br>1989 – 80,000 Chinese<br>1997 – 40,000 Haitians<br>1991 – 2,227 Kuwaitis<br>1999 – 10,000 Liberians |
| Credible Fear Parole | 2009 | 152,000 added since 2010 | 365,700 | Assume ultimate asylum approval rate of 70%, then 106,000 become LPRs triggering chain migration. |

| | | | | |
|---|---|---|---|---|
| Suspension of Worksite Raids | 2009 | Direct: 30,000 Indirect: Unknown | | Direct effect is due to the decline in deportations from less worksite enforcement. Indirect effect is due to fewer illegal aliens leaving on their own, as employers face no consequences for hiring them, and deterrence is weakened. |
| USCIS Guidelines Restricting Issuance of NTAs | 2011 | 320,000 | | Covers the projected number who would have been ordered deported from 2012-2016 based on denials and fraud. |
| Dismantling of ICE Interior Enforcement (Morton memos) | 2011-12 | 616,000 | | 416,000 aliens not deported since 2010 + 200,000 family members who would have left + 100,000 indirect effect due to less deterrence. |
| DACA | 2012 | 728,285 granted 2,000,000 est. eligible. | | Theoretically would have faced deportation (without certain other exec actions). Did not have to actually apply to avoid deportation. |
| Extension of Limits for H-2 status | 2013 | 180,000 potentially eligible | | Covers 2014-15. Allows aliens to stay an additional 3 years. |
| Allowing VWP Overstays to Adjust | 2013 | 137,000 per year | | Number of annual VWP overstays. |
| PIP for Military Families | 2013 | ? | ? | No data available. |
| Parole for CNMI Caregivers | 2011 | ? | ? | No data available. |
| DACA Extension | 2014 | 596,000 | | Estimated to be eligible. |

66

| | | | | |
|---|---|---|---|---|
| DAPA | 2014 | 3,605,000 | | Estimated to be eligible. |
| Priority Enforcement Program (PEP) | 2014 | 10,000,000 | | The estimated number of deportable aliens exempt from deportation due to strict prioritization. |
| Detainer Guidance (post-conviction criminal aliens, allows sanctuaries) | 2014 | 81,000 + 15,000 Family: 40,000 | | Decrease in the number of detainers issued from 2014-16 + family members not departing + sanctuary releases. |
| Arabally Decision – Advance Parole Path to Adjustment | 2014 | 22,340 as of December, 2015 | 77,000 | No data available. Potentially big. |
| Expansion of PIP for Military Reserves | 2014 | ? | ? | No data available. |
| Loosening of L-1 Standards – Specialized Knowledge | 2016 | 6,000 per year 6,000 family | 41,000 | Most L-1 visas lead to LPR status. |
| Central American Refugee Program | 2014 | 465,000 | 192,500 | 315,000 eligible parents (protected from removal) 150,000 potential sponsored kids 12% of kids have been admitted of refugees w/path to LPR (together w/ parents = 55,800). |
| Haitian Family Reunification Program | 2014 | 6,000/yr | | Accelerates arrival, but not LPR status. |
| International Entrepreneurs | August, 2016 | 6,000 | | 2,940 estimated principal aliens + 3,000 family members. |

B) **Estimation of Potential Population Growth in Counties of Interest to Plaintiffs, on an Action by Action Basis**

| Number of Individuals Potentially Remaining in the Settled Population Due to Certain Executive Actions: Counties and California | | | | | |
|---|---|---|---|---|---|
| Place | DACA | DAPA | Detainer | H-2A & H-2B | Enforcement Priorities |
| Larimer County, CO | NA | NA | 84 | 61 | NA |
| Denver County, CO | 9,000 | 15,170 | 324 | 15 | 35,670 |
| San Diego County, CA | 38,000 | 70,380 | 456 | 669 | 180,090 |
| Alameda County, CA | 17,000 | 31,500 | 624 | 0 | 91,350 |
| Los Angeles County, CA | 180,000 | 339,200 | 3,636 | 3 | 922,200 |
| Santa Barbara County, CA | 9,000 | 15,050 | 588 | 1,362 | 37,410 |
| Broward County, FL | 14,000 | 17,640 | 312 | 488 | 73,080 |
| Palm Beach | 12,000 | 14,740 | 216 | 2,293 | 58,290 |

