# EXHIBIT 1

## The Actions Under Challenge

Exhibit 1
1

# **Action 1:**

Subject: Authority to parole applicants for admission who are not also arriving aliens.

Exhibit 1
2

Legal Op. No. 98-10 (INS), 1998 WL 1806685
U.S. Department of Justice
Immigration and Naturalization Service
General Counsel's Office
MEMORANDUM FOR: EXECUTIVE ASSOCIATE COMMISSIONER FOR POLICY AND
PLANNING, EXECUTIVE ASSOCIATE COMMISSIONER FOR FIELD OPERATIONS,
ALL REGIONAL COUNSELS, ALL DISTRICT COUNSELS, and ALL SECTOR COUNSELS

FROM: Paul W. Virtue /s/ Bo Cooper for General Counsel

# SUBJECT: Authority to parole applicants for admission who are not also arriving aliens

HQCOU 120/17-P
**August 21, 1998**

## I. QUESTION

**\*1** This memorandum addresses the following issue, which has arisen recently in several cases in the Miami district:

> Does the Service have authority to parole an applicant for admission who is not also an "arriving alien," as defined by 8 C.F.R. § 1.1(q)?

## II. SUMMARY CONCLUSION

Aliens who were once deportable for having entered without inspection are now considered in law to be applicants for admission, *id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). As aliens applying for admission, they are within the scope of the statutory parole authority. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). The Service has authority, therefore, to parole an applicant for admission who is not also an "arriving alien," as defined by 8 C.F.R. § 1.1(q). It remains the case, however, that parole is an act of discretion, not an entitlement. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

## III. ANALYSIS

This question over the extent of the parole authority arises because of two significant amendments to the immigration laws enacted in 1996. INA § 212(a)(6)(A)(i) and 235, 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1225, *as amended by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Division C, §§ 301(c) and 302(a), 110 Stat. 3009-546, 3009-578, 3009-579. First, aliens who are present in the United States without having been admitted or paroled are now deemed to be applicants for admission, *id.* § 235(a)(1), 8 U.S.C. § 1225(a)(1), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Before this amendment, of course, aliens who had entered the United States without having been inspected were amenable to deportation, rather than to exclusion, proceedings. 8 U.S.C. § 1251(a)(1)(B) (1994). Second, Congress has now provided for an expedited removal proceeding, conducted by a Service officer, rather than an immigration judge.

Exhibit 1
3

INA § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A). The Service may invoke this procedure if an alien "who is arriving in the United States" is inadmissible because the alien does not have the required passport or visa, or because the alien obtained a passport or visa by fraud or material misrepresentation. The Service has defined by regulation which aliens are to be considered "arriving aliens." 8 C.F.R. § 1.1(q), *as amended,* 63 *Fed. Reg.* 19,382, 19,383 (1998). The consequence of these two amendments is that there are now two categories of applicants for admission: those who are arriving aliens, and those who are not. *See, e.g.,* 62 *Fed. Reg.* 444, 444-5 (1997).[1]

INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), gives the Attorney General authority to parole from custody "an alien applying for admission" who would otherwise be held in custody until the Attorney General had resolved whether to admit or remove the alien. In order to exercise this authority, the Attorney General must find, on a case-by-case basis, either that "urgent humanitarian reasons" justify the parole, or that paroling the alien will yield a "significant public benefit." *Id.* Even if the Attorney General finds that either factor exists, parole remains a matter of discretion. In fact, there is no judicial review of the exercise of this discretion. *Id.* § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). The Attorney General has delegated this parole authority to the Service. 8 C.F.R. § 2.1.

**\*2** As we have already noted, aliens who were once deportable for having entered without inspection are now considered in law to be applicants for admission, *id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). As aliens applying for admission, they are within the scope of the statutory parole authority. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

The question whether there is authority to parole these aliens arises not from the statute itself, but from an implementing regulation. 8 C.F.R. § 212.5. Section 212.5(a) specifies circumstances in which it is, generally, appropriate to parole aliens "detained in accordance with § 235.3(b) or (c)." *Id.* Sections 235.3(b) and (c), in turn, refer not to the universal set of all applicants for admission, but to the subset of arriving aliens. 8 C.F.R. § 235.3(b) (arriving aliens subject to expedited removal) and (c) (arriving aliens subject to § 240 removal proceedings).[2] Section 212.5(b) refers to "all other arriving aliens." 8 C.F.R. § 212.5(b). Neither § 212.5(a) nor § 212.5(b) addresses the parole of applicants for admission who are not also "arriving aliens." Neither provision, therefore, purports to prohibit the Service from exercising the Attorney General's broad statutory parole authority in the case of an applicant for admission who is not an "arriving alien."

For two reasons, we conclude that § 212.5 cannot correctly be read as exhausting the Service's parole authority. First, nothing in § 212.5 expressly purports to forbid the parole of applicants for admission who are not also arriving aliens. Section 212.5 simply says nothing at all about that issue. Second, as we have noted, the Attorney General has delegated to the Commissioner the fullness of the Attorney General's statutory authority under the INA, except for matters delegated to the Executive Office for Immigration Review. 8 C.F.R. § 2.1. The Service, therefore, may parole anyone whom the Attorney General may parole.

Exhibit 1
4

We are mindful of the protracted litigation that resulted in the Supreme Court's judgment in *Jean v. Nelson,* 472 U.S. 846 (1985). But our reading of § 212.5 is an expansive, not a restrictive, application of the parole authority. A rule that said, in effect, that the parole authority is as broad as the statute says it is, would clearly be an interpretative rule. There is no obligation to publish interpretative rules in accordance with the APA. 5 U.S.C. § 553(b)(A) and (d)(2).

We are also aware of the argument that our conclusion, in effect, gives an inadmissible applicant for admission who is not an arriving alien "two bites at the apple" in seeking release from custody. If the Service denies a parole request, the alien may seek release from the immigration judge. 8 C.F.R. § 236.1(d)(1). The restrictions on the immigration judge's authority would not apply, since the alien is not an "arriving alien." *Cf.* 8 C.F.R. §§ 3.19(h)(1)(B) and (2)(I)(B) and 236.1(c)(11), *as amended,* 63 *Fed. Reg.* 27,441, 27,448-49 (1998). But release under § 236 of the Act and 8 C.F.R. § 236.1(d)(1) should not be seen as a separate form of relief from custody. Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole. *See* INA §§ 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B) and 1182(d)(5)(A); *Leng May Ma v. Barber,* 357 U.S. 185, 189 (1958); *Matter of L- Y- Y-,* 9 I &N Dec. 70, 71 (BIA 1960). In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms. We realize that the traditional rule has been that neither the Board nor an immigration judge had authority to exercise the parole authority. *Matter of Conceiro,* 14 I &N Dec. 278, 281 (BIA 1973). But the Board based this rule on the fact that the Attorney General had established by regulation that only the Service could exercise the parole authority on the Attorney General's behalf. *Id.* the statute itself does not forbid delegation of the parole authority to officials who are not Service officers. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

**\*3** The Service may consider it imprudent, as a matter of policy, to permit an immigration judge to adjudicate requests for release made by applicants for admission who are not arriving aliens. The way to achieve this policy, however, is to ask the Attorney General to amend 8 C.F.R. §§ 3.19 and 236.1. Taking the position that the Service has no authority to parole in these cases does not amend the regulations that appear to permit an immigration judge to adjudicate a request for release, if the applicant for admission is not an arriving alien.

We conclude that the Service may, in the exercise of discretion, parole any applicant for admission, if the Service finds that parole would serve urgent humanitarian reasons or yield a significant public benefit. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 2.1. Aliens present in the United States without having been admitted or paroled are applicants for admission. *Id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A). To say that these aliens are *eligible* for parole, of course, does not mean that they are *entitled* to parole. Whether to parole any particular alien remains a matter entrusted to the exercise of discretion. *Id.* § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). The exercise of this discretion is not subject to judicial review. *Id.* § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).

Paul W. Virtue for Bo Cooper
General Counsel

**Footnotes**

1

Exhibit 1
5

The Attorney General has the authority to invoke the expedited removal proceeding against an alien who is inadmissible because he or she is present in the United States without admission or parole, if the alien has been physically present for less than 2 years. INA § 235(b)(1)(A)(iii), 8 U.S.C. § 1225(b)(1)(A)(iii). To date, neither the Attorney General nor the Commissioner has chosen to exercise this authority. 8 C.F.R. § 235.3(b)(1)(ii); *cf.* 62 *Fed. Reg.* 10,312, 10,313 (1996).

2

Section 235.3(b) also refers to applicants for admission who are not arriving aliens, but who are inadmissible, and subject to expedited removal, because they are present without admission or parole, but have been present for less than two years. 8 C.F.R. § 235.3(b)(1)(ii). No aliens currently belong to this subset, since neither the Attorney General nor the Commissioner has provided for the use of expedited removal proceedings for these aliens.

## Legal Op. No. 98-10 (INS), 1998 WL 1806685

1998 WL 1806685, 1-3

Exhibit 1
6

## **Action 2:**

Parole of arriving aliens found to have a credible fear of persecution or terror.

Exhibit 1
7

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
### Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

| | |
|---|---|
| **DISTRIBUTION:** | ICE |
| **DIRECTIVE NO.:** | 11002.1 |
| **ISSUE DATE:** | December 8, 2009 |
| **EFFECTIVE DATE:** | January 4, 2010 |
| **SUPERSEDES:** | See section 3. |
| **FEA NUMBER:** | 601-05 |

1. **PURPOSE.** The purpose of this ICE policy directive is to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States. This directive provides guidance to Detention and Removal Operations (DRO) Field Office personnel for exercising their discretion to consider the parole of arriving aliens processed under the expedited removal provisions of section 235 of the Immigration and Nationality Act (INA) who have been found to have a "credible fear" of persecution or torture by U.S. Citizenship and Immigration Services (USCIS) or an immigration judge of the Executive Office for Immigration Review. This directive establishes a quality assurance process that includes record-keeping requirements to ensure accountability and compliance with the procedures set forth herein.

1.1. This directive does not apply to aliens in DRO custody under INA § 236. This directive applies only to arriving aliens who have been found by USCIS or an immigration judge to have a credible fear of persecution or torture.

2. **AUTHORITIES/REFERENCES.**

2.1. INA §§ 208, 212(d)(5), 235(b), and 241(b)(3); 8 U.S.C. §§ 1158, 1182(d)(5), 1225(b), and 1231(b)(3); 8 C.F.R. §§ 1.1(q), 208.30(e)-(f), 212.5 and 235.3.

2.2. Department of Homeland Security Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Custom Enforcement" (Nov. 13, 2004).

2.3. ICE Delegations of Authority to the Directors, Detention and Removal and Investigations and to Field Office Directors, Special Agents in Charge and Certain Other Officers of the Bureau of Immigration and Customs Enforcement, No. 0001 (June 6, 2003).

3. **SUPERSEDED POLICIES AND GUIDANCE.** The following ICE directive is hereby superseded:

3.1. ICE Policy Directive No. 7-1.0, "Parole of Arriving Aliens Found to Have a 'Credible Fear' of Persecution or Torture" (Nov. 6, 2007).

Exhibit 1
8

4. **BACKGROUND.**

4.1. Arriving aliens processed under the expedited removal provisions of INA §235(b) may pursue asylum and related forms of protection from removal if they successfully demonstrate to USCIS or an immigration judge a credible fear of persecution or torture.

4.2. Arriving aliens who establish a credible fear of persecution or torture are to be detained for further consideration of the application for asylum. INA § 235(b)(1)(B)(ii). Such aliens, however, may be paroled on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding. 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c) (providing that aliens referred for INA § 240 removal proceedings, including those who have a credible fear of persecution or torture, may be paroled under § 212.5(b) standards).

4.3. The applicable regulations describe five categories of aliens who may meet the parole standards based on a case-by-case determination, provided they do not present a flight risk or security risk: (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) aliens whose continued detention is not in the public interest. *See* 8 C.F.R. § 212.5(b). *But compare* 8 C.F.R. § 235.3(b)(4)(ii) (stating that arriving aliens who have not been determined to have a credible fear will not be paroled unless parole is necessary in light of a "medical emergency or is necessary for a legitimate law enforcement objective").

4.4. While the first four of these categories are largely self-explanatory, the term "public interest" is open to considerable interpretation. This directive explains how the term is to be interpreted by DRO when it decides whether to parole arriving aliens determined to have a credible fear. The directive also mandates uniform record-keeping and review requirements for such decisions. Parole remains an inherently discretionary determination entrusted to the agency; this directive serves to guide the exercise of that discretion.

5. **DEFINITIONS:**

5.1. **Arriving Alien.** For purposes of this directive, "arriving alien" has the same definition as provided for in 8 C.F.R. § 1.1(q) and 1001.1(q).

5.2. **Credible Fear.** For purposes of this directive, with respect to an alien processed under the INA § 235(b) "expedited removal" provisions, "credible fear" means a finding by USCIS or an immigration judge that, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts

2

as are known to the interviewing USCIS officer or immigration judge, there is a significant possibility that alien could establish eligibility for asylum under INA § 208, withholding of removal under INA § 241(b)(3), or protection from removal under the Convention Against Torture.

5.3.    **Parole.** For purposes of this directive, "parole" is an administrative measure used by ICE to temporarily authorize the release from immigration detention of an inadmissible arriving alien found to have a credible fear of persecution or torture, without lawfully admitting the alien. Parole does not constitute a lawful admission or a determination of admissibility, *see* INA §§ 212(d)(5)(A), 101(a)(13)(B), and reasonable conditions may be imposed on the parole, *see* 8 C.F.R. § 212.5(d). By statute, parole may be used, in the discretion of ICE and under such conditions as ICE may prescribe, only for urgent humanitarian reasons or for significant public benefit. As interpreted by regulation, "urgent humanitarian reasons" and "significant public benefit" include the five categories set forth in 8 C.F.R. § 212.5(b) and listed in paragraph 4.3 of this directive, including the general category of "aliens whose continued detention is not in the public interest."

6.    **POLICY.**

6.1.    As soon as practicable following a credible fear determination by USCIS for an arriving alien detained by DRO, DRO shall provide the alien with the attached *Parole Advisal and Scheduling Notification*. This form informs the alien that he or she will be interviewed for potential parole from DRO custody and notifies the alien of the date of the scheduled interview and the deadline for submitting any documentary material supporting his or her eligibility for parole. The contents of the notification shall be explained to such aliens in a language they understand. In determining whether detained arriving aliens found to have a credible fear should be paroled from custody, DRO shall proceed in accordance with the terms of this directive.

6.2.    Each alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case. However, when an arriving alien found to have a credible fear establishes to the satisfaction of DRO his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors (as described in paragraph 8.3 of this directive), parole the alien on the basis that his or her continued detention is not in the public interest. DRO Field Offices shall uniformly document their parole decision-making processes using the attached *Record of Determination/Parole Determination Worksheet*.

6.3.    Consistent with the terms of this directive, DRO shall maintain national and local statistics on parole determinations and have a quality assurance process in place to monitor parole decision-making, as provided for in sections 7 and 8 of this directive.

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

Exhibit 1
10

6.4.    In conducting parole determinations for arriving aliens in custody after they are found to have a credible fear of persecution or torture, DRO shall follow the procedures set forth in section 8 of this directive.

6.5.    DRO shall provide every alien subject to this directive with written notification of the parole decision, including a brief explanation of the reasons for any decision to deny parole. When DRO denies parole under this directive, it should also advise the alien that he or she may request redetermination of this decision based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding. DRO shall ensure reasonable access to translation or interpreter services if notification is provided to the alien in a language other than his or her native language and the alien cannot communicate effectively in that language.

6.6.    Written notifications of parole decisions shall be provided to aliens subject to this directive and, if represented, their representative within seven days of the date an alien is initially interviewed for parole or the date the alien requests a parole redetermination, absent reasonable justification for delay in providing such notification.

6.7.    A decision to grant or deny parole shall be prepared by a DRO officer assigned such duties within his or her respective DRO Field Office. The decision shall pass through at least one level of supervisory review, and concurrence must be finally approved by the Field Office Director (FOD), Deputy FOD (DFOD), or Assistant FOD (AFOD), where authorized by the FOD.

7.    **RESPONSIBILITIES.**

7.1.    The **DRO Director** is responsible for the overall management of the parole decision-making process for arriving aliens in DRO custody following determinations that they have a credible fear of persecution or torture.

7.2.    The **DRO Assistant Director for Operations** is responsible for:

1) Ensuring considered, consistent DRO parole decision-making and recordkeeping nationwide in cases of arriving aliens found to have a credible fear;

2) Overseeing monthly tracking of parole statistics by all DRO Field Offices for such cases; and

3) Overseeing an effective national quality assurance program that monitors the Field Offices to ensure compliance with this directive.

7.3.    **DRO Field Office Directors** are responsible for:

1) Implementing this policy and quality assurance processes;

4

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

Exhibit 1
11

2) Maintaining a log of parole adjudications for credible fear cases within their respective geographic areas of responsibility, including copies of the *Record of Determination/Parole Determination Worksheet*;

3) Providing monthly statistical reports on parole decisions for arriving aliens found to have a credible fear;

4) Making the final decision to grant or deny parole for arriving aliens found to have a credible fear within their respective areas of responsibility or, alternatively, delegating such responsibility to their DFODs or AFODs (in which case, FODs nevertheless retain overall responsibility for their office's compliance with this directive regardless of delegating signatory responsibility to DFODs or AFODs); and

5) Ensuring that DRO field personnel within their respective areas of responsibility who will be assigned to make parole determinations are familiar with this directive and corresponding legal authorities.

7.4.  **DRO Deputy Field Office Directors** are responsible for reviewing, and forwarding for their respective FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture. Alternatively, DFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.5.  **Assistant Field Office Directors** are responsible for reviewing, and forwarding for their respective DFODs' or FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture.  Alternatively, AFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.6.  As applicable, **DRO field personnel** so assigned by their local chains-of-command are responsible for providing detained arriving aliens found to have a credible fear with the attached *Parole Advisal and Scheduling Notification* and for fully and accurately completing the attached *Record of Determination/Parole Determination Worksheet* in accordance with this directive and corresponding legal authorities.

## 8.   **PROCEDURES.**

8.1.  As soon as practicable following a finding that an arriving alien has a credible fear, the DRO Field Office with custody of the alien shall provide the attached *Parole Advisal and Scheduling Notification* to the alien and explain the contents of the notification to the alien in a language he or she understands, through an interpreter if

5

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

Exhibit 1
12

necessary. The Field Office will complete the relevant portions of the notification, indicating the time when the alien will receive an initial interview on his or her eligibility for parole and the date by which any documentary evidence the alien wishes considered should be provided, as well as instructions for how any such information should be provided.

8.2     Unless an additional reasonable period of time is necessary (e.g., due to operational exigencies or an alien's illness or request for additional time to obtain documentation), no later than seven days following a finding that an arriving alien has a credible fear, a DRO officer familiar with the requirements of this directive and corresponding legal authorities must conduct an interview with the alien to assess his or her eligibility for parole. Within that same period, the officer must complete the *Record of Determination/Parole Determination Worksheet* and submit it for supervisory review. If the officer concludes that parole should be denied, the officer should draft a letter to this effect for the FOD's, DFOD's, or AFOD's signature to be provided to the alien or the alien's representative and forward this letter for supervisory review along with the completed *Record of Determination/Parole Determination Worksheet*. The letter must include a brief explanation of the reasons for denying parole and notify the alien that he or she may request redetermination of parole based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding.

8.3.    An alien should be paroled under this directive if DRO determines, in accordance with paragraphs (1) through (4) below, that the alien's identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release of the alien.

    1) Identity.

        a) Although many individuals who arrive in the United States fleeing persecution or torture may understandably lack valid identity documentation, asylum-related fraud is of genuine concern to ICE, and DRO must be satisfied that an alien is who he or she claims to be before releasing the alien from custody.

        b) When considering parole requests by an arriving alien found to have a credible fear, Field Office personnel must review all relevant documentation offered by the alien, as well as any other information available about the alien, to determine whether the alien can reasonably establish his or her identity.

        c) If an alien lacks valid government-issued documents that support his or her assertion of identity, Field Office personnel should ask whether the alien can obtain government-issued documentation of identity.

6

    d)  If the alien cannot reasonably provide valid government-issued evidence of identity (including because the alien reasonably does not wish to alert that government to his or her whereabouts), the alien can provide for consideration sworn affidavits from third parties.  However, third-party affiants must include copies of valid, government issued photo-identification documents and fully establish their own identities and addresses.

    e)  If government-issued documentation of identity or third-party affidavits from reliable affiants are either not available or insufficient to establish the alien's identity on their own, Field Office personnel should explore whether the alien is otherwise able to establish his or her identity through credible statements such that there are no substantial reasons to doubt the alien's identity.

