these revenue criteria are reasonable and consistent with the requirement that the entity have the substantial potential for rapid growth and job creation and, ultimately, with the requirement that the entrepreneur's parole provide a significant public benefit to the United States.

Based on consultation with the SBA, DHS believes $500,000 and 20 percent annual revenue growth would be reasonable criteria for purposes of re-parole. Notably, evaluating revenue generation and growth is industry- and location-specific, and start-up entities may be at different stages of development at the time applicants file their parole requests. DHS considered proposing revenue and growth thresholds that varied by industry and geographic location, but determined that such an approach would be extremely difficult to administer. Instead, DHS decided to propose threshold criteria that would generally apply to start-up entities under this parole process. DHS chose $500,000 in revenue and 20 percent annual revenue growth as proposed threshold criteria because, after consulting with SBA, DHS determined these criteria: (1) Would be reasonable as applied across start-up entities regardless of industry or location; and (2) would serve as strong indications of an entity's potential for rapid growth and job creation (and that such entity is not, for example, a small business created for the sole or primary purpose to provide income to the owner and his or her family).

DHS's proposed revenue amount is based on analysis of available data [46] showing average revenue over a 3-year period of $215,000 for all new firms in innovative sectors. Adjusted for inflation, the average revenue of such firms is approximately $250,000. In analyzing this data, DHS applied a 20 percent growth rate, which is a high

[46] DHS analyzed data found in the Census Bureau's Survey of Business Owner's data (SBO) set, Table SB0700CSCB10, "Statistics for All U.S. Firms by Year the Business Was Originally Established by Industry, Gender, Ethnicity, Race, and Veteran Status for the U.S.: 2007" found at: *http://www.census.gov/econ/sbo/ historical.html?2007*. DHS calculated revenue per firm for the 3 years each of 2005, 2006 and 2007, which would account for "new firms" aged 3 or less since the benchmark year was 2007. To account for sectors involved mainly in innovation, DHS attempted to match sectors to those utilized in the volume projections section of the concomitant economic analysis section of the rule's regulatory impact assessment. Of those nine broad sectors, "Waste Services" is not listed separately and hence DHS utilized the other eight sectors. Because the data are arranged with two identifiers of interest, "year established" and "sector," DHS conducted an unweighted average across the 24 data points (8 sectors with 3 years each) to arrive at an average of $215,000.

growth threshold utilized in economic and business research,[47] to the $250,000 average revenue for 2 years (the proposed length for initial parole). At a growth rate of 20 percent each year, revenue of $250,000 would grow to $360,000 over a 2-year period. DHS proposed $500,000 as the revenue criterion to take into account the fact that revenue of $360,000 represents an average for all new firms in innovative sectors and the proposed rule is aimed towards assisting high-growth startups that will provide a significant public benefit. As such, DHS believes it is appropriate to propose an amount that takes into consideration that range of industries and locations in which start-ups may conduct business, but that exceeds the average revenue for new firms, so that such an amount can serve, in combination with a 20 percent growth rate, as a reliable indicator of a start-up entity's substantial potential for continued growth and job creation. While DHS does not have reliable revenue data that is specific to high-growth startups (the revenue data available to DHS includes all new firms, including non-startups, startups, and high-growth startups), DHS believes that its analysis of available data supports the proposed $500,000 revenue criteria as a reasonable indicator of the entrepreneur's ability to continue to provide a significant public benefit to the United States.

DHS is proposing *both* a general minimum revenue threshold and a threshold percentage increase in such revenue to account for a range of start-

[47] High-growth firms are defined by the Department of Labor's Bureau of Labor Statistics (BLS) and the Organization for Economic Cooperation (OECD) as those with at least ten employees that grow by at least 20 percent for each of 3 consecutive years based on employment. For a description of the methodology utilized to measure high-growth firms, see OECD, "*OECD-Eurostat Manual on Business Demography Statistics*" (2007), pp. 59–65, available at: *http:// www.oecd.org/std/39974460.pdf*. Although the BLS and standard OECD definition applies specifically to employment, both agencies recognize that employment growth may not be a suitable measure in all cases and that valid alternative measures may be utilized. There have been a number of alternatives proposed in various peer-reviewed literature and ongoing research. For purposes of the present rule, discussion of the 20 percent growth rate in revenue, instead of employment specifically, concomitant to that DHS proposes, can be found at: Mogos, S., Davis, A. & Baptista, R. (2015), "Defining High Growth Firms. Sustainable Growth, Volatility, and Survival," Proceedings of DRUID15 Conference. June 2015, available at: *http:// druid8.sit.aau.dk/acc_papers/ rpq1k6cpebbhti9vh29xudqp3juy.pdf*. See also Karl Wennberg, Managing High-Growth Firms: A literature review (2013), OECD: "International Workshop on "Management and Leadership Skills in High-Growth Firms," available at: *http:// www.oecd.org/cfe/leed/Wennberg_ Managing%20a%20HGF.pdf*.

up entities that may qualify an entrepreneur for re-parole under this rule based on revenue generation. A $500,000 minimum revenue threshold at the re-parole stage, for example, would by itself indicate little about a start-up entity that had already been generating such revenue when the application for initial parole was filed. For such an entity, the 20 percent revenue growth threshold would ensure the entity is exhibiting substantial growth and the ability to sustain substantial job creation. As noted above, 20 percent annual revenue growth is the rate used by the Department of Labor's Bureau of Labor Statistics to indicate a high rate of growth among U.S. businesses. At the same time, the 20 percent revenue growth threshold would be insufficient by itself with respect to entities that were at the lower end of the revenue generation scale when the application for initial parole was filed. For example, an entity that was generating only $250,000 in annual revenue at the time the initial parole application was filed would only require a total increase of $110,000 in annual revenue over the 2-year parole period to meet the 20 percent revenue growth threshold. For such entities, the $500,000 annual revenue threshold is intended to ensure rapid growth and the potential to sustain substantial job creation. As with the standards for initial parole, DHS believes that the above standards for re-parole: (1) Would be reasonable among start-up entities regardless of industry or location; and (2) would serve as strong indications of an entity's potential for continued rapid growth and job creation. DHS welcomes comments on the proposed revenue generation and annual revenue growth thresholds for re-parole, including any potential alternatives.

### iii. Job Creation

DHS further proposes to allow an applicant to demonstrate his or her entity's substantial potential for rapid growth and job creation by showing that the entity has exhibited rapid growth in terms of job creation during the relevant parole period. DHS proposes that an applicant may generally be able to meet this standard by demonstrating that the entity created at least 10 qualified jobs with the start-up entity for U.S. workers during the initial parole period. DHS decided to require at least 10 qualified jobs for re-parole based on survey data indicating that the average employment at new businesses in 2011 was 8.7 employees.[48] DHS further believes that

[48] Alicia Robb, Joseph Farhat, "An Overview of the Kauffman Firm Survey", June 2013, p. 4.

Exhibit 1
71

this job creation standard is reasonable for demonstrating a start-up entity's recent history of rapid growth and job creation.

Moreover, DHS is proposing a definition for the term "qualified job" to limit the types of jobs that may be used to justify a grant of parole under this rule. *See* proposed 8 CFR 212.19(a)(6). Under the proposed rule, the term "qualified job" would mean full-time employment, as defined at the proposed 8 CFR 212.19(a)(8), located in the United States with the entrepreneur's start-up entity that has been filled for at least 1 year by one or more qualifying employees. *See* Proposed 8 CFR 212.19(a)(6). In addition, the term "qualifying employee" would mean a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States (*e.g.*, an asylee or refugee), who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. *See* proposed 8 CFR 212.19(a)(7). For job creation to establish eligibility for a grant of parole, DHS believes it is important that the job be filled by an employee who is not closely related to an entrepreneur of the start-up entity. This limitation would mitigate the potential for fraud relating to any claimed job creation, and it would help to distinguish bona fide start-up entities from small businesses with limited growth potential created for the sole or primary purpose of providing income to the entrepreneurs and their families. DHS believes that merely creating jobs for the entrepreneur and the entrepreneur's family would be unlikely to provide a significant public benefit to the United States and should thus not serve as a basis for parole under this rule.

Additionally, DHS proposes that the term "full-time employment," as referenced in the proposed definition of "qualified job," would mean paid employment of an employee by the entrepreneur's start-up entity in a position that requires a minimum of 35 working hours per week. *See* proposed 8 CFR 212.19(a)(8). The Department of Labor similarly defines full time employment as requiring 35 or more hours a week.[49] Full-time employment,

however, would not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week. DHS believes that requiring that the employment include full-time remuneration would help to ensure that the entity will provide a significant public benefit to the United States and mitigates the potential for fraud as it relates to any claimed job creation and the legitimacy of the business. *See* proposed 8 CFR 212.19(a)(8).

iv. Alternative Criteria for Re-Parole Consideration

Finally, as with the application for an initial grant of parole, DHS proposes that an applicant who only partially meets one or more of the above sub-criteria related to capital investment, revenue generation, or job creation may be considered for re-parole under this rule in certain limited circumstances. *See* proposed 8 CFR 212.19(c)(2)(iii). Specifically, DHS may consider another period of parole for such an applicant if he or she provides, in addition to evidence that one or more of the sub-criteria have been partially met, "reliable and compelling" evidence of the entity's continued substantial potential for rapid growth and job creation than would be required if the applicant had fully met one or more of the above sub-criteria. *Id.* Importantly, re-parole would not be available to an applicant who fails to demonstrate any U.S. investment, revenue generation, or job creation. Rather, the applicant would need to show as a preliminary matter that the start-up entity has: (1) Received a substantial level of investment through a combination of qualifying investments and qualified government grants or awards (although less than $500,000); (2) generated a substantial level of revenue (although less than $500,000 with at least 20 percent average annual revenue growth); or (3) generated a substantial number of qualified jobs in the United States (although less than 10). The applicant would also need to demonstrate the entity's potential for rapid growth and job creation by submitting additional evidence that DHS determines to be both reliable and compelling. DHS proposes that such evidence be reliable and compelling in its own right to overcome the applicant's inability to fully meet the threshold criteria otherwise required by this rulemaking for re-parole.

As noted previously, DHS is not proposing to define the specific types of evidence that may be deemed "reliable and compelling" at this time, because DHS seeks to retain flexibility as to the

kinds of supporting evidence that may warrant the Secretary's exercise of discretion in granting parole based on significant public benefit. But DHS believes that such evidence would need to be compelling to demonstrate that the entrepreneur's presence here would provide a significant public benefit considering the entity's inability to meet the otherwise applicable threshold criteria for consideration. DHS will ultimately be required to decide whether such evidence—in conjunction with the entity's substantial investment, revenue generation, or job creation—is sufficient to establish that the applicant's presence in the United States will provide a significant public benefit. This approach is consistent with the discretionary nature of the Secretary's statutory parole authority and the fact that each parole request will be adjudicated, on a case-by-case basis, after considering the particularized facts of each case.

DHS invites public comment on the level and types of reliable and compelling evidence that may warrant a discretionary grant of parole in such cases. DHS also invites public comment on alternatives to the proposed funding, revenue generation, and job creation thresholds that applicants may use to demonstrate a start-up entity's continued substantial potential for rapid growth and job creation and that may serve as a principal basis for seeking re-parole under this rule. Commenters should recommend threshold levels for obtaining re-parole under suggested criteria, along with the types of reliable evidence that applicants may submit to substantiate their claims, including any relevant data if available.

2. Application Requirements for Re-Parole

Under the proposed rule, an entrepreneur parolee seeking a period of re-parole would be required to file a request for re-parole with USCIS using the same form as for initial parole, the Application for Entrepreneur Parole (Form I–941, or successor form), and pay the same fees (filing and biometric services fees). *See* proposed new 8 CFR 212.19(c)(1). The entrepreneur would generally be required to file the request for re-parole before the expiration of the current period of parole. If the entrepreneur is in the United States at the time that USCIS approves the request for re-parole, such approval would also constitute a grant of parole. *See* proposed new 8 CFR 212.19(d)(3). An entrepreneur present in the United States in a period of parole would not be required to depart and return to the United States in order to request a new

---

[49] Department of Labor Bureau of Labor Statistics, *Glossary* (last modified Feb. 28, 2008), *http://www.bls.gov/bls/glossary.htm#F.*

"While about 40 percent of firms had employees in 2004, by 2011 about 53 percent of surviving firms had employees. Surviving firms with employees, which are now in their eighth year of operations, increased average employment to 8.7 employees in 2011, up from 7.5 employees in 2010."

Exhibit 1
72

grant of parole from CBP at a port of entry. Along with the approval notice, USCIS would issue an electronic Arrival/Departure Record (Form I–94) reflecting the new period of parole and the code of admission assigned to entrepreneur parolees. USCIS would also issue the entrepreneur's spouse and children who have filed their own separate requests for parole, if also approved for an additional period of parole, new Arrival/Departure Records reflecting the same period of parole as the entrepreneur, but with the appropriate dependent entrepreneur parolee codes.

The entrepreneur (or spouse or dependent child), if outside the United States upon the approval of the re-parole application, would have to obtain a travel document from USCIS or DOS (e.g., a boarding foil) and appear at a port of entry for CBP to make the final re-parole determination and, if granted, issue new Arrival/Departure Records. Just as with initial parole, entrepreneurs granted re-parole would be authorized to be employed by the start-up entity, incident to their parole under this proposed rule. See proposed 8 CFR 274a.12(b)(37). Such entrepreneurs also would be permitted to use their foreign passport in combination with their Arrival/Departure Record reflecting the new period of parole to demonstrate their identity and employment authorization for purposes of compliance with the Employment Eligibility Verification (Form I–9) requirements. See proposed 8 CFR 274a.2(b)(1)(v)(A)(5); see also proposed revisions to the Form I–9, Lists of Acceptable Documents.

**3. Ensuring Continuous Employment Authorization**

To facilitate maintenance of continuous work authorization and parole, DHS is proposing that an entrepreneur parolee may file a request for re-parole beginning 90 days prior to the expiration date of his or her current period of parole. See proposed Form Instructions for the Application for Entrepreneur Parole (Form I–941). To prevent potential gaps in employment authorization for entrepreneurs seeking re-parole, DHS proposes to extend automatic employment authorization to those entrepreneurs whose current parole period expires while their request for re-parole is pending. See proposed 8 CFR 274a.12(b)(37). DHS is proposing that this automatic employment authorization will extend for 240 days from the date the entrepreneur's initial parole period expires, or until USCIS makes a decision on the re-parole request,

whichever is sooner, when a request for re-parole was timely filed by the entrepreneur. Id. This 240-day automatic extension of employment authorization is comparable to the extension currently provided by regulation to most nonimmigrants authorized for employment incident to status with a specific employer who have filed a request for an extension of stay with the same employer. See 8 CFR 274a.12(b)(20). DHS believes that a 240-day period of automatic employment authorization is equally appropriate for entrepreneur parolees and is a sufficient period of time to ensure that the entrepreneur does not experience gaps in employment authorization on account of the adjudication process. The 240-day period takes into account the complex and time-consuming adjudication required for re-parole, as well as the required biometric services appointment, which may require up to 90 days for scheduling.

*G. Termination of Parole*

DHS is proposing provisions governing termination of parole under this rule in cases where DHS believes such termination is appropriate, including circumstances indicating that continued parole would no longer provide a significant public benefit, pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A). Consistent with DHS's parole authority, under this proposed rule DHS may, in its discretion, terminate parole granted under 8 CFR 212.19 at any time and without prior notice or opportunity to respond. Alternatively, DHS may, in its discretion, provide the entrepreneur notice and an opportunity to respond prior to terminating his or her parole under 8 CFR 212.19. In addition to the general grounds for termination of parole described at 8 CFR 212.5(e),[50] DHS is proposing the following grounds for termination of entrepreneur parole:

**1. Automatic termination**

DHS believes that certain circumstances warrant automatic termination of parole. In this rule, DHS proposes that parole will automatically terminate if: (a) The period of parole expires, unless the individual timely files a non-frivolous application for re-parole; or (b) USCIS receives written notice from the entrepreneur that he or

she will no longer be employed by the start-up entity or ceases to possess at least a 10 percent ownership stake in the start-up entity in accordance with 8 CFR 212.19(j). See proposed 8 CFR 212.19(k)(2). Additionally, the parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. Id. If a spouse whose parole is terminated also has employment authorization, the employment authorization is automatically revoked.

**2. Termination on Notice**

Even though DHS has the discretion to terminate parole without prior notice, USCIS will generally attempt to provide the entrepreneur or his or her spouse or children, as applicable, written notice of its intent to terminate parole if USCIS believes that: (a) The facts or information contained in the request for parole were not true and accurate; (b) the alien failed to timely file or otherwise comply with the material change reporting requirements in this section; (c) the entrepreneur is no longer employed in a central and active role by the start-up entity or ceases to possess at least a 10 percent ownership stake in the start-up entity; (d) the alien otherwise violated the terms and conditions of parole; or (e) parole was erroneously granted. See proposed 8 CFR 212.19(k)(3). The decision to provide notice and an opportunity to respond prior to termination of parole under 8 CFR 212.19 will be made in the discretion of DHS on a case-by-case basis.

In cases where USCIS provides written notice and an opportunity to respond, through a notice of intent to terminate, DHS is proposing to provide a period of up to 30 days for the alien's written rebuttal. See proposed 8 CFR 212.19(k)(4). The notice of intent to terminate would generally identify the grounds for termination of the parole and the alien may submit additional evidence in support of his or her rebuttal, when applicable. Id. Providing a rebuttal period of up to 30 days is generally consistent with rebuttal periods applicable to other immigration petitions and applications (e.g., I–129 or I–140). If DHS nevertheless decides to terminate parole, the entrepreneur and/ or his or her spouse and children are restored to the status that he or she had at the time of parole, such as being applicants for admission. See 8 CFR 212.5(e)(2)(i). Consistent with current parole procedures, DHS does not propose a right to appeal a decision regarding termination of parole on notice. Id.

---

[50] The termination provisions in current parole regulations provide for termination on written notice in situations where the justification for granting parole has ended or, in the opinion of an authorized officer, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States. See 8 CFR 212.5(e)(2)(i).

Exhibit 1
73

If a charging document is served on the alien, the charging document will constitute written notice of termination of parole (if parole has not already been terminated), unless otherwise specified. *Id.*

In the event of a violation of one or more terms and conditions of parole solely by the spouse or a child of the entrepreneur, parole may be terminated for the violator (*i.e.*, spouse or child) without affecting the entrepreneur's parole. If a spouse whose parole is terminated also has employment authorization, the employment authorization will be revoked. 8 CFR 274a.14(b)(1)(i).

The entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. At any time prior to reaching the 5-year limit for parole under this proposed rule, such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or lawful permanent residency through employer sponsorship). If such individuals are approved for a nonimmigrant or employment-based immigrant visa classification, they would generally be required to depart the United States and apply for a visa with DOS. As noted above, because parole is not considered an admission to the United States, parolees are unable to apply to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications.

## H. Automatic Adjustment of Investment and Revenue Amount Requirements

DHS proposes that the investment and revenue amounts specified at proposed 8 CFR 212.19(a)(5), (b)(2)(ii) and (c)(2)(ii) will be automatically adjusted every 3 years by the Consumer Price Index for All Urban Consumers (CPI–U).[51] USCIS will provide notice in the **Federal Register** and on its Web site at *www.uscis.gov* prior to the beginning of the fiscal year in which the change would take effect. Investment and revenue amounts adjusted by the CPI–U will apply to all applications filed on or after the beginning of that fiscal year. DHS believes that automatically adjusting the minimum dollar amounts

by the CPI–U every 3 years will maintain investment and revenue requirements at an appropriate level in relation to future economic conditions. DHS believes adjusting the minimum dollar amounts every 3 years will be more manageable operationally for DHS and less burdensome to applicants than adjustments at more frequent intervals. *See* proposed 8 CFR 212.19(l).

## I. Technical Change

DHS is proposing a technical change to 8 CFR 274a.2(b)(1)(v)(C) to add the Department of State (DOS) Form FS–240 Consular Report of Birth Abroad, or successor form, to the list of acceptable documents under the "list C" column of Form I–9, Employment Verification Eligibility. Since 2011, Form FS–240 has been exclusively issued by DOS as evidence of a U.S. citizen's birth abroad and acquisition of U.S. citizenship at birth, as well as used to replace a lost, stolen, or damaged Form FS–545 Certification of Birth Abroad or Form DS–1350 Certification of Report of Birth. This technical change will formally recognize the Form FS–240, or successor form, as an acceptable document to establish employment authorization for Form I–9 purposes.

## V. Statutory and Regulatory Requirements

### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995 adjusted for inflation to 2015 levels by the Consumer Price Index for All Urban Consumers (CPI–U) is $155 million.

This rule does not exceed the $100 million expenditure in any one year when adjusted for inflation ($155 million in 2015 dollars), and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and DHS has not prepared a statement under the Act.

### B. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase in costs or prices, or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States companies to compete with foreign-based companies in domestic and export markets.

### C. Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action" under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

#### 1. Summary

The proposed rule is intended to add new regulatory provisions guiding the use of parole with respect to individual foreign entrepreneurs of start-up entities whose entry into the United States would provide a significant public benefit through the substantial and demonstrated potential for rapid growth and job creation. Such potential would be indicated by, among other things, the receipt of significant capital financing from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. The regulatory amendments would provide the general criteria for considering requests for parole submitted by such entrepreneurs.

DHS assesses that the rule, if finalized, will reduce a barrier to entry for new innovative research and entrepreneurial activity in the U.S. economy. The full potential of foreign entrepreneurs to benefit the U.S. economy is presently limited since many foreign entrepreneurs who seek to enter the United States and manage their own start-up entities do not qualify under existing nonimmigrant and

⁵¹ The CPI–U produces monthly data on changes in the prices paid by urban consumers for a representative basket of goods and services. *See* *http://www.bls.gov/cpi/*.

Exhibit 1
74

immigrant classifications.[52] If this rule were finalized, some new innovative entrepreneurs will be able to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of the rule, these innovative entrepreneurs might be delayed or discouraged altogether in bringing innovation and job creation to the United States.

Based on review of data on startup entities, foreign ownership trends, and Federal research grants, DHS expects that approximately 2,940 entrepreneurs, sourced to 2,105 new firms with investment capital and about 835 new firms with Federal research grants could be eligible for this parole program annually. This estimate assumes that each new firm is started by one person despite the possibility of up to three owners being associated with each startup. DHS has not estimated the potential for increased demand for parole among foreign nationals who may obtain substantial investment from U.S. investors and otherwise qualify for entrepreneur parole, because changes in the global market for entrepreneurs, or other exogenous factors, could affect the eligible population. Therefore, these volume projections should be interpreted as a reasonable estimate of the eligible population based on past conditions extrapolated forward. Eligible foreign nationals who wish to apply for parole as an entrepreneur would incur the following costs: A filing fee for the Application for Entrepreneur Parole (Form I–941) in the amount of $1,200 to cover the processing costs for the proposed application; a fee of $85 for biometrics submission; and the opportunity costs of time associated with completing the proposed application and biometrics collection. After monetizing the expected opportunity costs and combining them with the filing fees, an eligible foreign national applying for parole as an entrepreneur would face a total cost of $1,480. Any subsequent renewals of the parole period would result in the same previously discussed costs. Filings to notify USCIS of material changes to the entrepreneur's parole, when required,

would result in similar costs; specifically, in certain instances the entrepreneur would be required to submit to USCIS a new form I–941 to notify USCIS of material changes to their parole and would thus bear the direct filing cost and concomitant opportunity cost. However, because the $85 biometrics fee would not be required with such filings, these costs will be slightly lower than those associated with the initial parole request and any request for re-parole.

