Page 5

    a.  If the case is approvable, USCIS will consult with ICE prior to adjudication.

    b.  Once adjudicated, regardless of the decision, USCIS will notify ICE of the result by sending a copy of the original RTI to ICE with a cover memorandum advising of the outcome of the case.

EPS cases referred to ICE prior to adjudication should be called up and reviewed no later than 60 days after referral.  Normally, the case should be adjudicated by USCIS.  However, USCIS retains discretion to place the case on hold for more than 60 days if ICE requests additional time to conduct an investigation.[13]

Office-Specific Processes

  1.  Cases to be adjudicated by Service Centers and the National Benefits Center.  Adjudication will be suspended and the case will immediately be sent to the appropriate Service Center Background Check Unit (BCU).  The BCU will refer the case to the ICE Benefit Fraud Unit (BFU) via an RTI.  A hard copy of the RTI will be placed in the A-file and/or receipt file.  The BCU will retain the file unless ICE requests it or the 60 days expire.

  2.  Cases to be adjudicated by Field Offices.  The Immigration Services Officer (ISO) will suspend adjudication and the case will immediately be referred to the local ICE Special Agent in Charge (SAC) via an RTI.  A hard copy of the RTI will be placed in the A-file and/or receipt file.  A copy of the RTI must also be sent to the ICE BFU.  USCIS will retain the file unless ICE requests the file for their review.

An RTI should include any relevant attachments that USCIS has at the time, such as a copy of the RAP sheet and a copy of the petition and/or application.

  2.  Non-Egregious Public Safety Criminal Cases

If it appears that the alien is inadmissible or removable for a criminal offense not included on the EPS list, USCIS will complete the adjudication and then refer the case to ICE. This section applies to N-400 cases if the N-400 has been denied on good moral character (GMC) grounds based on the criminal offense.[14]  ICE will decide if, and how, it will institute removal proceedings and whether or not it will detain the alien.  USCIS will not issue an NTA if ICE declines to issue an NTA.

---

[13]  Pursuant to 8 CFR 274a.13(d), USCIS must complete processing of an Employment Authorization Document (EAD) within 90 days or issue an interim EAD card valid up to 240 days.  Officers should be mindful of this regulatory timeframe when cases with a pending Form I-765, Application for Employment Authorization, are referred to ICE.

[14]  See Section V of this memo addressing N-400 cases.

Exhibit 1
141

Page 6

If some other basis unrelated to the criminal offense becomes apparent upon return of the case to USCIS, an NTA may be issued in accordance with this memo.

<u>Referral Process</u>

The referral process is used to allow ICE to make a determination whether to issue an NTA, based on the totality of circumstances and its priorities.  ICE will determine the appropriate grounds for removal if an NTA is issued.

Once adjudication is complete, USCIS will send an RTI to ICE.  USCIS will concurrently transmit a copy of the RTI to ICE Headquarters (HQ) Enforcement and Removal Operations (ERO) Criminal Alien Division for statistical monitoring purposes.  If there is any confusion or uncertainty about classifying a case as egregious versus non-egregious, the USCIS ISO should refer the matter as an EPS case using the process described above.

The accompanying A-file will be referred to ICE with the RTI, if the file is in the possession of the referring USCIS office or center.  If the file is not at the referring USCIS office or center, the RTI should include any relevant attachments that USCIS has, such as a copy of the RAP sheet and a copy of the petition and/or application. Where USCIS obtained certified conviction records through normal processing of the case, USCIS will include the records with the RTI, but it will not hold the RTI on a completed case solely to obtain disposition records.  Instead ICE will decide whether, and how, it will obtain such records as part of its decision to issue an NTA.

<u>Office-Specific Processes</u>

1.  Cases adjudicated by Service Centers and the National Benefits Center.  Once adjudication is completed, if the alien is removable on a criminal charge, regardless of the reason for the denial, the file will be referred to the BCU. The BCU will refer the case, along with the A-file and/or receipt file, to the appropriate ERO Field Office Director (FOD) via an RTI.

2.  Cases adjudicated by Field Offices.  Once adjudication is completed, if the alien is removable on a criminal charge, regardless of the reason for the denial, USCIS will prepare an RTI and refer the case, along with the A-file and/or receipt file, to the local ERO FOD.

B.  National Security Entry Exit Registration System (NSEERS) Violator Cases

USCIS will refer all cases in which an application is denied based on an NSEERS violation to ICE for possible NTA issuance.

Exhibit 1
142

Page 7

## V. Cases Involving Form N-400, Application for Naturalization

The following guidance applies to the issuance of NTAs in cases in which applicants for naturalization are removable.  There are two primary situations in which NTAs may be issued in connection with a filed Form N-400.  If the N-400 case involves fraud (documented in the SOF) the procedures found in this section must be followed, rather than the procedures found in Section III (Fraud Cases with a Statement of Findings Substantiating Fraud).  However, the below guidance does not apply to EPS cases.  EPS cases must be referred in accordance with Section IV.A.1 (Egregious Public Safety Cases) of this memo.  Additionally, the below guidance does not apply to non-EPS criminal cases when the N-400 can be denied on GMC grounds based on the criminal act.  These cases must be denied and referred in accordance with Section IV.A.2 (Non-Egregious Public Safety Criminal Cases).

A.  The first situation occurs when the applicant may be eligible to naturalize but is also deportable under section 237 of the INA.  Examples include applicants convicted of aggravated felonies prior to November 29, 1990, or applicants convicted of deportable offenses after obtaining Lawful Permanent Resident (LPR) status that do not fall within the GMC period.  The ISO should:

1.  Make a written recommendation on the issuance of an NTA through a review of the totality of the circumstances to include factors such as: severity of crime, time since crime committed, other criminal conduct, reformation, immigration history including method of entry, length of presence in the U.S., and prior immigration violations, and contributions to society to include the pursuit of education and military service.[15]

2.  Once the ISO has made a recommendation on whether or not to issue an NTA, the case should be forwarded to the N-400 NTA Review Panel (Review Panel), along with the written recommendation.  A Review Panel must be formed in each Field Office and include a local Supervisory Immigration Services Officer (SISO), a local USCIS Office of Chief Counsel attorney, and a district representative.  An attorney from ICE's local Office of Chief Counsel will be invited to participate and will have an advisory role on the panel.  The Review Panel will make the final determination on NTA issuance.  If consensus cannot be reached by the Review Panel, the case will be elevated to the District Director, through the district representative, for a final decision.

3.  If the Review Panel decides to issue an NTA, place the N-400 on hold until removal proceedings have concluded.  Once proceedings have concluded, or if the Review Panel declines to issue an NTA, adjudicate the case appropriately.

---

[15] Additional factors to be taken under consideration can be found in the June 17, 2011 ICE memo, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens.*

Exhibit 1
143

Page 8

    B.  The second situation occurs when it is determined that the applicant was inadmissible at the time of adjustment or admission to the United States, thus deportable under section 237 of the INA and not eligible for naturalization under section 318 of the INA.[16]  The ISO should:

        1.  Make a written recommendation on the issuance of an NTA through a review of the totality of the circumstances to include factors such as: willfulness of actions, fraud factors, length of LPR status, criminal history, and officer error at time of adjustment.

        2.  Once the ISO has made a recommendation on the issuance of the NTA, the case should be forwarded to the Review Panel (see Section V.A.2), along with the written recommendation.  The Review Panel will make the final determination on NTA issuance.  If consensus cannot be reached by the Review Panel, the case will be elevated to the District Director, through the district representative, for a final decision.

        3.  If the Review Panel decides to issue an NTA, place the N-400 on hold until removal proceedings have concluded.  Once removal proceedings have concluded, adjudicate the case appropriately.  If the Review Panel declines to issue an NTA, deny the case under section 318 of the INA.

VI.   <u>Other Cases</u>

    A.  An alien may request NTA issuance to renew an application for adjustment or in certain cases with a denied N-400.  The request must be made in writing.[17]

    B.  An asylum applicant issued an NTA may request NTA issuance for family members not included on the asylum application as dependents for family unification purposes.  The request must be made in writing.[18]

VII.  <u>Exceptions</u>

    Exceptions to the guidance in this PM require concurrence from Regional or Center Directors, who will consult with ICE before issuing an NTA.

---

[16] In the Third Circuit *only* (Pennsylvania, New Jersey, Delaware, and the U.S. Virgin Islands)*,* based on the holding in *Garcia v. Att'y Gen*., 553 F.3d 724 (3d Cir. 2009), if the alien has been an LPR for at least five years, the alien cannot be placed in removal proceedings for fraud or willful misrepresentation of a material fact at time of adjustment, if USCIS could have learned of the fraud or misrepresentation through reasonable diligence before the five year rescission period expired.  Please consult with USCIS counsel if there are questions regarding the applicability of this precedent.

[17] USCIS retains discretion to deny a request.  USCIS should consider ICE actions and determinations when making an NTA issuance decision under this section.

[18] USCIS retains discretion to deny a request.

Exhibit 1
144

PM-602-0050: Revised Guidance for the Referral of Cases and Issuance of NTAs in Cases
Involving Inadmissible and Removable Aliens
Page 9

VIII. Coordination with ICE

> According to the June 2011 ICE memo regarding the exercise of prosecutorial discretion
> consistent with priorities,[19] USCIS will receive notice before an ICE attorney exercises
> prosecutorial discretion and dismisses, suspends, or closes a case.  The local N-400 NTA
> Review Panel will work with ICE to come to a resolution if USCIS does not agree with
> ICE's use of prosecutorial discretion in a particular case.  If concurrence cannot be reached,
> the case should be elevated to the USCIS Office of Chief Counsel in headquarters.

**Implementation**
Each field office must form an N-400 NTA Review Panel and create a process to complete RTIs
and refer EPS and non-EPS criminal cases to ICE.  A written list enumerating the members of
the Review Panel and a document outlining the process of referral must be sent to the appropriate
district office within 30 days of the issuance of this memorandum.

**Use**
This PM is intended solely for the guidance of USCIS personnel in the performance of their
official duties.  It is not intended to, does not, and may not be relied upon to create any right or
benefit, substantive or procedural, enforceable at law, or by any individual or other party in
removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**
Questions or suggestions regarding this PM should be addressed through appropriate channels to
the Field Operations Directorate, Service Center Operations Directorate, or the Refugee,
Asylum, and International Operations Directorate.

---

[19] *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency
for the Apprehension, Detention, and Removal of Aliens*, signed June 17, 2011.

Exhibit 1
145

## <u>Action 17</u>

ICE … issues new detainer form
Immigration Detainer: Notice of Action

Exhibit 1
146

I Share

Receive Updates Enter Email Address   Go



# ICE establishes hotline for detained individuals, issues new detainer form

U.S. Immigration and Customs Enforcement (ICE) sent this bulletin at 12/29/2011 12:47 PM EST

**ICE establishes hotline for detained individuals, issues new detainer form**



Having trouble viewing this email? View it as a Web page.

WASHINGTON — As part of a broader effort to improve our immigration enforcement process and prioritize resources to focus on threats to public safety, repeat immigration law violators, recent border entrants, and immigration fugitives while continuing to strengthen oversight of the nation's immigration detention system and facilitate legal immigration, U.S. Immigration and Customs Enforcement (ICE) today announced new measures to ensure that individuals being held by state or local law enforcement on immigration detainers are properly notified about their potential removal from the country and are made aware of their rights.

The new measures include a new detainer form and the launch of a toll-free hotline — (855) 448-6903 — that detained individuals can call if they believe they may be U.S. citizens or victims of a crime. The hotline will be staffed 24 hours a day, seven days a week by ICE personnel at the Law Enforcement Support Center. Translation services will be available in several languages from 7 a.m. until midnight (Eastern) seven days a week. ICE personnel will collect information from the individual and refer it to the relevant ICE Enforcement and Removal Operations (ERO) Field Office for immediate action.

The new form also includes:

　　• A request that the law enforcement agency (LEA) provide the subject of the detainer a copy of the detainer form and includes a notice advising the subject that ICE intends to assume custody. The notice informs these individuals that ICE has requested the LEA maintain custody beyond the time when they would have otherwise been released by the state or local law enforcement authorities based on their criminal charges or convictions. The notice also includes Spanish, French, Portuguese, Chinese and Vietnamese translations.

　　• Further emphasis that LEAs may only hold an individual for a period not to exceed 48 hours (excluding Saturdays, Sundays, and holidays). It also advises individuals that if ICE does not take them into custody within the 48 hours, they should contact the LEA or entity that is holding them to inquire about their release from state or local custody.

　　• Directions for individuals who may have a civil rights or civil liberties complaint regarding ICE activities.

　　• The new form allows ICE to make the detainer operative only upon the individual's conviction of the offense for which he or she was arrested.

• The new form makes clear that the existence of a detainer should not impact or prejudice the individual's conditions of detention, including matters related to the individual's custody classification, work or quarter assignments.

An immigration detainer (Form I-247) is a notice that DHS issues to federal, state and local LEAs to inform them that ICE intends to assume custody of an individual in the LEA's custody and to request that the LEA notify ICE as soon as possible prior to the time when LEA would otherwise release the individual.

Detainers help ensure that individuals who are convicted of criminal charges or have previously been removed are not released back into the community to potentially commit more crimes. Detainers are critical tools in assisting ICE's identification and removal of criminal aliens, immigration fugitives, illegal re-entrants, recent border crossers and others who have no legal right to remain in the United States.

SHARE

*U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security.*

*ICE is a 21st century law enforcement agency with broad responsibilities for a number of key homeland security priorities. For more information, visit www.ice.gov. To report suspicious activity, call 1-866-347-2423 or complete our tip form.*

Modify subscriptions | Delete profile | Help

 Follow ICE on Facebook    Follow ICE on Twitter    Watch ICE on YouTube

 U.S. Immigration and Customs Enforcement

 Homeland Security

Privacy Policy | GovDelivery is providing this information on behalf of U.S. Department of Homeland Security, and may not use the information for any other purposes.

Powered by GOVDELIVERY

DEPARTMENT OF HOMELAND SECURITY
## IMMIGRATION DETAINER - NOTICE OF ACTION

| Subject ID: | File No: |
|---|---|
| Event #: | Date: |

| TO: (Name and Title of Institution - OR Any Subsequent Law Enforcement Agency) | FROM: (Department of Homeland Security Office Address) |
|---|---|

### MAINTAIN CUSTODY OF ALIEN FOR A PERIOD NOT TO EXCEED 48 HOURS

Name of Alien: _____

Date of Birth: _____ Nationality: _____ Sex: _____

**THE U.S. DEPARTMENT OF HOMELAND SECURITY (DHS) HAS TAKEN THE FOLLOWING ACTION RELATED TO THE PERSON IDENTIFIED ABOVE, CURRENTLY IN YOUR CUSTODY:**

☐ Determined that there is reason to believe the individual is an alien subject to removal from the United States. The individual (check all that apply):

has a prior felony conviction or has been charged with a felony offense;

has three or more prior misdemeanor convictions;

has a prior misdemeanor conviction or has been charged with a misdemeanor for an offense that involves violence, threats, or assaults; sexual abuse or exploitation; driving under the influence of alcohol or a controlled substance; unlawful flight from the scene of an accident; the unlawful possession or use of a firearm or other deadly weapon, the distribution or trafficking of a controlled substance; or other significant threat to public safety;

has been convicted of illegal entry pursuant to 8 U.S.C. § 1325;

has illegally re-entered the country after a previous removal or return;

has been found by an immigration officer or an immigration judge to have knowingly committed immigration fraud;

otherwise poses a significant risk to national security, border security, or public safety; and/or

other (specify): _____.

☐ Initiated removal proceedings and served a Notice to Appear or other charging document. A copy of the charging document is attached and was served on _____ (date).

☐ Served a warrant of arrest for removal proceedings. A copy of the warrant is attached and was served on _____ (date).

☐ Obtained an order of deportation or removal from the United States for this person.

*This action does not limit your discretion to make decisions related to this person's custody classification, work, quarter assignments, or other matters. DHS discourages dismissing criminal charges based on the existence of a detainer.*

### IT IS REQUESTED THAT YOU:

☐ Maintain custody of the subject for a period **NOT TO EXCEED 48 HOURS**, excluding Saturdays, Sundays, and holidays, beyond the time when the subject would have otherwise been released from your custody to allow DHS to take custody of the subject. This request derives from federal regulation 8 C.F.R. § 287.7. For purposes of this immigration detainer, **you are not authorized to hold the subject beyond these 48 hours.** As early as possible prior to the time you otherwise would release the subject, please notify DHS by calling_____during business hours or_____after hours or in an emergency. If you cannot reach a DHS Official at these numbers, please contact the ICE Law Enforcement Support Center in Burlington, Vermont at: (802) 872-6020.

☐ Provide a copy to the subject of this detainer.

☐ Notify this office of the time of release at least 30 days prior to release or as far in advance as possible.

☐ Notify this office in the event of the inmate's death, hospitalization or transfer to another institution.

☐ Consider this request for a detainer operative only upon the subject's conviction.

☐ Cancel the detainer previously placed by this Office on _____ (date).

| _____ | _____ |
|---|---|
| (Name and title of Immigration Officer) | (Signature of Immigration Officer) |

**TO BE COMPLETED BY THE LAW ENFORCEMENT AGENCY CURRENTLY HOLDING THE SUBJECT OF THIS NOTICE:**
Please provide the information below, sign, and return to DHS using the envelope enclosed for your convenience or by faxing a copy to _____. You should maintain a copy for your own records so you may track the case and not hold the subject beyond the 48-hour period.

Local Booking/Inmate #: _____ Latest criminal charge/conviction: _____ (date) Estimated release: _____(date)

Last criminal charge/conviction: _____

**Notice:** Once in our custody, the subject of this detainer may be removed from the United States. If the individual may be the victim of a crime, or if you want this individual to remain in the United States for prosecution or other law enforcement purposes, including acting as a witness, please notify the ICE Law Enforcement Support Center at (802) 872-6020.

| _____ | _____ |
|---|---|
| (Name and title of Officer) | (Signature of Officer) |

DHS Form I-247 (12/12)

Exhibit 1
149

Page 1 of

## NOTICE TO THE DETAINEE

The Department of Homeland Security (DHS) has placed an immigration detainer on you.  An immigration detainer is a notice from DHS informing law enforcement agencies that DHS intends to assume custody of you after you otherwise would be released from custody.  DHS has requested that the law enforcement agency which is currently detaining you maintain custody of you for a period not to exceed 48 hours (excluding Saturdays, Sundays, and holidays) beyond the time when you would have been released by the state or local law enforcement authorities based on your criminal charges or convictions.  **If DHS does not take you into custody during that additional 48 hour period, not counting weekends or holidays, you should contact your custodian** (the law enforcement agency or other entity that is holding you now) to inquire about your release from state or local custody.  **If you have a complaint regarding this detainer or related to violations of civil rights or civil liberties connected to DHS activities, please contact the ICE Joint Intake Center at 1-877-2INTAKE (877-246-8253).  If you believe you are a United States citizen or the victim of a crime, please advise DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.**

## NOTIFICACIÓN A LA PERSONA DETENIDA

El Departamento de Seguridad Nacional (DHS) de EE. UU. ha emitido una orden de detención inmigratoria en su contra. Mediante esta orden, se notifica a los organismos policiales que el DHS pretende arrestarlo cuando usted cumpla su reclusión actual. El DHS ha solicitado que el organismo policial local o estatal a cargo de su actual detención lo mantenga en custodia por un período no mayor a 48 horas (excluyendo sábados, domingos y días festivos) tras el cese de su reclusión penal. **Si el DHS no procede con su arresto inmigratorio durante este período adicional de 48 horas, excluyendo los fines de semana o días festivos, usted debe comunicarse con la autoridad estatal o local que lo tiene detenido** (el organismo policial u otra entidad a cargo de su custodia actual) para obtener mayores detalles sobre el cese de su reclusión. **Si tiene alguna queja que se relacione con esta orden de detención o con posibles infracciones a los derechos o libertades civiles en conexión con las actividades del DHS, comuníquese con el Joint Intake Center (Centro de Admisión) del ICE (Servicio de Inmigración y Control de Aduanas) llamando al 1-877-2INTAKE (877-246-8253). Si usted cree que es ciudadano de los Estados Unidos o que ha sido víctima de un delito, infórmeselo al DHS llamando al Centro de Apoyo a los Organismos Policiales (Law Enforcement Support Center) del ICE, teléfono (855) 448-6903 (llamada gratuita).**

## Avis au détenu

Le département de la Sécurité Intérieure [Department of Homeland Security (DHS)] a émis, à votre encontre, un ordre d'incarcération pour des raisons d'immigration. Un ordre d'incarcération pour des raisons d'immigration est un avis du DHS informant les agences des forces de l'ordre que le DHS a l'intention de vous détenir après la date normale de votre remise en liberté. Le DHS a requis que l'agence des forces de l'ordre, qui vous détient actuellement, vous garde en détention pour une période maximum de 48 heures (excluant les samedis, dimanches et jours fériés) au-delà de la période à la fin de laquelle vous auriez été remis en liberté par les autorités policières de l'État ou locales en fonction des inculpations ou condamnations pénales à votre encontre. **Si le DHS ne vous détient pas durant cette période supplémentaire de 48 heures, sans compter les fins de semaines et les jours fériés, vous devez contacter votre gardien** (l'agence des forces de l'ordre qui vous détient actuellement) pour vous renseigner à propos de votre libération par l'État ou l'autorité locale. **Si vous avez une plainte à formuler au sujet de cet ordre d'incarcération ou en rapport avec des violations de vos droits civils liées à des activités du DHS, veuillez contacter le centre commun d'admissions du Service de l'Immigration et des Douanes [ICE - Immigration and Customs Enforcement] [ICE Joint Intake Center] au 1-877-2INTAKE (877-246-8253). Si vous croyez être un citoyen des États-Unis ou la victime d'un crime, veuillez en aviser le DHS en appelant le centre d'assistance des forces de l'ordre de l'ICE [ICE Law Enforcement Support Center] au numéro gratuit (855) 448-6903.**

