**558** **Federal Register** / Vol. 78, No. 2 / Thursday, January 3, 2013 / Rules and Regulations

USCIS. Individuals who are eligible to obtain LPR status while inside the United States through the adjustment of status process and intend to pursue LPR status through that process do not need the provisional unlawful presence waiver. The provisional unlawful presence waiver is only valid for the purpose of seeking an immigrant visa outside the United States. To avoid confusion, DHS has updated the form instructions to clarify that this restriction only applies to individuals with a pending Form I–485, Application to Register Permanent Residence or Adjust Status.

b. Limitations on Filing of Provisional Unlawful Presence Waivers

Many commenters suggested that DHS remove the restriction to the number of times an individual may seek a provisional unlawful presence waiver or modify it to allow re-filing of the provisional unlawful presence waiver application.

DHS considered these comments and has changed the final rule to reflect that if an individual's provisional unlawful presence waiver request is denied or withdrawn prior to final adjudication, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS of his or her intent to file a new Form I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. DHS has updated the form and instructions accordingly.

c. Qualifying Relatives

One commenter suggested adding "child" as a qualifying relative for establishing extreme hardship. DHS cannot adopt this suggestion because Congress limited the qualifying relationship for purposes of establishing extreme hardship to spouses or parents. DHS cannot change this statutory requirement.

d. Child Status Protection Act

One commenter asked DHS to clarify in the Form I–601A instructions how the provisional unlawful presence waiver relates to children who benefit from the CSPA. DHS has added language to the Form I–601A

instructions to make clear applicants will remain eligible for a provisional unlawful presence waiver as long as the applicants remain "immediate relatives" as defined in the INA, as amended by the CSPA. Thus, an aged-out child may still qualify for access to the provisional unlawful presence waiver process as long as the child is classified as an immediate relative under the INA.

e. Statement From Applicant

One commenter suggested adding a sentence in Part 5 of the instructions to explain that applicants may supplement their statements about extreme hardship and factors warranting a favorable exercise of discretion with an attached letter. DHS added the information as requested to the Form I–601A instructions.

f. Penalties

One commenter suggested adding a reminder in the instructions that applicants read the section entitled "Penalties" before the applicant signs the application. DHS added the reminder on the form and in the form instructions, as requested.

g. Required Documents—Check List

One commenter suggested adding a checklist to assist applicants with information on the types of documents and statements that should be submitted with the provisional unlawful presence waiver application. DHS added a separate section with a checklist as requested.

h. Unauthorized Practice of Immigration Law

One commenter suggested adding a warning regarding the unauthorized practice of immigration law.

DHS agrees with this suggestion. In 2011, USCIS started an initiative—the Unauthorized Practice of Immigration Law (UPIL) initiative—to educate the public about potential fraud and scams in the immigration context. USCIS has posted information about the UPIL initiative on its Web site. DHS encourages applicants to review the information at *www.uscis.gov/ avoidscams*. DHS also has added a link to this Web site on the form instructions.

J. Miscellaneous Comments

1. Statutory Changes

A large number of supporters of the rule indicated that the proposed rule did not go far enough. The commenters asked DHS to allow individuals who were eligible for the provisional

unlawful presence waiver but ineligible for adjustment of status to remain in the United States and adjust their status to a LPR. Several commenters asked DHS to reinstate INA section 245(i), 8 U.S.C. 1255(i). Others asked if DHS could reduce the number of years an alien must remain outside the United States because of unlawful presence under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). A few commenters also asked if DHS could include a waiver of INA section 212(a)(6)(C)(ii), 8 U.S.C. 1182(a)(6)(C)(i) (false claim to U.S. citizenship). Some commenters asked DHS to grant waivers even if the applicants did not meet all statutory requirements. One commenter said that DHS should eliminate the discretionary portion of the waiver in its entirety. Others wanted DHS to simply grant legal status to individuals married to U.S. citizens, irrespective of whether they had an approved petition or needed a provisional unlawful presence waiver. They argued that if an individual is the spouse of a U.S. citizen then such an individual should simply be able to become a LPR of the United States.

Congress has prescribed the statutory requirements for obtaining LPR status through adjustment of status in the United States. Congress also established the current grounds of inadmissibility and the conditions for any waivers associated with such grounds. DHS does not have the authority to change or dispense with those statutory requirements. DHS cannot reinstate INA section 245(i), 8 U.S.C. 1225(i), or take any action that would grant permanent resident status to individuals who do not meet the statutory requirements for that status. Only Congress can amend the statutory requirements that individuals must meet to qualify for adjustment of status. DHS, therefore, cannot adopt these recommendations. However, DHS supports comprehensive immigration reform, and DHS will implement any legislation that may be enacted by Congress, including any authorized extension of INA section 245(i), 8 U.S.C. 1225(i).

2. Fraud Detection and Prevention; National Security

Some commenters argued that the Federal Government's focus should be on enforcement and deterring illegal entry and marriage fraud. Others opined that the provisional unlawful presence waiver process was a "back door" through which illegal immigrants who pose a threat to national security could be granted a waiver and LPR status.

A core mission of DHS is to protect national security, public safety, and the

Exhibit 1
211

integrity of the immigration process. DHS has a number of preventative measures in place, as provided by law and through agency policy, to address matters relating to national security and fraud. DHS incorporates these measures through regulations and standard operating procedures that bolster the adjudications process. USCIS's Fraud Detection and National Security (FDNS) Directorate focuses on its fraud and national security mission. FDNS investigates fraud and national security issues relating to the immigration benefit process and makes appropriate referrals to ICE, DOJ, and other law enforcement agencies. USCIS has established standard operating procedures in field offices for referrals to FDNS on potential fraud cases that may require additional review. USCIS's Office of Policy and Strategy is responsible for developing future benefit fraud assessments. For fraud prevention, FDNS has initiated fraud training for Immigration Services Officers (ISOs) to detect any patterns or increase in fraudulent practices in a particular application type or area of the United States. Additionally, USCIS already has processes in place, including requiring additional interviews and home site visits, conducted by specially trained immigration officers throughout the United States, to assess whether a marriage was entered into to evade immigration laws. These processes provide strong tools for combating potential fraud.

Congress provided several measures aimed at preventing marriage fraud, focusing especially on the potential for fraud in marriages less than two years' duration. For instance, Congress mandated that aliens married less than two years generally are subject to conditional resident status for two years after admission as an immigrant. *See* INA section 216, 8 U.S.C. 1186a; 8 CFR part 216; 8 CFR 235.11. Once USCIS approves an immediate relative petition for an alien married to a U.S. citizen, and DOS determines that the alien is admissible and eligible for an immigrant visa, the alien can seek admission to the United States as an LPR. If, however, the alien married the U.S. citizen less than two years before the date of admission, the alien is admitted conditionally for a two-year period.

In general, the U.S. citizen petitioner and the conditional permanent resident must jointly seek to remove the conditions within the 90-day period immediately preceding the second anniversary of the date the alien obtained conditional permanent residence status. If the U.S. citizen petitioner and the conditional permanent resident fail to do so, the alien's conditional permanent resident status is terminated automatically, and any waiver granted in connection with the status under INA sections 212(h) or (i), 8 U.S.C. 1182(h) or (i), is automatically terminated. Furthermore, if USCIS determines that the marriage was entered into to evade the immigration laws, USCIS cannot approve future petitions for that alien. *See* INA section 204(c), 8 U.S.C. 1154(c). USCIS also reserves the authority, as it does generally for other benefit requests, to interview the alien and the U.S. citizen spouse in connection with the provisional unlawful presence waiver application in the exercise of discretion.

Another preventive measure is the provisional unlawful presence waiver requirement that the applicant appear for biometrics capture at a USCIS Application Support Center (ASC). The biometrics requirement allows USCIS to run thorough background and security checks on individuals seeking an immigration benefit to determine if an alien is not only potentially subject to other grounds of inadmissibility or not eligible for a favorable exercise of discretion, but also whether the alien poses a national security or public safety risk.

3. Backlog Reduction

One commenter suggested that DHS first clear all application backlogs abroad and at the AAO before implementing any new process. Commenters also indicated that DHS should give special consideration to individuals who have a pending waiver application that was filed abroad.

USCIS has already undertaken several efforts to reduce the backlogs in adjudication, both abroad and at the AAO. As of June 4, 2012, USCIS has implemented centralization of certain Form I–601 filings in the United States. USCIS has dedicated additional resources on a temporary basis to expeditiously process the cases filed prior to centralization. USCIS anticipates that the residual cases filed prior to centralization and during the transition period that recently ended on December 4, 2012, will be completed within about six months of the effective date of this final rule. By moving most of the adjudication case load to the United States for these cases, USCIS expects to reduce the filing and processing times for overseas filers of Form I–601.

The AAO has also undertaken various backlog reduction efforts in the context of administrative appeals. Since July 2011, the waiver adjudication branch of the AAO has reduced processing time from 27 to 19 months, and reduced the number of cases in the backlog by more than 1,400. USCIS anticipates this rate of reduction to continue and plans on reducing processing time for waivers to 6 months by June 2013. These various efforts demonstrate the Department's continued commitment to timely adjudication of waivers and customer service with the resources available.

4. Other Immigrant Visa Requirements

A few commenters suggested that individuals who are eligible for the provisional unlawful presence waiver should have the option to complete the medical examination required for immigrant visa issuance in either the United States or abroad. DHS did not adopt this suggestion.

DOS has jurisdiction for health-related inadmissibility determinations in the overseas immigrant visa application context; DOS, therefore, requires immigrant visa applicants to have the required medical examination performed by a DOS-designated panel physician abroad. *See* 22 CFR 42.66. DOS and the Centers for Disease Control and Prevention within the Department of Health and Human Services set the criteria and parameters for these medical exams depending on country conditions. While USCIS has designated civil surgeons for certifications in other contexts, these civil surgeons are not recognized by DOS and therefore cannot complete the required medical examination for purposes of the visa issuance abroad. Operationally, allowing provisional unlawful presence waiver applicants to complete the medical examination in the United States could cause delays and backlogs at DOS. DHS, therefore, will not adopt this suggestion.

5. Departure Requirement and Third-Country Processing

Several commenters asked why approved provisional unlawful presence waiver applicants are required to return to their home country to complete the immigrant visa requirement. The commenters suggested that these applicants should not have to travel to a dangerous place like Ciudad Juarez, Mexico, but instead complete their process in a safe third country like Canada. Many commenters said that requiring individuals to depart would have a significant impact on U.S. citizen family members, especially if the individual is the primary financial provider for the family. The commenters also said that departure would cause U.S. citizen family members to become dependent on the U.S. Government if

Exhibit 1
212

the immediate relative had to remain outside of the United States for a prolonged period of time. Several other commenters suggested that DHS eliminate the departure requirement altogether or at least allow provisional unlawful presence waiver applicants to be interviewed in the United States or pick up their immigrant visa at their country's embassy in the United States. Finally, several Congressional commenters urged DHS to coordinate with DOS so that provisional unlawful presence waiver applicants do not have to return home. The commenters stated that the departure requirement should be eliminated entirely or, alternatively, that DOS should identify additional consulates for processing of the provisional unlawful presence waiver and immigrant visa issuance. The commenters also suggested that DOS's NVC could assign immigrant visa petitions and provisional unlawful presence waiver applications to designated consular posts in safe and convenient locations, citing the authority as part 9 of the Foreign Affairs Manual (FAM) section 42.61, Note 2.1. Finally, the commenters said that DHS should consider using its parole authority broadly to eliminate the need for immediate family members to travel abroad to obtain an immigrant visa to which they are entitled under current law.

DOS has jurisdiction over consular processing and setting the location for immigrant visa application filing and interviews. *See* 22 CFR 42.61. DHS, therefore, will not alter this requirement and, as stated above, cannot change the statutory requirements for adjustment of status in the United States. In response to the request for DHS to broadly use its parole authority for provisional unlawful presence waiver applicants, DHS will continue to exercise its authority to parole applicants for admission into the United States on a case-by-case basis, reviewing the unique circumstances and facts that relate to each individual's case to determine whether the individual's circumstances warrant a discretionary grant of parole based on urgent humanitarian factors or as a significant public benefit. INA section 212(d)(5), 8 U.S.C. 1182(d)(5). With this rule, DHS is not changing its current policy on the use of its parole authority.

6. Comprehensive Immigration Reform

Many commenters, including numerous individuals who signed group petitions, said that the focus should be on comprehensive immigration reform (CIR) rather than a "patchwork" of small initiatives that do not fix the current

broken immigration system as a whole. While the commenters generally supported some type of CIR, their views on what should be included in a CIR bill varied significantly.

Some commenters stated that CIR is needed to legalize the current immigrant population in the United States and to create guest worker programs that will benefit the U.S. economy. The commenters argued that legalization will result in significant economic benefits to the United States and help solve many of our current immigration problems. These commenters supported the idea of reuniting U.S. citizen families and stated that the Administration should focus on legal immigration and naturalization to ensure that immigrants are fully aware of the rights and opportunities available to them.

Many commenters opposed the provisional unlawful presence waiver process because they believed it would encourage illegal immigration and that it was a form of "backdoor amnesty." Some commenters believed that Congress should enact stronger penalties against those who enter illegally and enforce the current laws against those who deliberately violated U.S. immigration law. The commenters also believed that the focus should be on border security and legal immigration, not on aliens who made the choice to come to the United States illegally. One commenter noted that the current immigration policy was not working and that the United States needs a "comprehensive top down rewrite" of all the immigration laws. A few commenters were opposed to the provisional unlawful presence waiver process because they believed it was politically motivated and not designed to fix the current immigration system.

Fixing the current immigration system is a top priority for DHS, and the Administration is committed to comprehensive immigration reform. Congress has the power to amend the immigration laws to create a workable system that unites families, improves the U.S. economy, and preserves national security and public safety. USCIS will do everything possible to prepare for successful implementation of any comprehensive immigration reform legislation and ensure that the integrity of the U.S. immigration system is maintained.

7. Transformation

Several commenters urged DHS to convert the provisional unlawful presence waiver process and immigrant visa process to an electronic process. The commenters believed that if

applicants and attorneys could file online, they would save money, time, paper, and the mailing costs that currently accompany paper filings. The commenters stated that E-filing is consistent with USCIS's current Transformation Initiative.

DHS agrees with the commenters that it should move toward electronic filing of immigration benefits. In fact, USCIS already is transforming its immigration benefit process and recently launched its new electronic filing and adjudication system known as USCIS Electronic Immigration System (USCIS ELIS). USCIS ELIS allows individuals to establish a USCIS ELIS online account and, currently, to apply online for an extension or change of their nonimmigrant status for certain visa types. USCIS ELIS also enables USCIS officers to review and adjudicate online filings from multiple agency locations across the country. USCIS believes that the Transformation Initiative is an important step forward for the agency and is working to expand system features and functionality in additional releases this calendar year and beyond. In future releases of USCIS ELIS, USCIS will add form types and functions, including waivers of inadmissibility, gradually expanding the system to cover filing and adjudication of all USCIS immigration benefits. USCIS will notify the public when such expansions and additions of form types occur.

*K. Comments on the EO 12866/13563 Analysis*

DHS received several comments on the volume projection included in the analysis, especially as it relates to the DHS projection of additional demand. Many commenters believed that application volume is understated. One commenter stated that the Federal Government stands to earn over one billion dollars from the change. Another commenter suggested that DHS examine rates of use of health care and public education as points for comparison in determining demand for the provisional unlawful presence waiver. This commenter suggested that using undocumented immigrant access to health care and public education as models will reveal that the provisional unlawful presence waiver is at risk for underuse. Many commenters noted that the costs of obtaining an immigrant visa limit those who can afford to apply for the provisional unlawful presence waiver and that increasing the cost with required biometric submission is another barrier to participation. A commenter was concerned about the cost of this rule would add to the national debt. Another commenter argued that current

Exhibit 1
213

immigration laws and the provisional unlawful presence waiver rule disproportionately impact children of immigrant families who have a greater likelihood to be either low-income or living under the poverty line and are not as likely to have resources needed to make use of the waiver option.

As stated repeatedly throughout the analysis, DHS was unable to precisely project application volumes for the provisional unlawful presence waiver due to unavailability of data on those who are unlawfully present. Historical estimates show only aliens who have taken the steps to obtain an immigrant visa. DHS did conduct a reasonable methodological approach based on those who have made use of inadmissibility waivers under the current process.

DHS does not believe that using public health and education records would better refine our estimates. As the commenter noted, these services are underutilized by undocumented immigrants. Furthermore, neither these models nor the others that were examined differentiate undocumented immigrants with U.S. citizen immediate relatives from those undocumented immigrants with other immigrant/citizen family compositions. Since only immediate relatives of U.S. citizens may apply for provisional unlawful presence waivers, DHS does not believe that using the suggested models will offer a more reliable means of estimating the additional demand.

While DHS acknowledges that the costs of obtaining an immigrant visa may be a constraint on demand, and agree these costs will have more impact on low-income immigrant families, the only additional cost of the provisional unlawful presence waiver process is beyond the costs incurred for submitting biometrics. Relative to the other costs, biometric costs represent approximately eight percent of the total cost of obtaining an immediate relative immigrant visa. The costs of obtaining an immigrant visa are not costs of this rule. Finally, this final rule will not add to the national debt. As explained in the proposed rule at 77 FR 19919, this final rule is not expected to impose additional costs on the federal government since the fee revenues collected should offset the form processing cost.

## V. Regulatory Amendments

DHS adopted most of the proposed regulatory amendments without change, except for the following provisions noted below:

### 1. Section 103.7(c)(3)(i)

In the proposed rule, DHS noted in the supplementary text that applicants for a provisional unlawful presence waiver cannot seek a fee waiver for the Form I–601A filing fees or the required biometric fees. *See* 77 FR at 19910. DHS incorrectly referenced proposed regulatory text at 8 CFR 103.7(b)(1)(i)(C) and inadvertently omitted the correct citation to the regulatory provision being amended and the amendatory text. DHS has corrected this error and has included an amendment to 8 CFR 103.7(c)(3)(i) in this final rule to clarify that fee waivers are not available for the biometric fee or filing fees for the Form I–601A. *See* section 103.7(c)(3)(i).

### 2. Section 212.7(a)(4)(iv)

DHS proposed an amendment to 8 CFR 212.7(a)(4) to provide that termination of an alien's conditional LPR status also would result in automatic revocation of an approved waiver of inadmissibility. *See* 77 FR at 19912 and 19921. Several commenters noted that INA section 216(f), 8 U.S.C. 1186a(f), only allows for automatic revocation of waivers of inadmissibility approved under INA sections 212(h) and (i), 8 U.S.C. 1182(h) and (i). DHS agrees and has revised the amendment to 8 CFR 212.7(a)(4) to clarify that automatic revocation of approved waivers upon termination of conditional resident status only applies to approved waivers based on INA section 212(h), 8 U.S.C. 1182(h) (waivers for certain criminal offenses) and INA section 212(i), 8 U.S.C. 1182(i) (waivers for fraud or willful misrepresentation of a material fact). *See* section 212.7(a)(4)(iv).

### 3. Section 212.7(e)(1)

During discussions about the proposed provisional unlawful presence waiver process and how it would affect aliens in removal proceedings, a question arose regarding the authority of DOJ IJs and whether IJs would adjudicate Forms I–601A for aliens in removal proceedings. DHS determined that it would be more efficient and appropriate to have Form I–601A waivers centralized and adjudicated by one agency, USCIS, especially given the streamlined nature of the process and the need for close coordination with DOS once a waiver is decided. DHS, therefore, added a new paragraph to clarify that the Application for Provisional Unlawful Presence Waiver, Form I–601A, will be filed only with USCIS even if an alien is in removal

proceedings before EOIR. *See* section 212.7(e)(1).[17]

### 4. Section 212.7(e)(2)

DHS restructured this provision and added language to make clear that approval of the provisional unlawful presence waiver is discretionary and does not constitute a grant of any lawful immigration status or create a period of stay authorized by the Secretary for purposes of INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). *See* section 212.7(e)(2)(i). DHS also clarified that a pending or approved provisional unlawful presence waiver does not authorize any interim benefits such as employment authorization or advance parole. *See* section 212.7(e)(2)(ii).

### 5. Section 212.7(e)(3)

Many commenters asked DHS to expand eligibility for the provisional unlawful presence waiver process to other categories of aliens seeking to immigrate to the United States.

DHS considered the commenters' suggestions but is limiting the provisional unlawful presence waiver to immediate relatives of U.S. citizens. After assessing the effectiveness of the provisional unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process to other categories.

### 6. Former Section 212.7(e)(4)(ii)(H)

DHS initially proposed to reject a provisional unlawful presence waiver application if an alien has not indicated on the application that the qualifying relative is a U.S. citizen spouse or parent. *See* 77 FR at 19922. DHS has determined that this criterion is more appropriate for an adjudicative decision and that this assessment should not be made through a review during the intake process. Thus, DHS has deleted this rejection criterion in the final rule.

### 7. Section 212.7(e)(4)(iv)

DHS proposed excluding aliens from the provisional unlawful presence waiver process who were already scheduled for their immigrant visa

---

[17] Under 8 CFR 1240.1(a)(1)(ii), immigration judges (IJs) have authority to adjudicate certain waiver applications made by aliens in removal proceedings. However, IJs will not be adjudicating provisional unlawful presence waiver applications under this rule because all aliens who are in removal proceedings—including those whose cases were administratively closed and have been recalendared or who are subject to an administratively final order of removal are ineligible for the provisional unlawful presence waiver by operation of this final rule. *See* 8 CFR 212.7(e)(4).

Exhibit 1
214

interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

### 8. Section 212.7(e)(4)(v)

DHS initially proposed excluding all aliens who were in removal proceedings

from the provisional unlawful presence waiver process, except those whose: (1) Removal proceedings had been terminated or dismissed; (2) Notices to Appear (NTAs) had been cancelled; and (3) cases had been administratively closed but subsequently were reopened to grant voluntary departure. *See* 77 FR at 19922. In this final rule, DHS allows aliens in removal proceedings to participate in this new provisional unlawful presence waiver process but only if their removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. *See* section 212.7(e)(4)(v). Through this final rule, the Form I–601A and its accompanying instructions, and additional information published on the USCIS Web site, DHS also will notify such applicants that, if granted a provisional unlawful presence waiver, applicants should seek termination or dismissal of their removal proceedings. The request for termination or dismissal should be granted *before* they depart for their immigrant visa interviews to avoid possible delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. *See* section 212.7(e)(2). Finally, DHS made conforming changes to the filing requirements in section 212.7(e)(5)(i) to include aliens who are in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A.

### 9. Section 212.7(e)(4)(ix)

For operational reasons, DHS initially proposed rejecting applications filed by aliens who had previously filed a Form I–601A provisional unlawful presence waiver application with USCIS. DHS designed the provisional unlawful presence waiver process to streamline waiver and immigrant visa processing by closely tying adjudication of the Form I–601A to the NVC's immigrant visa processing schedule. DHS considered the potential impact of multiple filings on this schedule, the possible delays to the immigrant visa process, and the potential for agency backlogs.

Many commenters, however, expressed concern that limiting the program to one-time filings could potentially exclude individuals who otherwise would qualify for the provisional unlawful presence waiver.

Upon consideration of these comments, DHS agrees that an alien could have compelling reasons for filing another provisional unlawful presence application, especially in cases where an alien's circumstances have changed

or the alien was a victim of individuals or entities not authorized to practice immigration law. For these reasons, DHS agrees that a one-time filing limitation is too restrictive and is removing the single-filing limitation in this final rule. If an individual's provisional unlawful presence waiver request is denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing prior to final adjudication, or whose Form I–601A is denied, can apply for a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. DHS, therefore, has removed this provision from the final rule.

### 10. Section 212.7(e)(5)(ii)

DHS corrected a typographical error in the prefatory language to this section, removing the term "application" the second time it appears in the paragraph. *See* section 212.7(e)(5)(ii).

### 11. Section 212.7(e)(5)(ii)(A)

DHS proposed a list of rejection criteria for Forms I–601A filed at the Lockbox, including the criterion to reject for failure to pay the required or correct fee for the waiver application. *See* 77 FR 19922. DHS inadvertently referenced the biometric fee as a basis for rejection in the supplementary information. *See* 77 FR 19911. DHS has modified the regulatory text to make clear that a Form I–601A will only be rejected for failure to pay the required or correct filing fee and not the biometric fee. *See* section 212.7(e)(5)(ii)(A). Individuals who have failed to pay the required or correct biometric fee will be notified of that failure. 8 CFR 103.17(b). USCIS will not process or adjudicate applications filed by individuals who do not pay the required or correct biometric fee.

### 12. Section 212.7(e)(5)(ii)(G)

DHS proposed rejecting provisional unlawful presence waiver applications filed by aliens who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at

Exhibit 1
215

19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.*, the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. Therefore, even if the alien failed to appear for his or her immigrant visa interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien if USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule an initial immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner. *See* section 212.7(e)(5)(iii)(G).

### 13. Section 212.7(e)(9)

DHS initially proposed that aliens who were denied a provisional unlawful presence waiver could not file a new Form I–601A. Instead, such aliens would have to leave the United States for their immigrant visa interviews and file a Form I–601, Application for Waiver of Grounds of Inadmissibility, after the Department of State determined they were inadmissible. Some commenters were concerned that limiting aliens to a single filing of an I–601A would potentially bar aliens from qualifying for a provisional unlawful presence waiver, especially when they may have experienced changed circumstances that would result in extreme hardship to the U.S. citizen spouse or parent. In light of these concerns, DHS has amended this final rule to allow aliens who are denied a provisional unlawful presence waiver to file another Form I–601A, based on the original approved immigrant visa petition. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another provisional unlawful presence waiver application under paragraph (e) provided the alien meets all of the requirements. The alien's case must be pending with the Department of State and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

### 14. Section 212.7(e)(10)

DHS has amended this provision to allow an applicant to withdraw a previously-filed provisional unlawful presence waiver application prior to final adjudication and file another Form I–601A. *See* section 212.7(e)(10).

### 15. Section 212.7(e)(14)(iv)

DHS clarified the language in section 212.7(e)(14)(v) to specify that a provisional unlawful presence waiver is automatically revoked if the alien, at any time before or after the approval of the provisional unlawful presence waiver, or before the immigrant visa is issued, reenters or attempts to reenter the United States without being admitted or paroled. *See* section 212.7(e)(14)(iv).

## VI. Statutory and Regulatory Requirements

### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector.

Although this rule does exceed the $100 million expenditure threshold (adjusted for inflation), this rulemaking does not contain such a mandate. The provisional unlawful presence waiver process is a voluntary program for aliens that are immediate relatives of U.S. citizens intending to become legal permanent residents. The requirements of Title II of the Act, therefore, do not apply and DHS has not prepared a statement under the Act.

### B. Small Business Regulatory Enforcement Fairness Act of 1996

DHS considers this rule a major rule as defined by section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. DHS was not able to estimate with precision the increase in demand due to this rule; therefore, we estimated costs using range scenario analysis. The final rule expanded eligibility for the provisional unlawful presence waiver process to aliens in removal proceedings whose cases have been or will be administratively closed, provided that the case has not been recalendared at the time of Form I–601A filing and that the alien is otherwise eligible. Due directly to this expansion, there is a possibility that the rule will have an impact on the economy of $100 million or more in the first year of implementation. If demand for the provisional unlawful presence waiver increases by 50 percent, 75 percent, or 90 percent, then the total impact on the economy would be approximately $107.8 million (undiscounted), $157.8 million (undiscounted), or $187.7 million (undiscounted), respectively, in the first year. By year 2, the total impact to the economy if demand for the provisional unlawful presence waiver increases by 50 percent, 75 percent, or 90 percent, is $33.2 million (undiscounted), $45.7 million (undiscounted), or $53.1 million (undiscounted), respectively. The impact of the rule is directly associated with the increased demand in legalizing immigration status by applying for legal permanent resident status via consular processing and participating in the provisional unlawful presence waiver process. The impact includes filing fees, time, and travel costs of complying with this final rule. The costs of this final rule will fall exclusively on alien immediate relatives of U.S. citizens that reside in the United States and must request a waiver for unlawful presence. This rule will not result in a major

Exhibit 1
216

**564**          **Federal Register** / Vol. 78, No. 2 / Thursday, January 3, 2013 / Rules and Regulations

increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

*C. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866. Accordingly, the Office of Management and Budget has reviewed this regulation. This effort is consistent with Executive Order 13563's call for agencies to "consider how best to promote retrospective analysis of rules that may be outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned."

1. Summary

The final rule will allow certain immediate relatives of U.S. citizens who are physically present in the United States to apply for a provisional unlawful presence waiver of the 3-year or 10-year bar for accrual of unlawful presence prior to departing for consular processing of their immigrant visa. This new provisional unlawful presence waiver process will be available to an alien whose only ground of inadmissibility is, or would be, the 3-year or 10-year unlawful presence bar. DHS anticipates that the changes made in this final rule will result in a reduction in the time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. In addition, the Federal Government will achieve increased efficiencies in processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar.

Since publication of the proposed provisional unlawful presence waiver

rule, DOS published an updated fee schedule for consular services which did the following with respect to this rule: (1) Reduced the immediate relative visa fee from $330 to $230; (2) increased the immigrant visa security surcharge fee from $74 to $75; and (3) discontinued charging a separate fee for the immigrant visa surcharge and instead embedded the fee in the immigrant visa application fees.[18] DHS has incorporated these changes and updated data into our final analysis.

DHS estimates the discounted total ten-year cost of this rule will range from approximately $196 million to approximately $538.1 million at a seven percent discount rate. Compared with the current waiver process, this rule requires that provisional unlawful presence waiver applicants submit biometric information. Included in the total cost estimate is the cost of collecting biometrics, which we estimate will range from approximately $32.9 million to approximately $56.6 million discounted at seven percent over ten years. Also included in the total cost estimate are the costs faced by those who choose to file a new provisional unlawful presence waiver application based on the same approved immediate relative petition if their original Form I-601A is denied or withdrawn, which DHS decided to allow in response to public comments to the proposed rule. Aliens that file a new Form I-601A will still face the biometric and Form I-601A filing fees and opportunity costs, which we estimate will range from approximately $56.2 million to approximately $96.7 million discounted at seven percent over ten years. In addition, as this rule significantly streamlines the current process, DHS expects that additional applicants will apply for the provisional unlawful presence waiver compared to the current waiver process. To the extent that this rule induces new demand for immediate relative visas, additional immigration benefit forms, such as the Petitions for Alien Relative, Form I-130, will be filed compared to the pre-rule baseline. These additional forms will involve fees being paid by applicants to the Federal Government for form processing and additional opportunity costs of time being incurred by applicants to provide the information required by the forms. The cost estimate for this rule also includes the impact of this induced demand, which we estimate will range from approximately $106.9 million to approximately $384.8 million discounted at seven percent over ten years.

A key uncertainty that impacts any cost estimate of this rule is the uncertainty involving the actual number of people that will avail themselves of this streamlined provisional unlawful presence waiver process. DHS is not aware of any data that will allow us to estimate with precision the increase in demand due to this rule. In this final rule DHS has made the careful determination to expand eligible participation to aliens in removal proceedings whose cases are administratively closed and have not been recalendared at the time of filing the Form I-601A, and who are otherwise eligible for the provisional unlawful presence waiver. DHS has accounted for any potential additions to the volume estimate as a result of these changes in the final analysis. Statistics compiled by the Department of Justice (DOJ) Executive Office of Immigration Review (EOIR) indicate there have been a total of 70,276 cases that were administratively closed at the immigration courts or the Board of Immigration Appeals (BIA) where the sole charge is INA 212(a)(6)(A)(i).[19] DHS has no way of knowing precisely how many of the 70,276 cases are immediate relatives of U.S. citizens and are otherwise eligible for the provisional unlawful presence waiver, so we have applied similar range analysis to estimate the additional population surge resulting from the influx of cases previously administratively closed. In addition to this static influx that could occur with previously administratively closed cases, permitting aliens in removal proceedings whose cases are administratively closed when this rule becomes effective or administratively closed but not recalendared at the time of filing the Form I-601A could add approximately 700 to 2,500, annually, to our volume estimate. Lastly, allowing applicants the ability to re-file a Form I-601A if the initial application was denied or withdrawn will result in an increase to our volume estimates. A review of USCIS Form I-601 processing statistics indicated a denial rate of 34%. A review of USCIS completion statistics for the current I-601 waiver process did not indicate a statistical trend for withdrawals. DHS has assumed in this final analysis that the same denial rate of 34% will apply for the provisional unlawful presence waiver application, and in an effort to present the maximum projected impact, has

---

[18] *See* 77 FR 18907.

[19] Source: Department of Justice, EOIR, Office of Planning, Analysis, and Technology; statistics include cases completed from January 1, 1992–December 5, 2012. Data compiled on December 5, 2012.

Exhibit 1
217

calculated cost impacts based on the assumption that every applicant with a denied or withdrawn Form I–601A will file a new Form I–601A. For cost estimating purposes, DHS has analyzed the cost of an increase in demand of 25%, 50%, 75% and 90% compared to the existing waiver process.

Table 1 provides an estimate of the annualized cost of this rule, in 2012 dollars, at three percent and seven percent discount rates, over the range of demand increases of 25%, 50%, 75%, and 90% compared to the existing

waiver process and also qualitative benefits. The annualized cost of this rule will range from approximately $27.9 million annualized to $76.6 million (7 percent discount rate) and approximately $27.4 million to $74.6 million (3 percent discount rate).

### TABLE 1—ANNUALIZED COSTS AND BENEFITS
[2013–2022, dollar amounts expressed in millions]

| | 3% Discount rate | | | | 7% Discount rate | | | |
|---|---|---|---|---|---|---|---|---|
| | Range analysis for demand increases by: | | | | Range analysis for demand increases by: | | | |
| | 25% | 50% | 75% | 90% | 25% | 50% | 75% | 90% |
| **COSTS:** Annualized monetized costs .... | $27.4 | $45.5 | $63.7 | $74.6 | $27.9 | $46.6 | $65.4 | $76.6 |
| Annualized quantified, but unmonetized costs. | None | | | | None | | | |
| Qualitative (unquantified) costs | None | | | | None | | | |
| **BENEFITS:** Annualized monetized benefits | None | | | | None | | | |
| Annualized quantified, but unmonetized benefits. | This rule will reduce the amount of time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. | | | | This rule will reduce the amount of time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. | | | |
| Qualitative (unquantified) benefits. | Federal Government will achieve increased efficiencies by streamlining the processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar. | | | | Federal Government will achieve increased efficiencies by streamlining the processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar. | | | |

### 2. Problems Addressed by the Rule

Currently, aliens undergoing consular processing of their immediate relative visas cannot apply for an unlawful presence waiver until the consular officer determines that they are inadmissible during their immigrant visa interviews. The current unlawful presence waiver process requires these immediate relatives to remain abroad until USCIS adjudicates the waiver. DOS can only issue the immigrant visa upon notification from USCIS that the waiver has been approved. As previously mentioned, the processing time under the current waiver process can take over one year. Because of these lengthy processing times, U.S. citizens may be separated from their immediate relative family members for prolonged periods resulting in financial, emotional, and humanitarian hardships. Promoting family unification is an important objective of the immigration laws. *See Holder* v. *Martinez Gutierrez*, 132 S. Ct. 2011, 2019 (2012).

The final rule will permit certain immediate relatives to apply for a provisional unlawful presence waiver prior to departing from the United States. USCIS will adjudicate the provisional unlawful presence waiver and, if approved, provide notification to DOS so that it is available to the consular officer at the immigrant visa interview. If the consular officer

determines there are no other impediments to admissibility and that the alien is otherwise eligible for issuance of the immigrant visa, the visa can be immediately issued. DHS anticipates that this process change will significantly reduce the amount of time U.S. citizens are separated from their immediate alien relatives. In addition, the changes will streamline the immigrant visa waiver process, thereby increasing efficiencies for both USCIS and DOS in the issuance of immediate relative immigrant visas.

### 3. The Population Affected by the Rule

As explained above, only certain immediate relatives undergoing consular processing for an immigrant visa who would be inadmissible based on accrual of unlawful presence at the time of the immigrant visa interview will be eligible to apply under the proposed waiver process. Immediate relatives of U.S. citizens who are seeking adjustment of status in the United States are not affected. Immediate relatives who are eligible for adjustment of status in the United States generally include those who were admitted to the United States on nonimmigrant visas (student, tourist, etc.) or who were paroled, including those who are present in the United States after the expiration of their authorized periods of stay. In addition,

immediate relatives that self-petition, using USCIS Form I–360, as battered spouses and/or children of U.S. citizens or LPRs are able to seek adjustment of status in the United States. While all immediate relative aliens can choose to pursue consular processing if they wish, due to the financial strain and family separation inherently involved in consular processing, we have chosen to exclude aliens that are eligible to adjust status in the United States from this economic analysis.

In most instances, aliens present in the United States without having been admitted or paroled are not eligible to adjust their status and must leave the United States for immigrant visa processing at a U.S. Embassy or consulate abroad. Because these aliens are present in the United States without having been admitted or paroled, many already have accrued more than 180 days of unlawful presence and, if so, would become inadmissible under the unlawful presence bars upon their departure from the United States to attend their immigrant visa interviews. While there may be limited exceptions, the affected population would consist almost exclusively of alien immediate relatives present in the United States without having been admitted or paroled. In addition, the final rule expands eligibility to aliens in removal proceedings whose cases are

Exhibit 1
218

administratively closed and have not been recalendared at the time of filing the Form I–601A and to aliens who are in receipt of a charging document, Notice to Appear, that has not yet been filed with the immigration courts. In both of these instances the aliens must still meet all other eligibility requirements in order to apply for the provisional unlawful presence waiver. Finally, the final rule removes the one-time filing restriction and allows aliens to file a new provisional unlawful presence waiver application on the same approved immediate relative petition if the initial Form I–601A is denied or withdrawn prior to final adjudication.

DHS does not maintain data on the number of immediate relatives present in the United States who would qualify under the unlawful presence waiver process. The DHS Office of Immigration Statistics (DHS OIS) estimates that the population of unauthorized immigrants (those present without admission or parole) residing in the United States is approximately 11.6 million as of January 2010.[20] While all persons affected by the rule are within the estimated population of 11.6 million, it is estimated that only a portion are immediate relatives of U.S. citizens who meet the criteria required for the new process.

Other estimates are equally inconclusive on the number of immediate relatives of U.S. citizens who are subject to the unlawful presence bars. For example, the Pew Hispanic Trust estimates that there are 9.0 million persons[21] living in mixed status families in the United States that include at least one unauthorized adult alien and at least one U.S.-born child. This, and associated information from the Pew Hispanic Trust, does not provide a reliable means for the calculation of how many of the individuals in these families are U.S.

[20] Department of Homeland Security, Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011*, available at *http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011.pdf*. **Note:** The OIS estimate of the unauthorized population residing in the United States in January 2010 was revised from a previous OIS estimate of 10.8 million. The revised 2010 estimate of 11.6 million is derived from the 2010 American Community Survey which uses population estimates based on the 2010 Census, whereas the previously released 2010 estimate was derived from the 2000 Census. The OIS estimate of the unauthorized population residing in the United States in January 2011 was 11.5 million, a decrease of 0.87% when compared to the 2010 estimate of 11.6 million.

