57 FR 31954

In accordance with *5 U.S.C. 605*(b), the Commissioner of the Immigration and Naturalization Service certifies that this rule does not have a significant adverse economic impact on a substantial number of small entities. This rule is not considered to be a major rule within the meaning of section 1(b) of Executive Order 12291, nor does this rule have Federalism implications warranting the preparation of a Federalism Assessment in accordance with Executive Order 12612.

The information collection requirements contained in this rule have been cleared by the Office of Management and Budget under the provisions of the Paperwork Reduction Act. Clearance numbers for these collections are contained in *8 CFR 299.5* Display of Control Numbers.

List of Subjects

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Employment.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Reporting and recordkeeping requirements.

Accordingly, chapter I of title 8 of the Code of Federal Regulations is amended as follows:

PART 214 -- NONIMMIGRANT CLASSES

1. The authority citation for part 214 continues to read as follows:

Authority: *8 U.S.C. 1101,* 1103, 1184, 1186a; 8 CFR part 2.

2. Section 214.2 is amended by revising paragraph (f)(9)(ii) to read as follows:

§ 214.2 Special requirements for admission, extension, and maintenance of status.

* * * * *

(f) * * *

(9) * * *

(ii) *Off-campus work authorization -- (A) General.* An F-1 student may be authorized to work off-campus on a part-time basis in accordance with paragraph (f)(9)(ii) (B) or (C) of this section after having been in F-1 status for one full academic year provided that the student is in good academic standing as determined by the DSO. Part-time off-campus employment authorized under this section is limited to no more than twenty hours a week when school is in session. A student who is granted off-campus employment authorization may work full-time during holidays or school vacation. The employment authorization is automatically terminated whenever the student fails to maintain status.

(B) *Wage-and-labor attestation requirement.* Except as provided under paragraphs (f)(9)(ii)(C) and (f)(9)(iii) of this section, a student may be authorized to accept off-campus employment only if the prospective employer has filed a labor-and-wage attestation pursuant to 20 CFR part 655, subparts J and K (requiring the employer to attest to the fact that it has actively recruited domestic labor for at least 60 days for the position and will accord the student worker the

Exhibit 1
281

same wages and working conditions as domestic workers similarly employed.)

(C) *Severe economic hardship.* If other employment opportunities are not available or are otherwise insufficient, an eligible F-1 student may request off-campus employment work authorization based upon severe economic hardship caused by unforeseen circumstances beyond the student's control. These circumstances may include loss of financial aid or on-campus employment without fault on the part of the student, substantial fluctuations in the value of currency or exchange rate, inordinate increases in tuition and/or living costs, unexpected changes in the financial condition of the student's source of support, medical bills, or other substantial and unexpected expenses.

(D) *Procedure for off-campus employment authorization.* The student must submit the application to the DSO on Form I-538, Certification by Designated School Official. The DSO may recommend the student work off-campus for one year intervals by certifying on the Form I-538 that:

(*1*) The student has been in F-1 status for one full academic year;

(*2*) The student is in good standing as a student and is carrying a full course of study as defined in paragraph (f)(6) of this section;

(*3*) The student has demonstrated that acceptance of employment will not interfere with the student's carrying a full course of study; and

(*4*) Either: (*i*) The prospective employer has submitted a labor-and-wage attestation pursuant to paragraph (f)(9)(ii)(B) of this section, or

(*ii*) The student has demonstrated that the employment is necessary to avoid severe economic hardship due to unforeseen circumstances beyond the student's control pursuant to paragraph (f)(9)(ii)(C) of this section, and has demonstrated that employment under paragraph (f)(9)(i) and (f)(9)(ii)(B) of this section is unavailable or otherwise insufficient to meet the needs that have arisen as a result of the unforeseen circumstances.

(E) *Wage-and-Labor attestation application to the DSO.* An eligible F-1 student may make a request for off-campus employment authorization to the DSO on Form I-538 after the employer has filed the labor-and-wage attestation. By certifying on Form I-538 that the student is eligible for off-campus employment, and endorsing the student's I-20 ID, the DSO may authorize off-campus employment in one year intervals for the duration of a valid attestation as determined by the Secretary of Labor. The endorsement on the student's I-20 ID should read "part-time employment with (name of employer) at (location) authorized from (date) to (date)." Off-campus employment authorized by the DSO under this provision is incident to the student's status pursuant to *8 CFR 274a.12(b)(6)(ii)* and employer-specific and, therefore, exempt from the EAD requirement. The DSO must notify the Service of each off-campus employment authorization by forwarding to the Service data processing center the completed Form I-538. The DSO shall return to the student the endorsed I-20 ID.

(F) *Severe economic hardship application -- (1)* The applicant should submit to the Service Form I-20 ID, Form I-538, and Form I-765 along with the fee required by *8 CFR 103.7(b)(1)*, and any other supporting materials such as affidavits which further detail the unforeseen circumstances that require the student to seek employment authorization and the unavailability or insufficiency of employment under paragraphs (f)(9)(i) and (f)(9)(ii)(B) of this section. The requirement with respect to paragraph (f)(9)(ii)(B) of this section is satisfied if the DSO certifies on Form I-538 that the student and the DSO are not aware of available employment in the area through the Pilot Off-Campus Employment Program. In areas where there are such Pilot program opportunities, this requirement is satisfied if the DSO certifies on Form I-538 that employment under the Pilot program is insufficient to meet the student's needs. The student must apply for the employment authorization on Form I-765 with the Service office having jurisdiction over his or her place of residence.

(*2*) The Service shall adjudicate the application for work authorization based upon severe economic hardship on the

Exhibit 1
282

57 FR 31954

basis of Form I-20 ID, Form I-538, and Form I-765, and any additional supporting materials. If employment is authorized, the adjudicating officer shall issue an EAD. The Service director shall notify the student of the decision, and, if the application is denied, of the reason or reasons for the denial. No appeal shall lie from a decision to deny a request for employment authorization under this section. The employment authorization may be granted in one year intervals up to the expected date of completion of the student's current course of study. A student has permission to engage in off-campus employment only if the student receives the EAD endorsed to that effect. Off-campus employment authorization may be renewed by the Service only if the student is maintaining status and good academic standing. The employment authorization is automatically terminated whenever the student fails to maintain status.

* * * * *

3. In § 214.2, paragraph (f)(10)(ii) is revised to read as follows:

§ 214.2 Special requirements for admission, extension, and maintenance of status.

* * * * *

(f) * * *

(10) * * *

(ii) *Optional practical training* -- (A) *General.* An F-1 student may apply to the Service for authorization for temporary employment for practical training directly related to the student's major area of study. Temporary employment for practical training may be authorized:

(*1*) During the student's annual vacation and at other times when school is not in session if the student is currently enrolled and eligible, and intends, to register for the next term or session;

(*2*) While school is in session, provided that practical training does not exceed twenty hours a week while school is in session;

(*3*) After completion of all course requirements for the degree (excluding thesis or equivalent), if the student is in a bachelor's master's, or doctoral degree program; or

(*4*) After completion of the course of study. A student must complete all practical training within a 14 month period following the completion of study.

(B) *Termination of practical training.* Authorization to engage in practical training employment is automatically terminated when the student transfers to another school.

(C) *Request for authorization for practical training.* A request for authorization to accept practical training must be made to the designated school official (DSO) of the school the student is authorized to attend on Form I-538, accompanied by his or her current Form I-20 ID.

(D) *Action of the DSO.* In making a recommendation for practical training, a designated school official must:

(*1*) Certify on Form I-538 that the proposed employment is directly related to the student's major area of study and commensurate with the student's educational level;

(*2*) Endorse and date the student's Form I-20 ID to show that practical training in the student's major field of study is recommended "full-time (or part-time) from (date) to (date)"; and

Exhibit 1
283

57 FR 31954

(*3*) Return to the student the Form I-20 ID and send to the Service data processing center the school certification on Form I-538.

* * * * *

4. In § 214.2, paragraph (f)(11) introductory text is amended by adding two sentences at the beginning of the paragraph to read as follows:

§ 214.2 Special requirements for admission, extension, and maintenance of status.

* * * * *

(f) * * *

(11) *Employment authorization.* The total periods of authorization for optional practical training under paragraph (f)(10) of this section shall not exceed a maximum of twelve months. Part-time practical training, 20 hours per week or less, shall be deducted from the available practical training at one-half the full-time rate.* * *

* * * * *

PART 274a -- CONTROL OF EMPLOYMENT OF ALIENS

5. The authority citation for part 274a continues to read as follows:

Authority: *8 U.S.C. 1101,* 1103, 1324a; 8 CFR part 2.

6. In § 274a.12, paragraph (c)(3) is revised to read as follows:

§ 274a.12 Classes of aliens authorized to accept employment.

* * * * *

(c) * * *

(3) A nonimmigrant (F-1) student who:

(i) Is seeking employment for purposes of optional practical training pursuant to *8 CFR 214.2(f),* provided the alien will be employed only in an occupation which is directly related to his or her area of studies and that he or she presents an I-20 ID endorsed by the designated school official;

(ii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669) and who presents a written certification from the international organization that the proposed employment is within the scope of the organization's sponsorship. The F-1 student must also present an I-20 ID endorsed by the DSO in the last 30 days; or

(iii) Is seeking employment because of severe economic hardship pursuant to *8 CFR 214.2(f)(9)(ii)(C)* and has filed the Form I-20, Form I-538 and any other supporting materials such as affidavits which further detail the unforeseen economic circumstances that require the student to seek employment authorization and evidence the fact that the student has attempted to find employment under *8 CFR 214.2(f)(9)(ii)(B);*

Exhibit 1
284

57 FR 31954

* * * * *

 Dated: July 14, 1992.

Gene McNary,

 Commissioner, Immigration and Naturalization Service.
[FR Doc. 92-16966 Filed 7-17-92; 8:45 am]

 BILLING CODE 4410-10-M

Exhibit 1
285



FEDERAL REGISTER

Vol. 67, No. 238

Rules and Regulations

DEPARTMENT OF JUSTICE (DOJ)

Immigration and Naturalization Service (INS)

**8 CFR Parts 103, 214, 248 and 274a**

**[INS No. 2185-02]**

**RIN 1115-AF55**

**Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor
Information System (SEVIS)**

Part III

*67 FR 76256*

**DATE:** Wednesday, December 11, 2002


**ACTION:** Final rule.


----------------------------------------------------------------------------
To view the next page, type .np* TRANSMIT.
To view a specific page, transmit p* and the page number, e.g. p*1
----------------------------------------------------------------------------

[*76256]

**SUMMARY:** This rule amends the Immigration and Naturalization Service (Service) regulations governing the
retention and reporting of information regarding F, J, and M nonimmigrants (foreign nationals having a residence in a
foreign country which they have no intention of abandoning, and who are seeking temporary admission to the United
States). This rule also implements the Student and Exchange Visitor Information System (SEVIS), establishes a process
for electronic reporting by designated school officials (DSO) of information required to be reported to the Service, and
provides clear standards governing the maintenance, extension and reinstatement of student status. This rule is
necessary to improve and streamline the reporting and recordkeeping of F, J, and M nonimmigrants.

Exhibit 1
286

67 FR 76256, *76256

**DATES:** This final rule is effective January 1, 2003.

**FOR FURTHER INFORMATION CONTACT:** Maura Deadrick, Assistant Director, Adjudications Division, Immigration and Naturalization Service, 425 I Street NW., Room 3040, Washington, DC 20536, telephone (202) 514-3228.

**SUPPLEMENTARY INFORMATION:**

**Background**

*Who Are F, J, and M Nonimmigrants?*

The Immigration and Nationality Act (Act) provides for the admission of various classes of nonimmigrants, including F, J, and M nonimmigrants, who are foreign nationals having a residence in a foreign country which they have no intention of abandoning, and who are seeking temporary admission to the United States. The purpose of the nonimmigrant's intended stay in the United States determines his or her proper nonimmigrant classification.

F-1 nonimmigrants, as defined in section 101(a)(15)(F) of the Act, are foreign students pursuing a full course of study in Service-approved colleges, universities, seminaries, conservatories, academic high schools, private elementary schools, other academic institutions, and in language training programs in the United States. For the purposes of this rule, the term "school" refers to all of these types of Service-approved institutions. An F-2 nonimmigrant is a foreign national who is the spouse or qualifying child of an F-1 nonimmigrant. J-1 nonimmigrants, as defined in section 101(a)(15)(J) of the Act, are foreign nationals who have been selected by a sponsor designated by the United States Department of State (formerly the United States Information Agency (USIA) to participate in an exchange visitor program in the United States. The J-1 classification includes aliens who are participating in programs under which they will receive graduate medical education or training. A J-2 nonimmigrant is a foreign national who is the spouse or qualifying child of a J-1 exchange visitor.

M-1 nonimmigrants, as defined in section 101(a)(15)(M) of the Act, are foreign nationals pursuing a full course of study at a Service-approved vocational or other recognized nonacademic institution (other than in language training programs) in the United States. The term "school" also encompasses those institutions attended by M-1 students for the purposes of this final rule. An M-2 nonimmigrant is a foreign national who is the spouse or qualifying child of an M-1 student.

Congress recently amended the Act to create new F-3 and M-3 nonimmigrant classifications for certain aliens who are citizens of Canada or Mexico who continue to reside in their home country while commuting to the United States to attend an approved F or M school. Public Law 107-274 (Nov. 2, 2002). Such border commuter students are not subject to the existing requirement for F-1 and M-1 students to be pursuing a full course of study, and are specifically permitted to engage in either full-time or part-time studies. However, F-3 and M-3 border commuter students will not be eligible to obtain F-2 or M-2 status for their dependents. The Service recently adopted regulations relating to border commuter students, *67 FR 54941* (August 27, 2002) (codified at *8 CFR 214.2(f)(18)* and (m)(19)), and will be amending those regulations in the future to make the necessary conforming amendments in response to the recent legislation. In this rule, the Service merely notes that, except for a reduction in course load, the new F-3 and M-3 students will be subject to the same reporting requirements and SEVIS processes as for F-1 and M-1 students.

The Service wishes to clarify that compliance with SEVIS reporting requirements does not exempt F, M or J nonimmigrants from requirements or restrictions associated with other applicable statutes and regulations. Nonimmigrant students or exchange visitors subject to such regulations or statutes may be required to seek government approval, and may be denied such approval, for initial enrollment in a program and for actions that a school or program

Exhibit 1
287

official may otherwise authorize for a nonimmigrant in SEVIS, such as transfers, extensions and changes to course of study. For example, among the kinds of schools approved for attendance by M nonimmigrants are flight training schools. The Service notes that section 113 of the Aviation and Transportation Security Act, Public Law 107-71 (Nov. 19, 2001), imposes new restrictions on providing flight training to aliens and requires prior notification to the Attorney General before such training can begin. The requirements of that law are separate from, and in addition to, the law and regulations governing F, M and J nonimmigrants. The Department of Justice has already published public notices and regulations pertaining to section 113 at *67 FR 2238 (Jan. 16, 2002), 67 FR 6051 (Feb. 8, 2002), 67 FR 41140* (June 14, 2002), and *67 FR 41147* (June 14, 2002). As another example, Title II of the Public Health Security and Bioterrorism Preparedness and Response Act, Public Law 107-188 (June 12, 2002), imposes restrictions on access to dangerous select bio-agents and toxins.

*Response to Public Comments on the Proposed Rule*

On May 16, 2002, the Service published a proposed rule in the **Federal Register** at *64 FR 34862,* to implement the electronic collection and reporting process mandated under section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104-208, *8 U.S.C. 1372.* Specifically, the regulation sought to improve the collection of information on nonimmigrant students by establishing real time updates of student information. The proposed rule also amended the current regulations to establish additional reporting requirements based upon the USA PATRIOT Act (Public Law 107-56) and section 501 of the Enhanced Border Security Act (Public Law 107-173). Comments were due to the Service on or before June 17, 2002.  [*76257]

The following discussion will address only those provisions about which comments were received. Many commenters addressed identical issues in their comments, and as a result, the number of comments exceeds the number of issues discussed. In general, commenters expressed their overall support for SEVIS and the improvements to be made by electronic reporting as well as stressing the importance of foreign students on the economy and culture of the United States.

**I. Mandatory Compliance Date**

The majority of comments opposed the January 30, 2003, mandatory compliance date. Most commenters suggested that the compliance date be established by the Service in a separate rulemaking after SEVIS becomes fully operational. Other commenters suggested that the compliance deadline be moved 9 to 12 months after the release of SEVIS.

The reason most often given by commenters for their belief that the January 30, 2003 date was not feasible for schools was the technological changes required for compliance. Commenters indicated that they have not had sufficient time to assess the system changes necessary to implement SEVIS at their school and expressed concern over the short time frame to change existing business processes to meet the new SEVIS requirements. Commenters stated that to bring schools into compliance requires time and scarce resources to purchase software and training from third party vendors. Several commenters stated that being forced to comply prematurely would result in an investment in technology that becomes obsolete once SEVIS is fully operational. These commenters also indicated that SEVIS should be placed into full operation only after the technology had been developed and tested and the Service was confident the system would work.

Further, many commenters indicated that they did not want to allocate significant investments toward the real time interactive portion of SEVIS and would instead choose to wait for the batch reporting capability. As the batch process will not be available until later in 2002, commenters stated they need time to install and test the software interface with SEVIS to determine any incompatibility and that such installation and testing would necessitate an implementation date after January 30, 2003. Commenters indicated that their schools must weigh using an outside vendor against the creation of a unique system within the school to comply with SEVIS. The commenters argued that the deliberation necessary to determine which path to follow would take time, especially when the schools need authsea authorization from the president or board of directors once all options have been weighed. Many commenters point out that there was

Exhibit 1
288

no vendor software then available that meets the SEVIS requirements, although some vendors were in the final stages of development. The commenters stated that the absence of final specifications for batch processing had hampered the schools' efforts to begin implementation. Those institutions that do not purchase a product available in the market and who instead choose to build their own batch system may take even more time. One commenter estimated that it would take 4,000-5,000 hours of information technology (IT) effort to develop the school's system. The fact that international student and scholar data is located in various university offices within one school was another reason cited by commenters as a reason that it would take schools beyond January 30, 2003, to implement new systems and processes to comply with SEVIS.

Many commenters cited cost as another prohibitive factor in being able to be ready in time for the mandatory compliance date. The Service was given monetary figures ranging from $ 15,000 to $ 500,000 as the cost per school to implement SEVIS. These costs include paying contract programming rates, buying servers, software licenses, and software from a vendor, receiving training in new XML technology, and additional positions for staff.

Finally, commenters stated that January 30, 2003, is not reasonable in light of the fact that the Department of State (DOS) has not yet published corresponding regulations with the new SEVIS requirements for program sponsors with the new SEVIS requirements. Commenters discussed the need for the Service regulations and the DOS regulations to be consistent in order to reduce the burden on schools. Several commenters expressed concern over the fact that the Service and the DOS were publishing separate rules and felt that they will be forced to duplicate efforts if the rules are not consistent.

While the Service is aware of the concerns that the education community has in meeting the January 30, 2003 compliance date, the Service believes the date can be met at little to no cost to the schools. Other than personnel costs for data entry, there is virtually no cost to schools as real time interactive capability only requires that the school have Internet access and a free browser. There is no other software necessary to use the real time interactive capability and there are no recurring access fees. Additionally, as will be discussed in the following section, January 30, 2003, is the date by which all schools must use SEVIS in order to issue a new Form I-20. Although schools may choose to do so, the Service does not intend January 30, 2003 to be the date by which schools must enter all students into SEVIS. Moreover, a Form I-20 issued prior to January 30, 2003, will be accepted for visa issuance, admission, or change of status prior to August 1, 2003.

The Service has been working under several statutory mandates for the implementation of SEVIS and must balance national security concerns against the concerns of the education community. The Service has been working within the tight timeframes required by statutory mandate since the inception of the Coordinated Interagency Partnership Regulating International Students (CIPRIS) pilot program in 1997. In 2001 Congress passed two separate laws to strengthen national security that focused directly on the Service's foreign student program. In addition, the Service has been involved with working groups on student issues as directed by the President in Presidential Directive Number 2. These working groups, led by the Office of Science and Technology Policy (OSTP) and Office of Homeland Security (OHS), included representatives from the National Institute of Standards and Technology (NIST), National Science Foundation (NSF), National Institute of Health (NIH), and other federal agencies. Several open meetings hosted by National Academy of Science (NAS) included representatives from NAFSA-Association of International Educators, American Council on Education (ACE), and universities such as MIT and UCLA. The January 30, 2003 compliance date evolved from the security concerns of Congress and the Administration. It was not a date chosen at random, but was a date chosen as the most reasonable balance between national security concerns and the education community's ability to comply. The sooner that all schools and students are in the SEVIS database, the sooner the Service will have the ability to more fully monitor them.

Furthermore, the Service and the DOS have been working collaboratively since the inception of SEVIS to ensure that similar requirements were being proposed in areas as appropriate. From the beginning of the CIPRIS pilot program, the DOS has committed a full-time staff person to SEVIS to develop  [*76258]  the SEVIS requirements with the Service and to incorporate such requirements in the DOS regulations. On numerous occasions both agencies have come

Exhibit 1
289

together to discuss SEVIS requirements with the education community. The fact that two separate rules are being promulgated setting out SEVIS requirements is a matter of the federal rulemaking process, and does not indicate that the two agencies are not working together.

Although the Attorney General has the primary responsibility for implementing SEVIS, the DOS must promulgate a rule setting forth SEVIS requirements that specifically pertain to J-1 program sponsors. Furthermore, in areas where the Service has responsibility over J-1 nonimmigrants (*e.g.*, admission and duration of status), the Service has addressed those areas in this rule. The DOS has addressed in their separate rule those areas in which the Service does not have responsibility over the J-1 exchange visitor (*e.g.*, eligibility for employment, change of category, transfer, or reinstatement). For more information on SEVIS as it relates to DOS authority over program sponsors and J exchange visitors, see the DOS rule. By the time the SEVIS mandatory compliance date is reached, the batch SEVIS technical requirements will have been available for approximately 18 months. It was the intent of the Service to provide schools and programs access to such technical requirements as early as possible in order to assist in the transition to SEVIS especially under the narrow timeframe as mandated by Congress. The Service began notification and publication of the batch technical specifications of the F, M and J data requirements in August 2001. The Service also published an announcement in the Commerce Business Daily and sponsored multiple vendor conferences specifically to release the SEVIS technical specifications for batch-interface. Nine vendor conferences were held on the east and west coasts during the months of August and September 2001. The technical specifications for the Service and the DOS were posted on the Internet at that time and were subsequently updated with a revised draft version on November 21, 2001. In response to a number of requests from the education community, the Service sponsored an additional technical conference in the Washington, DC metropolitan area on June 13, 2002, to continue to discuss XML technical specifications and to begin release of a finalized version of the Interface Control Document. The final Interface Control Document was published on the Service's Web site on August 14, 2002.

Finally, while the Service understands the time and monetary concerns expressed by those schools interested in utilizing the batch capability of SEVIS, the Service notes that the real time interactive capability of SEVIS remains available to such schools. The use of batch processing is a choice to be made voluntarily by each individual school. Therefore, the fact that a school may not be technologically or financially ready to use batch processing does not mean that the school is not able to comply with the new SEVIS reporting requirements and processes on January 30, 2003, by utilizing the real time interactive capability of SEVIS. The real time interactive portion of SEVIS is currently available to enrolled schools. The additional benefit to schools using real time interactive capability is that these schools may begin use of SEVIS through real time interactive now and enter students on a phased-in basis. By doing so, the school would essentially have all students already entered in SEVIS and could then switch over to batch processing at the first registration after the mandatory compliance date. By entering these students over time, schools will be able to gain system familiarity and requirement familiarity while still meeting the mandatory date.

## II. Form I-20, Certificate of Eligibility for Nonimmigrant (F-1)/(M-1) Student Status--For Academic and Language Students/Vocational Students

Many comments were received regarding the SEVIS Form I-20. The majority of commenters requested that the Service clarify the responsibilities of those schools that begin using SEVIS prior to the mandatory compliance date. Commenters urged the Service to allow schools sufficient time to enter all current students in SEVIS and suggested several alternative dates by which all current students should be entered in SEVIS.

While the proposed rule indicated that all schools were required to report the registration of all current students by the next academic term after mandatory compliance, the Service believes the final rule should impose one date upon all schools by which all current students must be entered in SEVIS. The Service agrees with the commenters that many schools with large student populations would be forced to input all current students in SEVIS in a very short time frame in order to meet the terms of the proposed rule. In response to the commenters and the Service's desire to allow schools sufficient time to ensure that the information entered in SEVIS is accurate, the Service believes that a specific date is an equitable solution that leads to less confusion among schools as to when all of their current students must be entered

Exhibit 1
290

into SEVIS. As such, the Service has determined August 1, 2003, to be the date upon which all current or continuing students must be entered into SEVIS.

To clarify, schools that begin using SEVIS prior to the mandatory compliance date must issue a SEVIS Form I-20 to any new student. Additionally, these schools must issue a SEVIS Form I-20 to any current student requiring a new Form I-20 because of a reportable action (*e.g.*, extension of status, practical training, or employment authorization, or for a new F-1, F-3, M-1, M-3 nonimmigrant visa). A current student with a previously issued non-SEVIS Form I-20 and a current nonimmigrant F or M visa will not be required to obtain a SEVIS Form I-20 for travel purposes and may use his or her current non-SEVIS Form I-20 with proper annotation for reentry until the date that all students must be entered in SEVIS. In order to comport with the required update events of § 214.2(f) and § 214.2(m) and the reporting requirements of § 214.3, including registration, schools need only update SEVIS as to those students whose information has been entered into SEVIS. These schools are not required to enter any of their current students into SEVIS or report on these students in SEVIS prior to the mandatory compliance date except for those current students who need a new Form I-20 for a reportable action or other reason.

After the mandatory compliance date is reached, schools must issue SEVIS Forms I-20 to all new students and all provisions and processes related to non-SEVIS schools will become void. At that time, schools must issue SEVIS Forms I-20 to current students requiring a reportable event. For students whose records have not been entered into SEVIS, schools are still required to comply with the recordkeeping and reporting requirements contained in section 214.3(g)(1) and (2). Lastly, schools must enter the record of all F or M students that are currently enrolled as of August 1, 2003, in SEVIS and report the enrollment for such nonimmigrants by August 1, 2003.

On a related topic, many commenters requested that the Service continue to accept, for a reasonable period of time, Forms I-20A-B, Certificate of Eligibility For Nonimmigrant (F-1) Student Status, For Academic and Language Students, [*76259] Forms I-20M-N, Certificate of Eligibility for Nonimmigrant (M-1) Student Status, For Vocational Students, and Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, that were issued prior to the mandatory compliance date. In response to this request, the Service has added provisions in § 214.2(f), (j) and (m) of this rule to allow F, J, and M nonimmigrants who were issued such documents prior to the mandatory SEVIS compliance date, to continue to be admitted to the United States using these documents for a limited period of time. As of August 1, 2003, however, all non-SEVIS Forms I-20 and DS-2019 will no longer be acceptable, and F, J, and M nonimmigrants must be in possession of a SEVIS Form I-20 or DS-2019.

Additionally, commenters stated that the proposed rule did not address the process by which the dependents of F-1 or M-1 students are to be issued the SEVIS Form I-20. The Service notes that section IV of the supplementary information in the proposed rule contains a discussion of this process. However, the Service agrees that the process as described in the proposed rule should be codified in the pertinent provisions of § 214.2 (f) and (m) and § 214.3(k).

Additionally, prior to August 1, 2003, if exigent circumstances can be demonstrated, the Service will allow the dependents of F-1, J-1, and M-1 nonimmigrants in possession of a SEVIS document to enter with a copy of the principal's SEVIS document.

The Service notes that passage of the Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. 107-173 (Border Security Act), necessitates changes to the disposition of the SEVIS Form I-20 at ports-of-entry. The Border Security Act requires the Service to notify approved schools and exchange programs that the F or M nonimmigrant has been admitted to the United States. By on, or about January 1, 2003, the Service anticipates that it will accomplish this notification to schools electronically through SEVIS.

However, for a short period of time, the Service will accomplish this notification to schools and exchange programs using a paper process. Upon the initial admission of the F or M student, the inspector at a port-of-entry will take the SEVIS Form I-20 from the student. The SEVIS Form I-20 will be returned to the school within approximately 10 days of the student's arrival. The school will be responsible for returning the SEVIS Form I-20 to the student or notifying the

Exhibit 1
291

Service that the student has failed to register. In the case of a non-SEVIS Form I-20, the student's copy and the school's copy will be appropriately annotated with the admission information. The student's copy will be returned to the student at the port-of-entry and the school copy will be forwarded to the Service's data processing center to be forwarded to the school listed on the Form I-20.

In the case of a SEVIS Form DS-2019, SEVIS will generate an original SEVIS Form DS-2019 and a watermark version of the Form DS-2019. Upon the initial admission of the J-1 exchange visitor, the inspector at the port-of-entry will properly annotate both the original SEVIS Form DS-2019 and the watermark draft copy. The inspector will return the original SEVIS Form DS-2019 to the exchange visitor and the watermark version will be forwarded by the inspector to the Service's data processing center. The watermark version will be returned to the program sponsor within approximately 10 days of the exchange visitor's arrival. The program sponsor will be responsible for notifying the Service and DOS that the exchange visitor has failed to commence program participation by updating the record in SEVIS within 30 days of the program commencement date. Upon the initial admission of a J-1 nonimmigrant, the Service will continue to process the non-SEVIS Form DS-2019 as it has done in the past.

While this paper-based process remains in effect, the Service's data processing center will attach a cover letter to all Forms I-20 and SEVIS Forms I-20 forwarded to schools, indicating that the student has entered the United States using the school's form. Such notification by the Service allows schools to be able to comply with the requirement that they report to the Service any students who fail to register. SEVIS schools must report such "no shows" in SEVIS. Non-SEVIS schools are required to report these "no shows" through the Service's National Customer Service Center at 1-800-892-4829. In accordance with the DOS regulations, program sponsors are also required to report in SEVIS if an exchange visitor has failed to commence participation in his or her program. A "no-show" is a student or exchange visitor who has been issued a Form I-20 or Form DS-2019 by an approved school or designated program, and has been admitted to the United States, but who fails to register at his or her school or commence participation in his or her program within 30 days of the institution's registration deadline. Comments were also received requesting the Service to clarify whether changes could be made in SEVIS to a student's Form I-20 information prior to the student's registration at the school. Although this is not specifically addressed in the regulations, the DSO may update all Form I-20 information in SEVIS prior to registration, with the exception of major for a student with M nonimmigrant status who is not authorized to change educational objective.

However, once the Service fully implements a data share with the Department of State's consular systems, the DSO will no longer be permitted to update biographic information after visa issuance until after the school has indicated the student has registered. Additionally, after a student has entered the country, the DSO will no longer be permitted to change a student's program start date. Schools will be permitted, however, to update SEVIS to indicate that a Form I-20 has been terminated at any time.

### III. Roles and Responsibilities of School Officials

The Service received many comments on the creation of the two new categories of designated school official, the principal designated school official (PDSO) and the administrative school official (ASO). While some commenters expressed the opinion that the creation of the ASO was helpful, others indicated that the three-tiered proposal imposes another layer of personnel, thereby limiting accountability. Several commenters were also opposed to the requirement that PDSOs and DSOs be United States citizens or lawful permanent residents. A primary source of concern for the majority of these commenters was the limitation on the number of DSOs per school or campus, citing the need for more personnel resources to input data in SEVIS. Commenters viewed the Service's limitation as arbitrary and suggested that schools should be left to determine the number of DSOs necessary to carry out their responsibilities. Others suggested that the number of DSOs be based upon the number of F-1, M-1, and J-1 nonimmigrants at a particular school.

The primary purpose of SEVIS is to provide access to current, accurate information to schools and the Service on all F, J, and M nonimmigrants. The information maintained in the system is only as reliable as those who are entering it. The Service's ability to control access is a customary and critical means of ensuring the integrity of the system. In order

Exhibit 1
292

67 FR 76256, *76259

to maintain the integrity of the data in SEVIS, the Service has determined, in accordance with applicable Department of Justice  [*76260]  policies governing access to Departmental systems, that PDSOs and DSOs must be either a citizen or lawful permanent resident of the United States.

In response to the comments received, the Service will not adopt the three-tiered category PDSO, DSO and ASO as proposed. The Service finds merit in the commenters' arguments that this is an unnecessary layer that would not improve accountability. As such, once the necessary programming changes have been made to SEVIS, the Service will remove the ASO category. The category of PDSO will remain.

The Service will maintain numeric limits on the number of DSOs per school or campus in order to control access to SEVIS. Under this rule, each school or campus will be allotted one position for the PDSO and up to nine positions for DSOs. However, the Service does find merit in the comments suggesting that the number of DSOs be proportional to the number of nonimmigrant students. Once SEVIS is fully operational and schools have entered all current students in the system, the Service may reconsider the numerical limits on the number of DSOs.

On a related issue, in response to the Service's request, many comments discussed the feasibility of a DSO certification program. A certification process for DSOs was supported by most commenters as a way to strengthen the reliability of the data retained in SEVIS. However, several commenters urged the Service to hold off on establishing a certification program until after SEVIS was fully implemented in order to enable DSOs to focus fully on adjustment to SEVIS. Other commenters stated they did not want the Service to institute another mandatory program and that the Service should leave such training up to schools on a voluntary basis. The Service appreciates the responses received and will review and consider all comments again before making a decision whether to establish a DSO certification program. If a certification program is pursued, the Service may revisit the DSO limitations based on immigration status once such a certification process (including background checks) is in place.

One commenter suggested that the Service make clear that institutions have a right to seek legal counsel in establishing appropriate SEVIS compliance systems. The commenter contended that the Service's use of the PDSO as the point of contact for SEVIS serves to contravene the Agency Practice Act, *5 U.S.C. 500*(b). The Service has no intention of denying a school's right to be represented by legal counsel. In fact, for many years there have been institutions that have designated a legal advisor as a designated school official. This rule does not prohibit a school from choosing to place counsel in the PDSO or DSO position or from conferring with counsel regarding the implementation of SEVIS requirements.

## IV. Reduction in a Student's Course Load

Many comments were submitted regarding the proposed rule's treatment of a reduction in a student's course load. Some commenters suggested that the Service remove the word "prior" in the sentence, "A student who drops below a full course of study without the prior approval of the DSO will be considered out of status." Additionally, commenters asserted that the Service should not consider a student to be out of status due to a reduced course load until the end of the semester or until the DSO is notified.

The Service cannot adopt these suggestions. With the implementation of SEVIS, the Service expects to have accurate, real time, information on all students. To allow a student to act, without first receiving approval from the DSO, undermines the most basic concept of SEVIS. As it is the responsibility of the student to maintain a full course of study in order to remain in compliance with his or her nonimmigrant status, it is reasonable to expect a student to understand this responsibility. Accordingly, the student should consult with, and receive the necessary permission from the designated school official prior to performing an act that affects status.

The Service understands that there may be situations in which a student is unable to maintain a full course load and has made allowances for such situations, provided the student receives permission first. The Service also understands there may be some situations in which a student's incapacitation may render it impossible for the student to request

Exhibit 1
293

permission from the DSO prior to reducing his or her course load (*e.g.*, a student who is hospitalized for an extended period of time as the result of an accident). In such cases, the student will not be considered out of status.

Many commenters stated that the Service did not clearly indicate in the proposed rule whether DSOs could authorize a nonimmigrant student to drop below a full course of study more than once during his or her course of study. To clarify, during the course of study within one program level, an F-1 nonimmigrant can only be authorized on one occasion to reduce his or her course load due to academic difficulties, and must resume a full course at the start of the next available term or session, excluding a summer session. An F-1 student taking a reduced course load for academic reasons must still be taking at least one class or half the clock hours required for a full course of study. A DSO may not authorize an M-1 student to reduce his or her course load based on academic difficulties.

Commenters also argued that the Service's requirement allowing an F-1 student to drop below a full course of study only where he or she faces "initial" difficulties should be expanded to include other legitimate reasons as determined by the DSO. The Service does not adopt this suggestion to permit the DSO to make a determination based on personal or academic reasons. Such a determination is extremely vague and is open to abuse.

Several commenters also suggest that the Service allow a DSO to authorize a reduced course load if students are unprepared or in jeopardy of failing a course. The Service notes that the current regulations already provide for this situation. For example, a student may be authorized to drop below full time study due to improper course level placement.

In the case of an illness or medical condition, an F-1 student may be authorized to reduce course load for a period not to exceed 12 months in aggregate. The DSO may also authorize a student to refrain from taking any courses due to medical condition or illness if the severity of the condition warrants such authorization. Although a student may be authorized for up to 12 total months of a reduced course load in this case, a school official must re-authorize the reduction each term or session, and must update this authorization in SEVIS. The 12 month limit on authorization to reduce course load for illness or medical condition is applied per each particular program level. If the student completes one program, and advances to a different program level, the student will be allowed a second aggregate 12-month period in which he or she may be authorized to reduce course load.

An F-1 nonimmigrant who has already received authorization to reduce course load for academic difficulties remains eligible for the aggregate 12-month period to reduce his or her course load due to illness or medical condition.

A student who is unable to resume a full course of study within the time limits previously specified will either have to leave the U.S. and reapply when  [*76261]  he or she is able to resume a full course of study, or change to a more appropriate nonimmigrant classification to continue medical treatment in the U.S.

The Service recognizes that there may be cases in which an F-1 student may need authorization to reduce his or her course load for more than 12 months while pursuing a single program level (for example, while studying for an undergraduate college degree). However, to allow a student to pursue less than full time study for an extended period of time with no limits opens the student program to a greater possibility for abuse. Furthermore, such extended authorization would run counter to the definition of a student as set forth in section 101(a)(15)(F) of the Act which requires that a student pursue full-time study.

As specified in the proposed rule, an M-1 student may only be authorized to reduce course load for a reason of illness or medical condition, and such authorization may not exceed an aggregate of 5 months. A school official must verify the continuation of the authorization at each term or session by updating the authorization in SEVIS. However, as previously noted, the Service cannot permit an institution to authorize a student to pursue less than full-time study for an extended period of time.

On a related topic, many commenters suggested that the documentation required to support authorization to drop below a full course of study for illness or medical condition be expanded to include documentation submitted by

Exhibit 1
294

67 FR 76256, *76261

counselors, psychologists, and other alternative medical practitioners. The Service adopts this suggestion and will allow DSOs to accept medical documentation provided by licensed medical doctors, doctors of osteopathy, or licensed clinical psychologists to substantiate a student's reason for dropping below a full course of study for illness or medical condition.

Some comments contended that students with long-term medical conditions, chronic illnesses, or learning disabilities may require a longer-term reduction in course load. The Service cannot, however, permit an unlimited reduction in course load, as this would undermine the premise of the F-1 and M-1 nonimmigrant student program. The Service believes that the existing minimum requirements for defining a "full course of study" are broad enough to accommodate students that may not be able to take a rigorous course load.

Finally, one commenter suggested that the Service include a specific provision in § 214.2(f)(6)(iii) to allow a DSO to authorize a reduced course load for graduate students enrolled in less than full time coursework. The Service does not believe that such a provision is necessary. The current regulation at § 214.2(f)(6)(i)(A) allows the DSO to make the determination of whether the graduate student is pursuing a full course of study. The determination is left to the DSO in this case because even though graduate students may not be enrolled in full-time classes, the school may still consider them to be a full-time student while they conduct research or work on their dissertation, for instance. As long as the student is pursuing what the institution considers to be a full time graduate program, the student is maintaining a full course of study. If the student is not pursuing full time study as determined by the DSO, then the student would not be maintaining lawful student status unless the DSO has authorized a reduced course load in accordance with the provisions of § 214.2(f)(6)(iii).

**V. Transfers**

Several commenters suggested that the Service permit F-1 students to transfer schools during the 60-day grace period following completion of studies or after completion of optional practical training. Although not explicitly authorized in previous regulations, the Service has accommodated school transfers within the 60-day period and has designed SEVIS to continue this practice. The final rule explicitly permits the transfer of student records in SEVIS during this 60-day period in § 214.2(f)(5)(iv). However, to clarify, the DSO must indicate the school to which the student intends to transfer in SEVIS. Therefore, the initiation of a student record transfer in SEVIS can only be carried out after the student has completed the application and acceptance process and has determined the school to which he or she is transferring.

The Service is also limiting the length of time a student may remain in the U.S. while transferring between schools. The student may not remain in the U.S. between programs if the student will not resume classes within 5 months of transferring out of the current school, or within 5 months of the program completion date as indicated on the Form I-20 issued by the current school, whichever date is earlier. In the case of a student authorized to engage in post-completion optional practical training (OPT), the student must be able to resume classes within 5 months of transferring out of the current school that recommended OPT or the date the OPT authorization ends, whichever is earlier. For example, in instances where a DSO initiates a transfer within the 60-day period following completion of studies, in order to remain in the United States between transfer of programs or schools, the 5 month period begins tolling on the date the program was completed, not the date the DSO initiated the transfer. The initiation of a transfer out date occurs when the DSO enters a date for the release of the student's record to the transfer school. While the DSO may enter any date reasonable and appropriate for a student's circumstances, in most instances, the DSO will want to enter the release date as the date the student completes the last day of the academic term at the current school.

The Service also received many comments stating that SEVIS should not prevent transferring F-1 students from applying to more than one school. In response to these comments, the Service wishes to clarify that this final rule does not place any limit on the number of schools to which a transferring F or M student may apply. The transferring student may apply to and be accepted by any number of schools. However, the rule restricts the number of SEVIS Forms I-20 that may be issued to a transferring student. For purposes of fraud prevention, as well as privacy and paperwork

Exhibit 1
295

reduction concerns, SEVIS will allow a student's record to be available only to one school at a time. Once the student decides which school he or she intends to transfer, the DSO of his or her current school will update SEVIS to reflect this choice and will enter the release date for the student. The student's name will then appear in SEVIS at the transfer school as an "alert" containing the student's name and release date. When the release date is reached, the transfer school will be able to issue the transferring student a new SEVIS Form I-20. In most cases, schools will be not be sending the acceptance letter and the SEVIS Form I-20 at the same time. If the student changes his or her mind prior to the release date, the DSO at the current school may cancel the transfer request. If the transfer request is cancelled the student may continue studies at the current school or make a new request to be transferred to another school. However, once the release date has been reached, the DSO at the current school may no longer access the student's record in SEVIS. Therefore, a student who changes his or her mind after the release date must work with the DSO of  [*76262]  the transfer school to accomplish a second transfer to another Service-approved school. In such cases, the DSO of the transfer school must complete the transfer process for the student in SEVIS and then initiate any subsequent transfer that the student may request.

The transfer process for M students differs from that of F students, in that M students must apply directly to the Service in order to transfer schools. In order to ensure that the M transfer student may continue in his or her studies without significant interruption, the M nonimmigrant transfer process allows the M transfer school to issue a SEVIS Form I-20 prior to the transfer student's release date. The initiation of the SEVIS student transfer process still requires that the current school enter the name of the M transfer school, and it is only the transfer school indicated in the system that can issue the SEVIS Form I-20 prior to the release date. The M student may then apply to the Service for a transfer without having to wait for the release date, which will most likely be at the end of the academic term. However, the transfer school will not have complete access to the student's SEVIS record until the release date is reached.

The M student may begin attending the transfer school pending the adjudication of his or her transfer request. However, if the transfer request is denied by the Service after the student has begun his/her program at the transfer school, the SEVIS student record will be automatically terminated and the student will be considered out of status. Therefore, students are strongly encouraged to file their applications for transfer approval with the Service Center as soon as they are able. As stated above, the initial SEVIS Form I-20 from the transfer school can be issued as soon as the current school indicates in SEVIS that the student intends to transfer to that school. The student will be notified by mail of the Service's decision. The DSO will be notified of the Service's decision on an M transfer via a system alert. Additionally, the DSO may view the status of any transfer request by either accessing the student's record or by viewing the list provided of pending/adjudicated applications in SEVIS. The process for a SEVIS transfer for both F and M students allows the students to apply to multiple schools but places the burden on the students to weigh their options and decide on one particular school before the issuance of a new SEVIS Form I-20 by the transfer school.

Several commenters stated that the limited time frame imposed by the SEVIS transfer process will adversely affect current business practices at some schools. Commenters indicated that, because a transfer school can only issue a new SEVIS Form I-20 on the student's release date, there will not be enough time for the transfer school to issue a SEVIS Form I-20 prior to the start of the new semester, especially in instances where the transfer student is returning home for a vacation.

In response, the Service notes that a transfer student who is traveling abroad for a vacation and who plans to attend a different school upon his or her return must make arrangements with the transfer school to ensure that all necessary documentation is received in a timely manner. For example, the student may obtain his or her SEVIS Form I-20 prior to departure, or request that the transfer school forward the SEVIS Form I-20 to his or her address abroad (just as the schools now do for newly-applying students).

Some commenters suggested that the Service allow the student's SEVIS record to be accessible by both the current and transfer schools until the transfer is complete.

The Service cannot adopt this suggestion. In its outreach efforts, the Service found that privacy was of the utmost

Exhibit 1
296

concern to the education community. Schools did not want other schools to have access to any of their students' school information. The SEVIS transfer process was designed with such concerns in mind. To allow students' records to be open to both schools would allow one school to have access to another school's data. One commenter noted that the reporting time frames for transfer for non-SEVIS schools were different from those for SEVIS schools and suggested that the Service use a standard 30-day reporting time period. For the sake of consistency in the transfer process, the Service adopts this suggestion in the final rule and allows non-SEVIS schools to send notification of transfer to the Service data processing center within 30 days.

Finally, commenters suggested that the Service use consistent terminology in its description of schools. The Service agrees with the comment and in the final rule adopts the terms "current school" and "transfer school."

**VI. Thirty-day Advance Admission**

Many commenters stated that the 30-day limit prior to the program start date is unreasonable. Commenters cited a student's need to find adequate housing, attend orientation, and begin research projects as reasons why a student might need additional time prior to the program start date.

The Service, however, does not agree with the commenters. The DSO is already able to take account of a student's obligations pertaining to orientation, research projects, etc., prior to the start of classes. Form I-20 states, "The student is expected to report to the school not later than (date) and complete studies not later than (date)." A DSO may enter a date that would accommodate the beginning of research projects or allow a student to attend an orientation session. The DSO is permitted to set a program start date that accommodates the need for students to be in attendance at the school for such required activities.

Information pertaining to student housing is readily available to prospective students and in many cases housing is arranged by the school. Although the Service recognizes that students need some time to find suitable housing, the Service does not believe that the advance admission period needs to be extended beyond 30 days for this reason. A period of 30 days prior to the time the student is expected to be in attendance at the school, as provided by this rule, should be adequate for students to make arrangements for housing.

Finally, the Service is considering a change to the SEVIS Form I-20 to capture two distinct dates: (1) the date by which the student is expected to enter the country (*e.g.*, to begin research or on-campus employment, attend orientation), and (2) the date that classes will commence.

**VII. Grace Periods**

Many comments were received on the proposed rule's effect on students who fail to maintain status by withdrawing from classes. Commenters suggested that the Service consider reasons other than medical conditions as a legitimate basis for withdrawing from classes, thereby entitling students to a reasonable grace period.

The Service agrees with these comments, in part, but must distinguish between instances where a student notifies the DSO and receives authorization to withdraw versus those where a student never attends or stops attending classes without DSO authorization. In instances such as a death in the family, unforeseen financial hardship, or a determination that the educational program is not appropriate for the student, a DSO may authorize the student to withdraw from classes. In such cases, the student will be afforded a 15-day grace period in which he or she may make and complete arrangements for travel and departure. In instances where the student has never registered  [*76263]  at the school or withdraws without DSO authorization, the student may not be afforded the 15-day grace period.

The importance of notifying the DSO and obtaining permission for withdrawal from classes cannot be overemphasized. A solid relationship and line of communication must be established between the student and the DSO to avoid adverse consequences to a student affecting his or her nonimmigrant status.

Exhibit 1
297

## VIII. Concurrent Enrollment

Several commenters requested that the Service clarify the language for concurrent enrollment. The commenters indicated that it was common for a student to be enrolled in an English language program as well as a university program. In such instances, the requirements for maintaining a full course of study vary. For English language programs, the Service definition requires clock hours, while for university programs the requirement is for credit hours. The commenters requested the Service allow the DSO to make the determination as to what constitutes a full course of study in such cases. The Service agrees with the commenters and has added clarifying language to the rule allowing the DSO to make these determinations.

## IX. On-line and Distance Education Courses

Some commenters suggested that the Service's proposed restriction of one class or three credits per semester of on-line or distance education courses is a restriction that should be made by schools, not by the Service. Other commenters stated that eliminating any distance education or on-line courses for English language programs or elementary and secondary students is too restrictive. Additional commenters stated that the Service's intended restriction will have a negative impact on their programs as more programs add on-line courses.

Service finds merit in the argument against prohibiting distance education and on-line courses for elementary and secondary students. Accordingly, the Service has removed the restriction and will allow elementary and secondary students to count distance education and on-line courses in their determination of a full course of study.

The Service does not agree with the commenters that this rule restricts schools from enrolling any student they wish in an on-line or distance education course. The rule does restrict a student in the United States in an F-1 nonimmigrant status from being able to consider more than one distance education or on-line class or three credits per semester towards his or her full course of study requirements. Furthermore, the rule restricts vocational students and English language students from being able to consider any on-line or distance education courses toward the full course of study requirements. Such restrictions do not prohibit international students from completing programs that are offered on-line, as the students can enroll in the course without being admitted to the United States.

To clarify, the restriction that this rule places upon distance education or on-line courses is that no more than one course or three credits can be counted toward the full course of study requirements. A student currently pursuing a full course of study may add as many distance education or on-line courses as he or she wishes in addition to the courses counting toward the full course of study. In the case of M-1 students and English language students, although these courses cannot be counted toward the full course of study requirement, these students are not prohibited from taking additional courses on-line or through distance education.

## X. Practical Training

Several commenters requested that the Service change the language in the optional practical training provision from "9 consecutive months" to "one full academic year." The commenters stated that many schools do not operate on a 9-month calendar and, therefore, the Service's 9-month requirement does not adequately address their needs. The Service agrees with the commenters and notes that the term "one full academic year" is already used in other parts of the Service regulations pertaining to practical training. The final rule will, therefore, incorporate the term "one full academic year" throughout the appropriate sections of § 214.2(f) and § 274a.12.

Although commenters were generally supportive of the Service allowing students involved in a study abroad program to use that time toward the 9-month requirement (now "one full academic year") for practical training, the Service must make one point of clarification to the rule. For a student to use the time spent studying abroad toward the one full academic year requirement, the student must have spent at least one full academic term in a full course of study

Exhibit 1
298

67 FR 76256, *76263

in the United States prior to going abroad to study.

Some commenters requested that the Service broaden the provision even further to allow graduate students conducting research abroad the same benefit. The Service cannot adopt this suggestion at this time. In the case of students involved in a study abroad program, there is a defined curriculum with courses that must be taken. However, the Service is not satisfied that the same is true for graduate students conducting research abroad. The Service may consider this in a future rulemaking.

Several commenters pointed out that the proposed rule eliminated § 214.2(f)(10)(ii)(A) (*3*) and (*4*). The Service notes that this was an unintentional error. This final rule combines those two clauses and revises the language for clarity.

Many commenters suggested that the Service allow students to apply for practical training prior to fulfilling the 9-month limit (now one "full academic year") but not be allowed to commence practical training prior to that time. The commenters indicated that such a provision is necessary for those students who want to participate in practical training in the summer following their first academic year but whose requests for practical training cannot be adjudicated in time for the students to begin in the summer. Other commenters made similar suggestions for students enrolled in one-year programs who, due to the new limitation that optional practical training be applied for prior to the completion of studies, would be unable to apply.

Although the Service believes that changing the term "9 months" to "one full academic year" will resolve most of the problems cited by the commenters, the Service will allow F students requesting optional practical training to submit their application up to 90 days prior to completing "one full academic year." In such cases, the DSO must indicate on the Form I-20 and/or update SEVIS to show that the "from date" in which the DSO is certifying is the date that the student completes a full academic year of enrollment. While the Service may adjudicate the request prior to the student's completion of one full academic year, employment authorization will only be granted from the date that the student actually completes a full academic year. The student may not begin working until the date specified on the employment authorization document. The Service, therefore, does not adopt the commenters' suggestion that the Service allow DSOs to approve optional practical training or give a type of interim employment authorization until the student completes one full academic year of enrollment.  [*76264]

Several commenters also requested that the Service clarify whether students, other than F-1 nonimmigrants, who have been lawfully enrolled in a Service-approved school for one full academic year, could also be eligible for optional practical training. However, while the Service agrees that this issue needs clarification, this was not an issue addressed in the proposed rule and the Service needs more time to consider these issues. The Service may consider such clarification in a future rulemaking.

One commenter requested that the Service clarify the responsibility of a DSO with regard to a student to whom the DSO has issued a Form I-20 and certified for optional practical training following completion of studies. The Service appreciates the opportunity to clarify these responsibilities in the final rule. Section 214.2(f)(10)(ii)(E) provides that a DSO who recommends a student for optional practical training remains responsible for maintaining the student's records in SEVIS during the time that training is authorized. During the period in which a student is authorized by the Service to engage in optional practical training following completion of studies, a student must notify the DSO if his or her name or address changes, or if the student wishes to discontinue training. Similar to the provision in current regulations that a student engaged in optional practical training have a Form I-20 endorsed within the last 6 months by the DSO for reentry, the DSO is responsible for updating the SEVIS record of any student participating in post-completion practical training. The DSO and student must continue to communicate in order to ensure that the student does not take any action that would adversely affect his or her nonimmigrant status. For example, if the student indicates that he or she has changed address or terminated employment for any reason prior to the period authorized by the employment authorization document and does not intend to resume employment, the DSO must notify the Service by updating SEVIS.

Exhibit 1
299

Finally, one commenter requested that the Service allow students to use a school's address for purposes of receiving employment authorization documents. While this practice will not be authorized by this final rule, the Service is considering incorporating this practice into the operating procedures of the Service centers.

## XI. Employment

Commenters also noted that the Service did not include a description of the process for endorsing employment in SEVIS other than practical training. In response, the Service has added language to the final rule incorporating procedures for the endorsement in SEVIS of employment authorization based upon severe economic hardship and internships with an international organization. At this time there are no such update requirements for on-campus employment.

Another commenter requested that the Service clarify when an F-1 student may begin working on-campus incident to status prior to the beginning of classes. The commenter suggested that the Service distinguish between work associated with being a Teacher's Assistant or Resident Assistant and, for example, working in the campus bookstore.

The Service agrees that this provision needs clarification. The Service will permit an F-1 student to begin on-campus employment prior to the start of classes. While it is the responsibility of the DSO to indicate a program start date that accommodates the student's particular needs for employment, the DSO is not permitted to indicate a program start date more than 30 days prior to the start of classes for the purpose of on campus employment. However, the Service does not impose any limitation on the type of on-campus employment in which a student may engage prior to the start of classes.

For off-campus employment based on severe economic hardship, the current rules require that the student apply to the Service based on a favorable recommendation of the DSO. Some commenters requested that the Service allow DSOs to grant F-1 students permission to work based on severe economic hardship without any review by the Service. That suggestion is beyond the scope of the proposed rule, and the Service is not prepared to change existing processes at this time to allow a DSO to grant such a benefit. However, the Service may consider this suggestion when it reviews student employment issues at a future date.

Finally, this final rule makes conforming amendments to § 214.2(f)(9) and § 274a.12 to remove the reference to filing a wage and labor attestation for off-campus employment. As indicated in the proposed rule, the requirement for a wage and labor attestation was part of a pilot program that has sunset. The final rule also amends references in § 274a.12 to include the current DOS Certificate of Eligibility, Form DS-2019 and to cite to current exchange visitor program designation regulations.

## XII. Extensions

Several commenters requested that the Service amend the language of § 214.2(f)(7)(i) to remove the reference to a student being "unable to complete a full course of study in a timely manner," indicating that this phrase implies that a student has done something wrong. Commenters cited illness and family emergencies as possible reasons why a student may take longer to complete his or her program, but should still be considered to be pursuing his or her program in a timely way. The Service has no objection to the removal of this language and has included a more neutral description in the final rule.

## XIII. Reinstatement

Many commenters contended that the provisions in the proposed rule for reinstatement were unnecessarily strict. Commenters urged the Service to provide relief for students who are adversely affected by "technical or computer errors" in SEVIS, and suggest that the Service adopt provisions similar to the provisions in DOS regulations that allow for a correction of "minor or technical infractions." Commenters stressed that DSOs will make mistakes occasionally,

Exhibit 1
300

especially when dealing with a new computer system. Other commenters stated that to punish students for mistakes on the part of the DSO is overly punitive.

The Service agrees that there may be a possibility that errors on the part of SEVIS or other technological failures may cause a student to fall out of status. Therefore, the Service has added § 214.3(g)(4) to allow for a student's record to be administratively corrected in situations where the error in question resulted from technological errors or errors on the part of SEVIS. To administratively correct a student's record in instances of SEVIS error or technological failure, the DSO must contact the SEVIS system administrator to explain the circumstances that caused the correction to be requested, with documentation if necessary, as provided in § 214.3(g)(4). An administrative correction by the system administrator will be completed without fee.

However, while the Service recognizes that a DSO may make a mistake in a student's record that causes the student to fall out of status, the Service does not believe that such errors merit an administrative correction. Ultimately, it is the student's responsibility to ensure that he or she remains in status and is in compliance with the regulations at all times. That is not to say that the student will not be [*76265] afforded a remedy in these situations. On the contrary, in instances where the DSO was neglectful or inadvertently failed to update or extend a student's status, the student is permitted to file for reinstatement and establish that the actions on the part of the DSO were beyond his or her control. Where the Service finds that a DSO has repeated violations of Service regulations or finds malfeasance on the part of a DSO, the Service may withdraw the approval of the designated school official.

Other commenters stated that the Service should abandon the proposed 5-month period as the demarcation of the outer limit for reinstatement and instead consider the overall record of the student. While the Service believes that 5 months is generally sufficient time for a student who has fallen out of status, unintentionally or otherwise, to become cognizant of this fact and to attempt to remedy the situation, the Service also recognizes that there may be legitimate situations in which this is not possible. In fairness to these students, the Service has created a provision in the final rule for a rebuttable presumption that a student who has been out of status for more than 5 months is ineligible for reinstatement unless the student can provide a substantial reason for the delay and an explanation of how the student filed the request for reinstatement as promptly as possible under the circumstances. If the student provides sufficient documentation, the presumption of ineligibility may be rebutted. Such a provision strikes a balance between the Service's desire to establish a limit on reinstatement requests while still accommodating those students with extenuating circumstances.

## XIV. Reporting Current Name and Address

Several commenters requested that the Service consider allowing students who live on-campus to list a mailing address in place of a physical address. Commenters noted that many students living on-campus, including boarding students in secondary schools, may only be able to receive mail via a mailing address. The Service agrees with the commenters, and has made a provision permitting students who physically reside on campus, but cannot receive their mail at a campus address, to list a mailing address that they use at the school rather than a physical address, provided that the school maintains a record of and, upon request, provides the exact location of the alien's residence. Likewise, in order to accommodate limited situations where similar circumstances might exist for students living off-campus, or for exchange visitors, a student's or exchange visitor's mailing address may be listed. The school or exchange visitor program, however, must maintain a record of and, upon request, provide the exact location of the alien's residence. The Service intends to modify SEVIS to accept both a mailing address and physical address. Once SEVIS is modified, in cases where the mailing and physical address are not the same, the school will be required to report both the current mailing and current physical address in SEVIS.

Additionally, commenters stated that requiring students to report changes of address to their DSO rather than directly to the Service on Form AR-11 may result in the DSO being accused of failing to update a student's SEVIS record when, in fact, the student failed to report his or her address change to the DSO. The commenters suggested that students be required to report address changes directly to the Service.

Exhibit 1
301

The Service, however, cannot adopt this suggestion. To do so would undermine the primary purpose of SEVIS; namely, to maintain current, accurate information on all F and M nonimmigrants. Currently, all nonimmigrants are required to report a change of address to the Service by submitting Form AR-11. The notification of the change of address is submitted by the nonimmigrant through the mail. The Service is not stipulating what interaction must take place between the student and the DSO to document notification of address change by the student. To avoid the type of situation cited by the commenters, schools may establish business processes to document when a student reports a change of address. For example, a school may require students to submit a completed Form AR-11 to be kept on file in the international office, in addition to the school updating SEVIS as required.

Finally, the Service wishes to clarify that, while the timely reporting and update of a student's address in SEVIS satisfies the alien student's requirement to notify the Service of a change of address as specified in *8 CFR 265.1*, such notification does not necessarily exempt the student from reporting a change of address as required by other applicable regulations, statutes or programs. Specifically, a nonimmigrant student required to report under the National Security Entry-Exit Registration System (NSEERS), *8 CFR 264.1(f)*, must report a change of address as mandated by that program, in addition to complying with SEVIS reporting requirements.

## XV. Relating to Reporting Requirements of § 214.3(g)(3)

One commenter requested that the requirement in section § 214.3(g)(3) for schools to report, "any other notification request made by SEVIS to the DSO with respect to the current status of the student," be removed based on the assertion that the requirement is overly broad.

The Service does not adopt this suggestion. The primary purpose of SEVIS is to maintain complete and up-to-date information on all foreign students. For this reason, the DSO needs to respond in a timely fashion to requests from the Service relating to the current status of any particular student.

Another commenter associated with independent, secondary schools asked the Service to consider allowing such schools to report on students only one time per year. The commenter stated that it is time-consuming to update student records each term because students at such schools register only once a year.

The Service does not adopt this suggestion. The requirement in question applies only to academic terms that run longer than 6 months. The DSO for such schools will be sent an electronic message from SEVIS requesting the DSO to verify that the students are still enrolled. To allow the DSO in such schools to update student records only at the time of initial registration would undermine the effectiveness of SEVIS.

Another commenter stated that the requirement of § 214.3(g)(3)(iii)(C), which requires schools to report the start date of the student's next term, is burdensome and inherently impossible because it requires the DSO to know the student's intent. The Service does not agree with this commenter. The Border Security Act requires that all schools to report in SEVIS each academic term as to whether a student has registered or not registered. This requirement is one of the most essential requirements in SEVIS because it enables SEVIS to identify those students who have failed to return to school following a term or vacation.

Finally, one commenter questioned the effect, if any, that the Family Educational Rights and Privacy Act, *20 U.S.C. 1232g* (FERPA) has on the information collected and reported in SEVIS. Although FERPA restricts the ability of an educational agency or institution that accepts certain Federal funding to disclose personal information contained in a student's educational record, this final rule makes clear that FERPA does not relieve any approved school or designated exchange  [*76266]  program of the duty to comply with the SEVIS reporting requirements.

Section 641 of IIRIRA requires approved schools and designated exchange visitor programs to collect the information specified in section 641(c). Section 641(d) makes it clear that schools may not enroll F or M nonimmigrant students and that exchange visitor programs may not accept J nonimmigrants unless the school or exchange program

Exhibit 1
302

67 FR 76256, *76266

collects the information and reports it to SEVIS as required.

The general rule is that two statutes that relate to the same issue must be read so as to give effect to both. Thus, section 641 of IIRIRA can properly be considered an exception to FERPA, such that an educational agency or institution does not violate FERPA by disclosing only so much as section 641 of IIRIRA requires the agency or institution to disclose. Section 641(c)(2) of IIRIRA expressly provides that FERPA does not apply to F, J, or M nonimmigrants, to the extent that the Attorney General determines that waiving FERPA is necessary to implement SEVIS. The Commissioner has authority to make this determination on the Attorney General's behalf. That the Commissioner has made this determination was implicit in the proposed rule since the proposed rule required approved schools and designated exchange programs to provide the information, or risk the loss of ability to enroll or accept F, J, or M nonimmigrants. The final rule includes new language in *8 CFR 214.1* to make this determination explicit. This new provision is stated in § 214.1, rather than § 214.3 to make clear that the FERPA waiver applies to J nonimmigrants as well as to F and M nonimmigrants.

## XVI. Dependents of F-1 and M-1 Nonimmigrants

Many commenters stated that F-2, J-2, and M-2 nonimmigrants should be allowed to enroll in full-time study, without being required to change status. The Service does not adopt this suggestion. The need to monitor nonimmigrants being educated and trained in the United States is of vital importance to the national security of the United States. The value of SEVIS would be undermined if the Service were to adopt the commenters' suggestion.

Other commenters suggested that the Service remove the language "avocational or recreational" from the types of study that may be permitted by F-2 and M-2 dependents as DSOs may have difficultly determining what study is avocational or recreational and what is not. While the Service will not remove such language from the rule, the Service provides the following clarification. If a student engages in study to pursue a hobby or if the study is that of an occasional, casual, or recreational nature, such study may be considered as avocational or recreational. The concept of avocational or recreational is not new, but is a long-standing policy applied by both the DOS and the Service for the interpretation of the B-1/B-2 nonimmigrant visa.

It should be noted that this regulation permits F-2 and M-2 nonimmigrants to attend elementary, middle and high school on a full-time basis. Furthermore, if a dependent of an F-1 or M-1 wishes to pursue his or her education full time, beyond what is avocational or recreational, or at the elementary, middle, or high school level, he or she has the option to change status to that of an F-1 or M-1 nonimmigrant.

One commenter requested that the Service clarify the status of those F-2 or M-2 dependents enrolled in a school in a full course of study prior to the effective date of this final rule. In response, the Service will allow an F-2 or M-2 dependent enrolled in a full course of study prior to January 1, 2003, to continue studies provided they apply for a change of status on or before March 11, 2003.

Finally, many commenters stated that the Service should allow F-2 and M-2 nonimmigrants to be authorized for employment. The existing regulations, § 214.2(f)(15) and (m)(13), prohibit employment for F-2 and M-2 dependents. The Service did not propose any change relating to employment authorization for dependents in the proposed rule and, therefore, this suggestion is beyond the scope of this rulemaking proceeding. The Service will not incorporate any changes relating to this issue in the final rule.

## XVII. Electronic Filing Issues

The Service incorporates many processes electronically into SEVIS and that are addressed in this final rule. For example, the requirement to complete and submit a paper Form I-538 attached to paper copies of the Form I-20 for updates has been completely eliminated. Furthermore, the Form I-17 is filed electronically in SEVIS and fee payment is made through Pay.gov on the Internet.

Exhibit 1
303

While SEVIS is a significant step forward in the transformation to e-Gov, there remain certain processes related to nonimmigrant students that are not incorporated into SEVIS, primarily because such processes are in regard to a broader range of nonimmigrants, not specific to F, M, or J visa classifications. As noted in this final rule, the Form I-765, Application for Employment Authorization, utilized for application for Optional Practical Training and other work authorization by a nonimmigrant student, is a hybrid process that includes SEVIS, but also the Service's benefit application process. Likewise, the Form I-539, Application to Extend/Change Nonimmigrant Status, is utilized for the M-1 transfer, M-1 extension, and the reinstatement processes. These are also hybrid processes that are used not merely in connection with SEVIS, but also for other Service processes.

The Service is currently in the process of establishing and implementing a new enterprise architecture to its information technology systems and business processes Service-wide. In order to further adjust business processes and fully take advantage of e-Gov systems and efficiencies, the Service will promote the electronic filing of applications. The Service wishes to take advantage of e-Gov and the Internet, while remaining flexible in order to best utilize emerging and future technologies to better serve the public. Accordingly, the Service hopes to be able to offer e-filing of the Form I-765 in fiscal year 2003, and e-filing of the Form I-539 by fiscal year 2005.

Currently the Form I-17 is filed electronically, but in accordance with the Service's full certification rule for SEVIS *(67 FR 60107)* there are certain supporting documents and signatures physically collected during an on-site visit to the school. The Service is looking at the potential to enhance SEVIS to accommodate electronic attachments of supporting documentation to the electronic Form I-17. In addition, the Service will be examining the issue of electronic signatures.

The Service also wishes to note that SEVIS addresses more than just the collection of data for monitoring and tracking of foreign students. In addition to providing efficiency to the Service's processes for the review and adjudication of items such as Form I-17 educational institution application and reinstatement, the system also provides value-added features that should prove useful to the school user. For example, SEVIS provides "ticklers" and system alerts to the school, such as when a foreign student is issued a visa (once data share with DOS Consular Affairs is in effect), or when a nonimmigrant student enters through a port-of-entry (once data share with entry data is in [*76267] effect). There are also system alerts for when a student is coming to the end of their program, as well as a selection of numerous reports available to the school user. Furthermore, the system provides a search engine functionality to enable direct queries based upon the SEVIS ID# from the Form I-20 issued by the school, as well as enhanced search capability to search by multiple parameters and data elements.

*Good Cause Exception*

This rule is effective on January 1, 2003. The Service finds that good cause exists, under *5 U.S.C 553*(d), for making this rule effective with less than the usual 30-day effective date. The USA PATRIOT Act, Public Law 107-56, mandates that SEVIS be fully implemented and expanded prior to January 1, 2003. Because of vital national security concerns that underpin the USA PATRIOT Act, and the Enhanced Border Security Act, Public Law 107-173, promulgation of this rule with a 30-day delayed effective date would be contrary to the public interest. This final rule does not vary greatly from the proposed rule published on May 16, 2002. Many of the changes in this final rule were made at the request of the affected community. As such the final rule provides more flexibility and imposes less of a burden upon the affected community. While the Service will not give the entire 30-day period prior to the effective date of this rule, the difference in the amount of time between the date of publication of this rule and the effective date of this rule still affords the affected community with sufficient notice for compliance.

*Regulatory Flexibility Act*

The Commissioner, in accordance with the Regulatory Flexibility Act *(5 U.S.C. 605*(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities. Although some schools may be considered small entities, the use of SEVIS as a means for recordkeeping and reporting will streamline the processes currently in existence.

Exhibit 1
304

SEVIS uses technology already in place at most schools, and has been designed for use over the Internet. Institutions need only have access to a web-browser to gain access to the Internet and will not require any software to download. The Service will not charge a subscriber or user fee in order to use SEVIS. However, while there is no charge for access to SEVIS, there might be undetermined, individual, organizational costs to upgrade vendor software or campus information technology systems to use the batch-method interface with SEVIS.

The Service has taken this cost into account and has developed SEVIS to utilize common standards. As previously discussed in the supplementary information, schools using SEVIS will no longer have to print out, file, and mail as many paper forms. Indeed, there should be little to no additional cost for schools that do not choose to use the optional batch processing capability. In fact, these schools may experience some savings as a result of the efficiencies that SEVIS will provide. Moreover, while the initial monetary impact on schools that choose to use batch capability may be greater, those schools might experience long-term savings because the automated process of maintaining student records for purposes of SEVIS would likely reduce future personnel costs. These decisions as to cost/benefit tradeoffs will be up to the discretion of each school. Accordingly, this rule will not have a significant economic impact on a substantial number of small entities as that term is defined in *5 U.S.C. 601*(6).

*Unfunded Mandates Reform Act of 1995*

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $ 100 million or more in any one year, and it will not significantly or uniquely effect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $ 100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

*Executive Order 12866*

This rule is considered by the Department of Justice, Immigration and Naturalization Service, to be a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review. Accordingly, this regulation has been submitted to the Office of Management and Budget (OMB) for review.

1. Purpose for Regulation

For close to twenty years, Service regulations have required the use of the Form I-20 and have required schools to maintain records on nonimmigrant students enrolled at their institution. These regulations also have required schools to furnish such information to the Service upon request. Schools have been required to maintain records and updates on student information such as the student's name, date and place of birth, country of citizenship, address, status, date of commencement of studies, and a photocopy of the student's Form I-20. This final rule incorporates similar collection and reporting requirements, with some additional information collection and reporting procedures that are mandated by IIRIRA, the USA PATRIOT Act, and the Enhanced Border Security Act. This rule is necessary to improve and streamline the reporting and recordkeeping of F, J, and M nonimmigrants by establishing a process for the electronic reporting DSOs of information required to be reported to the Service, and providing clear standards governing the maintenance, extension and reinstatement of student status.

Schools will be required to report some additional information that they were not required to maintain in the past, and there are changes to reporting requirements as a result of the above statutory authority and this final rule. However,

Exhibit 1
305

the implementation of SEVIS (an electronic and e-Gov system) mitigates the new elements and frequency of reporting. In order to create or update any student or exchange visitor related form (*e.g.*, Form I-20, Form DS-2019), the school or sponsor will now access SEVIS and enter the information electronically. Thus, the data is instantly collected in a central database before the form is ever printed. Because the information will be collected electronically, there will no longer be a need for multiple copies of forms. Neither the Service nor the DOS will need a separate paper copy for data entry because both agencies can access SEVIS in real time. Likewise, schools and sponsors will no longer be required to maintain their own paper copy of the record, because it will be accessible through SEVIS.

2. Assessment of Costs

    a. *One-time transition costs associated with continuing students and exchange visitors.*

The Service has set January 30, 2003, as the date by which all schools must use SEVIS in order to issue a new Form [*76268] I-20. However, in order to allow schools sufficient time to enter all current students in SEVIS, the Service has determined August 1, 2003, to be the date upon which all current or continuing students must be entered into SEVIS, unless such students require a new Form I-20 because of a reportable action such as new visa issuance.

While some percentage of current or continuing students may graduate or complete their programs prior to August 1, 2003, those students that are continuing a course of study as of August 1, 2003, must be entered into SEVIS by that date and issued a SEVIS Form I-20. This requirement for schools to input all current or continuing students will be a one-time event in the first year for transition to SEVIS.

The following estimate is based upon the amount of time it would take to complete a Form I-20 in order to enter a continuing student in SEVIS.

| Continuing student reporting burden | |
|---|---:|
| a. Number of Continuing Students | 625,000 |
| b. Number of Continuing Exchange Visitors | 275,000 |
| c. Number of Responses per Respondent | 1 |
| d. Hours per Response | .52 |
| e. Total One-time Reporting Burden | 468,000 |
| f. Total Public Cost | $ 4,680,000 |

The following estimate is based upon the amount of time it would take to complete a SEVIS Form I-20. This one-time reporting burden for continuing students and exchange visitors is based upon a standard requirement and process for each response. As such, the school or exchange program should not require much time to familiarize or refresh themselves on the relevant regulatory provision and process. The projected hours per response were derived by breaking the process into two basic components:

| | Minutes |
|---|---:|
| Learning about the Law and the Program | 1 |
| Data Collection and Input | 30 |
| Total Hours per Response | fn1 31 |

    fn1 .52 hours.

The total one-time reporting burden was derived by multiplying the number of applicant respondents (estimated continuing student plus estimated continuing exchange visitors = 900,000) x frequency of response (1) x average

Exhibit 1
306

67 FR 76256, *76268

response time of 31 minutes (.52 hours) per response. The estimated one-time public cost estimation is based on the number of respondents (900,000) x 31 minutes (.52 hours) per response x $ 10 (average hourly rate).

The number of applicant respondents, 625,000 students, is the Service's best estimate based upon experience, statistics, and industry sources such as the 2001 Open Doors Report on International Educational Exchange produced by the Institute of International Education. The number of applicant respondents, 275,000 exchange visitors, is the best estimate provided by the Department of State, Office of Exchange Coordination and Designation, Bureau of Educational and Cultural Affairs.

   b. *Operational costs.*

   The Service has worked closely with the Department of State as well as the American Council on Education (ACE), NAFSA-Association of International Educators, and others to obtain their views on the availability of data, frequency of collection, clarity of instructions, disclosure and the data elements to be reported. In addition, the educational community has attended several working group sessions and high-level policy discussions. As a result of these consultations, the Service has incorporated many suggestions in the SEVIS requirements.

   The following estimate is based upon the amount of time it would take to complete a SEVIS Form I-20. As the information being collected by SEVIS will differ for each individual depending on the event being updated, the data required for entry into SEVIS cannot be determined on a consistent basis. As such, the Service is using the SEVIS Form I-20 as the standard, and averaging the amount of data entry in SEVIS per response across initial SEVIS Form I-20 entry and subsequent update response.

| Annual reporting burden | |
| --- | --- |
| Number of Students | 625,000 |
| Number of Exchange Visitors | 275,000 |
| Number of Responses per Respondent | 5 |
| Hours per Response | .333 |
| Total Annual Reporting Burden | 1,498,500 |
| Total Public Cost | $ 14,985,000 |

   The projected hours per response for this collection of information were derived by first breaking the process into three basic components:

| | Minutes |
| --- | --- |
| Learning about the Law and the Program | 10 |
| Data Collection and Updates | 5 |
| Adjudication, notification, reports | 5 |
| Total Hours per Response | 20 |

   The Service anticipates that the initial data entry may require 30 minutes. However, once the records are uploaded into SEVIS, the updates and maintenance of the information will require considerably less time. Included in this estimate is time associated with each response for the school or exchange program to familiarize or refresh themselves as to the relevant regulatory provision and process. Unlike section (a) above, updates and other processes beyond the initial data entry of a Form I-20 (or Form DS-2019) may be varied, and as such may require a small amount of time to learn about the law. We estimate approximately 10 minutes for the update of these records. In calculating the hours per response, we considered both the initial data entry of the Form I-20 and the update of information and estimated an

Exhibit 1
307

average of 20 minutes per response. The Services estimates 5 responses per year for each respondent based upon a generalization that each student will require an initial Form I-20, the school will likely need to report registration of the student twice a year, and there may be one or two further responses such as a change of address, change of major, or request for employment.

The total annual reporting burden hours was derived by multiplying the number of applicant respondents (900,000) x frequency of response (5) x average response time of 20 minutes (.333 hours) per response. The estimated annual public cost estimation is based on the number of respondents (900,000) x 20 minutes (.333 hours) per response x $ 10 (average hourly rate).

c. *SEVIS Batch functionality.*

The use of SEVIS batch processing is a choice to be made voluntarily by each individual school. Therefore, any school cost to create, purchase, or upgrade technology to use batch processing is a business decision to be made by each school in context with their business processes, infrastructure, and cost/benefit assessment. Batch functionality is an optional method made available to schools and is not a requirement for SEVIS compliance.

Other than personnel costs to input and update student records in SEVIS, there is virtually no cost to schools as real time interactive capability only requires that the school have Internet access and a free browser. There is no other software necessary to use the real time interactive capability and there are  [*76269]  no recurring access fees. Therefore, for real-time interactive, there is no programming costs, server costs, and no software required to download or provide via CD-ROM, since SEVIS is accessed through the Internet similar to many commonly used Web sites.

In addition, those schools that do elect to incur any costs to create or purchase software to take advantage of SEVIS batch functionality would likely then not incur personnel costs and burden as described in section (a) above. Batch functionality entails school technology systems uploading larger amounts of data directly to SEVIS. As such, the cost of the one-time requirement of entering all continuing students in SEVIS may be substantially reduced since existing electronic records would be entered into SEVIS via a batch system-to-system upload. Furthermore, any start-up and maintenance costs incurred by schools using the SEVIS batch functionality might be highly cost effective in the longer term because, once the electronic interface is complete, the process of maintaining student records for purposes of SEVIS would be highly automated, thereby likely reducing the future personnel costs.

d. *Estimation of Total Cost*

The Service estimates that the total cost to implement and operate SEVIS the first year will be approximately $ 20 million. After the initial implementation costs are incurred, the Service estimates that the schools will incur yearly costs of less than $ 15 million to fulfill their ongoing SEVIS requirements. As schools become more adept at fulfilling these requirements, the Service expects that these costs may drop.

3. Assessment of Benefits

SEVIS implements IIRIRA, which requires the INS to collect current information, on an ongoing basis, from schools and exchange programs relating to nonimmigrant foreign students and exchange visitors during the course of their stay in the United States. Furthermore, the President issued Homeland Security Directive No. 2 (HS PDD-02) that, in part, directs an end to the abuse of international student status. In addition, the USA PATRIOT Act amended IIRIRA to require full implementation and expansion of SEVIS prior to January 1, 2003. Furthermore, the Enhanced Border Security Act adds to and clarifies the collection of information and specifically requires an educational institution to report any failure of an alien to enroll not later than 30 days after registration deadline.

SEVIS enables schools and exchange program sponsors to transmit electronic information and event notifications, via the Internet, to the Service and DOS throughout a student or exchange visitor's stay in the United States. SEVIS will be informed of status events for students and exchange visitors including, but not limited to, entry/exit data, changes of

Exhibit 1
308

address, program extensions, employment notifications, and changes in program of study. SEVIS will also provide system alerts, event notifications, and reports to the schools and exchange programs, as well as for Service and DOS offices.

Implementation of SEVIS will revise and enhance the process by which foreign students and exchange visitors gain admission to the United States. SEVIS will increase the Service's ability to track and monitor foreign students and exchange visitors in order to ensure that they arrive in the United States, show up and register at the school or exchange program, and properly maintain their status during their stay as valued guests in this country. SEVIS provides a proper balance between openness to international students and exchange visitors and the security obtained by enforcing the law.

SEVIS addresses more than the collection of data for monitoring and tracking of foreign students. In addition to providing efficiency to Service processes for the review and adjudication of items such as Form I-17 educational institution application and reinstatement, the system also provides value-added features that are useful to the school. For example, SEVIS provides "ticklers" and system alerts to the school, such as when a foreign student is issued a visa (once data share with DOS Consular Affairs is in effect), or when a nonimmigrant student enters through a port-of-entry (once data share with entry data is in effect). There are also system alerts for when a student is coming to the end of their program, as well as a selection of numerous reports available to the school user. Furthermore, the system provides a search engine functionality to enable direct queries based upon the SEVIS ID# from the Form I-20 issued by the school, as well as enhanced search capability to search by multiple parameters and data elements. SEVIS itself includes many self-help features for the end-user. Elements include an online tutorial, frequently asked questions, and system help and index.

This rule also increases the number of DSOs that a school is authorized from five to ten per school or campus. This increase in the number of SEVIS authorized DSOs is intended to provide schools with greater flexibility to address needs for personnel in the short or longer term for managing their international student programs and for properly reporting and updating records in SEVIS.

Another benefit and a Paperwork Reduction Act element is that SEVIS will eliminate the need for and use of the Form I-538 that formerly was used by schools to notify the Service in cases of the approval of an F-1 for extension or curricular practical training. The former process required a school to mail the Form I-538 to a Service contractor in London, KY for data entry. With SEVIS this notification can be made in real-time, through the update of the student's record in SEVIS. Ultimately, it is the intent of the Service and DOS to phase out the paper submission of all student and exchange visitor related forms in favor of completely electronic submissions, updates, and reporting.

4. Conclusion

The Service believes that the benefits of this rule far outweigh its costs. SEVIS will benefit both the approved schools and the Service by implementing an effective e-Gov system to replace what is currently a poorly performing paper-based reporting system. This rule improves and streamlines the reporting and recordkeeping of F, J, and M nonimmigrants and provides clear standards governing the maintenance, extension and reinstatement of student status. SEVIS also will be used as a tool for ensuring that F, J, and M nonimmigrant students are complying with their applicable regulatory requirements. This rule will provide the Service a means of determining whether nonimmigrant students and exchange visitors are currently enrolled in an approved course of study or exchange visitor program. Thus, SEVIS will serve as means of protecting both the public and national security. Therefore, the benefits of this rule outweigh any economic costs that will be incurred during its implementation and operation.

*Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of Government. Therefore,

Exhibit 1
309

in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.  [*76270]

*Executive Order 12988 Civil Justice Reform*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*Paperwork Reduction Act*

The Service is adding new electronic reporting requirements using SEVIS which is considered an information collection under the Paperwork Reduction Act. Accordingly, this information collection requirement has been approved by the Office of Management and Budget. The OMB control number for this information collection is 1115-0252.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Employment, Reporting and recordkeeping requirements, Students.

*8 CFR Part 248*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

**PART 103--POWERS AND DUTIES OF SERVICE OFFICERS: AVAILABILITY OF SERVICE RECORDS**

1. The authority citation for part 103 continues to read as follows:

**Authority:** *5 U.S.C. 552,* 552a; *8 U.S.C. 1101,* 1103, 1304, 1356; *31 U.S.C. 9701;* E.O. 12356, *47 FR 14874, 15557;* 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

**§ 103.7 -- [Amended]**

2. Section 103.7(b)(1) is amended by removing the entry for "Form I-538" from the listing of fees.

**PART 214--NONIMMIGRANT CLASSES**

3. The authority citation for part 214 is revised to read as follows:

**Authority:** *8 U.S.C. 1101,* 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301-1305 and 1372; sec. 643, Pub. L. 104-208, 110 Stat. 3009-708; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, *48 U.S.C. 1901,* note, and 1931 note, respectively; 8 CFR part 2.

Exhibit 1
310

67 FR 76256, *76270

4. Section 214.1 is amended by adding a new paragraph (h) to read as follows:

**§ 214.1 -- Requirements for admission, extension, and maintenance of status.**

\* \* \* \* \*

(h) *Education privacy and F, J, and M nonimmigrants.* As authorized by section 641(c)(2) of Division C of Pub. L. 104-208, *8 U.S.C. 1372,* and § 2.1(a) of this chapter, the Service has determined that, with respect to F and M nonimmigrant students and J nonimmigrant exchange visitors, waiving the provisions of the Family Educational Rights and Privacy Act (FERPA), *20 U.S.C. 1232g,* is necessary for the proper implementation of *8 U.S.C. 1372.* An educational agency or institution may not refuse to report information concerning an F or M nonimmigrant student or a J nonimmigrant exchange visitor that the educational agency or institution is required to report under *8 U.S.C. 1372* and § 214.3(g) (or any corresponding Department of State regulation concerning J nonimmigrants) on the basis of FERPA and any regulation implementing FERPA. The waiver of FERPA under this paragraph authorizes and requires an educational agency or institution to report information concerning an F, J or M nonimmigrant that would ordinarily be protected by FERPA, but only to the extent that *8 U.S.C. 1372* and § 214.3(g) (or any corresponding Department of State regulation concerning J nonimmigrants) requires the educational agency or institution to report information.

5. Section 214.2 is amended by:

a. Revising paragraph (f)(1)(i);

b. Adding new paragraphs (f)(1)(iii);

c. Revising paragraph (f)(3);

d. Revising paragraphs (f)(4)(i) and (ii);

e. Revising paragraph (f)(5)(i);

f. Revising paragraph (f)(5)(iv);

g. Revising paragraph (f)(6)(i) introductory text and paragraph (f)(6)(i)(E);

h. Adding paragraphs (f)(6)(i)(G) and (f)(6)(i)(H);

i. Revising paragraph (f)(6)(iii), and by adding a new paragraph (f)(6)(iv);

j. Revising paragraph (f)(7);

k. Revising paragraph (f)(8)(i) and adding paragraphs (f)(8)(ii)(A), (B), (C), and (D);

l. Adding two sentences to the end of paragraph (f)(9)(i);

m. Removing and reserving paragraphs (f)(9)(ii)(B) and (E);

n. Revising paragraphs (f)(9)(ii)(D), (f)(9)(ii)(F)(1), and (f)(9)(iii);

o. Revising paragraph (f)(10) introductory text;

p. Revising paragraph (f)(10)(i);

q. Revising paragraphs (f)(10)(ii)(A) and (B);

Exhibit 1
311

r. Revising the paragraph heading for paragraph (f)(10)(ii)(D);

s. Adding a new paragraph (f)(10)(ii)(E);

t. Revising paragraph (f)(11)(ii);

u. Revising paragraph (f)(12);

v. Revising paragraphs (f)(15) and (f)(16); and by

w. Adding a new paragraph (f)(17).

The additions and revisions read as follows:

## § 214.2 -- Special requirements for admission, extension, and maintenance of status.

* * * * *

(f) * * *

(1) * * *

(i) *Eligibility for admission.* A nonimmigrant student may be admitted into the United States in nonimmigrant status under section 101(a)(15)(F) of the Act, if:

(A) The student presents a SEVIS Form I-20 issued in his or her own name by a school approved by the Service for attendance by F-1 foreign students. (In the alternative, for a student seeking admission prior to August 1, 2003, the student may present a currently-valid Form I-20A-B/I-20ID, if that form was issued by the school prior to January 30, 2003);

(B) The student has documentary evidence of financial support in the amount indicated on the SEVIS Form I-20 (or the Form I-20A-B/I-20ID);

(C) For students seeking initial admission only, the student intends to attend the school specified in the student's visa (or, where the student is exempt from the requirement for a visa, the school indicated on the SEVIS Form I-20 (or the Form I-20A-B/I-20ID)); and

(D) In the case of a student who intends to study at a public secondary school, the student has demonstrated that he or she has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at the school for the period of the student's attendance.

* * * * *

(iii) *Use of SEVIS.* On January 30, 2003, the use of the Student and Exchange Visitor Information System (SEVIS) will become mandatory for the issuance of any new Form I-20. A student or dependent who presents a non-SEVIS Form I-20 issued on or after January 30, 2003, will not be accepted for admission to the United States. Non-SEVIS Forms I-20 issued prior to  [*76271]  January 30, 2003, will continue to be acceptable until August 1, 2003. However, schools must issue a SEVIS Form I-20 to any current student requiring a reportable action (*e.g.*, extension of status, practical training, and requests for employment authorization) or a new Form I-20, or for any aliens who must obtain a new nonimmigrant student visa. As of August 1, 2003, the records of all current or continuing students must be entered in SEVIS.

* * * * *

Exhibit 1
312

(3) *Admission of the spouse and minor children of an F-1 student.* The spouse and minor children accompanying an F-1 student are eligible for admission in F-2 status if the student is admitted in F-1 status. The spouse and minor children following-to-join an F-1 student are eligible for admission to the United States in F-2 status if they are able to demonstrate that the F-1 student has been admitted and is, or will be within 30 days, enrolled in a full course of study, or engaged in approved practical training following completion of studies. In either case, at the time they seek admission, the eligible spouse and minor children of an F-1 student with a SEVIS Form I-20 must individually present an original SEVIS Form I-20 issued in the name of each F-2 dependent issued by a school authorized by the Service for attendance by F-1 foreign students. Prior to August 1, 2003, if exigent circumstances are demonstrated, the Service will allow the dependent of an F-1 student in possession of a SEVIS Form I-20 to enter the United States using a copy of the F-1 student's SEVIS Form I-20. (In the alternative, for dependents seeking admission to the United States prior to August 1, 2003, a copy of the F-1 student's current Form I-20ID issued prior to January 30, 2003, with proper endorsement by the DSO will satisfy this requirement.) A new SEVIS Form I-20 (or Form I-20A-B) is required for a dependent where there has been any substantive change in the F-1 student's current information.

(4) * * *

(i) A current SEVIS Form I-20 (or, for readmission prior to August 1, 2003, a current Form I-20ID which was issued prior to January 30, 2003), properly endorsed by the DSO for reentry if there has been no substantive change to the most recent Form I-20 information; or

(ii) A new SEVIS Form I-20 (or, for readmission prior to August 1, 2003, a new Form I-20ID which was issued prior to January 30, 2003), if there has been a substantive change in the information on the student's most recent Form I-20 information, such as in the case of a student who has changed the major area of study, who intends to transfer to another Service approved institution or who has advanced to a higher level of study.

(5) * * *

(i) *General.* Except for border commuter students covered by the provisions of paragraph (f)(18) of this section, an F-1 student is admitted for duration of status. Duration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution approved by the Service for attendance by foreign students, or engaging in authorized practical training following completion of studies, except that an F-1 student who is admitted to attend a public high school is restricted to an aggregate of 12 months of study at any public high school(s). An F-1 student may be admitted for a period up to 30 days before the indicated report date or program start date listed on Form I-20. The student is considered to be maintaining status if he or she is making normal progress toward completing a course of study.

* * * * *

(iv) *Preparation for departure.* An F-1 student who has completed a course of study and any authorized practical training following completion of studies will be allowed an additional 60-day period to prepare for departure from the United States or to transfer in accordance with paragraph (f)(8) of this section. An F-1 student authorized by the DSO to withdraw from classes will be allowed a 15-day period for departure from the United States. However, an F-1 student who fails to maintain a full course of study without the approval of the DSO or otherwise fails to maintain status is not eligible for an additional period for departure.

* * * * *

(6) * * *

(i) *General.* Successful completion of the full course of study must lead to the attainment of a specific educational or professional objective. A course of study at an institution not approved for attendance by foreign students as provided in § 214.3(a)(3) does not satisfy this requirement. A "full course of study" as required by section 101(a)(15)(F)(i) of the

Exhibit 1
313

Act means:

* * * * *

(E) Study in a curriculum at an approved private elementary or middle school or public or private academic high school which is certified by a designated school official to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress toward graduation.

* * * * *

(G) For F-1 students enrolled in classes for credit or classroom hours, no more than the equivalent of one class or three credits per session, term, semester, trimester, or quarter may be counted toward the full course of study requirement if the class is taken on-line or through distance education and does not require the student's physical attendance for classes, examination or other purposes integral to completion of the class. An on-line or distance education course is a course that is offered principally through the use of television, audio, or computer transmission including open broadcast, closed circuit, cable, microwave, or satellite, audio conferencing, or computer conferencing. If the F-1 student's course of study is in a language study program, no on-line or distance education classes may be considered to count toward a student's full course of study requirement.

(H) On-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study.

* * * * *

(iii) *Reduced course load.* The designated school official may allow an F-1 student to engage in less than a full course of study as provided in this paragraph (f)(6)(iii). Except as otherwise noted, a reduced course load must consist of at least six semester or quarter hours, or half the clock hours required for a full course of study. A student who drops below a full course of study without the prior approval of the DSO will be considered out of status. On-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study.

(A) *Academic difficulties.* The DSO may authorize a reduced course load on account of a student's initial difficulty with the English language or reading requirements, unfamiliarity with U.S. teaching methods, or improper course level placement. The student must resume a full course of study at the next available term, session, or semester, excluding a summer session, in order to maintain student status. A student previously authorized to drop below a full course of study due to academic difficulties is not eligible for a second authorization by the DSO due to academic difficulties while pursuing a [*76272] course of study at that program level. A student authorized to drop below a full course of study for academic difficulties while pursuing a course of study at a particular program level may still be authorized for a reduced course load due to an illness medical condition as provided for in paragraph (B) of this section.

(B) *Medical conditions.* The DSO may authorize a reduced course load (or, if necessary, no course load) due to a student's temporary illness or medical condition for a period of time not to exceed an aggregate of 12 months while the student is pursuing a course of study at a particular program level. In order to authorize a reduced course load based upon a medical condition, the student must provide medical documentation from a licensed medical doctor, doctor of osteopathy, or licensed clinical psychologist, to the DSO to substantiate the illness or medical condition. The student must provide current medical documentation and the DSO must reauthorize the drop below full course of study each new term, session, or semester. A student previously authorized to drop below a full course of study due to illness or medical condition for an aggregate of 12 months may not be authorized by a DSO to reduce his or her course load on subsequent occasions while pursuing a course of study at the same program level. A student may be authorized to reduce course load for a reason of illness or medical condition on more than one occasion while pursuing a course of study, so long as the aggregate period of that authorization does not exceed 12 months.

Exhibit 1
314

(C) *Completion of course of study.* The DSO may authorize a reduced course load in the student's final term, semester, or session if fewer courses are needed to complete the course of study. If the student is not required to take any additional courses to satisfy the requirements for completion, but continues to be enrolled for administrative purposes, the student is considered to have completed the course of study and must take action to maintain status. Such action may include application for change of status or departure from the U.S.

(D) *Reporting requirements for non-SEVIS schools.* A DSO must report to the Service any student who is authorized to reduce his or her course load. Within 21 days of the authorization, the DSO must send a photocopy of the student's current Form I-20ID along with Form I-538 to Service's data processing center indicating the date and reason that the student was authorized to drop below full time status. Similarly, the DSO will report to the Service no more than 21 days after the student has resumed a full course of study by submitting a current copy of the students' Form I-20ID to the Service's data processing center indicating the date a full course of study was resumed and the new program end date with Form I-538, if applicable.

(E) S *EVIS reporting requirements.* In order for a student to be authorized to drop below a full course of study, the DSO must update SEVIS prior to the student reducing his or her course load. The DSO must update SEVIS with the date, reason for authorization, and the start date of the next term or session. The DSO must also notify SEVIS within 21 days of the student's commencement of a full course of study. If an extension of the program end date is required due to the drop below a full course of study, the DSO must update SEVIS by completing a new SEVIS Form I-20 with the new program end date in accordance with paragraph (f)(7) of this section.

(iv) *Concurrent enrollment.* An F-1 student may be enrolled in two different Service-approved schools at one time as long as the combined enrollment amounts to a full time course of study. In cases where a student is concurrently enrolled, the school from which the student will earn his or her degree or certification should issue the Form I-20, and conduct subsequent certifications and updates to the Form I-20. The DSO from this school is also responsible for all of the reporting requirements to the Service. In instances where a student is enrolled in programs with different full course of study requirements (*e.g.*, clock hours vs. credit hours), the DSO is permitted to determine what constitutes a full time course of study.

(7) *Extension of stay.-*

(i) *General.* An F-1 student who is admitted for duration of status is not required to apply for extension of stay as long as the student is maintaining status and making normal progress toward completion of his or her educational objective. An F-1 student who is currently maintaining status and making normal progress toward completing his or her educational objective, but who is unable to complete his or her course of study by the program end date on the Form I-20, must apply prior to the program end date for a program extension pursuant to paragraph (f)(7)(iii) of this section.

(ii) *Report date and program completion date on Form I-20.* When determining the report date on the Form I-20, the DSO may choose a reasonable date to accommodate a student's need to be in attendance for required activities at the school prior to the actual start of classes. Such required activities may include, but are not limited to, research projects and orientation sessions. However, for purposes of employment, the DSO may not indicate a report date more than 30 days prior to the start of classes. When determining the program completion date on Form I-20, the DSO should make a reasonable estimate based upon the time an average student would need to complete a similar program in the same discipline.

(iii) *Program extension for students in lawful status.* An F-1 student who is unable to meet the program completion date on the Form I-20 may be granted an extension by the DSO if the DSO certifies that the student has continually maintained status and that the delays are caused by compelling academic or medical reasons, such as changes of major or research topics, unexpected research problems, or documented illnesses. Delays caused by academic probation or suspension are not acceptable reasons for program extensions. A DSO may not grant an extension if the student did not apply for an extension until after the program end date noted on the Form I-20. An F-1 student who is unable to

Exhibit 1
315

complete the educational program within the time listed on Form I-20 and who is ineligible for program extension pursuant to this paragraph (f)(7) is considered out of status. If eligible, the student may apply for reinstatement under the provisions of paragraph (f)(16) of this section.

(iv) *Notification.* Upon granting a program extension, a DSO at a non-SEVIS school must immediately submit notification to the Service's data processing center using Form I-538 and the top page of Form I-20A-B showing the new program completion date. For a school enrolled in SEVIS, a DSO may grant a program extension only by updating SEVIS and issuing a new Form I-20 reflecting the current program end date. A DSO may grant an extension any time prior to the program end date listed on the student's original Form I-20.

(8) * * *

(i) A student who is maintaining status may transfer to another Service approved school by following the notification procedure prescribed in paragraph (f)(8)(ii) of this section. However, an F-1 student is not permitted to remain in the United States when transferring between schools or programs unless the student will begin classes at the transfer school or program within 5 months of transferring out of the current school or within 5 months of the program completion date on his or her current Form I-20, whichever is [*76273] earlier. In the case of an F-1 student authorized to engage in post-completion optional practical training (OPT), the student must be able resume classes within 5 months of transferring out of the school that recommended OPT or the date the OPT authorization ends, whichever is earlier. An F-1 student who was not pursuing a full course of study at the school he or she was last authorized to attend is ineligible for school transfer and must apply for reinstatement under the provisions of paragraph (f)(16) of this section, or, in the alternative, may depart the country and return as an initial entry in a new F-1 nonimmigrant status.

(ii) * * *

(A) *Non-SEVIS School to Non-SEVIS school.* To transfer from one non-SEVIS school to a different non-SEVIS school, the student must first notify the school he or she is attending of the intent to transfer, then obtain a Form I-20 issued in accordance with the provisions of *8 CFR 214.3(k)* from the school to which he or she intends to transfer. Prior to issuance of any Form I-20, the DSO at the transfer school is responsible for determining that the student has been maintaining status at his or her current school and is eligible for transfer to the new school. The transfer will be effected only if the student completes the Student Certification portion of the Form I-20 and returns the form to a DSO of the transfer school within 15 days of the program start date listed on Form I-20. Upon receipt of the student's Form I-20 the DSO must note "transfer completed on (date)" in the space provided for the DSO's remarks, thereby acknowledging the student's attendance at the transfer school; return the Form I-20 to the student; submit the School copy of the Form I-20 to Service's Data Processing Center within 30 days of receipt from the student; and forward a photocopy of the school copy to the school from which the student transferred.

(B) *Non-SEVIS school to SEVIS school.* To transfer from a non-SEVIS school to a SEVIS school, the student must first notify the school he or she is attending of the intent to transfer, then obtain a SEVIS Form I-20 issued in accordance with the provisions of *8 CFR 214.3(k)* from the school to which he or she intends to transfer. Prior to issuance of any Form I-20, the DSO at the transfer school is responsible for determining that the student has been maintaining status at his or her current school and is eligible for transfer to the new school. Once the transfer school has issued the SEVIS Form I-20 to the student indicating a transfer, the transfer school becomes responsible for updating and maintaining the student's record in SEVIS. The student is then required to notify the DSO at the transfer school within 15 days of the program start date listed on SEVIS Form I-20. Upon notification that the student is enrolled in classes, the DSO of the transfer school must update SEVIS to reflect the student's registration and current address, thereby acknowledging that the student has completed the transfer process. In the remarks section of the student's SEVIS Form I-20, the DSO must note that the transfer has been completed, including the date, and return the form to the student. The transfer is effected when the transfer school updates SEVIS indicating that the student has registered in classes within the 30 days required by § 214.3(g)(3)(iii).

Exhibit 1
316

(C) *SEVIS school to SEVIS school.* To transfer from a SEVIS school to a SEVIS school the student must first notify his or her current school of the intent to transfer and must indicate the school to which he or she intends to transfer. Upon notification by the student, the current school will update the student's record in SEVIS as a "transfer out" and indicate the school to which the student intends to transfer, and a release date. The release date will be the current semester or session completion date, or the date of expected transfer if earlier than the established academic cycle. The current school will retain control over the student's record in SEVIS until the student completes the current term or reaches the release date. At the request of the student, the DSO of the current school may cancel the transfer request at any time prior to the release date. As of the release date specified by the current DSO, the transfer school will be granted full access to the student's SEVIS record and then becomes responsible for that student. The current school conveys authority and responsibility over that student to the transfer school, and will no longer have full SEVIS access to that student's record. As such, a transfer request may not be cancelled by the current DSO after the release date has been reached. After the release date, the transfer DSO must complete the transfer of the student's record in SEVIS and may issue a SEVIS Form I-20. The student is then required to contact the DSO at the transfer school within 15 days of the program start date listed on the SEVIS Form I-20. Upon notification that the student is enrolled in classes, the DSO of the transfer school must update SEVIS to reflect the student's registration and current address, thereby acknowledging that the student has completed the transfer process. In the remarks section of the student's SEVIS Form I-20, the DSO must note that the transfer has been completed, including the date, and return the form to the student. The transfer is effected when the transfer school notifies SEVIS that the student has enrolled in classes in accordance with the 30 days required by § 214.3(g)(3)(iii).

(D) *SEVIS school to non-SEVIS school.* To transfer from a SEVIS school to a non-SEVIS school, the student must first notify his or her current school of the intent to transfer and must indicate the school to which he or she intends to transfer. Upon notification by the student, the current school will update the student's status in SEVIS as "a transfer out", enter a "release" or expected transfer date, and update the transfer school as "non-SEVIS." The student must then notify the school to which the he or she intends to transfer of his or her intent to enroll. After the student has completed his or her current term or session, or has reached the expected transfer date, the DSO at the current school will no longer have full access to the student's SEVIS record. At this point, if the student has notified the transfer school of his or her intent to transfer, and the transfer school has determined that the student has been maintaining status at his or her current school, the transfer school may issue the student a Form I-20. The transfer will be effected only if the student completes the Student Certification portion of the Form I-20 and returns the form to a designated school official of the transfer school within 15 days of the program start date listed on Form I-20. Upon receipt of the student's Form I-20 the DSO must do as follows: note "transfer completed on (date)" in the space provided for the DSO's remarks, thereby acknowledging the student's attendance; return the Form I-20 to the student; submit the school copy of the Form I-20 to the Service's data processing center within 30 days of receipt from the student; and forward a photocopy of the school copy to the school from which the student transferred.

* * * * *

(9) * * *

(i) * * * In the case of a transfer in SEVIS, the student may only engage in on-campus employment at the school having jurisdiction over the student's SEVIS record. Upon initial entry to begin a new course of study, an F-1 student may not begin on-campus employment more than 30 days prior to the actual start of classes.

(ii) * * *  [*76274]

(B) Reserved.

* * * * *

(D) *Procedure for off-campus employment authorization due to severe economic hardship.* The student must

Exhibit 1
317

request a recommendation from the DSO for off-campus employment. The DSO at a non-SEVIS school must make such a certification on Form I-538, Certification by Designated School Official. The DSO of a SEVIS school must complete such certification in SEVIS. The DSO may recommend the student for work off-campus for one year intervals by certifying that:

(*1*) The student has been in F-1 status for one full academic year;

(*2*) The student is in good standing as a student and is carrying a full course of study as defined in paragraph (f)(6) of this section;

(*3*) The student has demonstrated that acceptance of employment will not interfere with the student's carrying a full course of study; and

(*4*) The student has demonstrated that the employment is necessary to avoid severe economic hardship due to unforeseen circumstances beyond the student's control pursuant to paragraph (f)(9)(ii)(C) of this section and has demonstrated that employment under paragraph (f)(9)(i) of this section is unavailable or otherwise insufficient to meet the needs that have arisen as a result of the unforeseen circumstances.

(E) Reserved.

(F) * * *

(*1*) The applicant should submit the economic hardship application for employment authorization on Form I-765, with the fee required by *8 CFR 103.7(b)(1)*, to the service center having jurisdiction over his or her place of residence. Applicants at a non-SEVIS school should submit Form I-20, Form I-538, and any other supporting materials such as affidavits which further detail the unforeseen circumstances that require the student to seek employment authorization and the unavailability or insufficiency of employment under paragraph (f)(9)(i) of this section. Students enrolled in a SEVIS school should submit the SEVIS Form I-20 with the employment page demonstrating the DSO's comments and certification.

* * * * *

(iii) *Internship with an international organization.* A bona fide F-1 student who has been offered employment by a recognized international organization within the meaning of the International Organization Immunities Act (59 Stat. 669) must apply for employment authorization to the service center having jurisdiction over his or her place of residence. A student seeking employment authorization under this provision is required to present a written certification from the international organization that the proposed employment is within the scope of the organization's sponsorship, Form I-20 ID or SEVIS Form I-20 with employment page completed by DSO certifying eligibility for employment, and a completed Form I-765, with required fee as contained in § 103.7(b)(1) of this chapter.

(10) *Practical training.* Practical training may be authorized to an F-1 student who has been lawfully enrolled on a full time basis, in a Service-approved college, university, conservatory, or seminary for one full academic year. This provision also includes students who, during their course of study, were enrolled in a study abroad program, if the student had spent at least one full academic term enrolled in a full course of study in the United States prior to studying abroad. A student may be authorized 12 months of practical training, and becomes eligible for another 12 months of practical training when he or she changes to a higher educational level. Students in English language training programs are ineligible for practical training. An eligible student may request employment authorization for practical training in a position that is directly related to his or her major area of study. There are two types of practical training available:

(i) *Curricular practical training.* An F-1 student may be authorized by the DSO to participate in a curricular practical training program that is an integral part of an established curriculum. Curricular practical training is defined to be alternative work/study, internship, cooperative education, or any other type of required internship or practicum that is

Exhibit 1
318

offered by sponsoring employers through cooperative agreements with the school. Students who have received one year or more of full time curricular practical training are ineligible for post-completion academic training. Exceptions to the one academic year requirement are provided for students enrolled in graduate studies that require immediate participation in curricular practical training. A request for authorization for curricular practical training must be made to the DSO. A student may begin curricular practical training only after receiving his or her Form I-20 with the DSO endorsement.

(A) *Non-SEVIS process.* A student must request authorization for curricular practical training using Form I-538. Upon approving the request for authorization, the DSO shall: certify Form I-538 and send the form to the Service's data processing center; endorse the student's Form I-20 ID with "full-time (or part-time) curricular practical training authorized for (employer) at (location) from (date) to (date)"; and sign and date the Form I-20ID before returning it to the student.

(B) *SEVIS process.* To grant authorization for a student to engage in curricular practical training, a DSO at a SEVIS school will update the student's record in SEVIS as being authorized for curricular practical training that is directly related to the student's major area of study. The DSO will indicate whether the training is full-time or part-time, the employer and location, and the employment start and end date. The DSO will then print a copy of the employment page of the SEVIS Form I-20 indicating that curricular practical training has been approved. The DSO must sign, date, and return the SEVIS Form I-20 to the student prior to the student's commencement of employment.

(ii) * * *

(A) *General.* A student may apply to the Service for authorization for temporary employment for optional practical training directly related to the student's major area of study. The student may not begin optional practical training until the date indicated on his or her employment authorization document, Form I-766 or Form 688B. A student may submit an application for authorization to engage in optional practical training up to 90 days prior to being enrolled for one full academic year, provided that the period of employment will not begin until after the completion of the full academic year as indicated by the DSO. A student may be granted authorization to engage in temporary employment for optional practical training:

(*1*) During the student's annual vacation and at other times when school is not in session, if the student is currently enrolled, and is eligible for registration and intends to register for the next term or session;

(*2*) While school is in session, provided that practical training does not exceed 20 hours a week while school is in session; or

(*3*) After completion of the course of study, or, for a student in a bachelor's, master's, or doctoral degree program, after completion of all course requirements for the degree (excluding thesis or equivalent). Continued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for optional practical training. However, [*76275] optional practical training must be requested prior to the completion of all course requirements for the degree or prior to the completion of the course of study. A student must complete all practical training within a 14-month period following the completion of study.

(B) *Termination of practical training.* Authorization to engage in optional practical training employment is automatically terminated when the student transfers to another school or begins study at another educational level.

* * * * *

(D) *Action of the DSO-Non SEVIS schools.* * * *

(E) *SEVIS process.* In making a recommendation for optional practical training under SEVIS, the DSO will update the student's record in SEVIS as having been recommended for optional practical training. A DSO who recommends a

Exhibit 1
319

student for optional practical training is responsible for maintaining the record of the student for the duration of the time that training is authorized. The DSO will indicate in SEVIS whether the employment is to be full-time or part-time, and note in SEVIS the start and end date of employment. The DSO will then print the employment page of the student's SEVIS Form I-20, and sign and date the form to indicate that optional practical training has been recommended. The student must file with the service center for an Employment Authorization Document, on Form I-765, with fee and the SEVIS Form I-20 employment page indicating that optional practical training has been recommended by the DSO.

(11) * * *

(ii) A DSO's recommendation for optional practical training on Form I-20ID, or, for a SEVIS school, on an updated SEVIS Form I-20.

(12) *Decision on application for employment authorization.* The Service shall adjudicate the Form I-765 and issue an EAD on the basis of the DSO's recommendation unless the student is found otherwise ineligible. The Service shall notify the applicant of the decision and, if the application is denied, of the reason or reasons for the denial. The applicant may not appeal the decision. An F-1 student authorized by the Service to engage in practical training is required to report any change of name or address, or interruption of such employment to the DSO for the duration of the authorized training. A DSO who recommends a student for optional practical training is responsible for updating the student's record to reflect these reported changes for the duration of the time that training is authorized.

* * * * *

(15) *Spouse and children of F-1 student.* The F-2 spouse and minor children of an F-1 student shall each be issued an individual SEVIS Form I-20 in accordance with the provisions of § 214.3(k).

(i) *Employment.* The F-2 spouse and children of an F-1 student may not accept employment.

(ii) *Study.* (A) The F-2 spouse of an F-1 student may not engage in full time study, and the F-2 child may only engage in full time study if the study is in an elementary or secondary school (kindergarten through twelfth grade). The F-2 spouse and child may engage in study that is avocational or recreational in nature.

(B) An F-2 spouse or F-2 child desiring to engage in full time study, other than that allowed for a child in paragraph (f)(15)(ii)(A) of this section, must apply for and obtain a change of nonimmigrant classification to F-1, J-1, or M-1 status. An F-2 spouse or child who was enrolled on a full time basis prior to January 1, 2003, will be allowed to continue study but must file for a change of nonimmigrant classification to F-1, J-1, or M-1 status on or before March 11, 2003.

(C) An F-2 spouse or F-2 child violates his or her nonimmigrant status by engaging in full time study except as provided in paragraph (f)(15)(ii)(A) or (B) of this section.

(16) *Reinstatement to student status.-*

(i) *General.* The district director may consider reinstating a student who makes a request for reinstatement on Form I-539, Application to Extend/Change Nonimmigrant Status, accompanied by a properly completed SEVIS Form I-20 indicating the DSO's recommendation for reinstatement (or a properly completed Form I-20A-B issued prior to January 30, 2003, from the school the student is attending or intends to attend prior to August 1, 2003). The district director may consider granting the request if the student:

(A) Has not been out of status for more than 5 months at the time of filing the request for reinstatement (or demonstrates that the failure to file within the 5 month period was the result of exceptional circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances);

Exhibit 1
320

(B) Does not have a record of repeated or willful violations of Service regulations;

(C) Is currently pursuing, or intending to pursue, a full course of study in the immediate future at the school which issued the Form I-20;

(D) Has not engaged in unauthorized employment;

(E) Is not deportable on any ground other than section 237(a)(1)(B) or (C)(i) of the Act; and

(F) Establishes to the satisfaction of the Service, by a detailed showing, either that:

(*1*) The violation of status resulted from circumstances beyond the student's control. Such circumstances might include serious injury or illness, closure of the institution, a natural disaster, or inadvertence, oversight, or neglect on the part of the DSO, but do not include instances where a pattern of repeated violations or where a willful failure on the part of the student resulted in the need for reinstatement; or

(*2*) The violation relates to a reduction in the student's course load that would have been within a DSO's power to authorize, and that failure to approve reinstatement would result in extreme hardship to the student.

(ii) *Decision.* If the Service reinstates the student, the Service shall endorse the student's copy of Form I-20 to indicate the student has been reinstated and return the form to the student. If the Form I-20 is from a non-SEVIS school, the school copy will be forwarded to the school. If the Form I-20 is from a SEVIS school, the adjudicating officer will update SEVIS to reflect the Service's decision. In either case, if the Service does not reinstate the student, the student may not appeal that decision.

(17) *Current name and address.* A student must inform the DSO and the Service of any legal changes to his or her name or of any change of address, within 10 days of the change, in a manner prescribed by the school. A student enrolled at a SEVIS school can satisfy the requirement in *8 CFR 265.1* of notifying the Service by providing a notice of a change of address within 10 days to the DSO, who in turn shall enter the information in SEVIS within 21 days of notification by the student. A student enrolled at a non-SEVIS school must submit a notice of change of address to the Service, as provided in *8 CFR 265.1*, within 10 days of the change. Except in the case of a student who cannot receive mail where he or she resides, the address provided by the student must be the actual physical location where the student resides rather than a mailing address. In cases where a student provides a mailing address, the school must maintain a record of, and must provide upon request from the Service,  [*76276]  the actual physical location where the student resides.

* * * * *

## § 214.2 -- [Amended]

5. Section 214.2 is further amended by revising the term "IAP-66" to read "DS-2019" wherever that term appears in the following paragraphs:

Paragraph (j)(1)(iv)

Paragraph (j)(2)

Paragraph (j)(3)

Paragraph (j)(4)(i).

6. Section 214.2 is further amended by revising paragraphs (j)(1)(i) and (ii), and by adding new paragraphs (j)(1)(vii) and (j)(1)(viii) to read as follows:

Exhibit 1
321

§ 214.2 -- **Special requirements for admission, extension, and maintenance of status.**

* * * * *

(j) * * *

(1) *General* -(i) *Eligibility for admission.* A nonimmigrant exchange visitor and his or her accompanying spouse and minor children may be admitted into the United States in J-1 and J-2 classifications under section 101(a)(15)(J) of the Act, if the exchange visitor and his or her accompanying spouse and children each presents a SEVIS Form DS-2019 issued in his or her own name by a program approved by the Department of State for participation by J-1 exchange visitors. Prior to August 1, 2003, if exigent circumstances are demonstrated, the Service will allow the dependent of an exchange visitor possessing a SEVIS Form DS-2019 to enter the United States using a copy of the exchange visitor's SEVIS Form DS-2019. However, where the exchange visitor presents a properly completed Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, which was issued to the J-1 exchange visitor by a program approved by the Department of State for participation by exchange visitors and which remains valid for the admission of the exchange visitor, the accompanying spouse and children may be admitted on the basis of the J-1's non-SEVIS Form DS-2019.

(ii) *Admission period.* An exchange alien, and J-2 spouse and children, may be admitted for a period up to 30 days before the report date or start of the approved program listed on Form DS-2019. The initial admission of an exchange visitor, spouse and children may not exceed the period specified on Form DS-2019, plus a period of 30 days for the purposes of travel or for the period designated by the Commissioner as provided in paragraph (j)(1)(vi) of this section. Regulations of the Department of State published at 22 CFR part 62 give general limitations on the stay of the various classes of exchange visitors. A spouse or child may not be admitted for longer than the principal exchange visitor.

* * * * *

(vii) *Use of SEVIS.* At a date to be established by the Department of State, the use of the Student and Exchange Visitor Information System (SEVIS) will become mandatory for designated program sponsors. After that date, which will be announced by publication in the **Federal Register**, all designated program sponsors must begin issuance of the SEVIS Form DS-2019.

(viii) *Current name and address.* A J-1 exchange visitor must inform the Service and the responsible officer of the exchange visitor program of any legal changes to his or her name or of any change of address, within 10 days of the change, in a manner prescribed by the program sponsor. A J-1 exchange visitor enrolled in a SEVIS program can satisfy the requirement in *8 CFR 265.1* of notifying the Service by providing a notice of a change of address within 10 days to the responsible officer, who in turn shall enter the information in SEVIS within 21 days of notification by the exchange visitor. A J-1 exchange visitor enrolled at a non-SEVIS program must submit a change of address to the Service, as provided in *8 CFR 265.1*, within 10 days of the change. Except in the case of an exchange visitor who cannot receive mail where he or she resides, the address provided by the exchange visitor must be the actual physical location where the exchange visitor resides rather than a mailing address. In cases where an exchange visitor provides a mailing address, the exchange visitor program must maintain a record of, and must provide upon request from the Service, the actual physical location where the exchange visitor resides.

* * * * *

7. Section 214.2 is further amended by:

a. Revising paragraph (m)(1)(i);

b. Adding new paragraphs (m)(1)(iii);

Exhibit 1
322

67 FR 76256, *76276

c. Revising the paragraph heading and the introductory text in paragraph (m)(3);

d. Revising paragraph (m)(5);

e. Removing and reserving paragraphs (m)(6), (m)(7), and (m)(8);

f. Adding new paragraphs (m)(9)(v) and (vi);

g. Revising paragraphs (m)(10), (m)(11)(ii), (m)(13), and (m)(14)(ii) introductory text;

h. Adding a new paragraph (m)(14)(vi);

i. Revising paragraph (m)(16);

j. Revising paragraph (m)(17); and by

k. Adding new paragraph (m)(18).

The additions and revisions read as follows:

## § 214.2 -- Special requirements for admission, extension, and maintenance of status.

* * * * *

(m) * * *

(1) *Admission of student*. (i) *Eligibility for admission*. A nonimmigrant student may be admitted into the United States in nonimmigrant status under section 101(a)(15)(M) of the Act, if:

(A) The student presents a SEVIS Form I-20 issued in his or her own name by a school approved by the Service for attendance by M-1 foreign students. (In the alternative, for a student seeking admission prior to August 1, 2003, the student may present a currently-valid Form I-20M-N/I-20ID, if that form was issued by the school prior to January 30, 2003);

(B) The student has documentary evidence of financial support in the amount indicated on the SEVIS Form I-20 (or the Form I-20M-N/I-20ID); and

(C) For students seeking initial admission only, the student intends to attend the school specified in the student's visa (or, where the student is exempt from the requirement for a visa, the school indicated on the SEVIS Form I-20 (or the Form I-20M-N/I-20ID)).

* * * * *

(iii) *Use of SEVIS*. On January 30, 2003, the use of the Student and Exchange Visitor Information System (SEVIS) will become mandatory for the issuance of any new Form I-20. A student or dependent who presents a non-SEVIS Form I-20 issued on or after January 30, 2003, will not be accepted for admission to the United States. Non-SEVIS Forms I-20 issued prior to January 30, 2003, will continue to be accepted for admission to the United States until August 1, 2003. However, schools must issue a SEVIS Form I-20 to any current student requiring a reportable action (*e.g.*, extension of status, practical training, and requests for employment authorization) or a new Form I-20, or for any aliens who obtain a new nonimmigrant student visa. As of August 1, 2003, the records of all current or continuing students must be entered in SEVIS.

* * * * *

Exhibit 1
323

67 FR 76256, *76276

(3) *Admission of the spouse and minor children of an M-1 student*. The spouse and minor children accompanying an M-1 student are eligible for admission in M-2 status if the student is admitted in M-1 status. The spouse and minor children following-to-join an M-1 student are [*76277] eligible for admission to the United States in M-2 status if they are able to demonstrate that the M-1 student has been admitted and is, or will be within 30 days, enrolled in a full course of study, or engaged in approved practical training following completion of studies. In either case, at the time they seek admission, the eligible spouse and minor children of an M-1 student with a SEVIS Form I-20 must individually present an original SEVIS Form I-20 issued in the name of each M-2 dependent issued by a school authorized by the Service for attendance by M-1 foreign students. Prior to August 1, 2003, if exigent circumstances are demonstrated, the Service will allow the dependent of an M-1 student in possession of a SEVIS Form I-20 to enter the United States using a copy of the M-1 student's SEVIS Form I-20. (In the alternative, for dependents seeking admission to the United States prior to August 1, 2003, a copy of the M-1 student's current Form I-20ID issued prior to January 30, 2003, with proper endorsement by the DSO will satisfy this requirement.) A new SEVIS Form I-20 (or Form I-20M-N) is required for a dependent where there has been any substantive change in the M-1 student's current information.

* * * * *

(5) *Period of stay*. A student in M nonimmigrant status is admitted for a fixed time period, which is the period necessary to complete the course of study indicated on the Form I-20, plus practical training following completion of the course of study, plus an additional 30 days to depart the United States, but not to exceed a total period of one year. An M-1 student may be admitted for a period up to 30 days before the report date or start date of the course of study listed on the Form I-20. An M-1 student who fails to maintain a full course of study or otherwise fails to maintain status is not eligible for the additional 30-day period of stay.

(6) [Reserved]

(7) [Reserved]

(8) [Reserved]

(9) * * *

(v) *On-line courses/distance education programs*. No on-line or distance education classes may be considered to count toward an M-1 student's full course of study requirement if such classes do not require the student's physical attendance for classes, examination or other purposes integral to completion of the class. An on-line or distance education course is a course that is offered principally through the use of television, audio, or computer transmission including open broadcast, closed circuit, cable, microwave, or satellite, audio conferencing, or computer conferencing.

(vi) *Reduced course load*. The designated school official may authorize an M-1 student to engage in less than a full course of study only where the student has been compelled by illness or a medical condition that has been documented by a licensed medical doctor, doctor of osteopathy, or licensed clinical psychologist, to interrupt or reduce his or her course of study. A DSO may not authorize a reduced course load for more than an aggregate of 5 months per course of study. An M-1 student previously authorized to drop below a full course of study due to illness or medical condition for an aggregate of 5 months, may not be authorized by the DSO to reduce his or her course load on subsequent occasions during his or her particular course of study.

(A) *Non-SEVIS schools*. A DSO must report any student who has been authorized by the DSO to carry a reduced course load. Within 21 days of the authorization, the DSO must send a photocopy of the student's Form I-20 to the Service's data processing center indicating the date that authorization was granted. The DSO must also report to the Service's data processing center when the student has resumed a full course of study, no more than 21 days from the date the student resumed a full course of study. In this case, the DSO must submit a photocopy of the student's Form I-20 indicating the date that a full course of study was resumed, with a new program end date.

Exhibit 1
324

(B) *SEVIS reporting*. In order for a student to be authorized to drop below a full course of study, the DSO must update SEVIS prior to the student reducing his or her course load. The DSO must update SEVIS with the date, reason for authorization, and the start date of the next term or session. The DSO must also notify SEVIS within 21 days of the student's commencement of a full course of study.

(10) *Extension of stay*.

(i) *Eligibility*. The cumulative time of extensions that can be granted to an M-1 student is limited to a period of 3 years from the M-1 student's original start date, plus 30 days. No extension can be granted to an M-1 student if the M-1 student is unable to complete the course of study within 3 years of the original program start date. This limit includes extensions that have been granted due to a drop below full course of study, a transfer of schools, or reinstatement. An M-1 student may be granted an extension of stay if it is established that:

(A) He or she is a bona fide nonimmigrant currently maintaining student status;

(B) Compelling educational or medical reasons have resulted in a delay to his or her course of study. Delays caused by academic probation or suspension are not acceptable reasons for program extension; and

(C) He or she is able to, and in good faith intends to, continue to maintain that status for the period for which the extension is granted.

(ii) *Application*. A student must apply to the Service for an extension on Form I-539, Application to Extend/Change Nonimmigrant Status. A student's M-2 spouse and children seeking an extension of stay must be included in the application. The student must submit the application to the service center having jurisdiction over the school the student is currently authorized to attend, at least 15 days but not more than 60 days before the program end date on the student's Form I-20. The application must also be accompanied by the student's Form I-20 and the Forms I-94 of the student's spouse and children, if applicable.

(iii) *Period of stay*. If an application for extension is granted, the student and the student's spouse and children, if applicable, are to be given an extension of stay for the period of time necessary to complete the course of study, plus 30 days within which to depart from the United States, or for a total period of one year, whichever is less. A student's M-2 spouse and children are not eligible for an extension unless the M-1 student is granted an extension of stay, or for a longer period than is granted to the M-1 student.

(iv) *SEVIS update*. A DSO must update SEVIS to recommend that a student be approved for an extension of stay. The SEVIS Form I-20 must be printed with the recommendation and new program end date for submission by mail to the service center, with Form I-539, and Forms I-94 if applicable.

(11) * * *

(ii) *Procedure*. A student must apply to the Service on Form I-539 for permission to transfer between schools. Upon application for school transfer, a student may effect the transfer subject to approval of the application. A student who transfers without complying with this requirement or whose application is denied after transfer pursuant to this regulation is considered to be out of status. If the application is approved, the approval of the transfer will be determined to be the program start date listed on the Form I-20, and the student  [*76278]  will be granted an extension of stay for the period of time necessary to complete the new course of study plus 30 days, or for a total period of one year, whichever is less.

(A) *Non-SEVIS school*. The application must be accompanied by the Form I-20ID copy and the Form I-94 of the student's spouse and children, if applicable. The Form I-539 must also be accompanied by Form I-20M-N properly and completely filled out by the student and by the designated official of the school which the student wishes to attend. The student must submit the application for school transfer to the service center having jurisdiction over the school the

Exhibit 1
325

student is currently authorized to attend. Upon approval, the adjudicating officer will endorse the name of the school to which the transfer is authorized on the student's Form I-20ID copy and return it to the student. The officer will also endorse Form I-20M-N to indicate that a school transfer has been authorized and forward it to the Service's processing center for updating. The processing center will forward Form I-20M-N to the school to which the transfer has been authorized to notify the school of the action taken.

(B) *SEVIS school*. The student must first notify his or her current school of the intent to transfer and indicate the school to which the student intends to transfer. Upon notification by the student, the current school must update SEVIS to show the student as a "transfer out" and input the "release date" for transfer. Once updated as a "transfer out" the transfer school is permitted to generate a SEVIS Form I-20 for transfer but will not gain access to the student's SEVIS record until the release date is reached. Upon receipt of the SEVIS Form I-20 from the transfer school, the student must submit Form I-539 in accordance with § 214.2(m)(11) to the service center with jurisdiction over the current school. The student may enroll in the transfer school at the next available term or session and is required to notify the DSO of the transfer school immediately upon beginning attendance. The transfer school must update the student's registration record in SEVIS in accordance with § 214.3(g)(3). Upon approval of the transfer application, the Service officer will endorse the name of the school to which the transfer is authorized on the student's SEVIS Form I-20 and return it to the student.

(C) *Transition process*. Once SEVIS is fully operational and interfaced with the service center benefit processing system, the Service officer will transmit the approval of the transfer to SEVIS and endorse the name of the school to which transfer is authorized on the student's SEVIS Form I-20 and return it to the student. As part of a transitional process until that time, the student is required to notify the DSO at the transfer school of the decision of the Service within 15 days of the receipt of the adjudication by the Service. Upon notification by the student of the approval of the Service, the DSO must immediately update SEVIS to show that approval of the transfer has been granted. The DSO must then print an updated SEVIS Form I-20 for the student indicating that the transfer has been completed. If the application for transfer is denied, the student is out of status and the DSO must terminate the student's record in SEVIS.

* * * * *

(13) *Employment*. Except as provided in paragraph (m)(14) of this section, a student may not accept employment.

(14) * * *

(ii) *Application*. A M-1 student must apply for permission to accept employment for practical training on Form I-765, with fee as contained in *8 CFR 103.7(b)(1)*, accompanied by a Form I-20 that has been endorsed for practical training by the designated school official. The application must be submitted prior to the program end date listed on the student's Form I-20 but not more than 90 days before the program end date. The designated school official must certify on Form I-538 that-

* * * * *

(vi) *SEVIS process*. The DSO must update the student's record in SEVIS to recommend that the Service approve the student for practical training, and print SEVIS Form I-20 with the recommendation, for the student to submit to the Service with Form I-765 as provided in this paragraph (m)(14).

* * * * *

(16) *Reinstatement to student status*.

(i) *General*. A district director may consider reinstating a student who makes a request for reinstatement on Form I-539, Application to Extend/Change Nonimmigrant Status, accompanied by a properly completed SEVIS Form I-20 indicating the DSO's recommendation for reinstatement (or a properly completed Form I-20M-N issued prior to January

Exhibit 1
326

30, 2003, from the school the student is attending or intends to attend prior to August 1, 2003). The district director may consider granting the request only if the student:

(A) Has not been out of status for more than 5 months at the time of filing the request for reinstatement (or demonstrates that the failure to file within the 5 month period was the result of exceptional circumstances and that the student filed the request for reinstatement as promptly as possible under these exceptional circumstances);

(B) Does not have a record of repeated or willful violations of the Service regulations;

(C) Is currently pursuing, or intends to pursue, a full course of study at the school which issued the Form I-20M-N or SEVIS Form I-20;

(D) Has not engaged in unlawful employment;

(E) Is not deportable on any ground other than section 237(a)(1)(B) or (C)(i) of the Act; and

(F) Establishes to the satisfaction of the Service, by a detailed showing, either that:

(*1*) The violation of status resulted from circumstances beyond the student's control. Such circumstances might include serious injury or illness, closure of the institution, a natural disaster, or inadvertence, oversight or neglect on the part of the DSO, but do not include instances where a pattern of repeated violations or where a willful failure on the part of the student resulted in the need for reinstatement; or

(*2*) The violation relates to a reduction in the student's course load that would have been within a DSO's power to authorize, and that failure to approve reinstatement would result in extreme hardship to the student.

(ii) *Decision*. If the Service reinstates the student, the Service shall endorse the student's copy of Form I-20 to indicate that the student has been reinstated and return the form to the student. If the Form I-20 is from a non-SEVIS school, the school copy will be forwarded to the school. If the Form I-20 is from a SEVIS school, the adjudicating officer will update SEVIS to reflect the Service's decision. In either case, if the Service does not reinstate the student, the student may not appeal the decision. The district director will send notification to the school of the decision.

(17) *Spouse and children of M-1 student*. The M-2 spouse and minor children of an M-1 student shall each be issued an individual SEVIS Form I-20 in accordance with the provisions of § 214.3(k).

(i) *Employment*. The M-2 spouse and children may not accept employment.

(ii) *Study*. (A) The M-2 spouse may not engage in full time study, and the M-2 child may only engage in full time study if the study is in an elementary or secondary school (kindergarten through twelfth grade). The M-2 spouse and [*76279*] child may engage in study that is avocational or recreational in nature.

(B) An M-2 spouse or M-2 child desiring to engage in full time study, other than that allowed for a child in paragraph (m)(17)(ii) of this section, must apply for and obtain a change of nonimmigrant classification to F-1, J-1, or M-1 status. An M-2 spouse or child who was enrolled on a full time basis prior to January 1, 2003, will be allowed to continue study but must file for a change of nonimmigrant classification to F-1, J-1, or M-1 status on or before March 11, 2003.

(C) An M-2 spouse or M-2 child violates his or her nonimmigrant status by engaging in full time study except as provided in paragraph (m)(17)(i) and (ii) of this section.

(18) *Current name and address*. A student must inform the Service and the DSO of any legal changes to his or her name or of any change of address, within 10 days of the change, in a manner prescribed by the school. A student enrolled at a SEVIS school can satisfy the requirement in *8 CFR 265.1* of notifying the Service by providing a notice of

Exhibit 1
327

a change of address within 10 days to the DSO, and the DSO in turn shall enter the information in SEVIS within 21 days of notification by the student. A nonimmigrant student enrolled at a non-SEVIS institution must submit a notice of change of address to the Service, as provided in *8 CFR 265.1*, within 10 days of the change. Except in the case of a student who cannot receive mail where he or she resides, the address provided by the student must be the actual physical location where the student resides rather than a mailing address. In cases where a student provides a mailing address, the school must maintain a record of, and must provide upon request from the Service, the actual physical location where the student resides.

* * * * *

8. Section 214.3 is amended by:

a. Revising paragraph (a)(2)(i)(F);

b. Adding a new paragraph (a)(2)(v);

c. Adding a new paragraph (e)(3);

d. Revising paragraphs (g)(1)(iv) and (g)(1)(v);

e. Revising the paragraph heading and by adding two new sentences at the end of paragraph (g)(2);

f. Adding new paragraphs (g)(3) and (g)(4);

g. Revising paragraph (k) introductory text; and by

h. Revising paragraph (l).

The additions and revisions read as follows:

### § 214.3 -- Petitions for approval of schools.

(a) * * *

(2) * * *

(i) * * *

(F) A private elementary school.

* * * * *

(v) The following may not be approved for attendance by foreign students:

(A) A home school,

(B) A public elementary school, or

(C) An adult education program, as defined by section 203(l) of the Adult Education and Family Literacy Act, Public Law 105-220, as amended, *20 U.S.C. 9202*(l), if the adult education program is funded in whole or in part by a grant under the Adult Education and Family Literacy Act, or by any other Federal, State, county or municipal funding.

* * * * *

Exhibit 1
328

(e) * * *

(3) *SEVIS reporting.* Upon approval of a petition, the district director shall update SEVIS to reflect approval of the petition. An e-mail notification will be sent to the principal DSO by SEVIS. An approved school that has been enrolled in SEVIS must immediately update SEVIS to reflect any material changes to its name, address or curriculum for a determination of continued eligibility for approval.

* * * * *

(g) * * *

(1) * * *

(iv) Current address where the student and his or her dependents physically reside. In the event the student or his or her dependents reside on or off campus and cannot receive mail at that location, the school may provide a mailing address. The school, however, must maintain a record of the physical location of residence of the student and his or her dependents and provide such information to the Service upon request. Once SEVIS is modified, in cases where the mailing and physical address are not the same, the school will be required to report both the student's current mailing and current physical address in SEVIS.

(v) The student's current academic status.

* * * * *

(2) *Reporting requirements for non-SEVIS students.* * * * In the case of a student that does not have an electronic record in SEVIS, the Service will notify the school if the student enters the U.S. to attend their institution. No later than 30 days following the deadline for registering for classes, the school is then required to contact the Service if that student fails to register.

(3) *SEVIS reporting requirements.*

(i) Within 21 days of a change in any of the information contained in paragraph (e)(3) of this section, schools must update SEVIS with the current information.

(ii) Schools are also required to report within 21 days of the occurrence the following events:

(A) Any student who has failed to maintain status or complete his or her program;

(B) A change of the student's or dependent's legal name or U.S. address;

(C) Any student who has graduated early or prior to the program end date listed on SEVIS Form I-20;

(D) Any disciplinary action taken by the school against the student as a result of the student being convicted of a crime; and

(E) Any other notification request made by SEVIS with respect to the current status of the student.

(iii) Each term or session and no later than 30 days after the deadline for registering for classes, schools are required to report the following registration information:

(A) Whether the student has enrolled at the school, dropped below a full course of study without prior authorization by the DSO, or failed to enroll;

(B) The current address of each enrolled student; and

Exhibit 1
329

(C) The start date of the student's next session, term, semester, trimester, or quarter.

(4) *Administrative correction of a student's record.* In instances where technological or computer problems on the part of SEVIS cause an error in the student's record, the DSO may request the SEVIS system administrator, without fee, to administratively correct the student's record.

* * * * *

(k) *Issuance of Certificate of Eligibility.* A designated school official (DSO) of a school approved by the Service to enroll nonimmigrant students must sign any completed Form I-20 issued for either a prospective or continuing student or a dependent. A Form I-20 issued by an approved school system must state which school within the system the student will attend. The form must only be issued from within the United States. Only a designated official of a Service approved school shall issue a Certificate of Eligibility, Form I-20, to a prospective student and his or her dependents, and only after the following conditions are met:

* * * * *

(l) *Designated official* -

(1) Meaning of term *Designated Official.* As used in §§ 214.1(b), 214.2(b), 214.2(f), 214.2(m), and 214.4, a *Designated Official, Designated School Official (DSO),* or *Principal Designated* [*76280] School Official (PDSO), means a regularly employed member of the school administration whose office is located at the school and whose compensation does not come from commissions for recruitment of foreign students. An individual whose principal obligation to the school is to recruit foreign students for compensation does not qualify as a designated official. The PDSO and any other DSO must be named by the president, owner, or head of a school or school system. The PDSO and DSO may not delegate this designation to any other person.

(i) A PDSO and DSO must be either a citizen or lawful permanent resident of the United States.

(ii) Each campus must have one PDSO. The PDSO is responsible for updating SEVIS to reflect the addition or deletion of all designated officials on his or her associated campus. The Service will also use the PDSO as the point of contact on any issues that relate to the school's compliance with the regulations as well as any system alerts generated by SEVIS. In all other respects the PDSO and DSO will share the same responsibilities.

(iii) Each school may have up to 10 designated officials at any one time, including the PDSO. In a multi-campus school, each campus may have up to 10 designated officials at any one time including a required PDSO. In a private elementary or public or private secondary school system, however, the entire school system is limited to 10 designated officials at any one time including the PDSO.

(2) *Name, title, and sample signature.* Petitions for school approval must include the names, titles, and sample signatures of designated officials. An approved school must update SEVIS upon any changes to the persons who are principal or designated officials, and furnish the name and title of the new official within 21 days of the change. Any changes to the PDSO or DSO must be made by the PDSO. In its discretion, the Service may reject the submission of any individual as a DSO or withdraw a previous submission by a school of an individual.

(3) *Statement of designated officials.* A petition for school approval must include a statement by each designated official certifying that the official is familiar with the Service regulations relating to the requirements for admission and maintenance of status of nonimmigrant students, change of nonimmigrant status under part 248 of this chapter, and school approval under §§ 214.3 and 214.4, and affirming the official's intent to comply with these regulations. At the time a new designated official is added, the designated official must make the same certification.

**PART 248--CHANGE OF NONIMMIGRANT CLASSIFICATION**

Exhibit 1
330

9. The authority citation for part 248 continues to read as follows:

**Authority:** *8 U.S.C. 1101,* 1103, 1184, 1258; 8 CFR part 2.

10. Section 248.3 is amended by revising paragraph (e)(2) to read as follows:

## § 248.3 -- Application.

* * * * *

(e) * * *

(2) An alien classified under sections 101(a)(15)(A) or 101(a)(15)(G) of the Act as a member of the immediate family of a principal alien classified under the same section, or an alien classified under sections 101(a)(15)(E), (H), (I), (J), (L), or (Q)(ii) of the Act as the spouse or child who accompanied or followed-to-join a principal alien who is classified under the same section, may attend school in the United States, provided that the principal alien or spouse or child maintain their nonimmigrant status.

* * * * *

## PART 274a--CONTROL OF EMPLOYMENT OF ALIENS

11. The authority citation for part 274a continues to read as follows:

**Authority:** *8 U.S.C. 1101,* 1103, 1324a; 8 CFR part 2.

12. Section 274a.12 is amended by:

a. Removing and reserving paragraph (b)(6)(ii);

b Revising paragraph (b)(6)(iii);

c. Revising paragraph (b)(11);

d. Revising the last sentence of paragraph (c)(3)(ii); and by

e. Revising paragraph (c)(3)(iii).

The revisions read as follows:

## § 274a.12 -- Classes of aliens authorized to accept employment.

* * * * *

(b) * * *

(6) * * *

(ii) [Reserved]

(iii) Curricular practical training (internships, cooperative training programs, or work-study programs which are part of an established curriculum) after having been enrolled full-time in a Service approved institution for one full academic year. Curricular practical training (part-time or full-time) is authorized by the Designated School Official on the student's Form I-20. No Service endorsement is necessary.

Exhibit 1
331

67 FR 76256, *76280

* * * * *

(11) An exchange visitor (J-1), pursuant to § 214.2(j) of this chapter and 22 CFR part 62. An alien in this status may be employed only by the exchange visitor program sponsor or appropriate designee and within the guidelines of the program approved by the Department of State as set forth in the Form DS-2019, Certificate of Eligibility, issued by the program sponsor;

* * * * *

(c) * * *

(3) * * *

(ii) * * * The F-1 student must also present a Form I-20 ID or SEVIS Form I-20 with employment page completed by DSO certifying eligibility for employment; or

(iii) Is seeking employment because of severe economic hardship pursuant to *8 CFR 214.2(f)(9)(ii)(C)* and has filed the Form I-20 ID and Form I-538 (for non-SEVIS schools), or SEVIS Form I-20 with employment page completed by the DSO certifying eligibility, and any other supporting materials such as affidavits which further detail the unforeseen economic circumstances that require the student to seek employment authorization.

Dated: December 5, 2002.

**Michael J. Garcia,**

*Commissioner, Immigration and Naturalization Service.*

[FR Doc. 02-31184 Filed 12-6-02; 1:45 pm]

BILLING CODE 4410-10-P

Exhibit 1
332

# **<u>Action 30</u>**

Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students
with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students

Exhibit 1
333

This document is scheduled to be published in the
Federal Register on 03/11/2016 and available online at
**http://federalregister.gov/a/2016-04828**, and on **FDsys.gov**

[9111-28-P]

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 214 and 274a**

**[DHS Docket No. ICEB-2015-0002]**

**RIN 1653-AA72**

**Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students**

**AGENCY:** Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** The Department of Homeland Security (DHS) is amending its F-1 nonimmigrant student visa regulations on optional practical training (OPT) for certain students with degrees in science, technology, engineering, or mathematics (STEM) from U.S. institutions of higher education. Specifically, the final rule allows such F-1 STEM students who have elected to pursue 12 months of OPT in the United States to extend the OPT period by 24 months (STEM OPT extension). This 24-month extension effectively replaces the 17-month STEM OPT extension previously available to certain STEM students. The rule also improves and increases oversight over STEM OPT extensions by, among other things, requiring the implementation of formal training plans by employers, adding wage and other protections for STEM OPT students and U.S. workers, and allowing extensions only to students with degrees from accredited schools. As with the prior 17-month STEM OPT extension, the rule authorizes STEM OPT extensions only for students employed by employers who participate in E-Verify. The rule also includes the "Cap-Gap" relief first introduced in a 2008 DHS regulation for any F-1 student with a timely filed H-1B petition and request for change of status.

1

Exhibit 1
334

**DATES:** This rule is effective May 10, 2016, except the addition of 8 CFR 214.16, which is effective from May 10, 2016, through May 10, 2019.

**FOR FURTHER INFORMATION CONTACT:** Katherine Westerlund, Policy Chief (Acting), Student and Exchange Visitor Program, U.S. Immigration and Customs Enforcement, 500 12th Street SW, Washington, DC 20536; telephone (703) 603-3400; email SEVP@ice.dhs.gov.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Abbreviations

II. Executive Summary

   A. Summary of Purpose of the Regulatory Action

   B. Summary of the Major Provisions of the Final Rule

   C. Costs and Benefits

III. Background

   A. Statutory and Regulatory Authority and History

   B. The 2015 NPRM

   C. Basis and Purpose of Regulatory Action

IV. Discussion of Comments and Final Rule

   A. Including a STEM OPT Extension Within the OPT Program

   B. Enforcement, Monitoring, and Oversight

   C. Qualifying F-1 Nonimmigrants

   D. Qualifying Employers

   E. STEM OPT Extension Validity Period

   F. Training Plan for F-1 Nonimmigrants on a STEM OPT Extension

   G. Application Procedures for STEM OPT Extension

   H. Travel and Employment Authorization Documentation of Certain F-1 Nonimmigrants Changing Status in the United States or on a STEM OPT Extension

   I. Transition Procedures

   J. Comments on the Initial Regulatory Impact Analysis

   K. Other Comments

V. Statutory and Regulatory Requirements

2

Exhibit 1
335

A.  Executive Orders 12866 and 13563: Regulatory Planning and Review

B.  Regulatory Flexibility Act

C.  Small Business Regulatory Enforcement Fairness Act of 1996

D.  Unfunded Mandates Reform Act

E. Congressional Review Act

F.  Collection of Information

G.  Federalism

H.  Civil Justice Reform

I.  Energy Effects

J.  Environment

K.  Indian Tribal Governments

L.  Taking of Private Property

M.  Protection of Children

N.  Technical Standards

List of Subjects

The  Amendments

## I.  Abbreviations

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| CFR | Code of Federal Regulations |
| CIP | Classification of Instructional Program |
| DHS | Department of Homeland Security |
| DSO | Designated School Official |
| EAD | Employment Authorization Document |
| FOIA | Freedom of Information Act |
| FR | Federal Register |
| ICE | U.S. Immigration and Customs Enforcement |
| ID | Identification |
| IFR | Interim Final Rule |
| INA | Immigration and Nationality Act |
| NCES | National Center for Education Statistics |
| NPRM | Notice of Proposed Rulemaking |
| OPT | Optional Practical Training |
| RIA | Regulatory Impact Analysis |
| SEVP | Student and Exchange Visitor Program |
| SEVIS | Student and Exchange Visitor Information System |
| STEM | Science, Technology, Engineering, or Mathematics |
| U.S.C. | United States Code |

3

Exhibit 1
336

USCIS            U.S. Citizenship and Immigration Services

## II. Executive Summary

A.  Purpose of the Regulatory Action

This final rule affects certain F-1 nonimmigrant students who seek to obtain an extension of optional practical training (OPT) based on study at a U.S. institution of higher education in a science, technology, engineering or mathematics (STEM) field, as well as certain F-1 nonimmigrant students who seek so-called Cap-Gap relief.  The F-1 nonimmigrant classification is available to individuals seeking temporary admission to the United States as students at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program.[1]  To obtain F-1 nonimmigrant classification, the student must be enrolled in a full course of study at a qualifying institution and have sufficient funds for self-support during the entire proposed course of study.  Such course of study must occur at a school authorized by the U.S. government to accept international students.

OPT is a form of temporary employment available to F-1 students (except those in English language training programs) that directly relates to a student's major area of study in the United States.  A student can apply to engage in OPT during his or her academic program ("pre-completion OPT") or after completing the academic program ("post-completion OPT").  A student can apply for 12 months of OPT at each education level (e.g., one 12-month OPT period at the bachelor's level and another 12-month period at the master's level).  While school is in session, the student may work up to 20 hours per week pursuant to OPT.

---

[1] For purposes of 8 CFR 214.2(f), a "college or university" is an institution of higher learning that awards recognized bachelor's, master's, doctoral or professional degrees.  See 8 CFR 214.3(a)(2)(A).  A career or technical institution may therefore be categorized as a "college or university" if it awards such degrees.

4

Exhibit 1
337

This final rule provides for an extension of the OPT period for certain F-1 students who have earned certain STEM degrees and participate in practical training opportunities with employers that meet certain requirements.  The Department of Homeland Security (DHS) first introduced an extension of OPT for STEM graduates in a 2008 interim final rule (2008 IFR).  See 73 FR 18944 (Apr. 8, 2008).  Under the 2008 IFR, an F-1 student with a STEM degree from a U.S. institution of higher education could apply for an additional 17 months of OPT (17-Month STEM OPT extension), provided that the employer from which the student sought employment was enrolled in and remained in good standing in the E-Verify electronic employment eligibility verification program (E-Verify), as determined by U.S. Citizenship and Immigration Services (USCIS).  As discussed in further detail below, on August 12, 2015, the U.S. District Court for the District of Columbia ordered the vacatur of the 2008 IFR on procedural grounds and remanded the issue to DHS.  The court stayed the vacatur until February 12, 2016 to give DHS the opportunity to issue a new rule related to STEM OPT extensions through notice-and-comment rulemaking.

On October 19, 2015, DHS published a notice of proposed rulemaking (NPRM) in the Federal Register to reinstate the STEM OPT extension, with changes intended to enhance the educational benefit afforded by the extension and to increase program oversight, including safeguards to protect U.S. workers.  See 80 FR 63376.  On January 23, 2016, the Court further stayed its vacatur until May 10, 2016, to provide DHS additional time to complete the rulemaking following review of public comments received during the comment period and to allow the Department to publish the rule with a 60-day delayed effective date to provide sufficient time for efficient transition to the new rule's requirements.

B.  Summary of the Major Provisions of the Final Rule

1.  <u>Summary of Final Rule</u>

This rule finalizes the NPRM, with certain changes made following review and consideration of the public comments received by DHS.  Under this rule, a qualifying F-1 student with a STEM degree who has been granted 12 months of practical training pursuant to the general OPT program may apply to DHS for a 24-month extension of his or her period of practical training (STEM OPT extension).

The core purpose of the STEM OPT extension is to allow participating students to supplement their academic knowledge with valuable practical STEM experience.  Accordingly, as is the case with practical training generally, a student's practical training pursuant to the STEM OPT extension must be directly related to the student's major area of study.  The student's STEM degree must be awarded by an accredited U.S. college or university and be in a field recognized as a STEM field by DHS.  The student may base the extension on the student's most recent academic degree, or may (subject to a number of requirements described in more detail below) base the extension on a STEM degree that the student earned earlier in his or her academic career in the United States.  Under this rule, a student may be eligible for up to two, separate STEM OPT extensions over the course of his or her academic career, upon completing two qualifying STEM degrees at different educational levels.

This rule includes a number of measures intended to better ensure the educational benefit, integrity, and security of the STEM OPT extension.  For instance, the rule requires each STEM OPT student to prepare and execute with their prospective employer a formal training plan that identifies learning objectives and a plan for achieving those objectives.  The STEM OPT student and his or her employer must work together to finalize that plan.  The rule also prohibits students

from basing a STEM OPT extension on a degree from an unaccredited educational institution. Moreover, to ensure compliance with program requirements, the rule provides for DHS site visits to employer locations in which STEM OPT students are employed.  Although DHS will generally give notice of such site visits, DHS may conduct an unannounced site visit if it is triggered by a complaint or other evidence of noncompliance with the regulations.

The rule also includes a number of requirements intended to help DHS track STEM OPT students and further enhance the integrity of the STEM OPT extension.  Most prominent among these are reporting requirements, which the rule imposes primarily upon students and designated school officials (DSOs).  The rule includes four main reporting requirements, as follows.  First, the rule imposes a six-month validation requirement, under which a STEM OPT student and his or her school must work together to confirm the validity of certain biographical, residential, and employment information concerning the student, including the student's legal name, the student's address, the employer's name and address, and current employment status.  Second, the rule imposes an annual self-evaluation requirement, under which the student must report to the DSO on his or her progress with the practical training.  The student's employer must sign the self-evaluation prior to its submission to the DSO.  Third, the rule requires that the student and employer report changes in employment status, including the student's termination or departure from the employer.  Fourth, both the student and the employer are obligated to report to the DSO material changes to, or material deviations from, the student's formal training plan.

Finally, this rule includes a number of specific obligations for STEM OPT employers. These obligations are intended to ensure the integrity of the program and provide safeguards for U.S. workers in STEM fields.  Among other things, the employer must be enrolled in and remain in good standing with E-Verify; assist with the aforementioned reporting and training plan

requirements; and attest that (1) it has sufficient resources and trained personnel available to provide appropriate training in connection with the specified opportunity; (2) the student on a STEM OPT extension will not replace a full- or part-time, temporary or permanent U.S. worker; and (3) the opportunity helps the student attain his or her training objectives.

We describe each of these provisions in more detail below.

2.      Comparison to the 2008 IFR

As noted above, this rule contains a number of changes in comparison to the 2008 IFR, while retaining other provisions of the 2008 IFR.  Changes made by this rule in comparison to the 2008 IFR include:

- Lengthened STEM OPT Extension Period.  The rule increases the OPT extension period for STEM OPT students from the 2008 IFR's 17 months to 24 months.  The final rule also makes F-1 students who subsequently enroll in a new academic program and earn another qualifying STEM degree at a higher educational level eligible for one additional 24-month STEM OPT extension.

- STEM Definition and CIP Categories for STEM OPT Extension.  The rule defines which fields of study (more specifically, which Department of Education Classification of Instructional Program (CIP) categories) may serve as the basis for a STEM OPT extension.  The rule also sets forth a process for public notification in the Federal Register when DHS updates the list of eligible STEM fields on the Student and Exchange Visitor Program's (SEVP's) website.

- Training Plan for STEM OPT Students.  To improve the educational benefit of the STEM OPT extension, the rule requires employers to implement formal training programs to augment students' academic learning through practical experience.  This requirement is

8

Exhibit 1
341

intended to equip students with a more comprehensive understanding of their selected area of study and broader functionality within that field.

- <u>Previously Obtained STEM Degrees</u>.  The rule permits an F-1 student participating in a 12-month period of post-completion OPT based on a non-STEM degree to use a prior eligible STEM degree from a U.S. institution of higher education as a basis to apply for a STEM OPT extension, as long as both degrees were received from currently accredited educational institutions.  The practical training opportunity must be directly related to the previously obtained STEM degree.

- <u>Safeguards for U.S. Workers in Related Fields</u>.  To guard against adverse impacts on U.S. workers, the rule requires terms and conditions of a STEM practical training opportunity (including duties, hours, and compensation) to be commensurate with those applicable to similarly situated U.S. workers.  As part of completing the Form I-983, Training Plan for STEM OPT Students, an employer must attest that: (1) it has sufficient resources and trained personnel available to provide appropriate training in connection with the specified opportunity; (2) the student will not replace a full- or part-time, temporary or permanent U.S. worker; and (3) the opportunity will help the student attain his or her training objectives.

- <u>School Accreditation, Employer Site Visits, and Employer Reporting</u>.  To improve the integrity of the STEM OPT extension, the rule:  (1) generally limits eligibility for such extensions to students with degrees from schools accredited by an accrediting agency recognized by the Department of Education; (2) clarifies DHS discretion to conduct employer site visits at worksites to verify whether employers are meeting program requirements, including that they possess and maintain the ability and resources to

9

Exhibit 1
342

provide structured and guided work-based learning experiences; and (3) institutes new employer reporting requirements.

- <u>Compliance Requirements and Unemployment Limitation</u>.  In addition to reinstating the 2008 IFR's reporting and compliance requirements, the rule revises the number of days an F-1 student may remain unemployed during the practical training period.  The program in effect before this final rule allowed a student to be unemployed up to 90 days during his or her initial period of post-completion OPT, and up to an additional 30 days (for a total of 120 days) for a student who received a 17-month STEM OPT extension.  This rule retains the 90-day maximum period of unemployment during the initial period of post-completion OPT but allows an additional 60 days (for a total of 150 days) for a student who obtains a 24-month STEM OPT extension.

The rule retains other provisions of the 2008 IFR, as follows:

- <u>E-Verify and Reporting Requirements for STEM OPT Employers</u>.  The rule requires STEM OPT employers to be enrolled in and remain in good standing with E-Verify, as determined by USCIS, and to report changes in the STEM OPT student's employment to the DSO within five business days.

- <u>Reporting Requirements for STEM OPT Students</u>.  The rule requires STEM OPT students to report to their DSOs any name or address changes, as well as any changes to their employers' names or addresses.  Students also must verify the accuracy of this reporting information periodically.

- <u>Cap-Gap Extension for F-1 Students with Timely Filed H-1B Petitions and Requests for Change of Status</u>.  With a minor revision to improve readability, the rule includes the 2008 IFR's Cap-Gap extension provision, under which DHS temporarily extends an F-1

student's duration of status and any current employment authorization if the student is the beneficiary of a timely filed H-1B petition and change-of-status request pending with or approved by USCIS. The Cap-Gap extension extends the OPT period until the beginning of the new fiscal year (i.e., October 1 of the fiscal year for which the H-1B status is being requested).

3.       Summary of Changes from the Notice of Proposed Rulemaking

Following careful consideration of public comments received, DHS also has made several modifications to the regulatory text proposed in the NPRM. Those changes include the following:

- Time of Accreditation.  For a STEM OPT extension based on a previously obtained STEM degree, the student must have obtained that degree from an educational institution that is accredited at the time of the student's application for the extension.

- SEVP Certification Required for Prior Degrees.  For a STEM OPT extension based on a previously obtained STEM degree, the degree also must have been issued by an educational institution that is SEVP-certified at the time of application for the extension. Overseas campuses of U.S. educational institutions are not eligible for SEVP certification.

- Site Visit Notifications.  DHS will provide notice to the employer 48 hours before any site visit unless a complaint or other evidence of noncompliance with the STEM OPT extension regulations triggers the visit, in which case DHS may conduct the visit without notice.

11

Exhibit 1
344

- <u>Focus on Training</u>.  DHS has modified the proposed rule's Mentoring and Training Plan to increase the focus on training.  The information collection instrument for this plan is now titled Form I-983, Training Plan for STEM OPT Students.

- <u>Existing Employer Training Programs</u>.  This rule streamlines and clarifies the regulatory text and Training Plan for STEM OPT Students to clarify that employers may use existing training programs to satisfy certain regulatory requirements for evaluating the progress of STEM OPT students.

- <u>Employer Attestation</u>.  The rule revises the employer attestation to require that the employer attest that the student will not replace a full- or part-time, temporary or permanent U.S. worker.

- <u>Evaluation of Student Progress</u>.  The rule revises the evaluation requirement to require that the student and an appropriate individual in the employer's organization sign the evaluation on an annual basis, with a mid-point evaluation during the first 12-month interval and a final evaluation completed prior to the conclusion of the STEM OPT extension.

DHS also has clarified its interpretation of the rule in a number of ways, as explained more fully below.

C.  Costs and Benefits

The anticipated costs of compliance with the rule, as well as the benefits, are discussed at length in the section below, entitled "Statutory and Regulatory Requirements–Executive Orders 12866 and 13563."  A combined Regulatory Impact Analysis and a Final Regulatory Flexibility Analysis are available in the docket for this rulemaking.  A summary of the analysis follows.

DHS estimates that the costs imposed by the implementation of this rule will be approximately $737.6 million over the 10-year analysis time period, discounted at 3 percent, or $588.5 million, discounted at 7 percent. This amounts to $86.5 million per year when annualized at a 3 percent discount rate, or $83.8 million per year when annualized at a 7 percent discount rate.  The Summary Table at the end of this section presents the cost estimates in more detail.

With respect to benefits, making the STEM OPT extension available to additional students and lengthening the 17-month extension to 24 months will enhance certain students' ability to achieve the objectives of their courses of study by allowing them to gain valuable knowledge and skills through on-the-job training that may be unavailable in their home countries.  The changes will also benefit the U.S. educational system, U.S. employers, and the broader U.S. economy.  The rule will benefit the U.S. educational system by helping to ensure that the nation's colleges and universities remain globally competitive in attracting international students in STEM fields.  U.S. employers will benefit from the increased ability to rely on skilled U.S.-educated STEM OPT students, as well as their knowledge of markets in their home countries.  The nation also will benefit from the increased retention of such students in the United States, including through increased research, innovation, and other forms of productivity that enhance the nation's economic, scientific, and technological competitiveness.

Furthermore, strengthening the STEM OPT extension by implementing requirements for training, tracking objectives, reporting on program compliance, and accreditation of participating schools will further prevent abuse of the limited on-the-job training opportunities provided by OPT in STEM fields.  These and other elements of the rule also will improve program oversight, strengthen the requirements for program participation, and better ensure that U.S. workers are protected.

The Summary Table below presents a summary of the benefits and costs of the rule.  The costs are discounted at 7 percent.  Students will incur costs for completing application forms and paying application fees; reporting to DSOs; preparing (with their employers) the Training Plan for STEM OPT Students required by this rule; and periodically submitting updates to employers and DSOs.  DSOs will incur costs for reviewing information and forms submitted by students, inputting required information into the Student and Exchange Visitor Information System (SEVIS), and complying with other oversight requirements related to prospective and participating STEM OPT students.  Employers of STEM OPT students will incur burdens for preparing the Training Plan with students, confirming students' evaluations, enrolling in (if not previously enrolled) and using E-Verify to verify employment eligibility for all new hires, and complying with additional requirements related to E-Verify.

14

Exhibit 1
347

**Summary Table: Estimated Costs and Benefits of Final Rule (in millions of 2014 dollars)**

| | STEM OPT | E-Verify | Total |
|---|---|---|---|
| 10-Year Cost Annualized at 7 Percent Discount Rate | $79.8 | $4.0 | $83.8 |
| 10-Year Cost Annualized at 3 Percent Discount Rate | $82.3 | $4.2 | $86.5 |
| Qualitative Costs | <ul><li>Cost to students and schools resulting from accreditation requirement;</li><li>Cost to employers from the requirement to provide STEM OPT students commensurate compensation to similarly situated U.S. workers; and</li><li>Decreased practical training opportunities for students no longer eligible for the program due to improvements to the STEM OPT extension.</li></ul> | | |
| Monetized Benefits | N/A | N/A | N/A |
| Non-monetized Benefits | <ul><li>Increased ability of students to gain valuable knowledge and skills through on-the-job training in their field;</li><li>Increased global attractiveness of U.S. colleges and universities; and</li><li>Increased program oversight, strengthened requirements for program participation, and new protections for U.S. workers.</li></ul> | | |
| Net Benefits | N/A | N/A | N/A |

Finally, in response to public comments, DHS revised the regulatory impact analysis (RIA) published with the NPRM to reflect the changes made in the final rule and include new data that has become available since the publication of the NPRM, such as updated compensation rates.  DHS's major changes to the RIA from the NPRM are summarized in the table below.

15

Exhibit 1
348

**Table 1: Changes from Initial RIA to Final RIA**

| Variables | NPRM and Final Rule Comparison | | | Description of Changes |
|---|---|---|---|---|
| | NPRM | Final Rule | Difference | |
| Population of Affected Parties | | | | |
| *Number of Students due to Increased CIP List Eligibility as a percent of New STEM OPT Extension Students* | 10% | 5% | **-5%** | • The final rule's changes to the CIP list are not expected to result in the same expansion of eligibility as DHS anticipated in the proposed rule |
| *Number of Transitional Students* | 18,210 | 17,610 | **-600** | • Revised the estimate of transitional students based on the effective date of final rule |
| Wages | | | | |
| *STEM Students' Weighted Average Wage Rate (unloaded)* | $23.81 | $26.06 | **$2.25** | • New FLC Data Center Online Wage Library data for 2014–2015 was published<br>• Revised STEM occupations list to more closely reflect the STEM OPT extension degrees |
| Training Plan Form for STEM OPT Students – Initially Completing Training Plan Form | | | | |
| *Student Burden* | $58.05 | $82.44 | **$24.39** | • Time burden increased from 1.67 hours to 2.17 hours in response to public comments |
| *Employer Burden* | $123.47 | $280.81 | **$157.34** | • Training Plan form revisions require up to two employer officials contributing to the initial completion of the Training Plan form<br>• Time burden increased from 2 hours to 4 hours in response to public comments |

16

Exhibit 1
349

| Variables | NPRM and Final Rule Comparison | | | Description of Changes |
|---|---|---|---|---|
| | NPRM | Final Rule | Difference | |
| *DSO Burden* | $13.09 | $52.31 | **$39.22** | • Time burden revised from 0.33 hours to 1.33 hours to reflect public comments |
| Training Plan Form for STEM OPT Students – 12-Month Evaluations | | | | |
| *Student Burden* | $139.04[2] | $114.15 | **-$24.89** | • Frequency of evaluations changed from six to 12 months<br>• Updated STEM student wage rate<br>• Time burden increased from 1.17 hours to 1.5 hours in response to public comments |
| *Employer Burden* | $78.96 | $118.44 | **$39.48** | • Frequency of evaluations changed from six to 12 months<br>• Time burden increased from 0.25 to 0.75 hours in response to public comments |
| *DSO Burden* | $26.74[3] | $78.66 | **$51.92** | • Frequency of evaluations changed from six to 12 months<br>• Time burden increased from 0.33 hours to 1 hour in response to public comments |
| Additional Implementation Costs | | | | |

---

[2] In the NPRM, DHS presented a combined total student burden for six-month evaluations and validation check-ins (1.17 hours). Note that the NPRM cost estimate only included 1 hour for the student to complete the evaluation. The NPRM cost estimate did not include a separate estimate of 0.17 hours for associated with the six-month validation report requirement from the IFR. Hence, this value, $139.04 (= 2 evaluations x 1 hour x $34.76/hour), differs from that presented in the NPRM, $162.68 (= 4 evaluations x 1.17 hours x $34.76/hour).

[3] In the NPRM, DHS presented the combined total DSO burden for six-month evaluations and validation check-ins. Note that the NPRM estimate only included the 0.17 hours for the DSO to file each evaluation and did not include the 0.17 hours for the DSO to make a six-month validation report to SEVIS. Hence, this value, $26.74 (= 2 evaluations x 0.17 hours x $39.33/hour), differs from that presented in the NPRM, $52.39 (= 4 evaluations and validation check-ins x 0.333 hours x $39.33/hour).

| Variables | NPRM and Final Rule Comparison | | | Description of Changes |
|---|---|---|---|---|
| | NPRM | Final Rule | Difference | |
| *Evaluations* | $10.57[4] | $5.29 | **-$5.28** | • Frequency of evaluations changed from six to 12 months |
| Reporting Requirements | | | | |
| *Student Opportunity Cost for Updating Information Reports* | $12.94 | $0 | **$12.94** | • The student Reporting Requirements in the Final Rule do not represent a change from the baseline |
| E-Verify Requirements for STEM OPT Extension Employers | | | | |
| *Total Enrolled Employers Who Would Discontinue E-Verify without Final Rule over 10 years* | 70,025 | 8,753 | **-61,272** | • Updated based on further research |
| **Total 10-year Cost (Undiscounted)** | $759.3M | $886.1M | **$126.8M** | |

III.  Background

  A.  Statutory and Regulatory Authority and History

  The Secretary of Homeland Security (Secretary) has broad authority to administer and enforce the nation's immigration laws.  See generally 6 U.S.C. 202; Immigration and Nationality Act of 1952, as amended (INA), Sec. 103, 8 U.S.C. 1103.  Section 101(a)(15)(F)(i) of the INA establishes the F-1 nonimmigrant classification for individuals who wish to come to the United States temporarily to enroll in a full course of study at an academic or language training school certified by U.S. Immigration and Customs Enforcement's (ICE's) SEVP.  8 U.S.C. 1101(a)(15)(F)(i).  The INA provides the Secretary with broad authority to determine the time

---

[4] In the NPRM, DHS presented the combined total implementation cost for six-month evaluations and validation check-ins. Note that the NPRM estimate only included the costs associated with the six-month evaluations. Hence, this value, $10.57 ((= $78.96 + 26.74) x 10%), differs from that presented in the NPRM, $13.09 ((= $78.96 + $52.39) x 10%).

and conditions under which nonimmigrants, including F-1 students, may be admitted to the United States.  See INA Sec. 214(a)(1), 8 U.S.C. 1184(a)(1).  The Secretary also has broad authority to determine which individuals are authorized for employment in the United States. See, e.g., INA Sec. 274A(h)(3), 8 U.S.C. 1324a(h)(3).

Federal agencies dealing with immigration have long interpreted Sec. 101(a)(15)(F)(i) of the INA and related authorities to encompass on-the-job training that supplements classroom training.  See, e.g., 12 FR 5355, 5357 (Aug. 7, 1947) (authorizing employment for practical training under certain conditions, pursuant to statutory authority substantially similar to current INA Sec. 101(a)(15)(F)(i)); 38 FR 35425, 35426 (Dec. 28, 1973) (also authorizing, pursuant to the INA, employment for practical training under certain conditions).[5]

ICE manages and oversees significant elements of the F-1 student process, including the certification of schools and institutions in the United States that enroll F-1 students.  In overseeing these institutions, ICE uses SEVIS to track and monitor international students and communicate with the schools that enroll them while they are in the United States and participating in educational opportunities.  Additional statutory and other authority requires and supports this tracking and monitoring.[6]

---

[5] During a brief period following the Immigration Act of 1990, Congress expanded employment authorization for foreign students (referred to throughout this preamble as "international students") by allowing for a three-year pilot program in which students could be employed off-campus in positions unrelated to the student's field of study. Pub. L. 101-649, Sec. 221(a), 104 Stat. 4978, 5027 (Nov. 29, 1990).  In general, however, practical training has historically been limited to the student's field of study.

[6] DHS derives its authority to manage these programs from several sources, including, in addition to the authorities cited above, section 641 of Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, 110 Stat. 3009-546, 3009-704 (Sep. 30, 1996) (codified as amended at 8 U.S.C. 1372), which authorizes the creation of a program to collect current and ongoing information provided by schools and exchange visitor programs regarding F and other nonimmigrants during the course of their stays in the United States, using electronic reporting technology where practicable.  Consistent with this statutory authority, DHS manages these programs pursuant to Homeland Security Presidential Directive—2 (HSPD—2), Combating Terrorism Through Immigration Policies (Oct. 29, 2001), as amended, http://www.gpo.gov/fdsys/pkg/CPRT-110HPRT39618/pdf/CPRT-110HPRT39618.pdf); and Section 502 of the Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. 107-173, 116 Stat. 543, 563 (May 14, 2002).  HSPD-2 requires the Secretary of Homeland Security to conduct

19

Exhibit 1
352

1.  OPT Background

A student in F-1 status may remain in the United States for the duration of his or her education if otherwise meeting the requirements for the maintenance of status.  8 CFR 214.2(f)(5)(i).  Once an F-1 student has completed his or her academic program and any subsequent period of OPT, the student must generally leave the United States unless he or she enrolls in another academic program, either at the same school or at another SEVP-certified school; changes to a different nonimmigrant status; or otherwise legally extends his or her period of authorized stay in the United States.  As noted, DHS regulations have long defined an F-1 student's duration of status to include the student's practical training.  See, e.g., 48 FR 14575, 14583 (Apr. 5, 1983).[7]  Additionally, an F-1 student is allowed a 60-day "grace period" after the completion of the academic program or OPT to prepare for departure from the United States.  8 CFR 214.2(f)(5)(iv).

Unless an F-1 student meets certain limited exceptions, he or she may not be employed in the United States during the term of his or her F-1 status.  DHS permits an F-1 student who has been enrolled on a full-time basis for at least one full academic year in a college, university, conservatory, or seminary certified by SEVP, and who has otherwise maintained his or her

---

periodic, ongoing reviews of institutions certified to accept F nonimmigrants, and to include checks for compliance with recordkeeping and reporting requirements. See Weekly Comp. Pres. Docs., 37 WCPD 1570, http://www.gpo.gov/fdsys/granule/WCPD-2001-11-05/WCPD-2001-11-05-Pg1570/content-detail.html. Section 502 of the Enhanced Border Security and Visa Entry Reform Act of 2002 directs the Secretary to review the compliance with recordkeeping and reporting requirements under 8 U.S.C. 1101(a)(15)(F) and 1372 of all schools approved for attendance by F students within two years of enactment, and every two years thereafter.  Moreover, the programs discussed in this rule, as is the case with all DHS programs, are carried out in keeping with DHS's primary mission, which includes the responsibility to "ensure that the overall economic security of the United States is not diminished by the efforts, activities, and programs aimed at securing the homeland." 6 U.S.C. 111(b)(1)(F).
[7] See Washington Alliance of Tech. Workers v. U.S. Dep't of Homeland Security, No. 1:14-cv-00529, slip op. at 25-26 (D.D.C. Aug. 12, 2015) (finding that DHS's interpretation permitting "employment for training purposes without requiring school enrollment" is "'longstanding' and entitled to [judicial] deference").

status, to apply for practical training to work for a U.S. employer in a job directly related to his or her major area of study.  8 CFR 214.2(f)(10).

An F-1 student may seek employment through OPT either during his or her academic program (pre-completion OPT) or immediately after graduation (post-completion OPT).  The student remains in F-1 nonimmigrant status throughout the OPT period.  Thus, an F-1 student in post-completion OPT does not have to leave the United States within 60 days after graduation, but instead has authorization to remain for the entire post-completion OPT period.  8 CFR 214.2(f)(5)(i).  This initial post-completion OPT period (i.e., a period of practical training immediately following completion of an academic program) can be up to 12 months, except in certain circumstances involving students who engaged in either pre-completion OPT or curricular practical training (CPT).[8]

2.   Regulatory History

On April 8, 2008, DHS published an interim final rule in the Federal Register (73 FR 18944) that, in part, extended the maximum period of OPT from 12 to 29 months (through a 17-month "STEM OPT extension") for an F-1 student who obtained a degree in a designated STEM field from a U.S. institution of higher education and who was engaged in practical training with an employer that enrolled in and remained in good standing with E-Verify, as determined by USCIS.  As a result of that rule, F-1 students granted STEM OPT extensions were required to report to their DSOs any changes in their names or addresses, as well as any changes in their

---

[8] CPT provides a specially-designed program through which students can participate in an internship, alternative study, cooperative education, or similar programs.  52 FR 13223 (Apr. 22, 1987).  Defined to also include practicums, CPT allows sponsoring employers to train F-1 students as part of the students' established curriculum within their schools.  8 CFR 214.2(f)(10)(i).  CPT must relate to and be integral to a student's program of study. Unlike OPT and other training or employment, however, CPT can be full-time even while a student is attending school that is in session.  Schools have oversight of CPT through their DSOs, who are responsible for authorizing CPT that is directly related to the student's major area of study and reporting certain information, including the employer and location, the start and end dates, and whether the training is full-time or part time.  8 CFR 214.2(f)(10)(i)(B).

employer's information (including name or address), and periodically validate the accuracy of this information.  The rule further required employers of such students to report to the relevant DSO within two business days if a student was terminated from or otherwise left employment prior to the end of the authorized period of OPT.  The rule allowed an F-1 student to apply for post-completion OPT within the 60-day grace period at the conclusion of his or her academic program.  The rule also limited the total period in which students on initial post-completion OPT could be unemployed to 90 days.  Students granted 17-month STEM OPT extensions were provided an additional 30 days in which they could be unemployed, for an aggregate period of 120 days.

The 2008 IFR also addressed the so-called Cap-Gap problem, which results when an F-1 student's F-1 status and OPT-based employment authorization expires before the start date of an approved H-1B petition and change-of-status request filed on his or her behalf ("H-1B change-of-status petition").  Specifically, F-1 students on initial post-completion OPT frequently complete their period of authorized practical training in June or July of the year following graduation.  Before the 2008 IFR, if such a student was a beneficiary of an H-1B petition that was pending with or approved by USCIS and requested a change of status to H-1B classification commencing in the following fiscal year (i.e., beginning on October 1), the student would be unable to obtain H-1B status before his or her OPT period expired.  Such students were often required to leave the United States for a few months until they were able to obtain their H-1B status on October 1.  The 2008 IFR addressed this problem through a Cap-Gap provision that briefly extended the F-1 student's duration of status and employment authorization to enable the student to remain in the United States until he or she could change to H-1B status.

22

Exhibit 1
355

DHS received over 900 comments in response to the 2008 IFR.  Public comments received on the 2008 IFR and other records may be reviewed at the docket for that rulemaking, No. ICEB-2008-0002, available at www.regulations.gov.

Washington Alliance Litigation Regarding the 2008 IFR

On August 12, 2015, the U.S. District Court for the District of Columbia issued an order in the case of Washington Alliance of Tech. Workers v. U.S. Dep't of Homeland Security, --- F. Supp. 3d ----, 2015 WL 9810109, (D.D.C. Aug. 12, 2015) (slip op.).  Although the court held that the 2008 IFR rested upon a reasonable interpretation of the INA,[9] the court also held that DHS violated the notice and comment provisions of the Administrative Procedure Act (APA), 5 U.S.C. 553, by promulgating the 2008 IFR without advance notice and opportunity for public comment.  In its order, the court invalidated the 2008 IFR as procedurally deficient, and remanded the issue to DHS.

Although the court vacated the 2008 IFR, the court stayed the vacatur until February 12, 2016, to provide time for DHS to correct the procedural deficiency through notice-and-comment rulemaking.  Id. at *37.[10]  The court specifically explained that the stay was necessary to avoid "substantial hardship for foreign students and a major labor disruption for the technology sector" and that immediate vacatur of the STEM OPT extension would be "seriously disruptive." Id. at

---

[9] With respect to DHS's interpretation of the F-1 student visa provisions in the INA, the court found ample support for DHS's longstanding practice of "permit[ting F-1 student] employment for training purposes without requiring ongoing school enrollment."  Washington Alliance, No. 1:14-cv-00529, slip op. at 26-27.  The court recognized the Secretary's broad authority under the INA "to regulate the terms and conditions of a nonimmigrant's stay, including its duration." Id. at *29 (citing 8 U.S.C. 1103(a), 1184(a)(1)).  The court also recognized the Secretary's authority to consider the potential economic contributions and labor market impacts that may result from particular regulatory decisions.  Id. (citing 6 U.S.C. 111(b)(1)(F)).

[10] In an earlier preliminary ruling in the case regarding plaintiff's challenge to DHS's general OPT and STEM OPT extension programs, the court held that plaintiff did not have standing to challenge the general OPT program on behalf of its members because it had not identified a member of its association who suffered any harm from the general OPT program.  See Washington Alliance of Tech. Workers v. U.S. Dep't of Homeland Security, 74 F. Supp. 3d 247, 252 & n.3 (D.D.C. 2014).  The court held in the alternative that the challenge to the general OPT program was barred by the applicable statute of limitations.

*36.  On January 23, 2016, the Court further stayed its vacatur by 90 days until May 10, 2016.

Washington Alliance of Tech. Workers v. U.S. Dep't of Homeland Security, No. 1:14-cv-00529,

(D.D.C. Jan. 23, 2016) (slip op.).  The court further stayed the vacatur to provide DHS an

additional 30 days to complete the rulemaking and to allow the Department to publish the rule

with a 60-day delayed effective date.  Id.

Litigation in this matter is ongoing, as the plaintiff has appealed a portion of the court's

August 12, 2015, decision.  Thus the final disposition of the case remains to be determined.

Nevertheless, it is clear that DHS must issue a final rule that will take effect before the court's

stay expires on May 10, 2016, or a significant number of students will be unable to pursue

valuable training opportunities that would otherwise be available to them.

### B.      The 2015 NPRM

After the court's ruling, DHS acted quickly to address the imminent vacatur of the 2008

IFR and the significant uncertainty surrounding the status of thousands of students in the United

States.  As of September 16, 2015, over 34,000 students were in the United States on a STEM

OPT extension.  In addition, hundreds of thousands of international students, most of whom are

in F-1 status, already have chosen to enroll in U.S. educational institutions and are currently

pursuing courses of study in fields that may provide eligibility for this program.  Some of those

students may have considered the opportunities offered by the STEM OPT extension when

deciding whether to pursue their degree in the United States.  DHS therefore acted swiftly to

mitigate the uncertainty surrounding the 2008 IFR.  Prompt action is particularly appropriate

with respect to those students who have already committed to study in the United States, in part

based on the possibility of furthering their education through an extended period of practical training in the world's leading STEM economy.[11]

Accordingly, on October 19, 2015, DHS published an NPRM in the Federal Register, proposing to reinstate the STEM OPT extension along with changes intended to improve the integrity and academic benefit of the extension and to better protect U.S. workers.[12]  80 FR 63376.[13]  During the public comment period, approximately 50,500 comments were submitted on the NPRM and related forms.[14]  Comments were submitted by a range of entities and individuals, including U.S. and international students, U.S. workers, schools and universities, professional associations, labor organizations, advocacy groups, businesses, two members of Congress, and other interested persons.  DHS thanks the public for its helpful input and engagement during the public comment period.[15]

This final rule builds upon the NPRM and the public comments received.  DHS intends for this rule to further strengthen the integrity and educational benefit of STEM OPT extensions, as well as better protect U.S. workers.

---

[11] The National Science Foundation reports that the United States performs more science and engineering Research and Development (R&D) than any other nation, accounting for just under 30% of the global total.  See Science and Engineering Indicators 2014 (NSF) at Chapter 4 (International Comparisons), at 4-17, available at http://www.nsf.gov/statistics/seind14/index.cfm/chapter-4. According to NSF, the United States expends $429 billion of the estimated $1.435 trillion in global science and engineering R&D (p. 4-17), and business, government, higher education, and non-profits in the United States expend more than double that of any other country (Table 4-5).

[12] These proposed changes were consistent with the direction provided in the Secretary of Homeland Security's November 20, 2014 memorandum entitled, "Policies Supporting U.S. High Skilled Businesses and Workers."  DHS recognized the nation's need to evaluate, strengthen, and improve practical training as part of an overall strategy to enhance our nation's economic, scientific, and technological competitiveness.  Highly skilled persons educated in the United States contribute significantly to the U.S. economy, including through advances in entrepreneurial and research and development endeavors, which correlate highly with overall economic growth and job creation.

[13] DHS hereby incorporates all background material included in the NPRM in this final rule.

[14] Comments can be viewed in the online docket for this rulemaking at http://www.regulations.gov.  Enter "ICEB-2015-0002" into the search bar to find the docket.

[15] One commenter requested a public meeting on the NPRM, "[g]iven the major impact that the rules will have on the educational and labor markets, and the lack of attention in the rule to the adverse impacts the program's insufficient regulations and worker protections can have on U.S. workers and students."  DHS has determined that a public meeting would not be in the public interest, in light of the impending vacatur date and the extensive discussion of these issues in the NPRM, the public comments, and this final rule.

### C.    Basis and Purpose of Regulatory Action

In finalizing this rule, DHS recognizes the substantial economic, scientific, technological, and cultural benefits provided by the F-1 nonimmigrant program generally, and STEM OPT extensions in particular.

### 1.    Benefits of International Students in the United States

International students have historically made significant contributions to the United States, both through the payment of tuition and other expenditures in the U.S. economy, as well as by significantly enhancing academic discourse and cultural exchange on campuses throughout the United States.  In addition to these general benefits, STEM students further contribute through research, innovation, and the provision of knowledge and skills that help maintain and grow increasingly important sectors of the U.S. economy.

International students, for example, regularly contribute a significant amount of money into the U.S. economy.  According to statistics compiled by NAFSA: Association of International Educators (NAFSA), international students made a net contribution of $26.8 billion to the U.S. economy in the 2013-2014 academic year.[16]  This contribution included tuition ($19.8 billion) and living expenses for self and family ($16.7 billion), after adjusting for U.S. financial support ($9.7 billion).[17]  Public colleges and universities particularly benefit from the payment of tuition by international students, especially in comparison to the tuition paid by in-state students.[18]

---

[16] NAFSA: Association of International Educators, "The Economic Benefits of International Students: Economic Analysis for Academic Year 2013-2014," available at http://www.nafsa.org/_/File/_/eis2014/USA.pdf; see also NAFSA, International Student Economic Value Tool, available at http://www.nafsa.org/economicvalue.
[17] Id.
[18] Washington Post, "College Group Targets Incentive Payments for International Student Recruiters" (June 2, 2011), available at http://www.washingtonpost.com/local/education/college-group-targets-incentive-payments-for-international-student-recruiters/2011/05/31/AGvl5aHH_story.html.

International students also increase the benefits of academic exchange, while reinforcing ties with other countries and fostering increased understanding of American society.[19] International students, for example, "enrich U.S. universities and communities with unique perspectives and experiences that expand the horizons of American students and [make] U.S. institutions more competitive in the global economy."[20]  At the same time, "the international community in American colleges and universities has implications regarding global relationships, whether [those are] between nation-states, or global business and economic communities."[21]  International education and exchange at the post-secondary level in the United States builds relationships that "promote cultural understanding and dialogue" and bring a global dimension to higher education through the "diversity in culture, politics, religions, ethnicity, and worldview" brought by international students.[22]

Accordingly, international students provide substantial benefits to their U.S. colleges and universities, including beneficial economic and cultural impacts.  A study by Duke University in 2013 analyzing 5,676 alumni surveys showed that "substantial international interaction was positively correlated with U.S. students' perceived skill development in a wide range of areas across three cohorts."[23]  Current research also suggests that international students contribute to the overall economy by building global connections between their hometowns and U.S. host

---

[19] See The White House, National Security Strategy 29 (May 2010), available at https://www.whitehouse.gov/sites/default/files/rss_viewer/national_security_strategy.pdf.

[20] U.S. Department of State, "Why Internationalize," available at https://educationusa.state.gov/us-higher-education-professionals/why-internationalize.

[21] Pamela Leong, "Coming to America:  Assessing the Patterns of Acculturation, Friendship Formation, and the Academic Experiences of International Students at a U.S. College," *Journal of International Students* Vol. 5 (4): 459-474 (2015) at p. 459.

[22] Hugo Garcia and Maria de Lourdes Villareal, "The "Redirecting" of International Students:  American Higher Education Policy Hindrances and Implications," *Journal of International Students* Vol. 4 (2): 126-136 (2014) at p. 132.

[23] Jiali Luo and David Jamieson-Drake, "Examining the Educational Benefits of Interacting with International Students" at 96 (June 2013), available at https://jistudents.files.wordpress.com/2013/05/2013-volume-3-number-3-journal-of-international-students-published-in-june-1-2013.pdf.  The authors noted that U.S. educational institutions play an important role in ensuring U.S. students benefit as much as possible from this interaction.

cities.[24]  Evidence links skilled migration to transnational business creation, trade, and direct

investment between the United States and a migrant's country of origin.[25]

International STEM students contribute to the United States in all the ways mentioned

above.  They also contribute more specifically to a number of advanced and innovative fields

that are critical to national prosperity and security.  By conducting scientific research, developing

new technologies, advancing existing technologies, and creating new products and industries, for

example, STEM workers diversify our nation's economy and drive economic growth while also

producing increased employment opportunities and higher wages for all U.S. workers.[26]

Economic research supports the premise that scientists, technology professionals, engineers, and

mathematicians (STEM workers) are fundamental components in scientific innovation and

technological adoption, and critical drivers of productivity growth in the United States.[27]  For

example, research has shown that international students who earn a degree and remain in the

---

[24] Brookings Institution, "The Geography of Foreign Students in U.S. Higher Education: Origins and Destinations" (August 29, 2014), available at http://www.brookings.edu/research/interactives/2014/geography-of-foreign-students#/M10420.

[25] Sonia Plaza, "Diaspora resources and policies," in International Handbook on the Economics of Migration, 505-529 (Amelie F. Constant and Klaus F. Zimmermann, eds., 2013).

[26] See Michael Greenstone and Adam Looney, "A Dozen Economic Facts About Innovation" 2-3, available at http://www.brookings.edu/~/media/research/files/papers/2011/8/innovation-greenstone-looney/08_innovation_greenstone_looney.pdf [hereinafter Greenstone and Looney]; Bureau of Labor Statistics 2014 data show that employment in occupations related to STEM has been projected to grow more than nine million, or 13 percent, during the period between 2012 and 2022, 2 percent faster than the rate of growth projected for all occupations. Bureau of Labor Statistics, Occupational Outlook Quarterly, Spring 2014, "STEM 101: Intro to Tomorrow's Jobs" 6, available at http://www.stemedcoalition.org/wp-content/uploads/2010/05/BLS-STEM-Jobs-report-spring-2014.pdf.  See also Australian Government, Strategic Review of the Student Visa Program 2011 Report, ix, 1 (June 30, 2011), available at http://www.border.gov.au/ReportsandPublications/Documents/reviews-and-inquiries/2011-knight-review.pdf#search=knight%20review (concluding that the economic benefit of international master's and doctoral research students includes third-party job creation).

[27] See, e.g., Economics and Statistics Administration, Department of Commerce, "STEM: Good Jobs Now and For the Future" 5 (July 2011),  available at http://www.esa.doc.gov/Reports/stem-good-jobs-now-and-future ("Science, technology, engineering and mathematics (STEM) workers drive our nation's innovation and competitiveness by generating new ideas, new companies and new industries."); Giovanni Peri, Kevin Shih, Chad Sparber, "Foreign STEM Workers and Native Wages and Employment in U.S. Cities" 1 (National Bureau of Economic Research, May 2014)  Available at http://www.nber.org/papers/w20093 (observing that "Scientists, Technology professionals, Engineers, and Mathematicians (STEM workers) are fundamental inputs in scientific innovation and technological adoption, the main drivers of productivity growth in the U.S.").

Exhibit 1
361

United States are more likely than native-born workers to engage in activities, such as patenting and the commercialization of patents, that increase U.S. labor productivity.[28]  Similarly, other research has found that a 1 percentage point increase in immigrant college graduates' population share increases patents per capita by 9 to 18 percent.[29]  Research also has shown that foreign-born workers are particularly innovative, especially in research and development, and that they have positive spillover effects on native-born workers.[30]  One paper, for example, shows that foreign-born workers patent at twice the rate of U.S.-born workers, and that U.S.-born workers patent at greater rates in areas with more immigration.[31]  The quality of the nation's STEM workforce in particular has played a central role in ensuring national prosperity over the last century and helps bolster the nation's economic future.[32]  This, in turn, has helped to enhance national security, which is dependent on the nation's ability to maintain a growing and innovative economy.[33]  Innovation is crucial for economic growth, which is vital to continued funding for defense and security.[34]

### 2.   Increased Competition for International Students

---

[28] Jennifer Hunt, "Which Immigrants are Most Innovative and Entrepreneurial? Distinctions by Entry Visa," *Journal of Labor Economics* Vol 29 (3):  417-457 (2011).

[29]  Jennifer Hunt and Marjolaine Gauthier-Loiselle, "How Much Does Immigration Boost Innovation?" *American Economic Journal: Macroeconomics* 2: 31-56 (2010).

[30] Id.

[31] Id.

[32]  Greenstone and Looney, supra note 26, at 2-3.

[33] See Congressional Research Service, Economics and National Security: Issues and Implications for U.S. Policy 28, available at https://www.fas.org/sgp/crs/natsec/R41589.pdf [hereinafter Economics and National Security]; see also The White House, National Security Strategy 16 (Feb. 2015), available at https://www.whitehouse.gov/sites/default/files/docs/2015_national_security_strategy.pdf ("Scientific discovery and technological innovation empower American leadership with a competitive edge that secures our military advantage, propels our economy, and improves the human condition.") [hereinafter 2015 National Security Strategy]; The White House, National Security Strategy 29 (May 2010), available at https://www.whitehouse.gov/sites/default/files/rss_viewer/national_security_strategy.pdf ("America's long-term leadership depends on educating and producing future scientists and innovators.").

[34] The 2015 National Security Strategy concludes that "the American economy is an engine for global growth and a source of stability for the international system.  In addition to being a key measure of power and influence in its own right, it underwrites our military strength and diplomatic influence.  A strong economy, combined with a prominent U.S. presence in the global financial system, creates opportunities to advance our security."  2015 National Security Strategy, supra note 33, at 15.

DHS recognizes that the United States has long been a global leader in international education.  The number of international students affiliated with U.S. colleges and universities grew by 72 percent between 1999 and 2013 to a total of 886,052.[35]  However, although the overall number of international students increased over that period, the nation's share of such students decreased.  In 2001, the United States received 28 percent of international students; by 2011 that share had decreased to 19 percent.[36]  Countries such as Canada, the United Kingdom, New Zealand, Australia, Malaysia, Taiwan, and China are actively instituting new strategies to attract international students.[37]

For example, Canada also recognizes that educational institutions need international students to compete in the "global race for research talent."[38]  In April, 2008, Canada modified its Post-Graduation Work Permit Program to allow international students who have graduated from a recognized Canadian post-secondary institution to stay and gain valuable post-graduate work experience for a period equal to the length of the student's study program, up to a maximum of three years, with no restrictions on type of employment.[39]  This change resulted in a

---

[35] Pew Research Center, "Growth from Asia Drives Surge in U.S. Foreign Students" (June 18, 2015), available at http://www.pewresearch.org/fact-tank/2015/06/18/growth-from-asia-drives-surge-in-u-s-foreign-students/ (citing Institute for International Education, Open Doors Data: International Students: Enrollment Trends, available at http://www.iie.org/Research-and-Publications/Open-Doors/Data/International-Students/Enrollment-Trends/1948-2014.

[36] Organization for Economic Co-operation and Development (OECD) 2014, "Education at a Glance 2014: OECD Indicators," OECD Publishing at http://dx.doi.org/10.1787/eag-2014-en or http://www.oecd.org/edu/eag.htm.

[37] University World News Global Edition Issue 376, "Schools are the New Battleground for Foreign Students" (July 15, 2015), available at http://www.universityworldnews.com/article.php?story=201507150915156.

[38] Citizenship and Immigration Canada, "Evaluation of the International Student Program" 14 (July 2010) available at http://www.cic.gc.ca/english/pdf/research-stats/2010-eval-isp-e.pdf (citing Association of Universities and Colleges of Canada, Momentum: The 2008 report on university research and knowledge mobilization: A Primer: Driver 2: Global race for research talent, 3 (2008) [hereinafter Evaluation of the Int'l Student Program].

[39] Citizenship and Immigration Canada, Study permits: Post Graduation Work Permit Program, available at http://www.cic.gc.ca/english/resources/tools/temp/students/post-grad.asp [hereinafter Canadian Study permits]. Similarly, Australia, now offers international students who graduate with a higher education degree from an Australian education provider, regardless of their field of study, a post-study work visa for up to four years, depending on the student's qualification.  Students who complete a bachelor's degree may receive a two-year post study work visa, research graduates with a master's degree are eligible for a three-year work visa, and doctoral graduates are eligible for a four-year work visa.  See Australian Department of Immigration and Border Protection,

steady increase between 2003 and 2007 in the number of post-graduation work permits issued to international students, followed by a sharp increase of 64 percent from 2007 to 2008.[40]  By 2014, the number of international students in the program was more than double its 2008 total.[41] In addition, Canada aims to double the number of international students in the country from 211,949 in 2014 to 450,000 by 2022.[42]

In light of the United States' decreasing share of international students, and increased global efforts to attract them, DHS concludes that the United States must take additional steps to improve these students' educational experience (both academic and practical) to ensure that we do not continue to lose ground.  This is particularly true for international STEM students, who have comprised a significant portion of students in STEM degree programs in the United States, particularly at the graduate degree level.

The difference is particularly notable at the doctoral level, where international students earned 56.9 percent of all doctoral degrees in engineering; 52.5 percent of doctoral degrees in computer and information sciences; and approximately half the doctoral degrees in mathematics and statistics in the 2012-2013 academic year.[43]  Recognizing that the international education programs for these students are increasingly competitive, DHS is committed to helping U.S.

---

Application for a Temporary Graduate visa, available at http://www.border.gov.au/FormsAndDocuments/Documents/1409.pdf [hereinafter Australian Temporary Grad. visa].

[40] Evaluation of the Int'l Student Program, supra note 38, at 9.

[41] Citizenship and Immigration Canada, Quarterly Administrative Data Release, available at http://www.cic.gc.ca/english/resources/statistics/data-release/2014-Q4/index.asp.

[42] See Government of Canada, Quarterly Administrative Data Release (July 20, 2015), available at http://www.cic.gc.ca/english/resources/statistics/data-release/2014-Q4/index.asp; University World News Global Edition, Schools are the New Battleground for Foreign Students, July 15, 2015, Issue 376, available at http://www.universityworldnews.com/article.php?story=201507150915156.

[43] Pew Research Center, "Growth from Asia Drives Surge in U.S. Foreign Students" (June 18, 2015), available at http://www.pewresearch.org/fact-tank/2015/06/18/growth-from-asia-drives-surge-in-u-s-foreign-students/.

educational institutions contend with the expanded and diverse global opportunities for international study.

### 3.     The Need to Improve the Existing STEM OPT Extension

With this rule, DHS also recognizes the need to strengthen the existing STEM OPT extension to enhance the integrity and educational benefit of the program in order to help maintain the nation's economic, scientific, and technological competitiveness.  DHS is working to find new and innovative ways to encourage international STEM students to choose the United States as the destination for their studies.  This rule, in addition to including a modified version of the STEM OPT extension from the 2008 IFR, increases the maximum training time period for STEM students, requires a formal training plan for each STEM OPT extension, and strengthens protections for U.S. workers.  Providing an on-the-job educational experience through a U.S. employer qualified to develop and enhance skills through practical application has been DHS's primary guiding objective in crafting this rule.

Many of the elements of the 2015 NPRM were based on public comments on the 2008 IFR, which contained input from a range of stakeholders, including students and the broader academic community.  The NPRM also incorporated recommendations from the Homeland Security Academic Advisory Committee.[44]  DHS continues to find that the changes proposed by this rule to the existing STEM OPT extension would benefit both F-1 students and international study programs in the United States, while adding important protections.

---

[44] The Homeland Security Academic Advisory Council provides advice and recommendations to the Secretary and senior leadership on matters related to homeland security and the academic community, including: student and recent graduate recruitment, international students, academic research and faculty exchanges, campus resilience, homeland security academic programs, and cybersecurity. See U.S. Department of Homeland Security, Homeland Security Academic Advisory Council Charter, available at http://www.dhs.gov/publication/hsaac-charter.

32

Exhibit 1
365

The changes will allow F-1 STEM students to gain valuable on-the-job training from qualified employers. Maintaining and enhancing practical training for STEM students improves their ability to absorb a full range of project-based skills and knowledge directly related to their study. The changes will also help the nation's colleges and universities remain globally competitive, including by improving their ability to attract international STEM students to study in the United States. As noted above, these students enrich the academic and cultural life of college and university campuses throughout the United States and make important contributions to the U.S. economy and academic sector. The changes will help strengthen the overall F-1 program in the face of growing international competition for the world's most promising international students.

Additionally, safeguards such as employer attestations, requiring employers to enroll in and remain in good standing with E-Verify, providing for DHS site visits, and requiring that STEM training opportunities provide commensurate terms and conditions to those provided to U.S. workers will help protect both such workers and STEM OPT students. Implementing the changes in this rule thus will more effectively help STEM OPT students achieve the objectives of their courses of study while also benefiting U.S. academic institutions and guarding against adverse impacts on U.S. workers.

IV. Discussion of Comments and Final Rule

As noted above, during the public comment period, 50,500 comments were submitted on the NPRM and related forms. Comments were submitted by a range of entities and individuals, including U.S. and international students, U.S. workers, schools and universities, professional associations, labor organizations, advocacy groups, businesses, and other interested persons. Many commenters provided concrete suggestions that DHS has evaluated and responded to in

order to build upon the proposed rule and to better explain its provisions.  Overall,[45] comments

were primarily positive, but there were many criticisms as well.

A number of commenters expressed general opposition to the NPRM.   For instance,

some stated that the proposed rule would not serve the national interest because it would harm

U.S. workers, especially recent graduates with STEM degrees.  Commenters also suggested that

there was insufficient demand for STEM workers in the U.S. labor market to accommodate

STEM OPT students.  Other commenters were concerned that STEM OPT students would send

their wages back to their home countries.  Based on these and other concerns, various

commenters requested that DHS place a moratorium on practical training and related programs

until, for instance, every qualified U.S. citizen has a job.  Another commenter requested that

STEM OPT be phased out entirely after the current participants finish their training.

On the whole, however, commenters largely expressed support for the proposed rule.

Commenters stated that the NPRM would "make[] a number of important, thoughtful changes to

improve and enhance the opportunities available to F-1 students with STEM degrees"; that the

proposed rule struck a reasonable balance by distributing requirements among all who participate

in STEM OPT, including international students, institutions of higher education, and employers;

and that the proposed Mentoring and Training Plan requirement would improve the STEM OPT

---

[45] In addition, DHS also received a number of comments that were outside the scope of the rulemaking.  For instance, some commenters stated that DHS should not allow any foreign nationals to work in the United States.  Other commenters recommended that DHS make changes to the H-1B visa classification.  Another commenter stated that the United States should "send green cards to [STEM] PhDs right away."   Other commenters recommended that DHS apply the proposed rule's requirements to F-1 nonimmigrant students engaged in pre-completion OPT or the initial 12-month period of post-completion OPT.  Additionally, one commenter requested that DHS extend the period during which students may apply for post-completion OPT and related employment authorization.  DHS did not propose any of these changes in the NPRM, and readers of the NPRM could not reasonably have anticipated that DHS would make such changes in this final rule.  Accordingly, DHS has deemed these and similar comments outside the scope of this rulemaking, and has not discussed them further in this preamble.

Exhibit 1
367

extension by clearly identifying the students' learning objectives and the employer's commitments.

DHS thanks the public for its extensive input during this process.  In the discussion below, DHS summarizes and responds to all comments that were timely submitted on the NPRM.

**A.      Including a STEM OPT Extension Within the OPT Program**

1.      <u>Description of Final Rule and Changes from NPRM</u>

Consistent with the NPRM, this final rule provides for STEM OPT extensions as part of the OPT program under the F-1 nonimmigrant classification.  This action will better ensure, among other important national interests, that the U.S. academic sector can remain globally competitive.  Enabling extended practical training for qualifying students with experience in STEM fields is consistent with DHS's "Study in the States" initiative, announced after the 2008 IFR in September 2011, to encourage international students to study in the United States.  That initiative particularly has focused on enhancing our nation's economic, scientific and technological competitiveness by finding new ways to encourage talented international students to become involved in expanded post-graduate opportunities in the United States.  The initiative has taken various steps to improve the Nation's nonimmigrant student programs.[46]

The final rule enhances the ability of F-1 students to achieve the objectives of their courses of study while also benefiting the U.S. economy.  More students will return home confident in their training and ready to begin a career in their field of study; others may seek to change status to other nonimmigrant classifications consistent with section 248 of the INA, 8

---

[46] <u>See</u> DHS, "Study in the States," http://studyinthestates.dhs.gov.

U.S.C. 1258, following a STEM OPT extension, thus furthering economic growth and cultural exchange in the United States.

Before discussing and responding to public input on the substantive terms of the STEM OPT extension program proposed in the 2015 NPRM, DHS first addresses comments providing input on whether STEM OPT extensions should be authorized at all.  As discussed below, the STEM OPT extension rule is grounded in the long-standing recognition by DHS and its predecessor agency that (1) experiential learning and practical training are valuable parts of any post-secondary educational experience and (2) attracting and retaining international students is in the short- and long-term economic, cultural, and security interests of the United States. Thousands of comments expressed an opinion on one or both of these two points, either challenging or supporting the proposal to include a STEM OPT extension within the OPT program.  A significant number of commenters discussed the taxation rules applicable to F-1 students; some asserted that no STEM OPT extension was appropriate as long as certain F-1 students remained exempt from certain payroll or employment taxes.  Lastly, some commenters questioned the Department's legal authority to include a STEM OPT extension within the OPT program, while others maintained that a solid legal basis exists for such extensions.  The final rule retains STEM OPT extensions as part of the OPT program and explains in detail the underpinnings of this policy by responding in full to the many policy-related comments received from the public.

    2.    <u>Public Comments and Responses</u>

    i.    <u>Experiential Learning as Part of Completing a Full Course of Study</u>

Numerous commenters submitted views regarding the proposition that experiential learning opportunities such as practical training can significantly enhance the knowledge and

36

Exhibit 1
369

skills obtained by students during academic study, thus furthering their courses of study in the United States.

Comment.  DHS received hundreds of comments, mostly from students and universities, stating that experiential learning and practical training are key parts of university education. DHS also received comments challenging this premise.  One commenter, for example, strongly disagreed "that the objective of the students' course of study includes the acquisition of knowledge through on-the-job 'training.'"  Instead, this commenter stated that "the sole objective of the F-1 student's course of study is to obtain the desired degree and nothing more." According to the commenter, "[o]nce that objective has been achieved, the purpose of the F-1 status has been fulfilled and the status should terminate."

Many universities and higher education associations, however, made statements to the contrary.  Twelve higher education associations—representing land-grant universities, research universities, human resource professionals at colleges and universities, registrars, graduate schools, international student advisors, and religious colleges and universities, among others— jointly filed a comment stating that "experiential learning is a key component of the educational experience."  These higher education associations stated that:

> OPT allows students to take what they have learned in the classroom and apply "real world" experience to enhance learning and creativity while helping fuel the innovation that occurs both on and off campus. . . .  Learning through experience is distinct from learning that takes place in the classroom.  Experiential learning opportunities have become an integral part of U.S. higher education.

Universities individually made similar points, emphasizing the value of experiential learning. DHS received comments on this point from a range of public and private institutions of higher education.  For example, one university stated that experiential learning opportunities are particularly critical in "STEM fields where hands on work supplements classroom education."

Another university stated that "experiential learning fosters the capacity for critical thinking and application of knowledge in complex or ambiguous situations."  Other university commenters stated that experiential learning "is a necessary component of a 21st century education, especially in the STEM fields."

A national organization of graduate and professional students stated that offering a STEM OPT extension after bachelor's level studies allowed individuals to "identify research interests and develop skills" that they later can expand upon in their graduate studies when they focus on solving concrete problems.  An organization representing international educators stated that the OPT program appropriately focuses on the critical part of an education that occurs in partnership with employers.

An organization that serves U.S. institutions engaged in international educational and cultural exchange stated that "extended OPT eligibility creates space for more meaningful interactions between international OPT participants and their U.S. host employers."  Other comments stated that a recent membership survey found that 89 percent of responding employers found that OPT participants "work in conjunction with U.S. workers in a way that promotes career development for everyone involved."  A business association stated that "practical training allows foreign students in technical fields to maximize the return on their investment in education."

Response.  The Department agrees with the many U.S. universities and educational- and international-exchange organizations that provided comments stating that STEM OPT extensions would enhance the educational benefit provided to eligible students through practical training.  DHS agrees that practical training is an accepted and important part of international post-secondary education.

38

Exhibit 1
371

<u>Comment</u>.  One commenter asserted that OPT had "limited (if any) education[al] value" while noting that he "was unable to find any comment where someone described how the OPT program is related to a course of study or is a means to achieve specific educational goals." Many comments, however, described how practical training is related to a course of study and serves as a means to achieve educational goals.  In addition to the comments described above from academic associations and educational institutions, the Department received many comments from F-1 students describing the educational benefits that the OPT program provides both to students and to academic programs.  Examples of such comments include the following:

- "OPT allows international students the opportunity to engage in practical application of skills learned in academic programs."

- "[A]s an extension of college education, OPT extension is a great way to apply what's learnt in class to our real industry."

- "This experiential learning will allow me to integrate knowledge and theory learned in the classroom with practical application and skills development in a professional setting."

- "The proposal to reinstitute the STEM extension will provide valuable hands-on, educational experience in which STEM graduates gain real-world immersion into a chosen industry."

- "The new rule will allow me to meet my planned learning goals and allow for active reflection on [what] I am accomplishing throughout the experience."

<u>Response</u>.  Consistent with many of the comments received from academic associations, educational institutions, and F-1 students, DHS agrees that the OPT program enriches and augments a student's educational experience by providing the ability for students to apply in

39

Exhibit 1
372

professional settings the theoretical principles they learned in academic settings.  By promoting the ability of students to experience first-hand the connection between theory in a course of study and practical application, including by applying abstract concepts in attempts to solve real-world problems, the OPT program enhances their educational experiences.  A well-developed capacity to work with such conceptualizations in the use of advanced technology, for example, is critical in science-based professions.  Practical training programs related to STEM fields also build competence in active problem solving and experimentation, critical complements to academic learning in STEM fields.  As many commenters attested, practical training is an important avenue for enhancing one's educational experience, particularly for STEM students.

Comment.  A research organization contested the educational basis for providing two-year STEM OPT extensions in part by noting that the ACT testing organization (previously known as American College Testing) has published a "world of work map" stating that "a bachelor's degree is sufficient for electrical engineering jobs" without discussing any extended period of practical training.  The commenter also pointed out that the Department of Labor's Occupational Outlook Handbook states that in order to become an electrical engineer one "must have a bachelor's degree" and that "[e]mployers also value practical experience, so participation in cooperative engineering programs, in which students earn academic credit for structured work experience, is valuable as well."  According to the commenter, the standard OPT duration of 12 months is more than sufficient to become a fully trained engineer, as that is the duration of typical cooperative engineering programs.

Response.  DHS rejects the notion that ACT's "world of work map," a career planning tool for high school students, attempts to describe anything other than the educational degree level typically required for entry into an occupation.  The ACT's career planning map takes no

position on whether and to what extent on-the-job training and experiences help launch a career, enhance an educational program, or help facilitate mastery of material learned in the classroom. The Occupational Outlook Handbook of the Department of Labor similarly does not assess the relevancy of experiential learning theory or the extent to which on-the-job training complements classroom learning as part of post-secondary education. Instead, the Occupational Outlook Handbook identifies the typical level of degree or education that most workers need to enter the electrical engineering occupation and the extent to which additional training is needed (post-employment) to attain competency in the skills needed in the occupation.[47]  The fact that cooperative education programs in engineering may typically focus on the equivalent of one year of employment experience for academic credit is not determinative with regard to the type or length of experiential learning that can be considered part of a full course of study. Cooperative education is one type of experiential learning, but not the only type used by the nation's higher education community.[48]

Comment.  A commenter stated that DHS had not "provided any evidence . . . indicating that" nonimmigrant students lack access to similar opportunities in their home countries.

Response.  The United States hosts F-1 students from all over the world. Although DHS acknowledges that some students will have access to similar training opportunities in their home countries, DHS believes it is self-evident that many will not. In any case, the purpose of the rule is not simply to address a gap in training opportunities for F-1 students in their home countries but to help students develop their knowledge and skills through practical application, and to

---

[47] BLS, Occupational Outlook Handbook, at "Occupation Finder" (Dec. 17, 2015), available at http://www.bls.gov/ooh/occupation-finder.htm?pay=&education=&training=&newjobs=&growth=&submit=GO (see information defining "entry-level education" and "on-the-job training" for the Occupation Finder).
[48] The commenter questioning the educational basis of the STEM OPT extension referred to the co-op program at the Rochester Institute of Technology (RIT) as a useful example, since it is one of the nation's largest. RIT itself, though, recognizes that co-ops are just one type of experiential learning. See generally RIT, Cooperative Education and Experiential Learning, https://www.rit.edu/overview/cooperative-education-and-experiential-learning.

ensure that our nation's colleges and universities remain globally competitive in attracting international STEM students to study and lawfully remain in the United States.

Comment.  Some commenters asked DHS to reconsider the requirement that students be engaged in STEM OPT solely related to their fields of study.

Response.  The Department has historically required the OPT experience to be directly related to the student's major fields of study because, at its core, such work-based learning is a continuation of the student's program of study.  Indeed, the purpose of OPT is to better position students to begin careers in their fields of study by providing ways for them to supplement and enhance the knowledge they gained in their academic studies through application of that knowledge in work settings.  Allowing such students to engage in OPT in areas unrelated to their fields of study would be inconsistent with the purpose of OPT.

OPT's required nexus to the field of study also minimizes potential abuse or exploitation of international students by those seeking to impermissibly employ them in unskilled labor or other unauthorized work in the United States.  Moreover, this requirement is consistent with current regulations applicable to OPT more broadly; under these regulations, OPT must be directly related to the student's major area of study.  See 8 CFR 214.2(f)(10)(ii)(A).  For these reasons, DHS has determined that it will not permit a student to engage in STEM OPT in an area not related to his or her field of study.

ii.    International Students and the National Interest

A variety of comments addressed whether the STEM OPT extension benefited STEM OPT students, U.S. institutions of higher education, and the overall national interest.  Some commenters stated that the STEM OPT extension would provide such benefits and supported the proposed rule for these or related reasons; others stated that the proposed rule would negatively

impact the employment options of U.S. STEM graduates and workers.  The Department had carefully considered these issues in developing the NPRM, and has further evaluated these issues as raised in the public comments.  The Department's consideration of these issues is reflected in the discussion that immediately follows and throughout this preamble.

Comment.  One commenter stated that a recent study "shows that American students who actively interact with their international classmates are more likely to enhance their own self-confidence, leadership and quantitative skills."[49]  Another commenter, however, stated that in explaining the STEM OPT extension DHS had cited "no evidence of a measurable 'academic benefit' other than increased income for U.S. institutions of higher education."  This commenter stated that any such increased income would be "irrelevant to the OPT program, where F-1 students do NOT pay tuition, at premium or standard rates, to the academic institution from which they received a STEM degree."  The commenter also stated that STEM OPT employment does not and cannot provide "enhance[ed] academic discourse and cultural exchange on campuses," and that there is an internal conflict in the dual goal of bringing "knowledge and skills" to the U.S. economy through the STEM OPT extension, and helping STEM OPT students acquire knowledge and skills.

A university commenter, however, suggested that DHS should consider it a priority to finalize the STEM OPT extension rule in a way that ensures universities remain internationally competitive.  Representative of many comments from higher education, another university commenter strongly supported the STEM OPT extension within the OPT program.  The commenter stated that "if the United States is to maintain our economic, educational, and

---

[49] See generally Jiali Luo and David Jamieson-Drake, "Examining the Educational Benefits of Interacting with International Students" at 96 (June 2013), available at https://jistudents.files.wordpress.com/2013/05/2013-volume-3-number-3-journal-of-international-students-published-in-june-1-2013.pdf.

43

Exhibit 1
376

scientific competitiveness then it must continue to make itself attractive to the best talent worldwide." Another commenter, who identified as an F-1 student, noted that many people from his home country have degrees earned abroad, and that a "U.S.-university degree alone is not valued as [highly] as it was 10 or 20 years ago." This commenter stated that "experience on a complete project" will provide him an advantage over students who studied in countries that don't provide similar kinds of training opportunities.

Response.  The STEM OPT extension program is designed to address the very point raised by the final commenter, i.e., that the program will improve and expand the educational and training opportunities available to international students and maintain and improve the competitiveness of American institutions of higher education.  As explained in the NPRM, see 80 FR 63383-84, there is increasing international competition for attracting top international students, and other countries, including Canada and Australia, currently have programs similar to the STEM OPT extension.  The STEM OPT extension serves to maintain the United States' global competitiveness in these rapidly evolving fields.  As discussed in the NPRM, see, e.g., 80 FR 63382-84, this provides benefits to the U.S. economy that are independent of any need (or lack thereof) of STEM workers in the United States.

As noted in the NPRM, in light of increased global efforts to recruit international students, DHS believes that the United States must take additional steps to improve available educational experiences (both academic and practical) to ensure that the United States remains competitive for such students.  Such steps benefit the U.S. academic sector by contributing to its economic support and increasing academic diversity.  This is particularly true with regard to international STEM students, who have comprised a significant portion of students in STEM degree programs in the United States, particularly at the graduate degree level.  While it is of

course true that, as a commenter noted, OPT students do not pay tuition during their practical training, it is reasonable to assume the increased attractiveness of U.S. colleges and universities due to the availability of OPT will benefit the U.S. academic sector.  DHS's conclusions about the benefit of the STEM OPT extension to the F-1 student program and U.S. educational institutions found broad support in the comments submitted by educational institutions themselves.

Comment.  A significant number of commenters discussed whether STEM OPT participants positively or negatively impacted U.S. workers and U.S. students, with differing views on whether nonimmigrant STEM professionals complemented or replaced U.S. STEM professionals.  Some commenters cited their personal experience as STEM workers, or the experience of others they know, to demonstrate the existence of either a labor surplus or a labor shortage.  Many others cited and attached reports and studies to show there was either a labor surplus or a labor shortage.

A number of commenters stated that allowing employers to hire F-1 students on a STEM OPT extension would disadvantage U.S. citizens and lawful permanent residents.  Some of these commenters, as well as other commenters, provided facts and figures suggesting there was not a labor shortage of STEM workers.  For example, some commenters stated that wages have not increased, as would be expected during a shortage, and some of these commenters cited to a report from the Economic Policy Institute that found that wages in the information technology sector "have remained flat, with real wages hovering around their late 1990s levels."[50]  Some commenters provided data that contradicted these claims.  For example, one commenter stated

---

[50] Hal Salzman, Daniel Kuehn, Lindsay Lowell, Guestworkers in the High-Skill U.S. Labor Market:  An Analysis of Supply, Employment, and Wages 2 (Economic Policy Institute, Apr. 2013) available at http://www.epi.org/publication/bp359-guestworkers-high-skill-labor-market-analysis/.

Exhibit 1
378

that STEM workers receive a persistent wage premium and that wages for engineers are rising relative to other occupations.

Commenters cited data and reports on both sides of the question of whether there were sufficient numbers of qualified U.S. workers available to fill open STEM jobs in the U.S. economy.  One commenter stated that there were over 102,000 unemployed engineers.  Another commenter stated that there were two million unemployed Americans with STEM degrees.  A number of commenters, however, stated that even with millions of unemployed Americans, "the manufacturing sector cannot find people with the skills to take nearly 600,000 unfilled jobs, according to a study last fall by the Manufacturing Institute and Deloitte."[51]  One commenter stated that "unemployment rates in key STEM occupations are dramatically lower" than the overall unemployment rate in the United States, citing to 2.8 percent unemployment in "computer and mathematical occupations" and 2.2 percent unemployment in "architecture and engineering occupations," among others.

Response.  DHS recognizes, as explained by the National Science Foundation (NSF), that close study reveals that there is no straightforward answer on whether the United States has a surplus or shortage of STEM workers.[52]  As the NSF summarizes:

> Some analysts contend that the United States has or will soon face a shortage of STEM workers.  Some point to labor market signals such as high wages and the fact that STEM vacancies are advertised for more than twice the median number of days compared to non-STEM jobs.  Other analysts note that the shortage of STEM workers is a byproduct of the ability of STEM-capable workers to "divert" into other high-skill occupations that offer better working conditions or pay.  Relatedly, some say even if the supply were to increase, the United States might

---

[51] See generally Manufacturing Institute et al, "The Skills Gap in Manufacturing: 2015 and Beyond" (Mar. 2015), available at http://www.themanufacturinginstitute.org/Research/Skills-Gap-in-Manufacturing/Skills-Gap-in-Manufacturing.aspx.

[52] NSF, Revisiting the STEM Workforce:  A Companion to Science and Engineering Indicators 2014, 9 (Feb. 4, 2015), available at http://www.nsf.gov/pubs/2015/nsb201510/nsb201510.pdf.

46

Exhibit 1
379

still have a STEM worker shortage because an abundance of high-skill workers helps drive innovation and competitiveness and this might create its own demand.

Those analysts who contend the United States does not have a shortage of STEM workers see a different picture.  They suggest that the total number of STEM degree holders in the United States exceeds the number of STEM jobs, and that market signals that would indicate a shortage, such as wage increases, have not systematically materialized.  Analysts also raise concerns about labor market dynamics in academia—where a decreasing share of doctoral degree holders employed in the academic sector are tenured—and in industry—where there are reports that newly-minted degree holders and foreign "guestworkers" on temporary visas (e.g., H-1B, L-1) are displacing incumbent workers.  A few of these analysts go as far as to argue that firms claim shortages and mismatches in the hope of lowering compensation and training costs.

Close study of the surplus-shortage question reveals that there is no straightforward "yes" or "no" answer to whether the United States has a surplus or shortage of STEM workers. The answer is always "it depends." It depends on which segment of the workforce is being discussed (e.g., sub-baccalaureates, PhDs, biomedical scientists, computer programmers, petroleum engineers) and where (e.g., rural, metropolitan, "high-technology corridors"). It also depends on whether "enough" or "not enough STEM workers" is being understood in terms of the quantity of workers; the quality of workers in terms of education or job training; racial, ethnic or gender diversity, or some combination of these considerations.[53]

DHS credits NSF's views on this matter.  Although DHS acknowledges that commenters submitted a range of data related to the current state of the overall U.S. STEM labor market (and DHS discusses much of this data in more detail below), DHS does not rely on this data to finalize the rule.  Instead, this rule is based on the widely accepted proposition that educational and cultural exchange, a strong post-secondary education system, and a focus on STEM innovation are, on the whole, positive contributors to the U.S. economy and U.S. workers and in the overall national interest.  As noted above, these principles, combined with the labor market protections and other measures included in this rule, generally provide the basis for the Department's action.

---

[53] Id.

47

Exhibit 1
380

Comment.  Many commenters stated that data released by the U.S. Census Bureau in 2014 showed that three-quarters of American STEM graduates were not working in STEM fields.  The implication was that such data indicated no need for the STEM OPT extension program and that such a program would not benefit the national interest.

Response.  The 2014 Census Bureau data cited by commenters did identify that only about one-quarter of bachelor's level graduates with STEM degrees are employed in STEM fields.[54]  The Census Bureau, however, made no accounting of STEM graduates that use the technical skills developed in their STEM courses in high-skilled jobs in medicine, law, business, academia, or management.  For example, for purposes of the Census Bureau study, an individual with a chemistry degree who becomes a physician is considered a STEM graduate not employed in a STEM field.[55]  The cited 2014 Census Bureau figures are skewed in this regard.  A 2013 analysis from the Census Bureau found that more than one out of five U.S. STEM graduates who were not employed in a core STEM field were working in a managerial or business position utilizing quantitative skills developed through their STEM studies and often directly related to their degree; that more than one in eight STEM graduates were working in healthcare (including 594,000 who were working as physicians); and that another 522,000 were considered outside of STEM, but working in U.S. colleges and universities, where they were teaching in the field of

---

[54] U.S. Census Bureau, "Where do College Graduates Work:  A Special Focus on Science, Technology, Engineering and Math" (July 2014), available at http://www.census.gov/dataviz/visualizations/stem/stem-html/.

[55] The practice of medicine commonly is not considered to be a STEM field.  NSF, for example, considers as its mission the support of all fields of science and engineering except for the medical sciences.  See NSF Mission Statement, available at http://www.nsf.gov/about/what.jsp.  See also, e.g., U.S. Congress Joint Economic Committee, STEM Education: Preparing for the Jobs of the Future 1 (April 2012) (explaining that the medical sciences are not a STEM field), available at http://www.jec.senate.gov/public/index.cfm/democrats/2012/4/stem-education-preparing-jobs-of-the-future.

their STEM major and educating the next generation of STEM workers.[56]  In short, as pointed

out by the U.S. Congress Joint Economic Committee, "differences in definitions across sources

can complicate comparisons or analyses of trends in STEM."[57]

DHS disagrees that the U.S. Census data point to an across-the-board shortage of degree-

related employment opportunities for U.S. STEM graduates as the disparate definitions make

that conclusion unlikely.  DHS believes that many of the concerns identified about the proposed

rule are overstated or incomplete because of the nature of available data and reporting.

Comment.  A few commenters stated that DHS failed to consider the full range of

research related to the proposed rule's underlying policies.  One such commenter directed the

Department's attention to two bibliographies publicly available on the internet, and which were

attached to the comment, because the commenter believed the sources cited in the NPRM were

"funded by employers of cheap alien workers to justify the rule."  One of these bibliographies

identified 19 books, articles, and reports, most of which discuss the H-1B and L-1 visa programs.

The second was an annotated bibliography assembled by a professor providing an assessment

and criticism of four of the professor's articles and 23 other sources, principally related to H-1B

work visas and employer-sponsored green cards.

Response.  DHS did not rely on sources of information funded by employers of "cheap"

foreign labor to develop or justify the proposed rule.  Among other sources, DHS cited the

---

[56] Liana Christin Landivar, U.S. Census Bureau, The Relationship between Science and Engineering Education and Employment in STEM Occupations (Sept. 2013), available at http://www.census.gov/prod/2013pubs/acs-23.pdf?cssp=SERP.

[57] See U.S. Congress Joint Economic Committee, STEM Education:  Preparing for the Jobs of the Future 1 (April 2012) (explaining that the medical sciences are not a STEM field), available at http://www.jec.senate.gov/public/index.cfm/democrats/2012/4/stem-education-preparing-jobs-of-the-future; see also David A. Koonce, Jie Zhou, Cynthia D. Anderson, American Society for Engineering Education, "What is STEM?" (2011) available at http://www.asee.org/public/conferences/1/papers/289/download (explaining that "research institutes, government organizations and occupational groups, as well as different groups involved in STEM, use different definitions of STEM, based on their perspectives").

following sources:  the National Bureau of Economic Research, NSF, the Journal of Labor

Economics, the Congressional Research Service, the Brookings Institution, the American

Economic Journal, the Pew Research Center, the Journal of International Students, the

Organization for Economic Co-operation and Development, University World News, Citizenship

and Immigration Canada (a Canadian government agency), the Department of Immigration and

Border Protection of Australia (an Australian government agency), and the Homeland Security

Academic Advisory Committee (a discretionary committee of the U.S. government established

under the Federal Advisory Committee Act).

     Moreover, the commenter did not identify any specific findings in the sources cited in the

bibliographies that would support a change to the Department's proposal.  Many of the sources

cited in the bibliography involved the H-1B and L-1 nonimmigrant visa programs, as well as

employment-sponsored immigrant visa programs, rather than OPT.  Significantly, although the

organization that prepared the H-1B and L-1 bibliography cited by the commenter also submitted

a separate, detailed comment on the NPRM, the organization did not cite its bibliography or most

of the sources contained therein as part of its submission.  And in the course of reviewing the

extensive bibliographies presented, the Department noted that at least one of the sources, which

addressed permanent immigration and not OPT, concluded that "international students studying

in host country postsecondary institutions are particularly valued because they improve higher

education, subsidize domestic students, contribute to national economies and, if they qualify,

make valuable permanent residents because of their youth, occupational qualifications, language

skills, and familiarity with host country customs and institutions."[58]

---

[58]  Ray Marshall, Value-Added Immigration 187 (Economic Policy Institute, 2011).

Exhibit 1
383

Comment.  One commenter stated that the NPRM's references to U.S. patent rates for foreign-born individuals could not support the proposed rule because "no nationality data for inventors is associated with patents, so studies linking rates of patenting to immigration policy are inherently bogus."  Another commenter stated that although the NPRM cites publications by economist Dr. Jennifer Hunt for several assertions about higher rates of patenting and innovation by foreign-born researchers in the United States, the NPRM did not mention a report published by the Economic Policy Institute (EPI) (a research organization) "directly challenging [those] findings."  The commenter questioned sources cited in the NPRM regarding patent rates for foreign-born workers in the United States.

Response.  DHS disagrees with the statement that "no nationality data on inventors is associated with patents."  One data source for citizenship and nationality data for U.S. patents is the Patent Application Information Retrieval website maintained by the U.S. Patent and Trademark Office.[59]  When applying for a patent, each listed inventor submits an oath or power of attorney form on which they must indicate citizenship.  Other researchers have analyzed data from the Census Bureau, including the National Survey of College Graduates and the Integrated Public Use Microdata Series for the United States, in concert with patent information from the U.S. Patent and Trademark Office, to source citizenship and nationality figures for U.S. patents.[60]

With respect to the studies by Dr. Hunt, DHS notes that the NPRM cited those studies in support of the general proposition that STEM workers "are fundamental inputs in scientific innovation and technological adoption, critical drivers of productivity growth in the United

---

[59] U.S. Patent and Trademark Office, Patent Application Information Retrieval http://portal.uspto.gov/pair/PublicPair.  See also, e.g., Partnership for a New American Economy "Patent Pending: How Immigrants are Reinventing the American Economy" at 23 n. 2 (June 2012).
[60] See, e.g., Jennifer Hunt et al, supra notes 28-29, in the appendices of the cited articles.

Exhibit 1
384

States." 80 FR 63383.  The EPI study did not question this proposition.  Rather, the EPI study examined a narrow band of STEM fields to show that "immigrant workers, especially those who first came to the United States as international students, are in general of no higher talent than the Americans, as measured by salary, patent filings, dissertation awards, and quality of academic program."[61]  Specifically, the EPI finding is focused on whether foreign-born students who earned computer science and electrical engineering degrees in the United States file patent applications at higher levels than U.S.-born students earning the same degrees.  For electrical engineering, the analysis showed that patenting activity of U.S. and foreign-born students was about the same, while for computer science the analysis showed that foreign-born computer science students apply for somewhat fewer patents than do their American peers.

The EPI paper, however, acknowledges that the Hunt studies cited in the NPRM cast a much broader net, encompassing a myriad of science and engineering fields.  The Hunt papers considered the impact of foreign-born workers employed in the United States in myriad visa classifications and fields of study, and was not focused solely on F-1 students or STEM OPT students (nor to just Computer Science and Electrical Engineering research activity).  As explained in the Hunt papers, there is support for the proposition that foreign-born scientists and engineers achieve higher rates of U.S. patent filings.  The Department continues to believe such patent rates support the conclusion that the STEM OPT extension is in the national interest.

Comment.  Some commenters stated that the best interests of U.S. workers and students were not being considered by DHS.  Some of these commenters, as well as others, also stated that the STEM OPT extension should exist only if there was a documented STEM labor

---

[61] Norman Matloff, "Are Foreign Students the 'Best and Brightest'?" 17 (Economic Policy Institute, Feb 2013), available at http://epi.org/publication/bp356-foreign-students-best-brightest-immigration-policy/.

shortage.  Some commenters stated that the proposed STEM OPT extension would be harmful to U.S. workers and students.

A commenting employer stated that while it prioritized U.S. worker hiring, it also hired foreign-born students that it recruited on U.S. campuses "given the talent pool graduating from U.S. Ph.D. and M.S. STEM programs."  The employer also stated:  "we spend millions of dollars annually above and beyond what we have to pay to hire U.S. workers, merely to employ the talent required to successfully run our business."  Another commenter stated that "it makes no sense for the United States to educate and train foreign students in the STEM fields and then drive them away with obsolete immigration policies."

Response.  The number of international STEM graduates in the United States on STEM OPT extensions, as of September 16, 2015, was approximately 34,000, which, according to estimates of the overall U.S. STEM labor market from the U.S. Department of Commerce and the U.S. Bureau of Labor Statistics (BLS), represents a possible range of 0.19 percent[62] to 0.45 percent of the overall U.S. STEM job market.[63]  For that reason, and in light of the worker protections included in this rule, the Department sees no reason to eliminate the STEM OPT extension altogether in response to concerns about impacts on U.S. workers.  DHS instead seeks to balance the interests of stakeholders by both ensuring the availability of a STEM OPT extension program while strengthening program oversight and worker protections.  The rule

---

[62] U.S. Bureau of Labor Statistics Detailed 2010 Standard Occupation Classification (SOC) occupations in STEM from an August 2012 SOC Policy Committee recommendation to OMB, http://www.bls.gov/soc/Attachment_C_STEM.pdf. There are 184 occupations in STEM included in this list. When matched to the corresponding employment data in the BLS Occupational Employment and Wages, May 2014, the total employment of STEM occupations is approximately 17 million.

[63] U.S. Department of Commerce, Economic and Statistics Administration, David Langdon et al., "STEM:  Good Jobs Now and for the Future" (1), July 2011, available at http://www.esa.doc.gov/sites/default/files/stemfinalyjuly14_1.pdf ("In 2010, there were 7.6 million STEM workers in the United States."). This STEM employment estimate is based on a narrower range of occupations.

strengthens the integrity of the STEM OPT extension by requiring participants in the extension

to carefully consider and document the relationship between the STEM OPT opportunity and the

academic degree.  The rule also adds requirements relating to supervision and direction of STEM

OPT students in such jobs to better ensure the goals of the program are met.  The rule also adds

wage and other protections for STEM OPT students and U.S. workers.

Comment.  Numerous commenters repeated certain selected statements or figures on job

creation or job loss related to international students in the United States.  Hundreds of comments

stated that 340,000 U.S. jobs are created or supported each year by international students

studying in the United States, citing figures from an international student economic value tool

developed by NAFSA.  A few hundred comments instead posited that 430,000 U.S. workers lost

jobs over a recent five-year period because of international students, as suggested by an analysis

by one group.  More than a dozen comments repeated the finding from an economist's study

published by the American Enterprise Institute, in conjunction with the Partnership for New

American Economy, that about 2.6 jobs for Americans are created for each foreign-born student

who earns an advanced degree in the United States and then works in a STEM field.

Response.  This rule neither asserts nor relies on a quantified, direct relationship between

job creation and the STEM OPT extension.  At what rate such job creation occurs is unsettled in

the peer-reviewed literature.  To the Department's awareness, job loss rates tied solely to STEM

OPT students have not been documented in peer-reviewed literature.  The figures cited in the

comments summarized above also do not relate solely to STEM OPT students.

Comment.  A commenter stated that although the proposed rule discussed the economic

benefits of international students at length, DHS had not cited any estimate of the number of U.S.

workers who were unable to obtain employment because a position was filled by a STEM OPT student or the number of U.S. workers otherwise adversely affected by the proposed rule.

Response.  DHS acknowledges that this rule includes neither a quantified estimate of potential negative impacts to individual U.S. workers nor a quantified estimate of specific benefits to U.S. educational institutions or the overall economy.  Instead, the rule is based on the widely accepted proposition that educational and cultural exchange, a strong and competitive post-secondary education system, and a focus on STEM innovation are on the whole positive contributors to the U.S. economy and U.S. workers, and are in the national interest.  A significant number of comments agreed; many observed that STEM students have contributed significantly to the U.S. economy.  As noted above, these principles, combined with the labor market protections and other measures included in this rule, generally provide the basis for the Department's action.

Comment.  Some commenters stated that DHS had only considered studies supporting its conclusions and did not sufficiently review information that contradicted the sources cited by DHS.  One commenter suggested that DHS "go back to the drawing board and review the full range of related information," including the book "Falling Behind," which questions whether the United States is falling behind in the global race for scientific and engineering talent.

By contrast, one commenter stated that "any change in quality of living is dependent on highly skilled STEM workers who are fundamental inputs in scientific innovation and technological adoption."  Other commenters stated that "STEM students have contributed immensely to the U.S. economy with their skills and innovation" and that because "the U.S. STEM industry is at the forefront of technology in the world, international students come here to get the exposure and learn."

Some commenters flagged disagreement among economists with some of the findings included in a study published by the National Bureau of Economic Research (NBER) that extrapolates from the fundamental point for which it was cited by DHS.[64]  With respect to that study, some commenters criticized its conclusions, and some criticized the fact that it had not been peer-reviewed.  Because the study had received some criticism, commenters asked DHS to defend its citation to it.

Response.  DHS has carefully examined all of the commenters' views regarding the reasons provided for the proposed rule and the sources relied upon by DHS, and the Department believes adequate data and information has been provided in support of the rule.  As noted throughout this preamble, DHS has reviewed studies submitted by commenters and finds that the basic approach in this rule appropriately balances the goals of protecting American workers and promoting American academic and economic competitiveness by attracting top quality international STEM students.

With regard to the citation to the NBER study, the reference in the 2015 NPRM was for the general proposition that STEM workers are fundamental inputs in scientific innovation and technological adoption, and therefore critical drivers of productivity growth in the United States.[65]  The NSF, among many others, has reached the same conclusion.  Created by Congress in 1950, the NSF began publishing an annual report in 1955 regarding the condition of the science and engineering workforce, long before the term "STEM" was coined.  According to the

---

[64] Giovanni Peri, Kevin Shih, Chad Sparber, National Bureau of Economic Research, Foreign STEM Workers and Native Wages and Employment in U.S. Cities (May 2014), available at http://www.nber.org/papers/w20093.

[65] Id.  The article starts by observing that "Scientists, Technology professionals, Engineers, and Mathematicians (STEM workers) are fundamental inputs in scientific innovation and technological adoption, the main drivers of productivity growth in the U.S." and was cited as a recent example of this premise in footnote 24 in the NPRM. 80 FR at 63383.

2015 annual report, "[t]his workforce is of particular interest to the Nation because of its central role in fostering innovation, economic competitiveness, and national security."[66]

Comment.  A commenter requested that DHS annually publish data showing trends related to the impact of F-1 nonimmigrant students on labor markets in the United States.  Another commenter stated that in order to improve oversight and understanding of our legal immigration system, relevant agencies should publish timely online information for each nonimmigrant visa category and subcategory, including for F-1 nonimmigrant students with OPT.  This commenter stated that the public disclosure should include the underlying raw data gathered from the proposed Mentoring and Training Plan and other relevant forms as to the gender, age, country of origin, level of training, field of training, institution(s) of higher education, job title, wages, employer, and work location for "all OPT visa holders."  According to the commenter, this disclosure would be a "critical tool to empower advocates to ensure fair treatment and high standards within these visa programs."  Multiple commenters stated that although they lacked full information, the collection and release of data on all nonimmigrant visa categories was needed as a tool to help curtail fraud and abuse in employment visa categories.

Response. To the extent permissible under existing law (including under the Privacy Act and related authority), relevant information related to the STEM OPT extension program may be available through the Freedom of Information Act (FOIA) process.  A DHS effort to provide data and a program evaluation of all nonimmigrant visa categories is not within the scope of the proposed rule and is not required by any current statute or regulation.

Comment.  One commenter stated that "[t]he NPRM is procedurally and substantively arbitrary and capricious" because "DHS has entirely failed to provide a reasoned explanation of

---

[66] NSF, Revisiting the STEM Workforce: A Companion to Science and Engineering Indicators 2014, 5 (Feb. 4, 2015), available at http://www.nsf.gov/pubs/2015/nsb201510/nsb201510.pdf.

why its published policy rationale for the proposed rule has so fundamentally changed from that provided for the 2008 [IFR] that it now replaces." The commenter stated that DHS justified the 2008 IFR by asserting the need to provide labor to U.S. employers to remedy a critical labor shortage, but has justified the proposed rule by the need to continue and further enhance the educational benefit of the STEM OPT extension, while protecting STEM OPT students and U.S. workers. 80 FR 63381.

Response. DHS does not agree with the proposition that an agency's decision to state new or revised reasons for its policy renders the agency's policy arbitrary and capricious. This rule is grounded in DHS's seven years of experience with the STEM OPT extension. In the 2015 NPRM, DHS proposed that, independent of the labor market concerns that DHS expressed in the 2008 IFR, the STEM OPT extension offers significant educational benefits to students and educational institutions, as well as important economic and cultural benefits. It is not arbitrary or capricious for DHS to consider its experience with this program or to account for present-day realities when determining whether and how to retain and improve the program in a new rulemaking.

The commenter further requested that DHS explain "why its published policy rationale has changed" since 2008. In short, the policy rationale and, importantly, the substance of the rules governing the program, have changed based on a range of factors. As discussed at length in the NPRM, these factors include the public comments received on the 2008 IFR and DHS's assessment of the benefits provided by the 17-month STEM OPT extension. See, e.g., 80 FR 63379-63384. This assessment is informed by enduring national priorities, such as strengthening the U.S. educational system by helping to ensure that the nation's colleges and universities remain globally competitive in attracting international students in STEM fields and enhancing

58

Exhibit 1
391

the United States' economic, scientific, and technological sectors.  DHS believes that it has appropriately considered the evidence in determining whether and how to retain and improve the STEM OPT extension.

### iii.   Relationship between Taxation Rules and the Authority of the Secretary of Homeland Security Regarding Employment of F-1 Nonimmigrants

Comment.  DHS received a significant number of comments that discussed whether existing Federal tax law creates an incentive for employers to hire F-1 nonimmigrants for practical training, rather than U.S. workers, and whether DHS should make changes to Federal tax law before or as part of finalizing a rule allowing a STEM OPT extension with the OPT program.  The tax law provision primarily at issue in these comments is 26 U.S.C. 3121(b)(19), which exempts certain services from Federal Insurance Contributions Act (FICA) taxation when they are performed by F-1 nonimmigrants (among other nonimmigrant classifications) who are nonresidents for Federal tax purposes.[67]  Many comments suggested that this exemption creates an incentive for employers to hire F-1 nonimmigrants instead of U.S. workers, and that this rule would therefore disadvantage U.S. workers.  Other comments suggested that employers are not influenced by tax exemptions when making hiring decisions.

A number of commenters, for example, stated that employers save money by not incurring FICA payroll taxes when they hire F-1 nonimmigrants instead of U.S. workers and that these savings induce employers to prefer F-1 nonimmigrants over U.S. workers.  A few hundred comments labeled the Department's proposed rulemaking as "corporate welfare."  One commenter stated that it is "unethical" for F-1 nonimmigrants to be exempt from "paying taxes" since those nonimmigrants who are working under H-1B visas are not exempt.  One commenter

---

[67] See generally 26 CFR 31.3121(b)(19)-1.

suggested that the tax treatment of F-1 nonimmigrants has the effect of discouraging Americans from pursuing study in STEM fields.

Another commenter stated that excusing OPT participants from payroll taxes was not the result of congressionally created tax policy but instead a decision by "the administration" to "simply defin[e] recent alumni as foreign 'students'" and thus "allow[] employers to avoid payroll taxes."  One commenter criticized DHS because the Department "offered nothing in the proposed rule to deal with the wage savings enjoyed by the employers of OPT workers from not having to pay FICA payroll taxes for OPT workers."  This commenter stated that "the Department clearly believes it has the authority to impose wage-related conditions on OPT employers, but it's unclear why the Department wouldn't also address the FICA issue which some suggest is one of the biggest sources of unfairness to U.S. workers competing with OPT workers."

Several comments that referenced tax issues cited analysis by a research organization stating that "OPT removed $4 billion from the Social Security and Medicare trust funds" over five years. Others cited the same analysis to state that the OPT program "costs Social Security about $1 billion dollars a year" or "about $10,000 annually for each OPT" participant.

However, many other commenters who discussed taxation stated that because individuals in F-1 nonimmigrant status are ineligible to collect Social Security or Medicare benefits and may never qualify in the future for such benefits, contributions to those programs should not be required for services rendered by F-1 nonimmigrants.  Also, some commenters who identified as F-1 students stated that payroll taxes may be affected by tax treaties between the United States and other nations.  A number of F-1 students noted that they pay city, state, and federal income taxes, as well as sales tax.

A few commenters submitted ideas on how DHS could revise or address the payroll tax provisions.  One commenter suggested that the Department's proposed regulation could be changed to remove any financial incentive to hire non-U.S. citizens by exempting employers "from FICA for two years when they hire a new grad STEM U.S. worker, and [charging] a 10% penalty for displacing an American STEM graduate when an OPT is hired."  A labor union proposed that "DHS should require employers of STEM workers to pay an amount equal to payroll taxes into a fund to encourage employment of U.S. STEM workers."  A research organization proposed in the alternative that the amount of such payroll taxes could be paid to the U.S. Treasury.

One commenter stated that "Congress delegated authority to define periods of employment for F-1 nonimmigrants to the Treasury Department, not DHS."  This commenter criticized the proposed rulemaking on the grounds that it "never mentions or references the detailed applicable laws governing the FICA, Federal Unemployment Tax Act (FUTA), or Social Security withholding."  The commenter also stated that "the proposed agency policy authorizing graduates on F-1 visas to work full-time while exempt for FICA withholding directly conflicts with the Internal Revenue Code (IRC), the Social Security Act (SSA), and Supreme Court precedent."

Response.  Matters related to Federal taxation are controlled by Congress through the IRC, and by the Department of the Treasury (Treasury) through regulations promulgated thereunder, not DHS.  Although Congress may revise, eliminate, or create new obligations or conditions based on the payroll tax exemptions in the IRC for F-1 nonimmigrants, DHS may not do so.  Similarly, although Treasury may issue regulations interpreting and implementing federal

tax laws, DHS may not.  DHS is thus unable to amend the rule to accommodate reforms related to payroll taxation or to take other measures affecting federal tax policy or rules.

Under current tax laws, when F-1 nonimmigrants are exempt from payroll taxes, the employer saves an amount equal to 6.2 percent of the F-1 nonimmigrant's salary up to the taxable wage base ($118,500 in 2016) and an additional 1.45 percent of the total salary that, in the aggregate, would have been the employer contribution to the Social Security and Medicare trust funds.  The F-1 nonimmigrant similarly saves a deduction from his or her salary in the same amount that would have been the employee contribution.  The FICA chapter of the IRC, which governs the payroll tax owed by employers and employees to fund the Social Security and Medicare programs,[68] provides that no payroll taxes are to be withheld for services performed by a nonresident alien who is an F-1 nonimmigrant[69] as long as the services are "performed to carry out a purpose for which the individual was admitted."[70]

The IRC provides that aliens temporarily in the United States are resident aliens, rather than nonresident aliens, for Federal tax purposes, when they satisfy a substantial presence test based on physical presence in the United States.[71]  However, an individual temporarily present in the United States as an F-1 nonimmigrant who substantially complies with the requirements of the visa classification is an "exempt individual"[72] who does not count days physically present in the United States as an F-1 nonimmigrant for five calendar years toward the substantial presence test.[73]  Thus, an F-1 nonimmigrant who is an "exempt individual" (for any part of five calendar years) is not a resident alien for taxation under the IRC, and as a nonresident alien is not subject

---

[68] 26 U.S.C. 3101, et seq.
[69] 26 U.S.C. 3121(b)(19).
[70] 26 CFR 31.3121(b)(19)-1(a)(1).
[71] 26 U.S.C. 7701(b).
[72] 26 U.S.C. 7701(b)(5)(D)(i)(I).
[73] An individual present in the United States for any part of a calendar year as an F-1 nonimmigrant must count that year toward the five year cap on being considered an "exempt individual."  26 CFR 301.7701(b)-3(b)(4), (7)(iii).

to payroll taxes for Social Security and Medicare contributions (for those five calendar years).
Similarly, the FUTA chapter of the IRC, which governs payroll taxes for unemployment
compensation,[74] exempts from unemployment taxes those services performed by a nonresident
alien who is an F-1 nonimmigrant.[75]  In short, an individual who is an F-1 nonimmigrant
generally is exempt from FICA and FUTA payroll taxes during the first five calendar years in
which the individual holds F-1 nonimmigrant status.

These provisions, although of course relevant to F-1 students and employers for purposes
of determining FICA and FUTA tax liability, neither displace, nor authorize Treasury to
displace, the Secretary's broad authority to administer and enforce the nation's immigration
laws.  See, e.g., 6 U.S.C. 202; INA Sec. 103, 8 U.S.C. 1103.  Whether with respect to F-1
students or any other category of nonimmigrants, the IRC does not dictate the terms and
conditions relating to nonimmigrant status.  As Treasury explains in its U.S. Tax Guide for
Aliens (IRS Publication 519):  "[An alien is] considered to have substantially complied with the
visa requirements if [he or she has] not engaged in activities that are prohibited by U.S.
immigration laws and could result in the loss of [his or her] visa status."  In sum, DHS, not
Treasury, is charged with determining whether an individual is maintaining F-1 nonimmigrant
status, and Treasury, not DHS, must determine when and how payroll tax obligations accrue and
are calculated.  See, e.g., id; INA Sec. 101(a)(15), 8 U.S.C. 1101(a)(15);  INA Sec. 214, 8 U.S.C.
214.

Accordingly, the assertion by a commenter that Treasury controls when F-1
nonimmigrants are authorized for employment is incorrect.  This mistaken theory seems to be
grounded in a misreading of select provisions of the IRC referenced by the comment concerning

---

[74] 26 U.S.C. 3301, et seq.
[75] 26 U.S.C. 3306(c)(19); see also 26 CFR 31.3306(c)(18)-1(a)(1).

work performed as an employee of a school, college, or university.  Such work is exempt from

both FICA and FUTA under the IRC when Treasury determines that the worker is both taking

classes at and working for a qualifying institution and should be considered an exempt student.[76]

Although Treasury has further defined these provisions administratively, neither the IRC nor

Treasury's regulations relate to when F-1 nonimmigrants are authorized to work.  Rather, they

relate to when certain employed students (whether F-1 nonimmigrants or U.S. citizens) who are

enrolled in and regularly attending classes are exempt from payroll taxes.  In other words, these

provisions do not limit when an F-1 nonimmigrant can work, but instead control whether FICA

and FUTA taxes apply to services provided by certain individuals to certain institutions.[77]  DHS

thus rejects the suggestion that Treasury controls when F-1 nonimmigrants are authorized for

employment.

Additionally, following consultation with Treasury, DHS has determined that it would be

incorrect to conclude that the payroll tax exemption for F-1 nonimmigrants "removes" any

monies from the Social Security or Medicare program trust funds, despite many comments to

this effect.  At most, the statutory tax exemption has the (intended) effect of not generating FICA

and FUTA payroll tax revenue when certain F-1 nonimmigrant students are employed.

Moreover, the amount of revenue affected by these payroll tax exemptions does not

approach the $4 billion over five years (i.e., just under $1 billion annually, or approximately

$10,000 annually per STEM OPT participant) cited by certain commenters.  Other commenters

---

[76] 26 U.S.C. 3121(b)(10) (FICA) and 3306(c)(10)(B) (FUTA); see also 26 CFR 31.3121(b)(10)-2 (FICA) and 31.3306(c)(10)-2 (FUTA).

[77] Among other workers, these provisions are inapplicable to medical students in their capacity as hospital residents. Mayo Found. For Med. Educ. & Research v. U.S., 562 U.S. 44 (2011).  The *Mayo* case, cited by a commenter, is not controlling as to whether STEM OPT extensions are permitted for F-1 nonimmigrants.  Although the Supreme Court concluded that the FICA and FUTA exemptions for students are not available to medical residents working at hospitals, id., that decision (and Treasury's position on the circumstances in which employed students working for the institution where they take classes are exempt from payroll taxes) does not address the availability of work authorization to F-1 nonimmigrants more broadly.

noted that the research organization that calculated these figures did not take into account that (1) employers incur other costs if they choose to hire an individual who is an F-1 nonimmigrant, and (2) many F-1 nonimmigrants are not tax exempt.

With respect to the first point, some commenters noted that any employer savings related to tax laws are at least in part offset by administrative costs, legal fees, and staff time related to securing the authority under U.S. immigration law to employ the foreign-born worker.[78]  With respect to the second point, other commenters emphasized that not all F-1 nonimmigrants are exempt from payroll taxes under these specific FICA and FUTA rules.  Instead, some may be exempt because of tax treaty provisions, while many others, including F-1 nonimmigrants eligible for STEM OPT extensions, may not be exempt because they have already been in the United States for parts of five calendar years.  In regards to the tax treaty provisions, it should be noted that U.S. citizens would receive tax treatment while working abroad that is commensurate with the treatment received by nationals of our treaty partners while they work in the United States.  In addition, it is not clear to DHS that compliant employers would typically perceive an incentive to hire F-1 nonimmigrants due to a payroll tax exemption, as it is not clear how employers would definitively know a particular nonimmigrant's tax treatment prior to hiring.[79] Based on these factors, other provisions in this rule that safeguard the interests in U.S. workers, and DHS's long experience administering and enforcing the nation's immigration laws, DHS

---

[78] Below, DHS estimates some of the direct costs that this rule imposes upon employers of F-1 nonimmigrant students on STEM OPT extensions.  In addition to this rule's direct costs, the incentive cited by the commenters is offset by the fact that STEM OPT students are in the United States temporarily, and are therefore, to many employers, inherently less valuable than U.S. workers.  For instance, a commenter noted that there are significant costs and uncertainty associated with retaining an F-1 nonimmigrant beyond the STEM OPT extension period.

[79] Employers, for example, may not know whether an individual is in F-1 nonimmigrant status or whether he or she has been in such status in the United States for less than five years.  DHS notes that employers do not necessarily have access during the recruitment process to specific documentation confirming such information.  And DOJ cautions against requesting such information as it may cause the perception of discriminatory conduct.  See Office of Special Counsel, Technical Assistance Letter on Pre-employment Inquiries Related to Immigration Status, at http://www.justice.gov/sites/default/files/crt/legacy/2013/09/11/171.pdf.

concludes that commenters' concerns about the incentives created by the statutory tax exemptions are overstated.

DHS also observes that there are a number of other deficiencies in the figures suggested for the fiscal impact of the payroll tax exemptions for F-1 nonimmigrants.  For instance, the figures assume incorrectly that every F-1 nonimmigrant on a STEM OPT extension has displaced a U.S. worker who would otherwise be subject to payroll taxes, and that every STEM OPT student ultimately draws down on the funds generated by payroll taxes.  The figures also appear to be based on calculations related to the total number of students engaged in OPT, not just those on STEM OPT extensions.  In addition to the reasons discussed above, DHS declines to make changes to a successful international student program based on speculative assertions about the impact of certain statutory tax exemptions on the programs funded by the FICA and FUTA taxes.  Furthermore, if those tax exemptions are in fact problematic, they must be addressed by Congress.

    iv.    <u>Legal Authority</u>

<u>Comment</u>.  DHS received many comments concerning the legal authority underpinning the OPT program.  Some commenters challenged the Department's authority to maintain an OPT program at all, in part because there is no express statutory authority establishing such a program.  A commenter with this view cited a 1977 regulation from the legacy Immigration and Naturalization Service (INS) in which the INS had stated that there was no express authority in the INA establishing OPT employment for F-1 students.  Other commenters objected to the STEM OPT extension on the grounds that it is inconsistent with other provisions of the INA regulating visa classifications that expressly provide employment authorization.  These commenters took the position that the only permissible objective of an F-1 student's course of

66

Exhibit 1
399

study is to obtain a degree.  According to those commenters, once that objective has been achieved, the purpose of the F-1 status has been fulfilled and the student's status should terminate.  Other commenters contested the Department's authority to provide STEM OPT extensions because such extensions were inconsistent with one of the "INA's primary purpose[s]," which they characterized as restricting immigration "to preserve jobs for [U.S.] workers."

One commenter specifically argued that the statutory authority for OPT was undermined by certain congressional action in 1990 to create an OPT-related pilot program, followed by the failure in 1994 to extend that program:

> The only clear statutory authority that has ever existed for an OPT-like program was a three-year pilot program created by section 221 of the 1990 Immigration and Nationality Act [sic] that allowed foreign graduates to work in fields unrelated to their degree. . . .  However Congress did not allow the program to exist for more than a few years after its creation, in part because an INS and DOL evaluation found that it "may have adverse consequences for some U.S. workers."

The implication is that because Congress had authorized that specific OPT program by statute and then allowed it to expire, other forms of OPT that are not specifically authorized in statute are not legally justifiable.

Other commenters, however, submitted comments recognizing the legal justifications for the OPT program.  A number of commenters, for example, recounted the history of post-completion OPT in support of the proposed rule.  Those commenters noted that OPT employment had been provided by INS and DHS since at least 1947, and they concluded that DHS was on sound legal footing in including a STEM OPT extension within the OPT program.  Some commenters stated that DHS was utilizing broad authority granted by Congress to enforce and administer the immigration laws.  Those commenters generally considered persuasive the

fact that Congress had amended the INA numerous times in ways that indicated its knowledge of, and acquiescence to, the existence of a significant period of post-graduation OPT.

One commenter that recognized the Department's legal authority in issuing this rule addressed the significance of Congress' actions in 1990 to create a pilot program in which F-1 students could receive employment authorization for practical training underlined to the their fields of study. Although Congress later allowed the pilot program to expire in 1994, the commenter explained that the program's creation supported the Department's authority to permit OPT employment related to students' fields of study:

> In the Immigration Act of 1990, Congress authorized the creation of a pilot program which allowed F-1 student employment in positions that were unrelated to the alien's field of study. The creation of this program bolsters the argument that DHS's interpretation is reasonable. . . . The logical conclusion to draw here is that Congress only acted explicitly to authorize F-1 students to receive post-completion training in fields unrelated to their studies because the law already allowed post-completion training in fields related to the student's studies.

This commenter, along with many others, expressed support for the proposed rule as a reasonable construction of the authorities provided to the Department by the immigration laws.

Response.  The Homeland Security Act and the INA provide DHS with broad authority to administer the INA and regulate conditions for admission under nonimmigrant categories, including the F-1 student classification.  See, e.g., 6 U.S.C. 202; 8 U.S.C. 1103(a)(1) and (3); 8 U.S.C. 1184(a)(1).  As the U.S. District Court for the District of Columbia recently observed:

> Congress has delegated substantial authority to DHS to issue immigration regulations.  This delegation includes broad powers to enforce the INA and a narrower directive to issue rules governing nonimmigrants.  See 8 U.S.C. 1103(a)(1)…; id. § 1103(a)(3) ("The Secretary of Homeland Security shall establish such regulations [inter alia,] as he deems necessary for carrying out his authority under the provisions of the INA."); id. § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe . . . .").

68

Exhibit 1
401

<u>Washington Alliance</u>, No. 1:14-cv-00529, slip op. at 18-19.  In addition to explicitly authorizing the Secretary to admit international students to the United States temporarily to pursue a course of study, <u>see</u> 8 U.S.C. 1101(a)(15)(F)(i), the INA endows the Secretary with broad discretion to promulgate regulations establishing the time and conditions under which such aliens may be admitted, <u>see</u> 8 U.S.C. 1103(a)(3), 1184(a)(1), 8 U.S.C. 1101(a)(15)(F)(i), 1103(a) and 1184(a)(1).  The Secretary also has broad authority to determine which individuals are "authorized" for employment in the United States.  <u>See</u> 8 U.S.C. 1324a, 8 CFR part 274a.

To the extent that comments challenging DHS's legal authority concerned the OPT program generally, such comments are outside the scope of this rulemaking, which relates specifically to the availability of STEM OPT extensions.  DHS did not propose to modify the general post-completion OPT program in the proposed rule.  Moreover, to the extent that such comments can be construed as challenging DHS's authority to implement a STEM OPT extension in particular, DHS finds the comments unpersuasive.

Federal agencies charged with administration of the immigration laws have long interpreted the statutory authorities cited above to encompass on-the-job training that supplements classroom training for international students.  <u>See</u> <u>Washington Alliance</u>, No. 1:14-cv-00529, slip op. at 24; <u>Programmers Guild, Inc. v. Chertoff</u>, 338 F. App'x 239, 244 (3d Cir. 2009) (unpublished).  For example, in 1947, legacy INS promulgated a rule authorizing international students to work after graduation based upon statutory authority that is similar in relevant respects to current statutory authority governing the admission of international students.  The 1947 rule provided that "in cases where employment for practical training is required or recommended by the school, the district director may permit the student to engage in such employment for a six-month period subject to extension for not over two additional six-month

periods." See 12 FR 5355, 5357 (Aug. 7, 1947).  Again in 1973, legacy INS promulgated

regulations authorizing, pursuant to the INA, employment for international students for practical

training under certain conditions.  See 38 FR 35425, 35426 (Dec. 28, 1973).  For decades, INS

and DHS regulations have defined an international student's duration of status, in pertinent part,

as "the period during which the student is pursuing a full course of study in one educational

program . . . and any period or periods of authorized practical training, plus [a grace period]

following completion of the course of study or authorized practical training within which to

depart from the United States."  48 FR 14575, 14583-14584 (Apr. 5, 1983) (emphases added).

See also 8 CFR 214.2(f)(5)(i).

Moreover, during this period, Congress has had occasion to amend the INA in general,

and F-1 nonimmigrant provisions in particular, on numerous occasions.  Despite these numerous

amendments, Congress has left completely undisturbed the longstanding interpretation that

international students are authorized to work in practical training.  See e.g., Pub. L. No. 87-256,

§ 109(a), 75 Stat. 527, 534 (Sept. 21, 1961) (allowing an F-1 nonimmigrant's alien spouse and

minor children to accompany the F-1 nonimmigrant to the United States); Immigration Act of

1990 § 221(a) (permitting F-1 nonimmigrants to engage in limited employment unrelated to their

field of study); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.

No. 104-208, § 625, 110 Stat. 3009-546, 3009-699 (adding limitations related to F-1

nonimmigrants at public schools); Enhanced Border Security and Visa Entry Reform Act of

2002, Pub. L. No. 107-173, §§ 501-502, 116 Stat. 543, 560-63 (implementing monitoring

requirements for international students); Pub. L. No. 111-306, § 1, 124 Stat. 3280, 3280 (Dec.

14, 2010) (amending F-1 with respect to language training programs).  "[W]hen Congress

revisits a statute giving rise to a longstanding administrative interpretation without pertinent

change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." Commodities Futures Trading Comm'n v. Schor, 478 U.S. 833, 846 (1986) (quoting NLRB v. Bell Aerospace Co., 416 U.S. 267, 275 (1974)).

In light of the long regulatory history for the OPT program, including the Department's longstanding interpretation of the INA and the longstanding congressional recognition of that interpretation, DHS is confident that this rulemaking is consistent with statutory authority. As explained by the recent decision in the Washington Alliance litigation:

> DHS's interpretation of F-1—inasmuch as it permits employment for training purposes without requiring ongoing school enrollment—is "longstanding" and entitled to deference. See Barnhart [v. Walton], 535 U.S. [212,] 220 [(2002)]. Second, Congress has repeatedly and substantially amended the relevant statutes without disturbing this interpretation. These amendments have not been "isolated." Public Citizen [v. U.S. Dep't of Health and Human Services], 332 F.3d [654,] 668 [(D.C. Cir. 2003)]. The Immigration and Nationality Act of 1952, in particular, radically changed the country's immigration system. And, the Immigration Act of 1990 imposed a host of new protections for domestic workers and explicitly authorized F-1 students to engage in certain forms of employment. By leaving the agency's interpretation of F-1 undisturbed for almost 70 years, notwithstanding these significant overhauls, Congress has strongly signaled that it finds DHS's interpretation to be reasonable.

Washington Alliance, No. 1:14-cv-00529, slip op. at 26-27.

With respect to one commenter's reliance on the 1977 INS rulemaking, DHS recognizes that legacy INS previously noted the lack of specific statutory provisions expressly authorizing OPT. DHS agrees that the INA contains no direct and explicit provision creating a post-completion training program for F-1 students. But this does not mean that the Department lacks the authority to implement such a program. Indeed, as the 1977 Rule recognized, "section 103 of the Immigration and Nationality Act (8 U.S.C. 1103) . . . provides the Attorney General and the Commissioner of the Immigration and Naturalization Service certain powers and duties,

71

Exhibit 1
404

including the establishment of regulations." 42 FR at 26411. And it was pursuant to that authority that in the very 1977 rulemaking in which the INS made the statement cited by the commenter, the INS amended the regulations that authorized "a nonimmigrant alien student to engage in practical training" and continued to authorize OPT. Id. As noted above, Congress's actions over several decades make clear that Congress understood the F-1 statutory provisions to permit "at least some period of employment" and that "the clause in F-1—'solely for the purpose of pursuing such a course of study'—does not foreclose employment." Washington Alliance, No. 1:14-cv-00529, slip op. at 21.

Further, the fact that Congress has recognized and approved of OPT is further supported, rather than undermined, by its creation of an OPT-related pilot program in 1990. First, the legislative history indicates that Congress understood the new pilot program, which authorized temporary employment unrelated to a student's field of study, as an expansion of off-campus employment authorization for F-1 nonimmigrants. See H.R. Rep. No. 101-723, pt. 1, 1990 WL 200418, *6746 (recognizing that the legislation "expands the current authority of students to work off-campus"). Second, as recognized by other commenters, the fact that Congress chose to create a pilot program specifically authorizing employment unrelated to a student's field of study is itself proof that Congress understood that employment related to such a field of study already had been appropriately authorized by the INS. The fact that Congress, acting against the backdrop of the longstanding OPT program, sought to expand students' employment opportunities, without curtailing the existing OPT program, indicates that Congress did not perceive OPT to be in contravention of Department authority. Indeed, the fact that Congress understood that F-1 nonimmigrants were regularly employed is reflected in the fact that, as early as 1961, Congress acted to exempt such students from certain payroll taxes. If F-1

72

Exhibit 1
405

nonimmigrants could not be employed, there would be no reason for Congress to recognize in the tax code that employment could be related to the purpose specified in 8 U.S.C. 1101(a)(15)(F) or to exempt such employment from payroll taxes.[80]

Finally, DHS disagrees with the suggestion that the rule's objectives conflict with one of the "INA's primary purpose[s]" of restricting immigration "to preserve jobs for [U.S.] workers." The final rule, as with the proposed rule, contains important safeguards specifically designed to guard against such effects, while also furthering crucial benefits stemming from academic and cultural exchange, innovation, and economic growth. Accordingly, this rule maintains the U.S. Government's longstanding legal and policy positions on this matter; practical training is an important and recognized element of a student's educational experience and full course of study.

Comment. A number of commenters took issue with the duration of STEM OPT extensions as proposed in the 2015 NPRM, asserting that a two-year extension was contrary to DHS's statutory authority. A commenter stated that authorizing post-completion employment for an "extended period of time" is unlawful and quoted the above-referenced 1977 final rule, in which legacy INS reduced the maximum OPT period from 18 months to one year. See 42 FR 26411 (May 24, 1977). The commenter asserted that legacy INS issued the 1977 rule based on a finding that an extended duration of OPT could cause injury to U.S. workers because OPT students could work for less than prevailing wages during their training period. The commenter asked whether DHS had considered this 1977 INS finding when developing the present rulemaking, and whether DHS "now rejects the earlier finding of the INS" that "[t]here is no indication that the Congress intended that [a foreign student] remain and work in the U.S. for an

---

[80] Congress added 26 U.S.C. secs. 3121(b)(19) and 3306(c)(19) to the Internal Revenue Code in 1961. See P.L. 87-256, Sections 110(b), 110(f)(3) (1961). These provisions exempt from payroll taxes certain F-1 nonimmigrants who have not been present in the United States in F-1 status for parts of five calendar years, as discussed supra in part IV.A.3 of this preamble.

extended period after completion of his course of study and until he becomes fully experienced in his occupational skill." 42 FR at 26412.

  <u>Response</u>.  DHS acknowledges that approximately 40 years ago, legacy INS limited the maximum overall period of practical training for all degree programs from 18 months to 12 months.  The INS, however, made this change for policy reasons and not legal reasons.  At no point did the INS conclude that statutory authority required it to reduce the 18-month maximum period for OPT.  Moreover, INS apparently made the statement about legislative intent in the course of rejecting a request to provide an across-the-board maximum of two years for practical training in all fields of study.  This statement did not define the scope of INS' legal authority. And as part of this rule, DHS neither considered nor proposed an across-the-board increase in the duration of OPT for all students, but instead only proposed the extension for on-the-job training in STEM fields.

  With respect to policy, DHS also acknowledges that legacy INS recognized in the same 1977 rulemaking that "[i]t may be that foreign students will be less likely to find employment, and perhaps fewer aliens would enter the U.S. to obtain their education here."  <u>See</u> 42 FR at 26412.  DHS, however, does not believe that it should be constrained to the factual and policy determinations that legacy INS made approximately 40 years ago with respect to the effect of the overall OPT program on the 1977 U.S. labor market.  The world has changed a great deal since that time, and DHS believes it appropriate to shape policy accordingly.

  As noted previously, the enhancements made by this rule are supported by data generally suggesting that international students contribute to the overall U.S. economy by building global connections between their hometowns and U.S. host cities.  Evidence links skilled migration to transnational business creation, trade, and direct investment between the United States and a

74

Exhibit 1<br>407

migrant's country of origin.  International STEM students also contribute more specifically to a number of advanced and innovative fields that are critical to national prosperity and security.  By conducting scientific research, developing new technologies, advancing existing technologies, and creating new products and industries, for example, STEM workers diversify the economy and drive economic growth, while also producing increased employment opportunities and higher wages for U.S. workers.  The rule also reflects DHS's consideration of potential impacts on the U.S. labor market and includes important safeguards for U.S. workers in STEM fields.

Comment.  Some commenters made arguments based on comparisons between the STEM OPT program and the H-1B program, suggesting that DHS should infer from the H-1B category implicit limits on DHS's legal authority to allow F-1 students to engage in practical training as part of completing their full course of study.  Some commenters asserted that DHS had no legal authority for a STEM OPT extension because it "circumvents" the statutory requirements of the H-1B visa classification.  Relatedly, one commenter suggested that granting employment authorization through the OPT program permits F-1 students to sidestep restrictions on employment of foreign nationals enacted by Congress through establishment of a limited number of employment-authorized visa categories.  In support of this contention, the commenter cited the decision by the U.S. District Court for the Northern District of California in Int'l Union of Bricklayers & Allied Craftsman v. Meese, 616 F. Supp. 1387 (N.D. Cal. 1985).

Response.  DHS disagrees that the STEM OPT extension is an attempt to circumvent the requirements of the H-1B visa program, including the cap on H-1B visas.  The H-1B nonimmigrant classification is a unique program designed to meet different policy objectives than those of the F-1 visa program or OPT.  While this rule enhances the ability of F-1 students in STEM fields to implement and test educational concepts learned in the classroom in the

75

Exhibit 1
408

context of on-the-job training, the rule does nothing to modify the congressionally established annual H-1B visa cap nor to modify the longstanding policy objectives of the H-1B program that generally allow U.S. employers to temporarily fill job openings in specialty occupations by employing workers who possess at least a bachelor's degree.  Unlike the H-1B visa program where an employer must petition for an H-1B visa for a foreign worker to fill a job opening, in the F-1 visa program, it is F-1 students, including those affected by this final rule, who seek to participate in OPT in order to further their education attained through course work in the United States.  Unlike an H-1B specialty occupation worker, a student will participate in STEM OPT as a way to complement his or her academic experience in the United States pursuant to an individualized Training Plan that helps ensure that the STEM OPT experience furthers the student's course of study.

DHS thus agrees with the U.S. District Court for the District of Columbia, which explained the relationship between the F-1 and H-1B visa classifications in its recent decision in Washington Alliance.  In that decision, in which the court upheld the Department's legal authority to include a STEM OPT extension within the general OPT program, the court stated:

> F-1 and H-1B perform the interlocking task of recruiting students to pursue a course of study in the United States and retaining at least a portion of those individuals to work in the American economy. …But H-1B—which applies to aliens seeking to work in a "specialty occupation"—is far broader than the employment permitted by the OPT program.  DHS's interpretation of the word "student" does not render any portion of H-1B, or its related restrictions, surplusage.  Congress has tolerated practical training of alien students for almost 70 years, and it did nothing to prevent a potential overlap between F-1 and H-1B when it created the modern H-1B category in 1990.  As such, the Court does not believe that DHS's interpretation is unreasonable merely because of its limited overlap with H-1B.

Washington Alliance, No. 1:14-cv-00529, slip op. at 14, 28 (internal citations omitted).

As for a commenter's reference to the Int'l Union of Bricklayers case, DHS finds that decision of little relevance to this rulemaking.  In the cited case, the district court's holding was grounded in its finding that the admission of certain individuals as B-1 nonimmigrant visitors for particular construction work purposes was inconsistent with section 101(a)(15)(B) of the INA, 8 U.S.C. 1101(a)(15)(B), which expressly precludes admission in B nonimmigrant status of an alien "coming for the purpose . . . of performing skilled or unskilled labor."  This case has no clear application to the STEM OPT extension, where there is no express statutory bar similar to section 101(a)(15)(B) of the INA, 8 U.S.C. 1101(a)(15)(B).[81]  More critically, the overlap between the STEM OPT extension and the H-1B visa program does not invalidate DHS's interpretation of the controlling statutory authorities.  For that reason, the court in Washington Alliance rejected arguments similar to those made by commenters that DHS had "circumvented the statutory restrictions that rightfully should be applied" to college-educated labor.[82]

Comment.  A number of commenters similarly asserted that the proposed Cap-Gap provision, which further extends F-1 status for students who are beneficiaries of H-1B petitions, undermined the authority for this rulemaking.  One commenter, for example, wrote that there is a fundamental conflict between the purpose of the student visa program and STEM OPT extensions in that student visas are not to be used as a means of immigrating to the United States.  The commenter cited to comments from individuals who supported the proposed rule, including the Cap-Gap provision, as evidence that the rule would facilitate longer-term immigration to the United States.  The commenter expressed that the rule would transform the statutory basis for the

---

[81] Similarly, one commenter cited Texas v. United States, 787 F.3d 733, 760-61 (5th Cir. 2015) as authority for the commenter's disagreement with DHS's statement of authority in the NPRM for the STEM OPT extension.  That case is also inapposite here, as it did not address the Secretary's authority to grant work authorization for purposes of practical training.
[82] Washington Alliance, No. 1:14-cv-00529, slip op. at 28.

admission of foreign students—admission "solely for the purpose of pursuing . . . a course of study"—into admission "for pursuing a course of study or hanging around long enough to get an H-1B visa."  The commenter stated that the Cap-Gap provision serves no purpose other than to assist F-1 students to remain in United States in violation of the terms of their admission.

<u>Response</u>.  DHS does not agree with the commenter's views related to the Cap-Gap provision.  First, both the STEM OPT extension and the Cap-Gap extension are of limited duration, and neither provides anything other than short-term temporary status.  Second, as discussed above, practical training for international students has been authorized for many decades, and Congress has long recognized the Department's interpretation of the student visa and related sections of the INA.  Congress also created the H-1B nonimmigrant classification specifically for specialty occupation workers with bachelors' degrees or higher.  <u>See</u> INA Sec. 101(a)(15)(H)(i)(B) and 214(i)(l), 8 U.S.C. 1101(a)(15)(H)(i)(B) and 1184(i)(1).  As noted in the recent <u>Washington Alliance</u> decision, the fact that F-1 students on OPT share certain similarities with H-1B nonimmigrant workers does not render the OPT program invalid.  <u>See</u> <u>Washington Alliance</u>, No. 1:14-cv-00529, slip op. at 14, 28.  Third, Congress also created provisions expressly allowing individuals with one nonimmigrant classification to change status to a different nonimmigrant classification.  <u>See</u> INA Sec. 248, 8 U.S.C. 1258.  There is thus nothing problematic about the fact that F-1 students in a period of OPT may seek to remain in the United States in H-1B nonimmigrant status.  The immigration laws are specifically designed to facilitate such shifts.  <u>See</u> <u>id.</u>  And, as noted earlier, nothing about the Cap-Gap provision affects eligibility for H-1B status or visas, changes the number of such visas, or otherwise increases the ability of students to obtain classification as an H-1B nonimmigrant.

To the contrary, the Cap-Gap provision simply provides a temporary bridge between two lawfully available periods of nonimmigrant status.  As noted above, the problem rectified by the Cap-Gap provision is the result of the misalignment between the academic year and the fiscal year.  Because of this misalignment, F-1 students who were the beneficiaries of H-1B petitions often saw their F-1 status expire before they could effect the change to H-1B status, which required them to leave the United States and subsequently reenter on an H-1B visa.  The Cap-Gap provision would simply remove the need to depart and subsequently reenter by extending the student's F-1 status for a limited number of months until his or her H-1B status commenced. The Cap-Gap provision is thus nothing more than a common-sense administrative measure that helps these students maintain legal status and avoids inconvenience to them and their employers. It is also fully consistent with existing legal authorities and the underlying purpose of the practical training program.

B.      Enforcement, Monitoring, and Oversight

1.      Description of Final Rule and Changes from NPRM

The final rule includes a number of requirements related to enforcement and oversight of the STEM OPT extension program.  To better ensure its integrity, this rule prohibits STEM OPT extensions based on degrees from unaccredited institutions; provides for DHS site visits at STEM OPT employment sites; sets an overall limit for the amount of time a student may be unemployed during a STEM OPT extension; requires validation reports from students, as well as reporting from both students and employers, on the student's employment status; requires students to provide annual evaluation reports; and requires both students and employers to report material changes to training plans.  The proposed rule included these provisions; DHS has

retained the provisions in the final rule, with changes and clarifications in response to public comments.  We summarize these provisions and changes below.

    i.    <u>University Accreditation</u>

To qualify for a STEM OPT extension, a student's STEM degree must be received from a U.S. educational institution accredited by an accrediting agency recognized by the Department of Education.[83]  As noted in the proposed rule, the goal of accreditation is to ensure the quality of educational institutions and programs.  Specifically, the accreditation process involves the periodic review of institutions and programs to determine whether they meet established standards in the profession and are achieving their stated educational objectives.[84]

DHS retains the accreditation requirements from the proposed rule, with only one change in response to public comments received.  In cases where a student uses a previously obtained STEM degree to apply for the STEM OPT extension, the institution from which the qualifying degree was obtained must be accredited by an accrediting agency recognized by the Department of Education at the time of the student's application for the STEM OPT extension.  This is a change from the proposed rule's requirement that the institution be accredited at the time the degree was conferred.  This change will make the provision easier to administer by eliminating the need for DSOs to verify the historical accreditation status of other institutions.

    ii.    <u>Site Visits</u>

DHS may, at its discretion, conduct site visits to ensure that employers and students meet program requirements, including that they are complying with assurances and that they possess

---

[83] An accrediting agency is a private educational association of regional or national scope that develops evaluation criteria and conducts peer evaluations of educational institutions and academic programs.  U.S. Department of Education Office of Postsecondary Education, "The Database of Accredited Postsecondary Schools and Programs," available at http://ope.ed.gov/accreditation.
[84] U.S. Department of Education Office of Postsecondary Accreditation, "FAQs about Accreditation," available at http://ope.ed.gov/accreditation/FAQAccr.aspx.

the ability and resources to provide structured and guided work-based learning experiences in accordance with individualized Training Plans.  The combination of requiring school accreditation and conducting discretionary DHS site visits of employers will reduce the potential for fraudulent use of F-1 student status during the period of STEM OPT training.

DHS retains the site visit provisions from the proposed rule, with one change to accommodate concerns about the potential disruption associated with unannounced site visits. DHS is including in this rule a requirement that DHS will provide notice to the employer 48 hours in advance of any site visit, unless the visit is triggered by a complaint or other evidence of noncompliance with the STEM OPT extension regulations, in which case DHS reserves the right to conduct a site visit without notice.

### iii.    Unemployment Limits

Under this rule, a student may be unemployed for no more than 90 days during his or her initial period of post-completion OPT, and for no more than a total of 150 days for students whose OPT includes a 24-month STEM OPT extension.  This provision is finalized as proposed, with minor changes for clarity.[85]

### iv.    Employment Status and Validation Reporting

Under this rule, the employer must report to the relevant DSO when an F-1 student on a STEM OPT extension terminates or otherwise leaves his or her employment before the end of the authorized period of OPT and must do so no later than five business days after the student leaves employment.  Employers must report this information to the DSO.  The contact information for the DSO is on the student's Form I-20, Certificate of Eligibility for

---

[85] The 90-day aggregate period during initial post-completion OPT was proposed to remain at the level proposed in the 2008 IFR.  DHS proposed to revise the aggregate maximum allowed period of unemployment to 150 days for an F-1 student having an approved STEM OPT extension consistent with the lengthened 24-month period for such an extension.

Nonimmigrant (F-1) Student Status ("Form I-20 Certificate of Eligibility"), and on the student's Form I-983, Training Plan for STEM OPT Students.  DHS will extend OPT only for STEM students employed by employers that agree in the Training Plan to report this information.  This requirement is identical to that in the proposed rule, except that in response to public comments, DHS determined to extend the report period from 48 hours to five business days.  As noted below, DHS believes that this timeframe is more realistic and more likely to result in consistent efforts to comply.

The rule also enhances the ability to track F-1 students by requiring validation reporting every six months for such students on STEM OPT extensions.  This additional requirement is important in fulfilling the goals of the STEM OPT extension and in timely and accurately tracking students, who are often away from their school's campus.  Specifically, this rule requires students who are granted STEM OPT extensions to report to their DSOs every six months.  As part of such reporting, students must confirm the validity of their SEVIS information, including legal name, address, employer name and address, and the status of current employment.  This provision is largely finalized as proposed, but with some minor edits for clarity.  The text has been reorganized to clearly state the types of events that require a validation report and to clearly state that the requirement to submit such reports starts on the date the STEM OPT extension begins and ends when the student's F-1 status expires or the 24-month OPT extension concludes, whichever occurs first.

v.   <u>Periodic Student Evaluations</u>

As compared to the proposed rule, and in response to public comments received, the final rule makes a number of changes and clarifications to the student evaluation requirement.  First, DHS has changed the frequency of the evaluation requirement.  DHS proposed requiring an

evaluation every six months, but is reducing the frequency to every 12 months. This change is intended to better reflect employer practices where annual reviews are standard, allowing students and employers to better align the evaluations required under this rule with current evaluation cycles. Second, DHS is providing additional flexibility for employer participation in the evaluation process. Although the NPRM would have required the student's immediate supervisor to sign the evaluation, the final rule allows any appropriate individual in the employer's organization with signatory authority to sign the evaluations that the student will submit to the DSO. Third, DHS clarifies that this evaluation is not meant to replace or duplicate an employer's general performance appraisal process. Instead, the student evaluation is intended to confirm that the student is making progress toward his or her training objectives. These evaluations will help document the student's progress toward the agreed-upon training goals and thus better ensure that such goals are being met.

     vi.    <u>Reporting of Material Changes to or Deviations from the Training Plan</u>

This final rule also provides that if there are material modifications to or deviations from the Training Plan during the STEM OPT extension period, the student and employer must sign a modified Training Plan reflecting the material changes, and the student must file this modified Training Plan with the DSO at the earliest available opportunity. Material changes relating to training for the purposes of the STEM OPT extension include, but are not limited to, any change of Employer Identification Number (EIN) resulting from a corporate restructuring;[86] any reduction in compensation from the amount previously submitted on the Training Plan that is not the result of a reduction in hours worked; and any significant decrease in the hours per week that a student will engage in the STEM training opportunity, including a decrease below the 20-hour

---

[86] Changes of employers or EINs that are not simply a consequence of a corporate restructuring require filing of a new, rather than a modified, Training Plan by the new employer. <u>See</u> 8 CFR 214.2(f)(10)(ii)(C)(7)(iv).

minimum employment level per week that would violate the requirements of the STEM OPT extension.

This aspect of the final rule represents a clarification of a proposed provision in the NPRM.  Commenters on the proposed rule requested additional clarity with respect to what types of changes to or deviations from the training plan would be considered "material" and would therefore require the submission of a modified plan to the DSO.  As discussed in further detail below, DHS is departing from the proposal in response to public comments.

DHS further notes that ICE is working toward technology that would allow students to update their basic information in SEVIS without gaining access to restricted areas of the system where student access would be inappropriate.  Once ICE implements this technology, students will have an increased ability to maintain their own records.  This would also decrease the workload on DSOs, who would no longer be required to update student information while students are participating in OPT.

2.   <u>Public Comments and Responses</u>

i.   <u>University Accreditation</u>

<u>Comment</u>.  A number of commenters suggested additional restrictions on the types of educational institutions that should be allowed to participate in the STEM OPT extension program.  Several commenters asserted, for example, that STEM OPT extensions should be limited only to students from the "top 50-100" universities in the United States.  One commenter proposed that "academic programs that have been fined, reached a settlement, or are under investigation by federal or state law enforcement agencies should be barred from accessing OPT visas, as should any institutions that are subject to heightened cash monitoring."

84

Exhibit 1
417

Other commenters recommended further restrictions.  Some commenters suggested that accreditation alone was insufficient to ensure the quality of degree programs and that additional quality standards should be adopted for STEM OPT extensions.  Other commenters stated that students should be ineligible for STEM OPT extensions based on STEM degrees earned at for-profit institutions.  One commenter stated that for-profit institutions had been abusing the OPT system and should no longer be able to place students in OPT positions.  Another commenter asserted that prohibiting for-profit institutions from participating would eliminate the incentive of such institutions to recruit F-1 students under false pretenses.  One commenter stated that the Administration is seeking to curb abuses by for-profit institutions in other areas, and that such schools should be precluded from placing students in OPT, or, at a minimum, should be subject to heightened oversight.

Response.  DHS declines to adopt the suggested restrictions.  DHS, for example, does not believe it fair or appropriate to limit participation to an arbitrary number of accredited institutions and their students.  Although DHS has chosen to set limits on participating institutions and degree programs by requiring accreditation, accreditation determinations are made by accrediting entities that are recognized by the Department of Education as having expertise in this area.  DHS itself does not have the expertise to look behind the quality of assessments made by such entities, nor does it have the expertise necessary to further compare degree programs among accredited institutions.  Notably, the commenters that recommended limiting the extension to students at "top" universities did not specify how DHS would determine which institutions would be in the "top" 50 or 100.  Nor did the commenters explain how to address smaller institutions that may provide excellent STEM instruction but are not large enough to make more generalized lists of "top" schools.  DHS believes it would be inappropriate

Exhibit 1
418

to adopt such an ambiguous and subjective standard for distinguishing between educational institutions and their students in this rulemaking.

DHS also does not agree that a settlement or an open federal or state law enforcement investigation, without more, should bar an institution and its students from participating in the STEM OPT extension program.  A settlement or investigation is not, itself, a finding of wrongdoing, and a settlement, investigation, or fine may be totally unrelated to matters impacting the STEM practical training opportunity.  Barring participation based on nothing more than the existence of an investigation would be fair neither to the relevant institution nor its students.

DHS further declines to limit participation only to public and not-for-profit institutions, as there are accredited for-profit institutions that operate in a lawful manner and offer a quality education.  As noted above, DHS has chosen to rely on the determinations of accrediting entities with respect to the quality of participating institutions and their degree programs.  Schools meeting the accreditation requirement are subjected to significant oversight, including periodic review of the institution's programs to determine whether it is meeting the established standards in the profession and achieving its stated educational objectives.  These checks, in addition to the protections built into the rule, represent a comprehensive mechanism for detecting and avoiding fraud.  In addition, DHS is unaware of any special risk of fraud presented by accredited for-profit institutions, and the commenter did not identify any data showing that such institutions commit fraud at a higher rate than other institutions.  Requiring F-1 students to attend public or not-for-profit institutions is an unnecessary limitation that would reduce the program's adaptability and potential.

Comment.  Some commenters stated that the definition of "accreditation" is too vague and may be abused by employers, schools, and students.

Response.  DHS disagrees with these comments.  As noted above, to be eligible for a STEM OPT extension, a student's degree must be received from an educational institution accredited by an accrediting agency recognized by the U.S. Department of Education.  An accrediting agency is a private educational association of regional or national scope that develops evaluation criteria and conducts peer evaluations of educational institutions and academic programs.  See U.S. Department of Education Office of Postsecondary Education, "The Database of Accredited Postsecondary Schools and Programs," available at http://ope.ed.gov/accreditation/.  Because there is an objective list of accrediting entities recognized by the Department of Education that is publicly available, it is straightforward to confirm whether a school is appropriately accredited under the rule.  For that reason, DHS disagrees that the term "accreditation" is vague.

Comment.  DHS also received a number of comments regarding the use of STEM degrees earned abroad.  Some commenters, for example, requested that the rule allow students to use STEM degrees previously obtained from foreign institutions as a basis for STEM OPT extensions.  One commenter disagreed with a statement in the proposed rule discussing the difficulty of determining the equivalency of foreign degrees, and stated that such equivalency is sometimes determined for other immigration programs.  That commenter referenced the Council for Higher Education Accreditation as a resource that lists international accrediting agencies.  Other commenters requested that, as an alternative to allowing foreign degrees, DHS should allow students to obtain STEM OPT extensions based on previously obtained degrees earned at the accredited overseas campuses of U.S. institutions.  To that end, a commenter recommended

87

Exhibit 1
420

that DHS clarify the term "accredited U.S. educational institution" to include accredited U.S. institutions located abroad as well as programs offered by accredited U.S. institutions at international branch campuses or other overseas locations, so long as the location or program located outside the United States falls under the school's institutional accreditation.  This commenter also suggested that DHS consistently use the term "accredited U.S. educational institution" throughout the rule to reduce ambiguity.

<u>Response</u>.  DHS does not believe it is appropriate to allow the use of degrees earned abroad as a basis for obtaining STEM OPT extensions.  First, such extensions are part of the F-1 student visa program, and providing such extensions based on degrees previously earned abroad would be inconsistent with the Department's duty to administer the F-1 program.  Second, although DHS allows individuals to establish the equivalency of foreign degrees for other immigration programs, the need to assess such degrees presents particularly difficult complications in the OPT program.  Among other things, assessing foreign degrees and making equivalency determinations are often difficult and time-consuming tasks.  Finally, DHS believes that limiting qualifying degrees to those from accredited and SEVP-certified U.S. institutions will help preserve the integrity of the STEM OPT extension program, because the U.S. accreditation process helps to ensure the quality of educational institutions and programs.

Accordingly, this rule only permits a STEM OPT extension where the degree that is the basis of the extension is conferred by a domestic campus of a U.S. educational institution accredited by an entity recognized by the Department of Education and certified by SEVP at the time of application.  Because SEVP certifies educational institutions at the campus level, the overseas campuses of U.S. educational institutions are not eligible for SEVP certification.  A degree granted by an overseas campus of a U.S. educational institution will not qualify an F-1

88

Exhibit 1
421

student for a STEM OPT extension.  This clarification is consistent with the basis for this

rulemaking, which includes maintaining attractive conditions for international students to choose

to study in the United States.

    ii.    <u>Site Visits</u>

<u>Comment</u>.  Some commenters inquired about the employer site-visit provision in the

proposed rule, and specifically asked for clarification about the component within DHS that

would conduct such site visits.  In addition, a labor union opined that the Department of Labor

would be the more appropriate agency to conduct site visits to ensure employer compliance with

program requirements because "protection of labor standards is the central role of the

[Department of Labor] and the agency must have an oversight role in a program with the size

and scope of the OPT visa and its STEM extension."

<u>Response</u>.  DHS anticipates that ICE, a component of DHS, will be the agency

responsible for conducting site visits related to the STEM OPT extension program, though DHS

may consult with DOL as appropriate based upon their expertise.  These visits will be conducted

by the appropriate component to ensure compliance with the requirements of this rule.  DHS

does not intend to use these visits for other enforcement purposes; however, if evidence of a

violation of other requirements is discovered during a site visit, such potential violation will be

addressed appropriately.

DHS's authority to administer and enforce the immigration laws, track and monitor

students, and, relatedly, to conduct site visits, has strong statutory support.  For example, federal

law requires DHS to establish an electronic means to monitor and verify, among other things, the

admission of international students into the United States, their enrollment and registration at

approved institutions, and any other relevant acts by international students.  See 8 U.S.C. 1372 and 1762.

Relatedly, these statutes also obligate DHS to collect information concerning whether each nonimmigrant student is maintaining his or her status, any change in an international student's program participation as the result of being convicted of a crime, each international student's degree program and field of study, and the date of each nonimmigrant student's termination of enrollment in a program (including graduation, disciplinary action or other dismissal, and failure to re-enroll), among other things.  Id.  Significantly, the Enhanced Border Security and Visa Entry Reform Act of 2002, which clarified and augmented the requirements for international student data collection, also requires DHS to ensure that information concerning such students is timely reported and that all records are being kept in accordance with federal law.  See 8 U.S.C. 1762.

Additionally, Homeland Security Presidential Directive No. 2 (HSPD-2) (2001), which directed legacy INS to implement measures to end the abuse of student visas, requires DHS to track the status of international students (to include the proposed major course of study, the individual's status as a full-time student, the classes in which the student enrolls, and the student's source of financial support) and to develop guidelines that may include control mechanisms, such as limited-duration student immigration status.  HSPD-2 also provides that DHS may implement strict criteria for renewing student immigration status.  The rule's provisions regarding employer site visits are consistent with the foregoing authorities, which require DHS to monitor students pursuing STEM OPT training programs.  The site visits reduce the potential for abuse and ensure that STEM OPT students receive structured and guided work-based learning experiences.

90

Exhibit 1
423

Finally, DHS agrees that the Department of Labor (among other Federal, state, and local agencies) has significant expertise in worksite investigations, and may consult with the Department of Labor and other agencies as appropriate.  Also, where appropriate, DHS will refer matters to the Department of Labor and other agencies should a site visit suggest that such a referral is warranted.

Comment.  Some commenters requested additional information about the procedures and scope of employer site visits under the proposed rule.  For example, one commenter stated that "the Proposed Rule does not clearly define the scope of a STEM OPT site visit, nor what information DHS could appropriately elicit during a site visit."  Other commenters stated that the scope of any site visits should be limited to ensuring that the F-1 student remains employed at the STEM OPT employer sponsor identified in SEVIS, that the student is being compensated consistent with the information listed in SEVIS, and that the employer can confirm that the STEM degree is related to the practical training opportunity.  They stated that site visits should not become a de facto "gateway" to other DHS audits, such as I-9 audits.  They also stated that to the extent the scope of the site visit permits DHS to inquire into whether the duties and compensation of STEM OPT students are commensurate with that of U.S. workers, enforcement officers should be provided with very specific guidance to assure that STEM OPT investigations are not used as an additional mechanism to conduct I-9 audits.  Another commenter specifically called for site visits to include documentation vetting and employee interviews for the purpose of ensuring that no U.S. workers are negatively impacted by a STEM OPT extension.

Response.  As indicated above, the purpose of the employer site visit is for DHS to ensure that information in SEVIS concerning the STEM OPT extension is accurate (i.e., that students and employers are engaged in work-based learning experiences that are consistent with

the student's Form I-983, Training Plan for STEM OPT Students).  As part of a site visit, DHS may confirm that the employer has sufficient resources and supervisory personnel to effectively maintain the program.  In addition, DHS may ask employers to provide the evidence they used to assess wages of similarly situated U.S. workers.  DHS will train the officials who conduct these visits so they understand what information DHS expects from employers.  Site visits will be limited to checking information related to student STEM OPT employment, including the attestations made by the employer on the approved Training Plan.  Additionally, site visits based upon complaints or evidence of noncompliance may be tailored to the concerns asserted.  Site visits will not be used for other enforcement purposes unless evidence of a violation is discovered during such visits.

Comment.  Some commenters stated that DHS should provide advance notice for all site visits.  Some stated that consistent with similar government audits, three business days of advance notice should be provided to the student and employer prior to site visits, while another commenter suggested that companies be provided with 72 hours' notice prior to the site visit in the absence of a complaint.  One commenter stated that DHS should do unannounced site visits only when it has a reason to believe a violation has occurred based on specific, credible information from a known source that likely has knowledge of the employer's practices, employment conditions, or regulatory compliance.

Response.  DHS understands the commenters' concerns and has made changes in the final rule that balance concerns about employer burden against the need to ensure compliance with the rule.  Under this final rule, DHS will provide 48 hours' advance notice for any site visit unless the visit is triggered by a complaint or other evidence of noncompliance with these regulations, in which case DHS may conduct a site visit without notice.

Exhibit 1
425

Comment.  One commenter stated that STEM OPT site visits should be conducted only by experienced and well-trained ICE officers, rather than by contractors.  According to the commenter, DHS has previously recognized that the use of contractors to perform site visits on behalf of USCIS' Fraud Detection and National Security Directorate was inefficient and often problematic and thus eliminated their use in that context.  Other commenters questioned the expertise of ICE officers to make judgments about employer training programs.  One of these commenters stated that the proposed Mentoring and Training Plan requirement was so vague and devoid of standards that no meaningful review was possible, and no training plan would be deemed insufficient.

Response.  ICE currently intends to use federal employees for site visits under this rule.  There may be times when contractors accompany federal employees, but ICE currently intends that federal employees will be in charge of such visits.  DHS disagrees with the commenter's assessment that the Training Plan requirements are overly vague and unenforceable.  The program requires employers to provide detailed information regarding the nature of the training to be provided and the measures to be used to ensure that the goals of such training are met.  Form I-983, Training Plan for STEM OPT Students, which will be used to keep track of this information, requires employers to provide the information necessary to verify compliance.

Comment.  Several commenters requested that DHS further specify requirements and procedures related to site visits.  Such commenters expressed concern with the fact that the regulation does not specify: the manner in which a site visit would be conducted; the manner in which information gained in the course of a site visit would be stored, shared, or relied upon by the government; the manner in which a company or individual could correct or update

93

Exhibit 1
426

information gained through a site visit; or the manner in which confidential business and personal information will be protected during a site visit.

Response.  DHS clarifies that site visits will be conducted in a manner that balances the burden to the employer with the need to ensure compliance with the program.  This means that while ICE will physically inspect some sites, it also may request information concerning compliance through email or by phone.  The information obtained during a site visit will be stored and maintained by ICE.  DHS will notify an employer 48 hours before conducting a site visit unless DHS has received a complaint about the employer or has other evidence of non-compliance, in which case DHS reserves the right to conduct a site visit without notice.  If as a result of a site visit ICE determines that an employer or student needs to submit updated or corrected information, ICE will generally request the information in writing, with specific instructions on how the employer or student must submit the information.  Federal law imposes protections on information obtained by DHS in connection with site visits, and the Department will comply with those requirements.  Applicable federal laws include, but are not limited to, the Privacy Act, the Freedom of Information Act, and the Federal Information Security Management Act.

Comment.  Some commenters stated that ICE, prior to initiating a site visit, should attempt to verify program compliance requirements by communicating with the student and employer via telephone and email, as these means of communication are "less intrusive" than site visits.  The commenters suggested that if the information could be verified through these other means, there would then be no need to conduct a time-consuming site visit.

Response.  DHS expects that it will use all available mechanisms to ensure compliance with STEM OPT extensions, including contacting employers, students, or DSOs by phone or

94

Exhibit 1
427

email to verify or obtain information.  The Department, however, reserves the right to conduct

site visits of employers or schools to ensure full compliance with program requirements.  The

Department believes that the possibility that such site visits may be conducted to ensure

compliance, including on an unannounced basis, will further incentivize compliance with the

requirements of this rule.

    iii.    <u>Unemployment Limits</u>

<u>Comment</u>.  Commenters asked DHS to reconsider and adjust the amount of time a

student may be unemployed over the course of their STEM OPT extension.  Others asked that

DHS not allow for any unemployment while a student is on a STEM OPT extension.  One

commenter suggested that an unemployment period is inconsistent with student status and with

the training program component of OPT.  The commenter stated that unemployment would be an

unsupervised period inconsistent with DHS' security duties and would run contrary to

protections in place for U.S. workers.

By contrast, another commenter recommended that DHS allow unlimited unemployment

during the STEM OPT extension period.  The commenter stated that limiting the unemployment

period will have the effect of tying students more closely to one employer and limiting their

ability to change jobs.  The commenter was concerned this would increase the opportunity for

student exploitation.  A different commenter suggested that DHS allow STEM OPT students to

leave their initial employer during the 24-month extension, so as to allow students greater

mobility and avoid potential exploitation.  One commenter stated that the lack of mobility and

other protections for individuals participating in OPT could lead those students who are worried

about going out of status to "collude" with exploitative employers to cover up violations of the

safeguards for U.S. workers.

Response.  DHS respectfully disagrees with commenters' suggestions that the amount of time a student may be unemployed under this rule is too long, or that the allowance for a short period of unemployment should be eliminated altogether.  DHS continues to believe that authorizing a limited period for possible unemployment during a student's STEM OPT extension is both fair and reasonable, and consistent with the stated aims and objectives of the STEM OPT extension.  Moreover, the reporting requirement, with which a student must comply during any period of unemployment, effectively addresses security-related concerns by ensuring that DHS remains apprised of the student's location and status.

DHS also believes that limiting unemployment during the STEM OPT extension period is necessary to support the program's purpose and integrity.  The rationale for the program is to extend status to facilitate practical training.  Allowing an unlimited period of unemployment would thus undermine the purpose for the extension and increase the opportunity for fraud and abuse.  Moreover, the limited period of unemployment does not preclude a student who is unhappy with his or her current employer (for whatever reason) from effectively searching for a new practical training opportunity.  Under this rule, the student may seek such a new opportunity either while still employed with his or her current employer or in the period of unemployment provided by this rule.  Nothing in the rule prevents students from switching employers or from being unemployed for a temporary period, as long as they complete and submit a new training plan and comply with all reporting requirements.

Finally, students who believe they are being exploited or abused by their employers in any manner have several mechanisms to address their concerns, including reporting the conduct to their DSO or the SEVP Response Center, or seeking legal redress in appropriate cases.  DHS also provides information about studying in the United States on the DHS Study in the States

96

Exhibit 1
429

website, which links to State Department information for nonimmigrants, including a "Rights, Protections and Resources" pamphlet.[87]  DHS encourages all students to seek appropriate redress and emphasizes that such action will not impact their F-1 status.

Comment.  Some commenters stated that students should not be penalized for becoming unemployed for an extended period of time because their employers failed to provide appropriate training.

Response. The rule provides for a limited period of authorized unemployment precisely because DHS is aware that there may be situations where students may have their employment terminated for reasons that are beyond their control.  The rule's limited period of authorized unemployment is intended to provide students who find themselves in such a situation with sufficient time to seek and obtain alternative practical training opportunities directly related to their STEM fields of study.

Comment.  A DSO and a university requested clarification as to whether the proposed rule's authorized 90- and 150-day periods of unemployment are available at each educational level.  They sought clarification, for instance, with respect to a student who had previously used his or her authorized periods of unemployment while engaged in post-completion OPT and a STEM OPT extension after completing an undergraduate degree.  The commenters asked whether such a student would be eligible for the proposed rule's authorized periods of unemployment if the student subsequently engaged in post-completion OPT and a STEM OPT extension after completing a graduate degree.

---

[87] See DHS, Study in the States, available at https://studyinthestates.dhs.gov/what-is-a-commission-based-recruiter; U.S. Department of State, Rights, Protections and Resources Pamphlet (Dec. 22, 2014), available at http://1.usa.gov/1G0Nt5X.

Exhibit 1
430

<u>Response</u>.  Similar to the provisions in the 2008 IFR, a separate 90- or 150-day unemployment limit will apply to each post-completion OPT period.  A post-completion OPT period for these purposes means an initial period of up to 12 months of OPT, as well as the related 24-month STEM OPT extension.  If a student completes one period of OPT (including a STEM OPT extension), and then pursues a second period of OPT on the basis of having earned a second degree at a higher educational level, the student will be able to benefit from the rule's authorized 90- and 150-day periods of unemployment (as appropriate) at both educational levels.  DHS has revised the regulatory text to make this clear.

iv.    <u>Employment Status and Validation Reporting</u>

<u>Comment</u>.  Some commenters requested that DHS eliminate the requirement for the employer to timely report the termination of a STEM OPT student or, alternatively, extend the proposed 48-hour notification requirement.  Commenters suggested timeframes of 10 days or 21 days to better correspond with other reporting requirements in the rule.  Other commenters suggested alternative reporting periods of three business days or five business days.  With respect to the 48-hour notification requirement, one commenter stated that "it can be administratively difficult to comply within such a short timeframe given the amount of administrative work that accompanies a termination."  In addition, a commenter stated that having both the employer and the STEM OPT student report loss of employment is duplicative.

<u>Response</u>.  After reviewing these comments, DHS has agreed to extend the period for complying with the reporting requirement from 48 hours to 5 business days.  DHS believes such a timeframe is more realistic and more likely to result in consistent compliance, while at the same time ensuring that DHS obtains timely information with respect to international students.

DHS has been directed by Congress to monitor and track students, and obtaining current information is important to ensure that DHS continues to meet its responsibilities.

DHS recognizes that the rule requires reporting from both employers and students. While such dual reporting requirements may seem duplicative, DHS believes they are critical to ensuring compliance with program requirements. Employer reporting, for example, would be prudent in a situation involving a student who fails to report his or her termination so as to remain in the United States in violation of his or her status. Employers are also likely to have additional resources in comparison to individual employees, especially those who recently became unemployed. Moreover, DHS believes the burden imposed by the reporting requirements is minimal. Employers and students can satisfy these requirements with a simple email to the DSO indicating that the student was terminated or has otherwise departed, as well as the applicable date of such termination or departure.

Comment. Several educational institutions expressed opposition to the requirement that DSOs be informed whenever a student on a STEM OPT extension leaves the employment before the end of the extension period. These commenters expressed concern about the DSOs' role in such situations, especially because many students on STEM OPT extensions have left campus and are often removed from their university ties. A few universities stated that DHS should require employers to report this information directly to DHS, instead of to the DSO. One commenter argued that the reporting requirement would be an additional administrative burden on DSOs, who would now be responsible for data that that they do not "own." Another commenter expressed concern that the DSO could be held responsible for not having this information if the employer fails to report it to them in a timely manner, or that the student could also be held responsible.

Response.  While DHS understands the commenters' logistical concerns regarding students potentially not located on or near the DSO's campus, the compliance measure discussed in this section is not novel.  Rather, it has been in place since implementation of the 2008 IFR.  Moreover, DHS has sought to balance the burden that this requirement places on DSOs with the need for adequate oversight of the STEM OPT extension.  Because DSOs, unlike STEM OPT students or employers, have access to SEVIS, DHS continues to believe the program is best served by requiring employers and students to report these changes to DSOs so that such information can be uploaded into SEVIS on a timely basis.

Additionally, with the changes in this final rule, an employer is now required to report the termination or departure of a STEM OPT student within five business days of the termination or departure, if the termination or departure is prior to the end of the authorized period of OPT.  DHS believes this requirement, placed upon the entity with the closest connection to the student at the time of the termination or departure, is an effective mechanism for tracking students.  The provision reflects DHS' belief that the responsibility to report should initially rest with the student or employer, as appropriate, and that DSOs should continue serving in the same role they had before—helping DHS track students and providing timely access to reported information.  This system also reflects DHS' view that if an educational institution wishes to gain the benefits of F-1 students' enrollment with their school, including through the attraction of such students based upon the potential to participate in an extended period of practical training via the STEM OPT extension, the institution will be willing to undertake the associated reporting requirements as well.  Finally, DHS is currently working on ways to allow other program participants to input information directly into SEVIS.  Until that occurs, however, DHS believes the current reporting protocol should remain in place.

Exhibit 1
433

Comment.  Many DSOs submitted comments stating that students should be responsible for updating their information directly into SEVIS and that SEVIS should send automatic reminders to students about upcoming deadlines, such as deadlines for reporting termination of OPT.

Response.  As noted above, DHS recognizes that requiring DSOs to provide STEM OPT student information may, at times, be burdensome.  To aid in reducing this burden, DHS is developing a portal in SEVIS which, once fully deployed, will allow STEM OPT students to directly input information into SEVIS for DSO review.  DHS plans to have the first stages of this portal, designed specifically to allow OPT students to submit information on their own behalf, operational by the beginning of 2017.

Comment.  One employer stated that the requirement to notify DSOs in cases of termination or departure should be triggered only when STEM OPT students have actually abandoned their jobs, rather than for all absences of five consecutive days.  The commenter noted that there may be legitimate reasons why an employee may be absent from work for a five-day period without the consent of the employer.  The commenter suggested that employers should be allowed to follow their normal HR guidelines when determining whether the employment has been "abandoned" before reporting an employee's absence to the DSO, which may be either shorter or longer than the NPRM's five-day requirement.

Response.  As noted above, STEM OPT is a cooperative undertaking between the student and employer, and both voluntarily commit to participating in the program.  DHS therefore maintains that it is the employer's responsibility to notify the student's DSO if, for whatever reason, the student ceases to participate.  While DHS understands that there may be instances where an employee may be absent from work for five consecutive days without the consent of

the employer (such as a medical emergency requiring prolonged hospitalization where the employee is unable to notify the employer), any absence where the employee is unable to notify the employer and obtain consent remains material to the student's participation in the STEM OPT extension.  DHS therefore is maintaining the requirement that an employer must notify the STEM OPT student's DSO if the student has been absent from work for five consecutive business days without the consent of the employer.

      v.    <u>Periodic Student Evaluations</u>

<u>Comment</u>.  Some commenters requested clarification concerning the student and employer's respective roles in completing the student evaluation.  For instance, some commenters noted that the proposed form referred to self-assessment by the student, but was entitled "Six-Month Evaluation/Feedback on Student Progress."  Similarly, a commenter stated that the evaluation should involve input from both the student and a supervisor, and the form should be structured in a way that allows for a supervisor's comments.  One commenter requested that the evaluation consist solely of self-evaluations by the student, noting the burdens on employers of evaluations every six months.

A commenter expressed concern about being required to use the proposed Mentoring and Training Plan to evaluate STEM OPT students, explaining that the proposed rule's requirements "will not add value and will merely add redundant bureaucratic requirements for employers, who are already following their own internal processes for these employees."  The commenter stated that its company already "provides an annual review of individual employee performance and compensation" and that its review process "is the culmination of year round performance management activities in which employees receive a formal review of their performance, development goals for the upcoming year, and a compensation review."  One commenter stated

102

Exhibit 1
435

that the proposed process for completing the evaluation (which entails the student preparing it, the employer signing off on it, and the DSO retaining a copy) is redundant to the Training Plan.

Response.  DHS appreciates the commenters' concerns and clarifies that student evaluations are a shared responsibility of both the student and the employer to ensure that the student's practical training goals are being satisfactorily met.  The student is responsible for conducting a self-evaluation based on his or her own progress.  The employer must review and sign the self-evaluation to attest to its accuracy.  By requiring employers to review the self-evaluations, DHS better ensures that employers and students will continue working together to help the student achieve his or her training goals.  DHS believes that this requirement is integral to the success of the STEM OPT extension.

DHS has changed the title of the evaluation section to "Evaluation on Student Progress." DHS has not modified the evaluation to include a separate space for an employer to provide comments, because many employers expressed concern about the burden involved in reviewing the Training Plan, and DHS determined that an additional requirement was unnecessary. However, nothing in the rule prevents an employer from attaching and submitting such an appraisal of a STEM OPT student.

DHS disagrees that the student evaluation provision duplicates or displaces existing employer processes for evaluating employee performance.  The evaluation does not require employers to evaluate how well a STEM OPT student is performing his or her core duties at a job.  Instead, the evaluation section of the form is a mechanism for the student to document his or her progress towards meeting specific training goals, as those goals are described in the Training Plan.  DHS also disagrees that the student evaluation provision duplicates or is redundant to the Training Plan.  In contrast to the Training Plan, which helps the student set his

or her training objectives and ensures that the student's training conforms to the requirements of this rule, the 12-month evaluation confirms that the student is making progress toward his or her training objectives.

Comment.  DHS received a number of comments from employers about the frequency of the proposed six-month student evaluation requirement.  Some commenters stated that requiring students and employers to participate in such an evaluation every six months would be "overly burdensome" and would represent an "unprecedented level of additional reporting without commensurate improvement in compliance outcomes."  Some commenters indicated that they perform employee reviews every six months; however, given the timing of student graduations and STEM OPT start dates, the time of the year when these reviews occur might not coincide precisely with the schedule that is being mandated by DHS.  Some commenters stated that DHS should require only annual evaluations to reduce an employer's time and paperwork burdens.  Another commenter asked for 180 days to allow companies to adjust their processes if DHS insists on requiring evaluations every six months.

Response.  DHS acknowledges the concerns expressed by some employers about the ability to implement the evaluation requirement every six months as proposed in the NPRM.  While any burden associated with the evaluation is expected to rest in part on the student (who is responsible for drafting the self-assessment portion of his or her evaluation and ultimately submitting the evaluation to the DSO), DHS recognizes that the employer plays an important role in the student's evaluation by providing feedback to the student and confirming the accuracy of the evaluation.  Because of the concerns raised by commenters, DHS has decided to eliminate the six-month requirement and instead require annual evaluations: one evaluation after the first 12 months and a final evaluation when the student completes his or her practical training.  DHS

believes that annual reporting is a reasonable requirement when balanced against DHS's obligation to oversee the program and monitor students.

As finalized in this rule, a student on a 24-month STEM OPT extension must submit his or her first evaluation to the DSO within one year and 10 days of the first day of the validity period reflected on the Employment Authorization Document (EAD). Similarly, the STEM OPT student will be required to submit the final evaluation within 10 days of the conclusion of his or her practical training opportunity. DHS generally expects employers and students to be able to complete all reporting in a timely manner.

Comment. Commenters requested that DHS clarify when STEM OPT students must submit their periodic evaluations to their DSOs. Commenters stated that the proposed rule did not describe the reporting timeframe clearly. A commenter stated that it would be too burdensome to require students to submit each six-month evaluation within 10 business days of the conclusion of the evaluation period. The commenter suggested that DHS allow students to submit the evaluation either 15 or 30 days on either side of the reporting date. Similarly, a number of DSOs asked whether there would be SEVIS functionality for students who do not present Training Plans and whether there would be penalties for students who submit them late, and if so, what these penalties are. One commenter requested that, if the DSO is required to collect students' training plans for the six-month "reporting obligations," DHS provide lead time of at least 30 days between the "alert" and the deadline for submission.

Response. DHS clarifies that under the proposed rule, STEM OPT students would have been required to submit each six-month evaluation prior to the conclusion of each six-month period. As noted above, DHS has changed the evaluation period from six months to 12 months. This change should make the requirements on students and DSOs less burdensome. DHS also

agrees with the commenters that suggested additional flexibility and clarity for the submission of student evaluations.  Accordingly, this final rule also revises the proposal by providing that a student must submit the 12-month and final evaluations no later than 10 days following the conclusion of the applicable reporting period.

In response to the questions from DSOs, DHS notes that the deadlines for submitting the required training plan and evaluations are firm.  In order to maintain F-1 status, the STEM OPT student must submit the required materials to the DSO on a timely basis.  As noted above, updates to SEVIS are being developed to make it easier for students to meet these submission requirements.  DHS does note, however, that for the annual evaluation requirement, a full Training Plan form need not be submitted.  Rather, the student would need to timely provide the evaluation section of the form to the DSO.  DHS believes the associated timeline provides sufficient flexibility for all parties to comply with these requirements.

     vi.     <u>Reporting of Material Changes to or Deviations from the Training Plan</u>

<u>Comment</u>.  Some commenters submitted comments related to the attestation included in the proposed Mentoring and Training Plan that would have required the student and employer to notify the DSO at the earliest available opportunity regarding any material changes to, or material deviations from, the training plan ("material changes").  The proposed plan indicated that such a material change would include a change in supervisor.  A commenter objected to this requirement and posited that requiring the reporting of material changes would not advance the policies underlying the training plan requirement.  Some commenters requested that DHS clarify the meaning of the term "material" in this context.  Commenters stated that such clarification was necessary to minimize instances of over-reporting of immaterial changes to the Training

106

Exhibit 1
439

Plan.  One commenter stated that a mere change of supervisor should explicitly be considered an immaterial change to the STEM OPT opportunity.

Finally, a commenter recommended placing the responsibility for reporting material changes with the F-1 student, not the employer.  The commenter reasoned that shifting this particular reporting obligation to students is consistent with students' other reporting obligations under the proposed rule, including "reporting changes of employer."

Response.  DHS believes that the Training Plan requirement would be seriously undermined if DHS allowed students and employers to make material changes or deviations without creating a record of such changes and reporting those changes to the DSO.  The reporting requirement keeps students and employers accountable to the original Training Plan, and ensures that the DSO and DHS have access to accurate information about STEM OPT students.  DHS therefore declines the suggestion to eliminate the requirement to report material changes.

DHS agrees, however, that further clarification is warranted.  Accordingly, DHS has revised the final regulatory text to make clear that the STEM OPT student and employer are jointly required to report material changes.  The regulatory text also clarifies that material changes may include, but are not limited to, any change of Employer Identification Number resulting from a corporate restructuring; any reduction in compensation from the amount previously submitted on the Training Plan that is not a result of a reduction in hours worked; any significant decrease in hours per week that a student engages in the STEM training opportunity; and any decrease in hours below the 20-hours-per-week minimum required under this rule.  If these or other material changes occur, the student and employer must sign a modified Training

Plan reflecting the material changes or deviations, and they must ensure that the plan is submitted to the student's DSO at the earliest available opportunity.

DHS agrees with the comment stating that a change of supervisor does not, by itself, meet the level of a material change or deviation that would require submitting a modified Training Plan.  Similarly, it is not necessarily a material change if a STEM OPT student rotates among different projects, positions, or departments, or there is a change in the F-1 student's assigned division or research focus.  Such changes are not material unless they render inaccurate the information in the F-1 student's original Training Plan related to the nature, purpose, oversight, or assessment of the student's practical training opportunity.

In response to commenters' concerns, DHS has revised the regulatory text to make this clear.  Under this final rule, a material change is a change that DHS has specifically identified as "material" by regulation, renders an employer attestation inaccurate, or renders inaccurate the information in the Training Plan on the nature, purpose, oversight, or assessment of the student's practical training opportunity.  Thus, for example, a change in supervisor that results in such inaccuracy would be a material change, but a change in supervisor standing alone is not material.

Because DHS expects that not all changes in supervisor would be material, DHS has revised the Training Plan form to replace the reference to a student's supervisor with a reference to the "Official Representing the Employer."  Along with the changes discussed above, this change aims to produce flexibility for employers in completing the requisite sections of the form and further clarifies that the Training Plan would not require updating solely because the student is assigned new project supervision.

Finally, DHS declines to adopt the recommendation to make the student solely responsible for reporting material changes, as the employer should be accountable for the

108

Exhibit 1
441

Training Plan that it helped prepare.  This joint employer-student requirement strengthens DHS's ability to track F-1 nonimmigrants and is essential to monitoring employer compliance, maintaining strong U.S. worker safeguards, and ensuring continuing employer-accountability.

Comment.  A university stated that material changes or deviations to the original Training Plan will be self-reported events and that the DSO will have no other way of knowing if or when they occur.  The commenter suggested that if the Department simply seeks to have this information on file, and there is no role for the DSO other than to collect the information, then such information should be submitted directly to DHS by the employer or student.  The commenter further stated that the proposed rule was silent regarding DSO responsibilities over modified Training Plans, and that there appear to be no "teeth" for addressing a student's failure to report these changes.

Response.  DHS understands that DSOs have a limited role with respect to receiving and storing material changes to, or deviations from, submitted Training Plans.  DHS is developing a portal in SEVIS to allow students to provide their own information, including confirmation of modified Training Plans.  At this time, however, the DSO's role in this regard remains essential to the effective administration of the STEM OPT extension.  Consequently, the DSO at the student's school of most recent enrollment remains responsible for providing SEVP with access to the relevant information described in this section.  This rule also makes clear that it is the student's responsibility to provide changes in information to his or her DSO, and that a failure to do so would constitute a violation of the student's F-1 status.

Comment.  One commenter recommended that DHS require that changes in compensation be reported only when a student's salary has been lowered.  The commenter stated that if this change were adopted, it would eliminate a significant burden on students and DSOs

by eliminating the need to report when a student receives an annual cost-of-living increase as part of the employer's overall compensation program.  The commenter stated that this would also avoid confusion over whether to report every time the student receives a raise or stock options, or when other forms of non-cash compensation are added to the student's compensation package.

Response.  DHS understands the commenter's concern that the proposed rule lacked clarity on when compensation changes were required to be submitted through the Training Plan for STEM OPT Students.  To avoid any confusion, the final rule clearly states that employers are responsible for reporting only material changes to the Training Plan, which will include changes to the compensation reporting field of the form, and are required to do so at the earliest available opportunity.  However, a compensation change qualifies as material only when it is a reduction in compensation from the amount previously submitted on the Training Plan that is not the result of a reduction in hours worked.  An increase in compensation, on its own, does not constitute a material change that must be reported.  But such an increase may constitute a material change in the totality of the circumstances, such as when the increase is not commensurate with an increase in compensation afforded to the employer's similarly situated U.S. workers.

vii.    General Comments on DHS Enforcement, Monitoring, and Oversight

Comment.  DHS received a number of comments related to the Department's ability to track F-1 students on STEM OPT extensions.  One commenter, for example, cited a February 2014 report from the Government Accountability Office (GAO) that highlighted difficulties experienced by the Department in tracking F-1 students engaging in practical training.[88]  The

---

[88] The commenter referred to GAO, "Student and Exchange Visitor Program: DHS Needs to Assess Risks and Strengthen Oversight of Foreign Students with Employment Authorization," Feb. 2014, available at http://www.gao.gov/assets/670/661192.pdf.

commenter expressed concern over the ability of nonimmigrants to overstay their authorized

periods of stay, and suggested that making schools responsible for former students would be

unrealistic and would create a national security issue.  Another commenter asked how DHS

would keep track of all students participating in STEM OPT.  Some commenters suggested that

DHS adopt and publish a public list of program violators, identifying those companies and

universities found to be abusing the STEM OPT extension or otherwise failing to comply with

program requirements.  One commenter requested information regarding actions DHS has taken

to address problems identified by the February 2014 GAO report on the OPT program.

Response.  DHS believes it has made important improvements to the oversight of the

STEM OPT extension with this rule.  In addition to maintaining the validation reporting

requirement, this rule establishes an interlocking set of requirements that facilitate DHS

enforcement (site visits), permit DHS to better monitor students on STEM OPT (evaluations,

notification of material changes, and required notice if a student leaves an employer or fails to

show up for five consecutive business days without the employer's consent), and protect the

integrity of the program (accreditation requirements and unemployment limits).  These

requirements are intended to help DHS track F-1 nonimmigrants and better ensure their

departure.  See, e.g., 8 U.S.C. 1103, 1184, 1372.  All of these are discussed in detail above.

DHS believes that the enforcement, monitoring, and oversight provisions of this rule

provide the necessary tracking resources and mechanisms to appropriately monitor compliance

and to enforce the law against violators.  For these reasons, the Department declines to adopt the

suggestion to publish a list of program violators.

With regard to the 2014 GAO Report, DHS first notes that the report and its conclusions

concerned individuals beyond the limited population of STEM OPT students, who represent a

small subset of the total F-1 population engaging in authorized employment in the United States.[89] The report is thus much broader in scope than are the regulatory changes DHS has considered with this rulemaking.  Nonetheless, DHS believes it has adequately addressed many aspects of the GAO report impacting STEM OPT extensions.  DHS has taken measures or is finalizing action regarding seven recommendations included in the report.  For example, DHS has completed or is in the process of finalizing the following:

- Identifying and addressing risks in the OPT program through interagency coordination, including using relevant information from ICE's Counterterrorism and Criminal Exploitation Unit and field offices;

- Requiring that F-1 OPT students, both still in school and who have completed their education, provide DSOs with employer information, including their employer's name and address, so that DSOs can record that information in SEVIS;

- Developing and distributing guidance to DSOs for determining whether a practical training opportunity relates to a student's area of study, and requiring that DSOs provide information in SEVIS to help ensure that the regulatory requirement is met;

- Requiring that students report to DSOs, and that DSOs record in SEVIS, students' initial date of employment and any period of unemployment;

- Developing and implementing a process for SEVP to inform USCIS when students approved for OPT have transferred schools;

- Developing guidance to DSOs and USCIS regarding the definition of a full academic year for the purposes of recommending and authorizing OPT; and

---

[89] As of September 16, 2015, over 34,000 students were in the United States on a STEM OPT extension, as compared to more than 1.2 million international students studying in the United States.

Exhibit 1
445

- Developing and implementing a mechanism to monitor available information in SEVIS to determine if international students are accruing more OPT than allowed by DHS regulation.

Although DHS is always interested in ways to improve the security and efficacy of its programs, the Department believes that the above-referenced enforcement measures, as well as those described in this final rule, are thorough and sufficient to address the concerns discussed in the GAO report that relate to STEM OPT extensions.

Comment. Commenters expressed concern that many F-1 students on STEM OPT extensions work in fields unrelated to their areas of study and falsify work experience.  Some commenters stated that many employers fabricate work documents in an attempt to show that a work experience relates to a student's field of study.  Some commenters requested that DHS take additional steps to ensure that F-1 students do not work in unrelated fields, such as in restaurants, motels, gas stations or similar places of employment.

Other commenters expressed concerns about consulting firms that may seek to exploit F-1 students by underpaying them during their STEM OPT extension.  One commenter asked DHS to implement background checks for all STEM OPT students before they accept employment opportunities.  Similarly, another commenter suggested that DHS include annual in-person reissuance of identification cards with photos and fingerprints among measures required for "all OPT students."

Response.  As noted above, this rule includes multiple requirements to ensure strong program oversight.  DHS closely monitors the STEM OPT extension program, including F-1 students and schools certified to enroll such students.  DHS takes claims of fraud and abuse very seriously and encourages all individuals to contact DHS if they have information regarding any

113

Exhibit 1
446

individual or employer that he or she believes is engaging in fraud or abuse.  Individuals

possessing such information are encouraged to submit it online at

https://www.ice.gov/webform/hsi-tip-form.  Moreover, the rule requires employers to sign the

Training Plan and comply with all reporting requirements, while providing for site visits to

independently verify compliance.  These additional requirements will mitigate the potential for

fraud and abuse of the F-1 visa program and STEM OPT extension.

Regarding the request for DHS to implement background checks on STEM OPT

students, DHS confirms that this process is already in place.  USCIS conducts background

checks on all STEM OPT students before rendering a final decision on their Form I-765,

Application for Employment Authorization.  DHS does not believe the commenters' suggested

additional security measures (such as an annual ID card reissuance requirement) are necessary or

appropriate at this time.[90]

Comment.  Some commenters stated that the proposed rule was silent on the types of

penalties that students and employers may face for non-compliance with reporting requirements.

Other commenters expressed concern that DSOs may be held responsible if students and

employers fail to comply with those requirements.  One commenter described the reporting

requirements as "self-reporting events," noting that DSOs will have no way of monitoring

students or knowing about violations if they are not reported to the DSOs.  That commenter

suggested that "[t]here should be no repercussions to the school or the DSO for not getting these

data from the student or employer."  Similarly, another commenter voiced concerns about

---

[90] DHS notes that several commenters suggested that DHS implement new requirements for "all OPT students."
DHS believes these comments go beyond the scope of regulatory changes DHS has considered with this
rulemaking.  However, DHS understands and appreciates the commenters' concerns.  As stated previously, the rule
implements significant measures to strengthen program oversight and to mitigate fraud in the STEM OPT extension.
DHS may consider extending these measures more broadly in a future rulemaking.

whether there will be consequences for DSOs if employers or students fail to meet their reporting

obligations under the proposed rule, how DHS will monitor employers' and students'

compliance with the proposed rule's reporting requirements, and whether students will face

consequences if employers fail to timely report required information.

Response.  DHS respectfully disagrees with the commenters' statements concerning

available consequences for non-compliant students or employers.  The rule reflects ICE's

procedures for monitoring nonimmigrant students and provides for investigating employers'

compliance with the rule's requirements, including all reporting and recordkeeping obligations,

in accordance with SEVP's authority to track and monitor students.  Moreover, the rule clarifies

that employers will be monitored consistent with the site visit provisions, and that DHS has the

ability to deny STEM OPT extensions with employers that DHS determines have failed to

comply with the regulations.  With regard to STEM OPT students, the rule also provides for

serious consequences in instances of non-compliance.  For example, the rule specifies that

compliance with reporting requirements is required to maintain F–1 status.  See 8 CFR

214.2(f)(12)(i)-(ii).  Accordingly, a student's failure to comply with reporting obligations will

result in a loss of F-1 status.  Furthermore, although DHS expects certified schools and DSOs to

meet their regulatory obligations, including updating a student's record to reflect reported

changes for the duration of OPT, DHS does not intend to pursue enforcement actions against

schools or their officials for the reporting failures of third parties.

C.      Qualifying F-1 Nonimmigrants

1.      Description of Final Rule and Changes from NPRM

This rule allows only certain F-1 nonimmigrants to receive STEM OPT extensions.  The

rule requires the student's STEM OPT opportunity to be directly related to the student's STEM

degree; defines which fields DHS considers to be "STEM fields" for purposes of the extension; and allows students to use a previously obtained STEM degree as a basis for a STEM OPT extension.  The rule effectively prohibits students from using the STEM OPT extension to work in a volunteer capacity, among other requirements to ensure appropriate oversight and training in connection with the extension.  Finally, this rule clarifies that a student may qualify for a STEM OPT extension notwithstanding that the student has yet to complete a thesis requirement or equivalent, so long as the thesis requirement or equivalent is the only degree requirement still outstanding at the time of application (although this is not an available option when using a previously obtained STEM degree).  The proposed rule included most of these provisions; the final rule makes changes and clarifications in response to public comments.  We summarize these provisions and changes below.

      i.      <u>Relationship of STEM OPT Opportunity to the Student's Degree</u>

As noted above, under this final rule, the student's proposed STEM OPT opportunity must be directly related to the student's STEM degree.  Like OPT generally, a STEM OPT extension is at its core a continuation of the student's program of study in a work environment. This provision is finalized without change.

      ii.     <u>Limitation to STEM Degrees Only</u>

This final rule limits eligibility for the STEM OPT extension to those qualifying students who have completed a degree in a STEM field.  The degree that serves as the basis for the STEM OPT extension must be a bachelor's, master's, or doctoral degree.  Under this rule, a "STEM field" is a field included in the Department of Education's CIP taxonomy within the 2-digit series containing engineering, biological sciences, mathematics, and physical sciences, or a related field.  In general, related fields will include fields involving research, innovation, or

116

Exhibit 1
449

development of new technologies using engineering, mathematics, computer science, or natural sciences (including physical, biological, and agricultural sciences).  This definition is drawn in part from a definition developed by the Department of Education's National Center for Education Statistics (NCES).[91]  DHS added the definition of "related fields" in response to comments about the clarity of the proposed definition.

DHS will maintain a complete list of fields that DHS has determined fall within the regulatory definition of "STEM field."  This list is known as the STEM Designated Degree Program List ("STEM list").  DHS may publish updates to the STEM list in the Federal Register. A clear definition of the types of degree fields that DHS considers "STEM fields" for purposes of the STEM OPT extension will more effectively facilitate the process for altering categories contained within the STEM list.

In the proposed rule, DHS advised commenters that it was considering future revisions of the STEM list to include certain degrees listed within the two-digit series for Agriculture, Agriculture Operations, and Related Sciences; Computer and Information Sciences and Support Services; Engineering; Engineering Technologies and Engineering-Related Fields; Biological and Biomedical Sciences; Mathematics and Statistics; and Physical Sciences.  As noted in the comment summary below, DHS received a number of recommendations for fields to add to the STEM list and one recommendation to remove a field from the list.  As discussed below DHS has revised the list in response to the comments received; the final list is available in the docket for this rulemaking.  Consistent with past practice, DHS will continue to accept for consideration suggested changes to the STEM list at SEVP@ice.dhs.gov.

---

[91] U.S. Department of Education, NCES, Institute of Education Sciences, "Stats in Brief" (July 2009), available at http://nces.ed.gov/pubs2009/2009161.pdf.

117

Exhibit 1
450

### iii.    Prior STEM Degrees

The rule allows students to use a previously obtained and directly related STEM degree from an accredited school as a basis to apply for a STEM OPT extension.  This provision makes the STEM OPT extension available to students who have significant prior background in STEM but who are currently engaging in practical training that has been authorized based on their study towards a non-STEM degree.  The extension is available only to those students who seek to develop and utilize STEM skills from their prior STEM degree during the STEM OPT extension. A DSO at the student's school of most recent enrollment is responsible for certifying a prior STEM degree, which must have been obtained in the ten years prior to the DSO recommendation.  In addition, the regulatory text clarifies that the practical training opportunity that is the basis for the 24-month STEM OPT extension must directly relate to the degree that qualifies the student for such extension, including a previously obtained STEM degree.

### iv.    Prior STEM Degrees—Additional Eligibility Requirements

This final rule includes a number of requirements intended to ensure the educational benefit of a STEM OPT extension based on a previously obtained STEM degree.  First, for a student relying on a previously obtained degree, the student's most recent degree must also be from an accredited institution, and the student's practical training opportunity must be directly related to the previously obtained STEM degree.  Second, for a previously obtained degree to qualify as the basis for a STEM OPT extension, the degree must have been received within the 10 years preceding the student's STEM OPT application date.

As previously noted, the final rule clarifies that the prior degree cannot have been conferred via an overseas campus.  The institution that conferred the prior degree must be

accredited and SEVP certified at the time the DSO recommends the student for the STEM OPT application.[92]

### v. Volunteering and Bona Fide Employer-Employee Relationships

The final rule clarifies issues relating to various types of practical training scenarios and whether such scenarios qualify an F-1 student for a STEM OPT extension.  The rule specifically clarifies that a student may not receive a STEM OPT extension for a volunteer opportunity.  The rule also requires that a student must have a bona fide employer-employee relationship with an employer to obtain a STEM OPT extension.  In response to comments received, DHS clarifies that students may be employed by start-up businesses, but all regulatory requirements must be met and the student may not provide employer attestations on his or her own behalf.

### vi. Thesis Requirement

The final rule clarifies that F-1 students who have completed all other course requirements for their STEM degree may be eligible for a STEM OPT extension notwithstanding the continuing need to complete the thesis requirement or equivalent for their STEM degree.  DHS believes that this flexibility is consistent with DHS's historical interpretation of the regulatory provisions governing STEM OPT extensions.  This exception, however, does not apply with respect to a previously earned STEM degree if the student seeks to base the STEM extension on such a degree.

2.    Public Comments and Responses

i.    Relationship of STEM OPT Opportunity to the Student's Degree

---

[92] This final rule also clarifies that a qualifying, previously obtained degree provides eligibility for the STEM OPT extension so long as the educational institution that conferred the degree is accredited at the time of the student's application for the extension.  As discussed more fully below, DHS does not have full access to historical information on accreditation for all U.S. schools.  An organization's current status as accredited nonetheless serves as a signal of the quality of the education that the organization offers.

Comment.  DHS received a number of comments regarding the proposed relationship between students' degrees and their practical training opportunities.  Several commenters agreed with DHS that the rule should require a direct relationship between the student's qualifying STEM degree and the practical training opportunity.  One commenter indicated that the Department needed to be flexible in evaluating such relationships, particularly because of rapid changes in certain STEM fields.  Specifically, the commenter stated that "[i]n assessing whether a STEM degree relates to a particular position, it is important for DHS to be open to employers' explanations regarding the nexus between the STEM degree field and the employment opportunity."  Other commenters suggested that STEM OPT students should work only in the exact fields in which they earned their degrees, rather than in other related fields where their skills may be valued by employers.  One commenter opposed the requirement that work be directly related to the degree, especially in regard to prior STEM degrees.  The commenter suggested that eliminating the nexus requirement would create greater opportunities for STEM OPT students.

Response.  DHS does not believe further changes to the "directly related" standard are necessary or appropriate.  DHS disagrees, on the one hand, with comments recommending that STEM OPT extensions only be allowed where the practical training will be in the exact field in which the F-1 student earned his or her degree.  DHS also disagrees, on the other hand, with comments recommending the elimination of any connection between the degree and the practical training opportunity.  DHS believes that the rule strikes the right balance between these two positions.

The requirement that the practical training opportunity be directly related to the student's degree ensures that the opportunity is an extension of the student's academic studies and

120

Exhibit 1
453

enhances the knowledge acquired during those studies.  The purpose of the rule is not to give students unlimited employment opportunities.  At the same time, the "directly related" standard allows sufficient flexibility to give F-1 students a range of options when choosing how to apply and enhance their acquired knowledge in work settings.  DHS recognizes that the knowledge acquired when earning a STEM degree typically can be applied in a range of related fields, and the Department does not seek to narrow such options for students; rather, this rule requires that the practical training opportunity be directly related to the F-1 student's field of study.  Limiting opportunities to the exact field of study as named on the degree would create an unnecessary and artificial distinction, resulting in fewer opportunities for STEM OPT students.

DHS notes that the Training Plan required for a STEM OPT extension under this rule includes an entry for articulating how the practical training opportunity is directly related to the student's field of study.  DHS will carefully consider this explanation, among other relevant evidence, when evaluating the relationship between the practical training opportunity and the student's degree.

Comment. One commenter stated that STEM OPT extensions should be granted based on the needs of U.S. industries.  Specifically, the commenter recommended that DHS make extensions available to F-1 students who have earned degrees in fields that have a demonstrated need for workers, rather than to all fields on the STEM list.

Response.  The primary purpose of this rule is to expand upon the academic learning of F-1 students in STEM fields through practical training, not to supply STEM workers or address labor shortages.  Moreover, as noted previously, the NSF has reviewed the body of research in this area and concluded that there is no straightforward answer on whether there is a surplus or

shortage of STEM workers.[93]  Although it appears axiomatic that at any given time one industry may need workers more than another, the NSF has also found that labor needs in STEM fields are determined by factors other than industry, including level of education, training, and geographic location.[94]  Due to the complex set of factors that combine to affect the supply and demand of STEM workers, and the fact that labor needs are in constant flux, DHS has concluded that it would not be administratively feasible to limit STEM OPT extensions based on industry-specific needs that would be complex and difficult to ascertain objectively.  DHS declines to adopt the suggestion by the commenter.

Comment.  Another comment suggested that because the DHS-approved STEM list is actually a list of major areas (i.e., fields) of study, DHS should amend the proposed definition for the type of STEM degree that would qualify a student for a STEM OPT extension to refer to "program categories" instead of "degree programs."  The commenter added that the reference to "program categories" would be more consistent with other parts of the regulation that also use that term.

Response.  DHS agrees that the proposed definition could be confusing and has amended the regulatory text accordingly.  The final rule now provides that the degree that is the basis for the STEM OPT extension must be a bachelor's, master's, or doctoral degree in "a field" determined by the Secretary, or his or her designee, to qualify within a science, technology, engineering, or mathematics field.

Comment.  Several commenters requested that the STEM OPT extension program be broadened to include non-STEM degrees.  For example, one commenter remarked that it "sometimes encounters individuals with excellent technical credentials whose decision to obtain

_____

[93] See supra note 52.
[94] Id.

an MBA or other non-STEM advanced degrees precludes them from continuing employment in

the United States due to an inability to access STEM-OPT."  Other commenters similarly

suggested that STEM OPT extensions be available to students with non-STEM degrees by citing

to the changing nature of higher education and the need for increased experiential learning in

other fields.  One commenter suggested that DHS should create a process for expanding practical

training opportunities for foreign students in non-STEM fields.

Response.  An expansion of practical training to non-STEM degrees would be outside the

scope of this rulemaking.  In 2015, there were more than 1.2 million international students

studying in the United States, but only approximately 34,000 students on STEM OPT extensions.

DHS did not propose to authorize an extension of OPT for the entire international student

population, and will not authorize such an extension in this rule.

Moreover, as noted in the proposed rule, DHS received similar comments in response to

the 2008 IFR creating the 17-month extension for STEM graduates.  DHS has taken these

concerns into consideration in crafting this rule, and the Department determined that extending

OPT is particularly appropriate for STEM students because of the specific nature of their studies

and fields and the increasing need for enhancement of STEM skill application outside of the

classroom.  DHS also found, as noted previously, that unlike post-degree training in many non-

STEM fields, training in STEM fields often involves multi-year research projects[95] as well as

multi-year grants from institutions such as the NSF.  Although DHS recognizes that there may be

some non-STEM fields in which a student could benefit from increased practical training, the

Department believes the current 12-month post-completion OPT period is generally sufficient for

---

[95] Many STEM OPT practical training opportunities are research related, as indicated by the fact that the employer that retains the most STEM OPT students is the University of California system and that two other universities are among the top six of such employers (Johns Hopkins University and Harvard University).

123

Exhibit 1
456

such fields.  For these reasons, DHS is limiting the STEM OPT extension to STEM fields at this time.

Finally, DHS also notes that the rule does expand the availability of STEM OPT extensions to certain STEM students with advanced degrees in non-STEM fields.  Under the rule, a student who earns a STEM degree and then goes on to earn a non-STEM advanced degree, such as a Master of Business Administration (MBA), may apply for a STEM OPT extension following the MBA so long as the practical training opportunity is directly related to the prior STEM degree.

ii.      Definition of "STEM Field" and the STEM List

Comment.  Many commenters supported DHS's proposal to designate CIP codes in the STEM list at the two-digit level for the summary groups (or series) containing mathematics, natural sciences (including physical sciences and biological/agricultural sciences), engineering/engineering technologies, and computer/information sciences.  Commenters stated that this approach would provide important clarity to the public, as well as flexibility as STEM fields change.

Many commenters emphasized the importance of also allowing STEM OPT extensions for certain students who studied in fields that are not classified within the proposed definition of "STEM field."  Some commenters stated that DHS should not base its definition of the term on the NCES definition alone.[96]  Commenters stated that the Department of Education originally developed this definition in order to define the scope of a study of educational trends related to students who pursue and complete STEM degrees.  One commenter argued that repurposing this

---

[96] The NCES definition of "STEM fields" includes "mathematics; natural sciences (including physical sciences and biological/agricultural sciences); engineering/engineering technologies; and computer/information sciences."  U.S. Department of Education, NCES, Institute of Education Sciences, "Stats in Brief" 2 (July 2009), available at http://nces.ed.gov/pubs2009/2009161.pdf.

categorization for the STEM OPT extension would produce an unnecessarily narrow definition of "STEM field" for the STEM OPT extension.

Similarly, another commenter advised that the NCES description of STEM fields "is too narrow to capture graduate level STEM fields, especially those being pursued by students who obtained their baccalaureate-level education outside the United States, and who have come here for more specialized STEM education." Another commenter stated that the proposed rule's definition would "create[] a static definition of STEM fields that fails to provide the flexibility to adapt to the latest innovations and discoveries in STEM." The commenter suggested that DHS clarify that it may add new CIP codes to the list beyond the summary groups specifically identified in the proposed regulatory text.[97]

Another commenter stated that DHS's definition of "STEM field" differs from the NCES definition of the term in that DHS has included "related fields" in its definition. The commenter believed that DHS's expanded definition would lead to requests for DHS to include in the new STEM list a number of fields that DHS had included in prior versions of the STEM list, but that did not fall within the summary groups that DHS identified in the NPRM (mathematics, natural sciences (including physical sciences and biological/agricultural sciences), engineering/engineering technologies, and computer/information sciences). To address this concern, the commenter suggested that DHS include an innovation or competitiveness-related criterion as a factor in selecting STEM fields for inclusion on the list.

---

[97] One comment suggested that DHS clarify how it will map CIP codes to each of the listed summary groups if it retains these summary groups because, according to the commenter, neither the NPRM nor the Department of Education document provide enough detail to compare the proposed list to the current list, or to provide feedback on the scope of the proposed change. Another commenter asked whether DHS intended to retain fields on the list if they fell outside of the summary groups for mathematics, natural sciences, engineering/engineering technologies, and computer/information sciences. As noted above, as part of the 2015 NPRM, DHS offered for public comment the then-current STEM Designated Degree Program List, and specifically identified which codes it was considering designating at the two-digit level.

<u>Response</u>.  DHS believes the NCES definition for "STEM field" provides a sound starting point for the definition of that term in this rule.  First, the NCES definition draws on the Department of Education's expertise in the area of higher education.  Second, the NCES definition identifies STEM fields using CIP terminology, which is widely used by U.S. institutions of higher education and provides a straightforward and objective measure by which DSOs and adjudicators can identify STEM fields of study.  Consistent with the proposed rule, DHS has determined that four areas are core STEM fields and will list these four areas at the two-digit CIP code level.  As a result, any new additions to those areas will automatically be included on the STEM list.  These four areas are: Engineering (CIP code 14), Biological and Biomedical Sciences (CIP code 26), Mathematics and Statistics (CIP code 27), and Physical Sciences (CIP code 40).

DHS also recognizes that some STEM fields of study may fall outside the summary groups (or series) identified in the NCES definition.  As many commenters noted, the proposed rule defined "STEM field" to also include fields of study <u>related to</u> mathematics, natural sciences (including physical sciences, biological, and agricultural sciences), engineering and engineering technologies, and computer and information sciences.  The "related fields" language in the STEM definition means that DHS may consider a degree to be in a STEM field even if not within the CIP two-digit series cited in the rule, and it authorizes DHS to designate CIP codes meeting the definition at the two-, four-, or six-digit level.  DHS believes that the clarification provided here, coupled with the STEM list itself, are sufficient to address any concern about qualifying STEM degrees and therefore declines to amend the regulatory text.

DHS agrees, however, with comments suggesting that the "related fields" criterion alone may provide insufficient guidance and predictability to adjudicators and the public.  Consistent

with these commenters' suggestions and the basis of the STEM OPT extension, DHS has revised

the regulatory text to clarify that in general, related fields will include fields involving research,

innovation, or development of new technologies using engineering, mathematics, computer

science, or natural sciences (including physical, biological, and agricultural sciences).  DHS

intends to list any such "related fields" at the 6-digit level.

Comment.  DHS received a number of comments related to the process for updating the

STEM list.  One commenter recommended that DHS publish a list and provide for notice and

comment regarding any fields DHS intends to add or remove.  Other commenters proposed that,

in order to retain flexibility to adapt the definition of eligible STEM fields to an innovative

economy, DHS should make additions to the list through publication of updates in the Federal

Register but without providing for notice and comment.  Another commenter asked DHS "to

create a system whereby applications to add fields to the STEM list can be made and acted upon

quickly" but that "DHS provide a notice and comment period before eliminating specific fields

from the STEM list."

Response.  DHS agrees that the STEM list should be flexible and envisions making

periodic updates to the STEM list in response to changes in STEM fields, academic programs, or

technological trends.  DHS will review recommendations from the public concerning potential

additions or deletions to the list, and may announce changes through publication in the Federal

Register.  DHS intends to use a single procedure for amending the list and therefore disagrees

with the commenter who recommended two different procedures for additions and deletions.

Additionally, notice and comment publication for every change to the STEM list would hinder

DHS's ability to be flexible and responsive to changes in STEM fields.  DHS notes, however,

that changes to the STEM list would be based on the regulatory definition of "STEM field,"

which was subjected to notice and comment.  In addition, DHS has provided a mechanism for continuous feedback on the degrees included on the list and encourages interested parties to suggest changes by sending their recommendations to SEVP@ice.dhs.gov.  DHS believes this language and the process described provide sufficient clarity for the continued regulatory implementation of the STEM list.

Comment.  Many commenters requested that DHS include additional broad categories of degrees on the STEM list.  For instance, some commenters requested that DHS include all science degrees.  Others requested that DHS include "certain essential fields in the health care and business sectors," without specifically identifying the specific fields they considered "essential."  A commenter recommended adding to the STEM list programs with CIP codes within the summary groups (or series) for Business Management, Marketing, and Related Support Services (CIP code 52) and Homeland Security, Law Enforcement, Firefighting and Related Protective Services (CIP code 43).  Other commenters recommended specific degrees for DHS to include in the STEM OPT extension.  These proposed fields of study covered a wide range of subjects including patient-care fields such as nursing and dental sciences, business administration, exercise sciences, neuroscience, pharmaceuticals, economics, accounting, and geography.  Some commenters stated that "financial engineering" and "quantitative finance" (fields that are potentially encompassed within the CIP code for Financial Mathematics) should not be on the list of qualifying fields as many of those students work for financial institutions, and some degree programs in those fields might not focus heavily on quantitative skills.

Response.  DHS cannot fully respond to requests to include broad groups of degrees— such as degrees in certain "essential" health care and business fields—without an indication of the specific fields that are being suggested or a detailed explanation as to why those fields should

Exhibit 1
461

be included on the list.  Nevertheless, DHS declines to define "STEM field" to generally include patient care and business fields of study.  As noted above, these fields do not generally fall within the rubric of "STEM fields."  For similar reasons, DHS declines to add all CIP codes that begin with 52 and 43.  DHS notes, however, that the final STEM list that DHS is adopting with this rulemaking includes four CIP codes beginning with 52: Management Science; Business Statistics; Actuarial Science; and Management Science and Quantitative Methods, Other.  The final STEM list also includes two CIP codes beginning with 43: Forensic Science and Technology, and Cyber/Computer Forensics and Counterterrorism.

DHS notes that a number of the additional fields that commenters recommended for inclusion on the STEM list are included in the final list DHS is adopting with this rulemaking. These include Medical Technology (CIP code 51.1005), Health/Medical Physics (CIP code 51.2205), Econometrics and Quantitative Economics (CIP code 45.0603), Exercise Physiology (CIP code 26.0908), Neuroscience (CIP code 26.1501), Pharmacoeconomics/ Pharmaceutical Economics (CIP code 51.2007), Industrial and Physical Pharmacy and Cosmetic Sciences (CIP code 51.2009), Pharmaceutical Sciences (CIP code 51.2010),[98] and Geographic Information Science and Cartography (CIP code 45.0702).

With respect to suggestions to include certain accounting degree programs, DHS notes that accounting is not generally recognized as a STEM field and does not involve research, innovation, or development of new technologies using engineering, mathematics, computer science, or natural sciences (including physical, biological, and agricultural sciences).  DHS is thus not generally including accounting degrees on the STEM List.  DHS also disagrees with the

---

[98] DHS believes that those pharmacy-related CIP codes currently listed on the STEM list are in line with the STEM definition, whereas the recommendation of "Pharmacy" is too vague, and the other two recommendations, "Pharmacy Administration" and "Pharmacy Policy and Regulatory Affairs," fall outside the STEM definition.

Exhibit 1
462

suggestion to prohibit eligibility based on "financial engineering" and "quantitative finance" degrees.  Financial Mathematics is a very specialized field that involves utilizing traditional research methods and applying scientific principles and rigorous mathematical concepts (such as stochastic calculus).  These underlying principles, and not the end employer, dictate the bases for including this field on the STEM list.

Comment.  Many commenters requested that DHS classify STEM CIP codes at the two-digit level to allow for more majors to qualify as bases for STEM OPT extensions.  A commenter recommended that DHS consider identifying eligible CIP codes by the two-digit series of the CIP taxonomy, and that in cases where such series is too broad, DHS consider using the four-digit series, which "represent intermediate groupings of programs that have comparable content and objectives."

Some commenters requested that DHS include additional categories of degrees on the STEM list.  One commenter recommended that DHS designate at the two-digit level a number of potentially "related fields," including Psychology (CIP code 42), Health professions and Related Programs (CIP code 51), Military Science, Leadership and Operational Art (CIP code 28), Military Technologies and Applied Sciences (CIP code 29), and Agriculture, Agriculture Operations, and Related Sciences (CIP code 1).  The comment further recommended that DHS designate at the four-digit level "relevant 4-digit codes" from Architecture and Related Services (CIP code 04), Library Science (CIP code 25), Multi/Interdisciplinary Studies (CIP code 30), Homeland Security, Law Enforcement, Firefighting and Related Protective Services (CIP code 43), and Business, Management, Marketing, and Related Support Services (CIP code 52).  The commenter stated that these changes would account for "the increasingly multidisciplinary

nature of education, the needs of the STEM pipeline and STEM industry infrastructure, and other technically-based areas of national interest."

Response.  DHS believes that outside of the categories for which DHS proposed moving to a two-digit designation, designation at the two- or four-digit level may result in overbroad eligibility.  DHS reviewed the additional groups of CIP codes that were recommended for designation at the two- and four-digit level, and found that significant additional research would be necessary to determine whether all of the covered fields are appropriately characterized as STEM fields for purposes of this rule.  DHS welcomes further input on these designations and others within the standard process for providing input on the STEM list.

Comment.  DHS received a number of comments requesting that DHS explain whether the rule would effectively eliminate certain fields from the STEM list.  Specifically, commenters were concerned that the following fields would be removed from the list: Architectural and Building Sciences/Technology (CIP code 4.0902), Digital Communication and Media/Multimedia (CIP code 9.0702), Animation, Interactive Technology, Video Graphics and Special Effects (CIP code 10.0304), Management Science (CIP code 52.1301), Business Statistics (CIP code 52.1302), Actuarial Science (CIP code 52.1304), Management Science and Quantitative Methods, Other (CIP code 52.1399), Archaeology (CIP code 45.0301), Econometrics and Quantitative Economics (CIP code 45.0603), Geographic Information Science and Cartography (CIP code 45.0702), and Aeronautics/Aviation/Aerospace Science and Technology, General (CIP code 49.0101).

Response.  DHS has retained these fields in the final version of the list.  These fields continue to fit within DHS's criteria for covered degrees.

131

Exhibit 1
464

iii.    <u>Prior STEM Degrees—Application Process</u>

<u>Comment</u>.  DHS received a substantial number of comments pertaining to provisions allowing students to use previously earned degrees to apply for STEM OPT extensions.  Many commenters, particularly DSOs, supported the inclusion of previously earned degrees.  Other DSOs submitted comments requesting clarification regarding the process for DSOs to nominate students for STEM OPT extensions based on such degrees.  Some comments expressed concern about the increased responsibilities these provisions would place on DSOs.  To reduce DSO recordkeeping burdens, a few commenters recommended that a previously earned degree be allowed to suffice for nomination only if the student obtained the degree at his or her current school.  Other commenters asked DHS to clarify how DSOs would verify the accreditation of other institutions, while other commenters questioned how DSOs would verify previously earned degrees from other institutions.

Some commenters stated that DSOs need clear guidance on how to determine whether a previously earned degree qualifies as a STEM degree sufficient to support a STEM OPT extension.  Some commenters also stated that DSOs may have trouble verifying that a practical training opportunity is closely related to the student's prior field of study.  Some commenters asked DHS to clarify whether the DSO at the school from which the student received his or her most recent degree would be the DSO responsible for verifying the Department of Education CIP codes used to classify the student's previously earned degree.  Many commenters noted that for students with double majors or dual degrees, only the primary major's CIP code is visible on the Form I-20 Certificate of Eligibility.  Some commenters expressed an interest in displaying a CIP code history (i.e., a complete list of the student's earned degrees) in SEVIS for ease of reference and verification for students who are applying based on previously earned STEM degrees.

Response.  In response to commenters' concerns, DHS clarifies several requirements related to the use of previously earned degrees.  First, a STEM OPT extension may be granted based on a previously earned degree if that degree is on the STEM list at the time of application for the STEM OPT extension, rather than at the time that the student received the degree.  Second, the DSO at the school from which the student received his or her most recent degree (i.e., the DSO who recommended the student's current period of post-completion OPT) is the DSO responsible for verifying the CIP code(s) used to classify the student's previously earned degree.  Finally, the institution that conferred the prior degree must be accredited and SEVP-certified at the time the DSO recommends the student for the STEM OPT extension.

Thus, prior to approving a student's STEM OPT extension based on a previously earned degree, the DSO must ensure that the student is eligible for the extension based on the degree, which includes verifying that the degree is on the current STEM list, that the degree directly relates to the practical training opportunity, and that the degree was issued by an institution that is currently accredited and SEVP-certified.  DHS acknowledges that such verification may place an additional burden on DSOs.  But DHS expects this burden will be minimal, as the required information should be readily accessible in most cases.

With respect to verifying previously earned degrees, DHS notes that many institutions already require information about such degrees from incoming students.  As such, the certification required by this rule is consistent with an academic institution's normal review of its students' prior accomplishments.  Additionally, for the majority of degrees granted in the past 10 years, recent and upcoming improvements to SEVIS may provide additional assistance to DSOs.  CIP codes began appearing in SEVIS in 2008 and on Form I-20 Certificates of Eligibility in 2009, and in the December 2015 SEVIS upgrade, SEVP improved the student history section for

133

Exhibit 1
466

DSO reference.[99]  DHS is working toward an even more robust student history section.  Based on these improvements, a significant amount of information related to previously earned degrees will be included in the SEVIS system and immediately available to DSOs.  The Department also commits to providing additional training through SEVP to facilitate DSOs' ability to perform this work in an efficient manner.

With respect to determining whether a previously earned degree is in a STEM field, DHS notes that DSOs will only be required to determine whether the degree is on the current STEM list (i.e., the list in effect at the time of the application for a STEM OPT extension), not the list in effect at the time that the degree was conferred.  DSOs will not be required to review historical STEM lists.  As such, DHS expects that verification of a previously earned degree in this regard will be no more burdensome than that required of a recently-earned STEM degree.

Similarly, with respect to the institution that conferred the prior degree, the rule does not require the DSO to verify whether the institution was accredited or SEVP-certified at the time the degree was conferred.  The rule requires the DSO to determine only whether that institution is currently accredited and SEVP-certified.  Regarding the accreditation requirement, the DSO may simply consult the Department of Education's Database of Accredited Postsecondary Institutions and Programs, or any other reasonable resource used by DSOs, to verify the institution's accreditation.  Regarding SEVP-certification, the DSO may search the Certified Schools list available at https://studyinthestates.dhs.gov/school-search, to see if a student's educational institution is on the list at the time the DSO determines whether to make the recommendation.

---

[99] DHS will provide specific training and guidance related to this and other issues following publication of this rule and further SEVIS upgrades.

Additionally, DHS understands the concerns raised by DSOs regarding students with double majors or dual degrees.  DHS clarifies that in scenarios where a student has simultaneously earned a degree with a double major, or more than one degree, the DSO should first attempt to confirm eligibility through SEVIS data.  If the DSO is unable to do so, the DSO may then consult the student's academic file at the DSO's own institution to review whether the qualifying STEM degree was listed on the student's application for admission.  The DSO's educational institution either would already have access to that information or could request documentation from the student.  For further clarity, DHS has amended the regulatory text at 8 CFR 214.2(f)(10)(ii)(C) in this final rule to include a specific reference to dual degrees.

Finally, although DHS shares commenters' goals of minimizing administrative burdens on DSOs and their institutions, the Department disagrees with the recommendation to allow STEM OPT extensions based on previously earned degrees only if such degrees are obtained from the students' current educational institutions.  This restriction would severely limit educational options for F-1 students, as it would effectively require those who may wish to engage in extended practical training to pursue advanced degrees at the same institutions in which they had earned their prior degree(s).  Indeed, the limitation may even create disincentives to attend smaller colleges or other institutions that may not provide as many degree programs as larger universities.  And it would disqualify students based on nothing more than their decision to switch institutions.  Curtailing F-1 students' options with respect to educational institutions in the United States is inconsistent with the rule's objectives.  Furthermore, as noted previously, DHS has considered the suggestion to shift the rule's recordkeeping and reporting obligations to students and employers and is currently developing technological capabilities aimed at reducing administrative burdens on DSOs, employers, and students.

Exhibit 1
468

Comment.  DHS received comments seeking clarification on the specific types of information needed by DSOs to approve STEM OPT extensions based on previously earned STEM degrees.  One commenter, for example, asked whether DSOs would need to provide SEVIS printouts when the necessary CIP codes do not appear on the Form I-20 Certificate of Eligibility but are found in SEVIS.  The commenter also asked for information regarding the types of "authoritative evidence . . . regarding changes in CIP codes" that DSOs from prior institutions may provide "so that the STEM OPT-granting DSO has confidence that they are appropriately authorizing STEM OPT."

Response.  DHS continues to upgrade the SEVIS system to bring clear, specific, and easily-accessible information to users.  As the system evolves, DHS expects to update guidance concerning methods for acquiring and confirming CIP codes, and to provide specific training and guidance relating to these questions.  DHS clarifies, however, that the Department will not generally require DSOs to provide SEVIS printouts, as SEVIS information is already available to DHS.  For previously earned degrees, DSOs should provide, if it is available, the CIP code applicable at the time the degree was conferred.  CIP codes are currently republished every ten years, and immediately prior versions remain available electronically through the National Center for Education Statistics website, with a crosswalk that connects any changes between current and prior versions.[100]  DHS will take all circumstances into account when adjudicating the application and may ask for additional information as needed.

    iv.    Previously Earned STEM Degrees—Eligibility Requirements

Comment.  DHS received a number of comments applauding DHS's proposal to allow students to qualify for STEM OPT extensions based on previously earned STEM degrees.  Some

---

[100] See U.S. Department of Education, National Center for Education Statistics, Classification of Instructional Programs (CIP) 2010, available at http://nces.ed.gov/ipeds/cipcode/crosswalk.aspx?y=55.

employers stated that this change will be especially helpful in retaining scientists who obtain higher-level degrees in public health fields, as well as engineers and scientists who pursue MBA and other advanced business degrees after receiving a STEM degree.  Other commenters, however, expressed concern with the proposal.  One commenter, for example, asserted that students who have "abandoned" their previous STEM degrees to study in another non-STEM field should not be allowed to obtain STEM OPT extensions.  Another commenter stated that it was not clear from the regulatory text that an extension would be allowed "only to such students who seek to develop and utilize STEM skills from their prior STEM degree during the extended OPT period."

Response.  DHS agrees with comments stating that the provision related to prior STEM degrees provides important educational and training benefits to accomplished students with STEM backgrounds.  DHS acknowledges the benefits of combining STEM and non-STEM disciplines, as recognized by the majority of commenters who commented on this specific issue.  DHS also disagrees with the notion that STEM students who subsequently pursue non-STEM degrees have "abandoned" their STEM degrees.  It is not uncommon for STEM degrees to provide a foundation for career advancement in fields where multi-disciplinary backgrounds can be advantageous.[101]  Moreover, as stated previously, the rule requires that any practical training during the STEM OPT extension period must be "directly related" to the STEM degree.  This requirement applies with equal force to any such practical training based on a prior STEM degree.

---

[101] As the National Science Foundation explained in its 2015 report entitled, "Revisiting The STEM Workforce: A Companion to Science and Engineering Indicators 2014," the education-to-occupation pathways in STEM fields are not always linear, and individuals who earn multiple degrees, such as a "STEM-educated lawyer or an individual with both a STEM degree and a Master of Business Administration degree can add unique value in a number of work settings."  National Science Foundation, Revisiting the STEM Workforce: A Companion to Science and Engineering Indicators 2014 at 12 (Feb. 4, 2015), http://www.nsf.gov/nsb/publications/2015/nsb201510.pdf.

<u>Comment</u>.  One commenter requested clarification on when the 10-year "clock" starts for determining eligibility for STEM OPT extensions based on previously earned STEM degrees. The commenter requested that the final rule should clarify whether the 10-year period begins on the date of graduation listed on the diploma or the date on which all degree requirements were completed.  Additionally, the commenter requested that DHS clarify the meaning of the term "application date" with respect to applications for STEM OPT extensions.

<u>Response</u>.  DHS clarifies that the 10-year eligibility period for previously earned STEM degrees is determined from the date the degree was conferred, which would be the date on which the degree was earned or finalized, as reflected on the official transcript.  For purposes of this rule, the application date is the date on which the DSO recommends the STEM OPT extension in SEVIS.

<u>Comment</u>.  Commenters also submitted comments requesting that the proposed 10-year period for accepting previously earned STEM degrees be shortened.  Such commenters asserted that the 10-year period is too long for various reasons, including because degree programs, as well as the STEM list, change over time.  Some commenters also stated that students with older degrees would not be knowledgeable on current topics and research methods and would thus have to spend a greater portion of the STEM OPT extension learning new information rather than applying previously obtained knowledge.

<u>Response</u>.  DHS agrees with commenters that a previously earned STEM degree should not be a basis for a STEM OPT extension if the degree was awarded in the distant past.  DHS, however, believes that 10 years is a reasonable period for recognizing prior STEM degrees under this rule.  DHS disagrees that students who earned STEM degrees in the last 10 years are necessarily behind peers who have earned their degrees more recently.  A student in a STEM

138

Exhibit 1
471

field that has changed since the student received his or her degree may very well have kept up with the state of knowledge in his or her field through employment, training, or other means.

Moreover, DHS notes that employers are likely to provide practical training opportunities to candidates who are qualified based upon their individual degrees and knowledge. As noted previously, this rule provides that when a STEM OPT extension is based on a previously earned STEM degree, the practical training opportunity must be directly related to that previous degree. Based in part on this requirement, DHS expects that an employer will accept an F-1 student that the employer believes is qualified and prepared to engage in the offered position. While the pool of qualified STEM OPT candidates based on prior STEM degrees earned in the United States up to 10 years ago may be small, DHS believes the provision is an important feature of the final rule.

Comment. Commenters stated that the proposed rule did not address whether an F-1 student who earned a prior STEM degree in the United States while in another nonimmigrant status would qualify for STEM OPT extensions under this rule. In some cases, the commenters specifically recommended that DHS clarify that a current F-1 student who obtained a prior STEM degree in the United States while in H-4, L-2, or another nonimmigrant status would be eligible for a STEM OPT extension.

Response. DHS generally agrees with these comments and clarifies here that a current F-1 student who earned a prior STEM degree from a qualifying educational institution, regardless of whether he or she earned that prior degree as an F-1 student, may qualify for a STEM OPT extension so long as the degree otherwise meets the requirements for previously earned STEM degrees set out in this rule.

139

Exhibit 1
472

Comment.  A number of commenters requested that the regulations explicitly provide that a student who completes a double major or obtains dual degrees—with one major or degree in a STEM field and the other not in a STEM field—would be eligible for a STEM OPT extension.

Response.  DHS supports allowing students who previously graduated with dual degrees to participate in the STEM OPT extension so long as one of the prior degrees is an eligible STEM degree.  In response to the comments received on this issue, DHS has made changes to the proposed regulatory text.  The final rule now includes a specific reference to dual degrees in the regulatory text at 8 CFR 214.2(f)(10)(ii)(C).

Comment.  One commenter requested certain clarifications to the proposal to allow students to use a previously earned STEM degree as a basis for a STEM OPT extension. Specifically, the commenter requested that DHS clarify that the proposal would allow STEM OPT extensions for the following students:

1.  A student who completes a STEM degree and then subsequently completes a non-STEM degree;

2.  A student who earns a non-STEM degree after previously completing a double major or receiving dual degrees, where one major or degree was in a STEM field and the other was not; and

3.  A student who, while on post-completion OPT for a non-STEM degree, completes a STEM degree (e.g., the student was concurrently enrolled in two degree programs, and finishes the non-STEM program first, obtains post-completion OPT on the completed non-STEM program, then subsequently completes the STEM program while on OPT).

140

Exhibit 1
473

To further clarify this proposal, the commenter suggested that DHS delete the words "previously" and "previous" in proposed 8 CFR 214.2(f)(10)(ii)(C)(3), amend the section with suggested language, and issue guidance to assist DSOs responsible for facilitating STEM OPT extensions on the basis of degrees from other institutions.

Response.  DHS clarifies that the students in the first two scenarios described above would be able to request and obtain STEM OPT extensions if they are in compliance with all other OPT requirements, including that the practical training opportunity is directly related to the STEM degree.  For the student in the third scenario, however, eligibility may depend upon the degree level of the student's STEM degree.  In the commenter's description, the STEM degree was earned after the initiation of the student's current OPT period.  Because the rule limits eligibility for STEM OPT extensions in this context to those degrees obtained "previous to the degree that provided the [12-month OPT period]," the subsequently earned degree would not qualify the student for an extension of his or her current OPT period.  While the student would be unable to directly request a STEM OPT extension based on the new STEM degree, such a student may be able to start a new 12-month period of OPT based on that degree if the degree is of a more advanced level than the non-STEM degree.  If the commenter's scenario, however, involved a student receiving two degrees at the same level (e.g., both degrees are bachelor's degrees), the student could not start a new 12-month period of OPT based on the STEM degree.

DHS considered making adjustments to the rule to allow STEM OPT extensions for all students described in the third scenario, but the Department decided against making such changes after weighing several factors.  First, DHS does not believe that the situation described in the third scenario is very common.  Second, future students who find themselves in that scenario can preserve eligibility for STEM OPT extensions simply by waiting to request post-

completion OPT until after completing the coursework toward their STEM degrees.  Based on

the small number of students impacted and the relative ease with which such students can retain

STEM OPT eligibility, DHS concluded that the benefit to such students was outweighed by the

administrative complexity presented in allowing STEM OPT extensions based on subsequently

earned STEM degrees awarded at the same degree level.  For these reasons, DHS has not agreed

to make the changes recommended by the commenter.  DHS will address any remaining

confusion through training and guidance.

  v. Volunteering, Employer-Employee Relationships, and Related Matters

  DHS received several comments concerning various types of practical training scenarios

and whether they qualify under the STEM OPT extension provisions of this rule.  For the reasons

described below, DHS has determined that as a result of the rule's general requirements, a

student seeking a STEM OPT extension will not be allowed to use a volunteer opportunity as a

basis for a STEM OPT extension.  In addition, a STEM OPT extension must involve a bona fide

employer-employee relationship.  Finally, DHS clarifies that under this final rule students may

seek practical training opportunities with start-up businesses, so long as all regulatory

requirements are met.  Such students may not provide employer attestations on their own behalf.

  Comment.  Some commenters requested that F-1 students be allowed to gain practical

training as volunteers during their STEM OPT extensions.  Relatedly, a commenter asked DHS

"to carve out a limited exception to allow volunteering at the student's academic institution to

qualify as 'employment' for purposes of maintaining F-1 status."

  Response.  DHS carefully considered whether to allow volunteer positions to qualify

under the STEM OPT extension program but has decided against permitting such arrangements.

Among other things, DHS is concerned that allowing volunteering would increase the potential

for abuse on the part of international students who may accept volunteer positions for no reason other than a desire to extend their time in the United States.  DHS is also concerned that allowing volunteering positions could undermine the protections for U.S. workers contained in the rule, including the requirement that F-1 students on STEM OPT extensions receive compensation commensurate to that provided to similarly situated U.S. workers.  Similarly, disallowing volunteering avoids potentially negative impacts on U.S. students who may otherwise be denied paying research opportunities because universities, professors, or other employers would be able to retain F-1 student(s) for extended periods as volunteers.  Requiring commensurate compensation for F-1 students—which does not include no compensation—protects both international and domestic students and ensures that the qualifying STEM positions are substantive opportunities that will equip students with a more comprehensive understanding of their selected areas of study and provide broader functionality within their chosen fields.

Comment.  DHS received several comments concerning various types of employment relationships and whether F-1 students could request STEM OPT extensions based on such relationships.  For example, commenters suggested that an F-1 student be allowed to obtain a STEM OPT extension based on a business established and staffed solely by the student. Commenters stated that such a change would allow students to remain in the United States to start their own companies, while also improving their ability to directly benefit from their own innovations.  Other commenters suggested that DHS allow STEM OPT students to engage in employment with more than two employers and be employed through a temporary agency or a consulting firm arrangement that provides labor for hire.  A commenter asked DHS to clarify its position relating to placement agencies, asserting that there may be some legitimate situations in which a staffing company that supervises STEM students should not be prohibited from

participating in the STEM OPT extension.  In addition, a commenter suggested that DHS expand

the definition of "supervisor" to include advisory board members of venture capital firms, faculty

advisors, and "start-up mentors."  The commenter stated that many start-up companies are not

able to offer salaries before they become profitable (instead offering compensation plans that

might include stock options or alternative benefits), and recommended that DHS allow STEM

OPT students to work for such companies.

Response.  There are several aspects of the STEM OPT extension that do not make it apt for

certain types of arrangements, including multiple employer arrangements, sole proprietorships,

employment through "temp" agencies, employment through consulting firm arrangements that

provide labor for hire, and other relationships that do not constitute a bona fide employer-

employee relationship.  One concern arises from the difficulty individuals employed through

such arrangements would face in complying with, among other things, the training plan

requirements of this rule.  Another concern is the potential for visa fraud arising from such

arrangements.  Furthermore, evaluating the merits of such arrangements would be difficult and

create additional burdens for DSOs.  Accordingly, DHS clarifies that students cannot qualify for

STEM OPT extensions unless they will be bona fide employees of the employer signing the

Training Plan, and the employer that signs the Training Plan must be the same entity that

employs the student and provides the practical training experience.  DHS recognizes that this

outcome is a departure from SEVP's April 23, 2010 Policy Guidance (1004-03).

DHS, moreover, anticipates that it will be very unusual, though not expressly prohibited,

for students to work with more than two employers at the same time during the STEM OPT

extension period, given that each employer must fully comply with the requirements of this rule

and employ the student for no less than 20 hours per week.

DHS also clarifies that F-1 students seeking STEM OPT extensions may be employed by new "start-up" businesses so long as all regulatory requirements are met, including that the employer adheres to the training plan requirements, remains in good standing with E-Verify, will provide compensation to the STEM OPT student commensurate to that provided to similarly situated U.S. workers, and has the resources to comply with the proposed training plan.   For instance, alternative compensation may be allowed during a STEM OPT extension as long as the F-1 student can show that he or she is a bona fide employee and that his or her compensation, including any ownership interest in the employer entity (such as stock options), is commensurate with the compensation provided to other similarly situated U.S. workers.

vi.   <u>Thesis Requirement</u>

<u>Comment</u>.  One commenter asked for clarification about a possible contradiction between USCIS and SEVP policies.  Specifically, the commenter stated that on October 6, 2013, USCIS issued an interim policy memorandum (PM 602-0090) that clarified that an F-1 student engaging in post-completion OPT is eligible for a STEM OPT extension if the student has completed all course requirements, except for the thesis, dissertation, or equivalent requirement, when applying for the extension.[102]  The commenter noted that SEVP had not yet provided a written update consistent with this USCIS policy memorandum, but instead had previously issued guidance indicating that before a DSO could recommend a STEM OPT extension, the DSO needed to ensure that the student had already finished his or her thesis.  Another commenter asked DHS to clarify whether the completion of a STEM degree is a requirement before a student can apply for a STEM OPT extension, as the proposed rule referenced the "completion" of a degree.

---

[102] USCIS Policy Memorandum PM-602-0090, 17-Month Extension of Post-Completion Optional Practical Training (OPT) for F-1 Students Enrolled in Science, Technology, Engineering, and Mathematics (STEM) Degree Programs, available at http://www.uscis.gov/sites/default/files/files/nativedocuments/OPT_STEM.pdf.

Response.  DHS clarifies that an F-1 student engaging in a 12-month period of post-completion OPT based on the completion of coursework toward a STEM degree is eligible for a STEM OPT extension based on that same degree if the only outstanding requirement for obtaining the degree at the time of application is the completion of a thesis (or equivalent).  As USCIS noted in the cited policy memorandum, because the STEM OPT extension is an extension of a previously granted period of post-completion OPT, it is logical to conclude that students who are applying for the STEM OPT extension need not necessarily have completed their STEM degree thesis requirement (or equivalent) in order to be eligible for the extension.  DHS believes that this policy serves the nation's interest in attracting and retaining talented STEM students from around the world.

This option, however, is not applicable to a request for a STEM OPT extension based on a previously obtained STEM degree; in such a case, the prior STEM degree must be fully conferred.  The provision on previously obtained degrees requires that the student must have received the degree itself within 10 years preceding his or her STEM OPT application date.  In order to have received the degree, the student would have needed to complete his or her thesis (or equivalent), if such a requirement pertains to the degree.  Moreover, DHS does not believe it would be necessary or appropriate to excuse the thesis requirement for previously earned STEM degrees.  Importantly, the option to use a previously earned STEM degree as the basis for a STEM OPT extension is for students who are participating in a 12-month period of OPT based on the completion of coursework toward a non-STEM degree at a higher educational level.  Because such students have been admitted to degree programs at a higher educational level, DHS anticipates that such students would have already received their lower-level STEM degrees.  Moreover, because the rule allows previously earned STEM degrees to qualify if they were

146

Exhibit 1
479

conferred up to 10 years ago, DHS believes the need for conferral of the degree would further ensure the integrity of the program and reduce the possibility of fraud.

Finally, DHS does not agree that there are contradictions between the USCIS policy memorandum and the ICE guidance cited in the comments.  The USCIS policy memorandum is consistent with the position taken by SEVP in the ICE Policy Guidance (1004-03) with respect to the completion of a thesis (or equivalent).  For example, section 6.7 of the ICE policy guidance states that a student in a graduate-level program who has completed all course requirements except for completion of the thesis (or equivalent) may apply for either pre-completion or post-completion OPT while completing the thesis.  A student in this situation who applies for and receives post-completion OPT may work full-time in a field related to his or her degree; may apply for the STEM OPT extension if otherwise eligible; and would be eligible for the Cap-Gap extension.[103]  As noted above, however, such a student would be eligible for a STEM OPT extension only if that extension is based on the same STEM degree that is the basis for the student's current 12-month period of OPT.  A student who is on a 12-month period of OPT based on a non-STEM degree and who seeks a STEM OPT extension based on a previously earned STEM degree must have completed all requirements for conferral of the STEM degree— including any applicable thesis requirement (or equivalent).

     D.     Qualifying Employers

     1.     <u>Description of Final Rule and Changes from NPRM</u>

The final rule imposes certain additional requirements on employers as a condition of employing STEM OPT students.  This rule requires all such employers to participate in E-Verify and to make a number of attestations intended to better ensure the educational benefit of STEM

---

[103] <u>See</u> www.ice.gov/doclib/sevis/pdf/opt_policy_guidance_042010.pdf.

OPT extensions and the protection of U.S. workers.  The proposed rule included these provisions, and the final rule retains them with certain changes and clarifications in response to public comments.  We summarize these provisions and changes below.

     i.     <u>Employer Enrollment in E-Verify Required</u>

This final rule requires all employers training STEM OPT students to participate in E-Verify, as has been required since 2008.  E-Verify electronically compares information contained on Form I-9, Employment Eligibility Verification, with records contained in government databases to help employers confirm the identity and employment eligibility of newly-hired employees.  DHS includes this requirement because E-Verify is a well-established and important measure that complements other oversight elements in the rule, and because it represents an efficient means for employers to determine the employment eligibility of new hires, including students who have received STEM OPT extensions.

     ii.    <u>Use of E-Verify Company ID Number</u>

DHS adopts the regulation as proposed with regard to E-Verify, but has modified Form I-983, Training Plan for STEM OPT Students, so that it will not require the insertion of an employer's E-Verify Company Identification number (E-Verify ID number).  DHS makes this change in response to comments that raised concerns regarding the potential for fraud that may arise from requiring this number on a form accessible by other program participants, including students and DSOs.

     iii.    <u>Employer Attestations</u>

As noted in further detail below (<u>see</u> section IV.F. of this preamble, Training Plan for F-1 Nonimmigrants on a STEM OPT Extension), the rule requires the student and employer to complete Form I-983, Training Plan for STEM OPT Students.  Given DHS' recognition of the

148

Exhibit 1
481

need to protect U.S. workers from possible employer abuses of the STEM OPT extension, the

Training Plan contains terms and conditions for employer participation aimed at providing such

protection.  For instance, under the rule, any employer wishing to hire a student participating in

the STEM OPT extension must attest that, among other things: (1) the employer has sufficient

resources and personnel available to provide appropriate training in connection with the specified

opportunity; (2) the STEM OPT student will not replace a full- or part-time, temporary or

permanent U.S. worker; and (3) the opportunity assists the student in attaining his or her training

goals.  As described below, DHS has revised the second of these attestations in response to

public comments.  DHS believes that the revised language is clearer and better protects U.S.

workers.

Finally, consistent with the proposed rule, the final rule requires that the terms and

conditions of an employer's STEM practical training opportunity—including duties, hours and

compensation—be commensurate with those provided to the employer's similarly situated U.S.

workers.  Work duties must be designed to assist the student with continued learning and be set

at a minimum of 20 hours per week.  If the employer does not employ and has not recently

employed more than two similarly situated U.S. workers, the employer must instead ensure that

the terms and conditions of a STEM practical training opportunity are commensurate with those

for similarly situated U.S. workers employed by other employers of analogous size and industry

and in the same geographic area of employment.  The term "similarly situated U.S. workers"

includes U.S. workers performing similar duties and with similar educational backgrounds,

employment experience, levels of responsibility, and skill sets as the STEM OPT student.  The

student's compensation must be reported on the Training Plan, and the student and employer will

be responsible for reporting any change in compensation to help the Department monitor

whether STEM OPT students are being compensated fairly.  The employer must affirm that all attestations contained in the Training Plan are true and correct to the best of the employer's knowledge, information and belief.

2.      Public Comments and Responses

i.      Employer Enrollment in E-Verify Required

Comment.  Many commenters expressed support for requiring employers of F-1 students with STEM OPT extensions to participate in E-Verify as proposed.  Several commenters stated that the E-Verify requirement is an effective way to protect against employment of unauthorized individuals.  They observed that E-Verify provides the best means available for employers to confirm employment eligibility of new hires and, in some cases, existing employees.  Comments also reported that E-Verify is easy to use and clearly lays out the consequences of violations, while helping avoid hiring abuses.

Some commenters noted that employers would be less likely to use E-Verify unless such use was required.  Other commenters stated that the extra burden and expense placed on employers by the E-Verify requirement helps protect U.S. workers by providing an incentive for employers to hire U.S. citizens over international students.  Other commenters criticized the E-Verify requirement on the grounds that it also created a burden for students by limiting where they could receive work-based training.  Some commenters noted that employers are willing to incur E-Verify-related burdens because they believe that an F-1 student may be their only candidate for the specific job.

Response.  DHS agrees with commenters that support the E-Verify enrollment requirement, including because E-Verify contains important protections for U.S. and other workers.  Before an employer can participate in E-Verify, the employer must enter into a

Memorandum of Understanding (MOU) with DHS.  This MOU requires that employers follow required procedures in the E-Verify process to ensure maximum reliability and ease of use with the system, while preventing unauthorized disclosure of personal information and unlawful discriminatory practices based on national origin or citizenship status.  In particular, the employer agrees not to use E-Verify for pre-employment screening of job applicants or in support of any unlawful employment practice.[104]  The employer further agrees to comply with Title VII of the Civil Rights Act of 1964 and section 274B of the INA, 8 U.S.C. 1324b, by not discriminating unlawfully against any individual in hiring, firing, employment eligibility verification, or recruitment or referral practices because of his or her national origin or citizenship status, or by committing discriminatory documentary practices.  Illegal practices can include selective verification, improper use of E-Verify, or discharging or refusing to hire employees because they appear or sound "foreign" or have received tentative nonconfirmations.

The MOU also makes clear that USCIS may suspend or terminate an employer's access to E-Verify if the employer violates Title VII or section 274B of the INA, 8 U.S.C. 1324b, fails to follow required verification procedures, or otherwise fails to comply with E-Verify requirements.  Any employer who violates the immigration-related unfair employment practices provisions in section 274B of the INA could face civil penalties, including back pay awards. Employers who violate Title VII face potential back pay awards, as well as compensatory and punitive damages.  Under the MOU, employers who violate either section 274B of the INA or Title VII may have their participation in E-Verify terminated.  DHS may also immediately suspend or terminate the MOU, and thereby the employer's participation in E-Verify, if DHS or

---

[104] See U.S. Citizenship and Immigration Services, The E-Verify Memorandum of Understanding for Employers, available at http://www.uscis.gov/sites/default/files/USCIS/Verification/E-Verify/E-Verify_Native_Documents/MOU_for_E-Verify_Employer.pdf.

the Social Security Administration determines that the employer failed to comply with established E-Verify procedures or requirements.

DHS disagrees with comments asserting that E-Verify will impose significant burdens or costs on employers or students.[105]  First, E-Verify does not require a fee for its use.  Second, the E-Verify requirement remains unchanged since it was first established in the 2008 IFR, and DHS is not aware of significant burdens or costs on employers that have participated in the STEM OPT extension program since that time.  In fact, while in 2008 there were just over 88,000 employers enrolled in E-Verify, there are now more than 602,000 enrolled employers.[106]  Third, E-Verify is fast and accurate, with 98.8 percent of employees automatically confirmed as authorized to work either instantly or within 24 hours.[107]  Finally, E-Verify is one of the federal government's highest-rated services for customer satisfaction as measured by employer surveys,[108] and DHS continually looks for ways to improve and enhance the system.

Comment.  Commenters also supported the E-Verify requirement because its increased use further maximizes the reliability and ease of use of the system, while preventing the unauthorized disclosure of personal information and unlawful discriminatory practices based on national origin or citizenship status.  Many commenters stated that when using E-Verify pursuant to program requirements, an applicant's citizenship is less likely to be disclosed to employers,

---

[105] When DHS studied E-Verify costs, 76% of responding employers stated that the cost of using E-Verify was zero ($0).  See Westat study evaluating E-Verify, "Findings of the E-Verify Program Evaluation" at 184 (Dec. 2009). Available at http://www.uscis.gov/sites/default/files/USCIS/E-Verify/E-Verify/Final%20E-Verify%20Report%2012-16-09_2.pdf.

[106] USCIS, History and Milestones, https://www.uscis.gov/e-verify/about-program/history-and-milestones.

[107] USCIS, E-Verify Program Statistics: Performance, http://www.uscis.gov/e-verify/about-program/performance.

[108] Since 2011, USCIS has collected information through E-Verify surveys, which reflect high rates of customer satisfaction by employers.  For example, the employer 2014 Customer Satisfaction Index of USCIS E-Verify rose one point from 2013 for a score 87 (on a scale from 1-100) for all and existing users, and 86 for new enrollees. Moreover, since 2010, employer users have been highly satisfied with E-Verify and the E-Verify CSI number has never scored below the low 80s. See The E-Verify Customer Satisfaction Survey, July 2015 available at http://www.uscis.gov/sites/default/files/USCIS/Verification/E-Verify/E-Verify_Native_Documents/E-Verify_Annual_Customer_Satisfaction_Survey_2015.pdf.

and E-Verify employers are more likely to provide the same job opportunities, wages, and benefits to employees.  Some commenters stated that E-Verify helps ensure that employers will recruit applicants to meet their needs without negatively affecting the employment of U.S. workers.  They added that these requirements thus ensure the integrity of the STEM OPT extension.[109]

Response.  DHS agrees with comments supporting the E-Verify requirement, including because E-Verify protects against the unauthorized disclosure of personal information.  E-Verify has implemented an extensive set of technical, operational and physical security controls to ensure the confidentiality of an individual's information.  Those controls include user-specific accounts and complex passwords that must be changed often to access the system; user accounts that are locked after several failed attempts to log on; active session timeouts within the E-Verify interface; data encryption during all data transmissions between the employer's workstation and the system; and procedures for reporting and responding to breaches of information.  DHS continues to incorporate privacy principles and security measures into all E-Verify processes, and any changes to E-Verify will include the highest level of privacy protections possible.[110]

Comment.  A number of commenters stated their belief that E-Verify's non-discrimination provisions will ensure that all employees will receive the same wages and benefits.

Response.  DHS clarifies that the non-discrimination provisions in the E-Verify MOU prohibit only discrimination based on national origin or citizenship (or immigration) status in

---

[109] Additionally, one commenter supported the regulation generally, but expressed a misunderstanding about the process and the E-Verify program, writing that the "Government will check that if the company really need [sic] those F1 students or not and decide to give them E-verify or not."  DHS notes that a need-based check is not part of the E-Verify enrollment or participation process.
[110] See U.S. Citizenship and Immigration Services, "Our Commitment to Privacy," available at http://www.uscis.gov/e-verify/about-program/our-commitment-privacy.

violation of section 274B of the INA, 8 U.S.C. 1324b, or Title VII.  The language is not intended to ensure that all employees will receive the same wages and benefits, except where any differential is based on national origin status.  DHS notes, however, that the STEM OPT extension program contains separate provisions to prevent adverse impacts on U.S. workers. Among other things, the Training Plan established by this rule requires employers to attest to various wage and other protections for U.S. workers and STEM OPT students.

Comment.  One commenter stated that employers and the academic community are not familiar with E-Verify and suggested that DHS promote and explain it to stakeholders.

Response.  DHS agrees that it is important to promote and explain E-Verify to stakeholders, and the Department continues to focus on such outreach.  Additionally, the USCIS website contains an informative portal (http://www.uscis.gov/e-verify) with a number of resources regarding E-Verify, including but not limited to E-Verify manuals and guides; various memoranda of understanding; E-Verify brochures, fliers and presentations (in English and various other languages); presentations specially designed for employers, workers, federal contractors, and state workforce agencies; and the E-Verify monthly newsletter.

Comment.  One commenter suggested that DHS either apply the E-Verify participation requirement to the entire OPT program or waive it as a requirement for STEM OPT extensions.

Response.  DHS disagrees with the commenter's recommendation that the E-Verify requirement either be applied to the entire OPT program or waived as a requirement for STEM OPT extensions.  The focus of this rule is to amend regulations related to STEM OPT extensions. There are, of course, many cases in which DHS could condition receipt of a benefit on the use of E-Verify, but the Department has chosen to take a measured and incremental approach by thus far applying the E-Verify requirement to employers of STEM OPT workers.  DHS notes that this

154

Exhibit 1
487

approach has so far been highly successful.  DHS may consider requiring the use of E-Verify

with respect to other benefits granted by the Department in future rulemakings.

Comment.  Several commenters recommended eliminating the E-Verify requirement.

These commenters cited several concerns, including that E-Verify may increase burdens and

expenses on both employers and employees; unfairly limit job options and career opportunities

for STEM OPT students, because many companies are not willing to participate in E-Verify; and

create an unnecessary barrier to the hiring of qualified F-1 students.  Some commenters stated

that the E-Verify requirement is redundant for students in compliance with STEM OPT rules and

instead simply works against the interest of those students.

Response.  E-Verify is not new for employers of STEM OPT students.  Since 2008, every

employer that has employed F-1 students on STEM OPT extensions has been required to enroll

the relevant hiring site or work location in E-Verify.  Because E-Verify is fast and easy to use (as

discussed above) and STEM OPT employers have experience with the system, DHS does not

believe the requirement would be particularly burdensome to potential employers affected by this

rule.  Relatedly, DHS also disagrees that the E-Verify requirement will substantially change the

volume of STEM OPT employers or unfairly limit job options for STEM OPT students.

Comment.  One commenter provided anecdotal information suggesting that a specific

Federal agency does not currently participate in E-Verify.  According to that commenter, if a

federal agency is unwilling to register for E-Verify, "what hope is there that non-governmental

employers will utilize the system?"  Another commenter stated that companies with federal

employment contracts do not have policies reflecting E-Verify's prohibitions against unlawful

discriminatory practices based on national origin or citizenship status.

<u>Response</u>.  DHS supports the premise that the Federal Government should lead by example, and notes that the Office of Management and Budget (OMB) requires all Executive Branch agencies to participate in E-Verify.  The Federal Government also requires covered federal contractors to participate in E-Verify as a condition of federal contracting.  Even if a federal contractor that uses E-Verify does not have its own policies reflecting E-Verify's prohibitions against unlawful discriminatory practices based on national origin or citizenship status, that federal contractor is bound to the same prohibitions, as articulated in the E-Verify Memorandum of Understanding, regarding violation of Title VII and the anti-discrimination provision of the INA (INA sec. 274B, 8 U.S.C. 1324b) applicable to all E-Verify users.

<u>Comment</u>.  One commenter suggested that the E-Verify requirement should depend on the size of the employer's workforce or on the employer's specific industry.

<u>Response</u>.  DHS disagrees with the commenter's recommended change because of the inequities such a change would introduce into E-Verify.  Requiring all STEM OPT extension employers to enroll in E-Verify, without exception, supports a consistent and transparent program that treats all participants the same and helps protect both STEM OPT students and U.S. workers.  Further, E-Verify's robust public outreach materials and frequent technological enhancements reduce burdens on all employers, large and small.  Finally, when E-Verify employers sign the required Memorandum of Understanding, they agree to train their users on proper employment verification procedures.  This is in addition to the obligation to avoid unlawful discriminatory practices based on national origin or citizenship status.  Waiving the E-Verify requirement for certain employers would thus undermine the safeguards of the rule.

<u>Comment</u>.  Several commenters supported mandatory E-Verify participation for all employers, with resulting fines for any program violations, and recommended that DHS require

156

Exhibit 1
489

all employers to use E-Verify.  Another commenter requested more government regulation of E-

Verify.  Another commenter suggested additional regulation of E-Verify, but did not specify

what such regulation would entail.  Additionally, a commenter suggested that the E-Verify

parameters should include "better screening [mechanisms] to weed out" participation by what the

commenter described as dishonest consulting companies that exploit students.

Response.  With respect to requiring all employers to use E-Verify, DHS notes both (1)

that this request is outside the scope of this rulemaking and (2) that because participation

requirements are set by federal statute, congressional action would be required to make any such

changes.  With respect to the other suggestions noted above, DHS notes that the E-Verify MOU

already prescribes E-Verify enrollment and use, and broadly prohibits unlawful or improper use

of E-Verify.  USCIS also maintains an E-Verify Hotline and a Monitoring and Compliance

Division that investigates and responds to complaints regarding E-Verify-related exploitation.

The Department does not agree that additional mechanisms are necessary, and to the extent that

the comments are directed at the E-Verify program generally, they are outside the scope of this

rulemaking.

Accordingly, DHS is finalizing the proposed E-Verify requirement without change.  DHS

invites employers and employees to learn more about E-Verify.  Tutorials, guidance, and other

informative resources are available at http://uscis.gov/e-verify.  Information about employer

obligations and employee rights under the anti-discrimination provision of the INA (INA sec.

274B, 8 U.S.C. 1324b) is available on the following website: www.justice.gov/crt/about/osc.

ii.    Use of E-Verify Company ID Number

Comment.  Several commenters recommended eliminating the requirement that the

employer's E-Verify ID number be listed on Form I-983, Training Plan for STEM OPT Students,

157

Exhibit 1
490

because having this information visible to the student and DSO could lead to fraudulent use of such numbers.  According to two commenters, some employers currently refuse to provide their E-Verify ID number to students or universities due to fraud concerns and have adopted processes to avoid revealing this sensitive information, such as filing the students' STEM OPT extensions themselves.

One commenter cited anecdotal reports of E-Verify ID numbers being posted online and F-1 students fraudulently using those numbers to apply for STEM OPT extensions.  According to the commenter, there is no follow-up or investigation as to whether the student actually works for the employer whose number is listed on Form I-765, Application for Employment Authorization, so students can freely pass these numbers around, and have reportedly done so. The commenter also asked DHS to bolster E-Verify anti-fraud measures by allowing the employer to file the application instead of the prospective employee.  Similarly, another commenter asked DHS to give employers a list of F-1 students who have used their E-Verify ID numbers as a security measure.

Response.  DHS is concerned about the possible abuse of the E-Verify program and potential fraud from the unauthorized publication of E-Verify ID numbers.  In addressing this issue, DHS had considered that employers often provide their E-Verify ID numbers to potential employees in order to apply for work authorization from USCIS by filing Applications for Employment Authorization.[111]  In addition, some employers and universities make their E-Verify ID numbers available on the internet.  For that reason, DHS believed that releasing such numbers to a limited group of students would not represent a significant fraud risk.

---

[111] See item #17 on Form I-765, available at http://www.uscis.gov/sites/default/files/files/form/i-765.pdf.

Exhibit 1
491

DHS understands, however, that some employers take significant steps to protect their E-Verify ID numbers from publication, including mailing Applications for Employment Authorization directly to USCIS on their employees' behalf in order to avoid revealing the number to such employees.  Some employers believe that the unauthorized release or publication of an employer's E-Verify ID number could result in significant fraud that might be difficult to redress.  Accordingly, in response to these concerns, DHS has decided to remove the E-Verify ID number from the Training Plan for STEM OPT Students.  DHS notes that it will continue to receive such employers' E-Verify ID numbers through the submission of Applications for Employment Authorization.

DHS declines to adopt the suggestion to change the current STEM OPT application process so that the employer (rather than the student) would be required to file the Application for Employment Authorization on the student's behalf.  This change, in which the employer would effectively become the applicant for employment authorization, would represent a significant policy shift and could produce broad and unwanted repercussions.  Among other things, such a change would largely and improperly exclude the STEM OPT student from the application process, and further make the student dependent on the employer for maintaining the student's status.  DHS believes such a change to its longstanding policy would be disproportionate to the relatively few alleged cases of fraud.  Finally, DHS declines to adopt the recommendation to provide employers with lists of F-1 students, due to privacy considerations and the administrative burdens related to issuing such lists.

iii.    Non-Replacement Attestation

Comment.  Several commenters voiced concern about the breadth of some of the language in the Employer Certification section (Section 4) of the proposed Mentoring and

Training Plan, stating that such language could create litigation risks or interfere with employers' business judgments.  Specifically, several employers and business associations took issue with proposed certification 4(d), which would require the employer to attest that "the Student's practical training opportunity will not result in the termination, laying off, or furloughing of any full- or part-time, temporary or permanent U.S. workers."

Those commenters stated that the proposed attestation was overly broad and problematic. One commenter stated that this language could restrict the employer's ability to terminate a U.S. worker for cause.  As an example, the commenter added that "if an employee's work performance was deficient enough to warrant termination for cause, but the employee's work group also had employees working pursuant to STEM OPT, one could argue that the termination could not proceed."  Another commenter stated that "if an employee working pursuant to STEM OPT reported another employee for egregious misconduct, and the allegations were substantiated, an employer would be unable to proceed with a termination of the individual."

To alleviate these concerns, commenters alternatively requested that DHS entirely eliminate the attestation requirement, delete the word "terminate" from the attestation, or change the language to read as follows: "The employer is not providing the practical training opportunity for the purpose of and with the intent to directly terminate, lay off, or furlough, any full- or part-time, temporary or permanent U.S. workers."  Additionally, a commenter recommended amending the proposed rule to include a "presumption of non-violation for any employment decisions" that are supported by bona fide business reasons or reasons unrelated to replacing U.S. workers with STEM OPT students.  Finally, another commenter proposed that DHS consult protections provided to U.S. workers pursuant to provisions in the H-1B regulations.

Response.  DHS believes many of the recommendations described above would undermine the protections the attestation is meant to provide to the U.S. workers of participating employers.  In this rulemaking, the Department has sought to balance the benefit that STEM OPT students derive from practical training opportunities; the benefit that the U.S. economy, U.S. employers, and U.S. institutions of higher education receive from the continued presence of STEM OPT students in the United States; and the protection of U.S. workers, including those employed by STEM OPT employers.  The attestation related to U.S. employees is essential to achieving this balance, and the Department thus declines to eliminate it or to weaken its protections by introducing elements of intent or including a presumption of non-violation.

DHS, however, has made changes to the attestation in the final rule in response to comments expressing concern that the proposed attestation, including its reference to "terminating," could be understood to prohibit STEM OPT employers from terminating U.S. workers for cause.  In instituting this policy, the Department intends that employers be prohibited from using STEM OPT students to replace full- or part-time, temporary or permanent U.S. workers.  DHS has revised certification 4(d) on the Training Plan, and the associated regulatory text, to say exactly that.  See Section 4 of Form I-983, Training Plan for STEM OPT Students; 8 CFR 214.2(f)(10)(ii)(C)(10)(ii).  This modification is meant to address employers' claims about potential litigation risks and interference with their business judgments.  DHS also notes that the word "terminating" has been removed entirely from the attestation, as the Department believes its inclusion is unnecessary to make certain that STEM OPT extensions are not used as a mechanism to replace U.S. workers.

DHS further clarifies that hiring a STEM OPT student and signing certification 4(d) does not bar an employer from discharging an employee for cause, including inadequate performance

or violation of workplace rules.  DHS will look at the totality of the circumstances to assess compliance with the non-replacement certification.  For example, evidence that an employer hired a STEM OPT student and at the same time discharged a U.S. worker who was employed in a different division, worked on materially different project assignments, or possessed substantially different skills, would tend to suggest that the U.S. worker was not replaced by the STEM OPT student.  Conversely, evidence that an employer sought to obscure the nexus between a STEM OPT student's hire and the termination of a U.S. worker by delaying or otherwise manipulating the timing of the termination would tend to suggest that the U.S. worker was replaced by the STEM OPT student.  In any event, the barred "replacement" of U.S. workers refers to the loss of existing or prior employment.

With respect to the comment suggesting that DHS consult the protections for U.S. workers found in the H-1B statute, DHS notes that it considered those protections and other similar provisions in the INA.  DHS relied on many of these provisions as informative guideposts for this rulemaking, but the Department was also required to weigh the specific and different goals of the STEM OPT extension program and other factors specific to this rulemaking.  The Department believes it has found the right balance with revised certification 4(d).  This revised certification makes the Department's policy clear and thus provides protection for U.S. workers while addressing the legitimate business concerns raised by commenters.

Comment.  Some commenters requested that DHS amend certification 4(d) to further protect U.S. workers.  These commenters asked that the certification: (1) more broadly prohibit an employer from employing a STEM OPT student when the employer has laid off any U.S. worker employed in the occupation and field of the intended practical training within the 120-day period immediately preceding the date the student is to begin his or her practical training

with that employer; and (2) during the term of such practical training, require the employer to lay off any F-1 student before laying off any U.S. worker engaged in similar employment. The commenters further proposed that the relevant section of the proposed regulation be amended to prohibit an employer from providing practical training when there is a strike or lockout at any of the employer's worksites within the intended field of the OPT.

Response. DHS agrees that STEM OPT employment should be subject to strike or lockout protections. DHS notes, however, that current DHS regulations already provide such protections with regard to the employment of all F-1 students, not just those on STEM OPT extensions. The Department's regulations at 8 CFR 214.2(f)(14) automatically suspend any employment authorization granted to an F-1 student when the Secretary of Labor or designee certifies to DHS that there is a strike or other labor dispute involving work stoppage in the student's occupation at his or her place of employment. That regulation will remain in effect.

DHS has also considered the suggestion to establish a timeframe, such as the 120-day period suggested by commenters, for prohibiting layoffs of U.S. workers related to the employment of STEM OPT students. DHS believes, however, that its approach in the final rule, which contains no such timeframe, provides reasonable protections for U.S. workers while also balancing the legitimate business needs expressed by employer commenters. Under the final rule, an employer cannot replace a U.S. worker with a STEM OPT student, regardless of the timeline. DHS therefore declines to implement new attestations on this subject at this time, but will remain attentive to the effects of the attestations and the aforementioned balance produced by this rule, and may consider revising or supplementing the employer attestations at a future date.

iv.  <u>Commensurate Compensation Attestation</u>

Comment.  DHS received a number of comments on the requirement that employers provide STEM OPT students with compensation commensurate with that provided to similarly situated U.S. workers.  Some commenters supported the proposed "commensurate compensation" requirement, "applaud[ing] DHS's adoption of a standard that draws upon real world practices that employers already utilize in their hiring practices."  One commenter stated that the evidentiary requirements related to the commensurate compensation provision should not be so burdensome as to deter the participation of small employers or employers new to the OPT program.

Other commenters opposed the proposed requirement, suggesting that the proposal was unworkable because DHS had not defined the commensurate compensation standard in the proposed regulatory text.  One commenter stated that the proposed rule lacked necessary guidance on how to ensure that compensation offered to STEM OPT students is commensurate with compensation levels offered to U.S. workers.  Another commenter stated that the requirements for commensurate compensation were too stringent because STEM OPT should include students who are performing unpaid work or are awarded grants or non-monetary remuneration.  A significant number of comments, from universities and higher education associations, stated that STEM OPT students and U.S. students perform research for colleges and universities under a variety of grant and stipend programs without necessarily receiving taxable wages, and requested clarification that such participation was still contemplated for STEM OPT participants.  In contrast, another commenter urged that students doing unpaid work, or receiving only a "stipend," be explicitly ineligible for OPT status.  Another commenter stated that the proposed additional protections for American workers would prove to be "meaningless" due to a

164

Exhibit 1
497

variety of purported deficiencies in the proposed regulation, including participation by employers who hire only foreign workers. One commenter recommended that employers be allowed to factor in the effect of training time on productivity when setting compensation. One commenter suggested that employers be required to pay the Level Three wage from the Online Wage Library provided by the Department of Labor's Office of Foreign Labor Certification.

Response. The final rule includes specific requirements to address the potential for adverse impact on U.S. workers. For instance, any employer wishing to hire a student on a STEM OPT extension would, as part of the newly required Training Plan, be required to sign a sworn attestation affirming that, among other things: (1) the employer has sufficient resources and personnel available and is prepared to provide appropriate training in connection with the specified opportunity; (2) the student will not replace a full- or part-time, temporary or permanent U.S. worker; and (3) the opportunity assists the student in attaining his or her training objectives. Moreover, the final rule requires that the terms and conditions of an employer's STEM practical training opportunity—including duties, hours and compensation—be commensurate with those provided to the employer's similarly situated U.S. workers.

Along the same lines, work duties must be designed to assist the student with continued learning and satisfy existing ICE guidelines for work hours when participating in post-completion OPT. To help gauge compliance, employers are required to provide DHS with student compensation rate information, which will help the Department monitor whether STEM OPT students are being compensated fairly. Additionally, the rule authorizes a recurrent evaluation process and mandates notification of material changes to the Training Plan, including material changes to STEM OPT student compensation, to allow ICE to monitor student progress during the OPT period. The evaluations will ensure continuous focus on the student's

165

Exhibit 1
498

development throughout the student's training period.  Finally, the rule clarifies the Department's authority to conduct site visits to ensure compliance with the above requirements.

The above provisions protect against adverse consequences on the U.S. labor market, including consequences that may result from exploitation of STEM OPT students.  DHS believes that the assurances regarding the practical training opportunity, the attestation of non-replacement of existing employees, the requirement for commensurate compensation, and other related requirements, provide adequate safeguards to protect U.S. worker interests.  DHS expects this will still be the case even if a participating employer employs many non-U.S. workers.  If such an employer does not employ and has not recently employed more than two similarly situated U.S. workers in the area of employment, the employer nevertheless remains obligated to attest that the terms and conditions of a STEM practical training opportunity are commensurate with the terms and conditions of employment for other similarly situated U.S. workers in the area of employment.

DHS expects that STEM OPT students will be engaging in productive employment. DHS also expects the commensurate compensation of similarly situated U.S workers would account for any effects of training time on productivity.  While it is required for participating students and employers to explain the goals, objectives, supervision, and evaluation of a STEM OPT period, the fact that the employer is providing a work-based learning opportunity is not a sufficient reason to reduce the F-1 student's compensation.  Furthermore, such a discounted compensation also runs the risk of having a negative impact on similarly situated U.S. workers. A commenter's suggestion to this effect is thus rejected.

DHS also disagrees with comments stating that the proposed rule lacked adequate guidance on the issue of commensurate pay and suggesting further definition in the regulatory

Exhibit 1
499

text.  These commenters did not explain which aspects of DHS's guidance on this topic were ambiguous; nevertheless, DHS now further clarifies the commensurate compensation requirement.  Commensurate compensation refers to direct compensation provided to the student (pre-tax compensation).  This compensation must be commensurate to that provided to similarly situated U.S. workers.  "Similarly situated U.S. workers" means those U.S. workers who perform similar duties and have similar educational backgrounds, experience, levels of responsibility, and skill sets.   The employer must review how it compensates such U.S. workers and compensate STEM OPT students in a reasonably equivalent manner.  If an employer, for example, hires recent graduates for certain positions, the compensation provided to a STEM OPT student in such a position must be in accordance with the same system and scale as that provided to such similarly situated U.S. workers.

If the employer, however, does not employ or has not recently employed at least two other U.S. workers who are performing similar duties, then the employer is obligated to obtain information about other employers offering similar employment in the same geographic area. Helpful information can be obtained, for example, from the Department of Labor, which provides wage information based on data from the Occupational Employment Statistics survey through its Office of Foreign Labor Certification's Online Wage Library, available at http://flcdatacenter.com/OesWizardStart.aspx.  Whether relying on information from the Department of Labor, wage surveys, or other reasonable sources, the wage data must relate to the same area of employment as the work location of the STEM OPT student and the same occupation.  In general, it is DHS's expectation that employers have legitimate, market-based reasons for setting compensation levels.  This rule requires that an employer hiring a STEM OPT

student be prepared to explain those reasons and show that such F-1 students receive compensation reasonably equivalent to similarly situated U.S. workers.

In addition to these detailed requirements, DHS noted in the preamble of the proposed rule, and reiterates here, that DHS interprets the compensation element to encompass wages and other forms of remuneration, including housing, stipends, or other provisions typically provided to employees.  While positions without compensation may not form the basis of a STEM OPT extension, the compensation may include items beyond wages so long as total compensation is commensurate with that typically provided to U.S. workers whose skills, experience, and duties would otherwise render them similarly situated.  Any deductions from salary must be consistent with the Department of Labor's Fair Labor Standards Act regulations at 29 CFR Part 531 regarding reasonable deductions from workers' pay.  The combination of all the information here provides a sufficient basis for compliance with the rule's commensurate compensation provision.

In short, DHS believes that the protections provided in this rule are sufficient, but the Department will continue to monitor the program and may consider revising or supplementing program requirements at a future date.

Comment.  A commenter stated that the proposed rule lacks an enforcement mechanism to ensure compliance with the provisions included to protect American workers.  The commenter stated that the proposed rule provides no process to report and adjudicate suspected violations of the protections for U.S. workers, and fails to include any penalties for doing so.  The commenter also stated that if the STEM OPT student is "contract[ed] out" by the employer, DHS's ability to enforce the attestations will be significantly circumscribed.

Response.  There are a number of enforcement and oversight mechanisms built into the rule that will facilitate compliance, as detailed above (see section IV.B. of this preamble).  These

include reporting requirements, site visits, periodic evaluation of a student's training, and required notification of any material changes to or deviations from the Training Plan.  In addition, individuals may contact the Student and Exchange Visitor Program at ICE by following the instructions at https://www.ice.gov/sevis/contact.  Finally, violations of the regulation may also be reported through the form accessible at https://www.ice.gov/webform/hsi-tip-form.  For the reasons previously stated, DHS believes that the new protections for U.S. workers in this rule—which are unprecedented in the 70-year history of the overall OPT program—provide a reasonable and sufficient safeguard.

Comment.  The same commenter wrote that the rule should include more protections for U.S. workers; the commenter suggested that the rule should (1) require an approval process for employers similar to the process for approving schools that admit nonimmigrant students and (2) explain what constitutes sufficient resources and personnel in the employer attestation statement.  Finally, the commenter suggested that the rule should also address discriminatory hiring advertisements that seek to recruit only OPT students, including by providing a remedy for Americans who are replaced by OPT students.

Response.  For the reasons previously stated, DHS believes that the protections for U.S. workers in this rule provide a reasonable and sufficient safeguard.  With respect to the specific alternatives proposed by the commenter: item (1) would be extremely burdensome and resource intensive for DHS, and item (2) requests clarification for language that DHS believes is either self-explanatory or sufficiently addressed elsewhere in this preamble.  Of course, DHS stands ready to provide further clarification through guidance as needed.

Finally, DHS does not anticipate that the application of this rule will result in discriminatory hiring.  The rule in no way requires or encourages employers to target students

Exhibit 1
502

based on national origin or citizenship, particularly through any type of hiring advertisements. Rather, the rule protects against employment discrimination by requiring that an employer make and adhere to an assurance that the student on a STEM OPT extension will not replace a full- or part-time, temporary or permanent U.S. worker.  Furthermore, existing federal and state employment discrimination laws and regulations provide appropriate authorities for addressing and remedying employment discrimination.  In particular, employers that generally prefer to hire F-1 students over U.S. workers (including U.S. citizens), or that post job advertisements expressing a preference for F-1 students over U.S. workers, may violate section 274B of the INA, 8 U.S.C. 1324b, which is enforced by the Department of Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices.  This anti-discrimination provision provides for civil penalties and backpay, among other remedies, for employers found to have violated the law.  Such authorities clearly fall within certification 4(e) on the Form I-983, Training Plan for STEM OPT Students, which establishes a commitment by the employer that the training conducted under STEM OPT "complies with all applicable Federal and State requirements relating to employment."

Comment.  Some commenters stated that because STEM OPT participants are students, they would not be comparable to similarly situated U.S. workers, who are not students.

Response.  DHS disagrees that STEM OPT students cannot be compared to other members of the labor force.  Conditions experienced by an F-1 student participating in the STEM OPT extension should be the same as those experienced by U.S. workers performing similar duties and with similar educational backgrounds, employment experience, levels of responsibility, and skill sets.  If a university, for example, hires individuals who have just completed courses of study for certain positions, the university cannot use a different scale or

170

Exhibit 1
503

system to determine the compensation of a STEM OPT student.  The STEM OPT student must be compensated commensurate with the compensation provided to such similarly situated U.S. workers.

Comment.  One commenter suggested that employers should be required to provide compensation figures for all of their employees, not just STEM OPT employees.

Response.  The employer is required to identify the compensation provided to each STEM OPT student, as part of the Training Plan the employer signs.  DHS also reserves the right to ask employers to provide the evidence they used in assessing the compensation of similarly situated U.S. workers.  This may include compensation figures for similarly situated employees who are U.S. workers.  Requiring employers to report compensation figures for all U.S. worker employees, however, would not necessarily provide meaningful data.  STEM OPT students will use their knowledge and skills to perform duties and assume responsibilities that are not similar to those, for instance, of corporate management or mailroom employees.

iv.      Other Comments on Attestations and Restrictions

Comment.  DHS received a number of comments suggesting that additional attestations or other restrictions, including recruitment requirements, be added to further protect U.S. workers.  A number of commenters stated that companies should be unable to hire anyone but a U.S. citizen until U.S. citizens are all employed, whether in on-the-job training positions or regular staff positions.  One commenter stated that "[o]nly when a position cannot be filled by a U.S. worker should an international worker be considered; this is especially true for entry level positions since many international students have the benefit of experience or additional education in their home country before beginning their OPT qualifying degree program and are not truly 'entry level' employees."  One commenter proposed additional provisions to safeguard U.S.

171

Exhibit 1
504

workers, including requiring companies to look for U.S. citizen workers before hiring international students and having the U.S. Department of Labor fine companies that did not comply with the proposed labor protections.  Another comment referenced opinions of a professor that STEM OPT contributes to employers hiring younger workers who may replace more-experienced U.S. workers, and suggested that recruitment requirements favoring experienced U.S. workers be added to the rule.

One commenter also suggested that DHS amend the rule consistent with section 212(a)(5)(A) of the INA, 8 U.S.C. 1182(a)(5)(A), which designates as inadmissible any foreign national "seeking to enter the United States for the purpose of performing skilled or unskilled labor" absent a certification from the Department of Labor that such employment will not adversely affect similarly employed U.S. workers.  According to the commenter, this provision required DHS to include a recruitment requirement for STEM OPT employers and a role for the Department of Labor.  Some commenters similarly stated that the Department of Labor should review all employer submissions with respect to hours and wages.  Another commenter suggested that DHS add a labor condition application requirement and petition process similar to those used for seeking H-1B visas.

Response.  DHS carefully considered the suggestions to include recruitment requirements in the STEM OPT extension program but has determined not to include such requirements at this time.  DHS notes that it has implemented a number of new protections for U.S. workers and STEM OPT students in this rule, including the requirement to pay commensurate compensation, the prohibition against replacing U.S. workers, various reporting requirements, and clarifying the agency's authority to conduct site visits.  Balanced within the broader goals of this rule, DHS has determined that these protections are sufficient.  The Department, however, will continue to

172

Exhibit 1
505

evaluate these protections and may choose to include new attestations or other requirements in future rulemakings.

With regard to the suggestion that DHS is not in compliance with section 212(a)(5) of the INA, this provision is limited, by definition, to certain individuals seeking permanent immigrant status.  See INA sec. 212(a)(5)(D), 8 U.S.C. 1182(a)(5)(D).  The provision does not apply to students in F-1 nonimmigrant status or to any other nonimmigrant seeking employment in the United States.

With regard to suggestions to provide a greater role for the Department of Labor, DHS appreciates that the Department of Labor's long experience with foreign labor certification might assist DHS in its ongoing administration of the STEM OPT extension.  Accordingly, where it may prove valuable and as appropriate, DHS may consult with the Department of Labor to benefit from that agency's expertise.

 E.  STEM OPT Extension Validity Period

 1.  Description of Final Rule and Changes from NPRM

This final rule sets the duration of the STEM OPT extension at 24 months.  Following seven years of experience with the 17-month STEM OPT extension implemented in the 2008 IFR, DHS re-evaluated the length of the extension, primarily in light of the educational benefits such training provides to F-1 students and the benefits such students provide to the U.S. economy and other national interests.  Consistent with the proposed rule, this final rule increases the STEM OPT extension period to 24 months for students meeting the qualifying requirements. The 24-month extension, when combined with the 12 months of initial post-completion OPT, allows qualifying STEM students up to 36 months of practical training.

Also consistent with the proposed rule, the final rule provides, for students who subsequently attain another STEM degree at a higher educational level, the ability to participate in an additional 24-month extension of any post-completion OPT based upon that second STEM degree.  In particular, the rule would allow a student who had completed a STEM OPT extension pursuant to previous study in the United States and who subsequently obtained another qualifying degree at a higher degree level (or has a qualifying prior degree, as discussed in more detail below), to qualify for a second 24-month STEM OPT extension upon the expiration of the general period of OPT based on that additional degree.

This aspect of the rule is finalized as proposed.

2.    Public Comments and Responses

i.    Length of STEM OPT Extension Period

Comment.  Many commenters expressed support for the proposed 24-month STEM OPT extension period.  One commenter stated that this length, in combination with the 12-month post-completion OPT period, aligns well with the typical training period for doctoral students, as well as the three-year grants often provided by the NSF to such students.  A commenter commended the three-year total insofar as it "mirrors a cycle of research and training that is more in line with real-world, practical applications."  Another commenter, who self-identified as an F-1 student in Electrical Engineering, suggested that the 24-month period for a STEM OPT extension would dovetail with many research and development projects and was an appropriate time period because it would further encourage employers to allow STEM OPT students to gain practical experience related to their fields of study.  The student explained that a summer internship on a power generation project could lead to a post-completion training opportunity with the same company if the STEM OPT extension was finalized for a 24-month period.

Another commenter stated that "most development projects are done on a yearly basis," and that by lengthening the STEM OPT extension period to 24 months, students would be eligible to participate in STEM OPT for multiple project cycles.  One commenter welcomed the proposed 24-month extension because it provided "added flexibility" for workforce planning needs.  That commenter explained that this change could improve innovation and development of new products and services, and it could help STEM students gain necessary experience for their own career growth.

A commenter added that the extension period would allow students to gain more "hands-on practical experience" by working on new products and initiatives that are more complex and that have a longer development cycle.  One commenter suggested that the 24-month extension would greatly benefit research activities.  This commenter opined that such extensions would help students by providing a period of stay consistent with the research needs in the commenter's field, which would also benefit the commenter's future job prospects in the commenter's home country.

Some commenters recommended a longer STEM OPT extension, most commonly 36 months, thus increasing practical training to a total of 48 months for STEM students.  Other commenters suggested a total STEM OPT period as long as six years.  Some commenters sought longer extensions so as to allow students additional attempts at applying for and obtaining H-1B visas.

<u>Response</u>.  Currently, DHS views a 24-month extension as being sufficient to attract international STEM students to study in the United States, and to offer a significant opportunity for such students to develop their knowledge and skills through practical application.  Moreover, as stated elsewhere, the 24-month period—in combination with the 12-month post-completion

175

Exhibit 1
508

OPT period—is based on the complexity and typical duration of research, development, testing, and other projects commonly undertaken in STEM fields.  Such projects frequently require applications for grants and fellowships, grant money management, focused research, and publications.  As such, they usually require several years to complete.  For instance, NSF typically funds projects through grants that last for up to three years.[112]  As the NSF is the major source of federal funding for grants and projects in many STEM fields, including mathematics and computer science, DHS believes the standard duration of an NSF grant served as a reasonable benchmark for determining the maximum duration of OPT for STEM students.  DHS reiterates that the focus of this rule is to enhance educational objectives, not to allow certain graduates more opportunities to apply for or obtain H-1B visas.

Comment.  Some commenters viewed the 24-month extension as too lengthy, stating that a promising individual does not need an additional 24 months to prove his or her worth in a position.  One comment quoted a university professor as stating that "[i]t's an over-reach to claim that someone who completes a master's degree in as little as 12 months needs three years interning—at low or no pay in many cases—to get further training." The commenter stated that few STEM OPT graduates will work on an NSF grant-funded project and that "[v]irtually all of the STEM graduates will work in the private sector on applied projects and tasks where lengths are typically 6 months or less." The commenter did not provide a basis for these factual assertions.

---

[112] National Science Foundation, Grant Proposal Guide. sec. II.c.2.a.(4)(b), available at http://www.nsf.gov/pubs/policydocs/pappguide/nsf15001/gpg_index.jsp ("The proposed duration for which support is requested must be consistent with the nature and complexity of the proposed activity. Grants are normally awarded for up to three years but may be awarded for periods of up to five years."). For instance, NSF funding rate data show that in fiscal years 2012-2014, grant awards for biology were provided for an average duration of 2.87, 2.88, and 2.81 years, respectively.

176

Exhibit 1
509

Response.  The purpose of the 24-month extended practical training period is to provide the student an opportunity to receive work-based guided learning and generally enhance the academic benefit provided by STEM OPT extensions.  The purpose is not to have the student prove his or her worth.  DHS disagrees with the implication that the extension will not effectively enhance and supplement the individual's study through training.  Consistent with many comments received from higher education associations and universities, DHS believes that allowing students an additional two years to receive training in their field of study would significantly enhance the knowledge and skills such students obtained in the academic setting, benefitting the students, U.S. educational institutions, and U.S. national interests.

Moreover, while DHS agrees it is possible that some STEM OPT students may not "need" the extension, DHS expects that many qualifying students (including master's students) will receive significant educational benefits from the extension.  Based on the public comments received, DHS expects that some students in some fields and degree programs in fact would benefit from more than three years of practical training.  DHS concludes, however, that conditioning the period of employment authorization on case-by-case demonstrations of need would significantly increase burdens on the Department and potentially yield inefficient and inconsistent adjudications.  DHS also disagrees with the notion that the STEM OPT extension allows internships at little or no pay; this rule specifically prohibits that kind of activity.  Based on the above, DHS considers 24-month STEM OPT extensions, combined with the other features of this rule, sufficient to serve the purpose of this rule while appropriately protecting U.S. worker interests.

Comment.  Some commenters stated that DHS did not base the proposed 24-month duration on sufficient information.  One commenter stated that his first post-college software

development project took one year, and that "[t]he average time a new graduate stays at a first

job is only 18 months."  The commenter did not cite the source of this information or state

whether the 18-month figure applies to STEM graduates only.

Response.  The anecdotal information provided by the commenter about the commenter's

first software development project contradicts many other comments in the record stating that the

proposed extension length was consistent with their experience in STEM fields generally.  The

commenter's general statement about the average time a graduate stays at a first job is

unsupported; DHS has no basis to determine whether this figure relates to STEM students

specifically, or what the relationship might be between this figure and the appropriate period of

time for practical training.

Comment.  Several commenters suggested differentiating STEM OPT extension periods

by grade or degree level.  One commenter recommended that doctoral students should obtain

longer OPT periods than others.

Response.  DHS has decided to extend OPT periods based on field of study—

specifically, for students completing requirements for their degrees that are in STEM fields—

rather than based upon education level.  As noted above, this rule recognizes the need to

strengthen the existing STEM OPT extension, in significant part, to enhance the integrity and

educational benefit of the program in order to help maintain the nation's economic, scientific,

and technological competitiveness.  Additionally, a primary basis for extending OPT to 24

months for STEM students is, as stated above, the complexity and typical duration of research,

development, testing, and other projects commonly undertaken in STEM fields.  This policy is

also consistent with DHS practice, which has traditionally not extended the length of the OPT

period based upon level of degree.  For all these reasons, DHS declines to incorporate the

commenter's request to extend the validity period of the extension based upon degree level.

Comment.  A commenter suggested a total post-completion OPT period of three to four months.  The commenter stated that a shorter OPT period was necessary to prevent wages from declining and to avoid "pit[ting] foreign students against [U.S.-based workers] in [the] job market."  Another commenter stated that "[p]erhaps if the program is short enough, employers will treat it as mutually beneficial training rather than a more long-term employment prospect."

Response.  To the extent the commenters seek a change in the overall OPT program, the comment is outside the scope of the rulemaking.  And for the reasons stated above, DHS has determined that an OPT extension of three to four months would be insufficient for students in the STEM fields to further the objectives of their courses of study by gaining knowledge and skills through on-the-job training.  Additionally, this rule includes safeguards for the interests of U.S. workers.

ii.    Availability of a Second STEM OPT Extension

Comment.  One commenter requested that DHS provide further explanation as to "why a foreign student would need a second 2-year extension period after receiving an advanced STEM degree, when the student has already enjoyed a full 3 years of OPT after the initial STEM degree."  The commenter stated that, at a minimum, DHS should require a student who seeks a second STEM OPT extension to show that the advanced degree is in a field completely different from the undergraduate degree field.  A commenter similarly requested that DHS limit the extension to once per lifetime, stating that the increased duration "has the potential to blur the line between a student visa and an employment visa."

Response.  DHS disagrees with the commenter's suggestion that a second two-year STEM OPT extension be contingent upon obtaining an advanced degree in a completely

different field.  Such a requirement could stifle a student's effort to specialize and build substantial expertise in a selected field of interest, whereas affording a second two-year STEM OPT extension could encourage the student to invest further in his or her education to develop greater expertise or specialization within the STEM field.  In addition, an enormous range of practical training opportunities may exist within a given field.  For example, a student could initially graduate with a bachelor's degree in microbiology, physics, or engineering and conduct academic research during the first STEM OPT extension.  Then, the student could return to school to obtain a masters or doctoral degree in the same field and use a second STEM OPT extension to obtain practical training in a more specialized or industrial capacity.  Allowing only one lifetime STEM OPT extension may unnecessarily disincentivize specialization in these important and innovative fields.

     iii.   <u>Other Comments Related to Multiple Extensions</u>

<u>Comment</u>. One commenter sought clarification on whether the proposed rule would allow a student to obtain two consecutive STEM OPT extensions, with one directly following the other.  Another commenter stated that a footnote in the preamble to the proposed regulation suggested that an international student who earns successive qualifying STEM degrees "will be unable to link this extension with his or her first extension."  The commenter recommended that DHS clarify that an international student who qualifies for two OPT extensions may complete them without any disruption in his or her practical training, provided all other requirements are met.

<u>Response</u>.  DHS clarifies that the final rule, as with the proposed rule, does not allow students to obtain back-to-back STEM OPT extensions.  A STEM OPT extension can only be granted as an extension of a regular OPT period, and not as a freestanding period of practical

180

Exhibit 1
513

training.  A student who has already participated in a STEM OPT extension would need to engage in a new course of study and subsequently complete a new initial post-completion practical training period before applying for a second STEM OPT extension based on a new STEM degree or a previously obtained degree (other than a degree that had already been the basis for a STEM OPT extension).  The new or previously obtained STEM degree would need to be at a higher level than the STEM degree that formed the basis of the first STEM OPT extension.  For program integrity reasons, DHS believes that it would be inappropriate to allow a student to obtain two consecutive STEM OPT extensions without an intervening degree and period of post-completion OPT.

Comment.  Some commenters recommended that DHS consider allowing a third extension for students, thereby allowing one grant per higher education degree level (i.e., bachelor's, master's, and Ph.D.).  One such commenter noted that "[l]imiting the number of lifetime grants to two STEM periods would negatively impact Ph.D. graduates who do not already have an H-1B or qualify for another classification of employment authorization."

Response.  More often than not, nonimmigrant students do not take extended breaks after graduating from a master's program before pursuing a doctoral degree.[113]  For that reason, it would be rare for a Ph.D. student to use one STEM OPT extension for the master's portion of the degree, and another STEM OPT extension for the Ph.D. portion of the degree.  Most doctoral degrees are combined into a single program which grants both master's degrees and doctoral degrees.  DHS believes that the two extensions provided by this rule are consistent with typical

---

[113] SEVIS data as of January 28, 2016, shows that approximately 88 percent of students who had been at a master's education level and subsequently enrolled in a program at the doctoral level did so within one year of the end of their master's course of study.

education patterns and sufficient to provide the educational, economic, and cultural benefits intended by the rule.

Comment.  Commenters requested that a student be allowed multiple extensions for multiple degrees earned at the same educational level.

Response.  DHS has considered these comments.  Longstanding administration of the F-1 visa classification and the OPT program, see 8 CFR 214.2(f)(10), has required students to move to higher education levels before qualifying for additional periods of OPT, so that practical experience is more likely to be progressive in quality and scope.  DHS has determined that limiting additional periods of OPT, including a second STEM OPT extension, to a new educational level continues to be a legitimate construct to protect program integrity and better ensure work-based learning for F-1 students is progressive.

This higher degree requirement has long attached to 12-month post-completion OPT. Because 24-month STEM OPT extensions only are available to individuals completing their 12-month post-completion OPT period, individuals by definition can only obtain a STEM OPT extension after completing a higher education level.  The policy in this final rule merely recognizes that longstanding policy.

F.      Training Plan for F-1 Nonimmigrants on a STEM OPT Extension

1.      Description of Final Rule and Changes from NPRM

Central to the STEM OPT extension is a new training plan requirement to formalize the relationship between the F-1 student's on-the-job experience and the student's field of study and academic learning.  The rule requires the submission of Form I-983, Training Plan for STEM OPT Students (Training Plan), jointly executed by the F-1 student and the employer, but permits an employer to utilize certain training programs already in place.  The proposed rule included

this provision; DHS has retained the provision in the final rule, with changes and clarifications in response to public comments.  We summarize these provisions and changes below.

      i.    <u>General Training Plan Requirement and Submission Requirements</u>

The rule requires a formal training program for STEM OPT students in order to enhance and better ensure the educational benefit of STEM OPT extensions.  The employer must agree to take responsibility for the student's training and skill enhancement related to the student's field of academic study.  The student must prepare a formalized Training Plan with the employer and submit the plan to the DSO before the DSO may recommend a STEM OPT extension in the student's SEVIS record.  If the student intends to request an extension based on a previously-obtained STEM degree, the plan must be submitted to the institution that provided the student's most recent degree (i.e., the institution whose official is certifying, based on SEVIS or official transcripts, that a prior STEM degree enables the student to continue his or her eligibility for practical training through a STEM OPT extension).

As noted in the proposed rule, DHS expects to incorporate the submission of the Training Plan into SEVIS at a later date.  Until that time DHS may require the submission of the Training Plan to ICE or USCIS when the student seeks certain benefits from USCIS, such as when the student files an Application for Employment Authorization during a STEM OPT extension. Under 8 CFR 103.2(b)(8)(iii), for example, USCIS may request additional evidence of eligibility for a benefit if the evidence submitted in support of an application does not establish eligibility. Accordingly, USCIS may request a copy of the Training Plan, in addition to other documentation that may be in the possession of the student, the employer, or the student's DSO.

DSOs may not recommend a student for a STEM OPT extension if (1) the employer has not provided the attestations for that student required by the rule or (2) the Training Plan does

183

Exhibit 1<br>516

not otherwise reflect compliance with the relevant reporting, evaluation and other requirements of the rule.  DHS may deny STEM OPT extensions with employers that the Department determines have failed to comply with the regulatory requirements, including the required attestations.  As noted above, ICE may investigate an employer's compliance with these attestations, based on a complaint or otherwise, consistent with the employer site-visit provisions of the rule.

As compared to the proposed rule, and in response to public comments received, DHS has made two changes to the general training plan requirement.  First, DHS modified the regulatory text and Training Plan form to clarify that employers may use their existing training programs for STEM OPT students, so long as the existing training program meets this rule's requirements.  Second, DHS has modified the form to focus on training and has thus removed the word "mentoring" from the form.  The information collection instrument for this plan is now titled "Training Plan for STEM OPT Students," and not "STEM OPT Mentoring and Training Plan" as DHS had originally proposed.[114]

ii.      Standard of Review for Training Plan

Under this final rule, once the student and the employer complete and sign the Training Plan, the student must submit the plan to the DSO.  DSOs must review the Training Plan to ensure that it is completed and signed, and that it addresses all program requirements.  USCIS maintains the discretion to request and review all documentation for eligibility concerns.  A number of commenters requested additional information about the standards under which the DSO and DHS will review Training Plans.  DHS clarifies the standard below.

---

[114] DHS has also finalized the form with a new number in response to public comments, as explained below in the discussion of comments below regarding the form fields, number, and instructions.  As noted throughout the rule, the form is now designated as Form I-983, Training Plan for STEM OPT students.

iii.    Form Fields, Form Number, Form Instructions

A number of commenters provided specific suggestions regarding the proposed form and

instructions.  For instance, commenters recommended that DHS relabel certain fields, use a

different form number than the Form I-910 that DHS had initially proposed, and otherwise

improve the form.  DHS has made a number of changes in response to these comments,

including relabeling certain fields and changing the form number.  DHS explains these changes

below.

iv.    Training Plan Obligations and Non-Discrimination Requirements

A number of commenters stated or implied that U.S. employers do not have training

programs, or related policies, and that any requirement that such programs be offered to F-1

students would thus benefit such students and not U.S. workers.  Others stated that the program

was intended to benefit students from particular countries or backgrounds, to the disadvantage of

others.  Some of these commenters raised concerns about various non-discrimination laws that

they believed would be violated as a result of the training plan requirements.  DHS carefully

considered these concerns, and we summarize the comments and DHS's response below.

2.    Public Comments and Responses

i.    General Training Plan Requirement and Submission Requirements

DHS received a number of comments raising general concerns with the proposed

Mentoring and Training Plan, as well as related requirements.  Such comments concerned the

timelines proposed for training plan submission and review, as well as requirements related to

reporting changes of employer.

Comment.  DHS received many comments related to the training programs and policies

that many employers already have in place.  These comments expressed a range of positions,

from offering strong support for the proposed Mentoring and Training Plan to suggesting more flexible training plan requirements to suggesting the elimination of training plan requirements altogether.  Some commenters stated that the requirements for the proposed Mentoring and Training Plan were burdensome and unrealistic, that the proposed rule contained confusing references to the F-1 student's role in "the training program," and that the rule contained complex training requirements that seemed unrelated to the anticipated experiences of F-1 students seeking a STEM OPT extension.  Some commenters were concerned that small and medium-sized businesses may not have the resources to dedicate to fulfilling the proposed training plan requirements.  In addition, some stated that these requirements could deter both school officials and employers from authorizing and participating in the STEM OPT extension program.  One commenter stated that the proposed requirements were not mandated by the court decision in Washington Alliance.  The commenter stated that the court decision only compels DHS to allow for notice-and-comment on the STEM OPT extension itself, and "does not compel DHS to adopt new and more stringent requirements like the [Training Plan]."

Many commenters supported the requirement of a proposed Mentoring and Training Plan but requested the ability to utilize training programs and associated policies already in place in many businesses.  For example, one commenter stated that the requirement "validates DHS's efforts to preserve the academic component inherent in STEM OPT" but recommended that "DHS create a flexible framework that allows these controls to exist within the parameters of an employer's existing Human Resources policies."  Another commenter noted its broad experience in this area, stating that as a large employer, it "has achieved widespread recognition for the steps that it takes to develop and train employees."  The commenter added that in 2014, it "was inducted into the Training 'Top 10 Hall of Fame' and was ranked seventh for learning and

development by the Association for Talent Development." As such, the commenter stated that it should be able to utilize its existing training policies.

Another commenter stated that its STEM OPT student trainees already participate in "company training programs and develop ongoing mentoring relationships with senior team members in the natural course of employment." This commenter proposed that DHS provide more flexibility to employers by allowing them to meet the training plan requirements "by providing . . . any documentation evidencing [a current training program] that is currently operated by the company" and amending the proposed Mentoring and Training Plan to only ask for general objectives at the beginning of practical training.

Response. DHS believes that the burdens that students and employers may experience in seeking to comply with training plan requirements are outweighed by the benefits the STEM OPT extension will afford to students, employers, schools, and the U.S. economy as a whole. The Training Plan will help ensure the integrity of the program by holding employers and students jointly responsible for monitoring the students' progress and continued learning, while also better protecting U.S. workers.

DHS recognizes that many employers have existing training programs and related policies that enhance the learning and capabilities of their employees. DHS does not intend to require duplicative training programs or to necessarily require the creation of new programs or policies solely for STEM OPT students. Nor does DHS intend to require training elements that are unnecessary or overly burdensome for F-1 students seeking to engage in work-based learning. However, employer-specific training programs and policies may not always align with the rule's primary policy goals. For example, some businesses may focus more on managing a workload or maximizing individual output, whereas DHS's primary concern is the student's

continued learning and the relationship between the work-based learning experience and the student's studies.

Accordingly, DHS clarifies that employers may rely on an existing training program or policy to meet certain training plan requirements under this rule, so long as the existing training program or policy meets certain specifications.  In addition, DHS has modified the Training Plan to make it easier for employers to refer to existing training programs when completing the Training Plan.  For example, instead of requiring specific information about the individual supervisor's qualifications to provide supervision or training, the final Training Plan prompts the employer to explain how it provides oversight and supervision of individuals in the F-1 student's position.  DHS also revised the Training Plan to replace the reference to a student's supervisor with a reference to the "Official Representing the Employer."  Finally, DHS also modified the regulatory text to clarify that for companies that have a training program or policy in place that controls performance evaluation and supervision, such a program or policy, if described with specificity, may suffice.

DHS expects that in many cases, employers will find that existing training programs align well with the fields on the final Training Plan.  For instance, it should be straightforward for employers with existing programs to describe what qualifications the employer requires of its trainers or supervisors, and how the employer will measure an employee's training progress. DHS emphasizes, however, that most fields in the Training Plan must be customized for the individual student.  For instance, every Training Plan must describe the direct relationship between the STEM OPT opportunity and the student's qualifying STEM degree, as well as the relationship between the STEM OPT opportunity and the student's goals and objectives for work-based learning.

Exhibit 1
521

In addition, the Training Plan will document essential facts, including student and employer information, qualifying degrees, student and employer certifications, and program evaluations.  This data is important to DHS for tracking students as well as for evaluating compliance with STEM OPT extension regulations.  DHS is concerned that an employer's existing training program would not normally contain this information.  DHS believes these portions of the Training Plan should take a relatively short period of time to complete.

Comment.  Several commenters expressed concern that the proposed Mentoring and Training Plan would reduce flexibility within the STEM OPT extension program, and some of these commenters proposed alternatives to address these concerns.  Some commenters stated that requiring a training plan that ties the on-the-job training to the field of academic study would "limit [the participating F-1 student] to a specific department or reporting relationship." Commenters suggested that in order for STEM OPT extensions to reflect real world practices, STEM OPT students need to be able "to participate in project rotations that give them a broader skill set relating to their chosen academic field" and to accommodate already existing rotational programs and dynamic business environments.  Some commenters stated that requiring employers to list specific information about a supervisor's qualifications and the evaluation process for STEM OPT students would add an unnecessary and burdensome level of bureaucracy to the application process.

Commenters also indicated that they want to maintain the ability to easily and quickly shift STEM OPT students among positions, projects, or departments, and thus recommended the elimination of new training plan filings following each project, position, or department rotation or change.  For example, several commenters stated that even in currently existing, long-established in-house mentoring and training programs, flexibility is built-in because there are

many things that can change for an employer over a two-year period.  As examples of events necessitating such flexibility, commenters cited gaining and losing customers to competitors and changing focus from one product line to another.   A commenter stated that business plans are confidential in nature and employers may not be comfortable releasing detailed information to external sources, which will likely lead to the creation of training plans that are limited to generic, high level job descriptions.  The commenter suggested instead that the employer provide a "job profile document detailing employee roles and responsibilities and an organization structure chart," which would be updated in light of "any significant changes in job profile or positions during the course of OPT."

Another commenter stated that instead of requiring a training plan, DHS should send periodic SEVIS reports to employers and require the employers to verify that they still employ the listed students.  The commenter suggested that DHS also consider creating an employer portal to allow STEM OPT employers to verify and update information as required.  Another commenter recommended that DHS replace the proposed written Mentoring and Training Plan with an additional employer attestation that training will be provided consistent with similarly situated new hires, with the proviso that the training will relate directly to the STEM field.  One commenter recommended that all training plan requirements be better streamlined with already existing requirements contained on the Form I-20 Certificate of Eligibility.

One commenter stated that it was "impractical" to impose the proposed Mentoring and Training Plan requirements on "more seasoned trainees" who have completed one year of OPT and who are seeking a STEM OPT extension under the proposed rule.  This commenter suggested exempting students who plan to use their STEM OPT extension to continue their 12-month post-completion OPT with the same employer.  The commenter recommended that DHS

look to H-1B regulations as an example of a regulatory scheme that exempts certain individuals with advanced degrees from certain requirements and obligations.

Response.  DHS disagrees that employers' standard training practices are always sufficient for ensuring that the training needs of STEM OPT students are met.  The STEM OPT extension program, including its training plan requirement, is designed to be a work-based learning opportunity that meets specific long-term goals related to the student's course of study. Existing training practices may or may not ensure that such goals are met, and thus the fact that an employer has training practices is insufficient on its own to demonstrate that a practical training opportunity will support the central purpose of this rule.

For this reason, DHS rejects the alternative suggestions by commenters to replace the training plan requirement with an attestation related to employers' existing training practices, the submission of periodic SEVIS reports, or a revised Form I-20 Certificate of Eligibility.  As discussed, the main objective of the training plan requirement is to ensure that the work that the STEM OPT student undertakes is "directly related" to his or her STEM degree and is continuing his or her training in that field.  Providing generic job descriptions or periodically verifying that the student remains employed would not provide sufficient focus on the student's training.  The training plan requirement aims to elicit the level of detail needed to ensure appropriate oversight of the STEM OPT extension.  Additionally, requiring all participants to use a uniform form ensures that minimum requirements are met and makes it easier to evaluate the eligibility of an applicant without requiring agency adjudicators to familiarize themselves with the peculiarities of different employers' records and standards.

However, in response to commenters' concerns, DHS has modified the regulatory text to further ensure that employers may rely on their existing training programs to meet certain

training plan requirements under this rule, so long as such training programs otherwise meet the rule's training plan requirements.  Under the final rule, the Training Plan must, among other things: (1) identify the goals for the STEM practical training opportunity, including specific knowledge, skills, or techniques that will be imparted to the student; (2) explain how those goals will be achieved through the work-based learning opportunity with the employer; (3) describe a performance evaluation process; and (4) describe methods of oversight and supervision.  The rule additionally provides that employers may rely on their otherwise existing training programs or policies to satisfy the requirements relating to factors (3) and (4) (performance evaluation and oversight and supervision of the STEM OPT student), as applicable.  These provisions are intended to make it easier for employers to refer to existing training programs or policies when completing the Training Plan, as can be seen in Section 5 of the Training Plan form.

DHS has also made a number of changes to the Training Plan form for the same reason. For example, instead of requiring specific information about the individual supervisor's qualifications to provide supervision or training, the final Training Plan prompts the employer to explain how it provides oversight and supervision of individuals in the STEM OPT student's position.  DHS also revised the form to replace the reference to a student's supervisor with a reference to the "Official with Signatory Authority."  Such an official need not be the student's supervisor.  These modifications are intended to address specific comments indicating that the proposed Mentoring and Training plan would prevent employers from assigning such students to project rotations and "limit them to a single department or reporting relationship."  DHS made these modifications to provide employers with additional flexibility in complying with the rule's training plan requirements.

192

Exhibit 1
525

Moreover, as revised, DHS does not envision anything required in the final Training Plan as unnecessarily inhibiting flexibility for employers or STEM OPT students.  Instead, the standards set forth in the rule are intended to ensure that employers meet the STEM OPT extension requirements, including demonstrating compliance with the attestations, and ensuring that employers possess the ability and resources to provide structured and guided work-based learning experiences for the duration of the extension.  Nothing in the rule prohibits employers from incorporating into the Training Plan provisions for project, position, or department rotations that directly relate to STEM students' fields of study, provided there will be appropriate supervision during each rotation and the employer otherwise meets all relevant requirements.  To the extent new circumstances arise and such a change was not contemplated in the initial Training Plan, the employer may, working with the student, prepare and submit a modified Training Plan to the student's DSO.  Additionally, with regard to concerns relating to an employer sharing sensitive information, DHS does not anticipate that Training Plans would need to contain a level of detail that would reveal business plans.

Finally, DHS respectfully disagrees with the notion that students who have completed one year of OPT are "seasoned trainees" who should not be subject to the training plan requirements when seeking an extension under the rule.  DHS also disagrees that students pursuing a STEM OPT extension with the same employer should be exempt from the reporting obligations of the rule, including all training plan requirements.  As discussed, the purpose of the STEM OPT extension is to provide practical training to STEM students so they may pursue focused research and meaningful projects that contribute to a more complete understanding of their fields of study and help develop skills.  The requirements of the Training Plan are designed to assist students and employers in their pursuit of the aforementioned goals.

<u>Comment.</u>   Some commenters stated concerns about the "mentoring" requirements described in the proposed Mentoring and Training Plan.  For example, a commenter expressed concern that formalizing mentoring and training requirements could hinder students' ability to naturally develop mentorships and mentoring relationships, and suggested eliminating the proposed Mentoring and Training Plan requirement or, at least, aligning the proposed Mentoring and Training Plan requirement with current employer practices to minimize compliance burdens. Some employers stated that the references to mentoring were so problematic that the proposed Mentoring and Training Plan be dropped altogether.  One commenter stated that many technology companies lack expertise in establishing the kind of mentoring program contemplated in the proposed rule.  The commenter stated further that, because of this, some technology companies will likely submit whatever paperwork is necessary to demonstrate compliance with the mentoring requirement, without doing more.  Another commenter suggested eliminating the reference to mentoring and instead focusing on "the relevance of the proposed employment to the individual's STEM-related course of study."

A number of employers stated that they had long established practices concerning mentoring, some formal and some not.  Most of these comments suggested that what DHS proposed regarding mentoring was difficult to understand in the context of existing business practices.  For example, one company that said it was strongly committed to "the importance and benefits of well-designed mentoring programs," asserted that the proposed rule failed to define mentoring.  The commenter explained that:

> some mentoring relationships are highly structured in content and regularity of interactions, while others are more ad hoc and organic in nature.  In many circumstances, it is the mentee who takes responsibility for leading the interactions; in others, it is the mentor or the organization who structures the engagement.

194

Exhibit 1
527

This commenter believed it would not be feasible for DHS to provide sufficient certainty to employers about their mentoring responsibilities and obligations.  A comment co-signed by ten associations representing a variety of industries, as well as small, medium, and large businesses and professionals, stated that the proposed Mentoring and Training Plan would "in many cases force companies to make drastic changes to their current mentoring programs."

Response.  In light of the commenters' concerns, DHS has removed reference to, and the requirements related to, mentoring in the final rule and associated Training Plan.  For instance, DHS has removed the reference to "mentoring" in Form I-983 and re-designated it as the "Training Plan for STEM OPT Students." The Training Plan, however, continues to serve the core goal of the practical training program: to augment a student's learning and functionality in his or her chosen field of interest.

DHS disagrees with the suggestion that technology companies do not have robust training capabilities or a commitment to training and skill development.  This comment is directly contradicted by the many comments filed by employers asking that company policies on training, mentoring, and evaluation already in place be permitted as an alternative to the training plan requirements in the proposed rule.

Comment.  A few commenters suggested that DSOs should not be required to issue a new STEM OPT recommendation in SEVIS before a student can change employers during the STEM OPT extension period.  A university recommended that it should be sufficient for the student to submit the new Training Plan to the DSO, along with an update to the employer address information in SEVIS, as specified under current SEVIS reporting requirements.  Similarly, a school official asked whether an update in STEM employment information, rather than a recommendation, would suffice for such purposes.  The commenter stated that a

recommendation should be required only if the DSO is expected to review the content of the Training Plan, which the commenter suggested should be outside the DSO's duties. The commenter stated that the requirement for a new DSO recommendation each time the student changes employers "implies" that the STEM extension is employer specific. The commenter suggested that STEM OPT should not be tied to a specific employer, but should be tied solely to the student's field of study. Another commenter stated that the requirement for DSOs to issue a new STEM OPT recommendation served no particular purpose, and that the requirement could increase the likelihood that an employer might choose to hire a STEM OPT student over a U.S. worker. According to the commenter, such a STEM OPT student would be less likely to change employers during the STEM OPT period, which could lead to exploitation of the student by the employer.

Response. To ensure proper oversight and promote the continued integrity of the STEM OPT extension program, DHS declines to make the changes requested. When a student changes employers, the requirement to submit a new Training Plan to the DSO and have the DSO update SEVIS with a new recommendation is necessary for ensuring that DHS has the most up-to-date information on F-1 students. The requirement also ensures that STEM OPT students are receiving the appropriate training and compensation, which in turn helps to protect such students and U.S. workers. As noted previously, SEVIS is the real-time database through which the Department tracks F-1 student activity in the United States. Timely review by the DSO of the new Training Plan and timely updating of SEVIS with certain information from that form substantially assists DHS with meeting its statutory requirements related to F-1 students.

DHS also does not agree that the requirements related to changing employers, including obtaining a new DSO recommendation, are so burdensome that they would cause a STEM OPT

student to stay with an employer that is exploiting him or her. Among other things, this rule provides a substantial amount of time for students to find new practical training opportunities. And DHS anticipates that in most cases, DSOs will be able to review a newly submitted Training Plan and issue a new recommendation for a STEM OPT extension in a matter of days. For this reason, when a student changes employers, the rule requires a new Training Plan, new DSO recommendation, and update to SEVIS. DHS acknowledges that the potential exists for a student to begin a new practical training opportunity with a new employer less than 10 days after leaving the student's prior employer; in such a case, the student must fulfill his or her reporting obligations by submitting a new Training Plan, but can begin the new practical training opportunity only after submitting the new plan.

Comment. Some commenters expressed concern that various requirements and timeframes provided in the rule were inconsistent with each other. A university, for example, submitted a comment referencing a provision in the proposed rule that required STEM OPT students who changed employers to submit, within 10 days of beginning their new practical training opportunities, a new Mentoring and Training Plan to their DSOs, and subsequently obtain new DSO recommendations. The commenter believed this timeline contradicted the reporting obligation contained in another provision, which required such students to report changes in certain biographic and employment information to their DSOs "within 10 days" of the change in employer. The commenter said the former requirement implied that STEM OPT students must receive a new DSO recommendation before beginning new employment, while ignoring the fact that DSOs are given 21 days in which to report any such change of employer. The commenter further noted that DSOs depend on this 21-day reporting window to complete

administrative tasks, and the commenter urged DHS to amend the proposed regulations to fix the above inconsistencies.

Response.  DHS does not see a conflict between (1) the requirement that a STEM OPT student must submit a new Training Plan to the DSO within 10 days of starting a new practical training opportunity with a new employer and (2) the separate, general requirement that a STEM OPT student report to the DSO within 10 days certain changes in biographic and employment information.  Nor does DHS see a conflict between these requirements and the DSO's reporting period for inputting some of this information into SEVIS.

The two student reporting requirements cited by the commenter will frequently apply in different circumstances, and serve different purposes.  The requirement to submit a new training plan applies only when the student begins a new practical training opportunity with a new employer, and is intended to ensure that each STEM OPT extension will be accompanied by an accurate, up-to-date Training Plan.  The 10-day period for the requirement balances the burden of completing the Training Plan on a timely basis against the important benefits derived from the preparation and submission of such plans.  In contrast, the general student reporting requirement (which also existed in the 2008 IFR) applies whenever a STEM OPT student experiences a loss of employment, as well as a change in the student or employer's name or address.

Where a student begins a new practical training opportunity with a new employer less than 10 days after leaving the student's prior employer, the student may fulfill both reporting obligations by submitting a new Training Plan.  In cases where the period of time between employers is longer than 10 days, the student must first report the loss of employment to the DSO, and later submit a new Training Plan.  In either case, the DSO's SEVIS obligations will begin after the DSO receives the information from the student.  Again, these two student

reporting requirements serve different purposes; both reports will serve important functions at the time they are made.

Comment.  One commenter suggested that requiring both the student and the employer to attest that the job offer is directly related to the student's STEM degree is redundant, and that the employer's attestation should be sufficient for this purpose.  Another commenter suggested that the student and employer's attestation together should be sufficient, and that as a result, DSO review would be superfluous.  Some commenters implied that because the proposed rule required that training plans be completed by STEM OPT students and their employers, those plans would concern work-related training and not training of an academic nature.

Response.  DHS believes that it is appropriate to document that both the student and the employer agree that the practical training opportunity is directly related to the student's degree. The need for employer and student attestations helps ensure compliance by both relevant parties. And such attestations are not overly burdensome on either the student or the employer.

With respect to comments about the academic nature of the required Training Plans, DHS agrees that such plans will relate to practical training experiences, rather than academic coursework.  But that is the intent of the rule: to allow students to apply their academic knowledge in practical, work-based settings.  The Training Plan in this final rule helps ensure that the purpose of the rule is met, by clarifying the direct connection between the student's STEM degree and the practical training opportunity.

Comment.  DHS received a number of comments concerning the proposed rule's document retention requirements.  Some commenters suggested that in order to reduce the administrative and paperwork burdens on employers, DHS should allow employers to use electronic signatures, as well as electronic storage methods to maintain required records.

Commenters noted that allowing such options would be consistent with I-9 completion and retention requirements.  Some commenters requested that employers and DSOs specifically be allowed to electronically submit and retain the training plans required by the proposed rule,

DHS also received comments on the duration of the proposed rule's retention requirements.  One commenter stated that a 1-year retention requirement, rather than a 3-year requirement, would be more feasible.  Another commenter recommended that, to mitigate the substantial investment of time required of schools with many STEM students, no electronic form of the proposed Mentoring and Training Plan should be required until the form is provided electronically through the SEVIS system with batch functionality.  The commenter also requested that enough time be given to third-party software providers so that they may develop an equivalent upgrade to allow batch uploads of the forms to SEVIS.

One commenter also stated that if the student's school must maintain the training plan, the school then becomes responsible for maintaining sensitive information about the employer.  The commenter did not describe which data elements it considered particularly sensitive.  The commenter stated that the requirement to maintain this information constituted an "undue burden" for the school and a liability for both the employer and the school "in an age when data hacking and data breaches" are common occurrences.  The commenter also noted that DSOs would be "holding" training plans during a student's STEM OPT period, which, in some cases, would be unrelated to any similar degree conferred by the DSO's school.

Response.  DHS clarifies that the STEM OPT student's educational institution may retain the Training Plan using either paper or electronic means.  DHS acknowledges the burdens inherent with requiring DSOs to retain information on students who may have already graduated.  Because DSOs must already meet 3-year retention requirements for other documents concerning

F-1 students, this requirement is already a common standard with which DSOs have experience. Under 8 CFR 214.3(g)(1), institutions that educate F-1 students must keep records indicating compliance with reporting requirements for at least three years after such students are no longer pursuing a full course of study.

DHS understands the commenter's concern about the potential sensitivity of certain information contained in training plan documents. However, DHS has made efforts to ensure that the final Training Plan requires only information necessary for the Department to carry out the STEM OPT extension program.  DHS notes that it is developing a portal that, once fully deployed, will allow students to directly input training plans into SEVIS for DSO review, thus reducing burdens and potential liability on the part of DSOs and their institutions.  DHS plans to have the first stages of this portal operational by the beginning of 2017.  In the interim, DHS does not anticipate a significant increase in data storage costs for employers as a result of this rule, and the Department remains open to implementing additional technology improvements to reduce administrative processing and paperwork.

Under this final rule, the student's educational institution associated with his or her latest OPT period must ensure that SEVP has access to the student's Training Plan and associated student evaluations.  Such documents may be retained in either electronic or hard copy for three years following the completion of the student's practical training opportunity and must be accessible within 30 days of submission to the DSO.

    ii.    <u>DHS and DSO Review of the Training Plan</u>

<u>Comment</u>.  DHS received a number of comments concerning the need to review training plans and the respective roles that DHS and DSOs would play in such review.  Some commenters stated that DSOs are best positioned to evaluate the connection between a practical

201

Exhibit 1
534

training opportunity and a student's field of study, and requested confirmation that DHS does not intend to second-guess routine approvals of training plans by DSOs.   Some commenters requested that DHS clarify the relevant criteria and standards that USCIS and DSOs should apply when reviewing such plans.   Some commenters expressed uncertainty about how a qualitative review of training plans would or should be conducted.   Such commenters indicated that unless additional standards and instructions are given, DSO review of such plans would simply consist of making sure each field on the form is completed.   A commenter stated that DSOs should not be expected to become experts with respect to each individual student, nor should they be burdened with the weighty responsibility of fraud detection.

One commenter stated that it was unclear how a DSO would know, prior to the commencement of the STEM OPT extension, whether the employer had failed to meet the program's regulatory requirements.   The commenter recommended that DHS clarify the applicable standards for DSO review of training plans and ensure that such standards are appropriate for DSOs, given that they are experts neither in each area of STEM education nor in detecting fraud.   The commenter recommended that the level of review be similar to that required for Labor Condition Applications submitted to the Department of Labor.   According to the commenter, such applications require review only for completeness and obvious errors or inaccuracies.

A commenter stated that the proposed rule did not include standards for determining whether a STEM OPT student is being "trained," rather than simply working.   According to the commenter, this would result in every training plan being approved whether or not a bona fide educational experience is being achieved.   This commenter was also concerned that DSOs have an inherent conflict of interest in this regard.   According to the commenter, DSOs "have every

incentive, and likely pressure from their administrations, to approve all work permits."  The commenter concluded that the proposed rule's focus on "training" and "educational experience" will not prevent participants from seeing OPT as a work permit and treating it as such.

Some commenters requested that USCIS adjudicators make the final assessment as to the sufficiency of training plans, including because such plans are central to qualifying for STEM OPT extensions and employment authorization.  Other commenters asked for clear guidance and coordination with respect to USCIS's review of training plans.  Commenters expressed concern that in the absence of clear standards, USCIS adjudicators may issue erroneous Requests for Evidence (RFEs) or deny applications without appropriate due process.  Some commenters expressed concerns about the effect of the training plan requirement on USCIS processing times.  Another commenter stated that USCIS review of training plans would be insufficient, because "DHS employees have no expertise in evaluating what is, and is not, practical training."

Response.  DHS agrees with the commenters' suggestions to issue clear guidance for DSOs and USCIS adjudicators with respect to the adjudication of Training Plans.  As noted above, DHS has revised for clarity the regulatory text describing the requirements governing Training Plans, and has also revised the form itself.  DHS is aware that the new requirements will also require training and outreach to ensure that all affected parties understand their role in the process.

DHS also clarifies that DSO approval of a request for a STEM OPT extension means that the DSO has determined that the Training Plan is completed and signed, and that it addresses all program requirements.  DHS anticipates that such review will be fairly straightforward.  The Department does not expect DSOs to possess technical knowledge of STEM fields of study.  When reviewing the Training Plan for completeness, the DSO should confirm that it (1) explains

203

Exhibit 1
536

how the training is directly related to the student's qualifying STEM degree; (2) identifies goals for the STEM practical training opportunity, including specific knowledge, skills, or techniques that will be imparted to the student, and explains how those goals will be achieved through the work-based learning opportunity with the employer; (3) describes a performance evaluation process to be utilized in evaluating the OPT STEM student; and (4) describes methods of oversight and supervision that generally apply to the OPT STEM student.  The DSO should also ensure that all form fields are properly completed.  So long as the Training Plan meets these requirements, the DSO has met his or her obligation under the rule.

DHS also understands commenters' concerns on the ability of DSOs to determine whether an employer had failed to meet regulatory requirements prior to the commencement of a STEM OPT extension.  DHS clarifies that DSOs are not required to conduct additional outside research into a particular employer prior to making a STEM OPT recommendation.  In making such a recommendation, DSOs should use their knowledge of and familiarity with the F-1 regulations, including the STEM OPT requirements finalized in this rule.  DHS notes that a student often may be requesting to extend a training opportunity already underway with an employer for which he or she will have already received training, which the DSO will have previously recommended and of which he or she will already have some record.  Where this is not the case, the DSO can still rely, as he or she can in all cases, upon the information provided on the Training Plan and any other information the DSO believes to be pertinent to his or her recommendation decision, at the time he or she makes the recommendation.

DHS also disagrees with comments suggesting that DSOs have conflicts of interest with respect to reviewing training plans.  Based on decades of experience with OPT, DHS has no reason to question the integrity of DSOs or their ability to fulfill their obligations effectively and

maintain the integrity of the STEM OPT extension program.  The role of DSOs under this program is similar to the role they have historically played in the F-1 program.

DHS also notes that it may, at its discretion, withdraw a previous submission by a school of any individual who serves as a DSO.  See 8 CFR 214.3(l)(2).  Additionally, under longstanding statutes and regulations, SEVP may withdraw on notice any school's participation in the F-1 student program (or deny such a school recertification) for any valid and substantive reason.  See 8 CFR 214.4(a)(2).  For instance, SEVP may withdraw certification or deny recertification if SEVP determines that a DSO willfully issued a false statement, including wrongful certification of a statement by signature, in connection with a student's application for employment or practical training.  See id.  SEVP may take the same action if it determines that a DSO engaged in conduct that does not comply with DHS regulations.  Id.

With respect to comments about USCIS's role in the process, DHS clarifies that USCIS maintains the discretion to request and review all documentation when determining eligibility for benefits.  See 8 CFR 103.2(b)(8)(iii).  Accordingly, USCIS may request a copy of the Training Plan (if it is not otherwise available) or other documentation when such documentation is necessary to determine an applicant's eligibility for the benefit, including instances when there is suspected fraud in the application.[115]  DHS further clarifies that USCIS would deny an Application for Employment Authorization if it finds that any of the regulatory standards are not met.  DHS believes that the regulatory standards are articulated at a sufficient level of particularity for this purpose.

Beyond the clarifications provided above, DHS does not believe it is necessary or appropriate to issue significant additional guidance in this final rule.  Given the many different

---

[115] When Training Plans are available through SEVIS, USCIS will have real-time access to each plan without needing to issue an RFE.

practical training opportunities available to students, it would be cumbersome for DHS to define with more particularity the full range of student-employer interactions or guided-learning opportunities that may meet the rule's requirements.  DHS believes that it would be more appropriate to issue any necessary guidance separately, as needed.  Issuing guidance in this manner will allow DHS to promote consistent adjudications while allowing for flexibility as issues develop.  As such, DHS confirms that ICE and USCIS will finalize guidance and provide training to ensure that all entities are ready to process requests for STEM OPT extensions as soon as possible.

Comment.  Some commenters suggested that employers and students, rather than DSOs or DHS, are best positioned to explain how a student's STEM degree is related to a practical training opportunity.

Response.  DHS agrees that employers and students must identify the relationship between the student's STEM degree and the practical training opportunity.  This final rule requires the student and employer to complete and submit to the DSO a Training Plan that describes this relationship (among other things).  DHS does not agree, however, that students and employers should be solely responsible for determining whether a student's STEM degree is directly related to the practical training opportunity being offered, as doing so would result in a true conflict of interest and lack of accountability.

Comment.  One commenter expressed concern that DSOs will be required to check wages through the Department of Labor Foreign Labor Certification Data Center's Online Wage Library to ensure that the employee is being paid fairly.  The commenter stated that such a requirement would add additional time to approval of training plans and could expose schools to legal action from employers and students who submitted plans that were not accepted by the

school.  The commenter also said DSOs would be required to function as de facto USCIS

adjudicators when approving or denying training plans, and as de facto ICE agents when trying

to locate a student who has not completed his or her 6-month validation report.

Response.  As noted above, the DSO's role with respect to the Training Plan for STEM

OPT Students is limited.  DSOs are not expected to conduct independent research to determine

whether an employer attestation or other information in the Training Plan, including wage

information, is accurate.  Thus, DSOs are not expected to assess the wage information.  With

respect to validation reports, such reports have served since 2008 as important confirmations that

critical student information in SEVIS is current and accurate.  When a student fails to submit a

validation report on a timely basis, however, there is no requirement for further action on the part

of the DSO.  All necessary data for determining when a student has failed to submit a validation

report is contained in SEVIS, and no further action is necessary to alert DHS of the student's

failure.

iii.    Form Fields, Form Number, Form Instructions

Comment.  Some commenters stated that USCIS already has a form designated as Form

I-910, Application for Civil Surgeon Designation, and requested that ICE assign a different form

number to the Training Plan form.  Another commenter suggested that DHS use a form number

other than I-910 to avoid confusion with the current Form I-901, which all F-1 students use to

pay their SEVIS fees.

Response.  In response to these comments, DHS has revised the number for the Training

Plan for STEM OPT Students associated with this final rule to "Form I-983."  This change

should prevent confusion among F-1 students and other stakeholders.

207

Exhibit 1
540

Comment.  As proposed, the Mentoring and Training Plan would have required the student to attest that he or she will notify the DSO "at the earliest possible opportunity if I believe that my employer or supervisor . . . is not providing appropriate mentorship and training as delineated on this Plan."  Some commenters recommended that the student attestation on the Training Plan form be revised to eliminate the words "if I believe" and "appropriate" because they are confusing and ask students to make subjective assessments regarding the required training and mentoring.  Commenters suggested that the student should only be required to notify the DSO if the student believes that "a gross deviation" from the training plan has occurred.  Another commenter stated that this notification requirement was not necessary because students are already required to report any interruption of employment.

Response.  DHS believes that the student's subjective assessment matters.  If a student believes that the employer is not providing the practical training opportunity described in the Training Plan, the student should report the matter to his or her DSO.  DHS considers students in this program to be capable of self-reporting in a responsible manner.  DHS believes that relying upon students' reasonable judgment in the student attestation will best protect the well-being of students and the integrity of the STEM OPT extension.  Additionally, DHS clarifies that this attestation element does not reference, and is not intended to apply to, interruptions of employment.  Students and employers that are concerned about the risk of frequent reporting of the student's assessment may be able to avoid potential issues by clearly setting forth mutual expectations in the Training Plan.

Comment.  As proposed, the Mentoring and Training Plan included an attestation by the student that he or she understands that DHS may deny, revoke, or terminate a student's STEM OPT extension if DHS determines the student is not engaging in OPT in compliance with law,

including if DHS determines that the student or his or her employer is not complying with the Training Plan.  One commenter suggested removing this attestation because, according to the commenter, it is vague and overly harsh and holds the student accountable for the employer's noncompliance.  The commenter also stated that because the proposed rule allowed for 150 days of authorized unemployment, "there should be no further immigration repercussion to the student if they need to interrupt STEM OPT due to lack of appropriate mentorship."

Response.  DHS disagrees with the commenter.  The attestation serves as an important reminder to the student that failure to comply with the regulatory requirements related to the STEM OPT extension may result in a loss of status.  Moreover, contrary to the commenter's understanding, the attestation does not state or imply that DHS would take action against students who become unemployed, including because an employer has failed to comply with program requirements.  A period of unemployment, on its own, will not affect the STEM OPT student's status so long as the student reports changes in employment status and adheres to the overall unemployment limits.

Comment.  One commenter recommended that the phrase "SEVIS ID No." on the first page of the form (Section 1) should read "Student SEVIS ID No." for clarity.

Response.  DHS agrees that the suggested change increases clarity and has made this change to the Training Plan for STEM OPT Students.

Comment.  The same commenter stated that the "School Name and Campus Name" section should be reorganized for additional clarity.  Specifically, the commenter stated that the form should include a section for "School that Recommended Current OPT" and a separate section for "School Where Qualifying Degree was Earned" in order to cover students who are using previously obtained STEM degrees as the basis for a STEM OPT extension.

209

Exhibit 1
542

<u>Response</u>.  DHS agrees and the form has been updated to clarify information for previously obtained STEM degrees.

<u>Comment</u>.  A commenter requested that DHS clarify the question in Section 3 of the proposed Mentoring and Training Plan, which requests the number of full-time employees that work for the employer.  The commenter also suggested that DHS add the website address for North American Industry Classification System (NAICS) codes (http://www.census.gov/eos/www/naics) to the instructions for the relevant question on NAICS codes in Section 3.

<u>Response</u>.  DHS agrees with both of these suggestions.  To increase clarity, DHS has revised the question concerning full-time employees to read, "Number of full-time employees in the U.S."  DHS also has amended the form instructions to Section 3 to add the website for NAICS codes.

<u>Comment</u>.  Commenters suggested eliminating the "Training Field" box in Section 5 of the proposed Mentoring and Training Plan.  According to the commenters, a detailed description of the training opportunity was already required in other fields and it was not clear what the "Training Field" box added given that there was also a separate box for "Qualifying Major."

<u>Response</u>.  DHS agrees with the commenter and has removed the field from the final version of the Training Plan.

<u>Comment</u>.  One commenter sought clarification on whether all fields in the Mentoring and Training Plan were mandatory.  The commenter also sought clarification on what an employer should do if one or more fields were not applicable to that employer.

210

Exhibit 1
543

Response.  DHS clarifies that employer information should be filled in as applicable.  If an employer does not have a website, for example, "N/A" will suffice in the field requesting the employer website.

Comment.  One commenter stated that the form requirements should be included in the regulatory text.  The commenter noted that certain sections of the proposed Mentoring and Training Plan required parties to certify that they would make notifications "at the earliest available opportunity," but that such a requirement was not included in the regulatory text itself.

Response.  In response to this comment, DHS has amended the final regulatory text to more clearly reflect the responsibilities of participating parties.  The Department believes these requirements are now sufficiently clear.

iv.    Training Plan Obligations and Non-Discrimination Requirements

Comment.  One comment stated that "[t]he proposed OPT STEM hiring and extension process would also constitute national origin discrimination, as the program is clearly intended to benefit aliens whose nationality is among one of the nations for which employment based immigrant visas are continuously oversubscribed, in particular nationals of India and China."

Response.  DHS rejects the suggestion that the STEM OPT extension program will benefit individuals based on their national origin or nationality.  The program is equally available to all F-1 students with a qualifying STEM degree and has neither quotas nor caps for nationals of any given country or region.  The comment also offers no evidence to support the statement that the rule "is clearly intended to benefit" individuals based on nationality.

Comment.  Some commenters stated that the proposed rule would "induce" employers and universities to discriminate against U.S. workers in violation of 8 U.S.C. 1324b and would "impermissibly facilitate prohibited employment-related discrimination on the basis of alienage

and national origin." These commenters cited to various statutory provisions (42 U.S.C. 1981(a); 42 U.S.C. 2000e-2(a),(d); and 8 U.S.C. 1324b(a)(1)(A) and (B)) and suggested that the Department's proposed Mentoring and Training Form would violate these Federal anti-discrimination laws. Commenters stated that the rule would discriminate against U.S. citizen and lawful permanent resident students because it would not require employers to offer an identical "program" to such students. One commenter also likened the proposed Mentoring and Training Plan to the execution of a contract in violation of 42 U.S.C. 1981(a), which prohibits discrimination in making contracts. The comment cited to case law purporting to support the commenter's argument, but did not explain how the plan violated the statute.

Response. As a preliminary matter, the Training Plan for STEM OPT Students requires an employer to certify that the training conducted pursuant to the plan complies with all applicable Federal and State requirements relating to employment. This broad certification encompasses compliance with all of the laws the commenters referenced.

DHS also disagrees with the apparent premise behind the commenters' arguments. That premise appears to be that the rule will require or inappropriately induce U.S. employers to provide benefits to F-1 students that are not provided to its other employees, including U.S. workers. Neither the rule nor the Training Plan, however, requires or encourages employers to exclude any of their employees from participating in training programs. And insofar as an employer may decide to offer training required by the regulation only to STEM OPT students, doing so does not relieve that employer of any culpability for violations of section 274B of the INA, 8 U.S.C. 1324b, or any other federal or state law related to employment.

Moreover, the training plan requirement is not motivated by any intention on the part of DHS to encourage employers to treat STEM OPT students preferentially. Rather, DHS is

requiring the Training Plan to obtain sufficient information to ensure that any extension of F-1 student status under this rule is intended to augment the student's academic learning through practical experience and equip the student with a broader understanding of the selected area of study and functionality within that field.  The Training Plan also serves other critical functions, including, but not limited to, improving oversight of the STEM OPT extension program, limiting abuse of on-the-job training opportunities, strengthening the requirements for STEM OPT extension participation, and enhancing the protection of U.S. workers.  By documenting the student's participation in a training program with the employer, the Training Plan provides information necessary for oversight, verification, tracking, and other purposes.

The training plan requirement does not discriminate against U.S. students or anyone else, or create a discriminatory contract (even assuming that it creates a contractual obligation at all). In pertinent part, 42 U.S.C. 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts."  The commenter that raised concerns related to this provision did not identify any feature of the proposed rule that would deny or otherwise impair any person's rights "to make and enforce contracts" or any other rights described in the statute.  The statute has no bearing on the training plan requirement in this rule.

G.      Application Procedures for STEM OPT Extension

1.      Description of Final Rule and Changes from NPRM

Under the rule, a student seeking an extension must properly file a Form I-765, Application for Employment Authorization, with USCIS within 60 days of the date the DSO enters the recommendation for the STEM OPT extension into the SEVIS record.  The 2008 IFR had previously established a time period of 30 days after the DSO recommendation for the filing

213

Exhibit 1
546

of the Application for Employment Authorization.  As proposed in the NPRM, DHS believes the longer 60-day application period will, among other things, reduce the number of USCIS denials of such applications that result from expired Form I-20 Certificates of Eligibility, the number of associated data corrections needed in SEVIS, and the number of students who would need to ask DSOs for updated Certificates of Eligibility to replace those that have expired.  Under this rule, the "time of application" for a STEM OPT extension refers to the date that the Application for Employment Authorization is properly filed at USCIS.

2.    Public Comments and Responses

Comment.  Several commenters agreed with DHS's assessment in the proposed rule that no changes to Form I-765, Application for Employment Authorization, are needed.  These commenters thought that the application form is clear and that any minor changes or clarifications (such as the regulatory cite included on the form) should be incorporated into the instructions to the application rather than into the application itself.  Many commenters also agreed with DHS's proposal to extend the period of time to file the Application for Employment Authorization from 30 to 60 days from the date that the DSO enters the STEM OPT extension recommendation in SEVIS.  Some of these commenters stated that it can be challenging for DSOs and students to meet the current 30-day deadline, as STEM OPT students are already working at the time of application and may no longer be as close in proximity or contact with their DSOs as they were prior to starting practical training.  Commenters also stated that the 60-day filing deadline would provide greater flexibility for students and likely reduce the workload of DSOs, who would otherwise need to reissue Form I-20 Certificates of Eligibility to students whose forms have expired, as well as reduce the number of Applications for Employment Authorization that need to be filed.  Some commenters so strongly supported the 60-day deadline

214

Exhibit 1
547

that they requested it apply to all students requesting OPT in any academic field, noting that having two different application filing windows serves no useful purpose and also has the potential to confuse both students and adjudicators.

Response.  DHS agrees that no revisions to the Application for Employment Authorization are needed and that any minor revisions should be incorporated into the form instructions.  DHS also appreciates commenters' support for the proposed 60-day filing period for students to file their Application for Employment Authorization after the DSO enters the STEM OPT extension recommendation in SEVIS.  This final rule includes this proposal.  As noted in the proposed rule, the longer filing window addresses problems that resulted from expiration of Form I-20 Certificates of Eligibility and reduces the need for data corrections in SEVIS.  DHS also clarifies that this change only applies to STEM OPT extensions.  Changing the 30-day filing period for students seeking a 12-month period of post-completion OPT is outside the scope of this rulemaking.

Comment.  One commenter advocated for students to be able to file only one Application for Employment Authorization to cover the entire OPT period, including the 12-month post completion period and the 24-month STEM OPT extension period.  In support of this suggestion, the commenter noted that the application form already requires the applicant to reveal all previously filed Applications for Employment Authorization and provides an opportunity to request a STEM OPT extension.  The commenter also suggested that such form should be available to request a second STEM OPT extension.  Another commenter requested that the $380 fee for filing Applications for Employment Authorization not apply to students seeking STEM OPT extensions.  The commenter characterized the fee as generally a "heavy burden" for

students, and as an "unreasonable" burden for those students who failed to meet the eligibility requirements for reasons beyond their control.

Response.  DHS believes that it would be unwieldy and potentially confusing to allow a student to apply for a STEM OPT extension as part of the student's application for initial post-completion OPT.  The requirement for a separate application allows the student to engage in an initial period of post-completion OPT without requiring a student and employer to complete a full Training Plan a year in advance of the student's STEM OPT extension.  The requirement for a separate application also allows DHS to consider program eligibility closer in time to the start of the student's STEM OPT extension.

In regard to the fee for the associated Application for Employment Authorization, DHS declines to exempt certain students from the filing fee, which generally applies to all such applications filed by F-1 students.  As noted above, each application for STEM OPT requires DHS to consider the student's eligibility under the applicable regulations at the time of application.

Comment.  Some commenters expressed concern that USCIS officers adjudicating Applications for Employment Authorization from STEM OPT students would not have sufficient training on the contents or veracity of the proposed Mentoring and Training Plan to determine whether and how it should affect the student's eligibility for a STEM OPT extension and attendant employment authorization.  These commenters questioned whether the proposed plan was necessary for the adjudication of Applications for Employment Authorization, particularly because USCIS officers are not trained career counselors.  In contrast, some commenters requested that USCIS officers expand the scope of the adjudication of such applications.  Such requests included having USCIS officers make evaluations of a prior institution's accreditation

216

Exhibit 1
549

status and the student's proposed Mentoring and Training Plan, as such information is not related to the student's current academic program and is not widely available.

Response.  DHS appreciates commenters' concerns about appropriate training for USCIS officers and assures the public that USCIS will provide appropriate guidance and training resources for its adjudicators.  Adjudicators will be equipped with guidance that address, among other issues, whether the submitted evidence is sufficient to establish eligibility for employment authorization; what to do when the applicant has not provided sufficient evidence; and what information should be requested in an RFE or Notice of Intent to Deny.  Finally, in this final rule, USCIS confirms that adjudicators have the discretion to request a copy of the Training Plan, in addition to other documentation, when such documentation is necessary to determine an applicant's eligibility for the STEM OPT extension, including instances where there is suspected fraud in the application.

Comment.  An advocacy organization recommended that DHS publicly disclose raw data gathered from Applications for Employment Authorization.  The commenter argued that this disclosure would improve transparency and enhance the ability of policymakers and advocates to ensure fair treatment and compliance with these programs.

Response.  To the extent the commenter is seeking data from all filed Applications for Employment Authorization, and not just from STEM OPT students, the request is well outside the scope of this rulemaking.  With respect to applications filed by STEM OPT students, even assuming such a request is within the scope of this rule, DHS declines to affirmatively publish all raw data gathered from such applications.  Among other things, the application contains sensitive personally identifiable information, and blanket public disclosure would violate applicable privacy laws and policies.  Relevant information related to the STEM OPT extension program

217

Exhibit 1
550

may be available through the FOIA process.  The USCIS centralized FOIA office receives, tracks, and processes all USCIS FOIA requests to ensure transparency within the agency. Instructions on how to submit a FOIA request to USCIS are available on-line at https://www.uscis.gov/about-us/freedom-information-and-privacy-act-foia/uscis-freedom-information-act-and-privacy-act.

Comment.  One commenter sought clarification on whether relevant changes to the Application for Employment Authorization and SEVIS will be completed by the date that this rule goes into effect.  The commenter also asked whether these changes would affect the SEVIS releases scheduled for November 2015 and spring 2016.

Response.  DHS is not making any changes, as a result of this rulemaking, to the Application for Employment Authorization; rather, minor changes have been included in the form instructions.  The Application for Employment Authorization and its instructions are available on USCIS' website (http://www.uscis.gov/i-765), where users can also find information about filing locations and filing fees.  SEVIS, including planned releases, will not be affected by the minor changes to the form instructions.

Comment.  An individual commenter requested a change to the proposed rule's provision allowing F-1 students to file for a STEM OPT extension prior to the end of their initial 12-month period of post-completion OPT.  The commenter suggested that DHS also allow students to apply for a STEM OPT extension up to 60 days following the end of the initial OPT period.  The commenter stated that this change would align the provision with the application period for initial post-completion OPT, in which a student can file an application up to 60 days following graduation.

<u>Response</u>.  DHS declines to adopt the commenter's recommendation.  The current requirement to properly file the request for a STEM OPT extension prior to the end of the initial period of post-completion OPT allows sufficient time for the F-1 student to apply for the extension and is administratively convenient as it ensures continuing employment authorization during the transition from the initial OPT period to the STEM OPT extension period.  The requirement thus helps prevent disruption in the student's employment authorization as the student transitions from his or her initial post-completion OPT period to the STEM OPT extension period.

<u>Comment</u>.  One commenter requested clarification on whether a student who violates his or her F-1 status during a STEM OPT extension period may apply for reinstatement to F-1 status under 8 CFR 214.2(f)(16) if the status violation resulted from circumstances beyond the student's control.  The commenter also asked whether such a student would be able to continue working while the reinstatement application is pending.

<u>Response</u>.  A student who violates his or her F-1 status during the STEM OPT extension period may be granted reinstatement to valid F-1 status if he or she meets the regulatory requirements.  See 8 CFR 214.2(f)(16).  Importantly, in the STEM OPT context, the student will need to establish that the status violation resulted from circumstances beyond the student's control.  The student, however, will not be able to continue working during the pendency of the reinstatement application; such employment would be considered unlawful.  Moreover, if the student's reinstatement application is approved, the student will need to file a new Form I-765, Application for Employment Authorization.  If the Application for Employment Authorization is approved, the period of time the student spent out of status will be deducted from his or her 24-month STEM OPT extension period.

219

Exhibit 1
552

<u>Comment</u>.  One commenter recommended that the rule increase the time period during which a student with a pending STEM OPT application is allowed to remain employed.  The proposed rule provided an automatic extension of employment authorization of up to 180 days upon the timely filing of the application for a STEM OPT extension.  The commenter suggested amending the rule to provide a 240-day period, which the commenter believed would be consistent with a similar provision for other nonimmigrants who timely file applications for extensions of stay.[116]  According to the commenter, employers are familiar with the 240-day period provided in other contexts and using a common timeframe for STEM OPT applications would help employers more efficiently maintain their obligations to verify the eligibility of employees to work in the United States through the Form I-9 Employment Eligibility Verification process.  The commenter also noted that the 240-day period would better accommodate lengthy USCIS processing times.

<u>Response</u>.  DHS has determined that the current period of up to 180 days is appropriate and will not adopt the commenters' suggestion to lengthen this period.  DHS did not propose any changes to this 180-day period, which has been in existence since 2008.  Employers who hire individuals on STEM OPT extensions should thus already be familiar with this timeframe.  Moreover, given that USCIS' average EAD processing time is typically at about the 90-day

---

[116] 8 CFR 274a.12(b)(6)(iv) authorizes employment for students seeking a STEM OPT extension if they timely file an Application for Employment Authorization and such application remains pending.  Employment is authorized beginning on the expiration date of the student's OPT-related EAD and ending on the date of USCIS' written decision on the Application for Employment Authorization, but not to exceed 180 days.  In contrast, 8 CFR 274a.12(b)(20) allows certain nonimmigrants (not including F-1 students) whose statuses have expired but who have timely filed applications for an extension of stay to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay.

Exhibit 1
553

mark,[117] the 180-day timeframe provides sufficient flexibility in case of unexpected delays.

Therefore, a longer auto-extension period for EADs is unnecessary.

    H.   Travel and Employment Authorization Documentation of Certain F-1 Nonimmigrants Changing Status in the United States or on a STEM OPT Extension

    1.   Description of Final Rule and Changes from NPRM

This final rule includes the 2008 IFR's Cap-Gap provision, which allows for automatic extension of status and employment authorization for any F-1 student with a timely filed H-1B petition and request for change of status, if the student's petition has an employment start date of October 1 of the following fiscal year. The measure avoids inconvenience to some F-1 students and U.S. employers through a common-sense administrative mechanism to bridge two periods of authorized legal status. As noted previously, the so-called Cap Gap is a result of the misalignment of the academic year with the fiscal year.

This final rule also clarifies that an EAD that appears to have expired on its face but that has been automatically extended under 8 CFR 274a.12(c)(3)(i)(B) is considered unexpired for the period beginning on the expiration date listed on the Employment Authorization Document and ending on the date of USCIS' written decision on the current employment authorization request, but not to exceed 180 days, when combined with a Form I-20 Certificate of Eligibility endorsed by the DSO recommending the Cap-Gap extension. Otherwise, DHS is finalizing the Cap-Gap provision as proposed, but provides clarification and explanation below in response to public comments regarding status, travel, and employment authorization during a Cap-Gap period or a STEM OPT extension.

---

[117] For updated processing times, please see "USCIS Processing Time Information," available at https://egov.uscis.gov/cris/processTimesDisplay.do.

Lastly, the final rule clarifies that if a petitioning employer withdraws an H-1B petition upon which a student's Cap-Gap period is based, the student's Cap-Gap period will automatically terminate.  In other words, if an employer withdraws the H-1B petition before it is approved, the student's automatic extension of the student's duration of status and employment authorization under the Cap-Gap provision will automatically end, and the student will enter the 60-day grace period to prepare for departure from the United States.  8 CFR 214.2(f)(5)(iv).

        2.    <u>Public Comments and Responses</u>

        i.    <u>Inclusion of Cap-Gap Relief and End Date of Cap-Gap Authorization</u>

<u>Comment</u>.  Many commenters supported the Cap-Gap provision as proposed, noting that it would help the United States attract talented international students and bolster the economy. Some stated that Cap-Gap relief was an important part of the 2008 IFR and requested that it be retained because the H-1B visa program is a common mechanism for F-1 students to transition to long-term employment in the United States.  According to the commenters, Cap-Gap relief is essential to avoid gaps in work authorization between the April filing window for H-1B visas and the October 1 start date for most new H-1B beneficiaries who are subject to the H-1B cap.

Some commenters supported Cap-Gap relief for certain F-1 students based on the notion that these students have been following immigration laws and helping to maintain the United States' position as the world's leader in technology and innovation.  Other supporters asserted that Cap-Gap relief will boost productivity and entrepreneurship and thus provide the United States with a competitive advantage in the global market.  Several commenters stated that the Cap-Gap extension is helpful to employers as it avoids disruptions in the workplace caused by the students' departure from the United States solely due to a temporary gap in status.

Response.  DHS agrees with commenters that the Cap-Gap provision is a common-sense administrative measure to avoid gaps in status fully consistent with the underlying purpose of the practical training program.  The Cap-Gap provision is needed to address the inherent misalignment of the academic year with the fiscal year.  This relief measure avoids inconvenience to some F-1 students and U.S. employers by bridging short gaps in status for students who are the beneficiaries of H-1B petitions.

Comment.  Under the 2008 IFR and as proposed, the Cap-Gap provision automatically extends a qualifying student's status and employment authorization based on the filing of an H-1B petition and request for change of status until the first day of the new fiscal year (October 1). Some commenters requested that DHS revise the Cap-Gap provision so as to automatically extend status and employment authorization "until adjudication of such H-1B petition is complete."  Commenters stated that an extension until October 1 may have been appropriate in the past, when H-1B petitions were adjudicated well before that date, but current USCIS workload issues and RFE responses can delay such adjudications beyond October 1.  The result, according to one commenter, is that the beneficiary of an H-1B petition that remains pending beyond October 1 must stop working on that date and wait for a decision.  By amending the regulations to provide extensions until the date that the H-1B petition is finally adjudicated, the commenter noted, a beneficiary could avoid any such gaps in status.

In addition, one commenter requested that DHS clarify the date on which the automatic extension of status ends.  The commenter stated that September 30 would be a more appropriate end date than October 1, as the beneficiary's H-1B status would generally become effective on October 1.

      Response.  DHS recognizes that some cap-subject H-1B petitions remain pending on or after October 1; however, in light of the importance that DHS places on international students, USCIS prioritizes petitions seeking a change of status from F-1 to H-1B.  This prioritization normally results in the timely adjudication of these requests, so the vast majority of F-1 students changing status to H-1B do not experience any gap in status.

      The general presumption is that when a nonimmigrant's period of authorized stay has expired, he or she must depart the United States.  However, the Cap-Gap provision provides a special accommodation to F-1 students who are seeking to change to H-1B status, based on the understanding that the academic year of most colleges and universities does not align with the fiscal year cycle upon which the H-1B program is based.  The Cap-Gap provision is based in part on the premise that students who seek to benefit from the provision actually qualify for H-1B status.  USCIS is thus concerned that extending the Cap-Gap employment authorization beyond October 1, a date by which virtually all approvable change-of-status petitions for F-1 students are adjudicated by USCIS, would reward potentially frivolous filings.  The October 1 cut-off thus serves to prevent possible abuse of the Cap-Gap extension.  USCIS will continue to make every effort to complete adjudications on all petitions seeking H-1B status for Cap-Gap beneficiaries prior to October 1, including by timely issuing RFEs in cases requiring further documentation.  DHS therefore declines to allow students whose H-1B petitions remain pending beyond October 1 to continue to benefit from the Gap-Gap extension, primarily because doing so would enable students who may ultimately be found not to qualify for H-1B status to continue to benefit from the Cap-Gap extension.

      Finally, DHS clarifies that F-1 status for a Cap-Gap beneficiary under this provision expires on October 1, consistent with the regulatory text at 8 CFR 214.2(f)(5)(A)(vi).  However,

an individual with a timely-filed, non-frivolous H-1B change-of-status petition will be considered to be in a period of authorized stay during the pendency of the petition. An individual may remain in the United States during this time, but is not authorized to work. If an H-1B change-of-status petition requesting a start date of October 1 has been approved, the F-1 status will expire on the same day as the H-1B status begins.

Comment. Some commenters requested that DHS clarify that OPT students whose employment authorization has been extended pursuant to the Cap-Gap provision are permitted to change employers. Commenters expressed confusion because under the 2008 IFR, and as proposed, the regulatory provision authorizing employment for Cap-Gap beneficiaries is included in a list of nonimmigrant classifications that are authorized for employment "with a specific employer incident to status." See 8 CFR 274a.12(b) and (b)(6)(v). Commenters recommended that DHS revise the title of the list to eliminate confusion and clarify that an F-1 student can change employers between the filing of an H-1B petition (generally in April) and the date on which a cap-subject H-1B petition takes effect (generally on October 1). One of these commenters recommended that DHS include Cap-Gap beneficiaries under 8 CFR 274a.12(a), which lists categories of aliens who are authorized for employment "incident to status," in order to make such beneficiaries employment authorized without employer-specific restrictions.

Response. DHS clarifies that there is generally no prohibition against an F-1 student's changing of employers during a Cap-Gap period. However, F-1 students may only engage in employment that is directly related to their major area of study. Moreover, because the list of nonimmigrant classifications at 8 CFR 274a.12(b) covers a broad range of nonimmigrant classes, DHS believes deletion of the phrase "with a specific employer" from the regulatory provision would lead to confusion. DHS thus declines to adopt this suggestion. Additionally, given that

the vast majority of commenters supported the Cap-Gap provision as proposed, DHS has determined that the provision is sufficiently clear and therefore declines to further amend 8 CFR 274a.12(b)(6)(v) or to place the regulatory provision under 8 CFR 274a.12(a).  Again, an F-1 student may change employers during a Cap-Gap period, but must do so in accordance with the OPT regulations (e.g., by finding a position directly related to his or her major area of study, among other requirements).

Comment.  Some commenters requested clarification about whether the Cap-Gap provisions apply to H-1B petitions that are cap-exempt (i.e., not subject to the annual numerical cap on H-1B visas).  According to these commenters, proposed 8 CFR  214.2(f)(5)(vi) appeared to state that a STEM OPT student who was the beneficiary of a cap-exempt H-1B petition could also extend his or her duration of status and possibly employment authorization under the provision, provided the H-1B petition was timely filed and requested an employment start date of October 1.

Response.  DHS clarifies that the Cap-Gap provision applies only to the beneficiaries of H-1B petitions that are subject to the annual numerical cap.  The purpose of the Cap-Gap provision is to avoid situations where F-1 students are required to leave the country or terminate employment at the end of their authorized period of stay, even though they have an approved H-1B petition that would again provide status to the student in a few months' time.  Due to the realities associated with the H-1B filing season, employers filing H-1B petitions for cap-subject F-1 students are effectively required to file petitions with start dates of October 1, which allows such employers to file the change-of-status petitions with USCIS at the beginning of the H-1B

filing window (generally April 1 of the preceding fiscal year).[118]  A petitioner filing an H-1B

petition for a cap-subject beneficiary that does not file at the beginning of the filing window risks

not being able to file at all if the window closes due to high demand for H-1B visas.

In contrast, employers filing H-1B petitions on behalf of <u>cap-exempt</u> beneficiaries may

request an employment start date based on the petitioners' actual need rather than on the H-1B

filing season.  As such, cap-exempt beneficiaries do not share the same need as cap-subject

beneficiaries to bridge status until the next fiscal year.  For these reasons, the Cap-Gap provision

benefits only those beneficiaries who are subject to the H-1B cap.  DHS maintains its long-

standing interpretation that 8 CFR 214.2(f)(5)(vi) is limited to cap-subject H-1B beneficiaries,

but has revised the regulatory text to clarify this practice.

<u>Comment</u>.  One commenter asked DHS to clarify the deadline for filing applications for

STEM OPT extensions by F-1 students in a Cap-Gap period.  According to the commenter, the

relevant section in the proposed rule indicated that students are required to file "prior to the

expiration date of the student's current OPT employment authorization."  The commenter asked

DHS to clarify the meaning of this provision with respect to F-1 students with an approved Cap-

Gap extension.  Specifically, the commenter asked whether "the expiration date of the student's

current OPT employment authorization" refers to the date on which the student's EAD expires or

the end date of the student's approved Cap-Gap extension.

<u>Response</u>.  A student may file for a STEM OPT extension only if the student is in a valid

period of post-completion OPT at the time of filing.  A student whose post-completion OPT

---

[118] Employers may not file, and USCIS may not accept, H-1B petitions submitted more than six months in advance of the date of actual need for the beneficiary's services or training.  However, because demand for H-1B visas far exceeds supply in most years, employers generally rush to file at the first available opportunity.  As H-1B visas are authorized by fiscal year, and thus may begin to authorize employment as early as the first date of the fiscal year (October 1), the filing window for cap-subject H-1B petitions opens (and generally closes) six months earlier (April 1 of the preceding fiscal year).

Exhibit 1
560

period has been extended under Cap-Gap is in a valid period of post-completion OPT, and may therefore apply for a STEM OPT extension during the Cap-Gap period if he or she meets the STEM OPT extension requirements.[119]  Please note, however, that if the H-1B petition upon which the student's Cap-Gap period is based has been approved and is not withdrawn prior to October 1, the student's change to H-1B status will take effect on October 1, and the student will no longer be eligible for a STEM OPT extension.

      ii.    <u>Travel During Cap-Gap and While on STEM OPT Extension</u>

    <u>Comment</u>.  Several commenters requested that DHS allow students to travel abroad during the Cap-Gap period.  Some of these commenters requested that F-1 students in OPT be allowed to travel overseas if they have a pending or approved request to change status to that of an H-1B nonimmigrant during the Cap-Gap period.  One commenter asked DHS to harmonize policies with the Department of State regarding travel and reentry to the United States in Cap-Gap scenarios.  The commenter opined that the two Departments' policies on this issue have been inconsistent, recommending this rulemaking as an appropriate opportunity to clarify when an F-1 student in a Cap-Gap period may travel.  Another commenter suggested that the guidance in the Department of State Foreign Affairs Manual (9 FAM 41.61 N13.5-2 Cap Gap Extensions of F-1 Status and OPT) could serve as the basis for a unified policy among the two departments that allows travel and reentry during the Cap-Gap period.[120]  One commenter also asked DHS to

---

[119] A student in Cap-Gap who meets the eligibility requirements for a 24-month STEM OPT extension may file his or her Application for Employment Authorization, with the required fee and supporting documents, up to 90 days prior to the expiration of the Cap-Gap period on October 1.  8 CFR 214.2(f)(11)(i)(C).

[120] 9 FAM 402.5-5(N)(6)(f) (previously 9 FAM 41.61 N13.5-2) provides that if an F-1 student is the beneficiary of a timely filed petition for a cap-subject H-1B visa, with a start date of October 1, the F-1 status and any OPT authorization held on the eligibility date is automatically extended to dates determined by USCIS allowing for receipt or approval of the petition, up to September 30.  The Cap-Gap OPT extension is automatic, and USCIS will not provide the student with a renewed EAD.  However, F-1 students in this situation can request an updated Form I-20 Certificate of Eligibility from the DSO, annotated for the Cap-Gap OPT extension, as well as proof that the Form I-129, Petition for a Nonimmigrant Worker, was filed in a timely manner. Consular officers must verify that

allow a Cap-Gap beneficiary to return to the United States in F-1 status without having a valid visa.

Response.  DHS clarifies that an F-1 student may generally travel abroad and seek readmission to the United States in F-1 status during a Cap-Gap period if: (1) the student's H-1B petition and request for change of status has been approved; (2) the student seeks readmission before his or her H-1B employment begins (normally at the beginning of the fiscal year, i.e., October 1); and (3) the student is otherwise admissible.  However, as with any other instance in which an individual seeks admission to the United States, admissibility is determined at the time the individual applies for admission at a port of entry.  U.S. Customs and Border Protection (CBP) makes such determinations after examining the applicant for admission.  Students should refer to CBP's website (http://www.cbp.gov/travel/international-visitors/study-exchange/exchange-arrivals) for a list of the appropriate documentary evidence required to confirm eligibility for the relevant classification.  Moreover, DHS believes that the guidance provided in this response is fully consistent with the Department of State's Cap-Gap policy as outlined in its Foreign Affairs Manual.[121]

DHS also notes that if an F-1 student travels abroad before his or her H-1B change-of-status petition has been approved, USCIS will deem the petition abandoned.  Consequently, such a student no longer would be authorized for F-1 status during the Cap-Gap period based on the H-1B change-of-status petition and thus would be unable to rely on the Cap-Gap provision's extension of duration of status for purposes of seeking readmission as an F-1 student.  This has been the legacy INS and USCIS interpretation of its change-of-status authority under the INA for

---

the electronic SEVIS record has also been updated before issuing a visa.  See 9 FAM 402.5-5(N)(6)(f), available at https://fam.state.gov/FAM/09FAM/09FAM040205.html.
[121] See 9 FAM 402.5-5(N)(6)(f), available at https://fam.state.gov/FAM/09FAM/09FAM040205.html.

decades, applicable to all changes from one nonimmigrant status to another, not just those involving F-1 nonimmigrants.[122]  As such, DHS declines to adopt the suggestion to allow travel for Cap-Gap students while a change-of-status petition is pending.[123]

Comment.  Some commenters stated that certain documentary requirements in DHS regulations unnecessarily hampered a student's mobility.  Such commenters specifically cited 8 CFR 214.2(f)(13)(ii), which allows an otherwise admissible F-1 student with an unexpired EAD issued for post-completion practical training to return to the United States to resume employment after a period of temporary absence.  Under this provision, the EAD must be used in combination with an I-20 Certificate of Eligibility endorsed for reentry by the DSO within the last six months.  Some commenters claimed that this requirement resulted in DHS officers rejecting facially expired EADs at port of entries—despite the presentation of other documents indicating valid employment authorization—and denying entry to the applicants.

Response.  The Department acknowledges that it has previously cited 8 CFR 214.2(f)(13)(ii) in connection with travel during the Cap-Gap period.  That regulatory provision addresses the validity period of EADs.  Following careful review, DHS has determined that 8 CFR 214.2(f)(13)(ii), which expressly addresses the effects of departure from the United States by individuals with unexpired EADs, does not apply to Cap-Gap beneficiaries, who by definition

---

[122] See INA Sec. 248(a), 8 U.S.C. 1258(a) (providing that USCIS, in its discretion, may authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status).  See also INS memo HQ 70/6.2.9 (June 18, 2001 memo noting that it has long been Service policy deny a request for change of status where an alien travels outside of the United States while a request for a change of status is pending); Letter from Jacquelyn A. Bednarz, Chief, Nonimmigrant Branch, Adjudications, INS, CO 248-C (Oct. 29, 1993), reprinted in 70 Interp. Rel. 1604, 1626 (Dec. 6, 1993).

[123] An individual who travels while his or her H-1B petition and request for change of status is pending would be required to apply for an H-1B visa at a consular post abroad (unless visa-exempt) in order to be admitted to the United States in H-1B status, presuming the underlying H-1B petition is approved.

have underline expired EADs.  Therefore, 8 CFR 214.2(f)(13)(ii) does not apply to F-1 students who depart the United States during a Cap-Gap period.

underline Comment.  Several commenters requested that DHS allow students to travel abroad during the STEM OPT extension period or during the pendency of an application for such an extension.  One commenter stated that although the F-1 visa is a multiple entry visa, the Form I-20 Certificate of Eligibility states that a STEM OPT student's EAD is not valid for reentry into the United States.  The commenter requested that DHS allow STEM OPT students to make multiple entries based on their status.  The commenter noted that this would allow such students to visit their home countries at least once during the up-to-three-year period of practical training.

Similarly, some commenters requested that DHS permit F-1 students to travel during the pendency of a request for a STEM OPT extension and to reenter after a period of temporary absence.  Another commenter recommended that students with pending applications for STEM OPT extensions be permitted to travel outside the United States because many employers require their employees to engage in international travel as part of their jobs.  The commenter noted that the proposed rule prohibits such students from fulfilling such job requirements.

underline Response.  Students on STEM OPT extensions (including those whose application for a STEM OPT extension is pending) may travel abroad and seek reentry to the United States in F-1 status during the STEM OPT extension period if they have a valid F-1 visa that permits multiple entries[124] and a current Form I-20 Certificate of Eligibility endorsed for reentry by the DSO within the last six months.  The student's status is determined by CBP upon admission to the United States or through a USCIS adjudication of a change-of-status petition.

---

[124] Department of State consular officers determine whether an F-1 visa is valid for multiple or single entries, which is generally based on reciprocity.

231

Exhibit 1
564

Comment.  Several commenters raised the issue of whether F-1 nonimmigrants may have "dual intent" (i.e., whether such students, as F-1 nonimmigrants, may simultaneously seek lawful permanent residence or otherwise have the intent to immigrate permanently to the United States). Commenters that supported dual intent for F-1 students stated that such a policy would help attract and retain talented F-1 students in the United States.  Certain commenters that opposed dual intent for students stated that this rule should be limited to maintaining F-1 status in order to allow students to gain post-graduate practical experience and training in their fields of study. Other such commenters asserted that dual intent for students would violate Congressional intent and run counter to the F-1 visa classification provisions in the INA.  See INA 101(a)(15)(F)(i).

Response.  These comments, which concern dual intent for F-1 students generally, are beyond the scope of this rulemaking.  The changes in this rule affect only those F-1 students applying for STEM OPT extensions or Cap-Gap extensions, not the entire F-1 student population.  Moreover, none of the changes in this rule relate to individuals seeking lawful permanent resident status or their ability to hold immigrant intent while holding nonimmigrant status.

   iii.    Terms and Conditions of Employment Authorization Documents

Comment.  A few commenters requested that DHS include written restrictions on the face of the EADs provided to STEM OPT students.  Commenters stated that all EADs, including STEM OPT EADs, appear on their face to be valid for unrestricted employment.  Commenters were concerned that if a job candidate presents an EAD to complete the Form I-9 process, an employer will not know whether the underlying employment authorization is actually limited to employment with an E-Verify employer in a field related to the student's STEM degree. Because of this confusion, commenters believed it was possible that an employer could hire a

STEM OPT student whose employment authorization was in fact linked in SEVIS to a different employer. These commenters requested that DHS address this issue by adding a written restriction on the EAD itself.

Response. DHS already places written restrictions on the face of the EADs provided to STEM OPT students (under the "Terms and Conditions" section). Such EADs currently contain the following notation: "Stu: 17-Mnth Stem Ext." In response to the potential confusion described in the above comments, however, DHS has decided to update the notation to provide a stronger indication of the limitations of such EADs. Such EADs will now contain the following notation: "STU: STEM OPT ONLY." DHS believes this new notation will better alert employers that the cardholder's employment authorization is subject to certain conditions.

Comment. Another commenter requested that DHS issue new EADs to OPT students with expired EADs who either are in a Cap-Gap period or have a pending application for a STEM OPT extension. The commenter stated that these new EADs would allow such students to renew their driver's licenses and thus facilitate their work commute. In the alternative, the commenter requested that USCIS issue these students formal documents that would allow them to renew their driver's licenses.

Response. Under current processes, USCIS cannot issue new EADs to F-1 students with pending applications without adversely affecting fee revenues and overall EAD processing times. Under current guidance in the Handbook for Employers (M-274), the combination of the student's expired EAD and his or her Form I-20 Certificate of Eligibility endorsed by the designated school official is acceptable proof of identity and employment authorization for purposes of Form I-9 requirements. In response to the above comments, however, DHS has decided to clearly articulate this policy by updating the regulation at 8 CFR 274a.12(b)(6)(iv) to

indicate that this combination of documents is considered an unexpired EAD for purposes of complying with Form I-9 requirements.  DHS believes the regulatory change clearly articulates that students with the appropriate documents remain in F-1 status and are authorized for employment.

Comment.  One commenter recommended that DHS clarify whether EADs would be revoked if the Mentoring and Training Plan described in the proposed rule were to require modification or the insertion of additional information subsequent to the commencement of the STEM OPT student's employment.

Response.  As noted in section IV.B. of this preamble, if any material change to or deviation from the Training Plan occurs, the student and employer must sign a modified Training Plan reflecting the material changes or deviations, and must ensure that the modified plan is submitted to the student's DSO at the earliest available opportunity.  So long as the student and employer meet the regulatory requirements, and the modified Training Plan meets the requirements under this rule, the student's employment authorization will not cease based on a change to the plan.

I.      Transition Procedures

1.      Description of Final Rule and Changes from NPRM

The 17-month STEM OPT regulations remain in force through May 9, 2016.  This rule is effective beginning on May 10, 2016.  This rule includes procedures to allow for a smooth transition between the old rule and the new rule, as discussed below.

i.      STEM OPT Applications for Employment Authorization Pending on May 10, 2016

DHS will continue to accept and adjudicate applications for 17-month STEM OPT extensions under the 2008 IFR through May 9, 2016.  The Department, however, has modified

the transition procedures in the proposed rule for adjudicating those applications that remain pending when the final rule takes effect on May 10, 2016. In the NPRM, DHS had proposed that USCIS would adjudicate pending applications using the regulations that existed at the time the applications were submitted. As discussed further below, DHS has reconsidered its original proposal in light of comments received, and will instead apply the requirements of this rule to such pending cases. Beginning on May 10, 2016, USCIS will issue RFEs to students whose applications are still pending on that date. See 8 CFR 214.16(a). The RFEs will allow these students to effectively amend their application to demonstrate eligibility for 24-month extensions without incurring an additional fee or having to refile the Application for Employment Authorization.

Specifically, USCIS will issue RFEs requesting documentation that will establish that the student is eligible for a 24-month STEM OPT extension, including a Form I-20 Certificate of Eligibility endorsed on or after May 10, 2016, indicating that the DSO recommends the student for a 24-month STEM OPT extension. To obtain the necessary DSO endorsement in the Form I-20 showing that the student meets the requirements of this rule, the Training Plan has to be submitted to the DSO. Generally, under 8 CFR 214.2(f)(11)(i), a student must initiate the OPT application process by requesting a recommendation for OPT by his or her DSO. Thus, a DSO's recommendation for OPT on a Form I-20 Certificate of Eligibility is generally not recognized as valid if such endorsement is issued after the Application for Employment Authorization is filed with USCIS. DHS, however, will consider the submission of the Form I-20 Certificate of Eligibility as valid if the form is submitted in response to the RFE that has been issued under the transition procedures described in 8 CFR 214.16.

DHS recognizes that following this rule's effective date, some students may prefer to withdraw their pending application for a 17-month STEM OPT extension and instead file a new application for a 24-month STEM OPT extension.  Before a student decides to do so, however, the student should understand the applicable filing deadlines and ensure that he or she does not lose F-1 status.  Importantly, a student may file for a STEM OPT extension only if the student is in a valid period of post-completion OPT at the time of filing.  Thus if a student withdraws an application for a STEM OPT extension after his or her period of post-completion OPT has ended, the student will no longer be eligible to file for a STEM OPT extension.

ii.      Applications for 24-month STEM OPT

DHS will begin accepting applications for STEM OPT extensions under this rule on May 10, 2016.  Beginning on that date, DHS will process all Applications for Employment Authorization seeking 24-month STEM OPT extensions in accordance with the requirements of this rule.  In other words, the final rule's new requirements will apply to all STEM OPT students whose applications are pending or approved on or after the final rule is effective.

Thus, a student whose Application for Employment Authorization is filed and approved prior to May 10, 2016 will be issued an EAD that is valid for 17 months (even if he or she erroneously requested a 24-month STEM OPT extension).  As indicated above, a student whose application is pending on May 10, 2016 will be issued an RFE requesting documentation establishing that the student is eligible for a 24-month STEM OPT extension.  As described more fully below, this documentation must include, among other things, a Form I-20 Certificate of Eligibility endorsed on or after May 10, 2016, indicating that the requirements for a 24-month STEM OPT extension have been met.

iii.    Students with Valid, Unexpired 17-Month STEM OPT Employment

Authorization on May 10, 2016.

Any 17-month STEM OPT EAD that is issued before May 10, 2016 will remain valid

until the EAD expires or is terminated or revoked.  See 8 CFR 214.16(c)(1).[125]  As a transitional

measure, starting on May 10, 2016, certain students with such EADs will have a limited window

in which to apply for an additional 7 months of OPT, effectively enabling them to benefit from a

24-month period of STEM OPT.  See 8 CFR 214.16(c)(2).  To qualify for the 7-month extension,

the student must satisfy the following requirements:

- The STEM OPT student must properly file an Application for Employment

  Authorization with USCIS, along with applicable fees and supporting documentation,

  on or before August 8, 2016, and within 60 days of the date the DSO enters the

  recommendation for the 24-month STEM OPT extension into the student's SEVIS

  record.  See 8 CFR 214.16(c)(2)(i).  DHS believes that the 90-day window for filing

  such applications provides sufficient time for students to submit a required Training

  Plan, obtain the necessary Form I-20 Certificate of Eligibility and recommendation

  from the student's DSO, and fulfill other requirements for the 24-month extension.

- The student must have at least 150 calendar days[126] remaining prior to the expiration

  of the 17-month STEM OPT EAD at the time the Application for Employment

  Authorization is filed.  See 8 CFR 214.16(c)(2)(ii).  This 150-day period guarantees

  that a student who obtains an additional 7-month extension will have at least 1 year of

  practical training under the enhancements introduced in this rule, including site visits,

---

[125] As explained previously, 17-month STEM OPT EADs currently have annotations placed in the Terms and Conditions as follows: "Stu: 17-Mnth Stem Ext."
[126] DHS recognizes that it proposed a 120-day period in the NPRM, but has determined for the reasons stated above that the 150-day period is more appropriate.

reporting requirements, and statement and evaluation of goals and objectives.  For students who choose to seek an additional 7-month extension, the new enhancements apply upon the proper filing of the Application for Employment Authorization requesting the 7-month extension.  See 8 CFR 214.16(c)(3).

- The student must meet all the requirements for the 24-month STEM OPT extension as described in 8 CFR 214.2(f)(10)(ii)(C), including but not limited to submission of the Training Plan to the DSO.  See 8 CFR 214.16(c)(2)(iii).  STEM OPT students applying for this additional 7-month extension must be in a valid period of OPT, but are not required to be in a valid period of 12-month post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B) as would normally be required for a STEM OPT extension request.

DHS believes that these requirements are necessary to ensure that those who receive the additional 7-month extension are covered by this rule's improved compliance, reporting, and oversight measures.

Moreover, unless and until a student with a 17-month STEM OPT extension properly files the application for the 7-month extension under the transition procedures of 8 CFR 214.16, the student, and the student's employer and DSO, must continue to follow all the terms and conditions that were in effect when the 17-month STEM OPT employment authorization was granted.  See 8 CFR 214.16(c)(1).  Upon the proper filing of the application for the additional 7-month STEM OPT period, the student, and the student's employer and DSO, will be subject to all but one of the requirements of the 24-month STEM OPT extension period.  The only exception concerns the period of unemployment available to such a student.  Under the rule, the 150-day unemployment limit described in 8 CFR 214.2(f)(10)(ii)(E) will apply to a student

238

Exhibit 1
571

seeking a 7-month extension only upon approval of that extension.  Thus, while the application for the additional 7-month extension is pending, the student may not accrue an aggregate of more than 120 days of unemployment during the entire post-completion OPT period.  If the application for the 7-month extension is approved, the student may accrue up to 150 days of unemployment during the entire OPT period.

If an application for a 7-month extension is approved, USCIS will issue an EAD with a validity period that starts on the day after the expiration date stated in the 17-month STEM OPT EAD.  If an application for a 7-month extension is denied, the student, and the student's employer and DSO, must, subsequent to denial, abide by all the terms and conditions that were in effect when the 17-month STEM OPT EAD was issued, including reporting requirements.  See 8 CFR 214.16(c)(3).  They must abide by such terms throughout the remaining validity period of the 17-month STEM OPT extension.

DHS recommends that students who choose to request the additional 7-month extension obtain the necessary DSO recommendation and file their application as early as possible in advance of the August 8, 2016, application deadline.  USCIS's current processing times are available at https://egov.uscis.gov/cris/processTimesDisplayInit.do.

    2.    <u>Public Comments and Responses</u>

    i.    <u>STEM OPT Applications for Employment Authorization Pending on May 10, 2016</u>

<u>Comment</u>.  DHS received comments requesting clarification on the procedures that would apply to F-1 students whose applications for STEM OPT extensions are pending at the time of the implementation of the final rule.

<u>Response</u>.  As noted above, USCIS will issue RFEs to students whose applications for employment authorization requesting a 17-month STEM OPT extension are pending on the effective date of this rule.  By responding to the RFE, students will have the opportunity to demonstrate that they are eligible for a 24-month STEM OPT extension without incurring an additional fee, or having to refile the Application for Employment Authorization.

<u>Comment</u>.  Several commenters expressed concern about the proposed USCIS adjudicative process for 17-month STEM OPT applications that remain pending on the effective date of the final rule.  For example, one commenter noted that the proposed rule indicated that DHS intended to adjudicate STEM OPT applications "consistent with the regulations that existed at the time the application was submitted."  The commenter was concerned with the potential confusion that would arise if a DSO issued a 17-month STEM OPT recommendation before the new rule's effective date but the student filed the Application for Employment Authorization after that date.  In such a case, the commenter added, the student's Application for Employment Authorization would not meet the applicable requirements at the time of filing.  The commenter recommended that DHS instead use the date of the DSO recommendation as the determinative factor as to which regulatory requirements to apply.

<u>Response</u>.  DHS appreciates commenters' concerns about the possibility for confusion.  To clarify, 17-month STEM OPT applications that are filed prior to, and remain pending on, May 10, 2016 will be processed in accordance with the requirements of this rule.  As described above, USCIS will issue RFEs to students with such pending applications.  The RFE will request documentation showing that the student meets the requirements of the 24-month STEM OPT extension.  The documentation must include a Form I-20 Certificate of Eligibility endorsed on or after May 10, 2016, indicating that the DSO recommends the student for a 24-month STEM OPT

240

Exhibit 1
573

extension.  Submission of the Form I-20 in response to the RFE will be regarded as fulfillment of the requirement, contained in 214.2(f)(11)(i) of this section, that a student must initiate the OPT application process by requesting a recommendation for OPT by his or her DSO.  See 8 CFR 214.16(a)(1).

Moreover, DHS will deem 17-month STEM OPT applications that remain pending on May 10, 2016, to be covered by 8 CFR 214.2(f)(11)(i)(C) and 8 CFR 274a.12(b)(6)(iv) of this rule.  These provisions state that if a student's post-completion OPT expires while his or her timely filed STEM OPT application is pending, the student will receive an automatic extension of employment authorization of up to 180 days upon the expiration of his or her current employment authorization.[127]  See 8 CFR 214.16(a)(2).

ii.     New Applications for STEM OPT under this Rule

Comment.  Some commenters sought clarification on whether a student in the 60-day grace period following an initial 12-month period of post-completion OPT would be given the opportunity to apply for a STEM OPT extension if the new rule takes effect during the student's 60-day grace period.  Some commenters asked whether there will be an additional grace period allowing students to come into compliance with the final rule once it is published.

Response.  This rule, like the 2008 IFR, does not allow students to apply for STEM OPT extensions during the 60-day grace period following an initial 12-month period of post-completion OPT.  The current requirement to properly file the request for a STEM OPT extension prior to the end of the initial OPT period allows sufficient time for the F-1 student to apply for the extension and is administratively convenient as it ensures continuing employment authorization during the transition from the initial OPT period to the STEM OPT period.

---

[127] In addition, DHS considers students who apply for and are granted an additional 7-month period of STEM OPT eligible for the Cap-Gap provision described in section IV.H. of this preamble.

Accordingly, if a student anticipates that he or she will enter the 60-day grace period before May 10, 2016, the student should not wait to apply. Such a student should apply for the 17-month STEM OPT extension before his or her initial OPT period expires.

    iii.    <u>Students with Valid, Unexpired 17-Month STEM OPT Employment Authorization on May 10, 2016</u>.

<u>Comment</u>. Some commenters stated that a failure to promulgate a new rule prior to the vacatur of the 2008 IFR would result in negative impacts to students currently on 17-month STEM OPT extensions, as well as U.S. employers and the U.S. economy. Commenters stated that a regulatory gap would result in negative financial impacts for a great number of employers as well as several thousand students who will be at a risk of losing their status.

<u>Response</u>. DHS has endeavored to have a final rule in place before the vacatur takes effect. DHS understands the commenters' concerns, but believes that such concerns are now moot.

<u>Comment</u>. Some commenters also asked whether, following the final rule's effective date, students currently on 17-month STEM OPT extensions would be allowed to apply for a 24-month STEM OPT extension. One commenter requested that existing 17-month extensions automatically be extended to a 24-month period to reduce workload for both students and USCIS. Other commenters stated that students who received 17-month STEM OPT EADs should receive a waiver of application fees for a revised 24-month EAD. According to these commenters, students had not caused the program requirements to change, and they should not be punished for it.

<u>Response</u>. As noted above, after the effective date of this final rule, certain students with 17-month STEM OPT extensions may apply for an additional 7-month extension to effectively

242

Exhibit 1
575

obtain the balance of the new 24-month STEM OPT extension.  To qualify for the 7-month extension, such students must have at least 150 days remaining before the end of the student's 17-month OPT period, and they must otherwise meet all requirements of the final rule governing the 24-month STEM OPT extension.  DHS considered commenters' suggestions, but ultimately determined that automatically converting 17-month extensions into 24-month extensions would be inconsistent with many parts of the rule, including the requirements related to Training Plans, employer attestations, and reporting requirements.  For these reasons, students with 17-month extensions who seek to benefit from the 24-month extension must apply for the balance of the 24-month extension consistent with this rule's requirements.

Comment.  DHS received a number of comments seeking clarification on the categories of students who would be affected by the new requirements for obtaining STEM OPT extensions.  Several commenters asked DHS to clarify whether the new requirements would apply to students on 17-month STEM OPT extensions on the date the final rule becomes effective.  One commenter asked whether students currently on 17-month STEM OPT extensions would be permitted to complete their period of authorized STEM OPT.

Response.  As noted above, the new requirements apply only to STEM OPT applications that are pending on the effective date of the final rule or that are submitted after that date.  The new requirements do not affect current 17-month STEM OPT beneficiaries, except to the extent that such beneficiaries seek to avail themselves of the additional 7-month OPT period available to them under the transition provisions of the final rule.  Students currently on 17-month STEM OPT extensions who do not seek 7-month extensions will be permitted to complete their authorized 17-month STEM OPT period, barring termination or revocation of their EAD under 8

243

Exhibit 1
576

CFR 274a.14.  During this time, the student, and the student's employer and DSO, must continue to abide by all the terms and conditions that were in effect when that EAD was issued.

     J.   <u>Comments on the Initial Regulatory Impact Analysis</u>

     <u>Comment</u>.  Some commenters were generally supportive of the proposed rule, but stated that DHS severely underestimated the time-burden and costs to DSOs for complying with requirements concerning the submission of training plans and periodic evaluations.  Commenters believed that DHS estimates related to these requirements—including 30 minutes for review of training plans and 15 minutes for review of periodic evaluations—were unrealistic.  Specifically, one university representative explained that DSOs would need to spend 50 to 60 minutes reviewing and storing each training plan.  The commenter explained that DSOs would need 30 minutes to review training plans for completeness and follow up with students as necessary, and an additional 20 to 30 minutes to upload the document into SEVIS.  Other commenters stated that it would take an employer 90 to 120 minutes to complete the proposed Mentoring and Training Plan.

     <u>Response</u>.  In response to comments, DHS revised the time estimated to initially complete the Training Plan form.  DHS added an hour to the estimate of DSO's time to initially complete the Training Plan form, and 50 minutes to the estimate of DSO's time for the coordination and completion of each evaluation.  DHS added two hours to the estimate of employer's time to initially complete the Training Plan form, and 30 minutes to the estimate of employer's time for the coordination and completion of each evaluation.  DHS added 30 minutes to the estimate of student's time for the coordination to initially complete the Training Plan form, and 30 minutes for the coordination and completion of each evaluation.

As noted above, this final rule includes a number of provisions intended to minimize burden on employers while ensuring that the Training Plan for STEM OPT Students serves its stated purposes.  For instance, DHS has revised the regulatory text and the Training Plan form to clarify that employers may rely on existing training programs for STEM OPT students, so long as those programs satisfy this rule's requirements.  Also in response to comments, DHS has clarified the form instructions and various fields on the form.  Among other things, DHS has removed the reference to "mentoring," which many commenters stated would comprise a significant part of the expected time to both complete and review the proposed form.

With regard to the commenter's estimate of the approximate time required to upload the training plan into SEVIS, DHS clarifies that the rule does not require the Training Plan for STEM OPT Students to be uploaded into that database at this time, but instead only requires that DSOs properly store it.  Once SEVIS functionality is upgraded to permit the Training Plan to be uploaded, the form must be uploaded into SEVIS for each F-1 student participating in a STEM OPT extension.  DHS anticipates, however, that the new student portal will allow F-1 students to upload certain information, including the Training Plan, directly into SEVIS.  This means that DSOs ultimately will not be required to spend any time uploading the form into SEVIS and that their burdens will otherwise be reduced due to the student portal.

Comment.  Another commenter suggested that DHS "is neglecting its duty under federal guidance to discuss crucial economic considerations, such as how many OPT workers will be hired instead of American workers; how many STEM grads have given up finding work in the STEM field; how the new rule will affect tech-worker wages and American STEM-grad employment."

<u>Response</u>.  DHS disagrees that it neglected to consider the economic impact of the proposed rule, much of which was described in the Initial Regulatory Impact Analysis.  DHS carefully considered the potential direct costs and benefits of the proposed rule, and has carefully considered the potential direct costs and benefits of the final rule.

<u>Comment</u>.  Some commenters suggested that DHS shift costs away from students and universities.  For instance, some commenters supported the rule, but suggested fees to employers or students that would cover government costs or costs for universities, including the training of DSOs on how to administer and review the proposed Mentoring and Training Plan.

One DSO recommended that DHS establish a minimum personnel full-time equivalent (FTE) requirement for "SEVP regulatory advising and SEVIS reporting requirement[s]," which would be based on the number of F-1 students enrolled and whether the school uses SEVIS Real-time Interactive web processing or batch processing.  The same DSO also suggested that this FTE figure be a SEVIS reporting requirement as part of a school's recertification.  Some commenters said that DHS' estimation of the time required for reviewing the proposed Mentoring and Training Plan was too low in light of DSOs' current work duties.

<u>Response</u>.  DHS views the Training Plan as primarily the student's responsibility to create and submit, but has made a number of changes in this rule that will reduce the implementation costs for schools.  For example, DHS has decided to require only an annual evaluation, and the Department has also clarified a DSO's review responsibilities in section IV.F. of this preamble.  In addition, SEVIS will soon be updated to include a portal allowing students to update their own information.  DHS believes the rule offers benefits to U.S. institutions of higher education that outweigh administrative implementation costs.

246

Exhibit 1
579

With respect to the commenters' specific proposals, DHS notes that there are currently no plans to add a surcharge to employers to defray additional costs to schools or students.  DHS does not expect that this rule would require new hiring by the school; nevertheless, in 2015 DHS lifted the prior cap of 10 DSOs per campus, allowing schools to better allocate personnel to suit their F-1 student population needs.  See 8 CFR 214.3(l)(1)(iii); Final Rule: Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants, 80 FR 23680 (Apr. 29, 2015).   DHS will continue to seek feedback and proposals from school officials on ways to increase clarity and minimize burden.

Comment.  Some DSOs stated that their workloads would increase if they were obligated to follow up with students who miss their Training Plan deadlines and reporting requirements.

Response.  If a student does not submit his or her evaluation on time, the DSO should report that fact to DHS.  After such reporting is completed, the DSO would have no further responsibility related to student non-compliance aside from any potential case-by-case DHS request for documentation regarding the student.

Comment.  One commenter sought clarification on which persons would be responsible for advising U.S. employers of their reporting obligations under 8 CFR 214.2(f)(10)(ii)(C)(6). The commenter, a school, stated that this would be another burden that would fall on schools as they would end up educating employers about their obligations.

Response.  The employer, as an active participant in the STEM OPT extension program, is responsible for reporting any changes in student employment and monitoring students' progress and work via the Training Plan.  DHS will make initial guidance available to all parties—DSOs, employers, and students—regarding the responsibilities of each, as soon as feasible.  These guides will be posted at http://www.ice.gov and http://studyinthestates.dhs.gov.

Comment.  The Initial Regulatory Impact Analysis estimated that it would take approximately three hours for the employer to complete the proposed Mentoring and Training Plan, including 2 hours for employers to initially complete the plan and an additional hour for employers to help complete the required evaluations.[128]  Some commenters stated that DHS' initial estimate of the time burden for employers to complete the proposed Mentoring and Training Plan and conduct the required evaluation every six months was too low.  One commenter cited a survey of employers in which four out of five employers responded that "the government's estimate regarding time and cost to comply with the program requirements is too low."  Another commenter observed that DHS' initial time estimate did not account for time necessary for communication between the student, the DSO, and the employer in order to complete Section 1 of the form.

Response.  DHS recognizes the concerns of students and employers with regard to complying with the Training Plan requirements.  As noted above, DHS has incorporated significant flexibilities and clarifications into the Training Plan requirement, including by reducing the frequency of evaluations.  DHS has also revised the burden estimates upwards, including to account for time for necessary communication between the student, DSO, and employer.

Comment.  Some commenters stated that any government costs incurred to implement the rule should be used instead to help train and prepare U.S. students and graduates.

Response.  The STEM OPT extension is a program implemented by SEVP, which is entirely funded by fees paid by students and schools.  The program does not receive appropriated funds from Congress, and the program is not implemented at taxpayers' expense.  Thus, any

---

[128] See DHS, Initial Regulatory Impact Analysis, table 7 (Oct. 2015), available at http://www.regulations.gov/#!documentDetail;D=ICEB-2015-0002-0206.

elimination of the STEM OPT extension would not result in increased budget flexibility to address training of U.S. citizen students and workers.

K.      Other Comments

1.      <u>Introduction</u>

DHS received a number of comments related to matters falling outside the topics discussed above.  The comments are addressed below.

2.      <u>Public Comments and Responses</u>

i.      <u>Procedural Aspects of the Rulemaking</u>

<u>Comment</u>.  Several commenters asserted that foreign nationals (including students and non-U.S. workers) should not be allowed to comment on the proposed rule.

<u>Response</u>.  Such an approach would be inconsistent with the statutory requirements established by Congress in the APA's notice-and-comment provision, which do not include a citizenship or nationality requirement and places a priority on allowing all interested persons to participate in a rulemaking proceeding.

<u>Comment</u>.  One commenter stated that the use of a 30-day comment period instead of a 60-day comment period suggested an "executive power grab."  The commenter added that the 30-day comment period was intentionally designed to allow the rule to go into effect on February 13, 2016, when the 2008 STEM OPT extension was originally scheduled to be vacated.  The commenter stated that a February 13 effective date would allow DHS to avoid a hiatus in processing applications.  Another commenter stated that the 30-day comment period has the potential to expose the Department and this rule to unneeded scrutiny and possible delay.  The commenter suggested that DHS consider withdrawing the current proposal and re-release a new proposed rule with a timeline that is consistent with Executive Order 13563.

249

Exhibit 1
582

Response.  DHS recognizes that Executive Order 13563 recommends a 60-day comment period.  However, the Administrative Procedure Act makes no reference to that time period.  See 5 U.S.C. 553.  For many years courts have recognized that 30 days provides a meaningful opportunity for public input into rulemaking.  See, e.g., Conference of State Bank Sup'rs v. Office of Thrift Supervision, 792 F. Supp. 837, 844 (D.D.C. 1992).  DHS notes that the fact that it received over 50,500 comments on the proposed rule suggests that the 30-day period provided an adequate opportunity for public input.  Especially in light of the need for swift action to address impending vacatur of the 2008 IFR, DHS believes that the 30-day comment period was reasonable.

Comment.  One commenter expressed doubts that DHS would consider comments regarding this regulation rather than "just dismiss[ing]" them because, according to the commenter, "the Department seemingly didn't think the 'over 900' comments it got in response to the 2008 IFR were worth any response at all."  The commenter suggested that the final rule should explain why the first STEM OPT regulation was never finalized and why it was not a "violation of the spirit or the letter of the APA to not finalize the 2008 IFR."

Response.  DHS disagrees with the commenter.  DHS has considered all comments submitted in regard to this rulemaking, as reflected in the extensive discussion in this preamble. In any case, notwithstanding that DHS was under no legal obligation to do so, DHS relied on the comments to the 2008 IFR when developing the 2015 NPRM.  See, e.g., 80 FR 66380-82, 63384, 63386-91 (Oct. 19, 2015).

ii.    Impact of STEM OPT on the H-1B Program

Comment.  A number of commenters expressed concern about the impact that this rulemaking will have on the H-1B visa program.  One commenter stated that the proposed rule

would make it harder for individuals to obtain H-1B visas. The commenter explained that the extended OPT period effectively will give F-1 students multiple opportunities to apply for H-1B visas, and that without a commensurate increase in the number of H-1B visas, the rule would increase competition and make it harder to obtain such visas. Some commenters stated that only students who are not granted H-1B visas should be granted STEM OPT extensions, apparently believing the two programs are best considered as alternatives.

Another commenter stated that "DHS predicts the number of [individuals] working on student visas will be greater than the H-1B quotas." Another commenter expressed that STEM OPT graduates are advantaged over H-1B workers, because they have the liberty of changing employers more frequently and with more ease than H-1B workers. However, another commenter stated that students participating in the STEM OPT extension lack mobility and described them as "indentured laborers" that do not have rights "like being able . . . to change jobs."

Response. DHS acknowledges that some employers may choose to sponsor F-1 students on STEM OPT extensions for H-1B visas. However, DHS expects that employers will invest in retaining only those STEM OPT students who have demonstrated through their performance during OPT that they are likely to make valuable contributions in a position related to their STEM field of study. Employers would make such decisions using the same business judgments they currently rely on to competitively recruit and retain talent and, in some cases, sponsor foreign nationals for H-1B visas.

DHS does not believe sufficient data has been presented to make a determination one way or the other regarding the suggestion that the rule will make it harder for individuals to obtain H-1B visas but believes that any impact will be minimal. DHS notes that there is no limit

on the total number of H-1B petitions that an employer may submit in any given year, and no

requirement that the individual be in the United States when a petition is submitted on his or her

behalf.  As compared to the total number of people in the world who may be eligible for H-1B

visas, the total number of STEM OPT extension participants in any given year will be quite

small.  And to the extent that an increase in interest in the H-1B program from STEM OPT

students may result in increased competition for scarce H-1B visas, the appropriate remedy for

increasing the statutory limits imposed by Congress on H-1B visas would require legislative

action.

Additionally, as noted above, the fundamental purpose of the STEM OPT extension is

not to provide students with another chance at the H-1B lottery while in the United States.

Instead, as explained in detail in the above discussions regarding experiential learning and

important U.S. national interests, DHS believes the STEM OPT extension will promote what

DHS believes to be the worthy goals of expanding the educational and training opportunities of

certain international students, improving the competitiveness of U.S. academic institutions, and

ensuring the continued substantial economic, scientific, technological, and cultural benefits that

F-1 students bring to the United States generally.

DHS considered comments expressing concerns that STEM OPT students would add to

the number of workers competing for jobs in the U.S. labor market beyond those Congress

authorized in other employment-based nonimmigrant visa programs, and that they would

potentially displace more-experienced U.S. workers.  DHS considered potential impacts of

student training in the employment context and has included specific labor market safeguards in

this final rule.  Specifically, any employer providing a training opportunity to a STEM OPT

student must attest that the student will not replace a full- or part-time, temporary or permanent

U.S. worker.  The rule also includes protections to deter use of the STEM OPT extension to undercut U.S. workers' compensation, or sidestep other terms and conditions of employment that the employer would typically provide to U.S. workers.  Specifically, the rule requires that the terms and conditions of a STEM practical training opportunity (including duties, hours, and compensation) be commensurate with those applicable to similarly situated U.S. workers.  As stated previously, OPT is a part of the educational experience that individuals come to the United States to obtain, and the presence of these individuals in U.S. colleges and universities, as well as in workplaces, exposes U.S. students and workers to their intellectual and cultural perspectives, which ultimately provides significant cultural and economic benefits.

In response to the comment asserting that STEM OPT students can change jobs more easily and frequently than H-1B nonimmigrants, DHS first notes that commenters expressed varying views on whether the STEM OPT extension would result in such an impact. Additionally, unlike the H-1B program's objective to temporarily satisfy a sponsoring employer's need for labor, the STEM OPT extension's objective is to ensure adequate training appropriate to the major area of study for the student.  DHS determined that in order to meet that objective, the employer must comply with the requirements of this final rule, which include providing training conditions consistent with the established Training Plan.  Therefore, F-1 students may change employers during a STEM OPT extension, but only in accordance with the STEM OPT regulations and in order to further their practical education in a position directly related to their major area of study.  Outside of such a situation, STEM OPT students who leave their employers risk a loss of immigration status and the opportunity to further develop their skills through practical training.

     iii.    <u>Miscellaneous Other Comments</u>

Comment.  A university applauded the clarification in a footnote that "OPT can be full-time even while a student is attending school that is in session," but requested that the statement be affirmed via regulatory text.

Response.  DHS declines to make this change because it would impact not only STEM OPT extensions but also the general OPT program, which would be outside the scope of this rulemaking.

Comment.  A commenter asked whether a student can choose to end his or her post-completion OPT before the end of the eligibility period, so that the student may preserve some OPT eligibility time for another degree the student plans to pursue at the same educational level.

Response.  The time that a student may spend on OPT is not "bankable" between two different degrees.  This concept remains applicable to the STEM OPT extension as well as to all pre- or post-completion OPT.  If a student does not use the full period of time eligible for one degree, the extra time cannot be used for OPT based on a different degree.

Comment.  DHS received several comments regarding potential environmental costs resulting from an increased population, both in the United States generally, and in Silicon Valley, California specifically, where many STEM jobs are located.  Some also noted that California has been struggling with an ongoing drought.

Response.  Upon review, DHS remains convinced that our review pursuant to the National Environmental Policy Act is in compliance with the law and with our Directive and Instruction.

Exhibit 1
587

V.  Statutory and Regulatory Requirements

DHS developed this final rule after considering numerous statutes and executive orders related to rulemaking.  The below sections summarize our analyses based on a number of these statutes and executive orders.

A.     Executive Orders 12866 and 13563: Regulatory Planning and Review

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, as well as distributive impacts and equity).  Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.  DHS has prepared an analysis of the potential costs and benefits associated with this final rule.  The analysis can be found in the docket for this rulemaking and is briefly summarized here.  This rule has been designated a "significant regulatory action" that is economically significant, under section 3(f)(1) of Executive Order 12866.  Accordingly, OMB has reviewed this regulation.

1.     Summary

DHS is amending nonimmigrant student visa regulations on OPT for students with degrees in STEM from U.S. accredited institutions of higher education.  The final rule includes a 24-month STEM OPT extension.  The rule also seeks to strengthen the STEM OPT program by requiring formal training plans by employers, adding wage and other protections for STEM OPT students and U.S. workers, allowing extensions only to students with degrees from accredited schools, and requiring employers to enroll and remain in good standing with E-Verify.  The rule also provides Cap-Gap relief for any F-1 student with a timely filed H-1B petition and request

for change of status.

The rule provides a formal mechanism for updating the STEM Designated Degree Program list, and permits a student participating in post-completion OPT to use a prior eligible STEM degree from a U.S. institution of higher education as a basis to apply for an extension, provided the most recent degree was also received from a currently accredited institution.  The rule implements compliance and reporting requirements that focus on formal training programs to augment academic learning through practical experience, in order to equip students with a more comprehensive understanding of their selected area of study and broader functionality within their chosen field.  These changes also help ensure that the nation's colleges and universities remain globally competitive in attracting international STEM students to study and lawfully remain in the United States.

2.    <u>Summary of Affected Population</u>

DHS has identified five categories of students who will be eligible for STEM OPT extensions under the final rule: (1) those currently eligible based on a recently obtained STEM degree; (2) those eligible based upon a STEM degree earned prior to their most recent degree; (3) those eligible for a second STEM OPT extension;  (4) those eligible based on potential changes to the current STEM list; and (5) those eligible to increase a currently authorized STEM OPT extension period from 17 to 24 months.

DHS estimates the total number of affected students across the five categories to be almost 50,000 in year one and grow to approximately 92,000 in year 10.  This estimation is based on the growth rate of the overall proportion of students with an eligible STEM degree who participate in the post-completion OPT program.  DHS utilized a 15 percent growth rate that levelled off to 11 percent to achieve a long run stabilized participation rate in six years.  Based

on slightly lower and higher growth rates, DHS calculated low and high estimates; for year 1 the low and high figures are about the same as the primary estimate, but by year 10 the low estimate is about 80,000 and the high estimate is approximately 112,000.

DHS conducted a statistically valid sample analysis to estimate the number of STEM OPT employers and schools that would be considered small entities. To identify the entities that would be considered "small," DHS used the Small Business Administration's (SBA) guidelines on small business size standards applied by NAICS code.  This analysis indicated that 48 percent of schools are small entities.  Based on 1,109 approved and accredited schools participating in STEM OPT extensions, about 532 could reasonably be expected to be small entities impacted by this rule.  A sample of 26,260 entities that employed STEM OPT students under the 2008 IFR revealed that about 69 percent were small.  Hence, this rule could affect about 18,000 employers that are small entities.

3.  Estimated Costs of Final Rule

DHS estimates that the direct costs imposed by the implementation of this rule will be approximately $886.1 million over a 10-year analysis time period.  At a 7 percent discount rate, the rule will cost $588.5 million over the same period, which amounts to $83.8 million per year when annualized at a 7 percent discount rate.  At a 3 percent discount rate, the rule will cost $737.6 million over the same period, which amounts to $86.5 million per year when annualized at a 3 percent discount rate.  These costs include the direct and monetized opportunity costs to the three types of entities primarily affected by this rule: students, schools, and employers. Students will incur costs completing application forms and paying application fees; reporting to DSOs; preparing, with their employers, the Training Plan; and periodically submitting updates to employers and DSOs.  DSOs will incur costs reviewing information and forms submitted by

students, inputting required information into the SEVIS, and complying with other oversight requirements related to prospective and participating STEM OPT students.  Employers will incur costs preparing the Training Plan with students, confirming students' evaluations, undergoing site visits, researching the compensation of similarly situated U.S. workers, enrolling in (if not previously enrolled) and using E-Verify to verify employment eligibility for all new hires, and complying with additional requirements related to E-Verify.  The following table shows a summary of the total costs for a 10-year period of analysis.

**Table 2: Summary of the Total Costs of the Final Rule, 2016–2025**

**($ millions)**

| Year | STEM OPT Extension Cost | E-Verify Cost | Total Cost |
|------|-------------------------|---------------|------------|
|      | a | b | c = a + b |
| 1 | $65.5 | $1.8 | **$67.3** |
| 2 | $50.1 | $2.1 | **$52.2** |
| 3 | $57.7 | $2.5 | **$60.2** |
| 4 | $66.3 | $3.0 | **$69.3** |
| 5 | $76.2 | $3.5 | **$79.7** |
| 6 | $84.6 | $4.2 | **$88.8** |
| 7 | $93.9 | $5.0 | **$98.9** |
| 8 | $104.2 | $6.0 | **$110.2** |
| 9 | $115.7 | $7.1 | **$122.8** |
| 10 | $128.4 | $8.4 | **$136.8** |
| **Total** | **$842.5** | **$43.6** | **$886.1** |
| Total (7%) | $560.6 | $27.9 | **$588.5** |
| Total (3%) | $701.9 | $35.7 | **$737.6** |
| Annual (7%) | $79.8 | $4.0 | **$83.8** |
| Annual (3%) | $82.3 | $4.2 | **$86.5** |

*Estimates may not sum to total due to rounding.

DHS estimates the following distribution of costs per STEM OPT extension under the final rule at: $767 per student, $239 per university DSO, $1,268 per employer (with E-Verify), and $1,549 per employers new to STEM OPT (new to E-Verify).

In addition to the quantified costs summarized above, there could be unquantified direct costs associated with this rule.  Such costs could include costs to students and schools resulting from the final accreditation requirement; costs to employers from the final requirement to provide STEM OPT students with compensation commensurate to similarly situated U.S. workers; and decreased practical training opportunities for students no longer eligible for the program due to revisions to the STEM OPT program.  DHS does not have adequate data to estimate the monetary value of these possible costs.

4.      Estimated Benefits of Final Rule

Making the STEM OPT extension available to additional students and extending its length will enhance students' ability to achieve the objectives of their courses of study by allowing them to gain valuable knowledge and skills through on-the-job training that may be unavailable in their home countries.  The changes will also benefit the U.S. educational system, U.S. employers, and the U.S. economy.  The rule will benefit the U.S. educational system by helping ensure that the nation's colleges and universities remain globally competitive in attracting international students in STEM fields.  U.S. employers will benefit from the increased ability to rely on the skills acquired by STEM OPT students while studying in the United States, as well as their knowledge of markets in their home countries.  The U.S. economy as a whole will benefit from the increased retention of STEM students in the United States, including through increased research, innovation, and other forms of productivity that enhance the nation's scientific and technological competitiveness.

Furthermore, strengthening the STEM OPT extension by implementing requirements for training, tracking objectives, reporting on program compliance, and requiring the accreditation of participating schools will further prevent abuse of the limited on-the-job training opportunities

provided by this program.  These and other elements of the rule will also improve program

oversight, strengthen the requirements for program participation, and better protect against

adverse consequences on U.S. workers, as well as consequences that may result from

exploitation of students.

DHS has not attempted to quantify the potential benefits of the rule because such benefits

are difficult to measure.  These benefits encompass a number of dynamic characteristics and

explanatory variables that are very difficult to measure and estimate. Quantifying these variables

would require specific analyses to develop reasonable and accurate estimates from survey

methods that are not within the scope of this regulatory analysis.

5.    <u>Alternatives</u>

For purposes of this analysis, DHS considered three principal alternatives to the final

rule.  The first alternative was to take no regulatory action, in which case STEM OPT students

would no longer be allowed to work or reside in the United States past their 12-month post-

completion OPT period, unless they were able to convert to another employment-authorized visa

classification or complete another academic program.  DHS believes the benefits that accrue

from allowing the F-1 STEM OPT extension for students and educational institutions would not

be realized under this alternative and that in many cases these students would have to leave the

United States.  DHS rejects this alternative because it would deter future international students

from applying to STEM degree programs at U.S. educational institutions and reduce the

attractiveness of U.S. educational institutions compared to educational systems in other countries

that have more flexible postgraduate training programs.

The second alternative considered was to keep the maximum length of the STEM OPT

extension at 17 months, while implementing all other aspects of the final rule.  For students

seeking a STEM OPT extension based on a second or previously earned STEM degree, the alternative would be similar to the final rule, except with respect to the duration of the OPT period.  The 10-year total of this alternative is $29 million less than the final rule, discounted at 7 percent.  After evaluation of DHS's experience with the STEM OPT extension, DHS has rejected this alternative so as to ensure that the practical training opportunity is long enough to complement the student's academic experience and allow for a meaningful educational experience, particularly given the complex nature of many STEM projects.

The third alternative to the final rule was to include a six-month evaluation as part of the Training Plan.  This alternative was considered in the NRPM.  After considering an employer's typical schedule of annual evaluations for all employees, including STEM OPT extension students, DHS has rejected this alternative in favor of an annual evaluation.

The results of this comparison of alternatives are summarized in the following table.

**Table 3: Total Costs for Regulatory Alternatives Considered ($ millions)**

| Year | Alternative 1 No Action | Alternative 2 No Change in STEM OPT Length | Alternative 3 6 Month Evaluations | Improving and Extending STEM OPT (Final Rule) |
|------|------|------|------|------|
| 1 | $0.0 | $44.8 | $81.0 | $67.3 |
| 2 | $0.0 | $51.6 | $64.2 | $52.2 |
| 3 | $0.0 | $59.3 | $73.8 | $60.2 |
| 4 | $0.0 | $68.2 | $85.0 | $69.3 |
| 5 | $0.0 | $78.5 | $97.8 | $79.7 |
| 6 | $0.0 | $87.4 | $108.9 | $88.8 |
| 7 | $0.0 | $97.3 | $121.2 | $98.9 |
| 8 | $0.0 | $108.4 | $134.9 | $110.2 |
| 9 | $0.0 | $120.8 | $150.2 | $122.8 |
| 10 | $0.0 | $134.6 | $167.3 | $136.8 |
| **Total** | **$0.0** | **$851.1** | **$1,084.4** | **$886.1** |
| Total (7%) | $0.0 | $559.5 | $720.0 | $588.5 |
| Total (3%) | $0.0 | $705.5 | $902.5 | $737.6 |

*Estimates may not sum to total due to rounding.

B.  Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980, 5 U.S.C. 601-612, as amended by the Small

Business Regulatory Enforcement Fairness Act of 1996, Public Law 104-121 (March 29, 1996),

requires Federal agencies to consider the potential impact of regulations on small entities during

rulemaking.  The term "small entities" comprises small business, not-for-profit organizations that

are independently owned and operated and are not dominant in their fields, and governmental

jurisdictions with populations of less than 50,000.

1.      A statement of the need for, and objectives of, the rule

The final rule improves the STEM OPT extension by increasing oversight and

strengthening requirements for participation.  The changes to the STEM OPT extension

regulations are intended to enhance the educational benefit of the STEM OPT extension, create a

formal process for updating the list of STEM degree programs that are eligible for the STEM

OPT extension, and incorporate new measures to better ensure that STEM OPT extensions do

not adversely affect U.S. workers.  DHS objectives and legal authority for this final rule are

further discussed elsewhere in this preamble.

2.      A statement of the significant issues raised by the public comments in response to

the Initial Regulatory Flexibility Analysis, a statement of the assessment of the agency of such

issues, and a statement of any changes made in the rule as a result of such comments

Comment.  Many universities and employers specifically stated that the rule would

improve overall U.S. economic competitiveness.  However, commenters stated that the burden of

the proposed Mentoring and Training Plan would be felt more acutely by small- to medium-sized

businesses that use this program.  Commenters stated that managers of such businesses have

many daily responsibilities—they are responsible for payroll, managing the Human Resources

department, and personally working with their customers or clients, among other responsibilities. Commenters stated that DHS underestimated the increased administrative burdens that will be borne by small businesses, and noted that this time cannot be spent on the core competencies of the firm.  Many of these same concerns are shared by larger companies as well.  Commenters identifying as large participants in the OPT program stated concerns that the individualized training plan must be tracked by a supervisory employee at the firm for each worker. Commenters stated that many firms already have workable mentoring and training programs in place at their firms, and some expressed concerns that the training plan requirement, in many cases, would force companies to make major changes to their current mentoring programs while imposing an unreasonable cost burden.  Other commenters expressed concern that DHS severely underestimated the time to fill out the form.  Finally, in the initial regulatory flexibility analysis, DHS presented the costs to schools as a percentage of annual revenue.  A university commenter stated that comparing costs against revenue is not appropriate because schools do not generate revenue from their graduates directly, and universities do not fund their international student offices based on student population.

Response.  DHS recognizes the concerns of employers with regard to complying with the training plan requirements.  As noted in sections IV.B. and IV.F. of this preamble, DHS has revised the NPRM to allow for additional flexibilities for employers.  For instance, DHS has changed the frequency of the evaluation requirement.  DHS proposed requiring an evaluation every six months, but is reducing the frequency to every 12 months.  This change is intended to better reflect employer practices where annual reviews are standard, allowing students and employers to better align the evaluations required under this rule with current evaluation cycles. In addition, DHS has modified the regulatory text to further ensure that employers may rely on

their existing training programs to meet certain training plan requirements under this rule, so long as such training programs otherwise meet the rule's training plan requirements. Finally, in response to comments received, DHS has updated the estimate of time to complete the Training Plan for STEM OPT Students form to 7.5 hours.

While employers may need to make adjustments due to the training plan requirement, DHS views the educational and program integrity benefits as outweighing any costs associated with the Training Plan and supporting documentation. In addition, it is primarily the student's responsibility to complete the Training Plan with the employer and submit it to the DSO.

Finally, DHS disagrees with the comment concerning school revenue. DHS presents the costs to schools as a percentage of estimated annual revenue in order to assess the impact of universities' costs in the context of their overall revenue.

3. <u>The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any changes made to the proposed rule in the final rule as a result of the comments</u>

DHS did not receive comments from the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule.

4. <u>A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available</u>

DHS conducted a statistically valid sample analysis to estimate the number of STEM OPT employers and schools that would be considered small entities. To identify the entities that would be considered "small," DHS used the SBA guidelines on small business size standards applied by NAICS code. This analysis indicated that 48 percent of schools are small entities. Based on 1,109 approved and accredited schools participating in STEM OPT extensions, about

264

Exhibit 1
597

532 could reasonably be expected to be small entities impacted by the rule.  Analysis of a sample of 26,260 entities that employed students who had obtained STEM OPT extensions revealed that about 69 percent were small.  Hence, about 18,000 employers that are small entities could be affected by the rule.

5.    <u>A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities that will be subject to the requirements and the types of professional skills necessary for preparation of the report or record</u>

The final rule requires assurance that STEM OPT students develop, with their employers, a training plan.  When completed, students submit the Training Plan for STEM OPT Students form to their DSOs when requesting the 24-month STEM OPT extension.  The DSO must retain a copy of the form.  The student and employer must ensure that any modified Training Plan is submitted to the student's DSO (at the earliest available opportunity).  The student and employer must sign the modified Training Plan reflecting the material change(s) or deviation(s).  Additionally, students will be required to update the form every 12 months to include a progress report on accomplishments and skills or knowledge obtained.  Employers must meet with the student and sign the 12-month evaluation, and DSOs will check to ensure the evaluation has been completed and retain a copy.

<u>Schools</u>

Under the final rule, students must provide the completed Training Plan for STEM OPT Students forms to their DSOs to request STEM OPT extensions.  DHS's analysis includes an opportunity cost of time for reviewing the form to ensure its proper completion and filing the record either electronically or in a paper folder.

Schools will incur costs providing oversight, reporting STEM OPT students' information, and reviewing required documentation.  DSOs will be required to ensure the form has been properly completed and signed prior to making a recommendation in SEVIS.  Schools will be required to ensure that SEVP has access to student evaluations (electronic or hard copy) for a period of at least three years following the completion of each STEM practical training opportunity.  This rule, like the 2008 IFR, requires six-month student validation check-ins with DSOs.  While the DSO will be in communication with the student during a six-month validation check-in, the final rule adds an additional requirement that DSOs also check to ensure the 12-month evaluation has been properly completed and retain a copy.  The final rule maintains the 2008 IFR requirements for periodic information reporting requirements on students, which results in a burden for DSOs.  Table 3 summarizes the school costs from the final rule, as described in the Costs section of the separate Regulatory Impact Analysis.

### Table 4: Schools – Cost of Compliance per STEM OPT Opportunity

| Final Provision | Calculation of School Cost per Student | Cost in Year 1 per Student | Cost in Year 2 per Student |
|---|---|---|---|
| Initially Reviewing and Filing Training Plan Form [1] | (1.33 hours x $39.33) | $52.31 | $0.00 |
| 12-Month Evaluation [2] | (1 hour x 1 eval x $39.33) | $39.33 | $39.33 |
| 6-Month Validation Check-Ins [2] | (0.17 hours x 2 validation check-ins x $39.33) | $13.37 | $13.37 |
| Additional Implementation[2] | 0.10 x (Training Plan Initial + eval + validation check-ins costs) | $10.83 | $5.27 |
| Periodic Reports to DSO | 0.17 hours x 2 reports x $39.33 | $13.37 | $13.37 |
| **Total** | | **$128.88** | **$71.34** |

1 Training Plan initial costs are only in year 1 per STEM OPT student.
2 Estimated based on 12-month-period.

DHS estimates the annual impact to schools based on the school cost of compliance as a percentage of annual revenue.  Second-year costs account for new additional STEM OPT

266

Exhibit 1
599

extension students.  For not-for-profit schools, DHS multiplied full-time first-year student tuition by total number of students to estimate school revenue.[129]  While tuition revenue may underestimate actual school revenue, this is the best information available to DHS, and certainly the largest source of income for most schools.  DHS's analysis shows that the first-year annual impact for the sampled small-entity schools with sufficient data would be less than 1 percent, with the average annual impact being 0.005 percent.  All sampled small-entity schools with sufficient data had second-year annual impacts of less than 1 percent, with the average annual impact being 0.009 percent.

### Table 5: Schools – Annual Impact in Year 1

| Revenue Impact Range | Number of For-Profit Small Entities with Data | Number of Non-Profit Small Entities with Data | Percent of Small Entity Schools |
|---|---|---|---|
| 0% < Impact ≤ 1% | 4 | 137 | 100% |
| **Total** | **141** | | 100% |

### Table 6: Schools – Annual Impact in Year 2

| Revenue Impact Range | Number of For-Profit Small Entities with Data | Number of Non-Profit Small Entities with Data | Percent of Small Entity Schools |
|---|---|---|---|
| 0% < Impact ≤ 1% | 4 | 137 | 100% |
| **Total** | **141** | | 100% |

---

[129] U.S. Department of Education, National Center for Education Statistics, Institute of Education Sciences, "Academic year prices for full-time, first-time undergraduate students," (Total enrollment, including Undergraduate and Graduate) 2014-2015, Available at http://nces.ed.gov/globallocator/.

Exhibit 1
600

Finally, schools not accredited by a Department of Education-recognized accrediting agency may incur unquantified costs from the final rule's prohibition on participation in the STEM OPT extension by students attending unaccredited schools.  A few schools may choose to seek accreditation, or may potentially lose future international students and associated revenue.

Employers

Employers will be required to provide information for certain fields in the Training Plan for STEM OPT Students form, review the completed form, and attest to the certifications on the form.  The final rule also prohibits using STEM OPT extension students as volunteers.  The rule additionally requires that students work at least 20 hours per week while on their STEM OPT extension, and that they receive commensurate compensation.  DHS does not have data on the number of STEM OPT students who do not currently receive compensation.  Nor does DHS have data on the number of STEM OPT students who do not currently receive wages or other qualifying compensation that would be considered commensurate under the final rule.  To the extent that employers are not currently compensating STEM OPT students in accordance with the final rule, this rulemaking creates additional costs to these employers.  In the quantified costs, DHS does account for the possible additional burden of reviewing the employment terms of similarly situated U.S. workers in order to compare the terms and conditions of their employment to those of the STEM OPT student's practical training opportunity.

The final rule indicates that DHS, at its discretion, may conduct a site visit of an employer.  The employer site visit is intended to ensure that each employer meets program requirements, including that they are complying with their attestations and that they possess the ability and resources to provide structured and guided work-based learning experiences outlined

268

Exhibit 1
601

in students' Training Plans.  Site visits will be performed at the discretion of DHS either randomly or when DHS determines that such an action is needed.  The length and scope of such a visit would be determined on a case-by-case basis.  For law enforcement reasons, DHS does not include an estimate of the basis for initiating a site visit and is unable to estimate the number of site visits that may be conducted, and thus is unable to provide a total annual estimated cost for such potential occurrences.  However, based on previous on-site-reviews to schools, DHS estimates that an employer site visit may include review of records and questions for the supervisor, and will take five hours per employer.  Therefore, DHS estimates that if an employer were to receive such a site visit, it would cost the employer approximately $394.80 (5 hours × $78.96).[130]

---

[130] DHS estimates that this work will be performed by general management staff at an hourly rate of $54.08 (as published by the May 2014 BLS Occupational Employment and Wage Estimates), which we multiply by 1.46 to account for employee benefits to obtain a total hourly labor cost of $78.96.  Calculated 1.46 by dividing total compensation for all workers of $33.13 by wages and salaries for all workers of $22.65 per hour (yields a benefits multiplier of approximately 1.46 × wages). Bureau of Labor Statistics, Employer Costs for Employee Compensation, Table 1.  Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group, December 2014."  Available at: http://www.bls.gov/news.release/archives/ecec_03112015.htm.

269

Exhibit 1
602

**Table 7: Employers – Cost of Compliance**

| Final Provision | Calculation of Costs | Cost in Year 1 | Cost in Year 2 |
|---|---|---|---|
| Initially Completing Training Plan Form [1] | (3 hours x $78.96)+ (1 hour x $43.93) | $280.81 | $0.00 |
| 12-Month Evaluations [2] | (0.75 hours x 1 eval x $78.96) | $59.22 | $59.22 |
| Additional Implementation | 0.1 x (Training Plan Initial + evals costs) | $34.00 | $5.92 |
| **Employer STEM OPT Costs per Student =** | **Total** | **$374.03** | **$65.14** |
| **Cost for E-Verify per New Hire Case** | **(0.16 hours x $43.93)** | **$7.03** | **$7.03** |
| | | | |
| E-Verify Enrollment & Setup | (2.26 hours x $80.12) +  $100 | $281.07 | $0.00 |
| E-Verify Annual Training & Maintenance | (1 hour x $43.93) + $398 | $441.93 | $441.93 |
| Compliance Site Visit | ([5 hours x $78.96] + [5 hours × $43.93]) | $0.00 | $614.45 |
| **E-Verify and Site Visit Employer Costs =** | **Total** | **$723.00** | **$1,056.38** |

1 Training Plan initial costs are only in year 1 per STEM OPT student.
2 Estimated based on 12-month-period.

DHS estimates the annual impact to employers based on the employer cost of compliance as a percentage of annual revenue.  Second-year costs include initial submission of Training Plans for new STEM OPT students who will be hired in the second year.  For not-for-profit school employers without revenue data, DHS multiplied the tuition per full-time first-year student with total enrollment numbers to estimate their revenue.  DHS's analysis shows that the first- and second-year annual impact for 99 percent of the sampled small entities with sufficient data would be less than 1 percent, with the average first-year annual revenue impact being 0.11 percent and second-year annual revenue impact being 0.13 percent.  Additionally, the cost impact per employer included a compliance site visit in year 2; therefore, costs could be less for employers that do not receive a site visit.

**Table 8: Employers – Annual Impact in Year 1**

270

Exhibit 1
603

| Revenue Impact Range | Number of For-Profit Small Entities with Data | Number of Non-Profit Small Entities with Data | Percent of Small Entity Employers |
|---|---|---|---|
| 0% < Impact ≤ 1% | 240 | 7 | 99% |
| 1% < Impact ≤ 3% | 2 | 0 | 1% |
| **Total** | **249** | | 100.0% |

**Table 9: Employers – Annual Impact in Year 2**

| Revenue Impact Range | Number of For-Profit Small Entities with Data | Number of Non-Profit Small Entities with Data | Percent of Small Entity Employers |
|---|---|---|---|
| 0% < Impact ≤ 1% | 239 | 7 | 99% |
| 1% < Impact ≤ 3% | 3 | 0 | 1% |
| **Total** | **249** | | 100.0% |

<u>Current Employers That Do Not Continue to Participate</u>

Due to additional employer requirements that must be met in order to receive the benefit of a STEM OPT extension opportunity, some employers (such as temporary employment agencies) will no longer be allowed to participate in STEM OPT extensions. DHS has not attempted to quantify costs associated with this possible impact on employers due to lack of available information on employers that would fall under this category and the associated economic impacts.

6.      <u>A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule, and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected</u>

DHS recognizes that the final rule will increase requirements on schools and employers of STEM OPT students. DHS has tried to minimize, to the extent possible, the small entity

economic impacts of the final rule by structuring the program such that students are largely responsible for meeting its requirements.  This not only minimizes the burden of the final program on schools and employers but also helps to ensure that students, who are the most direct beneficiaries of the practical training opportunities, bear an equitable amount of responsibility.

DHS has tried to minimize additional DSO responsibilities while balancing the need for oversight.  For example, Training Plan evaluations will be conducted and submitted annually, rather than semi-annually, as DHS had initially proposed.

DHS has tried to provide flexibility for small entities in methods they can use to meet the commensurate duties, hours, and compensation requirements for STEM OPT students.  The final rule allows employers to perform an analysis that uses their own wage and compensation data to determine how to compensate their STEM OPT employee in a comparable manner to their similarly situated U.S. workers.  This provides small entities flexibility rather than applying a prescriptive national, state, or metropolitan data requirement.  And because small entities may not have similarly situated U.S. workers, the rule provides alternative options, discussed in the preamble, for compliance with the requirement to provide commensurate compensation.  Finally, the rule allows employers to meet some of the Training Plan requirements using existing training programs.

DHS will engage in further stakeholder outreach activities and provide clarifying information as appropriate.  DHS envisions that this outreach will reduce the burden that may result from small entities' uncertainty in how to comply with the requirements.

As explained in greater detail in Chapter 8 of the RIA, DHS examined three alternative options that could have reduced the burden of the rule on small entities.  The alternatives considered were (1) no regulatory action, (2) no change in the duration of the STEM OPT

extension, and (3) requiring a six month evaluation.  DHS rejected these alternatives.  First, without regulatory action, OPT students would no longer be allowed to work or reside in the United States past their 12-month post-completion OPT period.  This would deter future international students who would pursue STEM degrees from applying to U.S. educational institutions, and reduce the attractiveness of U.S. educational institutions compared to educational systems in other countries that have more flexible student work programs.  Second, without increasing the duration of the STEM OPT extension, students' practical training opportunities would not be long enough to complement the student's academic experience and allow for a meaningful educational experience, particularly given the complex nature of STEM projects.  After weighing the advantages and disadvantages of each alternative, DHS elected to improve and extend the STEM OPT program in order to increase students' ability to gain valuable knowledge and skills through on-the-job training in their field that may be unavailable in their home countries, increase global attractiveness of U.S. colleges and universities, increase program oversight and strengthen requirements for program participation, and institute new protections for U.S. workers.

C.  Small Business Regulatory Enforcement Fairness Act of 1996

Pursuant to Sec. 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. 104-121, DHS wants to assist small entities in understanding this rule.  If the rule would affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions, please consult DHS using the contact information provided in the FOR FURTHER INFORMATION CONTACT section above.  DHS will not retaliate against small entities that question or complain about this rule or about any DHS policy or action related to this rule.

D.  Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531-1538) requires federal agencies to assess the effects of their discretionary regulatory actions.  In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government in the aggregate, or by the private sector, of $100,000,000 (adjusted for inflation) or more in any year. Although this rule would not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

E. Congressional Review Act

DHS has sent this final rule to the Congress and to Comptroller General under the Congressional Review Act, 5 U.S.C. 801 et seq.  This rule is a "major rule" within the meaning of the Congressional Review Act.

F.  Collection of Information

Federal agencies are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule under the Paperwork Reduction Act of 1995, as amended, 44 U.S.C. 3501-3520.  Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

DHS has submitted the following information collection request to the OMB for review and approval in accordance with the review procedures of the Paperwork Reduction Act.  The information collection requirements are outlined in this rule.  The rule maintains the 2008 IFR revisions to previously approved information collections.  The 2008 IFR impacted information collections for Form I-765, Application for Employment Authorization (OMB Control No. 1615–0040); SEVIS and Form I–20, Certificate of Eligibility for Nonimmigrant Student Status

274

Exhibit 1
607

(both OMB Control No. 1653–0038); and E-Verify (OMB Control No. 1615–0092).  These four approved information collections corresponding to the 2008 IFR include the number of respondents, responses and burden hours resulting from the 2008 IFR requirements, which remain in this final rule.  Therefore DHS is not revising the burden estimates for these four information collections.  Additional responses tied to new changes to STEM OPT eligibility will minimally increase the number of responses and burden for Form I-765 and E-Verify information collections, as the two collections cover a significantly broader population of respondents and responses than those impacted by the rule and already account for growth in the number of responses in their respective published information collection notices burden estimates.

As part of this rule, DHS is creating a new information collection instrument for the Training Plan for STEM OPT Students, which is now available at https://studyinthestates.dhs.gov/.  This information collection is necessary to enable reporting and attesting to specified information relating to STEM OPT extensions, to be executed by STEM OPT students and their employers.  Such reporting will include goals and objectives, progress, hours, and compensation.  Attestations will ensure proper training opportunities for students and safeguard interests of U.S. workers in related fields.

Additionally, DHS is making minor non-substantive changes to the instructions to Form I-765 to reflect changes to the F-1 regulations that lengthen the STEM OPT extension and allow applicants to file Form I-765 with USCIS within 60 days (rather than 30 days) from the date the DSO endorses the STEM OPT extension.  Accordingly, USCIS submitted an OMB 83-C, Correction Worksheet, to OMB, which reviewed and approved the minor edits to the Form I-765 instructions.

Overview of New Information Collection- Training Plan for STEM OPT Students

(1) <u>Type of Information Collection</u>: New Collection.

(2) <u>Title of the Form/Collection</u>: Training Plan for STEM OPT Students.

(3) <u>Agency form number, if any, and the applicable component of DHS sponsoring the collection</u>: Immigration and Customs Enforcement Form I-983;

(4) <u>Affected public who will be asked or required to respond, as well as a brief abstract</u>:

- <u>Primary</u>: Students with F-1 nonimmigrant status, state governments, local governments, educational institutions, businesses, and other for-profit and not-for-profit organizations.

- <u>Other</u>: None.

- <u>Abstract</u>: DHS is publishing a final rule that makes certain changes to the STEM OPT extension first introduced by the 2008 IFR.  The rule lengthens the duration of the STEM OPT extension to 24 months; requires a Training Plan executed by STEM OPT students and their employers; requires that the plan include assurances to safeguard students and the interests of U.S. workers in related fields; and requires that the plan include objective-tracking and reporting requirements.  The rule requires students and employers (through an appropriate signatory official) to report on the Training Plan certain specified information relating to STEM OPT extensions.  For instance, the Training Plan explains how the practical training is directly related to the student's qualifying STEM degree; explains the specific goals of the STEM practical training opportunity and how those goals will be achieved through the work-based

276

Exhibit 1
609

learning opportunity with the employer, including details of the knowledge, skills, or techniques to be imparted to the student; identifies the performance evaluation process; and describes the methods of oversight and supervision. The Training Plan also includes a number of employer attestations intended to ensure the educational benefit of the practical training experience, protect STEM OPT students, and protect against appreciable adverse consequences on U.S. workers. The rule also requires schools to collect and retain this information for a period of three years following the completion of each STEM practical training opportunity.

5. An estimate of the total annual average number of respondents, annual average number of responses, and the total amount of time estimated for respondents in an average year to collect, provide information, and keep the required records is:

- 42,092 STEM OPT student respondents; 1,109 accredited schools endorsing STEM OPT students; and 16,891 employers of STEM OPT students.

- 42,092 average responses annually at 7.5 hours per initial Training Plan response.

- 70,153 average responses annually at 3.66 hours per 12-month evaluation response by STEM OPT students, DSOs, and employers.

6. An estimate of the total public burden (in hours) associated with the collection: 566,698 hours.

The recordkeeping requirements set forth by this rule are new requirements that require a new OMB Control Number.

During the NPRM, DHS sought comment on these proposed requirements.  DHS received a number of comments on the burden potentially imposed by the proposed rule.  The comments, and DHS's responses to those comments, can be found in the discussion of public comments regarding Form I-983 in section IV of this preamble.  The final form and instructions are available in the docket for this rulemaking.

G.  Federalism

A rule has implications for federalism under Executive Order 13132, Federalism, if it has substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.  We have analyzed this rule under that Order and have determined that it does not have implications for federalism.

H.  Civil Justice Reform

This rule meets applicable standards in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

I.  Energy Effects

We have analyzed this rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use.  We have determined that it is not a "significant energy action" under that order because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

J.  Environment

278

Exhibit 1
611

The U.S. Department of Homeland Security Management Directive (MD) 023-01 Rev. 01 establishes procedures that DHS and its components use to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321–4375, and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500-1508. CEQ regulations allow federal agencies to establish categories of actions, which do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement.  40 CFR 1508.4.  The MD 023-01 Rev. 01 lists the Categorical Exclusions that DHS has found to have no such effect.  MD 023-01 Rev. 01 Appendix A Table 1.

For an action to be categorically excluded, MD 023-01 Rev. 01 requires the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions.

(2) The action is not a piece of a larger action.

(3) No extraordinary circumstances exist that create the potential for a significant environmental effect.  MD 023-01 Rev. 01 section V.B(1)–(3).

Where it may be unclear whether the action meets these conditions, MD 023-01 Rev. 01 requires the administrative record to reflect consideration of these conditions.  MD 023-01 Rev. 01 section V.B.

DHS has analyzed this rule under MD 023-01 Rev. 01.  DHS has determined that this action is one of a category of actions that do not individually or cumulatively have a significant effect on the human environment.  This rule clearly fits within the Categorical Exclusion found in MD 023-01 Rev. 01, Appendix A, Table 1, number A3(a): "Promulgation of rules . . . of a strictly administrative or procedural nature;" and A3(d): "Promulgation of rules . . . that interpret

279

Exhibit 1
612

or amend an existing regulation without changing its environmental effect." This rule is not part of a larger action. This rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

### K.  Indian Tribal Governments

This rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

### L.  Taking of Private Property

This rule would not cause a taking of private property or otherwise have takings implications under Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights.

### M.  Protection of Children

DHS has analyzed this rule under Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks. This rule would not create an environmental risk to health or risk to safety that might disproportionately affect children.

### N.  Technical Standards

The National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through the OMB, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impracticable. Voluntary consensus

standards are technical standards (e.g., specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies.  This rule does not use technical standards.  Therefore, we did not consider the use of voluntary consensus standards.

281

Exhibit 1
614

**List of Subjects**

8 CFR Part 214

Administrative practice and procedure, Aliens, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

**The Amendments**

For the reasons set forth in the preamble, the Department of Homeland Security amends parts 214 and 274a of Chapter 1 of Title 8 of the Code of Federal Regulations as follows:

**PART 214—NONIMMIGRANT CLASSES**

1. Revise the authority citation for part 214 to read as follows:

Authority: 6 U.S.C. 111 and 202; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301-1305, 1324a, 1372 and 1762; Sec. 643, Pub. L. 104-208, 110 Stat. 3009-708; Pub. L. 106-386, 114 Stat. 1477-1480; Pub. L. 107-173, 116 Stat. 543; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

2. Amend § 214.2 by revising paragraphs (f)(5)(vi), (f)(10)(ii)(A)(3), (f)(10)(ii)(C), (D), and (E), and (f)(11) and (12) to read as follows:

**§ 214.2  Special requirements for admission, extension, and maintenance of status.**

* * * * *

(f) * * *

282

Exhibit 1
615

(5) * * *

(vi) <u>Extension of duration of status and grant of employment authorization</u>. (A) The duration of status, and any employment authorization granted under 8 CFR 274a.12(c)(3)(i)(B) or (C), of an F-1 student who is the beneficiary of an H-1B petition subject to section 214(g)(1)(A) of the Act (8 U.S.C.1184(g)(1)(A)) and request for change of status shall be automatically extended until October 1 of the fiscal year for which such H-1B status is being requested where such petition:

(<u>1</u>) Has been timely filed; and

(<u>2</u>) Requests an H-1B employment start date of October 1 of the following fiscal year.

(B) The automatic extension of an F-1 student's duration of status and employment authorization under paragraph (f)(5)(vi)(A) of this section shall automatically terminate upon the rejection, denial, revocation, or withdrawal of the H-1B petition filed on such F-1 student's behalf or upon the denial or withdrawal of the request for change of nonimmigrant status, even if the H-1B petition filed on the F-1 student's behalf is approved for consular processing.

(C) In order to obtain the automatic extension of stay and employment authorization under paragraph (f)(5)(vi)(A) of this section, the F-1 student, consistent with 8 CFR part 248, must not have violated the terms or conditions of his or her nonimmigrant status.

(D) An automatic extension of an F-1 student's duration of status under paragraph (f)(5)(vi)(A) of this section also applies to the duration of status of any F-2 dependent aliens.

* * * * *

(10) * * *

(ii) * * *

(A) * * *

283

Exhibit 1
616

(<u>3</u>) After completion of the course of study, or, for a student in a bachelor's, master's, or doctoral degree program, after completion of all course requirements for the degree (excluding thesis or equivalent).  Continued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for optional practical training.  A student must complete all practical training within a 14-month period following the completion of study, except that a 24-month extension pursuant to paragraph (f)(10)(ii)(C) of this section does not need to be completed within such 14-month period.

* * * * *

(C) <u>24-month extension of post-completion OPT for a science, technology, engineering, or mathematics (STEM) degree</u>.  Consistent with paragraph (f)(11)(i)(C) of this section, a qualified student may apply for an extension of OPT while in a valid period of post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B).  An extension will be for 24 months for the first qualifying degree for which the student has completed all course requirements (excluding thesis or equivalent), including any qualifying degree as part of a dual degree program, subject to the requirement in paragraph (f)(10)(ii)(C)(<u>3</u>) of this section that previously obtained degrees must have been conferred.  If a student completes all such course requirements for another qualifying degree at a higher degree level than the first, the student may apply for a second 24-month extension of OPT while in a valid period of post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B).  In no event may a student be authorized for more than two lifetime STEM OPT extensions.  A student who was granted a 17-month OPT extension under the rule issued at 73 FR 18944, whether or not such student requests an additional 7-month period of STEM OPT under 8 CFR 214.16, is considered to have been authorized for one STEM OPT extension, and may be eligible for only one more STEM OPT extension.  Any subsequent application for an

additional 24-month OPT extension under this paragraph (f)(10)(ii)(C) must be based on a degree at a higher degree level than the degree that was the basis for the student's first OPT extension.  In order to qualify for an extension of post-completion OPT based upon a STEM degree, all of the following requirements must be met.

(1) Accreditation.  The degree that is the basis for the 24-month OPT extension is from a U.S. educational institution accredited by an accrediting agency recognized by the Department of Education at the time of application.

(2) DHS-approved degree.  The degree that is the basis for the 24-month OPT extension is a bachelor's, master's, or doctoral degree in a field determined by the Secretary, or his or her designee, to qualify within a science, technology, engineering, or mathematics field.

(i) The term "science, technology, engineering or mathematics field" means a field included in the Department of Education's Classification of Instructional Programs taxonomy within the two-digit series or successor series containing engineering, biological sciences, mathematics, and physical sciences, or a related field.  In general, related fields will include fields involving research, innovation, or development of new technologies using engineering, mathematics, computer science, or natural sciences (including physical, biological, and agricultural sciences).

(ii) The Secretary, or his or her designee, will maintain the STEM Designated Degree Program List, which will be a complete list of qualifying degree program categories, published on the Student and Exchange Visitor Program Web site at http://www.ice.gov/sevis.  Changes that are made to the Designated Degree Program List may also be published in a notice in the Federal Register.  All program categories included on the list must be consistent with the definition set forth in paragraph (f)(10)(ii)(C)(2)(i) of this section.

(iii) At the time the DSO recommends a 24-month OPT extension under this paragraph (f)(10)(ii)(C) in SEVIS, the degree that is the basis for the application for the OPT extension must be contained within a category on the STEM Designated Degree Program List.

(3) Previously obtained STEM degree(s).  The degree that is the basis for the 24-month OPT extension under this paragraph (f)(10)(ii)(C) may be, but is not required to be, the degree that is the basis for the post-completion OPT period authorized under 8 CFR 274a.12(c)(3)(i)(B). If an application for a 24-month OPT extension under this paragraph (f)(10)(ii)(C) is based upon a degree obtained previous to the degree that provided the basis for the period of post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B), that previously obtained degree must have been conferred from a U.S. educational institution that is accredited and SEVP-certified at the time the student's DSO recommends the student for the 24-month OPT extension and must be in a degree program category included on the current STEM Designated Degree Program List at the time of the DSO recommendation.  That previously obtained degree must have been conferred within the 10 years preceding the date the DSO recommends the student for the 24-month OPT extension.

(4) Eligible practical training opportunity.  The STEM practical training opportunity that is the basis for the 24-month OPT extension under this paragraph (f)(10)(ii)(C) must be directly related to the degree that qualifies the student for such extension, which may be the previously obtained degree described in paragraph (f)(10)(ii)(C)(3) of this section.

(5) Employer qualification.  The student's employer is enrolled in E-Verify, as evidenced by either a valid E-Verify Company Identification number or, if the employer is using an employer agent to create its E-Verify cases, a valid E-Verify Client Company Identification number, and the employer remains a participant in good standing with E-Verify, as determined

by USCIS.  An employer must also have an employer identification number (EIN) used for tax purposes.

(6) Employer reporting.  A student may not be authorized for employment with an employer pursuant to paragraph (f)(10)(ii)(C)(2) of this section unless the employer agrees, by signing the Training Plan for STEM OPT Students, Form I-983 or successor form, to report the termination or departure of an OPT student to the DSO at the student's school, if the termination or departure is prior to the end of the authorized period of OPT.  Such reporting must be made within five business days of the termination or departure.  An employer shall consider a student to have departed when the employer knows the student has left the practical training opportunity, or if the student has not reported for his or her practical training for a period of five consecutive business days without the consent of the employer, whichever occurs earlier.

(7) Training Plan for STEM OPT Students, Form I–983 or successor form. (i) A student must fully complete an individualized Form I-983 or successor form and obtain requisite signatures from an appropriate individual in the employer's organization on the form, consistent with form instructions, before the DSO may recommend a 24-month OPT extension under paragraph (f)(10)(ii)(C)(2) of this section in SEVIS.  A student must submit the Form I-983 or successor form, which includes a certification of adherence to the training plan completed by an appropriate individual in the employer's organization who has signatory authority for the employer, to the student's DSO, prior to the new DSO recommendation.  A student must present his or her signed and completed Form I-983 or successor form to a DSO at the educational institution of his or her most recent enrollment.  A student, while in F-1 student status, may also be required to submit the Form I-983 or successor form to ICE and/or USCIS upon request or in accordance with form instructions.

Exhibit 1
620

(ii) The training plan described in the Form I-983 or successor form must identify goals for the STEM practical training opportunity, including specific knowledge, skills, or techniques that will be imparted to the student, and explain how those goals will be achieved through the work-based learning opportunity with the employer; describe a performance evaluation process; and describe methods of oversight and supervision.  Employers may rely on their otherwise existing training programs or policies to satisfy the requirements relating to performance evaluation and oversight and supervision, as applicable.

(iii) The training plan described in the Form I-983 or successor form must explain how the training is directly related to the student's qualifying STEM degree.

(iv) If a student initiates a new practical training opportunity with a new employer during his or her 24-month OPT extension, the student must submit, within 10 days of beginning the new practical training opportunity, a new Form I-983 or successor form to the student's DSO, and subsequently obtain a new DSO recommendation.

(8) Duties, hours, and compensation for training.  The terms and conditions of a STEM practical training opportunity during the period of the 24-month OPT extension, including duties, hours, and compensation, must be commensurate with terms and conditions applicable to the employer's similarly situated U.S. workers in the area of employment.  A student may not engage in practical training for less than 20 hours per week, excluding time off taken consistent with leave-related policies applicable to the employer's similarly situated U.S. workers in the area of employment.  If the employer does not employ and has not recently employed more than two similarly situated U.S. workers in the area of employment, the employer nevertheless remains obligated to attest that the terms and conditions of a STEM practical training opportunity are commensurate with the terms and conditions of employment for other similarly situated U.S.

Exhibit 1
621

workers in the area of employment.  "Similarly situated U.S. workers" includes U.S. workers

performing similar duties subject to similar supervision and with similar educational

backgrounds, industry expertise, employment experience, levels of responsibility, and skill sets

as the student.  The duties, hours, and compensation of such students are "commensurate" with

those offered to U.S. workers employed by the employer in the same area of employment when

the employer can show that the duties, hours, and compensation are consistent with the range of

such terms and conditions the employer has offered or would offer to similarly situated U.S.

employees.  The student must disclose his or her compensation, including any adjustments, as

agreed to with the employer, on the Form I-983 or successor form.

(9) Evaluation requirements and Training Plan modifications.  (i) A student may not be

authorized for employment with an employer pursuant to paragraph (f)(10)(ii)(C)(2) of this

section unless the student submits a self-evaluation of the student's progress toward the training

goals described in the Form I-983 or successor form.  All required evaluations must be

completed prior to the conclusion of a STEM practical training opportunity, and the student and

an appropriate individual in the employer's organization must sign each evaluation to attest to its

accuracy.  All STEM practical training opportunities require an initial evaluation within 12

months of the approved starting date on the employment authorization document granted

pursuant to the student's 24-month OPT extension application, and a concluding evaluation.  The

student is responsible for ensuring the DSO receives his or her 12-month evaluation and final

evaluation no later than 10 days following the conclusion of the reporting period or conclusion of

his or her practical training opportunity, respectively.

(ii) If any material change to or deviation from the training plan described in the Form I-

983 or successor form occurs, the student and employer must sign a modified Form I-983 or

successor form reflecting the material change(s) or deviation(s).  Material changes and

deviations relating to training may include, but are not limited to, any change of Employer

Identification Number resulting from a corporate restructuring, any reduction in compensation

from the amount previously submitted on the Form I-983 or successor form that is not tied to a

reduction in hours worked, any significant decrease in hours per week that a student engages in a

STEM training opportunity, and any decrease in hours worked below the minimum hours for the

24-month extension as described in paragraph (f)(10)(ii)(C)(8) of this section.  Material changes

and deviations also include any change or deviation that renders an employer attestation

inaccurate, or renders inaccurate the information in the Form I-983 or successor form on the

nature, purpose, oversight, or assessment of the student's practical training opportunity.  The

student and employer must ensure that the modified Form I-983 or successor form is submitted

to the student's DSO at the earliest available opportunity.

(iii) The educational institution whose DSO is responsible for duties associated with the

student's latest OPT extension under paragraph (f)(10)(ii)(C)(2) of this section is responsible for

ensuring the Student and Exchange Visitor Program has access to each individualized Form I-

983 or successor form and associated student evaluations (electronic or hard copy), including

through SEVIS if technologically available, beginning within 30 days after the document is

submitted to the DSO and continuing for a period of three years following the completion of

each STEM practical training opportunity.

(10) Additional STEM opportunity obligations.  A student may only participate in a

STEM practical training opportunity in which the employer attests, including by signing the

Form I-983 or successor form, that:

290

Exhibit 1
623

(i) The employer has sufficient resources and personnel available and is prepared to provide appropriate training in connection with the specified opportunity at the location(s) specified in the Form I-983 or successor form;

(ii) The student on a STEM OPT extension will not replace a full- or part-time, temporary or permanent U.S. worker; and

(iii) The student's opportunity assists the student in reaching his or her training goals.

(11) Site visits.  DHS, at its discretion, may conduct a site visit of any employer.  The purpose of the site visit is for DHS to ensure that each employer possesses and maintains the ability and resources to provide structured and guided work-based learning experiences consistent with any Form I-983 or successor form completed and signed by the employer.  DHS will provide notice to the employer 48 hours in advance of any site visit, except notice may not be provided if the visit is triggered by a complaint or other evidence of noncompliance with the regulations in this paragraph (f)(10)(ii)(C).

(D) Duration of status while on post-completion OPT.  For a student with approved post-completion OPT, the duration of status is defined as the period beginning on the date that the student's application for OPT was properly filed and pending approval, including the authorized period of post-completion OPT, and ending 60 days after the OPT employment authorization expires.

(E) Periods of unemployment during post-completion OPT.  During post-completion OPT, F-1 status is dependent upon employment.  Students may not accrue an aggregate of more than 90 days of unemployment during any post-completion OPT period described in 8 CFR 274a.12(c)(3)(i)(B).  Students granted a 24-month OPT extension under paragraph (f)(10)(ii)(C)(2) of this section may not accrue an aggregate of more than 150 days of

Exhibit 1
624

unemployment during a total OPT period, including any post-completion OPT period described in 8 CFR 274a.12(c)(3)(i)(B) and any subsequent 24-month extension period.

(11) OPT application and approval process—(i) Student responsibilities. A student must initiate the OPT application process by requesting a recommendation for OPT from his or her DSO. Upon making the recommendation, the DSO will provide the student a signed Form I-20 indicating that recommendation.

(A) Applications for employment authorization. The student must properly file an Application for Employment Authorization, Form I-765 or successor form, with USCIS, accompanied by the required fee, and the supporting documents, as described in the form's instructions.

(B) Applications and filing deadlines for pre-completion OPT and post-completion OPT—(1) Pre-completion OPT. For pre-completion OPT, the student may properly file his or her Form I-765 or successor form up to 90 days before being enrolled for one full academic year, provided that the period of employment will not start prior to the completion of the full academic year.

(2) Post-completion OPT. For post-completion OPT, not including a 24-month OPT extension under paragraph (f)(10)(ii)(C)(2) of this section, the student may properly file his or her Form I-765 or successor form up to 90 days prior to his or her program end date and no later than 60 days after his or her program end date. The student must also file his or her Form I-765 or successor form with USCIS within 30 days of the date the DSO enters the recommendation for OPT into his or her SEVIS record.

(C) Applications and filing deadlines for 24-month OPT extension. A student meeting the eligibility requirements for a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this

section may request an extension of employment authorization by filing Form I-765 or successor

form, with the required fee and supporting documents, up to 90 days prior to the expiration date

of the student's current OPT employment authorization.  The student seeking such 24-month

OPT extension must properly file his or her Form I-765 or successor form with USCIS within 60

days of the date the DSO enters the recommendation for the OPT extension into his or her

SEVIS record.  If a student timely and properly files an application for such 24-month OPT

extension and timely and properly requests a DSO recommendation, including by submitting the

fully executed Form I-983 or successor form to his or her DSO, but the Employment

Authorization Document, Form I-766 or successor form, currently in the student's possession

expires prior to the decision on the student's application for the OPT extension, the student's

Form I-766 or successor form is extended automatically pursuant to the terms and conditions

specified in 8 CFR 274a.12(b)(6)(iv).

(D) Start of OPT employment.  A student may not begin OPT employment prior to the

approved start date on his or her Employment Authorization Document, Form I-766 or successor

form, except as described in paragraph (f)(11)(i)(C) of this section.  A student may not request a

start date that is more than 60 days after the student's program end date.  Employment

authorization will begin on the date requested or the date the employment authorization is

adjudicated, whichever is later.

(ii) Additional DSO responsibilities.  A student must have a recommendation from his or

her DSO in order to apply for OPT.  When a DSO recommends a student for OPT, the school

assumes the added responsibility for maintaining the SEVIS record of that student for the entire

period of authorized OPT, consistent with paragraph (f)(12) of this section.

Exhibit 1
626

(A) Prior to making a recommendation, the DSO at the educational institution of the student's most recent enrollment must ensure that the student is eligible for the given type and period of OPT and that the student is aware of the student's responsibilities for maintaining status while on OPT.  Prior to recommending a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section, the DSO at the educational institution of the student's most recent enrollment must certify that the student's degree being used to qualify that student for the 24-month OPT extension, as shown in SEVIS or official transcripts, is a bachelor's, master's, or doctorate degree with a degree code that is contained within a category on the current STEM Designated Degree Program List at the time the recommendation is made.  A DSO may recommend a student for a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section only if the Form I-983 or successor form described in paragraph (f)(10)(ii)(C)(7) of this section has been properly completed and executed by the student and prospective employer.  A DSO may not recommend a student for an OPT extension under paragraph (f)(10)(ii)(C) of this section if the practical training would be conducted by an employer who has failed to meet the requirements under paragraphs (f)(10)(ii)(C)(5) through (9) of this section or has failed to provide the required assurances of paragraph (f)(10)(ii)(C)(10) of this section.

(B) The DSO must update the student's SEVIS record with the DSO's recommendation for OPT before the student can apply to USCIS for employment authorization.  The DSO will indicate in SEVIS whether the OPT employment is to be full-time or part-time, or for a student seeking a recommendation for a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section whether the OPT employment meets the minimum hours requirements described in paragraph (f)(10)(ii)(C)(8) of this section, and note in SEVIS the OPT start and end dates.

294

Exhibit 1
627

(C) The DSO must provide the student with a signed, dated Form I-20 or successor form indicating that OPT has been recommended.

(iii) <u>Decision on application for OPT employment authorization</u>.  USCIS will adjudicate a student's Form I-765 or successor form on the basis of the DSO's recommendation and other eligibility considerations.

(A) If granted, the employment authorization period for post-completion OPT begins on the requested date of commencement or the date the Form I-765 or successor form is approved, whichever is later, and ends at the conclusion of the remaining time period of post-completion OPT eligibility.  The employment authorization period for a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section begins on the day after the expiration of the initial post-completion OPT employment authorization and ends 24 months thereafter, regardless of the date the actual extension is approved.

(B) USCIS will notify the applicant of the decision on the Form I-765 or successor form in writing, and, if the application is denied, of the reason or reasons for the denial.

(C) The applicant may not appeal the decision.

(12) <u>Reporting while on optional practical training</u>—(i) <u>General</u>.  An F-1 student who is granted employment authorization by USCIS to engage in optional practical training is required to report any change of name or address, or interruption of such employment to the DSO for the duration of the optional practical training.  A DSO who recommends a student for OPT is responsible for updating the student's record to reflect these reported changes for the duration of the time that training is authorized.

(ii) <u>Additional reporting obligations for students with an approved 24-month OPT extension</u>.  Students with an approved 24-month OPT extension under paragraph (f)(10)(ii)(C) of

Exhibit 1
628

this section have additional reporting obligations.  Compliance with these reporting requirements is required to maintain F-1 status.  The reporting obligations are:

(A) Within 10 days of the change, the student must report to the student's DSO a change of legal name, residential or mailing address, employer name, employer address, and/or loss of employment.

(B) The student must complete a validation report, confirming that the information required by paragraph (f)(12)(ii)(A) of this section has not changed, every six months.  The requirement for validation reporting starts on the date the 24-month OPT extension begins and ends when the student's F-1 status expires or the 24-month OPT extension concludes, whichever is first.  The validation report is due to the student's DSO within 10 business days of each reporting date.

* * * * *

3.  In § 214.3, revise paragraph (g)(2)(ii)(F) to read as follows:

**§ 214.3  Approval of schools for enrollment of F and M nonimmigrants.**

* * * * *

(g) * * *

(2) * * *

(ii) * * *

(F) For F-1 students authorized by USCIS to engage in a 24-month extension of OPT under 8 CFR 214.2(f)(10)(ii)(C):

(1) Any change that the student reports to the school concerning legal name, residential or mailing address, employer name, or employer address; and

(2) The end date of the student's employment reported by a former employer in accordance with 8 CFR 214.2(f)(10)(ii)(C)(6).

* * * * *

4. Section § 214.16 is added, effective May 10, 2016 through May 10, 2019, to read as follows:

### § 214.16 Transition Procedures for OPT Applications for Employment Authorization

(a) <u>STEM OPT Applications for Employment Authorization that are filed prior to, and remain pending on May 10, 2016</u>.  (1) On or after May 10, 2016, USCIS will issue Requests for Evidence (RFEs) to students whose applications for a 17-month OPT extension under the rule issued at 73 FR 18944 are still pending.  The RFEs will request documentation that will establish that the student is eligible for a 24-month OPT extension under 8 CFR 214.2(f)(10)(ii)(C), including a Form I-20 endorsed on or after May 10, 2016, indicating that the Designated School Official (DSO) recommends the student for a 24-month OPT extension and that the requirements for such an extension have been met.  Submission of the Form I-20 in response to an RFE issued under 8 CFR 214.16(a) will be regarded as fulfilling the requirement in 8 CFR 214.2(f)(11)(i) that a student must initiate the OPT application process by requesting a recommendation for OPT by his or her DSO.

(2) Forms I-765 that are filed prior to, and remain pending on, May 10, 2016, will be regarded as being covered by 8 CFR 214.2(f)(11)(i)(C) and 8 CFR 274a.12(b)(6)(iv).

(b) <u>STEM OPT Applications for Employment Authorization that are filed and approved before May 10, 2016</u>.  A student whose Form I-765 is filed and approved prior to May 10, 2016 will be issued an Employment Authorization Document, Form I-766, that is valid for 17 months even if the student requested a 24-month OPT extension.

297

Exhibit 1
630