# EXHIBIT 2

<u>Affidavit of Jessica Vaughan</u>

Exhibit 2
707

## AFFIDAVIT OF JESSICA VAUGHAN

BEFORE ME, the undersigned authority, personally appeared, Jessica M. Vaughan who upon being first duly sworn, states as follows:

1.     My name is Jessica M. Vaughan, and I serve as Director of Policy Studies for the Center for Immigration Studies ("CIS"), a Washington, D.C.-based research institute that examines the impact of immigration on American society and educates policymakers and opinion leaders on immigration issues. I have worked for CIS since 1992, and my area of expertise is immigration policy and operations, covering topics such as visa programs, immigration benefits and immigration law enforcement.

2.     I have recently completed several major projects on immigration and crime, including a Department of Justice-funded project studying the use of immigration law enforcement in transnational gang-suppression efforts. I am also an adjunct instructor for senior law enforcement officer training seminars at Northwestern University's Center for Public Safety in Illinois. Prior to joining CIS, I served as a Foreign Service Officer with the State Department in Belgium and Trinidad & Tobago. I have had articles published in the Washington Post, Boston Globe, The Economist, the National Interest, Providence Journal, Hartford Courant, Arizona Republic and other publications. My articles can be found at www.cis.org. I have testified before Congress more than a dozen times, and several

1

Exhibit 2
708

times before state legislatures. I advise state and local lawmakers and agencies on immigration issues. I have served as an expert witness in several state and federal court cases. I am frequently cited in news-media reports on immigration and I have appeared many times on national, international and local broadcast news programs. I have given presentations at many academic, government and law enforcement conferences and trainings as a subject matter expert on immigration. I earned a Master's degree from Georgetown University and a Bachelor's degree in International Studies at Washington College in Maryland.

3.      I have spent nearly twenty-five years researching the policies and actions of the government agencies in charge of implementing and enforcing the nation's immigration laws, namely the U.S. Department of Homeland Security ("DHS") and its predecessor agency the Immigration and Naturalization Service ("INS"). I have written numerous Freedom of Information Act requests and examined numerous government and academic data and reports on immigration. I have made at least six study visits to several different sections of the U.S. border (at least five times to the southwest border and once to the northern border). I have interviewed U.S. and foreign immigration officials, including U.S. Border Patrol, immigration port of entry inspectors, U.S. Immigration and Customs Enforcement ("ICE") investigative and deportation officers, consular officers, immigration benefits examiners, fraud investigators, as well as state and local law enforcement

2

Exhibit 2
709

officers. The expertise I have developed has allowed me to understand and recognize the actual effects and significance of the discretionary policy actions taken by DHS that concern the entry into and settlement within the United States of foreign nationals.

4.      Based on my experience, I can identify 33 related past and ongoing actions, which, collectively, have had at least two significant impacts on the human environment that have also specifically injured the instant plaintiffs as detailed in the affidavits they have submitted. (*See* Exhibits 6-19) These two significant impacts on the environment are: 1) a substantial increase in the population through the actions themselves, population growth itself being a primary concern of the National Environmental Policy Act ("NEPA"), and entailing a host of environmental impacts (*See* discussion of the environmental impacts of population by Phil Cafaro, Exhibit 4); and 2) severe environmental degradation on the Southwest border caused by the passage of illegal aliens entering the country in reaction to many of these actions. In this affidavit, therefore, I am attaching two reports. In the first report entitled, *Discretionary Actions Past, Ongoing, And Potential That Increased Or Will Increase The Settled Population Of The United States* (attached hereto as Exhibit A), I provide a description of how each of the actions that have added to the settled population of the U.S. works and estimate by how much, if possible. In the second report, entitled *Analysis Of Discretionary*

*Agency Actions (Past And Ongoing) That Resulted In Cumulatively Significant Environmental Impacts On The Southwest Border* (attached hereto as Exhibit B), I provide a list of the actions (largely a subset of the first) that have led to increased numbers of illegal aliens crossing the Southwest Border, and an explanation of why they have done so.

5.     The actions described in these reports do not encompass an exhaustive list of all past and current DHS actions that have added foreign nationals to the settled population or led to an increase in illegal border crossing. Rather, they comprise only those impactful actions that I have a high degree of confidence in identifying and describing. They are related because all of these actions concern the entry into and settlement within the United States of foreign nationals, and have specifically harmed the plaintiffs by so doing. My description of the actions is retrospective; that is, I am describing the actions taken and proposed and estimating their impacts. The plaintiffs themselves, because they are seeking prospective relief and not damages for past harm, are only challenging those that are still ongoing.

6.     These actions do not in themselves represent the entire degree of population growth due to agency discretion. Such a list would have to include every action taken by DHS, and its predecessor agency (the INS), to use its authority to implement laws, regulations or policies in a way that affects the

4

Exhibit 2
711

numbers of foreign nationals entering and/or settling into this country as inhabitants in at least some way. However, while it may be, at this point, impossible to determine just how much population growth is attributable purely to DHS discretionary actions, it is clear from this list that the cumulative impact on the U.S. population from agency discretion is significant. Indeed, it is widely acknowledged that administrative discretion has been commonly used in the area of immigration. Though parties argue about the boundaries of precisely how much authority is proper under various statutes, there is no doubt that, as a practical reality, the nation's immigration agencies have frequently exercised discretion to create large-scale programs that affect the behavior of large numbers of individuals.[1]

7. Attached hereto as Exhibit C, I have also provided two charts that summarize my findings regarding population increases (nationally and in particular counties) as a result of the actions discussed in my reports.

---

[1] *See, e.g., Executive Grants of Temporary Immigration Relief, 1956-Present*, AM. IMM. COUNCIL, Oct. 2014,
https://www.americanimmigrationcouncil.org/sites/default/files/research/executive_grants_of_temporary_immigration_relief_1956-present_final_0.pdf.

5

Exhibit 2
712

FURTHER AFFIANT SAYETH NOT.

_Jessica M. Vaughan_ 10/15/16
Jessica M. Vaughan

Subscribed and sworn to before me on _October 15 2016_ by Jessica M.

Vaughan. She is personally known to me or has presented

_United States Passport_ as identification.

NOTARY PUBLIC maxwell J. Taylor
STATE OF MASSACHUSETTS
MY COMMISSION EXPIRES  11-26-2021

MAXWELL J. TAYLOR
MY COMM. EXPIRES
NOVEMBER 26, 2021
NOTARY PUBLIC
COMMONWEALTH OF
MASSACHUSETTS

6

Exhibit 2
713

# EXHIBIT A

Exhibit 2
714

# DISCRETIONARY ACTIONS PAST, ONGOING, AND POTENTIAL THAT INCREASED OR WILL INCREASE THE SETTLED POPULATION OF THE UNITED STATES

## Introduction

DHS, and its predecessor INS, have used at least seven methods to carry out 32 discretionary actions which have led to a substantial increase in the settled population of the United States. These methods, and the actions they have carried out, are described below along with an estimate of the numbers of incoming or remaining foreign nationals involved and, where possible, the estimates for certain locations of settlement for those individuals. Although the total population numbers of these actions cumulatively cannot simply be added together, it is a near-certainty and absolutely reasonable to assume that, at the very least, several million foreign nationals have entered or settled into the United States due to these specific discretionary actions, or ultimately will should these actions continue to remain DHS policy.

The kind of actions that I have included are both those that have the effect of influencing foreign nationals to enter the country and those that have the effect of influencing foreign nationals to remain settled in the country. Population growth occurs not just because foreign nationals enter the country, but also because they decide to remain on a permanent or long-term basis. I have organized them here based on the seven methods employed by DHS to carry them out.[2]

## I.      First Method: Parole

The Immigration and Nationality Act ("INA") gives DHS discretionary authority to allow the entry of foreign nationals into the country who are otherwise

---

[2] These actions are all related because they have a common impact on increasing entry and settlement into the U.S. But many are also related to each other because DHS conceived them as part of the same program. For instance, the "Johnson Memos" (included *infra*) were composed of ten policy memoranda, collectively published by DHS Secretary Jeh Johnson on November 14, 2014, and which he described as collectively intended to "fix" the immigration system. *See generally*, https://www.dhs.gov/immigration-action.

inadmissible through a process known as "parole," and sometimes by the longer description "humanitarian parole" (INA § 212(d)(5)). The alien paroled into the country is therefore temporarily lawfully present. DHS has adopted standards and processes by which individuals and classes of individuals apply for this parole, and, since at least 1989 has created numerous programs through its parole authority and continues to grant entry to tens of thousands of individuals through these programs. Even though no one particular grant of parole to any particular individual constitutes a major action in itself, the adoption of a discretionary parole program is a major action.

The parole power, and its underlying programs, have changed over the years, including by congressional amendments made under the Illegal Immigration Reform and Immigrant Responsibility of 1996 ("IIRIRA"). For both post- and pre-IIRIRA grants of parole, however, the discretionary actions creating programs or allowing many individuals receive parole remain a significant source of entry and settlement into the country for otherwise unqualified or illegally arriving foreign nationals.

DHS has created parole programs by way of rulemakings and policy memoranda. In neither has the agency cited its obligation under NEPA when creating or updating its many parole programs.

### A) <u>Humanitarian Parole – 1990s</u>

The Attorney General used humanitarian parole to allow large numbers of foreign nationals to enter the country through several programs between 1989 and 1998.[3] A variety of classifications of parolees were identified, including Advance Parole, Deferred Inspection, and "Overseas" Parole. Of these categories, only "overseas" parole was expected to lead to permanent residence, although not all aliens elected

---

[3] The earliest use of parole I have located was 1956, for Hungarians escaping after the 1956 uprising and for a group of orphans. This was described by the American Immigration Council, *see* AM. IMM. COUNCIL, *supra* note 1.

to apply for it. Most of the aliens who ended up staying for long-term residence were citizens from the Former Soviet Union, Southeast Asia, and Cuba.[4]

In this time period, approximately 176,000 aliens were allowed to enter as overseas parolees and ultimately adjusted to permanent status, according to a report to Congress by the INS.[5] Like everyone who obtains legal permanent status and citizenship, these parolees were able to sponsor immediate relatives and some extended family, producing a multiplier-effect known as "chain migration."

One prominent team of researchers has calculated a chain migration "multiplier."[6] This multiplier is based on data on family-sponsored immigration for the period 1996-2000. According to this research, every 100 original immigrants to the United States during this period sponsored another 345 family members as immigrants. This multiplier (3.45) is used here to estimate the number of additional immigrants that likely would be sponsored by the original beneficiaries of the described agency actions.

## B) Parole-in-Place

In 1998, Paul Virtue, then-General Counsel of the INS published a memorandum that used the discretionary authority of the agency to grant "parole" to certain inadmissible aliens who were already inside the boundary of the United States. *See* Exhibit 1, Action 1: Subject: Authority to parole applicants for admission who are not also arriving aliens.

Prior to this action, parole was available only to aliens who were arriving from outside the United States. This action inevitably increased the number of settled inhabitants of the United States as such grants allow individuals to put themselves on a path to long term permanent residence rather than remain as illegal migrants

---

[4] *See, Report to Congress Use of the Attorney General's Parole Authority Under the Immigration and Nationality Act Fiscal Years 1997-199*8, IMM. DAILY, *available at* http://www.ilw.com/immigrationdaily/news/2001,0329-Parole.shtml.

