# EXHIBIT 22

Programmatic Environmental Assessment for Actions to Address an Increased Influx of Unaccompanied Alien Children and Family Units Across the Southwest Border of the United States

**DEPARTMENT OF HOMELAND SECURITY**
**PROGRAMMATIC ENVIRONMENTAL ASSESSMENT**
**FOR**
**ACTIONS TO ADDRESS AN INCREASED INFLUX OF UNACCOMPANIED ALIEN CHILDREN AND FAMILY UNITS ACROSS THE SOUTHWEST BORDER OF THE UNITED STATES**

## 1.0 Introduction

The June 2, 2014 Presidential Memorandum *Response to the Influx of Unaccompanied Alien Children Across the Southwest Border* described the influx as an "urgent humanitarian situation requiring a unified and coordinated Federal response." The memorandum is available on-line at http://www.whitehouse.gov/the-press-office/2014/06/02/presidential-memorandum-response-influx-unaccompanied-alien-children-acr. In this memorandum, the President directed the Secretary of the Department of Homeland Security (Secretary) to establish an interagency Unified Coordination Group to ensure unity of effort across the executive branch in responding to the humanitarian aspects of the situation, consistent with the Homeland Security Act of 2002 and Homeland Security Presidential Directive-5 (Management of Domestic Incidents), including coordination with State, local, and other nonfederal entities.

In addition to the influx of unaccompanied alien children, there is also an increase in the number of family units entering the Unites States. The Department of Homeland Security (DHS) is responsible for the apprehension, processing, detention, and removal of such persons crossing the southwest border into the United States without authorization. The unprecedented increase in the number of apprehended persons has the potential to fill or exceed the capacity of the DHS supporting infrastructure (real property for processing and housing apprehended persons, services including medical care, transportation, utilities, meals, hygiene, recreation, etc.) currently available. Therefore, action is being considered at the DHS Headquarters level to provide increased and expedited allocation of Departmental resources in the following three areas:

1) Provide adequate facilities for Customs and Border Protection (CBP) to safely house unaccompanied alien children (normally for no more than 72 hours) and family units until they can be transferred to the Department of Health and Human Services (HHS) and Immigrations and Customs Enforcement (ICE) respectively, and provide adequate facilities for ICE to safely house family units;
2) Provide transportation (land, air, water) between intake, processing, and housing facilities, as well as between these facilities and physicians and dentists offices, hospitals, consular offices, and airports or other transportation hubs, and
3) Provide medical care, including care to treat, prevent, and minimize the spread of communicable illnesses.

## 1.1 Definitions

DHS and HHS use the same terminology for practices and processes regarding unaccompanied alien children. Consistent with the Homeland Security Act of 2002, Section 279(g) DEFINITIONS: (1) the term ''placement'' means the placement of an unaccompanied alien child in either a detention facility or an alternative to such a facility; and (2) the term ''unaccompanied alien child'' means a child who (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

This document uses the following definition of "family unit" from ICE's Family Detention and Intake Guidance (August 14, 2009): a family unit means a group of detainees that includes one or more non-United States citizen juvenile(s) accompanied by his/her/their parent(s) or legal guardian(s). For purposes of ICE custody, any individual detained as part of a family unit must be a non-criminal and have no history of violence, sexual, or substance abuse.

## 1.2 Geographic Location

The location of the Proposed Action is primarily the southwestern U.S./Mexico international border region area, extending from the Pacific Coast to the Gulf of Mexico, as shown on Figure 1. However, housing locations as well as related resources may be located and/or obtained elsewhere in the country depending on the availability of existing facilities that can be repurposed or availability of land where new facilities can be constructed.

**Figure 1: Southwestern US Border Area with US Border Patrol Sectors Shown**




## 1.3 Applicability

This Programmatic Environmental Assessment (PEA) is intended to cover DHS activities under existing authorities during the current increased influx of unaccompanied alien children and family units and any future such influx as result of which any component of DHS requires rapid acquisition of housing or detention space for such persons. DHS recognizes that this PEA may need to be revised or augmented or new environmental analysis may be needed if there are policy or legislative changes that would require significant changes to DHS' operations with regard to unaccompanied alien children and/or family units that enter into the United States illegally. If DHS makes any substantive changes to the PEA, DHS will make the revised document available to the public.

## 2.0 Background

### *2.1.1 The Department of Homeland Security Mission*

The DHS consists of Operational Components and Support Components (generally headquarters-level Directorates and Offices) responsible for the implementation of five homeland security missions: 1) prevent terrorism and enhancing security; 2) secure and manage our borders; 3) enforce and administer our immigration laws; 4) safeguard and secure cyberspace; and 5) prepare for, respond to, recover from and mitigate the effects of disasters. In the current humanitarian situation, CBP and ICE predominantly accomplish the first three listed missions with additional support provided by other DHS Components including the United States Coast Guard (USCG), the Federal Law Enforcement Training Center (FLETC), the Federal Emergency Management Agency (FEMA), the Office of Health Affairs (OHA) and the Transportation Security Administration (TSA). These six DHS Components work collaboratively across the Department and with external entities as part of the Federal response to the influx of unaccompanied alien children and family units who have crossed the southwest border into the United States.

*Customs and Border Protection (CBP)*
The mission of CBP is to prevent terrorists and terrorist weapons from entering the U.S., while also facilitating the flow of legitimate trade and travel. CBP includes three law enforcement offices: the Office of Field Operations, the Office of Air and Marine, and U.S. Border Patrol. CBP law enforcement offices place specific operational emphasis on terrorists and their weapons, criminals, and smugglers of both humans and narcotics who have illegally entered into the U.S. The Office of Field Operations is responsible for the land, air and seaports of entry into the U.S. The U.S. Border Patrol is responsible for border areas between the various Ports of Entry. The Office of Air and Marine provides surveillance and apprehension capabilities in the air and over rivers, lakes and ocean areas of the border. Upon apprehension, CBP law enforcement agents and officers process and determine the appropriate course of action for each detainee. Because large numbers of unaccompanied alien children and family units are apprehended in border areas between the various Ports of Entry, and because the U.S. Border Patrol is largely responsible for detention of undocumented entrants while they are in CBP custody, the U.S. Border Patrol has played the largest role within CBP in responding to the influx of unaccompanied alien children.

*Immigration and Customs Enforcement (ICE)*
The mission of ICE is to promote homeland security and public safety through criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. While the mission of CBP, and specifically, USBP is to physically prevent illegal entries into the United States, ICE determines the legal immigration status of individuals believed to be illegally present in the interior of the United States through the immigration courts and removes those who are determined to either be inadmissible or removable and are not eligible for any relief from removal. The Justice Department's Executive Office for Immigration Review conducts the immigration proceedings for both unaccompanied alien children and family units, in accordance with the requirements of Section 240 of the Immigration and Nationality Act. Unaccompanied alien children are in the custody of a sponsor until disposition of their cases, and family units stay together in Family Residential Centers until disposition of their cases. The full range of facility, services, and case management requirements for the ICE mission of enforcement and removal includes, but is not limited to, the following: providing office space, bed space, courtrooms, space for services such as medical exams, recreation, and religious services, attorney-client meetings, processing space, and transportation.

*Federal Emergency Management Agency (FEMA)*
The mission of FEMA is to support our citizens and first responders to ensure that as a nation we work together to build, sustain and improve our capability to prepare for, protect against, respond to, recover from and mitigate all hazards. With regard to the Federal response to the influx of unaccompanied alien children across the southwest border and the Presidential Memorandum, the DHS Secretary directed the Administrator of FEMA, subject to the oversight, direction, and guidance of the DHS Secretary, to serve as the Federal Coordinating Official. The Federal Coordinating Official leads the Unified Coordination Group (as described in Section 2.2.1) and ensures Federal agency authorities and the resources granted to the departments and agencies under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) are unified in providing humanitarian relief to the affected children, including housing, care, medical treatment, and transportation. The Federal Coordinating Official executes these responsibilities consistent with all applicable laws and regulations, including legal requirements governing the appropriate care and custody of unaccompanied alien children. In addition, FEMA is providing administrative services such as phone line answering services, records review, and translation services through IAA funding to CBP and HHS, and developing hurricane evacuation plans for all facilities identified by the Unified Coordination Group, where applicable.

*Federal Law Enforcement Training Center (FLETC)*
The mission FLETC is to provide cost-effective, high-quality training for Federal, state and local law enforcement agencies. In order to train and prepare law enforcement officers for deployment to their parent agencies, FLETC operates a wide variety of facilities so that the students might encounter the full range of situations they can expect to face in the exercise of their duties. One of the FLETC training facilities is providing support to the ICE mission in support of processing family units.

*United States Coast Guard (USCG)*
One of the five armed forces of the United States and the only military organization within DHS, the USCG safeguards our Nation's maritime safety, security and environmental stewardship. USCG provides airlift capability in support of other DHS needs, including support to CBP in the transport of apprehended persons, including unaccompanied alien children and family units to CBP processing centers. USCG has the authority to provide this assistance pursuant to 14 United States Code 141, the USCG Authorization Act.

