Julie B. Axelrod
California Bar No. 250165
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, D.C. 20001
Telephone: (202) 232-5590

Lesley Blackner
*Admitted Pro Hac Vice*
Florida Bar No. 654043
340 Royal Poinciana Way, Suite 317-377
Palm Beach, Florida 33480
Telephone: (561) 659-5754

James P. Miller
California Bar. No. 188266
Law Office of JP Miller Jr.
181 Rea Ave., Suite 101
El Cajon, CA 92020
Telephone: (619) 590-0383

## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITEWATER DRAW NATURAL, RESOURCE CONSERVATION DISTRICT, HEREFORD NATURAL RESOURCE CONSERVATION DISTRICT, ARIZONA ASSOCIATION OF CONSERVATION DISTRICTS, CALIFORNIANS FOR POPULATION STABILIZATION, SCIENTISTS AND ENVIRONMENTALISTS FOR POPULATION STABILIZATION, NEW MEXICO CATTLEGROWERS' ASSOCIATION, GLEN COLTON, FLORIDIANS FOR A SUSTAINABLE POPULATION, RALPH POPE | **Case No. 3:16-cv-2583**<br><br><br>**AMENDED COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF** |

1

Plaintiffs,

      v.

KIRSTJEN NIELSEN, IN HER
OFFICIAL CAPACITY AS
SECRETARY OF HOMELAND
SECURITY, and THE DEPARTMENT
OF HOMELAND SECURITY

Defendants.

## PRELIMINARY STATEMENT

1.     This case addresses a set of eight related programs and actions administered

by the Department of Homeland Security ("DHS") and DHS Secretary Elaine

Duke (together, DHS and the DHS Secretary are referred to as "DHS"). The eight

programs, which are authorized by statute or executive directive, include: 1)

employment based immigration; 2) family based immigration; 3) long term

nonimmigrant visas; 4) parole; 5) Temporary Protective Status ("TPS"); 6)

refugees; 7) asylum; and 8) Deferred Action for Childhood Arrivals ("DACA").

These programs, which result in similar environmental impacts, regulate the entry

into and settlement of millions of foreign nationals in the United States. To a

substantial degree, most of the population growth in the United States in recent

decades has been caused and continues to be caused by these federal programs. Human population growth causes impacts to the environment. Like its predecessor agency, the Immigration and Naturalization Service ("INS"), DHS has turned a blind eye to the environmental impacts, including cumulative impacts, resulting from its programs that regulate foreign nationals who enter into and settle in the United States.

2.     DHS's blind spot regarding the environmental impacts resulting from its programs that regulate the entry into and settlement of foreign nationals in the United States is epitomized by its failure to comply with the National Environmental Policy Act, 42 U.S.C. § 4331 *et seq*. (2012) ("NEPA") in the course of its administration of these programs.

3.     The core purpose of NEPA is to ensure that, before a federal agency undertakes a federal action, its decision-makers consider the range of potential environmental impacts the action may have on the "human environment." *See*  42 U.S.C. § 4332(2)(C) (2012). NEPA embodies a national policy that aims to ensure that decisions affecting the human environment are made with eyes wide open and in full view of the public, so that all stakeholders may understand the implications of federal actions on the natural resources that we all depend on. NEPA "help[s] public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."

40 C.F.R. § 1500.1 (2017) (Council on Environmental Quality ("CEQ") regulations). With respect to its programs that regulate the entry into and settlement of foreign nationals in the United States, DHS is woefully deficient in carrying forth this Congressional obligation.

4.      NEPA was enacted in 1970. At that time, INS administered the federal programs authorized by statute regulating the entry into and settlement of foreign nationals in the United States. Despite the adoption of NEPA, INS never undertook any NEPA compliance with respect to these programs. Thirty-three years later, DHS was established. The primary authority to implement and administer the programs regulating the entry into and settlement of foreign nationals in the United States was transferred to DHS. As a new federal agency, DHS adopted its own NEPA procedures, which were finalized in 2014 as DHS Directive 02301, Implementation of the National Environmental Policy Act, attached hereto as Ex. 1 and Instruction Manual 023-01-001-01 ("Instruction Manual"), attached hereto as Ex. 2.

5.      DHS's adoption of new NEPA procedures presented an opportunity to correct INS's decades-long failure to recognize environmental impacts resulting from its population-growth inducing programs, a particularly important task in light of the ever-increasing numbers of foreigners settling in the United States and their obvious environmental impacts. However, the Instruction Manual continued

4

to perpetuate the INS blind spot regarding the myriad environmental consequences of its actions concerning the entry into and settlement of mass numbers of people in the United States. In the Instruction Manual, DHS arbitrarily and capriciously fails even to recognize that one of its core missions is the regulation of the entry into and settlement of foreign nationals in the United States. The Instruction Manual accordingly fails to provide any analysis as to whether the programs that implement that mission might therefore have an effect on the environment. DHS continues to fail to undertake any NEPA review, in direct contravention of its statutory obligation, regarding these ongoing programs.

6.      In order to establish the scope and magnitude of the environmental impacts at issue, Plaintiffs have undertaken extensive research and retained experts to: a) identify and delineate those specific, ongoing DHS programs regulating the entry into and settlement in the United States of multitudinous foreign nationals; and b) identify and delineate environmental impacts to Plaintiffs resulting from these programs, including, but not limited to, the impacts from massive population growth and environmental damage along the Southwest border of the United States.[1]

---

[1]  Plaintiffs retained three experts for this action. Jessica Vaughan, an expert on United States immigration law, policy and practice, has analyzed DHS' programs and their impacts on the United States population as a whole, on the populations of

5

7.     Plaintiffs seek to compel DHS to properly comply with NEPA in connection with its programs that regulate the entry into and settlement of myriad foreign nationals in the United States. Plaintiffs seek both a declaration from this Court that DHS is violating NEPA and an injunction to require DHS to comply with the law. Further, Plaintiffs assert that, in the course of approving its agency actions implementing its programs regulating the entry into and settlement of foreign nationals in the United States, DHS violated its fundamental obligation to engage in well-reasoned, non-arbitrary decision making under the Administrative Procedure Act, ("APA"). *See* 5 U.S.C. § 701 *et seq.* (2012). In Count I, Plaintiffs assert that the NEPA procedures DHS adopted in 2014 are arbitrary and capricious, in violation of the APA and NEPA. In Count II, Plaintiffs assert that DHS's failure to initiate NEPA compliance for eight programs specified in ¶ 55 regulating the entry into and settlement of foreign nationals in the United States violates the APA and NEPA. In Count III, Plaintiffs assert the Categorical Exclusion A3 adopted by

the areas in which Plaintiffs reside, and the impacts of some of the programs on the land near the Southwest border. Her affidavit regarding these programs is attached hereto in Ex. 3. Steven Camarota, Ph.D., an expert on the demographic impacts of immigration, produced an expert report addressing the impact of immigration upon population growth. His report is attached hereto as Ex. 4. Phil Cafaro, Ph.D., a sustainability expert, produced a report on the environmental impacts of population growth. His report is attached hereto as Ex. 5.

DHS on November 6, 2014, is arbitrary and capricious on its face. Count IV addresses the four times that DHS promulgated rules that DHS deemed categorically excluded from NEPA review. Plaintiffs assert the application of the Categorical Exclusion A3 on these four separate occasions was arbitrary and capricious as applied, in violation of the APA and NEPA. Finally, in Count V, Plaintiffs challenge the NEPA review DHS completed for its June 2, 2014, Action "Response to the Influx of Unaccompanied Alien Children" as violating NEPA and the APA.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (2012) (federal question jurisdiction), 5 U.S.C. § 701 *et seq*. (2012) (APA), 28 U.S.C. § 1361 (2012) (mandamus) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. § 2202 (2012) (declaratory and injunctive relief). Plaintiffs claim that DHS has not and is not acting in accordance with federal law. *See* 5 U.S.C. § 706 (2012).

9.      Venue in this judicial district is proper under 28 U.S.C. § 1391(e) (2012) because this is an action against an agency of the United States and at least one plaintiff resides in this district.

7

# RELEVANT STATUTES

## A.  THE NATIONAL ENVIRONMENTAL POLICY ACT

10.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2017). NEPA's essential purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

11.    NEPA expressly recognizes Congressional concern for "the profound influences of population growth" on "the natural environment[.]" 42 U.S.C. § 4331(a). Through NEPA, Congress directs, in relevant part, that the Federal Government shall:

> use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may
>
> (1)  fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
> (2)  assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
> (3)  attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
> (4)  preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible an

environment which supports diversity and variety of individual
choice;
(5) *achieve a balance between population and resource use
which will permit high standards of living and a wide sharing
of life's amenities . . . .*

42 U.S.C. § 4331(b) (emphasis added).

12.     To accomplish its goals, NEPA requires each federal agency to identify and

consider the environmental impacts of its proposed federal actions. *See generally* 42

U.S.C. § 4331. Each agency must also consider alternatives and mitigating

measures which could avoid or reduce such impacts before implementing federal

agency actions that may significantly affect the environment. To these ends, NEPA

establishes, in relevant part:

> The Congress authorizes and directs that, to the fullest extent possible:
> (1) the policies, regulations, and public laws shall be interpreted and
> administered in accordance with the policies set forth in this Act, and
> (2) all agencies of the Federal Government shall
> . . .
> (C) include in every recommendation or report on proposals for
> legislation and other major Federal actions significantly affecting the
> quality of the human environment, a detailed statement by the
> responsible official on
> (i) the environmental impacts of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided
> should the proposal be implemented,
> (iii) alternatives to the proposed action, . . .
> (v) any irreversible or irretrievable commitment of resources which
> would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332.

9

13.     "The phrase 'to the fullest extent possible' in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operation expressly prohibits or makes compliance impossible." 40 C.F.R. § 1500.6 (2017). *See also* 40 C.F.R. § 1507.2 (2017) (Agency capability to comply).

14.     NEPA is designed to inject environmental considerations early into a federal agency's decision making process in order that the agency can "take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). NEPA is also intended to engage the public and stakeholders while the agency gathers and solicits relevant, "high quality" information, as well as inform and engage the public in the agency decision making process. *See* 40 C.F.R. § 1500.1(b). *See also* §§ 1503.1(a)(4) (Inviting comments), 1506.6 (Public involvement) (2017). Because "public involvement" is paramount in the NEPA process, each agency shall "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(b). NEPA thus is, at the very least, an environmental disclosure and public participation tool.

15.     NEPA established the White House Council on Environmental Quality ("CEQ"), which issues regulations guiding agencies' compliance with NEPA. *See* 42 U.S.C. § 4341 *et seq.* (2012); 40 C.F.R. § 1500 (2017). CEQ regulations clearly

define what constitutes agency action and set forth the process for determining whether an action or program significantly affects the quality of the human environment. "Major federal actions" are defined to "include new and continuing activities including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; [and] new or revised agency rules, regulations, plans, policies, or procedures . . . ." 40 C.F.R. § 1508.18(a) (2017).

16.   CEQ regulations provide that each federal agency shall adopt procedures to ensure that its "decisions are made in accordance with [NEPA's] policies and procedures . . . ." 40 C.F.R. § 1505.1. Further, agency procedures shall comply with CEQ regulations. *See* 40 C.F.R. § 1507.3(b)(1) (2017). An agency must specifically ensure that its NEPA procedures provide for designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them. 40 C.F.R. § 1505.1(b) (2017).

17.    CEQ regulations recognize that human population growth is an effect subject to NEPA analysis.  40 C.F.R. § 1508.8(b) (2017) provides, in relevant part: "Indirect effect may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."

11

18.     Pursuant to NEPA, DHS adopted its Instruction Manual on November 6,

2014. *See* Ex. 2. The Instruction Manual "serves as the DHS implementing

procedures for NEPA (as required by 40 C.F.R. §§ 1505.1 and 1507.3) which

supplement the CEQ regulations and therefore must be read in conjunction with

them." *Id.* at III-1. The Instruction Manual states that NEPA applies to a wide

range of DHS activities:

> Generally, NEPA applies to Federal actions that affect the human
> environment. Within DHS, NEPA generally applies to actions to be
> undertaken, funded, permitted or otherwise approved by DHS[,]
> including activities that may be wholly initiated within DHS, executed
> by DHS under the direction of Congress, or proposed by persons or
> organizations outside of DHS that require approval funding, a license,
> or a permit from DHS.

