# EXHIBIT 3

### Affidavit of Jessica Vaughan

Exhibit 3
99

## AFFIDAVIT OF JESSICA VAUGHAN

BEFORE ME, the undersigned authority, personally appeared, Jessica M. Vaughan who upon being first duly sworn, states as follows:

1.     My name is Jessica M. Vaughan, and I serve as Director of Policy Studies for the Center for Immigration Studies ("CIS"), a Washington, D.C.-based research institute that examines the impact of immigration on American society and educates policymakers and opinion leaders on immigration issues. I have worked with the CIS since 1992, and my area of expertise is immigration policy and operations, covering topics such as visa programs, immigration benefits and immigration law enforcement.

2.     I have recently completed several major projects on immigration and crime, including a Department of Justice-funded project studying the use of immigration law enforcement in transnational gang-suppression efforts. I am also an adjunct instructor for senior law enforcement officer training seminars at Northwestern University's Center for Public Safety in Illinois. Prior to joining CIS, I served as a Foreign Service Officer with the State Department in Belgium and Trinidad & Tobago. I have had articles published in the Washington Post, Boston Globe, The Economist, the National Interest, Providence Journal, Hartford Courant, Arizona Republic and other publications. My articles can be found at

Exhibit 3
100

www.cis.org. I have testified before Congress more than a dozen times, and several times before state legislatures. I advise state and local lawmakers and agencies on immigration issues. I have served as an expert witness in several state and federal court cases. I am frequently cited in news-media reports on immigration and I have appeared many times on national, international and local broadcast news programs. I have given presentations at many academic, government and law enforcement conferences and trainings as a subject matter expert on immigration. I earned a Master's degree from Georgetown University and a Bachelor's degree in International Studies at Washington College in Maryland.

3.      I have spent nearly twenty-five years investigating and researching the policies and actions of the government agencies in charge of implementing and enforcing the nation's immigration laws, namely the U.S. Department of Homeland Security ("DHS") and its predecessor agency the Immigration and Naturalization Service ("INS"). I have written numerous Freedom of Information Act requests and examined numerous government and academic data and reports on immigration. I have made at least six study visits to several different sections of the U.S. border (at least five times to the southwest border and once to the northern border). I have interviewed U.S. and foreign immigration officials, including U.S. Border Patrol, immigration port of entry inspectors, U.S. Immigration and Customs Enforcement ("ICE") investigative and deportation officers, consular officers,

Exhibit 3
101

immigration benefits examiners, fraud investigators, as well as state and local law enforcement officers. The expertise I have developed has allowed me to understand and recognize the actual effects and significance of the discretionary policy actions taken and regulations promulgated by DHS that concern the entry into and settlement within the United States by large numbers of foreign nationals.

4.       Based on my experience, I can identify at least eight programs, which, collectively, have had at least two significant impacts on the human environment that have also specifically injured the instant plaintiffs. These two significant impacts on the environment are: 1) a substantial increase in the population through the actions themselves, population growth itself being a primary concern of the National Environmental Policy Act ("NEPA"), and entailing a host of environmental impacts (*See* discussion of the environmental impacts of population by Phil Cafaro, Exhibit 5); and 2) severe environmental degradation on the Southwest border caused by the passage of illegal aliens entering the country in reaction to these programs and other actions by DHS. In this affidavit, therefore, I am attaching two reports.  In the first report entitled "DHS PROGRAMS CREATING POPULATION GROWTH" (attached hereto as Exhibits A, B, and C), I provide a discussion of the implementation of the eight programs and their population impacts, a set of tables and graphs providing timelines and geographic distribution of these impacts in areas where Plaintiffs reside, and a list of citations

Exhibit 3
102

to the regulations and copies of the policy memoranda wherein DHS took defined, specific actions to adopt or revise these programs. In the second report, entitled "HOW CERTAIN DHS PROGRAMS AFFECT LAND ON THE SOUTHWEST BORDER" (attached hereto as Exhibit D) I explain why some of these actions have led to degradation of the Southwest border.

6.     These programs do not encompass all programs and actions that regulate the entry and settlement into the United States. First, I have omitted the programs which are largely regulated by other Departments and for which DHS has only a minor role. Second, while I have tried to be comprehensive, it is not feasible to catalog every program created by DHS and every instance where it has used its authority to implement laws, regulations or policies in a way that affects the numbers of foreign nationals entering and/or settling in this country as inhabitants. Though parties argue about the boundaries of precisely how much authority is proper under various statutes, there is no doubt that, as a practical reality, the nation's immigration agencies have frequently engaged in the kind of discretionary final actions to which NEPA applies to create large-scale programs that affect large numbers of people.

Exhibit 3
103

FURTHER AFFIANT SAYETH NOT.

_Jessica M. Vaughan_
Jessica M. Vaughan

Subscribed and sworn to before me on _11-8-17_, by Jessica M.

Vaughan. She is personally known to me or has presented

_U.S. Passport_ as identification.

NOTARY PUBLIC
STATE OF MASSACHUSETTS
MY COMMISSION EXPIRES  Nov. 14, 2019

5

Exhibit 3
104

# EXHIBIT A

DHS Programs Creating Population Growth

Exhibit 3
105

# PROGRAMS IMPLEMENTED BY THE DEPARTMENT OF HOMELAND SECURITY THAT INCREASED OR WILL INCREASE THE SETTLED POPULATION OF VARIOUS REGIONS OF THE UNITED STATES

## Introduction

The entry of foreign nationals into the United States is governed statutorily by the Immigration and Nationality Act ("INA"), which authorizes agencies of the federal government to regulate their entry and settlement. The Fifth Circuit has described the INA as an "intricate regulatory scheme." (*Texas v. U.S.A*, 809 F. 3d 134 (5th Cir. 2015). This regulatory scheme under the INA, while authorized by statute, allows for an extremely significant degree of agency discretion. Given the patchwork quality of the immigration programs, that is, programs that regulate the entry and settlement of foreign nationals into the United States, I do not purport to have identified every immigration program in this report.

DHS, the defendant in this lawsuit, is currently the primary agency with the authority to carry out the programs that govern the introduction of foreign nationals into the United States.[1] The regulatory scheme set up by the INA has profound environmental impacts due to the large number of foreign nationals that may enter into and settle in the United States, especially since the passage of the National Environmental Policy Act ("NEPA") in 1974. The most significant of these impacts is population growth within the United States. DHS has the capacity to analyze how many foreign nationals enter the United States under the auspices of its programs, as well as the particular geographic areas in which they are settling. Such analysis is a necessary step in disclosing the environmental impacts of the programs implemented by DHS.

DHS has established, pursuant to statutory authority or executive directive, and in some cases with input from other federal agencies, at least eight such ongoing programs that regulate the entry of foreign nationals. These include: 1) employment based immigration authorized by INA § 203(b); 2) family based

_____

[1] Other agencies with authority over programs that regulate the entry and settlement of foreign nationals into the United States are the Department of State, the Department of Labor, the Department of Health and Human Services, and the Department of Justice. Only programs over which DHS, as the defendant in this lawsuit, has substantial authority are the subject of this lawsuit.

Exhibit 3
106

immigration authorized by INA §§ 201(b) and 203 (a); 3) non-immigrant visas authorized by INA § 214; 4) parole, authorized by INA § 212 (d)(5)(A); 5) Temporary Protective Status, authorized by INA § 244; 6) refugees, authorized by INA § 207; and 7) asylum, authorized by INA Section 208. The eighth program, which was established by executive directive rather than statute, is Deferred Action for Childhood Arrivals (DACA). While it is still ongoing, President Trump announced on September 5, 2018 that it will be phased out unless Congress provides statutory authority.[2] DHS administers all of these programs in its discretion primarily through the promulgation of regulations and the adoption of policy memoranda. Each time it takes action by either regulation or binding policy memorandum, DHS is taking a specific major action to which NEPA applies.

A very large number of foreign nationals became settled inhabitants of the United States via these programs. Population growth occurs not just because foreign nationals enter the country, but also because they decide to remain on a permanent or long-term basis, even under the auspices of a non-immigrant visa. This population growth has environmental impacts both for the United States as a whole and particularly in certain local communities around the country. These actions substantially increase the overall population of the United States. In addition, some local areas have experienced a disproportionate impact from these programs. These programs are all highly discretionary, and involve major final decisions impacting where large numbers of people move within the United States, how many come in, and at what rate they come in.

The actions through which DHS implements these eight programs are regulations, policy memoranda, manuals and other guidance documents. The actions DHS adopts to carry out these eight programs are interdependent parts of a program and depend on the program for their justification. The smaller actions DHS takes in carrying them out consist of systematic and connected agency decisions allocating agency resources to implement a specific statutory or executive program. For example, an agency of DHS such as the U.S. Citizenship and Immigration Services might take regulatory action concerning a certain definition related to eligibility for an employment-related visa category, or concerning how sub-populations of the refugee category will be reviewed and screened, or how certain types of asylum claims will be considered. Each of these regulatory actions could be narrow in scope but result in a dramatically different number of admissions, entries or adjustments to permanent status, and thus a

---

[2] https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president-donald-j-trump

Exhibit 3
107

different population change outcome. Some regulatory actions could affect applicants in more than one visa category or program.

Despite the clearly significant environmental impacts of these programs, none of them has ever gone through NEPA review. DHS has implemented and continues to administer these programs through the adoption of both regulation and policy memoranda. NEPA applies to such final actions. DHS and its predecessor agency failed to complete an environmental analysis before finalizing these actions.

Below, I briefly describe the programs and provide an estimate of the number of people who have entered and settled into the United States through them. Where possible, I also provide estimates for certain locations of settlement for those individuals. Several tables and graphs summarizing these numbers and how they have changed over time is attached hereto in Exhibit B. These programs create a number of visa categories and statuses for the aliens who enter through them, and I provide a breakdown of these categories. I also identify the dates when these programs were created and when these programs went through substantive changes, generally through regulation but also through policy memoranda. Citations to or copies of all of these actions are attached hereto in Exhibit C. Those points in time were the moments when NEPA analysis should have been done, but was not. On all occasions when DHS and its predecessor agency took action, it either failed to mention NEPA entirely or claimed the action was categorically excluded from NEPA.

Furthermore, when foreign nationals enter the country, the population growth is not merely limited to those individuals who enter the country and the children they will have. Foreign nationals who ultimately become lawful permanent residents (LPRs) and U.S. citizens can sponsor certain relatives for immigration, including their spouses and their minor children, their parents, their adult sons and daughters and the children thereof, and their siblings and the children thereof. This results in a phenomenon known as chain migration. Demographers have calculated a chain migration multiplier based on data on family-sponsored immigration for the period 1996-2000.[3] They found that every

---

[3] Stacie Carr and Marta Tienda, *Family Sponsorship and Late-Age Immigration in Aging America: Revised and Expanded Estimates of Chained Migration*, POPUL. RES. POLICY REV., Dec. 2013, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3884518/.

Exhibit 3
108

100 initiating (first in family) immigrants to the United States during this period sponsored an average of 345 family members as additional immigrants in chain migration categories. This multiplier (3.45) can be used to estimate the number of additional immigrants that likely would be sponsored by the original beneficiaries of the described agency programs who receive LPR status. Thus, any NEPA analysis of DHS programs should take into account that the future environmental impacts of programs that lead to the entrance into and settlement of foreign nationals in the United States will be even greater than those caused by the initial number of admitted immigrants.

**Program One: Employment Based Immigrant Program**

The current employment based immigrant program was established by the Immigration Act of 1990 ("IMMACT 90"), Pub. L. 101-649, passed by Congress on November 29, 1990. This law amended the INA. The employment based immigration program is authorized by INA § 203(b) 1-5. IMMACT 90 provided some broad contours of the program, requiring that it include a petition process, adjudication, and numerical limits, but many details were left to agency discretion through regulation. These regulations were promulgated by the responsible agencies and have been amended subsequently by Congress and by further agency regulation.

Five categories of visas are authorized under the employment based visa program: EB-1 for aliens of extraordinary ability, outstanding professors and researchers, and multi-national executives; EB-2 for members of professions with advanced degrees and aliens of extraordinary ability; EB-3 for skilled workers and other workers; EB-4 for special immigrants including religious workers; and EB-5 for entrepreneurs who make investments meeting certain criteria. While the program and the visa categories established by the program are authorized by Congress, DHS has some discretion over how to implement the program, which it does through regulations published in the Federal Register, as well as policy memoranda.

The regulations implementing the employment based immigration program are located in Title 8 of the Code of Federal Regulations (CFR): Aliens and Nationality, in Subchapter B: Immigration Regulations, and Part 204: Immigrant Petitions. The regulations that established and implemented the employment program that IMMACT 90 created are located in 8 CFR § 204.5: Petitions for employment-based immigrants, and 8 CFR § 204.6: Petitions for employment

Exhibit 3
109

creation aliens. 8 CFR § 204.5 and 8 CFR § 204.6 can be considered separate subprograms, as some of the rules and procedures differ, but some rules and procedures apply to both. However, they still comprise one program because the agency often has taken specific action on both at once and created them to work in harmony with each other.

INS promulgated the initial regulations under these sections of the CFR on November 29, 1991. *See* 56 FR 60897, November 29, 1991. These regulations created the program. Because the program would undoubtedly increase immigration and thus add to the population in the United States, it was precisely the kind of program that NEPA says should undergo an environmental analysis in a publicly transparent manner. However, INS promulgated the regulation without initiating any sort of NEPA review. The program is ongoing today, and furthermore, INS, and now DHS, have continued to revise 8 CFR 204.5 and 204.6.

The agency promulgated new regulations on numerous occasions. A partial list includes:
- 58 FR 44606, August 24, 1993 (creation of a pilot investor program)
- 67 FR 49561, July 31, 2002 (increase efficiency of petition process)
- 75 FR 58962, September 24, 2010 (change the fee schedule)
- 81 FR 73292, October 24, 2016 (change the fee schedule)

On each of these occasions of the creation and revision of this environmentally significant program, the agency arbitrarily and capriciously ignored the requirements of NEPA. Prior to 2014, the agency failed even to cite NEPA when creating or amending this program via regulation. After the promulgation of DHS's NEPA procedures in 2014, DHS did sporadically cite to a categorical exclusion when it proposed program changes, such as on January 13, 2017 (*See* 82 FR 4738). However, DHS's citation to a categorical exclusion was an empty exercise. DHS provided no reasoning for why the categorical exclusion would apply, and simply repeated phrases from the categorical exclusion provisions.

Since the employment based immigration program's creation and implementation in 1992, approximately 3.3 million foreign nationals have been admitted for permanent residence and settled in the United States under this program. *See also* Exhibit B.

Exhibit 3
110

## Program Two: Family Based Immigrant Visa Program

Though family based immigration has a long history in the United States, predating NEPA, the family based immigration program was substantially modified by IMMACT 90. The program is authorized by INA § 201(b) for immediate relatives (spouses of U.S. citizens and their children and parents of U.S. citizens) and INA § 203(a) for preference immigrants based on a qualifying relationship to a citizen or lawful permanent resident. These can be considered two subprograms, one that authorizes "Immediate Relative" visas, and one that authorizes "Family Preference" visas. The section of the Federal Register that implements the family based immigration program is also located in Title 8 of the Code of Federal Regulations (CFR): Aliens and Nationality, in Subchapter B: Immigration Regulations, and Part 204: Immigrant Petitions. The regulations that established and implemented the family based program that IMMACT 90 created are located specifically in 8 CFR § 204.1: General information about immediate relative and family-sponsored petitions and 8 CFR § 204.2: Petitions for relatives, widows, and widowers, and abused spouses and children.

The two subprograms of the family-based immigration program authorize nine visa categories. Immediate Relative Immigrant Visas include those for spouses of U.S. citizens (IR-1); unmarried children (under 21) of U.S. citizens (IR-2); orphans to be adopted abroad by U.S. citizens (IR-3);  Orphans to be adopted (IR-4); and parents of a U.S. citizen aged at least 21 (IR-5). The Family Preference Immigrant Visas include: the Family First Preference (F1) for unmarried sons and daughters (aged 21 or older) of U.S. citizens, and their children; the Family Second Preference (F2) for spouses, children, and unmarried sons and daughters of lawful permanent residents; the Family Third Preference (F3) for married sons and daughters of U.S. citizens, and their spouses and children; and the Family Fourth Preference (F4) for the brothers and sisters of U.S. citizens, and their spouses and children.

The INS promulgated regulations authorized by the change to the INA by IMMACT 90 under these sections of the CFR for the first time on September 9, 1992. *See* 57 FR 41053. The rule provided procedures and criteria for certain family members who were not previously eligible before IMMACT 90 and increased the number of immigrant visa issuances. Because this program would unquestionably induce population growth in the United States, it was precisely the kind of program that NEPA provides should undergo environmental analysis in a publicly transparent manner. However, INS promulgated the regulation without

Exhibit 3
111

initiating any sort of NEPA review. The program is ongoing, and DHS continues to revise the implementation of 8 CFR § 204.1 and 8 CFR § 204.2.

