Julie B. Axelrod
California Bar. No. 250165
Immigration Reform Law Institute
25 Massachusetts Ave, NW, Suite 335
Washington, D.C. 20001
Telephone: (202) 232-5590
Fax: (202) 464-3590

Lesley Blackner
Admitted *Pro Hac Vice*
Florida Bar No. 654043
340 Royal Poinciana Way, Suite 317-377
Palm Beach, FL 33480
Telephone: (561) 659-5754

James P. Miller
California Bar No. 188266
Law Office of JP Miller Jr.
181 Rea Ave, Suite 101
El Cajon, CA 92020
Telephone: (619) 590-0383

## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

WHITEWATER DRAW
NATURAL RESOURCE
CONSERVATION
DISTRICT, *et al.*,

Plaintiffs,

v.

KIRSTJEN NIELSEN, *et al.*,

Defendants.

Case No. 3:16-cv-2583

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES OPPOSING DEFENDANTS' PARTIAL MOTION TO DISMISS COUNTS I AND II OF THE AMENDED COMPLAINT**

Date: March 12, 2018
No Oral Argument Unless Requested by the Court

Hon. M. James Lorenz

Case no. 3:16-cv-2583

## **TABLE OF CONTENTS**

I.    Introduction……………………………………………………………1

II.   Standard of Review……………………………………………………4

III.  Argument………………………………………………………………5

    A. Count I…………………………………………………………...5

    1) The Instruction Manual is a final agency action subject to APA
review……………………………………………………………………5

      a) The Instruction Manual's promulgation history establishes that is
final and binding on DHS……………………………………………6

      b) The Instruction Manual's content demonstrates its legal
consequences……………………………………………...……8

      c) DHS relies on analogies to agency manuals that are factually
inapposite……………………………………………………...9

    2) The Instruction Manual qualifies as a rule under the
APA……………..10

      a) The Instruction Manual was promulgated with Notice and
Comment……………………………………………………11

      b) The Instruction Manual has the "force of law."…………………...12

    B. Count II……………………………………………………….....14

      1) Plaintiffs have identified eight distinct programs subject to NEPA..14

      2) DHS's arguments ignore the detailed specificity of the programs set
forth in the Amended Complaint…………………………………16

        a) Defendant relies on *Lujan* and *Norton*, but they are not
applicable………………………………………………...…………17

        b) Count II is a viable challenge because it specifically identifies
discrete agency actions that violated NEPA for a single reason...18

        c) DHS's "framework" is a set of related programs by another name,
and NEPA *does* intend review whenever the environment is
significantly affected……………………………………………...22

        d) Plaintiffs seek *some* form of NEPA review, not necessarily a
PEIS…………………………………………...………………24

IV.   DACA……………………………………………..…………………24

V.    Conclusion………………………………………………………25

i                                      Case No: 3:16-cv-2583

# TABLE OF AUTHORITIES

## Cases

*Amoco Oil Co. v. Envtl. Prot. Agency,*
    501 F.2d 722 (D.C. Cir. 1974)…………………………………………………11

*Am. Postal Workers Union v. U.S. Postal Srv.,*
    707 F.2d 548 (D.C. Cir. 1983)…………......……………………………...13

*Abramowitz v. Envtl. Prot. Agency,*
    832 F.2d 1071 (9th Cir. 1987)……………………...…………………………9

*Anderson v. Evans,*
    314 F.3d 1006, 1016 (9th Cir. 2002)……………………………………..…4

*Appalachian Power Co. v. Envtl Prot. Agency,*
    208 F.3d 1015 (D.C. Cir. 2000)…………………………………………………9

*Bennett v. Spear,*
    520 U.S. 154 (1997)……………………………………....5, 7, 8, 9

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,*
    449 F. 2d 1109 (D.C. Cir. 1971)…………………………………………………2

*Cement Kiln Recycling Coal. v. Envtl. Prot. Agency,*
    493 F.3d 207 (D.C. Cir. 2007)…………………………………………………10

*Citizens for Better Forestry v. U.S. Dep't. of Agric.,*
    481 F. Supp. 2d 1059 (N.D. Cal. 2007)……………………………………... 16

*Columbia Riverkeeper v. U.S. Coast Guard,*
    761 F.3d 1084 (9th Cir. 2014)…………………………………………………...9

*Defs. of Wildlife v. Tuggle,*
    607 F. Supp. 2d 1095 (D. Ariz. 2009)………………………….......……13, 14

*Found. on Econ. Trends v. Lyng,*
817 F. 2d 882, 884 (D.C. Cir. 1987)……………………………………………15, 21

           Case No: 3:16-cv-2583

*Friends of the Earth, Inc. v. Mosbacher*,
 488 F. Supp. 2d 889 (N.D. Cal 2007)………………………………………....15

*Friends of the River v. U.S. Army Corps of Eng'rs*,
 870 F. Supp. 2d 966, 978 (E.D. Cal. 2012)………………………………....16

*Gen. Elec. Co. v. Evntl. Prot. Agency*,
 290 F.3d 377 (D.C. Cir. 2002)………………………………………5, 11, 12

*Helgeson v. Bureau of Indian Affairs*,
 153 F.3d 1000 (9th Cir.1998)………………………………………………4

*Industrial Customers of Nw. Utils v. Bonnevile Power Admin.*,
 408 F.3d 638 (9th Cir. 2004)………………………………………………9

*Kern v. U.S. Bureau of Land Mgmt.*,
 284 F.3d 1062 (9th Cir. 2002)……………………………………………..23

*Kleppe v. Sierra Club*,
 427 U.S. 390, 412 (1976)………………………………………......15, 24

*Kugel v. United States*,
 947 F.2d 1504 (D.C. Cir. 1991)…………………………………………....10

*Lujan v. Nat'l Wildlife Fed'n*,
 497 U.S. 871 (1990)………………………………………………..17, 18, 22

*Molycorp, Inc. v. Envlt. Prot. Agency*,
 197 F.3d 543 (D.C. Cir. 1999)……………………………………………11

*Nat. Home Builders v. Norton*,
 415 F.3d 8, 15 (D.C. Cir. 2005)………………………………… 13, 14

*Nat. Wildlife Federation v. Appalachian Regional Com.*,
 677 F.2d 883 (D.C. Cir. 1981)……………………………………………24

*Navarro v. Block*,
 250 F.3d 729 (9th Cir. 2001)………………………………………………4

Case No: 3:16-cv-2583

*Nat. Res. Def. Council, Inc. ("NRDC"). v. U.S. Dep't. of State,*
        658 F. Supp. 2d 105, 108 (D.D.C. 2009)……………………………....4

*Norton v. S. Utah Wilderness All.,*
        542 U.S. 55 (2004)………………………………………………… 17, 18

