Julie B. Axelrod
California Bar. No. 250165
Center for Immigration Studies
1629 K Street, NW, Suite 600
Washington, D.C. 20006
Telephone: (703) 888-2442

Lesley Blackner
Admitted *Pro Hac Vice*
Florida Bar No. 654043
340 Royal Poinciana Way, Suite 317-377
Palm Beach, FL 33480
Telephone: (561) 659-5754

James P. Miller
California Bar No. 188266
Law Office of JP Miller Jr.
181 Rea Ave, Suite 101
El Cajon, CA 92020
Telephone: (619) 590-0383

## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITEWATER DRAW NATURAL, RESOURCE CONSERVATION DISTRICT *et al*, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN MCALEENAN, *et al.*, <br><br><br> Defendants. | Case No. 3:16-cv-2583 <br><br> **PLAINTIFFS' MEMORADUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNTS III, IV, AND V OF THE AMENDED COMPLAINT** <br><br> Date: June 28, 2019 <br> No Oral Argument Unless Requested by the Court <br><br><br> Hon. M. James Lorenz |

Case No: 3:16-CV-2583

# TABLE OF CONTENTS

I) Introduction .......................................................................................................... 1

II) Legal Background ................................................................................................. 2

III) Standard of Review .............................................................................................. 4

IV) Argument .............................................................................................................. 4

    A) Plaintiff is entitled to summary judgment on Count III because the adoption of CATEX A3 was invalid on its face under NEPA. ............... 4

        1) Factual and procedural background of CATEX A3 ..................... 5

        2) Legal standard governing the adoption of a categorical exclusion in the Ninth Circuit and CEQ regulations: specificity and scoping required. ............................................................................................... 6

        3) The adoption of CATEX A3 fails NEPA's requirements. ............. 9

            (a) CATEX A3 is too broad under CEQ's NEPA Regulations, as interpreted by *Bosworth* ...................................................... 9

            (b) CATEX A3 fails to conduct any form of scoping for potential individual or cumulative impacts as required by *Bosworth* ...................................................................... 11

            (c) CATEX A3 violates DHS's own requirements on categorical exclusions. .................................................... 12

    B) Plaintiffs are entitled to summary judgment on Count IV because DHS's four invocations of CATEX A3 are arbitrary and capricious under NEPA. ............................................................................................... 13

        1) Procedural Background of Each of the Invocations of CATEX A3 ..................................................................................................... 13

            (a) The Expansion of the Student Exchange Visitor Program (SEVP) ..................................................................................... 13

                (i) The Regulation ............................................................ 13

                (ii) Application of CATEX ............................................. 14

            (b) Expansion of the Optional Practical Training Program (OPT) ..................................................................................... 14

                (i) The Regulation ............................................................ 14

                (ii) Application of CATEX ............................................. 15

            (c) The adoption of increased flexibility for employment programs ................................................................................ 15

                (i) The Regulation ............................................................ 15

                (ii) Application of CATEX ............................................. 15

            (d) Creation of International Entrepreneur Program ............. 16

                (i) The Regulation ............................................................ 16

(ii)     Application of CATEX ............................................... 16

2)     Legal Standard: requirements for the application of categorical exclusions ............................................................................................. 16

3)     DHS's four invocations of CATEX A3 are arbitrary and capricious. ............................................................................................. 19

(a)     DHS employs circular reasoning in its applications of CATEX A3 ............................................................................ 19

(b)     DHS's improper reliance of CATEX A3(a) ...................... 19

(c)     DHS's improper reliance on CATEX A3(d) ..................... 20

(d)     Invoking a categorical exclusion on these four actions violates DHS's own NEPA procedures, because despite DHS's assertions, each action is a regulatory update that is part of a larger action, namely the existing regulatory framework.. ........................................................................ 21

(e)     By initiating a categorical exclusion with no original NEPA analysis and which segments the impacts of connected actions, DHS has improperly avoided analyzing the cumulative effect of growth-inducing impacts of these actions. ................................................................................ 23

C)     The Plaintiff is entitled to Summary Judgment on Count IV. ................. 24

1)     Requirements for FONSIs ......................................................... 24

2)     The administrative record shows that the June 2, 2014 FONSI fails to meet NEPA's requirements. ............................................. 24

V)     Conclusion ............................................................................................. 25

ii                                              CASE NO: 3:16-cv-2583

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Alaska Ctr. For Env't v. U.S. Forest Service*, 189 F.3d 851(9th Cir. 1999). ............6, 7, 9, 17

*Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1125 (D. Montana 2013) ... 7

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) ............................................................... 24

*Blue Mountains, Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir 1998 ................. 24

*Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009) ..... 19

*Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 481 F. Supp. 2d 1059 (N.D. Cal 2007)........................................................................................................................ 7, 18

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.* 123 F.3d 1142 (9th Cir. 1997).............. 2

*Churchill County v. Norton, 276 F.3d 1060* (9th Cir. 2001)……………………………...8

*Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) .............. 17,18, 19, 20

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006) ............................... 4

*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004).................................. 2

*Jones v. Gordon*, 792 F.2d 821 (9th Cir. 1986) ................................................................. 17

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ................. 6, 18, 19, 21

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.* 42 F.3d 517 (9th Cir. 1994)........................ 2

CASE NO: 3:16-cv-2583

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989). ........................................ 4

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983). ................................................................................................ 4, 24

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001 ......................... 3

*Native Ecosystems Council v. Dombeck*, 304 F.3d. 886 (9th Cir. 2002) ........................... 4, 24

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005); .................... 2

*Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973) ................................................ 17

*Save the Yaak Comm. v. Block*, 840 F.2d 714 (9th Cir. 1988) ................................................ 4

*Sierra Nevada Forest Protection Campaign v. Weingardt*, 376 F. Supp. 2d 984 (E.D. Cal. 2005) ........................................................................................................... 24

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007).. 3, 5, 7, 8, 9, 10, 11, 12, 17, 18, 20

