LAWRENCE VANDYKE
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

BARCLAY T. SAMFORD
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Telephone:   (303) 844-1475
Facsimile:   (303) 844-1350
Clay.Samford@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

| | |
|---|---|
| WHITEWATER DRAW NATURAL RESOURCE CONSERVATION DISTRICT, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>KEVIN K. MCALEENAN,[1] *et al.*,<br><br>        Federal Defendants. | **Case No. 3:16-cv-2583**<br><br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>Hon. M. James Lorenz |

---

[1] Under Fed. R. Civ. P. 25(d), Acting Secretary Kevin K. McAleenan is substituted for former Secretary Kirstjen M. Nielsen.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

BACKGROUND ........................................................................................3

    I.    Legal Background ........................................................................3

    II.    Factual Background ......................................................................4

        A.    Litigation Background..............................................4

        B.    The Challenged Decisions........................................5

            1.  Categorical Exclusion A3 ..................................5

            2.  The Designated School Officials Rule...............6

            3.  The STEM Rule ................................................7

            4.  International Entrepreneur Rule.........................7

            5.  The AC21 Rule ................................................8

            6.  Programmatic EA for Response to Influx of Unaccompanied Children and Families and Supplemental EA for Housing at Dilley, Texas ................................8

STANDARD OF REVIEW ..........................................................................9

ARGUMENT..............................................................................................9

    I.    Plaintiffs Lack Standing................................................................9

    II.    Plaintiffs Have Waived Any Challenge to Two of the Actions Before the Court........................................................................................14

    III.    Plaintiffs' Facial Challenge to CATEX A3 Fails ...........................15

        A.    Plaintiffs' Facial Challenge is Untimely.................................................15

        B.    CATEX A3 is Not Arbitrary or Capricious....................16

1.   CATEX A3 is Properly Defined ........................................16

2.  DHS Did Not Violate the NEPA Scoping
Requirements ......................................................................18

3.  Category A3(d) Complies with DHS's NEPA
Requirements ......................................................................21

IV.   DHS Properly Applied CATEX A3 to the Four Rules Challenged by
Plaintiffs ......................................................................................22

A.   Plaintiffs Misconstrue the Applicable
Standards…………………………………………….................23

B.   DHS Reasonably Applied CATEX A3(d) to All Four
Rules…………………………………………………………25

1.  CATEX A3(d) Does Not Require NEPA Review of the
Underlying Rule.........................................................................25

2.  The Four Rules are Not Pieces of a Larger Action............26

3.  The Record Supports DHS's Conclusion that the Four
Rules Do Not Have Significant Environmental Effects ..........27

C.   DHS Properly Applied CATEX A3(a) to the STEM Rule and
the International Entrepreneur
Rule…………………………………….....................................31

V.   DHS Prepared Appropriate NEPA Analyses of the Agency's Actions
to Address an Increased Influx of Unaccompanied Children and
Families Across the Southwest Border ................................................32

VI.   Plaintiffs' Requested Remedy is  Overbroad  and Premature ...........35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Alaska Center for Environment v. U.S. Forest Service*
 189 F.3d 851 (9th Cir. 1999)...............................................19, 23, 24

*Anderson v. Edwards*,
 514 U.S. 143 (1995) ...............................................................17

*Babbitt v. Sweet Home*,
 515 U.S. 687 (1995) ...............................................................17

*Back Country Horsemen of Am. v. Johanns*,
 424 F. Supp. 2d 89 (D.D.C. 2006) .........................................23

*Bicycle Trails Council of Marin v. Babbitt*,
 82 F.3d 1445 (9th Cir. 1996)...................................................15

*California Communities Against Toxics v. U.S. EPA*,
 688 F.3d 989 (9th Cir. 2012)...................................................35

*California v. Norton*,
 311 F.3d 1162 (9th Cir. 2002)..................................................23

*Citizens for Better Forestry v. USDA*,
 481 F. Supp. 2d 1059 (N.D. Cal. 2007) ..................................24

*Clapper v. Amnesty, Int'l*,
 568 U.S. 398 (2013) ..........................................................9, 11

*Ctr for Food Safety v. Johanns*,
 451 F. Supp. 2d 1165 (D. Hawai'i 2006)................................23

*Ctr. for Biological Diversity v. BLM*,
 937 F. Supp. 2d 1140 (N.D. Cal. 2013) ..................................34

*Ctr. for Biological Diversity v. Salazar*,
 706 F.3d 1085 (9th Cir. 2013)..................................................24

*Dep't of Transp. v. Pub. Citizen*,
 541 U.S. 752 (2004) ...................................................14, 15, 23

*Envtl Def. Fund v. Marsh*,
 651 F.2d 983 (5th Cir 1981)......................................................22

*Ground Zero Ctr. for Non–Violent Action v. U.S. Dep't of Navy*,
 383 F.3d 1082 (9th Cir. 2004)............................................28, 29

*Heartwood, Inc. v. U.S. Forest Service*,
    230 F.3d 947 (7th Cir. 2000)................................................................17

*Indep. Acceptance Co. v. California*,
    204 F.3d 1247 (9th Cir. 2000).............................................................9

*Kern v. U.S. Bureau of Land Management*,
    284 F.3d 1062 (9th Cir. 2002).............................................................26

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ..........................................................................9

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008)...............................................................8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................9, 12

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990) ..........................................................................10

*McFarland v. Kempthorne*,
    545 F.3d 1106 (9th Cir. 2008).............................................................8

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014).............................................................12

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983) ..............................................................*passim*

*Monsanto Co. v. Geertson Seed Farms*,
    562 U.S.  (2010) .................................................................................9

*Musacchio v. United States*,
    136 S. Ct. 709 (2016) .........................................................................13

*Natural Res. Def. Council v. Morton*,
    458 F.2d 827 (1972) ...........................................................................35

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994)...............................................................9

*O'Reilly v. U.S. Army Corps of Eng'rs*,
    477 F.3d 225 (5th Cir. 2007)...............................................................22

*Oregon Natural Desert Ass'n v. Jewell*,
    840 F.3d 562 (9th Cir. 2016)........................................................14, 15

*P & V Enterprises v. U.S. Army Corps of Eng'rs*,
    516 F.3d 1021 (D.C. Cir. 2008) ...........................................................15

*Presidio Golf Club v. Nat'l Park Serv.*,
    155 F.3d 1153 (9th Cir. 1998)...........................................................28

*Sensible Traffic Alternatives v. Fed'l Transit Admin.*,
    307 F. Supp. 2d 1149 (D. Haw., 2004) ............................................21

*Sequoia Forestkeeper v. U.S. Forest Service*,
    2010 WL 5059621 ..............................................................................24

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007)..................................................17, 19

*Sierra Club v. Penfold*,
    857 F.2d 1307 (9th Cir. 1988) ..........................................................15

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .......................................................................9, 13

*Utah Envtl. Cong. v. Bosworth*,
    443 F.3d 732 (10th Cir. 2006)....................................................*passim*

*Vermont Yankee Nuclear Power Corp.*,
    435 U.S. 519 (1978) ....................................................................19, 25

*Warm Springs Task Force v. Gribble*,
    621 F.2d 1017 (9th Cir. 1980)..........................................................35

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................8

5 U.S.C. §§ 701-06 ..................................................................................8

8 U.S.C. § 1182(d)(5) ............................................................................31

28 U.S.C. § 2401(a) ...............................................................................15

42 U.S.C. § 4332(C) ..................................................................................2

42 U.S.C. § 4342.......................................................................................2

42 U.S.C. §§ 4321-4370 .........................................................................2

**Rules**

Fed. R. Civ. P. 25(d) ...............................................................................1

**Regulations**

40 C.F.R. § 1501.7 ...........................................................................................18

40 C.F.R. § 1507.3(a) ................................................................................16, 19

40 C.F.R. § 1508.25 .........................................................................................24

40 C.F.R. § 1508.28 .........................................................................................33

40 C.F.R. § 1508.4 ...........................................................................................24

40 C.F.R. § 1508.8(b) ................................................................................28, 34

40 C.F.R. § 1500.4(p) ......................................................................................23

40 C.F.R. § 1501.4 .............................................................................................2

40 C.F.R. § 1502.1 .............................................................................................2

40 C.F.R. § 1508.8(a) .......................................................................................34

48 Fed. Reg. 34,263 (July 28, 1983)..........................................................17, 18

69 Fed. Reg. 33,043 (June 14, 2004) .....................................................*passim*

71 Fed. Reg. 16,790 (Apr. 4, 2006) .......................................................*passim*

75 Fed. Reg. 75,628 (Dec. 6, 2010).........................................................20, 24

79 Fed. Reg. 70,538 (Nov. 26, 2014) ...............................................................5

82 Fed. Reg. 5,238 (Jan.17, 2017) ....................................................................7

83 Fed. Reg. 24,415 (May 29, 2018) .................................................................7

**Other Authorities**

Connaughton, James L. *Department of Homeland Security NEPA Procedures*
(last visited May 23, 2019)
https://www.dhs.gov/sites/default/files/publications/Mgmt_NEPA_CEQConfor
mityLetter_20060324_0.pdf...........................................................................5, 16

