The estimate of the times required for record preparation and maintenance is based on agency communications with industry. Other information needed to finally calculate the total burden hours (i.e., number of recordkeepers, number of medicated feeds being manufactured, etc.) is derived from agency records and experience.

Dated: June 4, 2004.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 04–13215 Filed 6–10–04; 8:45 am]

**BILLING CODE 4160–01–S**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

**[Docket No. 2003N–0483]**

### Agency Information Collection Activities; Announcement of OMB Approval; Food Labeling Regulations

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing that a collection of information entitled ''Food Labeling Regulations'' has been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995.

**FOR FURTHER INFORMATION CONTACT:** Peggy Robbins, Office of Management Programs (HFA–250), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–1223.

**SUPPLEMENTARY INFORMATION:** In the **Federal Register** of February 18, 2004 (69 FR 7643), the agency announced that the proposed information collection had been submitted to OMB for review and clearance under 44 U.S.C. 3507. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. OMB has now approved the information collection and has assigned OMB control number 0910–0381. The approval expires on May 31, 2007. A copy of the supporting statement for this information collection is available on the Internet at *http://www.fda.gov/ohrms/dockets.*

Dated: June 4, 2004.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 04–13216 Filed 6–10–04; 8:45 am]

**BILLING CODE 4160–01–S**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

### Summaries of Medical and Clinical Pharmacology Reviews of Pediatric Studies; Availability

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing the availability of summaries of medical and clinical pharmacology reviews of pediatric studies submitted in supplements for Cipro (ciprofloxacin), Corlopam (fenoldopam), Glucovance (glyburide and metformin), Arava (leflunomide), Viracept (nelfinavir), Concerta (methylphenidate), Zemplar (paricalcitol), Zomig (zolmitriptan), and Ortho Tri-Cyclen (norgestimate and ethinyl estradiol). The summaries are being made available consistent with the Best Pharmaceuticals for Children Act (BPCA). For all pediatric supplements submitted under the BPCA, the BPCA requires FDA to make available to the public a summary of the medical and clinical pharmacology reviews of the pediatric studies conducted for the supplement.

**ADDRESSES:** Submit written requests for single copies of the summaries to the Division of Drug Information (HFD–240), Center for Drug Evaluation and Research, Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857. Please specify by product name which summary or summaries you are requesting. Send one self-addressed adhesive label to assist that office in processing your requests. See the **SUPPLEMENTARY INFORMATION** section for electronic access to the summaries.

**FOR FURTHER INFORMATION CONTACT:** Grace Carmouze, Center for Drug Evaluation and Research (HFD–960), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–594–7337, *carmouzeg@cder.fda.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background

FDA is announcing the availability of summaries of medical and clinical pharmacology reviews of pediatric studies conducted for Cipro (ciprofloxacin), Corlopam (fenoldopam), Glucovance (glyburide and metformin), Arava (leflunomide), Viracept (nelfinavir), Concerta (methylphenidate), Zemplar (paricalcitol), Zomig (zolmitriptan), and

Ortho Tri-Cyclen (norgestimate and ethinyl estradiol). The summaries are being made available consistent with section 9 of the BPCA (Public Law 107– 109). Enacted on January 4, 2002, the BPCA reauthorizes, with certain important changes, the pediatric exclusivity program described in section 505A of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355a). Section 505A permits certain applications to obtain 6 months of marketing exclusivity if, in accordance with the requirements of the statute, the sponsor submits requested information relating to the use of the drug in the pediatric population.

One of the provisions the BPCA added to the pediatric exclusivity program pertains to the dissemination of pediatric information. Specifically, for all pediatric supplements submitted under the BPCA, the BPCA requires FDA to make available to the public a summary of the medical and clinical pharmacology reviews of pediatric studies conducted for the supplement (21 U.S.C. 355a(m)(1)). The summaries are to be made available not later than 180 days after the report on the pediatric study is submitted to FDA (21 U.S.C. 355a(m)(1)). Consistent with this provision of the BPCA, FDA has posted on the Internet (*http://www.fda.gov/cder/pediatric/index.htm*) summaries of medical and clinical pharmacology reviews of pediatric studies submitted in supplements for Cipro (ciprofloxacin), Corlopam (fenoldopam), Glucovance (glyburide and metformin), Arava (leflunomide), Viracept (nelfinavir), Concerta (methylphenidate), Zemplar (paricalcitol), Zomig (zolmitriptan), and Ortho Tri-Cyclen (norgestimate and ethinyl estradiol). Copies are also available by mail (see **ADDRESSES**).

### II. Electronic Access

Persons with access to the Internet may obtain the document at *http://www.fda.gov/cder/pediatric/index.htm.*

Dated: June 3, 2004.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 04–13217 Filed 6–10–04; 8:45 am]

**BILLING CODE 4160–01–S**

---

## DEPARTMENT OF HOMELAND SECURITY

### Environmental Planning Program

**AGENCY:** Department of the Homeland Security.

**ACTION:** Notice of proposed directive; request for comments.

**SUMMARY:** The purpose of this notice is to provide an opportunity for public comment on the Department of Homeland Security draft directive containing policy and procedures for implementing the National Environmental Policy Act of 1969 (NEPA), as amended, Executive Order 11514, as amended, Executive Order 12114, and Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR parts 1500–1508). Pursuant to CEQ regulations, the DHS is soliciting comments on its proposed internal management directive from members of the interested public.

**DATES:** Comments and related material must be received by July 14, 2004.

**ADDRESSES:** Please submit your comments by only one of the following means: (1) By mail to: Environmental Planning, Office of Safety and Environment, Management Directorate, Department of Homeland Security, Washington, DC 20528

(2) By hand delivery to: Environmental Planning, Office of Safety and Environment, Management Directorate, Department of Homeland Security, Anacostia Naval Annex, Building 410, 245 Murray Lane, SW., Washington, DC 20528.

(3) By Fax to: (202) 772–9749.

In choosing among these means, please give due regard to the difficulties and delays associated with delivery of mail through the U.S. Postal Service.

**FOR FURTHER INFORMATION CONTACT:** Mr. David Reese, Office of Safety and Environment, Department of Homeland Security, 202.692.4224. e-mail: *ADMIN-S&E@hq.dhs.gov*.

**SUPPLEMENTARY INFORMATION:**

**Request for Comments**

The Department of Homeland Security encourages interested persons to submit written data, views, or comments. Persons submitting comments should please include their name, address, and other appropriate contact information. You may submit your comments and material by one of the means listed under **ADDRESSES.** If you submit them by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing. If you submit them by mail and would like to know that they were received, please enclose a stamped, self-addressed postcard or envelope. The DHS will consider all comments received during the comment period.

**Background**

This directive establishes policy and procedures to ensure the integration of environmental considerations into the unique mission of the Department of Homeland Security (DHS). It outlines roles and responsibilities for compliance with NEPA, as well as other laws and requirements for stewardship of the environment. This directive establishes a framework for the balanced and systematic consideration of environmental stewardship in the planning and execution of DHS activities.

DHS is composed of five major directorates and three services: Border and Transportation Security, Emergency Preparedness and Response, Science and Technology, Information Analysis and Infrastructure Protection, Management, and Bureau of Citizenship and Immigration Services, U.S. Coast Guard, and Secret Service. This organization resulted from a total of 22 Federal agencies that were brought together in March of 2003 and organized to form the new Department. DHS has the mission to lead the unified national effort to secure America. It has the responsibility to prevent and deter terrorist attacks and protect against and respond to threats and hazards to the Nation. As a part of this mission, DHS ensures safe and secure borders, facilitates lawful immigrants and visitors, and promotes the free flow of commerce among nations.

The policies and procedures in the Management Directive place particular emphasis on the requirements of the project proponent to ensure that environmental stewardship requirements are appropriately integrated into the performance of DHS missions. Substantive or procedural requirements in this directive apply to the program planning and project development in all DHS directorates and organization elements. In particular, there is special consideration of the requirements for intergovernmental coordination, public involvement, dispute resolution, handling of sensitive information, and emergency procedures in DHS decisionmaking.

This proposed management directive includes processes for preparing Environmental Assessments, Findings of No Significant Impact, and Environmental Impact Statements. The DHS proposes to use this directive in conjunction with NEPA, the CEQ regulations at 40 CFR parts 1500–1508, and other pertinent environmental regulations, Executive Orders, statutes, and laws developed for the consideration of environmental impacts of Federal actions.

This directive was established by reviewing the actions and existing regulations of all the elements that were integrated into the new department. Under the direction of the Office of Safety and Environment in the Management directorate, a panel of experts in environmental policy and law were drawn from the elements to prepare the new directive. This panel of experts worked for over 12 months to develop this draft directive.

In preparing this directive, the panel of experts reviewed existing law and requirements, former agency policies, existing guidance on the implementation of NEPA from the Council on Environmental Quality, and the latest studies on the implementation of NEPA. In addition, they examined policies and procedures from other Federal agencies to identify policies that could be appropriate for the missions of the new Department.

An area of emphasis included the development of appropriate categorical exclusions. Since DHS was brought together and organized around a core mission, many of the organizational elements are engaged in similar activities. Nearly all DHS component elements engage at various times in activities related to law enforcement, emergency response and recovery, screening and detection for dangerous or illegal materials or individuals, research and development of new systems or processes related to homeland security, and training exercises, among other things. These activities are performed in various environmental settings, for example both the Transportation Security Administration (TSA) and the Customs and Border Protection (CBP) screen packages for dangerous or illegal materials, but TSA works at airports while CBP works at borders. Many of the new elements of the Department came from agencies that had established categorical exclusions covering all or parts of their activities. These legacy categorical exclusions were evaluated for their broader applicability to similar missions and activities throughout the new Department. Likewise, the panel of experts examined existing categorical exclusions from other Federal departments to determine whether any might be adopted for DHS actions of a similar nature, scope, and intensity as those performed by other Federal agencies. The resulting list of proposed categorical exclusions in Attachment A of the Management Directive includes a large number that are applicable to all component elements of the DHS.

In addition, the panel reviewed the history of environmental assessments and environmental impact statements and the administrative history of the legacy categorical exclusions in developing proposed categorical exclusions in Attachment A of the Management Directive. The resultant list of proposed categorical exclusions contains several that are specific to certain organizational elements of DHS. It is also important to note that the directive maintains those categorical exclusions previously established by both the Coast Guard and the Federal Emergency Management Agency.

A copy of this **Federal Register** publication, as well as a summary of the administrative record for the list of categorical exclusions is available on the Internet at *http://www.dhs.gov/ dhspublic/interapp/editorial/ editorial_0468.xml.*

The Department of Homeland Security solicits public review of this document and will review and consider those comments before this directive is final.

**Tom Ridge,**
*Secretary.*

## Management Directive 5100.1, Environmental Planning Program

### 1. Purpose

A. This directive establishes policy and procedures to ensure the integration of environmental considerations into Department of Homeland Security (DHS) mission planning and project decision making. Environmental stewardship, homeland security, and economic prosperity are compatible and complementary. This directive establishes a framework for the balanced and systematic consideration of these factors in the planning and execution of DHS activities.

B. In particular, this directive establishes procedures that the DHS will use to comply with The National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. 4321–4335) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA (40 CFR parts 1500–1508). NEPA is the basic charter and foundation for stewardship of environmental resources in the United States. It establishes policy, sets goals, and provides a tool for carrying out federal environmental policy. NEPA requires federal agencies to use all practical means within their authority to create and maintain conditions under which people and nature can exist in productive harmony and fulfill the social, economic, and other needs of present and future generations of Americans.

C. This directive provides the means for the DHS to follow the letter and spirit of NEPA and comply fully with the CEQ regulations. This directive adopts and supplements the CEQ regulations, and is to be used in conjunction with the CEQ regulations. However, this directive encompasses requirements in addition to NEPA and establishes the DHS Environmental Planning Program.

### 2. Scope

A. Substantive or procedural requirements in this directive apply to all DHS elements and are to be used in all program planning and project development. This Directive applies to any DHS action with the potential to affect the quality of the environment of the United States, its territories, or its possessions. It also addresses those DHS actions having effects outside the United States, its territories, or its possessions under Executive Order 12114, Environmental Effects Abroad. More specifically, this Directive applies to:

1. All areas of the DHS mission and operations planning
2. Promulgation of regulations
3. Acquisitions and procurements
4. Asset management
5. Research and development
6. Grants programs

B. This Directive supplements the regulations for implementing NEPA published by CEQ at 40 CFR Parts 1500 through 1508. In the case of any apparent discrepancies between these procedures and the mandatory provisions of the CEQ regulations, the CEQ regulations will govern.

### 3. Authorities

This Directive is governed by numerous Public Laws, Regulations, and Executive Orders, such as, but not limited to:

A. The National Environmental Policy Act (42 U.S.C. § 4321 et. seq.)

B. Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. § 4321–4335)

C. Marine Mammal Protection Act (16 U.S.C. § 1361 et. seq.)

D. The National Historic Preservation Act (16 U.S.C. § 470 et. seq.)

E. The Clean Air Act (16 U.S.C. § 470 et. seq.)

F. Federal Water Pollution Control Act (33 U.S.C. § 1251 et. seq.)

G. The Coastal Zone Management Act (16 U.S.C. § 1451 et. seq.)

H. Endangered Species Act (16 U.S.C. § 1531 et. seq.)

I. National Marine Sanctuaries Act (16 U.S.C. § 1431 et. seq.)

J. CEQ Regulations November 29, 1978 (43 FR 55978) as 40 CFR Parts 1500–1508

K. Executive Order 11514, Protection and Enhancement of Environmental Quality, March 5, 1970, 35 FR 4247, as amended by E.O. 11991, May 24, 1977, 42 FR 26967

L. Executive Order 11988, Floodplain Management, 42 FR 26971

M. Executive Order 11990, Protection of Wetlands, 42 FR 26961

N. Executive Order 12114, Environmental Effects Abroad of Major Federal Actions, 44 FR 1957

O. Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 FR 7629

### 4. Definitions

A. All definitions of words and phrases in 40 CFR Part 1508 apply to this Directive.

B. Additional definitions of words and phrases as used in this Directive are contained in Appendix A.

### 5. Responsibilities

Responsibility for oversight of the DHS NEPA activities, unless otherwise delegated, is as follows:

A. The Secretary of DHS (Secretary) recognizes the long term value of incorporating environmental stewardship into the planning and development of all the DHS missions and activities and exercises the ultimate responsibility in the Department to fulfill environmental planning requirements. To this end, the Secretary has delegated specific authority for environmental planning to the DHS Department Environmental Executive, the Chief of Administrative Services, the Director of Office of Safety and Environment, and to other DHS officials as set forth in this Directive. The following objectives are to be used in guiding environmental planning activities in the DHS:

1. Timely and effective support
2. Sustainable capability
3. Consistency with fiscal and other considerations of national policy
4. Full compliance with all appropriate environmental planning laws, Executive Orders, regulations, and other requirements, such as environmental management systems (EMS)

B. The DHS Department Environmental Executive (DEE) is the DHS Undersecretary for Management and has authority to fulfill the Secretary's objectives by ensuring that the Department fully integrates environmental planning requirements into all the DHS missions and activities.

The DEE recognizes that environmental planning is an important and necessary part of good management practice in the Department. To this end, the DEE has delegated specific authority for environmental planning to the Chief of Administrative Services, the Director of the Office of Safety and Environment, and to other DHS officials as set forth in this Directive. In exercising the authority delegated from the Secretary, the DEE will perform the following roles:

1. Ensure that Under Secretaries and Designated DHS Officials incorporate environmental planning and stewardship requirements into their policies and procedures to fulfill the Secretary's objectives and the requirements of NEPA, the CEQ Regulations, this Directive, applicable Executive Orders, and other environmental planning requirements.

2. Support budget requests to meet the requirements of this Directive.

3. Consult, as needed, with Under Secretaries and Designated DHS Officials to ensure that they complete appropriate environmental planning for highly sensitive programs or actions that may require the attention of either the Deputy Secretary or the Secretary.

4. Delegate requests for environmental planning related information received at the Departmental level to the Chief, Administrative Services for action.

C. The Chief of Administrative Services (CAS) has authority to support the DEE in its efforts to promote good management practice by ensuring that the Department fully incorporates environmental planning requirements into all of the DHS missions and activities. To this end, the CAS has delegated specific authority for environmental planning to the Director of Office of Safety and Environment and to other DHS officials as set forth in this Directive. In exercising this authority, the CAS will perform the following:

1. Advise the DEE, as needed, on all environmental planning matters in the Department.

2. Establish, as needed, appropriate Department-wide policy, guidance, or training to enable the effective performance of environmental planning throughout the DHS.

3. Recommend, as requested by the DEE, appropriate action on budget requests for environmental planning resources from Under Secretaries and Designated DHS Officials.

4. Consult with Under Secretaries and Designated DHS Officials to ensure that their policies and procedures incorporate the requirements of this Directive.

5. Direct, as needed, the performance of environmental planning activities within the DHS directorates and elements with particular emphasis on highly sensitive programs or actions that may require the attention of the senior executive levels of the Department.

6. Advise the responsible Under Secretary or Designated DHS Official and, if appropriate, the Secretary, of a proposed action believed not to conform with the DHS policies or, after consulting with the General Counsel, applicable environmental laws and regulations.

7. Coordinate requests for environmental planning related information received at the Departmental level among appropriate DHS elements or assign the request to the appropriate element for resolution.

8. Approve new or revised supplementary procedures proposed by the DHS elements for the implementation of this Directive pursuant to the recommendations of the Director, Office of Safety and Environment.

9. Grant a delegation authority to an Under Secretary or a DHS official to sign environmental documents pursuant to the recommendations of the Director, Office of Safety and Environment. Delegations that exist within the DHS at the time this Directive becomes effective (i.e., Coast Guard, Federal Emergency Management Agency, Customs and Border Protection, Immigration and Customs Enforcement, and Citizenship and Immigration Services) will remain in effect until they are updated or revoked.

10. Revoke, as appropriate, a delegation of authority to a DHS Under Secretary or designated official.

D. The Director, Office of Safety and Environment (DOSE) is designated by the Secretary as the DHS Environmental Planning coordinator and has oversight responsibilities for the management and direction of the Department-wide environmental planning program. The DOSE will support the CAS with advice and assistance in carrying out the responsibilities of that office as set forth in the above paragraph. Such advice and assistance will, at a minimum, consist of the following:

1. Advise the CAS, as needed, on all environmental planning matters in the Department.

2. Develop, as needed, appropriate Department-wide policy, guidance, or training to enable the consistent, timely, and effective performance of environmental planning throughout the Department to fulfill the Secretary's objectives and other requirements of this Directive.

3. Evaluate for CAS, as requested, budget requests for environmental planning resources.

4. Guide programs within the DHS elements to ensure that their policies, procedures, and actions fulfill the Secretary's objectives and the requirements of this Directive.

5. Direct, as needed, the performance of environmental planning activities within the DHS elements, with particular emphasis on headquarters level programs or actions and those that have the interest of the CAS.

6. Coordinate and respond to requests for environmental planning related information received at the Departmental level among appropriate DHS elements or assign the request to the appropriate directorate for resolution.

7. Review environmental documents, public notices, and other related external communications that require a Departmental level approval prior to release by the project proponent. This includes all draft, final, and supplemental Environmental Impact Statements (EIS) originating in the Department prior to filing with EPA, unless otherwise delegated.

8. Evaluate new or revised supplementary procedures for DHS elements for the implementation of this Directive or other environmental planning requirements that are proposed by an Under Secretary or Designated DHS Official under 5.F.8. DHS element supplemental procedures will only be recommended for approval after successfully completing DOSE level review, all necessary CEQ and public review requirements, and incorporating all appropriate comments and revisions.

9. Evaluate requests for delegation of authority from an Under Secretary or a designated DHS Official to sign environmental documents. Such delegation shall only be recommended for approval if the requestor has both approved supplementary procedures and adequate staff resources to fulfill the Secretary's objectives and the requirements of this Directive. The adequacy of staff resources will involve an evaluation of knowledge and experience in fulfilling environmental planning requirements and preparing NEPA analyses and documentation sufficient to meet the Secretary's objectives. Requests for delegation of authority and supplementary procedures may be evaluated concurrently.

10. Recommend revocation of a delegation of authority from an Under Secretary or a designated DHS Official for inappropriate procedures or

inadequate staff resources to ensure full compliance with this Directive or other environmental planning requirements.

11. Assist the DHS elements, as needed, in reviewing and assessing the environmental impacts of proposed DHS actions covered by Executive Order (EO) 12114.

12. Discuss with CEQ any DHS requests for alternative arrangements or procedures to comply with NEPA and the CEQ regulations.

13. Review and comment on EISs and NEPA analyses originating from agencies outside of the DHS relating to:

(a) Actions with national policy implications relating to the DHS missions;

(b) Legislation, regulations, and program proposals having a potential national impact on a DHS mission, and

(c) Actions with the potential to encroach upon the DHS missions.

14. Act as the principal point of contact for the DHS on environmental issues of DHS-wide applicability brought before the CEQ, the Office of Management and Budget, the Advisory Council on Historic Preservation, U.S. Environmental Protection Agency headquarters, and other federal agency headquarters.

15. Perform other functions as are specified in this Directive or as are appropriate under NEPA, the CEQ Regulations, applicable Executive Orders, other environmental requirements, or other instructions or recommendations of CEQ or EPA concerning environmental matters.

E. *The General Counsel and/or Element Chief Counsel will:*

1. Provide legal sufficiency review, when appropriate, for all draft, final, and supplemental Environmental Assessments (EAs), Findings Of No Significant Impact (FONSIs), Environmental Impact Statements (EISs), and Records Of Decision (RODs).

2. Advise proponents, in consultation with the EPC, whether a proposed element action is subject to the procedural requirements of NEPA.

3. Advise proponents on compliance with NEPA, the CEQ Regulations, applicable Executive Orders, and other environmental planning requirements.

4. Assist in establishing or revising Departmental or elements' NEPA procedures, including appropriate categorical exclusions.

F. *All Under Secretaries and Designated DHS Officials will:*

1. Fully integrate the requirements of this Directive into planning for all applicable programs, activities, and operations. Ensure that the planning, development, and execution of all their missions and activities conform to the guidance in this Directive, the requirements of NEPA, the CEQ Regulations, applicable Executive Orders, and other environmental planning requirements.

2. Ensure that DHS proponents take the lead in environmental planning efforts and maintain an understanding of the potential environmental impacts of their programs and projects.

3. Plan, program, and budget for the requirements of this Directive and Prepare and submit budget requests for adequate staff and resources to meet the requirements of this Directive.

4. Support outreach processes for environmental planning.

5. Coordinate with other DHS elements on environmental issues that affect them.

6. Prepare and circulate environmental documents for the consideration of others when an action or policy area in question falls under their jurisdiction as required by 40 CFR Part 1506.9.

7. Request the assistance of DOSE in preparing the environmental analysis for any actions covered by E.O. 12114 unless otherwise delegated.

8. Propose to the CAS, for review and approval, any new or substantive revisions to existing supplementary procedures for the implementation of this Directive and other environmental planning requirements that the element deems necessary. All supplementary procedures will be consistent with this Directive and will be developed in accordance with the CEQ Regulations. Procedures revised solely to effect administrative changes or format issues do not need CAS and CEQ approval.

(a) For those Undersecretaries and Designated DHS Officials with delegated authority to sign environmental documents, preparation of handbooks and other technical guidance for element personnel regarding NEPA implementation do not need CAS and CEQ approval.

(b) The DHS elements, listed in paragraph 5.C.8, that have already developed -specific NEPA implementing procedures prior to becoming part of the DHS may continue to use those procedures. All revisions to supplementary procedures must be consistent with this Directive.

9. Send all environmental documents via their respective organizational hierarchy, to the DOSE for review, prior to release to the public, unless otherwise delegated.

10. For the DHS elements not listed in paragraph 5.C.8, Request from the CAS limited or unlimited delegation of authority to sign environmental documents. The request should include documentation demonstrating that the element has adequate staff resources with sufficient knowledge and experience in preparing NEPA analysis and documentation sufficient to ensure full compliance.

11. Ensure that all external communications on environmental planning requirements related to matters with potential for department wide implications are coordinated with the DOSE and provide DOSE with a courtesy copy of all related formal communications. Unless otherwise delegated, ensure that all external communications on matters concerning the DHS compliance with environmental planning requirements that relate to controversial, high-visibility, classified, or sensitive actions are coordinated with the DOSE.

12. Respond to requests for copies of environmental documents and reports or other information in connection with the implementation of NEPA.

13. Designate an appropriate Environmental Planning Coordinator (EPC) and alternate in their respective element as a single point of contact for coordination with DOSE on relevant environmental planning matters.

G. *Environmental Planning Coordinators (EPCs) will:*

1. Act as a single point of contact for DOSE on all environmental planning matters.

2. Inform key officials within their respective element of current developments in environmental policy and programs.

3. Coordinate environmental planning strategies for matters within their respective element's purview.

4. Act to further their respective element's compliance with the requirements of NEPA, the CEQ Regulations, this Directive, applicable Executive Orders, and other environmental requirements.

5. Identify discretionary activities within their respective element and ensure that the requirements of this Directive are fully integrated into those activities.

6. Work with their respective element proponents, as needed, to fulfill the requirements of this Directive and other environmental planning requirements. Consultation with proponents will involve the following objectives, at a minimum:

(a) Ensure that appropriate environmental planning, including the analyses and documentation required by NEPA, is completed before the proponent makes a decision that has adverse environmental effects or limits the choices of alternatives to satisfy an

objective, fix a problem, or address a weakness.

(b) Plan, program, and budget to meet the requirements of this Directive.

(c) Support the execution of the requirements of this Directive.

(d) Ensure that their respective DHS proponents are cognizant of the potential environmental impacts of their programs and projects.

(e) Monitor the preparation and review of environmental planning efforts to ensure compliance with all applicable scheduling, scoping, consultation, circulation, and public involvement requirements.

(f) Advocate and develop, as appropriate, agreements with federal, tribal, and state regulatory and/or resource agencies concerning NEPA and other environmental planning requirements.

(g) Coordinate with other DHS elements on environmental issues that affect them.

(h) Coordinate with DOSE in preparing the environmental analysis for any actions covered by E.O. 12114.

7. Propose new categorical exclusions to DOSE.

8. Support outreach processes for environmental planning.

9. In consultation with the DOSE, define appropriate environmental training requirements for personnel within their respective element(s).

H. The Project Proponent is the project or program manager. The proponent has the immediate authority to decide a course of action or has the authority to recommend a course of action, from among options, to the next higher organization level (e.g. district to region) for approval. He or she has the lead role in the environmental planning process and is responsible for meeting the following objectives, in consultation with the EPC:

1. Ensuring that appropriate environmental planning, including the analyses and/or documentation required by NEPA is completed before a decision is made that limits the choices of alternatives to satisfy an objective, fix a problem, address a weakness, or develop a program.

2. Preparing requests and or securing funding for environmental analysis and documentation in the budget process.

3. Ensuring the quality of the analysis and the documentation produced in the environmental planning process.

4. Ensuring that the project has adequate resources to complete all environmental analyses and documentation.

5. Performing the necessary outreach and communication with appropriate Federal, tribal, state, local, and public interests.

6. Ensuring that the project budget has sufficient resources to meet all mitigation commitments.

7. Seeking technical assistance from the DOSE, as needed, through the appropriate lines of authority to ensure compliance with NEPA.

### 6. Policy

A. Stewardship of the air, land, water, and cultural resources is compatible with and complementary to the planning and execution of the DHS missions. Environmental planning processes provide a systematic means of evaluating and fulfilling this aspect of DHS responsibility. The DHS will integrate environmental planning and management into homeland security operational planning, program development, and management methodologies consistent with homeland security requirements, fiscal policies, and other considerations of national policy.

B. The DHS proponents will have the lead role in the environmental planning process. The DHS proponents will be cognizant of the impacts of their decisions on cultural resources, soils, forests, rangelands, water and air quality, fish, and wildlife, and other natural resources in the context of terrestrial and aquatic ecosystems. The DHS proponents will employ all practical means consistent with other considerations of national policy to minimize or avoid adverse environmental consequences and attain the goals and objectives stated in section 101 of NEPA.

C. The DHS proponents will provide for adequate staff, funding, and time to perform NEPA analysis for DHS proposed actions, including those for programs, plans, policies, projects, regulations, orders, legislation or applications for permits, grants, licenses, etc. Should mitigation be necessary to reduce the environmental effects of a DHS proposed action, the proponent will be responsible for providing the costs of mitigation or ensuring that the applicant provides for mitigation.

D. The DHS proponents will integrate the NEPA process with other DHS planning and project decision making activities and other environmental review requirements sufficiently early to:

1. Ensure that mission planning, program development, and project decision making reflect the Secretary's objectives and the policies in this Directive, such as stewardship of resources effected by the DHS missions.

2. Ensure that no action moves forward for funding or approval without

the systematic and interdisciplinary examination of likely environmental consequences resulting from the proposed action and reasonable alternatives according to the policy and procedures in this Directive.

3. Balance environmental concerns with mission requirements, technical requirements, and economic feasibility in decision making processes to ensure long-term sustainability of the DHS operations.

4. Allow for appropriate communication, cooperation, and collaboration between the DHS, other government entities, the public, and non-governmental entities as an integral part of the NEPA process.

E. The DHS Proponents will emphasize the quality analysis of the potential for environmental effects among alternative courses of action to meet mission needs and the development of strategies to minimize those effects. Documentation required under NEPA will be a summary of the effort to evaluate the environmental effects and the development of the minimization strategies. The depth of analysis and volume of documentation will be proportionate to the nature and scope of the action, and to the complexity and level of anticipated effects on important environmental resources. Documentation is necessary to present results of the analysis, but the objective of NEPA and the DHS NEPA policy is quality analysis to support DHS decisions, not the production of documents.

F. The DHS proponent, in consultation with the EPC, will determine the level of NEPA analysis required for the proposed action. The DHS proponents will complete their NEPA analysis and review for each DHS proposed action before making a final decision on whether to proceed with the proposed action. No action or portion of an action, covered by a ROD or FONSI, will be taken that limits reasonable alternatives, involves a conflict of resource use, or has an adverse environmental effect until the final decision as justified in the ROD or FONSI has been made public. No actions or portions of an action covered by a CE that requires a Record of Environmental Consideration (REC) will be taken until the REC is completed.

G. Laws other than NEPA that require the DHS to obtain or confirm the approval of other federal, tribal, state, or local government agencies before taking actions that are subject to NEPA, will be integrated into the NEPA process at the earliest possible stage and to the fullest extent possible. However, compliance with other environmental laws does not

relieve the proponent from preparing environmental impact analyses and processing necessary environmental documents. NEPA compliance is required unless another law, applicable to a specific action or activity, prohibits, conflicts with, or exempts compliance.

*7. Procedures*

A. Attachment A contains specific procedures for the application of environmental planning requirements to the DHS consistent with the Secretary's objectives and the policies in this Directive.

B. A DHS element with delegation under section 5.C.9 may also develop its own supplemental procedures. DHS element-specific procedures will be immediately effective upon approval of CAS and may be disseminated within the DHS element, even before this Directive is revised to include them. A DHS element with approved supplemental procedures may use them in addition to the procedures in this instruction.

C. The DHS elements with approved supplemental procedures under 5.C.8 may use the approved procedures listed in their approved procedures and as indicated in this Directive. DHS elements may not use the categorical exclusions listed in another DHS element's or any other federal agency's specific procedures.

D. The CAS may revoke all or part of an element delegation and any implementing procedures. No element will be given approval of implementing procedures unless they also have received complete delegation authority.

E. The DHS elements may prepare handbooks or other technical guidance for their personnel on how to apply these procedures to their programs.

F. Any questions or concerns regarding this Directive should be addressed to the Director, Office of Safety and Environment.

**Attachment A, Timely and Effective Environmental Planning in the Department of Homeland Security**

**Table of Contents**

Introduction
1.0 General Policies and Provisions
  1.1 Up Front Planning
  Figure 1: The NEPA Decision Making Process
  1.2 Ongoing Administration
  1.3 Follow Through Monitoring and Mitigation (1505.3)
  1.4 Dispute Resolution
  Figure 2: Dispute Resolution Flowchart
2.0 Intergovernmental Collaboration and Public Involvement
  2.1 Purpose
  2.2 Scoping (1501.7)
  2.3 Coordination with Other Government Agencies
  2.4 Lead Agencies (1501.5)
  2.5 Cooperating Agencies (1501.6)
  2.6 Public Involvement (1506.6)
  2.7 Review of Other Agencies' Analysis and Documents
3.0 Categorical Exclusions (1507.3(b)(2)(ii))12
  3.1 Purpose
  3.2 Conditions and Extraordinary Circumstances (1508.4)
  3.3 List of Categorically Excludable Actions
  Table 1: Categorical Exclusions
4.0 Environmental Assessments
  4.1 When to Use
  4.2 Actions Normally Requiring an EA or a Programmatic EA (1501.3, 1508.9)
  4.3 Decision Document: Finding of No Significant Impact (FONSI) (1508.13)
  4.4 Supplemental EAs
5.0 Environmental Impact Statements (EISs)
  5.1 When to Use
  5.2 Actions Normally Requiring an EIS (1501.4), a Programmatic EIS, or a Legislative EIS (1506.8)
  5.3 Preparation and Filing (1506.9)
  5.4 Combining Documents
  5.5 Supplemental EISs (1502.9)
  5.6 Proposals for Legislation (1506.8)
  5.7 Decision Document: Record of Decision (ROD) (1505.2)
  5.8 Review of Other Agencies' EISs
6.0 Special Circumstances
  6.1 Emergencies (1506.11)
  6.2 Classified or Protected Information (1507.3(c))
  6.3 Procedures for Applicants (1501.2, 1506.5)
Appendix A: Definitions

**Introduction**

This Attachment provides guidance for timely and effective environmental planning and includes supplementary instructions for implementing the NEPA process in the DHS. The numbers in parentheses signify the relevant citation in the CEQ Regulations. The DHS and its elements will use NEPA as a strategic planning tool, not a documentation exercise. The DHS is committed to using all of the tools at its disposal to ensure timely and effective environmental planning and implementation of the NEPA process.

