worthwhile academic growth experience for the student incident to status, (2) contributes financially to the U.S. economy, and (3) contributes culturally to the U.S. classroom.

In fact, while the proposed rule would relax the current strict prohibition on full-time degree study for F-2s, we would respectfully suggest that SEVP consider whether restrictions on study might be eliminated altogether. Although the proposed relaxation of study restrictions for F-2 study is a positive step, the benefit of limiting study – either to part-time status or to avocational study only – is unclear.

Concerns: (1) Restricting F-2 study is not consistent with how benefits of "incidental" study are conferred to dependents in other nonimmigrant categories. (2) F-2 study does not pose any additional security threat to the U.S. as these students are already tracked through SEVIS as dependents. (3) The distinction to allow full-time avocation or recreational, but only part-time degree study is arbitrary. (4) Allowing part-time degree study only creates a potential for status violation that is complex to manage for international student advising offices. (5) While F-2 dependents have the option of applying for F-1 status prior to beginning degree study, it can take 3-5 months for such an application to be adjudicated by USCIS.

3. Given the concerns posed above, we would respectfully suggest that DHS and SEVP consider whether it might not be appropriate to eliminate continued restrictions on F-2 study entirely, for the following reasons. (1) Allowing full flexibility for F-2 study, would be consistent with how benefits of study are conferred to other nonimmigrant dependents. (2) Allowing F-2 dependents to pursue full-time degree study would benefit the U.S. economy. (3) Many full-time F-2 students might opt to change to F-1 status in order to take advantage of off-campus work or curricular training. (4) Eliminating the study restriction for F-2 would remove the potential of status violation and would lessen the burden of advisor case management for students in the process of change of status.

4. In the proposed ruling, it appears that paragraph (f)(15)(ii)(C) contains an error: "An F-2 spouse and child violates his or her nonimmigrant status by enrolling in any study except as provided in paragraph (f)(15)(ii)(A) (2) or (B) of this paragraph." This wording omits paragraph (f)(15)(ii)(A) (1) and, therefore, implies that authorized study outlined in paragraph (A)(1) would be a violation of F-2 status. Paragraph (f)(15)(ii)(C) should be corrected to read: "... except as provided in paragraph (f)(15)(ii)(A) or (B) of this paragraph."

# Attachments

Comment Submitted by M. Andrea Popa, Boston University ISSO (Attachment)

DSO00302

file:///z02vdm3icow/...0-%20ICE%20Regulations/DSO%20F-2%20M-2%20Rule/1.%20NPRM/Public%20Comments/Andrea%20Popa html[12/10/2018 1:11:02 PM]

Boston University International Students & Scholars Office

888 Commonwealth Avenue
Second Floor
Boston, Massachusetts 02215
T 617-353-3565   F 617-358-1170
www.bu.edu/isso



January 17, 2014

Student and Exchange Visitor Program
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street SW
Washington, D.C. 20536-5600

## RE: Proposed Rule [DHS Docket # ICEB-2011-0005] - Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

To Whom It May Concern:

We are writing on behalf of Boston University's International Students and Scholars Office (F-1 sponsor # BOS 214F00056000) in response to the proposed rule to adjust limitations on the number of Designated School Officials and study by F-2 and M-2 nonimmigrants in dependent status.

Boston University is a large research university sponsoring nearly 7,000 students in F-1 status, and these proposals will both have a noted impact for our student clients and our professional advising staff.

### 1. On the Proposed Adjustment to Limitations on Designated School Official Assignment

We wholeheartedly support the proposal to allow schools to assign a larger number of Designated School Officials (DSOs), as appropriate, to service their international student population. Currently, Boston University utilizes all 10 P/DSO allowed positions and we would immediately benefit from the ability to request additional DSOs, particularly for key management positions in our office. At the current time, our Managing Director and Associate Director for Student Services, who supervise and train DSOs, and regularly advise students, have not had direct access to SEVIS due to the DSO limit and so are not able to do SEVIS processing. We will careful evaluate of our staff resources and the roles requiring direct student advising to determine the appropriate number of additional DSOs to request.

We agree with the Student and Exchange Visitor Program (SEVP)'s assessment that, "the elimination of a DSO limit may improve the capability of DSOs to meet their liaison, reporting and oversight responsibilities, as required by 8 CFT 214.3 (g)."

We believe it is unlikely that this new flexibility will be abused, since, (1) currently only 88 out of 10,000 SEVP-approved schools utilize the maximum DSO numbers available, and since (2) SEVP will continue to review, and approve or deny each DSO request put forward by schools.

This proposed flexibility in DSO numbers is a welcomed and positive change which will improve compliance efforts and international student services at large institutions such as ours.

DSO00303

2. **On the Proposed Adjustment to Limitations of Study by F-2 and M-2 Dependents**

As Boston University is approved to sponsor F-1 students only, I will comment on the proposed rule primarily as it applies to F-2 dependents, though the same arguments might be made for M-2 dependents as well.

We strongly support the new proposed flexibility for F-2 dependent study. In fact, while the proposed rule would relax the current strict prohibition on full-time degree study for F-2s, we would respectfully suggest that SEVP consider whether restrictions on study might be eliminated altogether.

❖ **Benefits of relaxing the restriction on F-2/M-2 study**

Spouses or college-age children of F-1 students, who intend to study full-time in a degree program, routinely request admission in F-1 status to (1) correctly reflect full-time degree study as their principal goal in the U.S., and/or (2) in order to take advantage of curricular placements or employment-based training of their program of study.

In many other cases, however, an F-2 spouse or college-age child may legitimately wish to pursue college study "incident" to accompanying their F-1 spouse or parent.

The proposed relaxation of F-2 restrictions on study is a positive step as it will allow F-2 dependents the opportunity to engage in more flexible study including: (1) degree study that is less than part-time, or (2) full-time study that is avocational/ recreational.

This additional flexibility:

1. Allows a worthwhile academic growth experience for the student incident to status
2. Contributes financially to the U.S. economy, and
3. Contributes culturally to the U.S. classroom

❖ **Concerns about continued restrictions on F-2/M-2 study**

Although the proposed relaxation of study restrictions for F-2 study is a positive step, the benefit of limiting study – either to part-time status or to avocational study only – is unclear. These continued restrictions are inconsistent, unnecessary, arbitrary, complex to manage for the host school, and cumbersome for the F-2 dependent.

1. **Inconsistent -** Restricting F-2/M-2 study is not consistent with how benefits of "incidental" study are conferred to dependents in other nonimmigrant categories.

2. **Unnecessary/No additional threat –** F-2 and M-2 study does not pose any additional security threat to the U.S. as these students are already monitored and tracked through SEVIS as dependents.

3. **Arbitrary -** The distinction of allow *full-time* avocation or recreational, but only *part-time* degree study is arbitrary as full-time study at a SEVP school in either a degree

program or avocation programs might qualify for F-1 status. It is unclear what benefit is gained by limiting one type of study more than another.

4. **Complex to manage** – Allowing part-time degree study only creates a potential for status violation that is complex to manage for international student advising offices as (1) host colleges may advise F-2 students of their restrictions but may not be the sponsoring institution responsible for managing the F-1 principal's record, (2) sponsors of the F-1 principal may not be aware if an F-2 dependent is commencing a program of study in order to advise correctly on study restrictions.

5. **Change of status applications cumbersome and time-consuming** – While F-2 dependents have the option of applying for (and obtaining) F-1 status prior to beginning full-time degree study, these applications are time-consuming and unpredictable. It can routinely take 3-5 months for such an application to be adjudicated by USCIS, which makes a change to full-time study cumbersome. As not all programs of study allow for starts in the middle of academic year, students who are not approved for change to F-1 status before the desired program start date (1) may have to wait another semester and or another year to begin their program, and (2) may lose scholarship funding or on-campus jobs due to inability to begin work at the semester start.

## 3. Recommend Elimination of Restriction on F-2/M-2 study

Given the concerns posed above, we would respectfully suggest that DHS and SEVP consider whether it might not be appropriate to eliminate continued restrictions on F-2/M-2 study entirely, for the following reasons:

1. **Consistent Conferral of Benefits** – Allowing full flexibility for F-2/M-2 study, would be consistent with how benefits of study are conferred to nonimmigrant dependents in other categories – H-4, J-2, L-2, O-3, A-2, etc. – allowing the option of part-time or full-time study, and degree or recreational/ avocational study so long as such study is "incident" to their principal U.S. goal.

2. **Financial Benefit to U.S. Economy** – Allowing F-2/M-2 dependents to pursue full-time degree study would benefit the U.S. economy as full-time students would be required to meet tuition costs of the school.

3. **Change of Status still appropriate in certain cases** – While certain F-2 dependents might elect to complete their degree in the dependent status, many full-time students might opt to change to F-1 status (1) in order to take advantage of off-campus work or curricular or post-completion training benefits, (2) or to remain in the U.S. as the principal nonimmigrant.

4. **Remove Potential for Status Violation** – Eliminating the study restriction for F-2/ M-2s would remove the potential of status violation for a student who might inadvertently register beyond the part-time limit or begin study before F-1/M-1 status is granted, and would lessen the burden of advisor case management for students in the process of change of status.

DSO00305

4. **Recommend Correction of Citation Error in Proposed Rule**

In the proposed ruling, it appears that paragraph (f)(15)(ii)(C) contains an error. The paragraph reads: *"An F-2 spouse and child violates his or her nonimmigrant status by enrolling in any study except as provided in paragraph (f)(15)(ii)(A)(2) or (B) of this paragraph."*

This wording omits paragraph (f)(15)(ii)(A) **(1)** and, therefore, implies that authorized study outlined in paragraph (A)(1) would be a violation of F-2 status.

Paragraph (f)(15)(ii)(C) should be corrected to read: "An F-2 spouse and child violates his or her nonimmigrant status by enrolling in any study except as provided in paragraph (f)(15)(ii)**(A)** or **(B)** of this paragraph."

Paragraph (m)(17)(ii)(C) related to M-2 dependents appears to be correct.

**SUMMARY**

In summary, the proposed option to allow additional DSOs will be an immediate benefit to the staff and student clients of Boston University. Secondly, while we support the additional flexibility of study for F-2 dependents, we believe the continued restrictions are unnecessary and cumbersome, and would suggest a review of whether these restrictions might be eliminated.

Should further information be required, we can be reached at 617-353-3565 or the emails below.

Respectfully,

**Jeanne E. Kelley**
Managing Director, ISSO
Boston University
jkelley@bu.edu

**M. Andrea Popa**
Associate Director for
Student Services, ISSO
Boston University
apopa@bu.edu

**Beatrice Karam**
Assistant Director for Admissions and Student
Support Services, ISSO,
Principal Designated School Official (PDSO)
Boston University
bkaram@bu.edu

DSO00306



NAFSA: Association of
International Educators

1307 New York Avenue NW
Eighth Floor
Washington, DC 20005-4701
Telephone: 1.202.737.3699
Fax: 1.202.737.3657
E-mail: inbox@nafsa.org
http://www.nafsa.org

*President and
Chair of the Board of Directors*
Fanta Aw
American University

*Vice President for Education
and Professional Development*
Deborah L. Pierce, PhD
Northern Illinois University

*Vice President for
Member Relations*
Sandy Soohoo-Refaei
Linfield College

*Vice President for
Public Policy and Practice*
Sherif Barsoum
Vanderbilt University

*Treasurer*
Jolene Koester, PhD
California State University, Northridge

*Secretary*
Mary H. Reeves, PhD
Commission on English
Language Program Accreditation

*Executive Director and CEO*
Marlene M. Johnson

January 17, 2014

Student and Exchange Visitor Program
c/o Katherine Westerlund
Policy Chief (Acting)
U. S. Immigration and Customs Enforcement
2450 Crystal Drive
Century Tower 9th Floor
500 12th Street, SW, Stop 5600
Washington, DC 20536-5600

RE:    DHS Docket No. ICEB-2011-0005
       RIN 1653-AA63
       Adjustments to limitations on Designated School Official Assignment
       and Study by F-2 and M-2 Nonimmigrants

Via Federal e-Rulemaking Portal: http://www.regulations.gov

Dear Ms. Westerlund:

I write today on behalf of NAFSA: Association of International Educators with
respect to the notice of proposed rulemaking published at 78 *Fed. Reg.* 69778
(November 21, 2013) concerning adjustments to limitations on Designated
School Official assignment and study by F-2 and M-2 nonimmigrants.  NAFSA
is the world's largest nonprofit association for international education
professionals, with nearly 10,000 members at approximately 3,500 colleges and
universities throughout the United States and around the world.  Our membership
includes many professionals at U.S. institutions of higher education who serve as
Designated School Officials, manage F and M student programs, and advise F
and M nonimmigrants.  For this reason, NAFSA is well situated to comment on
the proposed rule.

NAFSA applauds the cooperation of the Department of Homeland Security
(Department), especially the Office of Academic Engagement and the Student
and Exchange Visitor Program (SEVP), and the Homeland Security Academic
Advisory Council.  We appreciate the interest of the Department in hearing from
its stakeholders in the academic community and look forward to other

U. S. Immigration and Customs Enforcement
January 17, 2014
Page 2

improvements in international student programs that should result from this cooperation.  While we find no fault with the specific provisions of the proposed rule, we have concerns about related agency processes and policies, and we urge the Department to re-visit these and a related provision governing change of nonimmigrant status.

As the Department notes in the supplementary information to the proposed rule, schools must be sufficiently staffed with Designated School Officials (DSOs) if international student programs are to operate successfully.  Schools experience changes in staffing, and when these occur, they must also be able to add or terminate DSOs quickly in order to carry out their programs effectively and ensure compliance.  It is essential for SEVP to process these changes quickly and in a streamlined manner.  While we note that SEVP has significantly reduced processing times recently, we urge the Department to commit the necessary resources to reduce processing times further and streamline the process.  Slow processing of DSO changes would limit the effectiveness of this proposed rule.

In 2011, when SEVP began adjudicating changes in schools' DSOs, rather than considering them updates in the schools' Student and Exchange Visitor Information System (SEVIS) records, NAFSA urged SEVP to publish the criteria used in these adjudications.  We again urge SEVP to publish the criteria.  Schools should know the criteria that will be applied in adjudicating their requested changes.  We also urge SEVP to create a process for clearly and thoroughly articulating to schools the basis for a denial of a DSO nomination or other requested change.  SEVP should also establish a reconsideration process that may be pursued by schools that consider such a denial to be in error.

The proposed change to allow F-2 and M-2 dependents to pursue studies part-time will be welcomed by international students and their families.  As the supplementary information to the proposed rule notes, however, on occasion a dependent may decide to pursue a full course of study, in which case a change of status to F-1 or M-1 would be required.  The proposed rule leaves unchanged the current requirement that a dependent "may engage in a full course of study only by applying for *and obtaining* a change of status to F-1, M-1 or J-1 nonimmigrant status, as appropriate, before beginning a full course of study."  We urge the Department to use the implementation of this proposed rule as an opportunity to re-visit this requirement and revise it so that an F-2 or M-2 nonimmigrant who has applied to U. S. Citizenship and Immigration Services for a change of nonimmigrant status to F-1 or M-1 may begin a full course of study as soon as the application is properly filed.

There is no statutory or regulatory bar to allowing an F-2 or M-2 nonimmigrant to begin a full course of study once she or he has applied for a change of status to F-1 or M-1.  There is also no security interest in requiring an F-2 or M-2 to wait until the change of status application is approved before beginning studies.  This requirement was implemented by legacy INS prior to the creation of SEVIS, in the days when a paper-based process did not apprise the agency in real time about a prospective student's identity or the nature of his or her studies.  The electronic SEVIS system now provides the Department thorough information about F and M nonimmigrants and their fields of study even before an application for change of status is filed.

U. S. Immigration and Customs Enforcement
January 17, 2014
Page 3

The requirement that F-2 and M-2 dependents wait until a change of status to F-1 or M-1 is approved before they may begin their course of study has become obsolete.

We urge the Department also to revise the change of status provision to specify that a nonimmigrant granted a change of status to F-1 or M-1 must begin the full course of study no later than the next available session or term after the change of status application has been approved.  Those granted a change of status to F-1 or M-1 during the school term or session, when it is impossible to enroll in classes immediately, often fear that their status may be in jeopardy.  Clarifying that they must begin the course of study when it is next available will reduce this concern.

Thank you for the opportunity to submit these comments.


Sincerely,


Judy Judd-Price
Deputy Executive Director
Leadership and Professional Development Services
NAFSA: Association of International Educators

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:42 PM
**Received:** January 17, 2014
**Status:** Posted
**Posted:** January 21, 2014
**Tracking No.** 1jy-89xd-6l9r
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0029
Comment Submitted by Stephen Springer, NAFSA: Association of International Educators

---

## Submitter Information

**Name:** Stephen Springer
**Address:**
   NAFSA: Association of International Educators
   1307 New York Avenue, NW
   Washington, DC, 20005
**Email:** steves@nafsa.org
**Phone:** 2024952533
**Fax:** 2027373657

---

## General Comment

I write today on behalf of NAFSA: Association of International Educators with respect to the notice of proposed rulemaking published at 78 Fed. Reg. 69778 (November 21, 2013) concerning adjustments to limitations on Designated School Official assignment and study by F-2 and M-2 nonimmigrants. NAFSA is the world's largest nonprofit association for international education professionals, with nearly 10,000 members at approximately 3,500 colleges and universities throughout the United States and around the world. Our membership includes many professionals at U.S. institutions of higher education who serve as Designated School Officials, manage F and M student programs, and advise F and M nonimmigrants. For this reason, NAFSA is well situated to comment on the proposed rule.

NAFSA applauds the cooperation of the Department of Homeland Security (Department), especially the Office of Academic Engagement and the Student and Exchange Visitor Program (SEVP), and the Homeland Security Academic Advisory Council. We appreciate the interest of the Department in hearing from its stakeholders in the academic community and look forward to other improvements in international student programs that should result from this cooperation. While we find no fault with the specific provisions of the proposed rule, we have concerns about related agency processes and policies, and we urge the Department to re-visit these and a related provision governing change of nonimmigrant status.

As the Department notes in the supplementary information to the proposed rule, schools must be sufficiently staffed with Designated School Officials (DSOs) if international student programs are to operate successfully.

DSO00310

Schools experience changes in staffing, and when these occur, they must also be able to add or terminate DSOs quickly in order to carry out their programs effectively and ensure compliance. It is essential for SEVP to process these changes quickly and in a streamlined manner. While we note that SEVP has significantly reduced processing times recently, we urge the Department to commit the necessary resources to reduce processing times further and streamline the process. Slow processing of DSO changes would limit the effectiveness of this proposed rule.

In 2011, when SEVP began adjudicating changes in schools' DSOs, rather than considering them updates in the schools' Student and Exchange Visitor Information System (SEVIS) records, NAFSA urged SEVP to publish the criteria used in these adjudications. We again urge SEVP to publish the criteria. Schools should know the criteria that will be applied in adjudicating their requested changes. We also urge SEVP to create a process for clearly and thoroughly articulating to schools the basis for a denial of a DSO nomination or other requested change. SEVP should also establish a reconsideration process that may be pursued by schools that consider such a denial to be in error.

The proposed change to allow F-2 and M-2 dependents to pursue studies part-time will be welcomed by international students and their families. As the supplementary information to the proposed rule notes, however, on occasion a dependent may decide to pursue a full course of study, in which case a change of status to F-1 or M-1 would be required. The proposed rule leaves unchanged the current requirement that a dependent "may engage in a full course of study only by applying for and obtaining a change of status to F-1, M-1 or J-1 nonimmigrant status, as appropriate, before beginning a full course of study." We urge the Department to use the implementation of this proposed rule as an opportunity to re-visit this requirement and revise it so that an F-2 or M-2 nonimmigrant who has applied to U. S. Citizenship and Immigration Services for a change of nonimmigrant status to F-1 or M-1 may begin a full course of study as soon as the application is properly filed. The requirement that F-2 and M-2 dependents wait until a change of status to F-1 or M-1 is approved before they may begin their course of study has become obsolete.

We urge the Department also to revise the change of status provision to specify that a nonimmigrant granted a change of status to F-1 or M-1 must begin the full course of study no later than the next available session or term after the change of status application has been approved. Those granted a change of status to F-1 or M-1 during the school term or session, when it is impossible to enroll in classes immediately, often fear that their status may be in jeopardy. Clarifying that they must begin the course of study when it is next available will reduce this concern.

Thank you for the opportunity to submit these comments.

---

# Attachments

Comment Submitted by Stephen Springer, NAFSA: Association of International Educators (Attachment)

DSO00311

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:42 PM
**Received:** January 20, 2014
**Status:** Posted
**Posted:** January 21, 2014
**Tracking No.** 1jy-89zd-yspc
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0030
Comment Submitted by Teresa Wise, University of Alabama's Capstone International Center (UA-CIC)

## Submitter Information

**Name:** Teresa Wise
**Address:**
   University of Alabama - Capstone International Center
   PO Box 870254
   Tuscaloosa,  AL,  35487
**Email:** cic@ua.edu

## General Comment

The University of Alabama's Capstone International Center (UA-CIC) appreciates the opportunity to respond to DHS Docket No. ICEB 2011-0005 regarding changes to International Student Programs.

UA-CIC strongly supports both proposals included within the proposal.

UA-CIC appreciates and supports ICE's expansion of the 10 DSO limit per school. While The University of Alabama has not yet exhausted its current limit of 10 DSOs, our institution has grown significantly, and we anticipate reaching that limit in the near future. This is a forward-thinking proposal which has our strong support.

UA-CIC has long advocated that dependents of F-1 students should be allowed to pursue academic studies in higher education, and UA-CIC supports ICE's proposal to allow F-2 dependents the opportunity to study part-time at SEVP certified schools. This will have a positive impact on both the F-2 spouses and F-2 minor children who find themselves without opportunity for higher education while in F-2 status.

UA-CIC further requests that US ICE consider extending to F and M dependents the option to apply for employment authorization through USCIS, an option that currently exists for the dependents of A, E, G, J, and L visa holders. We believe that as with educational opportunity, economic opportunity for dependent visa holder is essential to meeting SEVP Director Louis Farrell's goal to "provide greater incentives for international students to study in the United States." The I-765 processing should be able to accommodate the addition of F-2 and M-2 applicants for employment authorization.

DSO00312

UA-CIC enthusiastically supports both proposed changes, and respectfully requests that US ICE also consider the addition of employment authorization as an option for F-2 and M-2 dependents.

DSO00313

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:43 PM
**Received:** January 21, 2014
**Status:** Posted
**Posted:** January 21, 2014
**Tracking No.** 1jy-89zj-ji6w
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0031
Comment Submitted by Trecia [Last Name Unknown]

---

## Submitter Information

**Name:** Trecia Anonymous

---

## General Comment

I strongly support the proposed changes regarding the requirements governing its Student Exchange Visitors Program, that are intended to improve management of international student programs and increase opportunities for study by spouses and children of non immigrant students. I believe the more flexible approach of eliminating the limitation of the 10 designated school officials would be worth while. There is a greater need for more officials to assist in this area. Helping F-1 and M-1 non-immigrant students maintain their status, filling out important governmental forms and obtain benefits while living in the United States is beneficial. This will give these individuals a peace of mind knowing that there is sufficient help, as well as, the correct forms will be officially documented, creating less error. I have known individuals who struggled with these forms and still missed multiple questions. These changes will provide greater assistance for the international students and their families as they take part in the acclamation process. This is a major adjustment.

DSO00314

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:44 PM
**Received:** January 21, 2014
**Status:** Posted
**Posted:** January 21, 2014
**Tracking No.** 1jy-89zs-7y2z
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0032
Comment Submitted by Donna McPartland

## Submitter Information

**Name:** Donna McPartland

## General Comment

See attached file(s)

## Attachments

Comment Submitted by Donna McPartland (Attachment)

DSO00315



**GRADUATE MANAGEMENT
ADMISSION COUNCIL**

January 21, 2014

**VIA ELECTRONIC SUBMISSION**
Katherine Westerlund
Policy Chief (Acting)
U.S. Immigration and Customs Enforcement
Department of Homeland Security

**RE: Proposed Rule Making Adjustments to Limitations on Designated School Official Assignment
and Study by F-2 and M-2 Nonimmigrants**

**Docket No.: ICEB-2011-0005**

The Graduate Management Admission Council® (GMAC®) appreciates the opportunity to provide
comments on and strongly supports the Department of Homeland Security's (DHS) Notice of Proposed
Rulemaking (NPRM) regarding adjustments to limitations on designated school official (DSO) assignment
and study by F-2 and M-2 nonimmigrants.

GMAC is a non-profit organization of leading graduate business schools, and the owner of the
GMAT® exam used by more than 6,000 business and management programs worldwide. GMAC is based in
Reston, Virginia and has regional offices in London, New Delhi and Hong Kong.

GMAC applauds DHS for taking concrete steps to encourage the best and the brightest international
students to study in the United States and demonstrating its commitment to improving and enhancing the
nation's nonimmigrant student programs with this NPRM.

**1. Removing the Limit on DSO Nominations**

DSOs are the members of a school administration that serve as the main point of contact within the
school for F and M visa students. Thus, they are essential to facilitating nonimmigrant study in the United
States for international students. Current regulations limit the maximum number of DSOs that each certified
school may have at each campus to 10, which includes up to nine DSOs and one Principal Designated
School Official (PDSO).[1]

---

[1] 8 C.F.R. § 214.3(l)(1)(iii).

DSO00316


GRADUATE MANAGEMENT
ADMISSION COUNCIL

GMAC supports DHS's proposal to eliminate the maximum limit of DSO's in favor of a more flexible approach which would allow school officials to nominate the appropriate number of DSO's for approval by the Student and Exchange Visitor Program (SEVP) based upon their program needs.

GMAC advocates for this rulemaking as it benefits our member schools and the international students that attend their institutions. We believe that this change will provide greater flexibility for their schools and ultimately will better enable schools to assist international students at their institutions and foster their studies in the United States.

## 2. Study by F-2 and M-2 Spouses and Children

GMAC supports the DHS's proposal to relax its prohibition on F-2[2] nonimmigrant study by permitting F-2 nonimmigrant spouses and children to engage in study in the United States at SEVP-certified schools in a capacity that does not amount to a "full course of study"[3]. GMAC agrees with the comment in the Federal Register that the United States is engaged in global competition to attract the best and the brightest international students to study in our schools and this sort of change incentivizes international students to choose the United States as their destination due to expanded educational opportunities for their families.

Our member schools believe this rulemaking is important because it makes studying in the United States and their educational programs more attractive to F-1 students with spouses and families. This change will only increase the benefits to the international student community and the schools that actively seek out these students to better ensure their programs are culturally diverse.

If you would like to contact us for additional information or if you have questions regarding our submission, please contact me at 703-668-9764.

Sincerely,

Donna McPartland
Corporate Counsel and Compliance Director

---

[2] As GMAC member schools only enroll F-1 students in their programs we will opine only on F-2 nonimmigrants and not both F-2 and M-2 as the NPRM addresses.
[3] As defined at 8 C.F.R. § 214.2(f)(6)(i)(A)-(D) and 8 C.F.R. § 214.2(m)(9)(i)-(iv)).

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:45 PM
**Received:** January 21, 2014
**Status:** Posted
**Posted:** January 23, 2014
**Tracking No.** 1jy-89zy-6586
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0033
Comment Submitted by Kimberlee Lovaas

---

## Submitter Information

**Name:** Kimberlee Lovaas

---

## General Comment

I am writing as the Associate Director for International Student Admission, Enrollment, and Services and one of the Designated School Officials at the University of Washington. The Seattle campus of the University of Washington is a large, public, research university that enrolls over 6,000 undergraduate and graduate F-1 visa holders. The proposed changes to the regulations could have a significant impact on our students and our advising staff.

I strongly support the proposal to allow schools the ability to assign a larger number of DSO's based on the school's international student enrollment numbers. The University of Washington is severely limited in our ability to serve our students with a cap of 10 DSO's. With over 6,000 currently enrolled F-1 students, we have reached our capacity of DSO's. Both the Graduate School Office of Admissions, the Undergraduate Office of Admissions, and the International Student Services offices on our campus require DSO access to SEVIS to create and process immigration documents for incoming new students and currently enrolled students. With our international student population doubling in the last 5 years, we have been very limited in the services we can provide and the time it takes to create immigration documents due to the cap on DSO's. Although we have increased our staff to keep up with the demand, we are still limited to 10 DSO's across campus. It seems the proposal to allow additional DSO's would address the current restrictions and needs of large institutions like the UW and improve compliance efforts at these institutions serving large international student populations.

As the Associate Director of International Student Admission, Enrollment, and Services and a Designated School Official at the University of Washington, I fully support the implementation of the proposed rule without any reservations.

DSO00318

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:45 PM
**Received:** January 21, 2014
**Status:** Posted
**Posted:** January 23, 2014
**Tracking No.** 1jy-8a00-f73k
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0034
Comment Submitted by Anonymous

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I applaud the initiative to allow F-1 dependents to enroll in part-time studies at an SEVP approved school. It seems just logic that the F-2 category enjoys the same benefits of other category dependents.

Quite often, the spouse of an F-1 student wants to take language classes on a part-time basis because they cannot dedicate full time to any studies. The measure will benefit the dependent and the school and it will not hurt SEVP.

DSO00319

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:46 PM
**Received:** January 21, 2014
**Status:** Posted
**Posted:** January 23, 2014
**Tracking No.** 1jy-8a00-imqy
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0035
Comment Submitted by Jacqueline Chin

## Submitter Information

**Name:** Jacqueline Chin
**Address:** United States,
**Email:** jackie.chin@nyu.edu

## General Comment

As a Designated School Official, I am strongly advocating to increase the number of DSOs at each institution and campus. If the issue is security concerns, then the government should realize that increasing the numbers does not make it any less secure. If the government is concerned, it is more likely to be concerned about an institution, rather than an individual.

1) The numbers of international students coming to the U.S. to study is growing each year. Higher Education is a great
commodity the U.S. has. We have the best Higher Education system in the world. The fact that we have the greatest
numbers of internationals students attest to that fact. International students want to come to the U.S. to study because they respect the quality of the U.S.Higher Education system. We have to increase the numbers of DSOs to handle the challenge of the huge numbers.

2) International students add $21 billion [2012 NAFSA] to the U.S. economy. This is not only tuition, but also buying and renting homes, cars, appliances, airline tickets, computers, travel within the U.S.[more and more of my students are taking cruises], groceries, down to the local economy. The great majority of international students do not receive any financial aid. International students also deposit large amounts into bank accounts. The international students are not only spending money, but also investing [e.g. homes] and depositing funds into U.S. banks.

3) Increasing the number of DSOs will help institutions to meet the federal government reporting requirements. With more DSOs tracking F-1 students, the quicker and better we can report to SEVIS, especially if a student is to be listed as a "no show". This is a key security factor. If one DSO has hundreds of students to track, it is not easy to accomplish this in the time period the government requires. The more DSOs an institution has, makes the

DSO00320

number of students assigned much lower and quicker to manage, thus getting the information to SEVIS quicker.

4) The increase in DSO's also provides a great resource for international students. The more DSO's on a campus allows for DSO to take more time with a student. Now that we got the students into the U.S. we also have to keep them here. If a student gets lost in the system and feels unhappy, they will leave. Having a DSO will help the students to understand their immigration requirements, as well as their academic requirements. Most DSOs also provide programs to help students adjust to life and culture in the U.S. I strongly advocate for institutions to be able to hire as many DSOs as needed. Hopefully, it can be one [1] DSO to every 500 students or lower. This will be especially needed for universities with a large number of international students and also institutions looking to increase the number of international students. And I hear of more and more universities wanting to attract more international students.

5) As a DSO must be a U.S.citizen or Permanent Resident, the increase in the numbers of DSOs will create jobs for the U.S. It creates jobs specifically for U.S. citizens and Permanent Residents. The U.S.government wants to create more jobs in the U.S.but does not want to create federal jobs itself [quite understandable]. The simple act of the U.S. government approving the increase in the number of DSOs will create private sector jobs all over the U.S. and these jobs will be solely for U.S. citizens and Permanent Residents. If the U.S.government mandates that there must be only one [1] DSO for 500 students, then this will create better and quicker reporting and will also create much more jobs.

DSO00321

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:47 PM
**Received:** January 21, 2014
**Status:** Posted
**Posted:** January 23, 2014
**Tracking No.** 1jy-8a01-p87b
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2
Nonimmigrants

**Document:** ICEB-2011-0005-0036
Comment Submitted by Helen Leonard

---

## Submitter Information

**Name:** Helen Leonard

---

## General Comment

I am writing to support the adjustment to dso limitations. I work at an institution with over seven thousand international students most of whom are F1s. The present limit negatively impacts our day to day operations. We have several advisors who are not dsos and this makes advising much more complex. We respectfully request this be given positive consideration and changed.

DSO00322

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:48 PM
**Received:** January 21, 2014
**Status:** Posted
**Posted:** January 23, 2014
**Tracking No.** 1jy-8a03-1opy
**Comments Due:** January 21, 2014
**Submission Type:** Web

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0037
Comment Submitted by Alison Jackson

---

## Submitter Information

**Name:** Alison Jackson
**Address:**
    561 LaGuardia Place
    New York, NY, 10012
**Email:** alison.jackson@nyu.edu

---

## General Comment

I am writing today because the approval of the "Adjustments to limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants" proposed rule would have a direct and positive impact on my day-to-day work and the stakeholders that I work with as an employee of the Office for Global Services (OGS) at New York University (SEVIS School Code NYCF214F00169000). I've chosen to write because I am a concerned citizen and professional in the field of F-1 immigration advising for the last sixteen years.

New York University is a major research institution and according to the most recent Institute of International Education's Open Doors report, we host the third largest international student population in the United States. NYU is now enrolling close to 9000 F-1 and J-1 students as of September 2013. Nearly 19% of our Fall 2013 incoming undergraduate class were international students. At the OGS, there are thirteen full-time staff members who serve international students with regard to their non-immigrant status at NYU. There are also four additional full-time staff who serve in a leadership capacity in our office. That makes seventeen staff members who should have DSO standing in order to effectively serve our international student population.

I am not a Designated School Official (DSO) for the Office of Global Services the first time in sixteen years. Fourteen of those years have been here at New York University (NYU). Thankfully, my lack of DSO status is not due to unemployment, but rather because I am "serving my time" as a non-DSO as my other colleagues have done over the last few years. Some of them had to work with the inconvenience and now it is my turn to do so.

.....
Please see attachment for complete comments.

---

DSO00323

# Attachments

NAFSA Reg comment

DSO00324

file:///z02vdm3icow/...20ICE%20Regulations/DSO%20F-2%20M-2%20Rule/1.%20NPRM/Public%20Comments/Alison%20Jackson html[12/10/2018 1:10:33 PM]

January 21, 2014

Student and Exchange Visitor Program
c/o Katherine Westerlund
Policy Chief (Acting)
U. S. Immigration and Customs Enforcement
2450 Crystal Drive
Century Tower 9th Floor
500 12th Street, SW, Stop 5600
Washington, DC 20536-5600

RE:    DHS Docket No. ICEB-2011-0005
       RIN 1653-AA63
       Adjustments to limitations on Designated School Official Assignment and Study by F-2 and M-2
       Nonimmigrants

Dear Ms. Westerlund:

I am writing today because the approval of the "Adjustments to limitations on Designated School Official
Assignment and Study by F-2 and M-2 Nonimmigrants" proposed rule would have a direct and positive
impact on my day-to-day work and the stakeholders that I work with as an employee of the Office for
Global Services (OGS) at New York University (SEVIS School Code NYCF214F00169000).  I've chosen to
write because I am a concerned citizen and professional in the field of F-1 immigration advising for the
last sixteen years.

New York University is a major research institution and according to the most recent Institute of
International Education's Open Doors report, we host the third largest international student population
in the United States.  NYU is now enrolling close to 9000 F-1 and J-1 students as of September 2013.
Nearly 19% of our Fall 2013 incoming undergraduate class were international students. At the OGS,
there are thirteen full-time staff members who serve international students with regard to their non-
immigrant status at NYU. There are also four additional full-time staff who serve in a leadership capacity
in our office.  That makes seventeen staff members who should have DSO standing in order to
effectively serve our international student population.

I am not a Designated School Official (DSO) for the Office of Global Services the first time in sixteen
years. Fourteen of those years have been here at New York University (NYU). Thankfully, my lack of DSO
status is not due to unemployment, but rather because I am "serving my time" as a non-DSO as my
other colleagues have done over the last few years.  Some of them had to work with the inconvenience
and now it is my turn to do so.

Not being a DSO limits our office's ability to provide effective customer service to students.  As
commented in the proposed rule and in Boston University's comments (ICEB-2011-0005-0028), "the
elimination of a DSO limit may improve the capability of DSOs to meet their liaison, reporting and
oversight responsibilities, as required by 8CFR 214.3 (g)."  My colleagues and I will always act promptly

DSO00325

and cooperatively as required by our obligation as a SEVIS school but the potential for delay is there if there are not enough of us to carry on necessary work with a population this size.

Not being a DSO, I've realized some of the simple things that make me and other advisors at other large institutions effective and helpful are no longer possible:

- I came in to our office during our winter recess this year and in many times past to issue an I-20 for one student and sign a travel signature for another.  The former was planning to apply for a visa and travel with one of his professors to teach at our degree-granting program in Abu Dhabi.  The latter student had counted on our office re-opening on January 2 but due to a winter storm that did not happen.  After-hours appointments for such things or even when others are not available, will not be options for me either this semester.
- At the beginning of each term, I could look into SEVIS to see entry or departure information at times to determine if a new student should have reported in to one of our mandatory check-in workshops. Now I'll definitely have to depend on others and the accuracy of our school reports.
- In processing a reinstatement case during an appointment, I could check a student's event history in SEVIS in real-time to piece together how a student may have come to lose their status.  Now, that would have to wait for the student to bring in documentation or I will need to consult with a DSO colleague. Either would result in losing precious time for the student, myself, and my colleague.
- I've fielded phone calls from government officials in the past and would now need to pass the phone call on should the caller's request warrant immediate information from SEVIS that I do not have access to.
- I meet with students during our walk-in hours for three hours a day three to four times a week.  All SEVIS related requests from employment authorization to travel signatures have to take the time of one of my colleagues and myself – just to process one student's request.  It is no longer a one on one transaction but rather the time of two professional staff to one student.

I have not stated all of the issues a non-DSO could potentially face but these are just a few that have come to mind these last two weeks. Yes, there are practical solutions like the I-515A process to help with reentry should a student lack a signature, third-party software, and the rotation of DSO responsibilities to get around the problems I've stated.  I've been privileged in that NYU does believe in our work and the contributions of international students so we are supported in all ways that are possible. That said, however, providing adequate service to our stakeholders within and outside of NYU suffers when things outside of our control, like the DSO number, is limited.

Along with the lifting of the DSO limitation, I also support the statements made in the comments regarding F-2 and M-2 dependent study (See comments by Boston University ICEB-2011-0005-0028, NAFSA ICEB-2011-0005-0029, Lynne Vanahill ICEB-2011-0005-0002, and Beverly Plowucha ICEB-2011-0005-0015).  The non-English speaking dependents of our F-1 students could potentially adjust to the U.S. quicker if they have the advantage of learning English while interacting with their new community. It is also not surprising that the spouses and partners of our students would be just as intelligent as the student and may wish to explore their options to study in the U.S. This is a benefit granted to the dependents of H-1B temporary skilled workers and J-1 exchange visitors already.

DSO00326

Please note that Lynne Vanahill in ICEB-2011-0005-0002 makes a very good observation with regard to the training time and expense when taking on the DSO. It is a shame that there is nothing in the U.S. Department of Labor's Occupational Handbook when it comes to our work as DSOs.  Perhaps it is because the description of a "standard" DSO would vary widely since our responsibilities in this field can range from making airport pick-ups to facilitating intercultural communication workshops to authorizing employment. The amount of training I received at the start of my career was very similar to what she describes.  I also depend highly on regulatory information relayed by NAFSA: Association of International Educators and other non-immigration related training.

In closing, I applaud the work that the Department of Homeland Security, the Office of Academic Engagement and the Student and Exchange Visitor Program (SEVP), and the Homeland Security Academic Advisory Council (HSAAC) have done to bring about this proposed rule (NAFSA: Association of International Educators, ICEB-2011-0005-0029).  I appreciate the consideration of our very real problems.  I can be reached at NYU Office of Global Services, 561 LaGuardia Place, New York, NY 10012 or Alison.jackson@nyu.edu

Sincerely,

Alison N. Jackson
International Student Advisor and Program Coordinator
Alternate Responsible Officer

DSO00327

# PUBLIC SUBMISSION

**As of:** 12/10/18 12:49 PM
**Received:** February 05, 2014
**Status:** Posted
**Posted:** February 05, 2014
**Tracking No.** 1jy-8a9t-4hch
**Comments Due:** January 21, 2014
**Submission Type:** E-mail

**Docket:** ICEB-2011-0005
Designated School Officials and Part-Time Study for F-2 Nonimmigrants

**Comment On:** ICEB-2011-0005-0001
Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants

**Document:** ICEB-2011-0005-0038
Comment Submitted by Leeanne Johnson, Regent University

---

## Submitter Information

**Name:** Leeanne Johnson
**Address:**
    1000 Regent University Drive
    Virginia Beach,  VA,  23464
**Email:** ljohnson@regent.edu
**Phone:** 757-352-4130
**Fax:** 757-352-4100
**Organization:** Regent University

---

## General Comment

See Attached

---

## Attachments

Comment Submitted by Leeanne Johnson, Regent University (Attachment)

DSO00328

**From:** Leeanne Johnson [mailto:ljohnson@regent.edu]
**Sent:** Friday, December 06, 2013 12:11 PM
**To:** SEVP@dhs.gov
**Cc:** Leeanne Johnson
**Subject:** Attn: Katherine Westerlund, Question Reg. DHS Docket No. ICEB-2011-0005

Dear Ms. Westerlund,

As I contemplate the submission of any formal comments for the Proposed Rule on "Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants", I would greatly appreciate some assistance with my question below:

▶ Is it correct that it will be entirely permissible for F-2 dependents to obtain a degree--in things like biochemistry and nuclear engineering--as long as the F-2 dependent is:

A) enrolled at an SEVP-certified school--even if the degree program is not listed on the school's I-17, and
B) enrolled in at least 1 credit hour less than that which constitutes full-time status (a full course of study) each semester;

And, that none of this degree work would need to be tracked in SEVIS as a matter of national security, nor would any DSOs ever need to report when an F-2 has violated his/her status by enrolling full-time in a full course of study?

Any assistance you can provide with this question would be greatly appreciated.  Thank you in advance.
Sincerely,

*(Ms.) J. Leeanne Johnson, BA, MS, SEVIS PDSO, & Director*
Office of International Student Services (OISS)
=====================================
Regent University
Making the Extraordinary our Standard
201 Student Center
1000 Regent University Drive
Virginia Beach, VA 23464
=U.S.A.=

Phone:  (757) 352-4130   Fax:  (757) 352-4100
Grad. Asst. Phone:  (757) 352-4951
Website:  www.regent.edu/oiss
Office Walk-in Hours:  2-5 p.m. Mon-Fri  (No appointment necessary)
*Regent C.A.R.E.S.: After hours support & information center - www.regent.edu/cares*
*Hotline:  757.352.4738 | 855.352.4780*
=================================================





# FEDERAL REGISTER

| Vol. 81 | Friday, |
| No. 48 | March 11, 2016 |

Part II

## Department of Homeland Security

8 CFR Parts 214 and 274a
Improving and Expanding Training Opportunities for F–1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F–1 Students; Final Rule

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 214 and 274a**

[DHS Docket No. ICEB–2015–0002]

RIN 1653–AA72

## Improving and Expanding Training Opportunities for F–1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F–1 Students

**AGENCY:** Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** The Department of Homeland Security (DHS) is amending its F–1 nonimmigrant student visa regulations on optional practical training (OPT) for certain students with degrees in science, technology, engineering, or mathematics (STEM) from U.S. institutions of higher education. Specifically, the final rule allows such F–1 STEM students who have elected to pursue 12 months of OPT in the United States to extend the OPT period by 24 months (STEM OPT extension). This 24-month extension effectively replaces the 17-month STEM OPT extension previously available to certain STEM students. The rule also improves and increases oversight over STEM OPT extensions by, among other things, requiring the implementation of formal training plans by employers, adding wage and other protections for STEM OPT students and U.S. workers, and allowing extensions only to students with degrees from accredited schools. As with the prior 17-month STEM OPT extension, the rule authorizes STEM OPT extensions only for students employed by employers who participate in E-Verify. The rule also includes the "Cap-Gap" relief first introduced in a 2008 DHS regulation for any F–1 student with a timely filed H–1B petition and request for change of status.

**DATES:** This rule is effective May 10, 2016, except the addition of 8 CFR 214.16, which is effective from May 10, 2016, through May 10, 2019.

**FOR FURTHER INFORMATION CONTACT:** Katherine Westerlund, Policy Chief (Acting), Student and Exchange Visitor Program, U.S. Immigration and Customs Enforcement, 500 12th Street SW., Washington, DC 20536; telephone (703) 603–3400; email *SEVP@ice.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Abbreviations
II. Executive Summary
  A. Summary of Purpose of the Regulatory Action
  B. Summary of the Major Provisions of the Final Rule
  C. Costs and Benefits
III. Background
  A. Statutory and Regulatory Authority and History
  B. The 2015 NPRM
  C. Basis and Purpose of Regulatory Action
IV. Discussion of Comments and Final Rule
  A. Including a STEM OPT Extension Within the OPT Program
  B. Enforcement, Monitoring, and Oversight
  C. Qualifying F–1 Nonimmigrants
  D. Qualifying Employers
  E. STEM OPT Extension Validity Period
  F. Training Plan for F–1 Nonimmigrants on a STEM OPT Extension
  G. Application Procedures for STEM OPT Extension
  H. Travel and Employment Authorization Documentation of Certain F–1 Nonimmigrants Changing Status in the United States or on a STEM OPT Extension
  I. Transition Procedures
  J. Comments on the Initial Regulatory Impact Analysis
  K. Other Comments
V. Statutory and Regulatory Requirements
  A. Executive Orders 12866 and 13563: Regulatory Planning and Review
  B. Regulatory Flexibility Act
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Unfunded Mandates Reform Act
  E. Congressional Review Act
  F. Collection of Information
  G. Federalism
  H. Civil Justice Reform
  I. Energy Effects
  J. Environment
  K. Indian Tribal Governments
  L. Taking of Private Property
  M. Protection of Children
  N. Technical Standards
List of Subjects
The Amendments

## I. Abbreviations

CBP   U.S. Customs and Border Protection
CFR   Code of Federal Regulations
CIP   Classification of Instructional Program
DHS   Department of Homeland Security
DSO   Designated School Official
EAD   Employment Authorization Document
FOIA   Freedom of Information Act
FR   Federal Register
ICE   U.S. Immigration and Customs Enforcement
ID   Identification
IFR   Interim Final Rule
INA   Immigration and Nationality Act
NCES   National Center for Education Statistics
NPRM   Notice of Proposed Rulemaking
OPT   Optional Practical Training
RIA   Regulatory Impact Analysis
SEVP   Student and Exchange Visitor Program
SEVIS   Student and Exchange Visitor Information System
STEM   Science, Technology, Engineering, or Mathematics
U.S.C.   United States Code
USCIS   U.S. Citizenship and Immigration Services

## II. Executive Summary

### A. Purpose of the Regulatory Action

This final rule affects certain F–1 nonimmigrant students who seek to obtain an extension of optional practical training (OPT) based on study at a U.S. institution of higher education in a science, technology, engineering or mathematics (STEM) field, as well as certain F–1 nonimmigrant students who seek so-called Cap-Gap relief. The F–1 nonimmigrant classification is available to individuals seeking temporary admission to the United States as students at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program.[1] To obtain F–1 nonimmigrant classification, the student must be enrolled in a full course of study at a qualifying institution and have sufficient funds for self-support during the entire proposed course of study. Such course of study must occur at a school authorized by the U.S. government to accept international students.

OPT is a form of temporary employment available to F–1 students (except those in English language training programs) that directly relates to a student's major area of study in the United States. A student can apply to engage in OPT during his or her academic program ("pre-completion OPT") or after completing the academic program ("post-completion OPT"). A student can apply for 12 months of OPT at each education level (*e.g.*, one 12-month OPT period at the bachelor's level and another 12-month period at the master's level). While school is in session, the student may work up to 20 hours per week pursuant to OPT.

This final rule provides for an extension of the OPT period for certain F–1 students who have earned certain STEM degrees and who participate in practical training opportunities with employers that meet certain requirements. The Department of Homeland Security (DHS) first introduced an extension of OPT for STEM graduates in a 2008 interim final rule (2008 IFR). *See* 73 FR 18944 (Apr. 8, 2008). Under the 2008 IFR, an F–1 student with a STEM degree from a U.S. institution of higher education could apply for an additional 17 months of

---

[1] For purposes of 8 CFR 214.2(f), a "college or university" is an institution of higher learning that awards recognized bachelor's, master's, doctoral or professional degrees. *See* 8 CFR 214.3(a)(2)(A). A career or technical institution may therefore be categorized as a "college or university" if it awards such degrees.

OPT (17-Month STEM OPT extension), provided that the employer from which the student sought employment was enrolled in and remained in good standing in the E-Verify electronic employment eligibility verification program (E-Verify), as determined by U.S. Citizenship and Immigration Services (USCIS). As discussed in further detail below, on August 12, 2015, the U.S. District Court for the District of Columbia ordered the *vacatur* of the 2008 IFR on procedural grounds and remanded the issue to DHS. The court stayed the vacatur until February 12, 2016 to give DHS the opportunity to issue a new rule related to STEM OPT extensions through notice-and-comment rulemaking.

On October 19, 2015, DHS published a notice of proposed rulemaking (NPRM) in the **Federal Register** to reinstate the STEM OPT extension, with changes intended to enhance the educational benefit afforded by the extension and to increase program oversight, including safeguards to protect U.S. workers. *See* 80 FR 63376. On January 23, 2016, the Court further stayed its vacatur until May 10, 2016, to provide DHS additional time to complete the rulemaking following review of public comments received during the comment period and to allow the Department to publish the rule with a 60-day delayed effective date to provide sufficient time for efficient transition to the new rule's requirements.

*B. Summary of the Major Provisions of the Final Rule*

1. Summary of Final Rule

This rule finalizes the NPRM, with certain changes made following review and consideration of the public comments received by the Department. Under this rule, a qualifying F–1 student with a STEM degree who has been granted 12 months of practical training pursuant to the general OPT program may apply to DHS for a 24-month extension of his or her period of practical training (STEM OPT extension).

The core purpose of the STEM OPT extension is to allow participating students to supplement their academic knowledge with valuable practical STEM experience. Accordingly, as is the case with practical training generally, a student's practical training pursuant to the STEM OPT extension must be directly related to the student's major area of study. The student's STEM degree must be awarded by an accredited U.S. college or university and be in a field recognized as a STEM field by DHS. The student may base the

extension on the student's most recent academic degree, or may (subject to a number of requirements described in more detail below) base the extension on a STEM degree that the student earned earlier in his or her academic career in the United States. Under this rule, a student may be eligible for up to two, separate STEM OPT extensions over the course of his or her academic career, upon completing two qualifying STEM degrees at different educational levels.

This rule includes a number of measures intended to better ensure the educational benefit, integrity, and security of the STEM OPT extension. For instance, the rule requires each STEM OPT student to prepare and execute with their prospective employer a formal training plan that identifies learning objectives and a plan for achieving those objectives. The STEM OPT student and his or her employer must work together to finalize that plan. The rule also prohibits students from basing a STEM OPT extension on a degree from an unaccredited educational institution. Moreover, to ensure compliance with program requirements, the rule provides for DHS site visits to employer locations in which STEM OPT students are employed. Although DHS will generally give notice of such site visits, DHS may conduct an unannounced site visit if it is triggered by a complaint or other evidence of noncompliance with the regulations.

The rule also includes a number of requirements intended to help DHS track STEM OPT students and further enhance the integrity of the STEM OPT extension. Most prominent among these are reporting requirements, which the rule imposes primarily upon students and designated school officials (DSOs). The rule includes four main reporting requirements, as follows. First, the rule imposes a six-month validation requirement, under which a STEM OPT student and his or her school must work together to confirm the validity of certain biographical, residential, and employment information concerning the student, including the student's legal name, the student's address, the employer's name and address, and current employment status. Second, the rule imposes an annual self-evaluation requirement, under which the student must report to the DSO on his or her progress with the practical training. The student's employer must sign the self-evaluation prior to its submission to the DSO. Third, the rule requires that the student and employer report changes in employment status, including the student's termination or departure from

the employer. Fourth, both the student and the employer are obligated to report to the DSO material changes to, or material deviations from, the student's formal training plan.

Finally, this rule includes a number of specific obligations for STEM OPT employers. These obligations are intended to ensure the integrity of the program and provide safeguards for U.S. workers in STEM fields. Among other things, the employer must be enrolled in and remain in good standing with E-Verify; assist with the aforementioned reporting and training plan requirements; and attest that (1) it has sufficient resources and trained personnel available to provide appropriate training in connection with the specified opportunity; (2) the student on a STEM OPT extension will not replace a full- or part-time, temporary or permanent U.S. worker; and (3) the opportunity helps the student attain his or her training objectives.

We describe each of these provisions in more detail below.

2. Comparison to the 2008 IFR

As noted above, this rule contains a number of changes in comparison to the 2008 IFR, while retaining other provisions of the 2008 IFR. Changes made by this rule in comparison to the 2008 IFR include:

• *Lengthened STEM OPT Extension Period.* The rule increases the OPT extension period for STEM OPT students from the 2008 IFR's 17 months to 24 months. The final rule also makes F–1 students who subsequently enroll in a new academic program and earn another qualifying STEM degree at a higher educational level eligible for one additional 24-month STEM OPT extension.

• *STEM Definition and CIP Categories for STEM OPT Extension.* The rule defines which fields of study (more specifically, which Department of Education Classification of Instructional Program (CIP) categories) may serve as the basis for a STEM OPT extension. The rule also sets forth a process for public notification in the **Federal Register** when DHS updates the list of eligible STEM fields on the Student and Exchange Visitor Program's (SEVP's) Web site.

• *Training Plan for STEM OPT Students.* To improve the educational benefit of the STEM OPT extension, the rule requires employers to implement formal training programs to augment students' academic learning through practical experience. This requirement is intended to equip students with a more comprehensive understanding of

STEM000057

their selected area of study and broader functionality within that field.

• *Previously Obtained STEM Degrees.* The rule permits an F–1 student participating in a 12-month period of post-completion OPT based on a non-STEM degree to use a prior eligible STEM degree from a U.S. institution of higher education as a basis to apply for a STEM OPT extension, as long as both degrees were received from currently accredited educational institutions. The practical training opportunity must be directly related to the previously obtained STEM degree.

• *Safeguards for U.S. Workers in Related Fields.* To guard against adverse impacts on U.S. workers, the rule requires terms and conditions of a STEM practical training opportunity (including duties, hours, and compensation) to be commensurate with those applicable to similarly situated U.S. workers. As part of completing the Form I–983, Training Plan for STEM OPT Students, an employer must attest that: (1) It has sufficient resources and trained personnel available to provide appropriate training in connection with the specified opportunity; (2) the student will not replace a full- or part-time, temporary or permanent U.S. worker; and (3) the opportunity will help the student attain his or her training objectives.

• *School Accreditation, Employer Site Visits, and Employer Reporting.* To improve the integrity of the STEM OPT extension, the rule: (1) Generally limits eligibility for such extensions to students with degrees from schools accredited by an accrediting agency recognized by the Department of Education; (2) clarifies DHS discretion to conduct employer site visits at worksites to verify whether employers are meeting program requirements, including that they possess and maintain the ability and resources to provide structured and guided work-based learning experiences; and (3) institutes new employer reporting requirements.

• *Compliance Requirements and Unemployment Limitation.* In addition to reinstating the 2008 IFR's reporting and compliance requirements, the rule revises the number of days an F–1 student may remain unemployed during the practical training period. The program in effect before this final rule allowed a student to be unemployed up to 90 days during his or her initial period of post-completion OPT, and up to an additional 30 days (for a total of 120 days) for a student who received a 17-month STEM OPT extension. This rule retains the 90-day maximum period of unemployment during the initial

period of post-completion OPT but allows an additional 60 days (for a total of 150 days) for a student who obtains a 24-month STEM OPT extension.

The rule retains other provisions of the 2008 IFR, as follows:

• *E-Verify and Reporting Requirements for STEM OPT Employers.* The rule requires STEM OPT employers to be enrolled in and remain in good standing with E-Verify, as determined by USCIS, and to report changes in the STEM OPT student's employment to the DSO within five business days.

• *Reporting Requirements for STEM OPT Students.* The rule requires STEM OPT students to report to their DSOs any name or address changes, as well as any changes to their employers' names or addresses. Students also must verify the accuracy of this reporting information periodically.

• *Cap-Gap Extension for F–1 Students with Timely Filed H–1B Petitions and Requests for Change of Status.* With a minor revision to improve readability, the rule includes the 2008 IFR's Cap-Gap extension provision, under which DHS temporarily extends an F–1 student's duration of status and any current employment authorization if the student is the beneficiary of a timely filed H–1B petition and change-of-status request pending with or approved by USCIS. The Cap-Gap extension extends the OPT period until the beginning of the new fiscal year (*i.e.,* October 1 of the fiscal year for which the H–1B status is being requested).

3. Summary of Changes From the Notice of Proposed Rulemaking

Following careful consideration of public comments received, DHS also has made several modifications to the regulatory text proposed in the NPRM. Those changes include the following:

• *Time of Accreditation.* For a STEM OPT extension based on a previously obtained STEM degree, the student must have obtained that degree from an educational institution that is accredited at the time of the student's application for the extension.

• *SEVP Certification Required for Prior Degrees.* For a STEM OPT extension based on a previously obtained STEM degree, the degree also must have been issued by an educational institution that is SEVP-certified at the time of application for the extension. Overseas campuses of U.S. educational institutions are not eligible for SEVP certification.

• *Site Notifications.* DHS will provide notice to the employer 48 hours before any site visit unless a complaint or other evidence of noncompliance

with the STEM OPT extension regulations triggers the visit, in which case DHS may conduct the visit without notice.

• *Focus on Training.* DHS has modified the proposed rule's Mentoring and Training Plan to increase the focus on training. The information collection instrument for this plan is now titled Form I–983, Training Plan for STEM OPT Students.

• *Existing Employer Training Programs.* This rule streamlines and clarifies the regulatory text and Training Plan for STEM OPT Students to clarify that employers may use existing training programs to satisfy certain regulatory requirements for evaluating the progress of STEM OPT students.

• *Employer Attestation.* The rule revises the employer attestation to require that the employer attest that the student will not replace a full- or part-time, temporary or permanent U.S. worker.

• *Evaluation of Student Progress.* The rule revises the evaluation requirement to require that the student and an appropriate individual in the employer's organization sign the evaluation on an annual basis, with a mid-point evaluation during the first 12-month interval and a final evaluation completed prior to the conclusion of the STEM OPT extension.

DHS also has clarified its interpretation of the rule in a number of ways, as explained more fully below.

*C. Costs and Benefits*

The anticipated costs of compliance with the rule, as well as the benefits, are discussed at length in the section below, entitled "Statutory and Regulatory Requirements—Executive Orders 12866 and 13563." A combined Regulatory Impact Analysis and a Final Regulatory Flexibility Analysis are available in the docket for this rulemaking. A summary of the analysis follows.

DHS estimates that the costs imposed by the implementation of this rule will be approximately $737.6 million over the 10-year analysis time period, discounted at 3 percent, or $588.5 million, discounted at 7 percent. This amounts to $86.5 million per year when annualized at a 3 percent discount rate, or $83.8 million per year when annualized at a 7 percent discount rate. The Summary Table at the end of this section presents the cost estimates in more detail.

With respect to benefits, making the STEM OPT extension available to additional students and lengthening the 17-month extension to 24 months will enhance certain students' ability to achieve the objectives of their courses of

study by allowing them to gain valuable knowledge and skills through on-the-job training that may be unavailable in their home countries. The changes will also benefit the U.S. educational system, U.S. employers, and the broader U.S. economy. The rule will benefit the U.S. educational system by helping to ensure that the nation's colleges and universities remain globally competitive in attracting international students in STEM fields. U.S. employers will benefit from the increased ability to rely on skilled U.S.-educated STEM OPT students, as well as their knowledge of markets in their home countries. The nation also will benefit from the increased retention of such students in the United States, including through increased research, innovation, and other forms of productivity that enhance the nation's economic, scientific, and technological competitiveness.

Furthermore, strengthening the STEM OPT extension by implementing requirements for training, tracking objectives, reporting on program compliance, and accreditation of participating schools will further prevent abuse of the limited on-the-job training opportunities provided by OPT in STEM fields. These and other elements of the rule also will improve program oversight, strengthen the requirements for program participation, and better ensure that U.S. workers are protected.

The Summary Table below presents a summary of the benefits and costs of the rule. The costs are discounted at 7 percent. Students will incur costs for completing application forms and paying application fees; reporting to DSOs; preparing (with their employers) the Training Plan for STEM OPT Students required by this rule; and periodically submitting updates to employers and DSOs. DSOs will incur costs for reviewing information and forms submitted by students, inputting required information into the Student and Exchange Visitor Information System (SEVIS), and complying with other oversight requirements related to prospective and participating STEM OPT students. Employers of STEM OPT students will incur burdens for preparing the Training Plan with students, confirming students' evaluations, enrolling in (if not previously enrolled) and using E-Verify to verify employment eligibility for all new hires, and complying with additional requirements related to E-Verify.

SUMMARY TABLE—ESTIMATED COSTS AND BENEFITS OF FINAL RULE

[in millions of 2014 dollars]

| | STEM OPT | E-Verify | Total |
|---|---|---|---|
| 10-Year Cost Annualized at 7 Percent Discount Rate ... | $79.8 | $4.0 | $83.8 |
| 10-Year Cost Annualized at 3 Percent Discount Rate ... | $82.3 | $4.2 | $86.5 |
| Qualitative Costs ................................................ | • Cost to students and schools resulting from accreditation requirement;<br>• Cost to employers from the requirement to provide STEM OPT students commensurate compensation to similarly situated U.S. workers; and<br>• Decreased practical training opportunities for students no longer eligible for the program due to improvements to the STEM OPT extension. | | |
| Monetized Benefits ............................................. | N/A | N/A | N/A |
| Non-monetized Benefits .................................... | • Increased ability of students to gain valuable knowledge and skills through on-the-job training in their field;<br>• Increased global attractiveness of U.S. colleges and universities; and<br>• Increased program oversight, strengthened requirements for program participation, and new protections for U.S. workers. | | |
| Net Benefits ....................................................... | N/A | N/A | N/A |

Finally, in response to public comments, DHS revised the regulatory impact analysis (RIA) published with the NPRM to reflect the changes made in the final rule and include new data that has become available since the publication of the NPRM, such as updated compensation rates. DHS's major changes to the RIA from the NPRM are summarized in the table below.

TABLE 1—CHANGES FROM INITIAL RIA TO FINAL RIA

| Variables | NPRM and final rule comparison | | | Description of changes |
|---|---|---|---|---|
| | NPRM | Final rule | Difference | |
| Population of Affected Parties | | | | |
| *Number of Students due to Increased CIP List Eligibility as a percent of New STEM OPT Extension Students.* | 10% | 5% | −5% | • The final rule's changes to the CIP list are not expected to result in the same expansion of eligibility as DHS anticipated in the proposed rule. |
| *Number of Transitional Students* .................... | 18,210 | 17,610 | −600 | • Revised the estimate of transitional students based on the effective date of final rule. |

TABLE 1—CHANGES FROM INITIAL RIA TO FINAL RIA—Continued

| Variables | NPRM and final rule comparison | | | Description of changes |
|---|---|---|---|---|
| | NPRM | Final rule | Difference | |
| Wages | | | | |
| *STEM Students' Weighted Average Wage Rate (unloaded).* | $23.81 | $26.06 | $2.25 | • New FLC Data Center Online Wage Library data for 2014–2015 was published.<br>• Revised STEM occupations list to more closely reflect the STEM OPT extension degrees. |
| Training Plan Form for STEM OPT Students—Initially Completing Training Plan Form | | | | |
| *Student Burden* .......................................... | $58.05 | $82.44 | $24.39 | • Time burden increased from 1.67 hours to 2.17 hours in response to public comments. |
| *Employer Burden* .......................................... | $123.47 | $280.81 | $157.34 | • Training Plan form revisions require up to two employer officials contributing to the initial completion of the Training Plan form.<br>• Time burden increased from 2 hours to 4 hours in response to public comments. |
| *DSO Burden* .......................................... | $13.09 | $52.31 | $39.22 | • Time burden revised from 0.33 hours to 1.33 hours to reflect public comments. |
| Training Plan Form for STEM OPT Students—12-Month Evaluations | | | | |
| *Student Burden* .......................................... | [2]$139.04 | $114.15 | −$24.89 | • Frequency of evaluations changed from six to 12 months.<br>• Updated STEM student wage rate.<br>• Time burden increased from 1.17 hours to 1.5 hours in response to public comments. |
| *Employer Burden* .......................................... | $78.96 | $118.44 | $39.48 | • Frequency of evaluations changed from six to 12 months.<br>• Time burden increased from 0.25 to 0.75 hours in response to public comments. |
| *DSO Burden* .......................................... | [3]$26.74 | $78.66 | $51.92 | • Frequency of evaluations changed from six to 12 months.<br>• Time burden increased from 0.33 hours to 1 hour in response to public comments. |
| Additional Implementation Costs | | | | |
| *Evaluations* .......................................... | [4]$10.57 | $5.29 | −$5.28 | • Frequency of evaluations changed from six to 12 months. |
| Reporting Requirements | | | | |
| *Student Opportunity Cost for Updating Information Reports.* | $12.94 | $0 | $12.94 | • The student Reporting Requirements in the Final Rule do not represent a change from the baseline. |
| E-Verify Requirements for STEM OPT Extension Employers | | | | |
| *Total Enrolled Employers Who Would Discontinue E-Verify without Final Rule over 10 years.* | 70,025 | 8,753 | −61,272 | • Updated based on further research. |
| Total 10-year Cost (Undiscounted) ......... | $759.3M | $886.1M | $126.8M | |

## III. Background

*A. Statutory and Regulatory Authority and History*

The Secretary of Homeland Security (Secretary) has broad authority to

[2] In the NPRM, DHS presented a combined total student burden for six-month evaluations and validation check-ins (1.17 hours). Note that the NPRM cost estimate only included 1 hour for the student to complete the evaluation. The NPRM cost estimate did not include a separate estimate of 0.17 hours for associated with the six-month validation report requirement from the IFR. Hence, this value, $139.04 (= 2 evaluations × 1 hour × $34.76/hour), differs from that presented in the NPRM, $162.68 (= 4 evaluations × 1.17 hours × $34.76/hour).

[3] In the NPRM, DHS presented the combined total DSO burden for six-month evaluations and validation check-ins. Note that the NPRM estimate only included the 0.17 hours for the DSO to file each evaluation and did not include the 0.17 hours for the DSO to make a six-month validation report to SEVIS. Hence, this value, $26.74 (= 2 evaluations × 0.17 hours × $39.33/hour), differs from that

administer and enforce the nation's immigration laws. *See generally* 6 U.S.C. 202; Immigration and Nationality

presented in the NPRM, $52.39 (= 4 evaluations and validation check-ins × 0.333 hours × $39.33/hour).

[4] In the NPRM, DHS presented the combined total implementation cost for six-month evaluations and validation check-ins. Note that the NPRM estimate only included the costs associated with the six-month evaluations. Hence, this value, $10.57 ((= $78.96 + 26.74) × 10%), differs from that presented in the NPRM, $13.09 ((= $78.96 + $52.39) × 10%).

STEM000060

Act of 1952, as amended (INA), Sec. 103, 8 U.S.C. 1103. Section 101(a)(15)(F)(i) of the INA establishes the F–1 nonimmigrant classification for individuals who wish to come to the United States temporarily to enroll in a full course of study at an academic or language training school certified by U.S. Immigration and Customs Enforcement's (ICE's) SEVP. 8 U.S.C. 1101(a)(15)(F)(i). The INA provides the Secretary with broad authority to determine the time and conditions under which nonimmigrants, including F–1 students, may be admitted to the United States. *See* INA Sec. 214(a)(1), 8 U.S.C. 1184(a)(1). The Secretary also has broad authority to determine which individuals are authorized for employment in the United States. *See, e.g.,* INA Sec. 274A(h)(3), 8 U.S.C. 1324a(h)(3).

Federal agencies dealing with immigration have long interpreted Sec. 101(a)(15)(F)(i) of the INA and related authorities to encompass on-the-job training that supplements classroom training. *See, e.g.,* 12 FR 5355, 5357 (Aug. 7, 1947) (authorizing employment for practical training under certain conditions, pursuant to statutory authority substantially similar to current INA Sec. 101(a)(15)(F)(i)); 38 FR 35425, 35426 (Dec. 28, 1973) (also authorizing, pursuant to the INA, employment for practical training under certain conditions).[5]

ICE manages and oversees significant elements of the F–1 student process, including the certification of schools and institutions in the United States that enroll F–1 students. In overseeing these institutions, ICE uses SEVIS to track and communicate with the schools that enroll international students and communicate with the schools that enroll them while they are in the United States and participating in educational opportunities. Additional statutory and other authority requires and supports this tracking and monitoring.[6]

### 1. OPT Background

A student in F–1 status may remain in the United States for the duration of his or her education if otherwise meeting the requirements for the maintenance of status. 8 CFR 214.2(f)(5)(i). Once an F–1 student has completed his or her academic program and any subsequent period of OPT, the student must generally leave the United States unless he or she enrolls in another academic program, either at the same school or at another SEVP-certified school; changes to a different nonimmigrant status; or otherwise legally extends his or her period of authorized stay in the United States. As noted, DHS regulations have long defined an F–1 student's duration of status to include the student's practical training. *See, e.g.,* 48 FR 14575, 14583 (Apr. 5, 1983).[7] Additionally, an F–1 student is allowed a 60-day "grace period" after the completion of the academic program or OPT to prepare for departure from the United States. 8 CFR 214.2(f)(5)(iv).

Unless an F–1 student meets certain limited exceptions, he or she may not be employed in the United States during the term of his or her F–1 status. DHS permits an F–1 student who has been enrolled on a full-time basis for at least one full academic year in a college, university, conservatory, or seminary in the United States, using electronic reporting technology where practicable. Consistent with this statutory authority, DHS manages these programs pursuant to Homeland Security Presidential Directive—2 (HSPD—2), Combating Terrorism Through Immigration Policies (Oct. 29, 2001), as amended, *http://www.gpo.gov/fdsys/pkg/CPRT-110HPRT39618/pdf/CPRT-110HPRT39618.pdf*); and Section 502 of the Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. 107–173, 116 Stat. 543, 563 (May 14, 2002). HSPD–2 requires the Secretary of Homeland Security to conduct periodic, ongoing reviews of institutions certified to accept F nonimmigrants, and to include checks for compliance with recordkeeping and reporting requirements. *See* Weekly Comp. Pres. Docs., 37 WCPD 1570, *http://www.gpo.gov/fdsys/granule/WCPD-2001-11-05/WCPD-2001-11-05-Pg1570/content-detail.html.* Section 502 of the Enhanced Border Security and Visa Entry Reform Act of 2002 directs the Secretary to review the compliance with recordkeeping and reporting requirements under 8 U.S.C. 1101(a)(15)(F) and 1372 of all schools approved for attendance by F students within two years of enactment, and every two years thereafter. Moreover, the programs discussed in this rule, as is the case with all DHS programs, are carried out in keeping with DHS's primary mission, which includes the responsibility to "ensure that the overall economic security of the United States is not diminished by the efforts, activities, and programs aimed at securing the homeland." 6 U.S.C. 111(b)(1)(F).

certified by SEVP, and who has otherwise maintained his or her status, to apply for practical training to work for a U.S. employer in a job directly related to his or her major area of study. 8 CFR 214.2(f)(10).

An F–1 student may seek employment through OPT either during his or her academic program (pre-completion OPT) or immediately after graduation (post-completion OPT). The student remains in F–1 nonimmigrant status throughout the OPT period. Thus, an F–1 student in post-completion OPT does not have to leave the United States within 60 days after graduation, but instead has authorization to remain for the entire post-completion OPT period. 8 CFR 214.2(f)(5)(i). This initial post-completion OPT period (*i.e.,* a period of practical training immediately following completion of an academic program) can be up to 12 months, except in certain circumstances involving students who engaged in either pre-completion OPT or curricular practical training (CPT).[8]

### 2. Regulatory History

On April 8, 2008, DHS published an interim final rule in the **Federal Register** (73 FR 18944) that, in part, extended the maximum period of OPT from 12 to 29 months (through a 17-month "STEM OPT extension") for an F–1 student who obtained a degree in a designated STEM field from a U.S. institution of higher education and who was engaged in practical training with an employer that enrolled in and remained in good standing with E-Verify, as determined by USCIS. As a result of that rule, F–1 students granted STEM OPT extensions were required to report to their DSOs any changes in their names or addresses, as well as any changes in their employer's information (including name or address), and periodically validate the accuracy of this information. The rule further required employers of such students to report to the relevant DSO within two

---

[5] During a brief period following the Immigration Act of 1990, Congress expanded employment authorization for foreign students (referred to throughout this preamble as "international students") by allowing for a three-year pilot program in which students could be employed off-campus in positions *unrelated* to the student's field of study. Pub. L. 101–649, Sec. 221(a), 104 Stat. 4978, 5027 (Nov. 29, 1990). In general, however, practical training has historically been limited to the student's field of study.

[6] DHS derives its authority to manage these programs from several sources, including, in addition to the authorities cited above, section 641 of Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, 110 Stat. 3009–546, 3009–704 (Sep. 30, 1996) (codified as amended at 8 U.S.C. 1372), which authorizes the creation of a program to collect current and ongoing information provided by schools and exchange visitor programs regarding F and other nonimmigrants during the course of their stays in

[7] See *Washington Alliance of Tech. Workers* v. *U.S. Dep't of Homeland Security,* No. 1:14-cv-00529, slip op. at 25–26 (D.D.C. Aug. 12, 2015) (finding that DHS's interpretation permitting "employment for training purposes without requiring school enrollment" is '"longstanding' and entitled to [judicial] deference").

[8] CPT provides a specially-designed program through which students can participate in an internship, alternative study, cooperative education, or similar programs. 52 FR 13223 (Apr. 22, 1987). Defined to also include practicums, CPT allows sponsoring employers to train F–1 students as part of the students' established curriculum within their schools. 8 CFR 214.2(f)(10)(i). CPT must relate to and be integral to a student's program of study. Unlike OPT and other training or employment, however, CPT can be full-time even while a student is attending school that is in session. Schools have oversight of CPT through their DSOs, who are responsible for authorizing CPT that is directly related to the student's major area of study and reporting certain information, including the employer and location, the start and end dates, and whether the training is full-time or part time. 8 CFR 214.2(f)(10)(i)(B).

business days if a student was terminated from or otherwise left employment prior to the end of the authorized period of OPT. The rule allowed an F–1 student to apply for post-completion OPT within the 60-day grace period at the conclusion of his or her academic program. The rule also limited the total period in which students on initial post-completion OPT could be unemployed to 90 days. Students granted 17-month STEM OPT extensions were provided an additional 30 days in which they could be unemployed, for an aggregate period of 120 days.

The 2008 IFR also addressed the so-called Cap-Gap problem, which results when an F–1 student's F–1 status and OPT-based employment authorization expires before the start date of an approved H–1B petition and change-of-status request filed on his or her behalf ("H–1B change-of-status petition"). Specifically, F–1 students on initial post-completion OPT frequently complete their period of authorized practical training in June or July of the year following graduation. Before the 2008 IFR, if such a student was a beneficiary of an H–1B petition that was pending with or approved by USCIS and requested a change of status to H–1B classification commencing in the following fiscal year (*i.e.*, beginning on October 1), the student would be unable to obtain H–1B status before his or her OPT period expired. Such students were often required to leave the United States for a few months until they were able to obtain their H–1B status on October 1. The 2008 IFR addressed this problem through a Cap-Gap provision that briefly extended the F–1 student's duration of status and employment authorization to enable the student to remain in the United States until he or she could change to H–1B status.

DHS received over 900 comments in response to the 2008 IFR. Public comments received on the 2008 IFR and other records may be reviewed at the docket for that rulemaking, No. ICEB–2008–0002, available at *www.regulations.gov.*

Washington Alliance Litigation Regarding the 2008 IFR

On August 12, 2015, the U.S. District Court for the District of Columbia issued an order in the case of *Washington Alliance of Tech. Workers* v. *U.S. Dep't of Homeland Security*, — F. Supp. 3d —, 2015 WL 9810109, (D.D.C. Aug. 12, 2015) (slip op.). Although the court held that the 2008 IFR rested upon a

reasonable interpretation of the INA,[9] the court also held that DHS violated the notice and comment provisions of the Administrative Procedure Act (APA), 5 U.S.C. 553, by promulgating the 2008 IFR without advance notice and opportunity for public comment. In its order, the court invalidated the 2008 IFR as procedurally deficient, and remanded the issue to DHS.

Although the court vacated the 2008 IFR, the court stayed the *vacatur* until February 12, 2016, to provide time for DHS to correct the procedural deficiency through notice-and-comment rulemaking. *Id.* at *37.[10] The court specifically explained that the stay was necessary to avoid "substantial hardship for foreign students and a major labor disruption for the technology sector" and that immediate *vacatur* of the STEM OPT extension would be "seriously disruptive." *Id.* at *36. On January 23, 2016, the Court further stayed its vacatur by 90 days until May 10, 2016. *Washington Alliance of Tech. Workers* v. *U.S. Dep't of Homeland Security*, No. 1:14-cv-00529, (D.D.C. Jan. 23, 2016) (slip op.). The court further stayed the vacatur to provide DHS an additional 30 days to complete the rulemaking and to allow the Department to publish the rule with a 60-day delayed effective date. *Id.*

Litigation in this matter is ongoing, as the plaintiff has appealed a portion of the court's August 12, 2015, decision. Thus the final disposition of the case remains to be determined. Nevertheless, it is clear that DHS must issue a final rule that will take effect before the court's stay expires on May 10, 2016, or a significant number of students will be unable to pursue valuable training

opportunities that would otherwise be available to them.

*B. The 2015 NPRM*

After the court's ruling, DHS acted quickly to address the imminent *vacatur* of the 2008 IFR and the significant uncertainty surrounding the status of thousands of students in the United States. As of September 16, 2015, over 34,000 students were in the United States on a STEM OPT extension. In addition, hundreds of thousands of international students, most of whom are in F–1 status, already have chosen to enroll in U.S. educational institutions and are currently pursuing courses of study in fields that may provide eligibility for this program. Some of those students may have considered the opportunities offered by the STEM OPT extension when deciding whether to pursue their degree in the United States. DHS therefore acted swiftly to mitigate the uncertainty surrounding the 2008 IFR. Prompt action is particularly appropriate with respect to those students who have already committed to study in the United States, in part based on the possibility of furthering their education through an extended period of practical training in the world's leading STEM economy.[11]

Accordingly, on October 19, 2015, DHS published an NPRM in the **Federal Register**, proposing to reinstate the STEM OPT extension along with changes intended to improve the integrity and academic benefit of the extension and to better protect U.S. workers.[12] 80 FR 63376.[13] During the public comment period, approximately 50,500 comments were submitted on the

---

[9] With respect to DHS's interpretation of the F–1 student visa provisions in the INA, the court found ample support for DHS's longstanding practice of "permit[ting F–1 student] employment for training purposes without requiring ongoing school enrollment." *Washington Alliance*, No. 1:14-cv-00529, slip op. at 26–27. The court recognized the Secretary's broad authority under the INA "to regulate the terms and conditions of a nonimmigrant's stay, including its duration." *Id.* at *29 (citing 8 U.S.C. 1103(a), 1184(a)(1)). The court also recognized the Secretary's authority to consider the potential economic contributions and labor market impacts that may result from particular rulemaking. *Id.* (citing 6 U.S.C. 111(b)(1)(F)).

[10] In an earlier preliminary ruling in the case regarding plaintiff's challenge to DHS's general OPT and STEM OPT extension programs, the court held that plaintiff did not have standing to challenge the general OPT program on behalf of its members because it had not identified a member of its association who suffered any harm from the general OPT program. *See Washington Alliance of Tech. Workers* v. *U.S. Dep't of Homeland Security*, 74 F. Supp. 3d 247, 252 & n.3 (D.D.C. 2014). The court held in the alternative that the challenge to the general OPT program was barred by the applicable statute of limitations.

[11] The National Science Foundation reports that the United States performs more science and engineering Research and Development (R&D) than any other nation, accounting for just under 30% of the global total. *See* Science and Engineering Indicators 2014 (NSF) at Chapter 4 (International Comparisons), at 4–17, available at *http://www.nsf.gov/statistics/seind14/index.cfm/chapter-4.* According to NSF, the United States expends $429 billion of the estimated $1.435 trillion in global science and engineering R&D (p. 4–17), and business, government, higher education, and non-profits in the United States expend more than double that of any other country (Table 4–5).

[12] These proposed changes were consistent with the direction provided in the Secretary of Homeland Security's November 20, 2014 memorandum entitled, "Policies Supporting U.S. High Skilled Businesses and Workers." DHS recognized the nation's need to evaluate, strengthen, and improve practical training as part of an overall strategy to enhance our nation's economic, scientific, and technological competitiveness. Highly skilled persons educated in the United States contribute significantly to the U.S. economy, including through advances in entrepreneurial and research and development endeavors, which correlate highly with overall economic growth and job creation.

[13] DHS hereby incorporates all background material included in the NPRM in this final rule.

NPRM and related forms.[14] Comments were submitted by a range of entities and individuals, including U.S. and international students, U.S. workers, schools and universities, professional associations, labor organizations, advocacy groups, businesses, two members of Congress, and other interested persons. DHS thanks the public for its helpful input and engagement during the public comment period.[15]

This final rule builds upon the NPRM and the public comments received. DHS intends for this rule to further strengthen the integrity and educational benefit of STEM OPT extensions, as well as better protect U.S. workers.

*C. Basis and Purpose of Regulatory Action*

In finalizing this rule, DHS recognizes the substantial economic, scientific, technological, and cultural benefits provided by the F–1 nonimmigrant program generally, and STEM OPT extensions in particular.

1. Benefits of International Students in the United States

International students have historically made significant contributions to the United States, both through the payment of tuition and other expenditures in the U.S. economy, as well as by significantly enhancing academic discourse and cultural exchange on campuses throughout the United States. In addition to these general benefits, STEM students further contribute through research, innovation, and the provision of knowledge and skills that help maintain and grow increasingly important sectors of the U.S. economy.

International students, for example, regularly contribute a significant amount of money into the U.S. economy. According to statistics compiled by NAFSA: Association of International Educators (NAFSA), international students made a net contribution of $26.8 billion to the U.S. economy in the 2013–2014 academic year.[16] This contribution included tuition ($19.8 billion) and living expenses for self and family ($16.7 billion), after adjusting for U.S. financial support ($9.7 billion).[17] Public colleges and universities particularly benefit from the payment of tuition by international students, especially in comparison to the tuition paid by in-state students.[18]

International students also increase the benefits of academic exchange, while reinforcing ties with other countries and fostering increased understanding of American society.[19] International students, for example, "enrich U.S. universities and communities with unique perspectives and experiences that expand the horizons of American students and [make] U.S. institutions more competitive in the global economy." [20] At the same time, "the international community in American colleges and universities has implications regarding global relationships, whether [those are] between nation-states, or global business and economic communities." [21] International education and exchange at the post-secondary level in the United States builds relationships that "promote cultural understanding and dialogue" and bring a global dimension to higher education through the "diversity in culture, politics, religions, ethnicity, and worldview" brought by international students.[22]

Accordingly, international students provide substantial benefits to their U.S. colleges and universities, including beneficial economic and cultural impacts. A study by Duke University in 2013 analyzing 5,676 alumni surveys showed that "substantial international interaction was positively correlated with U.S. students' perceived skill development in a wide range of areas across three cohorts." [23] Current research also suggests that international students contribute to the overall economy by building global connections between their hometowns and U.S. host cities.[24] Evidence links skilled migration to transnational business creation, trade, and direct investment between the United States and a migrant's country of origin.[25]

International STEM students contribute to the United States in all the ways mentioned above. They also contribute more specifically to a number of advanced and innovative fields that are critical to national prosperity and security. By conducting scientific research, developing new technologies, advancing existing technologies, and creating new products and industries, for example, STEM workers diversify our nation's economy and drive economic growth while also producing increased employment opportunities and higher wages for all U.S. workers.[26]

---

[14] Comments can be viewed in the online docket for this rulemaking at *http://www.regulations.gov*. Enter "ICEB–2015–0002" into the search bar to find the docket.

[15] One commenter requested a public meeting on the NPRM, "[g]iven the major impact that the rules will have on the educational and labor markets, and the lack of attention in the rule to the adverse impacts the program's insufficient regulations and worker protections can have on U.S. workers and students." DHS has determined that a public meeting would not be in the public interest, in light of the impending *vacatur* date and the extensive discussion of these issues in the NPRM, the public comments, and this final rule.

[16] NAFSA: Association of International Educators, "The Economic Benefits of International Students: Economic Analysis for Academic Year 2013–2014," available at *http://www.nafsa.org/_/File/_/eis2014/USA.pdf; see also NAFSA, International Student Economic Value Tool, available at http://www.nafsa.org/economicvalue.*

[17] *Id.*

[18] Washington Post, "College Group Targets Incentive Payments for International Student Recruiters" (June 2, 2011), available at *http://www.washingtonpost.com/local/education/college-group-targets-incentive-payments-for-international-student-recruiters/2011/05/31/AGvl5aHH_story.html.*

[19] *See* The White House, National Security Strategy 29 (May 2010), available at *https://www.whitehouse.gov/sites/default/files/rss_viewer/national_security_strategy.pdf.*

[20] U.S. Department of State, "Why Internationalize," available at *https://educationusa.state.gov/us-higher-education-professionals/why-internationalize.*

[21] Pamela Leong, "Coming to America: Assessing the Patterns of Acculturation, Friendship Formation, and the Academic Experiences of International Students at a U.S. College," *Journal of International Students* Vol. 5 (4): 459–474 (2015) at p. 459.

[22] Hugo Garcia and Maria de Lourdes Villareal, "The "Redirecting" of International Students: American Higher Education Policy Hindrances and Implications," *Journal of International Students* Vol. 4 (2): 126–136 (2014) at p. 132.

[23] Jiali Luo and David Jamieson-Drake, "Examining the Educational Benefits of Interacting with International Students" at 96 (June 2013), *available at https://jistudents.files.wordpress.com/2013/05/2013-volume-3-number-3-journal-of-international-students-published-in-june-1-2013.pdf.* The authors noted that U.S. educational institutions play an important role in ensuring U.S. students benefit as much as possible from this interaction.

[24] Brookings Institution, "The Geography of Foreign Students in U.S. Higher Education: Origins and Destinations" (August 29, 2014), available at *http://www.brookings.edu/research/interactives/2014/geography-of-foreign-students#/M10420.*

[25] Sonia Plaza, "Diaspora resources and policies," in International Handbook on the Economics of Migration, 505–529 (Amelie F. Constant and Klaus F. Zimmermann, eds., 2013).

[26] *See* Michael Greenstone and Adam Looney, "A Dozen Economic Facts About Innovation" 2–3, available at *http://www.brookings.edu/~/media/research/files/papers/2011/8/innovation-greenstone-looney/08_innovation_greenstone_looney.pdf [hereinafter Greenstone and Looney];* Bureau of Labor Statistics 2014 data show that employment in occupations related to STEM has been projected to grow more than nine million, or 13 percent, during the period between 2012 and 2022, 2 percent faster than the rate of growth projected for all occupations. Bureau of Labor Statistics, Occupational Outlook Quarterly, Spring 2014, "STEM 101: Intro to Tomorrow's Jobs" 6, available at *http://www.stemedcoalition.org/wp-content/uploads/2010/05/BLS-STEM-Jobs-report-spring-2014.pdf. See also* Australian Government, Strategic Review of the Student Visa Program 2011 Report, ix, 1 (June 30, 2011), available at *http://www.border.gov.au/ReportsandPublications/Documents/reviews-and-inquiries/2011-knight-review.pdf#search=knight%20review (concluding that the economic benefit of international master's*
Continued

**13048**     **Federal Register** / Vol. 81, No. 48 / Friday, March 11, 2016 / Rules and Regulations

Economic research supports the premise that scientists, technology professionals, engineers, and mathematicians (STEM workers) are fundamental components in scientific innovation and technological adoption, and critical drivers of productivity growth in the United States.[27] For example, research has shown that international students who earn a degree and remain in the United States are more likely than native-born workers to engage in activities, such as patenting and the commercialization of patents, that increase U.S. labor productivity.[28] Similarly, other research has found that a 1 percentage point increase in immigrant college graduates' population share increases patents per capita by 9 to 18 percent.[29] Research also has shown that foreign-born workers are particularly innovative, especially in research and development, and that they have positive spillover effects on native-born workers.[30] One paper, for example, shows that foreign-born workers patent at twice the rate of U.S.-born workers, and that U.S.-born workers patent at greater rates in areas with more immigration.[31] The quality of the nation's STEM workforce in particular has played a central role in ensuring national prosperity over the last century and helps bolster the nation's economic future.[32] This, in turn, has helped to enhance national security, which is dependent on the nation's ability to maintain a growing and innovative economy.[33] Innovation

is crucial for economic growth, which is vital to continued funding for defense and security.[34]

2. Increased Competition for International Students

DHS recognizes that the United States has long been a global leader in international education. The number of international students affiliated with U.S. colleges and universities grew by 72 percent between 1999 and 2013 to a total of 886,052.[35] However, although the overall number of international students increased over that period, the nation's share of such students decreased. In 2001, the United States received 28 percent of international students; by 2011 that share had decreased to 19 percent.[36] Countries such as Canada, the United Kingdom, New Zealand, Australia, Malaysia, Taiwan, and China are actively instituting new strategies to attract international students.[37]

For example, Canada also recognizes that educational institutions need international students to compete in the "global race for research talent." [38] In

April, 2008, Canada modified its Post-Graduation Work Permit Program to allow international students who have graduated from a recognized Canadian post-secondary institution to stay and gain valuable post-graduate work experience for a period equal to the length of the student's study program, up to a maximum of three years, with no restrictions on type of employment.[39] This change resulted in a steady increase between 2003 and 2007 in the number of post-graduation work permits issued to international students, followed by a sharp increase of 64 percent from 2007 to 2008.[40] By 2014, the number of international students in the program was more than double its 2008 total.[41] In addition, Canada aims to double the number of international students in the country from 211,949 in 2014 to 450,000 by 2022.[42]

In light of the United States' decreasing share of international students, and increased global efforts to attract them, DHS concludes that the United States must take additional steps to improve these students' educational experience (both academic and practical) to ensure that we do not continue to lose ground. This is particularly true for international STEM students, who have comprised a

---

*and doctoral research students includes third-party job creation).*

[27] *See, e.g.,* Economics and Statistics Administration, Department of Commerce, "STEM: Good Jobs Now and For the Future" 5 (July 2011), available at *http://www.esa.doc.gov/Reports/stem-good-jobs-now-and-future* ("Science, technology, engineering and mathematics (STEM) workers drive our nation's innovation and competitiveness by generating new ideas, new companies and new industries."); Giovanni Peri, Kevin Shih, Chad Sparber, "Foreign STEM Workers and Native Wages and Employment in U.S. Cities" 1 (National Bureau of Economic Research, May 2014) Available at *http://www.nber.org/papers/w20093* (observing that "Scientists, Technology professionals, Engineers, and Mathematicians (STEM professionals) are fundamental inputs in scientific innovation and technological adoption, the main drivers of productivity growth in the U.S.").

[28] Jennifer Hunt, "Which Immigrants are Most Innovative and Entrepreneurial? Distinctions by Entry Visa," *Journal of Labor Economics* Vol 29 (3): 417–457 (2011).

[29] Jennifer Hunt and Marjolaine Gauthier-Loiselle, "How Much Does Immigration Boost Innovation?" *American Economic Journal: Macroeconomics* 2: 31–56 (2010).

[30] *Id.*

[31] *Id.*

[32] Greenstone and Looney, *supra* note 26, at 2–3.

[33] *See* Congressional Research Service, Economics and National Security: Issues and Implications for U.S. Policy 28, available at *https://www.fas.org/sgp/crs/natsec/R41589.pdf* [hereinafter Economics and

National Security]; *see also* The White House, National Security Strategy 16 (Feb. 2015), available at *https://www.whitehouse.gov/sites/default/files/docs/2015_national_security_strategy.pdf* ("Scientific discovery and technological innovation empower American leadership with a competitive edge that secures our military advantage, propels our economy, and improves the human condition.") [hereinafter 2015 National Security Strategy]; The White House, National Security Strategy 29 (May 2010), available at *https://www.whitehouse.gov/sites/default/files/rss_viewer/national_security_strategy.pdf* ("America's long-term future depends on educating and producing future scientists and innovators.").

[34] The 2015 National Security Strategy concludes that "the American economy is an engine for global growth and a source of stability for the international system. In addition to being a key measure of power and influence in its own right, it underwrites our military strength and diplomatic influence. A strong economy, combined with a prominent U.S. presence in the global financial system, creates opportunities to advance our security." 2015 National Security Strategy, *supra* note 33, at 15.

[35] Pew Research Center, "Growth from Asia Drives Surge in U.S. Foreign Students" (June 18, 2015), available at *http://www.pewresearch.org/fact-tank/2015/06/18/growth-from-asia-drives-surge-in-u-s-foreign-students/* (citing Institute for International Education, Open Doors Data: International Students: Enrollment Trends, available at *http://www.iie.org/Research-and-Publications/Open-Doors/Data/International-Students/Enrollment-Trends/1948-2014*.

[36] Organization for Economic Co-operation and Development (OECD) 2014, "Education at a Glance 2014: OECD Indicators," OECD Publishing at *http://dx.doi.org/10.1787/eag-2014-en* or *http://www.oecd.org/edu/eag.htm*.

[37] University World News Global Edition Issue 376, "Schools are the New Battleground for Foreign Students" (July 15, 2015), available at *http://www.universityworldnews.com/article.php?story=2015071509151556*.

[38] Citizenship and Immigration Canada, "Evaluation of the International Student Program" 14 (July 2010) available at *http://www.cic.gc.ca/*

*english/pdf/research-stats/2010-eval-isp-e.pdf* (citing Association of Universities and Colleges of Canada, Momentum: The 2008 report on university research and knowledge mobilization: A Primer: Driver 2: Global race for research talent, 3 (2008) [hereinafter Evaluation of the Int'l Student Program].

[39] Citizenship and Immigration Canada, Study permits: Post Graduation Work Permit Program, available at *http://www.cic.gc.ca/english/resources/tools/temp/students/post-grad.asp* [hereinafter Canadian Study permits]. Similarly, Australia, now offers international students who graduate with a higher education degree from an Australian education provider, regardless of their field of study, a post-study work visa for up to four years, depending on the student's qualification. Students who complete a bachelor's degree may receive a two-year post study work visa, research graduates with a master's degree are eligible for a three-year work visa, and doctoral graduates are eligible for a four-year work visa. *See* Australian Department of Immigration and Border Protection, Application for a Temporary Graduate visa, available at *http://www.border.gov.au/FormsAndDocuments/Documents/1409.pdf* [hereinafter Australian Temporary Grad. visa].

[40] Evaluation of the Int'l Student Program, *supra* note 38, at 9.

[41] Citizenship and Immigration Canada, Quarterly Administrative Data Release, available at *http://www.cic.gc.ca/english/resources/statistics/data-release/2014-Q4/index.asp*.

[42] *See* Government of Canada, Quarterly Administrative Data Release (July 20, 2015), available at *http://www.cic.gc.ca/english/resources/statistics/data-release/2014-Q4/index.asp*; University World News Global Edition Issue 376, *Schools are the New Battleground for Foreign Students*, July 15, 2015, Issue 376, available at *http://www.universityworldnews.com/article.php?story=2015075090915156*.

significant portion of students in STEM degree programs in the United States, particularly at the graduate degree level.

The difference is particularly notable at the doctoral level, where international students earned 56.9 percent of all doctoral degrees in engineering; 52.5 percent of doctoral degrees in computer and information sciences; and approximately half the doctoral degrees in mathematics and statistics in the 2012–2013 academic year.[43] Recognizing that the international education programs for these students are increasingly competitive, DHS is committed to helping U.S. educational institutions contend with the expanded and diverse global opportunities for international study.

### 3. The Need To Improve the Existing STEM OPT Extension

With this rule, DHS also recognizes the need to strengthen the existing STEM OPT extension to enhance the integrity and educational benefit of the program in order to help maintain the nation's economic, scientific, and technological competitiveness. DHS is working to find new and innovative ways to encourage international STEM students to choose the United States as the destination for their studies. This rule, in addition to including a modified version of the STEM OPT extension from the 2008 IFR, increases the maximum training time period for STEM students, requires a formal training plan for each STEM OPT extension, and strengthens protections for U.S. workers. Providing an on-the-job educational experience through a U.S. employer qualified to develop and enhance skills through practical application has been DHS's primary guiding objective in crafting this rule.

Many of the elements of the 2015 NPRM were based on public comments on the 2008 IFR, which contained input from a range of stakeholders, including students and the broader academic community. The NPRM also incorporated recommendations from the Homeland Security Academic Advisory Committee.[44] DHS continues to find that

the changes proposed by this rule to the existing STEM OPT extension would benefit both F–1 students and international study programs in the United States, while adding important protections.

The changes will allow F–1 STEM students to gain valuable on-the-job training from qualified employers. Maintaining and enhancing practical training for STEM students improves their ability to absorb a full range of project-based skills and knowledge directly related to their study. The changes will also help the nation's colleges and universities remain globally competitive, including by improving their ability to attract international STEM students to study in the United States. As noted above, these students enrich the academic and cultural life of college and university campuses throughout the United States and make important contributions to the U.S. economy and academic sector. The changes will help strengthen the overall F–1 program in the face of growing international competition for the world's most promising international students.

Additionally, safeguards such as employer attestations, requiring employers to enroll in and remain in good standing with E-Verify, providing for DHS site visits, and requiring that STEM training opportunities provide commensurate terms and conditions to those provided to U.S. workers will help protect both such workers and STEM OPT students. Implementing the changes in this rule thus will more effectively help STEM OPT students achieve the objectives of their courses of study while also benefiting U.S. academic institutions and guarding against adverse impacts on U.S. workers.

### IV. Discussion of Comments and Final Rule

As noted above, during the public comment period, 50,500 comments were submitted on the NPRM and related forms. Comments were submitted by a range of entities and individuals, including U.S. and international students, U.S. workers, schools and universities, professional associations, labor organizations, advocacy groups, businesses, and other interested persons. Many commenters provided concrete suggestions that DHS has evaluated and responded to in order to build upon the proposed rule and to

better explain its provisions. Overall,[45] comments were primarily positive, but there were many criticisms as well.

A number of commenters expressed general opposition to the NPRM. For instance, some stated that the proposed rule would not serve the national interest because it would harm U.S. workers, especially recent graduates with STEM degrees. Commenters also suggested that there was insufficient demand for STEM workers in the U.S. labor market to accommodate STEM OPT students. Other commenters were concerned that STEM OPT students would send their wages back to their home countries. Based on these and other concerns, various commenters requested that DHS place a moratorium on practical training and related programs until, for instance, every qualified U.S. citizen has a job. Another commenter requested that STEM OPT be phased out entirely after the current participants finish their training.

On the whole, however, commenters largely expressed support for the proposed rule. Commenters stated that the NPRM would "make[] a number of important, thoughtful changes to improve and enhance the opportunities available to F–1 students with STEM degrees"; that the proposed rule struck a reasonable balance by distributing requirements among all who participate in STEM OPT, including international students, institutions of higher education, and employers; and that the proposed Mentoring and Training Plan requirement would improve the STEM OPT extension by clearly identifying the students' learning objectives and the employer's commitments.

DHS thanks the public for its extensive input during this process. In the discussion below, DHS summarizes and responds to all comments that were timely submitted on the NPRM.

---

[43] Pew Research Center, "Growth from Asia Drives Surge in U.S. Foreign Students" (June 18, 2015), available at *http://www.pewresearch.org/fact-tank/2015/06/18/growth-from-asia-drives-surge-in-u-s-foreign-students/*.

[44] The Homeland Security Academic Advisory Council provides advice and recommendations to the Secretary and senior leadership on matters related to homeland security and the academic community, including: student and recent graduate recruitment, international students, academic research and faculty exchanges, campus resilience, homeland security academic programs, and cybersecurity. *See* U.S. Department of Homeland

Security, Homeland Security Academic Advisory Council Charter, available at *http://www.dhs.gov/publication/hsaac-charter*.

[45] In addition, DHS also received a number of comments that were outside the scope of the rulemaking. For instance, some commenters stated that DHS should not allow any foreign nationals to work in the United States. Other commenters recommended that DHS make changes to the H–1B visa classification. Another commenter stated that the United States should "send green cards to [STEM] Ph.D.s right away." Other commenters recommended that DHS apply the proposed rule's requirements to F–1 nonimmigrant students engaged in pre-completion OPT or the initial 12-month period of post-completion OPT. Additionally, one commenter requested that DHS extend the period during which students may apply for post-completion OPT and related employment authorization. DHS did not propose any of these changes in the NPRM, and readers of the NPRM could not reasonably have anticipated that DHS would make such changes in this final rule. Accordingly, DHS has deemed these and similar comments outside the scope of this rulemaking, and has not discussed them further in this preamble.

*A. Including a STEM OPT Extension Within the OPT Program*

1. Description of Final Rule and Changes From NPRM

Consistent with the NPRM, this final rule provides for STEM OPT extensions as part of the OPT program under the F–1 nonimmigrant classification. This action will better ensure, among other important national interests, that the U.S. academic sector can remain globally competitive. Enabling extended practical training for qualifying students with experience in STEM fields is consistent with DHS's "Study in the States" initiative, announced after the 2008 IFR in September 2011, to encourage international students to study in the United States. That initiative particularly has focused on enhancing our nation's economic, scientific and technological competitiveness by finding new ways to encourage talented international students to become involved in expanded post-graduate opportunities in the United States. The initiative has taken various steps to improve the Nation's nonimmigrant student programs.[46]

The final rule enhances the ability of F–1 students to achieve the objectives of their courses of study while also benefiting the U.S. economy. More students will return home confident in their training and ready to begin a career in their field of study; others may seek to change status to other nonimmigrant classifications consistent with section 248 of the INA, 8 U.S.C. 1258, following a STEM OPT extension, thus furthering economic growth and cultural exchange in the United States.

Before discussing and responding to public input on the substantive terms of the STEM OPT extension program proposed in the 2015 NPRM, DHS first addresses comments providing input on whether STEM OPT extensions should be authorized at all. As discussed below, the STEM OPT extension rule is grounded in the long-standing recognition by DHS and its predecessor agency that (1) experiential learning and practical training are valuable parts of any post-secondary educational experience and (2) attracting and retaining international students is in the short- and long-term economic, cultural, and security interests of the United States. Thousands of comments expressed an opinion on one or both of these two points, either challenging or supporting the proposal to include a STEM OPT extension within the OPT

program. A significant number of commenters discussed the taxation rules applicable to F–1 students; some asserted that no STEM OPT extension was appropriate as long as certain F–1 students remained exempt from certain payroll or employment taxes. Lastly, some commenters questioned the Department's legal authority to include a STEM OPT extension within the OPT program, while others maintained that a solid legal basis exists for such extensions. The final rule retains STEM OPT extensions as part of the OPT program and explains in detail the underpinnings of this policy by responding in full to the many policy-related comments received from the public.

2. Public Comments and Responses

i. Experiential Learning as Part of Completing a Full Course of Study

Numerous commenters submitted views regarding the proposition that experiential learning opportunities such as practical training can significantly enhance the knowledge and skills obtained by students during academic study, thus furthering their courses of study in the United States.

*Comment.* DHS received hundreds of comments, mostly from students and universities, stating that experiential learning and practical training are key parts of university education. DHS also received comments challenging this premise. One commenter, for example, strongly disagreed "that the objective of the students' course of study includes the acquisition of knowledge through on-the-job 'training.' " Instead, this commenter stated that "the sole objective of the F–1 student's course of study is to obtain the desired degree and nothing more." According to the commenter, "[o]nce that objective has been achieved, the purpose of the F–1 status has been fulfilled and the status should terminate."

Many universities and higher education associations, however, made statements to the contrary. Twelve higher education associations— representing land-grant universities, research universities, human resource professionals at colleges and universities, registrars, graduate schools, international student advisors, and religious colleges and universities, among others—jointly filed a comment stating that "experiential learning is a key component of the educational experience." These higher education associations stated that:

OPT allows students to take what they have learned in the classroom and apply "real world" experience to enhance learning

and creativity while helping fuel the innovation that occurs both on and off campus. . . . Learning through experience is distinct from learning that takes place in the classroom. Experiential learning opportunities have become an integral part of U.S. higher education.

Universities individually made similar points, emphasizing the value of experiential learning. DHS received comments on this point from a range of public and private institutions of higher education. For example, one university stated that experiential learning opportunities are particularly critical in "STEM fields where hands on work supplements classroom education." Another university stated that "experiential learning fosters the capacity for critical thinking and application of knowledge in complex or ambiguous situations." Other university commenters stated that experiential learning "is a necessary component of a 21st century education, especially in the STEM fields."

A national organization of graduate and professional students stated that offering a STEM OPT extension after bachelor's level studies allowed individuals to "identify research interests and develop skills" that they later can expand upon in their graduate studies when they focus on solving concrete problems. An organization representing international educators stated that the OPT program appropriately focuses on the critical part of an education that occurs in partnership with employers.

An organization that serves U.S. institutions engaged in international educational and cultural exchange stated that "extended OPT eligibility creates space for more meaningful interactions between international OPT participants and their U.S. host employers." Other comments stated that a recent membership survey found that 89 percent of responding employers found that OPT participants "work in conjunction with U.S. workers in a way that promotes career development for everyone involved." A business association stated that "practical training allows foreign students in technical fields to maximize the return on their investment in education."

*Response.* The Department agrees with the many U.S. universities and educational- and international-exchange organizations that provided comments stating that STEM OPT extensions would enhance the educational benefit provided to eligible students through practical training. DHS agrees that practical training is an accepted and important part of international post-secondary education.

---

[46] *See* DHS, "Study in the States," *http:// studyinthestates.dhs.gov.*

**Federal Register**/Vol. 81, No. 48/Friday, March 11, 2016/Rules and Regulations **13051**

*Comment.* One commenter asserted that OPT had "limited (if any) education[al] value" while noting that he "was unable to find any comment where someone described how the OPT program is related to a course of study or is a means to achieve specific educational goals." Many comments, however, described how practical training is related to a course of study and serves as a means to achieve educational goals. In addition to the comments described above from academic associations and educational institutions, the Department received many comments from F–1 students describing the educational benefits that the OPT program provides both to students and to academic programs. Examples of such comments include the following:

• "OPT allows international students the opportunity to engage in practical application of skills learned in academic programs."

• "[A]s an extension of college education, OPT extension is a great way to apply what's learnt in class to our real industry."

• "This experiential learning will allow me to integrate knowledge and theory learned in the classroom with practical application and skills development in a professional setting."

• "The proposal to reinstitute the STEM extension will provide valuable hands-on, educational experience in which STEM graduates gain real-world immersion into a chosen industry."

• "The new rule will allow me to meet my planned learning goals and allow for active reflection on [what] I am accomplishing throughout the experience."

*Response.* Consistent with many of the comments received from academic associations, educational institutions, and F–1 students, DHS agrees that the OPT program enriches and augments a student's educational experience by providing the ability for students to apply in professional settings the theoretical principles they learned in academic settings. By promoting the ability of students to experience first-hand the connection between theory in a course of study and practical application, including by applying abstract concepts in attempts to solve real-world problems, the OPT program enhances their educational experiences. A well-developed capacity to work with such conceptualizations in the use of advanced technology, for example, is critical in science-based professions. Practical training programs related to STEM fields also build competence in active problem solving and experimentation, critical complements

to academic learning in STEM fields. As many commenters attested, practical training is an important avenue for enhancing one's educational experience, particularly for STEM students.

*Comment.* A research organization contested the educational basis for providing two-year STEM OPT extensions in part by noting that the ACT testing organization (previously known as American College Testing) has published a "world of work map" stating that "a bachelor's degree is sufficient for electrical engineering jobs" without discussing any extended period of practical training. The commenter also pointed out that the Department of Labor's Occupational Outlook Handbook states that in order to become an electrical engineer one "must have a bachelor's degree" and that "[e]mployers also value practical experience, so participation in cooperative engineering programs, in which students earn academic credit for structured work experience, is valuable as well." According to the commenter, the standard OPT duration of 12 months is more than sufficient to become a fully trained engineer, as that is the duration of typical cooperative engineering programs.

*Response.* DHS rejects the notion that ACT's "world of work map," a career planning tool for high school students, attempts to describe anything other than the educational degree level typically required for entry into an occupation. The ACT's career planning map takes no position on whether and to what extent on-the-job training and experiences help launch a career, enhance an educational program, or help facilitate mastery of material learned in the classroom. The Occupational Outlook Handbook of the Department of Labor similarly does not assess the relevancy of experiential learning theory or the extent to which on-the-job training complements classroom learning as part of post-secondary education. Instead, the Occupational Outlook Handbook identifies the typical level of degree or education that most workers need to enter the electrical engineering occupation and the extent to which additional training is needed (post-employment) to attain competency in the skills needed in the occupation.[47] The fact that cooperative education programs in engineering may typically focus on the equivalent of one year of

employment experience for academic credit is not determinative with regard to the type or length of experiential learning that can be considered part of a full course of study. Cooperative education is one type of experiential learning, but not the only type used by the nation's higher education community.[48]

*Comment.* A commenter stated that DHS had not "provided any evidence . . . indicating that" nonimmigrant students lack access to similar opportunities in their home countries.

*Response.* The United States hosts F–1 students from all over the world. Although DHS acknowledges that some students will have access to similar training opportunities in their home countries, DHS believes it is self-evident that many will not. In any case, the purpose of the rule is not simply to address a gap in training opportunities for F–1 students in their home countries but to help students develop their knowledge and skills through practical application, and to ensure that our nation's colleges and universities remain globally competitive in attracting international STEM students to study and lawfully remain in the United States.

*Comment.* Some commenters asked DHS to reconsider the requirement that students be engaged in STEM OPT solely related to their fields of study.

*Response.* The Department has historically required the OPT experience to be directly related to the student's major fields of study because, at its core, such work-based learning is a continuation of the student's program of study. Indeed, the purpose of OPT is to better position students to begin careers in their fields of study by providing ways for them to supplement and enhance the knowledge they gained in their academic studies through application of that knowledge in work settings. Allowing such students to engage in OPT in areas unrelated to their fields of study would be inconsistent with the purpose of OPT.

OPT's required nexus to the field of study also minimizes potential abuse or exploitation of international students by those seeking to impermissibly employ them in unskilled labor or other unauthorized work in the United States. Moreover, this requirement is consistent

---

[47] BLS, Occupational Outlook Handbook, at "Occupation Finder" (Dec. 17, 2015), available at *http://www.bls.gov/ooh/occupation-finder.htm?pay=&education=&training=&newjobs=&growth=&submit=GO* (see information defining "entry-level education" and "on-the-job training" for the Occupation Finder).

[48] The commenter questioning the educational basis of the STEM OPT extension referred to the co-op program at the Rochester Institute of Technology (RIT) as a useful example, since it is one of the nation's largest. RIT itself, though, recognizes that co-ops are just one type of experiential learning. *See generally* RIT, Cooperative Education and Experiential Learning, *https://www.rit.edu/overview/cooperative-education-and-experiential-learning.*

STEM000067

with current regulations applicable to OPT more broadly; under these regulations, OPT must be directly related to the student's major area of study. *See* 8 CFR 214.2(f)(10)(ii)(A). For these reasons, DHS has determined that it will not permit a student to engage in STEM OPT in an area not related to his or her field of study.

ii. International Students and the National Interest

A variety of comments addressed whether the STEM OPT extension benefited STEM OPT students, U.S. institutions of higher education, and the overall national interest. Some commenters stated that the STEM OPT extension would provide such benefits and supported the proposed rule for these or related reasons; others stated that the proposed rule would negatively impact the employment options of U.S. STEM graduates and workers. The Department had carefully considered these issues in developing the NPRM, and has further evaluated these issues as raised in the public comments. The Department's consideration of these issues is reflected in the discussion that immediately follows and throughout this preamble.

*Comment.* One commenter stated that a recent study "shows that American students who actively interact with their international classmates are more likely to enhance their own self-confidence, leadership and quantitative skills." [49] Another commenter, however, stated that in explaining the STEM OPT extension DHS had cited "no evidence of a measurable 'academic benefit' other than increased income for U.S. institutions of higher education." This commenter stated that any such increased income would be "irrelevant to the OPT program, where F–1 students do NOT pay tuition, at premium or standard rates, to the academic institution from which they received a STEM degree." The commenter also stated that STEM OPT employment does not and cannot provide "enhance[ed] academic discourse and cultural exchange on campuses," and that there is an internal conflict in the dual goal of bringing "knowledge and skills" to the U.S. economy through the STEM OPT extension, and helping STEM OPT students acquire knowledge and skills.

A university commenter, however, suggested that DHS should consider it a priority to finalize the STEM OPT extension rule in a way that ensures universities remain internationally competitive. Representative of many comments from higher education, another university commenter strongly supported the STEM OPT extension within the OPT program. The commenter stated that "if the United States is to maintain our economic, educational, and scientific competitiveness then it must continue to make itself attractive to the best talent worldwide." Another commenter, who identified as an F–1 student, noted that many people from his home country have degrees earned abroad, and that a "U.S.-university degree alone is not valued as [highly] as it was 10 or 20 years ago." This commenter stated that "experience on a complete project" will provide him an advantage over students who studied in countries that don't provide similar kinds of training opportunities.

*Response.* The STEM OPT extension program is designed to address the very point raised by the final commenter, *i.e.,* that the program will improve and expand the educational and training opportunities available to international students and maintain and improve the competitiveness of American institutions of higher education. As explained in the NPRM, *see* 80 FR 63383–84, there is increasing international competition for attracting top international students, and other countries, including Canada and Australia, currently have programs similar to the STEM OPT extension. The STEM OPT extension serves to maintain the United States' global competitiveness in these rapidly evolving fields. As discussed in the NPRM, *see, e.g.,* 80 FR 63382–84, this provides benefits to the U.S. economy that are independent of any need (or lack thereof) of STEM workers in the United States.

As noted in the NPRM, in light of increased global efforts to recruit international students, DHS believes that the United States must take additional steps to improve available educational experiences (both academic and practical) to ensure that the United States remains competitive for such students. Such steps benefit the U.S. academic sector by contributing to its economic support and increasing academic diversity. This is particularly true with regard to international STEM students, who have comprised a significant portion of students in STEM degree programs in the United States, particularly at the graduate degree level. While it is of course true that, as a commenter noted, OPT students do not pay tuition during their practical training, it is reasonable to assume the increased attractiveness of U.S. colleges and universities due to the availability of OPT will benefit the U.S. academic sector. DHS's conclusions about the benefit of the STEM OPT extension to the F–1 student program and U.S. educational institutions found broad support in the comments submitted by educational institutions themselves.

*Comment.* A significant number of commenters discussed whether STEM OPT participants positively or negatively impacted U.S. workers and U.S. students, with differing views on whether nonimmigrant STEM professionals complemented or replaced U.S. STEM professionals. Some commenters cited their personal experience as STEM workers, or the experience of others they know, to demonstrate the existence of either a labor surplus or a labor shortage. Many others cited and attached reports and studies to show there was either a labor surplus or a labor shortage.

A number of commenters stated that allowing employers to hire F–1 students on a STEM OPT extension would disadvantage U.S. citizens and lawful permanent residents. Some of these commenters, as well as other commenters, provided facts and figures suggesting there was not a labor shortage of STEM workers. For example, some commenters stated that wages have not increased, as would be expected during a shortage, and some of these commenters cited to a report from the Economic Policy Institute that found that wages in the information technology sector "have remained flat, with real wages hovering around their late 1990s levels." [50] Some commenters provided data that contradicted these claims. For example, one commenter stated that STEM workers receive a persistent wage premium and that wages for engineers are rising relative to other occupations.

Commenters cited data and reports on both sides of the question of whether there were sufficient numbers of qualified U.S. workers available to fill open STEM jobs in the U.S. economy. One commenter stated that there were over 102,000 unemployed engineers. Another commenter stated that there were two million unemployed Americans with STEM degrees. A number of commenters, however, stated that even with millions of unemployed

---

[49] *See generally* Jiali Luo and David Jamieson-Drake, "Examining the Educational Benefits of Interacting with International Students" at 96 (June 2013), *available at https:// jistudents.files.wordpress.com/2013/05/2013-volume-3-number-3-journal-of-international-students-published-in-june-1-2013.pdf.*

[50] Hal Salzman, Daniel Kuehn, Lindsay Lowell, Guestworkers in the High-Skill U.S. Labor Market: An Analysis of Supply, Employment, and Wages 2 (Economic Policy Institute, Apr. 2013) available at *http://www.epi.org/publication/bp359-guestworkers-high-skill-labor-market-analysis/.*

STEM000068

Americans, "the manufacturing sector cannot find people with the skills to take nearly 600,000 unfilled jobs, according to a study last fall by the Manufacturing Institute and Deloitte." [51] One commenter stated that "unemployment rates in key STEM occupations are dramatically lower" than the overall unemployment rate in the United States, citing to 2.8 percent unemployment in "computer and mathematical occupations" and 2.2 percent unemployment in "architecture and engineering occupations," among others.

*Response.* DHS recognizes, as explained by the National Science Foundation (NSF), that close study reveals that there is no straightforward answer on whether the United States has a surplus or shortage of STEM workers. [52] As the NSF summarizes:

Some analysts contend that the United States has or will soon face a shortage of STEM workers. Some point to labor market signals such as high wages and the fact that STEM vacancies are advertised for more than twice the median number of days compared to non-STEM jobs. Other analysts note that the shortage of STEM workers is a byproduct of the ability of STEM-capable workers to "divert" into other high-skill occupations that offer better working conditions or pay. Relatedly, some say even if the supply were to increase, the United States might still have a STEM worker shortage because an abundance of high-skill workers helps drive innovation and competitiveness and this might create its own demand.

Those analysts who contend the United States does not have a shortage of STEM workers see a different picture. They suggest that the total number of STEM degree holders in the United States exceeds the number of STEM jobs, and that market signals that would indicate a shortage, such as wage increases, have not systematically materialized. Analysts also raise concerns about labor market dynamics in academia— where a decreasing share of doctoral degree holders employed in the academic sector are tenured—and in industry—where there are reports that newly-minted degree holders and foreign "guestworkers" on temporary visas (*e.g.,* H–1B, L–1) are displacing incumbent workers. A few of these analysts go as far as to argue that firms claim shortages and mismatches in the hope of lowering compensation and training costs.

Close study of the surplus-shortage question reveals that there is no straightforward "yes" or "no" answer to whether the United States has a surplus or

shortage of STEM workers. The answer is always "it depends." It depends on which segment of the workforce is being discussed (*e.g.,* sub-baccalaureates, Ph.D.s, biomedical scientists, computer programmers, petroleum engineers) and where (*e.g.,* rural, metropolitan, "high-technology" corridors"). It also depends on whether "enough" or "not enough STEM workers" is being understood in terms of the quantity of workers; the quality of workers in terms of education or job training; racial, ethnic or gender diversity, or some combination of these considerations. [53]

DHS credits NSF's views on this matter. Although DHS acknowledges that commenters submitted a range of data related to the current state of the overall U.S. STEM labor market (and DHS discusses much of this data in more detail below), DHS does not rely on this data to finalize the rule. Instead, this rule is based on the widely accepted proposition that educational and cultural exchange, a strong post-secondary education system, and a focus on STEM innovation are, on the whole, positive contributors to the U.S. economy and U.S. workers and in the overall national interest. As noted above, these principles, combined with the labor market protections and other measures included in this rule, generally provide the basis for the Department's action.

*Comment.* Many commenters stated that data released by the U.S. Census Bureau in 2014 showed that three-quarters of American STEM graduates were not working in STEM fields. The implication was that such data indicated no need for the STEM OPT extension program and that such a program would not benefit the national interest.

*Response.* The 2014 Census Bureau data cited by commenters did identify that only about one-quarter of bachelor's level graduates with STEM degrees are employed in STEM fields. [54] The Census Bureau, however, made no accounting of STEM graduates that use the technical skills developed in their STEM courses in high-skilled jobs in medicine, law, business, academia, or management. For example, for purposes of the Census Bureau study, an individual with a chemistry degree who becomes a physician is considered a STEM graduate not employed in a STEM field. [55] The cited 2014 Census

Bureau figures are skewed in this regard. A 2013 analysis from the Census Bureau found that more than one out of five U.S. STEM graduates who were not employed in a core STEM field were working in a managerial or business position utilizing quantitative skills developed through their STEM studies and often directly related to their degree; that more than one in eight STEM graduates were working in healthcare (including 594,000 who were working as physicians); and that another 522,000 were considered outside of STEM, but working in U.S. colleges and universities, where they were teaching in the field of their STEM major and educating the next generation of STEM workers. [56] In short, as pointed out by the U.S. Congress Joint Economic Committee, "differences in definitions across sources can complicate comparisons or analyses of trends in STEM." [57]

DHS disagrees that the U.S. Census data point to an across-the-board shortage of degree-related employment opportunities for U.S. STEM graduates as the disparate definitions make that conclusion unlikely. DHS believes that many of the concerns identified about the proposed rule are overstated or incomplete because of the nature of available data and reporting.

*Comment.* A few commenters stated that DHS failed to consider the full range of research related to the proposed rule's underlying policies. One such commenter directed the Department's attention to two bibliographies publicly available on the Internet, and which were attached to the comment, because the commenter believed the sources

---

[51] See generally Manufacturing Institute et al, "The Skills Gap in Manufacturing: 2015 and Beyond" (Mar. 2015), available at *http:// www.themanufacturinginstitute.org/Research/ Skills-Gap-in-Manufacturing/Skills-Gap-in-Manufacturing.aspx.*

[52] NSF, Revisiting the STEM Workforce: A Companion to Science and Engineering Indicators 2014, 9 (Feb. 4, 2015), available at *http:// www.nsf.gov/pubs/2015/nsb201510/nsb201510.pdf.*

[53] *Id.*

[54] U.S. Census Bureau, "Where do College Graduates Work: A Special Focus on Science, Technology, Engineering and Math" (July 2014), available at *http://www.census.gov/dataviz/ visualizations/stem/stem-html/.*

[55] The practice of medicine commonly is not considered to be a STEM field. NSF, for example, considers as its mission the support of all fields of

science and engineering except for the medical sciences. See NSF Mission Statement, available at *http://www.nsf.gov/about/what.jsp. See also, e.g.,* U.S. Congress Joint Economic Committee, STEM Education: Preparing for the Jobs of the Future 1 (April 2012) (explaining that the medical sciences are not a STEM field), available at *http:// www.jec.senate.gov/public/index.cfm/democrats/ 2012/4/stem-education-preparing-jobs-of-the-future.*

[56] Liana Christin Landivar, U.S. Census Bureau, The Relationship between Science and Engineering Education and Employment in STEM Occupations (Sept. 2013), available at *http://www.census.gov/ prod/2013pubs/acs-23.pdf?cssp=SERP.*

[57] *See* U.S. Congress Joint Economic Committee, STEM Education: Preparing for the Jobs of the Future 1 (April 2012) (explaining that the medical sciences are not a STEM field), available at *http:// www.jec.senate.gov/public/index.cfm/ democrats/2012/4/stem-education-preparing-jobs-of-the-future; see also* David A. Koonce, Jie Zhou, Cynthia D. Anderson, American Society for Engineering Education, "What is STEM?" (2011) available at *http://www.asee.org/public/ conferences/1/papers/289/download* (explaining that "research institutes, government organizations and occupational groups, as well as different groups involved in STEM, use different definitions of STEM, based on their perspectives").

cited in the NPRM were "funded by employers of cheap alien workers to justify the rule." One of these bibliographies identified 19 books, articles, and reports, most of which discuss the H–1B and L–1 visa programs. The second was an annotated bibliography assembled by a professor providing an assessment and criticism of four of the professor's articles and 23 other sources, principally related to H–1B work visas and employer-sponsored green cards.

*Response.* DHS did not rely on sources of information funded by employers of "cheap" foreign labor to develop or justify the proposed rule. Among other sources, DHS cited the following sources: the National Bureau of Economic Research, NSF, the Journal of Labor Economics, the Congressional Research Service, the Brookings Institution, the American Economic Journal, the Pew Research Center, the Journal of International Students, the Organization for Economic Co-operation and Development, University World News, Citizenship and Immigration Canada (a Canadian government agency), the Department of Immigration and Border Protection of Australia (an Australian government agency), and the Homeland Security Academic Advisory Committee (a discretionary committee of the U.S. government established under the Federal Advisory Committee Act).

Moreover, the commenter did not identify any specific findings in the sources cited in the bibliographies that would support a change to the Department's proposal. Many of the sources cited in the bibliography involved the H–1B and L–1 nonimmigrant visa programs, as well as employment-sponsored immigrant visa programs, rather than OPT. Significantly, although the organization that prepared the H–1B and L–1 bibliography cited by the commenter also submitted a separate, detailed comment on the NPRM, the organization did not cite its bibliography or most of the sources contained therein as part of its submission. And in the course of reviewing the extensive bibliographies presented, the Department noted that at least one of the sources, which addressed permanent immigration and not OPT, concluded that "international students studying in host country postsecondary institutions are particularly valued because they improve higher education, subsidize domestic students, contribute to national economies and, if they qualify, make valuable permanent residents because of their youth, occupational

qualifications, language skills, and familiarity with host country customs and institutions." [58]

*Comment.* One commenter stated that the NPRM's references to U.S. patent rates for foreign-born individuals could not support the proposed rule because "no nationality data for inventors is associated with patents, so studies linking rates of patenting to immigration policy are inherently bogus." Another commenter stated that although the NPRM cites publications by economist Dr. Jennifer Hunt for several assertions about higher rates of patenting and innovation by foreign-born researchers in the United States, the NPRM did not mention a report published by the Economic Policy Institute (EPI) (a research organization) "directly challenging [those] findings." The commenter questioned sources cited in the NPRM regarding patent rates for foreign-born workers in the United States.

*Response.* DHS disagrees with the statement that "no nationality data on inventors is associated with patents." One data source for citizenship and nationality data for U.S. patents is the Patent Application Information Retrieval Web site maintained by the U.S. Patent and Trademark Office. [59] When applying for a patent, each listed inventor submits an oath or power of attorney form on which they must indicate citizenship. Other researchers have analyzed data from the Census Bureau, including the National Survey of College Graduates and the Integrated Public Use Microdata Series for the United States, in concert with patent information from the U.S. Patent and Trademark Office, to source citizenship and nationality figures for U.S. patents. [60]

With respect to the studies by Dr. Hunt, DHS notes that the NPRM cited those studies in support of the general proposition that STEM workers "are fundamental inputs in scientific innovation and technological adoption, critical drivers of productivity growth in the United States." 80 FR 63383. The EPI study did not question this proposition. Rather, the EPI study examined a narrow band of STEM fields to show that "immigrant workers, especially those who first came to the

United States as international students, are in general of no higher talent than the Americans, as measured by salary, patent filings, dissertation awards, and quality of academic program." [61] Specifically, the EPI finding is focused on whether foreign-born students who earned computer science and electrical engineering degrees in the United States file patent applications at higher levels than U.S.-born students earning the same degrees. For electrical engineering, the analysis showed that patenting activity of U.S. and foreign-born students was about the same, while for computer science the analysis showed that foreign-born computer science students apply for somewhat fewer patents than do their American peers.

The EPI paper, however, acknowledges that the Hunt studies cited in the NPRM cast a much broader net, encompassing a myriad of science and engineering fields. The Hunt papers considered the impact of foreign-born workers employed in the United States in myriad visa classifications and fields of study, and was not focused solely on F–1 students or STEM OPT students (nor to just Computer Science and Electrical Engineering research activity). As explained in the Hunt papers, there is support for the proposition that foreign-born scientists and engineers achieve higher rates of U.S. patent filings. The Department continues to believe such patent rates support the conclusion that the STEM OPT extension is in the national interest.

*Comment.* Some commenters stated that the best interests of U.S. workers and students were not being considered by DHS. Some of these commenters, as well as others, also stated that the STEM OPT extension should exist only if there was a documented STEM labor shortage. Some commenters stated that the proposed STEM OPT extension would be harmful to U.S. workers and students.

A commenting employer stated that while it prioritized U.S. worker hiring, it also hired foreign-born students that it recruited on U.S. campuses "given the talent pool graduating from U.S. Ph.D. and M.S. STEM programs." The employer also stated: "we spend millions of dollars annually above and beyond what we have to pay to hire U.S. workers, merely to employ the talent required to successfully run our business." Another commenter stated that "it makes no sense for the United States to educate and train foreign

[58] Ray Marshall, Value-Added Immigration 187 (Economic Policy Institute, 2011).

[59] U.S. Patent and Trademark Office, Patent Application Information Retrieval *http://portal.uspto.gov/pair/PublicPair. See also, e.g.,* Partnership for a New American Economy "Patent Pending: How Immigrants are Reinventing the American Economy" at 23 n. 2 (June 2012).

[60] *See, e.g.,* Jennifer Hunt et al, *supra* notes 28–29, in the appendices of the cited articles.

[61] Norman Matloff, "Are Foreign Students the 'Best and Brightest'?" 17 (Economic Policy Institute, Feb 2013), available at *http://epi.org/publication/bp356-foreign-students-best-brightest-immigration-policy/*.

students in the STEM fields and then drive them away with obsolete immigration policies.''

*Response.* The number of international STEM graduates in the United States on STEM OPT extensions, as of September 16, 2015, was approximately 34,000, which, according to estimates of the overall U.S. STEM labor market from the U.S. Department of Commerce and the U.S. Bureau of Labor Statistics (BLS), represents a possible range of 0.19 percent [62] to 0.45 percent of the overall U.S. STEM job market.[63] For that reason, and in light of the worker protections included in this rule, the Department sees no reason to eliminate the STEM OPT extension altogether in response to concerns about impacts on U.S. workers. DHS instead seeks to balance the interests of stakeholders by both ensuring the availability of a STEM OPT extension program while strengthening program oversight and worker protections. The rule strengthens the integrity of the STEM OPT extension by requiring participants in the extension to carefully consider and document the relationship between the STEM OPT opportunity and the academic degree. The rule also adds requirements relating to supervision and direction of STEM OPT students in such jobs to better ensure the goals of the program are met. The rule also adds wage and other protections for STEM OPT students and U.S. workers.

*Comment.* Numerous commenters repeated certain selected statements or figures on job creation or job loss related to international students in the United States. Hundreds of comments stated that 340,000 U.S. jobs are created or supported each year by international students studying in the United States, citing figures from an international student economic value tool developed by NAFSA. A few hundred comments instead posited that 430,000 U.S. workers lost jobs over a recent five-year period because of international

students, as suggested by an analysis by one group. More than a dozen comments repeated the finding from an economist's study published by the American Enterprise Institute, in conjunction with the Partnership for New American Economy, that about 2.6 jobs for Americans are created for each foreign-born student who earns an advanced degree in the United States and then works in a STEM field.

*Response.* This rule neither asserts nor relies on a quantified, direct relationship between job creation and the STEM OPT extension. At what rate such job creation occurs is unsettled in the peer-reviewed literature. To the Department's awareness, job loss rates tied solely to STEM OPT students have not been documented in peer-reviewed literature. The figures cited in the comments summarized above also do not relate solely to STEM OPT students.

*Comment.* A commenter stated that although the proposed rule discussed the economic benefits of international students at length, DHS had not cited any estimate of the number of U.S. workers who were unable to obtain employment because a position was filled by a STEM OPT student or the number of U.S. workers otherwise adversely affected by the proposed rule.

*Response.* DHS acknowledges that this rule includes neither a quantified estimate of potential negative impacts to individual U.S. workers nor a quantified estimate of specific benefits to U.S. educational institutions or the overall economy. Instead, the rule is based on the widely accepted proposition that educational and cultural exchange, a strong and competitive post-secondary education system, and a focus on STEM innovation are on the whole positive contributors to the U.S. economy and U.S. workers, and are in the national interest. A significant number of comments agreed; many observed that STEM students have contributed significantly to the U.S. economy. As noted above, these principles, combined with the labor market protections and other measures included in this rule, generally provide the basis for the Department's action.

*Comment.* Some commenters stated that DHS had only considered studies supporting its conclusions and did not sufficiently review information that contradicted the sources cited by DHS. One commenter suggested that DHS ''go back to the drawing board and review the full range of related information,'' including the book ''Falling Behind,'' which questions whether the United States is falling behind in the global race for scientific and engineering talent.

By contrast, one commenter stated that ''any change in quality of living is dependent on highly skilled STEM workers who are fundamental inputs in scientific innovation and technological adoption.'' Other commenters stated that ''STEM students have contributed immensely to the U.S. economy with their skills and innovation'' and that because ''the U.S. STEM industry is at the forefront of technology in the world, international students come here to get the exposure and learn.''

Some commenters flagged disagreement among economists with some of the findings included in a study published by the National Bureau of Economic Research (NBER) that extrapolates from the fundamental point for which it was cited by DHS.[64] With respect to that study, some commenters criticized its conclusions, and some criticized the fact that it had not been peer-reviewed. Because the study had received some criticism, commenters asked DHS to defend its citation to it.

*Response.* DHS has carefully examined all of the commenters' views regarding the reasons provided for the proposed rule and the sources relied upon by DHS, and the Department believes adequate data and information has been provided in support of the rule. As noted throughout this preamble, DHS has reviewed studies submitted by commenters and finds that the basic approach in this rule appropriately balances the goals of protecting American workers and promoting American academic and economic competitiveness by attracting top quality international STEM students.

With regard to the citation to the NBER study, the reference in the 2015 NPRM was for the general proposition that STEM workers are fundamental inputs in scientific innovation and technological adoption, and therefore critical drivers of productivity growth in the United States.[65] The NSF, among many others, has reached the same conclusion. Created by Congress in 1950, the NSF began publishing an annual report in 1955 regarding the condition of the science and engineering workforce, long before the term ''STEM''

---

[62] U.S. Bureau of Labor Statistics Detailed 2010 Standard Occupation Classification (SOC) occupations in STEM from an August 2012 SOC Policy Committee recommendation to OMB, *http://www.bls.gov/soc/Attachment_C_STEM.pdf*. There are 184 occupations in STEM included in this list. When matched to the corresponding employment data in the BLS Occupational Employment and Wages, May 2014, the total employment of STEM occupations is approximately 17 million.

[63] U.S. Department of Commerce, Economic and Statistics Administration, David Langdon et al., ''STEM: Good Jobs Now and for the Future'' (1), July 2011, available at *http://www.esa.doc.gov/sites/default/files/stemfinalyjuly14_1.pdf* (''In 2010, there were 7.6 million STEM workers in the United States.''). This STEM employment estimate is based on a narrower range of occupations.

[64] Giovanni Peri, Kevin Shih, Chad Sparber, National Bureau of Economic Research, Foreign STEM Workers and Native Wages and Employment in U.S. Cities (May 2014), available at *http://www.nber.org/papers/w20093*.

[65] *Id.* The article starts by observing that ''Scientists, Technology professionals, Engineers, and Mathematicians (STEM workers) are fundamental inputs in scientific innovation and technological adoption, the main drivers of productivity growth in the U.S.'' and was cited as a recent example of this premise in footnote 24 in the NPRM. 80 FR at 63383.

STEM000071

was coined. According to the 2015 annual report, "[t]his workforce is of particular interest to the Nation because of its central role in fostering innovation, economic competitiveness, and national security." [66]

*Comment.* A commenter requested that DHS annually publish data showing trends related to the impact of F–1 nonimmigrant students on labor markets in the United States. Another commenter stated that in order to improve oversight and understanding of our legal immigration system, relevant agencies should publish timely online information for each nonimmigrant visa category and subcategory, including for F–1 nonimmigrant students with OPT. This commenter stated that the public disclosure should include the underlying raw data gathered from the proposed Mentoring and Training Plan and other relevant forms as to the gender, age, country of origin, level of training, field of training, institution(s) of higher education, job title, wages, employer, and work location for "all OPT visa holders." According to the commenter, this disclosure would be a "critical tool to empower advocates to ensure fair treatment and high standards within these visa programs." Multiple commenters stated that although they lacked full information, the collection and release of data on all nonimmigrant visa categories was needed as a tool to help curtail fraud and abuse in employment visa categories.

*Response.* To the extent permissible under existing law (including under the Privacy Act and related authority), relevant information related to the STEM OPT extension program may be available through the Freedom of Information Act (FOIA) process. A DHS effort to provide data and a program evaluation of all nonimmigrant visa categories is not within the scope of the proposed rule and is not required by any current statute or regulation.

*Comment.* One commenter stated that "[t]he NPRM is procedurally and substantively arbitrary and capricious" because "DHS has entirely failed to provide a reasoned explanation of why its published policy rationale for the proposed rule has so fundamentally changed from that provided for the 2008 [IFR] that it now replaces." The commenter stated that DHS justified the 2008 IFR by asserting the need to provide labor to U.S. employers to remedy a critical labor shortage, but has justified the proposed rule by the need

to continue and further enhance the educational benefit of the STEM OPT extension, while protecting STEM OPT students and U.S. workers. 80 FR 63381.

*Response.* DHS does not agree with the proposition that an agency's decision to state new or revised reasons for its policy renders the agency's policy arbitrary and capricious. This rule is grounded in DHS's seven years of experience with the STEM OPT extension. In the 2015 NPRM, DHS proposed that, independent of the labor market concerns that DHS expressed in the 2008 IFR, the STEM OPT extension offers significant educational benefits to students and educational institutions, as well as important economic and cultural benefits. It is not arbitrary or capricious for DHS to consider its experience with this program or to account for present-day realities when determining whether and how to retain and improve the program in a new rulemaking.

The commenter further requested that DHS explain "why its published policy rationale has changed" since 2008. In short, the policy rationale and, importantly, the substance of the rules governing the program, have changed based on a range of factors. As discussed at length in the NPRM, these factors include the public comments received on the 2008 IFR and DHS's assessment of the benefits provided by the 17-month STEM OPT extension. *See, e.g.,* 80 FR 63379–63384. This assessment is informed by enduring national priorities, such as strengthening the U.S. educational system by helping to ensure that the nation's colleges and universities remain globally competitive in attracting international students in STEM fields and enhancing the United States' economic, scientific, and technological sectors. DHS believes that it has appropriately considered the evidence in determining whether and how to retain and improve the STEM OPT extension.

### iii. Relationship Between Taxation Rules and the Authority of the Secretary of Homeland Security Regarding Employment of F–1 Nonimmigrants

*Comment.* DHS received a significant number of comments that discussed whether existing Federal tax law creates an incentive for employers to hire F–1 nonimmigrants for practical training, rather than U.S. workers, and whether DHS should make changes to Federal tax law before or as part of finalizing a rule allowing a STEM OPT extension with the OPT program. The tax law provision primarily at issue in these comments is 26 U.S.C. 3121(b)(19), which exempts certain services from Federal Insurance Contributions Act

(FICA) taxation when they are performed by F–1 nonimmigrants (among other nonimmigrant classifications) who are nonresidents for Federal tax purposes.[67] Many comments suggested that this exemption creates an incentive for employers to hire F–1 nonimmigrants instead of U.S. workers, and that this rule would therefore disadvantage U.S. workers. Other comments suggested that employers are not influenced by tax exemptions when making hiring decisions.

A number of commenters, for example, stated that employers save money by not incurring FICA payroll taxes when they hire F–1 nonimmigrants instead of U.S. workers and that these savings induce employers to prefer F–1 nonimmigrants over U.S. workers. A few hundred comments labeled the Department's proposed rulemaking as "corporate welfare." One commenter stated that it is "unethical" for F–1 nonimmigrants to be exempt from "paying taxes" since those nonimmigrants who are working under H–1B visas are not exempt. One commenter suggested that the tax treatment of F–1 nonimmigrants has the effect of discouraging Americans from pursuing study in STEM fields.

Another commenter stated that excusing OPT participants from payroll taxes was not the result of congressionally created tax policy but instead a decision by "the administration" to "simply defin[e] recent alumni as foreign 'students' " and thus "allow[] employers to avoid payroll taxes." One commenter criticized DHS because the Department "offered nothing in the proposed rule to deal with the wage savings enjoyed by the employers of OPT workers from not having to pay FICA payroll taxes for OPT workers." This commenter stated that "the Department clearly believes it has the authority to impose wage-related conditions on OPT employers, but it's unclear why the Department wouldn't also address the FICA issue which some suggest is one of the biggest sources of unfairness to U.S. workers competing with OPT workers."

Several comments that referenced tax issues cited analysis by a research organization stating that "OPT removed $4 billion from the Social Security and Medicare trust funds" over five years. Others cited the same analysis to state that the OPT program "costs Social Security about $1 billion dollars a year" or "about $10,000 annually for each OPT" participant.

However, many other commenters who discussed taxation stated that

---

[66] NSF, Revisiting the STEM Workforce: A Companion to Science and Engineering Indicators 2014, 5 (Feb. 4, 2015), available at *http://www.nsf.gov/pubs/2015/nsb201510/nsb201510.pdf.*

[67] *See generally* 26 CFR 31.3121(b)(19)–1.

because individuals in F–1 nonimmigrant status are ineligible to collect Social Security or Medicare benefits and may never qualify in the future for such benefits, contributions to those programs would not be required for services rendered by F–1 nonimmigrants. Also, some commenters who identified as F–1 students stated that payroll taxes may be affected by tax treaties between the United States and other nations. A number of F–1 students noted that they pay city, state, and federal income taxes, as well as sales tax.

A few commenters submitted ideas on how DHS could revise or address the payroll tax provisions. One commenter suggested that the Department's proposed regulation could be changed to remove any financial incentive to hire non-U.S. citizens by exempting employers "from FICA for two years when they hire a new grad STEM U.S. worker, and [charging] a 10% penalty for displacing an American STEM graduate when an OPT is hired." A labor union proposed that "DHS should require employers of STEM workers to pay an amount equal to payroll taxes into a fund to encourage employment of U.S. STEM workers." A research organization proposed in the alternative that the amount of such payroll taxes could be paid to the U.S. Treasury.

One commenter stated that "Congress delegated authority to define periods of employment for F–1 nonimmigrants to the Treasury Department, not DHS." This commenter criticized the proposed rulemaking on the grounds that it "never mentions or references the detailed applicable laws governing the FICA, Federal Unemployment Tax Act (FUTA), or Social Security withholding." The commenter also stated that "the proposed agency policy authorizing graduates on F–1 visas to work full-time while exempt for FICA withholding directly conflicts with the Internal Revenue Code (IRC), the Social Security Act (SSA), and Supreme Court precedent."

*Response.* Matters related to Federal taxation are controlled by Congress through the IRC, and by the Department of the Treasury (Treasury) through regulations promulgated thereunder, not DHS. Although Congress may revise, eliminate, or create new obligations or conditions based on the payroll tax exemptions in the IRC for F–1 nonimmigrants, DHS may not do so. Similarly, although Treasury may issue regulations interpreting and implementing federal tax laws, DHS may not. DHS is thus unable to amend the rule to accommodate reforms related to payroll taxation or to take other measures affecting federal tax policy or rules.

Under current tax laws, when F–1 nonimmigrants are exempt from payroll taxes, the employer saves an amount equal to 6.2 percent of the F–1 nonimmigrant's salary up to the taxable wage base ($118,500 in 2016) and an additional 1.45 percent of the total salary that, in the aggregate, would have been the employer contribution to the Social Security and Medicare trust funds. The F–1 nonimmigrant similarly saves a deduction from his or her salary in the same amount that would have been the employee contribution. The FICA chapter of the IRC, which governs the payroll tax owed by employers and employees to fund the Social Security and Medicare programs,[68] provides that no payroll taxes are to be withheld for services performed by a nonresident alien who is an F–1 nonimmigrant[69] as long as the services are "performed to carry out a purpose for which the individual was admitted."[70]

The IRC provides that aliens temporarily in the United States are resident aliens, rather than nonresident aliens, for Federal tax purposes, when they satisfy a substantial presence test based on physical presence in the United States.[71] However, an individual temporarily present in the United States as an F–1 nonimmigrant who substantially complies with the requirements of the visa classification is an "exempt individual"[72] who does not count days physically present in the United States as an F–1 nonimmigrant for five calendar years toward the substantial presence test.[73] Thus, an F–1 nonimmigrant who is an "exempt individual" (for any part of five calendar years) is not a resident alien for taxation under the IRC, and as a nonresident alien is not subject to payroll taxes for Social Security and Medicare contributions (for those five calendar years). Similarly, the FUTA chapter of the IRC, which governs payroll taxes for unemployment compensation,[74] exempts from unemployment taxes those services performed by a nonresident alien who is an F–1 nonimmigrant.[75] In short, an individual who is an F–1 nonimmigrant generally is exempt from FICA and FUTA payroll taxes during the first five calendar years in which the individual holds F–1 nonimmigrant status.

These provisions, although of course relevant to F–1 students and employers for purposes of determining FICA and FUTA tax liability, neither displace, nor authorize Treasury to displace, the Secretary's broad authority to administer and enforce the nation's immigration laws. *See, e.g.,* 6 U.S.C. 202; INA Sec. 103, 8 U.S.C. 1103. Whether with respect to F–1 students or any other category of nonimmigrants, the IRC does not dictate the terms and conditions relating to nonimmigrant status. As Treasury explains in its U.S. Tax Guide for Aliens (IRS Publication 519): "[An alien is] considered to have substantially complied with the visa requirements if [he or she has] not engaged in activities that are prohibited by U.S. immigration laws and could result in the loss of [his or her] visa status." In sum, DHS, not Treasury, is charged with determining whether an individual is maintaining F–1 nonimmigrant status, and Treasury, not DHS, must determine when and how payroll tax obligations accrue and are calculated. *See, e.g., id;* INA Sec. 101(a)(15), 8 U.S.C. 1101(a)(15); INA Sec. 214, 8 U.S.C. 214.

Accordingly, the assertion by a commenter that Treasury controls when F–1 nonimmigrants are authorized for employment is incorrect. This mistaken theory seems to be grounded in a misreading of select provisions of the IRC referenced by the comment concerning work performed as an employee of a school, college, or university. Such work is exempt from both FICA and FUTA under the IRC when Treasury determines that the worker is both taking classes at and working for a qualifying institution and should be considered an exempt student.[76] Although Treasury has further defined these provisions administratively, neither the IRC nor Treasury's regulations relate to when F–1 nonimmigrants are authorized to work. Rather, they relate to when certain employed students (whether F–1 nonimmigrants or U.S. citizens) who are enrolled in and regularly attending classes are exempt from payroll taxes. In other words, these provisions do not limit when an F–1 nonimmigrant can work, but instead control whether FICA and FUTA taxes apply to services provided by certain individuals to

---

[68] 26 U.S.C. 3101, *et seq.*

[69] 26 U.S.C. 3121(b)(19).

[70] 26 CFR 31.3121(b)(19)–1(a)(1).

[71] 26 U.S.C. 7701(b).

[72] 26 U.S.C. 7701(b)(5)(D)(i)(I).

[73] An individual present in the United States for any part of a calendar year as an F–1 nonimmigrant must count that year toward the five year cap on being considered an "exempt individual." 26 CFR 301.7701(b)-3(b)(4), (7)(iii).

[74] 26 U.S.C. 3301, *et seq.*

[75] 26 U.S.C. 3306(c)(19); *see also* 26 CFR 31.3306(c)(18)–1(a)(1).

[76] 26 U.S.C. 3121(b)(10) (FICA) and 3306(c)(10)(B) (FUTA); *see also* 26 CFR 31.3121(b)(10)–2 (FICA) and 31.3306(c)(10)–2 (FUTA).

certain institutions.[77] DHS thus rejects the suggestion that Treasury controls when F–1 nonimmigrants are authorized for employment.

Additionally, following consultation with Treasury, DHS has determined that it would be incorrect to conclude that the payroll tax exemption for F–1 nonimmigrants ''removes'' any monies from the Social Security or Medicare program trust funds, despite many comments to this effect. At most, the statutory tax exemption has the (intended) effect of not generating FICA and FUTA payroll tax revenue when certain F–1 nonimmigrant students are employed.

Moreover, the amount of revenue affected by these payroll tax exemptions does not approach the $4 billion over five years (*i.e.*, just under $1 billion annually, or approximately $10,000 annually per STEM OPT participant) cited by certain commenters. Other commenters noted that the research organization that calculated these figures did not take into account that (1) employers incur other costs if they choose to hire an individual who is an F–1 nonimmigrant, and (2) many F–1 nonimmigrants are not tax exempt.

With respect to the first point, some commenters noted that any employer savings related to tax laws are at least in part offset by administrative costs, legal fees, and staff time related to securing the authority under U.S. immigration law to employ the foreign-born worker.[78] With respect to the second point, other commenters emphasized that not all F–1 nonimmigrants are exempt from payroll taxes under these specific FICA and FUTA rules. Instead, some may be exempt because of tax treaty provisions, while many others, including F–1

nonimmigrants eligible for STEM OPT extensions, may not be exempt because they have already been in the United States for parts of five calendar years. In regards to the tax treaty provisions, it should be noted that U.S. citizens would receive tax treatment while working abroad that is commensurate with the treatment received by nationals of our treaty partners while they work in the United States. In addition, it is not clear to DHS that compliant employers would typically perceive an incentive to hire F–1 nonimmigrants due to a payroll tax exemption, as it is not clear how employers would definitively know a particular nonimmigrant's tax treatment prior to hiring.[79] Based on these factors, other provisions in this rule that safeguard the interests in U.S. workers, and DHS's long experience administering and enforcing the nation's immigration laws, DHS concludes that commenters' concerns about the incentives created by the statutory tax exemptions are overstated.

DHS also observes that there are a number of other deficiencies in the figures suggested for the fiscal impact of the payroll tax exemptions for F–1 nonimmigrants. For instance, the figures assume incorrectly that every F–1 nonimmigrant on a STEM OPT extension has displaced a U.S. worker who would otherwise be subject to payroll taxes, and that every STEM OPT student ultimately draws down on the funds generated by payroll taxes. The figures also appear to be based on calculations related to the total number of students engaged in OPT, not just those on STEM OPT extensions. In addition to the reasons discussed above, DHS declines to make changes to a successful international student program based on speculative assertions about the impact of certain statutory tax exemptions on the programs funded by the FICA and FUTA taxes. Furthermore, if those tax exemptions are in fact problematic, they must be addressed by Congress.

### iv. Legal Authority

*Comment.* DHS received many comments concerning the legal

authority underpinning the OPT program. Some commenters challenged the Department's authority to maintain an OPT program at all, in part because there is no express statutory authority establishing such a program. A commenter with this view cited a 1977 regulation from the legacy Immigration and Naturalization Service (INS) in which the INS had stated that there was no express authority in the INA establishing OPT employment for F–1 students. Other commenters objected to the STEM OPT extension on the grounds that it is inconsistent with other provisions of the INA regulating visa classifications that expressly provide employment authorization. These commenters took the position that the only permissible objective of an F–1 student's course of study is to obtain a degree. According to those commenters, once that objective has been achieved, the purpose of the F–1 status has been fulfilled and the student's status should terminate. Other commenters contested the Department's authority to provide STEM OPT extensions because such extensions were inconsistent with one of the ''INA's primary purpose[s],'' which they characterized as restricting immigration ''to preserve jobs for [U.S.] workers.''

One commenter specifically argued that the statutory authority for OPT was undermined by certain congressional action in 1990 to create an OPT-related pilot program, followed by the failure in 1994 to extend that program:

The only clear statutory authority that has ever existed for an OPT-like program was a three-year pilot program created by section 221 of the 1990 Immigration and Nationality Act [sic] that allowed foreign graduates to work in fields unrelated to their degree. . . . However Congress did not allow the program to exist for more than a few years after its creation, in part because an INS and DOL evaluation found that it ''may have adverse consequences for some U.S. workers.''

The implication is that because Congress had authorized that specific OPT program by statute and then allowed it to expire, other forms of OPT that are not specifically authorized in statute are not legally justifiable.

Other commenters, however, submitted comments recognizing the legal justifications for the OPT program. A number of commenters, for example, recounted the history of post-completion OPT in support of the proposed rule. Those commenters noted that OPT employment had been provided by INS and DHS since at least 1947, and they concluded that DHS was on sound legal footing in including a STEM OPT extension within the OPT program. Some commenters stated that

---

[77] Among other workers, these provisions are inapplicable to medical students in their capacity as hospital residents. *Mayo Found. For Med. Educ. & Research* v. *U.S.,* 562 U.S. 44 (2011). The *Mayo* case, cited by a commenter, is not controlling as to whether STEM OPT extensions are permitted for F–1 nonimmigrants. Although the Supreme Court concluded that the FICA and FUTA exemptions for students are not available to medical residents working at hospitals, *id.,* that decision (and Treasury's position on the circumstances in which employed students working for the institution where they take classes are exempt from payroll taxes) does not address the availability of work authorization to F–1 nonimmigrants more broadly.

[78] Below, this rule imposes some of the direct costs that this rule imposes upon employers of F–1 nonimmigrant students on STEM OPT extensions. In addition to this rule's direct costs, the incentive cited by the commenters is offset by the fact that STEM OPT students are in the United States temporarily, and are therefore, to many employers, inherently less valuable than U.S. workers. For instance, a commenter noted that there are significant costs and uncertainty associated with retaining an F–1 nonimmigrant beyond the STEM OPT extension period.

[79] Employers, for example, may not know whether an individual is in F–1 nonimmigrant status or whether he or she has been in such status in the United States for less than five years. DHS notes that employers do not necessarily have access during the recruitment process to specific documentation confirming such information. And DOJ cautions against requesting such information as it may cause the perception of discriminatory conduct. *See* Office of Special Counsel, *Technical Assistance Letter on Pre-employment Inquiries Related to Immigration Status,* at *http:// www.justice.gov/sites/default/files/crt/legacy/2013/ 09/11/171.pdf.*

DHS was utilizing broad authority granted by Congress to enforce and administer the immigration laws. Those commenters generally considered persuasive the fact that Congress had amended the INA numerous times in ways that indicated its knowledge of, and acquiescence to, the existence of a significant period of post-graduation OPT.

One commenter that recognized the Department's legal authority in issuing this rule addressed the significance of Congress' actions in 1990 to create a pilot program in which F–1 students could receive employment authorization for practical training *unrelated* to the their fields of study. Although Congress later allowed the pilot program to expire in 1994, the commenter explained that the program's creation supported the Department's authority to permit OPT employment *related* to students' fields of study:

In the Immigration Act of 1990, Congress authorized the creation of a pilot program which allowed F–1 student employment in positions that were unrelated to the alien's field of study. The creation of this program bolsters the argument that DHS's interpretation is reasonable. . . . The logical conclusion to draw here is that Congress only acted explicitly to authorize F–1 students to receive post-completion training in fields unrelated to their studies because the law already allowed post-completion training in fields related to the student's studies.

This commenter, along with many others, expressed support for the proposed rule as a reasonable construction of the authorities provided to the Department by the immigration laws.

*Response.* The Homeland Security Act and the INA provide DHS with broad authority to administer the INA and regulate conditions for admission under nonimmigrant categories, including the F–1 student classification. *See, e.g.,* 6 U.S.C. 202; 8 U.S.C. 1103(a)(1) and (3); 8 U.S.C. 1184(a)(1). As the U.S. District Court for the District of Columbia recently observed:

Congress has delegated substantial authority to DHS to issue immigration regulations. This delegation includes broad powers to enforce the INA and a narrower directive to issue rules governing nonimmigrants. *See* 8 U.S.C. 1103(a)(1) . . .; *id.* § 1103(a)(3) ("The Secretary of Homeland Security shall establish such regulations [inter alia,] as he deems necessary for carrying out his authority under the provisions of the INA."); *id.* § 1184(a)(1) ("The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe. . . .").

*Washington Alliance,* No. 1:14–cv–00529, slip op. at 18–19. In addition to explicitly authorizing the Secretary to admit international students to the United States temporarily to pursue a course of study, *see* 8 U.S.C. 1101(a)(15)(F)(i), the INA endows the Secretary with broad discretion to promulgate regulations establishing the time and conditions under which such aliens may be admitted, *see* 8 U.S.C. 1103(a)(3), 1184(a)(1), 8 U.S.C. 1101(a)(15)(F)(i), 1103(a) and 1184(a)(1). The Secretary also has broad authority to determine which individuals are "authorized" for employment in the United States. *See* 8 U.S.C. 1324a, 8 CFR part 274a.

To the extent that comments challenging DHS's legal authority concerned the OPT program generally, such comments are outside the scope of this rulemaking, which relates specifically to the availability of STEM OPT extensions. DHS did not propose to modify the general post-completion OPT program in the proposed rule. Moreover, to the extent that such comments can be construed as challenging DHS's authority to implement a STEM OPT extension in particular, DHS finds the comments unpersuasive.

Federal agencies charged with administration of the immigration laws have long interpreted the statutory authorities cited above to encompass on-the-job training that supplements classroom training for international students. *See Washington Alliance,* No. 1:14–cv–00529, slip op. at 24; *Programmers Guild, Inc.* v. *Chertoff,* 338 F. App'x 239, 244 (3d Cir. 2009) (unpublished). For example, in 1947, legacy INS promulgated a rule authorizing international students to work after graduation based upon statutory authority that is similar in relevant respects to current statutory authority governing the admission of international students. The 1947 rule provided that "in cases where employment for practical training is required or recommended by the school, the district director may permit the student to engage in such employment for a six-month period subject to extension for not over two additional six-month periods." *See* 12 FR 5355, 5357 (Aug. 7, 1947). Again in 1973, legacy INS promulgated regulations authorizing, pursuant to the INA, employment for international students for practical training under certain conditions. *See* 38 FR 35425, 35426 (Dec. 28, 1973). For decades, INS and DHS regulations have defined an international student's duration of status, in pertinent part, as "the period

during which the student is pursuing a full course of study in one educational program . . . *and any period or periods of authorized practical training,* plus [a grace period] *following completion of the course of study or authorized practical training* within which to depart from the United States." 48 FR 14575, 14583–14584 (Apr. 5, 1983) (emphases added). *See also* 8 CFR 214.2(f)(5)(i).

Moreover, during this period, Congress has had occasion to amend the INA in general, and F–1 nonimmigrant provisions in particular, on numerous occasions. Despite these numerous amendments, Congress has left completely undisturbed the longstanding interpretation that international students are authorized to work in practical training. *See e.g.,* Pub. L. 87–256, § 109(a), 75 Stat. 527, 534 (Sept. 21, 1961) (allowing an F–1 nonimmigrant's alien spouse and minor children to accompany the F–1 nonimmigrant to the United States); Immigration Act of 1990 § 221(a) (permitting F–1 nonimmigrants to engage in limited employment unrelated to their field of study); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, § 625, 110 Stat. 3009–546, 3009–699 (adding limitations related to F–1 nonimmigrants at public schools); Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. 107–173, §§ 501–502, 116 Stat. 543, 560–63 (implementing monitoring requirements for international students); Pub. L. 111–306, § 1, 124 Stat. 3280, 3280 (Dec. 14, 2010) (amending F–1 with respect to language training programs). "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Commodities Futures Trading Comm'n* v. *Schor,* 478 U.S. 833, 846 (1986) (quoting *NLRB* v. *Bell Aerospace Co.,* 416 U.S. 267, 275 (1974)).

In light of the long regulatory history for the OPT program, including the Department's longstanding interpretation of the INA and the longstanding congressional recognition of that interpretation, DHS is confident that this rulemaking is consistent with statutory authority. As explained by the recent decision in the *Washington Alliance* litigation:

DHS's interpretation of F–1—inasmuch as it permits employment for training purposes without requiring ongoing school enrollment—is "longstanding" and entitled

**13060** Federal Register / Vol. 81, No. 48 / Friday, March 11, 2016 / Rules and Regulations

to deference. *See Barnhart [v. Walton]*, 535 U.S. [212,] 220 [(2002)]. Second, Congress has repeatedly and substantially amended the relevant statutes without disturbing this interpretation. These amendments have not been ''isolated.'' *Public Citizen [v. U.S. Dep't of Health and Human Services]*, 332 F.3d [654,] 668 [(D.C. Cir. 2003)]. The Immigration and Nationality Act of 1952, in particular, radically changed the country's immigration system. And, the Immigration Act of 1990 imposed a host of new protections for domestic workers and explicitly authorized F–1 students to engage in certain forms of employment. By leaving the agency's interpretation of F–1 undisturbed for almost 70 years, notwithstanding these significant overhauls, Congress has strongly signaled that it finds DHS's interpretation to be reasonable.

*Washington Alliance,* No. 1:14–cv–00529, slip op. at 26–27.

With respect to one commenter's reliance on the 1977 INS rulemaking, DHS recognizes that legacy INS previously noted the lack of specific statutory provisions expressly authorizing OPT. DHS agrees that the INA contains no direct and explicit provision creating a post-completion training program for F–1 students. But this does not mean that the Department lacks the authority to implement such a program. Indeed, as the 1977 Rule recognized, ''section 103 of the Immigration and Nationality Act (8 U.S.C. 1103) . . . provides the Attorney General and the Commissioner of the Immigration and Naturalization Service certain powers and duties, including the establishment of regulations.'' 42 FR at 26411. And it was pursuant to that authority that in the very 1977 rulemaking in which the INS made the statement cited by the commenter, the INS amended the regulations that authorized ''a nonimmigrant alien student to engage in practical training'' and continued to authorize OPT. *Id.* As noted above, Congress's actions over several decades make clear that Congress understood the F–1 statutory provisions to permit ''at least some period of employment'' and that ''the clause in F–1—'solely for the purpose of pursuing such a course of study'—does not foreclose employment.'' *Washington Alliance,* No. 1:14–cv–00529, slip op. at 21.

Further, the fact that Congress has recognized and approved of OPT is further supported, rather than undermined, by its creation of an OPT-related pilot program in 1990. First, the legislative history indicates that Congress understood the new pilot program, which authorized temporary employment unrelated to a student's field of study, as an expansion of off-campus employment authorization for

F–1 nonimmigrants. *See* H.R. Rep. No. 101–723, pt. 1, 1990 WL 200418, *6746 (recognizing that the legislation ''expands the current authority of students to work off-campus''). Second, as recognized by other commenters, the fact that Congress chose to create a pilot program specifically authorizing employment *unrelated* to a student's field of study is itself proof that Congress understood that employment *related* to such a field of study already had been appropriately authorized by the INS. The fact that Congress, acting against the backdrop of the longstanding OPT program, sought to expand students' employment opportunities, without curtailing the existing OPT program, indicates that Congress did not perceive OPT to be in contravention of Department authority. Indeed, the fact that Congress understood that F–1 nonimmigrants were regularly employed is reflected in the fact that, as early as 1961, Congress acted to exempt such students from certain payroll taxes. If F–1 nonimmigrants could not be employed, there would be no reason for Congress to recognize in the tax code that employment could be related to the purpose specified in 8 U.S.C. 1101(a)(15)(F) or to exempt such employment from payroll taxes.[80]

Finally, DHS disagrees with the suggestion that the rule's objectives conflict with one of the ''INA's primary purpose[s]'' of restricting immigration ''to preserve jobs for [U.S.] workers.'' The final rule, as with the proposed rule, contains important safeguards specifically designed to guard against such effects, while also furthering crucial benefits stemming from academic and cultural exchange, innovation, and economic growth. Accordingly, this rule maintains the U.S. Government's longstanding legal and policy positions on this matter; practical training is an important and recognized element of a student's educational experience and full course of study.

*Comment.* A number of commenters took issue with the duration of STEM OPT extensions as proposed in the 2015 NPRM, asserting that a two-year extension was contrary to DHS's statutory authority. A commenter stated that authorizing post-completion employment for an ''extended period of time'' is unlawful and quoted the above-

referenced 1977 final rule, in which legacy INS reduced the maximum OPT period from 18 months to one year. *See* 42 FR 26411 (May 24, 1977). The commenter asserted that legacy INS issued the 1977 rule based on a finding that an extended duration of OPT could cause injury to U.S. workers because OPT students could work for less than prevailing wages during their training period. The commenter asked whether DHS had considered this 1977 INS finding when developing the present rulemaking, and whether DHS ''now rejects the earlier finding of the INS'' that ''[t]here is no indication that the Congress intended that [a foreign student] remain and work in the U.S. for an extended period after completion of his course of study and until he becomes fully experienced in his occupational skill.'' 42 FR at 26412.

*Response.* DHS acknowledges that approximately 40 years ago, legacy INS limited the maximum overall period of practical training for all degree programs from 18 months to 12 months. The INS, however, made this change for policy reasons and not legal reasons. At no point did the INS conclude that statutory authority required it to reduce the 18-month maximum period for OPT. Moreover, INS apparently made the statement about legislative intent in the course of rejecting a request to provide an across-the-board maximum of two years for practical training in all fields of study. This statement did not define the scope of INS' legal authority. And as part of this rule, DHS neither considered nor proposed an across-the-board increase in the duration of OPT for all students, but instead only proposed the extension for on-the-job training in STEM fields.

With respect to policy, DHS also acknowledges that legacy INS recognized in the same 1977 rulemaking that ''[i]t may be that foreign students will be less likely to find employment, and perhaps fewer aliens would enter the U.S. to obtain their education here.'' *See* 42 FR at 26412. DHS, however, does not believe that it should be constrained to the factual and policy determinations that legacy INS made approximately 40 years ago with respect to the effect of the overall OPT program on the 1977 U.S. labor market. The world has changed a great deal since that time, and DHS believes it appropriate to shape policy accordingly.

As noted previously, the enhancements made by this rule are supported by data generally suggesting that international students contribute to the overall U.S. economy by building global connections between their hometowns and U.S. host cities.

---

[80] Congress added 26 U.S.C. secs. 3121(b)(19) and 3306(c)(19) to the Internal Revenue Code in 1961. *See* P.L. 87–256, Sections 110(b), 110(f)(3) (1961). These provisions exempt from payroll taxes certain F–1 nonimmigrants who have not been present in the United States in F–1 status for parts of five calendar years, as discussed supra in part IV.A.3 of this preamble.

Evidence links skilled migration to transnational business creation, trade, and direct investment between the United States and a migrant's country of origin. International STEM students also contribute more specifically to a number of advanced and innovative fields that are critical to national prosperity and security. By conducting scientific research, developing new technologies, advancing existing technologies, and creating new products and industries, for example, STEM workers diversify the economy and drive economic growth, while also producing increased employment opportunities and higher wages for U.S. workers. The rule also reflects DHS's consideration of potential impacts on the U.S. labor market and includes important safeguards for U.S. workers in STEM fields.

*Comment.* Some commenters made arguments based on comparisons between the STEM OPT program and the H–1B program, suggesting that DHS should infer from the H–1B category implicit limits on DHS's legal authority to allow F–1 students to engage in practical training as part of completing their full course of study. Some commenters asserted that DHS had no legal authority for a STEM OPT extension because it "circumvents" the statutory requirements of the H–1B visa classification. Relatedly, one commenter suggested that granting employment authorization through the OPT program permits F–1 students to sidestep restrictions on employment of foreign nationals enacted by Congress through establishment of a limited number of employment-authorized visa categories. In support of this contention, the commenter cited the decision by the U.S. District Court for the Northern District of California in *Int'l Union of Bricklayers & Allied Craftsman* v. *Meese,* 616 F. Supp. 1387 (N.D. Cal. 1985).

*Response.* DHS disagrees that the STEM OPT extension is an attempt to circumvent the requirements of the H–1B visa program, including the cap on H–1B visas. The H–1B nonimmigrant classification is a unique program designed to meet different policy objectives than those of the F–1 visa program or OPT. While this rule enhances the ability of F–1 students in STEM fields to implement and test educational concepts learned in the classroom in the context of on-the-job training, the rule does nothing to modify the congressionally established annual H–1B visa cap nor to modify the longstanding policy objectives of the H–1B program that generally allow U.S. employers to temporarily fill job openings in specialty occupations by

employing workers who possess at least a bachelor's degree. Unlike the H–1B visa program where an employer must petition for an H–1B visa for a foreign worker to fill a job opening, in the F–1 visa program, it is F–1 students, including those affected by this final rule, who seek to participate in OPT in order to further their education attained through course work in the United States. Unlike an H–1B specialty occupation worker, a student will participate in STEM OPT as a way to complement his or her academic experience in the United States pursuant to an individualized Training Plan that helps ensure that the STEM OPT experience furthers the student's course of study.

DHS thus agrees with the U.S. District Court for the District of Columbia, which explained the relationship between the F–1 and H–1B visa classifications in its recent decision in *Washington Alliance.* In that decision, in which the court upheld the Department's legal authority to include a STEM OPT extension within the general OPT program, the court stated:

> F–1 and H–1B perform the interlocking task of recruiting students to pursue a course of study in the United States and retaining at least a portion of those individuals to work in the American economy. . . . But H–1B— which applies to aliens seeking to work in a "specialty occupation"—is far broader than the employment permitted by the OPT program. DHS's interpretation of the word "student" does not render any portion of H–1B, or its related restrictions, surplusage. Congress has tolerated practical training of alien students for almost 70 years, and it did nothing to prevent a potential overlap between F–1 and H–1B when it created the modern H–1B category in 1990. As such, the Court does not believe that DHS's interpretation is unreasonable merely because of its limited overlap with H–1B.

*Washington Alliance,* No. 1:14–cv–00529, slip op. at 14, 28 (internal citations omitted).

As for a commenter's reference to the *Int'l Union of Bricklayers* case, DHS finds that decision of little relevance to this rulemaking. In the cited case, the district court's holding was grounded in its finding that the admission of certain individuals as B–1 nonimmigrant visitors for particular construction work purposes was inconsistent with section 101(a)(15)(B) of the INA, 8 U.S.C. 1101(a)(15)(B), which expressly precludes admission in B nonimmigrant status of an alien "coming for the purpose . . . of performing skilled or unskilled labor." This case has no clear application to the STEM OPT extension, where there is no express statutory bar similar to section 101(a)(15)(B) of the

INA, 8 U.S.C. 1101(a)(15)(B).[81] More critically, the overlap between the STEM OPT extension and the H–1B visa program does not invalidate DHS's interpretation of the controlling statutory authorities. For that reason, the court in *Washington Alliance* rejected arguments similar to those made by commenters that DHS had "circumvented the statutory restrictions that rightfully should be applied" to college-educated labor.[82]

*Comment.* A number of commenters similarly asserted that the proposed Cap-Gap provision, which further extends F–1 status for students who are beneficiaries of H–1B petitions, undermined the authority for this rulemaking. One commenter, for example, wrote that there is a fundamental conflict between the purpose of the student visa program and STEM OPT extensions in that student visas are not to be used as a means of immigrating to the United States. The commenter cited to comments from individuals who supported the proposed rule, including the Cap-Gap provision, as evidence that the rule would facilitate longer-term immigration to the United States. The commenter expressed that the rule would transform the statutory basis for the admission of foreign students— admission "solely for the purpose of pursuing . . . a course of study"—into admission "for pursuing a course of study or hanging around long enough to get an H–1B visa." The commenter stated that the Cap-Gap provision serves no purpose other than to assist F–1 students to remain in United States in violation of the terms of their admission.

*Response.* DHS does not agree with the commenter's views related to the Cap-Gap provision. First, both the STEM OPT extension and the Cap-Gap extension are of limited duration, and neither provides anything other than short-term temporary status. Second, as discussed above, practical training for international students has been authorized for many decades, and Congress has long recognized the Department's interpretation of the student visa and related sections of the INA. Congress also created the H–1B nonimmigrant classification specifically

---

[81] Similarly, one commenter cited *Texas* v. *United States,* 787 F.3d 733, 760–61 (5th Cir. 2015) as authority for the commenter's disagreement with DHS's statement of authority in the NPRM for the STEM OPT extension. That case is also inapposite here, as it did not address the Secretary's authority to grant work authorization for purposes of practical training.

[82] *Washington Alliance,* No. 1:14–cv–00529, slip op. at 28.

for specialty occupation workers with bachelors' degrees or higher. *See* INA Sec. 101(a)(15)(H)(i)(B) and 214(i)(l), 8 U.S.C. 1101(a)(15)(H)(i)(B) and 1184(i)(1). As noted in the recent *Washington Alliance* decision, the fact that F–1 students on OPT share certain similarities with H–1B nonimmigrant workers does not render the OPT program invalid. *See Washington Alliance*, No. 1:14–cv–00529, slip op. at 14, 28. Third, Congress also created provisions expressly allowing individuals with one nonimmigrant classification to change status to a different nonimmigrant classification. *See* INA Sec. 248, 8 U.S.C. 1258. There is thus nothing problematic about the fact that F–1 students in a period of OPT may seek to remain in the United States in H–1B nonimmigrant status. The immigration laws are specifically designed to facilitate such shifts. *See id.* And, as noted earlier, nothing about the Cap-Gap provision affects eligibility for H–1B status or visas, changes the number of such visas, or otherwise increases the ability of students to obtain classification as an H–1B nonimmigrant.

To the contrary, the Cap-Gap provision simply provides a temporary bridge between two lawfully available periods of nonimmigrant status. As noted above, the problem rectified by the Cap-Gap provision is the result of the misalignment between the academic year and the fiscal year. Because of this misalignment, F–1 students who were the beneficiaries of H–1B petitions often saw their F–1 status expire before they could effect the change to H–1B status, which required them to leave the United States and subsequently reenter on an H–1B visa. The Cap-Gap provision would simply remove the need to depart and subsequently reenter by extending the student's F–1 status for a limited number of months until his or her H–1B status commenced. The Cap-Gap provision is thus nothing more than a common-sense administrative measure that helps these students maintain legal status and avoids inconvenience to them and their employers. It is also fully consistent with existing legal authorities and the underlying purpose of the practical training program.

*B. Enforcement, Monitoring, and Oversight*

1. Description of Final Rule and Changes From NPRM

The final rule includes a number of requirements related to enforcement and oversight of the STEM OPT extension program. To better ensure its integrity, this rule prohibits STEM OPT extensions based on degrees from unaccredited institutions; provides for DHS site visits at STEM OPT employment sites; sets an overall limit for the amount of time a student may be unemployed during a STEM OPT extension; requires validation reports from students, as well as reporting from both students and employers, on the student's employment status; requires students to provide annual evaluation reports; and requires both students and employers to report material changes to training plans. The proposed rule included these provisions; DHS has retained the provisions in the final rule, with changes and clarifications in response to public comments. We summarize these provisions and changes below.

i. University Accreditation

To qualify for a STEM OPT extension, a student's STEM degree must be received from a U.S. educational institution accredited by an accrediting agency recognized by the Department of Education.[83] As noted in the proposed rule, the goal of accreditation is to ensure the quality of educational institutions and programs. Specifically, the accreditation process involves the periodic review of institutions and programs to determine whether they meet established standards in the profession and are achieving their stated educational objectives.[84]

DHS retains the accreditation requirements from the proposed rule, with only one change in response to public comments received. In cases where a student uses a previously obtained STEM degree to apply for the STEM OPT extension, the institution from which the qualifying degree was obtained must be accredited by an accrediting agency recognized by the Department of Education at the time of the student's application for the STEM OPT extension. This is a change from the proposed rule's requirement that the institution be accredited at the time the degree was conferred. This change will make the provision easier to administer by eliminating the need for DSOs to verify the historical accreditation status of other institutions.

ii. Site Visits

DHS may, at its discretion, conduct site visits to ensure that employers and students meet program requirements, including that they are complying with assurances and that they possess the ability and resources to provide structured and guided work-based learning experiences in accordance with individualized Training Plans. The combination of requiring school accreditation and conducting discretionary DHS site visits of employers will reduce the potential for fraudulent use of F–1 student status during the period of STEM OPT training.

DHS retains the site visit provisions from the proposed rule, with one change to accommodate concerns about the potential disruption associated with unannounced site visits. DHS is including in this rule a requirement that DHS will provide notice to the employer 48 hours in advance of any site visit, unless the visit is triggered by a complaint or other evidence of noncompliance with the STEM OPT extension regulations, in which case DHS reserves the right to conduct a site visit without notice.

iii. Unemployment Limits

Under this rule, a student may be unemployed for no more than 90 days during his or her initial period of post-completion OPT, and for no more than a total of 150 days for students whose OPT includes a 24-month STEM OPT extension. This provision is finalized as proposed, with minor changes for clarity.[85]

iv. Employment Status and Validation Reporting

Under this rule, the employer must report to the relevant DSO when an F–1 student on a STEM OPT extension terminates or otherwise leaves his or her employment before the end of the authorized period of OPT and must do so no later than five business days after the student leaves employment. Employers must report this information to the DSO. The contact information for the DSO is on the student's Form I–20, Certificate of Eligibility for Nonimmigrant (F–1) Student Status (''Form I–20 Certificate of Eligibility''), and on the student's Form I–983, Training Plan for STEM OPT Students.

[83] An accrediting agency is a private educational association of regional or national scope that develops evaluation criteria and conducts peer evaluations of educational institutions and academic programs. U.S. Department of Education Office of Postsecondary Education, ''The Database of Accredited Postsecondary Schools and Programs,'' available at *http://ope.ed.gov/accreditation.*

[84] U.S. *Department of Education Office of Postsecondary Accreditation, ''FAQs about Accreditation,''* available at *http://ope.ed.gov/accreditation/FAQAccr.aspx.*

[85] The 90-day aggregate period during initial post-completion OPT was proposed to remain at the level proposed in the 2008 IFR. DHS proposed to revise the aggregate maximum allowed period of unemployment to 150 days for an F–1 student having an approved STEM OPT extension consistent with the lengthened 24-month period for such an extension.

DHS will extend OPT only for STEM students employed by employers that agree in the Training Plan to report this information. This requirement is identical to that in the proposed rule, except that in response to public comments, DHS determined to extend the report period from 48 hours to five business days. As noted below, DHS believes that this timeframe is more realistic and more likely to result in consistent efforts to comply.

The rule also enhances the ability to track F–1 students by requiring validation reporting every six months for such students on STEM OPT extensions. This additional requirement is important in fulfilling the goals of the STEM OPT extension and in timely and accurately tracking students, who are often away from their school's campus. Specifically, this rule requires students who are granted STEM OPT extensions to report to their DSOs every six months. As part of such reporting, students must confirm the validity of their SEVIS information, including legal name, address, employer name and address, and the status of current employment. This provision is largely finalized as proposed, but with some minor edits for clarity. The text has been reorganized to clearly state the types of events that require a validation report and to clearly state that the requirement to submit such reports starts on the date the STEM OPT extension begins and ends when the student's F–1 status expires or the 24-month OPT extension concludes, whichever occurs first.

v. Periodic Student Evaluations

As compared to the proposed rule, and in response to public comments received, the final rule makes a number of changes and clarifications to the student evaluation requirement. First, DHS has changed the frequency of the evaluation requirement. DHS proposed requiring an evaluation every six months, but is reducing the frequency to every 12 months. This change is intended to better reflect employer practices where annual reviews are standard, allowing students and employers to better align the evaluations required under this rule with current evaluation cycles. Second, DHS is providing additional flexibility for employer participation in the evaluation process. Although the NPRM would have required the student's immediate supervisor to sign the evaluation, the final rule allows any appropriate individual in the employer's organization with signatory authority to sign the evaluations that the student will submit to the DSO. Third, DHS clarifies that this evaluation is not

meant to replace or duplicate an employer's general performance appraisal process. Instead, the student evaluation is intended to confirm that the student is making progress toward his or her training objectives. These evaluations will help document the student's progress toward the agreed-upon training goals and thus better ensure that such goals are being met.

vi. Reporting of Material Changes to or Deviations From the Training Plan

This final rule also provides that if there are material modifications to or deviations from the Training Plan during the STEM OPT extension period, the student and employer must sign a modified Training Plan reflecting the material changes, and the student must file this modified Training Plan with the DSO at the earliest available opportunity. Material changes relating to training for the purposes of the STEM OPT extension include, but are not limited to, any change of Employer Identification Number (EIN) resulting from a corporate restructuring;[86] any reduction in compensation from the amount previously submitted on the Training Plan that is not the result of a reduction in hours worked; and any significant decrease in the hours per week that a student will engage in the STEM training opportunity, including a decrease below the 20-hour minimum employment level per week that would violate the requirements of the STEM OPT extension.

This aspect of the final rule represents a clarification of a proposed provision in the NPRM. Commenters on the proposed rule requested additional clarity with respect to what types of changes to or deviations from the training plan would be considered "material" and would therefore require the submission of a modified plan to the DSO. As discussed in further detail below, DHS is departing from the proposal in response to public comments.

DHS further notes that ICE is working toward technology that would allow students to update their basic information in SEVIS without gaining access to restricted areas of the system where student access would be inappropriate. Once ICE implements this technology, students will have an increased ability to maintain their own records. This would also decrease the workload on DSOs, who would no longer be required to update student

information while students are participating in OPT.

2. Public Comments and Responses

i. University Accreditation

*Comment.* A number of commenters suggested additional restrictions on the types of educational institutions that should be allowed to participate in the STEM OPT extension program. Several commenters asserted, for example, that STEM OPT extensions should be limited only to students from the "top 50–100" universities in the United States. One commenter proposed that "academic programs that have been fined, reached a settlement, or are under investigation by federal or state law enforcement agencies should be barred from accessing OPT visas, as should any institutions that are subject to heightened cash monitoring."

Other commenters recommended further restrictions. Some commenters suggested that accreditation alone was insufficient to ensure the quality of degree programs and that additional quality standards should be adopted for STEM OPT extensions. Other commenters stated that students should be ineligible for STEM OPT extensions based on STEM degrees earned at for-profit institutions. One commenter stated that for-profit institutions had been abusing the OPT system and should no longer be able to place students in OPT positions. Another commenter asserted that prohibiting for-profit institutions from participating would eliminate the incentive of such institutions to recruit F–1 students under false pretenses. One commenter stated that the Administration is seeking to curb abuses by for-profit institutions in other areas, and that such schools should be precluded from placing students in OPT, or, at a minimum, should be subject to heightened oversight.

*Response.* DHS declines to adopt the suggested restrictions. DHS, for example, does not believe it fair or appropriate to limit participation to an arbitrary number of accredited institutions and their students. Although DHS has chosen to set limits on participating institutions and degree programs by requiring accreditation, accreditation determinations are made by accrediting entities that are recognized by the Department of Education as having expertise in this area. DHS itself does not have the expertise to look behind the quality of assessments made by such entities, nor does it have the expertise necessary to further compare degree programs among accredited institutions. Notably, the

---

[86] Changes of employers or EINs that are not simply a consequence of a corporate restructuring require filing of a new, rather than a modified, Training Plan by the new employer. *See* 8 CFR 214.2(f)(10)(ii)(C)(7)(iv).

commenters that recommended limiting the extension to students at "top" universities did not specify how DHS would determine which institutions would be in the "top" 50 or 100. Nor did the commenters explain how to address smaller institutions that may provide excellent STEM instruction but are not large enough to make more generalized lists of "top" schools. DHS believes it would be inappropriate to adopt such an ambiguous and subjective standard for distinguishing between educational institutions and their students in this rulemaking.

DHS also does not agree that a settlement or an open federal or state law enforcement investigation, without more, should bar an institution and its students from participating in the STEM OPT extension program. A settlement or investigation is not, itself, a finding of wrongdoing, and a settlement, investigation, or fine may be totally unrelated to matters impacting the STEM practical training opportunity. Barring participation based on nothing more than the existence of an investigation would be fair neither to the relevant institution nor its students.

DHS further declines to limit participation only to public and not-for-profit institutions, as there are accredited for-profit institutions that operate in a lawful manner and offer a quality education. As noted above, DHS has chosen to rely on the determinations of accrediting entities with respect to the quality of participating institutions and their degree programs. Schools meeting the accreditation requirement are subjected to significant oversight, including periodic review of the institution's programs to determine whether it is meeting the established standards in the profession and achieving its stated educational objectives. These checks, in addition to the protections built into the rule, represent a comprehensive mechanism for detecting and avoiding fraud. In addition, DHS is unaware of any special risk of fraud presented by accredited for-profit institutions, and the commenter did not identify any data showing that such institutions commit fraud at a higher rate than other institutions. Requiring F–1 students to attend public and not-for-profit institutions is an unnecessary limitation that would reduce the program's adaptability and relevance.

*Comment.* Some commenters stated that the definition of "accreditation" is too vague and may be abused by employers, schools, and students.

*Response.* DHS disagrees with these comments. As noted above, to be eligible for a STEM OPT extension, a student's degree must be received from an educational institution accredited by an accrediting agency recognized by the U.S. Department of Education. An accrediting agency is a private educational association of regional or national scope that develops evaluation criteria and conducts peer evaluations of educational institutions and academic programs. *See* U.S. Department of Education Office of Postsecondary Education, "The Database of Accredited Postsecondary Schools and Programs," available at *http://ope.ed.gov/accreditation/*. Because there is an objective list of accrediting entities recognized by the Department of Education that is publicly available, it is straightforward to confirm whether a school is appropriately accredited under the rule. For that reason, DHS disagrees that the term "accreditation" is vague.

*Comment.* DHS also received a number of comments regarding the use of STEM degrees earned abroad. Some commenters, for example, requested that the rule allow students to use STEM degrees previously obtained from foreign institutions as a basis for STEM OPT extensions. One commenter disagreed with a statement in the proposed rule discussing the difficulty of determining the equivalency of foreign degrees, and stated that such equivalency is sometimes determined for other immigration programs. That commenter referenced the Council for Higher Education Accreditation as a resource that lists international accrediting agencies. Other commenters requested that, as an alternative to allowing foreign degrees, DHS should allow students to obtain STEM OPT extensions based on previously obtained degrees earned at the accredited overseas campuses of U.S. institutions. To that end, a commenter recommended that DHS clarify the term "accredited U.S. educational institution" to include accredited U.S. institutions located abroad as well as programs offered by accredited U.S. institutions at international branch campuses or other overseas locations, so long as the location or program located outside the United States falls under the school's institutional accreditation. This commenter also suggested that DHS consistently use the term "accredited U.S. educational institution" throughout the rule to reduce ambiguity.

*Response.* DHS does not believe it is appropriate to allow the use of degrees earned abroad as a basis for obtaining STEM OPT extensions. First, such extensions are part of the F–1 student visa program, and providing such extensions based on degrees previously earned abroad would be inconsistent with the Department's duty to administer the F–1 program. Second, although DHS allows individuals to establish the equivalency of foreign degrees for other immigration programs, the need to assess such degrees presents particularly difficult complications in the OPT program. Among other things, assessing foreign degrees and making equivalency determinations are often difficult and time-consuming tasks. Finally, DHS believes that limiting qualifying degrees to those from accredited and SEVP-certified U.S. institutions will help preserve the integrity of the STEM OPT extension program, because the U.S. accreditation process helps to ensure the quality of educational institutions and programs.

Accordingly, this rule only permits a STEM OPT extension where the degree that is the basis of the extension is conferred by a domestic campus of a U.S. educational institution accredited by an entity recognized by the Department of Education and certified by SEVP at the time of application. Because SEVP certifies educational institutions at the campus level, the overseas campuses of U.S. educational institutions are not eligible for SEVP certification. A degree granted by an overseas campus of a U.S. educational institution will not qualify an F–1 student for a STEM OPT extension. This clarification is consistent with the basis for this rulemaking, which includes maintaining attractive conditions for international students to choose to study in the United States.

### ii. Site Visits

*Comment.* Some commenters inquired about the employer site-visit provision in the proposed rule, and specifically asked for clarification about the component within DHS that would conduct such site visits. In addition, a labor union opined that the Department of Labor would be the more appropriate agency to conduct site visits to ensure employer compliance with program requirements because "protection of labor standards is the central role of the [Department of Labor] and the agency must have an oversight role in a program with the size and scope of the OPT visa and its STEM extension."

*Response.* DHS anticipates that ICE, a component of DHS, will be the agency responsible for conducting site visits related to the STEM OPT extension program, though DHS may consult with DOL as appropriate based upon their expertise. These visits will be conducted by the appropriate component to ensure compliance with the requirements of this rule. DHS does

not intend to use these visits for other enforcement purposes; however, if evidence of a violation of other requirements is discovered during a site visit, such potential violation will be addressed appropriately.

DHS's authority to administer and enforce the immigration laws, track and monitor students, and, relatedly, to conduct site visits, has strong statutory support. For example, federal law requires DHS to establish an electronic means to monitor and verify, among other things, the admission of international students into the United States, their enrollment and registration at approved institutions, and any other relevant acts by international students. *See* 8 U.S.C. 1372 and 1762.

Relatedly, these statutes also obligate DHS to collect information concerning whether each nonimmigrant student is maintaining his or her status, any change in an international student's program participation as the result of being convicted of a crime, each international student's degree program and field of study, and the date of each nonimmigrant student's termination of enrollment in a program (including graduation, disciplinary action or other dismissal, and failure to re-enroll), among other things. *Id.* Significantly, the Enhanced Border Security and Visa Entry Reform Act of 2002, which clarified and augmented the requirements for international student data collection, also requires DHS to ensure that information concerning such students is timely reported and that all records are being kept in accordance with federal law. *See* 8 U.S.C. 1762.

Additionally, Homeland Security Presidential Directive No. 2 (HSPD–2) (2001), which directed legacy INS to implement measures to end the abuse of student visas, requires DHS to track the status of international students (to include the proposed major course of study, the individual's status as a full-time student, the classes in which the student enrolls, and the student's source of financial support) and to develop guidelines that may include control mechanisms, such as limited-duration student immigration status. HSPD–2 also provides that DHS may implement strict criteria for renewing student immigration status. The rule's provisions regarding employer site visits are consistent with the foregoing authorities, which require DHS to monitor students pursuing STEM OPT training programs. The site visits reduce the potential for abuse and ensure that STEM OPT students receive structured and guided work-based learning experiences.

Finally, DHS agrees that the Department of Labor (among other Federal, state, and local agencies) has significant expertise in worksite investigations, and may consult with the Department of Labor and other agencies as appropriate. Also, where appropriate, DHS will refer matters to the Department of Labor and other agencies should a site visit suggest that such a referral is warranted.

*Comment.* Some commenters requested additional information about the procedures and scope of employer site visits under the proposed rule. For example, one commenter stated that "the Proposed Rule does not clearly define the scope of a STEM OPT site visit, nor what information DHS could appropriately elicit during a site visit." Other commenters stated that the scope of any site visits should be limited to ensuring that the F–1 student remains employed at the STEM OPT employer sponsor identified in SEVIS, that the student is being compensated consistent with the information listed in SEVIS, and that the employer can confirm that the STEM degree is related to the practical training opportunity. They stated that site visits should not become a *de facto* "gateway" to other DHS audits, such as I–9 audits. They also stated that to the extent the scope of the site visit permits DHS to inquire into whether the duties and compensation of STEM OPT students are commensurate with that of U.S. workers, enforcement officers should be provided with very specific guidance to assure that STEM OPT investigations are not used as an additional mechanism to conduct I–9 audits. Another commenter specifically called for site visits to include documentation vetting and employee interviews for the purpose of ensuring that no U.S. workers are negatively impacted by a STEM OPT extension.

*Response.* As indicated above, the purpose of the employer site visit is for DHS to ensure that information in SEVIS concerning the STEM OPT extension is accurate (*i.e.*, that students and employers are engaged in work-based learning experiences that are consistent with the student's Form I–983, Training Plan for STEM OPT Students). As part of a site visit, DHS may confirm that the employer has sufficient resources and supervisory personnel to effectively maintain the program. In addition, DHS may ask employers to provide the evidence they used to assess wages of similarly situated U.S. workers. DHS will train the officials who conduct these visits so they understand what information DHS expects from employers. Site visits will be limited to checking information

related to student STEM OPT employment, including the attestations made by the employer on the approved Training Plan. Additionally, site visits based upon complaints or evidence of noncompliance may be tailored to the concerns asserted. Site visits will not be used for other enforcement purposes unless evidence of a violation is discovered during such visits.

*Comment.* Some commenters stated that DHS should provide advance notice for all site visits. Some stated that consistent with similar government audits, three business days of advance notice should be provided to the student and employer prior to site visits, while another commenter suggested that companies be provided with 72 hours' notice prior to the site visit in the absence of a complaint. One commenter stated that DHS should do unannounced site visits only when it has a reason to believe a violation has occurred based on specific, credible information from a known source that likely has knowledge of the employer's practices, employment conditions, or regulatory compliance.

*Response.* DHS understands the commenters' concerns and has made changes in the final rule that balance concerns about employer burden against the need to ensure compliance with the rule. Under this final rule, DHS will provide 48 hours' advance notice for any site visit unless the visit is triggered by a complaint or other evidence of noncompliance with these regulations, in which case DHS may conduct a site visit without notice.

*Comment.* One commenter stated that STEM OPT site visits should be conducted only by experienced and well-trained ICE officers, rather than by contractors. According to the commenter, DHS has previously recognized that the use of contractors to perform site visits on behalf of USCIS' Fraud Detection and National Security Directorate was inefficient and often problematic and thus eliminated their use in that context. Other commenters questioned the expertise of ICE officers to make judgments about employer training programs. One of these commenters stated that the proposed Mentoring and Training Plan requirement was so vague and devoid of standards that no meaningful review was possible, and no training plan would be deemed insufficient.

*Response.* ICE currently intends to use federal employees for site visits under this rule. There may be times when contractors accompany federal employees, but ICE currently intends that federal employees will be in charge of such visits. DHS disagrees with the commenter's assessment that the

Training Plan requirements are overly vague and unenforceable. The program requires employers to provide detailed information regarding the nature of the training to be provided and the measures to be used to ensure that the goals of such training are met. Form I–983, Training Plan for STEM OPT Students, which will be used to keep track of this information, requires employers to provide the information necessary to verify compliance.

*Comment.* Several commenters requested that DHS further specify requirements and procedures related to site visits. Such commenters expressed concern with the fact that the regulation does not specify: The manner in which a site visit would be conducted; the manner in which information gained in the course of a site visit would be stored, shared, or relied upon by the government; the manner in which a company or individual could correct or update information gained through a site visit; or the manner in which confidential business and personal information will be protected during a site visit.

*Response.* DHS clarifies that site visits will be conducted in a manner that balances the burden to the employer with the need to ensure compliance with the program. This means that while ICE will physically inspect some sites, it also may request information concerning compliance through email or by phone. The information obtained during a site visit will be stored and maintained by ICE. DHS will notify an employer 48 hours before conducting a site visit unless DHS has received a complaint about the employer or has other evidence of non-compliance, in which case ICE reserves the right to conduct a site visit without notice. If as a result of a site visit ICE determines that an employer or student needs to submit updated or corrected information, ICE will generally request the information in writing, with specific instructions on how the employer or student must submit the information. Federal law imposes protections on information obtained by DHS in connection with site visits, and the Department will comply with those requirements. Applicable federal laws include, but are not limited to, the Privacy Act, the Freedom of Information Act, and the Federal Information Security Management Act.

*Comment.* Some commenters stated that ICE, prior to initiating a site visit, should attempt to verify program compliance requirements by communicating with the student and employer via telephone and email, as these means of communication are "less intrusive" than site visits. The commenters suggested that if the information could be verified through these other means, there would then be no need to conduct a time-consuming site visit.

*Response.* DHS expects that it will use all available mechanisms to ensure compliance with STEM OPT extensions, including contacting employers, students, or DSOs by phone or email to verify or obtain information. The Department, however, reserves the right to conduct site visits of employers or schools to ensure full compliance with program requirements. The Department believes that the possibility that such site visits may be conducted to ensure compliance, including on an unannounced basis, will further incentivize compliance with the requirements of this rule.

### iii. Unemployment Limits

*Comment.* Commenters asked DHS to reconsider and adjust the amount of time a student may be unemployed over the course of their STEM OPT extension. Others asked that DHS not allow for any unemployment while a student is on a STEM OPT extension. One commenter suggested that an unemployment period is inconsistent with student status and with the training program component of OPT. The commenter stated that unemployment would be an unsupervised period inconsistent with DHS' security duties and would run contrary to protections in place for U.S. workers.

By contrast, another commenter recommended that DHS allow unlimited unemployment during the STEM OPT extension period. The commenter stated that limiting the unemployment period will have the effect of tying students more closely to one employer and limiting their ability to change jobs. The commenter was concerned this would increase the opportunity for student exploitation. A different commenter suggested that DHS allow STEM OPT students to leave their initial employer during the 24-month extension, so as to allow students greater mobility and avoid potential exploitation. One commenter stated that the lack of mobility and other protections for individuals participating in OPT could lead those students who are worried about going out of status to "collude" with exploitative employers to cover up violations of the safeguards for U.S. workers.

*Response.* DHS respectfully disagrees with commenters' suggestions that the amount of time a student may be unemployed under this rule is too long, or that the allowance for a short period of unemployment should be eliminated altogether. DHS continues to believe that authorizing a limited period for possible unemployment during a student's STEM OPT extension is both fair and reasonable, and consistent with the stated aims and objectives of the STEM OPT extension. Moreover, the reporting requirement, with which a student must comply during any period of unemployment, effectively addresses security-related concerns by ensuring that DHS remains apprised of the student's location and status.

DHS also believes that limiting unemployment during the STEM OPT extension period is necessary to support the program's purpose and integrity. The rationale for the program is to extend status to facilitate practical training. Allowing an unlimited period of unemployment would thus undermine the purpose for the extension and increase the opportunity for fraud and abuse. Moreover, the limited period of unemployment does not preclude a student who is unhappy with his or her current employer (for whatever reason) from effectively searching for a new practical training opportunity. Under this rule, the student may seek such a new opportunity either while still employed with his or her current employer or in the period of unemployment provided by this rule. Nothing in the rule prevents students from switching employers or from being unemployed for a temporary period, as long as they complete and submit a new training plan and comply with all reporting requirements.

Finally, students who believe they are being exploited or abused by their employers in any manner have several mechanisms to address their concerns, including reporting the conduct to their DSO or the SEVP Response Center, or seeking legal redress in appropriate cases. DHS also provides information about studying in the United States on the DHS Study in the States Web site, which links to State Department information for nonimmigrants, including a "Rights, Protections and Resources" pamphlet.[87] DHS encourages all students to seek appropriate redress and emphasizes that such action will not impact their F–1 status.

*Comment.* Some commenters stated that students should not be penalized

---

[87] *See* DHS, Study in the States, available at *https://studyinthestates.dhs.gov/what-is-a-commission-based-recruiter*; U.S. Department of State, Rights, Protections and Resources Pamphlet (Dec. 22, 2014), available at *http://1.usa.gov/1G0Nt5X.*

for becoming unemployed for an extended period of time because their employers failed to provide appropriate training.

*Response.* The rule provides for a limited period of authorized unemployment precisely because DHS is aware that there may be situations where students may have their employment terminated for reasons that are beyond their control. The rule's limited period of authorized unemployment is intended to provide students who find themselves in such a situation with sufficient time to seek and obtain alternative practical training opportunities directly related to their STEM fields of study.

*Comment.* A DSO and a university requested clarification as to whether the proposed rule's authorized 90- and 150-day periods of unemployment are available at each educational level. They sought clarification, for instance, with respect to a student who had previously used his or her authorized periods of unemployment while engaged in post-completion OPT and a STEM OPT extension after completing an undergraduate degree. The commenters asked whether such a student would be eligible for the proposed rule's authorized periods of unemployment if the student subsequently engaged in post-completion OPT and a STEM OPT extension after completing a graduate degree.

*Response.* Similar to the provisions in the 2008 IFR, a separate 90- or 150-day unemployment limit will apply to each post-completion OPT period. A post-completion OPT period for these purposes means an initial period of up to 12 months of OPT, as well as the related 24-month STEM OPT extension. If a student completes one period of OPT (including a STEM OPT extension), and then pursues a second period of OPT on the basis of having earned a second degree at a higher educational level, the student will be able to benefit from the rule's authorized 90- and 150-day periods of unemployment (as appropriate) at both educational levels. DHS has revised the regulatory text to make this clear.

### iv. Employment Status and Validation Reporting

*Comment.* Some commenters requested that DHS eliminate the requirement for the employer to timely report the termination of a STEM OPT student or, alternatively, extend the proposed 48-hour notification requirement. Commenters suggested timeframes of 10 days or 21 days to better correspond with other reporting requirements in the rule. Other commenters suggested alternative reporting periods of three business days or five business days. With respect to the 48-hour notification requirement, one commenter stated that "it can be administratively difficult to comply within such a short timeframe given the amount of administrative work that accompanies a termination." In addition, a commenter stated that having both the employer and the STEM OPT student report loss of employment is duplicative.

*Response.* After reviewing these comments, DHS has agreed to extend the period for complying with the reporting requirement from 48 hours to 5 business days. DHS believes such a timeframe is more realistic and more likely to result in consistent compliance, while at the same time ensuring that DHS obtains timely information with respect to international students. DHS has been directed by Congress to monitor and track students, and obtaining current information is important to ensure that DHS continues to meet its responsibilities.

DHS recognizes that the rule requires reporting from both employers and students. While such dual reporting requirements may seem duplicative, DHS believes they are critical to ensuring compliance with program requirements. Employer reporting, for example, would be prudent in a situation involving a student who fails to report his or her termination so as to remain in the United States in violation of his or her status. Employers are also likely to have additional resources in comparison to individual employees, especially those who recently became unemployed. Moreover, DHS believes the burden imposed by the reporting requirements is minimal. Employers and students can satisfy these requirements with a simple email to the DSO indicating that the student was terminated or has otherwise departed, as well as the applicable date of such termination or departure.

*Comment.* Several educational institutions expressed opposition to the requirement that DSOs be informed whenever a student on a STEM OPT extension leaves the employment before the end of the extension period. These commenters expressed concern about the DSOs' role in such situations, especially because many students on STEM OPT extensions have left campus and are often removed from their university ties. A few universities stated that DHS should require employers to report this information directly to DHS, instead of to the DSO. One commenter argued that the reporting requirement would be an additional administrative burden on DSOs, who would now be responsible for data that that they do not "own." Another commenter expressed concern that the DSO could be held responsible for not having this information if the employer fails to report it to them in a timely manner, or that the student could also be held responsible.

*Response.* While DHS understands the commenters' logistical concerns regarding students potentially not located on or near the DSO's campus, the compliance measure discussed in this section is not novel. Rather, it has been in place since implementation of the 2008 IFR. Moreover, DHS has sought to balance the burden that this requirement places on DSOs with the need for adequate oversight of the STEM OPT extension. Because DSOs, unlike STEM OPT students or employers, have access to SEVIS, DHS continues to believe the program is best served by requiring employers and students to report these changes to DSOs so that such information can be uploaded into SEVIS on a timely basis.

Additionally, with the changes in this final rule, an employer is now required to report the termination or departure of a STEM OPT student within five business days of the termination or departure, if the termination or departure is prior to the end of the authorized period of OPT. DHS believes this requirement, placed upon the entity with the closest connection to the student at the time of the termination or departure, is an effective mechanism for tracking students. The provision reflects DHS' belief that the responsibility to report should initially rest with the student or employer, as appropriate, and that DSOs should continue serving in the same role they had before—helping DHS track students and providing timely access to reported information. This system also reflects DHS' view that if an educational institution wishes to gain the benefits of F–1 students' enrollment with their school, including through the attraction of such students based upon the potential to participate in an extended period of practical training via the STEM OPT extension, the institution will be willing to undertake the associated reporting requirements as well. Finally, DHS is currently working on ways to allow other program participants to input information directly into SEVIS. Until that occurs, however, DHS believes the current reporting protocol should remain in place.

*Comment.* Many DSOs submitted comments stating that students should be responsible for updating their

information directly into SEVIS and that SEVIS should send automatic reminders to students about upcoming deadlines, such as deadlines for reporting termination of OPT.

*Response.* As noted above, DHS recognizes that requiring DSOs to provide STEM OPT student information may, at times, be burdensome. To aid in reducing this burden, DHS is developing a portal in SEVIS which, once fully deployed, will allow STEM OPT students to directly input information into SEVIS for DSO review. DHS plans to have the first stages of this portal, designed specifically to allow OPT students to submit information on their own behalf, operational by the beginning of 2017.

*Comment.* One employer stated that the requirement to notify DSOs in cases of termination or departure should be triggered only when STEM OPT students have actually abandoned their jobs, rather than for all absences of five consecutive days. The commenter noted that there may be legitimate reasons why an employee may be absent from work for a five-day period without the consent of the employer. The commenter suggested that employers should be allowed to follow their normal HR guidelines when determining whether the employment has been "abandoned" before reporting an employee's absence to the DSO, which may be either shorter or longer than the NPRM's five-day requirement.

*Response.* As noted above, STEM OPT is a cooperative undertaking between the student and employer, and both voluntarily commit to participating in the program. DHS therefore maintains that it is the employer's responsibility to notify the student's DSO if, for whatever reason, the student ceases to participate. While DHS understands that there may be instances where an employee may be absent from work for five consecutive days without the consent of the employer (such as a medical emergency requiring prolonged hospitalization where the employee is unable to notify the employer), any absence where the employee is unable to notify the employer and obtain consent remains material to the student's participation in the STEM OPT extension. DHS therefore is maintaining the requirement that an employer must notify the STEM OPT student's DSO if the student has been absent from work for five consecutive business days without the consent of the employer.

v. Periodic Student Evaluations

*Comment.* Some commenters requested clarification concerning the student and employer's respective roles

in completing the student evaluation. For instance, some commenters noted that the proposed form referred to self-assessment by the student, but was entitled "Six-Month Evaluation/ Feedback on Student Progress." Similarly, a commenter stated that the evaluation should involve input from both the student and a supervisor, and the form should be structured in a way that allows for a supervisor's comments. One commenter requested that the evaluation consist solely of self-evaluations by the student, noting the burdens on employers of evaluations every six months.

A commenter expressed concern about being required to use the proposed Mentoring and Training Plan to evaluate STEM OPT students, explaining that the proposed rule's requirements "will not add value and will merely add redundant bureaucratic requirements for employers, who are already following their own internal processes for these employees." The commenter stated that its company already "provides an annual review of individual employee performance and compensation" and that its review process "is the culmination of year round performance management activities in which employees receive a formal review of their performance, development goals for the upcoming year, and a compensation review." One commenter stated that the proposed process for completing the evaluation (which entails the student preparing it, the employer signing off on it, and the DSO retaining a copy) is redundant to the Training Plan.

*Response.* DHS appreciates the commenters' concerns and clarifies that student evaluations are a shared responsibility of both the student and the employer to ensure that the student's practical training goals are being satisfactorily met. The student is responsible for conducting a self-evaluation based on his or her own progress. The employer must review and sign the self-evaluation to attest to its accuracy. By requiring employers to review the self-evaluations, DHS better ensures that employers and students will continue working together to help the student achieve his or her training goals. DHS believes that this requirement is integral to the success of the STEM OPT extension.

DHS has changed the title of the evaluation section to "Evaluation on Student Progress." DHS has not modified the evaluation to include a separate space for an employer to provide comments, because many employers expressed concern about the burden involved in reviewing the

Training Plan, and DHS determined that an additional requirement was unnecessary. However, nothing in the rule prevents an employer from attaching and submitting such an appraisal of a STEM OPT student.

DHS disagrees that the student evaluation provision duplicates or displaces existing employer processes for evaluating employee performance. The evaluation does not require employers to evaluate how well a STEM OPT student is performing his or her core duties at a job. Instead, the evaluation section of the form is a mechanism for the student to document his or her progress towards meeting specific training goals, as those goals are described in the Training Plan. DHS also disagrees that the student evaluation provision duplicates or is redundant to the Training Plan. In contrast to the Training Plan, which helps the student set his or her training objectives and ensures that the student's training conforms to the requirements of this rule, the 12-month evaluation confirms that the student is making progress toward his or her training objectives.

*Comment.* DHS received a number of comments from employers about the frequency of the proposed six-month student evaluation requirement. Some commenters stated that requiring students and employers to participate in such an evaluation every six months would be "overly burdensome" and would represent an "unprecedented level of additional reporting without commensurate improvement in compliance outcomes." Some commenters indicated that they perform employee reviews every six months; however, given the timing of student graduations and STEM OPT start dates, the time of the year when these reviews occur might not coincide precisely with the schedule that is being mandated by DHS. Some commenters stated that DHS should require only annual evaluations to reduce an employer's time and paperwork burdens. Another commenter asked for 180 days to allow companies to adjust their processes if DHS insists on requiring evaluations every six months.

*Response.* DHS acknowledges the concerns expressed by some employers about the ability to implement the evaluation requirement every six months as proposed in the NPRM. While any burden associated with the evaluation is expected to rest in part on the student (who is responsible for drafting the self-assessment portion of his or her evaluation and ultimately submitting the evaluation to the DSO), DHS recognizes that the employer plays

an important role in the student's evaluation by providing feedback to the student and confirming the accuracy of the evaluation. Because of the concerns raised by commenters, DHS has decided to eliminate the six-month requirement and instead require annual evaluations: One evaluation after the first 12 months and a final evaluation when the student completes his or her practical training. DHS believes that annual reporting is a reasonable requirement when balanced against DHS's obligation to oversee the program and monitor students.

As finalized in this rule, a student on a 24-month STEM OPT extension must submit his or her first evaluation to the DSO within one year and 10 days of the first day of the validity period reflected on the Employment Authorization Document (EAD). Similarly, the STEM OPT student will be required to submit the final evaluation within 10 days of the conclusion of his or her practical training opportunity. DHS generally expects employers and students to be able to complete all reporting in a timely manner.

*Comment.* Commenters requested that DHS clarify when STEM OPT students must submit their periodic evaluations to their DSOs. Commenters stated that the proposed rule did not describe the reporting timeframe clearly. A commenter stated that it would be too burdensome to require students to submit each six-month evaluation within 10 business days of the conclusion of the evaluation period. The commenter suggested that DHS allow students to submit the evaluation either 15 or 30 days on either side of the reporting date. Similarly, a number of DSOs asked whether there would be SEVIS functionality for students who do not present Training Plans and whether there would be penalties for students who submit them late, and if so, what these penalties are. One commenter requested that, if the DSO is required to collect students' training plans for the six-month "reporting obligations," DHS provide lead time of at least 30 days between the "alert" and the deadline for submission.

*Response.* DHS clarifies that under the proposed rule, STEM OPT students would have been required to submit each six-month evaluation prior to the conclusion of each six-month period. As noted above, DHS has changed the evaluation period from six months to 12 months. This change should make the requirements on students and DSOs less burdensome. DHS also agrees with the commenters that suggested additional flexibility and clarity for the submission of student evaluations. Accordingly, this final rule also revises the proposal by

providing that a student must submit the 12-month and final evaluations no later than 10 days following the conclusion of the applicable reporting period.

In response to the questions from DSOs, DHS notes that the deadlines for submitting the required training plan and evaluations are firm. In order to maintain F–1 status, the STEM OPT student must submit the required materials to the DSO on a timely basis. As noted above, updates to SEVIS are being developed to make it easier for students to meet these submission requirements. DHS does note, however, that for the annual evaluation requirement, a full Training Plan form need not be submitted. Rather, the student would need to timely provide the evaluation section of the form to the DSO. DHS believes the associated timeline provides sufficient flexibility for all parties to comply with these requirements.

### vi. Reporting of Material Changes to or Deviations From the Training Plan

*Comment.* Some commenters submitted comments related to the attestation included in the proposed Mentoring and Training Plan that would have required the student and employer to notify the DSO at the earliest available opportunity regarding any material changes to, or material deviations from, the training plan ("material changes"). The proposed plan indicated that such a material change would include a change in supervisor. A commenter objected to this requirement and posited that requiring the reporting of material changes would not advance the policies underlying the training plan requirement. Some commenters requested that DHS clarify the meaning of the term "material" in this context. Commenters stated that such clarification was necessary to minimize instances of over-reporting of immaterial changes to the Training Plan. One commenter stated that a mere change of supervisor should explicitly be considered an immaterial change to the STEM OPT opportunity.

Finally, a commenter recommended placing the responsibility for reporting material changes with the F–1 student, not the employer. The commenter reasoned that shifting this particular reporting obligation to students is consistent with students' other reporting obligations under the proposed rule, including "reporting changes of employer."

*Response.* DHS believes that the Training Plan requirement would be seriously undermined if DHS allowed

students and employers to make material changes or deviations without creating a record of such changes and reporting those changes to the DSO. The reporting requirement keeps students and employers accountable to the original Training Plan, and ensures that the DSO and DHS have access to accurate information about STEM OPT students. DHS therefore declines the suggestion to eliminate the requirement to report material changes.

DHS agrees, however, that further clarification is warranted. Accordingly, DHS has revised the final regulatory text to make clear that the STEM OPT student and employer are jointly required to report material changes. The regulatory text also clarifies that material changes may include, but are not limited to, any change of Employer Identification Number resulting from a corporate restructuring; any reduction in compensation from the amount previously submitted on the Training Plan that is not a result of a reduction in hours worked; any significant decrease in hours per week that a student engages in the STEM training opportunity; and any decrease in hours below the 20-hours-per-week minimum required under this rule. If these or other material changes occur, the student and employer must sign a modified Training Plan reflecting the material changes or deviations, and they must ensure that the plan is submitted to the student's DSO at the earliest available opportunity.

DHS agrees with the comment stating that a change of supervisor does not, by itself, meet the level of a material change or deviation that would require submitting a modified Training Plan. Similarly, it is not necessarily a material change if a STEM OPT student rotates among different projects, positions, or departments, or there is a change in the F–1 student's assigned division or research focus. Such changes are not material unless they render inaccurate the information in the F–1 student's original Training Plan related to the nature, purpose, oversight, or assessment of the student's practical training opportunity.

In response to commenters' concerns, DHS has revised the regulatory text to make this clear. Under this final rule, a material change is a change that DHS has specifically identified as "material" by regulation, renders an employer attestation inaccurate, or renders inaccurate the information in the Training Plan on the nature, purpose, oversight, or assessment of the student's practical training opportunity. Thus, for example, a change in supervisor that results in such inaccuracy would be a

material change, but a change in supervisor standing alone is not material.

Because DHS expects that not all changes in supervisor would be material, DHS has revised the Training Plan form to replace the reference to a student's supervisor with a reference to the ''Official Representing the Employer.'' Along with the changes discussed above, this change aims to produce flexibility for employers in completing the requisite sections of the form and further clarifies that the Training Plan would not require updating solely because the student is assigned new project supervision.

Finally, DHS declines to adopt the recommendation to make the student solely responsible for reporting material changes, as the employer should be accountable for the Training Plan that it helped prepare. This joint employer-student requirement strengthens DHS's ability to track F–1 nonimmigrants and is essential to monitoring employer compliance, maintaining strong U.S. worker safeguards, and ensuring continuing employer-accountability.

*Comment.* A university stated that material changes or deviations to the original Training Plan will be self-reported events and that the DSO will have no other way of knowing if or when they occur. The commenter suggested that if the Department simply seeks to have this information on file, and there is no role for the DSO other than to collect the information, then such information should be submitted directly to DHS by the employer or student. The commenter further stated that the proposed rule was silent regarding DSO responsibilities over modified Training Plans, and that there appear to be no ''teeth'' for addressing a student's failure to report these changes.

*Response.* DHS understands that DSOs have a limited role with respect to receiving and storing material changes to, or deviations from, submitted Training Plans. DHS is developing a portal in SEVIS to allow students to provide their own information, including confirmation of modified Training Plans. At this time, however, the DSO's role in this regard remains essential to the effective administration of the STEM OPT extension. Consequently, the DSO at the student's school of most recent enrollment remains responsible for providing SEVP with access to the relevant information described in this section. This rule also makes clear that it is the student's responsibility to provide changes in information to his or her DSO, and that a failure to do so

would constitute a violation of the student's F–1 status.

*Comment.* One commenter recommended that DHS require that changes in compensation be reported only when a student's salary has been lowered. The commenter stated that if this change were adopted, it would eliminate a significant burden on students and DSOs by eliminating the need to report when a student receives an annual cost-of-living increase as part of the employer's overall compensation program. The commenter stated that this would also avoid confusion over whether to report every time the student receives a raise or stock options, or when other forms of non-cash compensation are added to the student's compensation package.

*Response.* DHS understands the commenter's concern that the proposed rule lacked clarity on when compensation changes were required to be submitted through the Training Plan for STEM OPT Students. To avoid any confusion, the final rule clearly states that employers are responsible for reporting only material changes to the Training Plan, which will include changes to the compensation reporting field of the form, and are required to do so at the earliest available opportunity. However, a compensation change qualifies as material only when it is a reduction in compensation from the amount previously submitted on the Training Plan that is not the result of a reduction in hours worked. An increase in compensation, on its own, does not constitute a material change that must be reported. But such an increase may constitute a material change in the totality of the circumstances, such as when the increase is not commensurate with an increase in compensation afforded to the employer's similarly situated U.S. workers.

### vii. General Comments on DHS Enforcement, Monitoring, and Oversight

*Comment.* DHS received a number of comments related to the Department's ability to track F–1 students on STEM OPT extensions. One commenter, for example, cited a February 2014 report from the Government Accountability Office (GAO) that highlighted difficulties experienced by the Department in tracking F–1 students engaging in practical training.[88] The commenter expressed concern over the ability of nonimmigrants to overstay

their authorized periods of stay, and suggested that making schools responsible for former students would be unrealistic and would create a national security issue. Another commenter asked how DHS would keep track of all students participating in STEM OPT. Some commenters suggested that DHS adopt and publish a public list of program violators, identifying those companies and universities found to be abusing the STEM OPT extension or otherwise failing to comply with program requirements. One commenter requested information regarding actions DHS has taken to address problems identified by the February 2014 GAO report on the OPT program.

*Response.* DHS believes it has made important improvements to the oversight of the STEM OPT extension with this rule. In addition to maintaining the validation reporting requirement, this rule establishes an interlocking set of requirements that facilitate DHS enforcement (site visits), permit DHS to better monitor students on STEM OPT (evaluations, notification of material changes, and required notice if a student leaves an employer or fails to show up for five consecutive business days without the employer's consent), and protect the integrity of the program (accreditation requirements and unemployment limits). These requirements are intended to help DHS track F–1 nonimmigrants and better ensure their departure. *See, e.g.,* 8 U.S.C. 1103, 1184, 1372. All of these are discussed in detail above.

DHS believes that the enforcement, monitoring, and oversight provisions of this rule provide the necessary tracking resources and mechanisms to appropriately monitor compliance and to enforce the law against violators. For these reasons, the Department declines to adopt the suggestion to publish a list of program violators.

With regard to the 2014 GAO Report, DHS first notes that the report and its conclusions concerned individuals beyond the limited population of STEM OPT students, who represent a small subset of the total F–1 population engaging in authorized employment in the United States.[89] The report is thus much broader in scope than are the regulatory changes DHS has considered with this rulemaking. Nonetheless, DHS believes it has adequately addressed many aspects of the GAO report impacting STEM OPT extensions. DHS

---

[88] The commenter referred to GAO, ''Student and Exchange Visitor Program: DHS Needs to Assess Risks and Strengthen Oversight of Foreign Students with Employment Authorization,'' Feb. 2014, available at *http://www.gao.gov/assets/670/661192.pdf.*

[89] As of September 16, 2015, over 34,000 students were in the United States on a STEM OPT extension, as compared to more than 1.2 million international students studying in the United States.

has taken measures or is finalizing action regarding seven recommendations included in the report. For example, DHS has completed or is in the process of finalizing the following:

• Identifying and addressing risks in the OPT program through interagency coordination, including using relevant information from ICE's Counterterrorism and Criminal Exploitation Unit and field offices;

• Requiring that F–1 OPT students, both still in school and who have completed their education, provide DSOs with employer information, including their employer's name and address, so that DSOs can record that information in SEVIS;

• Developing and distributing guidance to DSOs for determining whether a practical training opportunity relates to a student's area of study, and requiring that DSOs provide information in SEVIS to help ensure that the regulatory requirement is met;

• Requiring that students report to DSOs, and that DSOs record in SEVIS, students' initial date of employment and any period of unemployment;

• Developing and implementing a process for SEVP to inform USCIS when students approved for OPT have transferred schools;

• Developing guidance to DSOs and USCIS regarding the definition of a full academic year for the purposes of recommending and authorizing OPT; and

• Developing and implementing a mechanism to monitor available information in SEVIS to determine if international students are accruing more OPT than allowed by DHS regulation.

Although DHS is always interested in ways to improve the security and efficacy of its programs, the Department believes that the above-referenced enforcement measures, as well as those described in this final rule, are thorough and sufficient to address the concerns discussed in the GAO report that relate to STEM OPT extensions.

*Comment.* Commenters expressed concern that many F–1 students on STEM OPT extensions work in fields unrelated to their areas of study and falsify work experience. Some commenters stated that many employers fabricate work documents in an attempt to show that a work experience relates to a student's field of study. Some commenters requested that DHS take additional steps to ensure that F–1 students do not work in unrelated fields, such as in restaurants, motels, gas stations or similar places of employment.

Other commenters expressed concerns about consulting firms that may seek to exploit F–1 students by underpaying them during their STEM OPT extension. One commenter asked DHS to implement background checks for all STEM OPT students before they accept employment opportunities. Similarly, another commenter suggested that DHS include annual in-person reissuance of identification cards with photos and fingerprints among measures required for "all OPT students."

*Response.* As noted above, this rule includes multiple requirements to ensure strong program oversight. DHS closely monitors the STEM OPT extension program, including F–1 students and schools certified to enroll such students. DHS takes claims of fraud and abuse very seriously and encourages all individuals to contact DHS if they have information regarding any individual or employer that he or she believes is engaging in fraud or abuse. Individuals possessing such information are encouraged to submit it online at *https://www.ice.gov/webform/ hsi-tip-form.* Moreover, the rule requires employers to sign the Training Plan and comply with all reporting requirements, while providing for site visits to independently verify compliance. These additional requirements will mitigate the potential for fraud and abuse of the F–1 visa program and STEM OPT extension.

Regarding the request for DHS to implement background checks on STEM OPT students, DHS confirms that this process is already in place. USCIS conducts background checks on all STEM OPT students before rendering a final decision on their Form I–765, Application for Employment Authorization. DHS does not believe the commenters' suggested additional security measures (such as an annual ID card reissuance requirement) are necessary or appropriate at this time.[90]

*Comment.* Some commenters stated that the proposed rule was silent on the types of penalties that students and employers may face for non-compliance with reporting requirements. Other commenters expressed concern that DSOs may be held responsible if students and employers fail to comply with these requirements. One

commenter described the reporting requirements as "self-reporting events," noting that DSOs will have no way of monitoring students or knowing about violations if they are not reported to the DSOs. That commenter suggested that "[t]here should be no repercussions to the school or the DSO for not getting these data from the student or employer." Similarly, another commenter voiced concerns about whether there will be consequences for DSOs if employers or students fail to meet their reporting obligations under the proposed rule, how DHS will monitor employers' and students' compliance with the proposed rule's reporting requirements, and whether students will face consequences if employers fail to timely report required information.

*Response.* DHS respectfully disagrees with the commenters' statements concerning available consequences for non-compliant students or employers. The rule reflects ICE's procedures for monitoring nonimmigrant students and provides for investigating employers' compliance with the rule's requirements, including all reporting and recordkeeping obligations, in accordance with SEVP's authority to track and monitor students. Moreover, the rule clarifies that employers will be monitored consistent with the site visit provisions, and that DHS has the ability to deny STEM OPT extensions with employers that DHS determines have failed to comply with the regulations. With regard to STEM OPT students, the rule also provides for serious consequences in instances of non-compliance. For example, the rule specifies that compliance with reporting requirements is required to maintain F–1 status. *See* 8 CFR 214.2(f)(12)(i)–(ii). Accordingly, a student's failure to comply with reporting obligations will result in a loss of F–1 status. Furthermore, although DHS expects certified schools and DSOs to meet their regulatory obligations, including updating a student's record to reflect reported changes for the duration of OPT, DHS does not intend to pursue enforcement actions against schools or their officials for the reporting failures of third parties.

*C. Qualifying F–1 Nonimmigrants*

1. Description of Final Rule and Changes From NPRM

This rule allows only certain F–1 nonimmigrants to receive STEM OPT extensions. The rule requires the student's STEM OPT opportunity to be directly related to the student's STEM degree; defines which fields DHS

---

[90] DHS notes that several commenters suggested that DHS implement new requirements for "all OPT students." DHS believes these comments go beyond the scope of regulatory changes DHS has considered with this rulemaking. However, DHS understands and appreciates the commenters' concerns. As stated previously, the rule implements significant measures to strengthen program oversight and to mitigate fraud in the STEM OPT extension. DHS may consider extending these measures more broadly in a future rulemaking.

considers to be "STEM fields" for purposes of the extension; and allows students to use a previously obtained STEM degree as a basis for a STEM OPT extension. The rule effectively prohibits students from using the STEM OPT extension to work in a volunteer capacity, among other requirements to ensure appropriate oversight and training in connection with the extension. Finally, this rule clarifies that a student may qualify for a STEM OPT extension notwithstanding that the student has yet to complete a thesis requirement or equivalent, so long as the thesis requirement or equivalent is the only degree requirement still outstanding at the time of application (although this is not an available option when using a previously obtained STEM degree). The proposed rule included most of these provisions; the final rule makes changes and clarifications in response to public comments. We summarize these provisions and changes below.

i. Relationship of STEM OPT Opportunity to the Student's Degree

As noted above, under this final rule, the student's proposed STEM OPT opportunity must be directly related to the student's STEM degree. Like OPT generally, a STEM OPT extension is at its core a continuation of the student's program of study in a work environment. This provision is finalized without change.

ii. Limitation to STEM Degrees Only

This final rule limits eligibility for the STEM OPT extension to those qualifying students who have completed a degree in a STEM field. The degree that serves as the basis for the STEM OPT extension must be a bachelor's, master's, or doctoral degree. Under this rule, a "STEM field" is a field included in the Department of Education's CIP taxonomy within the 2-digit series containing engineering, biological sciences, mathematics, and physical sciences, or a related field. In general, related fields will include fields involving research, innovation, or development of new technologies using engineering, mathematics, computer science, or natural sciences (including physical, biological, and agricultural sciences). This definition is drawn in part from a definition developed by the Department of Education's National Center for Education Statistics (NCES).[91] DHS added the definition of

"related fields" in response to comments about the clarity of the proposed definition.

DHS will maintain a complete list of fields that DHS has determined fall within the regulatory definition of "STEM field." This list is known as the STEM Designated Degree Program List ("STEM list"). DHS may publish updates to the STEM list in the **Federal Register**. A clear definition of the types of degree fields that DHS considers "STEM fields" for purposes of the STEM OPT extension will more effectively facilitate the process for altering categories contained within the STEM list.

In the proposed rule, DHS advised commenters that it was considering future revisions of the STEM list to include certain degrees listed within the two-digit series for Agriculture, Agriculture Operations, and Related Sciences; Computer and Information Sciences and Support Services; Engineering; Engineering Technologies and Engineering-Related Fields; Biological and Biomedical Sciences; Mathematics and Statistics; and Physical Sciences. As noted in the comment summary below, DHS received a number of recommendations for fields to add to the STEM list and one recommendation to remove a field from the list. As discussed below DHS has revised the list in response to the comments received; the final list is available in the docket for this rulemaking. Consistent with past practice, DHS will continue to accept for consideration suggested changes to the STEM list at *SEVP@ice.dhs.gov*.

iii. Prior STEM Degrees

The rule allows students to use a previously obtained and directly related STEM degree from an accredited school as a basis to apply for a STEM OPT extension. This provision makes the STEM OPT extension available to students who have significant prior background in STEM but who are currently engaging in practical training that has been authorized based on their study towards a non-STEM degree. The extension is available only to those students who seek to develop and utilize STEM skills from their prior STEM degree during the STEM OPT extension. A DSO at the student's school of most recent enrollment is responsible for certifying a prior STEM degree, which must have been obtained in the ten years prior to the DSO recommendation. In addition, the regulatory text clarifies that the practical training opportunity that is the basis for the 24-month STEM OPT extension must directly relate to the degree that

qualifies the student for such extension, including a previously obtained STEM degree.

iv. Prior STEM Degrees—Additional Eligibility Requirements

This final rule includes a number of requirements intended to ensure the educational benefit of a STEM OPT extension based on a previously obtained STEM degree. First, for a student relying on a previously obtained degree, the student's most recent degree must also be from an accredited institution, and the student's practical training opportunity must be directly related to the previously obtained STEM degree. Second, for a previously obtained degree to qualify as the basis for a STEM OPT extension, the degree must have been received within the 10 years preceding the student's STEM OPT application date.

As previously noted, the final rule clarifies that the prior degree cannot have been conferred via an overseas campus. The institution that conferred the prior degree must be accredited and SEVP certified at the time the DSO recommends the student for the STEM OPT application.[92]

v. Volunteering and Bona Fide Employer-Employee Relationships

The final rule clarifies issues relating to various types of practical training scenarios and whether such scenarios qualify an F–1 student for a STEM OPT extension. The rule specifically clarifies that a student may not receive a STEM OPT extension for a volunteer opportunity. The rule also requires that a student must have a bona fide employer-employee relationship with an employer to obtain a STEM OPT extension. In response to comments received, DHS clarifies that students may be employed by start-up businesses, but all regulatory requirements must be met and the student may not provide employer attestations on his or her own behalf.

vi. Thesis Requirement

The final rule clarifies that F–1 students who have completed all other course requirements for their STEM degree may be eligible for a STEM OPT extension notwithstanding the

---

[91] U.S. Department of Education, NCES, Institute of Education Sciences, "Stats in Brief" (July 2009), available at *http://nces.ed.gov/pubs2009/2009161.pdf*.

[92] This final rule also clarifies that a qualifying, previously obtained degree provides eligibility for the STEM OPT extension so long as the educational institution that conferred the degree is accredited at the time of the student's application for the extension. As discussed more fully below, DHS does not have full access to historical information on accreditation for all U.S. schools. An organization's current status as accredited nonetheless serves as a signal of the quality of the education that the organization offers.

continuing need to complete the thesis requirement or equivalent for their STEM degree. DHS believes that this flexibility is consistent with DHS's historical interpretation of the regulatory provisions governing STEM OPT extensions. This exception, however, does not apply with respect to a previously earned STEM degree if the student seeks to base the STEM extension on such a degree.

2. Public Comments and Responses

i. Relationship of STEM OPT Opportunity to the Student's Degree

*Comment.* DHS received a number of comments regarding the proposed relationship between students' degrees and their practical training opportunities. Several commenters agreed with DHS that the rule should require a direct relationship between the student's qualifying STEM degree and the practical training opportunity. One commenter indicated that the Department needed to be flexible in evaluating such relationships, particularly because of rapid changes in certain STEM fields. Specifically, the commenter stated that "[i]n assessing whether a STEM degree relates to a particular position, it is important for DHS to be open to employers' explanations regarding the nexus between the STEM degree field and the employment opportunity." Other commenters suggested that STEM OPT students should work only in the exact fields in which they earned their degrees, rather than in other related fields where their skills may be valued by employers. One commenter opposed the requirement that work be directly related to the degree, especially in regard to prior STEM degrees. The commenter suggested that eliminating the nexus requirement would create greater opportunities for STEM OPT students.

*Response.* DHS does not believe further changes to the "directly related" standard are necessary or appropriate. DHS disagrees, on the one hand, with comments recommending that STEM OPT extensions only be allowed where the practical training will be in the exact field in which the F–1 student earned his or her degree. DHS also disagrees, on the other hand, with comments recommending the elimination of any connection between the degree and the practical training opportunity. DHS believes that the rule strikes the right balance between these two positions.

The requirement that the practical training opportunity be directly related to the student's degree ensures that the opportunity is an extension of the student's academic studies and enhances the knowledge acquired during those studies. The purpose of the rule is not to give students unlimited employment opportunities. At the same time, the "directly related" standard allows sufficient flexibility to give F–1 students a range of options when choosing how to apply and enhance their acquired knowledge in work settings. DHS recognizes that the knowledge acquired when earning a STEM degree typically can be applied in a range of related fields, and the Department does not seek to narrow such options for students; rather, this rule requires that the practical training opportunity be directly related to the F–1 student's field of study. Limiting opportunities to the exact field of study as named on the degree would create an unnecessary and artificial distinction, resulting in fewer opportunities for STEM OPT students.

DHS notes that the Training Plan required for a STEM OPT extension under this rule includes an entry for articulating how the practical training opportunity is directly related to the student's field of study. DHS will carefully consider this explanation, among other relevant evidence, when evaluating the relationship between the practical training opportunity and the student's degree.

*Comment.* One commenter stated that STEM OPT extensions should be granted based on the needs of U.S. industries. Specifically, the commenter recommended that DHS make extensions available to F–1 students who have earned degrees in fields that have a demonstrated need for workers, rather than to all fields on the STEM list.

*Response.* The primary purpose of this rule is to expand upon the academic learning of F–1 students in STEM fields through practical training, not to supply STEM workers or address labor shortages. Moreover, as noted previously, the NSF has reviewed the body of research in this area and concluded that there is no straightforward answer on whether there is a surplus or shortage of STEM workers.[93] Although it appears axiomatic that at any given time one industry may need workers more than another, the NSF has also found that labor needs in STEM fields are determined by factors other than industry, including level of education, training, and geographic location.[94] Due to the complex set of factors that combine to affect the supply and demand of STEM workers, and the fact that labor needs are in constant flux, DHS has concluded that it would not be administratively feasible to limit STEM OPT extensions based on industry-specific needs that would be complex and difficult to ascertain objectively. DHS declines to adopt the suggestion by the commenter.

*Comment.* Another comment suggested that because the DHS-approved STEM list is actually a list of major areas (*i.e.,* fields) of study, DHS should amend the proposed definition for the type of STEM degree that would qualify a student for a STEM OPT extension to refer to "program categories" instead of "degree programs." The commenter added that the reference to "program categories" would be more consistent with other parts of the regulation that also use that term.

*Response.* DHS agrees that the proposed definition could be confusing and has amended the regulatory text accordingly. The final rule now provides that the degree that is the basis for the STEM OPT extension must be a bachelor's, master's, or doctoral degree in "a field" determined by the Secretary, or his or her designee, to qualify within a science, technology, engineering, or mathematics field.

*Comment.* Several commenters requested that the STEM OPT extension program be broadened to include non-STEM degrees. For example, one commenter remarked that it "sometimes encounters individuals with excellent technical credentials whose decision to obtain an MBA or other non-STEM advanced degrees precludes them from continuing employment in the United States due to an inability to access STEM–OPT." Other commenters similarly suggested that STEM OPT extensions be available to students with non-STEM degrees by citing to the changing nature of higher education and the need for increased experiential learning in other fields. One commenter suggested that DHS should create a process for expanding practical training opportunities for foreign students in non-STEM fields.

*Response.* An expansion of practical training to non-STEM degrees would be outside the scope of this rulemaking. In 2015, there were more than 1.2 million international students studying in the United States, but only approximately 34,000 students on STEM OPT extensions. DHS did not propose to authorize an extension of OPT for the entire international student population, and will not authorize such an extension in this rule.

---

[93] *See supra* note 52.

[94] *Id.*

Moreover, as noted in the proposed rule, DHS received similar comments in response to the 2008 IFR creating the 17-month extension for STEM graduates. DHS has taken these concerns into consideration in crafting this rule, and the Department determined that extending OPT is particularly appropriate for STEM students because of the specific nature of their studies and fields and the increasing need for enhancement of STEM skill application outside of the classroom. DHS also found, as noted previously, that unlike post-degree training in many non-STEM fields, training in STEM fields often involves multi-year research projects [95] as well as multi-year grants from institutions such as the NSF. Although DHS recognizes that there may be some non-STEM fields in which a student could benefit from increased practical training, the Department believes the current 12-month post-completion OPT period is generally sufficient for such fields. For these reasons, DHS is limiting the STEM OPT extension to STEM fields at this time.

Finally, DHS also notes that the rule does expand the availability of STEM OPT extensions to certain STEM students with advanced degrees in non-STEM fields. Under the rule, a student who earns a STEM degree and then goes on to earn a non-STEM advanced degree, such as a Master of Business Administration (MBA), may apply for a STEM OPT extension following the MBA so long as the practical training opportunity is directly related to the prior STEM degree.

ii. Definition of "STEM Field" and the STEM List

*Comment.* Many commenters supported DHS's proposal to designate CIP codes in the STEM list at the two-digit level for the summary groups (or series) containing mathematics, natural sciences (including physical sciences and biological/agricultural sciences), engineering/engineering technologies, and computer/information sciences. Commenters stated that this approach would provide important clarity to the public, as well as flexibility as STEM fields change.

Many commenters emphasized the importance of also allowing STEM OPT extensions for certain students who studied in fields that are not classified

within the proposed definition of "STEM field." Some commenters stated that DHS should not base its definition of the term on the NCES definition alone.[96] Commenters stated that the Department of Education originally developed this definition in order to define the scope of a study of educational trends related to students who pursue and complete STEM degrees. One commenter argued that repurposing this categorization for the STEM OPT extension would produce an unnecessarily narrow definition of "STEM field" for the STEM OPT extension.

Similarly, another commenter advised that the NCES description of STEM fields "is too narrow to capture graduate level STEM fields, especially those being pursued by students who obtained their baccalaureate-level education outside the United States, and who have come here for more specialized STEM education." Another commenter stated that the proposed rule's definition would "create[] a static definition of STEM fields that fails to provide the flexibility to adapt to the latest innovations and discoveries in STEM." The commenter suggested that DHS clarify that it may add new CIP codes to the list beyond the summary groups specifically identified in the proposed regulatory text.[97]

Another commenter stated that DHS's definition of "STEM field" differs from the NCES definition of the term in that DHS has included "related fields" in its definition. The commenter believed that DHS's expanded definition would lead to requests for DHS to include in the new STEM list a number of fields that DHS had included in prior versions of the STEM list, but that did not fall within the summary groups that DHS identified in the NPRM (mathematics,

natural sciences (including physical sciences and biological/agricultural sciences); engineering/engineering technologies, and computer/information sciences). To address this concern, the commenter suggested that DHS include an innovation or competitiveness-related criterion as a factor in selecting STEM fields for inclusion on the list.

*Response.* DHS believes the NCES definition for "STEM field" provides a sound starting point for the definition of that term in this rule. First, the NCES definition draws on the Department of Education's expertise in the area of higher education. Second, the NCES definition identifies STEM fields using CIP terminology, which is widely used by U.S. institutions of higher education and provides a straightforward and objective measure by which DSOs and adjudicators can identify STEM fields of study. Consistent with the proposed rule, DHS has determined that four areas are core STEM fields and will list these four areas at the two-digit CIP code level. As a result, any new additions to those areas will automatically be included on the STEM list. These four areas are: Engineering (CIP code 14), Biological and Biomedical Sciences (CIP code 26), Mathematics and Statistics (CIP code 27), and Physical Sciences (CIP code 40).

DHS also recognizes that some STEM fields of study fall outside the summary groups (or series) identified in the NCES definition. As many commenters noted, the proposed rule defined "STEM field" to also include fields of study *related* to mathematics, natural sciences (including physical sciences, biological, and agricultural sciences), engineering and engineering technologies, and computer and information sciences. The "related fields" language in the STEM definition means that DHS may consider a degree to be in a STEM field even if not within the CIP two-digit series cited in the rule, and it authorizes DHS to designate CIP codes meeting the definition at the two-, four-, or six-digit level. DHS believes that the clarification provided here, coupled with the STEM list itself, are sufficient to address any concern about qualifying STEM degrees and therefore declines to amend the regulatory text.

DHS agrees, however, with comments suggesting that the "related fields" criterion alone may provide insufficient guidance and predictability to adjudicators and the public. Consistent with these commenters' suggestions and the basis of the STEM OPT extension, DHS has revised the regulatory text to clarify that in general, related fields will

---

[95] Many STEM OPT practical training opportunities are research related, as indicated by the fact that the employer that retains the most STEM OPT students is the University of California system and that two other universities are among the top six of such employers (Johns Hopkins University and Harvard University).

[96] The NCES definition of "STEM fields" includes "mathematics; natural sciences (including physical sciences and biological/agricultural sciences); engineering/engineering technologies; and computer/information sciences." U.S. Department of Education, NCES, Institute of Education Sciences, "Stats in Brief" 2 (July 2009), available at *http://nces.ed.gov/pubs2009/2009161.pdf*.

[97] One comment suggested that DHS clarify how it will map CIP codes to each of the listed summary groups if it retains these summary groups because, according to the commenter, neither the NPRM nor the Department of Education document provide enough detail to compare the proposed list to the current list, or to provide feedback on the scope of the proposed change. Another commenter asked whether DHS intended to retain fields on the list if they fell outside of the summary groups for mathematics, natural sciences, engineering/engineering technologies, and computer/information sciences. As noted above, as part of the 2015 NPRM, DHS offered for public comment the then-current STEM Designated Degree Program List, and specifically identified which codes it was considering designating at the two-digit level.

include fields involving research, innovation, or development of new technologies using engineering, mathematics, computer science, or natural sciences (including physical, biological, and agricultural sciences). DHS intends to list any such "related fields" at the 6-digit level.

*Comment.* DHS received a number of comments related to the process for updating the STEM list. One commenter recommended that DHS publish a list and provide for notice and comment regarding any fields DHS intends to add or remove. Other commenters proposed that, in order to retain flexibility to adapt the definition of eligible STEM fields to an innovative economy, DHS should make additions to the list through publication of updates in the **Federal Register** but without providing for notice and comment. Another commenter asked DHS "to create a system whereby applications to add fields to the STEM list can be made and acted upon quickly" but that "DHS provide a notice and comment period before eliminating specific fields from the STEM list."

*Response.* DHS agrees that the STEM list should be flexible and envisions making periodic updates to the STEM list in response to changes in STEM fields, academic programs, or technological trends. DHS will review recommendations from the public concerning potential additions or deletions to the list, and may announce changes through publication in the **Federal Register**. DHS intends to use a single procedure for amending the list and therefore disagrees with the commenter who recommended two different procedures for additions and deletions. Additionally, notice and comment publication for every change to the STEM list would hinder DHS's ability to be flexible and responsive to changes in STEM fields. DHS notes, however, that changes to the STEM list would be based on the regulatory definition of "STEM field," which was subjected to notice and comment. In addition, DHS has provided a mechanism for continuous feedback on the degrees included on the list and encourages interested parties to suggest changes by sending their recommendations to *SEVP@ice.dhs.gov.* DHS believes this language and the process described provide sufficient clarity for the continued regulatory implementation of the STEM list.

*Comment.* Many commenters requested that DHS include additional broad categories of degrees on the STEM list. For instance, some commenters requested that DHS include all science degrees. Others requested that DHS

include "certain essential fields in the health care and business sectors," without specifically identifying the specific fields they considered "essential." A commenter recommended adding to the STEM list programs with CIP codes within the summary groups (or series) for Business Management, Marketing, and Related Support Services (CIP code 52) and Homeland Security, Law Enforcement, Firefighting and Related Protective Services (CIP code 43). Other commenters recommended specific degrees for DHS to include in the STEM OPT extension. These proposed fields of study covered a wide range of subjects including patient-care fields such as nursing and dental sciences, business administration, exercise sciences, neuroscience, pharmaceuticals, economics, accounting, and geography. Some commenters stated that "financial engineering" and "quantitative finance" (fields that are potentially encompassed within the CIP code for Financial Mathematics) should not be on the list of qualifying fields as many of those students work for financial institutions, and some degree programs in those fields might not focus heavily on quantitative skills.

*Response.* DHS cannot fully respond to requests to include broad groups of degrees—such as degrees in certain "essential" health care and business fields—without an explanation as to why those fields should be included on the list. Nevertheless, DHS declines to define "STEM field" to generally include patient care and business fields of study. As noted above, these fields do not generally fall within the rubric of "STEM fields." For similar reasons, DHS declines to add all CIP codes that begin with 52 and 43. DHS notes, however, that the final STEM list that DHS is adopting with this rulemaking includes four CIP codes beginning with 52: Management Science; Business Statistics; Actuarial Science; and Management Science and Quantitative Methods, Other. The final STEM list also includes two CIP codes beginning with 43: Forensic Science and Technology, and Cyber/Computer Forensics and Counterterrorism.

DHS notes that a number of the additional fields that commenters recommended for inclusion on the STEM list are included in the final list DHS is adopting with this rulemaking. These include Medical Technology (CIP code 51.1005), Health/Medical Physics (CIP code 51.2205), Econometrics and Quantitative Economics (CIP code 45.0603), Exercise Physiology (CIP code

26.0908), Neuroscience (CIP code 26.1501), Pharmacoeconomics/Pharmaceutical Economics (CIP code 51.2007), Industrial and Physical Pharmacy and Cosmetic Sciences (CIP code 51.2009), Pharmaceutical Sciences (CIP code 51.2010),[98] and Geographic Information Science and Cartography (CIP code 45.0702).

With respect to suggestions to include certain accounting degree programs, DHS notes that accounting is not generally recognized as a STEM field and does not involve research, innovation, or development of new technologies using engineering, mathematics, computer science, or natural sciences (including physical, biological, and agricultural sciences). DHS is thus not generally including accounting degrees on the STEM List. DHS also disagrees with the suggestion to prohibit eligibility based on "financial engineering" and "quantitative finance" degrees. Financial Mathematics is a very specialized field that involves utilizing traditional research methods and applying scientific principles and rigorous mathematical concepts (such as stochastic calculus). These underlying principles, and not the end employer, dictate the bases for including this field on the STEM list.

*Comment.* Many commenters requested that DHS classify STEM CIP codes at the two-digit level to allow for more majors to qualify as bases for STEM OPT extensions. A commenter recommended that DHS consider identifying eligible CIP codes by the two-digit series of the CIP taxonomy, and that in cases where such series is too broad, DHS consider using the four-digit series, which "represent intermediate groupings of programs that have comparable content and objectives."

Some commenters requested that DHS include additional categories of degrees on the STEM list. One commenter recommended that DHS designate at the two-digit level a number of potentially "related fields," including Psychology (CIP code 42), Health professions and Related Programs (CIP code 51), Military Science, Leadership and Operational Art (CIP code 28), Military Technologies and Applied Sciences (CIP code 29), and Agriculture, Agriculture Operations, and Related Sciences (CIP

---

[98] DHS believes that those pharmacy-related CIP codes currently listed on the STEM list are in line with the STEM definition, whereas the recommendation of "Pharmacy" is too vague, and the other two recommendations, "Pharmacy Administration" and "Pharmacy Policy and Regulatory Affairs," fall outside the STEM definition.

**13076**   **Federal Register** / Vol. 81, No. 48 / Friday, March 11, 2016 / Rules and Regulations

code 1). The comment further recommended that DHS designate at the four-digit level "relevant 4-digit codes" from Architecture and Related Services (CIP code 04), Library Science (CIP code 25), Multi/Interdisciplinary Studies (CIP code 30), Homeland Security, Law Enforcement, Firefighting and Related Protective Services (CIP code 43), and Business, Management, Marketing, and Related Support Services (CIP code 52). The commenter stated that these changes would account for "the increasingly multidisciplinary nature of education, the needs of the STEM pipeline and STEM industry infrastructure, and other technically-based areas of national interest."

*Response.* DHS believes that outside of the categories for which DHS proposed moving to a two-digit designation, designation at the two- or four-digit level may result in overbroad eligibility. DHS reviewed the additional groups of CIP codes that were recommended for designation at the two- and four-digit level, and found that significant additional research would be necessary to determine whether all of the covered fields are appropriately characterized as STEM fields for purposes of this rule. DHS welcomes further input on these designations and others within the standard process for providing input on the STEM list.

*Comment.* DHS received a number of comments requesting that DHS explain whether the rule would effectively eliminate certain fields from the STEM list. Specifically, commenters were concerned that the following fields would be removed from the list: Architectural and Building Sciences/Technology (CIP code 4.0902), Digital Communication and Media/Multimedia (CIP code 9.0702), Animation, Interactive Technology, Video Graphics and Special Effects (CIP code 10.0304), Management Science (CIP code 52.1301), Business Statistics (CIP code 52.1302), Actuarial Science (CIP code 52.1304), Management Science and Quantitative Methods, Other (CIP code 52.1399), Archaeology (CIP code 45.0301), Econometrics and Quantitative Economics (CIP code 45.0603), Geographic Information Science and Cartography (CIP code 45.0702), and Aeronautics/Aviation/Aerospace Science and Technology, General (CIP code 49.0101).

*Response.* DHS has retained these fields in the final version of the list. These fields continue to fit within DHS's criteria for covered degrees.

### iii. Prior STEM Degrees—Application Process

*Comment.* DHS received a substantial number of comments pertaining to provisions allowing students to use previously earned degrees to apply for STEM OPT extensions. Many commenters, particularly DSOs, supported the inclusion of previously earned degrees. Other DSOs submitted comments requesting clarification regarding the process for DSOs to nominate students for STEM OPT extensions based on such degrees. Some comments expressed concern about the increased responsibilities these provisions would place on DSOs. To reduce DSO recordkeeping burdens, a few commenters recommended that a previously earned degree be allowed to suffice for nomination only if the student obtained the degree at his or her current school. Other commenters asked DHS to clarify how DSOs would verify the accreditation of other institutions, while other commenters questioned how DSOs would verify previously earned degrees from other institutions.

Some commenters stated that DSOs need clear guidance on how to determine whether a previously earned degree qualifies as a STEM degree sufficient to support a STEM OPT extension. Some commenters also stated that DSOs may have trouble verifying that a practical training opportunity is closely related to the student's prior field of study. Some commenters asked DHS to clarify whether the DSO at the school from which the student received his or her most recent degree would be the DSO responsible for verifying the Department of Education CIP code used to classify the student's previously earned degree. Many commenters noted that for students with double majors or dual degrees, only the primary major's CIP code is visible on the Form I–20 Certificate of Eligibility. Some commenters expressed an interest in displaying a CIP code history (*i.e.,* a complete list of the student's earned degrees) in SEVIS for ease of reference and verification for students who are applying based on previously earned STEM degrees.

*Response.* In response to commenters' concerns, DHS clarifies several requirements related to the use of previously earned degrees. First, a STEM OPT extension may be granted based on a previously earned degree if that degree is on the STEM list at the time of application for the STEM OPT extension, rather than at the time that the student received the degree. Second, the DSO at the school from which the student received his or her most recent

degree (*i.e.,* the DSO who recommended the student's current period of post-completion OPT) is the DSO responsible for verifying the CIP code(s) used to classify the student's previously earned degree. Finally, the institution that conferred the prior degree must be accredited and SEVP-certified at the time the DSO recommends the student for the STEM OPT extension.

Thus, prior to approving a student's STEM OPT extension based on a previously earned degree, the DSO must ensure that the student is eligible for the extension based on the degree, which includes verifying that the degree is on the current STEM list, that the degree directly relates to the practical training opportunity, and that the degree was issued by an institution that is currently accredited and SEVP-certified. DHS acknowledges that such verification may place an additional burden on DSOs. But DHS expects this burden will be minimal, as the required information should be readily accessible in most cases.

With respect to verifying previously earned degrees, DHS notes that many institutions already require information about such degrees from incoming students. As such, the certification required by this rule is consistent with an academic institution's normal review of its students' prior accomplishments. Additionally, for the majority of degrees granted in the past 10 years, recent and upcoming improvements to SEVIS may provide additional assistance to DSOs. CIP codes began appearing in SEVIS in 2008 and on Form I–20 Certificates of Eligibility in 2009, and in the December 2015 SEVIS upgrade, SEVP improved the student history section for DSO reference.[99] DHS is working toward an even more robust student history section. Based on these improvements, a significant amount of information related to previously earned degrees will be included in the SEVIS system and immediately available to DSOs. The Department also commits to providing additional training through SEVP to facilitate DSOs' ability to perform this work in an efficient manner.

With respect to determining whether a previously earned degree is in a STEM field, DHS notes that DSOs will only be required to determine whether the degree is on the current STEM list (*i.e.,* the list in effect at the time of the application for a STEM OPT extension), not the list in effect at the time that the degree was conferred. DSOs will not be required to review historical STEM lists.

---

[99] DHS will provide specific training and guidance related to this and other issues following publication of this rule and further SEVIS upgrades.

As such, DHS expects that verification of a previously earned degree in this regard will be no more burdensome than that required of a recently-earned STEM degree.

Similarly, with respect to the institution that conferred the prior degree, the rule does not require the DSO to verify whether the institution was accredited or SEVP-certified at the time the degree was conferred. The rule requires the DSO to determine only whether that institution is currently accredited and SEVP-certified. Regarding the accreditation requirement, the DSO may simply consult the Department of Education's Database of Accredited Postsecondary Institutions and Programs, or any other reasonable resource used by DSOs, to verify the institution's accreditation. Regarding SEVP-certification, the DSO may search the Certified Schools list available at *https://studyinthestates.dhs.gov/school-search*, to see if a student's educational institution is on the list at the time the DSO determines whether to make the recommendation.

Additionally, DHS understands the concerns raised by DSOs regarding students with double majors or dual degrees. DHS clarifies that in scenarios where a student has simultaneously earned a degree with a double major, or more than one degree, the DSO should first attempt to confirm eligibility through SEVIS data. If the DSO is unable to do so, the DSO may then consult the student's academic file at the DSO's own institution to review whether the qualifying STEM degree was listed on the student's application for admission. The DSO's educational institution either would already have access to that information or could request documentation from the student. For further clarity, DHS has amended the regulatory text at 8 CFR 214.2(f)(10)(ii)(C) in this final rule to include a specific reference to dual degrees.

Finally, although DHS shares commenters' goals of minimizing administrative burdens on DSOs and their institutions, the Department disagrees with the recommendation to allow STEM OPT extensions based on previously earned degrees only if such degrees are obtained from the students' current educational institutions. This restriction would severely limit educational options for F–1 students, as it would effectively require those who may wish to engage in extended practical training to pursue advanced degrees at the same institutions in which they had earned their prior degree(s). Indeed, the limitation may

even create disincentives to attend smaller colleges or other institutions that may not provide as many degree programs as larger universities. And it would disqualify students based on nothing more than their decision to switch institutions. Curtailing F–1 students' options with respect to educational institutions in the United States is inconsistent with the rule's objectives. Furthermore, as noted previously, DHS has considered the suggestion to shift the rule's recordkeeping and reporting obligations to students and employers and is currently developing technological capabilities aimed at reducing administrative burdens on DSOs, employers, and students.

*Comment.* DHS received comments seeking clarification on the specific types of information needed by DSOs to approve STEM OPT extensions based on previously earned STEM degrees. One commenter, for example, asked whether DSOs would need to provide SEVIS printouts when the necessary CIP codes do not appear on the Form I–20 Certificate of Eligibility but are found in SEVIS. The commenter also asked for information regarding the types of "authoritative evidence . . . regarding changes in CIP codes" that DSOs from prior institutions may provide "so that the STEM OPT-granting DSO has confidence that they are appropriately authorizing STEM OPT."

*Response.* DHS continues to upgrade the SEVIS system to bring clear, specific, and easily-accessible information to users. As the system evolves, DHS expects to update guidance concerning methods for acquiring and confirming CIP codes, and to provide specific training and guidance relating to these questions. DHS clarifies, however, that the Department will not generally require DSOs to provide SEVIS printouts, as SEVIS information is already available to DHS. For previously earned degrees, DSOs should provide, if it is available, the CIP code applicable at the time the degree was conferred. CIP codes are currently republished every ten years, and immediately prior versions remain available electronically through the National Center for Education Statistics Web site, with a crosswalk that connects any changes between current and prior versions.[100] DHS will take all circumstances into account when adjudicating the application and may

ask for additional information as needed.

iv. Previously Earned STEM Degrees—Eligibility Requirements

*Comment.* DHS received a number of comments applauding DHS's proposal to allow students to qualify for STEM OPT extensions based on previously earned STEM degrees. Some employers stated that this change will be especially helpful in retaining scientists who obtain higher-level degrees in public health fields, as well as engineers and scientists who pursue MBA and other advanced business degrees after receiving a STEM degree. Other commenters, however, expressed concern with the proposal. One commenter, for example, asserted that students who have "abandoned" their previous STEM degrees to study in another non-STEM field should not be allowed to obtain STEM OPT extensions. Another commenter stated that it was not clear from the regulatory text that an extension would be allowed "only to such students who seek to develop and utilize STEM skills from their prior STEM degree during the extended OPT period."

*Response.* DHS agrees with comments stating that the provision related to prior STEM degrees provides important educational and training benefits to accomplished students with STEM backgrounds. DHS acknowledges the benefits of combining STEM and non-STEM disciplines, as recognized by the majority of commenters who commented on this specific issue. DHS also disagrees with the notion that STEM students who subsequently pursue non-STEM degrees have "abandoned" their STEM degrees. It is not uncommon for STEM degrees to provide a foundation for career advancement in fields where multi-disciplinary backgrounds can be advantageous.[101] Moreover, as stated previously, the rule requires that any practical training during the STEM OPT extension period must be "directly related" to the STEM degree. This requirement applies with equal force to

---

[100] *See* U.S. Department of Education, National Center for Education Statistics, Classification of Instructional Programs (CIP) 2010, available at *http://nces.ed.gov/ipeds/cipcode/crosswalk.aspx?y=55.*

[101] As the National Science Foundation explained in its 2015 report entitled, "Revisiting The STEM Workforce: A Companion to Science and Engineering Indicators 2014," the education-to-occupation pathways in STEM fields are not always linear, and individuals who earn multiple degrees, such as a "STEM-educated lawyer or an individual with both a STEM degree and a Master of Business Administration degree can add unique value in a number of work settings." National Science Foundation, Revisiting the STEM Workforce: A Companion to Science and Engineering Indicators 2014 at 12 (Feb. 4, 2015), *http://www.nsf.gov/nsb/publications/2015/nsb201510.pdf.*

any such practical training based on a prior STEM degree.

*Comment.* One commenter requested clarification on when the 10-year "clock" starts for determining eligibility for STEM OPT extensions based on previously earned STEM degrees. The commenter requested that the final rule should clarify whether the 10-year period begins on the date of graduation listed on the diploma or the date on which all degree requirements were completed. Additionally, the commenter requested that DHS clarify the meaning of the term "application date" with respect to applications for STEM OPT extensions.

*Response.* DHS clarifies that the 10-year eligibility period for previously earned STEM degrees is determined from the date the degree was conferred, which would be the date on which the degree was earned or finalized, as reflected on the official transcript. For purposes of this rule, the application date is the date on which the DSO recommends the STEM OPT extension in SEVIS.

*Comment.* Commenters also submitted comments requesting that the proposed 10-year period for accepting previously earned STEM degrees be shortened. Such commenters asserted that the 10-year period is too long for various reasons, including because degree programs, as well as the STEM list, change over time. Some commenters also stated that students with older degrees would not be knowledgeable on current topics and research methods and would thus have to spend a greater portion of the STEM OPT extension learning new information rather than applying previously obtained knowledge.

*Response.* DHS agrees with commenters that a previously earned STEM degree should not be a basis for a STEM OPT extension if the degree was awarded in the distant past. DHS, however, believes that 10 years is a reasonable period for recognizing prior STEM degrees under this rule. DHS disagrees that students who earned STEM degrees in the last 10 years are necessarily behind peers who have earned their degrees more recently. A student in a STEM field that has changed since the student received his or her degree may very well have kept up with the state of knowledge in his or her field through employment, training, or other means.

Moreover, DHS notes that employers are likely to provide practical training opportunities to candidates who are qualified based upon their individual degrees and knowledge. As noted previously, this rule provides that when

a STEM OPT extension is based on a previously earned STEM degree, the practical training opportunity must be directly related to that previous degree. Based in part on this requirement, DHS expects that an employer will accept an F–1 student that the employer believes is qualified and prepared to engage in the offered position. While the pool of qualified STEM OPT candidates based on prior STEM degrees earned in the United States up to 10 years ago may be small, DHS believes the provision is an important feature of the final rule.

*Comment.* Commenters stated that the proposed rule did not address whether an F–1 student who earned a prior STEM degree in the United States while in another nonimmigrant status would qualify for STEM OPT extensions under this rule. In some cases, the commenters specifically recommended that DHS clarify that a current F–1 student who obtained a prior STEM degree in the United States while in H–4, L–2, or another nonimmigrant status would be eligible for a STEM OPT extension.

*Response.* DHS generally agrees with these comments and clarifies here that a current F–1 student who earned a prior STEM degree from a qualifying educational institution, regardless of whether he or she earned that prior degree as an F–1 student, may qualify for a STEM OPT extension so long as the degree otherwise meets the requirements for previously earned STEM degrees set out in this rule.

*Comment.* A number of commenters requested that the regulations explicitly provide that a student who completes a double major or obtains dual degrees—with one major or degree in a STEM field and the other not in a STEM field—would be eligible for a STEM OPT extension.

*Response.* DHS supports allowing students who previously graduated with dual degrees to participate in the STEM OPT extension so long as one of the prior degrees is an eligible STEM degree. In response to the comments received on this issue, DHS has made changes to the proposed regulatory text. The final rule now includes a specific reference to dual degrees in the regulatory text at 8 CFR 214.2(f)(10)(ii)(C).

*Comment.* One commenter requested certain clarifications to the proposal to allow students to use a previously earned STEM degree as a basis for a STEM OPT extension. Specifically, the commenter requested that DHS clarify that the proposal would allow STEM OPT extensions for the following students:

1. A student who completes a STEM degree and then subsequently completes a non-STEM degree;

2. A student who earns a non-STEM degree after previously completing a double major or receiving dual degrees, where one major or degree was in a STEM field and the other was not; and

3. A student who, while on post-completion OPT for a non-STEM degree, completes a STEM degree (*e.g.,* the student was concurrently enrolled in two degree programs, and finishes the non-STEM program first, obtains post-completion OPT on the completed non-STEM program, then subsequently completes the STEM program while on OPT).

To further clarify this proposal, the commenter suggested that DHS delete the words "previously" and "previous" in proposed 8 CFR 214.2(f)(10)(ii)(C)(*3*), amend the section with suggested language, and issue guidance to assist DSOs responsible for facilitating STEM OPT extensions on the basis of degrees from other institutions.

*Response.* DHS clarifies that the students in the first two scenarios described above would be able to request and obtain STEM OPT extensions if they are in compliance with all other OPT requirements, including that the practical training opportunity is directly related to the STEM degree. For the student in the third scenario, however, eligibility may depend upon the degree level of the student's STEM degree. In the commenter's description, the STEM degree was earned after the initiation of the student's current OPT period. Because the rule limits eligibility for STEM OPT extensions in this context to those degrees obtained "previous to the degree that provided the [12-month OPT period]," the subsequently earned degree would not qualify the student for an extension of his or her current OPT period. While the student would be unable to directly request a STEM OPT extension based on the new STEM degree, such a student may be able to start a new 12-month period of OPT based on that degree if the degree is of a more advanced level than the non-STEM degree. If the commenter's scenario, however, involved a student receiving two degrees at the same level (*e.g.,* both degrees are bachelor's degrees), the student could not start a new 12-month period of OPT based on the STEM degree.

DHS considered making adjustments to the rule to allow STEM OPT extensions for all students described in the third scenario, but the Department decided against making such changes after weighing several factors. First,

DHS does not believe that the situation described in the third scenario is very common. Second, future students who find themselves in that scenario can preserve eligibility for STEM OPT extensions simply by waiting to request post-completion OPT until after completing the coursework toward their STEM degrees. Based on the small number of students impacted and the relative ease with which such students can retain STEM OPT eligibility, DHS concluded that the benefit to such students was outweighed by the administrative complexity presented in allowing STEM OPT extensions based on subsequently earned STEM degrees awarded at the same degree level. For these reasons, DHS has not agreed to make the changes recommended by the commenter. DHS will address any remaining confusion through training and guidance.

v. Volunteering, Employer-Employee Relationships, and Related Matters

DHS received several comments concerning various types of practical training scenarios and whether they qualify under the STEM OPT extension provisions of this rule. For the reasons described below, DHS has determined that as a result of the rule's general requirements, a student seeking a STEM OPT extension will not be allowed to use a volunteer opportunity as a basis for a STEM OPT extension. In addition, a STEM OPT extension must involve a bona fide employer-employee relationship. Finally, DHS clarifies that under this final rule students may seek practical training opportunities with start-up businesses, so long as all regulatory requirements are met. Such students may not provide employer attestations on their own behalf.

*Comment.* Some commenters requested that F–1 students be allowed to gain practical training as volunteers during their STEM OPT extensions. Relatedly, a commenter asked DHS "to carve out a limited exception to allow volunteering at the student's academic institution to qualify as 'employment' for purposes of maintaining F–1 status."

*Response.* DHS carefully considered whether to allow volunteer positions to qualify under the STEM OPT extension program but has decided against permitting such arrangements. Among other things, DHS is concerned that allowing volunteering would increase the potential for abuse on the part of international students who may accept volunteer positions for no reason other than a desire to extend their time in the United States. DHS is also concerned that allowing volunteering positions could undermine the protections for

U.S. workers contained in the rule, including the requirement that F–1 students on STEM OPT extensions receive compensation commensurate to that provided to similarly situated U.S. workers. Similarly, disallowing volunteering avoids potentially negative impacts on U.S. workers who may otherwise be denied paying research opportunities because universities, professors, or other employers would be able to retain F–1 student(s) for extended periods as volunteers. Requiring commensurate compensation for F–1 students—which does not include no compensation—protects both international and domestic students and ensures that the qualifying STEM positions are substantive opportunities that will equip students with a more comprehensive understanding of their selected areas of study and provide broader functionality within their chosen fields.

*Comment.* DHS received several comments concerning various types of employment relationships and whether F–1 students could request STEM OPT extensions based on such relationships. For example, commenters suggested that an F–1 student be allowed to obtain a STEM OPT extension based on a business established and staffed solely by the student. Commenters stated that such a change would allow students to remain in the United States to start their own companies, while also improving their ability to directly benefit from their own innovations. Other commenters suggested that DHS allow STEM OPT students to engage in employment with more than two employers and be employed through a temporary agency or a consulting firm arrangement that provides labor for hire. A commenter asked DHS to clarify its position relating to placement agencies, asserting that there may be some legitimate situations in which a staffing company that supervises STEM students should not be prohibited from participating in the STEM OPT extension. In addition, a commenter suggested that DHS expand the definition of "supervisor" to include advisory board members of venture capital firms, faculty advisors, and "start-up mentors." The commenter stated that many start-up companies are not able to offer salaries before they become profitable (instead offering compensation plans that might include stock options or alternative benefits), and recommended that DHS allow STEM OPT students to work for such companies.

*Response.* There are several aspects of the STEM OPT extension that do not make it apt for certain types of

arrangements, including multiple employer arrangements, sole proprietorships, employment through "temp" agencies, employment through consulting firm arrangements that provide labor for hire, and other relationships that do not constitute a bona fide employer-employee relationship. One concern arises from the difficulty individuals employed through such arrangements would face in complying with, among other things, the training plan requirements of this rule. Another concern is the potential for visa fraud arising from such arrangements. Furthermore, evaluating the merits of such arrangements would be difficult and create additional burdens for DSOs. Accordingly, DHS clarifies that students cannot qualify for STEM OPT extensions unless they will be bona fide employees of the employer signing the Training Plan, and the employer that signs the Training Plan must be the same entity that employs the student and provides the practical training experience. DHS recognizes that this outcome is a departure from SEVP's April 23, 2010 Policy Guidance (1004–03).

DHS, moreover, anticipates that it will be very unusual, though not expressly prohibited, for students to work with more than two employers at the same time during the STEM OPT extension period, given that each employer must fully comply with the requirements of this rule and employ the student for no less than 20 hours per week.

DHS also clarifies that F–1 students seeking STEM OPT extensions may be employed by new "start-up" businesses so long as all regulatory requirements are met, including that the employer adheres to the training plan requirements, remains in good standing with E-Verify, will provide compensation to the STEM OPT student commensurate to that provided to similarly situated U.S. workers, and has the resources to comply with the proposed training plan. For instance, alternative compensation may be allowed during a STEM OPT extension as long as the F–1 student can show that he or she is a bona fide employee and that his or her compensation, including any ownership interest in the employer entity (such as stock options), is commensurate with the compensation provided to other similarly situated U.S. workers.

vi. Thesis Requirement

*Comment.* One commenter asked for clarification about a possible contradiction between USCIS and SEVP policies. Specifically, the commenter stated that on October 6, 2013, USCIS

issued an interim policy memorandum (PM 602–0090) that clarified that an F–1 student engaging in post-completion OPT is eligible for a STEM OPT extension if the student has completed all course requirements, except for the thesis, dissertation, or equivalent requirement, when applying for the extension.[102] The commenter noted that SEVP had not yet provided a written update consistent with this USCIS policy memorandum, but instead had previously issued guidance indicating that before a DSO could recommend a STEM OPT extension, the DSO needed to ensure that the student had already finished his or her thesis. Another commenter asked DHS to clarify whether the completion of a STEM degree is a requirement before a student can apply for a STEM OPT extension, as the proposed rule referenced the ''completion'' of a degree.

*Response.* DHS clarifies that an F–1 student engaging in a 12-month period of post-completion OPT based on the completion of coursework toward a STEM degree is eligible for a STEM OPT extension based on that same degree if the only outstanding requirement for obtaining the degree at the time of application is the completion of a thesis (or equivalent). As USCIS noted in the cited policy memorandum, because the STEM OPT extension is an extension of a previously granted period of post-completion OPT, it is logical to conclude that students who are applying for the STEM OPT extension need not necessarily have completed their STEM degree thesis requirement (or equivalent) in order to be eligible for the extension. DHS believes that this policy serves the nation's interest in attracting and retaining talented STEM students from around the world.

This option, however, is not applicable to a request for a STEM OPT extension based on a previously obtained STEM degree; in such a case, the prior STEM degree must be fully conferred. The provision on previously obtained degrees requires that the student must have received the degree itself within 10 years preceding his or her STEM OPT application date. In order to have received the degree, the student would have needed to complete his or her thesis (or equivalent), if such a requirement pertains to the degree. Moreover, DHS does not believe it would be necessary or appropriate to

excuse the thesis requirement for previously earned STEM degrees. Importantly, the option to use a previously earned STEM degree as the basis for a STEM OPT extension is for students who are participating in a 12-month period of OPT based on the completion of coursework toward a non-STEM degree at a higher educational level. Because such students have been admitted to degree programs at a higher educational level, DHS anticipates that such students would have already received their lower-level STEM degrees. Moreover, because the rule allows previously earned STEM degrees to qualify if they were conferred up to 10 years ago, DHS believes the need for conferral of the degree would further ensure the integrity of the program and reduce the possibility of fraud.

Finally, DHS does not agree that there are contradictions between the USCIS policy memorandum and the ICE guidance cited in the comments. The USCIS policy memorandum is consistent with the position taken by SEVP in the ICE Policy Guidance (1004–03) with respect to the completion of a thesis (or equivalent). For example, section 6.7 of the ICE policy guidance states that a student in a graduate-level program who has completed all course requirements except for completion of the thesis (or equivalent) may apply for either pre-completion or post-completion OPT while completing the thesis. A student in this situation who applies for and receives post-completion OPT may work full-time in a field related to his or her degree; may apply for the STEM OPT extension if otherwise eligible; and would be eligible for the Cap-Gap extension.[103] As noted above, however, such a student would be eligible for a STEM OPT extension only if that extension is based on the same STEM degree that is the basis for the student's current 12-month period of OPT. A student who is on a 12-month period of OPT based on a non-STEM degree and who seeks a STEM OPT extension based on a previously earned STEM degree must have completed all requirements for conferral of the STEM degree—including any applicable thesis requirement (or equivalent).

*D. Qualifying Employers*

1. Description of Final Rule and Changes From NPRM

The final rule imposes certain additional requirements on employers as a condition of employing STEM OPT students. This rule requires all such

employers to participate in E-Verify and to make a number of attestations intended to better ensure the educational benefit of STEM OPT extensions and the protection of U.S. workers. The proposed rule included these provisions, and the final rule retains them with certain changes and clarifications in response to public comments. We summarize these provisions and changes below.

i. Employer Enrollment in E-Verify Required

This final rule requires all employers training STEM OPT students to participate in E-Verify, as has been required since 2008. E-Verify electronically compares information contained on Form I–9, Employment Eligibility Verification, with records contained in government databases to help employers confirm the identity and employment eligibility of newly-hired employees. DHS includes this requirement because E-Verify is a well-established and important measure that complements other oversight elements in the rule, and because it represents an efficient means for employers to determine the employment eligibility of new hires, including students who have received STEM OPT extensions.

ii. Use of E-Verify Company ID Number

DHS adopts the regulation as proposed with regard to E-Verify, but has modified Form I–983, Training Plan for STEM OPT Students, so that it will not require the insertion of an employer's E-Verify Company Identification number (E-Verify ID number). DHS makes this change in response to comments that raised concerns regarding the potential for fraud that may arise from requiring this number on a form accessible by other program participants, including students and DSOs.

iii. Employer Attestations

As noted in further detail below (*see* section IV.F. of this preamble, Training Plan for F–1 Nonimmigrants on a STEM OPT Extension), the rule requires the student and employer to complete Form I–983, Training Plan for STEM OPT Students. Given DHS' recognition of the need to protect U.S. workers from possible employer abuses of the STEM OPT extension, the Training Plan contains terms and conditions for employer participation aimed at providing such protection. For instance, under the rule, any employer wishing to hire a student participating in the STEM OPT extension must attest that, among other things: (1) The employer has sufficient resources and personnel

---

[102] USCIS Policy Memorandum PM–602–0090, 17-Month Extension of Post-Completion Optional Practical Training (OPT) for F–1 Students Enrolled in Science, Technology, Engineering, and Mathematics (STEM) Degree Programs, available at *http://www.uscis.gov/sites/default/files/files/nativedocuments/OPT_STEM.pdf.*

[103] *See www.ice.gov/doclib/sevis/pdf/opt_policy_guidance_042010.pdf.*

available to provide appropriate training in connection with the specified opportunity; (2) the STEM OPT student will not replace a full- or part-time, temporary or permanent U.S. worker; and (3) the opportunity assists the student in attaining his or her training goals. As described below, DHS has revised the second of these attestations in response to public comments. DHS believes that the revised language is clearer and better protects U.S. workers.

Finally, consistent with the proposed rule, the final rule requires that the terms and conditions of an employer's STEM practical training opportunity—including duties, hours and compensation—be commensurate with those provided to the employer's similarly situated U.S. workers. Work duties must be designed to assist the student with continued learning and be set at a minimum of 20 hours per week. If the employer does not employ and has not recently employed more than two similarly situated U.S. workers, the employer must instead ensure that the terms and conditions of a STEM practical training opportunity are commensurate with those for similarly situated U.S. workers employed by other employers of analogous size and industry and in the same geographic area of employment. The term "similarly situated U.S. workers" includes U.S. workers performing similar duties and with similar educational backgrounds, employment experience, levels of responsibility, and skill sets as the STEM OPT student. The student's compensation must be reported on the Training Plan, and the student and employer will be responsible for reporting any change in compensation to help the Department monitor whether STEM OPT students are being compensated fairly. The employer must affirm that all attestations contained in the Training Plan are true and correct to the best of the employer's knowledge, information and belief.

2. Public Comments and Responses

i. Employer Enrollment in E-Verify Required

*Comment.* Many commenters expressed support for requiring employers of F–1 students with STEM OPT extensions to participate in E-Verify as proposed. Several commenters stated that the E-Verify requirement is an effective way to protect against employment of unauthorized individuals. They observed that E-Verify provides the best means available for employers to confirm employment eligibility of new hires and, in some

cases, existing employees. Comments also reported that E-Verify is easy to use and clearly lays out the consequences of violations, while helping avoid hiring abuses.

Some commenters noted that employers would be less likely to use E-Verify unless such use was required. Other commenters stated that the extra burden and expense placed on employers by the E-Verify requirement helps protect U.S. workers by providing an incentive for employers to hire U.S. citizens over international students. Other commenters criticized the E-Verify requirement on the grounds that it also created a burden for students by limiting where they could receive work-based training. Some commenters noted that employers are willing to incur E-Verify-related burdens because they believe that an F–1 student may be their only candidate for the specific job.

*Response.* DHS agrees with commenters that support the E-Verify enrollment requirement, including because E-Verify contains important protections for U.S. and other workers. Before an employer can participate in E-Verify, the employer must enter into a Memorandum of Understanding (MOU) with DHS. This MOU requires that employers follow required procedures in the E-Verify process to ensure maximum reliability and ease of use with the system, while preventing unauthorized disclosure of personal information and unlawful discriminatory practices based on national origin or citizenship status. In particular, the employer agrees not to use E-Verify for pre-employment screening of job applicants or in support of any unlawful employment practice.[104] The employer further agrees to comply with Title VII and the Civil Rights Act of 1964 and section 274B of the INA, 8 U.S.C. 1324b, by not discriminating unlawfully against any individual in hiring, firing, employment eligibility verification, or recruitment or referral practices because of his or her national origin or citizenship status, or by committing discriminatory documentary practices. Illegal practices can include selective verification, improper use of E-Verify, or discharging or refusing to hire employees because they appear or sound "foreign" or have received tentative nonconfirmations.

The MOU also makes clear that USCIS may suspend or terminate an employer's access to E-Verify if the employer

violates Title VII or section 274B of the INA, 8 U.S.C. 1324b, fails to follow required verification procedures, or otherwise fails to comply with E-Verify requirements. Any employer who violates the immigration-related unfair employment practices provisions in section 274B of the INA could face civil penalties, including back pay awards. Employers who violate Title VII face potential back pay awards, as well as compensatory and punitive damages. Under the MOU, employers who violate either section 274B of the INA or Title VII may have their participation in E-Verify terminated. DHS may also immediately suspend or terminate the MOU, and thereby the employer's participation in E-Verify, if DHS or the Social Security Administration determines that the employer failed to comply with established E-Verify procedures or requirements.

DHS disagrees with comments asserting that E-Verify will impose significant burdens or costs on employers or students.[105] First, E-Verify does not require a fee for its use. Second, the E-Verify requirement remains unchanged since it was first established in the 2008 IFR, and DHS is not aware of significant burdens or costs on employers that have participated in the STEM OPT extension program since that time. In fact, while in 2008 there were just over 88,000 employers enrolled in E-Verify, there are now more than 602,000 enrolled employers.[106] Third, E-Verify is fast and accurate, with 98.8 percent of employees automatically confirmed as authorized to work either instantly or within 24 hours.[107] Finally, E-Verify is one of the federal government's highest-rated services for customer satisfaction as measured by employer surveys,[108] and DHS

---

[104] *See* U.S. Citizenship and Immigration Services, The E-Verify Memorandum of Understanding for Employers, available at *http://www.uscis.gov/sites/default/files/USCIS/Verification/E-Verify/E-Verify_Native_Documents/MOU_for_E-Verify_Employer.pdf.*

[105] When DHS studied E-Verify costs, 76% of responding employers stated that the cost of using E-Verify was zero ($0). *See* Westat study evaluating E-Verify, "Findings of the E-Verify Program Evaluation" at 184 (Dec. 2009). Available at *http://www.uscis.gov/sites/default/files/USCIS/E-Verify/E-Verify/Final%20E-Verify%20Report%2012-16-09_2.pdf.*

[106] USCIS, History and Milestones, *https://www.uscis.gov/e-verify/about-program/history-and-milestones.*

[107] USCIS, E-Verify Program Statistics: Performance, *http://www.uscis.gov/e-verify/about-program/performance.*

[108] Since 2011, USCIS has collected information through E-Verify surveys, which reflect high rates of customer satisfaction by employers. For example, the employer 2014 Customer Satisfaction Index of USCIS E-Verify rose one point from 2013 for a score 87 (on a scale from 1–100) for all and existing users, and 86 for new enrollees. Moreover, since 2010, employer users have been highly satisfied with E-Verify and the E-Verify CSI number has never scored below the low 80s. See The E-Verify Customer Satisfaction Survey, July 2015 available at
Continued

continually looks for ways to improve and enhance the system.

*Comment.* Commenters also supported the E-Verify requirement because its increased use further maximizes the reliability and ease of use of the system, while preventing the unauthorized disclosure of personal information and unlawful discriminatory practices based on national origin or citizenship status. Many commenters stated that when using E-Verify pursuant to program requirements, an applicant's citizenship is less likely to be disclosed to employers, and E-Verify employers are more likely to provide the same job opportunities, wages, and benefits to employees. Some commenters stated that E-Verify helps ensure that employers will recruit applicants to meet their needs without negatively affecting the employment of U.S. workers. They added that these requirements thus ensure the integrity of the STEM OPT extension.[109]

*Response.* DHS agrees with comments supporting the E-Verify requirement, including because E-Verify protects against the unauthorized disclosure of personal information. E-Verify has implemented an extensive set of technical, operational and physical security controls to ensure the confidentiality of an individual's information. Those controls include user-specific accounts and complex passwords that must be changed often to access the system; user accounts that are locked after several failed attempts to log on; active session timeouts within the E-Verify interface; data encryption during all data transmissions between the employer's workstation and the system; and procedures for reporting and responding to breaches of information. DHS continues to incorporate privacy principles and security measures into all E-Verify processes, and any changes to E-Verify will include the highest level of privacy protections possible.[110]

*Comment.* A number of commenters stated their belief that E-Verify's non-discrimination provisions will ensure

that all employees will receive the same wages and benefits.

*Response.* DHS clarifies that the non-discrimination provisions in the E-Verify MOU prohibit only discrimination based on national origin or citizenship (or immigration) status in violation of section 274B of the INA, 8 U.S.C. 1324b, or Title VII. The language is not intended to ensure that all employees will receive the same wages and benefits, except where any differential is based on national origin status. DHS notes, however, that the STEM OPT extension program contains separate provisions to prevent adverse impacts on U.S. workers. Among other things, the Training Plan established by this rule requires employers to attest to various wage and other protections for U.S. workers and STEM OPT students.

*Comment.* One commenter stated that employers and the academic community are not familiar with E-Verify and suggested that DHS promote and explain it to stakeholders.

*Response.* DHS agrees that it is important to promote and explain E-Verify to stakeholders, and the Department continues to focus on such outreach. Additionally, the USCIS Web site contains an informative portal (*http://www.uscis.gov/e-verify*) with a number of resources regarding E-Verify, including but not limited to E-Verify manuals and guides; various memoranda of understanding; E-Verify brochures, fliers and presentations (in English and various other languages); presentations specially designed for employers, workers, federal contractors, and state workforce agencies; and the E-Verify monthly newsletter.

*Comment.* One commenter suggested that DHS either apply the E-Verify participation requirement to the entire OPT program or waive it as a requirement for STEM OPT extensions.

*Response.* DHS disagrees with the commenter's recommendation that the E-Verify requirement either be applied to the entire OPT program or waived as a requirement for STEM OPT extensions. The focus of this rule is to amend regulations related to STEM OPT extensions. There are, of course, many cases in which DHS could condition receipt of a benefit on the use of E-Verify, but the Department has chosen to take a measured and incremental approach by thus far applying the E-Verify requirement to employers of STEM OPT workers. DHS notes that this approach has so far been highly successful. DHS may consider requiring the use of E-Verify with respect to other benefits granted by the Department in future rulemakings.

*Comment.* Several commenters recommended eliminating the E-Verify requirement. These commenters cited several concerns, including that E-Verify may increase burdens and expenses on both employers and employees; unfairly limit job options and career opportunities for STEM OPT students, because many companies are not willing to participate in E-Verify; and create an unnecessary barrier to the hiring of qualified F–1 students. Some commenters stated that the E-Verify requirement is redundant for students in compliance with STEM OPT rules and instead simply works against the interest of those students.

*Response.* E-Verify is not new for employers of STEM OPT students. Since 2008, every employer that has employed F–1 students on STEM OPT extensions has been required to enroll the relevant hiring site or work location in E-Verify. Because E-Verify is fast and easy to use (as discussed above) and STEM OPT employers have experience with the system, DHS does not believe the requirement would be particularly burdensome to potential employers affected by this rule. Relatedly, DHS also disagrees that the E-Verify requirement will substantially change the volume of STEM OPT employers or unfairly limit job options for STEM OPT students.

*Comment.* One commenter provided anecdotal information suggesting that a specific Federal agency does not currently participate in E-Verify. According to that commenter, if a federal agency is unwilling to register for E-Verify, "what hope is there that non-governmental employers will utilize the system?" Another commenter stated that companies with federal employment contracts do not have policies reflecting E-Verify's prohibitions against unlawful discriminatory practices based on national origin or citizenship status.

*Response.* DHS supports the premise that the Federal Government should lead by example, and notes that the Office of Management and Budget (OMB) requires all Executive Branch agencies to participate in E-Verify. The Federal Government also requires covered federal contractors to participate in E-Verify as a condition of federal contracting. Even if a federal contractor that uses E-Verify does not have its own policies reflecting E-Verify's prohibitions against unlawful discriminatory practices based on national origin or citizenship status, that federal contractor is bound to the same prohibitions, as articulated in the E-Verify Memorandum of Understanding, regarding violation of Title VII and the

---

*http://www.uscis.gov/sites/default/files/USCIS/ Verification/E-Verify/E-Verify/E-Verify_Native_Documents/ E-Verify_Annual_Customer_Satisfaction_Survey_ 2015.pdf.*

[109] Additionally, one commenter supported the regulation generally, but expressed a misunderstanding about the process and the E-Verify program, writing that the "Government will check that if the company really need [sic] those F1 students or not and decide to give them E-verify or not." DHS notes that a need-based check is not part of the E-Verify enrollment or participation process.

[110] *See* U.S. Citizenship and Immigration Services, "Our Commitment to Privacy," available at *http://www.uscis.gov/e-verify/about-program/ our-commitment-privacy.*

anti-discrimination provision of the INA (INA sec. 274B, 8 U.S.C. 1324b) applicable to all E-Verify users.

*Comment.* One commenter suggested that the E-Verify requirement should depend on the size of the employer's workforce or on the employer's specific industry.

*Response.* DHS disagrees with the commenter's recommended change because of the inequities such a change would introduce into E-Verify. Requiring all STEM OPT extension employers to enroll in E-Verify, without exception, supports a consistent and transparent program that treats all participants the same and helps protect both STEM OPT students and U.S. workers. Further, E-Verify's robust public outreach materials and frequent technological enhancements reduce burdens on all employers, large and small. Finally, when E-Verify employers sign the required Memorandum of Understanding, they agree to train their users on proper employment verification procedures. This is in addition to the obligation to avoid unlawful discriminatory practices based on national origin or citizenship status. Waiving the E-Verify requirement for certain employers would thus undermine the safeguards of the rule.

*Comment.* Several commenters supported mandatory E-Verify participation for all employers, with resulting fines for any program violations, and recommended that DHS require all employers to use E-Verify. Another commenter requested more government regulation of E-Verify. Another commenter suggested additional regulation of E-Verify, but did not specify what such regulation would entail. Additionally, a commenter suggested that the E-Verify parameters should include ''better screening [mechanisms] to weed out'' participation by what the commenter described as dishonest consulting companies that exploit students.

*Response.* With respect to requiring all employers to use E-Verify, DHS notes both (1) that this request is outside the scope of this rulemaking and (2) that because participation requirements are set by federal statute, congressional action would be required to make any such changes. With respect to the other suggestions noted above, DHS notes that the E-Verify MOU already prescribes E-Verify enrollment and use, and broadly prohibits unlawful or improper use of E-Verify. USCIS also maintains an E-Verify Hotline and a Monitoring and Compliance Division that investigates and responds to complaints regarding E-Verify-related exploitation. The Department does not agree that

additional mechanisms are necessary, and to the extent that the comments are directed at the E-Verify program generally, they are outside the scope of this rulemaking.

Accordingly, DHS is finalizing the proposed E-Verify requirement without change. DHS invites employers and employees to learn more about E-Verify. Tutorials, guidance, and other informative resources are available at *http://uscis.gov/e-verify.* Information about employer obligations and employee rights under the anti-discrimination provision of the INA (INA sec. 274B, 8 U.S.C. 1324b) is available on the following Web site: *www.justice.gov/crt/about/osc.*

ii. Use of E-Verify Company ID Number

*Comment.* Several commenters recommended eliminating the requirement that the employer's E-Verify ID number be listed on Form I–983, Training Plan for STEM OPT Students, because having this information visible to the student and DSO could lead to fraudulent use of such numbers. According to two commenters, some employers currently refuse to provide their E-Verify ID number to students or universities due to fraud concerns and have adopted processes to avoid revealing this sensitive information, such as filing the students' STEM OPT extensions themselves.

One commenter cited anecdotal reports of E-Verify ID numbers being posted online and F–1 students fraudulently using those numbers to apply for STEM OPT extensions. According to the commenter, there is no follow-up or investigation as to whether the student actually works for the employer whose number is listed on Form I–765, Application for Employment Authorization, so students can freely pass these numbers around, and have reportedly done so. The commenter also asked DHS to bolster E-Verify anti-fraud measures by allowing the employer to file the application instead of the prospective employee. Similarly, another commenter asked DHS to give employers a list of F–1 students who have used their E-Verify ID numbers as a security measure.

*Response.* DHS is concerned about the possible abuse of the E-Verify program and potential fraud from the unauthorized publication of E-Verify ID numbers. In addressing this issue, DHS had considered that employers often provide their E-Verify ID numbers to potential employees in order to apply for work authorization from USCIS by filing Applications for Employment

Authorization.[111] In addition, some employers and universities make their E-Verify ID numbers available on the internet. For that reason, DHS believed that releasing such numbers to a limited group of students would not represent a significant fraud risk.

DHS understands, however, that some employers take significant steps to protect their E-Verify ID numbers from publication, including mailing Applications for Employment Authorization directly to USCIS on their employees' behalf in order to avoid revealing the number to such employees. Some employers believe that the unauthorized release or publication of an employer's E-Verify ID number could result in significant fraud that might be difficult to redress. Accordingly, in response to these concerns, DHS has decided to remove the E-Verify ID number from the Training Plan for STEM OPT Students. DHS notes that it will continue to receive such employers' E-Verify ID numbers through the submission of Applications for Employment Authorization.

DHS declines to adopt the suggestion to change the current STEM OPT application process so that the employer (rather than the student) would be required to file the Application for Employment Authorization on the student's behalf. This change, in which the employer would effectively become the applicant for employment authorization, would represent a significant policy shift and could produce broad and unwanted repercussions. Among other things, such a change would largely and improperly exclude the STEM OPT student from the application process, and further make the student dependent on the employer for maintaining the student's status. DHS believes such a change to its longstanding policy would be disproportionate to the relatively few alleged cases of fraud. Finally, DHS declines to adopt the recommendation to provide employers with lists of F–1 students, due to privacy considerations and the administrative burdens related to issuing such lists.

iii. Non-Replacement Attestation

*Comment.* Several commenters voiced concern about the breadth of some of the language in the Employer Certification section (Section 4) of the proposed Mentoring and Training Plan, stating that such language could create litigation risks or interfere with

---

[111] *See* item #17 on Form I–765, available at *http://www.uscis.gov/sites/default/files/files/form/i-765.pdf.*

employers' business judgments. Specifically, several employers and business associations took issue with proposed certification 4(d), which would require the employer to attest that "the Student's practical training opportunity will not result in the termination, laying off, or furloughing of any full- or part-time, temporary or permanent U.S. workers."

Those commenters stated that the proposed attestation was overly broad and problematic. One commenter stated that this language could restrict the employer's ability to terminate a U.S. worker for cause. As an example, the commenter added that "if an employee's work performance was deficient enough to warrant termination for cause, but the employee's work group also had employees working pursuant to STEM OPT, one could argue that the termination could not proceed." Another commenter stated that "if an employee working pursuant to STEM OPT reported another employee for egregious misconduct, and the allegations were substantiated, an employer would be unable to proceed with a termination of the individual."

To alleviate these concerns, commenters alternatively requested that DHS entirely eliminate the attestation requirement, delete the word "terminate" from the attestation, or change the language to read as follows: "The employer is not providing the practical training opportunity for the purpose of and with the intent to directly terminate, lay off, or furlough, any full- or part-time, temporary or permanent U.S. workers." Additionally, a commenter recommended amending the proposed rule to include a "presumption of non-violation for any employment decisions" that are supported by bona fide business reasons or reasons unrelated to replacing U.S. workers with STEM OPT students. Finally, another commenter proposed that DHS consult protections provided to U.S. workers pursuant to provisions in the H–1B regulations.

*Response.* DHS believes many of the recommendations described above would undermine the protections the attestation is meant to provide to the U.S. workers of participating employers. In this rulemaking, the Department has sought to balance the benefit that STEM OPT students derive from practical training opportunities; the benefit that the U.S. economy, U.S. employers, and U.S. institutions of higher education receive from the continued presence of STEM OPT students in the United States; and the protection of U.S. workers, including those employed by STEM OPT employers. The attestation

related to U.S. employees is essential to achieving this balance, and the Department thus declines to eliminate it or to weaken its protections by introducing elements of intent or including a presumption of non-violation.

DHS, however, has made changes to the attestation in the final rule in response to comments expressing concern that the proposed attestation, including its reference to "terminating," could be understood to prohibit STEM OPT employers from terminating U.S. workers for cause. In instituting this policy, the Department intends that employers be prohibited from using STEM OPT students to replace full- or part-time, temporary or permanent U.S. workers. DHS has revised certification 4(d) on the Training Plan, and the associated regulatory text, to say exactly that. *See* Section 4 of Form I–983, Training Plan for STEM OPT Students; 8 CFR 214.2(f)(10)(ii)(*C*)(*10*)(*ii*). This modification is meant to address employers' claims about potential litigation risks and interference with their business judgments. DHS also notes that the word "terminating" has been removed entirely from the attestation, as the Department believes its inclusion is unnecessary to make certain that STEM OPT extensions are not used as a mechanism to replace U.S. workers.

DHS further clarifies that hiring a STEM OPT student and signing certification 4(d) does not bar an employer from discharging an employee for cause, including inadequate performance or violation of workplace rules. DHS will look at the totality of the circumstances to assess compliance with the non-replacement certification. For example, evidence that an employer hired a STEM OPT student and at the same time discharged a U.S. worker who was employed in a different division, worked on materially different project assignments, or possessed substantially different skills, would tend to suggest that the U.S. worker was not replaced by the STEM OPT student. Conversely, evidence that an employer sought to obscure the nexus between a STEM OPT student's hire and the termination of a U.S. worker by delaying or otherwise manipulating the timing of the termination would tend to suggest that the U.S. worker was replaced by the STEM OPT student. In any event, the barred "replacement" of U.S. workers refers to the loss of existing or prior employment.

With respect to the comment suggesting that DHS consult the protections for U.S. workers found in the H–1B statute, DHS notes that it

considered those protections and other similar provisions in the INA. DHS relied on many of these provisions as informative guideposts for this rulemaking, but the Department was also required to weigh the specific and different goals of the STEM OPT extension program and other factors specific to this rulemaking. The Department believes it has found the right balance with revised certification 4(d). This revised certification makes the Department's policy clear and thus provides protection for U.S. workers while addressing the legitimate business concerns raised by commenters.

*Comment.* Some commenters requested that DHS amend certification 4(d) to further protect U.S. workers. These commenters asked that the certification: (1) More broadly prohibit an employer from employing a STEM OPT student when the employer has laid off any U.S. worker employed in the occupation and field of the intended practical training within the 120-day period immediately preceding the date the student is to begin his or her practical training with that employer; and (2) during the term of such practical training, require the employer to lay off any F–1 student before laying off any U.S. worker engaged in similar employment. The commenters further proposed that the relevant section of the proposed regulation be amended to prohibit an employer from providing practical training when there is a strike or lockout at any of the employer's worksites within the intended field of the OPT.

*Response.* DHS agrees that STEM OPT employment should be subject to strike or lockout protections. DHS notes, however, that current DHS regulations already provide such protections with regard to the employment of all F–1 students, not just those on STEM OPT extensions. The Department's regulations at 8 CFR 214.2(f)(14) automatically suspend any employment authorization granted to an F–1 student when the Secretary of Labor or designee certifies to DHS that there is a strike or other labor dispute involving work stoppage in the student's occupation at his or her place of employment. That regulation will remain in effect.

DHS has also considered the suggestion to establish a timeframe, such as the 120-day period suggested by commenters, for prohibiting layoffs of U.S. workers related to the employment of STEM OPT students. DHS believes, however, that its approach in the final rule, which contains no such timeframe, provides reasonable protections for U.S. workers while also balancing the legitimate business needs expressed by

STEM000100

employer commenters. Under the final rule, an employer cannot replace a U.S. worker with a STEM OPT student, regardless of the timeline. DHS therefore declines to implement new attestations on this subject at this time, but will remain attentive to the effects of the attestations and the aforementioned balance produced by this rule, and may consider revising or supplementing the employer attestations at a future date.

### iv. Commensurate Compensation Attestation

*Comment.* DHS received a number of comments on the requirement that employers provide STEM OPT students with compensation commensurate with that provided to similarly situated U.S. workers. Some commenters supported the proposed "commensurate compensation" requirement, "applaud[ing] DHS's adoption of a standard that draws upon real world practices that employers already utilize in their hiring practices." One commenter stated that the evidentiary requirements related to the commensurate compensation provision should not be so burdensome as to deter the participation of small employers or employers new to the OPT program.

Other commenters opposed the proposed requirement, suggesting that the proposal was unworkable because DHS had not defined the commensurate compensation standard in the proposed regulatory text. One commenter stated that the proposed rule lacked necessary guidance on how to ensure that compensation offered to STEM OPT students is commensurate with compensation levels offered to U.S. workers. Another commenter stated that the requirements for commensurate compensation were too stringent because STEM OPT should include students who are performing unpaid work or are awarded grants or non-monetary remuneration. A significant number of comments, from universities and higher education associations, stated that STEM OPT students and U.S. students perform research for colleges and universities under a variety of grant and stipend programs without necessarily receiving taxable wages, and requested clarification that such participation was still contemplated for STEM OPT participants. In contrast, another commenter urged that students doing unpaid work, or receiving only a "stipend," be explicitly ineligible for OPT status. Another commenter stated that the proposed additional protections for American workers would prove to be "meaningless" due to a variety of purported deficiencies in the proposed regulation, including participation by

employers who hire only foreign workers. One commenter recommended that employers be allowed to factor in the effect of training time on productivity when setting compensation. One commenter suggested that employers be required to pay the Level Three wage from the Online Wage Library provided by the Department of Labor's Office of Foreign Labor Certification.

*Response.* The final rule includes specific requirements to address the potential for adverse impact on U.S. workers. For instance, any employer wishing to hire a student on a STEM OPT extension would, as part of the newly required Training Plan, be required to sign a sworn attestation affirming that, among other things: (1) The employer has sufficient resources and personnel available and is prepared to provide appropriate training in connection with the specified opportunity; (2) the student will not replace a full- or part-time, temporary or permanent U.S. worker; and (3) the opportunity assists the student in attaining his or her training objectives. Moreover, the final rule requires that the terms and conditions of an employer's STEM practical training opportunity—including duties, hours and compensation—be commensurate with those provided to the employer's similarly situated U.S. workers.

Along the same lines, work duties must be designed to assist the student with continued learning and satisfy existing ICE guidelines for work hours when participating in post-completion OPT. To help gauge compliance, employers are required to provide DHS with student compensation rate information, which will help the Department monitor whether STEM OPT students are being compensated fairly. Additionally, the rule authorizes a recurrent evaluation process and mandates notification of material changes to the Training Plan, including material changes to STEM OPT student compensation, to allow ICE to monitor student progress during the OPT period. The evaluations will ensure continuous focus on the student's development throughout the student's training period. Finally, the rule clarifies the Department's authority to conduct site visits to ensure compliance with the above requirements.

The above provisions protect against adverse consequences on the U.S. labor market, including consequences that may result from exploitation of STEM OPT students. DHS believes that the assurances regarding the practical training opportunity, the attestation of non-replacement of existing employees,

the requirement for commensurate compensation, and other related requirements, provide adequate safeguards to protect U.S. worker interests. DHS expects this will still be the case even if a participating employer employs many non-U.S. workers. If such an employer does not employ and has not recently employed more than two similarly situated U.S. workers in the area of employment, the employer nevertheless remains obligated to attest that the terms and conditions of a STEM practical training opportunity are commensurate with the terms and conditions of employment for other similarly situated U.S. workers in the area of employment.

DHS expects that STEM OPT students will be engaging in productive employment. DHS also expects the commensurate compensation of similarly situated U.S. workers would account for any effects of training time on productivity. While it is required for participating students and employers to explain the goals, objectives, supervision, and evaluation of a STEM OPT period, the fact that the employer is providing a work-based learning opportunity is not a sufficient reason to reduce the F–1 student's compensation. Furthermore, such a discounted compensation also runs the risk of having a negative impact on similarly situated U.S. workers. A commenter's suggestion to this effect is thus rejected.

DHS also disagrees with comments stating that the proposed rule lacked adequate guidance on the issue of commensurate pay and suggesting further definition in the regulatory text. These commenters did not explain which aspects of DHS's guidance on this topic were ambiguous; nevertheless, DHS now further clarifies the commensurate compensation requirement. Commensurate compensation refers to direct compensation provided to the student (pre-tax compensation). This compensation must be commensurate to that provided to similarly situated U.S. workers. "Similarly situated U.S. workers" means those U.S. workers who perform similar duties and have similar educational backgrounds, experience, levels of responsibility, and skill sets. The employer must review how it compensates such U.S. workers and compensate STEM OPT students in a reasonably equivalent manner. If an employer, for example, hires recent graduates for certain positions, the compensation provided to a STEM OPT student in such a position must be in accordance with the same system and scale as that provided to such similarly situated U.S. workers.

STEM000101

**13086** **Federal Register** / Vol. 81, No. 48 / Friday, March 11, 2016 / Rules and Regulations

If the employer, however, does not employ or has not recently employed at least two other U.S. workers who are performing similar duties, then the employer is obligated to obtain information about other employers offering similar employment in the same geographic area. Helpful information can be obtained, for example, from the Department of Labor, which provides wage information based on data from the Occupational Employment Statistics survey through its Office of Foreign Labor Certification's Online Wage Library, available at *http:// flcdatacenter.com/OesWizardStart.aspx.* Whether relying on information from the Department of Labor, wage surveys, or other reasonable sources, the wage data must relate to the same area of employment as the work location of the STEM OPT student and the same occupation. In general, it is DHS's expectation that employers have legitimate, market-based reasons for setting compensation levels. This rule requires that an employer hiring a STEM OPT student be prepared to explain those reasons and show that such F–1 students receive compensation reasonably equivalent to similarly situated U.S. workers.

In addition to these detailed requirements, DHS noted in the preamble of the proposed rule, and reiterates here, that DHS interprets the compensation element to encompass wages and other forms of remuneration, including housing, stipends, or other provisions typically provided to employees. While positions without compensation may not form the basis of a STEM OPT extension, the compensation may include items beyond wages so long as total compensation is commensurate with that typically provided to U.S. workers whose skills, experience, and duties would otherwise render them similarly situated. Any deductions from salary must be consistent with the Department of Labor's Fair Labor Standards Act regulations at 29 CFR part 531 regarding reasonable deductions from workers' pay. The combination of all the information here provides a sufficient basis for compliance with the rule's commensurate compensation provision.

In short, DHS believes that the protections provided in this rule are sufficient, but the Department will continue to monitor the program and may consider revising or supplementing program requirements at a future date.

*Comment.* A commenter stated that the proposed rule lacks an enforcement mechanism to ensure compliance with the provisions included to protect American workers. The commenter

stated that the proposed rule provides no process to report and adjudicate suspected violations of the protections for U.S. workers, and fails to include any penalties for doing so. The commenter also stated that if the STEM OPT student is ''contract[ed] out'' by the employer, DHS's ability to enforce the attestations will be significantly circumscribed.

*Response.* There are a number of enforcement and oversight mechanisms built into the rule that will facilitate compliance, as detailed above (see section IV.B. of this preamble). These include reporting requirements, site visits, periodic evaluation of a student's training, and required notification of any material changes to or deviations from the Training Plan. In addition, individuals may contact the Student and Exchange Visitor Program at ICE by following the instructions at *https:// www.ice.gov/sevis/contact.* Finally, violations of the regulation may also be reported through the form accessible at *https://www.ice.gov/webform/hsi-tip-form.* For the reasons previously stated, DHS believes that the new protections for U.S. workers in this rule—which are unprecedented in the 70-year history of the overall OPT program—provide a reasonable and sufficient safeguard.

*Comment.* The same commenter wrote that the rule should include more protections for U.S. workers; the commenter suggested that the rule should (1) require an approval process for employers similar to the process for approving schools that admit nonimmigrant students and (2) explain what constitutes sufficient resources and personnel in the employer attestation statement. Finally, the commenter suggested that the rule should also address discriminatory hiring advertisements that seek to recruit only OPT students, including by providing a remedy for Americans who are replaced by OPT students.

*Response.* For the reasons previously stated, DHS believes that the protections for U.S. workers in this rule provide a reasonable and sufficient safeguard. With respect to the specific alternatives proposed by the commenter: Item (1) would be extremely burdensome and resource intensive for DHS, and item (2) requests clarification for language that DHS believes is either self-explanatory or sufficiently addressed elsewhere in this preamble. Of course, DHS stands ready to provide further clarification through guidance as needed.

Finally, DHS does not anticipate that the application of this rule will result in discriminatory hiring. The rule in no way requires or encourages employers to target students based on national

origin or citizenship, particularly through any type of hiring advertisements. Rather, the rule protects against employment discrimination by requiring that an employer make and adhere to an assurance that the student on a STEM OPT extension will not replace a full- or part-time, temporary or permanent U.S. worker. Furthermore, existing federal and state employment discrimination laws and regulations provide appropriate authorities for addressing and remedying employment discrimination. In particular, employers that generally prefer to hire F–1 students over U.S. workers (including U.S. citizens), or that post job advertisements expressing a preference for F–1 students over U.S. workers, may violate section 274B of the INA, 8 U.S.C. 1324b, which is enforced by the Department of Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices. This anti-discrimination provision provides for civil penalties and backpay, among other remedies, for employers found to have violated the law. Such authorities clearly fall within certification 4(e) on the Form I–983, Training Plan for STEM OPT Students, which establishes a commitment by the employer that the training conducted under STEM OPT ''complies with all applicable Federal and State requirements relating to employment.''

*Comment.* Some commenters stated that because STEM OPT participants are students, they would not be comparable to similarly situated U.S. workers, who are not students.

*Response.* DHS disagrees that STEM OPT students cannot be compared to other members of the labor force. Conditions experienced by an F–1 student participating in the STEM OPT extension should be the same as those experienced by U.S. workers performing similar duties and with similar educational backgrounds, employment experience, levels of responsibility, and skill sets. If a university, for example, hires individuals who have just completed courses of study for certain positions, the university cannot use a different scale or system to determine the compensation of a STEM OPT student. The STEM OPT student must be compensated commensurate with the compensation provided to such similarly situated U.S. workers.

*Comment.* One commenter suggested that employers should be required to provide compensation figures for all of their employees, not just STEM OPT employees.

*Response.* The employer is required to identify the compensation provided to each STEM OPT student, as part of the

Training Plan the employer signs. DHS also reserves the right to ask employers to provide the evidence they used in assessing the compensation of similarly situated U.S. workers. This may include compensation figures for similarly situated employees who are U.S. workers. Requiring employers to report compensation figures for all U.S. worker employees, however, would not necessarily provide meaningful data. STEM OPT students will use their knowledge and skills to perform duties and assume responsibilities that are not similar to those, for instance, of corporate management or mailroom employees.

iv. Other Comments on Attestations and Restrictions

*Comment.* DHS received a number of comments suggesting that additional attestations or other restrictions, including recruitment requirements, be added to further protect U.S. workers. A number of commenters stated that companies should be unable to hire anyone but a U.S. citizen until U.S. citizens are all employed, whether in on-the-job training positions or regular staff positions. One commenter stated that ''[o]nly when a position cannot be filled by a U.S. worker should an international worker be considered; this is especially true for entry level positions since many international students have the benefit of experience or additional education in their home country before beginning their OPT qualifying degree program and are not truly 'entry level' employees.'' One commenter proposed additional provisions to safeguard U.S. workers, including requiring companies to look for U.S. citizen workers before hiring international students and having the U.S. Department of Labor fine companies that did not comply with the proposed labor protections. Another comment referenced opinions of a professor who stated that STEM OPT contributes to employers hiring younger workers who may replace more-experienced U.S. workers, and suggested that recruitment requirements favoring experienced U.S. workers be added to the rule.

One commenter also suggested that DHS amend the rule consistent with section 212(a)(5)(A) of the INA, 8 U.S.C. 1182(a)(5)(A), which designates as inadmissible any foreign national ''seeking to enter the United States for the purpose of performing skilled or unskilled labor'' absent a certification from the Department of Labor that such employment will not adversely affect similarly employed U.S. workers. According to the commenter, this provision required DHS to include a recruitment requirement for STEM OPT employers and a role for the Department of Labor. Some commenters similarly stated that the Department of Labor should review all employer submissions with respect to hours and wages. Another commenter suggested that DHS add a labor condition application requirement and petition process similar to those used for seeking H–1B visas.

*Response.* DHS carefully considered the suggestions to include recruitment requirements in the STEM OPT extension program but has determined not to include such requirements at this time. DHS notes that it has implemented a number of new protections for U.S. workers and STEM OPT students in this rule, including the requirement to pay commensurate compensation, the prohibition against replacing U.S. workers, various reporting requirements, and clarifying the agency's authority to conduct site visits. Balanced within the broader goals of this rule, DHS has determined that these protections are sufficient. The Department, however, will continue to evaluate these protections and may choose to include new attestations or other requirements in future rulemakings.

With regard to the suggestion that DHS is not in compliance with section 212(a)(5) of the INA, this provision is limited, by definition, to certain individuals seeking permanent immigrant status. *See* INA sec. 212(a)(5)(D), 8 U.S.C. 1182(a)(5)(D). The provision does not apply to students in F–1 nonimmigrant status or to any other nonimmigrant seeking employment in the United States.

With regard to suggestions to provide a greater role for the Department of Labor, DHS appreciates that the Department of Labor's long experience with foreign labor certification might assist DHS in its ongoing administration of the STEM OPT extension. Accordingly, where it may prove valuable and as appropriate, DHS may consult with the Department of Labor to benefit from that agency's expertise.

*E. STEM OPT Extension Validity Period*

1. Description of Final Rule and Changes from NPRM

This final rule sets the duration of the STEM OPT extension at 24 months. Following seven years of experience with the 17-month STEM OPT extension implemented in the 2008 IFR, DHS re-evaluated the length of the extension, primarily in light of the educational benefits such training provides to F–1 students and the benefits such students provide to the U.S. economy and other national interests. Consistent with the proposed rule, this final rule increases the STEM OPT extension period to 24 months for students meeting the qualifying requirements. The 24-month extension, when combined with the 12 months of initial post-completion OPT, allows qualifying STEM students up to 36 months of practical training.

Also consistent with the proposed rule, the final rule provides, for students who subsequently attain another STEM degree at a higher educational level, the ability to participate in an additional 24-month extension of any post-completion OPT based upon that second STEM degree. In particular, the rule would allow a student who had completed a STEM OPT extension pursuant to previous study in the United States and who subsequently obtained another qualifying degree at a higher degree level (or has a qualifying prior degree, as discussed in more detail below), to qualify for a second 24-month STEM OPT extension upon the expiration of the general period of OPT based on that additional degree.

This aspect of the rule is finalized as proposed.

2. Public Comments and Responses

i. Length of STEM OPT Extension Period

*Comment.* Many commenters expressed support for the proposed 24-month STEM OPT extension period. One commenter stated that this length, in combination with the 12-month post-completion OPT period, aligns well with the typical training period for doctoral students, as well as the three-year grants often provided by the NSF to such students. A commenter commended the three-year total insofar as it ''mirrors a cycle of research and training that is more in line with real-world, practical applications.'' Another commenter, who self-identified as an F–1 student in Electrical Engineering, suggested that the 24-month period for a STEM OPT extension would dovetail with many research and development projects and was an appropriate time period because it would further encourage employers to allow STEM OPT students to gain practical experience related to their fields of study. The student explained that a summer internship on a power generation project could lead to a post-completion training opportunity with the same company if the STEM OPT extension was finalized for a 24-month period.

STEM000103

Another commenter stated that "most development projects are done on a yearly basis," and that by lengthening the STEM OPT extension period to 24 months, students would be eligible to participate in STEM OPT for multiple project cycles. One commenter welcomed the proposed 24-month extension because it provided "added flexibility" for workforce planning needs. That commenter explained that this change could improve innovation and development of new products and services, and it could help STEM students gain necessary experience for their own career growth.

A commenter added that the extension period would allow students to gain more "hands-on practical experience" by working on new products and initiatives that are more complex and that have a longer development cycle. One commenter suggested that the 24-month extension would greatly benefit research activities. This commenter opined that such extensions would help students by providing a period of stay consistent with the research needs in the commenter's field, which would also benefit the commenter's future job prospects in the commenter's home country.

Some commenters recommended a longer STEM OPT extension, most commonly 36 months, thus increasing practical training to a total of 48 months for STEM students. Other commenters suggested a total STEM OPT period as long as six years. Some commenters sought longer extensions so as to allow students additional attempts at applying for and obtaining H–1B visas.

*Response.* Currently, DHS views a 24-month extension as being sufficient to attract international STEM students to study in the United States, and to offer a significant opportunity for such students to develop their knowledge and skills through practical application. Moreover, as stated elsewhere, the 24-month period—in combination with the 12-month post-completion OPT period—is based on the complexity and typical duration of research, development, testing, and other projects commonly undertaken in STEM fields. Such projects frequently require applications for grants and fellowships, grant money management, focused research, and publications. As such, they usually require several years to complete. For instance, NSF typically funds projects through grants that last for up to three years.[112] As the NSF is

the major source of federal funding for grants and projects in many STEM fields, including mathematics and computer science, DHS believes the standard duration of an NSF grant served as a reasonable benchmark for determining the maximum duration of OPT for STEM students. DHS reiterates that the focus of this rule is to enhance educational objectives, not to allow certain graduates more opportunities to apply for or obtain H–1B visas.

*Comment.* Some commenters viewed the 24-month extension as too lengthy, stating that a promising individual does not need an additional 24 months to prove his or her worth in a position. One comment quoted a university professor as stating that "[i]t's an over-reach to claim that someone who completes a master's degree in as little as 12 months needs three years interning—at low or no pay in many cases—to get further training." The commenter stated that few STEM OPT graduates will work on an NSF grant-funded project and that "[v]irtually all of the STEM graduates will work in the private sector on applied projects and tasks where lengths are typically 6 months or less." The commenter did not provide a basis for these factual assertions.

*Response.* The purpose of the 24-month extended practical training period is to provide the student an opportunity to receive work-based guided learning and generally enhance the academic benefit provided by STEM OPT extensions. The purpose is not to have the student prove his or her worth. DHS disagrees with the implication that the extension will not effectively enhance and supplement the individual's study through training. Consistent with many comments received from higher education associations and universities, DHS believes that allowing students an additional two years to receive training in their field of study would significantly enhance the knowledge and skills such students obtained in the academic setting, benefitting the students, U.S. educational institutions, and U.S. national interests.

Moreover, while DHS agrees it is possible that some STEM OPT students may not "need" the extension, DHS expects that many qualifying students

(including master's students) will receive significant educational benefits from the extension. Based on the public comments received, DHS expects that some students in some fields and degree programs in fact would benefit from more than three years of practical training. DHS concludes, however, that conditioning the period of employment authorization on case-by-case demonstrations of need would significantly increase burdens on the Department and potentially yield inefficient and inconsistent adjudications. DHS also disagrees with the notion that the STEM OPT extension allows internships at little or no pay; this rule specifically prohibits that kind of activity. Based on the above, DHS considers 24-month STEM OPT extensions, combined with the other features of this rule, sufficient to serve the purpose of this rule while appropriately protecting U.S. worker interests.

*Comment.* Some commenters stated that DHS did not base the proposed 24-month duration on sufficient information. One commenter stated that his first post-college software development project took one year, and that "[t]he average time a new graduate stays at a first job is only 18 months." The commenter did not cite the source of this information or state whether the 18-month figure applies to STEM graduates only.

*Response.* The anecdotal information provided by the commenter about the commenter's first software development project contradicts many other comments in the record stating that the proposed extension length was consistent with their experience in STEM fields generally. The commenter's general statement about the average time a graduate stays at a first job is unsupported; DHS has no basis to determine whether this figure relates to STEM students specifically, or what the relationship might be between this figure and the appropriate period of time for practical training.

*Comment.* Several commenters suggested differentiating STEM OPT extension periods by grade or degree level. One commenter recommended that doctoral students should obtain longer OPT periods than others.

*Response.* DHS has decided to extend OPT periods based on field of study—specifically, for students completing requirements for their degrees that are in STEM fields—rather than based upon education level. As noted above, this rule recognizes the need to strengthen the existing STEM OPT extension, in significant part, to enhance the integrity and educational benefit of the program

---

[112] National Science Foundation, *Grant Proposal Guide.* sec. II.c.2.a.(4)(b), available at *http://www.nsf.gov/pubs/policydocs/pappguide/nsf15001/*

*gpg_index.jsp* ("The proposed duration for which support is requested must be consistent with the nature and complexity of the proposed activity. Grants are normally awarded for up to three years but may be awarded for periods of up to five years."). For instance, NSF funding rate data show that in fiscal years 2012–2014, grant awards for biology were provided for an average duration of 2.87, 2.88, and 2.81 years, respectively.

in order to help maintain the nation's economic, scientific, and technological competitiveness. Additionally, a primary basis for extending OPT to 24 months for STEM students is, as stated above, the complexity and typical duration of research, development, testing, and other projects commonly undertaken in STEM fields. This policy is also consistent with DHS practice, which has traditionally not extended the length of the OPT period based upon level of degree. For all these reasons, DHS declines to incorporate the commenter's request to extend the validity period of the extension based upon degree level.

*Comment.* A commenter suggested a total post-completion OPT period of three to four months. The commenter stated that a shorter OPT period was necessary to prevent wages from declining and to avoid "pit[ting] foreign students against [U.S.-based workers] in [the] job market." Another commenter stated that "[p]erhaps if the program is short enough, employers will treat it as mutually beneficial training rather than a more long-term employment prospect."

*Response.* To the extent the commenters seek a change in the overall OPT program, the comment is outside the scope of the rulemaking. And for the reasons stated above, DHS has determined that an OPT extension of three to four months would be insufficient for students in the STEM fields to further the objectives of their courses of study by gaining knowledge and skills through on-the-job training. Additionally, this rule includes safeguards for the interests of U.S. workers.

### ii. Availability of a Second STEM OPT Extension

*Comment.* One commenter requested that DHS provide further explanation as to "why a foreign student would need a *second* 2-year extension period after receiving an advanced STEM degree, when the student has already enjoyed a full 3 years of OPT after the initial STEM degree." The commenter stated that, at a minimum, DHS should require a student who seeks a second STEM OPT extension to show that the advanced degree is in a field completely different from the undergraduate degree field. A commenter similarly requested that DHS limit the extension to once per lifetime, stating that the increased duration "has the potential to blur the line between a student visa and an employment visa."

*Response.* DHS disagrees with the commenter's suggestion that a second two-year STEM OPT extension be contingent upon obtaining an advanced degree in a completely different field. Such a requirement could stifle a student's effort to specialize and build substantial expertise in a selected field of interest, whereas affording a second two-year STEM OPT extension could encourage the student to invest further in his or her education to develop greater expertise or specialization within the STEM field. In addition, an enormous range of practical training opportunities may exist within a given field. For example, a student could initially graduate with a bachelor's degree in microbiology, physics, or engineering and conduct academic research during the first STEM OPT extension. Then, the student could return to school to obtain a masters or doctoral degree in the same field and use a second STEM OPT extension to obtain practical training in a more specialized or industrial capacity. Allowing only one lifetime STEM OPT extension may unnecessarily disincentivize specialization in these important and innovative fields.

### iii. Other Comments Related to Multiple Extensions

*Comment.* One commenter sought clarification on whether the proposed rule would allow a student to obtain two consecutive STEM OPT extensions, with one directly following the other. Another commenter stated that a footnote in the preamble to the proposed regulation suggested that an international student who earns successive qualifying STEM degrees "will be unable to link this extension with his or her first extension." The commenter recommended that DHS clarify that an international student who qualifies for two OPT extensions may complete them without any disruption in his or her practical training, provided all other requirements are met.

*Response.* DHS clarifies that the final rule, as with the proposed rule, does not allow students to obtain back-to-back STEM OPT extensions. A STEM OPT extension can only be granted as an extension of a regular OPT period, and not as a freestanding period of practical training. A student who has already participated in a STEM OPT extension would need to engage in a new course of study and subsequently complete a new initial post-completion practical training period before applying for a second STEM OPT extension based on a new STEM degree or a previously obtained degree (other than a degree that had already been the basis for a STEM OPT extension). The new or previously obtained STEM degree would need to be at a higher level than the STEM degree that formed the basis of the first STEM OPT extension. For program integrity reasons, DHS believes that it would be inappropriate to allow a student to obtain two consecutive STEM OPT extensions without an intervening degree and period of post-completion OPT.

*Comment.* Some commenters recommended that DHS consider allowing a third extension for students, thereby allowing one grant per higher education degree level (*i.e.,* bachelor's, master's, and Ph.D.). One such commenter noted that "[l]imiting the number of lifetime grants to two STEM periods would negatively impact Ph.D. graduates who do not already have an H–1B or qualify for another classification of employment authorization."

*Response.* More often than not, nonimmigrant students do not take extended breaks after graduating from a master's program before pursuing a doctoral degree.[113] For that reason, it would be rare for a Ph.D. student to use one STEM OPT extension for the master's portion of the degree, and another STEM OPT extension for the Ph.D. portion of the degree. Most doctoral degrees are combined into a single program which grants both master's degrees and doctoral degrees. DHS believes that the two extensions provided by this rule are consistent with typical education patterns and sufficient to provide the educational, economic, and cultural benefits intended by the rule.

*Comment.* Commenters requested that a student be allowed multiple extensions for multiple degrees earned at the same educational level.

*Response.* DHS has considered these comments. Longstanding administration of the F–1 visa classification and the OPT program, *see* 8 CFR 214.2(f)(10), has required students to move to higher education levels before qualifying for additional periods of OPT, so that practical experience is more likely to be progressive in quality and scope. DHS has determined that limiting additional periods of OPT, including a second STEM OPT extension, to a new educational level continues to be a legitimate construct to protect program integrity and better ensure work-based learning for F–1 students is progressive.

This higher degree requirement has long attached to 12-month post-completion OPT. Because 24-month

---

[113] SEVIS data as of January 28, 2016, shows that approximately 88 percent of students who had been at a master's education level and subsequently enrolled in a program at the doctoral level did so within one year of the end of their master's course of study.

STEM OPT extensions only are available to individuals completing their 12-month post-completion OPT period, individuals by definition can only obtain a STEM OPT extension after completing a higher education level. The policy in this final rule merely recognizes that longstanding policy.

### F. Training Plan for F–1 Nonimmigrants on a STEM OPT Extension

#### 1. Description of Final Rule and Changes from NPRM

Central to the STEM OPT extension is a new training plan requirement to formalize the relationship between the F–1 student's on-the-job experience and the student's field of study and academic learning. The rule requires the submission of Form I–983, Training Plan for STEM OPT Students (Training Plan), jointly executed by the F–1 student and the employer, but permits an employer to utilize certain training programs already in place. The proposed rule included this provision; DHS included the provision in the final rule, with changes and clarifications in response to public comments. We summarize these provisions and changes below.

#### i. General Training Plan Requirement and Submission Requirements

The rule requires a formal training program for STEM OPT students in order to enhance and better ensure the educational benefit of STEM OPT extensions. The employer must agree to take responsibility for the student's training and skill enhancement related to the student's field of academic study. The student must prepare a formalized Training Plan with the employer and submit the plan to the DSO before the DSO may recommend a STEM OPT extension in the student's SEVIS record. If the student intends to request an extension based on a previously-obtained STEM degree, the plan must be submitted to the institution that provided the student's most recent degree (*i.e.,* the institution whose official is certifying, based on SEVIS or official transcripts, that a prior STEM degree enables the student to continue his or her eligibility for practical training through a STEM OPT extension).

As noted in the proposed rule, DHS expects to incorporate the submission of the Training Plan into SEVIS at a later date. Until that time DHS may require the submission of the Training Plan to ICE or USCIS when the student seeks certain benefits from USCIS, such as when the student files an Application for Employment Authorization during a STEM OPT extension. Under 8 CFR 103.2(b)(8)(iii), for example, USCIS may request additional evidence of eligibility for a benefit if the evidence submitted in support of an application does not establish eligibility. Accordingly, USCIS may request a copy of the Training Plan, in addition to other documentation that may be in the possession of the student, the employer, or the student's DSO.

DSOs may not recommend a student for a STEM OPT extension if (1) the employer has not provided the attestations for that student required by the rule or (2) the Training Plan does not otherwise reflect compliance with the relevant reporting, evaluation and other requirements of the rule. DHS may deny STEM OPT extensions with employers that the Department determines have failed to comply with the regulatory requirements, including the required attestations. As noted above, ICE may investigate an employer's compliance with these attestations, based on a complaint or otherwise, consistent with the employer site-visit provisions of the rule.

As compared to the proposed rule, and in response to public comments received, DHS has made two changes to the general training plan requirement. First, DHS modified the regulatory text and Training Plan form to clarify that employers may use their existing training programs for STEM OPT students, so long as the existing training program meets this rule's requirements. Second, DHS has modified the form to focus on training and has thus removed the word ''mentoring'' from the form. The information collection instrument for this plan is now titled ''Training Plan for STEM OPT Students,'' and not ''STEM OPT Mentoring and Training Plan'' as DHS had originally proposed.[114]

#### ii. Standard of Review for Training Plan

Under this final rule, once the student and the employer complete and sign the Training Plan, the student must submit the plan to the DSO. DSOs must review the Training Plan to ensure that it is completed and signed, and that it addresses all program requirements. USCIS maintains the discretion to request and review all documentation for eligibility concerns. A number of commenters requested additional information about the standards under which the DSO and DHS will review

Training Plans. DHS clarifies the standard below.

#### iii. Form Fields, Form Number, Form Instructions

A number of commenters provided specific suggestions regarding the proposed form and instructions. For instance, commenters recommended that DHS relabel certain fields, use a different form number than the Form I–910 that DHS had initially proposed, and otherwise improve the form. DHS has made a number of changes in response to these comments, including relabeling certain fields and changing the form number. DHS explains these changes below.

#### iv. Training Plan Obligations and Non-Discrimination Requirements

A number of commenters stated or implied that U.S. employers do *not* have training programs, or related policies, and that any requirement that such programs be offered to F–1 students would thus benefit such students and not U.S. workers. Others stated that the program was intended to benefit students from particular countries or backgrounds, to the disadvantage of others. Some of these commenters raised concerns about various non-discrimination laws that they believed would be violated as a result of the training plan requirements. DHS carefully considered these concerns, and we summarize the comments and DHS's response below.

#### 2. Public Comments and Responses

#### i. General Training Plan Requirement and Submission Requirements

DHS received a number of comments raising general concerns with the proposed Mentoring and Training Plan, as well as related requirements. Such comments concerned the timelines proposed for training plan submission and review, as well as requirements related to reporting changes of employer.

*Comment.* DHS received many comments related to the training programs and policies that many employers already have in place. These comments expressed a range of positions, from offering strong support for the proposed Mentoring and Training Plan to suggesting more flexible training plan requirements to suggesting the elimination of training plan requirements altogether. Some commenters stated that the requirements for the proposed Mentoring and Training Plan were burdensome and unrealistic, that the proposed rule contained confusing references to the F–1 student's role in

---

[114] DHS has also finalized the form with a new number in response to public comments, as explained below in the discussion of comments below regarding the form fields, number, and instructions. As noted throughout the rule, the form is now designated as Form I–983, Training Plan for STEM OPT students.

"the training program," and that the rule contained complex training requirements that seemed unrelated to the anticipated experiences of F–1 students seeking a STEM OPT extension. Some commenters were concerned that small and medium-sized businesses may not have the resources to dedicate to fulfilling the proposed training plan requirements. In addition, some stated that these requirements could deter both school officials and employers from authorizing and participating in the STEM OPT extension program. One commenter stated that the proposed requirements were not mandated by the court decision in *Washington Alliance.* The commenter stated that the court decision only compels DHS to allow for notice-and-comment on the STEM OPT extension itself, and "does not compel DHS to adopt new and more stringent requirements like the [Training Plan]."

Many commenters supported the requirement of a proposed Mentoring and Training Plan but requested the ability to utilize training programs and associated policies already in place in many businesses. For example, one commenter stated that the requirement "validates DHS's efforts to preserve the academic component inherent in STEM OPT" but recommended that "DHS create a flexible framework that allows these controls to exist within the parameters of an employer's existing Human Resources policies." Another commenter noted its broad experience in this area, stating that as a large employer, it "has achieved widespread recognition for the steps that it takes to develop and train employees." The commenter added that in 2014, it "was inducted into the Training 'Top 10 Hall of Fame' and was ranked seventh for learning and development by the Association for Talent Development." As such, the commenter stated that it should be able to utilize its existing training policies.

Another commenter stated that its STEM OPT student trainees already participate in "company training programs and develop ongoing mentoring relationships with senior team members in the natural course of employment." This commenter proposed that DHS provide more flexibility to employers by allowing them to meet the training plan requirements "by providing . . . any documentation evidencing [a current training program] that is currently operated by the company" and amending the proposed Mentoring and Training Plan to only ask for general objectives at the beginning of practical training.

*Response.* DHS believes that the burdens that students and employers may experience in seeking to comply with training plan requirements are outweighed by the benefits the STEM OPT extension will afford to students, employers, schools, and the U.S. economy as a whole. The Training Plan will help ensure the integrity of the program by holding employers and students jointly responsible for monitoring the students' progress and continued learning, while also better protecting U.S. workers.

DHS recognizes that many employers have existing training programs and related policies that enhance the learning and capabilities of their employees. DHS does not intend to require duplicative training programs or to necessarily require the creation of new programs or policies solely for STEM OPT students. Nor does DHS intend to require training elements that are unnecessary or overly burdensome for F–1 students seeking to engage in work-based learning. However, employer-specific training programs and policies may not always align with the rule's primary policy goals. For example, some businesses may focus more on managing a workload or maximizing individual output, whereas DHS's primary concern is the student's continued learning and the relationship between the work-based learning experience and the student's studies.

Accordingly, DHS clarifies that employers may rely on an existing training program or policy to meet certain training plan requirements under this rule, so long as the existing training program or policy meets certain specifications. In addition, DHS has modified the Training Plan to make it easier for employers to refer to existing training programs when completing the Training Plan. For example, instead of requiring specific information about the individual supervisor's qualifications to provide supervision or training, the final Training Plan prompts the employer to explain how it provides oversight and supervision of individuals in the F–1 student's position. DHS also revised the Training Plan to replace the reference to a student's supervisor with a reference to the "Official Representing the Employer." Finally, DHS also modified the regulatory text to clarify that for companies that have a training program or policy in place that controls performance evaluation and supervision, such a program or policy, if described with specificity, may suffice.

DHS expects that in many cases, employers will find that existing training programs align well with the fields on the final Training Plan. For instance, it should be straightforward for employers with existing programs to describe what qualifications the employer requires of its trainers or supervisors, and how the employer will measure an employee's training progress. DHS emphasizes, however, that most fields in the Training Plan must be customized for the individual student. For instance, every Training Plan must describe the direct relationship between the STEM OPT opportunity and the student's qualifying STEM degree, as well as the relationship between the STEM OPT opportunity and the student's goals and objectives for work-based learning.

In addition, the Training Plan will document essential facts, including student and employer information, qualifying degrees, student and employer certifications, and program evaluations. This data is important to DHS for tracking students as well as for evaluating compliance with STEM OPT extension regulations. DHS is concerned that an employer's existing training program would not normally contain this information. DHS believes these portions of the Training Plan should take a relatively short period of time to complete.

*Comment.* Several commenters expressed concern that the proposed Mentoring and Training Plan would reduce flexibility within the STEM OPT extension program, and some of these commenters proposed alternatives to address these concerns. Some commenters stated that requiring a training plan that ties the on-the-job training to the field of academic study would "limit [the participating F–1 student] to a specific department or reporting relationship." Commenters suggested that in order for STEM OPT extensions to reflect real world practices, STEM OPT students need to be able to participate in project rotations that give them a broader skill set relating to their chosen academic field" and to accommodate already existing rotational programs and dynamic business environments. Some commenters stated that requiring employers to list specific information about a supervisor's qualifications and the evaluation process for STEM OPT students would add an unnecessary and burdensome level of bureaucracy to the application process.

Commenters also indicated that they want to maintain the ability to easily and quickly shift STEM OPT students among positions, projects, or departments, and thus recommended the elimination of new training plan filings following each project, position,

or department rotation or change. For example, several commenters stated that even in currently existing, long-established in-house mentoring and training programs, flexibility is built-in because there are many things that can change for an employer over a two-year period. As examples of events necessitating such flexibility, commenters cited gaining and losing customers to competitors and changing focus from one product line to another. A commenter stated that business plans are confidential in nature and employers may not be comfortable releasing detailed information to external sources, which will likely lead to the creation of training plans that are limited to generic, high level job descriptions. The commenter suggested instead that the employer provide a ''job profile document detailing employee roles and responsibilities and an organization structure chart,'' which would be updated in light of ''any significant changes in job profile or positions during the course of OPT.''

Another commenter stated that instead of requiring a training plan, DHS should send periodic SEVIS reports to employers and require the employers to verify that they still employ the listed students. The commenter suggested that DHS also consider creating an employer portal to allow STEM OPT employers to verify and update information as required. Another commenter recommended that DHS replace the proposed written Mentoring and Training Plan with an additional employer attestation that training will be provided consistent with similarly situated new hires, with the proviso that the training will relate directly to the STEM field. One commenter recommended that all training plan requirements be better streamlined with already existing requirements contained on the Form I–20 Certificate of Eligibility.

One commenter stated that it was ''impractical'' to impose the proposed Mentoring and Training Plan requirements on ''more seasoned trainees'' who have completed one year of OPT and who are seeking a STEM OPT extension under the proposed rule. This commenter suggested exempting students who plan to use their STEM OPT extension to continue their 12-month post-completion OPT with the same employer. The commenter recommended that DHS look to H–1B regulations as an example of a regulatory scheme that exempts certain individuals with advanced degrees from certain requirements and obligations.

*Response.* DHS disagrees that employers' standard training practices

are always sufficient for ensuring that the training needs of STEM OPT students are met. The STEM OPT extension program, including its training plan requirement, is designed to be a work-based learning opportunity that meets specific long-term goals related to the student's course of study. Existing training practices may or may not ensure that such goals are met, and thus the fact that an employer has training practices is insufficient on its own to demonstrate that a practical training opportunity will support the central purpose of this rule.

For this reason, DHS rejects the alternative suggestions by commenters to replace the training plan requirement with an attestation related to employers' existing training practices, the submission of periodic SEVIS reports, or a revised Form I–20 Certificate of Eligibility. As discussed, the main objective of the training plan requirement is to ensure that the work that the STEM OPT student undertakes is ''directly related'' to his or her STEM degree and is continuing his or her training in that field. Providing generic job descriptions or periodically verifying that the student remains employed would not provide sufficient focus on the student's training. The training plan requirement aims to elicit the level of detail needed to ensure appropriate oversight of the STEM OPT extension. Additionally, requiring all participants to use a uniform form ensures that minimum requirements are met and makes it easier to evaluate the eligibility of an applicant without requiring agency adjudicators to familiarize themselves with the peculiarities of different employers' records and standards.

However, in response to commenters' concerns, DHS has modified the regulatory text to further ensure that employers may rely on their existing training programs to meet certain training plan requirements under this rule, so long as such training programs otherwise meet the rule's training plan requirements. Under the final rule, the Training Plan must, among other things: (1) Identify the goals for the STEM practical training opportunity, including specific knowledge, skills, or techniques that will be imparted to the student; (2) explain how those goals will be achieved through the work-based learning opportunity with the employer; (3) describe a performance evaluation process; and (4) describe methods of oversight and supervision. The rule additionally provides that employers may rely on their otherwise existing training programs or policies to satisfy the requirements relating to factors (3)

and (4) (performance evaluation and oversight and supervision of the STEM OPT student), as applicable. These provisions are intended to make it easier for employers to refer to existing training programs or policies when completing the Training Plan, as can be seen in Section 5 of the Training Plan form.

DHS has also made a number of changes to the Training Plan form for the same reason. For example, instead of requiring specific information about the individual supervisor's qualifications to provide supervision or training, the final Training Plan prompts the employer to explain how it provides oversight and supervision of individuals in the STEM OPT student's position. DHS also revised the form to replace the reference to a student's supervisor with a reference to the ''Official with Signatory Authority.'' Such an official need not be the student's supervisor. These modifications are intended to address specific comments indicating that the proposed Mentoring and Training plan would prevent employers from assigning such students to project rotations and ''limit them to a single department or reporting relationship.'' DHS made these modifications to provide employers with additional flexibility in complying with the rule's training plan requirements.

Moreover, as revised, DHS does not envision anything required in the final Training Plan as unnecessarily inhibiting flexibility for employers or STEM OPT students. Instead, the standards set forth in the rule are intended to ensure that employers meet the STEM OPT extension requirements, including demonstrating compliance with the attestations, and ensuring that employers possess the ability and resources to provide structured and guided work-based learning experiences for the duration of the extension. Nothing in the rule prohibits employers from incorporating into the Training Plan provisions for project, position, or department rotations that directly relate to STEM students' fields of study, provided there will be appropriate supervision during each rotation and the employer otherwise meets all relevant requirements. To the extent new circumstances arise and such a change was not contemplated in the initial Training Plan, the employer may, working with the student, prepare and submit a modified Training Plan to the student's DSO. Additionally, with regard to concerns relating to an employer sharing sensitive information, DHS does not anticipate that Training Plans would need to contain a level of detail that would reveal business plans.

STEM000108

Finally, DHS respectfully disagrees with the notion that students who have completed one year of OPT are "seasoned trainees" who should not be subject to the training plan requirements when seeking an extension under the rule. DHS also disagrees that students pursuing a STEM OPT extension with the same employer should be exempt from the reporting obligations of the rule, including all training plan requirements. As discussed, the purpose of the STEM OPT extension is to provide practical training to STEM students so they may pursue focused research and meaningful projects that contribute to a more complete understanding of their fields of study and help develop skills. The requirements of the Training Plan are designed to assist students and employers in their pursuit of the aforementioned goals.

*Comment.* Some commenters stated concerns about the "mentoring" requirements described in the proposed Mentoring and Training Plan. For example, a commenter expressed concern that formalizing mentoring and training requirements could hinder students' ability to naturally develop mentorships and mentoring relationships, and suggested eliminating the proposed Mentoring and Training Plan requirement or, at least, aligning the proposed Mentoring and Training Plan requirement with current employer practices to minimize compliance burdens. Some employers stated that the references to mentoring were so problematic that the proposed Mentoring and Training Plan be dropped altogether. One commenter stated that many technology companies lack expertise in establishing the kind of mentoring program contemplated in the proposed rule. The commenter stated further that, because of this, some technology companies will likely submit whatever paperwork is necessary to demonstrate compliance with the mentoring requirement, without doing more. Another commenter suggested eliminating the reference to mentoring and instead focusing on "the relevance of the proposed employment to the individual's STEM-related course of study."

A number of employers stated that they had long established practices concerning mentoring, some formal and some not. Most of these comments suggested that what DHS proposed regarding mentoring was difficult to understand in the context of existing business practices. For example, one company that said it was strongly committed to "the importance and benefits of well-designed mentoring programs," asserted that the proposed rule failed to define mentoring. The commenter explained that:

some mentoring relationships are highly structured in content and regularity of interactions, while others are more ad hoc and organic in nature. In many circumstances, it is the mentee who takes responsibility for leading the interactions; in others, it is the mentor or the organization who structures the engagement.

This commenter believed it would not be feasible for DHS to provide sufficient certainty to employers about their mentoring responsibilities and obligations. A comment co-signed by ten associations representing a variety of industries, as well as small, medium, and large businesses and professionals, stated that the proposed Mentoring and Training Plan would "in many cases force companies to make drastic changes to their current mentoring programs."

*Response.* In light of the commenters' concerns, DHS has removed reference to, and the requirements related to, mentoring in the final rule and associated Training Plan. For instance, DHS has removed the reference to "mentoring" in Form I–983 and re-designated it as the "Training Plan for STEM OPT Students." The Training Plan, however, continues to serve the core goal of the practical training program: to augment a student's learning and functionality in his or her chosen field of interest.

DHS disagrees with the suggestion that technology companies do not have robust training capabilities or a commitment to training and skill development. This comment is directly contradicted by the many comments filed by employers asking that company policies on training, mentoring, and evaluation already in place be permitted as an alternative to the training plan requirements in the proposed rule.

*Comment.* A few commenters suggested that DSOs should not be required to issue a new STEM OPT recommendation in SEVIS before a student can change employers during the STEM OPT extension period. A university recommended that it should be sufficient for the student to submit the new Training Plan to the DSO, along with an update to the employer address information in SEVIS, as specified under current SEVIS reporting requirements. Similarly, a school official asked whether an update in STEM employment information, rather than a recommendation, would suffice for such purposes. The commenter stated that a recommendation should be required only if the DSO is expected to review the content of the Training Plan,

which the commenter suggested should be outside the DSO's duties. The commenter stated that the requirement for a new DSO recommendation each time the student changes employers "implies" that the STEM extension is employer specific. The commenter suggested that STEM OPT should not be tied to a specific employer, but should be tied solely to the student's field of study. Another commenter stated that the requirement for DSOs to issue a new STEM OPT recommendation served no particular purpose, and that the requirement could increase the likelihood that an employer might choose to hire a STEM OPT student over a U.S. worker. According to the commenter, such a STEM OPT student would be less likely to change employers during the STEM OPT period, which could lead to exploitation of the student by the employer.

*Response.* To ensure proper oversight and promote the continued integrity of the STEM OPT extension program, DHS declines to make the changes requested. When a student changes employers, the requirement to submit a new Training Plan to the DSO and have the DSO update SEVIS with a new recommendation is necessary for ensuring that DHS has the most up-to-date information on F–1 students. The requirement also ensures that STEM OPT students are receiving the appropriate training and compensation, which in turn helps to protect such students and U.S. workers. As noted previously, SEVIS is the real-time database through which the Department tracks F–1 student activity in the United States. Timely review by the DSO of the new Training Plan and timely updating of SEVIS with certain information from that form substantially assists DHS with meeting its statutory requirements related to F–1 students.

DHS also does not agree that the requirements related to changing employers, including obtaining a new DSO recommendation, are so burdensome that they would cause a STEM OPT student to stay with an employer that is exploiting him or her. Among other things, this rule provides a substantial amount of time for students to find new practical training opportunities. And DHS anticipates that in most cases, DSOs will be able to review a newly submitted Training Plan and issue a new recommendation for a STEM OPT extension in a matter of days. For this reason, when a student changes employers, the rule requires a new Training Plan, new DSO recommendation, and update to SEVIS. DHS acknowledges that the potential exists for a student to begin a new

practical training opportunity with a new employer less than 10 days after leaving the student's prior employer; in such a case, the student must fulfill his or her reporting obligations by submitting a new Training Plan, but can begin the new practical training opportunity only after submitting the new plan.

*Comment.* Some commenters expressed concern that various requirements and timeframes provided in the rule were inconsistent with each other. A university, for example, submitted a comment referencing a provision in the proposed rule that required STEM OPT students who changed employers to submit, within 10 days of beginning their new practical training opportunities, a new Mentoring and Training Plan to their DSOs, and subsequently obtain new DSO recommendations. The commenter believed this timeline contradicted the reporting obligation contained in another provision, which required such students to report changes in certain biographic and employment information to their DSOs "within 10 days" of the change in employer. The commenter said the former requirement implied that STEM OPT students must receive a new DSO recommendation before beginning new employment, while ignoring the fact that DSOs are given 21 days in which to report any such change of employer. The commenter further noted that DSOs depend on this 21-day reporting window to complete administrative tasks, and the commenter urged DHS to amend the proposed regulations to fix the above inconsistencies.

*Response.* DHS does not see a conflict between (1) the requirement that a STEM OPT student must submit a new Training Plan to the DSO within 10 days of starting a new practical training opportunity with a new employer and (2) the separate, general requirement that a STEM OPT student report to the DSO within 10 days certain changes in biographic and employment information. Nor does DHS see a conflict between these requirements and the DSO's reporting period for inputting some of this information into SEVIS.

The two student reporting requirements cited by the commenter will frequently apply in different circumstances, and serve different purposes. The requirement to submit a new training plan applies only when the student begins a new practical training opportunity with a new employer, and is intended to ensure that each STEM OPT extension will be accompanied by an accurate, up-to-date Training Plan. The 10-day period for the requirement

balances the burden of completing the Training Plan on a timely basis against the important benefits derived from the preparation and submission of such plans. In contrast, the general student reporting requirement (which also existed in the 2008 IFR) applies whenever a STEM OPT student experiences a loss of employment, as well as a change in the student or employer's name or address.

Where a student begins a new practical training opportunity with a new employer less than 10 days after leaving the student's prior employer, the student may fulfill both reporting obligations by submitting a new Training Plan. In cases where the period of time between employers is longer than 10 days, the student must first report the loss of employment to the DSO, and later submit a new Training Plan. In either case, the DSO's SEVIS obligations will begin after the DSO receives the information from the student. Again, these two student reporting requirements serve different purposes; both reports will serve important functions at the time they are made.

*Comment.* One commenter suggested that requiring both the student and the employer to attest that the job offer is directly related to the student's STEM degree is redundant, and that the employer's attestation should be sufficient for this purpose. Another commenter suggested that the student and employer's attestation together should be sufficient, and that as a result, DSO review would be superfluous. Some commenters implied that because the proposed rule required that training plans be completed by STEM OPT students and their employers, those plans would concern work-related training and not training of an academic nature.

*Response.* DHS believes that it is appropriate to document that both the student and the employer agree that the practical training opportunity is directly related to the student's degree. The need for employer and student attestations helps ensure compliance by both relevant parties. And such attestations are not overly burdensome on either the student or the employer.

With respect to comments about the academic nature of the required Training Plans, DHS agrees that such plans will relate to practical training experiences, rather than academic coursework. But that is the intent of the rule: to allow students to apply their academic knowledge in practical, work-based settings. The Training Plan in this final rule helps ensure that the purpose of the rule is met, by clarifying the

direct connection between the student's STEM degree and the practical training opportunity.

*Comment.* DHS received a number of comments concerning the proposed rule's document retention requirements. Some commenters suggested that in order to reduce the administrative and paperwork burdens on employers, DHS should allow employers to use electronic signatures, as well as electronic storage methods to maintain required records. Commenters noted that allowing such options would be consistent with I–9 completion and retention requirements. Some commenters requested that employers and DSOs specifically be allowed to electronically submit and retain the training plans required by the proposed rule,

DHS also received comments on the duration of the proposed rule's retention requirements. One commenter stated that a 1-year retention requirement, rather than a 3-year requirement, would be more feasible. Another commenter recommended that, to mitigate the substantial investment of time required of schools with many STEM students, no electronic form of the proposed Mentoring and Training Plan should be required until the form is provided electronically through the SEVIS system with batch functionality. The commenter also requested that enough time be given to third-party software providers so that they may develop an equivalent upgrade to allow batch uploads of the forms to SEVIS.

One commenter also stated that if the student's school must maintain the training plan, the school then becomes responsible for maintaining sensitive information about the employer. The commenter did not describe which data elements it considered particularly sensitive. The commenter stated that the requirement to maintain this information constituted an "undue burden" for the school and a liability for both the employer and the school "in an age when data hacking and data breaches" are common occurrences. The commenter also noted that DSOs would be "holding" training plans during a student's STEM OPT period, which, in some cases, would be unrelated to any similar degree conferred by the DSO's school.

*Response.* DHS clarifies that the STEM OPT student's educational institution may retain the Training Plan using either paper or electronic means. DHS acknowledges the burdens inherent with requiring DSOs to retain information on students who may have already graduated. Because DSOs must already meet 3-year retention

STEM000110

requirements for other documents concerning F–1 students, this requirement is already a common standard with which DSOs have experience. Under 8 CFR 214.3(g)(1), institutions that educate F–1 students must keep records indicating compliance with reporting requirements for at least three years after such students are no longer pursuing a full course of study.

DHS understands the commenter's concern about the potential sensitivity of certain information contained in training plan documents. However, DHS has made efforts to ensure that the final Training Plan requires only information necessary for the Department to carry out the STEM OPT extension program. DHS notes that it is developing a portal that, once fully deployed, will allow students to directly input training plans into SEVIS for DSO review, thus reducing burdens and potential liability on the part of DSOs and their institutions. DHS plans to have the first stages of this portal operational by the beginning of 2017. In the interim, DHS does not anticipate a significant increase in data storage costs for employers as a result of this rule, and the Department remains open to implementing additional technology improvements to reduce administrative processing and paperwork.

Under this final rule, the student's educational institution associated with his or her latest OPT period must ensure that SEVP has access to the student's Training Plan and associated student evaluations. Such documents may be retained in either electronic or hard copy for three years following the completion of the student's practical training opportunity and must be accessible within 30 days of submission to the DSO.

ii. DHS and DSO Review of the Training Plan

*Comment.* DHS received a number of comments concerning the need to review training plans and the respective roles that DHS and DSOs would play in such review. Some commenters stated that DSOs are best positioned to evaluate the connection between a practical training opportunity and a student's field of study, and requested confirmation that DHS does not intend to second-guess routine approvals of training plans by DSOs. Some commenters requested that DHS clarify the relevant criteria and standards that USCIS and DSOs should apply when reviewing such plans. Some commenters expressed uncertainty about how a qualitative review of training plans would or should be

conducted. Such commenters indicated that unless additional standards and instructions are given, DSO review of such plans would simply consist of making sure each field on the form is completed. A commenter stated that DSOs should not be expected to become experts with respect to each individual student, nor should they be burdened with the weighty responsibility of fraud detection.

One commenter stated that it was unclear how a DSO would know, prior to the commencement of the STEM OPT extension, whether the employer had failed to meet the program's regulatory requirements. The commenter recommended that DHS clarify the applicable standards for DSO review of training plans and ensure that such standards are appropriate for DSOs, given that they are experts neither in each area of STEM education nor in detecting fraud. The commenter recommended that the level of review be similar to that required for Labor Condition Applications submitted to the Department of Labor. According to the commenter, such applications require review only for completeness and obvious errors or inaccuracies.

A commenter stated that the proposed rule did not include standards for determining whether a STEM OPT student is being "trained," rather than simply working. According to the commenter, this would result in every training plan being approved whether or not a bona fide educational experience is being achieved. This commenter was also concerned that DSOs have an inherent conflict of interest in this regard. According to the commenter, DSOs "have every incentive, and likely pressure from their administrations, to approve all work permits." The commenter concluded that the proposed rule's focus on "training" and "educational experience" will not prevent participants from seeing OPT as a work permit and treating it as such.

Some commenters requested that USCIS adjudicators make the final assessment as to the sufficiency of training plans, including because such plans are central to qualifying for STEM OPT extensions and employment authorization. Other commenters asked for clear guidance and coordination with respect to USCIS's review of training plans. Commenters expressed concern that in the absence of clear standards, USCIS adjudicators may issue erroneous Requests for Evidence (RFEs) or deny applications without appropriate due process. Some commenters expressed concerns about the effect of the training plan requirement on USCIS processing times.

Another commenter stated that USCIS review of training plans would be insufficient, because "DHS employees have no expertise in evaluating what is, and is not, practical training."

*Response.* DHS agrees with the commenters' suggestions to issue clear guidance for DSOs and USCIS adjudicators with respect to the adjudication of Training Plans. As noted above, DHS has revised for clarity the regulatory text describing the requirements governing Training Plans, and has also revised the form itself. DHS is aware that the new requirements will also require training and outreach to ensure that all affected parties understand their role in the process.

DHS also clarifies that DSO approval of a request for a STEM OPT extension means that the DSO has determined that the Training Plan is completed and signed, and that it addresses all program requirements. DHS anticipates that such review will be fairly straightforward. The Department does not expect DSOs to possess technical knowledge of STEM fields of study. When reviewing the Training Plan for completeness, the DSO should confirm that it (1) explains how the training is directly related to the student's qualifying STEM degree; (2) identifies goals for the STEM practical training opportunity, including specific knowledge, skills, or techniques that will be imparted to the student, and explains how those goals will be achieved through the work-based learning opportunity with the employer; (3) describes a performance evaluation process to be utilized in evaluating the OPT STEM student; and (4) describes methods of oversight and supervision that generally apply to the OPT STEM student. The DSO should also ensure that all form fields are properly completed. So long as the Training Plan meets these requirements, the DSO has met his or her obligation under the rule.

DHS also understands commenters' concerns on the ability of DSOs to determine whether an employer had failed to meet regulatory requirements prior to the commencement of a STEM OPT extension. DHS clarifies that DSOs are not required to conduct additional outside research into a particular employer prior to making a STEM OPT recommendation. In making such a recommendation, DSOs should use their knowledge of and familiarity with the F–1 regulations, including the STEM OPT requirements finalized in this rule. DHS notes that a student often may be requesting to extend a training opportunity already underway with an employer for which he or she will have already received training, which the DSO will have previously recommended

and of which he or she will already have some record. Where this is not the case, the DSO can still rely, as he or she can in all cases, upon the information provided on the Training Plan and any other information the DSO believes to be pertinent to his or her recommendation decision, at the time he or she makes the recommendation.

DHS also disagrees with comments suggesting that DSOs have conflicts of interest with respect to reviewing training plans. Based on decades of experience with OPT, DHS has no reason to question the integrity of DSOs or their ability to fulfill their obligations effectively and maintain the integrity of the STEM OPT extension program. The role of DSOs under this program is similar to the role they have historically played in the F–1 program.

DHS also notes that it may, at its discretion, withdraw a previous submission by a school of any individual who serves as a DSO. *See* 8 CFR 214.3(1)(2). Additionally, under longstanding statutes and regulations, SEVP may withdraw on notice any school's participation in the F–1 student program (or deny such a school recertification) for any valid and substantive reason. *See* 8 CFR 214.4(a)(2). For instance, SEVP may withdraw certification or deny recertification if SEVP determines that a DSO willfully issued a false statement, including wrongful certification of a statement by signature, in connection with a student's application for employment or practical training. *See id.* SEVP may take the same action if it determines that a DSO engaged in conduct that does not comply with DHS regulations. *Id.*

With respect to comments about USCIS's role in the process, DHS clarifies that USCIS maintains the discretion to request and review all documentation when determining eligibility for benefits. *See* 8 CFR 103.2(b)(8)(iii). Accordingly, USCIS may request a copy of the Training Plan (if it is not otherwise available) or other documentation when such documentation is necessary to determine an applicant's eligibility for the benefit, including instances when there is suspected fraud in the application.[115] DHS further clarifies that USCIS would deny an Application for Employment Authorization if it finds that any of the regulatory standards are not met. DHS believes that the regulatory standards are articulated at a

sufficient level of particularity for this purpose.

Beyond the clarifications provided above, DHS does not believe it is necessary or appropriate to issue significant additional guidance in this final rule. Given the many different practical training opportunities available to students, it would be cumbersome for DHS to define with more particularity the full range of student-employer interactions or guided-learning opportunities that may meet the rule's requirements. DHS believes that it would be more appropriate to issue any necessary guidance separately, as needed. Issuing guidance in this manner will allow DHS to promote consistent adjudications while allowing for flexibility as issues develop. As such, DHS confirms that ICE and USCIS will finalize guidance and provide training to ensure that all entities are ready to process requests for STEM OPT extensions as soon as possible.

*Comment.* Some commenters suggested that employers and students, rather than DSOs or DHS, are best positioned to explain how a student's STEM practical training degree is related to a practical training opportunity.

*Response.* DHS agrees that employers and students must identify the relationship between the student's STEM degree and the practical training opportunity. This final rule requires the student and employer to complete and submit to the DSO a Training Plan that describes this relationship (among other things). DHS does not agree, however, that students and employers should be solely responsible for determining whether a student's STEM degree is directly related to the practical training opportunity being offered, as doing so would result in a true conflict of interest and lack of accountability.

*Comment.* One commenter expressed concern that DSOs will be required to check wages through the Department of Labor Foreign Labor Certification Data Center's Online Wage Library to ensure that the employee is being paid fairly. The commenter stated that such a requirement would add additional time to approval of training plans and could expose schools to legal action from employers and students who submitted plans that were not accepted by the school. The commenter also said DSOs would be required to function as de facto USCIS adjudicators when approving or denying training plans, and as de facto ICE agents when trying to locate a student who has not completed his or her 6-month validation report.

*Response.* As noted above, the DSO's role with respect to the Training Plan for STEM OPT Students is limited. DSOs are not expected to conduct independent research to determine whether an employer attestation or other information in the Training Plan, including wage information, is accurate. Thus, DSOs are not expected to assess the wage information. With respect to validation reports, such reports have served since 2008 as important confirmations that critical student information in SEVIS is current and accurate. When a student fails to submit a validation report on a timely basis, however, there is no requirement for further action on the part of the DSO. All necessary data for determining when a student has failed to submit a validation report is contained in SEVIS, and no further action is necessary to alert DHS of the student's failure.

### iii. Form Fields, Form Number, Form Instructions

*Comment.* Some commenters stated that USCIS already has a form designated as Form I–910, Application for Civil Surgeon Designation, and requested that ICE assign a different form number to the Training Plan form. Another commenter suggested that DHS use a form number other than I–910 to avoid confusion with the current Form I–901, which all F–1 students use to pay their SEVIS fees.

*Response.* In response to these comments, DHS has revised the number for the Training Plan for STEM OPT Students associated with this final rule to "Form I–983." This change should prevent confusion among F–1 students and other stakeholders.

*Comment.* As proposed, the Mentoring and Training Plan would have required the student to attest that he or she will notify the DSO "at the earliest possible opportunity if I believe that my employer or supervisor . . . is not providing appropriate mentorship and training as delineated on this Plan." Some commenters recommended that the student attestation on the Training Plan form be revised to eliminate the words "if I believe" and "appropriate" because they are confusing and ask students to make subjective assessments regarding the required training and mentoring. Commenters suggested that the student should only be required to notify the DSO if the student believes that "a gross deviation" from the training plan has occurred. Another commenter stated that this notification requirement was not necessary because students are already required to report any interruption of employment.

---

[115] When Training Plans are available through SEVIS, USCIS will have real-time access to each plan without needing to issue an RFE.

*Response.* DHS believes that the student's subjective assessment matters. If a student believes that the employer is not providing the practical training opportunity described in the Training Plan, the student should report the matter to his or her DSO. DHS considers students in this program to be capable of self-reporting in a responsible manner. DHS believes that relying upon students' reasonable judgment in the student attestation will best protect the well-being of students and the integrity of the STEM OPT extension. Additionally, DHS clarifies that this attestation element does not reference, and is not intended to apply to, interruptions of employment. Students and employers that are concerned about the risk of frequent reporting of the student's assessment may be able to avoid potential issues by clearly setting forth mutual expectations in the Training Plan.

*Comment.* As proposed, the Mentoring and Training Plan included an attestation by the student that he or she understands that DHS may deny, revoke, or terminate a student's STEM OPT extension if DHS determines the student is not engaging in OPT in compliance with law, including if DHS determines that the student or his or her employer is not complying with the Training Plan. One commenter suggested removing this attestation because, according to the commenter, it is vague and overly harsh and holds the student accountable for the employer's noncompliance. The commenter also stated that because the proposed rule allowed for 150 days of authorized unemployment, "there should be no further immigration repercussion to the student if they need to interrupt STEM OPT due to lack of appropriate mentorship."

*Response.* DHS disagrees with the commenter. The attestation serves as an important reminder to the student that failure to comply with the regulatory requirements related to the STEM OPT extension may result in a loss of status. Moreover, contrary to the commenter's understanding, the attestation does not state or imply that DHS would take action against students who become unemployed, including because an employer has failed to comply with program requirements. A period of unemployment, on its own, will not affect the STEM OPT student's status so long as the student reports changes in employment status and adheres to the overall unemployment limits.

*Comment.* One commenter recommended that the phrase "SEVIS ID No." on the first page of the form

(Section 1) should read "Student SEVIS ID No." for clarity.

*Response.* DHS agrees that the suggested change increases clarity and has made this change to the Training Plan for STEM OPT Students.

*Comment.* The same commenter stated that the "School Name and Campus Name" section should be reorganized for additional clarity. Specifically, the commenter stated that the form should include a section for "School that Recommended Current OPT" and a separate section for "School Where Qualifying Degree was Earned" in order to cover students who are using previously obtained STEM degrees as the basis for a STEM OPT extension.

*Response.* DHS agrees and the form has been updated to clarify information for previously obtained STEM degrees.

*Comment.* A commenter requested that DHS clarify the question in Section 3 of the proposed Mentoring and Training Plan, which requests the number of full-time employees that work for the employer. The commenter also suggested that DHS add the Web site address for North American Industry Classification System (NAICS) codes (*http://www.census.gov/eos/www/naics*) to the instructions for the relevant question on NAICS codes in Section 3.

*Response.* DHS agrees with both of these suggestions. To increase clarity, DHS has revised the question concerning full-time employees to read, "Number of full-time employees in the U.S." DHS also has amended the form instructions to Section 3 to add the Web site for NAICS codes.

*Comment.* Commenters suggested eliminating the "Training Field" box in Section 5 of the proposed Mentoring and Training Plan. According to the commenters, a detailed description of the training opportunity was already required in other fields and it was not clear what the "Training Field" box added given that there was also a separate box for "Qualifying Major."

*Response.* DHS agrees with the commenter and has removed the field from the final version of the Training Plan.

*Comment.* One commenter sought clarification on whether all fields in the Mentoring and Training Plan were mandatory. The commenter also sought clarification on what an employer should do if one or more fields were not applicable to that employer.

*Response.* DHS clarifies that employer information should be filled in as applicable. If an employer does not have a Web site, for example, "N/A" will suffice in the field requesting the employer Web site.

*Comment.* One commenter stated that the form requirements should be included in the regulatory text. The commenter noted that certain sections of the proposed Mentoring and Training Plan required parties to certify that they would make notifications "at the earliest available opportunity," but that such a requirement was not included in the regulatory text itself.

*Response.* In response to this comment, DHS has amended the final regulatory text to more clearly reflect the responsibilities of participating parties. The Department believes these requirements are now sufficiently clear.

iv. Training Plan Obligations and Non-Discrimination Requirements

*Comment.* One comment stated that "[t]he proposed OPT STEM hiring and extension process would also constitute national origin discrimination, as the program is clearly intended to benefit aliens whose nationality is among one of the nations for which employment based immigrant visas are continuously oversubscribed, in particular nationals of India and China."

*Response.* DHS rejects the suggestion that the STEM OPT extension program will benefit individuals based on their national origin or nationality. The program is equally available to all F–1 students with a qualifying STEM degree and has neither quotas nor caps for nationals of any given country or region. The comment also offers no evidence to support the statement that the rule "is clearly intended to benefit" individuals based on nationality.

*Comment.* Some commenters stated that the proposed rule would "induce" employers and universities to discriminate against U.S. workers in violation of 8 U.S.C. 1324b and would "impermissibly facilitate prohibited employment-related discrimination on the basis of alienage and national origin." These commenters cited to various statutory provisions (42 U.S.C. 1981(a); 42 U.S.C. 2000e–2(a),(d); and 8 U.S.C. 1324b(a)(1)(A) and (B)) and suggested that the Department's proposed Mentoring and Training Form would violate these Federal anti-discrimination laws. Commenters stated that the rule would discriminate against U.S. citizen and lawful permanent resident students because it would not require employers to offer an identical "program" to such students. One commenter also likened the proposed Mentoring and Training Plan to the execution of a contract in violation of 42 U.S.C. 1981(a), which prohibits discrimination in making contracts. The comment cited to case law purporting to support the commenter's argument, but

did not explain how the plan violated the statute.

*Response.* As a preliminary matter, the Training Plan for STEM OPT Students requires an employer to certify that the training conducted pursuant to the plan complies with all applicable Federal and State requirements relating to employment. This broad certification encompasses compliance with all of the laws the commenters referenced.

DHS also disagrees with the apparent premise behind the commenters' arguments. That premise appears to be that the rule will require or inappropriately induce U.S. employers to provide benefits to F–1 students that are not provided to its other employees, including U.S. workers. Neither the rule nor the Training Plan, however, requires or encourages employers to exclude any of their employees from participating in training programs. And insofar as an employer may decide to offer training required by the regulation only to STEM OPT students, doing so does not relieve that employer of any culpability for violations of section 274B of the INA, 8 U.S.C. 1324b, or any other federal or state law related to employment.

Moreover, the training plan requirement is not motivated by any intention on the part of DHS to encourage employers to treat STEM OPT students preferentially. Rather, DHS is requiring the Training Plan to obtain sufficient information to ensure that any extension of F–1 student status under this rule is intended to augment the student's academic learning through practical experience and equip the student with a broader understanding of the selected area of study and functionality within that field. The Training Plan also serves other critical functions, including, but not limited to, improving oversight of the STEM OPT extension program, limiting abuse of on-the-job training opportunities, strengthening the requirements for STEM OPT extension participation, and enhancing the protection of U.S. workers. By documenting the student's participation in a training program with the employer, the Training Plan provides information necessary for oversight, verification, tracking, and other purposes.

The training plan requirement does not discriminate against U.S. students or anyone else, or create a discriminatory contract (even assuming that it creates a contractual obligation at all). In pertinent part, 42 U.S.C. 1981(a) provides that ''[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts.'' The commenter that raised

concerns related to this provision did not identify any feature of the proposed rule that would deny or otherwise impair any person's rights ''to make and enforce contracts'' or any other rights described in the statute. The statute has no bearing on the training plan requirement in this rule.

## G. Application Procedures for STEM OPT Extension

### 1. Description of Final Rule and Changes From NPRM

Under the rule, a student seeking an extension must properly file a Form I–765, Application for Employment Authorization, with USCIS within 60 days of the date the DSO enters the recommendation for the STEM OPT extension into the SEVIS record. The 2008 IFR had previously established a time period of 30 days after the DSO recommendation for the filing of the Application for Employment Authorization. As proposed in the NPRM, DHS believes the longer 60-day application period will, among other things, reduce the number of USCIS denials of such applications that result from expired Form I–20 Certificates of Eligibility, the number of associated data corrections needed in SEVIS, and the number of students who would need to ask DSOs for updated Certificates of Eligibility to replace those that have expired. Under this rule, the ''time of application'' for a STEM OPT extension refers to the date that the Application for Employment Authorization is properly filed at USCIS.

### 2. Public Comments and Responses

*Comment.* Several commenters agreed with DHS's assessment in the proposed rule that no changes to Form I–765, Application for Employment Authorization, are needed. These commenters thought that the application form is clear and that any minor changes or clarifications (such as the regulatory cite included on the form) should be incorporated into the instructions to the application rather than into the application itself. Many commenters also agreed with DHS's proposal to extend the period of time to file the Application for Employment Authorization from 30 to 60 days from the date that the DSO enters the STEM OPT extension recommendation in SEVIS. Some of these commenters stated that it can be challenging for DSOs and students to meet the current 30-day deadline, as STEM OPT students are already working at the time of application and may no longer be as close in proximity or contact with their DSOs as they were prior to starting

practical training. Commenters also stated that the 60-day filing deadline would provide greater flexibility for students and likely reduce the workload of DSOs, who would otherwise need to reissue Form I–20 Certificates of Eligibility to students whose forms have expired, as well as reduce the number of Applications for Employment Authorization that need to be filed. Some commenters so strongly supported the 60-day deadline that they requested it apply to all students requesting OPT in any academic field, noting that having two different application filing windows serves no useful purpose and also has the potential to confuse both students and adjudicators.

*Response.* DHS agrees that no revisions to the Application for Employment Authorization are needed and that any minor revisions should be incorporated into the form instructions. DHS also appreciates commenters' support for the proposed 60-day filing period for students to file their Application for Employment Authorization after the DSO enters the STEM OPT extension recommendation in SEVIS. This final rule includes this proposal. As noted in the proposed rule, the longer filing window addresses problems that resulted from expiration of Form I–20 Certificates of Eligibility and reduces the need for data corrections in SEVIS. DHS also clarifies that this change only applies to STEM OPT extensions. Changing the 30-day filing period for students seeking a 12-month period of post-completion OPT is outside the scope of this rulemaking.

*Comment.* One commenter advocated for students to be able to file only one Application for Employment Authorization to cover the entire OPT period, including the 12-month post completion period and the 24-month STEM OPT extension period. In support of this suggestion, the commenter noted that the application form already requires the applicant to reveal all previously filed Applications for Employment Authorization and provides an opportunity to request a STEM OPT extension. The commenter also suggested that such form should be available to request a second STEM OPT extension. Another commenter requested that the $380 fee for filing Applications for Employment Authorization not apply to students seeking STEM OPT extensions. The commenter characterized the fee as generally a ''heavy burden'' for students, and as an ''unreasonable'' burden for those students who failed to meet the eligibility requirements for reasons beyond their control.

STEM000114

*Response.* DHS believes that it would be unwieldy and potentially confusing to allow a student to apply for a STEM OPT extension as part of the student's application for initial post-completion OPT. The requirement for a separate application allows the student to engage in an initial period of post-completion OPT without requiring a student and employer to complete a full Training Plan a year in advance of the student's STEM OPT extension. The requirement for a separate application also allows DHS to consider program eligibility closer in time to the start of the student's STEM OPT extension.

In regard to the fee for the associated Application for Employment Authorization, DHS declines to exempt certain students from the filing fee, which generally applies to all such applications filed by F–1 students. As noted above, each application for STEM OPT requires DHS to consider the student's eligibility under the applicable regulations at the time of application.

*Comment.* Some commenters expressed concern that USCIS officers adjudicating Applications for Employment Authorization from STEM OPT students would not have sufficient training on the contents or veracity of the proposed Mentoring and Training Plan to determine whether and how it should affect the student's eligibility for a STEM OPT extension and attendant employment authorization. These commenters questioned whether the proposed plan was necessary for the adjudication of Applications for Employment Authorization, particularly because USCIS officers are not trained career counselors. In contrast, some commenters requested that USCIS officers expand the scope of the adjudication of such applications. Such requests included having USCIS officers make evaluations of a prior institution's accreditation status and the student's proposed Mentoring and Training Plan, as such information is not related to the student's current academic program and is not widely available.

*Response.* DHS appreciates commenters' concerns about appropriate training for USCIS officers and assures the public that USCIS will provide appropriate guidance and training resources for its adjudicators. Adjudicators will be equipped with guidance that address, among other issues, whether the submitted evidence is sufficient to establish eligibility for employment authorization; what to do when the applicant has not provided sufficient evidence; and what information should be requested in an RFE or Notice of Intent to Deny. Finally, in this final rule, USCIS confirms that

adjudicators have the discretion to request a copy of the Training Plan, in addition to other documentation, when such documentation is necessary to determine an applicant's eligibility for the STEM OPT extension, including instances where there is suspected fraud in the application.

*Comment.* An advocacy organization recommended that DHS publicly disclose raw data gathered from Applications for Employment Authorization. The commenter argued that this disclosure would improve transparency and enhance the ability of policymakers and advocates to ensure fair treatment and compliance with these programs.

*Response.* To the extent the commenter is seeking data from all filed Applications for Employment Authorization, and not just from STEM OPT students, the request is well outside the scope of this rulemaking. With respect to applications filed by STEM OPT students, even assuming such a request is within the scope of this rule, DHS declines to affirmatively publish all raw data gathered from such applications. Among other things, the application contains sensitive personally identifiable information, and blanket public disclosure would violate applicable privacy laws and policies. Relevant information related to the STEM OPT extension program may be available through the FOIA process. The USCIS centralized FOIA office receives, tracks, and processes all USCIS FOIA requests to ensure transparency within the agency. Instructions on how to submit a FOIA request to USCIS are available on-line at *https://www.uscis.gov/about-us/freedom-information-and-privacy-act-foia/uscis-freedom-information-act-and-privacy-act.*

*Comment.* One commenter sought clarification on whether relevant changes to the Application for Employment Authorization and SEVIS will be completed by the date that this rule goes into effect. The commenter also asked whether these changes would affect the SEVIS releases scheduled for November 2015 and spring 2016.

*Response.* DHS is not making any changes, as a result of this rulemaking, to the Application for Employment Authorization; rather, minor changes have been included in the form instructions. The Application for Employment Authorization and its instructions are available on USCIS' Web site (*http://www.uscis.gov/i-765*), where users can also find information about filing locations and filing fees. SEVIS, including planned releases, will

not be affected by the minor changes to the form instructions.

*Comment.* An individual commenter requested a change to the proposed rule's provision allowing F–1 students to file for a STEM OPT extension prior to the end of their initial 12-month period of post-completion OPT. The commenter suggested that DHS also allow students to apply for a STEM OPT extension up to 60 days following the end of the initial OPT period. The commenter stated that this change would align the provision with the application period for initial post-completion OPT, in which a student can file an application up to 60 days following graduation.

*Response.* DHS declines to adopt the commenter's recommendation. The current requirement to properly file the request for a STEM OPT extension prior to the end of the initial period of post-completion OPT allows sufficient time for the F–1 student to apply for the extension and is administratively convenient as it ensures continuing employment authorization during the transition from the initial OPT period to the STEM OPT extension period. The requirement thus helps prevent disruption in the student's employment authorization as the student transitions from his or her initial post-completion OPT period to the STEM OPT extension period.

*Comment.* One commenter requested clarification on whether a student who violates his or her F–1 status during a STEM OPT extension period may apply for reinstatement to F–1 status under 8 CFR 214.2(f)(16) if the status violation resulted from circumstances beyond the student's control. The commenter also asked whether such a student would be able to continue working while the reinstatement application is pending.

*Response.* A student who violates his or her F–1 status during the STEM OPT extension period may be granted reinstatement to valid F–1 status if he or she meets the regulatory requirements. See 8 CFR 214.2(f)(16). Importantly, in the STEM OPT context, the student will need to establish that the status violation resulted from circumstances beyond the student's control. The student, however, will not be able to continue working during the pendency of the reinstatement application; such employment would be considered unlawful. Moreover, if the student's reinstatement application is approved, the student will need to file a new Form I–765, Application for Employment Authorization. If the Application for Employment Authorization is approved, the period of time the student spent out of status will be deducted from his or

her 24-month STEM OPT extension period.

*Comment.* One commenter recommended that the rule increase the time period during which a student with a pending STEM OPT application is allowed to remain employed. The proposed rule provided an automatic extension of employment authorization of up to 180 days upon the timely filing of the application for a STEM OPT extension. The commenter suggested amending the rule to provide a 240-day period, which the commenter believed would be consistent with a similar provision for other nonimmigrants who timely file applications for extensions of stay.[116] According to the commenter, employers are familiar with the 240-day period provided in other contexts and using a common timeframe for STEM OPT applications would help employers more efficiently maintain their obligations to verify the eligibility of employees to work in the United States through the Form I–9 Employment Eligibility Verification process. The commenter also noted that the 240-day period would better accommodate lengthy USCIS processing times.

*Response.* DHS has determined that the current period of up to 180 days is appropriate and will not adopt the commenters' suggestion to lengthen this period. DHS did not propose any changes to this 180-day period, which has been in existence since 2008. Employers who hire individuals on STEM OPT extensions should thus already be familiar with this timeframe. Moreover, given that USCIS' average EAD processing time is typically at about the 90-day mark,[117] the 180-day timeframe provides sufficient flexibility in case of unexpected delays. Therefore, a longer auto-extension period for EADs is unnecessary.

---

[116] 8 CFR 274a.12(b)(6)(iv) authorizes employment for students seeking a STEM OPT extension if they timely file an Application for Employment Authorization and such application remains pending. Employment is authorized beginning on the expiration date of the student's OPT-related EAD and ending on the date of USCIS' written decision on the Application for Employment Authorization, but not to exceed 180 days. In contrast, 8 CFR 274a.12(b)(20) allows certain nonimmigrants (not including F–1 students) whose statuses have expired but who have timely filed applications for an extension of stay to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay.

[117] For updated processing times, please see "USCIS Processing Time Information," available at *https://egov.uscis.gov/cris/processTimesDisplay.do.*

## H. Travel and Employment Authorization Documentation of Certain F–1 Nonimmigrants Changing Status in the United States or on a STEM OPT Extension

### 1. Description of Final Rule and Changes From NPRM

This final rule includes the 2008 IFR's Cap-Gap provision, which allows for automatic extension of status and employment authorization for any F–1 student with a timely filed H–1B petition and request for change of status, if the student's petition has an employment start date of October 1 of the following fiscal year. The measure avoids inconvenience to some F–1 students and U.S. employers through a common-sense administrative mechanism to bridge two periods of authorized legal status. As noted previously, the so-called Cap Gap is a result of the misalignment of the academic year with the fiscal year.

This final rule also clarifies that an EAD that appears to have expired on its face but that has been automatically extended under 8 CFR 274a.12(c)(3)(i)(B) is considered unexpired for the period beginning on the expiration date listed on the Employment Authorization Document and ending on the date of USCIS' written decision on the current employment authorization request, but not to exceed 180 days, when combined with a Form I–20 Certificate of Eligibility endorsed by the DSO recommending the Cap-Gap extension. Otherwise, DHS is finalizing the Cap-Gap provision as proposed, but provides clarification and explanation below in response to public comments regarding status, travel, and employment authorization during a Cap-Gap period or a STEM OPT extension.

Lastly, the final rule clarifies that if a petitioning employer withdraws an H–1B petition upon which a student's Cap-Gap period is based, the student's Cap-Gap period will automatically terminate. In other words, if an employer withdraws the H–1B petition before it is approved, the student's automatic extension of the student's duration of status and employment authorization under the Cap-Gap provision will automatically end, and the student will enter the 60-day grace period to prepare for departure from the United States. 8 CFR 214.2(f)(5)(iv).

### 2. Public Comments and Responses

#### i. Inclusion of Cap-Gap Relief and End Date of Cap-Gap Authorization

*Comment.* Many commenters supported the Cap-Gap provision as

proposed, noting that it would help the United States attract talented international students and bolster the economy. Some stated that Cap-Gap relief was an important part of the 2008 IFR and requested that it be retained because the H–1B visa program is a common mechanism for F–1 students to transition to long-term employment in the United States. According to the commenters, Cap-Gap relief is essential to avoid gaps in work authorization between the April filing window for H–1B visas and the October 1 start date for most new H–1B beneficiaries who are subject to the H–1B cap.

Some commenters supported Cap-Gap relief for certain F–1 students based on the notion that these students have been following immigration laws and helping to maintain the United States' position as the world's leader in technology and innovation. Other supporters asserted that Cap-Gap relief will boost productivity and entrepreneurship and thus provide the United States with a competitive advantage in the global market. Several commenters stated that the Cap-Gap extension is helpful to employers as it avoids disruptions in the workplace caused by the students' departure from the United States solely due to a temporary gap in status.

*Response.* DHS agrees with commenters that the Cap-Gap provision is a common-sense administrative measure to avoid gaps in status fully consistent with the underlying purpose of the practical training program. The Cap-Gap provision is needed to address the inherent misalignment of the academic year with the fiscal year. This relief measure avoids inconvenience to some F–1 students and U.S. employers by bridging short gaps in status for students who are the beneficiaries of H–1B petitions.

*Comment.* Under the 2008 IFR and as proposed, the Cap-Gap provision automatically extends a qualifying student's status and employment authorization based on the filing of an H–1B petition and request for change of status until the first day of the new fiscal year (October 1). Some commenters requested that DHS revise the Cap-Gap provision so as to automatically extend status and employment authorization "until adjudication of such H–1B petition is complete." Commenters stated that an extension until October 1 may have been appropriate in the past, when H–1B petitions were adjudicated well before that date, but current USCIS workload issues and RFE responses can delay such adjudications beyond October 1. The result, according to one commenter, is that the beneficiary of an

STEM000116

H–1B petition that remains pending beyond October 1 must stop working on that date and wait for a decision. By amending the regulations to provide extensions until the date that the H–1B petition is finally adjudicated, the commenter noted, a beneficiary could avoid any such gaps in status.

In addition, one commenter requested that DHS clarify the date on which the automatic extension of status ends. The commenter stated that September 30 would be a more appropriate end date than October 1, as the beneficiary's H–1B status would generally become effective on October 1.

*Response.* DHS recognizes that some cap-subject H–1B petitions remain pending on or after October 1; however, in light of the importance that DHS places on international students, USCIS prioritizes petitions seeking a change of status from F–1 to H–1B. This prioritization normally results in the timely adjudication of these requests, so the vast majority of F–1 students changing status to H–1B do not experience any gap in status.

The general presumption is that when a nonimmigrant's period of authorized stay has expired, he or she must depart the United States. However, the Cap-Gap provision provides a special accommodation to F–1 students who are seeking to change to H–1B status, based on the understanding that the academic year of most colleges and universities does not align with the fiscal year cycle upon which the H–1B program is based. The Cap-Gap provision is based in part on the premise that students who seek to benefit from the provision actually qualify for H–1B status. USCIS is thus concerned that extending the Cap-Gap employment authorization beyond October 1, a date by which virtually all approvable change-of-status petitions for F–1 students are adjudicated by USCIS, would reward potentially frivolous filings. The October 1 cut-off thus serves to prevent possible abuse of the Cap-Gap extension. USCIS will continue to make every effort to complete adjudications on all petitions seeking H–1B status for Cap-Gap beneficiaries prior to October 1, including by timely issuing RFEs in cases requiring further documentation. DHS therefore declines to allow students whose H–1B petitions remain pending beyond October 1 to continue to benefit from the Gap-Gap extension, primarily because doing so would enable students who may ultimately be found not to qualify for H–1B status to continue to benefit from the Cap-Gap extension.

Finally, DHS clarifies that F–1 status for a Cap-Gap beneficiary under this

provision expires on October 1, consistent with the regulatory text at 8 CFR 214.2(f)(5)(A)(vi). However, an individual with a timely-filed, non-frivolous H–1B change-of-status petition will be considered to be in a period of authorized stay during the pendency of the petition. An individual may remain in the United States during this time, but is not authorized to work. If an H–1B change-of-status petition requesting a start date of October 1 has been approved, the F–1 status will expire on the same day as the H–1B status begins.

*Comment.* Some commenters requested that DHS clarify that OPT students whose employment authorization has been extended pursuant to the Cap-Gap provision are permitted to change employers. Commenters expressed confusion because under the 2008 IFR, and as proposed, the regulatory provision authorizing employment for Cap-Gap beneficiaries is included in a list of nonimmigrant classifications that are authorized for employment "with a specific employer incident to status." *See* 8 CFR 274a.12(b) and (b)(6)(v). Commenters recommended that DHS revise the title of the list to eliminate confusion and clarify that an F–1 student can change employers between the filing of an H–1B petition (generally in April) and the date on which a cap-subject H–1B petition takes effect (generally on October 1). One of these commenters recommended that DHS include Cap-Gap beneficiaries under 8 CFR 274a.12(a), which lists categories of aliens who are authorized for employment "incident to status," in order to make such beneficiaries employment authorized without employer-specific restrictions.

*Response.* DHS clarifies that there is generally no prohibition against an F–1 student's changing of employers during a Cap-Gap period. However, F–1 students may only engage in employment that is directly related to their major area of study. Moreover, because the list of nonimmigrant classifications at 8 CFR 274a.12(b) covers a broad range of nonimmigrant classes, DHS believes deletion of the phrase "with a specific employer" from the regulatory provision would lead to confusion. DHS thus declines to adopt this suggestion. Additionally, given that the vast majority of commenters supported the Cap-Gap provision as proposed, DHS has determined that the provision is sufficiently clear and therefore declines to further amend 8 CFR 274a.12(b)(6)(v) or to place the regulatory provision under 8 CFR 274a.12(a). Again, an F–1 student may change employers during a Cap-Gap

period, but must do so in accordance with the OPT regulations (*e.g.,* by finding a position directly related to his or her major area of study, among other requirements).

*Comment.* Some commenters requested clarification about whether the Cap-Gap provisions apply to H–1B petitions that are cap-exempt (*i.e.,* not subject to the annual numerical cap on H–1B visas). According to these commenters, proposed 8 CFR 214.2(f)(5)(vi) appeared to state that a STEM OPT student who was the beneficiary of a cap-exempt H–1B petition could also extend his or her duration of status and possibly employment authorization under the provision, provided the H–1B petition was timely filed and requested an employment start date of October 1.

*Response.* DHS clarifies that the Cap-Gap provision applies only to the beneficiaries of H–1B petitions that are subject to the annual numerical cap. The purpose of the Cap-Gap provision is to avoid situations where F–1 students are required to leave the country or terminate employment at the end of their authorized period of stay, even though they have an approved H–1B petition that would again provide status to the student in a few months' time. Due to the realities associated with the H–1B filing season, employers filing H–1B petitions for *cap-subject* F–1 students are effectively required to file petitions with start dates of October 1, which allows such employers to file the change-of-status petitions with USCIS at the beginning of the H–1B filing window (generally April 1 of the preceding fiscal year).[118] A petitioner filing an H–1B petition for a cap-subject beneficiary that does not file at the beginning of the filing window risks not being able to file at all if the window closes due to high demand for H–1B visas.

In contrast, employers filing H–1B petitions on behalf of *cap-exempt* beneficiaries may request an employment start date based on the petitioners' actual need rather than on the H–1B filing season. As such, cap-exempt beneficiaries do not share the same need as cap-subject beneficiaries

---

[118] Employers may not file, and USCIS may not accept, H–1B petitions submitted more than six months in advance of the date of actual need for the beneficiary's services or training. However, because demand for H–1B visas far exceeds supply in most years, employers generally rush to file at the first available opportunity. As H–1B visas are authorized by fiscal year, and thus may begin to authorize employment as early as the first date of the fiscal year (October 1), the filing window for cap-subject H–1B petitions opens (and generally closes) six months earlier (April 1 of the preceding fiscal year).

STEM000117

to bridge status until the next fiscal year. For these reasons, the Cap-Gap provision benefits only those beneficiaries who are subject to the H–1B cap. DHS maintains its long-standing interpretation that 8 CFR 214.2(f)(5)(vi) is limited to cap-subject H–1B beneficiaries, but has revised the regulatory text to clarify this practice.

*Comment.* One commenter asked DHS to clarify the deadline for filing applications for STEM OPT extensions by F–1 students in a Cap-Gap period. According to the commenter, the relevant section in the proposed rule indicated that students are required to file "prior to the expiration date of the student's current OPT employment authorization." The commenter asked DHS to clarify the meaning of this provision with respect to F–1 students with an approved Cap-Gap extension. Specifically, the commenter asked whether "the expiration date of the student's current OPT employment authorization" refers to the date on which the student's EAD expires or the end date of the student's approved Cap-Gap extension.

*Response.* A student may file for a STEM OPT extension only if the student is in a valid period of post-completion OPT at the time of filing. A student whose post-completion OPT period has been extended under Cap-Gap is in a valid period of post-completion OPT, and may therefore apply for a STEM OPT extension during the Cap-Gap period if he or she meets the STEM OPT extension requirements.[119] Please note, however, that if the H–1B petition upon which the student's Cap-Gap period is based has been approved and is not withdrawn prior to October 1, the student's change to H–1B status will take effect on October 1, and the student will no longer be eligible for a STEM OPT extension.

### ii. Travel During Cap-Gap and While on STEM OPT Extension

*Comment.* Several commenters requested that DHS allow students to travel abroad during the Cap-Gap period. Some of these commenters requested that F–1 students in OPT be allowed to travel overseas if they have a pending or approved request to change status to that of an H–1B nonimmigrant during the Cap-Gap period. One commenter asked DHS to harmonize policies with the Department of State

regarding travel and reentry to the United States in Cap-Gap scenarios. The commenter opined that the two Departments' policies on this issue have been inconsistent, recommending this rulemaking as an appropriate opportunity to clarify when an F–1 student in a Cap-Gap period may travel. Another commenter suggested that the guidance in the Department of State Foreign Affairs Manual (9 FAM 41.61 N13.5–2 Cap Gap Extensions of F–1 Status and OPT) could serve as the basis for a unified policy among the two departments that allows travel and reentry during the Cap-Gap period.[120] One commenter also asked DHS to allow a Cap-Gap beneficiary to return to the United States in F–1 status without having a valid visa.

*Response.* DHS clarifies that an F–1 student may generally travel abroad and seek readmission to the United States in F–1 status during a Cap-Gap period if: (1) The student's H–1B petition and request for change of status has been approved; (2) the student seeks readmission before his or her H–1B employment begins (normally at the beginning of the fiscal year, *i.e.,* October 1); and (3) the student is otherwise admissible. However, as with any other instance in which an individual seeks admission to the United States, admissibility is determined at the time the individual applies for admission at a port of entry. U.S. Customs and Border Protection (CBP) makes such determinations after examining the applicant for admission. Students should refer to CBP's Web site (*http://www.cbp.gov/travel/international-visitors/study-exchange/exchange-arrivals*) for a list of the appropriate documentary evidence required to confirm eligibility for the relevant classification. Moreover, DHS believes that the guidance provided in this response is fully consistent with the Department of State's Cap-Gap policy as

outlined in its Foreign Affairs Manual.[121]

DHS also notes that if an F–1 student travels abroad before his or her H–1B change-of-status petition has been approved, USCIS will deem the petition abandoned. Consequently, such a student no longer would be authorized for F–1 status during the Cap-Gap period based on the H–1B change-of-status petition and thus would be unable to rely on the Cap-Gap provision's extension of duration of status for purposes of seeking readmission as an F–1 student. This has been the legacy INS and USCIS interpretation of its change-of-status authority under the INA for decades, applicable to all changes from one nonimmigrant status to another, not just those involving F–1 nonimmigrants.[122] As such, DHS declines to adopt the suggestion to allow travel for Cap-Gap students while a change-of-status petition is pending.[123]

*Comment.* Some commenters stated that certain documentary requirements in DHS regulations unnecessarily hampered a student's mobility. Such commenters specifically cited 8 CFR 214.2(f)(13)(ii), which allows an otherwise admissible F–1 student with an unexpired EAD issued for post-completion practical training to return to the United States to resume employment after a period of temporary absence. Under this provision, the EAD must be used in combination with an I–20 Certificate of Eligibility endorsed for reentry by the DSO within the last six months. Some commenters claimed that this requirement resulted in DHS officers rejecting facially expired EADs at port of entries—despite the presentation of other documents indicating valid employment

---

[119] A student in Cap-Gap who meets the eligibility requirements for a 24-month STEM OPT extension may file his or her Application for Employment Authorization, with the required fee and supporting documents, up to 90 days prior to the expiration of the Cap-Gap period on October 1. 8 CFR 214.2(f)(11)(i)(C).

[120] 9 FAM 402.5–5(N)(6)(f) (previously 9 FAM 41.61 N13.5–2) provides that if an F–1 student is the beneficiary of a timely filed petition for a cap-subject H–1B visa, with a start date of October 1, the F–1 status and any OPT authorization held on the eligibility date is automatically extended to dates determined by USCIS allowing for receipt and approval of the petition, up to September 30. The Cap-Gap OPT extension is automatic, and USCIS will not provide the student with a renewed EAD. However, F–1 students in this situation can request an updated Form I–20 Certificate of Eligibility from the DSO, annotated for the Cap-Gap OPT extension, as well as proof that the Form I–129, Petition for a Nonimmigrant Worker, was filed in a timely manner. Consular officers must verify that the electronic SEVIS record has also been updated before issuing a visa. *See* 9 FAM 402.5–5(N)(6)(f), available at *https://fam.state.gov/FAM/09FAM/09FAM040205.html.*

[121] *See* 9 FAM 402.5–5(N)(6)(f), available at *https://fam.state.gov/FAM/09FAM/09FAM040205.html.*

[122] *See* INA Sec. 248(a), 8 U.S.C. 1258(a) (providing that USCIS, in its discretion, may authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status). *See also* INS memo HQ 70/6.2.9 (June 18, 2001 memo noting that it has long been Service policy deny a request for change of status where an alien travels outside of the United States while a request for a change of status is pending); Letter from Jacquelyn A. Bednarz, Chief, Nonimmigrant Branch, Adjudications, INS, CO 248–C (Oct. 29, 1993), *reprinted in* 70 Interp. Rel. 1604, 1626 (Dec. 6, 1993).

[123] An individual who travels while his or her H–1B petition and request for change of status is pending would be required to apply for an H–1B visa at a consular post abroad (unless visa-exempt) in order to be admitted to the United States in H–1B status, presuming the underlying H–1B petition is approved.

STEM000118

authorization—and denying entry to the applicants.

*Response.* The Department acknowledges that it has previously cited 8 CFR 214.2(f)(13)(ii) in connection with travel during the Cap-Gap period. That regulatory provision addresses the validity period of EADs. Following careful review, DHS has determined that 8 CFR 214.2(f)(13)(ii), which expressly addresses the effects of departure from the United States by individuals with *unexpired* EADs, does not apply to Cap-Gap beneficiaries, who by definition have *expired* EADs. Therefore, 8 CFR 214.2(f)(13)(ii) does not apply to F–1 students who depart the United States during a Cap-Gap period.

*Comment.* Several commenters requested that DHS allow students to travel abroad during the STEM OPT extension period or during the pendency of an application for such an extension. One commenter stated that although the F–1 visa is a multiple entry visa, the Form I–20 Certificate of Eligibility states that a STEM OPT student's EAD is not valid for reentry into the United States. The commenter requested that DHS allow STEM OPT students to make multiple entries based on their status. The commenter noted that this would allow such students to visit their home countries at least once during the up-to-three-year period of practical training.

Similarly, some commenters requested that DHS permit F–1 students to travel during the pendency of a request for a STEM OPT extension and to reenter after a period of temporary absence. Another commenter recommended that students with pending applications for STEM OPT extensions be permitted to travel outside the United States because many employers require their employees to engage in international travel as part of their jobs. The commenter noted that the proposed rule prohibits such students from fulfilling such job requirements.

*Response.* Students on STEM OPT extensions (including those whose application for a STEM OPT extension is pending) may travel abroad and seek reentry to the United States in F–1 status during the STEM OPT extension period if they have a valid F–1 visa that permits multiple entries [124] and a current Form I–20 Certificate of Eligibility endorsed for reentry by the DSO within the last six months. The

student's status is determined by CBP upon admission to the United States or through a USCIS adjudication of a change-of-status petition.

*Comment.* Several commenters raised the issue of whether F–1 nonimmigrants may have "dual intent" (*i.e.,* whether such students, as F–1 nonimmigrants, may simultaneously seek lawful permanent residence or otherwise have the intent to immigrate permanently to the United States) Commenters that supported dual intent for F–1 students stated that such a policy would help attract and retain talented F–1 students in the United States. Certain commenters that opposed dual intent for students stated that this rule should be limited to maintaining F–1 status in order to allow students to gain post-graduate practical experience and training in their fields of study. Other such commenters asserted that dual intent for students would violate Congressional intent and run counter to the F–1 visa classification provisions in the INA. *See* INA 101(a)(15)(F)(i).

*Response.* These comments, which concern dual intent for F–1 students generally, are beyond the scope of this rulemaking. The changes in this rule affect only those F–1 students applying for STEM OPT extensions or Cap-Gap extensions, not the entire F–1 student population. Moreover, none of the changes in this rule relate to individuals seeking lawful permanent resident status or their ability to hold immigrant intent while holding nonimmigrant status.

### iii. Terms and Conditions of Employment Authorization Documents

*Comment.* A few commenters requested that DHS include written restrictions on the face of the EADs provided to STEM OPT students. Commenters stated that all EADs, including STEM OPT EADs, appear on their face to be valid for unrestricted employment. Commenters were concerned that if a job candidate presents an EAD to complete the Form I–9 process, an employer will not know whether the underlying employment authorization is actually limited to employment with an E-Verify employer in a field related to the student's STEM degree. Because of this confusion, commenters believed it was possible that an employer could hire a STEM OPT student whose employment authorization was in fact linked in SEVIS to a different employer. These commenters requested that DHS address this issue by adding a written restriction on the EAD itself.

*Response.* DHS already places written restrictions on the face of the EADs

provided to STEM OPT students (under the "Terms and Conditions" section). Such EADs currently contain the following notation: "Stu: 17-Mnth Stem Ext." In response to the potential confusion described in the above comments, however, DHS has decided to update the notation to provide a stronger indication of the limitations of such EADs. Such EADs will now contain the following notation: "STU: STEM OPT ONLY." DHS believes this new notation will better alert employers that the cardholder's employment authorization is subject to certain conditions.

*Comment.* Another commenter requested that DHS issue new EADs to OPT students with expired EADs who either are in a Cap-Gap period or have a pending application for a STEM OPT extension. The commenter stated that these new EADs would allow such students to renew their driver's licenses and thus facilitate their work commute. In the alternative, the commenter requested that USCIS issue these students formal documents that would allow them to renew their driver's licenses.

*Response.* Under current processes, USCIS cannot issue new EADs to F–1 students with pending applications without adversely affecting fee revenues and overall EAD processing times. Under current guidance in the Handbook for Employers (M–274), the combination of the student's expired EAD and his or her Form I–20 Certificate of Eligibility endorsed by the designated school official is acceptable proof of identity and employment authorization for purposes of Form I–9 requirements. In response to the above comments, however, DHS has decided to clearly articulate this policy by updating the regulation at 8 CFR 274a.12(b)(6)(iv) to indicate that this combination of documents is considered an unexpired EAD for purposes of complying with Form I–9 requirements. DHS believes the regulatory change clearly articulates that students with the appropriate documents remain in F–1 status and are authorized for employment.

*Comment.* One commenter recommended that DHS clarify whether EADs would be revoked if the Mentoring and Training Plan described in the proposed rule were to require modification or the insertion of additional information subsequent to the commencement of the STEM OPT student's employment.

*Response.* As noted in section IV.B. of this preamble, if any material change to or deviation from the Training Plan occurs, the student and employer must

---

[124] Department of State consular officers determine whether an F–1 visa is valid for multiple or single entries, which is generally based on reciprocity.

**13104** **Federal Register** / Vol. 81, No. 48 / Friday, March 11, 2016 / Rules and Regulations

sign a modified Training Plan reflecting the material changes or deviations, and must ensure that the modified plan is submitted to the student's DSO at the earliest available opportunity. So long as the student and employer meet the regulatory requirements, and the modified Training Plan meets the requirements under this rule, the student's employment authorization will not cease based on a change to the plan.

*I. Transition Procedures*

1. Description of Final Rule and Changes From NPRM

The 17-month STEM OPT regulations remain in force through May 9, 2016. This rule is effective beginning on May 10, 2016. This rule includes procedures to allow for a smooth transition between the old rule and the new rule, as discussed below.

i. STEM OPT Applications for Employment Authorization Pending on May 10, 2016

DHS will continue to accept and adjudicate applications for 17-month STEM OPT extensions under the 2008 IFR through May 9, 2016. The Department, however, has modified the transition procedures in the proposed rule for adjudicating those applications that remain pending when the final rule takes effect on May 10, 2016. In the NPRM, DHS had proposed that USCIS would adjudicate pending applications using the regulations that existed at the time the applications were submitted. As discussed further below, DHS has reconsidered its original proposal in light of comments received, and will instead apply the requirements of this rule to such pending cases. Beginning on May 10, 2016, USCIS will issue RFEs to students whose applications are still pending on that date. *See* 8 CFR 214.16(a). The RFEs will allow these students to effectively amend their application to demonstrate eligibility for 24-month extensions without incurring an additional fee or having to refile the Application for Employment Authorization.

Specifically, USCIS will issue RFEs requesting documentation that will establish that the student is eligible for a 24-month STEM OPT extension, including a Form I–20 Certificate of Eligibility endorsed on or after May 10, 2016, indicating that the DSO recommends the student for a 24-month STEM OPT extension. To obtain the necessary DSO endorsement on the Form I–20 showing that the student meets the requirements of this rule, the Training Plan has to be submitted to the

DSO. Generally, under 8 CFR 214.2(f)(11)(i), a student must initiate the OPT application process by requesting a recommendation for OPT by his or her DSO. Thus, a DSO's recommendation for OPT on a Form I–20 Certificate of Eligibility is generally not recognized as valid if such endorsement is issued after the Application for Employment Authorization is filed with USCIS. DHS, however, will consider the submission of the Form I–20 Certificate of Eligibility as valid if the form is submitted in response to the RFE that has been issued under the transition procedures described in 8 CFR 214.16.

DHS recognizes that following this rule's effective date, some students may prefer to withdraw their pending application for a 17-month STEM OPT extension and instead file a new application for a 24-month STEM OPT extension. Before a student decides to do so, however, the student should understand the applicable filing deadlines and ensure that he or she does not lose F–1 status. Importantly, a student may file for a STEM OPT extension only if the student is in a valid period of post-completion OPT at the time of filing. Thus if a student withdraws an application for a STEM OPT extension after his or her period of post-completion OPT has ended, the student will no longer be eligible to file for a STEM OPT extension.

ii. Applications for 24-Month STEM OPT

DHS will begin accepting applications for STEM OPT extensions under this rule on May 10, 2016. Beginning on that date, DHS will process all Applications for Employment Authorization seeking 24-month STEM OPT extensions in accordance with the requirements of this rule. In other words, the final rule's new requirements will apply to all STEM OPT students whose applications are pending or approved on or after the final rule is effective.

Thus, a student whose Application for Employment Authorization is filed and approved prior to May 10, 2016 will be issued an EAD that is valid for 17 months (even if he or she erroneously requested a 24-month STEM OPT extension). As indicated above, a student whose application is pending on May 10, 2016 will be issued an RFE requesting documentation establishing that the student is eligible for a 24-month STEM OPT extension. As described more fully below, this documentation must include, among other things, a Form I–20 Certificate of Eligibility endorsed on or after May 10, 2016, indicating that the requirements

for a 24-month STEM OPT extension have been met.

iii. Students With Valid, Unexpired 17-Month STEM OPT Employment Authorization on May 10, 2016

Any 17-month STEM OPT EAD that is issued before May 10, 2016 will remain valid until the EAD expires or is terminated or revoked. *See* 8 CFR 214.16(c)(1).[125] As a transitional measure, starting on May 10, 2016, certain students with such EADs will have a limited window in which to apply for an additional 7 months of OPT, effectively enabling them to benefit from a 24-month period of STEM OPT. *See* 8 CFR 214.16(c)(2). To qualify for the 7-month extension, the student must satisfy the following requirements:

• The STEM OPT student must properly file an Application for Employment Authorization with USCIS, along with applicable fees and supporting documentation, on or before August 8, 2016, and within 60 days of the date the DSO enters the recommendation for the 24-month STEM OPT extension into the student's SEVIS record. *See* 8 CFR 214.16(c)(2)(i). DHS believes that the 90-day window for filing such applications provides sufficient time for students to submit a required Training Plan, obtain the necessary Form I–20 Certificate of Eligibility and recommendation from the student's DSO, and fulfill other requirements for the 24-month extension.

• The student must have at least 150 calendar days[126] remaining prior to the expiration of the 17-month STEM OPT EAD at the time the Application for Employment Authorization is filed. *See* 8 CFR 214.16(c)(2)(ii). This 150-day period guarantees that a student who obtains an additional 7-month extension will have at least 1 year of practical training under the enhancements introduced in this rule, including site visits, reporting requirements, and statement and evaluation of goals and objectives. For students who choose to seek an additional 7-month extension, the new enhancements apply upon the proper filing of the Application for Employment Authorization requesting the 7-month extension. *See* 8 CFR 214.16(c)(3).

• The student must meet all the requirements for the 24-month STEM OPT extension as described in 8 CFR 214.2(f)(10)(ii)(C), including but not limited to submission of the Training Plan to the DSO. *See* 8 CFR 214.16(c)(2)(iii). STEM OPT students applying for this additional 7-month extension must be in a valid period of OPT, but are not required to be in a valid period of 12-month post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B) as would

---

[125] As explained previously, 17-month STEM OPT EADs currently have annotations placed in the Terms and Conditions as follows: "Stu: 17-Mnth Stem Ext."

[126] DHS recognizes that it proposed a 120-day period in the NPRM, but has determined for the reasons stated above that the 150-day period is more appropriate.

normally be required for a STEM OPT extension request.

DHS believes that these requirements are necessary to ensure that those who receive the additional 7-month extension are covered by this rule's improved compliance, reporting, and oversight measures.

Moreover, unless and until a student with a 17-month STEM OPT extension properly files the application for the 7-month extension under the transition procedures of 8 CFR 214.16, the student, and the student's employer and DSO, must continue to follow all the terms and conditions that were in effect when the 17-month STEM OPT employment authorization was granted. *See* 8 CFR 214.16(c)(1). Upon the proper filing of the application for the additional 7-month STEM OPT period, the student, and the student's employer and DSO, will be subject to all but one of the requirements of the 24-month STEM OPT extension period. The only exception concerns the period of unemployment available to such a student. Under the rule, the 150-day unemployment limit described in 8 CFR 214.2(f)(10)(ii)(E) will apply to a student seeking a 7-month extension only upon approval of that extension. Thus, while the application for the additional 7-month extension is pending, the student may not accrue an aggregate of more than 120 days of unemployment during the entire post-completion OPT period. If the application for the 7-month extension is approved, the student may accrue up to 150 days of unemployment during the entire OPT period.

If an application for a 7-month extension is approved, USCIS will issue an EAD with a validity period that starts on the day after the expiration date stated in the 17-month STEM OPT EAD. If an application for a 7-month extension is denied, the student, and the student's employer and DSO, must, subsequent to denial, abide by all the terms and conditions that were in effect when the 17-month STEM OPT EAD was issued, including reporting requirements. *See* 8 CFR 214.16(c)(3). They must abide by such terms throughout the remaining validity period of the 17-month STEM OPT extension.

DHS recommends that students who choose to request the additional 7-month extension obtain the necessary DSO recommendation and file their application as early as possible in advance of the August 8, 2016, application deadline. USCIS's current processing times are available at *https:// egov.uscis.gov/cris/ processTimesDisplayInit.do.*

### 2. Public Comments and Responses

i. STEM OPT Applications for Employment Authorization Pending on May 10, 2016

*Comment.* DHS received comments requesting clarification on the procedures that would apply to F–1 students whose applications for STEM OPT extensions are pending at the time of the implementation of the final rule.

*Response.* As noted above, USCIS will issue RFEs to students whose applications for employment authorization requesting a 17-month STEM OPT extension are pending on the effective date of this rule. By responding to the RFE, students will have the opportunity to demonstrate that they are eligible for a 24-month STEM OPT extension without incurring an additional fee, or having to refile the Application for Employment Authorization.

*Comment.* Several commenters expressed concern about the proposed USCIS adjudicative process for 17-month STEM OPT applications that remain pending on the effective date of the final rule. For example, one commenter noted that the proposed rule indicated that DHS intended to adjudicate STEM OPT applications "consistent with the regulations that existed at the time the application was submitted." The commenter was concerned with the potential confusion that would arise if a DSO issued a 17-month STEM OPT recommendation before the new rule's effective date but the student filed the Application for Employment Authorization after that date. In such a case, the commenter added, the student's Application for Employment Authorization would not meet the applicable requirements at the time of filing. The commenter recommended that DHS instead use the date of the DSO recommendation as the determinative factor as to which regulatory requirements to apply.

*Response.* DHS appreciates commenters' concerns about the possibility for confusion. To clarify, 17-month STEM OPT applications that are filed prior to, and remain pending on, May 10, 2016 will be processed in accordance with the requirements of this rule. As described above, USCIS will issue RFEs to students with such pending applications. The RFE will request documentation showing that the student meets the requirements of the 24-month STEM OPT extension. The documentation must include a Form I–20 Certificate of Eligibility endorsed on or after May 10, 2016, indicating that the DSO recommends the student for a 24-month STEM OPT extension.

Submission of the Form I–20 in response to the RFE will be regarded as fulfillment of the requirement, contained in 214.2(f)(11)(i) of this section, that a student must initiate the OPT application process by requesting a recommendation for OPT by his or her DSO. *See* 8 CFR 214.16(a)(1).

Moreover, DHS will deem 17-month STEM OPT applications that remain pending on May 10, 2016, to be covered by 8 CFR 214.2(f)(11)(i)(C) and 8 CFR 274a.12(b)(6)(iv) of this rule. These provisions state that if a student's post-completion OPT expires while his or her timely filed STEM OPT application is pending, the student will receive an automatic extension of employment authorization of up to 180 days upon the expiration of his or her current employment authorization.[127] *See* 8 CFR 214.16(a)(2).

ii. *New Applications for STEM OPT Under This Rule*

*Comment.* Some commenters sought clarification on whether a student in the 60-day grace period following an initial 12-month period of post-completion OPT would be given the opportunity to apply for a STEM OPT extension if the new rule takes effect during the student's 60-day grace period. Some commenters asked whether there will be an additional grace period allowing students to come into compliance with the final rule once it is published.

*Response.* This rule, like the 2008 IFR, does not allow students to apply for STEM OPT extensions during the 60-day grace period following an initial 12-month period of post-completion OPT. The current requirement to properly file the request for a STEM OPT extension prior to the end of the initial OPT period allows sufficient time for the F–1 student to apply for the extension and is administratively convenient as it ensures continuing employment authorization during the transition from the initial OPT period to the STEM OPT period. Accordingly, if a student anticipates that he or she will enter the 60-day grace period before May 10, 2016, the student should not wait to apply. Such a student should apply for the 17-month STEM OPT extension before his or her initial OPT period expires.

[127] In addition, DHS considers students who apply for and are granted an additional 7-month period of STEM OPT eligible for the Cap-Gap provision described in section IV.H. of this preamble.

iii. Students with Valid, Unexpired 17-Month STEM OPT Employment Authorization on May 10, 2016.

*Comment.* Some commenters stated that a failure to promulgate a new rule prior to the vacatur of the 2008 IFR would result in negative impacts to students currently on 17-month STEM OPT extensions, as well as U.S. employers and the U.S. economy. Commenters stated that a regulatory gap would result in negative financial impacts for a great number of employers as well as several thousand students who will be at a risk of losing their status.

*Response.* DHS has endeavored to have a final rule in place before the vacatur takes effect. DHS understands the commenters' concerns, but believes that such concerns are now moot.

*Comment.* Some commenters also asked whether, following the final rule's effective date, students currently on 17-month STEM OPT extensions would be allowed to apply for a 24-month STEM OPT extension. One commenter requested that existing 17-month extensions automatically be extended to a 24-month period to reduce workload for both students and USCIS. Other commenters stated that students who received 17-month STEM OPT EADs should receive a waiver of application fees for a revised 24-month EAD. According to these commenters, students had not caused the program requirements to change, and they should not be punished for it.

*Response.* As noted above, after the effective date of this final rule, certain students with 17-month STEM OPT extensions may apply for an additional 7-month extension to effectively obtain the balance of the new 24-month STEM OPT extension. To qualify for the 7-month extension, such students must have at least 150 days remaining before the end of the student's 17-month OPT period, and they must otherwise meet all requirements of the final rule governing the 24-month STEM OPT extension. DHS considered commenters' suggestions, but ultimately determined that automatically converting 17-month extensions into 24-month extensions would be inconsistent with many parts of the rule, including the requirements related to Training Plans, employer attestations, and reporting requirements. For these reasons, students with 17-month extensions who seek to benefit from the 24-month extension must apply for the balance of the 24-month extension consistent with this rule's requirements.

*Comment.* DHS received a number of comments seeking clarification on the categories of students who would be affected by the new requirements for obtaining STEM OPT extensions. Several commenters asked DHS to clarify whether the new requirements would apply to students on 17-month STEM OPT extensions on the date the final rule becomes effective. One commenter asked whether students currently on 17-month STEM OPT extensions would be permitted to complete their period of authorized STEM OPT.

*Response.* As noted above, the new requirements apply only to STEM OPT applications that are pending on the effective date of the final rule or that are submitted after that date. The new requirements do not affect current 17-month STEM OPT beneficiaries, except to the extent that such beneficiaries seek to avail themselves of the additional 7-month OPT period available to them under the transition provisions of the final rule. Students currently on 17-month STEM OPT extensions who do not seek 7-month extensions will be permitted to complete their authorized 17-month STEM OPT period, barring termination or revocation of their EAD under 8 CFR 274a.14. During this time, the student, and the student's employer and DSO, must continue to abide by all the terms and conditions that were in effect when that EAD was issued.

## J. Comments on the Initial Regulatory Impact Analysis

*Comment.* Some commenters were generally supportive of the proposed rule, but stated that DHS severely underestimated the time-burden and costs to DSOs for complying with requirements concerning the submission of training plans and periodic evaluations. Commenters believed that DHS estimates related to these requirements—including 30 minutes for review of training plans and 15 minutes for review of periodic evaluations—were unrealistic. Specifically, one university representative explained that DSOs would need to spend 50 to 60 minutes reviewing and storing each training plan. The commenter explained that DSOs would need 30 minutes to review training plans for completeness and follow up with students as necessary, and an additional 20 to 30 minutes to upload the document into SEVIS. Other commenters stated that it would take an employer 90 to 120 minutes to complete the proposed Mentoring and Training Plan.

*Response.* In response to comments, DHS revised the time estimated to initially complete the Training Plan form. DHS added an hour to the estimate of DSO's time to initially complete the Training Plan form, and 50 minutes to the estimate of DSO's time for the coordination and completion of each evaluation. DHS added two hours to the estimate of employer's time to initially complete the Training Plan form, and 30 minutes to the estimate of employer's time for the coordination and completion of each evaluation. DHS added 30 minutes to the estimate of student's time for the coordination to initially complete the Training Plan form, and 30 minutes for the coordination and completion of each evaluation.

As noted above, this final rule includes a number of provisions intended to minimize burden on employers while ensuring that the Training Plan for STEM OPT Students serves its stated purposes. For instance, DHS has revised the regulatory text and the Training Plan form to clarify that employers may rely on existing training programs for STEM OPT students, so long as those programs satisfy this rule's requirements. Also in response to comments, DHS has clarified the form instructions and various fields on the form. Among other things, DHS has removed the reference to "mentoring," which many commenters stated would comprise a significant part of the expected time to both complete and review the proposed form.

With regard to the commenter's estimate of the approximate time required to upload the training plan into SEVIS, DHS clarifies that the rule does not require the Training Plan for STEM OPT Students to be uploaded into that database at this time, but instead only requires that DSOs properly store it. Once SEVIS functionality is upgraded to permit the Training Plan to be uploaded, the form must be uploaded into SEVIS for each F–1 student participating in a STEM OPT extension. DHS anticipates, however, that the new student portal will allow F–1 students to upload certain information, including the Training Plan, directly into SEVIS. This means that DSOs ultimately will not be required to spend any time uploading the form into SEVIS and that their burdens will otherwise be reduced due to the student portal.

*Comment.* Another commenter suggested that DHS "is neglecting its duty under federal guidance to discuss crucial economic considerations, such as how many OPT workers will be hired instead of American workers; how many STEM grads have given up finding work in the STEM field; how the new rule will affect tech-worker wages and American STEM-grad employment."

*Response.* DHS disagrees that it neglected to consider the economic

impact of the proposed rule, much of which was described in the Initial Regulatory Impact Analysis. DHS carefully considered the potential direct costs and benefits of the proposed rule, and has carefully considered the potential direct costs and benefits of the final rule.

*Comment.* Some commenters suggested that DHS shift costs away from students and universities. For instance, some commenters supported the rule, but suggested fees to employers or students that would cover government costs or costs for universities, including the training of DSOs on how to administer and review the proposed Mentoring and Training Plan.

One DSO recommended that DHS establish a minimum personnel full-time equivalent (FTE) requirement for "SEVP regulatory advising and SEVIS reporting requirement[s]," which would be based on the number of F–1 students enrolled and whether the school uses SEVIS Real-time Interactive web processing or batch processing. The same DSO also suggested that this FTE figure be a SEVIS reporting requirement as part of a school's recertification. Some commenters said that DHS' estimation of the time required for reviewing the proposed Mentoring and Training Plan was too low in light of DSOs' current work duties.

*Response.* DHS views the Training Plan as primarily the student's responsibility to create and submit, but has made a number of changes in this rule that will reduce the implementation costs for schools. For example, DHS has decided to require only an annual evaluation, and the Department has also clarified a DSO's review responsibilities in section IV.F. of this preamble. In addition, SEVIS will soon be updated to include a portal allowing students to update their own information. DHS believes the rule offers benefits to U.S. institutions of higher education that outweigh administrative implementation costs.

With respect to the commenters' specific proposals, DHS notes that there are currently no plans to add a surcharge to employers to defray additional costs to schools or students. DHS does not expect that this rule would require new hiring by the school; nevertheless, in 2015 DHS lifted the prior cap of 10 DSOs per campus, allowing schools to better allocate personnel to suit their F–1 student population needs. *See* 8 CFR 214.3(l)(1)(iii); Final Rule: Adjustments to Limitations on Designated School Official Assignment and Study by F–2 and M–2 Nonimmigrants, 80 FR 23680

(Apr. 29, 2015). DHS will continue to seek feedback and proposals from school officials on ways to increase clarity and minimize burden.

*Comment.* Some DSOs stated that their workloads would increase if they were obligated to follow up with students who miss their Training Plan deadlines and reporting requirements.

*Response.* If a student does not submit his or her evaluation on time, the DSO should report that fact to DHS. After such reporting is completed, the DSO would have no further responsibility related to student non-compliance aside from any potential case-by-case DHS request for documentation regarding the student.

*Comment.* One commenter sought clarification on which persons would be responsible for advising U.S. employers of their reporting obligations under 8 CFR 214.2(f)(10)(ii)(C)(6). The commenter, a school, stated that this would be another burden that would fall on schools as they would end up educating employers about their obligations.

*Response.* The employer, as an active participant in the STEM OPT extension program, is responsible for reporting any changes in student employment and monitoring students' progress and work via the Training Plan. DHS will make initial guidance available to all parties—DSOs, employers, and students—regarding the responsibilities of each, as soon as feasible. These guides will be posted at *http://www.ice.gov* and *http://studyinthestates.dhs.gov*.

*Comment.* The Initial Regulatory Impact Analysis estimated that it would take approximately three hours for the employer to complete the proposed Mentoring and Training Plan, including 2 hours for employers to initially complete the plan and an additional hour for employers to help complete the required evaluations.[128] Some commenters stated that DHS' initial estimate of the time burden for employers to complete the proposed Mentoring and Training Plan and conduct the required evaluation every six months was too low. One commenter cited a survey of employers in which four out of five employers responded that "the government's estimate regarding time and cost to comply with the program requirements is too low." Another commenter observed that DHS' initial time estimate did not account for time necessary for communication between the student,

the DSO, and the employer in order to complete Section 1 of the form.

*Response.* DHS recognizes the concerns of students and employers with regard to complying with the Training Plan requirements. As noted above, DHS has incorporated significant flexibilities and clarifications into the Training Plan requirement, including by reducing the frequency of evaluations. DHS has also revised the burden estimates upwards, including to account for time for necessary communication between the student, DSO, and employer.

*Comment.* Some commenters stated that any government costs incurred to implement the rule should be used instead to help train and prepare U.S. students and graduates.

*Response.* The STEM OPT extension is a program implemented by SEVP, which is entirely funded by fees paid by students and employers. The program does not receive appropriated funds from Congress, and the program is not implemented at taxpayers' expense. Thus, any elimination of the STEM OPT extension would not result in increased budget flexibility to address training of U.S. citizen students and workers.

### K. Other Comments

#### 1. Introduction

DHS received a number of comments related to matters falling outside the topics discussed above. The comments are addressed below.

#### 2. Public Comments and Responses

##### i. Procedural Aspects of the Rulemaking

*Comment.* Several commenters asserted that foreign nationals (including students and non-U.S. workers) should not be allowed to comment on the proposed rule.

*Response.* Such an approach would be inconsistent with the statutory requirements established by Congress in the APA's notice-and-comment provision, which do not include a citizenship or nationality requirement and places a priority on allowing all interested persons to participate in a rulemaking proceeding.

*Comment.* One commenter stated that the use of a 30-day comment period instead of a 60-day comment period suggested an "executive power grab." The commenter added that the 30-day comment period was intentionally designed to allow the rule to go into effect on February 13, 2016, when the 2008 STEM OPT extension was originally scheduled to be vacated. The commenter stated that a February 13 effective date would allow DHS to avoid a hiatus in processing applications.

---

[128] *See* DHS, Initial Regulatory Impact Analysis, table 7 (Oct. 2015), available at *http://www.regulations.gov/#!documentDetail;D=/ICEB-2015=/-0002=/-0206*.

Another commenter stated that the 30-day comment period has the potential to expose the Department and this rule to unneeded scrutiny and possible delay. The commenter suggested that DHS consider withdrawing the current proposal and re-release a new proposed rule with a timeline that is consistent with Executive Order 13563.

*Response.* DHS recognizes that Executive Order 13563 recommends a 60-day comment period. However, the Administrative Procedure Act makes no reference to that time period. *See* 5 U.S.C. 553. For many years courts have recognized that 30 days provides a meaningful opportunity for public input into rulemaking. *See, e.g., Conference of State Bank Sup'rs* v. *Office of Thrift Supervision,* 792 F. Supp. 837, 844 (D.D.C. 1992). DHS notes that the fact that it received over 50,500 comments on the proposed rule suggests that the 30-day period provided an adequate opportunity for public input. Especially in light of the need for swift action to address impending vacatur of the 2008 IFR, DHS believes that the 30-day comment period was reasonable.

*Comment.* One commenter expressed doubts that DHS would consider comments regarding this regulation rather than "just dismiss[ing]" them because, according to the commenter, "the Department seemingly didn't think the 'over 900' comments it got in response to the 2008 IFR were worth any response at all." The commenter suggested that the final rule should explain why the first STEM OPT regulation was never finalized and why it was not a "violation of the spirit or the letter of the APA to not finalize the 2008 IFR."

*Response.* DHS disagrees with the commenter. DHS has considered all comments submitted in regard to this rulemaking, as reflected in the extensive discussion in this preamble. In any case, notwithstanding that DHS was under no legal obligation to do so, DHS relied on the comments to the 2008 IFR when developing the 2015 NPRM. *See, e.g.,* 80 FR 66380–82, 63384, 63386–91 (Oct. 19, 2015).

ii. Impact of STEM OPT on the H–1B Program

*Comment.* A number of commenters expressed concern about the impact that this rulemaking will have on the H–1B visa program. One commenter stated that the proposed rule would make it harder for individuals to obtain H–1B visas. The commenter explained that the extended OPT period effectively will give F–1 students multiple opportunities to apply for H–1B visas, and that without a commensurate increase in the number of H–1B visas, the rule would increase competition and make it harder to obtain such visas. Some commenters stated that only students who are not granted H–1B visas should be granted STEM OPT extensions, apparently believing the two programs are best considered as alternatives.

Another commenter stated that "DHS predicts the number of [individuals] working on student visas will be greater than the H–1B quotas." Another commenter expressed that STEM OPT graduates are advantaged over H–1B workers, because they have the liberty of changing employers more frequently and with more ease than H–1B workers. However, another commenter stated that students participating in the STEM OPT extension lack mobility and described them as "indentured laborers" that do not have rights "like being able . . . to change jobs."

*Response.* DHS acknowledges that some employers may choose to sponsor F–1 students on STEM OPT extensions for H–1B visas. However, DHS expects that employers will invest in retaining only those STEM OPT students who have demonstrated through their performance during OPT that they are likely to make valuable contributions in a position related to their STEM field of study. Employers would make such decisions using the same business judgments they currently rely on to competitively recruit and retain talent and, in some cases, sponsor foreign nationals for H–1B visas.

DHS does not believe sufficient data has been presented to make a determination one way or the other regarding the suggestion that the rule will make it harder for individuals to obtain H–1B visas but believes that any impact will be minimal. DHS notes that there is no limit on the total number of H–1B petitions that an employer may submit in any given year, and no requirement that the individual be in the United States when a petition is submitted on his or her behalf. As compared to the total number of people in the world who may be eligible for H–1B visas, the total number of STEM OPT extension participants in any given year will be quite small. And to the extent that an increase in interest in the H–1B program from STEM OPT students may result in increased competition for scarce H–1B visas, the appropriate remedy for increasing the statutory limits imposed by Congress on H–1B visas would require legislative action.

Additionally, as noted above, the fundamental purpose of the STEM OPT extension is not to provide students with another chance at the H–1B lottery while in the United States. Instead, as explained in detail in the above discussions regarding experiential learning and important U.S. national interests, DHS believes the STEM OPT extension will promote what DHS believes to be the worthy goals of expanding the educational and training opportunities of certain international students, improving the competitiveness of U.S. academic institutions, and ensuring the continued substantial economic, scientific, technological, and cultural benefits that F–1 students bring to the United States generally.

DHS considered comments expressing concerns that STEM OPT students would add to the number of workers competing for jobs in the U.S. labor market beyond those Congress authorized in other employment-based nonimmigrant visa programs, and that they would potentially displace more-experienced U.S. workers. DHS considered potential impacts of student training in the employment context and has included specific labor market safeguards in this final rule. Specifically, any employer providing a training opportunity to a STEM OPT student must attest that the student will not replace a full- or part-time, temporary or permanent U.S. worker. The rule also includes protections to deter use of the STEM OPT extension to undercut U.S. workers' compensation, or sidestep other terms and conditions of employment that the employer would typically provide to U.S. workers. Specifically, the rule requires that the terms and conditions of a STEM practical training opportunity (including duties, hours, and compensation) be commensurate with those applicable to similarly situated U.S. workers. As stated previously, OPT is a part of the educational experience that individuals come to the United States to obtain, and the presence of these individuals in U.S. colleges and universities, as well as in workplaces, exposes U.S. students and workers to their intellectual and cultural perspectives, which ultimately provides significant cultural and economic benefits.

In response to the comment asserting that STEM OPT students can change jobs more easily and frequently than H–1B nonimmigrants, DHS first notes that commenters expressed varying views on whether the STEM OPT extension would result in such an impact. Additionally, unlike the H–1B program's objective to temporarily satisfy a sponsoring employer's need for labor, the STEM OPT extension's objective is to ensure adequate training appropriate to the major area of study

for the student. DHS determined that in order to meet that objective, the employer must comply with the requirements of this final rule, which include providing training conditions consistent with the established Training Plan. Therefore, F–1 students may change employers during a STEM OPT extension, but only in accordance with the STEM OPT regulations and in order to further their practical education in a position directly related to their major area of study. Outside of such a situation, STEM OPT students who leave their employers risk a loss of immigration status and the opportunity to further develop their skills through practical training.

### iii. Miscellaneous Other Comments

*Comment.* A university applauded the clarification in a footnote that "OPT can be full-time even while a student is attending school that is in session," but requested that the statement be affirmed via regulatory text.

*Response.* DHS declines to make this change because it would impact not only STEM OPT extensions but also the general OPT program, which would be outside the scope of this rulemaking.

*Comment.* A commenter asked whether a student can choose to end his or her post-completion OPT before the end of the eligibility period, so that the student may preserve some OPT eligibility time for another degree the student plans to pursue at the same educational level.

*Response.* The time that a student may spend on OPT is not "bankable" between two different degrees. This concept remains applicable to the STEM OPT extension as well as to all pre- or post-completion OPT. If a student does not use the full period of time eligible for one degree, the extra time cannot be used for OPT based on a different degree.

*Comment.* DHS received several comments regarding potential environmental costs resulting from an increased population, both in the United States generally, and in Silicon Valley, California specifically, where many STEM jobs are located. Some also noted that California has been struggling with an ongoing drought.

*Response.* Upon review, DHS remains convinced that our review pursuant to the National Environmental Policy Act is in compliance with the law and with our Directive and Instruction.

## V. Statutory and Regulatory Requirements

DHS developed this final rule after considering numerous statutes and executive orders related to rulemaking.

The below sections summarize our analyses based on a number of these statutes and executive orders.

### A. Executive Orders 12866 and 13563: Regulatory Planning and Review

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, as well as distributive impacts and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. DHS has prepared an analysis of the potential costs and benefits associated with this final rule. The analysis can be found in the docket for this rulemaking and is briefly summarized here. This rule has been designated a "significant regulatory action" that is economically significant, under section 3(f)(1) of Executive Order 12866. Accordingly, OMB has reviewed this regulation.

#### 1. Summary

DHS is amending nonimmigrant student visa regulations on OPT for students with degrees in STEM from U.S. accredited institutions of higher education. The final rule includes a 24-month STEM OPT extension. The rule also seeks to strengthen the STEM OPT program by requiring formal training plans by employers, adding wage and other protections for STEM OPT students and U.S. workers, allowing extensions only to students with degrees from accredited schools, and requiring employers to enroll and remain in good standing with E-Verify. The rule also provides Cap-Gap relief for any F–1 student with a timely filed H–1B petition and request for change of status.

The rule provides a formal mechanism for updating the STEM Designated Degree Program list, and permits a student participating in post-completion OPT to use a prior eligible STEM degree from a U.S. institution of higher education as a basis to apply for an extension, provided the most recent degree was also received from a currently accredited institution. The rule implements compliance and reporting requirements that focus on formal training programs to augment academic learning through practical experience, in order to equip students with a more comprehensive understanding of their selected area of study and broader functionality within their chosen field. These changes also

help ensure that the nation's colleges and universities remain globally competitive in attracting international STEM students to study and lawfully remain in the United States.

#### 2. Summary of Affected Population

DHS has identified five categories of students who will be eligible for STEM OPT extensions under the final rule: (1) Those currently eligible based on a recently obtained STEM degree; (2) those eligible based upon a STEM degree earned prior to their most recent degree; (3) those eligible for a second STEM OPT extension; (4) those eligible based on potential changes to the current STEM list; and (5) those eligible to increase a currently authorized STEM OPT extension period from 17 to 24 months.

DHS estimates the total number of affected students across the five categories to be almost 50,000 in year one and grow to approximately 92,000 in year 10. This estimation is based on the growth rate of the overall proportion of students with an eligible STEM degree who participate in the post-completion OPT program. DHS utilized a 15 percent growth rate that levelled off to 11 percent to achieve a long run stabilized participation rate in six years. Based on slightly lower and higher growth rates, DHS calculated low and high estimates; for year 1 the low and high figures are about the same as the primary estimate, but by year 10 the low estimate is about 80,000 and the high estimate is approximately 112,000.

DHS conducted a statistically valid sample analysis to estimate the number of STEM OPT employers and schools that would be considered small entities. To identify the entities that would be considered "small," DHS used the Small Business Administration's (SBA) guidelines on small business size standards applied by NAICS code. This analysis indicated that 48 percent of schools are small entities. Based on 1,109 approved and accredited schools participating in STEM OPT extensions, about 532 could reasonably be expected to be small entities impacted by this rule. A sample of 26,260 entities that employed STEM OPT students under the 2008 IFR revealed that about 69 percent were small. Hence, this rule could affect about 18,000 employers that are small entities.

#### 3. Estimated Costs of Final Rule

DHS estimates that the direct costs imposed by the implementation of this rule will be approximately $886.1 million over a 10-year analysis time period. At a 7 percent discount rate, the rule will cost $588.5 million over the