same period, which amounts to $83.8 million per year when annualized at a 7 percent discount rate. At a 3 percent discount rate, the rule will cost $737.6 million over the same period, which amounts to $86.5 million per year when annualized at a 3 percent discount rate. These costs include the direct and monetized opportunity costs to the three types of entities primarily affected by this rule: students, schools, and employers. Students will incur costs completing application forms and paying application fees; reporting to DSOs; preparing, with their employers, the Training Plan; and periodically submitting updates to employers and DSOs. DSOs will incur costs reviewing information and forms submitted by students, inputting required information into the SEVIS, and complying with other oversight requirements related to prospective and participating STEM OPT students. Employers will incur costs preparing the Training Plan with students, confirming students' evaluations, undergoing site visits, researching the compensation of similarly situated U.S. workers, enrolling in (if not previously enrolled) and using E-Verify to verify employment eligibility for all new hires, and complying with additional requirements related to E-Verify. The following table shows a summary of the total costs for a 10-year period of analysis.

TABLE 2—SUMMARY OF THE TOTAL COSTS OF THE FINAL RULE, 2016–2025

[$ millions]

| Year | STEM OPT extension cost | E-Verify cost | Total cost |
|---|---|---|---|
| | a | b | c = a + b |
| 1 | $65.5 | $1.8 | $67.3 |
| 2 | 50.1 | 2.1 | 52.2 |
| 3 | 57.7 | 2.5 | 60.2 |
| 4 | 66.3 | 3.0 | 69.3 |
| 5 | 76.2 | 3.5 | 79.7 |
| 6 | 84.6 | 4.2 | 88.8 |
| 7 | 93.9 | 5.0 | 98.9 |
| 8 | 104.2 | 6.0 | 110.2 |
| 9 | 115.7 | 7.1 | 122.8 |
| 10 | 128.4 | 8.4 | 136.8 |
| Total | 842.5 | 43.6 | 886.1 |
| Total (7%) | 560.6 | 27.9 | 588.5 |
| Total (3%) | 701.9 | 35.7 | 737.6 |
| Annual (7%) | 79.8 | 4.0 | 83.8 |
| Annual (3%) | 82.3 | 4.2 | 86.5 |

* Estimates may not sum to total due to rounding.

DHS estimates the following distribution of costs per STEM OPT extension under the final rule at: $767 per student, $239 per university DSO, $1,268 per employer (with E-Verify), and $1,549 per employers new to STEM OPT (new to E-Verify).

In addition to the quantified costs summarized above, there could be unquantified direct costs associated with this rule. Such costs could include costs to students and schools resulting from the final accreditation requirement; costs to employers from the final requirement to provide STEM OPT students with compensation commensurate to similarly situated U.S. workers; and decreased practical training opportunities for students no longer eligible for the program due to revisions to the STEM OPT program. DHS does not have adequate data to estimate the monetary value of these possible costs.

4. Estimated Benefits of Final Rule

Making the STEM OPT extension available to additional students and extending its length will enhance students' ability to achieve the objectives of their courses of study by allowing them to gain valuable knowledge and skills through on-the-job training that may be unavailable in their home countries. The changes will also benefit the U.S. educational system, U.S. employers, and the U.S. economy. The rule will benefit the U.S. educational system by helping ensure that the nation's colleges and universities remain globally competitive in attracting international students in STEM fields. U.S. employers will benefit from the increased ability to rely on the skills acquired by STEM OPT students while studying in the United States, as well as their knowledge of markets in their home countries. The U.S. economy as a whole will benefit from the increased retention of STEM students in the United States, including through increased research, innovation, and other forms of productivity that enhance the nation's scientific and technological competitiveness.

Furthermore, strengthening the STEM OPT extension by implementing requirements for training, tracking objectives, reporting on program compliance, and requiring the accreditation of participating schools will further prevent abuse of the limited on-the-job training opportunities provided by this program. These and other elements of the rule will also improve program oversight, strengthen the requirements for program participation, and better protect against adverse consequences on U.S. workers, as well as consequences that may result from exploitation of students.

DHS has not attempted to quantify the potential benefits of the rule because such benefits are difficult to measure. These benefits encompass a number of dynamic characteristics and explanatory variables that are very difficult to measure and estimate. Quantifying these variables would require specific analyses to develop reasonable and accurate estimates from survey methods that are not within the scope of this regulatory analysis.

5. Alternatives

For purposes of this analysis, DHS considered three principal alternatives to the final rule. The first alternative was to take no regulatory action, in

STEM000126

which case STEM OPT students would no longer be allowed to work or reside in the United States past their 12-month post-completion OPT period, unless they were able to convert to another employment-authorized visa classification or complete another academic program. DHS believes the benefits that accrue from allowing the F–1 STEM OPT extension for students and educational institutions would not be realized under this alternative and that in many cases these students would have to leave the United States. DHS rejects this alternative because it would deter future international students from applying to STEM degree programs at U.S. educational institutions and reduce the attractiveness of U.S. educational

institutions compared to educational systems in other countries that have more flexible postgraduate training programs.

The second alternative considered was to keep the maximum length of the STEM OPT extension at 17 months, while implementing all other aspects of the final rule. For students seeking a STEM OPT extension based on a second or previously earned STEM degree, the alternative would be similar to the final rule, except with respect to the duration of the OPT period. The 10-year total of this alternative is $29 million less than the final rule, discounted at 7 percent. After evaluation of DHS's experience with the STEM OPT extension, DHS has rejected this alternative so as to ensure

that the practical training opportunity is long enough to complement the student's academic experience and allow for a meaningful educational experience, particularly given the complex nature of many STEM projects.

The third alternative to the final rule was to include a six-month evaluation as part of the Training Plan. This alternative was considered in the NRPM. After considering an employer's typical schedule of annual evaluations for all employees, including STEM OPT extension students, DHS has rejected this alternative in favor of an annual evaluation.

The results of this comparison of alternatives are summarized in the following table.

TABLE 3—TOTAL COSTS FOR REGULATORY ALTERNATIVES CONSIDERED

[$ millions]

| Year | Alternative 1 no action | Alternative 2 no change in STEM OPT length | Alternative 3 6 month evaluations | Improving and extending STEM OPT (final rule) |
|---|---|---|---|---|
| 1 | $0.0 | $44.8 | $81.0 | $67.3 |
| 2 | 0.0 | 51.6 | 64.2 | 52.2 |
| 3 | 0.0 | 59.3 | 73.8 | 60.2 |
| 4 | 0.0 | 68.2 | 85.0 | 69.3 |
| 5 | 0.0 | 78.5 | 97.8 | 79.7 |
| 6 | 0.0 | 87.4 | 108.9 | 88.8 |
| 7 | 0.0 | 97.3 | 121.2 | 98.9 |
| 8 | 0.0 | 108.4 | 134.9 | 110.2 |
| 9 | 0.0 | 120.8 | 150.2 | 122.8 |
| 10 | 0.0 | 134.6 | 167.3 | 136.8 |
| Total | 0.0 | 851.1 | 1,084.4 | 886.1 |
| Total (7%) | 0.0 | 559.5 | 720.0 | 588.5 |
| Total (3%) | 0.0 | 705.5 | 902.5 | 737.6 |

*Estimates may not sum to total due to rounding.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980, 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small entities during rulemaking. The term ''small entities'' comprises small business, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

1. A Statement of the Need for, and Objectives of, the Rule

The final rule improves the STEM OPT extension by increasing oversight and strengthening requirements for participation. The changes to the STEM OPT extension regulations are intended to enhance the educational benefit of the STEM OPT extension, create a

formal process for updating the list of STEM degree programs that are eligible for the STEM OPT extension, and incorporate new measures to better ensure that STEM OPT extensions do not adversely affect U.S. workers. DHS objectives and legal authority for this final rule are further discussed elsewhere in this preamble.

2. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Rule as a Result of Such Comments

*Comment.* Many universities and employers specifically stated that the rule would improve overall U.S. economic competitiveness. However, commenters stated that the burden of the proposed Mentoring and Training Plan would be felt more acutely by

small- to medium-sized businesses that use this program. Commenters stated that managers of such businesses have many daily responsibilities—they are responsible for payroll, managing the Human Resources department, and personally working with their customers or clients, among other responsibilities. Commenters stated that DHS underestimated the increased administrative burdens that will be borne by small businesses, and noted that this time cannot be spent on the core competencies of the firm. Many of these same concerns are shared by larger companies as well. Commenters identifying as large participants in the OPT program stated concerns that the individualized training plan must be tracked by a supervisory employee at the firm for each worker.

Commenters stated that many firms already have workable mentoring and training programs in place at their firms, and some expressed concerns that the

training plan requirement, in many cases, would force companies to make major changes to their current mentoring programs while imposing an unreasonable cost burden. Other commenters expressed concern that DHS severely underestimated the time to fill out the form. Finally, in the initial regulatory flexibility analysis, DHS presented the costs to schools as a percentage of annual revenue. A university commenter stated that comparing costs against revenue is not appropriate because schools do not generate revenue from their graduates directly, and universities do not fund their international student offices based on student population.

*Response.* DHS recognizes the concerns of employers with regard to complying with the training plan requirements. As noted in sections IV.B. and IV.F. of this preamble, DHS has revised the NPRM to allow for additional flexibilities for employers. For instance, DHS has changed the frequency of the evaluation requirement. DHS proposed requiring an evaluation every six months, but is reducing the frequency to every 12 months. This change is intended to better reflect employer practices where annual reviews are standard, allowing students and employers to better align the evaluations required under this rule with current evaluation cycles. In addition, DHS has modified the regulatory text to further ensure that employers may rely on their existing training programs to meet certain training plan requirements under this rule, so long as such training programs otherwise meet the rule's training plan requirements. Finally, in response to comments received, DHS has updated the estimate of time to complete the Training Plan for STEM OPT Students form to 7.5 hours.

While employers may need to make adjustments due to the training plan requirement, DHS views the educational and program integrity benefits as outweighing any costs associated with the Training Plan and supporting documentation. In addition, it is primarily the student's responsibility to complete the Training Plan with the employer and submit it to the DSO.

Finally, DHS disagrees with the comment concerning school revenue. DHS presents the costs to schools as a percentage of estimated annual revenue in order to assess the impact of universities' costs in the context of their overall revenue.

3. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Changes Made to the Proposed Rule in the Final Rule as a Result of the Comments

DHS did not receive comments from the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule.

4. A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate Is Available

DHS conducted a statistically valid sample analysis to estimate the number of STEM OPT employers and schools that would be considered small entities. To identify the entities that would be considered "small," DHS used the SBA guidelines on small business size standards applied by NAICS code. This analysis indicated that 48 percent of schools are small entities. Based on 1,109 approved and accredited schools participating in STEM OPT extensions, about 532 could reasonably be expected to be small entities impacted by the rule. Analysis of a sample of 26,260 entities that employed students who had obtained STEM OPT extensions revealed that about 69 percent were small. Hence, about 18,000 employers that are small entities could be affected by the rule.

5. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirements and the Types of Professional Skills Necessary for Preparation of the Report or Record

The final rule requires assurance that STEM OPT students develop, with their employers, a training plan. When completed, students submit the Training Plan for STEM OPT Students form to

their DSOs when requesting the 24-month STEM OPT extension. The DSO must retain a copy of the form. The student and employer must ensure that any modified Training Plan is submitted to the student's DSO (at the earliest available opportunity). The student and employer must sign the modified Training Plan reflecting the material change(s) or deviation(s). Additionally, students will be required to update the form every 12 months to include a progress report on accomplishments and skills or knowledge obtained. Employers must meet with the student and sign the 12-month evaluation, and DSOs will check to ensure the evaluation has been completed and retain a copy.

Schools

Under the final rule, students must provide the completed Training Plan for STEM OPT Students forms to their DSOs to request STEM OPT extensions. DHS's analysis includes an opportunity cost of time for reviewing the form to ensure its proper completion and filing the record either electronically or in a paper folder.

Schools will incur costs providing oversight, reporting STEM OPT students' information, and reviewing required documentation. DSOs will be required to ensure the form has been properly completed and signed prior to making a recommendation in SEVIS. Schools will be required to ensure that SEVP has access to student evaluations (electronic or hard copy) for a period of at least three years following the completion of each STEM practical training opportunity. This rule, like the 2008 IFR, requires six-month student validation check-ins with DSOs. While the DSO will be in communication with the student during a six-month validation check-in, the final rule adds an additional requirement that DSOs also check to ensure the 12-month evaluation has been properly completed and retain a copy. The final rule maintains the 2008 IFR requirements for periodic information reporting requirements on students, which results in a burden for DSOs. Table 3 summarizes the school costs from the final rule, as described in the Costs section of the separate Regulatory Impact Analysis.

TABLE 4—SCHOOLS—COST OF COMPLIANCE PER STEM OPT OPPORTUNITY

| Final provision | Calculation of school cost per student | Cost in year 1 per student | Cost in year 2 per student |
|---|---|---|---|
| Initially Reviewing and Filing Training Plan Form [1] ...... | (1.33 hours × $39.33) ................................................ | $52.31 | $0.00 |
| 12-Month Evaluation [2] ................................................ | (1 hour × 1 eval × $39.33) ......................................... | 39.33 | 39.33 |
| 6-Month Validation Check-Ins [2] .................................. | (0.17 hours × 2 validation check-ins × $39.33) ............ | 13.37 | 13.37 |

STEM000128

TABLE 4—SCHOOLS—COST OF COMPLIANCE PER STEM OPT OPPORTUNITY—Continued

| Final provision | Calculation of school cost per student | Cost in year 1 per student | Cost in year 2 per student |
|---|---|---|---|
| Additional Implementation[2] ......................................... | 0.10 × (Training Plan Initial + eval + validation check-ins costs). | 10.83 | 5.27 |
| Periodic Reports to DSO ............................................... | 0.17 hours × 2 reports × $39.33 .................................. | 13.37 | 13.37 |
| Total ...................................................................... | | 128.88 | 71.34 |

[1] Training Plan initial costs are only in year 1 per STEM OPT student.
[2] Estimated based on 12-month-period.

DHS estimates the annual impact to schools based on the school cost of compliance as a percentage of annual revenue. Second-year costs account for new additional STEM OPT extension students. For not-for-profit schools, DHS multiplied full-time first-year student tuition by total number of students to estimate school revenue.[129] While tuition revenue may underestimate actual school revenue, this is the best information available to DHS, and certainly the largest source of income for most schools. DHS's analysis shows that the first-year annual impact for the sampled small-entity schools with sufficient data would be less than 1 percent, with the average annual impact being 0.005 percent. All sampled small-entity schools with sufficient data had second-year annual impacts of less than 1 percent, with the average annual impact being 0.009 percent.

TABLE 5—SCHOOLS—ANNUAL IMPACT IN YEAR 1

| Revenue impact range | Number of for-profit small entities with data | Number of non-profit small entities with data | Percent of small entity schools |
|---|---|---|---|
| 0% < Impact ≤ 1% ........................................................ | 4 | 137 | 100% |
| Total ...................................................................... | 141 | | 100 |

TABLE 6—SCHOOLS—ANNUAL IMPACT IN YEAR 2

| Revenue impact range | Number of for-profit small entities with data | Number of non-profit small entities with data | Percent of small entity schools |
|---|---|---|---|
| 0% < Impact ≤ 1% ........................................................ | 4 | 137 | 100% |
| Total ...................................................................... | 141 | 100 | |

Finally, schools not accredited by a Department of Education-recognized accrediting agency may incur unquantified costs from the final rule's prohibition on participation in the STEM OPT extension by students attending unaccredited schools. A few schools may choose to seek accreditation, or may potentially lose future international students and associated revenue.

Employers

Employers will be required to provide information for certain fields in the Training Plan for STEM OPT Students form, review the completed form, and attest to the certifications on the form. The final rule also prohibits using STEM OPT extension students as volunteers. The rule additionally requires that students work at least 20 hours per week while on their STEM OPT extension, and that they receive commensurate compensation. DHS does not have data on the number of STEM OPT students who do not currently receive compensation. Nor does DHS have data on the number of STEM OPT students who do not currently receive wages or other qualifying compensation that would be considered commensurate under the final rule. To the extent that employers are not currently compensating STEM OPT students in accordance with the final rule, this rulemaking creates additional costs to these employers. In the quantified costs, DHS does account for the possible additional burden of reviewing the employment terms of similarly situated U.S. workers in order to compare the terms and conditions of their employment to those of the STEM OPT student's practical training opportunity.

The final rule indicates that DHS, at its discretion, may conduct a site visit of an employer. The employer site visit is intended to ensure that each employer meets program requirements, including that they are complying with their attestations and that they possess the ability and resources to provide structured and guided work-based learning experiences outlined in students' Training Plans. Site visits will be performed at the discretion of DHS either randomly or when DHS determines that such an action is needed. The length and scope of such a visit would be determined on a case-by-case basis. For law enforcement reasons, DHS does not include an estimate of the basis for initiating a site visit and is unable to estimate the number of site

[129] U.S. Department of Education, National Center for Education Statistics, Institute of Education Sciences, "Academic year prices for full-time, first-time undergraduate students," (Total enrollment, including Undergraduate and Graduate) 2014–2015, Available at *http://nces.ed.gov/globallocator/*.

visits that may be conducted, and thus is unable to provide a total annual estimated cost for such potential occurrences. However, based on previous on-site-reviews to schools,

DHS estimates that an employer site visit may include review of records and questions for the supervisor, and will take five hours per employer. Therefore, DHS estimates that if an employer were

to receive such a site visit, it would cost the employer approximately $394.80 (5 hours × $78.96).[130]

### TABLE 7—EMPLOYERS—COST OF COMPLIANCE

| Final provision | Calculation of costs | Cost in year 1 | Cost in year 2 |
|---|---|---|---|
| Initially Completing Training Plan Form [1] ................... | (3 hours × $78.96) + (1 hour × $43.93) ...................... | $280.81 | $0.00 |
| 12-Month Evaluations [2] ........................................... | (0.75 hours × 1 eval × $78.96) ................................... | 59.22 | 59.22 |
| Additional Implementation ........................................ | 0.1 × (Training Plan Initial + evals costs) ................. | 34.00 | 5.92 |
| Employer STEM OPT Costs per Student = ................ | Total .......................................................................... | 374.03 | 65.14 |
| Cost for E-Verify per New Hire Case ......................... | (0.16 hours × $43.93) ............................................... | 7.03 | 7.03 |
| E-Verify Enrollment & Setup ..................................... | (2.26 hours × $80.12) + $100 ................................... | 281.07 | 0.00 |
| E-Verify Annual Training & Maintenance ................... | (1 hour × $43.93) + $398 .......................................... | 441.93 | 441.93 |
| Compliance Site Visit ................................................ | ([5 hours × $78.96] + [5 hours × $43.93]) ................ | 0.00 | 614.45 |
| E-Verify and Site Visit Employer Costs = ................ | Total .......................................................................... | 723.00 | 1,056.38 |

[1] Training Plan initial costs are only in year 1 per STEM OPT student.
[2] Estimated based on 12-month-period.

DHS estimates the annual impact to employers based on the employer cost of compliance as a percentage of annual revenue. Second-year costs include initial submission of Training Plans for new STEM OPT students who will be hired in the second year. For not-for-profit school employers without

revenue data, DHS multiplied the tuition per full-time first-year student with total enrollment numbers to estimate their revenue. DHS's analysis shows that the first- and second-year annual impact for 99 percent of the sampled small entities with sufficient data would be less than 1 percent, with

the average first-year annual revenue impact being 0.11 percent and second-year annual revenue impact being 0.13 percent. Additionally, the cost impact per employer included a compliance site visit in year 2; therefore, costs could be less for employers that do not receive a site visit.

### TABLE 8—EMPLOYERS—ANNUAL IMPACT IN YEAR 1

| Revenue impact range | Number of for-profit small entities with data | Number of non-profit small entities with data | Percent of small entity employers |
|---|---|---|---|
| 0% < Impact ≤ 1% ..................................................................................... | 240 | 7 | 99% |
| 1% < Impact ≤ 3% ..................................................................................... | 2 | 0 | 1 |
| Total ........................................................................................................ | 249 | | 100.0 |

### TABLE 9—EMPLOYERS—ANNUAL IMPACT IN YEAR 2

| Revenue impact range | Number of for-profit small entities with data | Number of non-profit small entities with data | Percent of small entity employers |
|---|---|---|---|
| 0% < Impact ≤ 1% ..................................................................................... | 239 | 7 | 99% |
| 1% < Impact ≤ 3% ..................................................................................... | 3 | 0 | 1 |
| Total ........................................................................................................ | 249 | | 100.0 |

### Current Employers That Do Not Continue to Participate

Due to additional employer requirements that must be met in order to receive the benefit of a STEM OPT

extension opportunity, some employers (such as temporary employment agencies) will no longer be allowed to participate in STEM OPT extensions. DHS has not attempted to quantify costs associated with this possible impact on

employers due to lack of available information on employers that would fall under this category and the associated economic impacts.

---

[130] DHS estimates that this work will be performed by general management staff at an hourly rate of $54.08 (as published by the May 2014 BLS Occupational Employment and Wage Estimates), which we multiply by 1.46 to account for employee benefits to obtain a total hourly labor cost of $78.96.

Calculated 1.46 by dividing total compensation for all workers of $33.13 by wages and salaries for all workers of $22.65 per hour (yields a benefits multiplier of approximately 1.46 × wages). Bureau of Labor Statistics, Employer Costs for Employee Compensation, Table 1. Employer costs per hour

worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group, December 2014.'' Available at: http://www.bls.gov/news.release/archives/ecec_03112015.htm.

STEM000130

6. A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule, and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected

DHS recognizes that the final rule will increase requirements on schools and employers of STEM OPT students. DHS has tried to minimize, to the extent possible, the small entity economic impacts of the final rule by structuring the program such that students are largely responsible for meeting its requirements. This not only minimizes the burden of the final program on schools and employers but also helps to ensure that students, who are the most direct beneficiaries of the practical training opportunities, bear an equitable amount of responsibility.

DHS has tried to minimize additional DSO responsibilities while balancing the need for oversight. For example, Training Plan evaluations will be conducted and submitted annually, rather than semi-annually, as DHS had initially proposed.

DHS has tried to provide flexibility for small entities in methods they can use to meet the commensurate duties, hours, and compensation requirements for STEM OPT students. The final rule allows employers to perform an analysis that uses their own wage and compensation data to determine how to compensate their STEM OPT employee in a comparable manner to their similarly situated U.S. workers. This provides small entities flexibility rather than applying a prescriptive national, state, or metropolitan data requirement. And because small entities may not have similarly situated U.S. workers, the rule provides alternative options, discussed in the preamble, for compliance with the requirement to provide commensurate compensation. Finally, the rule allows employers to meet some of the Training Plan requirements using existing training programs.

DHS will engage in further stakeholder outreach activities and provide clarifying information as appropriate. DHS envisions that this outreach will reduce the burden that may result from small entities' uncertainty in how to comply with the requirements.

As explained in greater detail in Chapter 8 of the RIA, DHS examined three alternative options that could have reduced the burden of the rule on small entities. The alternatives considered were (1) no regulatory action, (2) no change in the duration of the STEM OPT extension, and (3) requiring a six month evaluation. DHS rejected these alternatives. First, without regulatory action, OPT students would no longer be allowed to work or reside in the United States past their 12-month post-completion OPT period. This would deter future international students who would pursue STEM degrees from applying to U.S. educational institutions, and reduce the attractiveness of U.S. educational institutions compared to educational systems in other countries that have more flexible student work programs. Second, without increasing the duration of the STEM OPT extension, students' practical training opportunities would not be long enough to complement the student's academic experience and allow for a meaningful educational experience, particularly given the complex nature of STEM projects. After weighing the advantages and disadvantages of each alternative, DHS elected to improve and extend the STEM OPT program in order to increase students' ability to gain valuable knowledge and skills through on-the-job training in their field that may be unavailable in their home countries, increase global attractiveness of U.S. colleges and universities, increase program oversight and strengthen requirements for program participation, and institute new protections for U.S. workers.

## C. Small Business Regulatory Enforcement Fairness Act of 1996

Pursuant to Sec. 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121, DHS wants to assist small entities in understanding this rule. If the rule would affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions, please consult DHS using the contact information provided in the **FOR FURTHER INFORMATION CONTACT** section above. DHS will not retaliate against small entities that question or complain about this rule or about any DHS policy or action related to this rule.

## D. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) requires federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government in the aggregate, or by the private sector, of $100,000,000 (adjusted for inflation) or more in any year. Although this rule would not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

## E. Congressional Review Act

DHS has sent this final rule to the Congress and to Comptroller General under the Congressional Review Act, 5 U.S.C. 801 *et seq*. This rule is a "major rule" within the meaning of the Congressional Review Act.

## F. Collection of Information

Federal agencies are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule under the Paperwork Reduction Act of 1995, as amended, 44 U.S.C. 3501–3520. Under the Paperwork Reduction Act, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

DHS has submitted the following information collection request to the OMB for review and approval in accordance with the review procedures of the Paperwork Reduction Act. The information collection requirements are outlined in this rule. The rule maintains the 2008 IFR revisions to previously approved information collections. The 2008 IFR impacted information collections for Form I–765, Application for Employment Authorization (OMB Control No. 1615–0040); SEVIS and Form I–20, Certificate of Eligibility for Nonimmigrant Student Status (both OMB Control No. 1653–0038); and E-Verify (OMB Control No. 1615–0092). These four approved information collections corresponding to the 2008 IFR include the number of respondents, responses and burden hours resulting from the 2008 IFR requirements, which remain in this final rule. Therefore DHS is not revising the burden estimates for these four information collections. Additional responses tied to new changes to STEM OPT eligibility will minimally increase the number of responses and burden for Form I–765 and E-Verify information collections, as the two collections cover a significantly broader population of respondents and responses than those impacted by the rule and already account for growth in the number of responses in their respective published information collection notices burden estimates.

As part of this rule, DHS is creating a new information collection instrument for the Training Plan for STEM OPT

Students, which is now available at *https://studyinthestates.dhs.gov/*. This information collection is necessary to enable reporting and attesting to specified information relating to STEM OPT extensions, to be executed by STEM OPT students and their employers. Such reporting will include goals and objectives, progress, hours, and compensation. Attestations will ensure proper training opportunities for students and safeguard interests of U.S. workers in related fields.

Additionally, DHS is making minor non-substantive changes to the instructions to Form I–765 to reflect changes to the F–1 regulations that lengthen the STEM OPT extension and allow applicants to file Form I–765 with USCIS within 60 days (rather than 30 days) from the date the DSO endorses the STEM OPT extension. Accordingly, USCIS submitted an OMB 83–C, Correction Worksheet, to OMB, which reviewed and approved the minor edits to the Form I–765 instructions.

Overview of New Information Collection- Training Plan for STEM OPT Students

(1) *Type of Information Collection:* New Collection.

(2) *Title of the Form/Collection:* Training Plan for STEM OPT Students.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* Immigration and Customs Enforcement Form I–983;

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:*

• *Primary:* Students with F–1 nonimmigrant status, state governments, local governments, educational institutions, businesses, and other for-profit and not-for-profit organizations.

• *Other:* None.

• *Abstract:* DHS is publishing a final rule that makes certain changes to the STEM OPT extension first introduced by the 2008 IFR. The rule lengthens the duration of the STEM OPT extension to 24 months; requires a Training Plan executed by STEM OPT students and their employers; requires that the plan include assurances to safeguard students and the interests of U.S. workers in related fields; and requires that the plan include objective-tracking and reporting requirements. The rule requires students and employers (through an appropriate signatory official) to report on the Training Plan certain specified information relating to STEM OPT extensions. For instance, the Training Plan explains how the practical training is directly related to the student's qualifying STEM degree; explains the specific goals of the STEM practical training opportunity and how

those goals will be achieved through the work-based learning opportunity with the employer, including details of the knowledge, skills, or techniques to be imparted to the student; identifies the performance evaluation process; and describes the methods of oversight and supervision. The Training Plan also includes a number of employer attestations intended to ensure the educational benefit of the practical training experience, protect STEM OPT students, and protect against appreciable adverse consequences on U.S. workers. The rule also requires schools to collect and retain this information for a period of three years following the completion of each STEM practical training opportunity.

5. An estimate of the total annual average number of respondents, annual average number of responses, and the total amount of time estimated for respondents in an average year to collect, provide information, and keep the required records is:

• 42,092 STEM OPT student respondents; 1,109 accredited schools endorsing STEM OPT students; and 16,891 employers of STEM OPT students.

• 42,092 average responses annually at 7.5 hours per initial Training Plan response.

• 70,153 average responses annually at 3.66 hours per 12-month evaluation response by STEM OPT students, DSOs, and employers.

6. An estimate of the total public burden (in hours) associated with the collection: 566,698 hours.

The recordkeeping requirements set forth by this rule are new requirements that require a new OMB Control Number.

During the NPRM, DHS sought comment on these proposed requirements. DHS received a number of comments on the burden potentially imposed by the proposed rule. The comments, and DHS's responses to those comments, can be found in the discussion of public comments regarding Form I–983 in section IV of this preamble. The final form and instructions are available in the docket for this rulemaking.

## G. Federalism

A rule has implications for federalism under Executive Order 13132, Federalism, if it has substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. We have analyzed this rule under that Order and

have determined that it does not have implications for federalism.

## H. Civil Justice Reform

This rule meets applicable standards in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

## I. Energy Effects

We have analyzed this rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. We have determined that it is not a "significant energy action" under that order because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

## J. Environment

The U.S. Department of Homeland Security Management Directive (MD) 023–01 Rev. 01 establishes procedures that DHS and its components use to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321–4375, and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500–1508. CEQ regulations allow federal agencies to establish categories of actions, which do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1508.4. The MD 023–01 Rev. 01 lists the Categorical Exclusions that DHS has found to have no such effect. MD 023–01 Rev. 01 Appendix A Table 1.

For an action to be categorically excluded, MD 023–01 Rev. 01 requires the action to satisfy each of the following three conditions:

(1) The entire action clearly fits within one or more of the Categorical Exclusions.

(2) The action is not a piece of a larger action.

(3) No extraordinary circumstances exist that create the potential for a significant environmental effect. MD 023–01 Rev. 01 section V.B(1)–(3).

Where it may be unclear whether the action meets these conditions, MD 023–01 Rev. 01 requires the administrative record to reflect consideration of these conditions. MD 023–01 Rev. 01 section V.B.

DHS has analyzed this rule under MD 023–01 Rev. 01. DHS has determined that this action is one of a category of actions that do not individually or cumulatively have a significant effect on

STEM000132

the human environment. This rule clearly fits within the Categorical Exclusion found in MD 023–01 Rev. 01, Appendix A, Table 1, number A3(a): ''Promulgation of rules . . . of a strictly administrative or procedural nature;'' and A3(d): ''Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect.'' This rule is not part of a larger action. This rule presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this rule is categorically excluded from further NEPA review.

### K. Indian Tribal Governments

This rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

### L. Taking of Private Property

This rule would not cause a taking of private property or otherwise have takings implications under Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights.

### M. Protection of Children

DHS has analyzed this rule under Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks. This rule would not create an environmental risk to health or risk to safety that might disproportionately affect children.

### N. Technical Standards

The National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through the OMB, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impracticable. Voluntary consensus standards are technical standards (*e.g.,* specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies. This rule does not use technical standards. Therefore, we did not consider the use of voluntary consensus standards.

### List of Subjects

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

### The Amendments

For the reasons set forth in the preamble, the Department of Homeland Security amends parts 214 and 274a of Chapter 1 of Title 8 of the Code of Federal Regulations as follows:

### PART 214—NONIMMIGRANT CLASSES

■ 1. Revise the authority citation for part 214 to read as follows:

**Authority:** 6 U.S.C. 111 and 202; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1324a, 1372 and 1762; Sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–1480; Pub. L. 107–173, 116 Stat. 543; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 2. Amend § 214.2 by revising paragraphs (f)(5)(vi), (f)(10)(ii)(A)(*3*), (f)(10)(ii)(C), (D), and (E), and (f)(11) and (12) to read as follows:

### § 214.2 Special requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(f) \* \* \*

(5) \* \* \*

(vi) *Extension of duration of status and grant of employment authorization.* (A) The duration of status, and any employment authorization granted under 8 CFR 274a.12(c)(3)(i)(B) or (C), of an F–1 student who is the beneficiary of an H–1B petition subject to section 214(g)(1)(A) of the Act (8 U.S.C. 1184(g)(1)(A)) and request for change of status shall be automatically extended until October 1 of the fiscal year for which such H–1B status is being requested where such petition:

(*1*) Has been timely filed; and

(*2*) Requests an H–1B employment start date of October 1 of the following fiscal year.

(B) The automatic extension of an F–1 student's duration of status and employment authorization under paragraph (f)(5)(vi)(A) of this section

shall automatically terminate upon the rejection, denial, revocation, or withdrawal of the H–1B petition filed on such F–1 student's behalf or upon the denial or withdrawal of the request for change of nonimmigrant status, even if the H–1B petition filed on the F–1 student's behalf is approved for consular processing.

(C) In order to obtain the automatic extension of stay and employment authorization under paragraph (f)(5)(vi)(A) of this section, the F–1 student, consistent with 8 CFR part 248, must not have violated the terms or conditions of his or her nonimmigrant status.

(D) An automatic extension of an F–1 student's duration of status under paragraph (f)(5)(vi)(A) of this section also applies to the duration of status of any F–2 dependent aliens.

\* \* \* \* \*

(10) \* \* \*

(ii) \* \* \*

(A) \* \* \*

(*3*) After completion of the course of study, or, for a student in a bachelor's, master's, or doctoral degree program, after completion of all course requirements for the degree (excluding thesis or equivalent). Continued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for optional practical training. A student must complete all practical training within a 14-month period following the completion of study, except that a 24-month extension pursuant to paragraph (f)(10)(ii)(C) of this section does not need to be completed within such 14-month period.

\* \* \* \* \*

(C) *24-month extension of post-completion OPT for a science, technology, engineering, or mathematics (STEM) degree.* Consistent with paragraph (f)(11)(i)(C) of this section, a qualified student may apply for an extension of OPT while in a valid period of post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B). An extension will be for 24 months for the first qualifying degree for which the student has completed all course requirements (excluding thesis or equivalent), including any qualifying degree as part of a dual degree program, subject to the requirement in paragraph (f)(10)(ii)(C)(*3*) of this section that previously obtained degrees must have been conferred. If a student completes all such course requirements for another qualifying degree at a higher degree level than the first, the student may apply for a second

24-month extension of OPT while in a valid period of post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B). In no event may a student be authorized for more than two lifetime STEM OPT extensions. A student who was granted a 17-month OPT extension under the rule issued at 73 FR 18944, whether or not such student requests an additional 7-month period of STEM OPT under 8 CFR 214.16, is considered to have been authorized for one STEM OPT extension, and may be eligible for only one more STEM OPT extension. Any subsequent application for an additional 24-month OPT extension under this paragraph (f)(10)(ii)(C) must be based on a degree at a higher degree level than the degree that was the basis for the student's first OPT extension. In order to qualify for an extension of post-completion OPT based upon a STEM degree, all of the following requirements must be met.

(*1*) *Accreditation.* The degree that is the basis for the 24-month OPT extension is from a U.S. educational institution accredited by an accrediting agency recognized by the Department of Education at the time of application.

(*2*) *DHS-approved degree.* The degree that is the basis for the 24-month OPT extension is a bachelor's, master's, or doctoral degree in a field determined by the Secretary, or his or her designee, to qualify within a science, technology, engineering, or mathematics field.

(*i*) The term ''science, technology, engineering or mathematics field'' means a field included in the Department of Education's Classification of Instructional Programs taxonomy within the two-digit series or successor series containing engineering, biological sciences, mathematics, and physical sciences, or a related field. In general, related fields will include fields involving research, innovation, or development of new technologies using engineering, mathematics, computer science, or natural sciences (including physical, biological, and agricultural sciences).

(*ii*) The Secretary, or his or her designee, will maintain the STEM Designated Degree Program List, which will be a complete list of qualifying degree program categories, published on the Student and Exchange Visitor Program Web site at *http://www.ice.gov/ sevis.* Changes that are made to the Designated Degree Program List may also be published in a notice in the **Federal Register**. All program categories included on the list must be consistent with the definition set forth in paragraph (f)(10)(ii)(C)(*2*)(*i*) of this section.

(*iii*) At the time the DSO recommends a 24-month OPT extension under this paragraph (f)(10)(ii)(C) in SEVIS, the degree that is the basis for the application for the OPT extension must be contained within a category on the STEM Designated Degree Program List.

(*3*) *Previously obtained STEM degree(s).* The degree that is the basis for the 24-month OPT extension under this paragraph (f)(10)(ii)(C) may be, but is not required to be, the degree that is the basis for the post-completion OPT period authorized under 8 CFR 274a.12(c)(3)(i)(B). If an application for a 24-month OPT extension under this paragraph (f)(10)(ii)(C) is based upon a degree obtained previous to the degree that provided the basis for the period of post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B), that previously obtained degree must have been conferred from a U.S. educational institution that is accredited and SEVP-certified at the time the student's DSO recommends the student for the 24-month OPT extension and must be in a degree program category included on the current STEM Designated Degree Program List at the time of the DSO recommendation. That previously obtained degree must have been conferred within the 10 years preceding the date the DSO recommends the student for the 24-month OPT extension.

(*4*) *Eligible practical training opportunity.* The STEM practical training opportunity that is the basis for the 24-month OPT extension under this paragraph (f)(10)(ii)(C) must be directly related to the degree that qualifies the student for such extension, which may be the previously obtained degree described in paragraph (f)(10)(ii)(C)(*3*) of this section.

(*5*) *Employer qualification.* The student's employer is enrolled in E-Verify, as evidenced by either a valid E-Verify Company Identification number or, if the employer is using an employer agent to create its E-Verify cases, a valid E-Verify Client Company Identification number, and the employer remains a participant in good standing with E-Verify, as determined by USCIS. An employer must also have an employer identification number (EIN) used for tax purposes.

(*6*) *Employer reporting.* A student may not be authorized for employment with an employer pursuant to paragraph (f)(10)(ii)(C)(*2*) of this section unless the employer agrees, by signing the Training Plan for STEM OPT Students, Form I–983 or successor form, to report the termination or departure of an OPT student to the DSO at the student's school, if the termination or departure is

prior to the end of the authorized period of OPT. Such reporting must be made within five business days of the termination or departure. An employer shall consider a student to have departed when the employer knows the student has left the practical training opportunity, or if the student has not reported for his or her practical training for a period of five consecutive business days without the consent of the employer, whichever occurs earlier.

(*7*) *Training Plan for STEM OPT Students, Form I–983 or successor form.* (*i*) A student must fully complete an individualized Form I–983 or successor form and obtain requisite signatures from an appropriate individual in the employer's organization on the form, consistent with form instructions, before the DSO may recommend a 24-month OPT extension under paragraph (f)(10)(ii)(C)(*2*) of this section in SEVIS. A student must submit the Form I–983 or successor form, which includes a certification of adherence to the training plan completed by an appropriate individual in the employer's organization who has signatory authority for the employer, to the student's DSO, prior to the new DSO recommendation. A student must present his or her signed and completed Form I–983 or successor form to a DSO at the educational institution of his or her most recent enrollment. A student, while in F–1 student status, may also be required to submit the Form I–983 or successor form to ICE and/or USCIS upon request or in accordance with form instructions.

(*ii*) The training plan described in the Form I–983 or successor form must identify goals for the STEM practical training opportunity, including specific knowledge, skills, or techniques that will be imparted to the student, and explain how those goals will be achieved through the work-based learning opportunity with the employer; describe a performance evaluation process; and describe methods of oversight and supervision. Employers may rely on their otherwise existing training programs or policies to satisfy the requirements relating to performance evaluation and oversight and supervision, as applicable.

(*iii*) The training plan described in the Form I–983 or successor form must explain how the training is directly related to the student's qualifying STEM degree.

(*iv*) If a student initiates a new practical training opportunity with a new employer during his or her 24-month OPT extension, the student must submit, within 10 days of beginning the new practical training opportunity, a

STEM000134

new Form I–983 or successor form to the student's DSO, and subsequently obtain a new DSO recommendation.

(*8*) *Duties, hours, and compensation for training.* The terms and conditions of a STEM practical training opportunity during the period of the 24-month OPT extension, including duties, hours, and compensation, must be commensurate with terms and conditions applicable to the employer's similarly situated U.S. workers in the area of employment. A student may not engage in practical training for less than 20 hours per week, excluding time off taken consistent with leave-related policies applicable to the employer's similarly situated U.S. workers in the area of employment. If the employer does not employ and has not recently employed more than two similarly situated U.S. workers in the area of employment, the employer nevertheless remains obligated to attest that the terms and conditions of a STEM practical training opportunity are commensurate with the terms and conditions of employment for other similarly situated U.S. workers in the area of employment. ''Similarly situated U.S. workers'' includes U.S. workers performing similar duties subject to similar supervision and with similar educational backgrounds, industry expertise, employment experience, levels of responsibility, and skill sets as the student. The duties, hours, and compensation of such students are ''commensurate'' with those offered to U.S. workers employed by the employer in the same area of employment when the employer can show that the duties, hours, and compensation are consistent with the range of such terms and conditions the employer has offered or would offer to similarly situated U.S. employees. The student must disclose his or her compensation, including any adjustments, as agreed to with the employer, on the Form I–983 or successor form.

(*9*) *Evaluation requirements and Training Plan modifications.* (*i*) A student may not be authorized for employment with an employer pursuant to paragraph (f)(10)(ii)(C)(*2*) of this section unless the student submits a self-evaluation of the student's progress toward the training goals described in the Form I–983 or successor form. All required evaluations must be completed prior to the conclusion of a STEM practical training opportunity, and the student and an appropriate individual in the employer's organization must sign each evaluation to attest to its accuracy. All STEM practical training opportunities require an initial evaluation within 12 months of the approved starting date on the

employment authorization document granted pursuant to the student's 24-month OPT extension application, and a concluding evaluation. The student is responsible for ensuring the DSO receives his or her 12-month evaluation and final evaluation no later than 10 days following the conclusion of the reporting period or conclusion of his or her practical training opportunity, respectively.

(*ii*) If any material change to or deviation from the training plan described in the Form I–983 or successor form occurs, the student and employer must sign a modified Form I–983 or successor form reflecting the material change(s) or deviation(s). Material changes and deviations relating to training may include, but are not limited to, any change of Employer Identification Number resulting from a corporate restructuring, any reduction in compensation from the amount previously submitted on the Form I–983 or successor form that is not tied to a reduction in hours worked, any significant decrease in hours per week that a student engages in a STEM training opportunity, and any decrease in hours worked below the minimum hours for the 24-month extension as described in paragraph (f)(10)(ii)(C)(*8*) of this section. Material changes and deviations also include any change or deviation that renders an employer attestation inaccurate, or renders inaccurate the information in the Form I–983 or successor form on the nature, purpose, oversight, or assessment of the student's practical training opportunity. The student and employer must ensure that the modified Form I–983 or successor form is submitted to the student's DSO at the earliest available opportunity.

(*iii*) The educational institution whose DSO is responsible for duties associated with the student's latest OPT extension under paragraph (f)(10)(ii)(C)(*2*) of this section is responsible for ensuring the Student and Exchange Visitor Program has access to each individualized Form I–983 or successor form and associated student evaluations (electronic or hard copy), including through SEVIS if technologically available, beginning within 30 days after the document is submitted to the DSO and continuing for a period of three years following the completion of each STEM practical training opportunity.

(*10*) *Additional STEM opportunity obligations.* A student may only participate in a STEM practical training opportunity in which the employer attests, including by signing the Form I–983 or successor form, that:

(*i*) The employer has sufficient resources and personnel available and is prepared to provide appropriate training in connection with the specified opportunity at the location(s) specified in the Form I–983 or successor form;

(*ii*) The student on a STEM OPT extension will not replace a full- or part-time, temporary or permanent U.S. worker; and

(*iii*) The student's opportunity assists the student in reaching his or her training goals.

(*11*) *Site visits.* DHS, at its discretion, may conduct a site visit of any employer. The purpose of the site visit is for DHS to ensure that each employer possesses and maintains the ability and resources to provide structured and guided work-based learning experiences consistent with any Form I–983 or successor form completed and signed by the employer. DHS will provide notice to the employer 48 hours in advance of any site visit, except notice may not be provided if the visit is triggered by a complaint or other evidence of noncompliance with the regulations in this paragraph (f)(10)(ii)(C).

(*D*) *Duration of status while on post-completion OPT.* For a student with approved post-completion OPT, the duration of status is defined as the period beginning on the date that the student's application for OPT was properly filed and pending approval, including the authorized period of post-completion OPT, and ending 60 days after the OPT employment authorization expires.

(*E*) *Periods of unemployment during post-completion OPT.* During post-completion OPT, F–1 status is dependent upon employment. Students may not accrue an aggregate of more than 90 days of unemployment during any post-completion OPT period described in 8 CFR 274a.12(c)(3)(i)(B). Students granted a 24-month OPT extension under paragraph (f)(10)(ii)(C)(*2*) of this section may not accrue an aggregate of more than 150 days of unemployment during a total OPT period, including any post-completion OPT period described in 8 CFR 274a.12(c)(3)(i)(B) and any subsequent 24-month extension period.

(*11*) *OPT application and approval process*—(i) *Student responsibilities.* A student must initiate the OPT application process by requesting a recommendation for OPT from his or her DSO. Upon making the recommendation, the DSO will provide the student a signed Form I–20 indicating that recommendation.

(*A*) *Applications for employment authorization.* The student must properly file an Application for

Employment Authorization, Form I–765 or successor form, with USCIS, accompanied by the required fee, and the supporting documents, as described in the form's instructions.

(B) *Applications and filing deadlines for pre-completion OPT and post-completion OPT*—(*1*) *Pre-completion OPT.* For pre-completion OPT, the student may properly file his or her Form I–765 or successor form up to 90 days before being enrolled for one full academic year, provided that the period of employment will not start prior to the completion of the full academic year.

(*2*) *Post-completion OPT.* For post-completion OPT, not including a 24-month OPT extension under paragraph (f)(10)(ii)(C)(*2*) of this section, the student may properly file his or her Form I–765 or successor form up to 90 days prior to his or her program end date and no later than 60 days after his or her program end date. The student must also file his or her Form I–765 or successor form with USCIS within 30 days of the date the DSO enters the recommendation for OPT into his or her SEVIS record.

(C) *Applications and filing deadlines for 24-month OPT extension.* A student meeting the eligibility requirements for a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section may request an extension of employment authorization by filing Form I–765 or successor form, with the required fee and supporting documents, up to 90 days prior to the expiration date of the student's current OPT employment authorization. The student seeking such 24-month OPT extension must properly file his or her Form I–765 or successor form with USCIS within 60 days of the date the DSO enters the recommendation for the OPT extension into his or her SEVIS record. If a student timely and properly files an application for such 24-month OPT extension and timely and properly requests a DSO recommendation, including by submitting the fully executed Form I–983 or successor form to his or her DSO, but the Employment Authorization Document, Form I–766 or successor form, currently in the student's possession expires prior to the decision on the student's application for the OPT extension, the student's Form I–766 or successor form is extended automatically pursuant to the terms and conditions specified in 8 CFR 274a.12(b)(6)(iv).

(D) *Start of OPT employment.* A student may not begin OPT employment prior to the approved start date on his or her Employment Authorization Document, Form I–766 or successor form, except as described in paragraph

(f)(11)(i)(C) of this section. A student may not request a start date that is more than 60 days after the student's program end date. Employment authorization will begin on the date requested or the date the employment authorization is adjudicated, whichever is later.

(ii) *Additional DSO responsibilities.* A student must have a recommendation from his or her DSO in order to apply for OPT. When a DSO recommends a student for OPT, the school assumes the added responsibility for maintaining the SEVIS record of that student for the entire period of authorized OPT, consistent with paragraph (f)(12) of this section.

(A) Prior to making a recommendation, the DSO at the educational institution of the student's most recent enrollment must ensure that the student is eligible for the given type and period of OPT and that the student is aware of the student's responsibilities for maintaining status while on OPT. Prior to recommending a student for OPT extension under paragraph (f)(10)(ii)(C) of this section, the DSO at the educational institution of the student's most recent enrollment must certify that the student's degree being used to qualify that student for the 24-month OPT extension, as shown in SEVIS or official transcripts, is a bachelor's, master's, or doctorate degree with a degree code that is contained within a category on the current STEM Designated Degree Program List at the time the recommendation is made. A DSO may recommend a student for a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section only if the Form I–983 or successor form described in paragraph (f)(10)(ii)(C)(*7*) of this section has been properly completed and executed by the student and prospective employer. A DSO may not recommend a student for an OPT extension under paragraph (f)(10)(ii)(C) of this section if the practical training would be conducted by an employer who has failed to meet the requirements under paragraphs (f)(10)(ii)(C)(*5*) through (*9*) of this section or has failed to provide the required assurances of paragraph (f)(10)(ii)(C)(*10*) of this section.

(B) The DSO must update the student's SEVIS record with the DSO's recommendation for OPT before the student can apply to USCIS for employment authorization. The DSO will indicate in SEVIS whether the OPT employment is to be full-time or part-time, or for a student seeking a recommendation for a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section whether the OPT employment meets the minimum hours

requirements described in paragraph (f)(10)(ii)(C)(*8*) of this section, and note in SEVIS the OPT start and end dates.

(C) The DSO must provide the student with a signed, dated Form I–20 or successor form indicating that OPT has been recommended.

(iii) *Decision on application for OPT employment authorization.* USCIS will adjudicate a student's Form I–765 or successor form on the basis of the DSO's recommendation and other eligibility considerations.

(A) If granted, the employment authorization period for post-completion OPT begins on the requested date of commencement or the date the Form I–765 or successor form is approved, whichever is later, and ends at the conclusion of the remaining time period of post-completion OPT eligibility. The employment authorization period for a 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section begins on the day after the expiration of the initial post-completion OPT employment authorization and ends 24 months thereafter, regardless of the date the actual extension is approved.

(B) USCIS will notify the applicant of the decision on the Form I–765 or successor form in writing, and, if the application is denied, of the reason or reasons for the denial.

(C) The applicant may not appeal the decision.

(12) *Reporting while on optional practical training*—(i) *General.* An F–1 student who is granted employment authorization by USCIS to engage in optional practical training is required to report any change of name or address, or interruption of such employment to the DSO for the duration of the optional practical training. A DSO who recommends a student for OPT is responsible for updating the student's record to reflect these reported changes for the duration of the time that training is authorized.

(ii) *Additional reporting obligations for students with an approved 24-month OPT extension.* Students with an approved 24-month OPT extension under paragraph (f)(10)(ii)(C) of this section have additional reporting obligations. Compliance with these reporting requirements is required to maintain F–1 status. The reporting obligations are:

(A) Within 10 days of the change, the student must report to the student's DSO a change of legal name, residential or mailing address, employer name, employer address, and/or loss of employment.

(B) The student must complete a validation report, confirming that the

information required by paragraph (f)(12)(ii)(A) of this section has not changed, every six months. The requirement for validation reporting starts on the date the 24-month OPT extension begins and when the student's F–1 status expires or the 24-month OPT extension concludes, whichever is first. The validation report is due to the student's DSO within 10 business days of each reporting date.

\*　\*　\*　\*　\*

■ 3. In § 214.3, revise paragraph (g)(2)(ii)(F) to read as follows:

### § 214.3   Approval of schools for enrollment of F and M nonimmigrants.

\*　\*　\*　\*　\*

(g) \* \* \*
(2) \* \* \*
(ii) \* \* \*
(F) For F–1 students authorized by USCIS to engage in a 24-month extension of OPT under 8 CFR 214.2(f)(10)(ii)(C):

(*1*) Any change that the student reports to the school concerning legal name, residential or mailing address, employer name, or employer address; and

(*2*) The end date of the student's employment reported by a former employer in accordance with 8 CFR 214.2(f)(10)(ii)(C)(6).

\*　\*　\*　\*　\*

■ 4. Section § 214.16 is added, effective May 10, 2016 through May 10, 2019, to read as follows:

### § 214.16   Transition Procedures for OPT Applications for Employment Authorization

(a) *STEM OPT Applications that are filed prior to, and remain pending on May 10, 2016.* (1) On or after May 10, 2016, USCIS will issue Requests for Evidence (RFEs) to students whose applications for a 17-month OPT extension under the rule issued at 73 FR 18944 are still pending. The RFEs will request documentation that will establish that the student is eligible for a 24-month OPT extension under 8 CFR 214.2(f)(10)(ii)(C), including a Form I–20 endorsed on or after May 10, 2016, indicating that the Designated School Official (DSO) recommends the student for a 24-month OPT extension and that the requirements for such an extension have been met. Submission of the Form I–20 in response to an RFE issued under 8 CFR 214.16(a) will be regarded as fulfilling the requirement in 8 CFR 214.2(f)(11)(i) that a student must initiate the OPT application process by requesting a recommendation for OPT by his or her DSO.

(2) Forms I–765 that are filed prior to, and remain pending on, May 10, 2016,

will be regarded as being covered by 8 CFR 214.2(f)(11)(i)(C) and 8 CFR 274a.12(b)(6)(iv).

(b) *STEM OPT Applications for Employment Authorization that are filed and approved before May 10, 2016.* A student whose Form I–765 is filed and approved prior to May 10, 2016 will be issued an Employment Authorization Document, Form I–766, that is valid for 17 months even if the student requested a 24-month OPT extension.

(c) *Students with 17-Month STEM OPT employment authorization.* (1) Subject to paragraph (c)(3) of this section, any Employment Authorization Document, Form I–766, indicating a 17-month OPT extension under the rule issued at 73 FR 18944 that has been issued and is valid prior to May 10, 2016 remains valid until such Form I–766 expires or is terminated or revoked under 8 CFR 274a.14, and the student, the student's employer, and the student's DSO must continue to abide by all the terms and conditions that were in effect when the Form I–766 was issued.

(2) Subject to the requirements in paragraphs (c)(2)(i) through (iii) of this section, F–1 students with a 17-month OPT extension under the rule issued at 73 FR 18944 are eligible to apply for an additional 7-month period of OPT. The F–1 student applying for the additional 7-month period of OPT must:

(i) Properly file a Form I–765, with USCIS on or after May 10, 2016 and on or before August 8, 2016, and within 60 days of the date the DSO enters the recommendation for the 24-month OPT extension into the student's SEVIS record, with applicable fees and supporting documentation, as described in the form instructions;

(ii) Have at least 150 calendar days remaining prior to the end of his or her 17-month OPT extension at the time the Form I–765, is properly filed; and

(iii) Meet all the requirements for the 24-month OPT extension as described in 8 CFR 214.2(f)(10)(ii)(C), except the requirement that the student must be in a valid period of post-completion OPT authorized under 8 CFR 274a.12(c)(3)(i)(B).

(3) Students on a 17-month OPT extension who apply for and are granted an additional 7-month period of OPT shall be considered to be in a period of 24-month OPT extension, as authorized under 8 CFR 214.2(f)(10)(ii)(C). Upon proper filing of the application for the additional 7-month OPT extension, the student, the student's employer as identified in the student's completed Form I–983 and the student's DSO are subject to all requirements of the 24-month OPT extension period, except for

the 150-day unemployment limit described in 8 CFR 214.2(f)(10)(ii)(E), which applies to students only upon approval of the additional 7-month OPT extension. Subsequent to any denial of the application for the additional 7-month extension, the student, the student's employer, and the student's DSO must abide by all the terms and conditions that were in effect when the 17-month OPT extension was issued throughout the remaining validity period of the 17-month OPT extension.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2.

### Subpart B—Employment Authorization

■ 6. In § 274a.12, revise paragraph (b)(6)(iv) and (v) and (c)(3)(i) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*　\*　\*　\*　\*

(b) \* \* \*
(6) \* \* \*
(iv) An Employment Authorization Document, Form I–766 or successor form, under paragraph (c)(3)(i)(C) of this section based on a STEM Optional Practical Training extension, and whose timely filed Form I–765 or successor form is pending and employment authorization and accompanying Form I–766 or successor form issued under paragraph (c)(3)(i)(B) of this section have expired. Employment is authorized beginning on the expiration date of the Form I–766 or successor form issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current Form I–765 or successor form, but not to exceed 180 days. For this same period, such Form I–766 or successor form is automatically extended and is considered unexpired when combined with a Certificate of Eligibility for Nonimmigrant (F–1/M–1) Students, Form I–20 or successor form, endorsed by the Designated School Official recommending such an extension; or

(v) Pursuant to 8 CFR 214.2(h) is seeking H–1B nonimmigrant status and whose duration of status and employment authorization have been extended pursuant to 8 CFR 214.2(f)(5)(vi).

\*　\*　\*　\*　\*

(c) \* \* \*
(3) \* \* \*

(i)(A) Is seeking pre-completion practical training pursuant to 8 CFR 214.2(f)(10)(ii)(A)(*1*) and (*2*);

(B) Is seeking authorization to engage in up to 12 months of post-completion

Optional Practical Training (OPT) pursuant to 8 CFR 214.2(f)(10)(ii)(A)(*3*); or

(C) Is seeking a 24-month OPT extension pursuant to 8 CFR 214.2(f)(10)(ii)(C);

*       *       *       *       *

**Jeh Charles Johnson,**

*Secretary of Homeland Security.*

[FR Doc. 2016–04828 Filed 3–9–16; 8:45 am]

**BILLING CODE 9111–28–P**

STEM000138

Between 2010 and 2014, the compound annual growth rate for F-1 nonimmigrant visa issuance has been approximately 11.5 percent.[23]  During the same period, the compound annual growth rate in the number of F-1 students graduating with a bachelor's, master's, or doctorate degree in a STEM field eligible for the 17-month extension has been 11 percent.  These figures indicate that the proportion of F-1 nonimmigrant students studying in STEM fields did not increase over this period.  However, the proportion of eligible students who chose to participate in the 17-month STEM OPT extension has been increasing over this period from a 28.9 percent participation rate in CY 2010 to a 44.4 percent participation rate in CY 2014.[24]  This equates to growth of 3.9 percentage points per year in the participation rate.[25]

It is difficult to forecast the continued growth of student participation in any STEM OPT program as such participation depends on a number of variables outside of the effect of this rulemaking, such as the strength of the global economy, the continued competitiveness of U.S. institutions of higher education, and the growth of jobs in STEM fields in the United States and globally.  Participation is also dependent on a number of variables resulting from this proposed rule, such as potential decreased participation by students or employers as a result of increased requirements or potential increased participation because of the longer training period and the ability to participate twice based upon a second qualifying degree at a higher education level.  As a result, DHS does not include any impact of induced visa or program participation demand resulting from the proposed rule.

---

[23] Department of State, Nonimmigrant Visa Statistics, Nonimmigrant Worldwide Issuance and Refusal Data by Visa Category, Nonimmigrant Visa Issuances by Visa Class and by Nationality, FY 2010 – FY 2014 for F-1 visas: http://travel.state.gov/content/visas/english/law-and-policy/statistics/non-immigrant-visas.html. http://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2014AnnualReport/FY14AnnualReport-TableXVIB.pdf
(595,569 F-1 Visas Issued in FY2014/385,210 F-1 Visas Issued in FY2010)^(1/12)-1 = 11.5%.
[24] ICE SEVIS data.
[25] 3.9% = (44.4% participation in 2010 - 28.9% participation in 2014)/4.

STEM005298

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 212, and 274a**

**[CIS No. 2572–15; DHS Docket No. USCIS–2015–0006]**

**RIN 1615–AC04**

### International Entrepreneur Rule

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Department of Homeland Security (DHS) regulations to implement the Secretary of Homeland Security's discretionary parole authority in order to increase and enhance entrepreneurship, innovation, and job creation in the United States. The final rule adds new regulatory provisions guiding the use of parole on a case-by-case basis with respect to entrepreneurs of start-up entities who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States. Such potential would be indicated by, among other things, the receipt of significant capital investment from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. If granted, parole would provide a temporary initial stay of up to 30 months (which may be extended by up to an additional 30 months) to facilitate the applicant's ability to oversee and grow his or her start-up entity in the United States.

**DATES:** This final rule is effective July 17, 2017.

**FOR FURTHER INFORMATION CONTACT:** Steven Viger, Adjudications Officer, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–1470.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Final Rule Provisions
  D. Summary of Changes From the Notice of Proposed Rulemaking
  E. Summary of Costs and Benefits
  F. Effective Date
II. Background
  A. Current Framework
  B. Final Rule
III. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Legal Authority
  C. Significant Public Benefit
  D. Definitions
  E. Application Requirements
  F. Parole Criteria and Conditions
  G. Employment Authorization
  H. Comments on Parole Process
  I. Appeals and Motions To Reopen
  J. Termination of Parole
  K. Opposition to the Overall Rule
  L. Miscellaneous Comments on the Rule
  M. Public Comments on Statutory and Regulatory Requirements
IV. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 and 13563
  1. Summary
  2. Purpose of the Rule
  3. Volume Estimate
  4. Costs
  5. Benefits
  6. Alternatives Considered
  D. Regulatory Flexibility Act
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act

## I. Executive Summary

### A. Purpose of the Regulatory Action

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), confers upon the Secretary of Homeland Security the discretionary authority to parole individuals into the United States temporarily, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS is amending its regulations implementing this authority to increase and enhance entrepreneurship, innovation, and job creation in the United States. As described in more detail below, the final rule would establish general criteria for the use of parole with respect to entrepreneurs of start-up entities who can demonstrate through evidence of substantial and demonstrated potential for rapid growth and job creation that they would provide a significant public benefit to the United States. In all cases, whether to parole a particular individual under this rule is a discretionary determination that would be made on a case-by-case basis.

Given the complexities involved in adjudicating applications in this context, DHS has decided to establish by regulation the criteria for the case-by-case evaluation of parole applications filed by entrepreneurs of start-up entities. By including such criteria in regulation, as well as establishing application requirements that are specifically tailored to capture the necessary information for processing parole requests on this basis, DHS

expects to facilitate the use of parole in this area.

Under this final rule, an applicant would need to demonstrate that his or her parole would provide a significant public benefit because he or she is the entrepreneur of a new start-up entity in the United States that has significant potential for rapid growth and job creation. DHS believes that such potential would be indicated by, among other things, the receipt of (1) significant capital investment from U.S. investors with established records of successful investments or (2) significant awards or grants from certain Federal, State, or local government entities. The final rule also includes alternative criteria for applicants who partially meet the thresholds for capital investment or government awards or grants and can provide additional reliable and compelling evidence of their entities' significant potential for rapid growth and job creation. An applicant must also show that he or she has a substantial ownership interest in such an entity, has an active and central role in the entity's operations, and would substantially further the entity's ability to engage in research and development or otherwise conduct and grow its business in the United States. The grant of parole is intended to facilitate the applicant's ability to oversee and grow the start-up entity.

DHS believes that this final rule will encourage foreign entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy through increased business activity, innovation, and dynamism. Particularly in light of the complex considerations involved in entrepreneur-based parole requests, DHS also believes that this final rule will provide a transparent framework by which DHS will exercise its discretion to adjudicate such requests on a case-by-case basis under section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5).

### B. Legal Authority

The Secretary of Homeland Security's authority for the proposed regulatory amendments can be found in various provisions of the immigration laws. Sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3), provides the Secretary the authority to administer and enforce the immigration and nationality laws. Section 402(4) of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 202(4), expressly authorizes the

Secretary to establish rules and regulations governing such efforts. Section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5), vests in the Secretary the discretionary authority to grant parole for urgent humanitarian reasons or significant public benefit to applicants for admission temporarily on a case-by-case basis.[1] Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes the Secretary's general authority to extend employment authorization to noncitizens in the United States. And section 101(b)(1)(F) of the HSA, 6 U.S.C. 111(b)(1)(F), establishes as a primary mission of DHS the duty to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."

### C. Summary of the Final Rule Provisions

This final rule adds a new section 8 CFR 212.19 to provide guidance with respect to the use of parole for entrepreneurs of start-up entities based upon significant public benefit. An individual seeking to operate and grow his or her start-up entity in the United States would generally need to demonstrate the following to be considered for a discretionary grant of parole under this final rule:

*1. Formation of New Start-Up Entity.* The applicant has recently formed a new entity in the United States that has lawfully done business since its creation and has substantial potential for rapid growth and job creation. An entity may be considered recently formed if it was created within the 5 years immediately preceding the date of the filing of the initial parole application. *See* 8 CFR 219.12(a)(2), 8 CFR 103.2(a)(7).

*2. Applicant is an Entrepreneur.* The applicant is an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. An applicant may meet this standard by providing evidence that he or she: (1) Possesses a significant (at least 10 percent) ownership interest in the entity at the time of adjudication of the initial

grant of parole; and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. *See* final 8 CFR 212.19(a)(1). Such an applicant cannot be a mere investor.

*3. Significant U.S. Capital Investment or Government Funding.* The applicant can further validate, through reliable supporting evidence, the entity's substantial potential for rapid growth and job creation. An applicant may be able to satisfy this criterion in one of several ways:

a. *Investments from established U.S. investors.* The applicant may show that the entity has received significant investment of capital from certain qualified U.S. investors with established records of successful investments. An applicant would generally be able to meet this standard by demonstrating that the start-up entity has received investments of capital totaling $250,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities.

b. *Government grants.* The applicant may show that the start-up entity has received significant awards or grants from Federal, State or local government entities with expertise in economic development, research and development, or job creation. An applicant would generally be able to meet this standard by demonstrating that the start-up entity has received monetary awards or grants totaling $100,000 or more from government entities that typically provide such funding to U.S. businesses for economic, research and development, or job creation purposes.

c. *Alternative criteria.* The final rule provides alternative criteria under which an applicant who partially meets one or more of the above criteria related to capital investment or government funding may be considered for parole under this rule if he or she provides additional reliable and compelling evidence that they would provide a significant public benefit to the United States. Such evidence must serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

This final rule states that an applicant who meets the above criteria (and his or her spouse and minor, unmarried children,[2] if any) generally may be

considered under this rule for a discretionary grant of parole lasting up to 30 months (2.5 years) based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. An applicant will be required to file a new application specifically tailored for entrepreneurs to demonstrate eligibility for parole based upon significant public benefit under this rule, along with applicable fees. Applicants will also be required to appear for collection of biometric information. No more than three entrepreneurs may receive parole with respect to any one qualifying start-up entity.

USCIS adjudicators will consider the totality of the evidence, including evidence obtained by USCIS through background checks and other means, to determine whether the applicant has satisfied the above criteria, whether the specific applicant's parole would provide a significant public benefit, and whether negative factors exist that warrant denial of parole as a matter of discretion. To grant parole, adjudicators will be required to conclude, based on the totality of the circumstances, that both: (1) The applicant's parole would provide a significant public benefit, and (2) the applicant merits a grant of parole as a matter of discretion.

If parole is granted, the entrepreneur will be authorized for employment incident to the grant of parole, but only with respect to the entrepreneur's start-up entity. The entrepreneur's spouse and children, if any, will not be authorized for employment incident to the grant of parole, but the entrepreneur's spouse, if paroled into the United States pursuant to 8 CFR 212.19, will be permitted to apply for employment authorization consistent with new 8 CFR 274a.12(c)(34). DHS retains the authority to revoke any such grant of parole at any time as a matter of discretion or if DHS determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS has reason to believe that the approved application involves fraud or misrepresentation. *See* new 8 CFR 212.19(k).

As noted, the purpose of this parole process is to provide qualified entrepreneurs of high-potential start-up entities in the United States with the improved ability to conduct research and development and expand the entities' operations in the United States so that our nation's economy may

---

[1] In sections 402 and 451 of the HSA, Congress transferred from the Attorney General to the Secretary of Homeland Security the general authority to enforce and administer the immigration laws, including those pertaining to parole. In accordance with section 1517 of title XV of the HSA, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the HSA, tit. XV, section 1517). Authorities and functions of DHS to administer and enforce the immigration laws are appropriately delegated to DHS employees and others in accordance with section 102(b)(1) of the HSA, 6 U.S.C. 112(b)(1); section 103(a) of the INA, 8 U.S.C. 1103(a); and 8 CFR 2.1.

[2] The terms "child" and "children" in this proposed rule have the same meaning as they do

under section 101(b)(1) of the INA, 8 U.S.C. 1101(b)(1) (defining a child as one who is unmarried and under twenty-one years of age).

IER00043

benefit from such development and expansion, including through increased capital expenditures, innovation, and job creation. The final rule allows individuals granted parole under this rule to be considered for re-parole for an additional period of up to 30 months (2.5 years) if, and only if, they can demonstrate that their entities have shown signs of significant growth since the initial grant of parole and such entities continue to have substantial potential for rapid growth and job creation.

An applicant under this rule will generally need to demonstrate the following to be considered for a discretionary grant of an additional period of parole:

*1. Continuation of Start-Up Entity.* The entity continues to be a start-up entity as defined by the proposed rule. For purposes of seeking re-parole, an applicant may be able to meet this standard by showing that the entity: (a) Has been lawfully operating in the United States during the period of parole; and (b) continues to have substantial potential for rapid growth and job creation.

*2. Applicant Continues to Be an Entrepreneur.* The applicant continues to be an entrepreneur of the start-up entity who is well-positioned to advance the entity's business. An applicant may meet this standard by providing evidence that he or she: (a) Continues to possess a significant (at least 5 percent) ownership interest in the entity at the time of adjudication of the grant of re-parole; and (b) continues to have an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and continuing to grow its business in the United States. This reduced ownership amount takes into account the need of some successful start-up entities to raise additional venture capital investment by selling ownership interest during their initial years of operation.

*3. Significant U.S. Investment/ Revenue/Job Creation.* The applicant further validates, through reliable supporting evidence, the start-up entity's continued potential for rapid growth and job creation. An applicant may be able to satisfy this criterion in one of several ways:

a. *Additional Investments or Grants.* The applicant may show that during the initial period of parole the start-up entity received additional substantial investments of capital, including through qualified investments from U.S. investors with established records of successful investments; significant

awards or grants from U.S. government entities that regularly provide such funding to start-up entities; or a combination of both. An applicant would generally be expected to demonstrate that the entity received at least $500,000 in additional qualifying funding during the initial parole period. As noted previously, any private investment that the applicant is relying upon as evidence that the investment criterion has been met must be made by qualified U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. Government awards or grants must be from U.S. federal, state or local government entities with expertise in economic development, research and development, or job creation.

b. *Revenue generation.* The applicant may show that the start-up entity has generated substantial and rapidly increasing revenue in the United States during the initial parole period. To satisfy this criterion, an applicant will need to demonstrate that the entity reached at least $500,000 in annual revenue, with average annualized revenue growth of at least 20 percent, during the initial parole period.

c. *Job creation.* The applicant may show that the start-up entity has demonstrated substantial job creation in the United States during the initial parole period. To satisfy this criterion, an applicant will need to demonstrate that the entity created at least 5 full-time jobs for U.S. workers during the initial parole period.

d. *Alternative criteria.* As with initial parole, the final rule includes alternative criteria under which an applicant who partially meets one or more of the above criteria related to capital investment, revenue generation, or job creation may be considered for re-parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole will continue to provide a significant public benefit. As discussed above, such evidence must serve as a compelling validation of the entity's substantial potential for rapid growth and job creation.

As indicated above, an applicant who generally meets the above criteria and merits a favorable exercise of discretion may be granted an additional 30-month period of re-parole, for a total maximum period of 5 years of parole under 8 CFR 212.19, to work with the same start-up entity based on the significant public benefit that would be served by his or her continued parole in the United States. No more than three

entrepreneurs (and their spouses and children) may receive such additional periods of parole with respect to any one qualifying entity.

As with initial parole applications, USCIS adjudicators will consider the totality of the evidence, including evidence obtained by USCIS through verification methods, to determine whether the applicant has satisfied the above criteria and whether his or her continued parole would provide a significant public benefit. To be re-paroled, adjudicators will be required to conclude, based on the totality of the circumstances, both: (1) That the applicant's continued parole would provide a significant public benefit, and (2) that the applicant continues to merit parole as a matter of discretion. If the applicant is re-paroled, DHS retains the authority to revoke parole at any time as a matter of discretion or if DHS determines that parole no longer provides a significant public benefit, such as when the entity has ceased operations in the United States or DHS believes that the application involved fraud or made material misrepresentations.

The entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. At any time prior to reaching the 5-year limit for parole under this final rule, such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or as a lawful permanent resident pursuant to an EB–2 National Interest Waiver). Because parole is not considered an admission to the United States, parolees are ineligible to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications. For example, if such individuals are approved for a nonimmigrant or employment-based immigrant visa classification, they would generally need to depart the United States and apply for a visa with the Department of State (DOS) for admission to the United States as a nonimmigrant or lawful permanent resident.

Finally, DHS is making conforming changes to the employment authorization regulations at 8 CFR 274a.12(b) and (c), the employment eligibility verification regulations at 8 CFR 274a.2(b), and fee regulations at 8 CFR 103.7(b)(i). The final rule amends 8 CFR 274a.12(b) by: (1) Adding entrepreneur parolees to the classes of

aliens authorized for employment incident to their immigration status or parole, and (2) providing temporary employment authorization for those applying for re-parole. The final rule amends 8 CFR 274a.12(c) by extending eligibility for employment authorization to the spouse of an entrepreneur paroled into the United States under 8 CFR 212.19. The final rule amends 8 CFR 274a.2(b) by designating the entrepreneur's foreign passport and Arrival/Departure Record (Form I–94) indicating entrepreneur parole as acceptable evidence for employment eligibility verification (Form I–9) purposes.[3] The final rule also amends 8 CFR 103.7(b)(i) by including the fee for the new Application for Entrepreneur Parole form.

*D. Summary of Changes From the Notice of Proposed Rulemaking*

Following careful consideration of public comments received, including relevant data provided by stakeholders, DHS has made several modifications to the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the **Federal Register** on August 31, 2016. *See* 81 FR 60129. Those changes include the following:

• *Minimum Investment Amount.* In the final rule, DHS is responding to public comment by revising proposed 8 CFR 212.19(b)(2)(ii)(B)(*1*), a provision that identifies the qualifying investment amount required from one or more qualified investors. In the NPRM, DHS proposed a minimum investment amount of $345,000. Based on data provided by the public, DHS is revising this figure to $250,000. Thus, under the final rule, an applicant would generally be able to meet the investment standard by demonstrating that the start-up entity has received investments of capital totaling $250,000 or more from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities. In addition, DHS has increased the timeframe during which the qualifying investments must be received from 365 days to 18 months immediately preceding the filing of an application for initial parole.

• *Definition of Entrepreneur: Ownership Criteria.* In the final rule,

DHS is revising proposed 8 CFR 212.19(a)(1), a provision that defines the term "entrepreneur," and establishes a minimum ownership percentage necessary to meet the definition. In the NPRM, DHS proposed that the entrepreneur must have an ownership interest of at least 15 percent for initial parole, and 10 percent for re-parole. In response to public comment, DHS is modifying this requirement to allow individuals who have an ownership interest of at least 10 percent in the start-up entity at the time of adjudication of the initial grant of parole, and at least a 5 percent ownership interest at the time of adjudication of a subsequent period of re-parole, to qualify under this definition.

• *Qualified Investment Definition.* DHS is revising proposed 8 CFR 212.19(a)(4), which establishes the definition of a qualified investment. In the NPRM, DHS proposed that the term "qualified investment" means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of equity or convertible debt issued by such entity. In response to public comment, DHS is modifying this provision to include other securities that are convertible into equity issued by such an entity and that are commonly used in financing transactions within such entity's industry.

• *Qualified Investor Definition.* DHS is revising proposed 8 CFR 212.19(a)(5), which establishes the definition of a qualified investor. In the NPRM, DHS proposed that an individual or organization may be considered a qualified investor if, during the preceding 5 years: (i) The individual or organization made investments in start-up entities in exchange for equity or convertible debt in at least 3 separate calendar years comprising a total within such 5-year period of no less than $1,000,000; and (ii) subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. In this final rule, the minimum investment amount has been decreased from the originally proposed $1,000,000 to $600,000. The requirement that investments be made in at least 3 separate calendar years has also been removed from this final rule. DHS is also making revisions to the form of investment made by the individual or organization consistent

with the change to the qualified investment definition by adding "or other security convertible into equity commonly used in financing transactions within their respective industries."

• *Start-up Entity Definition.* In the final rule, DHS is revising the definition of a start-up entity as proposed in 8 CFR 212.19(a)(2). In the NPRM, DHS proposed that an entity may be considered recently formed if it was created within the 3 years preceding the date of filing of the initial parole request. In response to public comment, DHS is modifying this provision so that an entity may be considered recently formed if it was created within the 5 years immediately preceding the filing date of the initial parole request. Additionally, for purposes of paragraphs (a)(3) and (a)(5) of this section, which pertain to the definitional requirements to be a qualified investor or qualified government award or grant, respectively, DHS made corresponding changes in this final rule such that an entity may be considered recently formed if it was created within the 5 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

• *Job Creation Requirement.* In the final rule, DHS is revising proposed 8 CFR 212.19(c)(2)(ii)(B)(2), a provision that identifies the minimum job creation requirement under the general re-parole criteria. In the NPRM, DHS proposed that an entrepreneur may be eligible for an additional period of parole by establishing that his or her start-up entity has created at least 10 qualified jobs during the initial parole period. In response to public comment, DHS is modifying this provision so that an entrepreneur may qualify for re-parole if the start-up entity created at least 5 qualified jobs with the start-up entity during the initial parole period.

• *Revenue Generation.* In the final rule, DHS is clarifying proposed 8 CFR 212.19(c)(2)(ii)(B)(3), a provision that identifies the minimum annual revenue requirement under the general re-parole criteria. DHS has clarified that for the revenue to be considered for purposes of re-parole, it must be generated in the United States.

• *Parole Validity Periods.* In the final rule, DHS is revising proposed 8 CFR 212.19(d)(2) and (3), which are provisions that identify the length of the initial and re-parole periods. In the NPRM, DHS proposed (1) a potential initial period of parole of up to 2 years beginning on the date the request is approved by USCIS and (2) a potential period of re-parole of up to 3 years beginning on the date of the expiration

---

[3] Additionally, DHS is making a technical change to this section by adding the Department of State (DOS) Consular Report of Birth Abroad (Form FS–240) to the regulatory text and to the "List C" listing of acceptable documents for Form I–9 verification purposes. This rule departs from the Notice of Proposed Rulemaking by not adding "or successor form" after Form FS–240. DHS determined that inclusion of the phrase is unnecessary and may cause confusion in the future.

of the initial parole period. First, DHS revised 8 CFR 212.19(d)(2) to correct that the initial parole period would begin running on the date the individual is initially paroled into the United States. Second, in response to public comment, DHS revised 8 CFR 212.19(d)(2) and (3) to provide 2 potential parole periods of up to 30 months each, rather than an initial 2-year period followed by a potential 3-year period of re-parole. Specifically, 8 CFR 212.19(d)(2) now provides that an applicant who meets the eligibility criteria (and his or her spouse and minor, unmarried children, if any) may be considered under this rule for a discretionary grant of an initial parole period of up to 30 months (2.5 years) based on the significant public benefit that would be provided by the applicant's (or family's) parole into the United States. DHS also revised in this final rule the period of re-parole in 8 CFR 212.19(d)(3) to reduce the period of re-parole from 3 years to 30 months in order to extend the initial parole period, while still maintaining the overall 5-year period of parole limitation.

• *Material Changes.* In the final rule, DHS is revising proposed 8 CFR 212.19(a)(10), a provision that defines material changes. The final rule adds the following to the definition of material changes: "a significant change with respect to ownership and control of the start-up entity." This reflects a change from the originally proposed language of any significant change to the entrepreneur's role in or ownership and control in the start-up entity or any other significant change with respect to ownership and control of the start-up entity. Additionally, the final rule at 8 CFR 212.19(a)(1) adds language that permits the entrepreneur during the initial parole period to reduce his or her ownership interest, as long as at least 5 percent ownership is maintained. This provision was revised in response to a number of public comments that requested that DHS reconsider how and when material changes should be reported.

• *Reporting of Material Changes.* In the final rule, DHS is revising proposed 8 CFR 212.19(j), a provision that describes reporting of material changes. DHS is revising 8 CFR 212.19(j) to allow DHS to provide additional flexibility in the future with respect to the manner in which material changes are reported to DHS. The final rule also makes conforming changes based on changes to the definition of entrepreneur.

• *Termination of Parole.* In the final rule, DHS is revising proposed 8 CFR 212.19(k)(2), a provision that describes automatic termination of parole. The final rule makes conforming revisions to this provision based on changes to the definition of entrepreneur and to the material change provisions.

*E. Summary of Costs and Benefits*

DHS does not anticipate that this rule will generate significant costs and burdens to private or public entities. Costs of the rule stem from filing fees and opportunity costs associated with applying for parole, and the requirement that the entrepreneur notify DHS of any material changes.

DHS estimates that 2,940 entrepreneurs will be eligible for parole annually and can apply using the Application for Entrepreneur Parole (Form I–941). Each applicant for parole will face a total filing cost—including the application form fee, biometric filing fee, travel costs, and associated opportunity costs—of $1,591, resulting in a total cost of $4,678,336 (undiscounted) for the first full year the rule will take effect and any subsequent year. Additionally, dependent family members (spouses and children) seeking parole with the principal applicant will be required to file an Application for Travel Document (Form I–131) and submit biographical information and biometrics. DHS estimates approximately 3,234 dependent spouses and children could seek parole based on the estimate of 2,940 principal applicants. Each spouse and child 14 years of age and older seeking parole will face a total cost of $765 per applicant,[4] for a total aggregate cost of $2,474,914.[5] Additionally, spouses who apply for work authorization via an Application for Employment Authorization (Form I–765) will incur a total additional cost of $446 each. Based on the same number of entrepreneurs, the estimated 2,940 spouses [6] will incur total costs of $1,311,830 (undiscounted). The total cost of the rule to include direct filing costs and monetized non-filing costs is estimated to be $8,136,571 annually.

DHS anticipates that establishing a parole process for those entrepreneurs who stand to provide a significant public benefit will advance the U.S. economy by enhancing innovation, generating capital investments, and creating jobs. DHS does not expect significant negative consequences or labor market impacts from this rule; indeed, DHS believes this rule will encourage entrepreneurs to pursue business opportunities in the United States rather than abroad, which can be expected to generate significant scientific, research and development, and technological impacts that could create new products and produce positive spillover effects to other businesses and sectors. The impacts stand to benefit the economy by supporting and strengthening high-growth, job-creating businesses in the United States.

*F. Effective Date*

This final rule will be effective on July 17, 2017, 180 days from the date of publication in the **Federal Register**. DHS has determined that this 180-day period is necessary to provide USCIS with a reasonable period to ensure resources are in place to process and adjudicate Applications for Entrepreneur Parole filed by eligible entrepreneurs and related applications filed by eligible dependents under this rule without sacrificing the quality of customer service for all USCIS stakeholders. USCIS believes it will thus be able to implement this rule in a manner that will avoid delays of processing these and other applications.

**II. Background**

*A. Discretionary Parole Authority*

The Secretary of Homeland Security has discretionary authority to parole into the United States temporarily "under conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any individual applying for admission to the United States," regardless of whether the alien is inadmissible. INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[7] The Secretary's parole authority is expansive. Congress did not define the phrase "urgent humanitarian reasons or significant public benefit," entrusting interpretation and application of those

---

[4] On October 24, 2016, U.S. Citizenship and Immigration Services published a final rule establishing a new fee schedule for immigration benefits and services (81 FR 73292). The new filing fees for Form I–131 and Form I–765, $575 and $410, respectively, will be effective on December 23, 2016. This final rule uses those new filing fees in estimating costs to potential applicants under this rule.

[5] For parole requests for children under the age of 14, only the filing fee will be required, as such children do not appear for biometric collection. Applicants under the age of 14 and over the age of 79 are not required to be fingerprinted. However, they may still be required to attend a biometrics appointment in order to have their photographs and signatures captured.

[6] DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 2,940 spouses, the same number as entrepreneur parolees.

[7] Although section 212(d)(5) continues to refer to the Attorney General, the parole authority now resides exclusively with the Secretary of Homeland Security. *See Matter of Arrabally,* 25 I. & N. Dec. 771, 777 n.5 (BIA 2012).

standards to the Secretary. Aside from requiring case-by-case determinations, Congress limited the parole authority by restricting its use with respect to two classes of applicants for admissions: (1) Aliens who are refugees (unless the Secretary determines that "compelling reasons in the public interest with respect to that particular alien require that the alien be paroled . . . rather than be admitted as a refugee" under INA section 207, 8 U.S.C. 1157), *see* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B); and (2) certain alien crewmen during a labor dispute in specified circumstances (unless the Secretary "determines that the parole of such alien is necessary to protect the national security of the United States"), INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A).

Parole decisions are discretionary determinations and must be made on a case-by-case basis consistent with the INA. To exercise its parole authority, DHS must determine that an individual's parole into the United States is justified by urgent humanitarian reasons or significant public benefit. Even when one of those standards would be met, DHS may nevertheless deny parole as a matter of discretion based on other factors.[8] In making such discretionary determinations, USCIS considers any criminal history or other serious adverse factors that would weigh against a favorable exercise of discretion.

Parole is not an admission to the United States. *See* INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); *see also* 8 CFR 1.2 ("An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked."). Parole may also be terminated at any time in DHS's discretion, consistent with existing regulations; in those cases, the individual is "restored to the status that he or she had at the time of parole." 8 CFR 212.5(e); *see also* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[9]

DHS regulations at 8 CFR 212.5 generally describe DHS's discretionary parole authority, including the authority to set the terms and conditions of parole. Some conditions are described in the regulations, including requiring reasonable assurances that the parolee

will appear at all hearings and will depart from the United States when required to do so. *See* 8 CFR 212.5(d).

Each of the DHS immigration components—USCIS, U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE)—has been delegated the authority to parole applicants for admission in accordance with section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). *See* 8 CFR 212.5(a). The parole authority is often utilized to permit an individual who is outside the United States to travel to and come into the United States without a visa. USCIS, however, also accepts requests for "advance parole" by individuals who seek authorization to depart the United States and return to the country pursuant to parole in the future. *See* 8 CFR 212.5(f); Application for Travel Document (Form I–131). Aliens who seek parole as entrepreneurs under this rule may need to apply for advance parole if at the time of application they are present in the United States after admission in, for example, a nonimmigrant classification, as USCIS is unable to grant parole to aliens who are not "applicants for admission." *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Advance authorization of parole by USCIS does not guarantee that the individual will be paroled by CBP upon his or her appearance at a port of entry.[10] Rather, with a grant of advance parole, the individual is issued a document authorizing travel (in lieu of a visa) indicating "that, so long as circumstances do not meaningfully change and the DHS does not discover material information that was previously unavailable, . . . DHS's discretion to parole him at the time of his return to a port of entry will likely be exercised favorably." [11]

Currently, upon an individual's arrival at a U.S. port of entry with a parole travel document (*e.g.,* a Department of State (DOS) foil, Authorization for Parole of an Alien into the United States (Form I–512L), or an Employment Authorization Document (Form I–766)), a CBP officer at a port of entry inspects the prospective parolee. If parole is authorized, the CBP officer issues an Arrival/Departure Record (Form I–94) documenting the grant of parole and the length of the parolee's

authorized parole period. *See* 8 CFR 235.1(h)(2). CBP retains the authority to deny parole to a parole applicant or to modify the length of advance parole authorized by USCIS. *See* 8 CFR 212.5(c).

Because parole does not constitute an admission, individuals may be paroled into the United States even if they are inadmissible under section 212(a) of the INA, 8 U.S.C. 1182(a). Further, parole does not provide a parolee with nonimmigrant status or lawful permanent resident status. Nor does it provide the parolee with a basis for changing status to that of a nonimmigrant or adjusting status to that of a lawful permanent resident, unless the parolee is otherwise eligible.

Under current regulations, once paroled into the United States, a parolee is eligible to request employment authorization from USCIS by filing a Form I–765 application with USCIS. *See* 8 CFR 274a.12(c)(11). If employment authorization is granted, USCIS issues the parolee an employment authorization document (EAD) with an expiration date that is commensurate with the period of parole on the parolee's Arrival/Departure Record (Form I–94). The parolee may use this EAD to demonstrate identity and employment authorization to an employer for Form I–9 verification purposes as required by section 274A(a) and (b) of the INA, 8 U.S.C. 1324a(a) and (b). Under current regulations, the parolee is not employment authorized by virtue of being paroled, but instead only after receiving a discretionary grant of employment authorization from USCIS based on the Application for Employment Authorization.

Parole will terminate automatically upon the expiration of the authorized parole period or upon the departure of the individual from the United States. *See* 8 CFR 212.5(e)(1). Parole also may be terminated on written notice when DHS determines that the individual no longer warrants parole or through the service of a Notice to Appear (NTA). *See* 8 CFR 212.5(e)(2)(i).

*B. Final Rule*

Following careful consideration of public comments received, DHS has made several modifications to the regulatory text proposed in the NPRM (as described above in Section I.C.). The rationale for the proposed rule and the reasoning provided in the background section of that rule remain valid with respect to these regulatory amendments. Section III of this final rule includes a detailed summary and analysis of public comments that are pertinent to the proposed rule and DHS's role in

---

[8] The denial of parole is not subject to judicial review. *See* INA section 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii); *Bolante* v. *Keisler*, 506 F.3d 618, 621 (7th Cir. 2007).

[9] The grounds for termination set forth in 212.19(k) are in addition to the general grounds for termination of parole described at 8 CFR 212.5(e).

[10] *See Matter of Arrabally*, 25 I. & N. Dec. at 779 n.6 (citing 71 FR 27585, 27586 n.1 (May 12, 2006) ("[A] decision authorizing advance parole does not preclude denying parole when the alien actually arrives at a port-of-entry, should DHS determine that parole is no longer warranted.")).

[11] *Id.*

administering the International Entrepreneur Rule. A brief summary of comments deemed by DHS to be out of scope or unrelated to this rulemaking, making a detailed substantive response unnecessary, is provided in Section III.K. Comments may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov*, docket number USCIS–2015–0006.

## III. Public Comments on the Proposed Rule

### A. Summary of Public Comments

In response to the proposed rule, DHS received 763 comments during the 45-day public comment period. Of these, 43 comments were duplicate submissions and approximately 242 were letters submitted through mass mailing campaigns. As those letters were sufficiently unique, DHS considered all of these comment submissions. Commenters consisted primarily of individuals but also included startup incubators, companies, venture capital firms, law firms and representatives from State and local governments. Approximately 51 percent of commenters expressed support for the rule and/or offered suggestions for improvement. Nearly 46 percent of commenters expressed general opposition to the rule without suggestions for improvement. For approximately 3 percent of the public comments, DHS could not ascertain whether the commenter supported or opposed the proposed rule.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses relevant comments in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by commenters.

### B. Legal Authority

*Comments.* One commenter supported DHS's stated authority for promulgating this regulation and said that the INA grants the Secretary of Homeland Security the authority to establish policies governing parole and that efforts to reduce barriers to entrepreneurship via regulatory reform directly addresses DHS's mandate, "to ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland." On the other hand, some commenters questioned DHS's authority to implement this rule. A commenter asserted that the rule created a new visa category which is under the exclusive purview of Congress, and therefore an illegal extension of authority by the executive branch. Another commenter indicated that the proposed rule is too vague regarding whether "the agency intends to grant parole to aliens already present in the United States," and questioned whether the proposed exercise of parole authority is supported by legislative history, is consistent with the INA's overall statutory scheme, and whether "significant public benefit parole" as outlined in this rule is "arbitrary and capricious."

*Response.* DHS agrees with the commenter that contended that the Secretary has authority to promulgate this rule. As noted above, DHS's authority to promulgate this rule arises primarily from sections 101(b)(1)(F) and 402(4) of the HSA; sections 103(a)(1) and (3) of the INA, 8 U.S.C. 1103(a)(1), (3); section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5); and section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B). The Secretary retains broad statutory authority to exercise his discretionary parole authority based upon "significant public benefit."

DHS disagrees with the comment asserting that the proposed rule would effectively create a new visa category, which only Congress has the authority to do. *See* INA section 101(a)(15), 8 U.S.C. 1101(a)(15) (identifying nonimmigrant categories). Congress expressly empowered DHS to grant parole on a case-by-case basis, and nothing in this rule uses that authority to establish a new nonimmigrant classification. Among other things, individuals who are granted parole—which can be terminated at any time in the Secretary's discretion—are not considered to have been "admitted" to the United States, *see* INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); and cannot change to a nonimmigrant category as a parolee, *see* INA section 248(a), 8 U.S.C. 1258(a). Nor does parole confer lawful permanent resident status. To adjust status to that of a lawful permanent resident, individuals generally must, among other things, be admissible to the United States, have a family or employment-based immigrant visa immediately available to them, and not be subject to the various bars to adjustment of status. *See* INA section 245(a), (c), (k); 8 U.S.C. 1255(a), (c), (k); 8 CFR 245.1.

DHS further disagrees with the comment that this rule is inconsistent with the legislative history on parole. Under current law, Congress has expressly authorized the Secretary to grant parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit. The statutory language in place today is somewhat more restrictive than earlier versions of the parole authority, which did not always require case-by-case review and now includes additional limits on the use of parole for refugees and certain alien crewmen. *See* INA section 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B) (refugees); INA section 214(f)(2)(A), 8 U.S.C. 1184(f)(2)(A) (alien crewmen); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, div. C, sec. 602(a)–(b), 110 Stat. 3009–689 (1996) (changing the standard for parole). But the statute clearly continues to authorize the granting of parole. Across Administrations, moreover, it has been accepted that the Secretary can identify classes of individuals to consider for parole so long as each individual decision is made on a case-by-case basis according to the statutory criteria. *See, e.g.,* 8 CFR 212.5(b) (as amended in 1997); Cuban Family Reunification Parole Program, 72 FR 65,588 (Nov. 21, 2007). This rule implements the parole authority in that way.

In addition to the concerns described above, one commenter argued that the proposed rule did not clearly explain whether "the agency intends to grant parole to aliens already present in the United States." DHS believes it is clear under this rule that an individual who is present in the United States as a nonimmigrant based on an inspection and admission is not eligible for parole without first departing the United States and appearing at a U.S. port of entry to be paroled into United States. *See* INA sections 212(d)(5)(A), 235(a)(1); 8 U.S.C. 1182(d)(5)(A), 1225(a)(1). As further discussed in section III.H. of this rule, moreover, DHS does not contemplate using this rule to grant requests for parole in place for initial requests for parole.

*Comment:* A commenter objected to the extension of employment authorization by this rule to entrepreneur parolees for the sole purpose of engaging in entrepreneurial employment, stating that DHS is barred from doing so given the comprehensive legislative scheme for employment-based temporary and permanent immigration.

*Response:* DHS disagrees with the commenter. Under a plain reading of INA section 103(a), 8 U.S.C. 1103(a), the Secretary is provided with broad discretion to administer and enforce the Nation's immigration laws and broad authority to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the [INA]," *see* INA section 103(a)(3), 8 U.S.C. 1103(a)(3). Further, the specific definitional

provision at section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), which was raised by the commenter, presumes that employment may be authorized by the Secretary and not just by statute. *See Arizona Dream Act Coal.* v. *Brewer,* 757 F.3d 1053, 1062 (9th Cir. 2014) (''Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States.''); *Perales* v. *Casillas,* 903 F.2d 1043, 1048, 1050 (5th Cir. 1990) (describing the authority recognized by INA 274A(h)(3) as ''permissive'' and largely ''unfettered''). The fact that Congress has directed the Secretary to authorize employment to specific classes of foreign nationals in certain statutory provisions does not diminish the Secretary's broad authority under other statutory provisions to administer the immigration laws, including through the extension of employment authorization. *See generally* 8 CFR 274a.12 (identifying, by regulation, numerous ''classes of aliens authorized to accept employment'').

*C.* Significant Public Benefit

*Comment:* One commenter stated that the quality of the jobs created should be a factor in determining whether the entrepreneur's parole will provide a significant public benefit. The commenter suggested formalizing some form of priority criteria.

*Response:* Under this final rule, evidence regarding job creation may be considered in determining whether to parole an individual into the United States for ''significant public benefit.'' An entrepreneur may be considered for an initial period of parole if the entrepreneur's start-up entity has received a qualifying investment or grant. Alternatively, if the entity has received a lesser investment or grant amount, the entrepreneur may still be considered for parole by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Evidence pertaining to the creation of jobs, as well as the characteristics of the jobs created (*e.g.,* occupational classification and wage level) may be considered by DHS in determining whether the evidence, when combined with the amount of investment, grant or award, establishes that the entrepreneur will provide a significant public benefit to the United States. As with initial parole determinations, evidence pertaining to the creation of jobs, as well as the characteristics of the jobs created (*e.g.,* occupational classification and wage level) may be considered by DHS to determine whether the entrepreneur should be granted re-parole.

Given the way job creation will already be considered, DHS believes it is unnecessary to make ''job quality'' its own separate criterion in determining whether to grant parole or re-parole. It is also unclear how the commenter believes DHS should apply any such criterion. Under this final rule, DHS will evaluate the totality of the circumstances, including the evidence about job creation, in determining whether to parole an individual into the United States for significant public benefit.

*D. Definitions*

1. Entrepreneur—Ownership Criteria

*Comments:* Several commenters expressed concern with the 15 percent ''substantial ownership interest'' requirement in the definition of ''entrepreneur'' in the proposed rule. One such commenter said the 15 percent ''substantial ownership interest'' requirement is only reasonable for smaller startups and proposed that the rule also separately include a dollar amount to satisfy the ''substantial ownership interest'' requirement (*e.g.,* 15 percent ownership interest or ownership interest valued at $150,000 or more). Several commenters recommended that the final rule reduce the initial parole threshold from 15 to 10 percent and reduce the re-parole threshold from 10 to 5 percent. Other commenters suggested that 10 percent ownership per individual would be a more appropriate threshold because some start-ups may be founded by teams of founders that need to split equity and requiring more than 15 percent ownership might be too restrictive and limit business creativity and growth.

*Response:* Consistent with the commenters' concerns and suggestions, DHS is revising the definition of entrepreneur in this final rule to reduce the ownership percentage that the individual must possess. *See* 8 CFR 212.17(a)(1). Based on further analysis, DHS believes that the thresholds from the proposed rule could have unnecessarily impacted an entrepreneur's ability to dilute his or her ownership interest to raise additional funds and grow the start-up entity. In this final rule, an individual may be considered to possess a substantial ownership interest if he or she possesses at least a 10 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and possesses at least a 5 percent ownership interest in the start-up entity at the time of adjudication of a subsequent period of re-parole. DHS believes that the revised

ownership percentage requirements in this final rule adequately account for the possibility of equity dilution, while ensuring that the individual continues to have a substantial ownership interest in, and assumes more than a nominal financial risk related to, the start-up entity.

Given that this is a new and complex process, DHS declines to adopt a separate option of establishing substantial ownership interest based on a valuation of the entrepreneur's ownership interest. DHS believes that the percentages provided within the final rule offer clear guidance to stakeholders and adjudicators as to what constitutes a substantial ownership interest regardless of the industry involved. Reliance upon valuations of an owner's interest would unnecessarily complicate the adjudicative review process, could potentially increase fraud and abuse, and may be burdensome for the applicant to obtain from an independent and reliable source. DHS, therefore, believes that the best indicator of an entrepreneur's ownership interest is the individual's ownership percentage since that is easy for an applicant to establish and provides an objective indicator for DHS to assess. DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

2. Other Comments on Entrepreneur Definition

*Comment:* One commenter stated that, in defining who counts as an ''entrepreneur,'' the rule should take into account whether an individual has been successful in the past, including by having previously owned and developed businesses, generated more than a certain amount of revenue, created more than a certain number of jobs, or earned at least a certain amount.

*Response:* Under this final rule, evidence regarding an entrepreneur's track record may be considered in determining whether to parole an individual into the United States for ''significant public benefit.'' The final rule's definition of entrepreneur requires the applicant to show that he or she both: (1) Possesses a substantial ownership interest in the start-up entity, and (2) has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the growth and success of its business. *See* new 8 CFR 212.17(a)(1). Some of the factors suggested by the commenter are

**5246**      **Federal Register** / Vol. 82, No. 10 / Tuesday, January 17, 2017 / Rules and Regulations

relevant evidence that the applicant can submit to show that he or she is well-positioned to substantially assist the entity with the growth and success of its business. DHS will also evaluate the totality of the evidence to determine whether an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. Given the way an entrepreneur's track record may already be considered on a case-by-case basis, DHS believes it is unnecessary to make the specific factors identified by the commenter their own separate criteria in determining whether to grant parole or re-parole.

*Comment:* A few commenters recommended that DHS clarify the term "well-positioned" as used in the definition of "entrepreneur." *See* final 8 CFR 212.19(a)(1) (requiring an international entrepreneur to prove that he or she "is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business"). The commenters believe that the proposed rule did not explain how an applicant would demonstrate that he or she is "well-positioned." The commenters recommend that the "substantial ownership interest" test in the same provision should provide a rebuttable presumption that the entrepreneur is "well-positioned" and that the "significant capital financing" requirements reflect the market demand for the entrepreneur to grow the business.

*Response:* DHS believes that both the proposed rule and this final rule sufficiently explain how an applicant may establish that he or she is "well-positioned" to grow the start-up entity. An applicant may generally establish that he or she is well-positioned to advance the entity's business by providing evidence that he or she: (1) Possesses a significant (at least 10 percent) ownership interest in the entity at the time of adjudication of the initial grant of parole, and (2) has an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States. Such an applicant cannot be a mere investor. The applicant must be central to the entity's business and well-positioned to actively assist in the growth of that business, such that his or her presence would help the entity create jobs, spur research and development, or provide other benefits to the United States. Whether an applicant has an "active and central

role," and therefore is well-positioned to advance the entity's business, will be determined based on the totality of the evidence provided on a case-by-case basis. Such evidence may include:

• Letters from relevant government agencies, qualified investors, or established business associations with an understanding of the applicant's knowledge, skills or experience that would advance the entity's business;

• news articles or other similar evidence indicating that the applicant has received significant attention and recognition;

• documentation showing that the applicant or entity has been recently invited to participate in, is currently participating in, or has graduated from one or more established and reputable start-up accelerators;

• documentation showing that the applicant has played an active and central role in the success of prior start-up or other relevant business entities;

• degrees or other documentation indicating that the applicant has knowledge, skills, or experience that would significantly advance the entity's business;

• documentation pertaining to intellectual property of the start-up entity, such as a patent, that was obtained by the applicant or as a result of the applicant's efforts and expertise;

• a position description of the applicant's role in the operations of the company; and

• any other relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States.

Particularly given the way this evidence will be evaluated on a case-by-case basis, and the need to ensure parole is justified by significant public benefit, DHS declines to adopt the commenters' suggestion of adopting a rebuttable presumption that certain applicants meet the "well-positioned" requirement. The burden of proof remains with the applicant.

*Comment:* One commenter representing a group of technology companies recommended that DHS add the term "intellectual property" as a metric that an adjudicator would take into consideration when determining the "active and central role" that the international entrepreneur performs in the organization. The commenter noted that it had several member companies that have non-citizen inventors on a key patent application, and have had core intellectual property developed by non-citizens, often within the university environment. In many of these situations, the non-citizen inventors were unable to obtain work

authorization and join the emerging startup company, resulting in loss of key technical ability, delay, and additional cost for the startup company to achieve market success. The commenter believes this rule could alleviate this investment risk.

*Response:* As discussed above, an applicant for parole under this rule may provide any relevant, probative, and credible evidence indicating the applicant's ability to advance the entity's business in the United States. Such evidence includes documentation pertaining to intellectual property of the start-up entity, such as a patent, that was obtained by the applicant or as a result of the applicant's efforts and expertise. DHS will consider such evidence to determine whether the applicant performs, or will perform, an active and central role in the start-up entity.

Given the breadth of evidence that can already be considered in these determinations, DHS declines to amend the definition of "entrepreneur" in 8 CFR 212.19(a)(1) to include some consideration of "intellectual property" as a specific metric to determine if the applicant will have an active and central role in the start-up entity. DHS believes it is appropriate to allow for sufficient flexibility in the definition for adjudicators to evaluate each case on its own merits. Given the considerable range of entrepreneurial ventures that might form the basis for an application for parole under this rule, DHS believes that such flexibility is important to ensure that cutting edge industries or groundbreaking ventures are not precluded from consideration simply because of an overly rigid or narrow definition of "entrepreneur."

*Comment:* One commenter noted that DHS's inclusion of criteria in section IV.B.1. of the NPRM, "Recent Formation of a Start-Up Entity," is reminiscent of criteria used in the O–1 nonimmigrant classification for individuals with extraordinary ability, except for the focus on entrepreneurial endeavors. The commenter especially welcomed the final "catch-all" that referenced "any other relevant, probative, and credible evidence indicating the entity's potential for growth." The commenter asserted that as it pertains to "newspaper articles," one of the major difficulties of the O–1 petition process is the lack of awareness by adjudicators of tech-press publications, such as Recode or TechCrunch. The commenter explained that coverage in these publications is very valuable to startups, and forcing startups to garner traditional media coverage in publications like the *Wall Street Journal* or the *New York*

*Times* is often counterproductive towards the entrepreneur's success.

*Response:* DHS agrees with the commenter that the list of evidence provided in the preamble to the NPRM and this final rule provides an illustrative, non-exhaustive list of the types of evidence that might be submitted by an applicant to establish that he or she meets the definition of entrepreneur in 8 CFR 212.19(a)(1). Applicants may submit any relevant, probative and credible evidence that demonstrates the entity's potential for growth, including tech-press publications.

*Comment:* One commenter recommended broadening the proposed requirement that the parolee play a central role in operations. The commenter noted that the DHS November 2014 memorandum,[12] which initially directed USCIS to develop a proposed rule under the Secretary's parole authority, refers to researchers, not just managers or founders. The commenter stated that in the technology world, "technical founders" are key employees who lead the research and development phase, and recommended that these technical founders be included even if they are not managing overall operations. To keep this expansion targeted, the commenter recommended requiring a technical founder to have an advanced degree in a STEM field from a U.S. institution of higher education.

*Response:* DHS agrees that "technical founders" are often key employees who play an important role in the development and success of a start-up entity. DHS disagrees, however, with the commenter's assertion that the definition of entrepreneur in 8 CFR 212.19(a)(1) does not sufficiently encompass technical founders. Technical founders can perform a central and active role in the operations of their start-up entity, and may be well-positioned, due to their knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. The definition of "entrepreneur" is not limited to those individuals who manage the overall operations of the start-up entity. Thus, DHS believes it is unnecessary to broaden the definition of "entrepreneur" in the way the commenter suggests.

*Comment:* One commenter suggested that the rule should provide a clear-cut definition of a typical entrepreneur.

This commenter asserted that the draft rule does not adequately account for situations where a typical entrepreneur partially qualifies or does not qualify for parole, but nevertheless seeks to start a business in the United States. The commenter stated that USCIS and the White House should plan to have a separate case study team to evaluate each application.

*Response:* DHS believes that the rule provides a reasonable and clear definition of an entrepreneur. This rule is not designed or intended to provide parole to everyone who seeks to be an entrepreneur, but will instead provide a framework for case-by-case determinations based upon specified criteria for determining that a grant of parole in this context provides a significant public benefit. The framework in this rule is consistent with DHS's parole authority under INA section 212(a)(5), 8 U.S.C. 1182(a)(5), and is based on the statutory authorization to provide parole for significant public benefit. Each application for parole under this rule will be adjudicated by an Immigration Services Officer trained on the requirements for significant public benefit parole under 8 CFR 212.19. DHS believes that a separate case-study team could unnecessarily complicate and delay adjudications and declines to adopt the commenter's suggestion.

3. Definition of Start-Up Entity—"Recently-Formed" and the 3-year Limitation

*Comment:* Several commenters expressed concern with the definition of "start-up entity" and the requirement that an entity, in order to satisfy that definition, must have been created within the 3 years immediately preceding the parole request filing date. A few individual commenters said that the 3-year limitation could be inadequate in certain situations, such as when investing in an inactive business with other co-founders to initiate the start-up, or when investing in high-priority areas like healthcare, biotechnology, and clean energy that have long gestation times. A couple of individual commenters said that the 3-year limitation may not be necessary given the other, more stringent requirements in the proposed rule. Some commenters provided the following recommendations relating to the 3-year limitation: Eliminate the limitation, lengthen the period to 5 years, lengthen the period to 10 years, or include a case-by-case provision allowing for submissions that may satisfy the definition of "start-up entity." One commenter recommended

that "recently formed" should include entities formed within the last 10 years, and also requested that where applicable, DHS accept alternative evidence to determine and establish that the company is a "start-up" entity, such as letters of attestation from investors, industry experts within a particular niche field, and government agencies that speak to the average growth cycle of a new company within a particular area. A few commenters stated that the 3-year limitation was appropriate.

*Response:* In response to these comments, DHS revised proposed 8 CFR 212.19(a)(2) and the definition of "start-up entity" in this final rule to require that the entity must have been formed within the 5 years immediately preceding the filing of the initial parole application, rather than 3 years as proposed. DHS believes that this definition appropriately reflects that some entities, particularly given the industry in which the entity operates, may require a longer gestation time before receiving substantial investment, grants, or awards. This 5-year limitation continues to reflect the Department's intention for parole under this final rule: To incentivize and support the creation and growth of new businesses in the United States, so that the country may benefit from their substantial potential for rapid growth and job creation. DHS recognizes that the term "start-up" is usually used to refer to entities in early stages of development, including various financing rounds used to raise capital and expand the new business, but the term "goes beyond a company just getting off the ground."[13] Limiting the definition of "start-up" in this proposed rule to entities that are less than 5 years old at the time the parole application is filed is a reasonable way to help ensure that the entrepreneur's entity is the type of new business likely to experience rapid growth and job creation, while still allowing a reasonable amount of time for the entrepreneur to form the business and obtain qualifying levels of investor financing (which may occur in several rounds) or government grants or awards.

4. Other Comments on the Definition of Start-Up Entity

*Comment:* One commenter said that formation should be defined to be either the creation of a legal entity under which the activities of the business

[12] Memorandum from Jeh Johnson, DHS Secretary, Policies Supporting U.S. High-Skilled Business and Workers 4 (Nov. 20, 2014), at *https://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*

[13] U.S. Small Business Administration, Startups & High Growth Businesses, available at *https://www.sba.gov/content/startups-high-growth-businesses* ("In the world of business, the word 'startup' goes beyond a company just getting off the ground.").

would be conducted or the effective date of an agreement between the entrepreneur and an existing business to launch the business activities as a start-up, branch, department, subsidiary, or other activity of an existing business entity. Another commenter suggested that DHS consider restructuring (*e.g.,* use successor-in-interest rules) and other pivots (in terms of changes in the service or product, as well as markets) during the 3-year period immediately preceding the filing of the parole application and at time of application for re-parole.

*Response:* DHS appreciates the commenters' suggestions and notes that recent formation within the definition of "start-up entity" in 8 CFR 212.19(a)(2) is already limited to the creation of the entity within the 5 years immediately preceding the filing date of the alien's initial parole request. DHS further declines to amend 8 CFR 212.19(a)(2) to broaden what may be considered "recently formed" to include the effective date of an agreement between the entrepreneur and an existing business to launch new business activities, restructurings and other pivots. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter suggested that start-up entities under this rule should be limited to businesses that fill a need that is currently not being fulfilled in the United States.

*Response:* One of the goals of this final rule is to increase and enhance entrepreneurship, innovation, and job creation in the United States; and, under this rule, evidence regarding the expected contributions of a start-up entity will be considered in determining whether to parole an individual into the United States. A successful start-up entity, particularly one with high-growth potential, will fulfill an identified business need. For example, the entrepreneur may be starting the business to alter an existing industry through innovative products or processes, innovative and more efficient methods of production, or cutting-edge research and development to expand an existing market or industry. It is also unclear from the commenter's suggestion how "business need" would be defined, and DHS believes that attempting to do so in this rule could result in an overly restrictive definition that fails to account for future innovation, would be unnecessarily rigid, and would lessen the rule's ability

to retain and attract international entrepreneurs who will provide a significant public benefit to the United States.

*Comment:* An individual commenter requested that staffing companies be included as a type of startup.

*Response:* In this final rule, and for purposes of parole under this program, DHS defines a "start-up entity" as a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job creation. *See* 8 CFR 212.19(a)(2). The rule requires that entities meet certain specified criteria for obtaining parole, but the rule does not specifically exclude staffing companies from participating if they otherwise meet these criteria. DHS therefore will not revise the definition of start-up entity in this rule as requested by the commenter.

*Comment:* One commenter asserted that the rule fails to specify how a start-up entity can demonstrate that it has "lawfully done business" or "has substantial potential for rapid growth and job creation." The commenter recommended revising the definition to more closely align with 8 CFR 214.2(l)(1)(ii)(G)(2) and (l)(1)(ii)(H) by instead requiring evidence that the entity is or will be engaged in the regular, systematic, and continuous provision of goods or services. This commenter suggested that the submission of expert witness testimony by a reputable third party, such as a recognized professor or leader in the start-up entity's proposed field, should be given deference and treated under the final rule as a rebuttable presumption establishing that the start-up "has substantial potential for rapid growth and job creation."

*Response:* DHS declines to adopt the commenter's suggested changes in this final rule. DHS believes that an applicant can demonstrate the start-up entity's lawful business activities through many different means and will keep this requirement flexible to account for the many differences among start-up entities. Such evidence might include, but is not limited to, business permits, equipment purchased or rented, contracts for products or services, invoices, licensing agreements, federal tax returns, sales tax filings, and evidence of marketing efforts.

DHS believes that the rule provides a clear framework for establishing that a start-up entity has substantial potential for rapid growth and job creation. *See* 8 CFR 212.19(b)(2)(ii) and (iii). An applicant generally must satisfy the criteria in 8 CFR 212.19(b)(2)(ii) to be

considered for parole under this rule. An applicant who only partially meets one or both of the criteria in 8 CFR 212.19(b)(2)(ii) may still be eligible for consideration for parole under this rule if the applicant provides additional reliable and compelling evidence that the start-up entity has the substantial potential for rapid growth and job creation. DHS recognizes that the rule does not provide specific evidence that must be submitted in order to satisfy the alternative criteria in 8 CFR 212.19(b)(2)(iii). DHS believes that providing a specific set of evidence would have the unintended effect of narrowing a provision that was designed to allow for the submission of any evidence that the applicant believes may establish the substantial potential of his or her start-up entity, recognizing that such evidence may vary depending on the nature of the business and the industry in which it operates. DHS believes that it is important to retain criteria that provide flexibility to the applicant and DHS. Such flexibility is consistent with DHS's parole authority and the case-by-case nature of each parole determination as required by statute. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

DHS does not believe that the rule should be revised to align with 8 CFR 214.2(l)(1)(ii)(G)(2) and (l)(1)(ii)(H). The requirements set forth in 8 CFR 214.2(l)(1)(ii)(G)(2) and (l)(1)(ii)(H) relate specifically to eligibility for classification as an L–1 nonimmigrant and are not necessarily relevant to the requirements set forth in this rule, which are specifically designed to provide the framework by which USCIS will determine whether to grant parole to certain individuals for significant public benefit. Particularly given the way this evidence will be evaluated on a case-by-case basis, and the need to ensure parole is justified by significant public benefit, DHS declines to adopt the commenters' suggestion of adopting a rebuttable presumption that certain entities have substantial potential for rapid growth and job creation. The burden of proof remains with the applicant.

5. Qualified Government Award or Grant

*Comment:* One commenter stated that the rule's grant-based criteria for consideration focused too narrowly on awards made by government entities The commenter noted that entrepreneurs seek grants from a variety of sources and that funding from non-profits or not-for-profit entities (such as U.S. universities) can be significant sources of start-up capital. The

commenter requested that the rule be revised to allow entrepreneurs of non-profit start-up entities to qualify for parole under this program based on the receipt of charitable grants.

*Response:* DHS appreciates the commenter's suggestion, but declines to adopt the suggestion in this final rule to include charitable grants as a type of qualifying grant or award under 8 CFR 212.19(a)(3). DHS believes, given the nature of charitable grants, that they would not present the same level of validation regarding the entity's high-growth potential as would a grant or award from a Federal, State, or local government entity with expertise in economic development, research and development, or job creation. Since the validating quality of a substantial government grant or award is an important factor DHS will rely upon to determine if the entrepreneur will provide a significant public benefit to the United States, and since that same validating quality does not necessarily extend to charitable grants or awards, DHS declines to adopt the commenter's suggestion. DHS notes, however, that nothing in this final rule prohibits entrepreneurs from accepting charitable grants or pointing to such funding as evidence that parole would be justified and that they merit a favorable exercise of discretion. Moreover, given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter noted that the definition of qualified government award or grant and the phrase "federal, state, or local government entity," are ambiguous as to whether an entrepreneur may qualify under the rule based on a grant by a foreign government. According to the commenter, the rule does not explicitly state that the "federal, state, or local government entity" needs to be restricted to entities in the United States. The commenter encouraged USCIS to adopt a broad approach in determining which kinds of grants may qualify and to allow entrepreneurs to qualify if their start-up entity attracts substantial foreign government financing. The commenter also suggested that USCIS and CBP should again emphasize that parole may be discretionarily denied in cases that could risk national security or impair international relations.

*Response:* While DHS always maintains the ability to deny parole in its discretion, including in those cases where there may be a national security

or foreign relations concerns, DHS declines to expand the definition of qualified government grant or award to include grants or awards from a foreign governmental entity. To eliminate potential confusion, DHS is revising the definition as proposed to specifically exclude foreign government entities. The receipt of significant funding from certain U.S. federal, state or local government entities is an important factor that DHS will weigh in determining if the entrepreneur will provide a significant public benefit to the United States. DHS believes that significant funding from certain U.S. federal, state or local governmental entities is a strong indicator of a start-up entity's substantial potential for rapid growth, including through enhancing innovation, generating revenue, obtaining significant additional investments of capital, and creating jobs. Such government entities regularly evaluate the potential of U.S. businesses, so the choice to provide a significant award or grant to a particular start-up entity can be a compelling indicator of that start-up's substantial potential for rapid growth and job creation. Because these government entities are formed to serve the U.S. public, their choice to fund a particular business may be more indicative than that of a foreign government as to whether the business's operations would provide a significant public benefit in the United States. DHS believes that the reliability and weight of the independent assessment performed by certain U.S. federal, state or local governmental entities before issuing a grant or award does not necessarily extend to grants or awards made by foreign governmental entities. DHS therefore declines to adopt the commenter's suggestion to revise the rule to include funding from foreign governmental entities as one of the criteria in 8 CFR 212.19(a)(3).

6. Qualified Investment

*Comment:* Some commenters suggested that DHS define "capital" broadly to include cash, cash equivalents, secured or unsecured loan proceeds, payments for or obligations under binding leases, the value of goods, equipment, and intangible property such as patent rights, trademarks, trade secrets, and distinctive "know how."

*Response:* DHS declines to adopt the commenters' suggestions. "Qualified investment" as a general criterion for parole is limited to a specific monetary investment in the form of equity or convertible debt, to ensure that the investment is easily valued as well as

significant in nature. This promotes fair and efficient administration of the process under this rule, while also ensuring the integrity of that process. In addition, equity investments and convertible debt investments both involve a distinctive level of expert review, due diligence, and oversight. For example, according to the Small Business Administration, venture capital firms and angel investors typically review a business plan and evaluate a start-up's management team, market, products and services, operating history, corporate governance documents, and financial statements before making an equity investment.[14] Such investment generally also involves active monitoring via board participation, strategic marketing, governance, and capital structure.[15] While non-monetary contributions made to a start-up entity may not be considered as a qualified investment for purposes of the general criteria of a parole determination under this rule, the rule does not prohibit such contributions and they may be considered as evidence under the alternative criteria at 8 CFR 212.19(b)(2)(iii) and (c)(2)(iii) to establish that the start-up entity has, or continues to have, substantial potential for rapid growth and job creation.

*Comment:* One commenter stated that the requirement that start-up capital must be equity or convertible debt may be too limiting given the venture finance markets today. The commenter said that other investment instruments are commonly used by sophisticated market participants, and that such investments might not technically be considered equity or convertible debt even though they are bona fide capital investments. The commenter recommended that the definition be made "future-proof" by creating a catch-all for other investment instruments that are convertible, exchangeable, or exercisable for equity in the start-up, regardless of the name of the investment instrument.

*Response:* DHS understands that the regulatory text may not capture all possible future investment instruments and has amended the regulatory text to capture other commonly used convertible securities now and in the future. The final rule defines "qualified investment" as an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up

---

[14] Venture Capital, *https://www.sba.gov/starting-business/finance-your-business/venture-capital/venture-capital.*
[15] *Id.*

entity that is a purchase from such entity of its equity, convertible debt or other security convertible into its equity commonly used in financing transactions within such entity's industry. DHS believes that this definition, in practice, will apply to other securities convertible into equity (other than convertible debt) that are or become commonly used within the start-up entity's industry, and DHS may issue additional guidance in the future regarding such securities as necessary. Given that this program is new and complex, DHS has decided to take an incremental approach and will consider potential modifications in the future after it is able to assess implementation of the rule and its impact on operational resources.

### 7. Qualified Investor

*Comment:* Several commenters, including associations and individual commenters, stated that the proposed "qualified investor" definition is more stringent than the "accredited investor" definition adopted by the Securities and Exchange Commission (SEC). Several commenters stated that many angel investors, especially newer investment firms and angels, would not be considered "qualified investors" under this rule. One of these commenters suggested revising the definition of a qualified investor using the guidelines set forth by AngelList, which requires all syndicate leads on their site to have registered as accredited investors, to have made at least two direct investments in technology start-ups, and to have attracted additional funding beyond the syndicate lead. Some commenters generally stated that many potentially high-growth firms started by international entrepreneurs will not qualify for parole or re-parole because the business did not receive an investment from a qualified U.S. investor, and encouraged the rule to be more flexible to allow for additional sources of capital.

*Response:* In response to comments received, DHS is revising proposed 8 CFR 212.19(a)(5), which provides the definition of a qualified investor. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years, the individual or organization made investments in start-up entities in exchange for equity or convertible debt or other security convertible into equity commonly used in financing transactions within their respective industries comprising a total in such 5-year period of no less than $600,000. *See* final 8 CFR 212.19(a)(5)(i). DHS has

removed the proposed requirement that the total investment amount be made in 3 separate calendar years and, consistent with its analysis of relevant investment data, reduced the amount from $1,000,000 to $600,000.[16] DHS is also making revisions consistent with the change to the qualified investment definition by adding "other securities that are convertible into equity issued by such an entity and that are commonly used in financing transactions within such entity's industry." DHS agrees with commenters that the qualified investor requirement is more stringent than the SEC "accredited investor" definition, but believes the additional parameters for qualified investors under the rule are appropriate. The "accredited investor" definition for SEC purposes is focused on the investing entity's assets or the individual investor's net worth or annual income,[17] not on the investor's

[16] To arrive at this level, DHS relied on the $250,000 median seed round for active firms that successfully exited accelerators, as is described more fully in the "Volume Projections" subsection of the "Statutory and Regulatory Requirements" section of this final rule notice. Second, DHS multiplied this figure by 2.4, which is an estimate of the average number of investments made over a five-year period by qualified investors. DHS arrived at the figure for average investments over five years using the following methodology. DHS used the "investor graph" section of the Seed DB data set to extract investment round information for investors that have invested in various startup accelerators' portfolio companies. The search engine is not set up in a manner in which random sampling can be done, so DHS obtained data for nine accelerators chosen from the 2016 Seed Accelerator Rankings project (SARP), the report of which is found at: *http://seedrankings.com/pdf/ sarp_2016_accelerator_rankings.pdf.* SARP ranks accelerators via a composite scoring system based on various metrics, including funding value averages and exit performance, and produces a list of the top-rated accelerators, although there is no pre-set number of accelerators that can appear in the ranking list each year. In the 2016 SARP report there were twenty-three Seed Accelerators ranked out of a total of 160 that the program tracks. DHS was able to extract investment round data from nine of the twenty-three SARP ranked accelerators, for a total of about 3,600 individual investment rounds. Next, DHS grouped these rounds for the five-year period October 2011–November 2016 to result in 3,085 records. Next, DHS removed duplicates to parse the list into records for unique investor names. As a result, 1,329 unique investors remained. Dividing the 3,085 by 1,329 investors yields an average of 2.4, which DHS used as a reasonable estimate of the average number of investments that qualified investors made in a five year period, at least for the specific accelerators involved. DHS notes that there are several caveats to this analysis. First, the data only includes investments made through accelerators. If non-accelerator investments were included, for which DHS could not obtain data, the average would likely be higher. Second, some rounds did not include an amount and some investor names represented variations. DHS conducted several data runs based on different filtering techniques and generally the range of average investments was between 2.32 and 2.5.

[17] 17 CFR 230.501(a).

track record of successfully investing in start-up entities. An investor's successful track record of investing in start-up entities provides an important measure of objective validation that DHS will rely upon as part of evaluating whether granting parole to a particular individual would provide a significant public benefit.

DHS also declines to adopt the investor track record criteria associated with AngelList's requirements, as DHS believes that the past success of qualified investors can be demonstrated sufficiently by utilizing the criteria set forth in the final rule. DHS has maintained the requirements under 8 CFR 212.19(a)(5)(ii) as evidence that the investor has had previous successful investments, which are similar to certain criteria for a start-up entity to demonstrate eligibility for re-parole under this rule. *See* final 8 CFR 212.19(a)(5)(ii).

*Comment:* A joint submission from an advocacy group and a non-profit organization proposed that DHS create a "whitelist" of qualified investors and modify the rule such that any start-up receiving an investment from a whitelisted investor proceed through an expedited review process. The commenter said that this would both streamline the parole process and diminish the burden on adjudicators to analyze the merits of often complicated technology companies. The commenter said that the qualification process for such an investor whitelist could be significantly more robust than the rule's proposed definition of "qualified investor" and should be updated on an annual or biannual basis. Another joint submission suggested the creation of a "Known Qualified Investor" program, similar to the "Known Employer" pilot program recently created by DHS in a different context, to assist the overall adjudication process.

*Response:* DHS appreciates the commenters' suggestions. The Known Employer program referenced by the commenter remains in a pilot stage. DHS will assess the effectiveness of the Known Employer program after the pilot is complete, and then determine whether the program should be made permanent. If the program is successful, DHS will assess whether it may be expanded to other adjudication contexts. Committing to use a similar program in the context of this rulemaking would thus be premature. DHS also declines to adopt the commenters' suggestion to create a "whitelist of qualified investors" and an expedited process for applications based on investment from such investors at this time. Given that this is a new and

complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after the Department has assessed the implementation the process and its impact on operational resources.

### 8. Evidence Required To Establish Qualified Investor

*Comment:* Several commenters expressed concern about the burden of proving that investors have met the revenue and job creation criteria in the definition of qualified investor, which the commenters said could prevent investors from participating. One commenter stated that early-stage investors usually do not keep records of employees or the revenues of their portfolio companies, and that those companies would not be inclined to respond to paperwork requests from their investors that do not relate to their own success. Another commenter said that some investors do not make their investments known publicly and the vast majority of investors do not make public their returns (let alone the number of jobs created). Another commenter said that the rule should only require evidence of publicly available information, concluding that it would be too invasive to require disclosure of confidential employee data or other confidential financial information of third-party companies that have no ties to the start-up entity related to the parole applicant. A few commenters requested that DHS allow venture capitalists, accelerators, and incubators to register so that they would not be required to produce the evidence of their qualifications with each parole application.

*Response:* DHS does not believe that providing evidence of revenues generated or jobs created by entities in which the investor previously invested is overly burdensome or would require the investor to publicly reveal otherwise sensitive information. DHS believes, given the significance of an investor's track record of successful investment in start-ups to the determination of significant public benefit, that the need for this evidence outweighs the potential burden on the applicant and investor to compile and submit it. However, as DHS continues to assess the implementation of the process once the rule is final, the Department will consider potential ways to modify the process given the kinds of issues raised by these comments.

### 9. Foreign Funding/Investment

*Comment:* Several commenters provided input on the proposed requirement that "qualified investor" funds must come from either U.S. citizens, lawful permanent residents, or entities that are majority owned and controlled by U.S. citizens or lawful permanent residents. Nearly all commenters on this topic expressed concerns about this requirement as a major limiting factor of the rule. Some commenters focused on the potential economic benefits of broadening the definition of "qualified investor" to include foreign investment. These commenters asserted that it would be economically beneficial to allow non-U.S. investments, as there are many experienced investors from outside the United States that could bring direct foreign investment into the country and create jobs. Another commenter stated that, by limiting qualification to domestic investors, DHS is foregoing a critical opportunity to attract foreign entrepreneurs and their investments.

*Response:* DHS disagrees with the assertion that this rule precludes or otherwise discourages foreign investment. This rule does not preclude entrepreneurs from seeking and obtaining investment from any number of sources, whether that is foreign investment, personal funds, or funds from friends and family. This rule, however, does limit the types of investment that will be considered by DHS as a qualifying investment for purpose of determining if the entrepreneur and his or her start-up entity meet the requirements for consideration for parole set out in 8 CFR 212.19. DHS believes it is important to limit the type and source of investment that will be considered a qualifying investment, since the investment is meant to serve in part as an objective way to help ensure and validate that the start-up entity's activities will benefit the United States. DHS does not believe investments from foreign sources—which are significantly more difficult for DHS to evaluate for legitimacy and screen for indicators of fraud and abuse—would provide the same measure of objective validation.

*Comment:* Multiple commenters stated that eligibility criteria should focus exclusively on the location of the start-up entity and its related growth and job creation, not on the citizenship and residence of the investor. Some commenters stated that excluding foreign investors from the definition of "qualified investors" is unduly limiting, because many high-potential international entrepreneurs might not have a pre-existing relationship with a U.S.-based investor. Commenters state that such entrepreneurs, especially if living in other countries, would have difficulty attracting investment from U.S. investors and becoming eligible for parole under this rule. Another commenter cited data concluding that foreign entrepreneurs currently outside of the United States are at a particular disadvantage, as they lack access to U.S.-based angel and venture funding.

*Response:* DHS agrees that the U.S. location of the start-up entity and its related growth and job creation should be a critical component of eligibility under this rule in order to help ensure the exercise of parole is justified by significant public benefit to the United States. DHS believes, however, that the "qualifying investor" must also be a U.S. citizen or lawful permanent resident or an entity that is majority owned or controlled by U.S. citizens or lawful permanent residents. DHS can evaluate more rapidly, precisely, and effectively whether these investors have an established track record of prior investments, in part due to greater access to relevant and reliable records. Such investors will also be subject to the laws of the United States, which provides some additional assurance that the entrepreneurs they back will provide a significant public benefit to the United States.

DHS is not prohibiting foreign investors from investing in the entrepreneur's start-up entity, but rather is simply limiting those investors that can serve as "qualified investors" for purposes of establishing the entrepreneur's eligibility for parole under this rule. DHS anticipates that entrepreneurs living outside the United States will be able to demonstrate eligibility for parole consideration under this rule, whether based on investment from U.S. investors, grants or awards from certain U.S. Government entities, or a mixture of alternative criteria. For all the reasons above, the definition of "qualified investor" will help DHS manage an efficient process for adjudicating requests under this rule while appropriately screening for potential fraud or abuse and ensuring that each grant of parole is justified by significant public benefit to the United States.

*Comment:* Other commenters focused on specific ways that DHS might allow applicants to use foreign investment to establish their eligibility for parole consideration, including by limiting such investment to the entrepreneur's country of origin, or to only those foreign investors who do not present a national security concern. A few commenters asserted that DHS has the capability to verify the bona fides of foreign investors through, for example, the following mechanisms: Making inquiries through U.S. embassy officials,

requesting resumes and the investment history for foreign angel investors, requesting similar documentation used by EB–5 petitioners to establish their lawful source of funds, and consulting publicly available data on reputable foreign investors with a history of successful investments in various countries. Some commenters provided suggestions for alternative or revised definitions relating to foreign investors that could remain easily verifiable by DHS, with the burden being on the investor, including (1) professionally managed funds with at least $10 million under management and registered with the local jurisdiction, and (2) angel investors that have made credible investments in U.S. companies under the same standards as U.S. "qualified investors." Finally, an individual commenter expressed concerns that even investments from U.S. sources could be suspect, and could serve as a pass-through for ineligible investors such as the entrepreneur's family or foreign nationals.

*Response:* While DHS understands that international entrepreneurs can attract legitimate investment capital from non-U.S. sources, DHS believes—as explained at greater length above—that it is appropriate and important to require that a "qualified investment" come from a U.S. source as one of the general criteria to establish that the start-up entity has the substantial potential for rapid growth and job creation. DHS is prepared to monitor the bona fide nature of such U.S.-based investments, as described in greater detail above. Moreover, the rule neither precludes an applicant from securing funding from non-U.S. sources nor precludes such funding from being considered, non-exclusively, under the alternative criteria at 8 CFR 212.19(b)(2)(iii) or (c)(2)(iii). Given that this is a new and complex process, DHS will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

### 10. Self-Funding/"Bootstrapping"

*Comment:* Several commenters argued that entrepreneurs should be able to demonstrate eligibility for parole under this rule not only through funding from U.S. investors or U.S. Government entities, but also through self-financing (known as "bootstrapping"). One commenter noted that many highly successful start-up founders initially grew their companies through bootstrapping, not by raising capital from external investors.

*Response:* DHS declines to expand the definition of "qualified investment" to

include self-funding by the entrepreneur applicant. DHS believes that this definition should include only those investors who have a history of making similar investments over a 5-year period and who can demonstrate that at least two of the entities receiving such investments have subsequently experienced significant growth in revenue or job creation. *See* final 8 CFR 212.19(a)(5). DHS believes that the investment of a substantial amount of capital by qualified investors in an entrepreneur's start-up entity can serve as a strong indication of the entity's substantial and demonstrated potential for rapid business growth and job creation. Self-funding, while a rational financing strategy for many entrepreneurs, does not provide the same objective and external validation that DHS requires in assessing whether granting parole to an individual is justified based on significant public benefit.

### 11. Other Comments on Qualified Investors

#### a. Crowdfunding

*Comment:* Several commenters stated that the rule should allow crowdfunding as a qualified investment. These commenters noted that entrepreneurs have raised over a billion dollars in investments through various types of crowdfunding platforms, which serve to broaden the base of available investors and demonstrate a venture's potential growth. Commenters also cited the Jumpstart Our Business Startups Act (JOBS Act) of 2012, which created a national regulatory framework for securities-based crowdfunding platforms in particular, along with public statements suggesting that securities-based crowdfunding is recognized by Congress and the Administration as a valuable and increasingly-used investment tool. One commenter also stated that allowing the use of crowdfunding platforms would increase the pool of potential applicants for entrepreneurial parole and could provide a workable intermediary for foreign investment in eligible start-up entities. One commenter suggested potential requirements that would facilitate the use of crowdfunding investment sources, such as setting a threshold amount for eligible crowdfunding investments and confirming that such investments have been deposited in the start-up entity's bank account after the end of the crowdfunding campaign.

*Response:* DHS appreciates the commenters' suggestions. Investments made in a start-up entity through an

SEC-compliant intermediary, such as an SEC-compliant crowdfunding platform, will be treated no differently for purposes of this rule than had the investments been made directly. In order to promote the integrity of adjudications under this rule, DHS declines to make changes to the definition of "qualified investor" that would effectively treat funds generated through crowdfunding platforms as a different class of eligible investment. DHS notes, however, that evidence of a successful donation-based or securities-based crowdfunding campaign could be provided under the rule's alternative eligibility criteria.

#### b. Established U.S. Investors

*Comment:* One commenter questioned the requirement that capital be received "from established U.S. investors (such as venture capital firms, angel investors, or start-up accelerators) with a history of substantial investment in successful start-up entities." The commenter stated that the requirement increases the relative bargaining power of established investors working with entrepreneurs seeking parole under this rule, while diminishing that of new venture capital firms, new angel investors, and new start-up accelerators. The commenter stated that if it is kept in its current form, the rule is not clear whether an investment from a non-established investor would jeopardize the parole eligibility of an entrepreneur whose start-up entity is also funded by established investors.

*Response:* The definition of "qualified investor, including the requirement that an investor have a history of substantial investment in successful start-up entities, is intended to help ensure that such investors are bona fide and not concealing fraud or other illicit activity—and thus protect the integrity of the parole process under this rule. The definition is also intended to ensure that a qualifying investment serves as a strong and reliable indicator of the start-up entity's substantial potential for rapid growth and job creation, which is relevant to assessing whether granting parole to an entrepreneur is justified by significant public benefit.

DHS emphasizes that the rule does not prohibit investment from U.S. investors who do not have an established track record of substantial investment in start-up entities under the rule's definition of "qualified investor." Any investment from an investor who is not a qualified investor, however, will not count toward the minimum investment criteria associated with the initial parole period or re-parole period. DHS will, of course, monitor all

elements of an application for evidence of fraud or other illegal or illicit activities. It will also assess the totality of the evidence in evaluating whether granting parole to an entrepreneur is justified by significant public benefit.

c. Approved Regional Centers

*Comment:* One commenter requested that USCIS-approved Regional Centers (based on an approved Form I–924) be allowed to qualify as established U.S. investors. The commenter stated that investment by a Regional Center in a U.S. start-up entity would be a natural extension of what Regional Centers already do, since Regional Centers pool investment for qualified EB–5 visa projects.

*Response:* DHS believes it is important to limit qualifying investors to those who have an established record of successful investments in start-up entities. DHS believes that such a record would include, during the 5-year period immediately preceding the filing of the parole application, one or more investments in other start-up entities in exchange for equity or convertible debt comprising a total of no less than $600,000. *See* final 8 CFR 212.19(a)(5)(i). DHS will require monetary commitments, rather than non-monetary commitments such as credit for in-kind value (*e.g.,* credit for services), given the difficulty of valuing such commitments and the potential for fraud and abuse. The applicant would also need to show that, subsequent to such investment by the investor, at least 2 such entities each created at least 5 qualified jobs or achieved at least $500,000 in revenue with average annualized revenue growth of at least 20 percent. *See* final 8 CFR 212.19(a)(5)(ii).

As described in greater detail above, these criteria are intended to ensure that investors are bona fide and thus protect the integrity of the parole process under this rule. They are also intended to ensure that a qualifying investment serves as a strong and reliable indicator of the start-up entity's substantial potential for rapid growth and job creation, which is relevant to assessing whether granting parole to an entrepreneur is justified by significant public benefit. DHS declines to adopt a special provision for regional centers approved to participate in the EB–5 visa program. Although such centers are not categorically excluded from the definition of "qualified investor" under this rule, they would need to meet all the same criteria as any other qualified investor.

12. Qualified Jobs

a. Qualifying Employee

*Comments:* Two commenters recommended that DHS broaden the definition of the term "qualifying employee." One commenter stated that the term should include any individual authorized to work in the United States, regardless of immigration status, to avoid creating a conflict for employers who are prohibited from discriminating based on an individual's citizenship or immigration status. Another commenter advocated for the inclusion of independent contractors in the definition of qualifying employee.

*Response:* DHS declines to expand the definition of qualifying employee, which already includes a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. *See* final 8 CFR 212.12(a)(7). DHS believes that creating jobs for these individuals is more likely to provide a significant public benefit given their stronger ties to the United States. Similarly, DHS believes that entrepreneurs and start-up entities that create positions for employees are more likely to provide a significant public benefit than those who rely only on arrangements with independent contractors. Such arrangements would generally have a weaker nexus to the start-up entity, may not have been created as a direct result of the start-up entity's activities, and could be more difficult to validate. Nothing in this rule either supersedes or conflicts with nondiscrimination laws enacted under the Immigration Reform and Control Act (IRCA).[18] Under existing law, it would generally be an unfair immigration-related employment practice for an entity to discriminate against someone authorized to work in the United States because of that person's national origin or, in the case of a "protected individual," citizenship status. *See* 8 U.S.C. 1324b(a) (generally prohibiting such practices, subject to specific exceptions, and defining "protected individual" to include U.S. citizens, lawful permanent residents, and certain other immigrants). This rule does not permit any such otherwise prohibited practices. Instead, it uses the creation of jobs for U.S. citizens, permanent residents, and other authorized immigrants as one indication of the benefit created by an entrepreneur's start-up entity.[19]

b. Full-Time Employment

*Comments:* Several commenters said that the rule should have a more flexible definition of "full-time employment." One commenter said that the definition of the term should not require the job to be filled for at least a year and should include job-sharing arrangements. Another commenter recommended that the definition of full-time employment include combinations of part-time positions.

*Response:* DHS declines to expand the definition of full-time employment to include jobs filled for less than a year by a qualifying employee, job-sharing arrangements, and combinations of part-time jobs. DHS believes that the creation of long-term and full-time positions is a more reliable indicator that an entrepreneur's start-up entity is continuing to yield significant public benefit. Jobs filled for less than a year could be temporary or seasonal, thus limiting the duration and impact of the benefit. Additionally, including job-sharing or combinations of part-time positions could significantly complicate adjudications. The final rule, moreover, already reduces by half the threshold number of jobs to qualify for a re-parole period, making it all the more reasonable to require that each of such jobs be full-time positions as part of the criteria for ensuring that granting parole to an international entrepreneur is justified by significant public benefit.[20]

13. Material Change

*Comment:* One commenter recommended that the final rule expressly exempt from the definition of "material change" transitions that are typical within start-ups, such as a company's (1) pivoting its products or services; (2) bringing on board a significant round of funding that could dilute the entrepreneur's ownership interest; (3) changing the role of a founder to meet the needs of the growing company; or (4) by virtue of a foreseeable stock or asset acquisition, executing a merger into or with a related or unrelated entity, or some other form of corporate restructuring. A few

---

[18] Public Law 99–603 section 102, 100 Stat. 3359 (Nov. 6, 1986); INA section 274B.

[19] It is important to note that job creation during the initial period of parole is not the only way to demonstrate the start-up entity's continued substantial potential for rapid growth and job creation. *See* final 8 CFR 212.19(c)(2)(ii)(A), (c)(2)(ii)(C), and (c)(2)(iii).

[20] As explained earlier, job creation during the initial period of parole is not the only way to demonstrate the start-up entity's continued substantial potential for rapid growth and job creation. *See* final 8 CFR 212.19(c)(2)(ii)(A), (c)(2)(ii)(C), and (c)(2)(iii).

commenters recommended that DHS clarify what constitutes a "material change" given the rapidly evolving nature of start-ups.

*Response:* DHS appreciates the concerns expressed by commenters regarding the material change definition in the NPRM. This final rule reflects changes that help clarify what constitutes a material change, with the understanding that start-up entities are likely to experience a variety of transitions as part of their legitimate development and growth. DHS disagrees, however, that all of the events listed by commenters should be specifically exempted from the definition of material change. Some changes to the start-up entity can clearly impact the determination of whether the entrepreneur provides, or will continue to provide, a significant public benefit to the United States. It is essential to the rule's integrity that such material changes are clearly defined and reported to DHS. In the final rule, DHS has outlined those changes that DHS believes are critical to the continuing eligibility of the entrepreneur to be granted parole based on a significant public benefit to the United States. Specifically, the final rule maintains that the following changes are material: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution, or cessation of operations of the start-up entity; and the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity. DHS has revised the definition of "material change" to include the cessation of the entrepreneur's qualifying ownership interest in the start-up entity.

DHS recognizes that not all changes to the ownership structure of a start-up entity constitute a change of such significance that it would reasonably affect the outcome of the determination of whether the entrepreneur provides, or

continues to provide, a significant public benefit to the United States. DHS has revised the final rule to limit material change regarding ownership changes only to "a significant change with respect to ownership and control of the start-up entity." For example, a significant change with respect to ownership and control of the start-up entity may include a transfer of equity in the start-up entity that results in an owner or owners not previously identified on the Application for Entrepreneur Parole (Form I–941) collectively acquiring a controlling stake in the entity. DHS recognizes that achieving a significant round of funding for the start-up entity during the initial parole period may often constitute the very qualifying investment that renders the entrepreneur eligible for a re-parole period under this rule's significant public benefit test, despite diluting the entrepreneur's ownership interest. While DHS will make these determinations on a case-by-case basis, DHS does not anticipate that such significant changes with respect to ownership and control of the start-up entity will often result in termination of parole. A full vetting of new investors with a significant ownership interest, however, can provide DHS with additional insights into the start-up entity's activities in the United States and will help DHS ensure the entrepreneur is continuing to provide a significant public benefit to the United States. In the future, DHS may issue additional guidance on the scope of such significant changes in ownership interest if deemed necessary.

DHS believes these changes are sufficient to clarify the definition of "material change" in regulation and to provide entrepreneurs with sufficient detail about the kinds of changes that could impact their eligibility and must be reported. Given that this is a new and complex process, DHS will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*E. Application Requirements*

1. Application for Entrepreneur Parole

*Comments:* One commenter supported the Application for Entrepreneur Parole (Form I–941), and called it "ideal" because without the form applicants must attempt to list information on existing application forms that do not specifically relate to entrepreneurs. Another commenter requested that the application process resemble the Canadian express entry immigration system and be simplified

so that the assistance of an attorney is not required.

*Response:* DHS agrees with the comment that the Form I–941 is beneficial for capturing information specific to parole requests filed under this rule. DHS declines to model the application process for parole under this rule after the Canadian express entry program as that program is a points system designed to manage applications for permanent residence under certain Canadian federal economic immigration programs.[21] DHS has attempted to develop the Form I–941 to be as simple as possible for applicants while capturing sufficient information to enable adjudicators to make appropriate case-by-case decisions under the statutory and regulatory requirements for parole.

2. Submissions of Documentary/ Supporting Evidence

*Comment:* Two commenters expressed concern that the evidentiary requirements were excessive and that start-up entities operating in "stealth-mode" would not be able to provide letters or media articles. Both commenters suggested that evidence of a significant capital investment from a qualified investor should be sufficient to demonstrate the potential for rapid growth and job creation.

*Response:* As an initial matter, DHS recognizes there may be legitimate reasons for operating a start-up in a manner that does not attract significant public attention. In part for this reason, this final rule extends the definition of start-up entity to include entities formed within the 5 years immediately preceding the filing date of the applicant's initial parole request. DHS believes that start-up entities that are seeking to operate without significant public attention will generally have sufficient time to emerge from that status prior to the parole application.

DHS agrees with the commenters that evidence of having received substantial investment from a qualified investor may be sufficient to establish that the start-up entity has the potential for rapid growth and job creation (one factor in making parole determinations under this rule). *See* 8 final CFR 212.19(b)(2)(ii)(B)(1). DHS understands that other evidence that may be required to establish eligibility for parole consideration under this rule, including whether the applicant is well-positioned to advance the entity's business, may not be a matter of public record. DHS believes, however, that even an entrepreneur operating a company in

---

[21] *http://www.cic.gc.ca/english/express-entry/.*

"stealth mode" should generally be able to provide such evidence for purposes of satisfying the requirements of this rule. Indeed, for entrepreneurs to be paroled under this rule, they must persuade adjudicators, based on the totality of the evidence, that they will provide a significant public benefit.

3. Application Requirements of Spouses and Minor Children

*Comment:* DHS received a few comments supporting the provision in the proposed rule allowing the spouse and children of an entrepreneur granted parole under this rule to also apply for and be granted parole in the United States in order to accompany or ultimately join the entrepreneur. One commenter also supported the proposal to allow the spouse, if granted parole, to obtain employment authorization in the United States in order to work and help support the entrepreneur's family.

*Response:* DHS agrees with these comments. Each spouse or child seeking parole must independently establish eligibility for parole based on significant public benefit (or, alternatively, for urgent humanitarian reasons), and that the individual merits a favorable exercise of discretion. In a case in which an entrepreneur has been granted parole based on significant public benefit under this rule, DHS may consider granting parole to the entrepreneur's spouse and children who provide a significant public benefit by maintaining family unity and thereby further encouraging the entrepreneur to operate and grow his or her business in the United States—and to provide the benefits of such growth to the United States.

Under this final rule, spouses of entrepreneur parolees who wish to obtain employment authorization must apply for an EAD pursuant to 8 CFR 274a.12(c)(34), consistent with current parole policy that allows parolees to apply for employment authorization. DHS agrees with the commenter that allowing spouses of entrepreneurs to apply for work authorization may alleviate a significant portion of the potential economic burdens that entrepreneurs and their families may face, such as paying for education expenses for their children, and to ensure that they satisfy the condition on their parole that they maintain household income that is greater than 400 percent of the Federal poverty line, as they grow and develop their start-up entities. Moreover, extending employment authorization to the spouse may further incentivize an international entrepreneur to bring a start-up entity to the United States—along with new jobs,

innovation, and growth—rather than create it in another country.

4. Other Comments on Application Requirements

*Comment:* One commenter asked that DHS clarify the application procedures for Canadians and whether they may apply at the border or whether they must visit a U.S. consulate prior to requesting to be paroled at a U.S. port of entry.

*Response:* Canadians and applicants from other countries may apply for parole under this rule while inside or outside of the United States. If the applicant's parole request is approved, the applicant would request to be paroled by Customs and Border Protection at a U.S. port of entry after arriving from outside the United States. Canadian nationals who will be appearing at a U.S. port of entry directly from Canada will not have to visit a U.S. consulate prior to appearing at the port of entry and requesting that CBP grant parole. Canadian nationals who will not be appearing at a U.S. port of entry directly from Canada, and will instead be travelling to the United States from another country abroad to request a grant of parole may, similar to other applicants, have to visit a U.S. consulate first in order to obtain travel documentation (*e.g.,* a boarding foil) that allows the individual to travel to a U.S. port of entry. In all cases, however, the individual must have an approved Form I–941 before the individual may appear at the port-of-entry to request a grant of parole.

*F. Parole Criteria and Conditions*

1. Minimum Investment

*Comment:* Numerous commenters—including advocacy groups, law firms, associations, and individual commenters—argued that the proposed rule's minimum investment criterion for the initial parole period would set too high an eligibility bar for many high-potential entrepreneurs. Citing a range of different kinds of evidence, several commenters argued that the proposed $345,000 threshold represented significantly more capital than is actually needed by most start-ups initially and would unnecessarily exclude from consideration some entrepreneurs whose entities would create significant public benefit in the United States.

*Response:* In response to public comments, DHS is reducing the proposed minimum investment of $345,000 to $250,000 in the final rule. *See* 8 final CFR 212.19(b)(2)(ii)(B)(*1*). Multiple public comments

recommended setting the threshold at $250,000, and DHS's further analysis of seed and angel investment data indicates that this level is reasonable. As is described more fully in the "Volume Projections" subsection of the "Statutory and Regulatory Requirements" section of this final rule, DHS's analysis of investments received by a set of new firms that graduated from startup accelerator programs revealed that the median seed investment was $250,000.[22] Following the intent of this final rule to increase and enhance entrepreneurship, innovation, and job creation in the United States, DHS determined that investment amounts that entrepreneurs would need to meet to be considered for parole under this rule should be more in line with typical early investment rounds, rather than the higher investment levels typical of later rounds. In each individual case, DHS must be persuaded that granting parole would provide a significant public benefit and that the person requesting parole merits a favorable exercise of discretion.

*Comment:* One commenter stated that there should not be a minimum investment amount and suggested that the rule instead establish minimum revenue amounts. Several other commenters suggested that evidence of rapid revenue growth should be a standalone eligibility criterion for the initial parole period under 8 CFR 212.19(b)(2)(ii).

*Response:* DHS disagrees with the suggestion that there should not be a minimum investment amount. Establishing a minimum investment amount based on available data provides a clear and predictable benchmark for how an applicant may demonstrate that a start-up entity has substantial potential for rapid growth and job creation (one factor in making parole determinations under this rule). If international entrepreneurs are unable to meet the threshold investment amount but have received some qualified investments or qualified government awards or grants, they may alternatively qualify for parole consideration under this rule if they partially meet the threshold criteria and provide "other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." *See* final 8 CFR 212.19(b)(2)(iii).

---

[22] The data utilized by DHS is provided publicly by SeedDB: *http://seed-db.com/accelerators,* as well as the Angel List: *https://angel.co/,* and the Angel Capital Association (ACA): *https:// www.angelcapitalassociation.org/.*

DHS disagrees with the suggestion that evidence of rapid revenue growth or generation of a certain amount of revenue should be a separate criterion under 8 CFR 212.19(b)(2)(ii). In setting threshold criteria, DHS intends to identify reliable indicators of a start-up entity's substantial potential for rapid growth and job creation and, ultimately, of the significant public benefit that a grant of parole would provide in an individual case. DHS does not believe that revenue should be the sole external validation factor as compared to substantial funding from qualified U.S. investors and government entities for initial parole applications. DHS reiterates, however, that a start-up entity's revenue may be taken under consideration, both under the "alternative criteria" test and as part of the totality of evidence relevant to whether the grant of parole in an individual case would be justified by significant public benefit and the person requesting parole deserves a favorable exercise of discretion. *See* 8 CFR 219.2(b)(2)(iii), 219.2(c)(2)(B)(iii).

*Comment:* Several individual commenters recommended that the investment threshold be based upon the type of business activity.

*Response:* In an effort to provide a reasonable level of simplicity and predictability in the final rule, DHS decided to utilize a single investment threshold rather than several amounts based on the type of business activity. DHS believes that determining multiple investment thresholds based on business activity or industry would be unduly complicated, making adjudications more labor-intensive and increasing processing times. DHS believes that using a single investment threshold, backed by available data, is a reasonable approach and provides a clearer benchmark for applicants, investors, and adjudicators.

*Comment:* Some commenters provided input on the requirement that funding be received within the preceding 365 days. A CEO roundtable agreed that the $345,000 threshold was an appropriate amount, but questioned the 365-day requirement, recommending that the rule be changed to require that only 65 percent of the investment to have occurred within the last 365 days. A trade association and a joint submission from a professional association and a non-profit organization recommended that the investment occur within a 3-year window. As an alternative, the trade association stated that some of a start-up entity's capital that would otherwise count toward the qualified investment amount should do so even if its ultimate receipt by the start-up entity is contingent upon the approval of parole.

*Response:* DHS is revising the proposed requirement that the substantial investment be received within the 365 days immediately preceding the filing of the application for initial parole. The final rule increases this period from 12 months (365 days) to 18 months. DHS made this change based on feedback that it often takes longer than 12 months for a start-up to secure and receive investment funding. This revised requirement still ensures that a qualified investor or government entity has recently validated (within 18 months) the start-up entity's potential for rapid growth and job creation. With respect to the comment suggesting that DHS accept funding contingent upon approval of parole toward the qualified investment amount, DHS believes that funds contingent on the occurrence of a future event, such as a grant of parole to the entrepreneur, would not satisfy the general criteria in 8 CFR 212.19(b)(2)(ii). DHS notes, however, that such funds may be considered under the alternative criteria in 8 CFR 212.19(b)(2)(iii) if the entrepreneur partially meets one or both of the criteria in 8 CFR 212.19(b)(2)(ii)(B), since DHS may consider such contingent funds as other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Given that this process is a new and complex one, DHS has decided to take an incremental approach and will consider the suggested modification in the future after assessing the implementation of the rule and its impact on operational resources.

### 2. Minimum Government Grants or Awards

*Comment:* Several commenters argued that DHS should require less than $100,000 to meet the eligibility criteria based on a start-up entity's receipt of government grants and awards. An individual commenter said that most government grants were well beneath the $100,000 minimum threshold in the proposed rule. Another individual commenter recommended a $50,000 government grant threshold. By contrast, one commenter stated that the $100,000 minimum investment for government grants and awards is too low to start a meaningful business and suggested increasing the amount to $500,000 or more. Several commenters stated that the $100,000 grant threshold aligns with the timing of the Federal Small Business Innovation Research (SBIR) [23] and Small Business Technology Transfer (STTR) awards and dollar amounts.

*Response:* DHS declines to make the suggested changes to the minimum government grant or award threshold. In light of the range of comments received on increasing or decreasing the minimum grant amount, DHS believes its proposed minimum grant amount is reasonable. Because government entities regularly evaluate the potential of U.S. businesses, the choice to provide a significant award or grant to a particular start-up entity will often be a strong indicator of that start-up's substantial potential for growth and job creation. Additionally, because government entities are by definition formed to serve the public, the choice by such an entity to fund a particular business generally indicates the government entity's independent assessment that the business's operations would provide a significant public benefit—and can be a strong indicator of a start-up entity's substantial potential for rapid growth and job creation. The specific $100,000 minimum government funding threshold identified in this final rule is based in part on the fact that seed funding awards ("Phase I" awards) from the Federal SBIR/STTR program are generally below $150,000.

### 3. Initial Parole Alternative Criteria

*Comment:* Several commenters offered suggestions for the factors to be considered by DHS under the rule's alternative criteria for the initial parole period, such as adding a metric for number of users or customers of the entrepreneur's start-up entity, the start-up entity's social impact, and the start-up entity's national scope or location in a low- or middle-class neighborhood. Other commenters proposed the following factors: The applicant's academic degree; participation in or training from a start-up accelerator; prior success as demonstrated by market share from patented innovations, annual sales volume, or job creation; and

---

[23] The Small Business Innovation Research (SBIR) program is coordinated by the Small Business Administration to seed capital for start-up businesses. It is designed to stimulate technological innovation among small private-sector businesses, and it is the largest source of seed capital in the United States for technology driven start-ups, funding between 5,000 and 7,000 projects a year. The "first phase" award is an innovation grant made for initial eligibility and corresponds to the start-up of the commercial business and proof of "concept phase"—the average award amounts vary by department, but most SBIR Phase I awards are made at or below $150,000. The Phase I awards are geared towards financing the startup of the private commercial entity and also the innovation and research and development (R&D) that the enterprise undertakes.

demonstrated success using alternative funding platforms.

*Response:* DHS agrees with these suggestions. DHS may consider the following additional types of evidence, among others, as factors under the alternative criteria for those applicants who partially satisfy 8 CFR 212.19(b)(2)(ii):

• number of users or customers;
• revenue generated by the start-up entity;
• social impact of the start-up entity;
• national scope of the start-up entity;
• positive effects on the start-up entity's locality or region;
• success using alternative funding platforms, including crowdfunding platforms;
• the applicant's academic degrees;
• the applicant's prior success in operating start-up entities as demonstrated by patented innovations, annual revenue, job creation, or other factors; and
• selection of the start-up entity to participate in one or more established and reputable start-up accelerators or incubators.

With respect to start-up accelerators and incubators, DHS expects to evaluate them on several relevant factors, including years in existence, graduation rates, significant exits by portfolio start-ups, significant investment or fundraising by portfolio start-ups, and valuation of portfolio start-ups.

DHS understands that some applicants will be able to establish that their start-up entity is likely to grow rapidly and create jobs based on other factors beyond only the amount of capital investment or government funding received, which is why DHS has not limited the types of evidence that may be considered under the alternative criteria at 8 CFR 212.19(b)(2)(iii) for those who only partially meet the initial threshold criteria at 8 CFR 212.19(b)(2)(ii)(B).

*Comment:* One commenter suggested linking the rule's application to applications for other initiatives, such as National Minority Supplier Development Council Certification and, when applicable, Minority Women Based Entrepreneur Certification.

*Response:* DHS appreciates the commenters' suggestions but declines to adopt these factors as evidence of substantial potential for rapid business growth or job creation. Nothing in this rule prohibits or discourages entrepreneurs from participating in initiatives or certification processes designed to help promote more diverse and inclusive entrepreneurship. DHS does not believe, however, that such initiatives and certifications

independently provide sufficient external validation that a start-up entity has the substantial potential for rapid growth or job creation and meets the "significant public benefit" requirement under this rule. Evidence that the start-up is involved with certain initiatives in the public interest can, however, be considered a positive factor in determining whether an entrepreneur merits a grant of parole as a matter of discretion. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

*Comment:* One commenter said the term "reliable and compelling evidence" in proposed 8 CFR 212.19(b)(2)(iii), with respect to the start-up entity's substantial potential for rapid growth and job creation, is too vague and should be elaborated on further in the regulatory text.

*Response:* DHS disagrees with the commenter's suggestion to elaborate further in 8 CFR 212.19(b)(2)(iii) on the type of evidence that may be submitted and considered as reliable and compelling. DHS believes that this alternative criterion should be flexible so as not to restrict the types of evidence that may be submitted and relied upon to determine if the start-up entity has substantial potential for rapid growth and job creation. DHS believes that such flexibility is important given the case-by-case nature of these discretionary parole determinations. An applicant for parole under this rule who does not meet the threshold capital investment or government funding criteria in 8 CFR 212.19(b)(2)(ii)(B) may submit any evidence that the applicant believes is reliable and compelling to support the claim that the applicant's start-up entity has substantial potential for rapid growth and job creation. DHS, after reviewing the application and all of the evidence submitted in support of the application, will make a determination as to whether the applicant is eligible for parole consideration under the relevant statutory and regulatory standards, and as to whether the person seeking parole merits a favorable exercise of discretion.

*Comment:* One commenter asserted that securing an investment from a U.S. investor or obtaining a U.S. government grant or award is not a viable option for most people.

*Response:* DHS believes that qualified investments or government funding are appropriate factors to consider when assessing the ability of a start-up entity to achieve rapid growth and job creation

(one factor in making parole determinations under this rule). DHS, however, understands that some start-up entities with the potential to yield significant public benefit may have legitimate economic or strategic reasons to not pursue or accept capital investment or government funding at the levels set forth in 8 CFR 212.19(b)(2)(ii)(B). Therefore, DHS has provided in the rule an alternative criterion for further consideration of those applications where the applicant only partially satisfies the capital investment or government funding thresholds, but provides additional reliable and compelling evidence that establishes the substantial potential of the start-up entity for rapid growth and job creation.

*Comment:* A commenter suggested that, instead of focusing on capital investment and job creation criteria, DHS should focus on whether the start-up entity would be in industries in traded sectors. The commenter proposed that the following industries would qualify: Manufacturing, software publishers, Internet publishing, and research and development services.

*Response:* While DHS recognizes the benefits of increased exports to the U.S economy, it declines to limit eligible start-up entities to traded sectors, since start-up entities in a much wider set of industries can yield significant public benefit to the United States through rapid growth and job creation.

*Comment:* A commenter requested that DHS form an advisory group of industry experts to recommend alternative criteria.

*Response:* DHS afforded an opportunity for notice and comment on the NPRM and expressly sought proposals for alternative criteria from the public. DHS does not believe that forming a new advisory group is necessary at this time.

*Comment:* One commenter suggested that the term "rapid growth" should be determined based on factors pertaining to the start-up entity's industry, normal business growth in the industry, geographic area, and the amount of investment in the entity. The commenter also recommended that the term "substantial potential" take into account the start-up entity's particular geographic area rather than a national scale.

*Response:* While the industry- and geography-specific factors suggested by the commenter may be taken into consideration by DHS as part of the totality of the circumstances for a given application, DHS believes that the general and alternative eligibility criteria provided in the final rule are

IER00061

sufficient to determine if a start-up entity has the substantial potential for rapid growth and job creation, and provide a more predictable framework by which these parole applications will be adjudicated than would a more mechanical and unduly rigid consideration of the variables suggested by the commenter.

### 4. Re-parole Criteria

#### a. Minimum Investment or Grants/Awards

*Comment:* Several commenters discussed the proposed re-parole eligibility criteria at 8 CFR 212.19(c)(2)(ii)(B)(*1*), namely that the applicant's start-up entity has received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period. Most commenters argued that this funding level was unduly high, especially given the duration of the initial parole period.

*Response:* DHS declines to adjust the $500,000 funding threshold. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*). DHS believes that $500,000 is a reasonable level for re-parole. An industry report on startups shows the median seed investment round for the first half of 2016 was $625,000, which rose from $425,000 in 2015. This figure is valuable because it includes seed rounds for firms that participate with accelerators and that often start out with investment rounds below $100,000.[24] The median for angel group seed investments is reported at $620,000 as the annual average over 2013–2015, which rose sharply to $850,000 in 2015 from a median of $505,000 from the previous two years. Venture capital round sizes are even larger, as the 2014 median round size for both seed and startup stage venture rounds was $1,000,000.

DHS has also increased the length of the initial parole period from 24 months to 30 months. This change will allow entrepreneurs additional time to seek and receive qualified investments or government funding, to meet the re-parole criteria. If an entrepreneur is unable to meet the minimum funding

criterion, moreover, he or she may still be eligible for re-parole based on revenue generated or jobs created. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*2*) and (*3*). Under the final rule, entrepreneurs partially meeting the threshold re-parole criteria may alternatively qualify "by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." Final 8 CFR 212.19(c)(2)(iii).

#### b. Minimum Annual Revenue

*Comment:* Several commenters discussed the proposed re-parole criterion at 8 CFR 212.19(c)(2)(ii)(B)(3), which establishes an eligibility threshold when the applicant's start-up entity has reached at least $500,000 in annual revenue and averaged 20 percent in annual revenue growth during the initial parole period. Most commenters suggested alternative approaches, arguing that start-ups are often legitimately focused on the development of an innovative product or service, and not on generating early revenue. Another commenter stated that the revenue criterion is reasonable.

*Response:* DHS declines to adjust these criteria. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*). DHS chose $500,000 in revenue and 20 percent annual revenue growth as threshold criteria because, after consulting with SBA, DHS determined these criteria: (1) Would be reasonable as applied across start-up entities regardless of industry or location; and (2) would serve as strong indications of an entity's potential for rapid growth and job creation (and that such entity is not, for example, a small business created for the sole or primary purpose to provide income to the owner and his or her family). As noted, DHS has also increased the length of the initial parole period from 24 months to 30 months. This change will allow entrepreneurs additional time to meet the minimum revenue threshold for re-parole. If an entrepreneur is unable to meet the minimum revenue requirement, he or she may still be eligible under the minimum investment or job creation criteria. *See* final 8 CFR 212.19(c)(2)(ii)(B)(*1*) and (*2*). Under the final rule, entrepreneurs partially meeting the threshold re-parole criteria may alternatively qualify "by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation." Final 8 CFR 212.19(c)(2)(iii).

*Comment:* An individual commenter suggested that DHS should include in the rule a criterion for user growth, rather than revenue growth, as many

start-ups focus more on growing their number of users in their early years.

*Response:* DHS declines to include user growth as a stand-alone criterion for establishing eligibility for re-parole. DHS, however, may consider user growth as a factor when evaluating an entrepreneur's eligibility under the alternative criteria provision. The list of factors provided in the preamble to the proposed rule was intended only to illustrate the kinds of factors that DHS may consider as reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

As noted in the NPRM, DHS is not defining in regulation the specific types of evidence that may be deemed "reliable and compelling" at this time, because DHS seeks to retain flexibility as to the kinds of supporting evidence that may warrant the Secretary's exercise of discretion in granting parole based on significant public benefit. DHS believes, however, that such evidence would need to be compelling to demonstrate that the entrepreneur's presence in the United States would provide a significant public benefit. DHS will evaluate on a case-by-case basis whether such evidence—in conjunction with the entity's substantial funding, revenue generation, or job creation—establishes that the applicant's presence in the United States will provide a significant public benefit during a re-parole period.

*Comment:* An individual commenter suggested that the minimum annual revenue threshold for re-parole be set as just enough to sustain the entrepreneur's salary and continue business operations.

*Response:* The final rule states that the start-up entity must be of a type that has the substantial potential to experience rapid growth and job creation, including through significant levels of capital investment, government awards or grants, revenue generation, or job creation during the re-parole period. These factors are intended to help DHS identify the types of start-up entities that are most likely to provide a significant public benefit, while excluding entities without such potential—such as a business with limited growth potential created by an entrepreneur for the sole or primary purpose of providing income to the entrepreneur and his or her family.[25] Because this latter type of business is less likely to experience rapid growth

---

[24] The report on the seed median is published as a newsletter by Crunchbase and is found at: *https://techcrunch.com/2016/09/07/crunchbase-sees-rise-in-average-seed-round-in-2016/*. The Angel group median round size is obtained from the Angel Resource Institute's annual (2015) "Halo Report," found at *http://angelresourceinstitute.org/reports/halo-report-full-version-ye-2015.pdf*. The venture capital figures are obtained from the Ernst and Young Venture Capital Insights Report (4th quarter 2014) and are found at: *http://www.ey.com/Publication/vwLUAssets/Venture_Capital_Insights_4Q14_-_January_2015/%24FILE/ey-venture-capital-insights-4Q14.pdf*.

[25] Erik Hurst & Benjamin Wild Pugsley, "What Do Small Businesses Do?" (Aug. 2011), *available at http://www.brookings.edu/~/media/files/programs/es/bpea/2011_fall_bpea_papers/2011_fall_bpea_conference_hurst.pdf*.

and job creation, DHS believes it is unlikely that the entrepreneur of such a business would be able to meet the significant public benefit requirement for a grant of parole. Establishing a minimum annual revenue threshold for re-parole that would, by definition, cover only an entrepreneur's salary and continue business operations would not likely help identify whether an entrepreneur's activity in the United States would provide a significant public benefit. DHS therefore declines to adopt the commenter's suggestion.

c. Minimum Jobs Created

*Comment:* Several commenters discussed the proposed re-parole criterion at 8 CFR 212.19(c)(2)(ii)(B)(2), which establishes an eligibility threshold for applicants whose start-up entities have created at least 10 qualified jobs within the start-up entities during the initial parole period. Most commenters argued that this job creation requirement was unduly high or that the time period for compliance was too short.

*Response:* Based on comments received, DHS has lowered the job creation criterion for re-parole from 10 to 5 qualified jobs. *See* final 8 CFR 212.19(c)(2)(ii)(B)(2). DHS agrees with commenters that requiring 10 jobs to satisfy this criterion may be unduly high for many start-ups, even those with demonstrated substantial potential for rapid growth and job creation. DHS believes that the creation of 5 qualifying jobs during the initial period of parole is sufficient to determine that the start-up entity continues to have substantial potential for rapid growth and job creation, particularly in light of the substantial capital investment, government funding, or other reliable and compelling evidence that supported the initial parole determination. In each case, DHS must be persuaded that re-parole is justified by significant public benefit and that the person seeking re-parole merits a favorable exercise of discretion. As discussed elsewhere in this preamble, DHS has also extended the initial period of parole from 2 years to 30 months, in order to allow additional time for start-up entities to grow, obtain additional substantial funding, generate substantial revenue, or create jobs. *See* 8 CFR 212.19(c)(2)(iii).

d. Re-Parole Alternative Criteria

*Comment:* One commenter suggested that DHS should consider taxes paid by a start-up entity as a criterion for re-parole, leaving the task to DHS to define the threshold of the amount and type of taxes paid.

*Response:* DHS declines to adopt the commenter's suggestion. DHS believes that a start-up entity would have to generate a significant level of revenue or job creation (which are already criteria under this rule) to meet any separate, standalone tax-based threshold. Any such additional criterion would therefore be unlikely to be particularly probative in determining whether re-parole is justified by significant public benefit or the person seeking re-parole merits a favorable exercise of discretion. DHS therefore declines to include the payment of taxes as a stand-alone eligibility criterion.

*Comment:* A commenter suggested that if DHS lowers the funding and job creation thresholds for re-parole, there should be no need for alternative criteria.

*Response:* While DHS did reduce the job creation threshold for re-parole in the final rule, DHS believes that parolees should have the flexibility to present other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation. Examples of such evidence are provided above, in the discussion on alternative criteria for the initial parole period. DHS believes that it is important to retain such flexibility in the final rule, consistent with the case-by-case nature of these parole determinations. DHS, therefore, has not adopted the commenter's suggestions.

5. Authorized Periods of Parole

*Comment:* Several commenters discussed the initial 2-year parole period at 8 CFR 212.19(d)(2). Most commenters argued that the 2-year period was unduly short, as start-ups with significant potential for rapid growth and job creation may require more time to meet re-parole eligibility requirements. Some commenters suggested having a 3-year initial period of parole and a 2-year period of re-parole. Other commenters suggested a range for initial parole from 3 to 5 years. A number of comments discussed the overall duration of the parole periods, the majority of which advocated for longer periods ranging from 6 to 10 years in total. Some of these commenters based the need for an extended parole period on the typical duration of the start-up growth path from seed funding to venture capital financing to exit (through an initial public offering or a merger or acquisition).

*Response:* Based on the comments received, DHS is changing the maximum periods for initial parole and re-parole to 30 months (2.5 years) each, for a total maximum parole period

under this rule of up to 5 years. The additional time for the initial parole period will provide entrepreneurs with more time to receive additional qualified investments or government funding, increase revenue, or create qualified jobs sufficient to meet the eligibility criteria for an additional period of parole. While this change does reduce the length of the re-parole period, DHS believes that this approach is necessary to provide additional time during the initial period of parole while maintaining the same maximum overall parole period of 5 years. DHS further believes that a 5-year total maximum parole period is consistent with the amount of time successful start-up entities generally require to realize rapid growth and job creation potential. Moreover, an entrepreneur of a start-up entity that is almost 5 years old when the parole application is filed would have the possibility to obtain up to 5 years of parole, which would allow the entity to realize its rapid growth and job creation potential by the time it is 10 years old—and to provide those benefits in the United States.[26] DHS retains the discretion to provide any length of parole to an applicant, including a period shorter than 30 months where appropriate. DHS also notes that although USCIS would designate an appropriate initial parole period upon approval of the Application for Entrepreneur Parole, CBP would retain its authority to deny parole to an applicant or to modify the length of parole authorized by USCIS upon issuing parole at the port of entry, consistent with CBP's discretion with respect to any advance authorization of parole by USCIS.

---

[26] Estimates based on the Census Bureau Business Dynamics Statistics suggest that on average 55 percent of new firms survived after 3 years, but 80 percent of the firms that survived 3 years also made it through 5 years. Dane Stangler and Jared Konczal "Give me your entrepreneurs, your innovators: Estimating the Employment Impact of a Startup Visa", Ewing Marion Kauffman Foundation (Feb. 2013), available at *http://www.kauffman.org/~/media/kauffman_org/research%2Oreport%20and%20covers/2013/02/startup_visa_impact_final.pdf*; "CrunchBase Reveals: The Average Successful Startup Raises $41M, Exits at $242.9M," Techcrunch.com (Dec. 14, 2013), available at *http://techcrunch.com/2013/12/14/crunchbase-reveals-the-average-successful-startup-raises-41m-exits-at-242-9m/*; *see also* TruBridge Capitol Partners, *Why the 'Next Billion Dollar Startup' Is not Always the Next IPO*, Forbes, Apr. 15, 2015, available at *http://www.forbes.com/sites/truebridge/2015/04/15/why-next-billion-dollar-startup-not-always-next-ipo/* ("From 2001–2004, the average age of a company at its public exit was 5.4 years. . . . From 2009–2012, the average age was 7.9.").

## 6. Limitation on Number of Entrepreneurs

*Comment:* Several commenters addressed 8 CFR 212.19(f) in the proposed rule, which states that no more than three entrepreneurs may be granted parole based on the same start-up entity. Most commenters on this provision recommended that DHS increase the number of entrepreneurs, with suggestions to increase the maximum number to 4 or 5. Several other commenters, including a trade association and a professional association, supported the proposed rule's limit of 3 entrepreneurs obtaining parole under this rule based on the same start-up entity. An individual commenter stated that DHS should allow for additional entrepreneurs to qualify for parole based on the same start-up entity, not only at the time of application but also at a later date, asserting that it is very common for technology companies to introduce multiple co-owners over time that are key personnel vital to the operations of the start-up entity.

*Response:* DHS appreciates the comments regarding this limitation and recognizes that some start-ups may initially have more than 3 founders or owners. After reviewing all comments, DHS declines to increase the number of entrepreneurs permitted to request parole related to the same start-up entity, and will retain the current limit of no more than 3 eligible entrepreneur applicants per start-up entity. *See* final 8 CFR 212.19(f). As an initial matter, DHS believes it would be difficult for a larger number of entrepreneurs associated with the same start-up entity to each meet the eligibility criteria and comply with the conditions on parole while ultimately developing a successful business in the United States. A higher number of entrepreneurs associated with the same start-up entity may affect the start-up's ability to grow and succeed, and may even result in the startup's failure, thus preventing the goals of the parole process under this rule from being realized.[27] Imposing a limit on the number of entrepreneurs who may be granted parole based on the same start-up entity is thus consistent with ensuring that each entrepreneur's

parole will provide a significant public benefit.

The limitation, moreover, will help strengthen the integrity of the international entrepreneur parole process in various ways. Among other things, limiting the number of individuals who may be granted parole under this rule in connection with the same start-up entity will provide an additional safeguard against an entity being used as a means to fraudulently allow individuals to come to the United States. Such a limit diminishes, for example, the incentive to dilute equity in the start-up entity as a means to apply for parole for individuals who are not bona fide entrepreneurs. Finally, DHS clarifies that the rule does not require that additional entrepreneurs, up to 3 entrepreneurs per start-up entity, apply for parole based on the same start-up entity at the same time.

## 7. Income-Related Conditions on Parole

*Comment:* Several commenters discussed the proposed rule's provision requiring that entrepreneurs paroled into the United States must maintain a household income that is greater than 400 percent of the Federal poverty line for their household size, as defined by the Department of Health and Human Services. Many of these commenters discussed the financial difficulties faced by start-ups and argued that the income requirements were unduly high or suggested other alternatives. The majority of commenters on this issue stated that entrepreneurs in start-up endeavors typically do not take a salary or take a minimal salary in the early years. Several commenters recommended lowering this income threshold, with many suggesting lowering it to 100 percent, while others suggested alternatives of 125 percent, 200 percent, or 250 percent of the Federal poverty level. An individual commenter recommended that DHS institute a minimum yearly income requirement of $80,000, while another individual commenter stated that DHS should adopt a more nuanced approach that takes into account factors like standard of living, unemployment rates, and economic growth by state. Other commenters recommended that DHS allow for other types of compensation, in the form of benefits or rewards, in addition to salary to satisfy the income-related conditions on parole. Another individual commenter stated that DHS should use the income threshold already established by the Affidavit of Support,[28] which is set at 125 percent

above the poverty guidelines. Lastly, one commenter said the "significant public benefit" determination should not just be applied to entrepreneurs who meet a particular income or wealth criterion, but should be liberally applied to all entrepreneurs who are seeking to build and grow a business.

*Response:* DHS appreciates the concerns raised by these commenters, but declines to adopt the commenter's suggestion to eliminate or alter the income-related condition on parole. Establishing this income-related condition on parole is consistent with the Secretary's discretionary authority to grant parole "under conditions as he may prescribe." INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). As stated in the NPRM, DHS established this income threshold to ensure that applicants seeking parole under this rule will have sufficient personal economic stability to make significant economic and related contributions to the United States. Those policy goals remain valid and are appropriate in guiding the decision to retain the requirement that the household income of an entrepreneur requesting parole under this rule be greater than 400 percent of the Federal poverty line.

Under this rule, DHS will take steps to ensure that each grant of parole will provide a positive net benefit to the economy of the United States, consistent with the statutory framework authorizing parole only for significant public benefit absent urgent humanitarian issues. In addition to considering all the other positive evidence—from job creation to investment to growth—DHS includes the income threshold as an additional safeguard that the entrepreneur and his or her family will not be eligible to draw upon Federal public benefits or premium tax credits under the Health Insurance Marketplace of the Affordable Care Act. Furthermore, Secretary Johnson indicated in his memorandum titled "Policies Supporting U.S. High-Skilled Business and Workers" that such thresholds would be created so that individuals would not be eligible for these public benefits or premium tax credits in light of the purpose of the policy.[29]

DHS emphasizes that the funding amounts received by a start-up entity from governmental sources or from

---

[27] Max Marmer, Bjoern Lasse Herrmann, Ertan Dogrultan, Ron Berman, *Startup Genome Report Extra on Premature Scaling,* Startup Genome Report: Premature scaling v 1.2 (Mar. 2012 ed.) (explaining that "hiring too many people too early" in a start-up's development is one of several reasons that most start-ups fail), available at *https://s3.amazonaws.com/startupcompass-public/StartupGenomeReport2_Why_Startups_Fail_v2.pdf.*

[28] Affidavits of Support, filed using Form I–134 or I–864, are required for certain immigrants to

show that they have adequate means of financial support and are not likely to rely on the U.S. government for financial support.

[29] Memorandum from Jeh Johnson, DHS Secretary, Policies Supporting U.S. High-Skilled Business and Workers 4 (Nov. 20, 2014), at *https://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*

qualified investors in order to meet the rule's eligibility thresholds are distinct from the possible sources of salary payments to the individual entrepreneur. Nothing in this rule prevents a start-up entity from raising higher funding levels than the minimum parole eligibility thresholds, and from a wider set of funders than those in the rule's definitions of qualified investors and government entities. DHS intends for the eligibility criteria for parole to be useful independent validation tools for assessing the significant growth and job creation potential of the start-up entity. While there is certainly validity to the arguments made by some of the commenters that many entrepreneurs do not take large salaries, choosing instead to re-invest available funds back into the start-up entity or to take other forms of non-cash compensation, DHS must establish criteria that protect the overall policy goals of this rule in accordance with the requirements of the INA. The income-related requirements offer a clear and predictable mechanism for DHS to have a strong measure of confidence that the entrepreneur and his or her family, while paroled into the United States under this rule, will be net positive contributors to the American economy.

8. Reporting of Material Changes

*Comment:* Several commenters discussed the proposed requirement that entrepreneurs report any material changes during a parole period to DHS by submitting a new application for parole. Most commenters argued that such a requirement would be onerous given the constantly changing nature of start-ups. A law firm argued that requiring entrepreneurs to report and reapply when there are pending actions against the start-up entity or entrepreneur would be unfair, as both are entitled to due process, and suggested a reporting requirement only if an adverse judgment were issued. An individual commenter stressed that a $1,200 fee to report every material change would create a major financial burden for entrepreneurs.

*Response:* DHS recognizes that the nature of start-up entities involves constant change. DHS also appreciates the concerns regarding the administrative and financial burden placed on entrepreneurs by additional filings. DHS believes, however, that the revised definition of material change in the final rule will help to clarify the situations in which the entrepreneur must notify the agency of material changes, and thus limit the administrative and financial burdens on the entrepreneur. Specifically, DHS

understands that start-ups may have frequent ownership changes over the course of successive funding rounds, and thus has revised the definition of "material change" regarding ownership changes to cover only those that are "significant" in nature. Clarifying the scope of the material change definition also limits the reporting requirement, which should help reduce the anticipated burden on entrepreneurs. DHS also emphasizes that the rule requires notification of pending actions only in the context of a criminal case or other action brought by a government entity, while actions brought by private individuals or entities are not considered "material changes" until a settlement, judgment, or other final determination is reached. DHS does not believe that the material change reporting requirement under this rule will impact an individual's due process or would otherwise be unfair. DHS believes, however, that it is important for an entrepreneur granted parole under this rule to immediately inform USCIS if certain actions are brought against the entrepreneur or his or her start-up entity.

*Comment:* One commenter recommended that the process of addressing material changes would be improved if DHS were to implement a policy similar to the "deference" policy it applies in the EB–5 investor program. Such a policy provides that DHS will defer to prior determinations regarding certain documentary evidence used to establishing program eligibility requirements absent fraud, misrepresentation, a mistake of law or fact, or a material change.

*Response:* As discussed above, DHS decided to narrow and clarify the definition of "material change" in order to address commenters' concerns about reporting burdens. In the absence of specific suggestions, DHS could not ascertain from this comment what aspect of the EB–5 deference policy could be applied under this rule. DHS believes it is important for this rule to provide mechanisms, including the requirement to report material changes, to ensure that parole continues to be justified by significant public benefit in each particular case.

*Comment:* A joint submission from a professional association and a non-profit organization stated that, where a material change filing is mandated by the rule, the entrepreneur should only be required to file an update with USCIS, instead of being required to re-file an entire parole or re-parole application.

*Response:* As explained above, while DHS appreciates that a new filing may

appear burdensome to the entrepreneur, DHS believes that a new filing is necessary in order to re-evaluate the entrepreneur's eligibility when such material changes occur. Material changes, by their definition, may affect the entrepreneur's ability to demonstrate that the start-up entity has potential for rapid growth and job creation, and whether the entrepreneur will continue to provide a significant public benefit to the United States. Therefore, at present, the entrepreneur must file a new application to allow DHS the opportunity to determine the entrepreneur's continued eligibility for parole. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after it has assessed the implementation of the rule and its impact on operational resources.

9. Other Comments on Parole Criteria and Conditions

*Comment:* Several comments expressed concern that the rule did not require that the entrepreneur receive prevailing wages for their work, with some commenters expressing concern that the only wage requirements relate to the Federal Poverty Level.

*Response:* DHS appreciates commenters' concerns regarding prevailing wages. Unlike some employment-based visa classifications, however, the intention of this parole process is not to address labor shortages in the United States. Rather, it is to encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States. DHS believes that requiring the parolee to maintain a household income of greater than 400 percent of the Federal Poverty Level adequately ensures that he or she will have sufficient personal economic stability to provide a significant public benefit to the United States through entrepreneurial activities.

*Comment:* One commenter recommended that DHS should not require an applicant's start-up entity to receive investment prior to the initial application for parole; that DHS should recognize cash infusions during the growth period of a start-up entity as eligibility criteria for re-parole; and that at the end of the initial parole period, if the venture is deemed successful, no additional funding milestones should be required for re-parole eligibility.

*Response:* DHS appreciates the comment but declines to revise the rule as suggested. DHS believes that the alternative criteria provided in this rule to determine if the start-up entity has

substantial potential for rapid growth and job creation provide sufficient flexibility for those entrepreneurs who may have received amounts of qualified investments or government funding that are less than those required to satisfy the general criteria for parole consideration under this rule. The determination that the entity has substantial potential for rapid growth and job creation will be made based on the evidence in the record at the time the parole application is adjudicated, rather than the possibility that the entity may receive cash infusions at some point in the future. If cash infusions from various sources are received by the start-up entity during the period of initial parole, evidence of such cash infusions may be taken into consideration if the entrepreneur applies for re-parole. DHS, however, does not believe that cash infusions into the start-up entity during the initial parole period will independently suffice to establish that the entity continues to have the significant potential for rapid growth and job creation. Infusions of cash, as a general matter, do not have the same validating qualities as do evidence of additional investment from qualifying investors, grants or awards from qualifying government entities, significant revenue growth, or job creation.

*Comment:* One commenter asserted that entrepreneurs who have left their start-up entity should not have their parole status immediately revoked. The commenter suggested that DHS issue guidance and options for entrepreneurs who leave their start-up entity but have contributed to the significant public benefit of the United States. A similar comment recommended that individuals be able to remain in the United States under parole and qualify for re-parole if a second start-up meets the requirements of the rule. Another related comment argued that entrepreneurs whose start-up entities fail should be given a second chance, in order to account for the dynamism and uncertainty inherent in new businesses.

*Response:* DHS appreciates the comments but declines to adopt the commenters' suggestions. As a matter of statutory authority, once, in the opinion of DHS, the purpose of parole has been served, parole should be terminated. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). DHS emphasizes that the purpose of granting parole under this rule is to allow an entrepreneur to grow a start-up entity in the United States with substantial potential for rapid growth and job creation, by working in an active and central role for the entity. Accordingly, DHS will not continue

parole for entrepreneurs who are no longer actively working in a central role with the start-up entity that served as the basis for the initial parole application. The individual's activity through a new start-up entity, however, could serve as a basis for a new grant of parole if all requirements for such parole are met.

*Comment:* One commenter suggested that DHS should utilize the same methodology for granting parole for entrepreneurs as defined in a proposed nonimmigrant visa classification in a Senate bill, S. 744, 113 Cong. section 4801(2013).

*Response:* DHS appreciates the comment but declines to adopt the commenter's suggestion. Under this rule, DHS has identified a process for implementing the Secretary's existing statutory authority to grant parole consistent with section 212(d)(5) of the INA. DHS does not believe it is advisable to import in this rule the standards from unenacted legislation focused on nonimmigrant visas rather than discretionary grants of parole.

*G. Employment Authorization*

1. Automatic Employment Authorization Upon Parole

*Comment:* One commenter suggested that if employment authorization were deemed incident to parole, rather than through a follow-up application, then the regulations governing employment verification would need to be amended to permit employment by the parolee and spouse without an EAD.

*Response:* DHS agrees that the employment verification provisions of the regulations should be appropriately revised. In this final rule, and as proposed, DHS is revising the employment eligibility verification regulations by expanding the foreign passport and Form I–94 document combination described at 8 CFR 274a.2(b)(1)(v)(A)(5) to include Forms I–94A containing an endorsement that an individual is authorized to work incident to parole. This document combination was previously acceptable only for certain nonimmigrants authorized to work for a specific employer incident to status pursuant to 8 CFR 274a.12(b), which the final rule amends to include those paroled into the United States as entrepreneurs under this rule. *See* final 8 CFR 274a.12(b)(37).

However, in this final rule, and as proposed, only the entrepreneur parolee is accorded employment authorization incident to his or her parole. *See* final 8 CFR 274a.12(b). Given the basis for parole, it is essential to limit any delays

in the entrepreneur's own employment authorization. Such delays could create difficulties for the entrepreneur's operation of the start-up entity, as he or she would be prohibited from working until work authorization was approved, and would frustrate the very purpose for paroling the entrepreneur into the United States. As an entrepreneur's spouse would not be coming for the same kind of specific employment purpose, DHS does not believe there is a similar need to provide him or her work authorization incident to parole. Instead, this rule adds a new provision making the spouse of an entrepreneur parolee eligible to seek employment authorization. *See* final 8 CFR 274a.12(c)(34). Based on this provision and 8 CFR 274a.13(a), an entrepreneur's spouse seeking employment authorization under this rule would need to file an Application for Employment Authorization (Form I–765) with USCIS in accordance with the relevant form instructions.

*Comment:* One commenter expressed concern that the proposed employment authorization provision is too narrow in scope. The commenter stated that DHS should clarify that employment with an entity that is under common control as the start-up entity, such as a subsidiary or affiliate, would be permissible.

*Response:* Under the final rule, the entrepreneur parolee's employment authorization is limited to the specific start-up entity listed on the Application for Entrepreneur Parole, Form I–941. This limitation helps ensure that the entrepreneur's work is consistent with the purposes for which parole was granted, especially since parole applications will be evaluated based in part on the activities and performance of that particular start-up entity. DHS appreciates that there are certain circumstances in which some flexibility could further the purpose of encouraging entrepreneurship, innovation, economic growth, and job creation in the United States. Given that this is a new process however, DHS has decided to take an incremental approach and will consider potential modifications in the future after assessing the implementation of the rule.

*Comment:* One commenter stated that difficulties obtaining a work visa have caused many entrepreneurs to move out of the United States.

*Response:* DHS agrees with the commenter's statement. While this rule does not address all of the difficulties that entrepreneurs may face, or make legislative changes that only Congress can make, DHS believes it will encourage international entrepreneurs

to develop and grow their start-up entities—and provide the benefits of such growth—in the United States. Entrepreneurs paroled into the United States under this rule will be authorized to work for the start-up entity for the duration of the parole (and any re-parole) period.

2. Spousal Employment

*Comment:* Several commenters, including a business incubator, asserted that spouses should be granted employment authorization and argued that spouse employment authorization will entice more entrepreneurs to come to the United States. Several other commenters stated that, in order to attract the best entrepreneurial talent, spouses of entrepreneur parolees should automatically receive work authorization incident to status without the need to apply separately.

*Response:* DHS agrees with commenters that extending employment authorization to spouses of entrepreneur parolees is important to help attract entrepreneurs to establish and grow start-up entities in the United States. For reasons provided above, however, DHS disagrees that these spouses must be provided with employment authorization incident to their parole. Instead, these spouses may seek employment authorization under 8 CFR 274a.12(c)(34).

*Comment:* A few commenters stated opposition to permitting employment authorization for the spouses of international entrepreneurs.

*Response:* DHS disagrees with the commenters' opposition to allowing an entrepreneur's spouse to apply for employment authorization. Permitting spouses to seek employment authorization is an important aspect of the rule's intent to attract international entrepreneurs who may provide a significant public benefit by growing their start-up entities in the United States.

*Comment:* One commenter objected to spousal employment authorization unless it is restricted to the same new high-potential start-up entity that served as the basis for the parole.

*Response:* DHS disagrees with the suggestion that spousal employment should be authorized only for employment with the start-up entity that served as the basis of parole for the entrepreneur. Nothing in this rule prevents people married to each other from applying for parole associated with the same start-up entity. But DHS believes that it is not appropriate or necessary to limit the employment of an entrepreneur's spouse to that entity. Making those spouses eligible to seek

employment from a broader range of employers can further the central purpose of the rulemaking—encouraging international entrepreneurs to develop and grow their start-up entities within the United States and provide the benefits of such growth to the United States. It may also encourage entrepreneurs to create more jobs outside the family through the start-up entity, furthering the benefits provided to others in the United States. DHS therefore declines to revise the rule as suggested.

*H. Comments on the Parole Process*

1. Ability of Individuals To Qualify for Parole Under This Rule

*Comment:* Two individual commenters asked what kind of immigration status or visa an international entrepreneur should maintain in order to be eligible to apply for parole under this rule. The commenters expressed concern about the types of activities that would need to be conducted in the United States prior to a parole application in order to establish a business, obtain funds from investors, and otherwise qualify for the parole under this rule. These commenters also expressed concern about requiring prior investment as a condition for parole, and that investors would be hesitant to make such an investment in a start-up entity if the entrepreneur lacked an immigrant or nonimmigrant visa. A professional association stated that, since parole does not constitute formal admission to the United States, it will likely be very difficult for international entrepreneurs without formal immigration status to enter into long-term contracts, raise significant investment capital, and employ people.

*Response:* This final rule aims to encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are in turn expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy. Under this final rule, an international entrepreneur may request parole in accordance with the form instructions. The final rule provides that individuals seeking initial parole under this program must present themselves at a U.S. port of entry to be paroled into the United States; there is no requirement that an international entrepreneur currently be in the United States or maintain any prior immigration status. DHS notes, however, that under the statute governing parole authority, individuals

who have already been admitted to the United States are ineligible to be considered for parole inside the United States because only applicants for admission are eligible to be considered for parole. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing ''applicants for admission''). Individuals who have been admitted in a nonimmigrant classification, and are currently in the United States pursuant to that admission, may not be paroled, even if they have overstayed their admission, unless they first depart the United States.

DHS appreciates that international entrepreneurs may face many challenges in starting and growing a business in the United States, including attracting investment capital or government grants or awards. DHS disagrees with the premise, however, that qualifying investors will be very reluctant to make a qualifying investment in a start-up entity that is wholly or partially owned by an individual that will be seeking a grant of parole under this rule. DHS believes that there are a myriad of factors that go into a decision to invest significant funds in a start-up entity. While the underlying immigration status, or lack thereof, of the start-up entity's owner(s) may be a factor presenting a degree of additional risk, DHS believes that this rule will effectively mitigate some of that risk by providing a known framework under which certain significant public benefit parole requests will be reviewed and adjudicated. This final rule provides investors and entrepreneurs with greater transparency into the evaluation process and manner in which such requests will be reviewed, so that those individuals and entities can weigh the various risks and benefits that might apply to the particular investment decision being considered. Given that this is a new and complex process, DHS has decided to take an incremental approach and will consider potential modifications in the future after assessing the implementation of the rule.

2. Waiver for Entrepreneurs Presently Failing To Maintain Status

*Comment:* An individual commenter stated that international entrepreneurs already in the United States should be able to receive a waiver in order to establish eligibility for parole under this rule if they do not have a valid prior immigration status. Another commenter suggested that immigration status violations, such as unauthorized employment, should not be grounds for denying parole under this rule and, if parole is granted, any prior

unauthorized employment that was used to meet the requirements for parole should be disregarded for purposes of any future immigration applications.

*Response:* As discussed above, eligibility for parole under INA section 212(d)(5), 8 U.S.C. 1182(d)(5), is not wholly dependent upon an individual's current immigration status. Unauthorized employment or a prior status violation will not necessarily preclude an individual from qualifying for parole under this rule. However, the fact that an entrepreneur has worked without authorization, is out of status, or not legally present in the United States would be considered in determining whether DHS should grant parole under its discretionary authority. All requests for a discretionary grant of parole are adjudicated on a case-by-case basis and ultimately determined by evaluating all positive and negative factors.

DHS will not adopt the commenter's suggestion to disregard, for purposes of any future immigration applications, any prior unauthorized employment that was used to meet the requirements for parole. DHS believes that such a provision would require a statutory change, as eligibility for certain benefits is barred by statute if the applicant previously worked without authorization.[30]

3. Relationship Between Parole and Various Nonimmigrant Visa Classifications

a. Pathway for Current Nonimmigrants To Use Entrepreneur Parole

*Comment:* Some commenters expressed concern that it would be challenging for foreign students, recent graduates of U.S. universities, and other nonimmigrants presently in the United States to meet this rule's requirements for parole consideration under the constraints of their current visas. These commenters said that the rule should allow these individuals a realistic and clear pathway to easily utilize parole, and should clarify that potential applicants currently in the United States in nonimmigrant status will not be violating their existing visa status when taking the necessary steps to establish eligibility for significant public benefit parole. One commenter requested that students in F–1 nonimmigrant status and eligible to work on Curricular Practical Training (CPT) or Optional Practical Training (OPT) should become eligible for parole under the rule if they founded a start-up and raised $100,000 in capital.

*Response:* DHS appreciates that some entrepreneurs who are present in the United States and who might otherwise qualify for parole under this program may be unable to engage in certain activities given the limitations placed on their nonimmigrant status, making it difficult, for example, for them to raise significant capital for a start-up entity. DHS, however, disagrees with the commenters' assertion that individuals present in the United States in F–1 nonimmigrant status will be unable to meet the requirements for parole under this program, such as starting a business and raising significant investment, without violating their F–1 nonimmigrant status. For example, an individual in F–1 status who has obtained OPT employment authorization may start and work for his or her own business in the United States. The OPT employment, and thus the business, must relate to the F–1 nonimmigrant's program of study and can occur either before (pre-completion OPT) or after the completion of a program of study (post-completion OPT).[31] Additional requirements apply to F–1 nonimmigrants who are otherwise eligible for a STEM OPT extension, such as establishing that their STEM OPT employer will have a valid employer-employee relationship with the F–1 OPT nonimmigrant, but those additional requirements do not pertain to the initial 12-month OPT period, and in any event do not present an absolute bar against entrepreneurial activities. DHS believes that it is certainly realistic that an F–1 nonimmigrant in the United States can start a business during his or her OPT period, and during that time can take steps to obtain significant investment in the start-up entity, which the individual may then rely upon if applying for parole under this rule. DHS declines to adopt the commenters' suggestion to include in this rule a blanket provision stating that potential applicants currently in the United States in nonimmigrant status will not be violating their existing status when taking steps to establish eligibility for parole. Such changes would pertain to the statutory and regulatory limitations placed on various nonimmigrant classifications and are outside the scope of this rule.

DHS believes that this final rule provides a realistic and clear option for certain entrepreneurs to actively grow their qualifying start-up entity in the United States. As discussed below, parole is not a nonimmigrant status, and individuals present in the United States

in a nonimmigrant status will not be able to change status or otherwise be granted parole without first departing the United States and appearing at a U.S. port of entry for inspection and parole. Under this final rule, however, an individual present in the United States in a nonimmigrant status may apply for and obtain an approval of the Application for Entrepreneur Parole (Form I–941). Filing and obtaining approval of a Form I–941 application under this rule will not, by itself, constitute a violation of the individual's nonimmigrant status. After approval of the Form I–941 application, if the individual decides to rely upon parole to actively grow his or her business in the United States, the individual will need to appear at a U.S. port of entry for a final parole determination to allow him or her to come into the United States as a parolee.

This final rule already provides appropriate criteria under which all applications will be reviewed, including those submitted by any F–1 nonimmigrants. As indicated in this final rule, one basis on which an individual may be considered for parole under this rule is if he or she has raised at least $250,000 in investment capital from a qualifying investor (and meets certain other criteria). Individuals who raise a substantial amount of capital from a qualifying investor, but less than $250,000, may still qualify for and be granted parole under other criteria identified in the rule—including the receipt of a qualifying government grant or award or other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

b. Switching Between Nonimmigrant Status and Parole

*Comment:* Several commenters raised questions or provided suggestions regarding switching from a nonimmigrant status to parole, or from parole to a nonimmigrant status. Specifically, one commenter asked what her status would be if she were in the United States as an H–4 nonimmigrant, authorized to work pursuant to an EAD, but nevertheless pursued parole under this rule. Another commenter suggested that DHS should include a provision in this final rule that expressly allows someone to switch from nonimmigrant status to parole, and from parole to nonimmigrant status, similar to DHS's policy to terminate and restore the H–1B or L–1 status of certain individuals who have temporarily departed the United States but came back using an advance parole document that was

---

[30] *See, e.g.,* INA section 245(c), 8 U.S.C. 1255(c).

[31] *https://studyinthestates.dhs.gov/training-opportunities-in-the-united-states.*

issued based on a pending Form I–485 application for adjustment of status.

*Response:* DHS declines to adopt a provision in this rule allowing individuals to change between nonimmigrant status and parole while in the United States. An individual who is present in the United States as a nonimmigrant based on an inspection and admission is not eligible for parole without first departing the United States and appearing at a U.S. port of entry to be paroled into United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Moreover, an individual who has been paroled into the United States cannot change to nonimmigrant status without leaving the United States, as INA section 248, 8 U.S.C. 1258, only permits individuals who are maintaining nonimmigrant status to change to another nonimmigrant status. If an individual who has been paroled into the United States under this rule has a petition for nonimmigrant classification approved on his or her behalf, he or she would have to leave the United States and pursue consular processing of a nonimmigrant visa application before seeking to return to the United States.

c. Entrepreneur Pathways and Entrepreneur Parole

*Comment:* One commenter stated that the international entrepreneur parole rule should complement and not supplant prior USCIS policy pertaining to entrepreneurs, including those reflected on the USCIS Entrepreneur Pathways Web site.[32] The commenter, while expressing concerns with aspects of existing policies pertaining to entrepreneurs and this rule, suggested that if an entrepreneur cannot qualify for parole under this rule, USCIS should encourage the entrepreneur to seek a visa associated with his or her start-up entity under the existing immigrant or nonimmigrant visa system. Specifically, the commenter suggested that the final rule should expressly include an amendment to the H–1B regulations to allow approval of an H–1B petition under the policies articulated on the Entrepreneur Pathways Web site, and that USCIS adjudicators should see an express statement in the final rule that, notwithstanding the existence of this rule, the H–1B visa remains available for working owners of start-up entities. The commenter noted that the USCIS Entrepreneur Pathways Web site also provides guidance for entrepreneurs to use other existing nonimmigrant visa classifications (*e.g.,* L–1, O, and E visas) that could be more advantageous to the

entrepreneur than the parole rule, so adjudicators should continue to approve petitions in that spirit. The commenter asserted that the unique requirements under the parole rule, such as a threshold investment amount, should not be allowed to ''bleed into and taint'' the adjudicatory process for securing employment-based visas traditionally used by entrepreneurs.

*Response:* DHS appreciates the commenter's suggestions, but the suggested changes to the H–1B regulations are outside the scope of this rulemaking. DHS agrees with the commenter that parole under this program is intended to complement, and not supplant, other options that may already exist for entrepreneurs under other immigrant and nonimmigrant visa classifications. This rule does not alter existing rules or policies regarding the ability of entrepreneurs to qualify for any immigrant or nonimmigrant status. This rule does, however, provide an additional avenue for entrepreneurs to consider when exploring options that may be available to them to grow a start-up entity in the United States.

4. Travel Document Issuance

*Comment:* A commenter urged DHS to grant multiple-entry parole to foreign nationals so that they may travel internationally and return to the United States, as this is not explicit in the regulation. The commenter stated that this ability is essential to ensure that entrepreneurs can raise additional funds and market innovations worldwide. In addition, this commenter stated that some foreign nationals may begin their businesses and seek entrepreneur parole while in nonimmigrant status in the United States, such as in F–1 or H–1B nonimmigrant status (and thus seek to depart the United States with advance parole and then request parole from CBP upon their return to a U.S. port of entry). The commenter suggested that the regulation clarify how these foreign nationals will be able to return to the United States.

*Response:* DHS notes that individuals who have been admitted to the United States, such as those in nonimmigrant status, are not eligible to be granted parole unless they first depart the United States. DHS clarifies that any immigration status violations by any applicant for parole, including those related to their entrepreneurial efforts, will be taken into account as negative factors in the case-by-case determination of whether the applicant merits an exercise of discretion to grant parole, though they will not necessarily

prohibit the individual from obtaining a grant of parole under this rule.

DHS recognizes that international travel can be essential for the success of some start-up entities. Under existing law, an individual's authorized period of parole ends each time he or she departs the United States. *See* 8 CFR 212.5(e)(1)(i). DHS may, however, authorize advance parole before departure and can specify that such authorization is valid for multiple uses. An entrepreneur granted advance parole would be able to leave the country, present himself or herself at a port of entry upon return, and request a subsequent grant of parole for the remaining period of his or her initially granted parole period. At such time, DHS must then inspect the individual and determine whether or not to grant parole into the United States.[33] If the individual is granted parole, he or she may only be paroled for up to the time initially granted. Any time spent outside the United States after the parole period is initiated will count against the total period of parole, so that the total time period of the parole period remains consistent with the date of initial parole granted by CBP.

5. Parole in Place

*Comment:* Several commenters requested that DHS allow parole-in-place under this rule. Some of these commenters stated that parole-in-place should be added so that individuals already in the United States in a nonimmigrant status, such as H–1B or F–1 nonimmigrant status, can apply for and be granted parole under this rule without having to depart the United States. Several other commenters noted that DHS has the jurisdiction to allow parole-in-place for spouses or dependents, as they do for military family members, and that this could be applied to the International Entrepreneur Rule. Some commenters argued that the requirement to be out of the country to apply for parole under this rule puts an unnecessary financial burden on applicants who are already residing in the United States.

*Response:* DHS appreciates, but declines to adopt, the commenters' suggestions that parole-in-place be allowed under this rule for individuals already in the United States in H–1B or F–1 nonimmigrant status. Only applicants for admission are eligible to

---

[32] *See https://www.uscis.gov/eir.*

[33] This process is not appropriately described as ''multiple-entry parole.'' Parole does not constitute an admission to the United States, INA sections 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A); and parole terminates upon the individual's departure from the United States, 8 CFR 212.5(e)(1)(i).

be considered for parole, thus precluding individuals who have already been admitted from being considered for parole inside the United States. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA section 235(a)(1), 8 U.S.C. 1225(a)(1) (describing "applicants for admission"). Such individuals are not eligible for parole, regardless of whether they have overstayed their admission, unless they first depart the United States.

6. Comments on Options After 5-Year Total Parole Period Ends

*Comment:* Many commenters provided views on the options available to entrepreneurs who have exhausted their up to 5 years of eligibility for parole under this rule. Some commenters were concerned that the rule does not provide a direct path to lawful permanent residence, which could limit the investment prospects for start-up entities. Other commenters were concerned that including such a path could exacerbate current immigrant visa backlogs and thus disadvantage those already in the queue for immigrant visa numbers.

A number of commenters were more broadly concerned that the overall uncertainty inherent in parole may discourage entrepreneurs from using this rule to start and grow their businesses in the United States. One particular commenter expressed concerns about an entrepreneur's ability to demonstrate nonimmigrant intent for purposes of a visa that does not permit dual intent. Others wanted DHS to consider entrepreneurs who have completed a 5-year parole period, and whose start-ups continue to demonstrate growth, as eligible for an EB–2 immigrant visa with a National Interest Waiver based upon the economic benefit to the United States. Other commenters urged DHS to establish *prima facie* eligibility for lawful permanent residence based on 3 years of parole under this rule. Still others wanted assurance that an individual who is the beneficiary of an approved immigrant petition would keep his or her priority date for purposes of receiving lawful permanent residence if he or she were granted parole under this rule.

*Response:* DHS appreciates the wide range of comments about immigration options for entrepreneurs after the end of their authorized period or periods of parole under this rule. Nothing in this rule forecloses otherwise available options for international entrepreneurs who are granted parole. DHS further notes that this rule does not impact existing rules and policies pertaining to

retention of priority dates in the immigrant petition context. The rule does not, however, establish a direct path to lawful permanent residence by creating a new immigrant visa classification for international entrepreneurs, which could only be done by Congress.

As discussed in the NPRM, the entrepreneur and any dependents granted parole under this program will be required to depart the United States when their parole periods have expired or have otherwise been terminated, unless such individuals are otherwise eligible to lawfully remain in the United States. Such individuals may apply for any immigrant or nonimmigrant classification for which they may be eligible (such as classification as an O–1 nonimmigrant or lawful permanent residence through employer sponsorship). Individuals who are granted parole under this rule may ultimately be able to qualify for an EB–2 immigrant visa with a National Interest Waiver. If an entrepreneur is approved for a nonimmigrant or employment-based immigrant visa classification, he or she would generally be required to depart the United States and apply for a visa at a U.S. embassy or consulate abroad. As noted above, because parole is not considered an admission to the United States, parolees will be unable to apply to adjust or change their status in the United States under many immigrant or nonimmigrant visa classifications. DHS does not believe that merely being granted parole under this rule would prevent an individual from demonstrating nonimmigrant intent for purposes of obtaining a subsequent nonimmigrant visa for entry into United States. DHS believes that this rule presents sufficient clarity and predictability for many individuals who want to establish and grow their businesses in the United States, and will contribute significantly to economic growth and job creation here. Such positive outcomes may be relevant in the event that entrepreneurs granted parole under this rule later seek to apply for an existing nonimmigrant or immigrant visa.

*I. Appeals and Motions To Reopen*

*Comment:* Several commenters requested that applicants be allowed to file appeals or motions to reconsider adverse parole decisions. A business association requested that submissions of motions to reopen or motions for reconsideration result in uninterrupted employment authorization for the parolee.

*Response:* DHS appreciates but declines to adopt these suggestions.

DHS has concluded that granting a right of appeal following a decision to deny entrepreneur parole would be inconsistent with the discretionary nature of the adjudication and contrary to how DHS treats other parole decisions. The final rule also precludes applicants from filing motions to reopen or for reconsideration under 8 CFR 103.5(a)(1). DHS retains its authority and discretion, however, to reopen or reconsider a decision on its own motion as proposed. *See* final 8 CFR 212.19(d)(4). Applicants may alert DHS, through existing customer service channels, that they believe that a decision to deny parole was issued in error and include factual statements and arguments supporting such claims.

Because the determination to grant or deny a request for parole is discretionary, the parole process in this final rule may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner. Parole determinations would continue to be discretionary, case-by-case determinations made by DHS, and parole may be revoked or terminated at any time in accordance with the termination provisions established by this rule at 8 CFR 212.19(k). Parolees under this final rule would assume sole risk for any and all costs, expenses, opportunity costs, and any other potential liability resulting from a revocation or termination of parole. A grant of parole would in no way create any reliance or due process interest in obtaining or maintaining parole or being able to remain in the United States to continue to operate a start-up entity or for other reasons.

*J. Termination of Parole*

1. Discretionary Authority To Revoke/ Terminate Parole

*Comments:* One commenter expressed concern that the basis for terminating parole is subjective, particularly with respect to reporting material changes. This commenter suggested that USCIS should limit such reporting to adverse judgments, since entrepreneurs and start-up entities are entitled to due process. Other commenters requested that USCIS adjudicators be specifically trained on entrepreneurship issues so that they can make the most informed decisions regarding parole.

*Response:* USCIS is committed to providing sufficient training on entrepreneurship issues for those adjudicators who will be assigned to adjudicating entrepreneur parole

requests. DHS does not believe that further revisions to the rule are necessary to protect against possible unfair or inconsistent determinations among adjudicators. By statute, parole decisions are discretionary and must be made on a case-by-case basis. This rule establishes transparent parameters for termination of parole, including automatic termination and termination on notice. Automatic termination applies at the expiration of parole, or upon written notification to DHS from the entrepreneur parolee that he or she is no longer employed by the start-up entity or no longer possesses the required qualifying ownership stake in the start-up entity. *See* final 8 CFR 212.19(k)(2). Termination on notice with an opportunity for the entrepreneur to respond is authorized by 8 CFR 212.19(k)(3). These bases for termination are tied to objective facts regarding eligibility for parole, thereby placing all parolees on the same footing.

The commenter expressed particular concern regarding terminations based on material changes. DHS believes that this concern is sufficiently addressed by the parameters set by this rule's definition of material change. Under this rule, material change means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. *See* final 8 CFR 212.19(a)(10). This rule provides further guidance by listing several examples illustrating material changes, including: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; a significant change with respect to ownership and control of the start-up

entity; and a cessation of the entrepreneur's qualifying ownership interest in the start-up entity or the entrepreneur's central and active role in the operations of that entity. *See* final 8 CFR 212.19(a)(10).

2. Notice and Decision

*Comments:* A couple of commenters suggested that DHS provide notice and opportunity to respond before terminating parole.

*Response:* DHS agrees with the commenters that providing the entrepreneur parolee with notice and an opportunity to respond prior to termination is reasonable in certain scenarios, such as when grounds for termination require an assessment of the underlying case by the adjudicator. However, where no such assessment is required, DHS believes that automatic termination is appropriate. The NPRM provided for termination at DHS's discretion, including automatic termination in limited circumstances and termination on notice under a range of circumstances deemed appropriate by DHS. This rule finalizes that proposal without change. *See* final 8 CFR 212.19(k)(2) and (3). Under this rule, therefore, DHS will generally provide notice of termination and an opportunity to respond where it believes that:

(1) The facts or information contained in the request for parole were not true and accurate;

(2) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(3) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess the required ownership stake in the start-up entity;

(4) The alien otherwise violated the terms and conditions of parole; or

(5) Parole was erroneously granted.

Automatic termination will apply upon the expiration of parole or if DHS receives written notice from the parolee informing DHS that he or she is no longer employed by the start-up entity or no longer possesses the required qualifying ownership stake in the start-up entity. DHS believes that these bases for automatic termination clearly evidence that the entrepreneur no longer qualifies for parole under this rule; therefore, notice and opportunity to respond are unnecessary. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. This rule also finalizes the provision indicating that the

decision to terminate parole may not be appealed, that USCIS will not consider a motion to reopen or reconsider a decision to terminate parole, and, upon its own motion, USCIS may reopen or reconsider a decision to terminate. *See* final 8 CFR 212.19(k)(4).

3. Other Comments on Application Adjudication and Parole Termination

*Comments:* Multiple commenters suggested an expedited or premium processing option for entrepreneur parole applicants. Some of these commenters suggested a maximum 30-day adjudication time period.

*Response:* While DHS appreciates the concern for timely adjudications, at this time DHS declines to include premium or expedited processing as part of the final rule. DHS may consider the possibility of premium processing or expedited processing after assessing implementation of the rule and an average adjudication time for processing requests for parole under this rule has been determined.

*K. Opposition to the Overall Rule*

*Comment:* Multiple commenters expressed overall opposition to the rule, stating that there is no reason to add an additional parole process for highly trained and talented entrepreneurs when visa and residency pathways already exist, such as the O nonimmigrant visa, EB–5 immigrant visa, or EB–2 immigrant visa based on a National Interest Waiver. Other commenters asserted that the United States needs to limit immigration, not create more immigration programs. Several individual commenters argued that the U.S. Government should reform other visa programs, such as the H–1B nonimmigrant classification, and address the current immigrant visa backlog before creating more programs. Several individual commenters asserted that taxpayer money should be used on domestic issues, such as reviving the American economy, rebuilding infrastructure, promoting national security, and supporting veterans, rather than on administering a parole process for international entrepreneurs.

*Response:* DHS disagrees with the commenters' assertions that sufficient avenues for international entrepreneurs already exist. DHS believes that this final rule will, by further implementing authority provided by Congress, reduce barriers standing in the way of innovation and entrepreneurial activity that will benefit the U.S. economy.[34]

---

[34] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the U.S. is a struggle,* The
Continued

This final rule provides an avenue for innovative entrepreneurs to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of this rule, these innovative entrepreneurs might be delayed or discouraged altogether in contributing innovation, job creation, and other benefits to the United States.

DHS also disagrees with the commenters' assertions that reforms should be made to the H–1B nonimmigrant classification and that the immigrant visa backlog should be addressed before this rule is finalized. Parole is an entirely separate option within the Secretary's authority to allow individuals to come to the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit. While DHS appreciates the commenters' sentiment that changes should be made in other contexts, the exact changes contemplated by the commenters are unclear, are outside the scope of this rulemaking, or would require congressional action.

DHS also disagrees with the assertion that taxpayer funds will be misallocated to process applications for parole under this final rule. Applicants for parole under this rule will be required to submit a filing fee to fully cover the cost of processing of applications.

*L. Miscellaneous Comments on the Rule*

1. Additional Suggested Changes to the Rule

*Comments:* A number of commenters suggested additional changes to the final rule that are beyond the scope of this rulemaking. These comments proposed changes to the regulations governing certain nonimmigrant programs, namely: Employment of F–1 nonimmigrant students through Optional Practical Training (OPT); annual H–1B numerical limitations; "period of stay" duration for L–1 nonimmigrants starting a new office in the United States; and merging significant public benefit parole with the O–1 visa program. A commenter suggested providing Employment Authorization Documents or lawful permanent resident status to individuals who obtained their Master's degrees in the United States. Other commenters

suggested providing tax incentives to established U.S. corporations that would agree to mentor immigrant entrepreneurs, or establishing a system of compensation for certain senior citizens in the United States to mentor immigrant entrepreneurs. Other commenters recommended balancing parole for entrepreneurs with refugee admissions.

*Response:* DHS thanks commenters for these suggestions but declines to make changes to the rule as these comments are outside the scope of this rulemaking.

*Comment:* A joint submission from an advocacy group and professional association recommended that DHS consider parole for individuals who work in social services fields that do not command a high income or who might otherwise perform work in the national interest.

*Response:* This final rule is aimed at international entrepreneurs who will provide a significant public benefit to the United States—which could include entrepreneurs whose startup entities operate in the field of social services, so long as they meet the criteria for parole in this final rule. Furthermore, this rule does not limit the Secretary's broader authority to grant parole to other applicants for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

2. Information/Guidance

*Comment:* One commenter recommended that DHS make parole data from the program publicly available.

*Response:* While DHS did not propose to disclose parole data related to this rule, DHS appreciates the commenter's suggestion, and may consider making such data publicly available after this rule is implemented.

*Comment:* Other commenters suggested that DHS provide additional guidance to those granted parole under this rule and to provide resources for small start-ups interested in applying for the rule.

*Response:* DHS will evaluate whether to provide additional guidance following publication of this final rule and an assessment of its implementation.

*Comment:* One commenter suggested that DHS add a provision to the rule for retrospective review, in order to analyze the effects of the rule's implementation.

*Response:* DHS agrees with the commenter's suggestion that the effects of the rule, after its implementation, should be reviewed; however, DHS does not believe adding a provision to the final regulatory text requiring such

review is necessary. DHS intends to review all aspects of this parole rule and process subsequent to its implementation and consistent with the direction of Executive Order 13563. Given that this is a new and complex process, DHS will consider potential modifications in the future after assessing the implementation of the rule and its impact on operational resources.

*Comment:* One commenter said these rules should serve as a guide, but that companies and entrepreneurs should be analyzed on case-by-case basis.

*Response:* DHS may grant parole on a case-by-case basis under this rule if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion.

*Comment:* An individual commenter suggested that DHS should, as part of its assessment of parole applications under this rule, evaluate the performance of applicants' prior start-ups in their home countries.

*Response:* DHS agrees with the commenter and believes that the performance of applicants' prior start-ups in their home countries is the type of evidence already contemplated by the final rule both under the alternative criteria provisions and as part of the determination as to whether an applicant merits a favorable exercise of discretion. The alternative criteria allow an applicant who partially meets one or more of the general criteria related to capital investment or government funding to be considered for initial parole under this rule if he or she provides additional reliable and compelling evidence that his or her parole would provide a significant public benefit to the United States. Such evidence would need to serve as a compelling validation of the entity's substantial potential for rapid growth and job creation. DHS is not defining the specific types of evidence that may be deemed "reliable and compelling" at this time, as DHS seeks to retain flexibility as to the kinds of supporting evidence that may warrant DHS's exercise of discretion in granting parole based on significant public benefit.

3. Comments Regarding the E–2 Nonimmigrant Classification

*Comment:* Several commenters submitted comments regarding the E–2 nonimmigrant classification. The majority supported the inclusion of E–2 businesses into the parole process under this rule. Several companies and an individual commenter further recommended that the rule should

---

Guardian, Sept. 14, 2014, available at *http://www.theguardian.com/business/2014/sep/14/foreign-tech-entrepreneurs-visa-us-struggle*; Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals,* April 11, 2014, available at *http://immigrationimpact.com/2014/04/11/majority-of-u-s-patents-granted-to-foreign-individuals/* ("Because of the limitations of the H–1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.").

accommodate E–2 businesses already in the United States.

*Response:* The final rule lays out specific criteria for determining the kind of start-up enterprise that has substantial potential for job growth and job creation, and for assessing whether an individual entrepreneur's parole would be justified by significant public benefit. DHS believes it is unnecessary to identify these enterprises even more specifically than in this final rule. DHS notes that the rule does not prevent individuals who might otherwise qualify for an existing immigrant or nonimmigrant classification from applying for parole under this rule.

*Comment:* One commenter stated that the proposed rule is much more complicated than the E–2 nonimmigrant classification, and that DHS should incorporate elements of the E–2 program into this rule's parole process.

*Response:* DHS disagrees with the commenter's suggestion.[35] A grant of parole under this rule is based on a determination that the individual will provide a significant public benefit to the United States. Eligibility for E–2 nonimmigrant classification is based on different standards, and DHS believes that applying E–2 requirements would not suffice to meet the statutory requirements for parole and establish that an individual merits a favorable exercise of discretion. DHS therefore declines to adopt the commenter's suggestion.

*Comment:* A commenter suggested that the proposed rule is unnecessary since the E–2 program already supports international entrepreneurs.

*Response:* DHS disagrees with the commenter's statement. The E–2 program allows nationals of a treaty country (a country with which the United States maintains a qualifying Treaty of Friendship, Commerce and Navigation or its equivalent) to be admitted to the United States when investing a substantial amount of capital in a U.S. business. Foreign entrepreneurs from nontreaty countries, such as Brazil, China, India, Israel, or Russia, are currently not eligible for an E–2 nonimmigrant visa. Also, the E–2 category requires the entrepreneur to invest his or her own funds, and is therefore not applicable to entrepreneurs relying upon funds from investors or government entities to build and grow their business. DHS believes that this rule provides a viable option,

consistent with the Secretary's parole authority, to allow entrepreneurs to build and grow their businesses in the United States, providing significant public benefit here.

### 4. Usefulness of the Rule

*Comment:* Multiple commenters argued that this rule will not necessarily help international entrepreneurs succeed, because there are too many restrictions in place for foreign residents to qualify. One commenter asserted that the rule as proposed is too complex and its goals will be impossible to achieve.

*Response:* DHS disagrees with these assertions. DHS acknowledges that this final rule will not benefit all international entrepreneurs seeking to enter or remain in the United States. As several commenters have stated, the final rule does not and cannot create a new visa classification specifically designed for international entrepreneurs, which is something that can only be done by Congress. This final rule, however, provides an additional option that may be available to those entrepreneurs who will provide a significant public benefit to the United States. This parole option complements, but does not supplant, current immigrant and nonimmigrant visa classifications for which some international entrepreneurs might qualify to bring or keep their start-up entities in the United States.

The requirements governing eligibility for consideration for parole under this rule establish a high evidentiary bar that must be met in order to assist DHS in its determination that the individual will provide a significant public benefit to the United States. DHS, however, does not agree with the commenter's assertion that the requirements are impossible for all entrepreneurs to meet. Given that this is a new and complex process, DHS will consider potential modifications in the future after assessing the implementation of the rule and its impact on operational resources.

### 5. Include On-Campus Business Incubators in the Rule

*Comment:* One commenter urged USCIS to tie eligibility for parole to an applicant's participation in business incubators and accelerators located on U.S. university and college campuses that allow international entrepreneurs to grow start-up companies. The commenter stated that these programs meet the goal of the rule while providing benefits on a local and national scale. The commenter elaborated that the proposed rule only contemplates a traditional start-up arrangement, which creates

requirements based on ownership interest, type of investor, and amount of money invested. The commenter asserted that international entrepreneurs that engage with campus-based incubators cannot meet these requirements because the structure and opportunities provided by a higher education institution do not follow the traditional models. The commenter urged DHS to create alternative criteria to recognize the role higher education plays in fostering international entrepreneurs.

*Response:* DHS appreciates the comment but will not adopt changes to the rule in response. DHS recognizes and values the important role that incubators and accelerators located on a U.S. university or college campuses perform in the entrepreneur community. DHS believes, however, that the framework provided by this rule does allow DHS to consider, in its discretionary case-by-case determination, the fact that the start-up entity is participating in such an incubator or accelerator. DHS believes that evidence of such participation is one factor to be weighed for those individuals who do not fully meet the general capital investment or government funding criteria and are relying on additional reliable and compelling evidence that the start-up entity has the substantial potential for rapid growth and job creation. DHS believes that reliable and compelling evidence may, depending on all the circumstances, include evidence that the start-up entity is participating in a reputable incubator or accelerator located on a U.S. university or college campus.

### 6. Objection to Use of the Word "Parole"

*Comment:* Multiple commenters objected to the use of the word "parole" to describe the provisions in this rule. Commenters are concerned that use of the word in an immigration context will be confused with the use of the word in the criminal context. A commentator suggested using the term "conditional status" or "provisional status."

*Response:* DHS declines to accept the commenters' suggestion. "Parole" is a term established by statute at section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). The use of that term in the INA should not be confused with the word's usage in non-immigration contexts. Use of alternative terms as suggested by the commenter would be misleading.

---

[35] The E–2 nonimmigrant classification allows a national of a treaty country (a country with which the United States maintains a treaty of commerce and navigation) to be admitted to the United States when investing a substantial amount of his or her own capital in a U.S. business.

## 7. Concern Over Possible Exploitation of Entrepreneurs

*Comment:* Two commenters suggested that international entrepreneurs would be vulnerable to exploitation by venture capital investors under this rule. The commenters compare the influence of venture capitalists over entrepreneurs granted parole to the influence of employers over H–1B employees. One commenter expressed concern that the rule could allow a venture capitalist almost total dominance over the international entrepreneur's life, through the threat of withdrawing funding and thereby triggering termination of parole.

*Response:* DHS disagrees with the commenters' assertions that the final rule will facilitate such exploitation of international entrepreneurs by venture capital investors. As a general matter, venture capitalists and other investors cannot easily withdraw funding from a start-up entity once this investment transaction has been duly executed. Once an entrepreneur has applied for parole on the basis of prior investment, and has been granted such parole, the investor will not be in a position to directly interfere with the entrepreneur's continued eligibility during the parole period. The final rule will not create significant new conditions for exploitation that do not already exist currently for international entrepreneurs—or for that matter, domestic entrepreneurs—in the United States.

*Comment:* One commenter stated that the United States should be mindful of what may happen to poorer countries when the United States attracts their best entrepreneurs.

*Response:* DHS stresses that application for parole under this rule is voluntary and has the primary goal of yielding significant public benefit for the United States. DHS believes that applicants will assess economic and business conditions both in the United States and in other countries and will consider these conditions, along with numerous others, in the decision to apply for parole under this rule. DHS does not believe that the rule itself, which authorizes parole only for a limited period of time and under specific limited circumstances, will create significant negative consequences for poorer countries. Additionally, positive spillovers from new innovations are not limited to the specific country in which they were developed. Parole under this rule in no way prevents an entrepreneur contributing to the economy of his or her home, including through remittance

payments or upon return. Furthermore, individuals may be interested in returning to their home countries in the future for a variety of reasons, including the temporary nature of parole.

### M. Public Comments on Statutory and Regulatory Requirements

#### 1. Regulatory Impact Analysis

*Comment:* Two commenters suggested alternative estimates for the number of applicants that could apply to this rule. One commenter estimated that 5,000 international entrepreneurs will apply for parole under this rule. This estimate was approximately 2,000 more entrepreneurs than the estimate provided by DHS. Another commenter stated that the rule's eligibility criteria are narrow and therefore, the rule would cause fewer than 3,000 people to apply.

*Response:* DHS recognizes that uncertainty in business and economic conditions, as well as data limitations, make it difficult to accurately predict how many entrepreneurs will apply for parole under this rule. However, as discussed in the "Volume Projections" section of this rule, DHS utilized limited data available to estimate that approximately 2,940 entrepreneurs could seek parole each year. This estimate is bolstered by an alternative estimate based on accelerator investment round data that DHS analyzed. Given limits on DHS's information about such entrepreneurs and that this is a new process, DHS does not know how many people within the estimated eligible population will actually apply. Additionally, fluctuations in business and economic conditions could cause the number of applications to vary across years.

While one commenter estimates that the eligible number of entrepreneurs will be higher than the DHS estimate, another commenter estimates it will be lower. Neither of the commenters provided a basis or data from which their figures were derived. DHS reaffirms that the estimate provided in this rule is reasonable. The assessment is based on analysis of data and publicly available information, and reflects, where data and analysis allow, reasonable medians or averages.

*Comment:* One commenter argued that the rule would only benefit certain special-interest venture capitalists.

*Response:* DHS respectfully disagrees with this commenter. Fundamentally, this rule is designed to yield significant public benefit to the United States—including through economic growth, innovation, and job creation—and not to any particular private-sector interest group. While some venture capital firms may benefit from the rule by having new

opportunities to invest in start-up entities that would not have otherwise been able to locate in the United States, this is also true for a range of other "qualified investors" as defined in the rule. Moreover, many international entrepreneurs may qualify for parole under this rule without having raised private-sector capital investment at all, since funding from government entities is also an eligibility criterion.

*Comment:* Several commenters stated that the rule would provide significant economic benefits.

*Response:* DHS agrees with these commenters that the rule will provide significant economic benefits to the United States. As discussed in the proposed rule and elsewhere in this section, DHS believes that this rule will help the United States compete with programs implemented by other countries to attract international entrepreneurs. International entrepreneurs will continue to make outsized contributions to innovation and economic growth in the United States.

*Comment:* Several commenters provided feedback on the costs of applications. One commenter stated that the fees were reasonable. Another commenter suggested allowing market prices to determine parole costs, essentially allowing those entrepreneurs with more likelihood of success to invest in parole opportunities. Still other commenters stated that the application fee was too high, especially compared to various visa applications.

*Response:* DHS appreciates commenters' feedback on the costs for applications. DHS determines the costs of applications through a biennial fee study it conducts, which reviews USCIS' cost accounting process and adjusts fees to recover the full costs of services provided by USCIS. The established fees are necessary to fully recover costs and maintain adequate service by the agency, as required by INA section 286(m); 8 U.S.C. 1356(m).

*Comment:* Several commenters generally stated support for the rule because it will likely improve innovation for local and regional economic areas. Another commenter stated support for the rule because it would increase intangible assets.

*Response:* DHS concurs with this expectation that the rule will foster innovation at the local and regional level. Studies on entrepreneurs reveal that they are key drivers of innovation throughout the United States, and that such innovation benefits local, regional, and the national economy through technical progress and improvements in efficiency and productivity. The rule's

eligibility criteria focus on start-ups with high growth potential, and DHS expects that new firms started by entrepreneurs covered by the rule will conduct research and development, expand innovation, and bring new technologies and products to market in addition to creating jobs in the United States. These activities will produce benefits that will spill over to other firms and sectors.

DHS also agrees with the commenter on impacts to intangible assets. Intangible assets are generally integrated into a firm's or sector's total assets and have become important in broad analyses of productivity and efficiency. Such assets can include proprietary software, patents, and various forms of research and development. This rule is intended to attract the types of ventures that will increase intangible assets.

a. Job Creation

*Comment:* Many commenters agreed that this rule will help create jobs and significantly benefit the U.S. economy. A commenter noted that immigrants have helped to found one quarter of U.S. firms and therefore allowing more international entrepreneurs would result in new job creation. Commenters also mentioned that immigrants have historically been successful in creating and establishing new businesses, which in turn create jobs in the United States. Commenters also more specifically endorsed the need to provide more investment opportunities for venture capitalists and angel investors who indirectly create jobs. Finally, commenters from the technology industry stated that attracting entrepreneurs to the Unites States to operate in high unemployment areas could provide access to new jobs where they are most needed.

*Response:* DHS appreciates the commenters' support of this rule with regard to attracting international entrepreneurs, and emphasizes that job creation for U.S. workers is one of the rule's primary goals, as discussed in the Regulatory Impact Analysis (RIA).

b. Impact on Native U.S. Entrepreneurs and Native U.S. Workers

*Comment:* Several commenters suggested the rule will have negative consequences for native U.S. entrepreneurs and native U.S. workers. These commenters were concerned that the rule would be disadvantageous to native U.S. entrepreneurs and would create incentives for venture capital firms to find international entrepreneurs instead of investing in native U.S. entrepreneurs. The commenters argued that job creation could be accomplished

through investment of native U.S. entrepreneurs instead of foreign entrepreneurs. Several commenters also stated that the government should assist U.S. entrepreneurs and workers before helping international entrepreneurs. Commenters also mentioned that the need for international innovators was overstated and that the number of native U.S. innovators is already adequate. Finally, these commenters asserted that foreign workers are often exploited for cheap labor and harm job prospects for native U.S. workers.

*Response:* DHS disagrees with these commenters' assertion that the rule will have negative impacts on native U.S. entrepreneurs and native U.S. workers. This rule focuses on identifying entrepreneurs associated with start-up entities with significant potential for bringing growth, innovation, and job creation in the United States. Much research supports the conclusion that high-growth firms drive job creation for workers in the United States, including for native U.S. workers. As discussed in further detail in the RIA, research also shows that immigrants have been outsized contributors to business ownership and entrepreneurship in the United States and abroad. Self-employment rates for immigrants are higher than for the native U.S. population. As discussed in the RIA, although one economic study has suggested that a very small number of native U.S. entrepreneurs may be displaced by international entrepreneurs, other researchers have noted that the finding simply raises the possibility that such displacement could occur without providing evidence that it actually does.[36] DHS reiterates, moreover, that the numbers of entrepreneurs who may be eligible for parole under this rule is limited and that the aim of the rule is to increase overall entrepreneurial activity and significant economic benefit throughout the United States. In any event, the purpose of the parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers.

---

[36] Compare Fairlie, R.W., and B.D. Meyer. "The effect of immigration on native self-employment." *Journal of Labor Economics* 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/papers/published/jole%202003%20-%20native%20se.pdf*, with, *e.g.,* Magnus Lofstrom, "Immigrants and Entrepreneurship," Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/immigrants-and-entrepreneurship.pdf*.

c. Impact on Innovation

*Comment:* Several commenters provided feedback on the rule's impact on innovation. Two commenters stated that this type of international entrepreneurship supports innovation in the United States. Another commenter stated that the rule would not help foreign innovators because of complications with patents and modeling designs.

*Response:* DHS agrees with the commenters that stated that this rule supports innovation in the United States. Entrepreneurs tend to engage in research and development in order to develop and commercialize new products and technologies, and often stimulate patents and other intellectual capital linked to these efforts. DHS does not agree with the commenter that stated the rule is not helpful to foreign innovators because of issues with patents and modeling designs, and DHS sees no basis for this comment. Nothing in the rule poses specific burdens or constraints on the ability of entrepreneurs to seek and obtain patents or other intellectual capital.

2. Review Under the National Environmental Policy Act (NEPA)

*Comment:* An advocacy organization stated that all rules, including immigration rules, are subject to review under the National Environmental Policy Act. The commenter suggested that, at minimum, an Environmental Assessment be conducted to account for the growth-inducing impacts that would occur with an influx in population under this rule.

*Response:* DHS agrees that NEPA applies to this, as to every, final rulemaking. As explained in section IV.E of this preamble, the rule has been reviewed for environmental effects and found to be within two categorical exclusions from further review because experience has shown rules of this nature have no significant impacts on the environment. DHS also notes that any entrepreneurial ventures undertaken will be governed by local, state and federal laws and regulations, including those protecting human health and the environment. We disagree with the commenter's assertion that an Environmental Assessment is required.

3. Proposed Information Collections Under the Paperwork Reduction Act

a. Employment Eligibility Verification, Form I–9

*Comment:* An individual commenter suggested that List A documents should be updated to include the verified

driver's licenses (sample attached and included in the file) that meet federal guidelines and require the presentation of the same documentation needed to obtain a passport. The commenter stated that it is no longer reasonable for those who receive a verified license and who paid the premium necessary for the processing of the extra documents, to have to locate their birth certificate and social security card in order to complete the Form I–9 process.

*Response:* DHS presumes that by "verified driver's licenses" the commenter is referring to State driver's licenses that comply with the REAL ID Act of 2005, Public Law 109–13, 119 Stat. 302. The specific suggestion about amending List A on Form I–9, which would have wide-ranging effect and not be limited to entrepreneurs under this rule, is outside the scope of this rulemaking. This rule and accompanying form revisions limit changes to List A of Form I–9 to the modification of the existing document specified at 8 CFR 274a.2(b)(1)(v)(A)(*5*) to include individuals authorized to work incident to parole.

b. Application for Entrepreneur Parole, Form I–941

*Comment:* DHS received a public comment that stated that the time burden estimate of 1.33 hours for the respondent to complete the information collection was too low.

*Response:* DHS appreciates and agrees with this comment. Based on further review of the information collection and public comments on this specific issue, DHS is revising the estimated time burden from 1.33 hours to 4.7 hours for Form I–941 respondents.

4. Comments and Responses to Impact on Small Businesses

*Comment:* The U.S. Small Business Administration, Office of Advocacy (SBA) commented by supporting the goals of this rule, but expressed concern that the rule could significantly impact small entities. The SBA commented that the proposed rule was erroneously certified under the Regulatory Flexibility Act (RFA). The SBA stated that the only international entrepreneurs eligible for this parole program are those with significant ownership stakes in a start-up entity formed in the previous three years. The SBA also stated that the thresholds to qualify for parole are directly tied to the ability of the entrepreneur's start-up to produce significant public benefit to the United States. The SBA noted that under the proposed rule, an entrepreneur is not permitted to transfer work authorization to another start-up

entity, and that these restrictions could impact start-up entities if the entrepreneur were no longer eligible to stay in the United States. For these reasons, SBA concluded that this rule directly impacts start-up entities. The SBA recommended that DHS submit a supplemental analysis on the impact of the final rule on small entities.

*Response:* DHS has concluded that a RFA certification statement for this final rule is appropriate. This final rule does not regulate small entities nor does it impose any mandatory requirements on such entities. Instead, it provides an option for certain individual entrepreneurs to seek parole on a voluntary basis. There are no compliance costs or direct costs for any entity, small or otherwise, imposed by this rule since it does not impose any mandatory requirements on any entity. Historically, when an employer petitions on behalf of an individual or employee, DHS has provided an RFA analysis for the impact to small businesses. However, under this rule, a small entity or an employer does not apply for parole on behalf of an employee; instead, an entrepreneur applies for parole on a voluntary basis on his or her own behalf, and only those eligible individuals seeking parole would be subject to the anticipated costs of application. Entrepreneurs with an ownership stake in a start-up make the cost-benefit decision to voluntarily apply for parole.

In both the RFA and SBA's Guide for Government Agencies on the RFA, government agencies are required to consider significant alternatives to the rule when providing a full RFA analysis. Among the kinds of alternatives that SBA suggests considering include "the exemption for certain or all small entities from coverage of the rule, in whole or in part." [38] Even if this rule directly impacted small entities and DHS were required to engage in an analysis to minimize negative impacts of the rule on small entities by exempting them from the rule, that alternative would only harm small entities, which would no longer be able to benefit from the rule's allowing entrepreneurs to seek parole and work authorization.

The SBA also commented on various policy issues on the eligibility of entrepreneurs in this rule. Notwithstanding DHS' belief that entrepreneurs when filing for parole are not small entities, DHS has carefully

considered all those comments and has made policy changes in this final rule to address the comments. Specifically, the SBA commented that thresholds to qualify for parole are directly tied to the ability of the international entrepreneur's start-up to produce significant public benefit for the United States. DHS has considered this comment along with other public comments on this issue and has made the decision to lower the eligible threshold investment amount for initial parole from the proposed $345,000 in the NPRM to $250,000 in the final rule. Additionally, in the NPRM and in this final rule, DHS has provided some flexibility and alternative criteria for those entrepreneurs meeting partial eligibility requirements, as described in further detail in the preamble.

SBA also commented that the rule only allows the entrepreneur to work for the business identified on the parole application without providing leniency in transferring the work authorization to another entity. The SBA further comments that the start-up entity may be imperiled if the entrepreneur is no longer eligible to stay in the United States. The eligibility criteria for consideration for parole under this rule require an entrepreneur to have recently formed a new entity in the United States with substantial potential for rapid growth and job creation. Before an application for parole under this rule is approved, USCIS must make a discretionary determination that the entrepreneur is well-positioned to provide a significant public benefit to the United States. Therefore, these eligibility criteria are not limiting entrepreneurs, but aimed at ensuring that only those entrepreneurs with high growth potential are eligible for parole consideration under this rule. DHS has also provided avenues for an additional parole period specifically to prevent instability of a start-up entity.

DHS reiterates that RFA guidance allows an agency to certify a rule, instead of preparing an analysis, if the rule is not expected to have a significant economic impact on a substantial number of small entities.[39] DHS reiterates that this rule does not regulate small entities. Any costs imposed on businesses will be driven by economic and business conditions and not by the

---

[38] The Regulatory Flexibility Act, 5 U.S.C. 603(c)(4). The Small Business Administration's RFA Guide for Government, p. 38, available at *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf.*

[39] *See* SBA, Office of Advocacy, "A Guide for Government Agencies; "How to Comply with the Regulatory Flexibility Act, Implementing the President's Small Business Agenda and Executive Order 13272" (May 2012), available at: *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf.*

IER00076

voluntary participation for benefits from this rule.

## IV. Statutory and Regulatory Requirements

### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995 adjusted for inflation to 2015 levels by the Consumer Price Index for All Urban Consumers (CPI–U) is $155 million.

This rule does not exceed the $100 million expenditure in any one year when adjusted for inflation ($155 million in 2015 dollars), and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and DHS has not prepared a statement under the Act.

### B. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase in costs or prices, or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States companies to compete with foreign-based companies in domestic and export markets.

### C. Executive Orders 12866 and 13563

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a ''significant regulatory action'' under section 3(f) of

Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

1. Summary

This final rule is intended to add new regulatory provisions guiding the use of parole with respect to individual international entrepreneurs who operate start-up entities and who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States. Such potential is indicated by, among other things, the receipt of significant capital financing from U.S. investors with established records of successful investments, or obtaining significant awards or grants from certain Federal, State or local government entities. The regulatory amendments will provide the general criteria for considering requests for parole submitted by such entrepreneurs.

DHS assesses that this final rule will, by further implementing authority provided by Congress, reduce a barrier to entry for new innovative research and entrepreneurial activity in the U.S. economy.[40] Under this final rule, some additional international entrepreneurs will be able to pursue their entrepreneurial endeavors in the United States and contribute to the U.S. economy. In the absence of the rule, these innovative entrepreneurs might be delayed or discouraged altogether in bringing innovation, job creation, and other benefits to the United States.

Based on review of data on startup entities, foreign ownership trends, and Federal research grants, DHS expects that approximately 2,940 entrepreneurs, arising from 2,105 new firms with investment capital and about 835 new firms with Federal research grants, could be eligible for this parole program annually. This estimate assumes that each new firm is started by one person despite the possibility of up to three owners being associated with each start-up. DHS has not estimated the potential for increased demand for parole among foreign nationals who may obtain

---

[40] Nina Roberts, *For foreign tech entrepreneurs, getting a visa to work in the US is a struggle,* The Guardian, Sept. 14, 2014, available at *http://www.theguardian.com/business/2014/sep/14/foreign-tech-entrepreneurs-visa-us-struggle;* Amy Grenier, *Majority of U.S. Patents Granted to Foreign Individuals,* April 11, 2014, available at *http://immigrationimpact.com/2014/04/11/majority-of-u-s-patents-granted-to-foreign-individuals/* (''Because of the limitations of the H–1B visa program, and the lack of a dedicated immigrant visa for entrepreneurs or innovators, foreign inventors struggle with inadequate visa options that often prevent them from obtaining permanent residency.'').

substantial investment from U.S. investors and otherwise qualify for entrepreneur parole, because changes in the global market for entrepreneurs, or other exogenous factors, could affect the eligible population. Therefore, these volume projections should be interpreted as a reasonable estimate of the eligible population based on past conditions extrapolated forward. Eligible foreign nationals who choose to apply for parole as an entrepreneur will incur the following costs: A filing fee for the Application for Entrepreneur Parole (Form I–941) in the amount of $1,200 to cover the processing costs for the application; a fee of $85 for biometrics submission; and the opportunity costs of time associated with completing the application and biometrics collection. After monetizing the expected opportunity costs and combining them with the filing fees, an eligible foreign national applying for parole as an entrepreneur will face a total cost of $1,591. Any subsequent renewals of the parole period will result in the same previously discussed costs. Filings to notify USCIS of material changes to the basis for the entrepreneur's parole, when required, will result in similar costs; specifically, in certain instances the entrepreneur will be required to submit to USCIS a new Form I–941 application to notify USCIS of such material changes and will thus bear the direct filing cost and concomitant opportunity cost. However, because the $85 biometrics fee will not be required with such filings, these costs will be slightly lower than those associated with the initial parole request and any request for re-parole.

Dependent spouses and children who seek parole to accompany or join the principal applicant by filing an Application for Travel Document (Form I–131), will be required to submit biographical information and biometrics as well. Based on a principal applicant population of 2,940 entrepreneurs, DHS assumes a total of 3,234 spouses and children will be eligible for parole under this rule. Each dependent will incur a filing fee of $575, a biometric processing fee of $85 (if 14 years of age and over) and the opportunity costs associated with completing the Form I–131 application and biometrics collection.[41] After monetizing the expected opportunity costs associated with providing biographical information to USCIS and submitting biometrics and combining it with the biometrics

---

[41] The filing fees have been updated and reflect those promulgated in the 2016 Fee Rule (1615–AC09, CIS No. 2577–15 DHS Docket No. USCIS–2016–0001).

processing fee, each dependent applicant will face a total cost of $765. DHS is also allowing the spouse of an entrepreneur paroled under this rule to apply for work authorization. Using a one-to-one mapping of principal filers to spouses, the total population of spouses eligible to apply for work authorization is 2,940. To obtain work authorization, the entrepreneur's spouse will be required to file an Application for Employment Authorization (Form I–765), incurring a $410 filing fee and the opportunity costs of time associated with completing the application. After monetizing the expected opportunity costs and combining it with the filing fees, an eligible spouse will face a total additional cost of $446 (rounded). DHS expects that applicants will face the above costs, but does not anticipate that this rule will generate significant additional costs and burdens to private entities, or that the rule will generate additional processing costs to the government to process applications. While applicants may face a number of costs linked to their business or research endeavors, these costs will be driven by the business and innovative activity that the entrepreneur is engaged in and many other exogenous factors, not the rule itself or any processes related to the rule. Thorough review of academic, business, and policy research does not indicate that significant expected costs or negative consequences linked to attracting international entrepreneurs are likely to occur. As such, DHS expects that the negative consequences, if any, will be greatly exceeded by the positive effects of this rule.

In each case in which an entrepreneur will be granted parole under this rule, DHS will have made a determination that parole will yield a significant public benefit and that the person requesting parole merits a favorable exercise of discretion. Consistent with those decisions, the rule is expected to produce broad economic benefits through the creation of new business ventures that otherwise would not be formed in the United States. These businesses are likely to create significant additional innovation, productivity, and job creation. It is reasonable to conclude that investment and research spending on new firms associated with this rule will directly and indirectly benefit the U.S. economy and create jobs for American workers. In addition, innovation and research and development spending are likely to generate new patents and new technologies, further enhancing innovation. Some portion of the international entrepreneurs likely to be

attracted to this parole process may develop high-growth and high-impact firms that can be expected to contribute disproportionately to U.S. job creation. In summary, DHS anticipates that this rule will produce positive effects that would greatly exceed any negative consequences.

Using an estimate of 2,940 annual applications for significant public benefit entrepreneur parole as developed in the ensuing volume projections section of this analysis, DHS anticipates the total cost of this rule for principal filers who face a total per applicant cost of $1,591 to be $4,678,336 (undiscounted) annually for any given year. (These estimates focus only on principal initial filers, not entrepreneurs who might be eligible for a re-parole period of up to 30 months, or their spouses.) Dependent spouses and children who must submit the Form I–131 application and biometrics will face a per-applicant cost of $765, for a total cost of $2,474,914 (undiscounted). Dependent spouses who apply for employment authorization will face a per applicant cost of $446, which DHS projects will total $1,311,830 (undiscounted). Adding together the costs for the principal filers and family members—including filing costs, costs of submitting biometrics, and monetized opportunity costs—yields a total cost of this rule for the first year, 2017 and subsequently 2018, of $8,465,080 (undiscounted). The total annual cost of the rule of $8,465,080 can be expected for each subsequent year in the ten-year period. The total ten-year undiscounted cost is $84,650,081.

### 2. Background and Purpose of the Rule

Section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(d)(5), grants the Secretary of Homeland Security the discretionary authority to parole applicants for admission into the United States temporarily, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. DHS is amending its regulations implementing this authority to increase and enhance entrepreneurship, research and development and other forms of innovation, and job creation in the United States. The rule will establish general criteria for the use of parole with respect to individual entrepreneurs who operate start-up entities and who can demonstrate through evidence of substantial and demonstrated potential for rapid business growth and job creation that they would provide a significant public benefit to the United States.

The purpose of the rule is to attract talented entrepreneurs to the United States who might otherwise choose to pursue such innovative activities abroad, or otherwise be significantly delayed in growing their companies in the United States, given the barriers they presently face. In addition to the benefits associated with entrepreneurial innovation, including new products, business networks, and production efficiencies that such activities are likely to generate, entrepreneurs have been and remain vital to economic growth and job creation in the United States and have generated a cohort of high-growth firms that have driven a highly disproportionate share of net new job creation.[42]

A body of research documents both the importance of entrepreneurial activity to the U.S. economy and its link to immigration. In this background section, DHS does not attempt to comprehensively summarize this large body of work but instead focuses on specific aspects central to the purpose of the rule and to its potential impacts.[43] In summary, DHS focuses on the role of new entrepreneurial firms in job creation in the United States, and the role that immigrant entrepreneurs have played in innovation and the high technology sector.

The labor market of the United States is highly dynamic. DHS analysis of data published by the U.S. Department of Labor's Bureau of Labor Statistics (BLS) indicates that between 2004 and 2013, on average about 847,000 firms were "born" each year and 784,000 "died."[44] To illustrate the extent of the labor market churn, since 1980 the private sector has generated about 16.3 million gross jobs annually but an average of only about 1.4 million net jobs annually. In both general business cycle expansions and contractions, large numbers of jobs are created and destroyed, comprising a key dynamic in the forces of creative destruction.[45]

---

[42] See Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, High-employment-growth firms: Defining and counting them, Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1–2, available at: http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf.

[43] DHS notes that the body of research concerning immigration in general and its impact on the labor market, most notably germane to earnings and employment of domestic workers, is not addressed in the present analysis.

[44] Figures were obtained from the BLS, Business employment Dynamics, Table 8, "Private sector establishment births and deaths, seasonally adjusted:" available at http://www.bls.gov/news.release/cewbd.t08.htm. Firm "births" in these data only include new firms and thus exclude new franchises and expansions of existing firms.

[45] See Ryan Decker, John Haltiwanger, Ron Jarmin, and Javier Miranda, The Role of

Research into the highly dynamic and volatile labor market in the United States has evolved. Earlier focuses on small- and new-firm size as the primary co-determinants of job creation has been reoriented to focus on the role of a relatively small subset of entrepreneurial firms.

This rule focuses on identifying entrepreneurs associated with types of start-up firms that are more likely to experience high growth, contribute to innovation, and create jobs in the United States. This deliberate focus is critical to ensuring that parole in individual cases is justified by significant public benefit. Research has shown that the average start-up company does not survive long.[46] Most new firms do not add much net job creation either, as they are not focused on achieving high growth. By some estimates, the vast majority—as much as 95 percent—of all new firms are not substantial job creators or innovators.[47] About 95 percent of new firms start with fewer than 20 employees, and about the same percentage ultimately close with fewer than 20 employees, indicating that business turnover is heavily influenced by small firms.[48]

There is significant research, however, demonstrating that a small subset of new firms tends to be highly dynamic and to contribute disproportionately to net job creation. The BLS has highlighted the role of the small subset of high-growth firms that comprise about 2 percent of all firms but have accounted for 35 percent of gross job gains in recent years. "High-growth firms" are defined by the BLS and the Organization for Economic Cooperation (OECD) as those with at least ten employees that grow by at least 20 percent for each of 3 consecutive years based on employment. As of 2012, there were 96,900 high-growth firms in the United States that had created about 4.2 million jobs.[49] A key finding by the BLS is that high-growth firms especially add jobs in their first ten years, though they generally continue to add a diminishing number of new jobs even after that period of time to the extent they survive. Job creation in the United States for the last several decades has been driven primarily by high-growth firms that tend to be young and new, and by a smaller number of surviving high-growth firms that age for a decade or more.[50]

This highly disproportionate, "up or out" dynamism of high-growth firms has been substantiated by many researchers. The SBA reported that about 350,000 "high impact firms"—defined as enterprises whose sales have at least doubled over a 4-year period and which have an employment growth quantifier of 2 or more over the same period—generated almost all net new jobs in the United States between 1994 and 2006.[51] The Kauffman Foundation, a leading institute on research, data collection, and advocacy for entrepreneurial activity, reports that the top-performing one percent of firms generates roughly 40 percent of new job creation, and, the fastest of them all—the "gazelles"—comprising less than one percent of all companies, generated roughly ten percent of new jobs.[52] The same general result has been found internationally; the OECD reports that between three percent and six percent of all firms can be considered high-growth firms but about one percent can be considered the even more high-performing "gazelles."[53]

Despite the finding across a large number of studies that small new firms tend to exhibit an "up or out" dynamic in which a small number survive to age five to become high-growth firms or "gazelles," other key findings that have emerged in the literature suggest that the growth and performance of new firms, even high-growth firms, vary substantially (as indicated by metrics that include labor productivity, profitability, revenue, and research and development intensity).[54] Models that can sort out various business characteristics and economic conditions to predict high-growth probabilities are still in nascent stages. Nevertheless, this rule includes threshold criteria for parole consideration meant to identify entrepreneurs associated with the kinds of promising start-up entities that appear more likely to contribute to American innovation, economic development, and job creation. As described in more detail below, businesses started and run by immigrants have propelled these kinds of broadly shared economic benefits for many years.

Broadly speaking, high-growth entrepreneurs engage in research and development (R&D) in order to develop and commercialize new products and technologies. Several studies have found that such entrepreneurs tend to engage in R&D spending in the first year, tend to attract patents and other forms of intellectual capital, and tend to attract venture capital financing.[55]

*Entrepreneurship in U.S. Job Creation and Economic Dynamism,* Journal of Economic Perspectives – Vol. 28, Number 3 (Summer 2014), pp. 3–24, available at: *http://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.28.3.3.*

[46] According to BLS findings, "20 percent of newly created establishments don't survive their first year in business, 32 percent don't survive their first two years, and 50 percent don't survive their first 5 years." *See* Richard L. Clayton, Akbar Sadeghi, David M. Talan, and James R. Spletzer, *High-employment-growth firms: Defining and counting them,* Office of Industry Employment Statistics, Bureau of Labor Statistics (BLS), Monthly Labor Review (June 2013), p. 1, available at: *http://www.bls.gov/opub/mlr/2013/article/pdf/clayton.pdf.*

[47] *See* Jason Wiens and Chris Jackson, *The Importance of Young Firms for Economic Growth,* Ewing Marion Kauffman Foundation (2014), pp. 1–2, available at: *http://www.kauffman.org/~/media/kauffman_org/resources/2014/entrepreneurship%202014/entrepreneurship_policy_digest_september2014.pdf; see also* Hurst, Erik, and Benjamin Wild Pugsley. 2011; *What Do Small Businesses Do?* Brookings Paper on Economic Activity, no. 2 (2011), pp. 73–142.

[48] *See* Headd, Brian, *An Analysis of Small Business and Jobs,* SBA Office of Advocacy (2010), p. 6, available at: *https://www.sba.gov/sites/default/files/files/an%20analysis%20of%20small%20business%20and%20jobs(1).pdf.*

[49] *See* R. Clayton et al. (June 2013), supra n. 50, pp. 2–4. For a description of the methodology utilized to measure high growth firms, see OECD, *OECD-Eurostat Manual on Business Demography Statistics* (2007), pp. 59–65, available at: *http://www.oecd.org/std/39974460.pdf.*

[50] For specific detailed information on survival rates and employment creation at various intervals along the HGF life span, *see* R. Decker et al. (2014), *supra* n. 53, pp. 6–24. The BLS and others use the term "gazelles" to differentiate the fastest growing young HGFs.

[51] *See* Spencer Tracy, Jr., *Accelerating Job Creation in America: The Promise of High-Impact Companies,* SBA Office of Advocacy (2011), pp. 1–4, available at: *https://www.sba.gov/sites/default/files/advocacy/HighImpactReport.pdf; see also* Acs, Zoltan, William Parsons, and Spencer L. Tracy, Jr, *High-Impact Firms: Gazelles Revisited; Study* prepared for the SBA, Office of Advocacy (2008), p. 1, available at: *http://www.sba.gov/advo/research/rs328tot.pdf.* The SBA high-impact cohort is about 6.3% of all firms, which is higher than the 2% high-growth category found in the BLS studies. The SBA cohort is larger because the criteria are slightly less restrictive and it includes older firms.

[52] *See* Dane Stangler, *The Economic Future of the American Economy, Kauffman Foundation Research Series: Firm Formation and Economic Growth* (2010), p. 2, available at: *http://www.kauffman.org/~/media/kauffman_org/*

research%20reports%20and%20covers/2010/04/highgrowthfirmsstudy.pdf.

[53] David B. Audretsch, *Determinants of High-Growth Entrepreneurship,* report prepared for the OECD/DBA International Workshop on High-growth firms: local policies and local determinants, OECD, p. 2–5, available at: *http://www.oecd.org/cfe/leed/Audretsch_determinants%20of%20high-growth%20firms.pdf.*

[54] *See* R. Decker et al (2014), *supra* n. 53, pp. 5–7; *see also* Davis, Steven J., R. Jason Faberman, John Haltiwanger, Ron Jarmin, and Javier Miranda, *Business Volatility, Job Destruction, and Unemployment.* American Economic Journal: Macroeconomics 2(2) (2010): 259–87. Research and development intensity is typically measured as the ratio of research and development spending to revenue, net income, or overall costs.

[55] *See* Shah, Sonali K. and Winston Smith, Sheryl and Reedy, E. J., *Who are User Entrepreneurs? Findings on Innovation, Founder Characteristics, and Firm Characteristics,* The Kauffman Firm Survey (Feb. 2012), pp. 2–5, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2012/02/whoareuserentrepreneurs.pdf.*

Immigrants have been central contributors to business ownership and entrepreneurship in the United States and abroad. According to OECD data, self-employment rates for immigrants are higher than those of the native-born populations in many counties, including in the United States.[56] Based on the most recent data available from the U.S. Census Bureau, 12.9 percent of the United States population was foreign-born. Their rate of self-employment is about 30 percent higher than that of the native-born population (7.7 percent vs. 5.9 percent; n=1.8 million). The Census Bureau's 2012 Survey of Business Owners showed that 14.4 percent of U.S. firms were owned by at least one person not born a citizen of the United States.[57] Two studies based on samples of U.S firms found slightly higher r foreign-born ownership rates.[58]

Many high-growth firms are involved in activities classified in the STEM (science, technology, engineering, and math) fields. The high concentration of immigrant entrepreneurs in these industries has garnered much attention. Between 2006 and 2012, one-third of companies financed with venture capital that made an initial public offering had an immigrant founder, a sharp rise from seven percent in 1980. These companies have generated 66,000 jobs and $17 billion in sales.[59] A survey

of entrepreneurs in technology-oriented privately held companies with venture backing also showed about one-third were foreign born, and 61 percent held at least one patent.[60]

Further evidence points to similar findings. Between 1995 and 2005, 25 percent of science and technology focused businesses founded in the United States had a foreign-born chief executive or lead technologist. In 2005, those companies generated $52 billion in sales revenue and employed 450,000 workers. In Silicon Valley, the share of immigrant-founded start-ups increased to 52 percent by 2005. In 2006, foreign nationals residing in the United States were involved (as inventors or co-inventors) in about 26 percent of patent applications filed that year. Immigrant founders of Silicon Valley firms tend to be highly educated, with 96 percent holding bachelor's degrees and 74 percent holding advanced degrees, and with three-quarters of the latter in STEM fields. As of 2010, according to one study, more than 40 percent of the Fortune 500 companies had been founded by an immigrant or the child of an immigrant.[61]

To reiterate, high-growth firms tend to be new and young, and one of their primary contributions to the highly dynamic labor market of the United States has been through job creation. High-growth firms tend to innovate and focus on developing new products and services. The intense involvement of immigrant entrepreneurs in successful technology-driven activities suggests substantial economic contributions. While measuring the precise value and impact of innovation is difficult and still at a nascent stage in research, many economists believe innovation creates positive externalities and spillover effects that further drive economic growth.[62]

Notwithstanding the research on the positive effects of high-growth entrepreneurship, there is some evidence of a long-term slowing in start-up dynamism and entrepreneurial activity in the United States; this trend began several decades ago, driving many economists to advocate for policies that attract more entrepreneurs in general.[63] Many business entrepreneurial

advocacy centers have also advocated in recent years for the United States to enact a formalized pathway for immigrant entrepreneurs. DHS is aware of one estimate of the potential benefits of a theoretical start-up visa (which, as an entirely new visa classification, only Congress can create). A Kauffman Foundation study (2013) estimated that, under certain conditions, the establishment of a start-up visa program could lead to the creation of between 500,000 and 1.6 million new jobs after ten years.[64] The potential benefits of attracting immigrant entrepreneurs have not gone unnoticed internationally. Thirteen of the thirty-five nations that are part of the Organization of Economic Cooperation and Development (OECD) have enacted special immigration programs for entrepreneurs, although the eligibility criteria vary among them to a significant extent.[65]

### 3. Population of Entrepreneurs Potentially Eligible

DHS cannot precisely predict the volume of new businesses that will start in the United States due to this rule. DHS has instead examined available data to provide a broad estimate of the population of individual entrepreneurs who may be eligible to request parole consideration under this rule. Given limits on DHS's information about such entrepreneurs, DHS does not know how many people within the estimated eligible population will actually seek such consideration; the estimates contained in this section represent an approximation to the size of the eligible population. DHS has estimated the population of entrepreneurs potentially eligible for parole under this rule based on two sub-groups: (1) Foreign individuals who seek to come to the United States to start a new business with financial backing from a qualified U.S. investor; and (2) foreign individuals who seek to come to the United States to start a new business as recipients of U.S. funded and awarded

---

[56] OECD, *Migrant Entrepreneurship in OECD Countries,* prepared by Maria Vincenza Desiderio (OECD) and Josep Mestres-Domènech for the Working Party on Migration (2011), pp. 141–144, available at: *http://www.oecd.org/els/mig/Part%20II_Entrepreneurs_engl.pdf.* This, and many other similar studies and analyses are based on self-employment rates, which are a proxy, but not a perfect measure, of business ownership, because some ownership structures such as partnerships, that could involve a foreign-born owner, are generally not considered to be proprietary.

[57] The categorization of "foreign-born" does not differentiate between lawful permanent residents and naturalized citizens. It also does not provide details of the firm history, implying that some firms owned by persons not born in the United States could have been founded by U.S. citizens and sold to foreign-born persons.

[58] *See* David M. Hart, Zoltan J. Acs, and Spencer L. Tracy, Jr., *High-tech Immigrant Entrepreneurship in the United States.;* report developed under a contract with the Small Business Administration, Office of Advocacy (2009), page 8, available at: *https://www.sba.gov/sites/default/files/advocacy/rs349tot_0.pdf; see also* Robert W. Fairlie and Magnus Lofstrom, *Immigration and Entrepreneurship,* Institute for the Study of Labor (2013), p. 1, available at: *http://ftp.iza.org/dp7669.pdf.* The foreign born ownership rates for U.S. firms reported in these papers is 16% and 18.2%, in order.

[59] This information is found from various sources and found in Stuart Anderson, *American Made 2.0. How Immigrant Entrepreneurs Continue to Contribute to the United States Economy,* National Foundation for American Policy, sponsored by the National Venture Capital Association (NVCA) (2013), pp. 3–7.

[60] *Id.* at pp. 2–5.

[61] Vivek Wadhwa, *Foreign-Born Entrepreneurs: An Underestimated American Resource,* Ewing Marion Kauffman Foundation (2008), pp. 2–6, available at: *http://www.kauffman.org/~/media/kauffman_org/z_archive/article/2008/11/wadhwadhook09.pdf.*

[62] *See* SMEs, *Entrepreneurship and Innovation,* OECD (2010), pp 26–28, available at: *http://www.oecd.org/berlin/45493007.pdf.*

[63] *See* R. Decker et al. (2014), supra n. 53, p. 16–22.

[64] *See* Dane Stangler and Jared Konczal, *Give Me your Entrepreneurs, Your innovators; Estimating the Employment Impact of a Startup Visa,* Ewing Marion Kauffman Foundation, (Feb. 2013), pp. 1–3, available at: *http://www.kauffman.org/~/media/kauffman_org/research%20reports%20and%20covers/2013/02/startup_visa_impact_finalsada.* The estimates are based on a fixed pool of 75,000 startup visas for a 10-year period, in which firm deaths each year cycle some of visa to new entrants.

[65] Most programs have been enacted after 2010. A country list and some descriptive data can be found at Jean-Christophe Dumont, *Investor Visas in OECD Countries,* OECD Conference on Global High-Skilled Immigration Policy, The National Academies Board on Science, Technology and Economic Policy (2014), available at: *http://sites.nationalacademies.org/cs/groups/pgasite/documents/Web page/pga_152202.pdf.*

research grants and who intend to conduct the concomitant research in the United States. DHS assumes that each member of the eligible population will start a business and that the general criterion for investment from a qualified investor (*e.g.,* venture capital firms, angel investors, or accelerators or incubators) be set at $250,000, while for government grants or awards the general criterion will be $100,000. Based on these amounts, DHS analyzed various past endeavors for the potential sources of funds. DHS estimates that approximately 2,940 foreign nationals annually could be eligible to apply for parole under this rule. Table 1 summarizes the analysis by source of funds.

TABLE 1—NUMBER OF ENTRE-
PRENEURS POTENTIALLY ELIGIBLE

| Sub-group | Annual eligibility |
|---|---|
| New firms funded with in-vestment capital ................ | 2,105 |
| New firms funded with U.S. grants or awards ............... | 835 |
| Total ................ | 2,940 |

DHS has no way of predicting with certainty the actual number of foreign nationals who will seek parole under this rule over time, as the size of the eligible population could change significantly. DHS acknowledges that the estimate of eligible individuals annually is an approximation based on past foreign ownership and start-up capital amounts. The analysis utilized to estimate the potential eligible population is also based implicitly on assumptions that: (1) The rule will not significantly change the frequency of U.S. funded grant applications from international researchers; and (2) that the rule will not significantly affect the market for international entrepreneurs and the market for the types of investment structures the rule will involve. Based on these assumptions and the data limitations, DHS projects that for the first full year that the rule will be effective, annual eligibility will be approximately 2,940.[66] DHS projects

that this number will hold steady for the second year as well. The next section provides key data and analytical approaches utilized to arrive at the estimates of eligible individuals. DHS first considers volume estimates of eligible individuals based on official U.S. data. The resulting estimates based on official data are those utilized for the cost projections of the rule. Due to particular constraints in the data, DHS follows with an alternative method of volume estimation of eligible individuals that adds robustness to the official estimate.

Volume Projections Data and Methodology

A. Grants

Because U.S.-funded research grants may be a qualifying investment under this rule, DHS obtained publicly available data on federally funded grants for fiscal years 2013–2015.[67] Although numerous agencies within the Federal Government award grants to foreign-born individuals, most are humanitarian or development focused.[68] For this reason DHS parsed the very large data set comprising 1.7 million records to obtain a viable analytical cohort. First, the records were filtered to capture Federal Government agencies that award grants to both United States and foreign-born recipients. Secondly, the records were sorted to only include the Federal Government agencies that award grants focused on ''projects,'' thereby excluding block and assistance grants.[69] The foreign-born cohort used for the eligibility projections excluded grants made to recipients in U.S. territories, as such recipients may be subject to special considerations outside the

types of investments involved, such as venture capital, are fluid and becoming more global in scope. DHS has no means to determine how the evolution of these investment markets will affect, or be affected by, the rule.

[67] The data were obtained from USASpending.gov: *https://www.usaspending.gov/Pages/Default.aspx.* From the homepage, the data can be accessed from the linked ''data download'' section. The files were obtained on April 20, 2015.

[68] It is certainly the case that U.S. State governments and other governmental entities issue research grants that foreign recipients could potentially utilize for parole eligibility. However, DHS is not aware of any database that collects and provides such data publicly.

[69] The Federal entities that awarded scientific focused research to foreign recipients were: Agricultural Resource Service, National Institutes of Health, Centers for Disease Control and Prevention, Food and Drug Administration, Department of Defense, National Aeronautics and Space Administration, National Oceanic and Atmospheric Administration, National Institute of Standards and Technology, and National Science Foundation. The U.S. Department of State and the Agency for International Development (USAID) were excluded from the analysis.

parole parameters.[70] DHS also excluded grant amounts recorded as negative, zero, and trivial amounts of less than $1,000—such values were recorded if grants were rescinded or for some other reason not ultimately funded. On average, 138,447 grants comprised the annual resulting analytical cohort derived from the above filtering procedures. Of that total, a small portion, 2,043 grants, or 1.5 percent, were awarded to foreign-born individuals. Having determined a reasonable eligibility threshold of $100,000, DHS proceeded to the next step, to determine the potential annual eligible population of grant-sourced researchers. Over the period of analysis, 41 percent of the Federal grants awarded to foreign recipients equaled or surpassed the $100,000 benchmark, for an average of 835 annually.

B. Investment Capital

To estimate the number of potential new entrepreneurial start-ups, DHS obtained and analyzed data from the BLS and the Census Bureau. From the BLS Business Employment Dynamics (BED) data suite, DHS obtained the number of private establishments aged 1 year or less for nine broad sectors likely to be involved in innovative activity, in order to focus on entrants.[71] Although a reasonable proxy, the number of establishments aged 1 year or less is not a perfect measure of firm start-ups (births). The chosen metric may

[70] There is a particular way in which the data germane to foreign grants were parsed and analyzed. There are two possible foreign indicators listed for each grant. One is the ''principal place'' involving the research and the other is the ''recipient country.'' The incumbent volume projections are based on the latter because this indicator generally implies that the grant was made to a person or institution outside the United States. The former is not used because this indicator could apply to grants awarded to U.S. or foreign persons in order to conduct the ensuing research outside the United States. Implicit in this analysis is that persons awarded U.S.-funded grants that are overseas could conduct their research and innovation in the United States, and are not otherwise precluded from doing so, even if the focus of such research is in a foreign country.

[71] The BLS data is found at *http://www.bls.gov/bdm/bdmage.htm.* DHS utilized the ''Establishment age and survival BED data for nation by major industry'' set and figures from Table 5, ''Number of private sector establishments by age,'' for the nine major sectors shown in Table 2. The BLS does provide figures on firm births that could be used in the present analysis. However, DHS chose establishment age data because it is broken down in a way that corresponds precisely to the innovating sectors, discussed below. The firm birth data is not categorized in the exact same manner. The nine major sectors were chosen to envelope the approximately 430 individual activities that DHS considers to involve ''science, technology, engineering, and math'' (STEM). The full list based on the 2012 update can be found at: *http://www.ice.gov/sites/default/files/documents/Document/2014/stem-list.pdf.*

[66] DHS emphasizes that the total is a broad estimate, as the Department has no means to determine the demand for entrepreneurial parole, changes in the eligible population that the rule may cause, time-variant possibilities, and application preferences. These conditions could change, if, for example, some foreign researchers see parole as attractive and apply for federally funded grants that they otherwise might not have applied for in the absence of the rule. In addition, volume estimates should be interpreted to apply to only initial applications, not considerations for re-parole at some future point in time. Lastly, the market for the

overstate births, by including expansions and new franchises of existing businesses. Conversely, it may understate the actual number of start-ups, because some fraction of firms does not survive the first year (the data are tabulated in March of the respective year such that the establishments aged 1 year and less are those that opened within the previous year but remained in business as of March of the following year), and those that opened in the previous year and were still in business but had not reached 2 years of age. DHS utilized the relevant figure for March 2015, because the latter is the most recent figure reported in the BED dataset.

For each sector, DHS obtained the corresponding share of firms owned by a person "not born a citizen of the United States" from the Census Bureau's Survey of Business Owners data set.[72][73] For brevity, we utilize the term "foreign" here to describe such firms. The foreign share was obtained by dividing the number of foreign-owned private firms in a sector by the total number of reporting firms in the same sector. This share applies to firms that have a least one owner who was not born in the United States but does not differentiate between various types of ownership structures. The figure for new firms obtained from the BLS BED data was multiplied first by the foreign share to generate an estimate of firms per sector started by a person not born in the United States.

Next, DHS attempted to calculate how many of the firms were started with at least $250,000, the minimum investment threshold that the rule sets. The SBO data provides ranges of such startup capital amounts but DHS could not conduct a precise estimate because the data do not provide a category bound by the threshold minimum. In fact, the encompassing tranche is very large, from $249,500 to $1 million in range. The SBO does not provide actual cohort data or other information from which DHS could evaluate the distribution and, therefore, DHS has no way of ascertaining how many firms in this large range will occupy the $250,000 to $1 million segment. As a result, DHS relied on the share of firms in this tranche and the additional tranches over $1,000,000 relative to the share of all firms reporting for the sector, and recognizes that the volume projection is likely larger than is realistic. An additional assumption is that the startup threshold is the same for businesses with native and foreign-born founders. The relevant data and estimates per sector are shown in Table 2.

## TABLE 2—SUMMARY OF ENTREPRENEUR ESTIMATES

| Sector | New firms | Foreign share (%) | Start-up threshold (%) | Annual eligible |
|---|---|---|---|---|
| Agriculture | 10,182 | 4.9 | 2.5 | 12 |
| Utilities | 1,204 | 10.8 | 5.5 | 7 |
| Manufacturing | 29,883 | 11.0 | 5.4 | 178 |
| Information | 22,855 | 11.9 | 2.0 | 55 |
| Professional Services * | 165,425 | 12.8 | 1.2 | 248 |
| Management | 7,334 | 7.3 | 20.2 | 108 |
| Waste Services | 66,161 | 16.4 | 0.9 | 94 |
| Education | 15,226 | 11.9 | 0.7 | 13 |
| Health Care | 210,977 | 18.0 | 3.7 | 1,391 |
| Total | .................. | .................. | .................. | 2,105 |

\* Abbreviation for "Professional, Scientific, and Technical Services".

As is discussed in the preamble, DHS has revised two substantive components of the eligibility criteria for this final rule. Foremost, the general investment amount requirement has been lowered from $345,000 to $250,000. DHS believes that the volume estimate of entrepreneurs based on investment capital will be higher than the 2,105 presented above but cannot make a determination of exactly how much higher. The reason is that the lower investment amount will allow some firms to be created that otherwise would not at the higher amount proposed initially, but the Census Bureau capital size bin relevant to the level proposed is the $249,500 to $1 million in range, which includes both figures. Because DHS does not have data on the distribution of amounts within this range, the entire bin was included in the proposed estimates and is retained in the final estimates. However, as is described below, DHS has conducted an alternative method of estimation—to include updates from the initial proposal based on new information and data—that compares very closely to the estimated total volume of 2,940. Specifically, an alternative estimate of total volume annually is 2,920.

## C. An Alternative Estimate of Entrepreneurs Based on Investment Structures

DHS recognizes the imperfections in estimating the potential population of eligible entrepreneurs based on extrapolating past conditions of foreign ownership rates and capital thresholds. The main benefit of this method is that it is based on official data. A main limitation is that it assumes that the annual crop of firms created are entrepreneurial and the types of firms covered by the parole process in the rule. In practice, some, but not all, will

[72] The Census SBO data are found at: *http://www.census.gov/data/tables/2012/econ/sbo/2012-sbo-characteristics.html.* The foreign ownership figures per sector are found under "Characteristics of Business owners," Table SB1200CSBO11: "Statistics for Owners of Respondent Firms by Whether the Owner Was Born in the United States by Gender, Ethnicity, Race, and Veteran Status for the U.S." and the startup capital data are found under Characteristics of Businesses, Table SB1200CSB16: "Statistics for All United States

Firms by Total Amount of Capital Used to Start or Acquire the Business by Industry, Gender, Ethnicity, Race, and Veteran Status for the United States: 2007." The foreign ownership share of firms is provided in the table and thus did not need to be calculated by DHS. The SBO data are part of the 2012 survey for which data was released publicly between February and June 2016.

[73] A possible source of upward bias in the foreign ownership share and hence the estimate of eligible entrepreneurs is that this share does not

differentiate between foreign workers who came to the United States to open a business and those who acquired one after being in the United States for some period of time (*e.g.,* lawful permanent residents or naturalized citizens). A general finding among the literature on this topic is that many foreign-born business owners were driven to start a business by "push" factors in the labor market after arrival in the United States. DHS does not have a means to parse out the ownership rate in a more granular way to account for such differences.

be innovators, even though the present analysis focuses on the sectors of the economy linked to STEM activity (DHS is not aware of any methods or data that can allocate a research-innovation share of firms to each sector). A second limitation is that the DHS method of measuring new firms in the context of the rule is imprecise. The final rule revised the definition of "start-up entity" in 8 CFR 212.19(a)(2) to include firms that were formed up to 5 years prior to the filing of the application for parole, compared to three years as proposed in the NPRM. However, the BLS cohort of new firms utilized for the volume projections are 1 year of age or less, not five or even three years, and is thus a smaller estimate of the number of new firms that could be eligible. This limitation cannot be overcome because of the manner in which the survival cohorts are presented.[74] Because the volume projections are derived from information obtained from official sources—the BLS and Census Bureau—DHS retains them for purposes of the costs and volume estimates of the rule. DHS believes, however, that an alternative method of estimation will inform readers and strengthen the regulatory analysis by providing a viable comparison to the official projections. In this alternative approach, DHS focuses on business accelerators and incubators (described together as "accelerators" for brevity). By analyzing the foreign component of these structures, data permitting, an alternative estimate of entrepreneurs can be obtained for comparison purposes.

DHS obtained publicly available information from Seed-DB, which provides data on U.S. accelerators collected from industry associations and fee-based data providers such as Crunchbase, which is a large data provider for venture capital, angel investors, and accelerators.[75] From the Seed-DB Web site DHS utilized the list to "firms that have exited" to collect the cohort of firms that underwent accelerators and then exited via an acquisition or public offering. Next, DHS parsed the data to capture firms that reported total funding, exit value, and were not recorded as "dead" (last accessed on Nov. 7, 2016). The parsing described above yielded a cohort of 89 firms. DHS followed the Seed-DB links to Crunchbase for each firm and extracted the seed round, recording its value.[76] Analysis of the investment rounds reveals that the median is $250,000. Having determined a median seed round size from the data, DHS next attempted to estimate a foreign share of accelerated firms. The exit cohort from which the median was calculated did not provide such information, hence DHS turned to the Seed-DB data suite that lists the total number of companies incubated for each accelerator and the countries that the companies were located in. Since there is wide variation in the number of companies per incubator, ranging from 1 to over a thousand, DHS grouped the incubators by country and then weighted each one for its share of total companies. The resulting weighted average indicates that one quarter of incubated companies were foreign.[77] Having determined a median seed round and a foreign share estimate, the final point required is the number of firms to apply these figures to. Based on the most recent data from the Center for Venture Research, the 2013–2015 annual average for angel financed firms in the seed and startup phase was 33 percent, which equals 23,336 firms annually. Multiplying this average number of firms by 0.25 to capture the foreign share and then by 0.5 to reflect the median and also the investment level DHS has set yields an annual estimate of 2,920.

This estimate compares well to the official total volume estimate of 2,940. The accelerator data captures seed rounds that involve venture capital, angel, accelerator investments, and grants, which is why it is compared to the total volume estimate.

D. Potential Variability in the Volume Projections

This section discusses several potential cohorts involving entrepreneurial activity that is difficult to estimate.

In light of the potential benefits to the U.S. economy and job creation, DHS is proposing this rule to provide a mechanism that, consistent with the requirements of the INA, encourages international entrepreneurs described herein to form and create innovative firms in the United States. In 2011, DHS began outreach and stood up the Entrepreneurs in Residence initiative to try to encourage entrepreneurship among foreign nationals.[78] DHS began tracking the number of foreign nationals who indicated interest in starting up an entrepreneurial endeavor at some point during their admission as an H–1B nonimmigrant. Over four fiscal years (FY 2010–2013), an average of 77 foreign nationals indicated such interest. In light of the relatively small numbers of foreign nationals who indicated their entrepreneurial intentions, DHS believes that considering parole requests under this rule will promote further innovation and other economic benefits in addition to those created by existing programs and policies used by foreign nationals to pursue high-growth entrepreneurial activity in the United States. When the rule is effective, there could be some small substitution effects as some portion of this cohort could switch to seeking parole instead of relying on other existing nonimmigrant programs and policies. DHS, however, does not believe such substitution will occur on a large scale because the ability to be admitted to the United States as a nonimmigrant offers materially more benefits and protections than parole.

In addition, the rule lists a number of ancillary conditions for eligibility—and conversely a number of conditions that

---

[74] Specifically, the BLS BED provides the number of firms surviving to a specific age and below. For example, the five year cohort includes all firms started within five years surviving up to that point, and so on for younger cohorts. However, the data does not count the number of firms within each survival cohort by their true age. Hence, the five year survivals do not include firms that started up and may have died after three years that could have been eligible at one time. Therefore, the five year survival cohort significantly undercounts the number of firms that will potentially have been considered new in the context of the final rule. Conversely, adding up the survival cohorts to a point, say year five, will significantly over-count the number of firms considered new in the context of the final rule. The reason is that a firm that survived four years and went on to age five will be included in both the five and four year cohort, not to mention the younger ones. Thus, adding the two (age four and five) cohorts together would double count the survivor. This problem is less onerous for firms aged one or zero.

[75] The Seed-DB information is found at *www.seed-db.com/*.

[76] For most of the firms in the exit cohort, the initial round of investment date-wise was also the smallest round in terms of value and labeled as the "seed" or "angel" round. For about 10 percent of the firms however, determining which round to use for the analysis was not straightforward and DHS had to utilize some discretion. For example, for some firms the seed round was listed after other rounds, such as venture capital or Series A rounds. For others, the seed round was not the smallest round recorded. DHS does not know why these anomalies are present but proceeded to choose the "seed round" regardless of its dating or amount. The only exception was in the few cases in which the seed round post-dated other rounds and was larger in amount. In these few cases the initial round was chosen, regardless of what investment type it was.

[77] This foreign share found by DHS in the analysis corresponds strongly to a finding in a study of high technology firms that found that 24 percent of such firms were founded by a foreign born person. *See America's New Immigrant Entrepreneurs,* Vivek Wadhwa, AnnaLee Saxenian, Ben Rissing, and Gary Gereffi, available at: *http:// people.ischool.berkeley.edu/~anno/Papers/ Americas_new_immigrant_entrepreneurs_I.pdf.*

[78] Source: "USCIS Announces 'Entrepreneurs in Residence Initiative,'" available at: *http:// www.uscis.gov/news/public-releases-topic/business-immigration/uscis-announces-entrepreneurs-residence-initiative;* see also *http://www.uscis.gov/ eir/visa-guide/entrepreneur-visa-guide.*

will leave individuals unlikely or unable to be paroled into the United States (or continue to be paroled in the country). Because ancillary conditions can be considered for eligibility, the actual volume may be smaller than the estimates herein. Two examples are that, under the rule, applicants must maintain household income greater than 400 percent of the poverty line and that the qualifying start-up capital cannot come from family members. The volume estimates presented in this analysis assume all ancillary eligibility conditions are met.

Finally, two potential elements of the eligible population are considered. First, as alluded to in the summary, the volume estimates and ensuing cost estimates assume one individual owner for each new firm; under the rule, DHS will allow up to three individuals per firm to seek parole but does not attempt to estimate how many of the startups could have more than one owner. Second, the volume estimate for grants is based on Federal awards only. DHS will consider eligibility based on State or local grants and awards, including those from State or local Economic Development Corporations (EDCs). However, unlike in the case of Federal awards, there is not a database capturing State and local grants or the transmission mechanisms through which some Federal grants are distributed to other entities, such as EDCs, and as such DHS was unable to estimate the number of entrepreneurs potentially eligible for parole as a result of receiving State and local grants.

**4. Costs**

**A. Principal Filer Costs**

The rule will permit certain foreign nationals to apply for a 30-month (2.5-year) initial period of parole into the United States provided they meet the eligibility criteria. Those who seek such parole into the United States will face the costs associated with the application, which involve a $1,200 application fee plus other costs, detailed below. The costs will stem from filing fees and the opportunity costs of time associated with filing the Application for Entrepreneur Parole (Form I–941).

The filing fee for the Form I–941 application is $1,200. The fee is set at a level intended to recover the anticipated processing costs to DHS.[79]

In addition, DHS is proposing that applicants for parole as an entrepreneur submit biometrics and incur the $85 biometric services fee. Because entrepreneurs could start firms in any number of occupations, DHS believes it is appropriate to utilize the mean hourly wage for all occupations, which is $22.71.[80] In order to anticipate the full opportunity cost to petitioners, DHS multiplied the average hourly U.S. wage rate by 1.46 to account for the full cost of employee benefits such as paid leave, insurance, and retirement, for a total of $33.16 per hour.

DHS estimates that the application will take 4.7 hours to complete. After DHS receives the application and fees, if the applicant is physically present in the United States, USCIS will send the applicant a notice scheduling him or her to visit a USCIS Application Support Center (ASC) for biometrics collection. Along with the $85 biometric services fee, the applicant will incur the following costs to comply with the biometrics submission requirement: the opportunity cost of traveling to an ASC, the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours. DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours.[81] By applying the

$33.16 hourly time value for applicants to the total biometrics-related time burden, DHS finds that the opportunity cost for a principal applicant to travel to and from an ASC, and to submit biometrics, will total $121.68.[82] In addition to the opportunity cost of providing biometrics, applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[83] DHS assumes that each individual will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each of these applicants.

DHS estimates that each principal parole applicant will incur the following costs: $1,285 in filing fees to cover the processing costs for the application and biometrics; $306.27 after summing the monetized cost of travel to submit biometrics, the total opportunity costs of time of the initial applications, biometrics, and estimated travel costs, resulting in a total cost of $1,591.27 per application, rounded to $1,591.[84] If DHS receives 2,940 applications from persons eligible to apply, DHS anticipates that such applications will result in annual filing fee transfers of $3,777,900 (undiscounted), which comprise the application fee and cost of submitting biometrics, and opportunity and other burden costs of $900,436 for a total annual cost of $4,678,366. Any subsequent renewal of the parole period will result in costs similar to those previously discussed, with the exceptions of travel costs, since the applicant will not be required to depart the United States and re-enter. Similarly, the same costs will result for material changes requiring the filing of amended applications, with the exception of the travel costs noted above and costs associated with biometrics collections, including the time and travel to an ASC.

---

[79] USCIS calculates its fees to recover the full cost of USCIS operations, including meeting national security, customer service, and adjudicative processing goals. As with other fees, USCIS uses Activity Based Costing (ABC) to assign costs to specific benefit requests. This model uses completion rates (actual or estimated depending on whether the benefit type is already being

adjudicated) to calculate a fee or fee adjustment for a benefit type. A completion rate reflects an average time an adjudicator spends actually working on a case but does not include "queue" or wait times. Because parole under this rule has not yet been implemented, the completion rate used is based on a 4-hour estimate provided by USCIS' subject matter experts. At this time, USCIS has estimated that 30 additional staff will be required to satisfy the forecasted workload associated with this rule. However, USCIS requires adjudicators to report actual adjudication hours and case completions by benefit type. This reporting will occur after this rule is implemented. Adjudication hours will be divided by the number of completions for the same time period to determine the *actual* average completion rate. This rate will be used in future fee adjustments and will help determine future staffing allocations necessary to handle the projected workload for parole under this rule.

[80] Please see U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment Statistics program, National Occupational Employment and Wage Estimates, United States (May 2014), available at: *http://www.bls.gov/oes/2014/may/oes_nat.htm.*

[81] Foreign nationals who submit their applications from outside the United States will still be required to pay the $85 biometric processing fee and travel to a USCIS office abroad, if available, or a U.S. embassy or consulate office for biometric processing at the time of travel document issuance. Due to data limitations, and to capture general

impacts of the rule, DHS has estimated costs of submitting biometrics under the assumption that all applicants are traveling to an ASC in the United States.

[82] Calculation: $33.16 * 3.67 hours = $121.68.

[83] Calculation: 50 miles multiplied by $0.575 per mile equals $28.75. See 79 FR 78437 (Dec. 30, 2014) for GSA mileage rate.

[84] Calculation: $1,285 + 306; $1,285 is the sum of the direct cost of the $1,200 filing fee and the $85 cost of biometrics. The $306(rounded) figure is obtained by adding the cost of travel ($28.75) plus the total opportunity cost of $277, the latter of which is the product of the total time burden (8.37 hours) and the average burdened hourly wage ($33.16).

## B. Dependent Spouses and Children

The rule will require all dependent family members (spouses and children) accompanying or joining the entrepreneur to file an Application for Travel Document (Form I–131), and will require all spouses and children 14 years of age through age 79 to submit biometrics.[85] Those spouses and children will face the costs associated with filing the application and submitting biometrics. DHS recognizes that many dependent spouses and children do not currently participate in the U.S. labor market, and as a result, are not represented in national average wage calculations. In order to provide a reasonable proxy of time valuation, DHS has to assume some value of time above zero and therefore uses an hourly cost burdened minimum wage rate of $10.59 to estimate the opportunity cost of time for dependent spouses. The value of $10.59 per hour represents the Federal minimum wage with an upward adjustment for benefits.[86] The value of $10.59 per hour is consistent with other DHS rulemakings when estimating time burden costs for those who are not authorized to work.[87]

DHS will require dependents of parole applicants (spouses and children of the parole applicant) to file an Application for Travel Document (Form I–131). There is a $575 filing fee associated with the Form I–131 application, and DHS estimates it will take 3.56 hours to complete each submission. In addition to filing the Form I–131 application, each dependent spouse and child 14 years of age and over will be required to submit biometric information (fingerprints, photograph, and signature) by attending a biometrics services appointment at a designated USCIS Application Support Center (ASC). The biometrics processing fee is $85.00 per applicant. In addition to the $85 biometrics services fee, the applicant will incur the following costs to comply with the biometrics submission requirement: the opportunity and mileage costs of

traveling to an ASC, and the opportunity cost of submitting his or her biometrics. While travel times and distances vary, DHS estimates that an applicant's average roundtrip distance to an ASC is 50 miles, and that the average time for that trip is 2.5 hours.[88] DHS estimates that an applicant waits an average of 1.17 hours for service and to have his or her biometrics collected at an ASC, adding up to a total biometrics-related time burden of 3.67 hours. In addition to the opportunity cost of providing biometrics, applicants will experience travel costs related to biometrics collection. The cost of such travel will equal $28.75 per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.575 per mile.[89] DHS has assumed that each applicant will travel independently to an ASC to submit his or her biometrics, meaning that this rule will impose a time cost on each of these applicants. DHS also assumed all children were over the age of 14 for the purposes of this analysis and, therefore, this cost estimate may be slightly overestimated.

DHS projects that approximately 3,234 dependents will be required to file a Form I–131 application and submit biometrics, based on the estimate of 2,940 principal applicants and using a multiplier for expected family members of 1.1.[90] The total cost for those spouses and children requesting parole under this program includes the filing fee, biometrics processing fee, travel costs associated with biometrics processing, and the opportunity cost of filing the Form I–131 application and submitting

biometrics. The total time burden is 7.23 hours. At the cost-burdened wage, the total opportunity cost is $76.53. Adding the $28.75 cost of travel, the total non-filing cost is estimated to be $105.28, and the total cost per applicant is $765.28. At the projection of 3,234 applicants, the non-filing cost is $340,474 (undiscounted), and combined with filing costs of $2,134,440, the total estimated cost for dependents germane to the Form I–131 application is $2,474,914.

In addition, DHS is allowing independent employment authorization for spouses of entrepreneurs granted parole under this rule. DHS will permit these individuals to apply for employment authorization by filing a Form I–765 application. To estimate the number of potential persons applying for employment authorization, DHS used a simple one-to-one mapping of entrepreneurs to spouses to obtain 2,940 spouses, the same number as entrepreneur parolees.

The current filing fee for the Form I–765 application is $410.00. The fee is set at a level to recover the processing costs to DHS. Based on the projection of 2,940 applicants, the total filing cost is $1,205,400 (undiscounted). DHS estimates the time burden of completing the Form I–765 application is 3.42 hours.[91] At the cost-burdened wage, the total opportunity cost is $36.20. At the projection of 2,940 applicants, the non-filing cost is $106,430 (undiscounted) and combined with filing costs of $1,205,400 the total estimated cost for spouses germane to the Form I–765 application is $1,311,830.

In addition to the filing costs, applicants for parole may face other costs associated with their entrepreneurial activities. These could include the administrative costs of starting up a business, applying for grants, obtaining various types of licenses and permits, and pursuing qualified investments. However, these costs apply to the entrepreneurial activity and the business activity that the applicant has chosen to be involved in and are not driven by the parole process or other governmental functions attributable to the rule itself. Hence, DHS does not attempt to estimate, quantify, or monetize such costs.

Lastly, DHS recognizes that some individuals who are lawfully admitted in the United States in certain nonimmigrant classifications may seek

---

[85] Note: If a child under the age of 14 requires a travel document, he or she will need to appear for biometrics by traveling to an ASC, but will not be required to pay a biometrics fee.

[86] U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009. Available at *http://www.dol.gov/dol/topic/wages/minimumwage.htm*. The calculation for total employer costs for employee compensation for dependent spouses and children of principals with an approved Form I–140: $7.25 per hour × 1.46 = $10.59 per hour.

[87] *See* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (Jan. 3, 2013).

[88] DHS has estimated travel distances and ensuing travel times at 2.5 hours in prior rulemakings. *See, e.g.,* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015); and "Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives; Final Rule," 78 FR 536, 572 (Jan. 3, 2013).

[89] *See* U.S. General Services Administration Web site for Privately Owned Vehicle (POV) Mileage Reimbursement Rates, *http://www.gsa.gov/portal/content/100715* (accessed Aug. 8, 2015).

[90] The multiplier of 1.1 was obtained from DHS estimates of the average historical ratio of principal versus dependent recipients of lawful permanent resident status. DHS studies based on statistics obtained from office of Immigration Statistics reveal that multipliers for the employment preference categories EB–1, EB–2, and EB–3 range from 2.04 to 2.27. DHS believes that 2.1. is a reasonable multiplier for the estimates and utilized this multiplier in regulatory assessments involved in American Competitiveness in the Twenty-First Century Act, (AC21) provisions, specifically: "Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers" (RIN 1615–AC05), rule. Because the Form I–131 filings relevant to this rule do not apply to principals, only spouses and dependent children, DHS believes it is valid to subtract 1 from the 2.1 multiplier to yield the final multiplier of 1.1.

[91] Source: Paperwork Reduction Act (PRA) Supporting Statement for Form I–765 (OMB control number 1615–0040). The PRA Supporting Statement can be found at Question 13 on *Reginfo.gov* at *http://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201502-1615-004*.

IER00085

parole. Individuals who are present in the United States at the time their parole application is approved, based on admission as a nonimmigrant, will have to depart the United States and appear at a U.S. port of entry in order to be granted parole since USCIS is unable to grant parole to individuals who are not applicants for admission. *See* INA section 212(d)(5), 8 U.S.C. 1182(d)(5). These individuals will be ineligible for a change of status under section 248 of the INA, 8 U.S.C. 1258. Such applicants will therefore bear the travel costs of exit and returning to a port of entry. However, because there are no similar programs for comparison, DHS cannot determine the demand for parole or substitution effects from other classifications and thus cannot estimate, quantify, or monetize such potential travel costs. Finally, because the program allows for re-parole under conditions that DHS has set, entrepreneurs and their spouse and children, if applicable, will likely face filing and opportunity costs associated with applying for re-parole. However, DHS has no means of estimating the share of the potential eligible population that will seek and be eligible for re-parole, hence re-parole conditions are not included in this analysis. In summary, DHS believes that it is possible that there could be some substitution into the parole program from other programs and such applicants and dependents will incur travel and possible other costs related to exit and requesting a grant of parole at a U.S. port of entry.

C. Potential for Negative U.S. Labor Market Impacts

DHS does not expect the rule to generate significant costs or negative consequences. Extensive review of information relevant to immigrant entrepreneurship indicates that while much about the impact of such entrepreneurship is not known, there is no reason to expect that substantial negative consequences, including adverse impact on domestic workers, are likely. The possibility that immigrant entrepreneurs may displace ("crowd-out") native entrepreneurs has been raised by a few researchers. One study indicated that a very small number of native entrepreneurs were possibly displaced by immigrant entrepreneurs.[92] However, because of difficulties in controlling for a large amount of variables related to entrepreneurship, other researchers have noted that this finding only raises the possibility that displacement could not be ruled out completely, but did not actually provide evidence that it had actually occurred.[93] Another study, conducted by the Brookings Institution, did not find displacement but acknowledged that more research and refined control techniques, along with longitudinal data, will need to be studied before ruling out the possibility completely.[94] In any event, the purpose of the parole rule is to foster innovation and entrepreneurial activities in new or very young endeavors, where the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers.

DHS recognizes that the potential inclusion of spouses can incur labor market implications and possibly impact U.S. workers. As was noted in previous sections of the regulatory impact analysis, DHS did not attempt to assess or measure the labor market impact of the estimated entrepreneurs potentially eligible for parole because as founders of firms, these persons will not affect the labor market in the same way as other workers. Although spouses could have labor market impacts as new labor market entrants, DHS believes such potential impacts will be negligible. The main reason is that the size of the potential new cohort is very small. As of the end of 2015, there were an estimated 157,130,000 people in the U.S. civilian labor force.[95] Consequently, the estimated "new" available workers in the first year will represent approximately 0.001 percent of the overall U.S. civilian labor force.[96] DHS believes this fraction is too small to have a significant impact on the labor market.

While the figures above apply to the general U.S. labor force, DHS recognizes that concentration of new labor force entrants can impact specific labor markets. DHS believes that any such potential impacts linked to this rule will be insignificant. The NVCA and other sources of information that DHS reviewed indicates that while the area of California known as Silicon Valley has traditionally been, and continues to be, the primary recipient geographically for technology startup capital, other large urban centers on the East Coast and, even more recently, parts of the Mid- and Mountain West have seen increased technology startup activity. To provide just one example of a potential area-specific impact, DHS considered the San Jose-San Francisco-Oakland (CA) Combined Statistical Area (CSA) conjoining the seven Metropolitan Statistical Areas (MSAs) and nine encompassed counties constituting the economic linkages of Silicon Valley. Based on data from the BLS, the population of this CSA is about 8.6 million (as of May 2014) and the employed population (a narrower measure of the labor market than the labor force) about 3.75 million. If the share of new entrants is based on the proportion of venture capital to the area, which is 42 percent, then 2,746 spousal entrants could impact the area.[97] Assuming such entrants gain employment, this cohort represents just 0.02 percent of the employed population of the specific CSA.

D. Government Costs

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing services, including administrative costs and services provided without charge to certain applicants and petitioners. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS has established the fee for the adjudication of the Form I–941 application based on notional application filing volumes and estimated resource commitments. During the biennial fee review, DHS

---

[92] Fairlie, R.W., and B.D. Meyer, *The effect of immigration on native self-employment*, Journal of Labor Economics 21:3 (2003): 619–650, available at: *http://people.ucsc.edu/~rfairlie/papers/published/jole%202003%20-%20native%20se.pdf*.

[93] *See* Magnus Lofstrom, *Immigrants and Entrepreneurship*, Public Policy Institute of California, USA, and IZA, Germany (2014), p. 4, available at: *http://wol.iza.org/articles/immigrants-and-entrepreneurship.pdf*.

[94] *See* Zoltan J. Acs and David M. Hart, *Immigration and High-Impact, High-Tech Entrepreneurship*, Brookings, Issues in Technological innovation (Feb. 2011), available at *http://www.brookings.edu/research/papers/2011/02/immigration-hart-acs*.

[95] *See* News Release, United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment–2015 Annual Averages, Table 1 "Employment status of the civilian non-institutional population 16 years of age and over by region, division, and state, 2014–15 annual averages" (Mar. 24, 2016), available at *http://www.bls.gov/news.release/pdf/srgune.pdf*.

[96] Source: United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistic. Figure applies to seasonally adjusted level for December 2014, available at: *http://data.bls.gov/timeseries/LNS11000000*. Calculation for new worker labor force share: 1813/157,130,000.

[97] The employment figures are provided by the BLS, Occupational Employment Statistics (OES), found at: *http://www.bls.gov/oes/current/oes_42100.htm*. The population data is provided by the Census Bureau, which tabulates CSAs: "Combined Statistical Area Totals Dataset: Population and Estimated Components of Change: April 1, 2010 to July 1, 2014" (CSV), 2014 Population Estimates. United States Census Bureau, Population Division. March 2015. The information on the venture capital share for the region is found in the NVCA 2015 yearbook, and is found in figure 8, p. 14. The calculation is as follows: (.42 ×1813) = 761, which is then divided by the CSA population of 3,750,000.

will examine whether the fee is sufficient to recover the full costs of adjudication, as required by the INA.

5. Benefits

As referenced previously, evidence suggests that innovation-focused start-ups contribute disproportionately to job creation. The rule will reduce entry barriers, and thus support efforts by international entrepreneurs to generate entrepreneurial activity in the United States.

The rule is expected to generate important net benefits to the U.S. economy. For one, expenditures on research and development by the grant-based researchers that DHS has identified that could qualify for entrepreneur parole will generate direct and indirect jobs. In addition, this research-focused spending could potentially generate patents, intellectual property, licensing, and other intangible assets that can be expected to contribute to innovation and technological advances and spill over into other sectors of the overall economy. DHS acknowledges that it is extremely difficult to gauge the precise economic value of such assets and that peer-reviewed research in this area is still nascent. Despite the nascent stage of the research and the difficulty of measuring quantitatively the benefit of innovation driven by new high technology firms, a large body of research indicates that the innovation driven by entrepreneurs contributes directly to economic growth, generates important efficiencies and cost reductions for firms that utilize such innovation, and increases productivity and profitability for firms that benefit indirectly through new products generated by such innovation.

Lastly, DHS believes that many of the start-up firms operated by international entrepreneurs during the parole period could eventually become high-growth firms that generate exceptionally high levels of economic activity and contribute disproportionately to job creation in the United States.

*D. Regulatory Flexibility Act*

In accordance with the Regulatory Flexibility Act (RFA), 5 U.S.C. 601(6), DHS examined the impact of this rule on small entities. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than 50,000 people).

In the proposed rule, DHS certified that this rule would not have a significant impact on a substantial number of small entities. DHS made this determination based on the following facts: This is not a mandatory rule; this rule only impacts those individual entrepreneurs who make the voluntary decision to apply for parole; and this rule does not regulate the business entities in any way. After reviewing public comments, including the formal letter submitted on the record by the U.S. Small Business Administration's Office of Advocacy (Advocacy), DHS maintains its certification that the rule does impose a significant impact on a substantial number of small entities. For a full discussion of the DHS response to the letter submitted by Advocacy, please see Section III.M.4 of this preamble.

Individuals are not defined as a "small entity" by the RFA. The rule will not mandate that all individuals apply for parole. This rule provides flexibilities and options that do not currently exist for individuals who wish to establish or operate a start-up business in the United States. Importantly, the rule does not require any individuals or businesses, including those created by foreign nationals, to seek parole—either generally or as a specific condition for establishing or operating a business in the United States. Rather, as mentioned previously, this rule is intended to provide an additional flexibility for foreign individuals who are unable to obtain another appropriate nonimmigrant or immigrant classification, in order to facilitate the applicant's ability to oversee and grow the start-up entity. If any individual believes this rule imposes a significant economic impact, that individual could simply choose not to seek parole under the rule and thus incur no economic impact. As discussed previously, this rule imposes direct filing costs of $1,285 (which includes the $1,200 application fee and the $85 biometrics fee), plus $194 in time-related opportunity costs for those individuals who do choose to apply for parole as entrepreneurs under the rule. This cost is relatively minor when considering the costs of starting up a new business and the capital necessary to start a business.

Under the general term "entrepreneur," DHS includes those who desire to form firms with investment funds from certain U.S. investors. For purposes of the RFA, the regulatory requirements place compliance costs and establish eligibility criteria for the individual requesting consideration for parole under this rule. DHS believes that the costs of application for parole will burden the individual applicant, and not the entrepreneurial venture (firm). This rule will not alter or change the normal procedure for fundraising or other start-up administrative costs that occur in forming a business entity. Such costs are not direct costs of this rule and could include, but are not limited to, business application fees, legal fees, and licensing that precede significant infusions of investment, the latter of which are primarily utilized for operational and capital expenses in order to produce goods or services.

It is possible that some of the 2,940 estimated entrepreneurs who could be eligible for parole annually could involve business structures in which the filing fees are paid by a business entity. In the event that small business entities are impacted by this rule because they choose to pay the filing fees on behalf of an individual entrepreneur, DHS believes that the filing cost of $1,285 per application will be insignificant compared to such entities' annual gross revenues, potential for revenue, and other economic activity.

For businesses that may pay the filing costs, the expected impact to such businesses will be small. For businesses that utilize either the minimum threshold of $100,000 for a qualifying government grant or award or $250,000 in capital investment to source the filing costs, such costs will constitute 1.3 percent and 0.4 percent, respectively, of the total capital amount. These relatively low cost proportions apply to those firms that only obtain the minimum investment amounts and have no other source of funding or revenues. In addition, DHS analyzed the cost impact relative to more typical RFA indices. DHS analysis of Census Bureau data on the smallest firms found that the average revenue based on sales receipts for firms with no paid employees is $309,000, while the average for firms with one to four paid employees is $411,000.[98] The filing cost relative to these averages is 0.42 percent and 0.31 percent, respectively.

DHS also analyzed the average revenue for new firms. Since the rule defines a new firm as one that is less than five years old at the time the initial parole application is filed, DHS grouped private sector firms for the 2012 survey as those responding that the year of

---

[98] The data utilized for the analysis are found in the SBO Table SB1200CSA09, "Statistics for All U.S. Firms with Paid Employees by Industry, Gender, and Employment Size of Firm for the U.S. and States: 2012, 2012 Survey of Business Owners: *http://census.gov/library/publications/2012/econ/2012-sbo.html.* The file location is: *http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=SBO_2012_00CSA09&prodType=table.* The figures are rounded from $309,279 and $410,900, respectively.

establishment was either 2012, 2011, 2010, 2009, or 2008. DHS obtained the average revenue per firm and then weighted the average by the yearly proportion of firms. Based on the resulting weighted average of $162,000, such new firms will face a filing-cost burden of 0.8 percent.[99] DHS notes that there is a large difference between the revenue of new firms with paid employees and those without such employees (*i.e.,* sole proprietors). For the latter, average revenues are about $34,000, and the cost burden will be 3.8 percent. However, because a central component of this parole program requires a demonstration of significant public benefit in the form of economic activity and job growth, DHS does not anticipate that sole proprietors will be eligible to participate in this program.

In summary, DHS believes that per-applicant costs will be primarily incurred by the individual (which is not covered by the RFA), any direct cost due to this rule will be relatively minor, and these costs will only be borne by those who voluntarily choose to apply for parole under this rule. While the applicant for parole may be the owner of a firm that could be considered small within the definition of small entities established by 5 U.S.C. 601(6), DHS considers the applicants to be individuals at the point in time they are applying for parole, particularly since it is the individual and not the entity that files the application and it is the individual whose parole must provide a significant public benefit under this rule. Furthermore, even if firms do voluntarily decide to incur the compliance costs on behalf of the individual requesting consideration for parole under this rule, the only compliance costs those businesses will be permitted to incur will be the filing costs for the applications. As indicated previously, based on the comparison metric used, those costs are expected to be insignificant.

Based on the evidence presented in this RFA section and throughout this preamble, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities.

[99] The data utilized for the analysis are found in the SBO Table SB1200CSCB11, "Statistics for All U.S. Firms by Year the Business Was Originally Established or Self-Employment Activity Begun by Industry, Gender, Ethnicity, Race, and Veteran Status for the U.S.: 2012: 2012 Survey of Business Owners: *http://census.gov/library/publications/ 2012/econ/2012-sbo.html.* The file location is: *http://factfinder.census.gov/faces/tableservices/jsf/ pages/productview.xhtml?pid=SBO_2012_ 00CSCB11&prodType=table.* The average revenue figure is rounded from $162,293.

### E. National Environmental Policy Act

DHS Directive (Dir) 023–01 Rev. 01 establishes the procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA. 40 CFR parts 1500 through 1508.

The CEQ regulations allow federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment (EA) or Environmental Impact Statement (EIS). 40 CFR 1507.3(b)(1)(iii), 1508.4. DHS Directive 023–01 Rev. 01 establishes Categorical Exclusions that DHS has found to have no such effect. Dir. 023–01 Rev. 01 Appendix A Table 1. For an action to be categorically excluded, DHS Directive 023–01 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. Dir. 023–01 Rev. 01 section V.B (1)–(3).

DHS analyzed this action and does not consider it to significantly affect the quality of the human environment. This rule provides criteria and procedures for applying the Secretary's existing statutory parole authority to entrepreneurs in a manner to assure consistency in case-by-case adjudications. DHS has determined that this rule does not individually or cumulatively have a significant effect on the human environment because it fits within two categorical exclusions under DHS Directive 023– 01 Rev. 01, Appendix A, Table 1. Specifically, the rule fits within Categorical Exclusion number A3(a) for rules strictly of an administrative or procedural nature and A3(d) for rules that interpret or amend an existing regulation without changing its environmental effect.

This rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Fewer than 3,000 individuals, an insignificant number in the context of the population of the United States, are projected to receive parole through this program. Furthermore, any ventures will be governed by local, state and federal laws and regulations, including those protecting the human health and the environment. Therefore, this rule is categorically excluded from further NEPA review.

### F. Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule involves a new information collection and makes revisions to the existing information collections as follows:

Overview of Information Collection, Application for Entrepreneur Parole, Form I–941

This final rule requires that an applicant requesting entrepreneur parole complete an Application for Entrepreneur Parole, Form I–941, and is considered a new information collection under the PRA. USCIS did receive one comment regarding the time burden of this form and, upon review of the work involved to review the form, gather necessary information to support the submission, and the time required to complete and submit the form, USCIS has revised the estimated hour burden per response to 4.7 hours.

a. *Type of information collection:* New information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals, other than those filing an application on the basis of a material change, are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Entrepreneur Parole, Form I–941.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–941, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Businesses and other for profit; Not-for-profit Institutions.

f. *An estimate of the total annual numbers of respondents:* 2,940.

g. *Hours per response:* The estimated hour per response for Form I–941 is 4.7 hours; the estimated hour burden per response for the biometric processing is 1.17 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 17,258 hours.

Overview of Information Collection, Application for Travel Document Form I–131, OMB Control No. 1615–0013

DHS is revising this collection by including spouses and children seeking parole on the basis of an entrepreneur parolee.

In addition to revising the form and form instructions, DHS is revising the estimate of total burden hours has increased due to the addition of this new population of Application for Travel Document, Form I–131, filers, and the increase of burden hours associated with the collection of biometrics from these applicants.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by dependents of individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C.1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

c. *Title of Form/Collection:* Application for Travel Document, Form I–131.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Application for Travel Document, Form I–131, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 594,324.

The total number of respondents includes the additional population of 3,234 individuals as estimated previously in the analysis in Section IV.C.

g. *Hours per response:* The estimated hour per response for Form I–131 Supplement is 1.9 hours; the estimated hour burden per response for the biometric processing is 1.17 hours; the estimated hour burden per response for the passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 1,372,928 hours.

Overview of Information Collection, Employment Eligibility Verification, Form I–9, OMB Control No. 1615–0047

In accordance with new 8 CFR 274a.2(b)(1)(v)(A)(5), DHS is revising the Employment Eligibility Verification, Form I–9, Lists of Acceptable Documents, List A item 5 to replace "nonimmigrant alien" with "individual," to replace "alien's nonimmigrant" with "individual," and to add "or parole" after "status" in List A item 5.b.(2). With these changes the acceptable List A document is described as the following: For an individual authorized to work for a specific employer because of his or her status or parole, a foreign passport and Form I–94 (or Form I–94A) that has the same name as the passport and has an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole. DHS is also updating the Lists of Acceptable Documents, List C so that the most current version of the certification or report of birth issued by the Department of State is acceptable for Form I–9.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This form was developed to facilitate compliance with section 274A of the Immigration and Nationality Act, which prohibits the knowing employment of unauthorized aliens. This information collection is necessary for employers, agricultural recruiters and referrers for a fee, and state employment agencies to verify the identity and employment authorization of individuals hired (or recruited or referred for a fee, if applicable) for employment in the United States.

c. *Title of Form/Collection:* Employment Eligibility Verification.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–9, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Business or other for-profit; Individuals or households; State, local or Tribal Government.

f. *An estimate of the total annual numbers of respondents:* 78 million employers and 78 million individuals. (The total number of responses will be only 78 million responses. Each response involves an employer and an individual who is being hired.)

g. *Hours per response:*
• Time Burden for Employees—20 minutes (.33 hours) total;
• Time Burden for Employers—10 minutes (.17 hours) total;
• Time Burden for Recordkeeping—5 minutes (.08 hours) total

h. *Total Annual Reporting Burden:* Approximately 40,600,000 total annual burden hours.

Overview of Information Collection, Application for Employment Authorization, Form I–765, OMB Control No. 1615–0040

DHS is making minor revisions to the form instructions to reflect changes made by this final rule that allow spouses of an entrepreneur parolee to request employment authorization.

a. *Type of information collection:* Revised information collection.

b. *Abstract:* This collection will be used by individuals who file an application for entrepreneur parole under INA section 212(d)(5)(A) (8 U.S.C. 1182(d)(5)(A)) and proposed new 8 CFR 212.19. Such individuals are subject to biometric collection in connection with the filing of the application.

This form was developed for individual aliens to request employment authorization and evidence of that employment authorization. The form is being amended to add a new class of aliens eligible to apply for employment authorization, specifically a spouse of an entrepreneur parolee described as eligible for employment authorization under this rule. Supporting documentation demonstrating eligibility must be filed with the application. The form lists examples of relevant documentation.

c. *Title of Form/Collection:* Application for Employment Authorization, Form I–765.

d. *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* Form I–765, U.S. Citizenship and Immigration Services.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total annual numbers of respondents:* 2,139,523.

This total represents the aggregate estimate for this information collection, to include the additional estimate of 2,940 respondents under this rule.

g. *Hours per response:* The estimated hour per response for Form I–765 is 3.42 hours; the estimated hour burden per response for biometric processing is 1.17 hours; the estimated hour burden per response for Form I–765 WS is .5 hours; the estimated hour burden per response for passport-style photographs is .5 hours.

h. *Total Annual Reporting Burden:* The total estimated annual hour burden associated with this collection is 8,985,859 hours.

**Regulatory Amendments**

DHS adopted most of the proposed regulatory amendments without change.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2; Pub. L. 112–54.

■ 2. Section 103.7 is amended by adding paragraph (b)(1)(i)(KKK) to read as follows:

**§ 103.7 Fees.**

\*        \*        \*        \*        \*

(b) \* \* \*

(1) \* \* \*

(i) \* \* \*

(KKK) *Application for Entrepreneur Parole (Form I–941).* For filing an application for parole for entrepreneurs: $1200.

\*        \*        \*        \*        \*

**PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE**

■ 3. The authority citation for part 212 is revised to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2.

Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 4. Add § 212.19 to read as follows:

**§ 212.19 Parole for entrepreneurs.**

(a) *Definitions.* For purposes of this section, the following definitions apply:

(1) *Entrepreneur* means an alien who possesses a substantial ownership interest in a start-up entity and has a central and active role in the operations of that entity, such that the alien is well-positioned, due to his or her knowledge, skills, or experience, to substantially assist the entity with the growth and success of its business. For purposes of this section, an alien may be considered to possess a substantial ownership interest if he or she possesses at least a 10 percent ownership interest in the start-up entity at the time of adjudication of the initial grant of parole and possesses at least a 5 percent ownership interest in the start-up entity at the time of adjudication of a subsequent period of re-parole. During the period of initial parole, the entrepreneur may continue to reduce his or her ownership interest in the start-up entity, but must, at all times during the period of initial parole, maintain at least a 5 percent ownership interest in the entity. During the period of re-parole, the entrepreneur may continue to reduce his or her ownership interest in the start-up entity, but must, at all times during the period of parole, maintain an ownership interest in the entity.

(2) *Start-up entity* means a U.S. business entity that was recently formed, has lawfully done business during any period of operation since its date of formation, and has substantial potential for rapid growth and job creation. An entity that is the basis for a request for parole under this section may be considered recently formed if it was created within the 5 years immediately preceding the filing date of the alien's initial parole request. For

purposes of paragraphs (a)(3) and (5) of this section, an entity may be considered recently formed if it was created within the 5 years immediately preceding the receipt of the relevant grant(s), award(s), or investment(s).

(3) *Qualified government award or grant* means an award or grant for economic development, research and development, or job creation (or other similar monetary award typically given to start-up entities) made by a federal, state, or local government entity (not including foreign government entities) that regularly provides such awards or grants to start-up entities. This definition excludes any contractual commitment for goods or services.

(4) *Qualified investment* means an investment made in good faith, and that is not an attempt to circumvent any limitations imposed on investments under this section, of lawfully derived capital in a start-up entity that is a purchase from such entity of its equity, convertible debt, or other security convertible into its equity commonly used in financing transactions within such entity's industry. Such an investment shall not include an investment, directly or indirectly, from the entrepreneur; the parents, spouse, brother, sister, son, or daughter of such entrepreneur; or any corporation, limited liability company, partnership, or other entity in which such entrepreneur or the parents, spouse, brother, sister, son, or daughter of such entrepreneur directly or indirectly has any ownership interest.

(5) *Qualified investor* means an individual who is a U.S. citizen or lawful permanent resident of the United States, or an organization that is located in the United States and operates through a legal entity organized under the laws of the United States or any state, that is majority owned and controlled, directly and indirectly, by U.S. citizens or lawful permanent residents of the United States, provided such individual or organization regularly makes substantial investments in start-up entities that subsequently exhibit substantial growth in terms of revenue generation or job creation. The term "qualified investor" shall not include an individual or organization that has been permanently or temporarily enjoined from participating in the offer or sale of a security or in the provision of services as an investment adviser, broker, dealer, municipal securities dealer, government securities broker, government securities dealer, bank, transfer agent or credit rating agency, barred from association with any entity involved in the offer or sale of securities or provision of such

services, or otherwise found to have participated in the offer or sale of securities or provision of such services in violation of law. For purposes of this section, such an individual or organization may be considered a qualified investor if, during the preceding 5 years:

(i) The individual or organization made investments in start-up entities in exchange for equity, convertible debt or other security convertible into equity commonly used in financing transactions within their respective industries comprising a total in such 5-year period of no less than $600,000; and

(ii) Subsequent to such investment by such individual or organization, at least 2 such entities each created at least 5 qualified jobs or generated at least $500,000 in revenue with average annualized revenue growth of at least 20 percent.

(6) *Qualified job* means full-time employment located in the United States that has been filled for at least 1 year by one or more qualifying employees.

(7) *Qualifying employee* means a U.S. citizen, a lawful permanent resident, or other immigrant lawfully authorized to be employed in the United States, who is not an entrepreneur of the relevant start-up entity or the parent, spouse, brother, sister, son, or daughter of such an entrepreneur. This definition shall not include independent contractors.

(8) *Full-time employment* means paid employment in a position that requires a minimum of 35 working hours per week. This definition does not include combinations of part-time positions even if, when combined, such positions meet the hourly requirement per week.

(9) *U.S. business entity* means any corporation, limited liability company, partnership, or other entity that is organized under federal law or the laws of any state, and that conducts business in the United States, that is not an investment vehicle primarily engaged in the offer, purchase, sale or trading of securities, futures contracts, derivatives or similar instruments.

(10) *Material change* means any change in facts that could reasonably affect the outcome of the determination whether the entrepreneur provides, or continues to provide, a significant public benefit to the United States. Such changes include, but are not limited to, the following: Any criminal charge, conviction, plea of no contest, or other judicial determination in a criminal case concerning the entrepreneur or start-up entity; any complaint, settlement, judgment, or other judicial or administrative determination

concerning the entrepreneur or start-up entity in a legal or administrative proceeding brought by a government entity; any settlement, judgment, or other legal determination concerning the entrepreneur or start-up entity in a legal proceeding brought by a private individual or organization other than proceedings primarily involving claims for damages not exceeding 10 percent of the current assets of the entrepreneur or start-up entity; a sale or other disposition of all or substantially all of the start-up entity's assets; the liquidation, dissolution or cessation of operations of the start-up entity; the voluntary or involuntary filing of a bankruptcy petition by or against the start-up entity; a significant change with respect to ownership and control of the start-up entity; and a cessation of the entrepreneur's qualifying ownership interest in the start-up entity or the entrepreneur's central and active role in the operations of that entity.

(b) *Initial parole*—(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file an Application for Entrepreneur Parole (Form I–941) with USCIS, with the required fees (including biometric services fees), and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for parole under this section if the alien demonstrates that a grant of parole will provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (b)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien is an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity is a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(1) Received, within 18 months immediately preceding the filing of an application for initial parole, a qualified investment amount of at least $250,000 from one or more qualified investors; or

(2) Received, within 18 months immediately preceding the filing of an application for initial parole, an amount of at least $100,000 through one or more qualified government awards or grants.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (b)(2)(ii)(A) of this section and partially meets one or both of the criteria in paragraph (b)(2)(ii)(B) of this section may alternatively meet the standard described in paragraph (b)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(c) *Additional periods of parole*—(1) *Filing of re-parole request form.* Prior to the expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file the Application for Entrepreneur Parole (Form I–941) with USCIS, with the required fees (including biometric services fees), and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

(2) *Criteria for consideration*—(i) *In general.* An alien may be considered for re-parole under this section if the alien demonstrates that a grant of parole will continue to provide a significant public benefit to the United States based on his or her role as an entrepreneur of a start-up entity.

(ii) *General criteria.* An alien may meet the standard described in paragraph (c)(2)(i) of this section by providing a detailed description, along with supporting evidence:

(A) Demonstrating that the alien continues to be an entrepreneur as defined in paragraph (a)(1) of this section and that his or her entity continues to be a start-up entity as defined in paragraph (a)(2) of this section; and

(B) Establishing that the alien's entity has:

(1) Received at least $500,000 in qualifying investments, qualified government grants or awards, or a combination of such funding, during the initial parole period;

(2) Created at least 5 qualified jobs with the start-up entity during the initial parole period; or

(3) Reached at least $500,000 in annual revenue in the United States and averaged 20 percent in annual revenue growth during the initial parole period.

(iii) *Alternative criteria.* An alien who satisfies the criteria in paragraph (c)(2)(ii)(A) of this section and partially meets one or more of the criteria in paragraph (c)(2)(ii)(B) of this section may alternatively meet the standard

described in paragraph (c)(2)(i) of this section by providing other reliable and compelling evidence of the start-up entity's substantial potential for rapid growth and job creation.

(d) *Discretionary authority; decision; appeals and motions to reopen*—(1) *Discretionary authority.* DHS may grant parole under this section in its sole discretion on a case-by-case basis if the Department determines, based on the totality of the evidence, that an applicant's presence in the United States will provide a significant public benefit and that he or she otherwise merits a favorable exercise of discretion. In determining whether an alien's presence in the United States will provide a significant public benefit and whether the alien warrants a favorable exercise of discretion, USCIS will consider and weigh all evidence, including any derogatory evidence or information, such as but not limited to, evidence of criminal activity or national security concerns.

(2) *Initial parole.* DHS may grant an initial period of parole based on the start-up entity listed in the request for parole for a period of up to 30 months from the date the individual is initially paroled into the United States. Approval by USCIS of such a request must be obtained before the alien may appear at a port of entry to be granted parole, in lieu of admission.

(3) *Re-parole.* DHS may re-parole an entrepreneur for one additional period of up to 30 months from the date of the expiration of the initial parole period. If the entrepreneur is in the United States at the time that USCIS approves the request for re-parole, such approval shall be considered a grant of re-parole. If the alien is outside the United States at the time that USCIS approves the request for re-parole, the alien must appear at a port of entry to be granted parole, in lieu of admission.

(4) *Appeals and motions to reopen.* There is no appeal from a denial of parole under this section. USCIS will not consider a motion to reopen or reconsider a denial of parole under this section. On its own motion, USCIS may reopen or reconsider a decision to deny the Application for Entrepreneur Parole (Form I–941), in accordance with 8 CFR 103.5(a)(5).

(e) *Payment of biometric services fee and collection of biometric information.* An alien seeking parole or re-parole under this section will be required to pay the biometric services fee as prescribed by 8 CFR 103.7(b)(1)(i)(C). An alien seeking an initial grant of parole will be required to submit biometric information. An alien seeking

re-parole may be required to submit biometric information.

(f) *Limitations.* No more than three entrepreneurs may be granted parole under this section based on the same start-up entity. An alien shall not receive more than one initial grant of entrepreneur parole or more than one additional grant of entrepreneur re-parole based on the same start-up entity, for a maximum period of parole of five years.

(g) *Employment authorization.* An entrepreneur who is paroled into the United States pursuant to this section is authorized for employment with the start-up entity incident to the conditions of his or her parole.

(h) *Spouse and children.* (1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file an Application for Travel Document (Form I–131). Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. A biometric services fee is required to be filed with the application. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

(2) The spouse and children of an entrepreneur granted parole under this section may be granted parole under this section for no longer than the period of parole granted to such entrepreneur.

(3) The spouse of the entrepreneur parolee, after being paroled into the United States, may be eligible for employment authorization on the basis of parole under this section. To request employment authorization, an eligible spouse paroled into the United States must file an Application for Employment Authorization (Form I–765), in accordance with 8 CFR 274a.12 and form instructions. An Application for Employment Authorization must be accompanied by documentary evidence establishing eligibility, including evidence of the spousal relationship.

(4) Notwithstanding 8 CFR 274a.12(c)(11), a child of the entrepreneur parolee may not be authorized for and may not accept employment on the basis of parole under this section.

(i) *Conditions on parole.* As a condition of parole under this section, a parolee must maintain household income that is greater than 400 percent of the federal poverty line for his or her household size as defined by the Department of Health and Human Services. USCIS may impose other such

reasonable conditions in its sole discretion with respect to any alien approved for parole under this section, and it may request verification of the parolee's compliance with any such condition at any time. Violation of any condition of parole may lead to termination of the parole in accordance with paragraph (k) of this section or denial of re-parole.

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee (not including any biometric fees), in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

(k) *Termination of parole*—(1) *In general.* DHS, in its discretion, may terminate parole granted under this section at any time and without prior notice or opportunity to respond if it determines that the alien's continued parole in the United States no longer provides a significant public benefit. Alternatively, DHS, in its discretion, may provide the alien notice and an opportunity to respond prior to terminating the alien's parole under this section.

(2) *Automatic termination.* Parole granted under this section will be automatically terminated without notice upon the expiration of the time for which parole was authorized, unless the alien timely files a non-frivolous application for re-parole. Parole granted under this section may be automatically terminated when USCIS receives written notice from the entrepreneur parolee that he or she will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity in accordance with paragraph (j) of this section. Additionally, parole of the spouse or child of the entrepreneur will be automatically terminated without notice if the parole of the entrepreneur has been terminated. If parole is terminated, any employment authorization based on that parole is automatically revoked.

(3) *Termination on notice.* USCIS may terminate on notice or provide the entrepreneur or his or her spouse or children, as applicable, written notice of

its intent to terminate parole if USCIS believes that:

(i) The facts or information contained in the request for parole were not true and accurate;

(ii) The alien failed to timely file or otherwise comply with the material change reporting requirements in this section;

(iii) The entrepreneur parolee is no longer employed in a central and active role by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity;

(iv) The alien otherwise violated the terms and conditions of parole; or

(v) Parole was erroneously granted.

(4) *Notice and decision.* A notice of intent to terminate issued under this paragraph should generally identify the grounds for termination of the parole and provide a period of up to 30 days for the alien's written rebuttal. The alien may submit additional evidence in support of his or her rebuttal, when applicable, and USCIS will consider all relevant evidence presented in deciding whether to terminate the alien's parole. Failure to timely respond to a notice of intent to terminate will result in termination of the parole. When a charging document is served on the alien, the charging document will constitute written notice of termination of parole (if parole has not already been terminated), unless otherwise specified. Any further immigration and removal actions will be conducted in accordance with the Act and this chapter. The decision to terminate parole may not be appealed. USCIS will not consider a motion to reopen or reconsider a decision to terminate parole under this section. On its own motion, USCIS may reopen or reconsider a decision to terminate.

(l) *Increase of investment and revenue amount requirements.* The investment and revenue amounts in this section will be automatically adjusted every 3 years by the Consumer Price Index and posted on the USCIS Web site at *www.uscis.gov.* Investment and revenue amounts adjusted under this paragraph will apply to all applications filed on or after the beginning of the fiscal year for which the adjustment is made.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 6. Section 274a.2 is amended by:

■ a. Revising paragraphs (b)(1)(v)(A)(*5*) and (b)(1)(v)(C)(2);

■ b. Removing paragraph (b)(1)(v)(C)(3); and

■ c. Redesignating paragraphs (b)(1)(v)(C)(*4*) through (*8*) as paragraphs (b)(1)(v)(C)(3) through (*7*).

The revisions read as follows:

### § 274a.2 Verification of identity and employment authorization.

\*    \*    \*    \*    \*

(b) \* \* \*

(1) \* \* \*

(v) \* \* \*

(A) \* \* \*

(5) In the case of an individual who is employment-authorized incident to status or parole with a specific employer, a foreign passport with an Arrival/Departure Record, Form I–94 (as defined in 8 CFR 1.4) or Form I–94A, bearing the same name as the passport and containing an endorsement by DHS indicating such employment-authorized status or parole, as long as the period of endorsement has not yet expired and the employment is not in conflict with the individual's employment-authorized status or parole;

\*    \*    \*    \*    \*

(C) \* \* \*

(2) Certification or report of birth issued by the Department of State, including Forms FS–545, DS–1350, FS–240;

\*    \*    \*    \*    \*

■ 7. Section 274a.12 is amended by:

■ a. Revising paragraph (b) introductory text;

■ b. Removing the word "or" at the end of paragraph (b)(24);

■ c. Removing the period at the end of paragraph (b)(25) and adding "; or" in its place;

■ d. Adding and reserving paragraphs (b)(26) through (36);

■ e. Adding paragraph (b)(37);

■ f. Revising paragraph (c)(11); and

■ g. Adding paragraph (c)(34).

The revisions and additions read as follows:

### § 274a.12 Classes of aliens authorized to accept employment.

\*    \*    \*    \*    \*

(b) *Aliens authorized for employment with a specific employer incident to status or parole.* The following classes of aliens are authorized to be employed in the United States by the specific employer and subject to any restrictions described in the section(s) of this chapter indicated as a condition of their parole or of their admission in, or subsequent change to, the designated nonimmigrant classification. An alien in one of these classes is not issued an employment authorization document by DHS:

\*    \*    \*    \*    \*

(37) An alien paroled into the United States as an entrepreneur pursuant to 8 CFR 212.19 for the period of authorized parole. An entrepreneur who has timely filed a non-frivolous application requesting re-parole with respect to the same start-up entity in accordance with 8 CFR 212.19 prior to the expiration of his or her parole, but whose authorized parole period expires during the pendency of such application, is authorized to continue employment with the same start-up entity for a period not to exceed 240 days beginning on the date of expiration of parole. Such authorization shall be subject to any conditions and limitations on such expired parole. If DHS adjudicates the application prior to the expiration of this 240-day period and denies the application for re-parole, the employment authorization under this paragraph shall automatically terminate upon notification to the alien of the denial decision.

(c) \* \* \*

(11) Except as provided in paragraphs (b)(37) and (c)(34) of this section and § 212.19(h)(4) of this chapter, an alien paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act.

\*    \*    \*    \*    \*

(34) A spouse of an entrepreneur parolee described as eligible for employment authorization in § 212.19(h)(3) of this chapter.

\*    \*    \*    \*    \*

**Jeh Charles Johnson,**

*Secretary of Homeland Security.*

[FR Doc. 2017–00481 Filed 1–13–17; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 204, 205, 214, 245 and 274a**

[CIS No. 2571–15; DHS Docket No. USCIS–2015–0008]

RIN 1615–AC05

## Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

---

**SUMMARY:** The Department of Homeland Security (DHS) is amending its regulations related to certain employment-based immigrant and nonimmigrant visa programs. Specifically, the final rule provides various benefits to participants in those programs, including the following: improved processes and increased certainty for U.S. employers seeking to sponsor and retain immigrant and nonimmigrant workers; greater stability and job flexibility for those workers; and increased transparency and consistency in the application of DHS policy related to affected classifications. Many of these changes are primarily aimed at improving the ability of U.S. employers to hire and retain high-skilled workers who are beneficiaries of approved employment-based immigrant visa petitions and are waiting to become lawful permanent residents, while increasing the ability of those workers to seek promotions, accept lateral positions with current employers, change employers, or pursue other employment options.

**DATES:** This final rule is effective January 17, 2017.

**ADDRESSES:** Comments and related materials received from the public, as well as background documents mentioned in this preamble as being available in the docket, are part of docket USCIS–2015–0008. For access to the online docket, go to *http://www.regulations.gov* and enter this rulemaking's eDocket number: USCIS–2015–0008 in the "Search" box.

**FOR FURTHER INFORMATION CONTACT:** Kathleen Angustia or Nikki Lomax-Larson, Adjudications Officers (Policy), Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529. The contact telephone number is (202) 272–8377.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Abbreviations
II. Executive Summary
A. Purpose and Summary of the Regulatory Action
1. Clarifications and Policy Improvements
2. Summary of Changes From the Notice of Proposed Rulemaking
B. Legal Authority
C. Costs and Benefits
III. Background
A. ACWIA and AC21
1. The American Competitiveness and Workforce Improvement Act of 1998
2. The American Competitiveness in the Twenty-first Century Act of 2000
i. AC21 Provisions Relating to Employment-based Immigrant Visas
ii. AC21 Provisions Seeking To Improve the H–1B Nonimmigrant Worker Classification
a. Exemptions From the H–1B Numerical Cap
b. Application of the H–1B Numerical Cap to Persons Previously Counted
c. H–1B Portability
B. Processing Applications for Employment Authorization Documents
C. The Increasing Challenges Caused by Immigrant Visa Backlogs
IV. Discussion of Comments
A. Overview of the Comments
B. Authority of DHS To Administer and Enforce Immigration Laws
1. Description of DHS's Legal Authority
2. Public Comments and Responses
C. Immigration Fraud and National Security Concerns
1. Description of Final Rule and Changes From the NPRM
2. Public Comments and Responses
D. Petitions for Employment-Based Immigrants and Priority Date Retention
1. Description of Final Rule and Changes From the NPRM
2. Public Comments and Responses
i. Establishing a Priority Date
ii. Retaining a Priority Date
iii. Priority Date Not Retained if Approval Revoked for Fraud, Willful Misrepresentation, DOL Revocation, Invalidation by USCIS or DOS, Material Error, or Denied Petition
iv. Beneficiary Standing To Challenge the Revocation of an Employment-Based Immigrant Visa Petition's Approval
E. Continuing and Bona Fide Job Offer and Supplement J Form
1. Description of Final Rule and Changes From the NPRM
2. Public Comments and Responses
i. Portability Under INA 204(j)
ii. Concerns Raised Regarding Supplement J
iii. Miscellaneous Comments on Supplement J
F. Compelling Circumstances Employment Authorization
1. Description of Final Rule and Changes From the NPRM
2. Public Comments and Responses
i. Support for Compelling Circumstances Employment Authorization
ii. Status of Individuals Who Are Granted a Compelling Circumstances EAD
iii. Changing the Scope of Proposed Employment Authorization
iv. Illustrations of Compelling Circumstances
v. Nonimmigrant and Immigrant Classifications of Individuals Eligible To Request Employment Authorization Based on Compelling Circumstances
vi. Application Timeframes for Compelling Circumstances EADs
vii. EAD Validity Period
viii. Visa Bulletin Dates
ix. Renewals of Employment Authorization Granted Pursuant to Compelling Circumstances
x. Automatically Granting Advance Parole to Individuals Who Have Compelling Circumstances EADs
xi. Employment Authorization Parity for Legal and Undocumented Workers, Including Individuals Granted Deferred Action for Childhood Arrivals (DACA)
G. Nonimmigrant Grace Periods
1. Description of Final Rule and Changes From NPRM
2. Public Comments and Responses
i. Length of the 10-Day Grace Periods
ii. Eligibility for 10-Day Grace Periods
iii. Miscellaneous Comments on 10-day Grace Periods
iv. Length of the 60-Day Grace Period
v. Frequency of the 60-Day Grace Period
vi. Classifications Eligible for the 60-Day Grace Period
vii. Clarifying the Meaning of "up to" in the 60-Day Grace Period
viii. Employment Authorization During the Grace Periods
H. Job Portability for H–1B Nonimmigrant Workers
1. Description of Final Rule and Changes From NPRM
2. Public Comments and Responses
i. H–1B Status Requirement
ii. International Travel and Successive Portability Petitions ("Bridge Petitions")
iii. Portability to New Employment Subject to the Cap
I. H–1B Licensing Requirements
1. Description of Final Rule and Changes From NPRM
2. Public Comments and Responses
i. Duties Without Licensure—Expand Circumstances
ii. Unlicensed Employment Under Supervision
iii. Duration of H–1B Petition Approval
iv. Unrestricted Extendable Licenses
J. Employers Exempt from H–1B Numerical Limitations and Qualifying for Fee Exemptions
1. Description of Final Rule and Changes From NPRM
2. Public Comments and Responses
i. Include Government Entities in the Definition of "Related or Affiliated"
ii. Clarify that a Nonprofit Entity Only Needs To Meet One of the Criteria in 8 CFR 214.2(h)(8)(ii)(F)(*2*) and 8 CFR 214.2(h)(19)(iii)(B)
iii. The "Primary Purpose" Requirement for Nonprofit Entities Seeking Exemptions Based on Formal Written Affiliation Agreements
iv. Formal Written Affiliation Agreement

AC00142

v. Impose Additional Requirements To Qualify as an Institution of Higher Education
vi. Impose Additional Requirements on the Nature of Employment at a Qualifying Nonprofit Entity or Nonprofit Research Organization
vii. Expand Interpretation of Research Organization
viii. Requirement that the H–1B Worker Perform a Majority of Duties ''at'' the Cap Exempt Entity
ix. Codify Existing USCIS Deference Policy
x. Create a Mechanism To Obtain a Pre-Determination of Cap Exemption
xi. Allot H–1B Visas Subject to the Cap on a Quarterly Basis
xii. Request for Continuation of Cap-Subject Employment When Concurrent Cap-Exempt H–1B Employment Ends
xiii. Prohibit Cap-Exempt H–1B Worker From Concurrent Employment
K. Exemptions to the Maximum Admission Period of H–1B Nonimmigrants
1. Description of Final Rule and Changes From NPRM
2. Public Comments and Responses
i. Recapture of H–1B Time
ii. AC21 106(a) and (b)—Lengthy Adjudication Delay Exemptions
iii. AC21 104(c)—Per Country Limitations
iv. Spousal Eligibility for H–1B Extensions Beyond Six Years under AC21
L. Whistleblower Protections in the H–1B Nonimmigrant Program
1. Description of Final Rule and Changes From NPRM
2. Public Comments and Responses
M. Haitian Refugee Immigrant Fairness Act of 1998
1. Changes to DHS HRIFA regulations
N. Application for Employment Authorization
1. Description of Final Rule and Changes From NPRM
2. Public Comments and Responses
i. Adjudication Timeframes for Initial and Renewal Applications of Employment Authorization
ii. Earlier Filing for EAD Renewals
iii. Concurrent Filings
iv. Potential Gaps in Employment Authorization
v. Interim EADs
vi. Automatic Extensions of EADs and Advance Parole
vii. H–4 Nonimmigrant Spouses
viii. F–1 Nonimmigrant Students
ix. Expanding Automatic Extensions to Additional Categories
x. State Driver's License Issues
xi. Form I–9 and Automatic Extensions of EADs
xii. National Security and Fraud Concerns
xiii. Separate Rulemaking for the Elimination of the EAD 90-Day Processing Timeframe
xiv. Requests for Premium Processing
O. Employment Authorization and Reverification on Form I–9
1. Description of Final Rule and Changes From NPRM
2. Public Comments and Responses
i. Reverification
ii. Use of Form I–9 To Change Employment Authorization Categories

iii. Comments Suggesting Additional Revisions
P. Other Comments
1. Procedural Aspects of the Rulemaking
2. Assertions That the Employment-Based Immigration System Enables Slavery and Servitude to Employers
3. Limits on Employment-Based Immigration by Country
4. Guidance on National Interest Waivers
5. The Revised Visa Bulletin System
Q. Public Comments and Responses on Statutory and Regulatory Requirements
1. Regulatory Impact Analysis
2. General Economy
3. Labor Market and Labor Force Impact, Including Jobs, Wages, and Job Portability
i. Effect of the Rule on the Availability of Jobs in the United States
ii. Effect of the Rule on Job Portability for Foreign Workers
iii. Effect of the Rule on Wages
iv. Effect of Employment-Based Immigration on Falling Income
v. Effect of the Rule on Costs Incurred by Employers
4. DHS Estimate of 155,000 Compelling Circumstances Employment Authorization Applicants
5. Unfunded Mandates Reform Act Violation
6. Review under the National Environmental Policy Act (NEPA)
V. Statutory and Regulatory Requirements
A. Executive Orders 12866 and 13563 (Regulatory Planning and Review)
B. Regulatory Flexibility Act
C. Unfunded Mandates Reform Act of 1995
D. Small Business Regulatory Enforcement Fairness Act of 1996
E. Executive Order 13132 (Federalism)
F. Executive Order 12988 (Civil Justice Reform)
G. Paperwork Reduction Act

# I. Abbreviations

AC21   American Competitiveness Act of the 21st Century
ACWIA   American Competitiveness and Workforce Improvement Act of 1998
APA   Administrative Procedure Act
CBP   U.S. Customs and Border Protection
CFR   Code of Federal Regulations
DACA   Deferred Action for Childhood Arrivals
DHS   Department of Homeland Security
DOL   Department of Labor
DOJ   Department of Justice
DOS   Department of State
EAD   Employment Authorization Document
EB   Employment-based immigrant visa category
EB–1   Employment-based first preference immigrant visa petition
EB–2   Employment-based second preference immigrant visa petition
EB–3   Employment-based third preference immigrant visa petition
EB–4   Employment-based fourth preference immigrant visa petition
EB–5   Employment-based fifth preference immigrant visa petition
FDNS   Fraud Detection and National Security
FR   Federal Register

FY   Fiscal Year
HSA   Homeland Security Act of 2002
IIRIRA   Illegal Immigration Reform and Immigrant Responsibility Act of 1996
ICE   U.S. Immigration and Customs Enforcement
INA   Immigration and Nationality Act
LCA   Labor Condition Application
LPR   Lawful Permanent Resident
NOID   Notice of Intent to Deny
NPRM   Notice of Proposed Rulemaking
RFE   Request for Evidence
RIA   Regulatory Impact Analysis
SOC   Standard Occupational Classification
STEM   Science, Technology, Engineering, and Mathematics
TPS   Temporary Protected Status
U.S.C.   United States Code
USCIS   U.S. Citizenship and Immigration Services

## II. Executive Summary

### A. Purpose and Summary of the Regulatory Action

DHS is amending its regulations related to certain employment-based immigrant and nonimmigrant visa programs. The final rule is intended to benefit U.S. employers and foreign workers participating in these programs by streamlining the processes for employer sponsorship of nonimmigrant workers for lawful permanent resident (LPR) status, increasing job portability and otherwise providing stability and flexibility for such workers, and providing additional transparency and consistency in the application of DHS policies and practices related to these programs. These changes are primarily intended to better enable U.S. employers to employ and retain high-skilled workers who are beneficiaries of employment-based immigrant visa (Form I–140) petitions, while increasing the ability of these workers to further their careers by accepting promotions, changing positions with current employers, changing employers, and pursuing other employment opportunities.

#### 1. Clarifications and Policy Improvements

First, the final rule largely conforms DHS regulations to longstanding DHS policies and practices established in response to certain sections of the American Competitiveness and Workforce Improvement Act of 1998 (ACWIA), Public Law 105–277, div. C, tit. IV, 112 Stat. 2681, and the American Competitiveness in the Twenty-first Century Act of 2000 (AC21), Public Law 106–313, 114 Stat. 1251, as amended by the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273, 116 Stat. 1758

AC00143

(2002).[1] Those sections were intended, among other things, to provide greater flexibility and job portability to certain nonimmigrant workers, particularly those who have been sponsored for LPR status as employment-based immigrants, while enhancing opportunities for innovation and expansion, maintaining U.S. competitiveness, and protecting U.S. workers. The final rule further clarifies and improves DHS policies and practices in this area—policies and practices that have long been specified through a series of policy memoranda and precedent decisions of the U.S. Citizenship and Immigration Services (USCIS) Administrative Appeals Office. By clarifying such policies in regulation, DHS provides greater transparency and certainty to affected employers and workers, while increasing consistency among DHS adjudications. In addition, this final rule clarifies several interpretive questions raised by AC21 and ACWIA.

Specifically, the final rule clarifies and improves policies and practices related to:

• *H–1B extensions of stay under AC21.* The final rule addresses the ability of H–1B nonimmigrant workers who are being sponsored for LPR status (and their dependents in H–4 nonimmigrant status) to extend their nonimmigrant stay beyond the otherwise applicable 6-year limit pursuant to AC21.

• *INA 204(j) portability.* The final rule addresses the ability of certain workers who have pending applications for adjustment of status to change employers or jobs without endangering the approved Form I–140 petitions filed on their behalf.

• *H–1B portability.* The final rule addresses the ability of H–1B nonimmigrant workers to change jobs or employers, including: (1) Beginning employment with new H–1B employers upon the filing of non-frivolous petitions for new H–1B employment ("H–1B portability petition"); and (2) allowing H–1B employers to file successive H–1B portability petitions (often referred to as "bridge petitions") and clarifying how these petitions affect lawful status and work authorization.

• *Counting against the H–1B annual cap.* The final rule clarifies the way in which H–1B nonimmigrant workers are counted against the annual H–1B

numerical cap, including: (1) The method for calculating when these workers may access so-called remainder time (*i.e.,* time when they were physically outside the United States), thus allowing them to use their full period of H–1B admission; and (2) the method for determining which H–1B nonimmigrant workers are "cap-exempt" as a result of previously being counted against the cap.

• *H–1B cap exemptions.* The final rule clarifies and improves the method for determining which H–1B nonimmigrant workers are exempt from the H–1B numerical cap due to their employment at an institution of higher education, a nonprofit entity related to or affiliated with such an institution, or a governmental or nonprofit research organization, including a revision to the definition of the term "related or affiliated nonprofit entity."

• *Protections for H–1B whistleblowers.* The final rule addresses the ability of H–1B nonimmigrant workers who are disclosing information in aid of, or otherwise participating in, investigations regarding alleged violations of Labor Condition Application (LCA) obligations in the H–1B program to provide documentary evidence to USCIS to demonstrate that their resulting failure to maintain H–1B status was due to "extraordinary circumstances."

• *Form I–140 petition validity.* The final rule clarifies the circumstances under which an approved Immigrant Petition for Alien Worker (Form I–140 petition) remains valid, even after the petitioner withdraws the petition or the petitioner's business terminates, including for purposes of status extension applications filed on behalf of the beneficiary, job portability of H–1B nonimmigrants, and job portability under section 204(j) of the Immigration and Nationality Act (INA), 8 U.S.C. 1154(j).

Second, this rule builds on the provisions listed above by making changes consistent with the goals of AC21 and ACWIA to further provide stability and flexibility in certain immigrant and nonimmigrant visa categories. The amended provisions improve the ability of certain foreign workers, particularly those who are successfully sponsored for LPR status by their employers, to accept new employment opportunities, pursue normal career progression, better establish their lives in the United States, and contribute more fully to the U.S. economy. These changes also provide certainty for the regulated community and improve consistency across DHS adjudications, thereby enhancing DHS's

ability to fulfill its responsibilities related to U.S. employers and certain foreign workers. Specifically, the final rule provides the following:

• *Establishment of priority dates.* To enhance clarity for the regulated community, the final rule provides that a priority date is generally established based upon the filing of certain applications or petitions. The new regulatory language is consistent with existing DHS practice in establishing priority dates for other Form I–140 petitions that do not require permanent labor certifications (labor certifications)—such as petitions filed under the employment-based first preference immigrant visa (EB–1) category.[2] *See* 8 CFR 204.5(d).[3]

• *Retention of priority dates.* To enhance job portability for workers with approved Form I–140 petitions, the final rule explains the circumstances under which workers may retain priority dates and effectively transfer those dates to new and subsequently approved Form I–140 petitions. Priority date retention will generally be available as long as the approval of the initial Form I–140 petition was not revoked for fraud, willful misrepresentation of a material fact, the invalidation or revocation of a labor certification, or material error. This provision improves the ability of certain workers to accept promotions, change employers, or pursue other employment opportunities without fear of losing their place in line for immigrant visas. *See* final 8 CFR 204.5(e).

• *Retention of employment-based immigrant visa petitions.* To enhance job portability for certain workers with approved Form I–140 petitions in the EB–1, second preference (EB–2), and third preference (EB–3) categories, but who are unable to obtain LPR status due to immigrant visa backlogs, the final rule provides that Form I–140 petitions that have been approved for 180 days or more would no longer be subject to automatic revocation based solely on withdrawal by the petitioner or the termination of the petitioner's business. *See* final 8 CFR 205.1(a)(3)(iii)(C) and (D).

---

[1] Except where changes to current policies and practices are noted in the preamble of this final rule, these amendments capture the longstanding policies and practices that have developed since AC21 and ACWIA were enacted. DHS also notes that policies implementing AC21 and ACWIA provisions, if not referenced, discussed, or changed through this rulemaking, remain in place.

[2] The EB–1 preference category is for individuals with extraordinary ability, outstanding professors and researchers, and multinational executives and managers.

[3] In this final rule, the word "final" before a reference to 8 CFR is used to refer to a provision promulgated through this final rule and the word "proposed" before 8 CFR is used to refer to a provision of the proposed rule. *See Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting Certain High-Skilled Nonimmigrant Workers;* Proposed Rule, 80 FR 81899 (Dec. 31, 2015).

• *Eligibility for employment authorization in compelling circumstances.* To enhance stability and job flexibility for certain high-skilled nonimmigrant workers in the United States with approved Form I–140 petitions who cannot obtain an immigrant visa due to statutory limits on the number of immigrant visas that may be issued, the final rule allows certain beneficiaries in the United States in E–3, H–1B, H–1B1, L–1, or O–1 nonimmigrant status to apply for separate employment authorization for a limited period if there are compelling circumstances that, in the discretion of DHS, justify the issuance of employment authorization. *See* final 8 CFR 204.5(p).

• *10-day nonimmigrant grace periods.* To promote stability and flexibility for certain high-skilled nonimmigrant workers, the final rule provides two grace periods of up to 10 days, consistent with those already available to individuals in some nonimmigrant classifications, to individuals in the E–1, E–2, E–3, L–1, and TN classifications. The rule allows an initial grace period of up to 10 days prior to the start of an authorized validity period, which provides nonimmigrants in the above classifications a reasonable amount of time to enter the United States and prepare to begin employment in the country. The rule also allows a second grace period of up to 10 days after the end of an authorized validity period, which provides a reasonable amount of time for such nonimmigrants to depart the United States or take other actions to extend, change, or otherwise maintain lawful status. *See* final 8 CFR 214.1(l)(1).

• *60-day nonimmigrant grace periods.* To further enhance job portability, the final rule establishes a grace period of up to 60 consecutive days during each authorized validity period for individuals in the E–1, E–2, E–3, H–1B, H–1B1, L–1, O–1 or TN classifications. This grace period allows high-skilled workers in these classifications, including those whose employment ceases prior to the end of the petition validity period, to more readily pursue new employment should they be eligible for other employer-sponsored nonimmigrant classifications or employment in the same classification with a new employer. The grace period also allows U.S. employers to more easily facilitate changes in employment for existing or newly recruited nonimmigrant workers. *See* final 8 CFR 214.1(l)(2).

• *H–1B licensing.* To provide clarity and certainty to the regulated community, the final regulations codify current DHS policy regarding exceptions to the requirement that makes the approval of an H–1B petition contingent upon the beneficiary's licensure where licensure is required to fully perform the duties of the relevant specialty occupation. The final rule generally allows for the temporary approval of an H–1B petition for an otherwise eligible unlicensed worker, if the petitioner can demonstrate that the worker is unable for certain technical reasons to obtain the required license before obtaining H–1B status. The final rule also clarifies the types of evidence that would need to be submitted to support approval of an H–1B petition on behalf of an unlicensed worker who will work in a state that allows the individual to be employed in the relevant occupation under the supervision of licensed senior or supervisory personnel. *See* final 8 CFR 214.2(h)(4)(v)(C).

As noted above, these changes codify and improve USCIS policies concerning various employment-based immigrant and nonimmigrant visa classifications, including by making it easier to hire and retain nonimmigrant workers who have approved Form I–140 petitions and giving such workers additional career options as they wait for immigrant visas to become available. These improvements are increasingly important considering the lengthy waits and consistently growing demand for immigrant visas.

Finally, to provide additional stability and certainty to U.S. employers and individuals eligible for employment authorization in the United States, this final rule changes several DHS regulations governing the processing of applications for employment authorization. First, to minimize the risk of any gaps in employment authorization, this final rule automatically extends the validity of Employment Authorization Documents (EADs or Forms I–766) in certain circumstances based on the timely filing of EAD renewal applications. Specifically, the rule automatically extends the employment authorization and validity of existing EADs issued to certain employment-eligible individuals for up to 180 days from the date of expiration, as long as: (1) A renewal application is filed based on the same employment authorization category as the previously issued EAD (or the renewal application is for an individual approved for Temporary Protected Status (TPS) whose EAD was issued under 8 CFR 274a.12(c)(19)); (2) the renewal application is timely filed prior to the expiration of the EAD (or, in

accordance with an applicable **Federal Register** notice regarding procedures for renewing TPS-related employment documentation) and remains pending; and (3) the individual's eligibility for employment authorization continues beyond the expiration of the EAD and an independent adjudication of the underlying eligibility is not a prerequisite to the extension of employment authorization. Concurrently, DHS eliminates the regulatory provisions that require adjudication of the Application for Employment Authorization (Form I–765 or EAD application) within 90 days of filing and that authorize interim EADs in cases where such adjudications are not conducted within the 90-day timeframe. These changes provide enhanced stability and certainty to employment-authorized individuals and their employers while reducing opportunities for fraud and protecting the security related processes undertaken for each EAD application. *See* final 8 CFR 247a.13(d).

2. *Summary of Changes From the Notice of Proposed Rulemaking*

Following careful consideration of public comments received, DHS has made several modifications to the regulatory text proposed in the Notice of Proposed Rulemaking (NPRM) published in the **Federal Register** on December 31, 2015. *See Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers; Proposed Rule,* 80 FR 81899. Those changes include the following:

• *Retaining a Priority Date.* In the final rule, DHS is responding to public comment by revising proposed 8 CFR 204.5(e)(2)(iv), a provision that identifies when error related to the approval of an employment-based immigrant visa petition can lead to loss of a priority date. The term "error" is clarified to mean "material error" in final 8 CFR 204.5(e)(2)(iv), which now states that a priority date may not be retained if USCIS revokes the approval of the Form I–140 petition because it determined that there was a material error with regard to the petition's approval.

• *Eligibility for employment authorization in compelling circumstances.* In the final rule, DHS is responding to public comment by revising several aspects of proposed 8 CFR 204.5(p) governing requests for EADs in compelling circumstances.

First, DHS is revising proposed 8 CFR 204.5(p)(1)(i), which discusses the eligibility of principal beneficiaries of immigrant visa petitions to obtain EADs

AC00145

in compelling circumstances. In the final rule, DHS provides clarification that principal beneficiaries may be eligible to file applications for such EADs during the authorized periods of admission that immediately precede or follow the validity periods of their nonimmigrant classifications (*i.e.*, "grace periods").

Second, DHS also is making several revisions to proposed 8 CFR 204.5(p)(3), which addresses certain eligibility requirements for principal beneficiaries and family members seeking to renew EADs issued in compelling circumstances. DHS clarifies in final § 204.5(p)(3) that applicants seeking to extend such employment authorization must file a renewal Form I–765 before the expiration of their current employment authorization. DHS also streamlines and clarifies the regulatory text covering the two instances in which applicants may be eligible to apply for renewal. DHS clarifies that under final § 204.5(p)(3)(i)(A), applicants may apply for renewal if the principal beneficiary continues to demonstrate compelling circumstances and an immigrant visa is not authorized for issuance to the principal beneficiary based on his or her priority date. DHS also clarifies that under final § 204.5(p)(3)(i)(B), a principal beneficiary may apply for renewal if his or her priority date is one year or less either before or after the relevant date in the Department of State Visa Bulletin. In determining whether the difference between the principal beneficiary's priority date and the date upon which immigrant visas are authorized for issuance is one year or less, DHS will use the applicable Final Action Date in the Visa Bulletin that was in effect on the date the application for employment authorization is filed.

Third, DHS is removing a ground of ineligibility that was proposed in § 204.5(p)(5), as it was duplicative of requirements for renewal under § 204.5(p)(3)(i)(B), which authorizes eligibility for renewals when the difference between the principal beneficiary's priority date and the date upon which immigrant visas are authorized for issuance to the principal beneficiary is 1 year or less according to the Visa Bulletin in effect on the date the application for employment authorization is filed.

Fourth, DHS is revising proposed § 204.5(p)(3)(ii) to clarify that family members may submit applications to renew employment authorization concurrently with renewal applications filed by the principal beneficiaries, or while such applications are pending, but family renewal applications cannot be approved unless the principal

beneficiaries' applications are granted under paragraph (p)(3)(i) and remain valid.

Finally, DHS is making several technical revisions for readability and clarity.

• *Automatic revocation.* In the final rule, DHS is responding to public comment by editing proposed 8 CFR 205.1(a)(3)(iii)(C) and (D), which provide the grounds for automatically revoking Form I–140 petitions. DHS is revising these provisions to clarify that a Form I–140 petition will remain approved if a request to withdraw it is received or the petitioner terminates its business 180 days or more after either the date of the petition's approval or the date of filing of an associated application for adjustment of status.[4] In addition, DHS is removing the phrase, "provided that the revocation of a petition's approval under this clause will not, by itself, impact a beneficiary's ability to retain his or her priority date under 8 CFR 204.5(e)" in § 205.1(a)(3)(iii)(C) and (D) because that phrase was redundant of text in 8 CFR 204.5(e), which, as proposed and retained in this final rule, already establishes the ability of the beneficiary to retain his or her priority date if his or her immigrant visa petition is revoked on any ground other than those enumerated in final 8 CFR 204.5(e)(2)(i)–(iv). The deletion of the redundant text does not change the substance of the provisions.

• *Period of stay.* In the final rule, DHS is responding to public comment by revising proposed 8 CFR 214.1(l), which concerns authorized grace periods that may immediately precede and follow periods of nonimmigrant petition validity and other authorized periods of stay. DHS is removing from proposed 8 CFR 214.1(l)(1) the phrase "to prepare for departure from the United States or to seek an extension or change of status based on a subsequent offer of employment" because it is unnecessarily limiting and did not fully comport with how the existing 10-day grace period may be used by individuals in the H, O and P nonimmigrant visa classifications. DHS is adding the phrase "or otherwise provided status" after "an alien admissible in E–1, E–2, E–3, H–1B, L–1, or TN classification and his or her dependents may be admitted to the United States" to clarify that the 10-day grace period may be granted to these nonimmigrants at time of admission or upon approval of an extension of stay or change of status.

Moreover, in § 214.1(l)(2), DHS is adding the O–1 classification to the list of visa classifications for which USCIS will not consider an individual to have failed to maintain nonimmigrant status for a period of up to 60 days or until the end of the authorized validity period, whichever is shorter, solely because of the cessation of the employment on which the visa classification was based. In addition, DHS is clarifying that the 60-day grace period must be used in a single period of consecutive days during the relevant authorized validity period. DHS also is changing the phrase "for a one-time period during any authorized validity period," to read "once during each authorized validity period" to clarify that the 60-day grace period may be provided to an individual only once per authorized validity period. However, an individual may be provided other such grace periods if he or she receives a new authorized validity period in one of the eligible nonimmigrant classifications. In addition, DHS is making other technical revisions to proposed § 214.1(l)(1), (2) and (3).

• *Duties without licensure.* In the final rule, DHS is responding to public comment by modifying proposed 8 CFR 214.2(h)(4)(v)(C), which sets standards for H–1B adjudication absent the beneficiary's full licensure. First, DHS is revising proposed 8 CFR 214.2(h)(4)(v)(C)(1) to expand the evidence USCIS will examine in cases where a state allows an individual without licensure to fully practice the occupation under the supervision of licensed senior or supervisory personnel to include "evidence that the petitioner is complying with state requirements."

Second, DHS is expanding the language in § 214.2(h)(4)(v)(C)(2) to account for other technical requirements in state or local rules or procedures that may, like the lack of a Social Security number or employment authorization, pose obstacles to obtaining a license. Specifically, in § 214.2(h)(4)(v)(C)(2)(i), DHS is adding the phrase "or met a technical requirement" following the references to the Social Security number and employment authorization. DHS is making similar conforming changes in two places in § 214.2(h)(4)(v)(C)(2)(ii).

Third, in § 214.2(h)(4)(v)(C)(2)(ii), which discusses the petitioner's qualifications for a license, DHS is adding "substantive" in front of the word "requirements," to allow flexibility to account for various state specific requirements. DHS is adding these clarifications to address other analogous obstacles of which DHS is not specifically aware, which present similar situations where the beneficiary

---

[4] Such petitions will remain approved unless revoked on other grounds.

AC00146

is qualified for licensure, but may not obtain the licensure because of a technical requirement.

In addition, DHS is making technical edits by replacing the use of the word "or" with "and" in the first clause of 8 CFR 214.2(h)(4)(v)(C)(2)(ii) to reflect that the beneficiary must have filed an application for the license in accordance with State and local rules and procedures. This does not change the intended meaning of the proposed rule. Finally, DHS is making a technical edit in the second clause by replacing the use of "and/or" with "or" preceding "procedures."

• *Definitions of non-profit entities related to or affiliated with an institution of higher education and governmental research organizations.* In the final rule, DHS is responding to public comment by editing proposed 8 CFR 214.2(h)(8)(ii)(F) and (h)(19), which define which entities are (1) nonprofit entities that are related to or affiliated with institutions of higher education, and (2) governmental research organizations for purposes of the H–1B visa program. H–1B nonimmigrant workers who are employed at such entities are exempt from the annual limitations on H–1B visas. Such entities are also exempt from paying certain fees in the H–1B program.

At § 214.2(h)(8)(ii)(F)(2), DHS is adding the phrase "if it satisfies any one of the following conditions," to clarify that a petitioner only has to meet one of the listed requirements. DHS is adding the same clarifying language to 8 CFR 214.2(h)(19)(iii)(B). In § 214.2(h)(8)(ii)(F)(2)(iv) and (h)(19)(iii)(B)(4), which address cap exemption and ACWIA fee exemption, respectively, for a nonprofit entity that is related to or affiliated with an institution of higher education based on a formal written affiliation agreement, DHS is replacing the term "primary purpose" with "fundamental activity" in response to public comments suggesting the term "primary purpose" was too restrictive. As a result, when a nonprofit entity claims exemption from the cap and ACWIA fee based on a formal written affiliation agreement with an institution of higher education, the final rule requires that "a fundamental activity" of the nonprofit entity is to directly contribute to the research or education mission of the institution of higher education. DHS is also removing the phrase "absent shared ownership or control" from § 214.2(h)(8)(ii)(F)(2)(iv) and (h)(19)(iii)(B)(4) to clarify that an entity need not prove the absence of shared ownership or control when relying on the existence of a formal affiliation agreement to establish

that a nonprofit entity is related to or affiliated with an institution of higher education.

In addition, DHS is defining the phrase "governmental research organization" in § 214.2(h)(19)(iii)(C) to include state and local government research entities, and not just federal government research entities, whose primary mission is the performance or promotion of basic research and/or applied research. This definition is adopted for cap exemption purposes at 8 CFR 214.2(h)(8)(ii)(F)(3).

• *Calculating the maximum H–1B admission period.* In the final rule, DHS is responding to public comment by revising proposed 8 CFR 214.2(h)(13)(iii)(C), which discusses how to calculate the time spent physically outside the United States during the validity of an H–1B petition that will not count against an individual's maximum authorized period of stay in H–1B status. DHS is amending the regulatory text to clarify that there is no temporal limit on recapturing time. The amendment makes clear that such time may be recaptured in a subsequent H–1B petition on behalf of the foreign worker, "at any time before the alien uses the full period of authorized H–1B admission described in section 214(g)(4) of the Act." DHS also is making a technical edit to § 214.2(h)(13)(iii)(C)(1) to clarify which form may be used for this provision.

• *Lengthy adjudication delay exemption from section 214(g)(4) of the Act.* In the final rule, DHS is responding to public comment by revising several subsections of proposed 8 CFR 214.2(h)(13)(iii)(D), which governs when a nonimmigrant may be eligible for H–1B status in 1-year increments beyond the 6-year limitation that otherwise applies. DHS is amending the text of proposed 8 CFR 214.2(h)(13)(iii)(D)(1) by striking the phrase, "prior to the 6-year limitation being reached." This change clarifies that a qualifying labor certification or Form I–140 petition is not required to be filed 365 days before the 6-year limitation is reached in order for the individual to be eligible for an exemption under section 106(a) of AC21; instead, the labor certification or Form I–140 petition would need to be filed at least 365 days before the day the exemption would take effect. DHS is also making several revisions to simplify and clarify § 214.2(h)(13)(iii)(D)(5), which concerns advance filing; § 214.2(h)(13)(iii)(D)(6), which defines petitioners who may seek the exemption; § 214.2(h)(13)(iii)(D)(7), which describes subsequent exemption

approvals after the 7th year; and § 214.2(h)(13)(iii)(D)(10), which describes limits on future exemptions from the lengthy adjudication delay.

• *Per country and worldwide limits.* In the final rule, DHS is responding to public comment by revising proposed 8 CFR 214.2(h)(13)(iii)(E), which governs when a nonimmigrant may be eligible for H–1B status in 3-year increments beyond the 6-year limitation that otherwise applies. This provision addresses eligibility for an extension of H–1B status under section 104(c) of AC21. DHS is striking the phrase, "the unavailability must exist at time of the petition's adjudication" to reflect longstanding DHS policy. By striking this phrase, DHS is clarifying that if the Visa Bulletin that was in effect on the date the H–1B petition is filed shows that the individual was subject to a per country or worldwide visa limitation, DHS may grant the extension under section 104(c) of AC21, even if the immigrant visa is available when the petition is adjudicated, so long as the beneficiary is otherwise eligible.

• *Retaliatory action claims.* In the final rule, DHS is responding to public comment by amending proposed 8 CFR 214.2(h)(20), which discusses eligibility for extensions of stay in H–1B status or change of status to other nonimmigrant classifications by beneficiaries who faced retaliatory action from their employers. Additionally, DHS is making a minor technical change to this section, correcting "labor certification application" to "labor condition application."

• *Validity of petition for continued eligibility for adjustment of status.* In the final rule, DHS is responding to public comment by amending proposed 8 CFR 245.25(a), which governs the circumstances in which an individual with a pending application for adjustment of status can move to a job in the same or a similar occupational classification. In particular, revisions are being made to implement DHS's current section 204(j) portability policy and longstanding practice related to the adjudication of qualifying Form I–140 petitions that are not approved at the time the beneficiary's application for adjustment of status has been pending for 180 days or more.

First, in § 245.25(a), DHS is replacing a general reference in the NPRM to a "USCIS designated form" with a specific reference to "Form I–485 Supplement J" as the form DHS intends to be used for an individual to demonstrate continuing eligibility for adjustment of status based on an existing or new job offer under INA 204(j).

Second, DHS also is clarifying that the Supplement J may be accompanied by "material and credible documentary evidence, in accordance with form instructions." This revision expands the types of evidence that can be submitted in support of Supplement J beyond "material and credible information provided by another Federal agency, such as information from the Standard Occupational Classification (SOC) system," as had been proposed. As a result, DHS is deleting the evidentiary list included in proposed § 245.25(b).

Third, DHS is revising proposed § 245.25(a)(2)(ii) to reaffirm that a qualifying Form I–140 petition must be approved before DHS examines a portability request under INA 204(j). Moreover, DHS is adding § 245.25(a)(2)(ii)(B) to confirm that, unless approval of the petition would be inconsistent with a statutory requirement, a pending qualifying Form I–140 petition may be approved if (1) the petitioner established the ability to pay at the time of filing the petition and (2) all other eligibility criteria are met at the time of filing and until the beneficiary's application for adjustment of status has been pending for 180 days.

Finally, DHS is reorganizing and renumbering § 245.25(a), and making other technical and conforming edits.

• *Concurrently filed EAD applications.* In the final rule, DHS is responding to public comment by amending proposed 8 CFR 274a.13(a) to facilitate USCIS's ability to notify the public of changes in concurrent filing procedures for EAD applications. DHS is adding text indicating that USCIS may announce on its Web site circumstances in which an EAD application may be filed concurrently with a related benefit request that, if granted, would form the basis for eligibility for employment authorization. Under the proposed rule, such announcement was limited to form instructions.

• *Automatic extensions of employment authorization for renewal applicants.* In the final rule, DHS is responding to public comment by amending proposed 8 CFR 274a.13(d) to clarify timeliness and termination rules for the automatic extension of certain EAD renewal applicants. DHS is clarifying that a renewal EAD application filed on the basis of a grant of TPS is timely if filed during the period described in the applicable **Federal Register** notice regarding procedures for renewing TPS. DHS is also making clarifying edits to the termination provision at § 274a.13(d)(3).

In addition to the above changes that were made in response to public comment, DHS is making several technical changes to the regulatory text in this final rule so that DHS regulations better reflect current ACWIA fee amounts and filing procedures:

• *ACWIA fee amount and filing procedures.* DHS is making technical changes to 8 CFR 214.2(h)(19)(i), (ii), (v), (vi) and (vii) to update the amount of the ACWIA fee applicable to certain H–1B petitions in accordance with statutory amendments, as well as procedures for submitting the fee to USCIS, or claiming an exemption from the fee, to conform with current procedures.[5] The statutory fee amount in INA 214(c)(9), 8 U.S.C. 1184(c)(9), was amended by section 1 of Pub. L. 106–311 (Oct. 17, 2000) (changing the fee amount from $500 to $1,000), and the Consolidated Appropriations Act, 2005, Pub. L. 108–447, Division J, Title IV, sec. 422 (L–1 Visa and H–1B Visa Reform Act) (Dec. 8, 2004) (permanently extending the fee and changing the fee amount from $1,000 to a bifurcated amount of $1,500 for employers with more than 25 employees, and half that amount for those with up to 25 employees). DHS is updating its regulations to conform the fee amount to the figure in current INA 214(c)(9). DHS regulations at 8 CFR 103.7(b)(1)(i)(CCC) and form instructions for the Petition for a Nonimmigrant Worker, Form I–129, already reflect these updated fee amounts. The technical changes also reflect the elimination of references to the now obsolete Form I–129W, which has been replaced by the Form I–129 H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement and which is already being used to make determinations for ACWIA fee exemptions.

• *Additional entities exempt from the ACWIA fee.* DHS is making a technical change to 8 CFR 214.2(h)(19)(iii) to include other entities that are statutorily exempt from the ACWIA fee, and thus to conform the regulation to INA 214(c)(9)(A), 8 U.S.C. 1184(c)(9)(A), as amended by section 1 of Pub. L. 106–311. DHS added a new paragraph (D) to include primary or secondary educational institutions, and a new paragraph (E) to include nonprofit entities that engage in an established curriculum-related clinical training of students registered at an institution of higher education. The Form I–129 and its form instructions already list these entities as fee exempt.

### B. Legal Authority

The authority of the Secretary of Homeland Security (Secretary) for these regulatory amendments is found in various sections of the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, ACWIA, AC21, and the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 101 *et seq.* General authority for issuing the final rule is found in section 103(a) of the INA, 8 U.S.C. 1103(a), which authorizes the Secretary to administer and enforce the immigration and nationality laws, as well as section 102 of the HSA, 6 U.S.C. 112, which vests all of the functions of DHS in the Secretary and authorizes the Secretary to issue regulations. Further authority for the regulatory amendments in the final rule is found in the following sections:

• Section 205 of the INA, 8 U.S.C. 1155, which grants the Secretary broad discretion in determining whether and how to revoke the approval of any Form I–140 petition approved under section 204 of the INA, 8 U.S.C. 1154;

• Section 214 of the INA, 8 U.S.C. 1184, including section 214(a)(1), 8 U.S.C. 1184(a)(1), which authorizes the Secretary to prescribe by regulation the terms and conditions of the admission of nonimmigrants;

• Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), which recognizes the Secretary's authority to extend employment authorization to noncitizens in the United States;

• Section 413(a) of ACWIA, which amended section 212(n)(2)(C) of the INA, 8 U.S.C. 1182(n)(2)(C), to authorize the Secretary to provide certain whistleblower protections to H–1B nonimmigrant workers;

• Section 414 of ACWIA, which added section 214(c)(9) of the INA, 8 U.S.C. 1184(c)(9), to authorize the Secretary to impose a fee on certain H–1B petitioners to fund the training and education of U.S. workers;

• Section 103 of AC21, which amended section 214(g) of the INA, 8 U.S.C. 1184(g), to provide: (1) An exemption from the H–1B numerical cap for certain H–1B nonimmigrant workers employed at institutions of higher education, nonprofit entities related to or affiliated with such institutions, and nonprofit research organizations or governmental research organizations; (2) that an H–1B nonimmigrant who ceases to be employed by a cap-exempt employer, and who was not previously counted against the cap, will be subject to the H–1B numerical limitations; and (3) that a worker who has been counted against

---

[5] DHS finds that prior notice and comment for these technical changes is unnecessary, as DHS is merely conforming its regulations to the self-implementing statutory amendments. *See* 5 U.S.C. 553(b)(B).

the H–1B numerical cap within the 6 years prior to petition approval will not again be counted against the cap unless the individual would be eligible for a new 6-year period of authorized H–1B admission.

• Section 104(c) of AC21, which authorizes the extension of authorized H–1B admission beyond the general 6-year maximum for H–1B nonimmigrant workers who have approved EB–1, EB–2, or EB–3 Form I–140 petitions but are subject to backlogs due to application of certain per-country limitations on immigrant visas;

• Section 105 of AC21, which added what is now section 214(n) of the INA, 8 U.S.C. 1184(n),[6] to allow an H–1B nonimmigrant worker to begin concurrent or new H–1B employment upon the filing of a timely, non-frivolous H–1B petition;

• Sections 106(a) and (b) of AC21, which, as amended, authorize the extension of authorized H–1B admission beyond the general 6-year maximum for H–1B nonimmigrant workers who have been sponsored for permanent residence by their employers and who are subject to certain lengthy adjudication or processing delays;

• Section 106(c) of AC21, which added section 204(j) of the INA to authorize certain beneficiaries of approved EB–1, EB–2, and EB–3 Form I–140 petitions who have filed applications for adjustment of status to change jobs or employers without invalidating their approved petitions; and

• Section 101(b)(1)(F) of the HSA, 6 U.S.C. 111(b)(1)(F), which establishes as a primary mission of DHS the duty to ''ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland.''

*C. Costs and Benefits*

Taken together, the amendments in this final rule are intended to reduce unnecessary disruption to businesses and workers caused by immigrant visa backlogs, as described in Section III.C of this preamble. The benefits from these amendments add value to the U.S. economy by retaining high-skilled workers who make important contributions to the U.S. economy, including technological advances and research and development endeavors, which are highly correlated with overall

economic growth and job creation.[7] For more information, the public may consult the Regulatory Impact Analysis (RIA), which addresses the short-term and long-term effects of these regulations. The RIA is available in the docket for this rulemaking.

DHS has analyzed potential costs of these regulations and has determined that the changes have direct impacts to individual beneficiaries of employment-based nonimmigrant and immigrant visa petitions in the form of filing costs, consular processing costs, and potential for longer processing times for EAD applications during filing surges, among other costs. Because some of these petitions are filed by sponsoring employers, this rule also has indirect effects on employers in the form of employee replacement costs.

The amendments clarify and amend policies and practices in various employment-based immigrant and nonimmigrant visa programs, with the primary aim of providing additional stability and flexibility to foreign workers and U.S. employers participating in those programs. In part, the final rule clarifies and improves upon longstanding policies adopted in response to the enactment of ACWIA and AC21 to ensure greater consistency across DHS adjudications and provide greater certainty to regulated employers and workers. These changes provide various benefits to U.S. employers and certain foreign workers, including the enhanced ability of such workers to accept promotions or change positions with their employers, as well as change employers or pursue other employment opportunities. These changes also benefit the regulated community by providing instructive rules governing: (1) Extensions of stay for certain H–1B nonimmigrant workers facing long delays in the immigrant visa process; (2) the ability of workers who have been sponsored by their employers for LPR status to change jobs or employers 180 days after they file applications for

adjustment of status; (3) the circumstances under which H–1B nonimmigrant workers may begin employment with a new employer; (4) the method for counting time in status as an H–1B nonimmigrant worker toward maximum periods of stay; (5) the entities that are properly considered related to or affiliated with institutions of higher education for purposes of the H–1B program; and (6) the circumstances under which H–1B nonimmigrant workers can claim whistleblower protections. The increased clarity provided by these rules enhances the ability of certain high-skilled workers to take advantage of the job portability and related provisions in AC21 and ACWIA.

The final rule also amends the current regulatory scheme governing certain immigrant and nonimmigrant visa programs to further enhance job portability for certain workers and improve the ability of U.S. businesses to retain highly valued individuals. These benefits are achieved by: (1) Revising the provisions affecting the continued validity of approved Form I–140 petitions, and retention of priority dates of those petitions, for purposes of processing immigrant visas or applications for adjustment of status; (2) establishing a means for certain nonimmigrant workers with approved Form I–140 petitions to directly request separate employment authorization for a limited time when facing compelling circumstances; (3) providing grace periods to certain nonimmigrants to enhance their ability to seek an authorized change of employment; and (4) identifying exceptions to licensing requirements applicable to certain H–1B nonimmigrant workers.

The final rule also amends current regulations governing the processing of applications for employment authorization to provide additional stability to certain employment-authorized individuals in the United States while addressing fraud, national security, and operational concerns. To prevent gaps in employment for such individuals and their employers, the final rule provides for the automatic extension of EADs (and, where necessary, employment authorization) upon the timely filing of a renewal application. To protect against fraud and other abuses, the final rule also eliminates current regulatory provisions that require adjudication of applications for employment authorization in 90 days and that authorize interim EADs when that timeframe is not met.

DHS has prepared a full costs and benefits analysis of the final rule, which can be found in the docket for this

---

[6] Section 8(a)(3) of the Trafficking Victims Protection Reauthorization Act of 2003, Public Law 108–193, (Dec. 19, 2003), redesignated section 214(m) of the INA, 8 U.S.C. 1184(m), as section 214(n) of the INA, 8 U.S.C. 1184(n).

[7] Hart, David, et al., ''High-tech Immigrant Entrepreneurship in the United States,'' Small Business Administration Office of Advocacy (July 2009), available at *https://www.sba.gov/sites/default/files/rs349tot_0.pdf. See also* Fairlie, Robert., ''Open for Business: How Immigrants are Driving Small Business Creation in the United States,'' The Partnership for a New American Economy (August 2012), available at: *http://www.renewoureconomy.com/sites/all/themes/pnae/openforbusiness.pdf;* ''Immigrant Small Business Owners a Significant and Growing Part of the Economy,'' Fiscal Policy Institute (June 2012), available at: *http://www.fiscalpolicy.org/immigrant-small-business-owners-FPI–20120614.pdf;* Anderson, Stuart, ''American Made 2.0 How Immigrant Entrepreneurs Continue to Contribute to the U.S. Economy,'' National Venture Capital Association (June 2013), available at: *http://nvca.org/research/stats-studies/.*

rulemaking on *regulations.gov*. The table below provides a summary of the provisions and impacts of this rule.

TABLE 1—SUMMARY OF PROVISIONS AND IMPACTS

| Provisions | Purpose | Expected impact of the final rule |
|---|---|---|
| Priority Date ........................ | Clarifies when a priority date is established for employment-based immigrant visa petitions that do not require a labor certification under INA 203(b). | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Removes ambiguity and sets consistent priority dates for affected petitioners and beneficiaries. |
| Priority Date Retention ......... | Explains that workers may retain priority dates and transfer those dates to new and subsequently approved Form I–140 petitions, except when USCIS revokes approval of the petition for: Material error, fraud or willful misrepresentation of a material fact, or revocation or invalidation of the labor certification accompanying the petition. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Results in administrative efficiency and predictability by explicitly listing when priority dates are lost as the approval of the petitions that are revoked under these specific grounds cannot be used as a basis for an immigrant visa.<br>• Improves the ability of certain workers to accept promotions, change employers, or pursue other employment opportunities. |
| Employment-Based Immigrant Visa Petition Portability Under 204(j). | Incorporates statutory portability provisions into regulation. | Quantitative:<br>Petitioners –<br>• Opportunity costs of time to petitioners for 1-year range from $126,598 to $4,636,448.<br>DHS/USCIS—<br>• Neutral because the new supplementary form to the application for adjustment of status to permanent residence will formalize the process for USCIS requests for evidence of compliance with INA 204(j) porting.<br>Qualitative:<br>Applicants/Petitioners—<br>• Replaces, through the Supplement J standardized form, the need for individuals to submit job offer and employment confirmation letters.<br>• Provides stability and job flexibility to certain individuals with approved employment-based immigrant visa petitions.<br>• Implements the clarifications regarding "same or similar occupational classifications" through the new Supplement J.<br>• Allows certain foreign workers to advance and progress in their careers.<br>• Potential increased employee replacement costs for employers.<br>DHS/USCIS—<br>• Administrative efficiency.<br>• Standardized and streamlined process. |
| Employment Authorization for Certain Nonimmigrants Based on Compelling Circumstances. | Provisions allowing certain nonimmigrant principal beneficiaries, and their dependent spouses and children, to apply for employment authorization if the principal is a beneficiary of an approved EB–1, EB–2, or EB–3 immigrant visa petition while waiting for his or her immigrant visa to become available. Applicants must demonstrate compelling circumstances justifying an independent grant of employment authorization. | Quantitative: Total costs over 10-year period to applicants are:<br>• $731.1 million for undiscounted costs.<br>• $649.9 million at a 3% discounted rate.<br>• $565.2 million at a 7% discounted rate.<br>Qualitative:<br>Applicants—<br>• Provides ability for nonimmigrants who have been sponsored for LPR status to change jobs or employers when compelling circumstances arise.<br>• Incentivizes such skilled nonimmigrant workers contributing to the economy to continue seeking LPR status.<br>• Nonimmigrant principal workers who take advantage of the compelling circumstances EAD will lose their current nonimmigrant status and may not be able to adjust to LPR status in the United States.<br>• Consular processing imposes potentially significant costs, risk and uncertainty for individuals and their families as well.<br>Dependents—<br>• Allows dependents to enter labor market earlier and contribute to household income. |

AC00150

TABLE 1—SUMMARY OF PROVISIONS AND IMPACTS—Continued

| Provisions | Purpose | Expected impact of the final rule |
|---|---|---|
| 90-Day Processing Time for Employment Authorization Applications. | Eliminates regulatory requirement for 90-day adjudication timeframe and issuance of interim-EADs. Adds provisions allowing for the automatic extension of EADs for up to 180 days for certain workers filing renewal requests. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>Applicants—<br>• Removing a regulatory timeframe and moving to one governed by processing goals could potentially lead to longer processing times whenever USCIS is faced with higher than expected filing volumes. If such a situation were to occur, this could lead to potential delays in work employment start dates for first-time EAD applicants until approval is obtained. However, USCIS believes such scenarios will be rare and mitigated by the automatic extension provision for renewal applications which will allow the movement of resources in such situations.<br>• Providing the automatic continuing authorization for up to 180 days for certain renewal applicants could lead to less turnover costs for U.S. employers. In addition, the automatic extension provision minimizes the applicants' risk of any gaps in employment authorization.<br>DHS/USCIS—<br>• Streamlines the application and card issuance processes.<br>• Enhances the ability to ensure all national security verification checks are completed.<br>• Reduces duplication efforts.<br>• Reduces opportunities for fraud and better accommodates increased security measures. |
| Automatic Revocation With Respect to Approved Employment-Based Immigrant Visa Petitions. | Revises regulations so that a petition may remain valid despite withdrawal by the employer or termination of the employer's business after 180 days or more of approval, or 180 days or more after the associated application for adjustment of status has been filed. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Beneficiary retains priority date unless the petition is revoked for one of the reasons specified in final 8 CFR 204.5(e)(2).<br>• Affords porting ability under INA 204(j) and extension of H–1B status pursuant to AC21 sections 104(c) and 106(a) and (b), as well as potential eligibility for the new compelling circumstances EAD. |
| Period of Admission for Certain Nonimmigrant Classifications. | Nonimmigrants in certain high-skilled, nonimmigrant classifications may be granted grace periods of up to 10 days before and after their validity period, and a grace period upon cessation of employment on which the foreign national's classification was based, for up to 60 days or until the end of their authorized validity period, whichever is shorter, during each authorized validity period. | Quantitative:<br>• Not estimated.<br>Qualitative: Nonimmigrant Visa Holders—.<br>• Assists the beneficiary in getting sufficiently settled such that he or she is immediately able to begin working upon the start of the petition validity period.<br>• Provides time necessary to wrap up affairs to depart the country.<br>• Allows the beneficiary to maintain nonimmigrant status when faced with a termination of employment to wrap up affairs, find new employment, or change to a different nonimmigrant classification. |
| Portability of H–1B Status Calculating the H–1B Admission Period Exemptions Due to Lengthy Adjudication Delays Per Country Limitation Exemptions Employer Debarment and H–1B Whistleblower Provisions. | Updates, improves, and clarifies DHS regulations consistent with policy guidance. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Formalizes existing DHS policy in the regulations, which will give the public access to existing policy in one location.<br>• Clarifies current DHS policy that there is no temporal limit on recapturing time. |
| H–1B Licensing Requirements. | Expands the evidence USCIS will examine in cases where a state allows an individual without licensure to fully practice the relevant occupation under the supervision of licensed senior or supervisory personnel in that occupation to include evidence of compliance with state requirements. Additionally, USCIS is expanding the possible situations in which it may approve an H–1B petition even though the beneficiary cannot obtain a license for certain technical reasons. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Provides additional flexibilities in obtaining necessary licensure while still permitting H–1B employment during the pendency of state or local license applications.<br>• Helps to relieve the circular predicament an H–1B beneficiary may encounter. |

AC00151

TABLE 1—SUMMARY OF PROVISIONS AND IMPACTS—Continued

| Provisions | Purpose | Expected impact of the final rule |
|---|---|---|
| | | • May minimally increase time burden for the petitioner to gather information and send it to USCIS. However, DHS anticipates that the benefits to the petitioner and beneficiary exceed the opportunity costs of time.<br>• May increase opportunity costs of time for USCIS adjudicators to evaluate additional evidence in such types of cases. However, DHS does not anticipate that the opportunity costs of time will be so substantial as to warrant additional hiring of staff or cause significant adjudication delays. |
| Exemptions to the H–1B Numerical Cap, Revised Definition of "Related or Affiliated Nonprofit Entity" in the ACWIA Fee Context, and Expanded Interpretation of "Governmental Research Organizations.". | Codifies definition of "institution of higher education" and adds a broader definition of "related or affiliated nonprofit entity." Also, revises the definition of "related or affiliated nonprofit entity" for purposes of the ACWIA fee to conform it to the new definition of the same term for H–1B numerical cap exemption. Expands the interpretation of "governmental research organizations" for purposes of the ACWIA fee and aligns definitions for H–1B cap and fee exemptions. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Clarifies the requirements for a nonprofit entity to establish that it is related to or affiliated with an institution of higher education.<br>• Better reflects current operational realities for institutions of higher education and how they interact with, and sometimes rely on, nonprofit entities.<br>• Clarifies the interpretation of governmental research organizations to include federal, state, and local governmental organizations.<br>• May expand the numbers of petitioners that are cap exempt and thus allow certain employers greater access to H–1B workers. |

## III. Background

### A. ACWIA and AC21

#### 1. The American Competitiveness and Workforce Improvement Act of 1998

ACWIA was enacted on October 21, 1998. Among other things, ACWIA was intended to address shortages of workers in the U.S. high-technology sector. To increase the number of such workers in the United States, section 411 of ACWIA increased the annual numerical cap on H–1B visas from 65,000 to 115,000 in each of fiscal years (FY) 1999 and 2000, and to 107,500 in FY 2001.[8] *See* section 411 of ACWIA (amending INA 214(g)(1), codified at 8 U.S.C. 1184(g)(1)). The congressional statements accompanying ACWIA recognized that the continued competitiveness of the U.S. high-technology sector is "crucial for [U.S.] economic well-being as a nation, and for increased economic opportunity for American workers." *See* 144 Cong. Rec. S12,741, S12,749 (daily ed. Oct. 21, 1998) (statement of Sen. Spencer Abraham); *see also id.* ("This issue is not only about shortages, it is about opportunities for innovation and expansion, since people with valuable skills, whatever their national origin,

will always benefit our nation by creating more jobs for everyone.")[9]

ACWIA also included several measures intended to improve protections for U.S. and H–1B nonimmigrant workers. Section 413 of the ACWIA provided enhanced penalties for employer violations of Labor Condition Application (LCA) obligations as well as willful misrepresentations by employers in LCAs. *See* ACWIA 413 (creating INA 212(n)(2)(C), codified at 8 U.S.C. 1182(n)(2)(C)). Section 413 of ACWIA also made it a violation for an H–1B employer to retaliate against an employee for providing information to the employer or other persons, or for cooperating in an investigation, related to an employer's violation of its LCA attestations and obligations. Employers are prohibited from taking retaliatory action in such situations, including any action "to intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate" against an employee for "disclos[ing] information to the employer, or to any other person, that the employee reasonably believes evidences [an LCA] violation, any rule or regulation pertaining to the statutory

LCA attestation requirements, or for cooperating, or attempting to cooperate, in an investigation or proceeding pertaining to the employer's LCA compliance." *See* INA 212(n)(2)(C)(iv), 8 U.S.C. 1182(n)(2)(C)(iv). Section 413 further required the development of a process to enable H–1B nonimmigrant workers who file complaints with DOL regarding illegal retaliation, and are otherwise eligible to remain and work in the United States, to seek other appropriate employment in the United States. *See* INA 212(n)(2)(C)(v), 8 U.S.C. 1182(n)(2)(C)(v).

Section 414 of ACWIA imposed a temporary fee on certain H–1B employers to fund, among other things, job training of U.S. workers and scholarships in the science, technology, engineering, and mathematics (STEM) fields. *See* ACWIA 414 (creating INA 214(c)(9), codified at 8 U.S.C. 1184(c)(9)). Although initially scheduled to sunset, the ACWIA fee was eventually made permanent by the H–1B Visa Reform Act of 2004, enacted as part of the Consolidated Appropriations Act, 2005, Public Law 108–447, div. J, tit. IV. That later enactment also established the current fee amounts of $1,500 per qualifying petition, or $750 for employers with no more than 25 full-time equivalent employees employed in the United States (including employees employed by any affiliate or subsidiary of such employer). Congress in the interim had amended section 214(c)(9)(A) of the INA, 8 U.S.C. 1184(c)(9)(A), by specifying additional

---

[8] Section 102(a) of AC21 further amended INA 214(g)(1) by increasing the annual numerical cap on H–1B visas to 195,000 for each of the fiscal years 2001, 2002, 2003. In fiscal year 2004 the annual H–1B numerical cap reverted to 65,000.

[9] Senator Abraham drafted and sponsored the original Senate bill for ACWIA, then titled the American Competitiveness Act, S. 1723, 105th Cong. (1998), which passed the full Senate by a 78–20 margin on May 18, 1998. 144 Cong. Rec. as S12,748–49 (daily ed. Oct. 21, 1998). He negotiated with the House of Representatives on a compromise ACWIA bill and was deputized to negotiate in talks between Congress and the White House to finalize the bill.

employers that are exempt from the ACWIA fee. *See* Act of Oct. 17, 2010, Public Law 106–311. Exempt employers include primary and secondary education institutions, certain institutions of higher education and related or affiliated nonprofit entities, nonprofit entities engaged in curriculum-related clinical training, and nonprofit research organizations or governmental research organizations. *See* INA 214(c)(9)(A), 8 U.S.C. 1184(c)(9)(A).

2. The American Competitiveness in the Twenty-First Century Act of 2000

AC21 was enacted on October 17, 2000. It made numerous changes to the INA designed to improve the U.S. economy in the short and long term. First, AC21 sought to improve economic growth and job creation by immediately increasing U.S. access to high-skilled workers. *See* S. Rep. No. 260, at 10 ("[A]rtificially limiting companies' ability to hire skilled foreign professionals will stymie our country's economic growth and thereby partially atrophy its creation of new jobs . . . American workers' interests are advanced, rather than impeded, by raising the H–1B cap"). Second, AC21 sought to improve the education and training of U.S. workers in high-skilled sectors, and thereby produce a U.S. workforce better equipped to fill the need in such sectors, through the funding of scholarships and high-skilled training programs. *See* section 111 of AC21. As noted by the accompanying Senate Report, foreign-born high-skilled individuals have played an important role in U.S. economic prosperity and the competitiveness of U.S. companies in numerous fields. *Id.* AC21 sought to provide such benefits by improving both the employment-based immigrant visa process and the H–1B specialty occupation worker program.

i. AC21 Provisions Relating to Employment-Based Immigrant Visas

AC21 contained several provisions designed to improve access to employment-based immigrant visas for certain workers. Section 104 of AC21, for example, sought to ameliorate the impact of the "per-country limitations," which generally limit the number of immigrant visas that may be issued to the nationals of any one country to no more than 7 percent of the total number of immigrant visas. *See* INA 202(a)(2), 8 U.S.C. 1152(a)(2). Sections 104(a) and (b) of AC21 amended the INA to effectively waive application of the per-country limitations when such application would result in immigrant visas going unused in any quarter of the

fiscal year. *See* AC21 104(a) and (b) (amending INA 202(a)(5), codified at 8 U.S.C. 1152(a)(5)); *see also* S. Rep. No. 260, 106th Cong., 2nd Sess. at 2. This provision recognized "the discriminatory effects of [the per-country limitations] on nationals from certain Asian Pacific nations," specifically Chinese and Indian nationals, which "prevent[ed] an employer from hiring or sponsoring someone permanently simply because he or she is Chinese or Indian, even though the individual meets all other legal criteria." *See* S. Rep. No. 260, at 22.

Section 104(c) of AC21 was designed to further ameliorate the impact of the per-country limitations on H–1B nonimmigrant workers who are the beneficiaries of approved EB–1, EB–2, or EB–3 Form I–140 petitions. Specifically, section 104(c) of AC21 authorized the extension of H–1B status beyond the statutory 6-year maximum for such individuals if immigrant visas are not immediately available to them because the relevant preference category is already over-subscribed for that foreign national's country of birth. *See* AC21 104(c). In support of this provision, Congress noted that "these immigrants would otherwise be forced to return home at the conclusion of their allotted time in H–1B status, disrupting projects and American workers." *See* S. Rep. No. 260, at 22. Section 104(c) "enables these foreign nationals to remain in H–1B status until they are able to receive an immigrant visa and adjust their status within the United States, thus limiting the disruption to American businesses." *Id.*

AC21 also sought to more generally ameliorate the impact of the lack of employment-based immigrant visas on the high-skilled beneficiaries of approved Form I–140 petitions. Sections 106(a) and (b) of AC21, as amended by section 11030A of the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273 (2002), authorized the extension of H–1B status beyond the statutory 6-year maximum for H–1B nonimmigrant workers who are being sponsored for LPR status by U.S. employers and are subject to lengthy adjudication or processing delays. Specifically, these provisions exempted H–1B nonimmigrant workers from the 6-year limitation on H–1B status contained in INA 214(g)(4), if 365 days or more have elapsed since the filing of a labor certification application (if such certification is required under INA 212(a)(5), 8 U.S.C. 1182(a)(5)), or a Form I–140 petition under INA 203(b), 8 U.S.C. 1153(b). These provisions were

intended to allow such high-skilled individuals to remain in the United States as H–1B nonimmigrant workers, rather than being forced to leave the country and disrupt their employers due to a long-pending labor certification application or Form I–140 petition. *See* S. Rep. No. 260, at 23.

Finally, to provide stability and flexibility to beneficiaries of approved Form I–140 petitions subject to immigrant visa backlogs and processing delays, AC21 also provided certain workers the improved ability to change jobs or employers without losing their positions in the immigrant visa queue. Specifically, section 106(c) of AC21 provides that certain Form I–140 petitions filed under the EB–1, EB–2, and EB–3 preference categories will remain valid with respect to a new qualifying job offer if the beneficiary changes jobs or employers, provided an application for adjustment of status has been filed and such application has been pending for 180 days or more. *See* AC21 106(c) (creating INA 204(j)). The new job offer must be in the same or a similar occupational classification as the job for which the original Form I–140 petition was filed. *Id.*

ii. AC21 Provisions Seeking To Improve the H–1B Nonimmigrant Worker Classification

As noted above, one of the principal purposes for the enactment of AC21 was to improve the country's access to high-skilled workers. AC21 therefore contains several additional provisions intended to expand and strengthen the H–1B program.

a. Exemptions From the H–1B Numerical Cap

Section 103 of AC21 amended the INA to create an exemption from the H–1B numerical cap for those H–1B nonimmigrant workers who are employed or offered employment at an institution of higher education, a nonprofit entity related or affiliated to such an institution, or a nonprofit research organization or governmental research organization. *See* INA 214(g)(5)(A) and (B); 8 U.S.C. 1184(g)(5)(A) and (B). Congress deemed such employment advantageous to the United States, based on the belief that increasing the number of high-skilled foreign nationals working at U.S. institutions of higher education would increase the number of Americans who will be ready to fill specialty occupation positions upon completion of their education. *See* S. Rep. No. 260, at 21–22. Congress reasoned that "by virtue of what they are doing, people working in universities are necessarily immediately

AC00153

contributing to educating Americans.'' *Id.* at 21. Congress also recognized that U.S. institutions of higher education are on a different hiring cycle from other U.S. employers, and in years of high H–1B demand, these institutions would be unable to hire cap-subject H–1B nonimmigrant workers. *Id.* at 22.

For purposes of this H–1B numerical cap exemption, the term ''institution of higher education'' is given the same meaning as that set forth in section 101(a) of the Higher Education Act of 1965, Public Law 89–329, 79 Stat. 1224 (1965), as amended (codified at 20 U.S.C. 1001(a) (''Higher Education Act'')).[10] *See* INA 214(g)(5)(A), 8 U.S.C. 1184(g)(5)(A). Due to the lack of statutory definitions, DHS defined the terms ''related or affiliated nonprofit entity,'' and ''nonprofit research organization or governmental research organization'' at 8 CFR 214.2(h)(19)(iii)(B) and (C), respectively, and adopted these definitions as a matter of interpretation in the cap exemption context.[11]

b. Application of the H–1B Numerical Cap to Persons Previously Counted

Section 103 of AC21 also amended the INA to ensure that H–1B nonimmigrant workers can change jobs or employers without again being counted against the H–1B cap. Specifically, section 103 provides that an individual who has been counted

against the H–1B numerical cap within the 6 years prior to petition approval shall not be counted against the cap unless that individual would be eligible for a new 6-year period of authorized H–1B admission. *See* INA 214(g)(7), 8 U.S.C. 1184(g)(7). In addition, an individual previously in the United States in H–1B nonimmigrant status is eligible for a full 6 years of authorized admission as an H–1B nonimmigrant after residing and being physically present outside the United States for the immediate prior year. *Id.*

Section 103 of AC21 also amended the INA to address cases in which an H–1B nonimmigrant worker seeks to change employment from a cap-exempt entity to a ''cap-subject'' entity. Section 103 provides that once employment ceases with respect to a cap-exempt entity, the H–1B nonimmigrant worker will be subject to the cap if not previously counted and no other exemptions from the cap apply. *See* INA 214(g)(6), 8 U.S.C. 1184(g)(6).

c. H–1B Portability

Section 105 of AC21 further improved the H–1B program by increasing job portability for H–1B nonimmigrant workers. Specifically, section 105 allows an H–1B nonimmigrant worker to begin concurrent or new H–1B employment upon the filing of a timely, nonfrivolous H–1B petition. *See* INA 214(n), 8 U.S.C. 1184(n). The H–1B nonimmigrant worker must have been lawfully admitted to the United States, must not have worked without authorization after the lawful admission, and must be in a period of stay authorized by the Secretary.[12] Employment authorization based on the pending petition continues until adjudication. *See* INA 214(n)(1), 8 U.S.C. 1184(n)(1). If the H–1B petition is denied, the employment authorization provided under this provision ceases. *Id.* Congress created H–1B portability to ''allow an H–1B visa holder to change employers at the time a new employer files the initial paperwork, rather than having to wait for the new H–1B petition to be approved. This responds to concerns raised about the potential for exploitation of H–1B visa holders as a result of a specific U.S. employer's control over the employee's legal status.'' *See* S. Rep. No. 260, at 22–23.

*B. Processing Applications for Employment Authorization Documents*

The Secretary of Homeland Security has broad authority to extend employment authorization to noncitizens in the United States. *See, e.g.,* INA sections 103(a) and 274A(h)(3)(B), 8 U.S.C. 1103(a) and 1324a(h)(3)(B). DHS regulations at 8 CFR 274a.12(a), (b), and (c) describe three broad categories of foreign nationals authorized to work in the United States. Individuals in the first class, described at 8 CFR 274a.12(a), are authorized to work in the United States incident to their immigration status, without restriction as to the location of their employment or the type of employment they may accept. In many cases, their immigration status and attendant employment authorization is evidenced by the Arrival-Departure Record (Form I–94). Those individuals seeking to obtain an EAD that contains not only evidence of employment authorization, but also a photograph, typically must file a separate application with USCIS. *See* 8 CFR 274a.13(a).

Individuals in the second class, described at 8 CFR 274a.12(b), are employment authorized incident to their nonimmigrant status, but each individual's employment authorization is valid only with a specific employer. Individuals in this second group do not file separate requests for evidence of employment authorization and are not generally issued EADs. These individuals instead obtain a Form I–94 indicating their nonimmigrant status and attendant employment authorization.

Individuals in the third class, described at 8 CFR 274a.12(c), are required to apply for employment authorization and may begin working only if USCIS approves their application. This employment authorization is subject to the restrictions described in the regulations for the specific employment eligibility category. Generally, the approval of an EAD application by an individual described in 8 CFR 274a.12(c) is within the discretion of USCIS. There is no right to appeal the denial of an EAD application. *See* 8 CFR 274a.13(c).

Individuals requesting an EAD must file Form I–765 with USCIS in accordance with the form instructions. *See* 8 CFR 274a.13. Under current regulations, if USCIS does not adjudicate the Form I–765 within 90 days from the date USCIS receives the application, the applicant will be granted an interim document evidencing employment authorization

---

[10] Section 101(a) of the Higher Education Act of 1965, as amended, defines ''institution of higher education'' as an educational institution in any state that:

(1) admits as regular students only persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such a certificate, or persons who meet the requirements of [20 U.S.C. 1091(d)];

(2) is legally authorized within such state to provide a program of education beyond secondary education;

(3) provides an educational program for which the institution awards a bachelor's degree or provides not less than a 2-year program that is acceptable for full credit toward such a degree, or awards a degree that is acceptable for admission to a graduate or professional degree program, subject to review and approval by the Secretary [of Education];

(4) is a public or other nonprofit institution; and

(5) is accredited by a nationally recognized accrediting agency or association, or if not so accredited, is an institution that has been granted preaccreditation status by such an agency or association that has been recognized by the Secretary [of Education] for the granting of preaccreditation status, and the Secretary [of Education] has determined that there is satisfactory assurance that the institution will meet the accreditation standards of such an agency or association within a reasonable time.

[11] *See* USCIS Memorandum from Michael Aytes, ''Guidance Regarding Eligibility for Exemption from the H–1B Cap Based on § 103 of the American Competitiveness in the Twenty-First Century Act of 2000 (AC21) (Public Law 106–313)'' (June 6, 2006) (''Aytes Memo June 2006'') at 2–4.

[12] *See* USCIS Memorandum from Donald Neufeld, ''Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act'' (May 6, 2009) (''Neufeld May 2009 Memo'') (describing various ''periods of authorized stay''), available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/revision_redesign_AFM.PDF.*

AC00154

with a validity period not to exceed 240 days. *See* 8 CFR 274a.13(d).

## C. The Increasing Challenges Caused by Immigrant Visa Backlogs

The final rule addresses in part some of the challenges that flow from the statutory limits on immigrant visas, consistent with existing DHS authorities. The number of employment-based immigrant visas statutorily allocated per year has remained unchanged since the passage of the Immigration Act of 1990. In the intervening 25 years, the country's economy has expanded dramatically. The size of the U.S. economy, as measured by U.S. gross domestic product (GDP), increased by about 83 percent since 1990, rising from $8.955 trillion in 1990 to $16.397 trillion in 2015.[13] Over the same period, GDP per capita increased by just over 42 percent, rising from $35,794 in 1990 to $50,970 in 2015.[14] The number of entities doing business in the United States increased by at least 24 percent during the same period.[15] Over the same period, employer demand for immigrant visas has increasingly outpaced supply in some categories and for some nationalities, resulting in growing waits for some sponsored employees to obtain their LPR status. Such delays have resulted in substantial inequalities and other hardships flowing from limits on the ability of sponsored workers to change employment to enhance their skills, to accept promotions, or to otherwise change their positions. Since AC21 was enacted in October of 2000, certain workers seeking LPR status in the United States have faced increasing challenges as a consequence of the escalating wait times for immigrant visas. Numerical limitations in the various employment-based preference categories, combined with the per-country limitations that further reduce visa availability to certain workers, has produced significant oversubscription in the EB–2 and EB–3 categories, particularly for individuals born in India and China. This oversubscription results in substantial delays in obtaining LPR status for many workers, especially for workers from oversubscribed countries who can face delays that extend for more than a decade.[16]

AC21 was enacted as a response to the long and growing delays for many beneficiaries of Form I–140 petitions, to ameliorate the detrimental impact of such delays on the U.S. economy, U.S. businesses, and affected workers themselves. Those delays, however, have grown substantially longer than those that existed at the time AC21 was passed. Although DHS has worked diligently to improve processing times during the intervening period, visa backlogs due to statutory numerical limits for many individuals seeking EB–2 and EB–3 classification have grown significantly for certain individuals.[17] DHS recognizes the resulting realities confronting individuals seeking employment-based permanent residence who, due to immigrant visa unavailability, are required to wait many years for visas to become available before they can file applications for adjustment of status or seek immigrant visas abroad and become LPRs. In many instances, these individuals are in the United States in a nonimmigrant, employer-specific temporary worker category (*e.g.*, H–1B or L–1 visa classification) and may be unable to accept promotions or otherwise change jobs or employers without abandoning their existing efforts—including great investments of time and money—to become permanent residents. Their employment opportunities may be limited to their original job duties with the U.S. employer that sponsored their temporary admission to the United States, despite the fact that they may have gained professional experience that would otherwise allow them to progress substantially in their careers.

Many individuals subject to the immigrant visa backlogs confront the choice between remaining employed in a specific job under the same terms and conditions originally offered to them, or abandoning the pursuit of an immigrant visa altogether if they do not have another Form I–140 petition filed on their behalf. When such a worker changes employers or jobs—including a change to an identical job with a different employer or to a new but related job for the same employer—the worker is typically subject to uncertainty as to whether USCIS will approve his or her application for LPR status based on the change. Moreover, these individuals must consider whether such changes would involve expensive additional immigration processes, greatly discouraging them. Indeed, under current regulations, some changes in employment could result in the loss of nonimmigrant status, loss of the ability to change to another nonimmigrant status, loss of an approved immigrant visa, loss of the ability to obtain an immigrant visa or adjust to LPR status, or the need for the affected worker and his or her family to immediately depart the United States. As a result, these employees often suffer through many years of effective career stagnation, as they are largely dependent on current employers for immigration status and are substantially restricted in their ability to change employers or even accept promotions from, or make lateral movements within, their current employers.

Simply put, many workers in the immigrant visa process are not free to consider all available employment and career development opportunities. This effectively prevents U.S. employers from treating them like the high-potential individuals the employer hired them to be, thus restricting productivity and the promise they offer to our nation's economy. The lack of predictability and flexibility for such workers may also prevent them from otherwise investing in and contributing to the local, regional, and national economy or fully integrating into American society.

---

[13] U.S. Department of Commerce, Bureau of Economic Analysis, Table 1.1.6 Real Gross Domestic Product, Chained (2009) Dollars, *https://www.bea.gov/iTable/index_nipa.cfm.*

[14] U.S. Department of Commerce, Bureau of Economic Analysis, Table 7.1 Selected Per Capita Product and Income Series and Chained (2009) Dollars, *https://www.bea.gov/iTable/index_nipa.cfm.*

[15] *Compare* U.S. Census data collected in 1990 identifying over 4.61 million firms doing business in the United States, available at *http://www.census.gov/prod/www/economic_census.html,* with U.S. Census data collected in 2012 identifying over 5.72 million firms doing business, available at *http://www.census.gov/econ/susb/.*

[16] According to the Visa Bulletin for November 2016, immigrant visas are currently issuable to all persons qualifying under the EB–1 preference category. The EB–2 category Application Final Action date cutoff is current for all countries except for China and India; the cutoff date for China is July 15, 2012 and the cutoff date for India is November 1, 2007, meaning nationals of these countries may have to wait 4 to 9 years for a visa to be authorized for issuance. The Application Final Action cut-off dates for nationals of most countries under the EB–3 preference category are set at July 1, 2016 (a wait of less than five months). But for EB–3 Indian nationals, the Application Final Action cutoff dates are set at March 8, 2005 (a wait of more than 10 years) and EB–3 cutoff dates for Chinese nationals are set at April 15, 2013 (a wait of more than 3 years). *See* Visa Bulletin for November 2016, *https://travel.state.gov/content/visas/en/law-and-policy/bulletin/2017/visa-bulletin-for-november-2016.html.*

[17] According to the Visa Bulletin for October 2000 (the month AC21 was enacted), visa availability was current for all persons qualifying under the EB–1 preference category. The EB–2 category was current for all countries except for China and India. The EB–2 cut-off dates were March 8, 1999 for persons chargeable to China (a wait of 19 months) and November 1, 1999 for persons chargeable to India (a wait of 11 months). The EB–3 category likewise was current for all countries except for China and India, with a cut-off date of March 15, 1998 for individuals charged to China (a wait of 31 months) and February 8, 1997 for individuals charged to India (a wait of 44 months). *See http://dosfan.lib.uic.edu/ERC/visa_bulletin/2000-10bulletin.html.*

## IV. Discussion of Comments

### A. Overview of the Comments

During the 60-day public comment period, DHS received 27,979 comments offering a wide variety of opinions and recommendations on the NPRM and related forms. A range of entities and individuals submitted comments, including nonimmigrants seeking to become LPRs, U.S. workers, schools and universities, employers, labor organizations, professional organizations, advocacy groups, law firms and attorneys, and nonprofit organizations.

Many commenters expressed support for the rulemaking, in whole or in part. Supporters of the proposed rule agreed that it would help the United States attract and retain high-skilled foreign workers and would provide some relief to nonimmigrants and their families during their transition to LPR status. In particular, these commenters approved of the proposals to retain priority dates for the beneficiaries of immigrant visa petitions; provide grace periods of up to 60 days for certain high-skilled nonimmigrant workers to enhance job portability; extend grace periods of up to 10 days for certain high-skilled nonimmigrant workers so that they may more easily change or extend their nonimmigrant status; and codify guidance on counting previously exempt workers under nonimmigrant visa caps, as well as policies determining admission periods for such workers. Some commenters who generally supported the proposals also suggested changes to certain provisions.

Other commenters opposed the proposed rule for different reasons. Some commenters who opposed the proposed rule questioned DHS's legal authority to promulgate some of the regulatory changes contained therein. A substantial number of other commenters, however, objected to the proposed rule because they believed many proposed changes should and could be more expansive. Such commenters, for example, believed that the rule should have substantially broadened the criteria for obtaining independent employment authorization for beneficiaries of immigrant visa petitions, rather than limiting such a benefit to cases involving compelling circumstances. Many commenters who opposed the rule were intending immigrants who described their personal experiences to illustrate how they would have been helped by the additional changes they requested. Some commenters argued that the proposed rule did nothing more than codify existing policies and that DHS

could have gone further under existing statutory authorities.

A number of other comments were opposed to the proposed rule based on generalized concerns about its impact on the U.S. economy. Some commenters were concerned that this rule may facilitate the displacement of American workers in certain sectors of the U.S. economy, such as in the information technology sector. Other commenters were concerned that the rule could facilitate the displacement of U.S. workers and a decrease in wages for U.S. citizen workers. One commenter opposing the proposed rule advocated for developing U.S. citizens' employment skills to enable them to have more employment opportunities.

Others submitted comments related to the potential for fraud or to perceived irregularities in the rulemaking process. Commenters, for example, expressed concern that this rule could increase the potential for fraud and abuse, particularly by employers seeking to take advantage of the immigration system. Commenters also expressed concern that the substance of the rulemaking was unduly affected by a former lobbyist. Other commenters were concerned that provisions in the proposed rule would provide greater financial benefits to immigration attorneys and to USCIS than to the foreign workers who are the subject of the rule.

Finally, DHS received a number of comments that were beyond the scope of this rulemaking. For example, several commenters asked DHS to include provisions creating new immigration benefits for inventors, researchers, and founders of start-up enterprises, a proposal that was not raised in the NPRM and some of which is the subject of a different rulemaking.[18] Other commenters focused on the U.S. political climate without addressing the proposed rule. Similarly, some submitted comments on the merits of other commenters' views without providing their own views on the proposal itself.

DHS has reviewed all of the public comments received in response to the proposed rule and thanks the public for its extensive input during this process. In the discussion below, DHS summarizes and responds to all relevant comments that were timely submitted on the NPRM, which are grouped by subject area.

---

[18] *See* International Entrepreneur Rule, 81 FR 60129 (Aug. 31, 2016).

### B. Authority of DHS To Administer and Enforce Immigration Laws

#### 1. Description of DHS's Legal Authority

As discussed at length in section II.B. above, the authority of the Secretary for these regulatory amendments is found in various sections of the INA, ACWIA, AC21, and the HSA. General authority for issuing the final rule is found in section 103(a) of the INA, 8 U.S.C. 1103(a), which authorizes the Secretary to administer and enforce the immigration and nationality laws, as well as section 102 of the HSA, 6 U.S.C. 112, which vests all of the functions of DHS in the Secretary and authorizes the Secretary to issue regulations. Other sections of the INA, together with ACWIA and AC21, provide specific statutory authority for multiple provisions of the final rule as detailed in section III.A of this preamble. DHS notes that, to the extent some of the commenters' requests for changes require action from Congress or other Departments, the Department lacks the authority to adopt these changes. DHS believes that this final rule improves upon existing policies and provides additional flexibilities consistent with DHS's existing authority to administer the U.S. immigration system under the relevant statutes passed by Congress.

#### 2. Public Comments and Responses

*Comment.* Many commenters opposed the rule based on what they perceived to be insufficient legal authority supporting the proposed changes. Many of these commenters asserted that the provisions in this rule were tantamount to new immigration legislation and that the rule thus effected an "unconstitutional" circumvention of Congress' role to establish the immigration laws. A few commenters claimed that only certain discrete proposals included in this rule are beyond DHS's legal authority.

*Response.* DHS maintains that each proposed revision in this rule is fully within DHS's statutory authority. Section 103(a) of the INA, 8 U.S.C. 1103(a), expressly vests the Secretary with broad authority to administer and enforce the immigration laws, including by establishing regulations or prescribing such forms as necessary to carry out this authority. Additionally, section 102 of the HSA 6 U.S.C. 112, vests all of the functions of DHS in the Secretary and authorizes the Secretary to issue regulations.

This rulemaking reflects the lawful exercise of statutory authority delegated by Congress. In the preamble to this final rule, DHS has identified the statutory authorities for all of the

revisions being made, including various provisions of the INA, the HSA, ACWIA and AC21. Through this rulemaking, DHS is exercising its authority to promulgate regulations as necessary to properly implement and administer existing immigration laws. As such, this final rule will improve processes for U.S. employers seeking to sponsor and retain immigrant and nonimmigrant workers; provide greater stability and job flexibility for such workers; and increase transparency and consistency in the application of DHS policy related to affected classifications.

*Comment.* Several commenters questioned the general basis for various immigration actions taken by the Executive Branch related to businesses and high-skilled workers. These commenters believed that the Executive Branch has exceeded its role by taking it upon itself to "achieve something that [C]ongress has failed to do."

*Response.* As noted above, DHS has the requisite legal authority to issue this final rule. In enacting the INA, ACWIA, AC21, and the HSA, Congress accorded DHS the responsibility for implementing and administering these laws. Consistent with that authority, DHS is promulgating this final rule to further define and clarify existing statutory requirements. With this final rule, DHS is also responding to a specific directive from the Secretary to strengthen and improve various employment-based visa programs within the Department's existing legal authority,[19] including to "consider amending its regulations to ensure that approved, longstanding visa petitions remain valid in certain cases where the beneficiaries seek to change jobs or employers." [20] These executive actions do not impinge on Congress's legislative role.

*Comment.* Commenters stated that this rule would effectively increase the number of immigrant visas issued in excess of their respective annual caps. These commenters also expressed concern that the rule would increase the number of H–1B workers who would be cap-exempt. Specifically, commenters stated that this rule circumvents overall caps on authorized visas through a two-step process: (1) Authorizing an unlimited number of individuals to seek permanent residence in excess of the cap on immigrant visas; and (2) giving these individuals (and their spouses and

children) employment authorization while they wait for their immigrant visas to become available. For example, one commenter stated that the rule would "nullify[ ] Americans' statutory protections against job-threatening flows of excess foreign labor." Other commenters believed that the perceived increase in the number of visas that would be issued under this rule reflects the Administration's favoring of skilled immigrant workers over natural-born U.S. citizens. One commenter claimed that the proposal to allow an H–1B worker whose employer has applied for LPR status on the worker's behalf to stay and work in the United States beyond the 6-year limit violates the Constitution, including by "waiv[ing] federal law without action of the Congress of the United States." Additionally, one commenter expressed concern that the proposed changes would allow foreign workers in the United States on expired H–1B visas to extend their stay indefinitely by applying for employment-based LPR status. The commenter stated that this was an impermissible change because Congress is responsible for setting the annual limits on H–1B visas.

*Response.* DHS is not modifying immigrant or nonimmigrant numerical limits set forth in the INA and is not changing the classes of foreign workers who qualify for employment-based immigrant or nonimmigrant visas. Contrary to commenters' statements, the provisions contained in this rule reflect a clear congressional mandate with respect to H–1B beneficiaries who are pursuing LPR status, but face long waits due to backlogs resulting from the statutory limits on immigrant visas or certain other adjudication or processing delays. Through the enactment of AC21, Congress authorized these individuals to remain in the United States beyond their initial 6-year period of authorized admission. *See* AC21 104(c) and 106(a) and (b).

Finally, with regard to the concerns about this rule increasing the number of H–1B visas that are exempt from the annual limit, DHS notes that, for the most part, this regulation codifies longstanding policy and practice implementing the relevant provisions of AC21. This rule generally codifies already existing policy interpretations identifying which employers are cap-exempt under the H–1B program and DHS also includes revised definitions of "related or affiliated nonprofit entity" and "governmental research organizations" to clarify certain terms and to avoid confusion. *See* IV, part J. In particular, although the revised definitions may expand the number of

petitioners that are cap-exempt, DHS believes that the changes improve current policy by better reflecting current operational realities for institutions of higher education and governmental research organizations, and are consistent with the exemption enacted by Congress. In addition, DHS added a provision that will protect against indefinite H–1B extensions under section 106(a) of AC21. *See* 8 CFR 214.2(h)(13)(iii)(D)(*10*).

Additionally, DHS is not providing compelling circumstances employment authorization to an unlimited number of foreign workers and their dependents while they wait for immigrant visas to become available. Rather, DHS is allowing certain high-skilled nonimmigrant workers and their dependents, who are all on the path to LPR status, to apply for independent and temporary employment authorization if they meet certain criteria, including demonstrating that the workers need such employment authorization due to compelling circumstances. While some of the dependents of these individuals may not have been part of the workforce at the time they receive such employment authorization, they would eventually become part of the workforce even without this separate employment authorization as they are already on the path to permanent residence. *See* Section IV, part F of this preamble for a discussion of compelling circumstances employment authorization.

*C. Immigration Fraud and National Security Concerns*

1. Description of Final Rule and Changes From the NPRM

DHS's core responsibilities include enhancing homeland security and preventing terrorism, enforcing and administering the immigration laws, and ensuring the integrity of the immigration system.[21] When drafting this rule, DHS carefully considered the impact of the proposed regulatory provisions on the safety and security of our nation and the integrity of the immigration system. DHS believes that the regulations as proposed appropriately address these concerns and further believes that this final rule will not compromise its vigilance.

2. Public Comments and Responses

*Comment.* Several commenters raised concerns about terrorism stemming from foreign nationals in various immigration statuses, and the adequacy of

---

[19] *See* Memo from Jeh Charles Johnson, Secretary of Homeland Security, "Policies Supporting U.S. High-Skilled Business and Workers" (Nov. 20, 2014)(Secretary Johnson Nov. 20, 2014 memo), available at *http://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*
[20] *Id.*

[21] *See https://www.dhs.gov/our-mission.*

AC00157

background checks for those seeking to acquire immigration status.

*Response.* DHS takes its core mission to safeguard the homeland extremely seriously, and it has a number of mechanisms in place to detect fraud and security threats. Individuals requesting immigration benefits from USCIS are subject to a variety of background and security checks, which vary depending on the benefit. USCIS created the Fraud Detection and National Security Directorate (FDNS) in part to investigate whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the immigration system. FDNS officers resolve background check information and other concerns that surface during the processing of immigration benefit applications and petitions. Resolution of specific questions related to an application or petition often requires communication with law enforcement or intelligence agencies to make sure that the information pertains to the applicant or petitioner and to determine whether the information would have an impact on his or her eligibility for the benefit. FDNS officers also check various databases and public information, as well as conduct other administrative inquiries, including pre- and post-adjudication site visits, to verify information provided on, and in support of, applications and petitions. FDNS uses the Fraud Detection and National Security Data System (FDNS–DS) to identify fraud and track potential patterns. In addition, FDNS routinely works with U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and other law enforcement and intelligence agencies, consistent with all relevant policies on information sharing and referrals.[22]

*Comment.* DHS received several comments concerning alleged fraud in the EB–1, H–1B, and L–1 visa programs, including falsification of worker qualifications and other misuses. These commenters requested that additional measures be taken to combat fraud.

*Response.* DHS continually seeks to strengthen its abilities to detect and combat immigration-related fraud. Possible consequences for fraud already include detention and removal, inadmissibility to the United States, ineligibility for naturalization and other benefits, and criminal prosecution. *See, e.g.,* INA 101(f), 204(c), 212(a)(2) and

(a)(6), 236(c), 237(a)(1)(A) and (G), (a)(2) and (a)(3), 316(a), 318, 8 U.S.C. 1101(f), 1154(c), 1182(a)(2) and (a)(6), 1226(c), 1227(a)(1)(A) and (G), (a)(2) and (a)(3), 1427(a), 1429. USCIS adjudicators receive training to recognize potential fraud indicators across all benefit types and the guidelines for referring cases of suspected fraud for further investigation.

Additionally, as provided under section 214(c)(12) of the INA, 8 U.S.C. 1184(c)(12), a Fraud Prevention and Detection Fee must be paid by an employer petitioning for a beneficiary's initial grant of H–1B or L nonimmigrant classification, as well as for a beneficiary who is changing employers within these classifications. The INA requires fees deposited into the Fraud Prevention and Detection Account to be divided into thirds, and allocated to DHS, DOL, and DOS. *See* INA 286(v); 8 U.S.C. 1356(v). DHS uses its portion of the fees to support activities related to preventing and detecting fraud in the delivery of all immigration benefit types.[23]

Additionally, FDNS currently combats fraud and abuse across all benefit types—including the EB–1, EB–2, EB–3, H–1B, and L–1 programs—by developing and maintaining efficient and effective anti-fraud and screening programs, leading information sharing and collaboration activities, and supporting the law enforcement and intelligence communities. As mentioned above, FDNS's primary mission is to determine whether individuals or organizations requesting immigration benefits pose a threat to national security, public safety, or the integrity of the nation's immigration system. USCIS verifies information and combats immigration fraud using various tools, including the Administrative Site Visit and Verification Program (ASVVP), under which FDNS conducts compliance review site visits for petitions in the H–1B, L–1, and religious worker programs. USCIS also conducts checks of various USCIS and other databases, including the FDNS–DS and the Validation Instrument for Business Enterprises (VIBE). USCIS has formed a partnership with ICE, under which FDNS pursues administrative inquiries into most application and petition fraud and ICE conducts criminal

investigations into major fraud conspiracies. Individuals with information regarding fraud and abuse in the immigration benefits system are encouraged to contact FDNS at *reportfraudtips@uscis.dhs.gov*, by mail at 111 Massachusetts Ave. NW., Ste. 7002, Mail Stop 2280, Washington, DC 20529–2280, or call (202) 529–2280.

DHS believes that existing rules and measures collectively provide adequate tools to detect and combat fraud and abuse, and that this rulemaking does not require new or additional protections. Accordingly, DHS has not made any changes in response to these comments.

*D. Petitions for Employment-Based Immigrants and Priority Date Retention*

1. Description of Final Rule and Changes From the NPRM

The final rule clarifies when priority dates are established for employment-based immigrants and expands the ability of beneficiaries of approved Form I–140 petitions in the EB–1, EB–2, and EB–3 categories to retain their priority dates for use with subsequently filed Form I–140 petitions. First, the final rule fills a hole in current regulations. Existing regulations establish that the priority date of an employment-based immigrant visa petition accompanied by a labor certification is established when the labor certification is accepted for processing by DOL. Those regulations, however, do not indicate when the priority date is established for an employment-based petition that is *not* accompanied by a labor certification. To provide further clarity, this final rule provides, generally, that the priority date of a Form I–140 petition that does not require a labor certification is the date such petition is properly filed with USCIS. *See* final 8 CFR 204.5(d).

Second, the final rule disallows retention of the priority date of an approved Form I–140 petition if the approval of the petition is revoked because of fraud, willful misrepresentation of a material fact, the invalidation or revocation of a labor certification, or material error. *See* final 8 CFR 204.5(e). Third, the final rule amends existing automatic revocation regulations to prevent Form I–140 petitions that have been approved for 180 days or more from being automatically revoked based solely on the withdrawal of the petition by the petitioner or the termination of the petitioner's business. *See* final 8 CFR 205.1(a)(3)(iii)(C) and (D). In response to comments, the final rule also prevents automatic revocation of approved petitions that are withdrawn or where

---

[22] Individuals may report suspicious activity to ICE Homeland Security Investigations at *www.ice.gov/webform/hsi-tip-form* or at (866) 347–2423.

[23] Further information about USCIS use and collection of fees can be found in March 2015 Congressional testimony available at *https://www.uscis.gov/tools/resources-congress/presentations-and-reports/oversight-us-citizenship-and-immigration-services-ensuring-agency-priorities-comply-law-senate-committee-judiciary-subcommittee-immigration-and-national-interest-march-2015.*

the business terminates 180 days after an associated adjustment of status application is filed. *See id.* These approved petitions will continue to be valid for priority date retention purposes, unless approval is revoked on other grounds specified in final 8 CFR 204.5(e)(2).[24] They also generally will remain valid for various other purposes under immigration laws including: (1) Job portability under INA section 204(j); (2) extensions of status for certain H–1B nonimmigrant workers under sections 104(c) and 106(a) and (b) of AC21; and (3) eligibility for employment authorization in compelling circumstances under final 8 CFR 204.5(p).

In addition, the final rule clarifies that an approved Form I–140 petition that is subject to withdrawal or business termination cannot on its own serve as a bona fide employment offer related to the petition. *See* final 8 CFR 205.1(a)(3)(iii)(C) and (D). To obtain an immigrant visa or adjust status, beneficiaries of these petitions must have either new Form I–140 petitions filed on their behalf, or, if eligible for job portability under section 204(j) of the INA, new offers of employment in the same or a similar occupational classification. *See id.*; final 8 CFR 245.25(a)(2).

DHS believes these regulatory changes are critical to fully implementing the job portability provisions of AC21. Therefore, the final rule retains these proposals with minor modifications to reflect public comment summarized below.

2. Public Comments and Responses

i. Establishing a Priority Date

*Comment.* Several commenters supported the proposed clarification of the methods for establishing priority dates.

*Response.* DHS agrees with commenters and believes such clarification will provide increased transparency and certainty for stakeholders. As noted above, the final rule generally establishes that the priority date of an employment-based immigrant visa petition that does not require a labor certification is the date on which such petition is appropriately filed with USCIS. *See* final 8 CFR 204.5(d). Given commenters' support of

this provision, DHS adopts this provision as proposed, including the proposed technical edits to delete obsolete references and otherwise improve the readability of the rule. *Id.*

ii. Retaining a Priority Date

*Comment.* Some commenters stated that the policy that provides for the retention of priority dates in cases in which an employer withdraws an approved petition already existed before this rulemaking. Those commenters suggested that the rule thus provides no additional benefits to such beneficiaries as they await adjustment of status.

*Response.* DHS believes the final rule clarifies and expands the ability of beneficiaries of approved EB–1, EB–2, and EB–3 Form I–140 petitions to retain their priority dates for use with subsequently filed EB–1, EB–2, and EB–3 Form I–140 petitions. *See* final 8 CFR 204.5(e). The prior regulations disallowed priority date retention in all instances in which approval of a Form I–140 petition was revoked. Thus, under the prior regulations, revocation of a Form I–140 petition based on withdrawal by the petitioner would have prevented the beneficiary of the petition from retaining his or her priority date. The NPRM proposed to change the prior regulations so that the beneficiary of a Form I–140 petition can retain the priority date of that petition unless USCIS denies the petition or revokes the petition's approval due to: (1) Fraud or a willful misrepresentation of a material fact; (2) revocation or invalidation of the labor certification associated with the petition or (3) a determination that there was a material error with regards to USCIS's approval of the petition. *See* final 8 CFR 204.5(e)(2).

This change expands the ability of beneficiaries to retain the priority dates of approved Form I–140 petitions, including but not limited to when a petition's approval is revoked based solely on withdrawal of the petition. This provision improves the ability of certain workers to accept promotions, change employers, or pursue other employment opportunities without fear of losing their place in line for certain employment-based immigrant visas.

*Comment.* Although many commenters supported the retention of priority dates, one commenter objected to the retention of the earliest priority date in cases in which a worker is shifting between employment-based immigrant visa (EB) preference categories. The commenter believed the provision was unfair to individuals who have been waiting in those EB preference queues. The commenter did

not believe it was fair to have an individual who is recently entering a specific queue to receive a better position than an individual who has been waiting in that queue for some time, even if the former individual has been waiting in a different queue for a longer period of time.

*Response.* The ability to retain priority dates in cases in which a worker is changing EB preference categories has long been permitted under existing regulations at 8 CFR 204.5(e); it is not a policy newly afforded by this rulemaking. DHS believes that allowing certain beneficiaries of multiple approved Form I–140 petitions to continue to retain the earliest established priority date for use with subsequently approved Form I–140 petitions, including cases of transfers between EB preference categories, provides needed stability, job flexibility, and certainty for workers while they await adjustment of status. The policy also facilitates the ability of individuals to progress in their careers while they wait for visa availability. DHS believes the policy is consistent with the goals of the AC21 statute and has accordingly chosen to maintain it.

*Comment.* A number of commenters supported the provisions in proposed 8 CFR 205.1(a)(3)(iii)(C) and (D), which provide that approval of a Form I–140 petition will not be automatically revoked based solely on withdrawal by the petitioner or termination of the petitioner's business if 180 days or more have passed since petition approval. The commenters said these provisions provide needed clarity and assurance to workers about the retention of priority dates in cases involving withdrawal or business termination. Several other commenters requested that DHS allow Form I–140 petitions to remain valid and approved despite petitioner withdrawal or business termination regardless of the amount of time that has passed since petition approval (*i.e.,* even for petitions that have not been approved for 180 days or more).

*Response.* DHS agrees that retaining the NPRM proposal related to validity of Form I–140 petitions in the event of withdrawal or business termination will bring clarity and assurance to workers that a petition's approval is not automatically revoked based solely on an employer's withdrawal of the petition or termination of the employer's business 180 days or more after the petition is approved or the associated application for adjustment of status is filed. This provision is intended to provide greater stability and flexibility to certain workers who are the beneficiaries of approved Form I–

---

[24] The four grounds are (i) fraud, or a willful misrepresentation of a material fact; (ii) revocation by the Department of Labor of the approved permanent labor certification that accompanied the petition; (iii) invalidation by USCIS or the Department of State of the permanent labor certification that accompanied the petition; and (iv) a determination by USCIS that petition approval was based on a material error.

140 petitions and are well on the path to obtaining LPR status in the United States.

DHS notes, however, that commenters may have confused provisions that govern the retention of *priority dates* with provisions that govern the retention of *petition approval.* As proposed in this final rule, 8 CFR 204.5(e)(2) allows for the retention of the *priority date* of an approved EB–1, EB–2, or EB–3 Form I–140 petition regardless of the amount of time that has passed since petition approval. As discussed, once such a petition has been approved, the beneficiary may retain that priority date for use with another EB–1, EB–2, or EB–3 Form I–140 petition, so long as the approval of the former petition was not revoked due to: (1) Fraud or a willful misrepresentation of a material fact; (2) revocation or invalidation of the labor certification associated with the petition; or (3) a determination that there was a material error with regards to USCIS's approval of the petition. *See* final 8 CFR 204.5(e)(2). In contrast, final 8 CFR 205.1(a)(3)(iii)(C) and (D) allow for retention of a petition's approval, despite withdrawal or business termination, but only if such withdrawal or termination occurs 180 days or more after the approval or 180 days or more after the associated application for adjustment of status is filed. Thus, under this rule, the beneficiary of a Form I–140 petition may be able to retain his or her priority date even if approval of the petition is revoked due to withdrawal or business termination.

To further provide clarity in this area, DHS removed the phrase "provided that the revocation of a petition's approval under this clause will not, by itself, impact a beneficiary's ability to retain his or her priority date under 8 CFR 204.5(e)" from proposed 8 CFR 205.1(a)(3)(iii)(C) and (D). DHS intended this phrase to simply restate that under § 204.5(e), a priority date may be retained, despite withdrawal or business termination that occurs less than 180 days after the petition's approval. DHS is removing the phrase from the proposed text because it could be construed as creating an unintended exception to the priority date retention provision.

DHS declines to adopt commenters' proposal that a Form I–140 petition remains approved if the withdrawal or business termination occurs at any time before the Form I–140 has been approved for at least 180 days. DHS believes that the 180-day threshold is consistent with and furthers the goals of job portability under INA 204(j).

Additionally, DHS believes the 180-day threshold protects against fraud and misuse while providing important stability and flexibility to workers who have been sponsored for permanent residence. In addition to the period that it typically takes for a petitioning employer to obtain a labor certification from DOL and approval of a Form I–140 petition from DHS, the 180-day requirement provides additional assurance that the petition was bona fide when filed. The final rule, therefore, maintains Form I–140 petition approval despite petitioner withdrawal or business termination when such petitions have been approved for 180 days or more, or its associated adjustment of status application has been pending for 180 days or more. *See* final 8 CFR 205.1(a)(3)(iii)(C) and (D).

*Comment.* One commenter suggested changes to the regulatory text concerning the requirement that the Form I–140 petition be approved for 180 days or more. Specifically, the commenter recommended amending the text to make clear that the 180-day threshold would not apply in cases in which an applicant has a pending Application to Register Permanent Residence or Adjust Status (Form I–485) that may provide job portability under INA 204(j). The commenter stated that, as proposed, the regulation would create a "double" waiting period in the portability context, requiring the foreign national to wait 180 days from approval of the Form I–140 petition and an additional 180 days from filing of the application of adjustment of status in order to be able to move to a new position. The commenter believed this outcome would be inconsistent with congressional intent under AC21.

*Response.* DHS thanks the commenter for identifying the potential for confusion given the text of proposed § 205.1(a)(3)(iii)(C) and (D) and DHS's stated goal to codify and expand upon its existing policy implementing INA 204(j). DHS proposed to allow a Form I–140 petition to remain valid for certain purposes if such a petition was withdrawn or the petitioner's business terminated 180 days or more after the Form I–140 petition had been approved.

This provision was intended to build upon existing DHS policies that have governed the validity of Form I–140 petitions in the event of withdrawal or business termination before and after beneficiaries are eligible to change jobs or employers under INA 204(j). DHS did not intend that its regulatory proposal would modify the existing timeframe before an individual would become eligible to port under INA 204(j); rather, this provision was intended to protect

those individuals who are not yet eligible for INA 204(j) portability from the automatic revocation of the approval of a Form I–140 petition that had been approved for 180 days or more. Consistent with the intent of AC21 and DHS policy, DHS is revising the regulatory language at 8 CFR 205.1(a)(3)(iii)(C) and (D) to make clear that an approved Form I–140 petition involving withdrawal or business termination occurring 180 days or more after *either* petition approval *or* the filing of an associated application for adjustment of status remains approved, unless its approval is revoked on other grounds. *See* final 8 CFR 205.1(a)(3)(iii).

*Comment.* One commenter recommended that the final rule require that the beneficiary of an employment-based Form I–140 petition remain with the petitioning employer for at least 3 years before the employee is able to retain the priority date of that petition. The commenter stated that a 3-year "mandatory stay" would provide some stability and security to petitioning employers.

*Response.* DHS declines to adopt the commenter's suggested "mandatory stay" requirement as it is contrary to the principles and policy goals of this final rule. Furthermore, DHS notes that Form I–140 petitions are for prospective employment, and there is no guarantee that the beneficiary of an approved Form I–140 petition has or would be able to obtain work authorization to commence employment with the petitioner prior to obtaining lawful permanent residence. In addition, allowing priority date retention furthers the goals of AC21 to grant stability, flexibility, and mobility to workers who are facing long waits for LPR status.

*Comment.* Several commenters requested that the rule's provision restricting revocation of a petition's approval based on withdrawal or business termination apply retroactively to petitions whose approvals were revoked prior to the rule's publication.

*Response.* DHS appreciates the commenters' suggestion; however, DHS has determined that retroactive application of this provision would be problematic. Generally, there is a presumption against retroactive application of new regulations. *Cf. Bowen* v. *Georgetown Univ. Hosp.,* 488 U.S. 204 (1988). Moreover, in this case, retroactive application of the revised automatic revocation provision would impose a disproportionate operational burden on USCIS, as it would require significant manual work. USCIS systems cannot be queried based on the specific reason(s) for revocation, and USCIS would be required to manually identify

and review these cases in order to verify the reason(s) for revocation, thus creating a highly labor-intensive process that would significantly strain USCIS resources. Therefore, the final 8 CFR 205.1(a)(3)(iii)(C) and (D) provisions will apply prospectively from the effective date of this final rule.

iii. Priority Date Not Retained if Approval Revoked for Fraud, Willful Misrepresentation, DOL Revocation, Invalidation by USCIS or DOS, Material Error, or Petition Denial

*Comment.* Some commenters supported the rule's requirement that priority dates will not be retained in cases of fraud, willful misrepresentation, revocation or invalidation of the labor certification, a determination that petition approval was the result of an error, or the denial of the petition. Other commenters opposed the inability to retain priority dates where a Form I–140 petition's approval has been revoked based on a determination that USCIS erroneously approved the petition. One commenter requested that DHS change the standard for revoking petition approval in error to "material" error to remain consistent with other USCIS policies in cases where DHS's error in a prior adjudication requires review of that adjudicatory outcome.

*Response.* DHS agrees that it is important for the integrity of the immigration system not to retain a priority date in cases in which the approval of a Form I–140 petition is revoked for fraud, willful misrepresentation of a material fact, the invalidation or revocation of a labor certification, or USCIS error. Based on feedback from commenters, however, DHS has determined that the text of the proposed rule at § 204.5(e)(2)(iv) that reads, "[a] determination by USCIS that petition approval was in error," needs to be clarified. In the final rule, that text is amended to read, "[a] determination by USCIS that petition approval was based on a material error" in order to clarify that a priority date will only be lost in those cases in which the error leading to revocation involves the misapplication of a statutory or regulatory requirement to the facts at hand. *See* final 8 CFR 204.5(e)(2)(iv). The change to the "material error" standard is consistent with other USCIS policy that addresses agency deference to prior adjudicatory decisions.[25] Examples of material errors include

situations in which an adjudicator relied on an inaccurate employer identification number and associated financial information that did not pertain to the petitioner for purposes of establishing its continuing ability to pay the proffered wage; information later comes to light indicating that the petitioner did not establish the ability to pay under the applicable regulatory criteria; or an adjudicator finds evidence in a subsequent related matter that the beneficiary did not have the education or experience required for the position offered. DHS declines to accept commenters' recommendations that the final regulation remove the error standard in its entirety because of the need to take appropriate action in cases in which the petition was not approvable in the first instance. Furthermore, it should be noted that the scope of the "material error" standard pertains only to whether the priority date is retained based on a USCIS revocation of the petition approval.

*Comment.* One commenter suggested that USCIS allow the retention of Form I–140 priority dates even in cases in which it is later discovered that the petitioner made material misrepresentations on the original petition and the petition's approval is revoked, as well as cases in which the petition's approval is revoked based on USCIS error—so long as it can be reasonably verified that the beneficiary had no involvement in the misrepresentation or the error later discovered by USCIS.

*Response.* DHS understands that revocation of long approved Form I–140 petitions due to the later discovery of willful misrepresentation(s) committed by the petitioner, but that are unbeknownst to the beneficiary, can negatively impact the beneficiary by causing the loss of his or her priority date and, therefore, the beneficiary's place in line for an immigrant visa. The revocation of the approval of a long approved Form I–140 petition due to material errors that are not the fault of the beneficiary can also negatively impact the beneficiary. DHS, however, believes it would be inappropriate to allow a Form I–140 petition that had its approval revoked for fraud or willful misrepresentation of a material fact, or because the Form I–140 petition was not eligible for approval in the first place, to confer a priority date. Allowing the retention of such petition to remain in line ahead of other individuals who are the beneficiaries of properly approved Form I–140 petitions would be contrary to DHS's goal of upholding the integrity of the immigration system.

*Comment.* Some commenters requested that beneficiaries of approved Form I–140 petitions who are not yet eligible for 204(j) portability be permitted to change jobs and adjust status to lawful permanent residence without the requirement of obtaining a new application for labor certification and a new approved Form I–140 petition. Some who advocated for this change noted that the ability to reuse or "port" an approved Form I–140 petition should be available after the initial petition has been approved for 180 days or more, and others requested that portability be allowed immediately after the petition's approval. Similar to job portability under INA 204(j) in certain regards, these and other commenters suggested that beneficiaries of approved Form I–140 petitions should be allowed to change jobs, file a Form I–485 application and adjust status to lawful permanent residence on the basis of the original Form I–140 petition as long as the new job is in the same or a similar occupation as the job described in the approved Form I–140 petition. Some commenters stated that there is an increase in time and monetary costs associated with multiple labor certification filings. Most of the commenters agreed that very few benefits were provided by requiring a new labor certification. Commenters also expressed that "recertification" additionally deters employers from sponsoring current foreign worker employees who are beneficiaries of Form I–140 petitions based on new jobs. One commenter urged DHS to allow a withdrawn or revoked Form I–140 petition to remain valid for the purposes of obtaining an immigrant visa, in order to fully implement Congress's intent in passing AC21.

*Response.* A foreign worker may obtain an employment-based immigrant visa only if he or she is the beneficiary of an approved employment-based immigrant visa petition. *See* INA 204(b), 8 U.S.C. 1154(b). In this final rule, DHS is allowing certain approved Form I–140 petitions to remain approved for various purposes despite withdrawal or business termination. However, such a petition may not be used to obtain lawful permanent residence, unless it meets the requirements of INA 204(j).

With respect to obtaining lawful permanent residence under the EB–2 and EB–3 classifications, the INA requires that the worker be the beneficiary of a valid Form I–140 petition, which generally must be supported by a valid labor certification at the time of adjustment of status. *See* INA 203(b)(2), (3); 204(a)(1)(F); and 212(a)(5)(A) and (D), 8 U.S.C. 1153(b)(2),

---

[25] *See* USCIS Memorandum from William Yates, "The Significance of a Prior CIS Approval of a Nonimmigrant Petition in the Context of a Subsequent Determination Regarding Eligibility for Extension of Petition Validity" (Apr. 24, 2004).

(3); 1154(a)(1)(F); 1182(a)(5)(A) and (D). Outside of the 204(j) context, an approved Form I–140 petition filed by an employer that no longer intends to employ the worker upon approval of the Form I–485 application, whether presently or at any time in the future, does not represent a bona fide job offer and, therefore, is not sufficient to support an application for adjustment of status.

INA section 212(a)(5)(A) and (D) generally prohibits any foreign worker seeking to perform skilled or unskilled labor from being admitted to the United States under the EB–2 and EB–3 immigrant visa classifications unless the Secretary of Labor has determined and certified that there are not sufficient workers who are able, willing, qualified, and available to perform that work at the location the foreign worker will perform the work and that the employment of that foreign worker will not adversely affect the wages and working conditions of similarly situated U.S. workers. Under current DOL regulations, a permanent labor certification remains valid only for the particular job opportunity, for the individual named on the labor certification, and for the area of intended employment stated on the application for permanent labor certification. *See* 20 CFR 656.30(c)(2). However, section 106(c)(2) of AC21 created an exception to this admissibility requirement, by allowing an approved Form I–140 petition supported by the associated labor certification to remain valid for certain long-delayed adjustment applicants "with respect to a new job accepted by the individual after the individual changes jobs or employers if the new job is in the same or a similar occupational classification as the job for which the certification was issued." INA 212(a)(5)(A)(iv), 8 U.S.C. 1182(a)(5)(A)(iv). DHS does not have authority to regulate the terms and requirements of these labor certifications and therefore cannot prescribe what is necessary for the labor certification to remain valid even for long-delayed applicants for adjustment of status, although DHS does have authority to invalidate labor certifications for fraud or willful misrepresentation. The INA designates DOL as the federal department responsible for making permanent labor certification determinations.

While DHS cannot expand portability beyond the INA 204(j) context, the final rule does provide some additional flexibility and stability for individuals who may not be eligible for INA 204(j) portability, by allowing beneficiaries of

approved Form I–140 petitions to retain their priority dates in certain situations and allowing certain Form I–140 petitions to remain valid, including for purposes of section 204(j) portability, notwithstanding withdrawal of the petition or termination of the petitioner's business, as described above.[26]

iv. Beneficiary Standing To Challenge the Revocation of an Employment-Based Immigrant Visa Petition's Approval

*Comment.* Several commenters expressed concern that individual beneficiaries of Form I–140 petitions are not provided notice when USCIS seeks to revoke the approval of those petitions. The commenters stated that this policy prevented beneficiaries from checking the status of their pending Form I–140 petitions and providing the evidence needed to avail themselves of AC21 portability. The commenters stated that under USCIS's current practice, a beneficiary may be unaware that approval of his or her Form I–140 petition has been revoked until his or her application for adjustment of status is denied. The commenters stated that not providing beneficiaries with notice and an opportunity to respond in such cases raises serious issues of fundamental fairness that could be remedied by permitting beneficiaries of petitions that may afford portability under section 204(j) to participate in visa petition proceedings, consistent with Congress's intent when it enacted AC21. The commenters urged DHS to undertake rulemaking to bring notice regulations in line with the realities of today's AC21 statutory scheme. Finally, a commenter stated that beneficiaries of Form I–140 petitions have interests equal to or greater than those of petitioners, including because revocation impacts beneficiaries' ability to retain priority dates, their admissibility, their eligibility to have immigrant visa petitions approved on their behalf, and their eligibility for adjustment of status under section 245(i) of the INA, 8 U.S.C. 1255(i). The commenter added that the enactment of AC21 had altered the analysis of which individuals should be considered "interested parties" before USCIS on various issues, including the ability to

extend H–1B status beyond the 6-year maximum period and to port to a "same or similar" occupation under INA section 204(j). Commenters also cited to various recent federal cases that have supported the commenters' interpretation of AC21.

*Response.* DHS appreciates the concerns raised by these comments. While DHS is unable to address these concerns in this final rule because they are outside the scope of this rulemaking, DHS is considering separate administrative action outside of this final rule to address these concerns.

*E. Continuing and Bona Fide Job Offer and Supplement J Form*

1. Description of Final Rule and Changes From NPRM

The final rule at 8 CFR 245.25 codifies DHS policy and practice requiring that a foreign worker seeking to adjust his or her status to that of an LPR must have a valid offer of employment at the time the Form I–485 application is filed and adjudicated. DHS at final 8 CFR 245.25(a)(2) codifies the existing policy and practice to determine eligibility to adjust status based on a request to port under section 204(j) of the INA. In the final rule at 8 CFR 245.25(a)(2)(ii)(A) and (B), DHS reaffirms that a qualifying immigrant visa petition has to be approved before DHS examines a portability request under INA 204(j) and determines an individual's eligibility or continued eligibility to adjust status based on the underlying visa petition. DHS also codifies current practice regarding the adjudication of portability requests when the Form I–140 petition is still pending at the time the application for adjustment of status has been pending for 180 days or more in final 8 CFR 245.25(a)(2)(ii)(B).

Based on its program experience in adjudicating adjustment of status applications, USCIS determined that certain threshold evidence regarding the job offer is required in all cases to successfully determine eligibility for adjustment of status based on an employment-based immigrant visa petition and facilitate the administrative processing of INA 204(j) porting requests. USCIS has consequently developed a new form—Supplement J to Form I–485, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) ("Supplement J")—to standardize the collection of such information. The offer of employment may either be the original job offer or, pursuant to INA 204(j), a new offer of employment, including qualifying self-employment, that is in the same or similar occupational

---

[26] The priority date of the earliest petition will be preserved in cases where the Form I–140 petition has been approved, no matter the amount of time that has passed since the approval, subject to the restrictions in 8 CFR 204.5(e)(2). *See* final 8 CFR 204.5(e)(1). The priority date can be retained even if approval is subsequently revoked, unless it is revoked for fraud, willful misrepresentation of a material fact, the invalidation or revocation of a labor certification, or USCIS material error as required by 8 CFR 204.5(e)(2).

classification as the original job offer.[27] *See* final 8 CFR 245.25(a)(1)–(2). In the final rule at 8 CFR 245.25(a) and (b), DHS clarifies that it may require individuals to use Supplement J, or successor form, to confirm existing or new job offers prior to adjudication of an application to adjust status. DHS also eliminates duplicative evidentiary provisions that were proposed in 8 CFR 245.25(b). As amended, the final 8 CFR 245.25(a) makes clear that any supporting material and credible documentary evidence may be submitted along with Supplement J, according to the form instructions. The definition of "same or similar occupational classification" that was proposed in 8 CFR 245.25(c) is being retained without change in the redesignated final 8 CFR 245.25(b).

The use of Supplement J will ensure uniformity in the collection of information and submission of initial evidence. Supplement J will be used to assist USCIS, as appropriate, in confirming that the job offer described in a Form I–140 petition is still available at the time an individual files an application for adjustment of status, or a qualifying job offer otherwise continues to be available to the individual before final processing of his or her application for adjustment of status. Supplement J also will be used by applicants for adjustment of status to request job portability, and by USCIS to determine, among other things, whether a new offer of employment is in the same or a similar occupational classification as the job offer listed in the Form I–140 petition.

Supplement J collects necessary information about the job offer and includes attestations from the foreign national and employer regarding essential elements of the portability request. In a number of ways, Supplement J will improve the processing of porting requests submitted under INA 204(j). As further described in the responses to comments below, DHS is making a revision to the Supplement J instructions to clarify that individuals applying for adjustment of status on the basis of a national interest waiver (NIW), as well as aliens of extraordinary ability, are not required to use Supplement J. Currently, USCIS is not adding an extra fee for submission of this new supplement, but may

consider implementing a fee in the future.

2. Public Comments and Responses

i. Portability Under INA 204(j)

*Comment.* One commenter requested that DHS clarify regulatory language to reflect current practice that permits a foreign national whose application for adjustment of status has been pending for 180 days or more to request portability under INA 204(j) in cases in which the Form I–140 petition underlying the application for adjustment of status is not yet approved. The commenter noted that current policy allows for such portability requests to be made provided the Form I–140 petition was approvable based on the facts in existence at the time of filing, with the exception of the petitioner's ability to pay the offered wage. The commenter stated that this has been USCIS's policy since 2005, when DHS confirmed through policy guidance that the 180-day portability clock under INA 204(j) begins to run when the Form I–485 application is filed, not when the Form I–140 petition is approved. This commenter cited to the Aytes Memo, "Interim guidance for processing I–140 employment-based immigrant petitions and I–485 and H–1B petitions affected by the American Competitiveness in the Twenty-First Century Act (AC21) (Public Law 106–313)" (May 12, 2005, revised Dec. 27, 2005) (Aytes 2005 memo) at 2, 4–5.

*Response.* DHS agrees that clarification is needed in the final rule regarding DHS's practice for qualifying Form I–140 petitions that remain pending when the beneficiary's application for adjustment of status has been pending for 180 days or more. As noted by the commenter, there may be instances in which an individual can request job portability pursuant to INA 204(j) because the worker's Form I–485 application has been pending for 180 days or more, but the Form I–140 petition has not yet been adjudicated. In such cases, however, the qualifying Form I–140 petition must be approved before a portability request under INA 204(j) may be approved.

In response to this comment, DHS amended proposed 8 CFR 245.25(a)(2) to reflect DHS's current policy and longstanding practice related to such pending Form I–140 petitions.[28] In final

8 CFR 245.25(a)(2)(ii)(A) and (B), DHS reaffirms that a qualifying immigrant visa petition must be approved before DHS examines a portability request under INA 204(j) and determines an individual's eligibility or continued eligibility to adjust status on the basis of the underlying visa petition. DHS also sets forth in this final rule how USCIS will assess specific Form I–140 petition eligibility requirements, including the petitioner's ability to pay, when a porting request has been made on a pending Form I–140 petition.

First, in accordance with existing practice, USCIS will only adjudicate a qualifying Form I–140 petition in accordance with the standards described in final 8 CFR 245.25(a)(2)(ii) when USCIS has been notified that the beneficiary intends to port to a new job pursuant to INA 204(j). As indicated in the precedent decision, *Matter of Al Wazzan,* 25 I&N Dec. 359, 367 (BIA 2010), the qualifying immigrant visa petition—

must have been filed for an alien who is "entitled" to the requested classification and that petition must have been "approved" by a USCIS officer pursuant to his or her authority under the Act . . . [A] petition is not made "valid" merely through the act of filing the petition with USCIS or through the passage of 180 days.

The burden is on the applicant to demonstrate eligibility or otherwise maintain eligibility for adjustment of status to lawful permanent residence.[29] *See* INA sections 204(e) and 291, 8 U.S.C. 1154(e) and 1361; *see also Tongatapu Woodcraft of Hawaii, Ltd.* v.

---

[27] For additional information on USCIS policy regarding the parameters of porting to self-employment, please see USCIS memorandum, "Determining Whether a New Job is in "the Same or a Similar Occupational Classification" for Purposes of Section 204(j) Job Portability" (Mar. 18, 2016) ("Same or Similar Memo March 2016").

[28] As indicated in the proposed rule, regulatory provisions would "largely conform DHS regulations to longstanding agency policies and procedures established in response to certain sections of [ACWIA] and [AC21]." *See* 80 FR 81899, 81901 (Dec. 31, 2015). The new regulatory provision under 8 CFR 245.25(a)(2)(ii) is one such provision that "update[s] and conform[s] [DHS's] regulations

governing adjustment of status consistent with longstanding agency policy." *Id.* at 81915.

[29] USCIS may inquire at any time whether an applicant for adjustment of status has, or continues to have, a qualifying job offer until the applicant ultimately obtains lawful permanent residence. *See* INA sections 204(a)(1)(F), (b), (e), (j) and 212(a)(5), 8 U.S.C. 1154(a)(1)(F), (b), (e), (j), and 1182(a)(5); *cf. Yui Sing Tse* v. *INS,* 596 F.2d 831, 835 (9th Cir. 1979) (finding that an alien need not intend to remain at the certified job forever, but at the time of obtaining lawful permanent resident status, both the employer and the alien must intend that the alien be employed in the certified job); *Matter of Danquah,* 16 I&N Dec. 191 (BIA 1975) (adjustment of status denied based on the ground that the labor certification was no longer valid because the foreign national was unable to assume the position specified in the labor certification prior to obtaining adjustment of status). USCIS may become aware of certain information that raises questions about whether an applicant for adjustment of status continues to have a qualifying job offer (*e.g.,* a letter from the petitioner requesting the withdrawal of the petition). In this and similar instances when the Form I–140 petition has already been approved, USCIS may issue a Notice of Intent to Deny (NOID) or Request for Evidence (RFE) to the applicant to make sure that the applicant has a new job offer that preserves his or her eligibility to become a lawful permanent resident in connection with the same Form I–485 application and based on the same qualifying petition pursuant to INA 204(j).

*Feldman,* 736 F.2d 1305, 1308 (9th Cir. 1984) (stating that the applicant "bears the ultimate burden of proving eligibility" and that this burden "is not discharged until" lawful permanent residence is granted); 8 CFR 103.2(b)(1).

Second, in determining whether a Form I–140 petitioner meets the "ability to pay" requirements under 8 CFR 204.5(g)(2) for a pending petition that a beneficiary seeks to rely upon for 204(j) portability, DHS reviews the facts in existence at the time of filing. *See* final 8 CFR 245.25(a)(2)(ii)(B)(*1*).[30] Thus, during the adjudication of the petition, DHS reviews any initial evidence and responses to requests for evidence (RFEs), notices of intent to deny (NOIDs), or any other requests for more information that may have been issued, to determine whether the petitioner met the ability to pay requirement as of the date of the filing of the petition. To effectuate the intent of INA 204(j) to enable workers to change employment, DHS looks only at the facts existing at the time of filing to determine whether the original petitioner has the ability to pay, notwithstanding the language in 8 CFR 204.5(g)(2), which otherwise requires that a petitioner has continuing ability to pay after filing the petition and until the beneficiary obtains lawful permanent residence. To require that the original Form I–140 petitioner demonstrate a continuing ability to pay when the beneficiary no longer intends to work for that petitioner is illogical and would create an incongruous obstacle for the beneficiary to change jobs, thus unnecessarily undermining the purpose of INA 204(j). USCIS will not review the original petitioner's continuing ability to pay after the filing date of the qualifying petition before it may approve such petition and then review a portability request. Under this final rule, USCIS will continue to determine whether the subsequent offer of employment by an employer that is different from, or even the same as, the employer in the original Form I–140 petition is bona fide.

Third, DHS is clarifying for INA 204(j) portability purposes that a qualifying Form I–140 petition will be approved if eligibility requirements (separate and apart from the ability to pay requirement) have been met at the time

of filing and until the foreign national's application for adjustment of status has been pending for 180 days. *See* final 8 CFR 245.25(a)(2)(ii)(B)(*2*). Consistent with current policy and practice, DHS will review the pending petition to determine whether the preponderance of the evidence establishes that the petition is approvable or would have been approvable had it been adjudicated before the associated application for adjustment of status has been pending for 180 days or more.[31] For example, if DHS receives a written withdrawal request from the petitioner, or the petitioner's business terminates, *after* the associated application for adjustment of status has been pending for 180 days or more, DHS will not deny the petition based solely on those reasons.[32] DHS, however, will deny a Form I–140 petition if DHS receives the written withdrawal request, or a business termination occurs, *before* the associated application for adjustment of status has been pending for 180 days, even when DHS adjudicates the petition after the associated application for adjustment of status has been pending for 180 days or more.

Section 8 CFR 245.25(a)(2), as amended in this final rule, is consistent with AC21, existing regulations, USCIS policies implementing AC21, and current practice. Specifically, DHS reads 8 CFR 245.25(a)(2), as amended in this final rule, in harmony with 8 CFR 103.2(b)(1), which requires an applicant or petitioner to "establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication." In cases involving a request for INA 204(j) portability that is filed before USCIS adjudicates the Form I–140 petition, DHS will assess a petitioner's ability to pay as of the date the Form I–140 petition was filed and all other issues as of the date on which the application for adjustment of status was pending 180 days, regardless of the date on which the petition is actually adjudicated. DHS believes this policy meaningfully implements congressional intent in enacting INA 204(j) to allow

workers who cannot immediately adjust status based on backlogs to move to new employment while their applications for adjustment of status remain pending.

Accordingly, for petitioners to satisfy the ability to pay requirement in this limited context, eligibility will be deemed established for purposes of 8 CFR 103.2(b)(1) if the ability to pay existed at the time the priority date is established through time of the petition's filing. *See* 8 CFR 204.5(g)(2). Similarly, again in this limited INA 204(j) context, DHS is defining eligibility for all other Form I–140 eligibility requirements for purposes of 8 CFR 103.2(b)(1) (*i.e.,* separate and apart from the ability to pay requirement) as being established if such eligibility can be demonstrated at time of filing through the date the associated application for adjustment of status has been pending for 180 days, instead of the date the final decision is issued.

DHS believes that this specific adjudicatory practice is consistent with the requirements in 8 CFR 103.2(b)(1),[33] accommodates the circumstances contemplated in final 8 CFR 245.25(a)(2)(ii), and is important to ensure that the goals of AC21 are met. As a practical matter, petitioners have diminished incentives to address inquiries regarding qualifying Form I–140 petitions once the beneficiaries have a new job offer that may qualify for INA 204(j) portability and the relevant focus has shifted to whether the new job offer meets the requirements of INA 204(j). Accordingly, denying a qualifying Form I–140 petition for either ability to pay issues that occur after the time of filing, or for other petition eligibility issues that transpire after the associated application for adjustment of

---

[30] *See* Aytes 2005 Memo, at 2; Donald Neufeld Memorandum "Supplemental Guidance Relating to Processing Forms I–140 Employment-Based Immigrant Petitions and I–129 H–1B Petitions, and Form I–485 Adjustment Applications Affected by the American Competitiveness in the Twenty-First Century Act of 2000 (AC21) (Pub. L. 106–313), as amended, and the American Competitiveness and Workforce Improvement Act of 1998 (ACWIA), Title IV of Div. C. of Public Law 105–277" at 9, (May 30, 2008) ("Neufeld May 2008 Memo").

[31] *See* Aytes 2005 Memo, at 1 (stating in the response to Section I, Question 1 that if it is discovered that a beneficiary has ported under an unapproved Form I–140 petition and Form I–485 application that has been pending for 180 days or more, the adjudicator should, among other things, "review the pending I–140 petition to determine if the preponderance of the evidence establishes that the case is approvable or would have been approvable had it been adjudicated within 180 days").

[32] Under current INA 204(j) portability practice, DHS considers the date it receives a withdrawal request from the petitioner as the date of withdrawal regardless of the date on which DHS adjudicates the Form I–140 petition.

[33] The current language in 8 CFR 103.2(b)(1) requires in pertinent part that a petitioner "establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication." This policy was codified through a final rule (with request for comments) in 2011 in which DHS noted the "longstanding policy and practice, as well as a basic tenet of administrative law, [ ] that the decision in a particular case is based on the administrative record that exists at the time the decision is rendered." 76 FR 53764, 53770 (Aug. 29, 2011) (citing *Citizens to Preserve Overton Park* v. *Volpe,* 401 U.S. 402 (1972)). The practice that DHS currently outlines in 8 CFR 245.25(a)(2)(ii), in which DHS interprets eligibility through "adjudication" in 8 CFR 103.2(b)(1) as eligibility at the time of filing (for the ability to pay requirement) or eligibility at the time of filing and up to the day before the associated application for adjustment of status has been pending for 180 days (for other requirements separate and apart from the ability to pay requirement), were in place since at least 2005, are consistent with the AC21 statute, and were not superseded by the amendments to 8 CFR 103.2(b)(1) in 2011.

status has been pending for 180 days or more, would be contrary to a primary goal of AC21. Such a policy would in significant part defeat the aim to allow individuals the ability to change jobs and benefit from INA 204(j) so long as their associated application for adjustment of status has been pending for 180 days or more. DHS notes that this does not prevent DHS from requiring a response from the Form I–140 petitioner and taking appropriate action on a request for evidence or notice of intent to deny issued before the associated application for adjustment of status has been pending for 180 days or more or, if appropriate for reasons described below, after that period.

Finally, DHS maintains through this final rule its existing policy and practice to deny a pending Form I–140 petition at any time, and even after the associated application for adjustment of status has been pending for 180 days or more, if the approval of such petition is inconsistent with a statutory requirement in the INA or other law. *See* final 8 CFR 245.25(a)(2)(ii)(B)(*2*). For example, DHS will deny an otherwise qualifying Form I–140 petition at any time if the beneficiary seeks or has sought LPR status through a marriage that has been determined by DHS to have been entered into for the purpose of evading the immigration laws. *See* INA 204(c), 8 U.S.C. 1154(c). DHS also will deny, at any time, a pending Form I–140 petition that involves a petitioner or an employer that has been debarred, under INA 212(n)(2)(C)(i) and (ii), 8 U.S.C. 1182(n)(2)(C)(i) and (ii), even when the debarment occurs after the filing of the petition. Similarly, DHS will deny a Form I–140 petition, at any time, if the beneficiary is required by statute to be licensed to perform his or her job and the beneficiary loses such licensure before the petition is adjudicated. *See e.g.,* INA 212(a)(5)(B) and (C), 8 U.S.C. 1182(a)(5)(B) and (C). DHS notes that these examples do not encompass all scenarios when a statute requires DHS to deny a pending Form I–140 petition. DHS will review such petitions on a case-by-case basis.

*Comment.* Some commenters requested that DHS eliminate references to the Department of Labor's Standard Occupational Classification (SOC) system in the regulatory text governing the adjudication of porting requests. One commenter noted that occupations that rely on similar skills, experience, and education are often classified in disparate major groups within the SOC structure. This commenter was also concerned that the SOC system is updated only once every 8 years, a schedule that is often outpaced by the speed of innovation, particularly with STEM occupations. Another commenter described concern that adjudicators will rely exclusively on the SOC codes when determining whether two jobs are in the same or similar occupational classification(s) ("same or similar determinations").

*Response.* DHS agrees with the commenters and, in this final rule, removes the specific reference to SOC codes in the final rule. *See* final 8 CFR 245.25. This change from the proposed rule is consistent with DHS policy under which SOC codes are just one factor that may be considered, in conjunction with other material evidence, when making the portability determination. To demonstrate that two jobs are in the same or similar occupational classification(s) for purposes of INA 204(j) portability, applicants and/or their employers should submit all relevant evidence. Such evidence includes, but is not limited to, a description of the job duties for the new position; the necessary skills, experience, education, training, licenses or certifications required for the new job; the wages offered for the new job; and any other material and credible evidence submitted by the applicant. Applicants or their employers may also reference DOL's labor market expertise as reflected in its SOC system, which is used to organize occupational data and classify workers into distinct occupational categories, as well as other relevant and credible information, when making portability determinations.

DHS recognizes that variations in job duties are natural and may occur because they involve employers in different economic sectors. This does not necessarily preclude two positions from being in similar occupational classifications for purposes of 204(j) portability. SOC codes provide a measure of objectivity in such assessments and thus can help address uncertainty in the portability determination process.

*Comment.* Several commenters stated that the definition of "same or similar" in proposed 8 CFR 245.25(c) is overly restrictive and will particularly cause difficulty for workers seeking promotions because the definition may not cover moves to certain higher level positions. In contrast, another commenter stated that the proposed definition is arbitrary and capricious, and that the definition effectively lowers the standard set in prior DHS guidance. That commenter believed the new definition would effectively nullify the statutory requirements related to labor certification approval.

*Response.* DHS disagrees with these comments. Congress did not define the term "same or similar," thus delegating that responsibility and authority to DHS. Through this final rule, DHS adopts a definition that is consistent with the statutory purpose underlying INA 204(j), and that reflects both common dictionary definitions and longstanding DHS practice and experience in this area. As has long been the case, to determine whether two jobs are in the same occupational classification, USCIS looks to whether the jobs are "identical" or "resembling in every relevant respect." [34] To determine whether two jobs are in similar occupational classifications, USCIS looks to whether the jobs share essential qualities or have a "marked resemblance or likeness." [35]

DHS recognizes that individuals earn opportunities for career advancement as they gain experience over time. Cases involving career progression must be considered under the totality of the circumstances to determine whether the applicant has established by a preponderance of the evidence that the relevant positions are in similar occupational classifications for INA 204(j) portability purposes. For further guidance on the DHS analysis of cases involving career progression, commenters are encouraged to read the March 16, 2016, USCIS policy memorandum, "Determining Whether a New Job is in 'the Same or a Similar Occupational Classification' for Purposes of Section 204(j) Job Portability." [36]

ii. Concerns Raised Regarding Supplement J

*Comment.* DHS received a number of comments on the new Supplement J to Form I–485, many of which came from individuals who are currently in the process of pursuing lawful permanent residence as beneficiaries of Form I–140 petitions. Many commenters stated that the Supplement J requirement is an unnecessary burden that will make portability requests under INA 204(j) more complex and cumbersome. Commenters also stated that the requirement would create uncertainty and confusion among employers and applicants. Commenters noted that employers may understand the Supplement J requirement as a

---

[34] For additional information on USCIS policy regarding the parameters of porting to "same" or "similar" employment, please see Same or Similar Memo March 2016.

[35] *Id.*

[36] *Id.*

disincentive to retaining or hiring new foreign nationals, as the requirement would increase administrative burdens and legal risks for employers in an already time-consuming and expensive process. Commenters stated that employers unfamiliar with the INA 204(j) process may be unwilling to cooperate in the completion of Supplement J. They also noted that the Supplement J requirement may require employers to draft new company policies concerning the supplement, thus further increasing administrative burdens. Some commenters stated that the Supplement J requirement would disrupt employers' existing procedures covering individuals seeking portability under INA 204(j).

*Response.* The majority of commenters that opposed the Supplement J requirement argued that it would be burdensome and complex, but they did not provide detailed explanations, analysis, or evidence supporting these assertions. Individuals requesting job portability under INA 204(j) have typically complied with that provision by submitting job offer letters describing the new job offer and how that new job is in the same or a similar occupational classification as the job offer listed in the underlying Form I–140 petition. The Supplement J requirement is intended to replace the need to submit job offer and employment confirmation letters by providing a standardized form, which will benefit both individuals and the Department. Under this rule, individuals will now have a uniform method of requesting job portability and USCIS will have a standardized means for capturing all of the relevant information necessary for processing.[37] DHS believes that a single standardized form, with accompanying instructions, provides greater clarity to the public regarding the types of information and evidence needed to support job portability requests. The form also ensures continued compliance with Paperwork Reduction Act (PRA) requirements.

Given the large overall number and variety of benefit requests and applications that USCIS adjudicates each year, DHS can more efficiently intake and process INA 204(j) portability requests on Supplement J than those submitted through letter correspondence. Among other things, Supplement J provides a consistent format and uniform content, which allows DHS to more easily find and capture necessary information as well as match the form with the corresponding Form I–485 application. Because there is no standardized form currently associated with porting requests, DHS contract and records staff cannot efficiently enter data associated with those requests. With the Supplement J, standardized data can more readily be entered and tracked in agency electronic systems. This, in turn, will greatly enhance USCIS's ability to monitor the status of portability requests, track file movement, and otherwise improve accountability and transparency regarding USCIS's processing of portability requests.

DHS does not agree with several commenters' statements that the Supplement J requirement will increase uncertainty with respect to job portability requests. Rather, DHS believes that Supplement J will reduce past uncertainties by facilitating (1) the tracking of portability requests through the adjudication process, (2) the provision of timely acknowledgments and notices, and (3) the ability of individuals to know if their new job is in a same or a similar occupational classification before the Form I–485 application is adjudicated.

Additionally, an individual who seeks to port in the future may affirmatively file Supplement J to seek a determination as to whether a new job offer is in the same or a similar occupational classification. A DHS decision will inform the individual whether the new job offer can support the pending Form I–485 application and continued eligibility to obtain lawful permanent residence without the need for a new employer to file a new Form I–140 petition. This process will provide transparency into USCIS's ''same or similar'' determinations, providing individuals with increased certainty and better allowing them to make informed career decisions, such as whether to change jobs prior to final adjudication of the pending Form I–485 application.

While an applicant may be required to submit Supplement J when requesting job portability, or in response to an RFE or NOID, DHS does not believe that this new requirement will create significant new burdens or legal risks for employers and employees. As discussed in more detail in the Regulatory Impact Analysis (RIA), the submission of Supplement J will not impose significant additional burdens of time on employers, because employers are already required in such cases to submit job offer or employment confirmation letters supporting INA 204(j) portability. For this same reason, DHS believes the Supplement J requirement will also not impose significant new legal costs, including by increasing the likelihood that individuals or employers will need to consult with lawyers.[38]

While DHS presents a sensitivity analysis for the potential annual costs of Supplement J in the RIA as ranging from $126,598 to $4,636,448, DHS believes that the submission of Supplement J does not impose significant additional burdens on USCIS or employers because applicants are already required to submit letters from employers when requesting INA 204(j) portability. DHS does not have information on how long it currently takes to complete employment confirmation or job offer letters, so DHS cannot conduct side-by-side comparisons. However, anecdotal input suggests that, notwithstanding concern to the contrary, the Supplement J requirement in fact is roughly equivalent to the letter-writing process, as employment confirmation and job offer letters currently provide information similar to that requested in Supplement J.

Additionally, USCIS recognizes in the RIA that the simplified and standardized process provided by the Supplement J requirement may facilitate the ability of employees to change employers. This process, along with the potential for an increased awareness of INA 204(j) portability as a result of this regulation, could potentially increase the number of Supplement J forms submitted. While beneficial to applicants, such an increase has the potential to result in higher turnover for some employers, along with additional costs that may be incurred due to employee replacement. However, DHS does not currently have data on the percentage of employees who port to other employers vis-à-vis those who port to other positions with their same employers. In the RIA, DHS qualitatively discusses the potential costs to employers resulting from employee turnover.

DHS reiterates that the Supplement J requirement will streamline adjudication by providing clear instructions on the types of information

---

[37] Along with Supplement J, individuals will still be able to provide additional information and documentary evidence supporting any aspect of the porting request. Individuals, if they so choose, may also include a letter further explaining how the new job offer is in the same or a similar occupational classification as the job offer listed in the qualifying Form I–140 petition.

[38] DHS notes that the RIA in this rulemaking provides potential filing costs of Supplement J as prepared by human resources specialists, in-house attorneys, and other attorneys. DHS included such legal costs not because it believes that legal assistance will be required to fill out Supplement J, but because many individuals and employers already use attorneys to submit portability requests under INA 204(j).

AC00166

required to be submitted to USCIS. Additionally, DHS does not believe that employers will need to create any new administrative processes for filling out Supplement J, as employers are already required to submit job offer or employment confirmation letters. DHS believes that Supplement J places similar burden on employers from what is required through the current process. Similarly, because Supplement J requests substantially the same information that is currently provided by employers through letter correspondence, DHS does not believe the Supplement J creates any new legal risks for those employers. For a more detailed analysis of the economic impact of this rule, please refer to the full RIA published on *regulations.gov*.

*Comment.* Several commenters expressed concern that Supplement J will allow employers to take advantage of and assert more control over foreign workers. Some commenters specifically focused on the requirement that employers review and sign Supplement J before it is submitted to USCIS. Those commenters believed that this requirement could create a power dynamic in which employers could further control and exploit workers, including by forcing them to accept depressed wages.

*Response.* DHS does not believe that Supplement J will give employers more power over, or the ability to take advantage of, foreign workers. When the use of Supplement J becomes effective, an applicant for adjustment of status will continue to have the same flexibility to accept other job offers, if eligible for INA 204(j) portability, as they currently have.

Applicants requesting portability under INA 204(j) must provide evidence that the employer is a viable employer extending a bona fide offer of full-time employment to the applicant, and that the employer will employ the applicant in the job proffered upon the applicant's grant of lawful permanent resident status. The current practice is to have applicants submit this evidence in the form of job offer letters from employers. These letters must contain the employer's signature, as well as a certification that everything in the letter is true and correct. Supplement J does not depart from this past practice in any meaningful way. Because Supplement J requests the same information as is currently provided in letters that are currently provided by employers, and that contain the employer's signature, DHS does not see how the Supplement J requirement increases the ability to take advantage of, or otherwise assert control over, employees.

*Comment.* Many commenters also expressed concern that the Supplement J requirement will cause additional processing delays or fail to alleviate current employment-based immigrant visa wait times. Many commenters who were on the path to obtaining lawful permanent residence expressed their belief that the Supplement J requirement will exacerbate the already backlogged process for adjusting status. Commenters also suggested the requirement will lead to even more procedural requests for evidence, further delaying completion of processing efforts. Another commenter requested elimination of the Supplement J requirement from the rule, stating that the requirement would deter employers from hiring porting workers and thus set back efforts to increase portability among workers.

*Response.* DHS does not believe the Supplement J requirement will exacerbate or otherwise increase Form I–485 application processing time, nor will it deter employers from hiring porting workers, because it is simply replacing the existing requirement to provide letters from employers. To the contrary, DHS believes Supplement J will streamline the processing of Form I–485 applications, minimizing any processing delays caused by a potential increase in porting resulting from this rule. USCIS currently reviews employment letters, often in response to inquiries issued by USCIS, when adjudicating Form I–485 applications. Now USCIS will review and process Supplement J submissions instead. Supplement J aims to reduce exchanges between applicants and adjudicators, including by eliminating the need for USCIS to issue RFEs and NOIDs to obtain employment confirmation letters, thereby reducing the adjudication time involved in such cases. It allows DHS to standardize data entry and tracking pertaining to permanent job offers that are required in order for the principal beneficiaries of Form I–140 petitions to be eligible for adjustment of status. Moreover, the electronic capture of data pertaining to job offers will help DHS monitor the status of certain Form I–485 applications awaiting visa allocation and will enable DHS to better determine which Form I–485 applications have the required evidence prior to final processing.

DHS agrees with commenters, however, that Supplement J will not alleviate current employment-based immigrant visa wait times. Many Form I–485 applications may remain pending for lengthy periods of time due to the retrogression of visa numbers for particular employment-based immigrant visa preference categories, which may lead to visas becoming unavailable after Form I–485 applications are filed. Congress established the numerical limitations on employment-based immigrant visa numbers. The Department of State allocates employment-based immigrant visas based on the applicant's preference category, priority date, and country of chargeability. Supplement J does not affect the statutory availability of employment-based immigrant visas or the allocation of such numbers by DOS. USCIS cannot approve an individual's application for adjustment of status until a visa has again become available to that individual.

Supplement J improves administration of the portability provisions that Congress created so that individuals experiencing lengthy delays in the adjudication of their Form I–485 applications can change jobs while retaining their eligibility to adjust status on the basis of an approved Form I–140 petition. Supplement J will result in the more efficient adjudication of Form I–485 applications once visas become available, which DHS believes will encourage, not deter employers from hiring workers eligible to port under section 204(j).

*Comment.* Several commenters indicated that Supplement J will require the use of attorneys, which may diminish employers' desires to extend new job offers pursuant to INA 204(j) and therefore limit job portability. One commenter expressed the belief that corporate human resources representatives will not feel comfortable filling out Supplement J and will therefore seek the involvement of immigration attorneys.

*Response.* An attorney is not required to complete or file Supplement J, although individuals and employers may choose to be represented by attorneys. As indicated previously, Supplement J will standardize information collection for job portability requests under INA 204(j) and request information and evidence that many individuals and employers already submit to demonstrate eligibility under INA 204(j). While DHS is aware that many individuals and employers have in the past been represented by or received assistance from attorneys in relation to portability requests under INA 204(j), DHS disagrees that requiring the use of Supplement J will substantially increase the likelihood that individuals or employers will need to consult with attorneys on future submissions, given that the information collected by the form largely overlaps with the information that individuals

AC00167

and employers already provide through less formalized channels.[39] As noted above, Supplement J does not impose any new requirements and will assist DHS in determining an individual's eligibility to adjust status to lawful permanent residence in certain employment-based immigrant visa categories, as well as to modernize and improve the process for requesting job portability under INA 204(j).

iii. Miscellaneous Comments on Supplement J

*Comment.* Several commenters asked for clarification on whether individuals granted EB–2 national interest waivers would be required to file Supplement J.

*Response.* Grantees of national interest waivers will not be required to file Supplement J. Individuals seeking immigrant visas under certain employment-based immigrant visa categories do not require job offers from employers, including those filing EB–1 petitions as an alien of extraordinary ability and those filing EB–2 petitions based on a national interest waiver, which waives the normal EB–2 job offer requirement when DHS determines that doing so is in the national interest. *See* 8 CFR 204.5(h)(5) and (k)(4)(ii). An individual classified as an alien of extraordinary ability or granted a national interest waiver is not required to demonstrate a job offer at the time of adjudication of the Form I–485 application and therefore would not need to submit Supplement J (although they are not precluded from doing so). However, USCIS may inquire whether such applicants are continuing to work in the area or field that forms the basis of their immigrant visa eligibility. USCIS may also assess inadmissibility by determining whether an individual would likely become a public charge under INA 212(a)(4). USCIS revised the Supplement J instructions to clarify that the form need not be filed by aliens of extraordinary ability or individuals applying for adjustment of status on the basis of a national interest waiver.

*Comment.* Several commenters stated that Supplement J requires certain information that is not relevant to either a portability determination under INA 204(j) or to confirm that a job offer is

available and bona fide. Specifically, commenters referred to sections in Supplement J that require employers to provide information such as type of business, gross annual income, net annual income, and number of employees. Commenters suggested revising the form to only require that kinds of information normally contained in employment confirmation letters.

*Response.* DHS agrees that certain information requested by Supplement J, such as the size of the employer's workforce, by itself, may not be determinative in the assessment of whether two jobs are in the same or similar occupational classification(s), or whether the job offered in the underlying Form I–140 petition is still available. However, such information can be relevant in the ''same or similar'' determination under the totality of the circumstances, as well as when USCIS is assessing whether a job offer is bona fide. DHS believes the information requested on Supplement J will assist USCIS in validating employers and in assessing whether a prospective employer is viable and making a bona fide job offer to the applicant. And in cases involving the same employer named in the underlying Form I–140 petition, Supplement J will assist USCIS in determining whether the employer is still viable and is still extending a bona fide job offer to the applicant.

*Comment.* Some commenters expressed concern that Supplement J would prevent economic growth and reduce labor mobility among workers who have various talents, especially in the technology sector. They argued that the ability of high-skilled talent to move between various organizations, or between different industries of the U.S. economy, would spur economic growth.

*Response.* DHS disagrees that the Supplement J requirement would prevent economic growth and hinder labor mobility. As noted previously, Supplement J simply allows DHS to collect and process information that employers already provide using a standardized information collection instrument, but it does not change the applicable standards of review. Contrary to assertions that Supplement J will limit worker mobility, DHS believes that Supplement J will facilitate the ability for eligible individuals to change between jobs while increasing the awareness of the availability of job portability under INA 204(j).

*F. Compelling Circumstances Employment Authorization*

1. Description of Final Rule and Changes From NPRM

The final rule provides a stopgap measure, in the form of temporary employment authorization, to certain nonimmigrants who are the beneficiaries of approved employment-based immigrant visa petitions, are caught in the continually expanding backlogs for immigrant visas, and face compelling circumstances. This stopgap measure is intended to address certain particularly difficult situations, including those that previously may have forced individuals on the path to lawful permanent residence to abruptly stop working and leave the United States. When sponsored workers and their employers are in particularly difficult situations due to employment-based immigrant visa backlogs, the compelling circumstances employment authorization provision may provide a measure of relief, where currently there is none.

Specifically, the final rule provides that, to obtain a temporary grant of compelling circumstances employment authorization, an individual must (1) be in the United States in E–3, H–1B, H–1B1, O–1, or L–1 nonimmigrant status, including in any applicable grace period, on the date the application for employment authorization is filed; (2) be the principal beneficiary of an approved Form I–140 petition; (3) establish that an immigrant visa is not authorized for issuance based on his or her priority date, preference category, and country of chargeability according to the Final Action Date in effect on the date the application is filed; and (4) demonstrate compelling circumstances that justify the exercise of USCIS discretion to issue an independent grant of employment authorization. *See* final 8 CFR 204.5(p)(1). The final rule limits the grant of employment authorization in compelling circumstances to a period of 1 year. *See* final 8 CFR 204.5(p)(4). Additionally, the principal beneficiary may seek renewals of this employment authorization in 1-year increments if: (1) He or she continues to face compelling circumstances and establishes that an immigrant visa is not authorized for issuance based on his or her priority date, preference category, and country of chargeability according to the Final Action Date in effect on the date the renewal application is filed; or (2) the difference between his or her priority date and the relevant Final Action Date is 1 year or less (without having to show compelling circumstances). *See* final 8 CFR 204.5(p)(3)(i). The final rule allows

---

[39] As noted previously, the RIA in this rulemaking provides potential filing costs of Supplement J as prepared by human resources specialists, in-house attorneys, and other attorneys. DHS recognizes that not all entities have human resources specialists or low-cost access to attorneys. DHS reaffirms, however, that aid of an attorney or a human resources specialist is not required to fill out Supplement J. DHS included these costs because many larger entities already rely on such individuals when preparing documents for use in portability requests under INA 204(j).

family members of these individuals to also apply for employment authorization, and provides that the validity period for their EADs may not extend beyond that authorized for the principal beneficiary. *See* final 8 CFR 204.5(p)(2) and (p)(3)(ii). The large majority of these individuals, after availing themselves of this temporary relief, are likely to continue on their path to permanent residence.

DHS is finalizing the compelling circumstances employment authorization provision with several changes to the proposed regulatory text to clarify the eligibility requirements for initial and renewal applications filed by principals and dependents. An individual requesting an EAD must file an application on Form I–765 with USCIS in accordance with the form instructions. Under final 8 CFR 204.5(p)(3), some individuals may be eligible for a renewal of their compelling circumstances EAD on either or both bases of eligibility, depending on their circumstances. DHS also recognizes that an applicant may seek to renew his or her compelling circumstances EAD on a different basis than that on the initial application. In the responses to comments below, DHS further explains the provisions in the final rule, including the manner in which DHS determined the specific population of beneficiaries who would be eligible for this type of employment authorization and its rationale for providing employment authorization only to those individuals who are facing compelling circumstances.

## 2. Public Comments and Responses

### i. Support for Compelling Circumstances Employment Authorization

*Comment.* Some commenters supported the rule completely as written and therefore supported employment authorization based on compelling circumstances as proposed. Many of these commenters expressed general support and did not provide a detailed explanation for their position. Other commenters highlighted the benefits of compelling circumstances employment authorization, such as facilitating the ability of certain nonimmigrants to work for other employers (*i.e.,* not just the sponsoring employer).

*Response.* DHS appreciates these comments. The compelling circumstances provision fills a gap in the regulations and provides short-term relief to high-skilled individuals who are already on the path to lawful permanent residence, but who find

themselves in particularly difficult situations generally outside of their control while they wait for their immigrant visas to become available.

*Comment.* One commenter supported the provision making individuals with a felony conviction ineligible for compelling circumstances employment authorization and recommended that such felons be "deported without asking questions."

*Response.* DHS confirms that, consistent with other processes, applicants who have been convicted of any felony or two or more misdemeanors are ineligible for employment authorization under the compelling circumstances provision. *See* final 8 CFR 204.5(p)(5). DHS, however, will not deport individuals without due process or in a manner inconsistent with controlling statutory and regulatory authority.

### ii. Status of Individuals Who Are Granted a Compelling Circumstances EAD

*Comment.* A few commenters asked DHS to clarify the "status" of an individual who receives employment authorization based on compelling circumstances. One commenter asked DHS to clarify whether such individuals will be given a period of "deferred action" so as to provide them with a temporary reprieve from removal or other enforcement action. Similarly, the commenter asked DHS to confirm that individuals who receive employment authorization under compelling circumstances will not accrue unlawful presence. Another commenter asked DHS to provide an underlying status for beneficiaries of compelling circumstances EADs or to consider such beneficiaries to be in lawful status for purposes of INA 245(k)(2)(A), 8 U.S.C. 1255(k)(2)(A), so that these beneficiaries would be eligible to file applications for adjustment of status from within the United States, rather than having to consular process.

*Response.* Congress sets the categories or "statuses" under which foreign nationals may be admitted to the United States. While individuals eligible for compelling circumstances EADs must have lawful nonimmigrant status at the time they apply, such individuals will generally lose that status once they engage in employment pursuant to such an EAD. Such a foreign national will no longer be maintaining his or her nonimmigrant status, but he or she will generally not accrue unlawful presence during the validity period of the EAD or during the pendency of a timely filed and non-frivolous application. This means that if an individual who was

employed under a compelling circumstances EAD leaves the United States to apply for a nonimmigrant or immigrant visa at a consular post abroad, the departure will not trigger the unlawful presence grounds of inadmissibility, as long as he or she is not subject to those grounds by virtue of having otherwise accrued periods of unlawful presence. USCIS intends to adjust its policy guidance to confirm that holders of compelling circumstances EADs will be considered to be in a period of stay authorized by the Secretary for that purpose. Because such individuals will be considered as being in a period of authorized stay for purposes of calculating unlawful presence, DHS does not believe it generally would be necessary to provide them with deferred action, which is an act of prosecutorial discretion that may be granted to individuals who generally have no other legal basis for being in the United States.

*Comment.* Commenters suggested that individuals who use compelling circumstances EADs should be permitted to adjust their status to lawful permanent residence once a visa becomes available, regardless of whether they are maintaining nonimmigrant status.

*Response.* With limited exception,[40] the INA does not permit the relief these commenters are requesting. Workers who initially apply for compelling circumstances EADs must be in a lawful nonimmigrant status. When a high-skilled worker engages in employment under a compelling circumstances EAD, he or she will no longer be working under the terms and conditions contained in the underlying nonimmigrant petition. Although the foreign national may remain in the United States and work under a compelling circumstances EAD, and generally will not accrue unlawful presence while the EAD is valid, he or she may be unable to adjust status to lawful permanent residence in the United States when his or her priority date becomes current. An individual who is seeking lawful permanent residence based on classification as an employment-based immigrant is generally barred by statute from applying to adjust status in the United States if he or she is not in lawful nonimmigrant status. *See* INA 245(c)(2) and (7), 8 U.S.C. 1254(c)(2) and (7). If an individual working on a compelling circumstances EAD finds an employer who is willing to sponsor him or her for a nonimmigrant classification (such as

---

[40] *See, e.g.,* INA 245(i) and (k), 8 U.S.C. 1255(i) and (k).

the H–1B nonimmigrant classification), he or she would have to leave the United States and may need to obtain a nonimmigrant visa from a consulate or embassy overseas before being able to return to the United States to work in that status. *See* INA 248, 8 U.S.C. 1258; 8 CFR 248.1(b). Once the individual has been admitted in nonimmigrant status, he or she may be eligible to adjust status to lawful permanent residence, if otherwise eligible.

### iii. Changing the Scope of Proposed Employment Authorization

*Comment.* A majority of commenters supported the ability of high-skilled workers to obtain independent employment authorization but stated that the proposal in the NPRM was too restrictive, particularly because of the inclusion of the compelling circumstances requirement. Commenters instead supported employment authorization for foreign workers in the United States who are beneficiaries of approved Form I–140 petitions, who are maintaining nonimmigrant status, and who are waiting for their immigrant visa priority dates to become current, regardless of whether they face compelling circumstances.

A common concern expressed by commenters opposing the compelling circumstances requirement was that the number of individuals who would be eligible for such EADs would be too narrow. Some commenters suggested that it would be better to never finalize the rule if the compelling circumstance provision were to remain intact. Certain commenters opposed DHS's introduction of a compelling circumstances requirement because no other employment authorization category is conditioned upon a showing of compelling circumstances. One commenter, for example, reasoned that the "compelling circumstances" requirement should be eliminated because applicants for adjustment of status, who similarly are on the path to lawful permanent residence, need not demonstrate compelling circumstances to obtain an EAD. Other commenters noted that recipients of deferred action under the Deferred Action for Childhood Arrivals (DACA) policy are not required to establish compelling circumstances to qualify for employment authorization and stated that it is only fair that nonimmigrants with approved Form I–140 petitions who are contributing to society by working and paying taxes be treated equivalently. Some commenters concluded that the Department is "targeting" certain foreign workers by imposing the compelling circumstances condition.

*Response.* The Department believes the compelling circumstances employment authorization provision strikes a reasonable balance between competing priorities. By providing greater flexibility to certain high-skilled foreign workers who are on the path to permanent residence but are facing particularly difficult situations, the provision incentivizes such workers to continue contributing to our economy; affords greater fairness to such individuals who have already cleared significant legal hurdles to becoming LPRs; and complements the flexibilities otherwise introduced by this rulemaking in a way that harmonizes with the broader immigration system. DHS therefore declines to expand the group of people who may be eligible for employment authorization under 8 CFR 204.5(p).

DHS believes the expansions suggested by commenters have the potential to create uncertainty among employers and foreign nationals with consequences for predictability and reliability in the employment-based immigration system. Among other things, the suggestions could lead to unlimited numbers of beneficiaries of approved immigrant visa petitions choosing to fall out of nonimmigrant status, as described in greater detail below. The resulting unpredictability in the employment-based immigrant visa process must be carefully weighed in light of the Secretary's directive to "provide stability" to these beneficiaries, while modernizing and improving the high-skilled visa system.[41] DHS is cognizant of these consequences for foreign nationals who may apply for compelling circumstances EADs, and carefully weighed these consequences when assessing the classes of individuals who should be eligible for such EADs. Moreover, the INA affords numerous mechanisms for high-skilled workers to obtain employment in the United States under a variety of applicable nonimmigrant classifications and, as necessary, change from one nonimmigrant status to another.[42] DHS regulations accordingly provide the processes and criteria for obtaining such statuses on behalf of high-skilled workers.[43] By authorizing

grants of employment authorization in 1-year increments to certain high-skilled individuals facing difficult situations, DHS intends to provide something different—a stopgap relief measure for intending immigrants, well on their way to achieving lawful permanent resident status, in the event certain circumstances arise outside their control, and that the existing framework fails to meaningfully address. Where no such circumstances are present, these individuals can avail themselves of other opportunities already permitted them under the INA and DHS regulations, including the improved flexibilities provided by this final rule. Among other things, this final rule provides high-skilled workers with nonimmigrant grace periods and includes provisions that help such workers retain approval of their employment-based immigrant visa petitions and related priority dates. These provisions enhance flexibility for employers and nonimmigrant workers and will decrease instances where the compelling circumstances EAD might otherwise be needed. Relatedly, DHS believes that providing compelling circumstances EADs only to the subset of the employment-sponsored population in need of this relief will limit disincentives for employers to sponsor foreign workers for permanent residence. DHS thus disagrees that the proposed eligibility factors for employment authorization in compelling circumstances are too restrictive and negate the value of the entire regulation. Further, DHS disagrees with the commenters' characterizations that the limitations on the compelling circumstances EAD are unfairly or improperly "targeting" certain high-skilled workers. DHS believes that the compelling circumstances EAD provides a useful benefit for all eligible high-skilled workers by allowing them to continue to progress in their careers and remain in the United States while they await immigrant visas, despite compelling circumstances that might otherwise force them to leave the United States. Retaining these high-skilled nonimmigrant workers who are well on their way to becoming LPRs is important when considering the contributions of these individuals to the U.S. economy, including through contributions to entrepreneurial endeavors and advances in research and development.[44]

---

[41] *See* Memo from Jeh Charles Johnson, Secretary of Homeland Security, Policies Supporting U.S. High-Skilled Business and Workers 2 (Nov. 20, 2014), available at *http://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf*.

[42] *See* INA 101(a)(15), 214(e), and 248, 8 U.S.C. 1101(a)(15), 1184(e), and 1258.

[43] *See* 8 CFR parts 214 and 248.

---

[44] *See* Hart, David, et al., "High-tech Immigrant Entrepreneurship in the United States," Small Business Administration Office of Advocacy, at 60 (July 2009), available at: *https://www.sba.gov/sites/*

*Comment.* Several commenters stated that the Department clearly has the legal authority to implement the compelling circumstances EAD, as well as the legal authority to significantly broaden eligibility for such EADs. Other commenters questioned DHS's legal authority to extend employment authorization to certain non-U.S. citizens based on compelling circumstances. One such commenter emphasized that employment for other categories is expressly authorized by statute.

*Response.* DHS agrees with the commenters who recognized that the Department has the statutory authority to grant employment authorization to these individuals. Such authority stems, in part, from the Secretary's broad discretion to administer the Nation's immigration laws and broad authority to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the [INA]." *See* INA 103(a)(3), 8 U.S.C. 1103(a)(3). Further, section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B) recognizes that employment may be authorized by statute or by the Secretary. *See Arizona Dream Act Coalition* v. *Brewer,* 757 F.3d 1053, 1062 (9th Cir. 2014) ("Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States."); *Perales* v. *Casillas,* 903 F.2d 1043, 1048, 1050 (5th Cir. 1990) (describing the authority recognized by INA 274A(h)(3) as "permissive" and largely "unfettered"). The fact that Congress has directed the Secretary to authorize employment to specific classes of foreign nationals (such as the spouses of E and L nonimmigrants) does not diminish the Secretary's broad authority to administer the INA and to exercise discretion in numerous respects, including through granting employment authorization as a valid exercise of such discretion. *See* INA

*default/files/rs349tot_0.pdf* (presenting the economic contributions of high-skilled immigrants and the need to retain them, and concluding that 36 percent of immigrant-founded companies conduct R&D and 29 percent of immigrant-founded companies held patents, both higher percentages than native-founded companies); Fairlie, Robert, "Open for Business: How Immigrants are Driving Small Business Creation in the United States," The Partnership for a New American Economy (August, 2012), available at: *http://www.renewoureconomy.org/sites/all/themes/pnae/openforbusiness.pdf;* "Immigrant Small Business Owners a Significant and Growing Part of the Economy" (June 2012), available at: *http://www.fiscalpolicy.org/immigrant-small-business-owners-FPI-20120614.pdf;* Anderson, Stuart, "American Made 2.0 How Immigrant Entrepreneurs Continue to Contribute to the U.S. Economy," National Venture Capital Association," available at: *http://nvca.org/research/stats-studies/.*

sections 103 and 274A(h)(3)(B), 8 U.S.C. 1103, and 1324a(h)(3)(B). The Secretary's exercise of discretion to grant employment authorization is narrowly tailored in this final rule to address the needs of a group of individuals who face compelling circumstances. The employment authorization is valid for 1 year, with limited opportunities for renewal, and is only available to discrete categories of nonimmigrant workers.

*Comment.* Several commenters opposed to the compelling circumstances limitation noted that such limitation was not referenced in the Secretary's November 20, 2014 Memorandum, "Policies Supporting U.S. High-Skilled Businesses and Workers." [45] Similarly, many commenters stated that the proposed rule did not deliver portable work authorization for high-skilled workers and their spouses, as described in the White House Fact Sheet on Immigration Accountability Executive Action.[46]

*Response.* In the November 20, 2014 Memorandum, the Secretary directed USCIS to take several steps to modernize and improve the immigrant visa process for high-skilled workers. In relevant part, the Secretary instructed USCIS to carefully consider regulatory or policy changes to better assist and provide stability to the high-skilled beneficiaries of approved Form I–140 petitions. DHS believes this rule meets the Secretary's objectives. Although the compelling circumstances provision was not specifically referenced in the November 20, 2014 Memorandum, it was proposed by the Department in response to the Secretary's directive to "carefully consider other regulatory or policy changes to better assist and provide stability to the beneficiaries of approved Form I–140 petitions." [47] The compelling circumstances provision specifically enables the beneficiaries of such petitions to remain and work in the United States if they face compelling circumstances while they wait for an immigrant visa to become available, and therefore directly responds to the Secretary's directive.

The White House Fact Sheet on Immigration Accountability Executive Action referenced by the commenters

[45] *See* Memo from Jeh Charles Johnson, Secretary of Homeland Security, Policies Supporting U.S. High-Skilled Business and Workers 2 (Nov. 20, 2014), available at *http://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*

[46] *See* FACT SHEET: Immigration Accountability Executive Action, White House (Nov. 20, 2014), *https://www.whitehouse.gov/the-press-office/2014/11/20/fact-sheet-immigration-accountability-executive-action.*

[47] *See id.* at 2.

concerning portability of high-skilled workers and their spouses is addressed in several elements of this rulemaking, including through the new H–1B portability provisions, the section 204(j) portability provisions, and provisions revising the circumstances under which Form I–140 petitions are automatically revoked. To the degree these comments specifically relate to provisions authorizing employment of H–4 nonimmigrant spouses of H–1B nonimmigrant workers who have been sponsored for permanent resident status, that provision was subject to separate notice-and-comment rulemaking and is now codified at 8 CFR 214.2(h)(9)(iv).

*Comment.* Several commenters claimed that the compelling circumstances EAD provision has limited value because it introduces additional hurdles for individuals who wish to ultimately adjust their status domestically. Some commenters asserted that the provision would provide employers with increased avenues to exploit workers.

*Response.* DHS appreciates that workers who are eligible for the compelling circumstances EAD may nevertheless choose to not to apply for this option after weighing all immigration options relevant to their specific situations. DHS is providing this new option in addition to others already available to foreign workers, such as changing status to another nonimmigrant category or applying for an extension of stay with a new employer in the same nonimmigrant category. DHS anticipates that an individual evaluating whether to apply for a compelling circumstances EAD will consider the benefits and drawbacks of using such an EAD. DHS expects that such individuals will specifically consider the effects of losing nonimmigrant status by working under a compelling circumstances EAD, which may require consular processing to reenter the United States on a nonimmigrant or immigrant visa. DHS believes that the rule provides a meaningful benefit to high-skilled individuals who otherwise may face particularly difficult situations.

Finally, commenters did not suggest how the compelling circumstances EAD would facilitate the ability of employers to exploit their employees. DHS disagrees that the availability of such EADs, which are available to high-skilled nonimmigrant workers on a voluntary basis, would result in

AC00171

increased exploitation of such workers.[48]

### iv. Illustrations of Compelling Circumstances

In the NPRM, DHS provided four examples of situations that, depending on the totality of the circumstances, may be considered compelling and justify the need for employment authorization: (1) Serious illness or disability faced by the nonimmigrant worker or his or her dependent; (2) employer retaliation against the nonimmigrant worker; (3) other substantial harm to the applicant; and (4) significant disruption to the employer. These situations are meant to be illustrative, as compelling circumstances will be decided on a case-by-case basis and may involve facts that vary from those provided above. For that reason, DHS invited the public to suggest other types of compelling circumstances that may warrant a discretionary grant of separate employment authorization. DHS also requested comments on the manner in which applicants should be expected to document such compelling circumstances. In response, DHS received numerous comments providing examples and suggestions, which are discussed below.

*Comment.* Several commenters requested that DHS clearly define the term ''compelling circumstances.'' Some of these commenters stated that the subjectivity of the compelling circumstances provision would lead to unfair and inconsistent results. Other commenters stated that the lack of a definition would lead to confusion.

Another commenter requested that DHS expand on the phrase ''other substantial harm to the applicant,'' believing that this provision may be the most common basis for demonstrating

compelling circumstances. Another commenter suggested that DHS broaden the circumstances in which employer retaliation would be considered to be compelling, so as to benefit employees involved in labor disputes. The commenter noted that, as discussed in the preamble of the NPRM, the category titled ''Employer Retaliation'' would require an employee to document that an employer had taken retaliatory action before the employee could become eligible to apply for employment authorization based on compelling circumstances. To alleviate undue risk, the commenter recommended revising the category so that it would cover individuals involved in labor disputes. The commenter believed that this change would reduce the harm that retaliation can cause to employees and prevent the chilling effect such retaliation can have on the exercise of labor rights.

A commenter also requested that, as related to DHS's proposal to consider significant disruption to employers, compelling circumstances apply when an employer attests that departure of the employee will: (1) Delay a project; (2) require the company to expend time or resources to train another employee to fill the role; (3) result in additional costs to recruit and hire a new employee; or (4) harm the company's professional reputation in the marketplace.

*Response.* DHS understands that establishing a bright-line definition may be easier to apply in the view of some stakeholders; however, it may also have the effect of limiting DHS's flexibility to recognize the various circumstances that could be considered compelling. Such flexibility is better afforded through a mechanism that permits DHS to determine which situations involve compelling circumstances on a case-by-case basis. Therefore, in the preamble to the NPRM, DHS identified four illustrative (*i.e.*, non-exhaustive) types of circumstances in which the Department may consider granting employment authorization. The possible types of circumstances that DHS may consider compelling are not restricted to these examples. In finalizing this rule, DHS considered comments requesting additional scenarios for DHS to add to the illustrative list of potential compelling circumstances in the NPRM. The broad range of additional scenarios suggested underscores the importance for retaining flexibility in making these discretionary determinations. Therefore, DHS declines to define the term ''compelling circumstances'' in more concrete and limiting terms in this rulemaking. In response to the public comments, however, the agency provides this updated list of illustrative

circumstances that USCIS, in its discretion, might find compelling. USCIS emphasizes that this list is not exhaustive of the types of situations that might involve compelling circumstances.

• *Serious Illnesses and Disabilities.* The nonimmigrant worker can demonstrate that he or she, or his or her dependent, is facing a serious illness or disability that entails the worker moving to a different geographic area for treatment or otherwise substantially changing his or her employment circumstances. A move to another part of the country to ensure proper medical care is just one example of compelling circumstances resulting from a serious illness or disability of the principal beneficiary or his or her family member.

• *Employer Dispute or Retaliation.* The nonimmigrant worker can demonstrate that he or she is involved in a dispute regarding the employer's alleged illegal or dishonest conduct as evidenced by, for example, a complaint filed with a relevant government agency[49] or court, and that the employer has taken retaliatory action that justifies granting separate employment authorization to the worker on a discretionary basis or that the dispute otherwise is shown to have created compelling circumstances. DHS recognizes that employer retaliation in response to a dispute is not limited to termination of employment and could include any number of actions taken by an employer, including harassment. Depending on the unique circumstances of a situation, an employer dispute could rise to the level of compelling circumstances even absent employer retaliation, but DHS declines to adopt the suggestion to grant a compelling circumstances EAD on the sole basis that the applicant is involved in a labor dispute. DHS is allowing sufficient flexibility on this ground, including by not defining ''retaliation'' or ''labor dispute'' in this rule or confining the ground to LCA violations alone. DHS further notes that the employer retaliation example does not identify the universe of fact patterns that might involve improper behavior by employers. DHS believes that the approach outlined in this final rule will make appropriate relief available for certain employees who can demonstrate

---

[48] DHS takes worker exploitation seriously. The Department has created the Blue Campaign to combat human trafficking and aid victims. More information about the Blue Campaign can be found at *www.dhs.gov/blue-campaign.* Other U.S. Government resources include the Department of Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices, which enforces the anti-discrimination provision of the INA. *See* INA section 274B; 8 U.S.C. 1324b. More information about reporting an immigration-related unfair employment practice may be found at *http://www.justice.gov/crt/about/osc.* In addition, the U.S. Equal Employment Opportunity Commission (EEOC) enforces Title VII of the Civil Rights Act of 1964 (Title VII), as amended, and other federal laws that prohibit employment discrimination based on race, color, national origin, religion, sex, age, disability and genetic information. More information about Title VII and the EEOC may be found at *www.eeoc.gov.* DHS also notes that DOL's Wage and Hour Division investigates allegations of employee abuse. Information about reporting a potential wage and hour violation can be found at *www.dol.gov* or by calling 1–866–4USWAGE (1–866–487–9243).

[49] Relevant government agencies include, but are not limited to, the Department of Labor, the Equal Employment Opportunity Commission, the National Labor Relations Board, and state or local counterparts to these federal agencies (*e.g.*, the Massachusetts Labor and Workforce Development Office, the New Hampshire Public Employee Labor Relations Board, and the Oregon Employment Relations Board).

AC00172

that they do not have the option of remaining with their current employer or that they face retaliatory actions if they do remain with their current employer.

• *Other Substantial Harm to the Applicant.* The nonimmigrant worker can demonstrate that due to compelling circumstances, he or she will be unable to timely extend or otherwise maintain status, or obtain another nonimmigrant status, and absent continued employment authorization under this proposal the applicant and his or her family would suffer substantial harm. In some situations, this showing might be tied to financial hardship facing the principal and his or her spouse and children. An example of such substantial harm may involve an H–1B nonimmigrant worker who has been applying an industry-specific skillset in a high-technology sector for years with a U.S. entity that is unexpectedly terminating its business, where the worker is able to establish that the same or a similar industry (*e.g.,* nuclear energy, aeronautics, or artificial intelligence) does not materially exist in the home country. Another example might include a nonimmigrant worker whose return to his or her home country would cause significant hardship to the worker and his or her family by resulting in a series of circumstances regarding the family being uprooted that in their totality, rise to the level of compelling circumstances. In this circumstance, the employment authorization proposal would provide the individual with an opportunity to find another employer to sponsor him or her for immigrant or nonimmigrant status and thereby protect the worker and his or her family members from the substantial harm they would suffer if required to depart the United States.

Although approaching or reaching the statutory temporal limit on an individual's nonimmigrant status will not, standing alone, amount to compelling circumstances, this could be a factor considered by DHS in weighing the totality of the circumstances on a case-by-case basis. Likewise, job loss alone will not be considered substantial harm to the applicant, unless an individual can show additional circumstances that compound the hardship associated with job loss.

• *Significant Disruption to the Employer.* The nonimmigrant worker can show that due to compelling circumstances, he or she is unexpectedly unable to timely extend or change status, there are no other possible avenues for the immediate employment of such worker with that employer, and the worker's departure

would cause the petitioning employer substantial disruption. DHS does not believe that, standing alone, a time delay in project completion would likely rise to a compelling circumstance, as a commenter suggested; however, such delays when combined with other factors, such as the cost to train or recruit a replacement or harm to an employer's reputation in the marketplace, might rise to a compelling circumstance. Additional examples of significant disruption may include the following:

○ An L–1B nonimmigrant worker sponsored for permanent residence by an employer that subsequently undergoes corporate restructuring (*e.g.,* a sale, merger, split, or spin-off) such that the worker's new employer is no longer a multinational company eligible to employ L–1B workers, there are no available avenues to promptly obtain another work-authorized nonimmigrant status for the worker, and the employer would suffer substantial disruption due to the critical nature of the worker's services. In such cases, the employment authorization proposal would provide the employer and worker a temporary bridge allowing for continued employment while they continue in their efforts to obtain a new nonimmigrant or immigrant status.

○ An H–1B nonimmigrant worker who provides critical work on biomedical research for a non-profit entity, affiliated with an institution of higher education, that subsequently reorganizes and becomes a for-profit entity, causing the worker to no longer be exempt from the H–1B cap. In cases where the worker may be unable to obtain employment authorization based on his or her H–1B status, and the employer is unable to file a new H–1B petition based on numerical limitations or to obtain another work-authorized nonimmigrant status, the employment authorization available under 8 CFR 204.5(p) could provide a temporary bridge for continued employment of the worker as his or her departure would create substantial disruption to the employer's biomedical research.

*Comment.* The NPRM requested that commenters submit examples of additional scenarios that could be considered for compelling circumstances EADs. Many commenters suggested fact patterns that they believed should rise to the level of a compelling circumstance. DHS received the following specific suggestions:

• *Extraordinary Wait.* Many commenters asked DHS to consider a lengthy wait for an immigrant visa to be a compelling circumstance. A number of commenters noted that having to

continuously extend nonimmigrant status was in itself a compelling circumstance and that employment authorization should be granted on that basis alone. Commenters suggested various timeframes for when the wait for an immigrant visa would be lengthy enough to qualify as a compelling circumstance, including situations involving beneficiaries: Who are facing waits of over 5 years before they are eligible to file their applications for adjustment of status; who have completed 6 years in H–1B nonimmigrant status and have an approved Form I–140 petition; who have an approved Form I–140 petition and are facing at least a three month wait before they may be eligible to file their applications for adjustment of status; or who have reached the limit of their nonimmigrant status solely because of the backlog on immigrant visas.

• *Academic Qualifications.* Several commenters suggested that DHS should grant compelling circumstances EADs to individuals seeking to gain advanced academic experience, such as those obtaining a U.S. graduate degree based on specialized research or entering a fellowship program. One commenter requested that U.S. educated advanced-degree holders in the fields of science, technology, engineering, and mathematics (STEM) be granted compelling circumstances employment authorization. Another commenter requested employment authorization under compelling circumstances for workers who are pursuing part-time education and would like to switch to a different type of job.

• *Dissatisfaction with Current Position or Salary.* Some commenters indicated that job dissatisfaction should be a compelling circumstance, because remaining in such employment can cause emotional harm and other problems.

• *Home Ownership.* One commenter recommended that home ownership be considered a compelling circumstance.

• *Unemployment.* One commenter recommended that unemployment be considered a compelling circumstance.

• *Effects on Derivatives.* One commenter suggested that certain family situations should be considered compelling circumstances. Specifically, the commenter stated that employment authorization should be approved where the employee submits evidence that his or her departure will: (1) Negatively affect the employee's, or a derivative family member's, professional career; or (2) disrupt the ongoing education of the employee's child. Many commenters requested that DHS amend the proposed

regulation to protect derivatives who may be "aging out." The majority of these commenters believed that "aging out" itself constituted a compelling circumstance.

• *Entrepreneurship.* Some commenters advocated for granting employment authorization to individuals who would like to start a business. These commenters suggested that such entrepreneurship should always be a compelling circumstance.

• *National Interest Waivers.* Several commenters urged DHS to include approval of a national interest waiver as a stand-alone compelling circumstance. One commenter requested that DHS grant employment authorization to beneficiaries who have pending petitions for national interest waivers, and that DHS eliminate the requirement that individuals be maintaining lawful nonimmigrant status to adjust status pursuant to an employment-based immigrant visa petition. Another commenter requested that employment authorization be granted to physicians with national interest waivers who have worked for at least 3 years in federally designated underserved areas.

*Response.* Compelling circumstances are generally situations outside a worker's control that warrant the Secretary's exercise of discretion in granting employment authorization, on a case-by-case basis, given the totality of the circumstances. Adjudicators will look at various factors, including all factors identified by the applicant, and may consider whether the evidence supports providing compelling circumstances employment authorization, such as where the high-skilled nonimmigrant worker is facing retaliation from the employer for engaging in protected conduct, where loss of work authorization would result in significant disruption to the employer or cause significant harm to the worker, or other circumstances of similar magnitude.

DHS acknowledges that many beneficiaries eagerly await the opportunity to become lawful permanent residents. The Department works closely with DOS to improve the immigrant visa processing system, but notes that it is inevitable that beneficiaries may experience long waits and that processing times will vary. As indicated in the NPRM, DHS does not believe that a long wait for an immigrant visa constitutes a compelling circumstance on its own. Many workers who face a lengthy wait for an immigrant visa, including those who have reached their statutory maximum time period in nonimmigrant status, often face difficult choices. DHS does

not consider that these common consequences, on their own, would amount to compelling circumstances. Nor does DHS believe that many of the other scenarios suggested by commenters involve compelling circumstances on their own. Home ownership, notable academic qualifications, or dissatisfaction with a position or salary, standing alone, do not rise to the level of a compelling circumstance. However, any one of these situations could rise to the level of compelling circumstances in combination with other circumstances.

Likewise, unemployment, in and of itself, will generally not be considered a compelling circumstance. However, unemployment could rise to the level of a compelling circumstance if, for example, the applicant demonstrates that the unemployment was a result of serious illness, employer retaliation, or would result in substantial harm or significant employer disruption, as described above and in the NPRM. *See* 80 FR 81899, at 81925. The compelling circumstances requirement is a higher standard than mere inconvenience, and the applicant would need to establish the harm resulting from the loss of employment and the benefits to be gained by being able to continue employment in the United States.

DHS closely considered comments advocating for protection of derivatives. DHS has determined it is appropriate to extend the benefits provided by the compelling circumstances provision to spouses and children of principal beneficiaries whose employment authorization has not been terminated or revoked. *See* final 8 CFR 204.5(p)(2). DHS, however, purposefully made the determinative factor the principal's status, because it is the principal's status that forms the basis for the family's presence in the United States. A principal beneficiary, however, would be able to present evidence that, for example, his or her departure will negatively impact the derivative family member's professional career or disrupt the ongoing education of the employee's child, and DHS will consider these factors together with all supporting factors as part of the overall analysis.

DHS also specifically considered comments expressing concern for children who may "age out" or have recently "aged out" of immigration benefit eligibility. DHS notes that, by statute, once a person turns 21, he or she is no longer a "child" for purposes of the INA, subject to certain statutory exceptions by which individuals who surpass that age are or may be considered to remain a "child" by

operation of law.[50] *See* INA 101(b)(1) and 203(d), 8 U.S.C. 1101(b)(1) and 1153(d). Such an individual would no longer qualify as an eligible dependent beneficiary of the principal's Form I–140 petition and would not be able to immigrate to the United States on that basis. As such, DHS will not extend the benefits of a compelling circumstances employment authorization to children who have aged out and will not consider the potential for aging-out as a *per se* compelling circumstance standing alone.

While circumstances relating to a business start-up could be relevant to a presentation of compelling circumstances, an interest in entrepreneurship standing alone cannot support an employment authorization request based on a compelling circumstance. With regard to Form I–140 petitions approved in the EB–2 category based on a national interest waiver, in this final rule DHS is confirming that beneficiaries of approved Form I–140 petitions under the EB–2 category, which include national interest waiver beneficiaries and physicians working in medically underserved areas, are eligible to apply for employment authorization based on compelling circumstances, as long as they meet all other applicable requirements.[51]

v. Nonimmigrant and Immigrant Classifications of Individuals Eligible To Request Employment Authorization Based on Compelling Circumstances

In the NPRM, DHS proposed to limit the discretionary grant of employment authorization based on compelling circumstances only to certain workers who are in the United States in E–3, H–1B, H–1B1, O–1, or L–1 nonimmigrant status and who are the beneficiaries of approved employment-based immigrant

[50] The Child Status Protection Act (CSPA) was enacted on August 6, 2002, and provides continuing eligibility for certain immigration benefits to the principal or derivative beneficiaries of certain benefit requests after such beneficiaries reach 21 years of age. *See* Public Law 107–208; INA sections 201(f), 203(h), 204(k) 207(c)(2), and 208(b)(3), 8 U.S.C. 1151(f), 1153(h), 1154(k), 1157(c)(2), and 1158(b)(3). Specifically, the CSPA addresses certain situations involving delays in the adjudication of petitions or applications. The CSPA has wide applicability, covering family-sponsored and employment-based beneficiaries, Diversity Visa immigrants, refugees, and asylees.

[51] DHS observes that physicians receiving employment authorization based on compelling circumstances who have sought a national interest waiver based on an immigrant visa petition under section 203(b)(2)(B)(ii) of the Act remain subject to all requirements relating to the national interest waiver. Similarly, a physician who may be eligible for a compelling circumstance EAD may still be subject to, and limited by, any applicable obligations under sections 212(e) and 214(l) of the Act.