visa petitions. *See* proposed 8 CFR 204.5(p)(1)(i). DHS invited public comment on the proposed nonimmigrant classifications, including whether other nonimmigrant classifications should be considered. DHS also invited public comment on the requirement that applicants be the beneficiaries of approved EB–1, EB–2, or EB–3 immigrant visa petitions. These comments are addressed below.

*Comment.* Commenters specifically asked DHS to expand eligibility for the compelling circumstances provision to other nonimmigrant classifications, including to the E–1, E–2, and J–1 nonimmigrant classifications. Some of these commenters noted that nonimmigrants in these classifications could experience the same types of hardship as nonimmigrants covered by the proposed rule.

*Response.* In developing the proposed rule, DHS carefully considered the classes of nonimmigrant workers who should be eligible to apply for compelling circumstances EADs. Providing additional benefits to E–1 and E–2 nonimmigrants would impact international treaties and foreign policy considerations and DHS therefore believes it is inappropriate to include them in this rulemaking. Likewise, changes related to J–1 nonimmigrants could not be made solely by DHS, as the program is administered predominantly by DOS. Moreover, many J–1 nonimmigrants are statutorily required to complete a 2-year foreign residence requirement before they can remain in the United States, and providing them with employment authorization in many circumstances could be contrary to these statutory restrictions. *See* INA 101(j), 212(e), 214(l), and 248, 8 U.S.C. 1101(j), 1182(e), 1184(l) and 1258. Therefore, DHS declines to include these classifications as eligible for employment authorization for compelling circumstances.

*Comment.* One commenter focused on DHS's inclusion of E–3 and H–1B1 nonimmigrants in the compelling circumstances provision, and asked whether DHS intended to include E–3 and H–1B1 nonimmigrants among the categories of nonimmigrants that are afforded "dual intent."

*Response.* DHS notes that the doctrine of "dual intent" is beyond the scope of this regulation. DHS notes, however, that individuals in these categories can be the beneficiaries of approved Form I–140 petitions while continuing to maintain nonimmigrant status.

*Comment.* One commenter requested that DHS grant compelling circumstances EADs to individuals in the employment-based fourth preference

(EB–4) category, including certain religious workers; Iraqis who have assisted the United States; Iraqi and Afghan translators; employees of international organizations; and others. The commenter further noted that some Iraqi translators have been neglected by the U.S. immigration system, and that DHS, through the NPRM, was continuing this asserted neglect.

*Response.* DHS aligned this rulemaking with the principles underlying AC21 and ACWIA, codifying longstanding policies and practices implementing those statutes, and building upon those provisions to provide stability and flexibility to certain foreign workers who are successfully sponsored for LPR status by their employers. DHS has carefully tailored the compelling circumstances EAD provision as a stopgap measure for certain high-skilled individuals facing particularly difficult situations who are on the path to lawful permanent residence under the EB–1, EB–2 and EB–3 immigrant visa classifications.

DHS declines the commenter's request to include EB–4 beneficiaries as eligible to apply for employment authorization based on compelling circumstances because Congress, with very limited exception,[52] did not prioritize the EB–4 visa category in AC21, which this rule was broadly intended to complement. Moreover, DHS did not propose to expand the scope of the rulemaking to address issues related to EB–4 beneficiaries, and therefore cannot adopt the commenter's suggestion.

## vi. *Application Timeframes for Compelling Circumstances EADs*

*Comment.* One commenter suggested that individuals should be permitted to apply for an initial compelling circumstances EADs well in advance (a minimum of 180 days) of the expiration of their current nonimmigrant status. Other commenters sought clarification on the timing requirements for renewal applications.

*Response.* DHS believes that establishing a timeframe for individuals to request initial employment authorization based on compelling circumstances is not necessary. Under this rule, an applicant can file a Form I–765 application to request an initial EAD based on compelling circumstances at any time before the expiration of his or her nonimmigrant status. For approval, the applicant must be able to demonstrate that he or she meets the criteria in 8 CFR 204.5(p)(1) or (2) on the date of filing, including

that compelling circumstances exist. DHS notes that a Form I–765 application filed far in advance of the expiration of the foreign national's nonimmigrant status may be adjudicated before such status expires; however, DHS's approval of the employment authorization based on compelling circumstances would still be limited to an initial grant of 1 year beginning on the date of approval.

With respect to the timing of the renewal application, DHS has reviewed the renewal provision as proposed and agrees with commenters that the proposed regulatory text was ambiguous regarding the timing of renewal applications. Therefore, DHS clarifies in the final rule at § 204.5(p)(3) that applications for renewal of employment authorization based on compelling circumstances must be filed by the applicant prior to the expiration of his or her current employment authorization. Requiring renewal applications to be properly filed prior to the expiration of the current employment authorization is consistent with DHS's goal of promoting ongoing employment and also encourages such applicants to avoid accruing unlawful presence, which could affect their eligibility to obtain LPR status. Like other Form I–765 applicants, individuals applying for employment authorization based on compelling circumstances, at either the initial or renewal stage, must be in the United States when applying for the benefit.

*Comment.* One commenter asked DHS to clarify whether a beneficiary in a grace period may submit an initial request for employment authorization pursuant to compelling circumstances.

*Response.* DHS affirms that beneficiaries may file an initial application for a compelling circumstances EAD if, on the date of filing, they are in a period authorized by § 214.1(l)(l) or (2), as well as any other grace period authorized by this chapter. *See* final 8 CFR 204.5(p)(1)(i).

## vii. *EAD Validity Period*

*Comment.* Some commenters opposed granting extensions in 1-year increments and requested that extensions instead be granted in longer increments. Several commenters noted that providing employment authorization in 1-year increments would cause certain beneficiaries to incur filing fees and other expenses on an annual basis. Another commenter requested that certain individuals be granted "indefinite renewals for 3 years" if they have been in H–1B status for 10 years and have had their Form I–140 petitions approved for 5 years. Similarly, one

---

[52] *See* AC21 104(a).

commenter requested employment authorization under compelling circumstances for up to 3 years so that the validity period would be in line with the initial periods of petition approval for individuals in the H–1B and L–1 classifications and consistent with section 104 of AC21. Commenters contended that such proposals would provide increased certainty and the ability to plan, while minimizing the possibility of employment disruptions.

*Response.* DHS disagrees that a single grant of employment authorization under compelling circumstances should last longer than 1 year. The compelling circumstances provision is meant to be a stopgap measure for nonimmigrant workers facing particularly difficult circumstances outside of their control, such as a serious illness, employer retaliation, significant disruption to the employer, or other substantial harm. The compelling circumstances EAD is not a substitute for completing the employment-based immigrant visa process or for obtaining nonimmigrant classifications authorizing foreign nationals to work or live in the United States. While some nonimmigrants may experience compelling circumstances that last beyond one year, DHS anticipates many of the compelling circumstances presented will be resolved within that timeframe. DHS thus intends to require confirmation that a foreign national's circumstances justify an extension of employment authorization each year to ensure that such employment authorization continues to be merited. DHS confirms that employment authorization for compelling circumstances will be granted only in 1-year increments.

viii. *Visa Bulletin Dates*

*Comment.* Several commenters generally objected to conditioning compelling circumstances EADs on the unavailability of immigrant visas, and they requested that DHS remove all references to the State Department Visa Bulletin in the compelling circumstances provision. Commenters asserted that this restriction weakens the compelling circumstances provision because a beneficiary with an available immigrant visa may still have a lengthy wait before receiving independent employment authorization. Other commenters objected to the references to priority dates in the regulatory text because of the unpredictability of the Visa Bulletin's priority date movement.

*Response.* DHS disagrees with commenters who requested eliminating the requirement that an immigrant visa must not be immediately available and authorized for issuance to an individual

at the time the application is filed. DHS designed this provision specifically to assist those individuals who otherwise may apply for and be granted an immigrant visa or adjustment of status but for the unavailability of an immigrant visa. The Department determined that linking eligibility for an EAD based on compelling circumstances to the authorization to issue an immigrant visa will provide stability to individuals already on the path to lawful permanent residence. The Visa Bulletin notifies individuals whether visas are authorized for issuance.

At the same time, DHS also wants to ensure that foreign workers whose priority dates have already been reached take appropriate measures to apply for permanent residence, as the compelling circumstances EAD is not a substitute for lawful permanent residence. DHS, therefore, believes it is reasonable to condition compelling circumstances EADs to the unavailability of immigrant visas, thereby ensuring that foreign workers avail themselves of the opportunity to apply for and obtain lawful permanent residence when able to do so.

*Comment.* A few commenters requested that DHS clarify which chart in the newly reformatted Visa Bulletin would govern the eligibility for individuals seeking employment authorization based on compelling circumstances (*i.e.,* the "Application Final Action" chart or the "Dates for Filing Employment-Based Visa Applications" chart).

*Response.* All references in 8 CFR 204.5(p) to the Visa Bulletin dates are to the "Final Action Date" chart. DHS intends that this date will be used to determine eligibility for both the initial and renewal applications for employment authorization. To provide clarification in this regard, DHS modified 8 CFR 204.5(p)(1)(ii) by replacing the phrase "immediately available" with "authorized for issuance" to signal that the relevant date for eligibility for an initial grant of employment authorization would be the Final Action Date for the principal beneficiary's preference category and country of chargeability that was effective on the date the application for employment authorization, or successor form, is filed.

ix. *Renewals of Employment Authorization Granted Pursuant to Compelling Circumstances*

*Comment.* Several commenters expressed confusion about the regulatory provisions governing renewals of compelling circumstances

EADs and were concerned that, as proposed, the provisions were internally inconsistent and even in conflict with one another. In particular, commenters stated that interactions between the priority date limitations proposed for initial applicants (proposed 8 CFR 204.5(p)(1)(ii)), eligibility for renewals without demonstrating compelling circumstances (proposed 8 CFR 204.5(p)(3)(i)(B)), and ineligibility grounds (proposed 8 CFR 204.5(p)(5)(ii)) may prevent some eligible individuals from renewing their compelling circumstances EADs.

*Response.* DHS agrees with commenters that the final rule needs to clarify when an applicant can qualify for a renewal by demonstrating compelling circumstances or based solely on his or her priority date. Moreover, DHS recognizes that the proposed regulatory language at § 204.5(p) could have led commenters to conclude that the provision was internally inconsistent or contradictory. In the NPRM, DHS proposed to require initial applicants to show that an immigrant visa was not immediately available to the principal beneficiary. *See* proposed 8 CFR 204.5(p)(1)(ii). For renewals, DHS proposed that principal beneficiaries would need to demonstrate either that they continue to face compelling circumstances or that their priority dates are "1 year or less" (either before or after) from the date visas are authorized for issuance according to the current Visa Bulletin. *See* proposed 8 CFR 204.5(p)(3)(i)(A) and (B). In addition, DHS proposed at § 204.5(p)(5)(ii) that an individual would be ineligible to apply for or renew a compelling circumstances EAD if "[t]he principal beneficiary's priority date is more than 1 year beyond the date immigrant visas were authorized for issuance" according to the Visa Bulletin in effect at the time of filing.

As noted by commenters, the proposed ineligibility ground based on a priority date being current for more than one year was superfluous with respect to initial applicants (who were required to show that a visa was not immediately available), as their eligibility would have already ended at the time their immigrant visa was authorized for issuance. The proposed ineligibility ground was also superfluous with respect to the second renewal criterion (*i.e.,* that the difference between the beneficiary's priority date and the date visas are authorized for issuance must be "1 year or less"), because that ineligibility ground was already embedded within that renewal ground. In addition, there was significant confusion as to the

interaction between the proposed ineligibility ground and the first ground for renewal (*i.e.,* that the beneficiary continues to demonstrate compelling circumstances). DHS acknowledges that the proposed ineligibility ground was superfluous to the initial eligibility ground and the second renewal criterion, and that the provisions were confusing as written. Therefore, without changing the eligible population as identified in the NPRM for the compelling circumstances EAD, DHS has streamlined the ineligibility and renewal grounds to eliminate any superfluous overlap and to clarify eligibility for renewal under the Final Rule.

In response to public comment, DHS is simplifying the renewal criteria for compelling circumstances EADs. As modified, the final rule makes clear that a principal beneficiary seeking to renew an EAD based on compelling circumstances remains eligible if his or her priority date is not authorized for immigrant visa issuance with respect to his or her preference category and country of chargeability based on the Final Action Date in the Visa Bulletin in effect on the date the renewal application is filed. This modification tracks the eligibility criteria for the initial application for the EAD, and therefore should be readily understood by all parties, making it easier for both the public and USCIS to determine whether someone is eligible for renewal under that basis. DHS retains the second renewal criterion where a principal beneficiary will be eligible to renew the EAD if his or her priority date is one year or less (either before or after) of the Final Action Date in the Visa Bulletin in effect on the date the renewal application is filed. For purposes of greater clarity, in this final rule DHS has included an illustrative example in the regulatory text applicable to renewal applications by principal beneficiaries based on the Visa Bulletin in effect on the date the renewal application is filed. In addition to these changes, DHS made additional edits in this provision to clarify the Visa Bulletin in effect on the date the application for employment authorization is filed establishes the Final Action Date for purposes of a renewal application.

Together, the renewal criteria operate to preclude eligibility to individuals for whom a visa has been authorized for issuance for over one year. Therefore, DHS removed the separate ineligibility criteria from § 204.5(p)(5) as unnecessary. DHS believes that these changes should eliminate the confusion or inconsistency in the regulatory provisions.

*Comment.* Several commenters suggested that individuals with compelling circumstances EADs be able to renew such EADs without restriction (*i.e.,* without needing to meet the proposed eligibility criteria for renewal). Commenters submitted a variety of reasons for requesting this revision, including that such a change would: Be ''truly useful for the immigrant community;'' help stop employer exploitation of workers; provide greater certainty to immigrants waiting to become LPRs; and help address the lack of available immigrant visas. In addition, several commenters questioned the usefulness of allowing for renewal where the applicant's priority date is less than 1 year from the current cut-off date for the relevant employment-based category and country of nationality in the most recently published Visa Bulletin. Some commenters sought clarification about the situations in which an applicant may seek renewal of compelling circumstances EADs.

*Response.* DHS agrees that the renewal of the employment authorization under this provision could be based on the same compelling circumstances that supported the initial grant of a compelling circumstances EAD. Moreover, DHS clarifies that individuals may also base their renewal applications on new compelling circumstances that may exist on the date of filing the renewal application.

DHS disagrees with the suggestion that no additional restrictions tied to authorization for immigrant visa issuance should apply to renewal eligibility. DHS intends this provision to provide short-term relief to certain high-skilled workers who are well on their way to LPR status to help them when they are facing compelling circumstances while they wait for their immigrant visas to become available. Consistent with that intent, applicants seeking to benefit from employment authorization based on compelling circumstances must also continue to pursue lawful permanent residence. Therefore, DHS believes it appropriate to deny a renewal application, even when compelling circumstances continue to be shown, in cases where the applicant should already have had ample time to obtain an immigrant visa and become a lawful permanent resident. Thus, renewal will not be granted under any circumstances if the applicant's priority date is more than one year earlier than the applicable Final Action date on the Visa Bulletin in effect at the time of filing the renewal application. In cases in which the Visa Bulletin at the time of a renewal

application is filed indicates that the beneficiary's priority date is not authorized for immigrant visa issuance, applicants can seek renewal of their employment authorization based on a showing of new or continuing compelling circumstances.

In addition, DHS believes that important additional flexibility for principal beneficiaries of Form I–140 petitions results from retaining the second ground for renewal, which allows applicants to renew employment authorization without a showing of compelling circumstances if the applicant's priority date is close to becoming or recently became eligible for immigrant visa issuance (*i.e.,* is one year or less either before or after the date on which immigrant visas are authorized for issuance). This provision recognizes that applicants, most of whom are high-skilled workers who have invested a substantial amount of time in the United States, are at advanced stages in the immigration process and, after waiting many years, may be able to obtain lawful permanent residence in the near future. If the immigrant visa has recently been authorized for issuance or may be authorized for issuance in the near future, it is consistent with the purpose for this provision to continue the employment authorization, even if the compelling circumstances that justified the initial employment authorization no longer exist, to avoid the possibility that there will be a significant break in employment authorization late in an individual's lawful permanent residence process that would jeopardize his or her ultimate eligibility to obtain lawful permanent resident status or unnecessarily disrupt the business of his or her employer.

Because there was confusion reflected in many comments with regard to eligibility to make a renewal request and the relevance of the Visa Bulletin, DHS has revised the regulatory text to foster a better understanding and simplify the use and implementation of the compelling circumstances EAD renewal process by both applicants and USCIS adjudicators. DHS has edited the text at 8 CFR 204.5(p)(3)(i)(A) to mirror the requirements for initial eligibility, as well as to eliminate a separate ineligibility ground (*see* proposed 8 CFR 204.5(p)(5)(ii)) that caused great confusion among commenters. In summary, in the final rule at 8 CFR 204.5(p)(3)(i), the principal beneficiary may apply for a renewal of his or her employment authorization in one of two ways.

First, § 204.5(p)(3)(i)(A) allows the principal beneficiary to apply for renewal of employment authorization if

he or she continues to face compelling circumstances and an immigrant visa is not authorized for issuance to the principal beneficiary based on his or her priority date listed in the Visa Bulletin for the applicable preference category and country of chargeability in effect on the date of filing. This first renewal ground mirrors the initial eligibility requirements set forth at final § 204.5(p)(1)(ii) and (iii).

Consequently, under this final rule, a principal beneficiary who continues to experience compelling circumstances, and whose immigrant visa is not authorized for issuance, may be able to renew the compelling circumstances EAD if DHS determines that the issuance of employment authorization is justified.

Second, final 8 CFR 204.5(p)(3)(i)(B) allows the principal beneficiary to apply for a renewal of his or her employment authorization without having to show compelling circumstances if, based on his or her priority date, he or she is near the date that an immigrant visa could be issued under the applicable preference category and country of chargeability. Specifically, the difference between the principal beneficiary's priority date and the Final Action Date must be 1 year or less according to the Visa Bulletin in effect on the date the renewal application is filed. This 1-year limitation extends both before and after the specified Final Action Date, thereby allowing beneficiaries whose priority dates are 1 year or less before the relative current priority date, as well as those beneficiaries whose priority dates are 1 year or less after the relative current priority date, to request renewal of their EADs. Allowing for renewals of employment authorization without a demonstration of continuing compelling circumstances provides a bridge for those individuals who may be issued an immigrant visa in the near future. As enumerated in the proposed rule at 8 CFR 204.5(p)(5), this renewal ground incorporates an important DHS policy goal of encouraging individuals to become lawful permanent residents by limiting eligibility for a compelling circumstances EAD to only those whose priority dates have been current for one year or less according to the Visa Bulletin in effect on the date the renewal is filed. DHS believes this provides a reasonable window during which an individual may either apply for adjustment of status, and thereby be issued employment authorization pursuant to that filing, or complete the immigrant visa process abroad. Additionally, DHS has revised this provision to clarify which Visa Bulletin governs for purposes of calculating the

difference between the beneficiary's priority date and the Final Action Date.

To avoid further confusion, DHS provides the following examples to facilitate a better understanding of the eligibility requirement for renewal with respect to the Visa Bulletin, and DHS has incorporated one of these examples in the regulatory text:

• The first example involves a Visa Bulletin Final Action cut-off date of November 1, 2000 for the beneficiary's preference category and country of chargeability. If the beneficiary is basing the renewal application on compelling circumstances, his or her priority date must be on or after November 1, 2000 to apply for a renewal under § 204.5(p)(3)(i)(A), as immigrant visas will not be authorized for issuance to beneficiaries with priority dates on or after November 1, 2000.

• The second example again involves a Visa Bulletin Final Action cut-off date of November 1, 2000, but the beneficiary is seeking a renewal under 8 CFR 204.5(p)(3)(i)(B), which provides that "[t]he difference between the principal beneficiary's priority date and the date upon which visas are authorized for issuance for the principal beneficiary's preference category and country of chargeability is 1 year or less according to the current Visa Bulletin on the date the application for employment authorization is filed." Because this 1-year window extends both ways—before and after the specified Final Action Date—the beneficiary's priority date can be as early as October 31, 1999 or as late as October 31, 2001. Beneficiaries qualifying for renewal under this alternative need not show compelling circumstances to meet the eligibility criteria. *See* final 8 CFR 204.5(p)(3)(i)(B). If, however, the beneficiary's priority date is on or before October 30, 1999, he or she would be ineligible to renew the compelling circumstances EAD under the final rule. If the priority date is on or after November 1, 2001, the beneficiary could not seek a renewal under the priority date range described in final 8 CFR 204.5(p)(3)(i)(B), but may be eligible to renew if he or she is able to demonstrate continuing compelling circumstance described in final 8 CFR 204.5(p)(3)(i)(A).

Finally, to implement this provision, DHS is revising Form I–765 and accompanying form instructions with this final rule and will conduct public outreach and publish guidance explaining the filing requirements and eligibility criteria for this new employment authorization category. Information about renewing applications for employment

authorization granted pursuant to compelling circumstances will be included.

x. Automatically Granting Advance Parole to Individuals Who Have Compelling Circumstances EADs

*Comment.* Some commenters requested that DHS automatically provide advance parole [53] in conjunction with compelling circumstances EADs. Some of these commenters indicated that the President had promised to grant advance parole to certain individuals, and they urged DHS to provide such an immigrant benefit here. The commenters also requested that DHS allow such individuals to adjust their status to lawful permanent residence after being paroled into the United States once an immigrant visa became available to them.

*Response.* Section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides the Secretary with discretionary authority to parole an individual into the United States temporarily "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See also* 8 CFR 212.5. Neither the President nor the Secretary, in his November 20, 2014 memorandum, specified that parole may be extended to foreign workers who are the beneficiaries of either a pending or an approved Form I–140 petition.[54] A DHS officer may, however, grant parole to individuals who are beneficiaries of approved Form I–140 petitions if, in the officer's discretion, the parole either would be for "urgent humanitarian reasons" or provide a "significant public benefit."

Importantly, as already noted, individuals who are seeking lawful permanent residence based on classification as an employment-based immigrant are generally barred by statute from applying to adjust their status in the United States if they are not in lawful nonimmigrant status. *See* INA 245(c)(2) and (7), 8 U.S.C. 1255(c)(2) and (7). Although INA 245(k), 8 U.S.C. 1255(k), enables certain individuals who failed to continuously maintain a lawful status for up to 180

---

[53] As explained on the Form I–131, Application for Travel Document, and the form instructions, advance parole documents allow individuals to return to a United States port of entry after temporary foreign travel. See USCIS Web site, Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131;* see also 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5).

[54] *See* Memo from Jeh Charles Johnson, Secretary of Homeland Security, "Policies Supporting U.S. High-Skilled Business and Workers" (Nov. 20, 2014), available at *http://www.dhs.gov/sites/default/files/publications/14_1120_memo_business_actions.pdf.*

days to apply for adjustment of status, these individuals must be present in the United States pursuant to a lawful admission. Individuals who are paroled into the United States, however, are not considered to be "admitted" into the United States. *See* INA 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A). Therefore, an individual who is granted advance parole, leaves the United States, and reenters on parole is not eligible for adjustment of status pursuant to section 245(k).

As such, granting advance parole to individuals who receive compelling circumstances EADs would not, as a rule, make them eligible for employment-based adjustment of status or otherwise enhance stability or certainty in the efforts of these individuals to become lawful permanent residents. DHS thus will not automatically grant advance parole in conjunction with all compelling circumstances EADs. However, to better assist individuals with compelling circumstances EADs who need to travel, DHS will consider granting advance parole, as appropriate for urgent humanitarian reasons or significant public benefit, to such individuals on a case-by-case basis.

xi. Employment Authorization Parity for Legal and Undocumented Workers, Including Individuals Granted Deferred Action for Childhood Arrivals (DACA)

*Comment.* Commenters asked why Deferred Action for Childhood Arrivals (DACA) recipients are not required to demonstrate compelling circumstances in order to obtain employment authorization and questioned whether being undocumented in the United States is sufficient to demonstrate compelling circumstances. These commenters noted that applying compelling circumstances only to nonimmigrants seeking an independent basis of employment authorization and not to DACA recipients sets an unfair higher bar for nonimmigrants and rewards individuals who came to the United States unlawfully relative to those who have abided by U.S immigration laws.

Many commenters stated that granting employment authorization to DACA recipients, while declining to do so for nonimmigrants, provides a significant advantage to undocumented individuals and encourages unauthorized immigration. Other commenters stated that it is unfair to provide employment authorization to undocumented individuals through DACA and not to nonimmigrants abiding by complex U.S. immigration laws and currently

suffering from a lack of job mobility while awaiting available immigrant visas. These commenters highlighted the benefits of independent employment authorization, including freedom from what they perceive as restrictive and immobile H–1B employment, increased opportunity for upward mobility with their current employer, and greater mobility within the U.S. job market in general. One commenter stated that denying independent employment authorization for nonimmigrants with approved Form I–140 petitions creates the equivalent to modern day slavery for nonimmigrant employees, while DACA recipients are allowed to work for whatever employer they choose. A number of commenters stated that their dependent children, who came to the United States legally, should be granted the same benefits as DACA recipients. Several commenters expressed the opinion that being in the United States in a legal status is more difficult than being in the United States under a grant of DACA.

*Response.* As an initial matter, although DACA requestors do not have to demonstrate compelling circumstances, DACA recipients, like other deferred action recipients, must show "economic necessity" for employment.[55] Further, DACA is strictly limited to individuals who are removable from the United States, meet other certain guidelines (*e.g.,* that they came to the United States under the age of sixteen; continuously resided in the United States since June 15, 2007; were under the age of 31 as of June 15, 2012; and have not been convicted of certain crimes or otherwise pose a threat to national security or public safety), and merit a favorable exercise of discretion.[56] As a result, the DACA process does not provide incentives for individuals to unlawfully migrate to the United States. DACA does not apply to all undocumented individuals who entered the United States as children. Even for those individuals who do satisfy the DACA guidelines, not all individuals receive DACA because of the discretionary nature of the process.

DHS disagrees with commenters who contend that the limitations placed on the compelling circumstances EAD give DACA recipients an advantage over nonimmigrant workers. DACA recipients are individuals who are removable from the United States but whose removal is deferred. They do not

have a lawful immigration status either before or after receiving DACA and instead are simply provided with relief from removal for periods of two years at a time, if they remain eligible. DACA is a discretionary policy related to enforcement and removal and is not comparable to individuals with nonimmigrant status. DHS considers DACA requests pursuant to an exercise of discretion on a case-by-case basis. Nonimmigrant workers are in a more advantageous position than DACA recipients with respect to the immigration laws by virtue of being in the United States in a lawful immigration status. Among other things, presence in nonimmigrant status is not a basis for removability, family members of nonimmigrants are typically able to obtain benefits through the nonimmigrant, and nonimmigrants are better situated with respect to eligibility to pursue lawful permanent residence and, thereafter, U.S. citizenship.

*G. Nonimmigrant Grace Periods*

1. Description of Final Rule and Changes From NPRM

Under the final rule, DHS may provide grace periods of up to 10 days before the petition validity period (or other authorized validity period) begins, and of up to 10 days after the validity period ends to individuals in certain employment-authorized nonimmigrant visa classifications that previously have not been afforded these periods, namely the E–1, E–2, E–3, L–1 and TN classifications. *See* final 8 CFR 214.1(l)(1). Similar grace periods are currently available to nonimmigrants with H–1B, O, and P classification. Extending such grace periods in these other classifications—which, like in the H–1B, O, and P classifications, are generally available to high-skilled individuals with authorized stays of multiple years—promotes stability and flexibility for such workers, thereby furthering goals consistent with those underlying AC21.

In response to public comment, DHS is striking a phrase from the proposed regulation that was unnecessarily limiting and not fully consistent with how existing 10-day grace periods may be used by H, O and P nonimmigrants. Specifically, DHS is deleting from proposed 8 CFR 214.1(l)(1) the phrase that could have been read to limit use of a 10-day grace period only "to prepare for departure from the United States or to seek an extension or change of status based on a subsequent offer of employment." As noted, this deletion will further the purpose of the NPRM proposal to extend to the E–1, E–2, E–

---

[55] 8 CFR 274a.12(c)(14).

[56] *See* DACA Frequently Asked Questions at *https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions.*

3, L–1 and TN nonimmigrant classifications a benefit similar to the one already available to the H, O, and P nonimmigrant classifications. DHS is also making minor technical edits to this provision.

Under the final rule, DHS may also authorize a grace period of up to 60 days in the E–1, E–2, E–3, H–1B, H–1B1, L–1, and TN classifications during the period of petition validity (or other authorized validity period). *See* final 8 CFR 214.1(l)(2). In response to public comments, DHS is retaining this provision while adding the O–1 visa classification to the list of nonimmigrant classifications eligible for the 60-day grace period. To enhance job portability for these high-skilled nonimmigrants, this rule establishes a grace period for up to 60 consecutive days, or until the existing validity period ends, whichever is shorter, whenever employment ends for these individuals. The individual may not work during the grace period. An individual may benefit from the 60-day grace period multiple times during his or her total time in the United States; however, this grace period may only apply one time per authorized nonimmigrant validity period. DHS believes that limiting this grace period to one instance during each authorized validity period balances the interests of nonimmigrant flexibility with the need to prevent abuse of this provision.

This 60-day grace period further supports AC21's goals of providing improved certainty and stability to nonimmigrants who need to change jobs or employers. The 60-day grace period would provide needed flexibility to qualifying nonimmigrants who face termination of employment prior to the end of their petition validity periods. The grace period, for example, allows such nonimmigrants to remain in the United States without violating their status and potentially obtain new job offers from employers that seek to file new nonimmigrant petitions, and requests for an extension of stay, on their behalf. In such cases, even though prior employment may have terminated several weeks prior to the filing of the new petition, DHS may consider such an individual to have not violated his or her nonimmigrant status and allow that individual to extend his or her stay with a new petitioner, if otherwise eligible. If the new petition is granted, the individual may be eligible for an additional grace period of up to 60 days in connection with the new authorized validity period.

Finally, the final rule at 8 CFR 214.1(l)(3) makes clear that the nonimmigrant worker, during either a 10-day or 60-day grace period, may

apply for and, if otherwise eligible, be granted an extension of stay or change of status. The beneficiary may also commence employment under H–1B portability per § 214.2(h)(2)(i)(H), discussed in some detail below, if otherwise eligible. To further effectuate the intended purpose of these provisions, DHS is also making clarifying edits to the regulatory text at § 214.1(l)(2), and (l)(3).

## 2. Public Comments and Responses

### i. Length of the 10-Day Grace Periods

*Comment.* While numerous commenters supported the proposal to make 10-day grace periods available to additional high-skilled nonimmigrant workers, one commenter suggested that the 10-day grace periods be lengthened to 15 or 30 days to provide nonimmigrant workers additional time to wrap up affairs after extended periods of stay in the United States.

*Response.* DHS is not adopting the commenter's suggestion to provide longer grace periods of up to 15 or 30 days. DHS has long provided 10-day grace periods in the H–1B, O, and P nonimmigrant classifications, and DHS has determined that such grace periods are sufficient to provide individuals in these classifications the time they need to initiate or conclude their affairs in the United States. Because individuals who obtain E–1, E–2, E–3, L–1 or TN classification are similarly situated to those who obtain H–1B, O, or P classification, DHS believes 10-day grace periods would also be sufficient for nonimmigrants in the former classifications.

### ii. Eligibility for 10-Day Grace Periods

*Comment.* Many commenters encouraged USCIS to broaden the classes of individuals eligible for the 10-day grace periods to include other nonimmigrant worker visa classifications. Commenters specifically requested that DHS add the following visa classifications to proposed 8 CFR 214.1(l)(1): A, H–1B1, H–2B, H–3, G, I, O, P, and Q.

*Response.* DHS declines to adopt these suggestions. First, DHS already provides a grace period of up to 10 days to some of these classifications, including the H–2B, H–3 O and P categories. *See* 8 CFR 214.2(h)(13)(i)(A), 8 CFR 214.2 (o)(10) and 8 CFR 214.2 (p)(12). Second, DHS is unable to extend authorized periods of admission to H–1B1 nonimmigrants through the use of such grace periods. The INA specifies that the admission for H–1B1 nonimmigrants "shall be 1 year," with extensions in 1 year increments. *See*

INA 214(g)(8), 8 U.S.C. 1184(g)(8). Third, this rulemaking is intended to benefit high-skilled workers and their employers by streamlining the processes for employer sponsorship of such workers for immigrant visas, increasing job portability and otherwise providing stability and flexibility for such workers, and providing additional transparency and consistency in the application of DHS policies and practices related to high-skilled worker programs. Because several of the additional nonimmigrant classifications proposed by commenters are not focused on facilitating the employment of high-skilled workers by employers in the United States, DHS believes providing grace periods in these classifications would not align with the purpose of this rule. For these reasons, DHS believes that the eligible classifications added to the final rule should be limited to individuals admissible in E–1, E–2, E–3, L–1 or TN classification, as well as their dependents.

### iii. Miscellaneous Comments on 10-Day Grace Periods

*Comment.* A few commenters suggested that DHS clarify whether the 10-day grace periods will be reflected on the approved petition or whether those periods may be automatically assumed by nonimmigrant workers. Another commenter noted that CBP usually annotates the Form I–94 when admitting an individual in H–1B classification to reflect the grace period of up to 10 days at the end of the H–1B authorized period of stay, but that the USCIS-issued Form I–797 Notice of Action for an approval of an extension of stay or change of status, which includes a Form I–94, does not reflect that grace period. This commenter further explained that, accordingly, if an individual is granted H–1B status pursuant to an extension of stay or change of status and remains in the United States in H–1B status for the petition's authorized validity period (*i.e.,* without leaving and seeking readmission into the United States as an H–1B nonimmigrant), he or she will not have any evidence of having been granted the grace period. Finally, one commenter requested that USCIS add the following language to its Form I–797 approval notices: "Beneficiary may be admitted up to 10-days prior to the validity period of the petition and will have a 10-day grace period at the end of nonimmigrant status to depart the United States or apply for another nonimmigrant or immigrant status."

*Response.* The commenters correctly point out that USCIS does not presently provide grace periods of up to 10 days

before or after petition validity approval when issuing Form I–797 or Form I–94, whether such issuance relates to an initial request for nonimmigrant status, a change of nonimmigrant status, or an extension of such status. Under existing regulations, DHS does not consider the 10-day grace periods to be automatically provided; rather, they are provided through an exercise of discretion on a case-by-case basis. USCIS is revising Form I–797 to facilitate consistent application of the discretionary 10-day grace periods and will continue to explore ways of notifying petitioners and beneficiaries when grace periods are provided. Specifically, DHS is revising 8 CFR 214.1(l)(1) to clarify that 10-day grace periods may be authorized as a matter of discretion, on a case-by-case basis, to nonimmigrants seeking changes of status or extensions of stay. *See* revised 8 CFR 214.1(l)(1). DHS further notes that if such individuals travel abroad and seek admission at a port of entry upon return, they may show the Form I–797 to a CBP officer who has the discretion to grant 10-day grace periods to eligible H–1B, E–1, E–2, E–3, L–1 and TN nonimmigrant workers. *See* INA 214(a)(1), 8 U.S.C. 1184(a)(1); final 8 CFR 214.2(l)(1).

*Comment.* A few commenters requested that USCIS revise the proposed rule at 8 CFR 214.1(l)(1), which states that eligible nonimmigrants "*may* be admitted . . . for the validity period of the petition . . . plus an additional period of up to 10 days." Because of the use of the word "may," commenters believed the proposed provision was more limiting than the existing regulatory language at 8 CFR 214.2(h)(13)(i)(A), which states that an H beneficiary "*shall* be admitted . . . for the validity period of the petition, plus a period of up to 10 days." The commenters requested that DHS harmonize these provisions and clarify whether, under the final rule, H–1B nonimmigrants would be eligible for a discretionary ("may") grace period of up to 10 days, whereas other H nonimmigrant classifications would be eligible for a mandatory ("shall") grace period of up to 10 days.

*Response.* DHS declines to revise the language in 8 CFR 214.1(l)(1) in response to commenters' suggestions. DHS chose to use the word "may," as opposed to the word "shall," in accordance with Federal regulatory drafting guidelines, to clarify that USCIS and CBP have the discretionary authority to limit periods of stay for all nonimmigrant classifications, including H nonimmigrants, consistent with current practice. Use of "may" rather than "shall" is also consistent with the

regulatory provision allowing 10-day grace periods for O and P nonimmigrants. *See* 8 CFR 214.2(o)(10) and (p)(12). DHS maintains broad discretion when admitting individuals in nonimmigrant classifications, including when determining whether to grant grace periods to such individuals. By statute, DHS has the authority and responsibility to decide which foreign nationals enter the country and under what terms and conditions.[57] *See* INA 214(a)(1), 8 U.S.C. 1184(a)(1) (providing that "the admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the [Secretary] may by regulations prescribe"); INA 215(a)(1), 8 U.S.C. 1185(a)(1) (authority to establish reasonable regulations governing aliens' entry or admission to and departure from the United States).[58] DHS has drafted the grace period provision to clarify that it maintains discretion to admit an individual with a full 10-day grace period, some part of that period, or no grace period at all, and to assure consistent administration of the grace period provision.

Additionally, in response to public comment, DHS is removing from the 10-day grace period provision in 8 CFR 214.1(l)(1) the clause that reads, "to prepare for departure from the United States or to seek an extension or change of status based on a subsequent offer of employment." DHS is removing this clause to avoid an unintended limitation on the use of such grace periods and to maintain consistency with grace periods already enjoyed by H, O and P nonimmigrants. While DHS maintains that the 10-day grace period commencing when the relevant validity period expires is typically used by individuals to prepare for departure from the United States or to extend or change status, DHS determined upon further examination that the clause is unnecessarily limiting and does not fully comport with how the existing 10-day grace period may be used by H, O and P nonimmigrants. Such grace periods are also used for other permissible non-employment activities such as changing one's status to that of a dependent of a nonimmigrant spouse or vacationing prior to departure. DHS clarifies that, under this final rule, nonimmigrants in E–1, E–2, E–3, L–1, or TN status may engage in the same types of activities during the 10-day grace period that H, O, and P nonimmigrants

currently engage in under the existing 10-day grace period.

*Comment.* One commenter requested that DHS add a regulatory provision that would deem nonimmigrants in a 10-day grace period as being in a period of stay authorized by the Secretary.

*Response.* Under 8 CFR 214.1(l)(1), the 10-day grace period is considered to be a period of nonimmigrant stay. Consistent with existing policy guidance, this is a period of stay authorized by the Secretary. Therefore, DHS does not believe additional revision to the regulatory text is necessary.[59]

*Comment.* One commenter suggested that USCIS allow eligible nonimmigrant workers who have experienced a cessation of employment and were unable to find work during the 60-day grace period, to use the additional 10-day grace period so that they can prepare to depart the United States.

*Response.* DHS declines to adopt the commenter's suggestion to allow eligible nonimmigrant workers the ability to add a 10-day grace period to the end of any 60-day grace period. DHS intends the 60-day grace period in 8 CFR 214.1(l)(2) to afford eligible high-skilled workers sufficient time following a cessation of employment to pursue other employment opportunities, seek a change or extension of status, or make the preparations necessary to depart the country. As the 10-day grace period at the end of a period of nonimmigrant validity is intended to serve the same purposes, providing both would be unnecessary and duplicative. DHS notes, however, that in limited instances it may be possible for a nonimmigrant worker to qualify for both grace periods. Use of both grace periods may occur, for instance, when a nonimmigrant worker, upon his or her last admission, was provided with a grace period of up to 10 days at the expiration of the validity period, and then experiences a cessation of employment in the last 60 days of the validity period. In these limited cases, DHS may consider the nonimmigrant to have maintained his or her status for up to 60 days immediately preceding the expiration of the validity period, and the nonimmigrant may also use the 10-day grace period after the validity period ends.

### iv. Length of the 60-Day Grace Period

*Comment.* Numerous commenters expressed support for the proposal

---

[57] *Id.*

[58] The President assigned to the Secretary of Homeland Security (acting with the concurrence of the Secretary of State) the functions under INA 215(a) with respect to noncitizens. Exec. Order No. 13323, 69 FR 241 (Dec. 30, 2003).

[59] For further guidance on periods of authorized stay, please see Neufeld May 2009 Memo (describing various "periods of authorized stay"), available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/revision_redesign_AFM.PDF.*

establishing a 60-day grace period for certain nonimmigrant classifications, including support for 60 days as sufficient time to find a new job. However, a significant number of other commenters believed that the 60-day grace period did not provide sufficient time for such purposes. These commenters suggested the grace period be lengthened to 90 or 120 days. One commenter suggested that USCIS extend the 60-day grace period to 90 days if a new petitioning employer submits evidence to USCIS indicating that it provided a written job offer to the nonimmigrant employee. Other commenters suggested giving USCIS the authority to extend the grace periods on a case-by-case basis. Commenters cited the difficulties of finding new jobs in the current economy, relocation and state-specific professional licensing requirements, personal responsibilities that complicate decision making when conducting job searches, and the fact that employer recruitment often takes 8–12 weeks.

*Response.* DHS appreciates the many comments suggesting alternate periods of time for the grace period, and the reasons offered in support of a longer grace period. However, DHS will retain the 60-day grace period, rather than provide additional time, to encourage affected high-skilled workers to pursue other options in the United States in an expedient manner. Adding a grace period of up to 60 consecutive days upon cessation of employment allows the affected high-skilled workers sufficient time to respond to sudden or unexpected changes related to their employment. DHS believes that such time may be used to seek new employment, seek a change of status to a different nonimmigrant classification, including B–1/B–2 classification, or make preparations for departure from the United States.

v. Frequency of the 60-Day Grace Period

*Comment.* Some commenters stated that 60-day grace periods should be available multiple times during any authorized validity period, rather than ''one time'' as described in the NPRM. The majority of these commenters stated that 60-day grace periods should be made available to foreign workers at least once per year. Other commenters suggested making 60-day grace periods available once every 3 years, once per visa extension or change of status, or each time a foreign worker loses his or her job. Commenters stated that lengthy delays in obtaining lawful permanent residence can leave foreign workers waiting for adjustment of status for 10 years or more, and it is likely that they

could lose their jobs more than once during this time.

Many commenters stated that the term ''one-time'' in the proposed regulatory text was unclear, and they did not understand whether the rule allowed for one grace period per lifetime, per employer, per petition validity period, or per total period of stay in any given status. Some commenters proposed alternative approaches to measuring the one-time 60-day grace period, including allowing the 60-day grace period to be divisible so that the unused portion of a 60-day grace period could be used toward a subsequent cessation of employment within the same period of valid nonimmigrant status, or carried forward into a new validity period and aggregated with a subsequent 60-day grace period.

*Response.* Given the number and diversity of comments received, DHS recognizes that the proposal did not clearly convey the intended operation of the 60-day grace period. Accordingly, in the final rule, DHS clarifies that, while the grace period may only be used by an individual once during any single authorized validity period, it may apply to *each* authorized validity period the individual receives. DHS also clarifies that the grace period can last up to 60 consecutive days or until the existing validity period ends, whichever is shorter. As modified, the final rule provides that while the nonimmigrant worker may only receive one grace period in an authorized validity period, he or she would be eligible for a new grace period of up to 60 days in connection with any subsequently authorized validity period. Any days available in such a grace period must be used consecutively, and unused days may not be used later in the same authorized validity period or carried over into a subsequent validity period. DHS believes that limiting the grace period to up to 60 days once during each authorized nonimmigrant validity period, and not allowing for aggregation or carryover of time, is most consistent with the intent of the grace period: to provide a single limited, but reasonable, period of time during which DHS may, when adjudicating an extension of stay or change of status petition, consider the nonimmigrant to have maintained valid nonimmigrant status following cessation of employment.[60] While DHS appreciates the alternative approaches

suggested by commenters, DHS believes that most of the underlying concerns are addressed by these clarifications made to this provision in the final rule.

vi. Classifications Eligible for the 60-Day Grace Period

*Comment.* Several commenters suggested that DHS broaden the classes eligible for the 60-day grace period to include other nonimmigrant worker visa classifications, namely those working in A, H–3, G, I, O, P, or Q nonimmigrant status.

*Response.* In response to these comments, DHS is adding O–1 nonimmigrants to the classes of individuals eligible for the 60-day grace period. DHS has decided not to add the other nonimmigrant classifications requested by commenters because the fundamental purposes of those classifications do not align with the fundamental purpose of this rule. As discussed previously, this rulemaking is intended to benefit high-skilled workers and their employers by streamlining the processes for employer sponsorship of such workers for immigrant visas, increasing job portability and otherwise providing stability and flexibility for such workers, and providing additional transparency and consistency in the application of DHS policies and practices related to high-skilled worker programs. The additional nonimmigrant classifications proposed by commenters, however, are not focused on facilitating the employment of high-skilled workers by employers in the United States. Authorizing grace periods for these nonimmigrant classifications would thus not align with the purpose of this rule.

*Comment.* One commenter suggested broadening the classes of individuals who might benefit from a 60-day grace period to include those nonimmigrant workers whose petitions to extend stay or change employers within an eligible visa classification are denied. This commenter opined that the inclusion of petition denials is consistent with the grace period's purpose of facilitating stability and job flexibility.

*Response.* DHS declines to adopt the commenter's suggestion to provide grace periods after an approved validity period in cases in which petitions requesting an extension of stay or a change of employers are denied. The 60-day grace period is intended to apply to individuals whose employment ends prior to the end of their approved validity period. It is not intended to apply after that period based on a denial of a benefit request. DHS notes that individuals may be eligible for the 60-day grace period if they port to new H–

---

[60] The 60-day grace period provision does not limit the scope of employer violations under section 212(n)(2)(c)(vii) of the Act, or the remedies available to correct such violations. See 8 U.S.C. 1182(n)(2)(c)(vii)(concerning employer failure to pay wages during ''nonproductive time'', commonly referred to as ''benching'').

1B employers under INA 214(n) and the petition for new employment (*i.e.*, the H–1B petition used to port) is denied prior to the expiration of the validity period of the previously approved petition on which the individual's status had been based. However, the 60-day grace period would not apply where a petition for new employment under section 214(n), or an extension of stay petition with the same employer, is denied after expiration of the validity period.

vii. Clarifying the Meaning of "Up To" in the 60-Day Grace Period

*Comment.* A few commenters asked DHS to clarify how it would exercise its discretion to eliminate or shorten the 60-day period on a case-by-case basis. These commenters wanted to know the circumstances in which DHS might deem it appropriate to eliminate or shorten the grace period, and the manner in which the beneficiary would be notified.

*Response.* At the time a petitioner files a nonimmigrant visa petition requesting an extension of stay or change of status, DHS will determine whether facts and circumstances may warrant shortening or refusing the 60-day period on a case-by-case basis. If DHS determines credible evidence supports authorizing the grace period, DHS may consider the individual to have maintained valid nonimmigrant status for up to 60 days following cessation of employment and grant a discretionary extension of stay or a change of status to another nonimmigrant classification. *See* 8 CFR 214.1(c)(4) and 248.1(b). Such adjudications require individualized assessments that consider the totality of the circumstances surrounding the cessation of employment and the beneficiary's activities after such cessation. While many cases might result in grants of 60-day grace periods, some cases may present factors that do not support the favorable exercise of this discretion. Circumstances that may lead DHS to make a discretionary determination to shorten or entirely refuse the 60-day grace period may include violations of status, unauthorized employment during the grace period, fraud or national security concerns, or criminal convictions, among other reasons.

viii. Employment Authorization During the Grace Periods

*Comment.* Several commenters requested that employment authorization be granted during grace periods so that foreign workers can begin their new jobs while awaiting approval of a petition filed by a new employer.

*Response.* DHS declines to provide employment authorization during the grace periods. Consistent with the intent of the grace periods as proposed, as well as similar grace periods already provided in DHS regulations, the final rule does not allow eligible nonimmigrants to be employed during either the 10- or 60-day grace periods unless otherwise authorized under 8 CFR 274a.12. DHS authorizes these grace periods simply to facilitate the ability of qualified nonimmigrants to transition to new employment in the United States, seek a change of status, or prepare to depart the United States. Consistent with longstanding policy, DHS declines to authorize individuals to work during these grace periods.

*Comment.* Several commenters requested that USCIS allow nonimmigrant workers to pursue their own businesses during grace periods.

*Response.* DHS declines to allow nonimmigrant workers to use the grace periods provided by this rule to work to start their own businesses. The grace periods allow qualified nonimmigrants to transition to new employment while maintaining nonimmigrant status, or seek a change of status, or prepare to depart the United States. These grace periods are not intended to provide a separate basis for employment authorization. Therefore, the final rule at 8 CFR 214.1(l)(3) provides that an individual may not work during the grace period unless otherwise authorized under 8 CFR 274a.12.

*H. Job Portability for H–1B Nonimmigrant Workers*

1. Description of Final Rule and Changes from NPRM

The final rule at 8 CFR 214.2(h)(2)(i)(H) codifies longstanding DHS policies implementing H–1B job portability under INA 214(n). This section of the final rule enhances the ability of H–1B nonimmigrant workers to change jobs or employers by authorizing them to accept new or concurrent employment upon the filing of a nonfrivolous H–1B petition ("H–1B portability petition"). *See* INA section 214(n), 8 U.S.C. 1184(n); 8 CFR 214.2(h)(2)(i)(H). Under section 214(n), the H–1B nonimmigrant worker must have been lawfully admitted into the United States, must not have worked without authorization after such lawful admission, and must be in a period of stay authorized by the Secretary.[61] *See* 8 CFR 214.2(h)(2)(i)(H)(*1*). Although DHS

---

[61] Neufeld May 2009 Memo (describing various "periods of authorized stay").

is not making any changes to the H–1B portability provisions proposed in the NPRM, the Department confirms that to be eligible for H–1B portability the new H–1B petition must have been filed while the foreign worker is in H–1B status or is in a period of authorized stay based on a timely filed H–1B extension petition. Employment authorization under the pending H–1B portability petition continues until adjudication. *See* 8 CFR 214.2(h)(2)(i)(H)(*2*).

The final rule allows H–1B employers to file successive H–1B portability petitions (often referred to as "bridge petitions") on behalf of H–1B nonimmigrant workers. An H–1B nonimmigrant worker who has changed employment based on an H–1B portability petition filed on his or her behalf may again change employment based on the filing of a new H–1B portability petition, even if the former H–1B portability petition remains pending. Eligibility for employment pursuant to a second or subsequent H–1B portability petition, however, would effectively depend on (1) whether any prior H–1B portability petitions have been approved or remain pending, and (2) whether the individual's Form I–94, issued upon admission or extended pursuant to an approved H–1B petition, has expired. If the request for an extension of stay was denied in a preceding H–1B portability petition and the individual's Form I–94 authorizing admission in or extension of H–1B status has expired, a request for an extension of stay in any successive H–1B portability petition(s) must also be denied. *See* 8 CFR 214.2(h)(2)(i)(H)(*3*). Successive H–1B portability petitions thus may provide employment authorization as long as each such H–1B portability petition separately meets the requirements for H–1B classification and for an extension of stay.

2. Public Comments and Responses

i. H–1B Status Requirement

*Comment.* Several commenters objected to limiting H–1B portability to workers who are in H–1B nonimmigrant status or in an authorized period of stay based on a timely filed H–1B extension petition. These commenters requested that the regulation permit any worker who was previously issued an H–1B visa or otherwise provided H–1B nonimmigrant status to port to H–1B employment through a request for a change of status from another nonimmigrant category. Commenters stated that the current limitation was contrary to the plain language of the INA and congressional intent, outside

the Department's authority, and inconsistent with DHS's stated goal of maximizing job flexibility for skilled foreign workers. One commenter stated that such a policy would impose further restrictions and fees on employers in the medical field, deterring them from recruiting physicians to work in medically underserved areas.

*Response.* DHS disagrees with these commenters. USCIS has long interpreted INA 214(n) as allowing only those nonimmigrants who are currently in H–1B status, or in a period of authorized stay as a result of a timely filed H–1B extension petition, to begin employment upon the filing by prospective employers of new H–1B portability petitions on the nonimmigrants' behalf. H–1B portability does not apply to a nonimmigrant who is in a valid status other than H–1B.[62] This interpretation is consistent with the text of INA 214(n)(1), which refers specifically to foreign workers admitted in or otherwise provided H–1B status. *See* INA 214(n)(1), 8 U.S.C. 1184(n)(1). This interpretation is also in harmony with congressional intent behind the creation of the provision. As noted in the Senate Report accompanying the bill, the H–1B portability provision at INA 214(n), titled "increased portability of H–1B status," was intended to "respond[ ] to concerns raised about the potential for exploitation of H–1B visa holders as a result of a specific employer's control over the employee's legal status." *See* S. Rep. No. 260, at 22–23. The Senate Report also noted that: "[t]he bill allows an H–1B visa holder to change employers at the time a new employer files the initial paperwork, rather than requiring the visa holder to wait for the new H–1B application to be approved." *Id.* at 10, 22. For these reasons, DHS believes this limitation is consistent with Congress's intent.

Additionally, DHS does not agree that these clarifications would impose new restrictions on employers. As noted above, USCIS has long interpreted INA 214(n) as requiring an individual to maintain lawful H–1B status, or be in an authorized period of stay based on a timely filed extension of H–1B status, in order to "port" to a new employer. As this is longstanding policy and practice, DHS disagrees that the codification of such provision would present a new deterrent to employers recruiting certain H–1B nonimmigrants, such as physicians.

*Comment.* One commenter expressed qualified support for the proposed H–1B portability provision at 8 CFR 214.2(h)(2)(i)(H). The commenter

expressed appreciation for the provision under the assumption that it rendered the so-called "240-day rule" at 8 CFR 274a.12(b)(20), which applies to timely filed H–1B extensions with the same employer, moot. This assumption was based on the fact that the proposed regulation provided H–1B portability to the beneficiary of the H–1B extension petition until such petition was adjudicated by USCIS. The commenter stated, however, that there was apparent discrepancy between the text of the proposed H–1B portability provision and the regulatory text at 8 CFR 274a.12(b)(20), and the commenter requested that DHS address such discrepancy.

*Response.* DHS appreciates the commenter's observations regarding the perceived implications of the portability provision at 8 CFR 214.2(h)(2)(i)(H) on the 240-day rule under 8 CFR 274a.12(b)(20). DHS notes that there is a difference in how these rules are applied, however, and that the portability provision does not in fact render the 240-day rule moot for H–1B nonimmigrants. Under the H–1B portability provision, if an H–1B employer is filing a petition for a change in employment (or an amended petition) for the same employee, then the H–1B nonimmigrant is authorized to work for that same employer in the new employment until the petition is adjudicated. *See* 8 CFR 214.2(h)(2)(i)(H)(2). However, if an H–1B employer files a timely petition for an employee seeking continuation of the same employment with the same employer without change, DHS does not consider that to be new employment, and thus is ineligible for H–1B portability. The statutory provision at INA 214(n)(1) plainly refers to new employment in describing what type of employment is authorized, and therefore limits the applicability of that provision. Thus, while a petition seeking extension of the *same* employment for the same employer is pending, employment authorization is not provided by 8 CFR 214.2(h)(2)(i)(H) and 8 CFR 274a.12(b)(9), but would be provided by 8 CFR 274a.12(b)(20), which authorizes employment for an additional 240 days beginning on the date of the expiration of the previously authorized period of stay.

Thus, an eligible nonimmigrant may be granted employment authorization until the adjudication of the H–1B petition if he or she chooses to engage in concurrent or new employment (including new employment with the same employer) or may be granted employment authorization for a period not to exceed 240 days if he or she

chooses to continue the current employment with the same employer. For these reasons, DHS disagrees with the commenter's assessment that this provision renders 8 CFR 274a.12(b)(20) moot.

ii. International Travel and Successive Portability Petitions ("Bridge Petitions")

*Comment.* A few commenters requested that DHS further clarify the effect of travel outside of the United States on the status of beneficiaries of pending bridge petitions. *See* 8 CFR 214.2(h)(2)(i)(H)(3). Many of these commenters expressed the view that DHS prohibited beneficiaries with pending successive portability petitions from traveling outside the United States. Other commenters objected to the potential consequences that beneficiaries of pending bridge petitions face if they travel internationally, including having DHS consider their petitions abandoned. One commenter asked DHS to extend portability to H–1B nonimmigrants who are employed, but are travelling for business or vacation purposes, asserting that true portability should allow job changes for H–1B nonimmigrants who are employed by their sponsors, whether the nonimmigrants are physically in the United States or not.

*Response.* DHS is aware that H–1B nonimmigrants (and their employers) have expressed concern about their eligibility for admission to the United States during the pendency of a new employer's petition on their behalf. DHS has long acknowledged that otherwise admissible H–1B nonimmigrants may travel and be admitted in H–1B status while H–1B portability petitions on their behalf are pending. However, individuals requesting admission as H–1B nonimmigrants must prove at the port of entry that they are eligible for admission in that status.[63]

Generally, if an individual's original H–1B petition has expired prior to the time that the beneficiary seeks admission to the United States, or if such petition is otherwise no longer valid, the beneficiary must present evidence that USCIS has approved a new H–1B petition to be admitted to the United States. If the original H–1B petition has not yet expired, however, the beneficiary of an H–1B portability petition who travels abroad may be admissible if, in addition to presenting

---

[62] See Aytes 2005 Memo, at 7.

[63] *See* USCIS Memorandum from Michael A. Pearson, "Initial Guidance for Processing H–1B Petitions as Affected by the 'American Competitiveness in the Twenty-First Century Act' (Public Law 106–313) and Related Legislation (Public Law 106–311) and (Public Law 106–396)" (June 19, 2001).

a valid passport and visa (unless visa-exempt), he or she provides a copy of the previously issued Form I–94 or Form I–797 approval notice for the original H–1B petition (evidencing the petition's validity dates), and a Form I–797 receipt notice demonstrating that the new H–1B petition requesting an amendment or extension of stay was timely filed on the individual's behalf. The inspecting officer at the port of entry will make the ultimate determination as to whether the applicant is admissible to the United States as an H–1B nonimmigrant.

*Comment.* One commenter opposed conditioning H–1B portability on the approval of the H–1B portability petition. The commenter noted that if an employer delays the filing, and chooses not to pay for premium processing, the employee will not be able to port for (potentially) several months. The commenter asked DHS to instead require that portability be conditioned on the portability petition being non-frivolous. Another commenter requested that where the H–1B nonimmigrant's Form I–94 remains valid and unexpired, the regulation should confirm that the denial or withdrawal of a portability petition in the "chain" will not result in the denial of successive portability petitions. The commenter advocated that in such situations, pending petitions should remain viable unless denied.

*Response.* DHS disagrees that an employee who is the beneficiary of a pending portability petition, whether or not premium processing has been requested, would be unable to change jobs for several months. As noted above, as long as a worker is in H–1B nonimmigrant status, or is in a period of authorized stay as a result of a timely filed H–1B petition, that worker may begin new employment upon the filing by the prospective employer of an H–1B portability petition on the foreign worker's behalf. There is no requirement that the portability petition be approved at the time the worker begins the new employment.

DHS notes that an H–1B beneficiary who has a valid and unexpired Form I–94 remains in a period of authorized stay. As long as the petitioner can demonstrate that the beneficiary remained in valid H–1B nonimmigrant status when a successive portability petition was filed, the timely filed petition and associated extension of stay request should not be denied simply because of a denial or withdrawal of the preceding portability petition. DHS does not consider an H–1B portability petition that is filed before the validity period expires to constitute a "bridge

petition"; rather, a bridge petition is one filed after expiration of the Form I–94, but during the time in which the individual was in a period of authorized stay based on a preceding timely filed extension petition.

DHS believes that this rule achieves the ameliorative purpose of section 214(n) to enhance the job flexibility of H–1B nonimmigrant workers and minimize the potential exploitation of such workers by employers. DHS thus adopts the proposed provision without change.

iii. Portability to New Employment Subject to the Cap

*Comment.* One commenter asked DHS to clarify H–1B portability in the context of a change from cap-exempt to cap-subject employment. The commenter asked DHS to explicitly allow cap-subject employment to begin prior to the beginning of the fiscal year (October 1), noting that H–1B portability provides "employment authorization" but not status.

*Response.* An H–1B nonimmigrant worker's cap-subject employment may not begin prior to October 1 of the fiscal year for which his or her cap-subject petition is approved. *See* INA section 214(g)(1), 8 U.S.C. 1184(g)(1). Therefore, in the circumstances described by the commenter, the H–1B nonimmigrant worker would not be eligible to begin working upon the timely filing of a nonfrivolous petition under 8 CFR 214.2(h)(2)(i)(H).

*I. H–1B Licensing Requirements*

1. Description of Final Rule and Changes From NPRM

The final rule amends existing DHS regulations to incorporate the Department's current policy[64] for determining when H–1B status may be granted notwithstanding the H–1B beneficiary's inability to obtain a required professional license. In response to public comment, the final rule also expands upon the bases for granting H–1B status in such cases. *See* final 8 CFR 214.2(h)(4)(v)(C).

First, in this final rule, DHS is making clarifications to the proposal in the NPRM covering unlicensed beneficiaries who will work, under the supervision of

---

[64] *See* USCIS Memorandum from Donald Neufeld, "Adjudicator's Field Manual Update: Chapter 31: Accepting and Adjudicating H–1B Petitions When a Required License Is Not Available Due to State Licensing Requirements Mandating Possession of a Valid Immigration Document as Evidence of Employment Authorization" (Mar. 21, 2008) ("Neufeld Memo March 2008"); INS Memorandum from Thomas Cook, "Social Security Cards and the Adjudication of H–1B Petitions" (Nov. 20, 2001) ("Cook Memo Nov. 2001").

licensed senior or supervisory personnel, in an occupation that typically requires licensure. *See* proposed 8 CFR 214.2(h)(4)(v)(C)(*1*). The proposed rule required petitioners to provide evidence concerning the duties to be performed by the prospective beneficiary, as well as the identity, physical location, and credentials of the individual(s) who will supervise the foreign worker. In the final rule, DHS is retaining these requirements with an amendment clarifying that petitioners must also submit evidence of compliance with applicable state requirements. DHS is adding this requirement, consistent with existing policy and practice, to clarify that the performance of such work by an unlicensed beneficiary, in an occupation that typically requires a license, would only be permissible if it is otherwise consistent with applicable state licensure requirements and exceptions to such requirements. In such cases, if the evidence demonstrates that the unlicensed H–1B nonimmigrant may fully perform the duties of the occupation under the supervision of licensed senior or supervisory personnel, H–1B classification may be granted. *See* final 8 CFR 214.2(h)(4)(v)(C)(*1*).

Second, DHS is expanding the bases under which an individual may be granted H–1B nonimmigrant status despite the individual's inability to obtain a required license in the United States. The proposed rule expressly allowed for a temporary exception to the licensure requirement for individuals who were substantively qualified for licensure but who could not obtain such licensure due only to the need to have a Social Security number or employment authorization. In response to public comment, DHS is clarifying that a temporary exception to the licensure requirement may also be available in cases in which the inability to obtain the license is due to a "similar technical requirement." Final 8 CFR 214.2(h)(4)(v)(C)(*2*)(*i*). DHS is expanding this provision in recognition that other technical obstacles may exist that would similarly prevent beneficiaries from obtaining licenses required for employment in certain occupations. Under the final rule, petitioners filing H–1B petitions on behalf of such beneficiaries are required to submit evidence from the relevant licensing authority indicating that the only obstacle to the beneficiary's licensure is the lack of a Social Security number, the lack of employment authorization, or the inability to meet a similar technical

AC00185

requirement. *See* final 8 CFR 214.2(h)(4)(v)(C)(*2*)(*ii*).

Petitions for such unlicensed H–1B beneficiaries may be approved for up to 1 year. *See* final 8 CFR 214.2(h)(4)(v)(C)(*2*). Thereafter, an H–1B petition filed on such a beneficiary's behalf may not be approved unless the required license has been obtained, the beneficiary is employed in a different position that requires another type of license, or the beneficiary is employed in the same occupation but in a different location that does not require a license. *See* final 8 CFR 214.2(h)(4)(v)(C)(*3*).

2. Public Comments and Responses

i. Duties Without Licensure—Expand Circumstances

*Comment.* Most of the commenters who addressed the proposed changes supported DHS's proposals and thanked DHS for clarifying exceptions to the general requirement making approval of H–1B petitions contingent on licensure when licensure is required for the relevant occupation. Two commenters asked DHS to include additional bases for excusing the general licensure requirement, such as by adding the phrase ''or other requirement'' to 8 CFR 214.2(h)(4)(v)(C)(*2*)(*ii*).

*Response.* DHS regulations provide that if an occupation, including a health care occupation, requires a state or local license to fully perform the duties of the occupation, the H–1B beneficiary must have the license prior to the approval of the petition. *See* 8 CFR 214.2(h)(4)(v). However, some states will not issue a foreign national a state license without evidence of an approved H–1B petition or other employment authorization. DHS has long acknowledged these beneficiaries sometimes face situations where the beneficiary is qualified for licensure but may not obtain the licensure because of a technical requirement, and the Department responded over 8 years ago by allowing for the *temporary* approval of H–1B petitions in such cases, provided all other requirements are met.[65] By incorporating this policy into the final regulations, DHS intends to provide clear guidance to help certain beneficiaries who cannot obtain the necessary license because they are unable to satisfy a technical prerequisite, including because they do not yet possess a Social Security number or are not yet legally authorized to work in the United States.

In addition, DHS agrees with commenters and recognizes that there may be other analogous technical

---

[65] *See* Neufeld Memo March 2008.

requirements not specifically identified in the proposed rule that similarly prevent a beneficiary from obtaining a license. DHS is therefore providing additional flexibility in the final rule by allowing beneficiaries to demonstrate that a ''similar technical requirement'' bars the issuance of a license to an individual who is not yet in H–1B status. In such situations, the petitioner must still demonstrate that the beneficiary is otherwise qualified to receive the state or local license, meaning that all educational, training, experience, and other substantive requirements have been met. The petitioner must also still demonstrate that the beneficiary has applied for such license in accordance with state or local rules and procedures, unless such rules and procedures prohibit the beneficiary from applying for the license without first meeting the technical requirement.

*Comment.* One commenter requested the same accommodation (*i.e.,* a 1-year approval) for physicians who complete their graduate medical education in H–1B nonimmigrant status using a limited or restricted license but who require an unrestricted license to begin post-training work in H–1B status. This commenter noted that these physicians sometimes face circumstances in which they have not yet completed their post-graduate training (*i.e.,* medical residency), which is a prerequisite to obtaining an unrestricted state license in many states, but must have an H–1B petition filed on their behalf to avoid a lapse in status. This commenter requested that USCIS consider the completion of the requisite post-graduate training as another technical impediment to obtaining a license.

*Response.* DHS declines to adopt the commenter's suggestion. As with other occupations, DHS will require physicians who complete their graduate medical education in H–1B status using a restricted license to demonstrate that the only obstacle to the issuance of an unrestricted license is the lack of a Social Security number, a lack of employment authorization, or the inability to meet a similar technical requirement that precludes the issuance of the license. DHS does not view the absence of completed post-graduate training as analogous to the purely technical prerequisites discussed above. The Department did not propose to excuse substantive prerequisites for obtaining licensure and disagrees that exceptions should extend to such prerequisites.

ii. Unlicensed Employment Under Supervision

*Comment.* Several commenters were concerned about petitioners being required to provide evidence ''as to the identity, physical location, and credentials of the individual(s) who will supervise the alien.'' *See* 8 CFR 214.2(h)(4)(v)(C)(*1*). One commenter indicated that the quoted text could be interpreted in different ways. According to the commenter, although the text may have been intended to require petitioners to provide broad details about the supervisor(s) who will oversee the work of the nonimmigrant worker, adjudicators may interpret this provision as requiring petitioners to provide the actual identities and qualifications of those supervisors. The commenter believed such an interpretation would pose a major logistical challenge for many petitioners. As an example, the commenter referred to medical residents who often rotate through numerous assignments and different supervisors, sometimes on a monthly basis, during their training. The commenter believed that in such cases it would be overly burdensome for petitioners to provide the actual identities of the supervisors, and the commenter urged DHS to eliminate this requirement. Some commenters recommended that DHS strike the provision requiring petitioners to provide specific information about supervisors and replace it with a provision requiring petitioners to proffer evidence from the appropriate licensing authority supporting the employment.

Additionally, commenters were concerned that the proposed rule gave USCIS too much authority to ''second-guess'' established practices followed by state licensing authorities. One commenter was of the view that if the relevant state licensing authority deems the proposed supervision to be adequate, USCIS should not evaluate the level at which duties are performed or the degree of supervision received. Another commenter stated that refining the regulatory text would help to avoid denials of H–1B petitions filed for unlicensed workers whose supervision is deemed adequate by the state but determined to be inadequate by USCIS.

*Response.* In this final rule, DHS is clarifying that, consistent with current policy, the petitioner is required to provide details about the supervisor(s) overseeing the work of the nonimmigrant worker, including physical location, credentials and identity of such supervisor(s). Petitioners are encouraged to fully document each case, as this helps DHS

ensure that while the beneficiary may as yet be unlicensed, he or she will be supervised by one or more individuals with the proper license. Finally, as the burden of proof is on the petitioner to establish eligibility for the benefit requested, the petitioner must also submit evidence that it is complying with state requirements. DHS is modifying the regulatory text at 8 CFR 214.2(h)(4)(v)(C)(*1*) to clarify the petitioner's burden of proof with respect to compliance with state requirements. As the final rule simply codifies current policy, DHS does not anticipate that petitioners would have to change the way they currently satisfy these requirements.[66]

### iii. Duration of H–1B Petition Approval

*Comment.* A few commenters suggested a longer duration of approval for H–1B petitions involving unlicensed H–1B beneficiaries, noting that limiting the duration of H–1B nonimmigrant status to 1 year seemed both "arbitrary" and "unnecessary." The commenters urged DHS to allow petitions to be approved for the full H–1B period requested—up to 3 years—regardless of whether the occupational license is subject to renewal before the requested petition expiration date. Alternatively, another commenter suggested an option whereby USCIS would approve H–1B status for the period requested on the petition and then send a request for proof of licensure 1 year after approval (rather than require a new petition). According to the commenter, if proof is not provided at that point, the grant of H–1B status could be revoked. One commenter proposed that DHS extend the 1-year exception to any foreign beneficiary who presents a health care worker certificate[67] at the time of the filing of the H–1B petition. The commenter noted that this proposal would relieve the need for DHS to parse through a myriad of state licensing prerequisites, while still guaranteeing that only qualified workers are granted H–1B status. The commenter noted that the proposal would provide additional certainty to petitioners and allow for more consistent DHS decision-making.

*Response.* USCIS has long used a 1-year period as the duration for approval for beneficiaries that cannot obtain

licensure due to technical requirements. Petitioners wishing to extend H–1B status for such beneficiaries beyond one year are required to file new petitions with requests for extensions and evidence that the necessary licensure has in fact been obtained.[68] While DHS recognizes that short approval periods impose a burden on employers, DHS must balance employer burden against the need to affirmatively confirm that the beneficiary ultimately received the requisite licensing. Extending the period of H–1B petition validity beyond 1 year in cases in which the beneficiary does not have a license needlessly weakens DHS's oversight of beneficiaries' eligibility for H–1B status.

DHS also declines to implement the commenter's proposal to approve petitions for beneficiaries lacking necessary licensure for the period requested on the petition and then issue an RFE to request proof of licensure 1 year after approval. Such a proposal would be operationally and administratively burdensome, both because it would require USCIS to track petitions and because it would require USCIS to incur the costs of re-determining eligibility without collecting an appropriate fee. The proposal could add also uncertainty for petitioners and H–1B nonimmigrant workers while their petitions are under re-review. For these reasons, DHS retains in the final rule the current 1-year limitation on the duration of approval of H–1B petitions filed on behalf of unlicensed workers under 8 CFR 214.2(h)(4)(v)(C)(*2*).

DHS also declines to adopt the commenter's request to provide an exception to the 1-year limit for a foreign beneficiary who submits a health care worker certificate with the H–1B petition. State laws govern licensure requirements for individuals to fully practice their profession, and DHS regulations accordingly require the petitioner to submit a copy of the beneficiary's license to establish that the beneficiary is fully qualified to practice in his or her specialty occupation. *See* 8 CFR 214.2(h)(4)(iii)(C)(*3*). The licensure exception only applies where

the individual is fully qualified for the state license, but is unable to acquire the license due to a technical, non-substantive reason. While a health care worker certification may help prove such qualification, such certificates, which are issued by private organizations, do not confer authorization to engage in the specialty occupation and are not sufficient evidence of a beneficiary's qualifications for the specialty occupation. Accordingly, such health care certificates are not acceptable substitutes for evidence establishing that the foreign national is licensed to practice his or her occupation. For these reasons, DHS declines to make changes to those requirements in the final rule.

### iv. Unrestricted Extendable Licenses

*Comment.* One commenter stated that the proposed rule did not reference the most recent USCIS guidance regarding unrestricted extendable licenses in health care occupations. The commenter cited a May 20, 2009 USCIS memorandum from Barbara Q. Velarde titled, "Requirements for H–1B Beneficiaries Seeking to Practice in a Health Care Occupation" ("2009 Velarde Memorandum"), that states, in part, that H–1B approvals in such instances should be for the full duration of time requested on the petition (*i.e.,* up to 3 years) notwithstanding the renewal date on the license, if the petition is otherwise approvable. The commenter asked that the applicability of the policy be expanded to include additional occupations beyond those in health care, and proposed that 8 CFR 214.2(h)(4)(v)(A) be amended accordingly.

*Response.* DHS did not propose to codify or change USCIS policy addressing the approval of petitions for individuals in health care occupations who are issued unrestricted extendable licenses, as articulated in the 2009 Velarde Memorandum, and therefore declines to address this comment in this rulemaking. USCIS will continue to adjudicate these petitions consistent with the policy guidance articulated in the 2009 Velarde Memorandum, and the agency declines to make any changes to this policy or the memorandum at this time.

### J. Employers Exempt From H–1B Numerical Limitations and Qualifying for Fee Exemptions

#### 1. Description of the Final Rule and Changes From the NPRM

In this final rule, DHS codifies its longstanding policy interpretations identifying which employers are exempt

---

[66] *See* the Adjudicator's Field Manual at Chapter 31.3(d)(2).

[67] A foreign national seeking admission to perform labor as a health care worker, other than a physician, is only admissible to the United States if he or she presents a certification from a USCIS-approved credentialing organization verifying that the worker has met the minimum requirements for education, training, licensure, and English proficiency in his or her field. *See* INA section 212(a)(5), 8 U.S.C. 1182(a)(5); 8 CFR 212.15.

[68] The 1-year time period dates back to 2001, when the former INS issued guidance to adjudicators to approve H–1B petitions for 1-year periods for teachers who could not obtain state licensure unless they obtained Social Security numbers, which in turn could not be obtained unless they were already authorized to work in the United States. *See* Cook Memo Nov. 2001. *See also* USCIS Memorandum from Barbara Q. Velarde, "Requirements for H–1B Beneficiaries Seeking to Practice in a Health Care Occupation" (May 20, 2009), available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/health_care_occupations_20may09.pdf.*

from the H–1B numerical limitations (*i.e.*, which employers are "cap-exempt") and makes conforming changes to the provisions that establish which employers are exempt under ACWIA from paying certain H–1B fees. DHS also modifies those policies in response to public comment as they relate to (1) nonprofit entities related to or affiliated with institutions of higher education, and (2) governmental research organizations. DHS is making revisions to the H–1B cap- and fee-exemption provisions where needed to reflect these modifications.

In the final rule, DHS is improving upon and codifying current policy interpreting the statutory cap and fee exemptions for a nonprofit entity that is related to or affiliated with an institution of higher education. *See* INA 214(c)(9) and (g)(5), 8 U.S.C. 1184(c)(9) and (g)(5); *see also* final 8 CFR 214.2(h)(8)(ii)(F)(2)(*iv*) and (h)(19)(iii)(B). Under current policy, DHS allows nonprofit entities to qualify for the cap and fee exemptions if such nonprofit entities are (1) connected or associated with an institution of higher education through shared ownership or control by the same board or federation; (2) operated by an institution of higher education; or (3) attached to an institution of higher education as a member, branch, cooperative, or subsidiary. In addition to proposing to retain this policy (*see* proposed 8 CFR 214.2(h)(8)(ii)(F)(2); 8 CFR 214.2(h)(19)(iii)(B)(4)), the NPRM proposed to also allow nonprofit entities to qualify for the cap and fee exemptions on the basis of having a written affiliation agreement with an institution of higher education. As proposed, the regulatory text would have allowed such an agreement to serve as the basis for the cap and fee exemptions if the agreement established an active working relationship between the nonprofit entity and the institution of higher education for the purposes of research or education and so long as one of the nonprofit entity's primary purposes was to directly contribute to the research or education mission of the institution of higher education.

In the final rule, DHS is replacing the phrase "primary purpose" with "fundamental activity" to avoid potential confusion. This change makes it clearer that nonprofit entities may qualify for the cap and fee exemptions even if they are engaged in more than one fundamental activity, any one of which may directly contribute to the research or education mission of a qualifying college or university. Further, the term "related or affiliated nonprofit entity" is defined consistently for both

cap-exemption and ACWIA fee-exemption purposes. This change results in a standard that better reflects current operational realities for institutions of higher education and how they interact with, and sometimes rely on, nonprofit entities.

Second, the final rule revises the definition of "governmental research organization," in response to public comment, so that the phrase includes state and local government research entities in addition to federal government research entities. *See* 8 CFR 214.2(h)(8)(ii)(F)(3) and (h)(19)(iii)(C). Both the ACWIA fee and H–1B cap statutes provide exemptions for "governmental research organizations," without specifying whether such organizations must be federal government entities. *See* INA 214(c)(9)(A) and (g)(5)(B), 8 U.S.C. 1184(c)(9)(A) and (g)(5)(B). DHS believes it is reasonable to interpret this language to include state and local government entities and that doing so is consistent with the goals of this rulemaking to improve access to and retention of high-skilled workers in the United States. DHS further believes that this interpretation will promote and encourage the significant and important research and development endeavors happening through state and local governments.

Third, the final rule codifies other existing policies and practices in this area. Specifically, the final rule codifies: (1) The requirements for exempting H–1B nonimmigrant workers from the cap in cases in which they are not directly employed by a cap-exempt employer (final 8 CFR 214.2(h)(8)(ii)(F)(4)); (2) the application of cap limitations to H–1B nonimmigrant workers in cases in which cap-exempt employment ceases (final 8 CFR 214.2(h)(8)(ii)(F)(5)); and (3) the procedures for concurrent cap-exempt and cap-subject employment (final 8 CFR 214.2(h)(8)(ii)(F)(6)). As discussed below, DHS did not make any changes to these provisions in response to public comment.

2. Public Comments and Responses

i. Include Government Entities in the Definition of "Related or Affiliated"

*Comment.* One commenter stated that DHS's failure to specifically reference government entities as a type of entity that could have a qualifying relationship or affiliation with an institution of higher education meant that government entities would be unable to request exemptions from the H–1B numerical limitations and ACWIA fees. The commenter argued that by only referring to nonprofit entities, the rule excluded

government entities, notably Department of Veterans Affairs (VA) hospitals, from these exemptions. The commenter suggested revising the text of the proposed regulation at 8 CFR 214.2(h)(8)(ii)(F)(2) and (h)(19)(iii)(B) to specifically include governmental entities related to or affiliated with institutions of higher education in the provisions providing for exemption from the H–1B numerical limitations and ACWIA fees.

*Response.* DHS thanks the commenter for the suggestion. In enacting sections 214(c)(9) and 214(g)(5) of the INA, Congress specifically identified the types of entities that are eligible for the cap and fee exemptions. DHS will not introduce additional entity types by regulation, but the agency will continue to consider exemption requests from government entities that are also organized as nonprofit entities. DHS notes that it did not propose a change to the definition of a "nonprofit organization" in 8 CFR 214.2(h)(19)(iv) for purposes of the cap or fee exemptions. Consistent with the current practice, DHS will assess on a case-by-case basis whether a governmental organization has established that it is a nonprofit entity related to or affiliated with an institution of higher education for purpose of the ACWIA fee and H–1B numerical limitations.

ii. Clarify That a Nonprofit Entity Only Needs To Meet One of the Criteria in 8 CFR 214.2(h)(8)(ii)(F)(2) and 8 CFR 214.2(h)(19)(iii)(B)

*Comment.* One commenter requested that DHS clarify in the final rule that a nonprofit entity, in order to qualify for exemption from the H–1B numerical limitation, need only meet one of the criteria set forth in 8 CFR 214.2(h)(8)(ii)(F)(2). The commenter recommended specific edits to the regulatory text to clarify this point and to avoid potential confusion over the disjunctive nature of the criteria in the definition. The commenter also requested that DHS make corresponding revisions to the fee-exemption provision at proposed 8 CFR 214.2(h)(19)(iii)(B).

*Response.* DHS believes that the regulatory text at proposed 8 CFR 214.2(h)(8)(ii)(F)(2) clearly provides that a nonprofit entity may qualify as "related to or affiliated with" an institution of higher education if it meets any one of the listed criteria. However, in response to the comment, DHS is revising the final rule by adding the phrase "if it satisfies any one of the following conditions" to the proposed text. DHS is also making conforming changes to 8 CFR 214.2(h)(19)(iii)(B).

AC00188

iii. The "Primary Purpose" Requirement for Nonprofit Entities Seeking Exemptions Based on Formal Written Affiliation Agreements

*Comment.* As noted above, the NPRM would have allowed nonprofit entities to qualify for cap and fee exemptions based on formal written affiliation agreements with institutions of higher education so long as such agreements establish an active working relationship with the institution of higher education for the purposes of research or education, and the nonprofit entity establishes that one of its primary purposes is to directly contribute to the educational or research mission of the institution of higher education. *See* proposed 8 CFR 214.2(h)(8)(ii)(F)(*2*)(*iv*) and 8 CFR 214.2(h)(19)(iii)(B)(*4*). This proposed path to eligibility for the cap and fee exemptions, which is not available under current policy, was intended to expand eligibility to nonprofit entities that maintain common, bona fide affiliations with institutions of higher education. Commenters were of the view that the term "a primary purpose" would make the provision overly restrictive and inconsistent with both the INA and the purpose of the proposed rule. Some commenters suggested eliminating any reference to the "purpose" of the nonprofit, while one commenter suggested simply deleting the word "primary" while maintaining reference to the "purpose" of the nonprofit entity. Another commenter claimed that the proposed regulatory definition was beyond DHS's statutory authority.

*Response.* In response to public comment, DHS is revising 8 CFR 214.2(h)(8)(ii)(F)(*2*)(*iv*) and (h)(19)(iii)(B)(*4*) to clarify the definition. Specifically, instead of referring to "a primary purpose" of the nonprofit entity, the final rule will require the nonprofit entity to show that "*a fundamental activity* of the nonprofit entity is to directly contribute to the research or education mission of the institution of higher education" (emphasis added). DHS emphasizes that a nonprofit entity may meet this definition even if it is engaged in more than one fundamental activity, so long as at least one of those fundamental activities is to directly contribute to the research or education mission of a qualifying college or university. This modified definition should capture those nonprofit entities that have bona fide affiliations with institutions of higher education and is consistent with the intent underlying the statute.

While some commenters suggested deleting the requirement altogether,

such that any entity could qualify merely by entering into any kind of affiliation agreement with a qualifying institution of higher education, DHS believes that Congress did not intend such a broad exemption from the cap and fee provisions. With respect to institutions of higher education, Congress intended to exempt those foreign national workers who would directly contribute to the research or education missions of those institutions; there is no evidence that Congress intended to allow exemptions based on agreements unrelated to those missions.[69] Finally, DHS disagrees with the suggestion that the proposed definition is beyond DHS's statutory authority. Congress chose not to define the term "related or affiliated," thus delegating the authority and responsibility to interpret that term to DHS. In this rule, DHS acts within its statutory authority by codifying a definition that is consistent with the statutory intent to provide exemptions for certain nonprofit entities that directly contribute to the higher education of Americans.[70]

iv. Formal Written Affiliation Agreement

*Comment.* Similarly, several commenters objected to the requirement in proposed 8 CFR 214.2(h)(8)(ii)(F)(*2*)(*iv*) and 8 CFR 214.2(h)(19)(iii)(B)(*4*) that the qualifying affiliation agreement be formal and in writing. These commenters proposed deleting this requirement and simply revising the rule to only require that the nonprofit entity have "an affiliation" with an institution of higher education in order to qualify for the cap and fee exemptions.

In addition, these commenters offered suggested edits to the regulatory text to ensure that a nonprofit entity that submits a formal written affiliation agreement is also not required to affirmatively prove that the entity is not owned or controlled by the institution of higher education. These commenters requested that proposed 8 CFR 214.2(h)(8)(ii)(F)(*2*)(*iv*) be revised to remove the phrase "absent shared ownership and control" to describe the nonprofit entity's affiliation with an institution of higher education. Some of these commenters also asked DHS to make conforming edits to 8 CFR

214.2(h)(19)(iii)(B)(*4*), so the cap and fee exemption provisions remain identical. These commenters also suggested that DHS include deference to other agency determinations of affiliation as an alternative to requiring a formal written affiliation agreement.

*Response.* DHS appreciates the concerns expressed by the commenters but believes that it is reasonable to require nonprofit entities to submit formal written affiliation agreements with institutions of higher education as evidence that they are adequately affiliated with such institutions and thus exempt from the cap and fee exemptions. DHS believes that submission of such affiliation agreements is important to ensure that the nonprofit entities will directly further the educational or research missions of the affiliated institutions of higher education.[71] A petitioner may wish to submit, or DHS may require the submission of, additional evidence to corroborate the nature of the affiliation and the nonprofit entity's activities.

Based on the comments received, DHS is removing the phrase "absent a demonstration of shared ownership or control" from 8 CFR 214.2(h)(8)(F)(*2*)(*iv*) and 8 CFR 214.2(h)(19)(iii)(B)(*4*) to clarify that a nonprofit entity need not prove the absence of shared ownership or control when relying on the existence of a formal affiliation agreement to establish that the entity is related to or affiliated with an institution of higher education. As proposed, the language was intended merely to signify that an affiliation agreement was one option for establishing that the requisite affiliation or relationship exists between the entities; DHS did not intend the phrase to require evidence of the absence of ownership or control.

DHS is not adopting the commenters' recommendation to allow for deference to another agency's determination that a nonprofit entity is related to or affiliated with an institution of higher education. Such determinations, including those made by state or local agencies, could be based on a different substantive standard than the INA requires and could result in inconsistent treatment of similar relationships and affiliations. Therefore, in the final rule, DHS adopts a standard that it will apply consistently across all H–1B petitions claiming cap and fee exemptions.

---

[69] *See* S. Rep. No. 106–260 (Apr. 11, 2000) (providing that individuals should be considered cap exempt because "by virtue of what they are doing, people working in universities are necessarily immediately contributing to educating Americans" and not simply referencing the identity of the petitioning employer).

[70] *Id.*

[71] *See* Aytes Memo June 2006, at 3 (citing S. Rep. No. 106–260, which stated that individuals should be considered cap exempt "by virtue of what they are doing" and not simply by reference to the identity of the petitioning employer).

v. Impose Additional Requirements To Qualify as an Institution of Higher Education

*Comment.* One commenter suggested DHS limit the cap exemption for educational institutions to those institutions that are accredited by an accrediting agency recognized by the Department of Education and that meet federal and state standards for quality educational institutions.

*Response.* DHS is not adopting the commenter's suggestion because the term ''institution of higher education'' is specifically defined in the INA by reference to 20 U.S.C. 1001(a). *See* INA 214(g)(5)(A), 8 U.S.C. 1184(g)(5)(A). The definition in 20 U.S.C. 1001(a) includes specific reference to accreditation and other standards. As such, DHS will not impose additional requirements or modify the definition of the term ''institution of higher education'' in this final rule.

vi. Impose Additional Requirements on the Nature of Employment at a Qualifying Nonprofit Entity and Nonprofit Research Organization

*Comment.* One commenter suggested that DHS limit the availability of cap and fee exemptions, for nonprofit entities and nonprofit research organizations, only to those entities and organizations that can document that the employment of H–1B nonimmigrant workers is for the purpose of educating Americans to work in specialty occupation fields. To accomplish this change, the commenter recommended that DHS revise the definition of the terms ''nonprofit entity'' and ''nonprofit research organization'' at proposed 8 CFR 214.2(h)(8)(ii)(F)(*3*). Specifically, the commenter recommended incorporating into the definition the condition that the entity or organization is primarily employing cap-exempt H–1B nonimmigrant workers to educate Americans so that they may immediately qualify for employment in a specialty occupation upon graduation.

*Response.* DHS declines to adopt the commenter's suggestion. DHS does not believe it would be consistent with congressional intent to impose such a highly limiting restriction on the otherwise broad array of nonprofit entities and nonprofit research organizations that may be eligible for a cap exemption under INA 214(g)(5). As previously discussed, legislative history indicates that Congress intended to include those entities and organizations that are directly contributing to the education and research missions of institutions of higher education. DHS

believes the regulatory text in this final rule appropriately reflects this intent.

vii. Expand Interpretation of Research Organization

*Comment.* Several commenters stated that the current definition of the terms ''nonprofit research organization'' and ''governmental research organization'' in the ACWIA fee-exemption regulation at 8 CFR 214.2(h)(19)(iii)(C), which the proposed rule adopted for purposes of the AC21 H–1B cap exemption at 8 CFR 214.2(h)(8)(ii)(F)(*3*), is inappropriately limited. These commenters questioned the basis for the requirement that qualifying nonprofit research and governmental research organizations be ''primarily'' engaged in or promoting research. The commenters therefore recommended deleting the words ''primarily'' and ''primary'' in 8 CFR 214.2(h)(19)(iii)(C).

*Response.* DHS does not agree with the commenters' suggestions to remove the requirement that research organizations be either (1) nonprofit entities ''primarily'' engaged in basic or applied research or (2) governmental entities whose ''primary'' mission is the performance or promotion of basic or applied research. These limitations have been in place since 1998 with regard to fee exemptions [72] and have been in effect for more than a decade for purposes of the cap exemptions.[73] The ''primarily'' and ''primary'' requirements were not the subject of any comments when the ACWIA fee regulation was promulgated,[74] and the commenters who raised concerns with these limitations in this rulemaking provided no legal or policy justification for eliminating these requirements. DHS believes that maintaining these longstanding interpretations, which include the ''primarily'' and ''primary'' requirements, will serve to protect the integrity of the cap and fee exemptions as well as clarify for stakeholders and adjudicators what must be proven to successfully receive such exemptions. The requirements thus will be retained for purposes of the ACWIA fee exemption under final 8 CFR 214.2(h)(19)(iii)(C), and also will continue to apply to the cap exemption. *See* final 8 CFR 214.2(h)(8)(ii)(F)(*3*) (adopting the ACWIA fee exemption

definition for purposes of the cap exemption).

*Comment.* A commenter expressed the view that proposed 8 CFR 214.2(h)(19)(iii)(C), as adopted for purposes of the AC21 H–1B cap exemption at 8 CFR 214.2(h)(8)(ii)(F)(*3*), would incorrectly limit ''governmental research organizations'' to federal government research organizations. The commenter stated that DOL reviewed the same issue when it published its final ACWIA prevailing wage rules and concluded that the words ''Governmental'' (capitalized) and ''governmental'' (lower case) convey different meanings, the former referring only to federal governmental entities and the latter referring to federal, state, and local governmental entities. The commenters therefore recommended deleting references in 8 CFR 214.2(h)(19)(iii)(C) to the ''United States Government.''

*Response.* DHS agrees with the suggestion that the term ''governmental'' should be interpreted to include state and local governmental research organizations in addition to U.S. (*i.e.,* federal) governmental research organizations. Whether governmental research organizations should include state and local government research entities was a straightforward determination when ACWIA was first enacted in 1998. In its original form, the ACWIA statute provided a fee exemption to employers described in INA section 212(p)(1), 8 U.S.C. 1182(p)(1), which in turn referenced ''Governmental'' (capitalized) research organizations. *See* ACWIA sections 414(a), 415(a). Thereafter, DOL and the legacy Immigration and Naturalization Service (INS) promulgated prevailing wage and ACWIA fee-exemption regulations, respectively.[75] In these rulemakings, DOL and INS specifically discussed suggestions from commenters that the term ''Governmental research organization'' should include state and local governmental organizations. DOL concluded that because the ''G'' in the word ''Governmental'' was capitalized, the provision was limited to U.S. (federal) governmental research organizations.[76] For its part, INS explained that it did not exempt state and local governmental organizations from the fee because Congress did not specifically reference them.[77]

In evaluating the commenter's analysis supporting its request that the phrase ''governmental research

---

[72] *See* Petitioning Requirements for the H–1B Nonimmigrant Classification Under Public Law 105–277, 63 FR 65657 (Nov. 30, 1998) (interim rule) (promulgating the ACWIA fee regulation at 8 CFR 214.2(h)(19)(iii)(C)). This rule was finalized with unrelated amendments in 2000. *See* Petitioning Requirements for the H–1B Nonimmigrant Classification Under Public Law 105–277, 65 FR 10678 (Feb. 29, 2000).

[73] *See* Aytes Memo June 2006, at 4–5.

[74] *See* 65 FR 10678.

[75] 65 FR 80109 (Dec. 20, 2000) (DOL rule); 65 FR 10678 (Feb. 29, 2000) (INS rule).

[76] *See* 65 FR 80109, 80183.

[77] *See* 65 FR 10678, 10680.

organization'' no longer be limited to federal governmental organizations in this final rule, DHS takes into account Congress's actions following enactment of ACWIA and the current ambiguous statutory language. In 2000, two years after ACWIA was signed into law, Congress enacted the cap exemption provision in AC21, which exempted ''governmental research organizations'' (lowercase) from the H–1B cap. *See* AC21 103. Congress also passed legislation that amended the ACWIA fee statute by removing the cross-reference to section 212(p) (which used the capitalized ''Governmental'') from the section 214(c)(9) text and replacing it with language indicating that certain ''governmental'' (lowercase) research entities are exempt. *See* Public Law 106–311, section 1. Legacy INS and later USCIS have not since revised the regulation limiting the fee exemption to federal governmental research organizations.

DHS believes that these intervening statutory changes support the commenter's requested change. In addition, the commenter's requested change would ensure that the DHS and DOL interpretations remain consistent in this context and reflect a recognition that the federal government does not have a monopoly on consequential government-led research and development efforts.[78] Accordingly, DHS is accepting the commenter's suggestion to define ''governmental research organizations'' to include state and local government research organizations for purposes of the cap exemption and fee exemption. DHS is therefore adopting a definition of ''governmental research organization'' for both cap and fee exemptions that covers federal, state, and local governmental research organizations.[79] See final 8 CFR 214.2(h)(19)(iii)(C).

viii. Requirement That the H–1B Worker Perform a Majority of Duties ''at'' the Cap Exempt Entity

*Comment.* One commenter objected to extending the cap exemption to individuals who are employed ''at'' a qualifying institution, organization or entity rather than limiting the cap exemption to those employed ''by'' such an institution, organization or entity. Other commenters supported the extension of the cap exemption but objected to the ''majority of work time'' requirement, which was proposed as a condition for the cap exemption when an H–1B beneficiary is not a direct employee of a qualifying institution, organization or entity. These commenters contested the proposed rule's requirements that an H–1B beneficiary who is not directly employed by a qualifying institution, organization or entity can only be eligible for a cap exemption if such beneficiary will spend a majority of his or her work time performing job duties at a qualifying institution, organization or entity and if those job duties directly and predominately further the essential purpose, mission, objectives or functions of the qualifying institution, organization or entity. *See* proposed 8 CFR 214.2(h)(8)(ii)(F)(4). These commenters requested that DHS eliminate the proposed requirement that such an H–1B beneficiary show that the majority of his or her work time will be spent performing job duties at a qualifying institution, organization or entity. These commenters also objected to the requirement that the H–1B petitioner establish that there is a nexus between the duties to be performed by the H–1B beneficiary and the essential purpose, mission, objectives or functions of the qualifying institution, organization or entity.

*Response.* DHS believes that its policy extending the cap exemption to individuals employed ''at'' and not simply employed ''by'' a qualifying institution, organization or entity is consistent with the language of the statute and furthers the goals of AC21 to improve economic growth and job creation by immediately increasing U.S. access to high-skilled workers, and particularly at these institutions, organizations, and entities.[80] DHS, moreover, believes that the ''majority of work time'' requirement is a reasonable means to ensure that Congress' aims in exempting workers from the H–1B cap based on their contributions at qualifying institutions, organizations or

entities are not undercut by employment that is peripheral to those contributions. DHS is not adopting the changes suggested by the commenters as these provisions in the final rule simply codify policy and practice designed to protect the integrity of the cap exemption. *See* final 8 CFR 214.2(h)(8)(ii)(F)(4).

ix. Codify Existing USCIS Deference Policy

*Comment.* Some commenters stated that the final rule should codify the current deference policy from the 2011 Interim Policy Memo under which USCIS generally defers to a prior agency determination that a nonprofit entity is exempt from the H–1B numerical limitations based on its relation to or affiliation with an institution of higher education.[81] These commenters stated that the lack of a deference regulation has led to uncertainty and unpredictability for employers and prospective H–1B nonimmigrant workers because adjudicators reviewing the same facts can reach opposite conclusions.

*Response.* DHS is not adopting this suggestion. The deference policy was expressly instituted as interim guidance to promote consistency in adjudications while USCIS reviewed its overall policy on H–1B cap exemptions for nonprofit entities that are related to or affiliated with an institution of higher education. This final rule represents the culmination of USCIS's review of past policy and public input on this issue. In this final rule, DHS specifies the means by which a nonprofit entity may establish that it is related to or affiliated with an institution of higher education. The final rule better reflects current operational realities for institutions of higher education and how they interact with, and sometimes rely on, nonprofit entities, and account for the nature and scope of common, bona fide affiliations between nonprofit entities and institutions of higher education. Rather than continuing to provide deference to past determinations of cap exemption under the 2011 Interim Policy Memo, the final rule includes the final evidentiary criteria that USCIS will now use to determine whether individuals employed at a nonprofit entity will be exempt from H–1B numerical limitations, and, as such, supersedes past guidance in this area.

---

[78] *See* National Science Foundation, Survey of State Government Research and Development: FYs 2012 and 2013 (June 2015), available at *https://www.nsf.gov/statistics/2015/nsf15323/pdf/nsf15323.pdf*.

[79] As noted, it has long been USCIS policy to apply the same definition of ''governmental research organization'' for both cap and fee exemptions. *See* Aytes Memo June 2006, at 4–5. In the NPRM for this rulemaking, DHS made clear its intent to continue aligning definitions for both exemptions by explicitly linking the AC21 cap exemption to the ACWIA fee-exemption definitions. *See* 80 FR at 81910 (explaining that DHS is adopting the ACWIA fee definition of ''governmental research organization'' for purposes of the cap exemption); *see also id.* at 81919 (explaining that ''DHS also proposes to conform its regulations to current policy with respect to the definitions of several terms in section 214(g)(5) and the applicability of these terms to both: (1) ACWIA provisions that require the payment of fees by certain H–1B employers; and (2) AC21 provisions that exempt certain employers from the H–1B

numerical caps''). Multiple commenters supported this approach.

[80] *See* S. Rep. No. 260, at 10.

[81] *See* USCIS Interim Policy Memorandum, ''Additional Guidance to the Field on Giving Deference to Prior Determinations of H–1B Cap Exemption Based on Affiliation'' (Apr. 28, 2011) (2011 Interim Policy Memo).

x. Create a Mechanism To Obtain a Pre-Determination of Cap Exemption

*Comment.* One commenter suggested that DHS create a mechanism for an H–1B petitioner to obtain a pre-determination of whether it qualifies for an exemption from the H–1B numerical limitations.

*Response.* DHS appreciates the commenter's suggestion and is in the process of evaluating how to address the administration of these cap and fee exemption provisions procedurally.

xi. Allot H–1B Visas Subject to the Cap on a Quarterly Basis

*Comment.* One commenter suggested that DHS allot H–1B visas subject to the H–1B numerical limitations on a quarterly basis.

*Response.* DHS is unable to address this suggestion as it is outside the scope of this rulemaking.

xii. Request for Continuation of Cap-Subject Employment When Concurrent Cap-Exempt H–1B Employment Ends

*Comment.* A few commenters suggested that when cap-exempt employment ceases, any concurrent H–1B employment with a cap-subject employer should be authorized to continue until the end of the existing H–1B validity period. One commenter stated that tying the validity period of an unrelated cap-exempt petition to the validity of a concurrent cap-subject petition is overly burdensome, as there is no requirement that employment for the cap-exempt petitioner and the cap-subject petitioner be related, and they may be on different hiring cycles. Another commenter stated that cap-exempt H–1B visa holders may have difficulty changing jobs as their only logical option is to move to another cap-exempt employer or, in the alternative, to attempt to obtain a cap-subject H–1B visa, which has frequently required going through the H–1B lottery in April of each year.

*Response.* DHS appreciates the challenges that cap-subject employers and H–1B visa holders may face when previously approved cap-exempt concurrent employment ceases, and that transitioning from cap-exempt employment to cap-subject employment may be challenging. However, as soon as an H–1B nonimmigrant worker ceases employment with a cap-exempt employer, that worker becomes subject to the H–1B numerical limitations. Section 103 of AC21 specifically provides that if an H–1B nonimmigrant worker was not previously counted against the cap, and if no other exemption from the cap applies, then

the H–1B nonimmigrant worker will be subject to the cap once employment with a cap-exempt entity ceases. *See* INA 214(g)(6), 8 U.S.C. 1184(g)(6).

In the scenario contemplated by the commenter, the basis for the H–1B nonimmigrant worker's employment with an employer that normally would be cap-subject is an exemption from the otherwise controlling H–1B numerical limits based on concurrent employment at a cap-exempt institution, entity or organization as described in section 214(g)(5)(A) and (B) of the INA, 8 U.S.C. 1184(g)(5)(A) and (B). If the concurrent cap-exempt employment ceases before the end of the petition validity period of the cap-subject employment, and the H–1B nonimmigrant worker is not otherwise exempt from the numerical limitations, USCIS may revoke the approval of the cap-subject concurrent employment petition. Because the concurrent employment at a cap-subject employer is considered cap-exempt solely because the H–1B nonimmigrant worker's concurrent cap-exempt employment is continuing, DHS believes it is reasonable to limit the cap-subject concurrent employment approval period to the approved concurrent cap-exempt employment. Although concurrent employers may be on different hiring cycles, this does not change the fact that the concurrent cap-subject employment is contingent upon the continuation of the cap-exempt employment. As such, DHS is not adopting the commenter's suggestion to allow for approval validity periods of cap-subject concurrent employment to exceed the validity period of the concurrent cap-exempt employment.

xiii. Prohibit Cap-Exempt H–1B Worker From Concurrent Employment

*Comment.* One commenter stated that a cap-exempt H–1B worker should be unable to obtain approval for concurrent employment except under another cap-exempt H–1B petition. This commenter disagreed with the codification in proposed 8 CFR 214.2(h)(8)(ii)(F)(*5*) of the existing policy allowing a cap-exempt H–1B nonimmigrant worker, based on continued employment at an institution, organization or entity under INA 214(g)(5)(A) and (B), to be concurrently employed by a cap-subject employer. The commenter suggested revising the rule to prohibit concurrent employment by a cap-exempt H–1B nonimmigrant worker unless the concurrent employment is independently exempt from the H–1B numerical limitations.

*Response.* DHS is not adopting this suggestion because it is inconsistent with our longstanding policy and

practice to allow a cap-exempt H–1B nonimmigrant worker, who is cap-exempt based on continued employment at an institution, organization or entity under INA 214(g)(5)(A) and (B), to be concurrently employed by a cap-subject employer. Consistent with INA 214(g)(6), if the H–1B nonimmigrant worker "ceases" his or her cap-exempt employment, the H–1B nonimmigrant worker would become subject to the numerical cap, unless otherwise exempt.

*K. Exemptions to the Maximum Admission Period of H–1B Nonimmigrants*

1. *Description of the Final Rule and Changes From the NPRM*

In this final rule, DHS is consolidating and codifying longstanding DHS policy implementing sections of AC21 related to the method for calculating time counted toward the maximum period of H–1B admission, as well as determining exemptions from such limits. Specifically, the final rule addresses: (1) When an H–1B nonimmigrant worker can recapture time spent physically outside of the United States (*see* final 8 CFR 214.2(h)(13)(iii)(C)); (2) whether the beneficiary of an H–1B petition should be counted against the H–1B numerical cap (*see* final 8 CFR 214.2(h)(13)(iii)(C)(*2*)); (3) when an individual qualifies for an H–1B extension beyond the general 6-year limit due to lengthy adjudications delays (*see* final 8 CFR 214.2(h)(13)(iii)(D)); and (4) when an individual qualifies for an H–1B extension beyond the general 6-year limit due to the per-country limitations on immigrant visas (*see* final 8 CFR 214.2(h)(13)(iii)(E)). Together, these provisions in the final rule will enhance consistency among DHS adjudicators and provide a primary repository of governing rules for the regulated community.

In response to public comment, DHS is also providing several clarifications in the final rule. First, DHS has amended the regulatory text at 8 CFR 214.2(h)(13)(iii)(C) to more clearly provide that remaining H–1B time may be recaptured at any time before the foreign worker uses the full period of H–1B admission described in section 214(g)(4) of the INA. Second, DHS has made several edits to simplify and streamline the regulatory text at 8 CFR 214.2(h)(13)(iii)(D), which describes eligibility for the "lengthy adjudication delay" exemption afforded by section 106(a) and (b) of AC21 to the general 6-year maximum period of H–1B admission. In particular, the final rule

makes clear that to be eligible for this exemption, the individual must have had an application for labor certification or a Form I–140 petition filed on his or her behalf at least 365 days before the date the exemption would take effect. *See* final 8 CFR 214.2(h)(13)(iii)(D)(*1*), (*5*), and (*7*). The final rule further clarifies that an individual becomes ineligible for the lengthy adjudication delay exemption if he or she fails to apply for adjustment of status or an immigrant visa within 1 year of the date an immigrant visa is authorized for issuance. *See* final 8 CFR 214.2(h)(13)(iii)(D)(*10*). The final rule also clarifies that exemptions pursuant to section 106(a) of AC21 may only be made in 1-year increments. *See* final 8 CFR 214.2(h)(13)(iii)(D)(*2*).

Finally, DHS is making a correction to 8 CFR 214.2(h)(13)(iii)(E), which was intended to codify existing policy regarding eligibility for H–1B status beyond the general 6-year maximum, pursuant to section 104(c) of AC21, for certain individuals who are beneficiaries of Form I–140 petitions but are affected by the per-country limitations.[82] In the proposed rule, DHS unintentionally departed from existing policy by requiring an individual seeking an H–1B extension under this provision to show visa unavailability both at the time of filing *and* at the time of adjudication. In the final rule, consistent with longstanding policy, DHS requires petitioners to *only* demonstrate immigrant visa unavailability as of the date the H–1B petition is filed with USCIS. *See* final 8 CFR 214.2(h)(13)(iii)(E).

2. Public Comments and Responses

i. Recapture of H–1B Time

*Comment.* A few commenters urged DHS to clarify that there is no "statute

of limitations" on recapture. Some of these commenters noted that nothing in INA 214(g)(7) restricts USCIS from granting unused H–1B time when a recapture request is made more than 6 years after the initial grant of the H–1B petition. One commenter asked DHS to clarify that time spent inside the United States in another nonimmigrant status is "recapturable." This commenter stated that the proposed regulatory text allows recapture only for time in which the foreign national was physically outside the United States.

*Response.* In the final rule, DHS clarifies that, consistent with its existing policy, there is no time limitation on recapturing the remainder of the initial 6-year period of H–1B admission under INA 214(g)(4).[83] DHS notes, however, that the remainder of any time granted pursuant to an AC21 extension cannot be recaptured. The purpose of this clarification is to promote consistency and efficiency in recapture determinations in accordance with the policy objectives described in USCIS's December 5, 2006 policy memorandum from Michael Aytes outlining the recapture policy.[84]

The relevant USCIS policy memoranda,[85] although not codified, specify that the "remainder" period of the initial 6-year admission period is that full admission period minus any time that the H–1B nonimmigrant worker previously spent in the United States in valid H–1B or L–1 status. This policy thus allows time spent inside the United States in any other nonimmigrant status (*i.e.,* any nonimmigrant status other than H–1B or L–1) to be "recapturable." This final rule does not impose any additional

limits on this policy. *See* final 8 CFR 214.2(h)(13)(iii)(C).

*Comment.* One commenter requested that the regulation clarify and expand the types of evidence that may be submitted to support the specific amount of time the H–1B nonimmigrant worker seeks to recapture. The commenter suggested that USCIS consider, in addition to passport stamps and travel tickets, other similar records and evidence of an individual's presence in another country, such as employer, school or medical records.

*Response.* DHS believes that the final regulation is broad enough to allow for submission of the additional types of records proposed by the commenter, and that the language suggested by the commenter therefore is unnecessary. *See* final 8 CFR 214.2(h)(13)(iii)(C)(*1*).

ii. *AC21 106(a) and (b)—Lengthy Adjudication Delay Exemptions*

*Comment.* One commenter expressed concern that the proposed provision relating to lengthy adjudication delay exemptions was under-inclusive. The commenter interpreted the language to suggest that 1-year extensions of H–1B status pursuant to section 106(a) of AC21 would be available *only* if the permanent labor certification application or Form I–140 petition was filed 365 days or more prior to the 6-year limitation being reached. The commenter stated that such a policy would be legally impermissible because under section 106(a) of AC21, and as reflected in current DHS policy memoranda, these 1-year H–1B extensions are available to a beneficiary of a permanent labor certification application or Form I–140 petition filed at least 365 days prior to the requested *extension start date,* even if that date is less than 365 days before the 6-year limitation will be reached. The commenter further noted that individuals should be eligible for such 1-year H–1B extensions even if they are in their 6th year of H–1B status or even if they are not in H–1B status at all.

*Response.* DHS agrees with the commenter that AC21 and current DHS policy allow certain beneficiaries to obtain H–1B status for another year if 365 days have passed since the filing of the permanent labor certification or Form I–140 petition, even if the permanent labor certification application or Form I–140 petition was not filed 365 days or more prior to the end of the 6-year limitation.[86] Section

---

[82] Under longstanding agency policy, H–1B extensions of stay may be granted pursuant to section 104(c) of AC21 regardless of whether the beneficiary of the Form I–140 petition will seek immigrant status by means of adjustment of status or consular processing. *See* Neufeld May 2008 Memo, at 6. Section 104(c) specifies that individuals become ineligible for extensions of stay after a decision is made on an application for adjustment of status, and this final rule provides that eligibility likewise terminates when the beneficiary's application for an immigrant visa is approved or denied. *See* final 8 CFR 214.2(h)(13)(iii)(E)(*2*)(*ii*). If individuals who seek to consular process are authorized for H–1B extensions of stay under section 104(c) despite adjudication of their immigrant visa applications, they could remain eligible for the extension indefinitely, even if their immigrant visa applications or adjustment of status applications are denied. These individuals could also strategically choose to seek an immigrant visa by means of consular processing rather than by adjusting status in order to benefit from indefinite extensions of H–1B status.

[83] USCIS Memorandum from Michael Aytes, "Guidance on Determining Periods of Admission for Aliens Previously in H–4 or L–2 Status; Aliens Applying for Additional Periods of Admission beyond the H–1B Six Year Maximum; and Aliens Who Have Not Exhausted the Six-Year Maximum But Who Have Been Absent from the United States for Over One Year.," at 4–5 (Dec. 5, 2006) (Aytes Dec. 2006 memo), available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/periodsofadm120506.pdf.*

[84] *Id.*

[85] Aytes, Dec. 2006 memo; USCIS memorandum from Michael Aytes, "Procedures for Calculating Maximum Period of Stay Regarding the Limitations on Admission for H–1B and L–1 Nonimmigrants (AFM Update AD 05–21)" (Oct. 21, 2005), available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2005/recaptureh1b111021 05.pdf* ("Because section 214(g)(4) of the Act states that 'the period of authorized admission' may not exceed 6 years, and because 'admission' is defined as 'the lawful entry of the alien into the United States after inspection and authorization by an immigration officer' only time spent in the United States as an H–1B counts towards the maximum.")

[86] DHS does not require that an individual who relies on one permanent labor certification application or Form I–140 petition for purposes of
Continued

106(a) of AC21 states that the limitations contained in section 214(g)(4) of the INA do not apply to the H–1B nonimmigrant worker if 365 days or more have elapsed since the filing of an application for permanent labor certification or Form I–140 petition on the individual's behalf. The regulation as proposed did not accurately capture the statute or DHS policy and practice, and DHS has therefore corrected the provision in this final rule to make clear that an application for permanent labor certification or Form I–140 petition only needs to be filed at least 365 days before the exemption would take effect.[87] *See* final 8 CFR 214.2(h)(13)(iii)(D)(*1*), (*5*), and (*7*).

Further, DHS agrees with the commenter that, in certain circumstances, foreign workers need not be in H–1B status to be eligible for the lengthy adjudication delay exemptions under section 106(a) and (b) of AC21, as long as they "previously held" H–1B status. This provision, as proposed and finalized in this rule, allows foreign workers to obtain additional periods of H–1B status through petitions to change status or through admission after H–1B visa issuance at a U.S. consulate.

*Comment.* A few commenters objected to the provision that makes an individual ineligible for the lengthy adjudication delay exemption if he or she fails to file an application for adjustment of status within 1 year of the date an immigrant visa becomes available. Commenters thought that the 1-year requirement is unnecessary, is beyond DHS's legal authority, is contrary to the statute, and would force inappropriate concurrent or premature filings. Additionally, commenters stated that including a provision tying AC21 extension time to immigrant visa availability would hamper H–1B portability and be difficult to apply due to pace of visa availability progression and retrogression. Related to this, a commenter requested that DHS clarify the exact circumstances under which an immigrant visa is deemed to be immediately available. One commenter asked DHS to revise the provision by

extending the 1-year limit to a minimum of two years to provide additional time for beneficiaries of Form I–140 petitions who lose their jobs to port to new H–1B employment. Finally, one commenter objected to the proposed requirements on the grounds that they could negatively affect an H–1B beneficiary who is subject to the J–1 program's 2-year foreign residence requirement under section 212(e) of the INA because the foreign national would be unable to file an application for adjustment of status until he or she fulfills the two-year home residency requirement of section 212(e) or obtains a waiver of the residency requirement.

*Response.* In section 106(a) of AC21, Congress provided exemptions to the general 6-year limitation on H–1B admission for certain individuals who experience lengthy adjudication delays in the processing of their applications for adjustment of status. However, in section 106(b), Congress placed a 1-year temporal limitation on the extension period afforded to these individuals. The intent of this exemption was to help facilitate the adjustment of status of those individuals whose process was stymied due to adjudication delays. Allowing foreign workers to benefit from the exemption when they do not file applications for adjustment of status after an immigrant visa becomes immediately available, may allow such workers to remain in H–1B status indefinitely, which would run counter to the purpose of the statute. *See* S. Rep. No. 260, at 23. To avoid this result, DHS is confirming that beneficiaries of section 106(a) must file an application for adjustment of status within 1 year of immigrant visa availability.[88]

DHS believes that, overall, the 1-year filing requirement is consistent with congressional intent and provides a reasonable amount of time for an individual to take the necessary steps toward obtaining lawful permanent residence, despite visa number

retrogression and progression. In addition, DHS believes that tying the extension to immigrant visa availability will encourage individuals to pursue lawful permanent residence without interfering with the ability of petitioners to file H–1B portability petitions on behalf of foreign workers.[89] DHS therefore is finalizing the provision with some technical clarifying revisions.

The final rule also retains current policy that alleviates concerns raised by commenters about the 1-year filing requirement. Specifically, the rule resets the 1-year clock following any period in which an application for adjustment of status or immigrant visa could not be filed due to the unavailability of an immigrant visa. It also authorizes USCIS to excuse the failure to timely file such an application, as a matter of discretion, if an individual establishes that the failure to apply was due to circumstances beyond his or her control. The final rule further clarifies that for purposes of determining when an individual becomes ineligible for the lengthy adjudication delay exemption, DHS will look to see if he or she failed to apply for adjustment of status or an immigrant visa within 1 year of the date an immigrant visa is authorized for issuance based on the applicable Final Action Date in the Visa Bulletin. *See* final 8 CFR 214.2(h)(13)(iii)(D)(*10*).

DHS recognizes that individuals admitted in J–1 status who are subject to a 2-year foreign residence requirement may experience uncertainty when seeking post-sixth year H–1B extensions under section 106(a) of AC21, but the Department believes that this uncertainty is balanced by including the discretion to excuse late filings due to circumstances beyond the individual's control. *See id.*

*Comment.* One commenter opposed the provision that prohibits extensions of H–1B status based on lengthy adjudication delays in cases in which the approval of the Form I–140 petition has been revoked, particularly in cases in which the revocation is based on employer withdrawal. The commenter stated that such a policy is contrary to the statute, will hinder worker portability, and will increase costs to new employers.

*Response.* DHS did not propose an across-the-board ban on future H–1B extensions in cases in which employers withdraw their Form I–140 petitions. In

---

an extension under this provision rely on the same labor certification application or Form I–140 petition for purposes of a subsequent extension request.

[87] As explained in the proposed rule, requests for 1-year extensions of H–1B status under the lengthy adjudication delay can include any periods of time the foreign national spent outside the United States during previous H–1B petition validity for which "recapture" is sought, as well as any H–1B "remainder" periods available to the foreign national. *See* 8 CFR 214.2(h)(13)(iii)(C); 8 CFR 214.2(h)(9)(iii)(A)(*1*) and 8 CFR 214.2(h)(15)(ii)(B) (explaining that in no case may an H–1B approval period exceed 3 years or the period of LCA validity).

[88] Unless otherwise indicated on the USCIS Web site at *www.uscis.gov/visabulletininfo*, individuals seeking to file applications for adjustment of status with USCIS must use the DOS monthly Visa Bulletin "Final Action Dates" chart indicating when individuals may file such applications. The Visa Bulletin is available at *https://travel.state.gov/content/visas/en/law-and-policy/bulletin.html*. When USCIS determines that there are more immigrant visas available for the fiscal year than there are documentarily qualified immigrant visa applicants (as reported by DOS) and pending applicants for adjustment of status, after accounting for the historic drop off rate (*e.g.*, denials, withdrawals, abandonments), USCIS will state on its Web site that applicants may instead reference the "Dates for Filing Visa Applications" charts in this Visa Bulletin to determine whether they may apply for adjustment of status. Specific questions related to DOS's determinations are beyond the scope of this rulemaking.

[89] Individuals who apply for adjustment of status generally may apply for employment authorization and, if eligible, may receive employment authorization documents. Upon issuance of employment authorization, such individuals would not require H–1B portability to be able to work in the United States.

fact, under this final rule, DHS will no longer automatically revoke the approval of a Form I–140 petition based on petitioner withdrawal or termination of the petitioner's business if the petition has been approved or the associated application for adjustment of status has been pending for 180 days or more. As long as the approval has not been revoked, the Form I–140 petition will generally continue to be valid with regard to the beneficiary for various job portability and status extension purposes under the immigration laws, including extensions of status for certain H–1B nonimmigrant workers under sections 104(c) and 106(a) and (b) of AC21. *See* final 8 CFR 205.1(a)(3)(iii)(C) and (D).

*Comment.* One commenter suggested that in situations in which an H–1B nonimmigrant worker applies to change status to another nonimmigrant classification but is faced with a lengthy adjudication, DHS should permit the worker to enter a requested start date for the new classification on the Application to Extend/Change Nonimmigrant Status (Form I–539). The commenter also asked DHS to clarify where on the form the beneficiary should list the date on which his or her H–1B period of admission ends.

*Response.* This issue will not be addressed in this final rule, as it outside the scope of this rulemaking. This rule does not concern questions relating to how individuals seeking to change status from the H–1B classification to other nonimmigrant classification may complete forms to account for delays in processing. DHS may consider this comment in future policy guidance or rulemaking. DHS also notes that applicants requesting a change of status through the filing of a current version of Form I–539 with USCIS may provide a future change of status effective date. *See* Form I–539 (version 04/06/15), Application to Extend/Change Nonimmigrant Status, Part 2, Question 2.

### iii. AC21 Section 104(c)—Per Country Limitations

*Comment.* One commenter recommended that DHS change its longstanding policy of granting extensions of H–1B status in 3-year increments under section 104(c) of AC21 for H–1B nonimmigrant workers who are the beneficiaries of approved Form I–140 petitions. That commenter requested that DHS instead grant extensions to cover the entire period during which such workers have pending applications for adjustment of status. The commenter believed that such a change would result in

additional benefits, including avoiding gaps in employment authorization, encouraging employers to file H–1B extension petitions, facilitating portability, and realizing cost savings for both existing and new employers.

*Response.* DHS declines the commenter's suggestion to grant extensions of H–1B status for individuals who are eligible for extensions of stay in H–1B status under section 104(c) of AC21 that would cover the entire period their applications for adjustment of status are pending adjudication. Although section 104(c) of AC21 provides authorization for H–1B status beyond the general 6-year maximum under section 214(g)(4) of the Act for certain beneficiaries when the H–1B petitioner can demonstrate that an immigrant visa is not available to the beneficiary at the time of filing, DHS regulations, consistent with section 212(n) of the Act, limit H–1B petition approval validity period to the validity period of the corresponding DOL-approved labor condition application. *See* 8 CFR 214.2(h)(9)(iii)(A)(*1*) and (h)(15)(ii)(B)(*1*). DOL regulations dictating H–1B labor condition application validity, which are not the subject of this rulemaking, establish an upper limit of 3 years. *See* 20 CFR 655.750(a)(1). Furthermore, the language of AC21 section 104(c) does not confer an automatic extension of status. An extension of up to 3 years provides a reasonable mechanism to ensure continued eligibility. USCIS accordingly grants such exemptions in increments of up to 3 years until it adjudicates the beneficiary's application for adjustment of status.[90] *See* 8 CFR 214.2(h)(13)(iii)(E)(*1*).

Although the heading for section 104(c) refers to a "one-time protection," the statutory text makes clear that the exemption remains available until the beneficiary has an EB–1, EB–2, or EB–3 immigrant visa immediately available to him or her.[91] *See* AC21 104(c) (authorizing H–1B extensions under this exemption "until the alien's application for adjustment of status has been processed and a decision made thereon"). An H–1B petition filed under section 104(c) may include any time remaining within the normal 6-year

period of authorized H–1B stay in addition to the time requested in the exemption request, but in no case may the approval period exceed 3 years or the validity period of the LCA. *See* 8 CFR 214.2(h)(13)(iii)(E)(*5*).

*Comment.* A few commenters requested that, for purposes of determining eligibility for this extension, DHS consider visa unavailability at the time of filing, not at the time of adjudication. Commenters noted that by doing so, the regulation would be more consistent with a plain-language reading of the statute. One commenter stated that such an interpretation would lead to greater efficiencies by increasing certainty within the process, including by allowing the petitioner and the beneficiary to know at the time of filing whether the beneficiary would qualify for the benefit sought.

*Response.* DHS appreciates the comments and recognizes that the proposed regulatory text was not consistent with its current practice to evaluate visa unavailability only at the time of filing.[92] Therefore, DHS has revised the regulatory text in the final rule by striking the phrase, "the unavailability must exist at time of the petition's adjudication." *See* final 8 CFR 214.2(h)(13)(iii)(E). Thus, consistent with current practice, when determining whether an H–1B nonimmigrant worker is eligible for an extension of H–1B status under section 104(c), USCIS officers will continue to review the Visa Bulletin that was in effect at the time of filing of the Form I–129 petition. If the Visa Bulletin in effect on the date the H–1B petition is filed shows that the foreign worker was subject to a per country or worldwide visa limitation in accordance with the foreign worker's immigrant visa "priority date," the H–1B extension request under section 104(c) may be granted.

*Comment.* One commenter requested that DHS clarify that the per-country limitation applies to beneficiaries of approved Form I–140 petitions who are ineligible for an immigrant visa either because the "per country" limit for their country has been reached or because the "worldwide" limit on immigrant visas in the EB–1, EB–2, and EB–3 categories has been reached. *See* 8 CFR 214.2(h)(13)(iii)(E). The commenter

---

[90] DHS notes that individuals may be eligible for H–1B extensions of stay under section 104(c) of AC21 before filing an application for adjustment of status, so long as a Form I–140 petition has been approved on their behalf and they are otherwise eligible for the extension.

[91] *See* Neufeld May 2008 Memo, at 6, discussing DHS policy allowing for H–1B extensions, in a maximum of three year increments, until such time as the foreign national's application for adjustment of status has been adjudicated, despite the title of section 104(c).

[92] *See* USCIS Memorandum from Donald Neufeld, "Supplemental Guidance Relating to Processing Forms I–140 Employment-Based Immigrant Petitions and I–129 H–1B Petitions, and Form I–485 Adjustment Applications Affected by the American Competitiveness in the Twenty-First Century Act of 2000 (AC21) (Pub. L. 106–313), as amended, and the American Competitiveness and Workforce Improvement Act of 1998 (ACWIA), Title IV of Div. C. of Public Law 105–277" (May 30, 2008).

noted that such an action would be consistent with current policy as expressed in USCIS's Neufeld May 2008 Memo, which clarified that both "per country limitations" and "worldwide" unavailability of immigrant visas can serve as the basis for extension under section 104(c).[93]

*Response.* DHS agrees with the commenter that the per-country limitation exemption applies to all beneficiaries of approved Form I–140 petitions whose priority dates are on or after the applicable cut-off date in either the country-specific or worldwide columns of the Visa Bulletin chart. These beneficiaries may apply for an extension under 8 CFR 214.2(h)(13)(iii)(E), consistent with longstanding policy. The reference to "per country limitations" in section 104(c) invokes chargeability: The determination as to which country's numerical limits the beneficiary's visa will be "charged to" or counted against. *See* INA 202(b), 8 U.S.C. 1152(b). For purposes of section 104(c), when reviewing the relevant Visa Bulletin chart, there is no difference between nationals of countries who are identified separately on the Visa Bulletin because their applicable per-country limitation has been exceeded (*i.e.,* nationals of India, China, or Mexico), and nationals of those countries who are grouped under the "All Chargeability" column, as long as the priority date has not been reached for the particular beneficiary in question.

#### iv. Spousal Eligibility for H–1B Extensions Beyond Six Years Under AC21

*Comment.* Several commenters objected to proposed 8 CFR 214.2(h)(13)(iii)(E)(*6*) and (h)(13)(iii)(D)(6), which would limit H–1B extensions under sections 104(c) and 106(a) of AC21 to principal beneficiaries of permanent labor certification applications or Form I–140 petitions, as applicable. Some commenters requested that 8 CFR 214.2(h)(13)(iii)(E)(*6*) and (h)(13)(iii)(D)(*6*) be stricken from the final rule entirely, asserting that DHS's alleged overly narrow reading of sections 104(c) and 106(a) would: Conflict with Congress's determination that family members are "entitled to the same status" as the principal beneficiary of an immigrant visa petition; create an unnecessary burden on some dependent spouses by forcing them to obtain a change of status to H–4 nonimmigrant status before an employment authorization application based on their H–4 status can be adjudicated (see 8

CFR 214.2(h)(9)(iv) and 274a.12(c)(26)); possibly create uncertainty and long gaps in employment eligibility; impede the efforts by some universities to recruit and retain the most high-skilled individuals for positions that are often hard to fill; and prevent U.S. employers from benefiting from the talent of both spouses.

Some commenters asked DHS only to revise the provision concerning extensions under section 104(c), such that a spouse who is in H–1B nonimmigrant status could benefit from his or her spouse's certified labor certification or approved Form I–140 petition as the basis for an H–1B extension under section 104(c). One commenter stated that section 106(a) of AC21 may be used as a basis to allow an H–1B nonimmigrant worker to seek a 1-year extension of H–1B status beyond 6 years when his or her spouse, who is also an H–1B nonimmigrant worker, is the beneficiary of an appropriately filed permanent labor certification application.

*Response.* DHS disagrees with the commenters' statements and is not adopting any of the suggested changes. In the final rule, DHS is formalizing longstanding DHS policy, without change, that requires a foreign worker seeking an extension of H–1B status to independently meet the requirements for such an extension.[94] *See* 8 CFR 214.2(h)(13)(iii)(D)(*9*) and (h)(13)(iii)(E)(*6*). DHS believes this policy best fulfills Congress's intent in enacting AC21. The legislation expressly allows H–1B nonimmigrant status beyond the 6-year general limitation for "the beneficiary of a petition filed under § 204(a) of [the INA] for a preference status under paragraph (1), (2), or (3) of § 203(b) [of the INA]." AC21 104(c). Section 203(b) of the INA, in turn, applies to principal beneficiaries of Form I–140 petitions, but not derivative beneficiaries who are separately addressed in section 203(d) of the INA. DHS concludes that the reference to a single beneficiary in section 104(c) of AC21 reasonably supports an interpretation that the

provision applies only to the principal beneficiary of the Form I–140 petition.

Similarly, section 106(a) clearly states that the exemption is available for any H–1B beneficiary on whose behalf an immigrant petition or labor certification has been filed. As amended, that section states in pertinent part: "The limitation contained in section 214(g)(4) of the Immigration and Nationality Act (8 U.S.C. 1184(g)(4)) with respect to the duration of authorized stay shall not apply to any nonimmigrant alien previously issued a visa or otherwise provided nonimmigrant status under section 101(a)(15)(H)(i)(b) of such Act (8 U.S.C. 1101(a)(15)(H)(i)(b)), if 365 days or more have elapsed since the filing of any of the following: (1) Any application for labor certification under section 212(a)(5)(A) of such Act (8 U.S.C. 1182(a)(5)(A)), in a case in which certification is required or used by the alien to obtain status under section 203(b) of such Act (8 U.S.C. 1153(b)). (2) A petition described in section 204(b) of such Act (8 U.S.C. 1154(b)) to accord the alien a status under section 203(b) of such Act."

As with section 104(c), DHS also interprets the reference to "section 203(b)" in section 106(a) to apply to principal beneficiaries of Form I–140 petitions, but not derivative beneficiaries who are separately addressed in section 203(d) of the INA, which provides that family members may be accorded the same immigrant visa preference allocation as the principal beneficiary.

DHS notes, however, that derivative beneficiaries may be eligible for an independent grant of work authorization in accordance with 8 CFR 214.2(h)(9)(iv) and 274a.12(c)(26). Those regulations extend eligibility for employment authorization to certain H–4 dependent spouses of H–1B nonimmigrant workers who are seeking LPR status, including H–1B nonimmigrant workers who are the principal beneficiaries of an approved Form I–140 petition or who have had their H–1B status extended under section 106(a) and (b) of AC21. Accordingly, DHS is not revising its longstanding policy to address the commenters' suggestion.

#### L. Whistleblower Protections in the H–1B Nonimmigrant Program

#### 1. Description of Final Rule and Changes From NPRM

In this final rule, DHS enhances worker protection by providing whistleblower protections in cases of retaliation by the worker's employer. The final rule provides that a qualifying employer seeking an extension of stay

---

[93] Neufeld May 2008 memo, at 6.

[94] *See* USCIS Memorandum from Donald Neufeld, " Supplemental Guidance Relating to Processing Forms I–140 Employment-Based Immigrant Petitions and I–129 H–1B Petitions, and Form I–485 Adjustment Applications Affected by the American Competitiveness in the Twenty-First Century Act of 2000 (AC21) (Pub. L. 106–313), as amended, and the American Competitiveness and Workforce Improvement Act of 1998 (ACWIA), Title IV of Div. C. of Public Law 105–277" at 6 (May 30, 2008), available at *https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files/Memoranda/Archives%201998-2008/2008/ac21_30may08.pdf.*

AC00196

for an H–1B nonimmigrant worker, or a change of status from H–1B status to another nonimmigrant classification, would be able to submit documentary evidence indicating that the beneficiary faced retaliatory action from his or her employer based on a report regarding a violation of the employer's LCA obligations. *See* final 8 CFR 214.2(h)(20). If DHS determines such documentary evidence to be credible, DHS may consider any loss or failure to maintain H–1B status by the beneficiary related to such violation as an "extraordinary circumstance" under 8 CFR 214.1(c)(4) and 248.1(b). Those regulations, in turn, authorize DHS to grant a discretionary extension of H–1B stay or a change of status to another nonimmigrant classification. *See* 8 CFR 214.1(c)(4) and 248.1(b). Finally, DHS makes a technical change to 8 CFR 214.2(h)(20), fixing the reference to the labor "condition" application.

2. Public Comments and Responses

*Comment.* Several commenters supported the provisions in the proposed rule regarding the protection of whistleblowers in the H–1B nonimmigrant program. The commenters believe that the regulatory text will enhance the likelihood that H–1B nonimmigrant workers will report employer violations and misconduct. One commenter, however, opposed the proposed codification of the ACWIA whistleblower protections in 8 CFR 214.2(h)(20), unless the phrase "the beneficiary faced retaliatory action" was amended to read, "the beneficiary suffered from retaliatory action described in 8 U.S.C. 1182(n)(2)(C)(iv)." The commenter reasoned that the statutory provision provides a precise definition of retaliatory action and that, without a more precise definition in the regulation, DHS would create arbitrary incentives for H–1B nonimmigrant workers to abuse the whistleblower process as a shortcut to obtaining lawful permanent residence.

*Response.* DHS appreciates the commenters' support for inclusion of the whistleblower protections in the final rule. DHS also believes the regulatory text is sufficiently clear and is not adopting the suggested change to the text at 8 CFR 214.2(h)(20). DHS notes that INA 212(n)(2)(C)(iv) and (v) require DHS and DOL to devise a process for protecting individuals who file complaints about their employers' retaliatory actions, but the statutory provisions do not require such individuals to demonstrate that they have suffered as a result of such actions. Therefore, DHS believes that adopting the commenter's suggestion would be

unduly restrictive. Moreover, DHS notes that the whistleblower provision does not provide a shortcut, or even a path, to lawful permanent residence status as asserted by the commenter.

*Comment.* One commenter expressed concern about the provision in the proposed rule that requires new employers to present DHS with the DOL complaint and evidence of retaliatory action. The commenter believed that provision may infringe on the worker's privacy and discourage the worker from taking advantage of the whistleblower protection. The commenter recommended that such workers be provided the option of providing documentary evidence in a sealed envelope with the H–1B petition, or in some other way that protects his or her privacy.

*Response.* While DHS appreciates the commenter's concerns regarding the privacy of whistleblowers, DHS has a fundamental interest in the integrity of the information and documentary evidence submitted as part of a nonimmigrant visa petition. Under 8 CFR 103.2(a)(2), the petitioner must ensure the credibility of such evidence. If the beneficiary of an H–1B petition were allowed to provide sealed evidence of which the petitioner may have no knowledge, then the petitioner would not be able to certify the veracity of such evidence in compliance with 8 CFR 103.2(a)(2). Moreover, because DHS did not propose to revise 8 CFR 103.2(a)(2) in the NPRM to allow for the proposed provision of sealed evidence by a beneficiary, DHS is unable to provide a regulatory accommodation to modify those requirements in this final rule. However, DHS will consider ways to address the concerns raised by the commenter in the future. In addition, DHS notes that the regulations do not preclude petitioners from working with beneficiaries of H–1B petitions to acquire and submit the requisite documentary evidence in a manner that would protect the beneficiaries' privacy.

*Comment.* One commenter requested that workers who have exceeded the maximum period of stay in H–1B status be allowed to apply for whistleblower protection. The commenter believed that by the time some workers become aware of employer violations, they may no longer be in status.

*Response.* The final rule allows for credible documentary evidence to be provided, in support of a petition seeking an extension of H–1B stay or change of status to another classification, indicating that the beneficiary faced retaliatory action from his or her employer based on the reporting of a violation of the

employer's labor condition application obligations under section 212(n)(2)(C)(iv) of the INA. USCIS may consider a loss or failure to maintain H–1B status by the beneficiary related to such violation as due to, and commensurate with, "extraordinary circumstances" as defined by 8 CFR 214.1(c)(4) and 248.1(b). These provisions allow DHS to take into account that the employee may no longer be in valid H–1B status at the time the new H–1B petition is submitted to DHS. However, this provision does not allow the beneficiary to stay beyond the maximum (generally, 6-year) period of stay for an H–1B nonimmigrant workers, unless otherwise eligible.

*Comment.* One commenter requested that DHS clarify the types of employment considered appropriate for whistleblowers when "seeking appropriate employment." *See* INA 212(n)(2)(C)(iv). The commenter further recommended that the H–1B nonimmigrant worker should be permitted to work in another position that is within the occupational classification of the LCA filed on his or her behalf by the petitioning employer.

*Response.* DHS notes that the final rule does not restrict the types of jobs or occupational classifications that whistleblowers may seek; however, a beneficiary seeking employment in such circumstances must be granted the appropriate work authorization to work for a new employer.

*Comment.* One commenter requested that DHS expand upon the types of documentary evidence the Department would accept to establish violations of employer LCA obligations. The commenter stated that acceptable forms of evidence should be broadened to include other relevant documents, such as an employment offer, prevailing wage confirmation letter, and ETA Form 9089, even if the worker has not filed a complaint against the employer.

*Response.* Section 212(n)(2)(C)(v) of the INA requires the Secretary of Labor and the Secretary of Homeland Security to devise a process under which an H–1B nonimmigrant worker may file a complaint regarding a violation of clause (iv), which prohibits employers from intimidating, threatening, restraining, coercing, blacklisting, discharging, or in any other manner discriminating against an employee as retaliation for whistleblowing. Under that section, an H–1B nonimmigrant worker who is otherwise eligible to remain and work in the United States may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for

H–1B classification. *See* INA section 212(n)(2)(C)(v), 8 U.S.C. 1182(n)(2)(C)(v). In addition, DHS has not limited the scope of credible evidence that may be included to document an employer violation. Rather, DHS generally requests credible documentary evidence indicating that the beneficiary faced retaliatory action from his or her employer due to a report regarding a violation of the employer's LCA obligations.

*Comment.* One commenter requested that the final rule include a provision granting employment authorization to an H–1B nonimmigrant worker who faces retaliatory action due to employer violations of LCA obligations, and his or her spouse and eligible dependents, in order to help defray the financial costs resulting from such violations.

*Response.* There is no express independent employment authorization for an H–1B nonimmigrant worker who faces retaliatory action due to employer violations of LCA obligations. However, under provisions in the rule, an H–1B nonimmigrant worker facing employer retaliation, along with his or her dependents, may benefit from the grace period of up to 60 days during which the worker could extend or change status. Alternatively, if the H–1B nonimmigrant worker is the beneficiary of a qualifying and approved employment-based immigrant visa petition, the worker may obtain employment authorization in compelling circumstances pursuant to 8 CFR 204.5(p), if otherwise eligible.

*Comment.* One commenter requested that DHS institute specific penalties against employers that are proven to have violated statutory requirements related to the H–1B program, particularly when those violations may have caused H–1B nonimmigrant workers to lose their H–1B status.

*Response.* DHS notes that the INA already provides penalties for employers that violate statutory requirements regarding H–1B compliance. Those penalties are listed in section 212(n)(2)(C) of the INA.

*Comment.* One commenter requested that DHS provide 30-day grace periods to H–1B nonimmigrant workers who experience involuntary termination. The commenter noted that a 30-day grace period would help such workers due to the considerable time it may take to gather credible evidence of retaliation and seek new employment.

*Response.* The final rule provides H–1B nonimmigrants, among others, a grace period during each authorized nonimmigrant validity period of up to 60 days or until the existing validity period ends, whichever is shorter,

whenever employment ends for these individuals. *See* 8 CFR 214.1(l)(2). Therefore, DHS does not believe it is necessary to add a specific provision to the regulations that gives a shorter grace period to H–1B nonimmigrants who may have been the victims of employer retaliation. DHS believes that the 60-day grace period allows certain high-skilled workers facing a sudden or unexpected end to their employment sufficient time to seek new employment, seek a change of status to a different nonimmigrant classification, or make preparations for departure from the United States.

*Comment.* One commenter requested that the debarment provisions in the H–1B program should be revised to strengthen whistleblower protections. The commenter stated that current H–1B debarment regulations fail to protect the existing workforce when violations are found, thus inadvertently penalizing the H–1B nonimmigrant workers themselves by making it impossible for them to renew their visas once their employers are debarred. The commenter further stated that the rule should include provisions to exempt the existing workforce from being affected by employer debarment or to make H–1B nonimmigrant workers whose employers are debarred automatically eligible for other forms of relief, such as deferred action or independent EADs.

*Response.* DHS does not believe it is necessary to revise 8 CFR 214.2(h)(20) to address the commenter's concerns, as various types of relief are available to these workers under this rule. For example, H–1B nonimmigrant workers of employers who are subsequently debarred from the H–1B program may be eligible to use the 60-day grace period afforded by this rule to seek new employment, seek a change of status to a different nonimmigrant classification, or make preparations for departure from the United States. Moreover, these workers may be eligible to apply for a compelling circumstances EAD.

*Comment.* One commenter noted that INA 212(n)(2)(C) requires DHS to establish a process for H–1B nonimmigrant workers to file complaints with DOL regarding illegal retaliation. The commenter encouraged DHS to coordinate this process with DOJ's Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) and argued that creating a streamlined, consistent reporting mechanism for whistleblowers would promote integrity in the enforcement process.

*Response.* DHS believes that the commenter is referencing INA 212(n)(2)(c)(v), which requires DOL and DHS to devise a process to ensure H–1B

nonimmigrants who file whistleblower complaints are able to seek continued employment in the United States in H–1B status or under other nonimmigrant classifications, if otherwise eligible. USCIS has implemented this statute by excusing an individual's failure to maintain H–1B status if there is credible evidence that the failure was due to employer retaliation. In this final rule, DHS is codifying this practice under new 8 CFR 214.2(h)(20), the provision addressing retaliatory action claims. Under that provision, USCIS may permit individuals who face retaliatory action from an employer based on a report regarding violations of the employer's LCA obligations, as described in section 212(n)(2)(C)(iv) of the Act, and whose loss or failure to maintain H–1B status relates to the employer violation, to extend their stay in H–1B status or change status to another classification. DHS currently collaborates with its interagency partners on matters of shared statutory responsibility and will continue to seek ways to enhance such collaboration in the future.

### M. Haitian Refugee Immigrant Fairness Act of 1998

#### 1. Changes to DHS HRIFA Regulations

DHS did not receive public comments regarding the proposed changes to the DHS regulations concerning individuals applying for adjustment of status under the Haitian Refugee Immigrant Fairness Act of 1998 (HRIFA), Public Law 105–277, div. A, title IX, sections 901–904, 112 Stat. 2681–538–542 (codified as amended at 8 U.S.C. 1255 note (2006)). Therefore, DHS is retaining these changes as proposed. Under the final rule, DHS will be required to issue an EAD, rather than an interim EAD, within the timeframes currently provided in 8 CFR 245.15(n)(2). Additionally, HRIFA-based applicants for adjustment of status are eligible for the automatic 180-day extension of expiring EADs, provided they file a timely request for renewal. *See* final 8 CFR 245.15(n)(2).

### N. Application for Employment Authorization

#### 1. Description of Final Rule and Changes From NPRM

In this final rule, DHS is adopting with minimal changes the NPRM's proposed regulatory text to update 8 CFR 274a.13 governing the processing of Applications for Employment Authorization (Forms I–765) and is also changing its policy concerning how early USCIS will accept renewal applications in the same employment

category (by allowing, except when impracticable, filings up to 180 days before expiration). First, DHS is modifying the changes to 8 CFR 274a.13(a) proposed in the NPRM by adding a provision indicating that USCIS may announce through its Web site, in addition to form instructions, which employment categories may file EAD applications concurrently with underlying benefit requests. Second, as proposed, DHS is eliminating the regulatory provision at current 8 CFR 274a.13(d) that directs USCIS to adjudicate Forms I–765 within 90 days of filing and that requires interim employment authorization documents to be issued if the adjudication is not completed within the 90-day timeframe.[95] Third, to help prevent gaps in employment authorization, DHS is providing for the automatic extension of expiring EADs (and underlying employment authorization, if applicable) for up to 180 days with respect to individuals who are seeking renewal of their EADs (and, if applicable, employment authorization) based on the same employment authorization categories under which they were granted. For a renewal applicant who is a Temporary Protected Status (TPS) beneficiary or individual approved for TPS "temporary treatment benefits,"[96] the renewal application can indicate an employment authorization category based on either 8 CFR 274a.12(a)(12) or (c)(19). In addition to

the employment category requirement, the renewal applicant must continue to be employment authorized incident to status beyond the expiration of the EAD or be applying for renewal under a category that does not first require adjudication of an underlying benefit application, petition, or request. The rule clarifies that this requirement applies to individuals granted TPS described in 8 CFR 274a.12(a)(12) and pending applicants for TPS issued EADs under 8 CFR 274a.12(c)(19). The final rule requires, as proposed, that qualifying applicants file their renewal applications timely (i.e., prior to the expiration of their EADs) for the automatic EAD extension to apply.[97] However, this rule clarifies that for renewal applications based on TPS, the automatic EAD extension provision will apply to individuals who file during the re-registration period described in the **Federal Register** notice applicable to their country's TPS designation, even if they file after their EADs are facially expired. This final rule is making this clarification because, in limited cases, the re-registration period may extend beyond the EAD validity period.

DHS listed 15 employment categories in the Supplementary Information to the NPRM that meet the regulatory criteria.[98] DHS reaffirms the list of 15

employment eligibility categories as qualifying for automatic EAD/ employment authorization extensions under this final rule.[99] USCIS will

been deemed prima facie eligible for TPS under 8 CFR 244.10(a) and have received an EAD as a "temporary treatment benefit" under 8 CFR 244.10(e) and 274a.12(c)(19); aliens who have properly filed applications for asylum or withholding of deportation or removal (see 8 CFR 274a.12(c)(8); aliens who have filed applications for adjustment of status under section 245 of the INA, 8 U.S.C. 1255 (see 8 CFR 274a.12(c)(9)); aliens who have filed applications for suspension of deportation under section 244 of the INA (as it existed prior to April 1, 1997), cancellation of removal under section 240A of the INA, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (see 8 CFR 274a.12(c)(10)); aliens who have filed applications for creation of record of lawful admission for permanent residence (see 8 CFR 274a.12(c)(16)); aliens who have properly filed legalization applications pursuant to section 210 of the INA, 8 U.S.C. 1160 (see 8 CFR 274a.12(c)(20)); aliens who have properly filed legalization applications pursuant to section 245A of the INA, 8 U.S.C. 1255a (see 8 CFR 274a.12(c)(22)); aliens who have filed applications for adjustment of status pursuant to section 1104 of the LIFE Act (see 8 CFR 274a.12(c)(24)); and aliens who are the principal beneficiaries or qualified children of approved VAWA self-petitioners, under the employment authorization category "(c)(31)" in the form instructions to the Application for Employment Authorization (Form I–765).

[99] The TPS-related employment authorization categories, 8 CFR 274a.12(a)(12) and (c)(19), are included in the list of categories that are eligible for the automatic 180-day EAD extension. The category based on 8 CFR 274a.12(a)(12) denotes that the EAD is for employment authorization based on a grant of TPS. The category based on 8 CFR 274a.12(c)(19) denotes that the EAD is for employment authorization for a TPS applicant who is prima facie eligible for TPS based on a pending TPS application. EADs are considered "temporary treatment benefits" when provided to such pending TPS applicants. See 8 CFR 244.5, 244.10(e). If TPS is granted before the expiration date on the individual's EAD based on 8 CFR 274a.12(c)(19), USCIS usually allows the individual to continue using that EAD until it expires and does not issue an 8 CFR 274a.12(a)(12)-based EAD for a TPS beneficiary until the individual requests an EAD during the next TPS re-registration period for the individual's country. If the relevant TPS country designation is extended, the re-registration process is published in the **Federal Register** and includes instructions on filing to show continued maintenance of TPS eligibility and to renew work authorization documentation. In the past, there have been some very limited circumstances where the designated filing period extended beyond the existing EAD validity date. Therefore, an applicant who files an application to renew his or her EAD may receive an automatic extension under this rule, as long as the application is filed during the designated TPS re-registration filing period in the TPS **Federal Register** notice, even where that period may extend beyond the current EAD validity date. Additionally, because the 8 CFR 274a.12(a)(12) and (c)(19) eligibility categories both relate to TPS, the applicant may benefit from the automatic 180-day extension as long as the receipt notice for the EAD renewal application and the facially expired card in the applicant's possession bear either of these two eligibility categories, but they do not need to match each other. Therefore, if an individual has an EAD bearing the 8 CFR 274a.12(c)(19) eligibility category, but has since

Continued

---

[95] Excepted from the 90-day processing requirement in 8 CFR 274a.13(d)), prior to its elimination in this rulemaking, are the following classes of aliens: Applicants for asylum described in 8 CFR 274a.12(c)(8); certain H–4 nonimmigrant spouses of H–1B nonimmigrants; and applicants for adjustment of status applying under the Haitian Refugee Immigrant Fairness Act of 1998 (HRIFA). Application processing for asylum applicants is governed by current 8 CFR 274a.13(a)(2) and does not include provisions for interim employment authorization documentation. The employment authorization of applicants for adjustment of status under HRIFA is governed by 8 CFR 245.15(n). The provision at 8 CFR 274a.13(d) also exempts applicants for adjustment of status described in 8 CFR 245.13(j). In 2011, 8 CFR 245.13 was removed from DHS regulations. See 76 FR 53764, 53793 (Aug. 29, 2011). However, the cross-reference to 8 CFR 245.13(j) in current 8 CFR 274a.13(d) was inadvertently retained. Prior to its removal in 2011, 8 CFR 245.13 provided for adjustment of status for certain nationals of Nicaragua and Cuba pursuant to section 202 of the Nicaraguan Adjustment and Central American Relief Act, Public Law 105–100, 111 Stat. 2160, 2193 (Nov. 19, 1997). The application period for benefits under this provision ended April 1, 2000. USCIS removed 8 CFR 245.13 from DHS regulations in 2011 as it no longer has pending applications pursuant to this provision. See 76 FR at 53793.

[96] Individuals approved for TPS "temporary treatment benefits" includes those who obtain employment authorization based on prima facie eligibility for TPS during adjudication of their TPS applications. See INA 244(a)(4), 8 U.S.C. 1254a(a)(4); 8 CFR 244.5, 244.10(e).

[97] This final rule also adopts, with clarifying changes, the provisions related to the new automatic EAD extension provision, including that: An EAD that is automatically extended will continue to be subject to any limitations and conditions that applied before the extension (see final 8 CFR 274a.13(d)(2)); although the validity of the expiring EAD will be extended for up to 180 days, such validity will be automatically terminated upon the issuance of a notification of denial of the renewal application (see final 8 CFR 274a.13(d)(3)); and automatic extensions may also be terminated before the renewal application is adjudicated either through written notice to the applicant, or a notice to a class of aliens published in the **Federal Register**, or any other applicable authority (see final 8 CFR 274a.13(d)(3)).)

[98] In the NPRM, DHS listed 15 employment authorization categories under which renewal applicants would be able to receive automatic EAD extensions. Note that this list corrects an error in the NPRM wherein DHS failed to include Palau among the list of nations specified in the eligible employment category based on 8 CFR 274a.12(a)(8). As corrected, the list of 15 employment authorization categories are: Aliens admitted as refugees (see 8 CFR 274a.12(a)(3)); aliens granted asylum (see 8 CFR 274a.12(a)(5)); aliens admitted as parents or dependent children of aliens granted permanent residence under section 101(a)(27)(I) of the INA, 8 U.S.C. 1101(a)(27)(I) (see 8 CFR 274a.12(a)(7)); aliens admitted to the United States as citizens of the Federated States of Micronesia, the Marshall Islands, or Palau under agreements between the United States and those nations (see 8 CFR 274a.12(a)(8)); aliens granted withholding of deportation or removal (see 8 CFR 274a.12(a)(10)); aliens granted Temporary Protected Status (TPS) (regardless of the employment authorization category on their current EADs) (see 8 CFR 274a.12(a)(12) and (c)(19)); aliens who have properly filed applications for TPS and who have

maintain, and update as necessary, the list of qualifying employment categories on its Web site.

Current DHS policy allows EAD renewal applications submitted under certain categories to be filed up to 120 days before the applicant's current EAD expires. In response to the comments received requesting additional time for advance filing, DHS will adopt a filing policy that will generally permit the filing of an EAD renewal application up to 180 days before the current EAD expires, except when impracticable. This filing policy will be posted on the USCIS Web site and will take into consideration any other regulatory provisions that might require a longer or shorter filing window depending on the specific renewal EAD employment category.

The measures DHS is taking in this final rule will provide additional stability and certainty to employment-authorized individuals and their U.S. employers, while reducing opportunities for fraud and better accommodating increased security measures, including technological advances that utilize centralized production of tamper-resistant documents.

## 2. Public Comments and Responses

### i. Adjudication Timeframes for Initial and Renewal Applications of Employment Authorization

*Comment.* Many commenters disagreed with the proposal to eliminate the 90-day processing requirement for adjudicating EAD requests. These commenters expressed concerns that eliminating this requirement would cause gaps in employment authorization for certain foreign workers, lead to longer adjudication times, ultimately lead to job losses, and cause hardship for many beneficiaries. Some commenters further noted that delays in the adjudication of EAD applications for certain vulnerable populations—such as crime victims, victims of domestic and other gender-based violence—could place them in even more desperate situations. Another commenter stated that the fee associated with the 90-day adjudication provides a "social contract" that ensures that USCIS will timely adjudicate requests and prevent delays that could harm the employment prospects of applicants.

*Response.* DHS carefully considered these concerns, but disagrees with the assertion that eliminating the 90-day

received TPS and is applying for a renewal under the 8 CFR 274a.12(a)(12) eligibility category, he or she would still get the benefit of the automatic 180-day extension under this rule.

processing time for Applications for Employment Authorization (Forms I–765) from the regulations will cause gaps in employment, undue hardship, job losses, or longer adjudication times. DHS believes that, regardless of the imposition of a fee, Forms I–765 must be adjudicated within reasonable timeframes. Although DHS is eliminating the 90-day processing timeframe for Forms I–765 from the regulatory text, USCIS continues to be committed to the processing goals it has established for Form I–765. Many renewal applicants who may have benefitted from the 90-day timeframe for Form I–765 will now be able to benefit from this rule's provision regarding automatic EAD extensions for up to 180 days for certain employment categories. DHS anticipates that the automatic EAD extension will ensure continued employment authorization for many renewal applicants and prevent any work disruptions for both the applicants and their employers.

Eliminating the 90-day EAD processing timeframe will also support USCIS's existing practice regarding concurrent filing of EAD applications based on underlying immigration benefits. For example, although victims of domestic violence can receive their initial EADs only after USCIS adjudicates the underlying victim-based benefit request, USCIS allows the concurrent filing of the Form I–765 with the underlying victim-based benefit request so that such victims receive EADs expeditiously following a grant of the benefit request. *See* Form I–765 form instructions, at page 7 (instructions for self-petitioners under the Violence Against Women Act (VAWA)). Before USCIS adopted this practice, applicants who concurrently filed a victim-based benefit request with a Form I–765 would have their Form I–765 denied if the underlying benefit was not adjudicated within 90 days of filing. USCIS issued such denials on the ground that the applicant was not yet eligible to receive an EAD because the underlying benefit request was still pending. Removal of the 90-day regulatory timeframe allows USCIS to not only accept Forms I–765 concurrently filed with the underlying victim-based benefit requests, but also permits the Form I–765 to remain pending until USCIS completes its adjudication of the benefit request. Once USCIS issues a final decision on the underlying benefit request that permits approval of the Form I–765, USCIS will be able to immediately issue a decision on the Form I–765 and produce an EAD. This will result in the victim-based EAD

applicant receiving employment authorization faster than if the applicant were required to file Form I–765 only after receiving a grant of the underlying benefit request.

*Comment.* Many commenters supported keeping the 90-day timeframe for adjudicating EADs in the regulations. These commenters stated that the regulatory timeframe provides certainty for applicants, offers a potential legal remedy if EADs are not delivered on time, and provides interim relief if adjudication deadlines are not met. Several of these commenters asserted that DHS's plan to publish operational policy guidance was an inadequate substitute for keeping the 90-day timeframe in the regulations, especially as it could strip applicants of legal protection when EAD adjudications take longer than 90 days.

Another commenter suggested that DHS keep the 90-day adjudication requirement in the regulations but add limited exceptions. According to the commenter, these exceptions could address situations involving security concerns, situations in which underlying benefit applications or petitions are still being adjudicated, and situations involving operational emergencies that prevent DHS from making timely adjudications.

*Response.* DHS disagrees that operational policy statements regarding the 90-day application adjudication timeframe will be inadequate. The public will be able to rely on USCIS's announcements regarding Form I–765 processing, which will reflect USCIS's up-to-date assessment of its operational capabilities. Applicants also will continue to have redress in case of adjudication delays by contacting USCIS. *See https://www.uscis.gov/ forms/tip-sheet-employment-authorization-applications-pending-more-75-days.*

DHS also declines to adopt the suggestion by commenters to retain the 90-day adjudication timeframe in the regulations and modify it to provide for exceptions, such as in cases involving security concerns. Applying different processing standards to certain applicants adds complexity to the overall management of the agency's workloads, and to the customer service inquiry process.

The additional relief from processing delays that DHS is providing in this final rule is the new provision that automatically extends the validity of EADs and, if needed, employment authorization for up to 180 days for certain applicants who timely file renewal EAD applications under the same eligibility category. The automatic

extension will only apply to such renewal applicants if their employment is authorized incident to status beyond the expiration of their current EADs or if their eligibility is not dependent on USCIS first adjudicating an underlying immigration benefit.

### ii. Earlier Filing for EAD Renewals

*Comment.* Several commenters asked DHS to permit the filing of a renewal EAD application up to 180 days in advance of the expiration of the applicant's current EAD. These commenters noted that DHS currently will not accept a renewal EAD application that is filed more than 120 days prior to the expiration date. They suggested that by permitting earlier filing, renewal applicants who are not eligible for the automatic 180-day extension will have a greater chance of having their applications adjudicated before their EADs expire and thus avoid a gap in employment authorization. One commenter also stated that a longer filing window would better align with the current Form I–129 filing window for H–1B and L–1 nonimmigrants, allowing nonimmigrant workers (and dependents eligible to apply for EADs) to concurrently apply for extensions of stay and employment authorization. Moreover, commenters stated that allowing applications to be submitted further in advance would benefit DHS by affording it more time to manage its workload, and alleviate concerns about its ability to process all Forms I–765 within 90 days.

*Response.* DHS strongly encourages eligible individuals to file renewal EAD applications (Forms I–765) sufficiently in advance of the expiration of their EADs to reduce the possibility of gaps in employment authorization and EAD validity. DHS appreciates commenters' desire to avoid such gaps and agrees with commenters that modifying the filing policy to allow Forms I–765 to be filed earlier is a reasonable solution. Therefore, DHS is adopting a flexible filing policy to permit the filing of a renewal EAD application as early as 180 days in advance of the expiration of the applicant's current EAD.[100] USCIS will permit the 180-day advance filing policy when practicable, taking into account workload, resources, filing surges, processing times, and specific regulatory provisions that mandate specific filing windows. DHS will continue to monitor the current filing conditions of Form I–765 applications and will set the filing time period for renewal EAD applications as

appropriate. USCIS will post filing time periods for renewal EAD applications on its Web site.

### iii. Concurrent Filings

*Comment.* One commenter suggested allowing applicants to file for EADs concurrently with related benefit requests (*e.g.,* a nonimmigrant visa petition or an application for adjustment of status). Although this is currently allowed to the extent permitted by the form instructions or as announced on the USCIS Web site, this commenter stated that form instructions rarely specify when an EAD may be filed concurrently with another petition, and also stated that forms should not be a substitute for the law when determining when a benefit can be requested. For example, the commenter noted that instructions have not been updated for the Application to Extend/Change Nonimmigrant Status (Form I–539) to state that some H–4 dependent spouses are now eligible for EADs. The commenter recommended amending the provision to allow concurrent filings to the extent permitted by law, rather than only as provided in form instructions.

*Response.* This rule provides general authority for allowing Forms I–765 to be concurrently filed with other benefit requests where eligibility for employment is contingent upon a grant of the underlying benefit request. *See* final 8 CFR 274a.13(a). It is not possible to allow concurrent filing across all eligible categories. For example, an asylum applicant cannot apply for work authorization until the completed asylum application has been pending for at least 150 days. *See* 8 CFR 208.7(a). By establishing regulatory authority for USCIS to permit concurrent filing when appropriate, this rule provides USCIS with the flexibility necessary to decide when concurrent filing is feasible based on existing operational considerations that take into account the particular circumstances of different underlying immigration benefits. Such decisions on filing procedures are appropriately placed in instructional materials rather than the regulations. Therefore, while DHS disagrees with the commenter that this more specific information should be included in the regulations, DHS agrees that locating up-to-date information regarding the availability of concurrent filing for particular eligibility categories can be challenging for the public. DHS has determined that, in addition to the form instructions proposed in the NPRM, a convenient and useful location to announce concurrent filing information is on the USCIS Web site. Accordingly, DHS is revising the regulatory text at 8 CFR 274a.13(a) in

this final rule to include Web site announcements related to the concurrent filing of Forms I–765. Placing information regarding the availability of concurrent filings on USCIS's Web site will enable DHS to more efficiently make updates, particularly as the transformation to electronic processing occurs in the future.[101] USCIS also will continue posting guidance in other public engagement materials regarding concurrent filings.[102] Applicants should consult the appropriate form instructions or the USCIS Web site to determine whether they may file their Form I–765 concurrently with their underlying benefit request.

Regarding the example raised by the commenter, the Form I–539 instructions do not address issues of employment authorization. Rather, the Form I–539 instructions outline who is eligible to apply for an extension of stay or change of nonimmigrant status. However, the current version of the Form I–765 instructions clearly state that some H–4 nonimmigrant spouses of H–1B nonimmigrant workers are eligible for employment authorization and may also be able to concurrently file their Form I–765 with Form I–539. DHS also currently permits such H–4 nonimmigrant spouses seeking an extension of stay to file Form I–539 concurrently with a Petition for a Nonimmigrant Worker (Form I–129) seeking an extension of stay on behalf of the H–1B nonimmigrant worker. This provides several efficiencies, as continued H–4 status of the dependent spouse is based on the adjudication of the H–1B nonimmigrant worker's Form I–129 petition and both forms may be processed at the same USCIS location. By posting concurrent filing instructions in form instructions or on the USCIS

---

[100] Current USCIS policy allows early filing up to 120 days in advance.

[101] Over the next several years, USCIS will continue rolling out a secure, customer-friendly online account system that will enable and encourage customers to submit benefit requests and supporting documents electronically. This Web-based system will greatly simplify the process of applying for immigration benefits. It will assign new customers a unique account which will enable them to access case status information, respond to USCIS requests for additional information, update certain personal information, and receive timely decisions and other communications from USCIS. For more information, *see https://www.uscis.gov/about-us/directorates-and-program-offices/office-transformation-coordination.*

[102] *See, e.g.,* FAQs for employment authorization for certain H–4 Spouses *https://www.uscis.gov/working-united-states/temporary-workers/faqs-employment-authorization-certain-h-4-dependent-spouses* and *https://www.uscis.gov/i-539-addresses.* USCIS also posts information on its Web site regarding concurrent filing for individuals seeking lawful permanent residence. The Web page can be found at *https://www.uscis.gov/green-card/green-card-processes-and-procedures/concurrent-filing.*

Web site, DHS can better address such complicated adjudication processes.

With respect to the Form I–765, DHS will post on the USCIS Web site a list of the categories of applicants who may file their Forms I–765 concurrently with their underlying eligibility requests. By posting this type of comprehensive information on the USCIS Web site, applicants will have up-to-date information on filing procedures.

### iv. Potential Gaps in Employment Authorization

*Comment.* Some commenters stated that the elimination of the 90-day processing timeframe may cause beneficiaries uncertainty and stress, and deter some individuals from traveling to their home countries. Commenters also expressed concerns about accruing unlawful presence while waiting for their EADs, which might affect their eligibility for future immigration benefits. Finally, commenters opposed eliminating the 90-day provision by noting that employers may refrain from hiring foreign workers, or even lay off foreign workers, who do not have a current EAD in order to avoid the risk of fines imposed by ICE.

*Response.* DHS does not believe that eliminating the 90-day EAD processing timeframe from the regulation will lead to the issues raised by commenters, except in rare instances. DHS plans to maintain current processing timeframes and will continue to post that information on its Web site.[103] Consistent with current protocols, applicants not covered by the automatic 180-day extension of employment authorization will continue to be able to call the National Customer Service Center (NCSC) if their application is pending for 75 days or more to request priority processing. Applicants covered by the 180-day automatic extension will be permitted to contact the NCSC if their application is still pending at day 165 of the auto-extension to request priority processing. For those cases that are not fit for adjudication within current processing timeframes, DHS does not believe that employment authorization should be granted, and EADs issued, before eligibility is determined.

To avoid potential gaps in employment authorization resulting from unexpected delays in processing, DHS is providing workable solutions in this final rule. As mentioned earlier in this Supplementary Information, USCIS is changing its recommended filing timelines and will accept renewal EAD applications filed as far in advance as 180 days from the expiration date of the current EAD. The extent of the advance filing window will depend on operational considerations. Affected stakeholders can, and are strongly encouraged to, reduce any potential gaps in employment authorization or employment authorization documentation by filing Forms I–765 well enough in advance of the expiration dates on their current EADs.

Further, DHS is providing automatic 180-day extensions of some EADs to renewal applicants within certain employment eligibility categories upon the timely filing of applications to renew their EADs.[104] This provision significantly mitigates the risk of gaps in employment authorization and required documentation for eligible individuals. In addition, the provision will provide consistency for employers, as the extension period is similar to that which already is used in other contexts. For example, DHS typically provides automatic 180-day extensions of EADs to TPS beneficiaries when the registration period does not provide sufficient time for TPS beneficiaries to receive renewal EADs.[105] DHS regulations also provide certain F–1 nonimmigrant students seeking extensions of STEM Optional Practical Training (OPT) with automatic extensions of their employment authorization for up to 180 days. *See* 8 CFR 274a.12(b)(6)(iv).

In response to concerns regarding accrual of unlawful presence, DHS believes that removal of the 90-day adjudication timeline from the regulations generally has no effect on the application of DHS's longstanding unlawful presence guidance. A foreign national will not accrue unlawful presence in the United States if he or she is deemed to be in an authorized period of stay. Neither the mere pendency of a Form I–765 application nor the receipt of an EAD generally determines whether an individual is in an authorized period of stay for purposes of accrual of unlawful presence. DHS has described circumstances considered to be "authorized periods of stay" in policy guidance.[106]

With respect to the comments regarding freedom to travel outside the United States, DHS is not prohibiting applicants with pending Forms I–765 from traveling. However, DHS's longstanding policy is that if an applicant travels outside of the United States without a valid visa or other travel document while he or she has a pending change of status application, DHS considers the applicant to have abandoned that application.[107] Moreover, although applicants may travel abroad, they must have a valid visa or other travel document that allows them to return to the United States. An EAD, by itself, does not authorize travel.

Finally, with respect to commenters' concerns that this rule will cause employers to refrain from hiring foreign workers or may lay off foreign workers to avoid potential fines imposed by ICE, DHS believes that the steps it has taken to minimize the possibility of gaps in employment authorization will satisfactorily allay these concerns. Employers that refuse to hire workers with 180-day extensions, or that terminate such workers, may be in violation of the INA's anti-discrimination provision at section 274B, 8 U.S.C. 1324b, which prohibits, inter alia, discrimination based on a worker's citizenship status, immigration status, or national origin, including discriminatory documentary practices with respect to the employment eligibility verification (Form I–9 and E-Verify) process. Employers that violate the anti-discrimination provision may be subject to civil penalties, and victims of such discrimination may be entitled to back pay awards and reinstatement. For more information, visit *https:// www.justice.gov/crt/about/osc.*

*Comment.* One commenter requested that DHS add a regulatory provision requiring USCIS to issue a Form I–797C Notice of Action (receipt notice) within a certain timeframe. This commenter stated that such a regulatory provision would assist individuals who use Form I–797C to "validate" continued employment with his or her employer or for state or federal agencies that rely on EADs to grant "safety net" benefits. Otherwise, according to the commenter, the value of the automatic EAD extension will be eviscerated.

---

[103] *See* current USCIS processing timeframes at *https://egov.uscis.gov/cris/ processTimesDisplayInit.do.*

[104] "Timely filed" for purposes of renewal applicants filing TPS-based EAD applications means filed according to the applicable TPS country-specific **Federal Register** notice regarding procedures for obtaining EADs. In very limited cases, the filing period described in the **Federal Register** notice may extend beyond the EAD validity date.

[105] *See, e.g.,* 80 FR 51582 (Aug. 25, 2015) (Notice auto-extending EADs of Haitian TPS beneficiaries for 6 months).

[106] *See* Neufeld May 2009 Memo.

[107] *See* USCIS Memorandum from Thomas Cook, "Travel after filing a request for a change of nonimmigrant status" (June 18, 2001), available at *https://www.uscis.gov/sites/default/files/files/ pressrelease/Travpub.pdf.*

*Response.* DHS declines to adopt the suggestion to impose a regulatory issuance deadline on the Form I–797C, Notice of Action (receipt notice). Issuance of the receipt notice depends on highly variable operational realities affecting the intake process, and thus cannot be held to a "processing" timeframe. Furthermore, DHS notes that receipt notices are generally issued in a timely manner, usually two weeks.

v. Interim EADs

*Comment.* Many commenters disagreed with the proposed elimination of the issuance of interim EADs with validity periods of up to 240 days when an EAD application is not adjudicated within the previously discussed 90-day timeframe. These commenters suggested that the lack of an interim EAD may result in an employer laying off a worker if his or her EAD application is not timely adjudicated.

*Response.* DHS anticipated and addressed these concerns raised by commenters by providing for the automatic extension of EADs of 180 days for individuals who: (1) File a request for renewal of their EAD prior to its expiration date or during the filing period described in the country-specific **Federal Register** notice concerning procedures for obtaining TPS-related EADs; (2) request a renewal based on the same employment authorization category under which the expiring EAD was granted (as indicated on the face of the EAD), or on an approval for TPS even if the expiring EAD was issued under 8 CFR 274a.12(c)(19);[108] and (3) either continue to be employment authorized incident to status beyond the expiration of the EAD or are applying for renewal under a category that does not first require the adjudication of an underlying benefit request. As discussed earlier, DHS had determined that 15 employment categories currently meet these conditions.

DHS recognizes the possibility of gaps in employment authorization for renewal applicants who are not included on the list of employment categories eligible for automatic renewal of their EADs because they require adjudication of an underlying benefit

request. Such individuals are encouraged to contact the National Customer Service Center (NCSC) if their application is pending for 75 days or more to request priority processing of their application. In order to further ensure against gaps in employment authorization for renewal applicants, DHS also is modifying its 120-day advance filing policy and will accept Forms I–765 that are filed up to 180 days in advance of the EAD expiration date, except where impracticable. With this modification, DHS expects that the risk of gaps in employment authorization and the possibility of worker layoffs will be minimal.

*Comment.* One commenter stated that harm would be caused by limiting automatic EAD extensions, but suggested that this harm could be ameliorated by allowing for unlimited automatic extension of work authorization upon the timely filing of a renewal EAD application until a decision is made on the application. The commenter alternatively suggested lengthening the extension period to 240 days to coincide with the validity period of interim EADs and consistent with the extension of employment authorization for certain nonimmigrants pursuant to 8 CFR 274a.12(b)(20). The commenter also suggested extending the 120-day advance filing policy for EADs. According to the commenter, if the automatic extension is limited to 180 days, USCIS should accept filings 240 days in advance of the expiration of the applicants EADs.

*Response.* DHS declines to adopt the commenter's suggestions and retains the proposed automatic extension period of 180 days in this final rule. Due to fraud concerns, DHS will not provide for an unlimited automatic extension until USCIS issues a decision on the renewal application. In addition, without a date certain, employers would have difficulties reverifying employment authorization to comply with the Employment Eligibility Verification (Form I–9) requirements and would not have the certainty necessary to maintain a stable and authorized workforce.

Regarding the commenter's suggestion to provide for a 240-day (rather than a 180-day) automatic extension, DHS determined that 180 days would be more appropriate. The 180-day period should provide USCIS sufficient time to adjudicate Form I–765 applications, particularly when individuals file well ahead of the expiration of their EADs, as explained further below. In fact, existing regulations already contain a provision granting an automatic 180-day extension of EADs in certain instances, and that time frame has proven workable. *See,*

*e.g.,* 8 CFR 274a.12(b)(6)(iv) (providing automatic 180-day EAD extensions for F–1 nonimmigrant students who timely file requests for STEM OPT extensions). DHS also typically provides TPS re-registrants with automatic EAD extensions of 180 days.[109] Maintaining consistency among rules regarding automatic EAD extensions will aid employers in complying with Form I–9 verification requirements, as well as other agencies making determinations on eligibility for the benefits they oversee (such as those issued by departments of motor vehicles). DHS acknowledges the regulatory provision granting an automatic extension of employment authorization for up to 240 days, as noted by the commenter, *see* 8 CFR 274a.12(b)(20), but that provision extends to certain classes of nonimmigrants who do not have or require an EAD. These classes of nonimmigrants are employment authorized for a specific employer incident to status. Because the adjudication of a Form I–765 application is materially different from the adjudication of petitions seeking extensions of stay in these nonimmigrant classifications, the 240-day time frame afforded to those nonimmigrants is inapposite. DHS believes it is more sensible that the period for automatically extending certain EADs based on the timely filing of renewal EAD applications should mirror the existing 180-day period in 8 CFR 274a.12(b)(6), as well as DHS's policy regarding automatic extensions of TPS-based EADs.

Moreover, DHS believes that providing an automatic 240-day extension is unwarranted given that the typical Form I–765 processing time is 90 days,[110] and DHS will be providing renewal applicants the opportunity to file up to 180 days in advance of the expiration of their EADs. Those Form I–765 application types that are taking more than 90 days to process are often associated with, and dependent upon, adjudication another underlying request such as Temporary Protected Status, DACA, and H–4 status. The current 120-day advance filing policy coupled with the 240-day interim EAD validity under current regulations at 8 CFR 274a.13(d) provide a total processing period of 360 days before an applicant may

---

[108] Under 8 CFR 274a.12(c)(19), an individual applying for Temporary Protected Status (TPS) must apply for employment authorization; such authorization is not automatic or granted incident to status unless and until the TPS application is granted. EADs are issued as "temporary treatment benefits" to pending TPS applicants who are considered *prima facie* eligible for TPS. Such temporary treatment benefits remain in effect until a final decision has been made on the application for TPS, unless otherwise terminated. *See* 8 CFR 244.5; 8 CFR 244.10(e).

[109] *See, e.g.,* 80 FR 51582 (Aug. 25, 2015) (notice auto-extending EADs of Haitian TPS beneficiaries for 6 months).

[110] USCIS Service Centers report that the majority of Form I–765 applications are adjudicated within 3 months. *See* current USCIS processing timeframes at *https://egov.uscis.gov/cris/ processTimesDisplayInit.do* (last accessed October 31, 2016).

experience a gap in employment authorization. Under this rule, the 180-day advance filing policy and automatic 180-day employment authorization extension similarly would provide a potential processing period of 360 days. In addition, DHS expects that a long automatic extension period of 240 days without an accompanying, secure EAD would increase the risk of fraud or other misuse of the automatic extension benefit. DHS believes that this rule imposes reasonable limitations on automatic EAD extensions that protect against both fraud and gaps in employment authorization.

*Comment.* A commenter requested that DHS include an interim EAD for initial applications, for renewal applications in categories not eligible for automatic extension, and for renewal applications that remain pending even after the automatic 180-day extension has expired in order to prevent hardship that could result when people lack employment authorization.

*Response.* DHS declines to adopt the commenter's suggestion as it would undermine DHS's fraud, national security, and efficiency goals. DHS has determined that the issuance of interim EADs does not reflect the operational realities of the Department, which are intended to promote efficiency, reduce fraud, and address threats to national security, such as through the adoption of improved processes and technological advances in document production. Authorizing an interim EAD for initial and renewal EAD applications whether or not eligible for automatic EAD extensions under this rule would be problematic because some applicants would receive an immigration benefit—employment authorization—before DHS is assured that the applicant is eligible for that benefit through the adjudication of the underlying benefit request. DHS anticipates a long adjudication period will be an extremely rare occurrence, most likely involving an application with serious security concerns, in which case DHS would not grant employment authorization until such concerns are resolved.

Moreover, the resources necessary to process interim EADs are similar to the resources necessary to issue EADs of full duration. Regardless of whether the EAD is for a full duration or for an interim period, the EAD must contain all of the same security and anti-counterfeiting features. Maintaining this duplicative processing would significantly hamper USCIS's ability to maintain reasonable processing times.

vi. Automatic Extensions of EADs and Advance Parole

*Comment.* DHS received a number of comments referencing the combination EAD/advance parole cards issued to applicants for adjustment of status. These comments requested that DHS provide automatic extensions for advance parole when requests for advanced parole are filed timely and concurrently with requests for EAD extensions.

*Response.* DHS declines to permit automatic extensions of advance parole in this final rule. Advance parole is a separate adjudication and is wholly discretionary, determined on a case-by-case basis, and, therefore, DHS does not believe that it is appropriate for automatic extensions.

DHS notes that if a renewal applicant with a combination EAD/advance parole card has an urgent need to travel outside the United States while the employment authorization renewal application is pending, the applicant may request expedited adjudication of the concurrently filed advance parole request under USCIS's longstanding expedite criteria. If USCIS expedites the adjudication of the advance parole request and grants advance parole, the applicant will receive a separate advance parole authorization on Form I–512 (Authorization for Parole of an Alien into the United States) and a separate EAD following adjudication of the renewal EAD application. If the applicant does not receive an expedited approval of the advance parole request, then the applicant may receive a combination card following adjudication of both the EAD renewal application and parole request.

vii. H–4 Nonimmigrant Spouses

*Comment.* Some commenters noted that certain H–4 nonimmigrant spouses of H–1B nonimmigrant workers can wait up to 9 months for an EAD (including time for the visa and EAD extension) and may thus experience gaps in employment.[111] The commenters felt this time period was too long, and they stated that to avoid potential lapses in employment authorization such spouses should be provided the option to: (1) Obtain an automatic extension of their EADs, (2) file their applications for EAD

extension at the same time as their requests for extension of their H–4 status, or (3) receive interim EADs.

*Response.* DHS disagrees with commenters that H–4 nonimmigrant spouses eligible to apply for EADs should receive automatic EAD extensions or interim EADs, and DHS thus declines to modify this rule as suggested by commenters.[112] Consistent with the commenters' requests, an H–4 nonimmigrant spouse eligible for an EAD already may concurrently file his or her EAD application with an H–4 extension request (on Form I–539), even if the Form I–539 is filed with the Form I–129, Petition Nonimmigrant Worker, that is being filed on his or her spouse's behalf. However, the Form I–765 will not be adjudicated until the underlying benefit requests are adjudicated. *See* Instructions to Form I–765. As discussed previously, because the employment authorization for an H–4 nonimmigrant spouse is contingent on the adjudication of an underlying immigration benefit, automatically extending EADs to such individuals significantly increases the risk that EADs may be extended to ineligible individuals.

In the case of an H–4 nonimmigrant spouse filing for an extension of stay and renewal of employment authorization, DHS cannot be reasonably assured that the spouse will continue to be eligible for employment authorization until a full adjudication of the Form I–765 is conducted. Under DHS regulations, an H–4 nonimmigrant spouse is eligible for employment authorization if either the H–1B nonimmigrant worker has an approved Form I–140 petition or the spouse's current H–4 admission or extension of stay was approved pursuant to the H–1B nonimmigrant worker's admission or extension of stay based on sections 106(a) and (b) of AC21. *See* 8 CFR 214.2(h)(9)(iv). Thus, before adjudicating a Form I–765 filed by the H–4 nonimmigrant spouse, USCIS must first make a determination on the principal's H–1B status, because the spouse derives his or her status from the principal. USCIS must then adjudicate the H–4 nonimmigrant spouse's application for an extension of stay. Only after concluding these adjudications with respect to the H–1B

---

[111] H–4 dependent spouses who may apply for employment authorization include certain H–4 dependent spouses of H–1B nonimmigrants who: Are the principal beneficiaries of an approved Form I–140, Immigrant Petition for Alien Worker; or have been granted H–1B status under sections 106(a) and (b) of the American Competitiveness in the Twenty-first Century Act of 2000, as amended by the 21st Century Department of Justice Appropriations Authorization Act. *See* 8 CFR 214.2(h)(9)(iv).

[112] DHS notes that in a separate rulemaking, commenters also requested automatic EAD extensions for H–4 nonimmigrant spouses who have requested renewal EADs. DHS declined to provide for automatic extensions of employment authorization for such nonimmigrants, because their employment authorization is contingent on the adjudication of an underlying benefit request. *See* 80 FR 10284, 10299. This rationale equally applies to this rule.

nonimmigrant worker and the H–4 nonimmigrant spouse, can USCIS adjudicate the spouse's application for a renewal EAD.

Allowing eligible H–4 nonimmigrant spouses to file Form I–765 concurrently with their Form I–539 extension applications (and, if needed, also with the Form I–129 filed on behalf of the H–1B principal) enables the receipt of employment authorization soon after the underlying immigration benefit requests are adjudicated, thereby significantly reducing the overall adjudication timeline for these H–4 nonimmigrant spouses. To further ensure against gaps in employment authorization for H–4 nonimmigrant spouses and others, except when impracticable, DHS will be permitting EAD renewal applicants to file Forms I–765 up to 180 days prior to the expiration of their current EADs.

### viii. F–1 Nonimmigrant Students

*Comment.* A few commenters requested a 90-day processing timeframe for F–1 nonimmigrant students, because Forms I–765 based on optional practical training (OPT) do not require the submission of biometrics through an Application Support Center (ASC). Additionally, a commenter stated that eliminating the 90-day EAD processing timeframe makes it difficult for F–1 nonimmigrant students to secure employment because OPT is only authorized for 12 months. A few commenters questioned security checks or suggested that DHS implement new requirements for F–1 nonimmigrant students.

*Response.* DHS declines to retain the current regulatory 90-day processing requirement for Form I–765 filings by F–1 nonimmigrant students. DHS remains committed to current processing timeframes for all Form I–765 applicants, including F–1 nonimmigrant students. When making plans to secure pre-completion or post-completion OPT, F–1 nonimmigrant students should consider the advance filing periods described in the regulations at 8 CFR 214.2(f)(11)(i)(B) and factor in Form I–765 processing times, which can be found on the USCIS Web site.[113] Additionally, F–1 nonimmigrant students who timely apply for STEM OPT extensions are provided with automatic extensions of their employment authorization for up to 180 days, which provides sufficient

flexibility in the event of unexpected delays. *See* 8 CFR 274a.12(b)(6)(iv).

The NPRM did not include a proposal regarding additional security checks for F–1 nonimmigrant students. Therefore, such changes would be outside the scope of this rulemaking. However, DHS notes that foreign nationals who apply for F–1 nonimmigrant visas undergo security checks before visa issuance. Additionally, USCIS conducts security checks on all F–1 nonimmigrant students on OPT before rendering a final decision on their Forms I–765. DHS may consider requiring additional security checks for F–1 nonimmigrant students in future rulemakings.

### ix. Expanding Automatic Extensions to Additional Categories

*Comment.* One commenter requested that DHS provide automatic 180-day extensions on all timely-filed, non-frivolous EAD extension applications, or in the alternative, that DHS provide automatic extensions to individuals in J–2 nonimmigrant status. The commenter reasoned that including J–2 status in the list of employment authorization categories that allow for automatic extension comports with the proposed rationale for such extensions since adjudication of an underlying benefit request is not needed. Another commenter urged DHS to grant automatic EAD extensions to L–2, F–1 OPT, and H–4 nonimmigrants, in order to provide an incentive for employers to retain valued employees. More generally, some commenters recommended that DHS automatically extend employment authorization for all work-authorized applicants, including H–4 and L–2 nonimmigrants and categories of applicants seeking employment-authorization based on humanitarian circumstances, regardless of their current basis for work authorization, in order to prevent gaps in employment.

*Response.* DHS declines to provide automatic EAD extensions (and employment authorization, if applicable) to eligibility categories beyond those listed in the Supplementary Information to the NPRM at this time. However, DHS may announce in the future additional categories of individuals eligible for such automatic extensions on the USCIS Web site. *See* final 8 CFR 274a.13(d)(1)(iii). While granting automatic EAD extensions to the additional nonimmigrant categories suggested by commenters may encourage employers to retain employees and minimize the risk of gaps in employment, such an expansion would undermine DHS's national

security and fraud prevention goals, as described above. DHS is limiting availability of automatic EAD extensions in a manner that reasonably ensures that the renewal applicant is eligible for employment authorization, thereby minimizing the risk that ineligible individuals will receive immigration benefits.

In addition, DHS disagrees with the commenter's assertion that the J–2 nonimmigrant category comports with the conditions stated in the NPRM and adopted in this final rule for automatic EAD extensions. DHS is limiting automatic extensions to those renewal applicants who, among other criteria, either continue to be employment authorized incident to status beyond the expiration of their EADs or are applying for renewal under a category that does not first require the adjudication of an underlying benefit request. J–2 nonimmigrants do not fit within the regulatory criteria because they must first receive approvals of their underlying requests for extension of J–2 nonimmigrant stay before they are eligible for employment authorization. The same is true with respect to the suggestion to expand the automatic extension provision to L–2, F–1 OPT, and H–4 nonimmigrants. Renewal of employment authorization for such nonimmigrants is dependent on the prior adjudication of underlying benefit requests. DHS cannot be reasonably assured these classes of individuals will remain eligible for employment authorization until full adjudication of the Form I–765 application is complete. L–2 nonimmigrants, for example, include both spouses and dependent children of L–1 nonimmigrants. However, only L–2 nonimmigrant spouses are eligible for employment authorization. USCIS must adjudicate the Form I–765 application to determine the applicant's valid L–2 nonimmigrant status, the L–1 principal's current nonimmigrant status, and evidence of the marital relationship. For F–1 OPT nonimmigrants, USCIS must determine whether the F–1 nonimmigrant student has obtained a Form I–20 A–B/I–20ID, Certificate of Eligibility of Nonimmigrant F–1 Student Status, endorsed by his or her Designated School Official within the past 30 days. If the applicant is an F–1 nonimmigrant student seeking STEM OPT, USCIS must examine the student's degree and determine whether the student's employer is an E-Verify employer, among other requirements. If the applicant is an F–1 nonimmigrant student seeking off-campus employment under the sponsorship of a qualifying

---

[113] *See https://egov.uscis.gov/cris/ processTimesDisplayInit.do* for service center processing times. At present, Forms I–765 filed by F–1 nonimmigrants pursuant to 8 CFR 274a.12(c)(3) are processed in 3 months.

international organization, USCIS must review the international organization's letter of certification along with the timely endorsed Form I–20.[114] DHS has similarly addressed this issue with respect to H–4 nonimmigrants elsewhere in this Supplementary Information. DHS does not agree that the list of categories eligible for automatic EAD extensions should be expanded to include these additional categories at this time.

x. State Driver's License Issues

*Comment.* Several commenters noted that they cannot obtain or renew a driver's license without a valid visa or EAD, and if this results in longer waits for EADs, it would delay their ability to obtain a driver's license, thereby interrupting their daily routines. One commenter recommended granting EADs for longer periods in order to closely align with state driver license renewal periods. An individual commenter suggested that DHS notify all state departments of motor vehicles (DMVs) so that the DMVs can update their current license issuance policies to account for automatic extensions of EADs. This commenter also asked DHS to provide a list of documentary evidence that can be presented to DMV officials to establish that a renewal EAD application was timely filed and that employment authorization was automatically extended.

*Response.* DHS remains committed to current processing timeframes and expects to adjudicate Form I–765 applications within 90 days. Regarding the commenter's request for documentary evidence, DHS generally issues applicants a Notice of Action (Form I–797C) within two weeks of filing a renewal EAD application. An individual may choose to present the Form I–797C to a DMV, depending on state DMV rules, in combination with his or her expired EAD that has been automatically extended pursuant to this rule.[115] The combination of the qualifying Form I–797C and expired EAD is the equivalent of an unexpired EAD for purposes of this rule. *See* final 8 CFR 274a.13(d)(4). USCIS will provide guidance to stakeholders, including DMVs, on its Web site to help clarify the provisions regarding automatically extended EADs as established by this rule. However, comments related to individual state driver's license

requirements are outside the scope of this rulemaking.

xi. Form I–9 and Automatic Extensions of EADs

*Comment.* One commenter suggested updating the instructions for Form I–9 and the M–274 Handbook for Employers: Guidance for Completing Form I–9 (Employment Eligibility Verification Form)) to include automatic extensions of EADs. This commenter also asked that DHS place stickers on EAD cards during biometrics appointments to indicate automatic extensions, which would serve as evidence of ongoing employment authorization and maintenance of status, and thus reduce confusion during the I–9 process.

*Response.* DHS has determined that it is not necessary to amend the Form I–9 instructions to include information regarding automatic extensions of EADs because this rule does not change the list of acceptable documents for Form I–9 purposes. In addition, DHS believes that such detailed information regarding the automatic extension of EADs is better placed in guidance materials. DHS will update all relevant public guidance materials on I–9 Central [116] concurrently with the publication of this final rule. DHS also intends to include information regarding the automatic extension of EADs along with other comprehensive revisions to the M–274 Handbook for Employers that are currently underway.

DHS declines to place stickers on EADs at biometrics appointments for several reasons. Most EAD renewal applicants are not requested to appear for biometrics appointments. In addition, DHS has determined that considering the wide variety of affected categories and the number of potential extensions involved, providing extension stickers poses security concerns and is not economical or operationally feasible.

xii. National Security and Fraud Concerns

*Comment.* Some commenters criticized DHS's national security concerns and fraud prevention rationales as insufficient to support an elimination of the regulatory 90-day EAD processing timeframe, especially as DHS had not provided any data related to fraud or abuse in the program. These commenters further stated that DHS's security rationale did not explain why issuance of an interim EAD could not be based on a USCIS-issued fee receipt showing that Form I–765 had been

pending for 90 days, given that USCIS routinely issues temporary Form I–551 stamps in foreign passports upon presentation of a Form I–90 fee receipt. Commenters faulted DHS for describing operational realities as a compelling reason to eliminate the interim EAD option, especially in light of a number of non-secure forms currently being submitted in some circumstances. Commenters suggested that the Form I–797C receipt could be designated an acceptable employment authorization document under current 8 CFR 274a.13(d), given that USCIS has been willing to issue a number of non-secure forms of employment authorization to some applicants.

*Response.* To support the Department's vital mission of securing the nation from the many threats it faces, DHS has determined that the elimination of both the 90-day EAD processing timeframe and the issuance of interim EADs from current regulations is necessary. This change at final 8 CFR 274a.13(d) reflects DHS's continued attention to security and commitment to improving adjudication processes, including technological advances in document production, to reduce fraud and address threats to national security.

The main security and fraud risks underpinning DHS's decision to remove the 90-day EAD adjudication timeline and interim EAD requirements flow from granting interim EADs to individuals before DHS is sufficiently assured of their eligibility and before background and security checks have been completed. DHS believes that any reduction in the level of eligibility and security vetting before issuing evidence of employment authorization, whether on an interim basis or otherwise, would both be contrary to its core mission and undermine the security, quality, and integrity of the documents issued.

In addition, the 90-day timeline and interim EAD requirements would hamper DHS's ability to implement effective security improvements in cases in which those improvements could extend adjudications in certain cases beyond 90 days. Given the inherent fraud and national security concerns that flow from granting immigration benefits (including EADs) to individuals prior to determining eligibility, DHS believes that the 90-day timeframe and interim EAD provisions at current 8 CFR 274a.13(d) do not provide sufficient flexibility for DHS to enforce and administer the immigration laws while enhancing homeland security.

Moreover, retaining the interim EAD provision would continue to fundamentally undermine overall

---

[114] *See* 8 CFR 214.2(f)(9)–(11).

[115] Depending on filing volume, USCIS may take longer than 2 weeks to issue Notices of Action (Forms I–797C).

[116] *See https://www.uscis.gov/i-9-central.*

operational efficiencies to the detriment of all applicants for employment authorization. In keeping with DHS secure document issuance policies, implementation of the interim EAD provision calls for DHS to issue tamper-resistant Form I–766 EADs.[117] Issuance of interim Forms I–766 requires the same resources as the issuance of full-duration Forms I–766, because both cards must be produced using the same operational processes at the same secure, centralized card production facility. Elimination of this costly and duplicative process is necessary to better ensure that sufficient resources are dedicated to adjudicating requests for employment authorization, rather than being diverted to monitoring the 90-day adjudication timelines and producing both interim EADs and full-duration EADs. In so doing, DHS believes that the EAD adjudication process will be more efficient and EAD processing timelines will decrease overall.

DHS rejects commenters' suggestions to designate alternate interim documents that do not evidence employment authorization or contain sufficient security features, such as the Form I–797C receipt notice, in lieu of EADs. For decades, Congress, legacy INS, and DHS have been concerned about the prevalence of fraudulent documents that could be presented to employers to obtain unauthorized employment in the United States. To address these concerns, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104–208, which strengthened the requirements for secure documentation used in the employment eligibility verification process.[118] Legacy INS, for its part, also took steps to reduce the number of insecure documents in circulation. For example, as described in the NPRM, legacy INS created the new, counterfeit-resistant Form I–766, which is produced at a centralized secure location, to replace the significantly less secure Form I–688B, which was produced at local offices and was easily counterfeited. In addition, legacy INS and DHS have sought to eliminate the issuance of ad hoc or otherwise insecure documents that could be used by individuals as temporary evidence of employment authorization. To reintroduce the issuance of ad hoc or

insecure documents to evidence employment authorization in this rule would be a step backwards from DHS's goals in this area.

The instances in which DHS issues temporary documentation concern lawful permanent residents and, therefore, are distinguishable.[119] First, temporary documentation is only issued to lawful permanent residents after they are admitted in that immigration status. Second, USCIS verifies an individual's identity and status before issuing temporary evidence of lawful permanent resident status. Such verification may include inputting fingerprint and photograph information into the Customer Profile Management System-IDENTity Verification Tool (CPMS–IVT).[120]

While DHS strongly believes that it is necessary to eliminate the 90-day adjudication timeline and the requirement to issue interim EADs, the Department understands the need for temporary employment authorization in cases involving application processing delays. For this reason, this rule authorizes automatic extensions of employment authorization, but only for defined classes of individuals. First, DHS is limiting the automatic extension of EADs (and employment authorization, if applicable) to certain renewal applicants, rather than initial filers. As previously mentioned, this limitation meets DHS's policy to issue EADs to only those individuals who have been determined eligible. Second, to further protect the integrity of the immigration process, DHS is requiring that renewal applications be based on the same employment authorization category as that indicated on the expiring EAD, with the narrow exception of TPS beneficiaries, as described earlier. *See* final 8 CFR 274a.13(d)(1)(ii). Because the resulting Form I–797C indicates the employment authorization category cited in the application, this requirement helps to ensure, both to DHS and to employers that such a notice was issued in response to a timely filed renewal application. Third, automatic extensions are restricted to individuals who

continue to be employment authorized incident to status beyond the expiration that is annotated on the face of their EADs or who are seeking to renew employment authorization in a category in which eligibility for such renewal is not dependent on a USCIS adjudication of an underlying benefit request. *See* 8 final CFR 274a.13(d)(1)(iii). This provision helps to ensure that individuals are eligible to receive automatic extensions of their EADs under this rule only if there is reasonable assurance of their continued eligibility for issuance of a full duration EAD.

### xiii. Separate Rulemaking for the Elimination of the EAD 90-Day Processing Timeframe

*Comment.* Some commenters stated that the proposal to eliminate the 90-day rule must be promulgated through a separate rulemaking so that the public has proper notice and opportunity to comment. These commenters suggested that DHS intentionally buried the elimination of this provision at the end of a lengthy NPRM that in most other respects seeks to ease the burdens on the employment of qualified nonimmigrant and immigrant workers. According to commenters, some businesses and individuals may not realize that this rule contains a provision that will adversely affect them.

*Response.* DHS disagrees that the elimination of the 90-day processing timeframe for EADs merits or requires its own rulemaking. The public was given proper notice of the proposed policy in this rulemaking, and the proposal was fully described in the Summary paragraph at the beginning of the NPRM. The thousands of commenters that submitted feedback on this specific issue is evidence that the public had an opportunity to comment, and in fact did comment, on this issue.

### xiv. Requests for Premium Processing

*Comment.* Several commenters asked USCIS to offer premium processing for Forms I–765, with some individuals asking the fee to be set at a reasonable level. One commenter also requested that premium processing be available for travel document requests.

*Response.* In order to balance workloads and resources in a way that ensures timely customer service across all product lines, DHS will not offer premium processing of Form I–765 applications or travel document requests at this time. DHS declines to adopt this suggestion, but may reconsider it in the future if resources permit.

---

[117] *See* USCIS Memorandum from Michael Aytes,"Elimination of Form I–688B, Employment Authorization Card'' (Aug. 18, 2006).

[118] *See* Conference Report on H.R. 2202, Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 142 Cong. Rec. H11071–02 (Sept. 25, 1996).

[119] Generally, a temporary Form I–551 (Permanent Resident Card) consists of either a Form I–551 stamp in the lawful permanent resident's foreign passport or a Form I–551 stamp on Form I–94 that also contains the lawful permanent resident's photograph.

[120] CPMS–IVT is a Web-based application that processes, displays and retrieves biometric and biographic data from DHS's fingerprint identity system, the Automated Biometric Identification System (IDENT). For more information, visit USCIS's Web site at *https://www.uscis.gov/news/alerts/uscis-implement-customer-identity-verification-field-offices.*

**82464** **Federal Register** / Vol. 81, No. 223 / Friday, November 18, 2016 / Rules and Regulations

*O. Employment Authorization and Reverification on Form I–9*

1. Description of Final Rule and Changes From NPRM

Employers are required to verify the identity and employment authorization of all individuals they hire for employment on Form I–9. For those individuals whose employment authorization or EADs expire, employers must reverify employment authorization at the time of expiration. DHS is finalizing the changes related to the Form I–9 verification process as proposed, with the exception of minor, technical revisions, in order to conform to the new automatic employment authorization provision established by this rule.[121] *See* final 8 CFR 274a.2(b)(1)(vii). In addition, this rule finalizes the proposal providing that a facially expired EAD is considered unexpired for Form I–9 purposes if it is used in combination with a Notice of Action (Form I–797C, or successor form) indicating the timely filing of the application to renew the EAD (provided the Form I–797C lists the same employment authorization category as that listed on the expiring or expired EAD, except in the case of TPS beneficiaries, and has been automatically extended under this rule). *See* final 8 CFR 274a.13(d)(4). Newly hired employees completing Forms I–9 may choose to present their employers with this document combination to show both identity and employment authorization.[122] When the expiration date on the face of an EAD previously used for the Form I–9 is reached, a renewal applicant whose EAD has been automatically extended under this rule and who is continuing in his or her employment with the same employer should, along with the employer, update the previously completed Form I–9 to reflect the extended expiration date based on the automatic extension while the renewal is pending. The need for reverification of employment authorization is not triggered until the expiration of the additional period of validity granted through the automatic

extension provisions discussed above. *See* 8 CFR 274a.2(b)(1)(vii).

2. Public Comments and Responses

i. Reverification

*Comment.* Several commenters expressed a concern that the proposed automatic extension of EADs will confuse the Form I–9 reverification process because employers will have no way to know, without the help of immigration attorneys, if a renewal application was filed under the same category as the individual's current EAD, and thus no way to know if the automatic extension applies. A commenter also suggested updating the Form I–9 instructions and M–274 Handbook for Employers to reflect the automatic extensions of EADs.

*Response.* DHS believes that the reverification process is fairly straightforward and can be completed without the assistance of an attorney. Employers will know whether an EAD has been automatically extended under this rule by checking whether the eligibility category stated on the individual's current EAD is the same as the eligibility category stated on the individual's Form I–797C receipt notice,[123] and whether the EAD renewal category is listed on the USCIS Web site as a qualifying category for automatic EAD extensions. The Notice of Action receipt (Form I–797C) that USCIS issues to an applicant who files a Form I–765 application contains the EAD eligibility category. The EAD currently in the employee's possession, combined with a receipt notice for a timely filed EAD application under the same eligibility category, is evidence of employment authorization for Form I–9 purposes.

DHS is taking additional steps to minimize potential confusion among employers. DHS will engage in public outreach in connection with this rule. USCIS will update the Form I–797C receipt notices to include information about automatic extensions of employment authorization based on renewal applications and to direct applicants to the USCIS Web site for more information about qualifying employment categories. USCIS will also update the I–9 Central Web page on its Web site to provide guidance to employers regarding automatically extended EADs and proper completion of Form I–9. DHS intends to include this information in a future revision to the M–274 Handbook for Employers. Because DHS did not propose changes to the Form I–9 instructions to add

information regarding automatic extensions of EADs in the proposed rule, DHS is unable to add this information to the form instructions in the final rule. DHS may consider such an addition in a future revision of the Form I–9 instructions under the PRA process.

ii. Use of Form I–9 To Change Employment Authorization Categories

*Comment.* Several commenters suggested that DHS allow foreign workers in H nonimmigrant status who are eligible for employment authorization based on compelling circumstances to "change status" by filling out Form I–9 and using the EAD issued based on compelling circumstances as evidence of employment authorization.

*Response.* DHS was unable to discern the commenters' specific concerns. However, DHS believes that the discussion below will alleviate any confusion about the Form I–9 process in these circumstances. Employers are responsible for proper completion and retention of Form I–9. *See* INA 274A(b), 8 U.S.C. 1324a(b). DHS does not use the Form I–9 process as a vehicle for workers to change their immigration status. Requests for EADs must be made on a separate form, currently the Application for Employment Authorization, Form I–765. The Form I–9 of an individual employed as an H–1B nonimmigrant who also receives an EAD while maintaining H–1B nonimmigrant status does not need to be updated merely based upon the individual's receipt of the EAD. If an H–1B nonimmigrant worker who also has been issued an EAD based on compelling circumstances obtains employment with a non-H–1B employer, then the individual may present his or her EAD to the non-H–1B employer to comply with the Form I–9 requirements, rather than presenting evidence based on the H–1B nonimmigrant status.

iii. Comments Suggesting Additional Revisions

*Comment.* A commenter suggested that DHS amend 8 CFR 274a.12(a) and Form I–9 to confirm that foreign nationals authorized for employment incident to status do not need to obtain an EAD. The commenter argued that the requirement in this regulatory provision to obtain an EAD effectively nullifies the portion of the provision that provides for employment authorization incident to status. The commenter noted that the suggested clarification would be even more important if the 90-day adjudication rule is eliminated.

---

[121] The technical changes include changing the cross reference in the regulatory text from "§ 274a.13(d)" to "8 CFR 274a.13(d)" in two places, and moving the parenthesis so that the reference to the Notice of Action form number reads, "(Form I–797)." In addition, this rule replaces "alien" with "individual" in keeping with the terminology of the paragraph.

[122] An automatically extended EAD in combination with the Notice of Action, Form I–797C, described in this rule constitute an unexpired EAD (Form I–766) under List A for Form I–9 purposes. *See* revised 8 CFR 274a.13(d)(4); 8 CFR 274a.2(b)(1)(v)(A)(*4*).

[123] This rule provides an exception for a TPS beneficiary whose EAD may not match the eligibility category on the receipt notice.

AC00208

*Response.* The suggested amendments to both 8 CFR 274a.12(a) and Form I–9 are beyond the scope of this rulemaking. Contrary to the commenter's statement, the part of 8 CFR 274a.12(a) that requires affected individuals to obtain an EAD does not nullify such individuals' employment authorization incident to status. Rather, the provision lists certain categories of foreign nationals whose employment authorization must be evidenced by an EAD. Workers within the listed categories are employment authorized incident to status independent of their receipt of an EAD or other evidence of employment authorization.

*Comment.* A commenter recommended updating the M–274 Handbook for Employers to permit Form I–9 verification of H–1B nonimmigrant workers whose Form I–129 petition seeking an extension of status or change of employer was filed during the 10-day or 60-day grace periods.

*Response.* The current M–274 Handbook for Employers contains information regarding Form I–9 completion for H–1B nonimmigrant workers who extend their stay with the same employer or who seek a change of employers. *See* M–274, *Handbook for Employers,* page 22. This guidance applies to those H–1B nonimmigrant workers whose petitions are filed during the 10-day or 60-day grace periods. While this rule does not change that guidance, DHS will consider whether additional clarifications are necessary to the M–274 Handbook for Employers and other guidance materials, such as USCIS's I–9 Central Web page.

*Comment.* A commenter suggested, as an alternative to eliminating the regulatory provisions establishing the 90-day processing timeframe and the issuance of interim EADs, that the regulation instead be amended for Form I–9 purposes to require foreign workers to present to their employers List B identification documentation along with a Form I–797C receipt notice issued by USCIS to acknowledge the filing of a Form I–765 application. In the alternative, the commenter suggested that USCIS amend the Form I–9 instructions to require employers to confirm the pendency of the Form I–765 application by checking the USCIS Web site for case status information and annotating the Form I–9 accordingly.

*Response.* DHS declines to adopt the commenter's suggestions. The Form I–9 process mandates that employees present their employers with evidence of current employment authorization and identity. *See* 8 CFR 274a.2(b)(1)(v). A Form I–797C receipt for the filing of a Form I–765 application, standing on

its own, does not establish employment authorization except when the filing was to replace a lost, stolen, or damaged EAD.[124] It is merely evidence that an application was filed with USCIS and, therefore, would not be sufficient to satisfy the Form I–9 requirements. For the reasons stated in the proposed rule, extending employment authorization to categories in which DHS lacks reasonable assurance of continued eligibility for employment authorization raises fraud and national security risks that DHS is striving to avoid. Regarding the suggestion by the commenter to require employers to check the case status of an employee's Form I–765 application, DHS believes that such a requirement raises privacy concerns and would introduce changes to the verification process that are beyond the scope of this rulemaking.

*P. Other Comments*

DHS received a number of comments related to matters falling outside the topics discussed above. These comments are addressed below.

1. Procedural Aspects of the Rulemaking

*Comment.* Some commenters submitted feedback about general immigration issues. A few commenters expressed support for, or opposition to, general immigration to the United States. Comments ranged from requesting that DHS discontinue immigration to the United States, to underscoring the need for comprehensive immigration reform, to general support for immigration.

*Response.* DHS is charged with administering the immigration laws enacted by Congress. Only Congress can change those laws. The comments described immediately above are therefore outside the scope of this rulemaking. DHS, however, is committed to strengthening the security and integrity of the immigration system through efficient and consistent adjudications of benefits, fraud detection, and enhanced customer service. DHS promotes flexible and sound immigration policies and programs as well as immigrant participation in American civic culture.

*Comment.* Several commenters objected to the ability of non-U.S. citizens to submit comments on the proposed rule.

*Response.* DHS welcomed comments from all interested parties without regard to citizenship or nationality. This approach is consistent with the statutory requirements established by Congress in the APA's notice-and-comment provision, which do not include a citizenship or nationality requirement and place priority on allowing all interested persons to participate in rulemaking proceedings.

2. Assertions That the Employment-Based Immigration System Enables Slavery and Servitude to Employers

*Comment.* DHS received numerous comments referencing the alleged slavery, servitude, or bondage of nonimmigrant workers in the United States. A number of commenters stated that the nonimmigrant visa and adjustment processes are tantamount to modern slavery or bonded labor, and that employers exploit and abuse workers subject to these processes. Other commenters stated that employers do not allow nonimmigrant workers to have a say in working conditions, leave, and other benefits.

*Response.* DHS takes allegations of worker slavery, bondage, and exploitation very seriously. There are statutes and regulations governing the terms and conditions of nonimmigrant employment that are intended for the protection of both U.S. and nonimmigrant workers. Commenters and nonimmigrant workers who believe they are being exploited by employers have a number of options to report misconduct. Those suffering abuse or exploitation are encouraged to immediately contact their local police department. DHS has created the Blue Campaign to combat human trafficking and aid victims. More information about the Blue Campaign can be found at *www.dhs.gov/blue-campaign.* Federal law also prohibits discrimination based on citizenship status, immigration status, national origin, and other protected characteristics. The Department of Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices enforces the anti-discrimination provision of the INA, which prohibits discrimination in hiring, firing, recruitment and referral for a fee, as well as discriminatory documentary practices in the employment eligibility verification (Form I–9 and E-Verify), based on citizenship, immigration status, or national origin. *See* INA section 274B; 8 U.S.C. 1324b. More information about reporting an immigration-related unfair employment practice may be found at *www.justice.gov/crt/office-special-counsel-immigration-related-unfair-*

---

[124] 8 CFR 274a.2(b)(1)(vi)(A) provides that when a worker shows a Form I–797C receipt for the filing of a Form I–765 application to replace a lost, stolen, or damaged EAD, this type of Form I–797C is considered a receipt for a Form I–9 List A document evidencing identity and employment authorization valid for 90 days.

*employment-practices.* The U.S. Equal Employment Opportunity Commission (EEOC) enforces Title VII of the Civil Rights Act of 1964 (Title VII), as amended, and other federal laws that prohibit employment discrimination based on race, color, national origin, religion, sex, age, disability and genetic information. More information about Title VII and the EEOC may be found at *www.eeoc.gov.* DHS also notes that DOL's Wage and Hour Division investigates allegations of employee abuse. Information about reporting a potential wage and hour violation can be found at *www.dol.gov* or by calling 1–866–4USWAGE (1–866–487–9243).

In addition, this rule enhances worker whistleblower protection by conforming regulations governing the H–1B program to certain policies and practices developed to implement the ACWIA amendments to the INA. *See* final 8 CFR 214.2(h)(20). Section 413 of ACWIA amended the INA by adding section 212(n)(2)(C), which makes it a violation for an H–1B employer to retaliate against an employee for providing information to the employer or any other person, or for cooperating in an investigation, with respect to an employer's violation of its LCA attestations. *See* INA 212(n)(2)(C)(iv), 8 U.S.C. 1182(n)(2)(C)(iv). Thus, employers may not intimidate, threaten, restrain, coerce, blacklist, discharge, or in any other manner discriminate against an employee for disclosing information that the employee reasonably believes evidences a violation of any rule or regulation pertaining to the statutory LCA attestation requirements, or for cooperating or attempting to cooperate in an investigation or proceeding pertaining to the employer's LCA compliance. *Id.*

Section 212(n)(2)(C) of the INA also requires DHS to establish a process under which an H–1B nonimmigrant worker who files a complaint with DOL regarding such illegal retaliation, and is otherwise eligible to remain and work in the United States, "may be allowed to seek other appropriate employment in the United States for a period not to exceed the maximum period of stay authorized for such nonimmigrant classification.'' *See* INA 212(n)(2)(C)(v), 8 U.S.C. 1182(n)(2)(C)(v). This final rule formalizes DHS's current policy regarding these protections, as described above. *See* final 8 CFR 214.2(h)(20).

Through this final rule, DHS also provides flexibility to certain nonimmigrants with approved Form I–140 petitions who face compelling circumstances that warrant an independent grant of employment

authorization. *See* final 8 CFR 204.5(p)(1). Such compelling circumstances may, depending on the circumstances, include employer retaliation.

*Comment.* Commenters also stated that employers are effectively in control of the lives of nonimmigrant workers. These commenters stated that if a nonimmigrant worker is fired or laid off by an employer, that worker is then faced with having to quickly find new employment or to return to his or her home country. According to commenters, this dynamic has created a sense of dependency on the employer, and the resulting uncertainty causes many nonimmigrant workers to be unwilling to purchase homes and make other long-term life investments in the United States.

*Response.* DHS is sympathetic to these comments. Through this final rule, DHS seeks to enhance worker mobility and ease the burdens nonimmigrant workers face when employment ends, either voluntarily or as a result of being laid off or terminated. DHS makes a grace period available to certain high-skilled nonimmigrant classifications (H–1B, H–1B1, O–1, E–1, E–2, E–3, L–1, and TN classifications) whose work ceases for up to 60 consecutive days during each period of petition validity (or other authorized validity period). *See* final 8 CFR 214.1(l)(2). The final rule also extends grace periods to dependents of eligible principal nonimmigrant workers. *Id.* The purpose of the 60-day grace period is to enable the nonimmigrant workers to seek new nonimmigrant employment and thus be able to extend or change their nonimmigrant status while remaining in the United States, should their employment conclude during the relevant validity period.

*Comment.* Some commenters explained that it is difficult for workers who have already received an approved Form I–140 petition with one employer to find a new employer who is willing to restart the immigrant visa petition process. Because of visa backlogs and country quotas, many nonimmigrants must wait years before they are eligible to adjust status to lawful permanent residence, and some commenters argued that the difficulty of the process has led workers to remain in the same job for years without promotions or salary increases. Commenters stated that the inability of nonimmigrant workers to accept promotions and to advance their careers has created a sense of hopelessness and a lack of motivation to grow skills.

*Response.* DHS is sympathetic to these comments and believes that this

rule includes many provisions, as discussed more fully throughout the preamble, that will facilitate workers' ability to change jobs while waiting for immigrant visa availability, including the following: Expanded priority date retention, changes to the automatic revocation process, clarification on INA 204(j) portability, and the discretionary provision authorizing independent work authorization to beneficiaries who demonstrate compelling circumstances. *See* final 8 CFR 204.5(e)(1), (2) and (p); and 205.1(a)(3)(iii)(C) and (D). Additionally, individuals with approved Form I–140 petitions who are in H–1B nonimmigrant status may benefit from the H–1B portability provisions at final 8 CFR 214.2(h)(2)(i)(H).

### 3. Limits on Employment-Based Immigration by Country

*Comment.* Several commenters suggested that the per-country limits on available immigrant visas disproportionately discriminate against individuals from India, China, the Philippines, and Mexico. Some commenters stated that the system should be changed so that the number of available immigrant visas would be proportionate to the percentage of individuals from India and China working as professionals in the United States on H–1B visas. Commenters noted that the per-country limits fail to account for high population countries with larger numbers of well-educated and high-skilled professionals given that smaller countries have the same percentage of visas available to them. One commenter suggested that the per-country limits are not compatible with the equitable concept of responding to applicants on a first-come, first-served basis. Several commenters suggested that DHS increase the number of available immigrant visas or remove the per-country limits completely, both to speed up processing times and to lessen the adverse impact on Indian and Chinese nationals. Another commenter stated that the per-country limits are illogical, unfair and unpredictable, causing individuals from India and China to suffer unfairly. One commenter stated that merit should be the metric for retaining high-skilled workers, not country of birth.

*Response.* DHS understands the frustration expressed by commenters who have begun the process to obtain lawful permanent residence, but who are subject to long waits before their priority date becomes current as a result of the per-country visa limits applicable to their country of birth. However, DHS is unable to make immigrant visas

available without regard to an individual's country of birth as these are statutory requirements under the INA. *See* generally INA 202, 8 U.S.C. 1152. In particular, INA 202(a)(2), requires that, in any fiscal year, individuals born in any given country generally may be allocated no more than seven percent of the total number of immigrant visas. Thus, only Congress can change the per-country limitations in this statutory provision. DHS notes that this Administration supported lifting the per-country cap as a part of commonsense immigration reform legislation that has considered and passed the U.S. Senate in 2013.

### 4. Guidance on National Interest Waivers

*Comment.* Some commenters stated that individuals applying for national interest waivers (NIWs) under the employment-based second preference immigrant visa (EB–2) category should be able to file their applications for adjustment of status immediately upon having their Form I–140 petitions approved, instead of enduring long waiting periods due to EB–2 immigrant visa backlogs. The commenter explained that those who qualify for NIWs would help improve the U.S. economy, wages and working conditions of U.S. workers, and educational and training programs for U.S. children and underqualified workers. Commenters compared the U.S. immigration system with other countries' systems and stated that the other countries facilitate permanent status and access to benefits faster than the United States. Another commenter requested that physicians granted NIWs be considered under the first preference employment-based immigrant visa category (EB–1) instead of the second preference as this change would attract more international physicians to come to the United States at a time when we are facing a shortage of physicians. Another commenter requested that DHS eliminate the per-country limits for NIW beneficiaries.

*Response.* DHS appreciates the concerns expressed by commenters regarding individuals who are subject to long waits for immigrant visas. However, DHS's ability to provide immigrant visas without regard to preference category is constrained by the statutory requirements set forth by Congress.

DHS agrees that those who qualify for NIWs could help contribute to research and medical advances, the U.S. economy, wages and working conditions of U.S. workers, and educational and training programs. Individuals who qualify for the NIW are already able to take advantage of a faster path to an immigrant visa because they are exempt from the labor certification process administered by DOL and may directly petition DHS for an immigrant visa. *See* INA 203(b)(2)(B), 8 U.S.C. 1153(b)(2)(B). However, DHS notes that by enacting INA 203(b)(1) and (b)(2), 8 U.S.C. 1153(b)(1) and (b)(2), Congress statutorily defined first- and second-preference (EB–1 and EB–2) categories for employment-based immigration, and specified that only those in the EB–2 category are eligible for a national interest waiver and that they too are subject to their respective country's annual visa allocation for that preference category. Additionally, Congress specifically provided that certain physicians working in shortage areas or veterans facilities may be eligible for NIWs. *See* INA 203(b)(2)(B)(ii), 8 U.S.C. 1153(b)(2)(B)(ii). Any changes to these provisions would need to be made by Congress. DHS notes, however, that physicians may also be eligible to seek immigrant visas under the EB–1 classification as individuals with extraordinary ability.

### 5. The Revised Visa Bulletin System

*Comment.* Several commenters submitted views on the recently revised Visa Bulletin system announced by DOS and DHS on September 9, 2015, and the subsequent revisions made on September 25, 2015, to certain dates on the October 2015 Visa Bulletin. Commenters expressed their disappointment at the September 25 revisions. One commenter requested that DHS provide relief in this final rule to the people who were affected by these revisions. Other commenters requested a better Visa Bulletin system. Finally, one commenter recommended that USCIS should continue to advance cut-off dates in the Visa Bulletin.

*Response.* DHS appreciates the concerns raised by individuals who may have been affected by the September 25 revisions to the October 2015 Visa Bulletin. However, further revisions to the Visa Bulletin system or dates indicated in the Visa Bulletin must be accomplished in coordination with DOS and are outside the scope of this rulemaking.

### Q. Public Comments and Responses on Statutory and Regulatory Requirements

### 1. Regulatory Impact Analysis

*Comment.* Some commenters questioned the validity of the economic cost-benefit analysis in the Regulatory Impact Analysis (RIA) that DHS developed in support of the rule. These commenters expressed concern as to whether the economic analysis adhered to the intent and principles of Executive Orders 12866 and 13563. Another commenter believed that the economic analysis was biased against U.S. workers in favor of foreign workers.

*Response.* DHS appreciates the comments received concerning the cost-benefit economic analysis in the RIA. However, DHS does not agree that the economic analysis is invalid or fails to comply with Executive Orders 12866 and 13563, or that the analysis is biased against U.S. workers in favor of foreign workers. DHS developed the RIA supporting this rule in compliance with these Executive Orders to assess and quantify, to the extent possible, the costs and benefits of this rule as well as the number of individuals that could be affected by the provisions of the rule. DHS places a high priority on conducting its regulatory impact analysis in an objective, fact-based manner with the highest degree of transparency and integrity in order to support and inform the regulatory process.[125] DHS discusses the impact of this rule on U.S. workers in more detail in other sections of Part Q.

### 2. General Economy

*Comment.* Many commenters stated that this rule would be good for the economy in general terms. Some commenters cited the positive effects of high-skilled foreign labor on the overall economy because of the stimulating effects in other sectors of the economy. Other commenters suggested this rule would stimulate the economy as principal beneficiaries and their dependents would contribute by accepting new jobs. Commenters cited the numbers of immigrants who hold patents or Nobel prizes and the growing number of entrepreneurs. Commenters also suggested that providing further flexibilities to these immigrants would foster more innovation and entrepreneurship.

Many commenters agreed that increased stability while waiting to adjust status would encourage these high-skilled workers to more fully contribute to the economy by making increased investments. Some high-skilled workers expressed interest in making purchases or investments—such as buying houses or cars, traveling abroad, or making retirement contributions—but refrained from doing so due to their inability to predict their

---

[125] The full Regulatory Impact Analysis published with the NPRM is available at *https://www.regulations.gov/#!documentDetail;D=USCIS-2015-0008-0270*.

**82468** **Federal Register** / Vol. 81, No. 223 / Friday, November 18, 2016 / Rules and Regulations

immigrant status. They also suggested that these kinds of purchases would produce many ripple effects on other industries. For example, investments in real estate would produce positive ripple effects in the construction industry. High-skilled workers also expressed a desire to invest in their local communities, but that they refrain from making such investments because they are uncertain how long they will be able to remain in those communities based on their immigration status. Other high-skilled workers commented that the lack of stability during the adjustment process caused many high-skilled foreign workers to invest in their native countries by sending back money, business, and talent. One high-skilled worker provided the example of students who come to the United States to study in STEM fields, and later return to their home countries due to the difficulties and long wait times for adjusting status in the United States. The commenter stated that the return of these foreign workers to their native countries results in losses to the United States of human capital, development of new technologies, revenue, and jobs. High-skilled workers also argued that foreign workers strengthen the U.S. economy by paying taxes, including making contributions to Social Security and Medicaid. However, these high-skilled workers felt they receive few benefits while waiting to adjust status. For example, they expressed frustration with the inability to obtain federal student loans for additional education for themselves and their children. The commenters also noted that the dependent children of high-skilled workers are not able to work and earn supplemental income while pursuing higher education, which adds to the financial constraints many immigrant families experience.

DHS also received other general comments concerning the economy in which the commenters recommended that DHS allow market supply-and-demand forces to dictate the responses to business needs for foreign workers. Other commenters asserted that only 1 to 2 percent of high-skilled foreign workers would benefit from the changes outlined in this rule.

Finally, commenters also expressed concern over the negative effects that both legal and illegal immigration have on wages, the economy, schools, the deficit, and the environment, among other things.

*Response.* DHS appreciates the comments received concerning the effect of this rule on the U.S. economy. The rule recognizes the value added to the U.S. economy by retaining high-

skilled workers who make important contributions to it, including technological advances and research and development endeavors, which are correlated with overall economic growth and job creation.[126] Furthermore, this rule provides these workers with the stability and job flexibility necessary to continue to contribute to the U.S. economy while waiting to adjust their status. DHS believes that increased flexibility and mobility will encourage nonimmigrant workers to remain in the United States and continue to pursue LPR status, and thereby bolster our economy by making long-term purchases and continued investments in the United States. The commenters' request for USCIS to provide additional benefits, such as financial assistance for furthering education, is beyond the scope of this rule.

While DHS appreciates commenters questioning the overall reach of this rule and the assertion that only limited numbers of high-skilled foreign workers will be impacted by these provisions, DHS has made an effort to provide additional flexibilities to as many high-skilled foreign workers as possible while still adhering to its statutory limitations. DHS estimates the maximum number of foreign workers that will be impacted by this rule based on the best available information.

The aim of the INA 204(j) portability provisions is to standardize the existing porting process with additional clarifications; these provisions thus do not change the population of individuals who are eligible to port under section 204(j) of the INA. The regulatory provision authorizing employment authorization in compelling circumstances is intended to offer a stopgap measure for those nonimmigrants who have been sponsored for lawful permanent residence and need additional flexibility due to particularly difficult circumstances. DHS intentionally limited the availability of such

[126] *See* Hart, David, et al., ''High-tech Immigrant Entrepreneurship in the United States,'' Small Business Administration Office of Advocacy (July 2009), available at: *https://www.sba.gov/sites/default/files/rs349tot_0.pdf. See also* Fairlie, Robert., ''Open for Business: How Immigrants Are Driving Small Business Creation in the United States,'' The Partnership for a New American Economy (Aug. 2012), available at: *http://www.renewoureconomy.org/sites/all/themes/pnae/openforbusiness.pdf;* ''Immigrant Small Business Owners a Significant and Growing Part of the Economy,'' Fiscal Policy Institute (June 2012), available at: *http://www.fiscalpolicy.org/immigrant-small-business-owners-FPI-20120614.pdf;* Anderson, Stuart, ''American Made 2.0 How Immigrant Entrepreneurs Continue to Contribute to the U.S. Economy,'' National Venture Capital Association (June 2013), available at: *http://nvca.org/research/stats-studies/.*

employment authorization in part because individuals who avail themselves of this benefit will, in many cases, lose their nonimmigrant status and thus be required to apply for an immigrant visa abroad via consular processing rather than through adjustment of status in the United States.

DHS appreciates the comments on the negative impacts of legal immigration including the impacts on wages, jobs, the labor force, employer costs, and the estimates derived by the agency. DHS responds to these comments more thoroughly in other sections of Part Q of this rule.

While DHS appreciates the commenters' concerns about the negative impacts of unauthorized immigration, this rule does not address the immigration of individuals who are admitted without inspection or parole, or those who stay beyond their authorized period of admission.

With respect to comments noting a negative impact of immigration on schools and the deficit, comments lacked specific information expanding on these statements and explaining how this rule would impact schools or the deficit. Without additional information, DHS cannot determine the impact this rule would have on schools or the deficit. The impact of this rule on environmental issues is discussed more fully in Review under the National Environmental Policy Act (NEPA), Section Q, subpart 6.

3. Labor Market and Labor Force Impact, Including Jobs, Wages, and Job Portability

i. Effect of the Rule on the Availability of Jobs in the United States

*Comment.* Many commenters expressed concerns about the effect this rule will have on the availability of jobs in the United States. One of the primary concerns commenters had is that there would be fewer jobs for U.S. workers if more foreign workers are granted work authorization. Such commenters felt that allowing foreign workers access to employment authorization when they can demonstrate compelling circumstances would lead to increased competition for jobs and fewer opportunities for U.S. workers. In addition, commenters argued that DHS should not increase the number of foreign workers, especially in science, technology, engineering, and mathematics (STEM) fields, which commenters allege are fields that hire many high-skilled foreign workers. Some commenters cited studies suggesting evidence that a STEM worker

AC00212

shortage does not exist in the United States.[127] Many commenters also cited recent DOL Bureau of Labor Statistics (BLS) data showing that native-born workers have lost 320,000 jobs while 306,000 foreign-born workers have gained jobs, and used these data to assert that immigration to the United States needs to be reduced.[128]

Other commenters expressed concern that large numbers of recent U.S. college graduates are having difficulty securing jobs. These commenters expressed their view that this rule will allow foreign workers to saturate the open job market, thereby increasing competition for jobs at all skill levels and denying them to recent U.S. graduates seeking work. Commenters noted their concern that many recent U.S. graduates carry large student loan debt and need jobs to begin paying off their loans shortly after graduation.

While many commenters expressed concern that the rule will adversely affect the availability of jobs for U.S. workers, other commenters stated that the rule will have a favorable effect. For example, some commenters asserted that immigration has a positive impact on job creation and that increasing the number of foreign workers increases employment opportunities for other workers in the labor market. Another commenter claimed that there is little evidence that immigrants diminish the employment opportunities of U.S. workers and thus they are unlikely to have an effect on the American labor force and labor market.

*Response.* DHS appreciates the points of view commenters expressed regarding the effect this rule may have on the U.S. labor market. In the RIA, DHS explains that only a limited number of foreign workers will seek to apply for employment authorization

based on compelling circumstances under the final rule, and that DHS does not expect this number to have a measurable impact on jobs as many of these workers will already be in the labor force. For example, as of 2015, there were an estimated 157,130,000 people in the U.S. civilian labor force.[129] DHS estimates in the RIA that there will be about 92,600 dependent spouses and children that may be eligible for compelling circumstances employment authorization in the first year (the year with the largest number of eligible applicants) which represents approximately 0.06 percent of the overall U.S. civilian labor force.[130] DHS based its analysis of labor market participants on an overestimate of the number of affected spouses and children who will be initially eligible to apply, despite the fact that this results in overstating the labor market impacts. As explained in the RIA, the principal beneficiaries of approved Form I–140 petitions who will be eligible under the rule are currently in a nonimmigrant status that provides employment authorization with a specific employer. Additionally, these principal beneficiaries must demonstrate circumstances compelling enough to warrant consideration of independent employment authorization. Only some dependent spouses and children eligible to apply for employment authorization could be considered "new" labor market participants under this rule.[131][132] DHS

notes that many of these labor market participants are not necessarily new participants but rather participants that are eligible to enter the labor market earlier than they normally would have. Dependent spouses and children may be eligible for employment authorization only if the principal beneficiary has been granted independent employment authorization under this rule and are in a nonimmigrant status (including while in a grace period authorized by final 8 CFR 214.1(l)).[133]

From a labor market perspective, it is important to note that the number of jobs in the United States is not fixed or static. Basic principles of labor market economics recognize that individuals not only fill jobs, but also stimulate the economy and create demand for jobs through increased consumption of goods and services.[134] These regulatory changes apply mainly to nonimmigrants who have actively taken certain steps to obtain LPR status. The rule simply accelerates the timeframe by which these nonimmigrants are able to enter the U.S. labor market. Importantly, the rule does not require eligible nonimmigrants to submit an application for an EAD based on compelling circumstances, nor does granting such an EAD guarantee employment for an individual. Further, the relatively small number of people the rule affects limits any effect this rule may have on the labor market.

DHS also appreciates commenters' concerns that DHS should not increase the number of foreign workers through this rule, especially in STEM fields. While DHS does not specifically identify foreign workers in STEM fields as the main beneficiaries of this rule, the main beneficiaries of this rule may nevertheless be high-skilled workers who happen to be in STEM fields. Further, it is not the goal of this rule to increase the numbers of workers in STEM fields, rather it is to provide various flexibilities to high-skilled foreign workers in certain employment-based immigrant and nonimmigrant visa programs who are already working in

---

[127] For example, commenters cited to the following studies to support the claim that there are no labor shortages in STEM fields: "Guest Workers in the U.S. Labor Market: An Analysis of Supply, Employment, and Wage Trends," Economic Policy Institute, Briefing Paper #359, Apr. 24, 2013, available at *http://www.epi.org/publication/bp359-guestworkers-high-skill-labor-market-analysis/.*; "Is There A STEM Worker Shortage? A Look at Employment and Wages in Science, Technology, Engineering, and Math," Center for Immigration Studies (May 2014,), available at *http://cis.org/no-stem-shortage/./*. Additionally, one commenter cited the book *Sold Out* by Michelle Malkin and John Miano to provide evidence that there is no STEM worker shortage in the United States.

[128] None of the commenters cited the source of the analysis using these Bureau of Labor Statistics (BLS) data. However, DHS has concluded through its own research that the source appears to be a news article. *See* "New Data: U.S.-born Workers Lose Jobs while Foreign-born Find Them," The Daily Caller News Foundation, (Jan. 8, 2016), available at *http://dailycaller.com/2016/01/08/new-data-us-born-workers-lose-jobs-while-foreign-born-find-them/.*

[129] *See* United States Department of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment—2015 Annual Averages, Table 1 "Employment status of the civilian non-institutional population 16 years of age and over by region, division, and state, 2014–15 annual averages" (Mar. 24, 2016), *available at http:// www.bls.gov/news.release/pdf/srgune.pdf.*

[130] *Calculation:* 92,600 / 157,130,000 * 100 = 0.059 percent (or 0.06 percent rounded).

[131] Spouses of E–3 and L–1 nonimmigrants are currently eligible for employment authorization. However, due to data limitations, DHS did not remove those spouses of E–3 and L–1 nonimmigrants from the estimate of dependent spouses and children who could be eligible to apply for EADs under this rule. Moreover, a recently promulgated DHS regulation allows for certain H–4 nonimmigrant spouses of H–1B nonimmigrant workers to apply for employment authorization if the principal H–1B nonimmigrant worker: (1) Is the beneficiary of an approved Form I–140 petition, or (2) is extending status under section 106(a) and (b) of AC21 because a petitioning employer has started the employment-based permanent residence process on his or her behalf. The RIA estimates in this final rule for dependent spouses and children do not include certain H–4 spouses who are eligible to apply for work authorization under the recently promulgated DHS regulation. *See* "Employment Authorization for Certain H–4 Dependent Spouses; Final rule," 80 FR 10284 (Feb. 25, 2015).

[132] DHS is not able to determine the age of dependent children at this time, and is therefore unable to predict the number of dependent children

who are eligible to work under the Fair Labor Standards Act (FLSA) (*see* U.S. Department of Labor, Youth and Labor Age Requirements, available at: *http://www.dol.gov/dol/topic/youth labor/agerequirements.htm*). While USCIS does not have a policy restricting eligibility for requesting employment authorization based on age, the FLSA restricts employment eligibility.

[133] DHS did not remove spouses of E–3 and L–1 nonimmigrants from the estimate of dependent spouses and children who could be eligible to apply for employment authorization under this rule. Spouses of E–3 and L–1 nonimmigrants are currently otherwise eligible to apply for EADs.

[134] Ehrenberg, R.G., and Smith, R.S. (2012). Modern labor economics: Theory and public policy. (11th ed.). Boston, Massachusetts: Prentice Hall.

the U.S. Many of the changes outlined in the rule are primarily aimed at high-skilled workers who are beneficiaries of approved employment-based immigrant visa petitions and are waiting to become lawful permanent residents (LPRs). Additionally, the changes are meant to increase the ability of such workers to seek promotions, accept lateral positions with current employers, change employers, or pursue other employment options. DHS acknowledges there is a possibility that this rule could impact foreign-born STEM workers in the United States. However, DHS is not able to quantify the magnitude of the potential effect this rule could have on the number of such workers because we cannot separate individuals who are specifically STEM workers from the broader population of high-skilled foreign workers, who are the focus of this rule. DHS notes that commenters did not provide estimates or sources of data to more accurately determine the additional number of workers this rule may add.

Moreover, DHS appreciates the comments received citing studies suggesting that the United States does not have a STEM worker shortage. DHS notes that the intention of this rule is not to increase the number of STEM workers in the United States or to eliminate a possible STEM worker shortage. While, as just noted, there is a possibility that this rule could impact the number of STEM foreign workers, DHS does not know how many STEM foreign workers would be impacted. Further, DHS explained in a recent rulemaking that there is no straightforward answer as whether the United States has a surplus or shortage of STEM workers.[135] Moreover, according to the National Science Foundation (NSF),

It depends on which segment of the workforce is being discussed (*e.g.*, sub-baccalaureates, Ph.D.s, biomedical scientists, computer programmers, petroleum engineers) and where (*e.g.*, rural, metropolitan, "high-technology corridors"). It also depends on whether "enough" or "not enough STEM workers" is being understood in terms of the quantity of workers; the quality of workers in terms of education or job training; racial, ethnic or gender diversity, or some combination of these considerations (p. 9).[136]

The NSF highlights the complexity in definitively stating whether there is or is not a STEM worker shortage or surplus.

DHS reviewed the cited BLS data showing that foreign-born workers are gaining jobs at a much higher rate than native-born workers in support of their argument that immigration to the United States needs to be reduced. DHS notes that the BLS employment data cited show the monthly change in employment levels of the entire U.S. population, separated into groups of native-born and foreign-born workers for comparison.[137] In addition, the BLS data commenters cite specifically show the net change in employment levels over the two-month period of November to December 2015, during which native-born workers lost 320,000 jobs while foreign-born workers gained 306,000 jobs. When one examines the same BLS employment level data for all of calendar year 2015 (January to December), the data show that native-born workers gained 2,278,000 jobs and foreign-born workers gained 873,000 jobs. Considering these longer-term trends in employment levels, the data obtained from the short, seasonal period of time between November and December 2015 presents an incomplete and misleading picture.[138]

In addition, DHS appreciates the comments it received that large numbers of recent college graduates are having difficulty securing jobs and that foreign workers will saturate the job market, thereby increasing competition for jobs and denying them to recent U.S. graduates seeking work. As this rule is primarily focused on retaining and providing flexibilities to high-skilled foreign workers who are already in the United States, DHS disagrees with these commenters. Most of the high-skilled foreign workers targeted in this rule would not be competing for similar jobs or levels of jobs as recent college graduates. However, DHS has considered the impact on the labor market, as discussed in the RIA and in other sections of this final rule. As previously discussed though, the rule simply accelerates the timeframe by which spouses and dependents are able to enter the U.S. labor market. Importantly, the rule does not require eligible spouses and dependents to submit an application for employment authorization, nor does the granting of employment authorization guarantee that spouses and dependents will obtain employment.

*Comment.* Several commenters requested that DHS take steps to prevent situations in which large companies lay off a number of U.S. workers and replace them with H–1B nonimmigrant workers. Commenters have stated that the laid-off U.S. workers are often forced to train their H–1B replacements or forgo severance pay. One commenter stated that large outsourcing agencies have promoted the practice of replacing U.S. workers, and the rule should prohibit entities from submitting petitions for H–1B and L–1 classification if the entities have more than 50 employees and more than 50 percent of their workforce or subcontracted vendors are on H–1B and L–1 visas.

*Response.* Existing law and regulation provide some protection against the types of employer abuses cited by commenters. Before filing an H–1B petition, the U.S. employer petitioner generally must first file a labor condition application (LCA) with DOL that covers the proposed dates of H–1B employment.[139] Among other things, the LCA requires the petitioner to attest to the occupational classification in which the worker will be employed, the wage to be paid to the worker, the location(s) where the employment will occur, that the working conditions provided to the H–1B nonimmigrant

---

[135] "Improving and Expanding Training Opportunities for F–1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F–1 Students; Final rule," 81 FR 13040 (11 Mar. 2016).

[136] National Science Foundation (NSF), "Revisiting the STEM Workforce: A Companion to Science and Engineering Indicators," 2014, 9 (Feb. 4, 2015), available at *http://www.nsf.gov/pubs/2015/nsb201510/nsb201510.pdf*.

[137] The BLS defines "foreign-born" as "persons residing in the United States who were not U.S. citizens at birth. That is, they were born outside the United States or one of its outlying areas such as Puerto Rico or Guam, to parents neither of whom was a U.S. citizen. The foreign-born population includes legally-admitted immigrants, refugees, temporary residents such as students and temporary workers, and undocumented immigrants. The survey data, however, do not separately identify the numbers of persons in these categories." *See http://www.bls.gov/news.release/forbrn.tn.htm*.

[138] DHS notes that the source of these data, the Current Population Survey at BLS, presents a broad picture of employment, as it is a household survey and includes agricultural workers and the self-employed, although neither of these groups is within the main target population of this rule. The BLS conducts another employment survey, the Current Employment Statistics, based on payroll data that is a more reliable gauge of measuring month-to-month change due to a smaller margin of error than the household survey. Both the payroll and household surveys are needed for a complete picture of the labor market due to the make-up of the surveys and the type of respondents. However, these commenters only rely on the household survey. It is misleading to attribute statistics that encompass all foreign-born workers in the United States to only the high-skilled employment-based workers identified in this rule. The BLS data does not distinguish foreign workers by educational attainment, and while this rule is mainly aimed at high-skilled foreign workers who likely have at least a bachelor's degree, it would be incorrect to compare this specific population to all foreign-born workers. Foreign-born workers could include low-skilled workers, temporary workers, students, or even undocumented immigrants, which are not the main target populations for this rule.

[139] *See* INA sections 101(a)(15)(H)(i)(B) and 212(n), 8 U.S.C. 1101(a)(15)(H)(i)(B) and 1182(n).

worker will not adversely affect other similarly situated workers, and that there is no strike or lockout in the occupational classification at the place of employment.[140] Petitioners who employ a certain percentage of H–1B nonimmigrant workers are considered to be ''H–1B dependent'' and are subject to additional attestations.[141] These U.S. employers are required to attest that they did not and will not displace U.S. workers employed by the employer within the period beginning 90 days before and ending 90 days after the date of the filing of any visa petition supported by the LCA and that they took good faith steps to recruit qualified U.S. workers for the prospective H–1B position.[142] Employers are not subject to these additional requirements, however, if the only H–1B nonimmigrant workers sought in the LCA receive at least $60,000 in annual wages or have attained a master's or higher degree in a specialty related to the relevant employment.[143] DOL may impose penalties and fines if an employer fails to comply with the requirements of the LCA.[144]

DHS appreciates the commenter's suggestion that the rule should prohibit certain petitioners from being allowed to submit H–1B or L–1 petitions based on how many of their employees are already foreign workers; however, DHS notes such action is beyond the scope of this regulation. While DHS does not prevent petitioners from filing based on current numbers of foreign workers, certain petitioning employers are required by law to pay additional fees when filing H or L nonimmigrant petitions, depending on the size of the employer and number of foreign workers it employs in those statuses.[145]

ii. Effect of the Rule on Job Portability for Foreign Workers

*Comment.* Some commenters expressed concerns about the effect this rule will have on the ability of foreign workers to change jobs or employers (the ability to port). One commenter claimed that the inability of foreign workers to port distorts the labor market by preventing such workers from taking more senior positions. According to the commenter, this inability to advance reduces the number of available jobs that U.S. workers could fill and reduces economic growth.

Other commenters stated that the rule will have a favorable effect on U.S. workers. For example, one commenter stated that job flexibility for foreign workers will improve competition in the job market and allow foreign workers to better compete with American workers, thereby improving wages for all workers. Moreover, according to the commenter, allowing foreign workers to change jobs, as outlined in the rule, would allow such workers to progress in their careers without restrictions and would make the labor market fairer for all American citizens.

*Response.* DHS appreciates the comments regarding the rule's effect on the labor market due to the ability or inability of high-skilled foreign workers to port. The intent of this final rule is, in part, to alleviate some of the difficulties high-skilled foreign workers experience while trying to change jobs to progress in their careers or to change employers altogether, consistent with existing statutory authorities. Currently, section 204(j) of the INA authorizes DHS to provide job flexibility for applicants with long-delayed applications for adjustment of status. Under this section, foreign nationals are eligible to port to a new position with either the same or a new employer if he or she filed an Application to Register Permanent Residence or Adjust Status (Form I–485) that has remained pending for 180 days or more, as long as the new job is in the same or a similar occupational classification as the job for which the underlying employment-based immigrant visa petition was filed. Moreover, DHS appreciates the commenter's concern that the lack of job portability diminishes economic growth by restricting upward and lateral job mobility of foreign workers, which in turn prevents jobs from opening up that may be filled by U.S. workers. The focus of this rule is to streamline and standardize the porting process and make it easier for eligible individuals to port and advance upwards in their careers. DHS believes that standardizing job portability will thus benefit high-skilled workers in immigrant and nonimmigrant visa classifications.

iii. Effect of the Rule on Wages

*Comment.* Many commenters expressed concerns about the effect this rule will have on wages. One of the primary concerns commenters had is that the rule will lead to an overall reduction in wages for U.S. workers because employers will be inclined to hire immigrant workers who may work for lower wages. A few commenters claimed that some companies underpay U.S. workers by implicitly threatening to replace them with lower-paid foreign workers with H–1B or L–1 nonimmigrants. Moreover, DHS received many comments about the impact this rule would have on wages from the perspective of immigrant workers. Many of these commenters stated that the rule will lead to wage suppression because it will still be difficult for immigrant workers to change jobs easily, thereby allowing employers to offer lower wages to immigrant workers as well as U.S. workers. Commenters expressed that this resulting decline in wages would especially be felt in the technology sector. Some commenters asserted that many companies lay off native-born engineers and other technology industry workers during economic downturns, and then rehire immigrant workers at reduced wages.

Other commenters stated that the rule will have a favorable effect on the wages of high-skilled U.S. and foreign workers. Many commenters noted that high-skilled foreign workers raise the wages of U.S. workers. For example, some commenters cited recently published research showing that higher numbers of H–1B nonimmigrant workers in STEM fields appear to positively affect the wages of U.S. high-skilled workers.[146] Finally, commenters mentioned that as wages increase for high-skilled foreign workers, the economy will improve and additional taxes will be paid into the system.

*Response.* DHS appreciates the points of view commenters expressed regarding the effect of the rule on wages for native-born and immigrant workers, but disagrees with statements that wages will be depressed by this rule. DHS notes that a large body of research exists supporting the findings that high-skilled immigrant workers are beneficial to the U.S. economy and labor market in the long term. While recent research shows evidence that immigration of high-skilled workers leads to net long-term benefits, there is a potential for negative impacts in the short-term for some U.S.

---

[140] *See* INA section 212(n), 8 U.S.C. 1182(n); *see also* 20 CFR 655.730(c)(4) and (d).

[141] *See* INA section 212(n)(3)(A), 8 U.S.C. 1182(n)(3)(A); *see also* 20 CFR 655.736.

[142] *Id. See* INA section 212(n)(1) and (3), 8 U.S.C. 1182(n)(1) and (3); *see also* 20 CFR 655.736.

[143] *See* INA section 212(n)(1)(E)(ii) and (n)(3)(B), 8 U.S.C. 1182(n)(1)(E)(ii) and (n)(3)(B).

[144] *See* INA 212(n)(2), 8 U.S.C. 1182(n)(2); *see also* 20 CFR 655.800 *et seq.*

[145] *See* H and L Filing Fees for USCIS Form I–129, Petition for a Nonimmigrant Worker, available at: *https://www.uscis.gov/forms/h-and-l-filing-fees-form-i-129-petition-nonimmigrant-worker.*

[146] *See* Rothwell, J., and N.G. Ruiz, ''H–1B Visas and the STEM Shortage,'' Brookings Institution, (2013), *available at http://www.brookings.edu/research/papers/2013/05/10-h1b-visas-stem-rothwell-ruiz.* The authors of this paper also published a companion white paper that expands upon the research published by the Brookings Institution, see Rothwell, J., and N.G. Ruiz, ''H–1B Visa and the STEM Shortage: A Research Brief. Social Science Research Network (SSRN)'' (2013), available at *http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2262872.*

workers.[147] In fact, most federal government reports and academic literature show that immigration generally produces a modest increase in the wages of native-born workers in the long run, and that any negative economic effects (in the form of wages) are largely felt by other immigrant workers with education and skill levels similar to native-born workers.[148] However, there is some debate regarding wages in the economic literature. For example, lower-skilled and less educated workers may experience declining wages as an immediate, short-run response to a sudden, unexpected increase in the labor supply (i.e., a labor supply shock) before wage levels recover or exceed where they were prior to the increase in the labor supply.[149] A recent Congressional Budget Office (CBO) report presents a similar finding, though with a focus on all U.S. workers rather than just native-born workers.[150] The CBO report finds that average wages for low-skilled workers would initially decline in response to a labor supply shock, but would steadily increase towards, and eventually exceed, the pre-labor supply shock wage level. The downward pressure on average wages would be an effect of the additional, new low-skilled workers being paid

lower wages, rather than native-born workers being paid less. Additionally, an increased number of high and low-skilled workers in the labor force are expected to increase employment and economic growth (i.e., increase the rate of growth of gross domestic product [GDP]) as well as increase labor productivity as workers gain more flexibility in the labor market and are able to pursue additional training and activities to improve skills.[151]

DHS takes seriously commenters that stated that some companies underpay U.S. workers by implicitly threatening to replace them with lower-paid foreign workers on H–1B and L–1 visas. DHS continues to work with DOL to protect U.S. workers. To protect the wages and working conditions of U.S. workers, the INA requires employers that file a request with DHS for an H–1B nonimmigrant worker to first file an LCA with DOL, attesting to pay the required wage; to provide working conditions that will not adversely affect the working conditions of U.S. workers similarly employed; that there is no strike, lockout, or work stoppage in the course of a labor dispute in the occupational classification at the place of employment at the time of filing; and to notify its U.S. workers that it intends to hire the nonimmigrant worker.[152] Similarly, the majority of employers that file a Form I–140 petition with DHS must first file a labor certification application with DOL, which requires a labor market test of U.S. workers and attestations to numerous labor conditions, such as paying the required wage,[153] providing working conditions that will not adversely affect U.S. workers, and only rejecting U.S. worker applicants for lawful, job-related reasons.[154]

### iv. Effect of Employment-Based Immigration on Falling Income

*Comment.* Some commenters stated that median household income has been driven down by $4,000 per year because

immigrants are entering the labor market.

*Response.* DHS does not agree with these commenters. While the commenters did not identify the source of their statement, DHS assumes the statement came from an opinion editorial that stated a series of assertions related to U.S. economic conditions.[155] Although the topic of the opinion editorial concerned the effect of immigration in the United States on native-born workers, the assertions it makes, including that "median family income is down $4,000 since November 2007," are not attributed as being directly caused by immigration as some commenters state in their opposition to this rule.[156] Of note, the United States, along with many other industrialized countries, experienced a major economic recession between 2007 and 2009, and which continued to impact the global economy well after 2009. It is far more likely that median family income decreased during that period as a result of such a major economic recession and the lasting impacts of that recession, rather than solely due to the effects of immigration.

### v. Effect of the Rule on Costs Incurred by Employers

*Comment.* Many commenters, both employers and employees, suggested that this rule overall would unnecessarily increase administrative and legal costs, as well as time burdens, for employers, which may discourage employers from hiring high-skilled foreign workers. Other commenters expressed concerns that the rule would deter employers from either retaining existing foreign workers or hiring new foreign workers by making regulatory compliance a more difficult process. Commenters suggested that hiring immigration attorneys would be necessary to complete the paperwork and thus employers would invest thousands of dollars into hiring high-skilled foreign workers, but have no guarantee of retaining those employees. Employers cited costs ranging from $10,000 to $20,000 or more per employee for both USCIS and attorney fees. Many employers expressed concern over losing their financial investment in new employees if portability is exercised more

---

[147] See "The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act," Congressional Budget Office (CBO), (June 18, 2013), *available at http://www.cbo.gov/sites/default/files/cbofiles/ attachments/44346-Immigration.pdf;* Ottaviano, G. & Peri, G., "Rethinking the Effects of Immigration on Wages," *Journal of the European Economic Association,* (Feb. 2012), 10(1): 152–197.

[148] Id.

[149] See Borjas, George J., "The Wage Impact of the *Marielitos:* A Reprisal" (2015), *available at http:// www.hks.harvard.edu/fs/gborjas/publications/ working%20papers/Mariel2015.pdf.* Borjas' findings focus specifically on low-skilled and low-educated Cuban immigrants who arrived in the United States during the 1980 Mariel boatlift. As many as 125,000 Cubans immigrated to the United States by the end of 1980 with as many as half settling in the Miami area, thereby increasing the number of workers by about 8 percent and increasing the number of high school dropouts by almost 20 percent.

[150] See "The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act," Congressional Budget Office (CBO), (June 18, 2013), *available at http://www.cbo.gov/sites/default/files/cbofiles/ attachments/44346-Immigration.pdf.* According to the report, wages for the entire labor force are projected to be 0.1 percent lower through 2023, but then increase through 2033 to where wages are about 0.5 percent higher than the initial wage level in 2013. After disaggregating relative wages according to skill level, CBO estimated that wages of those in the lowest and highest quintile (low-skilled and high-skilled, respectively) would decline by 0.3 percent; the wages of those in the middle three quintiles are expected to increase by 0.5 percent. The CBO report emphasizes the overall level of wages is also affected by other factors such as the capital-to-labor ratio and total factor productivity.

[151] Treyz, Frederick R., C. Stottlemyer, and R. Motamedi, "Key Components of Immigration Reform: An Analysis of the Economic Effects of Creating a Pathway to Legal Status, Expanding High-skilled Visas, & Reforming Lesser-skilled Visas," Regional Economic Models, Inc. (REMI), (2013), *available at http://www.remi.com/ immigration-report.*

[152] See INA 212(n), 8 U.S.C. 1182(n); *see also* 8 CFR 214.2(h)(4)(i)(B) and 20 CFR 655.700.

[153] Before filing a labor certification application, an employer must obtain a prevailing wage determination from DOL. The prevailing wage determination establishes the minimum wage the employer may offer and pay to the foreign national, as well as advertise in the course of recruitment to U.S. workers. See INA 212(p), 8 U.S.C. 1182(p); *see also* 20 CFR part 656.

[154] See 20 CFR part 656.

[155] None of the commenters cited the source for this statement. However, a similar amount for median household income in the immigration context was published in the *National Review. See* Sessions, J., "Who's Looking Out for the American Worker," National Review, (Dec. 12, 2014), *available at http://www.nationalreview.com/article/ 394614/whos-looking-out-american-worker-jeff-sessions.*

[156] Id.

extensively. However, some employers supported this rule because it would help them hire the best talent. Employees who commented on this issue stated that employers spend a small percentage of their revenue on immigration-related fees, which are offset from the benefits they receive from high-skilled workers.

*Response.* DHS appreciates the concern expressed about additional employer costs and the impact on high-skilled workers. It is unclear to DHS of the source and composition of the specific costs that commenters cited, which ranged from $10,000 to $20,000. Commenters did not provide any detailed evidence of how these total employer costs were calculated, nor did they indicate any source for these estimates. DHS assumes these total costs may be comprised of filing fees and opportunity costs of time, including the employment of a lawyer, among other costs not defined. There may be some additional costs to employers due to employee turnover, as recognized and discussed in the RIA. DHS acknowledges that the rule may negatively affect some U.S. employers that sponsor workers for employment-based immigrant visas, primarily through higher rates of employee turnover due to accepting offers of employment with other employers. DHS reiterates that these are not required benefits and employers voluntarily sponsor workers. Employers incur costs by filing an employment-based immigrant visa petition on an employee's behalf when seeking to sponsor that employee for lawful permanent residence. However, employers may view the costs associated with sponsoring an employee as a tangible investment in the company. Firms make rational decisions to hire foreign workers that fill a need such that the cost of the investment is outweighed by the potential benefit of employing that foreign worker. At the same time, if the principal beneficiary of the immigrant visa petition is in a compelling situation that qualifies for temporary employment authorization or ports and changes employers under either INA 204(j) or pursuant to the H–1B portability provisions, the petitioning employer could incur some turnover costs. Consequently, increased rates of employee turnover may occur as certain nonimmigrant workers pursue employment with different employers. Other employers, however, will benefit by being able to hire these foreign workers without having to expend any immigration petition costs.

With regard to commenters' concerns that the rule would deter employers

from either retaining existing foreign workers or hiring new foreign workers by making regulatory compliance a more difficult process, DHS notes that, for the most part, it is codifying longstanding policy and practice implementing relevant provisions of AC21. Many of these changes are primarily aimed at improving the ability of U.S. employers to hire and retain high-skilled workers who are beneficiaries of approved employment-based immigrant visa petitions and are waiting to become lawful permanent residents, while increasing the ability of those workers to seek promotions, accept lateral positions with current employers, change employers, or pursue other employment options. DHS's intention is not to add to regulatory compliance, but rather to simplify and ease regulatory compliance.

### 4. DHS Estimate of 155,000 Compelling Circumstances Employment Authorization Applicants

*Comment.* Several commenters questioned the DHS estimate of 155,000 EADs that could be issued under the compelling circumstances provisions of this rule. Many commenters stated that this estimate was much higher than the actual number of individuals who would qualify for the compelling circumstances EAD. One commenter stated that there is no justification for how this number was estimated. Another commenter asked if this estimate was changed at the last minute due to pressure from lobbyists. A commenter also asked if USCIS estimated how many people with approved Form I–140 petitions will be eligible for EADs based on "compelling circumstances."

*Response.* DHS appreciates the comments regarding the estimated number of compelling circumstances EADs that could be issued under the provisions of this rule. Commenters questioned DHS's estimate of more than 155,000 EADs and the lack of justification for how USCIS estimated this number. However, commenters did not provide an alternative source of data that would provide a more accurate estimate. DHS estimated the maximum annual average of individuals who may request employment authorization under the provisions of this rule in the first two years. DHS estimated this maximum average was 155,067 for PRA purposes in the NPRM.[157] In the NPRM, DHS estimated that a maximum total of 257,039 individuals may be eligible to

apply for employment authorization based on compelling circumstances in the first year of implementation and a maximum annual estimate of 53,095 individuals in the second and subsequent years.[158] As detailed in the RIA to the NPRM and final rule, DHS estimates the maximum number of individuals that may be eligible to apply for employment authorization; however, the analysis is unable to model for the number of individuals who will find themselves in compelling circumstances or predict their eligibility along those discretionary lines. Please consult the RIA for the final rule for a detailed explanation on the DHS estimates of the backlog, annual flow, and associated costs.

In the RIA for this final rule, DHS has updated the estimated maximum number of individuals that may be eligible to apply for the compelling circumstances employment authorization. DHS estimates for the final rule that a maximum total of 361,766 individuals may be eligible to apply for employment authorization based on compelling circumstances in the first year of implementation of this rule and a maximum annual estimate of 64,561 individuals in the second and subsequent years.[159] DHS reiterates that eligibility for independent employment authorization will be limited to those who meet specified criteria that demonstrate compelling circumstances, and who are physically present in the United States. Such individuals must be in specified, eligible nonimmigrant visa classifications with approved employment-based immigrant visa

---

[157] Calculation: [257,039 (maximum total of eligible individuals in year 1) + 53,095 (maximum annual estimate in year 2)]/2 = 155,067.

[158] For the proposed rule, DHS estimated a maximum total of 257,039 individuals, which includes the backlog estimate of 203,944 individuals (principals and eligible dependent spouses and children) and the annual estimate of 53,095 individuals. DHS assumes that all individuals in the backlog will apply for employment authorization in the first year of implementation of this rule. Moreover, as described in the RIA, the visa "backlog" is the estimated number of persons waiting for the availability of an immigrant visa. DHS estimated the number of persons in the specified, eligible nonimmigrant visa classifications with approved Form I–140 petitions who are currently waiting for a visa to become available in certain employment-based preference categories.

[159] For the final rule, DHS estimated a maximum total of 361,766 individuals, which includes the backlog estimate of 297,205 individuals (principals and eligible dependent spouses and children) and the annual estimate of 64,561 individuals. DHS again assumes that all individuals in the backlog will apply for employment authorization in the first year of implementation of this rule. Note that due to data limitations the estimates of the population eligible to be granted employment authorization based on compelling circumstances presented are the maximum number of individuals that may be eligible to apply; however, DHS expects that a smaller number of individuals, in practice, will choose to apply.

AC00217

petitions and are currently waiting for a visa to become available in certain employment-based preference categories. Employment authorization based on compelling circumstances granted under this rule will be valid for a period of one year.

### 5. Unfunded Mandates Reform Act Violation

*Comment.* One commenter stated that these regulations violate the federal mandates in the Unfunded Mandates Reform Act (UMRA). The commenter stated that the NPRM is clearly within the scope of both the private sector and state and local area UMRA mandates. The commenter was of the view that the rule falls within UMRA based on the following factors: (1) Economic expenditures exceed $100 million (adjusted for inflation) in the first year; and (2) if implemented, the proposed amendments codifying the AC21 and ACWIA policies and practices would affect and change the numbers of individuals subject to the H–1B cap and ACWIA fees. The commenter stated that extensions and other modifications to the ACWIA fee payment requirements "would be an intergovernmental mandate as defined by UMRA" because the rule changes the number and definition of foreign nationals to whom the ACWIA fees applies. The commenter also stated that these statutory mandates are imposed on all "institutions of higher education" and "affiliated and related non-profit entities."

The commenter also was of the view that the unfunded mandates associated with the published NPRM significantly change how the statutory caps on immigrant and H–1B nonimmigrant visas operate for all other H–1B employers as well. The commenter asserted that the NPRM states there is a very significant impact on the entire range of STEM- and IT-related economic sectors, which rely on increases in productivity and innovation driven by immigration of H–1B workers who adjust status while employed in the United States. The commenter stated that the proposed regulations are not the result of voluntary action by taxpayer funded state and local government agencies. Additionally, the commenter cited the book *Sold Out* by Michelle Malkin and John Miano to provide evidence that there is no STEM worker shortage in the United States.

*Response.* For this final rule, DHS has added a statement to address the requirements of Title II of UMRA. As stated in the UMRA section of this final rule, the $100 million expenditure threshold (adjusted for inflation) may be exceeded in the first year of implementation, and the main provisions driving the cost estimate are the employment authorization granted for compelling circumstances and porting ability under section 204(j) of the INA.

While these provisions do not directly impose any additional Federal mandates on state, local, and tribal governments, in the aggregate, or by the private sector, there may be some petitioning employers that could potentially experience some employee turnover costs should the worker beneficiaries of those petitions choose to port to another employer or obtain independent employment authorization based on compelling circumstances. DHS recognizes that these provisions could place additional burdens on the state and private sector in these circumstances. However, DHS reiterates that these are not required immigration benefits. State and private sector employers make the cost-benefit decisions of whether to expend finances to petition for foreign workers.

DHS agrees with the commenter that codifying the AC21 and ACWIA policies and practices would affect and change the numbers of individuals subject to the H–1B cap exemption and ACWIA fees. DHS provides this assessment of the ACWIA fees in the RIA of this final rule (as well as the RIA published in the NPRM). As stated in the RIA, DHS reported a total of 8,589 H–1B exemptions due to an employer being a nonprofit entity related to or affiliated with an institution of higher education.[160] DHS anticipates that there may be an increase as a result of these amendments in the numbers of cap exemptions, due to the employer being a nonprofit entity related to or affiliated with an institution of higher education. However, we cannot project the size of such an increase at this time. In addition, DHS notes that because petitioners that are currently cap-subject could become eligible for cap-exempt status, the transition of such currently cap-subject petitioners could result in other cap-subject petitioners being approved.

DHS does not state in the NPRM that there will be a significant impact on any specific sectors of the economy that may be reliant on H–1B workers, nor does it identify STEM- or IT-related workers as the main beneficiaries of the provisions in the final rule. As previously

mentioned, DHS does not have enough data to substantiate the commenter's conclusion from Malkin and Miano's book on STEM worker shortages. Please see section Q(3)(i) for further discussion about the rule's intended beneficiaries and the effect on foreign workers in STEM fields. DHS reiterates that the goals of this rule include enhancing U.S. employers' ability to retain and attract high-skilled and certain other workers to the United States and increasing flexibility in pursuing normal career progression for those workers pursuing LPR status in certain employment-based immigrant visa categories who are waiting for immigrant visas to become available.

### 6. Review Under the National Environmental Policy Act (NEPA)

*Comment.* A commenter asserted that this rule, like all immigration rules, must be subject to review under the National Environmental Policy Act (NEPA). Under NEPA, agencies must prepare an Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment." The commenter argued that concerns of the impact of human population growth on the quality of the environment must be taken into consideration under NEPA. The commenter suggested that both legal and illegal immigration is the principal cause of current U.S. population growth. Furthermore, the commenter claimed that DHS should prepare an environmental assessment to address the impacts of the result from this rule.

*Response.* The population affected by this rule is primarily comprised of immigrants and nonimmigrants who are already in the United States and have been present for a number of years. The rule increases flexibilities in pursuing normal career progression for those workers pursuing LPR status in certain employment-based immigrant visa categories who are waiting for visas to become available. For that reason, DHS does not consider this rulemaking to significantly affect the quality of the human environment. Further, this rule is categorically excluded from NEPA review. DHS Management Directive (MD) 023–01 Rev. 01 establishes procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500–1508. CEQ regulations allow federal agencies to establish categories of actions, which do not individually or cumulatively have a significant effect on the human environment and, therefore,

---

[160] Department of Homeland Security, Report on H–1B Petitions, Fiscal Year 2015 Annual Report to Congress October 1, 2014—September 30, 2015. Available at: *https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/H-1B/H-1B-FY-2015-Petitions.pdf.*

do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1507.3(b)(1)(iii), 1508.4. The MD 023–01 Rev. 01 establishes the Categorical Exclusions that DHS has found to have no such effect. MD 023–01 Rev. 01 Appendix A Table 1.

For an action to be categorically excluded, MD 023–01 Rev. 01 requires the action to satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. MD 023–01 Rev. 01 section V.B(1)–(3).

DHS has determined that this rule does not individually or cumulatively have a significant effect on the human environment because it fits within the Categorical Exclusion found in MD 023–01 Rev. 01, Appendix A, Table 1, number A3(d): "Promulgation of rules . . . that interpret or amend an existing regulation without changing its environmental effect." Rather, this rule affects current participants in immigration programs by codifying existing policies and procedures and making amendments to DHS regulations designed to improve its immigration programs.

Finally, this rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects because it does not introduce new populations that may have an impact on the environment. Therefore, this rule is categorically excluded from further NEPA review.

## V. Statutory and Regulatory Requirements

### A. Executive Orders 12866 and 13563 (Regulatory Planning and Review)

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action" that is economically significant, under section 3(f)(1) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

DHS is amending its regulations relating to certain employment-based immigrant and nonimmigrant visa programs. The amendments interpret existing law and change regulations in order to provide various benefits to participants in those programs, including: Improved processes for U.S. employers seeking to sponsor and retain immigrant and nonimmigrant workers, greater stability and job flexibility for such workers, and increased transparency and consistency in the application of DHS policy related to affected classifications. Many of these changes are primarily aimed at improving the ability of U.S. employers to retain high-skilled workers who are beneficiaries of approved employment-based immigrant visa petitions and are waiting to become LPRs, while increasing the ability of those workers to seek promotions, accept lateral positions with current employers, change employers, or pursue other employment options.

First, DHS amends its regulations consistent with certain worker portability and other provisions in AC21 and ACWIA. These amendments clarify and improve longstanding DHS policies and practices, previously articulated in DHS memoranda and precedent decisions. These amendments also implement sections of AC21 and ACWIA relating to certain foreign workers who have been sponsored for LPR status by their employers. In so doing, the rule provides a primary repository of governing rules for the regulated community and enhances consistency among DHS adjudicators. In addition, the rule clarifies several interpretive questions raised by AC21 and ACWIA.

Second, and consistent with existing DHS authorities and the goals of AC21 and ACWIA, DHS is amending its regulations governing certain employment-based immigrant and nonimmigrant visa programs to provide additional stability and flexibility to employers and workers in those programs. The final rule, among other things: Improves portability for certain beneficiaries of approved employment-based immigrant visa petitions by limiting the grounds for automatic revocation of petition approval; enhances job portability for such beneficiaries by improving their ability to retain their priority dates for use with subsequently approved employment-based immigrant visa petitions; establishes or extends grace periods for certain high-skilled nonimmigrant workers so that they may more easily maintain their nonimmigrant status when changing employment opportunities or preparing for departure; and provides additional stability and flexibility to certain high-skilled workers by allowing those who are working in the United States in certain nonimmigrant statuses, are the beneficiaries of approved employment-based immigrant visa petitions, are subject to immigrant visa backlogs, and demonstrate compelling circumstances to apply for employment authorization for a limited period. These and other changes provide much needed flexibility to the beneficiaries of employment-based immigrant visa petitions, as well as the U.S. employers who employ and sponsor them for permanent residence. In addition, these changes provide greater stability and predictability for U.S. employers and avoid potential disruptions to their operations in the United States.

Finally, consistent with providing additional certainty and stability to certain employment-authorized individuals and their U.S. employers, DHS is also changing its regulations governing the processing of applications for employment authorization to minimize the risk of any gaps in such authorization. These changes provide for the automatic extension of the validity of certain Employment Authorization Documents (EADs or Form I–766) for an interim period upon the timely filing of an application to renew such documents. At the same time, in light of national security and fraud concerns, DHS is removing regulations that provide a 90-day processing timeline for EAD applications and that require the issuance of interim EADs if processing extends beyond the 90-day mark.

Table 1, below, provides a more detailed summary of the provisions and their impacts.

AC00219

**82476**   **Federal Register** / Vol. 81, No. 223 / Friday, November 18, 2016 / Rules and Regulations

TABLE 2—SUMMARY OF PROVISIONS AND IMPACTS

| Provisions | Purpose | Expected impact of the final rule |
|---|---|---|
| Priority Date ........................ | Clarifies when a priority date is established for employment-based immigrant visa petitions that do not require a labor certification under INA 203(b). | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Removes ambiguity and sets consistent priority dates for affected petitioners and beneficiaries. |
| Priority Date Retention ......... | Explains that workers may retain priority dates and transfer those dates to new and subsequently approved Form I–140 petitions, except when USCIS revokes approval of the petition for: Material error, fraud or willful misrepresentation of a material fact, or revocation or invalidation of the labor certification accompanying the petition. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Results in administrative efficiency and predictability by explicitly listing when priority dates are lost as the approval of the petitions that are revoked under these specific grounds cannot be used as a basis for an immigrant visa.<br>• Improves the ability of certain workers to accept promotions, change employers, or pursue other employment opportunities. |
| Employment-Based Immigrant Visa Petition Portability Under 204(j). | Incorporates statutory portability provisions into regulation. | Quantitative:<br>Petitioners—<br>• Opportunity costs of time to petitioners for 1-year range from $126,598 to $4,636,448.<br>DHS/USCIS—<br>• Neutral because the new supplementary form to the application for adjustment of status to permanent residence will formalize the process for USCIS requests for evidence of compliance with INA 204(j) porting.<br>Qualitative:<br>Applicants/Petitioners—<br>• Replaces, through the Supplement J standardized form, the need for individuals to submit job offer and employment confirmation letters.<br>• Provides stability and job flexibility to certain individuals with approved employment-based immigrant visa petitions.<br>• Implements the clarifications regarding ''same or similar occupational classifications'' through the new Supplement J.<br>• Allows certain foreign workers to advance and progress in their careers.<br>• Potential increased employee replacement costs for employers.<br>DHS/USCIS—<br>• Administrative efficiency.<br>• Standardized and streamlined process. |
| Employment Authorization for Certain Nonimmigrants Based on Compelling Circumstances. | Provisions allowing certain nonimmigrant principal beneficiaries, and their dependent spouses and children, to apply for employment authorization if the principal is a beneficiary of an approved EB–1, EB–2, or EB–3 immigrant visa petition while waiting for his or her immigrant visa to become available. Applicants must demonstrate compelling circumstances justifying an independent grant of employment authorization. | Quantitative: Total costs over 10-year period to applicants are:<br>• $731.1 million for undiscounted costs.<br>• $649.9 million at a 3% discounted rate.<br>• $565.2 million at a 7% discounted rate.<br>Qualitative:<br>Applicants—<br>• Provides ability for nonimmigrants who have been sponsored for LPR status to change jobs or employers when compelling circumstances arise.<br>• Incentivizes such skilled nonimmigrant workers contributing to the economy to continue seeking LPR status.<br>• Nonimmigrant principal workers who take advantage of the compelling circumstances EAD will lose their current nonimmigrant status and may not be able to adjust to LPR status in the United States.<br>• Consular processing imposes potentially significant costs, risk and uncertainty for individuals and their families as well.<br>Dependents—<br>• Allows dependents to enter labor market earlier and contribute to household income. |

AC00220

TABLE 2—SUMMARY OF PROVISIONS AND IMPACTS—Continued

| Provisions | Purpose | Expected impact of the final rule |
|---|---|---|
| 90-Day Processing Time for Employment Authorization Applications. | Eliminates regulatory requirement for 90-day adjudication timeframe and issuance of interim-EADs. Adds provisions allowing for the automatic extension of EADs for up to 180 days for certain workers filing renewal requests. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>Applicants—<br>• Removing a regulatory timeframe and moving to one governed by processing goals could potentially lead to longer processing times whenever USCIS is faced with higher than expected filing volumes. If such a situation were to occur, this could lead to potential delays in work employment start dates for first-time EAD applicants until approval is obtained. However, USCIS believes such scenarios will be rare and mitigated by the automatic extension provision for renewal applications which will allow the movement of resources in such situations.<br>• Providing the automatic continuing authorization for up to 180 days for certain renewal applicants could lead to less turnover costs for U.S. employers. In addition, the automatic extension provision minimizes the applicants' risk of any gaps in employment authorization.<br>DHS/USCIS—<br>• Streamlines the application and card issuance processes.<br>• Enhances the ability to ensure all national security verification checks are completed.<br>• Reduces duplication efforts.<br>• Reduces opportunities for fraud and better accommodates increased security measures. |
| Automatic Revocation With Respect to Approved Employment-Based Immigrant Visa Petitions. | Revises regulations so that a petition may remain valid despite withdrawal by the employer or termination of the employer's business after 180 days or more of approval, or 180 days or more after the associated application for adjustment of status has been filed. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Allows beneficiary to retain priority date unless the petition is revoked for one of the reasons specified in final 8 CFR 204.5(e)(2).<br>• Affords porting ability under INA 204(j) and extension of H–1B status pursuant to AC21 sections 104(c) and 106(a) and (b), as well as potential eligibility for the new compelling circumstances EAD. |
| Period of Admission for Certain Nonimmigrant Classifications. | Nonimmigrants in certain high-skilled, nonimmigrant classifications may be granted grace periods of up to 10 days before and after their validity period, and a grace period upon cessation of employment on which the foreign national's classification was based, for up to 60 days or until the end of their authorized validity period, whichever is shorter, during each authorized validity period. | Quantitative:<br>• Not estimated.<br>Qualitative: Nonimmigrant Visa Holders—<br>• Assists the beneficiary in getting sufficiently settled such that he or she is immediately able to begin working upon the start of the petition validity period.<br>• Provides time necessary to wrap up affairs to depart the country.<br>• Allows the beneficiary to maintain nonimmigrant status when faced with a termination of employment to wrap up affairs, find new employment, or change to a different nonimmigrant classification. |
| Portability of H–1B Status Calculating the H–1B Admission Period Exemptions Due to Lengthy Adjudication Delays per Country Limitation Exemptions, Employer Debarment and H–1B Whistleblower Provisions. | Updates, improves, and clarifies DHS regulations consistent with policy guidance. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Formalizes existing DHS policy in the regulations, which will give the public access to existing policy in one location.<br>• Clarifies current DHS policy that there is no temporal limit on recapturing time. |

AC00221

TABLE 2—SUMMARY OF PROVISIONS AND IMPACTS—Continued

| Provisions | Purpose | Expected impact of the final rule |
|---|---|---|
| H–1B Licensing Requirements. | Expands the evidence USCIS will examine in cases where a state allows an individual without licensure to fully practice the relevant occupation under the supervision of licensed senior or supervisory personnel in that occupation to include evidence of compliance with state requirements. Additionally, USCIS is expanding the possible situations in which it may approve an H–1B petition even though the beneficiary cannot obtain a license for certain technical reasons. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Provides additional flexibilities in obtaining necessary licensure while still permitting H–1B employment during the pendency of state or local license applications.<br>• Helps to relieve the circular predicament an H–1B beneficiary may encounter.<br>• May minimally increase time burden for the petitioner to gather information and send it to USCIS. However, DHS anticipates that the benefits to the petitioner and beneficiary exceed the opportunity costs of time.<br>• May increase opportunity costs of time for USCIS adjudicators to evaluate additional evidence in such types of cases. However, DHS does not anticipate that the opportunity costs of time will be so substantial as to warrant additional hiring of staff or cause significant adjudication delays. |
| Exemptions to the H–1B Numerical Cap, Revised Definition of "Related or Affiliated Nonprofit Entity" in the ACWIA Fee Context, and Expanded Interpretation of "Governmental Research Organizations." | Codifies definition of "institution of higher education" and adds a broader definition of "related or affiliated nonprofit entity." Also, revises the definition of "related or affiliated nonprofit entity" for purposes of the ACWIA fee to conform it to the new definition of the same term for H–1B numerical cap exemption. Expands the interpretation of "governmental research organizations" for purposes of the ACWIA fee and aligns definitions for H–1B cap and fee exemptions. | Quantitative:<br>• Not estimated.<br>Qualitative:<br>• Clarifies the requirements for a nonprofit entity to establish that it is related to or affiliated with an institution of higher education.<br>• Better reflects current operational realities for institutions of higher education and how they interact with, and sometimes rely on, nonprofit entities.<br>• Clarifies the interpretation of governmental research organizations to include federal, state, and local governmental organizations.<br>• May expand the numbers of petitioners that are cap exempt and thus allow certain employers greater access to H–1B workers. |

As required by OMB Circular A–4, Table 2 presents the prepared accounting statement showing the expenditures associated with this regulation.[161] These updated expenditures take into account all of the changes made to the regulation in addition to the updated cost estimates since publication of the proposed rule. The main benefits of the regulation remain the same: To improve processes for U.S. employers seeking to sponsor and retain immigrant and nonimmigrant workers, provide greater stability and job flexibility for such workers, and increase transparency and consistency in the application of DHS policy related to affected classifications.

TABLE 2—OMB A–4 ACCOUNTING STATEMENT

[$ millions, 2015]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation (RIA, preamble, etc.) |
|---|---|---|---|---|
| **Benefits** | | | | |
| Monetized Benefits ................................................ | Not estimated ... | Not estimated ... | Not estimated ... | RIA. |
| Annualized quantified, but unmonetized, benefits ........................ | 0 ...................... | 0 ...................... | 0 ...................... | RIA. |
| Unquantified Benefits ................................................ | Improves processes for U.S. employers seeking to sponsor and retain immigrant and nonimmigrant workers, provides greater stability and job flexibility for such workers, and increases transparency and consistency in the application of DHS policy related to affected classifications | | | RIA. |
| **Costs** | | | | |
| Annualized monetized costs for 10-year period starting in 2016 to 2025 (discount rate in parenthesis). | (3%)  $78.5 ..... <br> (7%)  $82.8 ..... | $76.7 ................ <br> $80.9 ................ | $80.9 ................ <br> $85.1 ................ | RIA. <br> RIA. |

---

[161] OMB Circular A–4 is available at *www.white house.gov/sites/default/files/omb/assets/omb/ circulars/a004/a-4.pdf*.

AC00222

TABLE 2—OMB A–4 ACCOUNTING STATEMENT—Continued

[$ millions, 2015]

| Category | Primary estimate | Minimum estimate | Maximum estimate | Source citation (RIA, preamble, etc.) |
|---|---|---|---|---|
| Annualized quantified, but unmonetized, costs ............................... | N/A ................... | N/A ................... | N/A ................... | RIA. |
| Qualitative (unquantified) costs ...................................................... | Potential turnover cost due to enhanced job mobility of beneficiaries of nonimmigrant and immigrant petitions | | | RIA. |
| **Transfers** | | | | |
| Annualized monetized transfers: "on budget" ............................... | N/A ................... | 0 ...................... | 0 ...................... | RIA. |
| From whom to whom? ...................................................................... | N/A ................... | N/A ................... | N/A ................... | N/A. |
| Annualized monetized transfers: "off-budget" ............................... | N/A ................... | 0 ...................... | 0 ...................... | RIA. |
| From whom to whom? ...................................................................... | N/A ................... | N/A ................... | N/A ................... | N/A. |
| Miscellaneous analyses/category | Effects | | | Source Citation (RIA, preamble, etc.) |
| Effects on state, local, and/or tribal governments ......................... | None | | | RIA. |
| Effects on small businesses .......................................................... | No direct costs. Indirect effects only | | | RIA. |
| Effects on wages ............................................................................ | None | | | None. |
| Effects on growth ............................................................................ | None | | | None |

DHS has prepared a full analysis according to Executive Orders 12866 and 13563. This analysis can be found by searching for RIN 1615–AC05 on *regulations.gov*.

## B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121, 5 U.S.C. 601–612 requires Federal agencies to consider the potential impact of regulations on small entities during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. An "individual" is not defined by the RFA as a small entity, and costs to an individual from a rule are not considered for RFA purposes. In addition, the courts have held that the RFA requires an agency to perform a regulatory flexibility analysis of small entity impacts only when a rule directly regulates small entities.[162] Consequently, any indirect impacts from a rule to a small entity are not costs for RFA purposes.

The changes made by DHS have direct effects on individual beneficiaries of employment-based nonimmigrant and immigrant visa petitions. As individual

beneficiaries of employment-based immigrant visa petitions are not defined as small entities, costs to these individuals are not considered as RFA costs. However, because the petitions are filed by sponsoring employers, this rule has *indirect* effects on employers. The original sponsoring employer that files the petition on behalf of an employee will incur employee turnover related costs in cases in which that employee ports to a same or a similar occupation with another employer. Therefore, DHS has chosen to examine the indirect impact of this rule on small entities as well. The analysis of the indirect effects of these changes on small entities follows.

### 1. Final Regulatory Flexibility Analysis

Small entities that can incur additional indirect costs by this rule are those that file and pay fees for certain immigration benefit petitions, including Form I–140 petitions. DHS conducted a statistically valid sample analysis of these petition types to determine the number of small entities indirectly impacted by this rule. While DHS acknowledges that the changes engendered by this rule directly affect individuals who are beneficiaries of employment-based immigrant visa petitions, which are not small entities as defined by the RFA, DHS believes that the actions taken by such individuals as a result of this rule will have immediate indirect effects on U.S. employers. Employers will be indirectly affected by employee turnover-related costs as beneficiaries of employment-based

immigrant visa petitions take advantage of this rule. Therefore, DHS is choosing to discuss these indirect effects in this final regulatory flexibility analysis.

### i. A Statement of the Need for, and Objectives of, the Rule

The purpose of this action, in part, is to amend regulations affecting certain employment-based immigrant and nonimmigrant classifications in order to conform them to provisions of AC21 and ACWIA. The rule also seeks to provide greater job flexibility, mobility and stability to beneficiaries of employment-based nonimmigrant and immigrant visa petitions, especially when faced with long waits for immigrant visas. In many instances, the need for these individuals' employment has been demonstrated through the labor certification process. In most cases, before an employment-based immigrant visa petition can be approved, DOL has certified that there are no U.S. workers who are ready, willing and available to fill those positions in the area of intended employment. By increasing flexibility and mobility, the worker is more likely to remain in the United States and help fill the demonstrated need for his or her services.

---

[162] A Guide for Government Agencies How to Comply with the Regulatory Flexibility Act, May 2012 page 22. *See* Direct versus indirect impact discussion, *https://www.sba.gov/sites/default/files/advocacy/rfaguide_0512_0.pdf*.

ii. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

DHS published the NPRM along with the Initial Regulatory Flexibility Analysis (IRFA) on December 31, 2015 (80 FR 81899) with the comment period ending February 29, 2016. During the 60-day comment period, DHS received 27,979 comments from interested individuals and organizations. DHS received numerous comments that referred to aspects of the economic analysis presented with the NPRM. The comments, however, did not result in revisions to the economic analysis in the final rule that are relevant to the analysis of effects on small businesses, small organizations, and small governmental jurisdictions presented in this FRFA. DHS received few comments that referred specifically to the IRFA. DHS addresses these comments below.

Commenters only indirectly mentioned the IRFA by mentioning the impact of the form, Supplement J, on potential employers who may be small start-ups or small businesses. Commenters suggested that many of these small start-ups hire high-skilled foreign workers to stay competitive in high-technology industries in order to compete globally, and they believed that such hiring increased job opportunities for native-born U.S. citizens as well. Commenters expressed concern that Supplement J is an unnecessary burden, especially for small business owners and startups, and commented that it will not help to increase job portability.

DHS appreciates these viewpoints and carefully considered the impact of Supplement J throughout this rulemaking, especially to small entities. DHS reaffirms its belief expressed in the RIA for the NPRM and again in the RIA for the final rule that Supplement J will clarify the process to port to another job and increase flexibility to high-skilled workers so they can advance in their careers and progress in their occupations. As explained in the PRA, completing the Supplement J requires approximately 60 minutes. In the Initial Regulatory Flexibility Analysis, DHS examined the indirect impact of this rule on small entities as this rule does not directly impose costs on small entities. DHS recognizes that this rule imposes indirect costs on small entities because these provisions would affect beneficiaries of employment-based immigrant visa petitions. If those beneficiaries take certain actions in line with the rule that provide greater flexibility and job mobility, then there would be an immediate indirect impact on the current sponsoring U.S. employers. DHS reaffirms that the addition of Supplement J may negatively impact employers in the form of employee turnover costs and some additional burden.

iii. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments

No comments were filed by the Chief Counsel for Advocacy of the Small Business Administration.

iv. A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate Is Available

DHS conducted a statistically valid sample analysis of employment-based immigrant visa petitions to determine the maximum potential number of small entities indirectly affected by this rule when a high-skilled worker who has an approved employment-based immigrant visa petition, and an application for adjustment of status that has been pending for 180 days or more, ports to another employer. DHS utilized a subscription-based online database of U.S. entities, Hoovers Online, as well as three other open-access, free databases of public and private entities—Manta, Cortera, and Guidestar—to determine the North American Industry Classification System (NAICS) code, revenue, and employee count for each entity.[163] In order to determine the size of a business, DHS first classified each entity by its NAICS code, and then used SBA guidelines to note the requisite revenue or employee count threshold for each entity. Some entities were classified as small based on their annual revenue and some by number of employees.

Using a 12-month period, from September 2014 to August 2015, of data on actual filings of employment-based immigrant visa petitions, DHS collected internal data for each filing organization. Each entity may make multiple filings. For instance, there were 101,245 employment-based immigrant visa petitions filed, but only 23,284 unique entities that filed petitions. DHS devised a methodology to conduct the small entity analysis based on a representative, random sample of the potentially impacted population. To achieve a 95 percent confidence level and a 5 percent confidence interval on a population of 23,284 entities, DHS used the standard statistical formula to determine that a minimum sample size of 378 entities was necessary. DHS created a sample size greater than the 378 minimum necessary in order to increase the likelihood that our matches would meet or exceed the minimum required sample. Of the 514 entities sampled, 393 instances resulted in entities defined as small. Of the 393 small entities, 290 entities were classified as small by revenue or number of employees. The remaining 103 entities were classified as small because information was not found (either no petitioner name was found or no information was found in the databases). Table 3 shows the summary statistics and results of the small entity analysis of Form I–140 petitions.

TABLE 3—SUMMARY STATISTICS AND RESULTS OF SMALL ENTITY ANALYSIS OF FORM I–140 PETITIONS

| Parameter | Quantity | Proportion of sample (%) |
|---|---|---|
| Population—petitions | 101,245 | |
| Population—unique entities | 23,284 | |
| Minimum Required Sample | 378 | |
| Selected Sample | 514 | 100.0 |
| Entities Classified as "Not Small": | | |
| by revenue | 99 | 19.2 |

---

[163] The Hoovers Web site can be found at *http://www.hoovers.com/*; The Manta Web site can be found at *http://www.manta.com/*; and the Cortera Web site can be found at *https://www.cortera.com/*.

TABLE 3—SUMMARY STATISTICS AND RESULTS OF SMALL ENTITY ANALYSIS OF FORM I–140 PETITIONS—Continued

| Parameter | Quantity | Proportion of sample (%) |
|---|---|---|
| by number of employees | 22 | 4.3 |
| Entities Classified as "Small": | | |
| by revenue | 287 | 55.9 |
| by number of employees | 3 | 0.6 |
| because no petitioner name found | 84 | 16.3 |
| because no information found in databases | 19 | 3.7 |
| Total Number of Small Entities | 393 | 76.5 |

Source: USCIS analysis.

v. A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record

The amendments in this rule do not place direct requirements on small entities that petition for workers. However, if the principal beneficiaries of employment-based immigrant visa petitions take advantage of certain flexibility provisions herein (including porting to new sponsoring employers or pursuing employment authorization in cases involving compelling circumstances), there could be increased turnover costs (employee replacement costs) for U.S. entities sponsoring the employment of those beneficiaries, including costs of petitioning for new employees. While DHS has estimated 28,309 individuals who are eligible to port to new employment under section 204(j) of the INA, the Department was unable to predict how many will actually do so. As mentioned earlier in the Executive Orders 12866 and 13563 analysis, a range of opportunity costs of time to petitioners that prepare Supplement J ($43.93 for a human resources specialist, $93.69 for an in-house lawyer, or $160.43 for an outsourced lawyer) are anticipated depending on the total numbers of individuals who port. However, DHS is currently unable to determine the numbers of small entities who take on immigrant sponsorship of high-skilled workers waiting to adjust status based on petitions filed by original sponsoring employers. The estimates presented also do not represent employee turnover costs to original sponsoring employers, but only represent paperwork costs. Similarly, DHS is unable to predict the volume of principal beneficiaries of employment-based immigrant visa petitions who will pursue the option for employment authorization based on compelling circumstances.

The amendments relating to the H–1B numerical cap exemptions may impact some small entities by allowing them to qualify for exemptions of the ACWIA fee when petitioning for H–1B nonimmigrant workers. As DHS cannot predict the numbers of entities these amendments will affect at this time, the exact effect on small entities is not clear, though some positive effect should be anticipated.

vi. A Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities Was Rejected

This rule does not impose direct costs on small entities. Therefore, DHS has not proposed any measures to minimize direct effects on small entities. The final rule may indirectly affect small entities because the provisions would affect beneficiaries of employment-based immigrant visa petitions. If those beneficiaries take actions in line with certain proposals that provide greater flexibility and job mobility, then there is an immediate indirect impact—an externality—to the current sponsoring U.S. employers. DHS considered whether to exclude from the flexibility and job mobility provisions those beneficiaries who were sponsored by U.S. employers that were considered small. However, because DHS limited the eligibility for employment authorization to beneficiaries who are able to demonstrate compelling circumstances, and restricted the 204(j) portability provisions to those seeking employment within the same or a similar occupational classification, DHS did not believe it was necessary to pursue this alternative proposal. There

are no other alternatives that DHS considered that would further limit or shield small entities from the potential of negative externalities and that would still accomplish the goals of this regulation. To reiterate, the goals of this regulation include providing increased flexibility and normal job progression for beneficiaries of approved employment-based immigrant visa petitions. To incorporate alternatives that would limit such mobility for beneficiaries that are employed or sponsored by small entities would be counterproductive to the goals of this rule.

*C. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandate Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on state, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by state, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100 million in 1995 adjusted for inflation to 2014 levels by the Consumer Price Index for All Urban Consumers is $155 million. This rule exceeds the $100 million expenditure threshold in the first year of implementation (adjusted for inflation) and therefore DHS is providing this UMRA analysis.

1. An Identification of the Provision of Federal Law Under Which the Rule Is Being Promulgated

The authority of the Secretary of Homeland Security (Secretary) for these regulatory amendments is found in various sections of the INA, 8 U.S.C. 1101 *et seq.*, ACWIA, AC21, and the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 101 *et seq.* General authority for

issuing the final rule is found in section 103(a) of the INA, 8 U.S.C. 1103(a), which authorizes the Secretary to administer and enforce the immigration and nationality laws, as well as section 102 of the HSA, 6 U.S.C. 112, which vests all of the functions of DHS in the Secretary and authorizes the Secretary to issue regulations. Further authority for the regulatory amendments in the final rule is found in Section II, Subpart B.

2. A Qualitative and Quantitative Assessment of the Anticipated Costs and Benefits of the Federal Mandate, Including the Costs and Benefits to State, Local, and Tribal Governments or the Private Sector, as Well as the Effect of the Federal Mandate on Health, Safety, and the Natural Environment

The two major provisions of this rule for economic analysis purposes provide job flexibility through INA 204(j) portability and job flexibility through employment authorization to a limited number of employment-authorized nonimmigrants in compelling circumstances. These provisions do not directly impose any additional Federal mandates on state, local, and tribal governments, in the aggregate, or by the private sector. However, employers who petition on behalf of applicants could potentially experience some employee turnover costs should these applicants choose to obtain the compelling circumstances EAD or choose to port to another employer. DHS recognizes that these provisions could place additional burdens on the state and private sector in these circumstances. DHS specifically considered the situation where a public institution of higher education filed a petition on behalf of a high skilled worker and that high skilled worker utilized porting under section 204(j) of the INA to move to another employer. The flexibilities provided as a result of this rule would place additional costs and burdens on the states in this scenario and other similar scenarios. However, DHS reiterates that these are not required immigration benefits. State and private sector employers make the cost-benefit decisions of whether to expend finances to petition for foreign workers. DHS presents the impacts of these provisions more fully in the RIA found with this final rule on *www.regulations.gov*.

DHS does not believe that this rule will have any impact on health or safety. The impact of this rule on environmental issues is discussed more fully in Review under the National Environmental Policy Act (NEPA), Section Q, subpart 6 of this final rule.

3. Estimates by the Agency, if and to the Extent That the Agency Determines That Accurate Estimates Are Reasonably Feasible of Future Compliance Costs of the Federal Mandate and Any Disproportionate Budgetary Effects of the Federal Mandate Upon Any Particular Regions of the Nation or Particular State, Local, or Tribal Governments, Urban or Rural or Other Types of Communities, or Particular Segments of the Private Sector

DHS has provided compliance costs of the main provisions that may indirectly trigger Federal mandates in the full RIA discussion of each provision published with this final rule as well as in the FRFA. DHS reiterates that state and private sector employers make the cost-benefit decisions of whether to expend finances to petition for foreign workers and that these provisions are not mandatory requirements.

4. Estimates by the Agency of the Effect on the National Economy, Such as the Effect on Productivity, Economic Growth, Full Employment, Creation of Productive Jobs, and International Competitiveness of United States Goods and Services, if and to the Extent That the Agency in Its Sole Discretion Determines That Accurate Estimates Are Reasonably Feasible and That Such Effect Is Relevant and Material

DHS has provided discussions of the effect of this rule on the economy in Section Q of this final rule.

5. A Description of the Extent of the Agency's Prior Consultation With Elected Representatives (Under Section 204) of the Affected State, Local, and Tribal Governments

DHS has not consulted with elected representatives of the affected State, local, and tribal governments as the Federal mandates imposed by this rule are voluntary and DHS cannot predict which States or private sector entities will apply for these benefits in the future.

*D. Small Business Regulatory Enforcement Fairness Act of 1996*

This final rule is a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will result in an annual effect on the economy of more than $100 million in the first year only. For each subsequent year, the annual effect on the economy will remain under $100 million. As small businesses may be impacted under this regulation, DHS has prepared a Final Regulatory Flexibility analysis. The RFA analysis can be found with the analysis prepared

under Executive Orders 12866 and 13563 on *regulations.gov*.

*E. Executive Order 13132 (Federalism)*

This rule does not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Paperwork Reduction Act*

Under the Paperwork Reduction Act (PRA) of 1995, Public Law 104–13, Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. This final rule makes revisions to the following information collections:

1. The Application for Employment Authorization, Form I–765; and Form I–765 Work Sheet, Form I–765WS, OMB Control Number 1615–0040. Specifically, USCIS revises this collection by revising the instructions to Form I–765 to include information for the newly amended group of applicants (beneficiaries of approved Form I–140 petitions who are in the United States in E–3, H–1B, H–1B1, O–1, or L–1 nonimmigrant status, who do not have immigrant visas immediately available to them, and who demonstrate compelling circumstances justifying a grant of employment authorization) eligible to apply for employment authorization under final 8 CFR 274a.12(c)(35). Their dependent spouses and children who are present in the United States in nonimmigrant status are also eligible to obtain employment authorization under 8 CFR 274a.12(c)(36), provided that the principal foreign national has been granted employment authorization. USCIS is also amending Form I–765 to include Yes/No questions requiring these applicants to disclose certain criminal convictions. USCIS estimates an upper-bound average of 213,164 respondents will request employment authorization as a result of the changes in this rule in the first 2 years. This average estimate is derived from a maximum estimate of 361,766 new

respondents who may file applications for employment authorization documents in year 1 and a maximum estimate of 64,561 respondents in year 2. USCIS averaged this estimate for new I–765 respondents over a 2-year period of time based on its request seeking a 2-year approval of the form and its instructions from OMB.

2. USCIS is revising the form and its instructions and the estimate of total burden hours has increased due to the addition of this new population of Form I–765 filers, and the increase of burden hours associated with the collection of biometrics from these applicants.

3. The Immigrant Petition for Alien Worker, Form I–140; OMB Control Number 1615–0015. Specifically, USCIS is revising this information collection to remove ambiguity regarding whether information about the principal beneficiary's dependent family members should be entered on the Form I–140 petition, by revising the word "requests" to "requires" for clarification in the form instructions. USCIS is also revising the instructions to remove the terms "in duplicate" in the second paragraph under the labor certification section of the instructions because USCIS no longer requires uncertified Employment and Training Administration (ETA) Forms 9089 to be submitted in duplicate. There is no change in the data being captured on the information collection instrument, but there is a change to the estimated annual burden hours as a result of USCIS's revised estimate of the number of respondents for this collection of information.

4. The Petition for a Nonimmigrant Worker, Form I–129, OMB Control Number 1615–0009. USCIS is making revisions to Form I–129, specifically the H–1B Data Collection and Filing Fee Exemption Supplement and the accompanying instructions, to correspond with revisions to the regulatory definition of "related or affiliated nonprofit entities" for the purposes of determining whether the petitioner is exempt from: (1) Payment of the $750/$1,500 fee associated with the American Competitiveness and Workforce Improvement Act (ACWIA) and (2) the statutory numerical limitation on H–1B visas (also known as the H–1B cap). USCIS cannot predict the number of new respondents that would file petitions for foreign workers as a result of the changes in this rule.

5. The Application to Register Permanent Residence or Adjust Status, Form I–485, including new Supplement J, "Confirmation of Bona Fide Job Offer or Request for Job Portability under INA Section 204(J)," OMB Control Number

1615–0023. Specifically, USCIS is creating a new Supplement J to Form I–485 to allow the applicant for adjustment of status requesting portability under section 204(j) of the INA, and the U.S. employer offering the applicant a new permanent job offer, to provide formal attestations regarding important aspects of the job offer. Providing such attestations is an essential step to establish eligibility for adjustment of status in any employment-based immigrant visa classification requiring a job offer, regardless of whether the applicant is making a portability request under section 204(j) or is seeking to adjust status based upon the same job that was offered in the underlying immigrant visa petition. Through this new supplement, USCIS will collect required information from U.S. employers offering a new permanent job offer to a specific worker under section 204(j). Moreover, Supplement J will also be used by applicants who are not porting pursuant to section 204(j) to confirm that the original job offer described in the Form I–140 petition is still bona fide and available to the applicant at the time the applicant files the Form I–485 application. Supplement J replaces the current Form I–485 initial evidence requirement that an applicant must submit a letter on the letterhead of the petitioning U.S. employer that confirms that the job offer on which the Form I–140 petition is based is still available to the applicant.

This supplement also serves as an important anti-fraud measure, and it allows USCIS to validate employers extending new permanent job offers to individuals under section 204(j). USCIS estimates that approximately 28,309 new respondents will file Supplement J as a result of the changes made by this rule.

Additionally, USCIS is revising the instructions to Form I–485 to reflect the implementation of Supplement J. The Form I–485 instructions are also being revised to clarify that eligible applicants need to file Supplement J to request job portability under section 204(j). There is no change to the estimated annual burden hours as a result of this revision as a result of the changes in this rule.

Overview of This Information Collection

*(1) Type of Information Collection:* Revision of a Currently Approved Collection.

(2) Title of the Forms/Collections

• Application for Employment Authorization Document;

• Form I–765 Work Sheet;

• Immigrant Petition for Alien Worker;

• Petition for Nonimmigrant Worker;

• Application to Register Permanent Residence or Adjust Status.

(3) Agency form number, if any, and the applicable form component of the DHS sponsoring the collection: Forms I–765/ I–765WS, I–140, I–129 and I–485; USCIS.

(4) Affected public who will be asked or required to respond, as well as a brief abstract:

*Form I–765: Primary:* Individuals or households: This form was developed for individuals to request employment authorization and evidence of that employment authorization. USCIS is revising this form to add a new class of workers eligible to apply for employment authorization as the beneficiary of a valid immigrant visa petition for classification under sections 203(b)(1), 203(b)(2) or 203(b)(3) of the INA. Eligible applicants must be physically present in the United States in E–3, H–1B, H–1B1, O–1, or L–1 nonimmigrant status, and must demonstrate that they face compelling circumstances while they wait for their immigrant visas to become available. Dependent spouses and children who are present in the United States in nonimmigrant status are also eligible to apply provided that the principal has been granted employment authorization. Supporting documentation demonstrating eligibility must be filed with the application. The form instructions list examples of relevant documentation.

*Form I–140: Primary:* Business or other for-profit organizations, as well as not-for profit organizations. USCIS will use the information furnished on this information collection to classify individuals under sections 203(b)(1), 203(b)(2) or 203(b)(3) of the INA.

*Form I–129: Primary:* Business: This form is used by employers to petition for workers to come to the United States temporarily to perform services, labor, and training or to request extensions of stay or changes in nonimmigrant status for nonimmigrant workers. USCIS is revising Form I–129, specifically the H–1B Data Collection and Filing Fee Exemption Supplement, and the accompanying instructions, to correspond with revisions to the regulatory definition of "related or affiliated nonprofit entities" for the purposes of determining whether the petitioner is exempt from: (1) Payment of the $750/$1,500 fee associated with the American Competitiveness and Workforce Improvement Act (ACWIA), and (2) the statutory numerical

AC00227

limitation on H–1B visas (also known as the cap).

*Form I–485: Primary:* Individuals or households: The information collected is used to determine eligibility to adjust status under section 245 of the INA. The instructions to Form I–485, Application to Register Permanent Residence or Adjust Status, are being revised to reflect the implementation of Form I–485 Supplement J, Confirmation of Bona Fide Job Offer or Request for Job Portability under INA Section 204(j) (Supplement J). Supplement J will be used by individuals applying for adjustment of status to lawful permanent resident on the basis of being the principal beneficiary of an approved Form I–140, Immigrant Petition for Alien Worker. Applicants will use Supplement J to confirm that the job offer described in the Form I–140 petition is still bona fide and available to the applicant at the time the applicant files the Form I–485 application. Supplement J is replacing the current Form I–485 initial evidence requirement that an applicant must submit a letter on the letterhead of the petitioning employer which confirms that the job offer on which the Form I–140 petition is based is still available to the applicant. Applicants will also use Supplement J when requesting job portability pursuant to section 204(j) of the INA. Supplement J will provide a standardized procedure to confirm that the job offer described in the Form I–140 petition is still bona fide, or if applicable to request job portability pursuant to section 204(j) of the INA.

(5) An estimate of the total annual number of respondents and the amount of time estimated for an average respondent to respond:
• Form I–765/I–765WS:
  ○ 2,136,583 responses related to Form I–765 at 3.42 hours per response;
  ○ 250,000 responses related to Form I–765WS at .50 hours per response;
  ○ 405,067 responses related to Biometrics services at 1.17 hours; and
  ○ 2,136,583 responses related to Passport-Style Photographs at .50 hours per response.
• Form I–140:
  ○ 213,164 respondents at 1.08 hours per response.
• Form I–129:
  ○ Form I–129—333,891 respondents at 2.34 hours;
  ○ E–1/E–2 Classification to Form I–129—4,760 respondents at .67 hours;
  ○ Trade Agreement Supplement to Form I–129—3,057 respondents at .67 hours;
  ○ H Classification Supplement to Form I–129—255,872 respondents at 2 hours;

○ H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement—243,965 respondents at 1 hour;
○ L Classification Supplement to Form I–129—37,831 respondents at 1.34 hours;
○ and P Classifications Supplement to Form I–129—22,710 respondents at 1 hour;
○ Q–1 Classification Supplement to Form I–129—155 respondents at .34 hours; and
○ R–1 Classification Supplement to Form I–129—6,635 respondents at 2.34 hours.
• Form I–485:
○ 697,811 respondents at 6.25 hours per response;
○ 697,811 respondents related to Biometrics services at 1.17 hours.

(6) An estimate of the total annual public burden (in hours) associated with these collections:
• *Form I–765/I–765WS:* 8,974,364 hours.
• *Form I–140:* 230,217 hours.
• *Form I–129:* 1,631,400 hours.
• *Form I–485:* 5,238,100 hours.

(7) An estimate of the annual public burden (monetized) associated with these collections:
• *Form I–765/I–765WS:* $649,521,330.
• *Form I–140:* $123,642,620.
• *Form I–129:* $73,751,280.
• *Form I–485:* $239,349,173.

DHS has considered the public comments received in response to the NPRM, published in the **Federal Register** at 80 FR 81899 on December 31, 2015. DHS's responses to these comments appear in this final rule and in appendix to the supporting statements that accompany this rule and can be found in the docket. USCIS has submitted the supporting statements to OMB as part of its request for the approval of the revised information collection instruments.

## List of Subjects

### 8 CFR Part 204

Administrative practice and procedure, Adoption and foster care, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 205

Administrative practice and procedure, Immigration.

### 8 CFR Part 214

Administrative practice and procedure, Aliens, Cultural exchange programs, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

### 8 CFR Part 245

Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 204—IMMIGRANT PETITIONS

■ 1. The authority citation for part 204 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1324a, 1641; 8 CFR part 2.

■ 2. Section 204.5 is amended by:
■ a. Revising paragraphs (d), (e), and (n)(3); and
■ b. Adding paragraph (p).
The revisions and addition read as follows:

### § 204.5 Petitions for employment-based immigrants.

\* \* \* \* \*

(d) *Priority date.* The priority date of any petition filed for classification under section 203(b) of the Act which is accompanied by an individual labor certification from the Department of Labor shall be the date the labor certification application was accepted for processing by any office of the Department of Labor. The priority date of any petition filed for a classification under section 203(b) of the Act which does not require a labor certification from the Department of Labor shall be the date the completed, signed petition (including all initial evidence and the correct fee) is properly filed with USCIS. The priority date of any petition filed for classification under section 203(b) of the Act which is accompanied by an application for Schedule A designation shall be the date the completed, signed petition (including all initial evidence and the correct fee) is properly filed with USCIS. The priority date of an alien who filed for classification as a special immigrant under section 203(b)(4) of the Act prior to October 1, 1991, and who is the beneficiary of an approved petition for special immigrant status after October 1, 1991, shall be the date the alien applied for an immigrant visa or adjustment of status.

(e) *Retention of section 203(b)(1), (2), or (3) priority date.* (1) A petition approved on behalf of an alien under sections 203(b)(1), (2), or (3) of the Act accords the alien the priority date of the

AC00228

approved petition for any subsequently filed petition for any classification under section 203(b)(1), (2), or (3) of the Act for which the alien may qualify. In the event that the alien is the beneficiary of multiple approved petitions under section 203(b)(1), (2), or (3) of the Act, the alien shall be entitled to the earliest priority date.

(2) The priority date of a petition may not be retained under paragraph (e)(1) of this section if at any time USCIS revokes the approval of the petition because of:

(i) Fraud, or a willful misrepresentation of a material fact;

(ii) Revocation by the Department of Labor of the approved permanent labor certification that accompanied the petition;

(iii) Invalidation by USCIS or the Department of State of the permanent labor certification that accompanied the petition; or

(iv) A determination by USCIS that petition approval was based on a material error.

(3) A denied petition will not establish a priority date.

(4) A priority date is not transferable to another alien.

(5) A petition filed under section 204(a)(1)(F) of the Act for an alien shall remain valid with respect to a new employment offer as determined by USCIS under section 204(j) of the Act and 8 CFR 245.25. An alien will continue to be afforded the priority date of such petition, if the requirements of paragraph (e) of this section are met.

*       *       *       *       *

(n) * * *

(3) *Validity of approved petitions.* Unless approval is revoked under section 203(g) or 205 of the Act, an employment-based petition is valid indefinitely.

*       *       *       *       *

(p) *Eligibility for employment authorization in compelling circumstances*—(1) *Eligibility of principal alien.* An individual who is the principal beneficiary of an approved immigrant petition for classification under sections 203(b)(1), 203(b)(2) or 203(b)(3) of the Act may be eligible to receive employment authorization, upon application, if:

(i) In the case of an initial request for employment authorization, the individual is in E–3, H–1B, H–1B1, O–1, or L–1 nonimmigrant status, including the periods authorized by § 214.1(l)(l) and (2), as well as any other periods of admission authorized by this chapter before a validity period begins or after the expiration of a validity period, on the date the application for employment authorization (Form I–765) is filed;

(ii) An immigrant visa is not authorized for issuance to the principal beneficiary based on his or her priority date on the date the application for employment authorization is filed; and

(iii) USCIS determines, as a matter of discretion, that the principal beneficiary demonstrates compelling circumstances that justify the issuance of employment authorization.

(2) *Eligibility of spouses and children.* The family members, as described in section 203(d) of the Act, of a principal beneficiary, who are in nonimmigrant status at the time the principal beneficiary applies for employment authorization under paragraph (p)(1) of this section, are eligible to apply for employment authorization provided that the principal beneficiary has been granted employment authorization under paragraph (p) of this section and such employment authorization has not been terminated or revoked. Such family members may apply for employment authorization concurrently with the principal beneficiary, but cannot be granted employment authorization until the principal beneficiary is so authorized. The validity period of employment authorization granted to family members may not extend beyond the validity period of employment authorization granted to the principal beneficiary.

(3) *Eligibility for renewal of employment authorization.* An alien may be eligible to renew employment authorization granted under paragraph (p) of this section, upon submission of a new application before the expiration of such employment authorization, if:

(i) He or she is the principal beneficiary of an approved immigrant petition for classification under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act and either:

(A) An immigrant visa is not authorized for issuance to the principal beneficiary based on his or her priority date on the date the application for employment authorization, (Form I–765) is filed; and USCIS determines, as a matter of discretion that the principal beneficiary demonstrates compelling circumstances that justify the issuance of employment authorization; or

(B) The difference between the principal beneficiary's priority date and the date upon which immigrant visas are authorized for issuance for the principal beneficiary's preference category and country of chargeability is 1 year or less according to the Department of State Visa Bulletin in effect on the date the application for employment authorization (Form I–765), is filed. For example, if the

Department of State Visa Bulletin in effect on the date the renewal application is filed indicates immigrant visas are authorized for issuance for the applicable preference category and country of chargeability to individuals with priority dates earlier than November 1, 2000, USCIS may grant a renewal to a principal beneficiary whose priority date is on or between October 31, 1999 and October 31, 2001; or

(ii) He or she is a family member, as described under paragraph (p)(2) of this section, of a principal beneficiary granted a renewal of employment authorization under paragraph (p)(3)(i) that remains valid, except that the family member need not be maintaining nonimmigrant status at the time the principal beneficiary applies for renewal of employment authorization under paragraph (p) of this section. A family member may file an application to renew employment authorization concurrently with an application to renew employment authorization filed by the principal beneficiary or while such application by the principal beneficiary is pending, but the family member's renewal application cannot be approved unless the principal beneficiary's application is granted. The validity period of a renewal of employment authorization granted to family members may not extend beyond the validity period of the renewal of employment authorization granted to the principal beneficiary.

(4) *Application for employment authorization.* To request employment authorization, an eligible applicant described in paragraph (p)(1), (2), or (3) of this section must file an application for employment authorization (Form I–765), with USCIS, in accordance with 8 CFR 274a.13(a) and the form instructions. Such applicant is subject to the collection of his or her biometric information and the payment of any biometric services fee as provided in the form instructions. Employment authorization under this paragraph may be granted solely in 1-year increments.

(5) *Ineligibility for employment authorization.* An alien is not eligible for employment authorization, including renewal of employment authorization, under this paragraph if the alien has been convicted of any felony or two or more misdemeanors.

## PART 205—REVOCATION OF APPROVAL OF PETITIONS

■ 3. The authority citation for part 205 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1155, 1182, 1324a, and 1186a.

■ 4. Section 205.1 is amended by revising paragraphs (a)(3)(iii)(C) and (D) to read as follows:

### § 205.1   Automatic revocation.

(a) * * *
(3) * * *
(iii) * * *

(C) In employment-based preference cases, upon written notice of withdrawal filed by the petitioner to any officer of USCIS who is authorized to grant or deny petitions, where the withdrawal is filed less than 180 days after approval of the employment-based preference petition, unless an associated adjustment of status application has been pending for 180 days or more. A petition that is withdrawn 180 days or more after its approval, or 180 days or more after the associated adjustment of status application has been filed, remains approved unless its approval is revoked on other grounds. If an employment-based petition on behalf of an alien is withdrawn, the job offer of the petitioning employer is rescinded and the alien must obtain a new employment-based preference petition in order to seek adjustment of status or issuance of an immigrant visa as an employment-based immigrant, unless eligible for adjustment of status under section 204(j) of the Act and in accordance with 8 CFR 245.25.

(D) Upon termination of the petitioning employer's business less than 180 days after petition approval under section 203(b)(1)(B), 203(b)(1)(C), 203(b)(2), or 203(b)(3) of the Act, unless an associated adjustment of status application has been pending for 180 days or more. If a petitioning employer's business terminates 180 days or more after petition approval, or 180 days or more after an associated adjustment of status application has been filed, the petition remains approved unless its approval is revoked on other grounds. If a petitioning employer's business terminates the job offer of the petitioning employer is rescinded and the beneficiary must obtain a new employment-based preference petition on his or her behalf in order to seek adjustment of status or issuance of an immigrant visa as an employment-based immigrant, unless eligible for adjustment of status under section 204(j) of the Act and in accordance with 8 CFR 245.25.

* * * * *

## PART 214—NONIMMIGRANT CLASSES

■ 5. The authority citation for part 214 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 105–277, 112 Stat. 2681–641; Pub. L. 106–313, 114 Stat. 1251–1255; Pub. L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 6. Section 214.1 is amended by adding paragraph (l) to read as follows:

### § 214.1   Requirements for admission, extension, and maintenance of status.

* * * * *

(l) *Period of stay.* (1) An alien admissible in E–1, E–2, E–3, H–1B, L–1, or TN classification and his or her dependents may be admitted to the United States or otherwise provided such status for the validity period of the petition, or for a validity period otherwise authorized for the E–1, E–2, E–3, and TN classifications, plus an additional period of up to 10 days before the validity period begins and 10 days after the validity period ends. Unless authorized under 8 CFR 274a.12, the alien may not work except during the validity period.

(2) An alien admitted or otherwise provided status in E–1, E–2, E–3, H–1B, H–1B1, L–1, O–1 or TN classification and his or her dependents shall not be considered to have failed to maintain nonimmigrant status solely on the basis of a cessation of the employment on which the alien's classification was based, for up to 60 consecutive days or until the end of the authorized validity period, whichever is shorter, once during each authorized validity period. DHS may eliminate or shorten this 60-day period as a matter of discretion. Unless otherwise authorized under 8 CFR 274a.12, the alien may not work during such a period.

(3) An alien in any authorized period described in paragraph (l) of this section may apply for and be granted an extension of stay under paragraph (c)(4) of this section or change of status under 8 CFR 248.1, if otherwise eligible.

■ 7. Section 214.2 is amended by:
■ a. Adding paragraph (h)(2)(i)(H);
■ b. Revising paragraph (h)(4)(v)(C);
■ c. Adding paragraph (h)(8)(ii)(F);
■ d. Removing the fifth sentence from paragraph (h)(9)(iv);
■ e. Revising paragraph (h)(13)(i)(A);
■ f. Adding paragraphs (h)(13)(iii)(C) through (E);
■ g. Revising paragraphs (h)(19)(i) introductory text, (h)(19)(ii), and (h)(19)(iii)(B).
■ h. In paragraph (h)(19)(iii)(C):
■ i. Revising the second sentence; and

■ ii. Removing the period at the end of the paragraph and adding a semicolon in its place;
■ i. Adding paragraphs (h)(19)(iii)(D) and (E);
■ j. Revising paragraph (h)(19)(v);
■ k. Removing paragraph (h)(19)(vi);
■ l. Redesignating paragraph (h)(19)(vii) as paragraph (h)(19)(vi) and revising newly redesignated paragraph (h)(19)(vi); and
■ m. Adding paragraph (h)(20).
The revisions and additions read as follows:

### § 214.2   Special requirements for admission, extension, and maintenance of status.

* * * * *

(h) * * *
(2) * * *
(i) * * *

(H) *H–1B portability.* An eligible H–1B nonimmigrant is authorized to start concurrent or new employment under section 214(n) of the Act upon the filing, in accordance with 8 CFR 103.2(a), of a nonfrivolous H–1B petition on behalf of such alien, or as of the requested start date, whichever is later.

(*1*) *Eligible H–1B nonimmigrant.* For H–1B portability purposes, an eligible H–1B nonimmigrant is defined as an alien:

(*i*) Who has been lawfully admitted into the United States in, or otherwise provided, H–1B nonimmigrant status;

(*ii*) On whose behalf a nonfrivolous H–1B petition for new employment has been filed, including a petition for new employment with the same employer, with a request to amend or extend the H–1B nonimmigrant's stay, before the H–1B nonimmigrant's period of stay authorized by the Secretary of Homeland Security expires; and

(*iii*) Who has not been employed without authorization in the United States from the time of last admission through the filing of the petition for new employment.

(*2*) *Length of employment.* Employment authorized under paragraph (h)(2)(i)(H) of this section automatically ceases upon the adjudication of the H–1B petition described in paragraph (h)(2)(i)(H)(*1*)(*ii*) of this section.

(*3*) *Successive H–1B portability petitions.* (*i*) An alien maintaining authorization for employment under paragraph (h)(2)(i)(H) of this section, whose status, as indicated on the Arrival-Departure Record (Form I–94), has expired, shall be considered to be in a period of stay authorized by the Secretary of Homeland Security for purposes of paragraph (h)(2)(i)(H)(*1*)(*ii*) of this section. If otherwise eligible

under paragraph (h)(2)(i)(H) of this section, such alien may begin working in a subsequent position upon the filing of another H–1B petition or from the requested start date, whichever is later, notwithstanding that the previous H–1B petition upon which employment is authorized under paragraph (h)(2)(i)(H) of this section remains pending and regardless of whether the validity period of an approved H–1B petition filed on the alien's behalf expired during such pendency.

(*ii*) A request to amend the petition or for an extension of stay in any successive H–1B portability petition cannot be approved if a request to amend the petition or for an extension of stay in any preceding H–1B portability petition in the succession is denied, unless the beneficiary's previously approved period of H–1B status remains valid.

(*iii*) Denial of a successive portability petition does not affect the ability of the H–1B beneficiary to continue or resume working in accordance with the terms of an H–1B petition previously approved on behalf of the beneficiary if that petition approval remains valid and the beneficiary has maintained H–1B status or been in a period of authorized stay and has not been employed in the United States without authorization.

\*     \*     \*     \*     \*

(4) \* \* \*
(v) \* \* \*

(C) *Duties without licensure.* (*1*) In certain occupations which generally require licensure, a state may allow an individual without licensure to fully practice the occupation under the supervision of licensed senior or supervisory personnel in that occupation. In such cases, USCIS shall examine the nature of the duties and the level at which they are performed, as well as evidence provided by the petitioner as to the identity, physical location, and credentials of the individual(s) who will supervise the alien, and evidence that the petitioner is complying with state requirements. If the facts demonstrate that the alien under supervision will fully perform the duties of the occupation, H classification may be granted.

(*2*) An H–1B petition filed on behalf of an alien who does not have a valid state or local license, where a license is otherwise required to fully perform the duties in that occupation, may be approved for a period of up to 1 year if:

(*i*) The license would otherwise be issued provided the alien was in possession of a valid Social Security number, was authorized for employment in the United States, or met a similar technical requirement; and

(*ii*) The petitioner demonstrates, through evidence from the state or local licensing authority, that the only obstacle to the issuance of a license to the beneficiary is the lack of a Social Security number, a lack of employment authorization in the United States, or a failure to meet a similar technical requirement that precludes the issuance of the license to an individual who is not yet in H–1B status. The petitioner must demonstrate that the alien is fully qualified to receive the state or local license in all other respects, meaning that all educational, training, experience, and other substantive requirements have been met. The alien must have filed an application for the license in accordance with applicable state and local rules and procedures, provided that state or local rules or procedures do not prohibit the alien from filing the license application without provision of a Social Security number or proof of employment authorization or without meeting a similar technical requirement.

(*3*) An H–1B petition filed on behalf of an alien who has been previously accorded H–1B classification under paragraph (h)(4)(v)(C)(*2*) of this section may not be approved unless the petitioner demonstrates that the alien has obtained the required license, is seeking to employ the alien in a position requiring a different license, or the alien will be employed in that occupation in a different location which does not require a state or local license to fully perform the duties of the occupation.

\*     \*     \*     \*     \*

(8) \* \* \*
(ii) \* \* \*

(F) *Cap exemptions under sections 214(g)(5)(A) and (B) of the Act.* An alien is not subject to the numerical limitations identified in section 214(g)(1)(A) of the Act if the alien qualifies for an exemption under section 214(g)(5) of the Act. For purposes of section 214(g)(5)(A) and (B) of the Act:

(*1*) "Institution of higher education" has the same definition as described at section 101(a) of the Higher Education Act of 1965 (20 U.S.C. 1001(a)).

(*2*) A nonprofit entity shall be considered to be related to or affiliated with an institution of higher education if it satisfies any one of the following conditions:

(*i*) The nonprofit entity is connected to or associated with an institution of higher education through shared ownership or control by the same board or federation;

(*ii*) The nonprofit entity is operated by an institution of higher education;

(*iii*) The nonprofit entity is attached to an institution of higher education as a member, branch, cooperative, or subsidiary; or

(*iv*) The nonprofit entity has entered into a formal written affiliation agreement with an institution of higher education that establishes an active working relationship between the nonprofit entity and the institution of higher education for the purposes of research or education, and a fundamental activity of the nonprofit entity is to directly contribute to the research or education mission of the institution of higher education.

(*3*) An entity is considered a "nonprofit entity" if it meets the definition described at paragraph (h)(19)(iv) of this section. "Nonprofit research organization" and "governmental research organization" have the same definitions as described at paragraph (h)(19)(iii)(C) of this section.

(*4*) An H–1B beneficiary who is not directly employed by a qualifying institution, organization or entity identified in section 214(g)(5)(A) or (B) of the Act shall qualify for an exemption under such section if the H–1B beneficiary will spend the majority of his or her work time performing job duties at a qualifying institution, organization or entity and those job duties directly and predominately further the essential purpose, mission, objectives or functions of the qualifying institution, organization or entity, namely, either higher education, nonprofit research or government research. The burden is on the H–1B petitioner to establish that there is a nexus between the duties to be performed by the H–1B beneficiary and the essential purpose, mission, objectives or functions of the qualifying institution, organization or entity.

(*5*) If cap-exempt employment ceases, and if the alien is not the beneficiary of a new cap-exempt petition, then the alien will be subject to the cap if not previously counted within the 6-year period of authorized admission to which the cap-exempt employment applied. If cap-exempt employment converts to cap-subject employment subject to the numerical limitations in section 214(g)(1)(A) of the Act, USCIS may revoke the petition authorizing such employment consistent with paragraph (h)(11)(iii) of this section.

(*6*) Concurrent H–1B employment in a cap-subject position of an alien that qualifies for an exemption under section 214(g)(5)(A) or (B) of the Act shall not subject the alien to the numerical limitations in section 214(g)(1)(A) of the Act. When petitioning for concurrent cap-subject H–1B employment, the petitioner must demonstrate that the H–

AC00231

1B beneficiary is employed in valid H–1B status under a cap exemption under section 214(g)(5)(A) or (B) of the Act, the beneficiary's employment with the cap-exempt employer is expected to continue after the new cap-subject petition is approved, and the beneficiary can reasonably and concurrently perform the work described in each employer's respective positions.

(*i*) Validity of a petition for concurrent cap-subject H–1B employment approved under paragraph (h)(8)(ii)(F)(*6*) of this section cannot extend beyond the period of validity specified for the cap-exempt H–1B employment.

(*ii*) If H–1B employment subject to a cap exemption under section 214(g)(5)(A) or (B) of the Act is terminated by a petitioner, or otherwise ends before the end of the validity period listed on the approved petition filed on the alien's behalf, the alien who is concurrently employed in a cap-subject position becomes subject to the numerical limitations in section 214(g)(1)(A) of the Act, unless the alien was previously counted with respect to the 6-year period of authorized H–1B admission to which the petition applies or another exemption applies. If such an alien becomes subject to the numerical limitations in section 214(g)(1)(A) of the Act, USCIS may revoke the cap-subject petition described in paragraph (h)(8)(ii)(F)(*6*) of this section consistent with paragraph (h)(11)(iii) of this section.

\*    \*    \*    \*    \*

(13) \* \* \*

(i) \* \* \*

(A) Except as set forth in 8 CFR 214.1(l) with respect to H–1B beneficiaries and their dependents and paragraph (h)(5)(viii)(B) of this section with respect to H–2A beneficiaries, a beneficiary shall be admitted to the United States for the validity period of the petition, plus a period of up to 10 days before the validity period begins and 10 days after the validity period ends. The beneficiary may not work except during the validity period of the petition.

\*    \*    \*    \*    \*

(iii) \* \* \*

(C) *Calculating the maximum H–1B admission period.* Time spent physically outside the United States exceeding 24 hours by an alien during the validity of an H–1B petition that was approved on the alien's behalf shall not be considered for purposes of calculating the alien's total period of authorized admission under section 214(g)(4) of the Act, regardless of whether such time meaningfully interrupts the alien's stay in H–1B status

and the reason for the alien's absence. Accordingly, such remaining time may be recaptured in a subsequent H–1B petition on behalf of the alien, at any time before the alien uses the full period of H–1B admission described in section 214(g)(4) of the Act.

(*1*) It is the H–1B petitioner's burden to request and demonstrate the specific amount of time for recapture on behalf of the beneficiary. The beneficiary may provide appropriate evidence, such as copies of passport stamps, Arrival-Departure Records (Form I–94), or airline tickets, together with a chart, indicating the dates spent outside of the United States, and referencing the relevant independent documentary evidence, when seeking to recapture the alien's time spent outside the United States. Based on the evidence provided, USCIS may grant all, part, or none of the recapture period requested.

(*2*) If the beneficiary was previously counted toward the H–1B numerical cap under section 214(g)(1) of the Act with respect to the 6-year maximum period of H–1B admission from which recapture is sought, the H–1B petition seeking to recapture a period of stay as an H–1B nonimmigrant will not subject the beneficiary to the H–1B numerical cap, whether or not the alien has been physically outside the United States for 1 year or more and would be otherwise eligible for a new period of admission under such section of the Act. An H–1B petitioner may either seek such recapture on behalf of the alien or, consistent with paragraph (h)(13)(iii) of this section, seek a new period of admission on behalf of the alien under section 214(g)(1) of the Act.

(D) *Lengthy adjudication delay exemption from 214(g)(4) of the Act.* (*1*) An alien who is in H–1B status or has previously held H–1B status is eligible for H–1B status beyond the 6-year limitation under section 214(g)(4) of the Act, if at least 365 days have elapsed since:

(*i*) The filing of a labor certification with the Department of Labor on the alien's behalf, if such certification is required for the alien to obtain status under section 203(b) of the Act; or

(*ii*) The filing of an immigrant visa petition with USCIS on the alien's behalf to accord classification under section 203(b) of the Act.

(*2*) H–1B approvals under paragraph (h)(13)(iii)(D) of this section may be granted in up to 1-year increments until either the approved permanent labor certification expires or a final decision has been made to:

(*i*) Deny the application for permanent labor certification, or, if approved, to revoke or invalidate such approval;

(*ii*) Deny the immigrant visa petition, or, if approved, revoke such approval;

(*iii*) Deny or approve the alien's application for an immigrant visa or application to adjust status to lawful permanent resident; or

(*iv*) Administratively or otherwise close the application for permanent labor certification, immigrant visa petition, or application to adjust status.

(*3*) *No final decision while appeal available or pending.* A decision to deny or revoke an application for labor certification, or to deny or revoke the approval of an immigrant visa petition, will not be considered final under paragraph (h)(13)(iii)(D)(*2*)(*i*) or (*ii*) of this section during the period authorized for filing an appeal of the decision, or while an appeal is pending.

(*4*) *Substitution of beneficiaries.* An alien who has been replaced by another alien, on or before July 16, 2007, as the beneficiary of an approved permanent labor certification may not rely on that permanent labor certification to establish eligibility for H–1B status based on this lengthy adjudication delay exemption. Except for a substitution of a beneficiary that occurred on or before July 16, 2007, an alien establishing eligibility for this lengthy adjudication delay exemption based on a pending or approved labor certification must be the named beneficiary listed on the permanent labor certification.

(*5*) *Advance filing.* A petitioner may file an H–1B petition seeking a lengthy adjudication delay exemption under paragraph (h)(13)(iii)(D) of this section within 6 months of the requested H–1B start date. The petition may be filed before 365 days have elapsed since the labor certification application or immigrant visa petition was filed with the Department of Labor or USCIS, respectively, provided that the application for labor certification or immigrant visa petition must have been filed at least 365 days prior to the date the period of admission authorized under this exemption will take effect. The petitioner may request any time remaining to the beneficiary under the maximum period of admission described at section 214(g)(4) of the Act along with the exemption request, but in no case may the approved H–1B period of validity exceed the limits specified by paragraph (h)(9)(iii) of this section. Time remaining to the beneficiary under the maximum period of admission described at section 214(g)(4) of the Act may include any request to recapture unused H–1B, L–1A, or L–1B time spent outside of the United States.

(*6*) *Petitioners seeking exemption.* The H–1B petitioner need not be the employer that filed the application for

labor certification or immigrant visa petition that is used to qualify for this exemption.

(7) *Subsequent exemption approvals after the 7th year.* The qualifying labor certification or immigrant visa petition need not be the same as that used to qualify for the initial exemption under paragraph (h)(13)(iii)(D) of this section.

(8) *Aggregation of time not permitted.* A petitioner may not aggregate the number of days that have elapsed since the filing of one labor certification or immigrant visa petition with the number of days that have elapsed since the filing of another such application or petition to meet the 365-day requirement.

(9) *Exemption eligibility.* Only a principal beneficiary of a nonfrivolous labor certification application or immigrant visa petition filed on his or her behalf may be eligible under paragraph (h)(13)(iii)(D) of this section for an exemption to the maximum period of admission under section 214(g)(4) of the Act.

(10) *Limits on future exemptions from the lengthy adjudication delay.* An alien is ineligible for the lengthy adjudication delay exemption under paragraph (h)(13)(iii)(D) of this section if the alien is the beneficiary of an approved petition under section 203(b) of the Act and fails to file an adjustment of status application or apply for an immigrant visa within 1 year of an immigrant visa being authorized for issuance based on his or her preference category and country of chargeability. If the accrual of such 1-year period is interrupted by the unavailability of an immigrant visa, a new 1-year period shall be afforded when an immigrant visa again becomes immediately available. USCIS may excuse a failure to file in its discretion if the alien establishes that the failure to apply was due to circumstances beyond his or her control. The limitations described in this paragraph apply to any approved immigrant visa petition under section 203(b) of the Act, including petitions withdrawn by the petitioner or those filed by a petitioner whose business terminates 180 days or more after approval.

(E) *Per-country limitation exemption from section 214(g)(4) of the Act.* An alien who currently maintains or previously held H–1B status, who is the beneficiary of an approved immigrant visa petition for classification under section 203(b)(1), (2), or (3) of the Act, and who is eligible to be granted that immigrant status but for application of the per country limitation, is eligible for H–1B status beyond the 6-year limitation under section 214(g)(4) of the Act. The petitioner must demonstrate

such visa unavailability as of the date the H–1B petition is filed with USCIS.

(1) *Validity periods.* USCIS may grant validity periods for petitions approved under this paragraph in increments of up to 3 years for as long as the alien remains eligible for this exemption.

(2) H–1B approvals under paragraph (h)(13)(iii)(E) of this section may be granted until a final decision has been made to:

(*i*) Revoke the approval of the immigrant visa petition; or

(*ii*) Approve or deny the alien's application for an immigrant visa or application to adjust status to lawful permanent residence.

(3) *Current H–1B status not required.* An alien who is not in H–1B status at the time the H–1B petition on his or her behalf is filed, including an alien who is not in the United States, may seek an exemption of the 6-year limitation under 214(g)(4) of the Act under this clause, if otherwise eligible.

(4) *Subsequent petitioners may seek exemptions.* The H–1B petitioner need not be the employer that filed the immigrant visa petition that is used to qualify for this exemption. An H–1B petition may be approved under paragraph (h)(13)(iii)(E) of this section with respect to any approved immigrant visa petition, and a subsequent H–1B petition may be approved with respect to a different approved immigrant visa petition on behalf of the same alien.

(5) *Advance filing.* A petitioner may file an H–1B petition seeking a per-country limitation exemption under paragraph (h)(13)(iii)(E) of this section within 6 months of the requested H–1B start date. The petitioner may request any time remaining to the beneficiary under the maximum period of admission described in section 214(g)(4) of the Act along with the exemption request, but in no case may the H–1B approval period exceed the limits specified by paragraph (h)(9)(iii) of this section.

(6) *Exemption eligibility.* Only the principal beneficiary of an approved immigrant visa petition for classification under section 203(b)(1), (2), or (3) of the Act may be eligible under paragraph (h)(13)(iii)(E) of this section for an exemption to the maximum period of admission under section 214(g)(4) of the Act.

\*　　\*　　\*　　\*　　\*

(19) \* \* \*

(i) A United States employer (other than an exempt employer defined in paragraph (h)(19)(iii) of this section, or an employer filing a petition described in paragraph (h)(19)(v) of this section) who files a Petition for Nonimmigrant

Worker (Form I–129) must include the additional American Competitiveness and Workforce Improvement Act (ACWIA) fee referenced in § 103.7(b)(1) of this chapter, if the petition is filed for any of the following purposes:

\*　　\*　　\*　　\*　　\*

(ii) A petitioner must submit with the petition the ACWIA fee, and any other applicable fees, in accordance with § 103.7 of this chapter, and form instructions. Payment of all applicable fees must be made at the same time, but the petitioner may submit separate checks. USCIS will accept payment of the ACWIA fee only from the United States employer or its representative of record, as defined in 8 CFR 103.2(a) and 8 CFR part 292.

(iii) \* \* \*

(B) *An affiliated or related nonprofit entity.* A nonprofit entity shall be considered to be related to or affiliated with an institution of higher education if it satisfies any one of the following conditions:

(1) The nonprofit entity is connected to or associated with an institution of higher education through shared ownership or control by the same board or federation;

(2) The nonprofit entity is operated by an institution of higher education;

(3) The nonprofit entity is attached to an institution of higher education as a member, branch, cooperative, or subsidiary; or

(4) The nonprofit entity has entered into a formal written affiliation agreement with an institution of higher education that establishes an active working relationship between the nonprofit entity and the institution of higher education for the purposes of research or education, and a fundamental activity of the nonprofit entity is to directly contribute to the research or education mission of the institution of higher education;

(C) \* \* \* A governmental research organization is a federal, state, or local entity whose primary mission is the performance or promotion of basic research and/or applied research. \* \* \*

(D) A primary or secondary education institution; or

(E) A nonprofit entity which engages in an established curriculum-related clinical training of students registered at an institution of higher education.

\*　　\*　　\*　　\*　　\*

(v) *Filing situations where the American Competitiveness and Workforce Improvement Act of 1998 (ACWIA) fee is not required.* The ACWIA fee is not required if:

(A) The petition is an amended H–1B petition that does not contain any requests for an extension of stay;

(B) The petition is an H–1B petition filed for the sole purpose of correcting a Service error; or

(C) The petition is the second or subsequent request for an extension of stay filed by the employer regardless of when the first extension of stay was filed or whether the ACWIA fee was paid on the initial petition or the first extension of stay.

(vi) *ACWIA fee exemption evidence.* (A) Employer claiming to be exempt. An employer claiming to be exempt from the ACWIA fee must file a Petition for Nonimmigrant Worker (Form I–129), in accordance with the form instructions, including supporting evidence establishing that it meets one of the exemptions described at paragraph (h)(19)(iii) of this section. A United States employer claiming an exemption from the ACWIA fee on the basis that it is a non-profit research organization must submit evidence that it has tax exempt status under the Internal Revenue Code of 1986, section 501(c)(3), (c)(4) or (c)(6), 26 U.S.C. 501(c)(3), (c)(4) or (c)(6). All other employers claiming an exemption must submit a statement describing why the organization or entity is exempt.

(B) Exempt filing situations. Any non-exempt employer who claims that the ACWIA fee does not apply with respect to a particular filing for one of the reasons described in paragraph (h)(19)(v) of this section must indicate why the ACWIA fee is not required.

(20) *Retaliatory action claims.* If credible documentary evidence is provided in support of a petition seeking an extension of H–1B stay in or change of status to another classification indicating that the beneficiary faced retaliatory action from his or her employer based on a report regarding a violation of that employer's labor condition application obligations under section 212(n)(2)(C)(iv) of the Act, USCIS may consider a loss or failure to maintain H–1B status by the beneficiary related to such violation as due to, and commensurate with, ''extraordinary circumstances'' as defined by § 214.1(c)(4) and 8 CFR 248.1(b).

\*   \*   \*   \*   \*

**PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE**

■ 8. The authority citation for part 245 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 9. Revise § 245.15(n)(2) to read as follows:

**§ 245.15   Adjustment of status of certain Haitian nationals under the Haitian Refugee Immigrant Fairness Act of 1998 (HRIFA).**

\*   \*   \*   \*   \*

(n) \* \* \*

(2) *Adjudication and issuance.* Employment authorization may not be issued to an applicant for adjustment of status under section 902 of HRIFA until the adjustment application has been pending for 180 days, unless USCIS verifies that DHS records contain evidence that the applicant meets the criteria set forth in section 902(b) or 902(d) of HRIFA, and determines that there is no indication that the applicant is clearly ineligible for adjustment of status under section 902 of HRIFA, in which case USCIS may approve the application for employment authorization, and issue the resulting document, immediately upon such verification. If USCIS fails to adjudicate the application for employment authorization upon the expiration of the 180-day waiting period, or within 90 days of the filing of application for employment authorization, whichever comes later, the applicant shall be eligible for an employment authorization document. Nothing in this section shall preclude an applicant for adjustment of status under HRIFA from being granted an initial employment authorization or an extension of employment authorization under any other provision of law or regulation for which the applicant may be eligible.

\*   \*   \*   \*   \*

■ 10. Add § 245.25 to read as follows:

**§ 245.25   Adjustment of status of aliens with approved employment-based immigrant visa petitions; validity of petition and offer of employment.**

(a) *Validity of petition for continued eligibility for adjustment of status.* An alien who has a pending application to adjust status to that of a lawful permanent resident based on an approved employment-based immigrant visa petition filed under section 204(a)(1)(F) of the Act on the applicant's behalf must have a valid offer of employment based on a valid petition at the time the application to adjust status is filed and at the time the alien's application to adjust status is adjudicated, and the applicant must intend to accept such offer of employment. Prior to a final administrative decision on an application to adjust status, USCIS may require that the applicant demonstrate, or the applicant may affirmatively demonstrate to USCIS, on Form I–485

Supplement J, with any supporting material and credible documentary evidence, in accordance with the form instructions that:

(1) The employment offer by the petitioning employer is continuing; or

(2) Under section 204(j) of the Act, the applicant has a new offer of employment from the petitioning employer or a different U.S. employer, or a new offer based on self-employment, in the same or a similar occupational classification as the employment offered under the qualifying petition, provided that:

(i) The alien's application to adjust status based on a qualifying petition has been pending for 180 days or more; and

(ii) The qualifying immigrant visa petition:

(A) Has already been approved; or

(B) Is pending when the beneficiary notifies USCIS of a new job offer 180 days or more after the date the alien's adjustment of status application was filed, and the petition is subsequently approved:

(*1*) Adjudication of the pending petition shall be without regard to the requirement in 8 CFR 204.5(g)(2) to continuously establish the ability to pay the proffered wage after filing and until the beneficiary obtains lawful permanent residence; and

(*2*) The pending petition will be approved if it was eligible for approval at the time of filing and until the alien's adjustment of status application has been pending for 180 days, unless approval of the qualifying immigrant visa petition at the time of adjudication is inconsistent with a requirement of the Act or another applicable statute; and

(iii) The approval of the qualifying petition has not been revoked.

(3) In all cases, the applicant and his or her intended employer must demonstrate the intention for the applicant to be employed under the continuing or new employment offer (including self-employment) described in paragraphs (a)(1) and (2) of this section, as applicable, within a reasonable period upon the applicant's grant of lawful permanent resident status.

(b) *Definition of same or similar occupational classification.* The term ''same occupational classification'' means an occupation that resembles in every relevant respect the occupation for which the underlying employment-based immigrant visa petition was approved. The term ''similar occupational classification'' means an occupation that shares essential qualities or has a marked resemblance or likeness with the occupation for which the underlying employment-

based immigrant visa petition was approved.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 11. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2.

■ 12. Amend § 274a.2 by revising paragraph (b)(1)(vii) to read as follows:

### § 274a.2   Verification of identity and employment authorization.

\*     \*     \*     \*     \*

(b) \* \* \*

(1) \* \* \*

(vii) If an individual's employment authorization expires, the employer, recruiter or referrer for a fee must reverify on the Form I–9 to reflect that the individual is still authorized to work in the United States; otherwise, the individual may no longer be employed, recruited, or referred. Reverification on the Form I–9 must occur not later than the date work authorization expires. If an Employment Authorization Document (Form I–766) as described in § 274a.13(d) was presented for completion of the Form I–9 in combination with a Notice of Action (Form I–797C), stating that the original Employment Authorization Document has been automatically extended for up to 180 days, reverification applies upon the expiration of the automatically extended validity period under § 274a.13(d) and not upon the expiration date indicated on the face of the individual's Employment Authorization Document. In order to reverify on the Form I–9, the employee or referred individual must present a document that either shows continuing employment eligibility or is a new grant of work authorization. The employer or the recruiter or referrer for a fee must review this document, and if it appears to be genuine and relate to the individual, reverify by noting the document's identification number and expiration date, if any, on the Form I–9 and signing the attestation by a handwritten signature or electronic signature in accordance with paragraph (i) of this section.

\*     \*     \*     \*     \*

■ 13. Amend § 274a.12 by:
■ a. Adding a sentence to the end of paragraph (b)(9);
■ b. Adding and reserving paragraphs (c)(27) through (34); and

■ c. Adding paragraphs (c)(35) and (36). The additions read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*     \*     \*     \*     \*

(b) \* \* \*

(9) \* \* \* In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H);

\*     \*     \*     \*     \*

(c) \* \* \*

(35) An alien who is the principal beneficiary of a valid immigrant petition under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act described as eligible for employment authorization in 8 CFR 204.5(p).

(36) A spouse or child of a principal beneficiary of a valid immigrant petition under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act described as eligible for employment authorization in 8 CFR 204.5(p).

■ 14. Amend § 274a.13 by:
■ a. Revising paragraph (a) introductory text;
■ b. Removing the first sentence of paragraph (a)(1); and
■ c. Revising paragraph (d).
The revisions read as follows:

### § 274a.13   Application for employment authorization.

(a) *Application.* An alien requesting employment authorization or an Employment Authorization Document (Form I–766), or both, may be required to apply on a form designated by USCIS with any prescribed fee(s) in accordance with the form instructions. An alien may file such request concurrently with a related benefit request that, if granted, would form the basis for eligibility for employment authorization, only to the extent permitted by the form instructions or as announced by USCIS on its Web site.

\*     \*     \*     \*     \*

(d) *Renewal application*—(1) *Automatic extension of Employment Authorization Documents.* Except as otherwise provided in this chapter or by law, notwithstanding 8 CFR 274a.14(a)(1)(i), the validity period of an expiring Employment Authorization Document (Form I–766) and, for aliens who are not employment authorized incident to status, also the attendant

employment authorization, will be automatically extended for an additional period not to exceed 180 days from the date of such document's and such employment authorization's expiration if a request for renewal on a form designated by USCIS is:

(i) Properly filed as provided by form instructions before the expiration date shown on the face of the Employment Authorization Document, or during the filing period described in the applicable **Federal Register** notice regarding procedures for obtaining Temporary Protected Status-related EADs;

(ii) Based on the same employment authorization category as shown on the face of the expiring Employment Authorization Document or is for an individual approved for Temporary Protected Status whose EAD was issued pursuant to 8 CFR 274a.12(c)(19); and

(iii) Based on a class of aliens whose eligibility to apply for employment authorization continues notwithstanding expiration of the Employment Authorization Document and is based on an employment authorization category that does not require adjudication of an underlying application or petition before adjudication of the renewal application, including aliens described in 8 CFR 274a.12(a)(12) granted Temporary Protected Status and pending applicants for Temporary Protected Status who are issued an EAD under 8 CFR 274a.12(c)(19), as may be announced on the USCIS Web site.

(2) *Terms and conditions.* Any extension authorized under this paragraph (d) shall be subject to any conditions and limitations noted in the immediately preceding employment authorization.

(3) *Termination.* The period authorized by paragraph (d)(1) of this section will automatically terminate the earlier of up to 180 days after the expiration date of the Employment Authorization Document (Form I–766), or upon issuance of notification of a decision denying the renewal request. Nothing in paragraph (d) of this section will affect DHS's ability to otherwise terminate any employment authorization or Employment Authorization Document, or extension period for such employment or document, by written notice to the applicant, by notice to a class of aliens published in the **Federal Register**, or as provided by statute or regulation including 8 CFR 274a.14.

AC00235

(4) *Unexpired Employment Authorization Documents.* An Employment Authorization Document (Form I–766) that has expired on its face is considered unexpired when combined with a Notice of Action (Form I–797C), which demonstrates that the requirements of paragraph (d)(1) of this section have been met.

**Jeh Charles Johnson,**
*Secretary.*
[FR Doc. 2016–27540 Filed 11–17–16; 8:45 am]
**BILLING CODE 9111–97–P**

AC00236

**DEPARTMENT OF HOMELAND SECURITY**
**PROGRAMMATIC ENVIRONMENTAL ASSESSMENT**
**FOR**
**ACTIONS TO ADDRESS AN INCREASED INFLUX OF**
**UNACCOMPANIED ALIEN CHILDREN AND FAMILY UNITS ACROSS THE SOUTHWEST**
**BORDER OF THE UNITED STATES**

## 1.0     Introduction

The June 2, 2014 Presidential Memorandum *Response to the Influx of Unaccompanied Alien Children Across the Southwest Border* described the influx as an "urgent humanitarian situation requiring a unified and coordinated Federal response." The memorandum is available on-line at http://www.whitehouse.gov/the-press-office/2014/06/02/presidential-memorandum-response-influx-unaccompanied-alien-children-acr. In this memorandum, the President directed the Secretary of the Department of Homeland Security (Secretary) to establish an interagency Unified Coordination Group to ensure unity of effort across the executive branch in responding to the humanitarian aspects of the situation, consistent with the Homeland Security Act of 2002 and Homeland Security Presidential Directive-5 (Management of Domestic Incidents), including coordination with State, local, and other nonfederal entities.

In addition to the influx of unaccompanied alien children, there is also an increase in the number of family units entering the Unites States. The Department of Homeland Security (DHS) is responsible for the apprehension, processing, detention, and removal of such persons crossing the southwest border into the United States without authorization. The unprecedented increase in the number of apprehended persons has the potential to fill or exceed the capacity of the DHS supporting infrastructure (real property for processing and housing apprehended persons, services including medical care, transportation, utilities, meals, hygiene, recreation, etc.) currently available. Therefore, action is being considered at the DHS Headquarters level to provide increased and expedited allocation of Departmental resources in the following three areas:

1) Provide adequate facilities for Customs and Border Protection (CBP) to safely house unaccompanied alien children (normally for no more than 72 hours) and family units until they can be transferred to the Department of Health and Human Services (HHS) and Immigrations and Customs Enforcement (ICE) respectively, and provide  adequate facilities for ICE to safely house family units;

2) Provide transportation (land, air, water) between intake, processing, and housing facilities, as well as between these facilities and physicians and dentists offices, hospitals, consular offices, and airports or other transportation hubs, and

3) Provide medical care, including care to treat, prevent, and minimize the spread of communicable illnesses.

## 1.1     Definitions

DHS and HHS use the same terminology for practices and processes regarding unaccompanied alien children. Consistent with the Homeland Security Act of 2002, Section 279(g) DEFINITIONS: (1) the term ''placement'' means the placement of an unaccompanied alien child in either a detention facility or an alternative to such a facility; and (2) the term ''unaccompanied alien child'' means a child who (A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

UAC00534

This document uses the following definition of "family unit" from ICE's Family Detention and Intake Guidance (August 14, 2009): a family unit means a group of detainees that includes one or more non-United States citizen juvenile(s) accompanied by his/her/their parent(s) or legal guardian(s). For purposes of ICE custody, any individual detained as part of a family unit must be a non-criminal and have no history of violence, sexual, or substance abuse.

## 1.2    Geographic Location

The location of the Proposed Action is primarily the southwestern U.S./Mexico international border region area, extending from the Pacific Coast to the Gulf of Mexico, as shown on Figure 1. However, housing locations as well as related resources may be located and/or obtained elsewhere in the country depending on the availability of existing facilities that can be repurposed or availability of land where new facilities can be constructed.

**Figure 1:  Southwestern US Border Area with US Border Patrol Sectors Shown**



## 1.3    Applicability

This Programmatic Environmental Assessment (PEA) is intended to cover DHS activities under existing authorities during the current increased influx of unaccompanied alien children and family units and any future such influx as result of which any component of DHS requires rapid acquisition of housing or detention space for such persons. DHS recognizes that this PEA may need to be revised or augmented or new environmental analysis may be needed if there are policy or legislative changes that would require significant changes to DHS' operations with regard to unaccompanied alien children and/or family units that enter into the United States illegally. If DHS makes any substantive changes to the PEA, DHS will make the revised document available to the public.

2

## 2.0    Background

*2.1.1  The Department of Homeland Security Mission*

The DHS consists of Operational Components and Support Components (generally headquarters-level Directorates and Offices) responsible for the implementation of five homeland security missions: 1) prevent terrorism and enhancing security; 2) secure and manage our borders; 3) enforce and administer our immigration laws; 4) safeguard and secure cyberspace; and 5) prepare for, respond to, recover from and mitigate the effects of disasters.  In the current humanitarian situation, CBP and ICE predominantly accomplish the first three listed missions with additional support provided by other DHS Components including the United States Coast Guard (USCG), the Federal Law Enforcement Training Center (FLETC), the Federal Emergency Management Agency (FEMA), the Office of Health Affairs (OHA) and the Transportation Security Administration (TSA). These six DHS Components work collaboratively across the Department and with external entities as part of the Federal response to the influx of unaccompanied alien children and family units who have crossed the southwest border into the United States.

*Customs and Border Protection (CBP)*
The mission of CBP is to prevent terrorists and terrorist weapons from entering the U.S., while also facilitating the flow of legitimate trade and travel.  CBP includes three law enforcement offices: the Office of Field Operations, the Office of Air and Marine, and U.S. Border Patrol.  CBP law enforcement offices place specific operational emphasis on terrorists and their weapons, criminals, and smugglers of both humans and narcotics who have illegally entered into the U.S.  The Office of Field Operations is responsible for the land, air and seaports of entry into the U.S. The U.S. Border Patrol is responsible for border areas between the various Ports of Entry. The Office of Air and Marine provides surveillance and apprehension capabilities in the air and over rivers, lakes and ocean areas of the border.  Upon apprehension, CBP law enforcement agents and officers process and determine the appropriate course of action for each detainee.  Because large numbers of unaccompanied alien children and family units are apprehended in border areas between the various Ports of Entry, and because the U.S. Border Patrol is largely responsible for detention of undocumented entrants while they are in CBP custody, the U.S. Border Patrol has played the largest role within CBP in responding to the influx of unaccompanied alien children.

*Immigration and Customs Enforcement (ICE)*
The mission of ICE is to promote homeland security and public safety through criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. While the mission of CBP, and specifically, USBP is to physically prevent illegal entries into the United States, ICE determines the legal immigration status of individuals believed to be illegally present in the interior of the United States through the immigration courts and removes those who are determined to either be inadmissible or removable and are not eligible for any relief from removal. The Justice Department's Executive Office for Immigration Review conducts the immigration proceedings for both unaccompanied alien children and family units, in accordance with the requirements of Section 240 of the Immigration and Nationality Act. Unaccompanied alien children are in the custody of a sponsor until disposition of their cases, and family units stay together in Family Residential Centers until disposition of their cases. The full range of facility, services, and case management requirements for the ICE mission of enforcement and removal includes, but is not limited to, the following: providing office space, bed space, courtrooms, space for services such as medical exams, recreation, and religious services, attorney-client meetings, processing space, and transportation.

UAC00536

*Federal Emergency Management Agency (FEMA)*

The mission of FEMA is to support our citizens and first responders to ensure that as a nation we work together to build, sustain and improve our capability to prepare for, protect against, respond to, recover from and mitigate all hazards. With regard to the Federal response to the influx of unaccompanied alien children across the southwest border and the Presidential Memorandum, the DHS Secretary directed the Administrator of FEMA, subject to the oversight, direction, and guidance of the DHS Secretary, to serve as the Federal Coordinating Official. The Federal Coordinating Official leads the Unified Coordination Group (as described in Section 2.2.1) and ensures Federal agency authorities and the resources granted to the departments and agencies under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) are unified in providing humanitarian relief to the affected children, including housing, care, medical treatment, and transportation. The Federal Coordinating Official executes these responsibilities consistent with all applicable laws and regulations, including legal requirements governing the appropriate care and custody of unaccompanied alien children. In addition, FEMA is providing administrative services such as phone line answering services, records review, and translation services through IAA funding to CBP and HHS, and developing hurricane evacuation plans for all facilities identified by the Unified Coordination Group, where applicable.

*Federal Law Enforcement Training Center (FLETC)*

The mission FLETC is to provide cost-effective, high-quality training for Federal, state and local law enforcement agencies. In order to train and prepare law enforcement officers for deployment to their parent agencies, FLETC operates a wide variety of facilities so that the students might encounter the full range of situations they can expect to face in the exercise of their duties.  One of the FLETC training facilities is providing support to the ICE mission in support of processing family units.

*United States Coast Guard (USCG)*

One of the five armed forces of the United States and the only military organization within DHS, the USCG safeguards our Nation's maritime safety, security and environmental stewardship. USCG provides airlift capability in support of other DHS needs, including support to CBP in the transport of apprehended persons, including unaccompanied alien children and family units to CBP processing centers. USCG has the authority to provide this assistance pursuant to 14 United States Code 141, the USCG Authorization Act.

*Office of Health Affairs (OHA)*

OHA serves as the Department's principal authority for all medical and health issues. OHA provides medical, public health, and scientific expertise in support of the DHS mission to prepare for, respond to, and recover from all threats. OHA serves as the principal advisor to the Secretary on medical and public health issues. OHA's Health Threats Resilience Division strengthens national capabilities to prepare and secure the nation against the health impacts of chemical, biological, radiological and nuclear incidents and other intentional and naturally occurring events. OHA is providing health services support in DHS processing facilities for unaccompanied alien children and family units and is a liaison with HHS.

*Transportation Security Administration (TSA)*

TSA, created in response to the terrorist attacks of September 11, 2001, secures the nation's airports and screens all commercial airline passengers and baggage. TSA works closely with transportation, law enforcement, and intelligence communities to maintain the security of the traveling public and to protect the Nation's transportation systems to ensure freedom of movement for people and commerce. TSA provides a liaison role to the Unified Coordination Group.

UAC00537

*2.1.2 The Department of Health and Human Services (HHS) Mission*

*HHS Office of Refugee Resettlement*
To address the particular needs of unaccompanied children who have unlawfully entered, the United States, Congress gave HHS the task of providing care and housing for certain unaccompanied alien children [those from Mexico and Canada may be treated differently]. Care and custody of these unaccompanied alien children are entrusted to the HHS Office of Refugee Resettlement (ORR). Unaccompanied alien children are defined as people under the age of 18 apprehended by CBP without a parent or legal guardian or without a parent or legal guardian in the United States available to provide care and physical custody. Under the law, unaccompanied alien children from non-contiguous countries, as well as unaccompanied alien children from contiguous countries who meet certain criteria relating to whether the child is a victim of a severe form of a trafficking, fears persecution upon return to his or her country, and is able to independently decide to withdraw the application for admission to the United States, are referred to HHS-ORR for placement in a designated ORR shelter. ORR typically houses and cares for such children for a short time, until the children can be released (usually to a parent, or other relative) while awaiting removal proceedings in immigration court. Transportation from CBP custody to ORR is conducted by ICE via contract air, commercial air, or ground. As a result, CBP releases unaccompanied alien children into the custody of ORR while releasing family units to ICE.

*HHS Office of the Assistant Secretary for Preparedness and Response*
The Office of the Assistant Secretary for Preparedness and Response (ASPR) was created under the Pandemic and All Hazards Preparedness Act in the wake of Hurricane Katrina to lead the nation in preventing, preparing for, and responding to the adverse health effects of public health emergencies and disasters. ASPR focuses on preparedness planning and response; building federal emergency medical operational capabilities; countermeasures research, advance development, and procurement; and grants to strengthen the capabilities of hospitals and health care systems in public health emergencies and medical disasters. ASPR provides federal support, including medical professionals through ASPR's National Disaster Medical System, to augment state and local capabilities during an emergency or disaster. HHS ASPR is providing medical services support to unaccompanied alien children who are housed in HHS ORR facilities. ASPR is authorized to provide this support under sections 2811 and 2812 of the Public Health Service Act, 42 United States Code, 200hh-10, 300hh-11.

*2.2 The current situation*
Illegal migration of unaccompanied alien children is not new; however, the number has risen over the past several years and the countries of origin of the migrants have also changed. In Fiscal Year (FY) 2008, fewer than 7,000 unaccompanied alien children were apprehended and referred to ORR by DHS. In FY 2009, more than 19,000 unaccompanied alien children were apprehended (82% were from Mexico, and the remaining 17% were from El Salvador, Honduras and Guatemala). As of mid-July 2014, unaccompanied alien children from El Salvador, Honduras, and Guatemala constituted 73% of the more than 47,000 apprehended and Mexico was home to 25%. United States law requires treating unaccompanied alien children from non-neighboring countries differently than those from neighboring nations.

Unaccompanied alien children are also increasing as a portion of total apprehensions made by CBP. From January through June, 2014, there have been more than 381,000 individuals apprehended, representing an increase of 21% from the same period in in 2013. The number of unaccompanied alien children apprehensions has increased disproportionately: approximately 57,500 unaccompanied alien children were detained from January through June 2014 – an increase of 106% from the same period in 2013 and 220% from the same period in 2012. Similar trends have been identified for the number of family units. The more than doubling of unaccompanied alien children as well as the increase of unaccompanied alien children from non-neighboring countries have resulted in a humanitarian situation that threatens to exceed

5

the capacity of CBP and ICE to process people entering the United States illegally and to overwhelm the capacity of the federal government to house unaccompanied alien children and family units until disposition of their cases and subsequent necessary action (e.g., release, removal to their country of origin). Additional data on the number of unaccompanied alien children and family unit apprehensions is available on the CBP website at http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children, and additional information on the Department's response to the humanitarian situation is available on the DHS website at http://www.dhs.gov/unaccompanied-children-southwest-border.

*2.2.1 The process*

Figures 2 and 3 below illustrate DHS operations with regard to unaccompanied alien children and family units.

As previously noted, CBP is the DHS Component that is primarily responsible for border security. Thus, the vast majority of unaccompanied alien children are apprehended by CBP. Unaccompanied alien children apprehended by CBP are held until such time as they can be transferred to HHS-ORR for placement in a designated ORR facility. CBP representatives determine requirements for operational activities at CBP transition facilities. CBP facilities include, but are not limited to, Ports of Entry, Pre-Clearance Locations, Processing Centers, Border Patrol Traffic Checkpoints and Border Patrol stations. CBP acquires space in several ways, including but not limited to the following: expanding, renovating, or re-purposing its own existing facilities; leasing new space through GSA; or utilizing Department of Defense installations, which is typically accomplished through execution of a Memorandum of Understanding or Agreement. Under certain criteria, CBP also has authority from GSA to directly execute its own real property leases.

**Figure 2**



In addition to the CBP holding and processing facilities and the CBP and ICE transportation operations as shown in the above figure for the unaccompanied alien children  process, ICE operates separate processing facilities for family units. ICE Enforcement and Removal Operations is responsible for  the

UAC00539

docket management and all arrangements for removal for family units apprehended and processed at the southwest border by CBP and released from CBP custody or transferred to the custody of ICE. ICE family residential centers are operated in compliance with the agency's Family Residential Standards (see https://www.ice.gov/detention-standards/family-residential/) and are designed and/or retro-fitted for family units who were placed in administrative immigration proceedings and subject to mandatory detention. ICE family residential centers operate as an effective and humane alternative that maintains family unity with special consideration given to the unique needs of children as family units await the outcome of immigration hearings or are returned to their home countries. To ensure the safety and well-being of family units in ICE custody, only non-criminal adults and non-delinquent juveniles are housed in these facilities. These facilities adequately provide for the safety, security, and medical needs of family units. ICE ensures that these facilities operate in an open environment, which includes classrooms with state-certified teachers, access to an online legal library, and bilingual teachers.

**Figure 3**



ICE Enforcement and Removal Operations developed the Family Residential Standards to address the unique nature of family units held in ICE custody. While developing these standards, ICE Enforcement and Removal Operations solicited guidance from medical, psychological and educational subject matter experts and collaborated with various organizations including the DHS Office of Civil Rights and Civil Liberties and many non-governmental organizations (NGOs). In late 2007, ICE Enforcement and Removal Operations approved the Family Residential Standards, which contain many revisions based on public comments.

Namely, ICE uses the following housing facilities:

- Service Processing Centers (SPCs), owned and operated by ICE. SPCs may use contract guard services to perform basic custodial duties.

- Contract Detention Facilities (CDFs), contractor-owned; operated jointly with ICE. CDFs provide detention services under competitively bid contracts.

- Intergovernmental Service Agreements (IGSAs).  An IGSA is a contract between ICE and a state, county, or municipal government for the purpose of providing the services and staffing to house and care for ICE detainees. The non-Federal party then uses a third party commercial contractor to operate the facility. IGSA's may include existing facilities or the construction of new facilities.

UAC00540

Family units who are apprehended by CBP are transferred to ICE for detention after their immigration status has been examined and it is determined they are removable from the United States and suitable detention space is available for these individuals. Because of the influx in migrants and backlogs in the immigration courts, ICE currently faces a potential shortage of adequate facilities in which to detain family units until their hearing dates. Furthermore, although CBP normally delivers unaccompanied alien children to HHS within 72 hours of apprehension, absent exceptional circumstances, HHS facilities have been and may become stretched to and sometimes beyond their capacity when there is an increased influx of unaccompanied alien children. In the absence of HHS capability to accept and house unaccompanied alien children, CBP has a need to increase its capacity to detain unaccompanied alien children in a manner consistent with health and safety standards until HHS can receive them. In addition, CBP needs to provide risk-based Occupational Safety and Health controls for its workforce in a high-volume population environment.

At the direction of the President and the DHS, the Unified Coordination Group was established on June 1, 2014, to leverage Federal resources to provide humanitarian relief to the ongoing situation and to ensure cross agency logistical coordination. The Unified Coordination Group operates to support the missions in DHS and HHS to address the influx of unaccompanied alien children. As such it is comprised of many organizational elements of DHS and HHS, with liaisons from the Department of Defense, Department of Justice, General Services Administration, National Guard, U.S. Army Corps of Engineers, and the American Red Cross. The Unified Coordination Group has primarily been instrumental in identifying additional facilities for HHS/ORR use. The priority goals of the Unified Coordination Group are outlined below:

1. Health and safety:
   i. Ensure the safety and health of unaccompanied children, Federal employees, responders and the public.
   ii. Expedite the identification of tender-age children ($\leq 11$ years), pregnant females, and newborns to prioritize transfer to appropriate HHS facilities and ensure they remain in sibling groups.
   iii. Support contingency plans, to include hurricane evacuation plans, in coordination with FEMA regional offices and state and local emergency managers.

2. Shelter:
   i. Identify viable geographic locations that will support the establishment of HHS shelters.
   ii. Identify and assess specific shelter facilities to include beyond traditional models for occupancy.
   iii. De-compress over capacity issues in all CBP Sectors.
   iv. Expedite bringing transition facility online, including medical support.
   v. Implement HHS home-based services plan in DOD temporary shelters and HHS permanent facilities.
   vi. Identify long-term options for HHS that can be used to shelter the projected increase in unaccompanied children.

3. Expedited processing
   i. Expedite and optimize the HHS child release process to exceed the average number of children apprehended per day into the most integrated setting.
   ii. Increase through-put and improve the HHS unaccompanied children transfer process.

UAC00541

4.  Informing stakeholders, Consular, Congressional and government officials, and the public of activities by creating and implementing an effective notification and announcement program.

5.  Ensuring agencies optimize financial tracking systems.

## 3.0    Legal and Regulatory Framework

*a. Statutes*

The complex legal framework for apprehension, care and custody, transportation, processing and repatriation of illegal migrants—and specifically as to unaccompanied alien children —is based primarily in the Immigration and Nationality Act of 1952, the Homeland Security Act of 2002, and the William Wilberforce Trafficking Victims Protection and Reauthorization Act of 2008.

The legal framework for considering the impacts of federal actions on the human environment rests on the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) Regulations for Implementing the Procedural Provisions of NEPA (40 Code of Federal Regulations Parts 1500-1508).

The response to the influx of unaccompanied alien children, individual adults and family units across the southwest border is not covered by the Stafford Act exemption for certain emergency actions for declared disasters, and therefore, is subject to the statutory requirements for NEPA compliance. As defined in the CEQ regulations (Part 1508.9), an Environmental Assessment (EA) is a concise public document prepared by the responsible Federal agency that serves to 1) briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement (EIS) or a finding of no significant impact; 2) aid an agency's compliance with NEPA when no environmental impact statement is necessary, and 3) facilitate preparation of a statement when one is necessary.  At a minimum, an EA shall include brief discussions of the need for the proposal, alternatives as required by NEPA, the environmental impacts of the Proposed Action and alternatives, and a listing of agencies and persons consulted.

A PEA reduces or eliminates redundant and duplicative analyses and effectively addresses cumulative effects. Agencies rely on programmatic or broad scale analyses to focus the scope of alternatives, environmental effects analysis, and mitigation in subsequent tiered levels of documentation. PEAs are often regional in scope crossing political boundaries and covering numerous ecosystems and landforms. The difference between a programmatic approach and a project-level EA is that a PEA has more emphasis on multiple similar future activities in differing locations and the potential for cumulative effects of those similar activities all deriving from the same program. See Section 4.0 for additional information.

*b. Litigation Settlement Agreement*

The care and custody of unaccompanied alien children also is guided by the 1997 *Flores v. Reno* Stipulated Settlement Agreement, No. CV 85-4544 (C.D. Cal. entered Jan. 17, 1997), in which the former Immigration and Naturalization Service (INS) agreed to certain standards and procedures with respect to the immigration custody and processing of unaccompanied alien children. In the Homeland Security Act, Congress transferred responsibility for the care and custody of unaccompanied alien children from the former INS to HHS-ORR.

UAC00542

*c. Presidential Direction*

As previously noted, the federal response to the current situation is organized under the terms of the Presidential Memorandum *Response to the Influx of Unaccompanied Alien Children Across the Southwest Border* (June 2, 2014).

The Presidential Memorandum directs the Secretary of Homeland Security to establish an interagency Unified Coordination Group to ensure unity of effort across the executive branch in responding to the humanitarian aspects of this situation, consistent with the Homeland Security Act of 2002 and Homeland Security Presidential Directive-5 (Management of Domestic Incidents), including the coordination with State, local, and other nonfederal entities. The Secretary of Homeland Security directed the Administrator of FEMA, subject to the oversight, direction, and guidance of the Secretary, to serve as the Federal Coordinating Official. The Federal Coordinating Official leads the Unified Coordination Group and ensures Federal agency authorities and the resources granted to the departments and agencies under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) are unified in providing humanitarian relief to the affected children, including housing, care, medical treatment, and transportation. The Federal Coordinating Official executes these responsibilities consistent with all applicable laws and regulations, including legal requirements governing the appropriate care and custody of unaccompanied alien children. The Unified Coordination Group, as directed by the Federal Coordinating Official with the oversight by the Secretary, determines the requirements for facilities and services for the Federal response to the influx of unaccompanied alien children, based on the needs identified by the relevant agencies. The Presidential Memorandum requires all Federal departments and agencies to provide full and prompt cooperation, resources, and support, as appropriate and consistent with their own responsibilities for addressing this situation under existing authorities and in compliance with statutory requirements.

*d. Within DHS*

The Under Secretary for Management is responsible for budget, finance, human resources, information technology systems, facilities, and performance measurements related to the responsibilities of the Department. The Chief Readiness Support Office (CRSO) has been delegated responsibility for real property, asset and logistics management, headquarters consolidation, and sustainability and environmental programs (SEP). The Under Secretary for Management requested the CRSO/SEP to establish a Working Group and provide a unified approach to environmental compliance across the Department to demonstrate the Secretary's attention to the Presidential Memorandum on unaccompanied alien children and also the expanding needs for family units.

*Requirements under DHS Directive 023-01*
The DHS Directive and Instruction 023-01, Environmental Planning Program, establish the policy and procedures DHS follows to comply with NEPA and the CEQ regulations. Existing delegation of authority for NEPA compliance in DHS is delegated by the DHS Secretary to the Under Secretary for Management, Chief Readiness Support Office, Sustainability and Environmental Programs (SEP). In some cases, a delegation of authority from SEP to DHS Components for NEPA compliance exists; such delegation is currently held by FEMA, CBP, USCG, and FLETC. These Components will follow their existing processes to execute NEPA compliance for specific proposed projects and activities to address the large influx of unaccompanied alien children and family units, and will coordinate with SEP in circumstances specified in the DHS Directive and Instruction and in accordance with the August 5, 2014, memo from the DHS Acting Under Secretary for Management to Component Heads, *NEPA Compliance Activities in Support of Increased Border Apprehensions*. The Director SEP retains authority to approve NEPA analyses for DHS Components, including ICE, that do not have a delegation of authority.

UAC00543

*Requirements under other environmental laws and regulations*

In addition to NEPA and the laws listed above, numerous federal environmental statutes, regulations, and Executive Orders may apply to the Proposed Action. Adherence to these federal requirements, as well as state and local regulations, is part of the PEA.  The following is a list of major laws, presidential orders, and DHS policy and guidelines with broad applicability to the Proposed Action.

- DHS Directive and Instruction 017-01, Historic Preservation in Asset Management and Operations
- DHS Environmental Justice Strategy
- EO 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
- EO 11514, Protection and Enhancement of Environment Quality
- EO 11988, Floodplain Management
- EO 11990, Protection of Wetlands
- EO 12196, Occupation Safety and Health of Federal Employees
- EO 12372, Intergovernmental Review of Federal Programs
- EO 13084, Consultation with Indian Tribal Governments
- EO 13112, Invasive Species
- American Indian Religious Freedom Act of 1978
- Archaeological Protection Act
- Clean Air Act
- Clean Water Act
- Endangered Species Act
- Farmland Protection Policy Act
- Fish and Wildlife Coordination Act
- Migratory Bird Treaty Act
- Coastal Barrier Resources Act
- Coastal Zone Management Act
- National Historic Preservation Act
- Native American Graves and Repatriation Act
- Occupational Safety and Health Act
- Resource Conservation and Recovery Act
- Solid Waste Disposal Act
- Watershed Protection and Flood Protection Act

## 4.0    Programmatic Approach

This PEA is intended to serve the following purposes:

1. It provides a general framework to evaluate potential environmental impacts of common activities undertaken by DHS to accomplish the requirements of the Presidential Memorandum, but which will occur at different locations (including locations that are unknown at the time of preparing this PEA). When necessary, separate analysis will be conducted on a location-specific basis to determine if the proposals 1) are covered by a DHS CATEX, 2) meet the criteria listed in Table 1 and are covered by this PEA, 2) require a Supplemental EA tiered from this document, 3) require a standalone EA, 4) or require development of alternative arrangements with CEQ pursuant to 40 CFR 1506.11 for activities that would normally require preparation of an EIS.
2. It frames activities which ordinarily occur solely within DHS mission space in the context of the broader cooperative "whole of government" response of the Executive Branch.

UAC00544

3. It serves to establish a Departmental process to frame information on the who, what, why, where, when and how of NEPA compliance for DHS actions related to the implementation of the Presidential Memorandum on unaccompanied alien children and also to address the existing DHS missions involved in processing family units.

4. Support decisions to be made by leadership at DHS Headquarters regarding implementation of the Presidential Memorandum.

The multiple missions of DHS Component programs and operations (as summarized in Section 2.2.1 above) involved in the Federal response include a range of separable elements of facilities and services for unaccompanied alien children as identified by the Unified Coordination Group and for family units as identified by ICE. As with many border security issues, the future directions or expansion of unaccompanied alien children and family unit populations entering the U.S. along the southwest border are difficult to predict. However, the facilities and services along the southwest border provide a geographical origination reference point for the start of the DHS process followed for unaccompanied alien children and family units entering the U.S.

DHS delegation of authority (Delegation 00501) for the DHS NEPA Policy (Directive 023-01) identifies the Director SEP as the decision-maker for this Department-level analysis of the appropriate process for NEPA compliance for the DHS response to the influx of unaccompanied alien children and family units. The Director SEP has determined that a programmatic approach is appropriate for NEPA review of the DHS response to the influx of unaccompanied alien children and family units. This PEA was prepared in accordance with NEPA, the CEQ regulations and guidance, and DHS Directive and Instruction 023-01.

The following figure illustrates how DHS will use this PEA in its NEPA review and decision-making:

UAC00545

**Figure 4**



## 5.0    Decisions Supported by the PEA

This PEA is developed to support the following decisions:

- Department -level decisions involved in implementing the Presidential Memorandum
- Department-level concurrence on NEPA compliance for DHS Components to proceed with project(s) that meet established criteria in Directive 023-01 for non-asterisked (undocumented) Categorical Exclusions under these extraordinary circumstances;

UAC00546

- Department-level concurrence on NEPA compliance for DHS Components with existing delegation of authority for NEPA compliance (i.e., CBP, FEMA, FLETC, USCG) to proceed with project(s) that meet established criteria in Directive 023-01 for asterisked (documented) Categorical Exclusions under these extraordinary circumstances; and
- Department-level determinations of NEPA compliance for DHS Components without existing delegation of authority for NEPA compliance (i.e., ICE) to proceed with project(s) that meet established criteria in Directive 023-01 for asterisked (documented) Categorical Exclusions under these extraordinary circumstances; and
- Department-level or DHS Component decisions that the preparation of an Environmental Assessment tiered to this PEA is required to determine that a specific project will have no significant impact or to pursue developing alternative arrangements with CEQ for that specific project.

## 6.0 Purpose and Need

The purpose of the Proposed Action is to implement the DHS response to the influx of unaccompanied alien children and family units entering the United States across the southwestern border, and to identify a process for efficient and effective environmental review for action(s) subject to NEPA.

DHS is responsible for apprehension, processing, detention, and removal of persons crossing the border into the United States without authorization. Unaccompanied alien children and family units are crossing the border at a higher-than-anticipated rate. The need for the Proposed Action is based on the existing and expected increase in the number of apprehended persons being processed that may exceed the then current capacity of the DHS support infrastructure (e.g., housing and associated services, transportation, and medical care). In addition, the need for the Proposed Action is to meet the requirements in the June 2, 2014 Presidential Memorandum to address the humanitarian situation.

## 7.0 Interagency Coordination, Consultation and Public Involvement

This PEA was developed by NEPA practitioners at DHS Headquarters in close coordination with the NEPA program leads and environmental law counsel for the DHS Components participating in the response to the influx of unaccompanied alien children and family units across the southwest border. DHS recognizes that the types of actions analyzed in this PEA feature some jurisdictional complexity and that the agencies involved have different missions and authorities. Therefore, collaboration and cooperation are critical among Federal agencies and state and local governments in the affected jurisdictions. DHS has consulted on this PEA through the Unified Coordination Group and through counsel with HHS, DOD, GSA, CEQ, and the Advisory Council on Historic Preservation. Efforts to address the current influx of unaccompanied alien children and family units are being managed according to the Unified Coordination Group.

Open communication with the American public in the environmental planning process, consistent with other federal requirements, is DHS policy. Potentially affected communities are kept apprised of potential DHS efforts to address the influx of unaccompanied alien children and family units through DHS press releases and DHS-led media tours, news media coverage, and social media. DHS has discretion under the CEQ regulations (40 CFR 1501.4 (b) and 1506.6(a)) regarding the type and level of public involvement and the length of any public comment period in PEA preparation. Because of the urgent need to address the influx of unaccompanied alien children and family units while also being compliant with NEPA, the Director SEP is making this PEA and FONSI available to the public for thirty (30) days via the DHS NEPA webpage at http://www.dhs.gov/national-environmental-policy-act.  The *SEP-EPHP@hq.dhs.gov* email address is available for interested parties to request additional information on this PEA.

UAC00547

**8.0     Description of the Proposed Action and Alternatives**

**8.1     No Action Alternative**

The President has directed DHS to take action by way of the June 2, 2014, Presidential Memorandum. Therefore, taking no action is not an option. While NEPA does not apply to the President, the manner in which federal agencies comply with a Presidential direction are subject to NEPA to the extent of agency discretion in carrying out that direction. The President has proposed several actions to address a long term influx in unaccompanied alien children and family units to the Congress and requested funds to accomplish those actions. Unless and until Congress acts on and funds those actions, they are not within the discretion of DHS.

Inclusion of the No Action Alternative is prescribed by CEQ regulations (40 CFR 1502.14) as the benchmark against which proposed federal actions are evaluated. DHS has the discretion to try to resolve the humanitarian situation without acquiring additional facilities or services. In the routine operation of border protection and immigration enforcement, planning processes accommodate projected needs for facilities to hold, detain, and process unaccompanied alien children and family units. Those planning processes include NEPA. But in immediate response to the most recent influx of unaccompanied alien children and family units, the critical need for additional facilities and services leaves not acquiring such additional space as the default "No Action Alternative."

Under the No Action Alternative, no additional facilities and services would be acquired in an accelerated fashion. Unaccompanied alien children and family units could be detained in custody for unacceptable lengths of time in overcrowded and potentially unsafe and unhealthy conditions which do not meet standards acceptable to the United States. The No Action Alternative is reflected in the background explanation of how DHS performs its mission as it relates to apprehending, detaining, transporting, processing, and repatriating or releasing unaccompanied alien children and family units (Section 2 above), but with the added issues of inadequate space to safely perform those tasks.

To proceed along the entirely hypothetical No Action Alternative of acquiring and providing no additional facilities and services, would result in existing holding facilities becoming increasingly overcrowded with potential for deteriorating health and safety conditions of the inhabitants. In addition, transportation services, on-going care, and medical treatment of unaccompanied alien children and family units by DHS would continue to be strained, resulting in potentially unsafe working conditions.

Because of the potential for adverse impacts to human health and safety if there is no accelerated increase in facilities and services to address the influx of unaccompanied alien children and family units, the No-Action Alternative is not viable.

**8.2     Proposed Action**

DHS proposes to increase, in accelerated fashion, its capacity for managing unaccompanied alien children and family units crossing the southwest border of the United States during the present humanitarian situation until said persons can have their status determined or, in the case of unaccompanied alien children, can be transferred to HHS-ORR. Increased DHS capacity is needed in the following areas: temporary detention space and housing, transportation, childcare, and medical care. The DHS actions do not include the HHS actions taken to meet the needs of unaccompanied alien children while in HHS care and custody.

UAC00548

### 8.2.1 Detention Space and Housing

DHS actions include the emergency acquisition of sufficient space, renovation of existing space, and additions to existing facilities (1) for CBP to detain (a) unaccompanied alien children until HHS can accept transfer of them and (b) family units until ICE can take custody of them and (2) for ICE to detain family units pending the outcome of their removal proceedings, until granted a form of relief, until released on bond or other appropriate means of supervision, or until ready for repatriation.  Additional information on the routine DHS process, facilities, and services for unaccompanied alien children and family units is provided in Section 2.2.1.

Real property actions could include the following: leasing or purchasing new properties; constructing new facilities; and/or expanding or modifying existing property. Interior modifications to existing buildings could include replacement, removal, or addition of walls; addition of security, surveillance and protective equipment; addition of toilets, sinks and showers; sleeping accommodations; storage units; medical examination areas; office space and equipment; food preparation, dispensing and dining areas; clothes washing areas and equipment; indoor and outdoor recreational areas and equipment; religious services areas; heating, ventilation and air conditioning; potable water and solid waste and wastewater infrastructure; and any needed occupational safety and health workplace controls including specialized ventilation, barriers, and floors and walls capable of decontamination. Exterior modifications to existing facilities could include minor improvements to roads, parking lots, and driveways; addition of security fencing, entry gates, and vehicle and pedestrian barriers, including minor ground disturbance for footings; addition of security equipment such as cameras, lighting, employee identification and building access card readers; and physical measures to meet compliance requirements under the Americans with Disabilities Act. New facility construction would require space for the same activities and services described immediately above.

### 8.2.2 Transportation

ICE utilizes its own and contracted transportation to provide secure and safe ground transportation of individuals to and from locations designated by the Agency; these may include transportation from the ICE field locations where individuals are taken into custody. Usually such transportation is set to a pre-defined radius or travel time from the destination to eliminate unnecessarily long transportation times. This transportation can include routine non-emergency transportation to physician or dental offices, and specialty medical facilities and/or hospitals when needed. It can also include routine transportation needs to consular offices or other local needs. It also includes the transportation needs to airports or other common carrier destinations for the purposes of removing aliens from the United States by air or assisting their boarding of common carriers when a release has been authorized.  This transportation utilizes a variety of vehicle sizes including but not limited to: short and long range passenger buses, 15-20 passenger airporters and 10-12 passenger vans.

ICE also utilizes air transportation on common carrier aircraft and through lease agreements with chartered aircraft performing domestic transportation functions as well as international transportation. The international transportation is most typically to Central and South American destinations, but special charter missions are performed based on the need to other locations around the globe.

USCG may provide short-term support to CBP, such as the use of its C-130 heavy lift aircraft to provide once- or twice-daily flights to relocate apprehended persons as a stop gap measure (typically for a duration of no more than a couple of weeks) while CBP works to secure contract transportation services. These USCG transportation activities are consistent with the agency's existing mission and operation, and resource availability would depend on the USCG's operational status.

UAC00549

### 8.2.3 Medical Care

The Flores Agreement requires that unaccompanied alien children have access to emergency medical assistance. CBP's Office of Border Patrol's Policy for Encounters with Injured Subjects requires that all individuals who are injured or require medical assistance when encountered by Border Patrol agents be provided access to medical treatment.  In addition, the Office of Border Patrol's Hold Room and Short-Term Custody policy specifies that a qualified medical professional, such as an emergency medical technician, paramedic, or physician, evaluate detainees who require medical attention or display symptoms of serious infectious diseases or contagions such as tuberculosis, severe acute respiratory syndrome, or pandemic influenza. Border Patrol agents may observe that juveniles require medical assistance or juveniles may request such assistance.

CBP provides medical assistance at ports of entry when encountering unaccompanied alien children who need medical care.  The Office of Field Operations policy, Secure Detention, Transport and Escort Procedures at Ports of Entry, requires that all persons placed in a secure area at its facilities be asked whether they have a medical problem or condition that may require medical attention.

CBP personnel, when they apprehend and process unaccompanied alien children, identify injured juveniles and in cases of medical emergencies, transport or escort unaccompanied alien children to hospitals and monitor their condition. When appropriate, unaccompanied alien children are returned to Border Patrol stations or ports of entry to complete administrative processing.

### 8.3 Screening Among Alternative Locations

As previously described in Section 2.2, initial screening of alternatives is performed at the Unified Coordination Group level with results cascaded to DHS Components for implementation at the field level. The Unified Coordination Group responds to requirements provided by DHS and HHS, based upon feedback from four task forces related to holding, transportation, shelter and facilities, and child processing and release. The Unified Coordination Group Shelters and Facilities Task Force identifies potential facilities that meet pre-designated HHS, CBP or ICE criteria and also eliminates alternatives from further consideration. The facility list is also provided to GSA for evaluation. GSA returns a listing of recommended properties based on availability and leasing information. The GSA list of recommended properties is then provided to DHS for selection or consideration for further review. Where GSA provides facilities for DHS missions related to unaccompanied alien children and family units, GSA is responsible for NEPA review and documentation. DHS is responsible for NEPA review and compliance for DHS-owned facilities or facilities operated through IGSAs.

### 9.0      Affected Environment and Environmental Consequences

The following table identifies the affected environmental resources, conditions for implementation, and the extent of impacts anticipated from implementation of the Proposed Action. Specific activities under the Proposed Action that would not meet these conditions or requirements, or that would exceed the identified impacts would require a site- or activity-specific EA tiered from this PEA, a standalone EA, or the development of alternative arrangements with CEQ pursuant to 40 CFR 1506.11 for activities that would normally require preparation of an EIS.

For example, proposed actions that would require extensive ground disturbance on previously undisturbed or undeveloped land, extensive disturbance or removal of habitat, or that would require significant changes to buildings and infrastructure (e.g., transportation, energy, water supply, water treatment) that may exceed existing or planned capacities are not considered within the scope of this PEA and would require additional environmental review.

UAC00550

**Table #1**

| Resource/Area of Evaluation | Activities under the Proposed Action must meet the criteria or requirements listed below (when applicable) in order to be covered by this PEA | Anticipated Impacts |
| --- | --- | --- |
| **Land Use** | Proposed actions would be consistent with respective State Coastal Zone Management plans.<br><br>Proposed actions would not be located in a Coastal Barrier Resources System unit.<br><br>Proposed actions would score less than 160 points on Farmland Conversion Impact Rating (Form AD-1006)<br><br>Proposed actions would not result in the removal of a significant amount of lands designated for special use.<br><br>Proposed actions would be taken consistent with 40 United States Code 3312, Compliance with Nationally Recognized Codes. | The proposed action would have temporary or minor permanent impacts to land use. |
| **Geology, Soils, and Seismicity** | Proposed actions in areas characterized by susceptibility to seismic, volcanic, tsunamis, landslide or mudslide activity, structural instability, excessive erodibility, or steep slopes would be mitigated using appropriate engineering techniques.<br><br>Appropriate construction best management practices and erosion control measures would be followed.<br><br>Hazard evacuation plans would be in place. | Grading and contouring of sites would have minor impacts to surface soils of the site but would not significantly change the conditions of the soil, the types of soil, or the geology at the site.<br><br>Impacts from the proposed action to geology, soils, and seismicity would be minor. |

18

UAC00551

| Water Resources | A Stormwater Pollution Prevention Plan (SWPP) would be prepared where required by local, state, or federal regulations. During any construction activities, the best management practices identified in the SWPPP would be implemented.<br><br>Proposed new facilities would be in compliance with the Safe Drinking Water Act, including obtaining certification as a public water system and performing monitoring and sampling of the water according to applicable regulations, when water is not provide by a municipal water source.<br><br>All required water quality permits such as a National Pollution Discharge Elimination System and state permits would be obtained and all permit conditions would be met.<br><br>Existing service providers would have existing capacity to meet increase in demand for potable water, or water could be purchased from commercial sources and delivered to facility.<br><br>Existing infrastructure would be capable of handling increase in wastewater.<br><br>Contaminated wastewater would be pre-treated to disinfect it to prevent the spread of diseases that could be transmitted by wastewater and, depending on the system, could contaminate drinking water supplies and bodies of water used for outflow if not properly treated. | Impacts (chemical, physical, or biological effects) would be either not detectable or minor.<br><br>Alterations in water quality and hydrologic conditions relative to historical baseline may occur, however, only on a localized and short-term basis. |
| **Floodplains** | Proposed actions would not be located in a floodplain, or the decision-making process prescribed in EO 11988 would be conducted and documented for actions where there is not a feasible alternative located outside of the floodplain, and appropriate mitigation would be included. | There would be no impacts to floodplains for proposed actions located outside of floodplains.<br><br>If locating proposed actions in floodplains is unavoidable, impacts would be minor through the implementation of appropriate engineering controls and flood mitigation measures. |

19

UAC00552

| Wetlands | Proposed actions would not be located in wetlands, or proposed actions located near or adjacent to wetlands would utilize appropriate engineering controls and best management practices to avoid impacts to wetlands, or proposed actions would meet criteria for US Army Corps of Engineers (USACE) Nationwide or Regional General Permits including adherence to standard permit conditions and best management practices. | There would be no impacts to wetlands, or impacts to wetlands would be limited to minor works under the USACE Nationwide permit program. |
|---|---|---|
| **Biological Resources – Vegetation, Birds and Wildlife** | Activities would occur at existing facilities or in previously disturbed areas, therefore sufficient habitat would remain to maintain viability of all species.<br><br>USCG flight operations in support of CBP would follow existing standard operating procedures to prevent unnecessarily flying over sensitive environmental habitat areas, including critical habitat, migratory bird sanctuaries, marine mammal haul-outs and rookeries, and sea turtle nesting beaches. If it would be necessary to fly over such areas, an altitude of 2,000 feet above ground level would be maintained.<br><br>Best management practices would be implemented as necessary for the protection of wildlife from the presence of unaccompanied alien children and family units who are in DHS custody, as well as for the protection of unaccompanied alien children and family units who are in DHS custody from any potential wildlife encounters (e.g., coyotes, wood rats, snakes, opossums, raccoons). | Impacts to native species, their habitats, or the natural processes sustaining them may be detectable, but would be minor and are not expected to be outside the natural range of variability.<br><br>Occasional responses to disturbance by some individuals could be expected, but without interference to feeding, reproduction, or other factors affecting population levels.<br><br>Potential impacts to unaccompanied alien children and family units from wildlife that may surround housing facilities would be addressed through the utilization of comprehensive, integrated pest management and vermin control techniques to minimize the likelihood of potential contact between wildlife and residents. |

UAC00553

| Biological Resources – Listed Species, Critical Habitat, and Special Status Species | Activities would occur<br>a. at existing facilities or in previously disturbed or developed areas where these resources are not present; or<br>b. where these resources are present and DHS is able to make a "No Effect" determination; or<br>c. where these resources are present and DHS is able to propose a "May effect but not likely to adversely affect" determination regarding impacts to threatened and endangered species, critical habitat, or essential fish habitat for which upon informal consultation, the U.S. Fish and Wildlife Service or National Marine Fisheries Service provides written concurrence with the Department's proposed determination on effects to listed resources or requests additional information. (Depending on site specific facts, additional tiered NEPA documentation may be needed).<br><br>USCG flight operations in support of CBP would follow existing standard operating procedures to prevent unnecessarily flying over sensitive environmental habitat areas, including critical habitat, migratory bird sanctuaries, marine mammal haul-outs and rookeries, and sea turtle nesting beaches. If it would be necessary to fly over such areas, an altitude of 2,000 feet above ground level would be maintained.<br><br>Ground transportation activities would be limited to existing routes and roadways and would not require disturbance or removal of habitat.<br><br>*Note: Proposed actions that result in a "Jeopardy" finding are not covered by this PEA and require supplemental analysis.* | There would be no effects on listed species or designated critical habitat in project areas where these resources are not present or, if present, DHS has made a "No effect" determination.<br><br>Or, there would be no significant effects on listed species or designated critical habitat in project areas where DHS obtained concurrence from the U.S. Fish and Wildlife Service or National Marine Fisheries Service in a "May effect but not likely to adversely affect" determination.<br><br>Or, under normal ESA consultation timelines and/or under expedited consultation timelines for emergency situations (pursuant to 50 CFR 402.05), there would be a determination of "Not Likely to Jeopardize" listed species or designated critical habitat and any effects would be mitigated to insignificance through appropriate conservation measures identified in consultation with the Services.<br><br>. |

UAC00554

| Hazardous Materials/Waste | Hazardous or toxic materials and/or wastes would be safely and adequately managed in accordance with all applicable local, state, and Federal regulations and policies. This would include storage and disposal of hazardous chemicals if needed for disease decontamination.<br><br>Temporary increases of the generation of hazardous materials may occur (e.g., removal or mitigation of asbestos containing materials, lead based paint, petroleum contaminated materials, or mold) and may be necessary during renovations of existing facilities. However, any abatement actions would be completed by licensed/certified contractors utilizing best management practices and industry standard practices to properly mitigate, remove and/or dispose of any hazardous materials and protect human health and the environment. | The generation of any hazardous materials would be minor and temporary and limited to construction/renovation activities. |
|---|---|---|
| Utilities & Infrastructure | Existing landfills would be available off-site and have sufficient capacity to handle the temporary construction debris and additional waste for operation of detainee housing facilities.<br><br>Existing service providers would have the capacity to meet the increased demand for energy, or alternative sources of energy are feasible and can be utilized (e.g., generators, renewable sources such as solar photovoltaics, fuel tanks). This would include additional energy necessary to meet occupational safety and health controls such as ventilation.<br><br>Installation of any new electrical conduit would be placed within previously disturbed areas, such as existing roads and shoulders. | Impacts to utilities and infrastructure would be minor and temporary. |

22

| **Historic Properties** | DHS is able to make a determination of "No Historic Properties Affected" for proposed actions at existing non-historic buildings (e.g., renovation) or for proposed-ground disturbing activities where it has been previously determined that no archaeological resources are present and the relevant State Historic Preservation Officer/Tribal Historic Preservation Officer (SHPO/THPO) has provided written concurrence with the DHS determination.<br><br>Or, for proposed actions that may affect historic properties (e.g., existing buildings, archaeological sites), DHS makes a "Finding of No Adverse Effect" and the relevant SHPO/THPO provides written concurrence with the DHS determination.<br><br>Or, for proposed actions that result in an "adverse effect" finding, DHS is able to resolve those effects through measures agreed to in a Memorandum of Understanding or Programmatic Agreement negotiated with the relevant SHPO/THPO, Advisory Council on Historic Preservation (if participating), and consulting parties. This would also include public involvement, as specified in the regulations for implementing the National Historic Preservation Act (36 CFR Part 800).<br><br>*NOTE: Adverse effects to historic properties involving the following are not covered by this PEA and require supplemental analysis: a high level of public controversy; loss of integrity of a large grouping of historic properties (e.g., historic district, archaeological site); National Historic Landmarks.* | There would be no impacts to historic properties, or anticipated impacts would be avoided, minimized, or mitigated through the National Historic Preservation Act Section 106 consultation process. |

23

| **Air Quality** | Appropriate construction best management practices, including maintaining equipment per manufacturers recommendations, limiting idling of equipment, and using appropriate dust control technologies, such as watering disturbed areas, would be implemented to reduce impacts to air quality during these activities.<br><br>All new sources of air emissions would not generate emissions above the de minimis thresholds or contribute to a violation of any Federal, state, or local air regulation.<br><br>Additional provisions would be put in place in non-attainment areas.<br><br>Impacts to air quality during renovation or construction activities would be minor and temporary, such as those resulting from dust and emissions from construction vehicles and equipment.<br><br>Emissions from vehicles and aircraft used in transportation operations would not result in measureable impacts to air quality, as any increases in vehicle and aircraft use would be short-term and intermittent. | Impacts to air quality would be minor and temporary. |
| **Noise** | Noise levels would exceed natural sounds but would not exceed typical noise levels from construction equipment, vehicles, aircraft, or generators.<br><br>Human-generated outdoor noise (e.g., recreational activities, playgrounds) would be limited to daytime hours when practicable and would adhere to local noise ordinances and use noise buffers where required. | Noise generated by construction or renovation activities would be minor and temporary and limited to daytime hours.<br><br>Noise generated by operation of facilities (e.g., playgrounds, vehicle transport) would be minor to moderate and mitigated through noise buffers where required. |
| **Greenhouse Gas and Climate Change** | Construction- or transportation-related air emissions of carbon dioxide and carbon dioxide equivalents would be below the Federal de minimis threshold. | Impacts would be minor and temporary. |

24

UAC00557

| Traffic and Transportation Systems | Roadway construction and changes in traffic flow patterns would not require major reconfiguration of local traffic routes.<br><br>Traffic impacts during construction would be addressed through providing warning signage, limiting the use of public right-of-ways for staging of equipment or materials, using flag persons when needed, and coordinating detours if traffic access points would be obstructed.<br><br>Construction of new access roads for detention facilities would not require removal of significant amount of lands designated for special use, destruction of wildlife habitat, or impacts to archaeological resources.<br><br>Transportation of individuals would use existing modes and routes.<br><br>Any increase in the number of leased vehicles, distance travelled, or number of trips would not overwhelm existing transportation systems. | Impacts would be minor and temporary. |
| Human Health & Safety | Hypothetical increases in crime, illnesses, and safety (in regard to unaccompanied alien children family units, and populations in the surrounding communities) would be mitigated through the use of security staff, physical security measures, and medical care (including immunization screenings, vaccinations, and treatment).<br><br>Individuals would be housed within a secured facility and would not interact with the surrounding communities.<br><br>Individuals with communicable diseases (e.g., tuberculosis, measles) would be kept in quarantine and treated, and specialized equipment to remove the air of airborne pathogens would be used to prevent the spread of disease.<br><br>DHS would follow existing Occupational Safety and Health protocols for its personnel, as well as standard operating procedures for detention, escort, and transport activities to ensure the safety and security of both detained persons and DHS personnel.<br><br>DHS would develop evacuation plans, as necessary, for facilities located in areas prone to natural hazards such as hurricanes. | Implementation of the proposed action would have beneficial impacts to the health and safety of unaccompanied alien children, family units, DHS personnel, and the surrounding communities by providing safe and secure facilities with sufficient space and services. |
| Environmental Justice | Actions would be consistent with the Executive Order and the DHS Environmental Justice Strategy. | |

25

## 9.1    Physical Environment

The most probable existing physical environments of the Proposed Action would be locations where there is already existing infrastructure to support the requirements for additional facilities and services for unaccompanied alien children and family units. Utilization of existing built environments would be the most cost-effective and time efficient way for DHS to respond to the current humanitarian situation. Existing DHS and non-DHS facilities where expansion and/or modification  is possible to accommodate unaccompanied alien children, family units, and personnel and services are potential sites identified by the Unified Coordination Group and considered for selection by CBP and ICE.

No significant impacts are anticipated, provided that existing facilities and their proposed use, proposed new sites and new facility construction, and existing or proposed new transportation routes fall within the thresholds presented in Table 1 and/or would be covered by a DHS CATEX. Sites, facilities, and transportation routes that fall within the thresholds presented in Table 1 and follow applicable mitigation measures in Section 11 would not require additional NEPA analysis beyond this PEA.

It is also important to note that CBP is currently developing a Programmatic Agreement pursuant to the National Historic Preservation Act for CBP undertakings in states located along the southwest border of the United States. The Programmatic Agreement is a result of a multi-year coordination effort between CBP, State Historic Preservation Officers, Tribes, several other Federal agencies (consulting parties) with missions or jurisdiction in southwestern border states, and potentially interested parties.

Proposed sites, facilities, and/or transportation routes that cannot be covered by a DHS CATEX or that do not fall within the thresholds presented in Table 1 would require an additional analysis of environmental effects tiered to this PEA.

## 9.2    Biological Environment

The most probable existing biological environments of the Proposed Action would be managed landscapes including low maintenance vegetated areas adjacent to existing infrastructure to support the requirements for additional facilities and services for unaccompanied alien children and family units. Existing DHS and non-DHS facilities which have additional areas for expansion and/or site modification are potential sites identified by the Unified Coordination Group and considered for selection by CBP and ICE.

No significant impacts are anticipated, provided that existing facilities and their proposed use, proposed new sites and new facility construction, and existing or proposed new transportation routes fall within the thresholds presented in Table 1 or would be covered by a DHS CATEX. Therefore, sites, facilities, and transportation routes that fall within the thresholds presented in Table 1 and follow applicable mitigation measures in Section 11 would not require additional NEPA analysis beyond this PEA.

Conversely, proposed sites, facilities, or transportation routes that do not fall within the thresholds presented in Table 1 or cannot be covered by a DHS CATEX are expected to have a higher potential for impacts to biological resources; therefore, additional analysis of environmental effects tiered to this PEA would be required.

## 9.3    Social Environment

Communities and their resources in close proximity to the proposed additional facilities and services for unaccompanied alien children and family units constitute the existing affected social environments. The Unified Coordination Group may identify facilities for CBP and ICE to review and select. Ultimately the

UAC00559

action agency makes the decision on selection and path forward.  DHS recognizes that its activities have the potential to have human health, social, economic and/or or environmental effects and is committed to meeting the goals of EO 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," as well as to fulfilling its own Environmental Justice Strategy (see http://www.dhs.gov/dhs-environmental-justice-strategy).

The use of existing facilities and transportation routes is not anticipated to have disproportionately high and adverse human health, social, economic or environmental effects on minority populations, low-income populations, or children.  For proposed new or expanded facilities or transportation routes, potential impacts under EO 12898 will receive further evaluation to determine if mitigation measures are necessary.  However, the overall DHS response to the influx of unaccompanied alien children and family units across the southwest border is not anticipated to have disproportionately high and adverse human health, social, economic or environmental effects on minority or low-income populations.

Implementation of the Proposed Action is anticipated to have beneficial impacts to the health and safety of unaccompanied alien children, family units, DHS personnel, and the surrounding communities by providing safe and secure facilities with sufficient space and services. In addition, there is the potential for economic benefits, including increased employment opportunities, to the surrounding communities because of the increased need for a variety of services to shelter and care for unaccompanied alien children and family units.

Both DHS and HHS are increasing Spanish-speaking case management staff, increasing staff handling incoming calls from parents or guardians, raising awareness of the Parent Hotline (provided by FEMA and operated by HHS), surging staff to manage the intake of CBP referrals to track shelter bed capacity, and facilitate shelter designations. DHS is developing ways to expedite background checks for sponsors of unaccompanied alien children, integrate CBP and HHS information sharing systems, and increase capacity to transport and place children in a timely manner.

In addition, DHS has initiated and intensified its public affairs campaign in Spanish, with radio, print, and TV spots. One goal if this campaign is to communicate the dangers of sending unaccompanied children on the long journey from Central America to the United States, and the dangers of using criminal smuggling organizations to transport the children.

Additional information about the Department's efforts to address the dangers of illegal immigration into the United States, particularly for unaccompanied alien children, is available on the DHS website at http://www.dhs.gov/unaccompanied-children-southwest-border.

No disproportionately high and adverse human health, social, economic or environmental effects to low-income or minority populations are anticipated as a result of the Proposed Action. Potential impacts to the surrounding communities where housing and transportation activities would take place would be addressed through safety and security protocols, open communication between DHS and the public, and adherence to the Department's Environmental Justice Strategy and the requirements of EO 12898.

## 10.0    Cumulative Impact

The analysis of cumulative impact considers whether the incremental effects of an individual project are significant when viewed in connection with the overall effects of past projects, the effects of other current projects, and the effects of reasonably foreseeable projects, regardless of what agency (federal or non-federal) or persons undertake such other actions (44 CFR 1508.7). When the incremental impact associated with a Proposed Action is not significant, the discussion shall briefly indicate why the cumulative impact is not significant.

UAC00560

The Proposed Action evaluated in this PEA is limited to acquisition, renovation, and minor expansion of existing facilities, use of existing transportation routes, and new construction or transportation routes in areas where environmentally sensitive resources are either not present or where impacts to such resources would be avoided, minimized, or mitigated to insignificance; consequently, significant incremental effects are not anticipated. However, given the broad geographic area considered in this PEA, the fact that specific locations have not been identified, and the assumption that similar activities are ongoing in potential project locations due to normal economic and commercial processes, such as business expansion and relocation, the determination of need for additional, tiered site-specific reviews will take cumulative effects on potentially impacted resources into account.

## 10.1    Land Use

Impacts from the Proposed Action would be limited to the immediate project area (e.g., existing facility, new facility construction site, ground transportation route). Changes in or modifications to land use are not anticipated for the majority of activities; however, the construction of new housing facilities in certain geographic locations may, depending on the number of occupants and level or lack of existing supporting infrastructure,  result in some change in land use. However, because the majority of locations are anticipated to be consistent with 40 U.S.C. sec. 3312, Compliance with Nationally Recognized Codes, no more than minor cumulative impacts on land use are expected.

## 10.2    Geology, Soils, and Seismicity

The Proposed Action would not materially alter localized geologic conditions. Activities could require disturbance to the topography within the immediate work areas in order to meet operational and facility needs. Activities could include excavation, contouring, and filling to achieve gradient that allows construction of proposed structures, driveways, parking, etc.  Grading and contouring of sites would have a minor impact to surface soils of the site but would not significantly change the conditions of the soil or the types of soil at the site. In addition, commercial or residential activities undertaken by non-DHS entities may contribute to cumulative impacts due to the expansion of existing or construction of new facilities. Therefore, minor cumulative impacts on geology or soils from the Proposed Actions are expected.

## 10.3    Water Resources

To be covered by this PEA, impacts to water resources must fall within the criteria listed in Table 1. The Proposed Action may impact surface water and groundwater, but would be covered under existing applicable permits or under modifications to those permits. Therefore, cumulative impacts to water resources resulting from the Proposed Action would not be significant and would be addressed by water conservation measures in existing permits and by following best management practices during construction activities. For impacts to water resources that are not covered by this PEA, such as substantial increases in water consumption, and new wastewater management and/or water treatment requirements, analysis of cumulative impacts in supplemental NEPA documentation would be required.

## 10.3.1  Floodplains

The Proposed Action would not be located in floodplains or, if located in floodplains, appropriate flood mitigation measures and evacuation plans would be in place. Commercial or residential construction activities undertaken by non-DHS entities in floodplains may contribute to cumulative impacts to this resource, but such activities would be required to be in compliance with local floodplain management ordinances. Therefore, minor cumulative effects to floodplains as a result of the Proposed Action are expected.

UAC00561

### 10.3.2  Wetlands

The Proposed Action would avoid wetlands or would involve minor works that comply with USACE Nationwide Permit conditions and best management practices for actions in or affecting wetlands. Therefore, cumulative effects to wetlands as a result of the proposed action would be minor.

## 10.4    Biological Resources

### 10.4.1   Vegetation, Birds, and Wildlife

Impacts to vegetation would be limited to the immediate sites of facility construction and renovation and would only occur during the grading phase of a project. Disturbed areas would be re-vegetated following the completion of construction activities. The use of existing transportation routes would not contribute to cumulative impacts to vegetation, as vegetation would have previously been cleared from roadways. DHS will follow best management practices which may include pre-construction survey as appropriate to avoid impacts to biological resources (see section 11.2 below). Vegetation on neighboring properties could exist and could potentially provide nesting for migratory birds or habitat for wildlife. Nevertheless, because the majority of DHS actions to address the influx of unaccompanied alien children and family units are anticipated to occur on previously disturbed or previously developed land, it is anticipated that cumulative impacts to vegetation, birds, and wildlife would be minor.

### 10.4.2   Biological Resources – Listed Species, Critical Habitat, and Special Status Species

Under the Proposed Action, threatened and endangered species and critical habitat are not anticipated to be on-site and even if present nearby, a "no effect" determination will normally be appropriate. If these resources are present, potential impacts would be addressed through consultation with the U.S. Fish and Wildlife Service or National Marine Fisheries Service as described in Table 1.  There could be other projects undertaken by DHS or non-DHS entities at the same time of the Proposed Action or in the future. If other federal projects are proposed that could impact listed species or their designated critical habitat, approvals for those projects would require consultation and mitigation of the impacts.  Because the majority of DHS actions to address the influx of unaccompanied alien children and family units are anticipated to occur on previously disturbed or previously developed land, it is anticipated that cumulative effects to listed species, critical habitat, and special status species would be none to minor.

## 10.5    Hazardous Materials/Waste

Construction and renovation activities under the Proposed Action could result in the storage and use of small quantities of hazardous materials including fuels, oils, and lubricants and in the abatement of lead based paint, asbestos containing materials, or mold. Operations of the proposed housing facilities could result in the storage of fuel (for vehicles) and small quantities of oils and lubricants. Best management practices would be utilized to minimize the potential for spills of hazardous materials. Any hazardous waste generated during construction, renovation or operational activities would be limited in volume and disposed of at currently licensed facilities by appropriately certified/licensed personnel. Other actions in the vicinity of DHS projects would also be subject to requirements for the storage, handling and disposal of hazard materials and waste. Therefore, the Proposed Action is expected to contribute to only minor cumulative impacts to hazardous materials and waste.

## 10.6    Utilities and Infrastructure

Impacts to utilities and infrastructure from the Proposed Action must meet the criteria in Table 1 in order to be covered by this PEA. DHS anticipates that most housing facilities would be located in previously

29

UAC00562

developed or previously disturbed sites in developed urban areas, where existing infrastructure such as potable water supply, wastewater conveyance and treatment, sewer services, and energy services would already exist. Foreseeable DHS activities when combined with other similar state and municipal activities along with other public, private commercial and non-commercial activities are not expected to cumulatively exceed the available and planned capacity of available utilities and infrastructure. Therefore, only minor cumulative impacts are anticipated.

However, additional analysis of cumulative impacts to utilities and infrastructure would be necessary if projects undertaken by DHS, when considered with other local or regional projects undertaken by other entities, may result in exceeding the current or planned capacity of available utilities and infrastructure, or would require installation of new services where none currently exist.

## 10.7    Historic Properties

Each specific undertaking (as regards historic properties) which forms a part of the Proposed Action must meet the criteria in Table 1 in order to be covered by this PEA. If an undertaking does not meet those criteria, a further NEPA action which reflects NHPA compliance and is tiered to this PEA is required.

The Proposed Action would either not affect or not adversely affect historic properties; or where adverse impacts are identified, such impacts would be avoided, minimized or mitigated through the National Historic Preservation Act (NHPA) Section 106 consultation process and appropriate documentation. Other Federal undertakings in project areas in the vicinity of DHS undertakings would also be subject to NHPA requirements. Therefore, the Proposed Action is expected to result in no or minor cumulative impacts to historic properties.

## 10.8    Air Quality

Impacts to air quality from the Proposed Action must meet the criteria in Table 1 in order to be covered by this PEA. Construction and renovation activities under the Proposed Action would be short term. Similar construction and renovation activities by non-DHS entities, such as commercial activities, would also have de minimis levels of emissions or those activities would be subject to additional permit requirements. Therefore, the Proposed Action would have negligible cumulative effects to air quality.

## 10.9    Noise

Noise impacts are directly related to the intensity of the noise source and the distance of the receptor from the source.  Noise attenuates rapidly as distance from the source increases.  Cumulative contributions to noise impacts resulting from construction, renovation, or transportation activities under the Proposed Action are expected to be short term and minor. However, cumulative impacts to noise resulting from DHS operation and inhabitation of housing facilities when combined with other sources of noise are expected to be minor to moderate.

## 10.10    Greenhouse Gas and Climate Change

Construction, renovation, transportation and operational activities under the Proposed Action will contribute de minimis volumes of greenhouse gases.  However, research on the contributions of greenhouse gasses to climate change has concluded that past and present emissions have resulted in major ongoing impacts to climate of increasing significance mainly from the electricity generation, personal and commercial transportation, and fossil fuel for industrial power generation sectors. The Federal government has a number of programs in place to reduce its greenhouse gas emissions inventory, and DHS is participating fully in those efforts.  Therefore, although the baseline climate impacts are already cumulatively significant, the Proposed Action, in combination with other DHS initiatives to reduce greenhouse gas emissions would be negligible in the context of overall contributions to climate change.

30

## 10.11    Traffic and Transportation Systems

To be covered by this PEA, impacts to traffic and transportation systems must fall within the criteria listed in Table 1. Therefore, proposed actions under this PEA would contribute only minor impacts to existing individual transportation systems and overall cumulative impacts to traffic and transportation systems would be minor. However, additional analysis of cumulative impacts to traffic and transportation would be necessary if other projects undertaken by DHS or non-DHS entities could result in exceeding the current capacity of existing transportation systems or require major reconfiguration of traffic routes or new routes in already congested areas.

## 10.12    Human Health & Safety

DHS would maintain unaccompanied alien children and family units in secure facilities with negligible contact with the surrounding resident populations of municipalities where housing and transportation operations would occur. General public health and safety would not be impacted by acquisition, renovation, expansion, or construction of housing facilities in any way different from any other non-industrial, low impact construction activities. DHS operations on a whole would likely increase public safety by removing unaccompanied alien children and families seeking to evade detection from cities and areas between cities thus reducing the chance for accidents, crime, drug and human trafficking, or other unsafe or undesirable activities. DHS would follow existing Occupational Safety and Health protocols for its personnel. Therefore, significant cumulative impacts to human health and safety are not anticipated.

## 10.13    Socioeconomic Impacts

The Proposed Action could generate new employment opportunities in communities during facility renovation and construction activities and during operational activities.  Depending on the duration of the increased influx of unaccompanied alien children and family units and the Department's response to the influx, both beneficial and adverse, longer term impacts to local businesses, public works, property values, etc. could occur.  The exact nature of such impacts would be dependent upon local perceptions and cannot be known at this time. Therefore, DHS may further evaluate the long-term and cumulative socioeconomic impacts associated with the Proposed Action in supplemental analyses in the future if necessary.

## 10.14    Executive 12898 Environmental Justice

Communities in the vicinity of proposed housing sites for unaccompanied alien children and family units may be comprised of minority or low-income populations. DHS will ensure appropriate consideration of and outreach to these communities, consistent with the Executive Order and its own Environmental Justice Strategy. Therefore, the Proposed Action is not anticipated to result in cumulative impacts that are disproportionately high and adverse to minority or low-income populations.

UAC00564

## 10.15   Summary

Cumulative impacts resulting from the proposed action alternative are summarized in the table below:

**Table #2**

| Resource/Area of Evaluation | Cumulative Impacts |
|---|---|
| Land Use | None to Minor |
| Geology, Soils, and Seismicity | None to Minor |
| Water Resources | Minor |
| Floodplains | None to Minor |
| Wetlands | None to Minor |
| Biological Resources – Vegetation, Birds and Wildlife | None to Minor |
| Biological Resources – Listed Species, Critical Habitat, and Special Status Species | None to Minor |
| Hazardous Materials/Waste/Solid Waste | Minor |
| Historic Properties and Cultural Resources | None to Minor |
| Air Quality | Minor |
| Noise | Minor to Moderate |
| Greenhouse Gas and Climate Change | Minor |
| Electricity | Minor |
| Traffic and Transportation Systems | Minor |
| Human Health & Safety | Beneficial |
| Socioeconomic | Minor Beneficial, Minor Adverse |

## 11.0   Mitigation

Measures that reduce otherwise anticipated adverse impacts of a proposed action on the quality of the human environment are called mitigation measures. Directive 023-01 requires DHS Components to provide mitigation measures to reduce or eliminate potential adverse impacts of a proposed action and to monitor the effectiveness of measures implemented. DHS will take the following measures to the extent practicable and applicable to avoid or further minimize impacts to the quality of the human environment. The general mitigation measures outlined in this section may be superseded by higher or more stringent standards required by a particular federal, tribal, state or local government agency issuing a permit, license, or approval for activities undertaken by DHS to address the influx of unaccompanied alien children and family units across the border.

**11.1**   Measures to avoid impacts to the human environment:

1.   Avoid taking actions that modify existing land use patterns;
2.   Avoid areas characterized by susceptibility to seismic or volcanic activity, tsunamis, landslides, mudslides, structural instability, excessive erodibility, or steep slopes;
3.   Avoid sites in floodplains;
4.   Avoid sites on important farmlands;
5.   Avoid sites on or near Traditional Cultural Properties
6.   Avoid sites in wetlands;
7.   Avoid undertaking projects that adversely affect historic properties;
8.   Avoid projects that adversely affect threatened and endangered or special status species or critical habitat;
9.   Follow applicable Occupational Safety and Health requirements;

UAC00565

        10.     Follow applicable detention standards and policies.

**11.2**    Minimization measures and best management practices for ground-disturbing/construction activities:

    1.     Follow applicable state, territory, tribal, and local permitting requirements for construction;
    2.     Implement appropriate dust control measures and engineering controls to minimize dust, such as watering down construction areas;
    3.     Enclose or water down exposed dirt storage piles;
    4.     Minimize the disturbed area and preserve vegetation to the maximum extent practicable;
    5.     Maintain topsoil whenever possible;
    6.     Phase construction activities to the extent practicable;
    7.     Implement stormwater best management practices;
    8.     Implement erosion control measures such as erosion control blankets, bonded fiber matrices, turf reinforcement mats, silt fences (for moderate slopes), etc.;
    9.     Temporarily protect storm drain inlets until site is stabilized;
    10.    Retain sediment on-site and control dewatering practices by using sediment traps or basins for large areas (> 1 acre) when appropriate;
    11.    Establish stabilized construction entrances/exits (e.g. large crushed rocks, stone pads, steel wash racks, hose-down systems, pads);
    12.    Limit construction activities, including operation of heavy machinery, to normal business hours (M-F 7am-5pm);
    13.    Avoid engaging in construction activities within 200 feet of noise-sensitive receptors such as schools, hospitals, residential areas, nursing homes, etc.
    14.    Ensure adequate maintenance of equipment, including proper engine maintenance, adequate tire inflation, and proper maintenance of pollution control devices;
    15.    Ensure equipment at the project site uses the manufacturer's standard noise control devices (i.e., mufflers, baffling, and/or engine enclosures);
    16.    Reduce construction equipment idling to the maximum extent practicable;
    17.    Prepare and implement an appropriate spill prevention and response plan to eliminate and minimize oil or fuel spills from construction equipment;
    18.    Minimize the impacts of equipment staging areas;
    19.    Stabilize slopes promptly through temporary and permanent cover best management practices, including re-vegetating disturbed areas following completion of construction. Following construction, all remaining disturbed areas must be re-vegetated with native seeds and plants in a manner that returns the site to its pre-construction condition or better;
    20.    When applicable, adopt measures to minimize traffic impacts during construction such as providing warning signage, limit the use of public right-of-ways for staging of equipment or materials, use of flagpersons when needed, and coordinate detours if traffic access points will be obstructed;
    21.    Conduct appropriate biological resource surveys and nesting bird surveys of the project area and adjacent areas for migratory birds during the nesting season (typically March 15th to September 15th) at least two weeks in advance of any construction and implement appropriate exclusion zones around any identified bird nests;
    22.    Avoid archeological sites by altering the location and/or depth of ground disturbance in a particular area, when practicable;
    23.    To the extent practicable, adopt other feasible measures under the EPA Guidance Potential for Reducing Greenhouse Gas Emissions in the Construction Sector.

UAC00566

24.   Establish an inspection, maintenance, and documentation approach to ensure these measures are being implemented and are working adequately.

UAC00567

**DEPARTMENT OF HOMELAND SECURITY**

**FINDING OF NO SIGNIFICANT IMPACT**

**FOR**

**ACTIONS TO ADDRESS AN INCREASED INFLUX OF UNACCOMPANIED ALIEN**

**CHILDREN AND FAMILY UNITS ACROSS THE SOUTHWEST BORDER**

**OF THE UNITED STATES**

**Background:**

The June 2, 2014 Presidential Memorandum *Response to the Influx of Unaccompanied Alien Children Across the Southwest Border* described the influx as an "urgent humanitarian situation" requiring a unified and coordinated Federal response. The memorandum is available on-line at http://www.whitehouse.gov/the-press-office/2014/06/02/presidential-memorandum-response-influx-unaccompanied-alien-children-acr. In this memorandum, the President directed the Secretary of Homeland Security (Secretary) to establish an interagency Unified Coordination Group to ensure unity of effort across the executive branch in responding to the humanitarian aspects of the situation, consistent with the Homeland Security Act of 2002 and Homeland Security Presidential Directive-5 (Management of Domestic Incidents), including coordination with State, local, and other nonfederal entities.

In addition to the influx of unaccompanied alien children, there is also an increase in the number of family units entering the United States. The Department of Homeland Security (DHS) is responsible for the apprehension, processing, detention and removal of such persons crossing the southwest border into the United States without authorization. The unprecedented increase in the number of apprehended persons has the potential to fill or exceed the capacity of the DHS supporting infrastructure (real property for processing and housing apprehended persons, services including medical care, transportation, utilities, meals, hygiene, recreation, etc.) currently available. Therefore, action is being considered at the DHS Headquarters level to provide increased and expedited allocation of Departmental resources in the following three areas: 1) provide adequate facilities for Customs and Border Protection (CBP) to safely house unaccompanied alien children (normally for no more than 72 hours) and family units until they can be transferred to the Department of Health and Human Services (HHS) and Immigrations and Customs Enforcement (ICE) respectively, and provide adequate facilities for ICE to safely house family units; 2) provide transportation (land, air, water) between intake, processing, and housing facilities, as well as between these facilities and physicians and dentists offices, hospitals, consular offices, and airports or other transportation hubs, and 3) provide medical care, including to treat, prevent, and minimize the spread of communicable illnesses.

In accordance with the National Environmental Policy Act (NEPA) of 1969, the DHS procedures for implementing NEPA (DHS Directive 023-01, Environmental Planning Program), and the Council on Environmental Quality's (CEQ) NEPA implementing regulations at 40 CFR Parts 1500-1508, DHS prepared a Programmatic Environmental Assessment (PEA) to evaluate the potential impacts to the human environment resulting from increased Departmental activities necessary to process, detain, and transport UAC and families.

**Applicability:**

This Finding of No Significant Impact (FONSI) is intended to cover DHS activities, whether at Headquarters or in a Component under existing authorities during the current increased influx of unaccompanied alien children and family units and any future such influx as result of which any Component of DHS requires rapid acquisition of housing or detention space for such persons. DHS recognizes that this PEA may need to be revised or augmented or new environmental analysis may be needed if there are policy or legislative changes that would require significant changes to DHS' operations with regard to unaccompanied alien children and/or family units that enter into the United States illegally. If DHS makes any substantive changes to this FONSI, DHS will make the revised document available to the public.

**Purpose and Need for Action:**

The purpose of the Proposed Action is to implement DHS response to the influx of unaccompanied alien children and family units entering the United States across the southwestern border, and to identify a process for efficient and effective environmental review for action(s) subject to NEPA.

DHS is responsible for apprehension, processing, detention, and removal of persons crossing the border into the United States without authorization. Unaccompanied alien children and family units are crossing the border at a higher-than-anticipated rate. The need for the Proposed Action is based on the existing and expected increase in the number of apprehended persons being processed that may exceed the then current capacity of the DHS support infrastructure (e.g., housing and associated services, transportation, and medical care). In addition, the need for the Proposed Action is to meet the requirements in the June 2, 2014 Presidential Memorandum to address the humanitarian situation.

**Alternatives:**

The PEA evaluated two alternatives: No Action and Proposed Action.

Inclusion of the No Action Alternative is prescribed by CEQ regulations (40 CFR 1502.14) as the benchmark against which proposed federal actions are evaluated. Under the No Action Alternative, no additional facilities and services would be acquired in an accelerated fashion. That would result in existing holding facilities becoming increasingly overcrowded with potential for deteriorating health and safety conditions of the inhabitants. In addition, transportation services, on-going care, and medical treatment of unaccompanied alien children and family units by DHS would continue to be strained, resulting in potential unsafe working conditions.

The No Action alternative is not viable because it would not satisfy the requirements of the Presidential Memorandum, including decisions that need to be made by the Secretary pursuant to the memorandum, and because of the potential for adverse impacts to human health and safety if there is no accelerated increase in facilities and services to address the influx of unaccompanied alien children and family units.

**Description of Proposed Action:**

DHS proposes to increase, in accelerated fashion, its capacity for managing unaccompanied alien children and family units crossing the southwest border of the United States during the present humanitarian situation until said persons can have their status determined or, in the case of unaccompanied alien children, can be transferred to HHS-ORR. Increased DHS capacity is needed in the following areas: temporary detention space and housing, transportation, childcare, and medical care. The DHS actions do not include the HHS actions taken to meet the needs of unaccompanied alien children while in HHS care

DACO0569

and custody.

**Affected Environment and Consequences:**

Implementation of the Proposed Action has the potential to affect the human environment. The Proposed Action is limited to acquisition, renovation, and minor expansion of existing facilities, use of existing transportation routes, and new construction or transportation routes in areas where environmentally sensitive resources are either not present or where impacts to such resources would be avoided, minimized, or mitigated to insignificance. The following table identifies the affected environmental resources and the extent of impacts anticipated from implementation of the Proposed Action. For each resource area, criteria are provided in Table 1 of the PEA that constrain activities such that the anticipated impacts from implementation of the Proposed Action are not significant. DHS has identified mitigation measures which would reduce potential impacts to a level below significance; these measures are presented in Section 11 of the PEA. Proposed actions that would not meet these conditions or requirements, or that would exceed the identified impacts would require a site- or activity-specific EA tiered from this PEA, a stand-alone EA, or the development of alternative arrangements with CEQ pursuant to 40 CFR 1506.11 for activities that would normally require preparation of an EIS.

| Resource/Area of Evaluation | Anticipated Impacts |
|---|---|
| Land Use | None to Minor |
| Geology, Soils, and Seismicity | None to Minor |
| Water Resources | Minor |
| Floodplains | None to Minor |
| Wetlands | None to Minor |
| Biological Resources – Vegetation, Birds and Wildlife | None to Minor |
| Biological Resources – Listed Species, Critical Habitat, and Special Status Species | None to Minor |
| Hazardous Materials/Waste/Solid Waste | Minor |
| Historic Properties | None to Minor |
| Air Quality | Minor |
| Noise | Minor to Moderate |
| Greenhouse Gas and Climate Change | Minor |
| Electricity | Minor |
| Traffic and Transportation Systems | Minor |
| Human Health & Safety | Beneficial |
| Socioeconomic | Minor Beneficial; Minor Adverse |

**Findings and Conclusions:**

Implementation of the Proposed Action by activities that meet the criteria presented in Table 1 of the PEA and follow applicable mitigation measures in Section 11 of the PEA would not result in significant impacts to any of the resources analyzed in the PEA. Compliance with the Endangered Species Act and the National Historic Preservation Act are expected as indicated in Table 1 of the PEA. Therefore, an Environmental Impact Statement (EIS) will not be prepared. Proposed activities that do not meet the criteria presented in Table 1 of the PEA, which may include but are not limited to activities involving extensive ground disturbance on previously undisturbed or undeveloped land, extensive disturbance or removal of habitat, or that would require significant changes to buildings and infrastructure, historic or otherwise (e.g., transportation systems, energy, water supply, water treatment) that may exceed existing or planned capacities, may require additional analysis of the environmental effects tiered to this PEA, or

alternative arrangements developed with CEQ pursuant to 40 CFR 1506.11 for activities that would otherwise require preparation of an EIS.

DHS, in implementing the Proposed Action, will employ all practical and reasonable means to avoid, minimize, and/or mitigate to a level below significance the potential adverse impacts on the quality of the human environment, consistent with accomplishment of its mission and faithful execution of the Presidential Memorandum. Therefore, a Finding of No Significant Impact (FONSI) is warranted.

Dr. Teresa R. Pohlman
Director, DHS Sustainability and Environmental Programs

8/12/14
Date