**August 2014**
**FINAL**
**FINDING OF NO SIGNIFICANT IMPACT**
FOR THE PROPOSED U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
SOUTH TEXAS FAMILY RESIDENTIAL CENTER
DILLEY, TEXAS

**Background:**  On August 12, 2014, Dr. Teresa Pohlman, Director of Sustainability and Environmental Programs (SEP) for the Department of Homeland Security (DHS) signed a Finding of No Significant Impact (DHS FONSI) for the Department's actions to address an increased influx of unaccompanied children and family units across the southwest border of the United States.  Pursuant to the National Environmental Policy Act of 1969 (NEPA), Council on Environmental Quality (CEQ) regulations found at 40 C.F.R. Parts 1500-1508, and DHS NEPA implementing procedures (DHS Directive 023-01, Environmental Planning Program), DHS conducted a Programmatic Environmental Assessment (PEA) of the range of Departmental actions intended to handle this increased influx.  The PEA covers transportation of family units and the rapid provision of adequate housing facilities for family units pending disposition of their respective immigration proceedings by U.S. Immigration and Customs Enforcement (ICE), an operational component of DHS.  The PEA is available at https://www.federalregister.gov/articles  /2014/08/14/2014-19209/environmental-planning-and-historic-preservation-program and at http://www.dhs.gov/nepa.

ICE proposes to enter into an intergovernmental service agreement (IGSA) with a municipality for the provision of family unit housing services for 2,400 persons at the proposed South Texas Family Residential Center (STFRC) near the city of Dilley, Texas.  The municipality would subcontract with a private services provider, which would in turn construct and operate the facility.  DHS, including ICE, has determined that the PEA covers significant areas of analysis for this sort of activity and has found that there would be either no or only minor impacts to the quality of the human environment. However, because certain site-specific considerations for the STFRC warrant a closer examination under NEPA, DHS and ICE have prepared a Supplemental Environmental Assessment (SEA) and analyzed potential impacts on the human and natural environment from the construction, operation, and maintenance of the STFRC.

**Purpose and Need:**  The SEA adopts the description of the purpose and need set out in the PEA, as applicable.  Specifically, the purpose of the proposed STFRC is for ICE to meet its mission requirements to house family units pending the disposition of their immigration proceedings. The proposed STFRC is on an expedited implementation schedule as determined by ICE leadership to rapidly provide appropriate housing requirements for family units as part of the Department's overall response to the influx of unaccompanied children (Presidential Memorandum of June 2, 2014) and family units across the southwest border. ICE has determined that in order to fulfill this requirement, it needs to rapidly obtain appropriate housing, support services, and support staff for 2,400 women and children.  ICE's family residential center must be able to immediately house some family units.  The

UAC00769

evaluation criteria for this site specific action included being located on or near a major highway, not farther than a one and one-half hours' drive from a major metropolitan center, and within one and one-half hours' drive from the Southwest Border in the Rio Grande Valley. The siting of the STFRC near the city of Dilley, Texas meets these criteria.

**Proposed Action:**  The Proposed Action consists of the construction, operation, and maintenance of a facility to house family units in conformance with appropriate standards, and transportation of family unit members as necessary.  The facility would be located on a parcel of land leased from a private landowner and would be accessed from State Highway 85, west of Dilley, Texas.  The facility would encompass a total of approximately 51.5 acres and would consist of dormitories and support facilities (e.g., recreation, dining, medical, educational, courtrooms) for 2,400 persons at full operational capacity (FOC).  FOC would also necessitate a support staff of 600 persons, split among shifts.  A secure vehicular access entrance would be provided from State Highway 85 into the facility.

**Alternatives Considered:**  Four alternatives were identified and considered during the planning stages of the proposed project.   Two of these alternatives (Carrizo Springs and the Port Isabel Detention Center (PIDC)) were eliminated from further consideration because they did not meet the Purpose and Need for the Proposed Action. The Carrizo Springs alternative was eliminated because of its distance to the nearest major metropolitan area and increased logistical requirements for ICE. The PIDC alternative was eliminated because of immediate housing concerns and potential impacts and/or protection of habitat for the Federally-listed endangered Ocelot. Subsequently, the No Action Alternative and the Proposed Action Alternative were carried forward for further analysis.   Under the No Action Alternative, the STFRC would not be constructed.  The Purpose and Need would not be met under the No Action Alternative, leading to increased processing and transportation inefficiencies, and potentially housing family unit members in overcrowded and substandard facilities that could pose health and safety risks to both residents and staff.  The Proposed Action Alternative would satisfy the Purpose and Need by providing the necessary added capacity to accomplish ICE's mission in conformance with appropriate standards as well as yielding increased operational efficiency.

**Affected Environment and Consequences:**  The Proposed Action Alternative would not significantly impact any of the resources analyzed in the SEA.  Implementation of the Proposed Action would have minor and temporary impacts on land use, biological resources, air quality, and noise.  A summary of the resources analyzed and the consequences of the implementation of the Proposed Action is presented below.

- Land Use:  No significant impact. Minor impacts include the loss of 51.5 acres of relatively low-grade agricultural land well suited for rangeland and some cropland.  The proposed conversion is consistent with the Farmland Protection Policy Act (FPPA).  Temporary impact to soil erosion may occur during the land clearing and/or disturbance phase of construction.  Appropriate construction Best Management Practices (BMPs) would be

2

maintained to reduce soil erosion until permanent stabilization is achieved.

- **Water Resources**:  No significant impact.   Sufficient capacity exists within local utility suppliers to accommodate increases in demand for potable water and wastewater treatment.
- **Biological Resources**:  No significant impact.  No critical wildlife habitat occurs at the site. There would be no impact to Federally and State-listed endangered species and only minor impacts to State listed threatened species are expected to occur.
- **Utilities and Infrastructure**:  No significant impact.  Sufficient capacity exists within local utility suppliers to accommodate increases in demand.
- **Historic Properties**:  No impacts are anticipated to historic properties, including archaeological resources.  No significant historic properties were identified in the Area of Potential Effect (APE).
- **Air Quality**:  No significant impact.  Minor and temporary impacts will result from equipment and fugitive dust emissions during construction.  Emissions are not estimated to exceed Federal *de minimis* thresholds.
- **Noise**:  No significant impact.  Minor and temporary impacts will result from construction activities.
- **Greenhouse Gas & Climate Change**:  No significant impact.  Direct GHG emissions are anticipated to be minimal.
- **Social Environment & Environmental Justice**:  No significant impact. Minority and low-income communities would not experience a disproportionally high and adverse environmental impact. Minor positive impacts may be realized through an increase in local employment.
- **Cumulative Impacts**:  The impacts of the Proposed Action, when combined with impacts from other present or planned development in the surrounding area, will not result in significant adverse cumulative impacts.

**Best Management Practices:**  This FONSI and the SEA are premised on adoption of all mitigation measures as described in the DHS PEA, as applicable.   Additional site specific BMPs will be implemented during the construction and operation of the STFRC, and are described throughout the SEA.  These BMPs include:

1. Preparation and implementation of a Stormwater Pollution Prevention Plan (SWPPP) to reduce soil erosion, control stormwater runoff, and prevent sedimentation during construction. The SWPPP will outline procedures for minimizing the length of time soil is exposed to wind and rain, provide provisions for establishing vegetation as quickly as possible on disturbed areas following construction activities, and contain eroded material as practicable.
2. Implementation of wildlife conservation measures such as limiting vehicular traffic to/from the facility between the hours of 7:00 PM and 7:00 AM daily as practicable, briefing construction crews on the possibility of threatened or endangered species sightings (e.g., ocelots or horned lizards), and conducting orientation training on identifying characteristics of any listed species.
3. Preparation and implementation of a Spill Prevention, Control, and Countermeasure (SPCC)

3

Plan to prevent and manage accidental spills and prohibited discharges which may occur during construction of the facility.

4. Preparation and implementation of measures to mitigate particulate matter generated by construction and operations, and minimize the emission of regulated air pollutants by vehicles (e.g., development of a Construction Emissions Mitigation Plan).

**Findings and Conclusions:**  Implementation of the Proposed Action Alternative would not result in significant impacts on any of the resources analyzed within the SEA and no further analysis or documentation, such as the preparation of an Environmental Impact Statement, is required.  ICE does not anticipate receiving further information which point towards conclusions that differ from its assessment of no significant impact to any resource area.  In the event unexpected issues are raised, ICE may issue follow up NEPA documentation as appropriate. All practical and reasonable means will be employed by ICE to minimize the potential adverse impacts on the human and natural environment. Therefore, a Finding of No Significant Impact (FONSI) is warranted.

**Project Proponent:**
Marc J. Moore
Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Date 8/28/2014

**Approved:**
David D. Roberts
Director, Office of Facilities Administration
U.S. Immigration and Customs Enforcement
Date 8/28/2014

**Approved:**
Dr. Teresa R. Pohlman
Director, Sustainability and Environmental Programs
Department of Homeland Security
Date 8/28/14

4

Supplemental Environmental Assessment

UAC00773

UAC00774

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**SUPPLEMENTAL ENVIRONMENTAL ASSESSMENT**
**FOR HOUSING OF FAMILY UNITS AT THE SOUTH TEXAS FAMILY RESIDENTIAL CENTER**
**DILLEY, TEXAS**

## 1.0    Introduction

On August 12, 2014, Dr. Teresa Pohlman, Director of Sustainability and Environmental Programs (SEP) for the Department of Homeland Security (DHS) signed a Finding of No Significant Impact (DHS FONSI) for the Department's actions to address an increased influx of unaccompanied children and family units across the southwest border of the United States.  Pursuant to the National Environmental Policy Act of 1969 (NEPA), Council on Environmental Quality (CEQ) regulations found at 40 C.F.R. Parts 1500-1508, and DHS NEPA implementing procedures (DHS Directive 023-01, Environmental Planning Program), DHS conducted a Programmatic Environmental Assessment (PEA) of the range of Departmental actions intended to handle this increased influx.  The PEA covers transportation of family units and the rapid provision of adequate housing facilities for family units pending disposition of their respective immigration proceedings by U.S. Immigration and Customs Enforcement (ICE), an operational component of DHS.   The PEA is available at https://www.federalregister.gov/articles/2014/08/14/2014-19209/environmental-planning-and-historic-preservation-program and at http://www.dhs.gov/nepa.

ICE proposes to enter into an intergovernmental service agreement (IGSA) with a municipality for the provision of family unit housing services for 2,400 persons at the proposed South Texas Family Residential Center (STFRC) near the city of Dilley, Texas.  The municipality would subcontract with a private services provider, which would in turn construct and operate the facility.  DHS, including ICE, has determined that the PEA covers significant areas of analysis for this sort of activity and has found that there would be either no or only minor impacts to the quality of the human environment. However, because certain site-specific considerations for the STFRC warrant a closer examination under NEPA, DHS and ICE have prepared a Supplemental Environmental Assessment (SEA) and analyzed potential impacts on the human and natural environment from the construction, operation, and maintenance of the STFRC.  This SEA adopts the PEA analysis and conclusions as applicable, and provides additional analysis as necessary to adequately address the proposed STFRC site near Dilley, Texas.

## 1.1    Definitions

This SEA adopts the definitions set out in the PEA, as applicable.

## 1.2    Geographic Location

The STFRC site is located in southern Frio County, Dilley, Texas on State Highway 85, one-half mile west of Interstate 35 and approximately 69 miles south of San Antonio.  The Proposed Action is situated on 51.5 acres and its coordinates are 28°39'29.35"N and 99°12'1.63"W.

## 1.3    Applicability

1

UAC00775

This SEA adopts the description of scope of the evaluation as set out in the PEA, as applicable.  Further, this SEA specifically applies to the transportation of family units and family unit members to and from the STFRC site, and the rapid acquisition of facilities to house them in appropriate conditions at the site itself.

## 2.0   Background

This SEA adopts the description of the background of the agency action set out in the PEA, as applicable.

## 3.0   Legal and Regulatory Framework

This SEA adopts the description of the legal and regulatory framework set out in the SEA, as applicable.  Further, this SEA includes with the legal and regulatory framework the following Texas statutes and regulations related to threatened and endangered species, Title 31, Texas Administrative Code; Section 65, historic preservation, Title 13, Texas Administrative Code, Part 2; and air quality, Title 30, Texas Administrative Code, Section 116.

## 4.0   Purpose and Need

The SEA adopts the description of the purpose and need set out in the PEA, as applicable.  Specifically, the purpose of the proposed STFRC is for ICE to meet its mission requirements to house family units pending the disposition of their immigration proceedings. The proposed STFRC is on an expedited implementation schedule as determined by ICE leadership to rapidly provide appropriate housing requirements for family units as part of the Department's overall response to the influx of unaccompanied children (Presidential Memorandum of June 2, 2014) and family units across the southwest border. ICE has determined that in order to fulfill this requirement, it needs to rapidly obtain appropriate housing, support services, and support staff for 2,400 women and children. ICE's family residential center must be able to immediately house some family units.  The evaluation criteria for this site specific action included being located on or near a major highway, not farther than a one and one-half hours' drive from a major metropolitan center, and within one and one-half hours' drive from the Southwest Border in the Rio Grande Valley. The siting of the STFRC near the city of Dilley, Texas meets these criteria.

## 5.0   Interagency Coordination, Consultation and Public Involvement

This SEA adopts the description of the interagency coordination, consultation and public involvement set out in the PEA.  Specifically with regard to this Proposed Action, ICE consulted with the Natural Resources Conservation Service (NRCS), U.S. Fish and Wildlife Service (USFWS), the Texas Parks and Wildlife Department (TPWD, the Texas Historical Commission (THC), the Tribal Historical Preservation Officers of the Comanche Nation and the Mescalaro Apache, and elected officials for Frio County and the town of Dilley.  The SEA and the FONSI will be made available to the public on the DHS website, and hard copies will be available at the Dilley Public Library.  The availability of the SEA and the FONSI will be publicized in one local Frio County newspaper, the FRIO-NUECES CURRENT and in one San Antonio newspaper, the SAN ANTONIO EXPRESS-NEWS. The notice of availability will also be provided in Spanish, in the San Antonio Spanish-language newspaper RUMBO DE SAN ANTONIO.

## 6.0   Description of the Proposed Action and Alternatives

2

This SEA adopts the description of the Proposed Action and alternatives as set out in the PEA, as applicable.  The Proposed Action consists of the construction, operation, and maintenance of a facility to house family units in conformance with appropriate standards, and transportation of family unit members as necessary.  The facility would be located on a parcel of land leased from a private landowner and would be accessed from State Highway 85, west of Dilley, Texas.  The facility would encompass a total of approximately 51.5 acres and would consist of dormitories and support facilities (e.g., recreation, dining, medical, educational, courtrooms) for 2,400 persons at full operational capacity (FOC).  FOC would also necessitate a support staff of 600 persons, split among shifts.  A secure vehicular access entrance would be provided from State Highway 85 into the facility.

The No-Action Alternative would mean that no family residential center is constructed in Dilley, and therefore there would be no environmental effects.  As a result, ICE's need to address the present situation by providing adequate housing for family units resulting from the increased influx of such groups across the southwest border would in large part remain unmet, contrary to the directives issued in the Presidential Memorandum and the implementing guidance of DHS leadership.  Therefore, taking no action is not a viable alternative.  Inclusion of the No-Action Alternative is prescribed by CEQ regulations (40 CFR 1502.14) as the benchmark against which proposed federal actions are evaluated.  For this reason, though the No-Action Alternative is not viable, analysis of it will be carried through this SEA.

Three alternative sites in Texas were considered to meet the Purpose and Need: Port Isabel Detention Center, Carrizo Springs, and Dilley.  Please see below for further discussion of these alternatives.

## 6.1    Detention Space and Housing

This SEA adopts the description of detention space and housing as set out in the PEA, as applicable.

## 6.2    Screening Among Alternative Locations

This SEA adopts the description of the screening conducted among alternative locations set out in the PEA. ICE's family residential center must be able to immediately house some family units.  The evaluation criteria for this site specific action included being located on or near a major highway, not farther than a one and one-half hours' drive from a major metropolitan center, and within one and one-half hours' drive from the Southwest Border in the Rio Grande Valley. The siting of the STFRC near the city of Dilley, Texas meets these criteria because it has existing structures on site that can be quickly repurposed to house family units. In addition, the site also has sufficient space to expand to a proposed potential FOC of 2,400 persons, and contains pre-existing utility connections. The Dilley site also achieves the geographic requirements of being located less than one and one-half hours from a major metropolitan center (San Antonio), having immediate access to a major interstate highway connecting it with a major metropolitan center, and being situated between Dilley and the Southwest Border in the Rio Grande Valley area such that the length of the drive from the Rio Grande Valley Area and Dilley is between one and one and one-half hours.

## 6.2.1    Eliminated Alternative Location – Carrizo Springs, TX

3

Carrizo Springs is the seat of Dimmit County, Texas, near the Rio Grande Valley.  The site considered was a workforce housing facility, designed for the recent local influx of oil and natural gas workers, on an 80 acre plot upon which 2,400 persons could have been housed.  The Carrizo Springs site had existing infrastructure which could have been repurposed to provide the immediate housing, but the driving distance of 118 miles (or approximately two hours in driving time) between it and the nearest large metropolitan area (San Antonio) would have significantly increased logistical requirements for ICE as compared to the preferred alternative.  Such a remote location also would have greatly increased the difficulty of procuring goods, services, and personnel for the Carrizo Springs location.  This factor eliminated Carrizo Springs as a viable alternative to meet the Purpose and Need.

**6.2.2    Eliminated Alternative Location – Port Isabel Detention Center (PIDC)**

The Port Isabel Detention Center is an ICE owned and operated facility in Cameron County, Texas.  The site is a previously-cleared 12 acre plot upon which housing and support services for 1,000 persons could have been placed.  The PIDC site did not have existing infrastructure that could be repurposed to achieve the immediate housing need, nor did it have space to potentially expand to accommodate 2,400 people.  Further, the PIDC site abuts the Laguna Atascosa National Wildlife Refuge, which has habitat with known occurrences of the Ocelot, a Federally-listed endangered species. To avoid any potential impact on the Ocelot or other protected species, and because of the limitations on space and density of the site, PIDC was eliminated as a viable alternative to meet the Purpose and Need.

**7.0    Affected Environment and Environmental Consequences**

This SEA adopts the description of the affected environment and environmental consequences set out in the PEA.  However, because of the site specific features of the proposed STFRC location near Dilley, Texas, this SEA contains additional analysis required under NEPA to determine whether the Proposed Action will have a significant effect on the human environment.  ICE's review of the proposed facility at Dilley demonstrates that no significant environmental impacts would result in any analyzed resource category.  Historically, the site was previously used as private ranchland.  More recently, the site has been developed into workforce housing community called Sendero Ranch.  The construction of Sendero Ranch included clearing and grading the entire property and laid the groundwork to connect to existing public utilities and infrastructure.  Figures depicting the Proposed Action are included in **Appendix A**.  **Table 1** provides a summary of the findings for the environmental areas of concern that ICE typically reviews.  The site-specific analyses of selected resource categories follow **Table 1**.

**Table 1. Resource Areas**

| Section Number | Resource/Area of Evaluation | Anticipated Impacts |
|---|---|---|
| 7.1 | Land Use | None, ICE completed AD 1006 Farmland Impact Conversion Impact Rating Form. |
| ** | Geology, Soils & Seismicity | None. |
| 7.2 | Water Resources | Temporary impacts to increase demand for potable water and wastewater treatment. |
| ** | Flood Plains | None, proposed site not on a floodplain |
| ** | Wetlands | None, no wetlands would be affected by the |

4

| | | facility. |
|---|---|---|
| 7.3 | Biological Resources – Vegetation, Birds & Wildlife | Minor impact on surrounding wildlife, ICE will discuss best management practices (BMPs) for construction to limit impact. |
| 7.4 | Biological Resources – Listed Species, Critical Habitat & Special Status Species | No impact to Federally and State listed endangered species; minor to State listed threatened species. |
| ** | Hazardous Materials & Waste | None, the generation of hazardous materials and waste would be minor and temporary, and largely restricted to construction activities. Biohazardous waste might result from medical activities at the facility, but would be handled according to standard biohazard protocols and disposed of accordingly. |
| 7.5 | Utilities & Infrastructure | Impacts to utilities and infrastructure would be minor and temporary. ICE will analyze impacts caused by sewer connections because the PEA does not cover this topic. |
| 7.6 | Historic properties | No historic properties would be impacted. |
| 7.7 | Air Quality | Frio County is in an attainment area for all six criteria air pollutants. Impacts to air quality would be minor and temporary, and are under the Federal *de minimus* standard. |
| 7.8 | Noise | Noise generated by construction or repurposing activities would be minor and temporary and limited to daytime hours. Noise generated by the facility's operation would be minor and would be attenuated before reaching Dilley. |
| 7.9 | Greenhouse Gas & Climate Change | Impacts would be minor and below CEQ reporting threshold. |
| ** | Traffic & Transportation Systems | Impacts would be minor and temporary. |
| ** | Human Health & Safety | No adverse impacts. |
| 7.10 | Social Environment & Environmental Justice | Minority and low-income communities would not experience a disproportionately high and adverse environmental impact; |
| **These section will not be discussed in the SEA, please refer to the DHS PEA for further discussion. http://www.dhs.gov/sites/default/files/publications/PEA_UAC%26FamUnits_20140812.pdf | | |

The following Resource Areas will be expanded upon from the DHS PEA to include site specific information and analysis as determined by ICE.

UAC00779

## 7.1     Land Use

The purpose of the Farmland Protection Policy Act (FPPA) is to minimize the impact Federal programs have on the unnecessary and irreversible conversion of farmland to nonagricultural uses.  The FPPA requires any Federal action which may convert farmland to nonagricultural uses, may have an adverse effect on the preservation of farmland, and which does not qualify for exclusion, to complete an evaluation and site assessment for the proposed project and make a determination whether the proposed conversion is consistent with the FPPA.

*Affected Environment*

The Proposed Action site contains a mixture of soil types. The predominant soil types include Duval series, 1 to 3 percent slopes; Amphion sandy clay, 0 to 1 percent slopes; and Brystal very fine sandy loam, 1 to 3 percent slopes (NRCS 2014). The Duval series consists of deep, well drained, moderately permeable soils that formed in loamy residuum from interbedded sandstone and siltstone over sandstone bedrock (USDA 2014). Runoff from the soil is considered negligible to low. The Amphion series consists of very deep, well drained, moderately to slowly permeable soils that formed in calcareous clay loams, and sandy clay loams (USDA 2014b). Runoff from Amphion clay is considered to be slow to moderate. The Brystal series consists of very deep, well drained soils that formed in calcareous sandy clay loams derived from interbedded sandstone. Runoff from Brystal is considered slow to medium (USDA 2014c).

All three of these soil types found at the STFRC are suited for rangeland and some cropland. Duval and Brystal series soils can be irrigated to grow peanuts, melons, cotton, grain sorghum, vegetables, and tame pastures. The soils are all found in the Northern and Western Rio Grande Plain in Texas. All three series are considered to be moderate to large extent. The Duval series has a total acreage in excess of 500,000 acres (USDA 2014).

