1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAWRENCE VANDYKE
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

BARCLAY T. SAMFORD
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Telephone:   (303) 844-1475
Facsimile:    (303) 844-1350
Clay.Samford@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

| | |
|---|---|
| WHITEWATER DRAW NATURAL RESOURCE CONSERVATION DISTRICT, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN K. MCALEENAN,[1] *et al.* <br><br> Federal Defendants. | **Case No. 3:16-cv-2583** <br><br> **DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** <br><br> Date: Filed Pursuant to Briefing Schedule, ECF No. 68. <br><br> No oral argument unless requested by the Court <br><br> Hon. M. James Lorenz |

---

[1]  Under Fed. R. Civ. P. 25(d), Acting Secretary Kevin K. McAleenan is substituted for former Secretary Kirstjen M. Nielsen.

Case No. 3:16-cv-2583

## INTRODUCTION

Defendants are entitled to summary judgment.  Plaintiffs lack standing because they fail to demonstrate that that any of the six discrete agency actions actually before the Court is the cause of their alleged injuries. And assuming standing, DHS properly complied with NEPA when it made the six decisions at issue.

## ARGUMENT

### I.      Plaintiffs Lack Standing

As set forth in Defendants' opening brief, Plaintiffs lack standing because they fail to demonstrate that their broad claims of population-growth based injuries are "fairly traceable" to the six decisions before the Court. Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Br.") at 9-14.

In their reply, Plaintiffs suggest that they carry a lesser burden to establish standing because they bring "procedural" claims under NEPA. Pls.' Reply at 10. The fact that Plaintiffs' claims are procedural, however, does not absolve them of the burden of identifying a concrete and particularized injury that is "fairly traceable" to the government decisions they challenge: "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). As the Ninth Circuit has emphasized, a "procedural injury, standing on its own, cannot serve as an injury-in-fact." *Wilderness Soc'y v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010). Instead, a "concrete and particular project must be connected to the procedural loss." *Id., see also id.* at 1257 ("The lack of any linkage between the project and the claimed injury undermines the effort to establish standing").

Plaintiffs' failure to link the decisions before the Court to their allegations of injury is fatal to their claim to standing, and Plaintiffs' Reply does nothing to redress this deficiency. Plaintiffs claim they have demonstrated "ongoing population growth is caused primarily by Defendant's immigration related actions," and harms "directly

1                                                                    Case No. 3:16-cv-2583

1 traceable to population growth." Pls.' Reply at 11. But DHS's "immigration related

2 actions" are not before the Court. Plaintiffs' obligation is to show population growth and

3 injury to their interests is "fairly traceable" *to the six decisions actually before the Court*.

4 *Wilderness Soc'y v. Rey*, 622 F.3d at 1260 (injury must be traceable to a "concrete and

5 particular project"). This, they have not done.

6        Moreover, because the six challenged actions do not directly relate to permanent

7 immigration—they concern temporary work or study or temporary housing pending

8 immigration proceedings—Plaintiffs' claims that they will lead to population growth

9 requires speculation about the decisions of independent third parties; for example,

10 whether visiting students will seek to stay in the U.S. permanently and whether they will

11 be allowed to do so. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (An injury

12 "has to be 'fairly … trace[able] to the challenged action of the defendant, and not . . .

13 th[e] result [of] the independent action of some third party not before the court."). In such

14 cases, where the challenged government action is alleged to have "caused injury by

15 influencing the conduct of third parties," Plaintiffs face a heightened burden of producing

16 "more particular facts" demonstrating the acts challenged are the cause of their injury.

17 *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014). Plaintiffs' continued reliance of

18 the alleged effects of U.S. immigration policies as a whole and across decades, *see* Pls.'

19 Reply at 11, fails to carry that burden.

20        In short, Plaintiffs' Reply does not rehabilitate their claim to standing, and the

21 Court should dismiss Plaintiffs' complaint.

22 **II.    Plaintiffs' Facial Challenge to CATEX A3 is Untimely**

23        Plaintiffs concede that DHS issued CATEX A3 in 2006, but assert that their

24 challenge to the category is not untimely because CATEX A3 was also included in the

25 2014 revision of DHS's NEPA guidance. Pls.' Reply at 2. But the re-issuance of a prior

26 provision does not "reopen" the statute of limitations period unless "the entire context" of

27 the process "demonstrates that the agency has undertaken a serious, substantive

