LAWRENCE VANDYKE
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

BARCLAY T. SAMFORD
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Telephone:   (303) 844-1475
Facsimile:    (303) 844-1350
Clay.Samford@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

| | |
|---|---|
| WHITEWATER DRAW NATURAL RESOURCE CONSERVATION DISTRICT, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>KEVIN K. MCALEENAN, *et al.*,<br><br>        Federal Defendants. | **Case No. 3:16-cv-2583**<br><br>**SUPPLEMENTAL APPENDIX OF ADMINISTRATIVE RECORD CITATIONS**<br><br>Hon. M. James Lorenz |

# TABLE OF CONTENTS

## Categorical Exclusion A3

2006 Administrative Record, https://www.dhs.gov/publication/national-environmental-policy-act-nepa, pages 1-11.

## ADMINISTRATIVE RECORD FOR CATEGORICAL EXCLUSIONS (CATEX)

The development of the U.S. Department of Homeland Security (DHS or Department) categorical exclusions was a concerted effort on the part of many DHS legal and environmental professionals.  Together, they represented twenty-four DHS components and two independent contractors procured to provide administrative support and expert recommendations to inform the government's efforts. The professionals on the panel (Panel) were environmental practitioners with numerous years of planning and compliance experience including the preparation of environmental documentation such as assessments, impact statements, findings of no significant impact, and records of decision.  The Panel also included several legal practitioners with advanced education and experience advising Federal agency managers on environmental planning and compliance responsibilities.  All of these professionals had significant experience in other DHS legacy and non-legacy agencies, thereby bringing a breadth and wealth of environmental experience and history about the Department as well as other agencies with whom we share similar environmental practices and interests.  The agencies and contractors that were represented on the Panel include:

• Department of Homeland Security, Office of the Secretary
• Customs and Border Protection Agricultural Inspectors (formerly part of Animal & Plant Health Inspection Service) (USDA, MD)
• Coast Guard (DOT, DC)
• Chemical Biological Radiological & Nuclear Response and Civilian Bio-defense Research Programs (CDC, GA)
• Chemical Biological Radiological & Nuclear Countermeasures Programs (Energy, DC)
• National BW Defense Analysis Center (DOD, MD)
• Critical Infrastructure Assurance Office (Commerce, DC)
• Customs Service (Treasury, DC)
• Environmental Measurements Laboratory (DOE, NY)
• Federal Computer Incident Response Center (GSA, DC)
• Federal Emergency Management Agency (FEMA, DC)
• Federal Law Enforcement Training Center (FLETC) (Treasury, GA)
• Federal Protective Service (GSA, DC)
• Lawrence Livermore National Laboratory (DOE/UnivCA, CA)
• Immigration & Naturalization Service (DOJ, DC)
• National Communications System (DC)
• National Domestic Preparedness Office (DOJ, DC)
• National Infrastructure Simulation & Analysis Center (LLNL/UnivCA, CA)
• National Infrastructure Protection Center (FBI, DC)
• Nuclear Incident Response Team (DOE, DC)
• Domestic Emergency Support Team (DC)
• Plum Island Animal Disease Center (USDA, NY)
• Secret Service (Treasury, DC)
• Transportation Security Administration (DOT, DC)

• Representatives from independent contractors, including: the Shipley Group (SLC, UT)and the Clark Group (DC)


Each proposed categorical exclusion was reviewed and deliberated in concept, coverage, applicability, and wording by the Panel.  The Panel cautiously crafted each exclusion with the goal of balancing increased administrative efficiency in National Environmental Policy Act (NEPA) compliance with avoidance of misinterpretations and misapplications of exclusionary language that could lead to non-compliance with NEPA requirements.  The Panel concurred that the attached categorical exclusions meet both objectives.

