UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE WHITEWATER DRAW NATURAL RESOURCE CONSERVATION DISTRICT et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,<br><br>Defendants. | Case No.:  16cv2583-L-BLM<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court in this administrative review action are cross-motions for summary judgment. (Docs no. 70, 71.) The motions are fully briefed. They were taken under submission without oral argument pursuant to Civil Local Rule 7.1.d. For the reasons stated below, Plaintiffs' motion is denied, and Defendants' motion is granted.

**I.   BACKGROUND**

Plaintiffs are environmentalists, environmental groups, natural resource conservation groups and cattle ranchers from the southwestern region of the United States. They allege that Defendants, the United States Department of Homeland Security

/ / /

and its Secretary[1] (collectively, "DHS"), violated the National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.* ("NEPA"), and corresponding regulations.  They seek to set aside DHS actions they deem noncompliant.  Because NEPA itself does not provide for judicial review, Plaintiffs are proceeding under Administrative Procedure Act, 5 U.S.C. § 101 *et seq.*

NEPA requires federal agencies to identify environmental impacts of proposed actions, consider alternatives or mitigating measures capable of lessening the impact on the environment, and prepare a report detailing these considerations.  *See* 42 U.S.C. § 4332.  It was passed in part due to the recognition of "the profound influences of population growth" on the environment.  *Id.* § 4331(a).  NEPA established the Council on Environmental Quality ("CEQ"), which promulgates regulations guiding agency compliance.  *Id.*  The CEQ regulations provide that an agency's environmental report may take the form of an Environmental Assessment ("EA"), Environmental Impact Statement ("EIS"), or a Finding of No Significant Impact ("FONSI").  *See* 40 C.F.R. §§ 1508.9, 1508.11, 1508.13.

NEPA is a "primarily procedural" statute, and "agency action taken without observance of the procedure required by law will be set aside." *Metcalf v. Daley,* 214 F.3d 1135, 1141 (9th Cir. 2000).[2]  To implement NEPA, Congress prescribed, and the CEQ regulations require, that federal agencies integrate the "NEPA process" in their planning and decision making. *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979); *see* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

DHS policies and NEPA compliance procedures are contained in the DHS Instruction Manual on Implementation of the National Environmental Policy Act

---

[1]     The current Secretary is Chad Wolf.

[2]     Unless otherwise noted, internal quotation marks, citations, and footnotes are omitted throughout.

("Manual") and Directive 023-01, Implementation of the National Environmental Policy Act ("Directive"). (Doc. nos. 71-3 through 71-9 ("DHS App'x") at DIR00309.) The Manual supplements the CEQ regulations as provided in 40 C.F.R. § 1507.3. (*See id.*)

> CEQ regulations permit a "categorical exclusion" for those agency actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required.

40 C.F.R. § 1508.4. Pursuant to this provision, the DHS Manual provides for several categorical exclusions. (*See* DHS App'x at DIR00330.)

Plaintiffs seek to vacate DHS Categorical Exclusion A3 ("CATEX A3") which applies to the following DHS administrative and regulatory activities:

> Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:
> (a) Those of strictly administrative and procedural nature;
> (b) Those that implement, without substantive change, statutory or regulatory requirements;
> (c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;
> (d) Those that interpret or amend an existing regulation without changing its environmental impact[.]

(*See* DHS App'x at DIR00355.) Plaintiffs also seek to vacate application of CATEX A3 to certain amendments of existing regulations:

> (1) The April 2015 Adjustments to Limitations on Designated School Official Assignment and Study by F-1 and M-2 Nonimmigrants ("DSO Rule") amended the Student and Exchange Visitor Program by allowing for a greater number of designated school officials to oversee the program, and by allowing the spouses and children of visiting students to take classes, as long
> / / /

as they are not taking a full course load.  (DHS App'x at DSO00009-18 and DSO00271-329 (80 Fed. Reg, 23680 *et seq.* (Apr. 29, 2015)).)

