

**FILED**

Sep 10 2021

**CLERK, U.S. DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
BY _____s/ AKR_____ DEPUTY

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 10 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

| | |
|---|---|
| WHITEWATER DRAW NATURAL RESOURCE CONSERVATION DISTRICT; et al., | No. 20-55777 |
| Plaintiffs - Appellants, | D.C. No. 3:16-cv-02583-L-BLM U.S. District Court for Southern California, San Diego |
| v. | **MANDATE** |
| ALEJANDRO N. MAYORKAS, in his official capacity as Acting Secretary of Homeland Security and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants - Appellees. | |

The judgment of this Court, entered July 19, 2021, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Nixon Antonio Callejas Morales
Deputy Clerk
Ninth Circuit Rule 27-7

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| WHITEWATER DRAW NATURAL RESOURCE CONSERVATION DISTRICT; HEREFORD NATURAL RESOURCE CONSERVATION DISTRICT; ARIZONA ASSOCIATION OF CONSERVATION DISTRICTS; CALIFORNIANS FOR POPULATION STABILIZATION; SCIENTISTS AND ENVIRONMENTALISTS FOR POPULATION STABILIZATION; NEW MEXICO CATTLEGROWERS' ASSOCIATION; GLEN COLTON; RALPH POPE,<br><br>                *Plaintiffs-Appellants*,<br><br>v.<br><br>ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>                *Defendants-Appellees.* | No. 20-55777<br><br>D.C. No. 3:16-cv-02583-L-BLM<br><br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
M. James Lorenz, District Judge, Presiding

Argued and Submitted May 11, 2021
Pasadena, California

Filed July 19, 2021

Before:  Jay S. Bybee and Daniel A. Bress, Circuit Judges,
and Kathleen Cardone,* District Judge.

Opinion by Judge Bybee

## SUMMARY**

### Environmental Law / Immigration / Standing

The panel affirmed the district court's judgment in favor of the Secretary of the Department of Homeland Security in an action brought by plaintiff organizations and individuals alleging that the Secretary violated the National Environmental Policy Act ("NEPA") by failing to consider the environmental impacts of various immigration programs and immigration-related policies.

---

* The Honorable Kathleen Cardone, United States District Judge for the Western District of Texas, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Plaintiffs identify themselves as environmentalists, environmental groups, natural resource conservation groups, and cattle ranchers from Arizona, New Mexico, Colorado, and California. Count I of the First Amended Complaint challenged DHS's 2015 Instruction Manual, which implements NEPA and Council of Environmental Quality ("CEQ") regulations. Count II asserted that DHS implemented eight programs that failed to comply with NEPA. Count III alleged that DHS's Categorical Exclusion A3 ("CATEX A3") was arbitrary and capricious in violation of the Administrative Procedure Act. Count IV challenged DHS's application of CATEX A3 to four DHS actions as contrary to NEPA and the APA. Count V challenged environmental assessments ("EA") and findings of no significant impact ("FONSI") issued by DHS in August 2014.

Concerning Count I, the panel held that the Manual did not constitute "final agency action" subject to review under § 704 of the APA. Applying the two-part test in *Bennett v. Spear*, 520 U.S. 154 (1977), the panel held that the Manual did not meet the "consummation" first prong because it did not make any "decision," rather it merely established the procedures for ensuring DHS's compliance with NEPA. The panel held further that plaintiffs could not satisfy the "legal effect" second prong of the test because the Manual did not impose new legal requirements or alter the legal regime to which DHS was subject. The panel concluded that the district court properly dismissed Count I.

Concerning Count II, wherein the plaintiffs alleged that DHS implemented seven programs in violation of NEPA, the panel agreed with the district court that none of these programs were reviewable because they were not discrete agency actions. Specifically, as to the seven non-Deferred

Action for Childhood Arrivals ("DACA") programs, the panel held that *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), squarely foreclosed plaintiffs' request for judicial review, where plaintiffs' challenge to the seven programs was indistinguishable from the broad programmatic attack at issue in *National Wildlife*.

Concerning Count II (plaintiffs' challenge to DACA) and III-V (plaintiffs' facial challenge to CATEX A3), the panel considered whether plaintiffs lacked Article III standing. Plaintiffs could claim only procedural injury, and they alleged that compliance with NEPA was required and preparation of an environmental impact statement might have affected DHS's decisions.  To satisfy the injury-in-fact element for a procedural injury, the plaintiffs had to show that the procedures were designed to protect some threatened concrete interest that was the basis of their standing, and the reasonable probability of the challenged action's threat to plaintiffs' concrete interest.

Plaintiffs alleged they had standing to challenge DACA because, by allowing individuals who entered the country illegally to remain with federal approval, DACA both added "more settled population" when it was implemented in 2012 and now enticed future unlawful entry.  The panel rejected both theories.  As to the enticement theory, the panel held that plaintiffs alleged no facts supporting their allegations that DACA caused illegal immigration.  As to the "more settled population" theory, the panel held there was no redressability, and thus no standing, where DHS retained sole discretion over how to prioritize future removal proceedings.

Concerning Count III and plaintiffs' facial challenge to CATEX A3, the panel held that plaintiffs made no attempt to

tie CATEX A3 to any particular action by DHS, and this was insufficient to create Article III standing.

Concerning Count IV, plaintiffs alleged that DHS's application of CATEX A3 to the DSO Rule, the STEM Rule, the AC21 Rule, and International Entrepreneur Rules was improper because these rules contributed to immigration-induced population growth. The panel held that plaintiffs failed to show injury-in-fact or causation where they offered no evidence showing that population growth was a predictable effect of the DSO and STEM Rules. Similarly, the panel held that plaintiffs failed to show injury-in-fact or causation between the AC21 Rule and population growth where any increase in immigration that may result from the AC21 Rule would be a product of independent, third-party decisionmaking not fairly traceable to the AC21 Rule itself. The panel held that plaintiffs failed to show injury-in-fact or causation concerning their challenge to the International Entrepreneur Rule where they did not show that aliens admitted under the Rule permanently stayed in the United States because of the Rule. Finally, plaintiffs alleged they had standing to challenge all four rules because CEQ regulations required agencies to consider cumulative impacts on the environment. The panel held that any "cumulative effect" analysis required by NEPA did not bear on whether plaintiffs had standing to challenge the rules.

Concerning Count V, the panel held that plaintiffs also lacked Article III standing to challenge the sufficiency of the EAs and FONSIs issued in relation to President Obama's Response to the Influx of Unaccompanied Alien Children Across the Southwest border.

**COUNSEL**

Julie Axelrod (argued), Washington, D.C.; John C. Eastman and Anthony T. Caso, Center for Constitutional Jurisprudence, Orange, California; Lesley Gay Glackner, Legal Fellow, Center for Immigration Studies, Washington, D.C.; for Plaintiffs-Appellants.