| County, FL | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Martin County, FL | NA | NA | 108 | 58 | NA |
| | | | | | |
| California | 561,000 | 1,026,460 | NA | 11,582 | 2,626,530 |
| | | | | | |
| NA is Not Available | | | | | |
| Source | MPI | MPI | TRAC | DOL | MPI |
| | | | | | |
| Source Details: | | | | | |
| MPI - Migration Policy Institute Data Hub - DACA Data Tools and Unauthorized Immigrant Population Profiles | | | | | |
| TRAC - Syracuse University Transactional Records Clearinghouse - ICE Detainer Database | | | | | |
| DOL - Dept. of Labor Foreign Labor Certification Data Center | | | | | |

60.     These and other DHS Federal actions, which administer immigration and border control, have a significant effect on the size and growth of the population of the United States. Population growth itself is a significant environmental impact, as particularly noted by Congress in NEPA, and also as set forth in Dr. Cafaro's report, "The Environmental Impact of Immigration into the United States." *See* Ex. 4. As noted by Dr. Cafaro, population growth is a key

69

factor in determining a wide variety of environmental impacts. *Id*. For example, immigration-driven population growth leads to urban sprawl and farmland loss, habitat and biodiversity loss, an increase in worldwide levels of greenhouse gas emissions, and an increase of water demands and water withdrawals from natural systems. *See* Ex. 4 at 779.

61.     Surveying the "purposes and needs" sections of several recent federal and state agency EISs, Dr. Cafaro explains how new, environmentally harmful projects are continually created around the country to accommodate immigration-driven population growth. *See* Ex. 4 at 794. These recent EISs cite anticipated or planned population growth as creating the need for a myriad of environmentally harmful new infrastructure, e.g. transit projects, including the creation of light rail systems, new airports, projects for road-widening and road construction, energy projects, such as coal and natural gas development, new power plants, and pipelines; as well as water supply projects, such as new dams and reservoirs. *See* Ex. 4 at 794-799. There are also many other kinds of developments such as new schools and housing projects, that, not generally located on federal land, are rarely mentioned by EISs, but which nevertheless, are only needed because of population growth. *See* Ex. 4 at 801.

62.     Population growth is responsible for one of the leading environmental problems across the U.S.: urban sprawl, that is, new development on the fringes of

existing urban and suburban areas. *See* Ex. 4 at 802. Sprawl increases overall energy and water consumption, air and water pollution, and decreases open space and natural wildlife habitat, which endangers the survival of many species. *Id*. From 1982 to 2010, a period of massive immigration, 41.4 million acres of previously undeveloped urban land was built on to accommodate the U.S.'s growing cities and towns--an area approximately equivalent to the state of Florida. *Id*.

63.     The future loss of the undeveloped land remaining in the United States, due to unrelenting population growth, produces significant environmental consequences. The ongoing loss of such open spaces, habitats, and wilderness to unrelenting population growth is a source of anguish to those who love the wilderness, including many of the instant Plaintiffs. The current President of the United States recently acknowledged this great environmental loss in his speech marking the designation and preservation from development of the Papahānaumokuākea Marine National Monument in Hawaii last month. President Obama stated, "I look forward to knowing that 20 years from now, 40 years from now, 100 years from now, this is a place where people can still come to and see what a place like this looks like when it's not overcrowded or destroyed by human populations." White House Press Release, *Remarks by the President at the Designation of the Papahānaumokuākea Marine National Monument*, The White

House: Office of Press Secretary (September 1, 2016),

https://www.whitehouse.gov/the-press-office/2016/09/01/remarks-president-designation-papahanaumokuakea-marine-national-monument.