2)  <u>Flight Risk</u>.

    a)  In order to be considered for release, an alien determined to have a credible fear of persecution or torture must present sufficient evidence demonstrating his or her likelihood of appearing when required.

    b)  Factors appropriate for consideration in determining whether an alien has made the required showing include, but are not limited to, community and family ties, employment history, manner of entry and length of residence in the United States, stability of residence in the United States, record of appearance for prior court hearings and compliance with past reporting requirements, prior immigration and criminal history, ability to post bond, property ownership, and possible relief or protection from removal available to the alien.

    c)  Field Office personnel shall consider whether setting a reasonable bond and/or entering the alien in an alternative-to-detention program would provide reasonable assurances that the alien will appear at all hearings and depart from the United States when required to do so.

    d)  Officers should exercise their discretion to determine what reasonable assurances, individually or in combination, are warranted on a case-by-case basis to mitigate flight risk.  In any event, the alien must be able to provide an address where he or she will be residing and must timely advise DRO of any change of address.

7

    3) <u>Danger to the Community</u>.

        a) In order for an alien to be considered for parole, Field Office personnel must make a determination whether an alien found to have a credible fear poses a danger to the community or to U.S. national security.

        b) Information germane to the determination includes, but is not limited to, evidence of past criminal activity in the United States or abroad, of activity contrary to U.S. national security interests, of other activity giving rise to concerns of public safety or danger to the community (including due to serious mental illness), disciplinary infractions or incident reports, and any criminal or detention history that shows that the alien has harmed or would likely harm himself or herself or others.

        c) Any evidence of rehabilitation also should be weighed.

    4) <u>Additional Factors</u>.

        a) Because parole remains an inherently discretionary decision, in some cases there may be exceptional, overriding factors that should be considered in addition to the three factors discussed above. Such factors may include, but are not limited to, serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests.

        b) Field Office personnel may consider such additional factors during the parole decision-making process.

8.4. Assigned DRO officers should, where appropriate, request that parole applicants provide any supplementary information that would aid the officers in reaching a decision. The *Record of Determination/Parole Determination Worksheet* should be annotated to document the request for supplementary information and any response from the detainee.

8.5. After preparing and signing the *Record of Determination/Parole Determination Worksheet*, and in the case of a denial of parole, drafting a written response to the alien, the assigned DRO officer shall forward these materials and the parole request documentation to his or her first-line supervisor for review and concurrence.

8.6. Upon his or her concurrence, the first-line supervisor shall sign the *Record of Determination/Parole Determination Worksheet* where indicated and forward it, along with any related documentation, to the FOD (or, where applicable, the DFOD or AFOD) for final approval.

8.7. The FOD (or, where applicable, the DFOD or AFOD) shall review the parole documentation, consult with the preparing officer and supervisor as necessary, and

8

either grant or deny parole by signing the *Record of Determination/Parole Determination Worksheet* where indicated and, in the case of a denial, signing the written response to the alien.

8.8.    Following a final decision by the FOD to deny parole (or, where applicable, the DFOD or AFOD), the Field Office shall provide the written response to the alien or, if represented, to the alien's legal representative, indicating that parole was denied. If parole is granted, the Field Office shall provide the alien with a date-stamped I-94 Form bearing the following notation: **"Paroled under 8 C.F.R. § 212.5(b). Employment authorization not to be provided on this basis."**

8.9.    If an alien makes a written request for redetermination of an earlier decision denying parole, the Field Office may, in its discretion, reinterview the alien or consider the request based solely on documentary material already provided or otherwise of record.

8.10.   The supporting documents and a copy of the parole decision sent to the alien (if applicable), the completed *Record of Determination/Parole Determination Worksheet*, and any other documents related to the parole adjudication should be placed in the alien's A-file in a record of proceeding format.  In addition, a copy of the *Record of Determination/Parole Determination Worksheet* shall be stored and maintained under the authority of the FOD for use in preparing monthly reports.

8.11.   On a monthly basis, FODs shall submit reports to the Assistant Director for Operations, or his or her designee, detailing the number of parole adjudications conducted under this directive within their respective areas of responsibility, the results of those adjudications, and the underlying basis of each Field Office decision whether to grant or deny parole.  The Assistant Director for Operations, or his or her designee, in conjunction with appropriate DRO Headquarters components, will analyze this reporting and collect individual case information to review in more detail, as warranted.  In particular, this analysis will rely on random sampling of all reported cases for in-depth review and will include particular emphasis on cases where parole was not granted because of the presence of additional factors, per paragraph 8.3(4) of this directive.  Any significant or recurring deficiencies identified during this monthly analysis should be explained to the affected Field Office, which will take appropriate corrective action.

8.12.   At least once every six months, the Assistant Director for Operations, or his or her designee, shall prepare a thorough and objective quality assurance report, examining the rate at which paroled aliens abscond and the Field Offices' parole decision-making, including any noteworthy trends or corrective measures undertaken based upon the monthly quality assurance analysis required by paragraph 8.11 of this directive.

9

9.      **ATTACHMENTS.**

- *Parole Advisal and Scheduling Notification.*
- *Record of Determination/Parole Determination Worksheet.*

10.     **NO PRIVATE RIGHTS CREATED.**  This directive is an internal policy statement of ICE.  It is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**Approved:**    _____

John Morton
Assistant Secretary
U.S. Immigration and Customs Enforcement

10

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

Exhibit 1
17

## **Action 3**

Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

Exhibit 1
18

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship and Immigration Services**

November 15, 2013                                        PM-602-0091

# Policy Memorandum

SUBJECT:   Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

## Purpose

This policy memorandum (PM) amends Chapter 21.1 of the Adjudicator's Field Manual (AFM) to ensure consistent adjudication of parole requests made on behalf of aliens who are present without admission or parole and who are spouses, children and parents of those serving on active duty in the U.S. Armed Forces, in the Selected Reserve of the Ready Reserve or who previously served in the U.S. Armed Forces or Selected Reserve of the Ready Reserve.

This PM also amends AFM Chapter 40.6 concerning the effects of parole on an alien's inadmissibility under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i).  This amendment to AFM chapter 40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel.

## Scope

This PM applies to and is binding on all U.S. Citizenship and Immigration Services (USCIS) employees.

## Authority

INA §§ 212(a)(6)(A)(i), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1182(a)(6)(A)(i), 1182(d)(5)(A), 1225(a), and 1255(a), (c)

## Background

### Parole of Spouses, children and parents of Armed Forces personnel

- In partnership with the Department of Defense (DoD), USCIS has launched a number of initiatives to assist military members, veterans, and their families to navigate our complex immigration system and apply for naturalization and other immigration services and benefits.
- This PM builds on these important initiatives as there is concern within DoD that some active members of the U.S. Armed Services, individuals serving in the Selected Reserve of the Ready Reserve and individuals who have previously served in the U.S. Armed Forces or Selected Reserve

Exhibit 1
19

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

of the Ready Reserve face stress and anxiety because of the immigration status of their family members in the United States.

- Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children.

- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States. We as a nation have made a commitment to our veterans, to support and care for them. It is a commitment that begins at enlistment, and continues as they become veterans.

- Responding to these and similar concerns by several Members of Congress about soldiers and veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's commitment to assisting military families. The Secretary identified several of the discretionary tools that the Department utilizes "to help military dependents secure permanent immigration status in the United States as soon as possible." Among the tools listed was "parole … to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members."[1]

- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States. Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission. This latter use of parole is sometimes called "parole in place." The legal authority for granting parole in place was formally recognized by the then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2] That opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3] In 2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in relevant part.[4] The basic authority for parole in place is INA § 212(d)(5)(A), which expressly grants discretion to parole "any alien applying for admission to the United States." INA § 235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives (Aug. 30, 2010).
[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.
[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).
[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007). The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to release from detention under INA § 236(a)(2)(B) (so-called "conditional parole"), *see Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole under INA § 212(d)(5)(A)).

Exhibit 1
20

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

- This PM addresses two related issues. The first is a policy question: Should parole in place be granted to certain family members of active duty members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve, or individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve? The second is a legal question: Does parole in place (for military family members or anyone else) affect whether an alien is inadmissible under INA § 212(a)(6)(A)(i)? That provision is discussed below and is critical to determining the alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary. Generally, parole in place is to be granted only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place. Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual. If USCIS[5] decides to grant parole in that situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled." This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States). Aliens who have entered the United States without inspection, while not "arriving aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]." Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection. As is true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate. In enacting the various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

---

[5] ICE and CBP also have parole authority. "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008). Their decisions whether to grant parole are outside the scope of the present PM.

[6] INA § 235(a)(1).

Exhibit 1
21

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

individual grounds cover past, present, or future events, or some combination thereof.[7]  In particular, when Congress intended that a ground cover both past and present events, it said so explicitly.[8]  In contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense. Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i) would be practically superfluous.  Ordinarily, the only way for an alien to be present in the United States without admission or parole, as the first prong requires, is to have entered without inspection at some point in the past.[9]  Those individuals would already be covered by the second prong if "arrives" were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary. Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two anomalies.  First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically superfluous.  Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i), reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not possibly have intended.  The latter ground renders inadmissible any alien who has ever been unlawfully present in the United States for more than 180 days and then departs, but it limits the inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence.  If the second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct.  *See, e.g.*, sections 212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added); 212(a)(1)(A)(iv) ("determined … to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis added).  Other grounds cover only events that have occurred in the past (up to and including the present time).  *See, e.g.*, sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity) (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted, or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any other alien to enter or to try to enter the United States in violation of law") (emphasis added).  Still others cover only predictions of future activity.  *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge"); 212(a)(10)(A) ("coming to the United States to practice polygamy").

[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted to procure … prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist … party"); 212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit …"); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented, himself or herself" to be a U.S. citizen).

[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within even the more expansive interpretation of the second prong.  If the alien seeks admission at a designated port of entry, is denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be inadmissible under the first ground but not the second one.  It would be far-fetched, however, to assume that this was the only intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).

[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the United States."  But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have to be that "arrives" means "arrives or, if the person has not departed, has arrived."  There is no apparent legal basis or policy reason to interpret "arrives" in that way.

Exhibit 1
22

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual.
Please visit www.uscis.gov/policymanual for effective policy.**

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless. One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i). Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years. That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole. Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled. And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place. It is not a question of *parole* curing or erasing the second inadmissibility ground. Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies. An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status. First, adjustment of status requires that the person be "admissible." INA § 245(a)(2). As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i). Second, adjustment of status requires that the alien have been "inspected and admitted or paroled." INA § 245(a). The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well. The alien must still, however, satisfy all the other requirements for adjustment of status. One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection). Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific congressional focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i). It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

Exhibit 1
23

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States." INA § 245(c)(2). Parole does not erase any periods of prior unlawful status. Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**

AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞    1. A new section 21.1(c) is added to read:

## 21.1   General Information About Relative Petitions

* * * * *

(c) <u>Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces</u>, <u>individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve</u>.  The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, USCIS grants parole <u>in place</u> only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

o Completed Form I-131, Application for Travel Document  (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

o Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or less, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and  certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

Exhibit 1
24

- o Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173);
- o Two identical, color, passport style photographs; and
- o Evidence of any additional favorable discretionary factors that the requestor wishes considered.

☞    2. Chapter 40.6.2(a) of the AFM is revised:

  a.  By amending Chapter 40.6.2(a)(1);

  b.  By deleting Chapter 40.6.2(a)(3)(ii);

  c.  By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as Chapter 40.6.2(a)(4)(ii); and

  d.  By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

## 40.6.2 Individual Grounds of Inadmissibility Under INA Section 212(a)(6)

### (a) INA Section 212(a)(6)(A):  Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place

(1) General.  INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.  Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

Parole.  An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

Exhibit 1
25

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual.
Please visit www.uscis.gov/policymanual for effective policy.

(even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place. It is not a question of *parole* curing or erasing the second inadmissibility ground. Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground. Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status. First, adjustment of status requires that the person be "admissible." INA § 245(a)(2). As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i). Second, adjustment of status requires that the alien have been "inspected and admitted or paroled." INA § 245(a). The grant of parole overcomes that obstacle as well. The alien must still, however, satisfy all the other requirements for adjustment of status. One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since entry into the United States." Parole does not erase any periods of prior unlawful status or any other applicable grounds of inadmissibility. An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

* * * * *

 (4) Exemptions and Waivers

* * * * *

 (ii) Waivers. There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c). As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

Exhibit 1
26

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

☞    3.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:

| AFM Update AD12-30 11/15/2013 | **Chapter 21.1(c) Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |
|---|---|---|

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Field Operations Directorate.

Exhibit 1
27

# **Action 4**

Families of U.S. Armed Forces Members and Enlistees

Exhibit 1
28

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



November 20, 2014

MEMORANDUM FOR:         León Rodríguez
                        Director
                        U.S. Citizenship and Immigration Services

FROM:                   Jeh Charles Johnson
                        Secretary

SUBJECT:                **Families of U.S. Armed Forces Members and
                        Enlistees**

By this memorandum, I hereby direct U.S. Citizenship and Immigration Services
(USCIS) to issue new policies on the use of parole-in-place or deferred action for certain
spouses, children, and parents of individuals seeking to enlist in the U.S. Armed Forces.

The authority of the Secretary of Homeland Security to parole an immigrant into
the United States is expressly authorized by statute.  Section 212(d)(5)(A) of the
*Immigration and Nationality Act* (INA) authorizes the Secretary "in his discretion [to]
parole into the United States temporarily under such conditions as he may prescribe only
on a case-by-case basis for urgent humanitarian reasons or significant public benefit any
alien applying for admission into the United States."[1]

Although parole determinations must be made on an individualized basis, the
authority has long been interpreted to allow for designation of specific classes of aliens
for whom parole should be favorably considered, so long as the parole of each alien
within the class is considered on a discretionary, case-by-case basis.  Further, it is
generally accepted that this parole authority can lawfully be extended to persons outside
the United States as well as persons inside the United States who have not been lawfully
admitted.[2]  The latter use of parole is referred to as "parole-in-place."

---

[1] INA § 212(d)(5)(A); 8 U.S.C. § 1182(d)(5)(A).

[2] U.S. Citizenship and Immigration Services Policy Memorandum PM-602-0091 (Nov. 15, 2013).

www.dhs.gov

Under current policy, family members of U.S military service members and veterans are eligible for parole-in-place.[3]  The Department of Defense has requested that the Department of Homeland Security expand the scope of its parole-in-place memorandum of November 2013 to encompass family members of U.S. citizens and lawful permanent residents who seek to enlist in the U.S. Armed Forces.  To support the military and its recruitment efforts, I hereby direct USCIS to work with the Department of Defense to address the availability of parole-in-place and deferred action for the spouse, parent, and child of a U.S. citizen or lawful permanent resident who seeks to enlist in the U.S. Armed Forces.

Further, I am also directing USCIS to consider the availability of deferred action, on a case-by-case basis, to those now undocumented family members of U.S. military service members and veterans who would be otherwise eligible for parole-in-place, but who were inspected and lawfully admitted to the United States.

---

[3] U.S. Citizenship and Immigration Services, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)*, November 15, 2013.

Exhibit 1
30

# **Action 5**

Parole for Caregivers of Critical Medical or Special Needs Individuals

Exhibit 1
31



**U.S. Citizenship and
Immigration Services**

# Parole for Caregivers of Critical Medical or Special Needs Individuals

If you are a resident of the Commonwealth of the Northern Mariana Islands (CNMI) and have an in-home caregiver who is a foreign worker, your in-home caregiver may apply to U.S. Citizenship and Immigration Services (USCIS) for humanitarian parole if he or she is required for extraordinary medical or special needs reasons and meets other conditions for eligibility. With the expiration of umbrella permits on Nov. 27, 2011, caregivers such as these may not have another option under U.S. immigration law, and in-home care services currently may not be available through the commercial sector.

## General Eligibility Requirements

Foreign National Caregivers

USCIS may grant parole on a case-by-case basis based on the individual circumstances presented for urgenthumanitarian reasons when:

- There is a compelling medical or special needs situation (this may include but is not limited to an individual who is disabled and unable to care for him or herself or a special needs child for whom no care facilities exist in the CNMI)
- The existing foreign caregiver has worked for the same disabled or special needs individual prior to Nov. 28, 2011
- There is a continuing need for the special care

A foreign worker applying for parole under this situation must be providing care for a person who requires medical assistance in order to live independently or is otherwise in a situation of urgent humanitarian need.This means a significant medical or special needs situation going beyond normal house maintenance or ordinary childcare. This could include, for example, an individual who is disabled and unable to care for him or herself or a special needs child for whom no care facilities exist in the CNMI.

PLEASE NOTE:This is not a blanket option for anyone using the title "caregiver." If you are employed in the home simply to make life easier or to facilitate employment of the household outside the home by taking care of the children, cleaning the home, buying groceries, cooking meals and other such work, you are not eligible to be considered for parole under this situation.

U.S. citizen, U.S. permanent resident or Freely Associated State (FAS) National Caregivers

U.S.citizens, U.S. permanent residents or Freely Associated State (FAS) National Caregiversare authorized for any employment in the CNMI and may work as in-home workers. If you are in

another immigration status, your ability to work as an in-home worker will depend upon the specifics of your immigration situation. (For example, you may have work authorization that is limited to specific employment.)

You can apply for parole with USCIS for these purposes if you are:

- A CNMI permanent resident
- An immediate relative (spouse or child) of a CNMI permanent resident (**living or deceased**), or
- The immediate relative of an FAS national

See the 'Working with Parole' section below for more information about how to get work authorization as a parolee.

### For Employers

This use of parole is intended for those involved in significant long-term caregiver situations. This typically means that the person to whom the care is provided should have a status providing a continuing long-term right of residence in the CNMI, in particular:

- U.S.citizens
- U.S.lawful permanent residents
- FAS nationals

All situations will be considered on a case-by case-basis and the fact that the employer is not in one of these statuses does not absolutely preclude favorable consideration. For example, a situation could involve an employer in one immigration status and the person to whom the care is being given in another, such as a U.S. citizen child.

Employers must comply with federal and CNMI requirements relating to employment including, but not limited to, minimum wage requirements and Fair Labor Standards.

### Can an employer get a business license in order to apply for an in-home worker as a CW Transitional Worker?

A business for purposes of immigration is more than just having a business license. The CW rule specifies that to qualify to hire workers with CW status, an employer must be engaged in a legitimate business. This means he or she must produce services or goods for profit or be a governmental, charitable or other validly recognized nonprofit organization. The employer must also demonstrate that he or she has considered available U.S. workers for the position. The employer must be doing business as defined by the rule, meaning the regular, systematic and continuous provision of goods or services. **A business license does not transform a normal household into a legitimate business under the CW rule.**

Please go to the CW-1: Transitional Worker Web page for more information about the qualifications of a business under the CW rule.

## Filing Fee

There is **no** filing fee to obtain parole. However, there is a filing fee for Form I-765, Application for Employment Authorization.

## Prepare the Following Items

The following must be submitted as part of the caregiver's request:

- A letter from your employer explaining the compelling humanitarian need and details of your current employment, including the number of hours worked per week and other details of the arrangement
- A letter from you, the caregiver, asking for parole. Include:
  - A P.O. Box mailing address
  - A contact telephone number, and
  - The location where you work (give cross streets so that our inspectors can find the home)
- A completed Form G-325, Biographic Information
- A copy of a valid identity document such as a passport or birth certificate
- Evidence of your residence in the CNMI at the time of application
- Evidence of your legal presence in the CNMI at the time of application, such as a valid umbrella permit, and
- Evidence of status of the person being cared for, such as a copy of his or her valid passport or birth certificate

You should include evidence that supports the need for you to fill this position as a caregiver, in order to justify to USCIS the use of special consideration for you. USCIS will make a decision on the parole request based upon the merits of the case that you present. It is important that you include as much relevant information as possible such as:

- Your current work situation (how long you have worked for this person, number of hours per week, etc.)
- Why your services are **absolutely necessary** for the welfare of the person being cared for
- In the case of special needs children, this could include a letter from specialists and/or a verification from the school authorities about what is and is not available on-island outside of a homecare setting
- In the case of medical disabilities, this could include information from a medical doctor

## Where to Apply

The caregiver must apply for parole, not the person being cared for or the person paying the caregiver's salary. To request parole you, the caregiver, must make an InfoPass appointment and come into the USCIS office at TSL Plaza in Garapan. Bring all the items listed above to the interview. If you come to your appointment with a complete package and are eligible for parole, the USCIS officer could issue parole immediately.

## Parole Validity

Depending upon your request, both parole and the EAD will be issued for up to one year. To lawfully remain in the CNMI thereafter, you will need to request an extension of your parole or obtain another Immigration and Nationality Act (INA) nonimmigrant or immigrant classification before your parole expires.

Exhibit 1

## Working with Parole

Parole permits you to remain temporarily in the CNMI subject to any conditions but does not automatically provide for employment authorization. In order to work, you must submit a Form I-765, Application for Employment Authorization and receive an Employment Authorization Document (EAD.)