Dependent spouses and children who seek parole to accompany or join the principal applicant by filing a Form I–131, Application for Travel Document, would be required to submit biographical information and biometrics as well. Based on a principal applicant population of 2,940 entrepreneurs, DHS assumes a total of 3,234 spouses and children would be seeking parole and submitting biometrics. Each dependent would incur a filing fee of $360, a biometric processing fee of $85 (if 14 years of age and over) and the opportunity costs associated with biometrics collection. After monetizing the expected opportunity costs associated with providing biographical information to USCIS and submitting biometrics and combining it with the biometrics processing fee, each dependent applicant would face a total cost of $550. DHS is also proposing to allow the spouse of an entrepreneur paroled under this proposed rule to apply for work authorization. Using a one-to-one mapping of principal filers to spouses, the total population of spouses expected to apply for work authorization is 2,940, which is an upper bound estimate. To obtain work authorization, the entrepreneur's spouse would be required to file Form I–765, Application for Employment Authorization, incurring a $380 filing fee and the opportunity costs of time associated with completing the application. After monetizing the expected opportunity costs and combining it with the filing fees, an eligible spouse would face a total additional cost of $416 (rounded). DHS does not anticipate that this rule, if finalized, would generate significant costs and burdens to private or public entities. While applicants may face a number of costs linked to their business or research endeavors, these costs would be driven by the business and innovative activity that the entrepreneur is engaged in and many other exogenous factors, not the rule itself or any processes related to the rule. Thorough review of academic, business, and policy research does not indicate that

significant expected costs or negative consequences linked to drawing in foreign entrepreneurs are likely to occur. As such, DHS expects that the negative consequences, if any, would be greatly exceeded by the positive effects of this rule.

In each case where an entrepreneur would be granted parole under this rule, DHS would have made a determination that parole would yield a significant public benefit and that the person requesting parole merits a favorable exercise of discretion. Consistent with those decisions, the rule would be expected to produce broad economic benefits through the creation of new business ventures that otherwise would not be formed in the United States. These businesses are likely to create significant additional innovation, productivity, and job creation. It is reasonable to conclude that investment and research spending on new firms associated with this proposed rule will directly and indirectly benefit the U.S. economy and create jobs for American workers. In addition, innovation and research and development (R&D) spending are likely to generate new patents and new technologies, further enhancing innovation. Some portion of the foreign entrepreneurs likely to be attracted to this parole process may develop high growth and high impact firms that can be expected to contribute disproportionately to job creation. In summary, DHS anticipates that this proposed rule would produce positive effects that would greatly exceed any negative consequences.

Using an estimate of 2,940 annual applications for significant public benefit entrepreneur parole developed in the ensuing volume projections section of this analysis (these estimates focus only on principal initial filers, not entrepreneurs who might be eligible for a re-parole period of up to three years, or their spouses), DHS anticipates the total cost of this rule for principal filers who face a total per applicant cost of $1,480 to be $4,349,827 (undiscounted) annually for any given year. Dependent spouses and children who must submit Form I–131 and biometrics would face a per-applicant cost of $550, for a total cost of $1,779,604 (undiscounted). Dependent spouses who apply for employment authorization would face a per applicant cost of $416, which DHS projects would total $1,123,630 (undiscounted). Adding together the costs for the principal filers and family members—including filing costs, costs of submitting biometrics, and monetized opportunity costs—yields a total cost of this rule for the first year, 2017 and subsequently 2018, of $7,353,061

[52] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the US is a struggle*, The Guardian, Sept. 14, 2014, available at *http:// www.theguardian.com/business/2014/sep/14/ foreign-tech-entrepreneurs-visa-us-struggle*; Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals*, April 11, 2014, available at *http:// immigrationimpact.com/2014/04/11/majority-of-u-s-patents-granted-to-foreign-individuals/* ("Because of the limitations of the H-1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.")

Exhibit 1
75

(undiscounted). The total annual cost of the rule of $7,353,061 can be expected for each subsequent year in the ten-year period. The total ten-year undiscounted cost is $73,530,611.

## 2. Background and Purpose of the Proposed Rule

As described more fully in preceding sections of the preamble, Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), grants the Secretary of Homeland Security the discretionary authority to parole individuals into the United States, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS proposes to amend its regulations implementing this authority to increase and enhance entrepreneurship, research and development and other forms of innovation, and job creation in the United States. The proposed rule would establish general criteria for the use of parole with respect to individual entrepreneurs of start-up entities whose entry into the United States would provide a significant public benefit through the substantial and demonstrated potential for rapid growth and job creation.

The purpose of the proposed rule is to attract talented entrepreneurs to the United States who might otherwise choose to pursue such innovative activities abroad, or otherwise be significantly delayed, given the barriers they presently face. In addition to the intangible benefits associated with entrepreneurial innovation, and more tangible but difficult to measure benefits associated with new products, business networks, and possible production efficiencies that such activities are likely to generate, entrepreneurs have been and remain vital to economic growth and job creation in the United States and have generated a cohort of high-growth firms that have driven a highly disproportionate share of net new job creation.[53]

A body of research documents both the importance of entrepreneurial activity to the U.S. economy and its link to immigration. In this background section, DHS does not attempt to comprehensively summarize this large body of work but instead focuses on specific aspects central to the purpose of

the rule and to its potential impacts.[54] In summary, DHS focuses on the role of new entrepreneurial firms in job creation in the United States, and the role that immigrant entrepreneurs have played in innovation and the high technology sector.

The labor market of the United States is highly dynamic. DHS analysis of data published by the U.S. Department of Labor's Bureau of Labor Statistics (BLS) indicates that between 2004 and 2013, on average about 847,000 firms were "born" each year and 784,000 "died."[55] To illustrate the extent of the labor market churn, since 1980 the private sector has generated about 16.3 million gross jobs annually but an average of only about 1.4 million net jobs annually. In both general business cycle expansions and contractions, large numbers of jobs are created and destroyed, comprising a key dynamic in the forces of creative destruction.[56] Research into the highly dynamic and volatile labor market in the United States has evolved. Earlier focuses on small- and new-firm size as the primary co-determinants of job creation has been reoriented to focus on the role of a relatively small subset of entrepreneurial firms.

This proposed rule focuses on identifying entrepreneurs associated with types of entrepreneurial firms that are more likely to experience high growth, contribute to innovation in the United States, and create jobs in the country. This narrowed focus is critical to ensuring that parole in individual cases is justified by significant public benefit. Research has shown that the average start-up company does not survive long.[57] Most new firms do not

add much net job creation either, as they are not focused on achieving high growth. By some estimates, the vast majority—as much as 95 percent—of all new firms are not substantial job creators or innovators.[58] About 95 percent of new firms start-up with fewer than 20 employees, and about the same percentage ultimately close with fewer than 20 employees, indicating that business turnover is heavily influenced by small firms.[59]

There is significant research, however, demonstrating that a small subset of new firms tends to be highly dynamic and to contribute disproportionately to net job creation. The BLS has highlighted the role of the small subset of high-growth firms that comprise about 2 percent of all firms but have accounted for 35 percent of gross job gains in recent years. "High-growth firms" are defined by the BLS and the Organization for Economic Cooperation (OECD) as those with at least ten employees that grow by at least 20 percent for each of 3 consecutive years based on employment. As of 2012, there were 96,900 high-growth firms in the United States that had created about 4.2 million jobs.[60] A key finding by the BLS is that as high-growth firms age, although they contribute, on average, less and less each year to new jobs, by the time they reach the age of 10 years or more, their size at that point means that the jobs they do add still account for a large share of new jobs. Job creation in the United States for the last several decades has been driven primarily by high-growth firms that tend to be young and new, and by a smaller number of surviving high-growth firms that age for a decade or more.[61]

[53] See Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, "High-employment-growth firms: defining and counting them," Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1–2, available at: http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf.

[54] DHS notes that the body of research concerning immigration in general and its impact on the labor market, most notably germane to earnings and employment of domestic workers, is not addressed in the present analysis.

[55] Figures were obtained from the BLS, Business employment Dynamics, Table 8, "Private sector establishment births and deaths, seasonally adjusted:" Available at http://www.bls.gov/news.release/cewbd.t08.htm. Firm "births" in these data only include new firms and thus exclude new franchises and expansions of existing firms.

[56] See Ryan Decker, John Haltiwanger, Ron Jarmin, and Javier Miranda, "The Role of Entrepreneurship in US Job Creation and Economic Dynamism," Journal of Economic Perspectives—Vol. 28, Number 3 (Summer 2014), pp. 3–24, available at: http://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.28.3.3.

[57] According to BLS findings, "20 percent of newly created establishments don't survive their first year in business, 32 percent don't survive their first two years, and 50 percent don't survive their first 5 years." See Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer,"High-employment-growth firms: defining and counting them," Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1.

available at: http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf.

[58] See Jason Wiens and Chris Jackson, "The Importance of Young Firms for Economic Growth," Ewing Marion Kauffman Foundation (2014), pp. 1–2, available at: http://www.kauffman.org/~/media/kauffman_org/resources/2014/entrepreneurship%20policy%20digest/september%202014/entrepreneurship_policy_digest_september2014.pdf. See also Hurst, Erik, and Benjamin Wild Pugsley. 2011. "What Do Small Businesses Do?" Brookings Paper on Economic Activity, no. 2 (2011), pp. 73–142.

[59] See Headd, Brian, "An Analysis of Small Business and Jobs," SBA Office of Advocacy, (2010), p. 6, available at: https://www.sba.gov/sites/default/files/files/an%20analysis%20of%20small%20business%20and%20jobs(1).pdf.

[60] See R. Clayton et al., (June 2013), supra at N. 46, p. 2–4. For a description of the methodology utilized to measure high growth firms, see OECD, "OECD-Eurostat Manual on Business Demography Statistics" (2007), pp. 59–65, available at: http://www.oecd.org/std/39974460.pdf.

[61] For specific detailed information on survival rates and employment creation at various intervals along the HGF life span, see R. Decker et al., (2014), supra at N. 45, pp. 6–24. The BLS and others use

Continued

Exhibit 1
76

This highly disproportionate, "up or out" dynamism of high-growth firms has been substantiated by many researchers. The SBA reported that about 350,000 "high impact firms"—defined as enterprises whose sales have at least doubled over a 4-year period and which have an employment growth quantifier of 2 or more over the same period—generated almost all net new jobs in the United States between 1994 and 2006.[62] The Kauffman Foundation, a leading institute on research, data collection, and advocacy for entrepreneurial activity, reports that the top-performing one percent of firms generates roughly 40 percent of new job creation, and, the fastest of them all—the "gazelles"—comprising less than one percent of all companies, generated roughly ten percent of new jobs.[63] The same general result has been found internationally; the OECD reports that between three percent and six percent of all firms can be considered high-growth firms but about one percent can be considered the even more impressive performing "gazelles."[64]

Despite the finding across a large number of studies that small new firms tend to exhibit an "up or out" dynamic in which a small number survive to age five to become high-growth firms or "gazelles," other key findings that have emerged in the literature suggest that the growth and performance (as indicated by metrics that include labor productivity, profitability, revenue, and research and development intensity) of new firms, even high-growth firms, vary substantially.[65] Models that can sort out

the term "gazelles" to differentiate the fastest growing young HGFs.

[62] *See* Spencer Tracy, Jr., "*Accelerating Job Creation in America: The Promise of High-Impact Companies,*" SBA Office of Advocacy (2011), pp. 1–4, available at: *https://www.sba.gov/sites/default/files/advocacy/HighImpactReport.pdf. See also* Acs, Zoltan, William Parsons, and Spencer L. Tracy, Jr., "*High-Impact Firms: Gazelles Revisited.*" Study prepared for the SBA, Office of Advocacy (2008), p. 1, available at: *http://www.sba.gov/advo/research/rs328tot.pdf.* The SBA high-impact cohort is about 6.3% of all firms, which is higher than the 2% high-growth category found in the BLS studies. The SBA cohort is larger because the criteria are slightly less restrictive and it includes older firms.

[63] *See* Dane Stangler, "High-Growth Firms and the Future of the American Economy," *Kauffman Foundation Research Series: Firm Formation and Economic Growth* (2010), p. 2, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2010/04/highgrowthfirmsstudy.pdf.*

[64] David B. Audretsch, "*Determinants of High-Growth Entrepreneurship,*" report prepared for the OECD/DBA International Workshop on—Highgrowth firms: local policies and local determinants, OECD, p. 2–5, available at: *http://www.oecd.org/cfe/leed/Audretsch_determinants%20of%20highgrowth%20firms.pdf.*

[65] *See* R. Decker et al. (2014), *supra* at N. 45, pp. 5–7. See also Davis, Steven J., R. Jason Faberman, John Haltiwanger, Ron Jarmin, and Javier Miranda,

various business characteristics and economic conditions to predict high-growth probabilities are still in nascent stages. Nevertheless, this proposed rule includes threshold criteria for parole consideration meant to identify entrepreneurs associated with the kinds of promising start-up entities that appear more likely to contribute to American innovation, economic development, and job creation. As described in more detail below, businesses started and run by immigrants have propelled these kinds of broadly shared economic benefits for many years.

Broadly speaking, entrepreneurs engage in research and development (R&D) in order to develop and commercialize new products and technologies. Several studies have found that entrepreneurs tend to engage in R&D spending in the first year, tend to attract patents and other forms of intellectual capital, and tend to attract venture capital financing.[66]

Immigrants have been central contributors to business ownership and entrepreneurship in the United States and abroad. According to OECD data, self-employment rates for immigrants are higher than those of the native-born populations in many counties, including in the United States.[67] Based on the most recent data available from the U.S. Census Bureau, 12.9 percent of the United States population was foreign-born. Their rate of self-employment is about 30 percent higher than that of the native-born population (7.7 percent vs. 5.9 percent; n=1.8 million). The Census Bureau's 2012 Survey of Business Owners showed that 14.4 percent of U.S. firms were owned by at least one person not born a citizen

"*Business Volatility, Job Destruction, and Unemployment.*" American Economic Journal: Macroeconomics 2(2) (2010): 259–87. Research and development intensity is typically measured as the ratio of research and income, or overall costs.

[66] *See* Shah, Sonali K. and Winston Smith, Sheryl and Reedy, E. J., "*Who are User Entrepreneurs? Findings on Innovation, Founder Characteristics, and Firm Characteristics,*" The Kauffman Firm Survey (February 2012), pp. 2–5, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2012/02/whoareuserentrepreneurs.pdf.*

[67] OECD, "*Migrant Entrepreneurship in OECD Countries,*" prepared by Maria Vincenza Desiderio (OECD) and Josep Mestres-Domènech for the Working Party on Migration (2011), pp. 141–144, available at: *http://www.oecd.org/els/mig/Part%20II_Entrepreneurs_engl.pdf.* This, and many other similar studies and analyses are based on self-employment rates, which are a proxy, but not perfect measure, of business ownership, because some ownership structures such as partnerships, that could involve a foreign-born owner, are generally not considered to be proprietary.

of the United States.[68] In sampling-based studies, the SBA found a higher foreign-born ownership rate, at 16 percent, as did the German-based IZA Institute for the Study of Labor, which put the rate at 18.2 percent.[69]

Many high-growth firms are involved in activities classified in the STEM (science, technology, engineering, and math) fields. The high concentration of immigrant entrepreneurs in these industries has gained much attention. Between 2006 and 2012, one-third of companies financed with venture capital that made an initial public offering had an immigrant founder, a sharp rise from seven percent in 1980. These companies have generated 66,000 jobs and $17 billion in sales.[70] A survey of entrepreneurs in technology-oriented privately held companies with venture backing also showed about one-third were foreign born, and 61 percent held at least one patent.[71]

Further evidence points to similar findings. Between 1995 and 2005, 25 percent of science and technology focused businesses founded in the United States had a foreign-born chief executive or lead technologist. In 2005, those companies generated $52 billion in sales revenue and employed 450,000 workers. In Silicon Valley, the share of immigrant-founded start-ups increased to 52 percent by 2005. In 2006, foreign nationals residing in the United States were involved (as inventors or co-inventors) in about 26 percent of patent applications filed that year. Immigrant founders of Silicon Valley firms tend to be highly educated, with 96 percent holding bachelor's degrees and 74 percent holding advanced degrees, and with 3-quarters of the latter in STEM fields. As of 2010, more than 40 percent of the Fortune 500 companies had been

[68] The categorization of "foreign-born" does not differentiate between lawful permanent residents and naturalized citizens. It also does not provide details of the firm history, implying that some firms owned by persons not born in the United States could have been founded by U.S. citizens and sold to foreign-born persons.

[69] *See* David M. Hart, Zoltan J. Acs, and Spencer L. Tracy, Jr., "*High-tech Immigrant Entrepreneurship in the United States.*' Report developed under a contract with the Small Business Administration, Office of Advocacy (2009), page 8, available at: *https://www.sba.gov/sites/default/files/advocacy/rs349tot_0.pdf. See also* Robert W. Fairlie and Magnus Lofstrom, "*Immigration and Entrepreneurship,*" Institute for the Study of Labor (2013), p. 1, available at: *http://ftp.iza.org/dp7669.pdf.*

[70] This information is found from various sources and found in Stuart Anderson, "*American Made 2.0. How Immigrant Entrepreneurs Continue to Contribute to the United States Economy,*" National Foundation for American Policy, sponsored by the National Venture Capital Association (NVCA) (2013), pp. 3–5.

[71] *Id.* at pp. 2–5.

Exhibit 1
77

founded by an immigrant or the child of an immigrant.[72]

To reiterate, high-growth firms tend to be new and young, and one of their primary contributions to the highly dynamic labor market of the United States has been through job creation. High-growth firms tend to innovate and focus on developing new products and services. While no evidence points to immigrant entrepreneurs outperforming native-born entrepreneurs, the relatively intense involvement of immigrant entrepreneurs in successful technology-driven activities suggests substantial economic contributions. While measuring the precise value and impact of innovation is difficult and still at a nascent stage in research, many economists believe innovation creates positive externalities and spillover effects that further drive economic growth.[73]

Notwithstanding the research on the positive effects of high-growth entrepreneurship, there is some evidence of a long-term slowing in start-up dynamism and entrepreneurial activity in the United States; this trend began well over a decade ago, compelling many economists to advocate for policies that attract more entrepreneurs in general.[74] Many business entrepreneurial advocacy centers have also advocated in recent years for the United States to enact a formalized pathway for immigrant entrepreneurs. DHS is aware of one estimate of the potential benefits of a theoretical start-up visa. A Kauffman Foundation study (2013) estimated that, under certain conditions, a start-up visa could create between 500,000 and 1.6 million new jobs after ten years.[75] The potential benefits of attracting immigrant entrepreneurs have not gone unnoticed internationally, as discussed earlier in the preamble. Thirteen of the thirty-four nations who are part of the Organization of Economic Cooperation

and Development (OECD) have enacted special immigration programs for entrepreneurs, although the eligibility criteria vary among them to a significant extent.[76]

3. Population of Entrepreneurs Potentially Eligible

DHS cannot precisely predict the volume of new businesses that would start in the United States due to this rule. DHS has instead examined available data to provide an estimate of the population of individual entrepreneurs who may be eligible to request parole consideration under this proposed rule. Given limits on DHS's information about such entrepreneurs, DHS does not know how many people within the estimated eligible population would actually seek such consideration; as such, the estimates contained in this section represent an upper bound to the size of the eligible population. DHS estimated the population of entrepreneurs potentially eligible for parole under this rule based on two sub-groups: (1) Foreign individuals who seek to come to the United States to start a new business with financial backing from a qualified U.S. investor; and (2) foreign individuals who seek to come to the United States to start a new business as recipients of U.S. funded and awarded research grants and who intend to conduct the concomitant research in the United States. DHS assumes that each member of the eligible population will start a business and proposes that the general criterion for investment from a qualified investor (e.g. venture capital firms, angel investors, accelerators/incubators) be set at $345,000, while for government grants or awards the general criterion would be $100,000. Based on these amounts, DHS analyzed various past endeavors for the potential sources of funds. DHS estimates that approximately 2,940 foreign nationals annually could be eligible to apply for parole under this proposed rule. Table 1 summarizes the analysis by source of funds.

TABLE 1—NUMBER OF ENTRE-PRENEURS POTENTIALLY ELIGIBLE

| Sub-group | Annual eligibility |
|---|---|
| New foreign-owned firms funded with investment capital .............................. | 2,105 |
| New firms funded with U.S. grants or awards that could potentially decide to locate to the United States | 835 |
| Total .............................. | 2,940 |

DHS has no way of predicting with certainty the actual number of foreign nationals who would seek parole under this proposed rule over time, as the size of the eligible population could change significantly. DHS acknowledges that the estimate of individuals applying annually is an approximation based on past foreign ownership and start-up capital amounts. The analysis utilized to estimate the potential eligible population is also based implicitly on assumptions that: (1) The rule, if finalized, will not significantly change the frequency of U.S. funded grant applications from foreign researchers; and (2) that the rule, if finalized, will not significantly affect the market for foreign entrepreneurs and the market for the types of investment structures the rule will involve. Based on these assumptions and the data limitations, DHS projects that for the first full year that the rule would be effective, and for the second year, annual eligibility will be approximately 2,940.[77] The next section provides key data and analytical approaches utilized to arrive at the population estimates. DHS first considers volume estimates based on official U.S. data. The resulting estimates based on official data are those utilized for the cost projections of the proposed rule. Due to particular constraints in the data, DHS follows with an alternative method of volume

[72] Vivek Wadhwa, "Foreign-Born Entrepreneurs: An Underestimated American Resource," Ewing Marion Kauffman Foundation (2008), pp. 2–6, available at: http://www.kauffman.org/~/media/kauffman_org/z_archive/article/2008/11/wadhwatbook09.pdf.

[73] See "SMEs, Entrepreneurship and Innovation," OECD (2010), pp 26–28, available at: http://www.oecd.org/berlin/45493007.pdf.

[74] See R. Decker et al. (2014), supra at N. 45, p. 16–22.

[75] See Dane Stangler and Jared Konczal, "Give Me Your Entrepreneurs, Your Innovators: Estimating the Employment Impact of a Startup Visa," Ewing Marion Kauffman Foundation, (February 2013), pp. 1–3, available at: http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2013/02/startup_visa_impact_finalsada. The estimates are based on a fixed pool of 75,000 startup visas for a 10-year period, in which firm deaths each year cycle some of visas to new entrants.

[76] Most programs have been enacted after 2010. A country list and some descriptive data can be found at Jean-Christophe Dumont, "Investor Visas in OECD Countries," OECD Conference on Global High-Skilled Immigration Policy The national Academies—Board on science, technology and economic policy (2014), available at: http://sites.nationalacademies.org/cs/groups/pgasite/documents/webpage/pga_152202.pdf.