## AVISO AO DETENTO

O Departamento de Segurança Nacional (DHS) emitiu uma ordem de custódia imigratória em seu nome. Este documento é um aviso enviado às agências de imposição da lei de que o DHS pretende assumir a custódia da sua pessoa, caso seja liberado. O DHS pediu que a agência de imposição da lei encarregada da sua atual detenção mantenha-o sob custódia durante, no máximo, 48 horas (excluindo-se sábados, domingos e feriados) após o período em que seria liberado pelas autoridades estaduais ou municipais de imposição da lei, de acordo com as respectivas acusações e penas criminais. **Se o DHS não assumir a sua custódia durante essas 48 horas adicionais, excluindo-se os fins de semana e feriados, você deverá entrar em contato com o seu custodiante** (a agência de imposição da lei ou qualquer outra entidade que esteja detendo-o no momento) para obter informações sobre sua liberação da custódia estadual ou municipal. **Caso você tenha alguma reclamação a fazer sobre esta ordem de custódia imigratória ou relacionada a violações dos seus direitos ou liberdades civis decorrente das atividades do DHS, entre em contato com o Centro de Entrada Conjunta da Agencia de Controle de Imigração e Alfândega (ICE) pelo telefone 1-877-246-8253. Se você acreditar que é um cidadão dos EUA ou está sendo vítima de um crime, informe o DHS ligando para o Centro de Apoio à Imposição da Lei do ICE pelo telefone de ligação gratuita (855) 448-6903**

## THÔNG BÁO CHO NGƯỜI BỊ GIAM
### GIỮ

Bộ Quốc Phòng (DHS) đã có lệnh giam giữ quý vị vì lý do di trú. Lệnh giam giữ vì lý do di trú là thông báo của DHS cho các cơ quan thi hành luật pháp là DHS có ý định tạm giữ quý vị sau khi quý vị được thả. DHS đã yêu cầu cơ quan thi hành luật pháp hiện đang giữ quý vị phải tiếp tục tạm giữ quý vị trong không quá 48 giờ đồng hồ (không kể thứ Bảy, Chủ nhật, và các ngày nghỉ lễ) ngoài thời gian mà lẽ ra quý vị sẽ được cơ quan thi hành luật pháp của tiểu bang hoặc địa phương thả ra dựa trên các bản án và tội hình sự của quý vị. **Nếu DHS không tạm giam quý vị trong thời gian 48 giờ bổ sung đó, không tính các ngày cuối tuần hoặc ngày lễ, quý vị nên liên lạc với bên giam giữ quý vị** (cơ quan thi hành luật pháp hoặc tổ chức khác hiện đang giam giữ quý vị) để hỏi về việc cơ quan địa phương hoặc liên bang thả quý vị ra. **Nếu quý vị có khiếu nại về lệnh giam giữ này hoặc liên quan tới các trường hợp vi phạm dân quyền hoặc tự do công dân liên quan tới các hoạt động của DHS, vui lòng liên lạc với ICE Joint Intake Center tại số 1-877-2INTAKE (877-246-8253). Nếu quý vị tin rằng quý vị là công dân Hoa Kỳ hoặc nạn nhân tội phạm, vui lòng báo cho DHS biết bằng cách gọi ICE Law Enforcement Support Center tại số điện thoại miễn phí (855) 448-6903.**

## 对被拘留者的通告

美国国土安全部（DHS）已发出对你的移民监禁令。移民监禁令是美国国土安全部用来通告执法当局，表示美国国土安全部意图在你可能从当前的拘留被释放以后继续拘留你的通知单。美国国土安全部已经向当前拘留你的执法当局要求，根据对你的刑事起诉或判罪的基础，在本当由州或地方执法当局释放你时，继续拘留你，为期不超过 48 小时（星期六、星期天和假日除外）。**如果美国国土安全部未在不计周末或假日的额外 48 小时期限内将你拘留，你应该联系你的监管单位**（现在拘留你的执法当局或其他单位），询问关于你从州或地方执法单位被释放的事宜。**如果你对于这项拘留或关于美国国土安全部的行动所涉及的违反民权或公民自由权有任何投诉，请联系美国移民及海关执法局联合接纳中心（ICE Joint Intake Center），电话号码是 1-877-2INTAKE (877-246-8253)。如果你相信你是美国公民或犯罪被害人，请联系美国移民及海关执法局的执法支援中心（ICE Law Enforcement Support Center），告知美国国土安全部。该执法支援中心的免费电话号码是 (855) 448-6903。**

# **Action 18**

Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems

Exhibit 1
152

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

DEC 21 2012

| | |
|---|---|
| **MEMORANDUM FOR:** | All Field Office Directors<br>All Special Agents in Charge<br>All Chief Counsel |
| **FROM:** | John Morton<br>Director |
| **SUBJECT:** | Civil Immigration Enforcement: Guidance on the Use of Detainers<br>in the Federal, State, Local, and Tribal Criminal Justice Systems |

Purpose

This memorandum provides guidance on the use of U.S. Immigration and Customs Enforcement
(ICE) detainers in the federal, state, local, and tribal criminal justice systems. This guidance
applies to all uses of ICE detainers regardless of whether the contemplated use arises out of the
Criminal Alien Program, Secure Communities, a 287(g) agreement, or any other ICE
enforcement effort. This guidance does not govern the use of detainers by U.S. Customs and
Border Protection (CBP). This guidance replaces Sections 4.2 and 4.5 of the August 2010
*Interim Guidance on Detainers* (Policy Number 10074.1) and otherwise supplements the
remaining sections of that same guidance.

Background

In the memorandum entitled *Civil Immigration Enforcement: Priorities for the Apprehension,
Detention, and Removal of Aliens*, issued in June 2010,[1] ICE set forth clear priorities that guide
its civil immigration enforcement. These priorities ensure that ICE's finite enforcement
resources are dedicated, to the greatest extent possible, to individuals whose removal promotes
public safety, national security, border security, and the integrity of the immigration system.

As ICE's implementation of these priorities continues, it is of critical importance that ICE
remain focused on ensuring that the priorities are uniformly, transparently, and effectively
pursued. To that end, ICE issues the following guidance governing the use of detainers in the
nation's criminal justice system at the federal, state, local, and tribal levels. This guidance will
ensure that the agency's use of detainers in the criminal justice system uniformly applies the

---

[1] As amended and updated by the memorandum of the same title issued March 2, 2011.

Exhibit 1
153

www.ice.gov

Case 3:16-cv-02583-L-BLM   Document 1-4   Filed 10/17/16   PageID.240   Page 14 of 70
*The Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems*
*Page* 2

principles set forth in the June 2010 memorandum and is consistent with the agency's enforcement priorities.

<u>National Detainer Guidance</u>

Consistent with ICE's civil enforcement priorities and absent extraordinary circumstances, ICE agents and officers should issue a detainer in the federal, state, local, or tribal criminal justice systems against an individual only where (1) they have reason to believe the individual is an alien subject to removal from the United States and (2) one or more of the following conditions apply:

- the individual has a prior felony conviction or has been charged with a felony offense;

- the individual has three or more prior misdemeanor convictions;[2]

- the individual has a prior misdemeanor conviction or has been charged with a misdemeanor offense if the misdemeanor conviction or pending charge involves—
  o violence, threats, or assault;
  o sexual abuse or exploitation;
  o driving under the influence of alcohol or a controlled substance;
  o unlawful flight from the scene of an accident;
  o unlawful possession or use of a firearm or other deadly weapon;
  o the distribution or trafficking of a controlled substance; or
  o other significant threat to public safety;[3]

- the individual has been convicted of illegal entry pursuant to 8 U.S.C. § 1325;

- the individual has illegally re-entered the country after a previous removal or return;

- the individual has an outstanding order of removal;

- the individual has been found by an immigration officer or an immigration judge to have knowingly committed immigration fraud; or

- the individual otherwise poses a significant risk to national security, border security, or public safety.[4]

---

[2] Given limited enforcement resources, three or more convictions for minor traffic misdemeanors or other relatively minor misdemeanors alone should not trigger a detainer unless the convictions reflect a clear and continuing danger to others or disregard for the law.

[3] A significant threat to public safety is one which poses a significant risk of harm or injury to a person or property.

[4] For example, the individual is a suspected terrorist, a known gang member, or the subject of an outstanding felony arrest warrant; or the detainer is issued in furtherance of an ongoing felony criminal or national security investigation.

Exhibit 1
154

Case 3:16-cv-02583-L-BLM   Document 1-4   Filed 10/17/16   PageID.241   Page 15 of 70
*The Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems*
*Page* 3

## Revised Detainer Form

To ensure consistent application of this guidance, ICE will revise the DHS detainer form, Form I-247. The revised detainer form, which should be used in all cases once it is issued, will specifically list the grounds above and require the issuing officer or agent to identify those that apply so that the receiving agency and alien will know the specific basis for the detainer. The changes to the form will make it easy for officers and agents to document the immigration enforcement priorities and prosecutorial discretion analysis they have completed leading to the issuance of the detainer.

## Prosecutorial Discretion

This guidance identifies those removable aliens in the federal, state, local, and tribal criminal justice systems for whom a detainer may be considered. It does not require a detainer in each case, and all ICE officers, agents, and attorneys should continue to evaluate the merits of each case based on the June 2011 memorandum entitled *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* and other applicable agency policies.

## Six-Month Review

ICE Field Office Directors, Chief Counsel, and Special Agents in Charge should closely evaluate the implementation and effect of this guidance in their respective jurisdictions for a period of six months from the date of this memorandum. Based on the results of this evaluation, ICE will consider whether modifications, if any, are needed.

## Disclaimer

This guidance does not create or confer any right or benefit on any person or party, public or private. Nothing in this guidance should be construed to limit ICE's power to apprehend, charge, detain, administratively prosecute, or remove any alien unlawfully in the United States or to limit the legal authority of ICE or its personnel to enforce federal immigration law. Similarly, this guidance, which may be modified, superseded, or rescinded at any time, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

This guidance does not cover or control those detainers issued by officers and agents of CBP. Detainers issued by CBP officers and agents shall remain governed by existing CBP policy, and nothing in this guidance is intended to limit CBP's power to apprehend, charge, detain, or remove any alien unlawfully in the United States.

Exhibit 1
155

# **Action 19**

Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children

And

Secretary Napolitano's Memorandum Concerning the Exercise of Prosecutorial Discretion for Certain Removable Individuals Who Entered the United States as a Child

Exhibit 1
156

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland
# Security

June 15, 2012

| | |
|---|---|
| MEMORANDUM FOR: | David V. Aguilar<br>Acting Commissioner, U.S. Customs and Border Protection |
| | Alejandro Mayorkas<br>Director, U.S. Citizenship and Immigration Services |
| | John Morton<br>Director, U.S. Immigration and Customs Enforcement |
| FROM: | Janet Napolitano<br>Secretary of Homeland Security |
| SUBJECT: | Exercising Prosecutorial Discretion with Respect to Individuals<br>Who Came to the United States as Children |

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Exhibit 1
157

**www.dhs.gov**

Our Nation's immigration laws must be enforced in a strong and sensible manner.  They are not designed to be blindly enforced without consideration given to the individual circumstances of each case.  Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language.  Indeed, many of these young people have already contributed to our country in significant ways.  Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal.  No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis.  DHS cannot provide any assurance that relief will be granted in all cases.

1.  With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2.  With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3.  With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

*Office of the Assistant Secretary*
**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:    All Employees

FROM:    John Morton
Director

SUBJECT:    Secretary Napolitano's Memorandum Concerning the Exercise of Prosecutorial Discretion for Certain Removable Individuals Who Entered the United States as a Child

DATE:    June 15, 2012

Today the Secretary of Homeland Security issued the attached memorandum concerning the exercise of prosecutorial discretion for certain removable individuals who entered the United States as a child. Effective immediately, ICE agents and officers are instructed to exercise prosecutorial discretion in a manner that aligns with the Secretary's memorandum. The memorandum states that, with respect to individuals who meet the criteria outlined below, ICE agents and officers should immediately exercise their discretion, on an individual basis, in order to prevent these low priority individuals from being placed into removal proceedings or removed from the United States.

An individual is covered by the Secretary's memorandum if the individual—

- came to the United States under the age of sixteen;
- is not above the age of thirty;
- has continuously resided in the United States for at least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses; and
- does not otherwise pose a threat to national security or public safety.

ICE has also been directed to apply the Secretary's policy, on a case by case basis, to individuals whose cases are pending before the Executive Office for Immigration Review and can demonstrate that they meet the above noted criteria. To better facilitate this process, ICE has been further directed to implement a process within sixty days that allows individuals whose

Exhibit 1
160    www.ice.gov

Page 2

cases are pending before the Executive Office for Immigration Review to request a review of their cases through the ICE Public Advocate.

Additional guidance on the Secretary's memorandum will be issued as soon as possible.  In the meantime, if ICE personnel have questions about the exercise of prosecutorial discretion described in the Secretary's memorandum, they should contact their supervisor or local chief counsel's office.

<u>Disclaimer</u>

As there is no right to the favorable exercise of discretion by the agency, nothing in this memorandum should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of DHS or any of its personnel to enforce federal immigration law. Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

Exhibit 1
161

## **Action 20**

Adjudication of Adjustment of Status Applications for Individuals Admitted to the
United States Under the Visa Waiver Program

Exhibit 1
162

U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

November 14, 2013                                        PM-602-0093

# Policy Memorandum

SUBJECT:   Adjudication of Adjustment of Status Applications for Individuals Admitted to the
United States Under the Visa Waiver Program

## Purpose

This policy memorandum (PM) provides guidance on the adjudication of Form I-485, Application
to Register or Adjust Status, filed by immediate relatives of U.S. citizens who were last admitted
under the Visa Waiver Program (VWP).  This PM updates the Adjudicator's Field Manual (AFM)
by adding a new section (j) to Chapter 10.3 and 23.5 (AFM Update AD11-30).

## Scope

This PM applies to, and is binding on, all U.S. Citizenship and Immigration Services (USCIS)
employees, unless specifically exempt.

## Authority

- Immigration and Nationality Act (INA) sections 217, 245 and 245(c)(4)
- 8 CFR 245.1(b)

## Background

The VWP allows qualifying foreign nationals of designated countries to enter the United States for
up to 90 days to conduct business or for pleasure without first obtaining a visa.[1]  Before a foreign
national is admitted under the VWP, in addition to meeting certain requirements, he or she must
waive the right to contest any action for removal, other than on the basis of an application for

---

[1] INA section 217(a)(1).  Pursuant to INA section 217(a)(1), an individual seeking admission under the VWP applies for
admission as a nonimmigrant, as that term is defined in INA section 101(a)(15)(B), and is provided with a waiver of the
visa requirement.  See INA section 212(a)(7)(B)(i)(II).

Exhibit 1
163

asylum.[2]  Removal of such an individual "shall be effected without referral of the alien to an immigration judge for a determination of deportability."[3]

Unlike those who enter the United States in B-1 Temporary Visitor for Business status or as a B-2 Temporary Visitor for Pleasure, individuals admitted under the VWP cannot extend the duration of their stays.  Under limited circumstances, the local USCIS Director may grant a 30-day period of "Satisfactory Departure"; otherwise, the individual must depart from the United States prior to the expiration of the VWP admission period.[4]

INA section 245(c)(4) renders aliens admitted under the VWP ineligible to adjust status to that of a person admitted for permanent residence.  This provision, however, includes an exception for immediate relatives of U.S. citizens.[5]  Thus, an individual admitted under the VWP who is also an immediate relative is not precluded from seeking adjustment of status, even after the VWP period has expired.

U.S. Immigration and Customs Enforcement (ICE) has authority to order the removal of a VWP overstay, including an immediate relative, under INA section 217(b) and 8 CFR 217.4(b).  Numerous courts of appeals agree that, generally, a VWP overstay may not contest a removal action on the basis that he or she has filed Form I-485.[6]  However, these cases concern only the individual's inability to contest removal.  They do not address whether the Department of Homeland Security (DHS) can, as a matter of discretion, decline to seek the individual's removal and grant adjustment if the individual is eligible. Nor do these decisions preclude a VWP overstay who is not subject to a removal order from filing a Form I-485 with USCIS.

Whether to grant adjustment to an eligible applicant is a matter entrusted to DHS discretion.  USCIS exercises this discretion on behalf of DHS.

**Policy**

USCIS field offices shall adjudicate adjustment of status cases filed by immediate relatives of U.S. citizens who were last admitted to the United States under the VWP, in accordance with section 245 of the INA.  This includes cases where Form I-485 was filed after the 90-day period of admission.  Adjudication shall occur prior to referral to ICE unless:

- ICE has issued a removal order;

---

[2] INA section 217(b)(2). An application for asylum is also deemed to be an application for withholding of removal under INA section 241(b)(3).  See 8 CFR 1208.3(b).

[3] 8 CFR 217.4(b).

[4] In the event of an emergency that prevents the individual from departing the United States by the 90th day, USCIS may provide a period of Satisfactory Departure not to exceed 30 days.  See 8 CFR 217.3(a).

[5] INA section 201(b)(2)(A)(i) defines "immediate relatives" of U.S. citizens and provides that they are not subject to numerical limitations.

[6] See Bradley v. Att'y Gen., 603 F.3d 235 (3rd Cir. 2010); Lang v. Napolitano, 596 F.3d 426 (8th Cir. 2010); Bayo v. Napolitano, 593 F.3d 495 (7th Cir. 2010); McCarthy v. Mukasey, 555 F.3d 459 (5th Cir. 2009); Momeni v. Chertoff, 521 F.3d 1094 (9th Cir. 2008); Zine v. Mukasey, 517 F.3d 535 (8th Cir. 2008); Lacey v. Gonzales, 499 F.3d 514 (6th Cir. 2007); Ferry v. Gonzales, 457 F.3d 1117 (10th Cir. 2006); Schmitt v. Maurer, 451 F.3d 1092 (10th Cir. 2006); Freeman v. Gonzales, 444 F.3d 1031 (9th Cir. 2006); see also Nose v. Att'y Gen., 993 F.2d 75 (5th Cir. 1993).

Exhibit 1
164

- The adjustment applicant is under investigation for, has been arrested for (without disposition), or has been convicted of an egregious public safety offense as described in Part IV of USCIS Policy Memo 602-0050, "Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens" (November 7, 2011); or
- There are fraud and/or national security issues that require resolution.[7]

### Removal Order

INA section 245 provides that applicants who were inspected and admitted or paroled into the United States may be adjusted by the Secretary of Homeland Security,[8] in his or her discretion.[9] If ICE has issued a removal order for violation of INA section 217, USCIS should interpret the entry of that order as the Secretary exercising his or her discretion not to adjust the status of that individual. Therefore, as long as the individual remains subject to a section 217 removal order, USCIS should deny the Form I-485 *as a matter of discretion*. If ICE withdraws or rescinds the removal order, USCIS can then approve the application as appropriate.

### Refusal of Admission

A VWP applicant who is refused admission may also be removed from the United States. Refusal of admission under the VWP is not a "removal" for purposes of future inadmissibility under INA section 212(a)(9)(A) or (C). 8 C.F.R. § 217.4(a)(3). But like someone actually admitted under the VWP, a refused applicant is not entitled to appeal or review of the refusal of admission. INA section 217(b)(1).

The individual's actual removal, however, may be deferred pending an asylum-only proceeding before an immigration judge. Whether the refused applicant can seek adjustment at all would depend on his or her custody status. Adjustment of status would not be available if the individual were detained or released on a basis other than parole under INA section 212(d)(5)(A). But if, in a given case, the individual were paroled under INA section 212(d)(5)(A), that would be "parole" for purposes of adjustment of status under INA section 245(a).

---

[7] Before denying an application, ISO's must follow the guidance contained in the USCIS National Background Identity and Security Checks Operating Procedures (NaBISCOP) Handbook (FOUO) and the Fraud Detection and National Security Standard Operating Procedures (FOUO). These documents are continuously updated and contain links to all relevant PMs.

[8] INA section 245 specifically reads, "The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion . . ." Pursuant to the Homeland Security Act of 2002, tit. XV, Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557 (Supp. IV 2004)), the reference to the Attorney General in section 245(a) of the Act is now deemed to refer to the Secretary of Homeland Security as well.

[9] An alien who was released from custody on conditional parole pursuant to section 236(a)(2)(B) of the Act has not been 'paroled into the United States' for purposes of establishing eligibility for adjustment of status under section 245(a) of the Act, 8 U.S.C. § 1255(a) (2006)." *See Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010). Aliens who were refused admission under the VWP are only eligible for adjustment of status under INA section 245(a) if they were paroled into the United States under INA section 212(d)(5)(A).

Exhibit 1
165

Nevertheless, the refusal of admission under the VWP is a factor that weighs against a finding that the applicant merits a favorable exercise of discretion.  It could be a basis for denying adjustment of status, *as a matter of discretion*, especially if other negative factors are present.

### Denied Applications

A VWP overstay whose case is denied by USCIS has no appeal rights and may not be placed in removal proceedings before an immigration judge.  There is, however, an exception for cases filed within the jurisdiction of the Ninth Circuit.[10]  A VWP overstay who is an immediate relative and whose Form I-485 was filed within the 90-day period of admission within the jurisdiction of the Ninth Circuit is entitled to be placed in removal proceedings under INA section 240 should the adjustment application be denied by USCIS.  In such cases, USCIS will refer the case to ICE for its consideration.  USCIS may also issue an NTA before referring a Ninth Circuit case to ICE, if doing so is consistent with USCIS guidance on NTA issuance.

### Jurisdiction

Since ICE makes the determination to issue an order of removal for a VWP overstay under INA section 217, and the removal of that individual is, "effected without referral of the alien to an immigration judge for a determination of deportability,"[11] jurisdiction over the adjustment of status application remains with USCIS at all times.  There is no appeal from a denial of the adjustment of status application,[12] and the VWP overstay may not renew the application in removal proceedings before an immigration judge.  The only exception, as noted, applies to a case in the Ninth Circuit in which the individual applied for adjustment before the VWP admission expired.[13]


### Implementation

The AFM is updated by:

☞   1. Adding new section 10.3(j);

    2.  Redesignating current section 23.5(p) as section 23.5(q); and

    3.  Adding a new section 23.5(p).

The revisions read as follows.

---

[10] See *Freeman v. Gonzales*, 444 F.3d 1031 (9th Cir. 2006); *Momeni v. Chertoff*, 521 F.3d 1094 (9th Cir. 2008).
[11] 8 CFR 217.4(b).
[12] 8 CFR 245.2(a)(5)(ii).
[13] In the Ninth Circuit, a VWP overstay whose adjustment of status application is filed within the 90-day period of admission and denied by USCIS has the right to renew that application in removal proceedings.  *See Freeman v. Gonzales*, 444 F.3d 1031 (9th Cir. 2006); *see also Momeni v. Chertoff*, 521 F.3d 1094 (9th Cir. 2008).