[21] Pew Hispanic Trust, *Unauthorized Immigrants: Length of Residency, Patterns of Parenthood* 6 (Dec. 2011), available at *http://www.pewhispanic.org/files/2011/12/Unauthorized-Characteristics.pdf*.

citizens rather than alien immediate relatives, or the proportion of persons with unlawful presence who are the relatives of LPRs rather than U.S. citizens.[22] Nor do these data indicate how many persons within these families are under the age of 18[23] or have alternative methods of normalizing their immigration status without having to leave the United States and, consequently, are unlikely to be affected by the provisional unlawful presence waiver process.

Data from different sources cannot be reliably combined because of differences in their total estimates for different categories, the estimation and collection methodologies used, or other reasons of incompatibility. Absent information on the number of aliens who are in the United States without having been inspected and admitted or paroled and who are immediate relatives of U.S. citizens, DHS cannot reliably estimate the affected population of the rule.

4. Demand

DHS expects that the final rule will increase demand for both immigrant visa petitions for alien relatives and applications for waivers of inadmissibility. Existing demand is constrained by the current process that requires individuals to leave the United States and be separated for unpredictable and sometimes lengthy amounts of time from their immediate relatives in the United States in order to obtain an immigrant visa to become an LPR. Immediate relatives eligible for LPR status if issued a waiver of inadmissibility may be reluctant to avail themselves of the current process because of the length of time that they may be required to wait outside the United States before they can be admitted as LPRs.

The provisional unlawful presence waiver process will allow an immediate relative who meets the eligibility criteria to apply for a provisional unlawful presence waiver and receive a decision on that application before departing from the United States for a consular interview. This streamlined process may reduce the reluctance of aliens who may wish to obtain an immigrant visa to become an LPR but are deterred by the lengthy separation from family members

[22] The provisional unlawful presence waiver process will only be available to alien immediate relatives of U.S. citizens, not to alien relatives of lawful permanent residents.

[23] In the Pew Hispanic Trust report, *Unauthorized Immigrants: Length of Residency, Patterns of Parenthood*, "families" are defined as adults age 18 and older who live with their minor children (*i.e.*, younger than 18) and unmarried, dependent children younger than 25.

imposed by the current process and uncertainty related to the ultimate success of obtaining an approved inadmissibility waiver.

The costs associated with normalizing a qualifying immediate relative's status also may be a constraint to demand. These current costs include:[24]

1. Petition for Alien Relative, Form I–130, to establish a qualifying relationship to a U.S. citizen; cost to the petitioner of fee paid = $420.00.

2. Application for Waiver of Grounds of Inadmissibility, Form I–601, to obtain a waiver of inadmissibility for unlawful presence; cost to applicant of fee paid = $585.00.

3. Time and expense of preparing the evidence to support the "extreme hardship" requirements for a waiver of inadmissibility. The evidentiary requirements could include sworn statements from family members, friends and acquaintances, medical records, psychiatric/psychological records, school records, evidence of illness of family members, financial information and tax returns, letters from teachers, support letters from churches and community organizations, evidence of health and emotional problems that may result from the separation, and other such documentation; costs of evidentiary requirements are variable and based on the specific facts of individual cases.

4. Travel from the United States to the immediate relative's home country or country where the visa is being processed, and any additional living expenses required to support two households while awaiting an immigrant visa; cost of travel to consular interview are variable and dependent upon the specific circumstances of individual cases.

5. Immigrant visa processing fees paid to: (a) The Department of State ($230), processed on the basis of a USCIS-approved I–130 petition; and b) USCIS ($165). Total cost to the applicant of fees paid = $395.00.

6. An Affidavit of Support Under Section 213A of the Act, Form I–864; cost to petitioner of fee paid = $88.00.

7. Other forms, affidavits, etc. as required for individual applications; cost are variable.

The costs listed above are not new to this rule; they are the current costs faced by aliens who are inadmissible for

[24] Fees quoted are as of June 2012. Source for DOS fees: *http://travel.state.gov/visa/temp/types/types_1263.html#perm*. Source for USCIS fees: *http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=b1ae408b1c4b3210VgnVCM100000b92ca60aHCRD&vgnextchannel=b1ae408b1c4b3210VgnVCM100000b92ca60aHCRD*.

Exhibit 1
219

unlawful presence and must undergo consular processing for immediate relative immigrant visas.

Under the provisional unlawful presence waiver process, aliens must submit biometrics after filing the provisional unlawful presence waiver application, along with the corresponding fee (currently $85.00). Submission of biometrics to DHS is separate from the DOS immigrant visa security surcharge that recovers costs to DOS associated with providing enhanced border security. Since publication of the proposed provisional unlawful presence waiver rule, DOS published an updated fee schedule for consular services which did the following as respects this rule: (1) Reduced the immediate relative visa fee from $330 to $230; (2) increased the immigrant visa security surcharge fee from $74 to $75; and (3) discontinued charging a separate fee for the immigrant visa surcharge and instead embedded the fee in the immigrant visa

application fees.[25] The requirement to submit biometrics to DHS in order to apply for a provisional unlawful presence waiver, with the associated fee, time, and travel costs, would be a small portion of the total costs of the immigrant visa application process.

As there are no annual limitations on the number of immediate relative visas that can be issued, the increase in the annual demand for waivers would be determined by the size of the affected population and the increased propensity to apply. As previously mentioned, a potential increase in demand might be limited, as is current demand, by the costs previously noted.

With the absence of an estimate of the affected population, we have calculated an estimate for the increase in demand based on historical records and assumptions on the range of demand. Forecasts of demand based on historical volumes of immediate relatives who are seeking waivers for unlawful presence are limited, at best, due to the lack of data. Historical estimates show only

those aliens who have taken the steps to obtain an immigrant visa to become LPRs. The data are silent, however, on that population of aliens who have not initiated action to become LPRs due to current uncertainties and risks. Therefore, we recognize that the estimates provided may understate what may actually occur when this rule becomes effective.

The current level of demand, shown in Table 2, is a result of the existing constraints described previously: the possibility of lengthy separation of immediate relatives and their U.S. citizen relatives; uncertainty of the ultimate success of obtaining an approved inadmissibility waiver; and the financial constraints (costs). Because of the variability in timing between when immigrant visa petitions and waiver applications are submitted and adjudicated and the time when an immigrant visa is issued, comparisons between the totals within a single year are not meaningful.

TABLE 2—HISTORICAL IMMIGRATION DATA—FISCAL YEARS 2001 THROUGH 2010

| Fiscal year | Petitions for immediate alien relative, form I-130[26] | Immediate relative visas issued | Ineligibility finding[27] | Ineligibility overcome[28] |
|---|---|---|---|---|
| 2001 | [29]592,027 | 172,087 | 5,384 | 6,157 |
| 2002 | 321,577 | 178,142 | 2,555 | 3,534 |
| 2003 | 357,081 | 154,760 | 3,301 | 1,764 |
| 2004 | 330,514 | 151,724 | 4,836 | 2,031 |
| 2005 | 290,777 | 180,432 | 7,140 | 2,148 |
| 2006 | 309,268 | 224,187 | 13,710 | 3,264 |
| 2007 | 344,950 | 219,323 | 15,312 | 7,091 |
| 2008 | 412,297 | 238,848 | 31,069 | 16,922 |
| 2009 | 455,864 | 227,517 | 24,886 | 12,584 |
| 2010 | 471,791 | 215,947 | 22,093 | 18,826 |
| 10 year average | 388,615 | 196,297 | 13,029 | 7,432 |
| Ineligibility Findings overcome (10 year average) | n/a | n/a | n/a | 57.0% |

**Note:** Sums may not total due to rounding.

Sources: Petitions for Alien Relative, Form I–130, query of USCIS Performance Analysis System by USCIS' Office of Performance and Quality, Data Analysis and Reporting Branch. Immediate relative visas issued are from individual annual Report(s) of the Visa Office, Department of State Visa Statistics, accessible at http://travel.state.gov/visa/statistics/statistics_1476.html. Ineligibility data are also from the individual annual report(s) of the Visa Office, Department of State Visa Statistics and appears in Table XX of each annual report.

[25] *See* 77 FR 18907. DHS has revised the cost estimates in this final rule to reflect the updated DOS fee schedule.

[26] Numbers in this column differ from the proposed rule (77 FR 19915) as the proposed rule inadvertently used data for preference aliens. We've corrected the table to account for immediate relative petitions filed using Form I–130. We note the ten year average here of 388,615 differs by less than two percent from the ten year average of 395,919 used in the proposed rule. We recognize that immediate relative petitions also can be filed by certain aliens using the Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360. Immediate relative petitions filed for the Amerasian classification are filed for aliens that are already outside the United States so we do not believe these aliens would benefit from the provisional unlawful presence waiver requirements. Additionally, self-petitioning

battered spouses and children covered under the Violence Against Women Act (VAWA) are able to seek adjustment of status in the United States regardless of whether they have been inspected and admitted or paroled into the United States, *see* INA section 245(a). Moreover, self-petitioning battered spouses and children typically are exempt from accruing unlawful presence for purposes of INA section 212(a)(9)(B)(i). *See* INA section 212(a)(9)(B)(iii)(IV). While beneficiaries of immediate relative petitions for a widow(er) of a U.S. citizen may avail themselves of the provisional unlawful presence waiver, in the period 2001–2010, the ten-year average for these petitions was 594. For purposes of clarity in the assumptions and the future calculations of impact, we have decided not to include this population in the immediate relative petition volumes given the relatively negligible

filing volumes. *Note:* The current filing fee for Form I–360 is $405 for a widow(er) of a U.S. citizen.

[27] Both the Ineligibility Finding and Ineligibility Overcome columns refer only to ineligibility in which the grounds of inadmissibility were the 3-year or the 10-year unlawful presence bar. This figure is not limited to immigrant petitioners who are immediate relatives of U.S. citizens; it also includes relatives of LPRs. Ineligibility findings were low between 2001 and 2005/2006 because many individuals were not seeking immigrant visas through the consular process overseas; instead, they adjusted to lawful permanent resident status stateside under INA section 245(i).

[28] *Id.* Ineligibility Findings/Ineligibility Overcome includes alien relatives who are not affected by the rule. Comparisons between the totals of Ineligibility Findings/Ineligibility Overcome within a single
Continued

Exhibit 1
220

As is evident, each of the data sets in Table 2 demonstrates a wide variability. The estimate of future demand under the new process would be determined by the number of ineligibility findings. The data for Ineligibility Findings and Ineligibility Overcome in Table 2 refer only to ineligibility where the grounds of inadmissibility were the 3-year or the 10-year unlawful presence bar. This data, however, also includes alien relatives of LPRs (or preference aliens) who are not affected by this rule. DHS has provided the data in Table 2 to provide historical context noting that the last three years of ineligibility findings are well above the 10-year historical average. For this reason, DHS used the estimate for the future filings for waivers of inadmissibility made by the USCIS Office of Performance and Quality (OPQ), Data Analysis and Reporting Branch, as the basis for the estimated future filings. The current OPQ estimate for future waivers of inadmissibility is approximately 24,000 per year. Currently, 80 percent (or 19,200) of all waivers of inadmissibility are filed on the basis of inadmissibility due to the unlawful presence bars.[30] This estimate is further confirmed when examining the most recent 5-year period between FY 2006–FY 2010 where the average unlawful presence ineligibility finding is approximately 21,400. In light of the recent upward trend of immediate relative visas issued and ineligibility findings presented in Table 2, OPQ's estimate of 19,200 applications for waivers of unlawful presence represents as reasonable as an approximation as possible for future demand based on available data of the current waiver process.

DHS anticipates that the changes to create a new provisional unlawful presence waiver process will encourage immediate relatives who are unlawfully present to initiate actions to obtain an immigrant visa to become LPRs when they otherwise would be reluctant to under the current process. As confidence in the new process increases, we would expect demand to trend upward. DHS estimates were formulated based on general assumptions of the level of constraints on demand removed by the rule. DHS does not know of any available data that would enable a more precise calculation of the increases in filing propensities or an increase in the number of inadmissibility findings or the percentage of inadmissibility findings where the inadmissibility bar is overcome.

Table 3 indicates the estimate of demand under the current process. This is the baseline demand expected in the absence of the rule.

TABLE 3—BASELINE ESTIMATES OF GROWTH IN PETITIONS FOR ALIEN RELATIVES AND INELIGIBILITY FINDINGS BASED ON UNLAWFUL PRESENCE UNDER THE CURRENT PROCESS

| Fiscal year | Petitions for alien immediate relative, Form I–130 [31] | Ineligibility finding [32] |
|---|---|---|
| Year 1 | 402,217 | 19,709 |
| Year 2 | 416,294 | 20,398 |
| Year 3 | 430,864 | 21,112 |
| Year 4 | 445,945 | 21,851 |
| Year 5 | 461,553 | 22,616 |
| Year 6 | 477,707 | 23,408 |
| Year 7 | 494,427 | 24,227 |
| Year 8 | 511,732 | 25,075 |
| Year 9 | 529,642 | 25,952 |
| Year 10 | 548,180 | 26,861 |
| 10 Year Totals | 4,718,560 | 231,209 |

Note: Sums may not total due to rounding.

Based on the data available on requests for waivers under the current process, Table 3 forecasts the number of findings of inadmissibility due to accrual of unlawful presence. The results presented in Table 3 are meant to show forecasts for future demand for waivers due to unlawful presence bars under the current process. DHS assumes that in every case where a consular officer determines inadmissibility based on unlawful presence, the alien would apply for a waiver. Thus, Table 3 represents the baseline demand we expect in the absence of the provisional unlawful presence waiver process.

In these calculations, the petitions for an alien relative made by U.S. citizens are expected to increase annually by the 3.5 percent compound annual growth rate for the undocumented population for the previous 10 years based on reports by the DHS OIS.[33] This is an imperfect calculation, as the undocumented population has declined since its peak in 2007,[34] but because of the data association problems noted previously, DHS used the 10-year (long term) compound average growth rate.

The ineligibility findings in Table 3 are calculated using the estimate of 19,200 average annual waivers filed on the basis of unlawful presence, which

year are not meaningful because of the variability in timing between when an ineligibility finding is made and when (and if) it is overcome.

[29] The number of Petitions for Alien Relative, Form I–130, filed in 2001 is high because many filed petitions in anticipation of the INA section 245(i) sunset date, which occurred on April 30, 2001.

[30] The 80 percent estimate was calculated by USCIS based on data from all Forms I–601 completed by USCIS based on data from August 2010 to October 2011 and comparing those that listed only unlawful presence as an inadmissibility ground.

[31] The first year estimate for the baseline demand of I–130 petitions is the 10 year average of 388,615 multiplied by the 3.5 percent compound annual growth rate for the undocumented population for the previous 10 years reported in the DHS Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011*. Subsequent years are increased at the same 3.5 percent growth rate. As a comparison, the U.S. population as a whole rose at a compound annual growth rate of 0.930 percent over the same period.

[32] Ineligibility Findings are calculated at the USCIS estimate of 0.049 per alien immediate relative petition.

[33] DHS Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011*. The 3.5 percent (rounded) compound annual growth rate is calculated from the estimated populations of unauthorized immigrants living in the United States in 2000 (8.5 million) and in 2010 (11.6 million).

[34] *Id.*

Exhibit 1
221

equates to 0.049 ineligibility findings for every alien relative petition based on the 10-year average. Again, these calculations are imperfect since ineligibility findings are based on immigrant visas granted for the alien relative population (both immediate relative and family preference).

DHS does not have data available that would permit an estimation of the

escalation of change in this variable. Thus, this estimate of future petitions for alien relatives and ineligibility findings is based on a range of assumptions concerning the current constraint on demand. As a result, Table 4 provides a scenario analysis utilizing estimates of various amounts of constraint on demand. For example, an

assumption that demand is currently constrained by 25 percent would mean that there would be a 25 percent increase from the baseline in the number of Form I–601A applications for each year under the new provisional unlawful presence waiver process. The findings of this range analysis are presented in Table 4.

TABLE 4—ESTIMATES OF INADMISSIBILITY FINDINGS REQUIRING AN UNLAWFUL PRESENCE WAIVER, FORM I–601A ASSOCIATED WITH THE INCREASED DEMAND OF THE RULE

| Year | Expected demand for Form I–601A with current constrained demand of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | 24,636 | 29,563 | 34,490 | 37,446 |
| Year 2 | 25,498 | 30,598 | 35,697 | 38,757 |
| Year 3 | 26,390 | 31,669 | 36,947 | 40,113 |
| Year 4 | 27,314 | 32,777 | 38,240 | 41,517 |
| Year 5 | 28,270 | 33,924 | 39,578 | 42,971 |
| Year 6 | 29,260 | 35,111 | 40,963 | 44,475 |
| Year 7 | 30,284 | 36,340 | 42,397 | 46,031 |
| Year 8 | 31,344 | 37,612 | 43,881 | 47,642 |
| Year 9 | 32,441 | 38,929 | 45,417 | 49,310 |
| Year 10 | 33,576 | 40,291 | 47,006 | 51,036 |
| 10-Year Totals | 289,012 | 346,814 | 404,617 | 439,298 |

Note: Numbers may not total due to rounding.

In response to comments on the proposed rule, DHS has made the careful determination to expand participation in the provisional unlawful presence waiver process to immediate relative aliens in removal proceedings whose cases have been or will be administratively closed and have not been recalendared at the time of filing the Form I–601A. Aliens who are in removal proceedings whose cases have been or will be administratively closed are likely comprised primarily of aliens who would need to seek immigration relief via DOS consular processing. Thus, we believe that such individuals are also already accounted for in the volume estimates provided above which were based on historical filings of Form I–601 to waive the unlawful presence ground. However, to not understate the volume, we examined historical case resolution statistics of immigration proceedings provided by EOIR. Historical statistics are silent on the volume of cases that have been administratively closed and later recalendared.

Based on statistics compiled by EOIR, 66,365 cases at the immigration court level and 3,911 cases at the BIA (for a total of 70,276 cases) were administratively closed since 1992 where the sole charge is INA

212(a)(6)(A)(i).[35] DHS has no way of knowing precisely how many of the 70,276 previously administratively closed cases would be immediate relatives of U.S. citizens and otherwise eligible for the provisional unlawful presence waiver. In an effort to be balanced in our estimate, it would be incorrect to assume that every removal proceeding case that was administratively closed in the past will also meet the requirements under the provisional unlawful presence waiver process. Therefore, we will provide a range analysis to estimate the proportion that would be eligible to participate over a similar range of assumptions as used in calculating induced demand. In this instance, however, we will assume that removal proceeding cases that are eligible to participate would range from 25–90 percent, where 25 percent means that 25 percent of the administratively closed cases also meet the remaining provisional unlawful presence waiver requirements. Since cases that were administratively closed in the past represent a static statistic, we only reflect this potential influx in one year of our volume projections. Thus, the addition made to the volume estimate in

Year 1 to account for estimates of additional Form I–601A filings from aliens whose removal proceedings have been be administratively closed are: 17,569 (25 percent of 70,276 cases); 35,138 (50 percent); 52,707 (75 percent); and 63,249 (90 percent).

Similarly, DHS estimated increases to the yearly volume projection in order to account for those aliens with cases that will be administratively closed and therefore eligible to apply for the provisional unlawful presence waiver, provided they meet the additional requirements. DHS examined EOIR historical case resolution statistics over the five-year period FY 2007–FY 2011 to determine an appropriate average number of cases that are administratively closed from which to base this yearly estimate on. Those findings are presented in Table 5.

TABLE 5—NUMBER OF ADMINISTRATIVELY CLOSED CASES—FISCAL YEARS 2007 THROUGH 2011 [36]

| Fiscal year | Number |
|---|---|
| 2007 | 7,966 |
| 2008 | 8,409 |
| 2009 | 7,885 |

[35] Source: EOIR, Office of Planning, Analysis, and Technology; statistics include cases completed from January 1, 1992–December 5, 2012. Data compiled on December 5, 2012.

[36] Source: Executive Office for Immigration Review Office of Planning, Analysis, and Technology FY 2011 Statistical Year Book February 2012, available at: http://www.justice.gov/eoir/statspub/fy11syb.pdf.

Exhibit 1
222

TABLE 5—NUMBER OF ADMINISTRA-TIVELY CLOSED CASES—FISCAL YEARS 2007 THROUGH 2011 [36]—Continued

| Fiscal year | Number |
|---|---|
| 2010 | 8,939 |
| 2011 | 6,337 |
| 5-yr Average | 7,907 |

In examining the data over the five-year span (presented in Table 5), there is no obvious upward or downward trend, so for the purpose of simplifying, DHS assumes no growth in this statistic. Over the 20-year period of analysis of EOIR's statistics of administratively closed cases, DHS determined that 35% of all administratively closed cases were those where the sole charge is unlawful presence.[37] Assuming this proportion will continue to hold, we estimate that EOIR would administratively close 2,768 cases per year where the sole charge is unlawful presence.[38] Again, DHS has no way of knowing precisely how many of the 2,768 estimated unlawful presence administratively closed cases will be aliens who are immediate relatives of U.S. citizens and otherwise eligible for the provisional unlawful presence waiver process. Applying the same range analysis based on participation rates, DHS has made the following yearly additions to the volume estimate of additional Form I–601A filings to account for those aliens whose removal proceedings have been or will be administratively closed: 692 (25 percent of 5-year average 2,768); 1,384 (50 percent); 2,076 (75 percent); and 2,492 (90 percent). The final estimate for future filings of the provisional unlawful presence waiver considers both induced demand relative to the current process and the participation rate of aliens in removal proceedings whose cases have been or will be administratively closed. This final estimate is presented in Table 6.

TABLE 6—FINAL ESTIMATES OF INADMISSIBILITY FINDINGS REQUIRING AN UNLAWFUL PRESENCE WAIVER, FORM I–601A

[Table 4 plus an adjustment for aliens in removal proceedings whose cases have been or will be administratively closed and have not been recalendared]

| Year | Expected demand for Form I–601A with current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | 42,897 | 66,085 | 89,274 | 103,188 |
| Year 2 | 26,191 | 31,982 | 37,774 | 41,249 |
| Year 3 | 27,083 | 33,053 | 39,023 | 42,606 |
| Year 4 | 28,007 | 34,161 | 40,316 | 44,010 |
| Year 5 | 28,963 | 35,309 | 41,655 | 45,463 |
| Year 6 | 29,952 | 36,496 | 43,040 | 46,967 |
| Year 7 | 30,976 | 37,725 | 44,474 | 48,524 |
| Year 8 | 32,036 | 38,997 | 45,957 | 50,135 |
| Year 9 | 33,133 | 40,313 | 47,493 | 51,802 |
| Year 10 | 34,269 | 41,676 | 49,083 | 53,528 |
| 10-Year Totals | 313,501 | 395,793 | 478,084 | 527,467 |

**Note:** Numbers may not total due to rounding.

Table 7 is the expected marginal increase in inadmissibility waiver initial applications due to the final rule implementing the provisional unlawful presence waiver process. These estimates are obtained by subtracting the baseline estimates in Table 3 (without the rule) from the estimates when the rule becomes effective in Table 6.

TABLE 7—FINAL ESTIMATES OF THE ADDITIONAL INELIGIBILITY FINDINGS REQUIRING AN INADMISSIBILITY WAIVER UNDER THE RULE (INDUCED DEMAND) [39]

[Table 6 minus Table 3]

| Year | Additional ineligibility findings requiring an inadmissibility waiver with current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | 23,189 | 46,377 | 69,565 | 83,479 |
| Year 2 | 5,792 | 11,584 | 17,375 | 20,851 |
| Year 3 | 5,971 | 11,941 | 17,911 | 21,494 |
| Year 4 | 6,155 | 12,310 | 18,465 | 22,159 |
| Year 5 | 6,347 | 12,693 | 19,039 | 22,847 |
| Year 6 | 6,544 | 13,088 | 19,632 | 23,559 |

[37] Statistic calculated by DHS based on EOIR statistics on administratively closed cases from January 1, 1992–December 5, 2012. According to the EOIR report, there were a total of 189,566 aliens whose cases have been administratively closed at immigration court. Of those, a total of 66,365 cases were administratively closed at the immigration court where the sole charge is INA 212(a)(06)(A)(i). [Calculation: 66,365/189,566 = 0.3501 or 35%

(rounded)] Similarly, there were a total of 11,279 aliens whose cases have been administratively closed at the BIA. Of those, a total of 3,911 cases were administratively closed at the BIA where the sole charge is INA 212(a)(06)(A)(i). [Calculation: 3,911/11,279 = 0.3468 or 35% (rounded)].

[38] Calculation: 35% of the 5-year average of administratively closed cases (7,907) = 2,768 (rounded).

[39] The increased ineligibility findings in Table 6 are the difference in ineligibility findings from the different assumptions of the level of constrained demand or participation rate (as respects those in removal proceedings whose cases have been administratively closed) in Table 5 and the baseline ineligibility findings shown in Table 2.

Exhibit 1
223

TABLE 7—FINAL ESTIMATES OF THE ADDITIONAL INELIGIBILITY FINDINGS REQUIRING AN INADMISSIBILITY WAIVER UNDER THE RULE (INDUCED DEMAND) [39]—Continued

[Table 6 minus Table 3]

| Year | Additional ineligibility findings requiring an inadmissibility waiver with current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 7 | 6,749 | 13,498 | 20,247 | 24,297 |
| Year 8 | 6,961 | 13,922 | 20,883 | 25,060 |
| Year 9 | 7,181 | 14,361 | 21,541 | 25,850 |
| Year 10 | 7,408 | 14,815 | 22,222 | 26,667 |
| 10 Year Totals | 82,292 | 164,583 | 246,875 | 296,258 |

**Note:** Numbers may not total due to rounding.

Lastly, in response to public comments on the proposed rule, DHS has made the decision to not reject provisional unlawful presence waiver applications from aliens who previously submitted a Form I–601A application that either was denied or withdrawn. This means that an alien can file a new provisional unlawful presence waiver application on the basis of the original approved immediate relative petition. DHS has examined USCIS I–601 processing data over the 5-year period, FY 2007–2011. The average denial rate over that 5-year period is 34%.[40]

Internal USCIS review of I–601 historical application data indicated that withdrawals of Form I–601s were not a significant occurrence. At this time, DHS is unable to project a trend associated with the frequency of cases that are denied or withdrawn and later the alien chooses to re-file a waiver application. In an effort to present the maximum volume projection of I–601A re-filers, we have made the following assumptions: (1) The five-year denial rate of 34% calculated for Form I–601s will hold for Form I–601As; and (2) for every I–601A that is denied, we assume

that the alien will file an additional I–601A. We believe that showing the maximum volume projections under those assumptions will sufficiently account for those cases that are withdrawn. The volume projection of I–601A re-filers is shown in Table 8, and is based on a 34% denial rate for all initial filings presented in Table 6. We have chosen to present the re-filing volume projections separately because re-filers would be able to base the re-filed application on the initial immediate relative petition.

TABLE 8—FINAL ESTIMATES OF DENIED OR WITHDRAWN PROVISIONAL UNLAWFUL PRESENCE WAIVER APPLICATIONS WHERE AN ALIEN WOULD RE-FILE A NEW FORM I–601A

[Assumes that 34% of all initial applications in Table 6 will be denied or withdrawn]

| Year | Estimate of denied or withdrawn applications requiring a re-filed Form I–601A assuming the same demand and participation rates of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | 14,585 | 22,469 | 30,354 | 35,084 |
| Year 2 | 8,905 | 10,874 | 12,844 | 14,025 |
| Year 3 | 9,209 | 11,239 | 13,268 | 14,487 |
| Year 4 | 9,523 | 11,615 | 13,708 | 14,964 |
| Year 5 | 9,848 | 12,006 | 14,163 | 15,458 |
| Year 6 | 10,184 | 12,409 | 14,634 | 15,969 |
| Year 7 | 10,532 | 12,827 | 15,122 | 16,499 |
| Year 8 | 10,893 | 13,259 | 15,626 | 17,046 |
| Year 9 | 11,266 | 13,707 | 16,148 | 17,613 |
| Year 10 | 11,652 | 14,170 | 16,689 | 18,200 |
| 10-Year Totals | 106,593 | 134,571 | 162,551 | 179,341 |

**Note:** Numbers may not total due to rounding.

## 5. Costs

The final rule will require provisional unlawful presence waiver applicants to submit biometrics to USCIS. This is the only new cost applicants will incur under the provisional unlawful presence waiver process in comparison to the current waiver process. The other

costs of the rule emanate from the increase in the demand created by the provisional unlawful presence waiver process. These other costs include the fees and preparation costs for forms prepared by individuals who we believe take the initiative to normalize their immigration status where they

otherwise would not due to existing constraints previously described under the current I–601 waiver process.

For the biometric collection, the immediate relative alien will incur the following costs associated with submitting biometrics with an application for the provisional unlawful

---

[40] Source: USCIS Office of Performance and Quality, Data Analysis and Reporting Branch.

Query of CIS Consolidated Operational Repository

for I–601 receipts, approval and denials for FY 2007—2011; report created December 8, 2011.

Exhibit 1
224

presence waiver: the required USCIS fee and the opportunity and mileage costs of traveling to a USCIS ASC to have the biometric recorded.

The current USCIS fee for collecting and processing biometrics is $85.00. In addition, DHS estimates the opportunity costs for travel to an ASC in order to have the biometric recorded based on the cost of travel (time and mileage) plus the average wait time to have the biometric collected. While travel times and distances will vary, DHS estimates that the average round-trip distance to an ASC will be 50 miles, and that the average time for that trip will be 2.5 hours. DHS estimates that an alien will wait an average of one hour for service and to have biometrics collected.

DHS recognizes that the individuals impacted by the rule are unlawfully present and are generally not eligible to work; however, consistent with other DHS rulemakings, we use wage rates as a mechanism to estimate the opportunity or time valuation costs associated with the required biometric collection. The Federal minimum wage is currently $7.25 per hour.[41] In order to anticipate the full opportunity cost of providing biometrics, DHS multiplied the minimum hourly wage rate by 1.44 to account for the full cost of employee benefits such as paid leave, insurance, and retirement, which equals $10.44 per hour.[42] In addition, the cost of travel includes a mileage charge based on the estimated 50 mile round trip at the General Services Administration rate of $0.555 per mile, which equals $27.75 for each applicant.[43]

Using an opportunity cost of time of $10.44 per hour and the 3.5 hour estimated time for travel and service and the mileage charge of $27.75, DHS estimates the cost per provisional unlawful presence waiver applicant to be $64.29 for travel to and service at the ASC.[44] When the $85.00 biometric fee is added, the total estimated additional cost per provisional unlawful presence waiver over the current waiver process is $149.29. All other fees charged by USCIS and DOS to apply for immediate relative visas remain the same under the current and provisional unlawful presence waiver processes.[45]

The incremental costs of the biometric requirement of the rule are computed as the $149.29 cost per provisional unlawful presence waiver multiplied by the total number of applicants for provisional unlawful presence waivers applying after the final rule is effective. This population is represented in Table 6. The incremental costs of the additional biometric requirement are shown in Table 9.

TABLE 9—COSTS OF BIOMETRIC REQUIREMENT TO IMMEDIATE RELATIVES FILING A PROVISIONAL UNLAWFUL PRESENCE WAIVER APPLICATION

[Table 6 multiplied by $149.29]

| Year | Additional inadmissibility waiver application fees with current constrained demand or participation rate of | | | |
| --- | --- | --- | --- | --- |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | $6,404,093 | $9,865,830 | $13,327,715 | $15,404,937 |
| Year 2 | 3,910,054 | 4,774,593 | 5,639,280 | 6,158,063 |
| Year 3 | 4,043,221 | 4,934,482 | 5,825,744 | 6,360,650 |
| Year 4 | 4,181,165 | 5,099,896 | 6,018,776 | 6,570,253 |
| Year 5 | 4,323,886 | 5,271,281 | 6,218,675 | 6,787,171 |
| Year 6 | 4,471,534 | 5,448,488 | 6,425,442 | 7,011,703 |
| Year 7 | 4,624,407 | 5,631,965 | 6,639,523 | 7,244,148 |
| Year 8 | 4,782,654 | 5,821,862 | 6,860,921 | 7,484,654 |
| Year 9 | 4,946,426 | 6,018,328 | 7,090,230 | 7,733,521 |
| Year 10 | 5,116,019 | 6,221,810 | 7,327,601 | 7,991,195 |
| 10-Year Totals Undiscounted | 46,803,460 | 59,088,534 | 71,373,907 | 78,746,295 |
| 10-Year Totals Discounted at 7.0 percent | 32,907,683 | 42,030,423 | 51,153,460 | 56,628,050 |
| 10-Year Totals Discounted at 3.0 percent | 39,926,220 | 50,653,297 | 61,380,675 | 67,818,069 |

**Note:** Numbers may not total due to rounding.

In addition to the costs of the biometric requirement, DHS expects that the rule will induce an increase in demand for immediate relative visas, which will generate new fees paid to the USCIS and DOS. As the only new requirement imposed by this rule on provisional unlawful presence waiver applicants compared with the current waiver process is biometrics, fees collected for filing forms that are already required (such as the Form I–130) are not costs of this rule. The new fee revenue, however, is that generated by the additional demand shown in Table 7, and from transfers made by applicants to USCIS and DOS to cover the cost of processing the forms. In addition to the fees, there are nominal preparation costs associated with completing the forms. We estimate the amount of these fees and their associated preparation costs to give a more complete estimate of the impact of this rule. We consider the fee values to be a reasonable proxy for the underlying costs of this rule. The additional fees and preparation costs are shown in Table 10.

In determining the preparation cost for the forms, different labor rates were used depending on the citizenship status of the petitioner. If the form is completed by the alien immediate relative (Form I–601A), the loaded minimum wage of $10.44 per hour was used. If the form is completed by a U.S.

[41] U.S. Dep't of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009, available at: http://www.dol.gov/dol/topic/wages/minimumwage.htm.

[42] U.S. Dep't of Labor, Bureau of Labor Statistics, Economic News Release, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group, Dec. 2011, available at http://www.bls.gov/news.release/archives/ecec_03142012.htm.

[43] See 77 FR 22786.

[44] ($10.44 per hour × 3.5 hours) + ($0.555 per mile × 50 miles) = $64.29.

[45] The Application for a Provisional Waiver of Inadmissibility, Form I–601A, will carry the same USCIS fee as Form I–601.

Exhibit 1
225

citizen, we used the mean hourly wage for "all occupations" as reported by the Bureau of Labor Statistics and then adjusted that wage upward to account for the costs of employee benefits, such as annual leave, for a fully loaded hourly wage rate of $31.31.[46] The times to complete the forms are based on the estimated burden time reported for the individual forms.

These costs and appropriate fees paid to USCIS and DOS are calculated by the formula:

1. Cost of Form I–130: Preparation cost = ($31.31 × 1.5 hours) = $46.97; USCIS fee to cover processing costs = $420.00. Total cost = $466.97

2. Cost of Form I–601A: Preparation cost = ($10.44 × 1.5 hours) = $15.66; USCIS fee to cover processing costs = $585.00. Total cost = $600.66

3. Cost of Form I–864: Preparation cost = ($31.31 × 6.0 hours) = $187.86; DOS fee to cover processing costs = $88.00. Total cost = $275.86

4. Cost of Immigrant Visa: Preparation cost of Form DS–230 = ($10.44 × 1.0 hour) = $10.44; Processing Fees: DOS fee to cover the biometric costs = $230; USCIS fee to cover processing costs = $165. Total cost = $405.44.

Based on the above, the total costs per application: ($466.97 + 600.66 + 275.86 + 405.44) = $1,748.93.

TABLE 10—COSTS FOR PREPARING AND FILING USCIS AND DOS FORMS

[Table 7 multiplied by $1,748.93]

| Year | Additional preparation costs and filing fees with current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | $40,555,938 | $81,110,127 | $121,664,315 | $145,998,927 |
| Year 2 | 10,129,803 | 20,259,605 | 30,387,659 | 36,466,939 |
| Year 3 | 10,442,861 | 20,883,973 | 31,325,085 | 37,591,501 |
| Year 4 | 10,764,664 | 21,529,328 | 32,293,992 | 38,754,540 |
| Year 5 | 11,100,459 | 22,199,168 | 33,297,878 | 39,957,804 |
| Year 6 | 11,444,998 | 22,889,996 | 34,334,994 | 41,203,042 |
| Year 7 | 11,803,529 | 23,607,057 | 35,410,586 | 42,493,752 |
| Year 8 | 12,174,302 | 24,348,603 | 36,522,905 | 43,828,186 |
| Year 9 | 12,559,066 | 25,116,384 | 37,673,701 | 45,209,841 |
| Year 10 | 12,956,073 | 25,910,398 | 38,864,722 | 46,638,716 |
| 10 Year Totals Undiscounted | 143,931,692 | 287,854,640 | 431,775,838 | 518,143,249 |
| 10 Year Totals Discounted at 7.0 percent | 106,881,772 | 213,757,395 | 320,631,489 | 384,766,730 |
| 10 Year Totals Discounted at 3.0 percent | 125,678,197 | 251,348,945 | 377,018,045 | 452,432,274 |

**Note:** Sums may not total due to rounding.

The totals in Table 10 are calculated by multiplying the induced demand shown in Table 7 by the $1,748.93 shown above. DHS acknowledges there are additional costs to the existing process, such as travel from the United States to the immediate relative's home country where the immigrant visa is being processed and the additional expense of supporting two households while awaiting an immigrant visa. Such costs are highly variable and depend on the circumstances of the specific petitioner. We did not estimate the impacts of these variable costs. To the

extent that this rule allows immediate relatives to reduce the time spent in their home country, we expect a proportionate reduction in these costs. These cost savings represent a benefit of this rule.

In addition, the final rule has removed the limitation that allowed aliens to file only one Form I–601A on the basis of an approved immediate relative petition. In response to public comment, DHS will allow an alien to file a new Form I–601A based on the same approved immediate relative petition if the initial Form I–601A is

denied or withdrawn. If an alien chooses to file a new provisional unlawful presence waiver application, the alien would face the biometric costs (including biometric fees and travel to the ASC to submit biometrics) and the fee and preparation costs associated with Form I–601A. As previously established, the biometric costs are $149.29 and the Form I–601A costs are $600.66 per applicant. The total costs associated with the estimated population volume are presented in Table 11.

TABLE 11—COSTS ASSOCIATED WITH APPLICANTS THAT RE-FILE FORM I–601A AFTER THE INITIAL FORM I–601A IS DENIED OR WITHDRAWN

[Table 8 multiplied by $749.95]

| Year | Additional costs for applications that are denied and re-filed over the range analysis of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | $10,938,021 | $16,850,627 | $22,763,982 | $26,311,246 |
| Year 2 | 6,678,305 | 8,154,956 | 9,632,358 | 10,518,049 |
| Year 3 | 6,906,290 | 8,428,688 | 9,950,337 | 10,864,526 |

[46] The $31.31 rate is calculated by multiplying the $21.74 average hourly wage for all occupations May 2011 (available at http://www.bls.gov/oes/2011/may/oes_nat.htm) by the 1.44 fully loaded multiplier.