[5] *Id.*

[6] Stacie Carr and Marta Tienda, *Family Sponsorship and Late-Age Immigration in Aging America: Revised and Expanded Estimates of Chained Migration*, POPUL. RES. POLICY REV., Dec. 2013, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3884518/.

who are vulnerable to deportation. In general, aliens who have been neither admitted nor paroled into the United States are inadmissible pursuant to INA § 212(a)(6)(A). When an alien receives parole, however, this bar to inadmissibility no longer applies. Furthermore, unlike aliens who have been deported or who have voluntarily departed, paroled, otherwise illegal, aliens are not subject to the 3- and 10-year bars to admission for having been illegally present in the country. *See* INA § 212(a)(9)(B). With these two bars to admission inapplicable, a paroled alien will generally become admissible (unless other bars to admission apply, such as convictions for felonies). Aliens who are now admissible and are also immediate relatives of U.S. citizens are then eligible to obtain a green card and citizenship. INA § 245(a)(c)(2).

Estimates of the total number of aliens who were granted parole in place are unavailable. If DHS had done the required NEPA analysis, this information would be available for public review and analysis.

### C) Credible Fear Parole

In 2009, ICE Director John Morton authorized grants of parole for asylum-applicants who claimed a credible fear of return to their home country. *See* Exhibit 1, Action 2: Parole of arriving aliens found to have a credible fear of persecution or terror.

Prior to this time, arriving aliens claiming asylum were typically detained pending review of their claim in accordance with INA § 235(b)(1)(B)(ii), codified as 8 U.S.C. § 1225 (b)(1)(B)(ii)), that is, an alien who arrives and claims a fear of returning to his or her own country is intended to be detained. The alien is then intended to remain in detention first, while a U.S. Citizenship and Immigration Services ("USCIS") officer determines if that fear is credible, and, second, until an immigration judge determines if the alien should be granted asylum. Morton's directive instead called for aliens to be *released* upon determination by a USCIS officer that their claim of fear of return was "credible." According to DHS statistics, more than 90 percent of claims are ruled to be credible at this point in the

process.[7] The combination of a high rate of approval at the first hurdle in the process and an end to the practice of detaining applicants have eliminated a significant disincentive to making frivolous claims and led to prolonged proceedings, which trigger the issuance of work permits. Over time, asylum claims have increased dramatically.

Since 2010, there have been approximately 152,000 new credible-fear claims. According to the most recent estimate, DHS is now receiving approximately 5,500 such claims per month, up from 3,000 in 2013.[8] Of these, according to USCIS statistics, approximately 70% ultimately will be approved, leading to permanent status and further chain migration. Experts have stated that this influx of claims has less to do with conditions in the claimants' home countries and more to do with the widespread awareness of how the cases are processed, particularly the immediate release of claimants initially found to be "credible," the fact that cases can take years to be resolved, and the availability of work authorization in the interim.[9]

## D) Parole Program for Military Families

On November 15, 2013, DHS applied its discretionarily created parole-in-place power to establish a special program implementing a special path to long term permanent resident status and citizenship for illegal aliens who are immediate relatives of active and veteran U.S. military members, by publishing a policy

---

[7] Dan Cadman, *Asylum in the United States*, CENT. IMM. STUDIES, Mar. 2014, *available at* http://cis.org/asylum-system-checks-balances-dismantled.

[8] Stephen Dinan, *Haitian Immigrants Cross Border through Mexico, Claim Asylum for Quick Processing and Entry*, THE WASH. TIMES, Sept. 22, 2016, *available at* http://www.washingtontimes.com/news/2016/sep/22/haitian-immigrants-cross-border-through-mexico-cla/.

[9] *See*, United States. Cong. House, Committee on Judiciary, Subcommittee on Immigration and Border Security, Hearing: *Another Surge of illegal immigrants along the Southwest. Is this the Obama Administration's New Normal?*, Feb. 4, 2016, 114th Cong., *available at* http://cis.org/Testimony/vaughan-another-surge-southwest-border; *see also*, Stephen Dinan, *Surge in illegal immigrants blamed on U.S. policy, not on spiking violence in Central America*, THE WASH. TIMES, Jun. 11, 2014, *available at* http://www.washingtontimes.com/news/2014/jun/11/surge-illegals-blamed-us-policy/; *see also*, Kausha Luna, *The Realities of Illegal Immigration Into and Out of Honduras*, CENT. IMM. STUDIES, Mar. 2014, *available at* http://cis.org/luna/realities-illegal-immigration-and-out-honduras.

memorandum. *See* Exhibit 1, Action 3: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i).

DHS has provided no statistics or estimates of the number of beneficiaries of this program. If DHS had done the obligatory NEPA analysis, this information would be available.

### E) Expansion of Parole Program for Military Families

On November 20, 2014, DHS expanded the program by issuing a policy memorandum extending eligibility to the program for family members of citizens and permanent residents who merely seek to enlist in the military, rather than only active and veteran U.S. military members. *See* Exhibit 1, Action 4: Families of U.S. Armed Forces Members and Enlistees. Secretary Jeh Johnson announced this policy on November 20, 2014 as part of the collective "Johnson Memos."

No estimates of the number of beneficiaries of this expanded eligibility have been disclosed. If DHS had done the obligatory NEPA analysis, this information would be available.

### F) Parole Program for CNMI Caregivers

On October 27, 2011, DHS used the parole power to create a special program that gave eligibility for parole to foreign workers in the Commonwealth of the Northern Mariana Islands who were working as in-home care-givers. *See* Exhibit 1, Action 5: Parole for Caregivers of Critical Medical or Special Needs Individuals.

DHS has provided no estimates of the number of individuals who have been granted this form of parole. If DHS had done the obligatory NEPA analysis, this information would be readily available.

### G) Advance Parole for Deferred Action Recipients

On November 20, 2014, DHS published a policy memorandum ordering that all agencies within DHS, including U.S. Customs and Border Protection ("CBP"), must follow the precedent set by a 2012 Justice Department Executive Office Review ("EOIR"), Board of Immigration Appeals case, *Matter of Arrabally*. *See* Exhibit 1, Action 6: Directive to Provide Consistency Regarding Advance Parole. This precedent established a further expansion of the parole power, the discretionarily created "advance parole." With "advance parole," USCIS grants an unlawfully present alien permission to leave the country and return as a parolee. In *Arrabally*, the Department of Justice ordered that immigration judges *must* hold that aliens who leave the country with "advance parole," that is, permission to leave, have not "departed" the country under INA Section 212(a)(9)(B)(i). What that means is that the 3- and 10-year bars on admission to illegal aliens in the country will not apply to illegal aliens who leave with permission from USCIS. Advance parole therefore may be used to put a large number of illegal aliens who have received deferred action through various programs on a path to permanent legal residence and citizenship. Secretary Jeh Johnson announced this policy on November 20, 2014 as part of the collective "Johnson Memos."

According to USCIS data obtained by the Senate Judiciary committee, as of December 31, 2015, a total of 22,340 individuals with Deferred Action for Childhood Arrivals ("DACA") status have received advance parole. Of these, 5,068 applied to adjust to full legal status and 2,994 have been approved for adjustment of status.[10] Those obtaining Legal Permanent Resident ("LPR") status are then eligible to sponsor additional family members, triggering chain migration.

## H) Central American Minors Refugee and Parole Program

DHS established the Central American Refugee Program ("CAM") using the parole power between July 2014 and February 2015. *See* Exhibit 1, Action 7: In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors–CAM).

---

[10] Letter from U.S. Citizen & Imm. Services to Senate Judiciary Chairman, Charles Grassley, on "DACA Advance Parole Program," Jun. 29, 2016, *available at* https://www.judiciary.senate.gov/imo/media/doc/2016-06-29%20USCIS%20to%20CEG%20-%20DACA%20Advance%20Parole%20Program.pdf.

Under the CAM program, DHS offers either refugee or parole status to children and adults from Guatemala, Honduras, or El Salvador when a "qualifying parent" who is "lawfully present" in the U.S. files an application for refugee status on behalf of their child currently living in one of those countries. The guidelines announced in February 2015 provide that a "qualifying parent" may be an alien with 1) permanent resident status; 2) temporary protected status; 3) parole (after one year); 4) deferred action (after one year); 5) deferred enforced departure; or 6) withholding of removal. Practically speaking, the program allows illegal aliens living in the U.S. to use the laws of the United States governing refugees and parole to bring in their relatives living outside the U.S.

If an alien is a "qualifying parent," he or she may petition the U.S. government to admit a "qualifying child" to the United States. The "qualifying child" must be: 1) the biological, step, or legally adopted child of the parent in the U.S.; 2) unmarried; 3) under the age of 21; 4) a national of El Salvador, Guatemala, or Honduras; and 5) residing in his or her country of nationality. If aliens are ineligible to qualify as a refugee, the program allows the same aliens to apply for parole in order to enter the U.S.

I estimate that approximately 315,000 individuals are potentially eligible to sponsor an estimated 150,000 children for admission under CAM. This estimate is based on estimates of the number of Temporary Protected Status ("TPS"), U visa, The Violence Against Women Act ("VAWA") visas, Deferred Enforced Departure ("DED")/Withholding of Removal or parolee cases from El Salvador, Guatemala, and Honduras who could have children in their home country and DHS reports on the U visa, VAWA visa and credible fear approvals.[11] Separate DHS administrative data indicate that the number of children able to immigrate is typically half the total number of eligible principal aliens. Approximately 12% of the children are being admitted as refugees with a path to permanent status, also providing protected status to their parents, for a total of 55,800 individuals.

DHS further expanded the CAM program on July 26, 2016, making three additional categories of foreign nationals eligible to enter the U.S. if accompanied

---

[11] David North, *Leaving TPS Doesn't Necessarily Mean Going* Home, CENT. IMM. STUDIES, Jun. 2015, *available at* http://cis.org/Leaving-TPS-Doesnt-Mean-Going-Home.

Exhibit 2
722

by a "qualifying child."[12] These are: 1) sons and daughters of a U.S.-based lawfully-present parent who are over 21 years old; 2) the in-country biological parent of the qualified children; and 3) caregivers of qualified children who are also related to the U.S.-based lawfully present parents.

DHS has provided no information on the expected number of applicants for the expanded CAM program. The number is especially difficult to estimate due to the significant prospect of fraud in the vaguely defined category of "caregivers" who are "related" to the U.S.-based parents. If DHS had done the required NEPA analysis, this information would be readily available.

### I) Haitian Family Reunification Parole Program

On December 18, 2014, DHS created the Haitian Family Reunification Parole ("HFRP") Program to accelerate the arrival of Haitians whose immigration applications have been approved. *See* Exhibit 1, Action 8: The Haitian Family Reunification Parole (HRRP) Program.

According to workload projections that USCIS provided to the Senate Judiciary committee, the agency receives about 6,000 arrivals per year.[13] This program accelerates the arrival of immigrants from Haiti. According to experts, expanding the population at an earlier period has an environmental impact because of compound growth.

### J) International Entrepreneur Parole Rule

On August 26, 2016, DHS published a proposed rule that would create a program that would extend parole to "entrepreneurs." *See* Exhibit 1, Action 9: International Entrepreneur Rule, Proposed Rule. Eligibility criteria would include entrepreneurs of startup enterprises: 1) who have a significant ownership interest in the startup (at

---

[12] Press Release, Dept. Homeland Sec., *U.S. Expands Initiatives to Address Central American Migration Challenges*, Jul. 26, 2016, *available at* https://www.dhs.gov/news/2016/07/26/us-expands-initiatives-address-central-american-migration-challenges.
[13] Responses from DHS Secretary to Senate Judiciary Chairman, Charles Grassley, on "Visa Overstays," etc., *available at*
https://www.judiciary.senate.gov/imo/media/doc/Johnson%20Responses.pdf.

least 15 percent) and have an active and central role to its operations; 2) whose startup was formed in the United States within the past three years; and 3) whose startup has substantial and demonstrated potential for rapid business growth and job creation, as evidenced by: 1) receiving significant investment of capital (at least $345,000) from certain qualified U.S. investors with established records of successful investments; 2) receiving significant awards or grants (at least $100,000) from certain federal, state or local government entities; or 3) partially satisfying one or both of the above criteria in addition to other reliable and compelling evidence of the startup entity's substantial potential for rapid growth and job creation. This proposed rule is in the notice and comment period, but before this rule is finalized, DHS should do a NEPA analysis. Secretary Jeh Johnson announced this policy on November 20, 2014 as part of the collective "Johnson Memos."