*Office of Health Affairs (OHA)*
OHA serves as the Department's principal authority for all medical and health issues. OHA provides medical, public health, and scientific expertise in support of the DHS mission to prepare for, respond to, and recover from all threats. OHA serves as the principal advisor to the Secretary on medical and public health issues. OHA's Health Threats Resilience Division strengthens national capabilities to prepare and secure the nation against the health impacts of chemical, biological, radiological and nuclear incidents and other intentional and naturally occurring events. OHA is providing health services support in DHS processing facilities for unaccompanied alien children and family units and is a liaison with HHS.

*Transportation Security Administration (TSA)*
TSA, created in response to the terrorist attacks of September 11, 2001, secures the nation's airports and screens all commercial airline passengers and baggage. TSA works closely with transportation, law enforcement, and intelligence communities to maintain the security of the traveling public and to protect the Nation's transportation systems to ensure freedom of movement for people and commerce. TSA provides a liaison role to the Unified Coordination Group.

*2.1.2 The Department of Health and Human Services (HHS) Mission*

*HHS Office of Refugee Resettlement*

To address the particular needs of unaccompanied children who have unlawfully entered, the United States, Congress gave HHS the task of providing care and housing for certain unaccompanied alien children [those from Mexico and Canada may be treated differently]. Care and custody of these unaccompanied alien children are entrusted to the HHS Office of Refugee Resettlement (ORR). Unaccompanied alien children are defined as people under the age of 18 apprehended by CBP without a parent or legal guardian or without a parent or legal guardian in the United States available to provide care and physical custody. Under the law, unaccompanied alien children from non-contiguous countries, as well as unaccompanied alien children from contiguous countries who meet certain criteria relating to whether the child is a victim of a severe form of a trafficking, fears persecution upon return to his or her country, and is able to independently decide to withdraw the application for admission to the United States, are referred to HHS-ORR for placement in a designated ORR shelter. ORR typically houses and cares for such children for a short time, until the children can be released (usually to a parent, or other relative) while awaiting removal proceedings in immigration court. Transportation from CBP custody to ORR is conducted by ICE via contract air, commercial air, or ground. As a result, CBP releases unaccompanied alien children into the custody of ORR while releasing family units to ICE.

*HHS Office of the Assistant Secretary for Preparedness and Response*

The Office of the Assistant Secretary for Preparedness and Response (ASPR) was created under the Pandemic and All Hazards Preparedness Act in the wake of Hurricane Katrina to lead the nation in preventing, preparing for, and responding to the adverse health effects of public health emergencies and disasters. ASPR focuses on preparedness planning and response; building federal emergency medical operational capabilities; countermeasures research, advance development, and procurement; and grants to strengthen the capabilities of hospitals and health care systems in public health emergencies and medical disasters. ASPR provides federal support, including medical professionals through ASPR's National Disaster Medical System, to augment state and local capabilities during an emergency or disaster. HHS ASPR is providing medical services support to unaccompanied alien children who are housed in HHS ORR facilities. ASPR is authorized to provide this support under sections 2811 and 2812 of the Public Health Service Act, 42 United States Code, 200hh-10, 300hh-11.

*2.2 The current situation*

Illegal migration of unaccompanied alien children is not new; however, the number has risen over the past several years and the countries of origin of the migrants have also changed. In Fiscal Year (FY) 2008, fewer than 7,000 unaccompanied alien children were apprehended and referred to ORR by DHS. In FY 2009, more than 19,000 unaccompanied alien children were apprehended (82% were from Mexico, and the remaining 17% were from El Salvador, Honduras and Guatemala). As of mid-July 2014, unaccompanied alien children from El Salvador, Honduras, and Guatemala constituted 73% of the more than 47,000 apprehended and Mexico was home to 25%. United States law requires treating unaccompanied alien children from non-neighboring countries differently than those from neighboring nations.

Unaccompanied alien children are also increasing as a portion of total apprehensions made by CBP. From January through June, 2014, there have been more than 381,000 individuals apprehended, representing an increase of 21% from the same period in in 2013. The number of unaccompanied alien children apprehensions has increased disproportionately: approximately 57,500 unaccompanied alien children were detained from January through June 2014 – an increase of 106% from the same period in 2013 and 220% from the same period in 2012. Similar trends have been identified for the number of family units. The more than doubling of unaccompanied alien children as well as the increase of unaccompanied alien children from non-neighboring countries have resulted in a humanitarian situation that threatens to exceed

the capacity of CBP and ICE to process people entering the United States illegally and to overwhelm the capacity of the federal government to house unaccompanied alien children and family units until disposition of their cases and subsequent necessary action (e.g., release, removal to their country of origin). Additional data on the number of unaccompanied alien children and family unit apprehensions is available on the CBP website at http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children, and additional information on the Department's response to the humanitarian situation is available on the DHS website at http://www.dhs.gov/unaccompanied-children-southwest-border.

*2.2.1 The process*

Figures 2 and 3 below illustrate DHS operations with regard to unaccompanied alien children and family units.

As previously noted, CBP is the DHS Component that is primarily responsible for border security. Thus, the vast majority of unaccompanied alien children are apprehended by CBP. Unaccompanied alien children apprehended by CBP are held until such time as they can be transferred to HHS-ORR for placement in a designated ORR facility. CBP representatives determine requirements for operational activities at CBP transition facilities. CBP facilities include, but are not limited to, Ports of Entry, Pre-Clearance Locations, Processing Centers, Border Patrol Traffic Checkpoints and Border Patrol stations. CBP acquires space in several ways, including but not limited to the following: expanding, renovating, or re-purposing its own existing facilities; leasing new space through GSA; or utilizing Department of Defense installations, which is typically accomplished through execution of a Memorandum of Understanding or Agreement. Under certain criteria, CBP also has authority from GSA to directly execute its own real property leases.

**Figure 2**




In addition to the CBP holding and processing facilities and the CBP and ICE transportation operations as shown in the above figure for the unaccompanied alien children process, ICE operates separate processing facilities for family units. ICE Enforcement and Removal Operations is responsible for the

docket management and all arrangements for removal for family units apprehended and processed at the southwest border by CBP and released from CBP custody or transferred to the custody of ICE. ICE family residential centers are operated in compliance with the agency's Family Residential Standards (see https://www.ice.gov/detention-standards/family-residential/) and are designed and/or retro-fitted for family units who were placed in administrative immigration proceedings and subject to mandatory detention. ICE family residential centers operate as an effective and humane alternative that maintains family unity with special consideration given to the unique needs of children as family units await the outcome of immigration hearings or are returned to their home countries. To ensure the safety and well-being of family units in ICE custody, only non-criminal adults and non-delinquent juveniles are housed in these facilities. These facilities adequately provide for the safety, security, and medical needs of family units. ICE ensures that these facilities operate in an open environment, which includes classrooms with state-certified teachers, access to an online legal library, and bilingual teachers.

**Figure 3**




ICE Enforcement and Removal Operations developed the Family Residential Standards to address the unique nature of family units held in ICE custody. While developing these standards, ICE Enforcement and Removal Operations solicited guidance from medical, psychological and educational subject matter experts and collaborated with various organizations including the DHS Office of Civil Rights and Civil Liberties and many non-governmental organizations (NGOs). In late 2007, ICE Enforcement and Removal Operations approved the Family Residential Standards, which contain many revisions based on public comments.

Namely, ICE uses the following housing facilities:

- Service Processing Centers (SPCs), owned and operated by ICE. SPCs may use contract guard services to perform basic custodial duties.
- Contract Detention Facilities (CDFs), contractor-owned; operated jointly with ICE. CDFs provide detention services under competitively bid contracts.
- Intergovernmental Service Agreements (IGSAs). An IGSA is a contract between ICE and a state, county, or municipal government for the purpose of providing the services and staffing to house and care for ICE detainees. The non-Federal party then uses a third party commercial contractor to operate the facility. IGSA's may include existing facilities or the construction of new facilities.

Family units who are apprehended by CBP are transferred to ICE for detention after their immigration status has been examined and it is determined they are removable from the United States and suitable detention space is available for these individuals. Because of the influx in migrants and backlogs in the immigration courts, ICE currently faces a potential shortage of adequate facilities in which to detain family units until their hearing dates. Furthermore, although CBP normally delivers unaccompanied alien children to HHS within 72 hours of apprehension, absent exceptional circumstances, HHS facilities have been and may become stretched to and sometimes beyond their capacity when there is an increased influx of unaccompanied alien children. In the absence of HHS capability to accept and house unaccompanied alien children, CBP has a need to increase its capacity to detain unaccompanied alien children in a manner consistent with health and safety standards until HHS can receive them. In addition, CBP needs to provide risk-based Occupational Safety and Health controls for its workforce in a high-volume population environment.

At the direction of the President and the DHS, the Unified Coordination Group was established on June 1, 2014, to leverage Federal resources to provide humanitarian relief to the ongoing situation and to ensure cross agency logistical coordination. The Unified Coordination Group operates to support the missions in DHS and HHS to address the influx of unaccompanied alien children. As such it is comprised of many organizational elements of DHS and HHS, with liaisons from the Department of Defense, Department of Justice, General Services Administration, National Guard, U.S. Army Corps of Engineers, and the American Red Cross. The Unified Coordination Group has primarily been instrumental in identifying additional facilities for HHS/ORR use. The priority goals of the Unified Coordination Group are outlined below:

1. Health and safety:
   i. Ensure the safety and health of unaccompanied children, Federal employees, responders and the public.
   ii. Expedite the identification of tender-age children (≤ 11 years), pregnant females, and newborns to prioritize transfer to appropriate HHS facilities and ensure they remain in sibling groups.
   iii. Support contingency plans, to include hurricane evacuation plans, in coordination with FEMA regional offices and state and local emergency managers.