*Id.*

19.     Pursuant to 42 U.S.C. § 4332(C), each agency is required to prepare an

"Environmental Impact Statement" ("EIS") for each "major federal action[]

significantly affecting the quality of the human environment . . . ."

20.     CEQ regulations provide for the preparation of a document known as an

Environmental Assessment ("EA") to enable an agency to determine whether a

particular action may have a significant impact on the quality of the human

environment and thus require preparation of an EIS. 40 C.F.R. § 1501.4 (2017).

21.     An EA or EIS must also discuss and analyze alternatives to a proposed

program or project—including a "no-action" alternative, which may have less

12

environmental impact than the proposed action, as well as mitigation measures in relation to potential environmental impacts. *See* 40 C.F.R. §§ 1502.14, 1502.16, 1508.9 (2017).

22.     CEQ regulations provide that agency actions that are "related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a) (2017). An EIS may be, and sometimes must be, prepared for broad federal actions such as the adoption of new agency programs or regulations. 40 C.F.R § 1508.18. Agencies shall prepare statements on broad actions, including related actions, in order to include environmental considerations in policy, and shall time such statements to coincide with meaningful points in agency planning and decision making. 40 C.F.R. § 1502.4(b). Related actions "have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter." 40 C.F.R. § 1502.4(c)(2).

23.     In preparing an EA or EIS, an agency must consider direct, indirect, and cumulative effects. *See* 40 C.F.R. §§ 1502.16, 1508.8, 1508.9, 1508.27 (2017). Under NEPA, "effects" and "impacts" are synonymous and include:

> ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects . . .

13

40 C.F.R. § 1508.8(b).

24.     CEQ regulations authorize agencies to exempt certain agency actions from environmental review through the use of "categorical exclusions." 40 C.F.R. § 1508.4 (2017) provides:

> "Categorical Exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations. ([40 C.F.R.] § 1507.3) and for which therefore, neither an environmental assessment nor an environmental impact statement is required . . . . Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant effect.

25.     For those federal actions that are not categorically excluded and are, following completion of an EA, determined not to have "a significant impact on the human environment" and thus do not require preparation of an EIS, the agency issues a "finding of no significant impact" ("FONSI"). 40 C.F.R. § 1508.13 (2017).

**B.     THE ADMINISTRATIVE PROCEDURE ACT**

26.     The APA provides for judicial review of federal agency actions. *See* 5 U.S.C. § 701 *et seq*. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary,

14

capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5

U.S.C. § 706(2)(A) (2012). Accordingly, a federal agency must take a hard look at

the consequences of its actions. It must examine the relevant data and articulate a

satisfactory explanation for its action, including "a rational connection between the

facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. Inc. v.*

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must explain in

an explicit and rational manner how its decision is based upon and complies with

the relevant factors specified in the controlling statutory provision(s), together with

applicable agency regulations. *See id.* at 42-43. A reviewing court may set aside, as

arbitrary and capricious, agency factual findings and conclusions found to be

unsupported by substantial record evidence. 5 U.S.C. § 706(2).

## **PARTIES**

### A.   **PLAINTIFFS**

27.   The Whitewater Draw Natural Resource Conservation District

("WWDNRCD") and the Hereford Natural Resource Conservation District

("HNRCD") are a part of the state of Arizona's Natural Resource Conservation

District program that was established in response to the dust bowl of the 1930s.

*Natural Resources Conservation Districts,* Ariz. State Land Dep't.,

https://land.az.gov/natural-resources/natural-resource-conservation-districts (last

visited Dec. 8, 2017). The conservation district program promotes the restoration

15

and conservation of the state's natural resources. *Id*. As part of the conservation district program, WWDNRCD and HRNCD operate pursuant to Arizona Revised Statutes ("A.R.S.") Title 37, Chapter 6, and are governed by locally elected and appointed officials. *Id*. The districts are charged with evaluating the conservation needs of their respective areas and partnering with local, state, and federal agencies to restore and conserve the landscapes and waters of their respective regions. *Id*. The statutory purpose of the WWDNRCD and HNRCD is defined as follows:

> to provide for the restoration and conservation of lands and soil resources of the state, the preservation of water rights and the control and prevention of soil erosion, and thereby to conserve natural resources, conserve wildlife, protect the tax base, protect public lands and protect and restore this state's rivers and streams and associated riparian habitats, including fish and wildlife resources that are dependent on those habitats, and in such manner to protect and promote the public health, safety and general welfare of the people.

Ariz. Rev. Stat. Ann. § 37-1001 (2017); *see also Natural Resources Conservation Districts,* Ariz. State Land Dep't, https://land.az.gov/natural-resources/natural-resource-conservation-districts (last visited Dec. 8, 2017).

28.     The Arizona Association of Conservation Districts ("AACD") is a 501(c)(3) nonprofit organization established in 1944 by Arizona's conservation districts. *See Ariz. Ass'n of Conservation Dists.,* http://www.aacd1944.com/ (last visited Dec. 8, 2017). The mission of the AACD is to support the Conservation Districts in providing conservation leadership and education, and in addressing local

16

conservation priorities in partnership with landowners, federal and state agencies, tribal & local governments and other partners. *See id*.

29.     The members of the WWDNRCD, HNRCD, and AACD have been victimized and damaged by DHS's failure to comply with NEPA because their members live along the Southwest border, which has been environmentally degraded as a result of DHS's discretionary actions relating to border enforcement and immigration law. The policies of DHS have resulted in an increase in the numbers of individuals illegally crossing their members' properties. *See* Ex. 3 at Ex. D: How Certain DHS Programs Affect Land on the Southwest Border.

30.     Fred Davis is the Chairman of WWDNRCD, located in Southeastern Arizona. F. Davis Aff., attached hereto as Ex. 6 at ¶ 1. He is also a member of AACD. *Id.* He notes that "[t]he WWDNRCD seeks to protect, conserve and sustain natural resources in th[e] region, particularly soil and water." *Id.* at ¶ 2. Most of WWDNRCD's members are, like Mr. Davis, "multi-generation ranchers and farmers who are stewards of their land that plan to pass their traditional way of life on to future generations." *Id.* Mr. Davis lives on a 10,000-acre ranch 25 miles from the US/Mexico border that has been in his family for generations. *Id.* at ¶ 1. For Mr. Davis, "the ranch was a quiet and peaceful place to live and raise a family" before illegal border-crossings by illegal aliens and smugglers started becoming

rampant across his property. *Id.* at ¶ 5. The unending parade of illegal aliens has "physically degraded" his land. *Id.* at ¶ 11.

> The constant trampling of the land by illegal border crossers has left permanent damage as well. Many illegal aliens crossing over our native grasslands will follow the paths beaten over time by previous crossers, and in those places, the grass will no longer grow. There are now eleven paths near our house where sixty percent of the grass is gone. These grasses are native to the area, and illegal border crossers also have an adverse impact on protected plant life. Native plants that grow on our property, such as the Soaptree Yucca cactus, which can grow to be 12 feet high, Century Plant, barrel cactus, and the Mesquite tree that have been trampled by drug cartels crossing in vehicles. What makes me even angrier is that many of these plants are protected by the state of Arizona—we ourselves would be violating the law if we removed these native plants from our property. Yet these plants that take 6 to 8 years to grow are destroyed without consequence by illegal aliens.

*Id.* at ¶ 13.

Mr. Davis and his family have "picked up literally tons of trash" that illegal border-crossers have dumped on their land. *Id.* at ¶ 11. They have found human feces on their property "in abundance." *Id.* The garbage is a dangerous health hazard. *Id.* It has killed some of their cattle, and it has made ranching "far more difficult, dangerous and expensive." *Id.* at ¶¶ 11, 12. The years of illegal border-crossings have shattered Mr. Davis's peace and tranquility. *Id.* at ¶ 14. Life on the ranch has become much more stressful; Mr. Davis feels like he is living in a "war zone." *Id.* at ¶ 15.

18

> We feel that we are in constant reactionary mode, as people keep unlawfully crossing, and we know some of them may be a threat to our personal safety, giving us great anxiety for our children. The dogs bark in the night at the border crossers, making it difficult for us to sleep.

*Id.* at ¶ 14.

31.   The constant stress means that Mr. Davis has had "headaches and health problems [] at home, that go away when I travel." *Id.* at ¶ 15. The DHS actions at issue in this case "have real, concrete, harmful ongoing impacts on me, my family, our land, and the general border environment." *Id.* at ¶ 20. Like so many others, Mr. Davis is "angry contemplating all of the damage done to our environment that might never have occurred if DHS had followed its obligations under NEPA." *Id.* at ¶ 20.

32.   Peggy Davis has served as a clerk and as the Education Center Director of the WWDNRCD. P. Davis Aff., attached hereto as Ex. 7 at ¶ 2. She is also a member of the AACD. *Id.* Mrs. Davis lives with her husband Fred Davis, together with her children and grandchildren, on a 10,000-acre ranch 25 miles from the Arizona/Mexico border. *Id.* at ¶ 1. In her role as clerk and Education Director, Mrs. Davis has planned workshops on such topics as water and soil, solar energy, estate planning, and ranch tours. *Id.* at ¶ 2. Because of the unending flow of illegal border-crossers over her land, she can no longer take walks or bike rides alone. *Id.*

19

at ¶ 4. She is "afraid to go alone without a firearm." *Id.* Mrs. Davis's enjoyment of her ranch has diminished significantly over the years because DHS, and INS before it, adopted policies that have failed to secure the border. *Id.* Accordingly, "it feels like our land has been under siege." *Id.* at ¶ 1. She and her family are constantly picking up trash of all sorts, as well as continuously repairing fences, as documented in the photographs that are included in her affidavit. *Id.* She too has suffered injuries because DHS has failed to conduct any NEPA analysis regarding its myriad immigration-related actions, stating:

> Perhaps, if DHS had done the proper analysis and informed the public when it made discretionary decisions that encouraged illegal aliens to continue crossing the border, as the law requires, it would have decided that it was important to ramp up enforcement instead. Perhaps the public, if it had understood the environmental costs of DHS's actions, would have demanded more effective enforcement. My land and the whole border region in the Southwest might look different today—unspoiled, serene, and undamaged environmentally. Instead, ceaseless flows of people have crossed the border, with no end in sight, . . . because, our government has simply given up.

*Id.* at ¶ 9.

33.    Californians for Population Stabilization ("CAPS") is a 501(c)(3), non-partisan, membership-based, public interest organization organized and existing under the laws of California. *See About Us*, Californians for Population Stabilization, http://www.capsweb.org/about/about-us (last visited Dec. 2, 2017). CAPS's mission is to end policies and practices that cause human overpopulation

20

and the resultant decline in Americans' quality of life in California and the rest of the United States. *Id*. CAPS believes that unending human population growth causes environmental damage and overuse of nature's bounty, leaving an impoverished Golden State. *See id.* Unending population growth in California also strains local infrastructure. *Id.* Further, it frays community institutions. Environmental impacts resulting from unending population growth include, but are not limited to: damage to air quality, increasing sprawl, increasing demand for water, increasing water pollution, increasing greenhouse gases and accelerating climate change, exacerbated traffic congestion, school overcrowding, loss of green space, farmland, forests and wildlife, and other non-renewable resources. *See generally id.* CAPS has members and supporters in every state of the United States, with a majority residing throughout California. Because essentially all of California's population growth presently stems from immigration and births to immigrants, CAPS's priority goal is to reduce both legal and illegal immigration into California and the United States. *Id.* Indeed, California's population nearly doubled between 1970 and 2015, going from approximately 20 million to 39.6 million.[2] Most of that population growth resulted from immigrants and their

---

[2] Steven A. Camarota & Bryan Griffith, *By State: Number Immigrants and Their Minor Children*, Ctr. for Immigration Studies (March 28, 2016), http://cis.org/Camarota/Map-Number-Immigrants-Minor-Children.

21

offspring. *Id.* California has the largest share of foreign born of any state in this nation. *Id.* In 1970, immigrants and their minor children constituted roughly 13% of California's population—2.6 million people. *Id.* By 2015, 37.4% of California's population was comprised of immigrants and their minor children—nearly 15 million people. *Id.* There is no end in sight to the state's immigration-driven population growth. CAPS and its members who live, work and pursue recreational activities in California are adversely affected by the population growth resulting from the DHS actions at issue. CAPS members have a substantial interest in ensuring that DHS complies with federal law, including the requirements of NEPA. CAPS and its members are being, and will continue to be, harmed by the failure of DHS to make any attempt to comply with NEPA. Plaintiff's expert Jessica Vaughan estimates 21% of permanent residents admitted by DHS programs at issue between 2003 and 2015 settled in California. *See* Ex. 3 at Ex. B: Tables and Graphs of Population Increase Caused By DHS Programs, at 132.