The agency revised the program further by promulgating regulations on a number of additional occasions. A partial list of these regulations includes:

- 60 FR 38947, July 31, 1995 (clarifying the process of adjusting status)
- 61 FR 13061, March 26, 1996 (creating a process for victimized relatives)
- 62 FR 60769, November 13, 1997 (allowing INS to review spouse petitions)
- 71 FR 35732, June 21, 2006 (creating an easier process for sponsoring family members)
- 72 FR 19100, April 17, 2007, (adding greater flexibility to grant benefits)
- 72 FR 56832, October 4, 2007 (making a change for adopted children)
- 76 FR 28303, May 17, 2011 (allowing certain petitioners to file abroad)
- 81 FR 73292, October 24, 2016 (reviewing fee schedule)

On each of these occasions, the agency arbitrarily and capriciously ignored the requirements of NEPA. DHS has never cited NEPA when promulgating regulations or adopting policies that regulated this program.

Since the program's substantial revision in 1990, more than 14.6 million foreign nationals have entered and settled permanently in the United States under this program. *See also* Exhibit B.

## Program Three: The Nonimmigrant Visa Program:

A third program for the legal entry and settlement of foreign nationals authorized by the INA is the nonimmigrant, or temporary, visa program. Certain sub-programs were created or substantially modified by IMMACT 90, although there have been a number of further statutory revisions since. The nonimmigrant visa program regulates a host of "nonimmigrant" visas. Despite being called "nonimmigrant," in truth quite a few of the visas authorized through the nonimmigrant program actually result in the long term or permanent settlement of foreign nationals in the United States. Nonimmigrant visas are authorized by INA § 214. The nonimmigrant visa program is the most complex of the programs that provide for foreign nationals' entry into and settlement in the United States. Both DHS and the Department of State have authority to regulate the nonimmigrant visa program and its many subprograms. Only the subprograms for which DHS has

Exhibit 3
112

significant authority and which provide for long term residence are the ones at issue in this case. Since the revamping of the program by statute in 1990, it was established by agency regulation, and amended periodically by both congressional action and further agency regulation.

Nonimmigrant classifications and visas include: the A-1, A-2, and A-3 visas for foreign government officials; B-1 and B-2 visas for visitors; C-1, C-1D, C-2, C-3, C-3, and C-4 for aliens in transit; D-1 and D-2 for crewmen; E-1, E-2, and E-3 for treaty traders and their family members; F-1and F-2 for academic students; G-1, G-2, G-3, G-4, and G-5 for foreign government officials and for officials of international organizations; H-1B, H-1C, H-2A, H-2B, H-3, and H-4 for temporary workers; I for foreign media; J-1 and J-2 for exchange visitors; K-1, K-2, K-3, and K-4 for fiancées of citizens; L-1A, L-1B, and L-2 for intracompany transferees; M-1 and M-2 for vocational and language students; N-8 and N-9 for "special immigrants"; NATO-1, NATO-2; NATO-3, NATO-4, NATO-5, NATO-6, NATO-7 for representatives of NATO; O-1, O-2, O-3 for aliens of extraordinary ability; P-1, P-2, P-3, and P-4 for athletes and entertainers; Q-1, Q-2, and Q-3 for international cultural exchange visitors; R-1 and R-2 for religious workers; S-5, S-6, T, T-1, T-2, T-3,T-4 for victims, witnesses, and informants; TN and TD for NAFTA professionals; U, U-1, U-2, U-3, U-4 for victims; and V-1, V-2, and V-3 for certain visa beneficiaries. As this case concerns those nonimmigrant visas that are long term and regulated by DHS rather than by the Department of State, I have only included calculations for those who have entered under visas in the E, H, L, TN, O, P, T, and U categories.

A number of significant subprograms are created through the nonimmigrant visa program, such as the H-1B program and the Student Exchange Visitor Program. While the visas are called "nonimmigrant," large numbers of these nonimmigrants in fact settle permanently in the United States, either in perpetual "non-immigrant" status (such as in the E category) or by adjusting to lawful permanent resident status (as with H-1B and L categories, where the eligibility criteria are synched with the permanent employment based categories).

Congress also has made a number of minor adjustments to various subprograms in the nonimmigrant program over the years since 1990. For instance, the Student Exchange Visitor program was substantially changed in 2002 with the U.S. Patriot Act. The T and U visas for victims of crime were created by statute in the Violence Against Women Act in 1994 and augmented by the Battered Immigrant Women Protection Act of 2000.

Exhibit 3
113

The section of the Federal Register where DHS implements the nonimmigrant visa program is located in Title 8 of the Code of Federal Regulations (CFR): Aliens and Nationality, in Subchapter B: Immigration Regulations, Part 214. Specifically, regulations implementing nonimmigrant visas are under: 8 CFR § 214.1: Requirements for admission, extension, and maintenance of status; 8 CFR § 214.2: Special requirements for admission, extension, and maintenance of status; 8 CFR § 214.3: Approval of schools for enrollment of F and M nonimmigrants; 8 CFR § 214.4: Denial of certification, denial of recertification or withdrawal of SEVP certification; 8 CFR § 214.12: Preliminary enrollment of schools in the Student and Exchange Visitor Information System; 8 CFR § 214.13: SEVIS fee for certain F, J, and M nonimmigrants; 8 CFR § 214.11: Alien victims of severe forms of trafficking in persons; and 8 CFR § 214.14: Alien victims of certain qualifying criminal activity.

The program is ongoing, and the agency has revised the program by promulgating regulations a number of times since 1990. Often these revisions expanded various subprograms, and thus should have triggered NEPA review. A partial list of these expansions includes:

- 59 FR 41818, August 15, 1994 (implementing new provisions of several temporary worker program)
- 59 FR 511101, October 7, 1994 (allowing certain temporary workers to apply to become lawful permanent residents (LPRs))
- 60 FR 44260, August 25, 1995, corrected at 60 FR 52248 October 5, 1995 (adding T-visa)
- 60 FR 62021, December 4, 1995 (changing filing procedures for certain temporary workers)
- 62 FR10422, March 7, 1997 (revising h-1,h-2, h-13(ii))
- 62 FR 48138, September 12, 1997 (revising visa for treaty investor)
- 63 FR 31872, June 10, 1998 (allowing F-1 students to work)
- 64 FR 29208, June 1,1999, (revising H-1 and L-1 status during pending application, corrected at 64 FR 30103, June 4, 1999)
- 64 FR 32146, June 15, 1999 (extending period of duration of status for F and J nonimmigrants)
- 65 FR 10678, February 29, 2000 (revising petitions for H-1B, interim)
- 66 FR 31107, June 11, 2001 (created a new visa category for nurses)

Exhibit 3
114

- 66 FR 46697, September 7, 2001 (adding another V nonimmigrant visa)
- 67 FR 4783, January 31, 2002 (implementing new classification for trafficking victims)
- 67 FR 18062, April 12, 2002 (requiring change of status from B to F before taking course of study)
- 67 FR 44343, July 1, 2002 (requiring preliminary enrollment of schools in the Student and Exchange Visitor Information System "SEVIS")
- 67 FR 54941, August 27, 2002 (reducing required course load for F and M students near border)
- 67 FR 60107, September 25, 2002 (implementing current student visa program)
- 67 FR 76256, December 11, 2002 (changing retention and reporting for Student Exchange Visitor Program (SEVIS))
- 69 FR 39814, July 1, 2004 (authorizing fee collection for SEVIS)
- 70 FR 23775, May 5, 2005, (allocating additional H-1B visas under 2004 H-1B Visa Reform Act)
- 72 FR 18856, April 16, 2007 (changing petitioning requirements for O and P visas)
- 72 FR 19100, April 17, 2007 (giving more flexibility to USCIS in processing applications)
- 73 FR 53014, September 17, 2007 (establishing the requirements and procedures for seeking U visa status)
- 73 FR 15389, March 24, 2008 (clarifying treatment of H-1B workers subject to numerical limitations)
- 73 FR 18944, April 8, , corrected at 74 FR 26514, June 3, 2009 (extending period graduated students can stay in the country while working in the OPT program)
- 73 FR 55683, September 26, 2008 (adjusting Student and Exchange Visitor Program fees)
- 73 FR 75540, December 12, 2008 (allowing T or U visa holders to apply for permanent resident status)
- 73 FR 76891, December 18, 2008 (removing certain limitation on H-2A employers)

Exhibit 3
115

- 75 FR 47699, August, 9 2010 (granting work authorization for dependents of foreign officials)
- 77 FR 76353, December 28, 2012 (making corrections to H-2A petitions, rules)
- 78 FR 24047, April 24, 2013) (making interim rule, with the Department of labor, changing methodology of H-2B petitions)
- 78 FR 58867, September 25, 2013 (issuing notification of numerical limitation for Northern Mariana Islands for FY 2014)
- 73 FR 55683, September 26, 2008 (adjusting program fees, recertification of schools)
- 79 FR 58241, September 29, 2014 (setting numerical limitations on CW-1 workers in northern Mariana Islands)
- 80 FR 23680, April 29, 2015 (expanding the Student Exchange Visitor program and stating that the rule is categorically excluded from NEPA review)
- 80 FR 10284, February 25, 2015 (allowing H-4 dependent spouses to have work permits)
- 80 FR 24145, April 29, 2015 (implementing wage methodology for H-2B program)
- 80 FR 63911, October 10, 2015 (setting numerical limitation of CW-1 workers in Northern Mariana Islands)
- 81 FR 2068, January 15, 2016 (loosening employer rules for H-1B1, CW, and EB visas)
- 81 FR 13040, March 11, 2016 (expanding time F-1 visa holders can stay and work in the country after graduation in the "OPT program," and stating the rule is categorically excluded from NEPA consideration)
- 81 FR 60581, September 2, 2016 (setting numerical limitation of CW-1 workers in Northern Mariana Islands)
- 81 FR 72481, October 20, 2016 (establishing electronic visa update system)
- 81 FR 82398, November 18, 2016 (increasing flexibility in worker programs and stating the rule is categorically excluding from NEPA consideration)
- 81 FR 92266, December 19, 2017 (changing regulations governing T visas)
- 82 FR 32987, July 19, 2017 (increasing H-2B agricultural workers)

Exhibit 3
116

DHS has not only amended and expanded the program through regulations, it has also made changes to the program through policy memoranda, again, without NEPA review. Ongoing examples include:

- A policy memorandum issued by USCIS on November 11, 2013: Additional Guidance on Determining Periods of Admission for Foreign Nationals Previously Admitted as H-4 Nonimmigrants who are Seeking H-2 or H-3 Status, PM-602-0092 (The memorandum is available at https://www.uscis.gov/sites/default/files/USCIS/Outreach/2013-1111_H-4_Seeking_H-2_or_H-3_Status_PM_Effective_2.pdf )
  - This policy memorandum expands the time a seasonal worker or trainee can stay in the U.S.
- A policy memorandum issued by USCIS on August 17, 2015: L-1B Adjudications Policy, PM-602-0111 (The memorandum is available at https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2015/L-1B_Memorandum_8_14_15_draft_for_FINAL_4pmAPPROVED.pdf)
  - This policy memorandum loosens the requirements for the L-1B guest worker program.

On each of these occasions of the creation and revision of this environmentally significant program, the agency arbitrarily and capriciously ignored the requirements of NEPA. Prior to 2014, when DHS adopted its NEPA guidance documents, DHS had never even cited NEPA when promulgating regulations or adopting policies that regulated the program. After DHS adopted its new NEPA guidance, it did sporadically cite to NEPA. Each time it claimed that its action was subject to a categorical exclusion.

Since IMMACT was passed in 1990, 12.2 million foreign nationals potentially could have entered and settled in the United States under the parts of the nonimmigrant visa program regulated by DHS. *See also* Exhibit B.

**Program Four: Parole Program**

The INA gives DHS discretionary authority to allow the entry of foreign nationals who are otherwise inadmissible through a process known as "parole," sometimes referred to by the longer description "humanitarian parole" (INA §

Exhibit 3
117

212(d)(5)(A)). This section states that "[t]he Attorney General [now the Secretary of Homeland Security] may … in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian  reasons or significant public benefit any alien applying for admission to the United States…" The alien paroled into the country is therefore temporarily "lawfully present." The section of the Code of Federal Regulations that governs the parole authority is 8 CFR § 212.5.

While the wording of the statute would suggest that parole should only be given on a case by case basis, rather than on a programmatic level, in fact, DHS and INS before it have adopted standards and processes by which individuals and classes of individuals apply for this parole. Since the parole authority was granted, the agencies have created numerous programs through it, and continue to grant entry to tens of thousands of individuals through these programs. The Attorney General used humanitarian parole to allow large numbers of foreign nationals to enter the country through several programs between 1989 and 1998.[4] A variety of classifications of parolees were identified, including Advance Parole, Deferred Inspection, and "Overseas" Parole. Of these categories, only "overseas" parole was expected to lead to permanent residence, although not all aliens elected to apply for it. Most of the aliens who ended up staying for long-term residence were citizens from the Former Soviet Union, Southeast Asia, and Cuba.[5] In this time period, approximately 176,000 aliens were allowed to enter as overseas parolees and ultimately adjusted to permanent status, according to a report to Congress by the INS.[6]

The parole power, and its underlying programs, have changed over the years, including by congressional amendments made under the Illegal Immigration Reform and Immigrant Responsibility of 1996 ("IIRIRA"). For both post- and pre-IIRIRA grants of parole, however, discretionary agency actions creating programs or allowing many individuals to receive parole remain a significant source of entry into and settlement in the country for otherwise unqualified or illegally arriving foreign nationals.

---

[4] The earliest use of parole I have located was 1956, for Hungarians escaping after the 1956 uprising and for a group of orphans. This was described by the American Immigration Council, *see* AM. IMM. COUNCIL, *supra* note 1.
[5] *See, Report to Congress Use of the Attorney General's Parole Authority Under the Immigration and Nationality Act Fiscal Years 1997-199*8, IMM. DAILY, *available at* http://www.ilw.com/immigrationdaily/news/2001,0329-Parole.shtm.
[6] *Id.*

Exhibit 3
118

The parole program established under this provision of the INA is ongoing, and DHS has created many smaller parole programs by way of rulemaking and policy memoranda. At no time has the agency cited its obligation under NEPA when creating or updating the many parole programs. Often, the specific actions taken by the agency have expanded its authority to allow foreign nationals to enter and settle in the United States.

One key time when the agency took action was its discretionary expansion of parole from a program allowing foreign nationals enter the country to one that also allowed foreign nationals in the country unlawfully to remain lawfully. On August 21, 1998, Paul Virtue, then-General Counsel of the INS, published a memorandum that used the discretionary authority of the agency to grant "parole" to certain inadmissible aliens who were already inside the boundary of the United States. *See* Legal Op. No. 98-10 (INS), 1998 WL 1806685, U.S. Department of Justice, Immigration and Naturalization Service, General Counsel's Office. *See* Exhibit C. This form of parole became known as "parole in place."

This action inevitably increased the number of settled inhabitants of the United States, because such grants allow individuals to be on a path to long term permanent residence rather than remain as illegal migrants vulnerable to deportation. In general, aliens who have been neither admitted nor paroled into the United States are inadmissible pursuant to INA § 212(a)(6)(A). When an alien receives parole, however, this bar to inadmissibility no longer applies. Furthermore, unlike aliens who have been deported or who have voluntarily departed, or otherwise lack legal status, paroled aliens are not subject to the 3- and 10-year bars to admission for having been illegally present in the country. *See* INA § 212(a)(9)(B). With these two bars to admission inapplicable, a paroled alien will generally become admissible (unless other bars to admission apply, such as convictions for felonies). Aliens who are admissible and are also immediate relatives of U.S. citizens are then eligible to obtain a green card and citizenship. INA § 245(a)(c)(2).

DHS has used the authority established by parole, including parole-in-place, on a number of occasions to create parole subprograms, though not all of them are ongoing. Most recently, DHS established a "Central American Refugee Program" for minors from Honduras, El Salvador, and Guatemala in actions it took from 2013 to 2015; a Haitian Family Reunification Parole Program in December 2014 to allow Haitians whose applications had been approved to arrive earlier; a parole program for Military Families in November 2014; a parole program for

Exhibit 3
119

Commonwealth of Mariana Island caregivers; and an international entrepreneur parole program.

DHS has also established the parameters of its parole authority by regulation:

- 47 FR 30045, July 9, 1982 (setting forth INS's parole policy regarding detention and parole of aliens)
- 52 FR 48799, December 28, 1987 (creating parameters of the Mariel Cuban parole program)
- 53 FR 17449, May 17, 1988 (revising parole rules for juveniles)
- 61 FR 36610, July 12, 1996 (clarifying status of Cuban parolees)
- 62 FR 10312, March 6, 1997 (modifying the parole program to comport with the statutory changes of the Illegal Immigration Reform and Immigrant Responsibility Act)
- 65 FR 82254, December 28, 2000 (further clarifying the scope of the authority of the Attorney General to grant parole)
- 68 FR 35151, June 12, 2003 (updating the original regulation of the statutory parole authority for DHS)
- 82 FR 5238, January 17, 2017 (creating the international entrepreneur parole program and stating the rule is categorically excluded from NEPA)

On each of these occasions when this environmentally significant program was created and revised, the agency arbitrarily and capriciously ignored the requirements of NEPA. Prior to 2014, the agency failed even to cite NEPA when creating or amending this program via regulation. After the promulgation of DHS's NEPA procedures in 2014, however, DHS at least cited to a categorical exclusion when it adopted a subprogram under the parole authority in 2017. *See* 82 FR 5238. However, DHS's citation to a categorical exclusion was an empty exercise. DHS engaged in no reasoning explaining why the categorical exclusion should apply but simply repeated phrases from the categorical exclusion.