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
        465 F.3d 977 (9th Cir. 2006)…………………………………….8, 9

*Paralyzed Veterans of Am. v. D.C. Arena L.P.,*
        117 F.3d 579 (D.C. Cir. 1997)………………………………………13

*Protect Our Cmtys. Found. v Chu,*
        2014 U.S. Distr. LEXIS 42410……………………………...4, 5

*Public Citizen v. U.S. Dep't of Transp.,*
        316 F.3d 1002 (9th Cir. 2003)……………………………...…6

*Regents of the Univ. of Cal. v. United States, Dep't. of Homeland Sec.,*
         No. C 17-05211, 2018 U.S. Dist. LEXIS 4036 (Jan. 9, 2018)………………..24

*Robertson v. Methow Valley Citizens Council,*
        490 U.S. 332, 349 (1989)………………………………………...4

*Schweiker v. Hansen,*
        450 U.S. 785 (1981)………………………………………………10

*Sierra Club v. Watkins,*
        808 F. Supp. 852 (D.D.C. 1991)……………………………15

## **Statutes**

5 U.S.C. 551(4)……………………………………………………..10

5 U.S.C. § 553(c)……………………………………………………....11

5 U.S.C. § 704……………………………………………………5

5 U.S.C. § 706(1)…………………………………………………....17

5 U.S.C. § 706(2)(A)…………………………………………………………..17

28 U.S.C. § 1331………………………………………………………………4

42 U.S.C. § 4331 *et seq.*……………………………………………………1

42 U.S.C. § 4321 *et seq.*……………………………………………………7

42 U.S.C. § 4332(B)………………………………………………………...11

Pub. L. No. 82-414, 66 Stat. 163 (1952)……………………………………14

**Rules**

Fed. R. Civ. P. 12(b)(1)………………………………………………………4

Fed. R. Civ. P. 12(b)(6)………………………………………………………4

**Regulations**

8 C.F.R. § 201.1………………………………………………………………19

8 C.F.R. § 204.2………………………………………………………………19

8 C.F.R. § 204.5………………………………………………………………19

8 C.F.R. § 204.6………………………………………………………………19

8 C.F.R. §§ 207.1-9……………………………………………………………20

8 C.F.R. §§ 208.1-23…………………………………………………………..21

8 C.F.R. § 209………………………………………………………...…...20, 21

8 C.F.R. § 212.5…………………………………...…………………………..20

8 C.F.R. § 214.1-4……………………………………………………………19

8 C.F.R. § 214.12-14…………………………...……………………………19

8 C.F.R. §§ 244.1-19……………………………………………………………………..20

40 C.F.R. §§ 1500-1508………………………………………………………………...7, 8

40 CFR § 1507.3………………………………………………………………………6, 7, 11

40 CFR § 1502.4 (b)…………………………………………………………………..16

40 C.F.R. § 1508.18 (b)(3)………………………………………………………..14, 15, 19

**Federal Register**

National Environmental Policy Act Implementing Procedures,
      79 Fed. Reg. 32,563……………………………………………………...…6

Historic Preservation Program,
      79 Fed. Reg. 70,538……………………………………………....7, 12, 13

**Treatises**

D. Mandelker, *NEPA Law and Litigation* (2017)………………………………….6, 12

**Other**

Website: Federal Agency NEPA Procedures, Office of NEPA Policy and

Compliance………………………………………………………………………….6

Case No: 3:16-cv-2583

## I.      Introduction

This case concerns neither the substance nor the wisdom of the nation's immigration policies, but whether the Defendants, Department of Homeland Security and Secretary of DHS Kristjen Nielsen (hereinafter referred to together as "DHS" or "Defendant"), can avoid their procedural obligations under the National Environmental Policy Act, 42 U.S.C. § 4331 *et. seq.* ("NEPA"). NEPA compliance is obligatory for all federal agencies. DHS maintains in its Memorandum in Support of Partial Motion to Dismiss Counts One and Two of the Amended Complaint at 1, ECF No. 47-1 ("Def. Memo") that, in the Amended Complaint, Plaintiffs seek an "overhaul" of the nation's immigration policies, which must be provided by legislative channels. DHS is mistaken. This lawsuit seeks only to compel DHS to comply with the informed decision procedures NEPA guarantees to the public.

Plaintiffs are individual environmentalists, environmental groups, southwest natural resource conservation groups, and members of the southwest cattle-ranching community. They bring this NEPA challenge in an effort to remedy DHS's ongoing institutional failure to recognize that its actions regulating the entry and settlement of foreign nationals result in multiple environmental impacts. The heart of DHS's failure is simple. Defendant has failed to recognize the obvious fact that migration, because it causes population growth and the relocation of masses of people into and within the country, impacts the environment. When DHS adopts and implements large-scale actions such as programs granting classes of foreign nationals the right to enter and settle in the United States, pursuant to either its statutory authority or executive directive, it is engaging in actions subject to NEPA.

Plaintiffs' Amended Complaint extensively documents the important and quantifiable environmental impacts of immigration-induced population growth in an expert report prepared by Dr. Philip Cafaro, entitled "The Environmental Impact of Immigration into the United States." ("Am Compl. Ex. 5") ECF No. 44-6. Dr. Cafaro

documents many population growth effects from immigration, such as urban sprawl, loss of farmland, loss of habitat and biodiversity, increased greenhouse gas emissions, and increased water demand and withdrawal from natural systems. Plaintiffs' affidavits also document the extensive impacts of both immigration-related population growth and border crossing on their own communities and lands. Am. Compl. Exs. 6-18, ECF 44-7 to 44-19. NEPA requires that these impacts, as well as others, be reviewed and evaluated by DHS before it undertakes discretionary actions relating to the entry into and settlement of foreign nationals in the United States. But DHS has completely avoided any effort to comply with NEPA.

At first blush, what may make this case seem complicated (and what makes the Amended Complaint so "voluminous") is that the United States' immigration system *itself* is a *very* intricate regulatory scheme. DHS's reluctance to apply NEPA to its actions relating to the entry into and settlement of foreign nationals in the United States is perhaps understandable. But, as the D.C. Circuit said in one of the earliest cases involving agency obstruction over compliance with NEPA: the statute's language does not provide an "escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow 'discretionary.' Congress did not intend the Act to be a paper tiger." *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F. 2d 1109, 1114 (D.C. Cir. 1971).

Count I challenges DHS's final, published instruction manual establishing DHS's NEPA procedures (the "Instruction Manual"), attached to the Amended Complaint as Ex. 2. Am. Compl. Ex. 2, ECF 44-3. DHS acted arbitrarily and capriciously by failing to incorporate any framework of NEPA review for immigration-related actions into the Instruction Manual, despite their environmental impacts.