*The Steamboaters v. F.E.R.C.*, 759 F.2d 1382 (9th Cir. 1985) ................................. 12, 17, 19

The Wilderness Soc'y v. U.S. Fish & Wildlife Serv., 353 F.3d 1051 (9th Cir. 2003) .... 12

**Statutes**

42 U.S.C. § 4331 *et seq* ............................................................................................. 1, 23

42 U.S.C. §4331(a) ............................................................................................................ 3

42 U.S.C. §4331(b)(5) ........................................................................................................ 3

iv                                   CASE NO: 3:16-cv-2583

42 U.S.C. § 4332(C) ........................................................................................... 3

5 U.S.C. §§ 706(2)(A), (D) ................................................................................ 4

## Regulations

40 C.F.R. § 1500.1. ........................................................................................... 2

40 C.F.R. § 1501.2 ....................................................................................... 18, 20

40 C.F.R. § 1502.20 ........................................................................................... 1

40 C.F.R. § 1501.3 ........................................................................................... 39

40 C.F.R. § 1507.3(b)(2) ............................................................................ 6, 9, 10

40 C.F.R. § 1508.4 ........................................................................................ 3, 18

40 C.F.R. § 1508.7 ............................................................................................. 8

40 C.F.R. §1508.8(b) .......................................................................................... 1

40 C.F.R. 1508.4(28) ..................................................................................... 3, 17

40 C.F.R. § 1508.9 ............................................................................................. 3

43 C.F.R. § 46.140 ........................................................................................... 19

8 C.F.R. § 103 .................................................................................................. 16

8 C.F.R. § 204 .................................................................................................. 15

8 C.F.R. § 205 ................................................................................... 15

8 C.F.R. § 212 ................................................................................... 16

8 C.F.R. § 214 .............................................................................. 14, 15

8 C.F.R. § 214.2 ................................................................................ 14

8 C.F.R. § 214.3 ................................................................................ 14

8 C.F.R. § 245 ................................................................................... 15

8 C.F.R. § 274a ................................................................................. 15

**Other Authorities**

**Federal Register**

80 Fed. Reg. 23,680 ....................................... 13, 14, 16, 17, 19, 20, 21

81 Fed. Reg. 13,040 ................................... 13, 14, 15, 16, 17, 18, 19, 20

81 Fed. Reg. 82,398 .......................................... 13, 15, 19, 20, 21, 22

82 Fed. Reg. 5,238 ................................................ 13, 16, 19, 20, 22

**Government Reports**

U.S. Immigration and Customs Enforcement, *Sevis By the Numbers: Biannual Report on International Student Trends*, April 2018 ……………...……………………………………22

## I.      Introduction

This is a case of first impression. Plaintiffs seek to compel Department of Homeland Security and Secretary of Homeland Security Kevin McAleenan (hereinafter referred to together as "DHS" or "Defendant") to commence compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*, in connection with actions concerning one of its self-declared main missions: the entry and settlement of foreign nationals into the U.S., that is, the administration of immigration law and policy.[1]

Plaintiffs bring Count III of their Amended Complaint to vacate categorical exclusion A3 ("CATEX A3") adopted by DHS under NEPA. Plaintiffs bring Count IV to vacate four applications of CATEX A3 when DHS invoked it to avoid doing any NEPA analysis of several amendments to regulations that expanded its immigration programs. Plaintiffs bring Count V to vacate DHS's finding of no significant impact ("FONSI") for its June 2, 2014 "Response to the Influx of Unaccompanied Alien Children" (the "June 2014 FONSI"). Plaintiffs are individual environmentalists, environmental groups, southwest natural resource conservation groups, and members of the southwest cattle-ranching community. They bring this NEPA challenge to DHS's ongoing institutional failure to recognize that its actions regulating the entry and settlement of foreign nationals result in environmental impacts that require NEPA analysis.

Migration drives population growth and relocation, both of which have environmental impacts. Plaintiffs' Amended Complaint documents these environmental impacts, such as urban sprawl, loss of farmland, loss of habitat and

---

[1] DHS describes itself as having five missions, one of which is "[e]nforcing and administering our immigration laws." DIR00265.

biodiversity, increased greenhouse gas emissions, and increased water demand and withdrawal from natural hydrological systems. Administering and enforcing the nation's immigration laws is one of DHS's main missions, yet DHS has never analyzed the environmental effects of its immigration-related actions. Since 2015, when a public comment apprised DHS of its obligation to conduct NEPA analysis of its immigration rules, DHS has, however, used CATEX A3 on four of its immigration-related actions. DHS once conducted an Environmental Assessment ("EA") of an immigration related crisis—when preparing to respond to the crisis of unaccompanied alien children crossing the border in 2014— and issued a FONSI.

Council on Environmental Quality ("CEQ") regulation 40 C.F.R. §1508.8(b) establishes that NEPA analysis shall include "indirect effects," which are defined to include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." Plaintiffs cannot surmise why consideration of such effects is not a routine component of DHS's NEPA compliance, and this question lies at the heart of the instant case. Consideration of population-growth-inducing effects is routine for other federal agencies in their NEPA analysis. *See, e.g., Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005); *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997); *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517 (9th Cir. 1994).

## II.     Legal Background
### The National Environmental Policy Act

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1. NEPA "provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004). An agency must prepare an Environmental Impact Statement ("EIS") for "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Under regulations issued by the CEQ, a federal agency may prepare an EA to evaluate whether an EIS in required. 40 C.F.R. §§ 1501.3, 1508.9. If a proposed action is determined to have no significant impact, the agency must issue a FONSI "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007) (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001)).

An agency many only avoid preparing either an EIS or an EA when the agency action is properly "categorically excluded" from NEPA review. A categorical exclusion is a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect" in an agency's NEPA implementing regulations. 40 C.F.R. § 1508.4. However, even if a proposed action would otherwise fall within a categorical exclusion, an agency must prepare and EIS or EA when "extraordinary circumstances" enumerated in the agency's regulations exist. *Id.*

The adoption of NEPA in 1969 codified explicit Congressional concern for the "profound influences of population growth" on the natural environment. 42 U.S.C. §4331(a). NEPA aims to "achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities . . . ." 42 U.S.C. §4331(b)(5). Yet, as the Amended Complaint establishes, DHS never translated this Congressional directive into action, insofar as it never conducted analysis of its rules and policies regulating immigration.