*Administrative Record for the Categorical Exclusions (CATEX)s*
(last visited May 23, 2019)
https://www.dhs.gov/sites/default/files/publications/Mgmt_NEPA_AdminRecdet
ailedCATEXsupport_0.pdf.. .............................................................................20

*National Environmental Policy Act*, Department of Homeland Security
(Accessed May 23, 2019)https://www.dhs.gov/publication/national-
environmental-policy-act-nepa.............................................................................5

**INTRODUCTION**

Plaintiffs brought this suit blaming immigration-driven population growth for a host of environmental harms, and claiming broadly that the Department of Homeland Security ("DHS") failed to comply with the National Environmental Policy Act ("NEPA") in the "administration of immigration law and policy." Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pl. Br.") at 1, ECF No. 70-1. But, courts have long recognized that NEPA challenges are a particularly unsuitable vehicle for the pursuit of broad policy agendas—especially those as environmentally attenuated as Plaintiffs'. *See Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983) ("The political process, and not NEPA, provides the appropriate forum in which to air policy disagreements."). This Court has already dismissed Plaintiffs' wide-ranging claims that all of DHS's immigration-related functions are conducted in violation of the statute. *See* Order Granting Defs.' Partial Mot. to Dismiss, ECF No. 55. The Court should now reject Plaintiffs' request for summary judgment on their remaining claims and grant Defendants' cross-motion, bringing to a close Plaintiffs' effort to use NEPA to pursue policy goals far afield from the core purposes of the statute.

In the wake of the Court's prior Order, only six discrete agency actions remain: the issuance of a NEPA Categorical Exclusion, the application of that Categorical Exclusion to four regulations, and DHS's NEPA evaluation of a decision to construct a temporary housing facility in response to a 2014 influx of children and families crossing the southwestern border without authorization. Plaintiffs' challenges to these six decisions should be rejected.

First, Plaintiffs' remaining claims must be rejected for lack of standing. Plaintiffs allege the broadest possible harms, asserting that decades of immigration policy *writ large* has caused them a host of injuries. But this Court has dismissed the only claims that could even potentially correspond to such generalized harms.

Meanwhile, Plaintiffs' remaining claims are completely untethered to their broad population-growth based harms. For example, Plaintiffs make no attempt to demonstrate that the *specific* decision to construct a temporary housing facility, or the few rule amendments they challenge, will actually cause them injury. Thus, Plaintiffs have failed to carry their burden of demonstrating that their alleged harms are "fairly traceable" to the actions before the Court.

Second, even if Plaintiffs had standing, several of their claims have additional jurisdictional defects. Plaintiffs' challenge to the NEPA Categorical Exclusion is barred by the statute of limitations. And, Plaintiffs' challenges to the NEPA Categorical Exclusion and the Designated School Officials Rule are barred by their failure to raise their concerns in the public comment process.

Finally, even if Plaintiffs' could overcome these jurisdictional defects, their claims would fail on the merits. The record shows that DHS followed the law and applicable regulations, and drew reasoned opinions from the facts, in making the challenged decisions. Plaintiffs' attempt to leverage minor revisions of existing rules and programs—where those revisions have insignificant incremental environmental impacts—into a wholesale review of the environmental impact of the existing rules and programs themselves, based solely on an attenuated and unsupported belief that the rules indirectly cause environmental impacts, stretches NEPA beyond recognition. NEPA does not require speculative analysis of highly attenuated indirect effects. Nor does it require agencies to wholesale revisit long-past agency decisions anytime the agency makes an environmentally insignificant adjustment to a program. Such a reading of NEPA ignores the categorical exclusion process created by the CEQ, and would ossify decision-making, discouraging agencies from making minor—and potentially environmentally beneficial—revisions to their regulations for fear of triggering an obligation to undertake a time- and resource-consuming NEPA study of the entire underlying program. Plaintiffs'

1   attempt to so deform NEPA should be rejected, along with their remaining claims.

2                                **BACKGROUND**

3   **I.     Legal Background**

4        Congress enacted NEPA to establish a process through which federal

5   agencies must consider the consequences of their actions upon the environment. *See*

6   42 U.S.C. §§ 4321-4370. NEPA requires federal agencies to prepare a detailed

7   "environmental impact statement" ("EIS") for all "major Federal actions

8   significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

9   An EIS must include a "detailed written statement" concerning "the environmental

10  impact of the proposed action" and "any adverse environmental effects which

11  cannot be avoided." *Id.; see also* 40 C.F.R. §§ 1502.1, 1508.11.

12       NEPA also established the Council on Environmental Quality ("CEQ"). 42

13  U.S.C. § 4342. CEQ's implementing regulations provide that in order to determine

14  whether a proposed major federal action requires preparation of an EIS, the agency

15  may conduct a preliminary examination, called an environmental assessment

16  ("EA"). 40 C.F.R. §§ 1501.4, 1508.9. The EA "serves to . . . [b]riefly provide

17  sufficient evidence and analysis" to determine whether the action will have a

18  "significant" effect on the environment. *Id.* at 1508.9. If the agency determines that

19  the effects will not be significant, it issues a "finding of no significant impact"

20  ("FONSI") in lieu of preparing an EIS. *Id.* at 1508.13.

21       CEQ's regulations also instruct agencies to identify classes of actions,

22  referred to as "categorical exclusions" ("CATEXs"), that normally "do not

23  individually or cumulatively have a significant effect on the human environment"

24  and are therefore excluded from the requirement of preparing an EA or an EIS. *Id.*

25  at §§ 1508.4, 1507.3(b)(2). An agency's procedures regarding categorical

26  exclusions must "provide for extraordinary circumstances in which a normally

27  excluded action may have a significant environmental effect," and therefore

28

requires preparation of an EA or EIS. *Id.* at § 1508.4. Thus, for each proposed action that might fit a categorical exclusion, the agency must determine on a case-by-case basis whether the proposed action triggers any extraordinary circumstances that would preclude application of the category.

## II.     Factual Background

### A.     Litigation Background

Plaintiffs filed suit in October 2016, challenging DHS's compliance with NEPA for a broad range of "discretionary actions" "concerning the entry and settlement of multitudinous foreign nationals into the United States." ECF No. 1, ¶1. Defendants moved to dismiss, arguing that most of the actions challenged were not reviewable because they were moot, not final agency actions, or precluded from review by statute, and because Plaintiffs failed to state a claim under NEPA. ECF No. 39-1. In response, Plaintiffs filed an amended complaint. *See* ECF 40, ECF 44.

After reviewing Plaintiffs' amended complaint, DHS moved to dismiss two of Plaintiffs' five claims; Count I, which sought review of an internal agency guidance document, and Count II, which brought a sweeping programmatic challenge to DHS's NEPA compliance for broad areas of immigration authority, including: "1) employment based immigration; 2) family based immigration; 3) long-term nonimmigrant visas; 4) parole; 5) Temporary Protected Status ("TPS"); 6) refugees; 7) asylum; and 8) Deferred Action for Childhood Arrivals ("DACA")." ECF No. 44, ¶ 1. The Court granted Defendants' motion, dismissing Count I because it did not challenge a reviewable final agency action, and dismissing Court II because it failed to identify discrete agency actions, and sought impermissible programmatic review of the continuing and operations of DHS. ECF No. 55 at 8.

In the wake of the Court's Order, three claims challenging six separate agency actions remain. Count III brings a facial challenge to the promulgation of a NEPA Categorical Exclusion, CATEX A3. Count IV challenges the application of

CATEX A3 to four agency regulations, the DSO Rule, the STEM Rule, the International Entrepreneur Rule, and the AC21 Rule. Count V challenges DHS's compliance with NEPA in issuing a programmatic EA for its 2014 Response to an Influx of Unaccompanied Children and Families and a supplemental EA for construction of temporary housing at Dilley, Texas.

Defendants lodged the administrative records for the six decisions, and the matter is before the Court on the parties' cross-motions for summary judgment.[2]

### B.   The Challenged Decisions

#### 1.   Categorical Exclusion A3

In 2004, DHS published proposed NEPA procedures in the Federal Register for public comment. 69 Fed. Reg. 33,043 (June 14, 2004).[3]   The proposed procedures included a Categorical Exclusion—CATEX A3—for "[p]romulgation of rules [and] issuance of rulings or interpretations . . . of the following nature: (a) Those of a strictly administrative or procedural nature;" and "(d) Those that interpret or amend an existing regulation without changing its environmental effect." *Id.* at 33,056. The proposed NEPA procedures, including CATEX A3, were approved by the CEQ in March 2006. *See* Letter from Connaughton to Chertoff (March 23, 2006).[4] DHS published its NEPA procedures in final form in April 2006. 71 Fed. Reg. 16,790 (Apr. 4, 2006).

In 2014, DHS published draft revised NEPA procedures for public comment. DIR00001. The proposed revised procedures included both new Categorical

---

[2]  To facilitate review of the record, Defendants are filing herewith an Appendix containing those record materials cited in this brief.

[3]  The administrative record for DHS's 2006 NEPA procedures is available on DHS's website. https://www.dhs.gov/publication/national-environmental-policy-act-nepa (last visited May 23, 2019). Cited excerpts are included in Defendants' Appendix.