*1.0 General Policies and Provisions*

Timely and effective environmental planning involves a systematic process to identify and evaluate the potential for significant environmental effects from a proposed DHS action. Proponents of programs and activities within the DHS have a major role in this process. This process and the guidance in this Directive are designed to focus effort on those types of actions with the most potential for significant environmental effects. The process involves three levels of evaluation effort as shown in Figure 1: Categorical exclusion; environmental assessment; and environmental impact statement. These levels of effort reflect increasing potential for significant environmental effects. It is expected that the majority of proposed DHS actions will be able to be evaluated through categorical exclusions or environmental assessments. Fewer DHS actions are likely to require an EIS, but those with the greatest potential to impact natural resources and the human environment will likely require an environmental impact statement.

1.1 Up Front Planning Activities

A. Continually assess environmental planning in the DHS to improve its effectiveness in supporting and enabling departmental missions.

B. Adapt environmental planning goals and requirements to complement the DHS mission requirements.

C. Fully integrate NEPA and other environmental planning goals and requirements into internal element program planning and decision making processes and formal direction.

D. Ensure that environmental planning staffs are located within the DHS organization where they can function as effective members of interdisciplinary planning and project teams.

E. Enable effective environmental planning through appropriate training, education, and interagency support relationships.

**BILLING CODE 4410–10–P**

**Figure 1: The NEPA Decision Making Process**



## 1.2 Ongoing Administration

A. Ensure that appropriate environmental planning, including the analyses and documentation required by NEPA, is completed before the proponent makes a decision that limits the choice of alternatives to satisfy an objective, fix a problem, or address a weakness.

B. Integrate all other environmental and planning reviews concurrently, rather than sequentially, with the NEPA process.

C. Use the scoping and public involvement processes to limit the analysis of issues to those that are important to the decision making at hand.

D. Share information with and coordinate with other federal, tribal, state, and local agencies early in the planning process and integrate planning responsibilities with other agencies and governments.

E. Take into account the views of the surrounding community and other interested members of the public during its planning and decision making process.

F. Offer cooperating agency status to other federal, tribal, state, and local agencies that have special expertise or jurisdiction by law.

G. Base all environmental impact analyses, development of monitoring requirements, and mitigation requirements on sound science.

H. Make maximum use of programmatic analyses and tiering of environmental planning efforts to provide relevant environmental information at the appropriate element decision levels, eliminate repetitive analyses and discussion, ensure proper consideration of cumulative effects, and focus on issues that are important to the decision being made.

I. Review any relevant planning and decision making documents, whether prepared by the DHS or another agency, to determine if the DHS proposed action or application or any of their alternatives has been considered in a prior NEPA analysis. If so, the DHS will consider adopting the existing analyses, or any pertinent part thereof, in accordance with 40 CFR 1506.3. Adopted environmental impact analyses of others may be revised or supplemented as needed to serve the DHS purposes.

J. Incorporate material by reference to reduce unnecessary paperwork without impeding public review. The referenced material must be reasonably available for public review within the time allowed for comment.

K. Update the list of categorical exclusions to ensure that the DHS environmental planning resources remain focused on those activities with the most potential for significant effects.

### 1.3 Follow Through—Monitoring and Mitigation (1505.3)

A. Only those practical mitigation measures that can reasonably be accomplished as part of a proposed alternative will be identified. Any mitigation measures selected by the proponent will be clearly outlined in the NEPA decision document and will be included in the budget of the internal DHS project or made a part of the approved application from external entities.

B. Use best management practices, such as environmental monitoring systems, to implement a project and monitor the predicted environmental effects. Using adaptive management techniques, adapt the implementation of a project as new information becomes available.

C. Budget for mitigation. The proponent will ensure funding to implement mitigation commitments or ensure that external applicants provide for mitigation funding in their proposal prior to approval by the DHS.

D. Implement mitigation. Ensure that all mitigation commitments in the ROD or FONSI are implemented.

E. Monitor Results. Monitoring of the expected environmental effects from DHS projects, including appropriate indicators of effectiveness, is an integral part of any mitigation system. The proponent is responsible for ensuring monitoring during mitigation, where necessary, to ensure that the final decision justified in the ROD or FONSI is implemented. For external applicants, the proponent is responsible for ensuring that the applicant provides for monitoring. The proponent is responsible for responding to inquiries from the public or other agencies regarding the status of mitigation measures adopted in the NEPA process.

### 1.4✖Dispute Resolution

During the NEPA process, a DHS proponent and another federal agency may not agree on significant issues or aspects of the process. When these situations arise, the proponent will provide the other federal agency with written notification, using certified mail or a comparable method, detailing the nature of the disagreement. The proponent will attempt to resolve the dispute within 30 working days of notification, using Alternative Dispute Resolution or a similar mechanism. If dispute negotiations fail, the proponent must notify the other federal agency in writing, with a copy sent to the DHS element HQ, that an agreement is unlikely and the project or operation is jeopardized. From the date of that letter, the DHS element HQ will initiate 30 additional working days of negotiations. If after 30 working days, the DHS element HQ has not resolved the issue, it will be forwarded to the DEE. The DEE may appoint a negotiating team and/or seek Council on Environmental Quality (CEQ) support in informal dispute resolution. Figure 2 provides a diagram of this process. The DHS elements have the option to use the Institute for Environmental Conflict Resolution, a federally-chartered mediation group based in Tucson, Arizona. In rare instances another agency may independently refer a DHS EIS to CEQ for formal dispute resolution. Upon receipt of advice that another federal agency intends to refer a Departmental matter to CEQ, the DHS lead element will immediately notify and consult with the DOSE.

### 2.0 Intergovernmental Collaboration and Public Involvement

#### 2.1 Purpose

Open communication, consistent with other Federal requirements, is the DHS policy. The purpose of this policy is to build trust between the DHS and the communities it serves. Collaboration with other federal, tribal, state, and local agencies, as well as non-governmental organizations (NGOs) and the general public assists in identifying important issues in the environmental planning process. In many cases, these governments have expertise not available in the DHS or they may have authorities and obligations to protect specific resources.

The appropriate involvement of relevant organizations and citizens early in environmental planning is an effective means to focus environmental planning efforts on issues that are of most interest to the public and importance to the relevant DHS decision. Collaboration, through meaningful and regular dialogue with those outside of the DHS can also serve to avoid conflicts and facilitate resolution when conflicts occur. Other organizations and citizens play an important role in protection of resources and their communities. Awareness and consideration of the needs and requirements of other organizations and the general public, consistent with mission requirements, will enhance the effectiveness of the DHS missions.

#### 2.2 Scoping (1501.7)

A. Scoping is a process for taking into account the views of the surrounding

community and other interested parties during planning and decision making processes. It helps managers set the boundaries of the environmental evaluation and is an effective means to limit the analysis of issues to those that are of interest to the public and/or important to the decision making at hand. Scoping is a process that starts early and continues throughout the planning and early stages of conducting a NEPA analysis.

B. When the DHS is the lead agency, it is responsible for the scope of the NEPA analysis.

C. Scoping is required for EISs and strongly encouraged for EAs.

*Federal Register* / Vol. 69, No. 113 / Monday, June 14, 2004 / Notices

**Figure 2: Dispute Resolution Flowchart**



## 2.3  Coordination with Other Government Agencies, States, and Tribes

The DHS policy is to seek out and coordinate with other federal departments and agencies, tribal, state, and local governments, non-governmental organizations, and the general public early in the environmental planning process. In many cases, these organizations have expertise not available in the DHS or they may have authorities and obligations to protect specific resources.

A. Where an agency has special expertise or jurisdiction by law, the DHS proponent should invite and encourage the federal, state, or tribal governmental agency to be a cooperating agency.

B. When another agency has expertise to analyze the potential environmental effect of a DHS proposal, the proponent will coordinate early to ensure high quality and complete analysis.

C. The DHS will coordinate draft environmental impact analyses with appropriate federal, state and tribal governments, as well as other interested parties.

D. Among the various Federal agencies that can be involved in an environmental planning effort, EPA has a special role. Section 309 of the Clean Air Act provides the Administrator of EPA with authority to review and comment in writing on the environmental impact of any matter relating to the environment contained in any authorized federal projects for construction and any major federal agency action for which NEPA applies. At a minimum, the DHS proponents must ensure that their EISs are appropriately coordinated with the EPA.

## 2.4  Lead Agencies (1501.5)

The lead agency in an environmental planning process has the responsibility to define the scope and substance of the environmental planning effort.

A. The DHS will be the lead agency when a proposed action is clearly within the province of the DHS authority. Likewise, an Under Secretary or designated DHS official will seek to form a joint-lead relationship, when another agency has initiated an action within the province of the DHS authority or has a significant responsibility regarding the action.

B. Unless otherwise delegated, the Department will designate lead elements within the DHS when more than one element could be involved and will represent the Department in consultations with CEQ or other federal entities in the resolution of lead agency determinations.

C. To eliminate duplication with state and local procedures, a non-federal agency may be designated as a joint lead agency when an element has a duty to comply with state or local requirements that are comparable to the NEPA requirements.

## 2.5  Cooperating Agencies (1501.6)

Other federal, tribal, or state agencies may share a role in the planning and execution of a DHS mission. Likewise, these agencies often have specialized expertise or authorities in environmental planning requirements that can be of benefit to the DHS mission planning.

A. The Department, when requested, will coordinate and assist requests from non-Department agencies in determining cooperating agency status.

B. Any federal, tribal, state, or local government entity with special expertise or jurisdiction may be a cooperating agency by agreement, and elements of the Department are urged to use this process.

## 2.6  Public Involvement (1506.6)

The DHS believes that public involvement early in the NEPA analysis process will help produce better decisions. The DHS also believes that the public and NGOs play an important role in the protection of resources. The DHS will encourage early and open public involvement in proposals. Open communication with the American public, consistent with other federal requirements, is the DHS policy.

A. Environmental Assessments. While the proponent is encouraged to provide public involvement in EAs, the proponent has discretion regarding the type and level of public involvement in EAs (See Section 4.0). The guidance under the following section for EISs may be useful for EAs as well. Factors to be weighed include:

(1) Magnitude of the proposed project/action and impacts.

(2) Extent of anticipated public interest, based on experience with similar proposals.

(3) Urgency of the proposal.

(4) National security classification.

(5) The presence of minority or economically-disadvantaged populations that may be impacted.

B. Environmental Impact Statements. CEQ regulations mandate specific public involvement steps in the EIS. Elements will:

(1) Provide for appropriate public involvement. Public involvement must begin early in the proposal development stage, and during preparation of an EIS. The direct involvement of other agencies and state, local and tribal governments with jurisdiction or special expertise is an integral part of impact analysis, and provides information and conclusions for incorporation into EISs. Information obtained from public involvement efforts can help to focus environmental analysis effort on the impacts with the most potential for significance. A public meeting may be appropriate. The need for a formal public hearing should be determined in accordance with the criteria set forth in 40 CFR Part 1506.6(c).

(2) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents. The notice should be provided by effective and efficient means most likely to inform those persons and agencies that may be interested or affected, including minority populations and low-income populations. Special outreach efforts should be made to identify affected minority populations and low-income populations. Public notices for controversial, high-visibility, classified, or sensitive issues should be cleared with the DEE prior to publication.

(3) Tailor the methods to reach the audience of concern. Make every effort to make materials available and accessible to affected or interested populations. Special outreach efforts may be needed to reach affected tribes and minority populations and low-income populations. Translation may be required to reach limited-English speakers. Additionally, elements are encouraged to use electronic means to provide access to and distribution of environmental planning information and NEPA documents.

## 2.7  Review of Other Agencies' Analysis and Documents

A. The DHS elements should review and comment on other agencies' environmental analysis and documents when requested or when the proposed action may impact the DHS mission, operations, or facilities.

B. Comments should be confined to matters within the jurisdiction or expertise of the Department. However, comments need not be limited to environmental aspects, but may relate to security, immigration, enforcement, and other matters of concern to the Department.

C. If a DHS element intends to issue formal adverse comments on a non-DHS agency's analysis or document, the matter should be coordinated with DOSE prior to issuing the comments.

*3.0 Categorical Exclusions (1507.3(b)(2)(ii))*

This Chapter establishes the DHS categorical exclusions (CEs) and provides instructions for their implementation.

3.1 Purpose

A. CEQ regulations (1508.4) provide for federal agencies to establish categories of actions that based on experience do not individually or cumulatively have a significant impact on the human environment and, therefore do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). These CEs allow the DHS elements to avoid unnecessary analysis, process, and paperwork and concentrate their resources on those proposed actions having real potential for environmental concerns.

B. An element may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in CEQ regulations (1508.9) even though it is not required to do so.

C. All requests to establish, substantively revise, or delete CEs (along with justification) will be forwarded through the elements to the DOSE for review and comment, unless otherwise delegated. New or substantively modified CEs are subject to CEQ review and public comment before they will be available for use. Securing approval from both the DOSE and CEQ and promulgation remain the responsibility of the DHS element.

3.2 Conditions and Extraordinary Circumstances (1508.4)

For an action to be categorically excluded, the DHS element must satisfy each of the following three conditions. Proponents must involve the EPC in evaluating these conditions. If the proposed action does not meet these conditions or a statute or emergency provision does not exempt it, an EA or an EIS must be prepared before the action may proceed. Where it may not be clear whether a proposed action will meet these conditions, the proponent must ensure that the administrative record reflects consideration of these conditions. Certain categorical exclusions require documentation of the consideration of these conditions in the form of a Record of Consideration.

A. Clearly Fits the Category. The entire action clearly fits within one or more of the categories of excludable actions listed in Section 4.3 and/or in individual element's categorical exclusions. An element should not use a CE for an action with significant impacts whether they are beneficial or adverse.

B. Is Not A Small Piece of a Larger Action. The scope of the action has not been segmented. Segmentation can occur when an action or connected actions are broken into smaller parts in order to avoid the appearance of significance of the total action and thus reduce the level of NEPA review required. For purposes of NEPA, actions must be considered in the same review if the actions are connected and interdependent, such as: where one action triggers or forces another; where one action depends on another; or where actions have the potential for effects that would be cumulative.

C. No Extraordinary Circumstances Exist. No extraordinary circumstances with potentially significant impacts relating to the proposed action exist. Extraordinary circumstances are unique conditions that are associated with the potential for significant impacts. Specific actions that might otherwise be categorically excluded, but are associated with one or more extraordinary circumstances, should be carefully evaluated to determine whether a CE is appropriate. A determination of whether an action that is normally excluded requires additional analysis must focus on the action's potential effects and the environmental significance in context (whether local, state, regional, tribal, national, or international) and in intensity. This determination is made by considering whether the action is likely to involve one or more of the following circumstances:

(1) A potentially significant effect on public health or safety.

(2) A potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act.

(3) A potentially significant effect on a district, site, highway, structure, or object that is listed in or eligible for listing in the National Register of Historic Places, affects a historic or cultural resource or traditional and sacred sites, or the loss or destruction of a significant scientific, cultural, or historical resource.

(4) A potentially significant effect on a unique characteristic of the geographic area, such as park land, prime farmland, wetland, floodplain, coastal zone, or a wild and scenic river, sole or principal drinking water aquifers, or an ecologically critical area.

(5) A potential or threatened violation of a federal, state, or local law or administrative determination imposed for the protection of the environment. Some examples of administrative determinations to consider are a local noise control ordinance; the requirement to conform to an applicable State Implementation Plan (SIP); and federal, state, or local requirements for the control of hazardous or toxic substances.

(6) An effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, likely to involve unique or unknown environmental risks.

(7) Employment of new technology or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity.

(8) A precedent is set that forecloses future options that have significant effects.

(9) Significantly greater scope or size than normally experienced for a particular category of action.

(10) Potential for significant degradation of already existing poor environmental conditions. Also, initiation of a potentially significant environmental degrading influence, activity, or effect in areas not already significantly modified from their natural condition.

3.3 List of Categorically Excludable Actions

A. Table 1 is a list of Categorical Exclusions, those activities which normally require no further NEPA analysis. Proponents, in consultation with their EPC, should be alert for the presence of those extraordinary circumstances listed in section 3.2 of this attachment. These categorical exclusions were developed on the basis of an administrative record from the elements that comprise the new department, from professional staff and expert opinion, and/or past NEPA analyses. The DHS CEs are divided into the following functional groupings of activities conducted by the DHS elements in fulfilling the Department mission:

(1) Administrative and Regulatory Activities
(2) Operational Activities
(3) Real Estate Activities
(4) Repair and Maintenance Activities
(5) Construction, Installation, and Demolition Activities
(6) Hazardous/Radioactive Materials Management and Operations

(7) Training and Exercises
(8) Categorical Exclusions for specific DHS elements
   B. Activities that involve greater potential for environmental effect

require a Record of Environmental Consideration (REC) to justify the use of the CE. These activities are marked with an asterisk. A REC is a means of documenting whether the conditions

listed in 3.2 A, B, and C are met. The DOSE will sign all RECs unless signature authority has been delegated to the element. The REC will normally not exceed two pages.

TABLE 1.—CATEGORICAL EXCLUSIONS

| CE# | |
|---|---|
| **ADMINISTRATIVE AND REGULATORY ACTIVITIES**[1] | |
| A1 .................................. | Personnel, fiscal, management, and administrative activities, such as recruiting, processing, paying, recordkeeping, resource management, budgeting, personnel actions, and travel. |
| A2 .................................. | Reductions, realignments, or relocation of personnel that do not result in exceeding the infrastructure capacity or change the use of space. An example of a substantial change in use of the supporting infrastructure would be an increase in vehicular traffic beyond the capacity of the supporting road network to accommodate such an increase. |
| A3 .................................. | Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:<br>(a) Those of a strictly administrative or procedural nature;<br>(b) Those that implement, without substantive change, statutory or regulatory requirements;<br>(c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;<br>(d) Those that interpret or amend an existing regulation without changing its environmental effect;<br>(e) Technical guidance on safety and security matters; or<br>(f) Guidance for the preparation of security plans. |
| A4 .................................. | Information gathering, data analysis and processing, information dissemination, review, interpretation, and development of documents, that involves no commitment of resources or recommendations for future commitments of resources other than the associated manpower and funding. Examples include but are not limited to:<br>(a) Document mailings, publication and distribution, and training and information programs, historical and cultural demonstrations, and public affairs actions.<br>(b) Studies, reports, proposals, analyses, literature reviews; computer modeling; and other non-intrusive intelligence gathering activities. |
| A5 .................................. | Contingency planning and administrative activities in anticipation of emergency and disaster response and recovery. Examples include response plans, protocols for use of suppressants, etc. |
| A6 .................................. | Awarding of contracts for technical support services, ongoing management and operation of government facilities, and professional services that do not involve unresolved conflicts concerning alternative uses of available resources. |
| A7 .................................. | Procurement of non-hazardous goods and services, and storage, recycling, and disposal of non-hazardous materials and wastes, that complies with applicable requirements and that is in support of routine administrative, operational, maintenance activities. Storage activities must occur on previously disturbed land or in existing facilities. Examples include but are not limited to:<br>(a) Office supplies.<br>(b) Equipment.<br>(c) Mobile assets.<br>(d) Utility services.<br>(e) Chemicals and low level radio nuclides for analytical testing and research.<br>(f) Deployable emergency response supplies and equipment.<br>(g) Waste disposal and contracts for waste disposal in permitted landfills or other authorized facilities.. |
| A8 .................................. | The commitment of resources, personnel, and funding to conduct audits, surveys, and data collection of a minimally intrusive nature. Examples include, but are not limited to:<br>(a) Activities designed to support the improvement or upgrade management of natural resources, such as surveys for threatened and endangered species, wildlife and wildlife habitat, historic properties, and archeological sites; wetland delineations; timber stand examination; minimal water, air, waste, material and soil sampling; audits, photography, and interpretation.<br>(b) Minimally-intrusive geological, geophysical, and geo- technical activities, including mapping and engineering surveys.<br>(c) Site characterization studies and environmental monitoring, including siting, construction, operation, and dismantling or closing of characterization and monitoring devices, Facility Audits, Environmental Site Assessments, and Environmental Baseline Surveys.<br>(d) Vulnerability, risk, and structural integrity assessments of infrastructure. |
| **OPERATIONAL ACTIVITIES** | |
| B1 .................................. | Research, development, testing, and evaluation activities, or laboratory operations conducted within existing enclosed facilities consistent with previously established safety levels and in compliance with federal, tribal, state, and local requirements to protect the environment when it will result in no, or de minimus change in the use of the facility. If the operation will substantially increase the extent of potential environmental impacts or is controversial, an EA (and possibly an EIS) is required. |
| B2 .................................. | Transportation of personnel, detainees, equipment, and evidentiary materials in wheeled vehicles over existing roads or established jeep trails, including access to permanent and temporary observation posts. |
| B3 .................................. | Proposed activities and operations to be conducted in an existing structure that would be compatible with and similar in scope to its ongoing functional uses and would be consistent with previously established safety levels and in compliance with federal, tribal, state, and local requirements to protect the environment. |
| B4 .................................. | Provision of on-site technical assistance to non-DHS organizations to prepare plans, studies, or evaluations or to conduct training at sites currently used for such activities, Examples include, but are not limited to:<br>(a) General technical assistance to assist with development and enhancement of Weapons of Mass Destruction (WMD) response plans, exercise scenario development and evaluation, facilitation of working groups, etc. |

TABLE 1.—CATEGORICAL EXCLUSIONS—Continued

| CE# | |
|---|---|
| | (b) State strategy technical assistance to assist states in completing needs and threat assessments and in developing their domestic preparedness strategy. |
| | (c) Training on use, maintenance, calibration, and/or refurbishing of specialized equipment. |
| B5 ................................. | Support for community participation projects. Examples include, but are not limited to: |
| | (a) Earth Day activities. |
| | (b) Adopting schools. |
| | (c) Cleanup of rivers and parkways. |
| | (d) Repair and alteration of housing. |
| B6 ................................. | Approval of recreational or public activities or events at a location typically used for that type and scope (size and intensity) of that activity. Examples include, but are not limited to: |
| | (a) Picnics. |
| | (b) Encampments. |
| | (c) Interpretive programs for historic and cultural resources, such as programs in conjunction with State and Tribal Historic Preservation Officers, or with local historic preservation or re-enactment groups. |
| B7 ................................. | Realignment or initial home porting of mobile assets, including vehicles, vessels and aircraft, to existing operational facilities that have the capacity to accommodate such assets or where supporting infrastructure changes will be minor in nature to perform as new homeports or for repair and overhaul. |
| B8* ................................. | Acquisition, installation, maintenance, operation, evaluation, removal, or disposal of security equipment to screen for or detect dangerous or illegal individuals or materials at existing facilities. Examples include, but are not limited to: |
| | (a) Low-level x-ray devices. |
| | (b) Cameras and biometric devices. |
| | (c) Passive inspection devices. |
| | (d) Detection or security systems for explosive, biological, or chemical substances. |
| | (e) Access controls, screening devices, and traffic management systems. |
| B9* ................................. | Acquisition, installation, maintenance, operation, evaluation, removal, or disposal of target hardening security equipment, devices, or controls to enhance the physical security of existing critical assets to include, but not limited to: |
| | (a) Motion detection systems. |
| | (b) Temporary use of barriers, fences, and jersey walls on or adjacent to existing facilities. |
| | (c) Impact resistant doors and gates. |
| | (d) X-ray units. |
| | (e) Remote video surveillance systems. |
| | (f) Diver/swimmer detection systems except sonar. |
| | (g) Blast/shock impact-resistant systems. |
| | (h) Column and surface wraps. |
| | (i) Breakage/shatter-resistant glass. |
| B10 ............................... | Existing aircraft operations conducted in accordance with normal flight patterns and elevations. This categorical exclusion encompasses the actions of many component elements of the DHS during training and emergency response and recovery efforts, but would primarily be used by the elements of Coast Guard and Border and Transportation Security in their daily activities. |
| B11 ............................... | Identifications, inspections, surveys, or sampling, testing, seizures, quarantines, removals, sanitization, and monitoring of imported products and that cause little or no physical alteration of the environment. This categorical exclusion would primarily encompass a variety of daily activities performed at the borders and ports of entry by various elements of the Border and Transportation Security Directorate. |
| B12 ............................... | Routine monitoring and surveillance activities that support law enforcement or homeland security and defense operations, such as patrols, investigations, and intelligence gathering, but not including any construction activities except those set forth in subsection F of these categorical exclusions. This categorical exclusion would primarily encompass a variety of daily activities performed by the elements of Coast Guard, Border and Transportation Security, and the Secret Service. |
| B13* ............................. | Harvest of live trees on DHS facilities not to exceed 70 acres, requiring no more than ½ mile of temporary road construction. Do not use this category for even-aged regeneration harvest or vegetation type conversion. The proposed action may include incidental removal of trees for landings, skid trails, and road clearing. Examples include but are not limited to: |
| | (a) Removal of individual trees for saw logs, specialty products, or fuel wood. |
| | (b) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor. |
| | This categorical exclusion would encompass property management activities at larger properties within the Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Centers. |
| B14* ............................. | Salvage of dead and/or dying trees on DHS facilities not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. The proposed action may include incidental removal of live or dead trees for landings, skid trails, and road clearing. Examples include but are not limited to: |
| | (a) Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees. |
| | (b) Harvest of fire damaged trees. |
| | (c) Harvest of insect or disease damaged trees. |
| | This categorical exclusion would encompass property management activities at larger properties within the Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Centers. |
| | **REAL ESTATE ACTIVITIES** |
| C1 ................................. | Acquisition of an interest in real property that is not within or adjacent to environmentally sensitive areas, including interests less than a fee simple, by purchase, lease, assignment, easement, condemnation, or donation, which does not result in a change in the functional use of the property. |

TABLE 1.—CATEGORICAL EXCLUSIONS—Continued

| CE# | |
|---|---|
| C2 ................................. | Lease extensions, renewals, or succeeding leases where there is no change in the facility's use and all environmental operating permits have been acquired and are current. |
| C3 ................................. | Reassignment of real property, including related personal property within the DHS (*e.g.*, from one DHS element or activity to another) which does not result in a change in the functional use of the property. |
| C4 ................................. | Transfer of administrative control over real property, including related personal property, between a non-DHS federal agency and the DHS which does not result in a change in the functional use of the property. |
| C5 ................................. | Determination that real property is excess to the needs of the DHS and, in the case of acquired real property, the subsequent reporting of such determination to the General Services Administration or, in the case of lands withdrawn or otherwise reserved from the public domain, the subsequent filing of a notice of intent to relinquish with the Bureau of Land Management, Department of Interior. |
| **REPAIR AND MAINTENANCE ACTIVITIES** | |
| D1 ................................. | Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property (*e.g.* realigning interior spaces of an existing building, extending an existing roadway in a developed area a short distance, adding a small storage shed to an existing building, or retrofitting for energy conservation. This could also include installing a small antenna on an already existing antenna tower that does not cause the total height to exceed 200 feet and where the FCC would not require an environmental assessment or environmental impact statement of the installation). |
| D2 ................................. | Routine upgrade, repair, maintenance, or replacement of equipment and vehicles, such as aircraft, vessels, or airfield equipment which does not result in a change in the functional use of the property. |
| D3 ................................. | Repair and maintenance of buildings, roads, airfields, grounds, equipment, and other facilities which do not result in a change in functional use or an impact on a historically significant element or setting (*e.g.* replacing a roof, painting a building, resurfacing a road or runway, pest control activities, restoration of trails and firebreaks, culvert maintenance, grounds maintenance, existing security systems, waterfront facilities that do not require individual regulatory permits, and other facilities). |
| D4* ................................. | Reconstruction and/or repair by replacement of existing utilities or surveillance systems in an existing right-of-way or easement, upon agreement with the owner of the relevant property interest. |
| D5* ................................. | Maintenance dredging and repair activities within waterways, floodplains, and wetlands where no new depths are required, applicable permits are secured, and associated debris disposal will be at an approved disposal site. This categorical exclusion encompasses activities required for the maintenance of waterfront facilities managed primarily within the Coast Guard and Customs and Border Protection. |
| D6 ................................. | Maintenance of aquatic and riparian habitat in streams and ponds, using native materials or best natural resource management practices. Examples include, but are not limited to:<br>(a) Installing or repairing gabions with stone from a nearby source.<br>(b) Adding brush for fish habitat.<br>(c) Stabilizing stream banks through bioengineering techniques.<br>(d) Removing and controlling exotic vegetation, not including the use of herbicides or non-native biological controls.<br>This categorical exclusion would encompass property management activities at larger properties within the Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Centers. |
| **CONSTRUCTION, INSTALLATION, AND DEMOLITION ACTIVITIES** | |
| E1 ................................. | Construction, operation, maintenance, and removal of utility and communication systems, mobile antennas, data processing cable, intrusion detection systems, and similar electronic equipment that use existing rights-of-way, easements, utility distribution systems, and/or facilities and for equipment and towers not higher than 200 feet where the FCC would not require an environmental assessment or environmental impact statement for the acquisition, installation, operation or maintenance. |
| E2* ................................. | New construction upon or improvement of land where all of the following conditions are met:<br>(a) The structure and proposed use are compatible with applicable local planning and zoning standards.<br>(b) The site is in a developed area and/or a previously disturbed site.<br>(c) The proposed use will not substantially increase the number of motor vehicles at the facility or in the area.<br>(d) The site and scale of construction or improvement are consistent with those of existing, adjacent, or nearby buildings.<br>(e) The construction or improvement will not result in uses that exceed existing support infrastructure capacities (roads, sewer, water, parking, etc.). |
| E3* ................................. | Acquisition, installation, operation, and maintenance of equipment, devices, and/or controls necessary to mitigate effects of the DHS missions on health and the environment, including the execution of appropriate real estate agreements. Examples include but are not limited to:<br>(a) Pollution prevention and pollution control equipment required to meet federal, tribal, state, or local requirements.<br>(b) Noise abatement measures, including construction of noise barriers, installation of noise control materials, or planting native trees and/or native vegetation for use as a noise abatement measure.<br>(c) Devices to protect human or animal life, such as raptor electrocution prevention devices, fencing to restrict wildlife movement on to airfields, fencing and grating to prevent accidental entry to hazardous or restricted areas, and rescue beacons to protect human life. |
| E4* ................................. | Removal or demolition, along with subsequent disposal of debris to permitted or authorized off-site locations, of non-historic buildings, structures, other improvements, and/or equipment in compliance with applicable environmental and safety requirements. |
| E5 ................................. | Natural resource management activities to enhance native flora and fauna, including site preparation and landscaping. This categorical exclusion would encompass property management activities primarily at properties within the Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Centers. |

TABLE 1.—CATEGORICAL EXCLUSIONS—Continued

| CE# | |
|---|---|
| E6 ................................. | Construction or reconstruction of roads on previously disturbed areas on DHS facilities, where runoff, erosion, and sedimentation issues are mitigated through implementation of Best Management Practices. This categorical exclusion would encompass property management activities primarily at properties within the Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Centers. |
| E7 ................................. | Construction of exercise and training trails for non-motorized use in areas that are not environmentally sensitive and that are located on DHS facilities, where run-off, erosion, and sedimentation are mitigated through implementation of Best Management Practices. This categorical exclusion would encompass property management activities primarily at properties within the Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Centers. |
| E8* ............................... | Construction of aquatic and riparian habitat in streams and ponds, using native materials or best natural resource management practices. Examples include, but are not limited to:<br>(a) Installing or repairing gabions with stone from a nearby source.<br>(b) Adding brush for fish habitat.<br>(c) Stabilizing stream banks through bioengineering techniques.<br>(d) Removing and controlling exotic vegetation, not including the use of herbicides or non-native biological controls. This categorical exclusion would encompass property management activities primarily at properties within the Coast Guard, Science and Technology Directorate, and the Federal Law Enforcement Training Centers. |
| E9* ............................... | Except in environmentally sensitive areas, construction, operation, modification, or closure of:<br>(a) Wells for drinking water, sampling, and watering landscaping at DHS facilities.<br>(b) Septic systems in accordance with State and local environmental and health requirements.<br>(c) Field instruments, such as stream-gauging stations, flow- measuring devices, telemetry systems, geo-technical monitoring tools, geophysical exploration tools, water-level recording devices, well logging systems, water sampling systems, ambient air monitoring equipment.<br>This categorical exclusion would encompass property management activities primarily at properties within the Coast Guard, Science and Technology Directorate, and the Border and Transportation Security Directorate. |

**HAZARDOUS/RADIOACTIVE MATERIALS MANAGEMENT AND OPERATIONS**

| | |
|---|---|
| F1 | Routine procurement, handling, recycling, and off-site disposal of hazardous material/waste that complies with applicable requirements. Examples include but are not limited to:<br>(a) Process-related chemicals and metals used in repair, maintenance, alteration, and manufacturing.<br>(b) Routine transportation, distribution, use, storage, treatment, and disposal of solid waste, medical waste, radiological and special hazards conducted in accordance with all federal, state, local and tribal laws and regulations.<br>(c) Hazardous waste minimization and recycling activities. |
| F2 ................................. | Use of instruments that contain hazardous, radioactive, and radiological materials. Examples include, but are not limited to:<br>(a) Gauging devices, tracers, analytical instruments, and other devices containing sealed radiological and radioactive sources.<br>(b) Industrial radiography.<br>(c) Devices used in medical and veterinary practices.<br>(d) Installation, maintenance, non-destructive tests, and calibration. |
| F3 ................................. | Use, transportation, and placement of Nuclear Regulatory Commission (NRC) approved, sealed, small source radiation devices for scanning vehicles and packages where radiation exposure to employees or the public does not exceed 0.1 rem per year and where systems are maintained within the NRC license parameters at existing facilities. This categorical exclusion would primarily encompass a variety of daily activities performed by the elements of Coast Guard, Border and Transportation Security, and the Secret Service. |

**TRAINING AND EXERCISES**

| | |
|---|---|
| G1 ................................. | Training of homeland security personnel, including international, tribal, state, and local agency representatives using existing facilities where the training occurs in accordance with applicable permits and other requirements for the protection of the environment. This exclusion does not apply to training that involves the use of live chemical, biological, or radiological agents except when conducted at a location designed and constructed for that training. Examples include but are not limited to:<br>(a) Administrative or classroom training.<br>(b) Tactical training, including but not limited to training in explosives and incendiary devices, arson investigation and firefighting, and emergency preparedness and response.<br>(c) Vehicle and small boat operation training.<br>(d) Small arms and less-than-lethal weapons training.<br>(e) Security specialties and terrorist response training.<br>(f) Crowd control training, including gas range training.<br>(g) Enforcement response, self-defense, and interdiction techniques training.<br>(h) Techniques for use in fingerprinting and drug analysis. |
| G2 ................................. | Projects, grants, cooperative agreements, contracts, or activities to design, develop, and conduct national, state, local, or international exercises to test the readiness of the nation to prevent or respond to a terrorist attack of natural or manmade disasters and where in accordance with existing facility or land use designations. This exclusion does not apply to exercises that involve the use of chemical, biological, radiological, nuclear, or explosive agents/devices (other than small devices such as practice grenades/flash bang devices used to simulate an attack during exercise play). |

TABLE 1.—CATEGORICAL EXCLUSIONS—Continued

| CE# | |
|---|---|
| **UNIQUE CATEGORICAL EXCLUSIONS FOR THE TRANSPORTATION AND SECURITY ADMINISTRATION** | |
| H1 ................................. | Approval or disapproval of security plans required under legislative or regulatory mandates unless such plans would have a significant effect on the environment. |
| H2 ................................. | Issuance of grants for the conduct of security-related research and development or the implementation of security plans or other measures at existing facilities. |
| H3 ................................. | Issuance of planning documents and advisory circulars on planning for security measures which are not intended for direct implementation or are issued as administrative and technical guidance. |
| H4 ................................. | Issuance or revocation of certificates or other approvals, including but not limited to:<br>(a) Airmen certificates.<br>(b) Security procedures at general aviation airports.<br>(c) Airport security plans. |
| **UNIQUE CATEGORICAL EXCLUSION FOR THE U.S. VISIT PROGRAM** | |
| I1* ................................. | A portable or relocatable facility or structure used to collect traveler data at or adjacent to an existing port of entry that does not significantly disturb land, air, or water resources and does not individually or cumulatively have a significant environmental effect. The building footprint of the facility must be less than 5000 square feet and the facility or structure must not foreclose future land use alternatives. |
| **UNIQUE CATEGORICAL EXCLUSION FOR THE FEDERAL LAW ENFORCEMENT TRAINING CENTER** | |
| J7* ................................. | Prescribed burning, wildlife habitat improvement thinning, and brush removal for southern yellow pine at the FLETC facility in Glynco, Georgia. No more than 200 acres will be treated in any single year. These activities may include up to 0.5 mile of low- standard, temporary road construction to support these operations. |
| **UNIQUE CATEGORICAL EXCLUSIONS FOR THE CUSTOMS AND BORDER PATROL** | |
| K1 ................................. | Road grading of existing roads and trails to maintain a clearly delineated right-of-way and to provide evidence of foot traffic and that will not expand the width, length, or footprint of the road or trail. |
| K2 ................................. | Repair and maintenance of existing border fences that do not involve expansion in width or length of the project, and will not encroach on adjacent habitat. |

¹ These categorical exclusions have the additional requirement to be conducted in conformance with the Greening the Government Executive Orders (e.g., EO 13101, 13123, 13148, 13149, and 13150).