Soil erosion is a natural process that can be accelerated by activities that cause soil disturbance such as land clearing for construction. Once soil erosion begins, it can be difficult to reverse. Erosion resulting in sedimentation and impaired water quality can also cause significant negative impacts to surrounding ecosystems. Construction BMPs such as project phasing and timing, limiting the length of time that soil is exposed to wind and rain, protecting bare soils, establishing vegetation as quickly as possible on disturbed areas, containing eroded materials and treating stormwater, can aid significantly in preventing erosion and thus maintaining the potential impacts to local and regional ecosystems.

The topography of the Proposed Action site is essentially flat.

*Environmental Consequences*

**<u>Proposed Action</u>**

Under the Proposed Action 51.5 acres of potential farmland would be disturbed during the construction of the STFRC and all construction activities would be completed in compliance with the FPPA. According to the Farmland Conversion Impact Rating assessment completed for the site (see **Appendix D**), the site score is less than the 160 points needed to further consider the site for protection under the FPPA (ICE 2014). Consequently, no significant impact to Important Farmland Soils is anticipated. Temporary impacts to soil erosion may occur

6

during the land clearing phase of construction. Appropriate BMPs would be employed during construction and operation to minimize the potential for soil erosion within or near the Proposed Action site.

**No-Action Alternative**

Under the No-Action Alternative no impacts to land use, including soils would occur.

**7.2      Water Resources**

**Surface Waters**

Surface waters are generally divided into the following categories: oceans, lakes, rivers, streams, estuaries, and wetlands. Surface water supplies water for recreation, transportation, crop irrigation, power generation, and potable water. The quality of surface water describes its chemical, physical, and biological characteristics and is affected by both natural conditions (i.e., interactions with soil, sediments, rocks, groundwater, and the atmosphere) and human activities, including agricultural, industrial, and urban activities.

Surface water quality is directly impacted by stormwater runoff from surrounding watersheds. Stormwater is generated when precipitation runs off land and impervious areas such as paved streets, parking lots, and building rooftops. Stormwater runoff can collect pollutants such as oil and grease, chemicals, nutrients, metals, and bacteria as it travels across land, and carry them into surface waters. When traveling at velocities sufficient to carry sediment particles, stormwater runoff can also cause soil erosion.

Surface water regulations focus on the right to use water and the protection of water quality. The principal federal laws protecting water quality are the Clean Water Act (CWA) and the Safe Drinking Water Act (SDWA).  In addition, Section 402 of the CWA establishes the National Pollutant Discharge Elimination System (NPDES) permit program, which gives USEPA the authority to limit the discharge of pollutants into navigable waters of the United States through a combination of requirements, including technology-based and water-quality-based effluent limitations.

Stormwater runoff for federal facilities is regulated in part by Section 438 of the Energy Independence and Security Act of 2007 (EISA). Section 438 requires any federal projects with a footprint of 5,000 SF or greater to maintain or restore the predevelopment (pre-project) hydrology of the property to the maximum extent technically feasible.

*Affected Environment*

The Proposed Action site is located in Frio County, which is located in the Gulf Coastal Plain of south Texas. Primary surface water bodies in the vicinity of the Proposed Action area include the Frio River to the northeast and several small unnamed intermittent tributaries to the east and west (USEPA 2014a).  The Frio River, which flows northwest to southeast through the county, is located approximately six miles to the northeast of the Proposed Action.

7

No streams, designated wetlands, or other surface waters are located within or immediately adjacent to the Proposed Action site. The Leona River (Texas Waterbody ID: TX-2109_01), a tributary of the Frio River, is located approximately seven miles to the north of the Proposed Action and is currently designated as an impaired stream.

*Environmental Consequences*

**Proposed Action**

The Proposed Action would not directly impact any surface waters and would not generate any process wastewater discharges. The STFRC has the potential to increase generation of stormwater due to the construction of new impervious surfaces. Construction of the Proposed Action may temporarily impact stormwater runoff quality by increasing turbidity. However, effects on surrounding surface waters would be minimized through the use of Erosion and Sediment Control (ESC) and Stormwater Management (SWM) measures. These measures would be identified in the Stormwater Pollution Prevention Plan (SWPPP) and the ESC plan, as required by the General Permit for Discharges from Construction Activities and the ESC Ordinance. The SWPPP and the ESC plan would be developed for the Proposed Action and submitted to the Texas Commission on Environmental Quality (TCEQ) and Frio County. ESC controls would be implemented prior to clearing and grading, and maintained until the area is stabilized. The SWPPP would also specify measures to prevent spills of fuels and lubricants into nearby water bodies. If properly implemented, ESC and SWM measures would limit any effects of stormwater runoff to within the boundaries of the Proposed Action. Therefore, the Proposed Action would not result in impacts to any surface water.

**No-Action Alternative**

Under the No-Action Alternative no impacts to surface water would occur.

**Groundwater**

Groundwater is subsurface water found beneath the water table in soils and geologic formations. Groundwater is the most prevalent source of available freshwater that supports potable, agricultural, and industrial uses, especially in areas that lack access to river water resources. Groundwater quality is impacted by interactions with soil, sediments, rocks, surface waters, and the atmosphere. Groundwater quality may also be significantly affected by agricultural, industrial, urban, and other human actions.

*Affected Environment*

The Proposed Action is located within Groundwater Management Area #13, as established by the Texas Water Development Board (TWDB).  The site is also within the Evergreen Underground Water Conservation District, a priority groundwater management area governed by (TCEQ 2014).  The main aquifer for the site is the Carrizo-Wilcox Aquifer, the principal source of groundwater in Frio County, Texas.  The Carrizo-Wilcox Aquifer extends from the Louisiana border to the border of Mexico in a wide band adjacent to and northwest of the Gulf Coast Aquifer. It consists of the Wilcox Group and the overlying Carrizo Formation of the Claiborne Group. The aquifer is primarily composed of sand locally intermixed with gravel, silt, clay, and lignite. Although the Carrizo-Wilcox

8

Aquifer reaches 3,000 feet in thickness, the freshwater saturated thickness of the sands averages 670 feet (TWDB 2014). Irrigation pumping accounts for approximately half the water pumped, and pumping for municipal supply accounts for another 40 percent. Water levels have declined in the so-called Winter Garden area because of irrigation pumping and in the northeastern part of the aquifer because of municipal pumping; however neither of these locations is located near the Proposed Action (TWDB 2014).

*Environmental Consequences*

**Proposed Action**

The Proposed Action has the potential to impact groundwater during construction activities. Groundwater problems can be mitigated by installing berms or ditches along the perimeter of excavations to redirect surface runoff away from the site. Operation of the new facilities under the Proposed Action should not have any major impact on groundwater. Water used at the site will come from the local municipality accessing already existing water infrastructure in the area. The demand from the operation at the site is not expected to exceed the capacity or limits imposed by the TCEQ and TWDB.

**No-Action Alternative**

Under the No-Action Alternative no impacts to groundwater would occur.

**7.3      Biological Resources – Vegetation, Birds & Wildlife**

*Affected Environment*

The proposed project is located within the South Texas Plains Ecoregion (specifically the 31c Texas-Tamaulipan Thornscrub) and consists of mesquite trees, prickly-pear cactus, and other native and non-native grasses (Griffith et al. 2007). This region owes its diversity to converging elements of the Chihuahuan Desert to the west, the Tamaulipan thornscrub and subtropical woodlands along the Rio Grande, and the coastal grasslands to the east. The region is cut by arroyos and streams and is blanketed with low-growing, mostly thorny vegetation. The distinctive woody vegetation gives rise to the name "brush country."

The vegetation of the South Texas Plains Ecoregion 31c is dominated by drought-tolerant, mostly small-leaved, and often thorn-laden small trees and shrubs, especially legumes. The most important woody species is Honey Mesquite (*Prosopis glandulosa*). Where conditions are suitable, there is a dense understory of smaller trees and shrubs such as Brasil (*Condalia hookeri*), Colima or Lime Pricklyash (*Zanthoxylum fagara*), Texas Persimmon (*Diospyros texana*), Lotebush (*Ziziphus obtusifolia*), Granjeno (*Celtis pallida*), Kidneywood (*Eysenhardtia texana*), Coyotillo (*Karwinskia humboldtiana*), Texas Paloverde (*Parkinsonia texana*), Anacahuita (*Cordia boissieri*), and various species of cacti. Xerophytic brush species, such as Blackbrush (*Acacia rigidula*), Guajillo (*Acacia berlandieri*), and Ceniza (*Leucophyllum frutescens*), are typical on the rocky, gravelly ridges and uplands. The brush communities also tend to grade into desert scrub near the Rio Grande. Mid and short grasses are common, including Cane Bluestem (*Bothriochloa barbinodis*), Silver Bluestem (*Bothriochloa laguroides*), Multiflowered False Rhodesgrass (*Trichloris pluriflora*), Sideoats  Grama (*Bouteloua curtipendula*), Pink Pappusgrass (*Pappophorum bicolor*), Bristlegrasses (*Setaria spp.*), Lovegrasses (*Eragrostis spp.*), and Tobosa

9

(*Hilaria mutica*). On overgrazed sites or drier sites to the west, Red Grama (*Bouteloua trifida*), Texas Grama (*Bouteloua rigidiseta*), Buffalograss (*Buchloe dactyloides*), and Curleymesquite (*Hilaria belangeri*) occur (Griffith et al. 2007).

The proposed project location typical of the ecoregion consists of a wide variety of shrub and grassland species including Northern Bobwhite (*Colinus virginianus*), White-tailed Deer (*Odocoileus virginianus*), Mourning Doves (*Zenaida macroura*), Wild Turkey (*Meleagris gallopavo*), and Collared Peccary (*Pecari tajacu*) (Griffith et al. 2007). The previously disturbed and graded land existing at the proposed project location would provide suitable, albeit limited, habitat for a number of common species located throughout much of Texas such as bobcats, coyote, armadillos, skunks, opossums raccoons, foxes, and a wide variety of snakes, rats, and mice.

ICE reviewed the USFWS Information, Planning, and Conservation (IPaC) System[1] to identify a list of migratory birds of concern that may be affected by the proposed project. **Table 2** below provides the species name and potential seasonal occurrence within the project area as identified by USFWS.

**Table 2. Migratory Birds of concern for Frio County, TX**

| Species Name | Bird of Conservation Concern (BCC) | Potential Seasonal Occurrence in Project Area |
|---|---|---|
| Audubon's Oriole  (*Icterus graduacauda*) | Yes | Year-round |
| Bald eagle  (*Haliaeetus leucocephalus*) | Yes | Wintering |
| Bell's Vireo     (*Vireo bellii*) | Yes | Breeding |
| Burrowing Owl  (*Athene cunicularia*) | Yes | Wintering |
| Cassin's Sparrow  (*Aimophila cassinii*) | Yes | Year-round |
| Chestnut-collared Longspur (*Calcarius ornatus*) | Yes | Wintering |
| Curve-billed Thrasher  (*Toxostoma curvirostre*) | Yes | Year-round |
| Harris's Hawk  (*Parabuteo unicinctus*) | Yes | Year-round |
| Harris's Sparrow  (*Zonotrichia querula*) | Yes | Wintering |
| Hooded Oriole  (*Icterus cucullatus*) | Yes | Breeding |
| Lark Bunting  (*Calamospiza melanocorys*) | Yes | Wintering |

---

[1] http://ecos.fws.gov/crithab/

UAC00784

| Least Bittern   (*Ixobrychus exilis*) | Yes | Breeding |
| Lesser Yellowlegs   (*Tringa flavipes*) | Yes | Wintering |
| Summer tanager   (*Piranga rubra*) | Yes | Breeding |
| Verdin   (*Auriparus flaviceps*) | Yes | Year-round |

*Environmental Consequences*

**Proposed Action**

Construction activities and associated ground disturbance of the cleared and graded area proposed for the project would temporarily and minimally disturb any birds or other mammals and reptiles that may be in close vicinity to the construction area. Since the area has been cleared and graded, no trees are present and no native vegetative communities exist other than small patches of shrubbery. Because minimal native non-disturbed vegetation exists in the proposed project area, there is limited natural habitat for native wildlife. Furthermore, migratory birds and other wildlife will likely avoid the proposed project area during construction activities and during operations. The proposed project does not include the construction of any tall structures such as wind turbines or communications towers, so migratory flyways would not be impacted. In addition, no surface waters exist within the project area and, therefore, no fish or aquatic species would be impacted.

Best management practices and environmental considerations will be used during construction and operations to minimize any potential impacts to vegetation and wildlife. Trash and recycling materials will be removed from the facility on a routine basis to minimize on-site vectors, and signage warning of potentially dangerous wildlife (e.g., coyotes and venomous snakes) will be placed in strategic areas of the facility during operations. Contractors' employees and ICE personnel at the STFRC will receive orientation training as to the identifying characteristics of dangerous species, and will be asked to inform facility management if these wildlife are seen. Comprehensive, integrated pest management and vermin control techniques will be utilized at the facility to minimize the likelihood of potential contact between wildlife and residents. Fencing and lighting would be included as part of the project and lighting would be down-shielded and directed away from the surrounding areas to minimize impacts to wildlife.

Based upon a review of publically available information, ICE finds that there would no significant impacts to vegetation, birds, or wildlife species or habitat because the proposed project is located on cleared, graded, and previously disturbed lands. ICE submitted packages to USFWS and TPWD on August 22, 2014 to obtain concurrence of ICE's finding of no adverse effect to wildlife and birds (ICE 2014b) (ICE 2014c). ICE received a response from USFWS on August 27, 2014 (Consultation No. 02ETCC00-2014-I-0239) indicating the Service recognizes that ICE has complied with section 7(1)(a) of the Endangered Species Act (ESA).

**No-Action Alternative**

Under the No-Action Alternative no impacts to vegetation, birds, wildlife or habitat would occur.

**7.4     Biological Resources – Listed Species, Critical Habitat & Special Status Species**

11

*Affected Environment*

**Federally Listed Species**

The ESA [16 U.S.C. 1532 et. seq.] of 1973 requires all Federal agencies to implement protection programs for designated species and to use their authorities to further the purposes of the act. ICE reviewed the USFWS IPaC System[2] to identify endangered, threatened, or candidate species that should be considered for the proposed project. In addition, ICE reviewed the USFWS threatened and endangered species database[3] to identify species that are known to or are believed to occur in Frio County, Texas. Four species were identified for the proposed project area as identified in tables below, the Yellow-Billed Cuckoo (*Coccyzus americanus*), Sprague's Pipit (*Anthus spragueii*), Gulf Coast jaguarundi (*Herpailurus yagouaroundi cacomitli*), and Ocelot (*Leopardus pardalis*). **Table 3** below provides the conservation status, brief species description, and general habitat for each of the species listed.

**Table 3. Federally Protected Species List for Frio County, TX**

| Common/ Scientific Name | Federal Status | Brief Description | General Habitat |
|---|---|---|---|
| Yellow-Billed Cuckoo (*Coccyzus americanus*) | Proposed Threatened | The yellow-billed cuckoo is a medium sized brown bird, about 12 inches long and weighing about two ounces. The bird's most notable physical features are a long boldly patterned black and white tail and an elongated down-curved bill which is yellow on the bottom.[4] | Deciduous woods from Canada to Mexico. Western yellow-billed cuckoos breed in dense willow and cottonwood stands in river floodplains. |
| Sprague's Pipit (*Anthus spragueii*) | Candidate | The sprague's pipit is a relatively small bird that has a plain buff colored face with a large eye-ring. It feeds mostly on insects and spiders and some seeds.[5] | Open grasslands within North America. |
| Gulf Coast jaguarundi (*Herpailurus yagouaroundi cacomitli*) | Endangered | The jaguarundi is slightly larger than a domestic cat, with a uniform dark gray-brown to chestnut brown coat. Its body is long and low with short legs, small, flattened head with weasel-like ears and narrow brown eyes, and a long, flattened tail.[6] | Dense forest (darker colored individuals) to arid and open areas (lighter colored individuals). |
| Ocelot (*Leopardus pardalis*) | Endangered | The ocelot is a medium sized cat, with short fur that varies from creamy or tawny yellow, to reddish grey and grey. The underside of the body, tail, and inside of the limbs is whitish. It is between 30-41 inches long and generally weighs between 15 and 30 pounds (TPWD | Shrubland, particularly dense thornscrub over loamy clay soils, riparian areas, and |

---

[2] http://ecos.fws.gov/crithab/
[3] http://www.fws.gov/endangered/
[4] http://www.fws.gov/oregonfwo/Species/Data/YellowBilledCuckoo/
[5] http://www.fws.gov/mountain-prairie/species/birds/spraguespipit/index.html
[6] http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=A05H

12

UAC00786

| | | 2014b). | brushy arroyos. |
|---|---|---|---|

The ESA also calls for the conservation of "Critical Habitat." This refers to areas of land, water, and air space that an endangered species needs for survival. Critical habitat also includes such things as food and water, breeding sites, cover or shelter, and sufficient habitat area to provide for normal population growth and behavior. ICE reviewed the USFWS Critical Habitat mapper[7] to determine if the proposed project was located on or within a five-mile radius of any critical habitat. There is no designated critical habitat for any of these four species located within a five mile radius of the proposed project location.

**State Listed Species**

The State of Texas has also established a list of rare animal and plant species. ICE reviewed the Texas Parks and Wildlife Department (TPWD) database of Rare, Threatened, and Endangered Species for Frio County, Texas to identify rare, threatened, and endangered species that either are present or could potentially be present in Frio County (TPWD 2014c). The TPWD list includes 22 rare animal and plant species; seven of these species are classified as "Threatened" and three species are classified as "Endangered" under Texas wildlife regulations. **Table 4** below provides the conservation status, brief species description, and general habitat for the listed species.

**Table 4. State Protected Species List for Frio County, TX**

| Common/ Scientific Name | State Status | Brief Description | General Habitat |
|---|---|---|---|
| American Peregrine Falcon (*Falco peregrinus anatum*) | Threatened (Federally Delisted) | Subspecies of peregrine falcon – appearance is almost identical (see below), but the American peregrine is slightly smaller and adults are somewhat paler and less patterned.[8] | Range and habitat are similar to the Peregrine Falcon (see below). |
| Peregrine Falcon (*Falco peregrinus*) | Threatened (Federally Delisted) | The peregrine falcon is a crow-sized bird, weighing just over two pounds with a wing span of approximately 3 feet. An adult peregrine has a dark grey back and crown, dark bars or streaks on a pale chest and abdomen, and heavy malar (cheek) stripes on the side of the face. The peregrine falcon is characterized by long pointed wings and distinct sickle-shaped silhouette of its extended wings in flight.[9] | (In Texas) nests in tall cliff eyries. Occupies a wide range of habitats during migration - can move across the state from more northern breeding areas in the US and Canada. |
| American Black Bear (*Ursus* | Threatened (Federally Not Listed) | Black bears are huge, bulky mammals with long black hair. In the western US, their coat is black to cinnamon, with white blaze on the chest. | Bottomland hardwoods and large tracts of inaccessible forested areas. |

---

[7] http://ecos.fws.gov/crithab/flex/crithabMapper.jsp
[8] http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B01H
[9] http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=B01H

13

| | | | |
|---|---|---|---|
| _americanus_) | | Although weight varies considerably, large males may weigh more than 600 lbs. [10] [11] | |
| Reticulate Collared Lizard (_Crotaphytus reticulatus_) | Threatened | Moderately sized tan to brown lizard with reticulations covering most of its dorsum, limbs, and tail. They can grow to a length of 16 in (41 cm). They are diurnal and primarily feed on invertebrates and other small prey, even other lizards. [12] | Tamaulipan thorn scrub and open brush-grasslands; usually on well-drained rolling terrain of shallow gravel, caliche, or sandy soils. |
| Texas Indigo Snake (_Drymarchon melanurus erebennus_) | Threatened | The Texas indigo snake is a non-venomous serpent that may reach lengths of eight feet and is susceptible to dehydration. | Areas near natural or artificial bodies of water of Texas south of the Guadalupe River and Balcones Escarpment (Werler & Dixon 2000). |
| Texas Tortoise (_Gopherus berlandieri_) | Threatened | The Texas tortoise may grow to have a shell length of about 8.5 inches, may live as long as 60 years, and mostly feeds on succulent plants and the fruit of the common prickly pear (TPWD 2014). | Open brush with a grass understory is preferred; when inactive occupies shallow depressions at base of bush or cactus. |
| Texas Horned Lizard (_Phrynosoma cornutum_) | Threatened | The Texas horned lizard is the official Texas state reptile and is a flat-bodied and fierce-looking lizard. The head has numerous horns, all of which are prominent, with two central head spines being much longer than any of the others. It is brownish with two rows of fringed scales along each side of the body. | Arid or semi-arid habitats in open areas with sparse plant cover. They are commonly found in areas with loose or loamy soil (TPWD 2014d). |
| Gray Wolf (_Canis lupus_) | Endangered | The Gray Wolf is a close relative of domestic dogs. Its thick fur ranges in color from creamy white, reddish-brown, to shades of gray and black. Gray wolves are the largest species of wolf and range between 50 - 90 pounds and 4 - 5 feet long. Adult males are larger than adult females. [13] | (In Texas) forests, brushlands, or grasslands where suitable cover and denning sites are available. |
| Red Wolf (_Canis rufus_) | Endangered | Red wolves are known for the characteristic reddish color of their fur, but are mostly brown and buff colored with some black along their backs. Intermediate in size to gray wolves and coyotes, the average adult red wolf weighs 45-80 pounds, stands about 26 inches at the shoulder | (In Texas) brushy and forested areas, as well as coastal prairies. |

---

[10] http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=A0G1
[11] http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=A08F
[12] http://inaturalist.org/taxa/Crotaphytus_reticulatus
[13] http://www.tpwd.state.tx.us/huntwild/wild/species/graywolf/

14

UAC00788

| | | and is about 4 feet long from the tip of the nose to the end of the tail.[14] | |
| Ocelot (*Leopardus pardalis*) | Endangered | The ocelot is a medium sized cat, with short fur that varies from creamy or tawny yellow, to reddish grey and grey. The underside of the body, tail, and inside of the limbs is whitish. It is between 30-41 inches long and generally weighs between 15 and 30 pounds (TPWD 2014b). | Shrubland, particularly dense thornscrub over loamy clay soils, riparian areas, and brushy arroyos. |

ICE reviewed the State list of protected species that are also considered to also be listed as Species of Greatest Conservation Need (SGCN) (TPWD 2014e) when evaluating potential impacts. Of the state "Threatened" species, both falcon species have been delisted from Federal species protection, and the bear is not listed for Federal species protection.  All four species of "Threatened" reptiles (Reticulate Collared Lizard, Texas Indigo Snake, Texas Tortoise, and Texas Horned Lizard) are categorized as SGCN (TPWD 2014e).