28

2                                                        Case No. 3:16-cv-2583

1    reconsideration" of the prior provision. *P&V Enters. v. U.S. Army Corps of Eng'rs*, 516

2    F.3d 1021, 1024 (D.C. Cir. 2008) (quotation marks and citations omitted). Here, while

3    DHS did revise its NEPA procedures in 2014, there is no evidence the agency undertook

4    a serious reconsideration of CATEX A3 at that time. DHS's 2014 public notice advises

5    only that the "CATEXs published in 2006 are being retained," and no party submitted

6    comments suggesting DHS should reconsider or revise CATEX A3. DIR0002. Because

7    DHS's 2014 NEPA guidance simply carried forward the category from 2006 without

8    serious reconsideration, it did not reopen the statute of limitations for challenges to the

9    category, and Plaintiffs' facial challenge to CATEX A3 is untimely.

10

11   **III.    Plaintiffs Waived their Challenges to CATEX A3 and the DSO Rule by
            Failing to Raise their Concerns in the Public Comment Process**

12           Plaintiffs do not deny that they failed to submit public comments on CATEX A3 or

13   the DSO Rule. Instead they claim their failure should not result in waiver of their claims

14   because the Ninth Circuit recognizes an exception to the obligation to present an issue

15   during the administrative process when the issue is "so obvious" that there is no need for

16   a commentator to point it out to the agency. Pls.' Reply at 2 (citing *'Ilio'ulaokalani Coal.*

17   *v. Rumsfeld*, 464 F.3d 1083, 1091-92 (9th Cir. 2006). The bar for invoking the "so

18   obvious" exception is high, requiring the record to show that the agency had

19   "independent knowledge of the very issue that concerns Plaintiffs in this case."

20   *'Ilio'ulaokalani Coal.*, 464 F.3d at 1091-92. Here there is no evidence that DHS had

21   "independent knowledge" of Plaintiffs' concerns that the DSO Rule or CATEX A3

22   would contribute to significant population increases. Indeed, any connection between

23   these actions—which do not concern permanent immigration—and overall population

24   growth is sufficiently attenuated that Plaintiffs' argument that DHS should consider their

25   impacts on U.S. population is far from obvious, and Plaintiffs' failure to raise the issue in

26   the public comment period should not be excused.

27

28

     3                                                      Case No. 3:16-cv-2583

1   **III.   CATEX A3 is Not Arbitrary or Capricious**

2       Plaintiffs reiterate their allegations that CATEX A3 is based on an inadequate

3   record, overly-broad, and should have been issued only after a "scoping" process. Pls.'

4   Reply at 6-9. None of these arguments is persuasive.

5       **CATEX A3 is Properly Developed and Documented.**  As explained in

6   Defendants' opening brief, CATEX A3 was developed—in a process explicitly

7   encouraged by CEQ—by a panel of experts who reviewed and compared long-standing

8   categories used by other agencies. *See* Defs.' Br. at 20. The panel found that the activities

9   covered in CATEX A3 were indistinguishable from the activities covered by numerous

10  similar categorical exclusions used by other federal agencies. Supp. Appx at 8. [2]

11  Plaintiffs fault this record, claiming DHS failed to include input from any agency

12  concerned with "*the administration/regulation of immigration laws.*" Pls.' Reply at 4.[3]

13  To the contrary, the record makes clear that the panel included the Immigration and

14  Naturalization Service, which, prior to formation of the DHS, was the agency with

15  primary authority over implementation of immigration law. Supp. Appx at 1.[4]

16  _____

17  [2]  The administrative record for DHS's 2006 NEPA procedures is available at:
    https://www.dhs.gov/publication/national-environmental-policy-act-nepa (last visited

18  July 11, 2019). A Supplemental Appendix containing those record materials cited in this
    brief and not previously cited is attached.

19

20  [3]  Plaintiffs claim the record for the issuance of CATEX A3 "reveals that CATEX A3 is
    the *only* invocation of NEPA that DHS has *ever* utilized in connection with its actions

21  administering/ regulating the entrance and settlement of foreign nationals into the United
    States." Pls.' Reply at 4. The record "reveals" no such thing. The record of development

22  of CATEX A3 is exactly that – a record for *development* of the category; it does not
    purport to, nor should it, constitute the record of how DHS has complied with NEPA in

23  all actions related to immigration. And, except for the discrete actions before the Court,
    DHS's compliance with NEPA for other actions is outside the scope of this litigation.