The Department spent extraordinary amounts of time and effort deliberating over and drafting these categorical exclusions.  Between April 9, 2003 and April 13, 2004, the Panel was involved in extensive debate on the categorical exclusions initially presented to the public.  During that process, numerous environmental professionals, representing the many component agencies within Department, participated in group meetings and conference calls approximately twice per week.  Members of that group concurred with the proposed form of each categorical exclusion by active participation in meetings and teleconferences, as well as by reviewing the numerous drafts of categorical exclusions developed from those calls and meetings, and by soliciting or providing their own suggested changes or corrections.  Following that process, the draft of the Department's environmental planning directive containing the categorical exclusions was published in the Federal Register on June 14, 2004 for public comment.  The comment period closed on July 14, 2004, but the Department reopened the comment period on July 16, 2004 for an additional 30 days.  The interested public provided more than 7,500 letters and e-mails during those two comment periods.  Detailed and thorough review of those comments yielded approximately seventy unique comments for consideration in the final draft of the directive and the final versions of the categorical exclusions.

The Department then worked in close cooperation with the President's Council on Environmental Quality to ensure that the directive and all categorical exclusions conformed to the requirements of NEPA.  The Department took great care to ensure that the categorical exclusions were supported by the administrative record.

All of the agencies that transitioned into the Department were previously performing various aspects of what is now the Nation's homeland security mission.  The Panel noted that many of them had performed, and now as DHS components, still perform similar types of administrative and operational activities.  For that reason, many of the Department's components will share in the application of the categorical exclusions that reflect similar functions and activities.  The operational activities that were unique to one or more DHS component are specifically limited to the pertinent component(s).

A summary of information collected and relied upon by the Panel and Department personnel in formulating and deciding the extent and limitations of the categorical exclusions is provided below.  The Department envisions

that this information will help interested parties to understand the basis
and rationale behind each categorical exclusion that is presented.  This
information is not meant to provide an exhaustive list of factors relied upon
during the two years of deliberation, but rather, to detail the bases upon
which each categorical exclusion was established.

This summary reflects changes in the organization of DHS as directed by the
Congress in the FY 2006 appropriations.

## CATEGORICAL EXCLUSIONS for ADMINISTRATIVE AND REGULATORY ACTIVITIES.  These CATEX must also be conducted in conformance with the Executive Orders on Greening the Government, e.g., EO 13101, 13123, 13148, 13149, and 13150.

**A1     Personnel, fiscal, management, and administrative activities, such as recruiting, processing, paying, recordkeeping, resource management, budgeting, personnel actions, and travel.**

The actions contemplated by this categorical exclusion are a variety of
internal administrative activities that inherently have no potential for
significant environmental impacts.  This categorical exclusion is supported
by long standing categorical exclusions brought to the Department by its
legacy components.  Further, the Panel, in their extensive deliberations and
discussions found that actions of a similar nature, scope, and intensity were
performed throughout the Department without significant environmental
impacts.

The Panel determined that this categorical exclusion would benefit from a
detailed description of the characteristics of activities envisioned.  The
descriptive items, "…recruiting, processing, paying, recordkeeping, resource
management, budgeting, personnel actions, and travel…," are intended to
define the nature of activities encompassed by this categorical exclusion.
They are neither presented to limit the categorical exclusion to those
activities nor to extend the categorical exclusion to actions involving
extraordinary circumstances that could result in the activity having
significant environmental effects.

The Panel also noted that numerous other agencies have categorical exclusions
for similar activities that are sufficiently descriptive of the activity as
to establish for the Panel that those activities were similar in nature,
scope, and impact on the human environment as those performed by Department.
In addition, the Panel recognized that all agencies, with very few
limitations, must meet the same requirements to protect the environment.  The
Panel determined from their experience in or on behalf of other agencies that
the characteristics of the activities in the Department were no different
than those performed by other agencies.  The Panel also determined that those
activities have negligible impacts on the human environment.

Accordingly, through a deliberative process, the Panel determined that the proposed categorical exclusion encompassed programmatic activities that inherently did not have individual or cumulative significant impact on the human environment.