(2) The March 2016 rule entitled Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students ("STEM Rule"), allowed nonimmigrant students with degrees in STEM fields (science, technology, engineering or mathematics) from United States universities to participate in training opportunities for an additional 24 months and strengthened the reporting requirements to help DHS track students in the program.  (DHS App'x at STEM00055-137, STEM005298 (81 Fed. Reg, 13040 *et seq.* (Mar. 11, 2016)).)

(3) November 2018 rule entitled Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers ("AC21 Rule") amended regulations regarding several existing employment-based visa programs to enable U.S. employers to employ highly skilled workers with employment-based visas and increase the ability of visa-holding workers to change positions or employers.  (DHS App'x at AC0124-236 (81 Fed. Reg, 82398 *et seq.* (Nov. 18, 2016)).)

(4) The January 2017 rule established criteria for the use of DHS discretionary authority on a case-by-case basis to temporarily parole into the United States individual entrepreneurs of startup businesses with significant potential for growth and job creation ("International Entrepreneur Rule").  (DHS App'x at IER00041-93 (82 Fed. Reg, 5238 *et seq.* (Jan. 17, 2017)).)

CEQ regulations also permit that an agency's environmental report take the form of a FONSI.  To comply, the agency is required to

> briefly present[] the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.  It shall include the environmental assessment or a summary of it and shall note

> any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

40 C.F.R. § 1508.13. Plaintiffs seek to vacate the FONSI issued in relation to the June 2, 2014 Response to the Influx of Unaccompanied Alien Children Across the Southwest Border ("UAC Response"). The program entailed an infrastructure expansion for temporary detention, transportation and medical care of children and families crossing the border. DHS prepared an EA which defined the parameters for when a more detailed NEPA analysis for site-specific proposals would be required. Accordingly, in August 2014, DHS prepared a supplemental EA before construction of a housing facility for up to 2,400 women and children near Dilley, Texas, and issued a FONSI. (DHS App'x at UAC00534-58, UAC00568-71, and UAC00775-948.)

DHS had previously moved to dismiss Counts I and II of Plaintiffs' operative amended complaint (doc. no. 44 ("FAC")). Count I alleged that the DHS Manual violated NEPA because it did not require immigration program compliance. (*Id.* at 71.)[3] Count II alleged that DHS violated NEPA by failing to engage in NEPA review with respect to seven immigration statutes pertaining to employment-based immigration, family-based immigration, long-term nonimmigrant visas, parole, Temporary Protected Status, refugees, and asylum, and because it did not initiate NEPA compliance with regard to the immigration non-enforcement policy known as Deferred Action for Childhood Arrivals. (*Id.* at 73.) The motion to dismiss Counts I and II was granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* doc. no. 55.)

At issue on the pending cross-motions for summary judgment are Plaintiffs' remaining Counts III through V, alleging that on its face CATEX A3 is not sufficiently

---

[3] Unless otherwise noted, page citations in this Order refer to those generated by the court's CM/ECF system.

defined to comply with NEPA, that the application of CATEX A3 to the DSO, STEM, AC21 and International Entrepreneur Rules violated NEPA, and that the EA which led to the UAC Response FONSI was inadequate under NEPA. (FAC at 74-80.)

Plaintiffs move for summary judgment on Counts III through V. DHS cross-moves for summary judgment based on lack of Article III standing, or in the alternative, on the merits of Counts III through V.

## II. DISCUSSION

Federal Rule of Civil Procedure 56 empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment or adjudication of issues is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1).

The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial.

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*See C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). If the nonmoving party would bear the burden at trial, the moving party can meet the burden on summary judgment by pointing out the absence of evidence with respect to any one element of the opposing party's claim or defense. *See Celotex*, 477 U.S. at 325.

> When the moving party has carried its burden . . ., its opponent must do more than simply show that there is some metaphysical doubt as to the material facts[, but] must come forward with specific facts showing that there is a genuine dispute for trial. Where the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks, citations and footnote omitted).  The nonmoving party can make its showing by "citing to particular parts of materials in the record . . .; or [¶] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. Proc. 56(c)(1).