Kevin W. McArdle (argued), Barclay T. Samford, and Robert J. Lundman, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; Environment and Natural Resources Disivion, United States Department of Justice, Washington, D.C.; Amber N. Napolitano, Attorney, Office of General Counsel, United States Department of Homeland Security, Washington, D.C.; for Defendants-Appellants.

---

**OPINION**

BYBEE, Circuit Judge:

Plaintiffs are organizations and individuals who seek to reduce immigration into the United States because it causes population growth, which in turn, they claim, has a detrimental effect on the environment. Plaintiffs allege that the Secretary of the Department of Homeland Security (the Secretary or DHS) violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4331–4370m-12, by failing to consider the environmental impacts of various immigration programs and immigration-related policies. The district court dismissed two of Plaintiffs' claims and granted summary judgment in favor of the Secretary on the remaining claims. We affirm.

## I.  BACKGROUND

We begin with a brief overview of NEPA and its corresponding regulations before turning to the facts of this case.

### A.  *NEPA*

Congress enacted NEPA in recognition of "the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth," and other enumerated factors. 42 U.S.C. § 4331(a).  NEPA requires all federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" a "detailed statement" known as an "environmental impact statement" (EIS).  *Id.* § 4332(2)(C). The EIS should address "the environmental impact of the proposed action"; "any adverse environmental effects which cannot be avoided"; "alternatives to the proposed action"; "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of resources which would be involved in the proposed action." *Id.* § 4332(2)(C)(i)–(v).  "Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted).  Even where an agency determines that there will be "adverse environmental effects of the proposed action," the agency may still "decid[e] that other values outweigh the

8        WHITEWATER DRAW V. MAYORKAS

environmental costs." *Id.* (citations omitted).  The purpose of NEPA is "to insure that the agency has taken a 'hard look' at environmental consequences."  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (citing *Nat Res. Def. Council v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972)).

NEPA established in the Executive Office of the President a Council on Environmental Quality (CEQ) to promulgate regulations to implement NEPA.  42 U.S.C. § 4342.  Under CEQ regulations, an agency must first assess the appropriate level of NEPA review.  If it is clear that an EIS must be prepared, the agency should proceed with the EIS.  40 C.F.R. § 1501.4(a)(1) (2017).[1]  Otherwise, the agency may prepare an "environmental assessment" (EA)—which is a "concise public document," *id*. § 1508.9(a)—to determine whether a proposed action requires an EIS, *id.* §§ 1501.4, 1508.9.  If, after preparing an EA, the agency determines that an EIS is not required, the agency then may issue a "[f]inding of no significant impact" (FONSI).  *Id.* §§ 1501.4(e), 1508.13; *see also Metcalf v. Daley*, 214 F.3d 1136, 1142 (9th Cir. 2000).  The regulations also permit an agency to determine in advance that "a category of actions [will] not individually or cumulatively have a significant effect on the human environment . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required."  40 C.F.R. § 1508.4.  These categories of actions are often referred to as CATEXs.  Federal agencies must "adopt procedures to supplement [NEPA] regulations,"

---

[1] Unless otherwise noted, we will refer to the 2017 version of the CEQ regulations, which were in effect when Plaintiffs filed their complaint.  The regulations have since been revised substantially.  *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020).

*id.* § 1507.3(a), and "integrate the NEPA process with other planning at the earliest possible time," *Andrus v. Sierra Club*, 442 U.S. 347, 351 (1979) (citation omitted).

B. *Proceedings*

Plaintiffs identify themselves as environmentalists, environmental groups, natural resource conservation groups, and cattle ranchers from Arizona, New Mexico, Colorado, and California.[2] The gravamen of Plaintiffs' complaint is that "[t]he primary factor driving U.S. population growth is international migration"—the entry of "approximately 35 million foreign nationals"—and that such growth has caused "enormous impacts" to the human environment, such as urban sprawl, loss of biodiversity, and increasing $CO_2$ emissions. Plaintiffs complain that, despite the impact of immigration on the human environment, "DHS has failed to initiate *any* NEPA review" for "its programs regulating the entry and settlement of foreign nationals [in the United States]"; instead, DHS has "simply ignore[d] the impacts that foreign nationals themselves have on the human environment."

The First Amended Complaint (FAC) contains five counts. Count I challenges DHS's 2015 Instruction Manual (the Manual), which implements NEPA and CEQ regulations. The FAC alleges that the Manual failed to require DHS to comply with NEPA and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act (APA),

---

[2] The First Amended Complaint also included "Floridians for Population Stabilization" as an organizational Plaintiff. Plaintiffs have advised us that this organization is now defunct and not part of this appeal.

5 U.S.C. § 706(2)(A).  Count II asserts that DHS implements eight "programs" for which it failed to comply with NEPA: (1) employment-based immigration; (2) family-based immigration; (3) long-term nonimmigrant visas; (4) parole; (5) Temporary Protected Status (TPS); (6) refugees; (7) asylum; and (8) Deferred Action for Childhood Arrivals (DACA).   In Count III, Plaintiffs allege that DHS's Categorical Exclusion A3 (CATEX A3) is arbitrary and capricious, in violation of the APA.  CATEX A3 applies to the "[p]romulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents" that are "strictly administrative or procedural"; "implement, without substantive change, statutory or regulatory requirements . . . procedures, manuals, and other guidance documents"; or "interpret or amend an existing regulation without changing its environmental effect."  CATEX A3 is published in the appendix of the Manual.

In Count IV, Plaintiffs challenge DHS's application of CATEX A3 to four DHS actions as contrary to NEPA and arbitrary and capricious under the APA:

1.   Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants (DSO Rule), 80 Fed. Reg. 23680 (Apr. 29, 2015), which amended DHS's Student and Exchange Visitor Program by allowing for (1) more designated school officials to oversee the program; and (2) spouses and children of visiting students to take classes on a part-time basis. *Id.* at 23,681–82.

2.  Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students (STEM Rule), 81 Fed. Reg. 13,040 (Mar. 11, 2016), which allows nonimmigrant students with degrees in STEM fields from U.S. universities to apply for a 24-month visa extension (replacing the previously available 17-month extension). *Id.* at 13,041.  It also strengthens DHS's oversight of the program.  *Id.* at 13,041–42.

3.  Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers (AC21 Rule), 81 Fed. Reg. 82,398 (Nov. 18, 2016), which aims to improve "the ability of U.S. employers to hire and retain high-skilled workers" with employment-based visas, and to increase the ability of visa-holding workers to change positions or employers.  *Id.* at 82,398.

4. International Entrepreneur Rule, 82 Fed. Reg. 5,238 (Jan. 17, 2017), which establishes criteria for DHS to use its discretionary parole authority to grant temporary parole to "entrepreneurs of start-up entities" with significant potential for rapid growth and job creation.  *Id.* at 5,238.