64.    Population growth also threatens to accelerate biodiversity loss and the extinction of animal and plant species. *See* Ex. 4 at 820. The United Nations' Secretariat of the Convention on Biological Diversity estimates that humanity may be causing the extinction of one out of every three species on Earth in the next one to two hundred years. *Id*. Conservation biologists agree that the most important "direct drivers" of biodiversity loss are: habitat loss, the impacts of alien species, over-exploitation, pollution, and global climate change. *Id.* at 821. All five are caused by increased human population and the increased human activities associated with human population growth. *Id*.

65.    The carbon dioxide ("CO2") emissions produced in the United States also are increasing because of immigration-driven population growth. Furthermore, those foreign nationals that settle in the United States produce an estimated four times more CO2 in the United States than they would have in their countries of origin. The estimated 637 tons of CO2 produced annually by U.S. immigrants is 482 million tons more than they would have produced had they remained in their

72

home countries.[7] The impact of immigration to the United States on global emissions is equal to approximately 5 percent of the increase in annual world-wide $CO_2$ emissions since 1980. That is 5 percent of total *global* $CO_2$ emissions, not 5 percent of U.S. emissions. These numbers do not even include the $CO_2$ impacts of children born to United States immigrants. *See* Ex. 4. at 846.

66.   Because a greater population uses more water, population growth also results in a higher aggregate water use, putting increased pressure on water systems, including rivers and underground aquifers. Water taken for human consumption is necessarily removed from an ecosystem, leading to a host of environmental impacts. *Id*. at 854-865. "When too much water is taken from these ecosystems for consumptive use by human beings, there may not be enough water left behind to perform these critical ecosystem services and functions." *Id*. at 857.

67.   The environmental impacts resulting from population-based demands for water are most vividly illustrated in the state of California. The nation's most populous state also tops the nation in terms of water withdrawal. California has also been experiencing a severe, multi-year drought. Governor Jerry Brown has declared statewide mandatory water restrictions for the first time in California's

---

[7] Reducing $CO_2$ has been a focal point of the Obama administration's environmental initiatives. *See* Memorandum from Christina Goldfuss, Executive Office of the President: Council on Environmental Quality (Aug. 1, 2016), https://www.whitehouse.gov/sites/whitehouse.gov/files/documents/nepa_final_ghg_guidance.pdf.

history, ordering towns and cities to reduce their water use by 25 percent. *Id.* at 866-872. This drought has led the state to overdraft its underground aquifers, with potentially devastating environmental consequences. *Id.* at 867-868. Water quality is also an issue. Numerous human activities can also cause water pollution. For instance, the introduction of excess nitrogen and phosphorus fertilizers into streams, rivers, and lakes encourage explosive growth of "algal blooms," ultimately leading to eutrophication and the destruction of these ecosystems and those species that inhabit them. *Id.* at 859.

68.    DHS's administration of the nation's immigration system, including these specific discretionary actions, as detailed by Dr. Cafaro, increases the United States' population and thereby causes significant environmental impacts. Yet DHS has never acknowledged these impacts as NEPA requires.

69.    DHS's administration of the nation's immigration system, specifically its administration of its immigration enforcement system, has also produced significant environmental impacts on the Southwest border. Of the specific actions under challenge in this case and listed *supra* in paragraphs 53, those that have had an effect on border crossings include: Action 2; Action 7; Actions 10-13; Actions 15-19; Actions 21-27; and Action 33. Upon information and belief, these actions, together with other enforcement actions presently unknown to Plaintiffs and the general public, have led to and exacerbated environmental degradation along the

Southwest border.

70.     The massive numbers of people illegally crossing the Southwest border have left a host of environmental impacts in their wake, such as the destruction of native and at risks species and habitats by trampling over the native vegetation; garbage dumping on a massive scale; water pollution; and setting fires, many of which turn out of control, for the purposes of heat, cooking, or to distract Border Patrol agents. These and other environmental degradations are detailed in the affidavits of Fred Davis, Peggy Davis, Caren Cowen, John Ladd, and Ralph Pope. *See* Ex. 6, Ex. 7, Ex. 16, Ex. 17, and Ex. 19. The scale, location, and form of such environmental impacts necessarily depend on a number of factors, including, but not limited to, the number of individuals illegally crossing, where they choose to cross, and to some degree, what their goals are for crossing (for example, drug-running versus finding work in the interior). Though DHS enforcement policies are not the sole factor in all of these components of the illegal border-crossing phenomenon, there is no doubt DHS policies significantly affect each one.