Caregivers who are granted parole for humanitarian reasons (specifically because of their role as caregivers) are expected to continue to work in that position. Your parole will be revoked if you are no longer working as a caregiver as explained in your initial request.

### Working for More Than One Employer

If your parole request demonstrates that you provide care justifying a grant of parole for more than one household, your parole may similarly authorize you to provide care to more than one household, once you are issued an EAD.

### Dependents of Caregivers

If you are a worker eligible for parole under this guidance, you may also request parole for your spouse and dependent children (under the age of 21) who are lawfully present in the CNMI. You must submit the following information regarding any family member requesting parole along with you:

- A letter or affidavit signed by the family member requesting parole, or signed by you if the family member is a child under 18
- Evidence of the family relationship between you and the family member requesting parole
- A copy of a valid identity document, such as a passport biographic page (with photo, date of birth and expiration date), and
- A copy of any Form I-94 (front and back), umbrella permit and/or other document showing current lawful presence in the CNMI

This parole will allow the family member to remain with the worker lawfully in the CNMI after Nov. 27, 2011, but does not authorize employment. Work authorization will not be granted to paroled family members. If you and your spouse are both eligible for parole and work authorization as workers under this guidance, you should file separate requests for parole and for an EAD.

### Travel

Parole for caregivers of individuals with compelling medical or special needs will be granted for the CNMI only and does not authorize travel to any other part of the United States. If you need to travel, you will have to contact USCIS to apply for permission.

### Background

On October 27, 2011, USCIS announced that humanitarian parole will be made available on a case-by-case basis to certain in-home foreign worker caregivers of CNMI residents, if he or she is required for extraordinary medical or special needs reasons. With the expiration of umbrella permits on Nov. 27, 2011, caregivers such as these may not have another option under U.S. immigration law and in-home care services currently may not be available through the

commercial sector. USCIS may grant parole on a case-by-case basis and has exercised parole authority on a case-by-case basis in the CNMI since 2009 for urgent humanitarian reasons or significant public benefit.

With the publication of the transitional worker final rule, many foreign workers in the CNMI will be able to obtain authorization to live and work in the CNMI through a petitioning employer; however, USCIS will continue to consider parole in specific situations, including that of CNMI permanent residents and their immediate relatives and the immediate relatives of nationals of the Freely Associated States (FAS).

Last Reviewed/Updated: 10/31/2011

# **Action 6**

Directive to Provide Consistency Regarding Advance Parole.

Exhibit 1
37



*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528

November 20, 2014

MEMORANDUM FOR:   Stevan E. Bunnell
                  General Counsel
                  Office of the General Counsel

                  Leon Rodriguez
                  Director
                  U.S. Citizenship and Immigration Services

                  Thomas S. Winkowski
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  R. Gil Kerlikowske
                  Commissioner
                  U.S. Customs and Border Protection

FROM:             Jeh Charles Johnson
                  Secretary

SUBJECT:          **Directive to Provide Consistency Regarding Advance Parole**

Advance parole is an established procedure by which U.S. Citizenship and Immigration Services (USCIS) may authorize, as a matter of discretion, an individual to travel abroad with advance authorization to be considered for parole into the United States upon return. For example, USCIS regularly grants advance parole to individuals with certain types of temporary status or with pending immigration applications. Advance parole is subject to U.S. Customs and Border Protection (CBP) later considering parole at the port of entry.

In April 2012, the Board of Immigration Appeals issued the precedent decision *Matter of Arrabally* (later amended in August 2012),[1] which held that individuals who travel abroad after a grant of advance parole do not effectuate a "departure . . . from the

---

[1] *Matter of Arrabally*, 25 I. & N. Dec. 771 (BIA 2012).

1

Exhibit 1
38

www.dhs.gov

United States" within the meaning of section 212(a)(9)(B)(i) of the *Immigration and Nationality Act* (INA). That provision, along with section 212(9)(B)(i)(I), establishes the "3- and 10-year bars" for persons who have "departed" after more than 180 days of unlawful presence in the United States.[2] The *Arrabally* decision arose in the context of two aliens who had been in unlawful status for multiple years, applied for adjustment of status, and obtained advance parole to travel to India several times. The Board of Immigration Appeals held that travel on advance parole was not a "departure" within the meaning of the statute and hence did not trigger the ground of inadmissibility that bars admission after the accrual of unlawful presence.

This is to notify you that I have asked the Department's General Counsel to issue written legal guidance on the meaning of the *Arrabally* decision, which will clarify that in all cases when an individual physically leaves the United States pursuant to a grant of advance parole, that individual shall not have made a "departure" within the meaning of section 212(a)(9)(B)(i) of the INA. This instruction will ensure consistent application of the *Arrabally* decision across the Department, and provide greater assurance to individuals with advance parole of the consequences of their travel.

Nothing in this directive is intended to limit the authority of CBP to conduct its routine inspection and admission or parole of an individual returning to the United States.

---

[2] INA § 212(a)(9)(B)(i), 8 U.S.C. § 1182(a)(9)(B)(i).

# **Action 7**

In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and
Guatemala (Central American Minors – CAM)

Exhibit 1
40



**U.S. Citizenship and
Immigration Services**

# In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM)

Español

**Update:** On July 26, 2016, Department of State (DOS) and DHS announced an expansion of the CAM program. Under the expanded program, when accompanied by a qualified child, the following additional categories of applicants may also be considered:

- ° Sons and daughters of a U.S.-based lawfully-present parent who are married and/or age 21 or older;
- ° The in-country biological parent of the qualified child;
- ° A caregiver of a qualified child who is also related to the U.S.-based lawfully present parent.

DOS will begin accepting applications including these new categories of applicants within the coming months. Please check this page regularly for further updates to the program.

**NOTE: These changes are not yet in effect.** Please see below for the current parameters of the program.

## Introduction

The Central American Minors (CAM) Refugee/Parole Program provides certain qualified children in El Salvador, Guatemala and Honduras a safe, legal, and orderly alternative to the dangerous journey that some children are currently undertaking to the United States.

The CAM program began accepting applications from qualifying parents in the U.S. for their children on December 1, 2014. Only certain parents who are legally present in the U.S. are eligible to be qualifying parents and file for their children. Each qualified child must be unmarried, under the age of 21, and residing in El Salvador, Guatemala or Honduras. In certain cases, the in-country parent of the qualifying child may also qualify for access if the in-country parent is the legal spouse of the qualifying parent in the U.S. See below for eligibility details.

## Eligibility

*Qualifying Child*

The qualifying child in El Salvador, Guatemala or Honduras must be:

- The child (e.g. genetic, step or legally adopted) of the qualifying parent);

Exhibit 1
41

- Unmarried;
- Under the age of 21;
- A national of El Salvador, Guatemala, or Honduras; and
- Residing in his or her country of nationality.

*Eligible Family Members*

In some cases, other eligible family members may have access, including:

- Unmarried children of the qualifying child or in-country parent who are under the age of 21 can be included as derivatives.

*Parent of Qualifying Child Who is not the Qualifying Parent*

This program is primarily aimed at children under the age of 21, but a parent of the qualifying child may be included if:

- He/she is part of the same household and economic unit as the qualifying child,
- He/she is legally married to the qualifying parent at the time the qualifying parent files the CAM-Affidavit of Relationship (AOR), and
- He/she continues to be legally married to the qualifying parent at the time of admission or parole to the U.S.

*Qualifying Parent*

The qualifying parent may be any individual who is at least 18 years old and lawfully present in the United States in one of the following categories:

- Permanent Resident Status, or
- Temporary Protected Status, or
- Parolee, or
- Deferred Action
- Deferred Enforced Departure, or
- Withholding of Removal

*Parole and Deferred Action*

Parolees and persons granted deferred action must have been issued parole or deferred action for a minimum of one year. For all other categories listed above, individuals who are lawfully present and in a valid status at the time of application (this means the date of CAM-Affidavit of Relationship filing) are eligible.

## Application Process

There is currently no filing deadline for this program, but the qualifying parent must be in one of the immigration categories listed above at the time of applying for this program, as well as at the time of admission or parole of the beneficiary of this program.

Exhibit 1
42
https://www.uscis.gov/CAM                                                                9/29/2016

The qualifying parent in the U.S. files Form DS-7699 *Affidavit of Relationship (AOR) for Minors Who Are Nationals of El Salvador, Guatemala, and Honduras* (CAM-AOR). This form can only be accessed and completed with the assistance of a designated resettlement agency (RA). For additional information and a listing of resettlement agencies where the CAM-AOR may be filed please visit the Department of State, Refugee Processing Center's website.

There is no fee to participate in this refugee/parole program and it is prohibited for anyone to charge a fee for completion of the form.

## DNA Testing

DNA relationship testing must occur between the qualifying parent in the U.S. and his/her biological children for whom the parent files. The parent in the U.S. will pay the initial costs of DNA testing and will be reimbursed for testing costs ONLY if ALL claimed and tested biological relationships are confirmed by DNA test results.

## Refugee Status

Refugee status is a form of protection available to those who meet the definition of refugee and who are of special humanitarian concern to the United States. For a legal definition of refugee, see section 101(a)(42) of the Immigration and Nationality Act (INA).

Both the qualifying child and any in-country parent of the qualifying child must each establish independent refugee claims to be granted refugee status.

Eligibility for refugee status is determined on a case-by-case basis through an interview with a specially-trained USCIS officer.

Applicants who gain access to the program, but are found ineligible for refugee status will then be considered on a case-by-case basis for parole into the United States.

For more information about refugees, see the "Refugees" section of our website.

## Parole

Parole allows individuals who may be otherwise inadmissible to come to the U.S. for urgent humanitarian reasons or significant public benefit. Parole determinations are made on a case-by-case basis depending on each individual's unique circumstances. A separate application for this parole process is not required if the individual already has access to the CAM program. Parole is not in itself a lawful immigration status, but it does allow an individual to be lawfully present in the U.S. temporarily and to apply for an Employment Authorization Document (EAD).

For more information about parole as part of the CAM Program, see the Central American Minors (CAM) Refugee/Parole Program: Information for Conditionally Approved Parole Applicants page of our website.

Last Reviewed/Updated: 08/31/2016

# **Action 8**

The Haitian Family Reunification Parole (HRRP) Program

Exhibit 1
44



**U.S. Citizenship and
Immigration Services**

# The Haitian Family Reunification Parole (HFRP) Program

The HFRP Program allows certain eligible U.S. citizens and lawful permanent residents to apply for parole for their family members in Haiti. If granted parole, these family members can come to the United States before their immigrant visa priority dates become current. Once in the United States, these individuals may then apply for work authorization while they are waiting to apply for lawful permanent resident status.

NOTE: Do NOT attempt to come to the United States by boat. These trips are potentially life-threatening. If located at sea, you may be returned to Haiti.

### This page contains information on:

- Eligibility for HFRP
- Applying for HFRP
- Application fees
- Being authorized parole
- After being authorized parole
- Estimated costs
- Program background

### More Information

For more information on eligibility, invitations, the application process, and the interview process visit:

Applying for the HFRP Program and at Kisa-w Bezwen Konnen Konsènan Aplikasyon pou Pwogram HFRP an.

For more information on work authorization, applying for a Green Card, and benefits visit:

Arriving in the United States Under the HFRP Program and at Ki sa kap Rive nan Etazini nan Kad Pwogram HFRP an.

### Eligibility for HFRP

If you filed a Form I-130 for your relative, you are known as the petitioner and your relative is known as the beneficiary. You will be eligible to apply for parole for your relative(s) in Haiti under the HFRP Program if:

Exhibit 1
45

- You are either a U.S. citizen or lawful permanent resident (LPR);
- You filed a <u>Form I-130, Petition for Alien Relative</u>, for a Haitian family member and it was approved on or before Dec. 18, 2014;
- An immigrant visa is not yet available for your relative;
- You received an invitation from the Department of State's (DOS) National Visa Center (NVC) to participate in the HFRP Program. Please see the "Applying for HFRP" section below for more details.

To be eligible, the beneficiary must:

- Be a Haitian national, if the principal beneficiary; and
- Have a petitioner who has been invited to participate in the HFRP Program.

NOTE: Immediate relatives of U.S. citizens are NOT eligible for HFRP because they can immediately apply for immigrant visas once their Form I-130 is approved. Immediate relatives are:

- Spouses of U.S. citizens,
- Unmarried children of U.S. citizens under 21 years old, and
- Parents of U.S. citizens over 21 years of age.

Additional details on eligibility, invitations, the application process, and the interview process, can be found at <u>Applying for the HFRP Program</u> and at <u>Kisa-w Bezwen Konnen Konsènan Aplikasyon pou Pwogram HFRP an.</u>

## Applying for HFRP

*Do NOT apply for the HFRP program until the NVC invites you to do so.* Potential beneficiaries in Haiti cannot apply for themselves.

Updating your mailing address

If you are a petitioner who believes that you may be eligible for the HFRP Program, please make sure that the NVC has your current mailing address. You can contact the NVC through their Public Inquiry Form or emailing <u>asknvc@state.gov</u>. For additional contact information, please visit:
<u>http://travel.state.gov/content/visas/english/immigrate/nvc/nvc-contact-information.html</u>

Before a petitioner can apply for the HFRP Program, he or she must receive an invitation to participate from the NVC. At least once each year, the NVC will identify the Forms I-130 with priority dates that are expected to become current within the next 18 to 36 months from the time invitations are issued, and will send written invitation letters to the petitioners who filed

these petitions. The NVC issued the first round of invitations in March and April 2015 and the second round of invitations in November and December 2015.

The invitation letter includes instructions on how to:

- File a completed Form I-131, Application for Travel Document, along with necessary supporting documentation, for each Form I-130 beneficiary and each of his or her derivative family members, and
- Submit the required fee (or a fee waiver request).

The invitation letter specifies where and how the application should be filed and provides additional important instructions. You cannot submit any application materials to USCIS before first receiving the invitation letter from the NVC.

We will reject all HFRP applications that do not include the completed Form I-131 and fee (or a fee waiver request). For additional information on the application process, visit Applying for the HFRP Program.

## Application fees

You must pay the fee for the Form I-131 or apply for a fee waiver. For instructions, please see USCIS's Fee Waiver Guidance. Please also see the Estimated costs associated with becoming a lawful permanent resident section below for important information.

## Being authorized parole under the HFRP Program

We will complete a documentary review of the evidence provided by the petitioner with the HFRP application. If the application appears approvable, the NVC will forward it to the U.S. Embassy in Haiti. USCIS or DOS will interview the beneficiary in Port-au-Prince, Haiti, to determine whether to authorize parole. Beneficiaries may also have to provide biometrics (fingerprints and photos).

The authorization of parole is not automatic. We will use our discretion to authorize parole on a case-by-case basis. We will generally only authorize parole to beneficiaries who:

- Meet all the HFRP eligibility requirements;
- Meet all the eligibility requirements for an immigrant visa (except for the requirement that the immigrant visa number be available);
- Pass background checks;
- Pass a medical examination;
- Are admissible to the United States; and
- Warrant a favorable exercise of discretion.

Haitians who have committed serious crimes or who fail to pass background checks will not be authorized parole.

The Immigration and Nationality Act gives us the authority to use our discretion to authorize parole for urgent humanitarian or significant public benefit reasons.

## After USCIS authorizes parole

If we authorize parole under the HFRP Program, USCIS or DOS will issue the necessary travel documents to the beneficiary in Haiti. These travel documents will allow the beneficiary to travel to the United States and seek parole from a Customs and Border Protection Officer at a port of entry.

Beware of scams!

Visit our website, www.uscis.gov/avoidscams, for tips on filing forms, reporting scams and finding accredited legal services.

Please remember that official U.S. government websites end with ".gov" and that information on these official websites is official and correct. Official U.S. government email addresses also end in ".gov." If you receive any emails about your cases from an email address that does not end with ".gov," you should beware that it is a scam.

Parole allows an individual to be lawfully present in the United States and to apply for work authorization. Parole itself does not give you any legal immigration status in the United States.

However, HFRP Program beneficiaries paroled into the United States are expected to apply for lawful permanent resident status as soon as their immigrant visa becomes available—generally within two years of being paroled into the United States.

Please see Arriving in the United States Under the HFRP Program (also see Ki sa kap Rive nan Etazini nan Kad Pwogram HFRP an) for additional details on work authorization, applying for a Green Card, and benefits.

## Estimated costs associated with becoming a lawful permanent resident

To work in the United States, HFRP Program beneficiaries will have to file Form I-765, Application for Employment Authorization, after arriving in the United States. The fee is $380. Applicants can request a fee waiver by submitting Form I-912, Request for Fee Waiver. For instructions, please see USCIS Fee Waiver Guidance.

As beneficiaries of this program, your relatives will be expected to apply for lawful permanent resident status once their visas become "current" (meaning available). We anticipate that visas for HFRP Program beneficiaries will become current approximately two years after they are paroled into the United States.

Your relatives must pay to obtain lawful permanent resident status (Green Card). To apply for a Green Card, they must file Form I-485, Application to Register Permanent Residence or Adjust Status, once their visa is current. The fee is currently $1,070. No fee waiver is available. As fees are subject to change, you should check the USCIS fee schedule before filing any petition or application.

The total cost to obtain work authorization and become a lawful permanent resident if first paroled into the United States under the HFRP Program is roughly $1,810. In comparison, the

cost for an individual to enter the United States with an immigrant visa is approximately $610. An individual entering as an immigrant has lawful permanent resident status and is authorized to work upon admission, so no additional costs are required to apply for work authorization.

In rare cases, a person's immigrant visa may become available while his or her case is being processed under the HFRP Program. In those cases, the person may continue to be processed for parole, or he or she may choose to be processed by DOS for an immigrant visa. The person will be required to pay any fees associated with that process, and we will not refund the HFRP Program application fee.

The table below explains the total fees you will pay depending on how you come to the United States and obtain lawful permanent residence (Green Card).

| If you come to the United States: | Then file: | And pay: | Total cost per person* |
|---|---|---|---|
| Through the HFRP Program, then file to adjust your status | • Form I-131, Application for Travel Document | $360 | $1810 |
| | • Form I-765, Application for Employment Authorization ** | $380 | |
| | | $1,070 | |
| | • Form I-485, Application to Register Permanent Residence or Adjust Status + biometrics ($985 + $85) | | |
| Through an Immigrant Visa | • Immigrant Visa application processing fee (for approved Form I-130, Petition for Alien Relative) | $325 | $610 |
| | • Department of State Affidavit of Support Review | $120 | |
| | • USCIS Immigrant Fee | $165 | |

*Fees valid as of April 15, 2015, and are subject to change.

** Not required to adjust to lawful permanent resident status. However, if an HFRP beneficiary wishes to work in the United States before obtaining his or her Green Card, he or she must apply for work authorization.

The costs are associated with the immigration paths outlined in the table to become a lawful permanent resident and are not meant to represent any other costs or benefits which may be associated with parole or lawful permanent resident status in the United States.

### Please Note

In the rare case that an immigrant visa becomes available while someone is being processed for parole under the HFRP Program, that person may choose to continue with the parole process. Alternatively, the person may choose to be processed by the Department of State for an immigrant visa, in which case, he or she will be required to pay any fees associated with that process. We will not refund the HFRP Program application fee.

## Background

We created the HFRP Program on Dec. 18, 2014, to promote family unity by reducing the time that U.S. citizens and lawful permanent residents are separated from their relatives in Haiti. The program also supports broader U.S. goals for Haiti's long-term reconstruction and development by allowing the beneficiaries of the HFRP Program to work in the United States and contribute to Haiti through their remittances, if they wish to do so.

We aim to benefit as many individuals as possible with the HFRP program while also considering the operational capabilities of the U.S. government, especially the U.S. Embassy in Port-au-Prince, and the resources available to aid program beneficiaries.

We anticipate conducting approximately 5,000 HFRP Program interviews annually. This volume may fluctuate each year depending on the operational capabilities of the U.S. Embassy in Port-au-Prince and on the number of individuals who apply for the program when invited to do so.



Last Reviewed/Updated: 04/11/2016

## **Action 9**

International Entrepreneur Rule, Proposed Rule

Exhibit 1
51



# FEDERAL REGISTER

Vol. 81            Wednesday,

No. 169           August 31, 2016

Part II

Department of Homeland Security

8 CFR Parts 103, 212, and 274a
International Entrepreneur Rule; Proposed Rule

Exhibit 1
52

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 212, and 274a**

[CIS No. 2572–15; DHS Docket No. USCIS–2015–0006]

**RIN 1615–AC04**

**International Entrepreneur Rule**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Homeland Security (DHS) proposes to amend its regulations implementing the Secretary of Homeland Security's discretionary parole authority to increase and enhance entrepreneurship, innovation, and job creation in the United States. The proposed rule would add new regulatory provisions guiding the use of parole on a case-by-case basis with respect to entrepreneurs of start-up entities whose entry into the United States would provide a significant public benefit through the substantial and demonstrated potential for rapid business growth and job creation. Such potential would be indicated by, among other things, the receipt of significant capital investment from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. If granted, parole would provide a temporary initial stay of up to 2 years (which may be extended by up to an additional 3 years) to facilitate the applicant's ability to oversee and grow his or her start-up entity in the United States. A subsequent request for re-parole would be considered only when the entrepreneur and his or her start-up entity continues to provide a significant public benefit as evidenced by substantial increases in capital investment, revenue, or job creation. DHS believes that a regulatory process for seeking and granting parole in this business-creation context—including by establishing criteria for evaluating individual parole applications on a case-by-case basis—is important given the complexities involved in such adjudications and the need for guidance regarding the general criteria for eligibility for the start-up entrepreneurs, entities, and investors involved.