[77] DHS emphasizes that the total is a broad estimate, as the Department has no means to determine the demand for entrepreneurial parole; changes in the eligible population that the rule may cause, time-variant possibilities, and application preferences. These conditions could change, if, for example, some foreign researchers see parole as attractive and apply for federally funded grants that they otherwise might not have in the absence of the rule. In addition, volume estimates should be interpreted to apply to only initial applications, not considerations for re-parole at some future point in time. Lastly, the market for the types of investments involved, such as venture capital, are fluid and becoming more global in scope. DHS has no means to determine how the evolution of these investment markets will affect, or be affected by the proposed rule.

Exhibit 1
78

estimation that adds robustness to the official estimate.

## Volume Projections Data and Methodology

### A. Grants

Because U.S.-funded research grants may be a qualifying investment under this rule, DHS obtained publicly available data on federally funded grants for fiscal years 2013–2015.[78] Although numerous agencies within the Federal Government award grants to foreign-born individuals, most are humanitarian or development focused.[79] For this reason DHS parsed the very large data set comprising 1.7 million records to obtain a viable analytical cohort. First, the records were filtered to capture Federal Government agencies that award grants to both United States *and* foreign-born recipients. Secondly, the records were sorted to only include the Federal Government agencies that award grants focused on "projects," thereby excluding block and assistance grants.[80] The foreign-born cohort used for the eligibility projections excluded grants made to recipients in U.S. territories, as such recipients may be subject to special considerations outside the parole parameters.[81] DHS also excluded grant amounts recorded as negative, zero, and trivial amounts of less than

$1,000—such values were recorded if grants were rescinded or for some other reason not ultimately funded. On average, 138,447 grants comprised the annual resulting analytical cohort derived from the above filtering procedures. Of that total, a small portion, 2,043 grants, or 1.5 percent, were awarded to foreign-born individuals. Having determined a reasonable eligibility threshold of $100,000, DHS proceeded to the next step, to determine the potential annual eligible population of grant-sourced researchers. Over the period of analysis, 41 percent of the Federal grants awarded to foreign recipients equaled or surpassed the $100,000 benchmark, for an average of 835 annually.

### B. Investment Capital

To estimate the number of potential new entrepreneurial start-ups, DHS obtained and analyzed data from the BLS and the Census Bureau. From the BLS Business Employment Dynamics (BED) data suite, DHS obtained the number of private establishments aged 1 year or less for nine broad sectors likely to be involved in innovative activity, in order to focus on entrants.[82] Although a reasonable proxy, the number of establishments aged 1 year or less is not a perfect measure of firm start-ups (births). The chosen metric may understate births, by including expansions and new franchises of existing businesses. Conversely, it may understate the actual number of start-ups, because some fraction of firms does not survive the first year (the data are tabulated in March of the respective year such that the establishments aged 1 year and less are those that opened within the previous year but remained in business as of March of the following year), and those that opened in the previous year and were still in business but had not reached 2 years of age. DHS utilized the relevant figure for March 2015, because the latter is the most

recent figure reported in the BED dataset.

For each sector, DHS obtained the corresponding share of firms owned by a person "born a citizen of the United States" from the Census Bureau's Survey of Business Owners data set.[83][84] For brevity, we utilize the term "foreign" here to describe such firms. The foreign share was obtained by dividing the number of foreign-owned private firms in a sector by the total number of reporting firms in the same sector. This share applies to firms that have a least one owner who was not born in the United States but does not differentiate between various types of ownership structures. The figure for new firms obtained from the BLS BED data was multiplied first by the foreign share to generate an estimate of firms per sector started by a person not born in the United States.

Next, DHS attempted to calculate how many of the firms were started with at least $345,000, the minimum investment threshold that the rule proposes. The SBO data provides ranges of such startup capital amounts but DHS could not conduct a precise estimate because the data does not provide a category bound by the threshold minimum. In fact, the encompassing tranche is very large, from $249,500 to $1 million in range. The SBO does not provide actual cohort data or other information from which DHS could evaluate the distribution and, therefore, DHS has no way of ascertaining how many firms in this large range would occupy the $345,000 to $1 million

---

[78] The data were obtained from USASpending.gov: *https://www.usaspending.gov/Pages/Default.aspx*. From the homepage, the data can be accessed from the linked "data download" section. The files were obtained on April 20, 2015.

[79] It is certainly the case that U.S. State governments and other governmental entities issue research grants that foreign recipients could potentially utilize for parole eligibility. However, DHS is not aware of any database that collects and provides such data publicly.

[80] The Federal entities that awarded scientific-focused research to foreign recipients were: Agricultural Resource Service, National Institute of Health, Center for Disease Control, Food and Drug Administration, Department of Defense, National Aeronautics and Space Administration, National Oceanic and Atmospheric Administration, National Institute of Standards and Technology, National Science Foundation. The U.S. Department of State and Agency for International Development (USAID) were excluded from the analysis.

[81] There is a particular way in which the data germane to foreign grants were parsed and analyzed. There are two possible foreign indicators listed for each grant. One is the "principal place" involving the research and the other is the "recipient country." The incumbent volume projections are based on the latter because this indicator generally implies that the grant was made to a person or institution outside the United States. The former is not used because this indicator could apply to grants awarded to U.S. or foreign persons in order to conduct the ensuing research outside the United States. Implicit in this analysis is that persons awarded U.S. funded grants that are overseas could conduct their research and innovation in the United States, and are not otherwise precluded from doing so, even if the focus of such research is in a foreign country.

[82] The BLS data is found at *http://www.bls.gov/bdm/bdmage.htm*. DHS utilized the "Establishment age and survival BED data for nation by major industry" set and figures from Table 5, "Number of private sector establishments by age," for the nine major sectors shown in Table 2, above. The BLS does provide figures on firm births that could be used in the present analysis. However, DHS chose establishment age data because it is broken down in a way that corresponds precisely to the innovating sectors, discussed below. The firm birth data is not categorized in the exact same manner. The nine major sectors were chosen to envelope the approximately 430 individual activities that DHS considers to involve "science, technology, engineering, and math" (STEM)." The full list based on the 2012 update can be found at: *http://www.ice.gov/sites/default/files/documents/Document/2014/stem-list.pdf*.

[83] The Census SBO data are found at: *http://www.census.gov/data/tables/2012/econ/sbo/2012-sbo-characteristics.html*. The foreign ownership figures per sector are found under "Characteristics of Business owners," Table SB1200CSBO11: "Statistics for Owners of Respondent Firms by Whether the Owner Was Born in the United States by Gender, Ethnicity, Race, and Veteran Status for the U.S." and the startup capital data are found under Characteristics of Businesses, Table SB1200CSB16: "Statistics for All United States Firms by Total Amount of Capital Used to Start or Acquire the Business by Industry, Gender, Ethnicity, Race, and Veteran Status for the United States: 2007." The foreign ownership share of firms is provided in the table and thus did not need to be calculated by DHS. The SBO data are part of the 2012 survey for which data was released publicly between February and June 2016.

[84] A possible source of upward bias in the foreign ownership share and hence the estimate of eligible entrepreneurs is that this share does not differentiate between foreign owners who came to the United States to open a business and those who acquired one after being in the United States for some period of time (e.g., lawful permanent residents or naturalized citizens). A general finding among a large literature on this topic is that many foreign-born business owners were driven to start a business by "push" factors in the labor market after arrival in the United States. DHS does not have a means to parse out the ownership rate in a more granular way to account for such differences.

Exhibit 1
79

segment. As a result, DHS relied on the share of firms in this tranche and the additional tranches over $1,000,000 relative to the share of all firms

reporting for the sector, and recognizes that the volume projection is likely larger than is realistic. An additional assumption is that the startup threshold

is the same for businesses with native and foreign-born founders. The relevant data and estimates per sector are shown in Table 3.

TABLE 3—SUMMARY OF ENTREPRENEUR ESTIMATES

| Sector | New firms | Foreign share (%) | Start-up threshold (%) | Annual eligible |
|--------|-----------|-------------------|------------------------|-----------------|
| Agriculture | 10,182 | 4.9 | 2.5 | 12 |
| Utilities | 1,204 | 10.8 | 5.5 | 7 |
| Manufacturing | 29,883 | 11.0 | 5.4 | 178 |
| Information | 22,855 | 11.9 | 2.0 | 55 |
| Professional Services* | 165,425 | 12.8 | 1.2 | 248 |
| Management | 7,334 | 7.3 | 20.2 | 108 |
| Waste Services | 66,161 | 16.4 | 0.9 | 94 |
| Education | 15,226 | 11.9 | 0.7 | 13 |
| Health Care | 210,977 | 18.0 | 3.7 | 1,391 |
| Total | | | | 2,105 |

* Abbreviation for "Professional, Scientific, and Technical Services".

C. An Alternative Estimate of Entrepreneurs Based on Investment Structures

DHS recognizes the imperfections in estimating the potential population of eligible entrepreneurs based on extrapolating past conditions of foreign ownership rates and capital thresholds—and specifically, a lack of a demarcation threshold of $345,000—but this approach provides a reasonable approximation of the upper bound of the eligible population in light of the significant data limitations and the uncertainty involved with estimating future entrepreneurial activity. The main benefit of this method is that it is based on official data; a limitation is that it assumes that the annual crop of firms created are entrepreneurial and the types of firms covered by the parole process in the proposed rule. In practice, some, but not all, will be innovators, even though the present analysis focuses on the sectors of the economy linked to STEM activity (DHS is not aware of any methods or data that can allocate a research-innovation share of firms to each sector). Because the volume projections are derived from information obtained from official sources—the BLS and Census Bureau—DHS retains them for purposes of the costs and volume estimates of the proposed rule. However, DHS believes that an alternative method of estimation will inform readers and strengthen the regulatory analysis, by providing a viable comparison to the official projections. In this alternative approach, DHS focuses on the types of investment structures and ventures likely to be involved in the proposed parole process. Specifically, DHS believes that there will be three primary sources of

investment for innovative firms (excluding research grants, which are not addressed in this alternative estimate): Venture capital firms, angel investors, and business accelerators and incubators ("incubators" for brevity, henceforth).[85] Hence, by analyzing the foreign component of these structures, data permitting, an alternative estimate of entrepreneurs can be obtained for comparison purposes.

As is the case with the official estimates, this alternative method, which focuses on innovative firms and investment types, also suffers from limitations. Foremost, DHS recognizes uncertainty around utilization rates, i.e. how many potential entrepreneurs among the estimated eligible population would actually seek parole under the proposed rule. Second, there is potential overlap in these structures; for example, firms under incubation often receive angel financing and some firms receive both angel financing and venture capital. However, since DHS does not have data to separate out such capital infusions, each of the three investment types is treated as distinct.

For venture capital, DHS consulted the National Venture Capital Association (NVCA) 2016 yearbook. This yearbook provides the number of annual seed venture investments. The data reveal that between 2013 and 2015,

an average of 169 first sequence seed investments were made, which DHS considers to be new firms financed with venture capital.[86] To estimate the eligible share of these venture capital backed firms, DHS relied on the finding that about one third of venture financed companies involved a foreign born owner or founder.[87] Based on this share, approximately 56 firms and individuals (assuming each firm would have one foreign individual) annually would be eligible for parole (obtained by multiplying the annual average of 169 seed investments by 0.33). This estimate embodies the assumption that all of the seed venture investments are above the investment threshold.[88]

---

[85] DHS is aware that in recent years alternative sources of financing for new and young firms, such as crowdsourcing and merchant cash advances (MCA), to name just two, have become relevant and common in types of industries, and recognizes that such capital could finance the types of foreign established firms that parole under this rule is intended to involve. However, at present, DHS is not aware of sufficient data concerning these new alternative methods to include them in the context of the present analysis.

[86] The NVCA yearbook is found at: http://nvca.org/research/stats-studies/. The figures utilized are found in Figure 3.23, "First Sequence by Stage of Development (Number of Deals). "First sequence" venture finance typically describes the round that is the early stage following the start-up round. It is generally the capital investment round linked to producing and selling the firm's product.

[87] This figure is found in "American Made 2.0. How Immigrant Entrepreneurs Continue to Contribute to the United States Economy," National Foundation for American Policy, sponsored by the National Venture Capital Association (NVCA) (2013), pp. 3–7, available at http://www.nfap.com/pdf/American%20Made%202.0.Final.pdf.

[88] Information from the financial services advisory firm Ernst & Young indicates that the median venture capital round for startups is $900,000 based on the average for 2013–2014, and the median seed round is $850,000. Data in a report in Inc. indicates that median venture capital seed round is $1.05 million based on the period 2013–2015. The information can be found at: http://www.ey.com/Publication/vwLUAssets/Venture_Capital_Insights_4Q14_-_January_2015/$FILE/ey-venture-capital-insights-4Q14.pdf and at http://www.inc.com/linkedin/tomasz-tunguz/inflation-deflation-startup-fundraising-market-tomasz-tunguz.html, in order. Although the terms "seed" and "startup" can be convoluted, generally seed rounds preceded startup finance sequentially. Seed
Continued

Exhibit 1
80

To obtain an incubator estimate, DHS obtained publicly available information from SeedDb, which provides data on U.S. incubators collected from industry associations and fee-based data providers, including CB Insights and Crunchbase, which are two of the largest data providers for venture capital, angel investors, and accelerators.[89] The data are not collated in a way amenable to conducting a cohesive firm-by-firm or firm-wide analysis, but a DHS review of the available data indicates that the date range of firms included is about 2006–2016 (as of the last DHS data pull on March 20, 2016). The total number of firms is 6,248, yielding an annual average over 11 years of 568. Since all of these firms had to enter incubation at some point in the 11-year period, 568 is a reasonable estimate of the average number of firms entering incubation per year. One of the data suites lists the total number of companies incubated for each incubator and the countries that the companies were located in. Since there is wide variation in the number of companies per incubator, ranging from 1 to over a thousand, DHS grouped the incubators by country and then weighted each one for its share of total companies. The resulting weighted average indicates that one quarter of incubated companies were foreign.[90] Applying the 25 percent foreign share to the annual 568 firms, DHS estimates that about 144 firms could be eligible annually. DHS expects that not all foreign firms that enter incubation will meet the $345,000 investment threshold, but because DHS will potentially consider other factors for such firms, a threshold rate is not applied to the estimate for purposes of this analysis.

Having estimated 56 venture firms and 144 incubator firms as potentially eligible, DHS next estimated the largest source of startup investment, angel investors. Based on the most recent data from the Center for Venture Research, about 25 percent of angel investments are made at the seed and startup stage. For the 71,000 companies receiving angel financing per year, about 17,750

could be considered new, which compares favorably to other, unrelated sources that note that about 16,000 new firms are financed with angel investments per year.[91]

DHS used the 17,750 annual figure for angel backed startups and multiplied that number by the same 25 percent rate for foreign identifiers found in the SeedDB data. DHS is aware that many angel investments are made at low levels and that there is a wide range of such investment amounts. DHS does not have publicly available data in which to analyze a distribution of angel backed firms, and operates under the assumption that the $345,000 average is also the median, as is the case for a normal distribution. DHS multiplied the resulting foreign cohort by 0.5. The result of these extrapolations yields a figure of 2,151, which is an estimate of the potential population of eligible new firms annually financed by angel investments. By adding the three investment-type estimates together—144 incubator firms, 56 venture-backed firms, and 2,151 angel-backed firms—the resulting sum is 2,351. While uncertainties and limitations of the data involved in the volume estimates have been enunciated in detail, the closeness of this estimate to the 2,105 figure based on the Census and BLS data, adds robustness and confidence to the official estimate utilized in the cost projections.

### D. Potential Variability in the Volume Projections

This section discusses several potential cohorts involving entrepreneurial activity that is difficult to estimate.

In light of the potential benefits to the U.S. economy and job creation, DHS is proposing this rule to provide a mechanism that, consistent with the requirements of the INA, encourages foreign entrepreneurs described herein to form and create innovative firms in the United States. In 2011, DHS began outreach and stood up the Entrepreneurs in Residence initiative to try to encourage entrepreneurship among foreign nationals.[92] DHS began tracking the number of foreign nationals who indicated interest in starting up an entrepreneurial endeavor at some point during their admission as an H–1B

nonimmigrant. Over the past four fiscal years (FY 2010–2013), an average of 77 foreign nationals have indicated such interest. In light of the relatively small numbers of foreign nationals who indicated their entrepreneurial intentions, DHS believes that considering parole requests under this rule will promote further innovation and other economic benefits in addition to those created by existing programs and policies used by foreign nationals to pursue high-growth entrepreneurial activity in the United States. If the rule is finalized, there could be some small substitution effects as some portion of this cohort could switch to seeking parole instead of relying on other existing nonimmigrant programs and policies. However, DHS does not believe such substitution would occur on a large scale because the ability to be admitted to the United States as a nonimmigrant offers materially more benefits and protection than parole.

In addition, the proposed rule lists a number of ancillary conditions for eligibility—and conversely a number of conditions that would leave individuals unlikely or unable to be paroled into the United States (or continue to be paroled in the country). Because ancillary conditions can be considered for eligibility, the actual volume may be larger than the estimates herein. Two examples are that under the proposed rule, applicants must maintain household income greater than 400 percent of the poverty line and that the qualifying start-up capital cannot come from family members. The volume estimates presented in this analysis assume all ancillary eligibility conditions are met.

Finally, two potential elements of the eligible population are considered. First, as alluded to in the summary, the volume estimates and ensuing cost estimates assume one individual owner for each new firm; under the proposed rule, DHS would allow up to three individuals per firm to seek parole but does not attempt to estimate how many of the startups could have more than one owner. Second, the volume estimate for grants is based on Federal awards only. DHS will consider eligibility based on State or local grants and awards, including those from State or local Economic Development Corporations (EDCs). Although, unlike in the case of Federal awards, there is not a database capturing State and local grants or the transmission mechanisms through which some Federal grants are distributed to other entities, such as EDCs.

typically "refers" to capital utilized to found the firm and initialize concept and product development while "startup" generally refers to new capital utilized to support initial production and operations.

[89] The SeedDB information is found at the Web site *is://www.seed-db.com/*.

[90] This foreign share found by DHS in the analysis corresponds strongly to a finding in a study of high technology firms that found that 24 percent of such firms were founded by a foreign born person. *See* "America's New Immigrant Entrepreneurs," Vivek Wadhwa, AnnaLee Saxenian, Ben Rissing, and Gary Gereffi, available at: *http:// people.ischool.berkeley.edu/~anno/Papers/ Americas_new_immigrant_entrepreneurs_I.pdf*.

[91] This figure is reported in, among other sources: *http://www.angelblog.net/Angels_Finance_27_Times_More_Start-ups_Than_VCs.html* and *http://www.entrepreneurship.org/emed/angel-investing-versus-venture-capital-part-i.aspx*.

[92] Source: USCIS Announces "Entrepreneurs in Residence Initiative" available at: *http:// www.uscis.gov/news/public-releases-topic/business-immigration/uscis-announces-entrepreneurs-residence-initiative*. *See also http://www.uscis.gov/eir/visa-guide/entrepreneur-visa-guide*.

Exhibit 1
81

### 4. Costs

#### A. Principal Filer Costs

The proposed rule would permit certain foreign nationals to apply for a 2-year initial period of parole into the United States provided they meet the proposed eligibility criteria. Those who seek such parole into the United States would face the costs associated with the application, which involve a $1,200 application fee plus other costs, detailed below. The costs would stem from filing fees and the opportunity costs of time associated with filing the Application for Entrepreneur Parole, Form I–941.

The proposed filing fee for Form I–941 is $1,200. The fee is set at a level intended to recover the anticipated processing costs to DHS.[93] In addition, DHS is proposing that applicants for parole as an entrepreneur submit biometrics and incur the $85 biometric services fee. Because entrepreneurs could start firms in any number of occupations, DHS believes it is appropriate to utilize the mean hourly wage for all occupations, which is $22.71.[94] In order to anticipate the full opportunity cost to petitioners, DHS multiplied the average hourly U.S. wage rate by 1.46 to account for the full cost of employee benefits such as paid leave, insurance, and retirement, for a total of $33.16 per hour.

DHS estimates that the proposed application would require 1.33 hours to complete. After DHS receives the application and fees, if the applicant is physically present in the United States,

USCIS will send the applicant a notice scheduling him or her to visit a USCIS Application Support Center (ASC) for biometrics collection. Along with the $85 biometric services fee, the applicant would incur the following costs to comply with the proposed biometrics submission requirement: The opportunity cost of traveling to an ASC, the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours. DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours.[95] By applying the $33.16 hourly time value for applicants to the total biometrics-related time burden, DHS finds that the opportunity cost for a principal applicant to travel to and from an ASC, and to submit biometrics, would total $121.68.[96] In addition to the opportunity cost of providing biometrics, applicants would experience travel costs related to biometrics collection. The cost of such travel would equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[97] DHS assumes that each individual would travel independently to an ASC to submit his or her biometrics, meaning that this rule would impose a time cost on each of these applicants.

DHS estimates that each principal parole applicant would incur the following costs: $1,285 in filing fees to cover the processing costs for the application and biometrics; $194.53 after summing the monetized cost of travel to submit biometrics, the total opportunity costs of time of the initial applications, biometrics, and estimated travel costs, resulting in a total cost of $1,479.53 per application, rounded to $1,480.[98] If DHS receives 2,940

applications from persons eligible to apply, DHS anticipates that such applications would result in annual filing fee transfers of $3,777,900 (undiscounted), which comprise the application fee and cost of submitting biometrics, and opportunity and other burden costs of $571,927, for a total annual cost of $4,349,827. Any subsequent renewal of the parole period or material changes requiring the filing of an amended application would result in costs similar to those previously discussed, with the possible exception of travel costs, since the applicant would not be required to depart the United States and re-enter.

#### B. Dependent Spouses and Children

The proposed rule would require all dependent family members (spouses and children) accompanying or joining the entrepreneur to file a Form I–131, Application for Travel Document, and would require all spouses and children 14 years of age through age 79 to submit biometrics. Those spouses and children would face the costs associated with filing the application and submitting biometrics.

DHS recognizes that many dependent spouses and children do not currently participate in the U.S. labor market, and as a result, are not represented in national average wage calculations. In order to provide a reasonable proxy of time valuation, DHS has to assume some value of time above zero and therefore uses an hourly cost burdened minimum wage rate of $10.59 to estimate the opportunity cost of time for dependent spouses. The value of $10.59 per hour represents the Federal minimum wage with an upward adjustment for benefits.[99] The value of $10.59 per hour is consistent with other DHS rulemakings when estimating time burden costs for those who are not authorized to work.[100]

DHS would require dependents of parole applicants (spouses and children

---

[93] USCIS calculates its fees to recover the full cost of USCIS operations, including meeting national security, customer service, and adjudication processing costs. As with other fees, USCIS uses Activity Based Costing (ABC) to assign costs to specific benefit requests. This model uses completion rates (actual or estimated depending on whether the benefit type is already being adjudicated) to calculate a proposed fee or fee adjustment for a benefit type. A completion rate reflects an average time an adjudicator spends actually working on a case but does not include "queue" or wait times. Because parole under this proposed rule has not yet been implemented, the completion rate used is based on a 4-hour estimate provided by USCIS' subject matter experts. At this time, USCIS has estimated that 30 additional staff would be required to satisfy the forecasted workload associated with this rule. However, USCIS requires additional hours to report actual adjudication hours and case completions by benefit type. This reporting will occur after this rule is implemented. Adjudication hours will be divided by the number of completions for the same time period to determine the *actual* average completion rate. This rate will be used in future fee adjustments and will help determine future staffing allocations necessary to handle the projected workload for parole under this proposed rule.