Exhibit 1
166

**10.3 General Adjudication Procedures**

* * * * *

(j) Adjudicating Form I-485 for Immediate Relatives Last Admitted Under the Visa Waiver Program (VWP) outlined in Immigration and Nationality Act (INA) section 217.

    (1)  VWP overstays

o   Unless ICE has issued a removal order under 8 CFR 217.4(b), USCIS field offices may, as a matter of discretion, grant  adjustment of status applications filed by immediate relatives of U.S. citizens, or by section 245(i) applicants, who are present in the United States pursuant to admission under the VWP if they meet the requirements of INA section 245 and the USCIS Field Operations Standard Operating Procedures (the "SOP") for Form I-485, Application to Register Permanent Residence or Adjust Status.  This includes Form I-485 cases filed after the 90-day period of admission.

o   USCIS should deny the Form I-485, as a matter of discretion, in any case in which ICE has issued a removal order under 8 CFR 217.4(b).  Approval may be a proper exercise of discretion only if ICE rescinds or withdraws the removal order.

o   If, in the course of adjudication, information indicates the individual is under investigation, or has been arrested (without disposition), or has been convicted of an egregious public safety offense as described in USCIS Policy Memo 602-0050 titled "Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens" (November 7, 2011); or, there are fraud and/or national security issues that require resolution, do not adjudicate the case.  Instead, follow the guidance contained in USCIS's National Background Identity and Security Checks Operating Procedures (NaBISCOP) Handbook (FOUO) and the Fraud Detection and National Security Standard Operating Procedures (FOUO).

o   USCIS will refer all denied Form I-485 cases filed by VWP overstays to the local ICE office for consideration of a § 217 removal order.  There is an exception for certain cases filed within the Ninth Circuit.

    • ***Ninth Circuit Jurisdiction*** – A VWP overstay who is an immediate relative and who files a Form I-485 during the 90-day period of admission within the jurisdiction of the Ninth Circuit is entitled to be placed in section 240 removal proceedings if the case is denied.  This includes cases where the beneficiary originally files the Form I-485 while living within the jurisdiction of the Ninth Circuit, but moves out of the Ninth Circuit jurisdiction before the Form I-485 is adjudicated.  If USCIS denies an I-485 filed within the jurisdiction of the Ninth Circuit during the applicant's VWP admission, USCIS will refer the case to the

Exhibit 1
167

local ICE office.  USCIS may issue an NTA before referring the case to ICE, if doing so is consistent with USCIS guidance on NTA issuance.  If, however, the I-485 is filed after the 90-day period of admission, the VWP overstay is not entitled to be placed in removal proceedings if the I-485 is denied, and will be referred to ICE for consideration of a section 217 removal order.

(2)  Refused VWP applicants

o  If an adjustment applicant was refused admission under the VWP, the refused individual's eligibility for adjustment of status depends on his or her custody status.  Adjustment is not available if the individual is detained or has been released on a basis other than parole under INA section 212(d)(5)(A).  In particular, release under INA section 236 is not parole.  *See Matter of Castillo-Padilla,* 25 I&N Dec. 257 (BIA 2010).  If the individual was paroled under INA section 212(d)(5)(A), that is "parole" for purposes of adjustment under INA section 245(a).

o  Before reaching the exercise of discretion, the USCIS officer should examine the basis for the VWP refusal, to determine whether the basis for the refusal supports a finding of inadmissibility.  This inadmissibility, if not waived, would warrant denial of the Form I-485 as a matter of statutory ineligibility.

o  Refusal of admission does not, in the legal sense, result in a "removal" order.  Still, the refused applicant cannot challenge the refusal of admission.  For this reason, the fact that the applicant was refused VWP admission is a negative factor that, in conjunction with any other negative factors and in the absence of favorable equities, could warrant denial of the Form I-485, as a matter of discretion, even if CBP paroled the applicant for asylum-only proceedings.

## 23.5  Adjustment of Status under Section 245 of the Act

* * * * *

(p)  Exercise of discretion in Visa Waiver Program cases.

See chapter 10.3(j) for guidance concerning exercise of discretion in VWP cases.

(q)  Precedent Decisions Pertaining to Adjustment of Status.

* * * * *

Exhibit 1
168

☞   4. The AFM Transmittal Memoranda button is revised by adding, in numerical order, a new entry to read:

| AD11-30 11/14/2013 | Chapter 10.3(j) | Adds guidance regarding the adjudication of adjustment of status applications for immediate relatives who were last admitted under the Visa Waiver Program (VWP). |
| | Chapter 23.5 | Adds cross reference to chapter 10.3(j). |

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions regarding the guidance contained in this PM should be forwarded to the Field Operations Directorate, through appropriate channels.

Exhibit 1
169

## <u>Action 21 and Action 22</u>

Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the
United States as Children and with Respect to Certain Individuals Who Are the
Parents of U.S. Citizens or Permanent Residents

Exhibit 1
170



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

November 20, 2014

MEMORANDUM FOR:    León Rodríguez
    Director
    U.S. Citizenship and Immigration Services

    Thomas S. Winkowski
    Acting Director
    U.S. Immigration and Customs Enforcement

    R. Gil Kerlikowske
    Commissioner
    U.S. Customs and Border Protection

FROM:    Jeh Charles Johnson
    Secretary

SUBJECT:    **Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.* The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

www.dhs.gov

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3] Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1]  Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See,* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2]  INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization");* INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3]  In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas. Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country  since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security.  Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

A.    **Expanding DACA**

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis.  The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years.  On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.**  DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today.  The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981).  That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**.  The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments.  This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014.  Beginning on that date, USCIS should issue all work

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.** In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

### B.   Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

the Immigration and Nationality Act.[4] Deferred action granted pursuant to the program shall be for a period of three years. Applicants will pay the work authorization and biometrics fees, which currently amount to $465. There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement. As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal. Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only an Act of Congress can confer these rights. It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law. This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

# **Action 23**

Policies for the Apprehension, Detention and Removal of Undocumented
Immigrants

Exhibit 1
176

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528



**Homeland
Security**

November 20, 2014

MEMORANDUM FOR:  Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

Leon Rodriguez
Director
U.S. Citizenship and Immigration Services

Alan D. Bersin
Acting Assistant Secretary for Policy

FROM:  Jeh Charles Johnson
Secretary

SUBJECT:  **Policies for the Apprehension, Detention and
Removal of Undocumented Immigrants**

This memorandum reflects new policies for the apprehension, detention, and
removal of aliens in this country. This memorandum should be considered
Department-wide guidance, applicable to the activities of U.S. Immigration and Customs
Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship
and Immigration Services (USCIS). This memorandum should inform enforcement and
removal activity, detention decisions, budget requests and execution, and strategic
planning.

In general, our enforcement and removal policies should continue to prioritize
threats to national security, public safety, and border security. The intent of this
new policy is to provide clearer and more effective guidance in the pursuit of those priorities.
To promote public confidence in our enforcement activities, I am also directing herein
greater transparency in the annual reporting of our removal statistics, to include data that
tracks the priorities outlined below.

Exhibit 1
177
www.dhs..gov

The Department of Homeland Security (DHS) and its immigration components-CBP, ICE, and USCIS-are responsible for enforcing the nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. And, in the exercise of that discretion, DHS can and should develop smart enforcement priorities, and ensure that use of its limited resources is devoted to the pursuit of those priorities. DHS's enforcement priorities are, have been, and will continue to be national security, border security, and public safety. DHS personnel are directed to prioritize the use of enforcement personnel, detention space, and removal assets accordingly.

In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case. While DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding, it is generally preferable to exercise such discretion as early in the case or proceeding as possible in order to preserve government resources that would otherwise be expended in pursuing enforcement and removal of higher priority cases. Thus, DHS personnel are expected to exercise discretion and pursue these priorities at all stages of the enforcement process-from the earliest investigative stage to enforcing final orders of removal-subject to their chains of command and to the particular responsibilities and authorities applicable to their specific position.

Except as noted below, the following memoranda are hereby rescinded and superseded: John Morton, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens,* March 2, 2011; John Morton, *Exercising Prosecutorial Discretion Consistent with the Civil Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens,* June 17, 2011; Peter Vincent, *Case-by-Case Review of Incoming and Certain Pending Cases,* November 17, 2011; *Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems,* December 21, 2012; *National Fugitive Operations Program: Priorities, Goals, and Expectations,* December 8, 2009.

Exhibit 1
178

## A.      Civil Immigration Enforcement Priorities

The following shall constitute the Department's civil immigration enforcement priorities:

### Priority 1 (threats to national security, border security, and public safety)

Aliens described in this priority represent the highest priority to which enforcement resources should be directed:

(a)   aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;

(b)   aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States;

(c)   aliens convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 52l(a), or aliens not younger than 16 years of age who intentionally participated in an organized criminal gang to further the illegal activity of the gang;

(d)   aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status; and

(e)   aliens convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the *Immigration and Nationality Act* at the time of the conviction.

The removal of these aliens must be prioritized unless they qualify for asylum or another form of relief under our laws, or unless, in the judgment of an ICE Field Office Director, CBP Sector Chief or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.

### Priority 2 (misdemeanants and new immigration violators)

Aliens described in this priority, who are also not described in Priority 1, represent the second-highest priority for apprehension and removal. Resources should be dedicated accordingly to the removal of the following:

(a)   aliens convicted of three or more misdemeanor offenses, other than minor traffic offenses or state or local offenses for which an essential element

Exhibit 1
179

was the alien's immigration status, provided the offenses arise out of three separate incidents;

(b)   aliens convicted of a "significant misdemeanor," which for these purposes is an offense of domestic violence;[1] sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or if not an offense listed above, one for which the individual was sentenced to time in custody of 90 days or more (the sentence must involve time to be served in custody, and does not include a suspended sentence);

(c)   aliens apprehended anywhere in the United States after unlawfully entering or re-entering the United States and who cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014; and

(d)   aliens who, in the judgment of an ICE Field Office Director, USCIS District Director, or USCIS Service Center Director, have significantly abused the visa or visa waiver programs.

These aliens should be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or users Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority.

**Priority 3 (other immigration violations)**

Priority 3 aliens are those who have been issued a final order of removal[2] on or after January 1, 2014. Aliens described in this priority, who are not also described in Priority 1 or 2, represent the third and lowest priority for apprehension and removal. Resources should be dedicated accordingly to aliens in this priority. Priority 3 aliens should generally be removed unless they qualify for asylum or another form of relief under our laws or, unless, in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

---

[1] In evaluating whether the offense is a significant misdemeanor involving ..domestic violence," careful consideration should be given to whether the convicted alien was also the <u>victim</u> of domestic violence; if so, this should be a mitigating factor. *See generally,* John Morton, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs,* June 17, 2011.

[2] For present purposes, "final order" is defined as it is in 8 C.F.R. § 1241.1.

Exhibit 1
180

**B.      Apprehension, Detention, and Removal of Other Aliens Unlawfully in the   United States**

Nothing in this memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities herein.  However, resources should be dedicated, to the greatest degree possible, to the removal of aliens described in the priorities set forth above, commensurate with the level of prioritization identified.  Immigration officers and attorneys may pursue removal of an alien not identified as a priority herein, provided, in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest.

**C.      Detention**

As a general rule, DHS detention resources should be used to support the enforcement priorities noted above or for aliens subject to mandatory detention by law.  Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest.  To detain aliens in those categories who are not subject to mandatory detention, DHS officers or special agents must obtain approval from the ICE Field Office Director.  If an alien falls within the above categories and is subject to mandatory detention, field office directors are encouraged to contact their local Office of Chief Counsel for guidance.

**D.      Exercising Prosecutorial Discretion**

Section A, above, requires DHS personnel to exercise discretion based on individual circumstances.  As noted above, aliens in Priority 1 must be prioritized for removal unless they qualify for asylum or other form of relief under our laws, or <u>unless</u>, in the judgment of an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations, there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.  Likewise, aliens in Priority 2 should be removed unless they qualify for asylum or other forms of relief under our laws, or <u>unless</u>, in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority.  Similarly, aliens in Priority 3 should generally be removed unless they qualify for asylum or another form of relief under our laws or, <u>unless</u>, in the judgment of an immigration officer, the alien is not a threat to the

Exhibit 1
181

integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority.

In making such judgments, DHS personnel should consider factors such as: extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child, or a seriously ill relative. These factors are not intended to be dispositive nor is this list intended to be exhaustive. Decisions should be based on the totality of the circumstances.

## E.    Implementation

The revised guidance shall be effective on January 5, 2015. Implementing training and guidance will be provided to the workforce prior to the effective date. The revised guidance in this memorandum applies only to aliens encountered or apprehended on or after the effective date, and aliens detained, in removal proceedings, or subject to removal orders who have not been removed from the United States as of the effective date. Nothing in this guidance is intended to modify USCIS Notice to Appear policies, which remain in force and effect to the extent they are not inconsistent with this memorandum.

## F.    Data

By this memorandum I am directing the Office of Immigration Statistics to create the capability to collect, maintain, and report to the Secretary data reflecting the numbers of those apprehended, removed, returned, or otherwise repatriated by any component of DHS and to report that data in accordance with the priorities set forth above. I direct CBP, ICE, and USCIS to cooperate in this effort. I intend for this data to be part of the package of data released by DHS to the public annually.

## G.    No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

Exhibit 1
182

# **Action 24**

Secure Communities

Exhibit 1
183

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

November 20, 2014

MEMORANDUM FOR:   Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

Megan Mack
Officer
Office of Civil Rights and Civil Liberties

Philip A. McNamara
Assistant Secretary for Intergovernmental Affairs

FROM:   Jeh Charles Johnson
Secretary

SUBJECT:   **Secure Communities**

The Secure Communities program, as we know it, will be discontinued.

The goal of Secure Communities was to more effectively identify and facilitate the removal of criminal aliens in the custody of state and local law enforcement agencies. But the reality is the program has attracted a great deal of criticism, is widely misunderstood, and is embroiled in litigation; its very name has become a symbol for general hostility toward the enforcement of our immigration laws. Governors, mayors, and state and local law enforcement officials around the country have increasingly refused to cooperate with the program, and many have issued executive orders or signed laws prohibiting such cooperation. A number of federal courts have rejected the authority of state and local law enforcement agencies to detain immigrants pursuant to federal detainers issued under the current Secure Communities program.

The overarching goal of Secure Communities remains in my view a valid and important law enforcement objective, but a fresh start and a new program are necessary. As recommended by the Homeland Security Advisory Council Task Force, Secure Communities "must be implemented in a way that supports community policing and sustains the trust of all elements of the community in working with local law enforcement."

1

Exhibit 1
184

www.dhs.gov

Accordingly, I am directing U.S. Immigration and Customs Enforcement (ICE) to discontinue Secure Communities. ICE should put in its place a program that will continue to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the Federal Bureau of Investigation for criminal background checks. However, ICE should only seek the transfer of an alien in the custody of state or local law enforcement through the new program when the alien has been convicted of an offense listed in Priority 1 (a), (c), (d), and (e) and Priority 2 (a) and (b) of the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum, or when, in the judgment of an ICE Field Office Director, the alien otherwise poses a danger to national security. In other words, unless the alien poses a demonstrable risk to national security, enforcement actions through the new program will only be taken against aliens who are convicted of specifically enumerated crimes.

Further, to address the increasing number of federal court decisions that hold that detainer-based detention by state and local law enforcement agencies violates the Fourth Amendment,[1] I am directing ICE to replace requests for <u>detention</u> (*i.e.,* requests that an agency hold an individual beyond the point at which they would otherwise be released) with requests for <u>notification</u> (*i.e.*, requests that state or local law enforcement notify ICE of a pending release during the time that person is otherwise in custody under state or local authority).

If in special circumstances ICE seeks to issue a request for detention (rather than a request for notification), it must specify that the person is subject to a final order of removal or there is other sufficient probable cause to find that the person is a removable alien, thereby addressing the Fourth Amendment concerns raised in recent federal court decisions.

---

[1] *See, e.g., Miranda-Olivares*, 2014 WL 1414305, at *11 (D. Ore. Apr. 11, 2014) (holding that county violated the Fourth Amendment by relying on an ICE detainer that did not provide probable cause regarding removability); *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I. 2014) (concluding that detention pursuant to an immigration detainer "for purposes of mere investigation is not permitted"). *See also Moreno v. Napolitano*, Case No. 11 C 5452, 2014 WL 4814776 (N.D. Ill. Sept. 29, 2014) (denying judgment on the pleadings to the government on plaintiffs' claim that ICE's detainer procedures violate probable cause requirements); *Gonzalez v. ICE*, Case No. 2:13-cv-0441-BRO-FFM, at 12-13 (C.D. Cal. July 28, 2014) (granting the government's motion to dismiss, but allowing plaintiffs to file an amended complaint and noting that plaintiffs "have sufficiently pleaded that Defendants exceeded their authorized power" by issuing "immigration detainers without probable cause resulting in unlawful detention"); *Villars v. Kubiatoski*, --- F. Supp. 2d ----, 2014 WL 1795631, at * 10 (N.D. Ill. May 5, 2014) (rejecting dismissal of Fourth Amendment claims concerning an ICE detainer issued "without probable cause that Villars committed a violation of immigration laws"); *Galarza v. Szalczyk*, Civ. Action No. 10-cv-06815, 2012 WL 1080020, at *14 (E.D. Penn. March 30, 2012) (denying qualified immunity to immigration officials for unlawful detention on an immigration detainer issued without probable cause), rev'd and remanded on other grounds, 745 F.3d 634 (reversing district court's finding of no municipal liability); *Uroza v. Salt Lake City*, No. 2:11CV713DAK, 2013 WL 653968, at *6-7 (D. Utah Feb. 21, 2013) (denying dismissal on qualified immunity grounds where plaintiff claimed to have been held on an immigration detainer issued without probable cause). *Cf. Makowski v. United States*, --- F. Supp. 2d ---, 2014 WL 1089119, at *10 (N.D. Ill. 2014) (concluding that plaintiff stated a plausible false imprisonment claim against the United States where he was held on a detainer without probable cause).

This new program should be referred to as the "Priority Enforcement Program" or "PEP."

Nothing in this memorandum shall prevent ICE from seeking the transfer of an alien from a state or local law enforcement agency when ICE has otherwise determined that the alien is a priority under the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum and the state or locality agrees to cooperate with such transfer.  DHS will monitor these activities at the state and local level, including through the collection and analysis of data, to detect inappropriate use to support or engage in biased policing, and will establish effective remedial measures to stop any such misuses.[2]  I direct the Office of Civil Rights and Civil Liberties to develop and implement a plan to monitor state and local law enforcement agencies participating in such transfers.

Finally, acquainting state and local governments, and their law enforcement components, with this policy change will be crucial to its success.  I therefore direct the Assistant Secretary for Intergovernmental Affairs to formulate a plan and coordinate an effort to engage state and local governments about this and related changes to our enforcement policies.  I am willing to personally participate in these discussions.

[2] *See* Homeland Security Advisory Council, *Task Force on Secure Communities Findings and Recommendations*, September 2011.

3

Exhibit 1
186

# **Action 25**

Provisional Unlawful Presence Waivers of Inadmissibility for Certain Relatives;
Final Rule

Exhibit 1
187



# FEDERAL REGISTER

| Vol. 78 | Thursday, |
| --- | --- |
| No. 2 | January 3, 2013 |

Part III

## Department of Homeland Security

8 CFR Parts 103 and 212
Provisional Unlawful Presence Waivers of Inadmissibility for Certain
Immediate Relatives; Final Rule

Exhibit 1
188

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 103 and 212**

[CIS No. 2519–2011; DHS Docket No. USCIS–2012–0003]

**RIN 1615–AB99**

**Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** On April 2, 2012, U.S. Citizenship and Immigration Services (USCIS) published a proposed rule to amend its regulations to allow certain immediate relatives of U.S. citizens who are physically present in the United States to request provisional unlawful presence waivers prior to departing from the United States for consular processing of their immigrant visa applications. This final rule implements the provisional unlawful presence waiver process. It also finalizes clarifying amendments to other provisions within our regulations. The Department of Homeland Security (DHS) anticipates that these changes will significantly reduce the length of time U.S. citizens are separated from their immediate relatives who engage in consular processing abroad. DHS also believes that this new process will reduce the degree of interchange between the U.S. Department of State (DOS) and USCIS and create greater efficiencies for both the U.S. Government and most provisional unlawful presence waiver applicants.

DHS reminds the public that the filing or approval of a provisional unlawful presence waiver application will *not:* Confer any legal status, protect against the accrual of additional periods of unlawful presence, authorize an alien to enter the United States without securing a visa or other appropriate entry document, convey any interim benefits (*e.g.,* employment authorization, parole, or advance parole), or protect an alien from being placed in removal proceedings or removed from the United States in accordance with current DHS policies governing initiation of removal proceedings and the use of prosecutorial discretion.

**DATES:** This final rule is effective March 4, 2013.

**FOR FURTHER INFORMATION CONTACT:** Roselyn Brown-Frei, Office of Policy and Strategy, Residence and Naturalization Division, U.S. Citizenship and Immigration Services,

Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2099, Telephone (202) 272–1470 (this is not a toll free number).