Exhibit 1
226

TABLE 11—COSTS ASSOCIATED WITH APPLICANTS THAT RE-FILE FORM I–601A AFTER THE INITIAL FORM I–601A IS DENIED OR WITHDRAWN—Continued

[Table 8 multiplied by $749.95]

| Year | Additional costs for applications that are denied and re-filed over the range analysis of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 4 | 7,141,774 | 8,710,669 | 10,280,315 | 11,222,252 |
| Year 5 | 7,385,508 | 9,003,900 | 10,621,542 | 11,592,727 |
| Year 6 | 7,637,491 | 9,306,130 | 10,974,768 | 11,975,952 |
| Year 7 | 7,898,473 | 9,619,609 | 11,340,744 | 12,373,425 |
| Year 8 | 8,169,205 | 9,943,587 | 11,718,719 | 12,783,648 |
| Year 9 | 8,448,937 | 10,279,565 | 12,110,193 | 13,208,869 |
| Year 10 | 8,738,417 | 10,626,792 | 12,515,916 | 13,649,090 |
| 10-Year Totals Undiscounted | 79,942,420 | 100,924,521 | 121,908,872 | 134,499,783 |
| 10-Year Totals Discounted at 7.0 percent | 56,207,656 | 71,788,866 | 87,371,675 | 96,721,450 |
| 10-Year Totals Discounted at 3.0 percent | 68,195,707 | 86,516,943 | 104,840,098 | 115,834,193 |

Note: Sums may not total due to rounding.

The total cost to applicants is shown in Table 12 as the sum of Table 9, Table 10, and Table 11.

TABLE 12—TOTAL COSTS TO APPLICANTS OF THE FINAL RULE

[Sum of Tables 9–11]

| Year | Estimated total cost at current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | $57,898,052 | $107,826,583 | $157,756,013 | $187,715,110 |
| Year 2 | 20,718,162 | 33,189,154 | 45,659,297 | 53,143,051 |
| Year 3 | 21,392,372 | 34,247,144 | 47,101,166 | 54,816,677 |
| Year 4 | 22,087,603 | 35,339,893 | 48,593,083 | 56,547,045 |
| Year 5 | 22,809,853 | 36,474,349 | 50,138,095 | 58,337,702 |
| Year 6 | 23,554,023 | 37,644,613 | 51,735,204 | 60,190,697 |
| Year 7 | 24,326,409 | 38,858,631 | 53,390,853 | 62,111,325 |
| Year 8 | 25,126,162 | 40,114,053 | 55,102,544 | 64,096,488 |
| Year 9 | 25,954,429 | 41,414,276 | 56,874,124 | 66,152,230 |
| Year 10 | 26,810,510 | 42,758,999 | 58,708,239 | 68,279,001 |
| 10 Year Totals Undiscounted | 270,677,572 | 447,867,695 | 625,058,617 | 731,389,326 |
| 10 Year Totals Discounted at 7.0 percent | 195,997,110 | 327,576,683 | 459,156,625 | 538,116,229 |
| 10 Year Totals Discounted at 3.0 percent | 233,800,123 | 388,519,186 | 543,238,818 | 636,084,535 |

Note: Sums may not total due to rounding.

Costs to the Federal Government include the possible costs of additional adjudication personnel associated with increased volume and the associated equipment (computers, telephones) and occupancy costs (if additional space is required). However, we expect these costs to be offset by the additional fee revenue collected for form processing. As previously explained, DHS has adopted the current cost for adjudicating an Application for Waiver of Ground of Inadmissibility, Form I–601($585), as the initial filing fee that will be required for the Form I–601A. DHS will consider the impact of the provisional unlawful presence waiver process workflow and resource requirements as a normal part of its biennial fee review. The biennial fee review determines if fees for immigration benefits are sufficient in light of resource needs and filing trends. Consequently, we do not believe that this rule will impose additional costs on the Federal Government.

6. Benefits

The benefits of the rule are the result of streamlining the immigrant visa waiver process. The primary benefits of the provisional unlawful presence waiver process changes are qualitative and result from reduced separation time for U.S. citizens and their immediate relatives. In addition to the obvious humanitarian and emotional benefits derived from family reunification, we also anticipate significant financial benefits accruing to the U.S. citizen due to the shortened period he or she would have to financially support the alien relative abroad. DHS is currently unable to estimate the average duration of time an immediate relative must spend abroad while awaiting waiver adjudication under the current process, and so cannot predict how the time spent apart would be reduced under the provisional unlawful presence waiver process. As a result of streamlining the

Exhibit 1
227

unlawful presence waiver process, there also could be workflow efficiencies realized by both USCIS and DOS. The new process will enable USCIS to process and adjudicate the provisional unlawful presence waivers domestically. As a result, USCIS may be able to move a large part of its workload to Service Centers or field offices with resources that are less expensive than overseas staffing resources and that are flexible enough to accommodate filing surges. In addition, the new provisional unlawful presence waiver process will allow DOS to review these cases once, as opposed to the current unlawful presence process where these cases are reviewed twice, at a minimum. DHS anticipates that the new process will make the immigrant visa process more efficient.

### D. Executive Order 13132

This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### E. Executive Order 12988 Civil Justice Reform

Section 3(c) of Executive Order 12988 requires Executive agencies to review regulations in light of applicable standards in section 3(a) and section 3(b) to determine whether they are met or it is unreasonable to meet one or more of them. DHS has completed the required review and determined that, to the extent permitted by law, this final rule meets the relevant standards of Executive Order 12988.

### F. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting and recordkeeping requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule requires that an applicant requesting a provisional unlawful presence waiver complete an *Application for Provisional Waiver of Unlawful Presence,* Form I–601A. This form is considered new information collection and is covered under the PRA. USCIS is currently seeking

approval of this newly created instrument from OMB.

DHS submitted Form I–601A to OMB for review. OMB temporarily assigned an OMB Control Number, 1615–0123, to the form and also filed comments in accordance with 5 CFR 1320.11(c). DHS has considered the comments received in response to the publication of the proposed rule and the comments submitted by OMB concerning the creation of the Form I–601A. DHS' response to the comments appears in this final rule and in an appendix in the supporting statement that accompanies this rule. USCIS has submitted the supporting statement to OMB as part of its request for approval of this new information collection instrument.

On April 2, 2012, DHS published a proposed rule, *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives,* in the **Federal Register** at 77 FR 19902. In the PRA section of that rule, DHS inadvertently indicated that USCIS would be seeking to revise a currently approved information collection instrument. DHS, however, should have indicated that it would be requesting the approval of a new information collection instrument, *Application for Provisional Unlawful Presence Waiver,* Form I–601A. This final rule corrects that error.

Despite the inadvertent error in the notice inserted in the PRA portion of the proposed rule, DHS clearly communicated to the public, in other parts of the proposed rule, that it was considering the creation of a new information collection instrument, Form I–601A, to be able to collect information required from certain immediate relatives of U.S. citizens seeking a provisional unlawful presence waiver of the unlawful presence inadmissibility ground. USCIS received comments from the public on the proposed Form I–601A. Those comments have been addressed under part IV (Public Comments on Proposed Rule).

Lastly, DHS has updated the supporting statement to reflect a change in the estimate for the number of respondents that USCIS projected would submit this type of request from 38,277 respondents to 62,348 respondents. This change of the initially projected estimate is due to the final rule's expansion of the eligibility criterion initially proposed, which results in an increase of the estimated population of aliens that DHS expects could file Form I–601A. With the increase in the total number of respondents, DHS has increased the total annual burden hours to 166,469 hours. In addition, DHS has revised the

originally proposed form I–601A and its instructions to include the changes as discussed in Part IV (Public Comments on the Proposed Rule) and the appendix of the supporting statement. The revised materials can be viewed at *www.regulations.gov.*

### G. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act and certifies that this rule will not have a significant economic impact on a substantial number of small entities. The factual basis for this determination is that this rule directly regulates individuals who are the immediate relatives of U.S. citizens seeking to apply for an unlawful presence waiver of inadmissibility in order to be eligible to obtain an immigrant visa outside the United States. The impact is on these persons as individuals, so that they are not, for purposes of the Regulatory Flexibility Act, within the definition of small entities established by 5 U.S.C. 601(6). DHS received no public comments challenging this certification.

### VII. Amendments

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedures, Authority delegations (government agencies), Freedom of Information; Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

Accordingly, USCIS amends chapter I of title 8 of the Code of Federal Regulations as follows:

Exhibit 1
228

## PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2.

■ 2. Section 103.7 is amended by revising paragraphs (b)(1)(i)(AA) and (c)(3)(i) to read as follows:

### § 103.7   Fees.

\*     \*     \*     \*     \*

(b) \* \* \*

(1) \* \* \*

(i) \* \* \*

(AA) *Application for Waiver of Ground of Inadmissibility (Form I–601) and Application for Provisional Unlawful Presence Waiver (I–601A).* For filing an application for waiver of grounds of inadmissibility or an application for a provisional unlawful presence waiver: $585.

\*     \*     \*     \*     \*

(c) \* \* \*

(3) \* \* \*

(i) Biometric Fee, except for the biometric fee required for provisional unlawful presence waivers filed under 8 CFR 212.7(e).

\*     \*     \*     \*     \*

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 3. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); 8 CFR part 2. Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 4. Section 212.7 is amended by:
■ a. Revising paragraphs (a)(1), (a)(3), and (a)(4); and
■ b. Adding paragraph (e).
The revisions and addition read as follows:

### § 212.7   Waivers of certain grounds of inadmissibility.

(a)(1) *Application.* Except as provided by 8 CFR 212.7(e), an applicant for an immigrant visa, adjustment of status, or a K or V nonimmigrant visa who is inadmissible under any provision of section 212(a) of the Act for which a waiver is available under section 212 of the Act may apply for the related waiver by filing the form designated by USCIS, with the fee prescribed in 8 CFR

103.7(b)(1), and in accordance with the form instructions. Certain immigrants may apply for a provisional unlawful presence waiver of inadmissibility as specified in 8 CFR 212.7(e).

\*     \*     \*     \*     \*

(3) *Decision.* If the waiver application is denied, USCIS will provide a written decision and notify the applicant and his or her attorney or accredited representative and will advise the applicant of appeal procedures, if any, in accordance with 8 CFR 103.3. The denial of a provisional unlawful presence waiver is governed by 8 CFR 212.7(e).

(4) *Validity.* (i) A provisional unlawful presence waiver granted according to paragraph (e) of this section is valid subject to the terms and conditions as specified in paragraph (e) of this section. In any other case, approval of an immigrant waiver of inadmissibility under this section applies only to the grounds of inadmissibility, and the related crimes, events, or incidents that are specified in the application for waiver.

(ii) Except for K–1 and K–2 nonimmigrants and aliens lawfully admitted for permanent residence on a conditional basis, an immigrant waiver of inadmissibility is valid indefinitely, even if the applicant later abandons or otherwise loses lawful permanent resident status.

(iii) For a K–1 or K–2 nonimmigrant, approval of the waiver is conditioned on the K–1 nonimmigrant marrying the petitioner; if the K–1 nonimmigrant marries the K nonimmigrant petitioner, the waiver becomes valid indefinitely, subject to paragraph (a)(4)(iv) of this section, even if the applicant later abandons or otherwise loses lawful permanent resident status. If the K–1 does not marry the K nonimmigrant petitioner, the K–1 and K–2 nonimmigrants remain inadmissible for purposes of any application for a benefit on any basis other than the proposed marriage between the K–1 and the K nonimmigrant petitioner.

(iv) For an alien lawfully admitted for permanent residence on a conditional basis under section 216 of the Act, removal of the conditions on the alien's status renders the waiver valid indefinitely, even if the applicant later abandons or otherwise loses lawful permanent resident status. Termination of the alien's status as an alien lawfully admitted for permanent residence on a conditional basis also terminates the validity of a waiver of inadmissibility based on sections 212(h) or 212(i) of the Act that was granted to the alien. Separate notification of the termination

of the waiver is not required when an alien is notified of the termination of residence under section 216 of the Act, and no appeal will lie from the decision to terminate the waiver on this basis. If the alien challenges the termination in removal proceedings, and the removal proceedings end in the restoration of the alien's status, the waiver will become effective again.

(v) Nothing in this subsection precludes USCIS from reopening and reconsidering a decision if the decision is determined to have been made in error.

\*     \*     \*     \*     \*

(e) *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives.* The provisions of this paragraph (e) are applicable to certain aliens who are pursuing consular immigrant visa processing as an immediate relative of a U.S. citizen.

(1) *Jurisdiction.* All applications for a provisional unlawful presence waiver, including an application for a provisional unlawful presence waiver made by an alien in removal proceedings before the Executive Office for Immigration Review, must be filed with USCIS, with the fees prescribed in 8 CFR 103.7(b), and in accordance with the form instructions.

(2) *Provisional Unlawful Presence Waiver; In General.* (i) USCIS may adjudicate applications for a provisional unlawful presence waiver of inadmissibility based on section 212(a)(9)(B)(v) of the Act filed by eligible aliens described in paragraph (e)(3) of this section. USCIS will only approve such provisional unlawful presence waiver applications in accordance with the conditions outlined in paragraph (e) of this section. Consistent with section 212(a)(9)(B)(v) of the Act, the decision whether to approve a provisional unlawful presence waiver application is discretionary and does not constitute a grant of a lawful immigration status or a period of stay authorized by the Secretary.

(ii) A pending or an approved provisional unlawful presence waiver does not authorize any interim immigration benefits such as employment authorization or advance parole. Any application for a travel document or request for employment authorization that is submitted in connection with a provisional unlawful presence waiver application will be rejected.

(3) *Eligible aliens.* Except as provided in paragraph (e)(4) of this section, an alien may be eligible to apply for and receive a provisional unlawful presence

Exhibit 1
229

waiver for the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act if he or she meets the requirements in this paragraph. An alien may be eligible to apply for or receive a waiver if he or she:

(i) Is present in the United States at the time of filing the application for a provisional unlawful presence waiver, and for biometrics collection at a USCIS ASC;

(ii) Upon departure, would be inadmissible only under section 212(a)(9)(B)(i) of the Act at the time of the immigrant visa interview;

(iii) Qualifies as an immediate relative under section 201(b)(2)(A)(i) of the Act;

(iv) Is the beneficiary of an approved immediate relative petition;

(v) Has a case pending with the Department of State based on the approved immediate relative petition and has paid the immigrant visa processing fee as evidenced by a State Department Visa Processing Fee Receipt;

(vi) Will depart from the United States to obtain the immediate relative immigrant visa; and

(vii) Meets the requirements in section 212(a)(9)(B)(v) of the Act, except the alien must show extreme hardship to his or her U.S. citizen spouse or parent.

(4) *Ineligible Aliens.* Notwithstanding paragraph (e)(3) of this section, an alien is ineligible for a provisional unlawful presence waiver under paragraph (e) of this section if:

(i) USCIS has reason to believe that the alien may be subject to grounds of inadmissibility other than unlawful presence under section 212(a)(9)(B)(i)(I) or (II) of the Act at the time of the immigrant visa interview with the Department of State;

(ii) The alien is under the age of 17;

(iii) The alien does not have a case pending with the Department of State, based on the approved immediate relative petition, and has not paid the immigrant visa processing fee;

(iv) The Department of State initially acted to schedule the immigrant visa interview prior to January 3, 2013 for the approved immediate relative petition on which the provisional unlawful presence waiver is based, even if the interview has since been cancelled or rescheduled *after* January 3, 2013;

(v) The alien is in removal proceedings, unless the removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A;

(vi) The alien is subject to a final order of removal issued under section 217, 235, 238, or 240 of the Act or a final order of exclusion or deportation under former 236 or 242 of the Act (pre-April 1, 1997), or any other provision of law (including an in absentia removal order under section 240(b)(5) of the Act);

(vii) The alien is subject to reinstatement of a prior removal order under section 241(a)(5) of the Act; or

(viii) The alien has a pending application with USCIS for lawful permanent resident status.

(5) *Filing.* (i) An application for a provisional unlawful presence waiver of the unlawful presence inadmissibility bars under section 212(a)(9)(B)(i)(I) or (II) of the Act, including an application by an alien in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A, must be filed in accordance with 8 CFR part 103 and on the form designated by USCIS. The prescribed fee under 8 CFR 103.7(b)(1) and supporting documentation must be submitted in accordance with the form instructions.

(ii) An application for a provisional unlawful presence waiver will be rejected and the fee and package returned to the alien if the alien:

(A) Fails to pay the required filing fee for the provisional unlawful presence waiver application or to pay the correct filing fee;

(B) Fails to sign the provisional unlawful presence waiver application;

(C) Fails to provide his or her family name, domestic home address, and date of birth;

(D) Is under the age of 17;

(E) Does not include evidence of an approved petition that classifies the alien as an immediate relative of a U.S. citizen;

(F) Fails to include a copy of the fee receipt evidencing that the alien has paid the immigrant visa processing fee to the Department of State; or

(G) Has indicated on the provisional unlawful presence waiver application that the Department of State initially acted to schedule the immigrant visa interview prior to January 3, 2013, even if the interview was cancelled or rescheduled *after* January 3, 2013.

(6) *Biometrics.* (i) All aliens who apply for a provisional unlawful presence waiver under this section will be required to provide biometrics in accordance with 8 CFR 103.16 and 103.17, as specified on the form instructions.

(ii) *Failure to appear for biometrics capture.* If an alien fails to appear for biometrics capture, the provisional unlawful presence waiver application will be considered abandoned and denied pursuant to 8 CFR 103.2(b)(13).

The alien may not appeal or file a motion to reopen or reconsider an abandonment denial under 8 CFR 103.5.

(7) *Burden of proof.* The alien has the burden to establish eligibility for the provisional unlawful presence waiver as described in this paragraph of this section, and under section 212(a)(9)(B)(v) of the Act, including that the alien merits a favorable exercise of the Secretary's discretion.

(8) *Adjudication.* USCIS will adjudicate the provisional unlawful presence waiver application in accordance with this paragraph of this section and section 212(a)(9)(B)(v) of the Act, except the alien must show extreme hardship to his or her U.S. citizen spouse or parent. USCIS also may require the alien and the U.S. citizen petitioner to appear for an interview pursuant to 8 CFR 103.2(b)(9). If USCIS finds that the alien does not meet the eligibility requirements for the provisional unlawful presence waiver as described in paragraph (e) of this section, or if USCIS otherwise determines in its discretion that a waiver is not warranted, USCIS will deny the waiver application. Notwithstanding 8 CFR 103.2(b)(16), USCIS may deny an application for a provisional unlawful presence waiver without prior issuance of a request for evidence or notice of intent to deny.

(9) *Notice of Decision.* USCIS will notify the alien and the alien's attorney of record or accredited representative of the decision in accordance with 8 CFR 103.2(b)(19). USCIS also may notify the Department of State. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another provisional unlawful presence waiver application under paragraph (e) of this section, provided the alien meets all of the requirements in this part, and the alien's case must be pending with the Department of State. An alien also may elect to file a Form I–601, Waiver of Grounds of Inadmissibility, pursuant to paragraph (a)(1) of this section after departing the United States, appearing for his or her immigrant visa interview at the U.S. Embassy or consulate abroad, and after the Department of State determines the alien's admissibility and eligibility for an immigrant visa. Accordingly, denial of a request for a provisional unlawful presence waiver is not a final agency action for purposes of section 10(c) of the Administrative Procedure Act, 5 U.S.C. 704.

(10) *Withdrawal of waiver requests.* An alien may withdraw his or her request for a provisional unlawful presence waiver at any time before USCIS makes a final decision. Once the

Exhibit 1
230

case is withdrawn, USCIS will close the case and notify the alien and his or her attorney or accredited representative. The alien may file a new Form I–601A, in accordance with the form instructions and required fees. The alien's case must be pending with the Department of State and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

(11) *Appeals and Motions To Reopen.* There is no administrative appeal from a denial of a request for a provisional unlawful presence waiver under this section. The alien may not file, pursuant to 8 CFR 103.5, a motion to reopen or reconsider a denial of a provisional unlawful presence waiver application under this section.

(12) *Approval and Conditions.* A provisional unlawful presence waiver granted under this section:

(i) Does not take effect unless, and until, the alien who applied for and obtained the provisional unlawful presence waiver:

(A) Departs from the United States;

(B) Appears for an immigrant visa interview at a U.S. Embassy or consulate; and

(C) Is determined to be otherwise eligible for an immigrant visa by a Department of State consular officer in light of the approved provisional unlawful presence waiver.

(ii) Waives the alien's inadmissibility under section 212(a)(9)(B) of the Act only for purposes of the application for an immigrant visa and admission to the United States as an immediate relative of a U.S. citizen pursuant to the approved immediate relative petition (Form I–130 or I–360) upon which the provisional unlawful presence waiver application was based.

(iii) Does not waive any ground of inadmissibility other than the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act.

(13) *Validity.* Until the provisional unlawful presence waiver takes full effect as provided in paragraph (e)(12) of this section, USCIS may reopen and reconsider its decision at any time. Once a provisional unlawful presence waiver takes full effect as defined in paragraph (e)(12) of this section, the period of unlawful presence for which the provisional unlawful presence waiver is granted is waived indefinitely, in accordance with and subject to paragraph (a)(4) of this section.

(14) *Automatic Revocation.* The approval of a provisional unlawful presence waiver is revoked automatically if:

(i) The consular officer determines at the time of the immigrant visa interview that the alien is ineligible to receive a visa under section 212(a) of the Act other than under section 212(a)(9)(B)(i)(I) or (II) of the Act;

(ii) The immigrant visa petition approval associated with the provisional unlawful presence waiver is at any time revoked, withdrawn, or rendered invalid but not otherwise reinstated for humanitarian reasons or converted to a widow or widower petition;

(iii) The immigrant visa registration is terminated in accordance with section 203(g) of the Act, and has not been reinstated in accordance with section 203(g) of the Act; or

(iv) The alien, at any time before or after approval of the provisional unlawful presence waiver or before an immigrant visa is issued, reenters or attempts to reenter the United States without being inspected and admitted or paroled.

**Janet Napolitano,**
*Secretary.*
[FR Doc. 2012–31268 Filed 1–2–13; 4:18 pm]
**BILLING CODE 9111–97–P**

Exhibit 1
231

# **Action 26**

Expansion of Provisional Unlawful Presence Waivers of Inadmissibility; Final
Rule

Exhibit 1
232





# FEDERAL REGISTER

Vol. 81          Friday,

No. 146        July 29, 2016

Part V

## Department of Homeland Security

8 CFR Parts 103 and 212
Expansion of Provisional Unlawful Presence Waivers of Inadmissibility;
Final Rule

Exhibit 1
233

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 103 and 212**

[CIS No. 2557–2014; DHS Docket No. USCIS–2012–0003]

**RIN 1615–AC03**

**Expansion of Provisional Unlawful Presence Waivers of Inadmissibility**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule, consistent with the Immigration and Nationality Act (INA), expands the class of individuals who may be eligible for a provisional waiver of certain grounds of inadmissibility based on the accrual of unlawful presence in the United States. The provisional unlawful presence waiver ("provisional waiver") process allows certain individuals who are present in the United States to request from U.S. Citizenship and Immigration Services (USCIS) a provisional waiver of these grounds of inadmissibility before departing the United States for consular processing of their immigrant visas—rather than applying for a waiver abroad after their immigrant visa interviews using the Form I–601, Waiver of Grounds of Inadmissibility ("Form I–601 waiver process"). The provisional waiver process is designed to encourage unlawfully present individuals to leave the United States, attend their immigrant visa interviews, and return to the United States legally to reunite with their U.S. citizen or lawful permanent resident (LPR) family members. Having an approved provisional waiver helps facilitate immigrant visa issuance at DOS, streamlines both the waiver and the immigrant visa processes, and reduces the time that applicants are separated from their U.S. citizen or LPR family members, thus promoting family unity. The rule is intended to encourage eligible individuals to complete the immigrant visa process abroad, promote family unity, and improve administrative efficiency.

**DATES:** This final rule is effective August 29, 2016.

**FOR FURTHER INFORMATION CONTACT:** Roselyn Brown-Frei, Office of Policy and Strategy, Residence and Naturalization Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2099, Telephone (202) 272–8377 (this is not a toll free number).

**SUPPLEMENTARY INFORMATION:** This final rule adopts the proposed rule that the Department of Homeland Security (DHS) published on July 22, 2015, with changes made in response to comments received. This final rule provides that eligibility for the provisional waiver will no longer be limited to the subset of statutorily qualified individuals who seek to immigrate as immediate relatives of U.S. citizens [1] and who can show that denial of admission will result in extreme hardship to a U.S. citizen spouse or parent. Rather, this final rule makes eligibility for the provisional waiver available to all individuals who are statutorily eligible for a waiver of the unlawful presence grounds of inadmissibility. Under this final rule, such an individual must go abroad to obtain an immigrant visa, establish that denial of admission will result in extreme hardship to a U.S. citizen or LPR spouse or parent, establish that his or her case warrants a favorable exercise of discretion, and meet all other regulatory requirements. Eligibility for the provisional waiver will also extend to the spouses and children who accompany or follow to join principal immigrants. The rule is intended to encourage eligible individuals to complete the immigrant visa process abroad, and improve administrative efficiency. DHS believes that this rule will reduce overall immigrant visa processing times for eligible immigrant visa applicants; encourage individuals who are unlawfully present in the United States to seek lawful status after departing the country; save resources and time for the Department of State (DOS), DHS, and the individual; and reduce the hardship that U.S. citizen and LPR family members of individuals seeking the provisional waiver may experience as a result of the immigrant visa process.

**Table of Contents:**

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Costs and Benefits
II. Background
  A. Legal Authority
  B. Proposed Rule
  C. Final Rule
III. Public Comments on the Proposed Rule
  A. Summary of Public Comments
  B. Legal Authority
  C. Eligibility for the Provisional Waiver
  D. Adjudication
  E. Filing Requirements and Fees
  F. Comments on the Application for Provisional Unlawful Presence Waiver, Form I–601A, and the Form Instructions
  G. Miscellaneous Comments
  H. Comments on the Executive Orders 12866/13563 Analysis
IV. Regulatory Amendments
  A. Amending 8 CFR 212.7(e)(1) To Clarify Which Agency Has Jurisdiction To Adjudicate Provisional Waivers
  B. Removing the Provisional Waiver Reason To Believe Standard as a Basis for Ineligibility for Provisional Waivers
  C. Removing the DOS Visa Interview Scheduling Cut-Off Dates in 8 CFR 212.7(e)(4)(iv) and 212.7(e)(5)(ii)(G)
  D. Allowing Individuals With Final Orders of Removal, Deportation, or Exclusion To Apply for Provisional Waivers
  E. Clarifying When an Individual Is Subject to Reinstatement and Ineligible for Provisional Waivers
  F. Miscellaneous Technical Amendments
V. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  D. Executive Order 13132
  E. Executive Order 12988 Civil Justice Reform
  F. Paperwork Reduction Act
  G. Regulatory Flexibility Act

**I. Executive Summary**

*A. Purpose of the Regulatory Action*

This final rule, consistent with the INA, expands the provisional unlawful presence waiver process (hereinafter "provisional waiver process"), which specifies how an individual may be eligible to receive a provisional waiver of his or her inadmissibility for accrual of unlawful presence prior to departing the United States for processing of an immigrant visa application at a U.S. embassy or consulate abroad. *See* 8 CFR 212.7(e).

Generally, individuals who are in the United States and seeking lawful permanent resident (LPR) status must either obtain an immigrant visa abroad through what is known as "consular processing" with the Department of State (DOS) or apply to adjust their immigration status to that of an LPR in the United States, if eligible. Individuals present in the United States without having been inspected and admitted or paroled are typically ineligible to adjust their status in the United States. To obtain LPR status, such individuals must leave the United States for immigrant visa processing at a U.S. Embassy or consulate abroad. But because these individuals are present in the United States without having been inspected and admitted or paroled, their departures may trigger a ground of

---

[1] Immediate relatives of U.S. citizens are the spouses, children and parents of U.S. citizens, provided that, in the case of parents, the U.S. citizen son or daughter petitioner is over the age of 21. In certain situations, the former spouse of a deceased U.S. citizen is also considered an immediate relative.

Exhibit 1
234

inadmissibility based on the accrual of unlawful presence in the United States under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i).

Under subclause (I) of this provision, an individual who has been unlawfully present in the United States for more than 180 days but less than one year, and who then departs voluntarily from the United States before the commencement of removal proceedings, is inadmissible for 3 years from the date of departure. *See* INA section 212(a)(9)(B)(i)(I), 8 U.S.C. 1182(a)(9)(B)(i)(I). Under subclause (II), an individual who has been unlawfully present in the United States for one year or more and then departs the United States (before, during, or after removal proceedings), is inadmissible for 10 years from the date of the departure. *See* INA section 212(a)(9)(B)(i)(II), 8 U.S.C. 1182(a)(9)(B)(i)(II). These "3- and 10-year unlawful presence bars" do not take effect unless and until the individual departs from the United States. *See, e.g., Matter of Rodarte-Roman*, 23 I. & N. Dec. 905 (BIA 2006).

The Secretary of Homeland Security (Secretary) may waive this ground of inadmissibility for an individual who can demonstrate that the refusal of his or her admission to the United States would result in extreme hardship to his or her U.S. citizen or LPR spouse or parent. *See* INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). Prior to the creation of the provisional waiver process in 2013, any individual who was seeking an immigrant visa and became inadmissible under the 3- or 10-year unlawful presence bar upon departure from the United States, could apply for a waiver of such inadmissibility from DHS by filing an Application for Waiver of Grounds of Inadmissibility, Form I-601, with USCIS, but only after having attended the consular immigrant visa interview abroad. Those who applied for waivers under this "Form I-601 waiver process"[2] were effectively required to remain abroad for at least several months while USCIS adjudicated their waiver applications.[3]

For some individuals, the Form I-601 waiver process led to lengthy separations of immigrant visa applicants from their family members, causing some U.S. citizens and LPRs to experience the significant emotional and financial hardships that Congress aimed to avoid when it authorized the waiver. *See* INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v) (providing for an inadmissibility waiver, "if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien"). For this reason, many relatives of U.S. citizens and LPRs who are eligible to obtain LPR status may be reluctant to travel abroad to seek immigrant visas and obtain such status. The Form I-601 waiver process also created processing inefficiencies for both USCIS and DOS through repeated interagency communication and through multiple consular appointments or interviews.

On January 3, 2013, DHS promulgated a final rule, *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives*, in the **Federal Register**. *See* 78 FR 536 (Jan. 3, 2013) ("2013 Rule"). To improve administrative efficiency and reduce the amount of time that a U.S. citizen spouse or parent is separated from his or her relative while the relative completes the immigrant visa process, the 2013 Rule provided a process by which certain statutorily eligible individuals—specifically, certain parents, spouses and children of U.S. citizens—may apply for provisional waivers of the 3- and 10-year unlawful presence bars ("provisional waivers") before leaving the United States for their immigrant visa interviews. The final rule also limited eligibility for provisional waivers to those immediate relatives of U.S. citizens who could show extreme hardship to a U.S. citizen spouse or parent. One reason DHS limited eligibility for the provisional waiver was to allow DHS and DOS time to assess the effectiveness of the process and the operational impact it may have on existing agency processes and resources. *See* 2013 Rule, 78 FR at 541.

Administration of the provisional waiver process has shown that granting a provisional waiver prior to the departure of an immediate relative of a U.S. citizen can reduce the time that such family members are separated. The grant of a provisional waiver also reduces hardships to U.S. citizen families and lowers the processing costs for DHS and DOS. In light of these benefits, and because other individuals

are statutorily eligible for waivers of the 3- and 10-year unlawful presence bars, DHS decided to remove restrictions that prevented certain individuals from seeking such waivers through the provisional waiver process. On July 22, 2015, DHS proposed to expand the class of individuals who may be eligible for provisional waivers beyond certain immediate relatives of U.S. citizens to all statutorily eligible individuals regardless of their immigrant visa classification. DHS also proposed to expand the class of individuals who could obtain provisional waivers, consistent with the statutory waiver authority, by permitting consideration of extreme hardship not only to U.S. citizen spouses or parents, but also to LPR spouses or parents.

In this final rule, DHS adopts the changes discussed in the proposed rule with several modifications in response to comments submitted on the proposed rule. The new modifications include:

(1) Clarifying that all individuals seeking provisional waivers, including those in removal proceedings before the Executive Office for Immigration Review (EOIR), must file applications for provisional waivers with USCIS.

(2) Allowing individuals to apply for provisional waivers even if USCIS has a reason to believe that they may be subject to other grounds of inadmissibility.

(3) Eliminating the proposed temporal limitations that would have restricted eligibility for provisional waivers based on DOS visa interview scheduling.

(4) Allowing individuals with final orders of removal, exclusion, or deportation to be eligible for provisional waivers provided that they have already applied for, and USCIS has approved, an Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I-212.

(5) Clarifying that DHS must have actually reinstated a removal, deportation, or exclusion order in order for an individual who has returned to the United States unlawfully after removal to be ineligible for a provisional waiver on that basis.

In addition, DHS made several technical and non-substantive changes.

*B. Costs and Benefits*

This rule's expansion of the provisional waiver process will create costs and benefits for newly eligible provisional waiver (Form I-601A) applicants, their U.S. citizen or LPR family members, and the Federal Government (namely, USCIS and DOS), as outlined in the Summary Table. This rule will impose fee, time, and travel

---

[2] The "Form I-601 waiver process," for purposes of this rule, refers to the process that an applicant uses when seeking an immigrant visa at a U.S. Embassy or consulate abroad and applying for a waiver of inadmissibility by filing an Application for Waiver of Grounds of Inadmissibility, Form I-601.

[3] The average adjudication time of Form I-601 applications is currently about five months. Source: U.S. Citizenship and Immigration Services. USCIS Processing Time Information for the Nebraska Service Center-Form I-601, *available at https://egov.uscis.gov/cris/processTimesDisplayInit.do* (last updated Feb. 11, 2016).

Exhibit 1
235

costs on an estimated 100,000 newly eligible individuals who choose to complete and submit provisional waiver applications and biometrics (fingerprints, photograph, and signature) to USCIS for consideration during the 10-year period of analysis (*see* Table 8). These costs will equal an estimated $52.4 million at a 7 percent discount rate and $64.2 million at a 3 percent discount rate in present value across the period of analysis. On an annualized basis, the costs will measure approximately $7.5 million at both 7 percent and 3 percent discount rates (*see* Summary Table).

Newly eligible provisional waiver applicants and their U.S. citizen or LPR family members will benefit from this rule. Those applying for provisional waivers will receive advance notice of USCIS' decision to provisionally waive their 3- or 10-year unlawful presence bar before they leave the United States for their immigrant visa interview

abroad. This offers applicants and their family members the certainty of knowing that the applicants have been provisionally approved for waivers of the 3- and 10-year unlawful presence bars before departing from the United States. Individuals with approved provisional waivers may experience shortened periods of separation from their family members living in the United States while they pursue issuance of immigrant visas abroad, thus reducing any related financial and emotional strains on the families. USCIS and DOS will continue to benefit from the operational efficiencies gained from the provisional waiver's role in streamlining immigrant visa application processing, but on a larger scale.

In the absence of this rule, DHS assumes that the majority of individuals who are newly eligible for provisional waivers under this rule will likely continue to pursue an immigrant visa through consular processing abroad and

apply for waivers of grounds of inadmissibility resulting from the accrual of unlawful presence through the Form I–601 waiver process. Those who apply for unlawful presence waivers through the Form I–601 waiver process will incur fee, time, and travel costs similar to individuals applying for waivers through the provisional waiver process. However, without this rule, individuals who must seek a waiver of inadmissibility abroad through the Form I–601 waiver process after the immigrant visa interview may face longer separation times from their families in the United States and will experience less certainty regarding the approval of a waiver of the 3- or 10-year unlawful presence bar before departing from the United States. Absent a waiver, individuals who are subject to these bars would be unable to obtain LPR status for either 3 or 10 years.

SUMMARY TABLE—TOTAL COSTS AND BENEFITS OF RULE, YEAR 1–YEAR 10

|  | 10-Year present values | | Annualized values | |
|---|---|---|---|---|
|  | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| *Total Costs:* Quantitative ............... | $64,168,205 ...................... | $52,429,216 ...................... | $7,522,471 ...................... | $7,464,741 |
| *Total Benefits:* Qualitative ................. | Decreased amount of time that U.S. citizens or LPRs are separated from their family members with approved provisional waivers, leading to reduced financial and emotional hardship for these families. | | Decreased amount of time that U.S. citizens or LPRs are separated from their family members with approved provisional waivers, leading to reduced financial and emotional hardship for these families. | |
|  | Provisional waiver applicants will receive advance notice of USCIS' decision to provisionally waive their 3- or 10-year unlawful presence bar before they leave the United States for their immigrant visa interview abroad. This offers applicants and their family members the certainty of knowing that the applicants have been provisionally approved for a waiver before departing from the United States. | | Provisional waiver applicants will receive advance notice of USCIS' decision to provisionally waive their 3- or 10-year unlawful presence bar before they leave the United States for their immigrant visa interview abroad. This offers applicants and their family members the certainty of knowing that the applicants have been provisionally approved for a waiver before departing from the United States. | |
|  | Federal Government will achieve increased efficiencies by streamlining immigrant visa processing for applicants seeking inadmissibility waivers of unlawful presence. | | Federal Government will achieve increased efficiencies by streamlining immigrant visa processing for applicants seeking inadmissibility waivers of unlawful presence. | |

**Note:** The cost estimates in this table are contingent upon Form I-601A filing projections as well as the discount rates applied for monetized values.

## II. Background

### A. Legal Authority

Under section 212(a)(9)(B) of the INA, 8 U.S.C. 1182(a)(9)(B), an individual who has accrued more than 180 days of unlawful presence in the United States and then leaves the United States generally is inadmissible for a specified period after the individual's departure. The inadmissibility period lasts for 3 years if the individual accrued more than 180 days but less than 1 year of

unlawful presence, and for 10 years if the individual accrued 1 year or more of unlawful presence. Under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), the Secretary of Homeland Security ("Secretary") has discretion to waive this ground of inadmissibility if the Secretary finds that denying the applicant's admission to the United States would result in extreme hardship to the applicant's U.S. citizen or LPR spouse or parent. INA section 103, 8 U.S.C. 1103, gives the Secretary the

authority to prescribe regulations for the administration and enforcement of the immigration and naturalization laws of the United States.

### B. Proposed Rule

On July 22, 2015, DHS published a notice of proposed rulemaking to expand eligibility for provisional waivers of certain grounds of inadmissibility based on the accrual of unlawful presence to all individuals who are statutorily eligible for a waiver

Exhibit 1
236

of such grounds, are seeking a provisional waiver in connection with an immigrant visa application, and meet other conditions. *See* proposed rule, *Expansion of Provisional Waivers of Inadmissibility,* 80 FR 43338 (July 22, 2015) (2015 Proposed Rule).

In response to the proposed rule, DHS received 606 public comments from individuals, advocacy groups, attorneys, organizations, schools, and local governments. Some of the comments were submitted through mass mailing or email campaigns or petitions expressing support for or opposition to the provisional waiver process in general. Opinions on the proposed rule varied, but the majority of commenters (472) were supportive of the proposed expansion. Many of these commenters made additional suggestions to improve the provisional waiver process overall. These suggestions are discussed below.