In the proposed rule, DHS estimates that 2,940 entrepreneurs could be eligible annually, plus family members, which typically would be an equal number to the principal applicants. Therefore this action could be expected to add about 6,000 people to the population every year.

## II.     Second Method: Discretionary Responses to Overseas Events

### A) Temporary Protected Status

In 1990, Congress established the discretionary authority of the agency which became DHS to grant aliens present in the United States who are from countries temporarily unable to handle the return of their foreign nationals because of natural disaster or civil violence the authority to stay in the U.S. on a "temporary" basis, and receive work authorization. *See* Exhibit 1, Action 10: Temporary Protected Status. DHS designates a country for TPS, and then individuals may apply to the program. Since its inception, 20 countries have been designated, including El Salvador, Guinea, Haiti, Honduras, Liberia, Nepal, Nicaragua, Sierra Leone, Somalia, Sudan, South Sudan, Syria, and Yemen. Individuals may also apply for renewal status, and thus, practically speaking, though designated as "temporary," TPS status has become long term for most recipients.[14] An estimated 340,000

---

[14] *See* NORTH, *supra* note 11.

aliens currently have TPS (*see* North, *supra* note 11). As a result of *Arrabally*, some will be allowed to adjust to LPR status, setting off chain migration.

## B) <u>Deferred Enforced Departure</u>

DHS, as part of the Executive Branch's power to conduct foreign relations, has the discretionary power to defer the removal of eligible foreign nationals from designated countries through an action known as Deferred Enforced Departure. *See* Exhibit 1, Action 11: Deferred Enforced Departure.

Between 1989 and 1992, the government granted DED to 322,227 aliens including 190,000 El Salvadorans, 80,000 Chinese, 40,000 Haitians, 2,227 Kuwaitis, and 10,000 Liberians. Currently, only certain Liberians still have DED, through September 30, 2016. There is no provision for aliens with DED to adjust to permanent status, so there is no significant chain migration result from this status.

## III. Third Method: Agency Creation of New Enforcement Standards by Way of Defining "Priorities" and Exercising "Prosecutorial Discretion" for Non-Priorities

In 2011 and 2012, DHS, through the discretionary decisions of top levels of the DHS hierarchy, including particularly John Morton, then Director of the DHS subagency ICE, implemented a series of related actions, through what is called the "The Morton Memos," which worked in complement with each other as a program and actively redefined the implementation of immigration enforcement, thus creating major consequences relating to the entry and settlement of foreign nationals into the United States. This series of discretionary actions were all part of a related group of actions consolidating decisions regarding enforcement at higher levels of the DHS hierarchy than had previously been DHS's practice.

In 2014, the Secretary of DHS, Jeh Johnson, further expanded many of these actions with another series of policy memoranda. Johnson's November actions can be described as "the Johnson Memos" (though Secretary Johnson at that time also published policy memoranda that touched upon other areas of immigration law implementation, as well as expansions of the Morton Memos).

### A) Action Defining New Categories of Illegal Aliens Prioritized for Immigration Enforcement

On March 2, 2011, then ICE Director John Morton enacted this policy through the issuance of a policy memorandum. *See* Exhibit 1, Action 12: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens. This memorandum directed that ICE agents would only enforce the law against a specific subset of illegal aliens by setting forth new priorities for the apprehension, detention, and removal of illegal aliens. This subset, according to Director Morton, includes: 1) aliens who pose a danger to national security or are a risk to public safety; 2) recent Illegal entrants; and 3) aliens who are fugitives or "otherwise obstruct immigration controls." In practice, the adoption of this policy memorandum was a major action, the adoption of which substantially changed the enforcement of immigration law as aliens not meeting one of the categories were no longer, practically speaking, subject to deportation.

### B) Action Mandating Affirmative Discontinuance of Enforcement Procedures against New Categories of Illegal Aliens Protected from Enforcement ("Prosecutorial Discretion")

On June 17, 2011, then ICE Director Morton decreed in a policy memorandum that the agency must regularly exercise what he called "prosecutorial discretion," which, in practice, was the affirmative discontinuance by ICE agents of enforcement measures against an individual unlawfully present in the United States. *See* Exhibit 1, Action 13: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention and Removal of Aliens. ICE agents are encouraged to use "prosecutorial discretion" early on when an alien is encountered, preferably before the alien or his lawyer requests it. The memorandum states that appropriate moments to exercise prosecutorial discretion include: 1) deciding whom to stop, question, or to arrest for being unlawfully in the country; 2) deciding whom to detain or release; 3) settling or dismissing a proceeding; and 4) executing a removal order. This policy memorandum also delineated the factors to consider when exercising "prosecutorial discretion," including: 1) ICE's civil immigration enforcement priorities (from the previous action, *see* Exhibit 1, Action 12); 2) the

12

Exhibit 2
726

alien's length of presence in the U.S.; 3) whether the alien came as a young child; 4) the alien's pursuit of education in the U.S., with particular consideration to those who have graduated from a U.S. high school or are pursuing a college or advanced degree; 5) whether the alien or the alien's immediate relative has served in the U.S. military; 6) the alien's criminal history; and 7) the alien's ties and contributions to the community.

## C) Action Mandating Affirmative Discontinuance of Enforcement Procedures against Crime Victims

On June 17, 2011, then ICE Director Morton decreed in a policy memorandum special treatment for illegal aliens who are witnesses and victims of crime. *See* Exhibit 1, Action 14: Prosecutorial Discretion:  Certain Victims, Witnesses and Plaintiffs. The memorandum mandated release from detention or deferral of removal for certain categories of illegal aliens, including: 1) victims of domestic violence, human trafficking, or "other serious crimes;" 2) witnesses involved in pending criminal investigations or prosecutions; 3) plaintiffs in non-frivolous lawsuits regarding civil rights or liberties violations; and 4) individuals engaging in a protected activity related to civil or other rights (for example, union organizing or complaining to authorities about employment discrimination or housing conditions) who may be in a non-frivolous dispute with an employer, landlord, or contractor.

## D) Action Implementing New Deportation Standards Through Administrative Case Closures

Between August 2011 and November 2011, DHS determined how it would implement the new deportation standards created by the Morton Memos. On August 18, 2011, then DHS Secretary Janet Napolitano explained in a letter to Senate Majority Leader Harry Reid that DHS was establishing an "interagency working group to execute a case-by-case review" of all pending and incoming deportation cases to ensure no illegal aliens falling under the new categories would

be deported.[15] On November 17, 2011, ICE issued a policy memorandum announcing the new implementation guidelines that included two attachments. *See* Exhibit 1: Action 15: Case-by-Case Review of Incoming and Certain Pending Cases; Next Steps in the Implementation of the Prosecutorial Discretion Memorandum and the August 18th Announcement on Immigration Enforcement Priorities; and Guidance to ICE Attorneys Reviewing the CBP, USCIS, and ICE Cases Before the Executive Office of Immigration Review.

The memorandum instructed all chief counsel within ICE to start review of incoming deportation cases immediately. The memorandum also set up a pilot program in Denver and Baltimore to begin the review of pending deportation cases, with a plan to implement the program nationwide at the pilot program's successful conclusion.

For both pending and incoming deportation cases, the memorandum established strict guidelines for ICE attorneys regarding when proceedings against an alien should be discontinued. These guidelines applied to ICE removal cases, CBP cases, and USCIS cases. According to the procedure laid out by the guidelines, ICE attorneys must determine whether removal cases either: 1) fall into DHS's new protected categories and should be considered for administrative relief from deportation, or 2) meet DHS's new standards for removal and thus should enter the typical process for a deportation case. Aliens who are still subject to deportation include: (1) suspected terrorists; (2) aliens who have been convicted of a felony or multiple misdemeanors; (3) gang members or human rights violators; or (4) aliens who entered the country illegally or violated the terms of their admission within the last three years. The last category demonstrates a decision to exempt illegal aliens who have been in the U.S. more than three years from deportation. Aliens are determined to be potentially eligible for administrative relief from deportation if: 1) they came to the U.S. under the age of 16; 2) they have been in the country for over five years; and 3) they have completed high school or a GED program. Other deportation cases eligible for administrative amnesty include those in which aliens have a "very long-term presence" in the U.S., have an immediate family

---

[15] Letter from DHS Secretary to Senator Harry Reid, on "DREAM Act Response," Aug. 18 2011, *available at* https://democrats.senate.gov/wp-content/uploads/2011/08/11_8949_Reid_Dream_Act_response_08.18.11.pdf.

14

Exhibit 2
728

member who is a U.S. citizen, and have made "compelling" ties and contributions to the U.S. to remain in the country.

The implementation of these combined policy changes (A-D, *supra*) resulted in a significant decline in the number of aliens deported. In addition, wide public knowledge of these changes and the reduced risk of deportation can reasonably be expected to have provided an incentive or motivation for more illegal aliens to settle and/or remain in defiance of the law who otherwise might have been deterred from settling or remaining. The estimated population impact of this policy is an additional 616,000 additional settled aliens. This number is based on the decline in deportations since the implementation of the policy (416,000) plus the estimated number of family members who would have accompanied them if deported (200,000), plus an unknowable number of aliens who are incentivized to settle or remain as a result of the diminished enforcement.[16]

### E) <u>USCIS Guidelines Restricting Issuance of Notices to Appear</u>

On November 7, 2011, USCIS issued new guidelines that USCIS officials must consider when issuing a Notice to Appear ("NTA") to initiate removal proceedings against an alien. *See* Exhibit 1, Action 16: Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens. The new guidelines establish the circumstances USCIS personnel are allowed to unilaterally issue NTAs, and when they are required to refer a case to ICE for it to determine whether an NTA will be issued. According to the memo, USCIS can issue an NTA itself when: 1) USCIS denies a request for an alien spouse to become a lawful permanent resident by removing what is called the "conditional" status of a green card (and an "egregious public safety crime" is not involved); 2) USCIS denies a request by an alien who has invested in the EB-5 visa program to remove conditions of status (and an "egregious public safety crime" is not involved); 3) USCIS terminates or denies certain asylum or refugee benefits; or

---

[16] *See*, Jessica Vaughn, New Statistics: Enforcement Continues to Decline in 2016, CENT. IMM. STUDIES, Jul. 2016, *available at* http://cis.org/Immigration-Enforcement-Deportations-Decline-2016; *see also*, Gardenia Mendoza, *Half a million U.S.-born kids live in Mexico with deported parents, trying to assimilate*, FOX NEWS LATINO, Sept. 29, 2016, a*vailable at* http://latino.foxnews.com/latino/news/2016/09/29/half-million-us-born-kids-live-in-mexico-with-deported-parents-trying-to/.

4) fraud is formally part of an alien's case record (and no criminal investigation resulting in criminal prosecution results). In all other cases, USCIS must either: (1) refer the case to ICE; or (2) include ICE and its "priorities" (as established in Actions 14-16) in the NTA decision-making process. The memorandum also provides that USCIS officials must refer to ICE almost all cases involving criminal offenses, whether they are "egregious public safety cases" (in which case, before USCIS makes the determination) or "non-egregious public safety cases" (in which case, after USCIS makes its determination). After USCIS has referred a case to ICE, only ICE has the authority to determine whether to institute removal proceedings by issuing an NTA.