2. Shelter:
   i. Identify viable geographic locations that will support the establishment of HHS shelters.
   ii. Identify and assess specific shelter facilities to include beyond traditional models for occupancy.
   iii. De-compress over capacity issues in all CBP Sectors.
   iv. Expedite bringing transition facility online, including medical support.
   v. Implement HHS home-based services plan in DOD temporary shelters and HHS permanent facilities.
   vi. Identify long-term options for HHS that can be used to shelter the projected increase in unaccompanied children.

3. Expedited processing
   i. Expedite and optimize the HHS child release process to exceed the average number of children apprehended per day into the most integrated setting.
   ii. Increase through-put and improve the HHS unaccompanied children transfer process.

4. Informing stakeholders, Consular, Congressional and government officials, and the public of activities by creating and implementing an effective notification and announcement program.

5. Ensuring agencies optimize financial tracking systems.

## 3.0 Legal and Regulatory Framework

*a. Statutes*

The complex legal framework for apprehension, care and custody, transportation, processing and repatriation of illegal migrants—and specifically as to unaccompanied alien children —is based primarily in the Immigration and Nationality Act of 1952, the Homeland Security Act of 2002, and the William Wilberforce Trafficking Victims Protection and Reauthorization Act of 2008.

The legal framework for considering the impacts of federal actions on the human environment rests on the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA (40 Code of Federal Regulations Parts 1500-1508).

The response to the influx of unaccompanied alien children, individual adults and family units across the southwest border is not covered by the Stafford Act exemption for certain emergency actions for declared disasters, and therefore, is subject to the statutory requirements for NEPA compliance. As defined in the CEQ regulations (Part 1508.9), an Environmental Assessment (EA) is a concise public document prepared by the responsible Federal agency that serves to 1) briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement (EIS) or a finding of no significant impact; 2) aid an agency's compliance with NEPA when no environmental impact statement is necessary, and 3) facilitate preparation of a statement when one is necessary. At a minimum, an EA shall include brief discussions of the need for the proposal, alternatives as required by NEPA, the environmental impacts of the Proposed Action and alternatives, and a listing of agencies and persons consulted.

A PEA reduces or eliminates redundant and duplicative analyses and effectively addresses cumulative effects. Agencies rely on programmatic or broad scale analyses to focus the scope of alternatives, environmental effects analysis, and mitigation in subsequent tiered levels of documentation. PEAs are often regional in scope crossing political boundaries and covering numerous ecosystems and landforms. The difference between a programmatic approach and a project-level EA is that a PEA has more emphasis on multiple similar future activities in differing locations and the potential for cumulative effects of those similar activities all deriving from the same program. See Section 4.0 for additional information.

*b. Litigation Settlement Agreement*

The care and custody of unaccompanied alien children also is guided by the 1997 *Flores v. Reno* Stipulated Settlement Agreement, No. CV 85-4544 (C.D. Cal. entered Jan. 17, 1997), in which the former Immigration and Naturalization Service (INS) agreed to certain standards and procedures with respect to the immigration custody and processing of unaccompanied alien children. In the Homeland Security Act, Congress transferred responsibility for the care and custody of unaccompanied alien children from the former INS to HHS-ORR.

*c. Presidential Direction*

As previously noted, the federal response to the current situation is organized under the terms of the Presidential Memorandum *Response to the Influx of Unaccompanied Alien Children Across the Southwest Border* (June 2, 2014).

The Presidential Memorandum directs the Secretary of Homeland Security to establish an interagency Unified Coordination Group to ensure unity of effort across the executive branch in responding to the humanitarian aspects of this situation, consistent with the Homeland Security Act of 2002 and Homeland Security Presidential Directive-5 (Management of Domestic Incidents), including the coordination with State, local, and other nonfederal entities. The Secretary of Homeland Security directed the Administrator of FEMA, subject to the oversight, direction, and guidance of the Secretary, to serve as the Federal Coordinating Official. The Federal Coordinating Official leads the Unified Coordination Group and ensures Federal agency authorities and the resources granted to the departments and agencies under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) are unified in providing humanitarian relief to the affected children, including housing, care, medical treatment, and transportation. The Federal Coordinating Official executes these responsibilities consistent with all applicable laws and regulations, including legal requirements governing the appropriate care and custody of unaccompanied alien children. The Unified Coordination Group, as directed by the Federal Coordinating Official with the oversight by the Secretary, determines the requirements for facilities and services for the Federal response to the influx of unaccompanied alien children, based on the needs identified by the relevant agencies. The Presidential Memorandum requires all Federal departments and agencies to provide full and prompt cooperation, resources, and support, as appropriate and consistent with their own responsibilities for addressing this situation under existing authorities and in compliance with statutory requirements.

*d. Within DHS*

The Under Secretary for Management is responsible for budget, finance, human resources, information technology systems, facilities, and performance measurements related to the responsibilities of the Department. The Chief Readiness Support Office (CRSO) has been delegated responsibility for real property, asset and logistics management, headquarters consolidation, and sustainability and environmental programs (SEP). The Under Secretary for Management requested the CRSO/SEP to establish a Working Group and provide a unified approach to environmental compliance across the Department to demonstrate the Secretary's attention to the Presidential Memorandum on unaccompanied alien children and also the expanding needs for family units.

*Requirements under DHS Directive 023-01*

The DHS Directive and Instruction 023-01, Environmental Planning Program, establish the policy and procedures DHS follows to comply with NEPA and the CEQ regulations. Existing delegation of authority for NEPA compliance in DHS is delegated by the DHS Secretary to the Under Secretary for Management, Chief Readiness Support Office, Sustainability and Environmental Programs (SEP). In some cases, a delegation of authority from SEP to DHS Components for NEPA compliance exists; such delegation is currently held by FEMA, CBP, USCG, and FLETC. These Components will follow their existing processes to execute NEPA compliance for specific proposed projects and activities to address the large influx of unaccompanied alien children and family units, and will coordinate with SEP in circumstances specified in the DHS Directive and Instruction and in accordance with the August 5, 2014, memo from the DHS Acting Under Secretary for Management to Component Heads, *NEPA Compliance Activities in Support of Increased Border Apprehensions*. The Director SEP retains authority to approve NEPA analyses for DHS Components, including ICE, that do not have a delegation of authority.

*Requirements under other environmental laws and regulations*
In addition to NEPA and the laws listed above, numerous federal environmental statutes, regulations, and Executive Orders may apply to the Proposed Action. Adherence to these federal requirements, as well as state and local regulations, is part of the PEA. The following is a list of major laws, presidential orders, and DHS policy and guidelines with broad applicability to the Proposed Action.

- DHS Directive and Instruction 017-01, Historic Preservation in Asset Management and Operations
- DHS Environmental Justice Strategy
- EO 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
- EO 11514, Protection and Enhancement of Environment Quality
- EO 11988, Floodplain Management
- EO 11990, Protection of Wetlands
- EO 12196, Occupation Safety and Health of Federal Employees
- EO 12372, Intergovernmental Review of Federal Programs
- EO 13084, Consultation with Indian Tribal Governments
- EO 13112, Invasive Species
- American Indian Religious Freedom Act of 1978
- Archaeological Protection Act
- Clean Air Act
- Clean Water Act
- Endangered Species Act
- Farmland Protection Policy Act
- Fish and Wildlife Coordination Act
- Migratory Bird Treaty Act
- Coastal Barrier Resources Act
- Coastal Zone Management Act
- National Historic Preservation Act
- Native American Graves and Repatriation Act
- Occupational Safety and Health Act
- Resource Conservation and Recovery Act
- Solid Waste Disposal Act
- Watershed Protection and Flood Protection Act

## 4.0 Programmatic Approach

This PEA is intended to serve the following purposes:

1. It provides a general framework to evaluate potential environmental impacts of common activities undertaken by DHS to accomplish the requirements of the Presidential Memorandum, but which will occur at different locations (including locations that are unknown at the time of preparing this PEA). When necessary, separate analysis will be conducted on a location-specific basis to determine if the proposals 1) are covered by a DHS CATEX, 2) meet the criteria listed in Table 1 and are covered by this PEA, 2) require a Supplemental EA tiered from this document, 3) require a standalone EA, 4) or require development of alternative arrangements with CEQ pursuant to 40 CFR 1506.11 for activities that would normally require preparation of an EIS.
2. It frames activities which ordinarily occur solely within DHS mission space in the context of the broader cooperative "whole of government" response of the Executive Branch.

3. It serves to establish a Departmental process to frame information on the who, what, why, where, when and how of NEPA compliance for DHS actions related to the implementation of the Presidential Memorandum on unaccompanied alien children and also to address the existing DHS missions involved in processing family units.
4. Support decisions to be made by leadership at DHS Headquarters regarding implementation of the Presidential Memorandum.

The multiple missions of DHS Component programs and operations (as summarized in Section 2.2.1 above) involved in the Federal response include a range of separable elements of facilities and services for unaccompanied alien children as identified by the Unified Coordination Group and for family units as identified by ICE. As with many border security issues, the future directions or expansion of unaccompanied alien children and family unit populations entering the U.S. along the southwest border are difficult to predict. However, the facilities and services along the southwest border provide a geographical origination reference point for the start of the DHS process followed for unaccompanied alien children and family units entering the U.S.