34.     Richard D. Lamm, an attorney and Certified Public Accountant, served as Governor of Colorado from 1975 to 1987, and is a longtime member of CAPS. R. Lamm Aff., attached hereto as Ex. 8 at ¶ 2. Governor Lamm has been a resident of Colorado since 1961. *Id.* at ¶ 1. He is presently Co-Director of Public Policy at the University of Denver. *Id.* at ¶ 2. Governor Lamm has "been deeply involved in the environmental movement for decades and ha[s] always been concerned about out

22

of control population growth." *Id.* at ¶ 3. While attending law school at Berkeley during the years 1958-1961, he "was already appalled at what population growth was doing to California." *Id.* at ¶ 5. He notes that California's population has continued to swell, now largely because of immigration. *Id.* That is why he joined CAPS. *Id.* In the more than 50 years since Governor Lamm moved to Colorado he has "embraced and cherished its wilderness." *Id.* at ¶ 8. He notes that he has climbed 50 of Colorado's highest peaks, hiked and skied its mountains, and kayaked its rivers. *Id.* "That unspoiled, beautiful Colorado that stirred me so deeply has fallen victim to population growth, which is inseparable from mass foreign immigration." *Id.* Unhappily, he has "watched Colorado go from a lovely state with a high quality of life to a Colorado whose front range (from Pueblo to Fort Collins) is rapidly becoming a Los Angeles of the Rockies." *Id.* Substantial numbers of immigrants have settled in Colorado and the state's population has more than doubled between 1970 and 2015—from 2.2 million people to about 5.5 million people.[3] Many of the newcomers are Americans who have been "crowded out of California by endless foreign immigration." Ex. 8 at ¶ 14. He believes that his lifelong effort "to save Denver from an environmentally unsustainable, high

---

[3]  *See Resident population in Colorado from 1960 to 2016, in millions*,  Statista, https://www.statista.com/statistics/206101/resident-population-in-colorado/ (last visited Dec. 7, 2017).

23

growth future would not have been in vain" if DHS had complied with NEPA "as

it was supposed to." *Id.* at ¶ 17.

> The National Environmental Policy Act (NEPA), which became law
> in 1970, was supposed to have stopped this kind of ill-considered
> population growth from happening. In the 1960s and 1970s, the
> environmental movement understood how important population
> stabilization was to everything it stood for. This emphasis in NEPA
> itself of the importance of population growth reflects this priority.
> NEPA, the bedrock of our environmental law, was designed to ensure
> for environmentally informed decision making and public
> participation . .... Federal agencies, like the Department of Homeland
> Security (DHS), are not supposed to carry out actions that affect the
> environment without first considering the consequences. What can
> have a greater environmental impact on our states and the nation than
> immigration? In the days when NEPA was passed, population growth
> was not substantially a matter of immigration, but now immigration is
> our population's primary driver. Moreover, it is certainly the primary
> driver of population growth that is most within the federal
> government's control. Our immigration levels are ultimately a policy
> choice. DHS is the federal agency that actually implements our
> nation's immigration policies, and so DHS is responsible for carrying
> out the federal policy that has the greatest impact on the environment
> of all. And yet, DHS has done zero environmental review of its
> immigration related actions. Zero!

*Id.* at ¶ 16.

35.     Don Rosenberg is a 29-year resident of California. D. Rosenberg Aff. at ¶ 1,

attached hereto as Ex. 9. He is also the father of Drew Rosenberg, a 25-year old

law student who was hit and killed in 2010 by Roberto Gallo, a Honduran national

who illegally entered the United States and subsequently received a long term

24

lawful status under the TPS program, one of the programs at issue in this case. *Id.* at ¶ 8. Mr. Rosenberg joined CAPS after his son was killed because:

> mass immigration was imposing huge social and environmental costs. Mass immigration wasn't adding to our quality of life--it was detracting from it in a tremendous way. Furthermore, our government is even fostering and overlooking illegal activity, because our "leaders" were more interested in votes, campaign contributions and the cheap labor . . . .

*Id.* at ¶ 13. Mr. Rosenberg dreads the ever-increasing congestion of Los Angeles County's roads, and resents the ever-increasing air pollution coming from "millions of cars sitting on the 101 freeway for hours." *Id.* at ¶ 5. Because of the drought, exacerbated by endless population growth, he and his neighbors no longer water their yards. *Id.* at ¶ 6. He finds that "[l]iving in a landscape without plants drastically reduces the natural beauty and enjoyability of the surroundings." *Id.* Mr. Rosenberg recognizes that Southern California has a limited water supply and "when more people come in, we have no choice but to use less water personally." *Id.* He states:

> I fear that in the future, the environment will continue to deteriorate in Southern California. Despite the fact that we seem to have reached our land's capacity, and we are already straining to support the population we have now, DHS seems to only want to force ever more population growth on the nation. For Southern California's future, I see more water shortages, more traffic, and more pollution. The state is already in a hole, and it just seems like our public officials are looking for a bigger shovel. It will probably drive me out of California in the future.

25

*Id.* at ¶ 14. Finally, Mr. Rosenberg wistfully muses that perhaps, if DHS had complied with NEPA, it might not have created such a huge TPS program, which allowed his son's killer to stay in the United States, and maybe his son would still be alive. *Id.* at ¶ 16.

36.     Claude Wiley joined CAPS because "something needs to be done about the population explosion, the reckless disregard of immigration laws, and the ecological impacts" resulting from both. C. Wiley Decl. at ¶ 2, attached hereto as Ex. 10. He lives in Pasadena, California, and commutes to work by bicycle (wearing a mask) because he is "dedicated to doing [his] part to reduce pollution and carbon emissions." *Id.* at ¶ 5. But large scale unending population growth in the Los Angeles region, all of which now results from immigration, simply adds ever more pollution and erases air quality gains. *Id.* at ¶ 5. Mr. Wiley is frustrated because "if not for the immigration-driven population growth, the air quality in the Los Angeles region would be getting better." *Id.* at ¶ 10. He takes mass transit to lessen his impact on the environment and observes that, due to strong state and local policies to support mass transit, the buses and the trains are full and yet the roads are still choked with cars: "we're starting to hit a wall." *Id.* at ¶ 13. The lovely places where Mr. Wiley has enjoyed hiking and nature-watching over the years, including the San Gabriel Mountains and Echo Mountain, grow ever more crowded with people, and "[t]he more crowded the path becomes, the less I want to

26

use it." *Id.* at ¶ 15. Like others, Mr. Wiley fears for California's future if population growth trends continue unabated. *Id.* at ¶ 18. He notes that "DHS continues to drive population growth through its discretionary actions . . . ." *Id.* "If DHS had only followed its legal obligations under NEPA, perhaps the public would have realized the impact immigration was having on the environment and made different decisions—Perhaps the Los Angeles area and California would look very different today." *Id.* at ¶ 17.

37.     Ric Oberlink has lived in Berkeley California for nearly 40 years and is a member of CAPS. R. Oberlink Aff., attached hereto as Ex. 11, at ¶ 1-2. As the population of California, and particularly the Bay area, has continued to rise, his enjoyment of local parks has diminished due to increased crowding. *Id.* at ¶ 4. He notes that "[a]n increased human population has made camping in wilderness areas and national parks much more troublesome and much less convenient than it was in previous years when population levels were lower." *Id.* at ¶ 5. "Camping spots in prime areas at prime times require advance reservations, often far in advance." *Id.* at ¶ 5. Mr. Oberlink's enjoyment of cycling has also diminished because areas he once cycled through are more heavily trafficked and open space has been developed. *Id.* at ¶ 8. He notes that during the years 1990-2014, the population increase in Alameda County, where Berkeley is located, all resulted from immigration. *Id.* at ¶ 11. By 2014, immigrants comprised 31% of the county

27

population, or 483,750 individuals out of a total population of 1,559,308. *Id.* He

states that in Alameda County, "the portion of the population comprised of

immigrants soared from 18 percent in 1990 to 31 percent in 2014, to a total of

about half a million," not counting offspring. *Id.* Mr. Oberlink asserts that:

> Had DHS considered the environmental implications of its
> immigration actions, it might have chosen different actions, resulting
> in a California and an America with lower levels of population, more
> open space and wildlife habitat, and less environmental damage than
> that which we have today. Failure to review future actions could
> condemn this country to never-ending population growth and further
> diminution of natural resources.

*Id.* at ¶ 19.

38.    Richard Alan Schneider is the Chair of CAPS. R. Schneider Aff., attached

hereto as Ex. 12 at ¶ 2. Mr. Schneider has lived for nearly fifty years in California,

mostly in Oakland. *Id.* at ¶ 1. Mr. Schneider, a conservationist and scientist, has

"spent thousands of hours fighting to protect open space in the Bay Area . . . ." *Id.*

at ¶ 13. He states:

> Since 2000, I have orchestrated nine open space initiative campaigns
> in Alameda and Contra Costa Counties—formulating policies to
> protect the land, helping write the text to enact those policies,
> organizing signature drives to qualify the initiatives for the ballot,
> raising money for election campaigns, and then walking precincts and
> distributing literature in favor of those ballot measures. For each
> initiative I have put in hundreds of hours of volunteer time, and when
> an initiative passes, as most have, they must be defended in court if
> the developers sue; and after they are successfully defended, they
> must be continually monitored to make sure they are implemented and
> enforced by the local jurisdiction.

28

*Id.* at ¶ 12.

39.     Mr. Schneider has spent so much time trying to protect open space because he enjoys observing native California species, such as hawks and eagles, and irreplaceable native habitats. *Id.* at ¶¶ 18-19. The species he treasures and the open space he loves regularly disappear. *Id.* He states that "California leads the nation in the number of species at risk of extinction and the number of endemic species at risk, those species that occur nowhere else in the world." *Id.* at ¶ 18. The disappearance of nature and wildlife is deeply disturbing to Mr. Schneider. *See id.* at ¶¶ 19-20. Land is routinely bulldozed for new construction, all in service of accommodating endless population growth:

> Is it really too many people that are causing this loss of wildlife? In California, the answer is most emphatically yes. The California Department of Fish and Wildlife, in its Atlas of the Biodiversity of California, states unequivocally, "Habitat loss due to human population growth presents the single biggest problem facing native plants and animals in California."

*Id.* at ¶ 20

40.     Mr. Schneider observes that presently, all of California's population growth is "coming from foreign immigration and births to immigrants." *Id.* at ¶ 25. California's population continues to climb even though more U.S. citizens leave California for other states than move to California. *Id.* He views population growth

29

as "one of the greatest threats to the natural world." *Id.* at ¶ 27. And, like other

affiants, he is "amazed and appalled by DHS's total abdication of its legal

obligations under NEPA." *Id.* at ¶ 26.

41.     Scientists and Environmentalists for Population Stabilization ("SEPS") is a

small, informal, non-governmental organization run by scientists, but open to all.

*See generally* Scientists and Environmentalists for Population Stabilization,

http://www.populationstabilization.org/index.html (last visited on Dec. 8, 2017). It

currently has about 50 members throughout the United States. *Id.* SEPS's mission

is to improve understanding within the U.S. scientific, educational, and

environmental communities of the fact of overpopulation and its social, economic,

and environmental consequences at both the national and global levels. *See*

*generally id*. SEPS advocates for U.S. population stabilization, followed by its

gradual reduction to a sustainable level through humane, non-coercive means. *Id.*

SEPS also advocates for a gradual transition to ecological economics for our

economic system. *See generally id*. It chiefly advocates by operating exhibitor

booths addressing population stabilization at the annual meetings of scientific

societies; SEPS is usually the only U.S. organization of its kind at these meetings.