At least 96,150 foreign nationals have entered or settled into the country via the parole program. *See also* Exhibit B.

Exhibit 3
120

## Program Five: Temporary Protected Status

In addition to creating and revamping several legal immigration categories, IMMACT 90 also created another program that would allow foreign nationals unlawfully in the United States to remain in a legal status. This was the Temporary Protected Status (TPS) program. TPS is authorized by Section 244A of the INA. With TPS, DHS has the discretionary authority to grant "temporary" legal status to aliens present in the United States who are from countries temporarily unable to handle the return of their foreign nationals because of natural disaster or civil violence.

The regulations that implement the TPS program are in 8 CFR Part 244 and duplicated in Part 1244—Temporary Protected Status for Nationals of Foreign States.  *See* 244.1-244.19 and 1244.1-12.44.19

The agency promulgated regulations implementing and revising Part 244/Part 1244 on a number of occasions. A partial list includes:

- 56 FR 619, January 7, 1991 (implementing TPS program, creating procedures for applying)
- 56 FR 23491, May 22, 1991 (implementing TPS program)
- 58 FR 58935, November 5, 1993 (providing an exception for late registrations)
- 62 FR 10312, March 6, 1997 (authorizing employment for TPS)
- 63 FR 63593, November 16, 1998 (broadening exception for late registrations)
- 64 FR 4780, February 1, 1999 (amending requirements for employment authorization fee)
- 63 FR 63593, November 16, 1998 (allowing further late registration)
- 64 FR 4781, February 1, 1999 (amending requirements for employment authorization fee)
- 76 FR 53764, August 29, 2011 (automating forms)

At no time when implementing these regulations did DHS do an environmental review or even cite NEPA.

In accordance with all these regulations, DHS designates a country for TPS, and then individuals may apply to the program. Since its inception, 20 countries

Exhibit 3
121

have been designated, including El Salvador, Guinea, Haiti, Honduras, Liberia, Nepal, Nicaragua, Sierra Leone, Somalia, Sudan, South Sudan, Syria, and Yemen. Individuals may also apply for renewal status, and thus, practically speaking, though designated as "temporary," TPS status has become long term for most recipients.[7] An estimated 340,000 aliens currently have TPS. Some have been allowed to adjust to LPR status, setting off chain migration.

Since 1990, more than 377,000 individuals have been granted TPS. Of these, about 364,000 are citizens of countries for which TPS status has not been terminated.

**Program Six: Refugees**

The sixth program regulating the entrance and settlement of foreign nationals was authorized by law (in substantially its current form) by the United States Refugee Act of 1980, Public Law 96-212. This law amended the INA and the Migration and Refugee Assistance Act of 1962. It regulates the entrance and settlement of foreign nationals who are unable to return home because of fear of serious harm.

INA Section 207: Annual Admission of Refugees and Admission of Emergency Situation Refugees sets the parameters within which foreign nationals from abroad seeking refugee status are brought into and settled in the country. The Department of State shares responsibility for the refugee program, but DHS has significant authority. Section 101(a)(42) of the INA defines which foreign nationals meet the criteria to be classified as refugees.

The regulations that implement the refugee program are at 8 CFR 207.1-207.9, with regulations regarding adjustment of status in 8 CFR Part 209.

DHS has promulgated regulations implementing and amending the refugee program on numerous occasions. A partial list includes:

- 46 FR 45118, Sept. 10, 1981 (initially implementing the Refugee Act of 1980 and setting out refugee procedures)
- 56 FR 26897, June 12, 1991 (implementing the procedures by which a refugee adjusts status to LPR)

---

[7] *See* NORTH, *supra* note 11.

Exhibit 3
122

- 57 FR 42883, September 17, 1992 (amending procedures for filing for LPR status)
- 62 FR 10312, March 6, 1997 (amending handling of refugee claims according to IIRIRA)
- 63 FR 3795 Jan. 27, 1998 (establishing guidelines for the policy governing admitting the family members of refugees)
- 63 FR 30105, June 3, 1998 (changing procedures for refugees to adjust status to LPR)
- 64 FR 27660, May 21, 1999 (changing language regarding requirement of a sponsor to apply to program)
- 76 FR 53763, Aug. 29, 2011 (making benefit applications electronic)

Though this program as implemented by these regulations induced substantial growth of the United States population, DHS never did an environmental review and never cited NEPA.

A total of 2.2 million refugees have entered and settled in the United States since the initial regulations were promulgated under the Refugee Act of 1980. A breakdown is available in Exhibit B.

**Program Seven: Asylum**

The Refugee Act of 1980 also authorized a seventh program, the asylum program. The Asylum program is in many respects regulated the same way as the Refugee program. The same standards apply to determine whether a foreign national meets the legal definition of refugee or asylee. The difference is that refugees are abroad and asylees are already in the United States and seeking admission at a port of entry or after encountering immigration officials. Asylum is authorized by § 208 of the INA.

The regulations that implement the asylum program are at 8 CFR 208.1-208.23, with regulations regarding adjustment of status for asylees in 8 CFR Part 209.

DHS has promulgated regulations implementing and amending the asylum program on numerous occasions. A partial list includes:

Exhibit 3
123

- 46 FR 45118, Sept. 10, 1981 (initially implementing the Refugee Act of 1980 and setting out asylum procedures)
- 56 FR 26897, June 12, 1991 (implementing procedures by which an asylee adjusts status to LPR)
- 57 FR 42883, September 17, 1992 (amending procedures for filing for LPR status)
- 62 FR 10312, March 6, 1997(amending handling of asylum claims according to IIRIRA)
- 63 FR 3792, January 27, 1998 (establishing guidelines for the policy for admitting the family members of asylees)
- 63 FR 12979, March 17, 1998 (regulating rules for fingerprinting petitioners)
- 63 FR 30105, June 3, 1998 (changing procedures for asylees to adjust status to LPR)
- 64 FR 8478, February 19, 1999, corrected at 64 FR 13881, March 23, 1999 (establishing procedures for raising a claim from protection from torture)
- 64 FR 27856, May 21, 1999 (suspending deportation of asylees from certain countries according to Nicaraguan Adjustment and Central American Relief Act)
- 65 FR 76121, December 6, 2000 (changing guidelines on claims after IIRIRA)
- 69 FR 69480, November 29, 2004 (implementing agreement between U.S. and Canada concerning asylum claims at border)
- 74 FR 15367, April 6, 2009 (changing process of forwarding asylum applications to the Department of State)
- 76 FR 53763, August 29, 201176 FR 53763, Aug. 29, 2011 (making benefits electronic)
- 77 FR 76352, December 28, 2012 (giving officers authority to terminate asylum)

Though this program as implemented by these regulations induced substantial growth of the United States population, DHS never did an environmental review and never cited NEPA.

Exhibit 3
124

A total of approximately 789,935 asylees have entered and settled in the United States since the initial regulations were promulgated under the Refugee Act of 1980. *See also* Exhibit B.

## Program Eight: Deferred Action for Childhood Arrivals Program (DACA)

Unlike the first seven programs, which were authorized by statute, the DACA program was created by executive directive. On June 15, 2012, then DHS Secretary Janet Napolitano issued a policy memorandum creating the DACA program, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." Further details were adopted in another memorandum issued by John Morton, then Director of U.S. Immigration and Customs Enforcement, on June 15, 2015, "Secretary Napolitano's Memorandum Concerning the Exercise of Prosecutorial Discretion for Certain Removable Individuals Who Entered the United States as a Child." *See* Exhibit C.

Though created by executive directive rather than statutory authority, DACA was undoubtedly a program and a final administrative action. DACA provided a de facto lawful status to a class of certain illegal aliens by allowing them to apply for "deferred action." With the grant of "deferred action," DHS provided a two-year reprieve from deportation and allowed beneficiaries to apply for a two-year work authorization document, enabling the DACA recipient to obtain a Social Security card and other benefits and social services, often including access to welfare programs.

Originally, recipients could apply for renewal as their DACA status expired, indefinitely. The DACA program had specific criteria for applicants: 1) they must be under the age of 31 as of June 15, 2012; 2) they must have arrived in the U.S. before reaching their 16th birthday; 3) they must have continuously resided in the U.S. since June 15, 2007; 4) they must have been physically present in the U.S. on June 15, 2012, and at the time of application; 5) they must have had no lawful status on June 15, 2012; 6) they must be currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; 7) they must not have been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and must not otherwise pose a threat to national security or public safety; and 8) they must be at least 15 years old at the time of application.

Exhibit 3
125

Director Morton issued a policy memorandum on the same day, informing ICE personnel that the DACA program would be implemented immediately. ICE officers and agents were informed that they should cease deportation processing for any alien in custody or apprehended who claims to be eligible for the program.

In a demonstration of the highly discretionary nature of the immigration system, on September 5, 2017, President Donald Trump announced that the DACA program will be phased out unless given statutory authority. DHS has therefore stopped taking new applications as of October, though pending applications will continue to be considered until March 2018, meaning that a substantial number of foreign nationals could remain in DACA status until March 2020. Whether DHS will keep the program in March based on an authorization by Congress or by reinstituting the program by executive discretion is currently unknown. A number of DACA recipients have also filed a complaint in an attempt to stop DHS from rescinding the program. DACA is therefore an ongoing program.

A total of 793,000 foreign nationals were granted lawful presence through DACA, and approximately 690,000 still have that status.  *See* Exhibit B.

Exhibit 3
126

# EXHIBIT B

**Tables and Graphs of Population Increase Caused By DHS Programs**

Exhibit 3
127

**Table 1:**

**Table of Total\* Number of Individuals Added on Long Term or Permanent Basis to United States Population by Program since each Program's Creation in Substantially Current Form, based on available information. \*\***

| DHS Program | Total Number Admitted or Issued |
|---|---|
| Family Based Immigration Admissions between 1992 and 2015 | 14,622, 847 |
| Employment Based Immigration Admissions between 1992 and 2015 | 3,274,245 |
| Long Term Non-Immigrant Visa Issuances between 1992 and 2016 \*\*\* | 12, 214,328 |
| Parole Admissions between 1996 and 2015 | 53,378 |
| Temporary Protective Status Grants (Estimated) between 1992 and 2017 | 377, 218 |
| Refugee Admissions between 1980 and 2015 | 3,050,023 |
| Asylum Approvals/Adjustments to LPR Status between 1980 and 2015\*\*\*\* | 789,935 |
| Deferred Action for Childhood Arrivals Grants between 2012-2017 | 793,026 |

\* The cutoff date where information is available varies by program.
\*\*While most of these foreign nationals were added permanently, in some programs, legal status was never made permanent.
\*\*\* Breakdown of categories included in Table 2.
\*\*\*\*Includes counts of approvals for 1980-1991 and counts of adjustments of status from 1992-2015.

Exhibit 3
128

**Table 2: Long Term Non Immigrant Visa Category Included**

| Included Visa Category | Total Since Visa Created Through 2016 |
|---|---|
| E | 963,259 |
| H | 7,185,272***** |
| L | 2,829,315 |
| TN | 153,350***** |
| O | 308,663 |
| P | 759,518 |
| T | 4,070***** |
| U | 10,881***** |

*****Figures come from the State Department and do not include additional issuances processed by USCIS and CBP.

Exhibit 3
129

**Table 3: Trend in Individuals Added over Time for United States for all programs**



Exhibit 3
130

**Table 4: Trend in Individuals Added for Long Term Nonimmigrant Visas**



Exhibit 3
131

**Table 5: Number of Individuals Added by Geographic Region of Interest to Plaintiffs, where available:**

| Long Term Permanent Residents By State for Selected Years (Temporary Visa Issuances) | | | |
|---|---|---|---|
| State | 1997 | 2002 | 2015 |
| California | 135,526 | 264,074 | 418,772 |
| Colorado | 10,271 | 26,592 | 31,992 |
| Florida | 67,440 | 175,821 | 198,641 |
| | | | |
| % of Total Issuances | 23% | 26% | 17% |
| | | | |
| | | | |
| Permanent Residents Admitted for Selected Metro Areas: 2003-2015 | | | |
| Metro Area | Total | | |
| Los Angeles/Long Beach/Anaheim, CA | 1,197,465 | | |
| San Diego/Carlsbad, CA | 241,915 | | |
| Denver/Aurora/Lakewood, CO | 104,640 | | |
| Miami/Ft. Lauderdale/W. Palm Beach, FL | 938,412 | | |
| Combined % of National Total | 11% | | |
| | | | |
| California | 2,836,791 | | |
| % of National Total | 21% | | |

Exhibit 3
132

# EXHIBIT C

**Regulations and Policy Memoranda Implementing DHS Programs**

Exhibit 3
133

# **Regulations**

- 46 FR 45118, Sept. 10, 1981 (initially implementing the Refugee Act of 1980 and setting out asylum procedures)
- 47 FR 30045, July 9, 1982 (setting forth INS's parole policy regarding detention and parole of aliens)
- 52 FR 48799, December 28, 1987 (creating parameters for Mariel Cuban parole program)
- 53 FR 17449, May 17, 1988 (revising parole rules for juveniles)
- 56 FR 619, January 7, 1991 (implementing TPS program and creating procedures for applying)
- 56 FR 23491, May 22, 1991 (implementing TPS program)
- 56 FR 26897, June 12, 1991 (implementing procedures by which an asylee adjusts status to LPR)
- 57 FR 42883, September 17, 1992 (amending procedures for filing for lawful permanent resident ("LPR") status)
- 58 FR 44606, August 24, 1993 (creating a pilot investor program)
- 58 FR 58935, November 5, 1993 (providing an exception for late registrations)
- 59 FR 41818, August 15, 1994 (implementing new provisions of several temporary worker program)
- 59 FR 511101, October 7, 1994 (allowing certain temporary workers to apply to become LPRs)
- 60 FR 38947, July 31, 1995 (clarify the process of adjusting status)
- 60 FR 44260, August 25, 1995, corrected at 60 FR 52248 October 5, 1995 (adding T-visa)
- 60 FR 62021, December 4, 1995 (changing filing procedures for certain temporary workers)
- 61 FR 13061, March 26, 1996 (creating process for victimized relatives
- 61 FR 36610, July 12, 1996 (clarify status of Cuban parolees)
- 62 FR 10312, March 6, 1997 (amending programs pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"))

Exhibit 3
134

- 62 FR10422, March 7, 1997 (revising h-1,h-2, and h-13(ii))
- 62 FR 48138, September 12, 1997 (revising visa for treaty investor)
- 62 FR 60769, November 13, 1997 (allowing INS to review spouse petitions)
- 63 FR 3795, January 27, 1998 (establishing guidelines for the policy governing admitting the family members of refugees and asylees)
- 63 FR 12979, March 17, 1998 (regulating rules for fingerprinting petitioners)
- 63 FR 30105, June 3, 1998 (changing procedures for asylees and refugees to adjust status to LPR)
- 63 FR 31872, June 10, 1998 (allowing F-1 students to work)
- 63 FR 63593, November 16, 1998 (broadening exception for late registrations)
- 64 FR 4780, February 1, 1999 (amending requirements for employment authorization fee)
- 64 FR 4781, February 1, 1999 (amending requirements for employment authorization fee)
- 64 FR 8478, February 19, 1999, corrected at 64 FR 13881, March 23, 1999 (establishing procedures for raising a claim from protection from torture)
- 64 FR 27856, May 21, 1999 (suspending deportation of aslyees from certain countries according to Nicaraguan Adjustment and Central American Relief Act)
- 64 FR 27660, May 21, 1999 (changing language regarding requirement of a sponsor to apply to program)
- 64 FR 29208, June 1,1999, corrected at 64 FR 30103, June 4, 1999 (revising H-1 and L-1 status during pending application)
- 64 FR 32146, June 15, 1999 (extending period of duration of status for F and J nonimmigrants)
- 65 FR 10678, February 29, 2000 (revising petitions for H-1B, interim)
- 65 FR 76121, December 6, 2000 (changing guidelines on claims after IIRIRA)
- 65 FR 82254, December 28, 2000 (further clarifying the scope of the authority of the Attorney General to grant parole)
- 66 FR 31107, June 11, 2001, (creating a new visa category for nurses)
- 66 FR 46697, September 7, 2001 (adding another V nonimmigrant visa)

Exhibit 3
135

- 67 FR 4783, January 31, 2002 (implementing new classification for trafficking victims)
- 67 FR 18062, April 12, 2002 (requiring change of status from B to F before taking course of study)
- 67 FR 44343, July 1, 2002 (requiring preliminary enrollment of schools in the Student and Exchange Visitor Information System ("SEVIS"))
- 67 FR 49561, July 31, 2002 (increasing efficiency of petition process)
- 67 FR 54941, August 27, 2002 (reducing required course load for F and M students near border)
- 67 FR 60107, September 25, 2002 (implementing current student visa program)
- 67 FR 76256, December 11, 2002 (changing retention and reporting for SEVIS)
- 68 FR 35151, June 12, 2003 (updating the original regulation of the statutory parole authority for DHS)
- 69 FR 39814, July 1, 2004 (authorizing fee collection for SEVIS)
- 69 FR 69480, November 29, 2004 (implementing agreement between U.S. and Canada concerning asylum claims at border)
- 70 FR 23775 May 5, 2005 (allocating additional H-1B visas under 2004 H-1B Visa Reform Act)
- 71 FR 35732, June 21, 2006 (creating easier process for sponsoring family members)
- 72 FR 18856, April 16, 2007 (changing petitioning requirements for O and P visas)
- 72 FR 19100, April 17, 2007 (making grant benefits more flexible)
- 72 FR 56832, October 4, 2007 (making a change for adopted children)
- 73 FR 53014, September 17, 2007 (establishing the requirements and procedures for seeking U visa status)
- 73 FR 15389, March 24, 2008 (clarifying treatment of H-1B workers subject to numerical limitations)
- 73 FR 55683, September 26, 2008 (adjusting Student and Exchange Visitor Program fees)
- 73 FR 75540, December 12, 2008 (allowing T or U visa holders to apply for permanent resident status)