By contrast, Count II addresses the downstream legal consequences of DHS's original error in adopting binding NEPA procedures that arbitrarily and capriciously

ignore the environmental impacts of its immigration-related actions. Count II encompasses a host of environmentally significant final actions adopted without NEPA review. In only a handful does the agency even bother to reference NEPA with a citation to a categorical exclusion. Since NEPA became law in 1970, the entrance and settlement of tens of millions of foreign nationals in the country have been facilitated by the federal government. Their environmental effects *en masse* obviously have been significant. Yet DHS has never considered these effects, in violation of NEPA.

Today, there are eight discrete methods by which DHS sets conditions allowing foreign nationals to enter and stay in the country, or to stay after entry – seven authorized by statute, and one by executive directive. Under NEPA, the concerted actions DHS takes to implement each of these methods qualify as programs. All eight programs are currently ongoing without NEPA compliance. Because of the extraordinary complexity of the nation's immigration programs (a complexity that is no fault of Plaintiffs), Plaintiffs' Count II must be read to include the Amended Complaint's Ex. 3, an expert report commissioned by Plaintiffs by immigration expert Jessica Vaughan. Am. Compl. Ex. 3, ECF No. 44-4. Ms. Vaughan identified as many of these concerted final actions as possible and found a total of 88 individual actions. Am. Compl. Ex. 3 at 109-26, ECF No. 44-4. The report is an essential part of Count II and explains the structure of each of these programs, what qualifies them as programs under NEPA, and (to the extent possible) the specific occasions when each one was adopted or substantively updated through discrete and final agency action. Most of these instances were final regulations codified in the CFR, but five of them were final and binding policy memoranda. At the time Plaintiffs filed their Amended Complaint, none of these actions had been finally revoked, though the ultimate fate of some was unclear. Though these 88 actions encapsulate a host of different types of

revisions to DHS's programs relating to the entry and settlement of foreign nationals, *all* were undertaken without NEPA review.

## II.   Standard of Review

A Rule 12 (b)(6) motion "tests the legal sufficiency of a claim. A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (internal citation and quotation marks omitted). The appropriate procedural vehicle by which to move to dismiss a violation of NEPA and the APA is Rule 12(b)(6) rather than Rule 12(b)(1). Both NEPA and the Administrative Procedures Act ("APA") "raise a federal question covered by 28 U.S.C. § 1331." *Nat. Res. Def. Council, Inc. ("NRDC"). v. U.S. Dep't. of State*, 658 F. Supp. 2d 105, 108 (D.D.C. 2009). If "the crux of defendants' various arguments is not whether the [agency] has presented federal claims, but whether those claims are enforceable against the [agency]," then "the court must assume jurisdiction before deciding whether a cause of action exists." *Id.* at 108-09.

The APA provides the only avenue for judicial review of agency action, and there is a "strong presumption" that Congress intends such judicial review. *Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000, 1003 (9th Cir.1998) (citations omitted). Challenges under NEPA are therefore brought under the APA.

Congress enacted NEPA to "'promote environmentally sensitive decision-making'" *Protect Our Cmtys. Found. v Chu*, No. 12-cv-3062 L, 2014 U.S. Dist. LEXIS 42410 at *13 (Mar. 27, 2014) (quoting *Anderson v. Evans*, 314 F. 3d 1006, 1016 (9th Cir. 2002)). NEPA intends to guarantee that the "'larger audience'" that will play a role in both the decision-making process itself and the implementation of the resulting decisions will have access to all the relevant information. *Protect Our Cmtys. Found. v Chu* at*13 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). This larger audience includes not just the public, but "'the President, who is

responsible for the agency's policy, and Congress, which has authorized the agency's actions.'" *Protect Our Cmtys. Found. v Chu* at*13 (citations omitted). The information provided by NEPA "is critical for decision-makers who must 'decide whether they will support or overrule the agency's action…'" *Id.* (citations omitted).

## III.    Argument

## A.    Count I

## 1) The Instruction Manual is a final agency action subject to APA review.

Count I asserts that the Instruction Manual adopted by DHS to govern its compliance with NEPA is arbitrary and capricious under the APA because it fails to incorporate NEPA review into its actions relating to the entry into and settlement of foreign nationals in the United States. Defendant argues that 5 U.S.C. § 704, which limits review under the APA to final agency action, prevents judicial review of the Instruction Manual. Def. Memo at 8. ECF No. 47-1. Defendant asserts that the Instruction Manual fails the two-prong test set out in *Bennett v. Spear* for determining whether an agency action is final and thus subject to judicial review under the APA. 520 U.S. 154, 177-78 (1997). The first prong is that an agency action must "mark the consummation of the agency's decisionmaking process." The second prong requires that the action must be "one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* Contrary to Defendant's implication, such consequences need not be to a "third party" but may be to the agency itself. Def. Memo at 8, ECF No. 47-1. *See, e.g.*, *Gen. Elec. Co. v. Evntl. Prot. Agency*, 290 F.3d 377, 382 (D.C. Cir. 2002) (explaining that the question of APA review turns on whether "the agency action binds private parties or *the agency itself* with the force of law") (citations omitted) (emphasis added). Defendant asserts that the Instruction Manual is a "policy manual" and guide "for agency operations," and as such, neither marks the consummation of the agency's decision making process nor constitutes an action by

which legal consequences flow. Def. Memo at 17, ECF No. 47-1. Defendant's assertions are erroneous because the Instruction Manual is both final and of legal import, as an examination of both its promulgation history and its content reveals.

**a) The Instruction Manual's promulgation history establishes that it is final and binding on DHS.**

The Instruction Manual was not promulgated by DHS's choice—its history shows that it was a response to congressional and executive mandate. Both NEPA itself, 42 U.S.C. § 4332(B), and the Council on Environmental Quality ("CEQ"), the division of the Executive Office of the President established by the statute to ensure that federal agencies meet their requirements under NEPA, require each federal agency to adopt internal NEPA procedures. 40 C.F.R. § 1507.3. *See Public Citizen v. U.S. Dep't of Transp.*, 316 F.3d 1002, 1028 (9th Cir. 2003) ("Agencies are *required* to develop guidelines as to which of their actions do or do not require the preparation of an EA or an EIS") (emphasis added). [1]

DHS met its statutory obligation to adopt internal NEPA procedures through its promulgation of the Instruction Manual in 2014, following public notice and comment and review by CEQ. On Thursday, June 5, 2014, DHS provided a notice in the Federal Register that it was submitting its draft NEPA procedures for the purpose of soliciting comments from the public. National Environmental Policy Act Implementing Procedures, 79 Fed. Reg. 32,563, 32,563 (June 5, 2014). After a notice and comment period, DHS adopted its final policy and procedures for implementing