As the statute contains no exemption for immigration, it seems DHS considers these actions categorically excluded. Yet there is no administrative record evidence to support this exclusion. The only categorical exclusion among DHS's NEPA procedures that could potentially describe DHS's immigration-related actions is CATEX A3, which does not mention immigration, but applies to a subset of

"administrative and regulatory activities." When DHS once conducted an environmental assessment ("EA") in connection with the issue (its response to a border crisis) it avoided analyzing any environmental impacts associated with the entry and settlement of foreign nationals into the U.S. There is no record evidence that DHS considered the population growth inducing impacts of the crisis.

## III.   Standard of Review

DHS actions, including both the adoption and application of categorical exclusions and the adoption of a FONSI, are reviewable under the Administrative Procedures Act, which requires courts to "hold unlawful and set aside [an] agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is adopted "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). To determine whether agency action is arbitrary or capricious, a court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989). A court defers "to an agency's decision only when it is fully informed and well-considered." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988). To withstand review, "the agency must articulate a rational connection between the facts found and the conclusions reached." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156–57 (9th Cir. 2006); *Native Ecosystems Council v. Dombeck*, 304 F.3d. 886, 891 (9th Cir. 2002). Normally, an agency's decision under NEPA is arbitrary and capricious if it "has entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## IV.   Argument

### A. Plaintiff is entitled to summary judgment on Count III because the adoption of CATEX A3 was invalid on its face under NEPA.

4                                                    Case No: 3:16-CV-2583

Count III asserts that DHS failed to make a "reasoned decision" when it adopted Categorical Exclusion A3 ("CATEX A3") because the categorical exclusion is overbroad and does not meet the minimal requirements set forth in *Bosworth*, 510 F.3d at 1026.

### 1) Factual and procedural background of CATEX A3

DHS adopted 152 categorical exclusions for its NEPA procedures. DIR00355-DIR00376. These categorical exclusions are divided into eight "functional" categories: a) administrative and regulatory activities; b) operational activities; c) real estate and personal property management activities; d) repair and maintenance activities; f) hazardous/Radioactive Materials Management and operations; g) training and exercises, h) federal assistance activities, and i) component specific categorical exclusions. DIR00330. The first category, "administrative and regulatory activities," is very broad and can encompass activities and actions touching upon any one of DHS's missions, including enforcing and administering our nation's immigration laws.[2] Among the eight categorical exclusions classified as "administrative and regulatory

_____

[2] The administrative record submitted by DHS proves that the agency never specifically considered which of the eight "functional categories" its immigration related actions belong to for purposes of NEPA compliance. The administrative record is also devoid of any documentation demonstrating any initiation of NEPA related analysis in connection with its administration of immigration law and policy. DHS's posture regarding its immigration mission related NEPA obligations can be glimpsed in DHS's "Environmental Justice" Strategy memorandum. This document states that only three of its five agency-wide missions have "a significant nexus for Environmental Justice considerations." DIR00262-DIR00263. The document excludes the mission of "enforcing and administering our immigration laws." This exclusion demonstrates that DHS regards this mission to have no significant environmental impacts. Yet DHS provides no explanation in its Environmental Justice Strategy memorandum or anywhere else in the administrative record explaining or justifying this exclusion.

Case No: 3:16-CV-2583

activities" is CATEX A3, which is particularly indefinite and open-ended. CATEX A3 is as follows:

> Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:
> (a) Those of a strictly administrative or procedural nature;
> (b) Those that implement, without substantive change, statutory or regulatory requirements;
> (c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;
> (d) Those that interpret or amend an existing regulation without changing its environmental effect;
> (e) Technical guidance on safety and security matters; or
> (f) Guidance for the preparation of security plans.

DIR00355-DIR00356. Neither the NEPA procedures themselves nor the administrative record provide examples of a typical CATEX A3 action that would demonstration anything substantive about the category.

**2) Legal standard governing the adoption of a categorical exclusion in the Ninth Circuit and CEQ regulations: specificity and scoping required.**

In the Ninth Circuit, an "agency's threshold decision that certain activities are not subject to NEPA is reviewed for reasonableness." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1070 (9th Cir. 2002). "Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr. For Env't v. U.S. Forest Service*, 189 F.3d 851, 859 (9th Cir. 1999). Both CEQ regulations and Ninth Circuit case law are clear that an agency must employ sufficient specificity in its establishment of a categorical exclusion with respect to the subject matter or activity addressed. 40 C.F.R. § 1507.3(b)(2) provides that agency NEPA procedures shall include "specific criteria for and identification" of a typical class of action to be categorically excluded. The Ninth Circuit also holds that

the agency must "define the categorical exclusion with the requisite specificity." *Bosworth*, 510 F.3d at 1026. A broad, amorphous category of activity cannot be upheld as a lawful categorical exclusion, because a categorical exclusion by definition is "limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr.*, 189 F.3d at 859. There is no way to determine the effects resulting from a broad and amorphous category.

The controlling precedent in the Ninth Circuit establishing the requisite parameters for agency adoption of a categorical exclusion is *Bosworth*. As set forth in *Bosworth,* an agency must engage in certain minimal review prior to establishing a categorical exclusion, and evidence of such review must be documented in the administrative record.

First, the agency must "engage in the required scoping process" prior to establishment of the categorical exclusion in order to determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action."' *Bosworth*, 510 F.3d at 1026 (quoting *Alaska Ctr.*, 189 F.3d at 859) (quoting 40 C.F.R. § 1501.7). In determining the "scope" of a proposed action, the agency is "required to consider the cumulative impacts of connected, cumulative, and similar impacts." *Id.* at 1027. This process is necessary, because an agency "must adequately explain its decision" when "it decides to proceed with an action in the absence of an EA or EIS." *Alaska Ctr.,* 189 F.3d at 851.