[4]
https://www.dhs.gov/sites/default/files/publications/Mgmt_NEPA_CEQConformityLetter_20060324_0.pdf (last visited May 23, 2019).

Exclusions and Categorical Exclusions, including CATEX A3, which DHS proposed to retain unchanged from the prior procedures. DIR00002. No member of the public, including Plaintiffs, commented on CATEX A3. *See* DIR00270-288 (public comments); DIR00288-90 (addressing public comments).

As required by CEQ regulations, DHS consulted with CEQ. DIR00291-92. After reviewing the procedures, CEQ concluded that they conform with NEPA and the CEQ's regulations. *Id.* The NEPA procedures were published in final form in November 2014. DIR00288.

### 2.    The Designated School Officials Rule

DHS's Student and Exchange Visitor Program ("SEVP") manages the process under which American educational institutions interact with foreign students studying in the United States under F-1 and M-1 visas. DSO00009. Students studying under F-1 and M-1 visas are visiting to attend school. They are not immigrants to the United States.

In April 2015, after notice and comment rulemaking, DHS issued a rule entitled Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants" (the "DSO" Rule). DSO00009. The rule made two changes to improve administration of the SEVP. *Id*. First, the rule allows school officials greater ability to increase the number of DSOs at each school. DSO00010. DSOs are school employees who work as liaisons between the visiting students, the schools, and the U.S. Government. *Id*. DHS found that having more DSOs in particular schools could enhance the ability of DSOs to oversee the SEVP and report necessary student information to the U.S. Government. *Id.* Second, the rule allows spouses and children of visiting students to take classes, so long as they are not taking a full course load. DSO00011. DHS concluded this change would make studying in the Unites States. *Id*. With regard to NEPA, DHS concluded the rule fell within CATEX A3 because it amended an existing rule "without changing

its environmental effect," and there were no extraordinary circumstances creating the potential for significant environmental effects. DSO00017.

### 3. The STEM Rule

On March 11, 2016, DHS issued a final rule entitled "Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students" ("STEM Rule"). STEM000055. The STEM Rule modified the regulations applicable to nonimmigrant students with degrees in STEM fields—science, technology, engineering, or mathematics—from U.S. universities to allow such students to participate in practical training opportunities for an additional 24 months. STEM000056. The Rule also strengthened reporting requirements to help DHS track students in the program. *Id.* With regard to NEPA, DHS concluded that the Rule fell within CATEX A3 because it was a rule "of strictly administrative or procedural nature," amended an existing rule "without changing its environmental effect," and there were no extraordinary circumstances creating the potential for significant environmental effects. STEM000132.

### 4. International Entrepreneur Rule

In January 2017, DHS issued a final rule establishing criteria for the use of DHS's discretionary authority to temporarily parole into the United States, on a case-by-case basis, individual entrepreneurs of start-up entities with significant potential for rapid growth and job creation. IER00041 (82 Fed. Reg. 5,238 (Jan.17, 2017)) ("International Entrepreneur Rule"). DHS found the Rule fell within CATEX A3 and no extraordinary circumstances were present.   IER00075, IER00088. DHS also noted that the Rule would impact fewer than 3,000 individuals per year, a number insignificant in the context of the overall U.S. population. IER00088. On May 29, 2018, DHS proposed a rule ending the International Entrepreneur parole program and removing the applicable regulations. *See* 83 Fed.

Reg. 24,415 (May 29, 2018).

### 5.     The AC21 Rule

In November 2018, after public notice and comment, DHS issued a rule entitled Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers ("AC21 Rule"). AC00142. The AC21 Rule amended provisions of several existing employment-based visa programs to better enable U.S. employers to employ highly skilled workers with employment-based visas, and to increase the ability of visa-holding workers to change positions or employers. *Id.* With regard to NEPA, DHS determined that the Rule would primarily affect immigrant and nonimmigrant workers who are already in the United State and have been present for a number of years, and it that would not significantly impact the environment. AC000218-219. The agency also found the Rule fell within the CATEX A3(d) because it only "interpret[s] or amend[s] an existing regulation without changing its environmental effect." *Id.*

### 6.     Programmatic EA for Response to Influx of Unaccompanied Children and Families and Supplemental EA for Housing at Dilley, Texas

In 2014, DHS prepared a programmatic EA and issued a FONSI assessing the impacts of accelerating expansion of its infrastructure—temporary detention space, transportation and medical care—to address an influx of children and families crossing the southwestern border. UAC00534-58, UAC00568-71. The programmatic EA defined the parameters for when more detailed NEPA analysis of site-specific proposals would be required. UAC00550-58. In August 2014, DHS prepared a supplemental EA to consider the environmental impacts of the construction of a facility near Dilley, Texas, which would house up to 2,400 women and children pending the disposition of their immigration proceedings. UAC00775-948. DHS concluded the facility would not have significant environmental impacts,

1  and issued a FONSI. UAC00948.

2  ## STANDARD OF REVIEW

3  Agency decisions are reviewed under the judicial review provisions of the

4  Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. *Lands Council v.*

5  *McNair*, 537 F.3d 981, 987 (9th Cir. 2008). Under the APA, agency decisions may

6  be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise

7  not in accordance with law." 5 U.S.C. § 706(2)(A). In accordance with that

8  standard, an agency's decision will be overturned

9  > [O]nly if the agency relied on factors which Congress has not intended it to
10 > consider, entirely failed to consider an important aspect of the problem, or
   > offered an explanation for its decision that runs counter to the evidence before
11 > the agency or is so implausible that it could not be ascribed to a difference in
12 > view or the product of agency expertise.

13 *McFarland v. Kempthorne,* 545 F.3d 1106, 1110 (9th Cir. 2008) (citations and

14 quotation marks omitted).[5] The arbitrary and capricious standard requires affirming

15 the agency action if a reasonable basis exists for its decision. *Indep. Acceptance Co.*

16 *v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000).

17 ## ARGUMENT

18 ## I.    Plaintiffs Lack Standing

19 To establish Article III standing, Plaintiffs must demonstrate an injury that is

20 (1) "concrete, particularized, and actual or imminent," (2) "fairly traceable to the

21 challenged action," and (3) "redressable by a favorable ruling." *Clapper v. Amnesty,*

22 *Int'l*, 568 U.S. 398, 409 (2013) (citing *Monsanto Co. v. Geertson Seed Farms,* 561

23 U.S. 139 (2010)).

24 The party seeking jurisdiction bears the burden of establishing standing, and

25 "must 'set forth' by affidavit or other evidence 'specific facts'" establishing their

26 _____

27 [5]  The Ninth Circuit has endorsed the use of Rule 56 motions for summary
    judgment in reviews of agency administrative decisions, under the APA. *Nw.*
28 *Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994).

standing. *Clapper,* 568 U.S. at 409 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Because federal courts are courts of limited jurisdiction, the presumption is that they lack jurisdiction unless the party asserting jurisdiction establishes it. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The task of establishing standing is "'substantially more difficult'" in cases such as this one, where Plaintiffs are not themselves the "object[s] of the government action or inaction [they] challenge." *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (quoting *Lujan*, 504 U.S. at 562).

Plaintiffs—who proffer no argument in their summary judgment brief in support of standing—fall well short of demonstrating that they have standing. With their amended complaint Plaintiffs submitted numerous affidavits alleging two classes of injury: (1) broad environmental and quality of life harms allegedly attributable to immigration induced population growth,[6] and (2) injuries allegedly caused by individuals illegally crossing the southwestern border.[7] But Plaintiffs

---

[6] *See* Aff. of Richard D. Lamm, ECF No. 44-9, ¶ 8 (alleging harms to the quality of life in Colorado caused by "mass foreign immigration"); Aff. of  Don Rosenberg, ECF No. 44-10, ¶ 9 (alleging population growth in California in the past 30 years has harmed the environment and quality of life); Aff. of Claude Wiley, ECF No. 44-11 (asserting quality of life is decreased by population growth); Aff. of Ric Oberlink, ECF No. 44-12 ( alleging harms from traffic and crowding in California caused by population growth); Aff. of Richard Schneider, ECF No. 44-13 (asserting injuries from increased development and traffic caused by population growth in California); Aff. of Stuart Hurlbert, ECF No. 44-14 (alleging environmental and aesthetic harms in California from population growth); Aff. of Glen Colton, ECF No. 44-15 (alleging harms in Colorado from population growth since 1975); Aff. of John Oliver, ECF No. 44-18 (alleging broad harms in Florida from population growth since 1970).

[7] *See* Aff. of Fred Davis, ECF No.44-7(alleging environmental, property, and health impacts caused by illegal border crossers); Aff. of Peggy Davis, ECF 44-8 (alleging environmental, property, and health impacts caused by illegal border crossers); Aff. of Caren Cowan, ECF No. 44-16 (alleging fear and property destruction near the border caused by illegal border crossing); Aff. of John Ladd,

make no attempt to demonstrate that these injuries are "fairly traceable" to the six decisions before the Court. Plaintiffs instead rely on a broad policy-level argument, reasoning that: (1) DHS is charged with "enforcing and administering our immigration laws," (2) immigration "drives population growth," and (3) population growth has negative environmental impacts. *See* Pl. Br. at 1. While this broad policy concern may be appropriate "in the offices of the Department or the halls of Congress," *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), it does not suffice to carry Plaintiffs' burden of demonstrating a "concrete and particularized" injury that is "fairly traceable" to the decisions under review by the Court. *Clapper,* 568 U.S. at 409.