*4.0 Environmental Assessments*

This Chapter provides supplementary instructions for implementing environmental assessments (EA).

An EA is a brief analysis that is prepared pursuant to NEPA to assist the proponent in decision making. An EA concludes in either a finding of no significant impact or a Notice of Intent to prepare an environmental impact statement. The EA should include alternatives to the proposed action. EAs and the associated environmental documents should be reviewed and approved by the CAS, unless signature authority has been specifically delegated to the DHS element.

Based upon the analysis and selection of mitigation measures that reduce environmental impacts until they are no longer significant, an EA may result in a FONSI. If a proponent uses mitigation measures in such a manner, the FONSI must identify these mitigating measures, and they become legally binding and must be accomplished as the project is implemented. If any of these identified mitigation measures do not occur, so that significant adverse environmental effects could reasonably be expected to result, the proponent must stop the action and prepare an EIS.

It is the DHS policy to involve the public to the extent practicable. The proponent should consider the practicality of making the EA available for public review and comment before completing the FONSI. The proponent, working in consultation with the EPC, will determine the practicality based on consideration of the factors in section 2.6, Public Involvement. When practical, an EA will be made available for public review and comment for a period of 30 days before completing the FONSI.

*4.1 When to Use*

A. For any action proposed by an element that does not qualify for a categorical exclusion or does not clearly require an EIS, the element will prepare and circulate an EA.

B. If changes in the scope of a proposed element action could significantly affect the quality of the human environment, an EA shall be prepared as soon as possible to determine the significance of the effects unless it is otherwise clear that an EIS is needed.

C. An EA should be prepared for proposed actions that would normally be categorically excluded except that

the proposed action involves extraordinary circumstances that may result in the proposed action having potential for a significant impact on the human environment.

D. An EA need not be prepared if an element has decided to prepare an EIS on a proposed action.

*4.2 Actions Normally Requiring an EA or a Programmatic EA (1501.3, 1508.9)*

A. Projects for which environmental assessments will be the minimum level of analysis include, but are not limited to:

(1) Proposed construction, land use, activity, or operation that has the potential to significantly affect environmentally sensitive areas.

(2) Dredging projects that do not meet the criteria of the U.S. Army Corps of Engineers Nationwide Permit Program.

(3) New or revised regulations, directives, or policy guidance that is not categorically excluded.

(4) Proposal of new, low-altitude aircraft routes wherein over flights have the potential to significantly affect persons, endangered species, or property.

(5) Permanent closure or limitation of access to any areas that were previously

open to public use (*e.g.*, roads and recreational areas) where there is a potential for significant environmental impacts.

(6) New law enforcement field operations for which the impacts are unknown, or for which the potential for significant environmental degradation or controversy is likely.

B. A Programmatic EA may be prepared on a broad federal action, such as a program or plan, for which only very general environmental information is known, yet for which the anticipated environmental impacts are minor. A site or activity-specific EA or supplemental EA, may then be tiered to the PEA and the environmental analysis discussed in the broader statement be incorporated by reference in the site-specific EA. In some cases the programmatic assessment may be specific enough or contain sufficient information to require no or very little tiered analysis.

## 4.3   Decision Document: Finding of No Significant Impact (FONSI) (1508.13)

If the EA supports the conclusion that the action has no significant impact on the environment, the element will prepare a separate Finding of No Significant Impact (FONSI) that will accompany the EA.

A. The FONSI must either be attached to the EA or incorporate the EA by reference and consist of the following:

(1) The name of the proposed action.

(2) The facts and conclusions that led to the FONSI.

(3) Any mitigation commitments (including funding and/or monitoring) essential to render the impacts of the proposed action not significant, beyond those mitigations that are an integral part of the proposed action.

(4) A statement that the action will not have a significant impact on the human environment.

(5) The date of issuance and signature of the element official approving the document.

B. The proponent, in consultation with the EPC, will determine whether to make the FONSI available to the public for a reasonable period of time before making a decision or taking action. A reasonable period of time will be determined on the basis of an evaluation of the criteria in CEQ regulations at 40 CFR 1501.4(e) and an evaluation of the comments received during the EA review and comment period.

## 4.4   Supplemental EAs

A. The Proponent will prepare a supplemental EA if there are substantial changes to the proposal that are relevant to environmental concerns or significant new circumstances or information relevant to environmental concerns.

B. The Proponent may supplement a draft or final EA at any time to further the analysis. The proponent shall introduce any such supplement into its formal administrative record if such a record exists.

C. The Proponent will prepare, circulate, and file a supplement to an EA in the same manner as any other EA. A FONSI is required for the supplement prior to any decision making.

D. While the Proponent is encouraged to provide public involvement in Supplemental EAs, the proponent has discretion regarding the type and level of public involvement in Supplemental EAs. Factors to be weighed include those listed in Section 2.6 A.

## 5.0   Environmental Impact Statements (EISs)

This Chapter provides supplementary instructions for implementing environmental impact statements (EIS). An EIS analyzes the environmental impacts of a proposed action and all reasonable alternatives. It displays them in a report for review by the decision maker. The EIS provides an opportunity to work collaboratively with other federal, state, and tribal authorities. The EIS provides an opportunity for the public to understand the impacts and to influence the decision. An EIS is a more detailed analysis than an EA and is prepared for actions that appear to be major federal actions significantly affecting the quality of the human environment. It includes (1) a purpose and need statement (2) a reasonable range of alternative means to meet that purpose and need (3) a description of the affected environment and (4) a description of the environmental effects of each of the alternatives. The EIS must identify the element preferred alternative (if there is one) in the draft EIS.

## 5.1   When To Use

An EIS is prepared when a DHS element proposes an action that does not qualify for a categorical exclusion or EA, and that could constitute a major federal action significantly affecting the quality of the human environment.

## 5.2   Actions Normally Requiring an EIS (1501.4), a Programmatic EIS, or a Legislative EIS (1506.8)

A. Actions normally requiring EISs include, but are not limited to:

(1) Actions where the effects of a project or operation on the human environment are likely to be highly controversial.

(2) Proposed major construction or construction of facilities that would have a significant effect on wetlands, coastal zones, or other environmentally sensitive areas.

(3) Major federal actions having a significant environmental effect on the global commons, such as the oceans or Antarctica, as described in section 2–3 of EO 12114.

(4) Change in area, scope, type, and/or tempo of operations that may result in significant environmental effects.

(5) Where an action is required by statute or treaty to develop an EIS.

B. A Programmatic EIS may be prepared on a broad federal action, such as a program or plan, for which only very general environmental information is known. A site-specific EIS or EA may then be tiered to the PEIS and the environmental analysis discussed in the broader statement be incorporated by reference in the site-specific analysis.

C. A Legislative EIS will be prepared and circulated for any legislative proposal, for which the DHS or its elements are primarily responsible and which involve significant environmental impacts.

## 5.3   Preparation and Filing (1506.9)

The proponent is responsible for initiation, preparation, and approval of EISs. This official has overall responsibility for formulating, reviewing, or proposing an action or, alternatively, has been delegated the authority or responsibility to develop, approve, or adopt a proposal or action. Preparation at this level will ensure that the NEPA process will be incorporated into the planning process and that the EIS will accompany the proposal through existing review processes.

## 5.4   Combining Documents (1506.4)

Draft and Final EISs should refer to the underlying studies, reports, and other documents considered in conjunction with the preparation. The element should indicate how such documents could be obtained. If possible, the supporting documents should be posted on a DHS web site along with the EIS. With the exception of standard reference documents, such as congressional materials, the proponent should maintain a file of the respective documents, which may be consulted by interested persons. If especially significant documents are attached to the EIS, care should be taken to ensure that the statement remains an essentially self-contained instrument easily understood without the need for undue cross-reference.

## 5.5   Supplemental EISs (1502.9)

A. The proponent will prepare a supplemental EIS if there are substantial changes to the proposal that are relevant to environmental concerns or significant new circumstances or information relevant to environmental concerns as discussed in 40 CFR 1502.9(c)(1). In those cases where an action is not completed within a budget cycle (typically 2 years) from the execution of the ROD, the proponent will review the EIS when proceeding with the action to determine whether a supplement is needed.

B. The proponent may supplement a draft or final EIS or ROD at any time to further the analysis. The proponent shall introduce any such supplement into its formal administrative record if such a record exists.

C. Any element decision to prepare a supplemental EIS will be coordinated with the DEE unless such decision has been delegated to the respective EPC.

D. The proponent will prepare, circulate, and file a supplement to a draft or final EIS in the same manner as any other draft or final EIS, except that scoping is optional for a SEIS. A separate ROD is required for the supplement prior to any action being taken even if one had been prepared for the final EIS that is being supplemented. In special circumstances, it may be possible to negotiate alternative procedures for the SEIS with CEQ. The DEE will lead any discussions of alternative procedures with CEQ, unless delegated to the respective EPC.

E. The public notice methods should be chosen to reach persons who may be interested in or affected by the proposal, including actions with effects of primarily local concern, may include, but not be limited to, those listed in Attachment A, Section 2.6.B.

## 5.6   Proposals for Legislation (1506.8)

The proponent, in consultation with the DEE, is responsible for ensuring compliance with NEPA in legislative proposals. The DEE will maintain close coordination with the Office of the General Counsel whenever legislation is proposed that requires NEPA compliance.

## 5.7   Decision Document: Record of Decision (ROD) (1505.2)

If the element decides to take action on a proposal covered by an EIS, a ROD will be prepared. The element will publish the ROD in the appropriate manner to make it available to the public and to reach the range of interested parties involved. The element will also post the ROD on the element web site, if one exists.

## 5.8   Review of Other Agencies' EISs

A. If any DHS element receives a request for EIS comment directly from another agency, and the DHS element wants to provide comments on the EIS, the DHS element will notify the DOSE about the request. DOSE will check if other DHS elements have been requested to comment on the same EIS.

(1) If no other DHS elements have received a request for comment, DOSE will inform the requested element to provide comments it sees fit.

(2) If other DHS elements have received a request for comment, DOSE will either:

(a) Coordinate the response between the DHS elements, or

(b) Direct one of the DHS elements to serve as the lead commenting element.

B. Any pertinent DHS projects that are environmentally or functionally related to the action proposed in the EIS should be identified so that interrelationships can be discussed in the final statement. In such cases, the DHS element should consider serving as a joint lead agency or cooperating agency.

C. Several types of EIS proposals from non-DHS agencies should be referred by the DHS element directly to DOSE for comment, including:

(1) Actions with national policy implications relating to the DHS mission.

(2) Actions with national security, immigration, or law enforcement implications.

(3) Legislation, regulations, and program proposals having national impact on the DHS mission.

(4) Actions that may affect the DHS mission.

D. Provide a copy of formal comments on non-DHS agency EISs to DOSE.

## 6.0   Special Circumstances

### 6.1   Emergencies (1506.11)

In addition to natural and technological hazards, Americans face threats posed by hostile governments and extremist groups. These threats to national security include acts of terrorism and war, and require DHS action to protect public health and safety and may not provide adequate time to prepare the appropriate NEPA analyses and documentation.

A. In the event of such an emergency, the DHS will not delay an emergency action necessary for national defense, security, or preservation of human life or property in order to comply with this Directive or the CEQ regulations. Examples of emergencies that may require immediate DHS action include response to the release or imminent release of hazardous, biological or radiological substances.

B. The DHS senior executive on site responding to the emergency will consider the probable environmental consequences of the proposed DHS actions and will minimize environmental damage to the maximum degree practical, consistent with protecting human life, property, and national security. At the earliest practical time, the DHS Senior Executive on site responding to the emergency shall consult with the DEE on the emergency and the DHS actions that may have environmental impacts.

C. If the DHS Senior Executive on site and the DEE jointly conclude that the DHS emergency response actions would qualify for a DHS or DHS element categorical exclusion and give rise to no extraordinary circumstances as defined in this Directive or the CEQ regulations, then no further analysis or documentation is required to comply with NEPA prior to proceeding with the DHS actions.

D. For those cases when the DHS senior executive on site and the DEE jointly conclude that the DHS emergency response actions would not qualify for a categorical exclusion, the DEE will, at a minimum, document consideration of the potential environmental effects in an environmental assessment for the DHS response action. If the DEE concludes that no significant environmental effects will occur, a FONSI will be prepared and filed. In the event the EA cannot be concluded prior to the initiation of the DHS response actions, the DEE and DHS senior executive will develop alternative arrangements for the procedural requirements of other sections of this part and the CEQ regulations pertaining to environmental assessments that, to the maximum extent practical, ensure public notification and involvement and focus on minimizing the adverse environmental consequences of the DHS response action and the emergency. The DEE will inform CEQ of these arrangements at the earliest opportunity.

E. If, at any time, the DHS Senior Executive on site responding to the emergency or the DEE conclude that the emergency action appears to be a major federal action significantly affecting the quality of the human environment, the DEE will immediately notify the Council on Environmental Quality regarding the emergency and will seek alternative arrangements to comply with NEPA in accordance with 40 CFR section 1506.11.

F. The alternative arrangements developed under subsection D or E apply only to actions necessary to control the immediate effects of the

emergency to prevent further harm to life or property. Other actions remain subject to NEPA review as set forth herein.

G. A public affairs plan should be developed to ensure open communication among the media, the public, and the DHS in the event of an emergency.

## 6.2    Classified or Protected Information (1507.3(c))

A. Notwithstanding other sections of this Chapter, the DHS will not disclose classified, protected, proprietary, or other information that is exempted from disclosure by the Freedom of Information Act (FOIA)(5 U.S.C. 552), critical infrastructure information as defined in 6 U.S.C. 131(3), sensitive security information as defined in 49 CFR Part 1520, E.O. 12958, the DHS Management Directive 0460.1, "Freedom of Information Act Compliance", and the DHS Management Directive 11042, "Safeguarding Sensitive But Unclassified (For Official Use Only) Information", or other laws, regulations, or Executive Orders prohibiting or limiting the release of information.

B. The existence of classified or protected information does not relieve the DHS of the requirement to assess and document the environmental effects of a proposed action.

C. To the fullest extent possible, the DHS will segregate any such classified or protected information into an appendix sent to appropriate reviewers and decision makers, and allow public review of the remainder of the NEPA analysis. If exempted material cannot be segregated, or if segregation would leave essentially meaningless material, the DHS elements will withhold the entire NEPA analysis from the public; however, the DHS elements will prepare the NEPA analysis in accordance with the CEQ Regulations and this Directive, and use it in the DHS decision making process. The protected NEPA analysis may be shared with appropriately cleared officials in CEQ, EPA, and within the DHS. In such cases, other appropriate security and environmental officials will ensure that the consideration of environmental effects will be consistent with the letter and intent of NEPA. With regard to an EIS requiring a security clearance for review, a team of cleared personnel will review the classified or protected material for compliance with federal, tribal, state, and local environmental compliance. This team will be representative of internal environmental professionals and external resource

professionals with appropriate clearances.

## 6.3    Procedures for Applicants (1501.2, 1506.5)

A. The DHS elements with the role of processing applications for permits, grants, various certifications, awards, licenses, approvals, or other major federal actions become the project proponent for environmental planning purposes. These proponents must consider the environmental effects of their action in accordance with this Directive, unless the action is exempted by statute. The requirements of this management Directive may be approached in a programmatic manner (*e.g.* one NEPA evaluation and document for an entire category of grants) or may be approached on a single application basis. In either case, the DHS element must be alert to identify circumstances that may be associated with any single application that would have potential for significant environmental impacts.

B. For major categories of DHS actions involving a large number of applicants, the appropriate DHS element will prepare and make available generic guidance describing the recommended level and scope of environmental information that applicants should provide and identify studies or other information foreseeably required for later federal action.

C. The DHS proponent shall begin the NEPA review as soon as possible after receiving an application. The proponent must conduct an independent and objective evaluation of the applicant's materials and complete the NEPA process (including evaluation of any EA that may be prepared by the applicant) before rendering a decision on the application. The DHS proponents must consider the NEPA analysis in reaching a decision.

D. In all cases, the DHS program proponent shall ensure that its application submittal and approval process provides for appropriate time and resources to meet the requirements of this Directive. At a minimum, the application submittal and approval process must incorporate the following provisions. Each DHS program proponent must ensure, for each separate approval authority, that the responsibility for meeting these provisions is appropriately allocated between the applicant and the DHS for each program of applications and, potentially, for each individual applicant.

(1) Consultation with the DHS proponent as early as possible in the application development process to

obtain guidance with respect to the appropriate level and scope of any studies or environmental information that the program proponent may require to be submitted as part of the application. This includes the identification of the need for the DHS proponents to consult with federal, tribal, state, and local governments and with private entities and organizations potentially affected by or interested in the proposed action in accordance with 40 CFR 1501.2(d)(2).

(2) Anticipation of issues that may lead to either or both (1) a significant environmental impact; or (2) a concern with evaluating the level of significance. This may include identification of information gaps that may hinder an appropriate evaluation of significance.

(3) Performance of studies that the DHS proponent deems necessary and appropriate to determine the potential for environmental impacts of the proposed action.

(4) Identification and evaluation of appropriate options to resolve potentially significant environmental impacts. This may include development of appropriate actions to mitigate significant impacts.

(5) Consultation, as appropriate, with federal, tribal, state, and local governments and with private entities and organizations potentially affected by or interested in the proposed action as needed during the NEPA process for scoping and other public involvement activities. This would include consultation with minority populations and low-income populations in accordance with E.O. 12898.

(6) Notification to the DHS proponent as early as possible of other actions required to coordinate and complete the federal environmental review and to eliminate duplication with state and local procedures. (1506.2)

(7) Notification to the DHS proponent if the applicant changes the scope of the proposed action.

(8) Notification to the DHS proponent if the applicant plans to take an action that is within the proponent's jurisdiction that may have a significant environmental impact or limit the choice of alternatives. If the DHS proponent determines that the action would have a significant environmental impact or limit the choice of reasonable alternatives, the proponent will promptly notify the applicant that the permit, license, etc. will be withheld until the objectives and procedures of NEPA are achieved.

(9) Completion of appropriate NEPA documentation.

E. Final DHS approval of a grant, license, permit or other formal request

from an applicant may be conditioned by provisions for appropriate mitigation of potentially significant environmental impacts. The DHS proponents will ensure that all mitigation committed to as part of the ROD or FONSI is incorporated as conditions in whatever formal approval, contract, or legal document is issued. The DHS proponents will also ensure that appropriate monitoring of the implementation and success of the mitigation is also a condition of the formal documentation. The mitigation shall become a line item in the proponent's budget or other funding document, if appropriate, or included in the legal documents implementing the action (contracts, leases, or grants).

## Appendix A: Definitions

Categorical exclusion (CE) (1508.4): "Categorical exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the environment and which have been found to have no such effect in procedures adopted by a federal agency in implementation of these regulations (Sec. 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

Cooperating Agency (1508.5): "Cooperating agency" means any federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in Sec. 1501.6. A State or local agency of similar qualifications or an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

Council on Environmental Quality (CEQ): NEPA created in the Executive Office of the President a Council on Environmental Quality. The Chairman is appointed by the President with the advice and consent of the Senate. The Council, among other things, appraises programs and activities of the Federal Government in the light of the policy set forth in title I of NEPA and formulates and recommends national policies to promote the improvement of the quality of the environment.

Designated DHS Official: Senior DHS officials as designated by the Secretary, Deputy Secretary, or Under Secretaries.

Effects (1508.8): "Effects" include: (a) Direct effects, which are caused by the action and occur at the same time and place. (b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population, density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

Element: Any of the DHS organizational elements, including agencies, bureaus, services, directorates, etc.

Environmental assessment (EA) (1508.9): "Environmental Assessment":

(a) means a concise public document for which a federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an element in compliance with the Act when no environmental impact is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by NEPA section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

Environmental documents (1508.10): "Environmental documents" the document specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

Environmental impact analysis: A generic term that includes EAs and EISs.

Environmental impact statement (EIS) (1508.11): "Environmental impact statement" means a detailed written statement as required by section 102(2)(C) of the Act. It includes (1) a purpose and need statement, (2) a reasonable range of alternative means to meet that purpose and need, (3) a description of the affected environment and (4) a description of the environmental effects of each of the alternatives. The EIS must identify the element preferred alternative (if there is one) in the draft EIS.

Finding of No Significant Impact (FONSI) (1508.13): "Finding of no significant impact" means a document by a federal agency briefly presenting the reasons why an action, not otherwise excluded (Sec. 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (Sec. 1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

Environmentally Sensitive Areas: These include, but are not limited to, (1) proposed federally listed, threatened, or endangered species or their designated critical habitats; (2) properties listed or eligible for listing on

the National Register of Historic Places; (3) areas having special designation or recognition such as prime or unique agricultural lands, coastal zones, designated wilderness or wilderness study areas, wild and scenic rivers, 100 year floodplains, wetlands, sole source aquifers, National Wildlife Refuge, National Parks, etc.

Lead Agency (1508.16): "Lead agency" means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

Major Federal Action (1508.18): "Major federal action" includes actions with effects that may be major and which are potentially subject to federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (Sec. 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as element action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised element rules, regulations, plans, policies, or procedures; and legislative proposals (Secs. 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources, upon which future element actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected element decisions allocating element resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

Mitigation (1508.20): "Mitigation includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

National Environmental Policy Act (NEPA): Public Law 91–190 declares a national policy which will encourage productive and enjoyable harmony between man and his environment; establishes a Council on Environmental Quality in the Executive Office of the President; and requires that every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment, a detailed statement (EIS) by the responsible official.

Notice of Intent (NOI) (1508.22): ''Notice of Intent'' means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the element's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the element who can answer questions about the proposed action and the environmental impact statement.

Proponent: The identified project or program manager. Normally this person resides in the operational line of authority. The proponent has the immediate authority to decide a course of action or has the authority to recommend course of action, from among options, to the next higher organization level (*e.g.* district to region) for approval. The proponent must also be in a position with the authority to establish the total estimate of resource requirements for the proposed action or, in the execution phase, have the authority to direct the use of resources. While the proponent is not normally expected to personally execute and document the environmental planning process, he or she has the lead role and is responsible for initiating the effort and retains responsibility (with support from the EPC) for the content and quality of the process and documentation.

Proposal (1508.23): ''Proposal'' exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (Sec. 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

Record of Environmental Consideration (REC): A REC is a means of documenting element consideration of an action to ensure that it clearly fits a category of excludable actions (section 4.3), that it is not a small part of a larger action (section 3.2B), and that no extraordinary circumstances exist (3.2C). A REC is an internal DHS document to accompany the determination that a proposed action can be categorically excluded.

Record of Decision (ROD) (1505.2): The record, which may be integrated into any other record prepared by the agency shall:

(a) state what the decision was,

(b) identify all alternatives considered by the element in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An element may discuss preferences among alternatives based on relevant factors including economic and technical considerations and element statutory missions. An element shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the element making its decision and state how those considerations entered into its decision.

(c) State whether all practical means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

Scoping: Scoping (described at 40 CFR § 1501.7) shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (Sec. 1508.22) in the **Federal Register** except as provided in Sec. 1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under Sec. 1507.3(c). An agency may give notice in accordance with Sec. 1506.6.

(2) Determine the scope (Sec. 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (Sec. 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in Sec. 1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

(1) Set page limits on environmental documents (Sec. 1502.7).

(2) Set time limits (Sec. 1501.8).

(3) Adopt procedures under Sec. 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts. Scoping is used to define the scope of the environmental impact analysis and to identify institutional relationships in the process of the study.

The scope (described at 40 C.F.R. § 1508.25) consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (Secs.1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

1. Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

2. Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

3. Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

4. No action alternative.

5. Other reasonable courses of actions.
6. Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

Tiering (1508.28): "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basin-wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead element to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

[FR Doc. 04–13111 Filed 6–10–04; 8:45 am]
**BILLING CODE 4410–10–P**

# DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

**[CGD09–04–021]**

## Great Lakes Regional Waterways Management Forum

**AGENCY:** Coast Guard, DHS.
**ACTION:** Notice of meeting.

**SUMMARY:** "The Great Lakes Regional Waterways Management Forum" will hold a meeting to discuss various waterways management issues. Agenda items will include navigation; maritime security issues including the implementation of Marine Transportation Security Act (MTSA) and the International Ship and Port Facility Security (ISPS) Code; waterways management; ballast water regulation; and discussions about the agenda for the next meeting. The meeting will be open to the public.
**DATES:** The meeting will be held on June 15, 2004, from 12 p.m. to 4 p.m. and on June 16 from 8:30 a.m. to 12 p.m. Comments must be submitted on or before June 15, 2004 to be considered at the meeting.
**ADDRESSES:** The meeting will be held in the U.S. Coast Guard Club located on

the U.S. Coast Guard Moorings, 1055 East Ninth Street, Cleveland, OH 44199. Any written comments and materials should be submitted to Commander (map), Ninth Coast Guard District, 1240 E. Ninth Street, Room 2069, Cleveland, OH 44199.
**FOR FURTHER INFORMATION CONTACT:** CDR Michael Gardiner (map), Ninth Coast Guard District, OH, telephone (216) 902–6049. Persons with disabilities requiring assistance to attend this meeting should contact CDR Gardiner.
**SUPPLEMENTARY INFORMATION:** The Great Lakes Waterways Management Forum identifies and resolves waterways management issues that involve the Great Lakes region. The forum meets twice a year to assess the Great Lakes region, assign priorities to areas of concern and identify issues for resolution. The forum membership has identified agenda items for this meeting that include: Navigation; maritime security issues including the implementation of the MTSA and ISPS Code; waterways management; ballast water regulation; and discussions about the agenda for the next meeting. Additional topics of discussion are solicited from the public.

Dated: June 4, 2004.
**R.J. Papp, Jr.,**
*Rear Admiral, U.S. Coast Guard, Commander, Ninth Coast Guard District, Cleveland, Ohio.*
[FR Doc. 04–13380 Filed 6–9–04; 11:17 am]
**BILLING CODE 4910–15–M**

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–4910–N–12]**

## Notice of Proposed Information Collection for Public Comment; Outline Specification

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing, HUD.
**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.
**DATES:** *Comments Due Date:* August 13, 2004.
**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control number and should be sent to:

Sherry Fobear McCown, Reports Liaison Officer, Public and Indian Housing, Department of Housing and Urban Development, 451 7th Street, SW., Room 4116, Washington, DC 20410–5000.

**FOR FURTHER INFORMATION CONTACT:** Sherry Fobear McCown, (202) 708–0713, extension 7651, for copies of the proposed forms and other available documents. (This is not a toll-free number).

**SUPPLEMENTARY INFORMATION:** The Department will submit the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

This Notice is soliciting comments from members of the public and affected agencies concerning the proposed collection of information to: (1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information; (3) enhance the quality, utility, and clarity of the information to be collected; and (4) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated collection techniques or other forms of information technology; *e.g.*, permitting electronic submission of responses.

This Notice also lists the following information:

*Title of Proposal:* Outline Specification.

*OMB Control Number:* 2577–0012.

*Proposed Use:* Public Housing Agencies (PHAs) in the development of public housing employ architects or turnkey developers to establish quality and kind of materials and equipment to be incorporated into the housing developments. The Outline Specifications are used by the PHAs and HUD to determine that specified items comply with code and standards and are appropriate in the development.

*Agency form numbers, if applicable:* HUD–5087.

*Members of affected public:* State, local government; businesses or other for profit groups.

*Estimation of the total number of hours needed to prepare the information collection including number of respondents, frequency of response, and hours of response:* 610 total by development, (450 turnkey; 160 conventional), annual, three hours per response, .25 hours per specification for

March 23, 2006

The Honorable Michael Chertoff
Secretary
Department of Homeland Security,
3901 Nebraska Ave. NW
Washington, DC 20528

       Re:  <u>Department of Homeland Security NEPA Procedures</u>

Dear Secretary Chertoff:

       Thank you for forwarding the Department of Homeland Security Management Directive establishing the Department's National Environmental Policy Act (NEPA) procedures to the Council on Environmental Quality (CEQ).  The CEQ regulations provide that agencies develop their NEPA policies and procedures in consultation with CEQ to ensure full compliance with the purposes and provisions of NEPA (40 C.F.R. § 1507.3).

       CEQ has completed its review of the Management Directive which includes revisions based upon our discussions and consideration of the public comments.  The draft Management Directive was published in the Federal Register June 14, 2004.

       The Department of Homeland Security Management Directive establishes a solid basis for integrating environmental considerations into your mission planning and project decision making.

       Based on this review, CEQ concludes that the Department of Homeland Security NEPA Management Directive is in conformance with NEPA and the CEQ regulations. The Management Directive will take effect once it is published in final form in the <u>Federal Register</u> (attachment).

                           Sincerely,

                           James L. Connaughton

cc: Philip J. Perry, General Counsel

send their comments via email, commenters may also fax their comments to: 202–395–7285. Commenters may also mail them to: Office of Management and Budget, Office of Information and Regulatory Affairs, New Executive Office Building, Room 10102, Washington, DC 20503.

**Summer King,**

*Statistician.*

[FR Doc. 2014–13029 Filed 6–4–14; 8:45 am]

**BILLING CODE 4162–20–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[Docket Number DHS–2013–0052]**

### National Environmental Policy Act Implementing Procedures

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Proposed Revisions to National Environmental Policy Act implementing procedures and request for comments.

**SUMMARY:** The purpose of this notice is to provide an opportunity for public comment on the Department of Homeland Security (DHS or Department) draft Directive 023–01, Rev. 01 and draft Instruction Manual 023–01–001–01, Rev. 01, Implementation of the National Environmental Policy Act (herein after referred to as the Directive and Instruction). Together, the Directive and Instruction serve as the Department's procedures for implementing the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 et seq.), as amended, and the Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR Parts 1500–1508). Pursuant to the CEQ regulations, DHS is soliciting comments on its proposed internal Directive and Instruction from members of the interested public.

**DATES:** Comments and related material must be received on or before (or, if mailed, postmarked on or before) August 4, 2014 to ensure consideration. Late comments may be considered to the extent practicable.

**ADDRESSES:** Relevant documents are posted at *http://www.regulations.gov* (Docket ID: DHS–2013–0052) and *www.dhs.gov/nepa.* These documents include: this notice, the proposed Directive and Instruction, and a synopsis of the Department's administrative record for several proposed new NEPA categorical exclusions (CATEXs).

You may submit comments, identified by "DHS NEPA Procedures," by one of the following methods:

(1) *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the online instructions for submitting comments electronically via docket number DHS–2013–0052.

(2) *Mail:* Sustainability and Environmental Programs, Office of the Chief Readiness Support Officer, Management Directorate, Department of Homeland Security, 245 Murray Lane SW., Mail Stop 0075, Washington, DC 20528–0075.

(3) *Email: SEP–EPHP@hq.dhs.gov.*

In choosing among these means of providing comments, please give due regard to the security screening difficulties and delays associated with delivery of mail to federal agencies in Washington, DC, through the U.S. Postal Service.

All comments received, including any personal information provided, will become a part of the public record for the Department's NEPA procedures and may be posted without change on the internet at *http://www.regulations.gov* and *http://www.dhs.gov/nepa.*

**FOR FURTHER INFORMATION CONTACT:** Laura Shick, Environmental Protection Specialist, Department of Homeland Security, 202–603–3517, or *laura.shick@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The Department of Homeland Security (DHS or Department) encourages interested persons to submit written data, views, or comments. Persons submitting comments should include their name, address, and other appropriate contact information. You may submit your comments and material by one of the means listed under **ADDRESSES.** If you submit them by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing. If you submit them by mail and would like to know that they were received, please enclose a stamped, self-addressed postcard or envelope. DHS will consider all comments received during the comment period.

The Directive and Instruction establish the policy and procedures DHS follows to comply with NEPA (42 U.S.C. 4321 et seq.) and the CEQ regulations (40 CFR Parts 1500–1508). Together, the Directive and Instruction apply to all of DHS, which is currently comprised of over 20 support and operational components, and help ensure the integration of environmental stewardship into DHS decision making as required by NEPA. The Directive and Instruction serve as the DHS

implementing procedures for NEPA and the CEQ regulations (as required by 40 CFR 1505.1 and 1507.3) and therefore must be read in conjunction with the CEQ regulations.