Of the State "Endangered" mammals, neither species of wolf is considered to be a SGCN. The Gray Wolf was historically found throughout the western part of the state but is now locally extinct.  Likewise, the Red Wolf once ranged throughout the eastern and south-central United States, but the only remaining wild population of about 100 individuals appears to be located in northeastern North Carolina (USFWS 2014).

The endangered ocelot is an SGCN species, and importantly, Texas assigns priority to ocelot conservation measures, because it is a Federally-listed endangered species with a recovery plan (USFWS 2010).  Issues which negatively impact ocelot conservation include habitat loss and fragmentation, particularly the loss and conversion of thornscrub and floodplain areas to agricultural use and urban development, with associated roadway mortality and various barriers to movement and dispersal such as the use of high-powered stadium lighting, brush clearing, road cutting and dragging, road paving and fencing of various heights.

*Environmental Consequences*

**Proposed Action**

Construction activities for the proposed project do not involve the development of wind turbines, communications towers, or other structures that could potentially impact migration patterns for the Yellow-Billed Cuckoo or Sprague's Pipit. The Proposed Threatened population of Cuckoo is the western subspecies that could potentially use migration routes through south Texas. However, the proposed project location does not provide suitable habitat for the Cuckoo due to the lack of forested and/or riparian lands on or within the surrounding areas. Although the Pipit breeds and winters on open grasslands, the species would likely avoid the project area during construction and operation because similar habitat exists throughout Frio County and would likely be utilized as an alternative for breeding and wintering activities.

Conscious of the endangered status of the ocelot and jaguarundi, in 2010 ICE entered into a memorandum with USFWS to preserve approximately 80 acres of forested land near ICE's PIDC in Cameron County, Texas as

[14] http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=A00F

UAC00789

habitat in conjunction with ICE's construction and installation of an additional water line to meet the potable water needs of the facility (MOU 2010). At that time, USFWS provided ICE a biological opinion which set out species specific BMPs to avoid disturbing the ocelot during the laying of the pipe. These BMPs included using a biological monitor to watch for individual animals, avoiding the removal of wetland habitat or riparian vegetation, avoiding removal of dense thornscrub, documenting information regarding ocelot presence in the work area, and conducting work only during daylight areas to avoid noise and lighting issues at night (USFWS 2010b).

The existing land use for the proposed project is previously disturbed rangeland/pastureland which is unlikely to provide suitable habitat for ocelots and jaguarundis. In addition, no critical habitat exists for either species within the proposed project area. Historically, ocelots ranged throughout south Texas, but they have been reduced to very small populations occurring primarily in Cameron and Willacy Counties. However, ICE will apply BMPs provided by the USFWS for the previous project at the PIDC by employing similar conservation BMPs during construction and operation of the STFRC as appropriate and feasible. Because of the very low probability that ocelots or jaguarundis would be present in the area, there will be no need to avoid construction activities at night, if necessary, nor would lighting of the facility present any problems. Vehicular traffic to/from the facility will likely be minimized between the hours of 7PM and 7AM daily as practicable. In addition, construction crews will be briefed on the possibility of sighting an ocelot or jaguarundi, and will inform management in the event of a sighting. Likewise, contractors' employees and ICE personnel at the STFRC will receive orientation training as to the identifying characteristics of the ocelot and jaguarundi, and will be asked to inform facility management if one is seen. ICE would immediately consult with USFWS and TPWD regarding the appropriate measures to take to avoid disturbing these species.

As identified above, there are no wild populations of either the Red or Grey Wolf species in Texas, and subsequently, these species are highly unlikely to be present in Frio County.

A literature review suggests that each of the four State threatened reptile species could be present in the area of the proposed STFRC. Construction crews will organize activities to incorporate BMPs identified by the TPWD for the individual species to the greatest extent possible (e.g. construction personnel will confirm any open trenches or pits are covered after construction activities are completed for the day and will inspected prior to construction commencement each day to ensure no tortoises or other reptiles have been trapped inside). Similarly, contractors and ICE employees at the STFRC will receive orientation training prior to construction and once the facility is operating as to the identifying characteristics of each of the species and methods to avoid disturbance.

Based upon a review of publically available information, ICE finds that there would be no effect to Federal or state-listed species or critical habitat because the proposed project location does not provide suitable habitat for listed species. Therefore, ICE finds that there will be no significant impacts. ICE submitted packages to USFWS and TPWD on August 22, 2014 to obtain concurrence of ICE's finding of no adverse effect (ICE 2014b) (ICE 2014c). ICE received a response from USFWS on August 27, 2014 (Consultation No. 02ETCC00-2014-I-0239) indicating the Service recognizes that ICE has complied with section 7(1)(a) of the Endangered Species Act (ESA).

16

**No-Action Alternative**

Under the No-Action Alternative no impacts to threatened or endangered species or critical habitat would occur.

## 7.5     Utilities & Infrastructure

Infrastructure and utilities are the basic facilities, services, and installations a community or society needs to function. These facilities include transportation systems, communications systems, emergency response systems, and water and power lines, wastewater and sewage treatment plants, and solid waste landfills. An efficient infrastructure minimizes negative effects on the environment by conserving energy, water, and other natural resources.

The extent of analysis covered by the DHS PEA) included impacts to existing local landfills, existing electrical service providers, and installation of any new electrical conduit.  The PEA determined that impacts to those specific utilities and infrastructure would be minor.  The reason for further analysis, as covered in this SEA, is to ensure that utilities and infrastructure, specifically the capacities of the City of Dilley's water plant and wastewater treatment plant, will not be overwhelmed by the additional demand created by the Proposed Action.

*Affected Environment*

The location of the Proposed Action is ideal because of its proximity to existing utilities and infrastructure. Electrical power in the area is supplied by Medina Electric Cooperative, Inc., headquartered in Hondo, Texas. Medina provides service in 17 counties, including Frio County where the Proposed Action is located (Medina 2014).

Potable water in the area is provided by the City of Dilley, Texas.  The Dilley water plant currently relies on three existing groundwater wells, each approximately 2,000 feet deep.  Combined the wells currently produce 1,950 gallons per minute.  Dilley is also planning the development of a fourth well which is expected to produce an additional 850 gallons per minute.  In addition, the City of Dilley provides wastewater treatment services.  The wastewater treatment plant can treat a maximum of 800,000 gallons per day and currently the plant treats between 300,000 to 360,000 gallons per day (City of Dilley 2014).

The City of Dilley provides solid waste collection to residential and commercial entities.  Dilley contracts its solid waste removal with ACI Disposal, headquartered in San Antonio, Texas (City of Dilley 2014).  ACI takes all collected trash from Dilley, Texas to Clovel Gardens Landfill, located in San Antonio, Texas.  The Clovel Gardens property was permitted as a Type I municipal solid waste landfill in 1992 and currently encompasses a total of 783 acres with a disposal footprint of 480 acres.  The site is permitted under TCEQ Permit #2093B and is not expected to reach capacity for another 17 years (Waste Management 2014).

*Environmental Consequences*

**Proposed Action**

The Proposed Action would result in an increase in energy usage, solid waste generation, water usage, and wastewater generation.  The STFRC is expected to house 2,400 persons and employ approximately 600 total staff

17

members.  It is expected that the STFRC will be staffed in three shifts of approximately 200 staff members each. Therefore, it is expected that there will be approximately 2,600 persons at the STFRC at any given time.

Electrical infrastructure is already in the vicinity of the Proposed Action.  All power services will be provided by Medina Electric Cooperative, Inc.  The utility service provider has the capacity to meet the demand loads required for operation of the Proposed Action.

The Proposed Action will utilize existing underground sewer and water infrastructure located along State Road 85, adjacent to the site.  Approximately 1,500 feet of water and sewer pipe will be installed to connect to the existing 12-inch water and sewer mains.   It is expected that the 2,400 occupants of the STFRC will use water at a rate of approximately 85 gallons per person per day (Target 2014).  The 600 staff members, distributed among three 8-hour shifts, are assumed to use approximately 40 gallons of water per person per day (Target 2014). Based on the expected occupancy numbers, the STFRC population will use approximately 228,000 gallons of water and expel an equal amount in wastewater per day.  Currently the wastewater treatment plant is at 45 percent capacity and the new Proposed Action demands will increase capacity usage to approximately 73 percent, well below its maximum load.

Because of the readily available capacity and existing infrastructure, the Proposed Action would have minor impacts on utilities and infrastructure in Dilley, Texas.

**No-Action Alternative**

The No-Action Alternative would have no effect on existing utilities and infrastructure.  There would be no additional demands on the City of Dilley or the Medina Electric Cooperative, Inc.

**7.6    Historic Properties**

The National Historic Preservation Act (NHPA) of 1966, as amended [16 U.S.C. 470], and in particular Section 106 of the NHPA, requires Federal agencies to take into account the effect that a proposed undertaking will have on properties that are listed or eligible for listing on the National Register of Historic Places (NRHP). Section 106 of the NHPA governs the process in which agencies assess those impacts. As part of ICE's efforts to complete Section 106 requirements, ICE submitted a coordination letter to the Texas Historic Commission (THC) announcing the upcoming project and requesting THC to provide any relevant information regarding historic properties within or near the proposed STFRC (**Appendix B**).

Other applicable requirements include the Archaeological Resources Protection Act of 1979 (Public Law 96-95; 16 U.S.C. 470 *aa-mm)* as amended and EO 13007. ICE submitted coordination letters to applicable Native American tribes announcing the upcoming project and requesting they provide any relevant information regarding resources of interest within or near the proposed STFRC (**Appendix B**).

The area of potential effect (APE) for the proposed project includes the portions of the construction footprint where ground disturbance and excavation related activities will be conducted, which includes the approximately 51.5 acres for the construction of modular buildings, sprung structures, and a limited number of hard walled

UAC00792

structures requiring foundation pads and excavation. The APE also includes any aboveground resources that may be within the line-of-sight viewshed of the proposed new construction.

*Affected Environment*

Frio County is on the Southwest Texas Plains, in an area popularly known as the Winter Garden Region.  It is sparsely populated compared to Texas as a whole, with only 15.2 persons per square mile versus 96.3 persons per square mile for the state (US Census Bureau 2014).  Frio County's dimensions are 37 miles from east to west, and 30 miles from north to south, for a total land area of 1,133 square miles.  The terrain is essentially flat; elevations above sea level range from on average 600 feet in the north of the county, to 400 feet in the south of the county. Before European settlement of the Frio County area, the area was periodically inhabited by the nomadic Payaya and Pachal Native Americans, who appear to have lived a hunter-gatherer lifestyle.  According to historical accounts, these people moved from camp to camp, using lean-tos made of branches and leaves for shelter (UTA 2014).  These people appear to have been embraced by the Spanish missions (TSHA 2014) (UTA 2014b). The Camino Real, the royal Spanish road that connected the Rio Grande Valley area with San Antonio and points further east, traversed Frio County to the north and south of Dilley (NPS 2014). The Frio County area remained largely unsettled, however, until after the Civil War (TSHA 2014).  Although the Frio County area was well outside of the area controlled by the Comanche peoples, it was subject to Comanche incursions (Hamalainen 2008).  Between 1865 and 1876, there were a number of small engagements between Native Americans, presumably Comanche, and ranchers and settlers who had moved into the area (A.J. Sowell).  These raids appear to have been transitory and focused on acquiring horses and cattle from the ranchers and settlers, and were therefore unlikely to have left behind any items of archeological interest.

Large areas of Frio County were historically, and remain, suitable for ranching and agriculture.  The proposed project location consists of typical south Texas rangeland/pastureland (species include mesquite trees, prickly-pear cactus, and shrubbery). The site itself has no particular resources such as riparian features or shelter that would have attracted hunter-gatherer people, in contrast, for example, to the archeologically-rich Lower Pecos Canyonlands located to the northwest of Frio County (UTA 2014c). A review of the archeological abstracts on file with the Texas Archeological Research Laboratory shows that none have focused on cultural remains in Frio County (UTA 2014d) and large scale research projects that are currently ongoing, such as the Central Texas Ceramic Project (UTA 2014e), do not include Frio County.  Further, the characteristic features of such human presence, such as hearth sites (UTA 2014f) or the chipped stone and bone tool deposits such as those found at Tortuga Flat along Tortuga Creek in neighboring Zavala County (UTA 1977) would not likely have remained after the area was cleared and graded for potential commercial development.

ICE reviewed the National Park Service's NRHP database Google Earth mapping layer[15] to examine the proposed undertaking's impact on listed or eligible historic properties within the surrounding area. Additionally, resources from the THC[16] were referenced to examine the undertaking's potential impact on state listed or eligible historic properties within the surrounding area.

---

[15] NRHP site locations are based on the Google Earth mapping layer provided through the National Park Service.
  NATIONAL PARK SERVICE, U.S. DEPT OF INTERIOR, National Register of Historic Places,
  http://nrhp.focus.nps.gov/natreg/docs/Download.html
[16] http://atlas.thc.state.tx.us

UAC00793

- There are no NRHP-listed properties within a 15-mile radius of the STFRC.
- ICE is unaware of any historic properties eligible for inclusion on the NRHP within the APE.
- The built environment within the proposed project area consists of existing residential trailers none of which are older than 50 years.
- There is one Texas Historic Site located 0.9 miles NE of the proposed project location, the Dilley Cemetery.
- No additional existing structures are located within the viewshed of any properties or sites listed on the NRHP or classified as a Texas Historic Site.

*Environmental Consequences*

**Proposed Action**

Ground disturbing activities would occur only in association with construction activities within the identified 51.5 acres. Viewshed analyses and street view photos from the cemetery indicate that the line-of-site from the entrance of the cemetery to the proposed STFRC is obscured by trees and distance. As such, the proposed undertaking will not adversely affect the historic Dilley Cemetery.

Based upon a review of publically available information, ICE finds that there would be no historic properties affected because of the disturbed nature of the proposed project area, absence of above-ground historic properties within the APE, and the low probability of subsurface historical properties. ICE submitted consultation packages to the THC (ICE 2014d) as well as two Native American tribes (Mescalero Apache and Comanche Nation of Oklahoma) (ICE 2014e & ICE 2014f) on August 22, 2014 to obtain concurrence of ICE's finding of no historic properties affected. No response has been received as of the date of this report. ICE does not anticipate receiving further information which point towards conclusions that differ from its assessment of no significant impact to any resource area. In the event unexpected issues are raised, ICE may issue follow up NEPA documentation as appropriate. In the event historic properties were identified during excavation, additional coordination efforts would be conducted with the THC and applicable Native American tribes.

**No-Action Alternative**

There would be no short or long-term impacts to historic properties as a result of the No-Action Alternative.

## 7.7    Air Quality

Air quality can be defined as the concentrations of pollutants determined by USEPA to be of concern to the health and welfare of the general public and the environment. Poor ambient air quality typically results from emissions of fossil fuel combustion, usually from vehicles (mobile sources) or production facilities (stationary sources). Emissions from fossil fuel combustion also contain greenhouse gases (GHGs), which are very likely to be a contributor to global climate change.

**Ambient Air Quality**

UAC00794

The Clean Air Act (CAA) authorized USEPA to set National Ambient Air Quality Standards (NAAQS) for air pollutants considered to be harmful to public health and the environment (40 CFR Part 50). USEPA established NAAQS for specific pollutants determined to be of concern with respect to the health and welfare of the general public. The major pollutants of concern, or criteria pollutants, are carbon monoxide (CO), sulfur dioxide (SO2), nitrogen dioxide (NO2), ozone (O3), particulate matter less than 10 microns (PM-10), particulate matter less than 2.5 microns (PM-2.5), and lead (USEPA 2014f). NAAQS represent the maximum levels of background pollution that are considered safe, with an adequate margin of safety, to protect the public health and welfare. The NAAQS are included in **Table 5**.

Ambient air quality standards are classified as either "primary" or "secondary." Primary standards set limits to protect public health including the health of at-risk populations such as people with pre-existing heart or lung disease (e.g. asthmatics), children and older adults.   Secondary standards set limits to protect public welfare, including protection against visibility impairment, damage to animals, crops, vegetation, and buildings.

Ozone forms from a chemical reaction between volatile organic compounds (VOCs) and nitrogen oxides (NOx) in the presence of heat and sunlight. Typically, emissions of these precursors (i.e., VOC and NOx) are targeted to control the level of ozone in the ambient air.

**Table 5. National Ambient Air Quality Standards (NAAQS)**

| Pollutant | | Primary/ Secondary | Averaging Time | Level | Form |
|---|---|---|---|---|---|
| Carbon Monoxide | | primary | 8-hour | 9 ppm | Not to be exceeded more than once per year |
| | | | 1-hour | 35 ppm | |
| Lead | | primary and secondary | Rolling 3 month average | 0.15 µg/m$^3$ [1] | Not to be exceeded |
| Nitrogen Dioxide | | primary | 1-hour | 100 ppb | 98th percentile, averaged over 3 years |
| | | primary and secondary | Annual | 53 ppb [2] | Annual Mean |
| Ozone | | primary and secondary | 8-hour | 0.075 ppm [3] | Annual fourth-highest daily maximum 8-hr concentration, averaged over 3 years |
| Particle Pollution | PM$_{2.5}$ | primary | Annual | 12 µg/m$^3$ | annual mean, averaged over 3 years |
| | | secondary | Annual | 15 µg/m$^3$ | annual mean, averaged over 3 years |
| | | primary and secondary | 24-hour | 35 µg/m$^3$ | 98th percentile, averaged over 3 years |
| | PM$_{10}$ | primary and secondary | 24-hour | 150 µg/m$^3$ | Not to be exceeded more than once per year on average over 3 years |
| Sulfur Dioxide | | primary | 1-hour | 75 ppb [4] | 99th percentile of 1-hour |

| | | | | daily maximum concentrations, averaged over 3 years |
|---|---|---|---|---|
| | secondary | 3-hour | 0.5 ppm | Not to be exceeded more than once per year |

(1) Final rule signed October 15, 2008.  The 1978 lead standard (1.5 µg/m3 as a quarterly average) remains in effect until one year after an area is designated for the 2008 standard, except that in areas designated nonattainment for the 1978, the 1978 standard remains in effect until implementation plans to attain or maintain the 2008 standard are approved.
(2) The official level of the annual NO2 standard is 0.053 ppm, equal to 53 ppb, which is shown here for the purpose of clearer comparison to the 1-hour standard.
(3) Final rule signed March 12, 2008.  The 1997 ozone standard (0.08 ppm, annual fourth-highest daily maximum 8-hour concentration, averaged over 3 years) and related implementation rules remain in place.  In 1997, EPA revoked the 1-hour ozone standard (0.12 ppm, not to be exceeded more than once per year) in all areas, although some areas have continued obligations under that standard ("anti-backsliding").  The 1-hour ozone standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 ppm is less than or equal to 1.
(4) Final rule signed June 2, 2010.  The 1971 annual and 24-hour SO2 standards were revoked in that same rulemaking.  However, these standards remain in effect until one year after an area is designated for the 2010 standard, except in areas designated nonattainment for the 1971 standards, where the 1971 standards remain in effect until implementation plans to attain or maintain the 2010 standard are approved.

To monitor the criteria pollutants, USEPA divides the United States into more than one hundred air quality control regions (AQCRs) where concentrations of the criteria pollutants are continuously measured and reported. Areas that do not meet these NAAQS standards are called "non-attainment areas." States with nonattainment AQCRs are responsible for developing State Implementation Plans (SIPs), which specify the manner in which NAAQS will be achieved and maintained.

The Federal Conformity Final Rule (40 CFR Parts 51 and 93) specifies criteria and requirements for conformity determinations of Federal projects. The Federal Conformity Rule was first promulgated in 1993 by USEPA, following the passage of Amendments to the Clean Air Act in 1990. The rule mandates that a conformity analysis be performed when a Federal action generates air pollutants in a region that has been designated a non-attainment or maintenance area for one or more NAAQS. A conformity analysis demonstrates that the action conforms to the region's SIP, would not cause or contribute to any new violations of NAAQS, and would not increase the frequency or severity of any existing violations.

*Affected Environment*

The primary sources of direct ambient air pollutants at the STFRC are emissions from construction equipment (combustion emissions) and disturbance of soils (fugitive dust) during the initial construction phase, and vehicular use and emergency generators during the operation phase. Emergency generators would only be used for extended periods of time during power disruption events. The construction period is expected to last for 60 days. The STFRC is expected to be in operation at least through September 2015.

The STFRC is located in Frio County which is part of the Metropolitan San Antonio Intrastate AQCR, as defined in 40 CFR Part 81.40. However, the TCEQ does not include Frio County as part of the SIP to improve air quality in the San Antonio area. USEPA has not designated Frio County (or any county in the Metropolitan San Antonio Intrastate AQCR) as a non-attainment area for any of the six criteria air pollutants (USEPA 2014e). As a result, the Proposed Action does not require compliance with the Federal Conformity Rule and therefore a conformity determination is not required. The DHS PEA does require that any Proposed Action is required to be below the Federal *de minimis* thresholds for air quality.

22

*Environmental Consequences*

## **Proposed Action**

Under the Proposed Action, air pollution emissions would be generated by:
- Temporary use of construction vehicles and equipment during the construction of the proposed STFRC;
- fugitive dust emissions from ground disturbance during construction;
- emissions from worker commuting vehicles;
- emissions from supply vehicles;
- emissions from the vehicles of visitors to the STFRC; and
- regular testing and maintenance of the emergency generator as well as running the generator for back-up power in emergency situations.

## **Construction Activities**

Heavy construction often causes fugitive dust (PM) emissions that may have a temporary impact on local air quality. Emissions during building construction are associated with land clearing, ground excavation, grading, and the construction of the building itself. Dust emissions may vary substantially from day to day, depending upon the level of activity, specific type of activity, and weather conditions. The quantity of dust emissions from construction operations is proportional to the area of land where the activity is taking place, as well as the level of construction activity.

During the construction of the STFRC reasonable steps will be taking to reduce the likelihood of airborne PM emissions. These precautions may include a number of air quality best management practices, which would limit fugitive dust impacts to temporary, minimal health or environmental effects. These practices would include the following:

- Watering down active construction areas to reduce fugitive dust emissions;
- Stabilizing exposed or graded area as soon as possible upon completion of grading;
- Properly covering trucks hauling fill material or maintaining at least two feet of free-board;
- Limiting truck speeds on unpaved areas of the site to 15 miles per hour or less;
- Grading sites in phases, thereby limiting the time that disturbed soil is exposed; and
- Temporarily halting construction activities when winds exceed 25 miles per hour.

Fugitive dust emissions were calculated using USEPA's preferred emission factor of 0.19 ton per acre per month (MRI 1996).

Combustion emission calculations from typical construction equipment were calculated using USEPA's NONROAD2008a. USEPA's preferred on-road vehicle emission model MOVES2010a was used to calculate construction worker's commuter emissions. Details of the air emission calculations are provided in **Appendix C**. **Table 6** shows the total estimated emissions from the proposed construction activities, as compared to the *de minimis* thresholds. This includes fugitive dust emissions, construction equipment emissions, and on road commuter emissions.