24
    [4]  Plaintiffs object that while the administrative record lodged with the Court contained

25  the record for DHS's 2014 revision of its NEPA procedures, the record underlying the
    promulgation of CATEX A3 in 2006 was not filed until Defendants' Opening Brief. Pls.'

26
    Reply at 3. The 2006 record, however, has been publicly available on DHS's website for

27

28
    4                                              Case No. 3:16-cv-2583

1   **CATEX A3 is Properly Defined.**  Plaintiffs reiterate their claim that CATEX A3

2   must be invalidated because it is impermissibly broad and vague, allowing coverage of

3   "[l]iterally anything done or promulgated by DHS." Pls.' Reply at 6. As Defendants have

4   noted, CATEX A3 follows the CEQ's instruction to identify "broadly defined criteria

5   which characterize types of actions" that normally do not have significant environmental

6   effects, and is properly limited—in the two subsections challenged by Plaintiffs—to

7   actions that normally do not have environmental effect because they are "strictly

8   administrative or procedural" (A3(a)), and to actions that "interpret or amend an existing

9   regulation without changing its environmental effect" (A3(d)). *See* Defs.' Br. at 17.

10   Plaintiffs' fear that CATEX A3 could be used to "evade" NEPA and cover actions

11   with significant environmental effects misses the mark both legally and factually. As a

12   legal matter, the fact that it is possible to imagine improper applications of the category

13   does not provide legal grounds for finding it facially invalid. *See Babbitt v. Sweet Home*,

14   515 U.S. 687, 709 (1995); *Reno v. Flores*, 507 U.S. 292, 301 (1993)*.* Factually, Plaintiffs

15   ignore that the category is limited on its face to actions without environmental effects,

16   that it can be applied only after a determination that extraordinary circumstances

17   indicating significant effects are not present (*see* DIR00330-32), and that if DHS

18   improperly applies CATEX A3 to an action that may have significant environmental

19   impacts, that decision is subject to challenge and judicial review.

20   **Scoping.**  DHS was not required to conduct a "scoping" process prior to issuing

21   CATEX A3. *See* Defs.' Br. at 18-20. In their reply, Plaintiffs acknowledge that the Ninth

22   Circuit's decision in *Sierra Club v. Bosworth* regarding the Forest Service's obligation to

23   conduct scoping for categorical exclusions rests on Forest Service NEPA procedures not

24   applicable here. Pls.' Reply at 8-9. Instead, Plaintiffs shift focus and claim that scoping is

25

26

27   over a decade, and Plaintiffs allege no prejudice from the timing of its submission. *See* 5
     U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error").

28

required by both CEQ and DHS NEPA procedures. This claim badly misconstrues both agencies' NEPA procedures.

For example, in support of their claim that the CEQ requires scoping for categorical exclusions, Plaintiffs truncate the CEQ "scoping" regulation, 40 C.F.R. § 1501.7, to remove the timing provision that makes clear scoping occurs after the "decision to prepare an environmental impact statement." *Comp.* Pls.' Reply at 8 *with* 40 C.F.R. § 1501.7. Similarly, Plaintiffs misleadingly focus on DHS's inclusion of the word "scoping" in a broad description of the "NEPA process," in support of a claim that DHS's guidance mandates scoping for all NEPA procedures, while ignoring the fact that DHS's directives are explicit that scoping is only "required" for preparation of environmental impact statements (EISs), and only "strongly encouraged" for environmental assessments (EAs). DIR00195. There is no obligation in DHS's NEPA guidance requiring scoping for promulgation of categorical exclusions. *See also* DIR0329 (DHS NEPA flowchart showing scoping only for EISs). Because scoping is not required prior to the issuance of a categorical exclusion by law or by either CEQ or DHS procedures, it should not be imposed here.[5]

**Defendants Have Responded Consistently to Counts I and III.** Plaintiffs assert that Defendants are estopped from arguing that CATEX A3 is not arbitrary or capricious because Defendants previously argued—and the Court agreed—that DHS's NEPA Instruction Manual, which includes CATEX A3 in an appendix, was not a reviewable final agency action. Pls.' Reply at 16-17. Defendants' treatment of Counts I and III is not inconsistent.