LEGACY CATEGORICAL EXCLUSIONS AND COMPARABLE AGENCY CATEGORICAL EXCLUSIONS

**APHIS**
   *Reference: 7CFR372.5 (c)*
   *(1) Policy development, planning and implementation which relate to routine activities, such as personnel, organizational changes, or similar administrative functions*
   *(2) Activities which deal solely with the funding of programs, such as program budget proposals, disbursements, and transfer or reprogramming of funds;*

**FEMA**
   *Reference: 44CFR10.8 (d) (2)*
   *(i) Administrative actions such as personnel actions, travel, procurement of supplies, etc., in support of normal day-to-day activities and disaster related activities;*

**USCG**
   *Reference: Figure 2-1 Coast Guard Categorical Exclusions*
   *1. Administrative Actions: c. Routine personnel, fiscal, and administrative activities, actions, procedures, and policies which clearly do not have any environmental impacts, such as military and civilian personnel recruiting, processing, paying, and record keeping.*

**AIR FORCE**
   *Reference: Air Force Instruction, January 24, 1995*
   *A2.3.4. Normal personnel, fiscal or budgeting, and administrative activities and decisions including those involving military and civilian personnel (for example, recruiting, processing, paying, and records keeping).*

**ARMY**
   ***Reference: Department of the Army Categorical Exclusions, 32CFR651***
   *Appendix B*
       *(b) Administration/operation activities:*
       *(5) Normal personnel, fiscal, and administrative activities involving military and civilian personnel (recruiting, processing, paying, and records keeping).*

**INTERIOR**
   *Reference: Departmental Manual 516, Part 2, Appendix 1.*
   *1.1         Personnel actions and investigations and personnel services contracts.*
   *1.3         Routine financial transactions including such things as salaries and expenses, procurement contracts (in accordance with applicable procedures and Executive Orders for sustainable or green*

*procurement), guarantees, financial assistance, income transfers, audits, fees, bonds, and royalties.*
*1.7          Routine and continuing government business, including such things as supervision, administration, operations, maintenance, renovations, and replacement activities having limited context and intensity (e.g., limited size and magnitude or short-term effects).*
*1.8          Management, formulation, allocation, transfer, and reprogramming of the Department's budget at all levels. (This does not exclude the preparation of environmental documents for proposals included in the budget when otherwise required.)*

**A2     Reductions, realignments, or relocation of personnel that do not result in exceeding the infrastructure capacity or changing the use of space. An example of a substantial change in use of the supporting infrastructure would be an increase in vehicular traffic beyond the capacity of the supporting road network to accommodate such an increase.**

The Panel found that actions of a similar nature, scope, and intensity were performed throughout the Department.  Such actions include a variety of internal administrative activities, as well as activities that may involve the physical relocation of personnel and equipment.  The Panel determined that the administrative activities would inherently have no potential for significant environmental impacts.  However, the Panel was concerned that the physical relocations of personnel and equipment could involve a variety of associated activities, some of which could hold potential for impact to the human environment.  In order to clearly demonstrate that those types of activities were beyond the scope of this categorical exclusion, the Panel decided to include phrasing that limited its scope to actions that would not result in exceeding the infrastructure capacity or changing the use of space involved in that activity.  The Panel also recognized that physical relocations of personnel and equipment could result in indirect impacts to the human environment.

The Panel included the example of an increase in vehicular traffic beyond the capacity of the supporting road network to accommodate that increase.  This example was intended to exemplify a reduction, realignment or relocation that would not be encompassed by this categorical exclusion due to extraordinary circumstances that may result in the activity having significant environmental effects.  The Panel provided this example to ensure that future users of this categorical exclusion would be alerted to potential for such indirect impacts when contemplating the use of this categorical exclusion.

The Panel also noted that numerous other Federal agencies have categorical exclusions for similar activities that are sufficiently descriptive of the activity as to establish for the Panel that those activities were similar in nature, scope, and impact on the human environment as those performed by Department.  In addition, the Panel recognized that all Federal agencies, with very few limitations, must meet the same requirements to protect the environment.  The Panel determined from their experience in or on behalf of other Federal agencies that the characteristics of the activities in the

Department were no different than those performed by other Federal agencies. The Panel also determined that those activities have negligible impacts on the human environment.

Accordingly, through a deliberative process, the Panel determined that the proposed categorical exclusion encompassed activities that inherently did not have individual or cumulative significant impact on the human environment.