> [W]here the nonmoving party will bear the burden of proof at trial, [it must] go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial" on all matters as to which it has the burden of proof.

*Celotex*, 477 U.S. at 324 (internal quotation marks omitted).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *See Matsushita Electric Indus. Co., Ltd.*, 475 U.S. at 587.  "The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

/ / /

The filing of cross-motions for summary judgment "does not necessarily mean there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir. 1975). Furthermore, "each motion must be considered on its own merits," and the court must consider evidence submitted in support of and in opposition to both motions before ruling on each one. *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

DHS argues this action should be dismissed for lack of standing under Article III of the Constitution. A federal court "may not decide a cause of action before resolving whether the court has Article III jurisdiction." *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1056 n.6 (9th Cir. 2002). Standing is a requirement of Article III jurisdiction. *See id.* at 1056 n.6. Accordingly, the Court first turns to Plaintiffs' standing.

"[T]he party asserting federal jurisdiction . . . has the burden of establishing it." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). Furthermore, "[e]ach element of standing must be supported with the manner and degree of evidence required at the successive stages of the litigation." *Maya v. Centex Corp.,* 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)) (ellipsis omitted). Accordingly, Plaintiffs as the parties who commenced this action in federal court, have the burden of establishing Article III standing with the type of evidence required at summary judgment.

Article III standing "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (emphasis in original). When, as here, a plaintiff seeks injunctive relief, the plaintiff "must show that he is under threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely

///

that a favorable judicial decision will prevent or redress the injury." *Id.* He or she must do so with regard to each type of relief sought. *Id.*

To meet the injury-in-fact requirement, Plaintiffs claim they suffered a procedural injury. (Doc. no. 75-1 ("Pls.' Reply") at 15, 16.) In this context, a plaintiff need not meet "all the normal standards for redressability and immediacy," which are otherwise required to establish standing. *Lujan,* 504 U.S. at 572 n.7. However, the plaintiff's burden is heavier in other respects:

> deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing. Only a person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.

*Summers*, 555 U.S. at 496. For a cognizable injury in fact on the procedural-injury theory a plaintiff must establish that the government agency violated certain procedural rules which are "designed to protect" the plaintiff's "concrete interests" and that it is "reasonably probable" that the challenged agency action will threaten those concrete interests. *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 741 F.3d 961, 969-70 (9th Cir. 2003).

If a plaintiff has established an injury in fact for violation of a procedural rule under NEPA, "the causation and redressability requirements are relaxed." *Citizens for Better Forestry*, 341 F.3d at 975. Nevertheless, to meet the causation requirement, a plaintiff must show that his or her "injury is dependent upon the agency's policy" rather than "result[ing from] independent incentive governing a third party's decisionmaking process." *Id*; *see also id.* at 973 n.8. When, as here, the plaintiff's

> asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts

> cannot presume either to control or to predict; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

*Lujan*, 504 U.S. at 562; *see also Summers*, 555 U.S. at 493.

DHS argues that Plaintiffs cannot meet their burden to show injury in fact and causation. In their complaint, Plaintiffs request a finding that CATEX A3 violates NEPA, and seek to set aside its application to the DSO, STEM, AC21 and International Entrepreneur Rules, as well as the FONSI relative to the UAC Response. (FAC at 74-82.) Their theory of standing is that DHS is charged with enforcing and administering immigration laws, immigration drives population growth, which has a negative effect on the environment. Plaintiffs claim an interest in the quality of their environment. (*See* doc. no. 70-1 ("Pls' Mot.") at 8.)