Finally, in Count V, Plaintiffs challenge EAs and FONSIs issued by DHS in August 2014.  On June 2, 2014, President Barack Obama issued a memorandum entitled "Response to the Influx of Unaccompanied Alien Children Across the Southwest Border," in which he directed the Secretary to address a dramatic increase in children and families crossing our border with Mexico.  DHS responded with a proposal to expand infrastructure for temporary detention space,

transportation, and medical care for the children and families crossing the southwest border.   DHS prepared a programmatic EA under NEPA and ultimately issued a FONSI for the infrastructure proposal.   DHS subsequently prepared a supplemental EA and issued a FONSI for a project to construct additional housing in Dilley, Texas.   Plaintiffs allege that DHS failed to take a "hard look" at the environmental impacts of this action, in violation of NEPA, CEQ regulations, and the APA.

After Plaintiffs filed their FAC, the Secretary moved to dismiss Counts I and II.   The district court granted the motion in full under Rule 12(b)(6) of the Federal Rules of Civil Procedure, finding neither count reviewable under the APA. The parties subsequently filed cross-motions for summary judgment on Counts III–V, and the district court granted summary judgment in favor of DHS on the grounds that Plaintiffs lacked Article III standing to bring this action. Plaintiffs timely appealed.

## II.  SCOPE AND STANDARD OF REVIEW

The scope of our review is determined by the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.  Under the APA, "[t]he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter." 5 U.S.C. § 703.  Where "no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer." *Id.*  NEPA does not contain a "special statutory review" provision, so Plaintiffs properly filed their suit against the Secretary and DHS under the general review provisions of the APA.  *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency

action for which there is no other adequate remedy in a court are subject to judicial review."); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939 (9th Cir. 2005). In order to seek judicial review under the APA, the plaintiff or petitioner must have suffered a "legal wrong" or been "adversely affected or aggrieved" by a "final agency action." 5 U.S.C. §§ 702, 704. Under § 706 of the APA, as a reviewing court, we will "hold unlawful and set aside agency action, findings, and conclusions" when they are found to be, among other criteria, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The standard of review is our ordinary rule regarding review of determinations by a district court at the motion to dismiss and summary judgment stages. We review dismissals under Rules 12(b)(1) and 12(b)(6) de novo.[3] *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1156 (9th Cir. 2007). Likewise, we review a district court's grant of summary judgment and its determination on the issue of standing de novo. *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012); *see Nat'l Wildlife Fed'n*, 497 U.S. at 884–85.

## III.  DISCUSSION

We will address the district court's dismissal of Counts I and II separately, and then address the court's grant of summary judgment on Counts III–V together.

---

[3] The Secretary argues that the district court incorrectly dismissed Count I under Rule 12(b)(6), rather than under Rule 12(b)(1). But as the Secretary acknowledges, this issue is immaterial to this appeal because we review dismissals under both Rule 12(b)(1) and Rule 12(b)(6) de novo.

A. *Count I*

Plaintiffs allege in Count I that the Manual is arbitrary and capricious because it fails "to incorporate NEPA compliance" and violates CEQ regulations. The threshold question for the district court was whether the Manual constituted "final agency action" subject to our review under § 704 of the APA. We agree with the district court that it does not.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court established a two-part test for determining whether an agency action is final. The action must: (1) "mark the consummation of the agency's decisionmaking process [and] must not be of a merely tentative or interlocutory nature"; and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *See id.* at 177–78 (citations and internal quotation marks omitted). "In determining whether an agency's action is final, we look to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party, or if immediate compliance with the terms is expected." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (cleaned up). Our focus is "on the practical and legal effects of the agency action," with the understanding that the "finality element must be interpreted in a pragmatic and flexible manner." *Id.* (citations omitted).

1. Consummation

In holding that the Manual does not meet *Bennett*'s first prong, the district court relied on our decision in *Oregon*

*Natural Desert Ass'n v. United States Forest Service*, 465 F.3d 977 (9th Cir. 2006). In that case, we considered whether the Forest Service's issuance of annual operating instructions (AOIs) to permittees who graze livestock on national forest land constituted final agency action. *Id.* at 983. The Forest Service manages livestock grazing in national forests via land management directives known as Allotment Management Plans (AMPs), and it generally issues grazing permits for ten-year periods. *Id.* at 980. The Forest Service also issues AOIs to permit holders annually. *Id.* The AOIs convey the "more long-term directives [contained in the AMP and permits] into instructions to the permitee for annual operations." *Id.* Indeed, "the AOI is the only substantive document in the annual application process, [and] it functions to do more than make minor adjustments in the grazing permit . . . ; pragmatically, it functions to start the grazing season." *Id.* at 985. Because the AOI "is the only instrument that instructs the permit holder how [AMPs, grazing permits, and forest plans] will affect his grazing operations during the upcoming season," we reasoned that an AOI "is the Forest Service's 'last word' before the permit holders begin grazing their livestock." *Id.* We concluded that AOIs were final agency actions subject to judicial review under the APA. *Id.* at 990.

The district court here determined that, unlike an AOI, the Manual "does not make any decision." Rather, "[i]t establishes the procedures for ensuring DHS's compliance with NEPA." We agree with the district court. Although in *Oregon Natural Desert Ass'n*, an AOI represented the culmination of the Forest Service's decisionmaking process each grazing season, the Manual facilitates the *beginning* of the NEPA review process for proposed DHS actions. And although an agency's decision not to prepare an EIS is subject

to judicial review, *see San Luis & Delta Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640–55 (9th Cir. 2014), the Manual is not itself a decision that any particular DHS action requires or does not require an EIS. Any guidance that could be attributed to the Manual would be subsumed in any final rule issued by DHS on a particular matter. *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling . . . is subject to review on the review of the final agency action.").

Pointing to *Safer Chemicals, Healthy Families v. EPA*, 943 F.3d 397, 405 (9th Cir. 2019), Plaintiffs respond that "a rule that lays out mandatory criteria for how an agency will conduct its subsequent project-specific assessments is also a final action subject to APA review." But Plaintiffs' reliance on that case is misplaced. In *Safer Chemicals*, EPA adopted a "Risk Evaluation Rule" under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601–2697. *Id.* at 405. The TSCA has a special judicial review provision, 15 U.S.C. § 2618, authorizing petitions for review of a rule promulgated under the Act. *Id.* § 2618(a)(1)(A). We held, nevertheless, that the preamble to the rule was "not reviewable as final agency action" because it reserved discretion to EPA and thus was "not the sort of language that indicates an agency has intended to bind itself." *Safer Chemicals*, 943 F.3d at 418. By contrast, another section of the rule that was actually "part of the rule itself" was not "too speculative to evaluate" because it asserted EPA's discretion to exclude certain matters and because the petitioners claimed that the "TSCA forecloses the Agency from asserting such discretion." *Id.*