71.     As stated by Plaintiffs' expert Jessica Vaughan in "Analysis of Discretionary Agency Actions That Resulted in Cumulatively Significant Environmental Impacts on the Southwest Border" (*see* Ex. B of Ex. 2 at 749), "[h]istorical experience demonstrates that a real or even perceived change in enforcement policies, both at the border and in the interior, can significantly affect

the number of people attempting to cross the border illegally." Ex. 2 at 750. Indeed, a Border Patrol intelligence report from 2014 based on interviews with migrants reveals that 95% stated that their "main reason" for coming was because they had heard they would receive a "permiso," or, permission to stay. *Id.* at 751-752. The credible fear directive (Action 2, in ¶ 53 *supra*) in particular, quite clearly had a role in developing this belief, though other actions also played a role. For further explanation and analysis of DHS enforcement policy in general and how the agency's specific actions, *supra*, have encouraged and exacerbated the phenomenon of mass illegal crossing along the Southwest border, *see* Ex. B of Ex. 2.

## CAUSES OF ACTION

## COUNT I

### The DHS Instruction Manual Violates the APA and NEPA by Failing to Require NEPA Compliance with Respect to its Actions Relating to the Entry and Settlement of Foreign Nationals into the United States.

72.    Plaintiffs reallege paragraphs 1-71 as if fully set forth herein.

73.    CEQ regulations require each federal agency to adopt internal NEPA procedures to ensure NEPA compliance. 40 C.F.R. § 1507.3. Agency NEPA procedures shall comply with CEQ regulations. 40 C.F.R. § 1507.1. Further, such agency NEPA procedures shall include "specific criteria for an identification of

those typical classes of action" which either do require an Environmental Impact Statement, do typically require an EA but not an EIS, or are categorically excluded. 40 C.F.R. § 1507.3(b)(2).

74. The entry and settlement of foreign nationals into the United States is a major component of DHS's statutory mission, comprising "principle programs" pursuant to 40 C.F.R. § 1505.1(b) and "typical classes of action" pursuant to 40 C.F.R. § 1507.3(b)(2).

75. The entry and settlement of foreign nationals in the United States has impacts on the human environment.

76. The DHS Instruction Manual fails to address the class of actions concerning the entry and settlement of foreign nationals into the United States.

77. DHS's failure to address these "typical classes of actions" and/or "principle programs" in its Instruction Manual violates the CEQ NEPA regulations 40 C.F.R §§ 1500-1508.

78. The failure of DHS to incorporate NEPA compliance into its Instruction Manual regarding those actions relating to the entry and settlement of foreign nationals in the United States violates NEPA and the CEQ regulations, and accordingly is arbitrary, capricious, an abuse of discretion and otherwise contrary to law, in violation of the APA.

## COUNT II

**DHS is Violating the APA and NEPA by Failing to Initiate NEPA review with respect to Thirty-Three Actions Relating to the Entry and Settlement of Foreign Nationals into the United States.**

79.     Plaintiffs reallege paragraphs 1-78 as if fully set forth herein.

80.     The thirty-three actions set forth in ¶ 53 are federal actions subject to NEPA.

81.     DHS violated and continues to violate NEPA and the APA by failing to initiate NEPA compliance with respect to those thirty-three DHS actions set forth in ¶ 53.

82.     DHS's decision to proceed without initiating any NEPA compliance for these actions by preparing an EA for each action violates NEPA and the CEQ regulations, and accordingly is arbitrary, capricious, an abuse of discretion and otherwise contrary to law, in violation of the APA.