**DATES:** Written comments must be received on or before October 17, 2016.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. USCIS–2015–0006, by any one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Email:* You may submit comments directly to U.S. Citizenship and Immigration Services (USCIS) by email at *uscisfrcomment@dhs.gov.* Please include DHS docket number USCIS–2015–0006 in the subject line of the message.

• *Mail:* You may submit comments directly to USCIS by mail by sending correspondence to Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529. To ensure proper handling, please reference DHS Docket No. USCIS–2015–0006 in your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* You may submit comments directly to USCIS through hand delivery to: Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529; Telephone (202) 272–8377. To ensure proper handling, please reference DHS Docket No. USCIS–2015–0006 in your correspondence.

**FOR FURTHER INFORMATION CONTACT:** Steven Viger, Adjudications Officer, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–8377.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Public Participation
II. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of Proposed Amendments
  D. Costs and Benefits
III. Background
  A. Discretionary Parole Authority
  B. Historical Uses of Parole
  C. Significant Public Benefit of Attracting Foreign Entrepreneurs to the United States
  D. Proposal for Parole for Entrepreneurs
IV. Proposed Changes
  A. Overview of Parole for Entrepreneurs
  B. Criteria for Initial Parole
  1. Recent Formation of a Start-Up Entity
  2. Applicant is an Entrepreneur Who Is Well-Positioned To Advance the Entity's Business
  3. Capital Investment or Government Funding Criteria
C. Application Requirements for Initial Period of Parole
  1. Filing the Application for Entrepreneur Parole (Form I–941)
  2. Requirement To Appear for Submission of Biometric Information
  3. Income-Related Condition on Parole
  4. Adjudication of Applications
  5. Limitation on Number of Entrepreneur Parolees Per Start-Up Entity
  6. Authorized Period for Initial Grant of Entrepreneur Parole
  7. Spouses and Minor Children
  D. Employment Authorization
  1. Employment Authorization Incident to Parole With a Specific Employer
  2. Employment Authorization Eligibility for Spouses
  3. Documentation for Employment Eligibility Verification (Form I–9)
  4. Technical Changes
  E. Material Change Reporting
  F. Re-Parole
  1. Criteria for Re-Parole
  2. Application Requirements for Re-Parole
  3. Ensuring Continuous Employment Authorization
  G. Termination of Parole
  1. Automatic Termination
  2. Termination on Notice
  H. Automatic Adjustment of Investment and Revenue Amount Requirements
  I. Technical Change
V. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 and 13563
  1. Summary
  2. Background and Purpose of the Proposed Rule
  3. Population of Entrepreneurs Potentially Eligible
  4. Costs
  5. Benefits
  D. Regulatory Flexibility Act
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act

### I. Public Participation

DHS invites comments, data, and information from all interested parties, including advocacy groups, nongovernmental organizations, community-based organizations, entrepreneurs, investors, other entities in the entrepreneurial ecosystem of the United States, and legal representatives who specialize in immigration law on any and all aspects of this proposed rule. Comments that will provide the most assistance to DHS in developing these procedures will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authorities that support such recommended change. DHS is generally seeking comments on:

A. Proposed filing requirements and procedures;

B. Proposed definitions and criteria for evaluating parole applications,

Exhibit 1
53

including investment, award, revenue, job creation, and alternative criteria;

C. Proposed conditions, including limits on the number of entrepreneur parolees per start-up entity and time limits on parole periods;

D. Proposed provisions establishing employment authorization for entrepreneurs incident to parole;

E. Proposed provisions regarding termination of parole; and

F. Proposed opportunity to request re-parole, length of period for re-parole, and limitation on number of re-parole opportunities.

DHS also invites comments on the economic analysis supporting this rule and the proposed new parole request form for entrepreneurs.

*Instructions:* All submissions must include the agency name and the DHS Docket No. USCIS–2015–0006 for this rulemaking. Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http:// www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http:// www.regulations.gov.*

*Docket:* For access to the docket to read background documents or comments received, go to *http:// www.regulations.gov.*

## II. Executive Summary

### A. Purpose of the Regulatory Action

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), grants the Secretary of Homeland Security the discretionary authority to parole individuals into the United States, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS proposes to amend its regulations implementing this authority to increase and enhance entrepreneurship, innovation, and job creation in the United States. As described in more detail below, the proposed rule would establish general criteria for the use of parole with respect to entrepreneurs of start-up entities whose entry into the United States would provide a significant public

benefit through the substantial and demonstrated potential for rapid growth and job creation. In all cases, whether to parole a particular individual under this rule would be a discretionary determination that would be made on a case-by-case basis.

Given the complexities involved in adjudicating applications in this context and the need for guidance regarding the criteria for exercising parole in this area, DHS has decided to establish by regulation the criteria for the case-by-case evaluation of parole applications filed by entrepreneurs of start-up entities. By including such criteria in regulation, as well as establishing application requirements that are specifically tailored to capture the necessary information for processing parole requests on this basis, DHS expects to facilitate the use of parole in this area.

As discussed, the proposed rule would establish criteria for seeking and obtaining parole based on the creation of a start-up entity in the United States. DHS proposes that to be considered for parole under this rule, an applicant would need to demonstrate that his or her parole would provide a significant public benefit because he or she is the entrepreneur of a new start-up entity in the United States that has significant potential for rapid growth and job creation. DHS proposes that such potential would be indicated by, among other things, the receipt of (1) significant capital financing from U.S. investors with established records of successful investments or (2) significant awards or grants from certain Federal, State or local government entities. DHS also proposes alternative criteria for applicants who partially meet the proposed thresholds for capital financing or government awards or grants and who can provide additional reliable and compelling evidence of their entities' significant potential for rapid growth and job creation. An applicant would qualify for further consideration by showing that he or she has a substantial ownership interest in such an entity, has an active and central role in the entity's operations, and would substantially further the entity's ability to engage in research and development or otherwise conduct and grow its business in the United States. The grant of parole is intended to facilitate the applicant's ability to oversee and grow the start-up entity.

DHS believes that this proposal would encourage foreign entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are expected to facilitate research and development in the

country, create jobs for U.S. workers, and otherwise benefit the U.S. economy through increased business activity, innovation and dynamism. Particularly in light of the complex considerations involved in entrepreneur-based parole requests, DHS also believes that this proposal will provide a transparent framework by which DHS will exercise its discretion to adjudicate such requests on a case-by-case basis under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5).

### B. Legal Authority

The Secretary of Homeland Security's authority for the proposed regulatory amendments can be found in various provisions of the immigration laws. Section 402(4) of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 202(4), provides the Secretary the authority to administer and enforce the immigration and nationality laws. Sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3), expressly authorize the Secretary to establish rules and regulations governing parole. Section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), vests in the Secretary the discretionary authority to grant parole for urgent humanitarian reasons or significant public benefit to applicants for admission on a case-by-case basis.[1] Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes the Secretary's general authority to extend employment authorization to noncitizens in the United States. And section 101(b)(1)(F) of the HSA, 6 U.S.C. 111(b)(1)(F), establishes as a primary mission of DHS the duty to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."

### C. Summary of Proposed Amendments

DHS is proposing to add a new section 8 CFR 212.19 to provide guidance with respect to the use of parole for entrepreneurs of start-up entities based upon significant public

---

[1] In sections 402 and 451 of the HSA, Congress transferred from the Attorney General to the Secretary of Homeland Security the general authority to enforce and administer the immigration laws, including those pertaining to parole. In accordance with section 1517 of title XV of the HSA, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the HSA, tit. XV, section 1517). Authorities and functions of DHS to administer and enforce the immigration laws are appropriately delegated to DHS employees and others in accordance with section 102(b)(1) of the HSA, 6 U.S.C. 112(b)(1); section 103(a) of the INA, 8 U.S.C. 1103(a); and 8 CFR 2.1.

Exhibit 1
54

benefit. An individual seeking to operate and grow his or her start-up entity in the United States would generally need to demonstrate the following to be considered for a discretionary grant of parole under this proposed rule:

1. *Formation of New Start-Up Entity.* The applicant has recently formed a new entity in the United States that has lawfully done business since its creation and has substantial potential for rapid growth and job creation. DHS proposes that an entity may be generally considered recently formed if it was created within the 3 years preceding the date of the filing of the initial parole application.

2. *Applicant is an Entrepreneur.* The applicant is an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. DHS proposes that an applicant may generally meet this standard by providing evidence that he or she: (1) Possesses a significant (at least 15 percent) ownership interest in the entity at the time of adjudication of the initial grant of parole; and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. Such an applicant cannot be a mere investor.

3. *Significant U.S. Capital Investment or Government Funding.* The applicant can further validate, through reliable supporting evidence, the entity's substantial potential for rapid growth and job creation. DHS proposes that an applicant may be able to satisfy this criterion in one of several ways:

a. *Investments from established U.S. investors.* The applicant may show that the entity has received significant investment of capital from certain qualified U.S. investors with established records of successful investments. DHS proposes that an applicant would generally be able to meet this standard by demonstrating that the start-up entity has received investments of capital totaling $345,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities.

b. *Government grants.* The applicant may show that the start-up entity has received significant awards or grants from Federal, State or local government entities with expertise in economic development, research and development, and/or job creation. DHS proposes that an applicant would generally be able to meet this standard by demonstrating that the start-up entity has received monetary awards or grants totaling $100,000 or more from government entities that typically provide such funding to U.S. businesses for economic, research and development, or job creation purposes.

c. *Alternative criteria.* DHS further proposes alternative criteria under which an applicant who partially meets one or more of the above sub-criteria related to capital investment or government funding may be considered for parole under this rule if he or she provides additional reliable and

compelling evidence that his or her entry would provide a significant public benefit to the United States. Such evidence would need to serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

DHS proposes that an applicant who meets the above criteria (and his or her spouse and minor, unmarried children, if any) generally may be considered under this rule for a discretionary grant of parole lasting up to 2 years based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. An applicant would be required to file for entrepreneurs to demonstrate eligibility for parole based upon significant public benefit under this rule, along with proposed fees. Applicants would also be required to appear for collection of biometric information. DHS further proposes that no more than three entrepreneurs may receive parole with respect to any one qualifying entity.

USCIS adjudicators would be required to consider the totality of the evidence, including evidence obtained by USCIS through background checks and other means, to determine whether the applicant has satisfied the above criteria, whether the specific applicant's parole would provide a significant public benefit, and whether negative factors exist that warrant denial of parole as a matter of discretion. To grant parole, adjudicators would be required to conclude, based on the totality of the circumstances, that both: (1) The applicant's parole would provide a significant public benefit, and (2) the applicant merits a grant of parole as a matter of discretion.

DHS further proposes that if parole is granted, the entrepreneur would be authorized for employment incident to the grant of parole, but only with respect to the entrepreneur's start-up entity. The entrepreneur's spouse and children, if any, would not be authorized for employment incident to the grant of parole, but the entrepreneur's spouse, if paroled into the United States pursuant to 8 CFR 212.19, would be permitted to apply for employment authorization consistent with proposed 8 CFR 274a.12(c)(34). DHS retains the right to revoke any such grant of parole at any time as a matter of discretion or if the Department determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS believes that the application involves fraud or misrepresentation.

As noted, the purpose of the proposed parole process is to provide qualified entrepreneurs of high-potential start-up entities in the United States with the improved ability to conduct research and development and expand the entities' operations in the United States so that our nation's economy may benefit from such development and expansion, including through increased capital expenditures, innovation and job creation. DHS proposes to allow individuals granted parole under this rule to be considered for re-parole for an additional period of up to 3 years if, and only if, they can demonstrate that their entities have shown signs of significant growth since the initial grant of parole and such entities continue to have substantial potential for rapid growth and job creation. As proposed, an applicant under this rule would generally need to demonstrate the following to be considered for a discretionary grant of an additional period of parole:

1. *Continuation of Start-Up Entity.* The entity continues to be a start-up entity as defined by the proposed rule. For purposes of seeking re-parole, an applicant would be able to meet this standard by showing that the entity: (a) Has been lawfully operating in the United States during the period of parole; and (b) continues to have substantial potential for rapid growth and job creation.

2. *Applicant Continues to Be an Entrepreneur.* The applicant continues to be an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. DHS proposes that an applicant may generally meet this standard by providing evidence that he or she: (a) Continues to possess a significant (at least 10 percent) ownership interest in the entity; and (b) continues to have an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and continuing to grow its business in the United States. This reduced ownership amount takes into account the need of some successful start-up entities to raise additional venture capital financing by selling ownership interest during their initial years of operation.

3. *Significant U.S. Investment/Revenue/Job Creation.* The applicant can further validate, through reliable supporting evidence, the start-up entity's continued potential for rapid growth and job creation. DHS proposes that an applicant would be able to satisfy this criterion in one of several ways:

a. *Investments from established U.S. investors.* The applicant may show that during the initial period of parole the start-up entity received additional substantial investments of capital, including through qualified investments from U.S. investors with established records of successful investments; significant awards or grants from government entities that regularly provide such funding to start-up entities; or

Exhibit 1
55

a combination of both. DHS proposes that an applicant would generally be expected to demonstrate that the entity received at least $500,000 in additional qualifying funding during the initial parole period. As noted previously, any private investments must be made by qualified U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. Government awards or grants must be from Federal, State or local government entities with expertise in economic development, research and development, and/or job creation.

b. *Revenue generation.* The applicant may show that the start-up entity has generated substantial and rapidly increasing revenue in the United States during the initial parole period. DHS proposes that an applicant would generally be expected to demonstrate that the entity reached at least $500,000 in annual revenue, with average annualized revenue growth of at least 20 percent, during the initial parole period.

c. *Job creation.* The applicant may show that the start-up entity has demonstrated substantial job creation in the United States during the initial parole period. DHS proposes that an applicant would generally be expected to demonstrate that the entity created at least 10 full-time jobs for U.S. workers during the initial parole period.

d. *Alternative criteria.* As with initial parole, DHS further proposes alternative criteria under which an applicant who partially meets one or more of the above sub-criteria related to capital investment, revenue generation, or job creation may be considered for re-parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole would continue to provide a significant public benefit. As discussed above, such evidence would need to serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

DHS proposes that an applicant who generally meets the above criteria may be considered for one additional grant of parole to work with the same start-up entity based on the significant public benefit that would be served by his or her continued parole in the United States, if the applicant also merits a favorable exercise of discretion. If granted, re-parole may be for up to 3 years, for a total maximum period of 5 years for parole under 8 CFR 212.19. No more than three entrepreneurs (and their spouses and children) may receive such additional periods of parole with respect to any one qualifying entity.

As with initial parole applications, USCIS adjudicators would be required to consider the totality of the evidence, including evidence obtained by USCIS through verification methods, to determine whether the applicant has satisfied the above criteria and whether his or her continued parole would provide a significant public benefit. To re-parole, adjudicators would be

required to conclude, based on the totality of the circumstances, both: (1) That the applicant's continued parole would provide a significant public benefit, and (2) that the applicant continues to merit parole as a matter of discretion. If re-paroled, DHS retains the right to revoke parole at any time as a matter of discretion or if the Department determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS believes that the applicant committed fraud or made material misrepresentations.

Finally, DHS is proposing conforming changes to the employment authorization regulations at 8 CFR 274a.12(b) and (c), the employment eligibility verification regulations at 8 CFR 274a.2(b), and fee regulations at 8 CFR 103.7(b)(i). The proposed rule would amend 8 CFR 274a.12(b) by: (1) Adding entrepreneur parolees to the classes of aliens authorized for employment incident to their immigration status or parole, and (2) providing for temporary employment authorization for those applying for re-parole. The proposed rule would amend 8 CFR 274a.12(c) by extending eligibility for employment authorization to the spouse of an entrepreneur paroled into the United States under 8 CFR 212.19. The proposed rule would amend 8 CFR 274a.2(b) by designating the entrepreneur's foreign passport and Arrival/Departure Record (Form I–94) indicating entrepreneur parole as acceptable evidence for employment eligibility verification (Form I–9) purposes.[2] Finally, the proposed rule would amend 8 CFR 103.7(b)(i) by including the fee for the new proposed application form.

### D. Costs and Benefits

DHS does not anticipate that this rule, if finalized, would generate significant costs and burdens to private or public entities. Costs of the rule would stem from filing fees and opportunity costs associated with applying for parole, and the requirement that the entrepreneur alert DHS to any material changes.

DHS estimates that 2,940 entrepreneurs could be eligible for parole annually. Each applicant for parole would face a total filing cost—including the application form fee, biometric filing fee, travel costs, and associated opportunity costs—of $1,480, resulting in a total cost of $4,349,827

(undiscounted) for the first full year the rule could take effect and any subsequent year. Additionally, dependent family members (spouses and children) seeking parole with the principal applicant would be required to file an Application for Travel Document (Form I–131) and submit biographical information and biometrics. DHS estimates approximately 3,234 dependent spouses and children could seek parole based on the base estimate of 2,940 principal applicants. Each spouse and child 14 years of age and older seeking parole would face a total cost of $550 per applicant, for a total aggregate cost of $1,779,604.[3] Additionally, spouses who apply for work authorization via a Form I–765 application would incur a total additional cost of $416.20 each. Based on the same number of entrepreneurs, the estimated 2,940 spouses[4] would incur total costs of $1,223,630 (undiscounted). The total cost of the rule to include direct filing costs and monetized non-filing costs is estimated to be $7,353,061 annually.

DHS anticipates that establishing a parole process for those entrepreneurs who stand to provide a significant public benefit would advance the U.S. economy by enhancing innovation, generating capital investments, and creating jobs. DHS does not expect significant negative consequences or labor market impacts from this rule; indeed, DHS believes this proposal would encourage entrepreneurs to pursue business opportunities in the United States rather than abroad, which can be expected to generate significant scientific, research and development, and technological impacts that could create new products and produce positive spillover effects to other businesses and sectors. The impacts stand to benefit the economy by supporting and strengthening high-growth, job-creating businesses in the United States.

### III. Background

#### A. Discretionary Parole Authority

The Secretary of Homeland Security has discretionary authority to grant temporary parole "under conditions as he may prescribe only on a case-by-case

[2] Additionally, DHS is also proposing a technical change to this section to add the Department of State (DOS) Consular Report of Birth Abroad (Form FS–240, or successor form) to the "List C" column of acceptable documents for Form I–9 purposes.

[3] For parole requests for children under the age of 14, only the filing fee will be required, as they do not appear for biometric collection. Applicants under the age of 14 and over the age of 79 are not required to be fingerprinted. However, they may still be required to attend a biometrics appointment in order to have their photograph and signature captured.

[4] DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 1,813 spouses, the same number as entrepreneur parolees.

Exhibit 1
56

basis for urgent humanitarian reasons or significant public benefit [to] any individual applying for admission to the United States." INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[5] The Secretary's parole authority is expansive. Congress did not define the phrase "urgent humanitarian reasons or significant public benefit," entrusting interpretation and application of those standards to the Secretary. Aside from requiring case-by-case determinations, Congress limited the parole authority by prohibiting its use with respect to two classes of applicants for admissions: (1) Aliens who are refugees (unless the Secretary determines that parole is required for a particular alien for compelling reasons in the public interest), *see* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B); and (2) alien crewmen during certain labor disputes, *see* INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A).

Parole decisions are discretionary determinations and must be made on a case-by-case basis consistent with the INA. DHS may exercise its authority to determine that an individual's parole into the United States is justified by urgent humanitarian reasons or significant public benefit. Even when one of those standards would be met, DHS may nevertheless deny parole as a matter of discretion based on other factors.[6] In making such discretionary determinations, USCIS considers all relevant information, including any criminal history or other serious adverse factors that would weigh against a favorable exercise of discretion.

Parole is not an admission to the United States. *See* INA section 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B); 8 CFR 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."). Parole may also be terminated at any time in DHS's discretion, consistent with existing regulations; in those cases, the individual is "restored to the status that he or she had at the time of parole." 8 CFR 212.5(e); *see also* INA section 212(d)(5), 8 U.S.C. 1182(d)(5).

DHS regulations at 8 CFR 212.5 describe DHS's discretionary parole authority for arriving aliens to the United States (other than detained aliens), including the authority to set the terms and conditions of parole. Some conditions are described in the regulations, including requiring reasonable assurances that the parolee will appear at all hearings and will depart from the United States when required to do so. *See* 8 CFR 212.5(d).