[94] *See* National Occupational Employment and Wage Estimates United States. May 2014. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics program. Available at *http://www.bls.gov/oes/2014/may/oes_nat.htm.*

[95] Foreign nationals who submit their applications from outside the United States would still be required to pay the $85 biometric processing fee and travel to a USCIS office abroad, if available, or a U.S. embassy or consulate office for biometric processing. Due to data limitations, and to capture general impacts of the rule, DHS has estimated costs of submitting biometrics under the assumption that all applicants are traveling to an ASC in the United States.

[96] Calculation: $33.16 * 3.67 hours = $121.68.

[97] Calculation: 50 miles multiplied by $0.575 per mile equals $28.75. *See* 79 FR 78437 (Dec. 30, 2014) for GSA mileage rate.

[98] Calculation: $1,285 + 194; $1,285 is the sum of the direct cost of the $1,200 filing fee and the $85

cost of biometrics. The $194 (rounded) figure is obtained by adding the cost of travel ($28.75) plus the total opportunity cost of $166, the latter of which is the product of the total time burden (5 hours) and the average burdened hourly wage ($33.16).

[99] U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009. Available at *http://www.dol.gov/dol/topic/wages/minimumwage.htm.* The calculation for total employer costs for employee compensation for dependent spouses and children of principals with an approved Form I–140: $7.25 per hour × 1.46 = $10.59 per hour.

[100] *See* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (25 Feb. 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (3 Jan. 2013).

Exhibit 1
82

of the parole applicant) to file an Application for Travel Document (Form I–131) in order to be scheduled for biometric submission. There is a $360 filing fee associated with Form I–131, and DHS estimates it will take 3.56 hours to complete each submission. In addition to filing the Form I–131, each dependent spouse and child 14 years of age and over would be required to submit biometric information (fingerprints, photograph, and signature) by attending a biometrics services appointment at a designated USCIS Application Support Center (ASC). The biometrics processing fee is $85.00 per applicant. In addition to the $85 biometrics services fee, the applicant would incur the following costs to comply with the biometrics submission requirement: The opportunity and mileage costs of traveling to an ASC, and the opportunity cost of submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours.[101] DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours. In addition to the opportunity cost of providing biometrics, applicants would experience travel costs related to biometrics collection. The cost of such travel would equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[102] DHS has assumed that each applicant would travel independently to an ASC to submit his or her biometrics, meaning that this rule would impose a time cost on each of these applicants. DHS also assumed all children were over the age of 14 for the purposes of this analysis and, therefore, this cost estimate may be slightly overestimated.

DHS projects that approximately 3,234 dependents would be required to file a Form I–131 and submit biometrics, based on the estimate of 2,940 principal applicants and using a multiplier for

expected family members of 1.1.[103] The total cost for those spouses and children requesting parole under this program includes the filing fee, biometrics processing fee, travel costs associated with biometrics processing, and the opportunity cost of filing the Form I–131 and submitting biometrics. The total time burden is 7.23 hours. At the cost-burdened wage, the total opportunity cost is $76.53. Adding the $28.75 cost of travel, the total non-filing cost is estimated to be $105.78, and the total cost per applicant is $550. At the projection of 3,234 applicants, the non-filing cost is $340,474 (undiscounted), and combined with filing costs of $1,439,130, the total estimated cost for dependents germane to Form I–131 is $1,779,604.

In addition, DHS proposes to allow unrestricted employment authorization for spouses of entrepreneurs granted parole under this rule. DHS proposes to permit these individuals to apply for employment authorization by filing Form I–765. To estimate the number of potential persons applying for employment authorization, DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 1,813 spouses, the same number as entrepreneur parolees.

The current filing fee for Form I–765 is $380.00. The fee is set at a level to recover the processing costs to DHS. Based on the projection of 2,940 applicants, the total filing cost is $1,117,200 (undiscounted). DHS estimates the time burden of completing Form I–765 is 3.42 hours.[104] At the cost-burdened wage, the total opportunity cost is $36.20. At the projection of 2,940 applicants, the non-filing cost is $106,430 (undiscounted) and combined with filing costs of $1,117,200, the total

estimated cost for spouses germane to Form I–765 is $1,223,630.

In addition to the filing costs, applicants for parole may face other costs associated with their entrepreneurial activities. These could include the administrative costs of starting up a business, applying for grants, obtaining various types of licenses and permits, and pursuing qualified investments. However, these costs apply to the entrepreneurial activity and the business activity that the applicant has chosen to be involved in and are not driven by the parole process or other governmental functions attributable to the rule itself. Hence, DHS does not attempt to estimate, quantify, or monetize such costs.

Lastly, DHS recognizes that some individuals who were lawfully admitted in the United States in certain nonimmigrant classifications may seek parole. They would thus apply for parole and, if approved, exit the United States and request to be paroled into the United States at a port of entry, as parole will not involve any direct change from other nonimmigrant status. Such applicants would bear the travel costs of exit and returning to a port of entry. However, because there are no similar programs for comparison, DHS cannot determine the demand for parole or substitution effects from other classifications and thus cannot estimate, quantify, or monetize such potential travel costs. Finally, because the program allows for re-parole under conditions that DHS has set, entrepreneurs and their spouse and children, if applicable, would likely face filing and opportunity costs associated with applying for re-parole. However, DHS has no means of estimating the share of the potential eligible population that would seek and be eligible for re-parole, hence re-parole conditions are not included in this analysis. In summary, DHS believes that it is possible that there could be some substitution into the proposed parole program from other programs and such applicants and dependents would incur travel and possible other costs related to exit and re-entry.

## C. Potential for Negative U.S. Labor Market Impacts

DHS does not expect the rule to generate significant costs or negative consequences. Extensive review of information relevant to immigrant entrepreneurship indicates that while much about the impact of such entrepreneurship is not known, there is no reason to expect that substantial negative consequences, including adverse impact on domestic workers,

---

[101] DHS has estimated travel distances and ensuing travel times at 2.5 hours in prior rulemakings. *See, e.g.,* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (25 Feb. 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (3 Jan. 2013).

[102] *See* U.S. General Services Administration Web site for Privately Owned Vehicle (POV) Mileage Reimbursement Rates, *http://www.gsa.gov/portal/content/100715* (accessed August 8, 2015).

[103] The multiplier of 1.1 was obtained from DHS estimates of the average historical ratio of principal versus dependent recipients of LPR status. DHS studies based on statistics obtained from office of Immigration Statistics reveal that multipliers for the employment preference categories EB–1, EB–2, and EB–3 range from 2.04 to 2.27. DHS believes that 2.1, is a reasonable multiplier for the estimates and utilized this multiplier in regulatory assessments involved in American Competitiveness in the Twenty-First Century Act, (AC21) provisions, specifically: "Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers" (RIN 1615–AC05), proposed rule. Because the Form I–131 filings relevant to this rule do not apply to principals, only spouses and dependent children, DHS believes it is valid to subtract 1 from the 2.1 multiplier to yield the final multiplier of 1.1.

[104] Source: Paperwork Reduction Act (PRA) Supporting Statement for Form I–765 (OMB control number 1615–0040). The PRA Supporting Statement can be found at Question 13 on *Reginfo.gov* at *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201502-1615-004.*

Exhibit 1
83

are likely. The possibility that immigrant entrepreneurs may displace ("crowd-out") native entrepreneurs has been raised by a few researchers. One study indicated that a very small number of native entrepreneurs were possibly displaced by immigrant entrepreneurs.[105] However, because of difficulties in controlling for a large amount of variables related to entrepreneurship, other researchers have noted that this finding only raises the possibility that displacement could not be ruled out completely, but did not actually provide irrefutable evidence that it had occurred.[106] Another study, conducted by the Brookings Institution, did not find displacement but acknowledged that more research and refined control techniques, along with longitudinal data, would need to be studied before ruling out the possibility completely.[107] In any event, the purpose of the proposed parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers, offsetting any potential negative impacts for this group.

DHS recognizes that the potential inclusion of spouses can incur labor market implications and possibly impact U.S. workers. As was noted in previous sections of the regulatory impact analysis, DHS did not attempt to assess or measure the labor market impact of the estimated entrepreneurs potentially eligible for parole because as founders of firms, these persons would not affect the labor market in the same way as other workers. Although spouses could have labor market impacts as new labor market entrants, DHS believes such potential impacts will be negligible. The main reason is that the size of the potential new cohort is very small. As of the end of 2015, there were an estimated 157,130,000 people in the U.S. civilian labor force.[108]

Consequently, the estimated "new" available workers in the first year would represent approximately 0.001 percent of the overall U.S. civilian labor force.[109] DHS believes this fraction is too small to have a significant impact on the labor market.

While the figures above apply to the general U.S. labor force, DHS recognizes that concentration of new labor force entrants can impact specific labor markets. DHS believes that any such potential impacts linked to this rule will be insignificant. The NVCA and other sources of information that DHS reviewed indicates that while the area of California known as Silicon Valley has traditionally been, and continues to be, the primary recipient geographically for technology startup capital, other large urban centers on the East Coast and, even more recently, parts of the Mid- and Mountain West have seen increased technology startup activity. To provide just one example of a potential area-specific impact, DHS considered the San Jose-San Francisco-Oakland (CA) Combined Statistical Area (CSA) conjoining the seven Metropolitan Statistical Areas (MSAs) and nine encompassed counties constituting the economic linkages of Silicon Valley. Based on data from the BLS, the population of this CSA is about 8.6 million (as of May 2014) and the employed population (a narrower measure of the labor market than the labor force) about 3.75 million. If the share of new entrants is based on the proportion of venture capital to the area, which is 42 percent, then 2,746 spousal entrants could impact the area.[110] Assuming such entrants gain employment, this cohort represents just 0.02 percent of the employed population of the specific CSA.

### D. Government Costs

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing services, including administrative costs and services provided without charge to certain applicants and petitioners. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS has established the fee for the adjudication of proposed Form I–941 based on notional application filing volumes and estimated resource commitments. During the biennial fee review, DHS will examine whether the fee is sufficient to recover the full costs of adjudication, as required by the INA.

### 5. Benefits

As referenced previously, evidence suggests that innovation-focused start-ups contribute disproportionately to job creation. The proposed rule would reduce entry barriers, and thus support efforts by foreign entrepreneurs to generate entrepreneurial activity in the United States.

The proposed rule is expected to generate important net benefits to the United States economy. For one, expenditures on research and development by the estimated annual grant-based researchers that DHS has identified that could qualify for entrepreneur parole would generate direct and indirect jobs. In addition, this research-focused spending could potentially generate patents, intellectual property, licensing, and other intangible assets that can be expected to contribute to innovation and technological advances and spill over into other sectors of the overall economy. DHS acknowledges that it is extremely difficult to gauge the actual economic value of such assets and that peer-reviewed research in this area is still nascent. Despite the nascent stage of the research and the difficulty of measuring quantitatively the benefit of innovation driven by new high technology firms, various research indicates that the innovation driven by entrepreneurs contributes directly to economic growth, generates important efficiencies and cost reductions for firms that utilize such innovation, and increases productivities and profitability for firms that benefit indirectly through new products generated by such innovation.

Lastly, DHS believes that a subset of the start-up firms formed by foreign entrepreneurs during the proposed parole period could eventually become high-growth firms that generate high levels of profitability and contribute disproportionately to job creation in the United States.

[105] Fairlie, R. W., and B. D. Meyer, "The effect of immigration on native self-employment," *Journal of Labor Economics* 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/papers/published/jole%202003%20-%20native%20se.pdf.*

[106] *See* Magnus Lofstrom, "Immigrants and Entrepreneurship," Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/immigrants-and-entrepreneurship.pdf.*

[107] *See* Zoltan J. Acs and David M. Hart, "Immigration and High-Impact, High-Tech Entrepreneurship," *Brookings,* Issues in Technological innovation (February 2011), available at *http://www.brookings.edu/research/papers/2011/02/immigration-hart-acs.*

[108] *See* News Release, United States Department of Labor, Bureau of Labor Statistics, Regional and State Unemployment—2015 Annual Averages, Table 1

"Employment status of the civilian non-institutional population 16 years of age and over by region, division, and state, 2014–15 annual averages" (Mar. 24, 2016), available at *http://www.bls.gov/news.release/pdf/srgune.pdf.*

[109] Source: United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistic. Figure applies to seasonally adjusted level for December 2014, available at: *http://data.bls.gov/timeseries/LNS11000000.* Calculation for new worker labor force share: 1813/157,130,000.

[110] The employment figures are provided by the BLS, Occupational Employment Statistics (OES), found at: *http://www.bls.gov/oes/current/oes_42100.htm.* The population data is provided by the Census Bureau, which tabulates CSAs: "Combined Statistical Area Totals Dataset: Population and Estimated Components of Change: April 1, 2010 to July 1, 2014" (CSV), 2014 Population Estimates. United States Census Bureau, Population Division. March 2015. The information on the venture capital share for the region is found in the NVCA 2015 yearbook, and is found in figure 8, p. 14. The calculation is as follows: .(42 × 1813) = 761, which is then divided by the CSA population of 3,750,000.

Exhibit 1
84

*D. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (Mar. 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of fewer than 50,000. Individuals are not defined as a "small entity" by the RFA.

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act and certifies that this rule would not have a significant economic impact on a substantial number of small entities. This proposed rule would provide guidance on the use of parole for entrepreneurs who seek it on a voluntary basis. The proposed rule would not mandate that all individuals apply for parole. This proposed rule provides flexibilities and options that do not currently exist for individuals who wish to establish or operate a start-up business in the United States. Importantly, the proposed rule does not require any individuals or businesses, including those created by foreign nationals, to seek parole—either generally or as a specific condition for establishing or operating a business in the United States. Rather, as mentioned previously, this proposed rule is intended to provide an additional flexibility for foreign individuals who are unable to obtain another appropriate nonimmigrant or immigrant classification, in order to facilitate the applicant's ability to establish and grow the start-up entity. If any individual believes this rule imposes a significant economic impact, that individual could simply choose to not avail themselves to the requirements of the rule and would then incur no economic impact. As discussed previously, this rule imposes direct filing costs of $1,285 (which includes the $1,200 application fee and the $85 biometrics fee), plus $194 in time-related opportunity costs for those individuals who do choose to apply for entrepreneur parole. This cost is relatively minor when considering the costs of starting up a new business and the capital necessary to start a business.

Under the general term "entrepreneur," DHS includes those who desire to form firms with investment funds from certain U.S. investors. For purposes of the RFA, the regulatory requirements place compliance costs and establish eligibility criteria for the individual requesting consideration for parole under this proposal. DHS believes that the costs of application for parole would burden the individual applicant, and not the entrepreneurial venture (firm). This proposed rule would not alter or change the normal procedure for fundraising or other start-up administrative costs that occur in forming a business entity. Such costs are not direct costs of this rule and could include, but are not limited to, business application fees, legal fees, and licensing that precede significant infusions of investment, the latter of which are primarily utilized for operational and capital expenses in order to produce goods or services.

It is possible that some of the 2,940 estimated entrepreneurs who could be eligible for parole annually could involve business structures in which the filing fees are paid by a business entity. In the event that small business entities are impacted by this proposed rule because they choose to pay the filing fees on behalf of an individual entrepreneur, DHS believes that the filing cost of $1,285 per application would be insignificant compared to such entities' annual gross revenues, potential for revenue, and other economic activity. DHS welcomes public comment on the numbers of small business entities that may be impacted by this rule, the likely compliance costs for these entities, and any potential alternatives that may minimize these compliance costs.

For businesses that may pay the filing costs, the expected impact to such businesses would be small. For businesses that utilize either the minimum threshold of $100,000 from a Federal grant or $345,000 in capital investment to source the filing costs, such costs would constitute 1.3 percent and 0.4 percent, respectively, of the total capital amount. These relatively low cost proportions apply to those firms that only obtain the minimum investment amounts. In addition, DHS analyzed the cost impact relative to more typical RFA indices. DHS analysis of Census Bureau data on the smallest firms found that the average revenue based on sales receipts for firms with no paid employees is $309,000, while the average for firms with one to four paid employees is $411,000.[111] The filing cost relative to these averages is 0.42 percent and 0.31 percent, respectively.

DHS also analyzed the average revenue for new firms. Since the proposed rule defines a new firm as one that is less than three years old, DHS grouped private sector firms for the 2012 survey as those responding that the year of establishment was either 2012, 2011, or 2010. DHS obtained the average revenue per firm and then weighted the average by the yearly proportion of firms. Based on the resulting weighted average of $162,000, such new firms would face a filing-cost burden of 0.8 percent.[112] DHS notes that there is a large difference between the revenue of new firms with paid employees and those without such employees (*i.e.*, sole proprietors). For the latter, average revenues are about $34,000, and the cost burden would be 3.8 percent. However, because a central component of this parole program requires a demonstration of significant public benefit in the form of economic activity and job growth, DHS does not anticipate that sole proprietors would be eligible to participate in this program.

In summary, DHS believes that per-applicant costs would be primarily incurred by the individual (which is not covered by the RFA), any direct cost due to this rule would be relatively minor, and these costs would only be borne by those who voluntarily choose to apply for parole under this rule. While the applicant for parole may be the owner of a firm that could be considered small within the definition of small entities established by 5 U.S.C. 601(6), DHS considers the applicants to be individuals at the point in time they are applying for parole, particularly since it is the individual and not the entity that files the application and it is the individual whose parole must serve a significant public benefit under this proposed rule. Furthermore, even if firms do voluntarily decide to incur the compliance costs on behalf of the

---

[111] The data utilized for the analysis are found in the SBO Table SB1200CSA09, "Statistics for All U.S. Firms With Paid Employees by Industry,

Gender, and Employment Size of Firm for the U.S. and States: 2012, 2012 Survey of Business Owners: *http://census.gov/library/publications/2012/econ/2012-sbo.html*. The file location is: *http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012 00CSA09&prodType=table*. The figures are rounded from $309,279 and $410,900, respectively.

[112] The data utilized for the analysis are found in the SBO Table SB1200CSB11, "Statistics for All U.S. Firms by Year the Business Was Originally Established or Self-Employment Activity Begun by Industry, Gender, Ethnicity, Race, and Veteran Status for the U.S.: 2012: 2012 Survey of Business Owners: *http://census.gov/library/publications/2012/econ/2012-sbo.html*. The file location is: *http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012 00CSCB11&prodType=table*. The average revenue figure is rounded from $162,293.

Exhibit 1
85

individual requesting consideration for parole under the proposed criteria, the only compliance costs those businesses would be permitted to incur would be the filing costs for the applications. As indicated previously, based on the comparison metric used, those costs are expected to be insignificant.

Based on the evidence presented in this RFA section and throughout this preamble, DHS certifies that this rule would not have a significant economic impact on a substantial number of small entities.

*E. Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Paperwork Reduction Act*

Under the Paperwork Reduction Act (PRA) of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995).

This proposed rule requires that an applicant requesting entrepreneur parole complete an Application for Entrepreneur Parole, Form I–941, and is considered a new information collection that is covered under the PRA. To allow spouses and dependent children of the entrepreneur to remain united as a family, DHS will need to revise the Application for Travel Document, Form I–131, for these dependent family members to request parole.

This proposed rule also requires a revision to Employment Eligibility Verification, Form I–9, which has been previously approved for use by OMB under the PRA. The OMB Control Number for this information collection is 1615–0047. In accordance with new 8 CFR 274a.2(b)(1)(v)(A)(*5*) DHS is revising the Employment Eligibility Verification, Form I–9, Lists of Acceptable Documents, List A item 5 to replace "nonimmigrant alien" with "individual," to replace "alien's

nonimmigrant" with "individual," and to add "or parole" after "status" in List A item 5.b.(2) allowing an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole.

Lastly, this proposed rule will require minor revisions to the Application for Employment Authorization, Form I–765, to reflect proposed changes that allow spouses of an entrepreneur parolee to request employment authorization.

DHS has submitted these information collection requests to OMB for review and approval under the PRA. Accordingly, DHS is requesting comments on these impacted information collections. See the **ADDRESSES** section above for instructions on how to submit comments to DHS and OMB on the information collection provisions of this rulemaking. Written comments and suggestions from the public and affected agencies concerning the collection of information are encouraged. When submitting comments on these information collections, your comments should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of the information on those who are to respond, including through the use of any and all appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology (*e.g.,* permitting electronic submission of responses).

**Overview of Information Collection, Application for Entrepreneur Parole, Form I–941**

a. *Type of information collection:* New information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to

biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Entrepreneur Parole. Form I–941.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–941, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Applicants requesting entrepreneur parole; Businesses and/or other non-profit entities.

f. *An estimate of the total annual numbers of respondents:* 2,940.

g. *Hours per response:* The estimated hour per response for Form I–941 is 1.33 hours. The estimated hour burden per response for the biometric processing is 1.17 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 3,910 hours for the Form I–941 and 3,440 hours for the biometric processing, for a total of 7,350 hours.

**Overview of Information Collection, Application for Travel Document Form I–131, OMB Control No. 1615–0013**

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by dependents of individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Travel Document Form I–131.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Application for Travel Document Form I–131, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Dependents of applicants requesting entrepreneur parole.

f. *An estimate of the total annual numbers of respondents:* 594,324; 3,234 additional respondents as a result of this rule.

g. *Hours per response:* The estimated hour per response for Form I–131 Supplement is 1.90 hours. The estimated hour burden per response for the biometric processing is 1.17 hours.

h. *Total Annual Reporting Burden:* 1,372,928; the total estimated additional

Exhibit 1
86

**60164** Federal Register / Vol. 81, No. 169 / Wednesday, August 31, 2016 / Proposed Rules

annual hour burden associated with this collection is 143,942 hours.

## Overview of Information Collection, Employment Eligibility Verification, Form I–9, OMB Control No. 1615–0047

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This form was developed to facilitate compliance with section 274A of the Immigration and Nationality Act, which prohibits the knowing employment of unauthorized aliens. This information collection is necessary for employers, agricultural recruiters and referrers for a fee, and state employment agencies to verify the identity and employment authorization of individuals hired (or recruited or referred for a fee, if applicable) for employment in the United States.

c. *Title of Form/Collection:* Employment Eligibility Verification.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–9, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Employers, employees, recruiters and referrers for a fee (limited to agricultural associations, agricultural employers, or farm labor contractors), and state employment agencies.

f. *An estimate of the total annual numbers of respondents:* 78 million employers and 78 million individuals (The total number of responses will be only 78 million responses. Each response involves an employer and an individual who is being hired).

g. *Hours per response:*
• Time Burden for Employees—20 minutes (.33 hours) total;
• Time Burden for Employers—10 minutes (.17 hours) total;
• Time Burden for Recordkeeping—5 minutes (.08 hours) total.

h. *Total Annual Reporting Burden:* Approximately 40,600,000 total annual burden hours.