**Table of Contents**

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Summary of the Major Provisions of the Regulatory Action
  C. Costs and Benefits
II. Legal Authority
III. Background
  A. Notice of Intent
  B. Proposed Rule
  C. Final Rule
IV. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Legal Authority To Implement the Provisional Unlawful Presence Waiver Process
  C. Eligibility for the Provisional Unlawful Presence Waiver
  D. Filing Requirements and Fees
  E. Adjudication
  F. Denials, Motions To Reopen or Reconsider, and Appeals
  G. Effect of Pending or Approved Provisional Unlawful Presence Waivers
  H. Automatic Revocation
  I. Comments on Form I–601A, Application for Provisional Unlawful Presence Waiver
  J. Miscellaneous Comments
  K. Comments on Executive Orders 12866/ 13563 Analysis
V. Regulatory Amendments
VI. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  D. Executive Order 13132
  E. Executive Order 12988 Civil Justice Reform
  F. Paperwork Reduction Act
  G. Regulatory Flexibility Act

**SUPPLEMENTARY INFORMATION:**

**I. Executive Summary**

*A. Purpose of the Regulatory Action*

1. Need for the Regulatory Action

Certain spouses, children, and parents of U.S. citizens (immediate relatives) who are in the United States are not eligible to apply for lawful permanent resident (LPR) status while in the United States. Instead, these immediate relatives must travel abroad to obtain an immigrant visa from the Department of State (DOS) to return to the United States to request admission as an LPR, and, in many cases, also must request from the Department of Homeland Security (DHS) a waiver of inadmissibility as a result of their unlawful presence in the United States. Currently, these immediate relatives

cannot apply for the waiver until after their immigrant visa interviews abroad. As a result, these immediate relatives must remain outside of the United States, separated from their U.S. citizen spouses, parents, or children, while USCIS adjudicates their waiver applications. In some cases, waiver application processing can take well over one year, prolonging the separation of these immediate relatives from their U.S. citizen spouses, parents, and children. In addition, the action required for these immediate relatives to obtain LPR status in the United States— departure from the United States to apply for an immigrant visa at a DOS consulate abroad—is the very action that triggers the unlawful presence inadmissibility grounds under section 212(a)(9)(B)(i) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(a)(9)(B)(i). As a result of the often lengthy processing times and uncertainty about whether they qualify for a waiver of the unlawful presence inadmissibility grounds, immediate relatives who may qualify for an immigrant visa are reluctant to proceed abroad to seek an immigrant visa.

2. Provisional Unlawful Presence Waiver Process

Through this final rule, DHS is changing its current process for the filing and adjudication of certain waivers of inadmissibility for eligible immediate relatives of U.S. citizens, who are physically present in the United States but will proceed abroad to obtain their immigrant visas. The new waiver process will allow eligible immediate relatives to apply for a provisional unlawful presence waiver while they are still in the United States and before they leave to attend their immigrant visa interview abroad. DHS anticipates that this new provisional unlawful presence waiver process will significantly reduce the time that U.S. citizens are separated from their immediate relatives. USCIS's approval of an applicant's provisional unlawful presence waiver prior to departure also will allow the DOS consular officer to issue the immigrant visa without further delay, if there are no other grounds of inadmissibility and if the immediate relative is otherwise eligible to be issued an immigrant visa.

3. Legal Authority

The Homeland Security Act of 2002, Public Law 107–296 (Homeland Security Act of 2002), section 102, 116 Stat. 2135, 6 U.S.C. 112, and INA section 103, 8 U.S.C. 1103, charge the Secretary of Homeland Security

Exhibit 1
189

537

(Secretary) with the administration and enforcement of the immigration and naturalization laws. The Secretary is implementing this provisional unlawful presence waiver process under the broad authority to administer DHS and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority. The Secretary's discretionary authority to waive the ground of inadmissibility for unlawful presence can be found in INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The regulation governing certain inadmissibility waivers is 8 CFR 212.7. The fee schedule for provisional unlawful presence waiver applications is found at 8 CFR 103.7(b)(1)(i)(AA).

*B. Summary of the Major Provisions of the Regulatory Action*

On April 2, 2012, U.S. Citizenship and Immigration Services (USCIS) published a Notice of Proposed Rulemaking (NPRM), which outlined the provisional unlawful presence waiver process. *See* Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 77 FR 19902 (April 2, 2012). After careful consideration of the public comments, DHS adopts most of the proposed regulatory amendments without change, except for the provisions noted below:

1. Section 103.7(c)(3)(i)

In the proposed rule, DHS noted in the supplementary text that applicants for a provisional unlawful presence waiver cannot seek a fee waiver for the Form I–601A filing fees or the required biometric fees. *See* 77 FR at 19910. DHS incorrectly referenced proposed regulatory text at 8 CFR 103.7(b)(1)(i)(C) and inadvertently omitted the correct citation to the regulatory provision being amended and the amendatory text. DHS has corrected this error and has included an amendment to 8 CFR 103.7(c)(3) in this final rule to clarify that fee waivers are not available for the biometric or filing fees for the Form I–601A. *See* section 103.7(c)(3)(i).

2. Section 212.7(a)(4)(iv)

DHS proposed an amendment to 8 CFR 212.7(a)(4) to provide that termination of an alien's conditional LPR status also would result in automatic revocation of an approved waiver of inadmissibility. *See* 77 FR at 19912 and 19921. Several commenters noted that INA section 216(f), 8 U.S.C. 1186a(f), only allows for automatic revocation of waivers of inadmissibility approved under INA sections 212(h)

and (i), 8 U.S.C. 1182(h) and (i). DHS agrees and has revised the amendment to 8 CFR 212.7(a)(4) to clarify that automatic revocation of approved waivers upon termination of conditional resident status only applies to approved waivers based on INA sections 212(h), 8 U.S.C. 1182(h) (waivers for certain criminal offenses), and INA section 212(i), 8 U.S.C. 1182(i) (waivers for fraud or willful misrepresentation of a material fact). *See* section 212.7(a)(4)(iv).

3. Section 212.7(e)(1)

During discussions about the proposed provisional unlawful presence waiver process and how it would affect aliens in removal proceedings, a question arose regarding the authority of Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) immigration judges (IJs) and whether IJs would adjudicate Forms I–601A for aliens in removal proceedings. DHS determined that it would be more efficient and appropriate to have Form I–601A waivers centralized and adjudicated by one agency, USCIS, especially given the intended streamlined nature of the process and the need for close coordination with DOS once a waiver is decided. DHS therefore added a new paragraph to clarify that the *Application for Provisional Unlawful Presence Waiver,* Form I–601A, will be filed only with USCIS, even if an alien is in removal proceedings before EOIR. *See* section 212.7(e)(1).

4. Section 212.7(e)(2)

DHS restructured this provision and added language to make clear that approval of the provisional unlawful presence waiver is discretionary and does not constitute a grant of any lawful immigration status or create a period of stay authorized by the Secretary for purposes of INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). *See* section 212.7(e)(2)(i). DHS also clarified that a pending or approved provisional unlawful presence waiver does not authorize any interim benefits such as employment authorization or advance parole. *See* section 212.7(e)(2)(ii).

5. Section 212.7(e)(3)

Many commenters asked DHS to expand eligibility for the provisional unlawful presence waiver process to other categories of aliens seeking to immigrate to the United States. DHS considered the commenters' suggestions but is limiting the provisional unlawful presence waiver to immediate relatives of U.S. citizens. After assessing the effectiveness of the new provisional

unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process to other categories.

6. Former Section 212.7(e)(4)(ii)(H)

DHS initially proposed to reject a provisional unlawful presence waiver application if an alien has not indicated on the application that the qualifying relative is a U.S. citizen spouse or parent. *See* 77 FR at 19922. DHS has determined that this criterion is more appropriate for an adjudicative decision and that this assessment should not be made through a review during the intake process. Thus, DHS has deleted this rejection criterion in the final rule.

7. Section 212.7(e)(4)(iv)

DHS proposed excluding aliens from the provisional unlawful presence waiver process who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that the Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may

Exhibit 1
190

reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State initially acted to schedule an initial immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based, prior to the date of publication of this final rule. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

### 8. Section 212.7(e)(4)(v)

DHS initially proposed excluding all aliens who were in removal proceedings from the provisional unlawful presence waiver process, except those whose: (1) Removal proceedings had been terminated or dismissed; (2) Notices to Appear (NTAs) had been cancelled; or (3) removal proceedings had been administratively closed but subsequently were reopened to grant voluntary departure. *See* 77 FR at 19922. In this final rule, DHS has not used the initial proposed categories of aliens above. Rather, DHS has decided to allow aliens in removal proceedings to participate in this new provisional unlawful presence waiver process if their removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. *See* section 212.7(e)(4)(v). Aliens whose removal proceedings are terminated or dismissed are covered in the general population of aliens who are eligible to apply for a provisional unlawful presence waiver. Aliens who have had their NTAs cancelled by ICE are also covered in the general population of aliens who are eligible to apply for a provisional unlawful presence waiver, since their removal proceedings were never initiated through filing of an NTA with EOIR.

Through this final rule, the Form I–601A and its accompanying instructions, and additional information published on the USCIS Web site, DHS also will notify such applicants that, if granted the provisional unlawful presence waiver, applicants should seek termination or dismissal of their removal proceedings. The request for termination or dismissal should be

granted *before* they depart for their immigrant visa interviews to avoid possible delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. *See* section 212.7(e)(2). Finally, DHS has made conforming changes to the filing requirements in section 212.7(e)(5)(i) to include aliens who are in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A.[1]

### 9. Section 212.7(e)(4)(ix)

For operational reasons, DHS initially proposed rejecting applications filed by aliens who previously filed a Form I–601A with USCIS. DHS designed the provisional unlawful presence waiver process to streamline waiver and immigrant visa processing by closely tying adjudication of the Form I–601A to the National Visa Center (NVC) immigrant visa processing schedule. DHS considered the potential impact of multiple filings on this schedule, the possible delays to the immigrant visa process, and the potential for agency backlogs.

Many commenters, however, expressed concern that limiting the program to one-time filings could potentially exclude individuals who otherwise would qualify for the provisional unlawful presence waiver.

Upon consideration of these comments, DHS agrees that an alien could have compelling reasons for filing another provisional unlawful presence application, especially in cases where an alien's circumstances have changed or the alien was a victim of individuals or entities not authorized to practice immigration law. DHS agrees that a one-time filing limitation is too restrictive and is removing the single filing limitation. If an individual's provisional unlawful presence waiver request is

[1] DHS recognizes that this is a departure from the long-standing principle in immigration law and policy that aliens must establish eligibility not only at the time of filing but also up until the time USCIS adjudicates the case. *See, e.g., Matter of Isidro-Zamorano,* 25 I&N Dec. 829, 830–31 [BIA 2012] (explaining the "well established" principle that application for an immigration benefit is "continuing" and that eligibility is determined at the time of adjudication, not at the time of application). However, DHS believes that a departure from this general principle is permissible and warranted in this limited context, especially since the provisional unlawful presence waiver process is purely discretionary. Furthermore, the provisional unlawful presence waiver is not valid while the alien remains in the United States. It only takes effect after the alien departs from the United States, appears for his or her immigrant visa interview, and is determined by DOS to be otherwise eligible for an immigrant visa, in light of the approved I–601A provisional unlawful presence waiver.

denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing prior to final adjudication, or whose Form I–601A is denied, can apply for a traditional waiver by filing Form I–601, Application for Waiver of Grounds of Inadmissibility, with the USCIS Lockbox, after he or she attends the immigrant visa interview abroad and after DOS conclusively determines that the individual is inadmissible on a ground(s) that is waivable. DHS, therefore, has removed this provision from the final rule.

### 10. Section 212.7(e)(5)(ii)

DHS corrected a typographical error in the prefatory language to this section, removing the term "application" the second time it appears in the paragraph. *See* section 212.7(e)(5)(ii).

### 11. Section 212.7(e)(5)(ii)(A)

DHS proposed a list of rejection criteria for Forms I–601A filed at the Lockbox, including the criterion to reject for failure to pay the required or correct fee for the waiver application. *See* 77 FR at 19922. DHS inadvertently referenced the biometric fee as a basis for rejection in the supplementary information. *See* 77 FR at 19911. DHS has modified the regulatory text to make clear that a Form I–601A will only be rejected for failure to pay the required or correct application filing fee and not the biometric fee. *See* section 212.7(e)(5)(ii)(A).

### 12. Section 212.7(e)(5)(ii)(G)

DHS proposed rejecting provisional unlawful presence waiver applications filed by aliens who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially

Exhibit 1
191

Case 3:16-cv-02583-L-BLM   Document 1-4   Filed 10/17/16   PageID.278   Page 52 of 70

acted to schedule the applicant for his or her immigrant visa interview (i.e., the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her immigrant visa interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien if USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule an immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner. *See* section 212.7(e)(5)(ii)(G).

### 13. Section 212.7(e)(9)

DHS initially proposed that aliens who were denied a provisional unlawful presence waiver could not file a new Form I–601A. Instead, such aliens would have to leave the United States for their immigrant visa interviews and file a Form I–601, Application for Waiver of Grounds of Inadmissibility, after the Department of State determined they were inadmissible. Some commenters were concerned that limiting aliens to a single filing of an I–601A would potentially bar aliens from

qualifying for a provisional unlawful presence waiver, especially when they may have experienced changed circumstances that would result in extreme hardship to the U.S. citizen spouse or parent. In light of these concerns, DHS has amended this final rule to allow aliens who are denied a provisional unlawful presence waiver to file another Form I–601A, based on the original approved immigrant visa petition. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another Form I–601A under paragraph (e) provided the alien meets all of the requirements. The alien's case must be pending with the Department of State, and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

### 14. Section 212.7(e)(10)

DHS has amended this provision to allow an applicant to withdraw a previously-filed provisional unlawful presence waiver application before final adjudication and file another Form I–601A, in accordance with the form instructions and with the required filing and biometric services fees. *See* section 212.7(e)(10).

### 15. Section 212.7(e)(14)(iv)

DHS clarified the language in section 212.7(e)(14)(v) to specify that a provisional unlawful presence waiver is automatically revoked if the alien, at any time before or after the approval of the provisional unlawful presence waiver, or before the immigrant visa is issued, reenters or attempts to reenter the United States without being admitted or paroled. *See* section 212.7(e)(14)(iv).

### C. Costs and Benefits

This final rule is expected to result in a reduction of the time that U.S. citizens are separated from their immediate relatives, thus reducing the financial and emotional hardship for these families. In addition, the Federal Government should achieve increased efficiencies in processing immigrant visas for individuals subject to the unlawful presence inadmissibility bars under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). We expect costs to the Federal government of the provisional unlawful presence waiver process to be offset by the additional fee revenue collected for form processing.

DHS estimates the discounted total ten-year cost of this rule will range from approximately $196 million to

approximately $538.1 million at a seven percent discount rate. Compared to the current waiver process, this rule requires that provisional unlawful presence waiver applicants submit biometric information. Included in the total cost estimate is the cost of collecting biometrics, which DHS estimates will range from approximately $32.9 million to approximately $56.6 million discounted at seven percent over ten years. Also included in the total cost estimate are the costs faced by those who choose to file new provisional unlawful presence waiver applications based on the same approved immediate relative petition if their original Form I–601A is denied or withdrawn, which DHS decided to allow in response to public comments to the proposed rule. Individuals that file a new Form I–601A will still face the biometric and Form I–601A filing fees and opportunity costs, which we estimate will range from approximately $56.2 million to approximately $96.7 million discounted at seven percent over ten years. In addition, as this rule significantly streamlines the current process, DHS expects that additional applicants will apply for the provisional unlawful presence waiver. To the extent that this rule induces new demand for immediate relative immigrant visas, additional immigration benefit forms, such as the Petition for Alien Relative, Form I–130, will be filed compared to the pre-rule baseline. These additional forms will involve fees being paid by applicants to the Federal Government for form processing and additional opportunity costs of time being incurred by applicants to provide the information required by the forms. The cost estimate for this rule also includes the impact of this induced demand, which DHS estimates will range from approximately $106.9 million to approximately $384.8 million discounted at seven percent over ten years.

Estimates for the costs of the rule were developed assuming that current demand for requesting waivers of grounds of inadmissibility based only on unlawful presence is constrained because of concerns that families may endure lengthy separations under the current system. Due to uncertainties as to the degree of the current constraint of demand, DHS used a range of constraint levels with corresponding increases in demand to estimate the costs. The costs for each increase in demand are summarized below.

Exhibit 1
192

**540**     **Federal Register** / Vol. 78, No. 2 / Thursday, January 3, 2013 / Rules and Regulations

### ESTIMATED INCREASE IN COSTS WITH AN INCREASE IN DEMAND OF:

| | 25% | 50% | 75% | 90% |
|---|---|---|---|---|
| **Cost of Biometrics Collection and Processing** | | | | |
| 10 year Costs Undiscounted .............................................. | $46,803,460 | $59,088,534 | $71,373,907 | $78,746,295 |
| Total 10 year Costs Discounted at 7% ............................ | 32,907,683 | 42,030,423 | 51,153,460 | 56,628,050 |
| Total 10 year Costs Discounted at 3% ............................ | 39,926,220 | 50,653,297 | 61,380,675 | 67,818,069 |
| **Cost of Biometrics Collection and Processing and Form I–601A for Re-filers** | | | | |
| 10 year Costs Undiscounted .............................................. | $79,942,420 | $100,924,521 | $121,908,872 | $134,499,783 |
| Total 10 year Costs Discounted at 7% ............................ | 56,207,656 | 71,788,866 | 87,371,675 | 96,721,450 |
| Total 10 year Costs Discounted at 3% ............................ | 68,195,707 | 86,516,943 | 104,840,098 | 115,834,193 |
| **Costs of Applications for the Additional (Induced) Demand for Immigrant Visas** | | | | |
| 10 year Costs Undiscounted .............................................. | $143,931,692 | $287,854,640 | $431,775,838 | $518,143,249 |
| Total 10 year Costs Discounted at 7% ............................ | 106,881,772 | 213,757,395 | 320,631,489 | 384,766,730 |
| Total 10 year Costs Discounted at 3% ............................ | 125,678,197 | 251,348,945 | 377,018,045 | 452,432,274 |
| **Total Costs to New Applicants** | | | | |
| 10 year Costs Undiscounted .............................................. | $270,677,572 | $447,867,695 | $625,058,617 | $731,389,326 |
| Total 10 year Costs Discounted at 7% ............................ | 195,997,110 | 327,576,683 | 459,156,625 | 538,116,229 |
| Total 10 year Costs Discounted at 3% ............................ | 233,800,123 | 388,519,186 | 543,238,818 | 636,084,535 |

## II. Legal Authority

The Homeland Security Act of 2002, Public Law 107–296 (Homeland Security Act of 2002), section 102, 116 Stat. 2135, 6 U.S.C. 112, and section 103 of the INA, 8 U.S.C. 1103, charge the Secretary with administration and enforcement of the immigration and naturalization laws. The Secretary is implementing this provisional unlawful presence waiver process under the broad authority to administer DHS and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority. The Secretary's discretionary authority to waive the ground of inadmissibility for unlawful presence can be found in INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The regulation governing certain inadmissibility waivers is 8 CFR 212.7. The fee schedule for provisional unlawful presence waiver applications is found at 8 CFR 103.7(b)(1)(i)(AA).

## III. Background

### A. Notice of Intent

On January 9, 2012, DHS published a notice in the **Federal Register**— Provisional Waivers of Inadmissibility for Certain Immediate Relatives of U.S. Citizens, 77 FR 19902 (Jan. 9, 2012)— announcing its intent to change the current process for certain applications for waivers of inadmissibility filed in connection with an immediate relative immigrant visa application. The notice explained the proposed process that DHS was considering and that DHS

would further develop a proposal, which it would ultimately finalize through the rulemaking process.

On January 10, 2012, USCIS conducted a stakeholder engagement to discuss the Notice of Intent. More than 900 people participated via telephone and in person. USCIS provided an overview of how the proposed process changes may affect filing and adjudication. USCIS also addressed questions from stakeholders. Topics covered included eligibility, procedures, and consequences of an approval or denial of a provisional unlawful presence waiver.

### B. Proposed Rule

On April 2, 2012, DHS published a proposed rule in the **Federal Register**, proposing to amend the regulations to revise the process for applying for waivers of inadmissibility. *See 77 FR 19902.* DHS received over 4,000 public comments to the proposed rule. Comments were submitted by individuals, immigrant advocacy groups, attorneys, accredited representatives, religious organizations and leaders, individuals in academia, Members of Congress, and members of the media. Some comments also were submitted through mass mailing campaigns or petitions, expressing support for, or opposition to, the provisional unlawful presence waiver process. DHS counted each petition or mass mailing as one comment, but acknowledged the number of signatures associated with each comment.

Opinions on the proposed rule varied. A large number of comments (3,442)

were favorable and supported the implementation of the new provisional unlawful presence waiver process. A few hundred commenters (430) opposed the proposed rule, in many instances because of a misperception that the provisional unlawful presence waiver process would grant legal status to aliens not lawfully present in the United States and allow them to remain in the United States permanently. DHS also received 310 comments, some of which did not address any aspect of the proposed rule or reflect a commenter's support or opposition to the proposed rule. These 310 commenters also did not make any specific suggestions that related to the proposed rule. Finally, DHS received a comment in the form of a petition signed by 118,593 individuals who opposed the proposed rule; the signed petition, however, reflected the same misperception [2] about the provisional unlawful presence waiver process as seen in some of the comments from others who opposed the rule.

In preparing this final rule, DHS considered these public comments and other relevant materials contained in the docket. All comments may be reviewed at the Federal Docket Management System (FDMS) at *http://*

---

[2] The petition incorrectly summarized the substance and nature of the proposed rule. The petition also erroneously concluded that the provisional unlawful presence waiver process granted aliens not lawfully present in the United States a temporary legal status in the United States and put them on the "fast track" to permanent legal status—neither of which can occur under this final rule.

Exhibit 1
193

*www.regulations.gov,* docket number USCIS–2012–0003.

## C. Final Rule

This final rule adopts most of the regulatory amendments set forth in the proposed rule without change. The rationale for the proposed rule and the reasoning provided in its preamble remain valid with respect to these regulatory amendments. DHS also has made several clarifying changes to the regulatory text, based on suggestions from commenters and on policy decisions made after publication of the proposed rule. The changes to the regulatory text are summarized in Section V below. This final rule also adopts, without change, the regulatory amendment clarifying 8 CFR 212.7(a)(1) and (3). This final rule does not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the provisional unlawful presence waiver process or the clarifying amendments to 8 CFR 212.7(a). This final rule also does not change the procedures or policies of other DHS components or federal agencies, or resolve issues outside the scope of this rulemaking. After assessing the effectiveness of the provisional unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process in the future.