DHS received 82 comments opposed to the proposed rule. In many of these instances, these commenters argued that the Executive Branch lacks the legal authority to implement the proposed changes. Commenters indicated that expanding the program amounted to an abuse of authority. One commenter asserted that the rule exceeded the Secretary's authority under the INA and that provisionally approving a waiver before an individual departs from the United States based on a family unity rationale was arbitrary and capricious. Some commenters also believed that the provisional waiver process would grant legal status to individuals unlawfully present in the United States. Others asked that USCIS prioritize the lawful immigrant community over those unlawfully present in the United States.

DHS received 52 comments that either did not clearly express an opinion in support of or in opposition to the proposed rule or that did not address any aspect of the proposed rule. For example, a few commenters provided input on immigrants in general, immigration policy, the Federal government, and other government programs that are not within the scope of this rulemaking. Because these comments address nothing in the proposed rule, DHS provides no specific response to them.

Unless mentioned in this supplementary information, commenters did not make any specific suggestions for changes to the provisional waiver process based on what DHS outlined in the proposed rule. In preparing this final rule, DHS counted and considered each public comment and other relevant materials that appear in the Federal Docket Management System (FDMS). All

comments received may be reviewed in FDMS at *http://www.regulations.gov*, under docket number USCIS–2012–0003.

*C. Final Rule*

This final rule adopts most of the regulatory amendments set forth in the proposed rule except for a few provisions, as explained in this preamble. The rationale for the proposed rule and the reasoning provided in its preamble remain valid with respect to the regulatory amendments adopted. Additionally, DHS has made several changes to the regulatory provisions based on the comments received. This final rule also adopts the technical regulatory amendments suggested in the proposed rule without change. This final rule does not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the provisional waiver process or the clarifying technical amendments to 8 CFR 212.7. This final rule does not change the procedures or policies of other DHS components or Federal agencies, or resolve issues outside the scope of this rulemaking.

**III. Public Comments on the Proposed Rule**

*A. Summary of Public Comments*

The 60-day public comment period for the proposed rule ended on September 21, 2015. The majority of comments came from supporters who agreed that the proposed rule would promote family unity and reduce the length of time family members would be separated. Many considered family unity as one of the core principles of U.S. immigration law and stated that this rulemaking benefitted the United States overall, not just families. Several commenters made suggestions for simplifying the provisional waiver process overall.

Some commenters identified themselves as U.S. citizens or LPR family members (including children) who were worried about their relatives' immigration situations and about being separated from their family members for prolonged time periods. Numerous commenters who urged DHS to implement the proposed expansion shared personal stories and described hardships they have experienced or may experience upon being separated from family members. Many reasoned that keeping families together assists the U.S. economy and otherwise strengthens the country, because many individuals who are undocumented work hard, pay taxes, and are concerned

about the well-being of their children. Many asserted that the 3- and 10-year unlawful presence bars and other bars to admissibility are inhumane and cruel and that these laws need to change. Backlogs in the immigration system, such as visa backlogs, were raised generally by commenters as additional reasons for supporting this rule. Some commenters also believed that expanding eligibility for the provisional waiver process would streamline the waiver adjudication process for applicants inadmissible based on the accrual of unlawful presence in the United States, thereby making the immigrant visa process faster and more predictable. Finally, a commenter expressed the belief that expanding the process would reduce burdens on DOS.

Several commenters who disagreed with the proposed expansion argued that the Executive Branch lacks the legal authority to implement the proposed changes without congressional approval. Others stated that the proposed expansion is the Administration's way of circumventing existing laws, creating amnesty, and favoring those who are unlawfully present over lawful immigrants. Some considered the measure to be unconstitutional, arbitrary, and capricious. A number of commenters asserted that the expansion would reward law breakers, further illegal immigration, and lead to system abuse and fraud, as well as additional social problems.

For several commenters, unifying families was not an acceptable justification for the proposed rule. Some asserted that it is not the U.S. Government's place to accommodate people who are in the country illegally. Those commenters expressed that family separation is a natural consequence of an individual's choice to break the law. Others asserted that expanding the process would undermine the Nation's sovereignty, economy, security, and proper law enforcement efforts. Overall, these commenters believed that the expansion would erode the integrity of the immigration system.

Many of the commenters identified themselves as lawful immigrants or relatives of lawful immigrants. Some of these individuals voiced disappointment over the proposed expansion and indicated that the Federal Government's money and resources would be better invested in assisting U.S. citizens and lawful immigrants. These commenters emphasized that they have complied with the law, paid taxes, and worked hard toward maintaining lawful status,

Exhibit 1
237

and they asked DHS to first assist individuals who are lawfully present in the United States to obtain immigrant status by fixing the backlogged immigration system before fixing processes that benefit those who are unlawfully present in the United States.

One commenter suggested that local governments, rather than the Federal Government, should control the immigration process. This commenter indicated that local governments are in a better position to consider the costs of immigration measures to local communities. Other commenters considered the rule unnecessary and current regulations sufficient to address the immigrant community's needs. One commenter asked that DHS restrict and not expand the provisional waiver process in order to better control the U.S. border.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses those comments focused on aspects in this final rule. DHS's responses to these comments are grouped by subject area, with a focus on the most common issues and suggestions raised by the commenters. The response to each comment also explains whether DHS made any changes to address the comment. DHS received no comments on the following topics addressed in the proposed rule: Inclusion of Diversity Visa selectees; inclusion of derivative spouses and children; the rejection criteria; the validity of an approved provisional waiver; and automatic revocation.

### B. Legal Authority

A number of commenters questioned the Department's legal authority to expand the provisional waiver process. Some commenters expressed the view that the rule constituted an attempt to circumvent Congress, and that it was as an effort in disregard of current immigration laws, including case law. Some commenters also stated that the proposed rule exceeded DHS authorities in implementing the Secretary's directive to expand eligibility for provisional waivers. Others asserted that the rule was arbitrary and capricious.

DHS disagrees that this rule's expansion of the provisional waiver process exceeds the Secretary's legal authority. As a preliminary matter, the Federal Government has plenary authority over immigration and naturalization, and Congress may enact legislation establishing immigration law and policy. See, e.g., Arizona v. United States, 132 S. Ct. 2492, 2498 (2012) ("The Government of the United States

has broad, undoubted power over the subject of immigration and the status of aliens. This authority rests, in part, on the National Government's constitutional power to 'establish [a] uniform Rule of Naturalization,' and its inherent power as sovereign to control and conduct relations with foreign nations." (citations omitted)); see also Fiallo v. Bell, 430 U.S. 787, 792 (1977). The Executive Branch, which includes DHS, implements the laws passed by Congress, and Congress has specifically charged the Secretary with the administration and enforcement of the immigration and naturalization laws. See 6 U.S.C. 112, 202(3)–(5); INA section 103, 8 U.S.C. 1103(a). The Secretary is also authorized to promulgate rules and "perform such other acts as he deems necessary for carrying out his authority." INA section 103(a)(3), 8 U.S.C. 1103(a)(3). The Secretary thus has broad discretion to determine the most effective way to administer the immigration laws. See, e.g., Jean v. Nelson, 727 F.2d 957, 965 (11th Cir. 1984) ("The principal responsibility for immigration matters in the Executive branch resides with the [Secretary], who is the beneficiary of broad grants of discretion under the statute."), aff'd, 472 U.S. 846 (1985); Narenji v. Civiletti, 617 F.2d 745, 747 (D.C. Cir. 1979) (observing that the INA "need not specifically authorize each and every action taken by the Attorney General [(now Secretary of Homeland Security)], so long as his action is reasonably related to the duties imposed upon him").

More specifically, Congress provided for a waiver of the 3- and 10-year unlawful presence bars in INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), for individuals who can demonstrate extreme hardship to certain qualifying relatives. That section does not restrict the manner in which eligible individuals can seek such waivers. In 2013, DHS created the provisional waiver process to allow certain immigrant visa applicants who are immediate relatives of U.S. citizens to provisionally apply for waivers before they leave the United States for their consular interviews. The creation of this process was merely a procedural change that addressed the manner in which eligible individuals can apply for the statutorily provided waiver of inadmissibility. See Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 FR 536, 541 (Jan. 3, 2013) ("2013 Rule"). This rule expands on that process by simply expanding the pool of individuals eligible to apply for

provisional waivers to statutorily eligible individuals in all immigrant visa classifications, subject to certain conditions. See new 8 CFR 212.7(e). Like the 2013 Rule, this Final Rule, therefore, does not create new waiver authority; it implements an existing authority conferred by Congress.[4]

Finally, DHS disagrees with commenters who stated that the proposed rule is arbitrary and capricious. The commenters appear to assert that DHS exceeds its statutory authority by violating the substantive requirements of the Administrative Procedure Act (APA). See 5 U.S.C. 706(2)(A). A rulemaking may be considered arbitrary and capricious under the APA when an agency's action is unreasonable, unsound, or not explained, or when it fails to demonstrate that the agency has considered the circumstances surrounding its action. An agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42–43 (1983). DHS has made clear throughout the proposed rule and this preamble all of the factors that were considered in putting forth the proposal and has articulated how the expansion of the provisional waiver process is tied to the purposes of the immigration laws and efficient operation of the immigration system. See generally 2015 Proposed Rule, 80 FR 43339. DHS believes that the assertions of these commenters are unfounded.

### C. Eligibility for the Provisional Waiver

1. Categories of Eligible Individuals

Many commenters believed that expanding eligibility for the provisional waiver as proposed to all statutorily

---

[4] Neither conditioning a waiver on an individual's departure from the United States nor allowing advance application for a waiver is novel. For example, DHS regulations at 8 CFR 212.2(f) have long allowed an individual who is subject to a removal order to seek consent to reapply for admission under INA section 212(a)(9)(A)(iii), 8 U.S.C. 1182(a)(9)(A)(iii), while the individual is in the United States and before the individual departs the United States. A grant of consent to reapply for admission, like the provisional waiver, is conditioned on the individual's eventual departure from the United States. See 8 CFR 212.2(j). DHS and former Immigration and Naturalization Service (INS) regulations have permitted advance applications for consent to reapply for admission under INA section 212(a)(9)(A)(iii), 8 U.S.C. 1182(a)(9)(A)(iii) since at least 1969. See, e.g., 34 FR 9061 (1969); 36 FR 11635 (1971). The INS also permitted advance waiver applications under former INA section 212(c), 8 U.S.C. 1182(c) (repealed 1996). See 8 CFR 212.3(b); 52 FR 11620 (1987).

Exhibit 1
238

eligible individuals—including beneficiaries in family-sponsored and employment-based preference categories, as well as Diversity Visa selectees—would offer benefits to the U.S. Government and facilitate legal immigration and family unity. These commenters indicated that the expansion would reduce the fear of many immigrants, who otherwise may worry that they would be unable to reunite with their families after leaving the United States to have their immigrant visas processed abroad.

Accordingly, some commenters suggested that all individuals with approved immigrant visa petitions should be able to participate in the provisional waiver process, regardless of whether they are located inside or outside the United States. Other commenters asked that USCIS allow individuals with approved immigrant visa petitions to apply for provisional waivers regardless of their priority dates, especially if they had been present in the United States for many years.

Many commenters asked that DHS allow the following categories of individuals to apply for provisional waivers: (1) Married or unmarried individuals over the age of 21 with U.S. citizen parents; (2) individuals over the age of 21, whether single or married; (3) spouses of U.S. citizens without a criminal record and with good standing in their communities; (4) parents of U.S. citizens with approved petitions; (5) sons-in-law and daughters-in-law; and 6) self-petitioning widows and widowers of U.S. citizens. Some commenters urged DHS to prioritize relatives of U.S. citizens over relatives of LPRs. Some commenters asked that DHS focus not only on families, but also on sponsored employees, corporations, and self-sponsored business owners. Others requested that DHS include the following categories of individuals in the provisional waiver process: (1) Those with nonimmigrant investor-type visas; (2) well-educated professionals; (3) those with approved immigrant visa petitions but without any family in the United States; (4) spouses of nonimmigrant visa holders who are beneficiaries of approved employment-based immigrant visa petitions (Forms I–140); and (5) those with pending immigrant visa petitions. Many commenters requested that USCIS adjust an individual's status to that of an LPR upon approval of the waiver; others mistakenly believed that USCIS already does so.

The Secretary is authorized to waive the 3- and 10-year unlawful presence bars for individuals seeking admission

to the United States as immigrants if they can show that the refusal of admission would result in extreme hardship to a qualifying U.S. citizen or LPR spouse or parent, and provided that the applicant warrants a favorable exercise of discretion. *See* INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). With this final rule, DHS is allowing all individuals who are statutorily eligible for an immigrant visa and who meet the legal requirements for a waiver under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), to seek a provisional waiver in accordance with new 8 CFR 212.7(e). Consistent with the current provisional waiver process, provisional waivers are available only to those who are present in the United States, who must apply for immigrant visas at U.S. embassies or consulates abroad, and who at the time of the immigrant visa interview may be inadmissible based on the accrual of unlawful presence under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i).

DHS can only expand the pool of individuals eligible for this process to those who fall within one of the current statutory immigrant visa classifications and who meet the requirements for the unlawful presence waiver described in INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). DHS cannot expand eligibility to those who are not statutorily eligible for such waivers under current law. Similarly, DHS cannot change who is statutorily eligible to adjust status in the United States. Intending immigrants who are present in the United States but ineligible to adjust status must depart the United States and obtain their immigrant visas through consular processing abroad; approval of a provisional waiver does not change this requirement. *See* INA sections 104, 202(a)(1)(B), 211, 221, 222 and 245; 8 U.S.C. 1104, 1152(a)(1)(B), 1181, 1201, 1202, and 1255. *See generally* 8 CFR part 245; 22 CFR part 42.

As indicated above, many commenters asked that DHS expand the provisional waiver process to include additional categories of individuals, including sons or daughters who have approved immigrant visa petitions and are over the age of 21 or married. To clarify, in the proposed rule, DHS sought to include *all* beneficiaries of approved immigrant visa petitions who are statutorily eligible for a waiver of the 3- and 10-year unlawful presence bars, regardless of age, marital status, or immigration status. Individuals with approved immigrant visa petitions, including sons and daughters (married or unmarried) of U.S. citizens, as well as those who have been selected to

participate in the Diversity Visa program, may participate in the provisional waiver process provided they meet the requirements stated in 8 CFR 212.7(e). Consistent with its statutory authority under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), DHS will no longer limit the provisional waiver process to certain immediate relatives of U.S. citizens.[5]

2. Backlogged Immigrant Visa Categories and Eligibility for Interim Benefits

A large number of commenters suggested that individuals with approved family-sponsored and employment-based immigrant visa petitions should be permitted to obtain provisional waivers if immigrant visas are unavailable to them as a result of visa backlogs.[6] Many commenters expressed frustration with the current legal immigration system and lengthy wait times for visas, which separate families and hinder the professional development of many individuals and their family members. Some commenters said it was unfair that DHS and USCIS seek to implement rules that assist persons who came to the United States unlawfully. These commenters indicated that those who came legally to the United States but who cannot obtain immigrant status as a result of visa backlogs should also receive assistance. These commenters opined that those who immigrate lawfully, such as employment-based immigrants, bring economic advantages to the United States.

A few commenters suggested that individuals with or without approved provisional waivers should be given interim benefits while awaiting visa availability. For example, one commenter requested that USCIS grant deferred action and work authorization to undocumented individuals who are U.S.-educated professionals in nursing, medical, or engineering fields, are the beneficiaries of family-sponsored petitions, and have displayed good conduct. Another commenter requested that an individual with an approved provisional waiver be issued a temporary Social Security number and renewable work authorization for a minimum of 3 years. A commenter asked USCIS to provide work authorization and advance parole documents to enable travel outside of,

---

[5] Additionally, as explained throughout this preamble, DHS is changing other eligibility and ineligibility criteria in response to comments received.

[6] In particular, some commenters requested that DHS include married and unmarried sons and daughters of U.S. citizens for whom an immigrant visa is unavailable due to immigrant visa backlogs.

Exhibit 1
239

**50250**   **Federal Register** / Vol. 81, No. 146 / Friday, July 29, 2016 / Rules and Regulations

and facilitate return to, the United States to lawfully present individuals affected by visa backlogs if they otherwise complied with the immigration laws. Another commenter believed that USCIS should grant parole in place to an individual with an approved immigrant visa petition and provisional waiver, if the petitioner's or beneficiary's disability makes travel abroad hazardous due to a condition covered by the Americans with Disabilities Act (ADA).[7] After receiving parole in place, the commenter reasoned, the beneficiary could adjust his or her status in the United States and would not have to risk the petitioner's or the beneficiary's life by traveling. Finally, many commenters expressed the desire that individuals be able to adjust status in the United States if they have an approved petition or provisional waiver.

DHS acknowledges the concerns many intending immigrants face due to backlogs in available immigrant visa numbers. As noted, DHS is broadening the availability of the provisional waiver process to include all statutorily eligible individuals—including all beneficiaries of family-sponsored and employment-based immigrant visa petitions, as well as Diversity Visa selectees—who have a qualifying relative under the statute for purposes of the extreme hardship determination. Beneficiaries in family-sponsored and employment-based preference categories, as well as Diversity Visa immigrants, are subject to annual numerical limits that have been set by Congress. *See* INA sections 201, 202 and 203; 8 U.S.C. 1151, 1152 and 1153. Neither DOS nor DHS can change the number of visas that Congress allocates for particular immigrant visa categories, nor can they alter the statutory requirements for adjustment of status in the United States. Addressing those recommendations would require legislative changes.

DHS does not consider it appropriate to make an application for a provisional waiver, or the approval of such an application, a basis for granting interim benefits, including an advance parole document or employment authorization. In particular, because an approved immigrant visa petition and a waiver of inadmissibility do not independently confer any immigration status or otherwise afford lawful presence in the United States, neither may typically serve as the basis for interim benefits. Furthermore, issuance of interim benefits to individuals who are granted provisional waivers may encourage

them to postpone their timely departures from the United States to pursue their immigrant visa applications. The purpose of the provisional waiver process is not to prolong an applicant's unlawful presence in the United States. Rather, the purpose is to facilitate the applicant's departure to attend an immigrant visa interview abroad so that they may complete their application process for an immigrant visa. Moreover, providing an advance parole document is unnecessary because the premise of the provisional waiver process is that the applicant, if eligible, will depart the United States and return with an immigrant visa.

The provisional waiver process is designed to encourage unlawfully present individuals to leave the United States, attend their immigrant visa interviews, and return to the United States legally to reunite with their U.S. citizen or LPR family members. Having an approved provisional waiver helps facilitate immigrant visa issuance at DOS, streamlines both the waiver and the immigrant visa processes, and reduces the time that applicants are separated from their U.S. citizen or LPR family members, thus promoting family unity.

### 3. Individuals Outside the United States

A few commenters asked DHS to extend eligibility for provisional waivers to individuals outside the United States. Commenters argued that such individuals should be eligible for provisional waivers because they are often relatives of U.S. citizens with approved immigrant visa petitions and have immigrant visa applications pending with DOS. These commenters also suggested that those who need waivers of the 3- and 10-year unlawful presence bars but are now outside the United States should not be disadvantaged by their decision to ultimately comply with the immigration laws by departing the United States. The commenters believed that DHS should apply the same rules and processes to all visa applicants.

DHS understands the difficulties that U.S. citizens and LPRs face when their family members are outside the United States and are attempting to navigate the immigrant visa process. DHS notes, however, that individuals who are outside the United States and are eligible for waivers of the 3- and 10-year unlawful presence bars may apply for such waivers through the preexisting Form I–601 waiver process. Considering the existence of the Form I–601 waiver process, DHS continues to believe that expanding the provisional waiver

process to those individuals abroad would duplicate steps already incorporated in the DOS immigrant visa process and would not be an efficient use of agency resources. DHS thus will not adopt the suggestion.[8]

However, to alleviate some of the delays in waiver processing for those filing from abroad, USCIS has implemented the centralization of Form I–601 application filings, which no longer requires that applicants schedule "waiver filing" appointments with a U.S. embassy or consulate. Instead, Form I–601 applicants now file the waiver application directly with USCIS at a centralized location in the United States, thereby significantly reducing the time they are required to be outside the United States. By centralizing the processing of these waiver applications at locations in the United States, USCIS is able to better ensure that applications are processed in the most efficient manner possible.

### 4. Extreme Hardship

Several commenters requested that USCIS clarify the term "extreme hardship" in guidance or regulations. Others suggested that the proposed rule was legally flawed because DHS had not promulgated the requirements for establishing extreme hardship. Commenters requested that DHS clearly define the term and apply it fairly, including by considering the financial, emotional, and other harmful effects that result from separating families. Commenters believed that clarifying the term would lead to greater consistency in adjudication. One commenter asked that extreme hardship examples be included in guidance and in the provisional waiver application form.

Many commenters also requested that USCIS ease the extreme hardship standard and its documentary requirements, including, for example, by presuming extreme hardship in certain cases involving vulnerable families. Commenters often referenced the interim rule at 8 CFR 240.64(d)[9] as a precedent that DHS could consider for purposes of adopting one or more presumptions of extreme hardship. Commenters also urged USCIS to extend the special accommodation for beneficiaries of immigrant visa petitions described in INA section 204(l), 8 U.S.C. 1154(l), to self-petitioning widows and widowers of U.S. citizens when such

---

[7] *See* Americans with Disabilities Act of 1990 (Pub. L. 101–336), as amended.

[8] For additional discussion relating to this suggestion, please refer to the 2013 Rule, 78 FR at 543.

[9] This regulation was promulgated under section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105–100 (Nov. 19, 1997).

Exhibit 1
240

citizens died before filing immigrant visa petitions on behalf of their spouses. INA section 204(l), 8 U.S.C. 1154(l), allows for immigrant visa petitions and related applications to be approved or reinstated for certain beneficiaries despite the death of the petitioner or principal beneficiary. Under the special accommodation, the death of the petitioner or principal beneficiary is treated as the "functional equivalent" of a finding of extreme hardship in cases where he or she could have served as a "qualifying relative" for purposes of waiving the 3- and 10-year unlawful presence bars.[10]

Other commenters believed that if an applicant demonstrates some or all of the factors listed in the Secretary's November 20, 2014 memorandum directing expansion of the provisional waiver program [11]—such as those relating to the age of the affected U.S. citizen or LPR spouse or parent, length of U.S. residence, and family ties in the United States—USCIS should apply a rebuttable presumption and find that the applicant has established extreme hardship. Having a presumption, some believed, would ease the burden of proof for many families. Some commenters also indicated that it was often very difficult for families to produce documentation to demonstrate extreme hardship, which the commenters viewed as an unnecessary barrier.

A considerable number of commenters suggested alternative standards of extreme hardship or asked that DHS include additional individuals as qualifying relatives for purposes of the extreme hardship determination. For example, commenters believed that USCIS should find extreme hardship if: (1) The applicant has a U.S. citizen spouse or parent; (2) a family is separated, or a child is separated from his or her parents; (3) family members lose their jobs because they have to travel to other countries; (4) the applicant's child would experience extreme hardship; (5) the applicant's sibling would experience extreme hardship; (6) the applicant would trigger

the 3- or 10-year unlawful presence bar when departing the United States; (7) the applicant has waited for a prolonged period for an immigrant visa to become available; (8) the applicant is the beneficiary of an employment-based immigrant visa petition (because beneficiaries of such petitions may not have U.S. citizen or LPR qualifying relatives); [12] or (9) the applicant has family in the United States but not a qualifying relative. Many commenters also requested that DHS give consideration to extreme hardship that would be suffered by U.S. citizen or LPR sons and daughters who are over the age of 21 or who are married.[13] One commenter requested that special consideration be given to those in "special situation[s]" with respect to extreme hardship determinations, even if they do not have qualifying relatives. That commenter appeared to suggest that USCIS should create two classifications for assessing waiver eligibility, one for individuals with LPR family members and one for individuals without LPR family members. A few commenters asked DHS to eliminate the extreme hardship standard altogether. Many such commenters felt that taxpaying citizens who are "good people" should be able to keep their families together and that it is unfair to separate families simply because certain individuals cannot establish extreme hardship.

One commenter suggested that USCIS should contact experts and declarants claiming personal knowledge of a qualifying relative's hardship claim by mail in order to verify that such claims are legitimate. This commenter also suggested that DHS should only consider hardship flowing from a qualifying relative's decision to remain in the United States and not the hardship such a relative may confront if he or she chooses to depart with the inadmissible applicant. That commenter viewed as "hypothetical" the hardship that may result if the qualifying relative chooses to depart, but as "verifi[able]" the hardship resulting from the choice of a qualifying relative to stay behind in the United States. According to the commenter, considering hypothetical hardship in another country is

unnecessary and too difficult to document.

Other commenters proposed that DHS provide in its regulations a list of consequences or other factors typically associated with removal that adjudicators would consider when making extreme hardship recommendations. These commenters suggested that such a list of factors be drawn from historical data and precedent decisions. The commenters further suggested that such a list would be analogous to what is provided in the regulation for NACARA [14] applicants at 8 CFR 1240.58(b). The commenters considered such an approach invaluable to achieving consistent adjudication of all waiver applications under the INA, not just provisional waiver applications. The commenters also believed that such an approach would reduce the incentive for individuals to make conclusory and unsupported allegations when applying for provisional waivers. According to these commenters, the lack of such a regulation was a "capricious political benefit" to those unlawfully present in the United States.

Finally, another commenter requested that USCIS establish specific questions related to hardship so that USCIS officers can quickly determine whether a threshold level of extreme hardship has been demonstrated.[15] As an alternative to an extreme hardship showing, another commenter suggested that USCIS permit applicants to explain why they violated U.S. immigration laws. Another commenter indicated that it was important to train officers in this area.

DHS cannot adopt suggestions to revise the statutory requirements for waivers of the unlawful presence grounds of inadmissibility under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). The authorizing statute requires the applicant to show extreme hardship to a U.S. citizen or LPR spouse or parent, and DHS does not have the authority to change the statutory requirement. DHS also cannot approve a provisional waiver application if the applicant has not demonstrated extreme hardship to a qualifying relative as required by the INA.

DHS also declines in this rulemaking to define extreme hardship for purposes of the provisional waiver (or more generally), or to create a rebuttable

---

[10] See USCIS AFM Chapter 10.21(c)(5), https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/Chapter10-21.html. This guidance does not refer to the accommodation as a "presumption," even though it has similar effect to a presumption. As with any finding of extreme hardship, the accommodation permits, but does not require, approval of the waiver, which remains a matter of USCIS discretion.

[11] See Memorandum from Jeh Charles Johnson, Secretary of Homeland Security to Léon Rodríguez, Director, USCIS, Expansion of the Provisional Waiver Program (Nov. 20, 2014), available at https://www.dhs.gov/sites/default/files/publications/14_1120_memo_i601a_waiver.pdf.

[12] Some commenters asked USCIS to accept a showing of extreme hardship to an employer, but such consideration is not authorized by the statutory waiver authority at INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v).

[13] In many instances, it was unclear whether commenters were requesting additional eligibility criteria for provisional waivers in general, or whether they were requesting that DHS consider additional classes of individuals to be qualifying relatives for purposes of the extreme hardship determination.

[14] See note 8, supra.

[15] The commenter cited the Application for Suspension of Deportation or Special Rule Cancellation of Removal, Form I-881, which contains a list of questions relating to factors considered when evaluating extreme hardship as drawn from the NACARA special rule regulations at 8 CFR 1240.58(b).

Exhibit 1
241

presumption related to such determinations. The INA does not define extreme hardship. The Board of Immigration Appeals (BIA) has stated that extreme hardship is not a definable term of fixed and inflexible meaning, and that establishing extreme hardship is dependent upon the facts and circumstances of each case.[16] *See Matter of Cervantes-Gonzalez,* 22 I&N Dec. 560, 565 (BIA 1999) (describing factors to be considered in extreme hardship analysis), *aff'd, Cervantes-Gonzales* v. *INS,* 244 F.3d 1001 (9th Cir. 2001). Accordingly, DHS will continue to make extreme hardship determinations for purposes of provisional waivers on a case-by-case basis, consistent with agency guidance. On October 7, 2015, USCIS posted proposed guidance on extreme hardship determinations for public comment on its Web site at *www.uscis.gov.*[17] USCIS also continually trains its officers on all aspects of the provisional waiver adjudication, including the extreme hardship determination.

Finally, DHS cannot extend the special accommodation for beneficiaries of immigrant visa petitions described in INA section 204(l), 8 U.S.C. 1154(l), to self-petitioning widows and widowers of U.S. citizens when such citizens died prior to filing immigrant visa petitions on behalf of their spouses. Under this section, USCIS may approve, or reinstate the approval of, an immigrant visa petition despite the death of the petitioner or principal beneficiary, if at least one beneficiary was residing in the United States when the relative died and continues to reside in the United States. If USCIS approves or reinstates the approval of the immigrant visa petition, USCIS also has discretion to act favorably on "any related applications." INA section 204(l), 8 U.S.C. 1154(l). When Congress enacted INA section 204(l), 8 U.S.C. 1154(l), USCIS interpreted "any related applications" to include waiver applications that a beneficiary would have been able to file had the qualifying relative not died. But that section applies, by its express terms, only to an individual who "immediately prior to

the death of his or her qualifying relative was . . . the beneficiary of a pending or approved petition." If the deceased qualifying relative had not filed an immigrant visa petition at the time of death, there is no "pending or approved" petition to which INA section 204(l), 8 U.S.C. 1154(l), can apply. Nor can there be said to be any "related applications."

**5. Applicants With Other Grounds of Inadmissibility**

A large number of commenters supporting this rule stated that U.S. immigration laws are overly harsh, and that these laws harm families of U.S. citizens and LPRs. In general, many commenters asked DHS to waive certain grounds of inadmissibility for which the INA does not currently provide relief for immigrants.[18] Other commenters asked DHS to consider expanding the provisional waiver process to cover additional grounds of inadmissibility for which waivers are statutorily available. These commenters specifically referenced the waiver for fraud and willful misrepresentation under INA section 212(i), 8 U.S.C. 1182(i), or alien smuggling under INA section 212(d)(11), 8 U.S.C. 1182(d)(11). Some commenters recommended that when an applicant is granted a provisional waiver based on a finding of extreme hardship, the Department should conclude that the applicant has established extreme hardship for other types of waiver applications that apply the same standard. One commenter suggested that the standard for the waiver to overcome inadmissibility for alien smuggling is lower than the extreme hardship standard [19] and that USCIS should thus consider the lower standard as encompassed by the

extreme hardship standard. The commenter thus believed that the waiver to overcome the alien smuggling inadmissibility ground could easily be incorporated into the provisional waiver process. Overall, commenters suggested that DHS allow individuals to apply for all available waivers of inadmissibility through the provisional waiver process, which the commenters believed would further streamline the waiver and immigrant visa processes.[20]

Several commenters requested that the provisional waiver process be available to individuals who are barred for unlawful reentry after previous immigration violations under INA section 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(C). Others suggested making the process available to individuals who are inadmissible under that section if they are spouses of U.S. citizens or LPRs. A few commenters asked that certain categories of individuals receive special treatment.[21] For example, a commenter requested that DHS create a special waiver for Deferred Action for Childhood Arrivals (DACA) recipients. Others asked that DHS add special provisions to benefit the relatives of active members or veterans of the U.S. Armed Forces.

DHS considered these comments but did not adopt the suggested changes. DHS cannot waive grounds of inadmissibility for those who are not authorized to receive waivers under the immigration laws. Implementation of these suggestions thus would have exceeded DHS's statutory authority. Other suggestions did not support a principal goal of the provisional waiver process, which is to streamline immigrant visa issuance for individuals who are eligible for an immigrant visa and otherwise admissible to the United States [22] but whose family members would experience extreme hardship due to application of certain unlawful presence grounds of inadmissibility. As explained in the 2013 Rule, DOS consular officers are charged with

---

[16] The BIA and immigration judges, both under the jurisdiction of the Department of Justice, Executive Office for Immigration Review (EOIR), also make extreme hardship determinations for purposes of adjudicating applications for extreme hardship waivers under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), and for other immigration benefits and relief from exclusion, deportation, or removal.

[17] The proposed guidance on extreme hardship determinations can be viewed at *https:// www.uscis.gov/sites/default/files/USCIS/Outreach/ Policy%20Review/DRAFT_Extreme_Hardship_ Policy_Manual_Guidance_for_public_comment.pdf.*

[18] For example, some commenters asked for a waiver for falsely claiming U.S. citizenship under INA section 212(a)(6)(C)(ii), 8 U.S.C. 1182(a)(6)(C)(ii). Another commenter asked that all parents who illegally reentered after having been previously deported should be pardoned, because, according to the commenter, most parents enter to reunite with their children and family. Many commenters felt that children are being punished for the actions of their parents. Other commenters asked that the inadmissibility ground under INA section 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(C), be changed and the penalty reduced to a lesser inadmissibility period for which a waiver is available. All of these requests are outside of the scope of this rulemaking, which solely concerns the provisional waiver of the grounds of inadmissibility described in INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i), as authorized by INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v).

[19] DHS may waive the ground of inadmissibility described in INA section 212(a)(6)(E)(i), 8 U.S.C. 1182(a)(6)(E)(i), for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, provided the individual meets all other requirements. *See* INA section 212(d)(11), 8 U.S.C. 1182(d)(11).

[20] Of the commenters who asked DHS to expand the provisional waiver process to include waivers of other grounds of inadmissibility, many requested that DHS specifically include the Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I–212.

[21] It was often unclear if the commenters sought implementation of new waivers or an expansion of the provisional waiver to include these grounds of inadmissibility.

[22] Upon departure from the United States to attend a consular interview, an individual no longer would be inadmissible as a result of being present in the United States without admission or parole under INA section 212(a)(6)(A)(i), 8 U.S.C. 1182(a)(6)(A)(i), or for lacking proper immigrant entry documents under INA section 212(a)(7)(A), 8 U.S.C. 1182(a)(7)(A).

Exhibit 1
242

determining whether individuals are eligible for issuance of immigrant visas, including whether they are affected by one or more grounds of inadmissibility. Expanding the provisional waiver process to other grounds of inadmissibility would introduce additional complexity and inefficiencies into the immigrant visa process, create potential backlogs, and likely delay and adversely affect the processing of immigrant visas by DOS. Furthermore, USCIS generally assesses waiver applications for inadmissibility due to fraud, misrepresentation, or criminal history through an in-person interview at a USCIS field office. Because DOS already conducts a thorough in-person interview as part of the immigrant visa process, DHS believes that this type of review would be unnecessarily duplicative of DOS's efforts.

Because the text of the statute forecloses the issue, DHS also rejects the suggestion to expand the provisional waiver process to include individuals who are inadmissible based on a return (or attempted return) without admission after previous immigration violations under INA section 212(a)(9)(C)(i), 8 U.S.C. 1182(a)(9)(C)(i). The relevant forms of relief for individuals who are inadmissible under that section are found at INA section 212(a)(9)(C)(ii) and (iii), 8 U.S.C. 1182(a)(9)(C)(ii) and (iii). *See Matter of Torres-Garcia,* 23 I&N Dec. 866 (BIA 2006). Under the statute, waivers under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), cannot be used to relieve an applicant from inadmissibility under INA section 212(a)(9)(C)(i), 8 U.S.C. 1182(a)(9)(C)(i).

### 6. Reason-to-Believe Standard

Under current regulations, USCIS must deny a provisional waiver application if USCIS has "reason to believe" that the applicant may be subject to a ground of inadmissibility other than unlawful presence at the time of the immigrant visa interview abroad ("reason-to-believe standard"). 8 CFR 212.7(e)(4)(i).[23] Commenters asked DHS to clarify the reason-to-believe standard and to train officers[24] so that they

properly apply the standard. Many argued that USCIS often applies the standard too rigidly by denying applications on mere suspicion, rather than actually adjudicating the relevant inadmissibility concerns consistent with applicable law relating to these grounds.

Commenters also urged DHS to expand the scope of the January 24, 2014 field guidance memorandum on the reason-to-believe standard.[25] Commenters specifically asked DHS to direct USCIS officers to consider the totality of the evidence when assessing whether other grounds of inadmissibility apply to an applicant, and to issue Requests for Evidence (RFEs) related to such grounds prior to denying a provisional waiver application for mere suspicion that such grounds apply. Commenters criticized the lack of issuance of RFEs or Notices of Intent to Deny (NOIDs), as well as USCIS' use of standard denial template language when denying a provisional waiver application under the reason-to-believe standard. Commenters stated that the use of these denial templates implies that USCIS does not consider the evidence that applicants submit to show that they are in fact not inadmissible on other grounds. In addition, the commenters stated that the templates did not provide sufficient information to explain why USCIS determined it had reason to believe that the applicant would be inadmissible at the time of the immigrant visa interview, thus preventing applicants from addressing the agency's concerns upon reapplication. Commenters requested that USCIS instruct its officers to clearly articulate the fact specific circumstances that led them to deny an application for "reason to believe" that the applicant is inadmissible on other grounds.[26] A couple of commenters suggested that DHS make exceptions to the reason-to-believe standard for certain circumstances or classes of individuals.

Considering the confusion that has resulted from application of the reason-to-believe standard, DHS is eliminating the standard from the provisional

waiver process in this final rule. Under the 2013 Rule, an approved provisional waiver would take effect if DOS subsequently determined that the applicant was ineligible for an immigrant visa only on account of the 3- or 10-year unlawful presence bar under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). Accordingly, DHS had originally incorporated the reason-to-believe standard in the 2013 Rule to preclude individuals from obtaining provisional waivers if they may have triggered other grounds of inadmissibility. DHS reasoned, in part, that because the goal of the provisional waiver process was to streamline immigrant visa processing, it would be of little benefit to applicants or to DHS to grant provisional waivers to applicants who would eventually be denied immigrant visas based on other grounds of inadmissibility.

Since the implementation of the provisional waiver program, however, stakeholders have raised concerns over the application of the reason-to-believe standard. Among other things, DHS understands that the standard causes confusion for applicants, as evidenced by the comments submitted to this rule. Despite the Department's repeated attempts to explain the reason-to-believe standard, for example, commenters continue to erroneously believe that when USCIS denies a provisional waiver application under the reason-to-believe standard, the agency has actually made an inadmissibility determination with respect to the relevant other ground(s) of inadmissibility.

Alternatively, as explained in the 2013 Rule, it would be counterproductive for USCIS to make other inadmissibility determinations during the adjudication of provisional waiver applications, given DOS's role in the immigrant visa process. It is DOS, and not USCIS, that generally determines admissibility under INA section 212(a), 8 U.S.C. 1182(a), as part of the immigrant visa process, which includes an in-depth, in-person interview conducted by DOS consular officers. Moreover, it is U.S. Customs and Border Protection (CBP) that ultimately determines admissibility at the time that individuals seek admission at a port of entry. *See* INA sections 204(e), 221(h); 8 U.S.C. 1154(e), 1201(h). It is thus generally not USCIS's role to determine whether an individual applying for an immigrant visa, or for admission as an immigrant at a U.S. port of entry, is admissible to the United States. Any assessment by USCIS with respect to other grounds of inadmissibility would be, at best,

---

[23] That regulation reads: "Ineligible aliens. Notwithstanding paragraph (e)(3) of this section, an alien is ineligible for a provisional unlawful presence waiver under paragraph (e) of this section if: (i) USCIS has reason to believe that the alien may be subject to grounds of inadmissibility other than unlawful presence under section 212(a)(9)(B)(i)(I) or (II) of the Act at the time of the immigrant visa interview with the Department of State." 8 CFR 212.7(e)(4)(i).