Based on USCIS workload statistics, it can be estimated that from 2012-2016, approximately 320,000 petitions or applications for benefits likely were denied on the basis of fraud or other non-egregious public safety or security-related ground. Under previous policies, these individuals likely would have been issued an NTA; but as a result of this policy change, they likely were able to avoid the NTA and deportation proceedings, enabling them to remain in the United States with little threat of deportation.[17]

### F) Changing Detainer Policy: Adoption of New "Post-Conviction" Detainer Procedures and Limiting Detainers to Certain Categories of Aliens

On December 29, 2011, ICE announced that it had adopted a new policy on detainers. A detainer is a notice from ICE to another law enforcement agency to hold an alien so that ICE can take custody in order to initiate deportation proceedings. *See* Exhibit 1, Action 17: ICE … issues new detainer form Immigration Detainer: Notice of Action. Federal law allows ICE to take illegal aliens into its custody after they are released from state or local law enforcement custody regardless of whether or not they were convicted of the crime that landed them in state or local custody. Federal regulation also specifically provides that when an alien is in state or local custody, local officers shall hold the alien for up to 48 hours to allow ICE officers time to pick up the alien. Prior to the December

---

[17] U.S. Citizen. & Imm. Servs, Immigration and Citizenship Data, https://www.uscis.gov/tools/reports-studies/immigration-forms-data (last visited Oct. 11, 2016).

Exhibit 2
730

29, 2011 press release, longstanding enforcement policy was for ICE to issue such detainers if the officer had reason to believe the alien was deportable, regardless of whether the alien had been convicted. But under the new policy, in general, ICE officers could only issue detainers if the alien has actually been convicted of the offense for which he or she was arrested. The adoption of this new policy was apparent only by a difference in the new detainer form, which included a provision allowing ICE officers to "Consider this request for a detainer operative only upon the subject's conviction."

On December 21, 2012, then ICE Director John Morton issued a policy memorandum that limited the circumstances under which ICE agents can issue detainers and take custody of illegal aliens from state and local law enforcement officials. *See* Exhibit 1, Action 18: Civil Immigration Enforcement: Guidance on the Use of Detainers in the Federal, State, Local, and Tribal Criminal Justice Systems. Under the memorandum, ICE agents should issue a detainer against an alien only where they have reason to believe the alien is subject to removal and if one or more of the following conditions apply: 1) the alien has previously been convicted of or charged with a felony; 2) the alien has three or more prior misdemeanor convictions; 3) the alien has a prior misdemeanor conviction or has been charged with a misdemeanor offense that involves: a) violence, threats, or assault; b) sexual abuse or exploitation; c) driving under the influence of alcohol or a controlled substance; d) unlawful flight from the scene of an accident; f) unlawful possession or use of a firearm or other deadly weapon; g) the distribution or trafficking of a controlled substance; h) other significant threat to public safety; or; 1) the alien has been convicted of unlawful entry or has illegally reentered the U.S. after a previous removal or return; 2) the alien has an outstanding order of removal; 3) the alien has been found by an immigration officer or an immigration judge to have knowingly committed fraud; or 4) the alien otherwise poses a significant risk to national security, border security, or public safety.

It is estimated that the guidance of these two policies together resulted in approximately 85,000 deportable aliens remaining in the United States who otherwise would have been on the path to deportation. This estimate represents the decrease in the number of detainers issued by ICE from 2014-2016, as reported in

ICE internal documents (ICE's Weekly Report on Departures and Detention), plus the estimated number of family members of the deportable aliens.

## G) Deferred Action for Childhood Arrivals Program

On June 15, 2012, then DHS Secretary Janet Napolitano issued a policy memorandum creating the DACA program. *See* Exhibit 1, Action 19: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and Secretary Napolitano's Memorandum Concerning the Exercise of Prosecutorial Discretion for Certain Removable Individuals Who Entered the United States as a Child. DACA provides a de facto lawful status to a class of certain illegal aliens by allowing them to apply for "deferred action." With the grant of "deferred action," DHS provides a two year reprieve from deportation and allows beneficiaries to apply for a two-year work authorization, enabling the DACA recipient to obtain a social security card and other benefits and social services, often including access to welfare programs. Recipients may apply for renewal as their DACA status expires, indefinitely. Aliens eligible for the DACA program must meet the following criteria: 1) they must be under the age of 31 as of June 15, 2012; 2) they must have arrived in the U.S. before reaching their 16th birthday; 3) they must have continuously resided in the U.S. since June 15, 2007; 4) they must have been physically present in the U.S. on June 15, 2012, and at the time of application; 5) they must have had no lawful status on June 15, 2012; 6) they must either: be currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; 7) they must not have been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and must not otherwise pose a threat to national security or public safety; and 8) they must be at least 15 years old at the time of application.

Director Morton issued a policy memorandum on the same day, informing ICE personnel that the DACA program would be implemented immediately. ICE officers and agents were informed that they should cease deportation processing for any alien in custody or apprehended who claims to be eligible for the

Exhibit 2
732

program.[18] In the absence of this and other executive actions on enforcement, DACA eligible aliens and aliens claiming to be DACA-eligible would have been subject to deportation. Approximately two million aliens are eligible for DACA.[19]

Thus far, USCIS has approved 728,285 DACA applications, but again, because by policy nearly any alien who claims eligibility for DACA is exempted from deportation processing, regardless of whether they apply and are approved, nearly the entire population of two million has been protected from deportation.[20]

### H) Allowing Visa Overstays Admitted through Visa Waiver Program to Adjust to Lawful Permanent Resident Status

On November 14, 2013, USCIS issued a policy memorandum that grants illegal aliens who are immediate relatives of U.S. citizens and who entered the country through the Visa Waiver Program ("VWP") and remained beyond their authorized stay the ability to adjust their status to LPR. *See* Exhibit 1, Action 20: Adjudication of Adjustment of Status Applications for Individuals Admitted to the United States Under the Visa Waiver Program. Generally, federal immigration law requires foreign nationals to obtain a visa before they can be admitted to the United States. However, under the VWP, eligible aliens from designated countries are permitted to enter the U.S. for up to 90-days for "business or temporarily for pleasure" without a visa. INA §§ 212(a)(7)(B)(i)(II); 217(a)(1); 101(a)(15)(B). This 90-day time limit can only be temporarily extended in "emergency" situations, and in order to qualify to enter the U.S. under the VWP, an individual must waive his or her right to contest any removal orders placed against them. 8 C.F.R. § 217.3(a); INA § 217(b).

---

[18] Jessica Vaughn, *Lawsuit Documents Criminal Alien Releases, Decline in Enforcement, Cooked Statistics*, CENT. IMM. STUDIES, Apr. 9, 2013, *available at* http://cis.org/vaughan/lawsuit-documents-criminal-alien-releases-decline-enforcement-cooked-statistics.

[19] *See*, Deferred Action for Childhood Arrivals (DACA) Data Tools, MIG. POL. INST., http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles (last visited Oct. 11, 2016).

[20] U.S. Citizen. & Imm. Servs, Form I-812D Performance Data, FY2016 Q2, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/I821d_performancedata_fy2016_qtr2.pdf (last visited Oct. 11, 2016).

The policy memorandum instructs that DHS should use its authority to decline to remove a VWP overstay, and also to allow the individual to adjust to LPR status as well, if the alien is an immediate relative (spouse, parent, child) of a U.S. citizen. Specifically, the memorandum authorizes USCIS to adjust the status of applicants who file for a green card under this provision despite overstaying their authorized stay provided they: (1) entered under the VWP, (2) are "present in the United States" when applying, and (3) otherwise "meet the requirements of INA section 245." Even VWP overstays who have already been ordered deported may adjust their status if ICE rescinds or withdraws the deportation order. Individuals are ineligible if they are: (1) aliens investigated, arrested, or convicted of an "egregious public safety offense;" or (2) aliens with "fraud and/or national security issues that require resolution."

This order has the effect of wiping out ineligibility to adjust status for many VWP overstays, and encourages foreigners from VWP countries who are or may in the future become potentially eligible for permanent residence to ignore the duration of stay limits on the VWP, thereby bypassing the immigrant visa waiting list and other application requirements.

DHS estimates that in 2015, about 137,000 aliens overstayed their VWP admission.[21] Potentially all of them could now become permanent residents if sponsored by someone in the United States, when prior to this executive action, this privilege would not have been available to them, or it would have been delayed.

## I)  Expansion of DACA Program

On November 20, 2014, DHS Secretary Jeh Johnson expanded the DACA program to a larger group of illegal aliens. *See* Exhibit 1, Action 21: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents.

---

[21] U.S. Customs & Border Patrol, FY2015 Entry and Visa Overstay Report, Jan. 19, 2016, http://cis.org/sites/cis.org/files/16-0029%20FY%2015%20CBP%20Entry%20and%20Exit%20Overstay%20Report%20FINAL%2001.19.16.pdf.

Exhibit 2
734

This memorandum eliminates the age requirement and moves the date of entry requirement to January 1, 2010. It also extends the length of the deferred action to three years instead of two. This action has not yet been implemented as it was preliminary enjoined on February 16, 2015 in the case *Texas v. USA*, 14-254 (S.D. Tex.). The injunction was later upheld by the U.S. Court of Appeals for the Fifth Circuit, and then affirmed by a 4-4 decision of the U.S. Supreme Court. DHS sought, but was denied rehearing before the Supreme Court. The case is now proceeding to trial on the merits in the district court. DHS continues to prosecute the case, seeking to implement its new policy.

596,000 aliens would be eligible to apply for deferred action protection and work permits under the more expansive rules.[22]

### J) <u>Deferred Action for Parents of Americans Program</u>

On November 20, 2014, DHS Secretary Jeh Johnson ordered the creation of another, larger, deferred action program, entitled Deferred Action for Parents of Americans ("DAPA"), to grant reprieve from deportation and work authorization, to another class of illegal aliens. *See* Exhibit 1, Action 22: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents.

Alien applicants must, as of the date of the memo: 1) have a son or daughter who is a citizen or green card holder (legal permanent resident); 2) have continuously resided in the U.S. since before January 1, 2010; 3) be physically present in the U.S. and be physically present at the time of the request for deferred action; 4) have no lawful status; 5) not be an enforcement priority (as redefined by the Johnson Memos); 6) present no other factors that make the grant of deferred action inappropriate. The DAPA program also was also preliminarily enjoined in *Texas v. USA*, 14-254 (S.D. Tex.).

---

[22] *See* MIG. POL. INST., *supra* note 19.

Approximately 3,605,000 aliens would be eligible to apply for the DAPA program.[23]

### K) Further Revision and Implementation of New Enforcement Priorities

On November 20, 2014, DHS Secretary Jeh Johnson revised the "priorities" in the Morton Memos to protect a larger number of aliens from deportation. *See* Exhibit 1, Action 23: Policies for the Apprehension, Detention and Removal of Undocumented Immigrants. Under this memorandum, the only aliens who will be subject to deportation are: 1) aliens who pose a threat to national security, border security, or public safety, including aliens apprehended at the border and aliens convicted of a felony (except an immigration-related felony) and aliens convicted of aggravated felonies; 2) misdemeanants and new immigration violators, that is: a) aliens convicted of three or more misdemeanors, excluding traffic offenses; b) aliens convicted of a "significant" misdemeanor; c) aliens who have not been continuously present in the U.S. since January 1, 2014; d) aliens who have "significantly abused" the visa or visa waiver program; or e) aliens who have been issued a final order of removal after January 1, 2014.

Secretary Johnson also mandated that ICE agents obtain the approval of their ICE Field Office Director to approve the removal of any alien not in these categories. In addition, the memo lists a number of circumstances in which officers are encouraged to refrain from placing deportable aliens who meet the priorities into proceedings, including when they have family members, are ill, or have ties to their community.