DHS delegation of authority (Delegation 00501) for the DHS NEPA Policy (Directive 023-01) identifies the Director SEP as the decision-maker for this Department-level analysis of the appropriate process for NEPA compliance for the DHS response to the influx of unaccompanied alien children and family units. The Director SEP has determined that a programmatic approach is appropriate for NEPA review of the DHS response to the influx of unaccompanied alien children and family units. This PEA was prepared in accordance with NEPA, the CEQ regulations and guidance, and DHS Directive and Instruction 023-01.

The following figure illustrates how DHS will use this PEA in its NEPA review and decision-making:

**Figure 4**




## 5.0 Decisions Supported by the PEA

This PEA is developed to support the following decisions:

- Department -level decisions involved in implementing the Presidential Memorandum
- Department-level concurrence on NEPA compliance for DHS Components to proceed with project(s) that meet established criteria in Directive 023-01 for non-asterisked (undocumented) Categorical Exclusions under these extraordinary circumstances;

- Department-level concurrence on NEPA compliance for DHS Components with existing delegation of authority for NEPA compliance (i.e., CBP, FEMA, FLETC, USCG) to proceed with project(s) that meet established criteria in Directive 023-01 for asterisked (documented) Categorical Exclusions under these extraordinary circumstances; and
- Department-level determinations of NEPA compliance for DHS Components without existing delegation of authority for NEPA compliance (i.e., ICE) to proceed with project(s) that meet established criteria in Directive 023-01 for asterisked (documented) Categorical Exclusions under these extraordinary circumstances; and
- Department-level or DHS Component decisions that the preparation of an Environmental Assessment tiered to this PEA is required to determine that a specific project will have no significant impact or to pursue developing alternative arrangements with CEQ for that specific project.

## 6.0 Purpose and Need

The purpose of the Proposed Action is to implement the DHS response to the influx of unaccompanied alien children and family units entering the United States across the southwestern border, and to identify a process for efficient and effective environmental review for action(s) subject to NEPA.

DHS is responsible for apprehension, processing, detention, and removal of persons crossing the border into the United States without authorization. Unaccompanied alien children and family units are crossing the border at a higher-than-anticipated rate. The need for the Proposed Action is based on the existing and expected increase in the number of apprehended persons being processed that may exceed the then current capacity of the DHS support infrastructure (e.g., housing and associated services, transportation, and medical care). In addition, the need for the Proposed Action is to meet the requirements in the June 2, 2014 Presidential Memorandum to address the humanitarian situation.

## 7.0 Interagency Coordination, Consultation and Public Involvement

This PEA was developed by NEPA practitioners at DHS Headquarters in close coordination with the NEPA program leads and environmental law counsel for the DHS Components participating in the response to the influx of unaccompanied alien children and family units across the southwest border. DHS recognizes that the types of actions analyzed in this PEA feature some jurisdictional complexity and that the agencies involved have different missions and authorities. Therefore, collaboration and cooperation are critical among Federal agencies and state and local governments in the affected jurisdictions. DHS has consulted on this PEA through the Unified Coordination Group and through counsel with HHS, DOD, GSA, CEQ, and the Advisory Council on Historic Preservation. Efforts to address the current influx of unaccompanied alien children and family units are being managed according to the Unified Coordination Group.

Open communication with the American public in the environmental planning process, consistent with other federal requirements, is DHS policy. Potentially affected communities are kept apprised of potential DHS efforts to address the influx of unaccompanied alien children and family units through DHS press releases and DHS-led media tours, news media coverage, and social media. DHS has discretion under the CEQ regulations (40 CFR 1501.4 (b) and 1506.6(a)) regarding the type and level of public involvement and the length of any public comment period in PEA preparation. Because of the urgent need to address the influx of unaccompanied alien children and family units while also being compliant with NEPA, the Director SEP is making this PEA and FONSI available to the public for thirty (30) days via the DHS NEPA webpage at http://www.dhs.gov/national-environmental-policy-act. The *SEP-EPHP@hq.dhs.gov* email address is available for interested parties to request additional information on this PEA.

## 8.0 Description of the Proposed Action and Alternatives

### 8.1 No Action Alternative

The President has directed DHS to take action by way of the June 2, 2014, Presidential Memorandum. Therefore, taking no action is not an option. While NEPA does not apply to the President, the manner in which federal agencies comply with a Presidential direction are subject to NEPA to the extent of agency discretion in carrying out that direction. The President has proposed several actions to address a long term influx in unaccompanied alien children and family units to the Congress and requested funds to accomplish those actions. Unless and until Congress acts on and funds those actions, they are not within the discretion of DHS.

Inclusion of the No Action Alternative is prescribed by CEQ regulations (40 CFR 1502.14) as the benchmark against which proposed federal actions are evaluated. DHS has the discretion to try to resolve the humanitarian situation without acquiring additional facilities or services. In the routine operation of border protection and immigration enforcement, planning processes accommodate projected needs for facilities to hold, detain, and process unaccompanied alien children and family units. Those planning processes include NEPA. But in immediate response to the most recent influx of unaccompanied alien children and family units, the critical need for additional facilities and services leaves not acquiring such additional space as the default "No Action Alternative."

Under the No Action Alternative, no additional facilities and services would be acquired in an accelerated fashion. Unaccompanied alien children and family units could be detained in custody for unacceptable lengths of time in overcrowded and potentially unsafe and unhealthy conditions which do not meet standards acceptable to the United States. The No Action Alternative is reflected in the background explanation of how DHS performs its mission as it relates to apprehending, detaining, transporting, processing, and repatriating or releasing unaccompanied alien children and family units (Section 2 above), but with the added issues of inadequate space to safely perform those tasks.

To proceed along the entirely hypothetical No Action Alternative of acquiring and providing no additional facilities and services, would result in existing holding facilities becoming increasingly overcrowded with potential for deteriorating health and safety conditions of the inhabitants. In addition, transportation services, on-going care, and medical treatment of unaccompanied alien children and family units by DHS would continue to be strained, resulting in potentially unsafe working conditions.

Because of the potential for adverse impacts to human health and safety if there is no accelerated increase in facilities and services to address the influx of unaccompanied alien children and family units, the No-Action Alternative is not viable.

### 8.2 Proposed Action

DHS proposes to increase, in accelerated fashion, its capacity for managing unaccompanied alien children and family units crossing the southwest border of the United States during the present humanitarian situation until said persons can have their status determined or, in the case of unaccompanied alien children, can be transferred to HHS-ORR. Increased DHS capacity is needed in the following areas: temporary detention space and housing, transportation, childcare, and medical care. The DHS actions do not include the HHS actions taken to meet the needs of unaccompanied alien children while in HHS care and custody.

### 8.2.1 Detention Space and Housing

DHS actions include the emergency acquisition of sufficient space, renovation of existing space, and additions to existing facilities (1) for CBP to detain (a) unaccompanied alien children until HHS can accept transfer of them and (b) family units until ICE can take custody of them and (2) for ICE to detain family units pending the outcome of their removal proceedings, until granted a form of relief, until released on bond or other appropriate means of supervision, or until ready for repatriation. Additional information on the routine DHS process, facilities, and services for unaccompanied alien children and family units is provided in Section 2.2.1.

Real property actions could include the following: leasing or purchasing new properties; constructing new facilities; and/or expanding or modifying existing property. Interior modifications to existing buildings could include replacement, removal, or addition of walls; addition of security, surveillance and protective equipment; addition of toilets, sinks and showers; sleeping accommodations; storage units; medical examination areas; office space and equipment; food preparation, dispensing and dining areas; clothes washing areas and equipment; indoor and outdoor recreational areas and equipment; religious services areas; heating, ventilation and air conditioning; potable water and solid waste and wastewater infrastructure; and any needed occupational safety and health workplace controls including specialized ventilation, barriers, and floors and walls capable of decontamination. Exterior modifications to existing facilities could include minor improvements to roads, parking lots, and driveways; addition of security fencing, entry gates, and vehicle and pedestrian barriers, including minor ground disturbance for footings; addition of security equipment such as cameras, lighting, employee identification and building access card readers; and physical measures to meet compliance requirements under the Americans with Disabilities Act. New facility construction would require space for the same activities and services described immediately above.

### 8.2.2 Transportation

ICE utilizes its own and contracted transportation to provide secure and safe ground transportation of individuals to and from locations designated by the Agency; these may include transportation from the ICE field locations where individuals are taken into custody. Usually such transportation is set to a pre-defined radius or travel time from the destination to eliminate unnecessarily long transportation times. This transportation can include routine non-emergency transportation to physician or dental offices, and specialty medical facilities and/or hospitals when needed. It can also include routine transportation needs to consular offices or other local needs. It also includes the transportation needs to airports or other common carrier destinations for the purposes of removing aliens from the United States by air or assisting their boarding of common carriers when a release has been authorized. This transportation utilizes a variety of vehicle sizes including but not limited to: short and long range passenger buses, 15-20 passenger airporters and 10-12 passenger vans.

ICE also utilizes air transportation on common carrier aircraft and through lease agreements with chartered aircraft performing domestic transportation functions as well as international transportation. The international transportation is most typically to Central and South American destinations, but special charter missions are performed based on the need to other locations around the globe.