*See id.*

42.     Dr. Stuart Hurlbert is the president of SEPS and a longtime member of

CAPS. S. Hurlbert Aff., attached hereto as Ex. 13 at ¶ ¶ 4, 16. Dr. Hurlbert is

Professor Emeritus of Ecology at San Diego State University and has lived in San Diego and Del Mar, California, since 1970. *Id.* The negative impacts of constant population growth have been an ongoing subject of personal and professional concern for Dr. Hurlbert for many years. *Id.* at ¶ ¶ 1-2. San Diego County's population has more than doubled from 1.36 to 3.30 million people since 1970.[4] A substantial share of the population growth is the result of immigration. As an example, the immigrant share of the population in San Diego County has risen from 17.2% in 1990 to 23.4% in 2014. S. Hurlbert Aff. at ¶ 5. Unending population growth translates into more traffic, despite the addition of new freeways and expansion of existing roads. *Id.* at ¶ 5. Dr. Hurlbert avers that ever more traffic, and the congestion it creates, means "loss of time, restriction of travel schedules, and increased aggravation [which] has had a negative impact" on him. *Id.* A particular source of unhappiness is the increasing degradation of Mission Trails Regional Park, one of the largest urban parks in the United States, which Dr. Hurlbert has enjoyed both personally and professionally over the decades, for

---

[4]  *See Population of San Diego County*, Population.us, http://population.us/county/ca/san-diego-county/ (last visited on Oct. 15, 2016); Tatiania Sanchez, *SD County second largest in CA, despite slow growth*, The San Diego Union Tribune, (Jan. 4, 2016), http://www.sandiegouniontribune.com/news/border-baja-california/sdut-san-diego-county-population-2016jan04-story.html.

31

hiking, birdwatching, and class trips. *Id.* at ¶ 7. The vastly increased use of the park and its concomitant deterioration over the decades has corresponded with the population growth of San Diego County. *See id.* Areas in Del Mar that Dr. Hulbert used to hike with his son are now covered with "new highways, new housing developments and new shopping centers." *Id.* at ¶ 8. For Dr. Hurlbert, "[o]ne of the biggest ongoing, population-driven environmental disasters in Southern California is what is happening at the Salton Sea." *Id.* at ¶ 9. Dr. Hurlbert has studied the Salton Sea for several decades. It is "one of the most important habitats for waterbirds of diverse sorts in the Southwest" and Dr. Hurlbert has enjoyed bird watching there for fifty years. *Id.* at ¶¶ 9, 11. Much to Dr. Hurlbert's dismay, population growth now threatens the Salton Sea because the water that drains into it is now being tapped for diversion to facilitate population growth in coastal California. *See id.* at ¶ 9. "It pains me greatly to be a witness to its population-driven demise." *Id.* at ¶ 11. Dr. Hurlbert is well acquainted with NEPA and distinctly recalls being "greatly pleased at its passage, with its clear references to the 'profound influences of population growth' and 'the critical importance of restoring and maintaining environmental quality' and the need to 'achieve a balance between population and resource use.'" *Id.* at ¶ 16. He notes that population growth in both California and the United States in now driven primarily by immigration, and "[i]f DHS and its predecessor agencies had been doing proper

32

NEPA analyses all along, it might have changed it policies long ago, and I might have seen much less damage occur to the places I love." *Id.* at ¶ 19.

43.     Glen Colton has lived in Fort Collins, Colorado, for 37 years. G. Colton Aff., attached as Ex. 14 at ¶ 1. When he moved to Fort Collins, the town had 65,000 residents and was surrounded by "wide open spaces" and agricultural land. *Id.* at ¶ 3. At that time Fort Collins was "an idyllic place to live, work, and raise a family." *Id.* at ¶ 3. Over the decades, however, the town's population has soared to 160,000 today. *Id.* at ¶ 4. Its population is expected to grow by another 80,000 over the next 10 to 15 years with no end to the growth in sight. *See id.* Many of the agricultural areas and "wide open spaces" that used to surround the city are gone. *See id.* The population of the surrounding region is "projected to nearly double" from 500,000 to one million people within 20 years, with no end in sight. *See id.* Mr. Colton is negatively impacted by the endless surge of population growth which causes sprawl, degradation of the Poudre River, loss of nature and wildlife, increasing light and air pollution, and increasing traffic and congestion. *See id.* at ¶¶ 5-7. Like Mr. Oberlink, Mr. Colton's enjoyment of protected public land in the region has diminished because more and more users are "putting increasing pressure on trails, fragile habitat and wildlife." *Id.* at ¶ 8. He unhappily notes that Estes Park, the gateway to Rocky Mountain National Park, has changed over the years he has visited and now "is a crowded, congested mess . . . ." *Id.* at ¶ 8. The

destruction of the natural world from "rampant and destructive effects of population growth" is evident to Mr. Colton as he travels around the western United States. *Id.* at ¶ 10. He states that "[w]ater issues are becoming increasingly dire, infrastructure is overloaded, wildlife habitat is being destroyed, development is rapidly encroaching on fire prone areas, congestion and crowding is widespread, and consumption and resulting energy usage . . . are increasing." *Id.* He does not believe that this endless population growth is ecologically sustainable, and indeed feels "incredibly betrayed and cheated by the United States" because he chose to have only one child to help stabilize the nation's population yet the federal government has embraced a national population policy that imposes unending massive population growth through immigration. *Id.* at ¶ 15. DHS and the State Department are "de facto U.S. growth spigot[s]" that have completely ignored NEPA. *Id.* at ¶ 17. If these agencies had complied with NEPA, "the US landscape . . . would most likely look very different today." *Id.*

44.     Caren Cowan has been the Executive Director of the New Mexico Cattlegrowers' Association ("NMCGA") for nineteen years. C. Cowan Aff., attached hereto as Ex. 15 at ¶ 2. The purpose of NMCGA is to promote the interests of the cattle-ranching community in New Mexico and nineteen other states. *Id.* As Ms. Cowan states, "We preserve and protect our land not only because we depend on the land economically, but also because we love our land

34

and way of life. We also seek to protect the land in order to ensure the wellbeing and opportunities of generations to come." *Id.* at ¶ 3. Ms. Cowan's family has been continuously ranching in Cochise County, Arizona, since 1884, and she owns part of a ranch near Elfrida, Arizona. *Id.* at ¶ 4. She has always enjoyed being on the borderlands and calls them "a special place." *Id.* at ¶ 6. Ms. Cowan states, "I experience a spiritual renewal when I am out in these vast open spaces with no sounds other than wildlife and livestock, and not a person for miles around." *Id.* Because of the constant fear of illegal border-crossers, Ms. Cowan no longer feels safe out on the range. *Id.* at ¶¶ 5, 7 Her grandmother's homestead was ransacked and despoiled by illegal aliens on multiple occasions. *Id.* at ¶ 9. Many members of NMCGA have also experienced criminal activities on their lands, including stolen vehicles and break-ins. *Id.* at ¶ 7. Ms. Cowan understands that DHS has failed to consider any of the environmental impacts resulting from its myriad of agency actions, and finds that failure a "shocking disappointment." *Id.* at ¶ 10.

45.     John W. Ladd is a supervisor for the HNRDC and a member of the AACD. J. Ladd Aff., attached hereto as Ex. 16 at ¶ 4. Mr. Ladd has lived his entire life on a 16,400-acre ranch on the Arizona/Mexico border. *Id.* at ¶ 1. The ranch has been in his family since 1896. *Id.* at ¶ 1. He states that "[r]anching on this land is my heritage--passed from previous generations to me, and it is a way of life I have always hoped to pass on to many generations to come." *Id.* During his youth,

35

illegal border-crossers were not much of a problem, but he states the flow "has become such a problem that it has ruled our lives and dictated the way we ranch. An endless stream of illegal border crossers has trashed my land and destroyed my enjoyment of my property." *Id.* at ¶ 2. The grass has stopped growing in areas used as trails and "[t]he ground where grasses no longer grow is an eyesore that reminds me of how much environmental damage I am constantly suffering." *Id.* at ¶ 9. He estimates that hundreds of thousands of illegal border-crossers have been caught by the border patrol on his property. *Id.* at ¶ 5. This huge flow of people has led to the dumping of approximately 20 tons of trash on his property—too much to control, despite the efforts of Mr. Ladd and his family to pick up as much as they can. *See id.* at ¶ 6. Much of this garbage ultimately gets swept into the San Pedro River, which was clean enough to swim in when he was young but is now polluted with trash and human waste. *See id.* at ¶¶ 6-7. Mr. Ladd understands that DHS has never done "any environmental analysis that acknowledges that arriving aliens have environmental impacts." *Id.* at ¶ 13. This failure affects Mr. Ladd personally, because "[i]f DHS had done the proper NEPA analysis of the environmental impacts of its policies before implementing them, perhaps it would have realized that the environmental costs were too severe. The damages to the environment on my land might never occurred if DHS and the INS had followed NEPA." *Id.* at ¶ 14.

36

46.     John Charles Oliver is the President of Floridians for a Sustainable Population ("FSP"). J. Oliver Aff., attached hereto as Ex.1 7 at ¶¶ 4, 17. FSP was established as a not-for-profit in 1994 in an effort to educate Floridians about the necessity to stabilize Florida's human population in order "to preserve and protect our natural resources and open spaces for future generations to enjoy." *Id.* at ¶ 17. FSP recognizes that immigration is now the engine driving population growth in both Florida and the entire United States. *See id.* FSP operates a website and, among other things, commissioned a sprawl study in 2000 to coincide with Florida Overpopulation Awareness Week. *Id.* In the fifteen years following that 2000 campaign, Florida's population has continued to mushroom, from about 16 million to over 20 million. *Id.* at ¶ 16. Mr. Oliver has lived 28 years in Southeastern Florida—Broward, Palm Beach, and Martin Counties. *Id.* at ¶¶ 1, 6. The population of Broward increased from 628,980 to 1,815, 269 from 1970 to 2014. *Id.* at ¶ 16. Palm Beach County tells much the same story; its population grew from 353,158 in 1970 to 1,359,074 in 2014. *Id.* Martin County's population has increased from 28,460 in 1970 to 149,658 in 2014. *Id.* During the years he has lived in Florida, Mr. Oliver has witnessed and experienced the harmful impacts of intense population growth upon the natural world, especially water habitats. *Id.* at ¶ 13. Mr. Oliver is a certified diver and has "done extensive diving and fishing on the reefs of Broward and Palm Beach Counties, the Florida Keys, the Bahamas,

37

and Cozumel Mexico." *Id.* at ¶ 2. Coral reefs he enjoyed so much in the 1970's are largely gone now: "Today, the beautiful coral reefs I dived and fished [on] in Broward and Palm Beach County are no longer living[;] [93%] of hard corals have vanished due to six municipal sewage outfalls, port-dredging, and coral bleaching due to carbon acidification caused by the increase of fossil fuels being burned." *Id.* at ¶ 9. Formerly an avid fisher, Mr. Oliver no longer fishes as often as he did before because boat launches are backed up and it is hard to find a place to put one's boat in the water. *Id.* at ¶ 14. Previously-free boat ramps now charge money. *Id.* Moreover, numerous waterways, especially the St. Lucie River, have become polluted and contaminated by the septic tanks installed for thousands of new homes built along the river and fertilizer nitrate runoff:

> The river grasses that covered the bottom of the estuary are now dead and the bottom is covered with green slime. These grasses were essential to sustaining the entire food chain of fish, birds, turtles, and marine mammals. Many of the dolphins and manatees have sores on their bodies and some have died. Unfortunately, this scenario is being repeated at an alarming pace in waters across the state. The estuary of the west coast of Florida by Pine Island that was one of my favorite places to fish has also seen declining water quality.

*Id.* at ¶ 13. Mr. Oliver further notes that "[m]any species of table fare fish are now heavily regulated due to overharvesting . . . [n]umerous reefs in the Florida Keys have become Marine Sanctuaries and are totally off limits to fishing." *Id.* at ¶ 15. Florida's rapid population growth over the past fifty years has been exacerbated by

38

large inflows of immigrants—over 25% of Florida's 20-million plus-population are immigrants and their children. *Id.* at ¶ 16. Most of Florida's recent population growth is presently the result of federal immigration policies—67% according to a recent report, "Vanishing Open Spaces." *Id.* at ¶ 19. Mr. Oliver understands that DHS has not considered the environmental impacts of its myriad immigration-related actions, all the while, he says, "it has been established without question that the doubling and tripling of our population has had a very detrimental effect on our environment." *Id.* at ¶ 23.