Exhibit 3

- 73 FR 76891, December 18, 2008 (removing certain limitation on H-2A employers)
- 73 FR 18944, April 8, corrected at 74 FR 26514, June 3, 2009 (extending period graduated students can stay in the country while working in the OPT program)
- 74 FR 15367, April 6, 2009 (changing process of forwarding asylum applications to the Department of State)
- 75 FR 47699, August 9, 2010 (granting work authorization for dependents of foreign officials)
- 75 FR 58962, September 24, 2010 (changing the fee schedule)
- 76 FR 28303, May 17, 2011 (allowing certain petitioners to file abroad)
- 76 FR 53763, August 29, 2011 (making benefit applications electronic)
- 77 FR 76352, December 28, 2012 (giving officers authority to terminate asylum)
- 78 FR 24047, April 24, 2013 (issuing interim rule, with the Department of labor, changing methodology of H-2B petitions)
- 78 FR 58867, September 25, 2013 (issuing notification of numerical limitation for Northern Mariana Islands for FY 2014)
- 79 FR 58241, September 29, 2014 (setting numerical limitation CW-1 workers in northern Mariana Islands)
- 80 FR 10284, February 25, 2015 (allowing H-4 dependent spouses to have work permits)
- 80 FR 23680, April 29, 2015 (expanding the Student Exchange Visitor program and stating that the rule is categorically excluded from NEPA review)
- 80 FR 24145, April 29, 2015 (implementing wage methodology for H-2B program)
- 80 FR 63911, October 10, 2015 (setting numerical limitation of CW-1 workers in Northern Mariana Islands)
- 81 FR 2068, January 15, 2016 (loosening employer rules for H-1B1, CW, and EB visas)
- 81 FR 13040, March 11, 2016 (expanding time F-1 visa holders can stay and work in the country after graduation in the OPT program, and stating the rule is categorically excluding from NEPA consideration)

Exhibit 3

- 81 FR 60581, September 2, 2016 (setting numerical limitation of CW-1 workers in Northern Mariana Islands)
- 81 FR 72481, October 20, 2016 (establishing electronic visa update system)
- 81 FR 73292, October 24, 2016 (changing fee schedule)
- 81 FR 82398, November 18, 2016 (increasing flexibility in worker programs and stating the rule is categorically excluding from NEPA consideration)
- 81 FR 92266, December 19, 2017 (changing regulations governing T visas)
- 82 FR 5238, January 17, 2017 (creating international entrepreneur parole program and stating the rule is categorically excluded from NEPA)
- 82 FR 32987, July 19, 2017 (increasing number of H-2B agricultural workers)

## Policy Memoranda

- Memorandum issued by USCIS on November 11, 2013: Additional Guidance on Determining Periods of Admission for Foreign Nationals Previously Admitted as H-4 Nonimmigrants who are Seeking H-2 or H-3 Status, PM-602-0092 (attached hereto).
  - This memorandum expands the time a seasonal worker or trainee can stay in the U.S.
- Memorandum issued by USCIS on August 17, 2015: L-1B Adjudications Policy, PM-602-0111 (attached hereto).
  - This memorandum loosens the requirements for the L-1B guest worker program.
- Memorandum issued by INS on August 21, 1998 by Paul Virtue, then-General Counsel of the INS: Legal Op. No. 98-10 (INS), 1998 WL 1806685, U.S. Department of Justice, Immigration and Naturalization Service, General Counsel's Office (attached hereto).
  - This memorandum used the discretionary authority of the agency to grant "parole" to certain inadmissible aliens who were already inside the boundary of the United States.
- Memorandum issued by DHS on June 15, 2012: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (attached hereto).

Exhibit 3
138

- o DHS Secretary instructs agencies under DHS to create DACA program
- Memorandum issued by ICE Director John Morton on June 15, 2012: Secretary Napolitano's Memorandum Concerning the Exercise of Prosecutorial Discretion for Certain Removable Individuals Who Entered the United States as a Child (attached hereto).
  - o ICE Director instructs ICE to implement the DACA program.

Exhibit 3
139

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000



**U.S. Citizenship and Immigration Services**

November 11, 2013                                         PM-602-0092

# Policy Memorandum

SUBJECT:   Additional Guidance on Determining Periods of Admission for Foreign Nationals
                  Previously Admitted as H-4 Nonimmigrants who are Seeking H-2 or H-3 Status

**Purpose**

This policy memorandum (PM) provides additional guidance regarding how Immigration
Services Officers (ISOs) should determine periods of admission for a foreign national.
Specifically, this PM clarifies that time spent as an H-4 dependent does not count against the
maximum allowable periods of stay available to principals in H-2A, H-2B, or H-3 status.  This
PM updates Chapter 31.2(d)(2) of the Adjudicator's Field Manual (AFM), AFM Update AD13-
12.

**Scope**

Unless specifically exempted herein, this PM applies to and is binding on all U.S. Citizenship
and Immigration Services (USCIS) employees.

**Authorities**

- Immigration and Nationlity Act (INA) 101(a)(15)(H)(ii)(a), (ii)(b), and (iii)
- 8 CFR 214.2(h)(5)(viii)(C)
- 8 CFR 214.2(h)(9)(iii)(C)(1) and (2)
- 8 CFR 214.2(h)(13)(iv) and (v)
- 8 CFR 214.2(h)(15)(ii)(C) and (D)

# I. Introduction

A foreign national may be admitted to the United States in H-2A or H-2B status for a maximum
period of three years.[1]  A foreign national may be admitted to the United States in H-3 trainee
status for a period of up to two years, and an H-3 participant in a special education program may
be admitted to the United States for a period of up to 18 months.[2]

---

[1] 8 CFR 214.2(h)(5)(viii)(C) and  8 CFR 214.2(h)(15)(ii)(C).  This regulation also limits the total period of stay to
45 days for H-2B workers in the Virgin Islands.
[2] 8 CFR 214.2(h)(9)(iii)(C)(1) and (2) and 8 CFR 214.2(h)(15)(ii)(D).

Exhibit 3
140

At the end of the maximum period of stay, the foreign national must either change to a different status or depart the United States.  With some exceptions, USCIS regulations provide that a foreign national who has been outside the United States for the requisite three months may be eligible for a new period of admission of three years in H-2 status.[3]  Further, USCIS regulations provide that a foreign national who has been outside the United States for the immediate prior six months may, generally, be eligible for a new two-year period of admission in H-3 trainee status or a new 18-month period of admission as an H-3 participant in a special education program.[4]

## II. Previous Guidance Still Valid

On December 5, 2006, USCIS issued a memorandum stating that time spent as an H-4 and/or L-2 nonimmigrant does not count against, and is therefore "decoupled" from, the maximum period of admission allowable as an H-1B and/or L-1 nonimmigrant respectively.[5]  All of the provisions of that memorandum remain in effect.  This PM supplements the existing guidance and updates the AFM accordingly.

## III. Policy

USCIS currently allows H-1B nonimmigrants to decouple H-4 time when calculating their maximum period of authorized stay.  USCIS has determined that extending the decoupling policy to the H-2 and H-3 nonimmigrant classifications is appropriate because it is consistent with the statutory and regulatory framework along with the policy of promoting family unity.

As noted in the introduction, the statutory and regulatory framework allows an eligible foreign national a period of three years of authorized stay as an H-2 nonimmigrant or up to two years of authorized stay as an H-3 trainee or up to 18 months of authorized stay as an H-3 participant in a special education program.  This interpretation promotes family unity by affording each qualified spouse the opportunity to be granted the maximum period of stay applicable to the classification.  Congressional intent to limit a principal foreign national's ability to be classified as a temporary agricultural or non-agricultural worker or as a trainee or participant in a special education program for the relevant maximum period is not affected.

USCIS reviewed the current INA provisions governing the H-2 and H-3 nonimmigrant classifications as well as the applicable regulations and policy guidance, and found that existing guidance does not specifically address or clarify the issue on whether time spent in H-4 status counts against the maximum period of admission available to an H-2 or H-3 nonimmigrant.

---

[3] 8 CFR 214.2(h)(5)(viii)(C) and 8 CFR 214.2(h)(13)(iv).  See 8 CFR 214.2(h)(5)(viii)(C) and 8 CFR 214.2(h)(13)(v) for exceptions.
[4] 8 CFR 214.2(h)(13)(iv).  See generally 8 CFR 214.2(h)(13)(v) for exceptions.
[5] *See* USCIS Memorandum, M. Aytes, "Guidance on Determining Periods of Admission for Aliens Previously in H-4 or L-2 Status; Aliens Applying for Additional Periods of Admission beyond the H-1B Six Year Maximum; and Aliens Who Have Not Exhausted the Six-Year Maximum But Who Have Been Absent from the United States for Over One Year," (Dec. 5, 2006).

Exhibit 3
141

Further, USCIS has not issued any recent policy guidance that clarifies the issue of decoupling time spent in H-4 status from time spent in H-2 or H-3 status.[6]

USCIS is now clarifying that any time spent in H-4 status will not count against the maximum period of admission applicable to H-2 and H-3 nonimmigrants. Thus, a foreign national who was previously granted H-4 dependent status and subsequently is granted H-2 or H-3 classification may be eligible to remain in the United States for the maximum period of stay applicable to the classification. For example, a husband and wife who come to the United States as a principal H-2B and dependent H-4 spouse may maintain status for three years, and then change status to H-4 and H-2B respectively, as long as the change of status application is properly filed before the principal H-2B has spent the maximum allowable period of stay in the United States. Note that, upon the switch, the new "principal" foreign national would be subject to the H-2B cap. USCIS will consider, in the context of any applications for change of status from H-4 to H-2 and H-4 to H-3, whether the H-4 nonimmigrant complied with the requirements of accompanying or following to join the H principal foreign national, and whether the H-4 nonimmigrant otherwise maintained valid nonimmigrant status.[7]

## IV. Adjudicator's Field Manual Update

Chapter 31.2(d)(2) of the AFM (AFM Update AD13-12) is revised as follows.

☞   1. Chapter 31.2(d)(2) of the AFM is revised to read as follows:

*****

(d) <u>Limits on a Temporary Stay</u>.

*****

(2)   <u>Spouse and Dependents</u>.

Limitations on the duration of time spent in H-1B, H-2, or H-3 nonimmigrant status refer only to the principal worker in H status and do not apply independently to the principal worker's dependent spouse and children. Normal rules for maintenance of derivative status still apply such that the dependent may remain in the United States only for the purpose of family unity with the principal worker.

Time spent as an H-4 dependent does not count against the maximum allowable period of stay for principals in H-1B, H-2, or H-3 status. Thus, a foreign national who was previously an H-4 nonimmigrant and subsequently becomes an H-1B, H-2, or H-3 principal may be eligible for the maximum period of stay allowed under the H-1B, H-2 or

---

[6] The most recent USCIS guidance on time spent in H-4 status is from the 2006 memorandum cited above, which focuses only on decoupling time spent in H-4 status from time spent in H-1B or L-1 status.
[7] Maintenance of H-4 status continues to be tied to the principal's maintenance of H status. Thus, H-4 dependents may only maintain such status as long as the principal maintains the relevant principal H status.

Exhibit 3
142

H-3 classifications.  Furthermore, a principal H-1B, H-2, or H-3 nonimmigrant who subsequently changes to H-4 status may remain in the new derivative status for as long as the principal foreign national spouse maintains that principal status.  The application for a change of status to H-4 must be properly filed before the H-1B, H-2, or H-3 foreign national has spent the maximum allowable period of stay in the United States.

USCIS may limit, deny, or refer for removal an H-4 dependent that is not primarily intended for the purpose of being with the principal worker in the United States. Therefore, a spouse or child may be required to show that the requested stay is not intended to evade the normal requirements of the nonimmigrant classification that otherwise would apply when the principal foreign national is absent from the United States.

USCIS officers may adjudicate applications for dependent stays in order to prevent an H-1B nonimmigrant from using only occasional work visits to the United States in order to "park" the family members in the United States for extended periods while the principal alien is normally absent.

☞    2. The AFM **Transmittal Memorandum** button is revised by adding a new entry, in numerical order, to read:

| AFM Update AD13-12 11/11/2013 | Chapter 31.2(d)(2) | To provide additional guidance regarding how Immigration Services Officers (ISOs) should determine periods of admission for a foreign national. |
|---|---|---|

**Use**

This PM is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications and petitions.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Office of Policy and Strategy.

Exhibit 3
143

U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

**August 17, 2015**

PM-602-0111

# Policy Memorandum

SUBJECT:   L-1B Adjudications Policy

**Purpose**

This policy memorandum provides guidance on the adjudication of the L-1B classification, which permits multinational companies to transfer employees who possess "specialized knowledge" from their foreign operations to their operations in the United States.  It provides consolidated and authoritative guidance on the L-1B program, superseding and rescinding certain prior L-1B memoranda.  This memorandum also updates the Adjudicator's Field Manual (*AFM*) by replacing *AFM* chapter 32.6(e) with the version included in this memorandum.

**Scope**

This memorandum applies to and shall be used to guide determinations by all U.S. Citizenship and Immigration Services (USCIS) employees for all L-1B petitions pending or filed with USCIS on or after August 31, 2015.

**Authorities**

- Immigration and Nationality Act (INA) sections 101(a)(15)(L) and 214(c)(2), 8 U.S.C. 1101(a)(15)(L) and 1184(c)(2).
- 8 CFR 214.2(l).

**Policy**

**I.     Introduction**

The L-1 ("intracompany transferee") nonimmigrant visa classification permits multinational companies to transfer certain categories of employees from their foreign operations to their operations in the United States.  Specifically, the L-1A classification is available for intra-company transfers of corporate managers and executives, while the L-1B visa classification enables intracompany transfers of employees who possess "specialized knowledge."  This

Exhibit 3
144

memorandum sets forth USCIS policy regarding the L-1B classification for workers with specialized knowledge.

Congress created the L-1B classification so that multinational companies could more effectively transfer foreign employees with specialized knowledge to their U.S. operations, enhancing such companies' ability to leverage their workforces. Employees who work in any industry and serve in any type of position may be classified as L-1B nonimmigrants, so long as the position described in the L-1B petition requires specialized knowledge and the beneficiary is found to possess such knowledge. Creation of the program reflected Congress' concerns with meeting the workforce needs of multinational employers operating in an increasingly global marketplace. USCIS' mission is to ensure that the objectives of the L-1B program are achieved and that the program's integrity is maintained.

This memorandum provides guidance to officers in adjudicating petitions filed by employers seeking to transfer "specialized knowledge" personnel to the United States. The guidance provides clarification regarding how L-1B petitioners may demonstrate that an employee possesses specialized knowledge. In the case of off-site employment, it also provides greater clarity regarding compliance with the requirements of the L-1 Visa (Intracompany Transferee) Reform Act of 2004 ("L-1 Visa Reform Act"), Pub. L. No. 108-447, div. J, tit. IV, subtit. A, 118 Stat. 3351. The practical approach outlined in this guidance reflects the L-1B classification's broad statutory and regulatory definitions, while serving the purpose of the L-1B program and recognizing the fluid dynamics of the business world in which L-1B petitioners operate.

This memorandum provides consolidated and authoritative guidance on the L-1B program, superseding and rescinding prior L-1B memoranda as described in Section III. It interprets existing statutory and regulatory authorities to promote consistency and efficiency in L-1B adjudications and the policy objectives described herein. Such adjudications require individualized assessments based on a totality of the circumstances and determinations based upon the law and a preponderance of the evidence presented.

## II.   Background

In 1970, Congress created the L-1 visa program after concluding that immigration laws at the time unduly restricted the transfer and development of foreign personnel vital to the interests of U.S. businesses.[1] Congress designed the L-1 classification to enable employers to more effectively transfer such personnel within their organizations, including personnel with "specialized knowledge." The legislative history indicates that Congress intended for the class of eligible persons to be narrowly drawn, but Congress also anticipated that the L-1 petition process would be administered in an efficient way to facilitate qualifying personnel transfers for U.S. businesses.

---

[1] *See generally* Immigration Act of 1970, Pub. L. No. 91-225; H.R. Rep. 91-851, *as reprinted in* 1970 U.S.C.C.A.N. 2750, 2753-54 (noting the need to "help eliminate problems faced by American companies having offices abroad transferring key personnel freely within the organization").

Exhibit 3
145

The 1970 Act, however, did not define "specialized knowledge."  Interpretation of the term thus developed over time through a series of agency regulations and precedent decisions, which generally imposed new and increasingly restrictive requirements.  Such requirements included, for example, that specialized knowledge must relate to "proprietary" information and that such knowledge cannot otherwise be available in the U.S. labor market.