---

[1] NEPA procedures do vary among the federal agencies. *See*, D. Mandelker, NEPA Law and Litigation, § 2.11 at 34-39 (2017). Some agencies publish in the Code of Federal Regulations, while others publish departmental manuals. For a list of agency NEPA procedures, *see* Federal Agency NEPA Procedures, Office of NEPA Policy and Compliance,  https://energy.gov/nepa/downloads/federal-agency-nepa-procedures (last visited Feb. 21, 2018)

the National Environmental Policy Act of 1969, and duly issued its "Notice of Final National Environmental Policy Act Implementing Procedures" on November 26, 2014 (the "Notice"). Environmental Planning and Historic Preservation Program, 79 Fed. Reg. 70,538, 70,538 (Nov. 26, 2014). In its summary, DHS stated:

> The purpose of this notice is to inform the public that the Department of Homeland Security (DHS or the Department) is issuing the final update to its policy and procedures for implementing the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*), as amended, and the Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR parts 1500-1508). The Department's NEPA procedures are contained in Directive 023-01, Rev. 01 and Instruction Manual 023-01-001-01, Rev. 01, Implementation of the National Environmental Policy Act . . . .

In the Notice, DHS explained that the revised Instruction Manual is final and intended to bind the agency: "the revised Instruction establishes the procedures for ensuring [DHS's compliance with NEPA] is implemented in an effective and efficient manner." *Id.* DHS emphasized that the revised procedures including the Instruction Manual were the consummation of a long process:

> DHS invested over three years in developing the proposed revision to its NEPA procedures. The draft revised Directive and Instruction were provided to CEQ in the fall of 2013 for review and discussion prior to the June 5, 2014 publication for public comment. DHS provided its proposed final revised Directive and Instruction to CEQ in early September 2014; CEQ responded with a letter dated November 10, 2014 prior to this publication of the final Directive and Instruction as required under 40 CFR 1507.3(a), indicating that the Department's revised procedures conform to NEPA and the CEQ regulations.

> *Id* at 70,539.

The Notice definitively establishes that the Instruction Manual, along with the Directive, marked the "consummation of the agency's decisionmaking process," and thus meets the first prong of *Bennett*. *Id.* at 70,538.

**b) The Instruction Manual's content demonstrates its legal consequences.**

The Instruction Manual meets the second prong of *Bennett* because, by its own language, legal consequences have flowed and continue to flow from its adoption. The Instruction Manual "establishe[s] the policy and procedures DHS follows to comply with [NEPA] and the [CEQ] Regulations for Implementing the Procedural Provisions of NEPA (40 C.F.R. Parts 1500-1508). This Instruction Manual serves as the DHS implementing procedures for NEPA." Am. Compl. Ex. 2 at 19, ECF No. 44-3.

The adoption of the Instruction Manual has a profound, ongoing effect on DHS's NEPA compliance. The Instruction Manual itself itemizes those DHS activities that "normally" require preparation of an Environmental Assessment or Programmatic Assessment, including: construction projects in environmentally sensitive areas, projects that impact wetlands and federal waters, regulations for activities that impact environmentally sensitive areas, security measures that involve reduced public access, and new law enforcement activities with undetermined environmental impacts. *Id.* at 45. The Instruction Manual specifies when Supplemental Environmental Assessments are to be prepared, and when an Environmental Impact Statement or Programmatic Environmental Impact Statement is to be prepared. *Id.* at 45, 50-51. Significantly, the Instruction Manual lists those DHS actions that are categorically excluded from NEPA review. *Id.* at 65-93. The document itself states: "The requirements of this Instruction Manual apply to the execution of all NEPA activities across DHS." *Id.* at 19. The Instruction Manual says nothing about immigration-related actions.

The Instruction Manual constitutes DHS's "definitive statement of the agency's position" on implementing NEPA. *Or. Nat. Desert Ass'n v. U.S. Forest. Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). As noted in the last paragraph, "[t]he requirements of this Instruction Manual apply to the execution of all NEPA activities across DHS." Am.

Compl. Ex. 2 at 19, ECF No. 44-3. Thus, "immediate compliance [with the Instruction Manual] is expected." *Or. Nat. Desert Ass'n*, 465 F.3d at 982 (quoting *Industrial Customers of Nw. Utils v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2004). "[A] document styled as a 'guidance document' may amount to a final agency action when it 'reflect[s] a settled agency position which has legal consequences.'" *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1095 (9th Cir. 2014) (quoting *Appalachian Power Co. v. Envtl Prot. Agency*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). Since its promulgation, "legal consequences" have flowed and continue to flow from the Instruction Manual because it determines which DHS activities receive NEPA analysis, the scope of NEPA analysis to be accorded each action, and which DHS activities are automatically excluded from NEPA analysis.

Contrary to Defendants' assertion, the designation, title, or label placed on an agency document is not dispositive of whether it is subject to judicial review. The Ninth Circuit has made clear that "[i]t is the effect of the action and not its label that must be considered." *Or. Nat. Desert Ass'n*, 465 F.3d at 985 (quoting *Abramowitz v. Envtl. Prot. Agency*, 832 F.2d 1071, 1075 (9th Cir. 1987)). "Under the APA, for instance, even if the agency does not label its decision or action as final, it may be reviewable if it 'has the status of law or comparable legal force' or if 'immediate compliance with its terms is expected.'" *Columbia Riverkeeper*, 761 F.3d at 1095 (citations omitted). A final agency action subject to the requirements of the APA exists when the action has "'direct and appreciable legal consequences.'" *Id.* (quoting *Bennett*, 520 U.S. at 177-78).

**c) DHS relies on analogies to agency manuals that are factually inapposite.**

Two of the three cases DHS relies upon for its assertion that "[p]olicy memoranda and guides for agency operations do not constitute reviewable final agency action[]" are not relevant to analysis of the Instruction Manual because they do not involve the APA. Defendant seems only to be citing them to establish the false

proposition that any agency document labeled a "manual" does not bind an agency. *See* Def. Memo at 9, ECF No. 47-1 (citing *Schweiker v. Hansen*, 450 U.S. (1981) and *Kugel v. United States*, 947 F.2d 1504 (D.C. Cir. 1991)). The one opinion that does involve the APA, *Cement Kiln Recycling Coal. v. Envtl. Prot. Agency*, 493 F.3d 207, 226 (D.C. Cir. 2007), concerned a challenge to an EPA regulation and accompanying guidance document addressing the burning of hazardous waste as fuel. The guidance document was attacked "because it was not promulgated pursuant to the notice-and-comment procedures of the APA." *Id.* at 226. Such is obviously not the case with the Instruction Manual. Further, in contrast to DHS's Instruction Manual, which declares that "[t]he requirements of this Instruction Manual apply to the execution of all NEPA activities across DHS[]" Am. Compl. Ex. 2 at 19, ECF No. 44-3, the guidance document in *Cement Kiln* specifically declared that "this guidance does not impose legally binding requirements on EPA…" 493 F.3d at 227. The plain language of the Instruction Manual shows that it is intended to have the "force of law." *Cement Kiln's* contested document is thus clearly distinguishable from the instant Instruction Manual, which is binding and does command compliance by DHS and is, accordingly, subject to judicial review under the APA.