This "scoping" process is essential for the agency to be able to demonstrate it made a "reasoned decision" before it promulgates a categorical exclusion. *See Bosworth*, 510 F.3d at 1026. In determining the propriety of the use of a categorical exclusion, the agency is required to utilize what is referred to as a "scoping process" to "determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1081 (N.D. Cal 2007). *See also Alliance for the Wild Rockies v. Weber*,

979 F. Supp. 2d 1118, 1125 (D. Mont. 2013) ("Prior to establishing a categorical exclusion, the agency is required to perform a scoping process to identify the significant issues related to the proposed action and judge the scope of the issues.").

Second, *Bosworth* requires that the agency "must document that the action to be undertaken is insignificant" by documenting "controversial" and/or "unknown" risks to the environment, including "the degree to which the CEs might establish a precedent for future actions with significant effects or represented a decision in principle about future considerations . . . ." 510 F.3d at 1027.

Third, *Bosworth* requires consideration of whether the actions "might affect endangered species." *Id.*

Fourth, *Bosworth* requires consideration of "cumulative impacts from other related actions." *Id.* (citing 40 C.F.R. § 1508.27(b)). In determining the "scope" of a proposed action, the agency is "required to consider the cumulative impacts of connected, cumulative, and similar impacts." *Id.* That is, an agency cannot simply ignore that some actions have cumulative effects even if they do not have individual effects. CEQ regulations are clear that "cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. NEPA also prohibits agencies from "'breaking up a large or cumulative project" into smaller components to avoid NEPA review. *Bosworth*, 510 F.3d at 1028 (quoting *Churchill County v. Norton*, 276 F.3d 1060, 1076 (9th Cir. 2001)). As the *Bosworth* court noted, "if assessing the cumulative impacts of a [categorical exclusion] as a whole is impractical, then the use of the categorical exclusion was improper." *Id.* Cumulative impact analysis is particularly important in categorical exclusions that are "nationwide in scope." *Id.* The cumulative analysis also "must be more than perfunctory." *Id.* at 1030. Of particular significance, this analysis must be documented in the administrative record: an agency "must adequately explain its

8                                                           Case No: 3:16-CV-2583

decision" when "it decides to proceed with an action in the absence of an EA or EIS." *Alaska Ctr.*, 189 F.3d at 851.

### 3) The adoption of CATEX A3 fails NEPA's requirements

### a) CATEX A3 is too broad under CEQ's NEPA Regulations, as interpreted by *Bosworth*

As discussed above, CEQ regulation 40 C.F.R. § 1507.3(b)(2) provides that agency NEPA procedures shall provide "[s]pecific criteria for and identification of those typical classes of action" that qualify for application of a categorical exclusion. A basic rule of statutory construction is that a word is entitled to its ordinary and plain meaning. *The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060-61 (9th Cir. 2003). "Specific" is defined by the Merriam Webster online dictionary as:

> 1a: constituting or falling into a specifiable category
> b: sharing or being those properties of something that allow it to be referred to a particular category
> 2a: restricted to a particular individual, situation, relation, or effect . . .
> 3: free from ambiguity . . .

*Specific*, Merriam Webster Online Dictionary, www.merriam-webster.com/dictionary/specific (last visited April 22, 2019). CATEX A3 does not comport with the plain meaning of "specific." The plain language of CATEX A3 potentially encompasses virtually any and every kind of rule and/or type of activity engaged in by DHS in the service of any of its missions, including the administration of the entry and settlement of foreign nationals into the U.S. In CATEX A3(a), DHS does not establish any limiting principle for regulations or rules that are "strictly administrative or procedural," thereby authorizing DHS to deem regulations or rules that expand the conditions upon which foreign nationals enter and settle into the

country as included in "strictly administrative or procedural." [3] Meanwhile, CATEX A3(b) and (c) are also extremely broad, facially applicable to any kind of regulation or policy directive that DHS determines does not result in discretionary change.

Likewise, CATEX A3(d), which applies to those rules "that interpret or amend an existing regulation without changing its environmental effect," is very broad, potentially applying to any type of regulation or policy directive at all. CATEX A3(d) also fails to include any caveat ensuring the existing regulation itself went through proper NEPA analysis. Nor does CATEX A3(d) provide safeguards against the cumulative effects of many excluded actions changing the environmental effects of the regulation. As Plaintiffs have noted, there is no administrative record evidence of any NEPA analysis by DHS of growth-inducing impacts or cumulative impacts in connection with its discretionary actions relating to the entry and settlement of foreign nationals into the U.S.

The broadness of CATEX A3, at least CATEX A3 parts (a)-(d), violates 40 C.F.R. § 1507.3(b)(2) as interpreted by the Ninth Circuit in *Bosworth*. CEQ provides that agency NEPA procedures shall include "specific criteria for and identification of" a typical class of action to be categorically excluded, but CATEX A3 does not provide any such criteria to allow the identification of a type of action that will be categorically excluded. An infinite variety of types of action could be included in this category. This

_____

[3] DHS may wish to argue that its own interpretation of its regulations is entitled to deference, and it does not believe that this CATEX applies to actions expanding the conditions whereby foreign nationals enter and settle in the country. However, DHS is foreclosed from making this argument, as it has in fact cited this categorical exclusion under such circumstances, as discussed below. In addition, DHS's NEPA procedures nowhere else discuss actions related to the entrance and settlement of foreign nationals in the country, nor does DHS prepare EISs or EAs for them, so, by exclusion, DHS must consider them covered through CATEX A3(a).

demonstrated lack of specificity undermines the purpose of NEPA by creating a danger (that in case of the DHS mission of immigration has been realized) that DHS may simply assign any action it finds inconvenient or impractical to evaluate under NEPA into this enormous "black hole" categorical exclusion on a "improper post-hoc" basis. *See Bosworth*, 510 F.3d at 1026. Because CATEX A3 is devoid of specificity, DHS cannot "ensure that projects taken under it do not individually or cumulative inflict a significant impact. *Id.* at 1032. This categorical exclusion is so broad that it is unreasonable and accordingly arbitrary and capricious.