First, Plaintiffs fail to even allege, much less demonstrate, that any of the challenged actions have a direct impact on population growth or border crossings and thus could cause the harms they allege. And indeed, there is no such direct causal link. The DSO and STEM rules pertain only to students temporarily studying in the United States, not immigrants adding to the permanent population and not individuals illegally crossing the southwestern border. The AC21 Rule primarily addresses a population of immigrant and nonimmigrant visa holders who are already in the United States, not new immigrants or illegal border crossers. AC00218. The International Entrepreneur Rule is expected to impact an insignificant number of immigrants per year, and it has no relation to individuals illegally crossing the border. IER00088. And, DHS's 2014 decision to construct temporary housing near Dilley, Texas, does not increase immigration; it is a *response* to people entering the country illegally. It does not influence whether the individuals housed in the facility will ultimately be allowed to immigrate.

---

ECF No. 44-17 (alleging environmental, property and emotional injury caused by illegal border crossing); and Aff. of Ralph D. Pope, ECF No. 44-19, (alleging harm from "ecosystem degradation" caused by illegal border crossers).

1    Instead of attempting to provide argument or facts supporting a claim that the

2    actions they challenge directly increase population, Plaintiffs rely on an

3    unsupported assumption that the actions they challenge will induce permanent

4    immigration and induce an increase in border crossings. *See*, *e.g.,* Pl. Br. at 2.

5    Plaintiffs ask the Court to assume, for example, that the changes in the DSO Rule

6    or the STEM Rule will make it more likely that visiting students will remain in the

7    country permanently, either by illegally remaining and successfully evading

8    removal, or by seeking and being granted more permanent long-term status.

9    Similarly, Plaintiffs ask the Court to assume that the challenged decisions will

10    induce more individuals to attempt to illegally cross the southwestern border and

11    will increase the number of individuals who are permitted to stay in the country or

12    who succeed in staying the county illegally.

13    But standing cannot rest on speculation about the actions of independent third

14    parties—the Court should not have to guess the motivations of individuals seeking

15    to immigrate legally or illegally or to divine the future conclusions of officials

16    deciding questions related to immigration benefits or enforcement. *See Lujan*, 504

17    U.S. at 555 (An injury "has to be fairly traceable to the challenged action of the

18    defendant, and not . . . th[e] result [of] the independent action of some third party

19    not before the Court."). Where a plaintiff alleges that government action "caused

20    injury by influencing the conduct of third parties . . . more particular facts are needed

21    to show standing." *Mendia v. Garcia,* 768 F.3d 1009 (9th Cir. 2014) (citation

22    omitted). Specifically, without relying on "speculation" or "guesswork" about the

23    third parties' motivations, a plaintiff must offer facts showing that the government's

24    unlawful conduct "is at least a substantial factor motivating the third parties'

25    actions." *Id*.

26    Rather than meeting their heightened burden of showing "more particular

27    facts" demonstrating the influence of the challenged decisions on the actions of

28

independent third parties, Plaintiffs present no facts at all showing that the six decisions it issue—rather than broader economic and geopolitical forces—are the cause of their injuries. Plaintiffs' declarants instead attribute their injuries to generalized harms occurring over decades or trace their injuries to specific DHS actions not before the Court, including the DACA policy, TPS decisions, and "amnesty programs." *See, e.g.,* Aff. of Glen Colton, ECF No. 44-15 (alleging harms from population growth since 1975); Aff. of Don Rosenberg, ECF No. 44-10, ¶ 9 (alleging harms from population growth over past 30 years); Aff. of Fred Davis, ECF No.44-7(tracing injury to "lax interior enforcement policies," "amnesty programs," and DACA); Aff. of Don Rosenberg , ECF No. 44-10, ¶ 10 (tracing death of his son to individual who entered the United States illegally in 1999 and was granted TPS); Ladd Aff., ECF No. 44-17, ¶ 12 (tracing injury to "catch and release policies," "Morton Memos in 2011," DACA, and "decisions to cut back on worksite enforcement in 2009"). This Court has already rejected Plaintiffs' attempt to challenge these broad programs, and Plaintiffs cannot now base their standing to challenge the six discrete decisions before the Court on injuries allegedly traceable to broad claims no longer before the Court. *See* ECF No. 55 at 7 (dismissing Plaintiffs' challenges to "long term nonimmigrant visas, parole, Temporary Protected Status, refugees, and asylum, and DACA"); *see also Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) ("The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (quotation omitted)).

Finally, even had Plaintiffs demonstrated that population growth was fairly traceable to the challenged decisions, they still fall short of demonstrating the links of causation between that population growth and their alleged injuries. Plaintiffs allege population-based harms—increased traffic, increasing crowding in particular

parks—in specific areas of California, Colorado and Florida. *See, e.g.,* Willey Aff., ECF No. 44-10 (alleging harms in Los Angeles area); Ric Oberlink, ECF No. 44-12 (alleging injuries to use of Redwood Regional Park, Yosemite, and Mt. Whitney). But Plaintiffs adduce no evidence that, assuming the challenged decisions induce population growth, that growth will occur in these areas or will occur in manner causing Plaintiffs harm; i.e. that individuals will locate in areas used by Plaintiffs, drive on the highways used by Plaintiffs, or use the parks and other resources used by Plaintiffs. Plaintiffs appear to ask the Court to simply assume that any population growth anywhere in the country will necessarily harm their interests. But the Supreme Court has squarely rejected reliance on this sort of probabilistic link to injury. *Summers*, 555 U.S. at 498 (basing standing on the "statistical probability that some of [plaintiffs'] members are threatened with concrete injury . . . would make a mockery of our prior cases").

In sum, Plaintiffs proffer a collection of alleged injuries that they tie only in conclusory fashion to immigration policies *writ large*, or to specific DHS programs not before the Court. These broad and untethered allegations fall short of the requirement that an injury be "fairly traceable" to the government action challenged, and Plaintiffs' complaint should be dismissed for want of standing.

## II.   Plaintiffs Have Waived Any Challenge to Two of the Actions Before the Court

Even if Plaintiffs have standing, their challenge to two of the agency decisions—CATEX A3 and the DSO Rule—are precluded by Plaintiffs' failure to raise their concerns in the public comment process for the decisions.

A party seeking to challenge an agency's compliance with NEPA must structure its participation in the administrative process to alert the agency to the party's contentions so that the agency may give the concerns meaningful consideration. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). Failure to adequately identify and discuss a particular issue during the public comment

1    period constitutes waiver of the right to pursue that issue in court. *Id.; see also*

2    *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) (holding plaintiffs

3    barred from litigating issue not clearly presented in public comments).

4        In this case Plaintiffs failed to comment on the DHS's promulgation of NEPA

5    Procedures (including CATEX A3) in either 2006 or 2014, and also failed to

6    comment on the DSO Rule *See* DIR00270-287 (public comments on draft NEPA

7    procedures); DSO00271-329 (public comments on DSO Rule). Because Plaintiffs

8    failed to present their claims that these decisions might have significant effects on

9    U.S. population growth during the public comment process, they have waived their

10   right to challenge the decisions on that basis in this Court.

11   **III.    Plaintiffs' Facial Challenge to CATEX A3 Fails**

12       Plaintiffs bring a facial challenge to DHS's CATEX A3, asserting that (1) the

13   category is overly broad; (2) DHS failed to engage in "scoping" procedures when

14   promulgating the Categorical Exclusion, and that the promulgation of the

15   Categorical Exclusion violates DHS's own NEPA procedures.  These claims fail,

16   first because the Plaintiffs' challenge to CATEX A3 is barred by the statute of

17   limitations, and second, because the DHS fully complied with NEPA when it

18   promulgated the category.

19       **A.    Plaintiffs' Facial Challenge is Untimely**

20       Because neither NEPA nor the APA contains a statute of limitation, the

21   general six-year statute of limitations in 28 U.S.C. § 2401(a) applies. *Sierra Club v.*

22   *Penfold*, 857 F.2d 1307 (9th Cir. 1988). Facial challenges to a regulation accrue on

23   the date that the challenged regulation was promulgated. *P & V Enterprises v. U.S.*

24   *Army Corps of Eng'rs*, 516 F.3d 1021 (D.C. Cir. 2008). CATEX A3 was

25   promulgated in 2006. 71 Fed. Reg. 16790 (Apr. 4, 2006). The statute of limitations

26   for a facial challenge to CATEX A3 thus ran in 2012, four years before Plaintiffs

27   filed suit. *See Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 n.5

28

1    (9th Cir. 1996) (holding challenge to categorical exclusion barred by statute of
2    limitations).