The Directive and Instruction have been substantially revised to address a number of circumstances and requirements that have arisen since April 19, 2006, the effective date of the original DHS procedures (**Federal Register**, Vol. 71, No. 64, April 4, 2006). Revision of the Directive and Instruction, including additions to the Department's list of NEPA categorical exclusions (CATEXs), was a collaborative effort on the part of numerous DHS environmental and legal professionals from across the Department. These professionals are NEPA practitioners and environmental protection specialists with numerous years of federal NEPA experience, including experience in implementing the 2006 DHS NEPA procedures or Component-specific procedures, and legal practitioners with advanced education and experience advising federal agency project and program managers on NEPA compliance. The DHS Components and offices whose staff contributed to the update of the Directive and Instruction include:

• Sustainability and Environmental Programs (SEP), Office of the Chief Readiness Support Officer, Under Secretary for Management, DHS HQ

• Office of the General Counsel, DHS HQ

• Federal Emergency Management Agency (FEMA)

• United States Coast Guard (USCG)

• Customs and Border Protection (CBP)

• Transportation Security Administration (TSA)

• Immigration and Customs Enforcement (ICE)

• Federal Law Enforcement Training Center (FLETC)

• United States Secret Service (USSS)

• Science and Technology Directorate (S&T)

• National Protection and Programs Directorate (NPPD)

• United States Citizenship and Immigration Services (USCIS)

When originally published in 2006, the Directive and Instruction did not apply to the Components of FEMA, CBP, or USCG; these three Components each maintained their own procedures for implementing NEPA when the Department was established in 2002. This proposed revision to the Directive and Instruction incorporates FEMA, CBP, and USCG into the Department's NEPA procedures and addresses the full scope of DHS activities to which NEPA

applies. When the updated procedures are finalized and become effective, they will apply to all Components of DHS, including FEMA, CBP, and USCG. In addition, every Component will have the option of developing Supplemental Instructions to establish how that particular Component will meet the requirements of the final version of the DHS Directive and Instruction. In a separate yet related effort, FEMA will pursue rescission of its regulations at 44 CFR 10 and replace them with Supplemental Instructions that conform to requirements of the final version of the DHS Directive and Instruction.

As the Department has matured, the requirements of its Directives System have changed. The current DHS Directives System, effective as of August 2012, establishes standards for the length, format, and content of documents such as policies, delegations of authority, directives, instructions, manuals, handbooks, etc. The 2006 Directive and Instruction do not align to the requirements of the Department's current Directives System, and therefore revisions were necessary. For example, a directive must be used to establish policy as well as high-level roles and responsibilities, and cannot exceed five pages in length; an instruction accompanies a directive and provides detail on how to comply with the requirements of the directive, such as by establishing specific roles and responsibilities, processes, systems, and program management requirements. The revised Directive establishes the policy that DHS will comply with NEPA, and the revised Instruction establishes the procedures for ensuring this compliance is implemented in an effective and efficient manner.

The requirements put forth in the revised Directive and Instruction emphasize that the NEPA process must be appropriately integrated into the performance of DHS missions and activities and decision making. The Instruction covers the following: overview of NEPA requirements, including requirements for the preparation and content of NEPA documents; management of NEPA implementation in DHS; criteria for Components to obtain a delegation of authority to approve their respective NEPA reviews; public involvement; dispute resolution; information protected from public disclosure; procedures for emergencies; review of applications from persons or organizations outside of DHS (e.g., grant applications); and an identification of the types of DHS activities normally reviewed in a CATEX, Environmental

Assessment, or Environmental Impact Statement.

Revisions were also made to the Directive and Instruction to address the requirements of laws and Executive Orders since 2006, as well as to incorporate recent CEQ guidance memoranda. Readability, clarity, and organization of the content were improved to comply with the requirements of the Plain Writing Act of 2010. The revised Instruction incorporates CEQ guidance on mitigation and monitoring; establishing and applying CATEXs; emergencies; preparation of efficient and timely environmental reviews; and environmental collaboration and conflict resolution.

The CATEXs published in 2006 are being retained and are included in the revised Instruction (Appendix A, Table 1). In addition, the following new CATEXs are proposed: One CATEX for an administrative activity; five CATEXs for real property management activities; 13 CATEXs for non-grant activities unique to FEMA's mission and authorities; and 19 CATEXs for federal assistance (e.g., grant) activities. DHS followed the CEQ guidance memorandum on "Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act," dated November 23, 2010, in developing these new CATEXs. For synopses of the administrative record support for the Department's list of existing and proposed new CATEXs, see the docket and the DHS NEPA Web page at *http://www.dhs.gov/nepa*.

There are currently approximately 80 federal assistance programs in DHS (see the Catalogue of Federal Domestic Assistance (CFDA) at *https:// www.cfda.gov* for the list of programs). The majority of these programs are administered by FEMA. Applicants use federal assistance from DHS, such as grant funding, to implement a variety of emergency preparedness, response, and recovery and hazard mitigation activities and projects, ranging from classroom training and purchases of portable equipment to laboratory research to facility repair, renovation, and construction. Because these activities are federally-assisted, DHS, in coordination with the recipients of grants or other assistance, must ensure they are compliant with NEPA. DHS is proposing several CATEXs for its federal assistance activities because DHS has determined these activities would normally not have the potential to have an individually or cumulatively significant impact on the quality of the human environment. These CATEXs

will help ensure the timely and effective delivery of DHS assistance in an environmentally compliant fashion. These proposed new CATEXs are included in the Instruction in Appendix A, Table 1, Section N.

Several statutes, authorities, programs, and activities are unique to FEMA (i.e., not relevant to or undertaken by any other DHS component) and therefore additions to the list of CATEXs include several developed specifically for FEMA activities that would not normally have the potential to have individually or cumulatively significant impacts on the quality of the human environment. These include activities associated with the administration of the National Flood Insurance Program, and emergency and disaster response and recovery and hazard mitigation activities authorized by the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Public Law 93–288) as amended. These proposed new CATEXs are included in the Instruction in Appendix A, Table 1, Section M.

DHS invested over three years in developing the proposed revision to its NEPA procedures. The revised Directive and Instruction were provided to CEQ in the fall of 2013 for discussion prior to this publication for public comment. CEQ will remain engaged and be asked to issue a letter prior to publication of the final Directive and Instruction as required under 40 CFR 1507.3. The Directive and Instruction published here in the **Federal Register** are available for a 60-day public comment period. The comments received will be analyzed and any appropriate revisions will be made to the documents. The Directive and Instruction revised in response to public comments will be shared with CEQ prior to final adoption and implementation. A Notice of Final Directive and Instruction will be published in the **Federal Register** with a 120-day waiting period before the new NEPA procedures become effective. This notice will present the response to the public comments received on the proposed revised Directive and Instruction.

A copy of this **Federal Register** publication and the proposed Directive and Instruction and supporting documents are available on the internet at *www.regulations.gov* and *http:// www.dhs.gov/nepa*.

Dated: May 29, 2014.

**Teresa R. Pohlman,**

*Director of Sustainability and Environmental Programs.*

[FR Doc. 2014–13035 Filed 6–4–14; 8:45 am]

**BILLING CODE 9110–9B–P**

APPENDIX A

(3)     DHS will coordinate draft environmental impact analyses with appropriate federal, tribal, and state governments, as well as other interested parties.

(4)     Among the various Federal agencies that can be involved in an environmental planning effort, EPA has a special role.  Section 309 of the Clean Air Act provides the EPA Administrator with authority to, among other things, review and comment in writing on the environmental impact of any matter relating to the environment contained in any authorized federal projects for construction and any major federal agency action for which NEPA applies.  At a minimum, DHS Proponents must ensure that their EISs are appropriately coordinated with the EPA.

(5)     Proponents will make special effort to coordinate with affected tribes.  In particular, Executive Order 13175, entitled "Consultation and Coordination with Indian Tribal Governments" directs all federal departments to, among other things, "strengthen the United States government-to-government relationships with Indian tribes and establish regular and meaningful consultation and collaboration with tribal officials in the development of Federal policies that have tribal implications…"

(6)     Obtaining the views of the surrounding community and other interested parties during planning and decision making processes helps proponents to focus the analysis to issues that are important to the public or the decision making at hand and set the boundaries of the environmental evaluation.  Public involvement is a process that starts early and continues throughout the planning and early stages of conducting a NEPA analysis.

(7)     Scoping (40 CFR 1501.7) is a term for the process of coordination with other government agencies, tribes, states, and the general public that is required for EISs.  DHS strongly encourages the use of a process like scoping for EAs.

C.     **Lead Agencies (40 CFR 1501.5)**

The lead agency in an environmental planning process has the responsibility to define the scope and substance of the environmental planning effort.

(1)     DHS will be the lead agency when a proposed action is clearly within the province of DHS authority.  Likewise, an Under Secretary or designated DHS Official will seek to form a joint-lead relationship, when another agency has initiated an action within the province of DHS authority or has a significant responsibility regarding the action.

APPENDIX A

3.      **Categorical Exclusions (40 CFR 1507.3(b) (2) (ii))**

      A.      **Purpose**

            (1)      CEQ regulations (40 CFR 1508.4) provide for federal agencies to establish categories of actions that based on experience do not individually or cumulatively have a significant impact on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS).  These CATEXs allow DHS Components to avoid unnecessary efforts and paperwork and concentrate their resources on those proposed actions having real potential for environmental concerns.

            (2)      Components may otherwise decide to prepare environmental assessments for the reasons stated in CEQ regulations (1508.9) even though it is not required to do so.

            (3)      All requests to establish, substantively revise or delete CATEXs (together with justification) will be forwarded through the Component to the DOSEP for approval.  Upon DOSEP approval, proposals to delete, modify, or establish new CATEXs will be subject to both CEQ review and public comment before they will be available for use.

      B.      **Conditions and Extraordinary Circumstances (40 CFR 1508.4)**

For an action to be categorically excluded, DHS Components, working with the EPPM, must satisfy each of the three conditions described below.  If the proposed action does not meet these conditions, is not exempted by a statute or subject to emergency provisions for alternative compliance with NEPA, an EA or an EIS must be prepared before the action may proceed.  Where it may not be clear whether a proposed action will meet these conditions, the Proponent must ensure that the administrative record reflects consideration of these conditions. Certain CATEX require documentation of the consideration of these conditions in the form of a Record of Environmental Consideration.  A Component should not use a CATEX for an action with significant impacts, regardless of whether the impacts are beneficial or adverse.

            (1)      **Clearly Fits the Category**.  The entire action clearly fits within one or more of the categories of excludable actions listed in Section 3C.

Directive # 023-01
Revision # 00
DIR00199



# International Association of Fire Chiefs

*Providing leadership for the fire and emergency services since 1873*

4025 Fair Ridge Drive • Fairfax, VA 22033 • Tel: 703.273.0911 • Fax: 703.273.9363 • www.iafc.org

August 4, 2014

Laura Schick
Environmental Specialist
Sustainability and Environmental Programs
Office of the Chief Readiness Support Office
Management Directorate
U.S. Department of Homeland Security
245 Murray Lane, SW, Mailstop 0075
Washington, DC 20528-0075

RE: Draft National Environmental Policy Act Implementing Procedures (Docket Number DHS-2013-0052)

Dear Ms. Schick:

On behalf of the nearly 10,000 members of the International Association of Fire Chiefs (IAFC), I express our support for the U.S. Department of Homeland Security's (DHS) plan to extend a categorical exclusion (CATEX) to the National Environmental Policy Act (NEPA, 42 U.S.C. § 4321 et seq.) for the use of federal assistance for wildland fire mitigation. While we support the establishment of this CATEX, we also recommend that the DHS remove the 100-foot limit for the creation of defensible space around the structure.

The growth of wildland fires is an emerging problem for communities across the nation. In 2013, there were more than 47,500 wildland fires, which burned more than 4.3 million acres of land. The fires took place in all fifty states. The Federal Emergency Management Agency's (FEMA) Pre-Disaster Mitigation (PDM) program provides funds to mitigate the risks of wildland fires by supporting projects to create fire-safe communities.

The National Cohesive Wildland Fire Management Strategy highlights the importance of using the PDM program to maximize fuels reduction across the landscape with an emphasis on private lands. Currently, less than 1% of PDM funds are used for wildland fire mitigation. The National Cohesive Wildland Fire Management Strategy identifies enhanced use of the PDM program for fuels reduction as a "critical success factor."[1] The slow and cumbersome process that FEMA currently uses to comply with the NEPA serves as a barrier to the use of PDM funds. To encourage enhanced use of the PDM program for wildland fire mitigation, the IAFC supports the creation of a CATEX for federal assistance for wildfire hazard mitigation.

The IAFC has concerns about the plan to limit the exemption to "the creation of defensible space by the removal or reduction of flammable vegetation around existing structures for up to 100 feet of the

---

[1] "The National Cohesive Wildland Fire Management Strategy and Risk Analysis – Phase III Report," p. 19.

DIR00270

structure."[2] Current wildland fire mitigation guidelines, including those advocated by the IAFC's Ready, Set, Go! program, recommend that a three-zone defensible space system be used which covers an area from 0 to 200 feet or the residential property line from the structure.[3] The 100-foot limit in the CATEX does not comply with the current policy for defensible space and could put some communities at risk. Because of this problem, the IAFC recommends that DHS remove the 100-foot limit, so that any removal or reduction of hazardous fuels is covered by the CATEX.

Thank you for your consideration of our comments. The IAFC believes that the creation of this CATEX for wildland fire hazard mitigation will open up an important source of federal funding for the creation of fire-safe communities. In order to ensure the most effective use of these funds, the IAFC recommends that the 100-foot limit on the creation of defensible space be removed.

Sincerely,

Chief William R. Metcalf, EFO, CFO, FIFireE
President and Chairman of the Board

:kl

---

[2] CATEX N11, "Instruction Manual on Implementation of the National Environmental Policy Act (NEPA)," p. A-25.
[3] http://www.firewise.org/~/media/Firewise/Files/Pdfs/Toolkit/FW_TK_Principles.pdf

DIR00271



THE STATE OF ARIZONA
# GAME AND FISH DEPARTMENT

5000 W. CAREFREE HIGHWAY
PHOENIX, AZ 85086-5000
(602) 942-3000 • WWW.AZGFD.GOV

**GOVERNOR**
JANICE K. BREWER

**COMMISSIONERS**
CHAIRMAN, J.W. HARRIS, TUCSON
ROBERT E. MANSELL, WINSLOW
KURT R. DAVIS, PHOENIX
EDWARD "PAT" MADDEN, FLAGSTAFF
JAMES R. AMMONS, YUMA

**DIRECTOR**
LARRY D. VOYLES

**DEPUTY DIRECTOR**
TY E. GRAY



August 7, 2014

Sustainability and Environmental Programs
Office of the Chief Readiness Support Officer, Management Directorate
Department of Homeland Security
245 Murray Lane SW., Mail Stop 0075
Washington, DC 20528-0075
Attn: Laura Shick, Environmental Protection Specialist

Email: SEP-EPHP@hq.dhs.gov

RE: DHS NEPA Procedures

Dear Ms. Shick:

The Arizona Game and Fish Department (Department) appreciates the opportunity to provide comments on the Notice of Proposed Revisions to National Environmental Policy Act Implementing Procedures and Request for Comments regarding Department of Homeland Security (DHS) draft Directive 023-01, Rev. 01 and draft Instruction Manual 023-01-001-01, Rev. 01, Implementation of the National Environmental Policy Act (herein after referred to as Directive and Instruction).

Under Title 17 of the Arizona Revised Statutes, the Department, by and through the Arizona Game and Fish Commission, has jurisdictional authority for management of the state's wildlife resources, as well as safe watercraft and off highway vehicle recreation, for the enjoyment, appreciation, and use by present and future generations. These activities and our management authorities have the potential to be affected by the proposed Directive and Instruction. We provide the following comments and concerns for your consideration and incorporation.

The Federal Register notice was inadequate as a means of communicating this directive to the public and stakeholders. The hyperlink and availability of the actual directive language should have been clearly identified and easily accessible.

The Department is concerned with New Categorical Exclusion **N8** *'Federal Assistance for New Construction Activities of Less Than One Acre in <u>Undisturbed or Undeveloped Areas.</u>* As written, N8 has the potential to impact wildlife resources in undisturbed/undeveloped areas without appropriate direct or cumulative impact analysis of construction activities. Construction activities within an acre of undisturbed or undeveloped areas have the potential to result in direct take of wildlife, habitat fragmentation, and reduced landscape wildlife permeability.

The Department requests including clarifying language that ensures cumulative impacts for state trust wildlife resources are identified for all related actions, and that reasonable mitigation measures are implemented.  The Department requests the inclusion of Best Management Practices (BMPs) into 'New Categorical Exclusion **N8**' that reduce impacts to wildlife including timing restrictions, trenching guidelines, fencing guidelines, etc.

The Draft Instruction Manual's definition of 'cooperating agency' is misleading and suggests cooperating agency status is limited to Federal agencies (pg. II - 1).  The Department requests including the full and accurate 40 C.F.R. §1508.5 by adding: *'The selection and responsibilities of a cooperating agency are described in §1501.6.  A state or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency'*.

As an affected stakeholder with jurisdictional authority and statutory responsibilities for Arizona's wildlife, the Department requests continued collaboration with DHS in the development and implementation of the Directive and Instruction.  Please feel free to contact me with any questions regarding this letter at jfrancis@azgfd.gov or 623-236-7605.

Sincerely,

Joyce M. Francis
Habitat Branch Chief

JMF:lc

| | |
|---|---|
| **From:** | jean public <jeanpublic1@gmail.com> |
| **Sent:** | Saturday, June 21, 2014 10:00 AM |
| **To:** | SEP-EPHP; americanvoices; vicepresident@whitehouse.gov; INFO@judicialwatch.org; INFO; media; info@foxnews.com; INFO@dailynews.com; LETTERS@NYTIMES.COM |
| **Subject:** | Re: GOVT OUT TO BLAST NEPA OUT OF EXISTENCE |

PUBLIC COMMENT ON FEDERAL REGISTER

THIS NOTICE TO THE PUBLIC IS COMPLETELY INCOMPREHENSIBLE. IT REFERS YOU TO A DOCUMENT WHICH IS COMPLETELY UNREADABLE UNDER THE PLAIN ENGLISH LAW. IT REFERS TO VARIOUS OTHER DOCUMENTS NONE OF WHICH ARE AVAILABEL TO AMERICAN CITIZENS. THIS PROPOSAL NEEDS TO BE REWRITTEN UNTIL IT IS CLEAR EXACTLY WHAT IS BEING CHANGED. WHAT IS GOING ON HERE IS UNAMERICAN COMPLETELY. I CAN UNDERSTAND ENGLISH. THIS PROPOSAL IS WRITTEN IN GOVERNMENTALESE WHERE YOU HAV TO HAVE 50 DOCUMENTS TO UNDERSTAND THE CHANGES. THAT IS NOT RIGHT TO DO THAT TO THE PEOPLE.

THIS COMMENT IS FOR THE PUBLIC RECORD. PLEASE RECEIPT. JEAN PUBLIC AND PLEASE REWRITE. WITH THOSE DOCUMENTS AFFECTING THIS CHANGE AVAILABEL TO THEPUBLIC. PRESENTLY THEY ARE NOT AVAILABLE AT ALL.
PLEASE SEND ME A PAPER COPY OF ALL THE VARIOIUS DOCUMENTS THAT ARE INVOLVED HERE. JEAN PUBLIC 2 GLENWAY DRIVE FLEMINGTON NJ 08822


On Tue, Jun 10, 2014 at 9:25 AM, jean public <jeanpublic1@gmail.com> wrote:
  [Federal Register Volume 79, Number 108 (Thursday, June 5, 2014)]
  [Notices]
  [Pages 32563-32564]
  From the Federal Register Online via the Government Printing Office [www.gpo.gov]
  [FR Doc No: 2014-13035]


  =====================================================================
  -----------------------------------------------------------------------

  DEPARTMENT OF HOMELAND SECURITY

  [Docket Number DHS-2013-0052]


  National Environmental Policy Act Implementing Procedures

  AGENCY: Department of Homeland Security.

  ACTION: Notice of Proposed Revisions to National Environmental Policy
  Act implementing procedures and request for comments.

DIR00274

-----------------------------------------------------------------------

SUMMARY: The purpose of this notice is to provide an opportunity for public comment on the Department of Homeland Security (DHS or Department) draft Directive 023-01, Rev. 01 and draft Instruction Manual 023-01-001-01, Rev. 01, Implementation of the National Environmental Policy Act (herein after referred to as Directive and Instruction). Together, the Directive and Instruction serve as the Department's procedures for implementing the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 et seq.), as amended, and the Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR Parts 1500-1508). Pursuant to the CEQ regulations, DHS is soliciting comments on its proposed internal Directive and Instruction from members of the interested public.

DATES: Comments and related material must be received on or before (or, if mailed, postmarked on or before) August 4, 2014 to ensure consideration. Late comments may be considered to the extent practicable.

ADDRESSES: Relevant documents are posted at http://www.regulations.gov (Docket ID: DHS-2013-0052) and www.dhs.gov/nepa. These documents include: this notice, the proposed Directive and Instruction, and a synopsis of the Department's administrative record for several proposed new NEPA categorical exclusions (CATEXs).
    You may submit comments, identified by ``DHS NEPA Procedures,'' by one of the following methods:
    (1) Federal eRulemaking Portal: http://www.regulations.gov. Follow the online instructions for submitting comments electronically via docket number DHS-2013-0052.
    (2) Mail: Sustainability and Environmental Programs, Office of the Chief Readiness Support Officer, Management Directorate, Department of Homeland Security, 245 Murray Lane SW., Mail Stop 0075, Washington, DC 20528-0075.
    (3) Email: SEP-EPHP@hq.dhs.gov.
    In choosing among these means of providing comments, please give due regard to the security screening difficulties and delays associated with delivery of mail to federal agencies in Washington, DC, through the U.S. Postal Service.
    All comments received, including any personal information provided, will become a part of the public record for the Department's NEPA procedures and may be posted without change on the internet at http://www.regulations.gov and http://www.dhs.gov/nepa.

FOR FURTHER INFORMATION CONTACT: Laura Shick, Environmental Protection Specialist, Department of Homeland Security, 202-603-3517, or laura.shick@hq.dhs.gov.

SUPPLEMENTARY INFORMATION: The Department of Homeland Security (DHS or Department) encourages interested persons to submit written data, views, or comments. Persons submitting comments should include their

2

name, address, and other appropriate contact information. You may submit your comments and material by one of the means listed under ADDRESSES. If you submit them by mail or hand delivery, submit them in an unbound format, no larger than 8\1/2\ by 11 inches, suitable for copying and electronic filing. If you submit them by mail and would like to know that they were received, please enclose a stamped, self-addressed postcard or envelope. DHS will consider all comments received during the comment period.

The Directive and Instruction establish the policy and procedures DHS follows to comply with NEPA (42 U.S.C. 4321 et seq.) and the CEQ regulations (40 CFR Parts 1500-1508). Together, the Directive and Instruction apply to all of DHS, which is currently comprised of over 20 support and operational components, and help ensure the integration of environmental stewardship into DHS decision making as required by NEPA. The Directive and Instruction serve as the DHS implementing procedures for NEPA and the CEQ regulations (as required by 40 CFR 1505.1 and 1507.3) and therefore must be read in conjunction with the CEQ regulations.

The Directive and Instruction have been substantially revised to address a number of circumstances and requirements that have arisen since April 19, 2006, the effective date of the original DHS procedures (Federal Register, Vol. 71, No. 64, April 4, 2006). Revision of the Directive and Instruction, including additions to the Department's list of NEPA categorical exclusions (CATEXs), was a collaborative effort on the part of numerous DHS environmental and legal professionals from across the Department. These professionals are NEPA practitioners and environmental protection specialists with numerous years of federal NEPA experience, including experience in implementing the 2006 DHS NEPA procedures or Component-specific procedures, and legal practitioners with advanced education and experience advising federal agency project and program managers on NEPA compliance. The DHS Components and offices whose staff contributed to the update of the Directive and Instruction include:

Sustainability and Environmental Programs (SEP), Office of the Chief Readiness Support Officer, Under Secretary for Management, DHS HQ Office of the General Counsel, DHS HQ Federal Emergency Management Agency (FEMA) United States Coast Guard (USCG) Customs and Border Protection (CBP) Transportation Security Administration (TSA) Immigration and Customs Enforcement (ICE) Federal Law Enforcement Training Center (FLETC) United States Secret Service (USSS) Science and Technology Directorate (S&T) National Protection and Programs Directorate (NPPD) United States Citizenship and Immigration Services (USCIS) When originally published in 2006, the Directive and Instruction did not apply to the Components of FEMA, CBP, or USCG; these three Components each maintained their own procedures for implementing NEPA when the Department was established in 2002. This proposed revision to the Directive and Instruction incorporates FEMA, CBP, and USCG into the Department's NEPA procedures and addresses the full scope of DHS activities to which NEPA [[Page 32564]] applies. When the updated procedures are finalized and become effective, they will apply to all Components of DHS, including FEMA, CBP, and USCG. In addition, every Component will have the option of developing Supplemental Instructions to establish how that particular Component will meet the requirements of the final version of the DHS Directive and Instruction. In a separate yet related effort, FEMA will pursue rescission of its regulations at 44 CFR 10 and replace them with Supplemental Instructions that conform to requirements of the final version of the DHS Directive and Instruction. As the Department has matured, the requirements of its Directives System have changed. The current DHS Directives System, effective as of August 2012, establishes standards for the

length, format, and content of documents such as policies, delegations of authority, directives, instructions, manuals, handbooks, etc. The 2006 Directive and Instruction do not align to the requirements of the Department's current Directives System, and therefore revisions were necessary. For example, a directive must be used to establish policy as well as high- level roles and responsibilities, and cannot exceed five pages in length; an instruction accompanies a directive and provides detail on how to comply with the requirements of the directive, such as by establishing specific roles and responsibilities, processes, systems, and program management requirements. The revised Directive establishes the policy that DHS will comply with NEPA, and the revised Instruction establishes the procedures for ensuring this compliance is implemented in an effective and efficient manner. The requirements put forth in the revised Directive and Instruction emphasize that the NEPA process must be appropriately integrated into the performance of DHS missions and activities and decision making. The Instruction covers the following: overview of NEPA requirements, including requirements for the preparation and content of NEPA documents; management of NEPA implementation in DHS; criteria for Components to obtain a delegation of authority to approve their respective NEPA reviews; public involvement; dispute resolution; information protected from public disclosure; procedures for emergencies; review of applications from persons or organizations outside of DHS (e.g., grant applications); and an identification of the types of DHS activities normally reviewed in a CATEX, Environmental Assessment, or Environmental Impact Statement. Revisions were also made to the Directive and Instruction to address the requirements of laws and Executive Orders since 2006, as well as to incorporate recent CEQ guidance memoranda. Readability, clarity, and organization of the content were improved to comply with the requirements of the Plain Writing Act of 2010. The revised Instruction incorporates CEQ guidance on mitigation and monitoring; establishing and applying CATEXs; emergencies; preparation of efficient and timely environmental reviews; and environmental collaboration and conflict resolution. The CATEXs published in 2006 are being retained and are included in the revised Instruction (Appendix A, Table 1). In addition, the following new CATEXs are proposed: One CATEX for an administrative activity; five CATEXs for real property management activities; 13 CATEXs for non-grant activities unique to FEMA's mission and authorities; and 19 CATEXs for federal assistance (e.g., grant) activities. DHS followed the CEQ guidance memorandum on ``Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act,'' dated November 23, 2010, in developing these new CATEXs. For synopses of the administrative record support for the Department's list of existing and proposed new CATEXs, see the docket and the DHS NEPA Web page at http://www.dhs.gov/nepa. There are currently approximately 80 federal assistance programs in DHS (see the Catalogue of Federal Domestic Assistance (CFDA) at https://www.cfda.gov for the list of programs). The majority of these programs are administered by FEMA. Applicants use federal assistance from DHS, such as grant funding, to implement a variety of emergency preparedness, response, and recovery and hazard mitigation activities and projects, ranging from classroom training and purchases of portable equipment to laboratory research to facility repair, renovation, and construction. Because these activities are federally-assisted, DHS, in coordination with the recipients of grants or other assistance, must ensure they are compliant with NEPA. DHS is proposing several CATEXs for its federal assistance activities because DHS has determined these activities would normally not have the potential to have an individually or cumulatively significant impact on the quality of the human environment. These CATEXs will help ensure the timely and effective delivery of DHS assistance in an environmentally compliant fashion. These proposed new CATEXs are included in the Instruction in Appendix A, Table 1, Section N. Several statutes, authorities, programs, and activities are unique to FEMA (i.e., not relevant to or undertaken by any other DHS component) and therefore additions to the list of CATEXs include several developed specifically for FEMA activities that would not normally have the potential to have individually or cumulatively significant impacts on the quality of the human environment. These include activities associated with the administration of the National Flood Insurance Program, and emergency and disaster response and recovery and hazard mitigation activities authorized by the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Public Law 93- 288) as amended. These proposed new CATEXs are included in the Instruction in Appendix A, Table 1, Section M. DHS invested over three years in developing the proposed revision to its NEPA procedures. The revised Directive and Instruction were provided to CEQ in the fall of 2013 for discussion prior to this publication for public comment. CEQ will remain engaged and be asked to

DIR00277

issue a letter prior to publication of the final Directive and Instruction as required under 40 CFR 1507.3. The Directive and Instruction published here in the Federal Register are available for a 60-day public comment period. The comments received will be analyzed and any appropriate revisions will be made to the documents. The Directive and Instruction revised in response to public comments will be shared with CEQ prior to final adoption and implementation. A Notice of Final Directive and Instruction will be published in the Federal Register with a 120-day waiting period before the new NEPA procedures become effective. This notice will present the response to the public comments received on the proposed revised Directive and Instruction. A copy of this Federal Register publication and the proposed Directive and Instruction and supporting documents are available on the internet at www.regulations.gov and http://www.dhs.gov/nepa. Dated: May 29, 2014. Teresa R. Pohlman, Director of Sustainability and Environmental Programs. [FR Doc. 2014-13035 Filed 6-4-14; 8:45 am] BILLING CODE 9110-9B-P

DIR00278

**From:** jean public <jeanpublic1@gmail.com>
**Sent:** Wednesday, November 26, 2014 3:27 PM
**To:** Ecton, A. Marie <A.Marie.Ecton@hq.dhs.gov>; americanvoices <americanvoices@mail.house.gov>; vicepresident@whitehouse.gov; The Pew Charitable Trusts <INFO@PEWTRUSTS.ORG>
**Cc:** info <info@defenders.org>; info <info@earthjustice.org>
**Subject:** Re: ENVIRONMENTAL DEGRADATION UNDER SPURIOUS NOTICE TO THE PUBLIC

PUBLIC COMMENT ON FEDERAL REEGISTER

I AGAIN SAY THAT THE PUBLIC CANNOT UNDERSTAND THIS VERY VERY COMPLICATED GOVERNMENTALESE CATCH 22 LANGUAGE USED IN THESE CHANGES. THEY ARE NOT CLEARLY WRITTEN IN THE ENGLISH LANGUAGE AT ALL.

I ALSO BELIEVE THAT ONE ACRES PLOTS OF DEVELOPED LAND SEVERELY IMPACT ON ALL WILDLIFE HABITAT. PLEASE DONT PUT ACROSS THAT LIE. THIS COMMENT IS FOR THE PUBLIC RECORD. PLEASE RECEIPT. JEAN PUBLIC JEANPUBLIC1@YAHOO.COM

THE PUBLIC IS SEVERELY HARMED BY THE NOT UNDERSTANDABLE WAY THIS DOCUMENT IS WRITTEN. IT IS NOT CLEARLY WRITTEN AT ALL. BUT IS GOVT GOBBLEDYGOOK.

On Wed, Nov 26, 2014 at 10:50 AM, Jean Public <jeanpublic1@yahoo.com> wrote:

```
[Federal Register Volume 79, Number 228 (Wednesday, November 26, 2014)]
[Notices]
[Pages 70538-70540]
From the Federal Register Online via the Government Printing Office
[www.gpo.gov]
[FR Doc No: 2014-27966]


=====================================================================
---------------------------------------------------------------------

DEPARTMENT OF HOMELAND SECURITY

[Docket Number DHS-2013-0052]


Environmental Planning and Historic Preservation Program

AGENCY: Department of Homeland Security.

ACTION: Notice of Final National Environmental Policy Act Implementing
Procedures.

---------------------------------------------------------------------
```

SUMMARY: The purpose of this notice is to inform the public that the Department of Homeland Security (DHS or the Department) is issuing the final update to its policy and procedures for implementing the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 et seq.), as amended, and the Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR parts 1500-1508). The Department's NEPA procedures are contained in Directive 023-01, Rev. 01 and Instruction Manual 023-01-001-01, Rev. 01, Implementation of the National Environmental Policy Act (herein after referred to as Directive and Instruction). This notice also responds to the comments received on the Department's draft updated procedures published on June 5, 2014 (79 FR 32563).

DATES: The Directive and Instruction will be effective on March 26, 2015.

FOR FURTHER INFORMATION CONTACT: A. Marie Ecton, Senior Environmental Specialist, Department of Homeland Security, Telephone (202) 360-5661, or Email a.marie.ecton@hq.dhs.gov.

SUPPLEMENTARY INFORMATION: Once effective, the Directive and Instruction will apply to all of DHS, which is currently comprised of over 20 support and operational components, and help ensure the integration of environmental stewardship into DHS decision making as required by NEPA. The Directive and Instruction will serve as the DHS implementing procedures for NEPA and the CEQ regulations (as required by 40 CFR 1505.1 and 1507.3) and therefore must be read in conjunction with the CEQ regulations.

The Directive and Instruction were substantially revised to address a number of circumstances and requirements that have arisen since April 19, 2006, the effective date of the original DHS NEPA procedures (Federal Register, Vol. 71, No. 64, April 4, 2006). For example, when originally published in 2006 the Directive and Instruction did not apply to the following three Components of DHS: Federal Emergency Management Agency (FEMA), Customs and Border Protection (CBP), and United States Coast Guard (USCG); these three Components each maintained their own procedures for implementing NEPA when the Department was established in 2002. This revision to the Directive and Instruction incorporates FEMA, CBP, and USCG into the Department's NEPA procedures and addresses the full scope of DHS activities to which NEPA applies. When the updated procedures become effective, they will apply to all Components of DHS, including FEMA, CBP, and USCG. In addition, every Component will have the option of developing Supplemental Instructions to establish how that particular Component will meet the requirements of the final version of the DHS Directive and Instruction. In a separate yet related effort, FEMA will pursue rescission of its regulations at 44 CFR 10 and replace them with Supplemental Instructions that conform to requirements of the DHS Directive and Instruction.