UAC00797

**Table 6. Construction Air Emission Estimates**

| Pollutant | Emission Totals (tons/year) | de minimis Thresholds (tons/year) |
|---|---|---|
| Carbon Monoxide (CO) | 6.96 | 100 |
| Volatile Organic Compounds (VOCs) | 2.36 | 50 |
| Nitrogen Oxides (NOx) | 15.48 | 100 |
| PM-10 | 11.73 | 100 |
| PM-2.5 | 2.30 | 100 |
| Sulfur Dioxide (SO2) | 2.01 | 100 |

**Operational Activities**

Air emissions during operation of the proposed STFRC would also occur from transportation of commuting workers, processing of persons, delivery trucks, visitors to the STFRC, and testing and maintenance of the emergency generator as well as running the generator for back-up power in emergency situations. Emissions from automobiles from new residents, staff, and visitors were calculated using the USEPA's preferred on-road vehicle emission model MOVES2010a.

Employees of the STFRC are expected to commute from the nearby towns of Pearsall, Cotulla, and Carrizo Springs, and perhaps even the greater San Antonio area. Delivery trucks and visitors are also expected to arrive from nearby towns. **Table 7** shows estimated emissions for one year of operation of the STFRC.

**Table 7. New Commuter Activities Air Emission Estimates Full Year 2015**

| Pollutant | Emission Totals (tons/year) | de minimis Thresholds (tons/year) |
|---|---|---|
| Carbon Monoxide (CO) | 7.22 | 100 |
| Volatile Organic Compounds (VOCs) | 22.86 | 50 |
| Nitrogen Oxides (NOx) | 3.88 | 100 |
| PM-10 | 0.11 | 100 |
| PM-2.5 | 0.11 | 100 |
| Sulfur Dioxides (SO2) | 0.02 | 100 |

Under the Proposed Action, emergency generators would provide three days' worth of back-up power for the STFRC in the event of a power failure. STFRC is expected to have ten 1,000 hp rated generators to provide this backup power. The generators would produce emissions of NOx, CO, VOCs, SOx, and PM during regular testing and emergency operation. Projected emissions from the generators were estimated using EPA's AP-42 emissions factors for stationary internal combustion sources (USEPA 2014d) and are presented in **Table 8**.

**Table 8. Emergency Generator Air Emission Estimates**

| Year | Total | NOx | VOC | CO | PM10 | PM2.5 | SOx |
|---|---|---|---|---|---|---|---|

24

UAC00798

| | Run Time (hrs/yr) | (tons/year) | (tons/year) | (tons/year) | (tons/year) | (tons/year) | (tons/year) |
|---|---|---|---|---|---|---|---|
| 2014 | 42.50 | 5.10 | 0.15 | 1.17 | 0.03 | 0.026 | 1.72 |
| 2015 | 170.00 | 20.40 | 0.60 | 4.68 | 0.12 | 0.10 | 6.88 |

**Total Emissions**

As shown in **Table 9**, the emissions for the Proposed Action would be below the *de minimis* levels as required by the PEA. As such, no further study of the impacts of the air emissions was performed for the Proposed Action. Though a minor increase in air emissions would result from the Proposed Action, the Action would not cause or contribute to any new violations of NAAQ.

**Table 9**. **Annual Criteria Pollutant Emissions 2014-2015**

| Year | Pollutant | Total Emissions (Tons/Year) | *de minimis* Level (Tons/Year) |
|---|---|---|---|
| 2014 | Carbon Monoxide (CO) | 9.94 | 100 |
| | Volatile Organic Compounds (VOCs) | 8.23 | 50 |
| | Nitrogen Oxides (NOx) | 21.55 | 100 |
| | PM-10 | 11.79 | 100 |
| | PM-2.5 | 2.35 | 100 |
| | Sulfur Dioxides (SO2) | 3.74 | 100 |
| 2015 | Carbon Monoxide (CO) | 11.90 | 100 |
| | Volatile Organic Compounds (VOCs) | 23.46 | 50 |
| | Nitrogen Oxides (NOx) | 24.28 | 100 |
| | PM-10 | 0.24 | 100 |
| | PM-2.5 | 0.22 | 100 |
| | Sulfur Dioxides (SO2) | 6.90 | 100 |

**No-Action Alternative**

The No-Action Alternative would result in no additional air impacts.

**7.8   Noise**

High noise levels over a long duration can impact the health of exposed populations and be a nuisance to the surrounding community. The standard measurement unit of noise is the decibel (dB), which represents the acoustical energy present. The A-weighted decibel scale (dBA) is a logarithmic scale generally used to measure noise levels because it can account for the sensitivity of the human ear across the frequency spectrum.

25

In 1972, Congress passed the Noise Control Act (the Act) because it believed that inadequately controlled noise presented a growing danger to the health and welfare of the nation's population, particularly in urban areas. The major sources of noise include transportation vehicles and equipment, machinery, appliances, and other products in commerce.  The Act states "it should be the policy of the U.S. to promote an environment for all Americans free from noise that jeopardizes their health or welfare." The Act: 1) coordinated federal research and activities in noise control, 2) authorized the establishment of federal noise emissions standards for products distributed in commerce, and 3) provided information to the public about the noise emissions and noise reduction characteristics of such products.

The Occupational Safety and Health Administration (OSHA) regulates workplace noise with standards for two different types of noise: constant and impulse. The limit for constant noise is 90 dBA for 8 hours (29 CFR Part 1910.95). The maximum sound level for impulse noise is 140 dBA (29 CFR Part 1910.95). To protect activities and land uses from the interference of excessive noise levels, noise regulations establish daytime and nighttime noise limits for residential, commercial, and industrial areas including allowances for construction.  The day-night average sound level (DNL) is the community noise metric recommended by the U.S. Environmental Protection Agency (USEPA) and has been adopted by most Federal agencies (USEPA 1974).  The noise level most commonly used for noise planning purposes is a DNL of 65 dBA.

The DHS Hearing Conservation program, as outlined in the DHS Safety and Health Manual, is the principal document for noise control within DHS. This instruction aims to protect all DHS personnel from hearing loss resulting from operational and occupational noise exposure and reduce operational noise exposure to personnel to facilitate mission readiness, communication, and safety. Chapter 13 of the Safety and Health Manual provides procedures, noise limitations, implementation plans, and noise protection guidelines that promote responsible and effective hearing conservation practices (DHS 2010).

*Affected Environment*

The primary existing noise sources in the project area include vehicle traffic from State Highway 85 and Interstate Highway 35.

Sensitive noise receptors are generally humans engaged in noise sensitive activities, such as sleeping, convalescing, or studying, or land uses such as residential dwellings, hotels, motels, hospitals, nursing homes, education facilities, and libraries. Noise-sensitive receptors may also include noise-sensitive animal species that are nesting or breeding, or species habitat.  Commercial, office, and industrial land uses are not considered noise-sensitive by most definitions.  Potential noise-sensitive receptors currently near the Proposed Action include several residential homes to the north and west, and the Briscoe Unit Prison to the east.  The off-site noise sensitive receptors in the project area would include any residences close to project construction, along construction haul routes, and along roadways that would carry project-generated vehicle traffic.  The existing Sendero Ranch workforce housing facility (1925 West Highway 85, Dilley, Texas 78017) adjacent to the site of the Proposed Action will serve as a temporary housing location for family units.  It is expected that it will house up to 650 persons, consisting of female heads of household and children less than 18 years of age during construction of the Proposed Action.

*Environmental Consequences*

26

**Proposed Action**

Construction activities associated with the Proposed Action would temporarily increase environmental noise levels in the area. These activities would involve the use of heavy equipment, such as backhoes, bulldozers, and excavators, which typically generate noise levels of 85 to 100 dBA at the source (The Center to Protect Workers' Rights 2003). In order to ensure the safety of construction workers, protective measures to promote hearing conservation, such as noise hazard signs and labels, noise abatement measures, and the use of personnel protective equipment, would be implemented in accordance with the DHS Safety and Health Manual Hearing Conservation program and applicable OSHA standards. Noise levels dissipate as the distance from the noise source increases; this is known as attenuation. Noise level attenuation rates are based on the inverse square law, which states that sound level attenuates or drops off at a rate of 6 dBA for each doubling of the distance from the noise source (ICF Jones & Stokes 2009). **Table 10** illustrates the noise level attenuation of various construction equipment at various distances based on a study by the Federal Highway Administration (FHWA 2011).

**Table 10**. **Noise Levels Emitted from Construction Equipment**

| Source | dBA at 50 ft | dBA at 100 ft | dBA at 200 ft | dBA at 400 ft | dBA at 800 ft |
|---|---|---|---|---|---|
| Backhoe | 78 | 72 | 66 | 60 | 54 |
| Bulldozer | 84 | 78 | 72 | 66 | 60 |
| Concrete Truck | 79 | 73 | 67 | 61 | 55 |
| Crane | 81 | 75 | 69 | 63 | 57 |
| Dump Truck | 76 | 70 | 64 | 58 | 52 |
| Excavator | 81 | 75 | 69 | 63 | 57 |
| Front-end loader | 82 | 76 | 70 | 63 | 57 |

Source: FHWA 2011

The nearest non-ICE receptor is approximately 0.5 miles to the north of the Proposed Action and the town of Dilley proper is approximately 1.6 miles to the northeast. According to the inverse square law, construction noise generated at the site will attenuate well below 65 dBA once it reaches the nearest non-ICE receptor or the town of Dilley.

However, noise generated by the construction of the STFRC would directly affect those persons temporarily residing in the existing Sendero Ranch cottages. Proximity of the Sendero Ranch cottages to the proposed location of the STFRC would render infeasible any significant mitigation of these noise impacts other than physical separation and restricting construction actives to daytime hours. However, the increased noise would cease when construction is complete.

Noise levels from the construction of the Proposed Action would not be expected to exceed OSHA noise standards. All construction activities would occur between 7:00 AM and 7:00 PM The movement of heavy trucks hauling construction materials would also generate noise, which could impact residences located along designated haul routes. Due to the location of the project areas, I-35 and State Highway 85 would likely be the primary haul routes. Some residential areas are located along I-35 in the vicinity of the Proposed Action; however, interstates are designated for heavy truck traffic and surrounding areas are zoned for development that includes interstate highway noise levels.

UAC00801

The Proposed Action is expected to generate moderate new noise impacts resulting from daily operations of the STFRC. The STFRC would provide multiple playgrounds and other recreational opportunities for children and allow residents freedom of movement, within the confines of the site, during daylight hours. However, it is expected that there will be quiet hours at night. Once fully operational, noise levels from the STFRC could be consistent with sounds generated from playgrounds and schools. According to the New York City Environmental Quality Review (CEQR) Technical Manual, a 1987 study of 10 school playgrounds determined that noise levels at the playground boundary averaged 73 dBA (CEQR 2012). Other normal operations at the STFRC (i.e., medical facilities, cafeterias, etc.) will generate minimal new noise impacts to the surrounding area. However, the noise would dissipate as the distance from the source (i.e., playground) increases, following the inverse square law of sound attenuation. Thus, increases in noise levels in the surrounding area would be expected to be minimal.

The Proposed Action will moderately increase traffic volumes within the surrounding areas; therefore noise impacts due to increased vehicular traffic would be minimal. During the construction phase, the amount of larger truck traffic will increase. However, the proposed facility will be composed of relatively austere structures, thus reducing the amount of traffic and construction time, and this noise will largely disappear when the STFRC is complete. Once operational, an increase in personal vehicle traffic will occur during shift changes of the staff or when the transportation of persons housed at the STFRC is necessary. Due to the location of the project area, I-35 and State Highway 85 would likely be the primary route. Some residential areas are located along I-35 and State Highway 85 in the vicinity of the Proposed Action; however, interstates are designated for heavy truck traffic and surrounding areas are zoned for development that includes interstate highway noise levels. In addition, I-35 is a major transportation route for the Eagle Ford Shale Play; therefore, a high traffic volume of large construction type vehicles already exists in the area.

**No-Action Alternative**

There would be no impacts to noise as a result of the No-Action Alternative, as no construction or increased traffic activity would occur.

### 7.9    Greenhouse Gas & Climate Change

Greenhouse Gases (GHG) are gases in the lower atmosphere that absorb infrared radiation emitted from the earth's surface and then radiate most of this energy back to the earth's surface, allowing global average temperatures to be about 60°F warmer than they would otherwise be (USEPA 2014c). As concentrations of GHGs have increased over the past century, average global temperatures have increased as well. However, concentrations of naturally occurring GHGs have remained relatively constant for thousands of years, while concentrations of anthropogenic (human-generated) GHGs have sharply increased in the last 300 years. The primary sources of increased anthropogenic GHG emissions are the burning of fossil fuels (contributing more than 50 percent of global anthropogenic GHG emissions) and deforestation (contributing almost 20 percent of global anthropogenic GHG emissions) (IPCC, 2007).

According to the Intergovernmental Panel on Climate Change (IPCC), anthropogenic GHG emissions include the following: carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), methane ($CH_4$), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_4$). $CO_2$ constitutes more than 75 percent of these emissions.

28

Though the other five major GHGs are emitted at much lower rates, they have more potent heat-trapping effects or global warming potentials (GWPs), than $CO_2$ (IPCC, 2007)[17].

**Federal Regulations and Guidance**

EO 13514, Federal Leadership in Environmental, Energy, and Economic Performance, requires federal agencies to set GHG emission reduction targets for fiscal year 2020 (FY20), relative to FY08, and to report GHG emissions beginning in FY10. GHG emissions and reduction targets are classified as Scope 1 (direct), Scope 2 (indirect), and Scope 3 (other indirect) emissions. Scope 1 emissions include direct fossil fuel combustion such as the use of boilers, generators, incinerators, and vehicles owned by the organization, as well as direct emissions of refrigerants with global warming potentials. Scope 2 emissions include upstream emissions from purchased electricity, steam, or chilled water. Scope 3 emissions include all other indirect emissions not included in Scope 2, such as emissions due to commuting, business travel, transmission and distribution (T&D) losses due to electricity use, wastewater treatment, contracted waste removal to landfills, and product purchases.

EO 13423, Strengthening Federal Environmental, Energy, and Transportation Management, requires each federal agency to reduce GHG emissions through the reduction of energy intensity by three percent annually or 30 percent by the end of the FY15, relative to the agency's energy use in 2003. Additionally, heads of federal agencies must implement sustainable practices for GHG emissions avoidance or reductions.

The GHG covered by EO 13514 are CO2, CH4, N2O, HFC, perfluorocarbons, and sulfur hexafluoride. These GHG have varying heat-trapping abilities and atmospheric lifetimes. CO2 equivalency is a measuring methodology used to compare the heat-trapping impact from various GHG relative to CO2. Some gases have a greater global warming potential than others. Nitrous oxides (NOx), for instance, have a global warming potential that is 310 times greater than an equivalent amount of CO2, and CH4 is 21 times greater than an equivalent amount of CO2.

The CEQ has issued *Draft Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change* in NEPA Reviews. Though this Draft Guidance has not yet even been proposed as final guidance, ICE believes that, in the absence of other approved standards, it provides a useful benchmark against which GHG emissions can be analyzed. CEQ guidance states that if the project would be reasonably anticipated to cause direct emissions (Scope 1) of 25,000 metric tons or more of CO2 GHG emissions on an annual basis, agencies should consider this a threshold for discussion with decision makers and the public. CEQ does not propose this as an indicator of a threshold of significant effects, but rather as an indicator of a minimum level of GHG emissions that may warrant some description in the appropriate NEPA analysis for agency actions involving direct emissions of GHG (CEQ 2014).

*Affected Environment*

The initial sources of GHGs from the Proposed Action are emissions from construction equipment (combustion emissions) and vehicular use during the construction phase. Once construction is complete, operational GHG emissions generated will primarily be electricity consumption, which powers the lights, HVAC, computers, etc.,

---

[17] To account for the different potencies of GHGs, $CO_2$ is assigned a GWP equal to one, so the GWP of each of the other GHGs reflects its potency relative to $CO_2$. GWPs allow GHG emissions to be expressed in $CO_2e$, which represent the amount of $CO_2$ that would have the same heat-trapping effects of multiple types of GHGs over a 100-year period.

UAC00803

employees commuting, and emergency generators. Emergency generators would only be used for extended periods of time during power disruption events.

*Environmental Consequences*

**Proposed Action**

The Proposed Action would generate temporary GHG emissions from construction activities and annual recurring GHG emissions from operation of the STFRC. Emissions were calculated for the STFRC in alignment with the 2012 Federal Greenhouse Gas Accounting and Reporting Guidance developed by the Federal Working Group on GHG Accounting in 2012.

The Proposed Action would result in temporary construction emissions and operational emissions which will combine in year one to reach a level of 6420 metric tons, barely 26 percent of a level that warrants discussion. When construction is complete, operations create a level of emissions that is just over three percent of the amount that CEQ suggests would warrant discussion for the decision maker. Accordingly, no further assessment of the impacts of the GHG emissions was performed for the Proposed Action. More detailed information on the GHG calculations and assumptions is provided in **Appendix C**.

**No-Action Alternative**

GHG emissions would not increase as a result of the No-Action Alternative, as no construction or increased traffic activity would occur.

**7.10    Social Environment & Environmental Justice**

The Region of Interest (ROI) for the Proposed Action is the City of Dilley and Frio County, Texas. This SEA will examine particular socioeconomic resources such as: demographic characteristics of the ROI; employment and income; and public services including schools, law enforcement and emergency services. The Proposed Action could also have secondary impacts on other socioeconomic factors, such as the availability of housing and budgetary requirements for local governments. In addition, as required by EO 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, this EA will determine whether the Proposed Action has a disproportionate adverse impact on minority and low income populations in the ROI.

**General Description, ROI**

Frio County is located in the Southwest Texas Plains, and is highly agricultural, with approximately 50 percent of the land considered to be good farmland (TSHA 2014). The county seat is the city of Pearsall, population 9,146, located 17 miles north of Dilley. Both communities are on I-35, which runs roughly north to south through Frio County, and connects it with the large urban area of San Antonio, 72 miles to the northeast from Dilley, and the commercially important Eagle Ford Shale Play underlying counties to the south. As of August 11, 2014, oil production from the entire Eagle Ford Shale Play amounted to 1,140,000 barrels per day (Reuters 2014).

*Affected Environment*

**Population**

Between 1940 and 1980 the number of county inhabitants increased from 9,207 to 13,785. The population of Dilley and Frio County continue to grow, although at a slower pace than Texas as a whole. Population data for Dilley, Frio County, and Texas are shown in **Table 11.**

**Table 11. Population**

|  | **Dilley** | **Frio County** | **Texas** |
|---|---|---|---|
| 2010 Population | 3,894 | 17,217 | 25,145,561 |
| 2000 Population | 3,674 | 16,252 | 20,851,820 |
| % Change | +5.99% | +5.9% | +20.6% |

Source: U.S. Census Bureau Statistics, 2010 and 2000

The median age of a Frio County resident in 2013 was 31.9 years. Those under 17 years of age represented 23.6 percent of the population, and those 65 years of age or older represented only 12.6 percent of the population (TAC 2014).

**Race and Ethnicity**

The racial and ethnic composition of the population of Dilley and Frio County are very similar. Recent race and ethnicity data for Dilley, Frio County, and Texas are shown in **Table 12**. Both Dilley and Frio County differ markedly from the state of Texas as a whole in the number of people who identify as Hispanic and white, non-Hispanic. Dilley and Frio County both have a majority Hispanic population. Dilley's African-American population is closer to the percentage of African-Americans in Texas as a whole than it is to Frio County. The percentage of Native American people in Dilley and Frio County approach the percentage of people who identify as such in Texas.

**Table 12. Race and Ethnicity**

|  | **Dilley** | **Frio County** | **Texas** |
|---|---|---|---|
| Hispanic or Latino | 73.34% | 78.0% | 38.4% |
| White | 13.6% | 16.1% | 44.0% |
| African-American | 11.35% | 3.9% | 12.4% |
| Asian | 1.1% | 2.3% | 4.3% |
| Native American | 0.6% | 0.8% | 1.0% |

Source: U.S. Census Bureau Statistics, 2010 (Note: because individuals offered the opportunity to self-identify with more than one classification, total percentages reported may not equal 100%)

**Educational Attainment**

Historically, the percentage of adults in Frio County over the age of 25 who were either high school or college educated was approximately 11 percent in 1960.  By 1982, this percentage had risen to 40 percent (THSA 2014), and in 2012 this percentage had increased to 64 percent.  Further, only 647 people (7%) in the county held bachelor's degrees, and only 152 (1%) held a master's degree in 2012 .  In contrast, in Texas as a whole, 81 percent in 2012 had at least a high school education, 25 percent of the population held a bachelor's degree, and 7 percent held a master's degree (Locallabs 2014).

**Schools**

31

Dilley has three public schools: Dilley High School, Mary Harper Middle School, and Dilley Elementary School. Dilley High School has an enrollment of approximately 250 students in the grades of 9-12, 89 percent of which are described as Hispanic; Mary Harper has an enrollment of approximately 230 students in grades 6-8, 91 percent of whom are described as Hispanic; and Dilley Elementary School has an enrollment of approximately 520 students, 92 percent of whom are described as Hispanic.  The Texas state average enrollment by ethnicity is 51 percent Hispanic.  There is one private school in Dilley, the Faith Christian Academy, which has students in grades K-12, and which has a student body that is 78 percent described as white, and 22 percent described as Hispanic (Great Schools 2014) (Great Schools 2014b).  For higher education, Southwest Texas Junior College draws students from a three county area including Frio County, and has an instructional facility in the county seat of Pearsall. It provides classes in in subjects such as accounting, computers, developmental education, and management  Its student body largely reflects the demographics of Frio County; of the 5,410 students from a three county area, 83 percent are described as Hispanic and 13 percent are described as white (SWTJC 2014) (SWTJC 2014b).

**Emergency Services**

The Frio Regional Hospital is located in the county seat of Pearsall, and is a 42,000 square foot facility with 22 acute care beds with outpatient, surgical, obstetric and emergency services  The area served by the hospital includes the communities of Pearsall and Dilley in Frio County, Devine in Medina County, and Cotulla in La Salle County. The hospital is certified as a Level IV trauma center, and serious trauma cases are generally stabilized and transferred to Level 1 trauma centers in San Antonio. Specialty services in the areas of cardiology, neurology, orthopedics, podiatry, OB/GYN, ophthalmology, psychiatry and urology are provided on a rotating basis by visiting physicians (Frio Regional Hospital 2014). The Nix Community Hospital in Dilley has 18 acute care beds, provides 24 hour emergency room service with physician staffing, inpatient services, snake bite treatments, cardiac services, and a trauma center (Nix Health 2014). Dilley has a volunteer fire department, with 16 volunteer firefighters (USFIREDEPT 2014).

**Income and Poverty**

Between 2008 and 2012, one source assessed that the average wage per job in Frio County increased from $33,112 to $43,411 (TAC 2014).  U.S. Census Bureau estimates for the median income and poverty level for Dilley, Frio County, and Texas are shown in **Table 13**. The median income of Dilley is higher than Frio County, although the poverty level is slightly higher in Dilley. Both Dilley and Frio County are poorer and have a greater percent of residents below the poverty level than Texas as a whole.