Count I challenged DHS's Instruction Manual as a whole. *See* ECF No. 44, ¶¶ 92-

---

[5] To the extent Plaintiffs also claim DHS was required to conduct "scoping" when applying CATEX A3 to specific decisions, that claim fails for the reasons set forth above—scoping when applying a categorical exclusion is not required by CEQ or DHS procedures—and for the reasons in Defendants' opening brief. *See* Defs.' Br. at 23-24.

6                                                                 Case No. 3:16-cv-2583

102. The Court properly dismissed Count I, because the Manual is "a 'decision-making tool' to be used 'prior to making decisions'" rather than a reviewable final agency action. *See* ECF No. 55 at 5. Defendants did not include Plaintiffs' facial challenge to CATEX A3 (Count III) in their partial motion to dismiss, because Courts have treated the promulgation of categorical exclusions as reviewable final agency actions. *See Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007), *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732 (10th Cir. 2006). Instead, Defendants have moved for summary judgment on Count III because the record makes plain that CATEX A3 was properly promulgated. Plaintiffs' insistence that CATEX A3 is not a reviewable action because DHS's categorical exclusions are included in an Appendix to the Manual, *see* DIR00355, elevates form over substance by focusing on the document in which an agency action is published rather than the decision itself. More fatally, if Plaintiffs are correct that the list of categorical exclusions is inseparable from the rest of the Manual, then Count III is subsumed by the broader challenge to the Manual (Count I) and should be dismissed on the same grounds as Count I was.[6] ECF No. 55.

Defendants are entitled to summary judgment on Count III.

## IV.   DHS Properly Applied CATEX A3 to the Four Rules at Issue

In their Reply, Plaintiffs' only challenge to DHS's application of CATEX A3 to the four rules at issue is to claim that the record contains no evidence "*of even minimal analysis of 'impacts to the human environment.'*" Pls.' Reply at 2.[7] To the contrary, the record shows that, as required when applying a categorical exclusion, DHS documented that each rule fits within the category invoked and that no extraordinary circumstances

---

[6] Plaintiffs' claim that CATEX A3 and rest of the Manual are inseparable is belied by their own decision to challenge CATEX A3 separately from the rest of the Manual.
[7] Plaintiffs appear to have abandoned their claims that: (1) DHS was required to conduct a cumulative effects analysis; (2) DHS was required to conduct NEPA review of the underlying rules being amended; and (3) use of the CATEX was prohibited because the rules are a piece of a larger action. *See* Defs.' Br. at 24-26.

7                                                    Case No. 3:16-cv-2583

1   are present precluding use of the category. *See* DSO00017, STEM00132, IER00075, 88,

2   and AC21000218-19. With regard to the sole issue raised by Plaintiffs, the record makes

3   clear the rules will not directly cause a significant increase permanent U.S. population.

4   The DSO Rule applies only to visiting students and their families and to individuals who

5   are already citizens or permanent residents. Defs.' Br. at 27. The STEM Rule similarly

6   affects only a small group of visiting students. *Id.* at 29. The AC21 Rule primarily affects

7   a population of individuals already in the country. *Id.* at 30. And the Entrepreneur Rule is

8   likely to affect fewer than 3,000 individuals, an insignificant number in the context of the

9   permanent population of the U.S. *Id.* at 31. These conclusions are reasonable, supported

10  by the record, and wholly ignored by Plaintiffs.

11          Moreover, because the Rules do not directly affect population (and Plaintiffs make

12  no argument to the contrary), Plaintiffs' claim that the Rules will have significant

13  population effects rests on the theory that they will indirectly cause growth by inducing

14  participants in the affected programs to settle permanently in the U.S. either by

15  requesting and receiving permanent residence status or by remaining illegally. *See* Defs.'

16  Br. at 28. As noted in Defendants' opening brief, and unrebutted by Plaintiffs, this chain

17  of causation includes independent decisions of numerous individuals—including visiting

18  students and workers and immigration officials—and is well outside the scope of NEPA,

19  which does not obligate an agency to devote time to the speculative analysis of potential

20  environmental impacts that do not have a "reasonably close causal relationship" to the

21  proposed action. *Id.* (quoting *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163

22  (9th Cir. 1998)); *Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 767 (2004) (same).