LEGACY CATEGORICAL EXCLUSIONS AND COMPARABLE AGENCY CATEGORICAL EXCLUSIONS

**USCG**

*Reference: COMDTINST M16475.1D Figure 2-1 Coast Guard Categorical Exclusions*
*1.  Administrative Actions:  a.  Personnel and other administrative action associated with consolidations, reorganizations, or reductions in force resulting from identified inefficiencies, reduced personnel or funding levels, skill imbalances, or other similar causes.  (Checklist and CED required.)*
*2.  Real and Personal Property Related Actions  m.  Relocation of Coast Guard personnel into existing federally owned or leased space where use does not change substantially and any attendant modifications to the facility would be minor.*
*4.  Operational Actions d.  Routine movement of personnel and equipment…..*

**USBP**

*Reference: Environmental Assessment for the Proposed Construction of the U.S. Border Patrol Station in Laredo, Webb County, Texas, May 1998, resulting in a FONSI signed in May of 1998*
*This Environmental Assessment was prepared for the Immigration and Naturalization Service (INS) proposed land purchase, construction of a U.S. Border Patrol (USBP) station, and relocation of agents to the new facility on an approximately 10-acre tract at the southeast corner of Grand Central Boulevard and the McPherson Road extension in Laredo, Webb County, Texas.  Analysis: The proposed action was not anticipated to have any significant adverse impacts to soils, water, biological, or cultural resources.  No significant adverse impacts are anticipated to land use, socioeconomics, hazardous materials and waste, air quality, or noise.  In addition, the proposed action was not anticipated to have any long-term adverse impacts to the environment.  The facility has been in operation and no such impacts have occurred.*

*Reference: Final Environmental Assessment U.S. Border Patrol Station Wilcox, Arizona, September 2002, resulting in a FONSI signed in September 2002*
*The Immigration and Naturalization Service (INS) proposed to relocate the operation of a United States Border Patrol Station (USBPS) to a new facility. The existing and proposed facilities were located in Wilcox, Cochise County.*

*Analysis: Based on the analysis of the resource studies, no significant adverse impacts were expected to result from the proposed alternative. The facility has been in operation and no such impacts have occurred.*

*Reference: Environmental Assessment Proposed Construction of the U.S. Border Patrol Station in Sanderson, Terrell County, Texas, February 12, 2001, resulting in a FONSI signed in February 2001.*
*This EA assessed the potential impacts of the Immigration and Naturalization Service (INS) proposed property purchase, construction of a U.S. Border Patrol (USBP) station, and relocation of agents from an existing facility to the new facility. A new facility was needed to accommodate an increased number of agents assigned to the Marfa Sector, Sanderson Station. The existing Sanderson Station could not adequately accommodate the additional staff.*
*Analysis: Based upon the results of the EA, it was concluded that the proposed action would not have a significant adverse impact on the environment. The facility has been in operation and no such impacts have occurred.*

**ARMY**

*Reference: 32CFR651 Appendix B. Section II*
*(b)(14) Relocation of personnel into existing federally-owned (or state-owned in the case of ARNG) or commercially-leased space, which does not involve a substantial change in the supporting infrastructure (for example, an increase in vehicular traffic beyond the capacity of the supporting road network to accommodate such an increase is an example of substantial change)(REC required).*

**NAVY**

*Reference: Environmental Assessment for the Addition of Two P-3 Aircraft To The U.S. Customs Service's Air And Marine Interdiction Division At Naval Air Station Corpus Christi, Texas, resulting in a FONSI*
*The proposed action is to add two P-3 Orion aircraft to the USCS Air and Marine Interdiction Division at NAS Corpus Christi, Texas The additional two aircraft will increase to ten the number of aircraft used by USCS at NAS Corpus Christi to accomplish their mission of drug interdiction and homeland defense. Additional parking apron will be constructed for the aircraft. Twenty-two new support personnel will join the USCS staff. The existing on-base and off-base utility systems (water, sanitary sewer, telephone, and electric) have adequate capacity to accommodate the proposed activities and personnel.*
*Analysis: Based on the information gathered during preparation of the EA, the Navy and the U.S. Customs Service finds that adding two P-3 aircraft to the USCS Air and Marine Interdiction Division at Naval Air Station Corpus Christi, Texas, will not significantly impact the environment.*

**A3      Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:**
**(a) Those of a strictly administrative or procedural nature,**
**(b) Those that implement, without substantive change, statutory or regulatory requirements,**
**(c) Those that implement, without substantive change, procedures, manuals, and other guidance documents'**
**(d) Those that interpret or amend an existing regulation without changing its environmental effect,**
**(e) Technical guidance on safety and security matters; or,**
**(f) Guidance for the preparation of security plans.**

The Panel found that the activities contemplated by this categorical exclusion are a variety of administrative activities performed throughout the Department with impacts that are identical in nature, scope, and intensity, none of which have the inherent potential for significant environmental impacts.  In addition, this categorical exclusion is supported by long standing categorical exclusions brought to the Department by its legacy components which would have been developed through a process consistent with NEPA regulatory requirements.