Plaintiffs point to the affidavits filed in support of their amended complaint. (*See* Pls.' Reply at 16, 19.) They filed expert reports prepared by Jessica Vaughan, Director for Policy Studies for the Center for Immigration Studies (Pls.' Ex. 3 ("Vaughan Rept.")), Steven A. Camarota, Ph.D., Director of Research, Center for Immigration Studies (Pls.' Ex. 4 ("Camarota Rept.")), and Philip Cafaro, Ph.D. (Pls.' Ex. 5 ("Cafaro Rept."). (Doc. nos. 44-4 through 44-6, respectively.) The reports support Plaintiffs' contention that immigration causes an increase in population and that population growth has a negative effect on the environment. In addition, Plaintiffs filed affidavits of Plaintiff association members and individual Plaintiffs, which reference population growth and resulting impact on the environment in the areas where they reside or enjoy visiting. They attribute the growth to immigration. (Pls.' Reply at 16 (citing doc. nos. 44-9 through 44-15 (Lamm, Rosenberg, Willey, Oberlink, Schneider, Hurlbert and Colton Decl., respectively), 19 (citing doc. nos. 44-7, 44-8, and 44-16 through 19 (F. Davis, P. Davis, Cowan, Ladd, Oliver and Pope Decl.).)

### A. Count III -- Challenge to CATEX A3

NEPA regulations allow for exclusions from environmental assessment and environmental impact statement requirements for actions the agency finds do not have a significant effect on the environment. *See* 40 C.F.R. § 1508.4. Accordingly, CATEX A3 excludes promulgation of rules, issuance of rulings, and development of policies and other guidance documents that are "strictly administrative and procedural nature," that "implement, without substantive change," statutory, regulatory or procedural requirements, or "interpret or amend an existing regulation without changing its environmental impact[.]" (*See* DHS App'x at DIR00355.)

Plaintiffs argue that had DHS not promulgated CATEX A3 and had issued environmental assessments prior to all of their actions falling under CATEX A3, the public reaction to such disclosure may have altered immigration policies and slowed population growth and environmental damage. (*See* Pls.' Reply at 19-20; doc. nos. 44-9 through 44-15.)

Assuming solely for the purposes of this analysis, and without so finding, that Plaintiffs established a procedural injury, this alone is not sufficient for standing. "[P]rocedural injury, standing on its own, cannot serve as in injury-in-fact. A concrete and particular project must be connected to the procedural loss." *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010 (citing *Summers*, 555 U.S. at 496-97).

CATEX A3 is not a concrete and particular project. On its face, CATEX A3 has no effect on the environment, because it applies only to "strictly administrative and procedural" documents, implementation of other provisions "without substantive change," and interpretation or amendment of existing regulations "without changing their environmental impact." (*See* DHS App'x at DIR00355.) None of Plaintiffs' evidence supports a reasonable inference that CATEX A3 causes an increase in immigration.

Plaintiffs have not shown with reasonable probability that CATEX A3 on its face threatens their interest in the environment or that their claimed environmental injury is dependent on CATEX A3. Because Plaintiffs have not raised a genuine issue of material

fact as to the injury-in-fact and causation requirements, they lack Article III standing on Count III.

### B. Count IV – Challenge to the Application of CATEX A3 to DHS Actions

The DSO, STEM, AC21 and International Entrepreneur Rules amend existing immigration regulations. They refer to CATEX A3 for exclusion from the EA or EIS requirements. (*See* DHS App'x at DIR00355 (CATEX A3 subsect. (d).) Plaintiffs argue that had EA and EIS been prepared for each of the rules, they would have been changed to reduce their effect on population growth. (*See* Pls.' Reply at 19-20; doc. nos. 44-9 through 44-15.)

To support standing, Plaintiffs must show it is "reasonably probable" that the rules they challenge will threaten their interests. None of the expert reports or Plaintiff declarations does that.

Declarations of Plaintiff association members and individual Plaintiffs attribute environmental damage to an increase in population, which they attribute to immigration in general, or alternatively, to illegal immigration across the southwest border. The Camarota Report provides past and projected population growth numbers attributable to immigration in general. The Cafaro Report links environmental damage to population growth from immigration in general. The Vaughan Report provides past population increase numbers attributable to broad immigration programs. (Vaughan Rept. at 29-34.) The report, however, does not show that any increase is attributable to the DHS rules under challenge in the complaint.