The Manual, like the preamble to the rule at issue in *Safer Chemicals*, is not a final agency decision subject to review under the APA. The Manual describes how DHS will

implement NEPA, but it does not prescribe any action in any particular matter.  The Manual states that "NEPA applies to the majority of DHS actions."  It acknowledges that there may be "[e]xamples of situations in which NEPA is not triggered," but that such examples are "very few."   In accordance with CEQ regulations, the Manual provides for categorical exclusions (CATEXs) from NEPA to "enable DHS to avoid unnecessary efforts, paperwork, and delays and concentrate on those proposed actions having real potential for environmental impact," but it does not prescribe any decisions regarding NEPA review of proposed actions—including whether a CATEX applies to a proposed project.  *Cf. Fairbanks N. Star Borough v. U.S. Army Corps. of Eng'rs*, 543 F.3d 586, 593 (9th Cir. 2008) (Army Corps of Engineers' jurisdictional determination represented "the agency's 'last word' on whether it view[ed] the property as a wetland subject to regulation under the [Clean Water Act (CWA)]" because "[n]o further agency decisionmaking on that issue c[ould] be expected").  The Manual is careful to advise that DHS "Components[4] may otherwise decide to prepare an EA for any action at any time."  This is not the stuff of final agency decisionmaking.  The Manual contains very general instructions and has not bound DHS to any particular decision.  It is a manual for preparing to make NEPA-related decisions, not the "'consummation' of the agency's decisionmaking process."  *Bennett*, 520 U.S. at 178.

---

[4] Per the Manual, "Components" refer to "any organization which reports directly to the Office of the Secretary of DHS when approved as such by the Secretary."

### 2.  Legal Effect

It is equally clear that Plaintiffs cannot satisfy the second prong of the "final agency action" test.  If "consummation" addresses itself to "*final* agency action," *Bennett's* second prong addresses itself to "final agency *action*," which is an act "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 178 (citation and internal quotation marks omitted); *see also* 5 U.S.C. § 551(13) (defining "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act").  Agency actions "impose an obligation, deny a right, or fix *some* legal relationship as a consummation of the administrative process."  *Or. Nat. Desert Ass'n*, 465 F.3d at 987 (citation omitted).

Plaintiffs do not claim the Manual imposes any obligation upon them.  Rather, Plaintiffs argue that the Manual's mandatory language establishes "a binding set of legal obligations upon DHS."  This argument is too thin to satisfy *Bennett*'s second prong.  Plaintiffs' focus on the Manual's use of language like "must" and "requirement" ignores that NEPA, not the Manual, is the source of any binding legal obligations to which DHS is subject.  *Cf. Fairbanks*, 543 F.3d at 594 ("At bottom, [plaintiff] has an obligation to comply with the CWA . . . . [plaintiff]'s legal obligations arise directly and solely from the CWA.").  The Manual does not augment or diminish DHS's NEPA obligations; it simply facilitates DHS's fulfillment of those obligations.  Indeed, Plaintiffs point to no provision in the Manual for which DHS's noncompliance might result in a consequence beyond those contained in NEPA.

Moreover, that the Manual integrates "the NEPA process with review and compliance requirements" found in other federal laws and regulations does not mean the Manual announces *new* substantive rules that alter the legal regime to which DHS is subject.  In a proper action against DHS for failure to comply with NEPA, DHS would face liability for noncompliance with NEPA or other federal laws, not for its noncompliance with the Manual.  *See Fairbanks*, 543 F.3d at 594; *see also e.g.*, *Home Builders Ass'n of Chicago v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 616–19 (7th Cir. 2003) (evaluating an interagency coordination agreement (ICA) under *Bennett*'s second prong and finding the ICA did not "add[] new 'conflicting requirements'" where it referenced substantive requirements that are "a pervasive feature of the regulatory landscape, not something that the ICA created").  Because the Manual does not impose new legal requirements or alter the legal regime to which DHS is subject, the district court correctly concluded that the Manual fails *Bennett*'s second prong and properly dismissed Count I.

## B.  *Count II*

In Count II, Plaintiffs allege that DHS implements eight "programs" in violation of NEPA.  The FAC identifies the following "programs":

> 1) Employment-based immigration authorized by Immigration and Nationality Act (INA) § 203(b);

> 2) Family-based immigration, authorized by INA § 203(a) and INA § 201(b);

3) Long-term nonimmigrant visas, authorized by INA § 214;

4) Parole, authorized by INA § 212(d)(5)(A);

5) Temporary Protective Status, authorized by INA § 244;

6) Refugees, authorized by INA § 207;

7) Asylum, authorized by INA § 208; and

8) Deferred Action for Childhood Arrivals ("DACA"), authorized by executive order.

The FAC does not cite any regulations, rules, orders, public notices, or policy statements that authorize or enforce these "programs"; they are identified only generically and, with the exception of DACA, not by name.[5]  To be sure, in Appendix C to an affidavit attached to the FAC as Exhibit 3, the affiant listed 81 DHS regulations and five policy memoranda that implement these programs.  Many of the regulations—certainly those dating from the 1980s and 1990s—are well outside the six-year statute of limitations for actions under the APA.  *See* 28 U.S.C. § 2401(a); *Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1049 (9th Cir. 2016).   In their briefing, Plaintiffs concede that the

---

[5] In its briefing on appeal, DHS separates the first seven "programs" from the 2012 DACA Memorandum.  DHS does not challenge Plaintiffs' claim that DACA is a discrete agency action; DHS instead asserts that Plaintiffs lack standing to challenge DACA.  Accordingly, we will focus only on the first seven programs in this section and discuss DACA in the next section.

regulations cited are outside the statute of limitations, but aver that the "litany" they presented was merely illustrative of their claim that "DHS had *never* undertaken the environmental assessments required by NEPA." The district court determined that none of these "programs" are reviewable because they are not discrete agency actions. We agree.

It is axiomatic that Plaintiffs must identify an "agency action" to obtain review under the APA. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004). An agency action is "circumscribed" and "discrete," such as "a rule, order, license, sanction [or] relief." *Id.* at 62 (citing 5 U.S.C. § 551(13)). A plaintiff or petitioner "must direct its attack against some *particular* 'agency action' that causes it harm." *Nat'l Wildlife Fed'n*, 497 U.S. at 891 (emphasis added). This limitation on judicial review precludes "broad programmatic attack[s]," whether couched as a challenge to an agency's action or "failure to act." *See S. Utah Wilderness All.*, 542 U.S. at 64–65.[6]

---

[6] Plaintiffs attempt to avoid the requirement of identifying a discrete agency action by arguing that they "simply seek to compel DHS to perform the environmental assessments mandated by NEPA." But in *Southern Utah Wilderness Alliance*, the Court made clear that a plaintiff cannot obtain judicial review by simply recasting his or her challenge "in terms of 'agency action unlawfully withheld' under § 706(1), rather than agency action 'not in accordance with law' under §706(2)." 542 U.S. at 64–65 (observing that the plaintiffs in *National Wildlife* "would have fared no better" had they sought to compel agency action under § 706(1) because "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.").