## COUNT III

**DHS is Violating the APA and NEPA by Failing to prepare a Programmatic EIS for its actions relating to the Entry and Settlement of Foreign Nationals into the United States.**

83.     Plaintiffs reallege paragraphs 1-82 as if fully set forth herein.

84.     CEQ regulations provide that agency actions that are "related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a). In such actions an EIS:

> may be prepared, and are sometimes required, for
> broad federal actions such as the adoption of new
> agency programs or regulations. (§1508.18). Agencies
> shall prepare statements on broad actions so that they
> are relevant to policy and are timed to coincide with
> meaningful points in agency planning and decision
> making.

40 C.F.R. § 1502.4(b). Such actions "have relevant similarities, such as common

timing, impacts, alternatives, methods of implementation, media, or subject

matter." 40 C.F.R. § 1502.4(c)(2).

85.    The thirty-three actions set forth in ¶ 53 are federal actions subject to

NEPA.

86.    The thirty-three actions set forth in ¶ 53 have "relevant similarities"

and a common "subject matter" in that they concern the entry and settlement of

foreign nationals into the United States. Further, these actions have

"common...impacts" (40 C.F.R. § 1502.4(c)(2)) under NEPA including, but not

limited to, those population and border impacts including, but not limited to, those

population and border impacts described in Plaintiffs' affidavits (Ex. 6-19) and

summarized in ¶¶ 26-42, as well as the expert report written by Steven Camarota,

Ph.D. (Ex. 3), Phil Cafaro, Ph.D. (Ex. 4), and Jessica Vaughan (Ex. 2).

87.    Because the thirty-three actions set forth in ¶ 53 address a common

subject matter, "relevant similarities" and common impacts they are "related to

each other closely enough to be, in effect a single course of action" subject to the preparation of a Programmatic EIS. 40 C.F.R. § 1502.4(a)(2).

88.   DHS's failure to prepare a programmatic EIS for its thirty-three actions relating to entry and settlement of foreign nationals into the United States violates NEPA and the CEQ regulations and accordingly is arbitrary, capricious, an abuse of discretion and otherwise contrary to law, in violation of the APA.

## COUNT IV

## The Categorical Exclusion Issued by DHS on August 12, 2014 Violates NEPA and the APA.

89.   Plaintiff realleges paragraphs 1-88 as if fully set forth herein.

90.   DHS's OPT Rule is a federal action subject to NEPA. 40 C.F.R. § 1508.18.

91.   In issuing the OPT Rule, DHS stated:

> This rule clearly fits within the Categorical Exclusion found in MD 023–01 Rev. 01, Appendix A, Table 1, number A3(a):
> ''Promulgation of rules . . . of a strictly administrative or procedural nature;'' and A3(d): ''Promulgation of rules... that interpret or amend an existing regulation without changing its environmental effect.'' This rule is not part of a larger action. This rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

Ex. 1 at 611-613.

92.     NEPA requires federal agencies to take a "hard look" at the environmental impacts of their proposed actions. 42 U.S.C. § 4332(c).

93.     The OPT Rule poses potentially significant environmental impacts, including but not limited to population growth, particularly California, and all the impacts that population growth induces, as examined in ¶¶ 60-67, *supra*.

94.     NEPA analysis requires the examination of "indirect effects" which includes "population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R § 1508.8(b).

95.     DHS failed to prepare an EIS documenting the action's adverse environmental impacts or an EA measuring the potential significance of such impacts.

96.     DHS unlawfully excluded this action from NEPA without taking a "hard look" at the action's environmental impacts.

97.     DHS's Categorical Exclusion for the OPT Rule is not supported by substantial evidence in the Administrative Record.

98.     DHS's improper use of the Categorical Exclusion is contrary to NEPA and is accordingly arbitrary, capricious, an abuse of discretion and otherwise contrary to law, in violation of the APA.