Each of the DHS immigration components—USCIS, U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE)—has been delegated the authority to parole applicants for admission in accordance with section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). *See* 8 CFR 212.5(a). The parole authority is often utilized to permit an alien who is outside the United States to travel to and come into the United States without a visa. USCIS, however, also accepts requests for "advance parole" by aliens who seek authorization to depart the United States and return to the country pursuant to parole in the future.[7] *See* 8 CFR 212.5(f); Application for Travel Document (Form I–131). Advance authorization of parole by USCIS does not guarantee that the alien will be paroled by CBP upon his or her appearance at a port of entry. Rather, with a grant of advance parole, the alien is issued a document authorizing travel (in lieu of a visa) indicating the presumption that CBP will favorably exercise discretion to parole the alien in the future (so long as material circumstances do not change).

Currently, upon an alien's arrival to the United States with a parole travel document (*e.g.*, a Department of State (DOS) foil, Authorization for Parole of an Alien into the United States (Form I–512L), or an Employment Authorization Document (Form I–766)), a CBP officer at a port of entry inspects the prospective parolee. If parole is authorized, the CBP officer issues an Arrival/Departure Record (Form I–94) documenting the grant of parole and the length of the parole's authorized parole period. *See* 8 CFR 235.1(h)(2). Importantly, CBP retains the authority to deny parole to a parole applicant or to modify the length of advance parole authorized by USCIS. *See* 8 CFR 212.5(c).

Because parole does not constitute an admission, individuals may be paroled into the United States even if they are inadmissible. *See* section 212(a) of the INA, 8 U.S.C. 1182(a). Further, parole does not confer any immigration "status." *See* section 101(a)(13)(B) of the INA, 8 U.S.C. 1101(a)(13)(B); section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A). Parole does not provide a parolee with temporary nonimmigrant status or lawful permanent resident status. Nor does it provide the parolee with a basis for changing status to that of a nonimmigrant or adjusting status to that of a lawful permanent resident, unless the parolee is otherwise eligible.

Under current regulations, once paroled into the United States, a parolee is eligible to request employment authorization from USCIS by filing an Application for Employment Authorization (Form I–765) with USCIS. *See* 8 CFR 274a.12(c)(11). If employment authorization is granted, USCIS issues the parolee an EAD with an expiration date that is commensurate with the period of parole on the the parolee's Arrival/Departure Record (Form I–94). The parolee may use this EAD to demonstrate identity and employment authorization to an employer for Form I–9 verification purposes as required by section 274A(a) and (b) of the INA, 8 U.S.C. 1324a(a) and (b). Under current regulations, the parolee is not employment authorized by virtue of being paroled, but instead only after receiving a discretionary grant of employment authorization from USCIS based on the Application for Employment Authorization.

Parole may terminate automatically upon the expiration of the authorized parole period or upon the departure of the individual from the United States. *See* 8 CFR 212.5(e)(1). Parole also may be terminated on written notice when DHS determines that the individual no longer warrants parole or through the service of a Notice to Appear (NTA). *See* 8 CFR 212.5(e)(2)(i).

## B. Historical Uses of Parole

DHS and the former Immigration and Naturalization Service (INS) have long extended parole to individuals for urgent humanitarian reasons or significant public benefit. The authority has been exercised on behalf of individuals on an ad hoc basis, as well as through policy guidance or regulations defining classes of individuals to be considered for parole through individualized case-by-case adjudications. For example, parole has long been used on an ad hoc basis for individuals with serious medical conditions who need to come into the United States for medical treatment, individuals subject to prosecution or who are required to testify in court, individuals cooperating with law enforcement agencies, volunteers offering assistance in response to

[5] Although section 212(d)(5) continues to refer to the Attorney General, the parole authority now resides exclusively with the Secretary of Homeland Security. *See Matter of Arrabally*, 25 I. & N. Dec. 771, 777 n.5 (BIA 2012).

[6] The denial of parole is not subject to judicial review. *See* INA section 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii).

[7] Aliens who seek parole as entrepreneurs under this rule may need to apply for advance parole if at the time of application they are present in the United States after admission in a nonimmigrant classification, as USCIS is unable to grant parole to aliens who are not "applicants for admission." *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5).

Exhibit 1
57

natural or other disasters, and foreign officials and other dignitaries who are inadmissible but seek to attend events in the country. Depending on the circumstances, such uses of parole have been justified on "urgent humanitarian" or "significant public benefit" grounds, or both.

Parole has also long been exercised on a case-by-case basis with respect to individuals falling within certain designated parameters, as defined through regulation or policy guidance. Longstanding regulations, for example, provide discretionary criteria and other guidance for the use of parole with respect to arriving aliens detained in the United States. *See* 8 CFR 212.5. Those regulations provide that parole from immigration custody generally would be "justified" on a case-by-case basis if an individual falls within one of several specific categories, including individuals with serious medical conditions, pregnant women, juveniles, or individuals whose "continued detention is not in the public interest" as determined by certain listed officials. *Id.* Through longstanding policy memoranda or other guidance, DHS and the former INS have also provided instructions on the use of parole for other individuals, including certain vulnerable individuals who have been denied refugee status.

More recently, DHS has provided guidance on the case-by-case exercise of the parole authority through policy memoranda or notices in the **Federal Register**, including, for example, on behalf of certain Cuban nationals, certain individuals seeking to enter the Commonwealth of the Northern Mariana Islands (CNMI), and certain family members of U.S. military personnel:

• In 2007, DHS implemented the Cuban Family Reunification Parole Program to promote safe, legal, and orderly migration as an alternative to maritime crossings from Cuba. This program offers Cuban beneficiaries of approved family-based immigrant visa petitions an opportunity to apply for parole rather than remain in Cuba while awaiting the availability of an immigrant visa number.[8] USCIS implemented the program based on the significant public benefit rationales of "enabling the United States to meet its commitments under the Migration Accords" and "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States."[9]

[8] Cuban Family Reunification Parole Program, 72 FR 65,588 (Nov. 21, 2007); see also Changes to Application Procedures for the Cuban Family Reunification Parole Program, 79 FR 75579 (Dec. 18, 2014).

[9] *Id.*

• In 2009, DHS announced a policy on the use of parole into the CNMI for certain foreign workers, as well as visitors from the Russian Federation and the People's Republic of China.[10] The parole policy was justified based on the economic benefit such workers and visitors would provide to the U.S. territory.

• In 2013, DHS issued guidance encouraging the use of parole for spouses, children, and parents of active duty members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve, and individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve.[11] The cited benefits included mitigating the adverse effects on Service Members and military preparedness stemming from the stress and anxiety of their immediate family members due to immigration concerns.

## C. Significant Public Benefit From Attracting Foreign Entrepreneurs to the United States

DHS believes that enabling foreign entrepreneurs to establish and grow their start-up entities in the United States, rather than abroad, would yield a significant public benefit in certain cases. This would be expected to promote entrepreneurship and investment; facilitate research and development and other forms of innovation; support the continued growth of the U.S. economy; and lead to job creation for U.S. workers. To this end, DHS has considered the economic benefits of foreign entrepreneurs.

Evidence indicates that young business ventures, especially new start-up businesses, are important economic drivers and that the U.S. economy significantly benefits from the economic activity generated by entrepreneurs who start and grow new businesses here rather than abroad.[12] Indeed, evidence

[10] *See* 8 CFR 214.2(w)(1)(v); USCIS, Commonwealth of the Northern Mariana Islands (CNMI) Federalization of Immigration Law (Sept. 22, 2014), *available at* http://www.uscis.gov/laws/immigration-commonwealth-northern-mariana-islands-cnmi/commonwealth-northern-mariana-islands-cnmi-federalization-immigration-law; USCIS, Extending Parole in the CNMI (Jan. 30, 2012), *available at* http://www.uscis.gov/laws/immigration-commonwealth-northern-mariana-islands-cnmi/extending-parole-cnmi.

[11] *See* USCIS Policy Mem. PM–602–0091, Parole of Spouses, Children and Parents of Active Duty Members of the U. S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i) at 2–3 (Nov. 13, 2013), *available at* http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/2013-1115_Parole_in_Place_Memo_.pdf.

[12] *See, e.g.* Edward L. Glaeser, Sari Pekkala Kerr, and William R. Kerr "Entrepreneurship And Urban Growth: An Empirical Assessment With Historical Mines" (2013). Working Papers 13–15, Center for Economic Studies, U.S. Census Bureau. (Finding that increasing the proportion of startup

suggests that future economic and job growth for nations will hinge heavily on their ability to attract entrepreneurs, including those from abroad.[13] As entrepreneurs have increasing opportunities to establish and operate their start-up entities around the world, the need to create conditions that reduce barriers to entry and attract entrepreneurs has become a priority policy goal for a number of economically advanced and less economically advanced nations.[14] To compete for talented entrepreneurs, these countries have, or are planning to have, processes similar to that proposed in this rule.[15]

employment within a region increases the growth rate of overall employment and wages.); John C. Haltiwanger, Ron S. Jarmin, Javier Miranda, "Who Creates Jobs? Small vs. Large vs. Young" NBER Working Paper No. 16300, August 2010, available at *http://www.nber.org/papers/w16300* (Findings "highlight the important role of business startups and young businesses in U.S. job creation."); Jose Plehn-Dujowich, "Product Innovations by Young and Small Firms," Small Business Administration, Research Summary No. 408 available at *http://www.sba.gov/advocacy/7540/621871* (Finding that "innovation is characteristic of both young and small firms"); Tim Kane, "The Importance of Startups in Job Creation and Job Destruction," July 2010 Kauffman Foundation Research Series: Firm Formation and Economic Growth. available at *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2010/07/firm_formation_importance_of_startups.pdf* (showing the importance of startups for net job growth in the U.S. economy).

[13] Council of Economic Advisers The Economic Effects of Administrative Action on Immigration, 18 (November 2014, updated February 2015), available at *https://www.whitehouse.gov/sites/default/files/docs/economic_effects_of_immigration_ea_february_2015_update_final_v2.pdf* ("A body of academic research conducted over the past ten years has found that high-skilled immigration has positive effects on innovation (as measured by patenting) and on total factor productivity."); Robert Litan, *Start-Up Slowdown;* Council on Foreign Relation, Jan./Feb. 2015, available at *https://www.foreignaffairs.com/articles/americas/2014-12-15/start-slowdown;* Robert Fairlie, *Kauffman Index of Entrepreneurial Activity, 1996–2011,* Ewing Marion Kauffman Foundation, March 19, 2012, *http://www.kauffman.org/uploadedfiles/kiea_2012_report.pdf* (finding that immigrants were more than twice as likely as Americans to start new businesses in 2011); Madeleine Sumption, "Visas for Entrepreneurs: How Countries Are Seeking Out Immigrant Job Creators," June 13, 2012 Migration Information Source, Migration Institute, available at *http://www.migrationpolicy.org/article/visas-entrepreneurs-how-countries-are-seeking-out-immigrant-job-creators.*

[14] Robert Litan, "Start-Up Slowdown"; Council on Foreign Relation, Jan./Feb. 2015. available at *https://www.foreignaffairs.com/articles/americas/2014-12-15/start-slowdown;* Madeleine Sumption, "Visas for Entrepreneurs: How Countries Are Seeking Out Immigrant Job Creators," June 13, 2012 Migration Information Source, Migration Institute, available at *http://www.migrationpolicy.org/article/visas-entrepreneurs-how-countries-are-seeking-out-immigrant-job-creators.*

[15] Canada Start-up Visa, *http://www.cic.gc.ca/english/immigrate/business/start-up/;* UK Tier 1 (Entrepreneur) visa, *https://www.gov.uk/tier-1-entrepreneur/overview.*

Exhibit 1
58

Allowing certain qualified entrepreneurs to come to the United States as parolees on a case-by-case basis would produce a significant public benefit through substantial and positive contributions to innovation, economic growth, and job creation. New business ventures, especially start-up businesses, are important economic drivers.[16] A significant percentage of the employment generated by high-tech manufacturers backed by U.S. venture capital investment has come from immigrant-founded companies.[17] A study on the top 50 venture capital-funded start-up companies in the United States showed that 48 percent had at least one immigrant founder.[18]

Innovative foreign-born entrepreneurs are critical forces in the U.S. economy, having founded roughly one-quarter of technology and engineering companies created between 2006 and 2012.[19] As of June 2013, publicly-traded immigrant-founded venture-backed companies had a total market capitalization of $900 billion.[20] Another study by the National Venture Capital Association found that 40 percent of the immigrant founders in the survey entered the United States as

employment-sponsored immigrants, 38 percent as international students, 13 percent as family-sponsored immigrants, and the rest in other categories.[21] These studies, however, do not reflect the number of entrepreneurs who may have decided to start businesses in other countries because of the difficulty in locating their businesses in the United States due to current immigration policies.[22] The full potential of foreign entrepreneurs to benefit the U.S. economy through, for example, cutting-edge research, revenue generation, and job creation, is thus unknown. That current immigration policies create barriers for foreign entrepreneurs was a primary conclusion of the USCIS Entrepreneurs in Residence (EIR) program,[23] which was launched in 2012 to better understand how entrepreneurs fit within existing immigration classifications and to make policy recommendations based on its findings.

### D. Proposal for Parole for Entrepreneurs

DHS proposes to exercise its parole authority, on a case-by-case basis, for entrepreneurs of start-up entities whose parole into the United States would provide a significant public benefit through the substantial potential of his or her start-up entity for rapid growth and job creation. Under the proposed rule, such potential would be evidenced by, among other things, the receipt of (1) substantial significant capital financing by U.S. investors with established records of successful investments or (2) significant awards or grants from certain government entities. DHS also proposes alternative criteria for applicants who partially meet the proposed thresholds for capital financing or government awards or grants and who can provide additional reliable and compelling evidence of their entities' significant

potential for rapid growth and job creation.

If granted, parole would be authorized for up to 2 years to facilitate the entrepreneur's ability to oversee and grow his or her start-up entity in the United States. A subsequent request for re-parole would be considered only if the start-up entity continues to show significant promise of rapid growth and job creation through substantial and demonstrated increases in qualifying funding (whether capital investment or government grants or awards), revenue, or job creation. In all cases, whether to parole a particular individual under this rule would be a discretionary determination that would be made on a case-by-case basis. DHS believes that a regulatory process for seeking and granting parole in this business-creation context—including by establishing criteria for evaluating individual parole applications on a case-by-case basis—is important given the complexities involved in such adjudications and the need for general guidance regarding the relevant factors for eligibility by the start-up entrepreneurs, entities, and investors involved.

### IV. Proposed Changes

In this rule, DHS is proposing to add a new section 8 CFR 212.19 to its regulations to set forth application procedures and criteria specifically for considering parole requests filed by entrepreneurs of start-up entities. See proposed 8 CFR 212.19. Consistent with this new section, the proposed rule would also: (1) Amend 8 CFR 274a.12(b) to authorize entrepreneur parolees to work for their approved start-up entities in the United States, see proposed 8 CFR 274a.12(b)(37); (2) amend 8 CFR 274a.12(c) to extend eligibility for employment authorization to the spouses of entrepreneur parolees, see proposed 8 CFR 274a.12(c)(34); (3) make a conforming amendment to the employment eligibility verification regulations at 8 CFR 274a.2(b)(v)(A)(5) to allow entrepreneur parolees to use their foreign passports and Arrival/Departure Records (Forms I–94) indicating they have entrepreneur parole as evidence of identity and employment authorization for purposes of meeting the Employment Eligibility Verification (Form I–9) requirements, see proposed 8 CFR 274a.2(b)(v)(A)(5); and (4) amend 8 CFR 103.7(b)(1)(i) to include a fee for the new proposed entrepreneur parole application form, see proposed 8 CFR 103.7(b)(1)(i)(FFF).

### A. Overview of Parole for Entrepreneurs

At the proposed section 8 CFR 212.19, DHS sets forth the application

[16] Tim Kane, "The Importance of Startups in Job Creation and Job Destruction," July 2010 Kauffman Foundation Research Series: Firm Formation and Economic Growth, available at http://www.kauffman.org/~/media/kauffman_org/research%20reports%20covers/2010/07/firm_formation_importance_of_startups.pdf (showing the importance of startups for net job growth in the U.S. economy); Edward L. Glaeser, Sari Pekkala Kerr, and William R. Kerr, "Entrepreneurship And Urban Growth: An Empirical Assessment With Historical Mines," Working Papers 13–15, Center for Economic Studies, U.S. Census Bureau, 2013 (finding that increasing the proportion of startup employment within a region increases the growth rate of overall employment and wages.); John C. Haltiwanger, Ron S. Jarmin, Javier Miranda, "Who Creates Jobs? Small vs. Large vs. Young," NBER Working Paper No. 16300, August 2010, available at http://www.nber.org/papers/w16300 (highlighting "the important role of business startups and young businesses in U.S. job creation").

[17] Stuart Anderson & Michaela Platzer, "American Made: The Impact of Immigrant Entrepreneurs and Professionals on U.S. Competitiveness," National Venture Capital Association, Nov. 2006, at 11.

[18] Stuart Anderson, "Immigration Founders and Key Personnel in America's 50 Top Venture-Funded Companies," Dec. 2010, available at http://www.nfap.com/pdf/NFAPPolicyBriefImmigrantFoundersandKeyPersonnelinAmericasTopVentureFundedCompanies.pdf.

[19] Vivek Wadhwa, AnnaLee Saxenian & F. Daniel Siciliano, "America's New Immigrant Entrepreneurs: Then and Now," Kauffman Foundation, Oct. 2012, at 3, available at http://www.kauffman.org/what-we-do/research/immigration-and-the-american-economy/americas-new-immigrant-entrepreneurs-then-and-now.

[20] Stuart Anderson, "American Made 2.0: How Immigrant Entrepreneurs Continue to Contribute to the U.S. Economy," National Venture Capital Association, 2013, at 5, available at http://nvca.org/research/stats-studies/.

[21] Stuart Anderson, "American Made 2.0—How Immigrant Entrepreneurs Continue to Contribute to the U.S. Economy," supra 28.

[22] See, e.g., Vivek Wadhwa, "The Immigrant Exodus" (Philadelphia: Wharton Digital Press) (2012); Amy Grenier, "Majority of U.S. Patents Granted to Foreign Individuals, Immigration Impact," April 11, 2014, available at http://immigrationimpact.com/2014/04/11/majority-of-u-s-patents-granted-to-foreign-individuals/ (noting difficulties that foreign inventors face in coming to and staying in the United States).

[23] See http://www.uscis.gov/about-us/entrepreneurs-residence-initiative/entrepreneurs-residence-eir. For the EIR program, USCIS recruited both start-up experts from the private sector, using DHS's Loaned Executive Program, and internal immigration experts from across the agency. Working within the framework of current immigration law, the team set out with the overarching goal of optimizing existing visa categories used by entrepreneurs to provide pathways that are clear, consistent, and aligned with business realities.

Exhibit 1
59

requirements and proposed criteria for extending discretionary parole, on a case-by-case basis, to entrepreneurs of start-up entities and their spouses and children. As required by statute, the entrepreneur must demonstrate that his or her parole into the United States would provide a significant public benefit. DHS proposes that an individual may meet that standard under this rule by demonstrating that his or her start-up entity has substantial potential for rapid growth and job creation and that his or her parole would significantly help the entity conduct and grow its business here. *See* proposed new 8 CFR 212.19(b)(2). As described in more detail below, an applicant would generally be able to meet this standard by demonstrating the following:

• The entrepreneur's entity was recently formed (*i.e.*, generally within the 3 years immediately preceding the filing date of the entrepreneur's application for parole) in the United States and has the substantial potential for rapid growth and job creation. *See* proposed 8 CFR 212.19(a)(2).

• The applicant is an entrepreneur in that he or she possesses a substantial ownership interest (*i.e.*, generally 15 percent or more) in the entity and has an active and central role in the entity such that he or she is well-positioned to advance the entity's business. *See* proposed 8 CFR 212.19(a)(1).

• The entity has: (1) Received substantial investment from U.S. investors with established records of successful investments; or (2) received substantial awards or grants from certain Federal, State, or local government entities. *See* proposed 8 CFR 212.19(b)(2)(ii). Alternatively, an applicant who partially meets one or more of these two sub-criteria may be considered for parole if he or she provides additional reliable and compelling evidence that his or her parole would provide a significant public benefit. *See* proposed 8 CFR 212.19(b)(2)(iii).

Under the proposed rule, an applicant would file a new application specifically tailored for entrepreneurs to demonstrate eligibility for parole based upon significant public benefit, along with proposed fees. *See* proposed 8 CFR 212.19(b)(1). Applicants would also be required to appear for collection of biometric information. *See* proposed 8 CFR 212.19(e). To grant parole, USCIS adjudicators would be required to conclude, following an individualized assessment and based on the totality of the circumstances, that both: (1) The applicant's parole would provide a significant public benefit, and (2) the applicant merits a grant of parole as a matter of discretion. *See* proposed 8 CFR 212.19(d)(1).