## Overview of Information Collection, Application for Employment Authorization, Form I–765, OMB Control No. 1615–0040

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

This form was developed for individual aliens to request employment authorization and evidence of that employment authorization. The form is being amended to add a new class of aliens eligible to apply for employment authorization: a spouse of an entrepreneur parolee described as eligible for employment authorization under this rule. Supporting documentation demonstrating eligibility must be filed with the application. The form lists examples of relevant documentation.

c. *Title of Form/Collection:* Application for Employment Authorization, Form I–765.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–765, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Spouses of applicants requesting entrepreneur parole.

f. *An estimate of the total annual numbers of respondents:* 1,984,456; 2,940 additional respondents (assuming a 1:1 ratio based on the total estimate of principal applicants for entrepreneur parole).

g. *Hours per response:* The estimated hour per response for Form I–765 is 3.42 hours. The estimated hour burden per response for the biometric processing is 1.17 hours.

h. *Total Annual Reporting Burden:* 8,196,568; the total estimated additional annual hour burden associated with this collection is 11,525 hours.

## List of Subjects

### 8 CFR Part 103

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements.

### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS is proposing to amend chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2.

■ 2. Section 103.7 is amended by adding paragraph (b)(1)(i)(FFF) to read as follows:

### § 103.7 Fees.

\*      \*      \*      \*      \*

(b) \* \* \*

(1) \* \* \*

(i) \* \* \*

(FFF) *Application for Entrepreneur Parole (Form I–941).* For filing an application for parole for entrepreneurs: $1,200.

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 3. The authority citation for part 212 is amended to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

Section 212.1(q) also issued under section 702, Public Law 110–229, 122 Stat. 754, 854.

■ 4. Add § 212.19 to read as follows:

### § 212.19 Parole for entrepreneurs.

(a) *Definitions.* For purposes of this section, the following definitions apply:

(1) *Entrepreneur* means an alien who possesses a substantial ownership interest in a start-up entity and has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. For purposes of this section, an alien may be considered to possess a substantial ownership interest if he or she possesses at least a 15 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and maintains at least a 10 percent ownership interest in the start-up entity at all times during the period of parole and any subsequent period of re-parole.

(2) *Start-up entity* means a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job

Exhibit 1
87

creation. An entity that is the basis for a request for parole under this section may be considered recently formed if it was created within the 3 years immediately preceding the filing date of the alien's initial parole request. For purposes of paragraphs (a)(3) and (a)(5) of this section, an entity may be considered recently formed if it was created within the 3 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

(3) *Qualified government award or grant* means an award or grant for economic development, research and development, or job creation (or other similar monetary award typically given to start-up entities) made by a federal, state, or local government entity that regularly provides such awards or grants to start-up entities. This definition excludes any contractual commitment for goods or services.

(4) *Qualified investment* means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of equity or convertible debt issued by such entity. Such an investment shall not include an investment, directly or indirectly, from the entrepreneur; the parents, spouse, brother, sister, son, or daughter of such entrepreneur; or any corporation, limited liability company, partnership, or other entity in which such entrepreneur or the parents, spouse, brother, sister, son, or daughter of such entrepreneur directly or indirectly has any ownership interest.

(5) *Qualified investor* means an individual who is a U.S. citizen or lawful permanent resident of the United States, or an organization that is located in the United States and operates through a legal entity organized under the laws of the United States or any state, that is majority owned and controlled, directly and indirectly, by U.S. citizens or lawful permanent residents of the United States, provided such individual or organization regularly makes substantial investments in start-up entities that subsequently exhibit substantial growth in terms of revenue generation or job creation. The term "qualified investor" shall not include an individual or organization that has been permanently or temporarily enjoined from participating in the offer or sale of a security or in the provision of services as an investment adviser, broker, dealer, municipal securities dealer, government securities broker, government securities dealer, bank, transfer agent or credit rating agency, barred from association with

any entity involved in the offer or sale of securities or provision of such services, or otherwise found to have participated in the offer or sale of securities or provision of such services in violation of law. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years:

(i) The individual or organization made investments in start-up entities in exchange for equity or convertible debt in at least 3 separate calendar years comprising a total in such 5-year period of no less than $1,000,000; and

(ii) Subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent.

(6) *Qualified job* means full-time employment located in the United States that has been filled for at least 1 year by one or more qualifying employees.

(7) *Qualifying employee* means a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. This definition shall not include independent contractors.

(8) *Full-time employment* means paid employment in a position that requires a minimum of 35 working hours per week. This definition does not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week.

(9) *U.S. business entity* means any corporation, limited liability company, partnership, or other entity that is organized under federal law or the laws of any state, and that conducts business in the United States, that is not an investment vehicle primarily engaged in the offer, purchase, sale or trading of securities, futures contracts, derivatives or similar instruments.

(10) *Material change* means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. Such changes include, but are not limited to, the following: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up

entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; and any significant change to the entrepreneur's role in or ownership and control in the start-up entity or any other significant change with respect to ownership and control of the start-up entity.

(b) *Initial parole*—(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file an Application for Entrepreneur Parole (Form I–941, or successor form) with USCIS, with the required fees (including biometric services fees), and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

(2) *Criteria for consideration.* (i) *In general.* An alien may be considered for parole under this section if the alien demonstrates that a grant of parole will provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (b)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien is an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity is a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(1) Received, within 365 days immediately preceding the filing of an application for initial parole, a qualified investment amount of at least $345,000 from one or more qualified investors; or

(2) Received, within 365 days immediately preceding the filing of an application for initial parole, an amount of at least $100,000 through one or more qualified government awards or grants.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (b)(2)(ii)(A) of this section and partially

Exhibit 1
88

meets one or both of the criteria in paragraph (b)(2)(ii)(B) of this section may alternatively meet the standard described in paragraph (b)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(c) *Additional periods of parole*—(1) *Filing of re-parole request form.* Prior to the expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file the Application for Entrepreneur Parole (Form I–941, or successor form) with USCIS, with the required fees (including biometric services fees), and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for re-parole under this section if the alien demonstrates that a grant of parole will continue to provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (c)(2)(i) by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien continues to be an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity continues to be a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(1) Received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period;

(2) Created at least 10 qualified jobs with the start-up entity during the initial parole period; or

(3) Reached at least $500,000 in annual revenue and averaged 20 percent in annual revenue growth during the initial parole period.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (c)(2)(ii)(A) of this section and partially meets one or more of the criteria in paragraph (c)(2)(ii)(B) may alternatively meet the standard described in paragraph (c)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's

substantial potential for rapid growth and job creation.

(d) *Discretionary authority; decision; appeals and motions to reopen.*
(1) *Discretionary authority.* DHS may grant parole under this section in its sole discretion on a case-by-case basis if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. In determining whether an alien's presence in the United States will provide a significant public benefit and whether the alien warrants a favorable exercise of discretion, USCIS will consider and weigh all evidence, including any derogatory evidence or information, such as but not limited to, evidence of criminal activity or national security concerns.

(2) *Initial parole.* DHS may grant an initial period of parole based on the start-up entity listed in the request for parole for a period of up to 2 years from the date the request is approved by USCIS. Approval by USCIS of such a request must be obtained before the alien may appear at a port of entry to be granted parole, in lieu of admission.

(3) *Re-parole.* DHS may re-parole an entrepreneur for one additional period of up to 3 years from the date of the expiration of the initial parole period. If the entrepreneur is in the United States at the time that USCIS approves the request for re-parole, such approval shall be considered a grant of re-parole. If the alien is outside the United States at the time that USCIS approves the request for re-parole, the alien must appear at a port of entry to be granted parole, in lieu of admission.

(4) *Appeals and motions to reopen.* There is no appeal from a denial of parole under this section. USCIS will not consider a motion to reopen or reconsider a denial of parole under this section. On its own motion, USCIS may reopen or reconsider a decision to deny the Application for Entrepreneur Parole (Form I–941, or successor form), in accordance with 8 CFR 103.5(a)(5).

(e) *Payment of biometric services fee and collection of biometric information.* An alien seeking parole or re-parole under this section will be required to pay the biometric services fee as prescribed by 8 CFR 103.7(b)(1)(i)(C). An alien seeking an initial grant of parole will be required to submit biometric information. An alien seeking re-parole may be required to submit biometric information.

(f) *Limitations.* No more than three entrepreneurs may be granted parole under this section based on the same

start-up entity. An alien shall not receive more than one initial grant of entrepreneur parole or more than one additional grant of entrepreneur re-parole based on the same start-up entity, for a maximum period of parole of five years.

(g) *Employment authorization.* An entrepreneur who is paroled into the United States pursuant to this section is authorized for employment with the start-up entity incident to the conditions of his or her parole.

(h) *Spouse and children.* (1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file an Application for Travel Document (Form I–131). Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. A biometric services fee is required to be filed with the application. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

(2) The spouse and children of an entrepreneur granted parole under this section may be granted parole under this section for no longer than the period of parole granted to such entrepreneur.

(3) The spouse of the entrepreneur parolee, after being paroled into the United States, may be eligible for employment authorization on the basis of parole under this section. To request employment authorization, an eligible spouse paroled into the United States must file an Application for Employment Authorization (Form I–765, or successor form), in accordance with 8 CFR 274a.13 and form instructions. An Application for Employment Authorization must be accompanied by documentary evidence establishing eligibility, including evidence of the spousal relationship.

(4) Notwithstanding 8 CFR 274a.12(c)(11), a child of the entrepreneur parolee may not be authorized for and may not accept employment on the basis of parole under this section.

(i) *Conditions on parole.* As a condition of parole under this section, a parolee must maintain household income that is greater than 400 percent of the federal poverty line for his or her household size as defined by the Department of Health and Human Services. USCIS may impose other such reasonable conditions in its sole discretion with respect to any alien approved for parole under this section, and it may request verification of the

Exhibit 1
89

parolee's compliance with any such condition at any time. Violation of any condition of parole may lead to termination of the parole in accordance with paragraph (k) of this section or denial of re-parole.

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintains at least a 10 percent ownership interest in the start-up entity, the entrepreneur must submit a new Application for Entrepreneur Parole (Form I–941, or successor form) with filing fee (not including any biometrics fees) and supporting documentary evidence to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if he or she will no longer be employed by the start-up entity or ceases to possess at least a 10 percent ownership stake in the start-up entity.

(k) *Termination of parole*—(1) *In general.* DHS may, in its discretion, terminate parole granted under this section at any time and without prior notice or opportunity to respond if it determines that the alien's continued parole in the United States no longer provides a significant public benefit. Alternatively DHS may, in its discretion, provide the alien notice and an opportunity to respond prior to terminating the alien's parole under this section.

(2) *Automatic termination.* Parole granted under this section will be automatically terminated without notice at the expiration of the time for which parole was authorized, unless the alien timely files a non-frivolous application for re-parole. Parole granted under this section may be automatically terminated when USCIS receives written notice from the entrepreneur parolee that he or she will no longer be employed by the start-up entity or ceases to possess at least a 10 percent ownership stake in the start-up entity in accordance with paragraph (j) of this section. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. If parole is terminated, any employment authorization based on that parole is automatically revoked.

(3) *Termination on notice.* USCIS may terminate on notice or provide the entrepreneur or his or her spouse or children, as applicable, written notice of its intent to terminate parole if USCIS believes that:

(i) The facts or information contained in the request for parole were not true and accurate;

(ii) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(iii) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess at least a 10 percent ownership stake in the start-up entity;

(iv) The alien otherwise violated the terms and conditions of parole; or

(v) Parole was erroneously granted.

(4) *Notice and decision.* A notice of intent to terminate issued under this paragraph should generally identify the grounds for termination of the parole and provide a period of up to 30 days for the alien's written rebuttal. The alien may submit additional evidence in support of his or her rebuttal, when applicable, and USCIS will consider all relevant evidence presented in deciding whether to terminate the alien's parole. Failure to timely respond to a notice of intent to terminate will result in termination of the parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole (if parole has not already been terminated), unless otherwise specified. Any further immigration and removal actions will be conducted in accordance with the Act and this chapter. The decision to terminate parole may not be appealed. USCIS will not consider a motion to reopen or reconsider a decision to terminate parole under this section. On its own motion, USCIS may reopen or reconsider a decision to terminate.

(l) *Increase of investment and revenue amount requirements.* The investment and revenue amounts in this section will be automatically adjusted every 3 years by the Consumer Price Index and posted on the USCIS Web site at *www.uscis.gov.* Investment and revenue amounts adjusted under this paragraph will apply to all applications filed on or after the beginning of the fiscal year for which the adjustment is made.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2.

■ 6 Section 274a.2 is amended by:
■ (a) Revising paragraphs (b)(1)(v)(A)(*5*) and (b)(1)(v)(C)(*2*);
■ (b) Removing paragraph (b)(1)(v)(C)(*3*); and

■ (c) Redesignating paragraphs (b)(1)(v)(C)(*4*) through (8) as paragraphs (b)(1)(v)(C)(*3*) *through* (7).
   The revision reads as follows:

### § 274a.2   Verification of identity and employment authorization.

\*      \*      \*      \*      \*

   (b) \* \* \*
   (1) \* \* \*
   (v) \* \* \*
   (A) \* \* \*
   (*5*) In the case of an individual who is employment-authorized incident to status or parole with a specific employer, a foreign passport with an Arrival/Departure Record, Form I–94 (as defined in 8 CFR 1.4) or Form I–94A, bearing the same name as the passport and containing an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole.

\*      \*      \*      \*      \*

   (C) \* \* \*
   (*2*) Certification or report of birth issued by the Department of State, including Forms FS–545, DS–1350, FS–240, or successor forms;

\*      \*      \*      \*      \*

■ 7. Section 274a.12 is amended by:
■ a. Revising paragraph (b) introductory text,
■ b. Adding and reserving new paragraphs (b)(25) through (36);
■ c. Adding a new paragraph (b)(37);
■ d. Revising paragraph (c)(11);
■ e. Adding and reserving new paragraphs (c)(27) through (33);
■ f. Adding a new paragraph (c)(34).
   The revisions and additions read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*      \*      \*      \*      \*

   (b) *Aliens authorized for employment with a specific employer incident to status or parole.* The following classes of aliens are authorized to be employed in the United States by the specific employer and subject to any restrictions described in the section(s) of this chapter indicated as a condition of their parole, or admission in, or subsequent change to, such classification. An alien in one of these classes is not issued an employment authorization document by DHS:

\*      \*      \*      \*      \*

   (25)–(36) [Reserved] (37) An alien paroled into the United States as an entrepreneur pursuant to 8 CFR 212.19 for the period of authorized parole. An entrepreneur who has timely filed a non-frivolous application requesting re-

Exhibit 1
90

parole with respect to the same start-up entity in accordance with 8 CFR 212.19 prior to the expiration of his or her parole, but whose authorized parole period expires during the pendency of such application, is authorized to continue employment with the same start-up entity for a period not to exceed 240 days beginning on the date of expiration of parole. Such authorization shall be subject to any conditions and limitations on such expired parole. If DHS adjudicates the application prior to the expiration of this 240-day period

and denies the application for re-parole, the employment authorization under this paragraph shall automatically terminate upon notification to the alien of the denial decision.

\*   \*   \*   \*   \*

(c) \* \* \*

(11) Except as provided in § 274a.12(b)(37) and (c)(34) and § 212.19(h)(4) of this chapter, an alien paroled into the United States temporarily for urgent humanitarian

reasons or significant public benefit pursuant to section 212(d)(5) of the Act.

\*   \*   \*   \*   \*

(27)–(33) [Reserved]

(34) A spouse of an entrepreneur parolee described as eligible for employment authorization in § 212.19(h)(3) of this chapter.

\*   \*   \*   \*   \*

**Jeh Charles Johnson,**

*Secretary of Homeland Security.*

[FR Doc. 2016–20663 Filed 8–26–16; 1:00 pm]

**BILLING CODE 9111–97–P**

Exhibit 1
91

# **Action 10**

Temporary Protected Status

Exhibit 1
92



**U.S. Citizenship and
Immigration Services**

# Temporary Protected Status

Find on this page:

- What is TPS?
- Countries Currently Designated for TPS
- Eligibility Requirements
- What to File
- When and Where to File
- Application Process
- Maintaining TPS
- Automatic Employment Authorization Document (EAD) Extension
- Filing Late
- Travel
- Change of Address
- Help Filing an Application
- TPS Granted by an Immigration Judge or the Board of Immigration Appeals
- Appealing a Denial

## What is TPS

The Secretary of Homeland Security may designate a foreign country for TPS due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances, where the country is unable to handle the return of its nationals adequately. USCIS may grant TPS to eligible nationals of certain countries (or parts of countries), who are already in the United States. Eligible individuals without nationality who last resided in the designated country may also be granted TPS.

The Secretary may designate a country for TPS due to the following temporary conditions in the country:

- Ongoing armed conflict (such as civil war)
- An environmental disaster (such as earthquake or hurricane), or an epidemic
- Other extraordinary and temporary conditions

Exhibit 1

During a designated period, individuals who are TPS beneficiaries or who are found preliminarily eligible for TPS upon initial review of their cases (*prima facie* eligible):

- Are not removable from the United States
- Can obtain an employment authorization document (EAD)
- May be granted travel authorization

Once granted TPS, an individual also cannot be detained by DHS on the basis of his or her immigration status in the United States.

TPS is a temporary benefit that does not lead to lawful permanent resident status or give any other immigration status. However, registration for TPS does not prevent you from:

- Applying for nonimmigrant status
- Filing for adjustment of status based on an immigrant petition
- Applying for any other immigration benefit or protection for which you may be eligible

PLEASE NOTE: To be granted any other immigration benefit you must still meet all the eligibility requirements for that particular benefit.  An application for TPS does not affect an application for asylum or any other immigration benefit and vice versa. Denial of an application for asylum or any other immigration benefit does not affect your ability to register for TPS, although the grounds of denial of that application may also lead to denial of TPS.

Top

## Countries Currently Designated for TPS

Select the country link for additional specific country information.

| Designated Country | Most Recent Designation Date | Current Expiration Date | Current Re-Registration Period | Current Initial Registration Period | Employment Authorization Document (EAD) Automatically Extended Through |
|---|---|---|---|---|---|
| El Salvador | March 9, 2001 | March 9, 2018 | July 8, 2016 through September 6, 2016 | N/A | March 9, 2017 |
| Guinea* | November 21, 2014 | May 21, 2017 | N/A | N/A | May 20, 2017 |
| Haiti | July 23, 2011 | July 22, 2017 | August 25, 2015 - | N/A | July 22, 2016 |

Exhibit 1

| Designated Country | Most Recent Designation Date | Current Expiration Date | Current Re-Registration Period | Current Initial Registration Period | Employment Authorization Document (EAD) Automatically Extended Through |
|---|---|---|---|---|---|
| | | | October 26, 2015 | | |
| Honduras | January 5, 1999 | January 5, 2018 | May 16, 2016 - July 15, 2016 | N/A | January 5, 2017 |
| Liberia* | November 21, 2014 | May 21, 2017 | N/A | N/A | May 20, 2017 |
| Nepal | June 24, 2015 | December 24, 2016 | N/A | June 24, 2015 – December 21, 2015 | N/A |
| Nicaragua | January 5, 1999 | January 5, 2018 | May 16, 2016 through July 15, 2016 | N/A | January 5, 2017 |
| Sierra Leone* | November 21, 2014 | May 21, 2017 | N/A | N/A | May 20, 2017 |
| Somalia | September 18, 2012 | March 17, 2017 | June 1, 2015 - July 31, 2015 | N/A | NO Automatic Extension* *Sufficient time was deemed available to issue new EADs. |
| Sudan | May 3, 2013 | November 2, 2017 | January 25, 2016 – March 25, 2016 | N/A | November 2, 2016 |

| Designated Country | Most Recent Designation Date | Current Expiration Date | Current Re-Registration Period | Current Initial Registration Period | Employment Authorization Document (EAD) Automatically Extended Through |
|---|---|---|---|---|---|
| South Sudan | May 3, 2016 | November 2, 2017 | January 25, 2016 – March 25, 2016 | January 25, 2016 – July 25, 2016 | November 2, 2016 |
| Syria | August 1, 2016 | March 31, 2018 | August 1, 2016 through September 30, 2016 | August 1, 2016 through January 30, 2017 | March 31, 2017 |
| Yemen | September 3, 2015 | March 3, 2017 | N/A | September 3, 2015 through March 1, 2016 | N/A |

Top

## Eligibility Requirements

To be eligible for TPS, you must:

- Be a national of a country designated for TPS, or a person without nationality who last habitually resided in the designated country;
- File during the open initial registration or re-registration period, or you meet the requirements for late initial filing during any extension of your country's TPS designation (Late initial filers see 'Filing Late' section below);
- Have been continuously physically present (CPP) in the United States since the effective date of the most recent designation date of your country; and
- Have been continuously residing (CR) in the United States since the date specified for your country. (See your country's TPS Web page to the left). The law allows an exception to the continuous physical presence and continuous residence requirements for brief, casual and innocent departures from the United States. When you apply or re-register for TPS, you must inform USCIS of all absences from the United States since the CPP and CR dates. USCIS will determine whether the exception applies in your case.

You may **NOT** be eligible for TPS or to maintain your existing TPS if you:

- Have been convicted of any felony or two or more misdemeanors committed in the United States;

- Are found inadmissible as an immigrant under applicable grounds in INA section 212(a), including non-waivable criminal and security-related grounds;

- Are subject to any of the mandatory bars to asylum. These include, but are not limited to, participating in the persecution of another individual or engaging in or inciting terrorist activity;

- Fail to meet the continuous physical presence and continuous residence in the United States requirements;

- Fail to meet initial or late initial TPS registration requirements; or

- If granted TPS, you fail to re-register for TPS, as required, without good cause.

Top

## What to File

You must include the necessary forms, evidence, fees or fee waiver when filing your TPS application. Below is information about what you must include in your TPS package. Please also check your country's specific TPS page to the left to see if there are any special filing instructions specific to your TPS designated country.

### Forms

To register or re-register for TPS you must file:

1. Form I-821, Application for Temporary Protected Status
2. Form I-765, Application for Employment Authorization

PLEASE NOTE: Both I-821 and I-765 forms must be filed even if you do not want an Employment Authorization Document.

If you are aware when you apply that a relevant ground of inadmissibility applies to you and you need a waiver to obtain TPS, please include a Form I-601, Application for Waiver of Grounds of Inadmissibility, and fee or fee waiver request, with your TPS application package. However, you do not need to file a new Form I-601 for an incident that USCIS has already waived with a prior TPS application. USCIS may grant a waiver of certain inadmissibility grounds for humanitarian purposes, to assure family unity, or when it is in the public interest.