## IV. Public Comments on the Proposed Rule [3]

### A. Summary of Public Comments

The 60-day public comment period for the proposed rule ended on June 1, 2012. Commenters included individuals, immigrant advocacy groups, attorneys, and accredited representatives, as well as religious organizations and leaders, individuals in academia, Members of Congress, and members of the media. Some comments also were submitted through mass mailing campaigns or petitions, expressing support for, or opposition to, the provisional unlawful presence waiver process. The majority of comments came from supporters of the proposed rule who agreed that it would promote family unity and reduce the length of time immediate relatives (spouses, children, and parents of a U.S. citizen over the age of 21 years) would

be separated from the U.S. citizen petitioner. Many also agreed that it would relieve the financial burdens that the current process places on American families, encourage individuals to obtain a lawful status, and benefit the United States generally. Numerous commenters shared their personal stories about the hardships they experienced after being separated from their loved ones, and applauded DHS for taking a step to reduce such scenarios in the future.

Several commenters strongly disagreed with the proposed provisional unlawful presence waiver process, arguing that the Executive Branch did not have the legal authority to make the proposed changes without approval from Congress. Other commenters argued that the proposed rule was unconstitutional. Many commenters who opposed the change believed that the current immigration laws are not properly enforced and that DHS favors illegal aliens over legal immigrants. Some commenters also believed that DHS was rewarding illegal behavior by publishing this rule. These commenters stated that this rule would only encourage illegal immigration and fraud, would be harmful to the American economy, and that the Federal Government's money would be better invested in assisting U.S. citizens and legal immigrants, rather than illegal aliens and their U.S. citizen families. A few commenters opposed the proposed rule because they believed that it is unfair to exclude individuals outside the United States from eligibility for the proposed provisional unlawful presence waiver process or because the requirements articulated in the rule (for example, the lack of protection from removal) were too stringent or not helpful.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses them in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by the commenters. DHS received few or no comments on the following topics: (1) The rejection criteria, (2) withdrawals, and (3) the validity of an approved provisional unlawful presence waiver.

### B. Legal Authority To Implement the Provisional Unlawful Presence Waiver Process

Several commenters questioned DHS's legal authority to implement the provisional unlawful presence waiver process. Commenters argued that the proposed rule was unconstitutional and that it was the role of Congress, not the

Executive Branch, to create immigration laws and policy. DHS disagrees with the view that this rule exceeds the Secretary's legal authority.

Congress has plenary authority over immigration and naturalization and, through its legislative power, may enact legislation establishing immigration law and policy. *See, e.g., Arizona* v. *United States,* 132 S. Ct. 2492, 2498 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' U.S. Const., Art. 1, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations.") (citations omitted); *see also Fiallo* v. *Bell,* 430 U.S. 787, 792 (1977). The Executive Branch, which includes DHS, is charged with implementing the laws passed by Congress. Through section 102 of the Homeland Security Act of 2002, 106 Stat. 2135, 6 U.S.C. 112, and INA section 103, 8 U.S.C. 1103, Congress has specifically charged the Secretary with the administration and enforcement of the immigration and naturalization laws. The Secretary is authorized to promulgate rules and "perform such other acts as he deems necessary for carrying out his authority" based upon considerations rationally related to the immigration laws. INA section 103(a)(3), 8 U.S.C. 1103(a)(3). The Secretary has broad discretion to determine the most effective way to administer the laws. *See, e.g., Narenji* v. *Civiletti,* 617 F.2d 745, 747 (D.C. Cir. 1979) (observing that the INA "need not specifically authorize each and every action taken by the Attorney General [(now Secretary of Homeland Security)], so long as his action is reasonably related to the duties imposed upon him"); *see also Arizona,* 132 S. Ct. at 2499 (noting "broad discretion exercised by immigration officials" under the immigration laws).

The provisional unlawful presence waiver process is not a substantive change to the immigration laws but a procedural change in the way that a specific type of waiver application can be filed with USCIS. Generally, individuals who are required by law to obtain a waiver of inadmissibility must apply for the waiver through the procedures prescribed by the Secretary, as permitted under the Homeland Security Act and the INA. Current waiver filing procedures for an individual processing an immigrant visa application abroad at a consular post require the individual to apply for a waiver of grounds of inadmissibility

---

[3] USCIS received some comments prior to the official comment period, including two letters signed by over 200 immigrant advocate organizations. Most of the concerns or suggestions made by the pre-publication commenters were captured through other public comments submitted during the official period.

Exhibit 1
194

while outside the United States and after his or her immigrant visa interview. Under this final rule, DHS is permitting a category of aliens—certain immediate relatives of U.S. citizens who will be pursuing an immigrant visa application at a consular post abroad—to file an application for a provisional unlawful presence waiver of inadmissibility due to unlawful presence under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i), while still in the United States. By creating these new filing procedures, DHS anticipates that the immigrant visa waiver process will become more efficient for the U.S. Government and for U.S. citizens and their immediate relatives. It will reduce the length of time American families are separated while the immigrant visa applicant is going through the immigrant visa process. The applicant may remain in the United States with his or her family until the time the applicant must depart from the United States to attend his or her immigrant visa interview.

## C. Eligibility for the Provisional Unlawful Presence Waiver

### 1. Preference Categories

A large number of commenters focused on who is eligible to participate in the provisional unlawful presence waiver process. Some commenters believed the proposed rule was too restrictive and excluded many individuals who also could benefit from the new process. Others asked why DHS was not expanding eligibility to all families and their close immediate or distant relatives such as in-laws, grandparents, aunts and uncles. The commenters also asked why DHS did not include all family-sponsored or employment-based immigrants, especially if aliens in a particular immigrant visa category had current visa availability. The commenters argued that there was no discernible difference between immediate relatives and preference aliens who have current visa availability. The commenters also indicated that the hardships of lengthy family separation are just as compelling for LPR families as they are for U.S. citizen families. The commenters also asked that, if DHS will not expand the provisional unlawful presence waiver process to all LPR families, DHS should at least consider expanding the provisional unlawful presence waiver process to LPRs who have U.S. citizen children.

Several Congressional commenters argued that there was no compelling, legal, operational or other rationale that would justify DHS's decision to limit

the provisional unlawful presence waiver process to immediate relatives. The Congressional commenters stated that it was unambiguous that Congress intended the unlawful presence waiver under section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), to be available to immediate relatives and certain preference aliens, including unmarried adult children of U.S. citizens and LPR spouses and children. The Congressional commenters thought that DHS's distinction could not be justified based on DHS's reading of congressional intent. Instead, the Congressional commenters argued that DHS would be ignoring clear congressional intent and cause the provisional unlawful presence waiver process to be underutilized by entire categories of persons for whom the waiver is now available. Finally, many commenters believed that expanding the provisional unlawful presence waiver process to preference categories would offer more measurable benefits to USCIS and DOS and would facilitate legal immigration by encouraging a more sizeable population to seek to adjust their status.

Suggestions for additional eligibility criteria or categories of eligible aliens varied but most commenters asked DHS to consider expanding eligibility to: (1) All preference categories generally; (2) unmarried sons and daughters of U.S. citizens who are over the age of 21 years; (3) married sons and daughters or siblings of U.S. citizens; (4) spouses and minor children of LPRs; (5) parents of minor U.S. citizen children; (6) children who were brought to the United States when young, such as those aliens who would qualify under the proposed Development, Relief and Education for Alien Minors (DREAM) Act [4]; (7) preference aliens who have lived in the United States for more than 10 years; (8) family members of personnel in the U.S. Armed Forces, including the National Guard, reserves, and veterans; and (9) any preference category with current visa availability.

The focus of the provisional unlawful presence waiver process is to reduce the impact of the current waiver process on U.S. citizens by reducing the time U.S. citizens are separated from their immediate relatives. DHS chose to limit eligibility to immediate relatives of U.S. citizens not only because the immigrant

visas for this category are always available, but also because it is consistent with Congress' policy choice to prioritize family reunification of immediate relatives of U.S. citizens over other categories of aliens. For example, family-sponsored and employment-based categories have annual numerical limits, whereas there are no numerical limits on the availability of immigrant visas to immediate relatives. Compare INA section 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), with INA section 203(a), (b), 8 U.S.C. 1153(a), (b). Focusing on U.S. citizens as part of this discretionary process also is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens and between classes of aliens in immigration laws and policies. See, e.g., Fiallo, 430 U.S. at 792; Mathews v. Diaz, 426 U.S. 67, 81 (1976).

DHS also believes that focusing the provisional unlawful presence waiver process on immediate relatives of U.S. citizens is consistent with recognized government interests in encouraging eligible long-time LPRs to naturalize so that their spouses, parents, and children under the age of 21 years can become immediate relatives and also benefit from this new process. See, e.g., City of Chicago v. Shalala, 189 F.3d 598, 608 (7th Cir. 1999).

Family-sponsored and employment-based preference categories have annual numerical limits. Therefore, preference categories carry an inherent risk that they may become oversubscribed; if an individual's immigrant visa is based upon a preference category, his or her immigrant visa may become unavailable at any given time upon oversubscription of the preference category. Retrogression of visa availability can have a direct, adverse impact on agency backlogs and processing.

DHS appreciates the comments from the public on these issues and has given them serious consideration. DHS will consider future expansion of the program after DHS and DOS have assessed the effectiveness of the provisional unlawful presence waiver process and the operational impact it may have on existing agency processes and resources See Beach Commc'ns v. FCC, 508 U.S. 307, 316 (1993) (observing that policymakers "must be allowed leeway to approach a perceived problem incrementally"). For these reasons, DHS has not adopted the commenters' suggestions. At this time, the provisional unlawful presence waiver process will remain available only to individuals who are immediate relatives of U.S. citizens (i.e., spouses, children, and parents (if the U.S. citizen

---

[4] The DREAM Act, a bill that aims to permit children of undocumented immigrants, who were brought to the United States at a young age, to obtain a legal status if they meet certain criteria. Versions of the DREAM Act have been introduced and reintroduced on several occasions, including most recently in May 2011, but none has passed Congress to date. See, e.g., Development, Relief and Education for Alien Minors Act of 2011, S. 952, 112th Cong.

Exhibit 1
195

is at least 21 years of age)), as defined in INA section 201(b), 8 U.S.C. 1151(b).

## 2. Aliens Outside the United States

Numerous commenters asked DHS to extend eligibility to individuals who are currently outside the United States. Commenters argued that immediate relatives who had already departed from the United States to consular process or who voluntarily left the United States to avoid the consequences of removal should not be punished for their actions. Some commenters also felt that it was unfair to speed up the process for individuals residing illegally in the United States, while not doing anything for those individuals who departed the United States voluntarily to comply with the rules. Many commenters shared their personal stories about the difficulties of long-term separation from their spouses and the impact it had on them and their children. Most commenters wanted their family members abroad to have the opportunity to participate in a faster, more effective process or for DHS to at least provide some other form of relief to overcome the effects of the 3-year and 10-year bars for these individuals.

DHS recognizes that there are many difficulties faced by U.S. citizens when their immediate relatives must obtain waivers while outside the United States. DHS, however, believes that creating a provisional unlawful presence waiver process abroad would be duplicative of DOS's current immigrant visa processes and USCIS's current Form I–601, Application for Waiver of Grounds of Inadmissibility waiver process, which would not be an efficient use of agency resources.

To alleviate some of the delays in overseas waiver processing, USCIS recently centralized Form I–601 filings such that individuals located outside the United States now file the Form I–601 in the United States where USCIS has sufficient resources at its service centers to accommodate filing surges.[5] Applicants who need waivers are no longer required to schedule a "waiver filing" appointment with the U.S. Embassy or consulate, which in some cases required applicants to wait up to two months just for these waiver filing appointments. Centralization of Form I–601 filings from abroad should significantly reduce the time individuals must spend abroad, waiting to receive immigrant visas so they can

return to the United States. Centralizing Form I–601 filings in this manner also will significantly reduce the current backlog that exists at USCIS international offices. In addition, as of June 4, 2012, when USCIS began to implement centralized filing of Forms I–601 for individuals outside of the United States, USCIS had approximately 10,200 cases pending. USCIS has dedicated additional resources on a temporary basis to expeditiously process the cases filed prior to centralization, as well as those that individuals continue to file at the USCIS Field Office in Ciudad Juarez, Mexico through December 4, 2012.[6] USCIS anticipates that it will complete processing of all cases pending in USCIS offices abroad within approximately six months of the effective date of this rule.

For these reasons, DHS did not adopt the commenters' suggestions, and individuals who are already outside of the United States must pursue a waiver of inadmissibility through the current Form I–601 process. The provisional unlawful presence waiver process will remain available only to those individuals who are currently in the United States and will be departing for consular processing abroad.

## 3. Aliens Who Cannot Establish Extreme Hardship to a U.S. Citizen Spouse or Parent

Several commenters objected to the exclusion from the provisional unlawful presence waiver process of immediate relatives of U.S. citizens who could establish extreme hardship only to an LPR spouse or parent. Commenters argued that this restriction limited the number of individuals who could benefit from the provisional unlawful presence waiver process and that there was no rational basis for the limitation. Some also believed that applicants will submit "weak" extreme hardship claims relating to a qualifying U.S. citizen relative when the real hardship would be to an LPR spouse or parent. Commenters also asked that DHS allow individuals to make a showing of extreme hardship to their U.S. citizen children.

DHS has carefully considered these comments and the recommended changes. However, DHS will not adopt the suggested changes at this time. As stated in the proposed rule, a primary

purpose for creating the provisional unlawful presence waiver process is to reduce the amount of time U.S. citizens are separated from their immediate relatives. Focusing on hardship to U.S. citizens is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens. It also is consistent with the Secretary's authority to administer the immigration laws and determine the most efficient means for effectuating the provisional unlawful presence waiver process. *See* 77 FR at 19908. Finally, DHS cannot include children as qualifying relatives for purposes of the extreme hardship determination because the statute only permits a showing of extreme hardship to a spouse or parent as a basis for granting the waiver. *See* INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). Only Congress has the power to amend the immigration laws to add other individuals who can be qualifying relatives for purposes of the extreme hardship determination.

DHS is open to considering expanding the provisional unlawful presence waiver process to include lawful permanent residents as qualifying relatives after DHS has a better understanding of the impact of the provisional unlawful presence waiver process on agency resources and operations.

## 4. Aliens in Removal Proceedings

Numerous commenters asked DHS to expand eligibility for the provisional unlawful presence waiver to include aliens in removal proceedings. Some commenters suggested that DHS include anyone who is in removal proceedings, without further qualifications. Others suggested that DHS include aliens in removal proceedings if they: (1) Were granted prosecutorial discretion; (2) were the primary caretakers for U.S. citizens; (3) were previously granted voluntary departure; or (4) had their cases administratively closed. Commenters also believed that the provisional unlawful presence waiver process undermines DHS's ongoing prosecutorial discretion initiative. A few commenters also said DHS should eliminate the requirement that aliens with administratively closed cases pursue voluntary departure because it was too complicated and could result in separation from a U.S. citizen spouse, parent, or child if the alien fails to comply with the terms and conditions of voluntary departure. Several commenters criticized the use of voluntary departure, arguing that the time frames for voluntary departure in many instances would be too short (60 or 120 days) to cover the time needed

---

[5] As of June 4, 2012, most individuals abroad, who have applied for certain visas and have been found inadmissible by a DOS consular officer, must mail Forms I–601 directly to a USCIS Lockbox facility. For more information, please visit the USCIS Web site at *www.uscis.gov*.

[6] USCIS provided a transition period during which individuals who are processing their immigrant visa applications through the U.S. consulate in Ciudad Juarez, Mexico, could file their I–601 applications either with the Lockbox facility or at the USCIS Ciudad Juarez Field Office. This transition period ended on December 4, 2012.

Exhibit 1
196

for the adjudication of the Form I–601A and the time the applicant needs to prepare for departure after approval of the provisional unlawful presence waiver request. Other commenters suggested that DHS include any alien who has been issued a Notice to Appear (NTA). They reasoned that, if the purpose of the provisional unlawful presence waiver is to avoid hardship to U.S. citizens, it should make no difference whether or not an NTA has been issued. One commenter also requested that DHS allow individuals who have a fear of returning to their home countries to participate in the provisional unlawful presence waiver process.

Several immigrant advocacy groups asked DHS to allow individuals to file the provisional unlawful presence waiver application *before* termination of removal proceedings or a grant of voluntary departure. The commenters argued that allowing individuals to apply for the provisional unlawful presence waiver while still in proceedings would ensure that USCIS, and not U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP), is the first agency to determine if an applicant qualifies for the waiver. If the applicant's provisional unlawful presence waiver is approved, then the applicant could seek termination or dismissal of his or her case. The advocacy groups stated that many individuals subject to removal, whether detained or non-detained, were unrepresented and could be confused by the various barriers to filing the provisional unlawful presence waiver application. They also argued that allowing an individual to file the provisional unlawful presence waiver application while proceedings are pending would ensure that unrepresented aliens are not left with having to choose between seeking avenues of relief in removal proceedings and pursuing an immigrant visa abroad.

Finally, one commenter asked DHS to clarify the three options noted in the proposed rule at 8 CFR 212.7(e)(3)(v) through 212.7(e)(3)(vii) (*i.e.,* termination/dismissal, cancellation of NTA, administrative closure with voluntary departure) for aliens in removal proceedings. The commenter noted that two of the provisions, 8 CFR 212.7(e)(3)(v) (termination/dismissal) and 212.7(e)(3)(vii) (administrative closure with voluntary departure) in the proposed rule, conflicted because aliens who chose to pursue voluntary departure would need to have their cases recalendared before an IJ. Recalendaring of the alien's case would

result in the alien being barred under 8 CFR 212.7(e)(3)(v), because the removal proceedings would still be pending and not "terminated or dismissed." The commenter also recommended that the final rule make clear that USCIS can only accept a provisional unlawful presence waiver once DHS, through ICE's Office of Chief Counsel, affirmatively consents to it in the removal proceedings.

After careful consideration of all comments on this issue, DHS has decided to limit eligibility for the provisional unlawful presence waiver process to individuals whose removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. Under its prosecutorial discretion (PD) policies, ICE has been reviewing cases pending before EOIR and all incoming cases to ensure that they are aligned with the agency's civil enforcement priorities and that ICE is effectively using its finite resources. For cases that ICE determines are not enforcement priorities, it exercises its discretion where appropriate, typically by moving for administrative closure. *See* Memorandum by ICE Director John T. Morton in his June 17, 2011 memorandum and the subsequent November 17, 2011 directive from Peter S. Vincent, Principal Legal Advisor to all attorneys at the ICE Office of Chief Counsel. DHS, however, is not limiting eligibility solely to cases administratively closed under the ICE case-by-case review initiative, but also is allowing any alien whose case is administratively closed and has not been recalendered at the time of filing the Form I–601A to participate in the provisional unlawful presence waiver process. In addition, individuals in removal proceedings whose cases are deferred pursuant to the Deferred Action for Childhood Arrivals (DACA)[7] process may also request that ICE seek administrative closure once USCIS defers action in their cases.

If the Form I–601A is approved for an alien whose proceedings have been administratively closed, the alien should seek termination or dismissal of the proceedings, without prejudice, by EOIR. The request for termination or dismissal should be granted *before* the alien departs for his or her immigrant visa interview abroad. Applicants who leave the United States before their

removal proceedings are terminated or dismissed may experience delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility, such as INA section 212(a)(6)(B), 8 U.S.C. 1182(a)(6)(B) (failure to attend a removal proceeding without reasonable cause), or INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (aliens who have been ordered removed or who depart from the United States while an order of removal is outstanding). *See Matter of Sanchez-Herbert,* 26 I&N Dec. 43 (BIA 2012) (holding that an IJ is required to issue an in absentia removal order (rather than terminating proceedings) even though the alien previously had departed from the United States, if the alien had proper notice of the hearing and DHS establishes the alien's removability). ICE intends to work with individuals to facilitate the timely termination or dismissal of an individual's removal proceedings once he or she obtains a provisional unlawful presence waiver.

Focusing on this subset of aliens in removal proceedings is consistent with the Department's established enforcement priorities. Individuals who received administrative closure are likely individuals whom ICE or EOIR has determined, on a case-by-case basis or as a matter of policy, to be non-enforcement priorities. This includes individuals whose cases are deferred through the DACA process. Given that these individuals have been determined to not be enforcement priorities because of their compelling equities (*e.g.*, their long-term presence in the United States or their connection to U.S. citizen relatives), DHS determined that they should be able to participate in the provisional unlawful presence waiver process. DHS may consider expanding eligibility for the provisional unlawful presence waiver process to other subsets of aliens in removal proceedings in the future and after implementation of this final rule.

Aliens whose cases are deferred, whether authorized by ICE or by USCIS through approval of a Form I–821D, Consideration of Deferred Action for Childhood Arrivals, must meet all requirements under 8 CFR 212.7(e) to receive a provisional unlawful presence waiver. Deferred action does not override or modify the eligibility requirements specified in this final rule. Thus, aliens whose cases have been deferred but have final orders of removal or other grounds of inadmissibility beyond unlawful presence will remain ineligible for a provisional unlawful presence waiver.

---

[7] On June 15, 2012, the Secretary of Homeland Security issued a memorandum to USCIS, CBP, and ICE, regarding the exercise of prosecutorial discretion with respect to certain individuals who came to the United States as children. See the USCIS Web site—*www.uscis.gov*—for more information about the DACA process.

Exhibit 1
197

**5. Aliens With Final Orders of Removal and Previously Removed**

Numerous commenters requested that DHS allow aliens with final orders of removal to participate in the provisional unlawful presence waiver process. The commenters offered a variety of suggestions, many of which came out of their own personal circumstances. For example, some commenters suggested that DHS include aliens with final removal orders who: (1) are currently detained pending removal; (2) had their removal orders temporarily suspended; (3) are still in the United States and had final orders of removal issued within the last five to 10 years or, alternatively, issued more than 10 years ago; (4) were determined by DHS to warrant a favorable exercise of prosecutorial discretion; (5) were previously granted voluntary departure; (6) were granted voluntary departure but overstayed by 10 years; (7) are subject to in absentia final orders of removal due to ineffective assistance of counsel; (8) have been removed for a noncriminal ground of inadmissibility; (9) have obtained advanced consent to reapply for admission to the United States; or (10) were previously removed, regardless of whether the alien is abroad or still inside the United States. A few commenters indicated that those with final orders of removal should be included if they are married to U.S. citizens and have children. Most commenters stated that U.S. citizen family members of aliens with final orders of removal face the same hardships as those with relatives subject to inadmissibility based on unlawful presence in the United States.