[24] USCIS has continually trained its officers on all aspects of the provisional waiver adjudication, including how to determine whether individuals may be subject to additional inadmissibility grounds at the time of the immigrant visa interview. However, since USCIS is removing the reason-to-

believe standard as a basis for eligibility, we will no longer be training officers on application of this specific standard.

[25] *See* USCIS Memorandum, Guidance Pertaining to Applicants for Provisional Unlawful Presence Waivers (Jan. 24, 2014), *available at http:// www.uscis.gov/sites/default/files/files/ nativedocuments/2014-0124_Reason_To_Believe_ Field_Guidance_Pertaining_to_Applicants_for_ Provisional_Unlawful_Presence_Waivers-final.pdf.*

[26] These commenters suggested adding specific regulatory text in 8 CFR 212.7(e)(4) and 8 CFR 212.7(e)(9) that would require officers to consider the totality of the circumstances and to recount particular facts of the case when denying waiver applications under the reason-to-believe standard.

Exhibit 1
243

advisory in nature and would likely cause even greater confusion for applicants.

These considerations have prompted DHS to revisit the current approach. In this final rule, DHS has decided to eliminate the reason-to-believe standard as a basis for denying provisional waiver applications. Accordingly, when adjudicating such applications, USCIS will only consider whether extreme hardship has been established and whether the applicant warrants a favorable exercise of discretion. However, although this final rule eliminates the reason-to-believe standard, the final rule retains the provision that provides for the automatic revocation of an approved provisional waiver application if the DOS consular officer ultimately determines that the applicant is ineligible for the immigrant visa based on other grounds of inadmissibility. *See* 8 CFR 212.7(e)(14)(i). DHS thus cautions and reminds individuals that even if USCIS approves a provisional waiver application, DOS may still find the applicant inadmissible on other grounds at the time of the immigrant visa interview. If DOS finds the applicant ineligible for the immigrant visa or inadmissible on grounds other than unlawful presence, the approval of the provisional waiver application is automatically revoked. In such cases, the individual may again apply for a waiver of the unlawful presence ground of inadmissibility, in combination with any other waivable grounds of inadmissibility, by using the Form I–601 waiver process. As in all discretionary matters, DHS also has the authority to deny provisional waiver applications as a matter of discretion even if the applicant satisfies the eligibility criteria. *See* 8 CFR 212.7(e)(2)(i). Additionally, USCIS may reopen and reconsider its decision to approve or deny a provisional waiver before or after the waiver becomes effective if it is determined that the decision was made in error. *See* 8 CFR 212.7(e)(13) and 8 CFR 212.7(a)(4)(v).

As has always been the case, DHS will continue to uphold the integrity and security of the provisional waiver process by conducting full background and security checks to assess whether an individual may be a threat to national security or public safety. If the background check or the individual's immigration file reveals derogatory information, including a criminal record, USCIS will analyze the significance of the information and may

deny the provisional waiver application as a matter of discretion.[27]

Finally, the extreme hardship and discretionary eligibility assessments made during a provisional waiver adjudication could be impacted by additional grounds of inadmissibility and other information that was not known and therefore not considered during the adjudication. Accordingly, USCIS is not bound by these determinations when adjudicating subsequent applications filed by the same applicant, such as an application filed to waive grounds of inadmissibility, including a waiver of the unlawful presence grounds of inadmissibility. In other words, because separate inadmissibility grounds and material information not before USCIS at the time of adjudication may alter the totality of the circumstances present in an individual's case, a prior determination that an applicant's U.S. citizen or LPR spouse would suffer extreme hardship if the applicant were refused admission (and that the applicant merits a provisional waiver as a matter of discretion) does not dictate that USCIS must make the same determination in the future, although the factors and circumstances underlying the prior decision may be taken into account when reviewing the cases under the totality of the circumstances.

7. Individuals With Scheduled Immigrant Visa Interviews

The proposed rule would have made certain immediate relatives of U.S. citizens ineligible for provisional waivers if DOS had initially acted before January 3, 2013 to schedule their immigrant visa interviews. DHS had also proposed to make other applicants ineligible if DOS initially acted before the effective date of this final rule to schedule their immigrant visa interviews. *See* 80 FR 43338, 43343 (July 22, 2015). These date restrictions were intended to make the provisional waiver process more operationally manageable and to avoid processing

delays in the immigrant visa process. Commenters suggested that DHS either eliminate these restrictions or apply the January 3, 2013 restriction to all potential applicants.[28] Some commenters argued that DHS should eliminate these restrictions altogether for humanitarian reasons. Other commenters pointed out that the cutoff dates will cause preference-based immigrants difficulties with their priority dates.

In response to comments, and after consulting with DOS, DHS is eliminating the restrictions based on the date that DOS acted to schedule the immigrant visa interview. USCIS will adjust its processing of petitions and applications so that neither DOS nor USCIS will be adversely affected by the elimination of this restriction. Please note, however, that elimination of these date restrictions does not alter other laws and regulations relating to the availability of immigrant visas. Applicants will still be unable to obtain immigrant visas until an immigrant visa number is available based on the applicant's priority date. Applicants will need to act promptly, once DOS notifies them that they can file their immigrant visa application. If applicants do not apply within one year of this notice, DOS has authority to terminate their registration for an immigrant visa. *See* INA section 203(g), 8 U.S.C. 1153(g); *see also* 22 CFR 42.8(a). That action will also result in automatic revocation of the approval of the related immigrant visa petition. 8 CFR 205.1(a)(1).

In such a situation, applicants will have two options for continuing to pursue a provisional waiver. One option is for an applicant to ask DOS to reinstate the registration pursuant to 22 CFR 42.83(d). If DOS reinstates the registration, approval of the immigrant visa petition is also reinstated. Once such an applicant has paid the immigrant visa processing fee for the related immigrant visa application, the applicant can apply for a provisional waiver. A second option is for the

[27] Under current USCIS policy, officers adjudicating provisional waiver applications may issue a Request for Evidence (RFE) to address deficiencies in the extreme hardship showing or to resolve issues that may impact their exercise of discretion. USCIS will retain this practice. To maintain the streamlined nature of the program, USCIS retains the 30-day response time to any RFE issued in connection with provisional waiver applications. *See* USCIS Memorandum, Standard Timeframe for Applicants to Respond to Requests for Evidence Issued in Relation to a Request for a Provisional Unlawful Presence Waiver, Form I–601A (Mar. 1, 2013), *available at http:// www.uscis.gov/sites/default/files/USCIS/Laws/ Memoranda/Static_Files_Memoranda/2013/I-601A_ 30-Day_RFE_PM.pdf.*

[28] One commenter also asked that DHS allow individuals to reopen their "visa cases" and to file applications for provisional waivers. The commenter explained that many individuals let their DOS National Visa Center (NVC) cases lapse because they cannot leave to seek their visas and because ameliorative immigration legislation had failed to pass. The commenter asked that the DOS NVC reopen cases for those who have approved petitions so that they may apply for provisional waivers. DHS will not adopt this suggestion. DOS—and not DHS—will continue to determine whether to reopen immigrant visa application cases. Any visa applicant seeking to reopen a case should consult with DOS. An individual may file a provisional waiver if he or she meets the provisional waiver requirements, as outlined in 8 CFR 212.7(e).

Exhibit 1
244

relevant immigrant visa petitioner to file a new immigrant visa petition with USCIS. If USCIS approves the new immigrant visa petition, the beneficiary could then apply for the provisional waiver after paying the immigrant visa processing fee based on the new petition if otherwise eligible.

8. Individuals in Removal Proceedings

Commenters requested that DHS eliminate restrictions that prevent individuals in removal proceedings from seeking provisional waivers. Under the current regulations, those in removal proceedings may apply for and be granted provisional waivers only if their removal proceedings have been and remain administratively closed. *See* 8 CFR 212.7(e)(4)(v). Rather than excluding individuals whose removal proceedings are not administratively closed from obtaining provisional waivers, commenters asserted that DHS should find a way to allow them to apply for such waivers. Commenters suggested that once an individual in removal proceedings has a provisional waiver, he or she should be able to move to either dismiss or terminate proceedings or seek cancellation of the Notice to Appear (NTA) [29] so that he or she may depart to seek consular processing of an immigrant visa application. According to commenters, such a process would also ensure that an individual who is issued an NTA while his or her provisional waiver application is pending does not automatically become ineligible for the waiver.

Another commenter noted that immigration courts are severely backlogged and that individuals in removal proceedings often have to wait months or years before their cases can be scheduled or heard. This commenter asserted that requiring the case to be administratively closed before an individual may apply for the provisional waiver places an undue burden on the courts and also creates significant delays. Commenters generally believed that it would be more efficient if individuals were able to pursue provisional waivers and request termination or dismissal of proceedings upon approval of the waivers. They requested that the regulations and the provisional waiver application (Form I-601A) clarify that removal proceedings may be resolved by termination, dismissal, or a grant of voluntary departure if the provisional waiver is approved. Commenters believed that

[29] Notices to Appear (NTAs) are the charging documents that DHS issues to individuals to initiate removal proceedings.

such a solution would simplify the provisional waiver process, improve efficiency in the immigration court system, and further the spirit of expanding the process to all individuals who are statutorily eligible for waivers of the unlawful presence ground of inadmissibility at INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i).

Due to agency efficiency and resource concerns, DHS declines to adopt the above recommendations. On November 20, 2014, the Secretary directed the Department's immigration components—USCIS, ICE, and CBP—to exercise prosecutorial discretion, when appropriate, as early as possible in proceedings to ensure that DHS's limited resources are devoted to the greatest degree possible to the pursuit of enforcement priorities.[30] Prosecutorial discretion applies not only to the decision to issue, serve, file, or cancel an NTA, but also to other broad ranges of discretionary measures.[31] To promote docket efficiency and to ensure that finite enforcement resources are used effectively, ICE carefully reviews cases pending before the Department of Justice's Executive Office for Immigration Review (EOIR) to ensure that all cases align with the agency's enforcement and removal policies. As such, once an NTA is issued, ICE attorneys are directed to review the case, at the earliest opportunity, for the potential exercise of prosecutorial discretion.[32] The Department of Justice (DOJ) likewise instructs its immigration judges to use available docketing tools to ensure fair and timely resolution of cases, and to ask ICE attorneys at master calendar hearings whether ICE is seeking dismissal or administrative closure of a case.[33] In general, those who are low priorities for removal and are otherwise eligible for LPR status may be able to apply for provisional

[30] *See* Memorandum from Secretary Jeh Charles Johnson, DHS, Policies for Apprehension, Detention, and Removal of Undocumented Immigrants (Nov. 20, 2014), *available at https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.*
[31] *See id.*
[32] *See* Memorandum from Riah Ramlogan, Acting Principal Legal Advisor, U.S. Immigration and Customs Enforcement (ICE), Guidance Regarding Cases Pending Before EOIR Impacted by Secretary Johnson's Memorandum Entitled Policies for the Apprehension, Detention and Removal Of Undocumented Immigrants (Apr. 6, 2015), *available at https://www.ice.gov/sites/default/files/documents/FOIA/2015/guidance_eoir_johnson_memo.pdf.*
[33] *See* Memorandum from Brian M O'Leary, Chief Immigration Judge, EOIR, Operating Policies and Procedures Memorandum 15–01: Hearing Procedures for Cases Covered by New DHS Priorities and Initiatives (Apr. 6, 2015), *available at https://www.justice.gov/eoir/pages/attachments/2015/04/07/15-01.pdf.*

waivers. Among other things, ICE may agree to administratively close immigration proceedings for individuals who are eligible to pursue a provisional waiver and are not currently considered a DHS enforcement priority. ICE also works to facilitate, as appropriate, the timely termination or dismissal of administratively closed removal proceedings once USCIS approves a provisional waiver.

DHS believes the aforementioned steps being undertaken by ICE and EOIR to determine whether cases should be administratively closed effectively balances the commenters' provisional waiver eligibility concerns and agency resources in considering the exercise of prosecutorial discretion. Consequently, this rule has not changed the provisional waiver process and will not permit individuals in active removal proceedings to apply for or receive provisional waivers, unless their cases are administratively closed. The Department believes that current processes provide ample opportunity for eligible applicants to seek a provisional waiver, while improving the allocation of government resources and ensuring national security, public safety, and border security.

9. Individuals Subject to Final Orders of Removal, Deportation, or Exclusion

Commenters asked DHS to provide eligibility for provisional waivers to individuals who are subject to final orders of removal, deportation, or exclusion. Commenters asserted that many of these individuals may already request consent to reapply for admission, under 8 CFR 212.2(j), by filing an Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I–212, before departing the United States for immigrant visa processing. Upon receiving such consent, the individual's order of removal, deportation, or exclusion would no longer bar him or her from obtaining an immigrant visa abroad. One commenter reasoned that providing eligibility to spouses and children with removal orders would permit more families to stay together.

Many commenters suggested that USCIS allow individuals to file provisional waiver applications "concurrently" [34] with Form I–212 applications for consent to reapply for admission. These commenters believed that requiring separate or consecutive processing of the two applications when a domestic process already exists for

[34] Filing two or more immigration benefit requests together is often referred to as "concurrent" filing.

Exhibit 1
245

both is unnecessary, inefficient, and a waste of USCIS' resources. In support of their argument, commenters also referenced 2009 USCIS procedures for the adjudication of Form I–601 applications for adjudication officers stationed abroad. Under these procedures, an individual whose Form I–601 application is granted would also normally obtain approval of a Form I–212 application, as both forms require that the applicant show that he or she warrants a favorable exercise of discretion.

As a preliminary matter, DHS notes that requiring the filing of separate Forms I–601A and I–212 simply reflects the fact that they are intended to address two separate grounds of inadmissibility, each with different waiver eligibility requirements. In response to the comments, however, DHS has amended the rule to allow individuals with final orders of removal, deportation, or exclusion to apply for provisional waivers if they have filed a Form I–212 application seeking consent to reapply for admission and such an application has been conditionally approved.

Anyone who departs the United States while a final order is outstanding is considered to have executed that order. *See* INA section 101(g), 8 U.S.C. 1101(g); 8 CFR 241.7. The execution of such an order renders the individual inadmissible to the United States for a period of 5–20 years under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A). Certain individuals, however, may seek consent to reapply for admission to the United States before the period of inadmissibility has expired. *See* INA section 212(a)(9)(A)(iii), 8 U.S.C. 1182(a)(9)(A)(iii). DHS regulations provide a process for those in the United States to apply for such consent by filing a Form I–212 application before departing the United States. *See* 8 CFR 212.2(j). As with the provisional waiver process, the pre-departure approval of a Form I–212 application is conditioned on the applicant subsequently departing the United States. Thus, if an individual who is inadmissible under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A), obtains a conditional approval of his or her Form I–212 application while in the United States and thereafter departs to attend the immigrant visa interview abroad, he or she generally is no longer inadmissible under that section at the time of the immigrant visa interview and can be issued an immigrant visa.

Given that an applicant still has to demonstrate visa eligibility, including admissibility, at the time of the immigrant visa interview and that DHS

has decided to eliminate the reason-to-believe standard, the Department believes the goals of the provisional waiver process are supported by making it available to those with final orders only if they already have conditionally approved a Form I–212 application. The final rule thus extends eligibility for provisional waivers to such individuals. *See* 8 CFR 212.7(e)(4)(iv). Such an individual, however, must have the conditionally approved Form I–212 application at the time of filing the provisional waiver application. *See* 8 CFR 212.7(e)(4)(iv). USCIS will deny a provisional waiver application if the applicant's Form I–212 application has not yet been conditionally approved at the time the individual files his or her provisional waiver application. Additionally, if during the immigrant visa interview the consular officer finds that the applicant is inadmissible on other grounds that have not been waived, the approved provisional waiver will be automatically revoked.[35] *See* 8 CFR 212.7(e)(14)(i).

Finally, DHS notes that approval of Forms I–601A and I–212 does not waive inadmissibility under INA section 212(a)(9)(C), 8 U.S.C 1182(a)(9)(C), for having returned to the United States without inspection and admission or parole after a prior removal or prior unlawful presence. *See* INA section 212(a)(9)(C)(ii), 8 U.S.C 1182(a)(9)(C)(ii); *Matter of Briones*, 24 I&N Dec. 355 (BIA 2007); *Matter of Torres-Garcia*, 23 I&N Dec. 866 (BIA 2006).[36]

[35] In such cases, however, the approved Form I–212 application will generally remain valid and the individual may apply for any available waivers, including waiver of the 3- and 10-year bars, by filing a Form I–601 application after the immigrant visa interview.

[36] Although DHS received no comments on the issue, DHS has also amended the regulatory text to provide additional clarity with respect to provisional waiver eligibility for certain individuals who have previously been removed. Prior to the changes made by this rule, 8 CFR 212.7(e)(4)(vii) provided that an alien who is "subject to reinstatement of a prior removal order under section 241(a)(5) of the Act" is not eligible for a provisional waiver. DHS recognizes that this regulatory text was unclear with respect to whether it applies to (1) an individual who is a "candidate" for reinstatement of removal or (2) an individual whose prior removal order has already been reinstated. To avoid confusion, DHS has amended the regulatory text in 8 CFR 212.7(e)(4)(iv) to clarify that the prior removal order must actually be reinstated for an individual to be ineligible to apply for a provisional waiver under this provision. DHS notes, however, that USCIS is likely to deny as a matter of discretion a provisional waiver application when records indicate that the applicant is inadmissible under INA 212(a)(9)(C), 8 U.S.C 1182(a)(9)(C), for having unlawfully returned to the United States after a prior removal or prior unlawful presence. Moreover, even if such an individual obtains approval for a provisional waiver, such approval will be automatically revoked if he or she is ultimately determined to be inadmissible under that section.

**10. Individuals Granted Voluntary Departure**

Commenters requested that DHS address how voluntary departure under INA section 240B, 8 U.S.C. 1229c, affects provisional waiver eligibility. One commenter asked that USCIS provide eligibility for provisional waivers to individuals who have been granted voluntary departure but who failed to depart as required. Another commenter requested that regulations and instructions should clarify that an individual in compliance with an order of voluntary departure is considered by USCIS: (a) Not to be currently in removal proceedings; and (b) not subject to a final order of removal.

DHS has determined that individuals granted voluntary departure will not be eligible for provisional waivers. First, if an individual obtains voluntary departure while in removal proceedings, the immigration judge is required by law to enter an alternate order of removal. *See* 8 CFR 1240.26(d). DHS cannot execute the alternate order of removal during the voluntary departure period because such an order is not yet in effect. But if the individual does not depart as required under the order of voluntary departure, the alternate order of removal automatically becomes fully effective without any additional proceeding. *See* 8 CFR 1240.26(d). Thus, an individual who fails to leave as required under a grant of voluntary departure will have an administratively final order of removal, and will thus be ineligible for a provisional waiver. *See* INA section 240B(d)(1), 8 U.S.C. 1229c(d)(1); 8 CFR 212.7(e)(4)(iv). Under current law, removal proceedings for such individuals are considered to have ended when the grant of voluntary departure, with an alternate removal order, becomes administratively final. *See* INA sections 101(a)(47), 240(c)(1)(A), 8 U.S.C. 1101(a)(47), 1229(a)(c)(1)(A); 8 CFR 241.1, 1003.39, 1241.1; *Matter of Shih*, 20 I&N Dec. 697 (BIA 1993).

Second, a fundamental premise for a grant of voluntary departure is that the individual who is granted voluntary departure intends to leave the United States as required. *See* INA section 240B(b)(1)(D), 8 U.S.C. 1229c(b)(1)(D); *Dada* v. *Mukasey*, 554 U.S. 1, 18 (2008). Allowing an individual whose voluntary departure period has not expired to apply for a provisional waiver would suggest that the individual is excused from complying with the order of voluntary departure. This result would contradict the purpose of voluntary departure—allowing the subject to leave promptly

Exhibit 1
246

without incurring the future inadmissibility that results from removal. For these reasons, DHS did not modify the rule to allow those with grants of voluntary departure to apply for provisional waivers.

11. Applications for Lawful Permanent Resident (LPR) Status

Under current regulations, an individual is ineligible for a provisional waiver if he or she has an Application to Register Permanent Residence or Adjust Status, Form I–485 ("application for adjustment of status"), pending with USCIS, regardless of whether the individual is in removal proceedings. *See* 8 CFR 212.7(e)(4)(viii). One commenter suggested that USCIS should allow those seeking LPR status to file applications for adjustment of status concurrently with provisional waiver applications, and that USCIS should hold such applications for adjustment of status in abeyance until final resolution of the provisional waiver applications. According to the commenter, this would provide applicants present in the United States the opportunity to obtain work authorization and to appeal any denial of their provisional waiver applications. The commenter suggested that upon approval of a provisional waiver application, USCIS should route the application for adjustment of status to DOS for consular processing of the applicant's immigrant visa abroad.

DHS declines to adopt this suggestion. DHS believes that the commenter misunderstands the purpose of filing applications for adjustment of status. Those applications may be filed only by individuals who are in the United States and meet the statutory requirements for adjustment of status. If the applicant is eligible for adjustment of status, approval of the application adjusts one's status to that of an LPR in the United States, thus making it unnecessary to go abroad and obtain an immigrant visa. For those who are in the United States but are not eligible for adjustment of status, filing an application for adjustment of status serves no legitimate purpose. These individuals may not adjust status in the United States and must instead depart the United States and seek an immigrant visa at a U.S. consulate through consular processing. As these individuals are not eligible for adjustment of status, DHS believes it is inappropriate to invite them to submit applications seeking adjustment of status. Moreover, DOS has its own application process for immigrant visas. Thus, even if USCIS were to forward a denied application for adjustment of status to DOS, that application would have no role in the individual's

application process with DOS. The individual would still be required to submit the proper DOS immigrant visa application to seek his or her immigrant visa.

12. Additional Eligibility Criteria

A few commenters suggested that DHS consider imposing restrictions in the provisional waiver process, including by adding eligibility criteria for provisional waivers, to better prioritize the classes of individuals eligible to seek such waivers.[37] Two commenters suggested that the provisional waiver process should prioritize family members of U.S. citizens over those of LPRs. One commenter suggested using level of education as a factor for prioritizing applicants. This commenter implied that applicants should be prioritized if they have advanced degrees in science, technology, engineering, or mathematics fields. Additional suggestions included: (1) Making provisional waivers easier to obtain for couples who have children or have been married more than two years; (2) limiting the number or percentage of waivers that are made available to particular demographic groups within the United States; (3) combining eligibility for provisional waivers with "cross-chargeability" rules in the INA;[38] (4) prioritizing waivers for those with high school degrees or who paid their taxes; (5) making waivers available only to those who submit three letters of recommendation from community members; and (6) making waivers

available only to those who can demonstrate proficiency with the English language or who enroll in English language classes.

DHS declines to impose limitations or eligibility requirements for obtaining provisional waivers beyond those currently provided by regulation or statute. *See* INA section 212(a)(9)(B)(v), 8 U.S.C 1182(a)(9)(B)(v); 8 CFR 212.7. In the 2013 Rule, DHS originally limited eligibility to seek such waivers through the provisional waiver process to ensure operational feasibility and reduce the risk of creating processing delays with respect to other petitions or applications filed with USCIS or DOS. Considering the agency's capacity and the efficiencies gained through the provisional waiver process, DHS now believes that the provisional waiver process should be made available to all statutorily eligible individuals. DHS is confident that the expansion will reduce family separation and benefit the U.S. Government as a whole, and that all agencies involved possess the operational capacity to handle the additional casework.

13. Bars for Certain Inadmissible Individuals

Two commenters suggested that those who have committed crimes should be precluded from participating in the provisional waiver process, and another commenter cautioned DHS against adopting a standard that would allow provisional waiver eligibility to the "wrong people," in the commenter's view, such as those who hate American values and principles.[39]

As indicated above, DHS continues to uphold the integrity and security of the provisional waiver process by conducting full background and security checks to assess whether an applicant may be a threat to national security or public safety. If the background check or the applicant's immigration file reveals derogatory information, including a criminal record, USCIS analyzes the significance of the information and may deny the provisional waiver application as a matter of discretion.

---

[37] Many of the commenters who suggested additional eligibility criteria also believed that approved waivers should entitle individuals to adjust to LPR status in the United States. Others suggested that provisional waiver applicants should pay fines, and some of these commenters believed that paying fines should allow individuals to apply for adjustment of status as an alternative to consular processing. Many of these commenters believed that such changes would create efficiencies for both the applicant and the government. As explained throughout this rule, DHS cannot change the statutory requirements for adjustment of status in the United States. Similarly, USCIS cannot impose fines as part of its filing fees.

[38] Cross-chargeability is a concept employed by the INA in the context of applying the INA's numerical limits on immigrant visas, particularly the "per country" limitations that restrict the percentage of such visa numbers that may go to nationals of any one country. *See* generally INA sections 201, 202, and 203; 8 U.S.C. 1151, 1152, and 1153. Generally, an immigrant visa number that is allotted to an individual is "charged" to the country of his or her nationality. However, when application of the "per country" limits may lead to family separation, the immigrant visa number allotted to an individual may instead be charged to the country of nationality of that individual's spouse, parent, or child. *See* INA sections 202(b), 8 U.S.C. 1152(b); *see also* 22 CFR 42.12; Department of State, 9 Foreign Affairs Manual (FAM) ch. 503.2– 4A, *available at https://fam.state.gov/FAM/09FAM/ 09FAM050302.html* (last visited Apr. 26, 2016).

[39] One of these commenters believed that, although accrual of unlawful presence is not desirable, serious criminality and evidence of violent behavior should be the deciding factors when determining whether to separate families. Absent these factors, the commenter reasoned, immediate family members of U.S. citizens and LPRs should be allowed to remain with their loved ones in the United States before consular processing.

Exhibit 1
247

## D. Adjudication

### 1. Requests for Evidence (RFEs) and Notices of Intent To Deny (NOIDs)

Several commenters criticized USCIS' practice with respect to issuing Requests for Evidence (RFEs) or Notices of Intent to Deny (NOIDs) in cases where the agency ultimately denies provisional waiver applications. Commenters criticized USCIS for both (1) issuing denials without first submitting RFEs that provide applicants the opportunity to correct deficiencies, and (2) issuing RFEs that failed to clearly articulate the deficiencies in submitted applications. With respect to the latter, commenters indicated that RFEs tend to use boilerplate language that makes it impossible for applicants to respond effectively, especially with respect to assessments of extreme hardship or application of the reason-to-believe standard. Noting that terms such as "reason to believe" and "extreme hardship" are vague, commenters requested that USCIS issue detailed and case-specific RFEs or NOIDs (rather than templates) when the agency intends to deny applications, thereby giving applicants an opportunity to cure any deficiencies before such denials are issued.[40] Commenters also raised concerns with the number of days that USCIS provides applicants to respond to often lengthy RFEs, noting that, in most instances, USCIS provides only 30 days for such responses.

As provided in 8 CFR 212.7(e)(8), and notwithstanding 8 CFR 103.2(b)(16), USCIS may deny a provisional waiver without issuing an RFE or NOID. USCIS, however, is committed to issuing RFEs to address missing and critical information that relates to extreme hardship or that may affect how USCIS exercises its discretion. USCIS officers also have the discretion to issue RFEs whenever the officer believes that additional evidence would aid in the adjudication of an application. Due to the streamlined nature of the program, USCIS currently provides applicants only 30 days to respond to an RFE in such cases.[41]

USCIS will continue to issue RFEs in provisional waiver cases based on the current USCIS RFE policy [42] and to assess the effectiveness of its RFE practice in this area. In response to comments, however, the agency has instructed its officers to provide additional detail regarding application deficiencies in RFEs relating to claims of extreme hardship in order to better allow applicants to efficiently and effectively cure such deficiencies. USCIS will retain the 30-day RFE response period, because USCIS and DOS closely coordinate immigrant visa and provisional waiver application processing. The 30-day RFE response time streamlines USCIS processing, prevents lengthy delays at DOS, and allows applicants to complete immigrant visa processing in a timely manner.

As explained in the 2013 Rule, a NOID gives an applicant the opportunity to review and rebut derogatory information of which he or she may be unaware. Because provisional waiver adjudications do not involve full assessments of inadmissibility, however, USCIS is not issuing NOIDs describing all possible grounds of inadmissibility that may apply at the time of the immigrant visa interview. Rather, USCIS continues to decide an applicant's eligibility based on the submitted provisional waiver application and related background and security checks. If the applicant's provisional waiver is ultimately denied, he or she may file a new Form I-601A application in accordance with the form's instructions. Alternatively, the individual can file an Application for Waiver of Grounds of Inadmissibility, Form I-601, with USCIS after he or she attends the immigrant visa interview and after the DOS consular officer determines that the individual is inadmissible.

### 2. Motions To Reopen, Motions To Reconsider, and Administrative Appeals

A number of commenters requested that USCIS amend the regulations to allow applicants the opportunity to appeal, or otherwise seek reconsideration, of denied applications. Commenters stated that the only option for challenging wrongful denials is to file new applications or to hope that USCIS will exercise its *sua sponte* authority to reopen cases. Commenters felt that this policy damages the public's

trust and fails to hold USCIS officers accountable for errors. One commenter also noted that although denied applicants remain eligible to apply for waivers through the Form I-601 waiver process after the immigrant visa interview abroad, some still choose not to pursue their immigrant visas because of the uncertainty and hardships associated with consular processing. Commenters argued that these individuals are likely to remain in the United States, thereby diminishing the benefits of the provisional waiver process. Consequently, commenters requested that DHS amend its regulations to institute a mechanism for administrative appeal or reconsideration. According to these commenters, such a mechanism would provide additional due process protections for those whose applications are erroneously denied, those who experience changed circumstances, and those without legal representation (including those who have a deficient or improper application filed by a notario or other individual not authorized to practice law in the United States).

DHS declines to allow applicants to appeal or otherwise seek reconsideration of denials. The final rule retains the prohibition on appeals and motions, other than *sua sponte* motions entertained by USCIS. As a preliminary matter, DHS disagrees that there is a legal due process interest in access to or eligibility for discretionary provisional waivers of inadmissibility. *See, e.g., Darif v. Holder,* 739 F.3d 329, 336 (7th Cir. 2014) (no due process interest in discretionary extreme hardship waiver).[43] Additionally, and as stated in the 2013 Rule, section 10(c) of the Administrative Procedure Act (APA), 5 U.S.C. 704, permits an agency to provide an administrative appeal if the agency chooses to do so. *See Darby v. Cisneros,* 509 U.S. 137 (1993). Due to efficiency concerns, DHS continues to believe that administrative appeals should be reserved for actions that involve a comprehensive, final assessment of an applicant's admissibility and eligibility for a benefit. The provisional waiver process does not involve such a comprehensive assessment, and the denial of such an application is not a final agency action for purposes of the APA. *See* 8 CFR

[40] One commenter requested that USCIS ensure transparent processing of applications. USCIS is committed to providing processing information on its adjudication processes by including information on the form and its instructions. USCIS also intends to include a section in the USCIS Policy Manual on provisional waivers.

[41] *See* USCIS Memorandum, Standard Timeframe for Applicants to Response to Requests for Evidence Issued in Relation to a Request for a Provisional Unlawful Presence Waiver, Form I-601A (Mar. 1, 2013), available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2013/I-601A_30-Day_RFE_PM.pdf.*

[42] *See* USCIS Memorandum, Requests for Evidence and Notices of Intent to Deny (June 3, 2013), available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/June%202013/Requests%20for%20Evidence%20(Final).pdf.*

[43] Other courts of appeals have recognized that due process does not require an agency to provide for administrative appeal of its decisions. *See, e.g., Zhang v. U.S. Dep't of Justice,* 362 F.3d 155, 157 (2d Cir. 2004); *Loulou v. Ashcroft,* 354 F.3d 845, 850 (9th Cir. 2003); *Mendoza v. U.S. Att'y Gen.,* 327 F.3d 1283, 1289 (11th Cir. 2003); *Alhothani v. INS,* 318 F.3d 365, 376 (1st Cir. 2003); *Guentchev v. INS,* 77 F.3d 1036, 1037–38 (7th Cir. 1996).

Exhibit 1
248

212.7(e)(9)(ii). If a provisional waiver application is denied, the applicant may either file a new provisional waiver application or seek a waiver through the Form I–601 waiver process after DOS conclusively determines that he or she is inadmissible under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). In contrast to denial of a Form I–601A application for a provisional waiver, the denial of a Form I–601 application is appealable. In this regard, the final eligibility determination as it relates to the Form I–601 application lies with the USCIS Administrative Appeals Office (AAO), and the final immigrant visa eligibility determination rests with DOS. *See* 2013 Rule, 78 FR at 555.

Moreover, the provisional waiver process is intended to be a streamlined process that is closely coordinated with DOS immigrant visa processing. Holding cases during an administrative appeal of a provisional waiver application would produce logistical complications for the respective agencies, interrupting the regular adjudication flow, and therefore would be counterproductive to streamlining efforts.

### 3. Confidentiality Provisions

As with the 2013 Rule, commenters asked DHS to include confidentiality protections so that denials of provisional waiver applications would not automatically trigger removal proceedings. The commenters asserted that the Department should provide regulatory assurances stating that DHS will not put provisional waiver applicants in removal proceedings, even if their applications are denied. According to the commenters, such assurances were necessary because a new Administration might institute a change in policy in this area.

DHS declines to adopt these suggestions as the Department already has effective policies on these issues. DHS focuses its resources on its enforcement priorities, namely threats to national security, border security, or public safety.[44] Similarly, USCIS continues to follow current agency policy on the issuance of NTAs, which are focused on public safety threats, criminals, and those engaged in fraud.[45] Consistent with DHS enforcement

policies and priorities, the Department will not initiate removal proceedings against individuals who are not enforcement priorities solely because they filed or withdrew provisional waiver applications, or because USCIS denied such applications.

### E. Filing Requirements and Fees

#### 1. Concurrent Filing

One commenter requested that DHS allow for the concurrent filing of a Petition for Alien Relative, Form I–130 ("family-based immigrant visa petition"), with the application for a provisional waiver. The commenter reasoned that allowing the concurrent filing of the provisional waiver application and a family-based immigrant visa petition would create efficiencies for applicants and the U.S. Government by reducing paperwork and wait times. Other commenters asked that USCIS allow concurrent filing of a Form I–212 application for consent to reapply for admission with the provisional waiver application if the applicant also needs to overcome the inadmissibility bar for prior removal under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A), at the time of the immigrant visa interview. Given that processing of Form I–212 applications already takes place in the United States, these commenters believed that it would make sense to adjudicate the Form I–212 and provisional waiver applications at the same time and by the same officer.

DHS has considered these comments but maintains that concurrent filing would undermine the efficiencies that USCIS and DOS gain through the provisional waiver process. Currently, denials of family-based immigrant visa petitions are appealable to the BIA. *See* 8 CFR 1003.1(b)(5). Denials of other petitions also are generally appealable to the AAO. *See* 8 CFR 103.3.[46] If the denial of an immigrant visa petition is challenged on appeal, USCIS would have to either 1) hold the provisional waiver application until the decision on appeal is issued, or 2) deny the provisional waiver application and subsequently consider reopening it if the denial is overturned on appeal. Both scenarios produce administrative inefficiencies and could cause USCIS to incur additional costs for storing provisional waiver applications and transferring alien registration files (A– files) or receipt files between offices

until the administrative appeals process is complete. Therefore, DHS has decided against allowing the concurrent filing of provisional waiver applications and immigrant visa petitions.

DHS also declines to allow concurrent filing of Form I–212 and provisional waiver applications. In the event that a Form I–212 application is denied, the applicant may file an administrative appeal with the AAO. If USCIS allowed the concurrent filing of Form I–212 and provisional waiver applications, USCIS would again be faced with administratively inefficient options in cases where the Form I–212 application is denied and the applicant seeks to appeal that denial. As noted above, the agency would again be faced with the choice of either 1) holding the provisional waiver application in abeyance until the appeal is decided, or 2) denying the provisional waiver application and later reopening it if the appeal is sustained. As previously discussed, the provisional waiver process is intended to streamline DHS and DOS processes ahead of immigrant visa interviews at consular posts. The delay in the adjudication of provisional waiver applications that would result from allowing additional procedural steps would decrease the efficiencies derived from the provisional waiver process and thus be counterproductive to these streamlining efforts. As indicated previously in this preamble, however, DHS will allow an individual who has been approved for consent to reapply for admission under 8 CFR 212.2(j) to seek a provisional waiver. By allowing individuals with conditionally approved Form I–212 applications to apply for provisional waivers, DHS further expands the class of eligible individuals who can benefit from provisional waivers and, at the same time, maintains the program's streamlined efficiency.

#### 2. Fines or Penalties

Several commenters believed that DHS should require provisional waiver applicants to pay fines or fees of up to several thousand dollars to remain in the United States and obtain LPR status. Other commenters appeared to suggest that DHS should generally impose financial penalties on individuals unlawfully in the United States.

Congress has given the Secretary the authority to administer and enforce the immigration and naturalization laws of the United States. *See* 6 U.S.C. 112, 202(3)–(5); *see also* INA section 103, 8 U.S.C. 1103(a). The Secretary also is authorized to set filing fees for immigration benefits at a level that will ensure recovery of the full costs of

---

[44] *See* Memorandum from Secretary Jeh Charles Johnson, DHS, Policies for Apprehension, Detention, and Removal of Undocumented Immigrants (Nov. 20, 2014), *available at https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.*

[45] *See* USCIS Memorandum, Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens (Nov. 7, 2011), available at *www.uscis.gov/NTA.*

[46] See also AAO's Practice Manual, Chapter 3, Appeals, *available at https://www.uscis.gov/about-us/directorates-and-program-offices/administrative-appeals-office-aao/administrative-appeals-office-aao.*

Exhibit 1
249

providing adjudication and naturalization services, including services provided without charge to refugees, asylum applicants, and other immigrants. *See* INA section 286(m), 8 U.S.C. 1356(m). This fee revenue remains available to DHS to provide immigration and naturalization benefits. *See* INA section 286(n), 8 U.S.C. 1356(n). DHS has already established an appropriate filing fee for the Form I–601A application as authorized by the statute. Congress, however, has not imposed a specific fine or penalty on provisional waiver applicants or individuals unlawfully present in the United States. Congress also did not authorize any type of independent lawful status for such applicants. Such fines, as with a general fine for unlawful presence, would be unrelated to the costs incurred during the adjudication of immigration benefits. USCIS does not have the authority to impose such civil penalties.

### 3. Fees

DHS received several comments related to fees. One commenter noted that Congress has already approved DHS's funding for this fiscal year, and that Congress did not authorize changes to the Department's budget. The commenter thus requested an explanation as to why DHS believes that funding is available to effectuate the changes proposed by this rule. Another commenter believed that DHS and DOS should return immigrant visa fees to applicants if their provisional waiver applications are ultimately denied. One commenter stated that the derivative spouses of primary beneficiaries should pay separate application fees.