It has been estimated that the adoption of these new enforcement priorities had the effect of exempting approximately 10 million illegal aliens from deportation. This estimate is based on an estimate that approximately 13 percent of the estimated 11.5 million illegal aliens in the U.S. has a criminal or immigration history that would make them a priority for enforcement under the new guidelines (11.5 million x 87% = 10 million).[24]

---

[23] *Id.*

[24] Marc Rosenblum, *Understanding Potential Impact of Executive Action on Immigration Enforcement*, MIG. POL. INST., Jul. 2015, *available at*

### L)  Replacement of Secure Communities with the Priority Enforcement Program and Replacement of Notice of Action/Request for Detention with Requests for Notification

On November 20, 2014, DHS Secretary Jeh Johnson terminated the Secure Communities Program and replaced it with the Priority Enforcement Program ("PEP") via policy memorandum. *See* Exhibit 1, Action 24: Secure Communities.

The memorandum instructs ICE only to issue detainers to state and local law enforcement agencies for aliens who fit into one of the following categories: 1) terrorism suspects; 2) those with gang-related convictions; 3) those convicted of felonies; 4) those convicted of aggravated felonies; 5) those convicted of three or more misdemeanors; or 6) those convicted of a serious misdemeanor.

This policy has led to a dramatic decline in the number of detainers issued by ICE and contributed to a decline in deportations. From 2014 to mid-2016, the number of ICE detainers declined by approximately 81,000. As a result, an additional estimated 40,000 family members likely also avoided deportation.[25]

### IV.    Fourth Method: Regulatory Waivers

DHS by law is often given the discretion to grant waivers to the statutory bars to admission to the U.S. NEPA should apply to these major categorical actions when initiated by regulation.

### A) Provisional Unlawful Presence Waivers of Inadmissibility for Immediate Relatives

On January 3, 2013, DHS published a rule on the 3 and 10-year bars on admissibility for illegal aliens. *See* Exhibit 1, Action 25: Provisional Unlawful

---

http://www.migrationpolicy.org/research/understanding-potential-impact-executive-action-immigration-enforcement.

[25] Estimates reveal that one out of four has 2 family members. *See*, Gardenia Mendoza, *Half a million U.S.-born kids live in Mexico with deported parents, trying to assimilate*, FOX NEWS LATINO, Sept. 29, 2016, *available at* http://latino.foxnews.com/latino/news/2016/09/29/half-million-us-born-kids-live-in-mexico-with-deported-parents-trying-to/.

Exhibit 2
737

Presence Waivers of Inadmissibility for Certain Relatives, Final Rule. The 3 and 10-year bars were added in 1996 to INA Section 212 to help deter illegal immigration and marriage fraud. Section 212 provides that an alien who has been in the United States unlawfully for 180 days to one year and leaves is inadmissible to the U.S. for three years; aliens unlawfully in the U.S. for a year or more who leave are inadmissible for ten years. INA § 212(a)(9)(B)(i). DHS also has the discretion to grant waivers to the 3 and 10-year bars for spouses and children of citizens and LPRs, if an alien shows "extreme hardship" to the citizen or LPR and applies for the waiver at a U.S. consular office overseas. INA § 212(a)(9)(B)(v).

The rule published by DHS in January 2013 created a categorical waiver for spouses, parents, and children of U.S. citizens (otherwise known as immediate relatives). This rule permits these immediate relatives to apply for provisional waivers of the 3 and 10-year bars from within the United States. In addition, the final rule permitted certain aliens whose cases had been administratively closed and aliens whose waiver applications had been previously denied to apply under the new relief.

The Federal Register notice of the final rule, *see* Exhibit 1, Action 25, included a range of estimates of the additional number of waiver applications resulting from the rule over 10 years. According to USCIS, the number of estimated beneficiaries of the rule ranges from 188,885 to 475,599 over 10 years. It is reasonable to assume that a very large share of these aliens would not pursue a green card or immigrant visa application but for the availability of the provisional waiver of ineligibility. This is because the existing waiver process requires a period of weeks or months of waiting outside the United States, and the possible imposition of the 3 or 10-year bar of ineligibility. This is a risk many applicants are not willing to take, especially when under current enforcement policies the likelihood of deportation is small. While some of these applications will be denied, the failed applicants and their families in most cases will not be considered an enforcement priority under other policies current at the time of the new rule, so they can be expected to remain in the United States in most cases. In addition, the share of these beneficiaries that are approved for waivers (estimated by USCIS to be 66%) and subsequently approved for permanent residency (89%, according to 2014 approval rates) should be expected to have derivative family members on their benefits application and

also generate chain migration. Applying the chain migration multiplier of 3.45 to the number of expected approved cases (89%) produces an additional 380,000 to 964,000 people added to the population over 10 years as a result of this rule.

According to USCIS administrative data, in 2014 (the first full year in which the waivers were available), the agency received 37,592 provisional waivers applications and approved 27,433, while thousands were still pending adjudication. This suggests that the true population impact will be about midway between the ranges estimated by USCIS in the final rule.

### B) Expansion of Provisional Unlawful Presence Waivers of Inadmissibility

On July 29, 2016, DHS published a final rule expanding the categorical waiver of the 3 and 10-year bars on admissibility for more classes of relatives. *See* Exhibit 1, Action 26: Expansion of Provisional Unlawful Presence Waivers of Inadmissibility; Final Rule. This final rule sprang from the Johnson Memos announced on November 20, 2014, wherein Secretary Johnson ordered DHS to issue new regulations waiving inadmissibility for spouses and minor children of LPRs and sons and daughters (adults) of citizens and LPRs and allow these individuals to seek green cards from within the United States. The rule also authorizes DHS to issue waivers to those deemed to have a reasonable suspicion of inadmissibility and to some applicants who were subject to a final order of removal. The memo also ordered DHS to re-define the term "extreme hardship" (required to receive a waiver) to include family ties to the United States and home country, conditions in home country, age of citizen or LPR, length of residence in United States, health conditions, financial hardships, and educational hardships. DHS had published the proposed rule implementing this policy on July 22, 2015. *See* Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 80 Fed. Reg. 43338 (proposed July 22, 2015). Comments closed on September 21, 2015, after receiving 641 comments. DHS did not initiate a NEPA analysis. *See* Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 81 Fed. Reg. 50243 (final rule, July 29, 2016) (to be codified at 8 C.F.R. 103, 212.

According to the analysis provided by USCIS in the final rule, which was based on USCIS and State Department administrative data, the agency estimates that 100,435 aliens will apply for this waiver as a result of the expansion of eligibility

for it, and subsequently will apply for permanent residence. A percentage will be denied, but in most cases these aliens will not be considered a priority for enforcement even if they are denied. According to the analysis in the final rule, 9 percent of the existing provisional waiver applications had been denied; given that the new provisional waiver approval standards put into place by this new rule are more permissive than the old rule, it is reasonable to expect that the denial rate for these applications would be the same or less than for the old rule. Applying the chain migration multiplier to the estimated number that will be approved for permanent residency produces an estimated additional 280,630 people added to the population through chain migration (100,435 x .91 x .89 x 3.45).

## V.     Fifth Method: Suspension of Deterrence on Employers

DHS has discretion to enforce immigration laws not only by targeting deportable aliens, but also by targeting employers who hire aliens who are not authorized to work. Laws against the employment of unauthorized aliens are intended as a primary deterrent for illegal immigration, and therefore major actions that change the number of enforcement actions against employers can have a significant impact on the risk calculations that employers make in hiring decisions or in establishing practices that help them avoid hiring unauthorized workers.

### Example: <u>Suspension of Worksite Raids</u>

On April 30, 2009, DHS changed its worksite enforcement policy. Previously, DHS had enforced the laws against the employment of illegal aliens in part through worksite enforcement operations that resulted in the apprehension of illegal aliens at their places of employment. Under traditional worksite enforcement practices, these worksite raids resulted in the apprehension of illegal workers who became a potential source of testimony regarding the hiring practices of their employers, who could then be prosecuted for knowingly employing unauthorized workers and other workplace violations. In the April 30, 2009 action, DHS issued new worksite enforcement guidelines for all of its agents in the field, instructing ICE agents to suspend most worksite enforcement operations. *See* Exhibit 1, Action 27: Worksite Enforcement Strategy. After this date, DHS enforced laws against employing illegal aliens mainly by conducting personnel paperwork audits, including

26

Exhibit 2
740

inspection of the I-9 employment documents required for all new hires. In addition, the ICE investigative offices in the field that were responsible for worksite enforcement were directed to avoid contact with employees of the target employers, thus diminishing the agents' opportunity to pursue the more serious workplace violations of employers. This directive meant that very few unauthorized workers could be encountered or arrested for deportation proceedings. This policy change greatly reduced the threat of prosecution of employers, and greatly limited the likelihood of deportation for illegal workers resulting from an audit.

As a result of this policy, the number of administrative and criminal arrests of employees declined sharply. According to ICE enforcement statistics published by the Congressional Research Service, over the period 2009 to 2015, there were approximately 26,500 fewer illegal workers arrested in worksite operations and put on the path to removal (accounting for the percentage of those arrested who likely were managerial employees, not illegal workers).[26]  In addition, because of the widespread public knowledge of the policy changes, an unknowable number of employers persisted in illegal hiring practices, thus enabling an unknowable number of illegal aliens to gain employment and have a strong incentive and ability to remain in the United States, along with any family members.

## VI.    Sixth Method: Loosening Requirements on Work Visas

Many of the foreign nationals who come to the US arrive on temporary visas, particularly work visas. DHS has often over the years used its discretion to streamline the process or adjust the rules in ways that have the effect of allowing more foreign workers to  enter the country and stay longer, which, cumulatively, increases the numbers of foreign nationals who  become settled inhabitants. These actions are a sample.

### A) Expansion of Limits on Duration of Stay for Temporary Work Visas

---

[26] Andorra Bruno, *Immigration-Related Worksite Enforcement: Performance Measures R40002*, CONG. RESEARCH SERV., June 23, 2015, *available at* https://www.fas.org/sgp/crs/homesec/R40002.pdf.

On November 11, 2013, USCIS issued a policy memorandum that expanded the period of time that certain guest workers could stay in the United States by amending the USCIS Adjudicator's Field Manual, the guide instructing USCIS officials on how to process applications. *See* Exhibit 1, Action 28: Additional Guidance on Determining Periods of Admission for Foreign Nationals Previously Admitted as H-4 Nonimmigrants who are Seeking H-2 or H-3 Status. Specifically, the memorandum applied to H-2A (agricultural workers), H-2B (low-skilled workers), and H-3 ("trainee") visas. Under these programs, aliens may be admitted to the United States as temporary workers or trainees. INA § 101(a)(15)(H)(ii)(a), 101(a)(15)(ii)(b), and 101(a)(15)(iii); 8 C.F.R. § 214.2(h)(1)(ii)(C-E). The law stipulates that to qualify for the temporary visa, workers  must show, among other things, that they have strong ties to their home country and an intent to return after the temporary stay and that they are not intending immigrants. Regulations establish time limits for each of these visas: a total of three years for H-2A visa holders, until the holder spends at least six uninterrupted months outside the United States, generally less than a year for an H-2B visa holder, and either eighteen months or two years for an H-3 trainee. 8 C.F.R. §§ 214.2(h)(5)(viii)(C), 214.2(h)(15)(ii)(C), 214.2(h)(6)ii)(B), 214.2(h)(9)(iii)(C), and 214.2(h)(15)(ii)(D). Regulations also allow the spouse and dependent children of these visa holders to receive a derivative visa, which is subject to the same limitations as the principal visa, and does not allow the dependent visa holder to work. 8 C.F.R. § 214(h)(9)(iv).