USCG may provide short-term support to CBP, such as the use of its C-130 heavy lift aircraft to provide once- or twice-daily flights to relocate apprehended persons as a stop gap measure (typically for a duration of no more than a couple of weeks) while CBP works to secure contract transportation services. These USCG transportation activities are consistent with the agency's existing mission and operation, and resource availability would depend on the USCG's operational status.

**8.2.3 Medical Care**

The Flores Agreement requires that unaccompanied alien children have access to emergency medical assistance. CBP's Office of Border Patrol's Policy for Encounters with Injured Subjects requires that all individuals who are injured or require medical assistance when encountered by Border Patrol agents be provided access to medical treatment. In addition, the Office of Border Patrol's Hold Room and Short-Term Custody policy specifies that a qualified medical professional, such as an emergency medical technician, paramedic, or physician, evaluate detainees who require medical attention or display symptoms of serious infectious diseases or contagions such as tuberculosis, severe acute respiratory syndrome, or pandemic influenza. Border Patrol agents may observe that juveniles require medical assistance or juveniles may request such assistance.

CBP provides medical assistance at ports of entry when encountering unaccompanied alien children who need medical care. The Office of Field Operations policy, Secure Detention, Transport and Escort Procedures at Ports of Entry, requires that all persons placed in a secure area at its facilities be asked whether they have a medical problem or condition that may require medical attention.

CBP personnel, when they apprehend and process unaccompanied alien children, identify injured juveniles and in cases of medical emergencies, transport or escort unaccompanied alien children to hospitals and monitor their condition. When appropriate, unaccompanied alien children are returned to Border Patrol stations or ports of entry to complete administrative processing.

**8.3 Screening Among Alternative Locations**

As previously described in Section 2.2, initial screening of alternatives is performed at the Unified Coordination Group level with results cascaded to DHS Components for implementation at the field level. The Unified Coordination Group responds to requirements provided by DHS and HHS, based upon feedback from four task forces related to holding, transportation, shelter and facilities, and child processing and release. The Unified Coordination Group Shelters and Facilities Task Force identifies potential facilities that meet pre-designated HHS, CBP or ICE criteria and also eliminates alternatives from further consideration. The facility list is also provided to GSA for evaluation. GSA returns a listing of recommended properties based on availability and leasing information. The GSA list of recommended properties is then provided to DHS for selection or consideration for further review. Where GSA provides facilities for DHS missions related to unaccompanied alien children and family units, GSA is responsible for NEPA review and documentation. DHS is responsible for NEPA review and compliance for DHS-owned facilities or facilities operated through IGSAs.

**9.0 Affected Environment and Environmental Consequences**

The following table identifies the affected environmental resources, conditions for implementation, and the extent of impacts anticipated from implementation of the Proposed Action. Specific activities under the Proposed Action that would not meet these conditions or requirements, or that would exceed the identified impacts would require a site- or activity-specific EA tiered from this PEA, a standalone EA, or the development of alternative arrangements with CEQ pursuant to 40 CFR 1506.11 for activities that would normally require preparation of an EIS.

For example, proposed actions that would require extensive ground disturbance on previously undisturbed or undeveloped land, extensive disturbance or removal of habitat, or that would require significant changes to buildings and infrastructure (e.g., transportation, energy, water supply, water treatment) that may exceed existing or planned capacities are not considered within the scope of this PEA and would require additional environmental review.

**Table #1**

| Resource/Area of Evaluation | Activities under the Proposed Action must meet the criteria or requirements listed below (when applicable) in order to be covered by this PEA | Anticipated Impacts |
|---|---|---|
| **Land Use** | Proposed actions would be consistent with respective State Coastal Zone Management plans.<br><br>Proposed actions would not be located in a Coastal Barrier Resources System unit.<br><br>Proposed actions would score less than 160 points on Farmland Conversion Impact Rating (Form AD-1006)<br><br>Proposed actions would not result in the removal of a significant amount of lands designated for special use.<br><br>Proposed actions would be taken consistent with 40 United States Code 3312, Compliance with Nationally Recognized Codes. | The proposed action would have temporary or minor permanent impacts to land use. |
| **Geology, Soils, and Seismicity** | Proposed actions in areas characterized by susceptibility to seismic, volcanic, tsunamis, landslide or mudslide activity, structural instability, excessive erodibility, or steep slopes would be mitigated using appropriate engineering techniques.<br><br>Appropriate construction best management practices and erosion control measures would be followed.<br><br>Hazard evacuation plans would be in place. | Grading and contouring of sites would have minor impacts to surface soils of the site but would not significantly change the conditions of the soil, the types of soil, or the geology at the site.<br><br>Impacts from the proposed action to geology, soils, and seismicity would be minor. |

| | | |
|---|---|---|
| **Water Resources** | A Stormwater Pollution Prevention Plan (SWPP) would be prepared where required by local, state, or federal regulations. During any construction activities, the best management practices identified in the SWPPP would be implemented.<br><br>Proposed new facilities would be in compliance with the Safe Drinking Water Act, including obtaining certification as a public water system and performing monitoring and sampling of the water according to applicable regulations, when water is not provide by a municipal water source.<br><br>All required water quality permits such as a National Pollution Discharge Elimination System and state permits would be obtained and all permit conditions would be met.<br><br>Existing service providers would have existing capacity to meet increase in demand for potable water, or water could be purchased from commercial sources and delivered to facility.<br><br>Existing infrastructure would be capable of handling increase in wastewater.<br><br>Contaminated wastewater would be pre-treated to disinfect it to prevent the spread of diseases that could be transmitted by wastewater and, depending on the system, could contaminate drinking water supplies and bodies of water used for outflow if not properly treated. | Impacts (chemical, physical, or biological effects) would be either not detectable or minor.<br><br>Alterations in water quality and hydrologic conditions relative to historical baseline may occur, however, only on a localized and short-term basis. |
| **Floodplains** | Proposed actions would not be located in a floodplain, or the decision-making process prescribed in EO 11988 would be conducted and documented for actions where there is not a feasible alternative located outside of the floodplain, and appropriate mitigation would be included. | There would be no impacts to floodplains for proposed actions located outside of floodplains.<br><br>If locating proposed actions in floodplains is unavoidable, impacts would be minor through the implementation of appropriate engineering controls and flood mitigation measures. |

| | | |
|---|---|---|
| **Wetlands** | Proposed actions would not be located in wetlands, or proposed actions located near or adjacent to wetlands would utilize appropriate engineering controls and best management practices to avoid impacts to wetlands, or proposed actions would meet criteria for US Army Corps of Engineers (USACE) Nationwide or Regional General Permits including adherence to standard permit conditions and best management practices. | There would be no impacts to wetlands, or impacts to wetlands would be limited to minor works under the USACE Nationwide permit program. |
| **Biological Resources – Vegetation, Birds and Wildlife** | Activities would occur at existing facilities or in previously disturbed areas, therefore sufficient habitat would remain to maintain viability of all species.<br><br>USCG flight operations in support of CBP would follow existing standard operating procedures to prevent unnecessarily flying over sensitive environmental habitat areas, including critical habitat, migratory bird sanctuaries, marine mammal haul-outs and rookeries, and sea turtle nesting beaches. If it would be necessary to fly over such areas, an altitude of 2,000 feet above ground level would be maintained.<br><br>Best management practices would be implemented as necessary for the protection of wildlife from the presence of unaccompanied alien children and family units who are in DHS custody, as well as for the protection of unaccompanied alien children and family units who are in DHS custody from any potential wildlife encounters (e.g., coyotes, wood rats, snakes, opossums, raccoons). | Impacts to native species, their habitats, or the natural processes sustaining them may be detectable, but would be minor and are not expected to be outside the natural range of variability.<br><br>Occasional responses to disturbance by some individuals could be expected, but without interference to feeding, reproduction, or other factors affecting population levels.<br><br>Potential impacts to unaccompanied alien children and family units from wildlife that may surround housing facilities would be addressed through the utilization of comprehensive, integrated pest management and vermin control techniques to minimize the likelihood of potential contact between wildlife and residents. |

| | | |
|---|---|---|
| **Biological Resources – Listed Species, Critical Habitat, and Special Status Species** | Activities would occur<br>a. at existing facilities or in previously disturbed or developed areas where these resources are not present; or<br>b. where these resources are present and DHS is able to make a "No Effect" determination; or<br>c. where these resources are present and DHS is able to propose a "May effect but not likely to adversely affect" determination regarding impacts to threatened and endangered species, critical habitat, or essential fish habitat for which upon informal consultation, the U.S. Fish and Wildlife Service or National Marine Fisheries Service provides written concurrence with the Department's proposed determination on effects to listed resources or requests additional information. (Depending on site specific facts, additional tiered NEPA documentation may be needed).<br><br>USCG flight operations in support of CBP would follow existing standard operating procedures to prevent unnecessarily flying over sensitive environmental habitat areas, including critical habitat, migratory bird sanctuaries, marine mammal haul-outs and rookeries, and sea turtle nesting beaches. If it would be necessary to fly over such areas, an altitude of 2,000 feet above ground level would be maintained.<br><br>Ground transportation activities would be limited to existing routes and roadways and would not require disturbance or removal of habitat.<br><br>*Note: Proposed actions that result in a "Jeopardy" finding are not covered by this PEA and require supplemental analysis.* | There would be no effects on listed species or designated critical habitat in project areas where these resources are not present or, if present, DHS has made a "No effect" determination.<br><br>Or, there would be no significant effects on listed species or designated critical habitat in project areas where DHS obtained concurrence from the U.S. Fish and Wildlife Service or National Marine Fisheries Service in a "May effect but not likely to adversely affect" determination.<br><br>Or, under normal ESA consultation timelines and/or under expedited consultation timelines for emergency situations (pursuant to 50 CFR 402.05), there would be a determination of "Not Likely to Jeopardize" listed species or designated critical habitat and any effects would be mitigated to insignificance through appropriate conservation measures identified in consultation with the Services. |