47.     Ralph Pope is a retired Natural Resource Management/Ecologist for the U.S. Forest Service. R. Pope Aff., attached hereto as Ex. 18 at ¶ 7. Mr. Pope has lived in Southeastern Arizona and Southwestern New Mexico along the U.S/Mexico border for most of his life. *See id. at* ¶¶ 1-2. His affidavit details his personal and professional pleasure over the decades, experiencing and enjoying the entire "scope and range of southwest ecosystems, from desert to high elevation mixed conifers." *See id.* at ¶ 10. He notes his particular affection for the region's famed "sky islands"—hot spots of great biodiversity found nowhere else on the globe. *Id.* Mr. Pope devoted his career to monitoring and trying to protect the Piloncillo, Chiricahua, and Dragoon Mountains, federal lands which make up the Douglas Ranger District. *Id.* at ¶ 4. His job with the Forest Service entailed monitoring ecosystem health and livestock grazing operations on federal lands. *Id.*

39

Unfortunately, over the decades, Mr. Pope has personally witnessed the ecological degradation of "unique native ecosystems located on hundreds of thousands of acres of once pristine and unspoiled lands . . . ." *Id.* at ¶ 5. This degradation was caused by illegal border-crossings, whose destructive impacts include trampled native vegetation, garbage, polluted water, destroyed wilderness and fires that burn out of control. *Id.* at ¶ 11. Mr. Pope's affidavit describes the destruction of Burro Springs and the Chiricahua Mountain Range that occurred as a result of fires set by illegal border-crossers. *See id.* at ¶¶ 11, 14. One significant negative impact of such fires is that much of the native vegetation gets burned away and is replaced by invasives. *See id.* at ¶ 15. He states that "[a]s an ecologist, this upsets me tremendously." *Id.*

## B.   DEFENDANTS

48.   Defendant DHS is a federal agency which was established in 2003, pursuant to the Homeland Security Act passed on November 25, 2002. *See* Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (2002) ("Act"). Pursuant to this grant of authority, DHS is mandated to administer border security, immigration enforcement, naturalization, and establish and administer rules governing the granting of visas or other forms of permission to enter the country. *See* 116 Stat. at 2178, 2187. By the authority of the Act, DHS took over the functions of government formerly delegated by Congress to the INS, a division

40

since 1940 of the Department of Justice. DHS now carries out the functions of the former INS, that is, the regulation of immigration into the U.S., through three sub-agencies, U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and Immigration and Customs Enforcement ("ICE").[5] As a federal agency, DHS is subject to NEPA and the APA. In accordance with NEPA, DHS has adopted NEPA regulations to guide its discretionary agency action decision making. *See* 42 U.S.C. § 4333 (2016). *See* Ex. 1 and Ex. 2. *See also Synopsis of Administrative Record to Support Proposed New Categorical Exclusions Under the National Environmental Policy Act*, Dep't of Homeland Sec. (Dec. 2014), https://www.dhs.gov/sites/default/files/publications/CATEXs_admin%20record_version_Final_Dec2014_508compliantversion.pdf.

49.    Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of DHS ("Secretary"). The Secretary is authorized to lead and manage DHS. The Secretary is responsible for ensuring that DHS's actions, such as those actions at issue *sub judice*, comply with the requirements of NEPA.

---

[5]  *Our History*, U.S. Citizenship and Immigration Servs. (May 25, 2011), https://www.uscis.gov/about-us/our-history (providing a discussion of the history of the organization of immigration regulation within the U.S. government).

41

## GENERAL ALLEGATIONS

**People Cause Environmental Impacts. DHS's Programs That Regulate the Entry Into and Settlement of People in the United States Causes Human Population Growth. Accordingly, NEPA Requires Analysis by DHS of these Programs.**

50.     DHS fails to analyze the environmental impacts of its programs/actions that have allowed and continue to allow millions of foreign nationals to enter into and settle in the United States. These programs/actions result in significant population growth that produces ongoing myriad environmental impacts. Plaintiffs accordingly assert that NEPA requires DHS to assess the impacts of its programs/actions under NEPA:

i)     NEPA requires Federal agencies to apply NEPA when undertaking federal actions and making decisions that could have a significant impact on the human environment. CEQ regulation 40 C.F.R. §1508.18(a) provides that federal programs constitute "major federal actions" subject to NEPA compliance. 40 C.F.R. §1508.18(3) provides that federal actions include: "Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."

ii)      People cause myriad impacts to the environment. Additional people result in additional impacts to the environment. *See* Ex. 5.

iii)     The primary factor driving U.S. population growth is international migration. Immigrants from abroad add directly to the nation's population by their arrival and by the children they have after they come. Because the fertility of American women has been at or below replacement level for many years—2.1 children per women—absent immigration there would be very little long-term population growth in the United States. Census Bureau projections published in 2014 indicate that because of future immigration the U.S. population will be 95 million larger in 2060 than it would be absent immigration. *See* Ex. 4 at 182. The Pew Research center reported in 2015 that the 72 million post-1965 immigrants and their offspring and grandchildren account "for the majority of U.S. population growth in the past five decades." *See* Ex. 4 at 183. Indeed, Plaintiffs' demographic expert Dr. Camarota estimates that during the years 2010-2014, immigration and immigrant offspring added 8.3 million people to the U.S. population. This increase comprises 87% of U.S. population growth during that brief period. *Id.*

iv)     DHS is the agency charged with the mission of regulating and controlling the entry into and settlement of foreign nationals in the United States. DHS therefore is the agency that regulates most of the population growth of the United States.

v)      It is thus indisputable that DHS controls one of the most environmentally

significant mandates delegated to any federal agency, and yet DHS fails even to

consider the direct, much less the enormous indirect and cumulative, environmental

impacts of its programs relating to its statutory mission.

51.     DHS, like its predecessor agency INS, has continuously failed to make well-

informed decisions; has failed to conduct reasoned analyses of potential impacts to

the human environment resulting from its programs; and has failed to engage the

public on the range of potential environmental impacts or create public records so

that interested or affected members of the public could learn about the

environmental implications of DHS programs. Yet all of these steps are required by

both NEPA and the APA.

52.     Despite the enormous impacts to the human environment resulting from

DHS's programs regulating the entry into and settlement of foreign nationals in the

United States, DHS has failed to initiate *any* NEPA review for these ongoing

programs. DHS has implemented at least eight programs regulating the entry and

settlement of foreign nationals promulgated pursuant to its authority under the

nation's immigration laws, specifically the Immigration and Nationality Act, Pub.

L. No. 82-414, 66 Stat. 163 (1952), (the "INA"). These programs were created and

updated through DHS's ongoing exercise of discretion, via the adoption of both

regulations and policy memoranda. The programs at issue in this complaint, as well

44

as other DHS' exercises of discretion, have resulted and will continue to result in impacts to the human environment, including but not limited to significant ongoing population growth in the United States; unending increases in the population density of numerous localities throughout the United States (especially California). In addition, as a result of the implementation of four of these programs, the entry of large numbers of foreign nationals has led to further significant, ongoing environmental degradation along the Southwest border.

53.    In the few paltry places where DHS makes reference to NEPA with respect to its actions regulating the entry into and settlement of foreigners in the United States, DHS does so in a dismissive manner, and its record of decisions are woefully devoid of even the most basic forms of analytical support.

54.    One can only conclude—as the Plaintiffs in this case have—that DHS, with its outsized influence on our nation's population growth and *ipso facto* upon our nation's environmental health, has acted and continues to act in a manner that is arbitrary and capricious with respect to its NEPA obligations.

## DHS' Eight Programs Regulating the Entry Into and Settlement of Foreign Nationals in the United States

55.    DHS has established, pursuant to statutory authority or executive directive, and in some cases with input from other federal agencies, at least eight programs that accept and allow for long-term settlement of foreign nationals in the country.

45

These eight programs do not represent *all* entry and settlement by foreign nationals in the United States, but they do comprise the bulk of the programs substantially administered by DHS that allow for foreign nationals' entry and long-term settlement. These programs were created through systematic and connected agency decisions allocating agency resources in order to implement specific statutory programs or executive directives. The eight programs are:

1) Employment based immigration authorized by INA § 203(b);

2) Family based immigration, authorized by INA § 203 (a) and INA § 201(b);

3) Long term nonimmigrant visas, authorized by INA § 214;

4) Parole, authorized by INA § 212 (d)(5)(A);

5) Temporary Protective Status, authorized by INA § 244;

6) Refugees, authorized by INA § 207;

7) Asylum, authorized by INA § 208; and

8) Deferred Action for Childhood Arrivals ("DACA"), authorized by executive order.[6]

------

[6] The DACA program is an ongoing program under which hundreds of thousands of foreign nationals currently hold two-year permits to remain and work in the United States. DACA is a special case among the ongoing programs in this lawsuit implemented by DHS because it authorized by executive directive rather than statutory authority. *See* Memorandum by Janet Napolitano, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," June 15, 2012 in Ex. 3 at 171-173. Its future is currently uncertain, as the Department of Justice currently takes the position (undisputed by

56.    DHS administers these programs in its discretion primarily through the

promulgation of regulations and the adoption of policy memoranda. The

regulations and policy memoranda DHS adopts are interdependent and are done in

order to carry out the authorized programs.

57.    The eight programs at issue in this lawsuit have led to the entry and

settlement of approximately 35 million foreign nationals in total. Table 1 below,

complied by Plaintiffs' Expert Jessica Vaughan and also included in Ex. 3 at 128,

presents her best estimate of how many foreign nationals have arrived through each

program.

---

the Plaintiffs) that such a program is only lawful if authorized by statute, as
proposed by some members of Congress. A significant number of individuals
currently hold permits that will not expire until 2019, and DHS will continue to
process applications until March 5, 2018, so under current plans, which are subject
to change, individuals will continue to hold valid DACA permits at least until
March 5, 2020. DACA is thus an ongoing program. *See* President Donald J.
Trump, Statement from President Donald J. Trump (Sept. 5, 2017) (discussing
DACA). https://www.whitehouse.gov/the-press-office/2017/09/05/statement-
president-donald-j-trump.

**Table 1:**

**Table of Total\* Number of Individuals Added on Long Term or Permanent Basis to United States Population by Program since each Program's Creation in Substantially Current Form, based on available information. \*\***

| DHS Program | Total Number Admitted or Issued |
|---|---|
| Family Based Immigration Admissions between 1992 and 2015 | 14,622, 847 |
| Employment Based Immigration Admissions between 1992 and 2015 | 3,274,245 |
| Long Term Non-Immigrant Visa Issuances between 1992 and 2016 \*\*\* | 12, 214,328 |
| Parole Admissions between 1996 and 2015 | 53,378 |
| Temporary Protective Status Grants (Estimated) between 1992 and 2017 | 377, 218 |
| Refugee Admissions between 1980 and 2015 | 3,050,023 |
| Asylum Approvals/Adjustments to LPR Status between 1980 and 2015\*\*\*\* | 789,935 |
| Deferred Action for Childhood Arrivals Grants between 2012-2017 | 793,026 |

\* The cutoff date where information is available varies by program.

\*\*While most of these foreign nationals were added permanently, in some programs, legal status was never made permanent.

\*\*\* Breakdown of categories included in Table 2.

\*\*\*\*Includes counts of approvals for 1980-1991 and counts of adjustments of status from 1992-2015.

58.     Furthermore, when foreign nationals enter the United States, the resulting

population growth is not merely limited to those individuals who enter the country

and the children they will have. Foreign nationals who ultimately become lawful

permanent residents ("LPRs") can themselves sponsor further immigration to the

country via what is known as "chain migration." One prominent team of

researchers has calculated a chain migration "multiplier."[7] This multiplier is based

on data on family-sponsored immigration for the period 1996-2000. According to

this research, every 100 original immigrants to the United States during this period

sponsored another 345 family members as immigrants. *See* Ex. 3 at 108-109.

59.     These eight programs are described and analyzed in Ex. 3 by expert Jessica

Vaughan. *See* Ex. 3, Ex. A and B thereto, at 106-132. Ms. Vaughan identifies in

Ex. 3, specifically in Ex. C: Regulations and Policy Memoranda Implementing

DHS Programs, 81 of the specific, discrete instances where DHS has undertaken

regulatory action to implement each of the eight programs. *See* Ex. 3 at 134-138.

Because the implementation of these eight programs has also been substantially

affected by ad-hoc policy decisions that DHS never promulgated as regulations,

---

[7] Stacie Carr & Marta Tienda, *Family Sponsorship and Late-Age Immigration in Aging America: Revised and Expanded Estimates of Chained Migration*, Popul. Res. Policy Rev. (Dec. 2013), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3884518/.