In 1990, Congress sought, among other things, to provide clarity to the term "specialized knowledge" through the passage of the Immigration Act of 1990, Pub. L. No. 101-649.  This Act provides the current statutory definition of "specialized knowledge":

> [A]n alien is considered to be serving in a capacity involving specialized knowledge with respect to a company if the alien has a special knowledge of the company product and its application in international markets or has an advanced level of knowledge of processes and procedures of the company.

Immigration and Nationality Act (INA) 214(c)(2)(B).  In drafting the 1990 Act, Congress intended to broaden the use of the L-1 visa category in specific ways.[2]  Notably, the 1990 Act did not include a proprietary knowledge requirement.  H.R. Rep. 101-723(I), 1990 U.S.C.C.A.N. at 6749.

Subsequently, the former Immigration and Naturalization Service (INS) revised its L-1 regulations to include a more liberal interpretation of specialized knowledge.  56 Fed. Reg. 31,553, 31,554 (1991).  The definition of "specialized knowledge" in those regulations, which continues to govern today, closely tracks the statutory definition:

> [S]pecial knowledge possessed by an individual of the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets, or an advanced level of knowledge or expertise in the organization's processes and procedures.

Title 8, Code of Federal Regulations (8 CFR) 214.2(1)(l)(ii)(D).  The prior regulatory definition had required that the beneficiary possess an advanced level of expertise, as well as proprietary knowledge not available in the U.S. labor market.  The new (and current) definition eliminated these requirements, permitting a finding of specialized knowledge in more varied circumstances.  This approach is consistent with the intent of Congress to enhance the ability of multinational employers to use the specialized skills of their employees and to promote the United States as a global business destination.

---

[2] The 1990 Act expanded eligibility for L-1 classification in four ways: (1) by allowing certain accounting firms access to the L-1 program; (2) by codifying the L-1 blanket petition process; (3) by expanding the '1-year' foreign employment requirement to include employment within 3 years prior to admission; and (4) by providing a 7-year maximum period of L-1A admission for managers and executives.  *See* H.R. Rep. 101-723(I) (1990), reprinted in 1990 U.S.C.C.A.N. 6710, 6749.

Exhibit 3
146

Following promulgation of the above regulation, legacy INS and USCIS issued the following memoranda to clarify the meaning of specialized knowledge:

- Memorandum of James A. Puleo, Acting Executive Associate Commissioner, Office of Operations, INS, "Interpretation of Specialized Knowledge (CO 214L-P)" (Mar. 9, 1994) ("Puleo Memo");

- Memorandum of Fujie Ohata, Associate Commissioner, Service Center Operations, INS, "Interpretation of Specialized Knowledge (HQSCOPS 70/6.1)" (Dec. 20, 2002) ("2002 Ohata Memo"); and

- Memorandum of Fujie Ohata, Director, Service Center Operations, USCIS, "Interpretation of Specialized Knowledge for Chefs and Specialty Cooks Seeking L-1B Status" (Sept. 9, 2004) ("2004 Ohata Memo").

The Puleo Memo described "specialized knowledge" as knowledge that is different from that which is generally found in the particular industry, but not necessarily knowledge that is proprietary or unique. It also clarified that specialized knowledge based on knowledge of the company's processes or procedures must be "advanced, highly developed, or complex" but need not be proprietary, unique or narrowly held throughout the company. Similarly, the 2002 Ohata Memo stressed that specialized or advanced knowledge "need not be proprietary or unique," that "specialized knowledge of the company product . . . must be noteworthy or uncommon," and that "knowledge of company processes or procedures . . . must be advanced" but "need not be narrowly held throughout the company." Finally, the 2004 Ohata Memo noted the need to analyze whether "the petitioning entity would suffer economic inconvenience or disruption to its U.S. or foreign-based operations if it had to hire someone other than the particular overseas employee on whose behalf the petition was filed." The 2004 Ohata Memo also reiterated that advanced knowledge "need not be narrowly held throughout the company."

In 2004, Congress enacted the L-1 Visa Reform Act, which established further requirements for the adjudication of L-1B petitions.[3] This legislation did not affect the meaning of "specialized knowledge," but instead addressed the placing of L-1B beneficiaries at third-party worksites as "labor for hire." Among other things, the Act requires that any prospective L-1B beneficiary who will be primarily located at the worksite of an unaffiliated employer (referred to as "off-site employment") must be (1) controlled and supervised principally by the petitioning employer or a qualifying organization;[4] and (2) provided in connection with the provision of products or services for which specialized knowledge specific to the petitioning employer is required. *See* INA 214(c)(2)(F). Accordingly, where a prospective L-1B beneficiary will be located primarily at a third-party worksite, USCIS must determine whether that beneficiary is eligible for the classification under the conditions established in the L-1 Visa Reform Act.

---

[3] L-1 Visa Reform Act sections 412-417.
[4] *See* 8 CFR 214.2(l)(ii)(G) (defining qualifying organization to include the petitioning employer's parent, branch, affiliate or subsidiary).

Exhibit 3
147

**III.    Scope of this Memorandum and Revision to the Adjudicator's Field Manual (*AFM*)**

To date, policy on the L-1B classification has been set forth in a series of policy memoranda dating back to 1994.  This memorandum is consistent with those policy memoranda but provides consolidated and authoritative guidance on determining whether specialized knowledge has been established in L-1B petitions and ensuring compliance with the L-1 Visa Reform Act.  As such, USCIS supersedes and rescinds the following memoranda:

- Memorandum of James A. Puleo, Acting Executive Associate Commissioner, Office of Operations, INS, "Interpretation of Specialized Knowledge (CO 214L-P)" (Mar. 9, 1994);

- Memorandum of Fujie Ohata, Associate Commissioner, Service Center Operations, INS, "Interpretation of Specialized Knowledge (HQSCOPS 70/6.1)" (Dec. 20, 2002);

- Memorandum of Fujie Ohata, Director, Service Center Operations, "Interpretation of Specialized Knowledge for Chefs and Specialty Cooks Seeking L-1B Status" (Sept. 9, 2004); and

- Memorandum of William R. Yates, Associate Director for Operations, "Changes to the L Nonimmigrant Classification Made by the L-1 Reform Act of 2004 (HQ 70/8)" (July 28, 2005).

In addition, the update to chapter 32.6(e) of the AFM included in this memorandum supersedes the previous version of that chapter.  The previous version of AFM chapter 32.6(e) will no longer be applicable to the L-1B adjudicative process.

The guidance in this memorandum regarding the L-1 Visa Reform Act is consistent with that set forth in AFM chapters 32.3(c) and 32.5(b) and should be read in conjunction with those AFM chapters.

This guidance applies to all USCIS employees.  When adjudicating L-1B petitions, USCIS officers should apply the statutory and regulatory criteria for L-1B classification in a manner consistent with this guidance.

**IV.    "Preponderance of the Evidence" Standard**

A petitioner seeking L-1B classification for an employee must establish that it meets each eligibility requirement of the classification by a preponderance of the evidence.[5]  In other words, the petitioner must show that what it claims is more likely the case than not.  This is a lower standard of proof than that of "clear and convincing evidence" or the "beyond a reasonable doubt" standard.  The petitioner does not need to remove all doubt from the adjudication.  Even

---

[5] *See Matter of Chawathe*, 25 I. & N. Dec. 369, 375-376 (AAO 2010).

Exhibit 3
148

if an officer has some doubt about a claim, the petitioner will have satisfied the standard of proof if it submits relevant, probative, and credible evidence, considered "individually and within the context of the totality of the evidence," that leads to the conclusion that the claim is "more likely than not" or "probably" true.[6]

## V.   Elements of the L-1B Classification

In order to establish eligibility for approval, the L-1B petitioner must show: (1) that the beneficiary possesses "specialized knowledge"; (2) that the position offered involves the "specialized knowledge" held by the beneficiary; and (3) that the beneficiary has at least one continuous year of employment abroad in a managerial, executive, or specialized knowledge capacity with the petitioning employer and/or any qualifying organization (collectively referred to as the "petitioning organization") within the preceding 3 years.  If the beneficiary will be located primarily at the workplace of an unaffiliated company, the petitioner also must establish that the beneficiary is eligible for L-1B classification under the requirements of the L-1 Visa Reform Act, discussed below in section VI.

### A.      Definition of "specialized knowledge"

A petitioner can demonstrate "specialized knowledge" by establishing either one of two statutory criteria.  Under the statute, a beneficiary is deemed to have specialized knowledge if he or she has:  (1) a "special" knowledge of the company product and its application in international markets; or (2) an "advanced" level of knowledge of the processes and procedures of the company.  INA 214(c)(2)(B).  The corresponding regulation similarly defines specialized knowledge in terms of "special" or "advanced" knowledge:

> **[S]pecial knowledge** possessed by an individual of the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets, or an **advanced level of knowledge or expertise** in the organization's processes and procedures.

8 CFR 214.2(l)(1)(ii)(D) (emphasis added).

Because the statute and regulations do not define the terms "special" or "advanced," we look to their common dictionary definitions, as well as the agency's practice and experience in this context.  The term "special" is defined in leading dictionaries as "surpassing the usual," "distinct among others of a kind," "distinguished by some unusual quality," "uncommon," or "noteworthy."[7]  The term "advanced" is defined in various dictionaries as "greatly developed

---

[6] *Id.* at 376.
[7] *See* Merriam-Webster Dictionary ("special"), *available at* http://www.merriam-webster.com/dictionary/special?show=0&t=1418153019 (last visited Mar. 13, 2015); Dictionary.com ("special"), *available at* http://dictionary.reference.com/browse/special?s=t (last visited Mar. 13, 2015); Oxford English Dictionary ("special"), *available at* http://www.oed.com/search?searchType=dictionary&q=special&_searchBtn=Search (last visited Mar. 13, 2015).

Exhibit 3

149

beyond an initial stage," or "ahead or far or further along in progress, complexity, knowledge, skill, etc."[8]  Applying these definitions to the statutory and regulatory text, a beneficiary seeking L-1B classification should, as a threshold matter, possess:

- **special knowledge**, which is knowledge of the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets that is ***distinct or uncommon in comparison to*** that generally found in the particular industry; or

- **advanced knowledge**, which is knowledge of or expertise in the petitioning organization's specific processes and procedures that is not commonly found in the relevant industry and is ***greatly developed or further along in progress, complexity and understanding*** than that generally found within the employer.

The following section explains how to determine whether a beneficiary possesses special or advanced knowledge.

### B.     Application of the "specialized knowledge" definition

A beneficiary may possess either special or advanced knowledge, or both.  Determining whether a beneficiary has "special knowledge" requires review of the beneficiary's knowledge of how the petitioning organization manufactures, produces, or develops its products, services, research, equipment, techniques, management, or other interests (hereinafter "products or services"). Determinations concerning "advanced knowledge," on the other hand, require review of the beneficiary's knowledge of the specific petitioning organization's processes and procedures. With respect to either special or advanced knowledge, the petitioner ordinarily must demonstrate that the beneficiary's knowledge is not commonly held throughout the particular industry.  As discussed in detail below, however, a beneficiary's knowledge need not be proprietary in nature or narrowly held within the petitioning organization to be considered specialized.

Determining whether knowledge is "special" or "advanced" inherently requires a comparison of the beneficiary's knowledge against that of others.  The petitioner bears the burden of establishing such a favorable comparison.  Because "special knowledge" concerns knowledge of the petitioning organization's products or services and its application in international markets, the petitioner may meet its burden through evidence that the beneficiary has knowledge that is distinct or uncommon in comparison to the knowledge of other similarly employed workers in the particular industry.

Alternatively, because "advanced knowledge" concerns knowledge of a petitioning organization's processes and procedures that is not commonly found in the relevant industry, the petitioner may meet its burden through evidence that the beneficiary has knowledge of or

---

[8] *See* Merriam-Webster Dictionary ("advanced"), *available at* http://www.merriam-webster.com/dictionary/advanced (last visited Mar. 13, 2015); Dictionary.com ("advanced"), *available at* http://dictionary.reference.com/browse/advanced?s=t (last visited Mar. 13, 2015).

Exhibit 3
150

expertise in the petitioning organization's processes and procedures that is greatly developed or further along in progress, complexity and understanding in comparison to other workers in the employer's operations.  It is not sufficient to demonstrate that the beneficiary has general knowledge of processes and procedures common to the industry; the focus here is primarily on whether the beneficiary's knowledge of the processes and procedures *used specifically by the petitioning organization* is advanced.  Such advanced knowledge must be supported by evidence setting that knowledge apart from the elementary or basic knowledge possessed by others in the petitioning organization and the relevant industry.

The following is a ***non-exhaustive*** list of factors that USCIS may consider when determining whether a beneficiary's knowledge is specialized:

- The beneficiary possesses knowledge of foreign operating conditions that is of significant value to the petitioning organization's U.S. operations.

- The beneficiary has been employed abroad in a capacity involving assignments that have significantly enhanced the employer's productivity, competitiveness, image, or financial position.

- The beneficiary's claimed specialized knowledge normally can be gained only through prior experience with the petitioning organization.

- The beneficiary possesses knowledge of a product or process that cannot be easily transferred or taught to another individual without significant economic cost or inconvenience (because, for example, such knowledge may require substantial training, work experience, or education).[9]

- The beneficiary has knowledge of a process or a product that either is sophisticated or complex, or of a highly technical nature, although not necessarily unique to the petitioning organization.

- The beneficiary possesses knowledge that is particularly beneficial to the petitioning organization's competitiveness in the marketplace.

The presence of one or more of these (or similar) factors, when assessed in the totality of the circumstances, may be sufficient to establish by a preponderance of the evidence that a beneficiary has specialized knowledge.  As noted above, this list of factors is meant to be illustrative, not exhaustive, and it does not impose particular requirements that a petitioner must

---

[9] One factor that may be relevant in weighing economic inconvenience is the time-sensitivity of the petitioning organization's need in its U.S. operations for an employee with the particular type of specialized knowledge, and the harm the organization would suffer if it cannot fulfill its time-sensitive personnel need through transfer of the beneficiary.  *Cf. Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1142 (D.C. Cir. 2014) (observing that a "natural prox[y] for economic inconvenience" is "the amount of in-house training a company's employees would have to receive to acquire the knowledge in question").

Exhibit 3
151

demonstrate.  Suggested evidence that petitioners may provide consistent with these factors is provided in Section V.C.

      1.     <u>Specialized knowledge generally cannot be commonly held, lacking in complexity, or easily imparted to other individuals.</u>

One of the several factors that may be considered in determining whether knowledge is specialized is the amount and type of training, work experience, or education required to develop that knowledge.  *See* 8 CFR 214.2(l)(3)(iv) (requiring petitioner to submit evidence of the beneficiary's "prior education, training, and employment").  Knowledge generally may not be considered special or advanced if it is commonly held, lacks some complexity, or can be easily imparted from one person to another.  On the other hand, knowledge generally may be considered specialized if a petitioner can demonstrate through credible and relevant evidence that the knowledge possessed by the beneficiary would be difficult to impart to another individual without significant economic cost or inconvenience to the petitioning organization.[10]  Depending on the totality of the circumstances, significant economic cost or inconvenience may be a relevant factor; however, a petitioner is not required to establish significant economic cost or inconvenience if it can otherwise establish specialized knowledge.

      2.     <u>Specialized knowledge need not be proprietary or unique to the petitioning organization.</u>

Although specialized knowledge ordinarily cannot be knowledge that is generally possessed or easily transferable, it need not be proprietary or unique to the petitioning organization.  A petitioner is not required to demonstrate that it is the only company where the beneficiary could have acquired the knowledge, or that it is the only company that trades in the technologies, techniques, products, services, or processes that are the subject of the beneficiary's knowledge.  Although a petitioner may provide evidence that knowledge is proprietary or unique in support of its claim that the knowledge is also special or advanced, and thus specialized, the L-1B classification does not *require* such a finding.

      3.     <u>L-1B classification does not involve a test of the U.S. labor market.</u>

As noted above, the petitioner must ordinarily demonstrate that the beneficiary's knowledge is not generally or commonly held in the relevant industry.  Such a determination, however, does *not* involve a test of the U.S. labor market.  A petitioner is not required to demonstrate the lack of readily available workers to perform the relevant duties in the United States.[11]  The relevant inquiry is not whether workers with the beneficiary's knowledge are available to the employer;

---

[10] *See Fogo De Chao*, 769 F.3d at 1142.
[11] In *Fogo De Chao*, the D.C. Circuit noted that the Immigration Act of 1990 precludes USCIS from requiring evidence establishing that the specialized knowledge in question is not readily available in the United States labor market.  769 F.3d at 1145.  An inquiry into whether knowledge is generally or commonly held in a given industry— and thus not "special," as that term is naturally understood—is separate from an inquiry into whether there are U.S. workers available to perform a given job.

Exhibit 3
152

rather, it is whether there are so many such workers that the knowledge is generally or commonly held in the relevant industry, and therefore not specialized.  If there are numerous workers in the United States who possess knowledge that is generally similar to the beneficiary's, it is the petitioner's burden to establish that the beneficiary's knowledge nevertheless is truly specialized.[12]

### 4.   Specialized knowledge need not be narrowly held within the petitioning organization.

Although comparisons with other employees of the petitioning organization may be useful in determining whether the beneficiary's knowledge is "special" or "advanced," such knowledge need not be narrowly held within the petitioning organization.  Multiple employees within a company may have obtained the experience, training, or education necessary to possess the same type of specialized knowledge.  Some companies may use technologies or techniques that are so advanced or complex that nearly all employees working on the relevant products or services possess specialized knowledge.  The mere existence of other employees with similar knowledge should not, in and of itself, be a ground for denial.