**2) The Instruction Manual qualifies as a Rule under the APA.**

Secondly, Defendant erroneously claims that the Instruction Manual, which clearly is the "whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," does not qualify as a rule under 5 U.S.C. 551(4) because it is merely a document establishing "internal guidelines." Def. Memo at 9, ECF No. 47-1. When an agency argues that an action does not qualify as a rule under the APA because it is labelled a guidance document, though courts might consider "the Agency's own characterization of its action" and "whether the action was published in the Federal Register or the Code of Federal Regulations," the "ultimate focus of the [court's]

inquiry" is "whether the action has binding effects on third parties or on the agency." *Gen. Elec. Co.*, 290 F. 3d at 382 (internal quotations and citations omitted). It is the third factor that demonstrates "whether the agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law.' *Id.* (quoting *Molycorp, Inc. v. Envtl. Prot. Agency*, 197 F.3d 543, 545 (D.C. Cir. 1999)). DHS's characterization of the Instruction Manual as merely guidance and not a rule is particularly unavailing here. The Instruction Manual *was* promulgated with notice and comment, and is binding not only on its face, but also because DHS received permission from another entity (CEQ) to implement it in its final form.

**a) The Instruction Manual was promulgated with Notice and Comment.**

As discussed *supra,* the Instruction Manual was promulgated pursuant to both NEPA 42 U.S.C. § 4332(B) and CEQ 40 C.F.R. § 1507.3 in accordance with the APA notice and comment requirements set forth in 5 U.S.C. § 553(c). A procedure, protocol, regulation, or other rule promulgated pursuant to the notice and comment requirements set forth in the APA is indisputably subject to judicial review under the APA. The APA's applicability adheres upon a rule's announcement in the Federal Register, because even the announcement itself is subject to judicial review under the APA:

> The "basis and purpose" statement required by Section 4(c) of the APA must be sufficiently detailed and informative to allow a searching judicial scrutiny of how and why the regulations were actually adopted. In particular, the statement must advert to administrative determinations of a factual sort to the extent required for a reviewing court to satisfy itself that none of the regulatory provisions were framed in an "arbitrary" or "capricious" manner.

*Amoco Oil Co. v. Envtl. Prot. Agency*, 501 F.2d 722, 739 (D.C. Cir. 1974) (citations omitted). Defendant ignores the promulgation history of the Instruction Manual, which clearly reveals that DHS followed the APA's basic notice and comment

parameters while drafting and publishing it. The Instruction Manual's promulgation history thus establishes that it is subject to the APA.

Defendant's claim that the Instructional Manual itself was not published in the Code of Federal Regulations is not dispositive of this issue. Def. Memo at 12-13, ECF No. 47-1. As discussed *supra,* the manner in which agencies publish their implementing NEPA procedures varies from agency to agency, some publishing in the Code of Federal Regulations and some "simply publish[ing] in the Federal Register, without codifying the provisions in the Code." D. Mandelker, *NEPA Law and Litigation* § 2:11 at 34 (2017). Agencies also commonly "supplement" codification or publishing in the Federal Register "with the issuance of an agency manual or handbook also containing the applicable NEPA requirements," as DHS has done. *Id.* DHS even pushed back in the Notice on the idea that the procedure it followed was somehow inadequate in making the adoption of the Instruction Manual a public action. "Federal Register and www.regulations.gov," DHS claimed in the Notice, "are widely recognized as appropriate sources for the public to learn about and comment on Federal government initiatives." Environmental Planning and Historic Preservation Program, 79 Fed. Reg. at 70,538.

**b) The Instruction Manual has the "force of law."**

Whether an agency action has the "force of law," and is deemed binding on the agency, is an even more important factor in determining whether it qualifies as a rule. *See Gen. Elec. Co.*, 290 F.3d at 382. This factor decidedly favors Plaintiffs. As discussed *supra,* the Instruction Manual is binding on DHS on its face. The document itself states: "The requirements of this Instruction Manual apply to the execution of all NEPA activities across DHS." Am. Compl. Ex. 2 at 19, ECF No. 44-3. Not only does the document itself state that it is binding, but DHS has no choice whether or not to treat it as binding. DHS was required to submit it to CEQ for approval. That DHS did not choose to codify it in the Code of Federal Regulations is immaterial. Agencies

12                                             Case No: 3:16-CV-2583

that chose to codify their NEPA procedures as regulations are not more subject to NEPA than agencies that do not. NEPA applies to all federal agencies. DHS stated the Notice that CEQ agreed that "the Department's revised procedures [including the Instruction Manual] conform to NEPA and the CEQ regulations." Environmental Planning and Historic Preservation Program, Fed. Reg. at 70,539.

Having received permission from CEQ to use its published NEPA procedures, DHS cannot then deviate from them. Because DHS drafted its internal NEPA procedures pursuant to its statutory and regulatory obligation to follow CEQ's directives, the Instruction Manual is not akin to internal guidance documents adopted pursuant to no law or executive directive. It is, of course, possible that, unbeknownst to Plaintiffs, DHS does not in practice follow its own Instruction Manual. But, if that is the case, that itself is a violation of NEPA. DHS cannot use its flouting of its obligations under NEPA as a shield to prevent judicial review.

Furthermore, there is no hint within the Instruction Manual that DHS does not intend that it have a binding effect on its regulatory practices. The Instruction Manual qualifies as interpretive rule subject to judicial review under the APA because it "'spells out a duty fairly encompassed within the regulation that the interpretation purports to construe.'" *Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1115 (D. Ariz. 2009) (quoting *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 588 (D.C. Cir. 1997)). The Instruction Manual "spells out" DHS's "duty" to comply with NEPA and the CEQ NEPA regulations. The *Tuggle* court noted that though an interpretive rule "lacks the formal force of law, as a practical matter it affects the regulatory practices of an agency… as to what a law or regulation means and how it will be enforced." *Tuggle*, 607 F. Supp. 2d at 1115. Therefore, "[w]hen it has a substantial impact on the rights of individuals, its promulgation may constitute final agency action for purposes of judicial review. *Id.* (citing *Am. Postal Workers Union v. U.S. Postal Srv.*, 707 F.2d 548, 560 (D.C. Cir. 1983); *National Home Builders v. Norton*, 415 F.3d 8,

15 (D.C. Cir. 2005). While the action in Tuggle concerned procedures for endangered wolf removals, the Instruction Manual governs how DHS implements NEPA. In *Tuggle*, the U.S. Fish and Wildlife Service was statutorily obliged to implement binding "wolf management procedures and protocols" to deal with wolf removal actions. *Id*. The documents created did so with specificity and finality. Such is the case at bar. DHS is statutorily obligated to draft and publish internal NEPA procedures. In response, DHS produced the Instruction Manual, a 91-page document setting forth detailed, binding instructions that govern DHS's daily compliance with NEPA.