### b) CATEX A3 fails to conduct any form of scoping for potential individual or cumulative impacts as required by *Bosworth*.

The administrative record establishes that DHS never engaged in any process to determine "the proper scope of issues to be addressed" and identify "the significant environmental issues" at stake "prior to the establishment of the categorical exclusion." *Id.* at 1026. Instead, DHS merely asserted that it substantiated its categorical exclusions by relying on "the experiences and opinions of professional staff; assessments of the environmental effects of previously implemented agency actions; and benchmarking other agencies' experiences." DIR00391. These "experiences," "opinions," and "assessments" are not revealed in the administrative record. Taking DHS at its word, the administrative record demonstrates that DHS relied on what amounts to the ad hoc opinions by staff as its basis for the categorical exclusion which comprises DHS's only form of NEPA compliance for the entire scope of its myriad actions governing the administration of the U.S. immigration laws. These experiences and opinions of staff do not even begin to substantiate that all the actions potentially included in this categorical exclusion (which must necessarily include all of DHS' immigration related actions) have no potential to individually or cumulatively impact the "human environment" as required by NEPA.

DHS must "supply a convincing statement of reasons why potential effects are insignificant," and it did not do so here. *The Steamboaters v. F.E.R.C.*, 759 F.2d 1382, 1393 (9th Cir. 1985). On the contrary, before adopting this categorical exclusion, DHS failed even to consider the potential effects of the many actions CATEX A3 plausibly could cover in the future. As a result, DHS did not and cannot "document" any reasons showing that the actions to be taken would be "insignificant." *Bosworth*, 510 F. 3d at 1027. One type of actions whose effects were never scoped to ensure they were in fact insignificant was the category of DHS actions administering the nation's immigration laws, which bring tens of millions of foreign nationals to the U.S. The administrative record provides no factual basis which is essential to determining if the effects of immigration-related regulations and other policy directives are de minimis, either individually or cumulatively. The adoption of the CATEX A3 therefore violates NEPA and is accordingly arbitrary and capricious.

### c) CATEX A3 violates DHS's own requirements on categorical exclusions.

Finally, the adoption of CATEX A3 also conflicts with DHS's own NEPA procedures regarding the application of categorical exclusions. This obvious conflict is contained in CATEX A3(d) for rules that "interpret or amend an existing regulation without changing its environmental effect." According to DHS's NEPA procedures, a categorical exclusion must not be "a piece of a larger action." DIR00331.[4] DHS explains that:

---

[4] DHS's NEPA procedures are also available for viewing on its website. *See* Instruction Manual # 023-01-001-01, at V5, available at https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf

It is not appropriate to segment a proposed action or connected actions by division into smaller parts in order to avoid a more extensive evaluation of the potential for environmental impacts under NEPA. For the purposes of NEPA actions must be considered in the same review if the actions are connected.

*Id.* Yet, on its face, A3(d) allows DHS to categorically exclude updates to existing rules. An update to an existing regulation that is a component of a larger framework is by definition connected to (i.e., "a piece of") that larger regulatory framework. Segmentation under CATEX A3(d) is therefore inevitable. However, under the plain language of its own rule, DHS cannot apply a categorical exclusion to an action that is a segment of a larger action. This facial contradiction between CATEX A3(d) and DHS's own procedure governing segmentation renders CATEX A3(d) arbitrary and capricious.

**B. Plaintiffs are entitled to summary judgment on Count IV because DHS's four invocations of CATEX A3 are arbitrary and capricious under NEPA.**

**1) Procedural Background of Each of the Invocations of CATEX A3**

DHS cited CATEX A3 four times between 2015 and 2017 during the promulgation of immigration-related regulations. Each of these four rule-making actions was highly controversial and resulted in a large number of public comments. 80 Fed. Reg. 23680; 81 Fed. Reg. 13040; 81 Fed. Reg. 82398; 82 Fed. Reg. 5238. These rule-making actions included: 1) an expansion of the student exchange visitor program; 2) an expansion of the optional practical training program; 3) an increase of flexibility to certain employment programs; and 4) the creation of a parole program for international entrepreneurs.

**a)      Expansion of the Student Exchange Visitor Program (SEVP)**

i. The Regulation

On April 29, 2015, DHS promulgated Adjustments to Limitations on Designated School Official Assignments and Study by F-2 and M-2 Nonimmigrants, 80 Fed. Reg. 23,680 (Apr. 29, 2015) (to be codified as 8 C.F.R. pt. 214). This was a final rule amending 8 C.F.R. §§ 214.2 and 214.3, which regulate the Student and Exchange Visitor Program ("SEVP"). SEVP is a program that allows foreign nationals and their immediate family members to enter the U.S. and stay to study at an approved academic or approved vocational institution.[5] The rule expanded the program by allowing schools to designate more officials to oversee the program and by allowing dependent family members of visa-holders under the program to enroll in study in the U.S. *Id.* In short, these rule changes were meant to increase the number of foreign nationals entering and staying in the U.S. through the program.

    ii. Application of CATEX

DHS found that no EIS or EA was necessary, deeming the rule qualified for CATEX A3(d): "[the promulgation of actions] that interpret or amend an existing regulation without changing its environmental effect." DSO00236. The administrative record shows that DHS had no basis for this determination: it simply checked the box for categorically excluded. *Id.* DHS also concluded that the rule was not "part of a larger action" and presented "no extraordinary circumstances creating the potential for significant environmental effects." 80 Fed. Reg. 23,688.