3    **B.    CATEX A3 is Not Arbitrary or Capricious**

4        Should the Court conclude that Plaintiffs' facial challenge to CATEX 3 is
5    justiciable, the record demonstrates the category was properly developed consistent
6    with the applicable law and following CEQ and DHS procedures.

7        In order to establish a Categorical Exclusion, the CEQ requires that an
8    agency: (1) publish the proposed category in the Federal Register, (2) provide an
9    opportunity for public comment on the proposal, and (3) submit the proposed CE
10   to CEQ for review and approval. 40 C.F.R. § 1507.3(a).   Here DHS properly
11   followed the CEQ regulations when it established CATEX A3.

12       The proposed Categorical Exclusion was published in the Federal Register
13   for public comment in 2004. 69 Fed. Reg. 33,043. The category was approved by
14   the CEQ in March 2006. *See* Letter from Connaughton to Chertoff (March 23,
15   2006). DHS published its NEPA regulations in final form in April 2006. 71 Fed.
16   Reg. 16790 (Apr. 4, 2006). In 2014 DHS published draft revised NEPA regulations,
17   which retained CATEX A3, for public comment. *See* DIR00001. These regulations
18   were approved by CEQ, DIR00291, and published in final from in November 2014.
19   DIR00288.

20       As demonstrated below, Plaintiffs' critiques of CATEX A3—that it is
21   improperly broad, didn't comply with NEPA scoping requirements, and violates
22   DHS's own NEPA procedures—are all unavailing.

23       **1.    CATEX A3 is Properly Defined**

24       Plaintiffs first contend that CATEX A3 is contrary to CEQ regulations
25   requiring that Categorical Exclusions include "[s]pecific criteria for and
26   identification of those typical classes of action" which normally do not require
27   preparation of an EIS or an EA. Pl. Br. at 9; *see also* 40 C.F.R. § 1507.3(b)(2)(iii).

28

CATEX A3, however, properly identifies a class of actions—rules, interpretations, policies, orders, directives, notices, procedures, manual, advisory circulars, and other guidance documents—and then identifies specific criteria for identifying typical examples within that class; for example, those "of a strictly administrative or procedural nature," or those that "interpret or amend an existing regulation without changing its environmental effect." DIR00355 (A3(a), (d)).

While Plaintiffs deem CATEX A3 contrary to the dictionary definition of "specific," *see* Pl. Br. at 9, the category plainly comports with the CEQ regulations. Indeed, the CEQ has explicitly discouraged the use of "detailed lists of specific activities" and encouraged agencies to instead identify "broadly defined criteria which characterize types of actions that, based on the agency's experience," normally do not have "significant environmental effects." 48 Fed. Reg. 34,263, 34,265 (July 28, 1983). Compellingly, CEQ itself reviewed DHS's NEPA procedures, including CATEX A3, and determined that they conform to NEPA and the CEQ's own regulations. *See* Letter from Connaughton to Chertoff (March 23, 2006); DIR00291. The CEQ's interpretation of its own regulations is entitled to "great deference" from the Court. *Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) (quoting *Heartwood, Inc. v. U.S. Forest Service*, 230 F.3d 947 (7th Cir. 2000)).

Plaintiffs' related suggestion that the Category A3 is arbitrary and capricious because it could theoretically include actions with significant cumulative effects, *see, e.g.,* Pl. Br. at 10, is not persuasive. First, as a legal matter, the fact that it is *possible* to speculate circumstances in which a regulation could be applied improperly does not constitute grounds for finding the regulation facially invalid. *See, e.g., Babbitt v. Sweet Home,* 515 U.S. 687, 709 (1995) (O'Connor, J., concurring) (noting that "there is no need to strike a regulation on a facial challenge out of concern that it is susceptible of erroneous application"); *Anderson v.*

*Edwards*, 514 U.S. 143, 156 n.6 (1995) (noting plaintiffs "could not sustain their burden [of showing regulation facially invalid] even if they showed that a possible application of the rule . . . violated federal law").

Second, Plaintiffs ignore that CATEX A3 must be used in conjunction with the "extraordinary circumstances" inquiry, which provides a "safety-valve" that prevents proposals with significant effects from being issued under the category. *See, e.g., Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732 (10th Cir. 2006). As required by CEQ regulations, the DHS NEPA procedures contain a list of "extraordinary circumstances" that identify conditions where a proposal may have significant impacts and use of a categorical exclusion would be improper. DIR00330-32. Directly responsive to Plaintiffs' concern, one of the listed extraordinary circumstances is "whether the action is related to other actions with individually insignificant but cumulatively significant impacts." DIR00332.

## 2. DHS Did Not Violate the NEPA Scoping Requirements

Plaintiffs contend, based on the Ninth Circuit's decision in *Sierra Club v. Bosworth*, that DHS erred in not conducting a "scoping" process prior to the establishment of CATEX A3. Pl. Br. at 11. This claim fails. The DHS was not required to conduct scoping for CATEX A3 and the agency properly documented its determination that the category would not have significant effects.

"Scoping" is a NEPA process designed to gather input as to the "scope of the issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7. Under the CEQ regulations, scoping is required only for actions requiring preparation of an EIS. *Id.* (scoping applies "[a]s soon as practicable after [the agency's] decision to prepare an environmental impact statement").[8] The CEQ regulations do not extend the scoping obligation to the

---

[8] *See also* CEQ Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34,265 (1983) ("The purpose of this [scoping] process is to determine the scope of the EIS

1  creation of categorical exclusions. 40 C.F.R. § 1507.3(a).

2        In *Bosworth*, the court did, as Plaintiffs note, fault the Forest Service for

3  failing to conduct scoping during the creation of a categorical exclusion. 510 F.3d

4  1016, 1026 (9th Cir. 2007). That holding, however, is not generalizable to other

5  agencies because it rests on the court's belief that the Forest Service's NEPA

6  procedures had extended the scoping requirements beyond EISs to "all proposed

7  actions." In applying the scoping requirement the *Bosworth* court relied the Forest

8  Service's Handbook ("FSH") and on *Alaska Center for Environment v. United*

9  *States Forest Service*, which found that the FSH requires the agency to "conduct

10  scoping for '*all proposed actions*, including those that would appear to be

11  categorically excluded.'" 189 F.3d 851, 858 (9th Cir. 1999) (emphasis added).

12        In contrast to the Forest Service-specific procedures at issue in *Bosworth*,

13  DHS's NEPA procedures explicitly require scoping only for EISs. DIR00195. For

14  creation of Categorical Exclusions, DHS NEPA procedures require only "CEQ

15  review and public comment." DIR00199 (Paragraph 3(a)(iii)). This Court should

16  decline Plaintiffs' invitation to engraft onto DHS's NEPA procedures an obligation

17  not required by the statute. *See Vermont Yankee Nuclear Power Corp. v. Nat.*

18  *Resources Def. Council,* 435 U.S. 519, 525 (1978) (holding courts should not

19  impose their "own notions of proper procedures upon agencies entrusted with

20  substantive functions by Congress").

21        To the extent that Plaintiffs intend their "scoping" claim to be a challenge to

22  the administrative record underlying CATEX A3, that challenge also fails. Plaintiffs

23  contend that CATEX A3 is intended to include "the entire scope of [DHS's] myriad

24  actions governing the administration of the U.S. immigration laws," and that the

25  administrative record does not demonstrate that "all of DHS'[s] immigration related

26  actions[] have no potential to individually or cumulatively impact the 'human

27  _____

28  so that preparation of the documents can be effectively managed.").

environment.'" Pl. Br. at 11. This argument is a strawman. CATEX A3 establishes a general category for types of rules and interpretations that do not have significant environmental effects. The category itself is not related to immigration, and it can be used by any DHS component for any qualifying rule. *See* DIR00309 (noting procedures apply to all components of DHS). Nowhere does DHS assert that the category is intended to encompass all immigration related activities; DHS will determine and conduct the appropriate level of NEPA analysis for its actions at the time they are proposed.[9] *See* DIR00293 (noting NEPA procedures apply to DHS "programs, projects, and other activities"). Because CATEX A3 does not purport to cover "all of DHS'[s] immigration-related actions," Pl. Br. at 11, there was no need for DHS to establish a record that any and all immigration-related actions have no potential to impact the environment.

Contrary to Plaintiffs' assertions, CATEX A3 is well-supported by the record. DHS's 2006 NEPA procedures, including CATEX A3, where developed over a year-long process by a panel of experts. *See* 69 Fed. Reg. 33,043. In particular, the panel developed CATEX A3 through comparison to long-standing categories used by multiple other agencies, a process explicitly recommended by the CEQ. *See* Admin. R. for Categorical Exclusions;[10] 71 Fed. Reg. 16,790, 16791 (Apr. 4, 2006) ("The CATEXs were developed on the basis of an administrative record from the components that comprise the Department and the expertise of the Panel members); 75 Fed. Reg. 75,628, 75,629 (Dec. 6, 2010) (CEQ guidance encouraging agencies "to consider information and records from other private and public entities, including other Federal agencies"). CEQ reviewed and approved the

---

[9]  For example, in this case, DHS prepared a programmatic EA and Supplemental EA to analyze the environmental effects of adding infrastructure to address the influx of children and families along the southwestern border.