The requirements put forth in the revised Directive and Instruction emphasize that the NEPA process must be appropriately integrated into the performance of DHS missions and activities and decision making. The revised Directive establishes the overall policy that DHS will comply with NEPA, and the revised Instruction establishes the procedures for ensuring this compliance is implemented in an effective and efficient manner. The Instruction covers the following: Overview of NEPA requirements, including requirements for the preparation and content of

NEPA documents; management of NEPA implementation in DHS; criteria for
Components to obtain a delegation of authority to approve their
respective NEPA reviews; public involvement; dispute resolution;
information protected from public disclosure; procedures for
emergencies; review of applications from persons or organizations
outside of DHS (e.g., grant applications); and an identification of the
types of DHS activities normally reviewed in a CATEX, Environmental

[[Page 70539]]

Assessment, or Environmental Impact Statement.
    The CATEXs published in 2006 are being retained and are included in
the Instruction (Appendix A, Table 1). In addition, the Instruction
includes the following new CATEXs: One CATEX for an administrative
activity; five CATEXs for real property management activities; 13
CATEXs for non-grant activities unique to FEMA's mission and
authorities; and 19 CATEXs for federal assistance (e.g., grant)
activities. For synopses of the administrative record support for the
Department's list of 2006 and new CATEXs, see the docket and the DHS
NEPA Web page at http://www.dhs.gov/nepa.
    DHS invested over three years in developing the proposed revision
to its NEPA procedures. The draft revised Directive and Instruction
were provided to CEQ in the fall of 2013 for review and discussion
prior to the June 5, 2014 publication for public comment. DHS provided
its proposed final revised Directive and Instruction to CEQ in early
September 2014; CEQ responded with a letter dated November 10, 2014
prior to this publication of the final Directive and Instruction as
required under 40 CFR 1507.3(a), indicating that the Department's
revised procedures conform to NEPA and the CEQ regulations.
    Comments on Categorical Exclusions and DHS Response:
    DHS received a comment from the International Association of Fire
Chiefs (IACF) regarding the proposed new CATEX for federally-assisted
wildfire mitigation activities. To improve readability (but with no
change to the scope), DHS revised the CATEX between the draft and final
version to read as follows:
    *N11 Federal Assistance for Wildfire Hazard Mitigation Actions.
Federal assistance for wildfire hazard mitigation actions involving the
creation of defensible space or hazardous fuel reduction for up to 100
feet of at-risk structures which includes the selective removal of
vegetation less than 12 inches in diameter through thinning, pruning,
limbing, sawing, or brush cutting; removal of downed, dead, or dry
vegetation material as part of the overall action.
    The actions must be limited to less than 100 acres of vegetation
removal either individually or when combined with other reasonably
foreseeable private or public actions and follow appropriate best
management practices.
    Although IACF was supportive of the draft proposed CATEX, they
recommended removal of the 100-foot limit on the creation of defensible
space. DHS supports the mission and respects the perspective of IACF;
however, for the time being DHS has decided to retain the proposed
wording of the CATEX. DHS relied on only a small number of FEMA
Environmental Assessments (EAs) to support development of the new
CATEX, and none of those EAs included a buffer greater than 100 feet.
Without sufficient information from past DHS-funded wildfire mitigation
projects that demonstrates that a larger buffer results in no potential
for environmental impacts, DHS currently believes that a higher level
of NEPA review and impact evaluation is necessary for actions involving

DIR00281

more than 100 acres of vegetation removal.

If, as a result of additional DHS reviews of wildfire mitigation projects, DHS is able to document and determine that the buffer can reasonably be extended because there are few to no environmental impacts associated with larger scale clearing for wildfire mitigation purposes, then DHS will consider revising the CATEX. In addition, DHS will work with subject matter experts, including IACF, to obtain other data that may support future revisions to the CATEX.

Lastly, it is important to note that if proposed vegetation clearing for wildfire mitigation purposes is greater than 100 feet from a structure, DHS can still provide grant funding for the project once the appropriate level of environmental review has been conducted.

DHS received two comments from the State of Arizona Game and Fish Department (AZGFD) regarding the following proposed CATEX for federally-assisted new construction activities:

*N8 Federal Assistance for New Construction Activities of Less Than One Acre in Undisturbed or Undeveloped Areas. Federal assistance for new construction and associated site preparation activities in undisturbed or undeveloped areas when the activities comprise less than one acre and follow best management practices to control noise, water, and air pollution. This category does not apply to new construction in undisturbed or undeveloped floodplains, wetlands, or seaward of the limit of moderate wave action (or V zone when the limit of moderate wave action has not been identified). This CATEX covers the range of activities typically necessary for new construction, including field work (e.g.orings, site inspection) and temporary staging and use of construction equipment and vehicles.

AZGFD's first comment was that the draft proposed CATEX as written ``has the potential to impact wildlife resources in undisturbed/ undeveloped areas without appropriate direct or cumulative impact analysis of construction activities. Construction activities within an acre of undisturbed or undeveloped areas have the potential to result in direct take of wildlife, habitat fragmentation, and reduced landscape wildlife permeability.'' AZGFD's second comment was a request that DHS include ``clarifying language that ensures cumulative impacts for state trust wildlife resources are identified for all related actions, and that reasonable mitigation measures are implemented'' and include ``Best Management Practices (BMPs) . . . that reduce impacts to wildlife including timing restrictions, trenching guidelines, fencing guidelines, etc.''

In response to AZGFD's comments on new CATEX N8, DHS added the following sentence to Section V.B(2) of the Instruction, which discusses how to appropriately apply CATEXs to proposed actions: ``Application of a CATEX to a proposed action presumes review and compliance under other relevant environmental planning and historic preservation laws, regulations, and Executive Orders (e.g., National Historic Preservation Act, Endangered Species Act) has occurred, and that a higher level of NEPA analysis is not warranted as a result of any identified impacts to resources protected under those other requirements.'' In addition, DHS believes it has enough data from past actions to justify that no significant cumulative impacts result from the clearing of plots less than one acre each. If DHS were to provide federal assistance for the clearing of multiple one acre plots in close proximity to each other, this situation would constitute an extraordinary circumstance that would prohibit use of the CATEX and would require a higher level of NEPA analysis. The list of DHS extraordinary circumstances is provided in Section V.B(2)(c) of the

DIR00282

Instruction; these include a consideration of impacts to protected
species and habitat and environmentally sensitive areas, and a
consideration of whether the proposed action is related to other
actions with individually insignificant, but cumulatively significant
impacts. As to cumulative impacts on habitat and species, these will
get covered in the ESA consultation process; notwithstanding the new
CATEX N8, DHS will consult with the U.S. Fish and Wildlife Service and
relevant state agencies, such as AZGFD, for proposed

[[Page 70540]]

actions potentially affecting protected species and habitat.

    AZGFD also commented that the definition of Cooperating Agency
included in Section II of the draft Instruction was not fully
consistent with the CEQ definition in 40 CFR 1508.5. DHS agrees with
AZGFD, and has revised the definition accordingly in the final
Instruction.

    DHS received questions regarding the need for CATEXs for
Congressionally-mandated activities (existing USCG CATEXs L18 and L53,
and new DHS-wide CATEX C6), to which NEPA does not apply. When Congress
mandates an activity, such as the transfer of DHS controlled real
property to a non-Federal entity, DHS has no discretion whether or not
to perform the activity; however, DHS may have discretion on some
aspects of how the activity is executed. Therefore, DHS NEPA
practitioners expressed the need for such CATEXs where DHS has some
level of discretion and the activities have been determined not to have
the potential for significant environmental impacts.

    Lastly, DHS received three comments regarding the accessibility and
readability of the draft revised Directive and Instruction and
supporting documents; namely that the Federal Register notice was
inadequate as a means of communicating with stakeholders and the
public, that hyperlinks to the documents should have been clearly
identified and easily accessible, and that the documents were difficult
to comprehend. The Federal Register and www.regulations.gov are widely
recognized as appropriate sources for the public to learn about and
comment on Federal government initiatives. DHS wrote the documents
according to style guides and writing standards applicable to the
federal government as well as DHS-specific requirements of its formal
Directives system. All relevant documents were and remain available to
the public on the Department's NEPA Web page (www.dhs.gov/nepa) and on
the www.regulations.gov Web site under Docket Number DHS-2013-0052. The
June 5, 2014 Federal Register notice provided clear instructions to
readers to visit these two Web sites to view the draft revised
Directive and Instruction and supporting documents.

    A copy of this Federal Register publication and the final Directive
and Instruction and supporting documents are available on the internet
at www.regulations.gov (Docket Number DHS-2013-0052) and
http://www.dhs.gov/nepa.

Teresa R. Pohlman,
Director of Sustainability and Environmental Programs.
[FR Doc. 2014-27966 Filed 11-25-14; 8:45 am]
BILLING CODE 9110-9B-P

DIR00283

**From:** jean public <jeanpublic1@gmail.com>
**Sent:** Monday, October 23, 2017 3:39 PM
**To:** SEP-EPHP <sep-ephp@hq.dhs.gov>
**Subject:** Re: Returned mail: see transcript for details


On Thu, Oct 19, 2017 at 5:10 PM, postmaster <postmaster@epa.gov> wrote:
The original message was received at Thu, 19 Oct 2017 21:09:13 GMT
from:
<jeanpublic1@gmail.com>

   ----- The following addresses had permanent fatal errors -----
<jennifer.hass@epa.gov>
   (reason: 550 5.1.1 <jennifer.hass@epa.gov>: Recipient address rejected: User unknown in
relay recipient table)

   ----- Transcript of session follows -----
... while talking to epa.gov.:
>>> DATA
<<< 550 5.1.1 <jennifer.hass@epa.gov>: Recipient address rejected: User unknown in relay
recipient table
550 5.1.1 <jennifer.hass@epa.gov>: Recipient address rejected: User unknown in relay recipient
table
<<< 554 5.5.1 Error: no valid recipients

Final-Recipient: RFC822; jennifer.hass@epa.gov
Action: failed
Status: 5.1.1
Remote-MTA: DNS; epa.gov
Diagnostic-Code: SMTP; 550 5.1.1 <jennifer.hass@epa.gov>: Recipient address rejected: User
unknown in relay recipient table
Last-Attempt-Date: Thu, 19 Oct 2017 21:10:14 GMT


---------- Forwarded message ----------
From: jean public <jeanpublic1@gmail.com>
To: jennifer.hass@epa.gov, americanvoices@mail.house.gov, contact@thedodo.com, SCOOP
<scoop@huffingtonpost.com>
Cc:
Bcc:
Date: Thu, 19 Oct 2017 17:09:12 -0400
Subject: Re: obama revised nepa now trum p is revising nepa leaving nothing protective about it?
pubilc commenton federal register

this is a protest that all these changes have in fact taken the entire epa and nepa and ceq process
completely out of the hands of the 325 million people in the usa and thrust all mgt into the hands

of corporate rich people to erode every single inch of every acre of land the 325 million people own in this country. the emasculation is absolutely complete. the people hae nothing to say other than to say it and then epa throws all that they say out on the trash heap. this comment is for the public record. please receipt. then epa does whatever it wants to do. the people count for nothign in this country anymore. for the people, means nothing. this comment is for the pubilc record. 8 millinon people wrote in to save the wild horses and they are living in corrals and being slaughtered. please receipt. jean publiee jeanpublic1@gmail.com

On Fri, Oct 13, 2017 at 10:37 AM, barbara sachau <bsachau@gmail.com> wrote:
```
[Federal Register Volume 82, Number 197 (Friday, October 13, 2017)]
[Notices]
[Page 47761]
>From the Federal Register Online via the Government Publishing Office
[www.gpo.gov]
[FR Doc No: 2017-22077]


-----------------------------------------------------------------------

DEPARTMENT OF HOMELAND SECURITY


Environmental Planning and Historic Preservation Program

AGENCY: Office of the Chief Readiness Support Officer, Office of
Management, Department of Homeland Security.

ACTION: Notice of administrative corrections to directive and
instruction.

-----------------------------------------------------------------------

SUMMARY: The purpose of this notice is to provide information on
administrative revisions to the Department of Homeland Security (DHS or
Department) Categorical Exclusions found in DHS Instruction 023-01-001-
01, Rev. 01, Implementation of the National Environmental Policy Act
(herein after referred to as Instruction). The Instruction was
finalized October 31, 2014 and became effective on March 26, 2015;
however, unintended administrative errors have since been identified.
These errors are limited to Categorical Exclusions found in Appendix A,
Table 1 of the Instruction. The administrative revisions covered under
this notice either resolve ambiguity to ensure application which is
consistent with the administrative record or resolve typographical
errors that had the potential to result in inappropriate application.
These revisions are effective upon publication in the Federal Register.

DATES: The list of Categorical Exclusions, found in Appendix A, Table
1, of the Instruction is revised as of October 13, 2017.

ADDRESSES: Relevant documents are posted at www.dhs.gov/nepa. These
documents include: This notice, the Instruction with the revised list
of Categorical Exclusions, the Administrative Record supporting the
establishment of the Categorical Exclusions, a summary of revisions,
the U.S. Coast Guard's (USCG's) Commandant Instruction M16475.1D, and
the Federal Register notice entitled National Environmental Policy Act:
```

DIR00285

Coast Guard Procedures for Categorical Exclusions which appeared on
July 23, 2002 (67 FR 48243).

FOR FURTHER INFORMATION CONTACT: Ms. Jennifer Hass, Environmental
Planning and Historic Preservation Program Manager, DHS, SEP-EPHP@hq.dhs.gov
or at 202-834-4346.

SUPPLEMENTARY INFORMATION: DHS Directive 023-01 Rev. 01 (hereinafter
Directive) and the Instruction establish the Department's policy and
procedures for compliance with the National Environmental Policy Act
(NEPA) and the Council on Environmental Quality (CEQ) regulations for
implementing the procedural provisions of NEPA (40 CFR parts 1500-
1508). Together, the Directive and Instruction apply to all of the
Components of DHS and help ensure the integration of environmental
stewardship into DHS decision making as required by NEPA. The
Instruction serves as the DHS implementing procedures for NEPA (as
required by 40 CFR 1505.1 and 1507.3) and includes the Department's
list of Categorical Exclusions, found in Appendix A, Table 1. Notice of
the Directive and Instruction were published in the Federal Register on
November 26, 2014 (79 FR 70538) and became effective on March 26, 2015.
    During a recent review of the Instruction, a number of
administrative errors were identified which have the potential to
substantively alter the correct and intended application of several
Categorical Exclusions. Based on our internal review, we have
determined these errors occurred during the transcription process as
Categorical Exclusions unique to the USCG and the Federal Emergency
Management Agency were merged with the other DHS Component Categorical
Exclusions to create a single, unified list of Categorical Exclusions
for application within the Department. There was no intent to
substantively alter the language or application of these Categorical
Exclusions.
    For the Categorical Exclusions unique to the USCG, the impacted
Categorical Exclusions appear correctly in the USCG's Commandant
Instruction M16475.1D which has been in effect since November 29, 2000
and the Federal Register notice entitled National Environmental Policy
Act: Coast Guard Procedures for Categorical Exclusions which was
published on July 23, 2002 (67 FR 48243).
    In general, the administrative revisions include omission of an
asterisk (*) designating the requirement to prepare a Record of
Environmental consideration (REC); inclusion of an asterisk (*)
designating the requirement to prepare a REC where that was not
intended; administrative revision to more clearly delineate when a REC
is required; clarification to resolve ambiguity to ensure application
which consistent with the administrative record, and resolution of a
typographical error. A copy of this Federal Register publication, DHS
Instruction 023-01-001-01 Rev. 01 with the revised list of Categorical
Exclusions, the Administrative Record supporting the establishment of
the Categorical Exclusions, a summary of revisions, the USCG's
Commandant Instruction M16475.1D, and the Federal Register notice
entitled National Environmental Policy Act: Coast Guard Procedures for
Categorical Exclusions which appeared on July 23, 2002 (67 FR 48243)
are available on the internet at www.dhs.gov/nepa.

    Dated: October 5, 2017.
Teresa R. Pohlman,
Executive Director Sustainability and Environmental Programs.
[FR Doc. 2017-22077 Filed 10-12-17; 8:45 am]

BILLING CODE 9110-9B-P

DIR00287

*Place:* National Cancer Institute Shady Grove, 9609 Medical Center Drive, Room 1E030, Rockville, MD 20850 (Telephone Conference Call).

*Contact Person:* Gerald G. Lovinger, Ph.D., Scientific Review Officer, Research Technology and Contract Review Branch, Division of Extramural Activities, National Cancer Institute, 9609 Medical Center Drive, Room 7W266, Bethesda, MD 20892–9750, 240–276–6385, *lovingeg@mail.nih.gov.*

*Name of Committee:* National Cancer Institute Special Emphasis Panel Omnibus SEP–17.

*Date:* March 25, 2015.

*Time:* 1:00 p.m. to 4:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Cancer Institute Shady Grove, 9609 Medical Center Drive, 7W124, Rockville, MD 20850 (Telephone Conference Call).

*Contact Person:* David Ransom, Ph.D., Research Programs Review Branch, Division of Extramural Activities, National Cancer Institute, NIH, 9609 Medical Center Drive, Room 7W124, Bethesda, MD 20892–9750, 240–276–6351 *david.ransom@nih.gov.*

Information is also available on the Institute's/Center's home page: *http:// deainfo.nci.nih.gov/advisory/sep/sep.htm,* where an agenda and any additional information for the meeting will be posted when available.

(Catalogue of Federal Domestic Assistance Program Nos. 93.392, Cancer Construction; 93.393, Cancer Cause and Prevention Research; 93.394, Cancer Detection and Diagnosis Research; 93.395, Cancer Treatment Research; 93.396, Cancer Biology Research; 93.397, Cancer Centers Support; 93.398, Cancer Research Manpower; 93.399, Cancer Control, National Institutes of Health, HHS)

Dated: November 20, 2014.

**Melanie J. Gray,**

*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2014–27937 Filed 11–25–14; 8:45 am]

**BILLING CODE 4140–01–P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## National Institutes of Health

## Center for Scientific Review Amended; Notice of Meeting

Notice is hereby given of a change in the meeting of the Center for Scientific Review Special Emphasis Panel, November 11, 2014, 02:00 p.m. to November 11, 2014, 03:00 p.m., National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD, 20892 which was published in the **Federal Register** on October 16, 2014, 79 FR 200 Pg. 62166.

The meeting will be held on December 9, 2014 instead of November 11, 2014. The meeting will start at 12:00

p.m. and will end at 2:00 p.m. The meeting location remains the same. The meeting is closed to the public.

Dated: November 20, 2014.

**Carolyn A. Baum,**

*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2014–27936 Filed 11–25–14; 8:45 am]

**BILLING CODE 4140–01–P**

# DEPARTMENT OF HOMELAND SECURITY

**[Docket Number DHS–2013–0052]**

## Environmental Planning and Historic Preservation Program

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Final National Environmental Policy Act Implementing Procedures.

**SUMMARY:** The purpose of this notice is to inform the public that the Department of Homeland Security (DHS or the Department) is issuing the final update to its policy and procedures for implementing the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*), as amended, and the Council on Environmental Quality (CEQ) regulations for implementing the procedural provisions of NEPA (40 CFR parts 1500–1508). The Department's NEPA procedures are contained in Directive 023–01, Rev. 01 and Instruction Manual 023–01–001–01, Rev. 01, Implementation of the National Environmental Policy Act (herein after referred to as Directive and Instruction). This notice also responds to the comments received on the Department's draft updated procedures published on June 5, 2014 (79 FR 32563).

**DATES:** The Directive and Instruction will be effective on March 26, 2015.

**FOR FURTHER INFORMATION CONTACT:** A. Marie Ecton, Senior Environmental Specialist, Department of Homeland Security, Telephone (202) 360–5661, or Email *a.marie.ecton@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** Once effective, the Directive and Instruction will apply to all of DHS, which is currently comprised of over 20 support and operational components, and help ensure the integration of environmental stewardship into DHS decision making as required by NEPA. The Directive and Instruction will serve as the DHS implementing procedures for NEPA and the CEQ regulations (as required by 40 CFR 1505.1 and 1507.3) and therefore must be read in conjunction with the CEQ regulations.

The Directive and Instruction were substantially revised to address a number of circumstances and requirements that have arisen since April 19, 2006, the effective date of the original DHS NEPA procedures (**Federal Register,** Vol. 71, No. 64, April 4, 2006). For example, when originally published in 2006 the Directive and Instruction did not apply to the following three Components of DHS: Federal Emergency Management Agency (FEMA), Customs and Border Protection (CBP), and United States Coast Guard (USCG); these three Components each maintained their own procedures for implementing NEPA when the Department was established in 2002. This revision to the Directive and Instruction incorporates FEMA, CBP, and USCG into the Department's NEPA procedures and addresses the full scope of DHS activities to which NEPA applies. When the updated procedures become effective, they will apply to all Components of DHS, including FEMA, CBP, and USCG. In addition, every Component will have the option of developing Supplemental Instructions to establish how that particular Component will meet the requirements of the final version of the DHS Directive and Instruction. In a separate yet related effort, FEMA will pursue rescission of its regulations at 44 CFR 10 and replace them with Supplemental Instructions that conform to requirements of the DHS Directive and Instruction.

The requirements put forth in the revised Directive and Instruction emphasize that the NEPA process must be appropriately integrated into the performance of DHS missions and activities and decision making. The revised Directive establishes the overall policy that DHS will comply with NEPA, and the revised Instruction establishes the procedures for ensuring this compliance is implemented in an effective and efficient manner. The Instruction covers the following: Overview of NEPA requirements, including requirements for the preparation and content of NEPA documents; management of NEPA implementation in DHS; criteria for Components to obtain a delegation of authority to approve their respective NEPA reviews; public involvement; dispute resolution; information protected from public disclosure; procedures for emergencies; review of applications from persons or organizations outside of DHS (*e.g.*, grant applications); and an identification of the types of DHS activities normally reviewed in a CATEX, Environmental

DIR00288

Assessment, or Environmental Impact Statement.

The CATEXs published in 2006 are being retained and are included in the Instruction (Appendix A, Table 1). In addition, the Instruction includes the following new CATEXs: One CATEX for an administrative activity; five CATEXs for real property management activities; 13 CATEXs for non-grant activities unique to FEMA's mission and authorities; and 19 CATEXs for federal assistance (*e.g.,* grant) activities. For synopses of the administrative record support for the Department's list of 2006 and new CATEXs, see the docket and the DHS NEPA Web page at *http://www.dhs.gov/nepa.*

DHS invested over three years in developing the proposed revision to its NEPA procedures. The draft revised Directive and Instruction were provided to CEQ in the fall of 2013 for review and discussion prior to the June 5, 2014 publication for public comment. DHS provided its proposed final revised Directive and Instruction to CEQ in early September 2014; CEQ responded with a letter dated November 10, 2014 prior to this publication of the final Directive and Instruction as required under 40 CFR 1507.3(a), indicating that the Department's revised procedures conform to NEPA and the CEQ regulations.

*Comments on Categorical Exclusions and DHS Response:*

DHS received a comment from the International Association of Fire Chiefs (IACF) regarding the proposed new CATEX for federally-assisted wildfire mitigation activities. To improve readability (but with no change to the scope), DHS revised the CATEX between the draft and final version to read as follows:

*N11   Federal Assistance for Wildfire Hazard Mitigation Actions. Federal assistance for wildfire hazard mitigation actions involving the creation of defensible space or hazardous fuel reduction for up to 100 feet of at-risk structures which includes the selective removal of vegetation less than 12 inches in diameter through thinning, pruning, limbing, sawing, or brush cutting; removal of downed, dead, or dry vegetation material as part of the overall action.*

*The actions must be limited to less than 100 acres of vegetation removal either individually or when combined with other reasonably foreseeable private or public actions and follow appropriate best management practices.*

Although IACF was supportive of the draft proposed CATEX, they recommended removal of the 100-foot limit on the creation of defensible space.

DHS supports the mission and respects the perspective of IACF; however, for the time being DHS has decided to retain the proposed wording of the CATEX. DHS relied on only a small number of FEMA Environmental Assessments (EAs) to support development of the new CATEX, and none of those EAs included a buffer greater than 100 feet. Without sufficient information from past DHS-funded wildfire mitigation projects that demonstrates that a larger buffer results in no potential for environmental impacts, DHS currently believes that a higher level of NEPA review and impact evaluation is necessary for actions involving more than 100 acres of vegetation removal.

If, as a result of additional DHS reviews of wildfire mitigation projects, DHS is able to document and determine that the buffer can reasonably be extended because there are few to no environmental impacts associated with larger scale clearing for wildfire mitigation purposes, then DHS will consider revising the CATEX. In addition, DHS will work with subject matter experts, including IACF, to obtain other data that may support future revisions to the CATEX.

Lastly, it is important to note that if proposed vegetation clearing for wildfire mitigation purposes is greater than 100 feet from a structure, DHS can still provide grant funding for the project once the appropriate level of environmental review has been conducted.

DHS received two comments from the State of Arizona Game and Fish Department (AZGFD) regarding the following proposed CATEX for federally-assisted new construction activities:

*N8   Federal Assistance for New Construction Activities of Less Than One Acre in Undisturbed or Undeveloped Areas. Federal assistance for new construction and associated site preparation activities in undisturbed or undeveloped areas when the activities comprise less than one acre and follow best management practices to control noise, water, and air pollution. This category does not apply to new construction in undisturbed or undeveloped floodplains, wetlands, or seaward of the limit of moderate wave action (or V zone when the limit of moderate wave action has not been identified). This CATEX covers the range of activities typically necessary for new construction, including field work (e.g.orings, site inspection) and temporary staging and use of construction equipment and vehicles.*

AZGFD's first comment was that the draft proposed CATEX as written "has the potential to impact wildlife resources in undisturbed/undeveloped areas without appropriate direct or cumulative impact analysis of construction activities. Construction activities within an acre of undisturbed or undeveloped areas have the potential to result in direct take of wildlife, habitat fragmentation, and reduced landscape wildlife permeability." AZGFD's second comment was a request that DHS include "clarifying language that ensures cumulative impacts for state trust wildlife resources are identified for all related actions, and that reasonable mitigation measures are implemented" and include "Best Management Practices (BMPs) . . . that reduce impacts to wildlife including timing restrictions, trenching guidelines, fencing guidelines, etc."

In response to AZGFD's comments on new CATEX N8, DHS added the following sentence to Section V.B(2) of the Instruction, which discusses how to appropriately apply CATEXs to proposed actions: "Application of a CATEX to a proposed action presumes review and compliance under other relevant environmental planning and historic preservation laws, regulations, and Executive Orders (*e.g.,* National Historic Preservation Act, Endangered Species Act) has occurred, and that a higher level of NEPA analysis is not warranted as a result of any identified impacts to resources protected under those other requirements." In addition, DHS believes it has enough data from past actions to justify that no significant cumulative impacts result from the clearing of plots less than one acre each. If DHS were to provide federal assistance for the clearing of multiple one acre plots in close proximity to each other, this situation would constitute an extraordinary circumstance that would prohibit use of the CATEX and would require a higher level of NEPA analysis. The list of DHS extraordinary circumstances is provided in Section V.B(2)(c) of the Instruction; these include a consideration of impacts to protected species and habitat and environmentally sensitive areas, and a consideration of whether the proposed action is related to other actions with individually insignificant, but cumulatively significant impacts. As to cumulative impacts on habitat and species, these will get covered in the ESA consultation process; notwithstanding the new CATEX N8, DHS will consult with the U.S. Fish and Wildlife Service and relevant state agencies, such as AZGFD, for proposed

actions potentially affecting protected species and habitat.

AZGFD also commented that the definition of Cooperating Agency included in Section II of the draft Instruction was not fully consistent with the CEQ definition in 40 CFR 1508.5. DHS agrees with AZGFD, and has revised the definition accordingly in the final Instruction.

DHS received questions regarding the need for CATEXs for Congressionally-mandated activities (existing USCG CATEXs L18 and L53, and new DHS-wide CATEX C6), to which NEPA does not apply. When Congress mandates an activity, such as the transfer of DHS controlled real property to a non-Federal entity, DHS has no discretion whether or not to perform the activity; however, DHS may have discretion on some aspects of how the activity is executed. Therefore, DHS NEPA practitioners expressed the need for such CATEXs where DHS has some level of discretion and the activities have been determined not to have the potential for significant environmental impacts.

Lastly, DHS received three comments regarding the accessibility and readability of the draft revised Directive and Instruction and supporting documents; namely that the **Federal Register** notice was inadequate as a means of communicating with stakeholders and the public, that hyperlinks to the documents should have been clearly identified and easily accessible, and that the documents were difficult to comprehend. The **Federal Register** and *www.regulations.gov* are widely recognized as appropriate sources for the public to learn about and comment on Federal government initiatives. DHS wrote the documents according to style guides and writing standards applicable to the federal government as well as DHS-specific requirements of its formal Directives system. All relevant documents were and remain available to the public on the Department's NEPA Web page (*www.dhs.gov/nepa*) and on the *www.regulations.gov* Web site under Docket Number DHS–2013–0052. The June 5, 2014 **Federal Register** notice provided clear instructions to readers to visit these two Web sites to view the draft revised Directive and Instruction and supporting documents.

A copy of this **Federal Register** publication and the final Directive and Instruction and supporting documents are available on the internet at *www.regulations.gov* (Docket Number

DHS–2013–0052) and *http://www.dhs.gov/nepa*.

**Teresa R. Pohlman,**
*Director of Sustainability and Environmental Programs.*

[FR Doc. 2014–27966 Filed 11–25–14; 8:45 am]

**BILLING CODE 9110–9B–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

**[USCG–2014–0666; OMB Control Number 1625–0022]**

### Collection of Information Under Review by Office of Management and Budget

**AGENCY:** Coast Guard, DHS.

**ACTION:** Thirty-day notice requesting comments.

**SUMMARY:** In compliance with the Paperwork Reduction Act of 1995 the U.S. Coast Guard is forwarding Information Collection Requests (ICRs), abstracted below, to the Office of Management and Budget (OMB), Office of Information and Regulatory Affairs (OIRA), requesting approval of a revision to the following collection of information: 1625–0022, Application for Tonnage Measurement of Vessels. Review and comments by OIRA ensure we only impose paperwork burdens commensurate with our performance of duties.

**DATES:** Comments must reach the Coast Guard and OIRA on or before December 26, 2014.

**ADDRESSES:** You may submit comments identified by Coast Guard docket number [USCG–2014–0666] to the Docket Management Facility (DMF) at the U.S. Department of Transportation (DOT) and/or to OIRA. To avoid duplicate submissions, please use only one of the following means:

(1) *Online:* (a) To Coast Guard docket at *http://www.regulations.gov*. (b) To OIRA by email via: *OIRA-submission@omb.eop.gov*.

(2) *Mail:* (a) DMF (M–30), DOT, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE., Washington, DC 20590–0001. (b) To OIRA, 725 17th Street NW., Washington, DC 20503, attention Desk Officer for the Coast Guard.

(3) *Hand Delivery:* To DMF address above, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The telephone number is 202–366–9329.

(4) *Fax:* (a) To DMF, 202–493–2251. (b) To OIRA at 202–395–6566. To

ensure your comments are received in a timely manner, mark the fax, attention Desk Officer for the Coast Guard.

The DMF maintains the public docket for this Notice. Comments and material received from the public, as well as documents mentioned in this Notice as being available in the docket, will become part of the docket and will be available for inspection or copying at room W12–140 on the West Building Ground Floor, 1200 New Jersey Avenue SE., Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. You may also find the docket on the Internet at *http://www.regulations.gov*.

Copies of the ICRs are available through the docket on the Internet at *http://www.regulations.gov*. Additionally, copies are available from: COMMANDANT (CG–612), ATTN: PAPERWORK REDUCTION ACT MANAGER, US COAST GUARD, 2703 MARTIN LUTHER KING JR AVE SE., STOP 7710, WASHINGTON DC 20593–7710.

**FOR FURTHER INFORMATION CONTACT:** Contact Mr. Anthony Smith, Office of Information Management, telephone 202–475–3532 or fax 202–372–8405, for questions on these documents. Contact Ms. Cheryl Collins, Program Manager, Docket Operations, 202–366–9826, for questions on the docket.

**SUPPLEMENTARY INFORMATION:**

### Public Participation and Request for Comments

This Notice relies on the authority of the Paperwork Reduction Act of 1995; 44 U.S.C. Chapter 35, as amended. An ICR is an application to OIRA seeking the approval, extension, or renewal of a Coast Guard collection of information (Collection). The ICR contains information describing the Collection's purpose, the Collection's likely burden on the affected public, an explanation of the necessity of the Collection, and other important information describing the Collection. There is one ICR for each Collection.

The Coast Guard invites comments on whether these ICRs should be granted based on the Collection being necessary for the proper performance of Departmental functions. In particular, the Coast Guard would appreciate comments addressing: (1) The practical utility of the Collection; (2) the accuracy of the estimated burden of the Collection; (3) ways to enhance the quality, utility, and clarity of information subject to the Collection; and (4) ways to minimize the burden of the Collection on respondents, including the use of automated



EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL ON ENVIRONMENTAL QUALITY
WASHINGTON, D.C. 20503

November 10, 2014

Dr. Teresa R. Pohlman
Director, Sustainability and Environmental Programs
Office of the Chief Readiness Support Officer
Department of Homeland Security
MGMT/CRSO/Mailstop 0075
Washington, DC 20528-0075

RE: U.S. Department of Homeland Security Directive and Instruction Manual on
Implementation of the National Environmental Policy Act

Dear Dr. Pohlman:

Thank you for consulting with the Council on Environmental Quality (CEQ) on
the U.S. Department of Homeland Security (DHS) revision of the Directive and
Instruction Manual on Implementation of the National Environmental Policy Act
(Directive and Instruction Manual) as its National Environmental Policy Act (NEPA)
implementing procedures. The revised Directive establishes the overall policy that DHS
will comply with NEPA, and the revised Instruction Manual establishes the procedures
for ensuring this compliance is implemented in an effective and efficient manner.