**Table 13. Income and Poverty - 2012**

|  | Dilley | Frio County | Texas |
|---|---|---|---|
| Median Income | $40,625 | $38,161 | $51,563 |
| Poverty Level % | 24.4% | 22.8% | 17.4% |
| Hispanic Poverty Level % | 31.5% | 26.1% | 26.1% |

Source: U.S. Census Bureau, 2008-2012 American Community Survey 5-Year Estimates. http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml

**Housing**

UAC00806

The average number of persons per household in Dilley in 2010 was 2.89, as compared to the Frio County average of 2.87 for the same year, and the Texas average of 2.8. According to the 2010 census data, there were a total of 1,101 housing units in Dilley, of which 187 were vacant.  Of those Dilley housing units which were occupied, 566 were occupied by owners, and 348 were occupied by renters. In Frio County as a whole, there were a total of 5,846 housing units, of which 992 were vacant.  Of the Frio County housing units which were occupied, 3,287 were occupied by owners, and 1,567 were occupied by renters. Frio County had a 1.7 percent homeowner vacancy rate, and a 9.4 percent rental vacancy rate (US Census Bureau 2010).  As of August 14, 2014, on one internet realty site there were at least 37 homes for sale in Frio County, and there were eight for sale in Dilley itself (Zillow 2014).  For the year period between the third quarter of 2012 and the second quarter of 2013, a total of 24 homes were sold in Dilley, at median prices between $112,000 and $75,000 (City-Data 2014).  The median value of homes in Frio County was assessed in the 2010 census as $59,400, markedly less than the Texas median value of $128,000 (US Census Bureau 2010).  One study projects that the number of housing units in Frio County will increase by 3.9 percent in the time period between 2010 and 2025 (UTSA 2013).

**Labor Force and Employment**

Prior to 1930, the primary economic activities in Frio County were ranching and agriculture.  Agribusiness remains important for the Frio County economy; in 1989, for example, the leading products were peanuts, beef cattle, vegetables, cotton, and hogs. Hunting activities were also important, generating income of approximately $1,740,000 that year. Around 1930, the first oil wells in Frio County became active, and by 1952, over 100 oil wells were producing approximately 1,505,000 barrels of oil per year. Since 1990, the oil industry in Frio County has been of renewed economic importance because of new technologies that allow for horizontal drilling in the depths of the Austin Chalk Formation and the Eagle Ford Shale Play (TSHA 2014), although drilling is more active in neighboring counties.  As of August 12, 2014, there were only five active drilling rigs in Frio County.  In 2011 the oil industry may have accounted for as many as 982 jobs in Frio County (Eagle Ford 2014).  One study forecasts a total of 190 new permanent positions and 470 new transient positions between 2015 and 2025, with a net population increase for the county of 7 percent as more permanent workers settle there. The same study forecasts an increase of 57 new permanent oil industry jobs in Dilley over the same time period, and 141 new transient jobs (UTSA 2011). The unemployment rate in Frio County has steadily decreased from 7.9 percent in 2010 to 5.4 percent in 2013, likely driven in part by the increase in oil industry activity.

In Dilley itself, the largest single employer is the Dolph Briscoe Unit of the Texas Correctional Institutions Division, a prison located approximately ½ mile from the proposed STFRC site, which employed 233 people in 2013, and has a maximum capacity of 1,384 inmates (TDCJ 2014). It was estimated in 2012 that the labor force pool in Dilley was 1,106, and that of these people, 1,075 were employed. This resulted in an estimated unemployment rate of 2.8 percent, which is clearly lower than the 2012 actual Frio County unemployment rate of 5.6 percent.  The current unemployment rate for Frio County is 4.9 percent (Home Facts 2014). **Table 14** shows the estimated occupation and employment pattern for Dilley in 2012.

**Table 14. Dilley Occupation and Employment Pattern**

| Industry | Estimate | Percentage |
|---|---|---|
| Agriculture, Hunting & Mining | 135 | 12.6% |
| Construction | 31 | 2.9% |
| Manufacturing | 0 | 0% |

33

| Wholesale Trade | 26 | 2.4% |
|---|---|---|
| Retail Trade | 109 | 10.1% |
| Transportation, Warehousing & Utilities | 33 | 3.1% |
| Information | 0 | 0% |
| Finance, Insurance, Real Estate, Rental & Leasing | 40 | 3.7% |
| Professional, Scientific, & Waste Management Services | 116 | 10.8% |
| Educational Services, Health Care & Social Assistance | 197 | 18.3% |
| Arts, Entertainment, Recreation, Accommodation & Food Services | 123 | 11.4% |
| Other Services, Except Public Administration | 51 | 4.7% |
| Public Administration | 214 | 19.9% |

Dilley, Texas, U.S. Census Bureau, http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_12_5YR_DP03 (last visited Aug. 14, 2014)

*Environmental Consequences*

**Proposed Action**

**Population**

The construction of the STFRC would require a temporary surge in the number of workers in the Dilley area. Because of the austere design and temporary nature of the facilities to be constructed, the length of time over which this surge would last would be fairly short. These workers, to the extent that they were not already Dilley or Frio County inhabitants, would likely be housed in transient quarters. The use of the proposed site for the STFRC at a capacity of 2,400 persons would entail the employment of approximately 600 ICE and contract employees on a full time basis. Assuming that a one year contract with one, one-year option would be awarded for construction and operation of the STFRC, most of these employees would likely be transient and not bring their families with them.

**Race and Ethnicity**

The current racial and ethnic composition of Dilley and Frio County as a whole are unlikely to change because of the arrival of construction crews and new employees for the STFRC. To the extent that the employees are not already Dilley or Frio County inhabitants, their small numbers and the transient nature of their work would cause little impact.

**Educational Attainment**

The types of jobs created for the operation of the STFRC will be a mixture of low skill and higher skilled jobs. Most of the jobs for which new employees would be hired for construction of the STFRC would not likely require more than a high school education. The STFRC may have a positive effect on Dilley and Frio County, because

34

though the unemployment rate is currently low, jobs that would be available due to the Proposed Action would be suitable for the educational attainment demographics of the local communities. Higher skill jobs that will be required for the operation of the STFRC include medical professionals and teachers. These jobs will also require the individuals to be bilingual in Spanish and English. Most of these jobs are likely to be filled by individuals from outside Dilley and Frio County because of the lack of qualified candidates nearby.

**Emergency Services**

Medical services will be provided on-site by trained medical personnel for all except the most acute emergency situations.  Should a resident require acute emergency treatment, he or she will be stabilized on-site and then transported to a San Antonio-area hospital for further care.

The operator of the STFRC will implement a Fire Prevention and Control policy for all occupants and staff which will provide staff responsibilities, facility occupancy standards, emergency equipment, and communication, security, and fire drill procedures.   The STFRC will conform to applicable federal, state, and/or local fire safety codes.  Emergency fire control equipment will include sprinklers/water based protection systems, fire hydrants, fire extinguishers, and smoke detectors connected to a central supervisory alarm system.  Fire drills will be conducted regularly on-site.  All simulated fire emergencies will be documented extensively and evaluated for effectiveness.

The Proposed Action location is served by the Dilley Volunteer Fire Department, with the station located approximately two miles east of the STFRC at 115 East White Street, Dilley, Texas (USFIREDEPT 2014). Before the commencement of operations at the STFRC, a Memorandum of Understanding (MOU) will be negotiated and signed between the Dilley Volunteer Fire Department and the operator.  The MOU will identify services that can be made available by the Dilley Volunteer Fire Department to the STFRC in the event of a fire that is beyond the scope of firefighting equipment available at the facility.  In the event of a fire at the STFRC, the Dilley Volunteer Fire Department will be notified that assistance is needed by calling 911.

**Schools**

To the extent that new employees hired for the construction or the operation of the STFRC are not already inhabitants of Dilley or Frio County, they are expected to be mostly transient given the temporary and indefinite nature of the STFRC.  Therefore, they are not likely to bring their families with them, and any impact on class size in the schools is expected to be modest and incremental.

**Income and Poverty**

The jobs that are likely to result from the construction and operation of the STFRC are unlikely to be long-term because of the temporary and indefinite nature of the facility. The jobs created could however prove beneficial to the people of Dilley and Frio County in terms of helping alleviate the significant level of poverty in the area.  This is especially the case since those who are in poverty are less likely to have educational attainment levels beyond high school, and many of the jobs that would be available during construction and operation of the facility would not require a higher level of education.

**Housing**

UAC00809

The current housing stock of Dilley and Frio County is likely adequate to accommodate the temporary influx of construction workers and STFRC employees. Given the temporary and indefinite nature of the facility, those new employees who are not already residents of Dilley and Frio County are likely to be transient, and unlikely to bring their families with them.  Those new residents who would wish to obtain more permanent housing would likely be in the minority, and so the market for homes in the Frio County area under current conditions would likely accommodate this demand without distorting the market. Further, given that Dilley is just over an hour's drive from San Antonio, and that the STFRC is only a mile and a half from the interstate highway that connects the two, many non-resident workers might find it advantageous to commute from the San Antonio area to the STFRC.

**Labor Force and Employment**

The labor markets in Dilley and Frio County do not generally support large sectors of highly trained workers with specialized skills; the oil industry is likely an exception to this economic trend.  Rather, the demand for labor in this area tends to favor less-skilled workers, who most often have finished their education at the high school level. The majority of the workers required for the construction and operation of the STFRC would tend to fall in the same category.  The STFRC therefore would not result in labor market distortion; rather, it would provide opportunities to economically disadvantaged community members to obtain employment for which they would be qualified.

**No-Action Alternative**

There would be no short or long-term impacts to socioeconomic resources as a result of the No-Action Alternative.

**Environmental Justice**

*Affected Environment*

A review of the socioeconomic information for Dilley suggests that it is both a minority and a low-income community.  Dilley's population is 73 percent Hispanic, and 31 percent of the Hispanic population lives in poverty.

*Environmental Consequences*

**Proposed Action**

The assumption that Dilley is a minority, low-income community under EO 12898, for purposes of this assessment is bolstered by data laid out in Income and Poverty, **Table 13**. The proposed STFRC would not have a disproportionately high and adverse burden on this community.

The facility would be located approximately one and one-half miles outside the town, in a sparsely populated agricultural area. The Briscoe Unit prison is located between the STFRC site and the town. Noise from the construction of the facility would be temporary, abated to a degree by the presence of the Briscoe Unit, and

UAC00810

unlikely to be at a level that would register as unhealthy under accepted standards at even the closest Dilley neighborhood. BMPs would be used to mitigate particulate matter generated by construction and operations, and to minimize the emission of regulated air pollutants by vehicles. The total amount of regulated air pollutants emitted would not rise above levels of significance, and would be *de minimis*. Vehicular entrance to the site for both construction and operations purposes would most likely be accomplished by traveling either north or south on Interstate Highway 35, and then exiting directly on to State Highway 85 and traveling west for over one mile. Interstate Highway 35 is located at the western edge of Dilley, between the Briscoe Unit prison and the town proper. Both are established major highways, and any increase in total traffic upon them related to the STFRC would be small, incremental, in keeping with the typical character of current traffic, and would not venture into Dilley itself. Patterns of use and enjoyment of Dilley streets and roads in the conduct of normal everyday activities by Dilley residents have already adapted to the presence of these major highways. Additionally, these major highways have the effect of increasing the reasonable commuting area within which the new non-resident workers at the STFRC could obtain housing, reducing pressure on the Dilley and Frio County housing markets, which appear to have unused rental and owned home capacity. Therefore, ICE activity related to the STFRC would not have the effect of changing the community character of Dilley with regard to noise, air quality, trafficability, public services, safety or neighborhood cohesion.

Further, Dilley's demographics as to ethnicity and poverty are essentially mirrored by those of Frio County as a whole. Thus, regardless of where in Frio County the STFRC were built – given that it needs to be near established utilities and with convenient access to the highway network that leads to the San Antonio metropolitan area and the Rio Grande Valley area – it would be built in proximity to largely minority, low-income communities. Dilley, therefore, would not endure a burden disproportionately higher and adverse than any other community in the ROI even if there were other than minimal impacts on the human environment as a result of the proposed project.

### No-Action Alternative

There would be no short or long-term impacts to environmental justice as a result of the No-Action Alternative.

### 8.0    Indirect Impacts

Indirect effects are those which might be caused by the Proposed Action but occur later in time or farther in distance than the direct impacts discussed elsewhere in this document.  These effects include, but are not limited to, changes in socio-economic conditions, natural resources, cultural or historic resources, increased traffic, air quality, and noise levels (40 C.F.R. § 1508.8(b).  The agency, however, need only review those impacts that are reasonably foreseeable (*Sierra Club v. Marsh*, 976 F.2d 763, 788 (1st Cir. 1992).

Changes in cultural or historic resources are unlikely given their current nature and status in Dilley and Frio County.  The two primary natural resources in Frio County, oil and agricultural products, are unlikely to incur any indirect effects as a result of the construction and operation of the STFRC.  Although the minor to moderate increase in vehicular traffic on I-35, State Highway 85, and certain local roads would lead to an incremental increase in the consumption of fossil fuels, these fuels would most likely continue to be refined elsewhere, and therefore not change local fuel market conditions.  The corollary to pumping oil out of the ground is injection of waste water from petrochemical operations back into the ground.  Although Frio County only has five active oil rigs at this moment, it has approximately 20 active injection wells, which accept waste water shipments from

37

other locations tapping into the Eagle Ford shale play (UOGR 2013).  The construction and operation of the STFRC would have no foreseeable impact on this important economic activity, nor on continued oil infrastructure development (Eagle Ford 2014c).  The construction and operation of the facility could have a minor beneficial impact on the market for local fresh agricultural goods (USDA 1992), opening up a temporary local market through the provisioning of kitchens for the construction crews, facility staff, and family unit members.  This could reduce producers' costs in getting fresh fruit and vegetables, but would likely not have a discernable impact on the field crop economy (WSG 2014).

Those construction workers and facility staff who are not hired locally will be living primarily in temporary housing provided by their employers.  Although this situation would not skew the Dilley and Frio County home and ordinary rental markets significantly, it could have a temporary economic impact by increasing the demand for workforce housing facilities.  This could provide at least a temporary boost in construction trades activity, and later in retail activity among restaurants, convenience stores, and entertainment and recreation service providers in the Dilley and Frio County areas (Hannaford 2012).  Importantly, although the STFRC will be of temporary duration, estimates for the Eagle Ford Shale Play suggest that it could continue to support new drilling for another 15 years, and potentially be productive for another 30 years (Eagle Ford 2014d).  Workforce housing capacity and retail activity developed to meet demand from the construction and operation of the STFRC could then be used to accommodate workers in the continued development of the oil and gas industry.

If Dilley and Frio County offer more oil industry workforce housing than they do currently, there could be minor to moderate increases in automobile traffic over time, but it would not be in the nature of the heavy oil industry traffic that might damage local roads (Blackmon 2013).  Rather, these would be lighter, personal vehicles.  The noise level impact of this sort of traffic would be minor, and the occupants of the vehicles would in large part be transient, of working age, and without their families.  These persons would therefore increase local economic activity without placing an additional burden on Dilley or Frio County public services such as schools and hospitals.  A relatively small portion of the workforce required to operate the oil industry infrastructure would be of a more permanent nature.  There could be certain negative effects.  For example, Cotulla, Texas, the county seat of LaSalle County, which borders Frio County to the south, has experienced a significant population increase, an increase in crime, and higher food and housing prices as a result of the Eagle Ford Shale Play oil boom (Hannaford 2012).

From a labor pool perspective, the increased economic activity in the workforce housing and service industries trades would increase the number of possible jobs for which Dilley and Frio County residents would be eligible without the need for further significant training and education.  This could help increase the economic status of the number of local people who currently find themselves living in poverty, and could have positive effects on the level of educational and occupational attainment achieved by their children (Ermisch 2001).

## 9.0    Cumulative Impacts

A cumulative impact  is one which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions, regardless of what agency or person undertakes such actions (40 C.F.R. § 1508.7).  This SEA adopts the cumulative impacts analysis set forth in the PEA, as appropriate.

38

The growing significance and scale of the exploitation of the Eagle Ford Shale Play by the oil and gas industry dwarf all other trends in Frio County and neighboring counties. Conservative estimates suggest that by 2020, it is expected to have generated approximately $11.6 billion in gross state product, $21.6 billion in total economic output, support 67,971 full-time jobs in the general exploitation area, and add $450 million to local government revenues. These forecasts assume the availability of sufficient water to sustain the level of fracking activity required to generate these revenues. The availability of skilled workforce members is also a concern, and certain oil industry companies have begun internships and job training programs as a means of recruiting local underemployed and unemployed residents (UTSA 2011). There will also be an increased need for housing throughout the area for both transient and permanent workers (UTSA 2011).

Because Frio County is at the northern edge of the play, it is likely to see less of the drilling and exploitation activity occurring in neighboring counties. It is likely, however, to continue to provide logistical support to the drilling and exploitation work, in the form of workforce housing and waste water injection wells. Agriculture is expected to continue to play a significant role in the Frio County economy, but the majority of this activity requires irrigation – potentially using the same aquifer that provides water for fracking in the play. In this context, the temporary nature of the STFRC suggests that its construction and operation will have little discernable cumulative impact on Frio County. Further, even when being constructed and in operation, the scale of these activities in terms of resource consumption or use suggests that no major adverse cumulative impacts on the human environment. Temporary minor cumulative impacts on air and noise resources would occur during the construction phase of the proposed action alternative. Long-term minor cumulative impacts on utilities and infrastructure, roadways and traffic, and water resources would occur during both construction and operation. However, there would be no cumulative impacts on social resources, vegetation, wildlife, threatened or endangered species, and no impacts from hazardous waste. Long-term, minor beneficial cumulative impacts would be realized through increased local employment and retail activity.

## 10.0    Minimization measures and best management practices for ground-disturbing or construction activities

This SEA adopts the following minimization measures and best management practices in addition to those set out in the PEA, as applicable:

1.  Preparation and implementation of a Stormwater Pollution Prevention Plan (SWPPP) to reduce soil erosion, control stormwater runoff, and prevent sedimentation during construction. The SWPPP will outline procedures for minimizing the length of time soil is exposed to wind and rain, provide provisions for establishing vegetation as quickly as possible on disturbed areas following construction activities, and contain eroded material as practicable.
2.  Implementation of wildlife conservation measures such as limiting vehicular traffic to/from the facility between the hours of 7:00 PM and 7:00 AM daily as practicable, briefing construction crews on the possibility of threatened or endangered species sightings (e.g., ocelots or horned lizards), and conducting orientation training on identifying characteristics of any listed species.
3.  Preparation and implementation of a Spill Prevention, Control, and Countermeasure (SPCC) Plan to prevent and manage accidental spills and prohibited discharges which may occur during construction of the facility.
4.  Preparation and implementation of measures to mitigate particulate matter generated by construction and

UAC00813

operations, and minimize the emission of regulated air pollutants by vehicles (e.g., development of a Construction Emissions Mitigation Plan).

UAC00814

## 11.0  References

(A. J. Sowell) Early Settlers and Indian Fighters of Southwest Texas, pp. 268, 490, 503, 567, and 607 (Austin: Ben C. Jones & Co., 1900); Special Report of the Adjutant-General of the State of Texas, September 1884, pp. 36, 44 (Austin: E.W. Swindell, 1884).

(Blackmon 2013) "The Blessing that is the Eagle Ford Shale." David Blackmon. Mar. 13, 2013. http://www.forbes.com/sites/davidblackmon/2013/03/13/the-blessing-that-is-the-eagle-ford-shale/. Date accessed: 12 August 2014.

(CEQ 2014)    Council on Environmental Quality. 2014. Draft Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change.

(CEQR 2012)  City Environmental Quality Review – New York. 2012. Technical Manual. http://www.nyc.gov/html/oec/downloads/pdf/2012_ceqr_tm/2012_ceqr_tm_ch19_noise_revised_06_18.pdf. Date accessed: 15 August 2014.

(City-Data 2014) http://www.city-data.com/city/Dilley-Texas.html. Date accessed: 12 August 2014.

(City of Dilley 2014)  City of Dilley, Texas. 2014. Personal communication between Mr. Noel Perez (City of Dilley) and Immigration and Customs Enforcement via telephone on August 25, 2014.

(DHS 2010)  Department of Homeland Security (DHS). 2010. Safety and Health Manual: Hearing Conservation. June 2010.

"Dilley." 28°39'25.17"N and  99°12'2.21"W. Google Earth. March 24, 2013. Date accessed: 22 August 2014.

"Dilley." 28°39'25.17"N and  99°12'2.21"W. NEPAssist. National Geographic Society 2013. Date accessed: August 22, 2014.

(Eagle Ford 2014) Frio County. http://eaglefordshale.com/counties/frio-county-tx/.  Date accessed: 12 August 2014.

(Eagle Ford 2014b) News, Updates, Headlines, Press Releases. http://eaglefordshale.com/news/. Date accessed: 12 August 2014.

(Eagle Ford 2014c) "NuStar Buying Eagle Ford Midstream Assets – Selling San Antonio Refinery." R.T. Dukes. Nov. 12, 2012. http://eaglefordshale.com/pipeline-midstream-news/nustar-buying-eagle-ford-midstream-assts-selling-sa-refinery/. Date accessed: 12 August 2014.

(Ermisch 2001)  "The Effect of Parents' Employment on Outcomes for Children." John Ermisch and Marco Francesconi. Mar. 14, 2001.  http://www.jrf.org.uk/publications/effect-parents-employment-outcomes-children. Date accessed: 12 August 2014.

UAC00815

(FHWA 2011)  Federal Highway Administration. 2011. Special Report: Highway construction Noise: Measurement, Prediction, and Mitigation, Appendix A Construction Equipment Noise Levels and Ranges. www.fhwa.dot.gov/environment/noise/highway/hcn06.htm. Date accessed: 15 August 2014.

(Four Seasons 2014) "Welcome to Four Seasons Ranch!" http://www.fourseasonsranch.net/. Date accessed: 12 August 2014.

(Frio Regional Hospital 2014) Welcome; Services http://www.frioregionalhospital.com/. Date accessed: 14 August 2014.

(Great Schools 2014) Dilley Public Schools. http://www.greatschools.org/texas/dilley. Date accessed: 12 August 2014.

(Great Schools 2014b) Faith Christian Academy. http://www.greatschools.org/texas/dilley/8191-Faith-Christian-Academy. Date accessed: 12 August 2014.

(Griffith et al., 2007) Griffith, G.E., Bryce, S.A., Omernik, J.M., Rogers, A.C., "Ecoregions of Texas." December 27, 2007. http://www.tceq.state.tx.us/assets/public/comm_exec/pubs/as/199.pdf. Date Accessed: 14 August 2014.