23          In sum, DHS properly concluded the challenged Rules fell within CATEX A3, and

24  Defendants are entitled to summary judgment on Count IV.

25
    **V.    DHS Complied with NEPA in Addressing an Increased Influx of**
26  **       Unaccompanied Children and Families Across the Southern Border**

27

28
    8                                                        Case No. 3:16-cv-2583

1    Defendants previously explained that DHS's EA for a temporary housing facility

2  properly disclosed that the facility would not have a significant direct effect on

3  population, since it was built in *response* to an increase in children and families crossing

4  the border. Defs.' Br. at 33. Defendants also explained that Plaintiffs' implicit argument

5  that the facility would indirectly affect population by somehow inducing more people to

6  cross the border and somehow leading to more of those individuals being allowed to stay

7  permanently, relied on speculative impacts outside the ambit of "indirect effects"

8  required to be addressed under NEPA. *See id.* at 34.

9    In reply, Plaintiffs make no attempt to dispute these conclusions, and instead

10  proffer a new argument that the EA is deficient because the "border crisis" was "induced"

11  by DHS's "own asylum policies" and DHS should have considered "more aggressive

12  steps to *end* the border crisis rather than allow it." Pls.' Reply at 16. This Court need not

13  consider arguments raised for the first time in a reply brief. *Zamani v. Carnes*, 491 F.3d

14  990, 997 (9th Cir. 2007). To the extent it does so, Plaintiffs' attempt to parlay DHS's

15  NEPA analysis for a single small construction project into an obligation to conduct

16  wholesale reevaluation of American "asylum policy" must be rejected.

17    The purpose and need for DHS's site-specific EA analyzing construction of a

18  temporary housing facility, and the purpose and need for the Programmatic EA to which

19  it tiers, were developed in response to a 2014 Presidential Memorandum directing federal

20  agencies to respond to an influx of unaccompanied children through, in part, expedited

21  and coordinated provision of housing, transportation and medical treatment. *See*

22  UAC00523 (Presidential Memorandum), UAC00534 (EA acknowledging purpose of

23  meeting directive of Presidential Memorandum). DHS's decision to focus its purpose and

24  need on the mandates of the 2014 Presidential Memorandum was appropriate. *See, e.g.,*

25  *Protect Our Cmtys. Found. v. Jewell,* 825 F.3d 571, 580 (9th Cir. 2016) (holding agency

26  properly drafted its purpose and need to meet executive policy of promoting solar

27  development on federal land); *see also League of Wilderness Defenders v. U.S. Forest*

28

9                                                    Case No. 3:16-cv-2583

1    *Serv.*, 689 F.3d 1060, 1071 (9th Cir. 2012) (agencies are entitled to "considerable

2    discretion" in defining purpose and need).

3            Having developed a reasonable purpose and need, DHS was not obligated to

4    consider alternatives that would not meet that purpose and need. *Westlands Water*

5    *Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) ("The range of

6    alternatives that must be considered in the EIS need not extend beyond those

7    reasonably related to the purposes of the project.") (citation and quotation omitted).

8    Here, Plaintiffs' proposed alternative of broadly rewriting United States "asylum

9    policy"—which is shaped by, among other things, treaty obligations, statutory

10   requirements, and judicial orders (*see* UAC00542)—is well beyond the EA's

11   purpose and need, and well beyond the requirements of NEPA. *See, e.g., Protect*

12   *Our Cmtys. Found.*, 825 F.3d at 580 (holding agency was not required to include an

13   alternative of distributed roof-top solar panels where Secretarial policy called for

14   promotion of large-scale solar development on federal land); *City of Angoon v.*

15   *Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) ("When the purpose is to accomplish

16   one thing, it makes no sense to consider the alternative ways by which another

17   thing might be achieved.").

18           DHS's EA for its 2014 proposal to build temporary housing in response to an

19   influx of families and children crossing the southwestern border is not arbitrary or

20   capricious, and the agency is entitled to summary judgment on Count V.

21                                   **CONCLUSION**

22           For the reasons set forth herein and in Defendants' opening brief, Defendants'

23   Cross-Motion for Summary Judgment should be granted.

24   July 11, 2019                          Respectfully Submitted,

25
                                           LAWRENCE VANDYKE
26                                         Deputy Assistant Attorney General

27
                                           */s/ Barclay T. Samford*
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARCLAY T. SAMFORD
Trial Attorney
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO  80202
Tel.:  (303) 844-1475
Fax:  (303) 844-1350
E-mail:  clay.samford@usdoj.gov

Attorneys for the Federal Defendants

11

Case No. 3:16-cv-2583