The Panel determined that this categorical exclusion would benefit from a detailed description of the characteristics of the activities envisioned. Descriptive items (a) through (f) are intended to define the nature of activities encompassed by this categorical exclusion in a manner that does not extend the categorical exclusion to actions including extraordinary circumstances that may result in the activity having significant environmental effects.

The Panel also noted that numerous other Federal agencies have categorical exclusions for similar activities that are sufficiently descriptive of the activity as to establish for the Panel that those activities were similar in nature, scope, and impact on the human environment as those performed by Department.  In addition, the Panel recognized that all Federal agencies, with very few limitations, must meet the same requirements to protect the environment.  The Panel determined from their experience in or on behalf of other Federal agencies that the characteristics of the activities in the Department were no different than those performed by other Federal agencies. They Panel also determined that those activities have negligible impacts on the human environment.

Accordingly, through a deliberative process, the Panel determined that the proposed categorical exclusion encompassed activities that inherently did not have individual or cumulative significant impact on the human environment.

LEGACY CATEGORICAL EXCLUSIONS AND COMPARABLE AGENCY CATEGORICAL EXCLUSIONS

**APHIS**

*Reference: 7CFR372.5 (c)*
*(a)    (1) Policy development, planning and implementation which relate to routine activities, such as personnel, organizational changes, or similar administrative functions;*
*(6) Activities which are advisory and consultative to other agencies and public and private entities, such as legal counseling and representation*

**FEMA**

*Reference: 44CFR10.8 (d) (2)*
*(ii) Preparation, revision, and adoption of regulations, directives, manuals, and other guidance documents related to actions that qualify for categorical exclusions*

**FAA**

*Reference: FAA Order 1050.1d Chapter 31 (a)*
*(5) Policy and planning documents not intended for or which do not cause direct implementation of project or system actions*

*Reference: FAA Order 5050.4A Chapter 3, Section 23.*
*(b) (6) Issuance of airport policy and planning documents including the National Plan of Integrated Airport Systems (NPIAS), Airport Improvement Program (AIP) priority system, advisory circulars on planning, design, and development programs which are not intended for direct implementation or which are issued by FAA as administrative and technical guidance to the public.*

**USCG**

*Reference: Figure 2-1 Coast Guard Categorical Exclusions*
*1. Administrative Actions: e. Preparation of guidance documents that implement, without substantive change, the applicable Commandant Instruction or other Federal agency regulations, procedures, manuals, and other guidance documents.*
*6. Bridge Administration Actions e. Promulgation of operating regulations or procedures for drawbridges. f. Identification of advance approval waterways under 33 CFR 115.70.*
*7. Regulatory Actions a. Regulations concerning vessel operation safety standards (e.g., regulations requiring: certain boaters to use approved equipment which is required to be installed such as an ignition cut-off switch, or carried on board, such as personal flotation devices (PFDS), and/or stricter blood alcohol concentration (BAC) standards for recreational boaters, etc.), equipment approval, and/or equipment carriage requirements (e.g. personal flotation devices (PFDs) and visual distress signals (VDS's)). b. Congressionally mandated regulations designed to improve or protect the environment (e.g., regulations implementing the requirements of the Oil Pollution Act of 1990, such as those requiring vessels to have the capability to transmit and receive on radio channels that would allow them to receive critical safety and navigation warnings in U.S. waters, regulations to*