The Vaughan Report includes a discussion of eight DHS programs, including employment-based immigration, the nonimmigrant visa program, and the parole program. Although it alludes to the DSO, STEM, AC21 and International Entrepreneur Rules (Vaughan Rept. at 15 (F-1 and M-2 visas), 18 (DSO and STEM Rules), 11-12 (EB-1, EB-2 and EB-3 visas only and *not* referencing AC21 Rule), 22 (referencing International Entrepreneur Rule)), it does not address them apart from the broad immigration programs in which they are included—The Nonimmigrant Visa Program (*id.* at 14-19),

Employment Based Immigration Program (*id.* at 11-12), and Parole Program (*id.* at 19-22).

The AC21 Rule is a case in point. It amends the existing employment visa program authorized by Congress (*see* DHS App'x at AC00153; Vaughan Rept. at 11) and applies to immigrants who already hold EB-1, EB-2 or EB-3 visas (*see* DHS App'x at AC00219). It is therefore not reasonably probable that it will result in an increased immigration.

Drawing all reasonable inferences in Plaintiffs' favor, as the Court must on considering Defendants' summary judgment motion, *see Matsushita Electric Indus. Co., Ltd.*, 475 U.S. at 586-87, Plaintiffs' evidence does not support a finding that it is reasonably probable that the DHS rules at issue will threaten to damage their interest in the environment. Plaintiffs therefore lack Article III standing as to Count IV.

Alternatively, Plaintiffs lack standing because any increase in population which may result from the challenged rules would be due to independent third-party decision making rather than the rules themselves. To establish causation for purposes of procedural injury, Plaintiffs must show that their "injury is dependent upon the agency's policy" rather than "result[ing from] independent incentive governing a third party's decisionmaking process." *See Citizens for Better Forestry*, 741 F.3d at 969-70, 975; *see also id.* at 973 n.8.

This is often difficult when, as here, the alleged injury arises from government regulation of someone other than the plaintiff him- or herself. *See Summers*, 555 U.S. at 493. In such cases, causation "ordinarily hinge[s] on the response of the regulated . . . third party to the government action . . . ." *Lujan*, 504 U.S. at 562. Causation then "depends on the unfettered choices made by independent actors not before the courts and whose exercise of . . . discretion the courts cannot presume either to control or to predict . . .." *Id.*

So it is here with regard to the DSO and STEM Rules, which apply to student visas. As acknowledged in the Vaughan Report, these rules are included in the "The

Nonimmigrant Visa Program." (Vaughan Rept. at 14-15, 18.) Vaughan asserts that "large numbers of these nonimmigrants in fact settle permanently in the United States." (*Id.* at 15; *see also id.* at 14.) In this regard, permanent settlement depends on the independent choices of the visa holders, who are not before the Court. The visa holders individually decide whether to leave the United States after the expiration of their student visas, lawfully become permanent residents, or unlawfully overstay their visas. These decisions are made outside the DSO and STEM Rules. Furthermore, Vaughan's assertion is unsupported, as the population increase numbers provided in the report for the Nonimmigrant Visa Program do not segregate the F-1 and M-2 visas, which are the subject of the DSO and STEM Rules, from all the visas issued under the program. (*See* Vaughan Rept. at 15 (referencing E, H-1B and L visas, but not F-1 and M-2 visas), 30-31 (Tables 1 and 2 do *not* include F-1 and M-2 visas in the "Long Term Non Immigrant Visa Category").)