The Supreme Court's decision in *National Wildlife* squarely forecloses Plaintiffs' request for judicial review of these seven "programs."  In that case, the National Wildlife Federation brought a challenge to what it called the Bureau of Land Management (BLM)'s "land withdrawal review program," including a claim that BLM had violated NEPA. 497 U.S. at 879.  That "program" consisted of hundreds, and perhaps thousands, of actions, such as public land status determinations, that BLM undertook pursuant to the directives of the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701–1787.  *Id.* at 877; *see also id.* at 890 (referring to the district court's finding that the "program" extended to "1250 or so individual classification terminations and withdrawal revocations").  The Court held that the "so-called 'land withdrawal review program'" was "not an 'agency action' within the meaning of § 702" because it did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations."  *Id*. at 890.  What the National Wildlife Federation called a "program" was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration."  *Id.*

The Court's opinion was couched in terms of APA review, but its concerns sounded in separation of powers as well.  The Court did not disparage the National Wildlife Federation's claims that "violation of the law is rampant within this [land use] program."  *Id.* at 891.  Rather, the Court's focus was that such systemic challenges, seeking "*wholesale* improvement . . . by court decree," were properly matters that should be pursued in the "offices of the Department [of the Interior] or the halls of Congress, where programmatic improvements are normally made."  *Id.*  As

relevant here, Article III of the Constitution limits the "judicial Power" of the federal courts to "cases . . . arising under . . . the Laws of the United States . . . [and] to Controversies to which the United States shall be a Party." U.S. Const. art. III, § 2, cl. 1.  Consistent with the cases or controversies requirement, the APA does not give federal courts general supervisory authority over executive agencies, but only over cases in which "[a] person [has] suffer[ed] legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action."  5 U.S.C. § 702; *see Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471 (1982) ("The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts.").  The Court recognized in *National Wildlife* that this "case-by-case approach . . . is understandably frustrating" to those seeking "across-the board" relief.  497 U.S. at 894.  But in the absence of express congressional authorization, and subject to Article III constraints, "more sweeping actions are for the other branches." *Id.*

We cannot see how Plaintiff's challenge to the seven "programs" is in any way distinguishable from the broad programmatic attack at issue in *National Wildlife*.  As in *National Wildlife*, the challenged "programs" merely refer to continuing operations of DHS in regulating various types of immigration. *Id.* at 891.  That Plaintiffs attach a list of eighty plus actions taken by DHS over the past 40 years to implement these "programs" only weakens their case.  Plaintiffs cannot obtain review of *all* of DHS's individual actions pertaining to, say, "employment-based immigration"

in one fell swoop by simply labeling them a "program."[7] Plaintiffs either must identify a particular action by DHS that they wish to challenge under the APA, or they must pursue their remedies before the agency or in Congress. They may think that the third branch is more convenient or accessible, but the APA—consistent with Article III—will not permit such forays outside the "traditional, . . . normal[] mode of operation of the courts," which remains limited to "controvers[ies] . . . reduced to more manageable proportions." *Id.* at 891, 894.

## C. *Counts II (DACA) and III–V*

The district court granted summary judgment in favor of DHS on Counts III–V on the grounds that Plaintiffs lack Article III standing. Additionally, as we have discussed, DHS now argues that Plaintiffs also lack standing to challenge the portion of Count II relating to DACA. *See United States v. Viltrakis*, 108 F.3d 1159, 1160 (9th Cir. 1997) ("[T]he jurisdictional issue of standing can be raised at any time . . . ."). Plaintiffs' theory was (and remains) that they have standing because DHS administers immigration laws and programs that result in population growth, and

---

[7] This is not to say that, for example, an "employment-based immigration program" does not exist in the sense that an individual rule or regulation might "apply[] some particular measure across the board" to an alien's ability to enter the country based on his or her employment status. *Nat'l Wildlife Fed'n*, 497 U.S. at 890 n.2. But as the Court explained in *National Wildlife*, challenging such a specific rule or regulation (that is otherwise final) is "quite different from permitting a generic challenge to all aspects of the '. . . program.'" *Id.* Stated otherwise, challenging a *particular* rule with broad application is a far cry from attempting to challenge *all* rules relating to one subject matter in the aggregate. The latter is not sufficient for review under the APA.

population growth, in turn, has a negative impact on the environment in which Plaintiffs claim an interest.  Plaintiffs appeal the district court's holding in its entirety.

Article III's standing requirements are well-established. Plaintiffs must show that (1) they "have suffered an injury in fact" that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).[8] The doctrine of standing has its origins in separation of powers, *see Allen v. Wright*, 468 U.S. 737, 750 (1984)[9], and "confines the federal courts to a properly judicial role," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Because "NEPA itself does not mandate particular results, but simply prescribes the necessary process" by which an agency considers the impact of its proposed action on the environment, *Methow Valley Citizens Council*, 490 U.S. at 350, Plaintiffs can only claim procedural injury.  That is, Plaintiffs cannot argue (and they do not) that had DHS complied with NEPA, DHS would have enforced the immigration laws differently.  Rather, Plaintiffs allege only that compliance with NEPA was required and preparation of

---

[8] The parties dispute whether one of the organizational Plaintiffs, Californians for Population Stabilization (CAPS), has standing to sue in its own right.  In light of our resolution of this case, we do not address this issue.

[9] *Abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 127–28 (2014).

an EIS might have affected DHS's decisions.  This adds a layer to our analysis.  "[P]rocedural injuries frequently suffice for standing in the NEPA context. . . . [But] [a] free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact."  *Ashley Creek*, 420 F.3d at 938.

To satisfy the injury-in-fact element for a procedural claim, Plaintiffs must (1) "show that the procedures in question are designed to protect some threatened concrete interest of [Plaintiffs] that is the ultimate basis of [their] standing"; and (2) "establish the reasonable probability of the challenged action's threat to [their] concrete interest."  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003) (cleaned up).  We have "described [the] concrete interest test as requiring a geographic nexus between the individual asserting the claim and the location suffering an environmental impact."  *Id.* at 971 (citation and internal quotation marks omitted) (alteration in original).  As to the reasonable probability showing, "[e]nvironmental plaintiffs seeking to enforce a procedural requirement . . . can establish standing without meeting all the normal standards for immediacy."  *Id.* at 972 (cleaned up).

"Once a plaintiff has established an injury in fact under NEPA the causation and redressability requirements are relaxed."  *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011) (citation omitted).  This is so because environmental plaintiffs cannot show that compliance with NEPA would have changed the agency's decisions—the agency may decide that "other values outweigh the environmental costs," *Methow Valley Citizens Council*, 490 U.S. at 350—only that the agency had to consider the environmental calculus in its decision.  But

environmental plaintiffs must make some showing of how the agency's failure to account for environmental consequences affects them, even if the environmental effects might not be realized "for many years." *Defs. of Wildlife*, 504 U.S. at 572 n.7. The environmental plaintiff also must be able to show that if the agency agreed that environmental harms flowed from its decision, that the agency was capable of redressing those harms.