## COUNT V

81

**Failure to Take a "Hard Look" at the Environmental Impacts of the June 2, 2014 Action "Response to the Influx of Unaccompanied Alien Children" in Violation of NEPA and the APA**

100.   Plaintiffs reallege paragraphs 1-99 as if fully set forth herein.

101.   NEPA requires federal agencies to take a "hard look" at the environmental impacts of their proposed actions, and to prepare an EIS if the adverse environmental impacts of a proposed federal action are potentially significant. 42 U.S.C. § 4332(c).

102.   In preparing the EA for the June 2, 2014 "Response to the Influx of Unaccompanied Alien Children [,]" DHS failed to adequately consider the direct, indirect and cumulative impacts of the action upon the human environment, all in violation of 40 C.F.R. § 1508.9. These include, but are not limited to, those population and border impacts described in Plaintiffs' affidavits (Ex. 6-19) and summarized in ¶¶ 26-42, as well as the expert reports written by Steven Camarota, Ph.D. (Ex. 3), Phil Cafaro, Ph.D. (Ex. 4), and Jessica Vaughan (Ex. 2).

103.   DHS's reliance upon an inadequate and incomplete EA, without full compliance with NEPA constitutes a violation of Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(c), as well as the implementing CEQ regulations set forth at 40 C.F.R. § 1500 *et seq.*, is unreasonable, arbitrary, an abuse of discretion and not in accordance with law under the APA.

## **PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing, Plaintiffs respectfully request that this Court grant the following relief:

1)      Enter a declaratory judgment that the failure of DHS to incorporate NEPA compliance into its Instruction Manual regarding those of its actions relating to the entry and settlement of foreign nationals in the United States violates NEPA and the APA; and

2)      Enter a declaratory judgment that DHS has violated NEPA and the APA with respect to those thirty-three federal actions set forth in ¶ 53 for failing to initiate NEPA compliance; and

3)      Enter a declaratory judgment that DHS has violated NEPA and the APA by failing to prepare a Programmatic EIS for its actions relating to entry and settlement of foreign nationals into the United States; and

4)      Enter a declaratory judgment that the Categorical Exclusion issued by DHS on March 11, 2016 for its Final Rule entitled, "Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students," 8 C.F.R. 214 and 274(a), violates NEPA and the APA; and

5)      Enter a declaratory judgment that the EA and FONSI issued for the June 2, 2014 Action "Response to the Influx of Unaccompanied Alien Children" violates NEPA and the APA; and

6)      Enter an order requiring DHS to amend its Instruction Manual to fully comply with NEPA with respect to those federal actions relating to entry and settlement of foreign nationals into the United States; and

7)      Enter an order requiring DHS to fully comply with NEPA with respect to those thirty-three federal actions set forth in this complaint; and

8)      Enter an order requiring DHS to fully comply with NEPA and prepare a Programmatic EIS with respect to the thirty-three federal actions set forth in this complaint and all of its federal actions relating to the entry and settlement of foreign nationals into the United States; and

9)      Set aside the Categorical Exclusion issued by DHS for its Final Rule entitled, "Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students" and remand to DHS for compliance with NEPA; and

10)    Set aside the EA and FONSI issued by DHS for the June 2, 2014 Action "Response to the Influx of Unaccompanied Alien Children" and remand to DHS for compliance with NEPA; and

11)    Award Plaintiff reasonable attorney fees, costs and expenses incurred in pursuing this action to the extent permitted by law; and

12)    Provide such other relief as this Court deems just and proper.


Dated: October 17, 2016

Respectfully submitted,

 s/ Julie B. Axelrod
Dale L. Wilcox*
D.C. Bar No. 1029412
Julie B. Axelrod
California Bar No. 250165
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., N.W., Suite 335
Washington, D.C. 20001
Telephone: (202) 232-5590
Facsimile: (202) 464-3590
Email: dwilcox@irli.org
          jaxelrod@irli.org


Lesley Blackner*
Florida Bar No. 654043
340 Royal Poinciana Way, Suite 317-377
Palm Beach, Florida 33480
Telephone: (561) 659-5754
Email: lesleyblackner@gmail.com


*Pro Hac Vice application forthcoming