If a determination is made that parole of the applicant would provide a significant public benefit, DHS may parole the entrepreneur for a period of

up to 2 years, with an opportunity to apply for one additional period of parole of up to 3 years upon showing that parole would continue to provide a significant public benefit. *See* proposed 8 CFR 212.19(d)(2) and (h). DHS further proposes that no more than three principal entrepreneurs may receive parole with respect to any one qualifying entity. *See* proposed 8 CFR 212.19(f).

Following is a detailed discussion of the specific provisions proposed by DHS in this rulemaking.

*B. Criteria for Initial Parole Consideration*

To be considered for an initial grant of parole based on significant public benefit under this rule, DHS is proposing that the individual generally meet the following criteria:

1. Recent Formation of a Start-Up Entity

The key criterion under this proposed rule is the formation of a new entity in the United States that has substantial potential to rapidly increase revenue and create jobs for U.S. workers. DHS thus proposes that an applicant for parole under this rule be able to show that his or her start-up entity was recently formed in the United States, has lawfully done business during any period of operation since its date of formation, and has the substantial potential to experience rapid growth and job creation, including through the significant attraction of capital investment or government awards or grants. *See* proposed 8 CFR 212.19(a)(2). An entity that is the basis for a request for parole under this section may be considered "recently formed" if it is a U.S. business entity that was created within the 3 years immediately preceding the filing date of the entrepreneur's application for parole. *Id.*

As a preliminary matter, DHS proposes that a proffered start-up entity must meet the definition of "U.S. business entity" at proposed 8 CFR 212.19(a)(9). The term is defined as any corporation, limited liability company, partnership, or other entity that is organized under Federal law or the laws of any State,[24] and that conducts business in the United States that is not an investment vehicle primarily engaged in the offer, purchase, sale or trading of securities, futures contracts, derivatives or similar instruments. *See* proposed 8 CFR 212.19(a)(9). DHS

believes that this definition appropriately captures the range of start-up entities that are formed in the United States by entrepreneurs and that have the substantial potential for rapid growth and job creation. DHS is proposing to exclude an entity that is an investment vehicle primarily engaged in the offer, purchase, sale or trading of securities, futures contracts, derivatives or similar instruments to ensure that the start-up entities receiving investment capital under this proposed rule are not merely serving as a conduit for reinvestment, but providing or seeking to provide goods or services with the substantial potential for rapid growth and job creation.

As noted above, an entity must be recently formed in the United States to be considered a start-up entity for purposes of this rule. *See* proposed 8 CFR 212.19(a)(2). DHS proposes that an entity that is the basis for seeking parole under this rule may be considered recently formed if it is less than 3 years old at the time of filing the parole application.[25] *Id.* This limitation reflects the Department's intention for parole under this proposed rule to incentivize and support the creation and growth of new businesses in the United States, so that the country may benefit from their potential for rapid growth and job creation. DHS recognizes that the term "start-up" is usually used to refer to entities in early stages of development, including various financing rounds used to raise capital and expand the new business, but "goes beyond a company just getting off the ground."[26] DHS believes that limiting the definition of "start-up" in this proposed rule to entities that are less than 3 years old at the time the parole application is filed is reasonable to ensure that the entrepreneur's entity is the type of new business likely to experience rapid growth and job creation, while still allowing a reasonable amount of time for the entrepreneur to form the business, obtain qualifying levels of investor financing (which may occur in several rounds) or government grants or awards, and still meet the definition of a "start-up entity" under this rule.

---

[24] "State" is a defined term at INA section 101(a)(36). In addition to the 50 States, the term "includes the District of Columbia, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands."

[25] With respect to certain proposed definitions at 8 CFR 212.19(a)(3) and (a)(5), which discuss other entities that receive grants, awards, or investments, an entity may be considered recently formed if it was created within the 3 years immediately preceding the receipt of a relevant grant, award, or investment. *See* proposed 8 CFR 212.19(a)(2).

[26] U.S. Small Business Administration, Startups & High Growth Businesses, available at *https://www.sba.gov/content/startups-high-growth-businesses* ("In the world of business, the word 'startup' goes beyond a company just getting off the ground.").

Exhibit 1
60

DHS further proposes to consider parole under this rule only where it is demonstrated that the start-up entity has been operating lawfully in the United States since its formation. *See* proposed 8 CFR 212.19(a)(2). This limitation is intended to protect the integrity of this new parole process. Part of the parole determination would therefore include a review by DHS of the start-up entity's activities from the time of its formation in the United States.

Finally, DHS proposes that the start-up entity must be of a type that has the substantial potential to experience rapid growth and job creation, including through the significant attraction of capital investment or government awards or grants. This factor is intended to capture the types of start-up entities that are most likely to provide a significant public benefit, while excluding entities without such potential—such as small businesses with limited growth potential created by entrepreneurs for the sole or primary purpose of providing income to the entrepreneurs and their families.[27] Because this latter type of business is less likely to experience rapid growth and job creation, DHS believes it is unlikely that the entrepreneur of such a business would be able to meet the significant public benefit requirement for a grant of parole.

DHS anticipates that an applicant seeking parole under this rule would be able to meet the above criteria by providing various types of evidence. As part of the application process, an applicant would generally be expected to submit supporting documentation concerning the entity's business and its substantial potential for rapid growth and job creation (as well as the entrepreneur's day-to-day role in the business). *See* proposed 8 CFR 212.19(b)(2)(ii)(A). In addition to meeting the capital investment or government funding criteria discussed further below, such additional documentation may include:

• Evidence of capital investments from qualified investors, or government awards or grants, other than those relied on to satisfy the requirements of 8 CFR 212.19(b)(2)(ii)(B);

• letters from relevant government entities, qualified investors, or established business associations with knowledge of the entity's research, products or services and/or the applicant's knowledge, skills or experience that would advance the entity's business;

• newspaper articles or other similar evidence that the applicant or entity has received significant attention or recognition;

[27] Erik Hurst & Benjamin Wild Pugsley, "What Do Small Businesses Do?" (Aug. 2011), *available at* http://www.brookings.edu/~/media/files/programs/es/bpea/2011_fall_bpea_papers/2011_fall_bpea_conference_hurst.pdf.

• evidence that the applicant or entity has been recently invited to participate in, is currently participating in, or has graduated from one or more established and reputable start-up accelerators;

• evidence of significant revenue generation and growth in revenue;

• patent awards or other documents indicating that the entity or applicant is focused on developing new technologies or cutting-edge research;

• evidence that the applicant has played an active and central role in the success of prior start-up entities;

• degrees or other documentation indicating that the applicant has knowledge, skills, or experience that would significantly advance the entity's business;

• payroll, bookkeeping, salary, or bank records or other documents related to jobs created prior to filing the request for parole; and

• any other relevant, probative, and credible evidence indicating the entity's potential for growth and/or the applicant's ability to advance the entity's business in the United States.

DHS believes that such evidence would assist USCIS officers in determining whether an entity has substantial potential for rapid growth and job creation and, ultimately, whether an applicant has met the required standard for parole and merits a favorable exercise of discretion.

DHS welcomes public comment on the proposed definitions of the terms "start-up entity" and "U.S. business entity," as well as the requirement that the entity be formed within the 3 years preceding a request for parole. DHS also welcomes comments on the types of evidence that may be considered when determining whether such provisions have been met, including alternative suggestions on how applicants may be able to demonstrate eligibility.

## 2. Applicant Is an Entrepreneur Who Is Well-Positioned To Advance the Entity's Business

DHS is proposing that to be considered for parole under this rule, an applicant must be an entrepreneur who is well-positioned to advance his or her start-up entity's business. Specifically, DHS proposes that an applicant be able to demonstrate that he or she is an "entrepreneur" as defined at 8 CFR 212.19(a)(1). This definition would require the applicant to show that he or she both: (1) Possesses a substantial ownership interest in the start-up entity, and (2) has a central and active role in the operations of that entity, such that his or her knowledge, skills, or experience will substantially assist the entity with the growth and success of its business. *See* proposed 8 CFR 212.19(a)(1). The definition further provides that for purposes of this rule,

an individual may be considered to possess a substantial ownership interest if he or she possesses at least a 15 percent ownership stake in the start-up entity at the time of adjudication of the initial grant of parole (and maintains at least a 10 percent ownership stake in the start-up entity at all times during the parole period, including any period of re-parole). *Id.*

DHS believes these criteria are appropriate, as active ownership and participation provide stronger justifications for parole based on significant public benefit than investment alone. To establish that parole would serve a significant public benefit, DHS believes that the applicant should be central to the entity's business and well-positioned to actively assist in the growth of that business, such that his or her presence would help the entity provide related benefits in the United States, including by conducting research and development, increasing revenue, or creating jobs. DHS thus adopts the common meaning of the term "entrepreneur," which embodies the concept of active, material participation by an individual in the operations and growth of a new business entity. *See* Black's Law Dictionary (9th ed. 2009) (defining "entrepreneur" as "[o]ne who initiates and assumes the financial risks of a new enterprise and who usually undertakes its management"). Whether an applicant has an "active and central role" will be determined based on the totality of the evidence provided.

The ownership criterion proposed by DHS in this rule is also essential for connecting the individual to the start-up entity providing the significant public benefit. DHS has determined that a minimum 15 percent ownership interest is a reasonable threshold for seeking parole under this rule. DHS recognizes that entrepreneurs may possess larger equity stakes in the start-up entity at the time of formation or during initial seed rounds of financing (often ranging from 50–100 percent).[28] This equity stake, however, may be diluted significantly during financing rounds, or by the provision of equity compensation to key

[28] "Venture Capital," Encyclopedia of Small Business, 2007. Retrieved September 22, 2015 from Encyclopedia.com: http://www.encyclopedia.com/doc/1G2-2687200596.html ("The percentage of equity ownership required by a venture capital firm can range from 10 percent to 80 percent, depending on the amount of capital provided and the anticipated return. But most venture capital organizations want to secure equity in the 30–50 percent range so that the small business owners still have an incentive to grow the business. Since venture capital is in effect an investment in a small business' management team, the venture capitalists usually want to leave management with some control.").

Exhibit 1
61

personnel within the entity. DHS further recognizes that start-up entities are not limited to one entrepreneur, and that there may be instances when a team of entrepreneurs will form the start-up entity. The specific equity stake by the entrepreneur in the start-up entity will therefore vary based on the particular facts and circumstances of each case. DHS thus believes establishing a minimum 15 percent threshold with respect to ownership adequately accounts for the possibility of equity dilution for the reasons described above, while ensuring that the individual continues to have a substantial ownership interest in, and assumes more than a nominal financial risk related to, the entity.

DHS anticipates that an applicant would be able to demonstrate sufficient satisfaction of the above criteria by providing various forms of evidence. With respect to ownership, DHS anticipates that an applicant would be able to provide copies of legal or financial documents—such as formation and organizational documents, equity certificates, equity ledgers, ownership schedules, or capitalization tables—indicating the applicant's ownership interest in the start-up entity. With respect to the applicant's role within the entity, DHS expects that an applicant would provide supporting documentation of his or her role within the entity, as well as the knowledge and experience that is central to the entity's business. Such supporting documentation may include:

• Letters from relevant government agencies, qualified investors, or established business associations with an understanding of the applicant's knowledge, skills or experience that would advance the entity's business;

• newspaper articles or other similar evidence that the applicant has received significant attention and recognition;

• evidence that the applicant or entity has been recently invited to participate in, is currently participating in, or has graduated from one or more established and reputable start-up accelerators;

• evidence that the applicant has played an active and central role in the success of prior start-up entities;

• degrees or other documentation indicating that the applicant has knowledge, skills, or experience that would significantly advance the entity's business; and

• any other relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States.

DHS welcomes public comments on all aspects of these standards, including the definition of the term "entrepreneur." DHS also welcomes comment on the types of evidence that may be considered when determining whether an applicant is an entrepreneur, including alternative suggestions on how applicants may be able to demonstrate eligibility.

### 3. Capital Investment or Government Funding Criteria

DHS is also proposing that an individual who seeks parole under this rule must validate the entity's substantial potential for rapid growth and job creation by providing additional reliable evidence of such potential. DHS is proposing that this requirement may generally be satisfied by demonstrating that the entity has: (1) Received substantial investment of capital from U.S. investors with established records of successful investments; or (2) received substantial awards or grants for purposes of economic development, research and development, or job creation from Federal, State, or local government entities that regularly provide such awards or grants to U.S. businesses. *See* proposed 8 CFR 212.19(b)(2)(ii)(B). DHS further proposes alternative criteria under which an applicant who partially meets one or more of these two criteria may be considered for parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole would provide a significant public benefit. *See* proposed 8 CFR 212.19(b)(2)(iii).

These investment and funding criteria are proposed to serve as reliable indicators of an entity's substantial potential for rapid growth and job creation and, ultimately, of the significant public benefit that a grant of parole would provide in an individual case. Meeting these criteria, however, is intended to supplement—and not supplant—the need to provide other supporting evidence (such as that described in section IV.B.1) establishing that the applicant meets the general criteria for a grant of parole under the proposed rule. Even if an entity meets the investment or funding criteria discussed herein, additional evidence would generally assist USCIS officers in determining whether an applicant has met the required standard for parole and merits a favorable exercise of discretion. Among other things, such supplementary evidence may: provide additional external validation of the start-up entity (*e.g.*, receiving additional funding from a government entity, being accepted into a start-up accelerator, generating significant revenue, or creating jobs); show that the entity works in fields important to economic growth (*e.g.*, creating new technologies or engaging in cutting-edge research); or demonstrate that the entrepreneur has knowledge, skills, or experience that would substantially advance the entity's business (*e.g.*, successfully leading prior start-up entities, having advanced degrees in the appropriate field, or establishing critical patents). DHS also anticipates that such additional evidence would be available in the majority of cases involving recently formed entities that have substantial potential for growth and that otherwise meet the standards proposed in this rulemaking.

### a. Substantial Investment From Qualified U.S. Investors

DHS proposes to allow an applicant to demonstrate his or her entity's substantial potential for rapid growth and job creation by showing that the entity has received substantial investment of capital from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of successful investments in start-up entities. *See* proposed 8 CFR 212.19(b)(2)(ii)(B). DHS proposes that investments may generally be considered "substantial" with respect to an initial application for entrepreneur parole if total investments, which can be from one or more qualified U.S. investors, meet or exceed $345,000. *Id.* DHS further proposes that qualifying investors include only those investors who have a history of making similar or greater investments on a regular basis over the last 5 years and who can demonstrate that at least two of the entities receiving such investments have subsequently experienced significant growth in revenue or job creation. *See* proposed 8 CFR 212.19(a)(5). DHS believes that the investment of a substantial amount of capital by qualified investors in an entrepreneur's start-up entity may serve as a strong indication of an entity's potential to positively impact the U.S. economy and labor force.

DHS is proposing a general qualified investment threshold of $345,000, which DHS believes is a reasonable minimum investment amount that will serve as a reliable external validation factor by qualified investors.[29] DHS

---

[29] The $345,000 figure is rounded from the actual figure $345,390, which is the 2015 average for all angel investments (the largest source of start-up capital for innovative firms) received by start-up entities. *See* Jeffrey Sohl, "The Angel Investor Market in 2015: A Buyers' Market," Center for Venture Research, May 25, 2015, available at: *https://paulcollege.unh.edu/sites/paul college.unh.edu/files/webform/Full%20 Year%202015%20Analysis%20Report.pdf.* The rounded $345,000 figure from 2015 is also very close to the $342,000 grand mean for the period
Continued

Exhibit 1
62

reached this figure after analyzing available data on angel investments—the largest source of start-up capital for innovative firms—as well as initial or "seed" round investments from venture capital firms and start-up accelerators.[30] DHS also analyzed other available data on capital amounts used to create new businesses, and consulted with the Small Business Administration (SBA). In determining a minimum investment amount applicable to all qualified investors (e.g., venture capital firms,[31] angel investors,[32] and start-up accelerators [33]), the $345,000 amount is generally on par with, based on data that DHS reviewed, the combined capital investment typically obtained in

2012–2015, id., and it is corroborated by other sources. For example, according to a report from the business Web site Fundable, which specializes in startup finance, the average angel-financed firm receives approximately $333,000 in angel capital. This report can be found at: https:// www.fundable.com/learn/resources/guides/investor -guide/types-of-investors.

[30] DHS is aware that there is a wide range of investment amounts for angel, venture, and accelerator investment applied to startups. For example, DHS analysis of data from SeedDB reveals that some large accelerators provide initial investments of less than $100,000. DHS analysis reveals that angel investments that are conducted in groups, or that are co-invested with venture or other institutional investors, have ranged from about $350,000 to $725,000 since 2013, with an up-front over the last two years, and several data sources reveal medians of about $500,000. Seed and startup venture investments are generally over $1,000,000. DHS believes that the $345,000 angel average for 2015 is reasonable because it represents nearly a mid-point across the various data and sources DHS has reviewed for such investments, is publicly available from a reputable source, and includes all angel investments. Additional details on the Seed DB accelerators data are found in Section C, "An Alternative Estimate of Entrepreneurs Based on Investment Structures," in the ensuing "Statutory and Regulatory Requirements" section of this notice. Mean and median figures for venture backed and angel group can be found in the following sources: http://www.ey.com/Publication/vwLU Assets/Venture_Capital_Insights_4Q14_-_January_ 2015/$FILE/ey-venture-capital-insights-4Q14.pdf; http://www.angelresourceinstitute.org/--/media/ Files/Halo%20Report%202015%20 Annual%20vFinal.pdf; and http://www.inc.com/ linkedin/tomasz-tunguz/inflation-deflation-startup-fundraising-market-tomasz-tunguz.html.

[31] Government, semi-government, or private firm that provides startup or growth equity capital and/ or loan capital to promising ventures for returns that are higher than market interest rates. See http:// www.businessdictionary.com/definition/venture-capital-firm.html.

[32] Business "angels" are high net worth individual investors who seek high returns through private investments in start-up companies. See https://www.sba.gov/content/venture-capital#Angel Investors.

[33] Business entities that make seed-stage investments in promising companies in exchange for equity as part of a fixed-term, cohort-based program, including mentorship and educational components, that culminates in a public pitch event or demo day. See https://www.sba.gov/advocacy/ innovation-accelerators-defining-characteristics-among-startup-assistance-organizations.

early rounds of investment from venture capital firms or angel investors.[34]

DHS is also proposing a requirement that the substantial investment be received within the 365 days immediately preceding the filing of the application for initial parole. In addition to addressing potential fraud concerns, this requirement assists in validating the entity's substantial potential for rapid growth and job creation and, ultimately, of the significant public benefit that a grant of parole to the entrepreneur would provide. This requirement ensures that a qualified investor or government entity has recently validated (within 365 days) the start-up entity's potential for rapid growth and job creation. However, DHS recognizes that start-up investment is a rapidly evolving field, and welcomes additional feedback, including data on trends in investment that may be available, as such feedback and data may impact the minimum investment threshold in the Department's final rule.

As noted above, in order to meet the investment criteria for consideration of parole under this proposed rule, the $345,000 total investment must be made by one or more qualified investors. See proposed 8 CFR 212.19(a)(5) and (b)(2)(ii)(B)(1). DHS proposes to define "qualified investor" as either an individual or an organization. See proposed 8 CFR 212.19(a)(5). If the investor is an individual, the investor would need to be a U.S. citizen or lawful permanent resident. Id. If the investor is an organization, the investor would need to be located in the United States and operate through a legal entity organized under the laws of the United States that is majority owned and controlled, directly or indirectly, by U.S. citizens or lawful permanent residents. Id. In either case, such investor could not have been permanently or temporarily enjoined from participating in the offer or sale of a security or in the provision of services as an investment adviser, broker, dealer, municipal securities dealer, government securities broker, government securities dealer, bank, transfer agent or credit rating agency, barred from association with any entity involved in the offer or sale of securities or provision of such services, or otherwise found to have participated in the offer or sale of securities or provision of such services in violation of law. See proposed 8 CFR 212.19(a)(5).

In addition, DHS proposes to limit qualifying investors to those who have an established record of successful investments in start-up entities. DHS

[34] See note 29.

proposes that such a record would include, during the 5-year period prior to the date of filing of the parole application, 1 or more investments in other start-up entities in at least 3 separate calendar years in exchange for equity or convertible debt comprising a total of no less than $1,000,000.[35] See proposed 8 CFR 212.19(a)(5)(i). DHS will require monetary commitments, rather than non-monetary commitments such as credit for in-kind value (e.g., credit for services), given the difficulty of valuing such commitments and the potential for fraud and abuse. The applicant would also need to show that, subsequent to such investment by the investor, at least 2 such entities each created at least 5 qualified jobs or achieved at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. See proposed 8 CFR 212.19(a)(5)(ii).