These forms are **free** and available on the forms section of the USCIS website at: www.uscis.gov/forms or by calling the toll-free USCIS Forms Hotline at 1-800-870-3676. Please look below at the fee chart to see what fees you must pay (a properly documented fee waiver request may be submitted. If you do not pay the proper fees (or submit a proper fee waiver request), your application will be rejected.

### Evidence

When filing an initial TPS application, you must submit:

- **Identity and Nationality Evidence**: to demonstrate your identity and that you are a national of a country designated for TPS (or that you have no nationality and you last habitually resided in a country designated for TPS)

- **Date of Entry Evidence**: to demonstrate when you entered the United States

- **Continuously Residing (CR) Evidence**: to demonstrate that you have been in the United States since the CR date specified for your country (See your country's TPS Web page to the left)

Any document that is not in English must be accompanied by a complete English translation. The translator must certify that:

- He or she is competent both in English and the foreign language used in the original document; and
- the translation is true and correct to the best of his or her ability, knowledge and belief.

### Identity and Nationality Evidence

We encourage you to submit primary evidence, if available. If USCIS does not find that the documents you submit with your application are sufficient, we will send you a request for additional evidence. If you cannot submit primary evidence of your identity and nationality, you may submit the secondary evidence listed below with your application.

The following table explains the different types of evidence you can provide.

| | |
|---|---|
| **Primary Evidence** | • A copy of your passport<br><br>• A copy of your birth certificate, accompanied by photo identification<br><br>• Any national identity document bearing your photograph or fingerprint (or both) issued by your country, including such documents issued by your country's Embassy or Consulate in the United States. Such as a national ID card or naturalization certificate |
| **No Primary Evidence** | If you do not have any of the primary evidence listed above, you must submit an affidavit with:<br><br>• Proof of your unsuccessful efforts to obtain such documents; and<br><br>• An explanation why the consular process for your country was unavailable to you, and affirming that you are a national of your country.<br><br>USCIS will interview you regarding your identity and nationality, and you may also submit additional evidence of your nationality and identity then if available. |
| **Secondary Evidence** | • Nationality documentation, such as a naturalization certificate, even if it does not have your photograph and fingerprint<br><br>• Your baptismal certificate if it indicates your nationality or a parent's nationality<br><br>• Copies of your school or medical records if they have information supporting your claim that you are a national from a country designated for TPS<br><br>• Copies of other immigration documents showing your nationality and identity |

|                      | • | A copy of your passport |
|                      | • | A copy of your birth certificate, accompanied by photo identification |
| **Primary Evidence** | • | Any national identity document bearing your photograph or fingerprint (or both) issued by your country, including such documents issued by your country's Embassy or Consulate in the United States. Such as a national ID card or naturalization certificate |
|                      | • | Affidavits from friends or family members who have close personal knowledge of the date and place of your birth and your parents' nationality. The person making the affidavit should include information about how he or she knows you or is related to you, and how he or she knows the details of the date and place of your birth and the nationality of your parents. The nationality of your parents is of importance if you are from a country where nationality is derived from a parent. |

You may also provide any other document or information that you believe helps show your nationality.

PLEASE NOTE: Birth in a TPS designated country does not always mean you are a national from that country. Please see your TPS designated country's nationality laws for further information.

### Date of Entry Evidence

- A copy of your passport
- I-94 Arrival/Departure Record
- Copies of documents specified in the 'Continuous Residing Evidence' section below

### Continuously Residing (CR) Evidence

- Employment Records
- Rent receipts, utility bills, receipts or letters from companies
- School records from the schools that you or your children have attended in the U.S.
- Hospital or medial records concerning treatment or hospitalization of you or your children
- Attestations by church, union or other organization officials who know you and where you have been residing

Please see the I-821 Form Instructions for more details on acceptable evidence.

### Fees for Registering for TPS for the First Time

| Applicant Age | Form I-821 Fee | Biometrics Fee | Requesting EAD | Form I-765 | Total |
|---------------|----------------|----------------|----------------|------------|-------|
| under 14 | $50 | $0 | Yes | $0 | $50 |

| Applicant Age | Form I-821 Fee | Biometrics Fee | Requesting EAD | Form I-765 | Total |
|---|---|---|---|---|---|
| under 14 | $50 | $0 | No (You still must file the I-765) | $0 | $50 |
| 14-65 (inclusive) | $50 | $85 | Yes | $380 | $515 |
| 14-65 (inclusive) | $50 | $85 | No (You still must file the I-765) | $0 | $135 |
| 66+ | $50 | $85 | Yes | $0 | $135 |
| 66+ | $50 | $85 | No (You still must file the I-765) | $0 | $135 |

NOTE: If you do not want an EAD, *do not* check any of the three boxes at the top of Form I-765 where it states "I am applying for:"; leave all three boxes blank. Only check one of these boxes if you want an EAD (and then look to the above chart for proper fee).

Fees for Re-registering for TPS

If you are re-registering for TPS you must include the following fees:

1. A biometric services fee of $85 (if you are 14 years of age or older)
2. The Form I-765, Application for Employment Authorization fee of $380, if you wish to receive an EAD

If you are not seeking an EAD, you must still submit Form I-765 without fee (and *do not* check any of the three boxes at the top of Form I-765 where it states "I am applying for:"; leave all three boxes blank). There is no fee required to submit Form I-821, Application for Temporary Protected Status.

Please check your country's specific TPS page to see if there is any special fee information specific to your TPS designated country.

Fee Waiver

If you cannot afford the costs associated with filing, please make sure to include a fee waiver request on Form I-912, Application for Fee Waiver (or other written request). For more information about filing a fee waiver request, visit the Fee Waiver Guidance Web page.

If you are filing an initial application and USCIS denies your fee waiver request on or before the registration deadline, you may re-file and pay the correct fees either before the registration deadline or within 45 days of the date on the fee waiver denial notice, whichever is later. For more information see http://www.uscis.gov/feewaiver in the TPS section.

If you are filing a re-registration application and USCIS denies your fee waiver request on or before the re-registration deadline, you are urged to re-file and pay the correct fees before the re-registration deadline or within 45 days of the date of the fee waiver denial notice, whichever is later. If you are unable to file before the re-registration deadline, you may still re-file after the deadline and this will be reviewed under good cause for late re-registration.

Top

## When and Where to File

For information about when and where you must file your TPS application, please see the country specific pages to the left.

Top

## Application Process

### Step 1: File Your Petition
Once you have prepared your TPS package with the forms, evidence and filing fees (or request for a fee waiver), you will need to send it to the address indicated on your TPS country page to the left. Please make sure you **sign your application** and include the **correct fee** amount (or fee waiver request). These are the two of the most common mistakes USCIS receives on TPS applications.  Please look above at the fee chart to see what fees you must pay (a properly documented fee waiver request may be submitted).  If you do not pay the proper fees (or submit a proper fee waiver request), your application will be rejected.

### Step 2: USCIS Receives Your Application
When USCIS receives your application, we will review it for completeness and for the proper fees or a properly documented fee waiver request. If your case meets the basic acceptance criteria, your application will be entered into our system and we will send you a receipt notice. At the top of this notice you will find a receipt number which can be used to check the status of your case online.

If you do not receive your receipt notice within three weeks of filing, you can call Customer Service at 1-800-375-5283 to request assistance. If your application is rejected at the initial review stage, you may re-file within the registration period after correcting the problems described in the USCIS notification.

If your application was rejected because we determined you were not eligible for a fee waiver, you may submit a new TPS package. Go to the 'Fee Waiver' section above for more information.

### Step 3: USCIS Contacts You
If USCIS needs to collect your photograph, signature, and/or fingerprints (these are called biometrics), USCIS will send you an appointment notice to have your biometrics captured at an

Application Support Center (ASC). Every TPS applicant over 14 years old must have their biometrics collected. Biometrics are required for identity verification, background checks and the production of an EAD, if one has been requested.

In certain situations, such as when it's impossible to take a fingerprint, USCIS can waive the collection of biometrics. In some cases, we may be able to reuse the biometrics previously collected in association with your previous TPS application. Even if you do not need to attend an ASC appointment, you still need to pay the biometrics fee (if required) to help cover costs associated with reusing your biometrics.

### Step 4: Go to the ASC
When you report to an ASC, you must bring:

1. Evidence of nationality and identity with a photograph of you, such as a passport
2. Your receipt notice
3. Your ASC appointment notice
4. Your current EAD, if you already have one

If you cannot make your scheduled appointment, you may reschedule. To reschedule an ASC appointment, make a copy of your appointment notice to retain for your records, then mail the original notice with your rescheduling request to the ASC address listed on the notice. You should submit your request for rescheduling as soon as you know you have an unavoidable conflict on your scheduled ASC date. A new appointment notice will be sent to you by mail. Please note that rescheduling a biometrics appointment may cause the adjudication of your application to be delayed.

If you need an accommodation due to a disability that affects your ability to go to the ASC, please go to the Requesting Accommodations for Disabilities webpage for more information.

WARNING: If you fail to appear for your ASC appointment without rescheduling, or if you repeatedly miss scheduled ASC appointments, your TPS application could be denied for abandonment.

If there is an emergency need for you to travel abroad for humanitarian reasons, you may request expedited processing on your advance parole application (Form I-131) after you have appeared at an ASC for your biometrics appointment. Please see the travel section below for more information.

### Step 5: USCIS Determines Work Eligibility
If you are not seeking an employment authorization document (EAD), skip to Step 6.

| If you are ... | Then... |
|---|---|
| Applying for TPS for the first time and seeking an EAD | USCIS will review your case to determine whether you are eligible to work before we make a final decision on your TPS application. If you are found to be eligible upon initial review of your TPS application (prima facie eligible) you will receive an EAD. |

Exhibit 1
102

| If you are ... | Then... |
|---|---|
| | *Note*: If your application is denied and you choose to appeal to the USCIS Administrative Appeals Office (AAO) or request review of your application by an immigration judge, your EAD will be extended while you are waiting for a decision. If your EAD expires, to request an extension of your EAD, you must file a Form I-765 along with evidence of your appeal to the AAO or that you have requested an immigration judge to review your TPS application. |
| Re-Registering for TPS and seeking an EAD | You will receive your new EAD when your entire TPS package is adjudicated. |

USCIS makes every effort to avoid backlogs at this step, but we urge you to remember that USCIS may experience a higher volume of applications in the first few months of a registration period.

### Step 6: USCIS Adjudicates the Application

During this phase, we may ask you for additional documents to establish your eligibility for TPS. If you receive a request for evidence (RFE) or a notice of intent to deny, it is extremely important that you respond immediately to avoid processing delays and possible denial for failure to timely respond. Upon completion of your case, USCIS will notify you if your request for TPS is granted or denied. If one of the waivable grounds of inadmissibility applies to you, USCIS will give you an opportunity to submit a Form I-601, Application for Waiver of Grounds of Inadmissibility if you did not include this with your TPS package. Please submit this form within the time frame specified in the USCIS notice, or your case will be denied.

### Step 7: USCIS Approves or Denies the Application

| If your application for TPS is... | Then... |
|---|---|
| Approved and you filed an initial application | USCIS will send you an approval notice and an EAD, if you requested one and haven't received it before this step. |
| Approved and you filed a re-registration application | USCIS will send you an approval notice if you do not request an EAD.<br>USCIS will send you a new EAD if you do request one. |

| If your application for TPS is... | Then... |
|---|---|
| Denied | USCIS will send you a letter indicating the reason for your denial and, if applicable, provide you with the opportunity to appeal the denial. |

Top

## Maintaining TPS

Once you are granted TPS, you must re-register during each re-registration period to maintain TPS benefits. This applies to all TPS beneficiaries, including those who were initially granted by USCIS, an Immigration Judge, or the BIA. Follow the instructions above to apply for re-registration.

Top

## Automatic Employment Authorization Document (EAD) Extension

Sometimes DHS must issue a blanket automatic extension of the expiring EADs for TPS beneficiaries of a specific country in order to allow time for EADs with new validity dates to be issued. If your country's EADs have been automatically extended, it will be indicated on your country specific pages to the left.

### Filing Late

#### Late Re-Registration for TPS
USCIS may accept a late re-registration application if you have good cause for filing after the end of the re-registration period of your country. You must submit a letter that explains your reason for filing late with your re-registration application.
If you file your TPS re-registration application late, processing may be delayed and can lead to gaps in your work authorization.

#### Late Initial Filing for TPS
You can apply for TPS for the first time during an extension of your country's TPS designation period. If you qualify to file your initial TPS application late, you must still independently meet all the TPS eligibility requirements listed in the Eligibility section above.

To qualify to file your initial TPS application late, you must meet at least one of the late initial filing conditions below:

- During either the initial registration period of your country's designation or during any subsequent initial registration period if your country was re-designated you met one of the following conditions, and you register while the condition still exists or within a 60-day period immediately following the expiration or termination of such condition
  - You were a nonimmigrant, were granted voluntary departure status, or any relief from removal

- You had an application for change of status, adjustment of status, asylum, voluntary departure, or any relief from removal which was pending or subject to further review or appeal
- You were a parolee or had a pending request for re-parole
- You are a spouse of an individual who is currently eligible for TPS

OR

- During either the initial registration period of your country's designation or during any subsequent initial registration period if your country was re-designated you were a child of an individual who is currently eligible for TPS. There is no time limitation on filing if you meet this condition. So if your parent is currently eligible for TPS and you were his or her child (unmarried and under 21 years old) at any time during a TPS initial registration period for your country, you may still be eligible for late initial filing even if you are now over 21 years old or married.  You may file during an extension of your TPS designated country.

Please check your country-specific Web page for the dates of the initial registration period or periods that apply for late initial filing.

PLEASE NOTE: You cannot obtain TPS as a derivative because your parent or child has TPS.

Top

## Travel

If you have TPS and wish to travel outside the United States, you must apply for a travel authorization. Travel authorization for TPS is issued as an advance parole document if USCIS determines it is appropriate to approve your request. This document gives you permission to leave the United States and return during a specified period of time. To apply for advance parole, you must file Form I-131, Application for Travel Document (see form on right). If you leave the United States without requesting advance parole, you may lose TPS and you may not be permitted to re-enter the United States.

If USCIS is still adjudicating your TPS application, you may miss important USCIS notices, such as Requests for Additional Evidence, while you are outside the U.S. Failure to respond to these requests may result in the denial of your application.

We encourage you to read and understand the travel warning on Form I-131 before requesting advance parole, even if you have been granted TPS. If you have been unlawfully present in the U.S. for any period of time, you may want to seek legal advice before requesting advance parole for travel.

Top

## Change of Address

If your address changes after you file your application, you must notify USCIS immediately. For information about how to notify USCIS go to www.uscis.gov/addresschange.

Top

## Help Filing an Application

Please be aware that some underlined_practitioners may try to take advantage of you by claiming they can file TPS forms. These same individuals may ask that you pay them to file such forms. We want to ensure that all potential TPS applicants know how to obtain legitimate, accurate legal advice and assistance. A list of accredited representatives and free or low-cost legal providers is available on the USCIS website on the finding legal advice Web page.

## TPS Granted by an Immigration Judge or the Board of Immigration Appeals

**Step 1:** If an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) granted you TPS, you must provide USCIS with proof of the TPS grant (such as a final order from the IJ or final decision from the BIA) when you file for your first TPS benefit (such as an EAD, travel authorization, or with your first TPS re-registration application filed with USCIS). You should also submit a copy of the I-821 TPS application that the IJ or the BIA approved.

**Step 2:** See the table below for filing information based on the first TPS benefit you are requesting after an IJ or BIA granted you TPS.

| If the first TPS benefit you are requesting is... | Then you must... | And... |
|---|---|---|
| Your first EAD, | File Form I-765 only with required fee(s) or fee waiver request. You must also submit a cover sheet that states "DO NOT REJECT - TPS GRANTED BY IJ/BIA." | Send your Form I-765 to the mailing address on your country specific page to the left. |
| Travel Authorization | Form I-131 with required fee | Send your Form I-131 to the mailing address in the form instructions. |
| Your first re-registration<br><br>NOTE: Even if you were granted TPS by an IJ or the BIA, you must re-register with USCIS during each future extension period for your country. | File Form I-821 and Form I-765 with required fee(s) or a fee waiver request. See re-registration instructions above. | Send your TPS package to the mailing address on your country specific page to the left. |

Return to the top

## Appealing a Denial

If USCIS denies your application, you will be informed in the denial notice whether you have 30 days to appeal to the USCIS Administrative Appeals Office (AAO). If you do not have the right to appeal because you were placed in removal proceedings when your TPS application was denied by USCIS, you can request that the immigration judge adjudicate your TPS application.

You may also choose to file a motion to reconsider with the Service Center that adjudicated your TPS application by submitting:

1. A Notice of Appeal or Motion, Form I-290B
2. $630 filing fee, or Form I-912, Application for Fee Waiver (or written request) if you are unable to pay

If USCIS denies your TPS application, we recommend that you consult with an accredited legal representative to determine whether you should pursue an appeal or motion. If you have been placed in removal proceedings, you may request that the immigration judge adjudicate your TPS application. If an immigration judge denies your request for TPS, you may file an appeal with the BIA.

Top

This page can be found at http://www.uscis.gov/tps



Last Reviewed/Updated: 09/22/2016

# **Action 11**

Deferred Enforced Departure

Exhibit 1
108



**U.S. Citizenship and
Immigration Services**

# Deferred Enforced Departure

Deferred Enforced Departure (DED) is in the President's discretion to authorize as part of his power to conduct foreign relations. Although DED is not a specific immigration status, individuals covered by DED are not subject to removal from the United States, usually for a designated period of time.

## Countries that are Currently Covered Under DED

| Country | Effective Date of DED | Extension Date of DED | Expiration Date | EAD Automatically Extended Through |
|---------|----------------------|----------------------|-----------------|----------------------------------|
| Liberia | October 1, 2007 (by President Bush's order of September 12, 2007) | 18-month extension effective October 1, 2016 (by President Obama's order on September 28, 2016) | March 31, 2018 | March 31, 2017 |

## DED Eligibility

Eligibility requirements for a country's nationals who are covered under DED is based on the terms of the President's directive regarding DED for that country and any relevant implementing requirements established by DHS. Information on eligibility can be found on your DED country link to the left.

### Working in the United States

If work authorization is provided as a benefit of DED for your country, then you may request work authorization by filing a Form I-765, Application for Employment Authorization.

To see if work authorization is a provided benefit of your country, see your designated DED country link to the left

### Automatic Employment Authorization Document (EAD) Extension

Sometimes DHS must issue a blanket automatic extension of the expiring EADs for DED beneficiaries of a specific country in order to allow time for EADs with new validity dates to be

issued. The Federal Register will tell you if your EAD has been temporarily auto-extended and to what date.

Unless you are found to no longer be eligible for DED, you may show your DED-related EAD that has expired and a copy of the Federal Register notice to employers and government agencies (federal, state, and local). Employers are advised that they may rely on the Federal Register notice as evidence of the continuing validity of your EAD.

If you are an employer or government agency with questions or concerns about the automatic EAD extension, you may contact:

- USCIS Form I-9 Customer Support: 1-888-464-4218
- U. S. Department of Justice, Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) Employer Hotline: 1-800-255-8155

If you are an employee with questions or concerns about the automatic EAD extension, you may contact:

- The Office of Special Council Employee Hotline- 1-800-255-7688. Additional information is available on the OSC Website link to the right.

## Travel Outside the United States

If travel authorization is provided as a benefit of DED for your country, you must file for advance parole if you wish to travel. Advance parole gives you permission to leave the United States and return during a specified period. To request advance parole, you must file Form I-131, Application for Travel Document.

If you leave the United States without first receiving advanced parole, you may no longer be eligible for DED and may not be permitted to re-enter the United States.

To see if travel authorization is a provided benefit of your country, see your designated DED country link to the left.

Last Reviewed/Updated: 09/28/2016

## **Action 12**

Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens

Exhibit 1
111

Policy Number: 10072.1
FEA Number: 601-14

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

MAR 0 2 2011



U.S. Immigration
and Customs
Enforcement

MEMORANDUM FOR:     All ICE Employees

FROM:     John Morton
Director

SUBJECT:     Civil Immigration Enforcement: Priorities for the Apprehension,
Detention, and Removal of Aliens

Purpose

This memorandum outlines the civil immigration enforcement priorities of U.S. Immigration and Customs Enforcement (ICE) as they relate to the apprehension, detention, and removal of aliens. These priorities shall apply across all ICE programs and shall inform enforcement activity, detention decisions, budget requests and execution, and strategic planning.

*A.  Priorities for the apprehension, detention, and removal of aliens*

In addition to our important criminal investigative responsibilities, ICE is charged with enforcing the nation's civil immigration laws. This is a critical mission and one with direct significance for our national security, public safety, and the integrity of our border and immigration controls. ICE, however, only has resources to remove approximately 400,000 aliens per year, less than 4 percent of the estimated illegal alien population in the United States. In light of the large number of administrative violations the agency is charged with addressing and the limited enforcement resources the agency has available, ICE must prioritize the use of its enforcement personnel, detention space, and removal resources to ensure that the removals the agency does conduct promote the agency's highest enforcement priorities, namely national security, public safety, and border security.

To that end, the following shall constitute ICE's civil enforcement priorities, with the first being the highest priority and the second and third constituting equal, but lower, priorities.

### Priority 1.  Aliens who pose a danger to national security or a risk to public safety

The removal of aliens who pose a danger to national security or a risk to public safety shall be ICE's highest immigration enforcement priority. These aliens include, but are not limited to:

- aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;

Exhibit 1
112

www.ice.gov

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens
Page 2

- aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders;
- aliens not younger than 16 years of age who participated in organized criminal gangs;
- aliens subject to outstanding criminal warrants; and
- aliens who otherwise pose a serious risk to public safety.[1]

For purposes of prioritizing the removal of aliens convicted of crimes, ICE personnel should refer to the following new offense levels defined by the Secure Communities Program, with Level 1 and Level 2 offenders receiving principal attention.  These new Secure Communities levels are given in rank order and shall replace the existing Secure Communities levels of offenses.[2]

- Level 1 offenders: aliens convicted of "aggravated felonies," as defined in § 101(a)(43) of the Immigration and Nationality Act,[3] or two or more crimes each punishable by more than one year, commonly referred to as "felonies";
- Level 2 offenders: aliens convicted of any felony or three or more crimes each punishable by less than one year, commonly referred to as "misdemeanors"; and
- Level 3 offenders: aliens convicted of crimes punishable by less than one year.[4]

### Priority 2.  Recent illegal entrants

In order to maintain control at the border and at ports of entry, and to avoid a return to the prior practice commonly and historically referred to as "catch and release," the removal of aliens who have recently violated immigration controls at the border, at ports of entry, or through the knowing abuse of the visa and visa waiver programs shall be a priority.