DHS considered these suggestions and has concluded that it will not expand the provisional unlawful presence waiver process to include aliens with final removal orders. Generally, aliens who have outstanding final orders of removal may be inadmissible on a variety of grounds other than unlawful presence, such as criminal offenses (INA section 212(a)(2), 8 U.S.C. 1182(a)(2)) and fraud and misrepresentation (INA section 212(a)(6)(C), 8 U.S.C. 1182(a)(6)(C)). In addition, any alien who is subject to a final order of removal, decides to leave the United States, and subsequently seeks admission, is inadmissible as an alien with a prior removal under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A). Similarly, any alien who has been ordered removed or who has been unlawfully present in the United States for an aggregate period of a year or more and subsequently attempts to enter or reenter the United States without being

admitted is inadmissible under INA section 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(C), and may have his or her final order of removal reinstated under INA section 241(a)(5), 8 U.S.C. 1231(a)(5). The provisional unlawful presence waiver is only available to an alien who, upon departure from the United States, would be inadmissible only due to accrual of unlawful presence under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). Thus, a large percentage of aliens in removal proceedings will not be eligible for a provisional unlawful presence waiver. As a result, DHS has concluded that, because the success of this new provisional unlawful presence waiver process relies on its efficient, streamlined approach and close coordination with the NVC, the provisional unlawful presence waiver process will not be expanded to include aliens with final removal orders.

**6. Aliens With Scheduled Immigrant Visa Interviews**

Several commenters asked DHS to include aliens in the provisional unlawful presence waiver process regardless of whether they had an immigrant visa interview scheduled in the past. Several commenters objected to this ground of ineligibility, arguing that it was irrational and served no purpose or was arbitrary, capricious and cruel. Several commenters stated that many individuals already had cancelled their immigrant visa interviews after publication of the Notice of Intent on January 9, 2012 (77 FR 19902). An immigrant advocacy group asked DHS to include applicants with previously scheduled interviews. The group acknowledged that allowing such applicants to reschedule immigrant visa interviews would create an additional administrative burden on DOS, but believed that it would ensure equity among those immediate relatives seeking to legalize their status while minimizing the length of time they are separated from their families. The advocacy group also believed that failure to include this group would only create confusion and ultimately ineligibility for the very individuals who the rule is supposed to help.

Several commenters suggested that DOS return the immigrant visa application packet to the NVC once an alien files a provisional unlawful presence waiver. Another commenter suggested that the petitioner should be allowed to fly to the consulate abroad, retrieve the immigrant visa application packet, and return it to the NVC so DHS could adjudicate the waiver and the NVC could match the immigrant visa

application packet to the approved provisional unlawful presence waiver. One commenter suggested that aliens should be allowed to resubmit the immigrant visa application package to the NVC so that they could file the provisional unlawful presence waiver application. Some commenters also asked DHS to give individuals still in the United States the option to either postpone their immigrant visa interviews so they could file the provisional unlawful presence waiver or proceed with consular processing.

Several commenters were concerned that the time periods for filing and adjudication of a provisional unlawful presence waiver application, filing of the immigrant visa application, and DOS scheduling of the immigrant visa interview were too short. The commenters believed that it created timing issues for immigration law practitioners in terms of advising their clients on filing the Form I–601A and paying the immigrant visa fee. The commenters stated that once the immigrant visa fee was paid, DOS would schedule the immigrant visa interview potentially before USCIS adjudicated the Form I–601A and, as a result, the applicant would be ineligible for the provisional unlawful presence waiver. Finally, one commenter requested that DHS implement a grace period of at least one year after publication of the final rule during which applicants who had scheduled immigrant visa interviews could participate in the provisional unlawful presence waiver process.

DHS disagrees that limiting eligibility to aliens who have not had their immigrant visa interviews scheduled has no rational basis. DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS immigrant visa process. By including aliens who were scheduled for an interview prior to the date of publication of this final rule, the projected volume of cases could significantly increase and would create backlogs not only in the provisional unlawful presence waiver process, but also in adjudication of other USCIS benefits. The increased volume would also adversely impact DOS and their immigrant visa process.

For these reasons, DHS will not expand the provisional unlawful presence waiver to include individuals whose immigrant visa interviews were scheduled before the date of publication of this final rule January 3, 2013. DHS now adds language to the final rule to

Exhibit 1
198

clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.*, the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

DHS has clarified the regulatory text at 8 CFR 212.7(e)(4) and (5)(ii) so that aliens clearly understand that if the Department of State scheduled the alien for his or her initial immigrant visa interview prior to the date of publication of this final rule, the Form

I–601A will be rejected and returned to the applicant with the associated filing and biometric fees or denied. The Form I–601A will be rejected even if the applicant's interview is rescheduled *after* the date of publication of this final rule. USCIS will verify with DOS whether the applicant's immigrant visa interview was scheduled before the date of publication of this final rule.

### 7. Aliens With Other Grounds of Inadmissibility

Several commenters asked DHS to consider expanding the provisional unlawful presence waiver process to include additional grounds of inadmissibility and the waivers associated with such grounds. These commenters specifically referenced waivers such as the waiver for certain criminal grounds of inadmissibility under INA section 212(h), 8 U.S.C. 1182(h), for fraud and misrepresentation under INA section 212(i), 8 U.S.C. 1182(i), and for alien smuggling under INA section 212(d)(11), 8 U.S.C. 1182(d)(11). Some commenters suggested that DHS include any waiver that has the same extreme hardship standard into the provisional unlawful presence waiver process. Other commenters believed that it would be more efficient to resolve all grounds of inadmissibility at the same time. They suggested that DHS include all grounds of inadmissibility that can be waived and currently appear on the Form I–601. The commenters believed this change would alleviate the need for aliens to file multiple waiver requests at the time of their immigrant visa interviews.

Several commenters stated that an individual should not be precluded from filing a provisional unlawful presence waiver application if the individual: (1) Was previously arrested, especially if there was no conviction or the conviction was for a crime involving moral turpitude (CIMT) that meets the petty offense exception under INA section 212(a)(2)(A)(ii), 8 U.S.C. 1182(a)(2)(A)(ii); (2) violated his or her status; (3) worked without authorization; or (4) made a false claim to U.S. citizenship under INA section 212(a)(6)(C)(ii), 8 U.S.C. 1182(a)(6)(C)(ii). A few commenters also requested that USCIS make an affirmative finding that a specific ground of inadmissibility does not apply to an applicant. The commenters requested that such a finding be either persuasive or binding on DOS consular officers.

Finally, some commenters were confused about the effect of the provision that allows USCIS to deny a provisional unlawful presence waiver

application if USCIS has a "reason to believe" that the alien will be inadmissible on grounds other than unlawful presence. The commenters argued that DHS should not deny a provisional unlawful presence waiver simply because DHS has reason to believe that the applicant was convicted of a crime, especially since some crimes are not automatic bars to admission to the United States in a lawful immigration status and, upon further review, would not be considered convictions or criminal offenses for immigration purposes.

DHS has considered these comments but will not adopt the suggested changes. The goal of the provisional unlawful presence waiver process is to facilitate immigrant visa issuance for immediate relatives of U.S. citizens who are otherwise admissible [8] to the United States except for the 3-year and 10-year unlawful presence bars, which are triggered upon departure from the United States. DOS, not USCIS, determines if an immigrant visa applicant is eligible for an immigrant visa and whether there are any grounds of inadmissibility that may bar issuance of the immigrant visa. If USCIS were to consider other grounds of inadmissibility beyond unlawful presence, it would create backlogs in the adjudication of the provisional unlawful presence waivers and, in turn, adversely impact DOS's immigrant visa process. In particular, to assess an application for a waiver of inadmissibility based on fraud, misrepresentation, or criminal history, an individual generally must undergo vetting through an in-person interview at a USCIS Field Office. Since DOS already conducts an in-depth in-person interview as part of the immigrant visa process, DHS believes that such a full review by USCIS would be duplicative of DOS's efforts.

DHS, however, intends to uphold its responsibility to protect the integrity and security of the immigration process by conducting full background and security checks to assess whether an individual may be a threat to national security or public safety. To maintain a streamlined process, USCIS will, however, only conduct a limited review of the waiver application to determine if: (1) The individual has self-reported a ground of inadmissibility that would render him or her ineligible for the provisional unlawful presence waiver;

[8] An alien will not be inadmissible for being present in the United States without admission or parole under INA section 212(a)(6)(A)(i), 8 U.S.C. 1182(a)(6)(A)(i), or for lacking proper immigrant entry documents under INA section 212(a)(7)(A), 8 U.S.C. 1182(a)(7)(A), once he or she leaves the United States to attend a consular interview.

Exhibit 1
199

(2) the results of the background checks reveal conduct or actions that potentially would make an individual ineligible for an immigrant visa; or (3) the individual has engaged in activities that could impact the discretionary determination regarding whether he or she warrants a favorable exercise of discretion. If USCIS determines that there is reason to believe that the alien *may* be inadmissible to the United States at the time of his or her immigrant visa interview based on another ground of inadmissibility other than unlawful presence, USCIS will deny the request for the provisional unlawful presence waiver. USCIS's determination on the provisional unlawful presence waiver is not a *conclusive* finding of inadmissibility. It also is not an assessment of whether a particular crime or pattern of conduct would ultimately bar an individual from obtaining a legal status under the immigration laws.

Aliens who may have other grounds of inadmissibility are not precluded from obtaining a waiver of such grounds (if permitted by law) and ultimately an immigrant visa. The individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. If the ground(s) of inadmissibility identified by the DOS consular officer can be waived, the individual can file a Form I–601 along with any supporting documentation or evidence needed to demonstrate eligibility for the waiver and ultimately the immigrant visa.

8. Aliens in Temporary Protected Status

Several commenters asked DHS to clarify how the provisional unlawful presence waiver process affects aliens in Temporary Protected Status (TPS) and to ensure that such aliens are included in the provisional unlawful presence waiver process. DHS does not believe these additions to the eligibility criteria are necessary.

Any alien who meets the requirements of the provisional unlawful presence waiver process and who is consular processing abroad can obtain a provisional unlawful presence waiver regardless of the alien's current status in the United States.[9] An alien

currently registered for TPS under INA section 244, 8 U.S.C. 1254a, is considered to be maintaining lawful nonimmigrant status[10] for purposes of adjustment of status or change of status. *See* INA section 244(f)(4), 8 U.S.C. 1254a(f)(4). A grant of TPS, however, does not cure an unlawful entry prior to the alien's grant of TPS or any unlawful presence the alien may have accrued prior to being granted TPS. *See Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260 (11th Cir. 2011). If the TPS beneficiary needs a waiver of inadmissibility for unlawful presence, that alien is in the same position as any other alien who needs a waiver of inadmissibility under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), at the time of the immigrant visa processing abroad. As a result, TPS applicants who are immediate relatives of U.S. citizens can participate in the provisional unlawful presence waiver process if they are pursuing consular processing of an immigrant visa abroad.

9. Additional Eligibility Criteria

A few commenters suggested that DHS consider limiting or adding eligibility criteria to better prioritize aliens who may be eligible for the provisional unlawful presence waiver process. Two commenters suggested that DHS require an individual to have a minimum amount of time in the United States unlawfully (*e.g.*, two, three, or five years) before he or she could file a provisional unlawful presence waiver. Another commenter suggested that DHS limit eligibility to aliens who were married to a U.S. citizen prior to the effective date of this final rule. One commenter suggested limiting the eligibility criteria solely to aliens physically present in the United States, who are immediate relatives with an approved Form I–130, and who are at least 17 years of age. Several commenters suggested that DHS give priority to aliens who are minors and aliens who show good moral character, have no criminal record, and demonstrate that they have been productive and responsible as evidenced by paying taxes, mortgages, and self-sufficiency. Finally, several commenters requested that DHS base approval of the provisional unlawful presence waiver on factors such as: (1) Having good moral character; (2) having no criminal record; (3) not having abused government benefits; (4) putting

children through school; (5) paying taxes; (6) being married to a U.S. citizen or having U.S. citizen children; or (7) owning a home.

DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS/NVC immigrant visa process. DHS, however, did not adopt these limitations or restrictions. The commenters' suggestions are already part of the overall analysis of whether an individual warrants the grant of the provisional unlawful presence waiver as a matter of discretion. The factors that play into the discretionary analysis are not limited to one particular set of factors, *see, e.g., Matter of Cervantes-Gonzalez*, 22 I. & N. Dec. 560, 566 (BIA 1999); as part of the application for provisional unlawful presence waiver, an applicant should set forth any favorable discretionary factor he or she considers relevant to the adjudication. By setting restrictions on the number of years of unlawful presence or the date when an individual married the U.S. citizen, DHS would exclude a subset of immediate relatives of U.S. citizens who are or would be otherwise eligible. DHS, therefore, has not adopted these suggestions and retains the eligibility criteria listed in 8 CFR 212.7(e)(3).

*D. Filing Requirements and Fees*

1. Concurrent Filing

Many commenters asked DHS to allow concurrent filing of the Form I–130 or Form I–360, Form I–601A, and, if needed, the Form I–212, Application for Permission to Reapply for Admission Into the United States After Deportation or Removal. Several commenters noted that USCIS does adjudicate some Form I–212s in the United States pursuant to the regulations at 8 CFR 212.2(j) and in certain cases may grant the Form I–212 conditionally in anticipation of the individual's departure. Other commenters argued that applicants should be allowed to file the provisional unlawful presence waiver at any stage of immigrant petition or visa process. Several commenters said that DHS could avoid duplicating efforts by processing multiple applications at the same time. The commenters believed it was inefficient for DHS not to allow concurrent filing and an injustice to waiver applicants to maintain separate processes for the Form I–601A and Form I–212, especially when the separate processes have the effect of increasing the time applicants must

---

[9] USCIS also received two comments asking whether alien crewman could apply for a provisional unlawful presence waiver. As stated above, any alien in the United States who qualifies as an immediate relative and has an approved Form I–130 or Form I–360 may apply for the provisional unlawful presence waiver, irrespective of his or her current immigration status, if otherwise eligible.

[10] INA section 244(f)(4), 8 U.S.C. 1254a(f)(4), provides that, during the period that an alien is granted temporary protected status, the alien is considered as being in or maintaining lawful status as a nonimmigrant for purposes of adjustment or change of status.

Exhibit 1
200

spend outside the United States and away from their families. The commenters asked DHS to at least examine the feasibility of concurrently processing these applications before the alien has to leave for his or her immigrant visa interview. Finally, one commenter suggested that USCIS should allow applicants to submit the Form I–601A and Form I–212 prior to the filing of the Form I–130.

DHS has considered these comments but believes that concurrent filing, or allowing filing of the Form I–601A before the immediate relative petition, would undercut the efficiencies USCIS and DOS will gain through the streamlined provisional unlawful presence waiver process. Currently, Form I–130 denials are appealable to the DOJ, EOIR Board of Immigration Appeals (BIA), and if the alien challenges the denial, USCIS would either have to hold the provisional unlawful presence waivers until the Form I–130 was decided on appeal or deny the Form I–601A but reopen it if the appeal is decided favorably for the alien. Both scenarios are inefficient and could cause USCIS to incur additional costs for storing the provisional unlawful presence waiver applications and transferring any A-files or receipt files between offices until the administrative appeal process is complete. DHS developed this provisional unlawful presence waiver process in close coordination with DOS to ensure that both agencies could efficiently complete the waiver and immigrant visa process concurrently within a short timeframe. Allowing the filing of the Form I–601A after the Form I–130 or Form I–360 is approved is more efficient for USCIS and often is more efficient for the applicant as well. Therefore, DHS will not accept concurrently filed Forms I–130 and I–601A, or allow for the filing of the Form I–601A before approval of the immediate relative petition.

Moreover, DHS will not permit concurrent filing of Forms I–601A and I–212. While an individual can obtain advance, conditional consent to reapply for inadmissibility under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (prior removal or departure under order of removal), while still in the United States, DHS will not incorporate the Form I–212 in the provisional unlawful presence waiver process at this time for the following reasons.

First, most applicants seeking a provisional unlawful presence waiver will not have A-files. However, every I–212 applicant who is subject to a prior removal order has an A-file because he or she was in removal proceedings. If

concurrent filing of Forms I–601A and I–212 is permitted, USCIS in each case would have to request and review the applicant's A-file—a process that can cause significant delay. This extra procedural step in turn would create significant delays in USCIS processing of provisional unlawful presence waiver applications.

Second, individuals currently may file an administrative appeal with the Administrative Appeals Office (AAO) of a decision denying their Form I–212. Consequently, if concurrent filing of Forms I–601A and I–212 is permitted, and the Form I–212 is denied and an appeal taken, USCIS would have to hold the applicant's Form I–601A until the I–212 appeal is decided and, if the applicant seeks review in federal court, until the litigation is resolved. The streamlined Form I–601A process is designed to avoid these extra procedural steps, which would create backlogs in USCIS adjudication of the provisional unlawful presence waiver.

Form I–212 also is used to seek consent to reapply to overcome inadmissibility for unlawful reentry after a prior immigration violation under INA section 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(C).[11] Aliens who are subject to this ground of inadmissibility cannot seek consent to reapply until they have been outside of the United States continuously for 10 years. Therefore, allowing the Form I–212 to be filed concurrently with the Form I–601A might mistakenly imply that those inadmissible under INA section 212(a)(9)(C) can file in the United States and at an earlier time.

## 2. Filing Fees

One commenter stated that applying the current Form I–601 filing fee to the Form I–601A was fiscally irresponsible. The commenter argued that DHS does not know how many provisional unlawful presence waivers it will receive or adjudicate and, therefore, cannot accurately determine the case workload or what resources it will need to cover the actual costs for adjudicating the Form I–601A. The commenter suggested that DHS increase the filing fee to $650 plus $85 for the biometric fee to avoid a fiscal shortfall. Several commenters stated that DHS should require provisional unlawful presence waiver applicants to pay a fine or fee ($5,000 to $20,000) to remain in the United States and obtain LPR status

through an immigrant visa if eligible for the provisional unlawful presence waiver; some of these commenters believed that this fine or fee would help reduce the national debt.

Many opponents of the provisional unlawful presence waiver process indicated that the costs of implementation are too expensive and that the U.S. Government should not spend money on illegal aliens. The commenters believed that DHS was using tax money to support the new process. Additionally, two commenters recommended that DHS establish a premium processing fee to expedite processing of the provisional unlawful presence waiver. The commenters also suggested that DHS give special consideration to federal employees and those currently serving in active duty, reserve personnel, and veterans of the U.S. Armed Forces. Some commenters believed that individuals who did not commit any felonies should not have to pay a fee. Several commenters stated that the filing fee was either too high or too low. Some commenters stated that DHS should permit fee waivers because the fees were too high; others said that DHS should double the fee to offset the costs for implementing the new process because the Form I–601A fee was too low. Some commenters also indicated that fee waivers would be appropriate for aliens seeking the provisional unlawful presence waiver because most of them have low incomes, and that this is especially true for aliens who work in the agricultural and similar service sectors and cannot afford to cover the filing costs required by USCIS. Another commenter argued that the elimination of a fee waiver violated the Due Process Clause of the U.S. Constitution's Fifth Amendment because it was not legislated by Congress as was done in the context of INA section 245(i), 8 U.S.C. 1255(i). Finally, two commenters said that the provisional unlawful presence waiver process was too expensive and as a result would be at risk for underuse.

With regard to the immigrant visa fee that must be paid to DOS, several commenters mentioned that the DOS immigrant visa (IV) fee is only valid for one year. They were concerned that the period for adjudication of the provisional unlawful presence waiver might last longer than USCIS expects. The commenters asked DHS to state in the regulation that pending provisional unlawful presence waiver applications maintain the validity of the IV fees, so that applicants would not forfeit the IV fees and have to repay them in the future. Some commenters also indicated that the requirement to pay the

---

[11] The regulations governing the processing of advance, conditional consent to reapply in the United States at 8 CFR 212.2(j) do not apply to aliens who are subject to this ground of inadmissibility. *See Matter of Torres-Garcia*, 23 I&N Dec. 866 (BIA 2006).

Exhibit 1
201

immigrant visa fee before filing the provisional unlawful presence waiver was confusing. DHS's responses to these views are divided into the four categories below.

(i) Authority To Charge Immigration Fees

Congress has given the Secretary broad authority to administer and enforce the immigration and naturalization laws of the United States. As part of this broad authority, the Secretary has discretion to set filing fees for immigration benefits at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other immigrant applicants. INA section 286(m), 8 U.S.C. 1356(m). The Secretary also has authority to set fees needed to recover administrative costs. The fee revenue collected under INA section 286(m), 8 U.S.C. 1356(m), remains available to DHS to provide immigration and naturalization benefits and ensures the collection, safeguarding, and accounting of fees by DHS. INA section 286(n), 8 U.S.C. 1356(n).

The Secretary has discretion to waive filing fees or exempt certain types of benefit requests from the fee requirements. The Secretary also has broad discretion to waive any fee when an individual's circumstances warrant such a waiver. Aliens who request a fee waiver are not entitled to the waiver as a matter of law,[12] nor do they have a cognizable due process interest in a discretionary fee waiver. The denial of a fee waiver request is a matter of discretion. The agency also has not provided for administrative appeals of such discretionary decisions.

None of the money used for USCIS adjudication of the provisional unlawful presence waiver comes from appropriated funds. As a fee-based agency, USCIS is primarily funded by applicants seeking immigration benefits. Applicants are required to pay their own fees. USCIS uses these fees to process applicants benefit requests and to cover its administrative costs. USCIS,

however, will not, as a matter of discretion, grant fee waivers for the provisional unlawful presence waiver or associated biometric fee.

(ii) Premium Processing of the Provisional Unlawful Presence Waiver

The Secretary has established a premium processing fee for certain employment-based immigration benefit requests under INA section 286(u), 8 U.S.C. 1356(u). USCIS provides premium processing for certain benefit types if an authorized applicant or petitioner pays a surcharge of $1,225 for the service. The surcharge is paid in addition to the filing fees for the immigration benefit requested. USCIS's Premium Processing Service (PPS) generally provides faster processing times and adjudication. USCIS guarantees 15-calendar-day processing to those who choose to use the PPS. In general, if USCIS cannot make a final decision on the applicant's benefit request within this period, USCIS will refund the PPS fee. *See* 8 CFR 103.7(e)(2). Even if the PPS fee is refunded, USCIS will endeavor to continue expedited processing of the underlying benefit request.