In contrast to many other U.S. Government agencies, USCIS does not rely on appropriated funds for most of its budget. Rather, USCIS is a fee-based agency that is primarily funded by the fees paid by applicants and petitioners seeking immigration benefits. USCIS relies on these fees to fund the adjudication of provisional waiver applications; none of the funds used for these adjudications comes from funds appropriated annually by Congress.

Furthermore, as noted above, the fees received with provisional waiver applications and immigrant visa petitions cover the costs of adjudication. These fees are necessary regardless of whether the application or petition is ultimately approved or denied. Therefore, USCIS does not return fees when a petition, application, or request is denied. For its part, DOS determines its own fees pursuant to its own authorities. *See, e.g.,* INA section 104, 8

U.S.C. 1104; 8 U.S.C. 1714; *see also* 22 CFR 22.1, 42.71(b).

Finally, an individual who applies for a provisional waiver must submit the application with the appropriate filing and biometrics fees, as outlined in the form's instructions and 8 CFR 103.7, even if the individual is a derivative beneficiary.

### 4. Premium Processing

A few commenters recommended that DHS establish a premium processing fee to expedite processing of provisional waiver applications. One commenter indicated that the processing time for a provisional waiver application should not exceed 30 days under premium processing.

DHS declines to adopt the suggestion to extend premium processing to provisional waiver applications. The INA permits certain employment-based petitioners and applicants for immigration benefits to request premium processing for a fee. *See* INA section 286(u), 8 U.S.C. 1356(u). DHS has established the current premium processing fee at $1,225.[47] *See* 8 CFR 103.7(b)(1)(i)(RR); *see also* 8 CFR 103.7(e) (describing the premium processing service). The premium processing fee, which is paid in addition to the base filing fee, guarantees that USCIS processes a benefit request within 15 days. *See* 8 CFR 103.7(e)(2). If USCIS cannot take action within 15 days, USCIS refunds the premium processing fee.[48] *Id.*

DHS has not extended premium processing to any immigration benefit except for those authorized under INA section 286(u), 8 U.S.C. 1356(u). Notably, INA section 286(u) expressly authorizes premium processing only for employment-based petitions and applications. Even if USCIS could develop an expedited processing fee for other benefits, USCIS would not apply it to the provisional waiver process, as that process requires background checks over which USCIS does not control timing. Additionally, determining an appropriate fee for such a new process would require USCIS to estimate the costs of that service and engage in separate notice-and-comment rulemaking to establish the new fee. Thus, DHS will not establish a Form I–601A premium processing fee at this time.

---

[47] The fee was originally set at $1,000, and may be adjusted according to the Consumer Price Index (CPI). *See* INA section 286(u), 8 U.S.C. 1356(u).

[48] Even if USCIS refunds this fee, USCIS generally continues expedited processing of the benefit request.

### 5. Expedited Processing

One commenter stated that the processing time for a provisional waiver application should generally not exceed 30 days. Other commenters urged USCIS to expedite the processing of applications for family members of active duty members or honorably discharged veterans of the U.S. Armed Forces. One commenter asked that DHS and DOS expedite the immigrant visa interviews of individuals with approved provisional waivers.[49]

DHS did not incorporate these suggestions in this final rule. DHS believes the provisional waiver process is well managed, and officers adjudicate cases quickly after receiving an applicant's background check results. Creating an expedited process for certain applicants, including relatives of military members and veterans, would create inefficiencies and potentially slow the process for all provisional waiver applicants.[50]

Additionally, even if DHS were to expedite the provisional waiver process for certain applicants, they would still be required to spend time navigating the DOS immigrant visa process. DHS believes that expediting the processing of provisional waiver applications for certain individuals would generally not significantly affect the processing time of their immigrant visa processing with DOS. Individuals often file their provisional waiver applications with USCIS while the DOS National Visa Center (NVC) pre-processes their immigrant visa applications. The NVC pre-processing of immigrant visa applications usually runs concurrently with the USCIS processing of provisional waiver applications. Thus, even if DHS were to expedite the provisional waiver process for certain applicants, those applicants would nevertheless be required to wait for DOS to complete its process. Additionally, the processing time for immigrant visa applications at the NVC largely depends on other outside factors, including whether applicants submit necessary documents to the NVC on a timely basis throughout the process. In many cases, including those in which applicants

---

[49] One commenter also urged CBP to expedite Freedom of Information Act requests so that individuals are able to obtain the information they need to assess eligibility and complete their applications. The commenter indicated that expanding the provisional waiver process is useless unless potential applicants are given access to their files. DHS declines to adopt this suggestion as it is beyond the scope of this rulemaking.

[50] Each time USCIS has to set aside a regularly filed case to prioritize the adjudication of another case, it delays those cases that were filed prior to the prioritized case and disrupts the normal adjudication process.

Exhibit 1
250

delay in getting necessary documents to the NVC, immigrant visa processing would not be affected by the expediting of other processes.

DHS reminds applicants, however, that they may request expedited adjudication of a provisional waiver application according to current USCIS expedite guidance.[51] Also, relatives of current and former U.S. Armed Forces members may seek USCIS assistance through the agency's special military help line.[52]

6. Background Checks and Drug Testing

One commenter requested that USCIS conduct background checks and drug testing for provisional waiver applicants.[53]

DHS is not modifying the background checks and biometrics requirement in this rule to include drug testing. Individuals seeking provisional waivers already must provide biometrics for background and security checks. Based in part on the background check results, USCIS determines whether the applicant is eligible for the waiver, including whether a favorable exercise of discretion is warranted. DHS only collects the biometric information needed to run such checks and to adjudicate any requested immigration benefit. Additional testing, such as a medical examination, is required within the DOS immigrant visa process and for DOS's visa eligibility determinations. Performing medical tests as part of the provisional waiver process would duplicate the DOS process.

*F. Comments Outside the Scope of This Rulemaking*

DHS received a number of comments that are outside the scope of this rule. For example, one commenter asked USCIS to publish guidance on whether an individual who is subject to the 3- or 10-year unlawful presence bar, but who has already returned to the United States, could satisfy the requisite inadmissibility period while in the United States. Other commenters suggested that those with approved provisional waivers should be permitted to seek adjustment of status in the United States. Many asked DHS to extend the period for accepting adjustment of status applications pursuant to INA section 245(i), 8 U.S.C. 1255(i). Others requested that DHS: create a new waiver for people who leave the United States because of family emergencies; make certain immigrant visa categories immediately available or create new immigrant visa categories; Create new inadmissibility periods for purposes of INA sections 212(a)(9)(B)(i) and 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(B)(i) and 1182(a)(9)(C); and generally modify immigration laws, particularly those perceived as harsh.

Other commenters requested changes to DOS consular processes or regulations, which are also not within the scope of this rule. For example, commenters asked DHS to instruct DOS consular officers to issue immigrant visas to applicants with approved provisional waiver applications.[54] One commenter criticized the inability to appeal immigrant visa denials to DHS as unfair, even though DOS, not DHS, adjudicates immigrant visa applications. *See generally* 22 CFR part 42. Similarly, another commenter stated that individuals whose immigrant visa applications have been denied by DOS must be allowed to reopen those applications so that they can be allowed to file provisional waiver applications.[55]

Because DHS believes that these suggestions are outside the scope of this rule, the suggestions will not be addressed in this rule.

*G. Comments on the Executive Orders 12866/13563 Analysis*

In one comment requesting that the DOS visa interview scheduling cut-off date be eliminated as an ineligibility requirement, the commenter cited DHS's acknowledgement that the 2013 Rule's provisional waiver application projections were overestimated. Because of the overestimation in the 2013 Rule, the commenter suggested that DHS likely overestimated provisional waiver applications resulting from the 2015 Proposed Rule. Since publication of the 2015 Proposed Rule, DHS has adjusted its application projection method based on new, revised data from DOS and this rule's new provisional waiver eligibility criteria. DHS believes this new method will better project the provisional waiver applications resulting from the rule.

DHS received many comments affirming the benefits of the provisional unlawful presence waiver described in the 2015 Proposed Rule. Commenters agreed that the provisional waiver's expansion would provide greater certainty for families, promote family unity, improve administrative efficiency, improve communication between DHS and other government agencies, facilitate immigrant visa issuance, save time and resources, and relieve the emotional and financial hardships that family members experience from separation.

DHS also received several economic-related comments that were outside the scope of this rule. Several commenters mentioned that obtaining legal status, which both the provisional and general unlawful presence waivers may facilitate, provides a significant benefit to the undocumented individual as well as American society. According to the commenters, this is because obtaining legal status tends to increase taxable income, reduce poverty, contribute to job growth, help businesses gain qualified employees, and add to consumer spending. Although DHS agrees that obtaining legal status provides important economic benefits to once-undocumented individuals, and the United States in general, those benefits are not directly attributable to the provisional waiver eligibility

---

[51] For guidance on USCIS expedite procedures, please visit *http://www.uscis.gov/forms/expedite-criteria.*

[52] Information about the military help line is available at *http://www.uscis.gov/military/military-help-line.* DHS encourages military families that need assistance to reach out to USCIS through the help line.

[53] Two commenters also asked that USCIS allow provisional waiver applicants to include medical examinations performed by USCIS-designated civil surgeons with their provisional waiver applications. These commenters believed that the opportunity to provide the results of the medical examination before departure for the immigrant visa interview would further streamline the process. The commenters also believed that applicants could either avoid the higher panel physician examination fee abroad, or detect and treat possible medical conditions that would render them ineligible for their immigrant visas before departure. One of these commenters also indicated that such a process would allow an applicant's representative to check the panel physician's work. DHS did not adopt this suggestion. Under DOS regulations, each immigrant visa applicant must be examined by a DOS-designated panel physician, *see* 22 CFR 42.66, and altering DHS regulations to permit submission of medical examinations with a provisional waiver application would not eliminate that requirement.

[54] To the extent that these comments are read to suggest that DOS should issue immigrant visas to individuals with approved provisional waiver applications without assessing whether such individuals are inadmissible for other reasons, DHS believes those comments are outside the scope of this rulemaking. To the extent that the comments are read to suggest that DOS should not re-adjudicate or "second-guess" USCIS's provisional waiver determinations, DHS notes that DOS does not reassess USCIS' provisional waiver determination. DOS, however, is required to assess whether an individual is ineligible for an immigrant visa, including whether an applicant is inadmissible. If the individual is inadmissible on a ground other than unlawful presence, or is otherwise ineligible for the immigrant visa, DOS may deny the individual's immigrant visa application, even if the provisional waiver was approved.

[55] As with other DOS processes, review of the denial of a visa application is governed by DOS regulations, not DHS regulations.

Exhibit 1
251

provided by this rule. Rather, obtaining a waiver of the unlawful presence ground of inadmissibility (provisional or not) is just one step in the process for gaining legal status, which USCIS hopes this rule will facilitate.

A different commenter asserted that non-U.S. citizen workers hurt the economy. DHS disagrees with this comment and finds that it is beyond the scope of this rule because obtaining a waiver of inadmissibility (provisional or not) for unlawful presence does not provide employment authorization for someone who is unlawfully present. Receiving such a waiver is just one step in the process for gaining the legal status required to lawfully work in the United States.

## IV. Regulatory Amendments

After careful consideration of the public comments, as previously summarized in this preamble, DHS adopts the regulatory amendments in the proposed rule without change, except for the provisions noted below. In addition to these substantive changes, DHS also has made edits to the text of various provisions that do not change the substance of the proposed rule.

### A. Amending 8 CFR 212.7(e)(1) To Clarify Which Agency Has Jurisdiction To Adjudicate Provisional Waivers

Currently, 8 CFR 212.7(e)(1) specifies that all provisional waiver applications, including an application made by an individual in removal proceedings before EOIR, must be filed with USCIS. The provision implies, but does not specifically state, that USCIS has exclusive jurisdiction to adjudicate and decide provisional waivers. With this final rule, DHS modifies the regulatory text to clarify that USCIS has exclusive jurisdiction, regardless of whether the applicant is or was in removal, deportation, or exclusion proceedings. *See* new 8 CFR 212.7(e)(2).

### B. Removing the Reason-to-Believe Standard as a Basis for Ineligibility

Under the 2013 Rule, an individual is ineligible for a provisional waiver if "USCIS has reason to believe that the alien may be subject to grounds of inadmissibility other than unlawful presence under INA section 212(a)(9)(B)(i)(I) or (II), 8 U.S.C. 1182(a)(9)(B)(i)(I) or (II), at the time of the immigrant visa interview with the Department of State." 8 CFR 212.7(e)(4)(i). The 2015 Proposed Rule proposed to retain this requirement but requested any alternatives that may be more effective than the current provisional waiver process or the amended process in the proposed rule.

*See* 80 FR 43343. In response to comments, DHS is removing this standard as a basis for ineligibility for provisional waivers. *See* new 8 CFR 212.7(e)(4). DHS, however, retains 8 CFR 212.7(e)(14)(i), which provides that a provisional waiver is automatically revoked if DOS determines, at the time of the immigrant visa interview, that the applicant is inadmissible on any grounds of inadmissibility other than unlawful presence under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Revocation of the provisional waiver based on inadmissibility on other grounds, however, does not prevent the individual from applying for a general waiver under 8 CFR 212.7(a) to cure his or her inadmissibility under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B) or any other ground of inadmissibility for which a waiver is available.

### C. Removing the DOS Visa Interview Scheduling Cut-Off Dates in 8 CFR 212.7(e)(4)(iv) and 212.7(e)(5)(ii)(G)

In the proposed rule, DHS sought to retain date restrictions that prevented immediate relatives of U.S. citizens from obtaining provisional waivers if DOS acted prior to January 3, 2013 to schedule their immigrant visa interviews. *See* 80 FR at 43343. DHS also proposed that other individuals (*i.e.*, individuals other than certain immediate relatives of U.S. citizens) would be ineligible for provisional waivers if DOS had acted on or before the effective date of this final rule to schedule the immigrant visa interview. *Id.* Furthermore, DHS proposed to reject provisional waiver applications that were not filed consistent with the above date restrictions. *See* proposed 8 CFR 212.7(e)(5)(G)(ii)(1) and (2). In response to comments, DHS has decided to eliminate these filing restrictions. *See* new 8 CFR 212.7(e)(4) and (5).

### D. Allowing Individuals With Final Orders of Removal, Deportation, or Exclusion To Apply for Provisional Waivers

Since the inception of the provisional waiver process, individuals have been ineligible for provisional waivers if they are 1) subject to final orders of removal issued under INA sections 217, 235, 238, or 240, 8 U.S.C. 1187, 1225, 1228, or 1229a; 2) subject to final orders of exclusion or deportation under former INA sections 236 or 242, 8 U.S.C. 1226 or 1252 (pre-April 1, 1997), or 3) subject to final orders under any other provision of law (including an *in absentia* order of removal under INA section 240(b)(5), 8 U.S.C. 1229a(b)(5)). *See generally* 2013 Rule, 78 FR 536. As indicated in the response to comments

on this subject in the preamble, DHS is amending the rule to provide eligibility for provisional waivers to certain individuals who are subject to an administratively final order of removal, deportation, or exclusion and therefore will be inadmissible under INA section 212(a)(9)(A)(i) or (ii), 8 U.S.C. 1182(a)(9)(A)(i) or (ii), upon departure from the United States. Under the final rule, such individuals will be eligible to apply for provisional waivers if they have been granted consent to reapply for admission under INA section 212(a)(9)(A)(iii), 8 U.S.C. 1182(a)(9)(A)(iii) and 8 CFR 212.2(j). *See* new 8 CFR 212.7(e)(4) (iv). However, they cannot file Form I–212 applications and provisional waiver applications concurrently. *See* new 8 CFR 212.7(e)(4)(iv).

Notwithstanding this change, individuals will remain ineligible for provisional waivers if 1) they have returned unlawfully to the United States after removal, and 2) CBP or ICE, after service of notice under 8 CFR 241.8, has reinstated a prior order of removal, deportation, or exclusion. Under INA section 241(a)(5), 8 U.S.C. 1231(a)(5), reinstatement of a such an order makes the individual ineligible for waivers of inadmissibility and other forms of relief. *See* new 8 CFR 212.7(e)(4)(v). Moreover, even in the absence of reinstatement, the individual's unauthorized return to the United States may be considered as an adverse discretionary factor in adjudicating a provisional waiver application. Finally, the approval of a provisional waiver application will be automatically revoked if the applicant is ultimately determined to be inadmissible under INA 212(a)(9)(C), 8 U.S.C 1182(a)(9)(C), for having unlawfully returned to the United States after a prior removal or prior unlawful presence.

### E. Clarifying When an Individual Is Subject to Reinstatement and Ineligible for Provisional Waivers

Currently, an individual is ineligible for a provisional waiver if he or she is subject to reinstatement of a prior order under INA section 241(a)(5), 8 U.S.C. 1231(a)(5). *See* 8 CFR 212.7(e)(4)(vii). DHS retained this ineligibility criteria in the proposed rule. In this final rule, however, DHS clarifies which individuals are ineligible for provisional waivers based on application of the reinstatement of removal provision at INA section 241(a)(5), 8 U.S.C. 1231(a)(5). Under the final rule, an individual will be ineligible for a provisional waiver if ICE or CBP, after service of notice under 8 CFR 241.8, has reinstated the removal, deportation, or

Exhibit 1
252

exclusion order prior to the individual filing the provisional waiver or while the provisional waiver application is pending. *See* new 8 CFR 212.7(e)(4)(v).

*F. Miscellaneous Technical Amendments*

In this final rule, DHS made several technical and non-substantive changes. First, DHS amended 8 CFR 212.7(e)(2) by adding the word "document" after the terms "employment authorization" and "advance parole." Additionally, DHS simplified the text of 8 CFR 212.7(e)(5). Currently, that provision outlines filing conditions, which are also provided in the instructions to provisional waiver applications. DHS, therefore, revised the provision to refer individuals to the filing instructions of the form.

**V. Statutory and Regulatory Requirements**

*A. Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*B. Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

*C. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563

emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is a "significant regulatory action," although not an economically significant regulatory action, under section 3(f) of Executive Order 12866. Accordingly, the Office of Management and Budget has reviewed this regulation. This effort is consistent with Executive Order 13563's call for agencies to "consider how best to promote retrospective analysis of rules that may be outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned."

1. Summary

After careful consideration of public comments on the 2015 Proposed Rule,[56] DHS adopts most of the regulatory amendments specified in the proposed rule without change, except for the provisions addressing ineligibility for: 1) reason to believe that the applicant may be inadmissible on grounds other than unlawful presence at the time of the DOS immigrant visa interview (8 CFR 212.7(e)(4)(i)); 2) DOS initially acting before January 3, 2013 or before the effective date of this final rule to schedule an applicant's immigrant visa interview (proposed 8 CFR 212.7(e)(4)(iv) and 212.7(e)(5)(ii)(G)); and 3) the applicant being subject to an administratively final order of exclusion, deportation, or removal ("final order")(8 CFR 212.7(e)(4)(vi)). With the adoption of most of the proposed regulatory amendments, DHS largely applies the 2015 Proposed Rule's economic analysis approach to this final rule. However, some changes to the analysis are necessary to capture the population of individuals now eligible for provisional waivers through this final rule's elimination and modification of certain ineligibility provisions just described and source data revisions.

This rule's expansion of the provisional waiver process will create costs and benefits to newly eligible provisional waiver (Form I–601A) applicants, their U.S. citizen or LPR family members, and the Federal Government (namely, USCIS and DOS), as outlined in Table 1. This rule will impose fee, time, and travel costs on an estimated 100,000 newly eligible individuals who choose to complete and submit provisional waiver applications and biometrics (fingerprints, photograph, and signature) to USCIS for

consideration during the 10-year period of analysis (*see* Table 8). These costs will equal an estimated $52.4 million at a 7 percent discount rate and $64.2 million at a 3 percent discount rate in present value across the period of analysis. On an annualized basis, the costs will measure approximately $7.5 million at both 7 percent and 3 percent discount rates (*see* Table 1).

Newly eligible provisional waiver applicants and their U.S. citizen or LPR family members will benefit from this rule. Individuals applying for a provisional waiver will receive advance notice of USCIS's decision to provisionally waive their 3- or 10-year unlawful presence bar under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B), before they leave the United States for their immigrant visa interviews abroad. This offers applicants and their family members the certainty of knowing that the applicants have been provisionally approved for a waiver of certain unlawful presence grounds of inadmissibility before departing from the United States. Individuals with approved provisional waivers may experience shortened periods of separation from their family members living in the United States while they pursue immigrant visas abroad, thus reducing related financial and emotional strains on the families. USCIS and DOS will continue to benefit from the operational efficiencies gained from the provisional waiver's role in streamlining immigrant visa application processing, but on a larger scale than currently in place.

In the absence of this rule, DHS assumes that the majority of individuals who would have been newly eligible for provisional waivers under this rule will likely continue to pursue an immigrant visa through consular processing abroad and apply for waivers of unlawful presence through the Form I–601 process. Those who apply for unlawful presence waivers through the Form I–601 process will incur fee, time, and travel costs similar to individuals applying for waivers through the provisional waiver process. However, without this rule, those who must seek a waiver of inadmissibility abroad through the Form I–601 process after the immigrant visa interview may face longer separation times from their families in the United States and experience less certainty regarding the approval of a waiver of the 3- or 10-year unlawful presence bar before departing from the United States.

TABLE 1—TOTAL COSTS AND BENEFITS OF RULE, YEAR 1–YEAR 10

| | 10-Year present values | | Annualized values | |
|---|---|---|---|---|
| | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| **Total Costs:** Quantitative | $64,168,205 | $52,429,216 | $7,522,471 | $7,464,741 |
| **Total Benefits:** Qualitative | Decreased amount of time that U.S. citizens or LPRs are separated from their family members with approved provisional waivers, leading to reduced financial and emotional hardship for these families. | | Decreased amount of time that U.S. citizens or LPRs are separated from their family members with approved provisional waivers, leading to reduced financial and emotional hardship for these families. | |
| | Provisional waiver applicants will receive advance notice of USCIS' decision to provisionally waive their 3- or 10-year unlawful presence bar before they leave the United States for their immigrant visa interview abroad. This offers applicants and their family members the certainty of knowing that the applicants have been provisionally approved for a waiver before departing from the United States. | | Provisional waiver applicants will receive advance notice of USCIS' decision to provisionally waive their 3- or 10-year unlawful presence bar before they leave the United States for their immigrant visa interview abroad. This offers applicants and their family members the certainty of knowing that the applicants have been provisionally approved for a waiver before departing from the United States. | |
| | Federal Government will achieve increased efficiencies by streamlining immigrant visa processing for applicants seeking inadmissibility waivers of unlawful presence. | | Federal Government will achieve increased efficiencies by streamlining immigrant visa processing for applicants seeking inadmissibility waivers of unlawful presence. | |

**Note:** The cost estimates in this table are contingent upon Form I–601A filing projections as well as the discount rates applied for monetized values.

2. Background

Individuals who are in the United States and seeking LPR status must either obtain an immigrant visa abroad through consular processing with DOS or apply to adjust status in the United States, if eligible. Those present in the United States without having been inspected and admitted or paroled are typically ineligible to adjust status in the United States. To obtain LPR status, such individuals must leave the United States for immigrant visa processing at a U.S. Embassy or consulate abroad. Because these individuals are present in the United States without having been inspected and admitted or paroled, many have accrued enough unlawful presence to trigger the 3- or 10-year unlawful presence grounds of inadmissibility when leaving the United States for immigrant visa processing abroad.[57] *See* INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). While there may be limited exceptions, the population affected by this rule will consist almost exclusively of individuals who are eligible for immigrant visas but are unlawfully present in the United States without having been inspected and admitted or paroled.

Before the introduction of the provisional waiver process, individuals seeking immigrant visas through consular processing were only able to apply for a waiver of a ground of inadmissibility, such as unlawful presence, *after* attending the immigrant visa interview abroad. If a consular officer identified any ground(s) of inadmissibility during an immigrant visa interview, the applicant was tentatively denied an immigrant visa and allowed to seek a waiver of any waivable ground(s) of inadmissibility. The individual could apply for such a waiver by filing Form I–601 with USCIS. Those who applied for Form I–601 waivers were required to remain abroad while USCIS adjudicated their Forms I–601, which currently takes over five months to complete.[58] If USCIS approved the waiver of the inadmissibility ground(s), DOS subsequently scheduled a follow-up consular interview. Provided there were no other concerns raised by the consular officer, DOS generally issued the immigrant visa during the follow-up consular interview.

In some instances, the Form I–601 waiver process led to lengthy separations of immigrant visa applicants from their U.S. citizen or LPR spouses,

parents, and children, causing financial and emotional harm. The Form I–601 waiver process also created processing inefficiencies for both USCIS and DOS through repeated interagency communication and through multiple consular appointments or interviews.

With the goals of streamlining the inadmissibility waiver process, facilitating efficient immigrant visa issuance, and promoting family unity, DHS promulgated a rule that established an alternative inadmissibility waiver process on January 3, 2013 ("2013 Rule").[59] The 2013 Rule created a provisional waiver process for certain immediate relatives of U.S. citizens (namely, spouses, children (unmarried and under 21), and parents of U.S. citizens (provided the child is at least 21)) who are in the United States, are seeking immigrant visas, can demonstrate extreme hardship to a U.S. citizen spouse or parent, would be inadmissible upon departure from the United States due to only the accrual of unlawful presence, and meet other eligibility conditions. That process currently allows eligible individuals to apply for a provisional waiver and receive a notification of USCIS' decision on their provisional waiver application before departing for DOS consular processing of their immigrant visa applications. The provisional waiver process contrasts to the Form I–601 waiver process, which requires

---

[57] Individuals who depart the United States after accruing more than 180 days, but less than 1 year, of unlawful presence are generally inadmissible for 3 years. Those who depart the United States after accruing 1 year or more of unlawful presence are generally inadmissible for 10 years.

[58] U.S. Citizenship and Immigration Services. "USCIS Processing Time Information for the Nebraska Service Center- Form I–601." *Available at* https://egov.uscis.gov/cris/processTimesDisplayInit.do (last updated Feb. 11, 2016).

[59] *See* 78 FR 536 (Jan. 3, 2013).

Exhibit 1
254

applicants to wait abroad, away from their family members in the United States, while USCIS adjudicates their application for a waiver of inadmissibility. Once approved for a provisional waiver, they are scheduled for the immigrant visa interview abroad. During the immigrant visa interview, a DOS consular officer will determine whether the applicant is otherwise admissible to the United States and eligible to receive an immigrant visa. Since the provisional waiver process's inception, USCIS has approved more than 66,000 provisional waiver applications for certain immediate relatives of U.S. citizens,[60] allowing these individuals and their families to enjoy the benefits of such waivers.

3. Purpose of Rule

To assess the initial effectiveness of the provisional waiver process, DHS decided to offer this process to a limited group—certain immediate relatives of U.S. citizens—in the 2013 Rule.[61] Based on the lengthy separation periods and related financial and emotional burdens to families associated with the Form I–601 waiver process, and based on the efficiencies realized for both USCIS and DOS through the provisional waiver process, the Secretary directed USCIS to expand eligibility for the provisional waiver process beyond certain immediate relatives of U.S. citizens to all statutorily eligible immigrant visa applicants.[62] Consistent with that directive and the INA, on July 22, 2015, DHS published the 2015 Proposed Rule, which proposed to expand eligibility for provisional waivers of certain grounds of inadmissibility based on the accrual of unlawful presence to include all other individuals seeking an immigrant visa (all other immigrant visa applicants[63]) who are statutorily eligible for a waiver of such grounds, are seeking a waiver in connection with an immigrant visa application, are present in the United States, and meet other

conditions.[64] In the 2015 Proposed Rule, USCIS also proposed to allow LPR spouses and parents, in addition to currently eligible U.S. citizen spouses and parents, to serve as qualifying relatives for the provisional waiver's extreme hardship determination, consistent with the statutory waiver authority. Under this provision, provisional waiver applicants could show that their denial of admission would cause extreme hardship to their U.S. citizen *or* LPR spouses or parents.

This final rule adopts most of the regulatory amendments set forth in the 2015 Proposed Rule except for a few provisions. In particular, USCIS, in response to public comments on the 2015 Proposed Rule, will eliminate the current provisional waiver provisions addressing ineligibility for: (1) Reason to believe that the applicant may be inadmissible on grounds other than unlawful presence at the time of the DOS immigrant visa interview (8 CFR 212.7(e)(4)(i)); (2) DOS initially acting before January 3, 2013 (for certain immediate relatives) or before the effective date of this final rule to schedule an applicant's immigrant visa interview (proposed 8 CFR 212.7(e)(4)(iv) and 212.7(e)(5)(ii)(G)); and (3) applicants who are subject to an administratively final order of exclusion, deportation, or removal (8 CFR 212.7(e)(4)(vi)).[65] An individual subject to a final order may now seek a provisional waiver, but only if he or she has already requested and been approved for consent to reapply for admission under INA section 212(a)(9)(A)(iii), 8 U.S.C. 1182(a)(9)(A)(iii) via a Form I–212 application. Filing and receiving approval of the Form I–212 application is a requirement already in place for these individuals to be eligible for an immigrant visa.

Other than the changes outlined in this rulemaking, DHS will maintain all other eligibility requirements for the provisional waiver as currently described in 8 CFR 212.7(e), including the requirements to submit biometrics, pay the provisional waiver filing fee and the biometric services fee, and be

present in the United States at the time of the provisional waiver application filing and biometrics appointment.

This rule's amendments will provide more individuals seeking immigrant visas and their U.S. citizen or LPR family members with the provisional waiver's main benefit of shortened family separation periods, while increasing USCIS and DOS efficiencies by streamlining the immigrant visa process for such applicants.

4. Current Provisional Waiver Process

In this analysis, DHS draws on applicable DOS visa ineligibility statistics and historical provisional waiver application data to estimate the current demand for provisional waivers and the anticipated demand directly resulting from this final rule. Illustrating the past demand for provisional waivers, Table 2 displays the actual numbers of Form I–601A receipts, approvals, and denials recorded for March of fiscal year (FY) 2013[66] through the end of FY 2015. Across those years, DHS received about 107,000 Form I–601A applications, for an average of almost 42,000 per year.[67] During the same period, DHS approved 66,000 Form I–601A applications and denied 27,000.[68]

Of the provisional waiver applications adjudicated from FY 2013 to FY 2015, USCIS denied a total of 9 percent for the following reasons: An applicant's lack of a qualifying relative for the waiver's extreme hardship determination (0.8 percent);[69] reason to believe an applicant would be inadmissible based on grounds other than unlawful presence at the time of the immigrant visa interview (7.2 percent); DOS initially acting before January 3, 2013 to schedule an applicant's immigrant visa interview (0.1 percent); and an applicant being subject to a final order

---

[60] This figure is based on Form I–601A approvals data through the end of fiscal year 2015 (September 30, 2015). Note that USCIS began accepting provisional waiver applications on March 4, 2013. Source: USCIS' Office of Performance and Quality.

[61] *See* 78 FR at 542.

[62] This expansion included, but was not limited to, adult sons and daughters of U.S. citizens; brothers and sisters of U.S. citizens; and spouses and children of LPRs. *See* Memorandum from Jeh Charles Johnson, Secretary, DHS, to Léon Rodriguez, Director, USCIS, Expansion of the Provisional Waiver Program (Nov. 20, 2014). *Available at http://www.dhs.gov/sites/default/files/publications/14_1120_memo_i601a_waiver.pdf.*

[63] For the purposes of this analysis, the phrase "all other immigrant visa applicants" encompasses the following immigrant visa categories: family-sponsored immigrants, employment-based immigrants, diversity immigrants, and certain special immigrants.

[64] *See* 80 FR 43338 (July 22, 2015).

[65] As mentioned earlier in this preamble, USCIS will automatically revoke a provisional waiver if DOS determines, at the time of the immigrant visa interview, that the applicant is inadmissible on any ground(s) of inadmissibility other than unlawful presence under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Revocation of the provisional unlawful presence waiver for this reason does not prevent an individual from applying under 8 CFR 212.7(a) for a waiver of inadmissibility under INA section 212(a)(9)(B)(iv), 8 U.S.C. 1182(a)(9)(B)(iv), or for any other waiver that may be available for any other ground(s) of inadmissibility.

[66] FY 2013 was October 1, 2012 to September 30, 2013.

[67] DHS calculated the average Form I–601A receipts per month since the provisional waiver process's implementation in March 2013 through the end of FY 2015, which equaled 3,467.65, and multiplied the average monthly receipts by 12 to determine the annual average.

[68] Approvals and denials reflect actual cases adjudicated, which do not directly correspond to filing receipts for the same year.

[69] Note that applicants denied for not having a qualifying U.S. citizen spouse or parent include those who could potentially have LPR spouses and/or parents who might experience extreme hardship as well as those who attempted to demonstrate hardship to a U.S. citizen child—a relative who is not a qualifying relative for the purposes of the unlawful presence waiver, provisional or not. The exact number of denials according to these different demonstrations is unknown. Source: Email correspondence with USCIS' National Benefits Center on November 24, 2015.

Exhibit 1
255

**50266** Federal Register / Vol. 81, No. 146 / Friday, July 29, 2016 / Rules and Regulations

(0.9 percent).[70] With this final rule's elimination or modification of these ineligibility grounds, more individuals will presumably be eligible for provisional waivers.

The actual Form I–601A filing demands illustrated in Table 2 differ from the estimates in the 2013 Rule's

economic impact analysis. When DHS conducted the 2013 Rule's economic impact analysis, DHS did not have statistics on unlawful presence inadmissibility findings for certain immediate relatives that would have allowed for a precise calculation of the rule's impact. Due to these limitations,

DHS instead estimated the rule's impact based on various demand scenarios. In the analysis for this final rule, DHS uses actual USCIS receipts for provisional waiver applications to determine the future demand for provisional waivers, as discussed later.

TABLE 2—HISTORICAL NUMBERS OF FORM I–601A RECEIPTS, APPROVALS, AND DENIALS

| Fiscal year | Month | Receipts | Approvals | Denials |
|---|---|---|---|---|
| 2013 | Mar. | 1,306 | 0 | 0 |
| | Apr. | 2,737 | 5 | 2 |
| | May | 3,267 | 52 | 14 |
| | Jun. | 3,119 | 226 | 238 |
| | Jul. | 3,425 | 1,006 | 603 |
| | Aug. | 3,075 | 1,435 | 790 |
| | Sep. | 2,798 | 1,749 | 438 |
| FY 2013 Total | | 19,727 | 4,473 | 2,085 |
| 2014 | Oct. | 2,886 | 1,465 | 602 |
| | Nov. | 2,697 | 1,456 | 562 |
| | Dec. | 2,641 | 1,708 | 532 |
| | Jan. | 2,256 | 1,616 | 780 |
| | Feb. | 2,483 | 1,282 | 579 |
| | Mar. | 2,990 | 1,216 | 987 |
| | Apr. | 3,266 | 1,363 | 996 |
| | May | 3,650 | 2,052 | 708 |
| | Jun. | 4,184 | 3,151 | 1,100 |
| | Jul. | 3,778 | 4,211 | 1,460 |
| | Aug. | 3,907 | 3,912 | 1,801 |
| | Sep. | 4,237 | 4,075 | 1,484 |
| FY 2014 Total | | 38,975 | 27,507 | 11,591 |
| 2015 | Oct. | 4,540 | 4,196 | 1,469 |
| | Nov. | 3,728 | 2,167 | 951 |
| | Dec. | 4,103 | 2,838 | 1,180 |
| | Jan. | 3,370 | 3,011 | 1,433 |
| | Feb. | 3,402 | 2,986 | 1,381 |
| | Mar. | 4,588 | 2,024 | 960 |
| | Apr. | 4,176 | 2,966 | 1,138 |
| | May | 4,030 | 2,708 | 934 |
| | Jun. | 4,364 | 2,883 | 1,139 |
| | Jul. | 4,162 | 2,712 | 946 |
| | Aug. | 4,019 | 2,939 | 805 |
| | Sep. | 4,313 | 2,880 | 733 |
| FY 2015 Total | | 48,795 | 34,310 | 13,069 |
| FY 2013–FY 2015 Total | | 107,497 | 66,290 | 26,745 |
| FY 2013–FY 2015 Annual Average[71]. | | 41,612 | 25,661 | 10,353 |

**Note:** Approvals and denials reflect actual cases adjudicated, which do not directly correspond to filing receipts for the month.
**Source:** USCIS' Office of Performance and Quality.

Table 3 shows DOS's historical findings of immigrant visa ineligibility due to only unlawful presence inadmissibility grounds, which DOS revised for FY 2010 through FY 2014 following the 2015 Proposed Rule's

publication.[72] Between FY 2010 and FY 2015, DOS recorded ineligibility due to only unlawful presence for almost 118,000 immediate relative visas and 24,000 all other immigrant visas.[73]

Table 4 shows DOS's historical findings of immigrant visa ineligibility due to unlawful presence and any other inadmissibility ground barring visa eligibility.[74] DHS uses this population in part to estimate the number of

[70] Source: Email correspondence with USCIS' National Benefits Center on October 7, 2015 and December 7, 2015.

[71] To determine these annual averages, DHS calculated the average Form I–601A receipts, approvals, and denials per month since implementation of the provisional unlawful presence waiver process in March 2013 through the end of FY 2015 and multiplied those averages by 12. The average monthly receipts equaled 3,467.65,

while approvals measured 2,138.39 and denials equaled 862.74.

[72] DOS determined that the rules it used to collect the inadmissibility and ineligibility data included in the 2015 Proposed Rule resulted in errors. DOS has since revised its rules to correct the errors.

[73] Of the ineligibility figures recorded for the "all other immigrants" visa category, nearly 97 percent correspond to family-sponsored immigrant visa applications (which does not include applications

filed by immediate relatives of U.S. citizens), 2 percent correspond to employment-based immigrant visa applications, 1 percent correspond to Diversity Visa immigrant applications, and a fraction of 1 percent correspond to certain special immigrant visa applications.

[74] Other inadmissibility grounds barring visa eligibility can be found in INA section 212(a), 8 U.S.C. 1182(a).

Exhibit 1
256

immediate relatives who will become eligible for provisional waivers through this final rule's elimination or modification of certain provisional waiver ineligibilities currently in place.

TABLE 3—NUMBER OF IMMIGRANT VISA INELIGIBILITY FINDINGS DUE TO ONLY UNLAWFUL PRESENCE

| Fiscal year | Visa category type | | Total |
| | Immediate relatives [75] | All Other immigrants [76] | |
|---|---|---|---|
| 2010 | 15,870 | 2,739 | 18,609 |
| 2011 | 18,569 | 5,043 | 23,612 |
| 2012 | 19,989 | 5,100 | 25,089 |
| 2013 | 10,136 | 4,126 | 14,262 |
| 2014 | 18,201 | 3,406 | 21,607 |
| 2015 | 34,801 | 3,522 | 38,323 |
| Total | 117,566 | 23,936 | 141,502 |
| FY 2013–FY 2015 Annual Average | 21,046 | 3,685 | 24,731 |

Source: Email correspondence with the U.S. Department of State's Bureau of Consular Affairs on December 2, 2015.