The memorandum instructed Immigration Officers to allow the holders of a dependent visa to obtain their own principal visa as a seasonal worker or trainee without counting the time previously spent in the country against the maximum time limit of the visa. This policy therefore potentially doubles the amount of time a seasonal worker or trainee could stay in the United States, as it allows a spouse who has been a derivative visa holder to essentially switch places with the principal visa holder when the original principal visa holder's maximum time limit has been reached. The change in status would thus reset the clock to zero for both.

Prior to this memorandum, regulations required H-2A, H-2B, and H-3 visa holders to depart the country for three or six months before they can extend or adjust their

28

Exhibit 2
742

status, or be readmitted to the country. 8 C.F.R. §§ 214.2(h)(5)(viii)(C), 214.2(h)(13)(iv), 214.2(h)(13)(i)(B). However, the memorandum is silent on this departure requirement, meaning the principal and derivative visa holders could be allowed to switch status perpetually without ever returning home.

Information on the number of aliens who have availed themselves of this provision could not be located. According to State Department data in 2015, about 180,000 H-2A, H-2B, H-3 visas were issued by consulates overseas.[27] In addition, the number of derivative family visas issued is typically about half of the number of principal aliens with work authorization.

### B) Creation of Optional Practical Training Program (OPT)

Prior to 1992, foreign students were permitted to work only in certain circumstances. The only statutory authorization for F-1 students to work was a three-year trial program that has now expired. *See* The Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978, § 221. In 1992, the INS issued an interim rule that created the Optional Practical Training ("OPT") program, which authorizes any alien on an F-1 student visa and enrolled in school to work in the United States for up to twelve months. Pre-Completion Interval Training; F-1 Student Work Authorization, 57 Fed. Reg. 31,954 (proposed July 20, 1992) (codified at 8 C.F.R. § 214.2). In 2002, the INS changed 8 C.F.R. § 214.2 (F)(10)(ii)(A)(3)) to remove the requirement that OPT aliens be enrolled at a school. Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS), 67 Fed. Reg. 76,256 (proposed Dec. 11, 2002) (codified at 8 C.F.R. § 212.1, 212.2, 212.3) ("Continued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for optional practical training."). *See* Exhibit 1, Action 29. In short, through these rules DHS has authorized graduates to remain and work on a student visa for 12 months after graduation when many would otherwise be required to leave the United States.

### C) Expansion of Optional Practical Training Program (OPT)

---

[27] Dept. State, Table XVI(B) Nonimmigrant Visas Issued by Classification, FY2011-2015, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2015AnnualReport/FY15 AnnualReport-TableXVIB.pdf (last visited Oct. 11, 2016).

The most recent expansion of the OPT program was finalized on March 11, 2016. *See* Exhibit 1, Action 30: Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students. In this regulation, DHS extended the potential duration of the OPT program to 36 months (during or after graduation) for foreign graduates with STEM degrees and required employers to implement formal mentoring and training programs for its STEM OPT workers. This rule stems from the Johnson Memos announced on November 20, 2014.

During the comment period on the proposed 2016 OPT rule, a member of Californians for Population Stabilization ("CAPS"), as well as other interested individuals, asked the agency to consider NEPA in its analysis. In its final rule, DHS declared that this rule belongs to a category of actions that does not individually or cumulatively have an impact on the environment. DHS Docket No. ICEB-2015-002 at 278-279. This is the only instance that I have been able to locate such a claim by an agency for this category of action.

According to the final rule, with 50,000 expected beneficiaries in the first year, 92,000 in the second year, and a similar number each year thereafter, 700,000 aliens could benefit from this rule over a 10-year period. Other DHS administrative data shows that an additional 35,000 foreign family members could benefit from the rule. Other sources make clear that approximately 50 percent of foreign graduates seek temporary work and eventually permanent residency here.[28] But for the opportunity to remain after graduation to work, most likely would have departed; therefore, this rule could add more than 360,000 new permanent residents. Applying the chain migration multiplier of 3.45, these additional permanent residents from the first 10 years potentially could be expected to sponsor an additional 1.24 million people.

## C) Relaxing L-1B Visa Standards for Corporations to Sponsor Foreign Workers with "Specialized Knowledge"

---

[28] Xueying Han, et al., *Will They Stay or Will They Go? International Graduate Students and Their Decisions to Stay or Leave the U.S. upon Graduation*, PLOS|ONE, Mar. 11, 2015, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4356591/.

On March 24, 2015, USCIS issued a policy memorandum which took effect August 31, 2015 that loosened the requirements for the L-1B visa program, which is one of several types of temporary visas used to employ guest workers. *See* Exhibit 1, Action 31: L-1B Adjudications Policy. This memorandum implemented one of the policy actions first announced by Secretary Johnson in the Johnson Memos on November 20, 2014. The L-1B visa was created to enable multinational corporations to temporarily transfer managerial or professional-level employees with "specialized knowledge" to work in United States affiliate offices. INA § 101(a)(15)(L). Through the memorandum, DHS broadened the definition of "specialized knowledge," which will result in many more foreign employees qualifying for the L-1B visa.

The memorandum took several other steps to loosen the L-1B rules. First, it sets a lower standard of proof for aliens and their employers to meet in determining eligibility. In addition, it provides a new, more relaxed definition of off-site employment than was the case before the rule. No cap for the L-1B visa exists.

This memorandum is believed to have been issued in response to concerns raised by advocacy groups on behalf of L-1 employers that an increasing number of applications were being denied by USCIS. According to USCIS data obtained by these groups and also State Department data, from 2012 to 2014, the number of annual denials was 6,000.[29] I estimate that due to this rule, an additional 6,000 L-1B approvals can be expected each year. Other administrative data indicates that the number of additional family members admitted who are accompanying L-1 visa holders is approximately equal to the number of principal aliens. Therefore, it is reasonable to expect this rule to cause the admission of an additional 12,000 aliens per year. Many L-1 visa holders go on to adjust to permanent resident status, and other provisions in immigration law allow them to stay while their green card application is pending. Once they obtain permanent residency, then they are eligible to sponsor family members through chain migration.

---

[29] *L-1 Denial Rate Increase Against for High Skill Foreign Nationals*, NAT. FOUND. AMER. POL., March 2015, *available at* http://op.bna.com.s3.amazonaws.com/dlrcases.nsf/r%3FOpen%3dlfrs-9urgrl.

## VII.   Seventh Method: Implementing Visa Programs Expansively In General

Every time Congress creates a new visa category, the discretion of DHS may determine how many foreign nationals ultimately enter and settle into the country on the basis of that visa program. Because each new visa category many have a significant impact on population, DHS ought to conduct careful analysis and consider alternatives when implementing new visas. One example of a visa recently created by Congress is the U and T visa. The large amount of agency discretion inherent in this visa program demonstrates how the variation in the amount of population growth resulting from the creation of new visa categories— even if they are originated by Congress—is necessarily a result of agency as well as Congressional decisions. This variability in the actual implementation of visas, despite the visa category itself being having been created by Congress, would be revealed by a NEPA analysis. When DHS administers a visa category, particularly a highly discretionary visa category such as the T and U visas, a NEPA analysis could gauge how much the actual implementation of that visa category had increased the population of the United States. DHS never cited NEPA in its implementing U and T visa regulations.

### Example: Determining Eligibility for U and T Visa Status

In September 2007, DHS first published a rule implementing the procedures by which aliens who are victims of serious crimes would be able to adjust to temporary legal status and ultimately apply for permanent residency via the U and T visa categories. *See* Exhibit 1, Action 32: New Classification for Victims of Criminal Activity, Eligibility for "U" Nonimmigrant Status, 72 Federal Register, 53014, September 17, 2007. The U visa is for those who have been the victim of a crime, suffered "substantial mental or physical abuse," and are helpful to the government and law enforcement agencies in the investigation and prosecution of criminal activity. The T Visa is for victims of human trafficking. The U and T visa categories were created by the Victims of Trafficking and Violence Protection Act of 2000. To obtain U and T visas, a law-enforcement agency must certify that an alien is a crime victim and has been cooperating with a law enforcement agency to detect, investigate, and prosecute the crime. While these two visa categories

themselves were created by statute, like many visa categories, DHS has considerable discretion in implementing them. For example, the agency determines specifically which entities can certify beneficiaries, and, more importantly, how adjudicating officers shall make determinations of eligibility. This discretion can greatly affect the number of aliens that will be approved. DHS first established policies and procedures for the U and T visas on September 17, 2007, "New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status." 8 C.F.R. § 214.14. DHS further updated the regulations on December 12, 2008, "Adjustment of Status to Lawful Permanent Resident for T and U nonimmigrants" (8 C.F.R. § 245.24). *See* Exhibit 1, Action 31. In March, 2013, Congress enacted a number of changes to the U and T visa law.[30]  These included allowing extended family members of T visa holders to qualify, allowing child derivative applicants who age-out (turn 21) to remain eligible, and removing the bar to eligibility for applicants who have been a public charge (dependent on certain forms of public assistance).

Following the implementation of the 2013 changes and other initiatives by DHS to expand awareness of the availability of U and T visas, the number of applications has increased significantly. In 2014, USCIS received 1,869 T visa applications. According to USCIS workload statistics,[31] the annual number of T visa applications increased by about 400 after 2013, from 1,820 in 2013 to 2,224 in 2015, with nearly all of the growth expected to have occurred in the family member category.[32] According to USCIS workload statistics, the number of U visa applications increased by about 27,000 after 2013, from 25,432 in 2013 to 52,666 in 2015. Other USCIS reports indicate that one out of five U visa applications will be denied or withdrawn.[33]

---

[30] Dept. of State, T and U Visa Changes, Jun. 2013, *available at* https://travel.state.gov/content/dam/visas/policy_updates/T_and_U_Visa_Changes_June_2013.pdf.

[31] U.S. Citizen. & Imm. Serv., Form I-914 Performance Data, FY2016 Q2, *available at* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms/Data/Victims/I914t_visastatistics_fy2016_qtr3.pdf.

[32] *See* Grassley Letter, *supra* note 13.

[33] U.S. Citizen. & Imm. Serv. Ombud., *Improving the Process for Victims of Human Trafficking and Certain Criminal Activity: The T and U Visa*, Jan. 29, 2009.

Further, it has been determined by other researchers that 47 percent of U visa applicants have a child, with an average of 2.28 children on each application. In addition, this research has determined that 99.8 percent ultimately will become permanent residents.[34]

Based on these figures, the U and T visa programs have added more than 500,000 new permanent residents to the United States since the inception of the programs in 2001. Applying the chain migration multiplier of 3.45 yields an additional 1.7 million new residents over this time.

---

[34] Orloff, et al., *U-Visa Victims and Lawful Permanent Residency, National Immigrant Women's Advocacy Project*, Am. U., Wash. C. L., Sep. 6, 2012, *available at* http://www.ncdsv.org/images/NIWAP_U-VisaVictimsAndLawfulPermanentResidency_9-6-12.pdf.

34

Exhibit 2
748

# EXHIBIT B

Exhibit 2
749

# ANALYSIS OF DISCRETIONARY AGENCY ACTIONS (PAST AND ONGOING) THAT RESULTED IN CUMULATIVELY SIGNIFICANT ENVIRONMENTAL IMPACTS ON THE SOUTHWEST BORDER

## Introduction

The significant impact to the southwest border environment is due to the large scale of the number of illegal crossers resulting from these actions and their cumulative effect on border control. The list of actions, *infra*, has affected the numbers of foreign nationals crossing illegally. I do not posit that zero illegal border crossings would occur but for these actions; however, these discretionary actions have had the effect of significantly increasing the frequency of illegal border crossings, which have resulted in significant environmental impacts.