| | | |
|---|---|---|
| **Hazardous Materials/Waste** | Hazardous or toxic materials and/or wastes would be safely and adequately managed in accordance with all applicable local, state, and Federal regulations and policies. This would include storage and disposal of hazardous chemicals if needed for disease decontamination.<br><br>Temporary increases of the generation of hazardous materials may occur (e.g., removal or mitigation of asbestos containing materials, lead based paint, petroleum contaminated materials, or mold) and may be necessary during renovations of existing facilities. However, any abatement actions would be completed by licensed/certified contractors utilizing best management practices and industry standard practices to properly mitigate, remove and/or dispose of any hazardous materials and protect human health and the environment. | The generation of any hazardous materials would be minor and temporary and limited to construction/renovation activities. |
| **Utilities & Infrastructure** | Existing landfills would be available off-site and have sufficient capacity to handle the temporary construction debris and additional waste for operation of detainee housing facilities.<br><br>Existing service providers would have the capacity to meet the increased demand for energy, or alternative sources of energy are feasible and can be utilized (e.g., generators, renewable sources such as solar photovoltaics, fuel tanks). This would include additional energy necessary to meet occupational safety and health controls such as ventilation.<br><br>Installation of any new electrical conduit would be placed within previously disturbed areas, such as existing roads and shoulders. | Impacts to utilities and infrastructure would be minor and temporary. |

| | | |
|---|---|---|
| **Historic Properties** | DHS is able to make a determination of "No Historic Properties Affected" for proposed actions at existing non-historic buildings (e.g., renovation) or for proposed-ground disturbing activities where it has been previously determined that no archaeological resources are present and the relevant State Historic Preservation Officer/Tribal Historic Preservation Officer (SHPO/THPO) has provided written concurrence with the DHS determination.<br><br>Or, for proposed actions that may affect historic properties (e.g., existing buildings, archaeological sites), DHS makes a "Finding of No Adverse Effect" and the relevant SHPO/THPO provides written concurrence with the DHS determination.<br><br>Or, for proposed actions that result in an "adverse effect" finding, DHS is able to resolve those effects through measures agreed to in a Memorandum of Understanding or Programmatic Agreement negotiated with the relevant SHPO/THPO, Advisory Council on Historic Preservation (if participating), and consulting parties. This would also include public involvement, as specified in the regulations for implementing the National Historic Preservation Act (36 CFR Part 800).<br><br>*NOTE: Adverse effects to historic properties involving the following are not covered by this PEA and require supplemental analysis: a high level of public controversy; loss of integrity of a large grouping of historic properties (e.g., historic district, archaeological site); National Historic Landmarks.* | There would be no impacts to historic properties, or anticipated impacts would be avoided, minimized, or mitigated through the National Historic Preservation Act Section 106 consultation process. |

| | | |
|---|---|---|
| **Air Quality** | Appropriate construction best management practices, including maintaining equipment per manufacturers recommendations, limiting idling of equipment, and using appropriate dust control technologies, such as watering disturbed areas, would be implemented to reduce impacts to air quality during these activities.<br><br>All new sources of air emissions would not generate emissions above the de minimis thresholds or contribute to a violation of any Federal, state, or local air regulation.<br><br>Additional provisions would be put in place in non-attainment areas.<br><br>Impacts to air quality during renovation or construction activities would be minor and temporary, such as those resulting from dust and emissions from construction vehicles and equipment.<br><br>Emissions from vehicles and aircraft used in transportation operations would not result in measureable impacts to air quality, as any increases in vehicle and aircraft use would be short-term and intermittent. | Impacts to air quality would be minor and temporary. |
| **Noise** | Noise levels would exceed natural sounds but would not exceed typical noise levels from construction equipment, vehicles, aircraft, or generators.<br><br>Human-generated outdoor noise (e.g., recreational activities, playgrounds) would be limited to daytime hours when practicable and would adhere to local noise ordinances and use noise buffers where required. | Noise generated by construction or renovation activities would be minor and temporary and limited to daytime hours.<br><br>Noise generated by operation of facilities (e.g., playgrounds, vehicle transport) would be minor to moderate and mitigated through noise buffers where required. |
| **Greenhouse Gas and Climate Change** | Construction- or transportation-related air emissions of carbon dioxide and carbon dioxide equivalents would be below the Federal de minimis threshold. | Impacts would be minor and temporary. |

| | | |
|---|---|---|
| **Traffic and Transportation Systems** | Roadway construction and changes in traffic flow patterns would not require major reconfiguration of local traffic routes.<br><br>Traffic impacts during construction would be addressed through providing warning signage, limiting the use of public right-of-ways for staging of equipment or materials, using flag persons when needed, and coordinating detours if traffic access points would be obstructed.<br><br>Construction of new access roads for detention facilities would not require removal of significant amount of lands designated for special use, destruction of wildlife habitat, or impacts to archaeological resources.<br><br>Transportation of individuals would use existing modes and routes.<br><br>Any increase in the number of leased vehicles, distance travelled, or number of trips would not overwhelm existing transportation systems. | Impacts would be minor and temporary. |
| **Human Health & Safety** | Hypothetical increases in crime, illnesses, and safety (in regard to unaccompanied alien children family units, and populations in the surrounding communities) would be mitigated through the use of security staff, physical security measures, and medical care (including immunization screenings, vaccinations, and treatment).<br><br>Individuals would be housed within a secured facility and would not interact with the surrounding communities.<br><br>Individuals with communicable diseases (e.g., tuberculosis, measles) would be kept in quarantine and treated, and specialized equipment to remove the air of airborne pathogens would be used to prevent the spread of disease.<br><br>DHS would follow existing Occupational Safety and Health protocols for its personnel, as well as standard operating procedures for detention, escort, and transport activities to ensure the safety and security of both detained persons and DHS personnel.<br><br>DHS would develop evacuation plans, as necessary, for facilities located in areas prone to natural hazards such as hurricanes. | Implementation of the proposed action would have beneficial impacts to the health and safety of unaccompanied alien children, family units, DHS personnel, and the surrounding communities by providing safe and secure facilities with sufficient space and services. |
| **Environmental Justice** | Actions would be consistent with the Executive Order and the DHS Environmental Justice Strategy. | |

### 9.1 Physical Environment

The most probable existing physical environments of the Proposed Action would be locations where there is already existing infrastructure to support the requirements for additional facilities and services for unaccompanied alien children and family units. Utilization of existing built environments would be the most cost-effective and time efficient way for DHS to respond to the current humanitarian situation. Existing DHS and non-DHS facilities where expansion and/or modification is possible to accommodate unaccompanied alien children, family units, and personnel and services are potential sites identified by the Unified Coordination Group and considered for selection by CBP and ICE.

No significant impacts are anticipated, provided that existing facilities and their proposed use, proposed new sites and new facility construction, and existing or proposed new transportation routes fall within the thresholds presented in Table 1 and/or would be covered by a DHS CATEX. Sites, facilities, and transportation routes that fall within the thresholds presented in Table 1 and follow applicable mitigation measures in Section 11 would not require additional NEPA analysis beyond this PEA.

It is also important to note that CBP is currently developing a Programmatic Agreement pursuant to the National Historic Preservation Act for CBP undertakings in states located along the southwest border of the United States. The Programmatic Agreement is a result of a multi-year coordination effort between CBP, State Historic Preservation Officers, Tribes, several other Federal agencies (consulting parties) with missions or jurisdiction in southwestern border states, and potentially interested parties.

Proposed sites, facilities, and/or transportation routes that cannot be covered by a DHS CATEX or that do not fall within the thresholds presented in Table 1 would require an additional analysis of environmental effects tiered to this PEA.

### 9.2 Biological Environment

The most probable existing biological environments of the Proposed Action would be managed landscapes including low maintenance vegetated areas adjacent to existing infrastructure to support the requirements for additional facilities and services for unaccompanied alien children and family units. Existing DHS and non-DHS facilities which have additional areas for expansion and/or site modification are potential sites identified by the Unified Coordination Group and considered for selection by CBP and ICE.

No significant impacts are anticipated, provided that existing facilities and their proposed use, proposed new sites and new facility construction, and existing or proposed new transportation routes fall within the thresholds presented in Table 1 or would be covered by a DHS CATEX. Therefore, sites, facilities, and transportation routes that fall within the thresholds presented in Table 1 and follow applicable mitigation measures in Section 11 would not require additional NEPA analysis beyond this PEA.

Conversely, proposed sites, facilities, or transportation routes that do not fall within the thresholds presented in Table 1 or cannot be covered by a DHS CATEX are expected to have a higher potential for impacts to biological resources; therefore, additional analysis of environmental effects tiered to this PEA would be required.