49

Ms. Vaughan also identifies and includes five specific instances of policy memoranda revising the programs. These five are listed and included in full. *See* Ex. 3 at 138-175. As each of these programs is extremely complex, Ms. Vaughan does not purport to have identified every single instance when these programs were revised. Ms. Vaughan briefly describes how each regulation or policy decision implements each program. *See* Ex. 3 at 134-139.

60.    The vast scope of these eight programs is underscored by the large number of ongoing rules promulgated under the INA and other implementing actions, none of which received NEPA compliance. Because these actions cumulatively carry out DHS's statutory mandate to regulate the entry into and settlement of foreign nationals in the United States, NEPA review should have been initiated long ago. DHS has repeatedly failed to initiate NEPA compliance at any point during its administration of these ongoing programs, including promulgation of specific regulations or adoption of final action through policy memoranda pursuant to its authority to accept foreign nationals into the country under the INA.

61.  Ms. Vaughan's starting point for her best estimate of the number of individuals in each program is the date that each program was created or overhauled by statute or executive order. While the INA is the statute that governs all of the programs (except for DACA), and it was first passed prior to NEPA, there have been several large scale revisions of the INA by statute since its original passage that have either

50

created or substantially overhauled the programs at issue. These modifications are: the United States Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ("Refugee Act"); the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990) ("IMMACT 90"); and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104–208, 110 Stat. 3001 (1996) ("IIRIRA").  IMMACT 90 created the employment based immigration program and TPS, and overhauled the family based immigration program and the nonimmigrant visa program. IIRIRA overhauled parole. The Refugee Act overhauled the refugee and asylum programs.

62.     For the long term nonimmigrant visa program, which is the most complex program, Ms. Vaughan focuses on the long term nonimmigrant visas regulated substantially by DHS (rather than other agencies), and includes in her totals those foreign nationals who have entered under visas in the E, H, L, TN, O, P, T, and U categories. *See* discussion of the long term nonimmigrant visa program in Ex. 3 at 112-117. Table 2, included below and also in Ex. 3 at 129, shows how many foreign nationals have been admitted through each type of visa.

**Table 2: Long Term Non Immigrant Visa Category Included**

| Included Visa Category | Total Since Visa Created Through 2016 |
|---|---|
| E | 963,259 |
| H | 7,185,272***** |
| L | 2,829,315 |
| TN | 153,350***** |
| O | 308,663 |
| P | 759,518 |
| T | 4,070***** |
| U | 10,881***** |

*****Figures come from the State Department and do not include additional issuances processed by USCIS and CBP.

63.    It is also notable that the population growth of many of these programs changes through the years. Ms. Vaughan has complied two graphs illustrating the growth of these programs, Table 3 and Table 4, included below and in Ex. 3 at 130 and 131.

**Table 3: Trend in Individuals Added over Time for United States for all programs**



**Table 4: Trend in Individuals Added for Long Term Nonimmigrant Visas**



64.     The population growth from all these programs has particularly impacted the states and metropolitan areas where Plaintiffs reside. Ms. Vaughan has illustrated these impacts in Table 5, included below and in Ex. 3 at 132.

54

**Table 5: Number of Individuals Added by Geographic Region of Interest to Plaintiffs, where available:**

| Long Term Permanent Residents By State for Selected Years (Temporary Visa Issuances) | | | |
|---|---|---|---|
| State | 1997 | 2002 | 2015 |
| California | 135,526 | 264,074 | 418,772 |
| Colorado | 10,271 | 26,592 | 31,992 |
| Florida | 67,440 | 175,821 | 198,641 |
| | | | |
| % of Total Issuances | 23% | 26% | 17% |
| | | | |
| | | | |
| Permanent Residents Admitted for Selected Metro Areas:  2003-2015 | | | |
| Metro Area | Total | | |
| Los Angeles/Long Beach/Anaheim, CA | 1,197,465 | | |
| San Diego/Carlsbad, CA | 241,915 | | |
| Denver/Aurora/Lakewood, CO | 104,640 | | |
| Miami/Ft. Lauderdale/W. Palm Beach, FL | 938,412 | | |
| Combined % of National Total | 11% | | |
| | | | |
| California | 2,836,791 | | |
| % of National Total | 21% | | |

65.     In summary, these programs have resulted and continue to result in significant impacts through the population growth they induce in the United States. DHS has never subjected these programs to NEPA review.

66.     The CEQ provides that population growth-inducing effects/impacts must be analyzed.  40 C.F.R. § 1508.8(b).

67.     The programs are clearly growth-inducing because they produce "changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).

55

These growth-inducing impacts are felt not just at a national but at a local level, for there are many areas of the country that have been particularly attractive to foreign nationals settling in the United States. The population growth driven by settlement of foreign nationals has been especially intense in California, Colorado, and Florida, areas where Plaintiffs live.

68.     For some of DHS' programs, population growth is not the only significant environmental impact. While some of these programs only allow foreign nationals initially to enter the country legally (employment based immigration, family based immigration, long-term nonimmigrant visas, refugees, and some forms of parole), others (TPS, asylum, DACA, and some forms of parole) allow foreign nationals who have illegally entered or remained in the country to remain with federal approval. Programs such as these not only add more settled population at the time they are implemented, but also have further environmental impacts by encouraging future unlawful entry.

69.     Encouraging illegal entry into and settlement in the country has significant environmental impacts both from further increased population growth and by creating incentives for large numbers of people to enter unlawfully at the border. In recent decades, such large numbers of illegal aliens have crossed the southern border illegally that the physical environment at the border has been substantially degraded. Ms. Vaughan also explains how programs that reward illegal entry into

56

and settlement in the country lead to further mass unlawful entry, including Parole, TPS, Asylum, and DACA. *See* Ex. D: How Certain DHS Programs Affect Land on the Southwest Border, of Ex. 3 at 176-180. This mass entry causes physical environmental impacts to the land on the border, as documented by affidavits by Fred Davis, Peggy Davis, Caren Cowan, John Ladd, and Ralph Pope. (Ex. 6, Ex. 7, Ex. 15, Ex. 16, and Ex. 18).

**DHS's Categorical Exclusions**

70.     Prior to 2014, not only did DHS engage in no NEPA review of its programs regulating the entry into and settlement of foreign nationals in the United States, it also generally failed even to acknowledge the applicability of NEPA to these programs. Following its 2014 adoption of NEPA procedures, DHS began occasionally to cite NEPA when it promulgated regulations relating to the entry into and settlement of foreign nationals in the United States. Plaintiffs have documented the promulgation of only four rule revisions that acknowledge NEPA. Each of these citations to NEPA is arbitrary and capricious as applied:

71.     On April 29, 2015, DHS promulgated Adjustments to Limitations on Designated School Official Assignments and Study by F-2 and M-2 Nonimmigrants, 80 Fed. Reg. 23680 (Apr. 29, 2015), amending 8 C.F.R. §§ 214.2 and 214.3, which regulate the Student and Exchange Visitor Program ("SEVP"). The rule revision makes it easier for schools to participate in the SEVP and permits

57

certain dependents of aliens to enroll in less than a full course of study at SEVP

certified schools. Adjustments to Limitations on Designated School Official

Assignments and Study by F-2 and M-2 Nonimmigrants, 80 Fed. Reg. 23680. DHS

categorically excluded 80 Fed. Reg. 23680 from NEPA analysis under DHS

Categorical Exclusion A3(d) as a "rule[] . . . that interpret[s] or amend[s] an

existing regulation without changing its environmental effect."

72.    On March 11, 2016, DHS promulgated Improving and Expanding Training

Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap

Relief for All Eligible F-1 Students, 81 Fed. Reg. 13039 (Mar. 11, 2016),

amending 8 C.F.R. Parts 214 and 274a, to implement another revision to the

nonimmigrant visa program. Substantively, this regulation also expanded the

Student and Exchange Visitor program, by extending the length of time foreign

students with STEM (science, technology, engineering and math) degrees can

remain in the in the United States after graduation and work. DHS received over

900 public comments on this rule. Improving and Expanding Training

Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap

Relief for All Eligible F-1 Students, 81 Fed. Reg. at 13046. DHS categorically

excluded 81 Fed. Reg. 13039 from NEPA analysis under both Categorical

Exclusion A3(a), as a "rule[] . . . of a strictly administrative or procedural nature;"

and A3(d), as a "rule[] . . .that interpret[s] or amend[s] an existing regulation

without changing its environmental effect."

73.    On November 18, 2016, DHS promulgated Retention of EB-1, EB-2, and

EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled

Nonimmigrant Workers, 81 Fed. Reg. 82398 (Jan. 17, 2017), a Final Rule

amending "its regulations related to certain employment-based immigrant and

nonimmigrant visa programs." Retention of EB-1, EB-2, and EB-3 Immigrant

Workers and Program Improvements Affecting High-Skilled Nonimmigrant

Workers, 81 Fed. Reg. 82398. According to DHS: "[t]he final rule is intended to

benefit U.S. employers and foreign workers participating in these programs by

streamlining the processes for employer sponsorship of nonimmigrant workers for

lawful permanent resident (LPR) status, increasing job portability and otherwise

providing stability and flexibility for such workers…" Retention of EB-1, EB-2,

and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled

Nonimmigrant Workers, 81 Fed. Reg. at 82399. The rule further provides: "DHS

estimates for the final rule that a maximum total of 361,766 individuals may be

eligible to apply for employment authorization based on compelling circumstances

in the first year of implementation of this rule and a maximum annual estimate of

64,561 individuals in the second and subsequent years." Retention of EB-1, EB-2,

and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled

Nonimmigrant Workers, 81 Fed. Reg. at 82473. DHS received 27,979 comments on this rule. Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. at 82412. Nonetheless, DHS categorically excluded it from NEPA analysis under DHS Categorical Exclusion A3(d).  Circularly, the Final Rule stated: "DHS has determined that this rule does not individually or cumulatively have a significant effect on the human environment because it fits within the Categorical Exclusion found in MD 023–01 Rev. 01, Appendix A, Table 1, number A3(d)." Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. at 82475.

74.     On January 17, 2017, DHS promulgated International Entrepreneur Rule, 82 Fed. Reg. 5238 (Jan. 17, 2017) to implement an addition to the parole program. Substantively, this rule created a new parole subprogram for "international entrepreneurs" to remain in the United States. DHS received 763 public comments regarding the rule. International Entrepreneur Rule, 82 Fed. Reg. at 5244. DHS categorically excluded 82 Fed. Reg. 5238 from NEPA analysis under DHS Categorical Exclusions A3(a) and A3(d). Interestingly, this Final Rule provides:

> **Environmental Policy Act (NEPA)**
> *Comment*: An advocacy organization stated that all rules, including immigration rules, are subject to review under the National Environmental Policy Act. The commenter suggested that, at minimum, an Environmental Assessment be conducted to account for

the growth-inducing impacts that would occur with an influx in population under this rule.

*Response*: DHS agrees that NEPA applies to this, as to every, final rulemaking. As explained in section IV.E of this preamble, the rule has been reviewed for environmental effects and found to be within two categorical exclusions from further review because experience has shown rules of this nature have no significant impacts on the environment. DHS also notes that any entrepreneurial ventures undertaken will be governed by local, state and federal laws and regulations, including those protecting human health and the environment. We disagree with the commenter's assertion that an Environmental Assessment is required.

International Entrepreneur Rule, 82 Fed. Reg. at 5270.

**Programmatic Environmental Assessment for Actions to Address an Increased Influx of Unaccompanied Alien Children and Family Units Across the Southwest Border of the United States.**

75.    DHS did conduct a NEPA review in one instance related to the entry into and settlement of foreign nationals in the United States. On June 2, 2014, President Obama issued a Presidential Memorandum entitled "Response to the Influx of Unaccompanied Alien Children across the Southwest Border," in which he directed the Secretary of Homeland Security to establish an interagency working group to address the "humanitarian aspects" of a large influx of foreign nationals. *See* Ex. 19, attached hereto, at 569 ("Southwest Border Memo"). The Southwest Border Memo's goal was to assure a unified response by the federal government to provide "housing, care, medical treatment, and transportation" to the unaccompanied alien children crossing the Southwest border. *Id.*

61

76.     DHS determined that the Southwest Border Memo and the actions DHS took in response to it constitute a federal action subject to NEPA.  Accordingly, DHS prepared a "Programmatic Environmental Assessment for Actions to Address an Increased Influx of Unaccompanied Alien Children and Family Units Across the Southwest Border of the United States" ("PEA"), attached hereto as Ex. 20, together with a FONSI that was issued on August 12, 2014, attached hereto as Ex. 21.