Depending on the facts of the case,  where there are already a significant number of employees in the U.S. organization with the same claimed specialized knowledge as that of the beneficiary, a question may arise as to whether the relevant position needs to be filled by an individual having specialized knowledge.  Accordingly, officers should consider, as in other L-1B cases, whether the evidence of record demonstrates the organization's need to transfer the beneficiary to the United States.  The officer may consider, for example, whether the petitioner has shown the need for another individual with similar knowledge in the organization's U.S. operations and the difficulty in transferring or teaching the relevant knowledge to an individual other than the beneficiary.  In reviewing the record, the officer should also consider how the duties to be performed by the beneficiary that require his or her claimed specialized knowledge may or may not differ from those already employed in the organization's U.S. operations; the extent to which the petitioning organization would suffer economic inconvenience or disruption to its U.S. or foreign-based operations if it were unable to transfer the beneficiary; whether and to what degree the beneficiary's claimed specialized knowledge would be beneficial to the successful conduct of the employer's operations; and whether the total compensation[13] provided to the beneficiary is comparable in dollar value to similarly situated peers in such U.S. operations.[14]

---

[12] Comparisons that account for similarly employed workers within the petitioning organization's U.S. operations are discussed in section V.B.4.

[13] For this limited purpose, what constitutes "total compensation" is fact dependent, but may include, besides wages or salary, other guaranteed forms of payment made to an employee for services to be rendered for the petitioner.  Such compensation may be paid in the form of money, a commodity, a service, or a privilege, including food, transportation and housing allowances, as well as guaranteed bonuses.  Any such payment, however, must principally be for the convenience or benefit of the employee and be agreed upon by the petitioner and beneficiary before the petition is filed.  The petitioner bears the burden of establishing the actual value of any claimed compensation.

[14] Evidence that a significant  number of  employees within the petitioning organization's U.S. operations share the beneficiary's knowledge, yet the beneficiary will be paid substantially less than those similarly situated employees,

Exhibit 3
153

5. <u>Specialized knowledge workers need not occupy managerial or similar positions or command higher compensation compared to their peers.</u>

Unlike the L-1A nonimmigrant classification, the L-1B classification does not require that the beneficiary be a manager or executive. Nor does the classification require that the beneficiary be an officer or supervisor, or hold any other similar position within the petitioning organization. Although rank and compensation are factors that may be considered when analyzing whether a beneficiary possesses specialized knowledge, there is no requirement that the beneficiary be of a certain rank within the organization or that the beneficiary's compensation be "elevated" compared to his or her peers within the organization or the particular industry. There may be valid business reasons that one employee may be earning more or less than his or her peers. A company in its early development, for example, may not yet have generated sufficient income to pay the beneficiary a greater salary. In creating the L-1B classification, Congress focused on the beneficiary's "knowledge," not his or her position on a company's organizational chart or pay scale.

6. <u>Eligibility for another nonimmigrant classification is not a bar to eligibility for L-1B classification.</u>

The requirements for L-1B classification are distinct from other visa classifications. Eligibility for one classification does not preclude eligibility for another. A beneficiary may possess characteristics that make him or her potentially qualified for two or more distinct nonimmigrant classifications. For example, the beneficiary may have characteristics that make him or her eligible as an L-1B specialized knowledge worker and an H-1B "specialty occupation" worker. Similarly, a beneficiary may qualify for L-1B nonimmigrant status while at the same time possessing the extraordinary ability or achievement necessary for O-1 status. Possession of such dual qualifications does not render the beneficiary ineligible for either classification. Officers should only consider the requirements for the classification sought in the petition, without considering eligibility requirements for other classifications.

## C. Evaluating Claims of Specialized Knowledge

USCIS will be able to perform its adjudicatory function most effectively when the petitioner explains in detail the specific nature of the industry or field involved, the nature of the petitioning organization's products or services, the nature of the specialized knowledge required to perform the beneficiary's duties, and the need for the beneficiary's specialized knowledge. To show that the offered position in the United States involves specialized knowledge, the petitioner must submit "a detailed description of the services to be performed." 8 CFR 214.2(l)(3)(ii). A petitioner's statement may be persuasive evidence if it is detailed, specific, and credible. Adjudicators may, in appropriate cases, however, request further evidence to support a petitioner's statement, bearing in mind that there may be cases involving circumstances that may

---

may indicate that the beneficiary lacks the requisite specialized knowledge. As described *infra*, however, there may be valid business reasons for the wage discrepancy. Justification for the variance generally should be evaluated in light of the skills, experience, and other factors pertinent to the entire spectrum of employees in the U.S. operations who possess the requisite specialized knowledge.

Exhibit 3
154

be difficult to document other than through a petitioner's own statement.[15]  The petitioner must also submit evidence that the beneficiary's "prior education, training, and employment qualifies him/her to perform the intended services in the United States."  8 CFR 214.2(l)(3)(iv).  While the petitioner is required in all cases to compare the beneficiary's knowledge to that of others, the petitioner may also be able to demonstrate the nature of the claimed specialized knowledge by, among other things, indicating how and when the beneficiary gained such knowledge or explaining the difficulty of imparting such knowledge to others without significant cost or disruption to its business.

Other evidence that a petitioner may submit to demonstrate that an individual's knowledge is special or advanced, includes, but is not limited to:

- Documentation of training, work experience, or education establishing the number of years the individual has been using or developing the claimed specialized knowledge as an employee of the petitioning organization or in the industry;

- Evidence of the impact, if any, the transfer of the individual would have on the petitioning organization's U.S. operations;

- Evidence that the alien is qualified to contribute significantly to the U.S. operation's knowledge of foreign operating conditions as a result of knowledge not generally found in the petitioning organization's U.S. operations;

- Contracts, statements of work, or other documentation that shows that the beneficiary possesses knowledge that is particularly beneficial to the petitioning organization's competitiveness in the marketplace;

- Evidence, such as correspondence or reports, establishing that the beneficiary has been employed abroad in a capacity involving assignments that have significantly enhanced the petitioning organization's productivity, competitiveness, image, or financial position;

- Personnel or in-house training records that establish that the beneficiary's claimed specialized knowledge normally can be gained only through prior experience or training with the petitioning organization;

- Curricula and training manuals for internal training courses, financial documents, or other evidence that may demonstrate that the beneficiary possesses knowledge of a product or process that cannot be transferred or taught to another individual without significant economic cost or inconvenience;

---

[15] *See, e.g., Matter of Soffici*, 22 I. & N. Dec. 158, 165 (Assoc. Comm'r 1998) (citing *Matter of Treasure Craft of Calif.*, 14 I. & N. Dec. 190, 193 (Reg'l Comm'r 1972)); *cf. Brazil Quality Stones, Inc. v. Chertoff*, 531 F.3d 1063, 1070 (9th Cir. 2008) (holding that USCIS properly denied L-1A petition where "the documents submitted to the agency d[id] not describe with particularity what [the beneficiary's] duties entailed").

Exhibit 3
155

- Evidence of patents, trademarks, licenses, or contracts awarded to the petitioning organization based on the beneficiary's work, or similar evidence that the beneficiary has knowledge of a process or a product that either is sophisticated or complex, or of a highly technical nature, although not necessarily proprietary or unique to the petitioning organization; and

- Payroll documents, federal or state wage statements, documentation of other forms of compensation, resumes, organizational charts, or similar evidence documenting the positions held and the compensation provided to the beneficiary and parallel employees in the petitioning organization.

A petitioner may submit any other evidence it chooses.  In all cases, USCIS will review the entire record to determine whether the petitioner has established by a preponderance of the evidence that the beneficiary has specialized knowledge under the totality of the circumstances, in accordance with the standards set forth in the relevant statutes and regulations, as reflected in this memorandum.  Merely stating that a beneficiary's knowledge is somehow different from others or greatly developed does not, in and of itself, establish that he or she possesses specialized knowledge.  Ultimately, it is the weight and type of evidence that establishes whether the beneficiary possesses specialized knowledge.

### D.   Demonstrating Qualifying Employment

To be eligible for L-1B classification, the beneficiary must have been employed abroad by a qualifying organization on a full-time basis for one continuous year within the preceding three years. *See* INA 101(a)(15)(L); 8 CFR 214.2(l)(1) and 8 CFR 214.2(l)(3)(iii).  The required employment abroad must have been in a managerial or executive capacity, or a capacity involving specialized knowledge.  8 CFR 214.2(l)(3)(iv).  However, the work to be performed in the United States need not be the same type of work that the beneficiary performed abroad.  *Id.* For instance, a person who was employed abroad for one continuous year as a manager by a qualifying organization may, depending on the circumstances, meet the qualifying employment requirement for L-1B classification.[16]

## VI.   Offsite L-1B Employment (L-1 Visa Reform Act)

When an L-1B beneficiary will be primarily stationed at the worksite of an unaffiliated employer, the L-1 Visa Reform Act requires the petitioner to show that the beneficiary: (1) will not be "controlled and supervised principally" by the unaffiliated employer; and (2) will be placed "in connection with the provision of a product or service for which specialized knowledge specific to the petitioning employer is necessary."  INA 214(c)(2)(F).  Absent this showing, the worker is not eligible for L-1B classification.  *Id.*  The L-1 Visa Reform Act is designed to

---

[16] Further, an L-1B petitioner seeking to use the "blanket petition" process must show that the beneficiary is a "specialized knowledge *professional*," which is defined as an individual with specialized knowledge who is a member of the professions as defined in INA 101(a)(32).  8 CFR 214.2(l)(1)(ii)(E) (emphasis added).

Exhibit 3
156

prevent, among other things, the outsourcing of L-1B beneficiaries to third-party entities as "labor for hire."[17]   Accordingly, if a determination has been made that a beneficiary has specialized knowledge and that he or she will be stationed primarily at the worksite of an unaffiliated employer, USCIS must also determine whether the position involves "labor for hire."

USCIS has interpreted the "control and supervision" prong of the L-1 Visa Reform Act to require that, despite placement with an unaffiliated employer, the beneficiary will continue to be controlled and supervised principally by the petitioning organization.[18]   The petitioning organization therefore may not merely supply workers and issue their paychecks in a "labor for hire" arrangement.  Instead, the unaffiliated company must have a business relationship with the petitioning organization that involves the provision of products or services by the petitioning organization and not simply the supply of workers alone.  This ground of ineligibility applies to all petitions filed on or after June 6, 2005, including petitions for initial, amended, or extended L-1B classification.

With respect to section 214(c)(2)(F)(i) (which requires that the worker not be "controlled and supervised principally" by an unaffiliated employer), it is important to note that the L-1 Visa Reform Act permits off-site employment in certain circumstances.  An L-1B beneficiary may be legitimately stationed at a third-party worksite, even if it is located far from the petitioning employer's office(s).  Further, an unaffiliated employer is not necessarily prohibited from giving day-to-day assignments to the beneficiary, provided that, in the totality of the circumstances, the unaffiliated employer does not principally control and supervise the beneficiary's activities.  The petitioner may establish that the unaffiliated entity lacks principal control and supervision by showing, among other things, that the petitioner at all times retains the principal authority to: dictate the manner in which the work is to be performed, reward or discipline the worker for his or her work performance, and provide the worker's salary and any normal employer-provided benefits, such as health insurance.  In all cases, however, determinations with respect to control and supervision will be based on all of the facts presented.

To satisfy section 214(c)(2)(F)(ii), the off-site placement cannot be "essentially an arrangement to provide labor for hire for the unaffiliated employer, rather than a placement in connection with the provision of a product or service for which specialized knowledge specific to the petitioning employer is necessary." Accordingly, the petitioner must show that a beneficiary stationed primarily off-site will be using the specialized knowledge that served as the basis of the L-1B petition filed on his or her behalf while working at the off-site location.  USCIS will determine, based on the evidence presented, whether the petitioner has demonstrated that the placement is in connection with the provision of the beneficiary's specialized knowledge, and is not essentially an impermissible arrangement of labor for hire.[19]

---

[17] INA 214(c)(2)(F)(ii); *see also* 149 CONG. REC. 11,649, 11,686, 2003 WL 22143105 (2003) (statement of Sen. Saxby Chambliss introducing the L-1 Visa Reform Act).
[18] *See* 149 CONG. REC. at 11,686 (discussing supervision and control by petitioning organization).
[19] Where a petitioning organization provides a customized product or service to a third party, the beneficiary's knowledge of the third party's systems may be considered in addition to, but not as a substitute for, the beneficiary's knowledge of the petitioning organization's product or service to determine whether the beneficiary's knowledge is "specialized," based on the totality of the circumstances.

Exhibit 3
157

## VII.   Readjudication of L-1B Status

In matters relating to an extension of L-1B status involving the same parties (i.e., the same petitioner and beneficiary employee) and the same underlying facts, USCIS officers should give deference to the prior determination by USCIS approving L-1B classification.[20]  In such cases, USCIS officers should re-examine a finding of L-1B eligibility only where it is determined that: (1) there was a material error with regard to the previous approval for L-1B classification; (2) there has been a substantial change in circumstances since that approval; or (3) there is new material information that adversely impacts the petitioner's or beneficiary's eligibility.[21] In adjudicating a request for extension of L-1B status, USCIS will take note of a previous determination of L-1B eligibility made by the Department of State or U.S. Customs and Border Protection, but will make a determination on the instant petition based on the record before it, consistent with the guidance provided in this memorandum.

## VIII.  Conclusion

Congress has determined that the ability to transfer company personnel with specialized knowledge is important in fostering the growth and competitiveness of U.S. businesses. Companies should be able to transfer their specialized knowledge employees to do business in an increasingly global marketplace. The L-1B classification provides petitioning organizations flexibility, consistent with this memorandum, as to how they may demonstrate that an employee possesses specialized knowledge and, in the case of off-site employment, compliance with the requirements of the L-1 Visa Reform Act.  This practical approach is reflected in the L-1B classification's broad statutory and regulatory definitions, maintains the integrity of the L-1B program, and recognizes the fluid dynamics of the business world in which petitioning organizations operate.

## IX.   Implementation

### A.   *AFM* Update

The *AFM* is updated by replacing current chapter 32.6(e) with the following:

(e) Specialized Knowledge Capacity.

In order to establish eligibility for approval, the L-1B petitioner must show: (1) that the beneficiary possesses "specialized knowledge"; (2) that the position offered involves the

---

[20] This policy of deference does not apply to a request for extension where the prior petition indicated that the beneficiary would be coming to the United States to open or be employed in a "new office."  *See* 8 CFR 214.2(l)(3)(vi).

[21] *See* Memorandum of William R. Yates, Associate Director for Operations, USCIS, "The Significance of a Prior CIS Approval of a Nonimmigrant Petition in the Context of a Subsequent Determination Regarding Eligibility for Extension of Petition Validity (HQOPRD 72/11.3)" 1-2 (Apr. 23, 2004).  For example, a change in off-site employment, depending on the circumstances, may constitute a substantial change or new material information requiring readjudication by USCIS to ensure compliance with the L-1 Visa Reform Act.

Exhibit 3
158

"specialized knowledge" held by the beneficiary; and (3) that the beneficiary has at least one continuous year of employment abroad in a managerial, executive, or specialized knowledge capacity with the petitioning employer and/or any qualifying organization (collectively referred to as the "petitioning organization") within the preceding three years.  If the beneficiary will be located primarily at the workplace of an unaffiliated company, the petitioner also must establish that the beneficiary is eligible for L-1B classification under the requirements of the L-1 Visa Reform Act.

(1)  Definition of "specialized knowledge."

A petitioner can demonstrate "specialized knowledge" by establishing either one of two statutory criteria.  Under the statute, a beneficiary is deemed to have specialized knowledge if he or she has: (1) a "special" knowledge of the company product and its application in international markets; or (2) an "advanced" level of knowledge of the processes and procedures of the company.  INA 214(c)(2)(B).  The corresponding regulation similarly defines specialized knowledge in terms of "special" or "advanced" knowledge:

> **[S]pecial knowledge** possessed by an individual of the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets, or an **advanced level of knowledge or expertise** in the organization's processes and procedures.

8 CFR 214.2(l)(1)(ii)(D) (emphasis added).

Because the statute and regulations do not define the terms "special" or "advanced," we look to their common dictionary definitions, as well as the agency's practice and experience in this context.  The term "special" is defined in leading dictionaries as "surpassing the usual," "distinct among others of a kind," "distinguished by some unusual quality," "uncommon," or "noteworthy."[22]  The term "advanced" is defined in various dictionaries as "greatly developed beyond an initial stage," or "ahead or far or further along in progress, complexity, knowledge, skill, etc."[23]  Applying these definitions to the statutory and regulatory text, a beneficiary seeking L-1B classification should, as a threshold matter, possess:

- **special knowledge**, which is knowledge of the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets that is *distinct or uncommon in comparison to* that generally found in the particular industry; or

---

[22] *See* Merriam-Webster Dictionary ("special"), *available at* http://www.merriam-webster.com/dictionary/special?show=0&t=1418153019 (last visited Mar. 13, 2015); Dictionary.com ("special"), *available at* http://dictionary.reference.com/browse/special?s=t (last visited Mar. 13, 2015); Oxford English Dictionary ("special"), *available at* http://www.oed.com/search?searchType=dictionary&q=special&_searchBtn=Search (last visited Mar. 13, 2015).