**B) Count II**

**1) Plaintiffs have identified eight distinct programs subject to NEPA.**

In Count II, Plaintiffs assert that DHS failed to engage in any NEPA review in connection with eight programs it administers. Each of these eight programs, seven established by the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952) and one via Executive Directive, governs a different, discrete category of DHS's general statutory authority to regulate the entry into and settlement of foreign nationals in the United States. That is, each program establishes its own discrete policy goal of setting criteria for entry into or settlement of classes of foreign nationals in the country, and each is further codified by a series of regulations found in specific sections of the Code of Federal Regulations. The regulations and policy memoranda that implement each program are compiled and exhaustively detailed in Ex. 3 of the Amended Complaint by immigration expert Jessica Vaughan. Am. Compl. Ex 3, ECF No 44-4.

Under NEPA these eight categories of DHS authority constitute "programs." A program is defined as "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18(b)(3). The eight programs at issue in this case are: employment based

immigration, family based immigration, long term nonimmigrant visas, parole, Temporary Protective Status, refugees, asylum, and Deferred Action for Childhood Arrivals. These programs, individually and collectively, have a significant cumulative impact on population growth in the United States and particularly in California,[2] the state where many Plaintiffs reside. Yet these programs have never received even cursory NEPA compliance by DHS.

CEQ has developed regulations for determining whether concerted agency activities qualify as a major federal action under NEPA. *Found. on Econ. Trends v. Lyng*, 817 F. 2d 882, 884 (D.C. Cir. 1987). Among the actions subject to NEPA listed by the CEQ are the "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18(b)(3). A programmatic environmental impact statement ("PEIS") is utilized "where there are sufficiently 'related' actions [that] will have 'cumulative or synergistic environmental impact." *Lyng*, 817 F.2d at 885, quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 408-15 (1976). *See also, Sierra Club v. Watkins*, 808 F. Supp. 852, 863 (D.D.C. 1991) (reasoning that programmatic review is proper under NEPA when a related series of actions have cumulative effects); *Friends of the Earth, Inc. v. Mosbacher*, 488 F. Supp. 2d 889, 911 (N.D. Cal 2007) (finding that "concerted or connected" actions properly receive programmatic analysis).

Broadness of an action per se is no bar to compliance with NEPA: the CEQ regulations state that environmental impact statements are "sometimes required for broad Federal actions such as the adoption of new agency programs or regulations."

---

[2] *See* "The Environmental Impact of Immigration into the United States," by Dr. Cafaro. ("Am Compl. Ex. 5") ECF No. 44-6.

40 CFR § 1502.4 (b). CEQ promulgated a "Guidance for Effective Use of Programmatic NEPA Reviews" on December 23, 2014, in which it stated that "the analyses in a programmatic NEPA review are valuable in setting out the broad view of environmental impacts and benefits for a proposed decision such as a rulemaking, or establishing a policy, program, or plan." Final Guidance for Effective Use of Programmatic NEPA Reviews, Fed. Reg. 76,986, 76,986 (Dec. 23, 2014). CEQ also explains how programmatic reviews provide an opportunity to engage the public in federal decision making, a "key policy goal of NEPA and the CEQ regulations," and encourages agencies to support "early public participation." *Id.* at 76,989. DHS's own NEPA guidelines mirror the CEQ's. The Instruction Manual states, under the subheading Programmatic EAs, that "[a] component may prepare a Programmatic EA (PEA), for a broad Federal action, *such as a program,* plan, or actions of a similar type …" Am. Compl. Ex. 2 at 45, ECF No. 44-3 (emphasis added).

All programs, whether large or small, are subject to NEPA compliance. "NEPA compliance is required even if the challenged actions are part of a broad program." *Friends of the River v. U.S. Army Corps of Eng'rs*, 870 F. Supp. 2d 966, 978 (E.D. Cal. 2012). Claims under NEPA are proper if the plaintiff challenges "identifiable, final agency actions within the APA." *Id.* "NEPA requires *some* type of procedural due diligence – even in cases involving broad, programmatic changes." *Citizens for Better Forestry v. U.S. Dep't. of Agric.*, 481 F. Supp. 2d 1059, 1085 (N.D. Cal. 2007) This quotation summarizes the heart of Plaintiffs' argument: DHS has engaged in zero NEPA compliance with respect to the actions at bar.

**2) DHS's arguments ignore the detailed specificity of the programs set forth in the Amended Complaint.**

Defendant argues that Count II must be dismissed because Plaintiffs have not identified discrete programs or any discrete actions in their complaint, making the challenge an impermissible broad attack on all of DHS' statutory authority. See Def

Memo at 15, ECF 47-1. Defendant claims that therefore the Court must get involved in DHS's day-to-day operations in order to review Count II. *Id.* Defendant also argues that agencies have discretion over whether to use programmatic environmental impact statements (PEISs) in their NEPA compliance, and so Plaintiffs cannot force DHS to prepare one. *Id.* at 15-16.[3]

**a) Defendant relies on *Lujan* and *Norton*, but they are not applicable.**

DHS relies on *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) and *Norton v. S. Utah Wilderness All.*, 542, U.S. 55 (2004) in support of its argument that Plaintiffs have failed to cite specific actions subject to NEPA review because "the APA does not authorize suits seeking '*wholesale* improvement of [an agency] program by court decree'" Def. Memo at 13, ECF No. 47-1 (quoting both *Lujan* and *Norton*). DHS states that "Plaintiffs merely list the statutes that provide the parameters for DHS' operation; they fail to identify any discrete, final agency action on the part of the agency, and their claim fails." Def. Memo at 15, ECF No. 47-1. Defendant's assertion is patently false: the seven programs arising from the cited statutory authority, together with 86 specific regulations and policy memoranda that comprise the statutory programs, are in fact detailed comprehensively in Ex. 3 to the Amended Complaint, which is never acknowledged or recognized in Defendant's memorandum. *See* Am. Compl. Ex. 3, ECF No. 44-4. The body of the Amended Complaint refers to Ex. 3 on eight separate pages. Am. Compl. at 6, 47, 49-51, and 53-55. ECF 44.

---

[3] Defendant also erroneously states that Count II fails to state a claim under 5 U.S.C. § 706(1). Plaintiffs' claim asserts that DHS acted in an arbitrary and capricious fashion, in violation of 5 U.S.C. § 706(2)(A) for failing to undertake any NEPA compliance with respect to its programs governing the entry and settlement of foreign nationals into the U.S.