**b) Expansion of the Optional Practical Training Program (OPT)**

    i. The Regulation

On March 11, 2016, DHS promulgated Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students, 81 Fed. Reg. 13,040 (Mar. 11, 2016) (to be

---

[5] *See* https://www.ice.gov/sevis

          Case No: 3:16-CV-2583

codified as 8 C.F.R. pts. 214 and 274a), a final rule amending 8 C.F.R. Parts 214 and 274a, which allow foreign nationals studying science, technology, engineering, or mathematics (STEM) in the U.S. on a student visa to remain in the country after graduation for "optional practical training" (the "OPT" program). 81 Fed. Reg. 13,039. The rule expanded the program by lengthening the time that foreign nationals can remain in the U.S. after graduation. *Id.* This rule change therefore has the potential to induce foreign nationals to legally remain in the U.S. for a longer period of time than was previously the case.

ii. Application of CATEX

DHS found no EA or EIS was necessary, deeming that the rule qualified for CATEX A3(a): "[the promulgation of rules] of a strictly administrative or procedural nature," and CATEX A3(d): "[promulgation of rules] that interpret or amend an existing regulation without changing its environmental effect." 81 Fed. Reg. 13,117. DHS also found that the rule was "not part of a larger action" and "presents no extraordinary circumstances creating the potential for significant environmental effects." *Id.*

c) Adoption of increased flexibility for employment programs

i. The Regulation

On November 18, 2016 DHS promulgated Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82,398 (Nov. 18, 2016) (to be codified as 8 C.F.R. pts. 204, 205, 214, 245, and 274a), a final rule amending "its regulations related to certain employment-based immigrant and nonimmigrant visa programs." *Id.* With this rule, DHS gave increased flexibility and mobility to foreign nationals in the U.S. for employment based visas, in order to "encourage nonimmigrant workers to remain in the United States" *Id.* at 82,468.

ii. Application of CATEX A3

DHS invoked A3(d): "[promulgation of rules] that interpret or amend an existing regulation without changing its environmental effect." DHS found that "this rule affects current participants in immigration programs by codifying existing policies and procedures and making amendments to DHS regulations designed to improve its existing programs." *Id.* at 82,475. DHS also found that the rule was not part of a larger action and presented no extraordinary circumstances creating the potential for significant environmental effects because it "does not introduce new populations that may have an impact on the environment." *Id.*

**d) Creation of International Entrepreneur Program**

i. The Regulation

On January 17, 2017, DHS promulgated the International Entrepreneur Rule, 82 Fed. Reg. 5,238 (January 17, 2017) (to be codified as 8 C.F.R. pts. 103, 212, and 274a), which created a new program for "international entrepreneurs" to remain in the U.S. By the rule, DHS allowed certain individuals to remain in the country if they met certain new criteria. This rule is akin to creating a new visa by regulation.

ii. Application of CATEX

DHS found that this rule "fit within" CATEX A3(a), "for rules strictly of an administrative or procedural nature" and A3(d), "for rules that interpret or amend an existing regulation without changing its environmental effect." *Id.* at 5284. DHS found the rule was not part of a larger action and presented no extraordinary circumstances creating the potential for significant environmental effects. *Id.*

**2) Legal Standard: requirements for the application of categorical exclusions**

CEQ defines "categorical exclusion" to mean, in relevant part:

a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations. . . .

40 C.F.R. 1508.4.(28). Ninth Circuit precedent is clear that the courts must not allow an agency to perfunctorily cite a categorical exclusion as its sole compliance with NEPA before adopting an action. *See, e.g., Bosworth*, 510 F.3d at 1026; *Alaska Ctr.*, 189 F.3d at 859 ("When an agency decides to proceed with an action in the absence of an EA or an EIS, the agency must adequately explain its decision."); *see also Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986). The "[a]pplication of a categorical exclusion is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an environmental impact statement or an environmental assessment is necessary." *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013). While a categorical exclusion has the potential to streamline analysis, an agency cannot merely cite to it in order to completely avoid analysis of an action; NEPA thus requires an agency to provide a reasoned explanation why the proposed action "do[es] not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. 1508.4(28). If an agency could shield any action from review by simply claiming it fits into a categorical exclusion, NEPA would be a rendered a toothless statute. *See, e.g., Steamboaters*, 759 F.2d at 1393. "An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment. The agency must supply a convincing statement of reasons why potential effects are insignificant." *Id.* at 1393. Without such a statement, the court cannot tell if the agency took a "hard look" at the action. *Id. See, e.g., Save Our Ten Acres v. Kreger*, 472 F.2d 463, 466 (5th Cir. 1973) ("The spirit of [NEPA] would die aborning if a facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review.").

Scoping is necessary to determine if the agency's reasons for applying the categorical exclusion are reasonable. "In determining the propriety of the use of a CE, the agency is required to utilize what is referred to as a 'scoping process' to 'determine

the scope of the issues to be addressed and for identifying the significant issues related to a proposed action.'" *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059, 1081 (N.D. Cal. 2007). Application of a categorical exclusion is "inappropriate" if there is the possibility that an action *may* have a significant environmental effect. *Id.* at 1087. This scoping must include cumulative impacts and not solely individual impacts. "The cumulative impact analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects." *Bosworth*, 510 F.3d at 1030.

The agency must also conduct a meaningful analysis, and "provide procedures for determining whether extraordinary circumstances exist, such that the action, though 'normally excluded' from full NEPA analysis, 'may have a significant environmental effect.'" *Salazar*, 706 F.3d at 1096 (citing 40 C.F.R. § 1508.4). That is, at some point before the application of the categorical exclusion, the agency must be able to point to some sort of evaluation process (in which the outcome is not preordained) in order to reasonably determine whether the proposed action does have the potential for environmental impacts even though other actions fitting into the category do not. At the heart of NEPA is the requirement that evaluation of environmental considerations must occur early in the process of agency decision-making. *See* 40 CFR § 1501.2. As with the preparation of an EIS or an EA, the application of a categorical exclusion should not take place long after the action has been initiated.