[10]
https://www.dhs.gov/sites/default/files/publications/Mgmt_NEPA_AdminRecdetailedCATEXsupport_0.pdf

DHS's 2006 NEPA procedures, including CATEX A3. *See* Letter from Connaughton to Chertoff (March 23, 2006).

In sum, when it established CATEX A3, DHS was not required to conduct scoping, nor was it required to demonstrate that all of the Departments' immigration-related actions have no potential to impact the human environment. The category was developed and supported by a process approved by the CEQ.

### 3.    Category A3(d) Complies with DHS's NEPA Requirements

Finally Plaintiffs assert that CATEX A3(d) is facially inconsistent with DHS's NEPA procedures because it allows categorical exclusion of rules that "interpret or amend an existing regulation without changing its environmental effect" while the DHS's NEPA procedures prohibit the agency from using a categorical exclusion on a proposed action that is "a piece of a larger action." Pl. Br. at 12-13. Plaintiffs submit that any amendment or interpretation is necessarily "a piece of the larger action"—the existing rule and the "larger regulatory framework." *Id.* This reading misconstrues DHS's NEPA procedures.

In requiring that a Categorical Exclusion not be applied to "a piece of a larger action" DHS did not intend to preclude use of a Categorical Exclusion in any instance where the proposed action is, in any manner, "connected to" the "larger regulatory framework." Pl. Br. at 13. Were that the case, the exception would quickly swallow the rule, as all DHS actions are arguably connected to the Department's larger regulatory framework. Instead, as the DHS policy itself makes clear, the "not a piece of a larger action" requirement precludes "segmentation"— the artificial division of a single proposed action into smaller components to escape the application of NEPA to some of the segments or to reduce the perceived impacts of the whole action. *See* DIR00331 ("It is not appropriate to segment a proposed action or connected actions by division into smaller parts in order to avoid a more extensive evaluation of the potential for environmental impacts under NEPA"); *see*

*also Sensible Traffic Alternatives v. Fed. Transit Admin.*, 307 F. Supp. 2d 1149 (D. Haw. 2004) (defining segmentation).

To engage in impermissible segmentation, an agency must be aware of the scope of the entire action at the time it is proposed. *See, e.g,, O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 237 (5th Cir. 2007) ("improper segmentation is usually concerned with projects that have reached the proposal stage."); *Envtl Def. Fund v. Marsh*, 651 F.2d 983 (5th Cir 1981) (finding no impermissible segmentation where one project is proposed and the other is still being studied). The later discovery of a need to amend an existing regulation is not segmentation of a single proposed action, it is a simply a separate later decision. Tellingly, Plaintiffs cite to no caselaw for their untenable theory that a later amendment to a regulation should be considered part of the initial regulation for NEPA purposes.

Moreover, even if a later amendment could be deemed connected to the initial rule for purposes of a segmentation analysis, that would not provide a basis for the facial invalidation of CATEX A3(d) because its use is still explicitly limited to circumstances where the amendment or interpretation does not alter the environmental impact of the original rule. So, by its own terms, CATEX A3(d) still cannot be used for actions with significant environmental effects.

In sum, Plaintiffs' facial challenge to the validity of CATEX A3 fails. The category is properly defined, was created under a process approved by the CEQ, and is not in conflict with DHS's NEPA procedures.  Federal Defendants are entitled to summary judgment on Count III.

## IV.   DHS Properly Applied CATEX A3 to the Four Rules Challenged by Plaintiffs

Drawing from disparate and inapplicable provisions of NEPA and inapposite caselaw, Plaintiffs contend that DHS erred in concluding that the promulgation of four regulations—the DSO Rule, the STEM Rule, the AC21 Rule, and the International Entrepreneur Rule—fell within CATEX A3. Considered under the

appropriate standards, however, the record makes clear that the DHS properly applied CATEX A3 to all four rules.

### A.     Plaintiffs Misconstrue the Applicable Standards

When applying a categorical exclusion to a proposed action an agency must show: (1) that the proposed action fits within the established category; and (2) that there are no extraordinary circumstances requiring preparation of an EA or EIS. *Alaska Ctr.*, 189 F.3d at 858. DHS's NEPA procedures add a third determination, that the action not be segmented from "a larger action." DIR00331.

The purpose of the categorical exclusion process is to save agency resources for actions with significant impacts, and thus the requirements for documenting the application of a CATEX are minimal; the agency need only "adequately explain its decision." *Alaska Ctr.,* 189 F.3d at 859. So long as there is "a rational connection between the facts and the conclusion made, the [agency] has not acted arbitrarily." *Id.* The agency's application of a categorical exclusion need not follow any specific form. *See, e.g., California v. Norton,* 311 F.3d 1162, 1176 (9th Cir. 2002) ("In many instances, a brief statement that a categorical exclusion is being invoked will suffice."); *Ctr. for Food Safety v. Johanns*, 451 F. Supp. 2d 1165, 1174 (D. Haw. 2006) (when applying a categorical exclusion, "the agency must simply explain its decision in a reasoned manner"); *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (upholding use of a categorical exclusion where the agency did not document the decision). "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Alaska Ctr.,* 189 F.3d at 859.

Ignoring that the function of categorical exclusions is to reduce paperwork and delay, 40 C.F.R. §§ 1500.4(p), 1500.5(k), Plaintiffs seek to impose additional procedural obligations, asserting that DHS must conduct "scoping" and a

1    cumulative effects analysis when applying a categorical exclusion to a proposed
2    action. Pl. Br. at 17-18. Neither process is applicable here. First, with regard to
3    scoping, Plaintiffs mistakenly rely on a line of cases that rest on Forest Service-
4    specific NEPA regulations, which extend scoping obligations to "all proposed
5    actions." *See* Pl. Br. at 18 (citing *Citizens for Better Forestry v. USDA*, 481 F. Supp.
6    2d 1059, 1082 (N.D. Cal. 2007) ("the Forest Service is required to conduct scoping
7    of 'all proposed actions, including those that would appear to be "categorically
8    excluded"' citing *Alaska Ctr.,* 189 F.3d at 859)). These cases are inapplicable here,
9    because neither NEPA itself, nor CEQ regulations, nor DHS procedures, extend the
10   scoping process to the use of categorical exclusions.

11   Plaintiffs' contention that DHS is required to conduct a cumulative effects
12   analysis when applying a categorical exclusion is also misplaced. By definition
13   categorical exclusions are categories of actions which the agency has already
14   determined "do not individually or cumulatively have a significant effect on the
15   human environment." 40 C.F.R. § 1508.4. Obligating agencies to conduct a
16   cumulative effects analysis when using the category would thus "effectively render
17   useless the purpose of categorical exclusions," *Utah Envtl. Cong. v. Bosworth*, 443
18   F.3d at 740, and the Ninth Circuit has squarely rejected any such obligation. *See*
19   *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) (holding
20   application of 40 C.F.R § 1508.25 –which requires consideration of connected,
21   cumulative and similar actions—"is inconsistent with the efficiencies that the
22   abbreviated categorical exclusion process provides"); *Sequoia Forestkeeper v. U.S.*
23   *Forest Service*, 2010 WL 5059621 (holding cumulative effects analysis not required
24   when applying categorical exclusions).[11]

25

26   [11] Plaintiffs deride the fact that agencies are not required to conduct a cumulative
27   effects analysis when applying a categorical exclusion as a "cynical tautology." Pl.
     Br. at 19. But CEQ created categorical exclusions to "reduce paperwork and delay,
28   so that EAs or EISs are targeted toward proposed actions that truly have the

1   In short, to properly apply CATEX A3, DHS was required only to determine
2   that the proposed rules fell within the category, there were no extraordinary
3   circumstances, and the rules were not "a piece of a larger action." This Court should
4   decline to impose on the agency additional procedures not required by statute or
5   regulations. *Vermont Yankee,* 435 U.S. at 525.

6   **B.   DHS Reasonably Applied CATEX A3(d) to All Four Rules**

7   Plaintiffs assert that the DHS improperly determined that the rules at issue
8   fall within CATEX A3(d), which covers rules that "amend an existing regulation
9   without changing its environmental effect." Pl. Br. at 20. Plaintiffs contend DHS's
10  use of CATEX A3(d) was improper because they believe: (1) the category cannot
11  be used unless the rule being amended has itself undergone NEPA analysis; (2) the
12  rules are parts of a larger action; and (3) the rules may have significant impacts on
13  the population of the United States. None of these arguments are persuasive.

14  **1.   CATEX A3(d) Does Not Require NEPA Review of the
15         Underlying Rule**

16  Plaintiffs first argue that DHS cannot use CATEX A3(d) to amend existing
17  regulations if the underlying regulations never received NEPA review. Pl. Br. at 20-
18  21. Nothing in CATEX A3(d) itself or elsewhere in the DHS's NEPA procedures,
19  however, imposes any such restriction. By its terms, CATEX A3(d) only requires
20  that the proposed amendment not change the environmental effect of the existing
21  rule. The Court should not add procedural requirements not found in the text of the
22  category itself. *Vermont Yankee*, 435 U.S. at 525.