The CEQ regulations require that agencies review their NEPA policies and
procedures and, in consultation with CEQ, revise them as necessary to ensure full
compliance with the purposes and provisions of NEPA (40 C.F.R. § 1507.3). DHS
published the Directive and Instruction Manual for public review and comment (Federal
Register, Vol. 79, No. 108, Thursday, June 5, 2014). The consultation with CEQ on the
proposed changes to the NEPA implementing procedures took the public comments into
consideration and has concluded.

This revision to the Directive and Instruction incorporates DHS's components,
Federal Emergency Management Administration Agency, Customs and Border
Protection, and the United States Coast Guard into the Department's NEPA procedures.
It addresses the full scope of DHS activities to which NEPA applies, as well as the public
comments received. The requirements put forth in the revised Directive and Instruction
Manual emphasize that the NEPA process must be appropriately integrated into the
performance of DHS missions and activities and decision making (40 C.F.R. § 1507.3).

CEQ concludes that the revision of the Directive and Instruction Manual is in conformance with NEPA and the CEQ regulations (see attachments). The Directive and Instruction Manual will take effect once it is published in final form in the Federal Register.


Horst G. Greczmiel
Associate Director for NEPA Oversight

Attachments:
1. DHS Directive
2. DHS Instruction Manual

Department of Homeland Security
DHS Directives System
Directive Number: 023-01
Revision Number  01
Issue Date: 10/31/2014

# IMPLEMENTATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT

## I.   Purpose

The purpose of this Directive is to establish Department of Homeland Security (DHS) policy for implementing the requirements of the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA.  Instruction Manual 023-01-001-01 (Instruction Manual) provides the procedures for implementing this Directive.  This Directive and the Instruction Manual adopt and supplement the CEQ regulations and are to be used in conjunction with those regulations.  Together, this Directive and the Instruction Manual help ensure the integration of environmental stewardship into DHS decision making as required by NEPA.

## II.   Scope

A.      Policy and procedures in this Directive and the Instruction Manual apply to all DHS Components, direct appropriate compliance with NEPA, and are to be used in the planning and implementation of DHS programs, projects, and other activities as described in 40 CFR 1508.18 (herein after collectively referred to as "action").  DHS actions include, but are not limited to, the following: mission and operations planning; promulgation of regulations; acquisitions and procurements; asset and facility management; research and development; issuance of permits; and grants and other forms of federal assistance.

B.      This Directive and the Instruction Manual provide for a flexible framework for implementing NEPA in DHS.  To implement NEPA within their respective organizations to fit their unique missions, needs, and capabilities, Components have the option of developing Supplemental Instructions and of obtaining a delegation of authority to approve NEPA documents.

DIR00293

## III. Introduction

This Department of Homeland Security (DHS) "Instruction Manual on Implementation of the National Environmental Policy Act (NEPA) (Instruction 023-01-001-01)," together with DHS Directive 023-01, "Implementation of the National Environmental Policy Act," (hereafter Instruction Manual and Directive) establish the policy and procedures DHS follows to comply with the National Environmental Policy Act of 1969 (NEPA) (42 United States Code [U.S.C.] 4321 et seq.) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA (40 C.F.R. Parts 1500-1508). This Instruction Manual serves as the DHS implementing procedures for NEPA (as required by 40 C.F.R. Parts 1505.1 and 1507.3) which supplement the CEQ regulations and therefore must be read in conjunction with them.  The Directive and this Instruction Manual are available on the DHS website at www.dhs.gov/nepa.  The NEPA statute and the CEQ regulations are available at https://ceq.doe.gov/index.html.

NEPA is the basic charter and foundation for stewardship of environmental resources in the United States.  To implement the policies set forth in NEPA, Congress prescribed a procedure commonly referred to as the "NEPA process" for Federal agencies to follow. The NEPA process is a planning and decision-making tool that helps Federal agency decision-makers systematically identify and evaluate the potential environmental impacts of proposed actions prior to making decisions.  The NEPA process encourages public involvement in decisions that would affect the quality of the human environment and includes the identification and evaluation of reasonable alternatives to proposed actions that would avoid or minimize adverse environmental impacts.

Generally, NEPA applies to Federal actions that affect the human environment.  Within DHS,  NEPA generally applies to actions to be undertaken, funded, permitted, or otherwise approved by DHS, including activities that may be wholly initiated within DHS, executed by DHS under the direction of Congress, or proposed by persons or organizations outside of DHS that require approval, funding, a license, or a permit from DHS.

The requirements of this Instruction Manual apply to the execution of all NEPA activities across DHS.  Within Components, proponents of programs, projects, and activities implement the requirements of the Directive and this Instruction Manual in consultation with their respective Environmental Planning Program Manager (EPPM) (for a definition of EPPM, see Section II and Section IV, Part K) and Office of General Counsel (OGC), and the Director of Sustainability and Environmental Programs (SEP) when appropriate.

References to government organizations or regulations in this Instruction Manual include their succeeding organizations and requirements.

III-1

B.  **Categorical Exclusions and Extraordinary Circumstances**

(1)  **DHS Categorical Exclusions**

The CEQ regulations (40 C.F.R. §1508.4) enable Federal agencies to establish categories of actions that, based on experience, do not individually or cumulatively have a significant impact on the quality of the human environment and, therefore, do not require an EA or EIS. CATEXs enable DHS to avoid unnecessary efforts, paperwork, and delays and concentrate on those proposed actions having real potential for environmental impact. Components may otherwise decide to prepare an EA for any action at any time to assist in planning and decision-making (see 40 C.F.R. §1501.3 and §1508.9).

DHS CATEXs are specific to DHS as a whole, or to individual Components when so specified. DHS may not apply a CATEX established by another Federal agency to a proposed DHS action. However, DHS may justify its application of a DHS CATEX to a proposed DHS action when another Federal agency has applied a similar CATEX of its own to a similar activity.

DHS CATEXs are divided into the following functional groupings of DHS mission activities:

  (a)  Administrative and Regulatory Activities.

  (b)  Operational Activities.

  (c)  Real Estate and Personal Property Management Activities.

  (d)  Repair and Maintenance Activities.

  (e)  Construction, Installation, and Demolition Activities.

  (f)  Hazardous/Radioactive Materials Management and Operations.

  (g)  Training and Exercises.

  (h)  Federal Assistance Activities.

  (i)  Component-Specific Categorical Exclusions.

(2)  **Applying Categorical Exclusions**

DHS's list of CATEXs is provided in Appendix A, Table 1. When considering application of a CATEX to a proposed action, Components determine if there are any extraordinary circumstances present that may cause significant impacts preventing the application of the CATEX. For a proposed action to be categorically excluded, it must satisfy all three conditions described below. If the proposed action does not clearly meet all three conditions, the Component prepares an EA or EIS according to CEQ requirements and following the procedures provided in Section V, Parts C and D, respectively. Certain categories of proposed actions included in the CATEX list have a greater

V-4

DIR00330

potential to involve extraordinary circumstances and require the preparation of a REC to document the NEPA analysis, as described in Section V, Part B (4). A CATEX cannot be used for an action with significant impacts on the quality of the human environment, regardless of whether the impacts are beneficial or adverse. A CATEX may be applied to an entire program of DHS activities, if appropriate. Application of a CATEX to a proposed action presumes review and compliance under other relevant environmental planning and historic preservation laws, regulations, and Executive Orders (e.g., National Historic Preservation Act, Endangered Species Act) has occurred, and that a higher level of NEPA analysis is not warranted as a result of any identified impacts to resources protected under those other requirements.

Components consider the following when determining whether or not a proposed action is covered by a CATEX:

(a) **Clearly fits the category described in the CATEX**. The entire action clearly fits within one or more of the CATEXs in Appendix A, Table 1. Note that certain CATEXs are restricted to use by a single DHS Component. Where a CATEX is restricted for use to a particular DHS Component, no other Component may apply that CATEX to its proposed actions.

(b) **Is not a piece of a larger action**. It is not appropriate to segment a proposed action or connected actions by division into smaller parts in order to avoid a more extensive evaluation of the potential for environmental impacts under NEPA. For purposes of NEPA, actions must be considered in the same review if the actions are connected. Examples include actions that trigger or force other actions; and when one action depends on another (e.g., when one action is an interdependent part of a larger action, or when one action cannot proceed unless another action is taken).

(c) **No extraordinary circumstances exist**. The presence of one or more extraordinary circumstances precludes the application of a CATEX to a proposed action when the circumstance would have significant environmental impacts (i.e., EIS required), or presents the potential for significant environmental impacts (i.e., EA required), or that potential cannot be readily determined (i.e., EA required). A determination of whether an action that is normally excluded requires additional evaluation because of extraordinary circumstances focuses on the action's potential effects and considers the environmental significance of those effects in terms of both context (i.e., local, state, regional, Tribal, national, or international) and intensity. Components consider whether the proposed action involves one or more of the following extraordinary circumstances:

V-5

DIR00331

i. A potentially significant effect on public health or safety.

ii. A potentially significant effect on species or habitats protected by the ESA, Marine Mammal Protection Act, Migratory Bird Treaty Act, Magnuson-Stevens Fishery Conservation and Management Act, or other law protecting a species or habitat.

iii. A potentially significant effect on historic properties (e.g., districts, sites, buildings, structures, or objects) that are listed in or eligible for listing in the National Register of Historic Places, affects traditional cultural properties or sacred sites, or leads to the loss or destruction of a significant scientific, cultural, or historical resource.

iv. A potentially significant effect on an environmentally sensitive area.

v. A potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment. Some examples of other requirements to consider are: a local noise control ordinance; the requirement to conform to an applicable State Implementation Plan for air quality standards; Federal, Tribal, State, or local requirements to control hazardous or toxic substances; and environmental permits.

vi. An effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks. This also includes effects that may result from the use of new technology or unproven technology. Controversy over, including public opposition to, a proposed action absent any demonstrable potential for significant environmental impacts does not itself constitute an extraordinary circumstance.

vii. Extent to which a precedent is established for future actions with significant effects.

viii. Significantly greater scope or size than normally experienced for this particular category of action.

ix. Potential for significant degradation of already existing poor environmental conditions. Also, initiation of a potentially significant environmental degrading influence, activity, or effect in areas not already significantly modified from their natural condition.

x. Whether the action is related to other actions with individually insignificant, but cumulatively significant impacts.

**(3)   Establishment, Revision, and Deletion of Categorical Exclusions**

V-6

Components forward proposals to substantively revise or establish new CATEXs (together with justification) to Director SEP for approval. Proposals to substantively revise or establish new CATEXs require an Administrative Record that meets CEQ standards and are subject to both CEQ review and public comment. SEP reviews such proposals to determine whether the CATEX is appropriate for inclusion in the DHS-wide list or a Component-specific list. SEP revises Appendix A, Table 1 to include approved new or substantially revised CATEXs. In addition, Components notify SEP of non-substantive revisions to or deletions of Component-specific CATEXs so that SEP can amend the table accordingly.

All CATEXs and the list of extraordinary circumstances in this Instruction Manual are reviewed by SEP in consultation with Component EPPMs at least every seven years to ensure they are still appropriate, and to identify any changes that may be needed in light of additional experience gained in applying the CATEXs to proposed DHS actions. A complete review is conducted in conjunction with any major revision to the Directive and Instruction Manual or when seven years have passed since the last major revision.

### (4)   Record of Environmental Consideration

The application of a CATEX to a proposed action means that the proposed action is appropriately included in a category of actions that DHS has determined do not individually or cumulatively have a significant impact on the human environment and therefore neither the preparation of an EA or EIS is required. Certain CATEXs, identified by an asterisk in Appendix A, Table 1, include classes of actions that have a higher possibility of involving extraordinary circumstances that may preclude the use of a CATEX. A REC is required whenever a CATEX denoted by an asterisk is applied in order to document that potential impacts to the human environment have been appropriately considered and the determination that the proposed action is either appropriately categorically excluded or must be analyzed further through an EA or EIS process. In addition, there may be instances where a Component chooses to prepare a REC when it is not otherwise required.

RECs are normally prepared and maintained electronically in the EP&HP DSS. Completion of a REC involves a review and approval process to ensure the appropriate consideration of extraordinary circumstances, the quality of the NEPA analysis, and that the decision-maker has considered the impact of the proposal on the human environment, as required by NEPA, before making a decision. Director SEP signs all RECs as the approver of the NEPA analysis, unless otherwise delegated.

Component Supplemental Instructions may contain additional information on the administrative procedures and requirements to prepare a REC.

V-7

# Appendix A.  DHS List of Categorical Exclusions

## Table 1 - List of DHS Categorical Exclusions

**Note regarding the following table:** CATEX A8, CATEXs C6 through C10, and all the CATEXs in Sections M and N are new CATEXs. All others are existing CATEXs that DHS is retaining.

The CATEXs in Sections A through G and the CATEXs in Section N are available for use across the entire Department. The CATEXs in Sections H through M are available for use by only the Component specified in the section heading.

\* Denotes classes of actions that have a higher possibility of involving extraordinary circumstances. A REC will be prepared to document consideration of extraordinary circumstances whenever a CATEX that is identified by an asterisk is used.

### ADMINISTRATIVE AND REGULATORY ACTIVITIES

**A1** Personnel, fiscal, management, and administrative activities, such as recruiting, processing, paying, recordkeeping, resource management, budgeting, personnel actions, and travel.

**A2** Reductions, realignments, or relocation of personnel that do not result in exceeding the infrastructure capacity or changing the use of space.  An example of a substantial change in use of the supporting infrastructure would be an increase in vehicular traffic beyond the capacity of the supporting road network to accommodate such an increase.

**A3** Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:

    (a) Those of a strictly administrative or procedural nature;

    (b) Those that implement, without substantive change, statutory or regulatory requirements;

    (c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;

    (d) Those that interpret or amend an existing regulation without changing its environmental effect;

A-1

the Agency under any of the following conditions:

(1) The rate of submitted packaged loan applications that receive RHS approval is below the acceptable limit as determined by the Agency;

(2) The rate of submitted packaged loan applications from very low-income applicants is below the acceptable level as determined by the Agency;

(3) Violation of applicable regulations, statutes and other guidance; or

(4) No viable packaged loan applications are submitted to the Agency in any consecutive 12-month period.

Dated: March 31, 2015.

**Tony Hernandez,**

*Administrator, Rural Housing Service.*

[FR Doc. 2015–09958 Filed 4–28–15; 8:45 am]

**BILLING CODE 3410–XV–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 214**

[DHS Docket No. ICEB–2011–0005]

**RIN 1653–AA63**

**Adjustments to Limitations on Designated School Official Assignment and Study by F–2 and M–2 Nonimmigrants**

**AGENCY:** U.S. Immigration and Customs Enforcement, DHS.

**ACTION:** Final rule.

**SUMMARY:** The Department of Homeland Security is amending its regulations under the Student and Exchange Visitor Program (SEVP) to improve management of international student programs and increase opportunities for study by spouses and children of nonimmigrant students. This rule grants school officials more flexibility in determining the number of designated school officials to nominate for the oversight of campuses. The rule also provides greater incentive for international students to study in the United States by permitting accompanying spouses and children of academic and vocational nonimmigrant students with F–1 or M–1 nonimmigrant status to enroll in study at an SEVP-certified school so long as any study remains less than a full course of study. F–2 and M–2 spouses and children remain prohibited, however, from engaging in a full course of study unless they apply for, and DHS approves, a change of nonimmigrant status to a nonimmigrant status authorizing such study.

**DATES:** This rule is effective May 29, 2015.

**ADDRESSES:** Comments and related materials received from the public, as well as documents mentioned in this preamble as being available in the docket, are part of docket ICEB–2011–0005 and are available online by going to *http://www.regulations.gov*, inserting ICEB–2011–0005 in the "Search" box, and then clicking "Search."

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this final rule, call or email Katherine Westerlund, Policy Chief (Acting), Student and Exchange Visitor Program, telephone 703–603–3400, email: *sevp@ice.dhs.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. Regulatory History and Information**

On November 21, 2013, the Department of Homeland Security (DHS) published a notice of proposed rulemaking (NPRM) entitled Adjustments to Limitations on Designated School Official Assignment and Study by F–2 and M–2 Nonimmigrants in the **Federal Register** (78 FR 69778). We received 37 comments on the proposed rule. No public meeting was requested, and none was held. DHS is adopting the rule as proposed, with minor technical corrections.

**II. Abbreviations**

CFR   Code of Federal Regulations
DHS   Department of Homeland Security
DOS   Department of State
DSO   Designated school official
FR   Federal Register
HSPD–2   Homeland Security Presidential Directive No. 2
ICE   U.S. Immigration and Customs Enforcement
INA   Immigration and Nationality Act of 1952, as amended
INS   Legacy Immigration and Naturalization Service
IIRIRA   Illegal Immigration Reform and Immigrant Responsibility Act of 1996
OMB   Office of Management and Budget
PDSO   Principal designated school official
SEVIS   Student and Exchange Visitor Information System
SEVP   Student and Exchange Visitor Program
§   Section symbol
U.S.C.   United States Code
USCIS   U.S. Citizenship and Immigration Services
USA PATRIOT Act   Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001

**III. Basis and Purpose**

*A. The Student and Exchange Visitor Program*

DHS's Student and Exchange Visitor Program (SEVP) manages and oversees

significant elements of the process by which educational institutions interact with F, J and M nonimmigrants to provide information about their immigration status to the U.S. Government. U.S. Immigration and Customs Enforcement (ICE) uses the Student and Exchange Visitor Information System (SEVIS) to track and monitor schools, participants and sponsors in exchange visitor programs, and F, J and M nonimmigrants, as well as their accompanying spouses and children, while they are in the United States and participating in the educational system.

ICE derives its authority to manage these programs from several sources, including:

• Section 101(a)(15)(F)(i), (M)(i) and (J) of the Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. 1101(a)(15)(F)(i), (M)(i), and (J), under which a foreign national may be admitted to the United States in nonimmigrant status as a student to attend an academic school or language training program (F nonimmigrant), as a student to attend a vocational or other recognized nonacademic institution (M nonimmigrant), or as an exchange visitor (J nonimmigrant) in an exchange program designated by the Department of State (DOS), respectively. An F or M student may enroll in a particular school only if the Secretary of Homeland Security has certified the school for the attendance of F and/or M students. *See* 8 U.S.C. 1372; 8 CFR 214.3.

• Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546 (codified at 8 U.S.C. 1372), which authorized the creation of a program to collect current and ongoing information provided by schools and exchange visitor programs regarding F, J or M nonimmigrants during the course of their stays in the United States, using electronic reporting technology where practicable, and which further authorized the Secretary of Homeland Security to certify schools to participate in F or M student enrollment.

• Section 416(c) of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107–56, 115 Stat. 272 (USA PATRIOT Act), as amended, which provides for the collection of alien date of entry and port of entry information for aliens whose information is collected under 8 U.S.C. 1372.

• Homeland Security Presidential Directive No. 2 (HSPD–2), which, following the USA PATRIOT Act,

requires the Secretary of Homeland Security to conduct periodic, ongoing reviews of schools certified to accept F, J and/or M nonimmigrants to include checks for compliance with recordkeeping and reporting requirements, and authorizing termination of institutions that fail to comply. *See* 37 Weekly Comp. Pres. Docs. 1570, 1571–72 (Oct. 29, 2001); and

• Section 502 of the Enhanced Border Security and Visa Entry Reform Act of 2002, Public Law 107–173, 116 Stat. 543 (codified at 8 U.S.C. 1762), which directed the Secretary to review the compliance with recordkeeping and reporting requirements under 8 U.S.C. 1372 and INA section 101(a)(15)(F), (J) and (M), 8 U.S.C. 1101(a)(15)(F), (J) and (M), of all schools [1] approved for attendance by F, J and/or M students within two years of enactment, and every two years thereafter.

Accordingly, and as directed by the Secretary, ICE carries out the Department's ongoing obligation to collect data from, certify, review, and recertify schools enrolling these students. The specific data collection requirements associated with these obligations are specified in part in legislation, *see* 8 U.S.C. 1372(c), and more comprehensively in regulations governing SEVP found at 8 CFR 214.3.

## B. Student and Exchange Visitor Information System

SEVP carries out its programmatic responsibilities through SEVIS, a Web-based data entry, collection and reporting system. SEVIS provides authorized users, such as DHS, DOS, other government agencies, SEVP-certified schools, and DOS-designated exchange visitor programs, access to reliable information to monitor F, J and M nonimmigrants for the duration of their authorized period of stay in the United States. As discussed in the NPRM, schools must regularly update information on their approved F, J and M nonimmigrants to enable government agencies to fulfill their oversight and investigation responsibilities, such as enabling accurate port of entry screening, assisting in the adjudication of immigration benefit applications, ensuring and verifying eligibility for the appropriate nonimmigrant status, monitoring nonimmigrant status maintenance, and, as needed, facilitating timely removal.

## C. Importance of International Students to the United States

On September 16, 2011, DHS announced a "Study in the States" initiative to encourage the best and the brightest international students to study in the United States. As described in the NPRM, the initiative took various steps to enhance and improve the Nation's nonimmigrant student programs.[2] This rulemaking was initiated in support of the "Study in the States" initiative and to reflect DHS's commitment to those goals. The rule improves the capability of schools enrolling F and M students to assist their students in maintaining nonimmigrant status and to provide necessary oversight on behalf of the U.S. Government. The rule also increases the attractiveness of studying in the United States for foreign students by broadening study opportunities for their spouses and improving quality of life for visiting families.

## D. Removing the Limit on DSO Nominations

Designated school officials (DSOs) are essential to making nonimmigrant study in the United States attractive to international students and a successful experience overall. DHS charges DSOs with the responsibility of acting as liaisons between nonimmigrant students, the schools that employ the DSOs and the U.S. Government. Significantly, DSOs are responsible for making information and documents, including academic transcripts, relating to F–1 and M–1 nonimmigrant students, available to DHS for the Department to fulfill its statutory responsibilities. 8 CFR 214.3(g).

When the Immigration and Naturalization Service (INS) in 2002 established a limit of ten DSOs in order to control access to SEVIS, the INS noted that once SEVIS was fully operational, it might reconsider the numerical limits on the number of DSOs. *See* 67 FR 76256, 76260. Since SEVIS is now fully operational and appropriate access controls are in place, DHS has reconsidered the DSO limitation, and, with this rule, eliminates the maximum limit of DSOs in favor of a more flexible approach. The rule sets no maximum limit on the number of DSOs per campus, and instead allows school officials to nominate an appropriate number of DSOs for SEVP approval based upon the specific needs of the school.

DHS believes that concerns raised within the U.S. educational community that the current DSO limit of ten per campus is too constraining are of strong merit. While the average SEVP-certified school has fewer than three DSOs, SEVP recognizes that F and M students often cluster at schools within States that attract a large percentage of nonimmigrant student attendance. As such, schools in the three States with the greatest F and M student enrollment represent 35 percent of the overall F and M nonimmigrant enrollment in the United States.[3] In schools where F and M students are heavily concentrated or where campuses are in dispersed geographic locations, the limit of ten DSOs has been problematic. The Homeland Security Academic Advisory Council (HSAAC)—an advisory committee composed of prominent university and academic association presidents, which advises the Secretary and senior DHS leadership on academic and international student issues—included in its September 20, 2012 recommendations to DHS a recommendation to increase the number of DSOs allowed per school or eliminate the current limit of ten DSOs per school. Upon review, DHS concluded that, in many circumstances, the elimination of a DSO limit may improve the capability of DSOs to meet their liaison, reporting and oversight responsibilities, as required by 8 CFR 214.3(g). Therefore, removing the limit on the number of DSOs that a school official is able to nominate for SEVP approval provides the appropriate flexibility to enhance the attractiveness of nonimmigrant study in the United States for international students and increase the program's success.

This rule does not alter SEVP's authority to approve or reject a DSO or principal designated school official (PDSO) nomination. *See* 8 CFR 214.3(l)(2). SEVP reviews each DSO nomination as part of the school certification process, and requires proof of the nominee's U.S. citizenship or lawful permanent resident status. SEVP further considers whether the nominee has served previously as a DSO at another SEVP-approved school and whether the individual nominee should be referred to other ICE programs for further investigation. Until the school and the nominee have been approved by SEVP, access to SEVIS is limited solely to the school official submitting the certification petition, and is restricted to

---

[1] DHS oversees compliance of schools approved for attendance by J nonimmigrants; however, section 502(b) of this the Enhanced Border Security and Visa Entry Reform Act of 2002 assigns oversight of exchange visitor sponsors to the Secretary of State.

[2] *See* 78 FR 69780; *see also* "Study in the States," U.S. Department of Homeland Security, *http://studyinthestates.dhs.gov* (last visited April 28, 2014).

[3] *See* Student and Exchange Visitor Program, SEVIS by the Numbers (July 2014), page 15, available at *https://www.ice.gov/doclib/sevis/pdf/by-the-numbers1.pdf*.

DSO000010

entry of information about the school and the DSO nominees necessary to permit the school to initiate the Form I–17 petition process for approval. The nominee, if he or she is not the submitting school official, has no access to SEVIS while the application is pending. Any greater access to SEVIS, prior to approval, would undermine the nomination process and open the SEVIS program to possible misuse. The rule codifies this limitation. *See* new 8 CFR 214.3(l)(1)(iii). The rule also maintains SEVP's authority to withdraw a previous DSO or PDSO designation by a school of an individual. *See* 8 CFR 214.3(l)(2). Reasons for withdrawal include change in or loss of employment, as well as noncompliance with SEVP regulations. In order to withdraw for noncompliance, SEVP would make a determination of noncompliance following suspension of a DSO's SEVIS access, individually or institutionally. DHS is of the opinion that the increased flexibility afforded by this rulemaking to nominate more than ten DSOs will permit schools to better meet students' needs as well as the Department's reporting and other school certification requirements.

### E. Study by F–2 and M–2 Spouses and Children

This rulemaking also amends the benefits allowable for the accompanying spouse and children (hereafter referred to as F–2 or M–2 nonimmigrants) of an F–1 or M–1 student. On May 16, 2002, the former INS proposed to prohibit full-time study by F–2 and M–2 spouses and to restrict such study by F–2 and M–2 children to prevent an alien who should be properly classified as an F–1 or M–1 nonimmigrant from coming to the United States as an F–2 or M–2 nonimmigrant and, without adhering to other legal requirements, attending school full-time. 67 FR 34862, 34871. The INS proposed to permit avocational and recreational study for F–2 and M–2 spouses and children and, recognizing that education is one of the chief tasks of childhood, to permit F–2 and M–2 children to be enrolled full-time in elementary through secondary school (kindergarten through twelfth grade). *Id.* The INS believed it unreasonable to assume that Congress would intend that a bona fide nonimmigrant student could bring his or her children to the United States but not be able to provide for their primary and secondary education. *Id.; see also* 67 FR 76256, 76266. The INS further proposed that if an F–2 or M–2 spouse wanted to enroll full-time in a full course of study, the F–2 or M–2 spouse should apply for and obtain a change of his or her nonimmigrant

classification to that of an F–1, J–1, or M–1 nonimmigrant. 67 FR 34862, 34871.

The INS finalized these rules on December 11, 2002. 67 FR 76256 (codified at 8 CFR 214.2(f)(15)(ii) and 8 CFR 214.2(m)(17)(ii)). In the final rule, the INS noted that commenters suggested the INS remove the language "avocational or recreational" from the study of study that may be permitted by F–2 and M–2 dependents, as DSOs may have difficulty determining what study is avocational or recreational and what is not. In response to the comments, the INS clarified that if a student engages in study to pursue a hobby or if the study is that of an occasional, casual, or recreational nature, such study may be considered as avocational or recreational. 67 FR 76266.

DHS maintains the long-standing view that an F–2 or M–2 nonimmigrant who wishes to engage in a full course of study in the United States, other than elementary or secondary school study (kindergarten through twelfth grade), should apply for and obtain approval to change his or her nonimmigrant classification to F–1, J–1, or M–1. *See* 8 CFR 214.2(f)(15)(ii) and 8 CFR 214.2(m)(17)(ii). However, as described in the NPRM, because DHS recognizes that the United States is engaged in a global competition to attract the best and brightest international students to study in our schools, permitting access of F–2 or M–2 nonimmigrants to education while in the United States would help enhance the quality of life for many of these visiting families. The existing limitations on study to F–2 or M–2 nonimmigrant education potentially deter high quality F–1 and M–1 students from studying in the United States.[4]

Accordingly, DHS is relaxing its prohibition on F–2 and M–2 nonimmigrant study by permitting F–2 and M–2 nonimmigrant spouses and children to engage in study in the United States at SEVP-certified schools that does not amount to a full course of study. Under this rule, F–2 and M–2 nonimmigrants are permitted to enroll in less than a "full course of study," as defined at 8 CFR 214.2(f)(6)(i)(A) through (D) and 8 CFR 214.2(m)(9)(i)– (iv), at an SEVP-certified school and in

study described in 8 CFR 214.2(f)(6)(i)(A) through (D) and 8 CFR 214.2(m)(9)(i)–(iv).[5] Regulations at 8 CFR 214.2(f)(6)(i)(B) and 8 CFR 214.2(m)(9)(i) currently define full course of study at an undergraduate college or university (F nonimmigrants) or at a community college or junior college (M nonimmigrants) to include lesser course loads if the student needs fewer than 12 hours to complete a degree or specific educational objective. This limited exception, which defines a course load of less than 12 hours as a full course of study, only applies to F–1 and M–1 nonimmigrants and will not apply to F–2 or M–2 dependents. Accordingly, an F–2 or M–2 dependent taking less than 12 hours cannot be deemed to be engaging in a full course of study. As stated in the NPRM, over time such enrollment in less than a full course of study could lead to attainment of a degree, certificate or other credential. To maintain valid F–2 or M–2 status, however, the F–2 or M–2 nonimmigrant would not be permitted at any time to enroll in a total number of credit hours that would amount to a "full course of study," as defined by regulation.

In addition, the change limits F–2 and M–2 study, other than avocational or recreational study, to SEVP-certified schools, in order to make it more likely that the educational program pursued by the F–2 or M–2 nonimmigrant is a bona fide program and that studies at the school are unlikely to raise national security concerns. The F–2 or M–2 nonimmigrants can still participate full-time in avocational or recreational study (*i.e.,* hobbies and recreational studies). If an F–2 or M–2 nonimmigrant wants to enroll in a full course of academic study, however, he or she needs to apply for and obtain approval to change his or her nonimmigrant classification to F–1, J–1 or M–1. Similarly, as noted, the rule does not change existing regulations allowing full-time study by children in elementary or secondary school (kindergarten through twelfth grade).

This rule does not change the recordkeeping and reporting responsibilities of DSOs with regard to F–2 or M–2 nonimmigrants to DHS. DSOs at the school the F–1 or M–1

---

[4] *See* Letter of April 13, 2011 from NAFSA: Association of International Educators to DHS General Counsel Ivan Fong, available in the federal rulemaking docket for this rulemaking at *www.regulations.gov,* requesting that DHS eliminate the limitation on study by F–2 spouses to only "avocational or recreational" study because the limitation "severely restricts the opportunities for F–2 dependents, such as spouses of F–1 students, to make productive use of their time in the United States."

[5] As a general matter, a full course of study for an F–1 academic student in an undergraduate program is 12 credit hours per academic term. Similarly, a full course of study for an M–1 vocational student consists of 12 credit hours per academic term at a community college or junior college. For other types of academic or vocational study, the term "full course of study" is defined in terms of "clock hours" per week depending on the specific program. *See* 8 CFR 214.2(f)(6)(i)(A)–(D) and 8 CFR 214.2(m)(9)(i)–(iv).

student attends retain reporting responsibility for maintaining F–2 or M–2 nonimmigrant personal information in SEVIS. *See* 8 CFR 214.3(g)(1). In addition, to facilitate maintenance of F or M nonimmigrant status and processing of future applications for U.S. immigration benefits, F and M nonimmigrants are encouraged to retain personal copies of the information supplied for admission, visas, passports, entry, and benefit-related documents indefinitely.[6] Similarly, under this rule, DHS recommends, as it did in the NPRM, that an F–2 or M–2 nonimmigrant should separately maintain (*i.e.,* obtain and retain) his or her academic records. As F and M nonimmigrants already are encouraged to keep a number of immigration-related records, the suggested additional maintenance of academic records in an already existing file of immigration records will impose minimal marginal cost. This rule does not extend F–2 or M–2 nonimmigrants' access to any other nonimmigrant benefits beyond those specifically identified in regulations applicable to F–2 or M–2 nonimmigrants. *See* 8 CFR 214.2(f)(15) and 8 CFR 214.2(m)(17).

## IV. Discussion of Comments, Changes, and the Final Rule

DHS received a total of 37 comments on the proposed rule. After reviewing all the comments, DHS is adopting the rule as proposed, with minor technical corrections. Of the 37 comments received, 27 commenters supported the proposal to remove the limit on the number of DSO nominations per campus. These commenters noted that removing this limitation would permit schools to plan their staffing requirements more efficiently across campuses. In addition, the commenters suggested that permitting an increased number of DSOs would permit schools to better serve their students and would enhance their ability to meet SEVIS reporting and oversight requirements. Two commenters, however, recommended against the proposed change because of national security concerns. Because the commenters did not elaborate on the potential concerns they believed might result, and DHS

does not consider removing the limitation on the number of DSOs per campus to negatively affect national security, DHS is adopting this provision as proposed.

The majority of comments DHS received in response to the proposed rule supported the proposal to permit F–2 and M–2 nonimmigrants to study at SEVP-approved schools on a less than full-time basis. Many of these commenters argued that the change would enhance the quality of life of F–2 and M–2 nonimmigrants and would assist the United States in attracting the "best and brightest" students to U.S. institutions. Of these commenters, four asserted that the rule change would have a positive effect on the U.S. economy, particularly with more students paying tuition and buying books and supplies. Two of the commenters also noted that the proposed change would have the benefit of enabling F–2 and M–2 nonimmigrants to learn English at SEVP-approved schools, thereby facilitating their adjustment to life in the United States. One commenter specifically noted appreciation that DHS clarified that an F–2 nonimmigrant could complete a degree, so long as all study at SEVP-approved schools was completed on a less than full-time basis. DHS further notes that this same clarification also applies to an M–2 nonimmigrant, again, so long as all study at SEVP-approved schools occurs on a less than full-time basis.