(Eagle Ford 2014d) "How Long Will Eagle Ford Shale Drilling Last?" http://alleagleford.com/how_long_will_the_eagle_ford_shale%20last.htm. Date accessed: 12 August 2014.

(Hamalainen 2008) Comanche Empire. http://www.nowtopians.com/wp content/uploads/2012/10/Comanche444.jpg. Date Accessed 19 August 2014.

(Hannaford 2012) "A 'Black Gold' Rush in Cotulla." Alex Hannaford. July 27, 2012. http://www.texasobserver.org/a-black-gold-rush-in-cotulla/. Date accessed: 12 August 2014.

(Harman 2013) "Waste Land: Frio County Struggles with Fracking's Leftovers." Greg Harman. Sept. 25, 2013. http://www.texasobserver.org/waste-land-frio-county-struggles-frackings-leftovers/. Date accessed: 12 August 2014.

(Home Facts 2014) Frio County; TX Unemployment Rate Report http://www.homefacts.com/unemployment/Texas/Frio-County.html. Date accessed: 12 August 2014.

(ICE 2014) Letter to Natural Resource Conservation Service. Submitted 22 August 2014.

(ICE 2014b) Letter to United States Fish and Wildlife Service. Submitted 22 August 2014.

(ICE 2014c) Letter to Texas Parks and Wildlife Division. Submitted 22 August 2014.

UAC00816

(ICE 2014d) Letter to Texas Historical Commission. Submitted 22 August 2014.

(ICE 2014e) Letter to Mescalero Apache Tribe. Submitted 22 August 2014.

(ICE 2014f) Letter to Comanche Nation of Oklahoma. Submitted 22 August 2014.

(ICF Jones & Stokes 2009)  ICF Jones & Stokes. 2009. Technical Noise Supplement. November. (ICF J&S 00183.08) Sacramento, CA. Prepared for California Department of Transportation, Sacramento, CA. Pages 2-28 to 2-30.

(IPCC 2007)        Intergovernmental Panel on Climate Change (IPCC). 2007. Climate Change 2007: Synthesis Report. Summary for Policy Makers (SPM), p. 5.http://www.ipcc.ch/index.htm

(Locallabs 2014) Frio County; Texas Education Data. http://locallabs.org/friocounty-texas-education. Date accessed: 14 August 2014.

(Medina 2014) Medina Electrice Cooperative Inc. 2014. http://www.medinaec.org/. Date accessed: 22 August 2014.

(M. O'Brien & D. Jones 1999) "Children, parental employment and educational attainment: an English case study." Cambridge Journal of Economics, pp. 599-621. 1999.

(MOU 2010) Memorandum of Understanding Between Department of the Interior, U.S. Fish And Wildlife Service And The Department of Homeland Security, Immigration And Customs Enforcement. Dated 20 November 2010.

(MRI 1996)        MRI 1996. Improvement of Specific Emission Factors (BACM Project No. 1). Midwest Research Institute (MRI). Prepared for the California South Coast Air Quality Management District, March 29, 1996.

(Nix Health 2014) Nix Community General Hospital. http://www.nixhealth.com/home//facilities/nix-community-general-hospital?headerbar=2. Date accessed: 12 August 2014.

(NPS 2014) National Historic Trails and Scenic Routes. http://imgis.nps.gov/HTML/index.html?configBase=/Geocortex/Essentials/REST/sites/NHT/viewers/NHT/virtualdirectory/Resources/Config/Default&layerTheme=2&extent=-11249232.8769509,3101993.37907692,-10398637.1002386,3818284.5594663,102100. Date Accessed 19 August 2014.

(NRCS 2014)        Natural Resource Conservation Service, Web Soil Survey, ICE Dilley Texas. http://websoilsurvey.sc.egov.usda.gov/App/HomePage.htm. Date accessed:  13 August 2014

(Presidential Memorandum 2013) Response to the Influx of Unaccompanied Alien Children Across the Southwest Border, Memorandum for the Heads of Executive Departments and Agencies, the White House website, http://www.whitehouse.gov/the-press-office/2014/06/02/presidential-memorandum-response-influx-unaccompanied-alien-children-acr.

43

(Reuters 2014) "U.S. oil output from major shale plays to rise 89,000 bpd in Sept: EIA." Aug. 11, 2014.
http://www.reuters.com/article/2014/08/11/us-energy-crude-shaleoil-idUSKBN0GB25X20. Date accessed: 12 August 2014.

(SWTJC 2014) Southwest Texas Junior College; 2014 Course Catalog, pp. 26-27.
http://swtjc.edu/pages/academics/schedules. Date accessed: 12 August 2014.

(SWTJC 2014b) Southwest Texas Junior College; Quick Facts. http://swtjc.edu/pages//about-swtjc/quick-facts.
Date accessed: 14 August 2014.

(TAC 2014) Frio County Profile; County Information Program.
http://www.txcip.org/tac/census/profile.php?FIPS=48163. Date accessed: 12 August 2014.

(Target 2014)  Target Logistics. 2014. Personal communication between Mr. Stan Katz (Target
Logistics) and Elizabeth Kennett (Immigration and Customs Enforcement) via email on
August 25, 2014.

(TCEQ 2014)   Groundwater Conservation Districts.
https://www.tceq.texas.gov/groundwater/districts.html. Date accessed: 20
August 2014.

(TDCJ 2014) Briscoe (DB). http://www.tdcj.state.tx.us/unit_directory/db.html. Date accessed: 12 August 2014.

(TDSHS 2014) Texas Department of State Health Services; Annual Survey of Hospitals.
http://www.dshs.state.tx.us/chs/hosp/hosp2.shtm. Date accessed: 12 August 2014.

(The Center to Protect Workers Rights  2003)  The Center to Protect Workers Rights. 2003. Construction Noise
Hazard Alert. http://www.cpwr.com/sites/default/files/publications/kfnoise.PDF. Date accessed:
15 August 2014.

(TPWD 2014)  Texas  Tortoise  fact  sheet.  http://www.tpwd.texas.gov/huntwild/wild/species/txtort/.  Date
accessed: 11 August 2014.

(TPWD 2014b) Ocelot  fact  sheet.  http://www.tpwd.state.tx.us/huntwild/wild/species/ocelot/.  Date accessed:  11
August 2014.

(TPWD 2014c)  Rare, Threatened, and Endangered Species of Texas, Species Search Results for Frio County.
http://www.tpwd.state.tx.us/gis/ris/es/SpeciesList.aspx?parm=Frio.  Date  accessed:  11  August
2014.

(TPWD 2014d) Texas Horned Lizard fact sheet. http://www.tpwd.texas.gov/huntwild/wild/species/thlizard/.  Date
accessed: 11 August 2014.

(TPWD 2014e) Texas Conservation Action Plan: Species of Greatest Conservation Need, Copy of SGCN_2011
(Excel workbook).  http://www.tpwd.state.tx.us/landwater/land/tcap/sgcn.phtml. Date accessed:
11 August 2014.

UAC00818

(TSHA 2014) Texas State Historical Association. 2014 Frio County;
     http://www.tshaonline.org/handbook/online/articles/hcf10;

(TWDB 2014) Texas Water Development Board. 2014.
     http://www.twdb.state.tx.us/groundwater/aquifer/majors/carrizo-wilcox.asp.
     Date accessed: 20 August 2014.

(UOGR 2013) "South Texas County Addresses Disposal Concerns." Tayvis Dunnahoe. Oct. 1, 2013.
     http://www.ogj.com/articles/uogr/print/volume-1/issue-3/south-texas-county-addresses-
     disposal-concerns.html. Date accessed: 12 August 2014.

(US Census Bureau 2010) Texas (State), Frio County, and Dilley, Texas.
     http://quickfacts.census.gov/qfd/states/48/48163.html. Date Accessed 19 August 2014.
     http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml. Date Accessed 12 August 2014.

(USDA 1992) Soil Conservation Service; Soil Survey of Frio County, Texas, pp. 95-97. 1992.
     http://www.google.com/url?url=http://www.nrcs.usda.gov/Internet/FSE_MANUSCRIPTS/texas/
     TX163/0/Frio.pdf&rct=j&frm=1&q=&esrc=s&sa=U&ei=Tob3U8mhC_TJsQT6lICIDA&ved=0C
     EgQFjAJ&usg=AFQjCNFSTvAZcOz-DY2zSX5qAj426UEY6w. Date accessed: 12 August
     2014.

(USDA 2014)   U.S. Department of Agriculture. 2014. Duval Series
     https://soilseries.sc.egov.usda.gov/OSD_Docs/D/DUVAL.html. Date accessed: 22 August 2014.

(USDA 2014b) U.S. Department of Agriculture. 2014. Amphion Series.
     https://soilseries.sc.egov.usda.gov/OSD_Docs/A/AMPHION.html. Date accessed: 22 August
     2014.

(USDA 2014c)   U.S. Department of Agriculture. 2014Brystal Series.
     https://soilseries.sc.egov.usda.gov/OSD_Docs/B/BRYSTAL.html. Date accessed: 22 August
     2014.

(USEPA 1974)  U.S. Environmental Protection Agency. 1974. Information on Levels of Environmental Noise
     Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety, Publication
     No. 550/9-74-004, Washington, DC, March 1974.

(USEPA 2001)  U.S. Environmental Protection Agency. 2001. Procedures Document for National Emissions
     Inventory, Criteria Air Pollutants, 1985-1999. EPA-454/R-01-006. Office of Air Quality Planning
     and Standards, USEPA. March 2001.

(USEPA 2006)  U.S. Environmental Protection Agency. 2006. Documentation for the Final 2002 Nonpoint Sector
     (Feb 06 version) National Emission Inventory for Criteria and Hazardous Air Pollutants. Prepared
     for: Emissions Inventory and Analysis Group (C339-02) Air Quality Assessment Division Office
     of Air Quality Planning and Standards, USEPA. July 2006.

UAC00819

(USEPA 2014a)U.S. Environmental Protection Agency. 2014. Office of Water- MyWATERS (Watershed
Assessment, Tracking & Environmental Results) Mapper. http://watersgeo.epa.gov/mwm/.
Date accessed: 20 August 2014.

(USEPA 2014b) U.S. Environmental Protection Agency. 2014. Stormwater Management Best Practices.
http://www.epa.gov/greeningepa/stormwater/best_practices.htm. Date accessed:
20 August 2014.

(USEPA 2014c) U.S. Environmental Protection Agency. 2014. Climate Change Science.
http://www.epa.gov/climatechange/science/index.html. Date Accessed: 29 December 2009

(USEPA 2014d) U.S. Environmental Protection Agency. 2014. AP 42, Fifth Edition, Volume I. Chapter 3:
Stationary Internal Combustion http://www.epa.gov/ttn/chief/ap42/ch03/index.html. Date
accessed: 20 August 2014.

(USEPA 2014e) U.S. Environmental Protection Agency (EPA) 20014. The Green Book Nonattainment
Areas for Criteria Pollutants. http://www.epa.gov/air/oaqps/greenbk/index.html. Date accessed 20
August 2014.

(USEPA 2014f) U.S. Environmental Protection Agency. 2014. Six Common Air Pollutants.
http://www.epa.gov/air/urbanair/. Date accessed: 20 August 2014.

(USFIREDEPT 2014) Dilley Volunteer Fire Department. http://usfiredept.com/dilley-volunteer-fire-department-
6389.html. Date accessed: 25 August 2014.

(USFWS 2010) Draft Ocelot Recovery Plan - First Revision. Southwest Regional Office, Albuquerque, NM.
http://www.fws.gov/southwest/es/arizona/Documents/SpeciesDocs/Ocelot/Draft_Ocelot_Recover
y_Plan-First_Revision.pdf

(USFWS 2010b) U.S. Fish and Wildlife Service, Biological Opinion, Consultation No. 21410-2010-FE-0450.
Dated 25 October 2010.

(USFWS 2014) Red Wolf Recovery Program. U.S. Fish & Wildlife Recovery Program webpage.
http://www.fws.gov/redwolf/. Date accessed: 11 August 2014.

(UTA 1977) Thomas R. Hester, Archeological Research at the Hinojosa Site (41 JW 8), Jim Wells County,
Southern Texas, Center for Archeological Research, Archeological Survey Report No. 42 (1977).

(UTA 2014) Texas Beyond History, Tortuga Flat. http://www.texasbeyondhistory.net/st-plains/images/he12.html.
Date Accessed 19 August 2014. Pachal Indians.
http://www.tshaonline.org/handbook/online/articles/bmp04; Date Accessed 12 August 2014.

(UTA 2014b) Texas Beyond History, Who Were the "Coahuiltecans?"http://www.texasbeyondhistory.net/st-
plains/peoples/coahuiltecans.html. Date Accessed 19 August 2014.

(UTA 2014c) Texas Beyond History, Lower Pecos Canyonlands.
http://www.texasbeyondhistory.net/pecos/index.html; Artistic Expression, Texas Beyond History,

UAC00820

University of Texas at Austin. http://www.texasbeyondhistory.net/st-plains/artistic/index.html. Date Accessed 19 August 2014.

(UTA 2014d) Studies in Archeology, Texas Archeological Research Laboratory http://www.utexas.edu/research/tarl/records/studies.php. Date Accessed 19 August 2014.

(UTA 2014e) Current Research, Texas Archeological Research Laboratory. http://www.utexas.edu/research/tarl/research/current.php. Date Accessed 19 August 2014.

(UTA 2014f) Texas Beyond History; Archeology, Lower Pecos Canyonlands http://www.texasbeyondhistory.net/pecos/archeology.html. Date Accessed 19 August 2014.

(UTSA 2011) Institute for Economic Development; Center for Community and Business Research. "Economic Impact of the Eagle Ford Shale (Dated Feb. 2011)." http://ccbr.iedtexas.org/index.php/Our-Projects/economic-impact-of-the-eagle-ford-shale.html. Date accessed: 12 August 2014.

(UTSA 2013) Strategic Housing Analysis, Center for Urban and Regional Planning Research, College of Architecture. http://utsa.edu/today/2013/03/efsstudy.html. Date accessed: 12 August 2014.

(Waste Management 2014)    Waste Management. 2014. Clovel Gardens Landfill. http://covelgardenslandfill.wm.com/index.jsp. Date accessed: 22 August 2014.

(Werler & Dixon 2000) John E. Werler & James R. Dixon, TEXAS SNAKES: IDENTIFICATION, DISTRIBUTION, AND NATURAL HISTORY 99-101 (Austin: University of Texas Press, 2000)

(WSG 2014) Window on State Government; Economic Development, Alamo Region. http://www.window.state.tx.us/specialrpt/tif/alamo/ecodevo.php. Date accessed: 12 August 2014.

(Zillow 2014) Frio County. http://www.zillow.com/frio-county-tx/#/homes/for_sale/Frio-County-TX/house,mobile,townhouse_type/162_rid/pricea_sort/29.28041,-98.657227,28.449374,-99.556732_rect/9_zm/2_p/. Date accessed: 12 August 2014.

(Zillow 2014b) Dilley, TX. http://www.zillow.com/homes/Dilley-TX_rb/#/homes/for_sale/Dilley-TX/house_type/11118_rid/pricea_sort/29.156959,-98.787689,28.324933,-99.687195_rect/9_zm/. Date accessed: 12 August 2014.

UAC00821

UAC00822

Appendix A—Proposed Action Figures

UAC00823

UAC00824



Figure 1-1 Proposed Action Vicinity Map

Source: "Dilley." 28°39'25.17"N and 99°12'22.21"W.
Google Earth. March 24, 2013.
Date Accessed: August 22, 2014.

UAC00825

Appendix A -1

22.3 mi

☐ Approximate Site Boundary
and Existing Fence Line



Figure 1-2 Location Map of Proposed Action Area



Figure 1-3 Detailed View of the Proposed Action



Figure 1-4 Topography Map of Proposed Action Area

Source: "Dilley." 28°39'25.17"N and 99°1'22.21"W.
NEPAssist. National Geographic Society 2013.
Date Accessed: August 22, 2014.    UAC00828

0.6 mi

Approximate Site Boundary
and Existing Fence Line

Appendix A - 4

# Appendix B—Interagency and Intergovernmental Consultation Letters

UAC00829

UAC00830

U.S. Department of Homeland Security
500 12th Street S.W.
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

August 22, 2014

RE:     **Preparation of an Environmental Assessment (EA) for United States (U.S.)
        Immigration and Customs Enforcement in Frio County, Texas**

Drew Kinney
Modeling Unit Leader
USDA-Natural Resources Conservation Service
101 S. Main
Temple, TX 76501-7682
Office: (254) 742-9854
drew.kinney@tx.usda.gov

Dear Mr. Kinney

United States (U.S.) Immigration and Customs Enforcement (ICE) is the principal investigative
arm of the Department of Homeland Security (DHS) and the second largest investigative agency
in the Federal Government. ICE's primary mission is to promote homeland security and public
safety through criminal and civil enforcement of federal laws governing border control, customs,
trade, and immigration. ICE determines the legal immigration status of individuals believed to be
illegally present in the interior of the United States through the immigration courts and removes
those who are determined to either be inadmissible or in violation with U.S. law.

In accordance with the National Environmental Policy Act (NEPA) of 1969 (42 U.S. Code 4321-
4347) this letter is provided to inform you that ICE is proposing an undertaking subject to NEPA
and the Farmland Protection Policy Act (FPPA). The proposed undertaking is for the
construction and operation of a 2,400 person family detention center on approximately 51.5 acres
of land to the south and southwest of an existing community known as Sendero Ranch located at
1925 West Highway 85, West Dilley, Texas 78017. The detention center would include all of the
necessary services required for ICE to safely family units in compliance with applicable
detention and residential codes and standards while they await legal proceedings and processing.

ICE has completed Sections I and III of the attached AD 1006 Farmland Conservation Impact
Rating form for the proposed residential center.  ICE requests that the USDA NRCS complete
Sections II, IV, and V in order to allow ICE to complete the remainder of the document.  ICE has
also attached a county map, property vicinity map, site overview map, and a soil map of the
property.

ICE respectfully requests that you respond to this request via email (pdf) to me at (elizabeth.l.kennett@ice.dhs.gov) or in writing within forty-five (45) days of its receipt in accordance with 36 C.F.R. § 800.3(c)(4). Please direct any questions or informational requests to me at the contact information provided below.

Sincerely,

Elizabeth L. Kennett
Environmental Program Manager
DHS U.S. Immigration and Customs Enforcement
500 12th Street SW, Stop 5704
Washington, DC 20536
Office: (202) 732-6649
elizabeth.l.kennett@ice.dhs.gov

Enclosed:    **Attachment 1** – AD 1006 Farmland Conservation Impact Rating Form
             **Figure 1** – Frio County Map
             **Figure 2** – Vicinity Map
             **Figure 3** – Site Overview
             **Figure 4** – Soil Map

U.S. Department of Agriculture

# FARMLAND CONVERSION IMPACT RATING

| **PART I** *(To be completed by Federal Agency)* | | Date Of Land Evaluation Request | 8/13/14 |
|---|---|---|---|
| Name Of Project  South Texas Family Residential Center | | Federal Agency Involved  U.S. Immigration and Customs Enforcement | |
| Proposed Land Use  Family Residential Center | | County And State  Frio County, Texas | |

| **PART II** *(To be completed by NRCS)* | | Date Request Received By NRCS | | | |
|---|---|---|---|---|---|
| Does the site contain prime, unique, statewide or local important farmland? *(If no, the FPPA does not apply -- do not complete additional parts of this form).* | | Yes ☐  No ☐ | Acres Irrigated | Average Farm Size | |
| Major Crop(s) | Farmable Land In Govt. Jurisdiction  Acres:           % | | Amount Of Farmland As Defined in FPPA  Acres:           % | | |
| Name Of Land Evaluation System Used | Name Of Local Site Assessment System | | Date Land Evaluation Returned By NRCS | | |

| **PART III** *(To be completed by Federal Agency)* | | Alternative Site Rating | | | |
|---|---|---|---|---|---|
| | Maximum Points | Site A | Site B | Site C | Site D |
| A.  Total Acres To Be Converted Directly | | 51.5 | | | |
| B.  Total Acres To Be Converted Indirectly | | | | | |
| C.  Total Acres In Site | | 51.5 | 0.0 | 0.0 | 0.0 |

| **PART IV** *(To be completed by NRCS)*  Land Evaluation Information | | | | | |
|---|---|---|---|---|---|
| A.  Total Acres Prime And Unique Farmland | | | | | |
| B.  Total Acres Statewide And Local Important Farmland | | | | | |
| C.  Percentage Of Farmland In County Or Local Govt. Unit To Be Converted | | | | | |
| D.  Percentage Of Farmland In Govt. Jurisdiction With Same Or Higher Relative Value | | | | | |

| **PART V** *(To be completed by NRCS)*  Land Evaluation Criterion  Relative Value Of Farmland To Be Converted *(Scale of 0 to 100 Points)* | | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|

| **PART VI** *(To be completed by Federal Agency)* Site Assessment Criteria *(These criteria are explained in 7 CFR 658.5(b)* | Maximum Points | | | | |
|---|---|---|---|---|---|
| 1.  Area In Nonurban Use | | | | | |
| 2.  Perimeter In Nonurban Use | | | | | |
| 3.  Percent Of Site Being Farmed | | | | | |
| 4.  Protection Provided By State And Local Government | | | | | |
| 5.  Distance From Urban Builtup Area | | | | | |
| 6.  Distance To Urban Support Services | | | | | |
| 7.  Size Of Present Farm Unit Compared To Average | | | | | |
| 8.  Creation Of Nonfarmable Farmland | | | | | |
| 9.  Availability Of Farm Support Services | | | | | |
| 10.  On-Farm Investments | | | | | |
| 11.  Effects Of Conversion On Farm Support Services | | | | | |
| 12.  Compatibility With Existing Agricultural Use | | | | | |
| TOTAL SITE ASSESSMENT POINTS | 160 | 0 | 0 | 0 | 0 |

| **PART VII** *(To be completed by Federal Agency)* | | | | | |
|---|---|---|---|---|---|
| Relative Value Of Farmland *(From Part V)* | 100 | 0 | 0 | 0 | 0 |
| Total Site Assessment *(From Part VI above or a local site assessment)* | 160 | 0 | 0 | 0 | 0 |
| TOTAL POINTS *(Total of above 2 lines)* | 260 | 0 | 0 | 0 | 0 |

| Site Selected: | Date Of Selection | Was A Local Site Assessment Used?  Yes ☐    No ☐ |
|---|---|---|

Reason For Selection:

*(See Instructions on reverse side)*
This form was electronically produced by National Production Services Staff
UAC00833
Form AD-1006 (10-83)
Appendix B - 3

Figure 1: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Frio County Map



Appendix B - 4

**Figure 2: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Vicinity Map**



Existing Prison Bisco Unit

Existing Sendero Ranch Development

Existing Entrance

**Legend**

Approximate Site Boundary and Fence Line

Approximate Proposed Construction Limits

3118 ft

Figure 3: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Site Overview



All Ecological Sites -- Rangeland—Frio County, Texas
(ICE Dilley Texas Family Residential Center)

Map Scale: 1:6,050 if printed on A portrait (8.5" x 11") sheet.