*increase civil penalties against persons responsible for the discharge of oil or hazardous substances into U.S. waters, etc.). (Checklist and CED required.) c. Regulations which are editorial or procedural, such as those updating addresses or establishing application procedures. d. Regulations concerning internal agency functions or organization or personnel administration, such as funding, establishing Captain of the Port boundaries, or delegating authority. e. Regulations concerning the training, qualifying, licensing, and disciplining of maritime personnel. f. Regulations concerning manning, documentation, admeasurement, inspection, and equipping of vessels. g. Regulations concerning equipment approval and carriage requirements. h. Regulations establishing, disestablishing, or changing the size of Special Anchorage Areas or anchorage grounds. (Checklist and CED not required for actions that disestablish or reduce the size of the Area or grounds). i. Regulations establishing, disestablishing, or changing Regulated Navigation Areas and security or safety zones. (Checklist and CED not required for actions that disestablish or reduce the size of the area or zone. For temporary areas and zones that are established to deal with emergency situations and that are less than one week in duration, the checklist and CED are not required. For temporary areas and zones that are established to deal with emergency situations and that are one week or longer in duration, the checklist and CED will be prepared and submitted after issuance or publication.) j. Special local regulations issued in conjunction with a regatta or marine parade; provided that, if a permit is required, the environmental analysis conducted for the permit included an analysis of the impact of the regulations. (Checklist and CED not required) k. Regulations in aid of navigation, such as those concerning rules of the road, International Regulations for the Prevention of Collisions at Sea (COLREGS), bridge-to-bridge communications, vessel traffic services, and marking of navigation systems.*

**AIR FORCE**

*Reference: Air Force Instruction 32-7061, January 24, 1995.*
*A2.3. Categorical Exclusion List.*
*A2.3.5. Preparing, revising, or adopting regulations, instructions, directives, or guidance documents that do not, themselves, result in an action being taken.*
*A2.3.6. Preparing, revising, or adopting regulations, instructions, directives, or guidance documents that implement (without substantial change) the regulations, instructions, directives, or guidance documents from higher headquarters or other Federal agencies with superior subject matter jurisdiction.*

**ENERGY**

*Reference: 10CFR1021*
*Subpart D._Typical Classes of Actions*
*Appendix A to Subpart D of Part 1021--Categorical exclusions Applicable to General Agency Actions*

*A4   Interpretations   and   rulings   with   respect   to   existing regulations,  or  modifications  or  rescissions  of  such  interpretations and rulings.*
*A5   Rulemaking   interpreting   or   amending   an   existing   rule   or regulation that does not change the environmental effect of the rule or regulation being amended.*
*A6   Rulemakings   that   are   strictly   procedural,   such   as   rulemaking (under 48 CFR Part 9) establishing procedures for technical and pricing proposals  and  establishing  contract  clauses  and  contracting  practices for  the  purchase  of  goods  and  services,  and  rulemaking  (under  10  CFR Part  600)  establishing  application  and  review  procedures  for,  and administration,   audit,   and   closeout   of,   grants   and   cooperative agreements.*
*A10  Reports  or  recommendations  on  legislation  or  rulemaking  that  is not proposed by DOE.*
*A13  Administrative,  organizational,  or  procedural  Orders,  Notices, and guidelines.*

**A4    Information gathering, data analysis and processing, information dissemination, review, interpretation, and development of documents.  If any of these activities result in proposals for further action, those proposals must be covered by an appropriate CATEX. Examples include but are not limited to:**
**(a)      Document mailings, publication and distribution, training and information programs, historical and cultural demonstrations, and public affairs actions**
**(b)      Studies, reports, proposals, analyses, literature reviews; computer modeling; and non-intrusive intelligence gathering activities**

The actions contemplated by this categorical exclusion are a variety of administrative activities that have no inherent potential for significant environmental impacts.  This categorical exclusion is supported by long standing categorical exclusions that were brought to the Department by its components which would have only been developed through a process consistent with NEPA regulatory requirements.  Further, the Panel found that actions of a similar nature, scope, and intensity were performed throughout the Department without significant environmental impacts.

The Panel also determined that the use of examples in this particular categorical exclusion would be helpful to future users in clarifying the types of activities envisioned by the categorical exclusion.  In providing examples, the Panel did not intend to limit the categorical exclusion to those activities or to extend the categorical exclusion to actions including extraordinary circumstances that may result in the activity having significant environmental effects.

The Panel recognized that some of the activities contemplated by this categorical exclusion could result in proposals for further action.  To ensure that these proposals would not promote activities with potential to significantly impact the quality of the human environment, the categorical exclusion is specifically limited so that if an activity results in a