  The same is true with regard to the International Entrepreneur Rule. By its own terms, the rule provides entry into the United States on a *temporary* basis. (DHS App'x at IER00041; *see also* Vaughan Rept. at 20 ("The alien paroled into the country is therefore temporarily 'lawfully present.'").) Unlike with other parole programs, Vaughan does not contend that the International Entrepreneur Rule leads to permanent residency. (*See* Vaughan Rept. at 20-22.) Accordingly, as with student visas, to the extent persons admitted under the International Entrepreneur Rule remain in the United States on a long-term basis, it is the product of their independent decision making rather than the rule under challenge. The Vaughan Report provides no evidence to the contrary. (*See id.* at 30, 32 (Tables 1, 3 provide no information for the number of international entrepreneurs).)

  Based on the foregoing, and drawing all reasonable inferences in Plaintiffs' favor, they have not established the causation element of standing with respect to the DSO, STEM and International Entrepreneur Rules. Accordingly, Plaintiffs lack Article III standing on this alternative ground as well.

## C.     **Count V – Challenge to the UAC Response FONSI**

Finally, Plaintiffs challenge the sufficiency of the EA prepared in support of the FONSI related to the UAC Response. DHS prepared an EA relative to the UAC Response, as well as a supplemental EA for the decision pursuant to the UAC Response to construct a housing facility near Dilley, Texas for up to 2,400 illegal border crossers. (DHS App'x at UAC00769, UAC00773 *et seq.*) In both instances, DHS issued a FONSI. Plaintiffs have not provided sufficient evidence to show it is reasonably probable that this DHS action will increase illegal crossings, as the action was taken *in response* to the illegal crossings already in progress. Plaintiffs have provided no evidence that the UAC will foster additional illegal border crossings.

Plaintiffs argue the Court should focus on the environmental effect of the "border crisis itself," rather than on the UAC Response they challenge in their complaint. (Pls.' Reply at 21.) This argument is unavailing, because Plaintiffs must tie the asserted procedural violation to a "concrete and particular" DHS action. *See Wilderness Soc.*, 622 F.3d at 1260. The declarations of individual Plaintiffs and members of Plaintiff associations describe the environmental damage caused by illegal border crossers in along the southwest border in Arizona and New Mexico (*see* doc. nos. 44-7, 44-8, 44-16, 44-17, 44-19), however, the damage is attributed to illegal crossings in general, including drug trafficking, rather than to the UAC Response in particular.

Furthermore, to the extent Plaintiffs' challenge is directed at the FONSI relative to the facility in Texas, no Plaintiffs or Plaintiff association members who filed declarations reside in Texas. (*See* doc. nos. 44-7, 44-8, 44-16, 44-17, 44-19.) To meet their burden with regard to injury in fact on a procedural injury theory, Plaintiffs must show that their "concrete interest" lies in the relevant geographic area. *See Summers*, 555 U.S. at 499 ("to establish standing plaintiffs must show that they use the area affected by the challenged activity and not an area roughly in the vicinity of a project site"). Plaintiffs have not done so.

/ / /

Finally, to the extent Plaintiffs suggest their interest will be injured because the illegal crossers will settle in the United States after leaving the Texas facility (*see* Pls.' Reply at 21), the argument is unavailing because it fails to establish the requisite causation. If the illegal crosses are granted entry into the United States, this is the result of a separate DHS action. If the crossers settle in the United States illegally after their release from the facility, this is the result of their independent decision making. In either case, the result is independent of the UAC Response. *See Citizens for Better Forestry*, 341 F.3d at 973 n.8, 975; *Summers*, 555 U.S. at 493; *Lujan*, 504 U.S. at 562.

Based on the foregoing, Plaintiffs have not presented sufficient evidence to raise a genuine issue of material fact with respect to injury-in-fact and causation requirements of Article III standing. Accordingly, they lack standing with respect to Count V.

## III.   CONCLUSION

Defendants' motion for summary judgment is granted based on lack of Article III standing. Plaintiffs' Counts III through V are dismissed for lack of subject matter jurisdiction and the action is dismissed in its entirety. Plaintiffs' motion for summary judgment is denied as moot.

**IT IS SO ORDERED.**

Dated:  June 1, 2020

Hon. M. James Lorenz
United States District Judge