Where, as here, an "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" to demonstrate causation and redressability. *Id.* at 562. In that case, the plaintiffs must "adduce facts showing that [the choices of independent actors not before the courts] have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* In such circumstances, involving independent actors, the Court has cautioned that "standing is not precluded, but it is ordinarily substantially more difficult to establish." *Id.* (citation and internal quotation marks omitted). And, as we saw in the prior section, "a plaintiff [asserting a procedural harm] raising only a generally available grievance about government . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large[,] does not state an Article III case or controversy." *Id.* at 573–74.

With these principles in mind, we are prepared to consider Plaintiffs' standing to bring their remaining claims.

### 1. Count II (DACA)

In June 2012, then-DHS Secretary Janet Napolitano issued a memorandum outlining a policy to defer removal

proceedings for two years (subject to renewal) for individuals
who came to the United States as children, met certain
eligibility criteria, and cleared a background check. This
deferred action policy became known as Deferred Action for
Childhood Arrivals or DACA. Plaintiffs argue that they have
standing to challenge DACA because, by allowing
individuals who entered the country illegally to remain with
federal approval, DACA both added "more settled
population" when it was implemented in 2012 and now
entices future unlawful entry. Neither theory holds water.[10]

Turning first to Plaintiffs' enticement theory, we note that
the D.C. Circuit has rejected a similar theory of standing in
the context of a challenge to DACA. In *Arpaio v. Obama*,
797 F.3d 11, 18 (D.C. Cir. 2015), former Maricopa County
Sheriff Joseph Arpaio sued to enjoin DACA and a second
deferred action policy for parents of U.S. citizens and lawful
permanent residents ("Deferred Action for Parents of
Americans," or DAPA). *Id*. at 17–18. As relevant here,
Sheriff Arpaio argued that he had standing because "deferred
action will act as a magnet drawing more undocumented
aliens than would otherwise come across the Mexican border
into Maricopa County, where they will commit crimes" that
he would then need to police. *Id.* at 14. The court held that
Sheriff Arpaio could not establish causation because his
theory of standing rested on the assumption that aliens
outside of the United States would learn of DACA and

---

[10] Although we decide this issue on the failure of causation, we note
that DHS does not contest that Plaintiffs have met the injury-in-fact
requirement—that is, whether environmental degradation follows from
overpopulation. However, because Plaintiffs have plainly not established
causation, we need not address the injury-in-fact element with respect to
Plaintiffs' DACA challenge. Nor do we reach, for any of Plaintiffs'
claims, the question of redressability.

DAPA, mistakenly believe they might benefit from such policies in the future, and then, relying on their own conjectures, enter the United States unlawfully. *Id.* at 19–20. The court reasoned that "[e]ven if the causal links in that attenuated chain were adequately alleged . . . . the law. . . does not confer standing to complain of harms by third parties the plaintiff expects will act in unreasonable reliance on current governmental policies that concededly cannot benefit those third parties." *Id.* at 20. Moreover, as the court pointed out, Arpaio's claimed injury (increased law enforcement expenses) not only depended on future entrants' mistaken understanding and unlawful entry, but on the supposition that those entrants would commit crimes in Maricopa County. *Id.* None of the consequences predicted by Sheriff Arpaio resulted from anyone actually subject to DACA or DAPA, but from "unrelated third parties." *Id.* The court affirmed the district court's dismissal of Sheriff Arpaio's complaint for lack of Article III standing. *Id*. at 25.

As in *Arpaio*, Plaintiffs' standing theory hinges on the unreasonable response of third parties to DACA made through allegations that lack sufficient factual support. The 2012 DACA Memorandum only applies to children who have been in the United States for the previous five years. Yet Plaintiffs ask us to assume that aliens outside the United States who are, by definition, *ineligible* for DACA relief would learn about the policy; mistakenly believe it applicable to them or that they might obtain similar relief from a future administration; come to the United States based on their misconceptions; and permanently settle near Plaintiffs, thereby increasing the population and straining environmental resources. The attenuation in this chain of reasoning, unsupported by well-pleaded facts, is worthy of Rube Goldberg. Even were we to assume "that inaccurate

knowledge of DACA could have provided some
encouragement to those who crossed the southern border, the
Supreme Court's precedent requires more than illogic or
unadorned speculation before a court may draw the inference
[Plaintiffs] seek[]."  *Id.* at 21 (citation and quotation marks
omitted).   Plaintiffs alleged no facts supporting their
allegations that DACA caused illegal immigration and was
not merely one of the "myriad economic, social, and political
realities" that might influence an alien's decision to "risk[]
life and limb" to come to the United States.  *Id.*

In an effort to distinguish their allegations from those in
*Arpaio*, Plaintiffs rely on an affidavit from their expert,
Jessica Vaughan, in which she claims that, as of 2014, DACA
and "other discretionary actions by DHS have had the effect
of significantly increasing the number of illegal border
crossings, which has resulted in significant environmental
impacts."  But Vaughan does not detail any facts linking the
alleged influx in immigration to DACA.  To the contrary, she
attributes the dramatic influx of "unaccompanied minors and
families . . . that began around 2012 and continues today" to
"policy changes that occurred in 2008 (the Trafficking
Victims Protection and Reauthorization Act) and 2009
(Credible Fear Parole)."  Plaintiffs' reliance on an unreleased
Border Patrol intelligence report from 2014 that purportedly
"reveals that 95% [of migrants interviewed] stated that their
'main reason' for coming was because they had heard they
would receive . . . permission to stay," similarly lacks any
specific reference to DACA sufficient to confer standing.
Although we must accept Plaintiffs' factual allegations as
true at the pleading stage, Plaintiffs have failed to allege even
the barest of connections between DACA and an increase in
immigration.

Plaintiffs also attempt to distinguish *Arpaio* by pointing out that Sheriff Arpaio did not allege NEPA violations. That is true, but irrelevant.  The D.C. Circuit rejected Sheriff Arpaio's claim with the understanding that he would be "entitled to proceed based on a lenient assessment of his alleged concrete injury [] because his complaint includes a claim of procedural injury."  *Arpaio*, 797 F.3d at 21. Although causation and redressability requirements are relaxed when a plaintiff has established injury in fact under NEPA, the causation requirement remains implicated "where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant." *Citizens for Better Forestry*, 341 F.3d at 975 (citations omitted). Stated otherwise, as in *Arpaio*, a claim of procedural injury does not relieve Plaintiffs of their burden—even if relaxed—to demonstrate causation and redressability.  *See Wash. Envt'l Council v. Bellon*, 732 F.3d 1131, 1144 (9th Cir. 2013) (refusing to infer a causal connection simply because the plaintiffs sought "to enforce a specific regulatory obligation").  Here, Plaintiffs' speculation "lengthens the causal chain beyond the reach of NEPA." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 775 (1983).