These criteria are intended to ensure that investors are bona fide, and thus to prevent fraud and protect the integrity of the parole process under this rule. They are also intended to ensure that a qualifying investment serves as a strong and reliable indication of the start-up entity's substantial potential for rapid growth and job creation. By requiring an investor to have a track record of investing substantial funds in start-up entities that subsequently achieve significant revenue and job creation, these provisions would enhance the Department's ability to have confidence in the investments made by qualified investors as reliable validation of a start-up entity's potential. At the same time, the criteria would mitigate potential misuse of the parole process, including by individuals or entities that may claim to be bona fide investors to conceal fraud or other illicit activity. DHS expects that individuals and entities that meet these criteria would include existing and bona fide start-up investors that are known to operate successfully in the business community—including established venture capital firms, angel investors, and start-up accelerators.

Finally, DHS proposes to limit "qualified investments" under this rule to investments of lawfully derived capital in start-up entities through the purchase of equity or convertible debt issued by such entities. See proposed 8 CFR 212.19(a)(4). DHS proposes that a qualified investment would not include an investment from: (1) The entrepreneur him or herself; (2) the

[35] "Venture Capital," Encyclopedia of Small Business, 2007. Retrieved September 22, 2015 from Encyclopedia.com: http://www.encyclopedia.com/ doc/1G2-2687200596.html ("Most venture capital firms look for investment opportunities in the $250,000 to $2 million range.")

Exhibit 1
63

parents, spouse, brother, sister, son, or daughter of such entrepreneur; or (3) any corporation, limited liability company, partnership, or other entity in which such entrepreneur or the parents, spouse, brother, sister, son, or daughter of such entrepreneur directly or indirectly has any ownership interest. *Id.* DHS is proposing these exclusions to help ensure that the qualified investment was acquired through an arms-length transaction and is a bona fide investment. Any investment that does not meet the definition of "qualified investment" will not count toward the criteria to meet the proposed rule's minimum investment threshold.

DHS welcomes comments on all aspects of this section, including the proposed investment threshold, any potential alternative amounts for that threshold, and additional data. For comments recommending investment threshold amounts, the Department requests that commenters provide rationales and data, if available, to support their recommendations.

b. Substantial Government Awards or Grants

DHS proposes that an applicant may alternatively demonstrate a start-up entity's substantial potential for rapid growth and job creation by showing that the entity has received significant funding in the form of awards or grants from Federal, State or local government entities. DHS proposes that to satisfy this criterion, the awards or grants generally would need to be made by one or more Federal, State, or local government entities that regularly provide such funding to U.S. businesses for economic development, innovation, research and development, or job creation reasons. DHS proposes to exclude any contractual commitment for goods or services, including any contracts that might appear to be, or could be made to look like, an award or grant. DHS believes this exclusion is reasonable since a contract for goods and services with a Federal, State or local government entity would typically provide a direct benefit to that government entity and not a public benefit, such as encouraging economic development and innovation, that an award or grant would provide as required by this proposed rule. *See* proposed 8 CFR 212.19(a)(3). DHS also proposes that to be considered substantial, such awards or grants generally would need to total $100,000 or more. *See* proposed 8 CFR 212.19(b)(2)(ii)(B)(2).

In the United States today, a range of Federal, State, and local government entities, including State or local

economic development corporations (EDCs), evaluate U.S. businesses and provide awards or grants when such funding is deemed to be in the public interest.[36] DHS believes that significant funding from such a government entity is a strong indicator of a start-up entity's substantial potential for rapid growth, including through enhancing innovation, generating revenue, obtaining significant additional investments of capital, and creating jobs. Because such government entities regularly evaluate the potential of U.S. businesses, the choice to provide a significant award or grant to a particular start-up entity is generally a compelling indicator of that start-up's substantial potential for growth and job creation. Additionally, because government entities are by definition formed to serve the public, the choice by such an entity to fund a particular business generally indicates the government entity's independent assessment that the business's operations would provide a significant public benefit. For these reasons, DHS believes it is reasonable to establish a lower threshold amount for government funding in comparison to the previously discussed threshold amount for private investment. DHS proposes a general $100,000 minimum government funding threshold based on the above and the fact that seed capital awards ("Phase I" awards) from the Small Business Innovation Research (SBIR) program are generally below $150,000.[37]

---

[36] *See, e.g.,* U.S. Small Business Administration, *https://www.sbir.gov* (describing Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) programs, which provide early-stage capital for innovative small companies in the United States) and National Institutes of Health, *https://sbir.nih.gov/* (describing healthcare opportunities under SBIR and STTR); U.S. Economic Development Association (EDA), Regional Innovation Strategies Program (RIS), *http://www.eda.gov/oie/ris/* (providing grants to cities and local EDCs, among others, to fund startups); Energy Innovations Small Grant Program, *www.energy.ca.gov/research/innovations* (providing State grants of up to $150,000 to small businesses, among others, to research innovative energy concepts); Startup Philadelphia Call for Ideas, *http://www.startupphl.com/startup-phl-call-for-ideas* (partnership between City of Philadelphia and the Philadelphia Industrial Development Corporation to provide $500,000 to grow the startup and early-stage business economy in Philadelphia).

[37] The Small Business Innovation Research (SBIR) program is coordinated by the Small Business Administration to seed capital for start-up businesses. It is designed to stimulate technological innovation among small private-sector businesses and encourages small businesses to market the SBIR technology in the private sector. It is the largest source of seed capital in the United States for technology driven start-ups, funding between 5,000 and 7,000 projects a year. The "first phase" award is an innovation grant made for initial eligibility and corresponds to the start-up of the commercial business and proof of "concept phase"—the average

DHS welcomes comments on all aspects of this section, including the proposed government funding threshold, any potential alternative amounts for that threshold, and additional data. For comments recommending government funding threshold amounts, the Department requests that commenters provide rationales and data, if available, to support their recommendations.

c. Alternative Criteria for Parole Consideration

Additionally, DHS proposes that an applicant who only partially meets one or both of the above investment or government funding sub-criteria for parole under this rule may still be considered for parole under this rule in certain limited circumstances. *See* proposed 8 CFR 212.19(b)(2)(iii). Specifically, DHS would consider parole for such an applicant if the applicant provides additional "reliable and compelling" evidence of the entity's substantial potential for rapid growth and job creation. *See* proposed 8 CFR 212.19(b)(2)(iii). Importantly, such parole would not be available to applicants who are unable to demonstrate that their start-up entities have received a substantial amount of U.S. capital investment or government funding. Rather, the applicant would need to show as a preliminary matter that his or her entity has received a substantial level of capital investment or government funding, although less than $345,000 or $100,000, respectively. The applicant would also need to further validate the entity's substantial potential for rapid growth and job creation by submitting additional evidence that DHS determines to be both reliable and compelling. DHS proposes that such evidence be reliable and compelling in its own right to overcome the applicant's inability to fully meet the threshold criteria otherwise required under the proposed rule.

DHS is not proposing to define the specific types of evidence that may be deemed "reliable and compelling" at this time, as the Department seeks to retain flexibility as to the kinds of supporting evidence that may warrant the Secretary's exercise of discretion in granting parole based on significant public benefit. But DHS believes that to meet the parole standard in this context without meeting the threshold criteria,

award amounts vary by department, but most SBIR Phase I awards are made at or below $150,000. The Phase I awards are geared towards financing the startup of the private commercial entity and also the innovation and research and development (R&D) that the enterprise undertakes.

Exhibit 1
64

such additional evidence would need to be particularly persuasive. In other words, although all applicants for entrepreneur parole would be expected to provide supplementary evidence indicating that their parole would serve a significant public benefit, applicants who only partially meet the threshold criteria mentioned above would need to provide other reliable and compelling evidence to ensure that the totality of the evidence demonstrates that the start-up entity has the substantial potential for rapid growth and job creation.

DHS anticipates that the necessary amount and requisite evidentiary weight of such additional evidence would depend on the degree to which an applicant meets one or both of the threshold sub-criteria related to capital investment or government funding. For example, an applicant whose entity has received $200,000 in qualifying capital investment would be expected to provide more validating evidence than an applicant whose entity received $300,000 in such investment. Moreover, DHS may give particular weight to evidence that tends to serve as a strong validation of the entity's substantial potential for rapid growth and job creation. For example, evidence that an entity has been selected to participate in, is participating in, or has graduated from one or more established and reputable start-up accelerators (or incubators) may serve as, depending on the accelerator's success rate and other factors, a strong indicator of the entity's potential. With respect to start-up accelerators, DHS expects to evaluate them on several relevant factors, including years in existence, graduation rates, significant exits by portfolio start-ups, significant investment or fundraising by portfolio start-ups, and valuation of portfolio start-ups.

Ultimately, the USCIS adjudicator would be required to determine whether such additional evidence—in conjunction with the entity's substantial capital investment or government funding, among other factors—is sufficient to establish that the applicant's parole into the United States will provide a significant public benefit (and that the applicant merits a favorable exercise of discretion). This approach is consistent with the discretionary nature of the Secretary's statutory parole authority and the fact that each parole request will be adjudicated, on a case-by-case basis, after considering the particularized facts of each case. DHS invites public comment on the types of reliable and compelling evidence that may warrant a discretionary grant of parole in such cases.

As noted above, DHS also invites public comment on alternatives to the proposed investment amount and government funding thresholds that applicants may use to demonstrate a start-up entity's substantial potential for rapid growth and job creation and that may serve as a principal basis for seeking parole under this rule. Commenters are invited to submit comments on whether significant revenue generation, participation in established and reputable start-up accelerators, or any other significant external validation factor should be included as a principal basis for seeking parole under this rule. DHS specifically invites comment on whether applicants can adequately demonstrate the future substantial potential for rapid growth and job creation through established records of revenue generation, revenue growth, job creation, or any combination of these and other factors. Commenters should recommend threshold levels for obtaining parole under suggested criteria, data to support the recommended alternative thresholds, and the types of reliable evidence that applicants may submit to substantiate their claims. Comments should include any relevant data to substantiate recommendations, if available.

*C. Application Requirements for Initial Period of Parole*

1. Filing the Application for Entrepreneur Parole (Form I–941)

DHS is proposing to establish new application requirements for entrepreneurs seeking parole under this rule. Prior to appearing before DHS as an applicant for admission requesting parole, entrepreneurs would be required to file with USCIS an Application for Entrepreneur Parole (Form I–941 or successor form), established by this rulemaking, along with supporting documentation. This application is designed to capture information pertaining to the criteria that are specific to parole requests filed under this rule. USCIS would accept Applications for Entrepreneur Parole filed from within the United States or outside the United States. DHS is proposing an application filing fee of $1200. *See* proposed 8 CFR 103.7(b)(1)(i)(FFF). In addition to filing the application, supporting documentation, and filing fee, applicants would be required to submit a biometric services fee as prescribed by 8 CFR 103.7(b)(1)(i)(C).

2. Requirement To Appear for Submission of Biometric Information

DHS proposes that all individuals filing the Application for Entrepreneur Parole would be required to appear for collection of their biometric information, including fingerprints and photographs. *See* proposed 8 CFR 212.19(e). DHS is proposing a biometric collection requirement so that background checks can be completed for each applicant, and so that any necessary travel documents can be produced. As noted above, applicants would be required to pay the fee for biometric services at the time of filing the Application for Entrepreneur Parole.

As is currently the case for other applicants for parole, the location for the collection of biometric information will depend on whether the applicant filed the application from within the United States or outside the United States. *See* form instructions to Application for Entrepreneur Parole (Form I–941). Applicants applying from within the United States will be required to appear at a USCIS Application Support Center (ASC) for submission of biometrics. Applicants applying from outside the United States may be required to appear at an overseas USCIS office. Applicants who will be receiving their travel documents overseas from a Department of State Consulate (or Embassy) will have their biometrics taken after their parole is authorized, but before their travel document is issued. Under current DHS regulations, DHS may determine that an application has been abandoned and thus should be denied if the applicant fails to appear at the biometrics appointment or otherwise fails to provide required biometric information. *See* 8 CFR 103.2(b)(13)(ii).

3. Income-Related Condition on Parole

Under the process proposed by this rule, DHS would consider granting parole to individuals whose enterprises have the substantial potential for rapid growth and job creation, including through the development of new technologies or the pursuit of cutting-edge research. To further ensure this is the case, and in addition to the high threshold criteria discussed above, DHS is proposing that an individual who is paroled into the United States under this rule must, as a condition of that parole, maintain household income while in the United States that is greater than 400 percent of the Federal poverty line for his or her household size as defined by the Department of Health and Human Services (HHS). *See* proposed 8 CFR 212.19(i). DHS is

Exhibit 1
65

further proposing to require the applicant to attest, as part of the Application for Entrepreneur Parole, that he or she will maintain household income at this level as a condition of parole and to provide evidence that he or she satisfied this condition if applying for re-parole. *Id.*

This income threshold is intended to establish that applicants seeking parole under this rule will have sufficient personal economic stability so as to better ensure that they will make significant economic and related contributions to the United States. The income threshold and time limits on parole also mean that individuals eligible for parole under this rule would generally not be eligible for Federal public benefits or premium tax credits under the Health Insurance Marketplace of the Affordable Care Act.[38] Under the proposed rule, DHS would be authorized to terminate parole for any individual who fails to maintain the threshold income level. *See* proposed new 8 CFR 212.19(k)(3)(iv). DHS would request verification of the parolee's household income when the parolee applies for re-parole, if applicable, or subsequent to any material change notification submitted by the parolee to USCIS.

DHS welcomes comment on the proposed income threshold.

4. Adjudication of Applications

When adjudicating the Application for Entrepreneur Parole, DHS is proposing that USCIS will examine whether the entrepreneur has demonstrated, through credible and probative evidence, that he or she warrants a favorable exercise of the Secretary's discretion. *See* proposed new 8 CFR 212.19(d)(1). If the entrepreneur meets the criteria for parole under the proposed rule, and a favorable exercise of discretion is warranted, USCIS may approve the request for parole. *Id.* Moreover, in determining whether an individual applicant's parole would provide a significant public benefit and whether to favorably exercise the Secretary's discretion in that individual case, USCIS will consider and weigh all evidence, including any derogatory evidence or information, such as but not limited to evidence of criminal history or other adverse factors. *Id.*

If USCIS, in its discretion, determines that the applicant does not warrant a grant of parole under the proposed rule, it may deny the application. *See* proposed 8 CFR 212.19(b) and (c). DHS is also proposing that there would be no right of appeal following a decision to deny entrepreneur parole, just as is the case currently with other parole requests. *See* proposed 8 CFR 212.19(d)(4). DHS is also proposing that applicants be precluded from filing motions to reopen or reconsideration under 8 CFR 103.5(a)(1). *Id.*

DHS, however, proposes to retain its authority and discretion to reopen or reconsider a decision only on its own motion. *See* proposed 8 CFR 212.19(d)(4). For the parole process proposed in this rulemaking, DHS may, in its discretion, reopen a decision and deny or approve parole at any time if DHS finds that the decision was issued in error. If USCIS determines that approval of an Application for Entrepreneur Parole was made in error, parole may be revoked. DHS would follow the requirements of 8 CFR 103.5(a)(5) before reopening a case and denying a parole application.

Because the determination to grant or deny a request for parole is a discretionary determination, the parole process proposed in this rule may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner. Parole determinations would continue to be discretionary, case-by-case determinations made by DHS, and parole may be revoked or terminated at any time. Parolees under this proposal would assume sole risk for any and all costs, expenses, opportunity costs, and any other potential liability resulting from a revocation or termination of parole. A grant of parole would in no way create any reliance or due process interest in obtaining or maintaining parole or being able to remain in the United States to continue to direct a start-up entity or for other reasons.

5. Limitation on Number of Entrepreneur Parolees per Start-Up Entity

DHS proposes to limit the number of entrepreneurs who may be granted parole under this rule with the same start-up entity. DHS recognizes that a start-up entity may be developed by more than one entrepreneur. DHS also believes that it would be difficult for a large number of entrepreneurs associated with the same start-up entity to each meet the proposed criteria and

comply with the proposed conditions while ultimately developing a successful business in the United States. DHS therefore believes that imposing a limit on the number of entrepreneurs who may be granted parole based on the same start-up entity is consistent with ensuring that each entrepreneur's parole will provide a significant public benefit. Specifically, DHS is proposing that parole may be granted to no more than 3 entrepreneurs per start-up entity. *See* proposed 8 CFR 212.19(f).

This limitation is intended to strengthen the integrity of the proposed entrepreneur parole process in various ways. Among other things, limiting the number of individuals who may be granted parole under this rule with respect to the same start-up entity will be an additional means of preventing an entity from being used as a means to fraudulently allow individuals to enter the United States. Such a limit, for example, diminishes the incentive to dilute equity in the start-up entity as a means to fraudulently acquire parole for individuals who are not bona fide entrepreneurs. Such a limit will also help ensure that the tangible benefits that may flow from the start-up entity's success in the United States—such as rapid revenue generation and job creation—are more likely to inure to the United States and its workers. Relatedly, DHS is concerned that a higher number of entrepreneurs associated with the same start-up entity may affect the start-up's ability to grow and succeed, and may even result in the startup's failure, thus preventing the goals of the proposed parole process.[39] To facilitate this determination, DHS is proposing to require an applicant to provide information on the application about any other individuals who have applied for or been granted parole based on the same start-up entity.

DHS welcomes comments on the proposed limitation on the number of entrepreneurs who can qualify for parole under this rule with the same start-up entity, including alternative proposals.

6. Authorized Period for Initial Grant of Entrepreneur Parole

DHS proposes that applicants who are granted entrepreneur parole may be

---

[38] Although individuals who are granted parole for more than one year become "qualified aliens" for the purpose of applying for such benefits, *see* 8 U.S.C. 1641(b), such individuals must generally be "qualified aliens" for at least 5 years before becoming eligible for those benefits, *see* 8 U.S.C. 1613. Individuals paroled under this rule will thus generally not qualify for such benefits.

[39] Scaling Startup Genome Report: premature scaling v 1.2 (edited March 2012). Copyright 2011, Startup Genome Report Extra on Premature, Max Marmer, CSO Startup Genome, Bjoern Lasse Herrmann, CEO Startup Genome, Ertan Dogrultan, CTO Startup Genome, Ron Berman, Ph.D. at UC Berkeley [explaining that "hiring too many people too early" in a start-up's development is one of several reasons that most start-ups fail] available at *https://s3.amazonaws.com/startupcompass-public/StartupGenomeReport2_Why_Startups_Fail_v2.pdf*.

Exhibit 1
66

authorized for an initial parole period of up to 2 years. *See* proposed new 8 CFR 212.19(d)(2). DHS has determined that entrepreneurs paroled under this rule may need up to a 2-year period of parole initially to allow them sufficient time to develop their start-up entity, which would be at an early stage of development, and achieve rapid growth in terms of revenue generation and job creation. DHS further believes that an initial period of parole of up to 2 years, followed by one possible period of re-parole of up to 3 additional years as described below, is consistent with the amount of time successful start-up entities generally require to realize growth potential. An entrepreneur of a start-up entity that is almost 3 years old when the parole application is filed would have the possibility to obtain up to 5 years of parole, which would allow the entity to realize its growth potential by the time it is 8 years old.[40] As proposed, DHS retains the discretion to provide any length of parole to an applicant, including a period shorter than 2 or 3 years where appropriate. Moreover, although USCIS would designate an appropriate initial parole validity period upon approval of the Application for Entrepreneur Parole, CBP would retain the authority to deny parole to an applicant or to modify the length of parole authorized by USCIS upon issuing parole at the port of entry, consistent with CBP's discretion with respect to any advance authorization of parole by USCIS. DHS will issue a multiple entry travel document for individuals granted parole under this rule to permit travel during their parole validity period.

DHS welcomes public comment on the proposed limits on the duration of parole under this rule and any relevant data to support alternative durations of parole.

**7. Spouses and Minor Children**

DHS proposes that the spouse and children[41] of an entrepreneur granted parole under this proposed rule may also be granted parole for the same period as the entrepreneur. *See* proposed new 8 CFR 212.19(h)(2). To be paroled with (or later join) the entrepreneur, his or her spouse and children would each be required to file an Application for Travel Document (Form I–131) in accordance with the form instructions. Each spouse or child seeking parole must independently establish eligibility for parole based on significant public benefit (or, alternatively, for urgent humanitarian reasons), and that the individual merits a favorable exercise of discretion. In a case in which an entrepreneur has been granted parole based on significant public benefit under this rule, USCIS may consider granting parole to the entrepreneur's spouse and children, if any, to maintain family unity and thereby further encourage the entrepreneur to operate and grow his or her business in the United States. As with the entrepreneur, certain biometric information for each spouse and child must be included on the application, along with a biometric services fee for each dependent. If the spouse and children are in the United States, they would also be required to appear at a USCIS office within the United States. If the applicants are outside the United States, the collection of additional biometric information (fingerprints and photographs) will take place prior to travel document issuance rather than before the parole applications are adjudicated. In such cases, however, USCIS would conduct preliminary background checks on each accompanying or joining family member prior to making its discretionary determination on their parole applications.