### Priority 3.  Aliens who are fugitives or otherwise obstruct immigration controls

In order to ensure the integrity of the removal and immigration adjudication processes, the removal of aliens who are subject to a final order of removal and abscond, fail to depart, or intentionally obstruct immigration controls, shall be a priority.  These aliens include:

- fugitive aliens, in descending priority as follows:[5]

---

[1] This provision is not intended to be read broadly, and officers, agents, and attorneys should rely on this provision only when serious and articulable public safety issues exist.
[2] The new levels should be used immediately for purposes of enforcement operations.  DRO will work with Secure Communities and the Office of the Chief Information Officer to revise the related computer coding by October 1, 2010.
[3] As the definition of "aggravated felony" includes serious, violent offenses and less serious, non-violent offenses, agents, officers, and attorneys should focus particular attention on the most serious of the aggravated felonies when prioritizing among level one offenses.
[4] Some misdemeanors are relatively minor and do not warrant the same degree of focus as others.  ICE agents and officers should exercise particular discretion when dealing with minor traffic offenses such as driving without a license.
[5] Some fugitives may fall into both this priority and priority 1.

Exhibit 1
113

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens

Page 3

- o   fugitive aliens who pose a danger to national security;
- o   fugitives aliens convicted of violent crimes or who otherwise pose a threat to the community;
- o   fugitive aliens with criminal convictions other than a violent crime;
- o   fugitive aliens who have not been convicted of a crime;
- •   aliens who reenter the country illegally after removal, in descending priority as follows:
  - o   previously removed aliens who pose a danger to national security;
  - o   previously removed aliens convicted of violent crimes or who otherwise pose a threat to the community;
  - o   previously removed aliens with criminal convictions other than a violent crime;
  - o   previously removed aliens who have not been convicted of a crime; and
- •   aliens who obtain admission or status by visa, identification, or immigration benefit fraud.[6]

The guidance to the National Fugitive Operations Program: Priorities, Goals and Expectations, issued on December 8, 2009, remains in effect and shall continue to apply for all purposes, including how Fugitive Operation Teams allocate resources among fugitive aliens, previously removed aliens, and criminal aliens.

*B.  Apprehension, detention, and removal of other aliens unlawfully in the United States*

Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of other aliens unlawfully in the United States.  ICE special agents, officers, and attorneys may pursue the removal of any alien unlawfully in the United States, although attention to these aliens should not displace or disrupt the resources needed to remove aliens who are a higher priority.  Resources should be committed primarily to advancing the priorities set forth above in order to best protect national security and public safety and to secure the border.

*C.  Detention*

As a general rule, ICE detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law.  Absent extraordinary circumstances or the requirements of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, or who are disabled, elderly, pregnant, or nursing, or demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest.  To detain aliens in those categories who are not subject to mandatory detention, ICE officers or special agents must obtain approval from the field office director.  If an alien falls

---

[6] ICE officers and special agents should proceed cautiously when encountering aliens who may have engaged in fraud in an attempt to enter but present themselves without delay to the authorities and indicate a fear of persecution or torture. *See* Convention relating to the Status of Refugees, art. 31, *opened for signature* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137.  In such instances, officers and agents should contact their local Office of the Chief Counsel.

Exhibit 1
114

Civil Immigration Enforcement:  Priorities for the Apprehension, Detention, and Removal of Aliens
Page 4

within the above categories and is subject to mandatory detention, field office directors are encouraged to contact their local Office of Chief Counsel for guidance.

## D.  Prosecutorial discretion

The rapidly increasing number of criminal aliens who may come to ICE's attention heightens the need for ICE employees to exercise sound judgment and discretion consistent with these priorities when conducting enforcement operations, making detention decisions, making decisions about release on supervision pursuant to the Alternatives to Detention Program, and litigating cases.  Particular care should be given when dealing with lawful permanent residents, juveniles, and the immediate family members of U.S. citizens.  Additional guidance on prosecutorial discretion is forthcoming.  In the meantime, ICE officers and attorneys should continue to be guided by the November 17, 2000 prosecutorial discretion memorandum from then-INS Commissioner Doris Meissner; the October 24, 2005 Memorandum from Principal Legal Advisor William Howard; and the November 7, 2007 Memorandum from then Assistant Secretary Julie Myers.

## E.  Implementation

ICE personnel shall follow the priorities set forth in this memorandum immediately.  Further, ICE programs shall develop appropriate measures and methods for recording and evaluating their effectiveness in implementing the priorities.  As this may require updates to data tracking systems and methods, ICE will ensure that reporting capabilities for these priorities allow for such reporting as soon as practicable, but not later than October 1, 2010.

## F.  No Private Right Statement[7]

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[7] This statement was added to ICE Policy 10072.1, "Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens" on February 7, 2011.  The policy contained in this memorandum has not been altered or changed.

Exhibit 1
115

# **Action 13**

Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens

Exhibit 1
116

Policy Number: 10075.1
FEA Number: 306-112-0026

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

June 17, 2011

MEMORANDUM FOR:     All Field Office Directors
                    All Special Agents in Charge
                    All Chief Counsel

FROM:               John Morton
                    Director

SUBJECT:            Exercising Prosecutorial Discretion Consistent with the Civil
                    Immigration Enforcement Priorities of the Agency for the
                    Apprehension, Detention, and Removal of Aliens

Purpose

This memorandum provides U.S. Immigration and Customs Enforcement (ICE) personnel
guidance on the exercise of prosecutorial discretion to ensure that the agency's immigration
enforcement resources are focused on the agency's enforcement priorities. The memorandum
also serves to make clear which agency employees may exercise prosecutorial discretion and
what factors should be considered.

This memorandum builds on several existing memoranda related to prosecutorial discretion with
special emphasis on the following:

- Sam Bernsen, Immigration and Naturalization Service (INS) General Counsel, Legal
  Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976);
- Bo Cooper, INS General Counsel, INS Exercise of Prosecutorial Discretion (July 11,
  2000);
- Doris Meissner, INS Commissioner, Exercising Prosecutorial Discretion (November 17,
  2000);
- Bo Cooper, INS General Counsel, Motions to Reopen for Considerations of Adjustment
  of Status (May 17, 2001);
- William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (October 24,
  2005);
- Julie L. Myers, Assistant Secretary, Prosecutorial and Custody Discretion (November 7,
  2007);
- John Morton, Director, Civil Immigration Enforcement Priorities for the Apprehension,
  Detention, and Removal of Aliens (March 2, 2011); and
- John Morton, Director, Prosecutorial Discretion: Certain Victims, Witnesses, and
  Plaintiffs (June 17, 2011).

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

The following memoranda related to prosecutorial discretion are rescinded:

- Johnny N. Williams, Executive Associate Commissioner (EAC) for Field Operations, Supplemental Guidance Regarding Discretionary Referrals for Special Registration (October 31, 2002); and
- Johnny N. Williams, EAC for Field Operations, Supplemental NSEERS Guidance for Call-In Registrants (January 8, 2003).

Background

One of ICE's central responsibilities is to enforce the nation's civil immigration laws in coordination with U.S. Customs and Border Protection (CBP) and U.S. Citizenship and Immigration Services (USCIS). ICE, however, has limited resources to remove those illegally in the United States. ICE must prioritize the use of its enforcement personnel, detention space, and removal assets to ensure that the aliens it removes represent, as much as reasonably possible, the agency's enforcement priorities, namely the promotion of national security, border security, public safety, and the integrity of the immigration system. These priorities are outlined in the ICE Civil Immigration Enforcement Priorities memorandum of March 2, 2011, which this memorandum is intended to support.

Because the agency is confronted with more administrative violations than its resources can address, the agency must regularly exercise "prosecutorial discretion" if it is to prioritize its efforts. In basic terms, prosecutorial discretion is the authority of an agency charged with enforcing a law to decide to what degree to enforce the law against a particular individual. ICE, like any other law enforcement agency, has prosecutorial discretion and may exercise it in the ordinary course of enforcement[1]. When ICE favorably exercises prosecutorial discretion, it essentially decides not to assert the full scope of the enforcement authority available to the agency in a given case.

In the civil immigration enforcement context, the term "prosecutorial discretion" applies to a broad range of discretionary enforcement decisions, including but not limited to the following:

- deciding to issue or cancel a notice of detainer;
- deciding to issue, reissue, serve, file, or cancel a Notice to Appear (NTA);
- focusing enforcement resources on particular administrative violations or conduct;
- deciding whom to stop, question, or arrest for an administrative violation;
- deciding whom to detain or to release on bond, supervision, personal recognizance, or other condition;
- seeking expedited removal or other forms of removal by means other than a formal removal proceeding in immigration court;

---

[1] The Meissner memorandum's standard for prosecutorial discretion in a given case turned principally on whether a substantial federal interest was present. Under this memorandum, the standard is principally one of pursuing those cases that meet the agency's priorities for federal immigration enforcement generally.

Exhibit 1
118

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

- settling or dismissing a proceeding;
- granting deferred action, granting parole, or staying a final order of removal;
- agreeing to voluntary departure, the withdrawal of an application for admission, or other action in lieu of obtaining a formal order of removal;
- pursuing an appeal;
- executing a removal order; and
- responding to or joining in a motion to reopen removal proceedings and to consider joining in a motion to grant relief or a benefit.

Authorized ICE Personnel

Prosecutorial discretion in civil immigration enforcement matters is held by the Director[2] and may be exercised, with appropriate supervisory oversight, by the following ICE employees according to their specific responsibilities and authorities:

- officers, agents, and their respective supervisors within Enforcement and Removal Operations (ERO) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- officers, special agents, and their respective supervisors within Homeland Security Investigations (HSI) who have authority to institute immigration removal proceedings or to otherwise engage in civil immigration enforcement;

- attorneys and their respective supervisors within the Office of the Principal Legal Advisor (OPLA) who have authority to represent ICE in immigration removal proceedings before the Executive Office for Immigration Review (EOIR); and

- the Director, the Deputy Director, and their senior staff.

ICE attorneys may exercise prosecutorial discretion in any immigration removal proceeding before EOIR, on referral of the case from EOIR to the Attorney General, or during the pendency of an appeal to the federal courts, including a proceeding proposed or initiated by CBP or USCIS. If an ICE attorney decides to exercise prosecutorial discretion to dismiss, suspend, or close a particular case or matter, the attorney should notify the relevant ERO, HSI, CBP, or USCIS charging official about the decision. In the event there is a dispute between the charging official and the ICE attorney regarding the attorney's decision to exercise prosecutorial discretion, the ICE Chief Counsel should attempt to resolve the dispute with the local supervisors of the charging official. If local resolution is not possible, the matter should be elevated to the Deputy Director of ICE for resolution.

---

[2] Delegation of Authority to the Assistant Secretary, Immigration and Customs Enforcement, Delegation No. 7030.2 (November 13, 2004), delegating among other authorities, the authority to exercise prosecutorial discretion in immigration enforcement matters (as defined in 8 U.S.C. § 1101(a)(17)).

3

Exhibit 1
119

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

Factors to Consider When Exercising Prosecutorial Discretion

When weighing whether an exercise of prosecutorial discretion may be warranted for a given alien, ICE officers, agents, and attorneys should consider all relevant factors, including, but not limited to—

- the agency's civil immigration enforcement priorities;
- the person's length of presence in the United States, with particular consideration given to presence while in lawful status;
- the circumstances of the person's arrival in the United States and the manner of his or her entry, particularly if the alien came to the United States as a young child;
- the person's pursuit of education in the United States, with particular consideration given to those who have graduated from a U.S. high school or have successfully pursued or are pursuing a college or advanced degrees at a legitimate institution of higher education in the United States;
- whether the person, or the person's immediate relative, has served in the U.S. military, reserves, or national guard, with particular consideration given to those who served in combat;
- the person's criminal history, including arrests, prior convictions, or outstanding arrest warrants;
- the person's immigration history, including any prior removal, outstanding order of removal, prior denial of status, or evidence of fraud;
- whether the person poses a national security or public safety concern;
- the person's ties and contributions to the community, including family relationships;
- the person's ties to the home country and conditions in the country;
- the person's age, with particular consideration given to minors and the elderly;
- whether the person has a U.S. citizen or permanent resident spouse, child, or parent;
- whether the person is the primary caretaker of a person with a mental or physical disability, minor, or seriously ill relative;
- whether the person or the person's spouse is pregnant or nursing;
- whether the person or the person's spouse suffers from severe mental or physical illness;
- whether the person's nationality renders removal unlikely;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as a relative of a U.S. citizen or permanent resident;
- whether the person is likely to be granted temporary or permanent status or other relief from removal, including as an asylum seeker, or a victim of domestic violence, human trafficking, or other crime; and
- whether the person is currently cooperating or has cooperated with federal, state or local law enforcement authorities, such as ICE, the U.S Attorneys or Department of Justice, the Department of Labor, or National Labor Relations Board, among others.

This list is not exhaustive and no one factor is determinative. ICE officers, agents, and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities.

4

Exhibit 1
120

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens*

That said, there are certain classes of individuals that warrant particular care. As was stated in the Meissner memorandum on Exercising Prosecutorial Discretion, there are factors that can help ICE officers, agents, and attorneys identify these cases so that they can be reviewed as early as possible in the process.

The following positive factors should prompt particular care and consideration:

- veterans and members of the U.S. armed forces;
- long-time lawful permanent residents;
- minors and elderly individuals;
- individuals present in the United States since childhood;
- pregnant or nursing women;
- victims of domestic violence, trafficking, or other serious crimes;
- individuals who suffer from a serious mental or physical disability; and
- individuals with serious health conditions.

In exercising prosecutorial discretion in furtherance of ICE's enforcement priorities, the following negative factors should also prompt particular care and consideration by ICE officers, agents, and attorneys:

- individuals who pose a clear risk to national security;
- serious felons, repeat offenders, or individuals with a lengthy criminal record of any kind;
- known gang members or other individuals who pose a clear danger to public safety; and
- individuals with an egregious record of immigration violations, including those with a record of illegal re-entry and those who have engaged in immigration fraud.

Timing

While ICE may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing the enforcement proceeding. As was more extensively elaborated on in the Howard Memorandum on Prosecutorial Discretion, the universe of opportunities to exercise prosecutorial discretion is large. It may be exercised at any stage of the proceedings. It is also preferable for ICE officers, agents, and attorneys to consider prosecutorial discretion in cases without waiting for an alien or alien's advocate or counsel to request a favorable exercise of discretion. Although affirmative requests from an alien or his or her representative may prompt an evaluation of whether a favorable exercise of discretion is appropriate in a given case, ICE officers, agents, and attorneys should examine each such case independently to determine whether a favorable exercise of discretion may be appropriate.

In cases where, based upon an officer's, agent's, or attorney's initial examination, an exercise of prosecutorial discretion may be warranted but additional information would assist in reaching a final decision, additional information may be requested from the alien or his or her representative. Such requests should be made in conformity with ethics rules governing

5

Exhibit 1
121

*Exercising Prosecutorial Discretion Consistent with the Priorities of the Agency for the
Apprehension, Detention, and Removal of Aliens*

communication with represented individuals[3] and should always emphasize that, while ICE may
be considering whether to exercise discretion in the case, there is no guarantee that the agency
will ultimately exercise discretion favorably.  Responsive information from the alien or his or her
representative need not take any particular form and can range from a simple letter or e-mail
message to a memorandum with supporting attachments.

Disclaimer

As there is no right to the favorable exercise of discretion by the agency, nothing in this
memorandum should be construed to prohibit the apprehension, detention, or removal of any
alien unlawfully in the United States or to limit the legal authority of ICE or any of its personnel
to enforce federal immigration law.  Similarly, this memorandum, which may be modified,
superseded, or rescinded at any time without notice, is not intended to, does not, and may not be
relied upon to create any right or benefit, substantive or procedural, enforceable at law by any
party in any administrative, civil, or criminal matter.

---

[3] For questions concerning such rules, officers or agents should consult their local Office of Chief Counsel.

Exhibit 1
122

# **Action 14**

Prosecutorial Discretion:  Certain Victims, Witnesses and Plaintiffs

Exhibit 1
123

Policy Number: 10076.1
FEA Number: 306-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

**JUN 17 2011**



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:     All Field Office Directors
All Special Agents in Charge
All Chief Counsel

FROM:     John Morton
Director

SUBJECT:     Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs

Purpose:

This memorandum sets forth agency policy regarding the exercise of prosecutorial discretion in
removal cases involving the victims and witnesses of crime, including domestic violence, and
individuals involved in non-frivolous efforts related to the protection of their civil rights and
liberties. In these cases, ICE officers, special agents, and attorneys should exercise all
appropriate prosecutorial discretion to minimize any effect that immigration enforcement may
have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue
justice. This memorandum builds on prior guidance on the handling of cases involving T and U
visas and the exercise of prosecutorial discretion.[1]

Discussion:

Absent special circumstances or aggravating factors, it is against ICE policy to initiate removal
proceedings against an individual known to be the immediate victim or witness to a crime. In
practice, the vast majority of state and local law enforcement agencies do not generally arrest
victims or witnesses of crime as part of an investigation. However, ICE regularly hears concerns
that in some instances a state or local law enforcement officer may arrest and book multiple
people at the scene of alleged domestic violence. In these cases, an arrested victim or witness of
domestic violence may be booked and fingerprinted and, through the operation of the Secure

---

[1] For a thorough explanation of prosecutorial discretion, see the following: Memorandum from Peter S. Vincent,
Principal Legal Advisor, Guidance Regarding U Nonimmigrant Status (U visa) Applicants in Removal Proceedings
or with Final Orders of Deportation or Removal (Sept. 25, 2009); Memorandum from William J. Howard, Principal
Legal Advisor, VAWA 2005 Amendments to Immigration and Nationality Act and 8 U.S.C. § 1367 (Feb. 1, 2007);
Memorandum from Julie L. Myers, Assistant Secretary of ICE, Prosecutorial and Custody Discretion (Nov. 7,
2007); Memorandum from William J. Howard, Principal Legal Advisor, Prosecutorial Discretion (Oct. 24, 2005);
Memorandum from Doris Meissner, Commissioner, Immigration and Naturalization Service, Exercising
Prosecutorial Discretion (Nov. 17, 2000).

Exhibit 1
124

www.ice.gov

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 2

Communities program or another ICE enforcement program, may come to the attention of ICE. Absent special circumstances, it is similarly against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties.

To avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights, ICE officers, special agents, and attorneys are reminded to exercise all appropriate discretion on a case-by-case basis when making detention and enforcement decisions in the cases of victims of crime, witnesses to crime, and individuals pursuing legitimate civil rights complaints.  Particular attention should be paid to:

- victims of domestic violence, human trafficking, or other serious crimes;
- witnesses involved in pending criminal investigations or prosecutions;
- plaintiffs in non-frivolous lawsuits regarding civil rights or liberties violations; and
- individuals engaging in a protected activity related to civil or other rights (for example, union organizing or complaining to authorities about employment discrimination or housing conditions) who may be in a non-frivolous dispute with an employer, landlord, or contractor.

In deciding whether or not to exercise discretion, ICE officers, agents, and attorneys should consider all serious adverse factors.  Those factors include national security concerns or evidence the alien has a serious criminal history, is involved in a serious crime, or poses a threat to public safety.  Other adverse factors include evidence the alien is a human rights violator or has engaged in significant immigration fraud.  In the absence of these or other serious adverse factors, exercising favorable discretion, such as release from detention and deferral or a stay of removal generally, will be appropriate.  Discretion may also take different forms and extend to decisions to place or withdraw a detainer, to issue a Notice to Appear, to detain or release an alien, to grant a stay or deferral of removal, to seek termination of proceedings, or to join a motion to administratively close a case.

In addition to exercising prosecutorial discretion on a case-by-case basis in these scenarios, ICE officers, agents, and attorneys are reminded of the existing provisions of the Trafficking Victims Protection Act (TVPA),[2] its subsequent reauthorization,[3] and the Violence Against Women Act (VAWA).[4]  These provide several protections for the victims of crime and include specific provisions for victims of domestic violence, victims of certain other crimes,[5] and victims of human trafficking.

Victims of domestic violence who are the child, parent, or current/former spouse of a U.S. citizen or permanent resident may be able to self-petition for permanent residency.[6]  A U nonimmigrant visa provides legal status for the victims of substantial mental or physical abuse as

---

[2] Pub. L. No. 106-386, §§101-113, 114 Stat. 1464, 1466 (codified as amended in scattered sections of the U.S.C.).
[3] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[4] Pub. L. No. 106-386, §§1001-1603, 114 Stat. 1464, 1491 (codified as amended in scattered sections of the U.S.C.).
[5] For a list of the qualifying crimes, see INA §101(a)(15)(U)(iii).
[6] See INA §101(a)(51).

Exhibit 1
125

Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs
Page 3

a result of domestic violence, sexual assault, trafficking, and other certain crimes.[7]  A T nonimmigrant visa provides legal status to victims of severe forms of trafficking who assist law enforcement in the investigation and/or prosecution of human trafficking cases.[8]  ICE has important existing guidance regarding the exercise of discretion in these cases that remains in effect.  Please review it and apply as appropriate.[9]

Please also be advised that a flag now exists in the Central Index System (CIS) to identify those victims of domestic violence, trafficking, or other crimes who already have filed for, or have been granted, victim-based immigration relief.  These cases are reflected with a Class of Admission Code "384."  When officers or agents see this flag, they are encouraged to contact the local ICE Office of Chief Counsel, especially in light of the confidentiality provisions set forth at 8 U.S.C. § 1367.

No Private Right of Action

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[7] *See* INA §101(a)(15)(U).

[8] *See* INA §101(a)(15)(T).

[9] *See* Memorandum from John P. Torres, Director, Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, Interim Guidance Relating to Officers Procedure Following Enactment of VAWA 2005 (Jan. 22, 2007).

Exhibit 1
126

# **Action 15**

Case-by-Case Review of Incoming and Certain Pending Cases,

Next Steps in the Implementation of the Prosecutorial Discretion Memorandum and the August 18th Announcement on Immigration Enforcement Priorities,

And

Guidance to ICE Attorneys Reviewing the CBP, USCIS, and ICE Cases Before the Executive Office of Immigration Review

Exhibit 1
127



*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C.  20536

**U.S. Immigration
and Customs
Enforcement**

November 17, 2011

MEMORANDUM FOR:      All Chief Counsel
                                     Office of the Principal Legal Advisor

FROM:                         Peter S. Vincent
                                     Principal Legal Advisor

SUBJECT:                  Case-by-Case Review of Incoming and Certain Pending Cases

Purpose

In order to ensure that the cases before the Executive Office for Immigration Review (EOIR)
conform to the U.S. Immigration and Customs Enforcement (ICE) civil enforcement priorities as
described in ICE Director John Morton's memorandum *Exercising Prosecutorial Discretion
Consistent with the Civil Immigration Enforcement Priorities of the Agency for the
Apprehension, Detention, and Removal of Aliens* (June 17, 2011) (July 17, 2011 Prosecutorial
Discretion Memorandum), the Office of the Principal Legal Advisor (OPLA) will conduct a
review of the EOIR immigration court docket in each Office of Chief Counsel (OCC).

Scope of the Review

OPLA has been directed to begin a review of incoming cases and cases pending in immigration
court. Each OCC must immediately review three categories of cases: (1) cases in which the
Notices to Appear have not been filed with EOIR; (2) all cases on the master docket; and (3) all
non-detained cases with merits hearings scheduled up to seven months from the date of issuance
of this memorandum.[1]

The initial implementation of the review set forth in this memorandum will last for
approximately the next two months, until January 13, 2012. At the end of that period, we will
assess the data and other implementation outcomes related to this review and make any
necessary adjustments to the process before implementing a revised policy for the continuation
of this review.