DHS, however, cannot extend premium processing to family-based applications or to waivers of inadmissibility that accompany such applications because INA section 286(u), 8 U.S.C. 1356(u), only allows premium processing for employment-based petitions and applications. Therefore, DHS is not adopting this suggestion. DHS, however, reminds applicants that they can request expedited adjudication of a provisional unlawful presence waiver in accordance with current USCIS expedite guidance.[13]

(iii) Fee Level for the Provisional Unlawful Presence Waiver

DHS has adopted the current cost for adjudicating an Application for Waiver of Ground of Inadmissibility, Form I–601($585), as the initial filing fee that will be required for the Form I–601A. DHS decided to set the fee for the provisional unlawful presence waiver process to be the same as the current Form I–601 waiver application fee because the population that will be eligible for the provisional unlawful presence waiver is a subset of those individuals who would otherwise have to file under the current Form I–601 process. Also, the adjudication of the Form I–601A will be comparable to the adjudication of a Form I–601 requesting

waiver of inadmissibility pursuant to INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v).

Costs to the Federal Government include the possible costs of additional adjudication personnel associated with increased volume and the associated equipment (computers, telephones) and occupancy costs (if additional space is required). However, we expect these costs to be offset by the additional fee revenue collected for form processing. DHS will consider the impact of the provisional unlawful presence waiver process workflow and resource requirements as a normal part of its biennial fee review. The biennial fee review determines if fees for immigration benefits are sufficient in light of resource needs and filing trends.

(iv) DOS Immigrant Visa Fee

DOS is the agency in charge of NVC procedures. The NVC procedures are outlined in the information materials that applicants receive from the NVC. As long as the applicant follows NVC procedures, and has informed the NVC of the filing of the provisional unlawful presence waiver, as outlined in the NVC procedures, the fact that a Form I–601A is pending will not result in the invalidation of the NVC processes. A pending I–601A also will not affect the validity of DOS immigrant visa fee and applicants will not be required to resubmit the DOS immigrant visa fee solely due to the Form I–601A processing, provided the applicant complies with all DOS processing requirements.

3. Limitations on Filing of Provisional Unlawful Presence Waivers

Many commenters questioned why DHS would limit the number of provisional unlawful presence waiver applications that could be filed by an individual applicant. Some commenters stated that many applicants will be unrepresented, and, as a result of their lack of knowledge or understanding of the immigration process, could be denied solely for technical reasons, such as failure to present the proper documents. Commenters also stated that some pro se aliens may obtain inadequate, erroneous, or unscrupulous legal assistance, which could result in their cases being denied. The commenters argued that precluding these individuals from filing another Form I–601A would be unduly harsh and that DHS's duty of fairness to applicants should trump the agency's interest in administrative efficiency and finality. Several commenters also disagreed with the limitation on filing,

---

[12] One commenter referred to INA section 245(i) as an example in which Congress authorized fee waivers and asserted that USCIS cannot exclude fee waivers in the provisional unlawful presence waiver process. Congress has legislated when certain categories of aliens are exempt from paying certain immigration fees. The authority, however, to waive the provisional unlawful presence waiver application fee lies with the Secretary through her authorities under INA sections 103 and 286(m), 8 U.S.C. 1103 and 1356(m), among others. The fact that Congress has provided for fee waivers in different situations does not preclude the Secretary from exercising her discretionary authority not to provide for fee waivers in the context of this rule.

[13] For guidance on USCIS expedite procedures, please visit *www.uscis.gov*.

Exhibit 1
202

especially when an applicant withdraws his or her initial filing.

One commenter requested that USCIS return the fee if the waiver application is withdrawn. Some commenters also found it a cumbersome and costly approach to require individuals whose waivers are denied or withdrawn to file another waiver through the regular process after the consular interview. A few commenters requested that USCIS assign another officer to adjudicate a new Form I–601A, if the prior provisional unlawful presence waiver request was denied or withdrawn. Finally, some commenters believed that it was unjust to exclude applicants from the provisional unlawful presence waiver process if they had pending adjustment of status applications.

DHS appreciates the valid concerns of these commenters and recognizes that if it implemented the regulatory text as published in the NPRM, aliens with compelling circumstances could be precluded from obtaining a provisional unlawful presence waiver. For these reasons, DHS is removing the single-filing limitation. If an individual's provisional unlawful presence waiver request is denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing or whose Form I–601A is denied can apply for a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. If the ground(s) of inadmissibility identified by the DOS consular officer can be waived, the individual can file a Form I–601 along with any supporting documentation or evidence needed to demonstrate eligibility for the waiver and ultimately the immigrant visa. Since USCIS has now centralized adjudication of Forms I–601 filed by aliens abroad, USCIS anticipates that the processing time in the traditional Form I–601 waiver process will be reduced.

Applicants and their attorneys or accredited representatives also are reminded that they may address or correct mistakes by supplementing a pending Form I–601A waiver request

with additional evidence or correcting the request before USCIS makes a final decision in the case. USCIS will take into consideration any evidence received when making the decision.

4. Biometrics

Several commenters were concerned about the biometrics requirement and the potential harm to applicants, especially if they were denied a provisional unlawful presence waiver. One commenter believed that the biometrics requirement should be eliminated because it would make applicants hesitant to apply for the provisional unlawful presence waiver because of a perceived inherent danger for undocumented persons to work so closely with the U.S. Government. One commenter stated that, when DHS collects biometrics from applicants, it demands a great amount of personal information that could put applicants at risk. The commenter believed that the information collected from biometrics could be incriminating and used to initiate investigations. The commenter also noted that the proposed rule failed to offer applicants any protection from being placed in removal proceedings. One commenter claimed that the collection of biometrics was another way for DHS to "find fault" with the applicant and bar waiver approval. Finally, several commenters believed that DHS should allow all individuals to provide biometrics at a U.S. Embassy or consulate and, therefore, should include aliens outside the United States.

After consideration of these comments, DHS is not modifying the biometrics requirement. Requiring collection of biometrics helps USCIS determine if an alien is potentially subject to another ground of inadmissibility or if there are negative factors or conduct that may affect whether the individual warrants a favorable exercise of discretion. DHS only collects the biographic information needed to run such checks and to adjudicate any requested immigration benefit. Requiring biometrics also is consistent with the agency's enforcement priorities and necessary to ensure that an individual granted a Form I–601A is not a national security risk or public safety threat. USCIS will continue to follow its existing Notice to Appear (NTA) policies to determine whether the agency will initiate removal proceedings against a particular individual or refer them to ICE. Finally, DHS will not permit capture of biometrics abroad because the Form I–601A process is a domestic process that applies only to aliens who are present in the United States at the time of filing,

and DOS already collects an applicant's biometrics at the U.S. Embassy or consulate abroad as part of the immigrant visa application process.

5. The Minimum Age (17 Years) Requirement

Several commenters objected to the requirement that applicants must be 17 years of age or older to file a provisional unlawful presence waiver. The commenters argued that the requirement is confusing and suggested eliminating it altogether. One commenter suggested changing the minimum age from 17 to 18 years old. The commenters asked DHS to provide clear instructions to the public that individuals do not begin to accrue unlawful presence until they are 18 years old and stated that it would be best if applicants judged on their own whether and when they should file the provisional unlawful presence waiver application.

It is important for DHS to maintain the flexibility to reject applications filed by applicants under the age of 17 so these applicants are not precluded from filing another waiver application in the future. This approach would allow an applicant to save the cost for filing an unnecessary waiver application until the waiver is actually needed. This approach of allowing individuals who are 17 years or older request a provisional unlawful presence waiver also enables more efficient processing of the immigrant visa application for immediate relative children who are under the age of 18 years and therefore have not yet accrued unlawful presence, but who very possibly will turn 18 years old before the DOS consular interview, accrue unlawful presence subsequent to such time, and potentially trigger the bars under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i), upon a departure. If these children must wait until they have turned 18 years old and thereafter accrued at least 180 days of unlawful presence to file a Form I–601A, it may be the case that by that time DOS will have already scheduled a consular interview, thereby precluding the alien from eligibility for this process and leading to the hardship to U.S. citizen parents that this rulemaking intends to avoid.

6. Effect of the Child Status Protection Act (CSPA)

Several commenters asked DHS to clarify that the Child Status Protection Act (CSPA) provisions, which protects certain children from aging-out of eligibility for certain immigration benefits, be applied to the agency's definition of "immediate relative" for purposes of access to the provisional

Exhibit 1
203

unlawful presence waiver process. DHS clarifies in the Form I–601A instructions that an applicant will remain eligible for a provisional unlawful presence waiver so long as he or she remains an "immediate relative" as defined in the INA, as amended by the CSPA. Thus, an aged-out child may still qualify as an "immediate relative" for purposes of access to the provisional unlawful presence waiver process as long as the child is classified as an immediate relative under the INA. *See* INA section 201(f), 8 U.S.C. 1151(f).

*E. Adjudication*

1. Extreme Hardship—Standards and Training

Numerous commenters questioned DHS's policy on extreme hardship. Many urged DHS to issue more detailed guidance on extreme hardship, arguing that the term is unclear and potentially subjects applicants to arbitrary decision-making by USCIS officers. Other commenters indicated that clear guidance would allow individuals to better assess their chances for an approval. One commenter even provided DHS with a list of suggestions for consideration when creating new policy guidance on extreme hardship determinations. A number of commenters requested that DHS ensure, through training, that the extreme hardship standard is applied evenly and consistently, and that extreme hardship assessments include consideration of the financial and emotional effects of separation. Many commenters thought that the current extreme hardship standard applied by USCIS is too rigid and should be relaxed. Several commenters also asked DHS to conduct extensive training for domestic USCIS officers, specifically on country conditions, which are critical to making an extreme hardship determination. The commenters stated that USCIS personnel who adjudicate waivers abroad already are highly trained, have intimate familiarity with specific country conditions, and are knowledgeable about conditions in the applicant's home country. The commenters were concerned that, without extensive training, USCIS officers in the United States may adopt a more restrictive approach. The commenters wanted USCIS to ensure that country-specific knowledge is not lost once waiver processing is moved stateside. Several commenters also mentioned that USCIS should use the adjudicator's manual and standard operating procedures created by the Refugee, Asylum, and International Operations Directorate (RAIO) because

they explain the entire process, standard of review, and other requirements. The commenters stated that this manual is an invaluable resource and that USCIS should create a similar one for the provisional unlawful presence waiver process and make it publicly available.

Extreme hardship is a statutory requirement that an applicant must meet to qualify for an unlawful presence waiver under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The INA does not define the term, and federal courts have not specifically defined extreme hardship through case law. The BIA has stated that extreme hardship is not a definable term of fixed and inflexible meaning, but that the elements to establish extreme hardship are dependent upon the facts and circumstances of each case. *See Matter of Cervantes-Gonzalez,* 22 I&N Dec. 560, 565 (BIA 1999). When USCIS assesses whether an applicant has established extreme hardship, USCIS looks at the totality of the applicant's circumstances and any supporting evidence to determine whether the qualifying relative will experience extreme hardship.

In this final rule, USCIS is not modifying how it makes extreme hardship determinations or how it defines extreme hardship. Consistent with how USCIS currently makes extreme hardship determinations, USCIS will consider all factors and supporting evidence that an applicant submits with his or her provisional unlawful presence waiver application. USCIS also has included in the Form I–601A instructions examples of factors to help provisional unlawful presence waiver applicants understand what can be provided to establish the required extreme hardship to a U.S. citizen spouse or parent. USCIS will thoroughly train officers to adjudicate provisional unlawful presence waivers, create standard operating procedures specific to the Form I–601A process, and monitor implementation and conduct further training if necessary.

2. Presumption of Extreme Hardship

Several commenters asked DHS to apply a presumption of extreme hardship if the applicant has to file a new Form I–601 waiver application because the DOS consular officer determined that the applicant was inadmissible on other grounds that can be waived. The commenters argued that the extreme hardship would already be established as part of the provisional unlawful presence waiver application and USCIS should not have to re-adjudicate that aspect of the waiver.

Many commenters believed that USCIS should automatically find extreme hardship exists in certain circumstances. The commenters argued that extreme hardship should be found based solely on: (1) Separation of the U.S. citizen from his or her immediate relative; (2) dangerous conditions in the applicant's home country; (3) the fact that the U.S. citizen and undocumented alien have a U.S. citizen child; (4) the fact that the applicant would be separated from his or her children for three or 10 years; (5) being a student in the United States; or (6) the fact that the applicant was brought into the United States at a young age and that he or she could qualify under the DREAM Act if enacted. Some commenters also suggested that DHS publish clear criteria for extreme hardship and include factors such as the length of time an alien has been married, the existence of children, the payment of taxes, strong ties to the United States and life-long assets, lack of eligibility for adjustment of status, and the loss of a business. The commenters believed that setting out clear criteria would help applicants better understand how to meet the extreme hardship standard.

Several Congressional commenters stated that DHS has already established a precedent in its regulations that includes a presumption of extreme hardship for certain Salvadorans and Guatemalans under the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105–100, as amended, citing 8 CFR 1240.64(d)(1). These Congressional commenters believed that DHS could include similar regulations and even create a rebuttable presumption that an extreme hardship requirement has been satisfied when applicants would be required to remain for prolonged periods of time in dangerous locations. The Congressional commenters further argued that DHS could determine if a location was dangerous by whether DOS awards danger pay to its employees serving in such locations, citing 5 U.S.C. 5928 (awarding danger pay when there is a "civil insurrection, civil war, terrorism, or wartime conditions"). Many commenters also stated that the rule should, at a minimum, consider the dangerousness of a location as a highly-relevant factor during the adjudication. One commenter also suggested that extreme hardship should be found if the U.S. citizen has to relocate to a country where Peace Corps does not send its personnel because it is too dangerous.

DHS is not modifying how it makes extreme hardship determinations or defining extreme hardship for purposes of the provisional unlawful presence

Exhibit 1
204

waiver process. DHS also is not creating presumptions of extreme hardship. As indicated previously, extreme hardship is not a definable term and elements to establish extreme hardship are dependent upon the facts and circumstances of each case. Consistent with existing practice, USCIS will continue to consider all factors and supporting evidence that an applicant submits with his or her provisional unlawful presence waiver application in assessing if the applicant has established the requisite extreme hardship. DHS also has included in the Form I–601A instructions examples of factors to help provisional unlawful presence waiver applicants understand what types of documents can be provided to establish the required extreme hardship to a U.S. citizen spouse or parent.

In terms of re-adjudicating prior extreme hardship and discretionary determinations, DHS will not alter its position on this point. Every extreme hardship determination and discretionary determination is based on a careful consideration of the evidence of record at the time the determination is made. If the DOS consular officer determines that a new ground of inadmissibility applies in the applicant's case, USCIS may consider that as a new, material factor when assessing whether the applicant continues to warrant a favorable exercise of discretion. As such, USCIS reserves the authority to reopen and reconsider, on its own motion, an approval or a denial of a provisional unlawful presence waiver application at any time, including when new factors come to light after the provisional unlawful presence waiver applicant's immigrant visa interview.

3. Eliminating the Extreme Hardship Requirement

Several commenters suggested that DHS completely eliminate the extreme hardship requirement for purposes of the provisional unlawful presence waiver, rather than try to define it. Others argued that immediate relatives should not have to prove extreme hardship at all, especially if married to a U.S. citizen.

Congress enacted the provisions of the INA that describe the statutory requirements for obtaining a waiver of inadmissibility under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). *See* INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). DHS, as part of the Executive Branch, does not have the authority to dispense with any statutory requirement. As a result, DHS cannot eliminate extreme hardship as a

requirement or approve a provisional unlawful presence waiver for an individual who has not established that he or she meets all the statutory requirements set by Congress. Only Congress can change the minimum statutory requirements individuals must meet to qualify for a waiver of inadmissibility. USCIS, therefore, cannot adopt these suggestions.

4. Timelines for Adjudication; Interviews

Several commenters urged DHS to establish clear timeframes for adjudication of the provisional unlawful presence waiver and for immigrant visa issuance. The commenters stated that without a clear pronouncement, the uncertainties about the duration of the adjudication process would discourage applicants from taking advantage of the provisional unlawful presence waiver process. Some commenters believed that it would be beneficial if provisional unlawful presence waiver applicants could be interviewed to establish extreme hardship and the bona fides of the marriage and recommended that USCIS interview applicants electronically or through a remote interview process. The commenters also suggested combining the interview for Form I–130 with the interview for Form I–601A. One commenter believed that allowing applicants to be interviewed for the provisional unlawful presence waiver would result in what the commenter called "more humane adjudications."

DHS declines to adopt these suggestions. In terms of processing times, DHS generally publishes the estimated processing times for particular immigration benefits and for the local offices where an applicant's case would be adjudicated. *See https://egov.uscis.gov/cris/ processTimesDisplayInit.do* (USCIS case processing times). For the provisional unlawful presence waiver application, USCIS and DOS are coordinating closely to make sure that the timing of the approval of a provisional unlawful presence waiver application is close to the time of the scheduled immigrant visa interview abroad. DOS estimates that it will schedule the applicant for an immigrant visa interview within two to three months after approval of the provisional unlawful presence waiver and the applicant's submission of the required immigrant visa processing documents to DOS. This timeframe allows the immediate relative the opportunity to remain united with his or her U.S. citizen spouse or parent until shortly before his or her immigrant visa interview and will allow DOS to

adjudicate an immigrant visa shortly after the applicant appears for his or her interview. DHS also believes that this streamlined process will significantly shorten the length of time immediate relatives must remain outside the United States before they can rejoin their U.S. citizen relatives.

In most instances, the provisional unlawful presence waiver application will be adjudicated at the USCIS National Benefits Center (NBC). USCIS will adjudicate the applications based on the applicant's responses in the Form I–601A, any supporting documentation, and any results from background and security checks. The NBC does not conduct on-site interviews. In cases where an interview would be required, USCIS would have to transfer the applicant's information and A-File/ Receipt File to the local district office and schedule the applicant for an interview, which could take several months. Thus, a requirement to interview all provisional unlawful presence waiver applicants would undermine the goal of this new streamlined process. Through the streamlined provisional unlawful presence waiver process, DHS hopes to reduce the time it takes for an applicant to receive a decision from USCIS and complete the immigrant visa process abroad. DHS, however, has reserved its authority to request that a provisional unlawful presence waiver applicant appear for an interview.

5. Requests for Evidence and Notices of Intent To Deny

Several commenters believed that DHS should generously use Requests for Evidence (RFEs) and Notices of Intent to Deny (NOIDs) to clarify any weaknesses or deficiencies in an alien's provisional unlawful presence waiver application before USCIS renders a decision. Otherwise, some eligible applicants might be unnecessarily excluded from the process. Several commenters asked DHS to expand the use of RFEs to any aspect of the provisional unlawful presence waiver application and not just limit it to the extreme hardship determination. The commenters believed that this change would allow applicants to submit all evidence necessary to establish eligibility for the waiver and give USCIS more information about an applicant's admissibility rather than automatically issuing a denial. With respect to NOIDs, several commenters argued that USCIS should issue a NOID instead of a denial, especially if other grounds of inadmissibility were detected. The commenters also stated that USCIS should issue a NOID to at least let the

Exhibit 1
205

applicant know which grounds of inadmissibility USCIS believes may come up at the immigrant visa interview.

As stated in the proposed rule, DHS is committed to issuing RFEs to address applications it receives that are missing critical information related to extreme hardship or if applications are missing critical information related to whether the alien merits a favorable exercise of discretion. USCIS officers also retain the discretion to issue an RFE on any issue or subject matter, if the adjudicator believes that additional evidence will aid in the adjudication. DHS anticipates that most RFEs will focus on the substantive determination on extreme hardship and any factors that may establish that the applicant warrants a favorable exercise of discretion.

USCIS will not issue NOIDs in this provisional unlawful presence waiver process, notwithstanding the provisions of 8 CFR 103.2(b)(16). A NOID provides an applicant or petitioner with an opportunity to review and rebut derogatory information of which he or she is unaware. In the provisional unlawful presence waiver process, USCIS will not be conducting a full admissibility assessment and, as a result, will not be issuing a NOID describing all possible grounds of inadmissibility. USCIS, instead, will be deciding an individual's eligibility based on his or her responses to the Form I–601A questions and the results from the applicant's background and security checks. Most applicants would be aware of their prior criminal or immigration history and the potential that these offenses might make them ineligible for the requested benefit. If an individual's provisional unlawful presence waiver application is ultimately denied, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS that he or she intends to file a new I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. At that time, the applicant can make his or her case about whether a particular criminal offense or immigration violation renders the applicant ineligible for the immigrant visa. If needed, the applicant will have an opportunity to file all

required waivers and appeal any denial of the Form I–601 application to the AAO.

*F. Denials, Motions To Reopen or Reconsider, and Appeals*

1. Denials and Motions To Reopen/ Reconsider

Several commenters stated that USCIS should not deny a provisional unlawful presence waiver solely because there are other grounds of inadmissibility. The commenters suggested that USCIS approve the provisional waiver and then inform the applicant of any other potential grounds of inadmissibility or ineligibility discovered during adjudication of the provisional unlawful presence waiver application. Some commenters recommended that DHS allow an applicant to file a motion to reopen or reconsider if the provisional unlawful presence waiver application is denied, giving the applicant a chance to rebut DHS's findings. Several commenters and immigrant advocacy groups urged DHS to loosen restrictions on filing of motions to reopen or reconsider. The commenters argued that these are due process protections that are "integral parts of our legal system." The commenters urged DHS to allow such motions especially in cases of changed circumstances, erroneous denials, deficient applications filed by pro se applicants, and deficient or improper filings by "notarios" and individuals not authorized to practice immigration law in the United States. The commenters recommended that DHS do significant public outreach to familiarize potential applicants with the new provisional unlawful presence waiver process and ensure that immigrants are aware of notario practices. The commenters also asked DHS to place warnings in the instructions to the provisional unlawful presence waiver application and post them on the USCIS Web page to help applicants to avoid scams. The commenters suggested that DHS provide applicants with links to all 50 State Bar Associations so that applicants may contact the state bars to ensure that the person assisting them is a licensed attorney or accredited representative who is authorized to practice immigration law.