Population generally addressed in the 2013 Rule (certain immediate relatives of U.S. citizens).

Population impacted by this rule, excluding immediate relatives.

TABLE 4—NUMBER OF IMMIGRANT VISA INELIGIBILITY FINDINGS DUE TO UNLAWFUL PRESENCE AND ANY OTHER GROUND OF INADMISSIBILITY (OR VISA INELIGIBILITY)

| Fiscal year | Visa category type | | Total |
| | Immediate relatives | All other immigrants | |
|---|---|---|---|
| 2010 | 4,655 | 984 | 5,639 |
| 2011 | 4,679 | 1,768 | 6,447 |
| 2012 | 5,436 | 1,763 | 7,199 |
| 2013 | 3,891 | 1,471 | 5,362 |
| 2014 | 3,298 | 1,113 | 4,411 |
| 2015 | 4,323 | 1,087 | 5,410 |
| Total | 26,282 | 8,186 | 34,468 |
| FY 2013–FY 2015 Annual Average | 3,837 | 1,224 | 5,061 |

Source: Email correspondence with the U.S. Department of State's Bureau of Consular Affairs on December 2, 2015.

In the 2015 Proposed Rule, DHS based the demand for Form I–601A applications with and without the rule on the FY 2013 to FY 2014 average ratio of Form I–601A receipts to immigrant visa ineligibility findings based on unlawful presence inadmissibility grounds. Since the publication of the proposed rule, DOS provided DHS with revised data. Based on a review of the revised DOS ineligibility data, DHS has determined that using a year-specific ratio of receipts to ineligibility findings is no longer the best option to predict future provisional waiver demand because of recent changes in Form I–601A filing trends. DOS's new data suggests that the majority of immediate relatives found ineligible for an immigrant visa by DOS based on unlawful presence inadmissibility grounds in one fiscal year have filed provisional unlawful presence waivers of inadmissibility prior to DOS's immigrant visa ineligibility finding, though the dates of these separate events is unknown. Because the time lag between such filings and ineligibility findings is unknown, making same-year comparisons between these data could result in erroneous conclusions. As such, DHS believes it is most appropriate to estimate the future demand for provisional waivers in the absence of this rule using historical Form I–601A filing data.

In the absence of this rule, DHS projects that Form I–601A receipts from immediate relative immigrants would increase from their three-year average of 41,612 (see Table 2) by 2.5 percent per year based on the compound annual growth rate of the unauthorized immigrant population living in the United States between 2000 and 2012.[77] Under this method, USCIS would receive a projected 478,000 provisional waiver applications across 10 years of analysis in the absence of this rule, as shown in Table 5.

[75] Population generally addressed in the 2013 Rule (certain immediate relatives of U.S. citizens).

[76] Population impacted by this rule, excluding immediate relatives.

[77] Calculated by comparing the estimated unauthorized immigrant population living in the United States in 2000 (8,500,000) to the estimated unauthorized immigrant population living in the United States in 2012 (11,400,000). In recent years, the estimated unauthorized immigrant population has decreased. DHS uses the historical growth rate in the unauthorized immigrant population from 2000 to 2012 because it most likely reflects the population impacted by this rule. This population includes those who have likely been unlawfully present in the United States for an extended period and who have already started the immigrant visa process by having an approved petition. Source: U.S. Department of Homeland Security, Office of Immigration Statistics. *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012,* Figure 1, Unauthorized Immigrant Population: 2000–2012, Mar. 2013. *Available at http://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf.*

Exhibit 1
257

TABLE 5—PROJECTED NUMBER OF IM-
MEDIATE RELATIVE FORM I–601A
APPLICATIONS IN THE ABSENCE OF
RULE (POPULATION ADDRESSED IN
2013 RULE)

| Fiscal year | Form I–601A Receipts— Immediate Relatives [78] |
|---|---|
| Year 1 | 42,652 |
| Year 2 | 43,719 |
| Year 3 | 44,812 |
| Year 4 | 45,932 |
| Year 5 | 47,080 |
| Year 6 | 48,257 |
| Year 7 | 49,464 |
| Year 8 | 50,700 |
| Year 9 | 51,968 |
| Year 10 | 53,267 |
| Total | 477,851 |

**Notes:** The yearly estimates in this table were originally calculated using unrounded figures. Thereafter, all yearly estimates were simultaneously rounded for tabular presentation.

5. Population Affected by Rule

DHS does not believe this rule will induce any new demand above the status quo for filing petitions or immigrant visa applications for this expanded group of individuals. DHS bases this assumption on the fact that most of the newly eligible visa categories to which this rule will now apply (namely, family-sponsored, employment-based, diversity, and certain special immigrant visa categories) are generally subject, unlike the immediate relative category, to statutory visa issuance limits and lengthy visa availability waits due to oversubscription.[79] Even with this rule's elimination or modification of specific provisional waiver ineligibility criteria currently in place, DHS does not anticipate that a related rise in the demand for immigrant visas for immediate relatives of U.S. citizens will occur given the low historical share of applications denied for these reasons (approximately 9 percent as mentioned earlier). In addition, because immediate relative visas are readily available,

immediate relatives who were denied a provisional waiver previously have likely continued on with the consular interview process to obtain LPR status.[80] Therefore, DHS did not estimate that these immediate relatives would reapply for a provisional waiver. Furthermore, there is no evidence that the Secretary's November 2014 memorandum [81] on the expansion of the provisional waiver process spurred a significant increase in filings of the Petition for Alien Relative (Form I–130) or Immigrant Petition for Alien Worker (Form I–140).[82] Thus, DHS does not expect that this rule will increase the demand for the immigrant visa categories to which it applies.

With this rule's implementation, the number of provisional waiver applications is expected to increase from the figures listed in Table 5 as the provisional waiver eligibility criteria expands. This rule's broadened group of qualifying relatives for the provisional waiver's extreme hardship determination as well as its elimination or modification of current provisional waiver ineligibility provisions will allow some immediate relatives of U.S. citizens and LPRs to become eligible for provisional waivers. All other immigrant visa applicants [83] who are present in the United States and who otherwise meet the requirements of the provisional waiver process described in this final rule will also become eligible for provisional waivers.

[80] Immigrant visas for immediate relatives of U.S. citizens are unlimited, so they are always available. *See* INA section 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i). This means that immediate relatives do not have to wait in line for a visa number to become available for them to immigrate. Sources: U.S. Citizenship and Immigration Services. "Visa Availability and Priority Dates." *Available at http://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-and-priority-dates* (last reviewed/updated Nov. 5, 2015).

[81] *See* Memorandum from Jeh Charles Johnson, Secretary, DHS, to Léon Rodriguez, Director, USCIS, Expansion of the Provisional Waiver Program (Nov. 20, 2014). *Available at http://www.dhs.gov/sites/default/files/publications/14_1120_memo_i601a_waiver.pdf.*

[82] Based on a DHS comparison of Form I–130 and Form I–140 filings during the three months immediately following the Secretary's 2014 memorandum on the expansion of the provisional waiver program and during those same three months in FY 2013 and FY 2014.

[83] As previously mentioned, the phrase "all other immigrant visa applicants" encompasses the following immigrant visa categories: family-sponsored, employment-based, Diversity Visa, and (certain) special immigrant visa applicants. Examples of family relationships that fall under "all other immigrant visa applicants" include, but are not limited to, adult sons and daughters of U.S. citizens, brothers and sisters of U.S. citizens, and spouses and children of LPRs.

Immediate Relatives Affected by Rule

Some immediate relatives of U.S. citizens were denied provisional waivers under the 2013 Rule because USCIS had "reason to believe" that they were subject to a ground of inadmissibility other than unlawful presence. Others were denied because they were subject to a final order. This rule eliminates denials based on the reason-to-believe standard and modifies the ineligibility criteria related to final orders, thus allowing additional immediate relatives to become eligible for provisional waivers. As previously mentioned, Table 4 shows DOS's historical findings of immigrant visa ineligibility among immediate relatives due to unlawful presence and any other ground for denying visa issuance, such as being subject to a final order.[84] DHS believes that the population of immediate relatives found ineligible for immigrant visas based on unlawful presence and any other ground of inadmissibility shown in Table 4 best predicts the share of immediate relatives affected by the elimination or modification of ineligibility criteria in this rule, as the DOS figures presumably account for these provisional waiver ineligibilities.[85] According to the FY 2013 to FY 2015 annual average number of immediate relatives found ineligible for visas based on unlawful presence and any other ground of inadmissibility (and visa ineligibility) (3,837; *see* Table 4), and the historical 2.5 percent growth in the unauthorized immigrant population, DHS estimates that 3,933 immediate relatives will become eligible, and consequently apply, for provisional waivers as a direct result of this rule's expanded waiver eligibility during the rule's first year of implementation (*see* Table 6).

Table 6 shows that over a 10-year period of analysis, USCIS will receive approximately 44,000 provisional waiver applications from immediate relatives now eligible for provisional waivers based on this rule's elimination or modification of specific provisional

[84] Other grounds of inadmissibility barring visa eligibility can be found in INA section 212(a), 8 U.S.C. 1182(a).

[85] These ineligibility findings likely include the previously discussed 9 percent of historical Form I–601A applicants denied for the following reasons: an applicant's lack of a qualifying relative for the waiver's extreme hardship determination; reason to believe an applicant would be inadmissible based on grounds other than unlawful presence at the time of the immigrant visa interview; DOS initially acting before January 3, 2013 to schedule an applicant's immigrant visa interview; and an applicant being subject to a final order. However, due to data limitations, DHS does not know the exact number of ineligibility findings that correspond to provisional waiver denials.

[78] Estimated number of provisional waiver applications from the eligible population of immediate relatives. These applications do not necessarily correspond to waiver approvals.

[79] Family-sponsored immigrant visa applicants, who represent nearly 97 percent of the "all other immigrants" population found ineligible due to only unlawful presence inadmissibility grounds, currently face visa oversubscription. This means that any new family-sponsored visa applicants must wait in line for available visas. Depending on the applicant's country of chargeability and preference category, this wait could be many years. Source: U.S. Department of State. "Visa Bulletin: Immigrant Numbers for December 2015," IX (97), Nov. 2015. *Available at http://travel.state.gov/content/dam/visas/Bulletins/visabulletin_December2015.pdf.*

Exhibit 1
258

waiver ineligibility criteria. These figures reflect the assumption that the population of individuals historically found ineligible for immigrant visas based on unlawful presence and any other ground of inadmissibility will apply for provisional waivers even though they may still be inadmissible on another ground that would bar them from receiving an immigrant visa. However, these figures do not account for immediate relatives of U.S. citizens and LPRs who could become eligible for provisional waivers through this rule's broadened group of qualifying relatives for the provisional waiver's extreme hardship determination and for elimination of DOS scheduling date requirements. Due to data limitations, DHS cannot precisely measure the number of individuals impacted by these amendments, though based on historical denials, the number impacted will likely be small.[86]

Due to additional data limitations, DHS cannot determine the exact number of immediate relatives eligible to apply for provisional waivers under the 2013 Rule who either continued taking steps necessary to obtain LPR status or who abandoned the immigrant visa process altogether after being denied provisional waivers for the ineligibility criteria eliminated or modified with this rule (*e.g.*, DOS scheduling date requirements). DHS assumes for the purpose of this analysis that those immediate relatives who applied for provisional waivers prior to this final rule but were denied for the criteria eliminated or modified with this rule have continued taking the steps necessary to obtain LPR status rather than delay their immigration process. These individuals have likely sought waivers of the unlawful presence grounds of inadmissibility through the Form I–601 waiver process as part of obtaining their LPR status. For these reasons, DHS does not believe this rule will affect certain immediate relatives of U.S. citizens previously denied provisional waivers due to this rule's eliminated or modified criteria, and thus does not consider these individuals in the population affected by this rule. As such, Table 6 does not include these individuals.

[86] Of the provisional waiver applications adjudicated from FY 2013 to FY 2015, USCIS denied less than 1,000 applications in total based on an applicant's lack of a qualifying relative for the waiver's extreme hardship determination and for DOS initially acting before January 3, 2013 to schedule an applicant's immigrant visa interview. Source: Email correspondence with USCIS' National Benefits Center on October 7, 2015 and December 7, 2015.

TABLE 6—PROJECTED NUMBER OF IM-MEDIATE RELATIVE FORM I–601A APPLICATIONS RESULTING FROM RULE

| Fiscal year | Form I–601A Receipts—immediate relatives newly eligible for provisional waiver under rule [87] |
| --- | --- |
| Year 1 | 3,933 |
| Year 2 | 4,031 |
| Year 3 | 4,132 |
| Year 4 | 4,235 |
| Year 5 | 4,341 |
| Year 6 | 4,450 |
| Year 7 | 4,561 |
| Year 8 | 4,675 |
| Year 9 | 4,792 |
| Year 10 | 4,912 |
| Total | 44,062 |

**Notes:** The yearly estimates in this table were originally calculated using unrounded figures. Thereafter, all yearly estimates were simultaneously rounded for tabular presentation.

### All Other Immigrants Affected by Rule

In addition to the population of immediate relatives illustrated in Table 6, this rule will affect a portion of all other immigrant visa applicants. To capture the population of all other immigrant visa applicants (that is, those who are not immediate relative immigrant visa applicants) that may file for a provisional waiver due to this rule, DHS uses the following historical data: (1) DOS immigrant visa ineligibility findings due to only unlawful presence inadmissibility grounds (the population included in the 2015 Proposed Rule); (2) DOS immigrant visa ineligibility findings due to unlawful presence and any other inadmissibility ground (the population potentially now included in this final rule); and (3) growth in the unauthorized immigrant population. In particular, DHS applies the previously discussed 2.5 percent compound annual growth rate of unauthorized immigrants from 2000 to 2012 to the sum of the FY 2013 to FY 2015 annual averages of all other immigrant visa ineligibility findings due to: (1) Only unlawful presence inadmissibility grounds; and (2) unlawful presence and any other inadmissibility ground, which equals 4,909 (*see* Table 3 and Table 4).[88] For

[87] Estimated number of provisional waiver applications from the population of immediate relatives inadmissible due to unlawful presence and any other immigrant visa inadmissibility ground. These applications do not necessarily correspond to waiver approvals.

[88] Calculated as the FY 2013–FY 2015 average number of all other immigrant visa ineligibility

Year 1, DHS projects that Form I–601A applications from the population of all other immigrants now eligible for provisional waivers will measure approximately 5,032. For Years 2 through 10, applications are expected to range from 5,158 to 6,284 (*see* Table 7).[89] These figures partly reflect the assumption that the population of individuals historically found ineligible for immigrant visas based on unlawful presence and any other ground of inadmissibility will apply for provisional waivers even though they may still be inadmissible on another ground that would bar them from receiving an immigrant visa.

TABLE 7—PROJECTED NUMBER OF ALL OTHER IMMIGRANT FORM I–601A APPLICATIONS RESULTING FROM RULE

| Fiscal year | Form I–601A receipts—all other immigrants [90] |
| --- | --- |
| Year 1 | 5,032 |
| Year 2 | 5,158 |
| Year 3 | 5,286 |
| Year 4 | 5,419 |
| Year 5 | 5,554 |
| Year 6 | 5,693 |
| Year 7 | 5,835 |
| Year 8 | 5,981 |
| Year 9 | 6,131 |
| Year 10 | 6,284 |
| Total | 56,373 |

**Notes:** The yearly estimates in this table were originally calculated using unrounded figures. Thereafter, all yearly estimates were simultaneously rounded for tabular presentation.

### Total Population Affected by Rule

Table 8 outlines the entire population of immigrant visa applicants potentially impacted by this rule, as measured by the sum of Form I–601A receipts listed in Table 6 and Table 7. Across a 10-year period of analysis, DHS estimates that the provisional waiver applications from this rule's expanded population of individuals (including immediate relatives of U.S. citizens and LPRs, and

findings due to only unlawful presence (3,685) plus the FY 2013–FY 2015 average number of all other immigrant visa ineligibility findings due to unlawful presence and any other ground of inadmissibility (1,224) = 4,909.

[89] Year 1 figure calculated as the FY 2013–FY 2015 average number of all other immigrant visa ineligibility findings due to: (1) Only unlawful presence, and (2) unlawful presence and any other ground of inadmissibility of 4,909 multiplied by the assumed 2.5 percent growth rate (that is, 1.025), which equals 5,032.

[90] Estimated number of provisional waiver applications from the population of all other immigrants ineligible due to: (1) Only unlawful presence; and (2) unlawful presence and any other ground of inadmissibility. These applications do not necessarily correspond to waiver approvals.

Exhibit 1
259

family-sponsored, employment-based, Diversity Visa, and (certain) special immigrant visa applicants) will be nearly 100,000. These provisional waiver applications may ultimately result in waiver approvals or denials. Note that Table 8 presents only the additional Form I–601A filings that will occur as a result of this rule; it does not account for the provisional waiver applications that DHS anticipates will be filed in the absence of this rule by currently eligible certain immediate relatives of U.S. citizens (see Table 5). As stated earlier, the figures in Table 8 may underestimate the total Form I–601A applications resulting from this rule because they do not account for immediate relatives of U.S. citizens and LPRs who could become eligible for provisional waivers through this rule's broadened group of qualifying relatives for the provisional waiver's extreme hardship determination and its elimination of DOS scheduling date requirements. They could also overestimate the total Form I–601A applications resulting from this rule because they are partly based on the assumption that the population of individuals historically found ineligible for immigrant visas based on unlawful presence and any other ground of inadmissibility will apply for provisional waivers even though they may still be inadmissible on another ground that would bar them from receiving an immigrant visa.

TABLE 8—TOTAL FORM I–601A
APPLICATIONS RESULTING FROM RULE

| Fiscal year | Form I–601A receipts |
|---|---|
| Year 1 | 8,965 |
| Year 2 | 9,189 |
| Year 3 | 9,418 |
| Year 4 | 9,654 |
| Year 5 | 9,895 |
| Year 6 | 10,143 |
| Year 7 | 10,396 |
| Year 8 | 10,656 |
| Year 9 | 10,923 |
| Year 10 | 11,196 |
| Total | 100,435 |

**Notes:** The yearly estimates in this table were originally calculated using unrounded figures. Thereafter, all yearly estimates were simultaneously rounded for tabular presentation.

All public comments about specific elements of the projections, costs, or benefits of the rule are discussed earlier in the preamble.

6. Costs and Benefits

Costs

Individuals who are newly eligible to apply for a provisional waiver strictly

under this rule will bear the costs of this regulation. Although the waiver expansion may require the Federal Government (namely, DHS and USCIS) to expend additional resources on related adjudication personnel, equipment (e.g., computers and telephones), and occupancy demands, DHS expects these costs to be offset by the additional fee revenue collected from the Form I–601A filing fee and the biometric services fee. Currently, the filing fees for Form I–601A and biometric services are $585 and $85, respectively.[91] Accordingly, DHS does not believe this rule will impose additional net costs on the Federal Government.

With the exception of applicants subject to final orders,[92] eligible individuals must generally first complete Form I–601A and submit it to USCIS with its current $585 filing fee and $85 biometric services fee to receive a provisional waiver under this rule. DHS estimates the time burden of completing Form I–601A to be 1.5 hours, which translates to a time, or opportunity, cost of $15.89 per application.[93] DHS calculates the Form I–601A application's opportunity cost to individuals by first multiplying the current Federal minimum wage of $7.25 per hour by 1.46 to account for the full cost of employee benefits (such as paid leave, insurance, and retirement), which results in a time value of $10.59 per hour.[94] Then, DHS multiplies the

[91] Source of fee rates: U.S. Citizenship and Immigration Services. "I–601A, Application for Provisional Unlawful Presence Waiver." Available at http://www.uscis.gov/i-601a (last reviewed/ updated Oct. 7, 2015). The Form I–601A filing fee and biometric services fee are subject to change through the normal fee review cycle and any subsequent rulemaking issued by USCIS/DHS. USCIS/DHS will consider the impact of the provisional waiver and biometrics process workflows and resource requirements as a normal part of its biennial fee review. The biennial fee review determines if fees for immigration benefits are sufficient in light of resource needs and filing trends. See INA section 286(m), 8 U.S.C. 1356(m).

[92] As previously stated, individuals subject to a final order may now seek a provisional waiver only if they also request (and are approved for) consent to reapply for admission under INA section 212(a)(9)(A)(iii), 8 U.S.C. 1182(a)(9)(A)(iii) via an Application for Permission to Reapply for Admission into the United States After Deportation or Removal (Form I–212). Filing and receiving approval for a Form I–212 is a requirement already in place for individuals subject to inadmissibility under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A), to be eligible for an immigrant visa. Thus, USCIS does not include the cost to file Form I–212 to the applicable population of provisional waiver applicants in this rule.

[93] See 80 FR 16688 (Mar. 30, 2015) for the estimated Form I–601A completion time burden.

[94] Federal minimum wage information source: U.S. Department of Labor, Wage and Hour Division. "Wages- Minimum Wage." Available at http:// www.dol.gov/dol/topic/wages/minimumwage.htm

$10.59 hourly time value by the current 1.5-hour Form I–601A completion time burden to determine the opportunity cost for individuals to complete Form I–601A ($15.89). DHS recognizes that the individuals impacted by the rule are generally unlawfully present and not eligible to work; however, consistent with other DHS rulemakings, DHS uses wage rates as a mechanism to estimate the opportunity costs to individuals associated with completing this rule's required application and biometrics collection. The cost for applicants to initially file Form I–601A, including only the $585 filing fee and opportunity cost, equals $600.89.

After USCIS receives an applicant's completed Form I–601A and its filing and biometric services fees, the agency sends the applicant a notice scheduling him or her to visit a USCIS Application Support Center (ASC) for biometrics collection. Along with an $85 biometric services fee, the applicant will incur the following costs to comply with the provisional waiver's biometrics submission requirement: (1) The opportunity cost of traveling to an ASC, (2) the opportunity cost of submitting his or her biometrics, and (3) the mileage cost of traveling to an ASC. While travel times and distances to an ASC vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours. DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours.[95] By applying the $10.59 hourly time value for individuals to the total biometrics-related time burden of 3.67 hours, DHS finds that the opportunity cost for a provisional waiver applicant to travel to and from an ASC, and to submit biometrics, will total $38.87.[96] In addition to the opportunity cost of providing biometrics, provisional waiver applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the assumed 50-mile

(last accessed Dec. 7, 2015). Employer benefits adjustment information source: U.S. Department of Labor, Bureau of Labor Statistics. "Economic News Release: Employer Costs for Employee Compensation- September 2015, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group, September 2015- All Workers." Dec. 9, 2015. Available at http://www.bls.gov/ schedule/archives/ecec_nr.htm#current.

[95] See 80 FR 16688 (Mar. 30, 2015) for Form I–601A biometrics collection time burden.

[96] 3.67 hours multiplied by $10.59 per hour equals $38.87.

roundtrip distance to an ASC and the General Services Administration's travel rate of $0.575 per mile.[97] DHS assumes that each applicant will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each provisional waiver applicant. Adding the fee, opportunity, and travel costs of biometrics collection together, DHS estimates that the provisional waiver's requirement to submit biometrics will cost a total of $152.62 per Form I–601A filing.

Accounting for all of the fee, time, and travel costs to comply with the provisional waiver requirements, DHS finds that each Form I–601A filing will cost an applicant $753.51. Table 9 shows that the overall cost of this rule to the expanded population of provisional waiver applicants will measure $75.7 million (undiscounted) over the 10-year period of analysis. DHS calculates this rule's total cost to applicants by multiplying the individual cost of completing the provisional waiver application requirements ($753.51) by the number of newly eligible individuals projected to apply following the implementation of this rule (*see* Table 8). In present value terms, this rule will cost newly eligible waiver applicants $52.4 million to $64.2 million across a 10-year period at 7 percent and 3 percent discount rates, respectively (*see* Table 9). Because this rule will not generate any net costs to the Federal Government (as discussed previously), these costs to applicants also reflect the total cost of this rule. Depending on the population of individuals who apply for provisional waivers beyond the projections shown in Table 8, the costs of this rule may be over- or underestimated.

TABLE 9—TOTAL COST OF RULE TO
APPLICANTS/TOTAL COST OF RULE

| Fiscal year | Total waiver cost to applicants/ total cost of rule |
|---|---|
| Year 1 | $6,755,217 |
| Year 2 | 6,924,003 |
| Year 3 | 7,096,557 |
| Year 4 | 7,274,386 |
| Year 5 | 7,455,981 |
| Year 6 | 7,642,852 |
| Year 7 | 7,833,490 |
| Year 8 | 8,029,403 |
| Year 9 | 8,230,590 |

[97] 50 miles multiplied by $0.575 per mile equals $28.75. *See* 79 FR 78437 (Dec. 30, 2014) for the General Services Administration's mileage rate.

TABLE 9—TOTAL COST OF RULE TO
APPLICANTS/TOTAL COST OF
RULE—Continued

| Fiscal year | Total waiver cost to applicants/ total cost of rule |
|---|---|
| Year 10 | 8,436,298 |
| 10-Year Total: Undiscounted | 75,678,777 |
| 10-Year Total: Present Value, Discounted at 3 percent | 64,168,205 |
| 10-Year Total: Present Value, Discounted at 7 percent | 52,429,216 |

**Notes:** Estimates may not sum to total due to rounding. The cost estimates in this table are contingent upon Form I–601A filing (or receipt) projections as well as the discount rates applied.

Benefits

The benefits of this rule are largely the result of streamlining the immigrant visa process for an expanded population of individuals who are inadmissible to the United States due to unlawful presence. This rule will provide applicants seeking provisional waivers and their family members advance notice of USCIS' decision on their provisional waiver application prior to leaving the United States for their immigrant visa interviews abroad, offering many individuals the certainty of knowing they have been provisionally approved for a waiver of certain unlawful presence grounds of inadmissibility before departing from the United States. For those newly eligible individuals who receive a provisional waiver through this rule and their U.S. citizen or LPR family members, this rule's primary benefits are its reduced separation time among family members during the immigrant visa process. Instead of attending multiple immigrant visa interviews and waiting abroad while USCIS adjudicates a waiver application as required under the Form I–601 process, the provisional waiver process allows individuals to file a provisional waiver application while in the United States and receive a notification of USCIS' decision on their provisional waiver application before departing for DOS consular processing of their immigrant visa applications. Although DHS cannot estimate with precision the exact amount of separation time families will save through this rule, DHS estimates that some newly eligible individuals and their U.S. citizen or LPR family members could experience

several months of reduced separation time based on the average adjudication time for Form I–601 waiver applications.[98] In addition to the humanitarian and emotional benefits derived from reduced separation of families, DHS anticipates that the shortened periods of family separation resulting from this rule may lessen the financial burden U.S. citizens and LPRs face to support their immigrant relatives while they remain outside of the country. Because of data limitations, however, DHS cannot predict the exact financial impact of this change.

Due to the unique nature of the Diversity Visa program, individuals seeking an immigrant visa through that program and wishing to use the provisional waiver process are likely to enjoy fewer overall benefits from this rule than others. Although an individual may be selected to participate in the Diversity Visa program, he or she may not ultimately receive an immigrant visa due to visa unavailability. Under this rule, Diversity Visa selectees and their derivatives who wish to use the provisional waiver process may file a waiver application before knowing whether their immigrant visa will ultimately be available to them. For those pursuing the Diversity Visa track, the risk of completing the provisional waiver process without being issued a visa is higher compared to applicants of other immigrant visa categories filing Form I–601A.[99] If a Diversity Visa program selectee's provisional waiver is approved but he or she is not ultimately issued an immigrant visa, he or she will incur the costs but not obtain the benefits associated with a provisional waiver.

Based on USCIS and DOS efficiencies realized as a result of the current provisional waiver process, DHS believes that this rule could provide additional Federal Government efficiencies through its expansion to a larger population. As previously

[98] The average adjudication time of Form I–601 waivers is currently over five months. Source: U.S. Citizenship and Immigration Services. "USCIS Processing Time Information for the Nebraska Service Center-Form I–601." *Available at https://egov.uscis.gov/cris/processTimesDisplayInit.do* (last updated Feb. 11, 2016).

[99] There is a statutory maximum of 55,000 diversity visas authorized for allocation each fiscal year, but this number is reduced by up to 5,000 visas set aside exclusively for use under the Nicaraguan and Central American Relief Act. See NACARA section 203(d), as amended. DOS regularly selects more than 50,000 entrants to proceed on to the next step for diversity visa processing to ensure that all of the 50,000 diversity visas are allotted. Source: U.S. Department of State, Office of the Spokesman. Special Briefing: Senior State Department Official on the Diversity Visa Program. May 13, 2011. *Available at http://www.state.gov/r/pa/prs/ps/2011/05/166811.htm.*

Exhibit 1
261

described in the 2013 Rule, the provisional waiver process allows USCIS to communicate to DOS the status of the waiver application prior to an applicant's immigrant visa interview abroad. Such early communication eliminates the current need to transfer cases repeatedly between USCIS and DOS when adjudicating an immigrant visa application and Form I–601.[100] Through the provisional waiver process, DOS receives advance notification from USCIS of the discretionary decision to provisionally waive certain unlawful presence inadmissibility bars, allowing for better allocation of valuable agency resources like time, storage space, and human capital.

### D. Executive Order 13132

This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### E. Executive Order 12988 Civil Justice Reform

Section 3(c) of Executive Order 12988 requires Executive agencies to review regulations in light of applicable standards in section 3(a) and section 3(b) to determine whether they are met or it is unreasonable to meet one or more of them. DHS has completed the required review and determined that, to the extent permitted by law, this final rule meets the relevant standards of Executive Order 12988.

### F. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA), all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting and recordkeeping requirements inherent in a rule. See 44 U.S.C. 3507. This final rule requires that an applicant seeking a provisional waiver complete an *Application for Provisional Unlawful Presence Waiver*, Form I–601A, (OMB Control Number 1615–0123). This form is considered an information collection and is covered under the PRA. USCIS is currently seeking OMB approval of revisions that this final rule is causing to this information collection instrument. DHS specifically requested

public comments on the proposed changes to the Application for Provisional Unlawful Presence Waiver, Form I–601A, and the form instructions in the proposed rule in accordance with 5 CFR 1320.11(a). OMB reviewed the request filed in connection with the proposed rule and also filed comments in accordance with 5 CFR 1320.11(c).

#### 1. Comments on the Information Collection

DHS received several comments from the public directly related to the revised form and its instructions, and, in accordance with 5 CFR 1320.11(f), DHS has considered the comments, provided detailed responses to the comments on the form, and explained any modifications it has made in its submission to OMB. The comments and responses are summarized below.

##### a. The General Need for a Standardized Application Form

One commenter requested that USCIS adjudicate provisional waiver requests without requiring use of a specific form. The commenter believed requiring the completion of a standardized form effectively requires applicants to retain an immigration attorney, who may exploit them.

DHS has not accepted the suggestion. USCIS forms are generally designed for use by the public in a manner that standardizes the collection of necessary information and streamlines the adjudication of immigration benefits, which benefits both USCIS and applicants. Lack of a standardized information collection document, as well as the acceptance of ad hoc requests, could cause confusion and processing delays that adversely impact both USCIS and applicants. Standardized intake methods and forms help USCIS streamline processing requirements and minimize its costs, thereby moderating the fees it must charge for immigration benefit requests.

##### b. Form I–601A, Information About Your Immigrant Visa Petition or Your Immigrant Visa Case

DHS received several suggestions for improving the section of the form collecting information about the applicant's immigrant visa petition. Two commenters asked USCIS to include a section for applicants on Form I–601 [101] to indicate the name of the employer, sponsor, or petitioner. One of those commenters requested that the form include a section for applicants to submit information about approved

Immigration Petitions for Alien Worker, Forms I–140, particularly for beneficiaries under the employment-based third preference (EB–3) category.

DHS will not adopt this suggestion because it appears to be related to Form I–601 and not Form I–601A, the form used for this rule. Form I–601A already includes questions about the name of the petitioning employer or sponsor. See Part 3, Information About Your Immigrant Visa Petition and Your Immigrant Visa Case, Item Numbers 3 through 6 of Form I–601A.

Two commenters wanted to ensure that derivative spouses of principal beneficiaries are eligible for the provisional waiver. They requested that USCIS specifically ask whether the individual is filing this application based on an approved Form I–140 petition as a derivative spouse of the primary beneficiary and to provide the USCIS receipt number for the Form I–140 petition.

DHS agrees with the need to collect additional information, as suggested by the commenters, in light of this final rule's extension of eligibility for the provisional waiver to spouses and children who accompany or follow to join principal immigrants. DHS has added questions to Form I–601A about derivative spouses or children that should address the concern raised by the commenters.

##### c. Form I–601A, Date of Entry and Place or Port of Entry

One commenter suggested that Form I–601A applicants should be permitted to use approximate dates and places of entry when filling out the form, rather than only specific dates or places of entry. The commenter reasoned that it may be difficult for some applicants, especially those who entered at a young age or without lawful status, to specify an exact entry date or place.

Consistent with these comments, DHS has revised Part 1 of Form I–601A to permit applicants to provide approximate dates and places of entry, if necessary. Specifically, DHS added the phrase "on or about" to "Date of Entry (mm/dd/yyyy)" and "(actual or approximate)" after "Place or Port-of-Entry (City or Town)."

##### d. Form I–601A, and Instructions, Certain Inadmissibility and Criminal History Issues

One commenter requested that USCIS should not require Form I–601A applicants to provide all related court dispositions regarding criminal history if the disclosure of such court dispositions is prohibited by state law. The commenter was concerned that

---

[100] See 78 FR 536 (Jan. 3, 2013).

[101] Both commenters referred to Form I–601 rather than Form I–601A.

Exhibit 1
262

such a requirement would effectively ask applicants to violate state confidentiality laws or request records that may be impossible to obtain.

DHS did not adopt this suggestion. DHS does not believe that an individual's request for his or her own court dispositions, and the subsequent disclosure of that information to USCIS, would violate state confidentiality laws. Although state confidentiality laws may make it improper for a clerk of court to release information about a case to a third party, such laws do not prohibit the subjects of those proceedings from obtaining information about themselves.[102] USCIS may request any evidence relevant to the adjudication of an immigration benefit, including court records, when needed to assess the applicant's eligibility for the benefit. USCIS often requires court records to assess an applicant's eligibility for a provisional waiver, as well as to determine whether the applicant merits the waiver as a matter of discretion.

e. Form I–601A, Statement From Applicant

A commenter suggested that USCIS add questions related to hardship that would allow officers to quickly determine whether a threshold level of extreme hardship has been demonstrated. The commenter cited the Application for Suspension of Deportation or Special Rule Cancellation of Removal, Form I–881, as an example of a form that poses specific questions related to the establishment of extreme hardship.

DHS has not accepted this suggestion. Although Form I–881 includes questions relating to potential hardship, that form—unlike the provisional waiver application (and the statutory inadmissibility waiver grounds upon which it is based)—is used solely to adjudicate relief under NACARA, and thus utilizes questions generally tracking pertinent regulations outlining hardship factors that may be considered under the NACARA program. *See* 8 CFR 240.64; 8 CFR 1240.58(b). Because similar regulations do not exist in the provisional waiver context, DHS does not believe that adding specific hardship questions to Form I–601A is appropriate. Among other things, such questions may be understood as setting the contours of the extreme hardship determination in the provisional waiver context, which may unintentionally lead applicants to restrict the types of

evidence they submit to establish extreme hardship. Moreover, DHS notes that USCIS does provide, in the relevant form instructions, a list of non-exclusive factors that may be considered in making extreme hardship determinations. *See* Instructions to Form I–601 and Form I–601A.

f. Form I–601A Instructions, Criminal History Issues

One commenter suggested clarifications to the Form I–601A instructions regarding documentation of criminal history in two scenarios: those involving brief detentions and those where criminal records do not exist. First, the commenter suggested a change to the instructions to clarify that the relevant documentation requirements do not apply to an applicant unless he or she has been arrested for, or charged with, a criminal offense (*i.e.*, not individuals who were simply stopped or questioned by law enforcement authorities). Second, the commenter suggested a change to the instructions to clarify that an applicant may submit documents from a relevant court to show the lack of criminal charge or prosecution. To accomplish these two suggestions, the commenter recommended amending the instructions by inserting the following underlined text (and deleting the following text that has been struck through) in the instruction for Item Number 31: "For Item Number 31, if you were *arrested but* not charged with any crime or offense, provide a statement or other documentation from the arresting authority, or prosecutor's office, *or court, if available,* to show that you were not charged with any crime or offense."

In response to these suggestions, DHS has inserted the words "arrested but" and "or court" into the relevant instruction as suggested by the commenter. DHS agrees that the insertion of this language would provide additional clarity to applicants. DHS, however, did not add the words "if available" as suggested by the commenter, because USCIS believes it is self-evident that documents cannot be provided if they are not available. In this final rule, USCIS has provided applicants with various ways to prove the absence of a criminal conviction without necessarily specifying or limiting the types of documents USCIS will consider.

g. Form I–601A Instructions, Purpose of Form I–601A

A commenter suggested adding language to the Form I–601A instructions clarifying the categories of

individuals who may be eligible to apply for provisional waivers under this rule. Specifically, the commenter suggested adding the following underlined text to ensure that certain individuals are eligible to apply for provisional waivers: "Certain immigrant visa applicants who are relatives of U.S. citizen or Lawful Permanent Residents (LPRs); *family-sponsored immigrants; employment-based immigrants; special immigrants; and participants in the Diversity Visa Program* may use this application to request a provisional waiver of the unlawful presence grounds."

DHS has not adopted this suggestion. DHS believes the pre-existing language accurately captures those who have the requisite family relationships to apply for provisional waivers, including those who have become newly eligible to apply under this rulemaking. DHS believes the additional language suggested by the commenter could be read to imply that an applicant is not required to have the requisite relationship with a U.S. citizen or LPR in order to apply for a provisional waiver. DHS has thus not amended this portion of the Form I–601A instructions.

h. Form I–601A Instructions, Who May File

One commenter suggested that DHS add language to the Form I–601A instructions stating that individuals who are not immediate relatives and who filed more than one Form I–601A application are still eligible to file a subsequent Form I–601A application even if DOS acted, before the effective date of this rule, to schedule their first immigrant visa interview.

DHS has not adopted this suggestion. As noted previously, this final rule eliminates the regulatory provisions that make individuals ineligible for provisional waivers depending on the date on which DOS initially acted to schedule their immigrant visa interviews. Therefore, the commenter's suggested amendment is now unnecessary.

i. Form I–601A Instructions, Can I file other forms with Form I–601A?

One commenter suggested adding text to the Form I–601A instructions indicating that an applicant may request electronic notification of USCIS acceptance of the filing of Form I–601A by filing Form G–1145, E-Notification of Application/Petition Acceptance, along with Form I–601A.

DHS adopted this suggestion.

---

[102] For example, California state law specifies that individuals can obtain a copy of their own case files and can subsequently disclose such records freely. *See* Cal. Welf. & Inst. Code § 827(a)(1)(C) and (5).

Exhibit 1
263

j. Form I–601A Instructions, General Instructions

One commenter suggested changes to the Form I–601A instructions to make it easier for individuals with a physical or developmental disability or mental impairment to request waivers. Specifically, the commenter recommended replacing the portion of the Form I–601A instructions concerning the ability of a legal guardian to sign for a mentally incompetent individual with the following: "A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment."