Historical experience demonstrates that a real or even perceived change in enforcement policies, both at the border and in the interior, can significantly affect the number of people attempting to cross the border illegally. For example, it has been documented by numerous studies that the passage of the Immigration Reform and Control Act of 1986 ("IRCA") caused a significant decline in illegal crossings at first, which later rebounded after the impact of one key enforcement program was limited. In addition to a large legalization program, IRCA increased funding for the Border Patrol, made it illegal to hire unauthorized workers, established penalties for employers who engaged in illegal hiring or failed to conduct due diligence in hiring, and created an automated system for employers to verify the status of workers. The goal was to reduce opportunities for illegal workers and thus remove a key incentive for illegal crossing and settlement. The most sophisticated analysis of the effectiveness of the various components of IRCA found that different components of IRCA had different effects on the flow of illegal aliens into the United States and the probability of apprehension by authorities.[35] Overall, this study found that IRCA reduced apprehensions of illegal crossers by

---

[35] Frank Bean, et al., *Undocumented Migration to the United States. IRCA and the Experience of the 1980s*, RAND CORP. & URBAN INST., 1990, *available at* https://www.rand.org/content/dam/rand/pubs/joint_reports-immigration/2010/JRI07.pdf.

47 percent, or 2.3 million crossers over a period of nearly three years. About half of the decline in crossing was due to reduced circular migration from the legalization of farm workers and about half was due to the deterrent effect from the passage of employer sanctions. The researchers found a smaller effect from the increased enforcement activity by the Border Patrol. Notably, the study also found that by 1990 the trend in illegal crossings had reversed itself and begun increasing again – corresponding to the time period in which the employer sanctions aspects of the reforms were found to have been only partially funded and implemented. In addition, the study found that there was an increase in crossings of family members of the newly legalized aliens following the legalization. In sum, this study documented that passage of strong enforcement measures significantly deters illegal crossers, that legalization programs trigger the movement of family members into the country, and that failure to fully implement enforcement programs can negate the initial gains in deterrence that were brought about by passage of the measures, causing an increase in illegal crossings.

Other more recent studies have documented a correlation between increased border and interior enforcement resources and programs that impose consequences and penalties for illegal crossing with declines in apprehensions as a measure of crossings.[36]

The recent influx of unaccompanied minors and families from Central America and asylum seekers from Africa, Caribbean nations and Asia further demonstrates how U.S. policy changes can cause or contribute to an increase in new illegal crossings. The dramatic increase in the number of new arrivals in these categories can be traced to policy changes that occurred in 2008 (the Trafficking Victims Protection Reauthorization Act) and 2009 (Credible Fear Parole). According to an unreleased Border Patrol intelligence report based on recent interviews with Unaccompanied Alien Children ("UAC") from Central America who have surged the border, nearly all of the migrants (95%) stated that their "main reason" for coming to the United States illegally was because they had heard that they would

---

[36] Marc Rosenblum, *Border Security: Immigration Enforcement Between Ports of Entry Marc R. Rosenblum Specialist in Immigration Policy*, CONG. RESEARCH SERV., Jan. 6, 2012, *available at* http://fpc.state.gov/documents/organization/180681.pdf.

receive a "permiso," or permission to stay.[37] The report states: "Although economic and security concerns also influenced their decision to travel to the U.S., the issuance of 'permisos' to family units was the primary reason for leaving their countries…The subjects also indicated that 'everyone' in their home countries is aware that 'permisos' are being issued to family units in south Texas." These explanations have been widely confirmed in numerous research and news media accounts featuring interviews with recent illegal arrivals.

The "permiso policy" contrasts with the policy enforced against Mexican citizens, including unaccompanied minors, who are returned or removed to Mexico promptly, often using a process known as Expedited Removal. Over the same time period when illegal crossings of Central Americans and others increased, the number of new Mexican illegal crossers appears to have declined and/or remained relatively stable.

Finally, Border Patrol agents maintain that typically there is an increase in illegal immigration anytime there is even discussion of changing immigration enforcement policies, as prospective illegal aliens want to make it into the United States before such changes occur.

Census Bureau data reveals that an increase in the size of the illegally settled population has occurred. An analysis of the most recent data from the Current Population Survey, a monthly Census survey, shows that more than three million new legal and illegal immigrants settled in the United States in 2014 and 2015 — a 39 percent increase over the prior two years.[38] Immigration from countries in South and Central America and South and East Asia appear to have offset a decline in immigration from Mexico. My organization's preliminary estimate is that, of the 3.1 million immigrants who arrived in that last two years, about one-third, 1.1 million (or 550,000 annually) were new illegal immigrants, including both illegal crossers and visa and visa waiver overstays. This is a significant increase from the 700,000 illegal immigrants (350,000 annually) who entered in 2012 and

---

[37] Stephen Dinan, *Surge in illegal immigrants blamed on U.S. policy, not on spiking violence in Central America*, THE WASH. TIMES, June 11, 2014, *available at* http://www.washingtontimes.com/news/2014/jun/11/surge-illegals-blamed-us-policy/.

[38] Steve Camarota, *New Data: Immigration Surged in 2014 and 2015 - More than three million legal and illegal immigrants settled in the United States in the last two years*, CENT. IMM. STUDIES, Jun. 2016, *available at* http://cis.org/New-Data-Immigration-Surged-in-2014-and-2015.

3

Exhibit 2
752

2013. The numbers do not represent the net increase in the total illegal immigrant population.

The following actions are those that I have identified that have contributed to an increase in the number of illegal crossings:

## A) Credible Fear Parole[39]

This action provides a new incentive for people to cross into the United States illegally and, if apprehended, avoid deportation by claiming that they fear being returned to their home country. Prior to this policy change, those who claimed a fear of return were detained until their claim was fully adjudicated, and few claims were approved. Now, they may be released with a grant of parole after a preliminary review that is nearly always approved. This action has resulted in a sharp increase in the number of credible fear claims, as aliens learn of the policy, usually from family and friends, from smugglers, or from advocacy groups that give briefings in the U.S. Department of Homeland Security ("DHS") temporary detention facilities. They understand that if they make this claim upon or following apprehension by the Border Patrol, they almost certainly will be released and allowed to remain in the country while they await a hearing years in the future. They may also apply for a work permit after 180 days. According to USCIS administrative data, the number of credible fear claims has risen steadily since implementation of new policies in 2010, and dramatically since 2013, as described in the referenced document. Border Patrol agents have testified that approximately 80 percent of the aliens they apprehend are released, often because they make a credible fear claim.[40] At this writing, government officials in the United States and throughout Latin America report that there are tens of thousands of people from numerous countries across the globe who are making their way to the U.S. border with the assistance of smugglers and guides in order to seek entry under this policy.

---

[39] For a description of this action, please *see* Item I(C) in my report "Discretionary Actions Past, Ongoing, and Potential that Increased or Will Increase the Settled Population of the United States," hereafter referred to as "Report of Population Impact Actions."

[40] *See* United States. Cong. House. Committee on Judiciary, Subcommittee on Immigration and Border Security, Hearing: *Declining Deportations and Increasing Criminal Alien Releases – The Lawless Immigration Policies of the Obama Administration*, Feb. 4, 2016, 114th Cong., May 19, 2016, *available at* http://www.judiciary.senate.gov/meetings/declining-deportations-and-increasing-criminal-alien-releases_the-lawless-immigration-policies-of-the-obama-administration.

4

Exhibit 2
753

### B) Central American Minor ("CAM") Program and Expansion of CAM

*See* Item I(H) in Report of Population Impact Actions. This policy has the potential to increase the number of illegal crossers by creating an incentive for parents in Central America to enter the United States and seek a grant of parole, and after one year apply for their children and possibly other family members and friends to be admitted under the CAM program.

### 3) Grants of Temporary Protected Status ("TPS") and Redesignation of TPS.

*See* Item II(A) in Report of Population Impact Actions. This status has been used as a mechanism to enable large classes of illegal aliens to remain and work in the United States following a catastrophic event in their homeland. Granting large numbers of illegal aliens permission to stay and work can reasonably be expected to provide an incentive for the family members of these aliens to join them here, even without legal status, particularly if they are family members who are dependent on the alien who arrived initially for financial support. Under current enforcement priorities (a separate set of actions detailed elsewhere in this document) such aliens who are family members of TPS beneficiaries would not be a priority for enforcement and removal even if they were detected by U.S. immigration authorities, which provides additional incentive to come.  In addition, the Obama Administration's practice of re-designating instead of simply renewing TPS allows all those illegal aliens who came after the first period of eligibility expired to also receive TPS, even though they were not present here when the catastrophic event occurred.

### 4) Deferred Enforced Departure ("DED").

*See* Item II(B) in Report of Population Impact Actions. This action granting certain classes of aliens an exemption from deportation can contribute to the number of illegal crossings by family members joining the alien who originally came illegally and was allowed to stay.  In addition, together with all the other executive actions that shield illegal aliens from deportation, this action may help create the impression that illegal aliens who make it to the United States and stay for any length of time without facing consequences might eventually qualify for some version of an amnesty or legalization such as DED.

### 5) Action Defining New Categories of Illegal Aliens Prioritized for Immigration Enforcement.

5

Exhibit 2
754

*See* Item III(A) in Report of Population Impact Actions. This action substantially changed the nature of immigration enforcement by broadcasting that illegal aliens who do not meet these few specified categories, which is generally agreed to be the vast majority of illegal aliens, will not be sent home. This creates an incentive for people to attempt illegal entry, knowing that they will be unlikely to face consequences even if they are encountered in the interior by U.S. immigration authorities or other law enforcement agencies.

### 6) Action Mandating Affirmative Discontinuance of Enforcement Procedures Against New Categories of Illegal Aliens Protected from Enforcement ("Prosecutorial Discretion").

*See* Item III(B) in Report of Population Impact Actions. Like the action listed in number 5, this action substantially changed the nature of immigration enforcement by broadcasting that illegal aliens who do not meet these few specified categories, which is generally agreed to be the vast majority of illegal aliens, will not be sent home. This creates an incentive for people to attempt illegal entry, knowing that they will be unlikely to face consequences even if they are encountered in the interior by U.S. immigration authorities or other law enforcement agencies.

### 7) Action Implementing New Deportation Standards through Administrative Case Closures.

*See* Item III(D) in Report of Population Impact Actions. This action, which allows illegal aliens who were in deportation proceedings to have their cases dismissed, can contribute to the number of illegal crossings by giving the family members of the excused illegal aliens a reason to come to the United States illegally to join them. In addition, it contributes to the perception that there are few consequences for illegal settlement.

### 8) USCIS Guidelines Restricting Issuance of Notices to Appear (NTAs).

*See* Item III(E) in Report of Population Impact Actions. This action provided for those whose benefits applications were denied to avoid enforcement action despite not qualifying for legal status. This action could motivate individuals on their own, or in conjunction with smuggling organizations, to cross the border illegally in order to file frivolous benefits applications, knowing that even if the applications are denied, they will not face enforcement action.

6

Exhibit 2
755

9) **Changing Detainer Policy: Adoption of New "Post-Conviction" Detainer Procedures and Limiting Detainers to Certain Categories of Aliens.**

*See* Item III(F) in Report of Population Impact Actions. This action enables certain illegal aliens who have been arrested to avoid enforcement action. Like other enforcement-restricting actions, this action contributes to the perception that most illegal aliens will be spared immigration enforcement consequences even if they are arrested, and by reducing the threat of enforcement, substantially lessening the perceived risk that might otherwise deter a prospective illegal crosser, leading to an increase in illegal crossing attempts.