### 9.3 Social Environment

Communities and their resources in close proximity to the proposed additional facilities and services for unaccompanied alien children and family units constitute the existing affected social environments. The Unified Coordination Group may identify facilities for CBP and ICE to review and select. Ultimately the

action agency makes the decision on selection and path forward. DHS recognizes that its activities have the potential to have human health, social, economic and/or or environmental effects and is committed to meeting the goals of EO 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," as well as to fulfilling its own Environmental Justice Strategy (see http://www.dhs.gov/dhs-environmental-justice-strategy).

The use of existing facilities and transportation routes is not anticipated to have disproportionately high and adverse human health, social, economic or environmental effects on minority populations, low-income populations, or children. For proposed new or expanded facilities or transportation routes, potential impacts under EO 12898 will receive further evaluation to determine if mitigation measures are necessary. However, the overall DHS response to the influx of unaccompanied alien children and family units across the southwest border is not anticipated to have disproportionately high and adverse human health, social, economic or environmental effects on minority or low-income populations.

Implementation of the Proposed Action is anticipated to have beneficial impacts to the health and safety of unaccompanied alien children, family units, DHS personnel, and the surrounding communities by providing safe and secure facilities with sufficient space and services. In addition, there is the potential for economic benefits, including increased employment opportunities, to the surrounding communities because of the increased need for a variety of services to shelter and care for unaccompanied alien children and family units.

Both DHS and HHS are increasing Spanish-speaking case management staff, increasing staff handling incoming calls from parents or guardians, raising awareness of the Parent Hotline (provided by FEMA and operated by HHS), surging staff to manage the intake of CBP referrals to track shelter bed capacity, and facilitate shelter designations. DHS is developing ways to expedite background checks for sponsors of unaccompanied alien children, integrate CBP and HHS information sharing systems, and increase capacity to transport and place children in a timely manner.

In addition, DHS has initiated and intensified its public affairs campaign in Spanish, with radio, print, and TV spots. One goal if this campaign is to communicate the dangers of sending unaccompanied children on the long journey from Central America to the United States, and the dangers of using criminal smuggling organizations to transport the children.

Additional information about the Department's efforts to address the dangers of illegal immigration into the United States, particularly for unaccompanied alien children, is available on the DHS website at http://www.dhs.gov/unaccompanied-children-southwest-border.

No disproportionately high and adverse human health, social, economic or environmental effects to low-income or minority populations are anticipated as a result of the Proposed Action. Potential impacts to the surrounding communities where housing and transportation activities would take place would be addressed through safety and security protocols, open communication between DHS and the public, and adherence to the Department's Environmental Justice Strategy and the requirements of EO 12898.

## 10.0 Cumulative Impact

The analysis of cumulative impact considers whether the incremental effects of an individual project are significant when viewed in connection with the overall effects of past projects, the effects of other current projects, and the effects of reasonably foreseeable projects, regardless of what agency (federal or non-federal) or persons undertake such other actions (44 CFR 1508.7). When the incremental impact associated with a Proposed Action is not significant, the discussion shall briefly indicate why the cumulative impact is not significant.

The Proposed Action evaluated in this PEA is limited to acquisition, renovation, and minor expansion of existing facilities, use of existing transportation routes, and new construction or transportation routes in areas where environmentally sensitive resources are either not present or where impacts to such resources would be avoided, minimized, or mitigated to insignificance; consequently, significant incremental effects are not anticipated. However, given the broad geographic area considered in this PEA, the fact that specific locations have not been identified, and the assumption that similar activities are ongoing in potential project locations due to normal economic and commercial processes, such as business expansion and relocation, the determination of need for additional, tiered site-specific reviews will take cumulative effects on potentially impacted resources into account.

### 10.1 Land Use

Impacts from the Proposed Action would be limited to the immediate project area (e.g., existing facility, new facility construction site, ground transportation route). Changes in or modifications to land use are not anticipated for the majority of activities; however, the construction of new housing facilities in certain geographic locations may, depending on the number of occupants and level or lack of existing supporting infrastructure, result in some change in land use. However, because the majority of locations are anticipated to be consistent with 40 U.S.C. sec. 3312, Compliance with Nationally Recognized Codes, no more than minor cumulative impacts on land use are expected.

### 10.2 Geology, Soils, and Seismicity

The Proposed Action would not materially alter localized geologic conditions. Activities could require disturbance to the topography within the immediate work areas in order to meet operational and facility needs. Activities could include excavation, contouring, and filling to achieve gradient that allows construction of proposed structures, driveways, parking, etc. Grading and contouring of sites would have a minor impact to surface soils of the site but would not significantly change the conditions of the soil or the types of soil at the site. In addition, commercial or residential activities undertaken by non-DHS entities may contribute to cumulative impacts due to the expansion of existing or construction of new facilities. Therefore, minor cumulative impacts on geology or soils from the Proposed Actions are expected.

### 10.3 Water Resources

To be covered by this PEA, impacts to water resources must fall within the criteria listed in Table 1. The Proposed Action may impact surface water and groundwater, but would be covered under existing applicable permits or under modifications to those permits. Therefore, cumulative impacts to water resources resulting from the Proposed Action would not be significant and would be addressed by water conservation measures in existing permits and by following best management practices during construction activities. For impacts to water resources that are not covered by this PEA, such as substantial increases in water consumption, and new wastewater management and/or water treatment requirements, analysis of cumulative impacts in supplemental NEPA documentation would be required.

#### 10.3.1 Floodplains

The Proposed Action would not be located in floodplains or, if located in floodplains, appropriate flood mitigation measures and evacuation plans would be in place. Commercial or residential construction activities undertaken by non-DHS entities in floodplains may contribute to cumulative impacts to this resource, but such activities would be required to be in compliance with local floodplain management ordinances. Therefore, minor cumulative effects to floodplains as a result of the Proposed Action are expected.

### 10.3.2 Wetlands

The Proposed Action would avoid wetlands or would involve minor works that comply with USACE Nationwide Permit conditions and best management practices for actions in or affecting wetlands. Therefore, cumulative effects to wetlands as a result of the proposed action would be minor.

## 10.4 Biological Resources

### 10.4.1 Vegetation, Birds, and Wildlife

Impacts to vegetation would be limited to the immediate sites of facility construction and renovation and would only occur during the grading phase of a project. Disturbed areas would be re-vegetated following the completion of construction activities. The use of existing transportation routes would not contribute to cumulative impacts to vegetation, as vegetation would have previously been cleared from roadways. DHS will follow best management practices which may include pre-construction survey as appropriate to avoid impacts to biological resources (see section 11.2 below). Vegetation on neighboring properties could exist and could potentially provide nesting for migratory birds or habitat for wildlife. Nevertheless, because the majority of DHS actions to address the influx of unaccompanied alien children and family units are anticipated to occur on previously disturbed or previously developed land, it is anticipated that cumulative impacts to vegetation, birds, and wildlife would be minor.

### 10.4.2 Biological Resources – Listed Species, Critical Habitat, and Special Status Species

Under the Proposed Action, threatened and endangered species and critical habitat are not anticipated to be on-site and even if present nearby, a "no effect" determination will normally be appropriate. If these resources are present, potential impacts would be addressed through consultation with the U.S. Fish and Wildlife Service or National Marine Fisheries Service as described in Table 1. There could be other projects undertaken by DHS or non-DHS entities at the same time of the Proposed Action or in the future. If other federal projects are proposed that could impact listed species or their designated critical habitat, approvals for those projects would require consultation and mitigation of the impacts. Because the majority of DHS actions to address the influx of unaccompanied alien children and family units are anticipated to occur on previously disturbed or previously developed land, it is anticipated that cumulative effects to listed species, critical habitat, and special status species would be none to minor.

## 10.5 Hazardous Materials/Waste

Construction and renovation activities under the Proposed Action could result in the storage and use of small quantities of hazardous materials including fuels, oils, and lubricants and in the abatement of lead based paint, asbestos containing materials, or mold. Operations of the proposed housing facilities could result in the storage of fuel (for vehicles) and small quantities of oils and lubricants. Best management practices would be utilized to minimize the potential for spills of hazardous materials. Any hazardous waste generated during construction, renovation or operational activities would be limited in volume and disposed of at currently licensed facilities by appropriately certified/licensed personnel. Other actions in the vicinity of DHS projects would also be subject to requirements for the storage, handling and disposal of hazard materials and waste. Therefore, the Proposed Action is expected to contribute to only minor cumulative impacts to hazardous materials and waste.

## 10.6 Utilities and Infrastructure

Impacts to utilities and infrastructure from the Proposed Action must meet the criteria in Table 1 in order to be covered by this PEA. DHS anticipates that most housing facilities would be located in previously

developed or previously disturbed sites in developed urban areas, where existing infrastructure such as potable water supply, wastewater conveyance and treatment, sewer services, and energy services would already exist. Foreseeable DHS activities when combined with other similar state and municipal activities along with other public, private commercial and non-commercial activities are not expected to cumulatively exceed the available and planned capacity of available utilities and infrastructure. Therefore, only minor cumulative impacts are anticipated.

However, additional analysis of cumulative impacts to utilities and infrastructure would be necessary if projects undertaken by DHS, when considered with other local or regional projects undertaken by other entities, may result in exceeding the current or planned capacity of available utilities and infrastructure, or would require installation of new services where none currently exist.

### 10.7 Historic Properties

Each specific undertaking (as regards historic properties) which forms a part of the Proposed Action must meet the criteria in Table 1 in order to be covered by this PEA. If an undertaking does not meet those criteria, a further NEPA action which reflects NHPA compliance and is tiered to this PEA is required.