77.     The PEA provides, in relevant part:

> In addition to the influx of unaccompanied alien children, there is also an increase in the number of family units entering the Unites [*sic*] States. [DHS] is responsible for the apprehension, processing, detention, and removal of such persons crossing the southwest border into the United States without authorization. The unprecedented increase in the number of apprehended persons has the potential to fill or exceed the capacity of the DHS supporting infrastructure (real property for processing and housing apprehended persons, services including medical care, transportation, utilities, meals, hygiene, recreation, etc.) currently available. Therefore, action is being considered at the DHS level to provide increased and expedited allocation of Departmental resources in the following three areas:
>
> > 1) Provide adequate facilities for Customs and Border Protection (CBP) to safely house unaccompanied alien children (normally for no more than 72 hours) and family units

62

until they can be transferred to the department of Health and
Human Services (HHS) and Immigrations [*sic*] and Customs
Enforcement (ICE) respectively, and provide adequate
facilities for ICE to safely house family units;

2) Provide transportation (land, air, water) between intake,
processing, and housing facilities, as well as between these
facilities and physicians and dentists [*sic*] offices, hospitals,
consular offices, and airports or other transportations hubs, and

3) Provide medical care, including care to treat, prevent, and
minimize the spread of communicable illnesses.

Ex. 20 at 571.

78.     The PEA states that DHS's needs for increased support infrastructure (for example, housing and associated services, transportation, and medical care) while the foreign nationals are in DHS's custody will result in only "minor" and "temporary" environmental impacts. *See* Ex. 21 at 607. DHS's NEPA review only addresses the direct physical impacts resulting from DHS's temporary custody of foreign nationals. The PEA and FONSI fail to recognize that the foreign nationals comprising the "increased influx of unaccompanied alien children and family units" subject to the June 2, 2104, action entered the United States with the intent to settle in this nation. Many have indeed settled in the United States. Like the programs set forth *supra*, the PEA and the FONSI issued for this action fail to address the environmental impacts on the Southwest border resulting from the

63

crossing of these foreign nationals, or the population growth resulting from their presence. The PEA and the FONSI thus illustrate DHS's institutional blindness to the environmental impacts of people arriving and settling in the United States. Moreover, DHS performed no NEPA review of indirect or cumulative impacts, nor of connected and similar actions, in either the PEA or the FONSI.

**Environmental Impacts Resulting from These Programs**

79.    Upon information and belief, approximately 35 million foreign nationals have entered the United States and settled, and millions of foreign nationals will continue to enter and settle, pursuant to these eight programs. In some cases, DHS's very failure to provide public transparency and analysis regarding the numbers of foreign nationals subject to and benefiting from these or other such programs has disadvantaged Plaintiffs in their quest to establish the true magnitude of environmental impacts resulting from them. DHS's compliance with NEPA would remedy this lack of transparency.

80.    These programs have a significant effect on the size and growth of the United States's population, as well as the particular distribution of that population growth. Population growth itself is a significant environmental impact, as particularly noted by Congress in NEPA, and also as set forth in Dr. Cafaro's report, "*The Environmental Impact of Immigration into the United States*." *See* Ex. 5. As noted by Dr. Cafaro, population growth is a key factor in a wide variety of

environmental impacts. For example, immigration-driven population growth leads to urban sprawl and farmland loss, habitat and biodiversity loss, an increase in worldwide levels of greenhouse gas emissions, and an increase of water demands and water withdrawals from natural systems. *See* Ex. 5 at 196.

81.     Surveying the "purposes and needs" sections of several recent federal and state agency EISs, Dr. Cafaro explains how new, environmentally harmful projects are continually created around the country to accommodate immigration-driven population growth. *See* Ex. 5 at 211. These recent EISs cite anticipated or planned population growth as creating the need for a myriad of environmentally harmful new infrastructure, for example, transit projects, such as the creation of light rail systems, new airports, and projects for road-widening and road construction; energy projects, such as coal and natural gas development, new power plants, and pipelines; and water supply projects, such as new dams and reservoirs. *See* Ex. 5 at 211-216. There are many other kinds of developments, such as new schools and housing projects, that are only needed because of population growth. *See* Ex. 5 at 217-218.

82.     Population growth is responsible for one of the leading environmental problems across the United States: urban sprawl, that is, new development on the fringes of existing urban and suburban areas. *See* Ex. 5 at 219. Sprawl increases overall energy and water consumption and air and water pollution, and decreases

65

open space and natural wildlife habitat, endangering the survival of many species. *Id*. From 1982 to 2010, a period of massive immigration, 41.4 million acres of previously undeveloped urban land was built on to accommodate the United States's growing cities and towns—an area approximately equivalent to the State of Florida. *Id*.

83.     The future loss of the undeveloped land remaining in the United States, due to unrelenting population growth, will produce significant environmental consequences. The ongoing loss of open spaces, habitats, and wilderness to unrelenting population growth is a source of anguish to those who love the wilderness, including many of the instant Plaintiffs. Former President Barack Obama acknowledged this great environmental loss in his speech marking the designation and preservation from development of the Papahānaumokuākea Marine National Monument in Hawaii. President Obama stated, "I look forward to knowing that 20 years from now, 40 years from now, 100 years from now, this is a place where people can still come to and see what a place like this looks like when it's not overcrowded or destroyed by human populations." White House Press Release, Remarks by the President at the Designation of the Papahānaumokuākea Marine National Monument (September 1, 2016), *available at* https://obamawhitehouse.archives.gov/the-press-office/2016/09/01/remarks-president-designation-papahanaumokuakea-marine-national-monument.

84.    Population growth also threatens to accelerate biodiversity loss and the extinction of animal and plant species. *See* Ex. 5 at 236. The United Nations' Secretariat of the Convention on Biological Diversity estimates that humanity may be causing the extinction of one out of every three species on Earth in the next one to two hundred years. *Id*. Conservation biologists agree that the most important "direct drivers" of biodiversity loss are: habitat loss, the impacts of alien species, over-exploitation, pollution, and global climate change. *Id.* at 236-237. All five are caused by increased human population and the increased human activities associated with human population growth. *Id*.

85.    The carbon dioxide ("CO2") emissions produced in the United States also are increasing because of immigration-driven population growth. Furthermore, those foreign nationals that settle in the United States produce an estimated four times more CO2 in the United States than they would have in their countries of origin. The estimated 637 tons of CO2 produced annually by U.S. immigrants is 482 million tons more than they would have produced had they remained in their home countries.[8] The impact of immigration to the United States on global

---

[8]  Reducing CO2 has often been a focal point of presidential environmental initiatives even as the impacts of immigration on global carbon emissions were never calculated. *See, e.g.*, Memorandum from Christina Goldfuss, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in theNational Environmental Policy Act (Aug. 1, 2016), *available at*

emissions is equal to approximately 5 percent of the increase in annual world-wide

$CO_2$ emissions since 1980. That is 5 percent of total *global* $CO_2$ emissions, not 5

percent of U.S. emissions. These numbers do not even include the $CO_2$ impacts of

children born to United States immigrants. *See* Ex. 5. at 261.

86.     Because a greater population uses more water, population growth also results

in a higher aggregate water use, putting increased pressure on water systems,

including rivers and underground aquifers. Water taken for human consumption is

necessarily removed from an ecosystem, leading to a host of environmental

impacts. *Id*. at 270-280. "When too much water is taken from these ecosystems for

consumptive use by human beings, there may not be enough water left behind to

perform these critical ecosystem services and functions." *Id*. at 273.

87.     The environmental impacts resulting from population-based demands for

water are most vividly illustrated in the state of California. *Id*. at 281-288. The

nation's most populous state also tops the nation in terms of water withdrawal.

California has also been experiencing a severe, multi-year drought. Governor Jerry

Brown declared statewide mandatory water restrictions for the first time in

California's history, ordering towns and cities to reduce their water use by 25

percent. *Id*. at 286. This drought has led the state to overdraft its underground

___

https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/nepa_
final_ghg_guidance.pdf.

aquifers, with potentially devastating environmental consequences. *Id*. at 285-86.

Water quality is also an issue. Numerous human activities can cause water

pollution. For instance, the introduction of excess nitrogen and phosphorus

fertilizers into streams, rivers, and lakes encourage explosive growth of "algal

blooms," ultimately leading to eutrophication and the destruction of these

ecosystems and the species that inhabit them. *Id.* at 274.

88.     DHS's administration of the eight programs increases the United States's

population and thereby causes significant environmental impacts, as detailed by Dr.

Cafaro. Yet DHS has never acknowledged these impacts despite its recognition that

NEPA applies to its programs and actions.

89.     DHS has also never acknowledged the significant environmental impacts in

the area of the Southwest border caused by illegal entry of mass numbers of

foreigners. Parole, TPS, asylum, and DACA are all programs which have the effect

of encouraging further illegal entry across the Southwest border. As expert Jessica

Vaughan describes in her report on the Southwest border: "[h]istorical experience

demonstrates that a real or even perceived change in enforcement policies, both at

the border and in the interior, can significantly affect the number of people

attempting to cross the border illegally." Ex. 3 at 177. Indeed, a Border Patrol

intelligence report from 2014 based on interviews with migrants reveals that 95%

stated that their "main reason" for coming was because they had heard they would

69

receive a "permiso," or permission to stay. *Id*. at 178. The environmental effect of this illegal entry is not limited to population growth; the illegal entry has also caused environmental degradation along the Southwest border.

90.     The massive numbers of people illegally crossing the southwest border have left a host of environmental impacts in their wake, such as the destruction of native and at-risks species and habitats from the trampling of the native vegetation; garbage dumping on a massive scale; water pollution; and the setting of fires, many of which turn out of control, for the purposes of heat, cooking, or to distract Border Patrol agents. These and other environmental degradations are detailed in the affidavits of Fred Davis, Peggy Davis, Caren Cowen, John Ladd, and Ralph Pope. *See* Ex. 6, Ex. 7, Ex. 15, Ex. 16, and Ex. 18. The scale, location, and form of such environmental impacts necessarily depend on a number of factors, including, but not limited to, the number of individuals illegally crossing, where they choose to cross, and, to some degree, what their goals are in crossing (for example, drug-running versus finding work in the interior). Though DHS policies are not the sole factor in all of these components of the illegal border-crossing phenomenon, there is no doubt they are a factor.

91.     DHS's lack of response to these environmental effects on the southwest border is another example of how DHS simply ignores the impacts that foreign nationals themselves have on the human environment when they enter the country.

70

**CAUSES OF ACTION**

**COUNT I**

**The DHS Instruction Manual Violates the APA and NEPA by Failing to Require NEPA Compliance with Respect to its Actions Relating to the Entry Into and Settlement of Foreign Nationals in the United States.**

92.    Plaintiffs reallege paragraphs 1-91 as if fully set forth herein.

93.    CEQ regulations require each federal agency to adopt internal NEPA procedures to ensure NEPA compliance. 40 C.F.R. § 1507.3.  Agency NEPA procedures shall comply with CEQ regulations. 40 C.F.R. § 1507.1 (2017).

94.    CEQ regulation 40 C.F.R. § 1507.3(b)(2) requires DHS to set forth "specific criteria for and identification of those typical classes of action[]" which normally require (i) the preparation of an environmental impact statement, (ii) the finding that they are subject to categorical exclusion, or (iii) the preparation of an environmental assessment.

95.    DHS promulgated its Instruction Manual on November 6, 2014. (Ex. 2)

96.    The Instruction Manual qualifies as a "rule" under the APA because it is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4) (2012).

71

97.     Rules qualify as federal actions under NEPA. 40 C.F.R. §1508.18(a)

provides that federal actions include "new or revised agency rules, regulations,

plans, policies, or procedures; and legislative proposals[.]"

98.     The regulation of the entry into and settlement of foreign nationals in the

United States is a major component of DHS's statutory mission, and such

regulation comprises "principal programs" pursuant to 40 C.F.R. § 1505.1(b) and

"typical classes of action" pursuant to 40 C.F.R. § 1507.3(b)(2).

99.     The entry into and settlement of foreign nationals in the United States has

myriad impacts on the "human environment" subject to NEPA analysis, including,

but not limited to, population growth and the attendant impacts such growth

produces. 42 U.S.C. § 4332(2)(C) (2012); 40 C.F.R. §1508.14; *see also* 40 C.F.R.