[23] *See* Merriam-Webster Dictionary ("advanced"), *available at* http://www.merriam-webster.com/dictionary/advanced (last visited Mar. 13, 2015); Dictionary.com ("advanced"), *available at* http://dictionary.reference.com/browse/advanced?s=t (last visited Mar. 13, 2015).

Exhibit 3
159

- **advanced knowledge**, which is knowledge of or expertise in the petitioning organization's specific processes and procedures that is not commonly found in the relevant industry and is ***greatly developed or further along in progress, complexity and understanding*** than that generally found within the employer.

The following section explains how to determine whether a beneficiary possesses special or advanced knowledge.

    (2) <u>Application of the "specialized knowledge" definition</u>.

A beneficiary may possess either special or advanced knowledge, or both.  Determining whether a beneficiary has "special knowledge" requires review of the beneficiary's knowledge of how the petitioning organization manufactures, produces, or develops its products, services, research, equipment, techniques, management, or other interests (hereinafter "products or services").  Determinations concerning "advanced knowledge," on the other hand, require review of the beneficiary's knowledge of the specific petitioning organization's processes and procedures. With respect to either special or advanced knowledge, the petitioner ordinarily must demonstrate that the beneficiary's knowledge is not commonly held throughout the particular industry.  As discussed in detail below, however, a beneficiary's knowledge need not be proprietary in nature or narrowly held within the petitioning organization to be considered specialized.

Determining whether knowledge is "special" or "advanced" inherently requires a comparison of the beneficiary's knowledge against that of others.  The petitioner bears the burden of establishing such a favorable comparison.  Because "special knowledge" concerns knowledge of the petitioning organization's products or services and its application in international markets, the petitioner may meet its burden through evidence that the beneficiary has knowledge that is distinct or uncommon in comparison to the knowledge of other similarly employed workers in the particular industry.

Alternatively, because "advanced knowledge" concerns knowledge of a petitioning organization's processes and procedures that is not commonly found in the relevant industry, the petitioner may meet its burden through evidence that the beneficiary has knowledge of or expertise in the petitioning organization's processes and procedures that is greatly developed or further along in progress, complexity and understanding in comparison to other workers in the employer's operations.  It is not sufficient to demonstrate that the beneficiary has general knowledge of processes and procedures common to the industry; the focus here is primarily on whether the beneficiary's knowledge of the processes and procedures *used specifically by the petitioning organization* is advanced.  Such advanced knowledge must be supported by evidence setting that knowledge apart from the elementary or basic knowledge possessed by others in the petitioning organization and the relevant industry.

The following is a ***non-exhaustive*** list of factors that USCIS may consider when determining whether a beneficiary's knowledge is specialized:

- The beneficiary possesses knowledge of foreign operating conditions that is of significant value to the petitioning organization's U.S. operations.

Exhibit 3

160

- The beneficiary has been employed abroad in a capacity involving assignments that have significantly enhanced the employer's productivity, competitiveness, image, or financial position.

- The beneficiary's claimed specialized knowledge normally can be gained only through prior experience with the petitioning organization.

- The beneficiary possesses knowledge of a product or process that cannot be easily transferred or taught to another individual without significant economic cost or inconvenience (because, for example, such knowledge may require substantial training, work experience, or education).[24]

- The beneficiary has knowledge of a process or a product that either is sophisticated or complex, or of a highly technical nature, although not necessarily unique to the petitioning organization.

- The beneficiary possesses knowledge that is particularly beneficial to the petitioning organization's competitiveness in the marketplace.

The presence of one or more of these (or similar) factors, when assessed in the totality of the circumstances, may be sufficient to establish by a preponderance of the evidence that a beneficiary has specialized knowledge. As noted above, this list of factors is meant to be illustrative, not exhaustive, and it does not impose particular requirements that a petitioner must demonstrate. Suggested evidence that petitioners may provide consistent with these factors is provided in section 32.6(e)(3).

> (A) Specialized knowledge generally cannot be commonly held, lacking in complexity, or easily imparted to other individuals.

One of the several factors that may be considered in determining whether knowledge is specialized is the amount and type of training, work experience, or education required to develop that knowledge. *See* 8 CFR 214.2(l)(3)(iv) (requiring petitioner to submit evidence of the beneficiary's "prior education, training, and employment"). Knowledge generally may not be considered special or advanced if it is commonly held, lacks some complexity, or can be easily imparted from one person to another. On the other hand, knowledge generally may be considered specialized if a petitioner can demonstrate through credible and relevant evidence that the knowledge possessed by the beneficiary would be difficult to impart to another individual without significant economic cost or inconvenience to the petitioning organization.[25] Depending on the totality of the circumstances, significant economic cost or inconvenience may

---

[24] One factor that may be relevant in weighing economic inconvenience is the time-sensitivity of the petitioning organization's need in its U.S. operations for an employee with the particular type of specialized knowledge, and the harm the organization would suffer if it cannot fulfill its time-sensitive personnel need through transfer of the beneficiary. *Cf. Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1142 (D.C. Cir. 2014) (observing that a "natural prox[y] for economic inconvenience" is "the amount of in-house training a company's employees would have to receive to acquire the knowledge in question").
[25] *See Fogo De Chao*, 769 F.3d at 1142.

Exhibit 3
161

be a relevant factor; however, a petitioner is not required to establish significant economic cost or inconvenience if it can otherwise establish specialized knowledge.

(B) <u>Specialized knowledge need not be proprietary or unique to the petitioning organization</u>.

Although specialized knowledge ordinarily cannot be knowledge that is generally possessed or easily transferrable, it need not be proprietary or unique to the petitioning organization.  A petitioner is not required to demonstrate that it is the only company where the beneficiary could have acquired the knowledge, or that it is the only company that trades in the technologies, techniques, products, services, or processes that are the subject of the beneficiary's knowledge.  Although a petitioner may provide evidence that knowledge is proprietary or unique in support of its claim that the knowledge is also special or advanced, and thus specialized, the L-1B classification does not *require* such a finding.

(C) <u>L-1B classification does not involve a test of the U.S. labor market</u>.

As noted above, the petitioner must ordinarily demonstrate that the beneficiary's knowledge is *not* generally or commonly held in the relevant industry.  Such a determination, however, does *not* involve a test of the U.S. labor market.  A petitioner is not required to demonstrate the lack of readily available workers to perform the relevant duties in the United States.[26]  The relevant inquiry is not whether workers with the beneficiary's knowledge are available to the employer; rather, it is whether there are so many such workers that the knowledge is generally or commonly held in the relevant industry, and therefore not specialized.  If there are numerous workers in the United States who possess knowledge that is generally similar to the beneficiary's, it is the petitioner's burden to establish that the beneficiary's knowledge nevertheless is truly specialized.[27]

(D) <u>Specialized knowledge need not be narrowly held within the petitioning organization</u>.

Although comparisons with other employees of the petitioning organization may be useful in determining whether the beneficiary's knowledge is "special" or "advanced," such knowledge need not be narrowly held within the petitioning organization.  Multiple employees within a company may have obtained the experience, training, or education necessary to possess the same type of specialized knowledge.  Some companies may use technologies or techniques that are so advanced or complex that nearly all employees working on the relevant products or services possess specialized knowledge.  The mere existence of other employees with similar knowledge should not, in and of itself, be a ground for denial.

Depending on the facts of the case,  where there are already a significant number of employees in the U.S. organization with the same claimed specialized knowledge as that of the beneficiary,

---

[26] In *Fogo De Chao*, the D.C. Circuit noted that the Immigration Act of 1990 precludes USCIS from requiring evidence establishing that the specialized knowledge in question is not readily available in the United States labor market.  769 F.3d at 1145.  An inquiry into whether knowledge is generally or commonly held in a given industry—and thus not "special," as that term is naturally understood—is separate from an inquiry into whether there are U.S. workers available to perform a given job.
[27] Comparisons that account for similarly employed workers within the petitioning organization's U.S. operations are discussed in section 32.6(e)(2)(D).

Exhibit 3
162

a question may arise as to whether the relevant position needs to be filled by an individual having specialized knowledge.  Accordingly, officers should consider, as in other L-1B cases, whether the evidence of record demonstrates the organization's need to transfer the beneficiary to the United States.  The officer may consider, for example, whether the petitioner has shown the need for another individual with similar knowledge in the organization's U.S. operations and the difficulty in transferring or teaching the relevant knowledge to an individual other than the beneficiary.  In reviewing the record, the officer should also consider how the duties to be performed by the beneficiary that require his or her claimed specialized knowledge may or may not differ from those already employed in the organization's U.S. operations; the extent to which the petitioning organization would suffer economic inconvenience or disruption to its U.S. or foreign-based operations if it were unable to transfer the beneficiary; whether and to what degree the beneficiary's claimed specialized knowledge would be beneficial to the successful conduct of the employer's operations; and whether the total compensation[28] provided to the beneficiary is comparable in dollar value to similarly situated peers in such U.S. operations.[29]

   (E) <u>Specialized knowledge workers need not occupy managerial or similar positions or command higher compensation compared to their peers</u>.

Unlike the L-1A nonimmigrant classification, the L-1B classification does not require that the beneficiary be a manager or executive.  Nor does the classification require that the beneficiary be an officer or supervisor, or hold any other similar position within the petitioning organization.  Although rank and compensation are factors that may be considered when analyzing whether a beneficiary possesses specialized knowledge, there is no requirement that the beneficiary be of a certain rank within the organization or that the beneficiary's compensation be "elevated" compared to his or her peers within the organization or the particular industry.  There may be valid business reasons that one employee may be earning more or less than his or her peers.  A company in its early development, for example, may not yet have generated sufficient income to pay the beneficiary a greater salary.  In creating the L-1B classification, Congress focused on the beneficiary's "knowledge," not his or her position on a company's organizational chart or pay scale.

   (F) <u>Eligibility for another nonimmigrant classification is not a bar to eligibility for L-1B classification</u>.

---

[28] For this limited purpose, what constitutes "total compensation" is fact dependent, but may include, besides wages or salary, other guaranteed forms of payment made to an employee for services to be rendered for the petitioner.  Such compensation may be paid in the form of money, a commodity, a service, or a privilege, including food, transportation, and housing allowances, as well as guaranteed bonuses.  Any such payment, however, must principally be for the convenience or benefit of the employee and be agreed upon by the petitioner and beneficiary before the petition is filed.  The petitioner bears the burden of establishing the actual value of any claimed compensation.

[29] Evidence that a significant  number of  employees within the petitioning organization's U.S. operations share the beneficiary's knowledge, yet the beneficiary will be paid substantially less than those similarly situated employees, may indicate that the beneficiary lacks the requisite specialized knowledge.  As described *infra*, however, there may be valid business reasons for the wage discrepancy.  Justification for the variance generally should be evaluated in light of the skills, experience, and other factors pertinent to the entire spectrum of employees in the U.S. operations who possess the requisite specialized knowledge.

Exhibit 3
163

The requirements for L-1B classification are distinct from other visa classifications.  Eligibility for one classification does not preclude eligibility for another.  A beneficiary may possess characteristics that make him or her potentially qualified for two or more distinct nonimmigrant classifications.  For example, the beneficiary may have characteristics that make him or her eligible as an L-1B specialized knowledge worker and an H-1B "specialty occupation" worker.  Similarly, a beneficiary may qualify for L-1B nonimmigrant status while at the same time possessing the extraordinary ability or achievement necessary for O-1 status.  Possession of such dual qualifications does not render the beneficiary ineligible for either classification.  Officers should only consider the requirements for the classification sought in the petition, without considering eligibility requirements for other classifications.

> (3)  Evaluating claims of specialized knowledge.

USCIS will be able to perform its adjudicatory function most effectively when the petitioner explains in detail the specific nature of the industry or field involved, the nature of the petitioning organization's products or services, the nature of the specialized knowledge required to perform the beneficiary's duties, and the need for the beneficiary's specialized knowledge.  To show that the offered position in the United States involves specialized knowledge, the petitioner must submit "a detailed description of the services to be performed."  8 CFR 214.2(l)(3)(ii).  A petitioner's statement may be persuasive evidence if it is detailed, specific, and credible.  Adjudicators may, in appropriate cases, however, request further evidence to support a petitioner's statement, bearing in mind that there may be cases involving circumstances that may be difficult to document other than through a petitioner's own statement.[30]  The petitioner must also submit evidence that the beneficiary's "prior education, training, and employment qualifies him/her to perform the intended services in the United States."  8 CFR 214.2(l)(3)(iv).  While the petitioner is required in all cases to compare the beneficiary's knowledge to that of others, the petitioner may also be able to demonstrate the nature of the claimed specialized knowledge by, among other things, indicating how and when the beneficiary gained such knowledge or explaining the difficulty of imparting such knowledge to others without significant cost or disruption to its business.

Other evidence that a petitioner may submit to demonstrate that an individual's knowledge is special or advanced, includes, but is not limited to:

- Documentation of training, work experience, or  education establishing the number of years the individual has been using or developing the claimed specialized knowledge as an employee of the petitioning organization or in the industry;

- Evidence of the impact, if any, the transfer of the individual would have on the petitioning organization's U.S. operations;

---

[30] See, e.g., Matter of Soffici, 22 I. & N. Dec. 158, 165 (Assoc. Comm'r 1998) (citing Matter of Treasure Craft of Calif., 14 I. & N. Dec. 190, 193 (Reg'l Comm'r 1972)); cf. Brazil Quality Stones, Inc. v. Chertoff, 531 F.3d 1063, 1070 (9th Cir. 2008) (holding that USCIS properly denied L-1A petition where "the documents submitted to the agency d[id] not describe with particularity what [the beneficiary's] duties entailed").

Exhibit 3
164

- Evidence that the alien is qualified to contribute significantly to the U.S. operation's knowledge of foreign operating conditions as a result of knowledge not generally found in the petitioning organization's U.S. operations;

- Contracts, statements of work, or other documentation that shows that the beneficiary possesses knowledge that is particularly beneficial to the petitioning organization's competitiveness in the marketplace;

- Evidence, such as correspondence or reports, establishing that the beneficiary has been employed abroad in a capacity involving assignments that have significantly enhanced the petitioning organization's productivity, competitiveness, image, or financial position;

- Personnel or in-house training records that establish that the beneficiary's claimed specialized knowledge normally can be gained only through prior experience or training with the petitioning organization;

- Curricula and training manuals for internal training courses, financial documents, or other evidence that may demonstrate that the beneficiary possesses knowledge of a product or process that cannot be transferred or taught to another individual without significant economic cost or inconvenience;

- Evidence of patents, trademarks, licenses, or contracts awarded to the petitioning organization based on the beneficiary's work, or similar evidence that the beneficiary has knowledge of a process or a product that either is sophisticated or complex, or of a highly technical nature, although not necessarily proprietary or unique to the petitioning organization; and

- Payroll documents, federal or state wage statements, documentation of other forms of compensation, resumes, organizational charts, or similar evidence documenting the positions held and the compensation provided to the beneficiary and parallel employees in the petitioning organization.

A petitioner may submit any other evidence it chooses.  In all cases, USCIS will review the entire record to determine whether the petitioner has established by a preponderance of the evidence that the beneficiary has specialized knowledge under the totality of the circumstances, in accordance with the standards set forth in the relevant statutes and regulations.  Merely stating that a beneficiary's knowledge is somehow different from others or greatly developed does not, in and of itself, establish that he or she possesses specialized knowledge.  Ultimately, it is the weight and type of evidence that establishes whether the beneficiary possesses specialized knowledge.

| | | |
|---|---|---|
| The AFM Transmittal Memoranda table is updated as follows: August 17, 2015 | Chapter 32.6(e). | This memorandum replaces chapter 32.6(e) with revised chapters 32.6(e) to provide clarifying guidance for adjudicating L-1B specialized knowledge visa petitions. |

Exhibit 3
165

**X.**     **Use**

This memorandum is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications and petitions.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**XI.**     **Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Office of Policy and Strategy.

Exhibit 3
166

Legal Op. No. 98-10 (INS), 1998 WL 1806685
U.S. Department of Justice
Immigration and Naturalization Service
General Counsel's Office
MEMORANDUM FOR: EXECUTIVE ASSOCIATE COMMISSIONER FOR POLICY AND
PLANNING, EXECUTIVE ASSOCIATE COMMISSIONER FOR FIELD OPERATIONS,
ALL REGIONAL COUNSELS, ALL DISTRICT COUNSELS, and ALL SECTOR COUNSELS

**FROM: Paul W. Virtue /s/ Bo Cooper for General Counsel**

# SUBJECT: Authority to parole applicants for admission who are not also arriving aliens

HQCOU 120/17-P
**August 21, 1998**

## I. QUESTION

**\*1** This memorandum addresses the following issue, which has arisen recently in several cases in the Miami district:

> Does the Service have authority to parole an applicant for admission who is not also an "arriving alien," as defined by 8 C.F.R. § 1.1(q)?