Case No: 3:16-CV-2583

In *Lujan* and *Norton*, the Supreme Court rejected broad policy challenges to the entire way agencies carry out their statutory mandate because the plaintiffs failed to allege specific agency actions subject to NEPA. The challenges did not "refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations." *Lujan*, 497 U.S. at 890. If a plaintiff fails to specify particular and discrete actions that were carried out in violation of the law, then the plaintiff must be seeking "wholesale improvement" of a program by court decree, which a court is not empowered to perform. *Id.* at 891. A court cannot permit a "generic challenge to all aspects of a program" *Id.* at 890. A court also cannot supervise the substance of the agency's compliance with a broad statutory mandate because to do so would be to "inject the judge into day-to-day agency management." *Norton*, 542 U.S. at 66-67.

Such is clearly not the case at bar.

**b) Count II is a viable challenge because it specifically identifies discrete agency actions that violated NEPA for a single reason.**

For each of the eight programs at issue, Plaintiffs have identified (to the extent reasonably possible) and listed the particular group of specific, discrete, and concerted actions DHS has taken to implement each discrete policy goal of setting conditions for granting eligibility to classes of foreign nationals to enter and/or remain in the United States. A meticulous description of each program and a list of the specific actions taken by DHS to implement each one is located in Ex. 3. Am. Compl. Ex. 3 at 106-26, ECF No. 44-4. For each program, Plaintiffs first identify the initial regulation adopting the program pursuant to statutory authority (or in the case of DACA, identify the date of the executive directive) and then list the updating regulations, or in some cases, binding policy memoranda.

18                                                Case No: 3:16-CV-2583

The first program is employment based immigration, authorized in 1990, concerning the "specific policy plan"[4] of admitting foreign nationals based on U.S. employment needs. This program gives rise to five categories of immigrant visas. The regulations implementing it are found in 8 C.F.R. §§ 204.5, 204.6. Exhibit 3 of the Amended Complaint identifies five "concerted actions" DHS took in implementing, creating, and refining the petition process through regulation between 1991 and 2016. Am. Compl. Ex. 3 at 109-110, ECF No. 44-4. Approximately 3.3 million foreign nationals have settled in the country through this program. *Id.* at 110.

The second program is family based immigration, authorized (in current form) in 1990, concerning the specific policy plan of admitting foreign nationals based on family ties to American citizens. The program gives rise to nine immigrant visa categories.  Regulations implementing it are found in 8 C.F.R. §§ 201.1, 204.2. Exhibit 3 of the Amended Complaint identifies nine "concerted actions" DHS took in implementing this program between 1992 and 2016. Am. Compl. Ex. 3 at 111-112. ECF No. 44-4. Approximately 14.6 million foreign nationals have settled in the country through this program. *Id.* at 112.

The third program is the long-term Nonimmigrant Visa Program, authorized in 1990. The program gives rise to eight long-term nonimmigrant visa categories (as well as a host of short term nonimmigrant visa categories that Plaintiffs are not challenging under NEPA in this case). Regulations implementing it are found in 8 C.F.R. §§ 214.1-4, 214.12-14. Exhibit 3 of the Amended Complaint identifies 47 "concerted actions" DHS undertook in implementing this program between 1994 and 2017 through regulation or policy memoranda. Am. Compl. Ex. 3 at 114-117, ECF No. 44-

---

[4] 40 C.F.R. 1508.18(b)(3) specifics that a program is a group of "concerted actions" to implement a "specific policy plan."

4. Approximately 12.2 million foreign nationals have settled in the country through this program. *Id.* at 117.

The fourth program is parole, authorized in its current form in 1996, concerning the specific policy plan of allowing foreign nationals to enter the country without a visa for urgent humanitarian reasons or significant public benefit. Regulations implementing parole are found in 8 C.F.R. § 212.5. Exhibit 3 identifies 12 "concerted actions" DHS undertook in implementing the program by regulation or policy memoranda between 1982 and 2017. Am. Compl. Ex. 3 at 117-120, ECF No. 44-4. Approximately 100,000 foreign nationals have entered into or settled in the country through this program. *Id.* at 120.

The fifth program is Temporary Protected Status, authorized in 1990, concerning the specific policy plan of allowing foreign nationals in the United States without a valid visa to remain because of a natural disaster or civil violence in their nation of origin. Regulations implementing this program are found in 8 C.F.R. §§ 244.1-19. Exhibit 3 of the Amended Complaint identifies nine "concerted actions" DHS undertook in implementing this program by regulation between 1991 and 2011. Am. Compl. Ex. 3 at 121-122, ECF No. 44-4. Approximately 377,000 foreign nationals have settled in the country through this program. *Id.* at 122.

The sixth program is refugees, authorized in its current form in 1980, concerning the specific policy plan of admitting foreign nationals subject to persecution at home. Regulations implementing the refugee program are found in 8 C.F.R. §§ 207.1-9, 209. Exhibit 3 of the Amended Complaint identifies eight "concerted actions" DHS undertook in implementing this program by regulation between 1981 and 2011. Am Compl. Ex. 3 at 122-123, ECF 44-4. Approximately 2.2 million foreign nationals have settled in the country through this program. *Id.* at 123.

The seventh program is asylum, authorized in 1980, concerning the specific policy plan of allowing foreign nationals in the United States to stay because of

persecution at home. Regulations implementing asylum are found in 8 C.F.R. §§ 208.1-23, 209. Exhibit 3 of the Amended Complaint identifies 14 "concerted actions" DHS undertook in implementing this program by regulation between 1981 and 2012. Am. Compl. Ex. 3 at 123-124, ECF. No. 44-4. Approximately 790,000 foreign nationals have settled in the country through this program. *Id.* at 125.

The eighth program is DACA, authorized by executive directive in 2012, concerning the specific policy plan of allowing foreign nationals to stay in United States based on their age at entrance. Exhibit 3 of the Amended Complaint identifies the two "concerted actions" in implementing the program by policy memoranda. Am. Compl. Ex. 3 at 125-126, ECF. No. 44-4. Approximately 793,000 foreign nationals have settled in the country through this program. *Id.* at 126.

The CEQ's definition of a program thus justifies defining each specific area of statutory authority, together with its implementing regulations, as a single program. DHS could argue that organizing them as single programs is arbitrary, and that they are properly seen as more than eight programs. For instance, one might say that the regulations concerning long term nonimmigrant visas do not comprise a single program because they authorize many different visa programs, such as the Student and Exchange Visitor Program and the H-1B visa programs. Such semantics, however, matter very little in terms of DHS's failure to conduct *any* NEPA analysis of them. DHS did no NEPA analysis of any of the environmental effects resulting from the introduction of very large numbers of people into the country at any level.