While NEPA allows agencies to use prior analysis to streamline subsequent compliance, the agency can only cite to such previous compliance if it was actually performed. CEQ regulations expressly permit "tiering," that is, "avoiding detailed discussion by referring to another document containing the required discussion." *Kern*, 284 F.3d at 1073. CEQ provides, in relevant part: "[a]gencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same

issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20. "However, tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA." *Kern,* 284 F.3d at 1073. *See* 43 C.F.R. § 46.140. Likewise, the application of a categorical exclusion to an update of a regulation that was never submitted to prior NEPA compliance would circumvent the Act.

**3) DHS's four invocations of CATEX A3 are arbitrary and capricious.**

**a) DHS employs circular reasoning in its applications of CATEX A3.**

DHS states its actions have no environmental impact because they fit into categorical exclusions. 80 Fed. Reg. 23,680; 81 Fed. Reg. 13,040; 81 Fed. Reg. 82,398; 82 Fed. Reg. 5,238. By definition, categorical exclusions have no environmental impact. Therefore, to say that an action has no significant impact on the environment simply because DHS places it into a categorical exclusion is to express a tautology. Relying upon such a cynical tautology undercuts NEPA, rendering compliance a hollow exercise. DHS's application of CATEX A3 in the case at bar perfectly illustrates an agency avoiding "its statutory responsibilities under NEPA merely by asserting" the action has no environmental significance. *Steamboaters,* 759 F.2d at 1393. *See, e.g., Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 7 (D.D.C. 2009) ("By relying on this tautology, Defendants . . . abdicated their Congressionally-mandated obligation to evaluate all reasonably foreseeable environmental impacts . . . ."). The record therefore shows that DHS failed to engage in meaningful reasoning or provide a factual basis for its applications of the categorical exclusion, violating Ninth Circuit standards.

**b) DHS's improper reliance on CATEX A3(a)**

DHS invoked CATEX A3(a), rules that are "strictly administrative or procedural," to categorically exclude two rules that made substantive changes to the

conditions upon which foreign nationals may enter and remain in the country. 81 Fed. Reg. at 13117 and 82 Fed. Reg. 5284. One changed the length of time that foreign nationals in the U.S. could legally remain under the "Optional Practical Training" program, and the other created a new program with a whole set of defined criteria by which foreign nationals could enter and stay in the U.S. This new rule de facto established a new visa category. Yet expanding the length of stays of foreign nationals and creating new criteria allowing foreign nationals to remain in the country has reasonably foreseeable potential to cause U.S. population growth, which indisputably impacts the human environment. Nonetheless, DHS does not provide any limiting principle to the application of rules it deems "strictly administrative or procedural," suggesting that any rule promulgated by DHS could reasonably fit within this categorical exclusion.

### c) DHS's improper reliance on CATEX A3(d)

For each of the four rule-making actions at issue, DHS invokes CATEX A3(d), which applies to "rules that interpret or amend an existing regulation without changing its environmental effect." 80 Fed. Reg at 23,688.; 81 Fed. Reg. at 13,117; 81 Fed. Reg. at 82,475; 82 Fed. Reg. at 5,284. However, none of these existing regulations underwent *any* form of NEPA compliance, even during the citation of a categorical exclusion. DHS cannot use a categorical exclusion on an update to an existing regulation when that underlying regulation never received any NEPA compliance in the first place.

A categorical exclusion is not an exemption from NEPA compliance: it is a form of NEPA compliance. S*alazar*, 706 F.3d at 1096. Consistent with NEPA's statutory purpose, NEPA compliance must happen before action is taken, not post hoc after a decision on the action has been taken. "Post hoc examination" would "frustrate the fundamental purpose of NEPA." *Bosworth*, 510 F.3d at 1026. *See also* 40 C.F.R. § 1501.2 ("Apply NEPA early in the process. Agencies shall integrate the

20                                              Case No: 3:16-CV-2583

NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."). Yet the regulations at issue were all updates of regulations that never underwent NEPA compliance, even the least extensive type of NEPA compliance, the invocation of a categorical exclusion. Therefore, while DHS claims that these regulations do not change the environment impact of the existing regulation, there is no basis for this assertion. There is no record evidence or analysis supporting this claim. If DHS prepared an EIS, an EA, *or* an application of a categorical exclusion of the existing regulation, there would be documentation present in the administrative record. Such documentation would evince that DHS had a reasoned basis for understanding the environmental impacts of the existing regulation. Because DHS undertook absolutely no NEPA compliance on the existing regulations, DHS cannot now use a categorical exclusion that relies on an understanding of the original impact of the regulation, as CATEX A3(d) does. To do so is to patently "circumvent[] the purpose of NEPA" by relying on prior analysis that never occurred. *Kern*, 284 F.3d at 1073.

**d) Invoking a categorical exclusion on these four actions violates DHS's own NEPA procedures, because despite DHS's assertions, each action is a regulatory update that is part of a larger action, namely the existing regulatory framework.**

DHS justifies the application of CATEX A3(d) in each of the four regulatory updates by claiming that these relatively small regulatory updates do not significantly change the environmental impact of the existing regulatory framework. The first change modified the SEVP program. 80 Fed. Reg. 23,680. This update was clearly connected to and a relatively small update to the SEVP program, a large program currently responsible for the presence of about 1.4 million foreign nationals in the

U.S.[6] Indeed, if the population of the SEVP program were a city, it would be about the size of San Diego. The second change modified the OPT program (itself part of a larger program, in fact, the SEVP program), which allows foreign nationals to stay in the U.S. for a longer period. Clearly, this rule is a part of, and connected to, the regulatory framework of its larger program. The third change is an amendment increasing the flexibility of DHS's employment programs. This rule clearly is connected to and part of DHS's employment programs, which consist of a regulatory framework larger than this one rule updating it. As DHS explains, "this rule affects current participants in immigration programs by codifying existing policies and procedures to DHS regulations designed to improve its immigration programs." 81 Fed. Reg. 82,475. The amendment is now part of the program. The fourth change is the International Entrepreneur Rule. According to DHS, this rule "provides criteria and procedures for applying the Secretary's existing statutory parole authority to entrepreneurs..." 82 Fed. Reg. 5,284. Clearly, the rule is part of, and connected to, the larger action of "parole authority."