23  Plaintiffs suggest that in the absence of a NEPA analysis of the underlying
24  rule, DHS cannot understand the "original impact of the regulation." Pl. Br. at 21.

25  _____

26  potential to cause significant environmental effects." 75 Fed. Reg. 75,628, 75,631
    (Dec. 6, 2010). Requiring the agencies to conduct a cumulative effects analysis for
27  each project before applying a categorical exclusion would subvert the very intent
28  of the exception process. *Utah Envtl. Cong. v. Bosworth*, 443 F.3d at 740.

This argument misapprehends the categorical exclusion. CATEX 3A(d) does not require DHS to show that prior rule *including* the proposed amendment lacks significant environmental effects, only that the incremental change to the rule being proposed will not *change* the effects of the underlying rule. That conclusion does not require a NEPA analysis of the underlying rule, it only requires that the change itself be of nominal impact.[12] Here, as set forth below, the DHS provided an adequate explanation of its conclusion that the four rules will not significantly change the effects of the underlying rules on population growth (the only environmental effect alleged by Plaintiffs).

### 2.     The Four Rules are Not Pieces of a Larger Action

Plaintiffs' second claim is that DHS's conclusion that the four rules are covered by CATEX A3(d) is arbitrary or capricious because DHS's NEPA procedures preclude the use of categorical exclusions when the proposed action is a "piece of a larger action." DIR00331. In a reprise of their facial challenge to CATEX A3(d), Plaintiffs claim that each the four rules are by definition a "piece of a larger action"—the rule or policy they amend—and thus cannot be categorically excluded. As explained above, this argument misconstrues the "no piece of a larger action" provision of DHS's NEPA regulations. *See supra* at 21.

DHS's prohibition on using a categorical exclusion on an action that is "a piece of a larger action" is designed to avoid segmentation—dividing a single proposed action into smaller parts to reduce the perceived impact of the action and avoid more detailed NEPA analysis. Issuance of a new rule amending a rule or a

---

[12]  Plaintiff cites *Kern v. United States Bureau of Land Management,* 284 F.3d 1062 (9th Cir. 2002), for the proposition that by applying CATEX A3(d) where there is not a NEPA analysis of the underlying rule, DHS is inappropriately relying on a "prior analysis that never occurred." *Kern,* however, concerns circumstances where the agency was attempting to "tier" a project-specific EIS to a non-NEPA environmental analysis. Here, as noted above, the invocation of CATEX A3(d) does not rely on any prior analysis.

1    policy that has been in place for years, as each the four challenged rules does here,

2    cannot be an attempt to avoid NEPA review of a single proposed "larger action"

3    because the current amendments were not part of the proposed action at the time

4    the original rule was issued. For example, the 2015 DSO Rule amends a 2002 rule

5    limiting the number of Designated School Officials. DSO00010. These two actions

6    are not improperly segmented from one another, because the 2015 amendment was

7    not part of the 2012 proposal. *See, e.g, O'Reilly*, 477 F.3d at 237 ("improper

8    segmentation is usually concerned with projects that have reached the proposal

9    stage.").  DHS reasonably concluded that each of the four rules were not a "piece

10   of a larger action."  DSO00017, AC2100219, IER00088, STEM000132.

### 3.    The Record Supports DHS's Conclusion that the Four Rules Do Not Have Significant Environmental Effects

13          Finally, Plaintiffs claim DHS erred in applying CATEX A3(d) because the

14   rules will allegedly cause population growth substantial enough to cause significant

15   environmental impacts. The record belies this claim.

16          **The DSO Rule.** The DSO Rule amends prior regulations to improve the

17   experience of visiting foreign students by giving universities the ability to seek to

18   increase the number of DSOs working at the university and by allowing spouses

19   and children of visiting students to take limited coursework while they are in the

20   country. DSO00009. The record shows that the Rule would not have direct effects

21   on the population. DSOs are already citizens or long-term permanent residents, and

22   increasing their numbers would simply improve oversight of visiting students, not

23   increase the number of individuals entering the country. DSO00010. Similarly,

24   allowing spouses and children to take classes simply increases the opportunities

25   available to members of the family who are entering the country anyway to

26   accompany visiting students. DSO00011. The Rule does not directly increase the

27   number of individuals entering the country.

28

Rather than asserting the DSO Rule will directly impact the U.S. population or the environment, Plaintiffs appear to rely on an attenuated theory that the Rule will indirectly induce significant population growth. Specifically, Plaintiffs appear to suggest that by improving the visiting student experience, the Rule will significantly increase the number of foreign students with families desiring to study in the U.S., that a significantly increased number of those students will be permitted to study in the U.S., that an increased number of those students will attempt to stay in the country upon completion of their studies either by seeking permanent resident status or by remaining illegally, and that DHS will grant an increased number of applications for permanent residence or countenance an increased number of individuals remaining illegally in the U.S.  And, finally, even if the DSO Rule induced population growth, Plaintiffs' theory of indirect effects requires the additional speculative assumption that the induced population will settle in places and engage in behaviors causing significant environmental effects.

Although NEPA requires agencies to consider indirect effects, this chain of effects—which rests on independent decisions of multiple individuals and agencies—stretches the NEPA duty to examine "reasonably foreseeable" indirect effects well beyond the breaking point. 40 C.F.R. § 1508.8(b). NEPA requires "a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998) (quoting *Metro. Edison Co.*, 460 U.S. at 774). Here the effect of the DSO Rule—improving the study experience for visiting students—does not have "a reasonably close causal relationship" to the environmental effects alleged by Plaintiffs—the harms of population growth. *See also Ground Zero Ctr. for Non–Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1090 (9th Cir. 2004) (noting agencies "need not discuss remote and highly speculative consequences").  DHS's conclusion that the Rule would not have significant effects was not arbitrary or

capricious.

**STEM Rule.** The record also demonstrates that the STEM Rule will not have significant direct or indirect effects on the U.S. population. First, the STEM Rule concerns a small group of non-immigrant students, who must leave the country after completion of their practical training period. STEM000086. The STEM Rule thus does not have a significant direct impacts on the U.S. population or the environment

Nor is there a basis for concluding that the STEM Rule is likely to indirectly induce significant population growth. First, the record provides no evidence that the Rule is likely to induce significantly more people to participate in STEM practical training programs. DHS observed that while the new longer training period available under the Rule could induce some additional participation, the increased requirements on employers and students could have a countervailing effect and suppress participation. STEM005298. DHS also noted that found that program participation depends on variables outside the control of the DHS and unaffected by the Rule, including the strength of the global economy and the growth of STEM jobs in the U.S. and globally. *Id.* Second, even were the STEM Rule to induce increased participation in STEM practical training programs, there is not the requisite "reasonably close causal relationship" between an increase in participation in the training program and an increase in permanent residence in the United States. As with the DSO Rule, Plaintiffs' allegation that the STEM Rule will cause population increases rests on an attenuated chain of causation which includes speculation over whether individual program participants will seek to stay in the country (whether by remaining illegally or by seeking more permanent status) and speculation over the decisions of the officials taking enforcement actions or deciding applications for long-term resident status. This attenuated chain of causation stretches well beyond the "reasonably foreseeable" indirect effects that an agency must consider under NEPA, and DHS's conclusion that the STEM Rule

1    would not have significant effects was not arbitrary or capricious.

2         **AC21 Rule.** The administrative record shows that the AC 21 Rule will not

3    have significant impacts on the U.S. population. The record explains that the AC21

4    Rule is designed to improve processes applicable to workers who have already

5    obtained employment-based visas by improving the ability of U.S. employers to

6    hire and retain such workers and increasing the ability of the workers to change

7    positions or employers. AC00142. The Rule does not change the immigrant or

8    nonimmigrant numerical limits set by the Immigration and Naturalization Act, or

9    change the classes of foreign workers who qualify for employment-based visas.

10   AC00157. Thus, DHS concluded that the Rule will not increase U.S. population

11   because "the population affected by this rule is primarily comprised of immigrants

12   and nonimmigrants who are already in the United States and have been present for

13   a number of years." AC00218. Plaintiffs present no basis for a finding that this

14   conclusion is arbitrary or capricious.

15        To the extent that Plaintiffs assert that the AC21 Rule will induce behavior

16   that will ultimately increase the population, that argument runs aground on the same

17   overly speculative chain of causation present in Plaintiffs' challenges to the DSO

18   and STEM rules. There is simply not the "reasonably close causal relationship"

19   between the Rule and population growth or environmental effects required to trigger

20   NEPA analysis.

21        **International Entrepreneur Rule.** Finally, the record also demonstrates

22   that DHS reasonably found the International Entrepreneur Rule would not have a

23   significant impact on the overall U.S. population.  The International Entrepreneur

24   Rule established criteria under which the Secretary could use his or her

25   discretionary parole authority to allow qualifying individuals to stay temporarily in

26   the United States to oversee his or her start-up business in the United States.

27   IER00041. DHS found this case-by-case adjudicatory process was likely to affect

28

1    fewer than 3,000 individuals, "an insignificant number in the context of the

2    population of the United States." Plaintiffs point to no record evidence to

3    demonstrate this conclusion was arbitrary or capricious.