Four commenters suggested that the regulation change would be improved if it permitted F–2 and M–2 nonimmigrants to study full-time, in addition to permitting them to engage in less than a full course of study. The commenters noted that dependents of other nonimmigrant categories are permitted to study full-time, for example, the J–2 spouses of J–1 exchange visitors. DHS appreciates these comments and has considered them carefully. However, DHS is of the opinion that permitting F–2 and M–2 nonimmigrants to engage in a full course of study would blur fundamental distinctions between the F–1 and F–2, and M–1 and M–2 classifications, respectively. Moreover, it would be illogical to provide greater flexibility for study by F–2 or M–2 dependants than is afforded to F–1 or M–1 principals, respectively. The INA requires F–1 and M–1 principals to pursue a full course of study. INA sections 101(a)(15)(F)(i) and (M)(i); 8 U.S.C. 1101(a)(15)(F)(i) and (M)(i). Congress intended F–1 and M–1 principals to have greater educational opportunities, not fewer, than their F–2 and M–2 dependents. In establishing

the F–1 and M–1 classifications for principal nonimmigrant students separate from the F–2 and M–2 classifications for spouses and children, respectively, Congress clearly did not intend the classifications to be synonymous. Accordingly, it would not be appropriate to permit F–2 and M–2 dependents to engage in either full-time or less than full-time study, at the discretion of the individual F–2 or M–2 dependent, when such discretion is not afforded to the F–1 or M–1 principal. DHS thus has maintained the prohibition on full-time study by F–2 and M–2 nonimmigrants.

With respect to the commenters' observation about J–2 dependent spouses, the purpose of the J nonimmigrant classification is fundamentally different from that of the F and M classifications. Admission in J nonimmigrant status permits engagement in multiple activities other than full-time study (*e.g.,* to serve as researchers or professors, or performing other professional duties in the United States). The purpose of the Exchange Visitor Program (J visa) "is to further the foreign policy interest of the United States by increasing the mutual understanding between the people of the United States and the people of other countries by means of mutual educational and cultural exchanges." 9 Foreign Affairs Manual 41.62 N2. Specific Exchange Visitor programs are designated by DOS, not by DHS, and their parameters are set by DOS to advance U.S. foreign policy interests. The same foreign policy interests that apply to J–1 nonimmigrants and their dependents are not implicated in the F and M nonimmigrant context. The primary purpose of the F–1 and M–1 nonimmigrant classifications, in contrast with the J classification, is to permit foreign nationals to enter the United States solely to engage in full-time study. DHS believes that the best means to preserve the integrity of the F–1 and M–1 classifications, and to ensure these classifications remain the primary vehicles for full-time study, is to require a dependent in F or M status who wishes to engage in a full course of study to make such intent evident by applying for and receiving a change of status to F–1 or M–1.

One commenter advocating for full-time F–2 and M–2 study stated that the limit to less than full-time study is unnecessary, as dependent students do not pose any additional security risk because SEVIS tracks them. DHS disagrees with this commenter. The recordkeeping requirements for F–1 and M–1 nonimmigrants in SEVIS are more comprehensive than they are for F–2

---

[6] ICE encourages retention of these records in the Supporting Statement for SEVIS, OMB No. 1653–0038, Question 7(d). Additionally, recordkeeping by F and M nonimmigrants is encouraged in existing regulation, in particular for the Form I–20, Certificate of Eligibility for Nonimmigrant Student (F–1 or M–1) Status. *See* 8 CFR 214.2(f)(2) and 214.2(m)(2). Moreover, nonimmigrant students may wish to retain a copy of the Form I–901, Fee Remittance for Certain F, J, and M Nonimmigrants, as proof of payment. *See generally* 8 CFR 214.13(g)(3).

and M–2 dependents, which is a derivative status. Recognizing this, any full-time study in the F and M nonimmigrant classifications should occur only after receiving F–1 or M–1 status through the already existing and available process of changing status. Allowing F–2 and M–2 dependents to take a full course of study would permit their participation in full-time study without the fuller vetting and oversight required for F–1 and M–1 nonimmigrants in SEVIS. DHS therefore disagrees with the commenter that dependents would pose no additional security risk if permitted to take a full course of study In addition, allowing F–2 and M–2 dependents to take a full course of study could lead to manipulation of F–1 and M–1 visas by allowing one family member who is accepted as an F–1 student to facilitate the full-time enrollment of all other dependents in their own courses of study.

Three commenters suggested that F–2 and M–2 nonimmigrants be permitted to commence their full-time study as soon as they apply for a change of status to F–1 or M–1. One of these commenters also requested that DHS revise the regulations governing change of status to specify that a nonimmigrant who is granted a change of status to F–1 or M–1 must begin the full course of study no later than the next available session or term after the change of status has been approved. The commenter suggested that individuals granted a change of status to F–1 or M–1 often are concerned that they might lose their new status if they do not enroll in classes immediately, but that this may be impossible if the approval is received midway during the school term or session.

DHS continues to maintain that a foreign national who wishes to engage in a full course of study must apply for and receive a change of status to F–1 or M–1 prior to commencing a full course of study. *See* 8 CFR 214.2(f)(15)(ii)(B), 214.2(m)(17)(ii)(B) (2013); *see also* 8 CFR 214.2(f)(15)(ii)(A)(2), 214.2(m)(17)(ii)(A)(2), as finalized herein. Approval of the change of status application before engaging in a full course of study is necessary to maintain the integrity of data in SEVIS, as well as to ensure that appropriate distinctions exist between the F–1 and M–1 classifications and their dependent classifications. DHS declines to elaborate on this rulemaking on the issue of when a nonimmigrant granted a change of status to F–1 or M–1 must commence the full course of study. That issue is beyond the scope of the proposed rulemaking, which focused on

permissible study by F–2 and M–2 nonimmigrants, rather than how F–1 and M–1 nonimmigrants should comply with the terms and conditions of their status.

In addition to the comments discussed above, DHS received a number of individual comments on discrete issues. These include one comment requesting that DHS consider extending the option to apply for employment authorization for F–2 and M–2 nonimmigrants with U.S. Citizenship and Immigration Services (USCIS). DHS appreciates the commenter's interest but has determined not to extend employment authorization to F–2 and M–2 nonimmigrants as part of this rulemaking. The rule's changes to F–2 and M–2 opportunities are intended to increase access of F–2 or M–2 nonimmigrants to education while in the United States and not to increase employment opportunities.

DHS received two comments about the number of training hours and the wage rate for DSOs used in the economic analysis of the rulemaking. The commenters asserted that the number of training hours required for DSOs is closer to a minimum of 90 hours of training in the first year, not seven hours as DHS estimated. The commenters further suggested that DSOs be categorized as professional staff, not administrative, for the purpose of calculating their wage rate.

SEVP does not currently require any specific training for DSOs; however, SEVP does require that DSOs sign a certification that they are familiar with the appropriate regulations and intend to comply with them. In addition, SEVP provides an Internet-based voluntary SEVIS training, which DSOs are strongly encouraged to complete. SEVP recognizes that many schools go above and beyond this, and commends these schools. However, other DSOs will not complete any training. Moreover, schools that increase the number of employed DSOs beyond ten as a result of this rule likely already have large offices of international student advisors that may require little to no additional training to perform DSO duties. Because the duties and initial training of DSOs varies widely among schools, with some being above the minimum suggested training by SEVP and others below, DHS believes the seven-hour training estimate is appropriate for the flexibility this rulemaking intends to provide schools.

DHS agrees with the commenters that a different wage rate is appropriate for DSOs and has amended the wage rate estimation in this final rule. DHS is

supportive of DSOs and the importance of their role in serving as a link between nonimmigrant students, schools and SEVP. DHS agrees that DSOs are professionals and perform important duties. The occupation code chosen to estimate the DSO wage rate for the analysis is not meant to undermine the importance of the role of the DSO. Rather, it serves as a proxy for the basic job duties required by SEVP of DSOs. DSOs provide advice to students regarding maintenance of their nonimmigrant status and maintaining enrollment, provide information on participation in programs of study in SEVIS, authorize optional practical training, and report to SEVP if a student has violated the conditions of his or her status. Individuals approved as DSOs may also perform other job duties as an element of their employment with schools, which are outside of those required by SEVP, to enhance nonimmigrants' stays in the United States. As noted by one commenter, these duties may include responsibilities ranging from ''airport pick-ups, to facilitating intercultural communications workshops.'' Because schools rely on DSOs to counsel nonimmigrant students of their responsibilities and maintain their nonimmigrant status, and DHS relies on DSOs to ensure the integrity of the program, DHS has amended the category used to estimate the DSO wage rate. In this final rule, DHS revises the wage rate from BLS category 43–9199 Office and Administrative Support Workers, All Other, to BLS category 21–1012 Educational, Guidance, School, and Vocational Counselors. See the Executive Orders 12866 and 13563: Regulatory Planning and Review section below for this revision.

Another commenter addressed the procedures used by SEVP to adjudicate changes to DSOs. The commenter expressed concern at the pace of adjudicating requests to add or remove DSOs, and also requested that SEVP publish the criteria it uses in adjudicating changes to DSOs, as well as establish an appeals process for denials of such requests. DHS appreciates these comments, but notes that they are outside the scope of the proposed rulemaking, which focused on the more discrete issue of the regulatory limitation on the number of DSOs permitted at each campus. SEVP, however, is working to make its adjudications process more efficient in the future.

Several commenters identified areas where the rulemaking could benefit from additional clarification or the correction of possible errors. One

commenter suggested that DHS clarify whether study of English as a second language (ESL) or intensive English is considered a vocational/recreational or academic study. DHS declines to define whether ESL is properly categorized as a vocational/recreational or academic study because this is outside the scope of the proposed rulemaking. Another commenter questioned whether F–2 and M–2 dependents would be permitted to take only those courses listed as part of the school's academic/certificate programs on the school's Form I–17, or whether F–2 and M–2 dependents would be able to enroll in any program. The regulation should not be interpreted to permit an F–2 or M–2 to enroll in courses in any program offered at an SEVP-certified school, but only a course of study that is SEVP-certified. The same commenter also inquired whether the proposed rule intended to permit full-time "recreational" study only at SEVP-certified schools and only in non-academic, non-accredited courses, or whether the rule would permit F–2 and M–2 dependents to enroll full-time at SEVP-certified schools in non-credit courses. The regulation does not expand opportunity for full-time study of any type for F–2 and M–2 dependents. The regulations continue to provide that F–2 and M–2 dependents may engage in study that is avocational or recreational in nature, up to and including on a full-time basis.

Additionally, one commenter pointed out that the language in the preamble of the proposed rulemaking at 78 FR 69781, explaining the definition of full course of study, implied incorrectly that F nonimmigrants only may enroll at colleges or universities, and not at community colleges or junior colleges. DHS appreciates this comment and agrees that a community college or junior college may appropriately enroll an F nonimmigrant.

Finally, DHS is making four technical corrections to the proposed regulatory text. One commenter noted that the proposed regulatory text at 8 CFR 214.2(f)(15)(ii)(C) referenced paragraph (f)(15)(ii)(A)(2), whereas it should include both paragraphs (A)(1) and (A)(2). DHS agrees with the commenter that this was an error and accordingly has revised the final rule to refer to (f)(15)(ii)(A), so as to apply to both paragraphs. In the course of preparing this final rule, DHS also recognized additional areas of the proposed regulatory text where further revision was necessary for purposes of accuracy and clarity. The proposed text located at 8 CFR 214.2(m)(17)(ii)(A)(1) had omitted a reference to the courses described in 8 CFR 214.2(f)(6)(i)(A)–(D)

as a type of course at an SEVP-certified school that an M–2 spouse or M–2 child may enroll in as less than a full course of study. With this rule, courses of study approved under both F and M study are available to both F–2 and M–2 nonimmigrants. Lastly, DHS added a reference to 8 CFR 214.2(m)(14) in the new provision authorizing limited F–2 study at SEVP-certified schools to clarify that F–2 spouses and children are not eligible to engage in any type of employment or practical training during their studies; correspondingly, DHS added a reference to 8 CFR 214.2(f)(9)–(10) in the new provision authorizing limited M–2 study at SEVP-certified schools for the same reason.

## V. Statutory and Regulatory Requirements

DHS developed this rule after considering numerous statutes and executive orders related to rulemaking. The below sections summarize our analyses based on a number of these statutes or executive orders.

### A. Executive Orders 12866 and 13563: Regulatory Planning and Review

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Management and Budget (OMB) has not designated this final rule as a "significant regulatory action" under section 3(f) of Executive Order 12866. Accordingly, OMB has not reviewed this final rule.

### 1. Summary

The rule eliminates the limit on the number of DSOs a school may have and establishes eligibility for F–2 and M–2 nonimmigrants to engage in less than a full course of study at SEVP-certified schools. If a particular school does not wish to add additional DSOs, this rule imposes no additional costs on that school. Based on feedback from the SEVP-certified schools, however, DHS believes up to 88 schools may choose to take advantage of this flexibility and designate additional DSOs. These SEVP-certified schools would incur costs related to current DHS DSO documentation requirements and any training DSOs may undertake. DHS

estimates the total 10-year discounted cost of allowing additional DSOs to be approximately $223,000 at a seven percent discount rate and approximately $264,000 at a three percent discount rate. Regarding the provision of the rule that establishes eligibility for less than a full course of study by F–2 and M–2 nonimmigrants, DHS is once again providing additional flexibilities. As this rule does not require the F–2 or M–2 nonimmigrant to submit any new documentation or fees to SEVIS or the SEVP-certified school to comply with any DHS requirements, DHS does not believe there are any costs associated with establishing eligibility for F–2 and M–2 nonimmigrants to engage in less than full courses of study at SEVP-certified schools.

### 2. Designated School Officials

The only anticipated costs for SEVP-certified schools to increase the number of DSOs above the current limit of ten per school or campus derive from the existing requirement for reporting additional DSOs to DHS, and any training that new DSOs would undertake. DHS anticipates the number of schools that will avail themselves of this added flexibility will be relatively small. As of April 2012, there are 9,888 SEVP-certified schools (18,733 campuses), with approximately 30,500 total DSOs, and an average of 3.08 DSOs per school. However, there are only 88 SEVP-certified schools that currently employ the maximum number of DSOs.

DHS is unable to estimate with precision the number of additional DSOs schools may choose to add. While some of the 88 SEVP-certified schools that currently employ the maximum number of DSOs may not add any additional DSOs, others may add several additional DSOs. DHS's best estimate is that these 88 SEVP-certified schools will on average designate three additional DSOs, for a total of 264 additional DSOs.

DHS estimates that current documentation requirements, as well as training a DSO might undertake to begin his or her position, equate to approximately seven hours total in the first year. DHS does not track wages paid to DSOs; however, in response to a comment received on the NPRM, DHS is revising the wage rate used to estimate DSO wages. For this final rule, we are using the U.S. Department of Labor, Bureau of Labor Statistics occupation Educational, Guidance, School, and Vocational Counselors

DSO0014

occupational code as a proxy for DSOs.[7] The average wage rate for this occupation is estimated to be $27.00 per hour.[8] When the costs for employee benefits such as paid leave and health insurance are included, the full cost to the employer for an hour of DSO time is estimated at $37.80.[9] Therefore, the estimated burden hour cost as a result of designating 264 additional DSOs is estimated at $69,854 in the first year (7 hours × 264 DSOs × $37.80). On a per-school basis, DHS expects these SEVP-certified schools to incur an average of $794 dollars in costs in the initial year (7 hours × 3 new DSOs per school × $37.80). DHS notes that there are no recurrent annual training requirements mandated by DHS for DSOs once they have been approved as a DSO.

After the initial year, DHS expects the SEVP-certified schools that designate additional DSOs to incur costs for replacements, as these 264 new DSOs experience normal turnover. Based on information from the Bureau of Labor Statistics, we estimate an average annual turnover rate of approximately 37 percent.[10] Based on our estimate of 264 additional DSOs as a result of this rulemaking, we expect these schools will designate 98 replacement DSOs annually (264 DSOs × 37 percent annual turnover) in order to maintain these 264 additional DSOs. As current training and documentation requirements are estimated at seven hours per DSO, these SEVP-certified schools would incur total additional costs of $25,931 annually (7 hours × 98 replacement DSOs × $37.80) after the initial year. On a per school basis, DHS expects these schools to incur an average of $294

[7] The existing Paperwork Reduction Act control number OMB No. 1653–0038 for SEVIS uses the occupation "Office and Administrative Support Workers, All Other" as a proxy for DSO employment. However, DHS received comment on the NPRM that this is not the best category for the job duties or wages of a DSO, and suggesting that Counselor is more appropriate. Therefore, for this Final Rule, DHS has revised the BLS occupational code to Educational, Guidance, School, and Vocational Counselors.

[8] May 2012 Occupational Employment and Wage Estimates, National Cross-Industry Estimates, "21–1012 Educational, Guidance, School, and Vocational Counselors," Hourly Mean "H-mean," *http://www.bls.gov/oes/2012/may/oes211012.htm* (last modified Mar. 29, 2013).

[9] Employer Costs for Employee Compensation, June 2012, *http://www.bls.gov/news.release/archives/ecec_09112012.htm* (last modified Sept. 11, 2012). Calculated by dividing total private employer compensation costs of $28.80 per hour by average private sector wage and salary costs of $20.27 per hour (yields a benefits multiplier of approximately 1.4 × wages).

[10] Job Openings and Labor Turnover—Jan. 2013 (Mar. 12, 2013), *http://www.bls.gov/news.release/archives/jolts_03122013.pdf* reported that for 2012, annual total separations were 37.1 percent of employment.

dollars of recurring costs related to turnover after the initial year (7 hours × 3 new DSOs per school × 37 percent annual turnover × $37.80).

This rule addresses concerns within the U.S. education community that the current DSO limit of ten is too constraining. For example, allowing schools to request additional staff able to handle DSO responsibilities will increase flexibility in school offices and enable them to better manage their programs. This flexibility is particularly important in schools where F and M nonimmigrants are heavily concentrated or where instructional sites are in dispersed geographic locations. It will also assist schools in coping with seasonal surges in data entry requirements (e.g., start of school year reporting).

### 3. F–2 and M–2 Nonimmigrants

As of June 2012, SEVIS records indicate that there are 83,354 F–2 nonimmigrants in the United States, consisting of approximately 54 percent spouses and 46 percent children. Though both spouses and children may participate in study that is less than a full course of study at SEVP-certified schools under this rule, DHS assumes that spouses are more likely to avail themselves of this opportunity because most children are likely to be enrolled full-time in elementary or secondary education (kindergarten through twelfth grade). Though there may be exceptions to this assumption, for example, a child in high school taking a college course, the majority of F–2 nonimmigrants benefitting from this provision are likely to be spouses. DHS only uses this assumption to assist in estimating the number of F–2 nonimmigrants likely to benefit from this rule, which could be as high as 45,011 (83,354 × 54 percent), if 100 percent of F–2 spouses participate, but is likely to be lower as DHS does not expect that all F–2 spouses would take advantage of the opportunity. DHS does not believe there are any direct costs associated with establishing eligibility for F–2 nonimmigrants to engage in less than full courses of study at SEVP-certified schools. The rule would not require the F–2 nonimmigrant to submit any new documentation or fees to SEVIS or the SEVP-certified school to comply with any DHS requirements. In the NPRM, DHS requested comment on these assumptions and estimates. No comments were received in response to this request.

As of June 2012, SEVIS records indicate that there are 578 M–2 nonimmigrants in the United States. Pursuant to this rulemaking, these M–2

spouses and children will be eligible to take advantage of the option to participate in study that is less than a full course of study at SEVP-certified schools. Approximately 39 percent of M–2 nonimmigrants are spouses and 61 percent are children. Again, DHS assumes that spouses would comprise the majority of M–2 nonimmigrants to benefit from this provision. This number could be as high as 225 M–2 nonimmigrants (578 × 39 percent), but is likely to be lower as DHS does not expect that all M–2 spouses would take advantage of the opportunity. Under the same procedures governing F–2 nonimmigrants, the M–2 nonimmigrants would not be required to submit any new documentation or fees to SEVIS or the SEVP-certified school to comply with any DHS requirements. In the NPRM, DHS requested comment on these assumptions and estimates. No comments were received in response to this request.

The rule provides greater incentive for international students to study in the United States by permitting accompanying spouses and children of academic and vocational nonimmigrant students in F–1 or M–1 status to enroll in study at a SEVP-certified school if not a full course of study. DHS recognizes that the United States is engaged in a global competition to attract the best and brightest international students to study in our schools. The ability of F–2 or M–2 nonimmigrants to have access to education while in the United States is in many instances central to maintaining a satisfactory quality of life for these visiting families.

### 4. Conclusion

The rule eliminates the limit on the number of DSOs a school may have and establishes eligibility for F–2 and M–2 nonimmigrants to engage in less than a full course of study at SEVP-certified schools. If a particular school does not wish to add additional DSOs, this rule imposes no additional costs on that school. DHS believes up to 88 schools may choose to take advantage of this flexibility and designate additional DSOs. These SEVP-certified schools would incur costs related to current DHS DSO training and documentation requirements; DHS estimates the total 10-year discounted cost to be approximately $223,000 at a seven percent discount rate and approximately $264,000 at a three percent discount rate. DHS does not believe there are any costs associated with establishing eligibility for F–2 and M–2 nonimmigrants to engage in less than full courses of study at SEVP-certified schools as this rule does not require the

F–2 or M–2 nonimmigrant to submit any new documentation or fees to SEVIS or the SEVP-certified school to comply with any DHS requirements.

The table below summarizes the total costs and benefits of the rule to allow additional DSOs at schools and permit accompanying spouses and children of nonimmigrant students of F–1 or M–1 status to enroll in study at a SEVP-certified school if not a full course of study. In the NPRM, DHS welcomed public comments that specifically addressed the nature and extent of any potential economic impacts of the proposed amendments that we may not have identified. DHS specifically requested comments in the NPRM on whether there were any additional burdens imposed on F–2 and M–2 nonimmigrants related to additional record storage costs. No comments were received in response to this request.

|  | DSOs | F–2 and M–2 nonimmigrants | Total rulemaking |
|---|---|---|---|
| 10-Year Cost, Discounted at 7 Percent. | $223,000 | $0 | $223,000 |
| Total Monetized Benefits | N/A | N/A | N/A |
| Non-monetized Benefits | Increased flexibility in school offices to enable them to better manage their programs. | Greater incentive for international students to study in the U.S. by permitting accompanying spouses and children of nonimmigrant students with F–1 or M–1 status to enroll in study at a SEVP-certified school if not a full course of study. |  |
| Net Benefits | N/A | N/A | N/A |

*B. Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (5 U.S.C. 601–612), we have considered whether this rule would have a significant economic impact on a substantial number of small entities. The term "small entities" comprises small businesses, not-for profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. This rule eliminates the limit on the number of DSOs a school may nominate and permits F–2 and M–2 nonimmigrants to engage in less than a full course of study at SEVP-certified schools. Although some of the schools impacted by these changes may be considered as small entities as that term is defined in 5 U.S.C. 601(6), the effect of this rule is to benefit those schools by expanding their ability to nominate DSOs and to enroll F–2 and M–2 nonimmigrants for less than a full course of study.

In the subsection above, DHS has discussed the costs and benefits of this rule. The purpose of this rule is to provide additional regulatory flexibilities, not impose costly mandates on small entities. DHS again notes that the decision by schools to avail themselves of additional DSOs or F–2 or M–2 nonimmigrants who wish to pursue less than a full course of study is an entirely voluntary one and schools will do so only if the benefits to them outweigh the potential costs. In particular, removing the limit on the number of DSOs a school may designate allows schools the flexibility to better cope with seasonal surges in data entry requirements due to start of school year reporting. Accordingly, DHS certifies this rule will not have a significant economic impact on a substantial number of small entities. DHS received no comments challenging this certification.

*C. Small Business Regulatory Enforcement Fairness Act of 1996*

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121), we want to assist small entities in understanding this rule. If the rule would affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions or options for compliance, please contact the person listed in the **FOR FURTHER INFORMATION CONTACT**, above.

Small businesses may send comments on the actions of federal employees who enforce, or otherwise determine compliance with, federal regulations to the Small Business and Agriculture Regulatory Enforcement Ombudsman and the Regional Small Business Regulatory Fairness Boards. The Ombudsman evaluates these actions annually and rates each agency's responsiveness to small business. If you wish to comment on actions by employees of DHS, call 1–888–REG–FAIR (1–888–734–3247). DHS will not retaliate against small entities that question or complain about this rule or any policy or action of DHS.

*D. Collection of Information*

All Departments are required to submit to OMB for review and approval, any reporting or recordkeeping requirements inherent in a rule under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995), 44 U.S.C. 3501–3520. This information collection is covered under the existing Paperwork Reduction Act control number OMB No. 1653–0038 for the Student and Exchange Visitor Information System (SEVIS). This rule calls for no new collection of information under the Paperwork Reduction Act.

*E. Federalism*

A rule has implications for federalism under Executive Order 13132, *Federalism,* if it has a substantial direct effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. We have analyzed this rule under the Order and have determined that it does not have implications for federalism.

*F. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) requires federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Unfunded Mandates Reform Act addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate or by the private sector of $100,000,000 (adjusted for inflation) or more in any one year. Though this rule will not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

*G. Taking of Private Property*

This rule will not cause a taking of private property or otherwise have takings implications under Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights.

*H. Civil Justice Reform*

This rule meets applicable standards in sections 3(a) and 3(b)(2) of Executive

Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

*I. Protection of Children*

We have analyzed this rule under Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks. This rule is not a significant rule and does not create an environmental risk to health or risk to safety that might disproportionately affect children.

*J. Indian Tribal Governments*

This rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the federal government and Indian tribes or on the distribution of power and responsibilities between the federal government and Indian tribes.

*K. Energy Effects*

We have analyzed this rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. This final rule is not a ''significant regulatory action'' under Executive Order 12866 and is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The Administrator of the Office of Information and Regulatory Affairs has not designated it as a significant energy action. Therefore, it does not require a Statement of Energy Effects under Executive Order 13211.

*L. Technical Standards*

The National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through the Office of Management and Budget, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impracticable. Voluntary consensus standards are technical standards (*e.g.*, specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies. This rule does not use technical standards. Therefore, we did not consider the use of voluntary consensus standards.

*M. Environment*

The U.S. Department of Homeland Security Management Directive (MD) 023–01 establishes procedures that DHS and its Components use to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321–4375, and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500–1508. CEQ regulations allow federal agencies to establish categories of actions which do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1508.4. The MD 023–01 lists the Categorical Exclusions that DHS has found to have no such effect. MD 023–01 app. A tbl.1.

For an action to be categorically excluded, MD 023–01 requires the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions;

(2) The action is not a piece of a larger action; and

(3) No extraordinary circumstances exist that create the potential for a significant environmental effect. MD 023–01 app. A § 3.B(1)–(3).

Where it may be unclear whether the action meets these conditions, MD 023–01 requires the administrative record to reflect consideration of these conditions. MD 023–01 app. A § 3.B.

Here, the rule amends 8 CFR 214.2 and 214.3 relating to the U.S. Immigration and Customs Enforcement Student and Exchange Visitor Program. This rule removes the regulatory cap of ten designated school officials per campus participating in the SEVP and permits certain dependents to enroll in less than a full course of study at SEVP-certified schools.

ICE has analyzed this rule under MD 023–01. ICE has made a preliminary determination that this action is one of a category of actions which do not individually or cumulatively have a significant effect on the human environment. This rule clearly fits within the Categorical Exclusion found in MD 023–01, Appendix A, Table 1, number A3(d): ''Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect.'' This rule is not part of a larger action. This rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

**List of Subjects in 8 CFR Part 214**

Administrative practice and procedure, Aliens, Cultural exchange programs, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

**The Amendments**

For the reasons discussed in the preamble, DHS amends Chapter I of Title 8 of the Code of Federal Regulations as follows:

**PART 214—NONIMMIGRANT CLASSES**

■ 1. The authority citation for part 214 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 2. In § 214.2 revise paragraphs (f)(15)(ii) and (m)(17)(ii) to read as follows:

**§ 214.2   Special requirements for admission, extension, and maintenance of status.**

\*      \*      \*      \*      \*

(f) \* \* \*

(15) \* \* \*

(i) \* \* \*

(ii) *Study*—(A) *F–2 post-secondary/ vocational study*—(1) *Authorized study at SEVP-certified schools.* An F–2 spouse or F–2 child may enroll in less than a full course of study, as defined in paragraphs (f)(6)(i)(A) through (D) and (m)(9)(i) through (iv), in any course of study described in paragraphs (f)(6)(i)(A) through (D) or (m)(9)(i) through (iv) of this section at an SEVP-certified school. Notwithstanding paragraphs (f)(6)(i)(B) and (m)(9)(i) of this section, study at an undergraduate college or university or at a community college or junior college is not a full course of study solely because the F–2 nonimmigrant is engaging in a lesser course load to complete a course of study during the current term. An F–2 spouse or F–2 child enrolled in less than a full course of study is not eligible to engage in employment pursuant to paragraphs (f)(9) and (10) of this section or pursuant to paragraph (m)(14) of this section.

(2) *Full course of study.* Subject to paragraphs (f)(15)(ii)(B) and (f)(18) of this section, an F–2 spouse and child may engage in a full course of study only by applying for and obtaining a

DSO00017

change of status to F–1, M–1 or J–1 nonimmigrant status, as appropriate, before beginning a full course of study. An F–2 spouse and child may engage in study that is avocational or recreational in nature, up to and including on a full-time basis.

(B) *F–2 elementary or secondary study.* An F–2 child may engage in full-time study, including any full course of study, in any elementary or secondary school (kindergarten through twelfth grade).

(C) An F–2 spouse and child violates his or her nonimmigrant status by enrolling in any study except as provided in paragraph (f)(15)(ii)(A) or (B) of this section.

*    *    *    *    *

(m) *   *   *
(17) *   *   *
(i) *   *   *

(ii) *Study—*(A) *M–2 post-secondary/ vocational study—*(1) *Authorized study at SEVP-certified schools.* An M–2 spouse or M–2 child may enroll in less than a full course of study, as defined in paragraphs (f)(6)(i)(A) through (D) or (m)(9)(i) through (v), in any course of study described in paragraphs (f)(6)(i)(A) through (D) or (m)(9)(i) through (v) of this section at an SEVP-certified school. Notwithstanding paragraphs (f)(6)(i)(B) and (m)(9)(i) of this section, study at an undergraduate college or university or at a community college or junior college is not a full course of study solely because the M–2 nonimmigrant is engaging in a lesser course load to complete a course of study during the current term. An M–2 spouse or M–2 child enrolled in less than a full course of study is not eligible to engage in employment pursuant to paragraph (m)(14) of this section or pursuant to paragraphs (f)(9) through (10) of this section.

(2) *Full course of study.* Subject to paragraph (m)(17)(ii)(B) of this section, an M–2 spouse and child may engage in a full course of study only by applying for and obtaining a change of status to F–1, M–1, or J–1 status, as appropriate, before beginning a full course of study. An M–2 spouse and M–2 child may engage in study that is avocational or recreational in nature, up to and including on a full-time basis.

(B) *M–2 elementary or secondary study.* An M–2 child may engage in full-time study, including any full course of study, in any elementary or secondary school (kindergarten through twelfth grade).

(C) An M–2 spouse or child violates his or her nonimmigrant status by enrolling in any study except as

provided in paragraph (m)(17)(ii)(A) or (B) of this section.

*    *    *    *    *

■ 3. Revise § 214.3(l)(1)(iii) to read as follows:

**§ 214.3   Approval of schools for enrollment of F and M nonimmigrants.**

*    *    *    *    *

(l) *   *   *
(1) *   *   *

(iii) School officials may nominate as many DSOs in addition to PDSOs as they determine necessary to adequately provide recommendations to F and/or M students enrolled at the school regarding maintenance of nonimmigrant status and to support timely and complete recordkeeping and reporting to DHS, as required by this section. School officials must not permit a DSO or PDSO nominee access to SEVIS until DHS approves the nomination.

*    *    *    *    *

**Jeh Charles Johnson,**
*Secretary.*
[FR Doc. 2015–09959 Filed 4–28–15; 8:45 am]
**BILLING CODE 9111–28–P**

## DEPARTMENT OF ENERGY

### 10 CFR Part 1047

**RIN 1994–AA03**

### Authority of DOE Protective Force Officers That Are Federal Employees To Make Arrests Without a Warrant for Certain Crimes

**AGENCY:** National Nuclear Security Administration, Department of Energy.

**ACTION:** Final rule.

**SUMMARY:** Section 161 k. of the Atomic Energy Act, as amended, empowers the Secretary of Energy (''the Secretary'') to authorize designated U.S. Department of Energy (DOE) employees and contractors to make an arrest without a warrant for certain crimes. Specifically, the Secretary may authorize the arrest of any individual who has committed a federal crime in the presence of a DOE protective force officer regarding the property of the United States in the custody of DOE or DOE contractors. The Secretary may also authorize the arrest of any individual who is reasonably believed to have committed or to be committing a felony regarding the property of the United States in the custody of DOE or DOE contractors. Pursuant to this authority, DOE adds misdemeanor and felony violations of Assaulting a Federal Officer to the enumerated criminal violations for which DOE protective force officers that

are federal employees may execute an arrest without a warrant, as set forth in DOE regulations.

**DATES:** The rule is effective on April 29, 2015.

**FOR FURTHER INFORMATION CONTACT:** Mr. Bruce Diamond, U.S. Department of Energy, National Nuclear Security Administration, Mail Stop NNSA, Forrestal Building, 1000 Independence Avenue SW., Washington, DC 20585– 0103. Telephone: (202) 586–3700. Email: *Bruce.Diamond@nnsa.doe.gov.*

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Background and Authority
II. Synopsis of the Rule
III. Regulatory Procedures, Justification for Final Rule
    Administrative Procedure Act
    Review Under Executive Order 12866
    Review Under the Regulatory Flexibility Act
    Review Under the Paperwork Reduction Act
    Review Under the National Environmental Policy Act of 1969
    Review Under Executive Order 13132
    Review Under Executive Order 12988
    Review Under the Unfunded Mandates Reform Act of 1995
    Review Under the Treasury and General Government Appropriations Act, 1999
    Review Under Executive Order 12630
    Review Under the Treasury and General Government Appropriations Act, 2001
    Review Under Executive Order 13211
    Congressional Notification
IV. Approval of the Office of the Secretary

### I. Background and Authority

Section 161 k. of the Atomic Energy Act of 1954 (AEA), as amended by Pub. L. 105–394 (codified at 42 U.S.C. 2201(k)), empowers the Secretary of Energy (''the Secretary'') to authorize designated members, officer, employees, contractors, and subcontractors of the Department of Energy (DOE) to carry firearms while discharging their official duties. Section 161 k. further provides that the Secretary may authorize these designated officials to make an arrest without a warrant for any federal crime regarding the property of the United States in the custody of DOE or a DOE contractor and for any federal felony regarding the property of the United States in the custody of DOE or a DOE contractor that a designated official reasonably believes is being or has been committed. Lastly, section 161 k. authorizes the Secretary to issue guidelines, with the approval of the Attorney General, to implement this authority.