Map projection: Web Mercator   Corner coordinates: WGS84   Edge tics: UTM Zone 14N WGS84

**Natural Resources**
**Conservation Service**

Web Soil Survey
National Cooperative Soil Survey

All Ecological Sites -- Rangeland—Frio County, Texas
(ICE Dilley Texas Family Residential Center)

## MAP LEGEND

**Area of Interest (AOI)**

☐ Area of Interest (AOI)

**Soils**

**Soil Rating Polygons**

R083AY399TX

R083AY407TX

R083AY412TX

R083AY573TX

R083AY629TX

☐ Not rated or not available

**Soil Rating Lines**

⌇ R083AY399TX

⌇ R083AY407TX

⌇ R083AY412TX

⌇ R083AY573TX

⌇ R083AY629TX

⌇ Not rated or not available

**Soil Rating Points**

◼ R083AY399TX

◼ R083AY407TX

◼ R083AY412TX

◼ R083AY573TX

◼ R083AY629TX

☐ Not rated or not available

**Water Features**

⌇ Streams and Canals

**Transportation**

╅ Rails

∿ Interstate Highways

∿ US Routes

∿ Major Roads

∿ Local Roads

**Background**

◼ Aerial Photography

## MAP INFORMATION

The soil surveys that comprise your AOI were mapped at 1:24,000.

Warning: Soil Map may not be valid at this scale.

Enlargement of maps beyond the scale of mapping can cause misunderstanding of the detail of mapping and accuracy of soil line placement. The maps do not show the small areas of contrasting soils that could have been shown at a more detailed scale.

Please rely on the bar scale on each map sheet for map measurements.

Source of Map:   Natural Resources Conservation Service
Web Soil Survey URL:   http://websoilsurvey.nrcs.usda.gov
Coordinate System:   Web Mercator (EPSG:3857)

Maps from the Web Soil Survey are based on the Web Mercator projection, which preserves direction and shape but distorts distance and area. A projection that preserves area, such as the Albers equal-area conic projection, should be used if more accurate calculations of distance or area are required.

This product is generated from the USDA-NRCS certified data as of the version date(s) listed below.

Soil Survey Area:   Frio County, Texas
Survey Area Data:   Version 11, Dec 18, 2013

Soil map units are labeled (as space allows) for map scales 1:50,000 or larger.

Date(s) aerial images were photographed:     May 24, 2011—May 25, 2011

The orthophoto or other base map on which the soil lines were compiled and digitized probably differs from the background imagery displayed on these maps. As a result, some minor shifting of map unit boundaries may be evident.

USDA  Natural Resources
Conservation Service

Web Soil Survey
National Cooperative Soil Survey

8/19/2015
Page 2 of 4

Appendix B - 8

# All Ecological Sites — Rangeland

| Frio County, Texas | | | | | |
|---|---|---|---|---|---|
| Map unit symbol | Map unit name | Component name (percent) | Ecological site | Acres in AOI | Percent of AOI |
| AmA | Amphion sandy clay loam, 0 to 1 percent slopes | Amphion (85%) | R083AY629TX — Clay Loam 25-35" PZ | 14.8 | 11.1% |
| | | Unnamed, minor components (14%) | | | |
| | | Tiocano (1%) | | | |
| AmB | Amphion sandy clay loam, 1 to 3 percent slopes | Amphion (85%) | R083AY629TX — Clay Loam 25-35" PZ | 8.9 | 6.6% |
| | | Unnamed, minor components (14%) | | | |
| | | Tiocano (1%) | | | |
| BrB | Brystal very fine sandy loam, 1 to 3 percent slopes | Brystal (85%) | R083AY407TX — Sandy Loam 25-35" PZ | 10.3 | 7.7% |
| | | Unnamed, minor components (14%) | | | |
| | | Tiocano (1%) | | | |
| CaB | Caid very fine sandy loam, 1 to 3 percent slopes | Caid (85%) | R083AY389TX — GRAY SANDY LOAM 25-35" PZ | 6.9 | 5.2% |
| | | Unnamed, minor components (14%) | | | |
| | | Tiocano (1%) | | | |
| DvB | Duval very fine sandy loam, 1 to 3 percent slopes | Duval (85%) | R083AY407TX — Sandy Loam 25-35" PZ | 78.1 | 58.3% |
| | | Unnamed, minor components (14%) | | | |
| | | Tiocano (1%) | | | |
| MgB | Miguel very fine sandy loam, 1 to 3 percent slopes | Miguel (85%) | R083AY412TX — Tight Sandy Loam 21-35" PZ | 9.8 | 7.3% |
| | | Unnamed, minor components (14%) | | | |
| | | Tiocano (1%) | | | |

USDA   Natural Resources
Conservation Service

Web Soil Survey
National Cooperative Soil Survey

8/13/2014
Page 3 of 4
UAC00839

Appendix B - 9

| Frio County, Texas | | | | | |
|---|---|---|---|---|---|
| Map unit symbol | Map unit name | Component name (percent) | Ecological site | Acres in AOI | Percent of AOI |
| Pe | Poteet very fine sandy loam, occasionally flooded | Poteet (85%) | R083AY573TX — Loamy Bottomland 25-35" PZ | 0.0 | 0.0% |
| | | Unnamed, minor components (14%) | | | |
| | | Tiocano (1%) | | | |
| WeA | Webb very fine sandy loam, 0 to 1 percent slopes | Webb (85%) | R083AY412TX — Tight Sandy Loam 21-35" PZ | 5.1 | 3.8% |
| | | Unnamed, minor components (14%) | | | |
| | | Tiocano (1%) | | | |
| Totals for Area of Interest | | | | 133.9 | 100.0% |

USDA   Natural Resources
Conservation Service

Web Soil Survey
National Cooperative Soil Survey

8/13/2014
Page 4 of 4
UAC00840

Appendix B - 10



U.S. Department of Homeland Security
500 12th Street S.W.
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

August 22, 2014

RE:  **Preparation of a Supplemental Environmental Assessment (SEA) for United
States (U.S.) Immigration and Customs Enforcement (ICE) in Frio County,
Dilley, Texas**

Mark Wolfe
State Historic Preservation Officer
Texas Historical Commission
108 W. 16th Street
Austin, TX 78701
(512) 463-6100

Dear Mr. Wolfe,

United States (U.S.) Immigration and Customs Enforcement (ICE) is the principal investigative
arm of the Department of Homeland Security (DHS) and the second largest investigative agency
in the Federal Government. ICE's primary mission is to promote homeland security and public
safety through criminal and civil enforcement of federal laws governing border control, customs,
trade, and immigration. ICE determines the legal immigration status of individuals believed to be
illegally present in the interior of the United States through the immigration courts and removes
those who are determined to either be inadmissible or in violation with U.S. law. The Justice
Department's Executive Office for Immigration Review conducts the immigration proceedings
for both unaccompanied alien children and family units, in accordance with the requirements of
Section 240 of the Immigration and Nationality Act. Unaccompanied alien children are in the
custody of a sponsor until disposition of their cases, and family units stay together in Family
Residential Centers until disposition of their cases. The full range of facility, services, and case
management requirements for the ICE mission of enforcement and removal includes, but is not
limited to, the following: providing office space, bed space, courtrooms, space for services such
as medical exams, recreation, and religious services, attorney-client meetings, processing space,
and transportation.

The June 2, 2014 Presidential Memorandum "Response to the Influx of Unaccompanied Alien
Children Across the Southwest Border" described the influx as an "urgent humanitarian situation
requiring a unified and coordinated Federal response." The unprecedented increase in the
number of apprehended persons has the potential to fill or exceed the capacity of the DHS
supporting infrastructure (real property for processing and housing apprehended persons,
services including medical care, transportation, utilities, meals, hygiene, recreation, etc.)
currently available. Therefore, action is being considered at the DHS Headquarters level to

provide increased and expedited allocation of Departmental resources in a number of areas, including the construction of facilities for ICE to provide safe and adequate housing for families.

In accordance with the National Environmental Policy Act (NEPA) of 1969 (42 U.S. Code 4321-4347), this letter is provided to inform you that ICE is proposing an undertaking subject to review under Section 106 of the National Historic Preservation Act of 1966. ICE is preparing a Supplemental Environmental Assessment (SEA) tiered from a DHS Programmatic Environmental Assessment (PEA). The proposed undertaking is for the construction and operation of an approximate 2,400 person family residential center on approximately 51.5 acres of land to the south and southwest of an existing community known as Sendero Ranch located at 1925 West Highway 85, West Dilley, Texas 78017. The residential center would include all of the necessary services required for ICE to safely house the increased influx of family units in compliance with applicable detention and residential codes and standards while they await legal proceedings and processing.

The proposed undertaking would consist of mostly modular and sprung buildings. There will be very little digging associated with construction activities, however, if any artifacts of historical significance are found we will immediately stop construction and notify the THC.

## Site Considerations and Analysis:
Land use at the proposed project is typical south Texas brushland and rangeland/pastureland (mesquite trees, prickly-pear cactus, etc.). The proposed project would be located adjacent to the existing Sendero Ranch development on previously disturbed lands.

ICE reviewed the National Park Service's National Register of Historic Places (NRHP) database Google Earth mapping layer[1] to examine the proposed undertaking's impact on listed or eligible historic properties within the surrounding area. Additionally, resources from your office (Texas Historical Commission at http://atlas.thc.state.tx.us) were referenced to examine the undertaking's potential impact on state listed or eligible historic properties and cultural resources within the surrounding area.

- There are no NRHP-listed properties within a 15-mile radius of the proposed site in Dilley, TX.
- ICE is unaware of any historic properties eligible for inclusion on the NRHP within the surrounding area of the undertaking.
- There is one (1) Texas Historic Site located 0.9 miles NE of the proposed project location, the Dilley Cemetery. Viewshed analyses and street view photos from the cemetery indicate that the line-of-site from the entrance of the cemetery to the proposed site is obscured by trees and distance (**Figure 4**). As such, the proposed undertaking will not adversely affect historic properties.

## Conclusion:

---

[1] National Register of Historic Places (NRHP) site locations are based on the Google Earth mapping layer provided through the National Park Service. NATIONAL PARK SERVICE, U.S. DEPT OF INTERIOR, National Register of Historic Places, http://nrhp.focus.nps.gov/natreg/docs/Download.html

UAC00842

Based upon our review of publically available information and our viewshed analysis conducted for the proposed undertaking, ICE finds that the Dilley, TX undertaking will not affect historic properties under 36 C.F.R. § 800.4(d)(1).

ICE respectfully requests that you respond to this request for review of our finding via email (pdf) to me at (elizabeth.l.kennett@ice.dhs.gov) or in writing within thirty (30) days of its receipt in accordance with 36 C.F.R. § 800.3(c)(4). Please direct any questions or informational requests to me at the contact information provided below.

Sincerely,

Elizabeth Kennett

Elizabeth L. Kennett
Environmental Program Manager
DHS U.S. Immigration and Customs Enforcement
500 12th Street SW, Stop 5704
Washington, DC 20536
Office: (202) 732-6649
elizabeth.l.kennett@ice.dhs.gov

Enclosed:      **Attachment 1** - Request for SHPO Consultation Form
               **Figure 1** – Vicinity Map
               **Figure 2** – Site Overview
               **Figure 3** – Site Plan Overlay Map
               **Figure 4** – Viewshed Detail: Dilley Cemetery

UAC00843

## TEXAS HISTORICAL COMMISSION

### REQUEST FOR SHPO CONSULTATION:
### Section 106 of the National Historic Preservation Act and/or the Antiquities Code of Texas

*Please see instructions for completing this form and additional information on Section 106 and Antiquities Code consultation on the Texas Historical Commission website at http://www.thc.state.tx.us/crm/crmsend.shtml.*

■ This is a new submission.

☐ This is additional information relating to THC tracking number(s): _____

---

### Project Information

PROJECT NAME
**Supplement Environmental Assessment, Immigration and Customs Enforcement (ICE), Dilley, TX Family Residential Center**

| PROJECT ADDRESS | PROJECT CITY | PROJECT ZIP CODE(S) |
|---|---|---|
| **1925 West Highway 85** | **Dilley** | **78017** |

PROJECT COUNTY OR COUNTIES
**Frio County**

PROJECT TYPE (Check all that apply)

☐ Road/Highway Construction or Improvement      ☐ Repair, Rehabilitation, or Renovation of Structure(s)

■ Site Excavation      ☐ Addition to Existing Structure(s)

■ Utilities and Infrastructure      ☐ Demolition or Relocation of Existing Structure(s)

■ New Construction      ☐ None of these

BRIEF PROJECT DESCRIPTION: Please explain the project in one or two sentences. More details should be included as an attachment to this form.
**ICE is preparing a Supplemental Environmental Assessment tiered from a Department of Homeland Security Programmatic Environmental Assessment for the construction, operation, and maintenance of a family residential center for mothers of household and their children. The proposed building location is approximately 51.50 acres and is located south and west of an existing community of buildings identified as Sendero Ranch workforce housing community.**

---

### Project Contact Information

| PROJECT CONTACT NAME | TITLE | ORGANIZATION | | |
|---|---|---|---|---|
| **Elizabeth L. Kennett** | **Environmental Manager** | **ICE** | | |
| ADDRESS | CITY | STATE | ZIP CODE | |
| **500 12th Street SW, Stop 8058** | **Washington** | **D.C.** | **20536** | |
| PHONE | EMAIL | | | |
| **202-732-6649** | **Elizabeth.L.Kennett@ice.dhs.gov** | | | |

---

### Federal Involvement (Section 106 of the National Historic Preservation Act)

Does this project involve approval, funding, permit, or license from a federal agency?

■ Yes (Please complete this section)      ☐ No (Skip to next section)

| FEDERAL AGENCY | FEDERAL PROGRAM, FUNDING, OR PERMIT TYPE |
|---|---|
| **US Immigration and Customs Enforcement** | **National Environmental Policy Act of 1969 (NEPA) Document** |
| CONTACT PERSON | PHONE |
| **Elizabeth L. Kennett** | **202-732-6649** |
| ADDRESS | EMAIL |
| **500 12th Street SW, Stop 8058, Washington D.C. 20536** | **Elizabeth.L.Kennett@ice.dhs.gov** |

---

### State Involvement (Antiquities Code of Texas)

Does this project occur on land or property owned by the State of Texas or a political subdivision of the state?

☐ Yes (Please complete this section)      ■ No (Skip to next section)

CURRENT OR FUTURE OWNER OF THE PUBLIC LAND

| CONTACT PERSON | PHONE |
|---|---|
| | |
| ADDRESS | EMAIL |
| | |

REQUEST FOR SHPO CONSULTATION -- PROJECT NAME: Supplement Environmental Assessment, Immigration and Custor
1925 West Highway 85                                              Dilley                              Frio County

| *Identification of Historic Properties: Archeology* |
|---|

Does this project involve ground-disturbing activity?

☑ Yes (Please complete this section)          ☐ No (Skip to next section)

Describe the nature of the ground-disturbing activity, including but not limited to depth, width, and length.
**The proposed family residential center will be built in several phases on the 51.5 acre parcel that was previously cleared and graded.  Initial phases of the construction will provide housing for 960-1,148 persons with a completion maximum capacity of 4,000 persons and 400-800 staff.  Existing infrastructure such as sewer, water, and power will be expanded to accommodate the sites population.**

Describe the previous and current land use, conditions, and disturbances.
**The 51.5 acre parcel is currently vacant, cleared and actively maintained.  The site has been previously cleared and graded for potential housing/commercial construction.  Prior to clearing and grading the site was former rangeland/pastureland, based on historical aerial photos and surrounding land parcels.  A Phase I, completed in January 2012, noted that there was no evidence of any historical structures on the site.**

| *Identification of Historic Properties: Structures* |
|---|

Does the project area or area of potential effects include buildings, structures, or designed landscape features (such as parks or cemeteries) that are 45 years of age or older?

☑ Yes (Please complete this section)          ☐ No (Skip to next section)

Is the project area or area of potential effects within or adjacent to a property or district that is listed in or eligible for listing in the National Register of Historic Places?

☐ Yes, name of property or district:                              ☑ No          ☐ Unknown

In the space below or as an attachment, describe each building, structure, or landscape feature within the project area or area of potential effect that is 45 years of age or older.

| ADDRESS | DATE OF CONSTRUCTION | SOURCE FOR CONSTRUCTION DATE |
|---|---|---|
| **Dilley Cemetery - Dilley, Frio County, Texas** | **Unknown** | **N/A** |
| ADDRESS | DATE OF CONSTRUCTION | SOURCE FOR CONSTRUCTION DATE |
| | | |
| ADDRESS | DATE OF CONSTRUCTION | SOURCE FOR CONSTRUCTION DATE |
| | | |

**Attachments**

Please see detailed instructions regarding attachments.
Include the following with each submission:

☑ Project Work Description

☑ Maps

☑ Identification of Historic Properties

☑ Photographs

For Section 106 reviews only, also include:

☑ Consulting Parties/Public Notification

☑ Area of Potential Effects

☐ Determination of Eligibility

☐ Determination of Effect

**Submit completed form and attachments to the address below. Faxes and email are not acceptable.**

Mark Wolfe
State Historic Preservation Officer
Texas Historical Commission
P.O. Box 12276, Austin, TX 78711-2276 (mail service)
108 W. 16th Street, Austin, TX 78701 (courier service)

**For SHPO Use Only**

Appendix B - 16

UAC00846

Figure 1: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Vicinity Map

UAC00847

Appendix B - 17

Figure 2: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Site Overview



Existing Entrance

Future Main Entrance

Existing Sendero Ranch Development

Legend

Approximate Site Boundary and Fence Line

Approximate Proposed Construction Limits

1090 ft

Figure 3: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Site Plan Overlay Map



UAC00848

Appendix B - 18

**Figure 4: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Viewshed Detail: Dilley Cemetery**



Existing Sendero Ranch and Proposed Site

Dilley Cemetery is off Loma Vista Road and roughly 0.20 miles NW of I-35 Frontage Road. The Cemetery is approximately 0.95 miles NE of the existing entrance to Sendero Ranch.

View toward existing Sendero Ranch and the Proposed Site from the NE corner of the Dilley Cemetery on Loma Vista Road. Due to the distance and tree obstructions the site is not visible.

UAC00849

Appendix B - 19

**Kennett, Elizabeth L**

| | |
|---|---|
| **From:** | Orms, Mary <mary_orms@fws.gov> |
| **Sent:** | Wednesday, August 27, 2014 6:30 PM |
| **To:** | Kennett, Elizabeth L |
| **Subject:** | Re: Request for Expedited Review for ICE Project at Dilley, TX |

Consultation No. 02ETCC00-2014-I-0239

Ms. Kennett:

Thank you for your email with the proposed facility located south and southwest of an existing community known as Sendero Ranch located at 1925 West Highway 85, West Dilley, Frio County, Texas 78017. The proposed construction and operation of the a 2,400 person residential center site is approximately 51.5 acres of previously disturbed land and will include all of the necessary services required for Immigration and Customs Enforcement (ICE) to safely house the increased influx of family units in compliance with applicable detention and residential codes and standards while they await legal proceedings and processing.

In reviewing the U.S. Fish and Wildlife Service (Service) and Texas Parks and Wildlife Department's list of threatened and endangered species occurring in Frio County, only the ocelot (*Leopardus pardalis*) and Gulf Coast jaguarundi (*Herpailurus yagouaroundi cacomitli*) were listed. ICE will implement best management practices during construction activities to minimize any potential impacts. The facility will consist of modular or spring loaded tents, be fenced, lighting will be downshielded and directed away from the surrounding areas, and a roust pest management plan will be implemented for vector control and decrease impacts to wildlife from family units and vice versa. Existing roads off of Highway 85 will be used for entrances and exits and contractors and employees will be educated on the cats potential presence, necessary reduced speeds, and measures to reduce potential impacts.

ICE has determined because the site is cleared of vegetation, except for a few re-sprouts, measures will be implemented there will be no adverse effects to the ocelot and jaguarundi and therefore, does not require further consultation under section 7 of the Endangered Species Act.

The Service does not provide concurrences with "no effect" determinations, however, believes ICE has complied with section 7(1)(a) the Endangered Species . Should project plans change, or if additional information on the distribution of listed or proposed species become available, this determination can be reconsidered.

IF you have any questions please contact me at the numbers listed below.

On Fri, Aug 22, 2014 at 10:38 AM, Kennett, Elizabeth L <Elizabeth.L.Kennett@ice.dhs.gov> wrote:

Good morning Mary:

Attached please find notification of ICE's Proposed Action near Dilley, TX, with request for expedited review. Should you have any questions or concerns, please do not hesitate to contact me.

UAC00850

Respectfully,


Elizabeth


**Elizabeth Kennett**

Environmental Program Manager

Immigration and Customs Enforcement

500 12th Street SW, Washington, DC 20536

W 202.732.6649 |C 202.306.2998

Elizabeth.L.Kennett@ice.dhs.gov




--
Mary Orms
U.S. Fish and Wildlife Service
c/o Texas A&M University at Corpus Christi
6300 Ocean Drive, Unit 5837
Corpus Christi, TX 78412-5837
Phone: (361) 994-9005 EXT: 246
Fax: (361) 994-8262

UAC00851

U.S. Department of Homeland Security
500 12th Street S.W.
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

August 22, 2014

**RE:        Preparation of a Supplemental Environmental Assessment (SEA) for United
            States (U.S.) Immigration and Customs Enforcement (ICE) in Frio County,
            Dilley, Texas**

Mary Orms
Consultation Review Lead
U.S. Fish and Wildlife Service
c/o Texas A&M University at Corpus Christi
Corpus Christi Ecological Services Field Office
6300 Ocean Drive, Unit 5837
Corpus Christi, TX 78412-5837
Phone: (361) 994-9005 EXT: 246
mary_orms@fws.gov

Dear Ms. Orms,

United States (U.S.) Immigration and Customs Enforcement (ICE) is the principal investigative
arm of the Department of Homeland Security (DHS) and the second largest investigative agency
in the Federal Government. ICE's primary mission is to promote homeland security and public
safety through criminal and civil enforcement of federal laws governing border control, customs,
trade, and immigration. ICE determines the legal immigration status of individuals believed to be
illegally present in the interior of the United States through the immigration courts and removes
those who are determined to either be inadmissible or in violation with U.S. law. The Justice
Department's Executive Office for Immigration Review conducts the immigration proceedings
for both unaccompanied alien children and family units, in accordance with the requirements of
Section 240 of the Immigration and Nationality Act. Unaccompanied alien children are in the
custody of a sponsor until disposition of their cases, and family units stay together in Family
Residential Centers until disposition of their cases. The full range of facility, services, and case
management requirements for the ICE mission of enforcement and removal includes, but is not
limited to, the following: providing office space, bed space, courtrooms, space for services such
as medical exams, recreation, and religious services, attorney-client meetings, processing space,
and transportation.