Nor can Plaintiffs establish standing on their alternative theory that DACA's enactment added "more settled population" in 2012 by temporarily reducing the number of aliens in the United States who might have otherwise been removed.  Under government policy, the children eligible for DACA are already "low priority cases" for removal; thus, Plaintiffs can only speculate that changes to DACA (that might flow from a NEPA analysis) would actually result in the removal of DACA beneficiaries, thereby reducing the U.S. population.  Even without a declared DACA policy, DHS retains sole discretion over how to prioritize future

removal proceedings. "There is no redressability, and thus no standing, where (as is the case here) any prospective benefits depend on an . . . actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict." *Glanton ex rel. ALCOA Prescrip. Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (citation and quotation marks omitted).

### 2.  Count III

In Count III, Plaintiffs bring a facial challenge to CATEX A3. As we discussed in Part I, CEQ regulations permit agencies to establish categories of actions that "do not individually or cumulatively have a significant effect on the human environment" and, accordingly, do not require an EA or an EIS. 40 C.F.R. § 1508.4. Consistent with CEQ's regulations, DHS has published a list of categorical exemptions in an appendix in its Manual. CATEX A3 exempts from EIS and EA requirements the:

> Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:
>
> (a) Those of a strictly administrative or procedural nature;
>
> (b) Those that implement, without substantive change, statutory or regulatory requirements;
>
> (c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;

(d) Those that interpret or amend an existing regulation without changing its environmental effect;

(e) Technical guidance on safety and security matters; or

(f) Guidance for the preparation of security plans.

We are hard-pressed to see how this categorical exemption injures Plaintiffs.  The Supreme Court's decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), is on point.  In that case, conservation groups challenged amendments to the U.S. Forest Service's manual that categorically excluded certain Forest Service projects from the requirement to file an EIS or EA.  *Id.* at 490–91.  The plaintiffs settled a portion of the suit but continued to challenge "the regulation in the abstract."  *Id.* at 494. Because the plaintiffs "identified no other application of the invalidated regulations that threatens imminent and concrete harm to the interests of their members," the Court held the plaintiffs lacked standing.  *Id.* at 495.  In so holding, the Court emphasized that a procedural injury alone does not constitute an injury in fact.  *Id.* at 496.  We too have explained that "[a] concrete and particular project must be connected to the procedural loss."  *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010).

Plaintiffs make no attempt in Count III to tie CATEX A3 to any particular action by DHS.  They assert, as the Court put it, "a procedural right *in vacuo*," and that is "insufficient to create Article III standing."  *Earth Island Inst.*, 555 U.S. at 496.

3.   Count IV

In Count IV, trying to avoid their errors in Count III, Plaintiffs argue that DHS's application of CATEX A3 to the DSO, STEM, AC21, and International Entrepreneur Rules was improper because these rules all "contribute to immigration-induced population growth."

We begin with the DSO and STEM rules, which, as we explained in Part I, pertain to opportunities for foreign students.  Neither rule authorizes permanent immigration; nevertheless, Plaintiffs insist that the two rules lead to permanent population growth by encouraging additional foreign students to come to the United States.  Their claim suffers from some of the same convoluted reasoning as their DACA claim, and unlike the DACA claim, the district court ruled against Plaintiffs on summary judgment.  Once a case has proceeded to that stage, Plaintiffs "can no longer rest on . . . 'mere allegations,' but must set forth by affidavit or other evidence 'specific facts.'" *Defs. of Wildlife*, 504 U.S. at 562 (quoting Fed. R. Civ. P. 56(e)).

Plaintiffs offer no evidence to support their theory.  Instead, their expert, Vaughan, simply opines that large numbers of nonimmigrant visa holders settle permanently in the United States without identifying how many—or whether *any*—of those aliens obtained visas under the DSO and STEM Rules.  Plaintiffs request that we take judicial notice of "the fact that a large number of the schools participating in the Student and Exchange Visitor Program . . . are in California."  But, even if true, this fact is irrelevant, as Plaintiffs have not shown a reasonable probability that the DSO and STEM rules cause population growth *anywhere* in

a manner that affects Plaintiffs' interests.    Plaintiffs' conjecture does not establish their injury in fact.

Plaintiffs also cannot establish causation.    Where causation "depends on the unfettered choices made by independent actors not before the courts," Plaintiffs bear the burden to "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Defs. of Wildlife*, 504 U.S. at 562 (citations omitted).  Not only do Plaintiffs fail to offer any evidence showing that aliens holding visas under the DSO or STEM rules decide to settle permanently in the United States—via the legal process or by overstaying their visa—but Plaintiffs also fail to show that these aliens would do so *because* of the challenged rules.  As with the DACA claim, any number of variables might influence an alien's independent decision to resettle.  *See Arpaio*, 797 F.3d at 21. Plaintiffs provide no evidence to the contrary.

Plaintiffs insist that they have met their burden because they need only show that permanent population growth is a "predictable effect" of the STEM and DSO rules.  But the degree of predictability matters, and Plaintiffs have not come forward with any relevant evidence.  In *Department of Commerce v. New York*, 139 S. Ct. 2551, 2563–64 (2019), eighteen states brought suit to enjoin the use of a citizenship question on the 2020 census.  They alleged that the question would discourage noncitizens from responding to the census and that the resulting population count would affect, among other things, their representation in Congress and receipt of federal funds.  *Id.* at 2565.  The government contended that any harm resulted from the independent decisions of third parties, who would, mistakenly, believe they might be prosecuted if they answered truthfully about their non-citizen

status. *Id.* at 2565–66. The Court, unanimously, held that the
plaintiffs had satisfied "their burden of showing that third
parties will likely react in predictable ways to the citizenship
question." *Id.* at 2566. Plaintiffs had presented evidence at
trial that these groups "historically responded to the census at
lower rates than other groups." *Id.* The Court held that the
district court "did not clearly err in crediting the Census
Bureau's theory that the discrepancy is likely attributable at
least in part to noncitizens' reluctance to answer a citizenship
question." *Id.* The Court explained that the plaintiffs' theory
of standing did not "rest on mere speculation about the
decisions of third parties; it relie[d] instead on the predictable
effect of Government action on the decisions of third parties."
*Id.*

The Court has since shed further light on what a plaintiff
must do to meet his burden to show "that third parties will
likely react in predictable ways." *California v. Texas*, No.
19-840, slip. op. at 11–14 (U.S. June 17, 2021) (citing *Dep't
of Commerce*, 139 S.Ct. at 2566). In that case, eighteen states
and two individuals sought to enjoin the minimum essential
coverage requirement of the Patient Protection and
Affordable Care Act. *Id.* slip op. at 1. As amended by
Congress in 2019, the Act set all penalties for those who
failed to meet its minimum coverage requirements to zero.
*Id.* slip op. at 2–3. The state plaintiffs claimed the challenged
provision harmed them by leading more individuals to enroll
in state-operated or state-sponsored insurance programs. *Id.*
slip op. at 10. But the Court found the state plaintiffs'
proffered evidence did not establish such a causal
connection—only four of their twenty-one affidavits
attributed added state costs to the minimum essential
coverage requirement, and all of the affidavits referred "to
that provision as it existed *before Congress removed the*

*penalty*." *Id.* slip op. at 12.  Nor was the Court persuaded by the state plaintiffs' reliance on a "predictive sentence" in a 2017 Congressional Budget Office Report that did not "adequately trace the necessary connection between the provision without a penalty and new enrollment in [state programs]." *Id.* slip op. at 13–14.