DHS is proposing to consider granting parole to the spouses and children of entrepreneur parolees to further the central purpose of the rulemaking—encouraging foreign entrepreneurs to come to and remain in the United States to develop and grow their start-up entities and provide the benefits of such growth to the United States. DHS retains the authority to decide whether to grant parole to such spouses and children on a case-by-case basis and may determine that such individuals do not warrant parole (or re-parole) either because their

parole would not be justified on significant public benefit grounds or as a matter of discretion.

*D. Employment Authorization*

**1. Employment Authorization Incident to Parole With a Specific Employer**

DHS is proposing that an entrepreneur who is paroled into the United States under this rule would be authorized for employment incident to his or her parole with the start-up entity. *See* proposed new 8 CFR 212.19(g). Under the proposed rule, the entrepreneur parolee's employment authorization would be limited to the specific start-up entity listed on the Application for Entrepreneur Parole. This limitation is intended to keep the scope of employment authorization within the purposes for which parole was granted. As the purpose of this proposed rule is to encourage foreign entrepreneurs to develop and grow their start-up businesses in the United States—rather than obtain new sources of employment—DHS believes this limitation on employment authorization is a reasonable restriction.

DHS further proposes that such employment authorization be "automatic" upon the grant of parole so that the entrepreneur can pursue his or her parole-related activities with the start-up entity without delay. DHS believes that requiring entrepreneurs to file separate applications for employment authorization and wait for Employment Authorization Documents (EADs, Form I–766) before beginning work[42] would undermine the very basis for extending parole to entrepreneurs—the rapid growth and success of the start-up entity. The delay resulting from the need to apply for and receive EADs (up to 90 days or more) could be detrimental to the success of the start-up entity.

Finally, DHS is proposing several conforming amendments to 8 CFR 274a.12(b), which lists the classes of foreign nationals authorized for employment incident to status with specific employers. DHS proposes to amend the introductory paragraph of this provision, which currently refers only to employment-authorized "nonimmigrants," by adding a reference to parolees under this rule. *See* revised 8 CFR 274a.12(b). DHS also proposes to add entrepreneur parolees under this rule to the list of classes of individuals authorized for employment with a specific employer (as opposed to open market employment). *See* proposed new 8 CFR 274a.12(b)(37). Specifically, the

---

[40] Estimates based on the Census Bureau Business Dynamics Statistics suggest that on average 55 percent of new firms survived after 3 years, but 80 percent of the firms that survived 3 years also made it through 5 years. Dane Stangler and Jared Konczal "Give me your entrepreneurs, Your innovators: Estimating the Employment Impact of a Startup Visa", Ewing Marion Kauffman Foundation (February 2013), available at *http:// www.kauffman.org/~/media/kauffman_org/ research%2Creports%20and%20covers/2013/02/ startup_visa_impact_final.pdf*; "CrunchBase Reveals: The Average Successful Startup Raises $41M, Exits at $242.9M," Techcrunch.com (Dec. 14, 2013), available at *http://techcrunch.com/2013/12/ 14/crunchbase-reveals-the-average-successful-startup-raises-41m-exits-at-242-9m/*. See also TruBridge Capitol Partners, *Why the 'Next Billion Dollar Startup' Is not Always the Next IPO*, Forbes, Apr. 15, 2015, available at *http://www.forbes.com/ sites/truebridge/2015/04/15/why-next-billion-dollar-startup-not-always-next-ipo/* ("From 2001–2004, the average age of a company at its public exit was 5.4 years. . . . From 2009–2012, the average age was 7.9.").

[41] The terms "child" and "children" in this proposed rule have the same meaning as they do under section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1) (defining a child as one who is unmarried and under twenty-one years of age).

[42] This is the case with other parolees under existing regulations. *See* 8 CFR 274a.12(c)(11).

Exhibit 1
67

amendment would provide that entrepreneurs paroled under this rule would be employment authorized incident to their parole with their start-up entities, pursuant to proposed new 8 CFR 212.19(g). DHS would also assign a new code of admission for this class: "PE–1."

## 2. Employment Authorization Eligibility for Spouses

DHS is also proposing to extend eligibility for employment authorization to the accompanying spouses (but not the children) of entrepreneur parolees who have been paroled into the United States. See proposed new 8 CFR 212.19(h)(3). Under the proposed rule, such spouses who wish to obtain employment authorization would need to apply for an EAD pursuant to 8 CFR 274a.12(c)(34), consistent with current parole policy that allows parolees to apply for employment authorization. DHS believes that allowing spouses of entrepreneurs to apply for work authorization may alleviate a significant portion of the potential economic burdens that entrepreneurs and their families may face, such as paying for academic expenses for their children, and to ensure that they satisfy the proposed condition on their parole that they maintain household income that is greater than 400 percent of the Federal poverty line, as they grow and develop their start-up entities. Moreover, extending employment authorization to the spouse may further incentivize a foreign entrepreneur to bring a start-up entity to the United States rather than create it in another country.

DHS has proposed not to extend employment authorization to the children of entrepreneurs, as it does not view the employment of these children in the United States as a significant deciding factor for an entrepreneur considering to create and develop start-up entities with high growth potential in the United States. DHS has extended eligibility for employment authorization to minors within the following nonimmigrant categories: Dependents of Taipei Economic and Cultural Representative Office (TECRO) E–1 nonimmigrants; J–2 dependent children of J–1 exchange visitors; dependents of A–1 and A–2 foreign government officials; dependents of G–1, G–3, and G–4 international organization officials; and dependents of NATO officials. But in each of these instances, DHS has extended eligibility for employment authorization to minor children based on particular foreign policy considerations; these underlying considerations are not present in the proposed entrepreneur parole process.

## 3. Documentation for Employment Eligibility Verification (Form I-9)

As with other classes of aliens listed as employment authorized incident to status with a specific employer in 8 CFR 274a.12(b), entrepreneur parolees would not be issued EADs (Forms I–766) as evidence of employment authorization. Instead, DHS would issue Arrival/ Departure Records (Forms I–94) with the entrepreneur's code of admission ("PE–1"), which indicates that the entrepreneur is employment-authorized incident to parole. Because the Arrival/ Departure Record would contain this code, the record would be sufficient evidence of employment authorization for Employment Eligibility Verification (Form I–9) purposes.

As with other employers, the start-up entity would be required to verify the employment authorization of its employees, including the entrepreneur paroled under this rule, to comply with employment eligibility verification requirements. DHS is proposing to amend the regulations governing these requirements by adding to the list of documents acceptable by employers for completion of the Form I–9. The proposed rule would add to this list a combination of the entrepreneur's valid foreign passport and his or her Arrival/ Departure Record indicating employment-authorization pursuant to parole. See proposed 8 CFR 274a.2(b)(1)(v)(A)(5).

This proposal would ensure that entrepreneur parolees under this rule will have documentation evidencing identity and employment authorization that is acceptable for meeting the Form I–9 requirements immediately upon receiving parole to the United States. Because the document combination described above (foreign passport and Arrival/Departure Record) has been acceptable for Form I–9 purposes since the Employment Eligibility Verification requirements were first established in 1987, employers should readily recognize the document combination as acceptable for such purposes.

Further, DHS is satisfied that this document combination contains sufficient security features, as required by section 274A(b)(1)(B)(ii)(III) of the INA, 8 U.S.C. 1324a(b)(1)(B)(ii)(III). An Arrival/Departure Record issued to an entrepreneur parolee will indicate the validity period for parole and the new code of admission ("PE–1") that is specific to such parolees. In addition, DHS proposes to automatically extend the employment authorization of an entrepreneur parolee whose parole has expired but who has filed a timely application for re-parole with the same

start-up entity. See proposed 8 CFR 274a.12(b)(37). In such cases, employment authorization would be extended for a period not to exceed 240 days beginning on the date of expiration of parole. Extending work authorization in this manner would allow an entrepreneur parolee to continue working without interruption with his or her start-up entity while the application for re-parole is pending.

## 4. Technical Changes

DHS is proposing to revise the existing, general parolee employment eligibility provision at 8 CFR 274a.12(c)(11) to clarify that the employment eligibility of entrepreneur parolees and their spouses under this rule are governed by proposed 8 CFR 274a.12(b)(37) and 8 CFR 274a.12(c)(34) rather than 8 CFR 274a.12(c)(11). In addition, DHS is proposing to update 8 CFR 274a.12(c)(11) to replace outdated references to parole "for emergency reasons" and "reasons deemed strictly in the public interest" with the current statutory standards for parole—"urgent humanitarian reasons" and "significant public benefit." See INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

## E. Material Change Reporting

DHS proposes that, consistent with filing requirements for reporting material changes in other contexts (such as the requirement to submit amended petitions when there are material changes), an entrepreneur who has been granted parole under this rule would be required to immediately report to USCIS any material changes potentially affecting his or her grant of parole. See proposed 8 CFR 212.19(j). In cases involving one or more material changes where the entrepreneur will continue to be employed or associated with his or her start-up entity, the entrepreneur must submit a new Application for Entrepreneur Parole with fee (not including any biometric fees) to notify USCIS of the material change(s). Depending on the nature and scope of the material change(s) reported, USCIS may continue to authorize parole or seek to terminate parole. If the entrepreneur will no longer be employed or associated with the start-up entity, or if he or she ceases to possess at least a 10 percent ownership stake in the entity, the entrepreneur must immediately notify USCIS in writing of these changes. Upon receipt of such notification, USCIS would issue an automatic revocation of the entrepreneur's parole, as well as the parole of any dependents.

For purposes of this rule, DHS proposes the term "material change" to

Exhibit 1
68

mean any change in facts that could reasonably affect the outcome of DHS's determination that the entrepreneur provides, or continues to provide, a significant public benefit to the United States. Such changes would include, but are not limited to, the following: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization involving claims for damages exceeding 10 percent of the current assets; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; and any significant change to the entrepreneur's role in or ownership and control of the start-up entity or any other significant ownership and control change in the start-up entity. *See* proposed new 8 CFR 212.19(a)(10) and (j). Failure to timely file or otherwise comply with the material change reporting requirements may result in a denial of subsequent parole applications or revocation of parole to proposed 8 CFR 212.19(k)(3)(ii).

DHS welcomes public comment on the proposed definition of the term "material change." DHS also welcomes comment on the types of situations that would constitute material changes.

### F. Re-Parole

DHS proposes that individuals who have been granted entrepreneur parole may be eligible for one additional, successive period of re-parole of up to 3 years with the same start-up entity if such additional period of parole is determined to provide a significant public benefit. *See* proposed 8 CFR 212.19(c) and (f). An individual may thus be paroled into the United States under the proposed rule, pursuant to an initial period of parole and any period of re-parole, for a maximum period of 5 years. *See* proposed 8 CFR 212.19(f). An entrepreneur parolee seeking re-parole should request such re-parole before his or her current period of parole expires. Failure to file a request for re-parole before the expiration of the current parole period will result in an automatic

termination of parole and a loss of employment authorization for the entrepreneur and any derivatives (*i.e.*, spouse and any child(ren)). *See* proposed 8 CFR 212.19(k)(2) and 8 CFR 274.12(b)(37).

As discussed above, DHS believes that a total maximum 5-year period of parole under this rule (an initial period of up to 2 years, plus one possible re-parole period of up to 3 years) is consistent with the amount of time successful start-up entities generally require to realize their growth potential. This would generally allow sufficient time for a successful start-up entity to engage in an initial public offering, or otherwise advance past the generally recognized start-up phase.[43] As also noted above, DHS would retain the discretion to provide any length of parole to an applicant, including a *cumulative* period shorter than 5 years.

DHS welcomes comments regarding the length of parole and re-parole.

#### 1. Criteria for Re-Parole

To be considered for re-parole, an entrepreneur parolee must demonstrate that his or her stay in the United States pursuant to parole would continue to provide a significant public benefit. DHS proposes that an individual may meet this standard by demonstrating that his or her start-up entity continues to demonstrate substantial potential for rapid growth and job creation and that his or her parole would significantly help the entity continue to conduct and grow its business here. *See* proposed 8 CFR 212.19(c)(2). Because, however, the economic activity of a successful start-up entity would likely have changed since commencement of the initial parole period, DHS is proposing certain adjusted and additional criteria for granting re-parole in comparison to the criteria for initially granting parole

under this proposed rule. As described further below, such changes are intended to ensure that the start-up entity continues to have substantial potential for rapid growth and job creation and, ultimately, that parole of the entrepreneur parolee continues to be justified on significant public benefit grounds.

#### A. Entity Continues To Be a Start-Up Entity

As noted above, the key to meriting parole under this proposed rule is the formation of an entity in the United States with the substantial potential to show rapid growth, including through increased revenue and job creation. DHS thus proposes that an applicant for re-parole show that his or her entity continues to be a "start-up entity" as that term is defined at proposed 8 CFR 212.19(a)(2). *See* proposed 8 CFR 212.19(c)(2)(ii)(A). At the re-parole stage, this would mean showing that the entity: (1) Has continued to lawfully do business during the initial period of parole, and (2) continues to have the substantial potential to experience rapid growth and job creation, including through significant revenue generation or attraction of capital investment.[44] *Id.* As discussed in section IV.B.1, the requirement for the entity to have operated lawfully in the United States during any prior period of parole is intended to ensure lawful conduct and protect the integrity of the proposed parole process under this rule. The requirement that the entity have the substantial potential to experience rapid growth and job creation is intended to capture the types of start-up entities that are most likely to meet the significant public benefit test, while excluding types of entities without such potential.

As with the application for initial parole, DHS anticipates that an applicant for re-parole would be able to meet the above criteria by submitting various forms of evidence. In addition to meeting the investment, revenue, or job creation criteria described further below, an applicant will be expected to provide supplementary evidence of the entity's continued substantial potential for rapid growth and job creation.

#### B. Applicant Continues To Be an Entrepreneur

To ensure that any successive grant of parole would continue to serve a significant public benefit, DHS is proposing that an applicant for re-parole show that he or she continues to meet

---

[43] Estimates based on the Census Bureau Business Dynamics Statistics suggest that on average 55 percent of new firms survived after 3 years, but 80 percent of the firms that survived 3 years also made it through 5 years. Dane Stangler and Jared Konczal "Give me your entrepreneurs, your innovators: Estimating the Employment Impact of a Startup Visa", Ewing Marion Kauffman Foundation (February 2013), available at *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2013/02/startup_visa_impact_final.pdf*; "CrunchBase Reveals: The Average Successful Startup Raises $41M, Exits at $242.9M," Techcrunch.com (Dec. 14, 2013), available at *http://techcrunch.com/2013/12/14/crunchbase-reveals-the-average-successful-startup-raises-41m-exits-at-242-9m/*. See also TruBridge Capital Partners, *Why the 'Next Billion Dollar Startup' Is not Always the Next IPO*, Forbes, Apr. 15, 2015, available at *http://www.forbes.com/sites/truebridge/2015/04/15/why-next-billion-dollar-startup-not-always-next-ipo/* ("From 2001– 2004, the average age of a company at its public exit was 5.4 years . . . . From 2009–2012, the average age was 7.9.").

[44] The entity would also need to continue to meet the definition of "U.S. business entity" at proposed 8 CFR 212.19(a)(9).

Exhibit 1
69

the definition of "entrepreneur" at proposed 8 CFR 212.19(a)(1). *See* proposed 8 CFR 212.19(c)(2)(ii)(A). As discussed previously, this definition would require the applicant for re-parole to show that he or she: (1) Continues to possess a substantial ownership interest in the start-up entity, and (2) continues to serve in a central and active capacity in the entity, such that his or her knowledge, skills, or experience would continue to substantially assist the entity with the growth and success of its business. *See* proposed 8 CFR 212.19(a)(1). For purposes of seeking re-parole, the definition further provides that an individual may be considered to possess a substantial ownership interest if he or she maintains at least a 10 percent ownership stake in the start-up entity at all times during the period of parole and any subsequent period of re-parole. *Id.*

As discussed in section IV.B.2., DHS believes that the definition of "entrepreneur" proposed in this rule is essential to ensuring that granting parole in an individual case would provide a significant public benefit. By requiring an applicant for re-parole to demonstrate that he or she continues to serve in an active and central capacity and continues to have knowledge, skills, or experience integral to the entity's success, DHS is ensuring that the applicant is directly related to the entity's ability to benefit the United States, including by conducting research and development, increasing revenue, or creating jobs. Similarly, the ownership standard is also essential for connecting the individual to the start-up entity and ensuring that he or she continues to assume more than a nominal financial risk related to the entity. The reduced 10 percent equity requirement for seeking re-parole (as opposed to the 15 percent requirement for seeking initial parole) takes into account the need for successful start-up entities to raise additional venture capital financing by selling ownership interest during their initial years of operation.

As also discussed in section IV.B.2., DHS believes that an entrepreneur seeking re-parole would be able to demonstrate sufficient satisfaction of the above criteria by providing various forms of evidence. With respect to ownership, DHS anticipates that an applicant would be able to provide copies of legal or financial documents— such as formation and organizational documents, equity certificates, equity ledgers, ownership schedules, and capitalization tables—indicating the applicant's ownership interest in the start-up entity. With respect to the

applicant's role within the entity, DHS expects that an applicant could satisfy the criterion by providing evidence showing that he or she continues to serve in the same capacity as that described in the initial parole application. If the applicant has changed positions within the entity, he or she would need to provide evidence demonstrating that he or she continues to serve in a central and active capacity within the entity and that his or her knowledge, skills, or experience would continue to substantially assist the entity with the growth and success of its business.

### C. Investment, Revenue, and Job Creation Criteria for Re-Parole Consideration

DHS further proposes that, to seek re-parole under this rule, an entrepreneur would need to further validate, through additional reliable evidence, the start-up entity's continued substantial potential for rapid growth and job creation. DHS is proposing that this requirement may generally be satisfied by demonstrating that the entity has: (1) Received substantial additional qualifying funding, such as awards or grants from qualifying government entities or investments of capital from U.S. investors with established records of successful investment; (2) generated substantial and rapidly increasing revenue in the United States over the prior parole period; or (3) generated a substantial number of qualified jobs for U.S. workers. *See* proposed 8 CFR 212.19(c)(2)(ii)(B). As with applications for initial parole, DHS further proposes that an applicant who partially meets one or more of these criteria for re-parole may be considered for re-parole under this rule if he or she provides additional reliable and compelling evidence that his or her re-parole would provide a significant public benefit.

#### i. Qualifying Funding From U.S. Investors or Government Entities

DHS proposes to allow an applicant to demonstrate that a start-up entity continues to have substantial potential for rapid growth and job creation by showing that during the preceding period of parole the entity received additional substantial qualifying funding—through "qualifying investments," "qualified government grants or awards," or a combination of both. *See* proposed 8 CFR 212.19(a)(5) and (c)(2)(ii)(B)(*1*). DHS proposes that such total investments made to the entity during the initial parole period may generally be considered "substantial" with respect to an application for re-parole if they

cumulatively meet or exceed $500,000. *Id.* As with the application for initial parole, "qualifying investments" must be from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial and successful investments in start-up entities. Such qualifying investors would include only those investors who have a history of making similar or greater investments on a regular basis over the last 5 years and who can demonstrate that at least two of the entities receiving such investments have subsequently experienced significant growth in revenue and job creation. *See* proposed 8 CFR 212.19(a)(5). With respect to "qualified government grants or awards," the grants or awards generally would need to be made by one or more Federal, State, or local government entities that regularly provide such funding to U.S. businesses for economic development, innovation, research and development, or job creation reasons. *See* proposed 8 CFR 212.19(a)(3).

DHS believes that these investment criteria are reasonable for subsequent grants of parole based on consultation with the SBA, as well as the amounts of investment made in start-up entities during initial rounds of capital investment.[45] DHS believes these standards are important to ensure that the start-up entity is showing signs of success and continues to have substantial potential for rapid growth and job creation.

DHS welcomes comment on all aspects of this section, including the proposed investment threshold for re-parole and any potential alternatives to such thresholds. For comments regarding investment threshold amounts, the Department requests that commenters provide rationales and data, if available, to support their recommendations.

#### ii. Substantial Revenue Generation

DHS also proposes to allow an applicant to demonstrate that a start-up entity continues to have substantial potential for rapid growth and job creation by showing that the entity has exhibited rapid growth in terms of revenue generation in the United States during the relevant parole period. DHS proposes that an applicant may generally be able to meet this standard by demonstrating that the entity reached at least $500,000 in annual revenue, with at least 20 percent average annual revenue growth, during the initial parole period. *See* proposed 8 CFR 212.19(c)(2)(ii)(B)(*3*). DHS believes that

---

[45] *See* note 32.

Exhibit 1
70