---

[1] If a case is transferred from a detained to a non-detained immigration court docket, the case should also be
reviewed for prosecutorial discretion. Oftentimes, these cases will remain an ICE priority.

Case-by-Case Review of Incoming and Certain Pending Cases
Page 2

Criteria

This review process does not replace or supersede the June 17, 2011 Prosecutorial Discretion Memorandum, which remains the cornerstone for assessing whether prosecutorial discretion is appropriate in any circumstance. During the course of review, attorneys should focus on the factors discussed in the June 17, 2011 Prosecutorial Discretion Memorandum, as well as the criteria contained in the *Guidance to ICE Attorneys Reviewing CBP, USCIS, and ICE Cases Pending Before the Executive Office for Immigration Review* (Guidance). Moreover, at all stages of the immigration enforcement process, attorneys should consider, on a case-by-case basis, the full range of factors set forth in the June 17, 2011 Prosecutorial Discretion Memorandum.

The criteria set forth in the Guidance should prompt particular care and consideration and are intended to aid attorneys in identifying the cases most likely to be either eligible or ineligible for a favorable exercise of discretion. Based on this review, ICE attorneys should decide whether the proceedings before EOIR should continue or whether prosecutorial discretion in the form of administrative closure is appropriate.

In making a decision on whether to exercise prosecutorial discretion, attorneys should also consider the following memoranda from Director Morton: *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); *Guidance Regarding the Handling of Removal Proceedings of Aliens with Pending or Approved Applications or Petitions* (Aug. 20, 2010); and *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* (June 17, 2011).

Standard Operating Procedure

Each OCC shall immediately draft and implement a standard operating procedure (SOP) establishing a process for the review of all matters described in the previous section. Before implementation, each SOP must be reviewed by the Director of Field Legal Operations at headquarters.

Each SOP must include:

- Assistant Chief Counsel/Senior Attorney initial review;
- Supervisory review;
- Notification process to individuals where the OCC decides to exercise prosecutorial discretion in the absence of a request;
- Use and monitoring of an electronic mailbox for the receipt of additional documentation that individuals wish to be considered during the prosecutorial discretion review process;[2]
- Notification to a supervisory official at Enforcement and Removal Operations, Homeland Security Investigations, U.S. Citizenship and Immigration Services (USCIS), or U.S. Customs and Border Protection of the decision to exercise prosecutorial discretion;[3] and

---

[2] The mailbox should be named OPLA-PD-(*3-letter office abbreviation*)-OCC, e.g., OPLA-PD-WAS-OCC.

[3] Pursuant to each OCC's established SOP regarding cases that involve an application or petition pending before USCIS, notification to USCIS may not be needed.

Exhibit 1
129

Case-by-Case Review of Incoming and Certain Pending Cases
Page 3

- National security and public safety checks for any case being considered for administrative closure or dismissal.[4]

Each SOP should also contain the following language:

"Some individuals may decline prosecutorial discretion and elect to proceed before the immigration court. In some instances, applicants for immigration benefits whose applications are denied by USCIS are entitled to a *de novo* review before an immigration judge (IJ). Asylum and Temporary Protected Status are two examples. *See, e.g.,* 8 C.F.R. § 208.14(c)(1) (2011); 244.10(c)(1)—(2) (2011). Moreover, some adjustment of status provisions also provide for renewal of a USCIS-denied application before an IJ. *See, e.g., id.* §§ 209.1(e), 209.2(f), 245.2(a)(5)(ii). In addition, some forms of immigration relief or protection may be granted only in immigration court, including cancellation of removal under section 240A of the Immigration and Nationality Act, 8 U.S.C. § 1229b, as well as withholding and deferral of removal under 8 C.F.R. §§ 1208.16—17."

Motions to EOIR

A standard joint motion package should be filed with EOIR or an oral motion made before the immigration court for those cases in which, pursuant to this review process, the exercise of prosecutorial discretion is deemed appropriate.[5] A template for a joint motion to administratively close proceedings can be found on SharePoint.

Disclaimer

As there is no right to the exercise of discretion by the agency, nothing in this memorandum should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of ICE or any of its personnel to enforce federal immigration law. Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[4] The existing OCC's SOPs regarding cases that involve an application or petition pending before USCIS should remain in effect.

[5] ICE attorneys may agree to the administrative closure of removal proceedings of an individual with an underlying asylum application under this process if the individual jointly requests administrative closure with the immigration judge. Upon the filing of such a joint request, however, the individual will be subject to 8 CFR 208.7(a)(2) which tolls the 180-day clock for employment authorization eligibility.

Exhibit 1
130

**Next Steps in the Implementation of the Prosecutorial Discretion Memorandum and the August 18th Announcement on Immigration Enforcement Priorities**

On August 18, 2011, the Administration announced an effort to better focus the immigration enforcement system on the removal of criminal aliens, the promotion of public safety and border security, and the integrity of the immigration system. This effort began with the establishment of a working group, comprised of officials from the Department of Homeland Security (DHS), including Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP), as well as representatives from the Department of Justice (DOJ), tasked with identifying best practices to accelerate the apprehension and removal of high priority aliens by, in part, limiting the initiation or pursuit of low priority cases. As a result of this process, ICE is implementing the following initiatives:

- *Prosecutorial Discretion Training:* On November 17, ICE launched a comprehensive training program on the appropriate use of the June 17, 2011 Prosecutorial Discretion Memorandum. This program consists of scenario-based training that emphasizes how the Prosecutorial Discretion Memorandum should be utilized in order to focus immigration enforcement resources on ICE priorities.

  This program builds on training that has already occurred since the June 17, 2011 memorandum was issued. On September 29 and October 24, Secretary Napolitano met with supervisory ICE officers and attorneys to discuss the agency's enforcement priorities and the importance of these initiatives. ICE Director Morton, along with other members of ICE's senior leadership team, have traveled around the country to discuss the importance of consistent application of prosecutorial discretion. Over the last month, Director Morton and his senior leadership have traveled to Los Angeles, Chicago, San Francisco, San Diego, Miami, New York, and Newark to personally instruct enforcement officers and attorneys on the appropriate use of this policy. Over the next several weeks, Director Morton and other members of the ICE senior leadership will travel to New Orleans and other jurisdictions to conduct additional training. By January 13, all ICE enforcement officers and attorneys nationwide will have completed scenario based prosecutorial discretion training.

- *Review of Incoming Cases:* Beginning immediately, ICE attorneys nationwide will review all incoming cases in immigration court. This review, based on the Prosecutorial Discretion Memorandum and guided by a set of more focused criteria, will help reduce inefficiencies that delay the removal of criminal aliens and other priority cases by preventing new low priority cases from clogging the immigration court dockets. This process is designed to identify the cases most clearly eligible and ineligible for a favorable exercise of discretion and will focus on cases appearing on the master calendar and those cases that have not yet been filed in immigration court. The initial test run of this review of incoming cases will last until January 13.

Exhibit 1
131

- ***Review of Cases Pending in Immigration Court***:  Beginning December 4, DHS and DOJ will launch pilot programs in two jurisdictions to test run the process for reviewing all cases pending in immigration court.  Over the course of the six week pilot, an intra-agency team of attorneys from ICE, USCIS, and CBP will review the cases on the non-detained dockets in the Denver and Baltimore immigration courts based on the Prosecutorial Discretion Memorandum and guided by a set of more focused criteria.  During this time, DOJ's Executive Office for Immigration Review (EOIR) has agreed to shift judges from the non-detained docket in those jurisdictions to hear detained cases, in order to enhance the processing of such detained cases.

Both the review of incoming and pending cases will initially take place over the course of approximately two months, lasting until January 13.  The purpose of the initial timing and scope limitations is to allow DHS to test run various methods for affirmatively reviewing cases at the different stages of the immigration enforcement cycle, and to gather data and other information related to the implementation of these methods.

At the end of the period, DHS will promptly review that data and other implementation outcomes and, where appropriate, consult with DOJ to determine, on an expedited basis, the best methods to implement these processes on an ongoing basis nationwide.  During the entire period of these initiatives, ICE attorneys, officers, and agents will be applying, on a case-by-case basis, the full range of factors set forth in the June 17, 2011 Prosecutorial Discretion memorandum in the course of their regular duties.

Exhibit 1
132

*Guidance to ICE Attorneys Reviewing the CBP, USCIS, and ICE Cases Before the Executive Office for Immigration Review*

## I. Introduction

On August 18, 2011, the Department of Homeland Security announced a review of all administrative removal cases pending before and incoming to the Executive Office for Immigration Review (EOIR) of the Department of Justice. The purpose of the review is to identify those cases that reflect a high enforcement priority for the Department of Homeland Security. This review covers all CBP, USCIS, and ICE removal cases, whether the cases are before immigration judges or the Board of Immigration Appeals. The review to which this guidance applies shall focus on the criteria laid out in Section II, but nothing in this guidance should be construed to prohibit or discourage the consideration of all of the factors laid out in the June 17, 2011 Prosecutorial Discretion Memorandum.

## II. Criteria for Review

The following removal cases are enforcement priorities for the Department of Homeland Security and should generally be pursued in an accelerated manner before EOIR. These cases involve an alien—

- who is a suspected terrorist or national security risk;
- who has a conviction for—
    - a felony or multiple misdemeanors,
    - illegal entry, re-entry, or immigration fraud, or
    - a misdemeanor violation involving—
        - violence, threats, or assault,
        - sexual abuse or exploitation,
        - driving under the influence of alcohol or drugs,
        - flight from the scene of an accident,
        - drug distribution or trafficking, or
        - other significant threat to public safety;
- who is a gang member, human rights violator, or other clear threat to public safety;
- who entered the country illegally or violated the terms of their admission within the last three years;
- who has previously been removed from the country;
- who has been found by an immigration officer or immigration judge to have committed immigration fraud; or
- who otherwise has an egregious record of immigration violations.

1

Exhibit 1
133

The following cases are generally not enforcement priorities for the Department of Homeland Security and should be carefully considered for prosecutorial discretion on a case-by-case basis to avoid unnecessary diversion of resources from the enforcement priorities identified above. These cases involve an alien—

- who is a member in good standing of the Coast Guard or Armed Forces of the United States, an honorably discharged veteran of the Coast Guard or Armed Forces of the United States, or the spouse or child of such a member or veteran;
- who is a child, has been in the United States for more than five years, and is either in school or has successfully completed high school (or its equivalent);
- who came to the United States under the age of sixteen, has been in the United States for more than five years, has completed high school (or its equivalent), and is now pursuing or has successfully completed higher education in the United States;
- who is over the age of sixty-five and has been present in the United States for more than ten years;
- who is a victim of domestic violence in the United States, human trafficking to the United States; or of any other serious crime in the United States;
- who has been a lawful permanent resident for ten years or more and has a single, minor conviction for a non-violent offense;
- who suffers from a serious mental or physical condition that would require significant medical or detention resources; or
- who has very long-term presence in the United States, has an immediate family member who is a United States citizen, and has established compelling ties and made compelling contributions to the United States.

### III. National Security and Public Safety Checks

If an ICE attorney decides to exercise prosecutorial discretion to dismiss or administratively close a particular case or matter, the attorney must first ensure that the alien in question is vetted for national security and public safety concerns. No exercise of discretion under this case review may proceed without this vetting.

### IV. Special Rule for Asylum Cases

ICE attorneys may agree to the administrative closure of removal proceedings of an individual who filed an asylum application if the individual jointly requests administrative closure with the immigration judge. Upon the filing of such a joint request, however, the individual will be subject to 8 CFR 208.7(a)(2) which tolls the 180-day clock for employment authorization eligibility.

## V.  Individual Case Review

ICE attorneys are reminded that the decision to exercise prosecutorial discretion should be made on a case-by-case basis and on the totality of the circumstances presented by the individual case in question.  The factors discussed in section II do not replace or supersede the June 17, 2011 Prosecutorial Discretion Memorandum, which remains the cornerstone for assessing whether prosecutorial discretion is appropriate in any circumstance.  No one positive factor is determinative, and no one factor should be considered solely in isolation.  General guidance such as this guidance cannot provide a "bright line" test, and many cases will require a balancing of the various factors laid out in the June 17, 2011 Prosecutorial Discretion Memorandum and earlier memoranda on the same subject.  Reasonable minds can differ on close cases, and ICE attorneys should consult closely with their ICE supervisors whenever questions, concerns, or issues arise.  ICE attorneys should base their decisions on the information in the record and are not expected to conduct additional investigation, although they may seek additional information if easily and timely available. Similarly, individuals may submit to ICE attorneys additional information relevant to their case for consideration under this process.

## VI.  Notice to Charging Component

If an ICE attorney decides to exercise prosecutorial discretion to dismiss or administratively close a particular case or matter, the attorney must notify a relevant supervisory charging official at CBP, USCIS, or ICE about the decision.  In the event there is a dispute between the supervisory official and the ICE attorney regarding the attorney's decision to exercise prosecutorial discretion, the ICE Chief Counsel should attempt to resolve the dispute locally.  If local resolution is not possible, the matter should be elevated to the Deputy Director of ICE for resolution.

## VII.  Disclaimer

As there is no right to the favorable exercise of discretion by the agency, nothing in this guidance should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of ICE, CBP, or USCIS or any of their respective personnel to enforce Federal immigration law.  Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## **Action 16**

Revised Guidance for the Referral of Cases and Issuance of Notices to Appear
(NTAs) in Cases Involving Inadmissible and Removable Aliens.

Exhibit 1
136



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

November 7, 2011                                PM-602-0050

# Policy Memorandum

SUBJECT:   Revised Guidance for the Referral of Cases and Issuance of Notices to Appear
(NTAs) in Cases Involving Inadmissible and Removable Aliens

**Purpose**
This Policy Memorandum (PM) establishes new USCIS guidelines for referring cases and
issuing Notices to Appear (NTAs) in a manner that promotes the sound use of the resources of
the Department of Homeland Security and the Department of Justice to enhance national
security, public safety, and the integrity of the immigration system.  This PM supersedes Policy
Memorandum No. 110, *Disposition of Cases Involving Removable Aliens*, dated July 11, 2006.

**Scope**
This PM applies to and is binding on all USCIS employees unless otherwise specifically
provided in this PM.

**Authority**
Immigration and Nationality Act (INA) sections 101(a)(43), 103(a), 239, 240 and 318; Title 8,
Code of Federal Regulations (8 CFR) parts/sections 2.1, 103, 204, 207.9, 208, 216.3(a),
216.6(a)(5), 236.14(c), and 239; Adjudicator's Field Manual Chapter 10.11(a).

**Background**
U.S. Citizenship and Immigration Services (USCIS) has authority, under the immigration laws,
*see, e.g.,* INA §§ 103(a), 239; 8 CFR §§ 2.1, 239.1, to issue Form I-862, Notice to Appear, to
initiate removal proceedings.[1]  U.S. Immigration and Customs Enforcement (ICE) and U.S.
Customs and Border Protection (CBP) also have authority to issue NTAs.  Accordingly, USCIS
must ensure that its issuance of NTAs fits within and supports the Government's overall removal
priorities, while also ensuring that its NTA policies promote national security and the integrity of
the nation's immigration system.

To those ends, this PM identifies the circumstances under which USCIS will issue an NTA, or
will refer the case to ICE for NTA issuance, in order to effectively handle cases that involve
public safety threats, criminals, and aliens engaged in fraud.

---

[1] *Delegation by the Secretary of the Department of Homeland Security to the Bureau of Citizenship and Immigration
Services,* Delegation Number 0150.1; Paragraph 2(N).  However, international District Directors and officers are not
authorized to issue NTAs.

Exhibit 1
137

Page 2

**Policy**

I. <u>National Security Cases</u>

This PM does not affect the handling of cases involving national security concerns.[2] Guidance from the Fraud Detection and National Security Directorate (FDNS)[3] will continue to govern the definition of these cases and the procedures for resolution and NTA issuance.

II. <u>NTA Issuance Required by Statute or Regulation</u>

USCIS will issue an NTA in the following circumstances:[4]

    A. Termination of Conditional Permanent Resident Status and Denials of Form I-751, Petition to Remove the Conditions of Residence (8 CFR 216.3, 216.4, 216.5)[5]
    B. Denials of Form I-829, Petition by Entrepreneur to Remove Conditions (8 CFR 216.6)
    C. Termination of refugee status by the District Director (8 CFR 207.9)
    D. Denials of NACARA 202 and HRIFA adjustments
        1. NACARA 202 adjustment denials (8 CFR 245.13(m));
        2. HRIFA adjustment denials (8 CFR 245.15(r)(2)(i)).
    E. Asylum[6], NACARA 203, and Credible Fear cases:[7]
        1. Asylum referrals (8 CFR 208.14(c)(1));
        2. Termination of asylum or termination of withholding of removal or deportation (8 CFR 208.24(e));[8]
        3. Positive credible fear findings (8 CFR 208.30(f));
        4. NACARA 203 cases where suspension of deportation or cancellation of removal is not granted, and the applicant does not have asylum status, or lawful immigrant or non-immigrant status (8 CFR 240.70(d)).

This PM does not apply to, or change, NTA or notification procedures for Temporary Protected Status cases.[9] Further, Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, processed under the Violence Against Women Act (VAWA), should continue to

---

[2] National Security Cases include cases involving Terrorist Related Grounds of Inadmissibility (TRIG) pursuant to sections 212(a)(3)(B) and 212(a)(3)(F) of the INA.
[3] See, e.g., *Policy for Vetting and Adjudicating Cases with National Security Concerns* (April 11, 2008).
[4] If any Form I-751 or I-829 cases are also Egregious Public Safety cases, they will be referred to ICE in accordance with Section IV.A.1 of this PM.
[5] See the October 9, 2009 internal memo, *Adjudication of Form I-751, Petition to Remove Conditions on Residence Where the CPR Has a Final Order of Removal, Is in Removal Proceedings, or Has Filed an Unexcused Untimely Petition or Multiple Petitions. See also* the April 3, 2009 memo, *I-751 Filed Prior to Termination of Marriage.*
[6] USCIS may issue an NTA when an asylum applicant withdraws his or her asylum application.
[7] This memo does not apply to the Asylum Division's issuance of Form I-863, Notice of Referral to Immigration Judge, to certain stowaways, crewmembers, and VWP individuals who are requesting asylum or withholding of removal; reasonable fear screenings and negative credible fear screenings.
[8] See also section 208(c)(3) of the INA describing removal when asylum is terminated.
[9] See the September 12, 2003 internal memo, *Service Center Issuance of Notice to Appear (Form I-862).*

Exhibit 1
138

Page 3

be processed under existing protocols.  If the VAWA applicant's Form I-485 is denied, this memorandum is applicable in terms of NTA issuance.[10]

III. Fraud Cases with a Statement of Findings Substantiating Fraud

To protect the integrity of the immigration system and address fraud, USCIS will issue NTAs when a Statement of Findings (SOF) substantiating fraud is part of the record.[11]  An NTA will be issued upon final adjudicative action on the petition and/or application or other appropriate eligibility determination.[12]  NTAs will be issued even if the petition and/or application is denied for a ground other than fraud, such as lack of prosecution or abandonment, is terminated based on a withdrawal by the petitioner/applicant, or where an approval is revoked, so long as an SOF substantiating fraud is in the record.

The NTA should include the charge of fraud or misrepresentation, if possible.  The appropriate charge(s) will be determined on a case-by-case basis.  Consultation with local USCIS counsel to determine the appropriate charge(s) is recommended.

IV. Cases to be Referred to ICE for a Decision on NTA Issuance

A. Criminal Cases:  Criminal aliens are a top immigration enforcement priority for the government.  The following guidance recognizes the prioritization and requires USCIS to refer criminals to ICE for action or issue an NTA in accordance with this PM.

1. Egregious Public Safety (EPS) Cases

USCIS will refer all EPS cases, including cases with pending N-400s, to ICE prior to adjudicating the case even if USCIS can deny the petition and/or application on its merits.  An EPS case is defined by USCIS and ICE as a case where information indicates the alien is under investigation for, has been arrested for (without disposition), or has been convicted of, any of the following:

a. Murder, rape, or sexual abuse of a minor as defined in section 101(a)(43)(A) of the INA.
b. Illicit trafficking in firearms or destructive devices as defined in section 101(a)(43)(C) of the INA.
c. Offenses relating to explosive materials or firearms as defined in section 101(a)(43)(E) of the INA.

---

[10] When making determinations, employees must keep in mind USCIS's obligations under 8 USC § 1367, which prohibits the release of any information, outside of DHS, relating to aliens who are seeking or have been approved for immigration benefit(s) under the provisions for battered spouses, children, and parents in the Violence Against Women Act.

[11] Alternatively, ICE will determine whether to issue the NTA if a criminal investigation is conducted, fraud is found, and the investigation results in criminal prosecution.

[12] This includes, but is not limited to, aliens that were granted asylum status by USCIS, adjusted to Lawful Permanent Resident status, presented fraud indicators, were subject to the Post Adjustment Eligibility Review (PAER) process in an Asylum Office, and met the PAER criteria for NTA issuance.

Exhibit 1
139

Page 4

    d. Crimes of violence for which the term of imprisonment imposed, or where the penalty for a pending case, is at least one year as defined in section 101(a)(43)(F) of the INA.

    e. An offense relating to the demand for, or receipt of, ransom as defined in section 101(a)(43)(H) of the INA.

    f. An offense relating to child pornography as defined in section 101(a)(43)(I) of the INA.

    g. An offense relating to peonage, slavery, involuntary servitude, and trafficking in persons as defined in section 101(a)(43)(K)(iii) of the INA.

    h. An offense relating to alien smuggling as described in section 101(a)(43)(N) of the INA

    i. Human Rights Violators, known or suspected street gang members, or Interpol hits.

    j. Re-entry after an order of exclusion, deportation or removal subsequent to conviction for a felony where a Form I-212, Application for Permission to Reapply for Admission into the U.S. after Deportation or Removal, has not been approved.

All EPS cases must be referred to ICE using the procedures outlined below. The case will be referred as soon as it is identified. ICE will have an opportunity to decide if, when, and how to issue an NTA and/or detain the alien. USCIS will not issue an NTA in these cases if ICE declines to issue an NTA. If some other basis unrelated to the EPS concern becomes apparent during the course of adjudication, an NTA may be issued in accordance with this memo.

<u>Referral Process</u>

This referral process is utilized in order to give ICE the opportunity to determine the appropriate course of action before USCIS adjudicates the case. A decision to issue an NTA may directly affect the processing of the pending petition and/or application. Upon issuing the Referral to Immigration and Customs Enforcement (RTI), USCIS will suspend adjudication for 60 days, or until ICE provides notification of its action on the case, whichever is earlier.

In response to the RTI –

    1. ICE may issue an NTA. ICE's issuance of an NTA allows USCIS to proceed with adjudication (unless jurisdiction transfers to EOIR or the pending application is an N-400), taking into account the basis for the NTA.

    2. If ICE does not issue an NTA or otherwise provide notification of its action on the case within 60 days of the RTI, USCIS may resume its adjudication of the case, taking into account the referral grounds.

Exhibit 1
140