With regard to DHS's concern with substantial delays in immigrant visa processing if motions to reopen or multiple filings were permitted, the commenters stated that DHS would still expend additional resources on cases where an applicant is denied a provisional unlawful presence waiver

and must go abroad to apply again with USCIS for a waiver of inadmissibility. The commenters also noted that USCIS and DOS would have to coordinate processes anyway if the waiver application is denied or when the agency elects to reopen and deny the waiver on its own motion. Finally, several commenters said that DHS should give the applicant a chance to file a new provisional unlawful presence waiver application if the first request is denied. The commenters noted that most applicants have been in the United States for extended periods of time and have not traveled abroad because of the uncertainty in the process, the hardships, and potential dangers in their home countries. According to these commenters, if USCIS denied waiver applications for this group and did not permit a second filing in the United States, most of these applicants would simply choose to remain in the United States unlawfully and without status.

DHS understands the concerns of the commenters but nonetheless believes that allowing motions to reopen or reconsider would undercut the efficiencies USCIS and DOS will gain through the streamlined provisional unlawful presence waiver process. DHS also has determined that allowing motions to reopen or reconsider could significantly interfere with the operational agreements between USCIS and DOS and could substantially delay waiver and immigrant visa processing. To alleviate some of the commenters' concerns, however, USCIS has eliminated the filing limitation initially proposed in the NPRM. Consequently, if an individual's provisional unlawful presence waiver request is ultimately denied, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS that he or she intends on filing a new I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible.

As indicated in the proposed rule, DHS is retaining its authority and discretion to reopen or reconsider a decision on its own motion. For the provisional unlawful presence waiver process, USCIS may reopen the decision and deny or approve the provisional

Exhibit 1
206

unlawful presence waiver at any time if USCIS finds that the decision was issued in error or approval is no longer warranted. USCIS will follow the requirements of 8 CFR 103.5(a)(5) before reopening a case and denying a waiver application.

DHS agrees with the need for public outreach and materials specific to the provisional unlawful presence waiver process to help potential applicants avoid being the victims of scams by individuals who are not authorized to practice immigration law. USCIS has already begun an initiative, the Unauthorized Practice of Immigration Law (UPIL) initiative, to inform the public about individuals who are not authorized to practice immigration laws and has held several stakeholders outreach engagements on the topic. For more details about this initiative, please visit the USCIS Web site at *www.uscis.gov/avoidscams.*

2. Denials and Initiation of Removal Proceedings

Several commenters questioned the usefulness of the proposed rule, especially because it did not contain any confidentiality provisions or make clear what would happen to an individual if a provisional unlawful presence waiver is denied. Many thought that undocumented individuals will be hesitant or deterred from filing the provisional unlawful presence waiver as it would expose their status in the United States and cause their families even more stress. Numerous commenters asked DHS to implement a confidentiality provision so that the denial of the provisional unlawful presence waiver request does not automatically trigger removal proceedings or notice to ICE that the individual's case was denied; others requested that DHS include a "nonremovability" clause in the regulatory text. Some commenters also urged USCIS to work closely with CBP to ensure that CBP will not initiate removal proceedings against an alien who is departing the United States to attend the immigrant visa interview.

DHS is committed to focusing its finite enforcement resources on its enforcement priorities, including individuals who pose a threat to public safety or national security. As indicated in the proposed rule, DHS will follow current agency policy for issuance of Notices to Appear (NTAs). *See www.uscis.gov/NTA.* However, consistent with its civil enforcement priorities, DHS does not envision initiating removal proceedings against aliens or referring aliens to ICE whose provisional unlawful presence waiver

applications have been approved. Similarly, consistent with its civil enforcement priorities, DHS also does not envision initiating removal proceedings against aliens whose Form I–601As are denied or withdrawn prior to final adjudication. Pursuant to its existing policy governing issuance of NTAs and referrals to ICE,[14] an individual whose request for a provisional unlawful presence waiver is denied or who withdraws the Form I–601A prior to final adjudication will typically be referred to ICE only if he or she is considered a DHS enforcement priority—that is, if the individual has a criminal history, has committed fraud, or otherwise poses a threat to national security or public safety. Given USCIS's existing NTA policy, which appropriately focuses USCIS's referrals to ICE on individuals who are considered DHS enforcement priorities, DHS will not create a "nonremovability" clause or confidentiality provision to preclude automatic initiation of removal proceedings. DHS will follow the NTA issuance policy in effect at the time of the adjudication to determine if it will initiate removal proceedings against an applicant whose Form I–601A provisional unlawful presence waiver application is denied. Furthermore, if DHS discovers acts, omissions, or post-approval activity that would meet the criteria for NTA issuance or determines that the provisional unlawful presence waiver was granted in error, DHS may issue an NTA, consistent with DHS's NTA issuance policy, as well as reopen the provisional unlawful presence waiver approval and deny the waiver request.

3. Appeals

Several commenters argued that DHS should permit appeals of denials while the applicant is in the United States. The commenters claimed that denial of a provisional unlawful presence waiver was equivalent to a final waiver denial and should be subject to appeal rights similar to those allowed for the current Form I–601 denials that are filed with the AAO. One commenter argued that not allowing aliens to appeal essentially meant that DHS would adjudicate all waivers favorably. The commenter also stated that denying appeals would not meet the due process requirements. A

few commenters urged DHS to allow appeals at least in cases in which there were questions of law, errors, or changed circumstances. Finally, several commenters stated that DHS, by relegating certain questions of inadmissibility to either DOS or federal court, was abdicating its authority to interpret the law for grounds of inadmissibility where no waiver is available.

DHS disagrees with these positions. There is no cognizable due process interest in access to or eligibility for a discretionary, provisional unlawful presence waiver of inadmissibility. *See, e.g., Champion* v. *Holder,* 626 F.3d 952, 957 (7th Cir. 2010) ("To articulate a due process claim, [the individual] must demonstrate that she has a protected liberty or property interest under the Fifth Amendment. Aliens have a Fifth Amendment right to due process in some immigration proceedings, but not in those that are discretionary.") (citations omitted). The provisional unlawful presence waiver process is purely discretionary and no alien has a right to obtain a waiver from the Secretary of Homeland Security.[15]

Even assuming that such an interest exists, none of the commenters cite any case or statute that supports the claim that the Due Process Clause of the Fifth Amendment *requires* an Executive agency to provide for administrative appeal of an agency decision. Section 10(c) of the Administrative Procedure Act, 5 U.S.C. 704, does permit an agency to provide an administrative appeal and if the agency chooses to do so, the agency can also, by regulation, make the filing of an administrative appeal a necessary prerequisite to judicial review. *See Darby* v. *Cisneros,* 509 U.S. 137 (1993). But nothing in section 10(c) or the *Darby* decision *mandates* that an agency must provide for an administrative appeal.[16] In upholding

[14] *See* USCIS Memorandum, Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in cases Involving Inadmissible and Removable Aliens (Nov. 7, 2011), available at: *http://www.uscis.gov/USCIS/Laws/Memoranda/Static_Files_Memoranda/NTA%20PM%20(Approved%20as%20final%202011-7-11).pdf.*

[15] Even with respect to ordinary Form I–601 waivers, Congress specifically gave the Secretary discretion to decide who should or should not be granted an unlawful presence waiver under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). This discretion is not diminished by the fact that one element of that determination rests on a legal requirement—satisfying the extreme hardship standard. Even if an applicant establishes extreme hardship, the Secretary is not required to favorably exercise her discretion in the adjudication of the waiver. *See Matter of Mendez-Moralez,* 21 I&N Dec. 296, 301 (BIA 1996) ("Extreme hardship is a requirement for eligibility, but once established it is but one favorable discretionary factor to be considered.").

[16] To the contrary, the Court's conclusion in *Darby* that pursuing an administrative appeal is a prerequisite to judicial review only if required by statute or the agency chooses to provide for such an administrative appeal and also chooses to make it mandatory strongly suggests that an agency is not

Exhibit 1
207

the BIAs's practice of "affirmance without opinion" of immigration judge decisions, for example, several courts of appeals have recognized that Due Process does not require an agency to provide for administrative appeal of its decisions. *See, e.g., Zhang* v. *U.S. Dep't of Justice,* 362 F.3d 155, 157 (2d Cir. 2004); *Loulou* v. *Ashcroft,* 354 F.3d 706, 709 (8th Cir. 2003); *Falcon Carriche* v. *Ashcroft,* 350 F.3d 845, 850 (9th. Cir. 2003); *Mendoza* v. *U.S. Att'y Gen.,* 327 F.3d 1283, 1289 (11th Cir. 2003); *Albathani* v. *INS,* 318 F.3d 365, 376 (1st Cir. 2003); *Guentchev* v. *INS,* 77 F.3d 1036, 1037–38 (7th Cir. 1996).

Finally, if USCIS denies an alien's Form I–601A, the alien has two alternate avenues for obtaining a waiver of inadmissibility: (1) Filing a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver or (2) filing a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. The Form I–601 is appealable to the AAO.

Appeals should be reserved for actions that are based on a comprehensive assessment of the applicant's admissibility. Jurisdiction over the final admissibility determination in the context of the Form I–601 lies with the AAO and with DOS in the context of the immigrant visa eligibility determination. It would be an inefficient use of resources for DHS to allow an administrative appeal of a decision that does not take into consideration the full inadmissibility determination or any other factors that may be discovered during the course of the immigrant visa interview abroad. DHS, therefore, is retaining its policy of not affording an administrative appeal of the denial of a provisional unlawful presence waiver application.

## G. Effect of Pending or Approved Provisional Unlawful Presence Waivers

Many commenters asked USCIS to consider allowing aliens with pending provisional unlawful presence waiver applications to travel and work while waiting for a decision from USCIS to travel abroad for their immigrant visa interview. Several commenters also suggested that individuals with pending provisional unlawful presence waiver applications be given Social Security numbers and driver's licenses. Some

required to allow for administrative appeal at all, in the absence of a statutory mandate.

commenters requested that aliens not accrue unlawful presence during the pendency of Form I–601A or while waiting for their immigrant visa interview. The commenters believed that a pending provisional unlawful presence waiver application should "stop the clock" on any immigration violation. Another commenter stated that the final rule should clearly specify that the pendency of a Form I–601A protects an individual from further accrual of unlawful presence and places the individual in a period of stay authorized by the Secretary described in INA section 212(a)(9)(B)(ii), 8 U.S.C. 1182(a)(9)(B)(ii). Finally, several commenters stated that approval of the provisional unlawful presence waiver should guarantee immigrant visa issuance and the right to return to the United States.

A waiver of inadmissibility is an ancillary benefit to a primary application that would give an alien legal immigrant status; the waiver, by itself, does not convey a legal status. In the provisional unlawful presence waiver process, the primary application is the immigrant visa over which DOS, not USCIS, has jurisdiction. The waiver only addresses grounds of inadmissibility (in this instance, unlawful presence) that may preclude DOS from issuing the immigrant visa at the time of the applicant's interview abroad. If DOS approves the immigrant visa, the alien can be admitted to the United States as a LPR, should CBP determines that he or she is otherwise admissible and entitled to that immigrant visa classification. *See* INA sections 204(e), 211(a), and 221(h); 8 U.S.C. 1154(e), 1181(a), and 1201(h). Interim benefits provided on the basis of something pending with DHS or DOJ are granted only in connection with a pending application for an immigration status within the United States. DHS does not have authority to issue Social Security numbers; the Social Security Administration has sole jurisdiction over the issuance of Social Security numbers. Finally, DHS has no authority to issue driver's licenses; the issuance of these types of documents are governed by the laws and regulations of the individual U.S. states, which prescribe the conditions for obtaining and issuance of identification cards and drivers' licenses.

As stated in the proposed rule, the approval of a provisional unlawful presence waiver does not create a lawful immigration status, extend any authorized period of stay, protect aliens from removal or law enforcement action, or grant any other immigration benefits, including temporary work

authorization and advance parole. DHS is not altering its position on interim benefits as initially stated in the proposed rule. Finally, the grant of a provisional unlawful presence waiver does not guarantee that an individual with an approved immigrant visa will be admitted to the United States by CBP.

Operationally, USCIS and DOS have coordinated closely on this streamlined process and the close timeframe between processing of the Form I–601A approval and the immigrant visa application will encourage individuals to speed up the consular process and to depart from the United States as quickly as possible. Any issuance of interim benefits or specific authorized periods of stay will hinder this goal and the integrity of the program. DHS added language to the final rule to make clear that applicants are not eligible for interim benefits and that a pending or approved application for provisional unlawful presence waiver does not authorize any interim benefits. *See* section 212.7(e)(2).

DHS reminds the public that the filing or approval of a provisional unlawful presence waiver application will *not:* (1) Confer any legal status; (2) protect against the accrual of additional unlawful presence; (3) authorize an alien to enter the United States without securing a visa or other appropriate entry document; (4) convey any interim benefits (*e.g.,* employment authorization, advance parole, or eligibility to be paroled based solely on a pending or approved Form I–601A); or (5) protect an alien from being placed in removal proceedings or removed from the United States, in accordance with current DHS policies governing initiation of removal proceedings and use of prosecutorial discretion.

## H. Automatic Revocation

Several commenters questioned the regulatory text in proposed 8 CFR 212.7(a)(4)(iv), which provides for automatic termination of the validity of an approved waiver under INA section 216(f), 8 U.S.C. 1186a(f), when the conditional resident status of an alien admitted under INA section 216, 8 U.S.C. 1186a, is terminated. The commenters argued that this provision was contrary to the INA and should be removed from the final rule. The commenters noted that under INA section 216(f), 8 U.S.C. 1186a(f), waivers under INA section 212(h), 8 U.S.C. 1182(h) (for certain criminal grounds of inadmissibility), and INA section 212(i) 8 U.S.C. 1182(h) (for fraud or misrepresentation), are the only types of waivers that are automatically terminated upon termination of

Exhibit 1
208

conditional resident status. As a result, they assert, DHS lacks the authority to implement this regulatory change when Congress has already clearly spoken on the matter.

A few commenters also argued that DHS should eliminate automatic revocation or adjudicate revocations separate and apart from the provisional unlawful presence waiver process. The commenters believed that it would be more efficient for DHS to reserve the right to review an approved provisional unlawful presence waiver rather than automatically revoke it, especially when DOS determines that the applicant is subject to another ground of inadmissibility or there are other negative discretionary factors that were not considered at the time of the Form I–601A adjudication. The commenters also opined that DHS would not need to re-adjudicate any portion of the waiver that has the same or lesser standard needed for waiving the newly discovered ground of inadmissibility (e.g., if the new ground of inadmissibility required a showing of extreme hardship, DHS could simply adopt the provisional unlawful presence waiver determination on extreme hardship, when adjudicating the waiver request for the new ground of inadmissibility).

DHS agrees that the statute at INA section 216(f), 8 U.S.C. 1186a(f), only addresses automatic revocation of approved waivers under INA sections 212(h) or (i). As a result, it has clarified that the amendment to 8 CFR 212.7(a)(4), regarding treatment of certain waivers upon the termination of conditional resident status under INA section 216(f), 8 U.S.C. 1186a(f), and automatic revocation of approved waivers of inadmissibility, only applies to approved waivers based on INA sections 212(h) and (i), 8 U.S.C. 1182(h) and (i), and is revising 8 CFR 212.7(a)(4) accordingly.

As to revocations, DHS has not adopted the commenters' suggestions. DHS believes that revocation of an approved case requires an assessment of the facts and circumstances as they existed at the time the case was approved as well as any newly discovered information that may have affected the officer's decision or discretion at the time of adjudication. When USCIS reviews a case for possible revocation, USCIS looks at the facts and law at the time the case was approved to determine if the applicant was in fact eligible for the benefit requested. USCIS also reviews any newly discovered information to see if it is relevant and could have potentially affected the officer's discretionary assessment in the

case. Since the provisional unlawful presence waiver is a discretionary process, DHS will retain its authority on revocations and its position on automatic revocations. Consistent with 8 CFR 103.2(b)(16), if USCIS discovers derogatory information that was unknown to the applicant, USCIS will provide notice of such information and give the applicant an opportunity to respond prior to any decision to deny the application. DHS, however, will not allow aliens to appeal a decision to revoke a provisional unlawful presence waiver.

*I. Comments on Form I–601A, Application for Provisional Unlawful Presence Waiver, and the Form Instructions*

DHS invited the public to comment on the proposed rule and the Form I–601A and the instructions to accompany the form. DHS has considered the comments to the Form I–601A and the form instructions. While DHS has not adopted all suggestions made by comments, below is a list of changes to the form and instructions that DHS incorporated as a result of these comments.

1. Comments on Form

a. Part 1, Information About Applicant—Immigration or Criminal History Records

Several commenters suggested that USCIS allow individuals in removal proceedings to apply for provisional unlawful presence waivers if their removal proceedings had been administratively closed pursuant to ICE's Prosecutorial Discretion (PD) initiative. Several commenters also stated that this section of the form was confusing and/or inaccurate. Specifically, the commenters believed this section was inaccurate because it indicates that an applicant will be ineligible for a provisional unlawful presence waiver if the applicant answers "Yes" to certain questions relating to other possible grounds of inadmissibility. The commenters also believed the questions were too broad to lead to a firm finding of inadmissibility and should be amended to say that the applicant "may" not be eligible and that USCIS "may" deny the application if the applicant answers "Yes" to those questions. These commenters also identified specific inaccuracies and provided suggested edits to revise this section.

DHS has amended the final rule to indicate that an individual in removal proceedings may apply for a provisional unlawful presence waiver if the

individual's removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. DHS is not limiting eligibility solely to individuals whose cases were closed pursuant to the ICE Prosecutorial Discretion (PD) initiative. Any alien whose removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A, can apply for a provisional unlawful presence waiver. If USCIS approves the provisional unlawful presence waiver for an individual whose removal proceedings are administratively closed, the individual should seek termination or dismissal of his or her removal proceedings before departing the United States to appear at the immigrant visa interview to avoid possible delays in his or her immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. DHS has updated the form and its instructions accordingly.

DHS has incorporated many of the commenters' suggested edits while rewriting this part of the form to clarify ambiguities and to correct inaccuracies. DHS also has revised the form and instructions to clarify that USCIS "may" find an applicant ineligible for a provisional unlawful presence waiver if USCIS determines that there is *reason to believe* the Department of State may find the applicant ineligible for a ground of inadmissibility other than unlawful presence. Regardless of whether USCIS approves or denies the provisional unlawful presence waiver, an immigrant visa applicant should present evidence of eligibility and any documents needed to establish admissibility to the consular officer at the time of his or her immigrant visa interview. The approval of a provisional unlawful presence waiver does not guarantee that the consular officer will find the applicant eligible for an immigrant visa. Also, the denial of a provisional unlawful presence waiver does not preclude the applicant from filing a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A.

Alternatively, the applicant can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after his or her immigrant visa interview at the U.S. Embassy or consulate abroad. The

Exhibit 1
209

purpose of these eligibility questions is not for USCIS to pre-adjudicate immigrant visa eligibility, but to limit the provisional unlawful presence waiver process to individuals whose only potential ground of inadmissibility is based on prior unlawful presence in the United States. All other potential grounds of inadmissibility and/or ineligibility need to be addressed with the consular officer during the immigrant visa interview.

Finally, one commenter suggested that the form be enhanced by incorporating a detailed questionnaire, similar to that of Form I–601, aimed at uncovering other potential grounds of inadmissibility.

DHS did not include a detailed questionnaire covering every potential ground of inadmissibility because the Form I–601A may only be used to waive unlawful presence. The purpose of the section entitled "Immigration or Criminal History Records" is to give applicants an opportunity to explain any possible immigration or criminal history records which USCIS may uncover during routine system and background checks. DHS will not make any changes to the form based on this comment.

b. Part 2, Information About Immediate Relative Petitions and Consular Processing

Many commenters suggested that DHS allow individuals to cancel or reschedule their immigrant visa interviews in order to seek a provisional unlawful presence waiver.

In response to these suggestions, DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS immigrant visa process. By including aliens who were scheduled for an interview prior to the publication of this final rule, the projected volume of cases could significantly increase and would create backlogs not only in the provisional unlawful presence waiver process, but also in adjudication of other USCIS benefits. The increased volume would also adversely impact DOS and its immigrant visa process.

For these reasons, DHS will not expand the provisional unlawful presence waiver to include individuals whose immigrant visa interviews were scheduled before the date of publication of this final rule January 3, 2013, even if the consulate or individual cancelled or rescheduled the immigrant visa interview *after* the date of publication of this final rule. DHS adds language to the

final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.*, the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

USCIS will reject or deny any Form I–601A filed by an alien who was scheduled for an interview prior to the date of publication of this final rule, even if the alien's interview is rescheduled *after* the date of publication

of this final rule. DHS has updated the form and its instructions accordingly.

c. Part 3, Information About Qualifying Relative

Many commenters asked DHS to allow eligible applicants to show extreme hardship to a LPR spouse or parent, if applicable, since the statute authorizes a waiver of unlawful presence based on a showing of extreme hardship to a spouse or parent who is either a U.S. citizen or LPR.

DHS has considered these comments but is not adopting the suggested change. As stated in the proposed rule, a primary purpose for creating the provisional unlawful presence waiver process is to reduce the separation of U.S. citizens and their immediate relatives. Focusing on hardship to U.S. citizens is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens. It also is consistent with the Secretary's authority to administer the immigration laws and determine the most efficient means for effectuating the waiver process. *See* 77 FR at 19908.

d. Interviews

One commenter suggested that when USCIS requires an interview for a provisional unlawful presence waiver, USCIS should allow the applicant to choose to either appear at a local USCIS field office for an in-person interview or have a video-conferenced interview with an adjudicator at a USCIS service center using appropriate technology (*e.g.*, Skype).

DHS reviewed these comments but did not adopt the suggestions. DHS does not anticipate that many provisional unlawful presence waiver applicants will require an in-person interview. Also, USCIS does not conduct interviews at the NBC, namely because of its remote location and the type of benefit requests adjudicated by that center, which are generally paper-based decisions. USCIS also will not conduct video interviews in lieu of in-person interviews when such interviews are required. Therefore, DHS will not make the suggested change to the form.

2. Comments on Instructions

a. Eligibility Criteria—Pending Adjustment Applications

Several commenters were confused about what it means to have a pending application for adjustment of status and did not understand why this would affect eligibility for a provisional unlawful presence waiver.

DHS will not remove the restriction for individuals who have an application for adjustment of status pending with

Exhibit 1
210