DHS has not adopted this suggestion, as the Department believes that current regulations are sufficient to address the commenter's concerns. First, current regulations provide that a legal guardian may sign for an individual who is mentally incompetent. *See* 8 CFR 103.2(a)(2). Second, even if no legal guardianship has been established, applicants with disabilities have various options for affecting signatures. Under USCIS policy, a valid signature does not need to be legible or in English, and it may be abbreviated provided it is consistent with the manner in which the individual normally signs his or her name. An individual who is unable to write in any language may place an "X" or similar mark in lieu of a signature. DHS believes existing regulations already address the commenters concern and did not adopt the suggestion.

k. Form I–601A Instructions, General Instructions

One commenter requested that DHS include an example of a translation certification in the Form I–601A instructions.

DHS did not adopt this suggestion. Regulations require that any document containing foreign language submitted to USCIS must be accompanied by (1) a full English language translation that the translator has certified as complete and accurate, and (2) the translator's certification that he or she is competent to translate from the foreign language into English. *See* 8 CFR 103.2(b)(3). DHS believes the regulation is sufficiently clear, and the Department is worried that providing an example translation certification will be understood by applicants as a required form, thus effectively limiting options for obtaining translation services.

l. Form I–601A Instructions, Specific Instructions

One commenter suggested providing applicants with additional instructions

to help clarify when individuals are deemed to be admitted or to have entered without inspection. Specifically, the commenter suggested that DHS replace the term "EWI" (entry without inspection) with "no lawful status" in the Form I–601A instructions and to add a note to the instructions indicating that applicants without lawful status who entered at a port of entry may have nevertheless entered pursuant to inspection and admission. The commenter, citing to the decision of the Board of Immigration Appeals at *Matter of Quilantan*, 25 I. & N. Dec. 285 (BIA 2010), stated that an individual without lawful status who is nevertheless permitted to enter the United States at a port of entry may be "admitted," even if the inspection at the port did not comply with substantive legal requirements and there is no record of the individual having been admitted in any particular status.

DHS has not adopted these suggestions. DHS believes that the form instructions are sufficiently clear for applicants to appropriately answer all relevant questions. DHS does not believe it is necessary to add reminders or warnings on the issue raised by the commenter, as DHS does not believe that an applicant will erroneously state that he or she is present without admission or parole.

m. Form I–601A Instructions, Immigration or Criminal History

One commenter requested that the Form I–601A instructions be amended to provide information about grants of voluntary departure and how such grants affect the provisional waiver process. Specifically, the commenter requested that the instructions include a provision specifying that an immigration judge may grant voluntary departure, or dismiss or terminate removal proceedings, prior to the applicant leaving the United States for immigrant visa processing.

DHS has not adopted this suggestion, as an individual granted voluntary departure is not eligible for a provisional waiver. USCIS, however, modified Form I–601A by including a question asking whether the applicant has been granted voluntary departure. USCIS also made corresponding amendments in the form instructions.

n. Form I–601A Instructions, Penalties

One commenter asserted that USCIS established an overly broad standard for denying Form I–601A applications, as well as other immigration benefits, due to the submission of false documents with such applications. To address this concern, the commenter suggested that

the Form I–601A instructions be amended to indicate that applications will be denied only if the applicants submit "materially" false documents.

DHS has not adopted the commenter's suggestion, as there are existing statutory requirements regarding the use of false documents. DHS, however, has modified the relevant language in the form instructions to more closely match the language of 8 U.S.C. 1324c and 18 U.S.C. 1001(a), which relate to civil and criminal penalties for the use of false documents to defraud the U.S. Government or obtain an immigration benefit. The new language reads, "If you knowingly and willfully falsify or conceal a material fact or submit a false, altered, forged, or counterfeited writing or document with your Form I–601A, we will deny your Form I–601A and may deny any other immigration benefit."

2. Changes to the Information Collection (OMB Control No. 1615–0123)

DHS has revised the Form I–601A as indicated in the preceding responses. The revised form and instructions are available for review at *http://www.reginfo.gov/public/do/PRAMain* under OMB control number 1615–0123, or at *https://www.regulations.gov/#!home* in docket USCIS–2012–0003.

As a result of the final rule's elimination or modification of certain provisional waiver eligibility criteria, and a result of newer and better data and historical source data revisions,[103] DHS has updated the supporting statement for the Form I–601A. The update reflects changes in the respondent estimates that USCIS projected in the 2015 Proposed Rule. In the 2015 Proposed Rule, DHS estimated that approximately 10,258 new respondents would file applications for provisional waivers because of the changes proposed by the rule. DHS also estimated that 42,707 individuals currently eligible for provisional waivers would file Form I–601 applications in the future. DHS has revised these estimates, projecting that approximately 9,191 new respondents will file applications for provisional waivers because of the changes in this final rule and 43,728 individuals currently eligible for provisional waivers will file Form I–601 applications in the future. With these changes in the number of Form I–601A applications, the estimate for the total number of respondents has been

[103] DOS determined that its rules used to collect the inadmissibility data included in the 2015 Proposed Rule resulted in errors. DOS has since revised its rules to correct the errors.

Exhibit 1
264

updated from 52,965 to 52,918, which represents a decrease of 47 respondents. The current burden hour inventory approved for this form is 141,417 hours, and the requested new hour burden is 141,292 hours. This revision reflects an increase (47,841 annual burden hours) in the annual burden hours previously reported for this information collection.

Overview of this information collection (OMB Control Number 1615–0123):

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Provisional Unlawful Presence Waiver.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring, the collection:* I–601A; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households: Individuals who are: (a) Immigrant visa applicants, including (1) immediate relatives, (2) individuals seeking to immigrate under a family-sponsored, employment-based, or special immigrant visa category, or (3) Diversity Visa selectees and derivatives; and (b) applying from within the United States for a provisional waiver under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), before obtaining an immigrant visa abroad.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–601A is 52,918 and the estimated hour burden per response is 1.5 hours; and 52,918 respondents providing biometrics at 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 141,292 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $1,496,282.

## G. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules.

The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act and certifies that this rule will not have a significant economic impact on a substantial number of small entities. The factual basis for this determination is that this rule directly regulates individuals, who are not, for purposes of the Regulatory Flexibility Act, within the definition of small entities established by 5 U.S.C. 601(6). DHS received no public comments challenging this certification.

## List of Subjects

Accordingly, DHS adopts the regulatory amendments proposed on July 22, 2015. In addition, DHS modifies certain provisions based on comments received in response to the proposed rule so that chapter I of title 8 of the Code of Federal Regulations reads as follows:

### 8 CFR Part 103

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

## PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135; 6 U.S.C. 1 *et seq.;* E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2; Pub. L. 112–54.

### § 103.2   [Amended]

■ 2. Section 103.2 is amended by:
■ a. In paragraphs (a)(2) and (3), (b)(6) and (7), and (b)(9) and (10) by removing "an benefit request" and adding in its place "a benefit request", wherever it appears; and
■ b. In paragraph (b)(12) by removing "An benefit request" and adding in its place "A benefit request", wherever it appears.

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 3. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); 8 CFR part 2. Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 4. Section 212.7 is amended by:
■ a. Removing the paragraph (a) subject heading; and
■ b. Revising paragraph (e).
The revision reads as follows:

### 212.7   Waivers of certain grounds of inadmissibility.

\*    \*    \*    \*    \*

(e) *Provisional unlawful presence waivers of inadmissibility.* The provisions of this paragraph (e) apply to certain aliens who are pursuing consular immigrant visa processing.

(1) *Jurisdiction.* USCIS has exclusive jurisdiction to grant a provisional unlawful presence waiver under this paragraph (e). An alien applying for a provisional unlawful presence waiver must file with USCIS the form designated by USCIS, with the fees prescribed in 8 CFR 103.7(b), and in accordance with the form instructions.

(2) *Provisional unlawful presence waiver; in general.* (i) USCIS may adjudicate applications for a provisional unlawful presence waiver of inadmissibility based on section 212(a)(9)(B)(v) of the Act filed by eligible aliens described in paragraph (e)(3) of this section. USCIS will only approve such provisional unlawful presence waiver applications in accordance with the conditions outlined in paragraph (e) of this section. Consistent with section 212(a)(9)(B)(v) of the Act, the decision whether to approve a provisional unlawful presence waiver application is discretionary. A pending or approved provisional unlawful presence waiver does not constitute a grant of a lawful immigration status or a period of stay authorized by the Secretary.

(ii) A pending or an approved provisional unlawful presence waiver does not support the filing of any application for interim immigration benefits, such as employment authorization or an advance parole document. Any application for an advance parole document or employment authorization that is submitted in connection with a provisional unlawful presence waiver application will be rejected.

Exhibit 1
265

(3) *Eligible aliens.* Except as provided in paragraph (e)(4) of this section, an alien may be eligible to apply for and receive a provisional unlawful presence waiver for the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act if he or she meets the requirements in this paragraph. An alien may be eligible to apply for and receive a waiver if he or she:

(i) Is present in the United States at the time of filing the application for a provisional unlawful presence waiver;

(ii) Provides biometrics to USCIS at a location in the United States designated by USCIS;

(iii) Upon departure, would be inadmissible only under section 212(a)(9)(B)(i) of the Act at the time of the immigrant visa interview;

(iv) Has a case pending with the Department of State, based on:

(A) An approved immigrant visa petition, for which the Department of State immigrant visa processing fee has been paid; or

(B) Selection by the Department of State to participate in the Diversity Visa Program under section 203(c) of the Act for the fiscal year for which the alien registered;

(v) Will depart from the United States to obtain the immigrant visa; and

(vi) Meets the requirements for a waiver provided in section 212(a)(9)(B)(v) of the Act.

(4) *Ineligible aliens.* Notwithstanding paragraph (e)(3) of this section, an alien is ineligible for a provisional unlawful presence waiver under paragraph (e) of this section if:

(i) The alien is under the age of 17;

(ii) The alien does not have a case pending with the Department of State, based on:

(A) An approved immigrant visa petition, for which the Department of State immigrant visa processing fee has been paid; or

(B) Selection by the Department of State to participate in the Diversity Visa program under section 203(c) of the Act for the fiscal year for which the alien registered;

(iii) The alien is in removal proceedings, in which no final order has been entered, unless the removal proceedings are administratively closed and have not been recalendared at the time of filing the application for a provisional unlawful presence waiver;

(iv) The alien is subject to an administratively final order of removal, deportation, or exclusion under any provision of law (including an *in absentia* order under section 240(b)(5) of the Act), unless the alien has already filed and USCIS has already granted,

before the alien applies for a provisional unlawful presence waiver under 8 CFR 212.7(e), an application for consent to reapply for admission under section 212(a)(9)(A)(iii) of the Act and 8 CFR 212.2(j);

(v) CBP or ICE, after service of notice under 8 CFR 241.8, has reinstated a prior order of removal under section 241(a)(5) of the Act, either before the filing of the provisional unlawful presence waiver application or while the provisional unlawful presence waiver application is pending; or

(vi) The alien has a pending application with USCIS for lawful permanent resident status.

(5) *Filing.* (i) An alien must file an application for a provisional unlawful presence waiver of the unlawful presence inadmissibility bars under section 212(a)(9)(B)(i)(I) or (II) of the Act on the form designated by USCIS, in accordance with the form instructions, with the fee prescribed in 8 CFR 103.7(b), and with the evidence required by the form instructions.

(ii) An application for a provisional unlawful presence waiver will be rejected and the fee and package returned to the alien if the alien:

(A) Fails to pay the required filing fee or correct filing fee for the provisional unlawful presence waiver application;

(B) Fails to sign the provisional unlawful presence waiver application;

(C) Fails to provide his or her family name, domestic home address, and date of birth;

(D) Is under the age of 17;

(E) Does not include evidence of:

(1) An approved immigrant visa petition;

(2) Selection by the Department of State to participate in the Diversity Visa Program under section 203(c) of the Act for the fiscal year for which the alien registered; or

(3) Eligibility as a derivative beneficiary of an approved immigrant visa petition or of an alien selected for participation in the Diversity Visa Program as provided in this section and outlined in section 203(c) of the Act.

(F) Fails to include documentation evidencing:

(1) That the alien has paid the immigrant visa processing fee to the Department of State for the immigrant visa application upon which the alien's approved immigrant visa petition is based; or

(2) In the case of a diversity immigrant, that the Department of State selected the alien to participate in the Diversity Visa Program for the fiscal year for which the alien registered.

(6) *Biometrics.* (i) All aliens who apply for a provisional unlawful

presence waiver under this section will be required to provide biometrics in accordance with 8 CFR 103.16 and 103.17, as specified on the form instructions.

(ii) *Failure to appear for biometric services.* If an alien fails to appear for a biometric services appointment or fails to provide biometrics in the United States as directed by USCIS, a provisional unlawful presence waiver application will be considered abandoned and denied under 8 CFR 103.2(b)(13). The alien may not appeal or file a motion to reopen or reconsider an abandonment denial under 8 CFR 103.5.

(7) *Burden and standard of proof.* The alien has the burden to establish, by a preponderance of the evidence, eligibility for a provisional unlawful presence waiver as described in this paragraph, and under section 212(a)(9)(B)(v) of the Act, including that the alien merits a favorable exercise of discretion.

(8) *Adjudication.* USCIS will adjudicate a provisional unlawful presence waiver application in accordance with this paragraph and section 212(a)(9)(B)(v) of the Act. If USCIS finds that the alien is not eligible for a provisional unlawful presence waiver, or if USCIS determines in its discretion that a waiver is not warranted, USCIS will deny the waiver application. Notwithstanding 8 CFR 103.2(b)(16), USCIS may deny an application for a provisional unlawful presence waiver without prior issuance of a request for evidence or notice of intent to deny.

(9) *Notice of decision.* (i) USCIS will notify the alien and the alien's attorney of record or accredited representative of the decision in accordance with 8 CFR 103.2(b)(19). USCIS may notify the Department of State of the denial of an application for a provisional unlawful presence waiver. A denial is without prejudice to the alien's filing another provisional unlawful presence waiver application under this paragraph (e), provided the alien meets all of the requirements in this part, including that the alien's case must be pending with the Department of State. An alien also may elect to file a waiver application under paragraph (a)(1) of this section after departing the United States, appearing for his or her immigrant visa interview at the U.S. Embassy or consulate abroad, and after the Department of State determines the alien's admissibility and eligibility for an immigrant visa.

(ii) Denial of an application for a provisional unlawful presence waiver is not a final agency action for purposes of

Exhibit 1
266

section 10(c) of the Administrative Procedure Act, 5 U.S.C. 704.

(10) *Withdrawal of waiver applications.* An alien may withdraw his or her application for a provisional unlawful presence waiver at any time before USCIS makes a final decision. Once the case is withdrawn, USCIS will close the case and notify the alien and his or her attorney or accredited representative. The alien may file a new application for a provisional unlawful presence waiver, in accordance with the form instructions and required fees, provided that the alien meets all of the requirements included in this paragraph (e).

(11) *Appeals and motions to reopen.* There is no administrative appeal from a denial of a request for a provisional unlawful presence waiver under this section. The alien may not file, pursuant to 8 CFR 103.5, a motion to reopen or reconsider a denial of a provisional unlawful presence waiver application under this section.

(12) *Approval and conditions.* A provisional unlawful presence waiver granted under this section:

(i) Does not take effect unless, and until, the alien who applied for and obtained the provisional unlawful presence waiver:

(A) Departs from the United States;

(B) Appears for an immigrant visa interview at a U.S. Embassy or consulate; and

(C) Is determined to be otherwise eligible for an immigrant visa by the Department of State in light of the approved provisional unlawful presence waiver.

(ii) Waives, upon satisfaction of the conditions described in paragraph (e)(12)(i), the alien's inadmissibility under section 212(a)(9)(B) of the Act only for purposes of the application for an immigrant visa and admission to the United States as an immigrant based on the approved immigrant visa petition upon which a provisional unlawful presence waiver application is based or selection by the Department of State to participate in the Diversity Visa Program under section 203(c) of the Act for the fiscal year for which the alien registered, with such selection being the basis for the alien's provisional unlawful presence waiver application;

(iii) Does not waive any ground of inadmissibility other than, upon satisfaction of the conditions described in paragraph (e)(12)(i), the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act.

(13) *Validity.* Until the provisional unlawful presence waiver takes full effect as provided in paragraph (e)(12) of this section, USCIS may reopen and reconsider its decision at any time. Once a provisional unlawful presence waiver takes full effect as defined in paragraph (e)(12) of this section, the period of unlawful presence for which the provisional unlawful presence waiver is granted is waived indefinitely, in accordance with and subject to paragraph (a)(4) of this section.

(14) *Automatic revocation.* The approval of a provisional unlawful presence waiver is revoked automatically if:

(i) The Department of State denies the immigrant visa application after completion of the immigrant visa interview based on a finding that the alien is ineligible to receive an immigrant visa for any reason other than inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act. This automatic revocation does not prevent the alien from applying for a waiver of inadmissibility for unlawful presence under section 212(a)(9)(B)(v) of the Act and 8 CFR 212.7(a) or for any other relief from inadmissibility on any other ground for which a waiver is available and for which the alien may be eligible;

(ii) The immigrant visa petition approval associated with the provisional unlawful presence waiver is at any time revoked, withdrawn, or rendered invalid but not otherwise reinstated for humanitarian reasons or converted to a widow or widower petition;

(iii) The immigrant visa registration is terminated in accordance with section 203(g) of the Act, and has not been reinstated in accordance with section 203(g) of the Act; or

(iv) The alien enters or attempts to reenter the United States without inspection and admission or parole at any time after the alien files the provisional unlawful presence waiver application and before the approval of the provisional unlawful presence waiver takes effect in accordance with paragraph (e)(12) of this section.

**Jeh Charles Johnson,**

*Secretary.*

[FR Doc. 2016–17934 Filed 7–28–16; 8:45 am]

**BILLING CODE 9111–97–P**

Exhibit 1
267

# **Action 27**

Worksite Enforcement Strategy

Exhibit 1
268

*Office of Investigations*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, DC  20536

APR 3 0 2009



U.S. Immigration
and Customs
Enforcement

MEMORANDUM FOR:    Assistant Director
                   Deputy Assistant Directors
                   Special Agents in Charge

FROM:              Marcy M. Forman 
                   Director, Office of Investigations

SUBJECT:           Worksite Enforcement Strategy


**Worksite Enforcement Strategy**

## I.    The Purpose and Priorities of Worksite Enforcement

The prospect for employment in the United States continues to be one of the leading causes of illegal immigration, creating a market for criminal smuggling organizations who exploit people willing to pay high fees and take great risks to enter the United States without detection.  Immigration and Customs Enforcement (ICE) has a vital responsibility to engage in effective worksite enforcement to reduce the pull of illegal employment, ease pressure at the border, and protect employment opportunities for the nation's lawful workforce.

DHS has extensive but finite resources which it must effectively allocate.  Arresting and removing illegal workers must be part of a strategy to deter unlawful employment, but alone is insufficient as a comprehensive worksite enforcement strategy.  Of the more than 6,000 arrests related to worksite enforcement in 2008, only 135 were of employers. Enforcement efforts focused on employers better target the root causes of illegal immigration. An effective strategy must do all of the following:  1) penalize employers who knowingly hire illegal workers; 2) deter employers who are tempted to hire illegal workers; and 3) encourage all employers to take advantage of well-crafted compliance tools. To accomplish these goals, ICE must prioritize the criminal prosecution of the actual employers who knowingly hire illegal workers because such employers are not sufficiently punished or deterred by the arrest of their illegal workforce.

Although criminal prosecution of employers will efficiently advance the stated goal of worksite enforcement, ICE will not rely solely on that approach.  ICE will continue to fulfill its responsibility to arrest and process for removal illegal workers encountered during worksite enforcement operations.  Furthermore, ICE will use all available civil and administrative tools, including civil fines and debarment, to penalize and deter illegal employment.

Exhibit 1
269          www.ice.gov

SUBJECT: Worksite Enforcement Strategy
Page 2

ICE will strategically approach worksite enforcement efforts to maximize their impact. To that end, ICE offices should refer to this Worksite Enforcement Strategy when beginning any worksite enforcement investigation. ICE offices also must refer to the reporting requirements and humanitarian guidelines applicable to worksite enforcement operations.

## II.     Criminal Prosecution of Employers

- The criminal prosecution of employers[1] is a priority of ICE's worksite enforcement (WSE) program and interior enforcement strategy.
- ICE is committed to targeting employers, owners, corporate managers, supervisors, and others in the management structure of a company for criminal prosecution through the use of carefully planned criminal investigations.
- ICE offices should utilize the full range of reasonably available investigative methods and techniques, including but not limited to: use of confidential sources and cooperating witnesses, introduction of undercover agents, consensual and non-consensual intercepts and Form I-9 audits.
- ICE offices should consider the wide variety of criminal offenses that may be present in a worksite case. ICE offices should look for evidence of the mistreatment of workers, along with evidence of trafficking, smuggling, harboring, visa fraud, identification document fraud, money laundering, and other such criminal conduct.
- Absent exigent circumstances, ICE offices should obtain indictments, criminal arrest or search warrants, or a commitment from a U.S. Attorney's Office (USAO) to prosecute the targeted employer before arresting employees for civil immigration violations at a worksite. In the absence of a timely commitment from a USAO, ICE offices should obtain guidance from ICE Headquarters prior to proceeding with a worksite enforcement operation.

## III.     Administrative and Civil Tools

ICE offices should use administrative tools to advance criminal cases and, in the absence of criminal charges, to support the imposition of civil fines or other available penalties.

### A. Form I-9 Audits

The most important administrative tool is the Notice of Inspection (NOI) and the resulting administrative Form I-9 audit.

- The Form I-9 audit process will be utilized in both criminal and administrative investigations to identify illegal workers, including criminal aliens employed at a business.
- Although auditors will assume primary responsibility for conducting Form I-9 audits, ICE special agents and auditors must coordinate closely because this process will often serve as an important step in the criminal investigation and prosecution of employers.

---

[1] In this context, "employer" refers to someone involved in the hiring or management of employees. This includes owners, CEOs, supervisors, managers and other occupational titles.

Exhibit 1
270

SUBJECT: Worksite Enforcement Strategy
Page 3

- ICE offices may issue documents to employers, including Discrepancy and Suspect Document letters, for the purpose of fostering prompt corrections in hiring and documentation practices and also laying the groundwork to establish probable cause to support subsequent criminal charges if corrections are not made.

### B. Civil Fines

Civil fines, although not as key as criminal prosecution, are an important part of an effective worksite enforcement strategy. These fines provide a penalty when the evidence is not sufficient to support a criminal prosecution or as otherwise appropriate. In the mid-1990's, employers received notices of intent to fine (NIFs) totaling $26 million.

- ICE offices should work with attorneys in OPLA when issuing a NIF, to facilitate the collection of civil fines for each worker employed in violation of the law.

### C. Debarment Proceedings

Debarment precludes companies that have knowingly hired illegal workers from securing work on federal contracts. Debarment, therefore, carries highly significant consequences. As ICE increasingly pursues debarment, the practice may have a significant deterrent effect.

- ICE offices should initiate the debarment process, if appropriate, following the successful prosecution of an employer or the occurrence of another trigger to debarment.

### D. Outreach

Through the ICE Mutual Agreement between Government and Employers (IMAGE) program and other means, ICE will continue to seek out employers who want to comply with our nation's immigration laws and provide them with the training and tools they need to minimize the risk of unwittingly hiring illegal workers.

## IV.   Critical Infrastructure and National Security Sites

- ICE has a responsibility to help assure a legal workforce at America's critical infrastructure workplaces and other security-sensitive locations. Based on careful investigative work, ICE will initiate audits, searches, and targeted employee interviews to remove unlawful workers from such worksites.
- Whenever possible, critical infrastructure protection enforcement operations also will target the employer, including contractors, for criminal or administrative penalties.

## V.   Executing a Worksite Enforcement Operation

Historically, ICE's worksite enforcement operations receive significant attention from Congress, non-governmental organizations, the press, and the public. In addition, particularly because the arrest of a number of illegal workers at the same site can have rippling

Exhibit 1
271

SUBJECT: Worksite Enforcement Strategy
Page 4
consequences on others in the community, ICE offices must refer to and comply with the following:

### A. Reporting Requirements

All worksite investigations will adhere to pre-existing reporting requirements, including providing 14-day notice to ICE Headquarters in advance of developing or executing enforcement activity. Advance reporting should include a comprehensive operational plan with a section dedicated to the prosecution plan as well as the worksite operation checklist. Requests for exceptions due to exigent circumstances will require immediate telephonic notification to the Assistant Director, Operations.

### B. Humanitarian Guidelines

The existing humanitarian guidelines, found on the Office of Investigation's intranet, remain in effect, except they will apply to all worksite enforcements involving 25 or more illegal workers rather than 150.

## VI.   Conclusion

ICE is committed to robust worksite enforcement. The above guidance re-prioritizes and refines the existing ICE worksite enforcement strategy and methodology, in order to emphasize the criminal prosecution of employers who violate the law. This strategy is subject to further refinements and improvements as deemed necessary. Additional guidance will be issued in the Special Agent Handbook, currently under revision. While ICE is re-focusing efforts to develop criminal cases against employers who hire and use illegal workers, the administrative arrest of the illegal workforce under ICE's existing immigration authorities continues to be an integral aspect of the overall ICE worksite enforcement strategy. To ensure maximum deterrence, ICE also will pursue all other available tools to encourage employers to utilize and rely on this nation's lawful workforce.

Exhibit 1
272

# **Action 28**

Additional Guidance on Determining Periods of Admission for Foreign Nationals
Previously Admitted as H-4 Nonimmigrants who are Seeking H-2 or H-3 Status

Exhibit 1
273

<div style="border:1px solid">
**INTERIM MEMO FOR COMMENT**

Posted:                          11-15-2013

Comment period ends:   12-02-2013

This memo is in effect until further notice.
</div>

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000



**U.S. Citizenship
and Immigration
Services**

November 11, 2013                                    PM-602-0092

# Policy Memorandum

SUBJECT:   Additional Guidance on Determining Periods of Admission for Foreign Nationals
           Previously Admitted as H-4 Nonimmigrants who are Seeking H-2 or H-3 Status

**Purpose**

This policy memorandum (PM) provides additional guidance regarding how Immigration
Services Officers (ISOs) should determine periods of admission for a foreign national.
Specifically, this PM clarifies that time spent as an H-4 dependent does not count against the
maximum allowable periods of stay available to principals in H-2A, H-2B, or H-3 status.  This
PM updates Chapter 31.2(d)(2) of the Adjudicator's Field Manual (AFM), AFM Update AD13-
12.

**Scope**

Unless specifically exempted herein, this PM applies to and is binding on all U.S. Citizenship
and Immigration Services (USCIS) employees.

**Authorities**

- Immigration and Nationlity Act (INA) 101(a)(15)(H)(ii)(a), (ii)(b), and (iii)
- 8 CFR 214.2(h)(5)(viii)(C)
- 8 CFR 214.2(h)(9)(iii)(C)(1) and (2)
- 8 CFR 214.2(h)(13)(iv) and (v)
- 8 CFR 214.2(h)(15)(ii)(C) and (D)

**I. Introduction**

A foreign national may be admitted to the United States in H-2A or H-2B status for a maximum
period of three years.[1]  A foreign national may be admitted to the United States in H-3 trainee
status for a period of up to two years, and an H-3 participant in a special education program may
be admitted to the United States for a period of up to 18 months.[2]

---

[1] 8 CFR 214.2(h)(5)(viii)(C) and  8 CFR 214.2(h)(15)(ii)(C).  This regulation also limits the total period of stay to
45 days for H-2B workers in the Virgin Islands.
[2] 8 CFR 214.2(h)(9)(iii)(C)(1) and (2) and 8 CFR 214.2(h)(15)(ii)(D).

Exhibit 1
274

At the end of the maximum period of stay, the foreign national must either change to a different status or depart the United States. With some exceptions, USCIS regulations provide that a foreign national who has been outside the United States for the requisite three months may be eligible for a new period of admission of three years in H-2 status.[3] Further, USCIS regulations provide that a foreign national who has been outside the United States for the immediate prior six months may, generally, be eligible for a new two-year period of admission in H-3 trainee status or a new 18-month period of admission as an H-3 participant in a special education program.[4]

## II. Previous Guidance Still Valid

On December 5, 2006, USCIS issued a memorandum stating that time spent as an H-4 and/or L-2 nonimmigrant does not count against, and is therefore "decoupled" from, the maximum period of admission allowable as an H-1B and/or L-1 nonimmigrant respectively.[5] All of the provisions of that memorandum remain in effect. This PM supplements the existing guidance and updates the AFM accordingly.

## III. Policy

USCIS currently allows H-1B nonimmigrants to decouple H-4 time when calculating their maximum period of authorized stay. USCIS has determined that extending the decoupling policy to the H-2 and H-3 nonimmigrant classifications is appropriate because it is consistent with the statutory and regulatory framework along with the policy of promoting family unity.

As noted in the introduction, the statutory and regulatory framework allows an eligible foreign national a period of three years of authorized stay as an H-2 nonimmigrant or up to two years of authorized stay as an H-3 trainee or up to 18 months of authorized stay as an H-3 participant in a special education program. This interpretation promotes family unity by affording each qualified spouse the opportunity to be granted the maximum period of stay applicable to the classification. Congressional intent to limit a principal foreign national's ability to be classified as a temporary agricultural or non-agricultural worker or as a trainee or participant in a special education program for the relevant maximum period is not affected.

USCIS reviewed the current INA provisions governing the H-2 and H-3 nonimmigrant classifications as well as the applicable regulations and policy guidance, and found that existing guidance does not specifically address or clarify the issue on whether time spent in H-4 status counts against the maximum period of admission available to an H-2 or H-3 nonimmigrant.

---

[3] 8 CFR 214.2(h)(5)(viii)(C) and 8 CFR 214.2(h)(13)(iv). See 8 CFR 214.2(h)(5)(viii)(C) and 8 CFR 214.2(h)(13)(v) for exceptions.
[4] 8 CFR 214.2(h)(13)(iv). See generally 8 CFR 214.2(h)(13)(v) for exceptions.
[5] See USCIS Memorandum, M. Aytes, "Guidance on Determining Periods of Admission for Aliens Previously in H-4 or L-2 Status; Aliens Applying for Additional Periods of Admission beyond the H-1B Six Year Maximum; and Aliens Who Have Not Exhausted the Six-Year Maximum But Who Have Been Absent from the United States for Over One Year," (Dec. 5, 2006).

Exhibit 1
275

Further, USCIS has not issued any recent policy guidance that clarifies the issue of decoupling time spent in H-4 status from time spent in H-2 or H-3 status.[6]

USCIS is now clarifying that any time spent in H-4 status will not count against the maximum period of admission applicable to H-2 and H-3 nonimmigrants. Thus, a foreign national who was previously granted H-4 dependent status and subsequently is granted H-2 or H-3 classification may be eligible to remain in the United States for the maximum period of stay applicable to the classification. For example, a husband and wife who come to the United States as a principal H-2B and dependent H-4 spouse may maintain status for three years, and then change status to H-4 and H-2B respectively, as long as the change of status application is properly filed before the principal H-2B has spent the maximum allowable period of stay in the United States. Note that, upon the switch, the new "principal" foreign national would be subject to the H-2B cap. USCIS will consider, in the context of any applications for change of status from H-4 to H-2 and H-4 to H-3, whether the H-4 nonimmigrant complied with the requirements of accompanying or following to join the H principal foreign national, and whether the H-4 nonimmigrant otherwise maintained valid nonimmigrant status.[7]

## IV. Adjudicator's Field Manual Update

Chapter 31.2(d)(2) of the AFM (AFM Update AD13-12) is revised as follows.

☞    1. Chapter 31.2(d)(2) of the AFM is revised to read as follows:

*****

(d) <u>Limits on a Temporary Stay</u>.

*****

(2)    <u>Spouse and Dependents</u>.

Limitations on the duration of time spent in H-1B, H-2, or H-3 nonimmigrant status refer only to the principal worker in H status and do not apply independently to the principal worker's dependent spouse and children. Normal rules for maintenance of derivative status still apply such that the dependent may remain in the United States only for the purpose of family unity with the principal worker.

Time spent as an H-4 dependent does not count against the maximum allowable period of stay for principals in H-1B, H-2, or H-3 status. Thus, a foreign national who was previously an H-4 nonimmigrant and subsequently becomes an H-1B, H-2, or H-3 principal may be eligible for the maximum period of stay allowed under the H-1B, H-2 or

---

[6] The most recent USCIS guidance on time spent in H-4 status is from the 2006 memorandum cited above, which focuses only on decoupling time spent in H-4 status from time spent in H-1B or L-1 status.

[7] Maintenance of H-4 status continues to be tied to the principal's maintenance of H status. Thus, H-4 dependents may only maintain such status as long as the principal maintains the relevant principal H status.

Exhibit 1
276

H-3 classifications.  Furthermore, a principal H-1B, H-2, or H-3 nonimmigrant who subsequently changes to H-4 status may remain in the new derivative status for as long as the principal foreign national spouse maintains that principal status.  The application for a change of status to H-4 must be properly filed before the H-1B, H-2, or H-3 foreign national has spent the maximum allowable period of stay in the United States.

USCIS may limit, deny, or refer for removal an H-4 dependent that is not primarily intended for the purpose of being with the principal worker in the United States. Therefore, a spouse or child may be required to show that the requested stay is not intended to evade the normal requirements of the nonimmigrant classification that otherwise would apply when the principal foreign national is absent from the United States.

USCIS officers may adjudicate applications for dependent stays in order to prevent an H-1B nonimmigrant from using only occasional work visits to the United States in order to "park" the family members in the United States for extended periods while the principal alien is normally absent.

☞    2. The AFM **Transmittal Memorandum** button is revised by adding a new entry, in numerical order, to read:

| AFM Update AD13-12 11/11/2013 | Chapter 31.2(d)(2) | To provide additional guidance regarding how Immigration Services Officers (ISOs) should determine periods of admission for a foreign national. |
|---|---|---|

**Use**

This PM is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications and petitions.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Office of Policy and Strategy.

Exhibit 1
277

# **Action 29**

Pre-Completion Interval Training; F-1 Student Work Authorization

And

Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS)

Exhibit 1
278



FEDERAL REGISTER

8 CFR Parts 214 and 274a

Pre-Completion Interval Training; F-1 Student Work Authorization

RIN 1115-AD16

[INS No. 1458-92]

*57 FR 31954*

July 20, 1992

ACTION: Interim rule with request for comments.

SUMMARY: This rulemaking will restore the ability of foreign students to engage in practical training prior to completion of their course of study and will also provide employment authorization for F-1 students based upon severe economic hardship. Pre-completion training is necessary to permit students to accept short-term employment that furthers their academic studies before the students have graduated. It will provide a student with practical training as a part of the student's educational experience within the United States. Providing work authorization based on severe economic hardship is necessary to permit students who suffer unforeseen financial difficulties to remain in status and to continue their education at the school in which they are enrolled.

DATES: This interim rule is effective July 20, 1992. Written comments must be submitted on or before September 18, 1992.

ADDRESSES: Please submit written comments, in triplicate, to the Records Systems Division, Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW., room 5304, Washington, DC 20536. To ensure proper handling, please reference INS number 1458-92 on your correspondence. FOR FURTHER INFORMATION CONTACT: William R. Tollifson, Senior Immigration Examiner, Immigration and Naturalization Service, Examinations Division, 425 I Street, NW., room 7122, Washington, DC 20536, telephone (202) 514-3240.

TEXT: SUPPLEMENTARY INFORMATION: The Immigration and Naturalization Service (Service) published a final rule in the Federal Register concerning F-1 student work authorization on October 29, 1991, at *56 FR 55608-55617*. The final rule attempted to streamline the procedures for employment authorization. While the regulation implemented the Pilot Off-Campus Employment Program and both simplified the paperwork involved in and expanded the definition

Exhibit 1
279

57 FR 31954

of on-campus employment, it eliminated the separate pre-completion training and economic necessity work authorization provisions.

The Service is restoring pre-completion practical training within the ambit of the standard practical training regulations. Permitting practical training prior to course completion will provide foreign students with more flexibility to engage in employment directly related to their studies. Such practical training will be deducted from the 12 months of practical training generally available.

Authorization for pre-completion practical training will be expedited by the Service for the 1992 summer vacation period. The Service will issue an Employment Authorization Document (EAD) to an eligible walk-in applicant at the Service office having jurisdiction over the applicant's place of residence. Alternatively, if an eligible student elects to mail the Form I-765, Application for Employment Authorization, to the designated Service office, the Service will make every attempt to schedule an appointment to issue the EAD within 7 days of receipt. With respect to periods after the summer of 1992, the integrity considerations pertaining to the issuance of an EAD to an eligible F-1 student are undergoing further policy review. This issue will be addressed at the time of publication of the final rule.

The Service is also providing for work authorization based upon severe economic hardship. This will enable students who have suffered unexpected financial difficulties, and for whom the Pilot Off-Campus Employment Program is unavailable or insufficient, to continue their education without interruption. It should be noted that work authorization based upon severe economic hardship will differ from the former economic hardship program.

First, the Designated School Official (DSO) will no longer endorse the Form I-20 Student ID. As is the case with other categories of work authorization for nonimmigrants, F-1 students will have to apply for an EAD on Form I-765 at the district offices having jurisdiction over their place of residence. Form I-538, the DSO certification, should accompany the Form I-765 application. This new rule also mandates that a student must make a good faith effort to pursue employment authorization on-campus and under the Pilot Off-Campus Employment Program. The DSO must certify on Form I-538 that neither the existing Pilot program nor on-campus employment is available or sufficient to meet the student's severe economic hardship. If a student were able to find adequate employment on-campus or under the Pilot program, the student would not be able to make a showing of need for work authorization based upon severe economic hardship.

It is the view of the Service that requiring the student to make a good faith effort to find employment through other programs will not impose an onerous burden on the students, the DSOs, or the employers. The Service has provided a suggested approach to complying with this requirement. The student should consult his or her DSO to determine whether there are any employment opportunities under the Pilot program available in the area. If such opportunities exist, the student should pursue those available opportunities. If employment under the Pilot program is insufficient, the DSO's certification to that effect on Form I-538 will satisfy the requirements of this section. On the other hand, if the DSO knows that no Pilot program employment exists and on-campus employment is unavailable or insufficient, the DSO's certification to that effect on Form I-538 will also satisfy the requirements of this section.

Finally, the Service is revising 8 CFR 274a to require that students who seek employment for purposes of optional practical training or who seek employment because of severe economic hardship apply for work authorization.

The Service's implementation of this rule as an interim rule, with a provision for post-promulgation public comment, is based upon the "good cause" exceptions found at *5 U.S.C. 553* (b)(B) and (d)(3). This rulemaking falls under the good cause exception because a notice and comment period would be impracticable and contrary to the public interest. This rulemaking confers a benefit upon eligible students, and does not impose a penalty of any kind. It is imperative that this interim rule become effective upon publication so that those persons who are eligible to apply for work authorization based upon severe economic hardship or for pre-completion practical training may apply for either benefit accordingly.

Exhibit 1
280