10) **Deferred Action for Childhood Arrivals ("DACA") Program and DACA Expansion.**

*See* Item III(G) and (I) in Report of Population Impact Actions. This action exempted hundreds of thousands of illegally resident aliens from deportation and allowed them to receive work permits. This contributes to the perception that illegal aliens who manage to settle in the United States stand a good chance of eventually obtaining permission to stay. In addition, departed former aliens of the same age as the aliens who qualified for DACA, but who had left on their own prior to this program because they were concerned about the possibility of deportation, may have been motivated to return to seek this benefit.

11) **Deferred Action for Parents of Americans ("DAPA") Program.**

*See* Item III(J) in Report of Population Impact Actions. This action creates a great incentive for new illegal crossings by contributing to the perception that those who are able to settle in the United States illegally eventually will be rewarded with an amnesty or other exemption from deportation, especially if they have a child in the United States.

12) **Further Revision and Implementation of New Enforcement Priorities.**

*See* Item III(K) in Report of Population Impact Actions. Like the prior enforcement-related actions, this action contributes to the perception that most illegal aliens will be spared immigration enforcement consequences even if they are arrested, and by reducing the threat of enforcement, substantially lessening the perceived risk that might otherwise deter a prospective illegal crosser, leading to an

increase in illegal crossing attempts. In addition, this action has a direct effect in reducing the risk of enforcement for illegal border crossers. Prior to this action, the Border Patrol was not subject to the restrictions of the prioritization scheme and had full discretion to enforce the law in every encounter with illegal border crossers. As a result of this action, Border Patrol agents were newly required to adhere to the same enforcement prioritization guidelines as U.S. Immigration and Customs Enforcement ("ICE") and U.S. Citizenship and Immigration Services ("USCIS"), with the result that agents were no longer able to enforce the law in cases where the alien encountered lacks a criminal record or prior immigration history, and/or claimed to have been present in the country prior to 2014, and/or claimed to have family members or other ties to the United States. This has drastically reduced the number of apprehensions and deportations by the Border Patrol.  Border Patrol agents have testified that approximately 80 percent of the aliens they apprehend are released.

### 13) Replacement of Secure Communities with the Priority Enforcement Program and Replacement of Notice of Action/Request for Detention with Requests for Notification.

*See* Item III(L) in Report of Population Impact Actions. This action enables certain illegal aliens who have been arrested to avoid enforcement action. Like other enforcement-restricting actions, this action contributes to the perception that most illegal aliens will be spared immigration enforcement consequences even if they are arrested, and by reducing the threat of enforcement, substantially lessening the perceived risk that might otherwise deter a prospective illegal crosser, leading to an increase in illegal crossing attempts.

### 14) Provisional Unlawful Presence Waivers of Inadmissibility for Immediate Relatives and Expansion of Provisional Unlawful Presence Waivers of Ineligibility.

 *See* Items IV(A) and (B) in Report of Population Impact Actions. This action eliminated one severe consequence of unlawful presence in the United States, namely the imposition of a 3 or 10-year bar to adjustment to legal status. The removal of this consequence serves to further lessen the risk of migrating illegally to the United States. In addition, family members of U.S. citizens or permanent residents who qualify for green cards but who must wait outside the United States because of the numerical limits and waiting lists now will face no consequence if they ignore the law and come into the United States illegally before they are

eligible to apply, essentially jumping in line. Many individuals in this situation would cross the land border illegally, because as a beneficiary of an immigrant visa petition, typically they are disqualified from obtaining a legal temporary visa.

### 15)  Suspension of Worksite Raids.

*See* Item V in Report of Population Impact Actions. Like other enforcement-related actions, this action contributes to the perception that illegal employment will be tolerated and that new illegal arrivals will be able to find employment. As cited above, prior research has shown that robust worksite enforcement is one of the most powerful disincentives to illegal crossings; therefore, eliminating this disincentive is very likely to cause an increase in illegal crossings.

### 16)  Orders to Reduce Border Patrol Inspections at Transportation Hubs.

 In October, 2011 U.S. Customs and Border Protection ("CBP") management issued an order to agents in the field to greatly reduce the practice of conducting inspections of travelers at transportation hubs.[41]  *See* Exhibit 1: Action 33. This practice was the primary enforcement activity in certain Border Patrol stations.[42] At the time, agents predicted that the action would greatly reduce the number of apprehensions of illegal crossers. In addition, knowledge of this policy will encourage the smuggling organizations that bring nearly all illegal land crossers into the country to make greater use of bus stations, train stations and airports to transport new illegal crossers to their final destination without detection, greatly facilitating their smuggling success. As a result, illegal crossings will likely increase, and apprehensions will likely decrease.

---

[41] Press Release, *Border Patrol Union, Border Patrol curtails transportation checks with increased bureaucracy*, Oct. 27, 2011, *available at* http://www.bpunion.org/index.php/newsroom/press-releases/86-border-patrol-curtails-transportation-checks-with-increased-bureaucracy.

[42] Associated Press, *Border Patrol stops searches at hubs*, PORT. PRESS HERALD, Oct. 29, 2011, *available at* http://www.pressherald.com/2011/10/29/border-patrol-stops-searches-at-hubs_2011-10-29/.

# EXHIBIT C

Exhibit 2
759

## ESTIMATES OF POPULATION INCREASES RESULTING FROM EXECUTIVE ACTIONS

| ACTION | DATE | NUMBER ADDED | CHAIN MIGRATION MULTIPLIER (3.45) | COMMENTS |
|---|---|---|---|---|
| | | | | |
| Humanitarian Parole (1990s) | 1989-1998 | 176,000 | 607,200 | These are the parolees who adjusted to LPR. |
| Temporary Protected Status | 1990-2014 | 340,000 | | Most recent estimate available.   As a result of Arrabally (see below), some will be allowed to adjust to LPR status, bringing chain migration. |
| Parole-in-Place | 1998-Present | No data | | Mixed in with other parolees. |
| I-601A Provisional Waiver to 3/10 year bar | 2012 Effective March 2013 | 189,000-476,000 | 380,000-964,000 | Without the provisional waiver (and relaxation of hardship standard) most affected aliens would not apply for LPR status, preferring to depart or stay in illegal status (and would not be able to sponsor relatives). |
| Expansion of I-601 Waivers | July, 2015 | 100,435 | 280,630 | See above. |
| OPT 24-month extension for STEM graduates | 2016 | 360,000 | 1,240,000 | 700,000 workers  + 35,000 family w/50% stay rate = 360,000 |
| U and T Visas | 2007 | 507,000 new residents added (includes kids) | 1.7 million | One-fifth are denied or withdrawn.  99.8% of those approved resulted in permanent residency. |
| Deferred Enforced Departure | 1989 | 322,227 | | 1992 – 190,000 Salvadorans<br>1989 – 80,000 Chinese<br>1997 – 40,000 Haitians<br>1991 – 2,227 Kuwaitis<br>1999 – 10,000 Liberians |

Exhibit 2
760

| | | | | |
|---|---|---|---|---|
| **Credible Fear Parole** | 2009 | 152,000 added since 2010 | 365,700 | Assume ultimate asylum approval rate of 70%, then 106,000 become LPRs triggering chain migration. |
| **Suspension of Worksite Raids** | 2009 | Direct: 30,000 Indirect: Unknown | | Direct effect is due to the decline in deportations from less worksite enforcement. Indirect effect is due to fewer illegal aliens leaving on their own, as employers face no consequences for hiring them, and deterrence is weakened. |
| **USCIS Guidelines Restricting Issuance of NTAs** | 2011 | 320,000 | | Covers the projected number who would have been ordered deported from 2012-2016 based on denials and fraud. |
| **Dismantling of ICE Interior Enforcement (Morton memos)** | 2011-12 | 616,000 | | 416,000 aliens not deported since 2010 + 200,000 family members who would have left + 100,000 indirect effect due to less deterrence. |
| **DACA** | 2012 | 728,285 granted 2,000,000 est. eligible. | | Theoretically would have faced deportation (without certain other exec actions). Did not have to actually apply to avoid deportation. |
| **Extension of Limits for H-2 status** | 2013 | 180,000 potentially eligible | | Covers 2014-15. Allows aliens to stay an additional 3 years. |
| **Allowing VWP Overstays to Adjust** | 2013 | 137,000 per year | | Number of annual VWP overstays. |
| **PIP for Military Families** | 2013 | ? | ? | No data available. |
| **Parole for CNMI Caregivers** | 2011 | ? | ? | No data available. |
| **DACA Extension** | 2014 | 596,000 | | Estimated to be eligible. |

Exhibit 2
761

| | | | | |
|---|---|---|---|---|
| **DAPA** | 2014 | 3,605,000 | | Estimated to be eligible. |
| **Priority Enforcement Program (PEP)** | 2014 | 10,000,000 | | The estimated number of deportable aliens exempt from deportation due to strict prioritization. |
| **Detainer Guidance (post-conviction criminal aliens, allows sanctuaries)** | 2014 | 81,000 + 15,000 Family: 40,000 | | Decrease in the number of detainers issued from 2014-16 + family members not departing + sanctuary releases. |
| **Arabally Decision – Advance Parole Path to Adjustment** | 2014 | 22,340 as of December, 2015 | 77,000 | No data available. Potentially big. |
| **Expansion of PIP for Military Reserves** | 2014 | ? | ? | No data available. |
| **Loosening of L-1 Standards – Specialized Knowledge** | 2016 | 6,000 per year 6,000 family | 41,000 | Most L-1 visas lead to LPR status. |
| **Central American Refugee Program** | 2014 | 465,000 | 192,500 | 315,000 eligible parents (protected from removal) 150,000 potential sponsored kids 12% of kids have been admitted of refugees w/path to LPR (together w/ parents = 55,800). |
| **Haitian Family Reunification Program** | 2014 | 6,000/yr | | Accelerates arrival, but not LPR status. |
| **International Entrepreneurs** | August, 2016 | 6,000 | | 2,940 estimated principal aliens + 3,000 family members. |

Exhibit 2
762

| Number Potentially Remaining in the Settled Population Due to Certain Executive Actions: Counties and California | | | | | |
|---|---|---|---|---|---|
| Place | DACA | DAPA | Detainers | H-2A & H-2B | Enforcement Priorities |
| | | | | | |
| Larimer County, CO | NA | NA | 84 | 61 | NA |
| | | | | | |
| Denver County, CO | 9,000 | 15,170 | 324 | 15 | 35,670 |
| | | | | | |
| San Diego County, CA | 38,000 | 70,380 | 456 | 669 | 180,090 |
| | | | | | |
| Alameda County, CA | 17,000 | 31,500 | 624 | 0 | 91,350 |
| | | | | | |
| Los Angeles County, CA | 180,000 | 339,200 | 3,636 | 3 | 922,200 |
| | | | | | |
| Santa Barbara County, CA | 9,000 | 15,050 | 588 | 1,362 | 37,410 |
| | | | | | |
| Broward County, FL | 14,000 | 17,640 | 312 | 488 | 73,080 |
| | | | | | |
| Palm Beach County, FL | 12,000 | 14,740 | 216 | 2,293 | 58,290 |
| | | | | | |
| Martin County, FL | NA | NA | 108 | 58 | NA |
| | | | | | |
| California | 561,000 | 1,026,460 | NA | 11,582 | 2,626,530 |
| | | | | | |
| NA is Not Available | | | | | |
| Source | MPI | MPI | TRAC | DOL | MPI |
| | | | | | |
| Source Details: | | | | | |
| MPI - Migration Policy Institute Data Hub - DACA Data Tools and Unauthorized Immigrant Population Profiles | | | | | |
| TRAC - Syracuse University Transactional Records Clearinghouse - ICE Detainer Database | | | | | |
| DOL - Dept. of Labor Foreign Labor Certification Data Center | | | | | |

Exhibit 2
763