The Proposed Action would either not affect or not adversely affect historic properties; or where adverse impacts are identified, such impacts would be avoided, minimized or mitigated through the National Historic Preservation Act (NHPA) Section 106 consultation process and appropriate documentation. Other Federal undertakings in project areas in the vicinity of DHS undertakings would also be subject to NHPA requirements. Therefore, the Proposed Action is expected to result in no or minor cumulative impacts to historic properties.

### 10.8 Air Quality

Impacts to air quality from the Proposed Action must meet the criteria in Table 1 in order to be covered by this PEA. Construction and renovation activities under the Proposed Action would be short term. Similar construction and renovation activities by non-DHS entities, such as commercial activities, would also have de minimis levels of emissions or those activities would be subject to additional permit requirements. Therefore, the Proposed Action would have negligible cumulative effects to air quality.

### 10.9 Noise

Noise impacts are directly related to the intensity of the noise source and the distance of the receptor from the source. Noise attenuates rapidly as distance from the source increases. Cumulative contributions to noise impacts resulting from construction, renovation, or transportation activities under the Proposed Action are expected to be short term and minor. However, cumulative impacts to noise resulting from DHS operation and inhabitation of housing facilities when combined with other sources of noise are expected to be minor to moderate.

### 10.10 Greenhouse Gas and Climate Change

Construction, renovation, transportation and operational activities under the Proposed Action will contribute de minimis volumes of greenhouse gases. However, research on the contributions of greenhouse gasses to climate change has concluded that past and present emissions have resulted in major ongoing impacts to climate of increasing significance mainly from the electricity generation, personal and commercial transportation, and fossil fuel for industrial power generation sectors. The Federal government has a number of programs in place to reduce its greenhouse gas emissions inventory, and DHS is participating fully in those efforts. Therefore, although the baseline climate impacts are already cumulatively significant, the Proposed Action, in combination with other DHS initiatives to reduce greenhouse gas emissions would be negligible in the context of overall contributions to climate change.

### 10.11 Traffic and Transportation Systems

To be covered by this PEA, impacts to traffic and transportation systems must fall within the criteria listed in Table 1. Therefore, proposed actions under this PEA would contribute only minor impacts to existing individual transportation systems and overall cumulative impacts to traffic and transportation systems would be minor. However, additional analysis of cumulative impacts to traffic and transportation would be necessary if other projects undertaken by DHS or non-DHS entities could result in exceeding the current capacity of existing transportation systems or require major reconfiguration of traffic routes or new routes in already congested areas.

### 10.12 Human Health & Safety

DHS would maintain unaccompanied alien children and family units in secure facilities with negligible contact with the surrounding resident populations of municipalities where housing and transportation operations would occur. General public health and safety would not be impacted by acquisition, renovation, expansion, or construction of housing facilities in any way different from any other non-industrial, low impact construction activities. DHS operations on a whole would likely increase public safety by removing unaccompanied alien children and families seeking to evade detection from cities and areas between cities thus reducing the chance for accidents, crime, drug and human trafficking, or other unsafe or undesirable activities. DHS would follow existing Occupational Safety and Health protocols for its personnel. Therefore, significant cumulative impacts to human health and safety are not anticipated.

### 10.13 Socioeconomic Impacts

The Proposed Action could generate new employment opportunities in communities during facility renovation and construction activities and during operational activities. Depending on the duration of the increased influx of unaccompanied alien children and family units and the Department's response to the influx, both beneficial and adverse, longer term impacts to local businesses, public works, property values, etc. could occur. The exact nature of such impacts would be dependent upon local perceptions and cannot be known at this time. Therefore, DHS may further evaluate the long-term and cumulative socioeconomic impacts associated with the Proposed Action in supplemental analyses in the future if necessary.

### 10.14 Executive 12898 Environmental Justice

Communities in the vicinity of proposed housing sites for unaccompanied alien children and family units may be comprised of minority or low-income populations. DHS will ensure appropriate consideration of and outreach to these communities, consistent with the Executive Order and its own Environmental Justice Strategy. Therefore, the Proposed Action is not anticipated to result in cumulative impacts that are disproportionately high and adverse to minority or low-income populations.

### 10.15 Summary

Cumulative impacts resulting from the proposed action alternative are summarized in the table below:

**Table #2**

| Resource/Area of Evaluation | Cumulative Impacts |
|---|---|
| **Land Use** | None to Minor |
| **Geology, Soils, and Seismicity** | None to Minor |
| **Water Resources** | Minor |
| **Floodplains** | None to Minor |
| **Wetlands** | None to Minor |
| **Biological Resources – Vegetation, Birds and Wildlife** | None to Minor |
| **Biological Resources – Listed Species, Critical Habitat, and Special Status Species** | None to Minor |
| **Hazardous Materials/Waste/Solid Waste** | Minor |
| **Historic Properties and Cultural Resources** | None to Minor |
| **Air Quality** | Minor |
| **Noise** | Minor to Moderate |
| **Greenhouse Gas and Climate Change** | Minor |
| **Electricity** | Minor |
| **Traffic and Transportation Systems** | Minor |
| **Human Health & Safety** | Beneficial |
| **Socioeconomic** | Minor Beneficial, Minor Adverse |

## 11.0 Mitigation

Measures that reduce otherwise anticipated adverse impacts of a proposed action on the quality of the human environment are called mitigation measures. Directive 023-01 requires DHS Components to provide mitigation measures to reduce or eliminate potential adverse impacts of a proposed action and to monitor the effectiveness of measures implemented. DHS will take the following measures to the extent practicable and applicable to avoid or further minimize impacts to the quality of the human environment. The general mitigation measures outlined in this section may be superseded by higher or more stringent standards required by a particular federal, tribal, state or local government agency issuing a permit, license, or approval for activities undertaken by DHS to address the influx of unaccompanied alien children and family units across the border.

**11.1** Measures to avoid impacts to the human environment:

1. Avoid taking actions that modify existing land use patterns;
2. Avoid areas characterized by susceptibility to seismic or volcanic activity, tsunamis, landslides, mudslides, structural instability, excessive erodibility, or steep slopes;
3. Avoid sites in floodplains;
4. Avoid sites on important farmlands;
5. Avoid sites on or near Traditional Cultural Properties
6. Avoid sites in wetlands;
7. Avoid undertaking projects that adversely affect historic properties;
8. Avoid projects that adversely affect threatened and endangered or special status species or critical habitat;
9. Follow applicable Occupational Safety and Health requirements;

10. Follow applicable detention standards and policies.

**11.2** Minimization measures and best management practices for ground-disturbing/construction activities:

1. Follow applicable state, territory, tribal, and local permitting requirements for construction;
2. Implement appropriate dust control measures and engineering controls to minimize dust, such as watering down construction areas;
3. Enclose or water down exposed dirt storage piles;
4. Minimize the disturbed area and preserve vegetation to the maximum extent practicable;
5. Maintain topsoil whenever possible;
6. Phase construction activities to the extent practicable;
7. Implement stormwater best management practices;
8. Implement erosion control measures such as erosion control blankets, bonded fiber matrices, turf reinforcement mats, silt fences (for moderate slopes), etc.;
9. Temporarily protect storm drain inlets until site is stabilized;
10. Retain sediment on-site and control dewatering practices by using sediment traps or basins for large areas (> 1 acre) when appropriate;
11. Establish stabilized construction entrances/exits (e.g. large crushed rocks, stone pads, steel wash racks, hose-down systems, pads);
12. Limit construction activities, including operation of heavy machinery, to normal business hours (M-F 7am-5pm);
13. Avoid engaging in construction activities within 200 feet of noise-sensitive receptors such as schools, hospitals, residential areas, nursing homes, etc.
14. Ensure adequate maintenance of equipment, including proper engine maintenance, adequate tire inflation, and proper maintenance of pollution control devices;
15. Ensure equipment at the project site uses the manufacturer's standard noise control devices (i.e., mufflers, baffling, and/or engine enclosures);
16. Reduce construction equipment idling to the maximum extent practicable;
17. Prepare and implement an appropriate spill prevention and response plan to eliminate and minimize oil or fuel spills from construction equipment;
18. Minimize the impacts of equipment staging areas;
19. Stabilize slopes promptly through temporary and permanent cover best management practices, including re-vegetating disturbed areas following completion of construction. Following construction, all remaining disturbed areas must be re-vegetated with native seeds and plants in a manner that returns the site to its pre-construction condition or better;
20. When applicable, adopt measures to minimize traffic impacts during construction such as providing warning signage, limit the use of public right-of-ways for staging of equipment or materials, use of flagpersons when needed, and coordinate detours if traffic access points will be obstructed;
21. Conduct appropriate biological resource surveys and nesting bird surveys of the project area and adjacent areas for migratory birds during the nesting season (typically March 15th to September 15th) at least two weeks in advance of any construction and implement appropriate exclusion zones around any identified bird nests;
22. Avoid archeological sites by altering the location and/or depth of ground disturbance in a particular area, when practicable;
23. To the extent practicable, adopt other feasible measures under the EPA Guidance Potential for Reducing Greenhouse Gas Emissions in the Construction Sector.

24. Establish an inspection, maintenance, and documentation approach to ensure these measures are being implemented and are working adequately.