§ 1508.8 (specifying that "growth inducing effects [and] . . . population density or

growth rate . . . ." are impacts subject to NEPA analysis).

100.    The Instruction Manual omits any mention of that vast class of DHS

programs/actions that concerns the entry into and settlement of foreign nationals in

the United States.

101.    DHS's failure to address these "typical classes of actions" and/or "principal

programs" in its Instruction Manual violates the CEQ NEPA regulations 40 C.F.R

§§ 1500-1508.

72

102.   The failure of DHS to incorporate NEPA compliance into its Instruction

Manual for those actions relating to the entry into and settlement of foreign

nationals in the United States violates the CEQ regulations, and accordingly is

arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in

violation of the APA.

## COUNT II

### DHS is Violating the APA and NEPA by Failing to Engage in Any NEPA Review with Respect to its Eight Programs Regulating the Entry Into and Settlement of Foreign Nationals in the United States.

103.   Plaintiffs reallege ¶¶ 1-91 as if fully set forth herein.

104.   CEQ regulation 40 C.F.R. § 1508.18(b)(3) provides that federal actions

subject to NEPA include: "Adoption of programs, such as a group of concerted

actions to implement a specific policy or plan; systematic and connected agency

decisions allocating agency resources to implement a specific statutory program or

executive directive."

105.   DHS has eight programs covering, respectively: 1) employment based

immigration; 2) family based immigration; 3) long-term nonimmigrant visas; 4)

parole; 5) TPS; 6) refugees; 7) asylum; and 8) DACA. They are set forth in ¶ 55.

Each of these eight programs comprises "a group of concerted actions to

implement a specific policy or plan" and "implement[s] a specific statutory

program or executive directive" pursuant to 40 C.F.R. § 1508.18(b)(3), and thus

qualifies as a federal action subject to NEPA.

106.   DHS never initiated NEPA compliance with respect to these eight programs.

107.   DHS's decision to proceed without initiating any NEPA compliance for

these eight programs or any component of these eight programs violates NEPA

and the CEQ regulations, and accordingly is arbitrary, capricious, an abuse of

discretion, and otherwise contrary to law, in violation of the APA.

## Count III

## The Categorical Exclusion A3 Established by DHS on November 6, 2014, Violates the APA.

108.   Plaintiffs reallege ¶¶ 1-91 as if fully set forth herein.

109.   CEQ regulation 40 C.F.R. § 1507.3(b)(2) provides that agency NEPA

procedures shall provide "[s]pecific criteria for and identification of those typical

classes of action" that qualify for application of a categorical exclusion.

110.   DHS promulgated Categorical Exclusion A3 as part of its NEPA

compliance. Categorical Exclusion A3 provides:

> Promulgation of rules, issuance of rulings or interpretations, and the
> development and publication of policies, orders, directives, notices,
> procedures, manuals, advisory circulars, and other guidance
> documents of the following nature:

74

 (a) Those of a strictly administrative or procedural nature;
 (b) Those that implement, without substantive change, statutory or
regulatory requirements;
 (c) Those that implement, without substantive change, procedures,
manuals, and other guidance documents;(d) Those that interpret or
amend an existing regulation without changing its environmental
effect[.]

Ex. 2 at 65.

111.   DHS fails to define "rules, or interpretations, . . . policies, orders, directives,

notices, procedures, manuals . . . of a strictly administrative or procedural

nature[.]" *Id*. These undefined terms are so broad that they potentially encompass

much of the entire DHS mission. Many, if not most, DHS rules, policies, orders,

manuals, and so on, are arguably "strictly administrative or procedural" in the

broadest sense but do in fact, have an impact on the "human environment"; such

actions include, at a minimum, those actions DHS chose to subject to Categorical

Exclusion A3 that are now at issue in this Complaint. Impermissibly, Categorical

Exclusion A3 gives absolute discretion to DHS to determine what constitutes

"rules, or interpretations, . . . policies, orders, directives, notices, procedures,

manuals…of a strictly administrative or procedural nature[.]"

112.   Indeed, some DHS activities that may qualify as "rules, or

interpretations, . . . policies, orders, directives, notices, procedures, manuals . . . of

a strictly administrative or procedural nature . . ." do result in environmental

impacts because they regulate the entry into and settlement of foreign nationals in the United States. Such regulatory actions unquestionably cause population growth, and thus are subject to NEPA analysis. CEQ regulation 40 C.F.R. §1508.8(b) provides that population growth is an "effect" subject to NEPA analysis. It is thus arbitrary and capricious to exclude these types of regulatory actions categorically from NEPA analysis.

113.    DHS Categorical Exclusion A3 is facially arbitrary, capricious, and overbroad under the APA because the criteria it lists for application are not "specific," in violation of CEQ regulation 40 C.F.R. § 1507.3(b)(2). Categorical Exclusion A3 does not give fair warning of what is covered by the Categorical Exclusion and is thus fatally overbroad. Contrary to 40 C.F.R. § 1508.4, A3 it does not adequately identify the categories of actions to be covered by the Categorical Exclusion.

114.    In sum, DHS's promulgation of Categorical Exclusion A3 violates NEPA, and is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA.

## COUNT IV

### The Categorical Exclusion A3 is Arbitrary and Capricious as Applied to Four Actions Regulating the Entry Into and Settlement of Foreign Nationals in the United States.

115.    Plaintiffs reallege ¶¶ 1-91 as if fully set forth herein.

76

116.   The use of Categorical Exclusion A3 is unlawful as applied to the federal

actions set forth in ¶¶ 71-74, and contrary to NEPA and the APA:

I.      Adjustments to Limitations on Designated School Official

Assignments and Study by F-2 and M-2 Nonimmigrants, 80 Fed. Reg. 23680 (Apr.

29, 2015), amending 8 C.F.R. §§ 214.2 and 214.3, which regulates the Student and

Exchange Visitor Program (at ¶ 71);

II.     Improving and Expanding Training Opportunities for F-1

Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible

F-1 Students, 81 Fed. Reg. 13039 (Mar. 11, 2016), amending 8 CFR Parts 214 and

274a, to implement a revision to the nonimmigrant visa program (at ¶ 72);

III.    Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program

Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82398

(Jan. 17, 2017), a Final Rule amending "its regulations related to certain

employment-based immigrant and nonimmigrant visa programs" (at ¶ 73);

IV.     International Entrepreneur Rule, 82 Fed. Reg. 5238 (Jan. 17, 2017) to

implement an addition to the parole program for "international entrepreneurs" to

remain in the United States (at ¶ 74).

117.   A categorical exclusion shall only be utilized for "a category of actions

which do not individually or cumulatively have a significant effect on the human

environment . . . ." 40 C.F.R. § 1508.4. "Significantly" is defined by 40 C.F.R. §

1508.27(4) to include effects which are "highly controversial." The four actions regulating the entry into and settlement of foreign nationals in the United States for which Categorical Exclusion A(3) was utilized qualify as "significant" due to the high number of public comments received by DHS. The controversy surrounding these actions alone should have disqualified them from Categorical Exclusion.

118.    Additionally, the four actions to which Categorical Exclusion A3 was utilized regulate the entry into and settlement of foreign nationals in the United States. These actions result in population growth. NEPA implements congressional concern for "the profound influences of population growth" on "the natural environment[.]" 42 U.S.C. § 4331(a). Implementing CEQ regulation 40 C.F.R. §1508.8(b) expressly establishes that "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate . . ." are "effects" subject to NEPA analysis. The application of Categorical Exclusion A3 to these four actions regulating entry into and settlement of foreign nationals in the United States is thus inconsistent with NEPA and its implementing CEQ regulations and is accordingly arbitrary and capricious under the APA.

115.    Because each of these actions has individual and or cumulatively significant effects, the use of the Categorical Exclusion A3 is contrary to 40 C.F.R. §§ 1501.4, 1508.4, and 1508.27. DHS's application of the Categorical Exclusion A3 is thus

78

arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA.

119.   Furthermore, DHS's lack of support in the administrative record for the application of the Categorical Exclusion to these four actions also renders that application arbitrary and capricious under the APA.

120.   DHS's improper application of the Categorical Exclusion to these four actions is contrary to NEPA and is accordingly arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA.

## COUNT V

### Failure to Take a "Hard Look" at the Environmental Impacts of the June 2, 2014, Action "Response to the Influx of Unaccompanied Alien Children" in Violation of NEPA and the APA

121.   Plaintiffs reallege paragraphs 1-91 as if fully set forth herein.

122.   NEPA requires federal agencies to take a "hard look" at the environmental impacts of their proposed actions, and to prepare an EIS if the adverse environmental impacts of a proposed federal action are potentially significant. 42 U.S.C. § 4332(c).

123.   In preparing the EA for the June 2, 2014, "Response to the Influx of Unaccompanied Alien Children [,]" DHS failed adequately to consider the direct, indirect, and cumulative impacts of the action upon the human environment, in

79

violation of 40 C.F.R. § 1508.9. These impacts include, but are not limited to, those population and border impacts described in Plaintiffs' affidavits (Ex. 6-18), as well as described in the expert reports written by Steven Camarota, Ph.D. (Ex. 4), Phil Cafaro, Ph.D. (Ex. 5), and Jessica Vaughan (Ex. 2).

124.   DHS's reliance upon an inadequate and incomplete EA, without full compliance with NEPA, constitutes a violation of Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(c), as well as the implementing CEQ regulations set forth at 40 C.F.R. § 1500 *et seq.*, and is unreasonable, arbitrary, an abuse of discretion, and not in accordance with law under the APA.

## **PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing, Plaintiffs respectfully request that this Court grant the following relief:

1)      Enter a declaratory judgment that the failure of DHS to incorporate NEPA compliance into its Instruction Manual regarding those of its actions relating to the entry into and settlement of foreign nationals in the United States violates NEPA and the APA; and

2)      Enter a declaratory judgment that DHS has violated NEPA and the APA with respect to the eight programs set forth in ¶ XX for failing to initiate NEPA compliance; and

3)      Enter a declaratory judgment that the DHS's Categorical Exclusion A3 is arbitrary and capricious on its face under the APA; and

4)       Enter a declaratory judgment that the DHS's application of Categorical Exclusion A3 is arbitrary and capricious under the APA as applied to 80 FR 23680, 81 FR 13039, 81 FR 82398, and 82 FR 5238; and

5)      Enter a declaratory judgment that the EA and the FONSI issued for the June 2, 2014, Action "Response to the Influx of Unaccompanied Alien Children" violates NEPA and the APA; and

6)      Enter an order requiring DHS to comply fully with NEPA with respect to those eight programs set forth set forth in this complaint; and

7)      Enter an order requiring DHS to pause the eight active programs regulating the entry into and settlement of foreign nationals in the United States pending NEPA compliance; and

8)      Set aside DHS's application of Categorical Exclusion A3 to: Adjustments to Limitations on Designated School Official Assignments and Study by F-2 and M-2 Nonimmigrants, 80 Fed. Reg. 23680 (Apr. 29, 2015); Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students, 81 Fed. Reg. 13039; Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82398; and International

81

Entrepreneur Rule, 82 Fed. Reg. 5238, and remand to DHS for proper compliance with NEPA; and

9)     Set aside the EA and FONSI issued by DHS for the June 2, 2014, Action "Response to the Influx of Unaccompanied Alien Children" and remand to DHS for compliance with NEPA; and

10)     Award Plaintiff reasonable attorney fees, costs and expenses incurred in pursuing this action to the extent permitted by law; and

11)     Provide such other relief as this Court deems just and proper.


Dated: December 8, 2017

Respectfully submitted,

 s/ Julie B. Axelrod
Julie B. Axelrod
California Bar No. 250165
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., N.W., Suite 335
Washington, D.C. 20001
Telephone: (202) 232-5590
Facsimile: (202) 464-3590
Email: jaxelrod@irli.org

Lesley Blackner
*Admitted Pro Hac Vice*
Florida Bar No. 654043
340 Royal Poinciana Way, Suite 317-377

82

Palm Beach, Florida 33480
Telephone: (561) 659-5754
Email: lesleyblackner@gmail.com

James P. Miller
California Bar. No. 188266
Law Office of JP Miller Jr.
181 Rea Ave., Suite 101
El Cajon, CA 92020
Telephone: (619) 590-0383
Email: jpmiller@jpmillerlaw.com