## II. SUMMARY CONCLUSION

Aliens who were once deportable for having entered without inspection are now considered in law to be applicants for admission, *id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). As aliens applying for admission, they are within the scope of the statutory parole authority. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). The Service has authority, therefore, to parole an applicant for admission who is not also an "arriving alien," as defined by 8 C.F.R. § 1.1(q). It remains the case, however, that parole is an act of discretion, not an entitlement. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

## III. ANALYSIS

This question over the extent of the parole authority arises because of two significant amendments to the immigration laws enacted in 1996. INA § 212(a)(6)(A)(i) and 235, 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1225, *as amended by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Division C, §§ 301(c) and 302(a), 110 Stat. 3009-546, 3009-578, 3009-579. First, aliens who are present in the United States without having been admitted or paroled are now deemed to be applicants for admission, *id.* § 235(a)(1), 8 U.S.C. § 1225(a)(1), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Before this amendment, of course, aliens who had entered the United States without having been inspected were amenable to deportation, rather than to exclusion, proceedings. 8 U.S.C. § 1251(a)(1)(B) (1994). Second, Congress has now provided for an expedited removal proceeding, conducted by a Service officer, rather than an immigration judge.

Exhibit 3
167

INA § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A). The Service may invoke this procedure if an alien "who is arriving in the United States" is inadmissible because the alien does not have the required passport or visa, or because the alien obtained a passport or visa by fraud or material misrepresentation. The Service has defined by regulation which aliens are to be considered "arriving aliens." 8 C.F.R. § 1.1(q), *as amended,* 63 *Fed. Reg.* 19,382, 19,383 (1998). The consequence of these two amendments is that there are now two categories of applicants for admission: those who are arriving aliens, and those who are not. *See, e.g.,* 62 *Fed. Reg.* 444, 444-5 (1997).[1]

INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), gives the Attorney General authority to parole from custody "an alien applying for admission" who would otherwise be held in custody until the Attorney General had resolved whether to admit or remove the alien. In order to exercise this authority, the Attorney General must find, on a case-by-case basis, either that "urgent humanitarian reasons" justify the parole, or that paroling the alien will yield a "significant public benefit." *Id.* Even if the Attorney General finds that either factor exists, parole remains a matter of discretion. In fact, there is no judicial review of the exercise of this discretion. *Id.* § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). The Attorney General has delegated this parole authority to the Service. 8 C.F.R. § 2.1.

**\*2** As we have already noted, aliens who were once deportable for having entered without inspection are now considered in law to be applicants for admission, *id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). As aliens applying for admission, they are within the scope of the statutory parole authority. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

The question whether there is authority to parole these aliens arises not from the statute itself, but from an implementing regulation. 8 C.F.R. § 212.5. Section 212.5(a) specifies circumstances in which it is, generally, appropriate to parole aliens "detained in accordance with § 235.3(b) or (c)." *Id.* Sections 235.3(b) and (c), in turn, refer not to the universal set of all applicants for admission, but to the subset of arriving aliens. 8 C.F.R. § 235.3(b) (arriving aliens subject to expedited removal) and (c) (arriving aliens subject to § 240 removal proceedings).[2] Section 212.5(b) refers to "all other arriving aliens." 8 C.F.R. § 212.5(b). Neither § 212.5(a) nor § 212.5(b) addresses the parole of applicants for admission who are not also "arriving aliens." Neither provision, therefore, purports to prohibit the Service from exercising the Attorney General's broad statutory parole authority in the case of an applicant for admission who is not an "arriving alien."

For two reasons, we conclude that § 212.5 cannot correctly be read as exhausting the Service's parole authority. First, nothing in § 212.5 expressly purports to forbid the parole of applicants for admission who are not also arriving aliens. Section 212.5 simply says nothing at all about that issue. Second, as we have noted, the Attorney General has delegated to the Commissioner the fullness of the Attorney General's statutory authority under the INA, except for matters delegated to the Executive Office for Immigration Review. 8 C.F.R. § 2.1. The Service, therefore, may parole anyone whom the Attorney General may parole.

Exhibit 3
168

We are mindful of the protracted litigation that resulted in the Supreme Court's judgment in *Jean v. Nelson,* 472 U.S. 846 (1985). But our reading of § 212.5 is an expansive, not a restrictive, application of the parole authority. A rule that said, in effect, that the parole authority is as broad as the statute says it is, would clearly be an interpretative rule. There is no obligation to publish interpretative rules in accordance with the APA. 5 U.S.C. § 553(b)(A) and (d)(2).

We are also aware of the argument that our conclusion, in effect, gives an inadmissible applicant for admission who is not an arriving alien "two bites at the apple" in seeking release from custody. If the Service denies a parole request, the alien may seek release from the immigration judge. 8 C.F.R. § 236.1(d)(1). The restrictions on the immigration judge's authority would not apply, since the alien is not an "arriving alien." *Cf.* 8 C.F.R. §§ 3.19(h)(1)(B) and (2)(I)(B) and 236.1(c)(11), *as amended,* 63 *Fed. Reg.* 27,441, 27,448-49 (1998). But release under § 236 of the Act and 8 C.F.R. § 236.1(d)(1) should not be seen as a separate form of relief from custody. Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole. *See* INA §§ 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B) and 1182(d)(5)(A); *Leng May Ma v. Barber,* 357 U.S. 185, 189 (1958); *Matter of L- Y- Y-,* 9 I &N Dec. 70, 71 (BIA 1960). In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms. We realize that the traditional rule has been that neither the Board nor an immigration judge had authority to exercise the parole authority. *Matter of Conceiro,* 14 I &N Dec. 278, 281 (BIA 1973). But the Board based this rule on the fact that the Attorney General had established by regulation that only the Service could exercise the parole authority on the Attorney General's behalf. *Id.* The statute itself does not forbid delegation of the parole authority to officials who are not Service officers. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

**\*3** The Service may consider it imprudent, as a matter of policy, to permit an immigration judge to adjudicate requests for release made by applicants for admission who are not arriving aliens. The way to achieve this policy, however, is to ask the Attorney General to amend 8 C.F.R. §§ 3.19 and 236.1. Taking the position that the Service has no authority to parole in these cases does not amend the regulations that appear to permit an immigration judge to adjudicate a request for release, if the applicant for admission is not an arriving alien.

We conclude that the Service may, in the exercise of discretion, parole any applicant for admission, if the Service finds that parole would serve urgent humanitarian reasons or yield a significant public benefit. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 2.1. Aliens present in the United States without having been admitted or paroled are applicants for admission. *Id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A). To say that these aliens are *eligible* for parole, of course, does not mean that they are *entitled* to parole. Whether to parole any particular alien remains a matter entrusted to the exercise of discretion. *Id.* § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). The exercise of this discretion is not subject to judicial review. *Id.* § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).

Paul W. Virtue for Bo Cooper
General Counsel

Footnotes
1

Exhibit 3
169

The Attorney General has the authority to invoke the expedited removal proceeding against an alien who is inadmissible because he or she is present in the United States without admission or parole, if the alien has been physically present for less than 2 years. INA § 235(b)(1)(A)(iii), 8 U.S.C. § 1225(b)(1)(A)(iii). To date, neither the Attorney General nor the Commissioner has chosen to exercise this authority. 8 C.F.R. § 235.3(b)(1)(ii); *cf.* 62 *Fed. Reg.* 10,312, 10,313 (1996).

2

Section 235.3(b) also refers to applicants for admission who are not arriving aliens, but who are inadmissible, and subject to expedited removal, because they are present without admission or parole, but have been present for less than two years. 8 C.F.R. § 235.3(b)(1)(ii). No aliens currently belong to this subset, since neither the Attorney General nor the Commissioner has provided for the use of expedited removal proceedings for these aliens.

## Legal Op. No. 98-10 (INS), 1998 WL 1806685

1998 WL 1806685, 1-3

Exhibit 3
170

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



## Homeland
## Security

June 15, 2012

MEMORANDUM FOR:     David V. Aguilar
                    Acting Commissioner, U.S. Customs and Border Protection

                    Alejandro Mayorkas
                    Director, U.S. Citizenship and Immigration Services

                    John Morton
                    Director, U.S. Immigration and Customs Enforcement

FROM:               Janet Napolitano
                    Secretary of Homeland Security

SUBJECT:            Exercising Prosecutorial Discretion with Respect to Individuals
                    Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the
Department of Homeland Security (DHS) should enforce the Nation's immigration laws against
certain young people who were brought to this country as children and know only this country as
home. As a general matter, these individuals lacked the intent to violate the law and our ongoing
review of pending removal cases is already offering administrative closure to many of them.
However, additional measures are necessary to ensure that our enforcement resources are not
expended on these low priority cases but are instead appropriately focused on people who meet
our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of
prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of
  this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education
  development certificate, or is an honorably discharged veteran of the Coast Guard or
  Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple
  misdemeanor offenses, or otherwise poses a threat to national security or public safety;
  and
- is not above the age of thirty.

Exhibit 3
171

www.dhs.gov

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

*Office of the Assistant Secretary*
**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:          All Employees

FROM:                    John Morton
                         Director

SUBJECT:                 Secretary Napolitano's Memorandum Concerning the Exercise of
                         Prosecutorial Discretion for Certain Removable Individuals Who
                         Entered the United States as a Child

DATE:                    June 15, 2012

Today the Secretary of Homeland Security issued the attached memorandum concerning the
exercise of prosecutorial discretion for certain removable individuals who entered the United
States as a child. Effective immediately, ICE agents and officers are instructed to exercise
prosecutorial discretion in a manner that aligns with the Secretary's memorandum. The
memorandum states that, with respect to individuals who meet the criteria outlined below, ICE
agents and officers should immediately exercise their discretion, on an individual basis, in order
to prevent these low priority individuals from being placed into removal proceedings or removed
from the United States.

An individual is covered by the Secretary's memorandum if the individual—

- came to the United States under the age of sixteen;
- is not above the age of thirty;
- has continuously resided in the United States for at least five years preceding the date
  of this memorandum and is present in the United States on the date of this
  memorandum;
- is currently in school, has graduated from high school, has obtained a general
  education development certificate, or is an honorably discharged veteran of the Coast
  Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, or
  multiple misdemeanor offenses; and
- does not otherwise pose a threat to national security or public safety.

ICE has also been directed to apply the Secretary's policy, on a case by case basis, to individuals
whose cases are pending before the Executive Office for Immigration Review and can
demonstrate that they meet the above noted criteria. To better facilitate this process, ICE has
been further directed to implement a process within sixty days that allows individuals whose

Exhibit 3
174

www.ice.gov

Page 2

cases are pending before the Executive Office for Immigration Review to request a review of their cases through the ICE Public Advocate.

Additional guidance on the Secretary's memorandum will be issued as soon as possible.  In the meantime, if ICE personnel have questions about the exercise of prosecutorial discretion described in the Secretary's memorandum, they should contact their supervisor or local chief counsel's office.

<u>Disclaimer</u>

As there is no right to the favorable exercise of discretion by the agency, nothing in this memorandum should be construed to prohibit the apprehension, detention, or removal of any alien unlawfully in the United States or to limit the legal authority of DHS or any of its personnel to enforce federal immigration law. Similarly, this memorandum, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

Exhibit 3
175

# EXHIBIT D

**How Certain DHS Programs Affect Land on the Southwest Border**

Exhibit 3
176

# DHS PROGRAMS RESULTING IN ENVIRONMENTAL IMPACTS ON THE SOUTHWEST BORDER

A significant impact to the southwest border environment is caused by the large number of illegal crossers resulting from several DHS programs and their cumulative effect on border control. Of the eight programs at issue in this lawsuit, those programs which grant forgiveness to illegal aliens (that is, parole, TPS, asylum, and DACA) have affected the numbers of foreign nationals crossing illegally. I do not maintain that zero illegal border crossings would occur in the absence of these programs; however, these and other discretionary actions by DHS have had the effect of significantly increasing the number of illegal border crossings, which has resulted in significant environmental impacts. While DHS will do a NEPA analysis of many of its own actions at the border, it consistently overlooks that border crossers themselves have significant environmental impacts and that when policy choices increase the motivation of illegal aliens to cross the border, those illegal aliens often will damage the environment when they cross.

Historical experience demonstrates that a real or even perceived change in enforcement policies, both at the border and in the interior, can significantly affect the number of people attempting to cross the border illegally. For example, it has been documented by numerous studies that the passage of the Immigration Reform and Control Act of 1986 ("IRCA") caused a significant decline in illegal crossings at first, which later rebounded after the impact of one key enforcement program was limited. In addition to a large legalization program, IRCA increased funding for the Border Patrol, made it illegal to hire unauthorized workers, established penalties for employers who engaged in illegal hiring or failed to conduct due diligence in hiring, and created an automated system for employers to verify the status of workers. The goal was to reduce opportunities for illegal workers and thus remove a key incentive for illegal crossing and settlement. The most sophisticated analysis of the effectiveness of the various components of IRCA found that different components of IRCA had different effects on the flow of illegal aliens into the United States and the probability of apprehension by authorities.[1] Overall, this study found that IRCA reduced apprehensions of illegal crossers by 47 percent, or 2.3 million crossers over a period of nearly three years. About half of

---

[1] Frank Bean, et al., *Undocumented Migration to the United States. IRCA and the Experience of the 1980s*, RAND CORP. & URBAN INST., 1990, *available at* https://www.rand.org/content/dam/rand/pubs/joint_reports-immigration/2010/JRI07.pdf.

Exhibit 3
177

the decline in crossing was due to reduced circular migration from the legalization of farm workers and about half was due to the deterrent effect of the passage of employer sanctions. The researchers found a smaller effect from the increased enforcement activity by the Border Patrol. Notably, the study also found that by 1990 the trend in illegal crossings had reversed itself, and such crossings began increasing again – corresponding to the time period in which the employer sanctions aspect of the reforms was found to have been only partially funded and implemented. In addition, the study found that there was an increase in crossings of family members of the newly legalized aliens following the legalization. In sum, this study documented that the passage of strong enforcement measures significantly deters illegal crossers, that legalization programs trigger the movement of family members into the country, and that failure to fully implement enforcement programs can negate the initial gains in deterrence that were brought about by passage of the measures, causing an increase in illegal crossings.

Other, more recent studies have documented a correlation between increased border and interior enforcement resources and programs that impose consequences and penalties for illegal crossing with declines in apprehensions as a measure of crossings.[2]

The influx of unaccompanied minors and families from Central America and asylum seekers from Africa, Caribbean nations and Asia that began around 2012 and continues today further demonstrates how U.S. policy changes can cause or contribute to an increase in new illegal crossings. The dramatic increase in the number of new arrivals in these categories can be traced to policy changes that occurred in 2008 (the Trafficking Victims Protection Reauthorization Act) and 2009 (Credible Fear Parole). According to an unreleased Border Patrol intelligence report based on recent interviews with Unaccompanied Alien Children ("UAC") from Central America who have surged across the border, nearly all of the migrants (95%) stated that their "main reason" for coming to the United States illegally was because they had heard that they would receive a "permiso," or permission to stay.[3] The report states: "Although economic and security concerns

---

[2] Marc Rosenblum, *Border Security: Immigration Enforcement Between Ports of Entry Marc R. Rosenblum Specialist in Immigration Policy*, CONG. RESEARCH SERV., Jan. 6, 2012, *available at* http://fpc.state.gov/documents/organization/180681.pdf.
[3] Stephen Dinan, *Surge in illegal immigrants blamed on U.S. policy, not on spiking violence in Central America*, THE WASH. TIMES, June 11, 2014, *available at*

Exhibit 3
178

also influenced their decision to travel to the U.S., the issuance of 'permisos' to family units was the primary reason for leaving their countries…The subjects also indicated that 'everyone' in their home countries is aware that 'permisos' are being issued to family units in south Texas." These explanations have been widely confirmed in numerous research and news media accounts featuring interviews with recent illegal arrivals.

The "permiso policy" contrasts with the policy enforced against Mexican citizens, including unaccompanied minors, who are returned or removed to Mexico promptly, often using a process known as Expedited Removal. Over the same time period when illegal crossings of Central Americans and others increased, the number of new Mexican illegal crossers appears to have declined and/or remained relatively stable.

Finally, Border Patrol agents maintain that typically there is an increase in illegal immigration anytime there is even discussion of changing immigration enforcement policies, as prospective illegal aliens want to make it into the United States before such changes occur.

The flow of illegal aliens across the border is not constant over time. Census Bureau data reveals that an increase in the size of the illegally settled population occurred in 2014 and 2015. An analysis of the most recent data from the Current Population Survey, a monthly Census survey, shows that more than three million new legal and illegal immigrants settled in the United States in 2014 and 2015 — a 39 percent increase over the prior two years.[4] Immigration from countries in South and Central America and South and East Asia appears to have offset a decline in immigration from Mexico. My organization's preliminary estimate is that, of the 3.1 million immigrants who arrived in that last two years, about one-third, 1.1 million (or 550,000 annually) were new illegal immigrants, including both illegal crossers and visa and visa waiver overstays. This is a significant increase from the 700,000 illegal immigrants (350,000 annually) who entered in

http://www.washingtontimes.com/news/2014/jun/11/surge-illegals-blamed-us-policy/.
[4] Steven Camarota, *New Data: Immigration Surged in 2014 and 2015 - More than three million legal and illegal immigrants settled in the United States in the last two years*, CENTER FOR IMMIGRATION. STUDIES, Jun. 2016, *available at* http://cis.org/New-Data-Immigration-Surged-in-2014-and-2015.

Exhibit 3
179

2012 and 2013. The numbers do not represent the net increase in the total illegal immigrant population.

In summary, four of the programs at issue in this case (Parole, TPS, Asylum, and DACA) have been used to grant legalization to large numbers of foreign nationals who have entered or stayed in the country illegally. All such programs have a significant effect on the physical environment of the southwest border.

Exhibit 3
180