These eight programs have "cumulative" and "synergistic" impacts because they produce similar environmental impacts from ongoing population growth in specific areas of the United States and the movement of large numbers of foreign nationals into and within the country, particularly in the southwestern states and Florida – the states where Plaintiffs' affiants reside. *See Lyng*, 817 F. 2d at 885. As set forth in their affidavits, the affiants have experienced profound environmental

impacts resulting from ongoing, large-scale migration of foreign nationals into their communities, which has been induced by these DHS programs. *See* Am. Compl. Ex. 6-18, ECF Doc. 44-7 to 19. Because DHS adopted interrelated programs with cumulative environmental impacts impacting the members of the Plaintiff organizations, the manner in which these DHS programs are labeled should not be dispositive of whether DHS can completely evade NEPA compliance with respect to its actions governing the entry and settlement of foreign nationals.

**c) DHSs' "framework" is a set of related programs by another name, and NEPA *does* intend review whenever the environment is significantly affected.**

Defendant argues that its immigration-related actions are not programs but a "Congressionally mandated framework under which DHS operates." Def. Memo at 15, ECF No. 47-1. As such, Defendant argues that Count II must be dismissed because it requires "general judicial review of an agency's day-today-operations," which the Supreme Court in *Lujan* has precluded. Defendant is mistaken. Plaintiffs merely seek compliance with NEPA. The reality is that this congressionally-mandated framework established under the authority of a statue *is* the same as a program. Such a framework creates "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive." Plaintiffs have indeed identified those specific concerted actions and systematic and connected agency decisions that are subject to NEPA compliance. Unlike the plaintiffs in *Lujan*, Plaintiffs here have taken the trouble to identify the "completed universe of particular [agency] orders and regulations" that make up these programs. 497 U.S. at 890.

Of course, Plaintiffs could have, in the alternative, listed all 88 actions separately in the Amended Complaint as individual violations of NEPA. But to do so would not only have rendered the complaint *less* manageable, it would also have meant that the interconnectedness of each group of actions that implement a particular grant

22                                                          Case No: 3:16-CV-2583

of statutory authority (many actions, in fact, implemented more than one grant of statutory authority), and how they actually constitute discrete programs, would have been *less* apparent. Defendant would have then likely complained that Plaintiffs had cited a host of random actions that had nothing to do with each other. That such a situation should be avoided is precisely what the Ninth Circuit meant when it reasoned that NEPA is not subject to the "tyranny of small decisions." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1078 (9th Cir. 2002).

Nothing in the Amended Complaint requires that the Court inject itself into the decision-making process of the agency's day-to-day operations that relate to immigration. The immigration scheme of the United States is very complicated, and injecting informed environmental decision-making into the decisions that carry it out may seem daunting to DHS. However, injecting environmental awareness into this agency's decision making is no more daunting than the task *any* agency faces in applying NEPA. The complexity of the task presented by the law is *precisely* why the CEQ *mandated* in 1978 that all agency specifically adopt NEPA procedures to guide them. 40 C.F.R. § 1500 *et seq.* Thus, if the agency's NEPA guidelines themselves arbitrarily and capriciously fail to notice a large part of the agency's mandate, the agency can expect the consequences of this failure to be felt in broad areas.

In this case, if this Court were to order proper compliance with the Instruction Manual, such an order would in no way "inject" the court "into day-to-day agency management." Ignoring the environmental impacts of immigration is arbitrary and capricious, but if DHS were to reissue its NEPA regulations without this error and then properly apply that guidance, it would then be in compliance with NEPA. If this Court ordered NEPA compliance, it would in no way rob DHS of its discretion in carrying its NEPA procedures out, nor in carrying out its duties to implement immigration law. NEPA's mandate is strictly procedural. DHS needs to fix its NEPA procedure, not its actions.

**d) Plaintiffs seek *some* form of NEPA review, not necessarily a PEIS.**

Defendants rely on *Kleppe v. Sierra Club* for the proposition that the decision to prepare a PEIS rests within its discretion. 427 U.S. 390, 412 (1976). " Def. Memo at 15, ECF No. 47-1. Defendant overlooks the fact that the Amended Complaint does not seek a Court order compelling DHS to specifically prepare a PEIS. Rather, Plaintiffs seek to compel DHS to initiate *some* form of NEPA review. Only upon initiating NEPA compliance, will DHS be in a position to assess the appropriate scope of its NEPA review regarding these programs.[5]

**C. DACA**

Finally, DHS asserts that the DACA program is exempt from NEPA as "a judicial or administrative civil or criminal enforcement action." Def. Memo at 17. Such an exemption would indeed apply if Plaintiffs were challenging a particular decision to grant an individual status under DACA. But Plaintiffs are only challenging the adoption of the program itself without NEPA review. Like the seven statutory programs, DACA grants permission to stay in the country for certain amounts of time and under specific conditions to classes of individuals based on certain criteria. DACA therefore also meets the definition of a program under the CEQ guidelines: "concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or *executive directive."* (emphasis added).

Courts that have reviewed DACA have not disputed the "programmatic nature" of this federal action. *See, e.g., Regents of the Univ. of Cal. v. United States, Dep't. of*

_____

[5] The proper scope of environmental review and the decision whether to prepare a PEIS are then "initially" committed to agency discretion, and thus reviewed according to the "rule of reason." *National Wildlife Federation v. Appalachian Regional Com.*, 677 F.2d 883, 888-889 (D.C. Cir. 1981)

*Homeland Sec.*, No. C 17-05211, 2018 U.S. Dist. LEXIS 4036 (Jan. 9, 2018) ("Programmatic deferred action has been in use since at least 1997, and other forms of programmatic discretionary relief date back to at least 1956."). Therefore, DACA is reviewable under NEPA for the same reasons the other programs are reviewable under NEPA, as specified *supra*. Under NEPA, it is immaterial whether the program is adopted pursuant to statute or executive directive.

## V. Conclusion

Both Counts I and II validly challenge agency actions under NEPA and the APA and therefore survive Defendant's Motion to Dismiss.

Dated February 21, 2018                    Respectfully submitted,

                                                                    /s/Julie B. Axelrod
                                                                    California Bar. No. 250165
                                                                    Immigration Reform Law Institute
                                                                    25 Massachusetts Ave, NW, Suite 335
                                                                    Washington, D.C. 20001

                                                                    Lesley Blackner
                                                                    Admitted *Pro Hac Vice*
                                                                    Florida Bar No. 654043
                                                                    340 Royal Poinciana Way, Suite 317-377
                                                                    Palm Beach, FL 33480

                                                                    James P. Miller
                                                                    California Bar No. 188266
                                                                    Law Office of JP Miller Jr.
                                                                    181 Rea Ave, Suite 101
                                                                    El Cajon, CA 92020