DHS therefore does document that these four rules are components of larger regulations. And clearly, if they were not, DHS would not try to invoke CATEX A3(d) in the first place, as it is for rules that amend existing regulations.

Despite employing factual analysis to argue that these four regulations amend existing regulations, DHS contradictorily concludes with a bare assertion that each of the four rules is "not part of a larger action." 80 Fed. Reg 3,688.; 81 Fed. Reg. 13,117; 81 Fed. Reg. 82,475; 82 Fed. Reg. 5,284. In none of these cases does DHS present

---

[6] The most recent available numbers are from April 2018. *See* U.S. Immigration and Customs Enforcement, *Sevis By the Numbers: Biannual Report on International Student Trends*, April 2018., available at
https://www.ice.gov/doclib/sevis/pdf/byTheNumbersApr2018.pdf

reasoned analysis for why the rules are not "part of" the actions (which are in all cases larger) that they update. These findings appear to be merely perfunctory recitation. Any reasonable interpretation of these four regulatory updates should accept that they are connected and part of larger actions, in most cases, to larger programs.

Unfortunately for DHS, its own NEPA procedures explicitly prevent the application of a categorical exclusion for smaller actions that are part of larger actions. DIR00331. As addressed in the discussion above, DHS considers it inappropriate "to segment a proposed action or connected actions by division into smaller parts in order to avoid a more extensive evaluation of the potential for environmental impacts under NEPA." *Id.* But this is exactly what DHS impermissibly did. DHS's analysis of each of the four regulatory updates shows that these regulatory updates are indeed connected to the regulations they amend. Therefore, under DHS's own NEPA procedures, these invocations of categorical exclusions are improper segmentation under NEPA. DHS violated its own NEPA rule.

**e) By initiating a categorical exclusion with no original NEPA analysis and which segments the impacts of connected actions, DHS has improperly avoided analyzing the cumulative effect of growth-inducing impacts of these actions.**

On each of these occasions, DHS took an action that has the potential to expand the population of the U.S. Cumulatively, actions that substantially expand the population of the U.S. have the potential to significantly impact the environment, which is why such population growth is a primary concern of NEPA 42 U.S.C. § 4331 *et seq.* DHS claims that these regulations are not part of a larger action, and that there are no extraordinary circumstances that would cause environmental effects, but it points to no factual basis for considering that these immigration-related actions are not part of a larger system that has tremendous environmental repercussions by increasing the U.S. population by tens of millions of people. Other federal agencies routinely include potential population growth impacts in their NEPA analysis, as

discussed above. It is unknown why DHS refuses to engage in such NEPA compliance.

**C. The Plaintiff is entitled to Summary Judgment on Count V.**

### 1. Requirements for FONSIs

When evaluating an EA under the appropriate standard under NEPA, a "court must determine whether the agencies that prepared the EA took a 'hard look' at the environmental consequences of the proposed action." *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004). If the agency concludes with a FONSI, the EA "must provide sufficient information and detail to demonstrate that the agency took the required 'hard look' at the environmental consequences of the project before concluding that those impacts were insignificant." *Sierra Nevada Forest Protection Campaign v. Weingardt*, 376 F. Supp. 2d 984, 990-91 (E.D. Cal. 2005). Given that agencies conduct far more EAs than EISs, EAs are clearly required to weigh "the additive effect of many incremental environmental encroachments" rather than ignore cumulative impacts. *Native Ecosystems*, 304 F.3d at 896. To prevail on the claim that a federal agency was required to prepare an EIS, the plaintiff need not demonstrate that significant effects will occur. A showing that there are "'*substantial questions* whether a project may have a significant effect' on the environment" is sufficient. *Blue Mountains, Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir 1998).

### 2. The administrative record shows the June 2, 2014 FONSI fails to meet NEPA's requirements.

DHS's EA for the June 2, 2014 "Response to the Influx of Unaccompanied Alien Children" was arbitrary and capricious because it "entirely failed to consider" an important aspect of the problem. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. A review of the administrative record reveals that DHS only considered the environmental effects of the *detention center* it planned to build in Texas to hold minors and families

24                                              Case No: 3:16-CV-2583

who had crossed the border. By looking *only* at the planned construction site, DHS entirely failed to consider that the crossing of tens of thousands of individuals could have an impact on the ecosystems through which they passed, or on the local populations among whom they settled after their release by DHS. DHS failed altogether to consider any growth-inducing impacts of their potential resettlement. Even if the crossing and settlement of tens of thousands of foreign nationals for an indefinite time period ultimately had no environmental impacts, DHS was obligated to consider such impacts if there was a substantial question that they might occur. Furthermore, DHS failed to consider how long the crisis would last, and whether the length of the crisis would change its environmental impact. The crisis is on-going today, and has grown in scope, but DHS has never updated its EA.

DHS's June 2, 2014 EA/FONSI was thus arbitrary and capricious, and the agency should be ordered to revisit its analysis with proper scoping.

## V. Conclusion

Plaintiffs should be granted summary judgment on Counts III, IV, and V, and the Court should vacate DHS's Categorical Exclusion A3, its invocations, and its June 2014 FONSI, and the EA should be remanded to DHS for further NEPA review. Respectfully Submitted on April 23, 2019,

/s/Julie B. Axelrod
California Bar. No. 250165
Center for Immigration Studies
1629 K Street, NW, Suite 600
Washington, D.C. 20001
jba@cis.org

Lesley Blackner
Admitted *Pro Hac Vice*
Florida Bar No. 654043
340 Royal Poinciana Way, Suite 317-377
Palm Beach, FL 33480
lesleyblackner@gmail.com

James P. Miller
California Bar No. 188266
Law Office of JP Miller Jr.
181 Rea Ave, Suite 101
El Cajon, CA 92020
jpmiller@jpmillerlaw.com

25                                      Case No: 3:16-CV-2583