4         In sum, DHS's properly applied CATEX A3(d) to all four rules, and

5    Defendants are entitled to summary judgment on Court IV.

6        **C.**    **DHS Properly Applied CATEX A3(a) to the STEM Rule and the**

7               **International Entrepreneur Rule**

8         In addition to concluding that all four rules fell within CATEX A3(d), DHS

9    found that the International Entrepreneur Rule and the STEM Rule also fell within

10   CATEX A3(a), which covers rules "of a strictly administrative or procedural

11   nature." DIR00355.[13] Plaintiffs contend that DHS's use of CATEX A3(a) is

12   inappropriate because the two rules "made substantive changes to the conditions

13   upon which foreign nationals may enter and remain in the country." Pl. Br. at 20.[14]

14   This claim fails.

15        DHS's determination that the International Entrepreneur Rule falls within the

16   CATEX A3(a) is reasonable. IER000088. The Immigration and Nationality Act, 8

17   U.S.C. § 1182(d)(5), vests the Secretary of Homeland Security with discretionary

18   authority to parole individuals into the United States temporarily on a case-by-case

19   basis for urgent humanitarian reasons or where parole would be a significant public

20   benefit. IER00041. The International Entrepreneur Rule merely sets forth criteria

21   for the Secretary to consider when determining whether to parole particular

22   individuals based on the public benefit of their entrepreneurial activities. *Id.* The

23   Rule does not alter the Secretary's substantive discretion to grant or deny parole.

24

25    [13]  DHS NEPA procedures provide that the proposed action should "clearly fit[]

26   within *one or more* of the CATEXs." DIR00331 (emphasis added).

27   [14]  Because the two rules are also covered by CATEX A3(d), a finding that DHS misapplied CATEX A3(a) would not invalidate either rule. Plaintiffs must show

28   invocation of both CATEX A3(a) and A3(d) was arbitrary or capricious.

1   Nor does it create new rights in potential applicants for parole. IER00041, 48. A
2   rule that creates an application process under which the agency can exercise existing
3   discretion is quintessentially administrative in nature and DHS's decision to invoke
4   CATEX A3(a) was not arbitrary or capricious.

5        DHS's application of CATEX A3(a) to the STEM Rule was also reasonable.
6   STEM000132-33. The STEM Rule generally authorizes students to continue to
7   engage in an extended period of practical training subject to reporting requirements
8   for students, school officials, and employers that are intended to help DHS track
9   students to limit abuse of the program and safeguard U.S. workers in STEM fields.
10  STEM000057, STEM000086. These reporting provisions fall squarely within the
11  "administrative or procedural" ambit of CATEX A3(a).

12  **V.    DHS Prepared Appropriate NEPA Analyses of the Agency's Actions
13         to Address an Increased Influx of Unaccompanied Children and
             Families Across the Southwest Border**

14       Plaintiffs allege that DHS failed to comply with NEPA with regard to its
15  efforts in 2014 to address the need to add additional infrastructure—particularly
16  temporary housing—in response to an influx of families and unaccompanied
17  children crossing the southwestern border. Pl. Br. at 24-25. Specifically Plaintiffs
18  assert DHS was obligated to analyze the impact of "tens of thousands of individuals
19  . . . on the impacts on the ecosystems through which they passed," and the
20  population impacts of the potential "resettlement" of those individuals. Pl. Br. at
21  25. These claims fail because the DHS infrastructure improvements under review
22  do not *cause* individuals to cross the border into the United States; they are a
23  response to individuals who have already done so. Similarly, the DHS actions under
24  review are not related to whether individuals who have crossed the border will
25  ultimately be permanently resettled in the United States; that determination is based
26  on individual immigration adjudications. Because the "impacts" identified by
27  Plaintiffs are not causally related to the DHS actions at issue, DHS was not

obligated to include them in its NEPA analysis, and Defendants are entitled to summary judgment on Count V.

In 2014, the United States faced an increase in the number of unaccompanied children and families being apprehended crossing the southwestern border and entering the United States without authorization. UAC01167. This influx created a need to expand DHS's existing infrastructure for safely housing children and families pending the outcome of their immigration proceedings. UAC00534. To analyze the impacts of expanding its infrastructure, DHS prepared a programmatic EA which found that if future projects fell with specified criteria they would not have significant impacts, and DHS therefore issued a FONSI. UAC00534-567, UAC00568-571.

Tiering to the programmatic analysis, DHS also prepared a supplemental EA to consider the environmental impacts of construction of a facility outside of Dilley, Texas which would house up to 2,400 women and children pending the disposition of their immigration proceedings. UAC00773-948.[15] In its supplemental EA DHS considered the impacts of the housing facility on a wide range of resources, including land use patterns, water, air, climate change, and wildlife. UAC00779-813. In addition to the direct impacts of the 2,400 people living in the facility while awaiting their judicial proceedings, DHS considered the impacts of the facility on the population of Dilley and Frio County and concluded that while there would be a short-term increase in population as the facility was constructed the overall impact would not be significant. UAC00808. Concluding that the project would not have significant environmental impacts, DHS issued a FONSI. UAC00769 (FONSI).

NEPA requires that an agency disclose the effects, both direct and indirect, that are *caused by* its proposed action. Direct effects" are "caused by the action and

---

[15] "Tiering" refers the coverage of general matter in a broad environmental analysis with subsequent narrower statements focusing solely on the issues specific to the subsequent proposal.  40 C.F.R. § 1508.28.

1    occur at the same time and place." 40 CFR § 1508.8(a). "Indirect effects" are

2    "caused by the action and are later in time or farther removed in distance, but are

3    still reasonably foreseeable." 40 CFR § 1508.8(b). The test of whether an effect is

4    reasonably foreseeable is measured similarly to the tort law's proximate cause

5    doctrine—whether there is a "reasonably close causal relationship" between the

6    agency's action and the environmental effect. *Public Citizen,* 541 U.S. 752; *see also*

7    *Ctr. for Biological Div. v. BLM.*, 937 F. Supp. 2d 1140 (N.D. Cal. 2013).

8          The impacts individuals have as they cross the border and the impacts of

9    potential resettlement of those individuals are not *caused* directly or indirectly by

10   DHS's decision to construct a housing facility in Dilley, Texas. To the contrary, the

11   purpose of the facility is to *respond* to individuals who have already determined to

12   cross the border and the need to house those individuals pending resolution of their

13   immigration proceedings. *See* UAC00776 (The purpose of the action is to "rapidly

14   provide appropriate housing requirements for family units as part of the

15   Department's overall response to the influx of unaccompanied children . . . and

16   family units across the southwest border."); UAC00547 ("The need for the

17   Proposed Action is based on the existing and expected increase in the number of

18   apprehended persons being processed that may exceed the then current capacity of

19   the DHS support infrastructure."). In other words, the DHS facility challenged by

20   Plaintiffs is not the *cause* of increased border crossings but their *effect*.

21         Nor was DHS required to consider—as an impact of a proposal to build

22   temporary housing—the impacts of the "potential resettlement" of individuals

23   crossing the border. Pl. Br. at 25. As noted above, the Supplemental EA

24   appropriately discloses the impacts of housing approximately 2,500 people at the

25   Dilley facility while their immigration proceedings are pending. But predicting the

26   outcome of those individual immigration proceeding—i.e. how many individuals

27   will ultimately be allowed to stay in the United States or will be returned to their

28

country of origin, and if allowed to stay, where in the United States they might settle—would be a speculative endeavor well outside of DHS's NEPA obligations. *Warm Springs Task Force v. Gribble,* 621 F.2d 1017, 1026 (9th Cir. 1980) (NEPA does not require discussion of "remote and highly speculative consequences.").

Because DHS fully complied with NEPA in analyzing its proposal to add infrastructure in response to an influx of families and children crossing the southwestern border, the agency is entitled to summary judgment on Count V.

## VI. Plaintiffs' Requested Remedy is Overbroad and Premature

Plaintiffs broadly ask that the Court vacate CATEX A3, all of "its invocations," and the 2014 NEPA analyses underlying the Dilley Facility. Pl. Br. at 25. This request is unwarranted and inappropriate. Vacatur is not automatically imposed upon a finding of a legal defect in an agency's analysis. *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). To the contrary, vacatur is an equitable remedy that requires a court to balance "how serious the agency's errors are" against the "disruptive consequences" of vacating the decision. *Id.* In this case, the rules at issue have been in place and relied on by DHS and numerous third parties for years, and the Dilley facility has been constructed and is in use. Under these circumstances, a broad vacatur order would be highly disruptive. Therefore, while Defendants believe the decisions before the Court should be upheld, if the Court finds any violation of law, we request further briefing on remedy so that the Court is afforded the opportunity to weigh the equities and determine whether vacatur is appropriate.

May 24, 2019          Respectfully Submitted,

LAWRENCE VANDYKE
Deputy Assistant Attorney General

*/s/ Barclay T. Samford*
BARCLAY T. SAMFORD
Trial Attorney

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO  80202
Tel.:  (303) 844-1475
Fax:  (303) 844-1350
E-mail:  clay.samford@usdoj.gov

Attorneys for the Federal Defendants