The Secretary has previously exercised this authority to sanction arrests without warrants for certain federal crimes through the regulation at

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/10/18 12:10 PM |
| **Received:** November 22, 2013 |
| **Status:** Posted |
| **Posted:** November 22, 2013 |
| **Tracking No.** 1jx-88vq-aztv |
| **Comments Due:** January 21, 2014 |
| **Submission Type:** Web |

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0002
Comment Submitted by Lynne Vanahill

---

## Submitter Information

**Name:** Lynne Vanahill
**Address:**
    1450 Jayhawk Blvd Rm 2
    Lawrence,  KS,  66045
**Email:** vanahill@ku.edu
**Phone:** 785-864-3617

---

## General Comment

ICEB-2011-0005 Proposed Rule - See attached for easier reading with formatting

I am the PDSO at a large research institution. We currently have 2044 Active F-1 records and 304 Active F-2 records. We do not have any M-1 students.

IV. Discussion of Proposed Rule
A. Removing the Limit on DSO Nominations
Praise
My school currently uses less than 10 DSOs and does not anticipate needing more than 10; however, I know this limitation has been an issue for a few other schools and this change is warmly received. Thank you very much for listening to the needs of our community and responding. It is greatly appreciated!

B. Study by F-2 and M-2 Spouses and Children
Praise
This change is very well received as well! Thank you. This has been an on-going issue for many F-2 dependents who wish to study.
Points in the proposed rule very much appreciated:
• DHS recognizing the U.S. is engaged in a global completion to attract the best and brightest international students and that limits on F-2 study can deter high quality F-1 students from coming to the U.S.
• Allowing F-2s to engage in study less than a full course of study
• Clarifying that F-2s can be degree-seeking

DSO00271

Clarification sought

DHS states F-2s "could still participate full-time in avocational or recreational study" ; however, if an F-2 wants to "enroll in a full course of academic study", the F-2 would have to change to F-1.

• For the last decade there has been extensive debate if "English language study" (ESL or intensive English) is considered avocational or recreational.

• Please clarify if English language study is considered avocational/recreational or academic.

• Can an F-2 pursue a full course of English language study?


V. Regulatory Analyses

A. Executive Orders 13563 and 12866: Regulatory Planning and Review

2. DESIGNATED SCHOOL OFFICIALS

Suggestions

Training for a New DSO

• DHS "estimates that current training and documentation requirements for a DSO to begin his or her position equate to seven hours total in the first year."

• For a new DSO, in the first year, we usually send them two 9-hour workshops for a total of eighteen hours. I haven't timed the SEVP online DSO-training lately, but when it first came out I think it took me about four hours to go through it. We also have the new DSO meet with another advisor one on one for an hour every day for the first month for a total of twenty hours. After that, the new advisor still meets one on one for training one hour a week for the first year for a total of forty-eight hours. This is just direct training; however, training is ongoing and we don't even feel a DSO is fully trained after one year in the job. It is a major investment to train a DSO.

• I estimate it is a minimum of 90 hours of training the first year for a new DSO.

Wage Rate

• DHS selected the average wage rate for the occupation "Office and Administrative Support Workers."

• Although not familiar with the options, we consider DSO to be professional (not support staff). We require a bachelor's and prefer a master's degree. Currently, all 5 of our immigration advisors have a master's degree. Perhaps a Counselor would be a more appropriate category.

• Our starting advisor position pays an annual salary of $38,000 and we are in Kansas which has a relatively low cost of living.

• Please adjust the wages to a higher, more appropriate salary for a DSO.


3. F-2 AND M-2 NONIMMIGRANTS

Agreement

Direct Costs

• It is agreed there aren't any significant direct costs associated with F-2 enrolling in less than a full course of study.


SUMMARY

Thank you very much for these proposed changes. They are very favorable and I think they are reflective of how understanding and supporting SEVP is in regards to listening to the education community. My primary request is to push for clarification if pursuing a full course of study in ESL as an F-2 would be considered acceptable by SEVP. My secondary concern is to make adjustments to the calculation for wages and the amount of time needed to train a new DSO.


Again, thank you very much for these positive changes.


Lynne Vanahill
1450 Jayhawk Blvd Rm 2
Lawrence, KS 66045
vanahill@ku.edu
Ph: (785) 864-3617


P.S. Instructions for Submitting Comments are Incorrect

"To submit your comment online, go to http://www.regulations.gov, click on the "submit a comment" box,

DSO00272

which will then become highlighted in blue

I went to www.regulations.gov and cannot find a "submit a comment" box anywhere on that page Please update your instructions.

# Attachments

ICEB-2011-0005 comments by vanahill

DSO00273

ICEB-2011-0005 Proposed Rule

I am the PDSO at a large research institution.  We currently have 2044 Active F-1 records and 304 Active F-2 records.  We do not have any M-1 students.

## IV. Discussion of Proposed Rule
### A. Removing the Limit on DSO Nominations
Praise

My school currently uses less than 10 DSOs and does not anticipate needing more than 10; however, I know this limitation has been an issue for a few other schools and this change is warmly received.  Thank you very much for listening to the needs of our community and responding.  It is greatly appreciated!

### B. Study by F-2 and M-2 Spouses and Children
Praise

This change is very well received as well!  Thank you.  This has been an on-going issue for many F-2 dependents who wish to study.

Points in the proposed rule very much appreciated:

! DHS recognizing the U.S. is engaged in a global completion to attract the best and brightest international students and that limits on F-2 study can deter high quality F-1 students from coming to the U.S.

! Allowing F-2s to engage in study less than a full course of study

! Clarifying that F-2s can be degree-seeking

Clarification sought

DHS states F-2s "could still participate full-time in avocational or recreational study" ; however, if an F-2 wants to "enroll in a full course of academic study", the F-2 would have to change to F-1.

! For the last decade there has been extensive debate if "English language study" (ESL or intensive English) is considered avocational or recreational.

! **Please clarify if English language study is considered avocational/recreational or academic.**

! **Can an F-2 pursue a full course of English language study?**

## V. Regulatory Analyses
### A. Executive Orders 13563 and 12866: Regulatory Planning and Review
#### 2. DESIGNATED SCHOOL OFFICIALS
Suggestions

Training for a New DSO

! DHS "estimates that current training and documentation requirements for a DSO to begin his or her position equate to *seven hours* total in the first year."

! For a new DSO, in the first year, we usually send them two 9-hour workshops for a total of *eighteen hours*.  I haven't timed the SEVP online DSO-training lately, but when it first came out I think it took me about *four hours* to go through it.  We also have the new DSO meet with another advisor one on one for an hour every day for the first month for a total of *twenty hours*.  After that, the new advisor still meets one on one for training one hour a week for the first year for a total of *forty-eight* hours.  This is just direct training; however, training is ongoing and we don't even

feel a DSO is fully trained after one year in the job.  It is a major investment to train a DSO.

! **I estimate it is a minimum of 90 hours of training the first year for a new DSO.**

Wage Rate

! DHS selected the average wage rate for the occupation "Office and Administrative Support Workers."

! Although not familiar with the options, we consider DSO to be professional (not support staff).  We require a bachelor's and prefer a master's degree.  Currently,  all 5 of our immigration advisors have a master's degree.  Perhaps a Counselor would be a more appropriate category.

! Our starting advisor position pays an annual salary of $38,000 and we are in Kansas which has a relatively low cost of living.

! **Please adjust the wages to a higher, more appropriate salary for a DSO.**

**3.  F-2 AND M-2 NONIMMIGRANTS**

Agreement

Direct Costs

! It is agreed there aren't any significant direct costs associated with F-2 enrolling in less than a full course of study.

**SUMMARY**

Thank you very much for these proposed changes.  They are very favorable and I think they are reflective of how understanding and supporting SEVP is in regards to listening to the education community.  **My primary request is to push for clarification if pursuing a full course of study in ESL as an F-2 would be considered acceptable by SEVP**.  My secondary concern is to make adjustments to the calculation for wages and the amount of time needed to train a new DSO.

Again, thank you very much for these positive changes.

Lynne Vanahill
1450 Jayhawk Blvd Rm 2
Lawrence, KS 66045
vanahill@ku.edu
Ph: (785) 864-3617

**P.S.  Instructions for Submitting Comments are Incorrect**

"To submit your comment online, go to *http://www.regulations.gov,* click on the "submit a comment" box, which will then become highlighted in blue

I went to www.regulations.gov  and cannot find a "submit a comment" box anywhere on that page Please update your instructions.

DSO00275

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:20 PM
**Received:** November 22, 2013
**Status:** Posted
**Posted:** November 22, 2013
**Tracking No.** 1jx-88vs-galx
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0003
Comment Submitted by Irena Aleksic

---

## Submitter Information

**Name:** Irena Aleksic
**Address:** United States,
**Email:** irena.aleksic@hccs.edu

---

## General Comment

I think this is an excellent decision and I hope that it will be put into practice soon. Many schools have thousands of international students, which makes them burdensome to manage with a maximum of 10 DSOs. SEVP-certified institutions will be able to remain compliant more effectively when the need for more SEVIS users is met. Additionally, I support the idea to permit a freedom to study to the dependents of our F-1 and M-1 visa holders.

DSO00276

file:///z02vdm3icow/...-%20ICE%20Regulations/DSO%20F-2%20M-2%20Rule/1.%20NPRM/Public%20Comments/Irena%20Aleksic html[12/10/2018 1:22:15 PM]

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:21 PM
**Received:** November 24, 2013
**Status:** Posted
**Posted:** November 26, 2013
**Tracking No.** 1jx-88xa-3d27
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0004
Comment Submitted by Marni Sanders

---

## Submitter Information

**Name:** Marni Sanders
**Address:**
    2605 E Andrew Rd/192
    Sherman,  62684
**Email:** antmarni10@aol.com

---

## General Comment

I agree to the limitation to the amount (10) students allowed at each specialized grant school for better tracking
and national security measures. Good luck

DSO00277

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:22 PM
**Received:** November 27, 2013
**Status:** Posted
**Posted:** November 27, 2013
**Tracking No.** 1jx-88z4-xnm4
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0005
Comment Submitted by Duane Rohovit

---

## Submitter Information

**Name:** Duane Rohovit

---

## General Comment

This is an excellent change that will encourage international students to study in the U.S. It would be even better
if F-2 non-immigrants were allowed to study full time as well as part time. Dependents of J-1 students have been
allowed this option for some time and there have been no problems. It doesn't make sense that F-2 visa holders
would be treated differently than J-2 students.

DSO00278

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/10/18 12:22 PM |
| **Received:** November 27, 2013 |
| **Status:** Posted |
| **Posted:** November 27, 2013 |
| **Tracking No.** 1jx-88z5-c1yw |
| **Comments Due:** January 21, 2014 |
| **Submission Type:** Web |

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0006
Comment Submitted by Theresa GanglGhassemlouei

---

## Submitter Information

**Name:** Theresa GanglGhassemlouei

---

## General Comment

Providing more flexibility to schools in determining the number of designated school officials (DSOs) by eliminating the limit of 10 DSOs in favor of a more flexible approach will result in better service to international students and DHS. This change will particularly benefit larger schools who have had difficulty because DSOs are spread across admissions, graduate school and international student services offices, and all are required to provide service to students but when peak demand periods occur none are adequately staffed (with DSOs) to address the need.

Secondly, while allowing F-2/M-2 dependents of F-1 or M-1 nonimmigrants to study is movement in the right direction, the change doesn't go far enough. If individuals in every other a dependent visa status are allowed to study full-time what is the justification for limiting F-2s to part-time study? Individuals in J-2 status who accompany J-1 students are allowed to study full-time and are not required to change their status. Why are F-2s treated in this disadvantaged manner? How does the limitation to part-time study benefit the US government? Why create this artificial disparity among dependent visa statuses? I hope you will take this recommendation under serious consideration.

DSO00279

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:23 PM
**Received:** November 27, 2013
**Status:** Posted
**Posted:** November 29, 2013
**Tracking No.** 1jx-88z8-f9fs
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0007
Comment Submitted by Debra Siegel

---

## Submitter Information

**Name:** Debra Siegel

---

## General Comment

These changes are very positive. The additional DSOs will save us a lot of time and extra work which also translates to cost. The ability for F2s to be able to study will be attractive to many. As it has been, dependents come and are unable to do anything productive and find themselves bored and frustrated, so this is definitely a good change. However, it is not clear why F2's are unable to study full-time as do dependents on many other visa types including J2. Offering a full-time option would benefit the student and their dependent as well as the chosen academic institution. It would also add incentive for students to choose to come to a U.S. school over schools in other parts of the world.

Thank you.

DSO00280

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:26 PM
**Received:** November 27, 2013
**Status:** Posted
**Posted:** November 29, 2013
**Tracking No.** 1jx-88zf-veu1
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0008
Comment Submitted by Anonymous

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

The Department of Homeland Security should not amend its regulations under the Student and Exchange Visitor
Program .first of all this program is not working,the homeland security should crosscheck check all the foreign
students that have graduated,with the IRS to see IF THEY ARE WORKING HOMELAND SECURITY WILL
BE SURPRISED JUST UNDER 10 PERCENT WORK,THEY JUST LEAVE SCHOOL AND WANT TO
SELL DRUGS,SEND THE MONEY BY WESTERN UNION AND EVENTUALLY GO BACK TO THEIR
COUNTRY AND INVEST THEIR ILLEGAL PROCEEDS. THE IMMIGRATION AND CUSTOMS
ENFORCEMENT BUREAU SHOULD NOT DO ANY ADJUSTMENTS.FOR NATIONAL SECURITY
CONCERNS.

DSO00281

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:26 PM
**Received:** November 29, 2013
**Status:** Posted
**Posted:** November 29, 2013
**Tracking No.** 1jx-890g-dbqd
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0009
Comment Submitted by Ron Cushing

---

## Submitter Information

**Name:** Ron Cushing
**Address:**
   47 W. Corry St.
   3134 Edwards Center One
   Cincinnati,  OH,  45221-0640
**Email:** cushinrb@ucmail.uc.edu
**Phone:** 513-556-2879
**Fax:** 513-556-2990

---

## General Comment

I support the proposed regulation that will allow the institution to determine the number of DSO's necessary to comply with SEVIS reporting requirements. I also agree with the proposed regulation that will allow F-2 and M-2 dependents to study part time. However, I strongly suggest that language be added to the final rule to allow F-2 and M-2 dependents who have applied for a change of status to F-1 or M-1 to study full time while the change of status is being processed. If denied, the F-2 or M-2 dependent could then drop to part-time study the next available term. This addition would allow students who taken the necessary steps to apply for the correct status to study while a decision is being made.

DSO00282

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/10/18 12:27 PM |
| **Received:** December 03, 2013 |
| **Status:** Posted |
| **Posted:** December 05, 2013 |
| **Tracking No.** 1jx-893g-cwxx |
| **Comments Due:** January 21, 2014 |
| **Submission Type:** Web |

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0010
Comment Submitted by Abdul Salam

---

## Submitter Information

**Name:** Abdul Salam
**Address:** United States,

---

## General Comment

Part time study permission to F-2 and M-2 is really very good step. It will be helpful for thousands of these
dependants to go to universities without going through the extra hassle of changing status and is recommended
strongly.

DSO00283

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:27 PM
**Received:** December 06, 2013
**Status:** Posted
**Posted:** December 06, 2013
**Tracking No.** 1jx-8954-hcyc
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0011
Comment Submitted by Brett Reichert

---

## Submitter Information

**Name:** Brett Reichert

---

## General Comment

Yes, I support this change. It's way overdue and a small step in the right direction. Requiring these individuals to stay home and do nothing is more of a threat to national security than letting them learn something, pay tuition, fees, and feel engaged in the community that is hosting them.

DSO00284

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:28 PM
**Received:** December 16, 2013
**Status:** Posted
**Posted:** December 17, 2013
**Tracking No.** 1jx-89bv-79vn
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0012
Comment Submitted by Laura Buhs, University of Denver

---

## Submitter Information

**Name:** Laura Buhs
**Address:**
  c/o ISSS
  2200 S. Josephine
  Denver,  CO,  80210
**Email:** lbuhs@du.edu
**Phone:** 303-871-7861
**Fax:** 303-871-4910

---

## General Comment

I fully support the proposed changes and welcome their speed implementation. Increasing the number of DSO will greatly help schools with large F-1 student populations or multiple sites and allowing F-2 dependents to study part-time will enhance their stays in the U.S. and contribute to the U.S. economy.

Laura Buhs
Assistant Director
Int'l Student and Scholar Services
University of Denver

DSO00285

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:28 PM
**Received:** December 16, 2013
**Status:** Posted
**Posted:** December 17, 2013
**Tracking No.** 1jx-89bx-zje5
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0013
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

A. Removing the Limit on DSO Nominations
This is a needed and necessary move. The elimination of limitations for DSOs will increase the efficiency of
schools, produce better documents, and provide more clarity to students. I support this change.

DSO00286

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:28 PM
**Received:** December 18, 2013
**Status:** Posted
**Posted:** December 19, 2013
**Tracking No.** 1jx-89da-9a5a
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0014
Comment Submitted by Anonymous

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I fully support both the adjustments to limitation on DSO Assignment and less than full-time study by F-2 and M-2 nonimmigrants. As a DSO, I understand the administrative frustrations that can occur when those who need access aren't allowed the tools they need in order to do their job. Lifting the limitation would also benefit schools with larger international student populations who have more than 10 advising/directing staff.

In regard to study by F-2 and M-2, many of them come to the U.S. to be with their spouse/parent, but otherwise have nothing to do. Allowing them to study would give them the opportunity to use their time to learn a new skill (including English), engage in American culture, and/or explore options of degree programs with potential to change to F-1 and study full-time. Allowing them to study could also have a positive impact our the economy in regard to tuition, books and supplies.

DSO00287

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:29 PM
**Received:** December 19, 2013
**Status:** Posted
**Posted:** December 20, 2013
**Tracking No.** 1jx-89ds-j3xo
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0015
Comment Submitted by Beverly Plowucha

---

## Submitter Information

**Name:** Beverly Plowucha

---

## General Comment

In reading through the proposed rule on DSO and F-2/M-2 study and I noticed on page 69781, column 2, 1st sentence of Federal Register/Vol. 78, No. 225 from Thursday, Nov. 21, 2013, Proposed Rules that they state "… at an undergraduate college or university (F nonimmigrant) or at a community college or junior college (M nonimmigrant)…." It implies that F are only at colleges/universities and M are only at community colleges/junior colleges which is inaccurate. A community college has the ability to enroll F non immigrant students just as at an "undergraduate college of university". The wording implies that is not the case and can hopefully be corrected to be inclusive of that fact prior to the rule being finalized.

Thank you for your consideration.

DSO00288

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:30 PM
**Received:** December 20, 2013
**Status:** Posted
**Posted:** December 23, 2013
**Tracking No.** 1jx-89em-qjrm
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0016
Comment Submitted by Michelle Massey

---

## Submitter Information

**Name:** Michelle Massey

---

## General Comment

At UMBC, we all appreciate these changes and look forward to the positive impact they could have on our students and their families. Thank you!!

DSO00289

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:30 PM
**Received:** January 06, 2014
**Status:** Posted
**Posted:** January 07, 2014
**Tracking No.** 1jy-89py-qbky
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0017
Comment Submitted by Thomas Sirinides

---

## Submitter Information

**Name:** Thomas Sirinides
**Address:**
  New York University
  New York,  NY,
**Email:** ts92@nyu.edu

---

## General Comment

1) Removing the Limit on DSO Nominations - I strongly support this proposal. At my current workplace, we have several full-time advisors who are not active DSOs because there are no DSO slots available for them use. This makes workflow issues in general a challenge and at times a great difficulty. For example during school holiday closings or when some DSOs are on approved vacation and others fall ill and do not come in, there have been days when only a few active DSOs are on hand to serve our busy international office. Though other advisors are here, they are not DSOs and so are limited in what they can do for students. Furthermore, with multiple schools and campuses, and with a staff team that moves among these sites, I have often had to plan staffing assignments based first on who is an active DSO, and then on other considerations. This is a challenge, and in many ways a needless waste of staffing and management resources. Staffing could be planned more efficiently if we were permitted to have all the DSOs needed to serve our various campuses and student populations.

2) Study by F-2 and M-2 Spouses and Children - I strongly support this proposal, as well. Although the primary purpose of these dependents is to accompany the F-1 student while in the US, many dependents would benefit greatly from the opportunity to study in more than an "avocational or recreational" capacity. This proposal would enhance dependents' quality of life in the US and thus help the US in the global competition to attract and retain the best and the brightest students.

DSO00290

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:31 PM
**Received:** January 07, 2014
**Status:** Posted
**Posted:** January 07, 2014
**Tracking No.** 1jy-89qf-b1zo
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0018
Comment Submitted by Kyoko Tirado

---

## Submitter Information

**Name:** Kyoko Tirado
**Address:**
  Office of Global Services, NYU
  561 LaGuardia Place
  New York,  NY,  10012
**Email:** kn219@nyu.edu
**Phone:** 2129984720

---

## General Comment

1) Removing the Limit on DSO Nominations - I strongly support this proposal.
Our school serves over 10,000 international students in multiple locations. We need more than 10 DSO slots to
be able to serve our students efficiently.

2) Study by F-2 and M-2 Spouses and Children - I strongly support this proposal, as well.
Although the primary purpose of these dependents is to accompany the F-1 student while in the US, many
dependents would benefit greatly from the opportunity to study in more than an "avocational or recreational"
capacity. This proposal would enhance dependents' quality of life in the US and thus help the US in the global
competition to attract and retain the best and the brightest students.

DSO00291

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:31 PM
**Received:** January 07, 2014
**Status:** Posted
**Posted:** January 08, 2014
**Tracking No.** 1jy-89qj-80zm
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0019
Comment Submitted by David Austell

---

## Submitter Information

**Name:** David Austell
**Address:**
  Office of Global Services
  561 LaGuardia Place, New York University
  New York,  NY,  10012
**Email:** david.austell@nyu.edu
**Phone:** (212) 998-4726
**Fax:** (212) 995-4115

---

## General Comment

1) Removing the Limit on DSO Nominations - I strongly support this proposal. At my current workplace, we have several full-time advisors who are not active DSOs because there are no DSO slots available for them use. This makes workflow issues in general a challenge and at times a great difficulty. For example during school holiday closings or when some DSOs are on approved vacation and others fall ill and do not come in, there have been days when only a few active DSOs are on hand to serve our busy international office. Though other advisors are here, they are not DSOs and so are limited in what they can do for students. Furthermore, with multiple schools and campuses, and with a staff team that moves among these sites, I have often had to plan staffing assignments based first on who is an active DSO, and then on other considerations. This is a challenge, and in many ways a needless waste of staffing and management resources. Staffing could be planned more efficiently if we were permitted to have all the DSOs needed to serve our various campuses and student populations.

2) Study by F-2 and M-2 Spouses and Children - I strongly support this proposal, as well. Although the primary purpose of these dependents is to accompany the F-1 student while in the US, many dependents would benefit greatly from the opportunity to study in more than an "avocational or recreational" capacity. This proposal would enhance dependents' quality of life in the US and thus help the US in the global competition to attract and retain the best and the brightest students.

DSO00292

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:32 PM
**Received:** January 08, 2014
**Status:** Posted
**Posted:** January 08, 2014
**Tracking No.** 1jy-89r4-wjti
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0020
Comment Submitted by Leanne Tsuruda

---

## Submitter Information

**Name:** Leanne Tsuruda

---

## General Comment

I strongly support the proposed rule that would allow schools to increase the number of Designated School Officials and permit F-2 and M-2 spouses and children to enroll in part time study.

Allowing additional DSOs would enable larger schools to adequately serve their burgeoning international student population. It makes little sense that a school with only a handful of international students can have 10 DSOs and a school of over 10,000 international students is met with the same limit. The DSO limit has been both a challenge and frustration for our school. Not all advisors have equal access and authority and thus, as an office we find it difficult to efficiently and effectively assist our students.

Permitting F-2 and M-2 spouses and children to enroll in part-time study would greatly enhance the dependents' quality of life in the U.S. and thereby help our schools to attract the most talented and brightest F-1/M-1 students.

DSO00293

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:32 PM
**Received:** January 08, 2014
**Status:** Posted
**Posted:** January 08, 2014
**Tracking No.** 1jy-89r7-ts0n
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0021
Comment Submitted by Sarah Willyard

---

## Submitter Information

**Name:** Sarah Willyard

---

## General Comment

I fully support ICEB-2011-0005. As an employee of a large university, it would be extremely beneficial to adjust the number of DSOs available to serve the large, and constantly growing, international student population here. Since we have such a large international student population, there are more than ten staff members in the office and some of my colleagues cannot fully carry out their job duties due to the current DSO limitations.

DSO00294

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:32 PM
**Received:** January 09, 2014
**Status:** Posted
**Posted:** January 09, 2014
**Tracking No.** 1jy-89rr-cjse
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0022
Comment Submitted by Melissa Zuroff

---

## Submitter Information

**Name:** Melissa Zuroff

---

## General Comment

1) Removing the Limit on DSO Nominations - I strongly support this proposal. At my current workplace, we have several full-time advisors who are not active DSOs because there are no DSO slots available for them use. This makes workflow issues in general a challenge and at times a great difficulty. For example during school holiday closings or when some DSOs are on approved vacation and others fall ill and do not come in, there have been days when only a few active DSOs are on hand to serve our busy international office. Though other advisors are here, they are not DSOs and so are limited in what they can do for students. Furthermore, with multiple schools and campuses, and with a staff team that moves among these sites, I have often had to plan staffing assignments based first on who is an active DSO, and then on other considerations. This is a challenge, and in many ways a needless waste of staffing and management resources. Staffing could be planned more efficiently if we were permitted to have all the DSOs needed to serve our various campuses and student populations.

2) Study by F-2 and M-2 Spouses and Children - I strongly support this proposal, as well. Although the primary purpose of these dependents is to accompany the F-1 student while in the US, many dependents would benefit greatly from the opportunity to study in more than an "avocational or recreational" capacity. This proposal would enhance dependents' quality of life in the US and thus help the US in the global competition to attract and retain the best and the brightest students.

DSO00295

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:38 PM
**Received:** January 09, 2014
**Status:** Posted
**Posted:** January 09, 2014
**Tracking No.** 1jy-89rv-259h
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0023
Comment Submitted by Jessica Fumanti

---

## Submitter Information

**Name:** Jessica Fumanti

---

## General Comment

In order to serve the growing international student population, it is extremely important to have DSO's available to handle student questions. Increasing the number of DSO slots will alleviate stress and over-worked advisors. Ultimately, there will be less errors as international student officers will have the resources to address and handle student questions/issues.

Study by F-2 and M-2 Spouses and Children - I strongly support this proposal, as well. Although the primary purpose of these dependents is to accompany the F-1 student while in the US, many dependents would benefit greatly from the opportunity to study in more than an "avocational or recreational" capacity. This proposal would enhance dependents' quality of life in the US and thus help the US in the global competition to attract and retain the best and the brightest students.

DSO00296

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:38 PM
**Received:** January 14, 2014
**Status:** Posted
**Posted:** January 15, 2014
**Tracking No.** 1jy-89v8-4axo
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0024
Comment Submitted by Anonymous

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I support the proposed rule permitting F-2 dependents to engage in study in the United States; however clarification on two points would be helpful.

F-2 Academic Study: The proposed rule permits F-2 dependents to enroll unmonitored in up to 11 credit hours each semester at a SEVP approved school in an academic or certificate program. Is the F2 restricted at a SEVP approved school to the academic/certificate programs listed on the school's I-17 – OR – will the F-2 be permitted to enroll in a program of study that is not authorized for the F-1 ( and not on the school's I-17)?

Avocational and Recreational Study: The proposed rule states on Federal Register, Vol.78, No.225, 11/21/2013, page 69781, Column 2, " . . . the proposed change would limit F-2 and M-2 study , other than avocational or recreational study, to SEVP-certified schools, " which implies that avocational/recreational study should be at a non-SEVIS approved school and in non-academic courses, such as at an adult learning center or a non-accredited school. What is considered recreational study for F-2's is still not clear. For clarification, does the proposed rule mean that full-time "recreational" study can only occur at a non-SEVIS approved school and in non-academic, non-accredited courses? Related to this, can the F2 enroll full time at a SEVP-certified school in non-credit courses, such as workforce development courses?

Some institutions, such as community colleges, offer both credit and non-credit courses so it is important for DSO's to be able to clarify the proposed rule for F-2's, particularly related to full-time recreational/avocational study.

DSO00297

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:39 PM
**Received:** January 15, 2014
**Status:** Posted
**Posted:** January 15, 2014
**Tracking No.** 1jy-89vs-hkch
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0025
Comment Submitted by Anonymous

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

1) Removing the Limit on DSO Nominations - I strongly support this proposal. At my current workplace, we have several full-time advisors who are not active DSOs because there are no remaining DSO slots available for them use. This makes workflow issues in general a challenge and at times a great difficulty as we serve over 9,000 international students. For example during school holiday closings or when some DSOs are on approved vacation and others fall ill and do not come in, there have been days when only a few active DSOs are on hand to serve our busy international office. Though other advisors are here, they are not DSOs and so are limited in what they can do for students. Furthermore, with multiple schools and campuses, and with a staff team that moves among these sites, I have often had to plan staffing assignments based first on who is an active DSO, and then on other considerations. This is a challenge, and in many ways a needless waste of staffing and management resources. Staffing could be planned more efficiently if we were permitted to have all the DSOs needed to serve our various campuses and student populations.

2) Study by F-2 and M-2 Spouses and Children - I strongly support this proposal, as well. Although the primary purpose of these dependents is to accompany the F-1 student while in the US, many dependents would benefit greatly from the opportunity to study in more than an "avocational or recreational" capacity. This proposal would enhance dependents' quality of life in the US and thus help the US in the global competition to attract and retain the best and the brightest students.

DSO00298

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/10/18 12:39 PM |
| **Received:** January 16, 2014 |
| **Status:** Posted |
| **Posted:** January 17, 2014 |
| **Tracking No.** 1jy-89wp-2zsf |
| **Comments Due:** January 21, 2014 |
| **Submission Type:** Web |

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0026
Comment Submitted by Machelle Allman, University of Washington - Seattle

## Submitter Information

**Name:** Machelle Allman
**Organization:** University of Washington - Seattle

## General Comment

I am the Primary Designated School Official for the University of Washington in Seattle. Our Research 1 institution is a top receiver of international students. I have the permission of the UW to comment in support of this proposed rule. Given our international student population, the limit of 10 DSOs greatly impacts our ability to effectively serve our students and remain in compliance with the reporting regulations. There are three separate offices that need DSO designations, Undergraduate Admissions, Graduate Enrollment Management Services, and International Student Services. As we hire additional staff, we are severely limited by the 10 DSO cap. The UW supports the implementation of the proposed rule without reservation.

Machelle Allman, Assistant Director of International Student Services and PDSO

DSO00299

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:40 PM
**Received:** January 17, 2014
**Status:** Posted
**Posted:** January 21, 2014
**Tracking No.** 1jy-89x6-hcg3
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0027
Comment Submitted by Maureen Martin

## Submitter Information

**Name:** Maureen Martin
**Address:**
    Harvard International Office
    1350 Massachusetts Ave., Room 864
    Cambridge, MA, 02138
**Email:** maureen_martin@harvard.edu
**Phone:** 617-496-2820
**Fax:** 617-495-4088

## General Comment

We write on behalf of Harvard University in Cambridge, MA to applaud ICE and SEVP for its recent proposal to adjust the limitation on DSO's (DHS Docket No. ICEB-2011-0005). We have advocated for such a change for many years and are appreciative that ICE and SEVP are finally able to make this much needed change. Although we realize that less than 100 schools fully utilize the current ten DSO limit, this proposal will provide much needed relief to those DSOs who provide service to the many thousands of international students at the larger schools. This type of forward thinking will benefit universities as they work to provide the best possible service to international students while at the same time fulfilling their obligations to ICE and SEVP. The economic and political benefit to encouraging international students to study in the United States is well documented. Increasing the services offered to them helps everyone achieve the goal of enhancing and improving nonimmigrant student programs in the U.S.

We look forward to working with SEVP to implement this change at Harvard University in the near future.

Sincerely yours,

Martha Gladue, Acting Director, Harvard International Office
Maureen Martin, Acting Director of Immigration Services, Harvard International Office

DSO00300

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:41 PM
**Received:** January 17, 2014
**Status:** Posted
**Posted:** January 21, 2014
**Tracking No.** 1jy-89x8-csdh
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0028
Comment Submitted by M. Andrea Popa, Boston University ISSO

---

## Submitter Information

**Name:** M. Andrea Popa
**Address:**
    Boston University ISSO
    888 Commonwealth Ave, 2nd Floor
    Boston, MA, 02215
**Email:** apopa@bu.edu
**Phone:** 617-353-3565
**Fax:** 617-358-0667
**Organization:** Boston University ISSO

---

## General Comment

[See attached for complete letter]

We are writing on behalf of Boston University, a large research university sponsoring nearly 7,000 students in F-1 status, and these proposals will both have a noted impact for our clients and advising staff.

1. We wholeheartedly support allowing schools to assign a larger number of DSOs to service their international student population. Currently, Boston University utilizes all 10 P/DSO allowed positions and we would immediately benefit from the ability to request additional DSOs, particularly for key management positions in our office. At the current time, our Managing Director and Associate Director for Student Services, who supervise and train DSOs, and regularly advise students, have not had direct access to SEVIS due to the DSO limit and so are not able to do SEVIS processing. We will careful evaluate of our staff resources and the roles requiring direct student advising to determine the appropriate number of additional DSOs to request. We agree with the Student and Exchange Visitor Program (SEVP)'s assessment that, "the elimination of a DSO limit may improve the capability of DSOs to meet their liaison, reporting and oversight responsibilities..." This proposed flexibility in DSO numbers is a welcomed and positive change which will improve compliance efforts and international student services at large institutions such as ours.

2. We strongly support the proposed flexibility for F-2 dependent study. This additional flexibility (1) allows a

DSO00301