The June 2, 2014 Presidential Memorandum "Response to the Influx of Unaccompanied Alien
Children Across the Southwest Border" described the influx as an "urgent humanitarian situation
requiring a unified and coordinated Federal response." The unprecedented increase in the
number of apprehended persons has the potential to fill or exceed the capacity of the DHS

supporting infrastructure (real property for processing and housing apprehended persons, services including medical care, transportation, utilities, meals, hygiene, recreation, etc.) currently available. Therefore, action is being considered at the DHS Headquarters level to provide increased and expedited allocation of Departmental resources in a number of areas, including the construction of facilities for ICE to provide safe and adequate housing for family units.

In accordance with the National Environmental Policy Act (NEPA) of 1969 (42 U.S. Code 4321-4347), this letter is provided to inform you that ICE is proposing an undertaking subject to NEPA and the Endangered Species Act (ESA). ICE is preparing a Supplemental Environmental Assessment (SEA) tiered from a DHS Programmatic Environmental Assessment (PEA). The proposed undertaking is for the construction and operation of a 2,400 person family residential center on approximately 51.5 acres of land to the south and southwest of an existing community known as Sendero Ranch located at 1925 West Highway 85, West Dilley, Texas 78017. The residential center would include all of the necessary services required for ICE to safely house the increased influx of family units in compliance with applicable detention and residential codes and standards while they await legal proceedings and processing.

## Site Considerations and Analysis:
Land use at the proposed project location is typical south Texas brushland and rangeland/pastureland that consists of mesquite trees, prickly-pear cactus, and other native and non-native grasses. The proposed project would be located adjacent to the existing Sendero Ranch development on previously disturbed lands which would provide suitable habitat for a number of common species located throughout much of Texas such as snakes, bobcats, coyote, armadillos, skunks, raccoons, foxes, and miscellaneous varieties of rats and mice.

ICE reviewed the United States Fish and Wildlife Service (USFWS) Critical Habitat mapper[1] and associated USFWS database[2] for Frio County, TX to examine the proposed undertaking's impact on any surrounding critical habitat for listed or endangered species. There is no critical habitat located within or adjacent to the proposed area of disturbance as depicted in **Figure 3**. Additionally, ICE reviewed both the USFWS and Texas Parks and Wildlife (TPW) threatened and endangered species lists for Frio County (copies are included in **Attachments 1 & 2**). There are six species listed on the USFWS database and 22 species listed on the TPW database for Frio County. Best management practices and environmental considerations will be used during construction activities to minimize any potential impacts to list threatened or endangered species. Migratory birds and other wildlife will likely avoid the proposed project area during construction activities and during operations. Fencing and lighting would be included as part of the project (lighting would be downshielded and directed away from the surrounding areas) and a robust pest management plan would be implemented for vector control and to decrease the likelihood of impacts to wildlife from family units and vice versa.

## Conclusion:
Based upon our review of publically available information, the existing pre-disturbed nature of the site, and the best management practices that will be employed during construction and

---

[1] http://ecos.fws.gov/crithab/flex/crithabMapper.jsp
[2] http://ecos.fws.gov/crithab/

operation of the proposed facility, **ICE finds that there would be no adverse effects to State or Federally protected threatened or endangered species or habitat. Therefore, the proposed project does not require further consultation under Section 7 of the Endangered Species Act.**

ICE respectfully requests that you provide us with any concerns or issues that you feel should be addressed in this SEA. A copy of the SEA for the proposed action can be made available upon request. ICE would appreciate you providing your agency's review and concurrence of our finding to me via email (pdf) at elizabeth.l.kennett@ice.dhs.gov as soon as possible to expedite this project. Given the urgent humanitarian issues in this situation, time is of the essence. Please direct any questions or informational requests to me at the contact information provided below.

Sincerely,

Elizabeth Kennett

Elizabeth L. Kennett
Environmental Program Manager
DHS U.S. Immigration and Customs Enforcement
500 12th Street SW, Stop 5704
Washington, DC 20536
Office: (202) 732-6649
elizabeth.l.kennett@ice.dhs.gov

Enclosures:    **Attachment 1** – USFWS Trust Resource List
               **Attachment 2** – Texas Parks and Wildlife Endangered Species Report
               **Figure 1** – Vicinity Map
               **Figure 2** – Site Overview
               **Figure 3** – Critical Habitat Map

UAC00855

Figure 1: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Vicinity Map



Legend

Approximate Site Boundary and Fence Line

Approximate Proposed Construction Limits

10479 ft

Appendix B - 26

UAC00856

**Figure 2: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Site Overview**



Figure 3: ICE Project: Dilley, TX (1925 West Highway 85, 78017) – Critical Habitat Map



Figure generated from the USFWS Critical Habitat Mapper with all "Live Maps" selected. The site boundary was drawn with the Critical Habitat Mapper "draw" tool. This area is designated as the "Lower Frio" hydrologic area, as shown on the map.

© Copyright 2008 ESRI. All rights reserved. Printed on Mon Aug 11 2014 12:35:34 PM

UAC00857

Texas Parks & Wildlife Dept.
Annotated County Lists of Rare Species

Page 1 of 1

Last Revision: 5/25/2011 3:02:00 PM

# FRIO COUNTY

| BIRDS | | Federal Status | State Status |
|---|---|---|---|
| **American Peregrine Falcon** | *Falco peregrinus anatum* | DL | T |

year-round resident and local breeder in west Texas, nests in tall cliff eyries; also, migrant across state from more northern breeding areas in US and Canada, winters along coast and farther south; occupies wide range of habitats during migration, including urban, concentrations along coast and barrier islands; low-altitude migrant, stopovers at leading landscape edges such as lake shores, coastlines, and barrier islands.

| **Arctic Peregrine Falcon** | *Falco peregrinus tundrius* | DL | |
|---|---|---|---|

migrant throughout state from subspecies' far northern breeding range, winters along coast and farther south; occupies wide range of habitats during migration, including urban, concentrations along coast and barrier islands; low-altitude migrant, stopovers at leading landscape edges such as lake shores, coastlines, and barrier islands.

| **Baird's Sparrow** | *Ammodramus bairdii* | | |
|---|---|---|---|

shortgrass prairie with scattered low bushes and matted vegetation; mostly migratory in western half of State, though winters in Mexico and just across Rio Grande into Texas from Brewster through Hudspeth counties.

| **Mountain Plover** | *Charadrius montanus* | | |
|---|---|---|---|

breeding: nests on high plains or shortgrass prairie, on ground in shallow depression; nonbreeding: shortgrass plains and bare, dirt (plowed) fields; primarily insectivorous.

| **Peregrine Falcon** | *Falco peregrinus* | DL | T |
|---|---|---|---|

both subspecies migrate across the state from more northern breeding areas in US and Canada to winter along coast and farther south; subspecies (F. p. anatum) is also a resident breeder in west Texas; the two subspecies' listing statuses differ, F.p. tundrius is no longer listed in Texas; but because the subspecies are not easily distinguishable at a distance, reference is generally made only to the species level; see subspecies for habitat.

| **Sprague's Pipit** | *Anthus spragueii* | C | |
|---|---|---|---|

only in Texas during migration and winter, mid September to early April; short to medium distance, diurnal migrant; strongly tied to native upland prairie, can be locally common in coastal grasslands, uncommon to rare further west; sensitive to patch size and avoids edges.

| **Western Burrowing Owl** | *Athene cunicularia hypugaea* | | |
|---|---|---|---|

open grasslands, especially prairie, plains, and savanna, sometimes in open areas such as vacant lots near human habitation or airports; nests and roosts in abandoned burrows

UAC00858

Texas Parks & Wildlife Dept.                                                    Page 1 of 1
Annotated County Lists of Rare Species

# MAMMALS

|  |  | Federal Status | State Status |
|---|---|---|---|
| **Black bear** | *Ursus americanus* | T/SA;NL | T |

bottomland hardwoods and large tracts of inaccessible forested areas; due to field characteristics similar to Louisiana Black Bear (LT, T), treat all east Texas black bears as federal and state listed Threatened.

**Cave myotis bat**          *Myotis velifer*

colonial and cave-dwelling; also roosts in rock crevices, old buildings, carports, under bridges, and even in abandoned Cliff Swallow (Hirundo pyrrhonota) nests; roosts in clusters of up to thousands of individuals; hibernates in limestone caves of Edwards Plateau and gypsum cave of Panhandle during winter; opportunistic insectivore.

**Frio pocket gopher**          *Geomys texensis bakeri*

associated with nearly level Atco soil, which is well-drained and consists of sandy surface layers with loam extending to as deep as two meters.

**Ghost-faced bat**          *Mormoops megalophylla*

colonially roosts in caves, crevices, abandoned mines, and buildings; insectivorous; breeds late winter-early spring; single offspring born per year.

| **Gray wolf** | *Canis lupus* | LE | E |

extirpated; formerly known throughout the western two-thirds of the state in forests, brushlands, or grasslands.

| **Ocelot** | *Leopardus pardalis* | LE | E |

dense chaparral thickets; mesquite-thorn scrub and live oak mottes; avoids open areas; breeds and raises young June-November.

**Plains spotted skunk**          *Spilogale putorius interrupta*

catholic; open fields, prairies, croplands, fence rows, farmyards, forest edges, and woodlands; prefers wooded, brushy areas and tallgrass prairie.

| **Red wolf** | *Canis rufus* | LE | E |

extirpated; formerly known throughout eastern half of Texas in brushy and forested areas, as well as coastal prairies.

UAC00859

Texas Parks & Wildlife Dept.                                                                                      Page 1 of 1
Annotated County Lists of Rare Species

| | **REPTILES** | Federal Status | State Status |
|---|---|---|---|
| **Reticulate collared lizard** | *Crotaphytus reticulatus* | | T |

requires open brush-grasslands; thorn-scrub vegetation, usually on well-drained rolling terrain of shallow gravel, caliche, or sandy soils; often on scattered flat rocks below escarpments or isolated rock outcrops among scattered clumps of prickly pear and mesquite.

**Spot-tailed earless lizard**     *Holbrookia lacerata*

central and southern Texas and adjacent Mexico; moderately open prairie-brushland; fairly flat areas free of vegetation or other obstructions, including disturbed areas; eats small invertebrates; eggs laid underground.

**Texas horned lizard**     *Phrynosoma cornutum*     T

open, arid and semi-arid regions with sparse vegetation, including grass, cactus, scattered brush or scrubby trees; soil may vary in texture from sandy to rocky; burrows into soil, enters rodent burrows, or hides under rock when inactive; breeds March-September.

**Texas indigo snake**     *Drymarchon melanurus erebennus*     T

Texas south of the Guadalupe River and Balcones Escarpment; thornbush-chaparral woodlands of south Texas, in particular dense riparian corridors; can do well in suburban and irrigated croplands if not molested or indirectly poisoned; requires moist microhabitats, such as rodent burrows, for shelter.

**Texas tortoise**     *Gopherus berlandieri*     T

open brush with a grass understory is preferred; open grass and bare ground are avoided; when inactive occupies shallow depressions at base of bush or cactus, sometimes in underground burrows or under objects; longevity greater than 50 years; active March-November; breeds April-November.

| | **PLANTS** | Federal Status | State Status |
|---|---|---|---|
| **Elmendorf's onion** | *Allium elmendorfii* | | |

Texas endemic; grassland openings in oak woodlands on deep, loose, well-drained sands; in Coastal Bend, on Pleistocene barrier island ridges and Holocene Sand Sheet that support live oak woodlands; to the north it occurs in post oak-black hickory-live oak woodlands over Queen City and similar Eocene formations; one anomalous specimen found on Llano Uplift in wet pockets of granitic loam; flowering March-April, May.

**Sandhill woollywhite**     *Hymenopappus carrizoanus*

Texas endemic; disturbed or open areas in grasslands and post oak woodlands on deep sands derived from the Carrizo Sand and similar Eocene formations; flowering April-June.

 U.S. Fish and Wildlife Service

# Trust Resources List

This resource list is to be used for planning purposes only — it is not an official species list.

**Endangered Species Act species list information for your project is available online and listed below for the following FWS Field Offices:**

**Corpus Christi Ecological Services Field Office**
U.S. FISH AND WILDLIFE SERVICES, C/O TAMU-CC
6300 OCEAN DRIVE, #5837
CORPUS CHRISTI, TX 78412
(361) 994-9005
http://www.fws.gov/southwest/es/CorpusChristiTexas/
http://www.fws.gov/southwest/es/ES_Lists_Main2.html

## *Project Name:*

Dilley, TX

 U.S. Fish and Wildlife Service

# Trust Resources List

## *Project Location Map:*



## *Project Counties:*
Frio, TX

## *Geographic coordinates (Open Geospatial Consortium Well-Known Text, NAD83):*
MULTIPOLYGON (((-99.2050907 28.6542656, -99.202857 28.6617991, -99.1978359 28.6633806, -99.1970634 28.6590877, -99.1985225 28.6543051, -99.2050907 28.6542656)))

## *Project Type:*
Development

 U.S. Fish and Wildlife Service

# Trust Resources List

## *Endangered Species Act Species List (USFWS Endangered Species Program).*

There are a total of **6** threatened, endangered, or candidate species on your species list. Species on this list should be considered in an effects analysis for your project and could include species that exist in another geographic area. For example, certain fishes may appear on the species list because a project could cause downstream effects on the species. Note that **3** of these species should be considered only under certain conditions. See the second table below for a list of these species and the conditions under which effects should be considered. Critical habitats listed under the **Has Critical Habitat** column may or may not lie within your project area. See the **Critical habitats within your project area** section below for critical habitat that lies within your project area. Please contact the designated FWS office if you have questions.

**Species that should be considered in an effects analysis for your project:**

| Birds | Status | | Has Critical Habitat | Contact |
|---|---|---|---|---|
| Sprague's Pipit<br>(*Anthus spragueii*) | Candidate | species info | | Corpus Christi Ecological Services Field Office |
| **Mammals** | | | | |
| Gulf Coast jaguarundi<br>(*Herpailurus (=felis) yagouaroundi cacomitli*)<br>    Population: U.S.A.(TX),Mexico | Endangered | species info | | Corpus Christi Ecological Services Field Office |
| ocelot<br>(*Leopardus (=felis) pardalis*)<br>    Population: U.S.A.(AZ, TX) to Central and South America | Endangered | species info | | Corpus Christi Ecological Services Field Office |

**Species that should be considered in an effects analysis for your project under specified conditions:**

| Birds | | | | | |
|---|---|---|---|---|---|
| Least tern (*Sterna antillarum*)<br>    Population: interior pop. | Endangered | species info | condition info | | Corpus Christi Ecological Services Field Office |
| Piping Plover<br>(*Charadrius melodus*)<br>    Population: except Great Lakes watershed | Threatened | species info | condition info | Final designated critical habitat Final designated critical habitat | Corpus Christi Ecological Services Field Office |

 U.S. Fish and Wildlife Service

# Trust Resources List

| Red Knot (*Calidris canutus*) | Proposed Threatened | species info | condition info | | Corpus Christi Ecological Services Field Office |
|---|---|---|---|---|---|

**Critical habitats within your project area:**

*There are no critical habitats within your project area.*

## *FWS National Wildlife Refuges (USFWS National Wildlife Refuges Program).*

*There are no refuges found within the vicinity of your project.*

## *FWS Migratory Birds (USFWS Migratory Bird Program).*

The protection of birds is regulated by the Migratory Bird Treaty Act (MBTA) and the Bald and Golden Eagle Protection Act (BGEPA). Any activity, intentional or unintentional, resulting in take of migratory birds, including eagles, is prohibited unless otherwise permitted by the U.S. Fish and Wildlife Service (50 C.F.R. Sec. 10.12 and 16 U.S.C. Sec. 668(a)). The MBTA has no provision for allowing take of migratory birds that may be unintentionally killed or injured by otherwise lawful activities. For more information regarding these Acts see http://www.fws.gov/migratorybirds/RegulationsandPolicies.html.

All project proponents are responsible for complying with the appropriate regulations protecting  birds when planning and developing a project. To meet these conservation obligations,  proponents should identify potential or existing project-related impacts to migratory birds and  their habitat and develop and implement conservation measures that avoid, minimize, or  compensate for these impacts. The Service's Birds of Conservation Concern (2008) report  identifies species, subspecies, and populations of all migratory nongame birds that, without additional conservation actions, are likely to become listed under the Endangered Species Act as  amended (16 U.S.C 1531 et seq.).

For information about Birds of Conservation Concern, go to http://www.fws.gov/migratorybirds/CurrentBirdIssues/Management/BCC.html.

### Migratory birds of concern that may be affected by your project:

There are 15 birds on your Migratory birds of concern list. The Division of Migratory Bird Management is in the process of populating migratory bird data with an estimated completion date of August 1, 2014;  therefore, the list below may not include all the migratory birds of concern in your project area at this time.  While this information is being populated, please contact the Field Office for information about migratory birds in your project area.

 U.S. Fish and Wildlife Service

# Trust Resources List

| Species Name | Bird of Conservation Concern (BCC) | Species Profile | Seasonal Occurrence in Project Area |
|---|---|---|---|
| Audubon's Oriole (*Icterus graduacauda*) | Yes | species info | Year-round |
| Bald eagle (*Haliaeetus leucocephalus*) | Yes | species info | Wintering |
| Bell's Vireo (*Vireo bellii*) | Yes | species info | Breeding |
| Burrowing Owl (*Athene cunicularia*) | Yes | species info | Wintering |
| Cassin's Sparrow (*Aimophila cassinii*) | Yes | species info | Year-round |
| Chestnut-collared Longspur (*Calcarius ornatus*) | Yes | species info | Wintering |
| Curve-billed Thrasher (*Toxostoma curvirostre*) | Yes | species info | Year-round |
| Harris's Hawk (*parabuteo unicinctus*) | Yes | species info | Year-round |
| Harris's Sparrow (*Zonotrichia querula*) | Yes | species info | Wintering |
| Hooded Oriole (*Icterus cucullatus*) | Yes | species info | Breeding |
| Lark Bunting (*Calamospiza melanocorys*) | Yes | species info | Wintering |
| Least Bittern (*Ixobrychus exilis*) | Yes | species info | Breeding |
| Lesser Yellowlegs (*Tringa flavipes*) | Yes | species info | Wintering |
| Summer tanager (*piranga rubra*) | Yes | species info | Breeding |
| Verdin (*Auriparus flaviceps*) | Yes | species info | Year-round |

 U.S. Fish and Wildlife Service

# Trust Resources List

## *NWI Wetlands (USFWS National Wetlands Inventory).*

The U.S. Fish and Wildlife Service is the principal Federal agency that provides information on the extent and status of wetlands in the U.S., via the National Wetlands Inventory Program (NWI). In addition to impacts to wetlands within your immediate project area, wetlands outside of your project area may need to be considered in any evaluation of project impacts, due to the hydrologic nature of wetlands (for example, project activities may affect local hydrology within, and outside of, your immediate project area). It may be helpful to refer to the USFWS National Wetland Inventory website. The designated FWS office can also assist you. Impacts to wetlands and other aquatic habitats from your project may be subject to regulation under Section 404 of the Clean Water Act, or other State/Federal Statutes. Project Proponents should discuss the relationship of these requirements to their project with the Regulatory Program of the appropriate U.S. Army Corps of Engineers District.

### Data Limitations, Exclusions and Precautions
The Service's objective of mapping wetlands and deepwater habitats is to produce reconnaissance level information on the location, type and size of these resources. The maps are prepared from the analysis of high altitude imagery. Wetlands are identified based on vegetation, visible hydrology and geography. A margin of error is inherent in the use of imagery; thus, detailed on-the-ground inspection of any particular site may result in revision of the wetland boundaries or classification established through image analysis.

The accuracy of image interpretation depends on the quality of the imagery, the experience of the image analysts, the amount and quality of the collateral data and the amount of ground truth verification work conducted. Metadata should be consulted to determine the date of the source imagery used and any mapping problems.

Wetlands or other mapped features may have changed since the date of the imagery and/or field work. There may be occasional differences in polygon boundaries or classifications between the information depicted on the map and the actual conditions on site.

**Exclusions** - Certain wetland habitats are excluded from the National mapping program because of the limitations of aerial imagery as the primary data source used to detect wetlands. These habitats include seagrasses or submerged aquatic vegetation that are found in the intertidal and subtidal zones of estuaries and nearshore coastal waters. Some deepwater reef communities (coral or tuberficid worm reefs) have also been excluded from the inventory. These habitats, because of their depth, go undetected by aerial imagery.

**Precautions** - Federal, state, and local regulatory agencies with jurisdiction over wetlands may define and describe wetlands in a different manner than that used in this inventory. There is no attempt, in either the design or products of this inventory, to define the limits of proprietary jurisdiction of any Federal, state, or local government or to establish the geographical scope of the regulatory programs of government agencies. Persons intending to engage in activities involving modifications within or adjacent to wetland areas should seek the

 U.S. Fish and Wildlife Service

# Trust Resources List

advice of appropriate federal, state, or local agencies concerning specified agency regulatory programs and proprietary jurisdictions that may affect such activities.

*IPaC is unable to display wetland information at this time.*



U.S. Department of Homeland Security
500 12th Street S.W.
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

August 22, 2014

RE:      **Preparation of a Supplemental Environmental Assessment (SEA) for United
States (U.S.) Immigration and Customs Enforcement (ICE) in Frio County,
Dilley, Texas**

Russell Hooten
Wildlife Habitat Assessment Program
TPWD-Wildlife Division
6300 Ocean Drive, NRC 2501
Unit 5846
Corpus Christi, TX  78412
Office: (361) 825-3240
russell.hooten@tpwd.texas.gov

Dear Mr. Hooten,

United States (U.S.) Immigration and Customs Enforcement (ICE) is the principal investigative
arm of the Department of Homeland Security (DHS) and the second largest investigative agency
in the Federal Government. ICE's primary mission is to promote homeland security and public
safety through criminal and civil enforcement of federal laws governing border control, customs,
trade, and immigration. ICE determines the legal immigration status of individuals believed to be
illegally present in the interior of the United States through the immigration courts and removes
those who are determined to either be inadmissible or in violation with U.S. law. The Justice
Department's Executive Office for Immigration Review conducts the immigration proceedings
for both unaccompanied alien children and family units, in accordance with the requirements of
Section 240 of the Immigration and Nationality Act. Unaccompanied alien children are in the
custody of a sponsor until disposition of their cases, and family units stay together in Family
Residential Centers until disposition of their cases. The full range of facility, services, and case
management requirements for the ICE mission of enforcement and removal includes, but is not
limited to, the following: providing office space, bed space, courtrooms, space for services such
as medical exams, recreation, and religious services, attorney-client meetings, processing space,
and transportation.

The June 2, 2014 Presidential Memorandum "Response to the Influx of Unaccompanied Alien
Children Across the Southwest Border" described the influx as an "urgent humanitarian situation
requiring a unified and coordinated Federal response." The unprecedented increase in the
number of apprehended persons has the potential to fill or exceed the capacity of the DHS
supporting infrastructure (real property for processing and housing apprehended persons,