Like the state plaintiffs in *California v. Texas*, Plaintiffs have offered no evidence showing that population growth is a predictable effect of the DSO and STEM rules.  Vaughan's affidavit provides only general population increase numbers; her report does not separate the F-1, F-2, and M-2 visas (the subject of the DSO and STEM rules) from all the other nonimmigrant visas, and she cannot draw any line connecting the DSO and STEM rules to population increase.  Try as they may, Plaintiffs cannot rely on their ipse dixit to establish standing.

We turn next to the AC21 Rule, which "largely conforms DHS regulations to longstanding DHS policies and practices" aimed at providing "greater flexibility and job portability to certain nonimmigrant workers, particularly those who have been sponsored for [legal permanent resident] status."  DHS intended the rule to "better enable U.S. employers to employ and retain high-skilled workers who are beneficiaries of employment-based immigrant visa (Form I-140) petitions." Seizing on DHS's use of the word "retain," Plaintiffs argue that this rule threatens the environment by encouraging immigration growth.  The problem with Plaintiffs' claim is that, as the district court noted, the AC21 Rule generally only applies to immigrants who *already hold* EB-1, EB-2, or EB-3 visas—that is, aliens who have been present in the United States for a number of years.  Absent a concrete link between the AC21 Rule and population growth, then, Plaintiffs cannot

show injury in fact.  Nor can Plaintiffs establish causation.
As with DACA, the DSO Rule, and the STEM Rule, any
increase in immigration that may result from the AC21 Rule
would be a product of independent, third-party
decisionmaking and not fairly traceable to the AC21 Rule
itself.

Finally, we address Plaintiffs' standing to challenge the
International Entrepreneur Rule.  This rule is explicitly
designed to encourage aliens to come to the United States;
however, it only provides for entry on a temporary basis.
Plaintiffs assert that this particular rule results in population
growth.  This evidence might be difficult to come by given
that, in explaining its decision not to conduct NEPA review,
DHS stated that "[f]ewer than 3,000 individuals, an
insignificant number in the context of the population of the
United States, are projected to receive parole through this
program."  International Entrepreneur Rule, 82 Fed. Reg.
5,238, 5,284 (Jan. 17, 2017) (to be codified at 8 C.F.R. pts.
103, 212, 274a).  Furthermore, Plaintiffs have failed to show
that any aliens granted parole under this rule settle, either
temporarily or permanently, near Plaintiffs in numbers that
materially contribute to population growth.  *See Ashley
Creek*, 420 F.3d at 938.  Finally, even assuming injury in fact,
Plaintiffs cannot establish causation.  As with the other
challenged rules, Plaintiffs have not shown that aliens
admitted under the International Entrepreneur Rule
permanently stay in the United States because of the rule.

In a last-ditch effort, Plaintiffs argue that they have
standing to challenge all four rules because former CEQ
regulations required agencies to consider cumulative impacts
on the environment.  *See* 40 C.F.R. § 1508.7 (repealed Sept.
14, 2020).  Plaintiffs claim that the challenged rules have a

"significant cumulative effect on the human environment" and it was therefore "improper" for DHS to exempt these rules from NEPA review. But any "cumulative effect" analysis required by NEPA does not bear on whether Plaintiffs have standing to challenge these rules. We may not find standing based on the Plaintiffs' cumulative speculation about their injuries in fact.

### 4. Count V

Finally, Plaintiffs challenge the sufficiency of the EAs and FONSIs issued in relation to President Obama's Response to the Influx of Unaccompanied Alien Children Across the Southwest Border. Recall that DHS prepared a programmatic EA for the UAC Response and a supplemental EA (pursuant to the UAC Response) before constructing a facility near Dilley, Texas to house temporarily up to 2,400 women and children detainees. DHS ultimately issued a FONSI in both instances.

At the outset, given that both the UAC Response and the Texas facility were *responses* to an influx in immigration, Plaintiffs face an uphill battle to show that these two actions *cause* illegal immigration. Plaintiffs' experts do not attribute an increase in illegal immigration to the UAC Response or the Texas facility. For example, Vaughan's citation of a 2014 *Washington Times* newspaper article attributing a surge in illegal immigration to U.S. policy does not satisfy Plaintiffs' burden, as the article does not support a claim that infrastructure improvements are a reason that migrants enter the United States. Nor is Vaughan's general observation that "real or even perceived change[s] to enforcement policies . . . can significantly affect the number of people attempting to cross the border illegally" sufficient. Plaintiffs must connect

a "concrete and particular project" to the "procedural loss" to establish standing. *See Wilderness Soc'y.*, 622 F.3d at 1260.

To the extent Plaintiffs challenge the FONSI related to the Texas facility, Plaintiffs also lack a geographic nexus to do so. Several individual Plaintiffs and members of Plaintiff organizations provided declarations describing the environmental damage along the southwest border in Arizona and New Mexico. That none of the declarants actually live in Texas underscores their lack of standing. In *Ashley Creek*, we found no geographic nexus where the plaintiff challenged the BLM's EIS for a proposed mining project that was 250 miles from plaintiffs' phosphate reserves. 420 F.3d at 938–39. We rejected the plaintiff's theory, under which "any owner of a phosphate mine, whether located in Alaska, Utah, or Florida, would have standing to challenge the EIS." *Id.* at 939. Yet that is precisely the theory Plaintiffs advance here—under Plaintiffs' framework, *anyone* living near Texas would have standing to challenge the EA and FONSI prepared for the Dilley facility. That is beyond the scope contemplated by Article III. *See Defs. of Wildlife*, 504 U.S. at 572 n.7.

Finally, causation also presents a problem for Plaintiffs. As with the DACA policy, we know of no evidence in the record indicating that either the UAC Response or the building of the Dilley facility entices aliens to come to the United States. Plaintiffs' enticement theory is even less compelling in this context because, unlike DACA, neither action offers non-citizens an opportunity to remain in the United States. If an alien were granted relief *after* his or her stay in the Texas (or another) facility, that would be the result of a separate DHS action, having nothing to do with these policies. And if an alien decides to settle illegally, such a

decision would be attributable to "the myriad" considerations beyond the UAC Response or the Dilley housing facility. *Arpaio*, 797 F.3d at 21.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs cannot challenge DHS's actions under NEPA or the APA. The judgment of the district court is **AFFIRMED**.